**CRAVATH, SWAINE & MOORE LLP**
ANTONY L. RYAN (*pro hac vice*)
(aryan@cravath.com)
RACHEL G. SKAISTIS (*pro hac vice*)
(rskaistis@cravath.com)
YONATAN EVEN (*pro hac vice*)
(yeven@cravath.com)
JUSTIN C. CLARKE (*pro hac vice*)
jcclarke@cravath.com
M. BRENT BYARS (*pro hac vice*)
(mbyars@cravath.com)
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

**COOLEY LLP**
STEVEN M. STRAUSS (99153)
(sms@cooley.com)
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
CHRISTOPHER DURBIN (218611)
(cdurbin@cooley.com)
PETER M. ADAMS (243926)
(padams@cooley.com)
4401 Eastgate Mall
San Diego, CA 92121-9109
Telephone: (858) 550-6000
Facsimile: (858) 550-6420

*Attorneys for Defendants Qualcomm Incorporated, Derek K. Aberle, Steven R. Altman, William F. Davidson, Paul E. Jacobs, Steven M. Mollenkopf and Donald J. Rosenberg*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE QUALCOMM INCORPORATED SECURITIES LITIGATION | No. 17-cv-0121-JO-MSB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Hon. Jinsook Ohta<br>Date: October 19, 2022<br>Time: 9:30 a.m.<br>Courtroom: 4C |

1

# **TABLE OF CONTENTS**

2

**Page**

3   SUMMARY OF ARGUMENT ...................................................................1

4   STATEMENT OF FACTS .......................................................................3

5   I.   Background of Qualcomm ...............................................................3

6       **A.**   Standard Essential Patents .......................................................4

7       **B.**   Qualcomm's Publicly Disclosed Device-Level Licensing
8           Practice .....................................................................................4

9       **C.**   Qualcomm's Publicly Disclosed Practice of Selling Modem
        Chips Only to Licensed OEMs ................................................9

10       **D.**   Allegations of Royalty Relief for Chip Exclusivity ..........10

11       **E.**   Qualcomm's Warnings of Regulatory and Litigation Risks..............11

12   II.   The Alleged Misstatements ........................................................12

13   III.   The Alleged Corrective Disclosures ........................................13

14   LEGAL STANDARD ..............................................................................15

15   ARGUMENT ............................................................................................16

16   I.   There Was No Price Impact, Meaning that Plaintiffs Will Be Required
17       To Prove Reliance on an Individualized Basis. ..............................17

18       **A.**   First Alleged Corrective Disclosure – Qualcomm Press Release
        Regarding KFTC Case Examiner's Report (November 17,
19           2015) ........................................................................................20

20       **B.**   Second Alleged Corrective Disclosure – Press Releases
        Regarding the EC's Statement of Objections (December 8,
21           2015) ........................................................................................25

22       **C.**   Third Alleged Corrective Disclosure – KFTC Press Release
        Announcing Findings of Qualcomm Investigation
23           (December 27, 2016)................................................................27

24       **D.**   Fourth & Fifth Alleged Corrective Disclosures – FTC & Apple
        Complaints (January 17 & 20, 2017)................................28

25   II.   Plaintiffs Have Not Offered a Damages Model That Is Consistent with
26       Their Classwide Liability Theories, and Accordingly Will Be Forced
    To Litigate Damages on an Individualized Basis. .......................30

27

28

**A.**   Plaintiffs Are Unable To Isolate Damages Attributable to Each Theory of Liability. ...............................................................31

**B.**   Plaintiffs Are Unable To Calculate Damages Under Their "Materialization of the Risk" Theory. .........................................33

III.   Lead Plaintiffs Are Subject to Unique Defenses, Not Typical of the Class. .................................................................................37

CONCLUSION.................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................ 16

*Amgen Inc. v. CT Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) ............................................ 22

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) .......................................................... 18, 19

*Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708 (9th Cir. 2010) .......................................... 16

*Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) ................................................................................ 19

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014) ..................................................................... 20, 29

*Comcast Corporation. v. Behrend*, 569 U.S. 27 (2013) ........................................ passim

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ............................... 17

*Eng v. Edison Int'l*, 2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) ............................ 35

*Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251 (N.D. Tex. 2015) ................................................................................ 20, 21

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) (*Halliburton I*) ................... 16

*Ericsson Inc. v. D-Link Sys., Inc.*, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013) ................... 4, 7

*GAMCO Invs. v. Vivendi, S.A.*, 927 F. Supp. 2d 88 (S.D.N.Y. 2013), *aff'd*, 838 F.3d 214 (2d Cir. 2016) .............................................................................. 39

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951 (2021) .................... passim

*Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198 (9th Cir. 2020) ................................ 18

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ...................... 2, 17, 19, 29

*Hanon v. Dataproducts*, 976 F.2d 497 (9th Cir. 1992) ....................................... 38

*IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775 (8th Cir. 2016) .................. 20

*In re Apple Inc. Sec. Litig.*, 19-cv-2033, 2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ........... 21

*In re Auto. Parts Antitrust Litig.*, 2019 WL 626143 (E.D. Mich. Jan 7, 2019) ................ 33

*In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781 (9th Cir. 2020) ........................... 28

*In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)....................................36

*In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823 (S.D. Tex. May 20, 2014)...............................37

*In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153 (2d Cir. 1998)................................19, 23

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .........................................................................................................................20, 29

*In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ...........................19

*In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011)......................32

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)...........................................35

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) ...........................................32

*Loritz v. Exide Technologies*, 2015 WL 6790247 (C.D. Cal. July 21, 2015) ...........................33

*Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015)...............................................34, 37

*Mandalevy v. BofI Holding, Inc.*, 2018 WL 3032588 (S.D. Cal. June 19, 2018) .................19, 23

*Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013)................................................18, 31

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111 (9th Cir. 2013) ...........................................................................................................35, 36

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) ...................................................................................................................16

*Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008) .........................................5, 6

*State of Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317 (9th Cir. 1997)......................38

*Tex. Grain Storage, Inc. v. Monsanto Co.*, 2019 WL 4087430 (W.D. Tex. June 24, 2019) .......33

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ............................................16

*Villella v. Chem. & Mining Co. of Chile*, 2018 WL 2958361 (S.D.N.Y. June 13, 2018)...........41

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................15, 16, 17

**Statutes & Rules**

Rule 10b–5 .....................................................................................................17

Rule 23 ...................................................................................................passim

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| 201_ 10-K | Qualcomm's Annual Report on Form 10-K to the SEC filed in the year in question |
| 201_ Q_ 10-Q | Qualcomm's Quarterly Report on Form 10-Q to the SEC filed in the quarter and year in question |
| Apple | Apple Inc. |
| Class Period | February 1, 2012 through January 20, 2017 |
| Compl. | Consolidated Class Action Complaint (Dkt. 32) |
| Durbin Ex. __ | Exhibit to the Declaration of Christopher Durbin, filed contemporaneously herewith |
| Ex. __ | Exhibit to the Declaration of Yonatan Even, filed contemporaneously herewith |
| EC | European Commission |
| FRAND | Fair, reasonable and non-discriminatory |
| FTC | U.S. Federal Trade Commission |
| KFTC | Korea Fair Trade Commission |
| Longman Ex. __ | Exhibit to the Declaration of Christopher Longman, filed contemporaneously herewith |
| Mot. | Notice of Motion and Motion for Class Certification and Appointment of Class Representatives and Class Counsel; Lead Plaintiffs' Memorandum of Points and Authorities in Support Thereof (Dkt. 217) |
| NDRC | Chinese National Development and Reform Commission |
| OEMs | Original Equipment Manufacturers |
| QCT | Qualcomm CDMA Technologies |
| QTL | Qualcomm Technology Licensing |
| SEC | U.S. Securities and Exchange Commission |
| SEP | Standard-essential patent |
| TFTC | Taiwan Fair Trade Commission |

## SUMMARY OF ARGUMENT

Plaintiffs accuse Qualcomm of misleading investors into buying stock by hiding its "anticompetitive" practices.  They claim that investors were harmed when competition regulators in three jurisdictions and one of the world's largest companies (Apple) attacked those business practices, causing the stock price to drop.  And, they claim this constitutes securities fraud because (in Plaintiffs' eyes) those regulatory and legal challenges revealed the "truth" that Qualcomm had concealed.

Plaintiffs' theory was always a stretch—Qualcomm warned investors about regulatory and legal risks and never hid its business practices from anyone.  Indeed, two of Qualcomm's key business practices—(i) that Qualcomm licenses cellular devices such as phones, not components such as chips; and (ii) that Qualcomm sells modem chips only to licensees—were well understood in the market before and during the proposed class period.  But Plaintiffs' theory looks even more far-fetched now, after the Ninth Circuit and European Union have each held that Qualcomm's business practices are legal and procompetitive, and its stock price has regained what it originally lost and more.  Under these circumstances, common sense dictates that the declines at issue in the price of Qualcomm stock were the result of the initiation of regulatory and litigation proceedings seeking to dismantle Qualcomm's (fully disclosed) business practices, not (as Plaintiffs would have it) of a supposed revelation in connection with those regulatory and litigation proceedings about who Qualcomm does or does not license or sell its modem chips to.

Plaintiffs have survived two motions on the pleadings by means of a favorable pleading standard.  We are past that point now.  On a motion for class certification, Plaintiffs must prove that they are entitled to pursue their case on a classwide basis.  Plaintiffs cannot meet that evidentiary standard.  Qualcomm will

demonstrate, based on this brief and the accompanying declarations of patent licensing expert Bruce Bernstein, financial economics expert René Stulz and financial analyst expert Richard Windsor, that class treatment should be rejected on three grounds:

**First**, Defendants' alleged misrepresentations did not affect the company's stock price, as required to support a classwide presumption of reliance under the "fraud-on-the-market" theory. That is, neither the statements that Plaintiffs claim were misleading, nor the supposed "correction" of those statements, had any "price impact". The lack of price impact defeats class certification because each plaintiff's reasons for purchasing the stock will require an independent inquiry. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279-82 (2014). There are many ways to show a lack of price impact, and the Supreme Court has instructed judges to use "a good dose of common sense" in evaluating all of the evidence on a class certification motion. *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1960 (2021). Here, there was no price impact because (1) all of the information that Qualcomm supposedly concealed about its business practices was well-known to the market, and the repetition of public information does not affect stock prices in an efficient market; (2) there is a clear "mismatch" between the contents of the alleged misstatements and the five disclosures that purportedly corrected them; and (3) there was no statistically significant stock price decline following Plaintiffs' third alleged corrective disclosure, as Plaintiffs themselves concede.

**Second**, Plaintiffs have not offered a classwide damages model that is consistent with their theories of liability, as required under *Comcast Corporation. v. Behrend*, 569 U.S. 27 (2013). Specifically, Plaintiffs' model fails in two respects: (1) it provides no methodology for disentangling damages attributable to each discrete theory of liability (*i.e.*, an alleged misstatement and the corresponding disclosure alleged to have corrected that misstatement); and (2) it

1  does not provide a viable methodology for calculating damages under Plaintiffs'

2  "materialization of the risk" theory.

3      ***Third***, Lead Plaintiffs' trading activity and investment approach

4  demonstrate that they did not rely on the integrity of the market when making

5  transactions in Qualcomm stock, subjecting them to a unique non-reliance defense

6  that renders them atypical, and thus, inadequate class representatives.

7      In light of these issues, class certification should be denied.

8  **STATEMENT OF FACTS**

9  **I.  Background of Qualcomm**

10      Founded in 1985, Qualcomm has developed much of the technology that

11  makes up the modern cellular ecosystem.  (Ex. 3 at A74-75.)  Qualcomm operates

12  two primary lines of business—Qualcomm Technology Licensing ("**QTL**"), a

13  patent licensing business, and Qualcomm CDMA Technologies ("**QCT**"), a chip

14  supply business.  (*See* Ex. 21 at A685-86.)

15      QTL operates the largest licensing program in the cellular industry,

16  licensing Qualcomm's extensive patent portfolio to hundreds of manufacturers of

17  cellular devices such as phones and tablets.  (*See id.* at A686.)  These device

18  manufacturers are often referred to as Original Equipment Manufacturers, or

19  OEMs.

20      QCT designs and sells cellular modem chips to OEMs.  (*See id.* at A689.)

21  QCT sells modem chips only to OEMs that have taken a license to Qualcomm's

22  patent portfolio.  (Ex. 1 at A15.)  This policy, which has been in place for decades

23  (*see* Ex. 1 at A688), ensures Qualcomm does not facilitate infringement of its own

24  patents, as unlicensed OEMs by definition infringe Qualcomm's patents when

25  manufacturing and selling cellular devices (which cannot operate without

26  practicing Qualcomm's patented technology).  (*See* Ex. 21 at A688); *FTC v.*

27  *Qualcomm Inc.*, 969 F.3d 974, 994–95 (9th Cir. 2020).

28      QTL and QCT report to the same Qualcomm CEO, but they operate as

distinct business divisions and operating segments, with their own employees, independent management structures and separate profit-and-loss statements.  (*See* Ex. 43 at A945-46.)

### A.    Standard Essential Patents

Standards development organizations ("SDOs") are cooperative organizations where engineers from across the cellular industry meet to develop and reach consensus on the technical standards that govern the operation of cellular networks.  *FTC*, 969 F.3d at 982-83.  These standards often require the use of patented technologies, making the attendant patents "standard essential" patents ("SEPs").  *Id.*  A patent is considered a SEP when "it is not possible on technical . . . grounds" to "make . . . or operate equipment or methods which comply with a standard "without infringing" it.  (Ex. 37 at A826 ¶ 15.6.)

As a prolific innovator, Qualcomm owns thousands of SEPs.  (*See* Ex. 21 at A684, A686, A689; Bernstein Decl. ¶ 23, n.9.)  SDOs have chosen to include patented Qualcomm inventions in standards for successive generations of cellular technologies—*i.e.*, the 2G, 3G, 4G LTE and 5G cellular standards.  (Ex. 21 at A686-87.)  Qualcomm, like other major cellular innovators, has committed to SDOs to offer to license its SEPs for certain purposes on terms that are Fair, Reasonable and Non-Discriminatory ("FRAND").  (Ex. 37 at A821 ¶ 6.1bis); *Ericsson Inc. v. D-Link Sys., Inc.*, 2013 WL 4046225, at *23 (E.D. Tex. Aug. 6, 2013).  It has always been Qualcomm's position—and the position of all major SEP holders—that SDO commitments permit patent holders to license cellular devices such as cellphones and tablets rather than components such as chips. (Ex. 37 at A821 ¶ 6.1 (using defined term "EQUIPMENT"); Ex. 3 at A166.)

### B.    Qualcomm's Publicly Disclosed Device-Level Licensing Practice

Qualcomm licenses its patent portfolio at the device level, meaning that it licenses OEMs for the manufacture and sale of devices and does not license the manufacture or sale of their constituent components.  (Ex. 1 at A15); *FTC*, 969

1   F.3d at 994-95.  Device-level licensing is industry practice because it is efficient;

2   Qualcomm's patents cover communications between phones and cellular

3   networks, as well as nearly every other facet of a modern mobile phone.

4   (Bernstein Decl. ¶¶ 30-34); *FTC*, 969 F.3d at 996.

5       Qualcomm's ability to license at the component level is also limited by the

6   patent law doctrine of "exhaustion".  Pursuant to that doctrine, the first authorized

7   sale of a product (*e.g.*, a chipmaker's sale pursuant to a license) grants the buyer

8   the right to use the product to practice all patents "substantially embodied"

9   therein, without the need for a further license from the patent owner, whose rights

10  in such patents are said to be "exhaust[ed]".  *Quanta Comput., Inc. v. LG Elecs.,*

11  *Inc.*, 553 U.S. 617, 638 (2008) ("*Quanta*").  Therefore, if Qualcomm were to

12  license its patents to chipmakers, downstream OEMs that purchase those licensed

13  chips could argue that they do not *also* need a license from Qualcomm to any

14  patent "substantially embodied" in the licensed chip.  (Longman Ex. 4 at L161,

15  L170, L187; Bernstein Decl. ¶¶ 43-44.)  As a commercial matter, Qualcomm must

16  therefore choose at which point in the manufacturing chain it wants to exhaust its

17  patent rights:  at the component level or at the device level.  (Longman Ex. 4 at

18  L161, L187; Bernstein Decl. ¶¶ 43-44.)  Qualcomm, like all major SEP licensors

19  in the cellular industry, chose to license at the device level rather than the chip

20  level.  (Ex. 3 at A166); *see FTC*, 969 F.3d at 996 (device-level licensing is

21  "reasonable and consistent with current industry practice").

22      Since it began licensing in 1991, Qualcomm has consistently granted

23  exhaustive licenses at the device level, not the component level.  (Longman Ex. 4

24  at L164, L166.)  Indeed, device-level licensing has been the continuous practice of

25  all major cellular SEP licensors since the early 1990s.  (Bernstein Decl. ¶¶ 21-22.)

26  Prior to 2008, however, licensors were thought to be able to contract around

27  exhaustion.  (Longman Ex. 4 at L166; Bernstein Decl. ¶¶ 41, 43.)  Qualcomm

28  occasionally granted "non-exhaustive" limited licenses to chipmakers to

manufacture and sell, but not to use, modem chips.  (Longman Ex. 4 at L166, L168; Windsor Decl. ¶ 21.)  Under then-prevailing law, Qualcomm believed that chip makers that were not licensed to "use" the patented chips were unable to pass that right onto the OEMs that purchased the chips.  (Ex. 1 at A13-14; Longman Ex. 4 at L166-67.)  This allowed Qualcomm to license both chipmakers (non-exhaustively) and their downstream OEM customers (exhaustively) under some of the same patents.  (Ex. 1 at A13-14.)  *Quanta*, however, put this practice in jeopardy, holding that "[t]he authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights", even if the express language of the license agreement and the intent of the parties to that agreement was to avoid exhaustion.  553 U.S. at 638.  After *Quanta*, licensors—including Qualcomm—shifted away from using limited licenses at the component level for fear of inadvertently exhausting their patent rights, and continued their focus on exhaustive licensing at the device level.  (Bernstein Decl. ¶¶ 43-44; Longman Ex. 4 at L171.)

Given its centrality to Qualcomm's business, as well as to the cellular industry in general, device-level licensing has often been the subject of public discussion.  For example, public references to Qualcomm's device-level licensing practice before and during the Class Period include:

- December 10, 2007:  In an amicus brief *filed publicly in the U.S. Supreme Court* in *Quanta*, Qualcomm explained that its typical practice at the time was to grant broad licenses to OEMs that "exhaust[] Qualcomm's patent rights when handset makers sell finished handsets".  (Ex. 1 at A15.)

- April 26, 2009:  A Deutsche Bank Company Alert stated that "Qualcomm does not collect royalty payments from chip vendors, they collect them from chip vendors' customers (handset makers)".  (Ex. 23 at A695.)

- July 30, 2013:  *In a hearing before the Senate Judiciary Subcommittee on Antitrust, Competition Policy and Consumer Rights*, Donald Rosenberg,

Qualcomm's then-General Counsel, a Defendant in this action,[1] publicly submitted written testimony explaining that "at least in the 3G/4G wireless communications sector, it is and has long been the industry norm for substantial patent holders to license at the level of complete standard-compliant devices, not parts and components", such as modem chips. (Ex. 3 at A166.) Licensing separate levels in the value chain (such as both OEMs and chipmakers) would require "negotiating licenses for individual patents", which "would be utterly impractical". (*Id.* at A167.)

- <u>July 30, 2013</u>: Intel's General Counsel, A. Douglas Melamed, publicly testified in that same Senate hearing that "SEP holders . . . often go to great lengths to avoid licensing upstream component (*e.g.*, chip) manufacturers and choose instead to license their patents downstream, at for example the device (*e.g.*, computer) level." (*Id.* at A138.)

- <u>August 6, 2013</u>: In a decision following a major trial involving SEPs (*Ericsson v. D-Link*), the court referenced Ericsson's practice of licensing "end product manufacturers" and noted that "other large companies ha[d] adopted similar policies of only licensing fully compliant products". *Ericsson Inc.*, 2013 WL 4046225, at *24.

- <u>February 27, 2014</u>: Qualcomm submitted an amicus brief to the Court of Appeals for the Federal Circuit arguing that FRAND commitments "Do Not Require the Licensing of Components" and stating that licensing the "finished, fully standard-compliant product" has been "widespread industry licensing practice". (Ex. 4 at A344.)

- <u>May 26, 2014</u>: In a public report regarding a proposed policy change by IEEE, a standards development organization, Qualcomm argued that the proposal would force SEP holders to "license exhaustively" at the component level, which would lead to "a disruptive change to existing industry licensing practices". (Ex. 5 at A370.)

- <u>July 23, 2014</u>: Qualcomm disclosed in its Form 10-Q that "[i]n November 2013, the NDRC notified the Company that it had commenced an investigation of the Company relating to the Chinese Anti-Monopoly Law

---

[1] Defendants accept that issues of scienter are not before the Court at this stage, but note the glaring omission by Plaintiffs—in their Complaint or since—of any mention of the fact that a named defendant affirmatively disclosed the central practice that Plaintiffs allege was concealed in a public congressional hearing years before what Plaintiffs allege was the first corrective disclosure.

(AML). The Company understands that the investigation concerns . . . the alleged refusal of the Company to grant patent licenses to chipset manufacturers". (Ex. 16 at A650-51.)

- August 22, 2014: An S&P Capital IQ analyst report noted that the NDRC investigation concerned Qualcomm's "refusal to grant patent licenses to certain chipset manufacturers". (Ex. 25 at A714.)

- September 16, 2014: A Bernstein Research analyst report discussed the NDRC investigation, stating that "accusations included Qualcomm's practice of . . . refusing to license chipset manufacturers". (Ex. 26 at A725.)

- February 10, 2015: Following Qualcomm's entry into a "rectification plan" with the NDRC, which allowed Qualcomm to continue its practice of device-level licensing, a Cowen and Company analyst report stated that Qualcomm has "staved off the elephant in the room—possible erosion of the royalty base down to baseband chip-level licensing, an outcome that would require fundamental changes to its biz model". (Ex. 28 at A739.)

- February 11, 2015: Following a proposal by the IEEE to require the licensing of SEPs to component-makers and to set royalty rates based on the price of components—rather than the price of the device—Qualcomm issued a press release announcing that it "will not make licensing commitments under the new policy". (Ex. 33 at A782.)

- March 16, 2015: A public "alert memorandum" by Cleary Gottlieb following the NDRC rectification plan stated that "Qualcomm retained its ability to calculate royalties based on the wholesale price of the entire device . . . rather than only on the price of the chip . . . .  The result is not only that Qualcomm has been able to preserve part of its royalty formula, but also that Qualcomm has *avoided a duty to license at the chip level*, which could in turn have led to patent exhaustion." (Ex. 6 at A417 (emphasis added).)

- June 26, 2015: Three advocacy organizations submitting a brief to the FCC stated that ETSI's policy "allows companies like Qualcomm to deny patent licenses to chipmakers and only offer licenses to users of those chips". (Ex. 34 at A811.)

Between August and September 2016, Qualcomm fought competition charges before the KFTC addressing, among other things, Qualcomm's device-

level licensing practice.  (Ex. 21, at A690.)  Qualcomm's defense included the following testimony, given in a series of public hearings:

- August 17, 2016:  Defendant Aberle, then Qualcomm's President, testified that Qualcomm "[e]xhaustively license[s] its cellular SEPs only for the making and selling of devices but not for the making or selling of components".  (Longman Ex. 1 at L5.)  At the same hearing, licensing and FRAND expert Eric Stasik testified that it is Qualcomm's practice to exhaustively license its SEP portfolio "only at the end-user device level" and that "[l]icensing only at the device level conforms with the IPR policies of [relevant SDOs] and is confirmed by more than two decades of commercial practice".  (Longman Ex. 2 at L68.)

- September 5, 2016:  Christina Petersson, an Ericsson Vice President, testified about the "[l]ong history of industry licensing on [the] fully compliant end user device level", noting that "[c]ompulsory chip level licensing will have significant negative effects".  (Longman Ex. 5 at L207.)

## C.    Qualcomm's Publicly Disclosed Practice of Selling Modem Chips Only to Licensed OEMs

A corollary to device-level licensing is Qualcomm's practice of selling modem chips only to OEMs that have licensed its patents.  Because Qualcomm holds thousands of SEPs that every cellular phone must practice, any unlicensed OEM, by definition, is an infringer of Qualcomm's patents—and Qualcomm reasonably declines to sell modem chips to known infringers.  (*See* Ex. 21 at A688); *FTC*, 969 F.3d at 985.  Moreover, without this practice, unlicensed OEMs could purchase chips at a price that does not reflect the value of Qualcomm's IP and then argue that they need not pay royalties to Qualcomm because some (or all) of Qualcomm's SEPs are "substantially embodied" in the chip and have been exhausted.  "This would . . . prevent Qualcomm from obtaining the maximum value for its patents."  *FTC*, 969 F.3d at 985.

Qualcomm's practice of selling modem chips only to licensed OEMs was also discussed in various public contexts before and during the Class Period:

- December 10, 2007:  In Qualcomm's *Quanta* amicus brief, Qualcomm stated that it "typically sells chips only to those handset manufacturers that

are licensed to Qualcomm's patents".  (Ex. 1 at A15.)

- July 23, 2014:  In its Form 10-Q disclosure regarding the NDRC investigation, Qualcomm stated that the NDRC was investigating Qualcomm's "policy of selling chipsets only to the Company's patent licensees . . . ."  (Ex. 16 at A651.)

- August 22, 2014:  An S&P Capital IQ analyst reported that the NDRC investigation concerned Qualcomm's "policy of selling chipsets only to its patent licensees".  (Ex. 25 at A714.)

- February 9, 2015:  Qualcomm issued a press release stating that the "rectification plan" accepted by the NDRC "does not require Qualcomm to sell chips to any entity that is not a Qualcomm licensee".  (Ex. 18 at A662.)

- February 9, 2015:  A Wells Fargo analyst reported that Qualcomm's settlement with the NDRC "does not require Qualcomm to sell chips to any entity that is not a Qualcomm licensee".  (Ex. 27 at A734.)

- February 10, 2015:  A Raymond James analyst reported that Qualcomm's settlement with the NDRC allowed Qualcomm to continue "withhold[ing] chipset shipments to device manufacturers who do not sign a license".  (Ex. 29 at A750.)

- February 10, 2015:  A Susquehanna analyst report discussing that same settlement noted that the agreement "does not require QCOM to sell chips to any entity that is not a QCOM licensee".  (Ex. 30 at A756.)

- March 16, 2015:  Cleary Gottlieb issued a public "alert memorandum" about the NDRC settlement stating that "Qualcomm is not required to sell chips to any entity that is not a Qualcomm licensee . . . ."  (Ex. 6 at A415.)

**D.    Allegations of Royalty Relief for Chip Exclusivity**

Beginning in 2013, several regulators have investigated conduct related to alleged chip exclusivity agreements, with some of those also looking at whether such agreements involved royalty discounts.  None of these investigations resulted in a final determination that Qualcomm provided royalty relief in exchange for chip exclusivity, let alone that Qualcomm violated competition laws by doing so:

- In November 2013, the NDRC began an investigation of Qualcomm.

Qualcomm publicly disclosed the investigation, which analysts reported as pertaining (among other things) to allegations that Qualcomm "bundled" chips and royalties to some of its customers.  (Ex. 14 at A644; Ex. 26 at A725 ("bundling practices (e.g. chipsets with licensing)"); Ex. 24 at A699 ("Bundling patents with chip sales").)  In early 2015, the NDRC concluded its investigation, making no findings as to any such bundling.  (Ex. 31 at A761.)

- In December 2015, the EC announced that it was investigating whether Qualcomm paid "significant amounts to a major smartphone and tablet manufacturer [Apple] on condition that it exclusively use Qualcomm baseband chipsets".  (Ex. 7 at A423.)  The EC concluded in January 2018 that Qualcomm had done so.  (Ex. 38 at A832.)  But on June 15, 2022, the European General Court dismissed all of the EC's allegations against Qualcomm.  (Ex. 42 at A938.)

- In June 2016, Qualcomm disclosed that the TFTC was investigating allegations that Qualcomm provided "royalty rebates" to certain companies in exchange for exclusive use of Qualcomm's chipsets.  (Ex. 20 at A680.)  The TFTC concluded in October 2017 that Qualcomm entered into such an arrangement with Apple.  (Ex. 22 at A694.)  But on August 8, 2018, that decision was revoked "ab initio" as part of a settlement.  (Ex. 39 at A834.)

- In August 2016, during public hearings before the KFTC, Apple made a presentation alleging that Qualcomm "requires bundl[ing] of IPR and chipset" by, among other things, "insist[ing] on exclusionary terms in exchange for renewed royalty limits".  (Longman Ex. 3 at L115, L120.)  However, the KFTC made no finding on Apple's "bundling" allegations.

- In mid-January 2017, the FTC filed a Complaint alleging that Qualcomm provided Apple with "large lump sum payments that constituted partial relief from Qualcomm royalties."  (Ex. 9 at A476.)  It further alleged that "Qualcomm conditioned this relief on Apple's exclusive use of Qualcomm baseband processors".  (*Id.*)  In 2020, however, the Ninth Circuit entered judgment for Qualcomm and rejected the claim that Qualcomm provided Apple (or any licensee) royalty relief for using Qualcomm's chips, finding that "Qualcomm's royalties are 'chip-supplier neutral'".  *FTC,* 969 F.3d at 996.

## E.    Qualcomm's Warnings of Regulatory and Litigation Risks

Over the years, Qualcomm's success has attracted regulatory scrutiny and

litigation threats.  Qualcomm therefore routinely informs its shareholders about the risks of current and future legislative developments, regulatory proceedings and litigation in its annual and quarterly SEC filings.  For example, in each of its 2012 to 2016 10-Ks, Qualcomm disclosed:

> "[Some] companies [have] initiate[d] various strategies in an attempt to renegotiate, mitigate and/or eliminate their need to pay royalties to us for the use of our intellectual property.  These strategies have included . . . litigation, often alleging . . . *some form of unfair competition*, . . . appeals to governmental authorities, [and] . . . lobbying governmental regulators and elected officials for the purpose of seeking the imposition of some form of compulsory licensing and/or to weaken a patent holder's ability to enforce its rights or obtain a fair return for such rights."

(*See, e.g.*, Ex. 21 at A688 (emphasis added).)  These SEC filings also warned shareholders:

> "[W]e cannot be certain that the laws and policies of any country or the practices of any standards bodies, foreign or domestic, with respect to intellectual property enforcement or licensing or the adoption of standards, will not be changed in the future in a way detrimental to our licensing program or to the sale or use of our products or technology.  We have had and may in the future have difficulty in certain circumstances in protecting or enforcing our intellectual property rights and/or contracts, including collecting royalties for use of our patent portfolio in particular foreign jurisdictions . . . ."

(*See, e.g.*, Ex. 19 at A672.)

## II.   The Alleged Misstatements

Plaintiffs assert that Defendants made four categories of allegedly misleading statements during the Class Period (February 1, 2012–January 20, 2017):  (1) Qualcomm licenses its patents "broadly" and on a "non-discriminatory" basis, (2) Qualcomm's licensing practices were decades long; (3) Qualcomm tried to keep its chip and licensing divisions "separate"; and

(4) Qualcomm's business model is "procompetitive" and "facilitated competition".  (Compl. ¶¶ 10, 130.)

Plaintiffs claim that, in making these statements, Defendants omitted to disclose two business practices:  (1) Qualcomm's practice of licensing at the device level rather than at the chip level (*id.* ¶¶ 10-11, 131); and (2) Qualcomm's "bundling" of its business and chip sale businesses.  Although it is unclear exactly what Plaintiffs mean by "bundling", they appear to encompass:  (a) providing "royalty relief" to OEMs that agreed to purchase Qualcomm chips and (b) selling modem chips only to licensees.  (Compl. ¶¶ 14-15, 131.)

Plaintiffs do not allege that any of Defendants' statements artificially increased the price of Qualcomm's stock when Defendants made the statements; instead, they allege that Defendants' statements "artificially *maintained* inflation in Qualcomm's stock price".  (Compl. ¶¶ 14-15, 131; *see* Ex. 41 at A846-47 (emphasis added).)  This is therefore an "inflation maintenance" case, which hinges on the inference that a back-end stock price decline (following each allegedly corrective disclosure) shows that a front-end misstatement propped up Qualcomm's stock price.  *See Goldman Sachs Grp. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1961 (1951).

## III.    The Alleged Corrective Disclosures

Despite the overwhelming evidence of the market's knowledge of the two allegedly omitted business practices, Plaintiffs nevertheless contend that these business practices were revealed to the public for the first time in five so-called "corrective disclosure" events between the end of 2015 and the beginning of 2017:

- **KFTC Case Examiner's Report:**  On November 17, 2015, Qualcomm issued a press release disclosing that a Case Examiner of the Korea Fair Trade Commission issued a report concluding that Qualcomm's "practice of licensing [its] patents only at the device level and requiring that [its] chip customers be licensed to [its] intellectual property violate Korean competition law".  (Compl. ¶ 212; Ex. 35 at A815.)

- **EC Press Release:**  On December 8, 2015, the European Commission issued a press release announcing that it had opened an investigation into Qualcomm for violating European competition laws by "pa[ying] significant amounts to a major smartphone and tablet manufacturer [Apple] on condition that it exclusively use Qualcomm baseband chipsets in its smartphones and tablets".  (Compl. ¶ 216; Ex. 7 at A423.)

- **KFTC Findings:**  On December 27, 2016, the KFTC issued a press release announcing that its investigation had concluded that Qualcomm violated Korean law in the manner described in the KFTC Case Examiner's Report. (Compl. ¶ 220; Ex. 8 at A425-26.)

- **FTC Complaint:**  On January 17, 2017, the U.S. Federal Trade Commission filed a lawsuit alleging that Qualcomm had violated U.S. antitrust laws in the following ways:

  > "a) Qualcomm withholds its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm . . . ('no license-no chips'). . . .
  >
  > b) [REDACTED BY THE FTC FROM THE JANUARY 17, 2017 PUBLIC FILING]
  >
  > c) Qualcomm has consistently refused to license its cellular standard-essential patents to its competitors [*i.e.*, other chipmakers] . . . .
  >
  > d) Qualcomm entered into exclusive dealing arrangements with Apple Inc., a particularly important cell phone manufacturer."

  (Compl. ¶ 224; Ex. 9 at A453-54.)

- **Apple Complaint:**  On January 20, 2017, Apple—a major modem chip customer that practices Qualcomm's cellular patents—filed a lawsuit alleging, among other claims, that Qualcomm violated U.S. antitrust laws by conditioning royalty rebates on Apple's exclusive use of Qualcomm chips.  (Compl. ¶ 228; Ex. 11 at A580.)  Apple also made clear that its allegations tracked the FTC Complaint:

  > "The *FTC's complaint alleged the same integrated cycle of anticompetitive conduct which Apple alleges here*, including Qualcomm's refusal to license its competitors, its refusal to sell chipsets without a license, and its imposition of exclusivity on Apple in exchange for a degree of royalty relief all of which has had, according to the FTC, the effect of marginalizing Qualcomm's

competitors and elevating prices above competitive levels."

(Ex. 11 ¶ 164 (emphasis added).)  Apple further announced that it would also cease paying Qualcomm royalties.  (Ex. 11 at A547.)

## LEGAL STANDARD

"[A] party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Comcast*, 569 U.S. at 33 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  To do so, the movant must "prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)" and "must also *satisfy through evidentiary proof* at least one of the provisions of Rule 23(b)".  *Id.* (second emphasis added).  The movant must do so by a preponderance of the evidence.  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022).

Because Plaintiffs seek to certify a damages class under Rule 23(b)(3), they must also prove predominance of common questions.  *See* Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) is an "'adventuresome innovation . . . designed for situations in which class-action treatment is not as clearly called for'", meaning the court has a "duty to take a close look at whether common questions predominate over individual ones".  *Comcast*, 569 U.S. at 34 (quoting *Wal-Mart*, 564 U.S. at 362).  This heightened duty protects against the unwarranted "pressure on the defendant to settle even unmeritorious claims" that could result from an improvident grant of class certification.  *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 722 (9th Cir. 2010) (internal quotation omitted).

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  This "criterion is far more demanding" than the commonality requirement of Rule 23(a).  *Id.* at 623-24.  If

one or more individual questions "where members of a proposed class will need to present evidence that varies from member to member" will predominate over common questions, then class treatment should be denied. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (*Halliburton I*). A plaintiff's failure to "establish[] that damages are capable of measurement on a classwide basis" will likewise violate the predominance requirement of Rule 23(b)(3). *Comcast*, 569 U.S. at 34.

To determine whether Plaintiffs have satisfied Rule 23's requirements, the Court is required to conduct a "rigorous analysis" of Plaintiffs' submission. *Wal-Mart*, 564 U.S. at 351. As both the Supreme Court and Ninth Circuit have instructed, district courts must "probe behind the pleadings" and may consider merits issues. *See, e.g.*, *Comcast*, 569 U.S. at 35 (courts must "determine that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim"); *Wal-Mart*, 564 U.S. at 351 ("The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) ("In many cases, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." (internal quotation marks omitted)).

## ARGUMENT

"To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss [damages]; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (*Halliburton II*) (internal quotation

marks omitted).  Below, Defendants demonstrate that for the "reliance" and damages elements, individualized questions predominate and preclude class certification under Rule 23(b)(3).  *First*, Defendants show that because there was no price impact associated with the alleged misstatements on any of the corrective disclosure dates, Plaintiffs will be required to prove reliance on an individualized basis.  (*See* Part I.)  *Second*, Defendants show that because Plaintiffs have failed to meet their burden to offer a damages model consistent with their classwide liability theories, their damages must be litigated on an individualized basis.  (*See* Part II.)  Defendants also demonstrate below that Lead Plaintiffs are subject to a unique defense of lack of reliance on the integrity of the market, and therefore do not meet the typicality requirement of Rule 23(a)(3).  (*See* Part III.)  For each of these reasons, Plaintiffs' motion should be denied.

## I.   There Was No Price Impact, Meaning that Plaintiffs Will Be Required To Prove Reliance on an Individualized Basis.

There is no price impact here because (1) by the time of the alleged corrective disclosures, the market was already fully aware of the allegedly omitted information, and (2) there is a glaring mismatch between some of the alleged misstatements and the alleged corrective disclosures.  Plaintiffs cannot invoke the presumption of classwide reliance, rendering class certification inappropriate.

Reliance on a false or misleading statement, an essential element of a securities fraud action, is typically an individualized inquiry.  In the context of publicly traded securities, however, the Supreme Court has recognized a rebuttable presumption of reliance on public misstatements because "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."  *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988).  When the presumption applies, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price."  *Id.* at 247.  Conversely, "[b]ecause publicly available

information in an efficient market is generally reflected in the price of a security, the disclosure of confirmatory information—or information already known by the market—will not cause a change in stock price." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020). In this sense, "[t]he efficient market theory . . . is a Delphic sword: it cuts both ways." *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013).

To invoke the presumption, a plaintiff must show, among other things, "that the stock traded in an efficient market".[2] *Halliburton II*, 573 U.S. at 268. An efficient market is "said to digest or impound news into the stock price in a matter of minutes". *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017) (citation omitted). This rapid incorporation occurs regardless of whether every investor actually knows the information, because certain "information-hungry" market participants seek all information from all sources and are actively and continuously trading a company's stock. *Mandalevy v. BofI Holding, Inc.*, 2018 WL 3032588, at *13 (S.D. Cal. June 19, 2018); *see also In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) (efficient market can absorb "complex scientific" or "technical" information); *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753, at *5 (N.D. Cal. Sept. 2, 2016) (in an efficient market "[o]ne presumes that all public information is incorporated into the market price no matter how far flung it may be").

A defendant may rebut the *Basic* presumption at class certification by demonstrating that "the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock"—that is, there was no "price impact". *Halliburton II*, 573 U.S. at 264, 279-80. "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse." *Id.* at 278. In an inflation maintenance case, such as this, if Defendants show that ***the back-end***

---

[2] Plaintiffs maintain that "the market for Qualcomm's stock was efficient". (Mot. at 13-14.) Defendants do not dispute this for purposes of this Motion.

*disclosures* did not impact the price, this eliminates the inference "that the back-end price drop equals front-end inflation". *Goldman*, 141 S. Ct. at 1961.

One way to rebut price impact is to show that the market already knew of the allegedly corrective information, in which case the stock price could not have been inflated or maintained through the omission of that information. *See Basic*, 485 U.S. at 248 ("[P]etitioners could show that the 'market makers' were privy to the truth . . . and thus that the market price would not have been affected by their misrepresentations."); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7 n.5 (S.D.N.Y. Mar. 23, 2020) ("[A] court should review the 'newness' of a corrective disclosure [to rebut price impact] at the class certification stage."); *see also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 89 (1st Cir. 2014).

A defendant may also rebut price impact by demonstrating that the alleged misstatement was too dissimilar from the allegedly corrective information to be linked to the stock price decline. *See Goldman*, 141 S. Ct. at 1961. In an inflation maintenance case, plaintiffs ask the court to *infer* from the stock drop at the back end that the misstatement propped up an inflated stock price. However, "when there is a mismatch between the contents of the misrepresentation and the corrective disclosure . . . there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id*. An example of this mismatch is "when the earlier misrepresentation is generic (*e.g.,* 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')." *Id*. In that situation, the disclosure would be too different from the misstatement to have actually *corrected* it, thereby severing the inferential link between the stock drop and the misstatement. This type of "mismatch" between the misstatement and corrective disclosure "often will be important evidence" in rebutting price impact. *Goldman*, 141 S. Ct. at 1961.

Finally, a defendant may directly show that there was no price impact through quantitative proof that the stock price impact following an alleged corrective disclosure was not statistically significant.  *See IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016); *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 262, 272-73 (N.D. Tex. 2015).

In the end, the district court's task at class certification is "to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact".  *Goldman*, 141 S. Ct. at 1963.  In so doing, "courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense".  *Id.* at 1960 (emphasis in original).  "A court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact." *Id.* at 1961 (emphasis in original).

*** 

At the class certification stage, courts typically analyze price impact separately for each alleged corrective disclosure date.  *See, e.g.*, *In re Apple Inc. Sec. Litig.*, 19-cv-2033, 2022 WL 354785, at *9-10 (N.D. Cal. Feb. 4, 2022); *Halliburton*, 309 F.R.D. at 269-80.  The Court should deny class certification with respect to each date for which Defendants prove lack of price impact.  *See Halliburton*, 309 F.R.D. at 280 (granting class certification motion "only with respect to the alleged corrective disclosure of December 7, 2001" and denying class certification "as to the other five corrective disclosures").

Here, there was no price impact associated with any of the five alleged corrective disclosures.

### A.   First Alleged Corrective Disclosure – Qualcomm Press Release Regarding KFTC Case Examiner's Report (November 17, 2015)

On November 17, 2015, Qualcomm issued a three-paragraph press release regarding a KFTC Case Examiner's Report alleging Qualcomm violated Korean

competition law.  (Ex. 35 at A815.)  The press release referred to Qualcomm's "practice of licensing our patents only at the device level" and its practice of "requiring that our chip customers be licensed to our intellectual property".  (*Id.*)  The market, however, already knew about both of these practices, meaning the "disclosure" of them in the press release could not have caused the stock price decline that day.  In addition, the earlier statements that Plaintiffs claim were false were too dissimilar from those in the November 17, 2015 press release to infer that the stock price decline resulted from a correction of the earlier statements.

### 1.   *Qualcomm's Practice of Device-Level Licensing*

**First**, Qualcomm's practice of device-level licensing was well known.  As noted above, between 2007 and November 17, 2015, investors were repeatedly informed from a wide range of sources that Qualcomm, consistent with industry practice, licenses its patents to OEMs for the manufacture and sale of cellular devices, but *not* to the upstream manufacturers of individual components such as chips.  (*See* Statement of Facts I.B.)  As Defendant Rosenberg publicly told the U.S. Senate in 2013, "it is and has long been the industry norm for substantial patent holders to license at the level of complete standard-compliant devices, not parts and components".  (Ex. 3 at A166.)

Numerous public reports discussing the NDRC's investigation into Qualcomm's device-level licensing practice disclosed the same information.  These reports are important not just because they widely disseminated the existence of Qualcomm's practice, but also because the reports came in the context of a regulatory investigation.  The market was on notice of the practice *and* the fact that a competition regulator was investigating it.  Moreover, several of these reports referred to a *refusal* to license chipset manufacturers (*see, e.g.*, Ex. 25 at A714; Ex. 26 at A725), the same language Plaintiffs employ throughout their Complaint (*see, e.g.*, Compl. ¶¶ 73, 130, 150, 199), thus dispelling any

notion that Qualcomm engaged in licensing at the chip level during the Class Period.

These are only a few examples.[3]  Just one of these public statements, let alone the many others on record, sufficed to put an efficient market on notice of this practice.  *See Amgen Inc. v. CT Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) ("[I]n an efficient market, all publicly available information is rapidly incorporated into . . . the market price.").  Indeed, in an efficient market, as Plaintiffs maintain the market for Qualcomm's stock was (Mot. at 13-14), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See Carter-Wallace*, 150 F.3d at 156; (Durbin Ex. 6, 142:1-143:15).  Here, as Mr. Windsor attests, research analysts covering the technology sector understood that Qualcomm did not license chipmakers.  (*See* Windsor Decl. ¶ 18.)  As a matter of economics, Dr. Stulz explains, this understanding by research analysts was adequate for the market to incorporate that information into Qualcomm's stock price.  (*See* Stulz Decl. ¶ 47 ("Assuming Qualcomm's stock traded in an efficient market during the Proposed Class Period, Qualcomm's stock price reflected all public information, even if not all investors had accessed the same information and even if not all investors were in a position to understand the value implications of that information.")); *see also Mandalevy*, 2018 WL 3032588, at *13.

Plaintiffs' attempt to avoid this result by pointing to "contemporaneous analyst reports" containing incorrect information fails.  (Dkt. 166 at 6.)  Plaintiffs are wrong on the facts—most of the sources they cite are not analyst reports at all—and they misread the one analyst report (from BMO Capital Markets) they do cite.  (*See* Stulz Decl. ¶ 97.)  Moreover, as a matter of economics, such reports "would not have impacted Qualcomm's stock price in an efficient market"

---

[3] For more, *see* Statement of Facts above and Stulz Declaration ¶¶ 68-107.

because arbitrageurs would exploit the informational imbalance, ensuring completion of the market mechanism.  (*Id.* ¶ 18.)  Indeed, "[f]or a market to be efficient, it is *necessary* that there are investors who are able to take advantage of situations where they are aware of publicly available information that is not incorporated in stock prices when and if such situations arise."  (*Id.* ¶ 42 (emphasis added).)  Plaintiffs' insinuation that a small minority of misinformed observers could upend an efficient market is inadequate at class certification.  *See Goldman*, 141 S. Ct. at 1963 ("The district court's task is simply to . . . determine whether it is more likely than not that the alleged misrepresentations had a price impact.").

**Second**, there is an obvious "mismatch" between (a) the statements in Qualcomm's November 17, 2015 press release and (b) Defendants' prior statements that Plaintiffs allege were false.  (*Compare* Ex. 35 *with* Compl. ¶ 130.) Defendants' earlier statements—for example, that Qualcomm's licensing program was "broad" and that its practices were "procompetitive"—say nothing about whether Qualcomm licensed chipmakers.  (Bernstein Decl. ¶¶ 50-56.)  Rather, Defendants' statements are at a high level of generality, like those in *Goldman*, 141 S. Ct. at 1961 ("we have faith in our business model"), and would tend to "affect a security's price less than a more-specific statement" about licensing OEMs or chipmakers, *id.* at 1960.  Given the mismatch between the alleged misstatement and the corrective disclosure, the inference that the back-end stock price decline reflects front-end stock price inflation "starts to break down", and a class cannot be certified.  *Id.* at 1961.

2.    ***Qualcomm's Practice of Selling Modem Chips Only to Licensed OEMs***

**First**, Qualcomm's practice of selling modem chips only to licensed OEMs—the other business practice at issue in the press release regarding the KFTC Case Examiner's Report—was also well known.  This practice is necessary

because Qualcomm sells its modem chips at a price that does not incorporate the value of its patents.  *See FTC*, 969 F.3d at 985.  Thus, an OEM would receive a windfall by purchasing the chips without also licensing Qualcomm's patents.  The market, of course, understood this common-sense proposition.

Qualcomm described this practice in public SEC filings, and in particular with respect to the NDRC investigation.  For example, in its June 2014 10-Q and 2014 10-K, Qualcomm disclosed that "[i]n November 2013, the NDRC notified the Company that it had commenced an investigation of the Company relating to . . . the Company's *policy of selling chipsets only to the Company's patent licensees*".  (Ex. 16 at A650-51 (emphasis added).)  And Qualcomm's "rectification plan", which resolved the NDRC investigation, specifically "d[id] not require Qualcomm to sell chips to any entity that is not a Qualcomm licensee" (Ex. 18 at A662)—a fact that was not lost on analysts.  (*See, e.g.*, Ex. 27 at A734 ("[T]his does not require Qualcomm to sell chips to any entity that is not a Qualcomm licensee[.]"); Ex. 29 at A750 (same); Ex. 30 at A756 (same).)  Accordingly, as Mr. Windsor opines, securities analysts covering the technology sector during the Class Period understood that Qualcomm sold its modem chips only to licensees.  (Windsor Decl. ¶ 54.)  This was informed not only by the extensive public references to the practice (*see supra* Statement of Facts I.C), but also by the clear implications of the patent exhaustion doctrine (Bernstein Decl. ¶ 44; Windsor Decl. ¶¶ 48-57).

**Second**, there is a mismatch between (a) the statement in the November 17, 2015 press release that Qualcomm required its chip customers to be licensed and (b) Defendants' earlier statements that Qualcomm "tend[s] to keep the licensing and the chip business very separate" and does not "bundle those together".  Indeed, the statements about "separateness" and "bundling" are several levels of generality higher than the specific information in the press release, namely, that "[we require] that our chip customers be licensed to our intellectual property".

(Ex. 35 at A815.)  In other words, those generic statements were not meaningfully contradicted by the disclosure of Qualcomm's practice.  *See Goldman*, 141 S. Ct. at 1960 ("[T]he generic nature of an alleged misrepresentation often will be important evidence of price impact because, as a rule of thumb, 'a more-general statement will affect a security's price less than a more-specific statement on the same question.'" (citation omitted)).

***

Thus, it is more likely than not that there was no price impact in connection with the first alleged corrective disclosure.  Class certification should therefore be denied with respect to the November 17, 2015 alleged corrective disclosure date.

### B.  Second Alleged Corrective Disclosure – Press Releases Regarding the EC's Statement of Objections (December 8, 2015)

Class certification should also be denied with respect to the EC statement of objections (Plaintiffs' second alleged corrective disclosure), for two separate reasons.  *First*, on December 8, 2015, the EC issued a press release stating that it "informed Qualcomm of its preliminary conclusions that the company may have illegally *paid* a major customer for exclusively using its chipsets."  (Ex. 7 at A423 (emphasis added).)  Qualcomm issued a press release that day confirming that the EC's Statement of Objection "concerns the supply of Qualcomm's chipsets to a single customer under an existing agreement".  (Ex. 36 at A817.)  Despite the lack of *any* reference to royalties, Plaintiffs allege that these press releases disclose arrangements in which Qualcomm provided "*royalty relief* to handset manufacturers, including its largest customer Apple, if they agreed to purchase all or most of their chipsets from Qualcomm".  (Compl. ¶ 79 (emphasis added).)  And despite the lack of any reference to licensing in these press releases, which were about chipset sales, Plaintiffs assert that the press releases "corrected" statements "to investors that Qualcomm's business and licensing divisions were kept 'separate' and that they 'don't bundle'" the two.  (Compl. ¶ 130(iii).)

The most glaring problem with this so-called corrective disclosure is that the disclosure bears no resemblance to the statements that Plaintiffs allege were false—in other words, there is a "mismatch". *See Goldman*, 141 S. Ct. at 1961. The specific statements Defendants made were:

> "And within the Company, **we tend to keep the licensing and the chip business very separate**. Obviously, our view is that companies need a license if they are doing 3G or 4G devices, sort of irrespective of whose chip they use. And **we try to keep that separated** from whether they are using a QRD or a Qualcomm chip, and **we don't bundle those together**."

And:

> "[When questioned by an analyst about the Company's chip and licensing businesses] Well, **they are really separate businesses**. I mean we have been very clear that **we keep those two things separate** – separate propositions to the customer. So**, really two different things**."

(Compl. ¶¶ 76-77, 142, 146 (bold text added).)

These statements are about the relationship between Qualcomm's licensing and chip segments. But the press releases *do not mention licensing at all*. Rather, they are concerned solely with Qualcomm's chip segment. This rebuts Plaintiffs' argument that the press releases concerned "bundling" (or any other interaction) between the two businesses, or that they concerned "royalty relief"—which *would* implicate Qualcomm's licensing business. For this reason, Mr. Windsor opines that reasonable analysts would not have read the press releases to concern bundling or, for that matter, Qualcomm's licensing segment at all. (Windsor Decl. ¶¶ 60-62.) Because there is no basis to read "bundling" into the EC or Qualcomm press releases, that disclosure did not *correct* Defendants' earlier statements. Thus, there is no "reason to infer front-end price inflation—that is, price impact— from the back-end price drop". *Goldman*, 141 S. Ct. at 1961.

**Second**, even if the press releases *could* be read to announce that the EC was investigating "bundling", the market was already aware of previous public disclosures in which another regulator, China's NDRC, investigated Qualcomm for that very same conduct—precluding price impact from the EC and Qualcomm

press releases.  Qualcomm publicly disclosed in its March and June 2014 10-Qs (filed on April 23, 2014 and July 23, 2014, respectively) that the NDRC investigation "concerns primarily the Company's licensing business and ***certain interactions between the Company's licensing business and its chipset business***".  (Ex. 15 at A647; Ex. 16 at A650 (emphasis added).)  Consequently, analysts discussed the NDRC's accusation that Qualcomm engaged in "***bundling practices (e.g. chipsets with licensing)***".  (Ex. 26 at A725 (emphasis added); *see also* Ex. 24 at A697.)  These prior disclosures preempt the EC and Qualcomm press releases.  *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) ("A corrective disclosure . . . must by definition reveal new information to the market . . . .").

To be sure, unlike Qualcomm's clear disclosures that it licensed at the device level and sold modem chips only to licensed OEMs (*see supra* I.A), the prior disclosures here were that the NDRC was *investigating* "bundling", not that Qualcomm engaged in such a practice.  But that is because the NDRC never found Qualcomm liable for improper "bundling"; and Qualcomm was vindicated of the accusation of unlawful conduct in its arrangements with Apple by *both* the E.U. General Court (Ex. 42 at A938.) *and* the Ninth Circuit, *see FTC*, 969 F.3d at 1005. Plaintiffs' alleged corrective disclosure, read in the most favorable light to Plaintiffs, mirrors the prior NDRC-related disclosures:  at most, both are government investigations accusing Qualcomm of "bundling", for which Qualcomm was never found liable.  Accordingly, there can be no price impact with respect to Plaintiffs' second alleged corrective disclosure date.

### C.    Third Alleged Corrective Disclosure – KFTC Press Release Announcing Findings of Qualcomm Investigation (December 27, 2016)

Class certification should also be denied with respect to the third alleged corrective disclosure.  On December 27, 2016, the KFTC issued a press release

announcing that it had concluded that Qualcomm violated Korean law as described in the Case Examiner's Report (Plaintiffs' first alleged corrective disclosure).  (Ex. 8 at A425.)  The KFTC concluded that (1) "Qualcomm has refused to license, or imposed restrictions on the license for, the cellular SEPs that are necessary for the manufacture and sale of chipsets", and (2) Qualcomm "link[s] the chipset supply with patent license agreements".  (*Id.* at A425-26.)

As Plaintiffs' own expert concedes, however, "[t]he December 27, 2016 disclosure is not associated with a statistically significant price movement in my analysis using the event-study model described earlier in this report.  Thus, my damages model will assign no inflation or damages as a result of that disclosure." (Tabak Report, Pls.' Ex. 1 ¶ 61 n.49.)  This concession rebuts price impact.  *See Halliburton II*, 573 U.S. at 279-80 (a defendant can rebut the presumption with "evidence that the misrepresentation (or its correction) did not affect the market price of the defendant's stock").  Thus, there is no dispute that there was no price impact in connection with the third alleged corrective disclosure, and class certification should be denied with respect to that corrective disclosure date.

### D.     Fourth & Fifth Alleged Corrective Disclosures – FTC & Apple Complaints (January 17 & 20, 2017)

Finally, class certification should be denied with respect to the fourth and fifth alleged corrective disclosures, a Complaint the FTC filed on January 17, 2017 in the Northern District of California and a Complaint Apple filed on January 20, 2017 in the Southern District.  These lawsuits were brought three days apart and contained similar underlying allegations:  that Qualcomm violated the antitrust laws through its device-level licensing practice and its practice of selling modem chips only to licensees, as well as by allegedly providing royalty rebates to Apple as an incentive to purchase Qualcomm's chips.  Because these allegations were fully disclosed prior to January 2017, at the very least by the first three alleged corrective disclosures, there can be no price impact with respect to the

same information disseminated in the FTC and Apple Complaints. *See Bricklayers*, 752 F.3d at 89; *In re Chicago Bridge*, 2020 WL 1329354, at *7 n.5.

The disclosures regarding the KFTC investigation (Plaintiffs' first and third alleged corrective disclosures) already addressed Qualcomm's device-level licensing practice and its practice of selling its modem chips only to licensed OEMs. As shown above, this information was also well known to the market through analyst reports, court filings, congressional hearings and other public sources. And the disclosure regarding the EC investigation (Plaintiffs' second alleged corrective disclosure) addressed Qualcomm's arrangement with Apple (*i.e.*, the "major smartphone and tablet manufacturer"), which Plaintiffs maintain concerned "bundling" and "royalty relief". (*See* Ex. 41 at A844; Compl. ¶¶ 79, 123, 216.)

As noted above in the Statement of Facts, in the summer and fall of 2016, two other significant regulatory developments occurred that further disclosed the allegations that the January 2017 Complaints would later recycle. *First*, in its June 2016 10-Q, filed with the SEC on July 26, Qualcomm disclosed an investigation by the TFTC into whether "the Company provided royalty rebates to certain companies in exchange for their exclusive use of the Company's chipsets". (Ex. 20 at A680.) This is the *precise* alleged conduct at issue in the FTC and Apple Complaints. (*See* Ex. 9 at A453; Ex. 11 at A535.)

*Second*, the KFTC hearings held in August and September 2016 included extensive testimony about Qualcomm's device-level licensing practice, its practice of selling modem chips only to licensed OEMs, and the so-called "royalty relief" arrangements with Apple. Indeed, *Apple itself* gave a lengthy presentation on each of these topics, previewing the allegations it would make in its Complaint several months later. (*See* Longman Ex. 3.)

In sum, the information was (i) already on the market prior to the first alleged corrective disclosure; (ii) disseminated *again* in the first three alleged

corrective disclosures; and (iii) extensively covered in the TFTC and KFTC proceedings, which fully disclosed to the market *all* of the allegedly corrective information about Qualcomm's business practices disseminated on the fourth and fifth corrective disclosure dates months later.

Thus, based on the same efficient-market principles on which Plaintiffs rely, there could not have been any price decline associated with the alleged corrective disclosures in the FTC and Apple Complaints. *See Meyer*, 710 F.3d at 1198 ("The efficient market theory . . . is a Delphic sword: it cuts both ways."). It is therefore more likely than not that the corresponding alleged misstatements did not have a price impact; class certification should be denied with respect to Plaintiffs' fourth and fifth alleged corrective disclosure dates.

## II. Plaintiffs Have Not Offered a Damages Model That Is Consistent with Their Classwide Liability Theories, and Accordingly Will Be Forced To Litigate Damages on an Individualized Basis.

Class certification should be denied for the independent reason that Plaintiffs have not shown that they will be able to calculate damages attributable to their theories of liability under *Comcast*.

To satisfy Rule 23(b)(3)'s predominance requirement, Plaintiffs must demonstrate that their damages are measurable on a classwide basis using a common methodology that is consistent with their theory of liability. *Comcast*, 569 U.S. at 35. This means "that a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory". *Id.* "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Moreover, the proposed methodology cannot be based on "speculative" inferences because "[s]uch a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity". *Id.* at 35-36.

In *Comcast*, the plaintiffs alleged four theories of antitrust liability, of

which just one was capable of classwide proof.  *Id.* at 30-31.  Nevertheless, the plaintiffs' expert proposed a damages model that assumed plaintiffs prevailed on all four theories.  *Id.*  The Supreme Court held that class certification was improper because it authorized "a methodology that identifies damages that are not the result of the wrong".  *Id.* at 37.  As the Ninth Circuit has held, *Comcast* means plaintiffs seeking class certification "must be able to show that their damages stemmed from the defendant's actions that created the legal liability".  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

Here, Plaintiffs have not offered a model that can isolate damages attributable to each of their liability theories while excluding damages "that are not the result of the wrong".  *Comcast*, 569 U.S. at 37.  Furthermore, Plaintiffs' theory of the case—based on the *materialization of a known risk*—is premised upon unreasonably speculative assumptions, the acceptance of which "would reduce Rule 23(b)(3)'s predominance requirement to a nullity".  *Id.* at 36.

## A.  Plaintiffs Are Unable To Isolate Damages Attributable to Each Theory of Liability.

Plaintiffs do not offer a damages model that is able to (or even attempts to) isolate the damages attributable to each of their theories of liability.  Plaintiffs will need to prove liability separately for each of Defendants' statements that they challenge.  *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 534, 577-78 (S.D.N.Y. 2011) (listing statements separately on verdict form).  Here, Plaintiffs present four liability theories, as they group the challenged statements into four categories:  (a) broad and non-discriminatory licensing practices, (b) decades-long practices, (c) separate businesses, and (d) pro-competitiveness.  (Compl. ¶ 130; *see also* 12(b)(6) Opp'n at 7-11.)  Each of these liability theories will require separate proof, and a jury could reach different results on different liability theories.  Notably, Plaintiffs contend that each of their five alleged corrective disclosure dates provided the market with information

corresponding to *multiple* theories of liability.  (*See* Compl. ¶¶ 212, 216, 220, 224, 228.)  Accordingly, if the jury finds liability on some (but not all) of the challenged misstatements, then the jury would need a damages model that allows it to determine what portion of the stock price decline on a given corrective disclosure date was caused by Defendants' statements for which (hypothetically) the jury found liability.

A securities class action in the Central District of California presented a similar situation:  In *Loritz v. Exide Technologies*, 2015 WL 6790247 (C.D. Cal. July 21, 2015), the court described the challenges in certifying a class where:

> (1) there are multiple alleged misrepresentations, (2) corrective information was allegedly disclosed at multiple times, (3) corrective information regarding different alleged misrepresentations was allegedly disclosed on the same day, and (4) some of the allegedly concealed facts arose or were made known to the company (and thus for the first time could have been disclosed) during the class period.

*Id.* at *22.

Despite those challenges, the plaintiffs' damages model in *Loritz*, as here, only discussed "general techniques for computing damages in securities fraud cases" and failed to tie the several liability theories "to the facts of th[e] case".  *Id.*  The *Loritz* court held, therefore, that the expert "fail[ed] to propose one model explaining how he would use these techniques in concert to calculate damages in this case", running afoul of the rule in *Comcast*.  *Id.*; *see also Tex. Grain Storage, Inc. v. Monsanto Co.*, 2019 WL 4087430, at *3-4 (W.D. Tex. June 24, 2019) (denying class certification where plaintiffs' damages model did not distinguish damages from each of three liability theories); *In re Auto. Parts Antitrust Litig.*, 2019 WL 626143, at *13-15 (E.D. Mich. Jan 7, 2019) (same).

Plaintiffs' expert in this case dedicates just eight paragraphs to his damages methodology.  (Pls.' Ex. 1 ¶¶ 57-64.)  As in *Loritz*, this does nothing more than raise questions without providing any answers.  The report does not "explain how

his proposed damages methodology can separately estimate inflation for Plaintiffs' different categories of alleged misrepresentations".  (Stulz Decl. ¶ 159.) Plaintiffs' expert, Dr. Tabak, says only that he would conduct an event study (Pls.' Ex. 1 ¶ 60); but an event study "would not be sufficient to separate the impact of corrective information regarding different categories of alleged misrepresentations disclosed" on the same day (Stulz Decl. ¶ 159).  This is especially concerning in light of the Ninth Circuit's decision in *FTC v. Qualcomm Inc.*, which holds that many of the same Qualcomm business practices at issue in this case *are procompetitive*, 969 F.3d at 995-97, and the European General Court decision finding that Qualcomm *did not engage in illegal exclusive dealing* with Apple (Ex. 42 at A938.)  These decisions render Qualcomm's statements about the procompetitive nature of its conduct inactionable; and any decline in Qualcomm's stock price attributable to the "procompetitive" category of alleged misstatements would necessarily need to be disentangled from the remaining damages calculation.  As the Fifth Circuit described this very scenario:

> If certain corrective events were later determined to be independent of the misrepresentations, but those corrective events could not be disaggregated from the damages model, the plaintiffs would travel to a place forbidden by *Comcast*: they would recover damages other than those "resulting from the particular . . . injury on which [defendant's] liability in this action is premised."

*Ludlow v. BP, P.L.C.*, 800 F.3d 674, 688 (5th Cir. 2015) (quoting *Comcast*, 569 U.S. at 36).  Here, Plaintiffs travel to such a forbidden place.

## B. Plaintiffs Are Unable To Calculate Damages Under Their "Materialization of the Risk" Theory.

Plaintiffs face a second *Comcast* problem:  they cannot disentangle or isolate the stock price decline caused by the filing of regulatory actions or litigations from what they contend was a stock price decline caused by the disclosure—in those regulatory actions or lawsuits—of factual information about

Qualcomm's business practices.  In an attempt to address this *Comcast* problem, Plaintiffs offer the entirely speculative assertion that the regulatory actions and Apple lawsuit were the *inevitable* result of disclosure of Qualcomm's business practices.  (Pls.' Ex. 1 ¶ 64.)   Plaintiffs have not established (and cannot establish) that that implausible theory satisfies Rule 23(b)(3)'s predominance requirement.

Plaintiffs' theory of the case is that Defendants failed to disclose Qualcomm's business practices to the market, thereby misleading investors as to the level of antitrust risk in Qualcomm's business.  (Dkt. 193, Feb. 2, 2022 Tr. 33:24-36:25.)  According to Plaintiffs, Defendants' statements "misrepresented or concealed a business practice that *created a risk that ultimately materialized*, diminishing the value of a company's stock".  (Dkt. 166 at 24 (emphasis added).)[4]

The Ninth Circuit has not endorsed the "materialization of the risk" theory of loss causation.  *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1122 n.5 (9th Cir. 2013); *Eng v. Edison Int'l*, 2018 WL 1367419, at *3 (S.D. Cal. Mar. 16, 2018).  But it has explained that the approach differs from traditional proof of loss causation, where the plaintiff shows that "the revelation of th[e] misrepresentation or omission" caused the stock price decline.  *Nuveen*, 730 F.3d at 1119 (internal quotation omitted).  For those courts that have adopted it, materialization of the risk permits loss causation "if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor".  *Id.* at 1120 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).

---

[4] In their opposition to Defendants' motion for judgment on the pleadings, Plaintiffs refer to materialization of the risk as their "alternative theory of loss causation".  (Dkt. 166 at 24.)  In fact, it is Plaintiffs' only theory of loss causation, as the allegations throughout the Complaint characterize the damages as the stock drop that resulted from the filing of regulatory and litigation actions when Qualcomm's allegedly concealed business practices came to fruition.  (*See, e.g.*, Compl. ¶¶ 1-16, 130(ii), 232.)

1    Here, Qualcomm repeatedly warned investors of the risk of regulatory

2    proceedings and litigation.  (*See supra* Statement of Facts I.E.)  And during the

3    Class Period, regulators such as the NDRC began to investigate Qualcomm

4    regarding the very issues in this case.  (*See supra* Statement of Facts I.B-D.)  As a

5    result, the regulatory investigations and actions announced on Plaintiffs' alleged

6    corrective disclosure dates were not "within [a] zone of risk concealed" by

7    Defendants.  *Nuveen*, 730 F.3d at 1120.  The relevant "zone of risk" was fully

8    disclosed, and consequently Plaintiffs cannot satisfy the *Comcast* requirement to

9    disentangle the stock price decline from the initiation of regulatory and litigation

10   proceedings from the supposed disclosure within those proceedings of new factual

11   information about Qualcomm's business practices.

12   Plaintiffs therefore resort to arguing that Qualcomm did not *conceal* the

13   risk, but rather *understated* it—*i.e.*, investors did not appreciate the *extent* of the

14   risk, and would have assessed the risk of regulatory proceedings and litigation to

15   be higher had they known of Qualcomm's business practices.  (Dkt. 166 at 25

16   n.12.)  Defendants' expert, Dr. René Stulz, explains in his report the difficulties in

17   calculating classwide damages in a case about *understatement* of the risk.

18   Specifically, Plaintiffs must be able to identify the probability that the risk would

19   materialize at a given point in time, as well as how earlier disclosure of the extent

20   of the risk would have impacted the company's stock price—figures that in some

21   cases are impossible to determine.  (Stulz Decl. ¶¶ 197-215.)

22   This problem is laid bare in the *British Petroleum* securities litigation that

23   followed the Deepwater Horizon oil spill.  In that case, the plaintiffs sought to

24   certify a class based on the theory that BP understated its exposure to an oil rig

25   explosion.  *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *16-17 (S.D. Tex.

26   Dec. 6, 2013).  Relying on a report from Dr. Stulz, the court found that because

27   BP's statements allegedly "understated a known risk", the plaintiffs' request for

28   damages of "the full value of the stock price drop from the materialization of that

risk" would have overcompensated them for their harm.  *Id.* at 16.  The court

therefore denied class certification on *Comcast* grounds because of the

"disconnect[] between damages and liability".  *Id.* at 17.

On a renewed motion, the district court again denied the plaintiffs' motion

for a subclass claiming materialization of the known—but understated—risk of an

oil rig explosion.  *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *9-11 (S.D.

Tex. May 20, 2014).  The court observed that "when the corrective event is the

materialization of an understated risk, the stock price movement on the date of

correction (i.e., on the date that the risk materialized) will not equate to inflation

on the date of purchase ***unless the probability of the risk materializing was 100***

***percent***."  *Id.* at *10 (emphasis added).  Because "not even Plaintiffs argue[d] that

the risk . . . was 100 percent", the court held that their proposed damages model

did not match their liability theory.  *Id.* at *10-12.  The Fifth Circuit affirmed.

*Ludlow v. BP, p.l.c.*, 800 F.3d 674 (5th Cir. 2015).

Plaintiffs' proposed damages model here is just as inadequate as the model

in *BP*.  The Tabak Report dedicates only a single paragraph to the calculation of

damages reflecting the materialization-of-the-risk theory.  In order to avoid the

pitfall highlighted in the *BP* case, Dr. Tabak relays the extraordinary claim that,

"[t]o the extent Plaintiffs' loss-causation theory is viewed as 'materialization of

the risk,' it is my understanding that Plaintiffs will attempt to show that

Qualcomm's allegedly misrepresented licensing and bundling practices would

*inevitably* lead to the regulatory and customer scrutiny" that eventually came to

pass (*i.e.*, the KFTC, EC, FTC and Apple proceedings).  (Pls.' Ex. 1 ¶ 64

(emphasis added).)[5]

---

[5] Dr. Tabak further suggests that "Plaintiffs may seek to determine whether the market would have understood that the allegedly improperly disclosed business practices would not be sustainable had they been made public."  (Pls.' Ex. 1 ¶ 62.) Any such exercise would be certainly fruitless because the Ninth Circuit and

1    Staking the viability of the damages model on the *inevitability* of the events

2    at issue—*i.e.*, a 100% probability the risk would materialize—is wildly

3    unreasonable.  *First*, the FTC's decision authorizing litigation against Qualcomm

4    was split 2-to-1, with one Commissioner issuing a vigorous dissent.  (Ex. 10 at

5    A485.)  Because a single vote could have swung the decision the other way, the

6    suggestion that the FTC litigation was inevitable is completely baseless.  *Second*,

7    the U.S. Department of Justice took a position directly opposed to the FTC in the

8    ensuing litigation, supporting Qualcomm's efforts to stay the district court's

9    injunction (Ex. 40 at A841-42) and appearing as an amicus curiae on Qualcomm's

10   behalf on appeal (Ex. 13 at A596).  And *third*, perhaps most significantly, both the

11   Ninth Circuit and the European General Court ultimately *dismissed* all claims

12   against Qualcomm, making clear there was nothing remotely inevitable about

13   them.  *FTC*, 969 F.3d at 1005; (Ex. 42 at A938).

14   By pinning their damages theory on "arbitrary" and "speculative"

15   assumptions, Plaintiffs ask the Court to "reduce Rule 23(b)(3)'s predominance

16   requirement to a nullity".  *Comcast*, 569 U.S. at 35-36.  Accordingly, class

17   certification should be denied.

18   ### III.   Lead Plaintiffs Are Subject to Unique Defenses, Not Typical of the

19   ### Class.

20   Rule 23(a)(3) precludes class certification "where a putative class

21   representative is subject to unique defenses which threaten to become the focus of

22   the litigation."  *Hanon v. Dataproducts*, 976 F.2d 497, 508 (9th Cir. 1992); *see*

23   *State of Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir.

24   1997).  As explained in *Hanon*, the question is not whether a unique defense will

25   succeed at trial, but whether "it is predictable that a major focus of the litigation

26   will be on [the] defense."  976 F.2d at 509.  Although non-reliance is a merits

27   

28   European Court have now determined that the practices challenged in those
     cases were lawful, and therefore sustainable.

defense, the proposed representative's trading strategy led the *Hanon* court to conclude that his "reliance on the integrity of the market would be subject to serious dispute." 976 F.2d at 508.  This rendered him atypical because it "requir[ed] him to prepare to meet defenses that are not typical of . . . other members of the proposed class," and thus "threaten[ed] to become the focus of the litigation."  *Id.* at 508.

**Non-Reliance.**  Here too, Lead Plaintiffs and their outside investment managers ("IMs") engaged in trading activity with an investment approach that raises serious questions about whether they relied on the integrity of the market. The most glaring examples are Metzler itself and its only US-based IM, PanAgora. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████   (*See* Durbin Ex. 2; Durbin Decl. ¶ 9.) PanAgora's witness █████████████████████████████

████████████████████████████████   (Durbin Ex. 4, PanAgora Dep. Tr. at 113:18-114:14); *see GAMCO Invs. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 97 (S.D.N.Y. 2013) (no reliance where plaintiffs used "proprietary" valuations and techniques "to evaluate the intrinsic value of Vivendi securities"), *aff'd*, 838 F.3d 214 (2d Cir. 2016).  Importantly, PanAgora's ███████████████

████████████████████████████████   *See id.* at 101-02 (reliance rebutted when there was "no indication in the record that Plaintiffs would have viewed Vivendi as a less attractive investment vehicle if Vivendi had fully disclosed" concealed information).  PanAgora ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████   (Durbin Ex. 4, PanAgora Dep. Tr. at 41:22-42:11, 112:13-113:4.)

1   Similarly, Metzler's 30(b)(6) witness ████████████████████████

2   ████████████████████████████████████████████████ (Durbin

3   Ex. 5, Metzler Tr. at 205:20-206:7); *see GAMCO*, 927 F. Supp. 2d at 97.

4   Metzler's witness ████████████████████████████████████████

5   ████████████████████████████████████ (Durbin Ex. 5,

6   Metzler Tr. at 58:12-23 (████████), 67:14-68:15 (████████), 78:9-79:15

7   (████████), 82:15-85:25, 91:7-20, 98:24-99:6 (████████), 104:18-105:14 (████████),

8   110:11-21, 114:1-116:7, 119:1-120:7 (████████).)[6]

9         **Discovery Gamesmanship.**  There is enough evidence of non-reliance to

10  render Lead Plaintiffs atypical and deny certification on that basis.  But to the

11  extent there are gaps in the evidentiary record, they are attributable entirely to

12  Lead Plaintiffs' and their IMs' resistance to Defendants' discovery efforts.

13  Metzler's witness testified ████████████████████████████████████

14  ████████████████████████ (Durbin Ex. 5, Metzler Dep. Tr. at 58:12-23,

15  67:14-68:15, 78:9-79:15, 82:15-85:25, 91:7-20, 98:24-99:6, 104:18-105:14,

16  110:11-21, 114:1-116:7, 119:1-120:7.)  And AP7's witness ████████████████

17  ████████████████████████████████████████████████

18  ████████████████████ (*See, e.g.*, Durbin Ex. 6, AP7 Dep. Tr. at 152:11-153:21.)

19  But 11 of the 12 IMs are in foreign jurisdictions; all 11 have refused Defendants'

20  requests for voluntary depositions[7] and have collectively produced only 439

21  documents.  (Durbin Decl. ¶¶ 5-6.)  Metzler's witness claimed, ████████████

22

23  [6] One of AP7's ████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████ (*see, e.g.*, Durbin Ex. 6, AP7 Dep. Tr. at 108:6-110:25 ████████

26  ████████████████████████████████████████████████████████).

27  [7] With no other option to obtain testimony from any foreign-based IM, Defendants
    arranged a hearing in Swiss court on the earliest available date, July 28, 2022, in

28  which a Metzler IM, ACATIS, will answer questions from both parties submitted
    to and asked by a judicial official.  (Durbin Decl. ¶ 2.)

████████████████████████████████████ (Durbin Ex. 5, Metzler Dep. Tr. at 213:4-215:18 (████████), 219:18-222:9 (████████), 223:3-227:15 (████████), 232:6-23 (████████), 235:14-25 (████████), 236:11-237:18 (████████); but that is no substitute for the robust document and deposition discovery to which Defendants are entitled.  Lead Plaintiffs should not ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ (*See, e.g.*, *id.* at 91:21-94:3, 96:6-97:11, 105:16-107:4, 115:18-116:7, 117:8-23); *see Villella v. Chem. & Mining Co. of Chile*, 2018 WL 2958361, at *5 (S.D.N.Y. June 13, 2018) ("[I]f courts could not look to an investment adviser's knowledge, plaintiffs could immunize themselves from reliance challenges by outsourcing their investment decisions to their investment advisers, or other agents.").

Defendants intend to aggressively pursue a non-reliance defense against Metzler and AP7, inevitably preoccupying both with a defense unique to them. The Court should deny class certification for lack of typicality under Rule 23(a)(3).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny in full Plaintiffs' motion for class certification.

1   Dated:  July 22, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

By:   */s/ Antony L. Ryan*

**CRAVATH, SWAINE & MOORE LLP**
Antony L. Ryan (*pro hac vice*)
(aryan@cravath.com)
Rachel G. Skaistis (*pro hac vice*)
(rskaistis@cravath.com)
Yonatan Even (*pro hac vice*)
(yeven@cravath.com)
Justin C. Clarke (*pro hac vice*)
(jcclarke@cravath.com)
M. Brent Byars (*pro hac vice*)
(mbyars@cravath.com)
825 Eighth Avenue
New York, NY 10019
Telephone:   (212) 474-1000
Facsimile:   (212) 474-3700

**COOLEY LLP**
Christopher Durban (218611)
(cdurbin@cooley.com)
Koji F. Fukumura (189719)
(kfukumura@cooley.com)
Peter M. Adams (243926)
(padams@cooley.com)
4401 Eastgate Mall
San Diego, CA 92121-9109
Telephone:   (858) 550-6000
Facsimile:   (858) 550-6420

*Attorneys for Defendants Qualcomm Incorporated, Derek K. Aberle, Steven R. Altman, William F. Davidson, Paul E. Jacobs, Steven M. Mollenkopf and Donald J. Rosenberg*