# Longman Decl. Exhibit 1



# Qualcomm's SEP Licensing Practices and Overview of Select Negotiations

August 17, 2016



Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Overview



- **Overview of Qualcomm's SEP Licensing Practices**

  - No hold-up:  Qualcomm's longstanding practices were well known before 3G and 4G standardization

  - Harms of multi-level licensing

- **Qualcomm's Negotiations with LG and Samsung**

  - Overview of Negotiations Between Qualcomm and LG

    - 2003-2004 LG Negotiations

    - 2006-2007 LG Negotiations

    - 2011 Discussions Regarding ASIC Sales

  - Overview of Negotiations Between Qualcomm and Samsung

    - 2004 Samsung Negotiations

    - 2008-2009 Samsung Negotiations

    - 2011-2013 Chip-Level Patent Agreement Negotiations

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

2





# Overview of Qualcomm's SEP Licensing Practices

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

3

# Qualcomm Licenses Its System-Level Innovations



- **Qualcomm innovates to develop technologies that form the basis of all cellular communications.**

  - Qualcomm invests billions of dollars in R&D each year, with no guarantee of finding new innovations, much less that any innovations will find commercial success and/or become standardized.

    - Only those technologies that are truly successful, and better than the alternatives, will get incorporated into standards.

  - If successful, the results of Qualcomm's system-level R&D are provided to the world in the form of standardized technology.

    - The standards provide detailed information that anyone can use to implement Qualcomm's technologies—much more than the basic disclosure provided in a patent.

  - Upon standardization, implementers obtain the benefit of Qualcomm's innovations – while Qualcomm has to wait years after the investment has been sunk and after the technology has already been shared with the world to potentially earn a return on its contribution to standards.

  - The cellular industry has been thriving under this model for over 20 years.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Qualcomm's Licensing Policies Were Well-Known Prior to Standardization



- **Qualcomm's licensing practices were well known when industry adopted Qualcomm's 3G and 4G patented technologies into standards.**

  – The conducts now challenged by the Examiner have been consistent for over 20 years.

  – When 3G and 4G standards were adopted, participants knew that Qualcomm would:

    • Exhaustively license its cellular SEPs only for the making and selling of devices but not for the making or selling of components;

    • Use the NSP of complete devices as the royalty base; and

    • Seek cross grants to protect its product businesses against opportunistic assertion by licensees.

  – Advance knowledge of those practices prior to standardization means no hold up.

    • It was the industry's choice to adopt Qualcomm's technology, recognizing the technological superiority of its inventions.

    • The industry made that choice with the understanding of how Qualcomm intended to license its SEPs.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

5

## Qualcomm's Licensing Policies Were Well-Known Prior to Standardization



- **Qualcomm announced its licensing practices for 3G before standardization and during the course of licensing.**

  – Before 3G standardization, it was well known that Qualcomm would apply its 2G licensing structure to its 3G patents.

  – For example, at an analyst meeting held on September 15, 1999, Qualcomm explained that the same royalty terms for licenses to its 2G SEPs would apply to licenses for its 3G SEPs:



Qualcomm Confidential and Proprietary – Confidential Treatment Requested

6

Longman Decl. Ex. 1
L6

## Qualcomm's Licensing Policies Were Well-Known Prior to Standardization



Qualcomm announced its well-known licensing practices for 4G, before standardization.

– Qualcomm's licensing practices for 2G and 3G were well known and it had given no indication that its practices would change for 4G LTE.

– Qualcomm published its intended licensing practices for 4G SEPs on its website before the standard was finalized.

LTE/WiMax license agreements, Qualcomm expects that it will charge royalties for a license under its standards essential LTE patents and/or standards essential WiMax patents for complete, end user subscriber devices that implement LTE and/or WiMax standards, but do not implement any 3G CDMA standards, of approximately 3.25% of the wholesale selling price of each such device, subject to reciprocity and other standard terms and conditions.  Qualcomm's expectation is based upon its understanding of the

ER Response Exhibit 35

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

7

# Qualcomm Exhaustively Licenses Complete Cellular Equipment



- **Qualcomm enters into exhaustive licenses for the manufacture and sale of complete cellular equipment, such as cellular handsets.**

- **Qualcomm's license agreements for mobile devices are typically structured as follows:**

  - An <u>exhaustive license</u> for <u>making and selling</u> handsets.

    - Qualcomm has <u>never</u> exhaustively licensed the making and selling of cellular components.

  - Payment to Qualcomm, typically in the form of a <u>modest lump sum payment + a running royalty</u> measured as a percentage of the net selling price of the end-user device, such as a phone or tablet.

  - Some type of <u>cross-grant</u> of the licensee's patents back to Qualcomm.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

8

# Qualcomm Does Not Assert its Patents Against, Nor Seek Royalties From, Chipmakers



◦ **Qualcomm forbears from asserting patents against components used in cellular handsets.**

– Modem chipmakers can make and sell modem chips without any agreement with Qualcomm, and without paying any royalties or reporting any information to Qualcomm.

– Qualcomm has never initiated a patent assertion against a modem chipmaker.

– Qualcomm would not be able to seek to exclude a modem chipmaker from practicing its SEPs without disrupting its device-level licensing policy.

• Before such a SEP assertion, Qualcomm would first need to offer a license to those SEPs.

• In other words, asserting SEPs against a modem chipmaker would undermine Qualcomm's policy of licensing the making and selling of devices only.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Qualcomm's Licensing Structure is Normal Industry Practice



- **The entire industry follows the same practice of exhaustively licensing the manufacture and sale of complete devices.**

  – This practice began before Qualcomm started licensing its patents.

  – The widespread practice of all major SEP holders has consistently been to license exhaustively only the making and selling of complete end-user devices.

- **Other SEP holders following the same practice of exhaustively licensing only at the device level include:**

| Alcatel-Lucent | Motorola | Nokia-Siemens Networks |
|---|---|---|
| Ericsson | Nortel | Samsung |
| Huawei | Nokia | ZTE |

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

10

# Licensing Complete Cellular Equipment Is Efficient and Practical for Qualcomm's Portfolio



◦ **Licensing the making and selling of devices is efficient and logical due to the nature of Qualcomm's portfolio.**

  – Qualcomm's broad portfolio of cellular SEPs includes a vast number of patent claims that extend beyond, or do not relate to, the modem chip.

  – Even if Qualcomm licensed chip suppliers exhaustively, handset makers would still infringe Qualcomm's patents and Qualcomm would still need to license them as well.

◦ **Requiring <u>exhaustive</u> licensing of the making and selling of components would lead to multi-level licensing.**

  – Licensing at multiple levels would be extremely inefficient for the industry.

  – The end result would harm the entire industry and limit future innovation.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

Longman Decl. Ex. 1
L11

# Multi-Level Licensing Is Practically Unworkable and Would Harm the Industry



○ **Licensing exhaustively at multiple levels would vastly complicate license agreements and negotiations, leading to higher costs and reduced innovations.**

|  | Current Practice | Multi-Level Licensing |
|---|---|---|
| Number of Agreements | One agreement with a device maker covers multiple generations of devices. | Multiple agreements with several component makers and the device maker for *each device* required. |
| Determining Where Claims Are Practiced | Efficiently license all patents to device makers who practice the patent claims. | Must negotiate with component makers and device makers over where each patent claim is practiced. And this will change over time. |
| Transaction Costs | Efficient negotiations with a single counterparty. | Complex negotiations involving multiple parties. |

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

12

# Multi-Level Licensing Is Practically Unworkable and Would Harm the Industry (Continued)



|  | Current Practice | Multi-Level Licensing |
|---|---|---|
| Disputes | No disputes about the level at which patents are practiced. | Endless disputes about the level at which patents are practiced and where they should be licensed. |
| Administration and Tracking | Can efficiently monitor compliance by device makers without the need to know any information about components used. | Need to track components used in each device, and may need to adjust device royalty terms depending on agreements with component makers. |
| Value of the Licensed Technology | Agreements reflect the value of the licensed patents to the complete device. | The same technology/patent can have different value in different end products. Very difficult to know where a component will be used upon sale of the component. |

Qualcomm Confidential and Proprietary – Confidential Treatment Requested





# Overview of Qualcomm's Negotiations with Select Customers

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

14

# Qualcomm's Negotiations with LG and Samsung



- **LG and Samsung were not coerced in any way during negotiations with Qualcomm.**

- **Both companies have negotiated hard on several different occasions and ultimately obtained significant concessions from Qualcomm.**

- **This presentation will address the negotiations for the two most important recent amendments of the LG and Samsung agreements.**

  - LG:  2003-2004 and 2007.

  - Samsung:  2004 and 2008-2009.

- **It will also address Qualcomm's negotiations and discussions with LG and Samsung regarding the sale of chips to third parties.**

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

15





# 2003-2004 Negotiations with LG

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

16

# LG's Original Agreement



- **LG and Qualcomm first entered into a license agreement in 1993.**

- **The license agreement was pursuant to Qualcomm's agreement with ETRI and the Korean Government's designation of LG as a device maker with whom Qualcomm should execute an agreement.**

  - The terms of the agreement were approved by Korean Government.

  - The license was at the device level with royalties calculated based on the net selling price of complete devices.

  - During the negotiations, LG agreed to a flat royalty rate of 5.75%, rather than a volume based rate ranging between 5.0%-6.5% agreed to by many other licensees.

  - Negotiating leverage tilted heavily in favor of LG; Qualcomm was a small upstart with an unproven technology, and LG had the support of the Korean Government.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

17

## LG's Original Agreement (continued)



- **At LG's request, Qualcomm re-negotiated the agreement with LG in 2004.**

  - During negotiations, LG tried to use Qualcomm's supply of engineering samples of WCDMA modem chips as leverage against Qualcomm.

  - Both before and after LG claimed Qualcomm's sale of chips to LG provided an "implied license" to Qualcomm's patents, LG negotiated strongly and obtained major concessions.

  - Qualcomm was in no position to coerce LG into accepting unreasonable terms and the terms of the resulting agreement were fair and reasonable.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

18

## Qualcomm Assured LG It Would Continue the Supply of Modem Chips During Their Dispute



◦ **During negotiations in 2003, Qualcomm discovered that LG was not reporting or paying royalties on WCDMA devices.**

◦ **In order to resolve the dispute over WCDMA, Qualcomm brought the issue to arbitration.**

– Qualcomm made clear that it did not intend for the dispute to interrupt Qualcomm's sale of chips to LG.

– At that time, the President of QTL, Steve Altman told LG:

> We do not intend to allow this arbitration to negatively effect our relationship with LGE and will continue our efforts to meet all of your ASIC supply needs during the course of the arbitration.

ER Response Exhibit 154

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

19

# LG Asserted That Qualcomm's Sale of WCDMA Chips Constituted an Implied License



- ◦ **Over five months after Qualcomm initiated arbitration, LG asserted that the sale of a small number of sample WCDMA chips to LG constituted the "conveyance of an implied license" covering the millions of WCDMA phones sold by LG at the time – phones that contained chips made by EMP, not Qualcomm!**

- ◦ **Prior to this assertion, Qualcomm never did anything to jeopardize the sale of chips.**

Mr. Louis M. Lupin
May 12, 2004
Page 2 of 2

notice (prior to your letter of May 6, 2004) of the alleged breach of the Supply Agreement, as clearly required by Section 13 of the Supply Agreement or of the alleged breach of the MOU, as clearly required by Section 4 of the MOU. As you know, Section 13 of the Supply Agreement entitles a party allegedly in breach of the Supply Agreement 60 days after receipt of written notice of the alleged breach in which to cure the deficiency and Section 4 of the MOU provides that the cure period specified within the Supply Agreement applies also for purposes of the MOU. Your letter of May 6 was the first such notice to LGE of any purported breach of either the Supply Agreement or the MOU. If you are aware of any earlier effective notice provided by Qualcomm to LGE of any of these alleged breaches, please provide us with a copy of the purported notice or notices immediately and we will promptly give them due consideration.

You further state that, even assuming that the 1996 License Agreement does not cover WCDMA technology, LGE is still in breach of the Supply Agreement for using Qualcomm chipsets not "subject to and in accordance with the [1996 License Agreement]," as required by Section 12 of the Supply Agreement. This argument derives from circular reasoning and cannot be relied upon to support an alleged breach. Again, the scope of the 1996 License Agreement is the subject of currently pending arbitration commenced by Qualcomm against LGE. It is inappropriate to premise a breach of the Supply Agreement on the 1996 License Agreement until the arbitrators determine the scope of sales that are "subject to and in accordance with" the 1996 License Agreement, under Section 12 of the Supply Agreement. <mark>Further, to the extent Qualcomm has sold to LGE equipment containing WCDMA technology, but has not licensed such technology to LGE, Qualcomm's sale constitutes, as a matter of law, the conveyance of an implied license to use the WCDMA technology in question.</mark> Therefore, assuming that the 1996 License Agreement does not cover WCDMA technology, LGE is not in breach of the Supply Agreement by virtue of the implied license.

You next assert that LGE's alleged sale of chipsets obtained under the Supply Agreement "into the market" constitutes a breach of the Supply Agreement. Again, your letter fails to identify with any specificity the alleged sale of chipsets or modules by LGE "into the market." As mentioned above, no notice of such sales "into the market" has been provided to LGE before May 6, 2004, and, further, even the May 6, 2004 letter constitutes insufficient notice of any such breach in that no identifying facts surrounding

<mark>Further, to the extent Qualcomm has sold to LGE equipment containing WCDMA technology, but has not licensed such technology to LGE, Qualcomm's sale constitutes, as a matter of law, the conveyance of an implied license to use the WCDMA technology in question.</mark> Therefore, assuming that the 1996 License Agreement does not cover WCDMA technology, LGE is not in breach of the Supply Agreement by virtue of the implied license.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

ER Exhibit 71

Longman Decl. Ex. 1
L20

## LG's Claim Presented Serious Risks to Qualcomm



- LG's claim that it was unlicensed for WCDMA and that it had an implied license to Qualcomm's WCDMA patents created a significant risk arising from the sale of any WCDMA chips to LG.

- LG was essentially claiming that if Qualcomm continued to supply WCDMA chips to LG that LG would not owe any royalties to Qualcomm for LG's sales of WCDMA products.

- By making these claims, LG was trying to use Qualcomm's commitment to continue to supply WCDMA chips to LG against Qualcomm in order to obtain leverage in the parties' WCDMA dispute.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Qualcomm Asked LG To Withdraw Its Claim



- Qualcomm asked LG to rescind its implied license argument so that Qualcomm could sell WCDMA chips to LG.

Mr. Park
06/16/04
Page 2 of 3

Not only do we strongly disagree with Mr. Ham's conclusion, but this new position expressed in his letter, if maintained, leaves QUALCOMM with very few options, as you can readily understand. I therefore request that LGE promptly (i) retract and waive Mr. Ham's claim that QUALCOMM has waived its rights under our existing Supply Agreement or that LGE has received or somehow receives any implied royalty free license to use our WCDMA ASICs and (ii) without prejudice to either party's position in the present arbitration, agree to report and pay royalties on all of its sales of past and future WCDMA subscriber units and infrastructure

> I therefore request that LGE promptly (i) retract and waive Mr. Ham's claim that QUALCOMM has waived its rights under our existing Supply Agreement or that LGE has received or somehow receives any implied royalty free license to use our WCDMA ASICs

MSM 6200 scheduled to ship during the first week in July;

3) QUALCOMM will withdraw all of its substantial WCDMA engineering resources currently providing technical support to LGE and reassign those resources to our strategic ASIC customers, all of whom are honoring their supply contracts and licensing obligations; and

4) QUALCOMM will require that LGE return to QUALCOMM all versions and derivations of our WCDMA ASIC software (AMSS versions for the MSM5200, MSM6200 and MSM6250).

To preserve our full range of remedies, I am informed that, if LGE does not pay royalties on sales of WCDMA products, QUALCOMM may be required to inform LGE's WCDMA customers that LGE is selling them products that LGE considers to be unlicensed - despite LGE's acknowledgement that it requires a license from QUALCOMM for WCMDA - thereby exposing LGE and its customers to liability for willful infringement.

Our respective teams have been discussing possible proposals to resolve our issues and I had hoped and expected that by this time they would have reached an agreement eliminating the need to write this letter to you. It appears, however, based on LGE's most recent counter-proposal, that we are quite far apart. Nonetheless, I have asked my team to continue to try and work with LGE in hopes that we can resolve this matter and resume the close relationship that has to date been beneficial to both parties and which is continuing for CDMA2000 products.

ER Response Exhibit 167

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

22

# Qualcomm Did Not Use the Sale of Modem Chips To Coerce Unreasonable License Terms



- **Qualcomm <u>never</u> suggested it would stop the sale of CDMA modem chips.**

- **Qualcomm <u>never</u> suggested that LG needed to accept <u>any</u> licensing term in order to obtain chips from Qualcomm – it simply asked that LG withdraw the "implied license" argument it had raised.**

- **LG was not dependent on Qualcomm for WCDMA chip supply at the time.**

  – A disruption in the sale of Qualcomm WCDMA chips could not have meaningfully impacted LG's business or provided the basis to coerce LG to accept license terms.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Qualcomm Did Not Use the Sale of Modem Chips To Coerce Unreasonable License Terms (Continued)



- **No other licensee seriously disputed Qualcomm's WCDMA licenses – LG continued to fight very hard, and did not make any concession due to any chip-related issue.**

- **To the contrary, in the ultimate agreement reached between the parties LG obtained several important concessions from Qualcomm:**

  – A waiver on past-due royalties that amounted to a total of $25 million in royalty savings. (This was first demanded by LG *after* LG raised the issue regarding the sale of chips!)

  – A reduction in the royalty rate on mobile devices sold outside Korea from 5.75% (the rate agreed to in the 1993 agreement) to 5.0%. This resulted in tens of millions of dollars of savings to LG over the years.

  – A reduction in the per unit running royalty cap for handsets from $25 to $20.

  – A double covenant structured cross-grant with a defensive suspension clause in LG's cross-grant to Qualcomm's customers. This provided LG with significantly increased opportunities to use its patents against Qualcomm's customers.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested



# Timeline of LG 2003-2004 Negotiations



Qualcomm Confidential and Proprietary – Confidential Treatment Requested

25

# 2003-2004 LG Negotiations:  In Summary



| Examiner's Claim | Actual Facts |
| --- | --- |
| Qualcomm threatened LG with a chip cut-off. | Qualcomm assured LG it would <u>not</u> cut off chips, but LG then used that assurance as a basis to claim implied license. |
| LG had to back down because it was dependent on Qualcomm for WCDMA chips. | LG was not even selling devices with Qualcomm WCDMA chips at the time; it was using WCDMA chips from EMP.<br><br>Qualcomm did not request any concession on licensing terms in connection with chip supply; the only request it made was that LG withdraw its implied license argument. |
| LG caved immediately after the threat of Qualcomm stopping chip sales and signed up the deal Qualcomm demanded. | Qualcomm believed it had a stronger legal position in the dispute, and yet LG used its strong negotiating leverage to extract concessions even after when the Examiner claims LG was threatened. |

Qualcomm Confidential and Proprietary – Confidential Treatment Requested





# 2006-2007 Negotiations with LG

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

27

## 2007 LG Negotiations



- **Qualcomm negotiated on an even playing field with LG, and the agreement reached in 2007 was fair and reasonable.**

- **The negotiations lasted just under a year and a half, running from January 2006 to May 2007.**
  - The parties held numerous meetings and exchanged over 25 drafts of the amendment and agreement.

- **LG obtained significant concessions across a variety of terms.**

- **LG and Qualcomm operated under this agreement for over 8 years.**

- **If LG believed any of the terms were unreasonable LG had the ability to challenge them in arbitration under the agreement but didn't.**

Qualcomm Confidential and Proprietary – Confidential Treatment Requested



## 2007 LG Negotiations (Continued)

- **Qualcomm did not refuse to provide LG with patent claim charts.**

  – In an April 13, 2006 email, I explained that Qualcomm believed that patent lists and other discussions would be more effective and that patent claim charts were unnecessary.

  – Nevertheless, I offered to share claim charts if LG still wanted to but LG never followed up with this request.



Finally, for the reasons I previously explained, we continue to believe that engaging in a detailed discussion of a small number of patents using claim charts will not be particularly helpful in concluding our overall discussions since such a small number of patents may not be representative of the larger portfolio. Having said that, if LGE continues to believe that it is necessary we can certainly do that.

- **During the negotiations, Qualcomm shared extensive information about its patents with LG.  Qualcomm presented:**

  – Technical information about its portfolio; and

  – Working lists of its SEPs for certain cellular standards as well as a list of its SEPs for the WiMax and 802.20 standards and certain non-essential patents.

ER Response Exhibit 206

Qualcomm Confidential and Proprietary – Confidential Treatment Requested





# 2011 Discussions with LG Regarding Modem Chip Sales

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

30

Longman Decl. Ex. 1
L30

# Qualcomm Provided LG with the Assurance It Requested Regarding Modem Chip Sales



- **In 2011, LG asked Qualcomm to confirm that its existing license agreement did not prevent it from selling modem chips to third parties.**

  – MKE was carrying out a project to support the domestic development of LTE modems.

  – On April 11, 2011, in connection with this project, JungSheek Juhn of LG called me to discuss the effect of LG's license agreement on its ability to sell modem chips to third parties.

- **I confirmed that the agreement with LG did not prevent it from selling chips to third parties.**

  – JungSheek Juhn understood that Qualcomm did not exhaustively license – and did not need to license – the manufacture and sale of components.

  – LG never requested a license or other rights from Qualcomm to sell components to third parties.

  – It was clear from my discussion with LG that it did not need a license from Qualcomm to sell components to third parties.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Qualcomm Provided LG with the Assurance It Requested Regarding Modem Chip Sales (Continued)



- At JungSheek Juhn's request, I also sent written confirmation that LG's license agreement with Qualcomm does not prevent the sale of modem chips to third parties.



ER Response Exhibit 47

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

## Qualcomm Never Suggested It Would Assert Patents Against LG for Making and Selling Modem Chips



- **A Qualcomm employee in Korea, Hee-Joung Lee, misunderstood my email to LG and thought that Qualcomm had granted LG express authorization to make and sell modem chips using Qualcomm's patents.**

- **I clarified that Qualcomm had not granted LG a license.  I wrote to Hee-Joung Lee:**

  - "We have done nothing to give LGE permission to develop and sell chips to third parties. If they do so, we could assert our patents against LGE or LGE's customers."  (ER Ex. 47.)

- **This was an internal email clarifying Hee-Joung Lee's misunderstanding of Qualcomm's contract with LG.**

  - I clarified this point so that Hee-Joung  did not make an incorrect statement suggesting that LG had authorization, which could have supported an implied license or waiver argument.

  - At no point did I suggest to Hee-Joung Lee or anyone else at Qualcomm that Qualcomm intended to assert its patents against LG.

  - And at no point did I (or, to my knowledge, anyone else at Qualcomm) convey to LG that Qualcomm would assert its patents against LG for the sale of chips to third parties.

- **LG was satisfied with the confirmation Qualcomm provided and understood Qualcomm's forbearance practice.**

Qualcomm Confidential and Proprietary – Confidential Treatment Requested





# 2004 Samsung Negotiations

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

34

# Samsung's Original Agreement



○ **Samsung and Qualcomm first entered into a license agreement in 1993.**

○ **The license agreement was pursuant to Qualcomm's agreement with ETRI and the Korean Government's designation of Samsung as a device maker with whom Qualcomm should execute an agreement.**

   – The terms of the agreement were approved by Korean Government.

   – The license was at the device level with royalties calculated based on the net selling price of complete devices.

   – During the negotiations, Samsung agreed to a flat royalty rate of 5.75%, rather than a volume based rate ranging between 5.0%-6.5% agreed to by many other licensees.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

## Samsung Demanded Lower Royalty Rates than Other Licensees



- ◦ **At Samsung's request, Qualcomm re-negotiated the agreement with Samsung in 2003-2004.**

- ◦ **Samsung's primary concerns related to the royalties it would pay.**

- ◦ **Samsung demanded "the most favorable terms over our competitors for every single condition".**

> On the other hand, Samsung's position on the IPR and royalty issue for
> CDMA/W-CDMA is firm. We strongly believe that Samsung should be provided
> with the most favorable terms over our competitors for every single
> condition in the area of CDMA/W-CDMA. It is not acceptable if Samsung is
> placed in a less competitive position than our competitors as a result of
> QUALCOMM's offering to others with better conditions.

ER Response Exhibit 177

# Samsung Received an Individualized Agreement with Favorable Terms



- **After 7 months of negotiations, the parties agreed on an amendment.  Two of the key aspects of the amendment were:**

  - <u>Royalty Rate</u>:  The parties lowered Samsung's royalty rate to 5% of the NSP for all subscriber units sold for use outside Korea, subject to a running royalty cap of $20.

    - Samsung was also able to continue to enjoy the existing terms in its agreement for sales of devices in Korea, which included a favorable component deduction.

  - <u>Cross-Grant</u>:  At Samsung's request, the parties agreed to amend the cross grant in a double covenant structure so that Samsung could have greater flexibility to assert patents against Qualcomm's modem chip customers.

    - The "double covenant" provides <u>less</u> protection to Qualcomm's customers than a cross license and therefore Qualcomm gave up rights that it had prior to this negotiation.

    - It is expressly designed to benefit Samsung by giving Samsung greater flexibility to assert certain of its patents against Qualcomm's modem chip customers.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested





# 2008-2009 Samsung Negotiations

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

38

# Overview of 2008-2009 Negotiations with Samsung



- **In January of 2008, Samsung approached Qualcomm to renegotiate the terms of its agreement and in particular, the royalty and cross-grant provisions.**

- **The negotiations were hard fought and lasted just under two years, until November 2009.  The parties:**

    - Held over 20 in-person meetings and conference calls;

    - Exchanged over 20 drafts;

    - Exchanged over 80 substantive emails; and

    - Exchanged patent presentations, numerous representative patent claim charts and representative patent lists.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

39

# Overview of 2008-2009 Negotiations with Samsung (continued)



- **Qualcomm made significant concessions on important terms, including royalty rate.**

- **Samsung ultimately obtained a highly individualized agreement with a number of highly favorable terms, including:**

  - A running royalty rate that is less than half of Qualcomm's "typical" royalty rate.

  - A individualized cross-grant that gives it even more flexibility in asserting its patent portfolio.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Samsung Has a Uniquely Broad License from Qualcomm



○ **Samsung negotiated an unusually broad license from Qualcomm.**

– Samsung's license covers all of Qualcomm's SEPs and non-SEPs, regardless of the date that those patents were filed.

– This gives Samsung a license to all new patents that Qualcomm receives without paying additional royalties.

– In comparison, most licensees receive a license to SEPs relevant to specified standards and a license to non-SEPs that is limited to a specific capture period.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

41

# Samsung Negotiated for a Customized Cross Grant & Defensive Suspension Rights



- **Samsung negotiated the scope and structure of its cross-grant to Qualcomm and Qualcomm's customers, to preserve its flexibility in asserting its patents.**

- **Samsung retained the double covenant not to assert that it had bargained for in the 2004 Amendment.**

  - Samsung successfully negotiated to carve out certain patents in patent pools and patents owned by Samsung affiliates from the covenant to Qualcomm and Qualcomm customers.

  - Samsung's covenant to Qualcomm customers for patents after December 31, 2000 was further limited and excluded certain other non-SEPs.

- **Samsung negotiated for broad defensive suspension rights that would permit it to assert patents against Qualcomm and Qualcomm customers under certain circumstances.**

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Samsung Gave Qualcomm a Narrow Cross Grant



○ **Samsung carved out some of its SEPs from the cross grant.**

– The cross grant to Qualcomm excludes certain SEPs for various non-cellular standards such as WiFi, audio, visual and multimedia codec standards.

– These SEPs (which are subject to FRAND licensing commitments) were excluded, and Samsung refused to offer <u>any</u> type of cross grant to Qualcomm components for those SEPs.

– Samsung's Heungmo Lee explained that Samsung did this so it avoids any risk of exhaustion of these patents and is free to monetize them through a device-level licensing program.

> While other division are still reviewing above structure, they are requesting such exclusion in order to completely eliminate the possibility of raising an argument by Qualcomm customers
>
> of patent exhaustion, even though they feel it's meritless.
>
> Considering that the policy of patent pools is to collect royalties on end-user products, not
>
> component manufacturers, I think that this should not concern Qualcomm.

QKFTC201400040063A.00001

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

43

Longman Decl. Ex. 1
L43

# Samsung Negotiated for a Low Running Royalty Rate



- **Qualcomm proposed a running royalty rate of 2.85%.**

  – That was significantly lower than the 5% royalty rate that Samsung was obligated to pay under its existing license agreement.

  – Qualcomm also offered most favored royalty rate protections.

  – Nevertheless, Samsung maintained this was insufficient and demanded an even lower royalty rate.

- **Qualcomm offered an even lower initial rate of 2.65%, with even more advantageous most favored royalty rate protections.**

- **In the end, Samsung's running royalty rate is determined by a formula that accounts for Samsung's success in the handset market.**

  – In the first 3 years of the agreement from 2009 to 2011, the royalty rate was 2.65%.

  – In 2012 it was reduced to 2.5%.

  – In 2015, the rate was further reduced to 2.35%; Samsung is assured this rate through 2023.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Samsung Negotiated for a Low Running Royalty Rate (Continued)





Qualcomm Confidential and Proprietary – Confidential Treatment Requested

45

# Samsung's Unique Agreement vs. Qualcomm's Typical License Terms



| Agreement Provision | Qualcomm's Typical License Term | Terms In Samsung's Unique Agreement |
|---|---|---|
| **Scope of License Granted** | • All of Qualcomm's cellular SEPs relevant to specified standards.<br>• Qualcomm's non-SEPs within a specified capture period. | • All of Qualcomm's cellular SEPs for ALL STANDARDS.<br>• All non-cellular SEPs and non-SEPs, regardless of the date that those patents were filed. |
| **License Fee/Royalty Rate** | Running royalty rate of 5% for 3G devices and 3.5%-4% for 4G-only devices. | Running royalty rate of 2.65% beginning in 2009 that has declined to and will remain at 2.35% to 2023. |
| **Cross-Grant** | A cross license to the licensee's:<br>•Present and future cellular SEPs, and<br>•Non-SEPs and non-cellular SEPs within a fixed capture period. | • Limited "double covenant" not to assert specified patents against Qualcomm and its customers.<br>• Defensive suspension provision permitting Samsung to assert its patents under certain circumstances. |

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

46



# Samsung Could Not Have Been Coerced Into Accepting License Terms Because of Concerns About Chip Supply

- **At the beginning of the negotiations, Qualcomm assured Samsung that it would not let the negotiation interfere with the sale of chips to Samsung.**

  – On March 4, 2008, Qualcomm and Samsung agreed that the negotiations would not interfere with the sale of chips to Samsung.

  – In a March 6, 2008 email, Qualcomm again assured Samsung that this was the case.



QKFTC201400039498A.00006

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

47

# Samsung Could Not Have Been Coerced Into Accepting License Terms Because of Concerns About Chip Supply



- **Samsung negotiated for a unique and highly favorable license agreement with an achievable royalty rate that is more than 50% lower than what Samsung was paying at the time.**

  - There is no credible basis to believe that Samsung was forced to accept those terms because of concerns about modem chip supply.

- **The Examiner relies on an October 29, 2009 email regarding the sale of modem chips for data dongles.  That email could not have impacted handset license negotiations.**

  - At the time, Samsung was such an important customer to Qualcomm that stopping chip supply would have been disastrous to Qualcomm's business.

  - All key terms of the 2009 agreement, including the royalty rate and scope of cross grant had been resolved <u>before</u> that date.

  - Qualcomm made additional concessions and adjustments to the most favored royalty provisions <u>after</u> that date to finalize the agreement.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested



# Timeline of Samsung 2008-2009 Negotiations



Qualcomm Confidential and Proprietary – Confidential Treatment Requested

49





# 2011-2013 Chip-Level Patent Agreement Negotiations with Samsung

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

## Qualcomm Told Samsung It Did Not Need a Patent Agreement for Modem Chips



◦ **In 2011, Samsung requested a chip-level patent agreement from Qualcomm.**

◦ **I explained to Samsung that an agreement was not necessary.**

> Sender : Aberle, Derek<daberle@qualcomm.com>
>
> Date : 2011-07-12 13:40 (GMT+09:00)
>
> Title : Re: proposal of conference call
>
> Injung,
>
> It was good to speak with you as well. After we spoke last week, I reviewed the Samsung–Qualcomm license agreement to refresh my memory. As I thought, we did discuss and address Samsung's component business as part of that agreement. Given that, I don't see the need for an additional agreement at this time. I suggest we discuss again so that I can point you to the relevant provisions in the agreement and explain my thinking.
>
> Derek

ER Response Exhibit 72

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

## Samsung Knew It Did Not Need a Patent Agreement for Modem Chips



○ **In-Jung Lee of Samsung acknowledged that Samsung does not need a separate agreement to sell modem chips and that I had assured him that "Qualcomm would not prohibit Samsung Electronics' external sale of chipsets".**

is willing to provide a license for external chip sales, initiate a license negotiation using the existing negotiation channel.

3.   Background to the negotiation with Qualcomm

Per such request, I called Derek Aberle at Qualcomm (who was in charge of Qualcomm's modem chip project, Qualcomm will provide LG with a license and as President Young-Koo Cha did an interview during which he said to the effect that Qualcomm would allow a license for the external sale of chipsets, and thus, Samsung Electronics also needs to obtain a license from Qualcomm.

Derek Aberle replied that as its policy, Qualcomm does not grant a license to a chipset maker, but Qualcomm would not prohibit Samsung Electronics' external sale of chipsets.

[end of page 2]

In response, I told Derek Aberle that Samsung Electronics needs an explicit permission for its external sale of modem chipsets, and suggested to enter into a detailed written agreement providing that Qualcomm would not prohibit Samsung Electronics' external sale of modem chips.

Derek Aberle agreed and said that he would send a draft agreement after reviewing the

> Derek Aberle replied that as its policy, Qualcomm does not grant a license to a chipset maker, but Qualcomm would not prohibit Samsung Electronics' external sale of chipsets.

at Samsung on chipsets. en Samsung s for patent ts, such as semiconductor and LCD patents, and thus, there would not be a situation in which Qualcomm would attack Samsung Electronics in spite of such risk.

However, according to the 2009 SULA, if Qualcomm were to attack Samsung Electronics, Samsung Electronics could not counterattack Qualcomm with Samsung Electronics' communication SEPs that can actually impact Qualcomm. Thus, Samsung Electronics' countermeasures were significantly limited.

For this reason, I thought that the existing license agreement was not enough to completely eliminate the risk of Qualcomm's patent infringement claim, and on July 13, 2011, I requested executive director Hong-Mo Lee (at the time, a standing director in the IP application team at the DMC Research Institute of Samsung Electronics), who was conversant with the terms of the license agreement with Qualcomm, to recheck the terms of the license agreement.

Hong-Mo Lee confirmed that, as I described above, even if Qualcomm asserts its patents against Samsung Electronics, Samsung Electronics cannot counterattack Qualcomm with Samsung Electronics' communication SEPs.

ER Exhibit 60

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

Longman Decl. Ex. 1
L52

# Qualcomm Never Thought An Agreement Was Necessary



- **<u>Internally</u>, Qualcomm understood that the agreement with Samsung was not necessary.**

- **In a June 24, 2013 internal email discussing the Samsung negotiations, Eric Reifschneider explained that he did not believe an agreement was necessary.**

From:       Reifschneider, Eric
Sent:       Monday, June 24, 2013 9:04 PM
To:         Aberle, Derek
Subject:    RE: discussion with Roger Brooks – privileged

Attorney-client privileged

Working on the draft e-mail, will send it shortly.

I would continue to try to convince them of #1 with (a) the standstill lasting a bit longer (180 days or perhaps even a year after the royalty payment due date) and (b) some additional language on "diligent efforts" that includes legal action to recover the royalties (but goes no farther than that). When you think about how unnecessary this agreement is in the first place and how little risk they will have if we take this approach, it just seems crazy to me for them to reject it and also complain about it. We are trying very hard to give them something they don't really need (and the lawyers on their side fully understand this) and we need to do it in a way where we are comfortable that we are not taking on an undue amount of risk. The most troubling aspect of the Pender decision is how it takes offense to the "null and void from inception" language – which means if what we do in an agreement like the one with Samsung doesn't work, but we won't be able to prevent all the damage that will have already been done. To me that alone justifies taking a more conservative approach in this situation. What would Samsung do if the roles were reversed? If their chipset management is upset, how could that hurt our relationship with the handset business, given how independent the two are? (At the meeting last week, Andrew went on and on about how the handset business guys treat the chipset business no differently from,

> When you think about how unnecessary this agreement is in the first place and how little risk they will have if we take this approach, it just seems crazy to me for them to reject it and also complain about it. We are trying very hard to give them something they don't really need (and the lawyers on their side fully understand this) and we need to do it in a way where we are comfortable that we are not taking on an undue amount of risk.

QUALCOMM BUSINESS SECRETS - HIGHLY CONFIDENTIAL                    GKFTC201400048882

ER Response Exhibit 74-3

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Samsung Never Stated That It Was Harmed By a Lack of An Agreement.



- **Samsung never stated:**

  - That it was having trouble selling chips or losing business because it does not have a patent agreement from Qualcomm for modem chips.

  - That potential chip customers asked for indemnification as to Qualcomm patents.

  - That it had any reason to fear being sued by Qualcomm for chip sales.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

54

## Qualcomm Negotiated for a Non-Exhaustive Chip-Level Patent Agreement



- **When Samsung insisted upon a written agreement, Qualcomm negotiated for a non-exhaustive agreement in good faith.**

- **From the start of negotiations, the parties always understood and expected that the agreement would be non-exhaustive.**

  - Samsung never insisted on an exhaustive license.

  - This point is critical.  The Examiner suggests that an exhaustive license is necessary for fair competition, but at the time of the negotiations, Samsung did not think so.

- **Qualcomm initially offered a covenant to exhaust remedies.**

  - Based on the law of patent exhaustion when negotiations began, a covenant to exhaust remedies was the best structure to honor the parties' intent that the agreement be non-exhaustive.

  - Samsung did not demand an exhaustive license during these negotiations.

- **There is no contemporaneous indication that Samsung took issue with any of the other provisions in the draft agreement.**

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Qualcomm Negotiated for a Non-Exhaustive Chip-Level Patent Agreement (Continued)



- **On June 14, 2013, an Administrative Law Judge at the ITC released to the public the <u>Nokia-HTC</u> decision, which impacted the agreement Qualcomm had been negotiating with Samsung.**

  - That decision increased the risk that a covenant to exhaust remedies to Samsung might be found to be exhaustive.

  - Even though both parties intended the agreement to be non-exhaustive, the agreement contained an important protection that it would be null and void from inception if found to be exhaustive.

  - A similar provision was not enforced in the <u>Nokia-HTC</u> decision.

- **Because of the increased uncertainty, Qualcomm proposed changing the form of the agreement.**

- **This is the same concern (i.e., the risk of a component customer arguing exhaustion) that led Samsung to exclude SEPs that it wanted to monetize through a device level licensing program from the covenants granted to Qualcomm in the parties' license agreement (see slide 42).**

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

56

## Qualcomm Proposed Changing the Form of the Agreement Due to the Risks Created by <u>Nokia-HTC</u>



◦ **Qualcomm's concerns about the decision in <u>Nokia-HTC</u> were not pretextual.**

◦ **We were concerned about the prospect that the agreement under negotiation could lead to exhaustion, as shown by emails Eric Reifschneider and I exchanged about the impact of the <u>Nokia-HTC</u> decision on the pending agreement with Samsung.**

ER Response Exhibit 74-3

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

57

# Qualcomm Proposed Changing the Form of the Agreement Due to the Risks Created by <u>Nokia-HTC</u>



- ○ **I explained those concerns to Dr. S. Ahn of Samsung in a June 25, 2013 email.**

From: Aberle, Derek
To: s.ahn@samsung.com
Sent: 6/25/2013 5:14:07 PM
Subject: Re: Issue

Dear Dr. Ahn,

Thank you for your e-mail. I understand your frustration. We are frustrated as well. We have all been devoting a significant amount of time and energy to try to close this agreement and we too want to get it done as soon as possible, but we need to ensure that we do so in a manner that adequately protects our business. It is unfortunate that the case law addressing exhaustion continues to evolve, making it difficult for companies to negotiate and enter into agreements that create certainty instead of uncertainty. We seem to have a different view regarding the recent ITC decision. I think it would be more productive to discuss that during a call rather than go back and forth on email about it.

Thank you for your e-mail. I understand your frustration. We are frustrated as well. We have all been devoting a significant amount of time and energy to try to close this agreement and we too want to get it done as soon as possible, but we need to ensure that we do so in a manner that adequately protects our business. It is unfortunate that the case law addressing exhaustion continues to evolve, making it difficult for companies to negotiate and enter into agreements that create certainty instead of uncertainty. We seem to have a different view regarding the recent ITC

very close to that. We dropped our request for coverage under the new agreement for our core components business,

I also trust that you understand that we only had a limited amount of time to digest the decision before the meeting last week. Based on the analysis we have done so far, we believe it is advisable to modify the terms we have been discussing. We thought we came up with a proposal that was both consistent with some of the options we discussed at our meeting in San Diego and that, although different, would be acceptable to Samsung. I think we may have a misunderstanding about certain points of the proposal and I believe that we should be able to work through the issues raised by you and your team.

happens in almost all cases. I think we can also look at expanding to some extent what would constitute "diligent efforts" on our part.

I will be travelling in Europe the remainder of this week and it will be difficult for me to have a call. I suggest that we have a call the week of July 1st to discuss our respective views. I can also be available to meet with you on July 18th in San Diego. Finally, I will be coming to Korea on July 29th and 30th and will make time to meet then as well if needed. Let me repeat that our goal is the same as yours: to get the agreement done as soon as possible. I believe that we can do that by the end of July.

QUALCOMM BUSINESS SECRETS - HIGHLY CONFIDENTIAL                QKFTC201400036173

# Qualcomm Offered Samsung a Standstill with Release Agreement



- Qualcomm remained willing to enter a non-exhaustive chip-level patent agreement with Samsung even after the <u>Nokia v. HTC</u> decision.

- We proposed changing the form of the agreement to a standstill with conditional release.

- The standstill with conditional release agreement would have provided Samsung with the contractual assurances it sought from Qualcomm.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

# Qualcomm Offered Samsung a Standstill with Release Agreement (Continued)



- **Qualcomm remained willing to negotiate the terms of the agreement with Samsung. As a starting point, Qualcomm proposed that:**

  - Qualcomm would agree not to pursue any claims against Samsung until 90 days from the day on which royalties became due on a device using a Samsung modem chip.

  - Qualcomm would release any claims against Samsung upon the payment of royalties to Qualcomm by the purchaser of the Samsung modem chips.

  - Because the due date for royalties is generally 30-60 days from the purchase, virtually all licensees would have paid their royalties before the 90-day standstill expired.



Qualcomm Confidential and Proprietary – Confidential Treatment Requested

60

## Qualcomm Offered Samsung a Standstill with Release Agreement (Continued)



- Even in the rare case where the purchaser did not pay their royalties on time, Qualcomm's forbearance policy provided Samsung with assurance that Qualcomm could not bring infringement claims against Samsung without undermining its practice of licensing only at the device level.

- Qualcomm was willing to continue discussions to reach an agreement acceptable to both parties, but Samsung walked away from the negotiations.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested

61

# Samsung Actively Sells Modem Chips Without Any Agreement from Qualcomm



- **Even though Samsung stopped negotiating for a component-level patent agreement from Qualcomm, it nevertheless sells modem chips to third parties.**

- **Qualcomm has never threatened to assert patents against Samsung for that activity.**

- **Samsung has not achieved greater success in the modem chip market because:**

  – Samsung's modem chips are not as competitive as Qualcomm's or certain competitors.

  – Samsung competes directly with other handset makers that buy modem chips. Companies don't like to buy from their competitors if they can avoid it, and there are many alternatives to Samsung's chips available in the market.

Qualcomm Confidential and Proprietary – Confidential Treatment Requested