**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE QUALCOMM INCORPORATED SECURITIES LITIGATION | No. 17-cv-0121-JO-MSB |

**EXPERT DECLARATION OF BRUCE G. BERNSTEIN**

**Table of Contents**

I.   Assignment ........................................................................................................1

II.  Professional Credentials and Qualifications .........................................................3

III. The Customary Practice in the Cellular Communications Industry Is and Has
     Been for Licensors of Large, Diverse Patent Portfolios to License End-User
     Devices...............................................................................................................5

     A.   Licensing at the End-User Device Level Is the Longstanding Cellular
          Communications Industry Norm. .............................................................6

     B.   End-User Device-Level Licensing Developed and Has Persisted in the
          Cellular Communications Industry Because It Is Practical and Efficient
          and Because Patent Holders Believe It Appropriately Compensates Them. .........14

          i.    End-User Device-Level Licensing Is Practical and Efficient. ..................14

          ii.   Patent Holders Prefer Licensing and Assessing Royalties at the
                End-User Device Level Because It Appropriately Reflects the
                Value of Their Patents. .............................................................18

IV.  Patent Holders Cannot (Without Substantial Risk) License the Same Patents at
     Multiple Levels in the Supply Chain. ...............................................................20

V.   Those Familiar With the Cellular Communications Industry Would Understand
     That Qualcomm's Practice Was To Not License Chip Manufacturers
     Post-*Quanta*. ....................................................................................................26

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

## I.     ASSIGNMENT

1.     I have been retained as an expert on patent licensing in the cellular communications industry by the law firm of Cravath, Swaine & Moore LLP, counsel to Qualcomm Incorporated ("Qualcomm") and the individual defendants (with Qualcomm, "Defendants"), in the consolidated class action matter, *In re Qualcomm Incorporated Securities Litigation*, Case No. 3:17-cv-00121 (S.D. Cal.) (the "Litigation").  Specifically, I have been asked to provide expert testimony regarding the following questions:

- In the cellular communications industry, at what point or points in the supply chain have licensors of large, diverse portfolios of patents, including standard essential patents ("SEPs"), customarily licensed their patents, and what factors led to that practice?

- Can patent holders license the same patents at multiple levels in the supply chain, for example by licensing an end-user device maker and also licensing the suppliers of components used to make the end-user device?

- How would one familiar with the licensing of patents, including SEPs, in the cellular communications industry interpret certain of Qualcomm's public statements regarding its licensing program and what would such a person conclude regarding whether Qualcomm's practice was to only license manufacturers of end-user devices, *e.g.*, handset original equipment manufacturers ("OEMs"), and to not license the suppliers of intermediate components (such as chipsets) used to make those end-user devices?

2.     In short, as I explain below, I answer these questions as follows.  In my opinion:

- In the cellular communications industry, licensors of large, diverse portfolios of patents, including SEPs, have customarily licensed their patents only at the device level, because it is practical and efficient and because the licensors believe it most appropriately compensates them for the use of their patented innovations.

- Since at least 2008, patent holders in the cellular communications industry cannot viably license the same patent at multiple levels of the end-user device supply chain without running the significant risk of unintentionally exhausting the licensor's patent rights as to the end-user device and losing the ability to obtain royalties based on the sale of the end-user device.

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

- • Anyone following or otherwise familiar with patent licensing in the cellular communications industry would have understood that Qualcomm's public statements made between 2012 and 2017 regarding its licensing program were referring to Qualcomm's practice of only licensing manufacturers of end-user devices, *e.g.*, handset OEMs, and that Qualcomm did not license its patents to the suppliers of components used to make those end-user devices, *e.g.*, cellular chipset suppliers.

3.      This declaration explains my basis for the opinions outlined above.  I have

endeavored to do so succinctly by focusing on key considerations.  In preparing this declaration

and reaching the opinions outlined below, I have relied on my extensive experience with patent

licensing and patent-related investments, particularly in the cellular communications industry;

independent research and analysis of publicly available information; and my review of various

documents and pleadings from the Litigation.  The complete list of data, materials, and other

information that I have relied upon in preparing this declaration is presented in Exhibit A.

Certain of these materials are collected for convenience in Appendix 1.

4.      A copy of my curriculum vitae is attached as Exhibit B.  I am being compensated

for my time in this matter at a rate of $695 per hour.  No compensation is contingent upon the

outcome of this class certification motion.

5.      The opinions expressed in this declaration are based on information available to

me at this time.  I offer the opinions in this declaration solely in connection with Defendants'

opposition to Plaintiffs' motion for class certification.  I reserve the right to revise or supplement

my opinions if any additional information makes that appropriate, to respond to any opinions

offered by Plaintiffs or their experts retained in this litigation, or to correct any inadvertent

errors.  My work in this matter is ongoing, and I reserve the right to address these or other issues,

or to amend or supplement these opinions, at later stages of this litigation.

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

## II.   PROFESSIONAL CREDENTIALS AND QUALIFICATIONS

6.      I have been actively involved in the business of patent licensing since 1997, and I have extensive experience licensing and investing in large, diverse portfolios of patents, including SEPs, and patent applications (and in some cases, patent applications that have not yet been filed or even drafted) related to the cellular communications industry.  Throughout the course of my career, I have negotiated and/or overseen nearly $1 billion in aggregate patent licensing deals and patent-related investments, the majority of which were in the cellular communications industry.

7.      In addition, I have been a practicing U.S. patent lawyer since 1992, both in private practice and as in-house counsel, in which capacities I have represented patent licensors and patent licensees; have represented small, medium, and large companies in connection with patent licensing matters; and have been directly involved with negotiating numerous patent license agreements involving patent portfolios of various sizes.

8.      I hold a Bachelor of Science in Electrical Engineering from the University of Pennsylvania and a Juris Doctor from the American University, Washington College of Law.  I am also a registered U.S. patent attorney.

9.      During law school, I practiced as a U.S. patent agent and student associate from 1989-1992 at the law firm of Finnegan, Henderson, Farabow, Garrett & Dunner LLP.  After obtaining my law degree in 1992, I practiced as a patent lawyer—at the firms Finnegan, Henderson, Farabow, Garrett & Dunner LLP, Dickstein Shapiro LLP, and Morgan, Lewis & Bockius LLP—until 1997.

10.      In 1997, I joined BTG International Inc., which at the time was a leading, global intellectual property and technology commercialization company focusing on both physical and

3

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

life sciences technologies,[1] as Vice President, Head of Patents.  During my tenure at BTG, I was a member of the company's executive team and was responsible for managing a group of U.S. and U.K. patent professionals (attorneys and staff) in support of BTG's physical sciences business.  In that capacity, I developed global intellectual property licensing strategies for the company and its partners and negotiated and closed several multi-million-dollar intellectual property licensing and development agreements.

11.     In 2005, I joined InterDigital, Inc., as Chief Intellectual Property and Licensing Officer and General Patent Counsel.  InterDigital was and continues to be a holder of one of the most significant patent portfolios (including SEPs) in the cellular communications industry.  During my tenure at InterDigital, I managed the company's patent and licensing business and negotiated and closed licensing deals valued in excess of $700 million.

12.     In 2008, I joined Coller Capital, one of the largest global investors in the private equity secondary market, as an Investment Principal and Chief Patent Counsel.  During my tenure at Coller, I negotiated and closed IP investment transactions, several of which involved patents related to the cellular communications industry.

13.     In 2012, I joined Bluestone Innovations, an intellectual property management and commercialization company, where I continue to serve as the company's Chief Operating Officer and General Counsel.  In those capacities, I manage the company's patent monetization (*e.g.*, patent sales and licensing) and litigation activities.

14.     Also in 2012, I founded The Law Office of Bruce G. Bernstein PLLC, of which I am the sole member.  In that capacity, I provide patent-related legal and business advice and

---

[1] BTG has since decided to focus only on life sciences technologies and specialty pharmaceuticals, and was acquired in 2019 by Boston Scientific before being divested and acquired in 2021 by a European specialty pharmaceutical group.

DocuSign Envelope ID: 6CDBC2C8-6FG5-484B-9522-706F450A1388

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

services, including advice and services regarding patent investments, monetization, and portfolio development.  I also manage patent licensing and litigation programs (both offensive and defensive) for my clients.

15.  From 2013-2021, I served as President of the Trustee of Signal Trust for Wireless Innovation.  Signal Trust was established by InterDigital to monetize a large portfolio of more than 500 of InterDigital's patents and patent applications (including SEPs) related to cellular infrastructure and handsets.  In that capacity, I led the Trust's patent monetization efforts and was directly involved in multiple licensing negotiations.

16.  Recently, I became a licensing executive at IdeaHub, a Korea-based company focused on bringing value to, and realizing value from, intellectual property, including patents (many of which are SEPs related to the cellular communications industry).  I also serve as President of an IdeaHub affiliate that focuses on licensing a large portfolio of patents including SEPs related to wireless communications.

17.  Through work at IdeaHub and Bluestone, consulting, and my law practice, I am actively involved with patent licensing and, in particular, licensing large, diverse portfolios (including SEPs) in the cellular communications industry.  I also keep up to date on current licensing practices as they pertain to the cellular communications industry and SEPs in general.

## III.  THE CUSTOMARY PRACTICE IN THE CELLULAR COMMUNICATIONS INDUSTRY IS AND HAS BEEN FOR LICENSORS OF LARGE, DIVERSE PATENT PORTFOLIOS TO LICENSE END-USER DEVICES.

18.  I have been asked to address what the customary practice is of licensors of large, diverse portfolios of patents, including SEPs, in the cellular communications industry with respect to the point in the supply chain at which they license their patents, and the factors that led to that practice.

DocuSign Envelope ID: 6CDBC2C8-6FG5-484B-9522-706F4B0A1388

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

19.     In Part A of this section, I explain that it is and has been the longstanding, well-known, and customary practice in the cellular communications industry to license at the end-user device level.  In Part B of this section, I explain the factors that led to this customary practice and why it has persisted.

**A.     Licensing at the End-User Device Level Is the Longstanding Cellular Communications Industry Norm.**

20.     Based on my experience in the cellular communications industry, and as set forth below, it is my opinion that, for owners of patent portfolios, especially owners of large, diverse patent portfolios that include SEPs—such as Qualcomm, InterDigital, Nokia, and Ericsson—the longstanding practice has been (and continues to be) to license their portfolios at the end-user device level, *i.e.*, to license the OEMs of mobile handsets, such as Apple, Samsung, LG, Huawei, and Lenovo (or their respective contract manufacturers), using the end-user device price as the royalty base.  This is in contrast to a practice (which, in my opinion, has never been customary in the cellular communications industry) of licensing at the component level, *i.e.*, licensing the manufacturers of the chipsets and/or other components that go into making the completed mobile handsets, and is likewise in contrast to a practice (which, again, in my opinion, has never been customary in the cellular communications industry) of assessing royalties using a royalty base other than the end-user device price.  While it is theoretically possible to license at one level of the supply chain and use a royalty base from a different level of the supply chain (*e.g.*, to license at the component level and assess royalties based on the end-user device price, or vice versa), the known and customary practice in the cellular communications industry is (and has been) to license and assess royalties at the same level of the supply chain, in particular, at the end-user device level.

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

21.    End-user device level licensing has been the norm for the cellular communications industry since its very early days.  For example, when the GSM standard[2] was first developed and went into commercial production in the early 1990s, Motorola, Ericsson, Nokia, and Siemens were among the major holders of the SEPs required to implement GSM cellular communications.  They were also among the major manufacturers of cellular handsets implementing that technology.  Motorola was one of the first SEP holders to develop a licensing program for its GSM SEPs.  In its licensing program, Motorola licensed other GSM handset makers and used the price of the handset as the royalty base.[3]  The other major GSM SEP holders at that time also had similar licensing programs.[4]  Qualcomm, which developed the CDMA cellular standard and began its licensing program in 1993, followed the industry standard and likewise licensed its CDMA SEPs to makers of CDMA handsets and used the price of the handset as the royalty base.[5]

22.    This practice of licensing at the end-user device level (and charging royalties based on the price of the end-user device) has continued through successive generations of cellular communications technology to the present day.[6]  Industry publications, for example,

---

[2] GSM, which was based on TDMA technology, was one of two cellular standards (the other being CDMA) used for the second generation ("2G") of mobile cellular technology (2G was the first technology to be based on digital radio signals, rather than analog radio transmissions).

[3] *See* Marvin Blecker, Tom Sanchez and Eric Stasik, *An Experience-Based Look At The Licensing Practices That Drive The Cellular Communications Industry:  Whole Portfolio/Whole Device Licensing*, 51 les Nouvelles 221 (Dec. 2, 2016), at 222, 230 [hereinafter, "*Licensing Practices That Drive The Cellular Communications Industry*"].

[4] *Id.* at 230-31.

[5] Presentation of Qualcomm (Derek Aberle) to the KFTC, "Qualcomm's SEP Licensing Practices and Overview of Select Negotiations" (Aug. 17, 2016), at slide 10 (noting that "[t]he entire industry follows the same practice of exhaustively licensing the manufacture and sale of complete devices" and that "[t]his practice began before Qualcomm started licensing its patents"); *Licensing Practices That Drive The Cellular Communications Industry*, at 230 & n.34.

[6] *E.g.*, *In the Matter of Certain Electronic Devices, Commission Opinion*, Inv. No. 337-TA-794, at n. 19 (Int'l Trade Comm'n July 5, 2013), at 60 n.19 ("[T]he record supports a conclusion that a common industry practice is to use the end user device as a royalty base."); David J. Teece & Edward F. Sherry, *On the 'Smallest Saleable Patent Practicing Unit' Doctrine:  An Economic and Public Policy Analysis* (Jan. 20, 2016), at 11 ("In the cellular communications industry, it is common practice to license at the device level (cellphones and base stations), rather than at either the chipset or cellular service provider levels. Royalties are typically calculated based on the selling prices of the licensed

---

7

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

catalog that at least 29 significant cellular industry licensors—including Qualcomm, InterDigital, Nokia, and Ericsson—license their 3G and 4G cellular SEPs at the end-user device level and charge royalties based on the end-user device price.[7]   Indeed, this end-user device level licensing remains the industry wide practice in the present generation (5G) of cellular communications technology.[8]

---

products, rather than as a percentage of the selling price of either chipsets or cellular service. . . .   It is conceptually possible to have a license at any level in value chain with a royalty base set at a different level in the value chain (e.g., licensing at the device level, with the royalty base calculated on chipset prices), but we have never seen such a license."); Bertram Huber, *Why the ETSI IPR Policy Does Not and Has Never Required Compulsory "License to All": A Rebuttal to Karl Heinz Rosenbrock* (Sept. 15, 2017), at 4 ("ETSI enacted its current IPR Policy in 1994, and has not altered its terms in any material way since that time.  When the Policy was formulated, the prevailing industry practice was for manufacturers of complete end-devices (e.g. handsets, infrastructure equipment) to negotiate and enter into any necessary licenses to the essential patents practiced in those end-devices.  The manufacturers of electronic components generally would not in-license essential IPRs.  Instead, the component manufacturers would sell their products (i.e. chipsets) to the manufacturers of end-products without agreeing to indemnify the end-product manufacturers for any infringement of third party patents.  This continues to be the prevailing industry practice today."); Keith Mallinson, *Busting Smartphone Patent Licensing Myths*, Center for the Protection of Intellectual Property, George Mason School of Law (Sept. 2015), at 4 ("Virtually every IP rightholder in the cellular communications industry that publicly reveals information about its licensing requirements, including EU companies (Alcatel-Lucent, Ericsson, Nokia, Siemens), North American companies (InterDigital, Motorola, Nortel, Qualcomm), and Chinese companies (Huawei, ZTE), has publicly stated in recent years that its mobile standard-essential patent (SEP) licensing rates are based on a percentage of the entire handset price . . . .  Licensing on this basis is a long-standing practice and was widely recognized since the introduction of 2G GSM, as noted by the International Telecommunications Standards User Group in 1998 and in 2G and 3G standards by several other observers including PA Consulting Group (2005), Credit Suisse First Boston (2005), and ABI Research (2007).").

[7] *Licensing Practices That Drive The Cellular Communications Industry*, at 231 ("Based on a review of publicly available disclosures, including regulatory filings, documents produced in litigation and press releases, the following 29 major licensor companies (listed in order of the number of declared SEPs) continue to license their 3G and 4G SEPs at the device level and use the device price as the royalty base: Qualcomm, InterDigital, Nokia, Ericsson, Motorola, Samsung, Huawei, Panasonic, NEC, Sharp, NTT, Siemens, ZTE, Apple, Alcatel-Lucent, Nortel Networks, Mitsubishi Electric, Dolby Laboratories, Fujitsu, Toshiba, Infineon, Wi-Lan, Thomson Licensing, AT&T, Deutsche Telekom, Vringo, Hewlett-Packard, SK Telecom, Telecom Italia."); *see also* Erik Stasik, *Royalty Rates And Licensing Strategies For Essential Patents on LTE (4G) Telecommunication Standards*, 45 les Nouvelles 114 (Sept. 2010), at 114-16 (noting that Alcatel-Lucent, Ericsson, Huawei, Motorola, Nokia, Nortel, Qualcomm, and ZTE all stated that they would use the device price as the royalty base in their 3G license agreements).

[8] Erik Stasik & David L. Cohen, *Royalty Rates And Licensing Strategies For Essential Patents On 5G Telecommunication Standards:  What To Expect, Patents on 5G Telecommunication*, 55 les Nouvelles 176 (Sept. 2020), at 177-80 (detailing whole-device licensing practices of Ericsson, Nokia, Qualcomm and InterDigital).

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

23.     The practice of licensing end-user devices in the cellular communications industry is well known in the industry and has been repeatedly (and publicly) confirmed by significant holders of major patent portfolios, including Qualcomm, Ericsson, Nokia, and InterDigital.[9]

24.     Ericsson, for example, has frequently stated that it licenses at the end-user device level and that this practice is the industry norm.  In public submissions to the Institute of Electrical and Electronics Engineers ("IEEE"), a standard setting organization, Ericsson has stated that "current" and "long time industry practice" is to license OEMs.[10]  Similarly, in a 2016 presentation given at a public hearing[11] before Korean competition authorities, Ericsson's then-Head of IPR Legal Services confirmed that Ericsson licenses its cellular SEPs only at the OEM level, that "OEM licensing in the industry has a long history," that Ericsson's practice of OEM licensing dates back "from the early-mid 1990s," and that Ericsson does not license its SEPs to chipset manufacturers.[12]  And Ericsson has publicly explained in litigation over its patents that Ericsson's "policy, which . . . is the main practice in [the] industry, is to license end-user

---

[9] Qualcomm Licensing Webpage, https://www.qualcomm.com/licensing ("Our portfolio includes foundational cellular essential patents that led 3G, 4G, and 5G, respectively, and valuable implementation inventions that make cellular commercialization viable. . . .  Our unmatched portfolio of inventions includes over 140,000 granted and pending patents . . ."); Ericsson IPR and Licensing Press Backgrounder, https://www.ericsson.com/en/patents/presskit ("Ericsson has the industry's leading cellular patent portfolio, and a total of more than 60,000 granted patents worldwide."); Nokia Patent Licensing Webpage, https://www.nokia.com/licensing/patents ("[W]e have created one of the broadest and strongest patent portfolios in the communications industry[,] . . . [with] ~20,000 patent families . . ."); InterDigital Portfolio Data Webpage, https://www.interdigital.com/portfolio-data ("InterDigital's overall portfolio, and specifically, our portfolio of wireless patents and applications, is among the largest in the world. As of January 31, 2022, our overall portfolio included approximately 27,500 patents and applications worldwide.").

[10] Comments of Ericsson to the IEEE Ad Hoc Committee (Third Comment Disposition Report) (May 10, 2014), at 32 (stating that proposed standard amendment that would require component-level licensing "contradicts the current industry practice of licensing at the device level" and "attempts to change this long time industry practice.").

[11] Declaration of Christopher Longman in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (July 20, 2022) ("Longman Decl.") ¶ 13.

[12] Presentation to the KFTC of Christina Petersson (Ericsson Head of IPR Legal Services), *FRAND IPR Policies and Applicable Licensing Practices* (Sept. 5, 2016), at slide 3 ("Ericsson currently has more than 100 license agreements with OEMs in place."), slide 7 ("Ericsson has not out-licensed its 4G essential patent portfolio to any chipset supplier[.]"), slide 11 ("Ericsson has over 100 licenses in place with other OEMs, covering both parties' patent portfolios and both parties' sale of end user devices ... OEM licensing in the industry has a long history.  Ericsson has agreements from the early-mid 1990s (originally with players like Nokia, Siemens, Alcatel, Motorola, Lucent).").

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

products,"[13] and that Ericsson's "policy of a number of years [is] to license the makers of end-user products but not chipmakers."[14]

25.     Nokia has likewise publicly confirmed on many occasions that it follows this industry norm by licensing OEMs rather than component makers.  Nokia has indicated in SEC filings that it targets OEMs, stating for instance that its patent licensing strategy consists of "renewing existing license agreements, and negotiating new license agreements with mobile device manufacturers."[15]  In an amicus brief filed in 2013, Nokia explained that patents are not licensed to component makers, but rather "are typically licensed at the end user device level."[16] And in trial testimony given in 2019, Nokia's Head of Standards Policy (and the Chairman of the board of the European Telecommunications Standard Institute ("ETSI"), a standard setting organization) explained that Nokia upholds its FRAND licensing obligations by "licensing its patents on the [end-user] device level" and that that practice is shared by all members of ETSI.[17] Nokia has consistently explained that the "prevailing and longstanding industry understanding," shared by Nokia, is that "licensing only at the end-user product level [is] permitted."[18]  In a public comment to a draft change to the IP policies of the IEEE, Nokia again underscored that

[13] Testimony of Gustav Brismak (Ericsson Chief Intellectual Property Officer), in *Ericsson v. D-Link Systems* (June 12, 2013) at 148:24-149:11.
[14] *Id.* at 148:8-16 (confirming that Ericsson has a "policy of a number of years to license the makers of end-user products but not chip makers" and opining that this policy is consistent with Ericsson's FRAND commitments).
[15] Nokia Corporation, Annual Report (Form 20-F) at 42 (Mar. 23, 2017).
[16] Amicus Brief of Nokia, filed in *Apple v. Motorola* (Fed. Cir.) (May 6, 2013) at 14-15 ("They [patents] are typically licensed at the end user device level.  Standards-essential patent holders in the telecommunications space do not typically license or have any obligation to license component makers[.]")
[17] Testimony of Dirk Weiler (Nokia Head of Standards Policy), in *FTC v. Qualcomm* (Jan. 22, 2019), at 1672:5-14, 1673:25-1674:17 (explaining Nokia's practice of device-level licensing and adding, "What is my understanding of the industry practice is that in the case of the cellular business [FRAND] means that these companies license, for example, the handset and not any part of this [sic] handset.").
[18] Amicus Brief of Nokia, filed in *FTC v. Qualcomm* (9th Cir.) (Aug. 30, 2019) at 16-17.

DocuSign Envelope ID: 6CDBC26A-6FCF-4B4B-8522-706F4B0A1388

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

end-user device-level licensing is the longstanding industry custom, stating that end-user device level licensing has been the "well established practice through IEEE history."[19]

26.    Qualcomm too has made its practice of licensing OEMs rather than component makers known to the public.  For example, in a 2013 prepared statement before the U.S. Senate, Qualcomm General Counsel Donald Rosenberg explained that end-user device-level licensing "has long been the industry norm."[20]  Similarly, Eric Reifschneider, Qualcomm Senior Vice President and General Manager of Technology Licensing, stated in a 2013 public presentation to fellow licensing executives that Qualcomm licenses "equipment manufacturers" while chipset suppliers, on the other hand, are "outside [Qualcomm's] standard licensing program."[21]  And Qualcomm's SEC filings explain that it licenses and seeks royalties from the OEMs—and that any agreements it reaches with component makers contain language preserving its ability to seek licensing royalties from OEMs.[22]  Qualcomm has also publicly defended the device-level licensing practices of other SEP holders as sensible and FRAND-compliant.[23]  And, in public

---

[19] Comments of Nokia to the Ad Hoc of the Patent Committee (PatCom) of the IEEE-SA Standards Board (Second Comment Disposition Report) (Mar. 4, 2014), at 27.

[20] Supplemental Prepared Statement of Donald J. Rosenberg (Executive President, General Counsel, and Corporate Secretary of Qualcomm Inc.), in response to the July 30, 2013 hearing on "Standard Essential Patents and Antitrust Law" before the Antitrust, Competition and Consumer Rights Subcommittee of the Senate Judiciary Committee (submitted Sep. 3, 2013) at 4-5 ("First, at least in the 3G/4G wireless communications sector, it is and has long been the industry norm for substantial patent holders to license at the level of complete standard-compliant devices, not parts and components.") [hereinafter "Rosenberg Supplemental Prepared Statement"].

[21] Presentation of Eric Reifschneider (Senior VP & General Manager, Qualcomm Technology Licensing), to High Technology Sector Committee of the Licensing Executive Society, "The Qualcomm Technology Licensing Program and the Licensing of Standard-Essential Patents" (Feb. 20, 2013) at slides 17-18.

[22] Qualcomm Inc., 2016 Annual Report (Form 10-K) at 11 (Nov. 2, 2016) ("In every case, these agreements [with chipset makers] expressly reserve the right for QTL to seek royalties from the customers of such integrated circuit suppliers with respect to such suppliers' customers' sales of CDMA-, WCDMA- and OFDMA-based wireless devices into which such suppliers' integrated circuits are incorporated."); *see also* Qualcomm Inc., 2010 Annual Report (Form 10-K) at 8 (Nov. 3, 2010); Qualcomm Inc., 2012 Annual Report (Form 10-K) at 8 (Nov. 7, 2012); Qualcomm Inc., 2013 Annual Report (Form 10-K) at 6 (Nov. 6, 2013); Qualcomm Inc., 2014 Annual Report (Form 10-K) at 7 (Nov. 5, 2014); Qualcomm Inc., 2015 Annual Report (Form 10-K) at 11 (Nov. 4, 2015)

[23] Amicus Brief of Qualcomm, filed in *Ericsson v. D-Link Systems* (Fed. Cir.) (Mar. 12, 2014) at 27-31.

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

hearings before the KFTC in 2016,[24] Qualcomm President Derek Aberle showed slide presentations that explained that "Qualcomm's licensing structure is normal industry practice," "[t]he entire industry follows the same practice of exhaustively licensing the manufacture and sale of complete devices,"[25] Qualcomm has "consistently used the net selling price ('NSP') of cellular handsets as the royalty base in device-level licenses and has[] [n]ever licensed exhaustively the manufacture and sale of modem chipsets," and "[a]ll major cellular SEP holders follow similar practices of licensing at the device level using the NSP of complete devices as the royalty base."[26]

27.    InterDigital, whose large SEP licensing program I oversaw for several years, similarly licenses at the end-user device level and considers that practice to be standard in the telecommunications industry.  For years, InterDigital's public annual reports have indicated that the company licenses OEMs and targets OEMs as new licensees.[27]

---

[24] Longman Decl. ¶¶ 9, 14.

[25] Presentation of Qualcomm (Derek Aberle) to the KFTC, "Qualcomm's SEP Licensing Practices and Overview of Select Negotiations" (Aug. 17, 2016) at slide 10 (collecting list of "Other SEP holders following the same practice of exhaustively licensing only at the device level includ[ing]:  Alcatel-Lucent, Ericsson, Huawei, Motorola, Nortel, Nokia, Nokia-Siemens Networks, Samsung, ZTE").  Qualcomm also publicly stated its position that licensing OEMs is standard practice in the industry in a press release announcing the KFTC investigation.  Qualcomm Press Release, "Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report" (Nov. 17, 2015) at 1-2 ("Our patent licensing practices, which we and other patent owners have maintained for almost two decades . . . are lawful and procompetitive.  Device-level licensing is the worldwide industry norm[.]").

[26] Presentation of Qualcomm (Derek Aberle) to the KFTC, "Response to Presentation by Interested Third Parties" (Nov. 9, 2016) at slides 13-14.

[27] E.g., InterDigital, Inc., 2015 Annual Report (Form 10-K) at 5 (Feb. 18, 2016) ("We believe that companies making, importing, using or selling products compliant with the standards covered by our patent portfolio, including all manufacturers of mobile handsets, tablets and other devices, require a license under our patents. . . . We have successfully entered into license agreements with many of the leading mobile communications companies globally, including Samsung Electronics Co., Ltd. ('Samsung'), Sony Corporation of America ('Sony'), Kyocera Corporation ('Kyocera'), HTC Corporation and BlackBerry Limited, among others."); InterDigital, Inc., 2011 Annual Report (Form 10-K) at 13 (Feb. 27, 2012) ("We intend to expand our licensing revenue base by aggressively pursuing the remaining mobile device manufacturers that are not covered by our patent license agreements and by pursuing licensing revenue in adjacent markets, such as wireless consumer electronics, mobile infrastructure, over-the-top services and operator services."); InterDigital, Inc., 2009 Annual Report (Form 10-K) at 17 (Feb. 26, 2010) ("Currently, numerous manufacturers supply digital cellular equipment conforming to 2G, 3G, and WiMax Standards

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

28.     The well-established and public nature of the practice of licensing at the end-user device level in the cellular communications industry is further evidenced by the fact that several related industries have developed to support the practice.  For example, there are numerous companies that specialize in producing market reports, intelligence, and analytics regarding sales of handsets and other cellular end-user products.  Market reports from these companies (including, among others, ABI Research, IDC, and Gartner) regarding handset sales and prices are nearly universally used by companies (both patent holders and prospective licensees) engaged in patent licensing and royalty negotiations in the cellular communications industry.  In addition to these market intelligence firms, there has also arisen an array of specialized consulting and analytics firms—including IPlytics, RCR Wireless News, Foss Patents, 4iP Counsel, IAM Media, and others—that focus on patent licensing in the cellular industry (especially situations involving SEPs).  Like the market reports, the consulting and analytics provided by these firms are used by both patent holders and prospective licensees (and even courts throughout the world) during licensing negotiations and litigation and, again, the focus is on the end-user product, *e.g.*, cellular handset, as being what is licensed and on which royalties are to be paid.[28]

---

and are starting to supply digital cellular equipment conforming to LTE Standards.  We believe that any of those companies that use our patented inventions will require licenses from us.").

[28] *E.g.*, *Unwired Planet Int'l Ltd. v. Huawei Techs. Co.* [2017] EWHC (Pat) 711 (Eng. & Wales) at 176, 261-72 (The court relied heavily on market prices, royalty rebate reports from individual companies, and market figures from each party's respective expert reports *made by consultancies* (FTI Consulting, Oxera Consulting, Cosmos Communications Consulting) in creating a benchmark figure for the FRAND dispute.  Further, the court recognized that arguments from both sides for acceptable FRAND rates were derived from global SEP portfolio rates, relying on publicly available data and market intelligence from consultancies); European Commission, *EU Commission Publishes Landscaping Study on SEPs by IPlytics*, IPLYTICS, at 18 (2016), *available at* http://www.iplytics.com/general/eu-commission-publishes-landscaping-study-seps-iplytics/ (IPlytics study commissioned by DG GROW Unit F. 5, European Commission).

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

     **B.**     **End-User Device-Level Licensing Developed and Has Persisted in the Cellular Communications Industry Because It Is Practical and Efficient and Because Patent Holders Believe It Appropriately Compensates Them.**

     29.     In Part 1 of this subsection, I explain the practical and efficiency benefits associated with end-user device level licensing.  In Part 2, I explain that licensors seek to license at the end-user device level because, in addition to the efficiency and practicality benefits identified in Part 1, in their view it appropriately compensates them for the use of their patented inventions.

     **i.**     **End-User Device-Level Licensing Is Practical and Efficient.**

     30.     As described above, I have personally negotiated scores of license agreements for diverse portfolios that include numerous (sometimes tens of thousands) of patents, including SEPs, in the cellular communications industry.  In my experience, the licensing of large, diverse patent portfolios can be a difficult, time consuming, and expensive endeavor.  It is not atypical for license negotiations to span several years and require litigation in multiple jurisdictions across the globe.  In addition, an experienced staff of professionals, including technical experts, business executives, and legal counsel, is required.  Thus, when devising a licensing strategy, the patent holder needs to consider not only how it is going to recoup (and hopefully make a profit on) the investment it made to develop the patented technology and secure patent protection, but it must also consider the costs associated with licensing (and possibly litigating) the patents, the amount of time it may take to secure licenses, and the efforts/costs associated with managing and monitoring its license agreements once consummated (*e.g.*, to ensure compliance by its licensees and negotiate renewals).

     31.     As detailed below, the practice of licensing at the end-user device level developed and has persisted in the cellular communications industry in part because holders of large,

14

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

diverse patent portfolios (including SEPs) find it most practical and efficient to license their portfolios in this manner for at least the following reasons.[29]

32. First, licensing at the end-user device level concentrates all of the expense and effort associated with licensing negotiations (described above) at a single, logical point in the supply chain (*e.g.*, the OEM level) and provides the most certainty as to whether the most "appropriate" entity is being licensed and paying the royalty.[30] The end-user device is the most complete product in the supply chain, and therefore by definition practices the most patents relative to any individual component included in the device. In particular, the end-user device practices all patents practiced by any of its constituent components, as well as many patents that can be practiced *only* by multiple components working together (often with attendant software and/or operations performed when the device is in use), as opposed to by the individual components themselves.[31] Critically, because complete handsets practice patents that individual components cannot, but not vice versa, making licenses available to component manufacturers (such as chipset manufacturers) would not eliminate the need for licensors also to license at the handset level—it would simply fragment the licensing process and introduce a need to negotiate

---

[29] *See generally* Amicus Brief of Nokia, filed in *FTC v. Qualcomm* (9th Cir.) (Aug. 30, 2019); Amicus Brief of Dolby Laboratories, filed in *FTC v. Qualcomm* (9th Cir.) (Aug. 30, 2019); Bertram Huber, *Why the ETSI IPR Policy Does Not and Has Never Required Compulsory "License to All": A Rebuttal to Karl Heinz Rosenbrock* (Sept. 15, 2017) at 10 ("a system where essential IPR holders are required to license at all levels of the ecosystem [in contrast to end-user-licensing] would be highly inefficient and unfair to essential IPR owners").

[30] Amicus Brief of Nokia, filed in *FTC v. Qualcomm* (9th Cir.) (Aug. 30, 2019) at 18-19 ("There are good reasons for SEP owners to structure their licensing programs to license end-user products," including the reduction of "transaction costs and complexities associated with negotiating and executing licenses at multiple points in the supply chain" and the avoidance of "overlapping and duplicative licensing."'); Amicus Brief of Dolby Laboratories, filed in *FTC v. Qualcomm* (9th Cir.) (Aug. 30, 2019) at 28 ("Forcing SEP holders to license component suppliers would interfere with historical precedents and established practices, and produce significant inefficiencies[.]").

[31] *See, e.g.*, Jean-Sébastien Borghetti, Igor Nikolic & Nicolas Petit, *FRAND Licensing Levels under EU Law*, European Competition Journal (Feb. 5, 2020), at 16 ("[R]eal life cases show a more complex picture: SEPs' claims are not confined to a single component, but are related to a combination of multiple components, final downstream products and even networks.")

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

licenses at multiple levels of the supply chain and add significant risk to the licensor, as detailed below.  This piecemeal licensing approach would be less efficient and add considerable cost and complexity to the licensing process. To add even further complexity to the situation, in cases where a patent portfolio includes pending patent applications, the scope of which might not be known until years after a license agreement has been entered into, it would be extremely complicated (if not impossible) to know at the time the license agreement is entered into which entity will end up infringing the patents that eventually issue from the applications.  By licensing the portfolio to the handset OEMs, the patent owner can be assured at the time the license is entered into that the ultimate infringer is being licensed.

33.     Second, licensing at the end-user device level and using the device price as the royalty base simplifies enforcement of any licensing agreement by increasing accountability.[32] In my experience, among the most significant concerns faced by licensors in the cellular communications industry is a need for an accountability mechanism to ensure that licensees do not underreport their sales or otherwise attempt improperly to evade paying royalties.  Licensing at the end-user device level provides such an accountability mechanism because end-user device sales and pricing are most transparent (compared to component sales and pricing) to the licensor. Because data regarding sales and pricing for end-user devices is readily available for purchase by industry participants, it is difficult for a licensee to "hide" sales from a licensor.[33]  Moreover,

---

[32] Amicus Brief of Nokia, filed in *FTC v. Qualcomm* (9th Cir.) (Aug. 30, 2019) at 19 (asserting that end-product licensing also " expedites access to SEPs for the entire supply chain, while also providing greater visibility to what products are actually licensed, for example, for auditing purposes."); Amicus Brief of Dolby Laboratories, filed in *FTC v. Qualcomm* (9th Cir.) (Aug. 30, 2019) at 28 (noting that component-level licensing may lead to "a lack of transparency regarding whether products in the stream of commerce are in fact licensed.").

[33] Rosenberg Supplemental Prepared Statement at 5 (stating that "licensing the entire portfolio only at the level of the completed product radically simplifies the negotiation, licensing, royalty collection, and auditing process, to the ultimate benefit of the entire industry."); InterDigital "Statement on FRAND Licensing" at 2 ("Licensing at multiple levels of the value chain is inefficient, increasing monitoring costs, creating uncertainty for both licensees and licensors and raising costs for both parties."), *available at*

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

projections for future sales can be utilized or agreed upon during licensing negotiations using market share data and total market projections provided by independent third-party reports as described above. By contrast, intermediate components are sold between companies (not to consumers on the open market), subject to confidential terms and often as part of complicated transactions reflecting specialized pricing arrangements. As a result, reliable third-party data (such as that available from the firms mentioned above) is often unavailable to monitor such transactions. While many license agreements include provisions requiring licensees to report sales, and provide for audit rights for the licensor, in my experience, such provisions do not provide adequate safeguards for the licensor in the absence of reliable third-party market data and can be time consuming, costly, and difficult to enforce. It would therefore be difficult, if not impossible, for licensors to reliably verify sales volumes and prices for intermediate components, increasing enforcement costs.

34. Third, end-user device licensing simplifies negotiations and provides operational freedom. Given the size and complexity of large, diverse patent portfolios in the cellular communications industry, such as Qualcomm's, it is sometimes unclear (and would be expensive and burdensome to determine) which components of an end-user device practice which patents.[34]

---

https://s3.amazonaws.com/files.interdigital.com/55bd0288af0b0930ba599bd0c4b7ca38/resources/uploads/licensing/InterDigital-FRAND-Statement.pdf.

[34] Amicus Brief of Nokia, filed in *FTC v. Qualcomm* (9th Cir.) (Aug. 30, 2019) at 20 (expressing that "incompatible licensing obligations would create a patchwork of confusing requirements for SEP owners and implementers across various jurisdictions, and even among SEP owners depending on the member organizations through which they have participated in 3GPP and 3GPP2. Such a regime would lead to widescale confusion, higher transaction costs, and uncertainty, at best."); Amicus Brief of Qualcomm, filed in *Ericsson v. D-Link Systems* (Fed. Cir.) (Mar. 12, 2014) at 10 ("An SSO IPR policy (or judicially imposed rule) that requires patentees to grant licenses to all comers could make licensing far more complex, requiring . . . hugely complex determinations of which patents are practiced (and hence licensed) at each level in that chain."); Comments of Nokia to the Ad Hoc of the Patent Committee (PatCom) of the IEEE-SA Standards Board (Second Comment Disposition Report) (Mar. 4, 2014), at 27 (noting that device-level licensing "clarifies the situation, because if licensing happens at various levels, it would only increase the royalty stacking problem and make it difficult to adjust right royalty level.").

DocuSign Envelope ID: 6CDBC26A-6FCF-4B4B-8523-706F4B0A1388

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

And, as technology and handset features evolve, the identities of the relevant components and their manufacturers may change over time. By licensing at the OEM level, licensors avoid the need to constantly monitor all component suppliers' products to determine which one(s) should be paying royalties and avoid having to engage in negotiations and disputes regarding patent coverage. And, by taking licenses themselves, OEMs avoid the need to determine which of their component suppliers are licensed (and if they are licensed, to determine the scope of their licenses—a complicated and expensive endeavor) and are able freely to switch component suppliers without further investigation.

> ii.    **Patent Holders Prefer Licensing and Assessing Royalties at the End-User Device Level Because It Appropriately Reflects the Value of Their Patents.**

35.    In the cellular communications industry, owners of large, diverse patent portfolios that include SEPs seek to license at the end-user device level, using the end-user device price as the royalty base, because they believe that the value of the standardized technology covered by their patents is only fully realized when it is incorporated into a complex end-user product (*e.g.*, the mobile handset), and therefore that it is appropriate to assess royalties based on the value of the end-user product as it is sold to the consumer.

36.    Handset OEMs in the cellular communications industry have pursued a variety of strategies to attempt to reduce the royalties they have to pay for the right to use patent holders' intellectual property,[35] including commencing litigation,[36] lobbying regulators and

---

[35] *See, e.g.*, Qualcomm Inc., 2008 Annual Report (Form 10-K) at 20 (Nov. 6, 2008) (detailing strategies pursued by licensees to reduce and/or eliminate royalties).

[36] *See, e.g.*, Complaint, filed by Apple in *Apple v. Qualcomm* (Jan. 20, 2017) at ¶ 354 ("Given the relative paucity of chipset competitors and the fact that Qualcomm's cellular SEPs are generally embodied in the chipset (or components thereof, it would be considerably more efficient for licensing to occur first and foremost at the chipset level."); Qualcomm Opening Statement Demonstrative, given in *Apple v. Qualcomm* (Apr. 6, 2019), slides 6-7 (reproducing Apple strategy documents showing Apple's "Goal: Reduce Apple's Net Royalty to Qualcomm" and that Apple intended to "Devalue SEPs" and "Build favorable, arms-length 'comp'[onent] licenses").

DocuSign Envelope ID: 6CDBC26A-6FCF-4B4B-8522-706F4B0A1388

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

governments,[37] and seeking to change the IP policies of various standard setting organizations.[38] To that end, some end-user device manufacturers have argued that it is inappropriate for Qualcomm and other owners of large, diverse patent portfolios to license at the end-user device level.[39] These attempts are often coupled with arguments that royalties should be assessed based on component prices, not handset prices.[40]

37. Licensors (such as Qualcomm) believe that assessing royalties based only on the price of a chipset used in the end-user product—as opposed to assessing royalties on the basis of the full value of the end-user product itself—fails to adequately capture the added value that the standardized cellular technology creates and does not properly compensate the patent holder for the research and development costs that it incurred in developing the standardized technology practiced by the device.[41] In this regard, they argue that chipset prices do not appropriately

---

[37] See, e.g., Oral Statement of A. Douglas Melamed (Senior Vice President and General Counsel of Intel Corp.), given at a July 30, 2013 hearing on "Standard Essential Patents and Antitrust Law" before the Antitrust, Competition and Consumer Rights Subcommittee of the Senate Judiciary Committee (July 30, 2013) at 9 ("[S]ome SEP holders refuse to license component manufacturers like Intel. They insist instead that it is okay for them just to license our customers, manufacturers of PCs and other end products. Aside from the obvious breach of a contractual commitment to license everyone, these refusals to license chip makers inflicts [sic] substantial harm. SEP holders refuse to license chip makers so that they can seek excessive royalties.").

[38] See, e.g., Comments of Ericsson to the Ad Hoc of the Patent Committee (PatCom) of the IEEE-SA Standards Board (Second Comment Disposition Report) (Mar. 4, 2014), at 17 (commenting in response to a proposed change to the IEEE rules that "Ericsson believes this is merely another means to impose, retroactively, a change in industry practice and understanding from end-use device licensing to compulsory component level licensing. Ericsson believes that the intent and effect of the ad-hoc Committee's proposed amendment is to drive down licensing rates to sub-RAND levels.").

[39] See, e.g., Amicus Brief of Samsung, filed in FTC v. Qualcomm (9th Cir.) (June 15, 2018) at 10 ("Chief among these onerous terms is Qualcomm's insistence that handset manufacturers pay a royalty equal to a percentage of the price of the full handset instead of the smallest saleable patent practicing unit ('SSPPU')—i.e., the baseband chipset itself— as required by the Federal Circuit. While Qualcomm argues this practice is necessary . . . , Qualcomm relinquished its right to select the level of production at which to exhaust its SEPs by promising to license all comers when it entered the FRAND contract.") (internal citations omitted).

[40] Id.

[41] See, e.g., Rosenberg Supplemental Prepared Statement at 8; InterDigital "Statement on FRAND Licensing" at 2 ("A FRAND royalty for handsets should reflect the value of the innovation, not the cost of the component"), available at https://s3.amazonaws.com/files.interdigital.com/55bd0288af0b0930ba599bd0c4b7ca38/resources/uploads/licensing/InterDigital-FRAND-Statement.pdf; Jean-Sébastien Borghetti, Igor Nikolic & Nicolas Petit, FRAND Licensing Levels under EU Law, European Competition Journal (Feb. 5, 2020), at 3 ("In some industries like

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

account for the substantial R&D and investments required to develop the standard technology, but rather reflect only the cost of designing and manufacturing the chipset.[42]

38.     Attempts by the handset OEMs to reduce the royalties they must pay for the right to use patented technology by changing the longstanding industry practice of both licensing at the end-user device level and assessing royalties based on end-user device prices have been unsuccessful.

39.     Regardless of the merits of each side's position, the fact of the matter is that both sides (the licensors and the licensees) publicly acknowledge, time and time again, that the longstanding practice in the cellular communications industry of licensing large, diverse patent portfolios that include SEPs is to license at the end-user device level, using the end-user device price as the royalty base.  It is clear to all involved that the practice is to not license at the component level.

## IV.     PATENT HOLDERS CANNOT (WITHOUT SUBSTANTIAL RISK) LICENSE THE SAME PATENTS AT MULTIPLE LEVELS IN THE SUPPLY CHAIN.

40.     I have been asked to address whether patent holders can license the same patents at multiple levels in the supply chain, for example, whether a patent holder can license a patent to an end-user device maker and also license the same patent to one or more suppliers of

---

smartphones, end-products most accurately reflect the true value of standardised technologies as the functionality of the standard is only fully realised in the end-product device").

[42] Keith Mallinson, *Busting Smartphone Patent Licensing Myths*, Center for the Protection of Intellectual Property, George Mason School of Law (Sept. 2015), at 5 ("[A] chip-based royalty scheme incorrectly and unfairly associates royalties to costs, process economics, and competitive outcomes in the silicon chip foundry manufacturing business that have nothing to do with mobile technology development costs and the market value generated from these investments in the broader ecosystem."); Rosenberg Supplemental Prepared Statement at 4-5 (Component-level licensing "would be highly disruptive and injurious generally to the value of patents and thus to incentives to invest in R&D."); Comments of Nokia to the Ad Hoc of the Patent Committee (PatCom) of the IEEE-SA Standards Board (Third Comment Disposition Report) at 43 (May 10, 2014) ("[C]urrent licensing practices in the ICT sector mostly occur on the end-user product level . . . where the value of the patented invention to the product value chain can most accurately be determined.").

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

components used to make the end-user device.  As described above, it is my opinion that the longstanding and customary practice in the cellular communications industry has been to license at the end-user device level.  It is further my opinion that, especially since a development in U.S. patent law in 2008, licensors can safely license their patents only once, at a single level of the supply chain.  As I explain below, this conclusion is based, in part, on developments in the common law doctrine of patent exhaustion, which have greatly increased the commercial risk associated with licensing at multiple levels in a supply chain.  I provide below a brief overview of certain industry licensing practices prior to 2008 and explain how later developments in the common law doctrine of patent exhaustion impacted those practices.

41.     In the 1990s and early 2000s, patent holders believed it was possible to license, under the same patents, both the makers of end-user devices and their component suppliers.  In the cellular communications industry, many licensors did not engage in this practice because, for all the reasons stated in Part III.B above, effectively negotiating and managing multiple licenses across multiple points of a supply chain (which would involve negotiating agreements with several companies, the pool of which might change over time) is overly complex, time consuming, expensive, and burdensome.  In addition, licensing the component makers was vastly less lucrative than licensing the end-user device makers.[43]

42.     Some companies—such as LGE and Qualcomm—did enter into limited license agreements with component makers, even though their licensing programs were based primarily on licensing at the end-user device level.  However, these companies had to ensure that the agreements with the component makers would be "non-exhaustive," meaning that they would

---

[43] For those patent holders that did license component makers, their associated revenues from the component makers were negligible relative to the revenues generated from broad and longstanding licensing programs targeted at end-user device manufacturers.

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

not exhaust all of the patent rights of the licensor and thus prevent the licensor from also licensing the end-user device makers.  Ensuring that license agreements with component manufacturers were non-exhaustive—and thus preserved the licensor's ability to also license (and obtain a royalty from) the end-user device manufacturers—was critically important for licensors that did choose to engage in this multi-level licensing.  Again, end-user device licensing was far more lucrative.[44]

43.     This limited practice of licensing multiple points along a supply chain remained feasible (in the view of industry participants) until the Supreme Court's 2008 decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008).  In *Quanta*, the Supreme Court held that a license agreement between a patent holder and a component maker that was specifically negotiated and drafted to be non-exhaustive—and thus preserve the patent holder's right to also license and obtain royalties from the component maker's customers that made the end-user devices—could nevertheless be deemed exhaustive by operation of law, forever preventing the licensor from licensing and obtaining royalties further downstream.  *Id.* at 637.  *Quanta* thus created a significant risk that by licensing component manufacturers, patent holders could inadvertently exhaust their rights in some or all of their patents and therefore lose their ability to license end-user device manufacturers.

44.     As a result, following *Quanta*, it became clear, based on my experience in the industry, that licensors can only reliably license their patents once, at a single level of the supply chain and that licensing at multiple points of the supply chain introduced significant uncertainty as to whether one's patents might later be found to have been exhausted downstream.

---

[44] In my experience in the cellular communications industry, exhaustive licensing at only one point—the end-user device level—has always been the industry practice, and to my knowledge multi-level licensing has not been a material part of any significant licensor's licensing program in that industry.

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

Nevertheless, *Quanta* did not alter the longstanding practice in the cellular communications industry of licensors of large diverse portfolios including SEPs to grant exhaustive licenses at the end-user device level. However, following *Quanta*, these licensors have made it their practice to license *only* at the end-user device level. Based on my experience in the industry, to do otherwise would put a patent holder's licensing program at great risk by undermining the patent holder's ability to license OEMs and collect royalties based on handset sales. This is clearly something that major licensors (such as Qualcomm) would not do and, in my opinion, those familiar with Qualcomm's business and the cellular communications industry would understand that.

45. This post-*Quanta* practice in the cellular communications industry of *not* licensing component manufacturers at all in order to preserve the ability to license end-user device manufacturers is well known and understood in the industry.

46. Prior to *Quanta*, Qualcomm, for example, disclosed that it had entered into licensing agreements with chipset manufacturers that permitted them to manufacture chips using Qualcomm's IP in exchange for royalties and further disclosed that these licenses were intended to preserve Qualcomm's ability to also license (and obtain royalties from) end-user device manufacturers.[45] Since *Quanta*, however, Qualcomm has disclosed that its *licensing* program

_____

[45] Qualcomm Inc., 2006 Annual Report (Form 10-K) at 18 (Nov. 4, 2006) ("We have entered into licensing agreements with certain companies, including EoNex Technologies, Infineon, Lucent, Motorola, NEC, Philips, Texas Instruments and VIA Telecom. These licenses permit the licensees to manufacture CDMA-based integrated circuits using certain of our intellectual property for sale to CDMA-based phone manufacturers. In exchange for granting the licenses, we are entitled to receive license fees, royalties (determined as a percentage of the selling price of the integrated circuits) and/or royalty-free cross-licenses, which allow us to use these companies' CDMA and, in some cases, non-CDMA intellectual property for specified purposes. In every case, the phone manufacturers' sales of CDMA-based phones are subject to the payment of royalties to us on the products into which the integrated circuits are incorporated in accordance with the manufacturers' separate licensing arrangements with us."); Qualcomm Inc., 2007 Annual Report (Form 10-K) at 10 (Nov. 8, 2007) ("We have entered into agreements with certain companies, including EoNex Technologies, Infineon, Lucent, Motorola, NEC, Philips, Texas Instruments and VIA Telecom. These agreements permit the licensees to manufacture CDMA-based integrated circuits using certain of our intellectual property for sale

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

extends to end-user device manufactures and disclosed that any agreements it has with chipset manufacturers are *not* licenses. Qualcomm has further explained how those chipset manufacturer agreements (which, again, are not licenses) were designed to ensure that Qualcomm is able to continue its practice of licensing (and obtaining royalties from) the OEMs.[46]

47. Component manufacturers, including chip makers, have also disclosed the fact that, under prevailing, post-*Quanta* licensing practices in the cellular communications industry, they do not receive licenses from portfolio holders in connection with chipset manufacturing. In a 2009 joint press release by Qualcomm and chipmaker MediaTek, for example, MediaTek explained that "MediaTek's customers do not receive rights to any of Qualcomm's patents and such customers will need to obtain a separate license from Qualcomm in order to receive rights

---

to CDMA-based wireless device manufacturers. In exchange for these rights, we are entitled to receive fees, royalties (determined as a percentage of the selling price of the integrated circuits) and/or royalty-free cross-licenses, which allow us to use these companies' CDMA and, in some cases, non-CDMA intellectual property for specified purposes. In every case, the wireless device manufacturers' sales of CDMA-based wireless subscriber devices are subject to the payment of royalties to us on the products into which the integrated circuits are incorporated in accordance with the manufacturers' separate licensing arrangements with us.").

[46] Qualcomm Inc., 2009 Annual Report (Form 10-K) at 9 (Nov. 4, 2009) ("In addition to licensing manufacturers of subscriber and network equipment, we have made our essential CDMA patents available to competitors of our QCT segment. . . . In every case, these agreements do not allow such integrated circuit suppliers to pass through rights under Qualcomm's patents to such suppliers' customers . . . ." ); Qualcomm Inc., 2010 Annual Report (Form 10-K) at 8 (Nov. 3, 2010) ("In addition to licensing manufacturers of subscriber and network equipment, we have made our essential CDMA and OFDMA patents available to competitors of our QCT segment . . . . In every case, these agreements do not allow such integrated circuit suppliers to pass through rights under Qualcomm's patents to their customers . . . ); Qualcomm Inc., 2011 Annual Report (Form 10-K) at 7-8 (Nov. 2, 2011) ("Separate and apart from licensing manufacturers of subscriber and network equipment, we have entered into certain patent arrangements with competitors of our QCT segment . . . . In every case, these agreements expressly reserve the right for QTL to seek royalties from the customers of such integrated circuit suppliers with respect to such suppliers' customers' sales . . ."); Qualcomm Inc., 2012 Annual Report (Form 10-K) at 8 (Nov. 7, 2012) ("Separate and apart from licensing manufacturers of subscriber and network equipment, we have entered into certain patent arrangements with competitors of our QCT segment . . . . In every case, these agreements expressly reserve the right for QTL to seek royalties from the customers of such integrated circuit suppliers with respect to such suppliers' customers' sales . . . .); Qualcomm Inc., 2013 Annual Report (Form 10-K) at 6 (Nov. 6, 2013)   ("Separate and apart from licensing manufacturers of wireless products and devices and network equipment, we have entered into certain arrangements with competitors of our QCT segment . . .   In every case, these agreements expressly reserve the right for QTL to seek royalties from the customers of such integrated circuit suppliers . . . .").

to any of Qualcomm's patents."[47]  And in a 2013 joint public statement, MediaTek and

Qualcomm again confirmed that the "agreements between MediaTek and Qualcomm were not,

and the amended agreements are not, 'license' (or 'licensing') agreements," that "MediaTek does

not have a license to any of Qualcomm's patents, and Qualcomm does not have a license to any

of MediaTek's patents," and that "neither Qualcomm nor MediaTek receives any patent rights of

each other that can be conveyed to another party."[48]  And MediaTek's General Manager for

Corporate Sales and Business Development confirmed in public trial testimony that licensing

cellular patents to handset manufacturers had "been the common practice for a while" in the

cellular industry.[49]

48.    Other chipmakers have also publicly disclosed their understanding that the custom

and practice in the cellular industry is for licensors to license handset manufacturers, not makers

of intermediate components.  For example, in public testimony given before the U.S. Senate,

Douglas Melamed, then General Counsel of chipmaker Intel, explained that SEP holders "often

go to great lengths to avoid licensing upstream component (e.g., chip) manufacturers and choose

instead to license their patents downstream, at for example the device (e.g., computer) level."[50]

Mr. Melamed was critical of this practice, but clearly affirmed it as the prevailing practice in the

industry.

49.    The fact that cellular communications industry licensors did not wish to license

component manufacturers due to concerns about potentially exhausting their patent rights and

---

[47] Press Release, "MediaTek and Qualcomm Enter Into Patent Agreement", at 2 (Nov. 19, 2009).
[48] Joint Public Statement by MediaTek and Qualcomm (Sept. 25, 2013).
[49] Testimony of Finbarr Moynihan (MediaTek General Manager of Corporate Sales and Business Development) in *FTC v. Qualcomm* (Jan. 7, 2019) at 355:15-357:1.
[50] Supplemental Statement for the Record of A. Douglas Melamed (SVP and General Counsel of Intel Corp.) for the Senate Committee on the Judiciary Subcommittee on Antitrust, Competition Policy and Consumer Rights on Standard Essential Patents and Antitrust Law SEPs (Aug. 13, 2013) at 2.

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

risking their ability to license (and collect royalties from) end-user device manufacturers was well known. For example, after the Chinese National Development and Reform Commission ("NDRC") concluded its investigation into Qualcomm's licensing practices, industry observers specifically noted that the NDRC's resolution did not require Qualcomm to "use the smallest saleable component [i.e., the chipset] as the [royalty] base," noting that this result "not only" permitted Qualcomm to "preserve a part of its royalty formula" but also "avoided a duty to license at the chip level, which could in turn have led to patent exhaustion."[51]

## V. THOSE FAMILIAR WITH THE CELLULAR COMMUNICATIONS INDUSTRY WOULD UNDERSTAND THAT QUALCOMM'S PRACTICE WAS TO NOT LICENSE CHIP MANUFACTURERS POST-*QUANTA*.

50. I have been asked to address how one familiar with the cellular communications industry would have interpreted certain statements by Qualcomm and its executives about its licensing program and what such a person would conclude from these statements about whether Qualcomm licensed intermediate component manufacturers such as chipmakers. Specifically, I have been asked to address the following statements, which I understand that Plaintiffs in this case have alleged were misleading and concealed the fact that Qualcomm did not license chipmakers:

- <u>April 11, 2012</u>: "Qualcomm's business model—broadly licensing our technology and reinvesting in R&D—is enabling the success of many other companies in the wireless value chain."[52]

---

[51] Cleary Gottlieb, Alert Memorandum, "China's NDRC Concludes Qualcomm Investigation, Imposes Changes in Licensing Practices" (Mar. 16, 2015) at 7, *available at* https://www.clearygottlieb.com/-/media/organize-archive/cgsh/files/publication-pdfs/chinas-ndrc-concludes-qualcomm-investigation-imposes-changes-in-licensing-practices.pdf.

[52] Compl. ¶ 70 (quoting Intan Hamdan-Livramento, WIPO, "The Evolution of Technology Markets: Separating Fact from Fiction" (Apr. 2012).)

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

- <u>April 26, 2012</u>: "[W]e broadly license[s] our portfolio of U.S. and foreign patents to virtually every manufacturer in the mobile industry."[53]

- <u>November 7, 2012</u>: "[W]e have facilitated competition in the wireless communications industry by licensing and enabling a large number of manufacturers."[54]

- <u>November 7, 2012</u>: "Our strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products and features while driving down average and low-end selling prices for 3G handsets and other wireless services."[55]

- <u>March 5, 2013</u>: "[O]ne of the things that we've really focused on was making sure that we license broadly, that we were seen as a company who is an enabler for the rest of the industry . . . ."[56]

- <u>November 6, 2013</u>: "Through our broad licensing program, we continue to foster innovation, and enable a large and growing ecosystem that benefits wireless consumers worldwide."[57]

- <u>November 22, 2013</u>: Qualcomm "make[s] [its patents] available to the industry through its licensing program."[58]

- <u>February 18, 2014</u>: Qualcomm "created this unique business model of not holding our patents to ourselves to advantage our own products, but creating a product of them and broadly licensing them on a pro-active basis."[59]

- <u>November 17, 2015</u>: "[O]ur patent licensing practices, which we and other patent owners have maintained for almost two decades, and which have facilitated the growth of the mobile communications industry in Korea and elsewhere, are … pro-competitive."[60]

- <u>January 27, 2016</u>: "[O]ur licensing model, as you know, has been in effect for quite a few decades" and has been "sharing our intellectual property."[61]

---

[53] *Id.* ¶ 136 (quoting testimony of Sean Murphy, former Qualcomm VP and Counsel of International Government Affairs to the Subcommittee on Intellectual Property, Competition and the Internet of the Committee on the Judiciary House of Representatives).

[54] *Id.* ¶ 140 (quoting Qualcomm's 2012 Form 10-K).

[55] *Id.* ¶ 141 (quoting Qualcomm's 2012 Form 10-K).

[56] *Id.* ¶ 70 (citing Transcript, "Qualcomm Annual Shareholder Meeting" (Mar. 5, 2013)).

[57] *Id.* ¶ 155 (quoting Qualcomm Q4 2013 earnings call transcript).

[58] *Id.* ¶ 157 (quoting *The San Diego Union Tribune*).

[59] *Id.* ¶ 161 (quoting interview with *PowerTrend Profits*).

[60] *Id.* ¶ 173 (quoting Qualcomm Press Release regarding KFTC Case Examiner's Report).

[61] *Id.* ¶ 177 (quoting Qualcomm Q1 2016 earnings call).

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

- <u>December 6, 2016</u>:  "[Y]ou think about Qualcomm . . . [O]nce we solve [technological problems], we don't keep the technology to ourselves: our business model is to share that technology through licensing."[62]

- <u>January 17, 2017</u>:  Qualcomm engaged in "broad-based licensing of those technologies [the standard-essential patents] on fair, reasonable and nondiscriminatory terms."[63]

51.    For the reasons described below, it is my opinion that anyone familiar with licensing in the cellular communications industry would certainly understand these statements to mean that Qualcomm, like the other significant SEP holders in the cellular communications industry, licensed (and continue to license) their portfolios at the end-user device level (*e.g.*, licensing handset OEMs), consistent with the longstanding and customary practice in the industry.  It is also my opinion that anyone familiar with licensing in the cellular communications industry would also have understood from these statements that Qualcomm was *not* licensing intermediate component makers, such as chipmakers.

52.    As described above, from the early days of the cellular communication industry, the industry norm has been to license at the end-user device level.  In my opinion, in light of the public nature of that industry norm, anyone familiar with licensing in the cellular communications industry would understand that statements (such as those listed above) from a significant licensor in the industry (such as Qualcomm) that its licensing program was "broad" and encompassed "a large number of" or "virtually every" manufacturer(s) in the mobile industry would have understood those statements to be referring specifically to licensing of end-user device manufacturers (*e.g.*, handset OEMs), not makers of intermediate components.

53.    Qualcomm's own statements regarding its licensing program are consistent with this interpretation.  For example, Qualcomm's description of its licensing program explain that

---

[62] *Id.* ¶ 70 (quoting Derek Aberle's keynote speech at the 2016 Shanghai Forum).
[63] *Id.* ¶ 71 (quoting FTC Press Release).

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

Qualcomm's licensees "manufacture wireless products, such as mobile devices" without mentioning intermediate component suppliers.[64]  Similarly, Qualcomm's earnings presentations present QTL revenues as a function of end-user device sales and prices, without any reference to prices or volumes of intermediate components, such as chipsets, that go into those devices.[65]

54.     As a corollary to the above, it is also my opinion that anyone familiar with licensing in the cellular communications industry would understand from these statements that Qualcomm was not licensing makers of intermediate components (such as chipset makers) that were used to make handsets.  Even before *Quanta*, it was well known to anyone familiar with licensing in the cellular communications industry that end-user device level licensing was the industry norm, and that any license to a chipmaker would therefore have to be non-exhaustive.  And, as discussed above, after the decision in *Quanta*, it became clear that licensors can reliably license their patents only once, at a single level of the supply chain.  Conversely, any attempt by a patent portfolio holder to license its portfolio at several levels in the supply chain—for example, to license components in addition to licensing end-user devices—would run a very significant risk of exhausting the patents upon the sale of the components and negate the ability

---

[64] *See, e.g.*, Qualcomm Inc., 2012 Annual Report (Form 10-K) at 2 (Nov. 7, 2012) ("We grant licenses to use portions of our intellectual property portfolio to manufacturers of wireless products, such as mobile devices, also known as subscriber units, which include handsets, other consumer devices (e.g., tablets, personal computers, e-readers), machine-to-machine devices (e.g., telematics devices, meter reading devices) and data modem cards, the infrastructure equipment required to establish and operate a network, and equipment to test networks and subscriber units."); Qualcomm Inc., 2013 Annual Report (Form 10-K) at 6 (Nov. 6, 2013) ("Our licensees manufacture wireless products, such as mobile devices, also known as subscriber units, which include handsets, other consumer devices (e.g., tablets, personal computers, e-readers, personal navigation devices), machine-to-machine devices (e.g., telematics devices, meter reading devices) and plug-in end user data modem cards, certain embedded modules for incorporation into end user products, the infrastructure equipment required to establish and operate a network, and equipment to test networks and subscriber units."); Qualcomm Inc., 2014 Annual Report (Form 10-K) at 7 (Nov. 5, 2014) (same)

[65] *See, e.g.*, Qualcomm Inc., Third Quarter Fiscal 2013 Earnings Presentation (July 24, 2013), at slides 6, 8-10 (projecting QTL revenues based on number of devices sold and ASP of such devices).

DocuSign Envelope ID: 6CDBC26A-6FCF-4B4B-8522-706F4B0A1388

EXPERT DECLARATION OF BRUCE G. BERNSTEIN

of the licensor to be compensated for use of its patented technology by securing royalties from end-user device makers.

55.     As a result, based on my experience in the industry, while it has been (and continues to be) common practice in the cellular communications industry for holders of large, diverse patent portfolios including SEPs to license the end-user device makers, *e.g.*, handset OEMs, after *Quanta*, licensing <u>only</u> the end-user device makers became, from a practical standpoint, the <u>only</u> practice.

56.     It is my opinion that anyone familiar with licensing in the cellular communications industry would have been knowledgeable about Qualcomm's business (given that Qualcomm ran one of the largest licensing programs in the industry) and about the legal landscape following *Quanta,* and therefore would understand these statements to mean that Qualcomm does not grant licenses to component makers, including to those that compete with Qualcomm's chip business.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that I executed this declaration on July 22, 2022, in Taos, New Mexico.



Bruce G. Bernstein

# Exhibit 1

## BRUCE G. BERNSTEIN
### 724 Periwinkle Lane ▪ Wynnewood, PA 19096
### (484) 432-0175 ▪ bruce@bernsteiniplaw.com

---

## PROFESSIONAL EXPERIENCE

**The Law Office of Bruce G. Bernstein PLLC (2012-present)**
*Sole Practitioner*

*Single member PLLC focused on providing clients with patent-related advice and services, including providing patent investment, licensing, monetization and development advice, and running/managing patent licensing and litigation programs (both offensive and defensive).*

*Exemplary Client base:*

- Mid-sized, European-based oil and gas processing company
- Mid-sized, US based wireless technology company
- Mid-sized, US based manufacturer of WDM optical transmission equipment
- Small, privately held DSL/wireline technology company
- US and foreign based nonpracticing entities (NPEs)
- IP investment vehicles/funds
- Buy-side and sell-side patent brokers

**Ideahub Inc. (2022-present)**
*Licensing Executive and CEO of Wholly-Owned Subsidiary*

*Ideahub operates as an Intellectual Property "hub" for bringing value to patents, trademarks and copyrights. The company oversees multiple worldwide licensing platforms.*

*Representative licensing platforms:*

- Telecommunications Licensing Platform - focused on 3G/4G/5G standard essential patents, mobile device features/functions, and virtual reality/augmented reality
- IoT Licensing Platform - focused on cellular technologies (3G/4G/5G), WiFi technologies (802.11n/802.11ac/WiFi 6) and wireless mesh technologies (Zigbee/Zwave/802.15.4/WirelessHart etc.)
- Streaming Licensing Platform - focused on subscription VOD/Authenticated VOD, transactional VOD, live streaming services, and advertisement VOD

*Responsibilities:*

- Responsible for licensing 3G/4G/5G standard essential patents to cellular infrastructure and handset manufacturers
- Responsible for managing day-to-day business of Ideahub subsidiary, including licensing, litigation, and auditing functions

DocuSign Envelope ID: 6CDBC26B-6FCF-4B4B-8522-706F4B0A1388

**Signal Trust for Wireless Innovation (2013-2021)**
*President/Sole Member of HCJ Advisors LLC (Trustee)*

*Delaware Statutory Trust established to monetize patents and patent applications relating to 3G and LTE cellular technologies. The patented inventions were developed by engineers and researchers at InterDigital, Inc. over more than a decade, with a number of the innovations contributed to the worldwide standards process.*

*Responsibilities:*

- Responsible for all aspects of managing and monetizing Trust assets through licensing, litigation, sales and other IP-related transactions
- Responsible for managing budgets and engaging and managing third party consultants and legal counsel

**Bluestone Ventures, Inc. (2012-Present)**
*COO and General Counsel*

*Privately held patent licensing and enforcement company located in Reston Virginia.*

*Responsibilities:*

- Manage licensing and settlement negotiations for Bluestone portfolios
- Handle IP due diligence and negotiations for new investment opportunities
- Manage and negotiate Bluestone patent divestitures

**Coller Capital, New York, NY (2008-2012)**
*Chief IP Counsel and Principal, IP Investment Team*

*Coller Capital, the leading global investor in private equity's secondary market, provides liquidity to investors wishing to exit early from their private equity investments – which may be either Limited Partner positions in private equity funds or portfolios of direct investments in private companies. In 2007, Coller closed its fifth fund with capital commitments of $4.8 billion and backing from 200 of the world's leading institutional investors.*

*Responsibilities:*

- Serve as sole legal counsel to multidisciplinary team responsible for sourcing and divesting of Coller's IP investments
- Handle all legal and tax aspects of Coller's IP investments
- Negotiate and transact all third-party contracts in connection with the management, sourcing and divesting of Coller's IP investments
- Evaluate, price and negotiate IP sourcing and divestment opportunities
- Provide IP and licensing advice to Coller's portfolio companies

*Key Achievements:*

- Negotiated IP transactions (both sourcing and divesting) valued in excess of $150M

DocuSign Envelope ID: 6CDBC26A-6FCF-484B-8522-706F4B0A1388

- Managed offshore vehicles and tax structures used for holding IP investments to minimize tax impact on ROI/IRR (in some cases, upwards of 20% savings were realized)
- Managed teams of external legal and technical consultants to increase the value of Coller's IP assets and achieve Coller's desired returns criteria
- Managed legal due diligence on all IP investments
- Advised portfolio IP-holding companies on IP acquisition, licensing and divestiture decisions
- Negotiated litigation settlement on behalf of Coller portfolio company

**InterDigital, Inc. King of Prussia, PA (2005-2008)**
***Chief IP and Licensing Officer reporting directly to CEO***
***Board member of wholly-owned patent holding subsidiaries***

*InterDigital develops fundamental wireless technologies that are at the core of mobile devices, networks, and services worldwide. The company holds approximately 8,800 U.S. and foreign issued patents combined, and nearly 10,000 patent applications in process around the world. Its licensing practices are considered exemplary by licensing and industry experts, and in 2006, it received the prestigious Licensing Achievement Award from the Licensing Executives Society.*

*Responsibilities:*

- Managed company's worldwide patent development, licensing and enforcement operations for patent portfolio including several thousand issued patents and pending applications worldwide
- Managed patent and licensing group that included 13 professionals (lawyers, licensing/finance executives, licensing/patent engineers and paralegals)
- Overall annual budget responsibility in excess of $40M
- Led company's political efforts before the US Congress concerning proposed changes to the US patent system

*Key Achievements:*

- Closed licensing deals having a cumulative value in excess of $700M
- Settled 2G/3G legal dispute between InterDigital and Nokia resulting in a $253M payment to InterDigital
- Devised and managed a complete overhaul of InterDigital's patent filing and development processes to create an order of magnitude increase in the value of the company's patent portfolio
- Successfully negotiated with non-US governments with weak IP regimes to further InterDigital's patent and licensing program
- Instrumental to the creation of the Innovation Alliance, a coalition of entrepreneurial companies seeking to enhance America's innovation environment by improving the quality of patents granted and protecting the integrity of the U.S. patent system
- Selected by the Innovation Alliance to testify before the Senate Judiciary Committee on "Patent Reform: The Future of American Innovation" (https://www.govinfo.gov/content/pkg/CHRG-110shrg37760/html/CHRG-110shrg37760.htm)

**BTG International Inc., West Conshohocken, PA (2002-2005)**
*Vice President, Head of Patents*

*Responsibilities:*

- Member of BTG Executive Management Team responsible for overall management of BTG worldwide (team included BTG's CEO, COO, CFO and Legal/Patent Heads)
- Managed BTG global (US & UK) patents group (five US patent lawyers, six UK/EP patent attorneys, one US patent agent, two patent trainees, six patent administrators, three support staff, and one consultant)
- Developed processes and procedures for IP "best practices" within the company
- Set the company's overall corporate IP strategy and direction
- Oversaw the development and execution of IP strategies for specific BTG technology portfolios, development programs, and portfolio companies
- Conducted performance appraisals and set group and personal objectives, determined salary and bonus levels, oversaw work quality and workload, managed a budget of approximately $4M, and provided mentoring and career development for patent group employees

*Key Achievements:*

- Worked with other Executive Management Team members to revise company organizational structure and develop new business models to ensure that company met its 2006 goals and maintained a sustainable business
- Led multidisciplinary teams composed of internal and external legal, patent, commercial and technical resources to successfully source, develop and extract value from various patent assertion and technology-based licensing programs.  This involved evaluating and rendering opinions on complex legal and business issues, leading license negotiations, managing outside litigation counsel, and overseeing day-to-day operations of the teams
- Developed screening, acquisition, and execution models for patent assertion/litigation opportunities to decrease time to accept/reject, increase likelihood of generating near term revenues, and ensure viability of accepted opportunities
- Initiated cost tracking, management and reporting procedures for BTG patent portfolio to enable up to date ROI analysis for each of BTG's portfolio technologies and business opportunities
- Developed internal IP training & education programs to increase the level of IP knowledge among all BTG employees

**BTG International Inc., West Conshohocken, PA (1997-2002)**
*Vice President, Legal and Patents*

*Responsibilities:*

- Managed BTG's intellectual property portfolios to create business opportunities and to support BTG's technology commercialization efforts in the following technology areas: telecommunications systems, Internet, e-business and software technologies, computer systems, semiconductor devices and related technologies, optics, audio and video systems, data storage technologies, and medical devices and systems
- Developed global intellectual property commercialization strategies for BTG and its partners with a view toward maximizing revenue by way of intellectual property licensing and enforcement, joint development programs, new business ventures, and strategic partnering

- Created intellectual property strategies and provided intellectual property management services for companies funded by BTG/Primaxis joint venture to enhance revenue generation, provide strategic market advantage, and build shareholder value
- Performed technology assessments and intellectual property due diligence analyses for technologies acquired from corporate, university, and individual sources
- Served as primary U.S. intellectual property counsel for BTG/Rolic Technologies joint venture

*Key Achievements:*

- Instrumental in closing multi-million dollar intellectual property transactions for voice coding and semiconductor memory technologies
- Successfully structured, negotiated, and transacted multi-million dollar intellectual property commercialization and joint development agreements
- Developed Internet, e-commerce/business, and semiconductor related intellectual property portfolios that realized multi-million dollar valuations
- Created and implemented intellectual property assessment, management and commercialization strategies and procedures within BTG to support the physical science business group

**Morgan, Lewis & Bockius, LLP, Washington, DC**
*Associate (1995-1997)*

**Dickstein, Shapiro & Morin, LLP, Washington, DC**
*Associate (1994-1995)*

**Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC**
*Associate / Registered U.S. Patent Agent (1989-1994)*

- Instrumental in establishing Morgan Lewis & Bockius' first patent practice group
- Negotiated and drafted patent license and technology transfer agreements on behalf of both U.S. and foreign clients
- Conducted intellectual property due diligence analyses for clients seeking to invest in emerging high technology markets
- Developed intellectual property portfolios and licensing strategies for start-up companies
- Served as co-counsel on various trade secret misappropriation and patent infringement litigations
- Rendered patent infringement, validity and patentability opinions
- Conducted reexamination proceedings before the U.S. Patent & Trademark Office
- Wrote and prosecuted patent applications for both U.S. and foreign filing
- Rendered opinions regarding U.S. export licensing issues and proposed export control programs for foreign clients
- Trained and supervised junior attorneys in patent prosecution, counseling, and litigation matters

**Hewlett-Packard Company, Washington, DC**
*Technical Export Specialist (1987-1989)*

- Expanded foreign sales of Hewlett-Packard's line of medical, analytical, computer, and software products through formulation of creative export control strategies
- Identified and proposed opportunities to influence U.S. policies and practices relating to export regulations to support the interests of Hewlett-Packard's foreign sales offices

DocuSign Envelope ID: 6CDBC26B-6FCF-4B4B-8522-706F4B0A1388

- Devised and implemented export licensing strategies for joint-venture and off-shore manufacturing projects

**EDUCATION**

- University of Pennsylvania (B.S., Electrical Engineering)
  Philadelphia, PA
- American University, Washington College of Law (J.D.)
  Washington, DC

**PROFESSIONAL ACTIVITIES**

- Member of New Jersey and District of Columbia Bars
- Registered Patent Attorney, United States Patent & Trademark Office
- Association of Corporate Patent Counsels ("ACPC")

**PUBLICATIONS & PRESENTATIONS**

- Guest lecturer, Lehigh University MBA program Venture Series course on Intellectual Property Management & Valuation, Bethlehem, PA (October 28, 2011)
- "The Power of Angel Investing: Due Diligence," a private workshop for angel investors sponsored by Innovation Philadelphia & Mid-Atlantic Angel Group, Philadelphia, PA (November 14, 2003)
- "How to Develop Patent Portfolios That Enable Maximum Value Extraction through Licensing Programs," presented at the LES 2002 Spring Meeting, Washington, DC (May 1-4, 2002)
- "Developing Global IP Strategies for Start Up Companies," presented at IP and Competitive Strategy class at University of Pennsylvania, Wharton graduate program (January 2002)
- "Role of IP in a Start Up: Protection of Existing Technology," presented at the AIPLA 25th Mid-Winter Institute, Phoenix, AZ (January 23-26, 2002)
- "When, Why and How To Create A Strategic Patent Portfolio To Enhance IP Value," presented at the Symposium on International Patent and Technology Licensing in the 21st Century, London, England (May 4-5, 2000)
- "Whether, Why, When and How To Extract Value From Licensing, Litigation, Joint Venturing, Strategic Partnering Or By Creating a Spin-off Company," presented at the Symposium on International Patent and Technology Licensing in the 21st Century, London, England (May 4-5, 2000)

# Exhibit 2

Expert Declaration of Bruce G. Bernstein
Materials Relied Upon

**Articles**

Bertram Huber, *Why the ETSI IPR Policy Does Not and Has Never Required Compulsory 'License to All': A Rebuttal to Karl Heinz Rosenbrock* (Sept. 15, 2017).

David J. Teece & Edward F. Sherry, *On the "Smallest Saleable Patent Practicing Unit" Doctrine: An Economic and Public Policy Analysis* (Jan. 20, 2016).

Erik Stasik & David L. Cohen, *Royalty Rates And Licensing Strategies For Essential Patents On 5G Telecommunication Standards: What To Expect, Patents on 5G Telecommunication*, 55 les Nouvelles 176 (Sept. 2020).

Erik Stasik, *Royalty Rates And Licensing Strategies For Essential Patents on LTE (4G) Telecommunication Standards*, 45 les Nouvelles 114 (Sept. 2010).

European Commission, *EU Commission Publishes Landscaping Study on SEPs by IPlytics*, IPLYTICS (2016), *available at* http://www.iplytics.com/general/eu-commission-publishes-landscaping-study-seps-iplytics/.

Jean-Sébastien Borghetti, Igor Nikolic and Nicolas Petit, *FRAND Licensing Levels under EU Law*, European Competition Journal (Feb. 5, 2020).

Keith Mallinson, *Busting Smartphone Patent Licensing Myths*, Center for the Protection of Intellectual Property, George Mason School of Law (Sept. 2015).

Marvin Blecker, Tom Sanchez and Eric Stasik, *An Experience-Based Look At The Licensing Practices That Drive The Cellular Communications Industry: Whole Portfolio/Whole Device Licensing*, 51 les Nouvelles 221 (Dec. 2016).


**Press Releases and Websites**

InterDigital "Statement on FRAND Licensing" *available at* https://s3.amazonaws.com/files.interdigital.com/55bd0288af0b0930ba599bd0c4b7ca38/resources/uploads/licensing/InterDigital-FRAND-Statement.pdf.

Joint Public Statement by MediaTek and Qualcomm (Sept. 25, 2013), https://corp.mediatek.com/news-events/press-releases/joint-public-statement-by-mediatek-and-qualcomm.

Press Release, *MediaTek and Qualcomm Enter Into Patent Arrangement* (Nov. 20, 2009), https://corp.mediatek.jp/news-events/press-releases/mediatek-and-qualcomm-enter-into-patent-arrangement.

Qualcomm Press Release, *Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report* (Nov. 17, 2015) https://www.prnewswire.com/news-releases/qualcomm-confirms-receipt-of-korea-fair-trade-commissions-case-examiners-report-300180670.html.

Cleary Gottlieb, Alert Memorandum, *China's NDRC Concludes Qualcomm Investigation, Imposes Changes in Licensing Practices,* (Mar. 16, 2015), *available at* https://www.clearygottlieb.com/-/media/organize-archive/cgsh/files/publication-pdfs/chinas-ndrc-concludes-qualcomm-investigation-imposes-changes-in-licensing-practices.pdf.

Ericsson IPR and Licensing Press Backgrounder, https://www.ericsson.com/en/patents/presskit.

Nokia Patent Licensing Webpage, https://www.nokia.com/licensing/patents.

InterDigital Portfolio Data Webpage, https://www.interdigital.com/portfolio-data.

Qualcomm Licensing Webpage, https://www.qualcomm.com/licensing.

Qualcomm Inc., Third Quarter Fiscal 2013 Earnings Presentation (July 24, 2013).


## SEC Filings

InterDigital, Inc., 2009 Annual Report (Form 10-K) (Feb. 26, 2010).

InterDigital, Inc., 2011 Annual Report (Form 10-K) (Feb. 27, 2012).

InterDigital, Inc., 2015 Annual Report (Form 10-K) (Feb. 18, 2016).

Nokia Corporation, Annual Report (Form 20-F) (Mar. 23, 2017).

Qualcomm Inc., 2006 Annual Report (Form 10-K) (Nov. 2, 2006).

Qualcomm Inc., 2007 Annual Report (Form 10-K) (Nov. 8, 2007).

Qualcomm Inc., 2008 Annual Report (Form 10-K) (Nov. 6, 2008).

Qualcomm Inc., 2009 Annual Report (Form 10-K) (Nov. 5, 2009).

Qualcomm Inc., 2010 Annual Report (Form 10-K) (Nov. 3, 2010).

Qualcomm Inc., 2011 Annual Report (Form 10-K) (Nov. 2, 2011).

Qualcomm Inc., 2012 Annual Report (Form 10-K) (Nov. 7, 2012).

Qualcomm Inc., 2013 Annual Report (Form 10-K) (Nov. 3, 2013).

Qualcomm Inc., 2014 Annual Report (Form 10-K) (Nov. 5, 2014).

Qualcomm Inc., 2015 Annual Report (Form 10-K) (Nov. 4, 2015).

Qualcomm Inc., 2016 Annual Report (Form 10-K) (Nov. 2, 2016).


**Standard-Setting Organization Materials**

Comments to the Ad Hoc of the Patent Committee (PatCom) of the IEEE-SA Standards Board (Second Comment Disposition Report) (Mar. 4, 2014).

Comments to the Ad Hoc of the Patent Committee (PatCom) of the IEEE-SA Standards Board (Third Comment Disposition Report) (May 10, 2014).


**Legislative Materials**

Record of the Hearing on "Standard Essential Patents and Antitrust Law" before the Antitrust, Competition and Consumer Rights Subcommittee of the Senate Judiciary Committee


**Litigation and Regulatory Enforcement Materials**

Amicus Brief of Dolby Laboratories, filed in *FTC v. Qualcomm* (9th Cir.) (Aug. 30, 2019).

Amicus Brief of Nokia, filed in *Apple v. Motorola* (Fed. Cir.) (May 6, 2013).

Amicus Brief of Nokia, filed in *FTC v. Qualcomm* (9th Cir.) (Aug. 30, 2019).

Amicus Brief of Qualcomm, filed in *Ericsson v. D-Link Systems* (Fed. Cir.) (Mar. 12, 2014).

Amicus Brief of Samsung, filed in *FTC v. Qualcomm* (9th Cir.) (June 15, 2018).

Complaint, filed by Apple in *Apple v. Qualcomm* (Jan. 20, 2017).

Consolidated Class Action Complaint, *In re Qualcomm Incorporated Securities Litigation*, No. 17-cv-121 (S.D. Cal.) (July 3, 2017) [Docket No. 32], and materials quoted therein.

*In the Matter of Certain Electronic Devices, Commission Opinion*, Inv. No. 337-TA-794, (Int'l Trade Comm'n July 5, 2013).

Declaration of Christopher Longman in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.

Presentation of Eric Reifschneider (Senior VP & General Manager, Qualcomm Technology Licensing), to High Technology Sector Committee of the Licensing Executive Society, "The Qualcomm Technology Licensing Program and the Licensing of Standard-Essential Patents" (Feb. 20, 2013).

Presentation of Qualcomm (Derek Aberle) to the KFTC, "Qualcomm's SEP Licensing Practices and Overview of Select Negotiations" (Aug. 17, 2016).

Presentation of Qualcomm (Derek Aberle) to the KFTC, "Response to Presentation by Interested Third Parties" (Nov. 9, 2016).

Presentation to the KFTC of Christina Petersson (Ericsson Head of IPR Legal Services) "FRAND IPR Policies and Applicable Licensing Practices" (Sept. 5, 2016).

Qualcomm Opening Statement Demonstrative, given in *Apple v. Qualcomm* (Apr. 6, 2019).

Testimony of Dirk Weiler (Nokia Head of Standards Policy), in *FTC v. Qualcomm* (Jan. 22, 2019).

Testimony of Finbarr Moynihan (MediaTek General Manager of Corporate Sales and Business Development) in *FTC v. Qualcomm* (Jan. 7, 2019).

Testimony of Gustav Brismak (Ericsson Chief Intellectual Property Officer), in *Ericsson v. D-Link*, No. 10-cv-00473 (E.D. Tex.) (June 12, 2013).

*Unwired Planet Int'l Ltd. v. Huawei Techs. Co.* [2017] EWHC (Pat) 711 (Eng. & Wales).