**THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE QUALCOMM INCORPORATED SECURITIES LITIGATION | Case No. 3:17-cv-00121-JO-MSB |

# EXPERT DECLARATION OF DR. RICHARD WINDSOR

DocuSign Envelope ID: A5AAB49F-1549-4F75-BF1F-A29283E36653

# TABLE OF CONTENTS

I.      Assignment ......................................................................................................... 1

II.     Opinions .............................................................................................................. 1

III.    Education and Work Experience ........................................................................ 2

        A.      Education ................................................................................................. 2

        B.      Relevant Work Experience ...................................................................... 2

IV.     Sell-Side Equity Research Analyst Overview .................................................... 3

V.      During the Class Period, There Were Extensive Public Disclosures
        Available to Professional Sell-Side Equity Research Analysts Regarding
        Qualcomm's Practice of Licensing Exclusively at the Device, Rather Than
        Chip, Level, and Their Research Reflected That Understanding. ........................ 6

        A.      Analysts Understood, and Commented Upon, Qualcomm's Pre-
                2008 Licensing Practices. ........................................................................ 7

        B.      There Were Extensive Public Disclosures Available to Sell-Side
                Analysts Regarding Qualcomm's and the Industry's Post-2008
                Licensing Practices, and Analysts' Research Reflected That
                Understanding. ....................................................................................... 10

                i.      Qualcomm's Public Statements Disclosed Its Post-2008
                        Licensing Practice. ................................................................... 111

                ii.     Qualcomm's Competitors and Other Industry Players Also
                        Disclosed that They Licensed at the Device Level ................... 14

        C.      Qualcomm's Practice of Licensing Only Device Makers Was
                Publicly Confirmed by the NDRC Investigation and Qualcomm's
                Related Public Statements. ..................................................................... 16

        D.      Throughout the Late 2000s and Early 2010s, There Were
                Extensive Public Disclosures Available to Sell-Side Analysts
                Regarding Qualcomm's Practice of Licensing Only at the Device
                Level, and Their Research Reflected That Understanding. ..................... 18

VI.     There Were Extensive Public Disclosures Available to Sell-Side Analysts
        Regarding Qualcomm's Practice of Selling Chips Only to QTL Licensees,
        and Their Research Reflected That Understanding. ......................................... 22

        A.      Qualcomm Publicly and Repeatedly Stated That It Sells Chips
                Only to QTL Licensees. ......................................................................... 23

        B.      Analysts Understood that Qualcomm Sells Chips Only to QTL
                Licensees. ............................................................................................... 25

VII.    Analysts Would Not Have Been Misled by Qualcomm's "Separate
        Businesses" Statements. ................................................................................... 27

VIII.   Conclusion ........................................................................................................ 28

DocuSign Envelope ID: A5AAB49F-1549-4F75-BE1E-A29283E36653

## I.      Assignment

1.      I have been retained by counsel for Defendants in *In re Qualcomm Inc. Securities Litigation.*, Case No. 17-cv-121 (the "Action") to opine based on my experience on what professional sell-side equity research analysts understood regarding the Qualcomm business practices that the Plaintiffs in the Action allege were concealed.[1]   In particular, I have been asked both to offer my own understanding of certain Qualcomm business practices in the years prior to and during the Class Period (which I understand to be 2012 to 2017) and to assess what other analysts—who, like me, closely followed Qualcomm's performance—would have known and understood based on public disclosures by Qualcomm and others, given the custom and practice of the analyst industry.  The Qualcomm business practices I was asked to examine are (1) Qualcomm's practice of licensing exclusively at the device level and not at the chip level, (2) Qualcomm's practice of not selling chips to non-licensees, and (3) Qualcomm's separate operation of its chip and licensing business units (Qualcomm CDMA Technologies, "QCT", and Qualcomm Technology Licensing, "QTL", respectively).

2.      This task requires an examination of the types of information regularly consulted by members of the sell-side analyst community, including public disclosures made with respect to:  Qualcomm's business practices; industry standards; Qualcomm's partners, customers and competitors; regulatory agencies around the world; and litigation implicating Qualcomm or others in the semiconductor, cellular and wireless communications industries.  I have undertaken this examination and offer below my conclusions on analysts' understanding of Qualcomm's business.

3.      A copy of my curriculum vitae is attached as Exhibit 1.  The complete list of materials and other information that I have relied upon in preparing this declaration is presented in Exhibit 2.[2]

## II.     Opinions

4.      After providing an overview of sell-side equity research analysts, I provide the following opinions:

      a.      Based on my experience, my interactions with sell-side analysts who followed Qualcomm during the relevant time period, the custom and practice of the analyst industry and my examination of publicly

---

[1]   See generally Consolidated Class Action Complaint for In re Qualcomm Incorporated Securities Litigation ("Complaint"), No. 17-cv-121 (S.D. Cal.) (July 3, 2017), Docket No. 32.

[2]   Copies of certain of the analyst reports cited herein (and included in Exhibit 2) bear a watermark showing that were acquired by Qualcomm through various subscription services.  As discussed below, analyst reports are publicly available to analysts' customers and to anyone who wishes to use the various subscription services that compile analyst reports.

DocuSign Envelope ID: A5AAB49F-1549-4F75-BE1E-A29283E36653

available materials from the relevant time period, it is my opinion that analysts understood before November 17, 2015, that Qualcomm licenses at the device level and that it does not license at the chip level.[3]   I set out the bases for this opinion in Part V. below.

b.   Based on my experience, my interactions with sell-side analysts who followed Qualcomm during the relevant time period, the custom and practice of the sell-side analyst industry and my examination of publicly available materials from the relevant time period, it is my opinion that analysts understood before November 17, 2015, that Qualcomm does not sell chips to non-licensees.   I set out the bases for this opinion in Part VI. below.

c.   Based on my experience, my interactions with sell-side analysts who followed Qualcomm during the relevant time period, the custom and practice of the analyst industry and my examination of publicly available materials from the relevant time period, it is my opinion that analysts who heard statements made by Qualcomm about the separateness of Qualcomm's businesses in 2012 and 2013 would have understood those statements to be about the separate functioning of the business units and not about alleged royalty relief arrangements. I set out the bases for this opinion in Part VII. below.

## III.   Education and Work Experience

### A.   Education

5.   I graduated from the University of Edinburgh in 1992.  I then completed a Ph.D. in Molecular Immunology at the University College London in 1996 and subsequently embarked on the CFA program, completing it with the award of my charter in 2000.

### B.   Relevant Work Experience

6.   I joined a small broker called Williams De Broë (a subsidiary of Brussels Lambert) in London in September 1996 as a junior and then senior analyst covering Dutch equities.  In 1998, Barings took over Williams De Broë, and I shifted to covering the Baltic states as a generalist analyst during the period of the 1998 Russian financial crisis.  In 1999, I joined the Abu Dhabi Investment Authority in Abu Dhabi as analyst and portfolio manager for both emerging market telecoms and pan-European technology.  In 2001, I returned to London to cover global telecom equipment at Nomura Securities, where I began analyzing Qualcomm, its peer group and its customers.  During this period, I was lead

---

[3] For purposes of this declaration, I consider device-level licensing in reference to the licensing of phones and tablets as opposed to chips.

analyst on these names and also covered the Nokia/Qualcomm dispute as well as the Broadcom/Qualcomm dispute.

7.     Following the financial crisis of 2008, Nomura purchased the non-U.S. business of Lehman Brothers, and I moved to become the Global Technology Specialist. This was a role on the trading desk that involved analysis of equity and simple derivatives but was not part of the research department.

8.     In 2012, I left Nomura to found my own research company, Radio Free Mobile (RFM).  For 10 years, RFM has offered its clients in-depth, strategic analysis of the technology sector.  RFM's clients consist almost exclusively of corporations rather than financial institutions.  Each corporation pays a subscription to access research material, enquiry hours used for executive education, bespoke research projects, financial due diligence and so on.  At any one time, there are 15 to 20 subscribers, each of whom pay almost exactly the same price.  Qualcomm has been a subscriber to RFM research for around seven years and has a slight discount to RFM's standard rate as it has been a subscriber for a long period of time.

## IV.     Sell-Side Equity Research Analyst Overview

9.     Sell-side equity research analysts are individuals who work for investment banks, brokerage firms or independent research firms, and publish investment research regarding publicly traded companies.[4]  Analysts conduct investment research on publicly traded firms, often with a focus on a particular sector of the market and/or particular companies within a sector.[5]  Investment research forms the basis

---

[4] "Analyst," John Downes & Jordan Elliot Goodman, Barron's Dictionary of Finance and Investment Terms at 29 (8th ed. 2010) (defining "analyst" as "a person in a brokerage house, bank trust department, or mutual fund group who studies a number of companies and makes buy or sell recommendations on the securities of particular companies and industry groups.  Most analysts specialize in a particular industry, but some investigate any company that interests them, regardless of its line of business.  Some analysts have considerable influence, and can therefore affect the price of a company's stock when they issue a buy or sell recommendation."); see also id. at 643 (defining "Securities Analyst" as an "individual, usually employed by a stock brokerage house, bank, or investment institution, who performs investment research and examines the financial condition of a company or group of companies in an industry and in the context of the securities markets.  Many analysts specialize in a single industry or sector and make investment recommendations to buy, sell, or hold in that area.  Among a corporation's financial indicators most closely followed by analysts are sales and earnings growth, capital structure, stock price trend and price/earnings ratio, dividend payouts, and return on invested capital."); "Analyst," Barbara J. Etzel, Webster's New World Finance and Investment Dictionary at 13 (Wiley 2003) (defining "analyst" as "[a]n employee of a sell-side firm (a Wall Street broker), a buy-side firm (a mutual fund or investment management company), or an independent research firm that makes buy and sell recommendations on companies in a particular industry.  Analysts also are employed by companies involved in commodities trading to recommend when customers should buy and sell futures contracts and suggest appropriate trading strategies.").

[5] Boris Groysberg & Paul M. Healy, Wall Street Research:  Past, Present, and Future at 21, 23 (Stanford Univ. Press 2013) ("In performing their research function, analysts typically specialize in covering companies in a particular industry. . . .  A typical analyst follows ten to twenty companies in a single industry, although the number of companies covered varies widely by sector, by research firm, and

3

of analysts' reports, in which analysts publish their views and issue investment recommendations regarding whether to buy, sell or hold securities in a sector or particular company.  In connection with developing buy, sell or hold recommendations, analysts routinely conduct and publish valuations of the companies they cover.  Analysts typically gather and use all available public information to reach a view regarding a company's value or future value (often called a "price target") based on a company's projected earnings, performance, competitive positioning and any other available information bearing on value.[6] Analysts (or the firms that employ them) then publish their research reports to assist clients and the investing public in making informed investment decisions, including the buying and selling of securities.[7]

10.     Investment research relies on all available public information that may impact the value of the subject company.[8]  Such information may come from several key sources:  First, analysts study disclosures made by the company itself through traditional disclosure channels, e.g., SEC filings (such as quarterly, annual and current reports), quarterly earnings presentations and investor calls.

11.     Second, analysts use the financial data and other information contained in these sources—including balance sheets, income statements, cash flow statements, segment information, performance projections, expected and actual earnings, and strategic decisions by management—to inform their forecasts regarding a company's value.[9]

12.     Third, in addition to reviewing corporate disclosures and financial statements, analysts also meet with management and industry executives (including by

---

over time.  Analysts are generally hired to cover an industry group, often one on which they have significant knowledge from prior work or educational experience.  Analysts who are hired without knowledge of a particular industry will generally be assigned one based on the firm's personnel needs.  Once they begin to cover an industry, analysts rarely move from one industry group to another.").

[6] See id. at 22–26.

[7] Id. at 23–24 ("Once written, research reports and notes are sent by the analysts to buy-side clients via e-mail, fax, or mail.  Analyst reports are also forwarded electronically to database services (such as Thomson Reuters's FirstCall), which aggregate sell-side research reports.  Buy-side investors are then able to have access to reports directly via these online databases.").

[8] See id. at 21–25 ("For analysts, a typical day in the office begins with a review of the morning news to determine whether there is anything new that could affect the stocks they cover.").

[9] "Fundamental Analysis," John Downes & Jordan Elliot Goodman, Barron's Dictionary of Finance and Investment Terms at 287–88 (8th ed. 2010) (defining "Fundamental Analysis" for investments as an "analysis of the balance sheet and income statements of companies in order to forecast their future stock price movements.  Fundamental analysts consider past records of assets, earnings, sales products, management, and markets in predicting future trends in these indicators of a company's success or failure.  By appraising a firm's prospects, these analysts assess whether a particular stock or group of stocks is undervalued or overvalued at the current market price.").

participating in earnings calls) to ask questions and discuss information about the company, the sector and the peer companies involved.[10]

13.    Fourth, beyond public disclosures like SEC filings, analysts also utilize other publicly available information about the companies and sectors they cover, such as court filings, congressional testimony, conference presentations, news stories and media interviews by industry participants.

14.    Fifth, analysts consult with and learn from each other.  For example, during my time as an investment analyst covering Qualcomm, approximately 30 sell-side analysts followed Qualcomm as a major part of their portfolios, and it was a fairly close-knit industry.  We knew each other, interacted at meetings, attended conferences together and regularly discussed our research—including that which related to Qualcomm.

15.    Finally, analysts rely on any other available information that may inform value, including market data, industry economic conditions, supply chain data, information from or about competitors and, where relevant, changes in the political, regulatory and legal landscape that may impact a company's earnings or performance potential, and, therefore, value.

16.    Based on the information available to them, analysts then prepare models, conduct valuations and/or issue price targets and buy/sell/hold recommendations, which are compiled into analysts' reports and published.[11]  As additional information becomes available (whether disclosed by the company or otherwise), analysts publish updated analyses with new valuations and price targets to incorporate the new information such as that regarding performance relative to

---

[10] Boris Groysberg & Paul M. Healy, Wall Street Research:  Past, Present, and Future at 23–24 (Stanford Univ. Press 2013).

[11] Id. at 23 ("Analysts communicate their research to clients in the form of written reports that include qualitative assessments of industry dynamics and the firm's business model; quantitative forecasts of earnings, financial models, and target stock prices; and an investment recommendation.  Forecasts of quarterly earnings and revenues are typically issued for as many as eight quarters ahead, whereas target price forecast horizons are usually for the following twelve months.  Analysts write a new research piece every few days, each of which can range from a one- to five-page news-related publication, generally referred to as a 'note,' to a fifty-page in-depth company report.  Each research firm has its own standard template, but the front page usually includes the brokerage and analyzed firms' names, the analyst's name, the report name, summary market data, summary financial data, earnings estimates, an investment recommendation, and a summary of the report's findings.  One- to five-page notes are the most common written output.  Analysts produce them quickly (often in a matter of hours) in response to a piece of news, such as a quarterly earnings release, an acquisition, or a change in key personnel.  The purpose of a note is to summarize the event, describe any anticipated change in company fundamentals as a result of the event, and reaffirm (or if necessary, change) an analyst's investment recommendation on the company.  Analysts also write upgrade or downgrade notes to announce a change in their investment recommendations on particular stocks or sectors and to detail the rationale for the changes.  Longer reports represent months of research and analysis; they present a thorough overview of a company, industry, product line, or strategy.").

DocuSign Envelope ID: A5AAB49F-1549-4F75-BE1F-A29283E36653

expectations, new or changed business risks, changed political landscape, and broader economic variables. Information is the fuel that drives analysts—and they compete for it vigorously: to be successful, analysts strive to be the *most* informed, and therefore actively seek information they think could give them an edge in providing the most accurate and comprehensive analyses.

**V.  During the Class Period, There Were Extensive Public Disclosures Available to Professional Sell-Side Equity Research Analysts Regarding Qualcomm's Practice of Licensing Exclusively at the Device, Rather Than Chip, Level, and Their Research Reflected That Understanding.**

17.  I understand that Plaintiffs in this Action allege that Qualcomm misled investors with statements that it licenses "broadly"[12] and on "non-discriminatory"[13] terms to "manufacturers" in the mobile industry. It is also my understanding that Plaintiffs allege that the truth about Qualcomm's licensing practice—that Qualcomm licenses exclusively at the device, rather than chip, level—was revealed to the public for the first time in a November 17, 2015 Qualcomm press release detailing allegations brought by the Korea Fair Trade Commission (KFTC) against Qualcomm. The press release set forth the KFTC's allegations that Qualcomm's "practice of licensing [its] patents only at the device level" violates Korean competition law.[14]

18.  It is my opinion based on my experience, my interactions with sell-side analysts who followed Qualcomm during the relevant time period, the custom and practice of the analyst industry and my examination of publicly available materials from the relevant time period, that analysts understood before November 17, 2015, that Qualcomm licensed exclusively at the device level during the Class Period and did not license at the chip level.[15]

19.  This conclusion is based on the following sets of documents, each pre-dating November 17, 2015: (A) Qualcomm's public statements about, and analysts'

---

[12] See, e.g., Compl. ¶¶ 134, 135, 136, 137, 141.

[13] See, e.g., id. ¶¶ 65, 130, 151, 163.

[14] Qualcomm Press Release, *Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report* (Nov. 17, 2015), https://www.prnewswire.com/news-releases/qualcomm-confirms-receipt-of-korea-fair-trade-commissions-case-examiners-report-300180670.html.

[15] I also understand that Plaintiffs refer to a later alleged corrective disclosure, a KFTC press release dated December 27, 2016, regarding Qualcomm's business practice. The KFTC's press release announced the full Commission's finding that "Qualcomm has refused to license competing chipset companies . . . ." KFTC Press Release, *Strict Sanctions on Qualcomm's Abuse of Cellular SEPs* (Dec. 27, 2016), Q121SEC00373861 at -862. Because Qualcomm's November 17, 2015 press release (concerning the KFTC Case Examiner report) predates the KFTC's findings, and it is undisputed that as of November 17, 2015, Qualcomm had a "practice of licensing [its] patents only at the device level," I use the November 17, 2015 date as the starting point of my analysis for what analysts understood about Qualcomm's business model.

6

acknowledgment of, Qualcomm's pre-2008 licensing practices; (B) Qualcomm's public statements about, and the industry's clear messaging about, post-2008 licensing practices; (C) Qualcomm's public disclosures regarding, and analysts' reporting on, the Chinese National Development and Reform Commission's (NDRC) investigation into Qualcomm's licensing practices; and (D) analyst reports spanning several years prior to the first alleged corrective disclosure that explicitly detailed Qualcomm's licensing practice and employed valuation models that estimated QTL royalties as a function of device—not chip—sales, demonstrating a clear understanding that Qualcomm's total addressable licensing market comprised almost entirely device, not chip, manufacturers.

### A.  Analysts Understood, and Commented Upon, Qualcomm's Pre-2008 Licensing Practices.

20.   It was clear to me as early as 2007 that Qualcomm only licensed its intellectual property (IP) exhaustively at the device level and did not provide exhaustive licenses to chipmakers.  As I stated in a Nomura report dated March 1, 2007: "Historically Qualcomm has been able to set the [royalty] price at around 4.4% of the wholesale price of the device for its technology,"[16] and "[h]andset makers are going to require a licence with the larger IPR holders regardless of any pass through rights from Qualcomm."[17]

21.   Moreover, it is my opinion based on my experience that, before and into early 2008, analysts and market participants understood that while certain companies in the cellular communications industry with significant patent portfolios, including Qualcomm, had agreements with certain component manufacturers (such as chipmakers) designed to permit component manufacturers to use their intellectual property, these agreements invariably did not grant chipmakers "pass-through" rights that would flow to end-device-making customers.[18]  Specifically, the agreements with chipmakers provided for the usage of the licensor's intellectual property to *make* cellular chips, but did not grant chipmakers the rights to incorporate them into devices for sale to a consumer.  These agreements were intended to prevent intellectual property rights from passing through the

---

[16] Nomura Report, *Equipment Matters:  IPR:  War of the Worlds* (Mar. 1, 2007), Q2017MDL1_01761812 at -822.

[17] Id. at -830.

[18] Qualcomm Inc. SEC Form 10-K (Nov. 2, 2006), Q2017MDL1_01500131 at -153 ("In every case, the phone manufacturers' sales of CDMA-based phones are subject to the payment of royalties to us on the products into which the integrated circuits are incorporated in accordance with the manufacturers' separate licensing arrangements with us."); Qualcomm Inc. SEC Form 10-K (Nov. 8, 2007), Q121SEC00102652 at -665 ("In every case, the wireless device manufacturers' sales of CDMA-based wireless subscriber devices are subject to the payment of royalties to us on the products into which the integrated circuits are incorporated in accordance with the manufacturers' separate licensing arrangements with us.").

chipmakers to their end-device-making customers.[19]  These agreements were sometimes referred to as non-exhaustive licenses or patent agreements without "pass-through rights."

22.   My review of the public information from this time period also confirms my recollection that Qualcomm repeatedly publicly disclosed the fact that it entered into such limited agreements with chipmakers (and not exhaustive licensing agreements).  In the first instance, Qualcomm stated in two consecutive SEC Form 10-K filings that it entered into certain agreements with chipmakers that "permit the licensees to manufacture integrated circuits using certain of [its] intellectual property for sale to CDMA-based phone manufacturers."  Qualcomm further stated that the "phone manufacturers' sales of CDMA-based phones are subject to the payment of royalties to [Qualcomm] on the products into which the integrated circuits are incorporated" and noted that such royalties were payable "in accordance with the manufacturers' separate licensing arrangements with [Qualcomm]."[20]  The fact that these agreements were subject to Qualcomm's receipt of royalty payments from the phone manufacturers indicated that Qualcomm did not intend exhaustively to license chipmakers.

23.   Later that year, Qualcomm's licensing practice was explicitly discussed by analysts during Qualcomm's litigation with Nokia.  For example, on October 12, 2007, Merrill Lynch analysts demonstrated their understanding of Qualcomm's licensing model when they wrote that when Nokia argued that Qualcomm had exhausted its patents by licensing Texas Instruments (Nokia's chipmaker), "Qualcomm responded the next day saying [the ASIC manufacturer] does NOT have pass through rights that would otherwise relieve handset vendors from royalties payable to Qualcomm."[21]  It also became clear to the analyst community during the dispute that Texas Instruments paid a 0% royalty rate in order to prevent patent exhaustion so that royalties could be collected at the device level, as I alluded to in my April 28, 2008 report.[22]

24.   In November of 2007, Qualcomm again explained this practice, both in a press release and in a slide deck presentation from the same day.  Qualcomm's press release stated:  "Qualcomm's agreements with ASIC suppliers include as material terms express provisions that such agreements (1) are not intended to result in the exhaustion of any of Qualcomm's patents and (2) reserve for Qualcomm the right

---

[19] Qualcomm Inc. Amicus Brief (Dec. 10, 2007) in Quanta Computer, Inc. v. LG Electronics, Inc., No. 06-937, 553 U.S. 617 (2008), Q121SEC00782353 at -366.

[20] Qualcomm Inc. SEC Form 10-K (Nov. 2, 2006), Q2017MDL1_01500131 at -152–53; Qualcomm Inc. SEC Form 10-K (Nov. 8, 2007), Q121SEC00102652 at -665.

[21] Merrill Lynch Report, Qualcomm Inc. Company Update:  Navigating the Legal Minefield (Oct. 12, 2007), Q2014FTC03533601 at -616.

[22] See Nomura Report, Equipment Matters:  IPR:  The Master Craftsman (Apr. 28, 2008), Q2017MDL1_02917805 at -825.

DocuSign Envelope ID: A5AAB49F-1E49-4575-BE45-A29382536653

to seek royalties from handset manufacturers incorporating chips from any such ASIC supplier." [23]  The slide deck presentation likewise explained:  "Agreements with companies selling ASIC[s]:  Expressly disclaim the ability for the ASIC supplier to pass through rights to Qualcomm's patents[;] Provide for termination of any provision found to create exhaustion as to any jurisdiction in which exhaustion is found[;] Provide for retroactive termination as if the exhaustive rights were never granted."[24]  During the meeting, Qualcomm further elaborated:  "Over 90% of the royalties that we collect are from the handsets. . . .  [O]ur licensing program and the success of our model is really derived from the royalties that apply to the handsets."[25]  It was my understanding then and now that most or all of the remaining 10% of revenue comes from royalties paid on mobile infrastructure, with no (or almost no) revenues coming from royalties paid by semiconductor makers on chips.[26]

25.    Finally, in a publicly available Amicus brief from December 2007 in the <u>Quanta Computer v. LG</u> litigation, Qualcomm explained that its non-exhaustive ASIC[27] Patent License Agreements "do *not* grant a license to the chipmaker to *use* the ASICs—i.e., licensed chipmakers may not themselves use or pass on to others the right to use the chipmaker's ASICs to make, operate or sell handsets or any other product."[28]  Media further commented on the legal position regarding non-exhaustive licensing that Qualcomm articulated in its December 2007 Amicus brief.[29]

---

[23] Qualcomm Press Release, *Dutch and German Courts Dismiss Nokia's Patent Exhaustion Complaints* (Nov. 14, 2007), https://www.qualcomm.com/news/releases/2007/11/dutch-and-german-courts-dismiss-nokias-patent-exhaustion-complaints.

[24] Qualcomm Presentation, *New York Investor Day* (Nov. 14, 2007), Q121SEC00315554 at -570.

[25] Qualcomm Inc. Analyst Meeting Transcript (Nov. 14, 2007), Q121SEC00246600 at -634–35.

[26] Qualcomm Earnings Call Transcript (Apr. 27, 2009), Q121SEC00171031 at -043 ("[T]he royalties from ASIC suppliers are a very minimal part of our program.").

[27] "ASIC" refers to an application-specific integrated circuit, a term used to describe a certain type of modem chip designed to perform a particular function within a device.

[28] Qualcomm Inc. Amicus Brief (Dec. 10, 2007) in <u>Quanta Computer, Inc. v. LG Electronics, Inc.</u>, No. 06-937, 553 U.S. 617 (2008), Q121SEC00782353 at -366.

[29] <u>See, e.g.</u>, Communications Daily Article (Jan. 18, 2008) https://communicationsdaily.com/article/view?BC=bc_62d55a716b8b0&search_id=569590&id=318852 ("However, the court will let patent holders limit licenses so they can get royalties or damages from the end buyer, the analyst firm predicted.  The case has drawn the interest of major semiconductor, computer and Internet firms.  Cisco, IBM, Dell, Hewlett-Packard and eBay say the first buyer of the patent technology should pay full royalty and pass the cost to its customers.  Qualcomm and Yahoo support LG.  A Qualcomm filing said the changes Quanta seeks could 'affect significantly and fundamentally the foundations of Qualcomm's businesses (and those of other high technology companies).'").

26.    Shortly after Qualcomm filed its December 2007 Amicus brief, on January 23, 2008, on an earnings call, Qualcomm articulated its commitment to ensuring that its ASIC agreements were non-exhaustive and that a device manufacturer could "only obtain rights to Qualcomm's patents by entering into its own license agreement with Qualcomm."[30]  It is my opinion based on my experience that this was readily apparent to analysts, who understood that Qualcomm explicitly excluded pass-through rights in its ASIC patent license agreements.  For example, in a 2007 report covering the Nokia-Qualcomm legal battle, Bernstein Research analysts observed that "[p]atent exhaustion would be devastation to Qualcomm."[31]  Similarly, William Blair & Company articulated its understanding in an equity research report published just two days after the earnings call, on January 25, 2008.  William Blair & Company noted:  "On one specific point of contention between the companies, QUALCOMM did specify that its ASIC manufacturer licensing contracts contain provisions that do not allow for pass-through rights, reducing the likelihood that the agreements would lead to patent exhaustion."[32]

27.    Thus, Qualcomm made explicit and, in my opinion based on my experience, analysts understood, as I did, that Qualcomm's licensing business revolved around the exhaustive licensing at the device level, and that although Qualcomm had patent agreements with certain component manufacturers (such as chipmakers), those did not grant "pass-through" rights to end-device-making customers.  This was true both before and after the U.S. Supreme Court's 2008 decision in <u>Quanta</u>.

   **B.    There Were Extensive Public Disclosures Available to Sell-Side Analysts Regarding Qualcomm's and the Industry's Post-2008 Licensing Practices, and Analysts' Research Reflected That Understanding.**

28.    My review of the publicly available documents confirms my recollection that licensors' (including Qualcomm's) practice of licensing and collecting royalties at the device level has remained the same since the early days of the cellular communications industry.  In my opinion based on my experience, this practice has been well understood by analysts.

---

[30] Qualcomm Earnings Call Transcript (Jan. 23, 2008), Q2014FTC04501674 at -694.

[31] Bernstein Research Report, *Qualcomm & Nokia: Stakes Now Higher for Both Sides; Eventual Settlement Still More Likely than Long Legal Battle* (Apr. 9, 2007), Q2014FTC03522780 at -780.

[32] <u>See</u> William Blair & Company Report, *Qualcomm Inc. First Quarter 2008 Earnings Call:  Results In Line With Expectations; Chipset Business Gaining Share* (Jan. 25, 2008), Q2017MDL1_00044414 at -416.

i.  **Qualcomm's Public Statements Disclosed Its Post-2008 Licensing Practice.**

29.  While the industry practice of licensing and collecting royalties at the device level has remained the same, after 2008, certain licensors (including Qualcomm) ceased their practice of providing even limited licensing agreements further down in the value chain (such as to chipmakers) as a result of increased legal risks that granting limited licenses to chipmakers would threaten the more efficient practice of licensing at the device level.  For example, Qualcomm entered into an agreement with Broadcom in 2009 that was explicit that it was not a limited license and did not have pass-through rights.[33]

30.  As set forth below, in my opinion based on my experience, while this was not viewed by analysts as a meaningful change in practice (because chip-level licensing was never a meaningful revenue source for licensors), this business practice was nonetheless publicly disclosed by licensors (including Qualcomm) and was well understood by analysts.  For example, a 2009 MediaTek press release announced that Qualcomm and MediaTek had entered into a "patent arrangement", rather than a license, and further articulated that MediaTek customers would not receive rights to any of Qualcomm's patents.[34]  Likewise, in a 2013 joint statement by Qualcomm and chip manufacturer MediaTek, the parties explained:  "The original agreements between MediaTek and Qualcomm were not, and the amended agreements are not, 'license' (or 'licensing') agreements.  MediaTek does not have a license to any of Qualcomm's patents, and Qualcomm does not have a license to any of MediaTek's patents."[35]

---

[33] See, e.g., Barclays Capital Report, *Qualcomm, Inc.:  Robust Units, Lower ASPs; 1-OW* (Apr. 27, 2009), Q2014FTC03504393 at -398 ("While the agreement clarifies that Qualcomm customers do not receive any rights to BRCM patents outside of the cellular offerings, Broadcom customers do not receive any of QCOM's patents (pass through we believe) used in cellular offerings."); J.P. Morgan Report, *Qualcomm:  Q2 Wrap:  Happy Days Are Here Again for the Chip Biz as Latest Bottom is Found in San Diego, Reit. OW* (Apr. 28, 2009), Q2014FTC03669833 at -835 ("And most importantly, Broadcom customers *do not* get pass through rights to Qualcomm's IP, meaning Qualcomm will continue to collect royalties on any CDMA or WCDMA phone powered by a Broadcom chip – so there is no lasting change to Qualcomm's royalty stream.").

[34] MediaTek Press Release, *MediaTek and Qualcomm Enter Into Patent Arrangement* (Nov. 20, 2009), https://corp.mediatek.jp/news-events/press-releases/mediatek-and-qualcomm-enter-into-patent-arrangement ("MediaTek's customers do not receive rights to any of Qualcomm's patents and such customers will need to obtain a separate license from Qualcomm in order to receive rights to any of Qualcomm's patents.  Qualcomm's customers do not receive rights to any of MediaTek's patents and such customers will need to obtain a separate license from MediaTek in order to receive rights to any of MediaTek's patents.").

[35] Press Release, *Joint Public Statement by MediaTek and Qualcomm* (Sept. 25, 2013), https://corp.mediatek.com/news-events/press-releases/joint-public-statement-by-mediatek-and-qualcomm; see also Qualcomm Inc. at JPMorgan Global Technology, Media and Telecom Conference (May 20, 2009), QNDCAL01877078 at -089 ("[T]he focus of our licensing program for years has been the handset

11

31.     My review has also confirmed my understanding, then and now, that Qualcomm
        publicly disclosed the differences between the licenses it entered into with device
        manufacturers and the non-exhaustive patent agreements that it entered into with
        chipmakers in its quarterly and annual SEC filings.[36]  In 2009, for example,
        Qualcomm articulated in its annual SEC Form 10-K:  "In every case, these
        agreements do not allow such integrated circuit suppliers to pass through rights
        under Qualcomm's patents to such suppliers' customers."[37]  The following year,
        Qualcomm's 2010 SEC Form 10-K stated:  "We generate revenues by licensing
        portions of our intellectual property to manufacturers of wireless products (such
        as mobile devices, also known as subscriber units, which include handsets, other
        consumer devices and modem cards, and the infrastructure required to establish
        and operate a wireless network)."[38]  In 2011, Qualcomm's SEC Form 10-K
        stated:  "Separate and apart from licensing manufacturers of subscriber and
        network equipment, we have entered into certain patent arrangements with
        competitors of our QCT segment . . . .  In every case, these agreements expressly
        reserve the right for QTL to seek royalties from the customers of such integrated
        circuit suppliers with respect to such suppliers' customers' sales . . . ."[39]  And
        again in 2013, Qualcomm's SEC Form 10-K explained:  "Our licensees
        manufacture wireless products, such as mobile devices, also known as subscriber
        units, which include handsets, other consumer devices (e.g., tablets, personal
        computers, e-readers, personal navigation devices), machine-to-machine devices
        (e.g., telematics devices, meter reading devices) and plug-in end user data modem
        cards, certain embedded modules for incorporation into end user products, the
        infrastructure equipment required to establish and operate a network, and
        equipment to test networks and subscriber units."[40]

32.     Taken together, Qualcomm's 2010 and 2013 SEC Form 10-K filings emphasize
        that Qualcomm licenses at the device level and does not engage in chip-level
        licensing.  The 2011 SEC Form 10-K provides color that Qualcomm did not grant
        pass-through rights to chipmakers and expressly reserved Qualcomm's rights to
        license and seek royalties from the chipmakers' customers (the device
        manufacturers).[41]  Numerous other Qualcomm statements, made in various

---

manufacturers.  There has not been a major focus on our end for 3G chipset manufacturers.  In fact, it was a
few years ago that a licensee in the chipset business disclosed that they had a royalty-free rate.").

[36] Qualcomm Inc. SEC Form 10-K (Nov. 5, 2009), Q121SEC00038374 at -390; Qualcomm Inc. SEC
Form 10-K (Nov. 3, 2010), Q121SEC00038789 at -797; Qualcomm Inc. SEC Form 10-K (Nov. 2, 2011),
Q121SEC00039144 at -155; Qualcomm Inc. SEC Form 10-K (Nov. 6, 2013) Q121SEC00039933 at -943.

[37] Qualcomm Inc. SEC Form 10-K (Nov. 5, 2009), Q121SEC00038374 at -390.

[38] Qualcomm Inc. SEC Form 10-K (Nov. 3, 2010), Q121SEC00038789 at -797.

[39] Qualcomm Inc. SEC Form 10-K (Nov. 2, 2011), Q121SEC00039144 at -155–56.

[40] Qualcomm Inc. SEC Form 10-K (Nov. 6, 2013) Q121SEC00039933 at -943.

[41] Qualcomm Inc. SEC Form 10-K (Nov. 2, 2011), Q121SEC00039144 at -155–56.

DocuSign Envelope ID: A5AAB49E-1E49-4575-BE4E-A29282536653

earnings calls over the years that predate the alleged corrective disclosure in November 2015, similarly informed analysts regarding Qualcomm's business practices.[42]  It is my opinion based on my experience, therefore, given these extensive Qualcomm disclosures, that analysts understood Qualcomm's business practices before the alleged corrective disclosure in November 2015.

33.    In addition to reviewing Qualcomm's SEC filings, I reviewed various public presentations and comments by Qualcomm and its executives, which disclosed Qualcomm's longstanding practice of licensing device manufacturers.  For example, I understand that Qualcomm publicly objected to a proposed policy change before the IEEE Standards Association (the "IEEE") that would have required holders of essential patents to license certain components of devices.  Indeed, Sean Murphy, Qualcomm's vice president and counsel for international government affairs, was quoted in the *Wall Street Journal* stating that the policy change would have constituted "a seismic shift."[43]

34.    Beyond such comments, Donald Rosenberg stated during a 2013 Senate hearing on standard essential patents that "it is and has long been the industry norm for substantial patent holders to license at the level of complete standard-compliant devices, not parts and components."[44]  Competitor component manufacturer Intel openly opposed this practice in the same Senate hearing, with Intel's then-general counsel A. Douglas Melamed arguing against patent holders' "refus[al] to license component manufacturers like Intel" and instead licensing only "[Intel's] customers, manufacturers of . . . end products."[45]  Despite the dispute as to the lawfulness of Qualcomm's licensing practices, both sides agreed on and understood that Qualcomm licensed only at the device level.

---

[42] See, e.g., Qualcomm Earnings Call Transcript (Jan. 28, 2015), Q121SEC00283109 at -124 ("So we'll have to watch this and see where it goes.  But certainly the norm in our industry has been very much in line with the way that we have licensed historically, and we think there's a lot of good reasons that support that long-term. . . .  But you even look at the Chinese OEMs that have disclosed how they might license their IP portfolios, and they talk about licensing at the handset level, not the chip level.").

[43] Wall Street Journal, *Patent Holders Fear Weaker Tech Role: Engineering Group's Policy Revisions Could Cut License Fees* (Feb. 9, 2015), https://www.wsj.com/articles/patent-holders-fear-weaker-tech-role-1423442219; Consistent with its public stance on the policy change, Qualcomm also submitted public comments directly to the IEEE objecting to the proposed policy change and arguing that it "would constitute . . . a disruptive change to existing industry licensing practices" that would "limit licensing costs, in particular royalty costs, to a fraction of the price of those chip components, neither of which is currently a requirement of the IEEE patent policy."  IEEE-SA Standards Board Bylaws Draft Comment Report, Qualcomm Comment (May 26, 2014), https://grouper.ieee.org/groups/pp-dialog/drafts_comments/PatCom_sort_by_comment_ID_260514.pdf at 20.

[44] Supplemental Prepared Statement of Donald J. Rosenberg, Senate Hearing on Standard-Essential Patent Disputes and Antitrust Law (Sept. 3, 2013), Q2017MDL1_00020215 at -319.

[45] Statement of A. Douglas Melamed for Intel Corporation, Senate Hearing on Standard-Essential Patent Disputes and Antitrust Law (July 30, 2013), Q2017MDL1_00020215 at -227.

35.     Thus, it is my opinion that Qualcomm's public statements, including testimony before Congress, informed analysts about Qualcomm's post-2008 (i.e., post-Quanta) licensing practices.

### ii.     Qualcomm's Competitors and Other Industry Players Also Disclosed that They Licensed at the Device Level.

36.     Qualcomm's competitors and entities familiar with Qualcomm's competitors publicly discussed the industry-standard practice of licensing exclusively at the device level.  Most broadly, representatives from the European Telecommunications Standards Institute ("ETSI"), a leading cellular standards body, defended device-level royalties at the 2015 Standards Patents & Competition Conference.[46]  Analysts at the conference reported on the "very strong support" among other major licensors, including Nokia and Ericsson, for the "current practice of device based royalty" and noted that "the current practice of device-based royalty has been the general practice in the cellular industry for over two decades."[47]  Indeed, Nokia once explained in an Amicus brief that royalty rates "are typically based on, and applied against, the price of the end product in private negotiations between parties in the industry."[48]  And this practice is universal:[49] when the IEEE proposed a policy change that would have required component-level licensing, Ericsson agreed with Qualcomm's public position that such a change would have been a "seismic shift."[50]  What is more, Ericsson publicly defended its practice of licensing exclusively at the device level

---

[46] Bank of America Merrill Lynch Report, *Key Takeaways from a Patent Conference: Implications for Qualcomm* (Dec. 7, 2015), Q121SEC00561405 at -405.

[47] Id.

[48] Nokia Amicus Brief (May 6, 2013) in Apple Inc. v. Motorola Inc., No. 2012-1548, 757 F.3d 1286 (Fed. Cir. 2014), Q2017MDL1_02785251 at -258.

[49] See Prepared Statement of A. Douglas Melamed for Intel Corporation, Senate Hearing on Standard-Essential Patent Disputes and Antitrust Law (July 30, 2013), Q2017MDL1_00020215 at -282 ("There is no mystery as to why some SEP holders prefer to selectively license only downstream entities in the supply chain . . . ."); see also Supplemental Statement of A. Douglas Melamed for Intel Corporation, Senate Hearing on Standard-Essential Patent Disputes and Antitrust Law (Aug. 13, 2013), Q2017MDL1_00020215 at -291 ("SEP holders, however, often go to great lengths to avoid licensing upstream component (e.g., chip) manufacturers and choose instead to license their patents downstream, at for example the device (e.g., computer) level.").

[50] Wall Street Journal, *Patent Holders Fear Weaker Tech Role: Engineering Group's Policy Revisions Could Cut License Fees* (Feb. 9, 2015), https://www.wsj.com/articles/patent-holders-fear-weaker-tech-role-1423442219 ("The Swedish telecommunications-equipment company has sided with Qualcomm in the IEEE dispute.").  This is consistent with the public comments Ericsson submitted against the proposed policy change, arguing that it would "attempt[] to significantly expand future RAND commitments beyond where they currently apply" and "contradict[] the current industry practice of licensing on the OEM level." IEEE-SA Standards Board Bylaws Draft Comment Report, Ericsson Comment (May 26, 2014), https://grouper.ieee.org/groups/pp-dialog/drafts_comments/PatCom_sort_by_comment_ID_260514.pdf, at 50, 53.

at least twice:  First, in litigation against D-Link, Ericsson explained that it has a "policy of a number of years to license the makers of end-user products but not chip makers" and that this policy is consistent with Ericsson's FRAND commitments.[51]  Then in 2015, Ericsson defended its practice yet again in litigation against Apple, during which analysts at BMO Capital Markets summarized that "Apple is arguing that Ericsson should be charging [Apple] only on the phone's [smallest salable unit] that applies to its patent portfolio, which is the baseband modem in this case.  Should the courts rule in Apple's favor, we believe the decision could threaten the current standard IPR licensing terms for Ericsson, Qualcomm, and others."[52]

37.    Finally, the documents I reviewed show that various analyst reports pre-dating the alleged corrective disclosure reported on the industry's objections to proposed standards changes and on challenges to device-level licensing more generally. This illustrates that it was well known that the prevailing practice in the industry—including Qualcomm and others—was to license exhaustively exclusively at the end-device level.

38.    Each of the disclosures described above, among others,[53] was available to—and, in my opinion based on my experience, would have been reviewed by— knowledgeable market participants and investors, including sell-side equity research analysts such as myself who were interested in understanding and evaluating Qualcomm's licensing business.  Accordingly, it is my opinion that analysts covering the cellular communications sector recognized the longstanding

---

[51] Testimony of Gustav Brismark, Chief Intellectual Property Officer, (June 12, 2013) in Ericsson v. D-Link Systems, No. 10-cv-00473 (E.D. Tex.), Docket No. 98, at 148:8-149:11.  On appeal, Qualcomm filed an amicus brief consistent with Brismak's opinion:  "[A]s has been recognized through widespread industry licensing practice, the finished, fully standard-compliant product may provide the better locus for identifying the value realized from enabling IP."  Qualcomm Amicus Curiae Brief (Feb. 27, 2014) in Ericsson v. D-Link Systems, No. 2013-1625, 2014 WL 1159108 (Fed. Cir. Mar. 12, 2014), Q2017MDL1_00020624 at -658–59.

[52] BMO Capital Markets, *Communicating Equipment (9); Mobile IPR Getting Pressured, but Still Growing* (June 2015), Q121SEC00595362 at -368.

[53] Qualcomm Inc. SEC Form 10-K (Nov. 6, 2008), Q121SEC00038038 at -053 ("In addition to licensing manufacturers of subscriber and network equipment, we have made our essential CDMA patents available to competitors of our QCT segment.  We have entered into agreements with certain companies, including EoNex Technologies, Fujitsu, Infineon, NEC, Philips, Renesas and Texas Instruments.  These agreements permit the manufacture of CDMA-based integrated circuits.  In exchange for these rights, we are, in various cases, entitled to receive fees, royalties . . . .  In every case, these agreements do not allow such integrated circuit suppliers to pass through rights under Qualcomm's patents to such suppliers' customers, and such customers' sales of CDMA-based wireless subscriber devices into which such suppliers' integrated circuits are incorporated are subject to the payment of royalties to us in accordance with the customers' separate licensing arrangements with us."); Qualcomm Inc. SEC Form 10-K (Nov. 2, 2011), Q121SEC00039144 at -155 ("Separate and apart from licensing manufacturers of subscriber and network equipment, we have entered into certain patent arrangements with competitors of our QCT segment . . . .  In every case, these agreements expressly reserve the right for QTL to seek royalties from the customers of such integrated circuit suppliers with respect to such suppliers' customers' sales.").

15

practice in the industry of licensing primarily or only at the device level.  This conclusion is further supported by the analyst reports, including my own, from 2008–2009 that consistently acknowledged Qualcomm's practice of doing so.[54]

### C.   Qualcomm's Practice of Licensing Only Device Makers Was Publicly Confirmed by the NDRC Investigation and Qualcomm's Related Public Statements.

39.    In late 2013, the Chinese National Development and Reform Commission (NDRC) publicly announced an investigation into Qualcomm's business practices, alleging that the company had violated China's Anti-Monopoly Law (AML).  Qualcomm disclosed the investigation to shareholders in its Q3 2014 SEC Form 10-Q, in which the company stated that "the [NDRC] investigation concerns primarily the Company's licensing business and certain interactions between the Company's licensing business and its chipset business, including . . . the alleged refusal of the Company to grant patent licenses to chipset manufacturers."[55]  My review of the publicly available information confirmed my recollection that news of the investigation and the underlying allegations were widely reported.[56]

---

[54] Nomura Report, *Equipment Matters:  IPR:  The Master Craftsman* (Apr. 28, 2008), Q2017MDL1_02917805 at -812 ("IPR licence holders have been adamant in their position that IPR should not be paid for twice."); Brandpoint.AmTech Report, *QCOM / BRCM Settlement; Earnings Call at 5 am PT* (Apr. 27, 2009), Q2014FTC04007366 at -366 ("[I]t appears QCOM's business model of charging royalties to handset makers remains intact for both BRCM and more importantly the overall industry. . . . Neither QCOM nor BRCM non-cellular customers receive 'pass through' rights."); see also J.P. Morgan Report, *Q2 Wrap:  Happy Days Are Here Again for the Chip Biz As Latest Bottom Is Found in San Diego, Reit.  OW* (Apr. 28, 2009), Q2014FTC03669833 at -834; Goldman Sachs Report, *Assuming Coverage with Buy:  Compelling Growth Trumps Legal Risks* (June 2, 2008), Q2017MDL1_00240337 at -360–61; Deutsche Bank Report, *Qualcomm, Broadcom to Settle for $891 Million* (Apr. 26, 2009) Q121SEC00676950 at -950.

[55] Qualcomm Inc. SEC Form 10-Q (July 23, 2014), Q121SEC00040209 at -225–26.

[56] See, e.g., S&P Capital IQ Report, *QUALCOMM Inc. Stock Report* (Aug. 22, 2014), Q121SEC00082669 at -670 ("The [NDRC] investigation also reviews QCOM's license agreements tied to its key patents, the policy of selling chipsets only to its patent licensees, and its refusal to grant patent licenses to certain chipset manufacturers."); Goldman Sachs Report, *Royalty Challenges in China Mar Outlook; Cutting Price Target to $88* (July 24, 2014), Q121SEC00083054 at -058 (The NDRC "is investigating the company's licensing business and its chipset business, including . . . the alleged refusal of Qualcomm to grant patent licenses to chipset manufacturers."); Wall Street Journal, *Qualcomm Says FTC Is Investigating It* (Nov. 5, 2014), https://www.wsj.com/articles/qualcomm-profit-rises-but-china-still-presents-challenges-1415224324 ("China's National Development and Reform Commission is examining several issues . . . includ[ing] . . . [Qualcomm's] alleged refusal to grant patent licenses to other chip makers."); Dong-Yoon Kim, *Chinese Government Disciplining 'Super Dominant' Qualcomm*, Hankyung News (Dec. 26, 2014), http://plus.hankyung.com/apps/newsinside.view?category=AA006&aid=201412260949A ("Qualcomm's biggest problem is said to be that the company does not license its SEPs for communication chips to other chip makers.").

40.     It is my opinion based on my experience that Qualcomm's SEC Form 10-Q disclosure and the ensuing news coverage did not provide analysts or the market with new information; rather, it confirmed analysts' long-established understanding that Qualcomm only granted licenses to end-user device makers and charged royalties at the end-user device level.  For example, in a September 16, 2014 report, Stacy Rasgon of Bernstein Research explicitly noted that the NDRC's complaint "painted many *core* components of Qualcomm's licensing business . . . as 'alleged malpractice.'"[57]  According to Rasgon, these components "included Qualcomm's practice of charging royalties based on the value of the device itself (rather than the mobile chipset) . . . and refusing to license to chipset manufacturers."[58]  Rasgon's articulation was not an outlier; it reflected the market's understanding at the time that the NDRC was not pursuing some unknown facet of Qualcomm's practices, but instead was challenging the legality of Qualcomm's well-understood business model.

41.     Analysts covering the outcome of the NDRC investigation in February 2015 continued to describe device-level licensing as the "core" component of Qualcomm's licensing practices.  For example, at Cowen and Company, analysts noted on February 10, 2015, that "erosion of the royalty base down to baseband chip-level licensing . . . would [have] require[d] fundamental changes to [Qualcomm's] biz model."[59]  Likewise, in a publicly available Alert Memorandum, the law firm Cleary Gottlieb observed that the settlement allowed Qualcomm to "retain[] its ability to calculate royalties based on the wholesale price of the entire device . . . , rather than only on the price of the chip, the smallest saleable component, as many have advocated. . . .  The result is not only that Qualcomm has been able to preserve part of its royalty formula, but also that Qualcomm has avoided a duty to license at the chip level, which could in turn have led to patent exhaustion."[60]  Thus, Qualcomm's practice of licensing only device makers was publicly confirmed, not newly announced, by the NDRC investigation and Qualcomm's attendant disclosures.

---

[57] Bernstein Research Report, *QCOM:  Parsing Recent Newsflow on NDRC Case Entering "Punishment Stage?"  Will Business Changes Be Mandated?* (Sept. 16, 2014), Q121SEC00527433 at -433 (emphasis added).

[58] Id. at -434.

[59] Cowen and Company Analyst Report (Feb. 10, 2015), Q121SEC00078685 at -685.

[60] Cleary Gottlieb Alert Memorandum, *China's NDRC Concludes Qualcomm Investigation, Imposes Changes in Licensing Practices* (Mar. 16, 2015), QNDCAL04776822 at -828.

### D. Throughout the Late 2000s and Early 2010s, There Were Extensive Public Disclosures Available to Sell-Side Analysts Regarding Qualcomm's Practice of Licensing Only at the Device Level, and Their Research Reflected That Understanding.

42.     Based on the expertise I have developed through decades of studying the cellular industry, I understand that it has long been the practice for companies like Qualcomm to license primarily or exclusively at the end-user device level. As noted above, this was well known to analysts. Accordingly, analyst reports covering QTL, the licensing arm of Qualcomm's business, in the late 2000s and early 2010s not only reflected an understanding that QTL only licensed device makers and not chipmakers, but also leveraged models that estimated QTL royalties as a function of device sales, and not chip sales. Analysts modeled royalties as a function of device sales because they understood device royalties to be the primary and dominant driver of Qualcomm's licensing revenues.

43.     As early as 2008, for example, I described QTL's business model as "pretty simple": "QTL is the part of Qualcomm that collects royalties from handset makers that make use of Qualcomm's innovations. . . . [A]nyone who ships a mobile device that makes use of Qualcomm technology is required to pay around 4% of the wholesale price of the device to Qualcomm."[61]  Analysts at Goldman Sachs similarly recognized that "Qualcomm generates the majority of its licensing revenues through its subscriber licenses, which are predominantly from handset vendors" that "pay[] Qualcomm a royalty payment that is based off the wholesale ASP of each handset sold."[62]  Likewise, analysts at Deutsche Bank stated in 2009 that "Qualcomm does not collect royalty payments from chip vendors, they collect them from chip vendors' customers (handset makers)."[63]  Further coverage from other institutions explicitly linked QTL royalty revenues to device prices and noted correlation of QTL performance to device revenues from top device vendors.[64]

---

[61] Nomura Report, *QUALCOMM: School of Hard NOKs* (Apr. 28, 2008), Q2014FTC03490700 at -720; see also id. at -704, -722, -727, -728, -730; Nomura Report, *Equipment Matters: IPR: The Master Craftsman* (Apr. 28, 2008), Q2017MDL1_02917805 at -821; Radio Free Mobile, *IPR — The Weakness of Essential (Part II)* (Oct. 4, 2012), http://www.radiofreemobile.com/ipr-the-weakness-of-essential-part-ii/.

[62] Goldman Sachs Report, *Assuming Coverage with Buy: Compelling Growth Trumps Legal Risk* (June 2, 2008), Q2017MDL1_00240337 at -360–61.

[63] Deutsche Bank Report, *Qualcomm, Broadcom to Settle for $891 Million* (Apr. 26, 2009) Q121SEC00676950 at -950.

[64] A&G Edwards Report, *QCOM: Downgrading to Hold on Valuation* (Feb. 21, 2007), Q2014FTC03521712 at -713 ("Qualcomm's royalties are based on a percent of handset selling price."); Merrill Lynch Report, *Explaining Nokia's 3% Royalty Comment* (Apr. 12, 2007), Q2014FTC03522825 at -825 ("We believe Qualcomm royalties are capped at a certain, unknown handset price."); Wachovia Report, *QCOM: Initiating with a Market Perform Rating* (Oct. 3, 2007), Q2014FTC04205065 at -067 ("Qualcomm's royalty receipts are based on a percentage . . . of the wholesale price of the phone.");

44.     Indeed, it is my opinion based on my experience that the fact of Qualcomm's device-level licensing was deeply ingrained in analysts' knowledge of the company and incorporated into their evaluations of (and writings and recommendations about) Qualcomm, as it was my own. Discussions regarding Qualcomm's interactions with chipmakers, for example, recognized that all device vendors that used chips with Qualcomm's IP needed a license, regardless of whether they used Qualcomm's chips.[65] To cite one well-known example, MediaTek was "constrained by the terms of its patent license from Qualcomm. The terms of this license essentially require that any handset vendor who wants to use Mediatek's 3G chips has to already have a license from Qualcomm."[66]

45.     Moreover, the possibility that Qualcomm would be forced by regulators to move to a chip-level licensing paradigm—meaning that Qualcomm would have to provide exhaustive licenses to chipmakers—was often discussed as an existential threat to Qualcomm's business. In my opinion based on my experience, this serves as yet another indication of analysts' familiarity with the company's longstanding device-level licensing program, its importance to the financial success of Qualcomm's licensing business and the regulatory risk that it potentially posed. For example, in his coverage of the Korean antitrust investigation into the company, Stacy Rasgon of Bernstein Research noted: "[M]ost disturbing to investors [is] basically the accusation that Qualcomm's practice of licensing patents at the device level potentially violates Korean competition law. This is obviously critical as the chipset prices have been order of magnitude below the device pricing, and the picture of chipset level royalties, even if highly unlikely, would of course be quite disturbing. It would significantly impact the profit stream."[67] Again, this report shows concern not about the fact that Qualcomm did not license chipmakers, but about the possibility that the KFTC could decide Qualcomm *must* license them going forward.

46.     Analysts' financial modeling also consistently demonstrated their understanding of the industry practice of licensing (and collecting royalties) at the end-user device level. When valuing licensing businesses (and components of businesses)

---

Goldman Sachs Report, *Reiterate Conviction Buy on Strong Royalties and Dec Qtr Snap-Back* (July 19, 2012), Q2017MDL1_00178565 at -570; Goldman Sachs Report, *2Q Handset Wrap Supports Solid 3Q Royalties for QCOM; CommTech Sector Update* (Aug. 6, 2012), Q2017MDL1_00084731 at -735 ("Qualcomm's royalty-bearing device market is about 95% correlated to handset revenues of the top 8 vendors, plus the 3G portion of the iPad.").

[65] A&G Edwards Report, *QCOM: Assuming Coverage with a Hold Rating* (Apr. 6, 2006), Q2017MDL1_00083183 at -191 ("Qualcomm generates revenue on every handset sold . . . regardless of whether it supplies the chipset for that phone."); Merrill Lynch Report, *Legal Issues Far from Being Resolved* (July 26, 2007), Q2014FTC04051115 at -118 ("Qualcomm currently charges handset vendors royalties based on the price of a handset regardless of the chipmaker.").

[66] Deutsche Bank Report, *Solidifying the Lead* (Feb. 22, 2011), Q2014FTC03546269 at -273.

[67] Bernstein Report, *Qualcomm (QCOM): A Conversation (and Q&A) with A Korean Antitrust Attorney – Conference Call Transcript & Slides* (Dec. 30, 2015), Q121SEC00561616 at -623.

in the cellular communications industry—such as Interdigital, Nokia's licensing business, Ericsson, and Qualcomm's licensing business (QTL)—analysts invariably based their expectations of future licensing revenues on three factors: (i) the expected number of devices sold, (ii) the wholesale average selling price ("ASP") of those devices, and (iii) the expected royalty rate.[68] Analysts applied a simple formula to these factors—number of devices x average selling price (ASP) x royalty rate—to estimate future licensing revenues. This approach was employed in analyst reports covering Qualcomm from before, during and after the Class Period published by A&G Edwards,[69] Barclays,[70] Bank of America Merrill Lynch,[71] Bernstein Research,[72] BMO Capital Markets,[73]

---

[68] See, e.g., Goldman Sachs Report, *Buy QCOM and SNDK: Market Eventually Gets Royalty Streams Right* (July 27, 2009), Q2017MDL1_00138529 at -531–32.

[69] A&G Edwards Report, *Qualcomm Raises March Quarter Guidance* (Mar. 13, 2007), Q2014FTC04031688 at -688.

[70] Barclays Capital Report, *Solid Market, Early 8960 Ramp Lifts EPS* (Jan. 23, 2012), Q2017MDL1_00215318 at -321; Barclays Report, *QTL Upside, QCT Recovery to Aid Shares* (Sept. 27, 2012), Q2017MDL1_00134707 at -709.

[71] Merrill Lynch Report, *Solid Quarter and Guidance* (Apr. 20, 2006), Q2017MDL1_00166318 at -324; Merrill Lynch Report, *Updating Model to Reflect Pre-Announcement* (Jan. 5, 2007), Q2017MDL1_00067753 at -757; Merrill Lynch Report, *Downgrading to Neutral; ITC Loss Is Significant* (Dec. 13, 2007), Q2014FTC03535524 at -529; Merrill Lynch Report, *Upgrading to Buy with $48 PO* (Mar. 25, 2008), Q2017MDL1_00080620 at -628; Bank of America Merrill Lynch Report, *Secular Growth Continues; Raise PO to $50* (Apr. 27, 2009), Q2017MDL1_00153458 at -467; Bank of America Merrill Lynch Report, *Leverage Unleashed, More to Come* (Nov. 4, 2010), Q2017MDL1_00268509 at -517; Bank of America Merrill Lynch Report, *Focus on Strong QCT Pipeline, Supportive of FY12 EPS Upside* (July 21, 2011), Q2017MDL1_00108562 at -569; Bank of America Merrill Lynch Report, *Qualcomm — a Deep Dive into Royalties, Semis, and Cash* (Sept. 9, 2014), Q2014FTC03451921 at -930; Bank of America Merrill Lynch Report, *South Korean Antitrust Agency Issues Fine, Outlines Licensing Changes* (Dec. 28, 2016), Q2017MDL1_03274989 at -992.

[72] Bernstein Research Report, *AAPL, QCOM: iPhone Royalties Part I: QCOM's Beneficial Licensing "Loophole" - Could It Close?* (Nov. 19, 2009), Q121SEC00067378 at -382; Bernstein Research Report, *Qualcomm: What Could the "Dream" Look Like? Dimensioning Nine Potential Sources of Long-Term Upside to Our Model* (Apr. 5, 2012), Q2017MDL1_00084101 at -114; Bernstein Research Report, *Qualcomm: "Book-ending" the Investment Thesis – Transcript and Slides from Our Recent Client Conference Call* (Apr. 23, 2012), Q2017MDL1_00103362 at -383; Bernstein Research Report, *Qualcomm (QCOM): FQ115 Recap - Chipping Away...* (Jan. 29, 2015), Q2017MDL1_00201726 at -728; Bernstein Research Report, *Qualcomm: Is Chipset Outlook for the Year Too Aggressive? Taking 2H Numbers Down a Bit – FQ215 Preview* (Apr. 20, 2015), Q2017MDL1_00881445 at -452; Bernstein Report, *Qualcomm: Are Expectations for Licensing Growth Fair or Full? FQ416 Preview* (Nov. 1, 2016), Q2017MDL1_03274688 at -693.

[73] BMO Capital Markets Report, *More Detail on China IPR Issues* (Aug. 14, 2014), Q121SEC00520335 at -344; BMO Capital Markets Report, *Communicating Equipment (9); Mobile IPR Getting Pressured, but Still Growing* (June 8, 2015), Q121SEC00595362 at -367 ("[I]n Qualcomm's case, we believe the typical agreement involves a fixed percentage applied to the wholesale average selling price (ASP) of a phone.").

Citi,[74] Credit Suisse,[75] Deutsche Bank,[76] Goldman Sachs,[77] Lehman Brothers,[78] Morgan Stanley,[79] Nomura (my own reporting),[80] Pacific Crest,[81] RBC Capital Markets,[82] Wachovia[83] and Wells Fargo.[84]  Widespread use of this formula

[74] Citi Report, *Qualcomm: Upside Indeed—Reported and Still Ahead* (Nov. 3, 2011), Q2014FTC03781061 at -064; Citi Report, *Spreading Its Tendrils* (Nov. 17, 2011), Q2017MDL1_00106606 at -608; Citi Report, *Alert:  Making Headways in Latin America* (Oct. 10, 2012), Q2017MDL1_00134317 at -317; Citi Report, *After 3G Comes 4G; Riding the LTE Wave Forward to a Buy* (Dec. 10, 2013), Q2017MDL1_00123904 at -923.

[75] Credit Suisse Report, *Smartphones?  Yes! ...  Smart Investments?* (June 26, 2008), Q2014FTC03500049 at -051; Credit Suisse Report, *US Carriers Pushing Out Upgrades* (May 11, 2011), Q2017MDL1_00091959 at -962; Credit Suisse Report, *Growth and Cash Return Ahead* (Nov. 21, 2013), Q2017MDL1_00124652 at -654; Credit Suisse Report, *The Wireless View 2014:  Smartphones — a Slowing Disruptive Force* (Jan. 6, 2014), Q2014FTC04069692 at -751.

[76] Deutsche Bank Report, *Q3 Results* (July 25, 2007), Q2014FTC03524766 at -768.

[77] Goldman Sachs Report, *The Mobile Data Opportunity — Finding the Best Spots in the Food Chain* (Apr. 17, 2008), Q2017MDL1_01969890 at -905; Goldman Sachs Report, *Assuming Coverage with Buy: Compelling Growth Trumps Legal Risks* (June 2, 2008), Q2017MDL1_00240337 at -344; Goldman Sachs Report, *Buy QCOM and SNDK:  Market Eventually Gets Royalty Streams Right* (July 27, 2009), Q2017MDL1_00138529 at -534; Goldman Sachs Report*, Chipset Share Gains Fuel Upside Despite Licensing Soft Patch; CL-Buy* (Nov. 3, 2011), Q2017MDL1_00093419 at -422; Goldman Sachs Report, *Supply Constraints Impact the June Q but Not the Thesis; CL-Buy* (Apr. 19, 2012), Q2017MDL1_00208514 at -518; Goldman Sachs Report, *China Scenario Analysis and Updated Sum-of-the-Parts Valuation* (Sept. 3, 2014), Q2017MDL1_00212773 at -788.

[78] Lehman Brothers Report, *New Report:  Key Themes for 2008* (Mar. 14, 2008), Q2014FTC03496980 at -988.

[79] Morgan Stanley Report, *Royalty Headache Relief Likely from Top Brand Share Gains* (Nov. 5, 2015), Q2017MDL1_03318818 at -818 ("For Qualcomm, every time a consumer chooses an Apple or Huawei (or ZTE or Samsung or TCL, or any other fully compliant brand) instead of a non-paying brand, Qualcomm's capture rate goes up.").

[80] Nomura Report, *Equipment Matters:  IPR:  War of the Worlds* (Mar. 1, 2007), Q2017MDL1_01761812 at -831; Nomura Report, *Qualcomm vs Nokia – Cunning Plans and Nasty Tricks* (Apr. 5, 2007), Q2017MDL5_07954457 at -457.

[81] Pacific Crest Report, *Washed Out in San Diego:  Initiating Coverage of QCOM at Overweight* (Dec. 3, 2015), Q121SEC00561129 at -133.

[82] RBC Capital Markets Report, *A Little Crowded, So Use the Dips* (July 15, 2009), Q2017MDL1_00346270 at -280; RBC Capital Markets Report, *Value Stock or "Value Trap"?  Assuming with Sector Perform* (Mar. 3, 2016), Q2017MDL1_02030065 at -079.

[83] Wachovia Report, *QCOM:  Initiating with a Market Perform Rating* (Oct. 3, 2007), Q2014FTC04205065 at -065; Wachovia Report, *QCOM:  Raises December Quarter Guidance* (Dec. 20, 2007), Q2014FTC03535804 at -804.

[84] Wells Fargo Report, *QCOM Earnings:  Strong Unit and ASP Growth; Raising Ests.* (Jan. 27, 2011), Q2017MDL1_00146833 at -833; Wells Fargo Report, *Mobile Chip Monitor - March/April Updates* (May 9, 2014), Q2017MDL1_00213385 at -387; Wells Fargo Report, *Mobile Chips 4Q15:  Qualcomm*

DocuSign Envelope ID: A5AAB49F-1E49-4F75-BE4E-A29382F36653

evidences analysts' understanding that, because Qualcomm's licensing revenues are directly linked to device sales, QTL would only (and does indeed only) license at the device level.  I am not aware of any major analyst report that modeled the expected licensing revenues of any major licensor in the cellular industry based on expected royalties from *components* (*i.e.*, chips) rather than expected royalties from *devices*.  In my opinion based on my experience, that is because analysts understood that licensors in the cellular communications industry licensed—and collected royalties—at the device level, not the component level.

* * *

47.     Based on the publicly available Qualcomm statements, third-party commentary, and analyst reports detailing Qualcomm's business practices and my experience, it is my opinion that during the class period, analysts fully understood Qualcomm's practice of licensing at the device, not the chip, level.

**VI.     There Were Extensive Public Disclosures Available to Sell-Side Analysts Regarding Qualcomm's Practice of Selling Chips Only to QTL Licensees, and Their Research Reflected That Understanding.**

48.     As noted above, I understand Plaintiffs allege in this case that Qualcomm misled investors with statements that it does not bundle its licensing and chipset negotiations, and that it keeps its licensing and chipset businesses separate.  I further understand that Plaintiffs allege that these statements concealed from the market certain interactions between Qualcomm's licensing and chipset businesses, including the fact that the company requires its chip customers to take a license to its intellectual property.  These practices were allegedly only revealed to the market by a press release on November 17, 2015.  Through its press release issued on that date, Qualcomm disclosed that it had received a Case Examiner's Report from the KFTC, which had found that Qualcomm's licensing practices violated certain Korean competition laws by requiring that the company's chip customers be licensed to its intellectual property, among other things.[85]  I understand that Plaintiffs allege that, prior to this November 17, 2015 disclosure, the market did not know that the company had a policy not to sell its chips to non-licensees.

49.     It is my opinion, based on my experience, my interactions with sell-side analysts who followed Qualcomm during the relevant time period, the custom and practice of the analyst industry and my examination of publicly available materials from the relevant time period, that analysts understood before November 17, 2015 that

---

*Turning Around* (Mar. 24, 2016), Q2017MDL1_03207654 at -668; Wells Fargo Report, *QCOM:  Posed for a Multi-Year Recover* (Apr. 13, 2016), Q2017MDL1_03269965 at -972.

[85] Qualcomm Press Release, *Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report* (Nov. 17, 2015), https://www.prnewswire.com/news-releases/qualcomm-confirms-receipt-of-korea-fair-trade-commissions-case-examiners-report-300180670.html.

Qualcomm does not sell chips to non-licensees. As set forth below, my opinion is based on (A) Qualcomm's repeated public statements, prior to November 17, 2015, that it sells chips only to QTL licensees, and (B) statements by analysts, prior to November 17, 2015, indicating their understanding that Qualcomm sells chips only to QTL licensees.

**A.    Qualcomm Publicly and Repeatedly Stated That It Sells Chips Only to QTL Licensees.**

50.    Qualcomm's regulatory filings prior to November 2015 made explicit Qualcomm's policy of selling chips only to customers that license the company's intellectual property. On July 23, 2014, Qualcomm filed its Q3 2014 SEC Form 10-Q, which disclosed various legal proceedings then pending that had the potential to materially affect the company's earnings potential.[86] As relevant here, and as noted above, the 10-Q disclosed that China's NDRC had launched an investigation into the company for potential violations of the country's AML.[87] The 10-Q explained that the NDRC investigation appeared to be focused on certain interactions between Qualcomm's licensing and chipset businesses, and it explicitly stated that this included Qualcomm's "policy of selling chipsets only to the Company's patent licensees."[88]

51.    Subsequent regulatory filings made the same disclosure, in each instance repeating Qualcomm's policy that it sells chips only to licensees. Specifically, in Qualcomm's 2014 SEC Form 10-K filed on November 5, 2014,[89] and 2015 SEC Form 10-Q filed on January 28, 2015,[90] the Company's review of material legal proceedings disclosed the NDRC investigation into Qualcomm's licensing and

---

[86] Qualcomm Inc. SEC Form 10-Q (July 23, 2014), Q121SEC00040209 at -224–26.

[87] Id. at -225 ("November 2013, the NDRC notified the Company that it had commenced an investigation of the Company relating to the Chinese Anti-Monopoly Law (AML).").

[88] Id. at -225–26 ("The Company understands that the investigation concerns primarily the Company's licensing business and certain interactions between the Company's licensing business and its chipset business, including . . . the Company's policy of selling chipsets only to the Company's patent licensees.").

[89] Qualcomm Inc. SEC Form 10-K (Nov. 5, 2014), Q121SEC00082039 at -072 ("In November 2013, the NDRC notified us that it had commenced an investigation of us relating to the Chinese Anti-Monopoly Law (AML). We understand that the investigation concerns primarily our licensing business and certain interactions between our licensing business and our chipset business, including . . . our policy of selling chipsets only to our patent licensees.").

[90] Qualcomm Inc. SEC Form 10-Q (Jan. 28, 2015), Q121SEC00040420 at -434–35 ("In November 2013, the NDRC notified the Company that it had commenced an investigation of the Company relating to the Chinese Anti-Monopoly Law (AML). The investigation concerns primarily the Company's licensing business and certain interactions between the Company's licensing business and its chipset business, including . . . the Company's policy of selling chipsets only to the Company's patent licensees.").

chipset businesses, and, in so doing, noted that the investigation concerned the company's "policy of selling chipsets only to the Company's patent licensees."[91]

52.    On February 9, 2015, Qualcomm issued a press release disclosing that it had reached a rectification plan that resolved the NDRC's stated concerns.[92]  The press release explained that the NDRC had issued an Administrative Sanction Decision finding that Qualcomm had violated the AML, and that Qualcomm had agreed to a rectification plan that would result in modifications to certain business practices in China.[93]  The press release, as well as the Administrative Sanction Decision itself, repeated what the company's regulatory filings had already disclosed to the market:  that Qualcomm had a policy of not selling chips to customers that refuse to take a license to its intellectual property.  As the Administrative Sanction Decision stated explicitly, Qualcomm "conditions a licensee's procurement of . . . baseband chips on signing . . . [a] patent licensing agreement."[94]  Going forward, Qualcomm explained in its press release, the company would no longer condition chipset sales on licensing terms that the NDRC had deemed "unreasonable," but the company would not be "require[d] . . . to sell chips to any entity that is not a Qualcomm licensee."[95]  Simply put, so long as Qualcomm's licensing agreements did not contain the

---

[91] Qualcomm Inc. SEC Form 10-K (Nov. 5, 2014), Q121SEC00082039 at -123; Qualcomm Inc. SEC Form 10-Q (Jan. 28, 2015), Q121SEC00040420 at -434–35.

[92] Qualcomm Press Release, *Qualcomm and China's National Development and Reform Commission Reach Resolution* (Feb. 9, 2015), https://investor.qualcomm.com/news-events/press-releases/detail/672/qualcomm-and-chinas-national-development-and-reform.

[93] Id. ("Qualcomm Incorporated (NASDAQ: QCOM) today announced that it has reached a resolution with China's National Development and Reform Commission (NDRC) regarding the NDRC's investigation of Qualcomm under China's Anti-Monopoly Law (AML).  The NDRC has issued an Administrative Sanction Decision finding that Qualcomm has violated the AML.  Qualcomm will not pursue further legal proceedings contesting the NDRC's findings.  Qualcomm has agreed to implement a rectification plan that modifies certain of its business practices in China and that fully satisfies the requirements of the NDRC's order.").

[94] National Development and Reform Commission Administrative Sanction Decision [2015] No. 1 (Feb. 9, 2015), Q121SEC00761656 at -684 ("We find that, the Subject Company conditions a licensee's procurement of the Subject Company's baseband chips on signing and non-challenging of the patent licensing agreement.  If a potential licensee has not signed a patent licensing agreement containing unreasonable licensing conditions with the Subject Company, the Subject Company will refuse to enter into the baseband chip sales agreement with such licensee and refuse to supply the baseband chips to such licensee.").

[95] Qualcomm Press Release, *Qualcomm and China's National Development and Reform Commission Reach Resolution* (Feb. 9, 2015), https://investor.qualcomm.com/news-events/press-releases/detail/672/qualcomm-and-chinas-national-development-and-reform ("The following are the key terms of the rectification plan: . . . Qualcomm will not condition the sale of baseband chips on the chip customer signing a license agreement with terms that the NDRC found to be unreasonable or on the chip customer not challenging unreasonable terms in its license agreement.  However, this does not require Qualcomm to sell chips to any entity that is not a Qualcomm licensee, and does not apply to a chip customer that refuses to report its sales of licensed devices as required by its patent license agreement.").

DocuSign Envelope ID: A5AAB49F-1E49-4575-BE4E-A29382536653

terms that the NDRC had found to be unreasonable, Qualcomm remained free to continue its longstanding practice of refusing chip sales to customers that did not license its intellectual property.

53.   Thus, on at least five occasions prior to the November 17, 2015 press release (Plaintiffs' alleged corrective disclosure), Qualcomm itself disclosed its practice of not selling chips to non-licensees.

**B.     Analysts Understood that Qualcomm Sells Chips Only to QTL Licensees.**

54.   Further to my conclusion above that Qualcomm disclosed its practice of not selling chips to non-licensees prior to November 17, 2015—as a result of the above-discussed disclosures—it is my opinion based on my experience that analysts understood Qualcomm's chip sale and licensing practices.  At the time, it was customary in the analyst industry for analysts to review and consider such disclosures.  Indeed, based on my experience and review, in my opinion, reports by sell-side equity research analysts show that the analyst community understood that Qualcomm sold chips only to QTL licensees at least a year before the KFTC press release on November 17, 2015.  After Qualcomm publicly disclosed that the NDRC had launched an investigation into certain interactions between the company's licensing and chipset businesses, including the company's policy of selling chips only to customers that licensed its intellectual property, analyst reports repeatedly described the investigation, highlighted its focus on the policy of not selling chips to non-licensees and analyzed the potential effects on the company's growth and earnings potential of a regulatory outcome that would require Qualcomm to change its longstanding policy.

55.   For instance, an August 22, 2014 analyst report from S&P Capital IQ explained that the NDRC was specifically investigating "the policy of selling chipsets only to [the company's] patent licensees."[96]  Additional reporting from around the same time included similar descriptions and assessments of the NDRC

---

[96] S&P Capital IQ Report, *QUALCOMM Inc. Stock Report* (Aug. 22, 2014), Q121SEC00082669 at -670 ("In November 2013, China National Development and Reform Commission (NDRC) notified the QCOM that it had commenced an investigation of the company relating to the Chinese Anti-Monopoly Law (AML).  The QCOM investigation reviews its licensing business and certain interactions between its licensing business and chipset business, including how royalties are calculated, and the value exchanged for cross-licenses to patents of its licensees.  The investigation also reviews QCOM's license agreements tied to its key patents, the policy of selling chipsets only to its patent licensees, and its refusal to grant patent licenses to certain chipset manufacturers.").

DocuSign Envelope ID: A5AAB49F-1E49-4575-BE4F-A29282F36653

investigation.  This included an analyst report from Bernstein Research on September 16, 2014,[97] and a Dow Jones article on November 5, 2014.[98]

56.   After Qualcomm issued its February 9, 2015 press release disclosing its settlement with the NDRC and the details of the NDRC's Administrative Sanction Decision, analyst reports continued to highlight Qualcomm's policy of not selling chips to customers that refused to license its intellectual property, including specifically noting that the NDRC's sanction was favorable to Qualcomm because it did not require Qualcomm to change this policy.  For example, on the same day as Qualcomm's February 9, 2015 press release, a Wells Fargo analyst report recognized that Qualcomm would no longer "condition the sale of baseband chips on the chip customer signing a license agreement with terms that the NDRC found to be unreasonable," but further noted that Qualcomm was not required to sell chips to "any entity that is not a Qualcomm licensee."[99]  Likewise, as a Raymond James analyst report published on the following day made clear, analysts interpreted this to mean that the company "[r]etain[ed] the ability to withhold chipset shipments to device manufacturers who do not sign a license."[100]

57.   Therefore, informed by my own experience and understanding at the time and by publicly available analyst reports examining Qualcomm's business, I conclude

---

[97] Bernstein Research Report, *QCOM:  Parsing Recent Newsflow on NDRC Case - Entering "Punishment Stage?" Will Business Changes Be Mandated?* (Sept. 16, 2014), Q121SEC00527433 at -434 ("We note that these accusations included Qualcomm's practice of charging royalties based on the value of the device itself (rather than the mobile chipset), bundling standards-essential patents together with non-essential patents, requiring free cross-licensing of licensee IP, bundling practices (e.g. chipsets with licensing), and refusing to license chipset manufacturers, among other things.").

[98] Wall Street Journal, *Qualcomm Says FTC Is Investigating It* (Nov. 5, 2014), https://www.wsj.com/articles/qualcomm-profit-rises-but-china-still-presents-challenges-1415224324 ("China's National Development and Reform Commission is examining several issues, the company said in a Securities and Exchange Commission filing.  These include interactions between the company's licensing and chip businesses, how royalties are calculated, the company's policy of selling chips only to patent licensees and its alleged refusal to grant patent licenses to other chip makers.").

[99] Wells Fargo Report, *QCOM:  Poised for a Multi-Year Recovery* (Apr. 13, 2016), Q2017MDL1_03269965 at -971 ("Qualcomm will not condition the sale of baseband chips on the chip customer signing a license agreement with terms that the NDRC found to be unreasonable or on the chip customer not challenging unreasonable terms in its license agreement.  However, this does not require Qualcomm to sell chips to any entity that is not a Qualcomm licensee, and does not apply to a chip customer that refuses to report its sales of licensed devices as required by its patent license agreement.").

[100] Raymond James Report, *China Resolution a Positive, But Little Near Term Financial Impact* (Feb. 10, 2015), Q121SEC00612159 at -159.

that analysts understood Qualcomm's practice of selling chips only to QTL licensees.

## VII.  Analysts Would Not Have Been Misled by Qualcomm's "Separate Businesses" Statements.

58.     It is my understanding that Plaintiffs allege that certain statements by Qualcomm executives misled the market by concealing Qualcomm's alleged "bundling" practices.  In particular, I understand that Plaintiffs claim that the following two statements concealed certain interactions between Qualcomm's chip sales business unit (QCT) and licensing business unit (QTL) that Plaintiffs claim constitute "bundling" of licensing and chipset sales:

      a.     <u>November 27, 2012</u>:  In response to a question posed to him by an analyst at a Credit Suisse Technology Conference regarding whether Qualcomm would "bundle so you offer a lower royalty, get more share with QRD platform" Qualcomm's then-EVP and Group President Derek Aberle stated that "[w]ithin the Company, we tend to keep the licensing and the chip business very separate.  Obviously, our view is that companies need a license if they are doing 3G or 4G devices, sort of irrespective of whose chip they use.  And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and we don't bundle those together."[101]

      b.     <u>February 25, 2013</u>:  In response to a question posed to him by an analyst at a GSM Association Mobile World Congress session regarding Qualcomm's chip and licensing businesses, Qualcomm's then-President and COO Steven Mollenkopf stated that "they are really separate businesses.  I mean we have been very clear that we keep those two things separate – separate propositions to the customer. So, really two different things."[102]

59.     In my opinion based on my experience, analysts would not have understood these statements to mean that QCT and QTL are operated completely separately or that they did not cooperate or coordinate with each other.  Indeed, analysts were well aware that QCT and QTL are both part of one company, Qualcomm; that they reported to a common management structure; that they had many overlapping customers; and, as I noted above, that QCT would only sell chips to QTL's licensees.  Accordingly, in my opinion, analysts would have interpreted these statements as meaning that, in general, QCT and QTL had separate personnel, kept separate profit and loss statements, tried to maximize their own respective profits, provided different products and services that presented different value

---

[101] Compl. ¶ 76.

[102] <u>Id.</u> ¶ 77.

DocuSign Envelope ID: A5AAB49F-1E49-4575-BE4E-A29382F36653

propositions to their respective customers and that Qualcomm did not leverage QTL royalty rates in order to increase market share for QCT.

60.    I understand that Plaintiffs allege that a December 8, 2015 press release by the European Commission revealed that Qualcomm in fact "provided extensive royalty relief to handset manufacturers, including its largest customer Apple, if they agreed to purchase all or most of their chipsets from Qualcomm."[103]

61.    I have reviewed the EC press release, and, in my opinion based on my experience, the information it contains would not have been viewed as contradictory to the statements of Messrs. Aberle and Mollenkopf.  The EC press release states that "Qualcomm has paid significant amounts to a major smartphone and tablet manufacturer on condition that it exclusively use Qualcomm baseband chipsets in its smartphones and tablets."[104]  It does not state anything about royalties (or relief from them), rebates, licensing or bundling.

62.    My opinion that analysts did not view the EC press release as contradicting the statements of Messrs. Aberle and Mollenkopf (both of which were made to groups of analysts directly in response to questions posed by analysts) is corroborated by the fact that, to my knowledge, no analysts commented about any such contradiction.

## VIII.    Conclusion

63.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 22, 2022, in Beirut, Lebanon.

DocuSigned by:

*Richard Windsor*

D6DD8AD67603496...

Dr. Richard Windsor CFA
July 22, 2022

---

[103] Id. ¶ 79.

[104] European Commission Press Release, *Antitrust: Commission Sends Two Statements of Objections on Exclusivity Payments and Predatory Pricing to Qualcomm* (Dec. 8, 2015), https://ec.europa.eu/commission/presscorner/detail/en/IP_15_6271.

# Exhibit 1

# Curriculum Vitae

# Dr. Richard Windsor CFA

*#63 Mangrove One Complex, Khalifa Park, Abu Dhabi*
+971 56 1142 482  |  rhswindsor@gmail.com

## Education

| | | | |
|---|---|---|---|
| **1998-2000** | *U.S.A.* | CFA Institute (formerly Association for Investment Management and Research) | CFA (awarded charter 14th September 2000) |
| **1996-1997** | *London, UK* | CFA Institute U.K. | IMC |
| **1992-1996** | *London, U.K.* | University College London | PhD |
| **1988-1992** | *Edinburgh, U.K.* | University of Edinburgh | Bsc (Honours) 2.1 |
| **1983-1988** | *Oundle, U.K.* | Oundle School | 10 'O' Levels, 2'AO' Levels, 3 'A' Levels: Maths, Biology, Chemistry |

## Skills

Bridge the gap between technical and business issues. RFM research brings complex technical issues to the layman without over generalising. Deep technical knowledge and experience of mobile handset, internet and mobile operator industries and the ability to asses the strengths and weaknesses of businesses and their likely financial performance.

## Employment

**2012-Present**    **Radio Free Mobile** | Mobile Industry Independent Research Provider
*Founder & Shareholder*

- Coverage includes mobile and consumer electronics industry, artificial intelligence, digital automotive, ecosystem, handset and semiconductor analysis, reports and consultancy
- Clients include Intel, IBM, MTN Group Limited (formerly M-Cell), Telia, Accenture, Arm, Qualcomm, MediaTek, ON Semi, Global Foundries, Renault, HERE Technologies, Nissan, Mubadala

**2018-Present**    **Renovo Capital** | *London, U.K.*
*Advisory Board Member*

- Duties include developing technology strategy, M&A advisory, lead generation, and management advisory

DocuSign Envelope ID: A5AAB49F-1E49-4575-BE45-A29282536653

**2001-2012**     **Nomura International** | *London, U.K.*
*Senior Analyst – Global Communications Equipment*

Ranked in the top 50 most influential people in the Mobile Industry in 2009 and 2010. by the mobile phone industry (Mobile Today Magazine)

- Subject coverage includes extensive interaction with private equity and venture capital communities, as well as small companies and start-ups in an advisory capacity

- Company coverage includes Nokia, Motorola, Qualcomm, Research in Motion, Ericsson, Alcatel-Lucent, Nortel Networks, Mobile Software, Handset Platforms, Intellectual Property Rights

**1999-2001**     **Abu Dhabi Investment Authority** | *Abu Dhabi, United Arab Emirates*
*Head of Information Technology; Portfolio Manager & Analyst; Senior Investment Analyst (Central and Eastern European Cellular Operators)*

- Duties include supervision of European IT sector and investments, tech hardware and equipment equity research, Internet equity research, EMEA cellular research

## Languages

English (native); French (conversational)

# Exhibit 2

Expert Report of Richard Windsor
Materials Relied Upon

**Analyst Reports**

A&G Edwards Report, *QCOM:  Assuming Coverage with a Hold Rating* (Apr. 6, 2006), Q2017MDL1_00083183.

A&G Edwards Report, *QCOM:  Downgrading to Hold on Valuation* (Feb. 21, 2007), Q2014FTC03521712.

A&G Edwards Report, *Qualcomm Raises March Quarter Guidance* (Mar. 13, 2007), Q2014FTC04031688.

Bank of America Merrill Lynch Report, *Focus on Strong QCT Pipeline, Supportive of FY12 EPS Upside* (July 21, 2011), Q2017MDL1_00108562.

Bank of America Merrill Lynch Report, *Key Takeaways from a Patent Conference; Implications for Qualcomm* (December 7, 2015), Q121SEC00561405.

Bank of America Merrill Lynch Report, *Leverage Unleashed, More to Come* (Nov. 4, 2010), Q2017MDL1_00268509.

Bank of America Merrill Lynch Report, *Qualcomm — a Deep Dive into Royalties, Semis, and Cash* (Sept. 9, 2014), Q2014FTC03451921.

Bank of America Merrill Lynch Report, *Secular Growth Continues; Raise PO to $50* (Apr. 27, 2009), Q2017MDL1_00153458.

Bank of America Merrill Lynch Report, *South Korean Antitrust Agency Issues Fine, Outlines Licensing Changes* (Dec. 28, 2016), Q2017MDL1_03274989.

Barclays Capital Report, *Qualcomm, Inc.:  Robust Units, Lower ASPs; 1-OW* (Apr. 27, 2009), Q2014FTC03504393.

Barclays Capital Report, *Solid Market, Early 8960 Ramp Lifts EPS* (Jan. 23, 2012), Q2017MDL1_00215318.

Barclays Report, *QTL Upside, QCT Recovery to Aid Shares* (Sept. 27, 2012), Q2017MDL1_00134707.

Bernstein Report, *Qualcomm (QCOM):  A Conversation (and Q&A) with A Korean Antitrust Attorney – Conference Call Transcript & Slides* (Dec. 30, 2015), Q121SEC00561616.

Bernstein Report, *Qualcomm:  Are Expectations for Licensing Growth Fair or Full? FQ416 Preview* (Nov. 1, 2016), Q2017MDL1_03274688.

Bernstein Research Report, *AAPL, QCOM:  iPhone Royalties Part I:  QCOM's Beneficial Licensing "Loophole" - Could It Close?* (Nov. 19, 2009), Q121SEC00067378.

Bernstein Research Report, *QCOM:  Parsing Recent Newsflow on NDRC Case Entering "Punishment Stage?"  Will Business Changes Be Mandated?* (Sept. 16, 2014), Q121SEC00527433.

Bernstein Research Report, *QCOM & Nokia: Stakes Now Higher for Both Sides; Eventual Settlement Still More Likely Than Long Legal Battle* (Apr. 9, 2007), Q2014FTC03522780.

Bernstein Research Report, *Qualcomm (QCOM):  FQ115 Recap - Chipping Away...* (Jan. 29, 2015), Q2017MDL1_00201726.

Bernstein Research Report, *Qualcomm:  "Book-ending" the Investment Thesis – Transcript and Slides from Our Recent Client Conference Call* (Apr. 23, 2012), Q2017MDL1_00103362.

Bernstein Research Report, *Qualcomm:  Is Chipset Outlook for the Year Too Aggressive? Taking 2H Numbers Down a Bit – FQ215 Preview* (Apr. 20, 2015), Q2017MDL1_00881445.

Bernstein Research Report, *Qualcomm:  What Could the "Dream" Look Like? Dimensioning Nine Potential Sources of Long-Term Upside to Our Model* (Apr. 5, 2012), Q2017MDL1_00084101.

BMO Capital Markets Report, *More Detail on China IPR Issues* (Aug. 14, 2014), Q121SEC00520335.

BMO Capital Markets, *Communicating Equipment (9); Mobile IPR Getting Pressured, but Still Growing* (June 2015), Q121SEC00595362.

Brandpoint.AmTech Report, *QCOM / BRCM Settlement; Earnings Call at 5 am PT* (Apr. 27, 2009), Q2014FTC04007366.

Citi Report, *After 3G Comes 4G; Riding the LTE Wave Forward to a Buy* (Dec. 10, 2013), Q2017MDL1_00123904.

Citi Report, *Alert:  Making Headways in Latin America* (Oct. 10, 2012), Q2017MDL1_00134317.

Citi Report, *Qualcomm:  Upside Indeed—Reported and Still Ahead* (Nov. 3, 2011), Q2014FTC03781061.

Citi Report, *Spreading Its Tendrils* (Nov. 17, 2011), Q2017MDL1_00106606.

Cowen and Company Analyst Report, *Kissing the Ring, but Limiting Collateral Damage* (Feb. 10, 2015), Q121SEC00078685.

Credit Suisse Report, *Growth and Cash Return Ahead* (Nov. 21, 2013), Q2017MDL1_00124652.

Credit Suisse Report, *Smartphones?  Yes! ...  Smart Investments?* (June 26, 2008), Q2014FTC03500049.

Credit Suisse Report, *The Wireless View 2014:  Smartphones — a Slowing Disruptive Force* (Jan. 6, 2014), Q2014FTC04069692.

Credit Suisse Report, *US Carriers Pushing Out Upgrades* (May 11, 2011), Q2017MDL1_00091959.

Deutsche Bank Report, *Q3 Results* (July 25, 2007), Q2014FTC03524766.

Deutsche Bank Report, *Qualcomm, Broadcom to Settle for $891 Million* (Apr. 26, 2009), Q121SEC00676950.

Deutsche Bank Report, *Solidifying the Lead* (Feb. 22, 2011), Q2014FTC03546269.

Goldman Sachs Report, *2Q Handset Wrap Supports Solid 3Q Royalties for QCOM CommTech Sector Update* (Aug. 6, 2012), Q2017MDL1_00084731.

Goldman Sachs Report, *Assuming Coverage with Buy:  Compelling Growth Trumps Legal Risks* (June 2, 2008), Q2017MDL1_00240337.

Goldman Sachs Report, *Buy QCOM and SNDK:  Market Eventually Gets Royalty Streams Right* (July 27, 2009), Q2017MDL1_00138529.

Goldman Sachs Report, *China Scenario Analysis and Updated Sum-of-the-Parts Valuation* (Sept. 3, 2014), Q2017MDL1_00212773.

Goldman Sachs Report*, Chipset Share Gains Fuel Upside Despite Licensing Soft Patch; CL-Buy* (Nov. 3, 2011), Q2017MDL1_00093419.

Goldman Sachs Report, *Reiterate Conviction Buy on Strong Royalties and Dec Qtr Snap-Back* (July 19, 2012), Q2017MDL1_00178565.

Goldman Sachs Report, *Royalty Challenges in China Mar Outlook; Cutting Price Target to $88* (July 24, 2014), Q121SEC00083054.

Goldman Sachs Report, *Supply Constraints Impact the June Q but Not the Thesis; CL-Buy* (Apr. 19, 2012), Q2017MDL1_00208514.

Goldman Sachs Report, *The Mobile Data Opportunity — Finding the Best Spots in the Food Chain* (Apr. 17, 2008), Q2017MDL1_01969890.

J.P. Morgan Report, *Qualcomm:  Q2 Wrap:  Happy Days Are Here Again for the Chip Biz as Latest Bottom is Found in San Diego, Reit. OW* (Apr. 28, 2009), Q2014FTC03669833.

Lehman Brothers Report, *New Report:  Key Themes for 2008* (Mar. 14, 2008), Q2014FTC03496980.

Merrill Lynch Report, *Downgrading to Neutral; ITC Loss Is Significant* (Dec. 13, 2007), Q2014FTC03535524.

Merrill Lynch Report, *Explaining Nokia's 3% Royalty Comment* (Apr. 12, 2007), Q2014FTC03522825.

Merrill Lynch Report, *Legal Issues Far from Being Resolved* (July 26, 2007), Q2014FTC04051115.

Merrill Lynch Report, *Qualcomm Inc. Company Update:  Navigating the Legal Minefield* (Oct. 12, 2007), Q2014FTC03533601.

Merrill Lynch Report, *Solid Quarter and Guidance* (Apr. 20, 2006), Q2017MDL1_00166318.

Merrill Lynch Report, *Updating Model to Reflect Pre-Announcement* (Jan. 5, 2007), Q2017MDL1_00067753.

Merrill Lynch Report, *Upgrading to Buy with $48 PO* (Mar. 25, 2008), Q2017MDL1_00080620.

Morgan Stanley Report, *Royalty Headache Relief Likely from Top Brand Share Gains* (Nov. 5, 2015), Q2017MDL1_03318818.

Nomura Report, *Equipment Matters:  IPR:  The Master Craftsman* (Apr. 28, 2008), Q2017MDL1_02917805.

Nomura Report, *Equipment Matters:  IPR:  War of the Worlds* (Mar. 1, 2007), Q2017MDL1_01761812.

Nomura Report, *Qualcomm vs Nokia – Cunning Plans and Nasty Tricks* (Apr. 5, 2007), Q2017MDL5_07954457.

Nomura Report, *QUALCOMM:  School of Hard NOKs* (Apr. 28, 2008), Q2014FTC03490700.

Pacific Crest Report, *Washed Out in San Diego:  Initiating Coverage of QCOM at Overweight* (Dec. 3, 2015), Q121SEC00561129.

Raymond James Report, *China Resolution A Positive, But Little Near Term Financial Impact* (Feb. 10, 2015), Q121SEC00612159.

RBC Capital Markets Report, *A Little Crowded, So Use the Dips* (July 15, 2009), Q2017MDL1_00346270.

RBC Capital Markets Report, *Value Stock or "Value Trap"?  Assuming with Sector Perform* (Mar. 3, 2016), Q2017MDL1_02030065.

S&P Capital IQ Report, *QUALCOMM Inc. Stock Report* (Aug. 22, 2014), Q121SEC00082669.

Wachovia Report, *QCOM:  Initiating with a Market Perform Rating* (Oct. 3, 2007), Q2014FTC04205065.

Wachovia Report, *QCOM:  Raises December Quarter Guidance* (Dec. 20, 2007), Q2014FTC03535804.

Wells Fargo Report, *Mobile Chip Monitor -  March/April Updates* (May 9, 2014), Q2017MDL1_00213385.

Wells Fargo Report, *Mobile Chips 4Q15:  Qualcomm Turning Around* (Mar. 24, 2016), Q2017MDL1_03207654.

Wells Fargo Report, *QCOM Earnings:  Strong Unit and ASP Growth; Raising Ests.* (Jan. 27, 2011), Q2017MDL1_00146833.

Wells Fargo Report, *QCOM:  Posed for a Multi-Year Recover* (Apr. 13, 2016), Q2017MDL1_03269965.

William Blair & Company Report, *Qualcomm Inc. First Quarter 2008 Earnings Call: Results In Line With Expectations; Chipset Business Gaining Share* (Jan. 25, 2008), Q2017MDL1_00044414.

**Books and Articles**

Barbara J. Etzel, <u>Webster's New World Finance and Investment Dictionary</u> at 13 (Wiley 2003).

Boris Groysberg & Paul M. Healy, <u>Wall Street Research:  Past, Present, and Future</u> at 21, 23 (Stanford Univ. Press 2013).

Communications Daily Article (Jan. 18, 2008) https://communicationsdaily.com/article/view?BC=bc_62d55a716b8b0&search_id=569590&id=318852.

Dong-Yoon Kim, <u>Chinese Government Disciplining 'Super Dominant' Qualcomm</u>, Hankyung News (Dec. 26, 2014), Q2017MDL1_01749291, http://plus.hankyung.com/apps/newsinside.view?category=AA006&aid=201412260949A.

John Downes & Jordan Elliot Goodman, <u>Barron's Dictionary of Finance and Investment Terms</u> at 29 (8th ed. 2010).

Radio Free Mobile, *IPR — The Weakness of Essential (Part II)* (Oct. 4, 2012), http://www.radiofreemobile.com/ipr-the-weakness-of-essential-part-ii/.

Wall Street Journal, *Patent Holders Fear Weaker Tech Role* (Feb. 9, 2015), https://www.wsj.com/articles/patent-holders-fear-weaker-tech-role-1423442219?mod=WSJ_TechWSJD_NeedToKnow.

Wall Street Journal, *Qualcomm Says FTC Is Investigating It* (Nov. 5, 2014), https://www.wsj.com/articles/qualcomm-profit-rises-but-china-still-presents-challenges-1415224324.


**Press Releases**

European Commission Press Release, *Antitrust: Commission Sends Two Statements of Objections on Exclusivity Payments and Predatory Pricing to Qualcomm* (Dec. 8, 2015), Q121SEC00168100, https://ec.europa.eu/commission/presscorner/detail/en/IP_15_6271.

Joint Public Statement by MediaTek and Qualcomm (Sept. 25, 2013), https://corp.mediatek.com/news-events/press-releases/joint-public-statement-by-mediatek-and-qualcomm.

KFTC Press Release, *Strict Sanctions on Qualcomm's Abuse of Cellular SEPs* (Dec. 27, 2016), Q121SEC00373861.

MediaTek Press Release, *MediaTek and Qualcomm Enter Into Patent Arrangement* (Nov. 20, 2009), https://corp.mediatek.jp/news-events/press-releases/mediatek-and-qualcomm-enter-into-patent-arrangement.

Qualcomm Inc. Press Release, *Qualcomm and China's National Development and Reform Commission Reach Resolution* (Feb. 9, 2015) https://investor.qualcomm.com/news-events/press-releases/detail/672/qualcomm-and-chinas-national-development-and-reform.

Qualcomm Press Release, *Dutch and German Courts Dismiss Nokia's Patent Exhaustion Complaints* (Nov. 14, 2007) https://www.qualcomm.com/news/releases/2007/11/dutch-and-german-courts-dismiss-nokias-patent-exhaustion-complaints.

Qualcomm Press Release, *Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report* (Nov. 17, 2015) https://www.prnewswire.com/news-releases/qualcomm-confirms-receipt-of-korea-fair-trade-commissions-case-examiners-report-300180670.html.


**SEC Filings**

Qualcomm Inc. SEC Form 10-K (Nov. 2, 2006), Q2017MDL1_01500131.

Qualcomm Inc. SEC Form 10-K (Nov. 8, 2007), Q121SEC00102652.

Qualcomm Inc. SEC Form 10-K (Nov. 5, 2009), Q121SEC00038374.

Qualcomm Inc. SEC Form 10-K (Nov. 3, 2010), Q121SEC00038789.

Qualcomm Inc. SEC Form 10-K (Nov. 2, 2011), Q121SEC00039144.

Qualcomm Inc. SEC Form 10-K (Nov. 6, 2013) , Q121SEC00039933.

Qualcomm Inc. SEC Form 10-K (Nov. 6, 2008), Q121SEC00038038.

Qualcomm Inc. SEC Form 10-Q (July 23, 2014), Q121SEC00040209.

Qualcomm Inc. SEC Form 10-K (Nov. 5, 2014), Q121SEC00082039.

Qualcomm Inc. SEC Form 10-Q (Jan. 28, 2015), Q121SEC00040420.


## **Other Materials**

Cleary Gottlieb Alert Memorandum, *China's NDRC Concludes Qualcomm Investigation, Imposes Changes in Licensing Practices* (Mar. 16, 2015), QNDCAL04776822.

Consolidated Class Action Complaint, *In re Qualcomm Incorporated Securities Litigation*, No. 17-cv-121 (S.D. Cal.) (July 3, 2017) [Docket No. 32], and materials quoted therein.

Testimony of Gustav Brismark, Chief Intellectual Property Officer, (June 12, 2013) in Ericsson v. D-Link Systems, No. 10-cv-00473 (E.D. Tex.), Docket No. 98.

IEEE-SA Standards Board Bylaws Draft Comment Report (May 26, 2014), Q2017MDL1_01573251, https://grouper.ieee.org/groups/pp-dialog/drafts_comments/PatCom_sort_by_comment_ID_260514.pdf

National Development and Reform Commission Administrative Sanction Decision [2015] No. 1 (Feb. 9, 2015), Q121SEC00761656.

Nokia Amicus Brief (May 6, 2013) in Apple Inc. v. Motorola Inc., No. 2012-1548, 757 F.3d 1286 (Fed. Cir. 2014), Q2017MDL1_02785251.

Qualcomm Amicus Curiae Brief (Feb. 27, 2014) in Ericsson v. D-Link Systems, No. 2013-1625, 2014 WL 1159108 (Fed. Cir. Mar. 12, 2014), Q2017MDL1_00020624.

Qualcomm Earnings Call Transcript (Apr. 27, 2009), Q121SEC00171031.

Qualcomm Earnings Call Transcript (Jan. 23, 2008), Q2014FTC04501674.

DocuSign Envelope ID: A5AAB49F-1E49-4575-BE4F-A29382E36653

Qualcomm Earnings Call Transcript (Jan. 28, 2015), Q121SEC00283109.

Qualcomm Inc. Amicus Brief (Dec. 10, 2007) in Quanta Computer, Inc. v. LG Electronics, Inc., No. 06-937, 553 U.S. 617 (2008), Q121SEC00782353.

Qualcomm Inc. Analyst Meeting Transcript (Nov. 14, 2007), Q121SEC00246600.

Qualcomm Inc. at JPMorgan Global Technology, Media and Telecom Conference (May 20, 2009), QNDCAL01877078.

Qualcomm Presentation, *New York Investor Day* (Nov. 14, 2007), Q121SEC00315554.

Senate Hearing on Standard-Essential Patent Disputes and Antitrust Law and Supplemental Materials, (2013), Q2017MDL1_00020215.