UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE: QUALCOMM INCORPORATED
SECURITIES LITIGATION

Civil  Action  No.  3:17-cv-00121-JO-MSB

EXPERT REPORT OF RENÉ STULZ, Ph.D.

July 22, 2022

# Table of Contents

I.      Qualifications .................................................................................................. 2

II.     Assignment and Compensation ...................................................................... 3

III.    Summary of Allegations ................................................................................. 4

IV.     Summary of Opinions ..................................................................................... 6

V.      Background ................................................................................................... 10

    A.    Overview of Qualcomm .............................................................................. 10

    B.    Patents, Licenses, Standards Development Organizations, and FRAND Licensing
Terms ................................................................................................................. 12

    C.    Qualcomm's Licensing Practices ................................................................ 13

    D.    Litigation Regarding Qualcomm's Licensing Practices and Alleged Bundling ........... 16

VI.     Background on Market Efficiency, Price Discovery, and Event Study Analysis .......... 22

    A.    Overview of Market Efficiency and Price Discovery in Efficient Markets ................... 22

    B.    Event Study Analysis .................................................................................. 27

VII.    Information Regarding Qualcomm's Licensing Practices and Its Practice of Not
Providing Chips to Unlicensed Device Makers Was Public before the First Alleged Corrective
Disclosure, and Repetition of This Information Would Not Have Affected Qualcomm's Stock
Price in an Efficient Market ..................................................................................... 31

    A.    Information Regarding Qualcomm's Licensing Practices Was Public before the First
Alleged Corrective Disclosure ............................................................................. 32

    B.    Qualcomm's Practice of Not Providing Chips to Unlicensed Device Makers Was Public
before the First Alleged Corrective Disclosure .................................................... 56

    C.    Stock Price Changes Associated with the Alleged Corrective Disclosures Do Not
Demonstrate the Price Impact of Alleged Misrepresentations Regarding Qualcomm's
Licensing Practices ............................................................................................. 59

VIII.   Dr. Tabak Has Failed to Articulate a Damages Methodology That Can Measure
Damages Resulting from the Specific Allegations in This Case ................................... 75

    A.    Summary of Dr. Tabak's Proposed Approach ............................................. 78

    B.    Dr. Tabak Has Not Explained How His Damages Methodology Could Compute
Inflation Separately for Each Category of Plaintiffs' Alleged Misrepresentations throughout
the Proposed Class Period, If Some Categories Are Not Ultimately Proven .......... 80

    C.    Dr. Tabak Has Not Presented a Damages Methodology That Can Measure Damages
Associated with Materialization of Risk .............................................................. 90

## I.      Qualifications

1.      I hold the Everett D. Reese Chair of Banking and Monetary Economics at The Ohio State University.  I am also Director of the Dice Center for Research in Financial Economics at The Ohio State University and a Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts.  Since receiving my Ph.D. in Economics from the Massachusetts Institute of Technology in 1980, I have taught at the Massachusetts Institute of Technology, the University of Rochester, the University of Chicago, and The Ohio State University.  I was a Bower Fellow at the Harvard Business School from 1996 to 1997.

2.      I am a past president of the American Finance Association; a fellow of the American Finance Association, the Financial Management Association, the European Corporate Governance Institute, and the Wharton Financial Institutions Center; and a past president of the Western Finance Association.  I received a Doctorate Honoris Causa from the University of Neuchâtel in Switzerland and the Risk Manager of the Year award from the Global Association of Risk Professionals.  I have also been recognized by a number of organizations for my contributions to financial economics by awards or by invitations to be a keynote speaker.  I belong to the editorial boards of a number of academic and practitioner publications.  Further, I am a member of the Asset Pricing and Corporate Finance Programs and the director of the Risk of Financial Institutions Group of the National Bureau of Economic Research.  I was editor of the *Journal of Finance* for 12 years and co-editor of the *Journal of Financial Economics* for five years (two of the generally recognized top three journals in the field of financial economics).  Thomson Reuters has included me in its list of the world's most influential scientific minds, which identifies top researchers based on the number of authored publications that are highly cited by peers.[1]

3.      I have published more than 100 articles in finance and economics journals, including the *Journal of Political Economy*, the *Journal of Financial Economics*, the *Journal of Finance*, and the *Review of Financial Studies*.  I am the author of a textbook titled *Risk Management and Derivatives*, a co-author of *The Squam Lake Report: Fixing the Financial System*, and have

---

[1] *See, e.g.*, "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015, p. 46, available at https://www.ludwigcancerresearch.org/wp-content/uploads/2018/09/37a987a9-e378-4888-8baa-d4ba20efdbfd_tr_scientific_minds_online_final.pdf.

edited several books, including the *Handbook of the Economics of Finance* and *International Capital Markets*.

4.      I have taught in executive development programs in North America, Europe, and Asia.  I have consulted for major corporations, law firms, the New York Stock Exchange, the International Monetary Fund, and the World Bank.  I also have served as a member of advisory boards of the U.S. Treasury and of the Federal Reserve Bank of New York.  I have belonged to several corporate boards and was the vice-chairman of the board of trustees of the Global Association of Risk Professionals, where I also chaired the governance committee.

5.      A copy of my curriculum vitae is attached as **Exhibit 1**, which includes a list of my publications.  **Exhibit 2** contains a list of my testimony over the last four years.

## II.      Assignment and Compensation

6.      I have been retained by counsel for Defendants ("Counsel"), including Qualcomm Incorporated ("Qualcomm" or "the Company") and the individual defendants, in the above-captioned matter.

7.      I have been asked by Counsel to assume that Plaintiffs' alleged misstatements and omissions ("misrepresentations") comprise several categories, namely (i) alleged misrepresentations regarding Qualcomm's "broad" and "non-discriminatory" licensing practices; (ii) alleged misrepresentations regarding Qualcomm's "decades"-long licensing practices; (iii) alleged misrepresentations regarding Qualcomm's "separate" business segments; and (iv) alleged misrepresentations regarding "pro-competitive" business practices.[2]  I understand from Counsel that Plaintiffs allege that these alleged misrepresentations concealed two types of business practices, namely (a) Qualcomm's licensing practices with respect to chipmakers and (b) Qualcomm's alleged bundling behavior.[3]  I have also been asked to assume that the various categories are subject to being proven or disproven individually, such that some may be proven while others may not.

---

[2] Consolidated Class Action Complaint for Violation of the Federal Securities Laws, *In Re Qualcomm Incorporated Securities Litigation*, United States District Court for the Southern District of California, Case No. 3:17-cv-00121-JAH-WVG, July 3, 2017 ("Complaint"), ¶¶ 73, 130.  The specific misrepresentations alleged by Plaintiffs are discussed in **Section III**.
[3] I have been instructed by Counsel to assume that Plaintiffs' allegations regarding "bundling" refer either to Qualcomm's practice of not providing chips to unlicensed device makers, or the alleged practice of providing royalty relief that was conditioned on chip sales.

8.      I have been asked to evaluate the price impact of any alleged misrepresentations regarding Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers.[4]  In addition, I have been asked to evaluate the price impact of any alleged misrepresentations regarding Qualcomm's practice of not providing chips to unlicensed device makers.[5]

9.      I have also been asked to review and respond to the expert report of David I. Tabak, Ph.D., submitted on May 19, 2022.[6]  In particular, I have been asked to evaluate whether Dr. Tabak has proposed a methodology that is capable of calculating damages on a class-wide basis and in a manner that is consistent with Plaintiffs' allegations in this matter.

10.      The analyses and opinions expressed in this report are my own.  I am compensated for my time and services on this case at my regular hourly rate of $1,200.  I am assisted in this matter by staff of Cornerstone Research, who work under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

11.      Lists of the materials I relied upon in preparing this report are attached as **Exhibit 3** and **Exhibit 4**.  My work in this matter is ongoing, and I reserve the right to supplement my opinions in the event that Plaintiffs or their experts submit additional analyses or information.

### III.      Summary of Allegations

12.      Plaintiffs allege that Qualcomm misrepresented certain of its business practices over an approximately five-year Proposed Class Period covering the period from February 1, 2012 to January 20, 2017.[7]  In particular, I understand that Plaintiffs allege that Qualcomm made

---

[4] As I discuss in **Section V**, I understand that the principle of patent exhaustion means that licensing the manufacture and sale of individual components ultimately incorporated into end devices prevents asserting those patents against the manufacturer of the end device.
[5] I understand modem chips to be at issue in this litigation.  In this report, I only speak to chips that include modems.
[6] Expert Report of David I. Tabak, Ph.D., dated May 19, 2022 ("Tabak Report").
[7] Complaint, p. 1.

numerous "materially false and misleading statements."[8]  In the Complaint, Plaintiffs summarize their allegations as follows:

> (i) Defendants represented to investors that Qualcomm made its standard-essential patents "available to the industry through its licensing program" on a "non-discriminatory" basis when, in reality, Qualcomm refused to license competitor chipmakers;

> (ii) Defendants represented to investors that Qualcomm's "patent licensing practices" had been "maintained for almost two decades" when, in reality, Qualcomm materially altered its licensing practices in 2008, creating significant business and regulatory risks;

> (iii) Defendants represented to investors that Qualcomm's business and licensing divisions were kept "separate" and that they "don't bundle" when, in reality, Qualcomm refused to license companies if they were a Qualcomm chipset competitor and provided licensees with royalty relief conditioned on their exclusive purchase of Qualcomm chips; and

> (iv) Defendants represented to investors that Qualcomm adopted a "procompetitive" licensing model that "facilitated competition" when, in reality, Qualcomm instituted a business model and implemented a set of licensing policies that stifled and blocked competition, enabling it to achieve market dominance.[9]

13.     I understand that Plaintiffs further allege that Qualcomm "omitted material facts when speaking to investors during the Class Period" including that Qualcomm:

> (i) refused to license to competitor chipmakers, including MediaTek, Samsung, Intel, and VIA Technologies; (ii) bundled the terms of its chipset and license agreements by, among other things, providing handset manufacturers royalty relief conditioned on their exclusive use of Qualcomm chips; and (iii) amended its licensing policies in 2008 by refusing to license to competitors.[10]

---

[8] Complaint, § VI.
[9] Complaint, ¶ 130.
[10] Complaint, ¶ 131.

14.     Plaintiffs also allege that Qualcomm's allegedly discriminatory licensing practices with respect to chipmakers ran counter to Qualcomm's commitment to license its standard essential patents ("SEPs") on a fair, reasonable, and non-discriminatory ("FRAND") basis.[11]

15.     Finally, Plaintiffs allege that "revelations of Qualcomm's clear-cut anti-competitive practices" caused Qualcomm's stock price to decline following five alleged corrective disclosures that occurred between November 2015 and January 2017.[12]  According to the Complaint, the first four alleged corrective disclosures are regulatory actions by the Korea Fair Trade Commission ("KFTC"), European Commission ("EC"), Taiwan Fair Trade Commission ("TFTC"),[13] and the U.S. Federal Trade Commission ("FTC"), while the final alleged corrective disclosure is a civil lawsuit against Qualcomm by Apple Inc. ("Apple").[14]

16.     I understand that Plaintiffs claim that by allegedly misrepresenting its business practices, Qualcomm understated to the market the true risk of being subject to regulatory actions by "anti-competition regulators around the world."[15]

## IV.     Summary of Opinions

17.     I summarize my opinions in this section.[16]  The subsequent sections, as outlined below, provide the bases for my opinions and include explanations of my analyses and reasoning.

---

[11] *See*, *e.g.*, Complaint, ¶¶ 37, 46, 51.  *See* **Section V** for further discussion of FRAND commitments and SEPs.

[12] Complaint, ¶¶ 2, 212–232.

[13] Qualcomm's press release on December 8, 2015 disclosed that the TFTC had initiated an investigation into whether Qualcomm's "patent licensing arrangements violate the Taiwan Fair Trade Act."  According to the Complaint the TFTC announced on December 8, 2015 that it was investigating Qualcomm because its "patent licensing practices violated the Taiwan Fair Trade Act, specifically, 'by declining to grant licenses to chipset makers' and providing 'royalty rebates to certain companies in exchange for their exclusive use of the Company's chipsets.'"  However, the specific allegations that the Complaint quotes as having been disclosed on December 8, 2015 are not included in Qualcomm's press release on that date, and instead became public in Qualcomm's SEC 10-Q filing on July 20, 2016.  *See* "Qualcomm Comments on Regulatory Matters," Qualcomm Press Release, December 8, 2015; Complaint, ¶ 216; Qualcomm Incorporated, Form 10-Q for Q3 2016, filed July 20, 2016 ("Q3 2016 10-Q"), p. 17.

[14] Complaint, ¶¶ 121–127 ("Defendants' anti-competitive conduct—their refusal to license competitors and their bundling of licenses and chipset agreements—has come to light through the revelation of a series of regulatory investigations and findings around the world, an enforcement action by the FTC, and a multi-billion dollar action by Qualcomm's largest customer.").

[15] Lead Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Judgment on the Pleadings, *In Re Qualcomm Incorporated Securities Litigation*, United States District Court for the Southern District of California, Case No. 3:17-cv-00121-BEN-MSB, February 18, 2020 ("2020 Memorandum"), pp. 24–25 ("Had investors known that Qualcomm was engaged in anti-competitive licensing practices—violating its commitments to the standard-setting bodies, worldwide anti-competition laws, and its affirmative representations to the market—investors would have understood the foreseeable risks that materialized across the globe.").

[16] The opinions in my report are based on my analyses, a review of relevant materials, and my expertise and training in financial economics.

18.    _First_, as discussed in **Section VII**, information regarding Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, and its practice of not providing chips to unlicensed device makers, was public before the first alleged corrective disclosure and repetition of this information would not have impacted Qualcomm's stock price in an efficient market once the information was public.  Specifically:

    a.   The fact that Qualcomm licensed exhaustively at the device level was public before the first alleged corrective disclosure.  Qualcomm publicly discussed its longstanding practice of licensing exhaustively at the device level before the first alleged corrective disclosure.  The practice of device-level licensing was also publicly discussed as being a standard practice among major owners of cellular SEPs in the context of a policy proposal by one of the standards development organizations ("SDOs").  Consistent with the Company's own commentary and discussion in the context of the SDO device-level licensing debate, equity research analysts discussed Qualcomm's longstanding practice of licensing exhaustively at the device level, the fact that this was standard practice, and that device-level licensing was central to Qualcomm's business model.  Furthermore, consistent with its device-level licensing model, Qualcomm made numerous public statements regarding not providing exhaustive licenses to chipmakers and regarding non-exhaustive agreements with chipmakers, including agreements with specific chipmakers.  Equity research analysts also discussed Qualcomm's non-exhaustive agreements with chipmakers.  Finally, the practice among major owners of cellular SEPs of licensing at the device level was challenged through litigation and regulatory investigations that were publicly disclosed and discussed by equity research analysts before the first alleged corrective disclosure.

    b.   Qualcomm's practice of not providing chips to unlicensed device makers was likewise public before the first alleged corrective disclosure.  China's National Development and Reform Commission ("NDRC") investigated what Qualcomm described as "the Company's policy of selling chipsets only to the Company's patent licensees" prior to the first alleged corrective disclosure date.[17]  Equity

---

[17] Qualcomm Incorporated, Form 10-Q for Q3 2014, filed July 23, 2014 ("Q3 2014 10-Q"), pp. 12–13.

research analyst commentary surrounding the NDRC investigation noted the Company's practice of providing chips only to patent licensees.

c.  In an efficient market, information about Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, and its practice of not providing chips to unlicensed device makers, would have been incorporated into Qualcomm's stock price once the information was public, which was before the first alleged corrective disclosure.  The alleged corrective disclosures correspond to information regarding international regulatory investigations, a regulatory lawsuit by the FTC, and private litigation by Apple.  The price declines associated with these alleged corrective disclosure dates may be associated with announcements regarding the various regulatory actions and the litigation by Apple due to the potential for such events to result in negative future outcomes for Qualcomm.  However, they are not evidence of price impact of the alleged misrepresentations regarding Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, or its practice of not providing chips to unlicensed device makers, given that information about these practices was already public before the first alleged corrective disclosure and would have been already incorporated into Qualcomm's share price by that time.

19.    _Second_, as discussed in **Section VIII**, Dr. Tabak has not established the existence of a methodology for calculating class-wide damages that is consistent with the allegations in this matter.

a.  Dr. Tabak proposes a generic damages approach.  He fails to show that such an approach can address the challenging and unusual case-specific issues that arise in this litigation due to the existence of multiple categories of alleged misrepresentations and Plaintiffs' allegations that the alleged corrective disclosures were materializations of understated risks.  An event study by itself cannot be used to compute damages given these issues.

b.  In particular, Dr. Tabak fails to explain how his proposed damages methodology can separately estimate inflation throughout the Proposed Class Period for the

different categories of misrepresentations alleged by Plaintiffs, if such disaggregation is required.  I understand from Counsel that Plaintiffs' multiple categories of alleged misrepresentations are subject to being proven or disproven individually, and that each of the alleged corrective disclosure dates involves more than one of Plaintiffs' categories of alleged misrepresentations.  An event study alone—which is a specific technique used by financial economists, not a damages model—is not sufficient to separate the economic impact of corrective information concerning the different categories of alleged misrepresentations if such information was disclosed simultaneously, as is the case on the alleged corrective disclosure dates in this matter.  In addition, Plaintiffs' categories of alleged misrepresentations, as an economic matter, appear not to be sufficiently interchangeable to support a claim that even if liability is found for only a subset of the categories, damages could still be measured using the entirety of residual stock price declines on the alleged corrective disclosure dates, without first removing the impact of any categories of alleged misrepresentations that are not proven.  Therefore, if liability is only found with respect to some of the categories of alleged misrepresentations and not others, damages cannot be measured using the entire residual stock price declines on the alleged corrective disclosure dates, and Dr. Tabak has not shown whether he would be able to reliably separate residual stock price declines for each of Plaintiffs' categories of alleged misrepresentations, if required.  Finally, Dr. Tabak does not propose a methodology that could account for potential changes in artificial price inflation (if any) for the different categories of alleged misrepresentations over the five-year Proposed Class Period.

c.  Dr. Tabak has also not shown whether a damages methodology exists that can measure damages associated with materialization of understated regulatory and litigation risks due to Qualcomm allegedly misrepresenting its business practices, as alleged by Plaintiffs.  A damages approach that can account for materialization of risk would need to include a methodology for separating the impact of previously understated risk (if any) from the impact that would have occurred

upon the materialization of the risk even if that risk had been fully disclosed.  Dr. Tabak does not describe any methodology that could accomplish this despite discussing the need for such a methodology in his previously published work. Instead of articulating a methodology that could address allegations based on the materialization of previously understated risk, Dr. Tabak's proposed approach rests on the implausible assumption that Plaintiffs will somehow be able to demonstrate that the actions by various regulators and litigation by Apple that actually occurred would have been assessed by the market as inevitable, had Qualcomm disclosed the alleged truth regarding its business practices at the beginning of the Proposed Class Period.  Dr. Tabak has not proposed any methodology to assess whether those events were in fact inevitable (and there is no basis to assume they were), or to calculate damages if the alleged corrective disclosures represented materialization of allegedly understated risks and the actions by regulators and litigation by Apple on the alleged corrective disclosure dates were, in fact, not inevitable.

## V.      Background

20.      In this section, I provide a brief overview of certain factual matters, as I understand them, that provide background to my opinions expressed in the remainder of my report.  I am not offering opinions regarding any factual matters or legal conclusions.

### A.  Overview of Qualcomm

21.      Qualcomm is a cellular communication technology company.[18]  Qualcomm develops and commercializes cellular communications technologies, licenses its intellectual property ("IP") portfolio, and designs and sells products based on these technologies.[19]

22.      Since the 1990s, Qualcomm has been developing and licensing technologies used in cellular wireless communications networks and devices, including technologies that are deemed

---

[18] *See, e.g.*, Qualcomm Incorporated, Form 10-K for FY 2012, filed November 7, 2012 ("2012 10-K"), pp. 1–2.
[19] *See, e.g.*, 2012 10-K, pp. 1–2.

"essential" to one or more cellular standards.[20]  In particular, Qualcomm was a leader in developing the cellular communication technology Code Division Multiple Access ("CDMA") for mobile applications, and subsequent generations of cellular standards (including 3G (CDMA2000, WCDMA), 4G (OFDMA/LTE), and 5G standards), which are standard technologies in the cellular devices industry that have been used at various times in wireless communications from the 1990s to the present day.[21]

23.     Qualcomm also designs and supplies specialized integrated circuits ("chips") and software used in consumer wireless products (including cellular devices); Qualcomm's products include chips that incorporate baseband processors (which are also known as modem chips or modem integrated circuits).[22]  Together with other components of a cellular device, these modem chips facilitate each device's connection to cellular networks.[23]  Qualcomm's chips and software support voice and data communication, networking, application processing, and other functions.[24]

24.     During the Proposed Class Period, Qualcomm's business was separated into up to four reportable segments.  The Company's two main business segments were Qualcomm Technology Licensing ("QTL"), which licenses the Company's IP portfolio; and Qualcomm CDMA Technologies ("QCT"), which is its chip business.[25]  Qualcomm's two other business segments were Qualcomm Wireless and Internet ("QWI"), which sold products, services, and software to support wireless applications; and Qualcomm Strategic Initiatives ("QSI"), which makes investments focused on opportunities for technologies, including supporting the design and introduction of new products and services and enhancing existing products.[26]  The QWI reportable segment was eliminated starting in fiscal year 2014.[27]

---

[20] *See, e.g.*, 2012 10-K, pp. 1–2.

[21] Qualcomm Incorporated, Form 10-K for FY 2011, filed November 2, 2011 ("2011 10-K"), p. 1.  CDMA, 3G, and LTE technologies are vital to the performance of cell phones:  CDMA allows cell phones to communicate with cell towers on CDMA networks, and later advances of 3G/4G/5G allow for faster sharing of data.  *See* Qualcomm Incorporated, Form 10-K for FY 2006, filed November 2, 2006 ("2006 10-K"), p. 1; Qualcomm Incorporated, Form 10-K for FY 2014, filed November 5, 2014 ("2014 10-K"), p. 2; Qualcomm Incorporated, Form 10-K for FY 2017, filed November 1, 2017 ("2017 10-K"), pp. 4–5.  *See also* "The World Changing Technology That Almost Wasn't," *Qualcomm,* available at https://www.qualcomm.com/research/stories/world-changing-technology.

[22] Qualcomm Incorporated, Form 10-K for FY 2016, filed November 2, 2016 ("2016 10-K"), pp. 4–5, 9.

[23] 2014 10-K, pp. 3, 5.

[24] 2014 10-K, p. 5.

[25] 2016 10-K, pp. 9–11.

[26] 2012 10-K, pp. 8–9.  *See also* 2014 10-K, p. 8; 2017 10-K, p. 5.

[27] 2014 10-K, p. 19.

25.     During the Proposed Class Period, Qualcomm derived, on average, approximately two-thirds of its revenue, and one-third of its profit, from its QCT business.  Qualcomm derived approximately the remaining one-third of its revenue, and two-thirds of its profit, from the QTL business, with the remaining two segments contributing only small shares of each.[28]

### B.  Patents, Licenses, Standards Development Organizations, and FRAND Licensing Terms

26.     As part of its QTL business, Qualcomm licenses its IP to manufacturers of cellular devices and infrastructure.[29]  Qualcomm's patent portfolio contains thousands of patents covering cellular wireless communications technologies,[30] and Qualcomm licensed its IP to hundreds of companies in each year of the Proposed Class Period.[31]  Qualcomm's patents have coverage in many countries, including the U.S., China, Japan, South Korea, Taiwan, and European countries.[32]

27.     Qualcomm bilaterally negotiates its license agreements and licensing arrangements; the specific terms of the agreements are confidential.[33]  In general, the Company's licensees are required to pay Qualcomm ongoing royalties based on a percentage of the wholesale selling price of each licensed product.[34]

28.     As part of its patent portfolio, Qualcomm holds numerous patents that have been declared potentially "essential" to the technology standards used by cellular equipment and cellular network infrastructure.[35]  I understand that such SEPs are considered "essential" when "it is not

---

[28] QCT revenue ranged from 60.9% to 74.3% of total revenue during the Proposed Class Period and QTL revenue ranged from 25.7% to 38.9% of total revenue.  QCT profit (calculated as earnings before taxes) ranged from 8.2% to 42.1% of profit during the Proposed Class Period and QTL profit ranged from 58.0% to 89.6% of profit.  *See* Qualcomm Incorporated, Form 10-Ks for FY 2012–2017, filed November 7, 2012–November 1, 2017; Qualcomm Incorporated, Form 10-Qs for Q2 2012–Q2 2017, filed April 18, 2012–April 19, 2017.

[29] *See, e.g.*, 2014 10-K, p. 7.  As Qualcomm explained on a call with investors, "a license is a promise from the licensor to the licensee not to be sued for the use or infringement of the licensor's patent.  It is not a right to necessarily practice everything under the patent. The licensee may need patent licenses from multiple license patent holders.  But it is a promise that [] I as a patent holder won't sue you as a practitioner of the patent under the agreement."  *See* "Licensing/IPR Overview Conference Call & Webcast," Qualcomm, June 21, 2006.

[30] "Qualcomm Technology Licensing," Qualcomm, January 23, 2013, available at https://web.archive.org/web/20130123160834/http://www.qualcomm.com/about/businesses/qtl.

[31] *See, e.g.*, 2017 10-K, p. 12.

[32] 2014 10-K, p. 7.

[33] *See, e.g.*, "Industry Giants Agree on LTE IPR; Qualcomm Notably Absent from List," *RCR Wireless News*, April 21, 2008 ("Qualcomm Inc. … does not disclose its licensing terms with partners.  Qualcomm has always insisted it licenses its essential patents on FRAND terms, while reserving the right to keep individual agreements confidential.").

[34] 2012 10-K, p. 11.

[35] 2016 10-K, p. 11.

possible on technical grounds to make or operate equipment or methods which comply with a standard without infringing" the patent.[36]

29.     I understand that SDOs—also sometimes called standard-setting organizations—are regional member-supported institutions that, through the consensus of industry participants, develop and maintain technical standards.[37]  The establishment and maintenance of cellular standards ensures that cellular devices, such as mobile phones, are able to connect to cellular networks.[38]  I understand that the European Telecommunications Standards Institute ("ETSI") is considered a leading cellular SDO.[39]

30.     I understand that SDOs generally require their members to make certain contractual commitments concerning the licensing of their intellectual property rights ("IPR") that may be essential to a standard.[40]  ETSI's policy, for example, requires each member to give, with respect to "essential IPR," an "irrevocable undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory ('FRAND') terms under such IPR."[41]  I understand that FRAND is a voluntary commitment to license standard essential patents in a fair, reasonable, and non-discriminatory fashion.  Qualcomm disclosed that it committed to certain SDOs that it would offer to license its patents on FRAND terms.[42]

### C.  Qualcomm's Licensing Practices

31.     I understand that Qualcomm's licensing model is based on the principle of "exhaustively" licensing the manufacture and sale of cellular devices, and that it licenses at the device level.[43]  I

---

[36] *See*, *e.g.*, "ETSI IPR Policy," ETSI, available at https://www.etsi.org/intellectual-property-rights.

[37] "Standard-Setting Organization (SSO)," *Thomson Reuters*, available at https://content.next.westlaw.com/9-557-1858.

[38] Hearing on "Standard Essential Patent Disputes and Antitrust Law" before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Committee on the Judiciary of the United States Senate, July 30, 2013, p. 2, available at https://www.judiciary.senate.gov/imo/media/doc/CHRG-113shrg88369.pdf.

[39] "About ETSI," ETSI, available at https://www.etsi.org/about.  *See also* "Expert Meetings Support IPR Upside for Nokia & Ericsson," *Bank of America Merrill Lynch*, September 17, 2015, p. 1; "IT HW and Telecom Equipment," *Credit Suisse*, August 4, 2017, p. 30.

[40] J. Ratliff and D. Rubinfeld (2013), "The Use and Threat of Injunctions in the RAND Context," *Journal of Competition Law & Economics*, pp. 1–22 at p. 4.

[41] "ETSI IPR Policy," ETSI, available at https://www.etsi.org/intellectual-property-rights.

[42] *See*, *e.g.*, 2016 10-K, p. 22.

[43] For the wireless telecommunications industry, device-level licensing means licensing manufacturers of complete cellular end user products, which typically means mobile phones (as well as tablets and similar devices).  *See*, *e.g.*, "Reinstate with Hold as NXP in DBe, But Significant Uncertainties Persist," *Deutsche Bank*, June 18, 2017, p. 44 ("QTL revenues are comprised of license fees (fixed) and royalties based on sales of products utilizing QCOM's IP.  While the vast majority of QTL revenues are derived from licensee sales of mobile phones, royalties are also derived from other products incorporating QCOM's wireless IP including tablets, NBs, data modem cards, machine-to-machine devices, embedded modules, infrastructure equipment and IOT devices.").

understand that cellular devices (often referred to as "handsets") are complete cellular end-user products such as mobile phones and tablets. As a practical matter, I understand that the principle of patent exhaustion means that if Qualcomm were to license the manufacture and sale of individual components, such as modem chips, that would then ultimately be incorporated into cellular devices, then that modem chip sale would exhaust any Qualcomm patents that are substantially embodied by those modem chips, and Qualcomm would not be able to successfully assert those patents against (and therefore license those patents to) the manufacturer of the complete cellular device, such as a phone.[44]

32.     I also understand that device makers, which are also known as original equipment manufacturers ("OEMs"), use a more extensive range of Qualcomm's IP than component makers. Qualcomm has stated that because its patent portfolio relates to technologies across the entire wireless system, licensing the "downstream" device makers (*i.e.*, OEMs) simplifies the negotiation, royalty collection, and auditing process for the parties, and that licensing at the chip or component level would involve "endless complications and grounds for dispute."[45] As I discuss in **Section VII**, device-level licensing was also the norm among other major owners of cellular SEPs.

33.     I understand that before 2008, in addition to its licenses to handset makers, Qualcomm entered into limited license agreements with some chipmakers. I understand that these agreements provided the counterparty with the right to manufacture and sell, but not to use, cellular chips. Qualcomm provided these rights either in exchange for licensing fees, paid as royalties, and/or on a royalty-free basis.[46] Qualcomm's agreements did not provide chipmakers rights that would "pass through" to their OEM customers and thereby exhaust Qualcomm's patent rights;[47] rather, Qualcomm expressly reserved the right to license to OEMs separately and exhaustively.[48] Thus, I understand that Qualcomm's patent agreements with chipmakers were

---

[44] "Licensing/IPR Overview Conference Call & Webcast," Qualcomm, June 21, 2006.

[45] Additional Statement of Donald J. Rosenberg Prepared in Response to the July 30, 2013 Hearing on "Standard Essential Patent Disputes and Antitrust Law" before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Committee on the Judiciary of the United States Senate, September 3, 2013 ("Rosenberg September 2013 Congressional Statement"), p. 5, available at https://www.judiciary.senate.gov/imo/media/doc/CHRG-113shrg88369.pdf. *See also* discussion in **Section VII**.

[46] Qualcomm Incorporated, Form 10-K for FY 2009, filed November 4, 2009 ("2009 10-K"), p. 9.

[47] *See*, *e.g.*, 2009 10-K, p. 9. I understand that chipmakers' customers are generally manufacturers of subscriber and network equipment (and in particular, device makers or OEMs). Further, I understand that in some cases, firms that sell handsets (*e.g.*, Apple) outsource the manufacturing of handsets to contract manufacturers ("CMs"), and in these cases, the CM (*e.g.*, Foxconn) may be the chipmakers' customer.

[48] *See*, *e.g.*, 2009 10-K, p. 9.

intended to be "non-exhaustive" so as to preserve Qualcomm's ability to license OEMs.[49]  I also understand that in June 2008, a U.S. Supreme Court ruling in *Quanta Computer, Inc. v. LG Electronics, Inc.* ("*Quanta*") held that "non-exhaustive" licenses of the type Qualcomm had entered into with some chipmakers could be deemed exhaustive.[50]

34.      Prior to and throughout the Proposed Class Period there was also a public debate over device-level licensing.  In particular, some industry participants questioned whether FRAND commitments implied that exhaustive licenses should be provided at the component level, in contrast to Qualcomm's device-level licensing model.[51]  In February 2015, the Institute of Electrical and Electronics Engineers ("IEEE")—an SDO that has developed standards concerning Wi-Fi and Ethernet, as opposed to cellular standards[52]—implemented a new policy under which "reasonable" royalty rates would reflect the selling price of the "smallest salable implementation" of a patented invention, a practice that was noted in the public press to "run[] counter to customary practices in mobile phones."[53]  The IEEE also proposed that SEP holders "cannot refuse to license its patents for use in IEEE-SA standards at certain levels of production," which the Department of Justice noted in a comment letter could "entail[] a departure from historical licensing practices for some licensors (who, for example, may prefer to license manufacturers of the end product, not manufacturers of the input)."[54]  ETSI, the aforementioned leading SDO for cellular standards, declined to adopt similar changes.[55]  To the

---

[49] Indeed, revenues from license arrangements with chipmakers have historically been a small part of Qualcomm's licensing revenues.  *See* "QCOM - Q2 2009 Qualcomm Inc. Earnings Conference," *CQ Transcriptions*, April 27, 2009, p. 18 ("[M]ore than 90% of our licensing revenue comes from royalties on handsets. And we -- the royalties from [chip] suppliers are a very minimal part of our program.").

[50] *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008) ("*Quanta* Opinion").

[51] *See, e.g.*, "Patent Holders Fear Weaker Tech Role," *Wall Street Journal*, February 9, 2015, available at https://www.wsj.com/articles/patent-holders-fear-weaker-tech-role-1423442219.

[52] "IEEE at a Glance," IEEE.org, available at https://www.ieee.org/about/at-a-glance.html?utm_source=linkslist_text&utm_medium=lp-about&utm_campaign=at-a-glance#ieee-quick-facts.  *See also* "IT HW and Telecom Equipment," *Credit Suisse*, August 4, 2017.

[53] "Patent Holders Fear Weaker Tech Role," *Wall Street Journal*, February 9, 2015, available at https://www.wsj.com/articles/patent-holders-fear-weaker-tech-role-1423442219?mod=WSJ_TechWSJD_NeedToKnow.  Following the proposed change in IEEE rules, Qualcomm commented that it was reconsidering participation in the IEEE and would not follow the new rules.  *See* "Qualcomm Says It Won't Follow New Wi-Fi Rules on Patents," *Bloomberg*, February 11, 2015, available at https://www.bloomberg.com/news/articles/2015-02-11/qualcomm-says-new-wi-fi-standard-rules-unfair-may-not-take-part.  *See also* Qualcomm (QCOM): TANSTAAFL?," *Bernstein Research*, February 19, 2015, p. 3; "InterDigital and IEEE," *InterDigital*, available at https://www.interdigital.com/page/interdigital-and-ieee.

[54] Letter from Renata B. Hesse, Acting Assistant Attorney General, to Michael A. Lindsay, Esq., Dorsey & Whitney LLP, February 2, 2015, available at https://www.justice.gov/file/338591/download.  *See also* "Patent Holders Fear Weaker Tech Role," *Wall Street Journal*, February 9, 2015, available at https://www.wsj.com/articles/patent-holders-fear-weaker-tech-role-1423442219.

[55] *See, e.g.*, "Expert Meetings Support IPR Upside for Nokia & Ericsson," *Bank of America Merrill Lynch*, September 17, 2015; "IT HW and Telecom Equipment," *Credit Suisse*, August 4, 2017.

contrary, the organization defended device-level licensing, a policy that, as I discuss in **Section VII**, Qualcomm (and other major owners of cellular SEPs) maintained prior to and throughout the Proposed Class Period.[56]

### D.  Litigation Regarding Qualcomm's Licensing Practices and Alleged Bundling

35.    Before and during the Proposed Class Period, Qualcomm faced allegations, in litigation by other companies and through actions by regulatory bodies, that, among other issues, its device-level licensing model was anti-competitive, contrary to Qualcomm's FRAND obligations, and illegal, and that it improperly bundled its licensing and its chip sales.

36.    **Exhibit 5** summarizes a selection of regulatory and legal actions initiated between 2005 and 2017 that Qualcomm disclosed in its SEC Form 10-Q and 10-K filings, including:

   a.  Litigation with Broadcom beginning in 2005, in which Broadcom alleged "infringement of [] patents" and "violations of state and federal antitrust and unfair competition laws … generally relating to licensing and chip sales activities."[57]  Broadcom claimed that Qualcomm had "refused to provide Broadcom with a license for Qualcomm's [] essential WCDMA patents on FRAND terms," engaged in "discrimination [of licensing terms] based on whether [] manufacturers also agree to purchase Qualcomm chipsets," and "provided cell phone manufacturers substantial payments or other economic incentives to not use chipsets from a competitor."[58]  The two companies settled all litigation in April 2009, signing a new multi-year patent agreement, in which Broadcom and Qualcomm granted certain limited rights to each other under their respective patent portfolios, that I understand left Qualcomm's licensing model unchanged.[59]

   b.  Litigation with Nokia beginning in 2005, in which Nokia brought claims of IP infringement and sought "declaratory and injunctive relief relating to alleged

---

[56] "About ETSI," ETSI, available at https://www.etsi.org/about.  *See also, e.g.*, "Patently Bullish Pt. II," *Bank of America Merrill Lynch*, December 3, 2015, p. 1; "Expert Meetings Support IPR Upside for Nokia & Ericsson," *Bank of America Merrill Lynch*, September 17, 2015, p. 2.
[57] 2006 10-K, p. 40.
[58] Complaint, *In Re Broadcom Corporation v. Qualcomm Incorporated*, United States District Court for the District of New Jersey, Case No. 05-3350-MLC, July 1, 2005, ¶¶ 13, 14, 16.
[59] "Q2 2009 Qualcomm Inc. Earnings Conference Call – Final," *CQ Transcriptions*, April 27, 2009, p. 2; "Qualcomm and Broadcom Reach Settlement and Patent Agreement," Qualcomm Press Release, April 26, 2009.

commitments made by [Qualcomm] to wireless industry standard setting organizations."[60]   The two companies announced a settlement in July 2008, signing a new license agreement under which Nokia agreed not to assert its patents against Qualcomm and assigned ownership of many of its patents to Qualcomm.[61]

c.   An investigation initiated by the KFTC beginning in 2006, prompted by complaints that Qualcomm had allegedly "violate[d] South Korean antitrust regulations."[62]   In 2010, the KFTC found that Qualcomm had violated Korean law by "offering certain discounts and rebates for purchases of its CDMA chips and for including in certain agreements language requiring the continued payment of royalties after all licensed patents have expired"[63] and found that "'[w]hen licensing its CDMA mobile technology, Qualcomm levied higher royalties on companies that used modem chips supplied by rival companies.'"[64]

d.   An investigation by the EC beginning in October 2005 initiated by complaints from six companies that alleged that Qualcomm had "violated European Union competition law in its WCDMA licensing practices."[65]   The investigation was closed in 2009 after all complainants had withdrawn or notified the EC of their intent to withdraw, before the EC reached any findings.[66]

e.   An investigation by the Japanese FTC ("JFTC") beginning in 2006, initiated in response to complaints from unnamed parties that Qualcomm's business practices were "a violation of the Japanese competition laws."[67]   In September 2009, the JFTC issued a cease and desist order concluding that Japanese licensees were "forced to cross-license patents [] on a royalty-free basis and were forced to

---

[60] 2006 10-K, p. 41.
[61] "Nokia and Qualcomm Enter into a New Agreement," Qualcomm Press Release, July 22, 2008.
[62] "Qualcomm's Abuse of Market Dominance," KFTC, July 23, 2009; Qualcomm Incorporated, Form 10-K for FY 2010, filed November 3, 2010 ("2010 10-K"), p. 26; Qualcomm Incorporated, Form 10-K for FY 2008, filed November 6, 2008 ("2008 10-K"), p. 20.
[63] "Qualcomm's Abuse of Market Dominance," KFTC, July 23, 2009; 2010 10-K, p. 26.
[64] "South Korea Fines Qualcomm $208 Million in Anti-Trust Case," *Reuters*, July 23, 2009, available at https://www.reuters.com/article/us-qualcomm-korea/south-korea-fines-qualcomm-208-million-in-anti-trust-case-idUKTRE56M29T20090723.
[65] Qualcomm Incorporated, Form 10-K for FY 2007, filed November 8, 2007 ("2007 10-K"), p. 38.
[66] 2009 10-K, pp. 19–20; Qualcomm Incorporated, Form 10-Q for Q1 2010, filed January 27, 2010, p. 14.
[67] 2007 10-K, pp. 19–20.

accept a provision under which they agreed not to assert their essential patents against [Qualcomm's] other licensees."[68]  In 2019, the JFTC reversed its 2009 order and concluded that "Qualcomm's cross licensing provision and non-assertion covenants that were the subject of the cease-and-desist order did not violate Japanese antimonopoly law."[69]

f.   <u>An investigation by the Chinese NDRC</u> beginning in November 2013.[70]  As I discuss in **Section VII**, the NDRC investigation examined whether the Company was in violation of Chinese Anti-Monopoly Law for "interactions between the Company's licensing business and its chipset business, including how royalties are calculated in the Company's patent licenses, the value exchanged for cross-licenses to patents of the Company's licensees, whether the Company will offer license agreements limited to patents essential to certain standards, whether royalties are sought for the Company's expired patents, the Company's practice of selling chipsets only to the Company's patent licensees, the alleged refusal of the Company to grant patent licenses to chipset manufacturers, and certain other terms and conditions in the Company's patent license and chipset sale agreements."[71]  The NDRC concluded its investigation in February 2015, after Qualcomm agreed to a "rectification plan" that required modification of several of its licensing practices.[72]  The NDRC also imposed a $975 million fine on the Company.[73]

g.   <u>An FTC investigation</u> initiated in 2014.[74]  In January 2017, the FTC filed a complaint, which is the subject of one of the alleged corrective disclosures in this matter, alleging that Qualcomm had "engaged in anticompetitive conduct and unfair methods of competition in violation of Section 5 of the FTCA [Federal

---

[68] 2009 10-K, p. 36.

[69] "JFTC Revokes Order, Finds Qualcomm Licensing Program Lawful," Qualcomm Press Release, March 13, 2019.

[70] "China's National Development and Reform Commission Notifies Qualcomm of Investigation," Qualcomm Press Release, November 25, 2013.

[71] "China's National Development and Reform Commission Notifies Qualcomm of Investigation," Qualcomm Press Release, November 25, 2013; Q3 2014 10-Q, pp. 12–13.

[72] One of the modified practices included requiring the Company to base royalties, that is, payments for its patented technologies, on 65% of the handset price, rather than the full price.  *See* "Qualcomm and China's National Development and Reform Commission Reach Resolution," Qualcomm Press Release, February 9, 2015.

[73] Qualcomm Incorporated, Form 10-Q for Q2 2015, filed April 22, 2015 ("Q2 2015 10-Q"), p. 9.

[74] Qualcomm Incorporated, Form 10-Q for Q1 2015, filed January 28, 2015 ("Q1 2015 10-Q"), p. 13.

Trade Commission Act] by conditioning the supply of baseband processors on the purchaser first agreeing to a license to the Company's standard-essential patents, paying incentives to purchasers of baseband processors to induce them to accept certain license terms, refusing to license its standard-essential patents to the Company's competitors and entering into alleged exclusive dealing arrangements with Apple Inc."[75]  In May 2019, the district court issued a ruling and injunction against Qualcomm and ordered the Company to change its business practices.[76]  The Company appealed the decision and the injunction.[77]  In August 2020, the ruling was reversed and the injunction was vacated.[78]

h.  An EC investigation initiated in July 2015, which followed from a complaint by Icera, a British chipmaker, to the EC in June 2010 that alleged that Qualcomm had "engaged in anticompetitive activity."[79]  In July 2015, the EC initiated formal proceedings in the matter alleging that Qualcomm engaged in "'predatory pricing' by charging prices below costs with a view to forcing its competition out of the market."[80]  The EC issued preliminary findings in December 2015 and a final decision in 2019 that included a 242 million euro fine.[81]  Qualcomm has appealed the decision.[82]

i.  A separate EC investigation formally initiated in July 2015, which is the subject of one of the alleged corrective disclosures in this matter, concerning "'alleged payments, rebates and/or other consideration granted by Qualcomm … to smartphone and/or tablet manufacturers which are conditional upon the exclusive or quasi-exclusive use or purchase of Qualcomm products, in particular baseband

---

[75] Redacted Federal Trade Commission's Complaint for Equitable Relief, *Federal Trade Commission v. Qualcomm Incorporated*, United States District Court for the Northern District of California, Case No. 5:17-cv-00220, January 17, 2017 ("FTC Complaint"); 2017 10-K, p. F-33.
[76] Qualcomm Incorporated, Form 10-K for FY 2020, filed November 4, 2020 ("2020 10-K"), p. 38.
[77] 2020 10-K, p. 38.
[78] 2020 10-K, p. F-31.
[79] Qualcomm Incorporated, Form 10-K for FY 2015, filed November 4, 2015 ("2015 10-K"), p. F-24; "Nvidia Acquires Icera for $367M," *San Francisco Business Times*, May 9, 2011, available at https://www.bizjournals.com/sanfrancisco/news/2011/05/09/nvidia-acquires-icera-for-367m html.
[80] "Antitrust: Commission Opens Two Formal Investigations against Chipset Supplier Qualcomm," European Commission Press Release, July 16, 2015; 2015 10-K, p. F-24.
[81] "Antitrust: Commission Fines US Chipmaker Qualcomm €242 Million for Engaging in Predatory Pricing," European Commission Press Release, July 18, 2019.
[82] Qualcomm Incorporated, Form 10-K for FY 2021, filed November 3, 2021 ("2021 10-K"), p. F-26.

chipsets.'"[83]  The EC issued preliminary findings in December 2015 and a final decision in 2018, which the Company appealed.[84]  As part of the final decision from 2018, the EC imposed a fine of approximately 997 million euros on the Company.[85]  In June 2022, the European Union General Court annulled the EC's 2018 finding that Qualcomm's payments to its major customer (Apple) were anti-competitive and vacated the fine.[86]

j.   An investigation by the TFTC beginning in December 2015.[87]  The TFTC examined whether Qualcomm had violated Taiwan's Fair Trade Act by allegedly "jointly licens[ing] its patents rather than separately licensing standard-essential patents and non-standard-essential patents;" charging "unreasonable" royalties; "unreasonably requir[ing] licensees to grant it cross-licenses;" "fail[ing] to provide lists of licensed patents to licensees;" "declining to grant licenses to chipset makers;" "[d]eclin[ing] to sell chipsets to unlicensed potential customers;" and "provid[ing] royalty rebates to certain companies in exchange for their exclusive use of the Company's chipsets."[88]  The TFTC issued a decision in October 2017, finding that Qualcomm's practices violated Taiwan's Fair Trade Act, requiring remediation of the Company's licensing practices, and issuing a fine of over $750 million.[89]  The Company appealed the decision and in August 2018 settled with the TFTC, whereby the regulatory agency revoked its earlier decision.[90]

k.   A KFTC investigation initiated in 2015, which is the subject of two of the alleged corrective disclosures in this matter.  The KFTC alleged, among other things, that "the Company is in violation of Korean competition law by licensing its patents

[83] "Antitrust: Commission Opens Two Formal Investigations against Chipset Supplier Qualcomm," European Commission Press Release, July 16, 2015; 2015 10-K, p. F-24.
[84] "Antitrust: Commission Fines Qualcomm €997 Million for Abuse of Dominant Market Position," European Commission Press Release, January 24, 2018; Qualcomm Incorporated, Form 10-K for FY 2018, filed November 7, 2018 ("2018 10-K"), p. F-36.
[85] Qualcomm Incorporated, Form 10-Q for Q1 2018, filed December 24, 2017 ("Q1 2018 10-Q"), p. 21.
[86] "Abuse of Dominance on the LTE Chipset Market: The General Court Annuls the Commission Decision Imposing on Qualcomm a Fine of Approximately €1 Billion," Court of Justice of the European Union Press Release, June 15, 2022.
[87] As noted, the Complaint alleges that the disclosure of allegations by the TFTC constituted a corrective disclosure on December 8, 2015, but the specific allegations were not made public until July 2016.
[88] 2016 10-K, p. F-27.
[89] 2018 10-K, p. F-37; "Qualcomm Disagrees with Decision by Taiwan Fair Trade Commission and Intends to Seek a Stay and Appeal the Decision," Qualcomm Press Release, October 10, 2017.
[90] 2018 10-K, p. F-37.

exhaustively only to device manufacturers and requiring that its chipset customers be licensed to the Company's intellectual property."[91]   The KFTC ruled against Qualcomm in December 2016 and issued a formal decision in January 2017.[92] Qualcomm has since appealed the decision.[93]

1. <u>A lawsuit filed by Apple in 2017</u>, which is also the subject of one of the alleged corrective disclosures in this matter, whereby Apple accused Qualcomm of having "breached certain agreements and violated antitrust and California state unfair competition laws."[94]   In addition, Apple claimed that Qualcomm "refused to deal with competitors in contravention of the Company's agreements with applicable standard setting organizations," "used its market position to impose contractual obligations on Apple that prevented Apple from challenging the Company's licensing practices," "tied the purchase of the Company's CDMA-enabled and 'premium' LTE-enabled chipsets to licensing certain of the Company's patents," and "required Apple to purchase baseband chipsets exclusively from the Company as a condition of the Company's payment to Apple of certain rebates."[95]   Qualcomm filed multiple counter claims,[96] as well as lawsuits against Apple in other jurisdictions.[97]   In a global settlement in April 2019, the two companies agreed to drop all litigation against each other and enter into chip supply and license agreements, and Apple agreed to make a payment to Qualcomm based on which Qualcomm recognized licensing revenues of $4.7 billion from the settlement.[98]

---

[91] 2016 10-K, p. F-26; "Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report," Qualcomm Press Release, November 17, 2015.
[92] 2017 10-K, p. F-32.
[93] 2017 10-K, p. F-32.
[94] 2017 10-K, p. F-28.
[95] 2017 10-K, p. F-28.
[96] *See, e.g.*, 2017 10-K, pp. F-28–F-30.
[97] Qualcomm Incorporated, Form 10-Q for Q2 2019, filed May 1, 2019 ("Q2 2019 10-Q"), pp. 21–24.
[98] "Qualcomm and Apple Agree to Drop All Litigation," Qualcomm Press Release, April 16, 2019; Qualcomm Incorporated, Form 10-Q for Q3 2019, filed July 31, 2019 ("Q3 2019 10-Q"), p. 30.

## VI.    Background on Market Efficiency, Price Discovery, and Event Study Analysis

### A.  Overview of Market Efficiency and Price Discovery in Efficient Markets

#### 1.  Market Efficiency in Financial Economics

37.    The question of whether markets are efficient has been investigated in various financial markets over the past fifty years.  The concept of market efficiency in financial economics was introduced in the 1960s by Eugene Fama and Paul Samuelson.  Professor Fama defined an efficient market as a "market in which prices provide accurate signals for resource allocation: that is, a market in which firms can make production-investment decisions, and investors can choose among the securities that represent ownership of firms' activities under the assumption that security prices at any time 'fully reflect' *all* available information."[99]

38.    Financial economists recognize three forms of market efficiency:  weak form, semi-strong form, and strong form.[100]  In a weak form efficient market, historical returns or prices cannot be used to predict future price movements.[101]  In a semi-strong form efficient market, security prices react quickly and fully to new, unexpected, value-relevant public information, so that security prices reflect all public information at all times.  As a result, neither historical returns or prices, nor public information, can be used to predict future price movements in a semi-strong form efficient market.[102]  In a strong form efficient market, prices react quickly and fully not only to public information (as in semi-strong form efficient markets), but also to private information.[103]

39.    When referring to market efficiency and efficient markets in this report, I refer to the semi-strong form of market efficiency.  Dr. Tabak uses the same definition of efficiency in his report.[104]  Dr. Tabak notes that semi-strong market efficiency means "that the price of a stock

---

[99] E. Fama (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 25(2), pp. 383–417 ("Fama (1970)") at p. 383 (emphasis added).
[100] Fama (1970), p. 388.
[101] Fama (1970), p. 388.  *See also* E. Fama (1991), "Efficient Capital Markets: II," *Journal of Finance*, 46(5), pp. 1575–1617 ("Fama (1991)") at p. 1576.
[102] Fama (1970), p. 388.  *See also* Fama (1991), p. 1576.
[103] Fama (1970), p. 388.
[104] Tabak Report, ¶ 9 ("When discussing the 'Efficient Market Hypothesis' with regard to publicly traded securities such as Qualcomm's, financial economists are generally referring to the semi-strong form of market efficiency.  I will follow the same convention here.").

rapidly incorporates *all* publicly available information."[105]  Similarly, finance textbooks define the market for a stock as being semi-strong form efficient if all public information is rapidly incorporated into the stock price.[106]

40.    In this litigation, I understand that Plaintiffs must establish that the market for Qualcomm's stock was efficient to support a presumption of reliance on the alleged misrepresentations.  For the purposes of this report, I have been asked to assume that the market for Qualcomm's stock was semi-strong form efficient.  Therefore, I am assuming that any frictions that may have existed in the market for Qualcomm's stock did not prevent Qualcomm shares from incorporating all public information as implied by this form of market efficiency.[107] My assumption of semi-strong form efficiency is consistent with Dr. Tabak's stated opinion that during the Proposed Class Period "Qualcomm's common stock traded in an efficient market."[108]

## 2.  Price Discovery in Efficient Markets

41.    Consistent with my assumption of market efficiency, trading by investors will quickly eliminate situations where public information is not incorporated in stock prices because investors will be strongly incentivized to take advantage of such situations.[109]  If at any given time some positive public piece of information about the future prospects of a company is not, for whatever reason, yet incorporated in the company's stock price, in an efficient market traders with access to that information will rapidly choose to buy the stock, driving the price up. Similarly, traders with access to negative public information about the future prospects of a

---

[105] Tabak Report, ¶ 9 (emphasis added).

[106] S. Ross et al. (2022), *Corporate Finance*, 13th ed., New York, NY: McGraw-Hill/Irwin, p. 437 ("A market is semistrong form efficient if prices reflect, or incorporate, all publicly available information, including information such as published accounting statements for the firm, as well as historical price information. … However, if the market is semistrong form efficient, the price should rise immediately upon the news release.").

[107] While the general findings of the literature in financial economics as of the late 1980s provided much support for semi-strong form market efficiency, empirical research at that time had also identified examples that appeared to be inconsistent with semi-strong form market efficiency (as summarized by Professor Fama 1991).  Since 1991, academic research has studied implications for the efficient markets hypothesis of real-world practicalities and complexities in markets, including limits to efficiency that may sometimes arise because of the existence of frictions in the workings of markets.  *See* Fama (1991); A. Shleifer and R. Vishny (1997), "The Limits of Arbitrage," *Journal of Finance*, 52(1), pp. 35–55.

[108] Tabak Report, ¶ 2.  For the purposes of this report, I have been asked to assume that the market for Qualcomm's shares was efficient, but I am not affirmatively offering an opinion of market efficiency, which is beyond the scope of my assignment.

[109] Dr. Tabak does not find evidence of costs that would prevent arbitrageurs from taking advantage of profitable trading opportunities arising from temporary mispricing.  In particular, Dr. Tabak analyzes bid-ask spreads for Qualcomm's stock as a means of evaluating the costs of arbitrage.  He concludes that the "low level of the bid-ask spread [for Qualcomm] supports a finding that arbitrageurs would have an incentive to trade on any perceived mispricing, and therefore would have an incentive to undertake the activities that lead to a stock trading in an efficient market."  *See* Tabak Report, ¶¶ 47–48.

company that is not yet incorporated in the company's stock price will rapidly choose to sell the stock, driving the price down.  Traders can sell the stock by reducing existing positions or by selling the stock short.[110]

42.　　For a market to be efficient, it is necessary that there are investors who are able to take advantage of situations where they are aware of public information that is not incorporated in stock prices when and if such situations arise.  Such investors are often referred to as "arbitrageurs."  If some piece of public information is not incorporated in a stock's price, arbitrageurs could earn profits from trading on that piece of information.  Therefore, investors have strong incentives to find public information that is not yet incorporated in a firm's stock price and trade on it.  To this point, Dr. Tabak cites the court opinion in *Cammer v. Bloom* stating that "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[111]  Dr. Tabak explains that "[a]rbitrageurs are investors who attempt to profit from any possible mispricing of a security," including "those who take a 'long' (or positive) position in the stock (profiting from an increase in price) and those that take a 'short' (or negative) position (profiting from a decrease in price)."[112]  This competition among investors for profit opportunities eliminates market inefficiencies.[113]

43.　　In particular, institutional investors could make large profits if they access some public information that is not yet incorporated in the stock price as they can generally trade in large sizes to take advantage of that information.[114]  This creates incentives for them to pay close attention to whether public information is incorporated in a stock price and to seek out public information that may not yet be incorporated in that stock price.  However, institutional investors

---

[110] A "short seller" is an investor who seeks to profit from a decline in a company's stock price.  According to Brealey et al. (2011), "[t]o sell a stock short, you borrow shares from another investor's portfolio, sell them, and then wait hopefully until the price falls and you can buy the stock back for less than you sold it for."  *See* R. Brealey, S. Myers, and F. Allen (2011), *Principles of Corporate Finance*, 10th ed., New York, NY: McGraw-Hill/Irwin, p. 327.

[111] Tabak Report, ¶ 22; *Cammer v. Bloom*, 711 F. Supp. 1287 (D.N.J. 1989).

[112] Tabak Report, ¶ 23.

[113] Dr. Tabak notes that the large market capitalization of Qualcomm during the Proposed Class Period meant that "there would have been opportunities for investors to make large profits if there were any apparent mispricing, thus providing an incentive for investors to carefully analyze news and information about Qualcomm."  *See* Tabak Report, ¶ 46.

[114] Dr. Tabak notes that institutional investors take large positions, which will lead to large total profits even if the per-share profit is small.  *See* Tabak Report, ¶ 23 ("Though not all institutions are arbitrageurs, many of the major arbitrageurs who take a long position large enough to affect the price of a stock would be institutional investors, as non-institutional investors generally do not have the capital to take a long-term position of the same magnitude.").

can only make these profits if they discover this information before other investors discover it and trade to incorporate it in the price.  If there is a large number of institutional investors, they can compete against each other to be first in taking advantage of public information.[115]  Thus, when market prices do not yet reflect public information, traders take advantage of profitable trading opportunities arising from temporary mispricing.  As a result, as long as frictions to trade on information are small, in an efficient market new public information will be incorporated in stock prices quickly and investors will not be able to profit from such information once it is incorporated in stock prices.[116]

### 3. Not All Market Participants Need to Be Equally and Fully Informed in an Efficient Market for the Price to Reflect All Public Information

44.     In an efficient market, all public information about a company is incorporated in the stock price.  This does not mean that all investors have that information.[117]  To start with, if the market for a stock is efficient, investors can rely on the stock price to incorporate all the relevant information.  As a result, some investors may not find it worthwhile to acquire information.  That is, if the market for a stock is efficient, investors who may not be able to out-compete other investors in acquiring public information and trading on it may not benefit from investing resources to acquire new public information.  Given their competitive disadvantage, these investors would not generally make profits from trading on public information if they were to acquire it because that information would already be incorporated in the stock price.

---

[115] Dr. Tabak highlights the level of institutional ownership of Qualcomm stock during the relevant period, noting that "[o]ver 1,500 institutions are known to have collectively held over 1.3 billion shares of Qualcomm, or 81.8 percent of the shares outstanding as of December 31, 2011, the last calendar quarter-end before the start of the Class Period, as seen in Exhibit 5."  Dr. Tabak further notes that "as a group, institutions were not passive investors, but changed their positions," which he describes to be "a hallmark of arbitrage activity."  *See* Tabak Report, ¶¶ 24–25.

[116] Dr. Tabak finds that institutional investors and short sellers actively changed their holdings in Qualcomm during the Proposed Class Period, which suggests that "investors were able to, and did, take and change positions in Qualcomm's stock to reflect their views, the core mechanism by which financial markets are driven to efficiency."  *See* Tabak Report, ¶ 27.

[117] Professor Fama explains that "the market may be efficient if 'sufficient numbers' of investors have ready access to available information."  *See* Fama (1970), p. 388.  *See also*, F. Mishkin (2004), *The Economics of Money, Banking, and Financial Markets*, 7th ed., Boston: Addison Wesley, p. 152 (emphasis in original) ("An extremely important factor in this reasoning is that *not everyone in a financial market must be well informed about a security or have rational expectations for its price to be driven to the point at which the efficient markets condition holds.*  Financial markets are structured so that many participants can play.  As long as a few keep their eyes open for unexploited profit opportunities, they will eliminate the profit opportunities that appear because in so doing, they make a profit.  The theory of efficient markets makes sense because it does not require everyone in a market to be cognizant of what is happening to every security.").

45.     Importantly, however, if the market for a stock is efficient, the price of that stock is set *as if* everybody has all the public information concerning the stock.[118]  As described above, investors who gain access to new information about a company can profit from trading on the information, up to the point at which the information is fully reflected in the market price and there are no further opportunities to profit by trading on the information.  Thereafter, by trading in the stock, investors trade at a price that reflects all public information, even though those investors may only know a fraction of the public information concerning that stock.

46.     Moreover, even for those participants who have access to a certain piece of public information, an efficient market does not require all market participants to understand or agree on the implications of that piece of information for the stock price.  In a seminal academic paper on market efficiency, Professor Fama notes that "disagreement among investors about the implications of given information does not in itself imply market inefficiency unless there are investors who can consistently make better evaluations of available information than are implicit in market prices."[119]

47.     Dr. Tabak notes that his analyses are consistent with market participants being able to "take and change positions in Qualcomm's stock to reflect their views," which he characterizes as "the core mechanism by which financial markets are driven to efficiency."[120]  Assuming Qualcomm's stock traded in an efficient market during the Proposed Class Period, Qualcomm's stock price reflected all public information, even if not all investors had accessed the same information and even if not all investors were in a position to understand the value implications of that information.  Conversely, if some market frictions prevented investors from taking advantage of profitable trading opportunities arising from mispricing such that the price of Qualcomm's shares did not reflect all public information, that would mean that the market for Qualcomm's stock could not have been efficient.

48.     A corollary of the above is that, to the extent Plaintiffs contend that some equity research analysts and/or journalists did not correctly understand the implications of public information regarding Qualcomm's business practices, it would not mean that Qualcomm's stock price would have been impacted by this lack of understanding, if one assumes market efficiency.  Put

---

[118] W. Beaver (1981), "Market Efficiency," *Accounting Review*, 56(1), pp. 23–37, at p. 23.
[119] Fama (1970), p. 388.
[120] Tabak Report, ¶ 27.

differently, if the market for Qualcomm stock was efficient during the Proposed Class Period, as Dr. Tabak opines, then Qualcomm's stock price reflected all public information even if not all investors had accessed that information or understood its value implications.

## B. Event Study Analysis

49.    In this section, I describe how financial economists typically use an event study methodology to assess whether new information affected the price of a company's stock. I then describe the implementation of my event study.

### 1. Overview of Event Study Methodology

50.    Event studies have been widely used for more than fifty years to measure the impact of new information that enters the marketplace on security prices. I have employed this technique numerous times in my peer-reviewed research.[121]  Professor Craig MacKinlay summarizes the essence of the event study approach as follows: "Using financial market data, an event study measures the impact of a specific event on the value of a firm."[122]  Because of their ability to isolate the impact of firm-specific information, event studies are commonly used in securities litigation.

51.    Typically, event studies use a regression model to isolate the firm-specific stock price change ("return") after controlling for market-wide and/or industry-wide factors.[123]  To do so, a financial economist selects the appropriate market and/or industry indices and typically assumes that there exists a stable linear relationship between the firm's stock return and the returns of the market and/or industry-wide indices. Such a relationship between the firm's stock return and these indices can be estimated over an "estimation window."[124]

52.    Using this estimated relationship, it is possible to calculate the firm's expected return on any given day based on that day's market and/or industry index returns. Intuitively, the firm's

---

[121] **Exhibit 1** lists my publications. The first event study listed on my CV is Y. Kim and R. Stulz (1988), "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," *Journal of Financial Economics*, 22(2), pp. 189–205.

[122] A. MacKinlay (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), pp. 13–39 ("MacKinlay (1997)") at p. 13.

[123] Dr. Tabak agrees, defining an event study as "a statistical test that first measures the movement in the price of a stock or other security by removing the influence of general market and/or industry effects." *See* Tabak Report, ¶ 31.

[124] Dr. Tabak refers to "estimation window" as "control period." *See* Tabak Report, ¶ 31.

expected return is the return one would predict on a particular day based on the typical relationship between the stock's return and the market and industry indices. Because financial economists are interested in the "typical" relationship, they often exclude from the estimation window the events being tested to ensure that the returns on the event dates do not affect the measurement of the typical relationship.[125]

53.     The difference between a stock's actual ("raw" or "observed") return and its expected return estimated from the regression model is called the stock's "residual" return. The period over which the stock's return is analyzed is called the "event window" (*e.g.*, one day). Financial economists use statistical measures to determine whether a return is statistically distinguishable from zero, that is, whether the return is greater in magnitude than the typical variation in the residual returns of that stock during the estimation window. Residual returns that exceed the threshold are "statistically significant."

54.     The statistical significance of a residual return is generally evaluated using a t-statistic. A t-statistic is defined as the ratio between the residual return on a particular date of interest and the volatility of that residual return.[126] A residual return is "statistically significant" using a two-sided test at the 95% confidence level when the absolute value of the t-statistic is greater than 1.96.[127] Thus, when the t-statistic for a particular date is greater than 1.96 (in absolute value), the residual return is considered statistically significant relative to the typical range of residual returns that one would expect to observe on that date, indicating the arrival of new, value-relevant, firm-specific information.

55.     In an event study, a statistically significant residual return over a given event window reflects the estimated stock price impact of the total mix of information released during that event window. The typical null hypothesis being tested is that the residual return over a

---

[125] *See, e.g.*, MacKinlay (1997), p. 20.

[126] Specifically, the volatility of the residual return on a given date is the estimated standard deviation of the residual return for that specific date (also known as the forecast standard error).

[127] The 95% confidence level is the commonly accepted scientific standard in peer-reviewed journals in finance and economics. *See, e.g.*, J. Stock and M. Watson (2012), *Introduction to Econometrics*, 3rd ed., Global ed., Pearson Education Limited, pp. 119–120, available at https://archive.org/details/introductiontoec0000stoc_l3e7 ("What significance level should you use in practice? In many cases, statisticians and econometricians use a 5% significance level.… For example, legal cases sometimes involve statistical evidence, and the null hypothesis could be that the defendant is not guilty; then one would want to be quite sure that a rejection of the null (conclusion of guilt) is not just a result of random sample variation. In some legal settings, the significance level used is 1%, or even 0.1%, to avoid this sort of mistake.… Many economic and policy applications can call for less conservatism than a legal case, so a 5% significance level is often considered to be a reasonable compromise.").

particular event window is equal to zero.  In other words, a residual return that is statistically significant indicates the arrival of new, value-relevant information to the market.

56.    An event study is helpful to assess whether the totality of new information arriving to the market over a specific event window affected the stock.  However, an event study cannot answer the question of how a specific new piece of information arriving to the market among multiple pieces of new information at the same time caused the stock price to change, as discussed further in **Section VIII.B.2**.

57.    As part of his market efficiency analysis, Dr. Tabak conducts an event study for which he uses a regression model to identify days "associated with statistically significant market-adjusted stock price movements."[128]

## 2.  Regression Model Specification

58.    To assess whether information affected the price of Qualcomm stock, I performed an event study for Qualcomm's common stock on each date that Plaintiffs allege that Qualcomm's stock price declined as a result of an alleged corrective disclosure.  According to the academic literature, a regression model used in an event study should be properly specified, which requires (i) defining the estimation window, and (ii) selecting appropriate market and/or industry indices to account for market- and/or industry-wide factors.[129]

59.    Regarding the selection of the estimation window, it is important to note that the Proposed Class Period spans almost five years, during which time the relationship between Qualcomm's stock return and market- and/or industry-wide factors may have varied.  I therefore used "rolling" estimation periods consisting of the 126 trading days immediately before the event date, which allows for variation over time in the estimated relationship between Qualcomm's stock return and market-wide and/or industry-wide factors.[130]  I excluded from each "rolling" estimation window any stock return corresponding to (i) dates on which Plaintiffs identify an

---

[128] Tabak Report, ¶¶ 31, 37.  I was not asked to opine on Dr. Tabak's market efficiency analyses in general, or event study regression model in particular.  I am not, by virtue of not offering an opinion at this stage of the litigation, endorsing his regression specification.

[129] *See, e.g.*, MacKinlay (1997), pp. 14–15.

[130] For use of rolling regressions when the parameters of the market model change over time, *see, e.g.*, E. Fama and K. French (1997), "Industry Costs of Equity," *Journal of Financial Economics*, 43(2), pp. 153–193 at p. 158.

alleged misrepresentation, and (ii) dates on which Plaintiffs identify an alleged corrective disclosure.[131, 132]

60.      In order to estimate the relationship between Qualcomm's stock return and market and industry factors, I used the returns on the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index to control for market movements and returns on two industry indices, the NASDAQ Telecommunications Index[133] and the Philadelphia Semiconductor Index (SOX).[134]  The NASDAQ Telecommunications Index focuses on companies in telecommunications and telecommunications equipment, and the SOX index is focused on chipmakers.  The NASDAQ Telecommunications Index is a broad index of telecommunications companies, while the SOX index includes a narrower universe specifically targeting "companies primarily involved in the design, distribution, manufacture, and sale of semiconductors."[135]  A number of analyst reports I reviewed referred to the SOX index as a benchmark for Qualcomm.[136, 137]

61.      **Exhibit 6** provides a summary of the event study model, and **Exhibit 7** shows the firm-specific (residual) return for Qualcomm stock on each date that Plaintiffs allege that Qualcomm's stock price declined as a result of an alleged corrective disclosure.

---

[131] Specifically, the dates excluded from the regressions are the relevant impact dates for each alleged misrepresentation and alleged corrective disclosure, that is, for alleged misrepresentations and alleged corrective disclosures that occur after market hours or on weekends, the relevant impact date would be the following trading date.

[132] As a robustness check, I also considered an alternative event study approach in which the estimation window for each event date is the 252 trading days immediately preceding the event date.  This additional specification yields qualitatively similar results.

[133] The NASDAQ Telecommunications Index "contains securities of NASDAQ-listed companies classified according to the Industry Classification Benchmark as Telecommunications and Telecommunications Equipment.  They include providers of fixed-line and mobile telephone services, and makers and distributors of high-technology communication products."  *See* "Overview of IXTC," NASDAQ, available at https://indexes nasdaqomx.com/Index/Overview/IXTC.  The index is reconstructed to remove Qualcomm.

[134] The Philadelphia Semiconductor Index (SOX) "is a modified market capitalization-weighted index composed of companies primarily involved in the design, distribution, manufacture, and sale of semiconductors."  *See* "Overview of SOX," NASDAQ, available at https://indexes nasdaqomx.com/index/overview/sox.  The index is reconstructed to remove Qualcomm.

[135] *See* "Overview of IXTC," NASDAQ, available at https://indexes nasdaqomx.com/Index/Overview/IXTC; "Overview of SOX," NASDAQ, https://indexes nasdaqomx.com/index/overview/sox.

[136] *See, e.g.,* "Decoupling Maintain Buy," *Nomura*, January 31, 2013, p. 7; "Qualcomm: Short Term Headwinds, but Long Term Value; Q4 Preview – Monitor Guidance, Snapdragon, Samsung, Legal," *Bernstein Research*, October 29, 2009, p. 6; "Strong Near-Term Momentum Continues; Reiterate Overweight," *Piper Jaffray*, March 20, 2013, p. 1.

[137] Both industry indices were reconstructed to exclude Qualcomm, using Qualcomm's daily constituent weight information obtained from NASDAQ.

VII.   **Information Regarding Qualcomm's Licensing Practices and Its Practice of Not Providing Chips to Unlicensed Device Makers Was Public before the First Alleged Corrective Disclosure, and Repetition of This Information Would Not Have Affected Qualcomm's Stock Price in an Efficient Market**

62.     In his report, Dr. Tabak asserts that the market for Qualcomm's stock was efficient during the Proposed Class Period.  As discussed in **Section VI.A**, in an efficient market, "the price of a stock rapidly incorporates *all* publicly available information"[138] because incentives exist for informed traders to trade on any public information not yet incorporated into the price such that this information becomes rapidly reflected in the price.

63.     As discussed in this section, any alleged misrepresentations regarding Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, and its practice of not providing chips to unlicensed device makers, did not have price impact by the time of the first alleged corrective disclosure.  This is because, as discussed in **Section VII.A**, Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers were publicly disclosed before the first alleged corrective disclosure on November 17, 2015.  Furthermore, as discussed in **Section VII.B**, Qualcomm's practice of not providing chips to unlicensed device makers was also publicly disclosed before the first alleged corrective disclosure.  Given that this information was previously disclosed, in an efficient market this information would have already been incorporated in the stock price before the first alleged corrective disclosure.

64.     Any additional disclosures of the above information would not have affected Qualcomm's stock price in an efficient market because the information was already public before the first alleged corrective disclosure.  Therefore, stock price changes following alleged corrective disclosures do not demonstrate price impact of any alleged misrepresentations regarding Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, or its practice of not providing chips to unlicensed device makers.  In addition, as discussed in **Section VII.C**, consistent with the information being public, I did not identify evidence that equity research analysts expressed surprise regarding the alleged corrective disclosures containing information about the facts of Qualcomm's business practices

---

[138] Tabak Report, ¶ 9 (emphasis added).

related to the above issues.  Instead, as detailed in **Section VII.C**, equity research analysts commented on the regulatory and civil actions on each of the alleged corrective disclosure dates and potential future implications of these actions on Qualcomm's business.

### A.  Information Regarding Qualcomm's Licensing Practices Was Public before the First Alleged Corrective Disclosure

65.     As discussed above in **Section V**, Qualcomm's licensing model is based on the principle of licensing exhaustively at the device level.  The Company's practice of licensing exhaustively at the device level—that is, collecting royalties for its IP at the "downstream" handset or complete device level—was discussed by Qualcomm and market participants before the first alleged corrective disclosure and throughout the Proposed Class Period as a standard practice among major owners of cellular SEPs.  Consistent with this, Qualcomm made numerous public statements regarding its licensing practices with respect to chipmakers.  In particular, Qualcomm stated that any agreements with chipmakers were separate from its licensing agreements with device makers and that these agreements did not provide pass-through rights to chipmakers' customers.

66.     In **Section VII.A.1**, I discuss public statements and market discussion occurring before the first alleged corrective disclosure and throughout the Proposed Class Period regarding Qualcomm's practice of licensing exhaustively at the device level.  In **Section VII.A.2**, I discuss public statements and market discussion occurring before the first alleged corrective disclosure regarding Qualcomm's practice of not providing exhaustive licenses to chipmakers.  Finally, in **Section VII.A.3**, I discuss various litigation events that occurred before the first alleged corrective disclosure that publicly shed additional light on these practices.

### 1.  The Fact That Qualcomm Licensed Exhaustively at the Device Level Was Public before the First Alleged Corrective Disclosure

67.     As discussed in **Section VII.A.1.a**, Qualcomm publicly discussed its longstanding practice of licensing exhaustively at the device level.  This practice was also discussed among SDOs (see **Section VII.A.1.b**) and by equity research analysts (see **Section VII.A.1.c**).

### a) Qualcomm Publicly Discussed Its Practice of Licensing Exhaustively at the Device Level

68.    Before the first alleged corrective disclosure, Qualcomm publicly discussed its practice of licensing exhaustively at the device level, the fact that this practice was common among major owners of cellular SEPs, and the reasons for applying this practice instead of component-level licensing.  Examples of these statements are detailed below.

69.    In congressional testimony in July and September 2013, in response to a statement by another witness that "a FRAND commitment should be interpreted to require the patentee to license semiconductor and other component providers, not merely manufacturers of consumer devices or other end products that fully embody and practice the relevant standard,"[139] Qualcomm's General Counsel Donald J. Rosenberg noted that such a requirement would be "novel," "inconsistent with what leading [SDO] policies actually say," and "inconsistent with widely accepted industry practice."[140]

70.    Mr. Rosenberg further noted that "at least in the 3G/4G wireless communications sector, it is and has long been the industry norm for substantial patent holders to license at the level of complete standard-compliant devices, not parts and components."[141]  In written testimony as part of the same hearing, Intel's Senior Vice President and General Counsel, Douglas Melamed, noted that "SEP holders … often go to great lengths to avoid licensing upstream component (e.g., chip) manufacturers and choose instead to license their patents downstream, at for example the device (e.g., computer) level."[142]

71.    Moreover, Mr. Rosenberg explained Qualcomm's reasons for the practice of licensing at the complete device, rather than component, level in his written testimony, stating:

> In industries characterized by complex technology and large numbers of patents (such as the wireless communications sector), negotiating licenses

---

[139] Rosenberg September 2013 Congressional Statement, p. 4.  *See also* Hearing Transcript of "Standard-Essential Patent Disputes and Antitrust Law" before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Committee on the Judiciary, United States Senate, July 30, 2013, pp. 1–2, available at available at https://www.judiciary.senate.gov/imo/media/doc/CHRG-113shrg88369.pdf.

[140] Rosenberg September 2013 Congressional Statement, p. 4.

[141] Rosenberg September 2013 Congressional Statement, p. 4.

[142] Additional Statement for the Record of Intel Corporation Prepared in Response to the July 30, 2013 Hearing on "Standard Essential Patent Disputes and Antitrust Law" before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Committee on the Judiciary of the United States Senate, August 13, 2013, available at https://www.judiciary.senate.gov/imo/media/doc/CHRG-113shrg88369.pdf ("Intel August 2013 Congressional Statement"), p. 2.

for individual patents (so-called "per-patent licenses") would be utterly impractical, and not surprisingly holders of significant portfolios routinely license – and implementers regularly seek licenses – on a portfolio basis. Those portfolios often contain patents covering a broad range of technological innovations; some patents that read on the physical details of discrete components, others that read only on the finished device in operation, and others that read on the physical details or operations at various stages in between…. If one were to attempt to license multiple manufacturers of individual parts or sub-assemblies, there would be endless complications and grounds for dispute involved in determining who requires licenses to what, with the added complexity of widely varying royalty rates and licensing terms. By contrast, licensing the entire portfolio only at the level of the completed product radically simplifies the negotiation, licensing, royalty collection, and auditing process, to the ultimate benefit of the entire industry.[143]

72.     Further, in the context of the proposed IEEE policy change to require SEP holders to charge royalties at the smallest saleable unit and to require that patent holders cannot refuse to license its patents "at certain levels of production" (see discussion in **Section V**), Qualcomm noted in public comments in May 2014 that requiring licensing at the component level would be "a disruptive change to existing industry licensing practices."[144]

73.     During the Company's Q1 2015 earnings call on January 28, 2015, Derek Aberle, President of Qualcomm, noted that there had been "efforts or arguments made for a number of years both in patent litigation as well as standards bodies that the appropriate royalty base should be the chip instead of the full device.… But certainly the norm in our industry has been very much in line with the way we have licensed historically, and we think there's a lot of good reasons that support that long-term." Mr. Aberle went on to note that others in the industry "have disclosed how they might license their IP portfolios, and they talk about licensing at the handset level, not the chip level…."[145]

74.     Similarly, following the first alleged corrective disclosure, during the Company's Q1 2016 earnings call on January 27, 2016, Mr. Rosenberg noted:  "[Qualcomm's] licensing model

---

[143] Rosenberg September 2013 Congressional Statement, p. 5.
[144] Memorandum of Points and Authorities in Support of Defendants' Motion for Judgment on the Pleadings, *In Re Qualcomm Incorporated Securities Litigation*, United States District Court for the Southern District of California, Case No. 3:17-cv-00121-BEN-MSB, January 15, 2020, Exhibit 22, p. A 215; "Comments," *IEEE*, May 26, 2014, available at https://grouper.ieee.org/groups/pp-dialog/drafts_comments/PatCom_sort_by_comment_ID_260514.pdf.
[145] "Q1 2015 Qualcomm Inc. Earnings Call - Final," *CQ-Roll Call*, January 28, 2015, p. 13.

… has been in effect for quite a few decades.  It's been modeled after others.  Everybody in the industry follows the device-level licensing, for example."[146]

### b) The Practice of Device-Level Licensing Was Publicly Discussed as a Common Practice in the Context of a Policy Proposal by an SDO

75.     Before the first alleged corrective disclosure, the practice of device-level licensing was also publicly discussed as a norm among major owners of cellular SEPs in the context of a policy proposal by an SDO.

76.     As discussed in **Section V**, the IEEE (an SDO responsible for WiFi and Ethernet standards) proposed in early February 2015 that "reasonable" royalty rates should reflect the "smallest salable implementation" of a patented invention, a practice that was noted to "run[] counter to customary practices in mobile phones."[147]  Further, as discussed in **Section V**, the IEEE also proposed to require that patent holders cannot refuse to license its patents "at certain levels of production."  Although ETSI (an SDO responsible for cellular communications technology) defended device-level licensing at the time,[148] equity research analysts commented on the potential implications of such changes for both Qualcomm and its peers if the IEEE's view prevailed.  Equity research analysts covering Qualcomm commented that a change to component-level licensing and royalty rates at the "smallest salable implementation" would mark a shift from the current practice for Qualcomm and other major owners of cellular SEPs.  For example, before the first alleged corrective disclosure:

> **Bernstein Research, 2/19/2015**:  The IEEE Standards Association has redefined "reasonable rates" to mean something less than the full price of a device (namely, "least saleable unit" or effectively the price of the chip). While WiFi is much more relevant to the IEEE than cellular, Qualcomm is (*understandably*) up in arms about the new definitions.…  Qualcomm has

---

[146] "Q1 2016 Qualcomm Inc. Earnings Call - Final," *CQ-Roll Call*, January 27, 2016, p. 7.

[147] "Patent Holders Fear Weaker Tech Role," *Wall Street Journal*, February 9, 2015, available at https://www.wsj.com/articles/patent-holders-fear-weaker-tech-role-1423442219.  Following the change in IEEE rules, Qualcomm commented that it was reconsidering participation in the IEEE and would not follow the new rules.  *See* "Qualcomm Says It Won't Follow New Wi-Fi Rules on Patents," *Bloomberg*, February 11, 2015, available at https://www.bloomberg.com/news/articles/2015-02-11/qualcomm-says-new-wi-fi-standard-rules-unfair-may-not-take-part.

[148] *See, e.g.*, "Patently Bullish Pt. II," *Bank of America Merrill Lynch*, December 3, 2015, p. 1; "Expert Meetings Support IPR Upside for Nokia & Ericsson," *Bank of America Merrill Lynch*, September 17, 2015, p. 2.

indicated that it will not make licensing commitments under this new policy.[149]

**BMO Capital Markets, 6/8/2015**:  We see the debate over the appropriate royalty base as the current hot topic in mobile IPR.  The outcome of the Qualcomm investigation in China avoided the reduction of the royalty base to component level, which we believe would have set a dangerous precedent for the industry.[150]

Similarly, after the first alleged corrective disclosure:

**Bank of America Merrill Lynch, 12/3/2015**:  Anecdotally we believe that this change (and subsequent "follow-ups" aimed to spread this policy approach more widely) has created a perception of risk amongst investors that royalties for SEP owners could be materially lower in the future.  However, the move does not seem to be widely accepted by contributors of patents such as Qualcomm, Nokia and Ericsson.…  Going forward IEEE may risk alienating contributors of SEP's to the body, who may decide not to do so going forward.[151]

**Bank of America Merrill Lynch, 12/7/2015**:  Representatives from ETSI explicitly highlighted that the IEEE policy is incompatible with ETSI's cellular policies and governance.  *We also note that the current practice of device based royalty has been the general practice in the cellular industry for over two decades*, and we find it hard to believe there would be any reason or trigger to change it now.  Very strong support for the current practice is not only in the interest of Qualcomm, but also other net royalty receivers, like Ericsson and Nokia.[152]

**J.P. Morgan, 12/27/2015**:  An offsetting negative risk to royalties is the IEEE effort to move licensing to the chip level, which could further pressure rates.[153]

**Bank of America Merrill Lynch, 1/23/2017**:  The biggest risk to Qualcomm's business model is the demand for component-level licensing versus Qualcomm's practice of device-level licensing.  We have seen a

---

[149] "Qualcomm (QCOM): TANSTAAFL?," *Bernstein Research*, February 19, 2015, p. 3 (emphasis added).

[150] "Communicating Equipment (9); Mobile IPR Getting Pressured, but Still Growing," *BMO Capital Markets*, June 8, 2015, p. 1.

[151] "Patently Bullish Pt. II," *Bank of America Merrill Lynch*, December 3, 2015, p. 3.

[152] "Key Takeaways from a Patent Conference; Implications for Qualcomm," *Bank of America Merrill Lynch*, December 7, 2015, p. 1 (emphasis added).

[153] "Valuation Becomes Difficult to Ignore.  Upgrading to Overweight," *J.P. Morgan*, December 17, 2015, p. 6.

similar approach applied to WiFi patents by the IEEE, yet Qualcomm claims the FTC does not have any power dealing with the issue of component vs. device-basis for licensing.[154]

### c) Equity Research Analysts Discussed Qualcomm's Practice of Licensing Exhaustively at the Device Level

77.    Consistent with the Company's own commentary and discussion in the context of the SDO device-level licensing debates, equity research analysts discussed Qualcomm's longstanding practice of licensing exhaustively at the device level, the fact that this was a standard practice among major owners of cellular SEPs, and the fact that device-level licensing was central to Qualcomm's business model.  Consistent with device-level licensing, a number of equity research analysts also modeled Qualcomm's licensing revenues as a share of handset average selling price ("ASP").

78.    Before and during the Proposed Class Period, equity research analysts commented on Qualcomm's longstanding practice of licensing at the device level.  For example, before the first alleged corrective disclosure:

>    **Bernstein Research, 9/29/2006**:  [Qualcomm and other] technology patent holders typically apply their IPR to the end product (not to components).[155]

>    **Deutsche Bank, 4/26/2009**:  Qualcomm does not collect royalty payments from chip vendors, they collect them from chip vendors' customers (handset makers).[156]

Similarly, after the first alleged corrective disclosure:

>    **Morningstar, 12/14/2015**:  In our view, Qualcomm will defend itself by pointing to not only its underlying IP, but also two decades of

---

[154] "Worst Case Scenario Is Likely Better than Feared," *Bank of America Merrill Lynch*, January 23, 2017, p. 3.
[155] "Qualcomm: W-CDMA to Drive Growth; Minimal Risks from Nokia Renegotiation and CDMA Market," *Bernstein Research*, September 29, 2006, p. 2.
[156] "Qualcomm, Broadcom to Settle for $891 million," *Deutsche Bank*, April 26, 2009, p. 1.

industrywide precedents where royalties within the wireless industry are based on the full price of the phone….[157]

> **Bernstein Research, 12/30/2015**:  Qualcomm had this business model effectively unchallenged for several decades at this point and they are actually not the only ones that tend to charge device-level royalties.[158,159]

79.    Equity research analysts also discussed the fact that Qualcomm was not alone in its approach, but that device-level licensing was common.  For example, before the first alleged corrective disclosure:

> **BMO Capital Markets, 6/8/2015**:  In the mobile space, companies traditionally negotiate licensing agreements on the value of the products sold.…[T]he general approach scales royalty revenue with device sales revenue.[160]

Similarly, after the first alleged corrective disclosure:

> **Pacific Crest Securities, 12/3/2015**:  QUALCOMM has over 20 years of precedent regarding device level licensing in the industry, implemented by not only itself, but other companies such as Ericsson and Motorola.[161]

> **Morningstar, 12/14/2015**:  In our view, Qualcomm will defend itself by pointing to not only its underlying IP, but also two decades of industrywide precedents where royalties within the wireless industry are based on the full price of the phone, as well as the Chinese government's validation of Qualcomm's IP (and of basing royalties on the price of the

---

[157] "We Are Lowering Our Qualcomm Moat Rating to Narrow Owing to Regulatory Uncertainty; Maintain $68 FVE," *Morningstar*, December 14, 2015, p. 1.
[158] "Qualcomm (QCOM): A Conversation (and Q&A) with a Korean Antitrust Attorney—Conference Call Transcript & Slides," *Bernstein Research*, December 30, 2015, pp. 11–12.
[159] Similarly, after the end of the Proposed Class Period, when Qualcomm and Apple announced the settlement of all litigation and a new agreement between the two companies, Canaccord Genuity noted that "the licensing agreement is a device level licensing agreement consistent with Qualcomm's long-term licensing model."  *See* "Settlement Reached with Apple and Long-Term Licensing Model Remains Intact: Increasing PT to $89 and Reiterate BUY Rating," *Canaccord Genuity*, April 16, 2019, p. 2.
[160] The report notes slight differences in licensing practices across Qualcomm, Ericsson, and Nokia:  "For example, in Qualcomm's case, we believe the typical agreement involves a fixed percentage applied to the wholesale average selling price (ASP) of a phone.  Of course, there can also be lump payments, per-unit payments, and caps, but the general approach scales royalty revenue with device sales revenue.  We believe similar principles apply to licensing deals with Ericsson.  We believe Nokia's agreements are a little different, as they are likely based on fixed payments per year."  *See* "Communicating Equipment (9); Mobile IPR Getting Pressured, but Still Growing," *BMO Capital Markets*, June 8, 2015, p. 6.
[161] "Washed Out in San Diego: Initiating Coverage of QCOM at Overweight," *Pacific Crest Securities*, December 3, 2015, p. 19.

phone and not on a far lower amount) within its recently completed investigation.[162]

> **Bank of America Merrill Lynch, 1/18/2017**:  [C]omponent-based licensing … could still take considerable time and may require industry reform.[163]

80.     Furthermore, as I discuss below in the context of specific legal challenges, equity research analysts not only discussed Qualcomm's device-level licensing practice, but also observed that device-level licensing was "central" to Qualcomm's business model.  For example, before the first alleged corrective disclosure:

> **Bernstein Research, 4/9/2007**:  Nokia announced that it would pay Qualcomm just $20M for 2Q07.…  It believes that Qualcomm's licensing agreement with baseband supplier Texas Instruments "exhausts" Qualcomm's patent claims in Europe, where Nokia asserts the law does not recognize an explicit clause that denies TI's customers such protection.…  Patent exhaustion would be devastating to Qualcomm.[164]

> **Broadpoint, 4/27/2009**:  [The Company's] *business model* [is] of charging royalties to handset makers.[165]

Similarly, after the first alleged corrective disclosure:

> **Morgan Stanley, 11/18/2015**:  Apparent challenge to [a] *central tenet* of Qualcomm's licensing practice … Qualcomm has long pursued licensing of its IP, and has generally pursued licensing agreements that encompass the entire device on the premise that its IP and its functionality and applicability is not limited just within its chips, but instead its IP is applicable to a wide range of functions in the phone.[166]

---

[162] "We Are Lowering Our Qualcomm Moat Rating to Narrow Owing to Regulatory Uncertainty; Maintain $68 FVE," *Morningstar*, December 14, 2015, p. 1.

[163] "US FTC Files Antitrust Charges, Citing Licensing and Chipset Violations," *Bank of America Merrill Lynch*, January 18, 2017, p. 1.

[164] "Qualcomm & Nokia: Stakes Now Higher for Both Sides; Eventual Settlement Still More Likely than Long Legal Battle," *Bernstein Research*, April 9, 2007, pp. 1–2.

[165] "QCOM / BRCM Settlement; Earnings Call at 5 am PT," *Broadpoint*, April 27, 2009, p. 1 (emphasis added).

[166] "Where's the Aspirin? Korean FTC Examiner's Report Makes Royalty Headaches Worse," *Morgan Stanley*, November 18, 2015, p. 1 (emphasis added).

> **Bernstein Research, 11/18/2015**:  [T]he prospect of moving away from device-level royalty determination is of course among the doomsday scenarios for the business.[167]

81.     Moreover, a number of the equity research analyst reports I reviewed modeled Qualcomm's licensing revenue as a function of the *handset* price, which is consistent with licensing at the device level.[168, 169]  Equity research analysts covering Qualcomm also commented that the licensing revenues that Qualcomm generated were a function of the price and the number of *handsets* sold.  For example:

> **Goldman Sachs, 6/6/2005**:  As a result of its significant intellectual property ownership in the globally adopted 3G standards, Qualcomm is positioned to receive an approximate 4.3% royalty on the wholesale price of each 3G handset sold.[170]

> **Nomura, 4/28/2008**:  [C]ustomers pay a percentage of the wholesale price of their devices to license [Qualcomm's] IPR portfolio.…  The model is pretty simple in that anyone who ships a mobile device that makes use of Qualcomm technology is required to pay around 4% of the wholesale price of the device to Qualcomm.[171]

> **Sterne Agee, 5/17/2010:**  Qualcomm gets its licensing revenue from the telecom provider and operators primarily as a % of the ASP of the CDMA handset shipped.…  Qualcomm's current royalty rates hover around 3% of the handset ASP.[172]

> **Macquarie, 3/14/2011**:  For each handset that is sold using QCOM technologies, the company's licensing division (QTL) receives a fee

---

[167] "Quick Take - QCOM: Korea Kicks Qualcomm While They're Down…," *Bernstein Research*, November 18, 2015, p. 2.
[168] *See, e.g.*, "Riding the 3G Wave – Initiating Coverage at Outperform," *FBR Capital Markets*, April 7, 2009, p. 23, Figure 23; "Growth and Leverage … More to Come," *Credit Suisse*, June 26, 2008, pp. 6–7, Figures 2 and 3; "QCOM: Leading the Wireless Revolution; Initiating Coverage with BUY Rating, $63 Price Target," *Lazard Capital Markets*, April 26, 2006, p. 8, Exhibits 5 and 6.
[169] I understand that in the cellular communications industry it is common practice to license and assess royalties at the same level (*e.g.*, device level).
[170] "US Communications Technology: Wireline/Wireless Equipment," *Goldman Sachs*, June 6, 2005, pp. 3, 13.
[171] "School of Hard NOKs," *Nomura*, April 28, 2008, pp. 4, 20.
[172] "QCOM: Initiating Coverage with a Neutral Rating; Worldwide Leader in 3G/4G, but Handset Pricing and New Competition Headwinds," *Sterne Agree*, May 17, 2010, p. 10.

roughly equal to 3-5% of the wholesale average selling price of the device.[173]

**Stifel Nicolaus, 10/14/2013**:  We start with our global device model, which includes our forecast for smartphones, tablets, and other devices.  Next we make assumptions for the various technologies – 2G, 3G, 4G – to come up with a 3G/4G device shipment forecast.  Because our forecast includes TD-SDCMA shipments, we subtract those shipments from our forecast.  Finally, using our forecasted ASP, we arrive at our [total revenue from device sales].  Applying a royalty rate, we forecast the company's QTL revenues for each quarter through FY2015.[174]

### 2.   The Fact That Qualcomm Did Not Provide Exhaustive Licenses to Chipmakers Was Public Information before the First Alleged Corrective Disclosure

82.   As discussed in this section, there was public information regarding Qualcomm's licensing model before the first alleged corrective disclosure, and in particular that Qualcomm did not provide (and had not historically provided) exhaustive licenses to chipmakers.

83.   **Section VII.A.2.a** discusses public statements Qualcomm made regarding non-exhaustive agreements with chipmakers both before and after the June 2008 Supreme Court ruling in *Quanta*, which I understand clarified that any authorized sale of products that "substantially embody" a patent exhausts the patent holder's rights, therefore limiting the restrictions a patent holder could put in place on the use of its IP after an authorized sale.[175] **Section VII.A.2.b** details analyst discussion of these agreements both before and after the *Quanta* decision.

#### a)   Qualcomm Made Numerous Public Statements Regarding Any Agreements with Chipmakers Being Non-exhaustive before the First Alleged Corrective Disclosure

84.   Consistent with its device-level licensing model, Qualcomm made numerous public statements both before and after the 2008 *Quanta* decision regarding not providing exhaustive

---

[173] "Could Get More Positive after the 1H Smart Phone and Tab-Stravaganza," *Macquarie*, March 14, 2011, p. 30, Figures 43, 45.
[174] "Initiating with a Buy Rating; Leading Innovator across Wireless Value Chain," *Stifel*, October 14, 2013, p. 28.
[175] *Quanta* Opinion, p. 2.

licenses to chipmakers and regarding having non-exhaustive agreements with chipmakers, including agreements with specific chipmakers.  A number of these statements are detailed below.

85.    Prior to the 2008 *Quanta* decision and before the beginning of the Proposed Class Period, Qualcomm explained that any patent agreements it had with chipmakers did not provide pass-through rights to the chipmakers' customers (*i.e.*, I understand that these agreements were non-exhaustive, which meant that Qualcomm was still able to license and collect royalties "downstream" at the handset level, consistent with its business model discussed in **Section VII.A.1**).

86.    In its SEC filings, Qualcomm described the patent arrangements it had entered into with chipmakers, and which chipmakers specifically it had agreements with.  Before *Quanta*, Qualcomm characterized its agreements with chipmakers as "separate" from licensing agreements with device makers and stated that its agreements with chipmakers expressly reserved its right to collect royalties from device makers (which I understand means that these agreements were explicitly non-exhaustive).  For example, Qualcomm stated in its 2007 SEC Form 10-K:

> We have entered into agreements with certain [chip manufacturer] companies, including EoNex Technologies, Infineon, Lucent, Motorola, NEC, Philips, Texas Instruments and VIA Telecom.  These agreements permit the licensees to manufacture CDMA-based integrated circuits using certain of our intellectual property for sale to CDMA-based wireless device manufacturers.  In exchange for these rights, we are entitled to receive fees, royalties (determined as a percentage of the selling price of the integrated circuits) and/or royalty-free cross-licenses, which allow us to use these companies' CDMA and, in some cases, non-CDMA intellectual property for specified purposes.  *In every case, the wireless device manufacturers' sales of CDMA-based wireless subscriber devices are subject to the payment of royalties to us on the products into which the integrated circuits are incorporated in accordance with the manufacturers' separate licensing arrangements with us.*[176]

---

[176] 2007 10-K, p. 10 (emphasis added).

87.     Qualcomm made numerous other public statements regarding its licensing practice with respect to chipmakers before the *Quanta* decision, including in public filings and on calls with analysts:

     a.  In a press release on November 14, 2007, well before the beginning of the Proposed Class Period, Qualcomm indicated that agreements with chip suppliers "are not intended to result in the exhaustion of any of Qualcomm's patents."[177]

     b.  During an analyst meeting, also on November 14, 2007, Steve Altman, President of Qualcomm, stated: "[W]hen we license ASIC [application specific integrated circuits] companies, we license our patents to them or we grant them rights under our patents and that allows them to sell chips to subscriber unit suppliers. But it expressly in every case makes it clear that they do not have the right to pass through our patents to those companies, to the handset manufacturers that use our patents."[178]

     c.  At the same analyst meeting, Mr. Altman commented on the debate raised by *Quanta*, noting that "we made sure in agreements that, even though we said every which way we could that there's no patent exhaustion, there's no pass-through rights, that if any jurisdiction ever determined that there is pass-through rights that we have provision in our agreement that terminates the rights that we've granted, so that the provisions that granted the exhaustion go away. So we've taken I think very good steps to ensure that the licensing programs are not impacted in any significant way by these patent exhaustion arguments."[179]

     d.  In a December 2007 brief *amicus curiae* filed in the Supreme Court in *Quanta*, Qualcomm wrote that its agreements with chipmakers "do *not* grant a license to the chipmaker to *use* the ASICs—i.e., licensed chipmakers may not themselves use or pass on to others the right to use the chipmaker's ASICs to make, operate or sell handsets or any other product."[180]

---

[177] "Dutch and German Courts Dismiss Nokia's Patent Exhaustion Complaints," Qualcomm Press Release, November 14, 2007.
[178] "QCOM – Qualcomm Inc. Analyst Meeting," *Thomson StreetEvents*, November 14, 2007, p. 36.
[179] "QCOM – Qualcomm Inc. Analyst Meeting," *Thomson StreetEvents*, November 14, 2007, p. 37.
[180] Memorandum of Points and Authorities in Support of Defendants' Motion for Judgment on the Pleadings, *In Re Qualcomm Incorporated Securities Litigation*, United States District Court for the Southern District of California, Case No. 3:17-cv-00121-BEN-MSB, January 15, 2020, Exhibit 7, p. A52 (emphasis in original); Brief of Amicus Curiae Qualcomm Incorporated in

e.  On an earnings call on January 23, 2008, Mr. Altman explained:  "Our
agreements with companies supplying ASICs are very clear that in every case, the
ASIC supplier does not have the right to pass through any of our patent rights to
their handset manufacturer customer or otherwise grant their customers the right
to use any of our patents for their handsets.  In other words, the handset
manufacturer can only obtain rights to [Qualcomm's] patents by entering its own
license agreement with [Qualcomm].  The agreements we have with ASICs
suppliers are, therefore, in every case expressly non-exhaustive."[181]

88.     Following the *Quanta* decision, the Company described in its SEC filings that its
arrangements with chipmakers provided those chipmakers "certain freedom of operation with
respect to each party's integrated circuits business."[182]  Qualcomm emphasized that these
arrangements were "separate" and "apart from" licensing agreements with manufacturers and did
not provide pass-through rights to chip competitors' customers (*i.e.*, device makers).  For
example:

a.  In its 2009 SEC Form 10-K, Qualcomm stated:  "In addition to licensing
manufacturers of subscriber and network equipment, we have made our essential
CDMA patents available to competitors of our QCT segment.  We have entered
into agreements with certain companies, including but not limited to Broadcom,
Fujitsu, Infineon, NEC, Philips, Renesas and Texas Instruments.  These
agreements permit the manufacture of CDMA-based integrated circuits.  In
exchange for these rights, we are, in various cases, entitled to receive fees,
royalties and/or rights that allow us to use these companies' CDMA and, in some
cases, certain non-CDMA intellectual property for specified purposes.  In every
case, these agreements do not allow such integrated circuit suppliers to pass
through rights under Qualcomm's patents to such suppliers' customers, and such
customers' sales of CDMA-, WCDMA- and OFDMA-based cellular devices into

---

Support of Respondent, Quanta Computer, Inc. v. LG Electronics, Inc., On Writ of Certiorari to the United States Court of
Appeals for the Federal Circuit, Case No. 06-937, December 10, 2007.
[181] "Q1 2008 Qualcomm Inc. Earnings Conference Call - Final," *Voxant Inc.*, January 23, 2008, pp. 5–6.
[182] *See*, *e.g.*, 2012 10-K, p. 8.

which such suppliers' integrated circuits are incorporated require separate licensing arrangements with us in order to use our patented technologies."[183]

b. In its 2011 SEC Form 10-K, Qualcomm stated: "Separate and apart from licensing manufacturers of subscriber and network equipment, we have entered into certain patent arrangements with competitors of our QCT segment, such as Broadcom, Fujitsu, Mediatek, NEC, Renesas Electronics, Texas Instruments and VIA Telecom. The purpose of these arrangements is to provide our QCT segment and the counterparties certain freedom of operation with respect to each party's integrated circuits business. In every case, these agreements expressly reserve the right for QTL to seek royalties from the customers of such integrated circuit suppliers with respect to such suppliers' customers' sales of CDMA-, WCDMA- and OFDMA-based cellular devices into which such suppliers' integrated circuits are incorporated."[184]

89.     The Company continued to make similar disclosures in its SEC Form 10-K filings throughout the Proposed Class Period.[185]

90.     In addition to descriptions of these arrangements in its SEC filings, Qualcomm also publicly discussed its non-exhaustive arrangements with specific chipmakers, for example:

a. In litigation with Qualcomm that began in 2005, Broadcom, one of the Company's chipmaker competitors, sought a license agreement with pass-through rights for its customers (*i.e.*, a chip-level exhaustive license), which Qualcomm did not agree to.[186] When the two companies attempted to settle in July 2007, analysts highlighted that Qualcomm was "deadlocked" with Broadcom over pass-through rights and would be *unable* to provide pass-through rights to Broadcom in any potential settlement.[187] Nearly two years later, Qualcomm's General Counsel

---

[183] 2009 10-K, p. 9.  Qualcomm repeated similar language in its 2010 10-K.  *See* 2010 10-K, p. 8.

[184] 2011 10-K, pp. 7–8.

[185] *See* 2012 10-K, p. 8; Qualcomm Incorporated, Form 10-K for FY 2013, filed November 6, 2013 ("2013 10-K"), p. 6; 2014 10-K, p. 7; 2015 10-K, p. 11; 2016 10-K, p. 11; 2017 10-K, p. 13.

[186] *See, e.g.*, "Legal Issues Far from Being Resolved," *Merrill Lynch*, July 26, 2007, p. 1 ("Broadcom is also seeking free pass-through rights, meaning that Broadcom's WCDMA chip customers will be exempt from paying Qualcomm royalties. [Qualcomm] said [it] would not agree to such terms."); "Qualcomm: Acute Myopia?," *Arete*, August 30, 2007, p. 2 ("Qualcomm offered Broadcom a royalty-free license, but would still collect royalties from Broadcom's customers on the entire selling price of the device (standard practice in its agreements today).").

[187] *See, e.g.*, "Legal Issues Far from Being Resolved," *Merrill Lynch*, July 27, 2007, p. 2 ("Deadlocked with Broadcom over pass through rights.  Qualcomm has been unable to come to an agreement with Broadcom because the latter is asking that any

Mr. Rosenberg noted on the Company's Q2 2009 earnings call following its settlement with Broadcom that "Broadcom customers do not receive rights to any of our patents with respect to Broadcom integrated circuit products incorporated into cellular products and equipment.  In other words, Qualcomm did not grant pass-through rights to Broadcom."[188]

b.  Qualcomm also described the non-exhaustive nature of its patent arrangement with chipmaker competitor MediaTek.  In a press release on November 19, 2009, Qualcomm explained that while many terms of the agreement were confidential, "MediaTek's customers do not receive rights to any of Qualcomm's patents and such customers will need to obtain a separate license from Qualcomm in order to receive rights to any of Qualcomm's patents."[189]

c.  When Qualcomm renewed its agreement with MediaTek in 2013, a joint public statement between the two companies also explained, "[t]he original agreements between MediaTek and Qualcomm were not, and the amended agreements are not, 'license' (or 'licensing') agreements.  MediaTek does not have a license to any of Qualcomm's patents, and Qualcomm does not have a license to any of MediaTek's patents.…  Under the amended agreements, neither Qualcomm nor MediaTek receives any patent rights of each other that can be conveyed to another party."[190]

---

settlement include the ability of its customers to obtain royalty free pass through rights to Qualcomm's intellectual property and patent portfolio.  (Qualcomm currently charges handset vendors royalties based on the price of a handset regardless of the chipmaker)."); "Fundamentally Strong; Previous Confident Tone Appears to Yield to Cautiousness on Legal Front," *William Blair & Company*, July 27, 2007, p. 3 (emphasis added) ("Management noted it will *not likely be able* to settle with Broadcom as long as it is pursuing the ability to access patents and provide them royalty free to their customers, given the obvious negative impact to QUALCOMM's licensing model.").

[188] "QCOM - Q2 2009 Qualcomm Inc. Earnings Conference," *Thomson StreetEvents*, April 27, 2009, pp. 34–35.  *See also* "QCOM / BRCM Settlement; Earnings Call at 5 am PT," *Broadpoint*, April 27, 2009, p. 1 ("[I]t appears QCOM's business model of charging royalties to handset makers remains intact for both [Broadcom] and more importantly the overall industry.").

[189] "MediaTek and Qualcomm Enter into Patent Agreement," Qualcomm Press Release, November 19, 2009.

[190] "Joint Public Statement by MediaTek and Qualcomm," MediaTek Press Release, September 25, 2013.

> **b) Equity Research Analysts Discussed Qualcomm's Non-exhaustive
> Agreements with Chipmakers before the First Alleged Corrective
> Disclosure**

91.     As detailed below, before the *Quanta* decision, equity research analysts discussed
Qualcomm's non-exhaustive agreements with chipmakers.  In 2008, market participants
commented on the potential implications of *Quanta* for Qualcomm.  Following the *Quanta*
decision, equity research analysts continued to comment on the Company's non-exhaustive
arrangements with chipmakers.

92.     Consistent with the Company's own commentary, equity research analysts noted prior to
the 2008 *Quanta* decision that Qualcomm's agreements with chipmakers did not provide pass-
through rights to chipmakers' customers.  For example:

> **Credit Suisse, 3/26/2007**:  QCOM denies licensees who manufacture
> integrated circuit products pass through rights because it would remove
> any obligation of handset vendors to pay royalties.[191]

> **Merrill Lynch, 10/12/2007**:  Qualcomm … notes that its agreements with
> chip manufacturers are expressly non-exhaustive.[192]

> **William Blair & Company, 1/25/2008**:  [Qualcomm] … specif[ied] that
> its ASIC manufacturer licensing contracts contain provisions that do not
> allow for pass-through rights, reducing the likelihood that the agreements
> would lead to patent exhaustion.[193]

93.     In 2008, equity research analysts and others commented on the potential implications of
*Quanta*, and in particular, uncertainty as to whether IP-holders such as Qualcomm would need to
modify their licensing practices.[194]  After the June 2008 *Quanta* decision, the potential

---

[191] "3G Economics Update," *Credit Suisse*, March 26, 2007, p. 9.
[192] "Navigating the Legal Minefield," *Merrill Lynch*, October 12, 2007, p. 16.
[193] "First Quarter 2008 Earnings Call: Results In Line With Expectations; Chipset Business Gaining Share," *William Blair & Company*, January 25, 2008, p. 3.
[194] For example, Stifel Nicolaus commented on January 16, 2008, prior to the ruling, that the case "raises the question whether a patent holder can recover royalties from ultimate purchasers, or whether it must collect all its payment from the point of initial sale" and "has particular significance for companies, such as Qualcomm (QCOM), that collect royalties from manufacturers of final products as well as from initial licensees. …  According to Qualcomm, non-trivial changes to this area of patent law 'have the potential to affect significantly and fundamentally the foundations of Qualcomm's businesses (and those of other high technology companies).'"  *See* "Supreme Court Patent Exhaustion Case Implicates Qualcomm, Yahoo!," *Stifel Nicolaus*, January 16, 2008, pp. 1–2.  The *New York Times* also noted in a January 6, 2008 article that *Quanta* would "shape the power of patent holders to extract royalties from companies at each stage when a product is being made" and that "Quanta says the high court can rule in its favor without calling Qualcomm's basic business model into question.  Quanta says patent holders can attach

implications of the decision were publicly discussed.[195]  Following the ruling, equity research analysts continued to comment on Qualcomm's agreements with chipmakers and that these agreements did not provide pass-through rights.  For example, post-2008, equity research analysts discussed the Company's specific agreements with chipmakers and the non-exhaustive nature of each:

> **Deutsche Bank, 4/26/2009**:  Importantly, the agreement [reached in settlement with Broadcom] does not grant Broadcom's customers the right to use Qualcomm's patents in cellular products (i.e., no pass through rights).  This implies that Broadcom can sell UMTS [Universal Mobile Telecommunications System] cellular chips only to handset vendors with a license from QCOM.  Qualcomm does not collect royalty payments from chip vendors, they collect them from chip vendors' customers (handset makers).  Today's settlement [with Broadcom] leaves Qualcomm's royalty model unchanged.[196]

> **Barclays, 4/27/2009**:  Broadcom agrees not to assert its patents against QCOM's cellular customers.  While the agreement clarifies that Qualcomm customers do not receive any rights to [Broadcom] patents outside of the cellular offerings, Broadcom customers do not receive any of QCOM's patents (pass through we believe) used in cellular offerings.[197]

> **J.P. Morgan, 4/28/2009**:  [M]ost importantly, Broadcom customers *do not* get pass through rights to Qualcomm's IP, meaning Qualcomm will continue to collect royalties on any CDMA or WCDMA phone powered

---

conditions to licenses and enforce those restrictions through breach-of-contract suits.  Qualcomm requires those licensing its mobile phone technology to pass it on only to handset makers that have reached agreements with Qualcomm."  *See* "U.S. Patent Case Likely to Redefine Royalties," *New York Times*, January 6, 2008, available at https://www.nytimes.com/2008/01/16/technology/16iht-patents.4.9274649 html.

[195] For example, *Reuters* commented on June 9, 2008 that "[t]he decision could have major implications for companies which license patents, since the court unanimously overturned a federal appeals court ruling with the practical effect of voiding an agreement between two firms, patent experts said.…  'The lesson for licensors who really want downstream restrictions is put it in the license agreement.'"  *See* "UPDATE 3-US Court Rules in Quanta's Favor in LG Patent Case," *Reuters*, June 9, 2008, available at https://www.reuters.com/article/quanta-lg/update-3-us-court-rules-in-quantas-favor-in-lg-patent-case-idUSN0925655120080609.  *RCR Wireless News* also noted the ways existing policies could be adjusted under the decision and cited to comments from equity research analysts at Stifel who noted, "'[w]e see nothing in the court's decision today that restricts the patent holder from contracting around the patent exhaustion doctrine by expressly limiting the licensee's ability to sell downstream so that a patent holder can collect downstream royalties.'"  *See* "Patent Decision Could Have Wide-Ranging Impact: Qualcomm Downplaying Significance of Decision," *RCR Wireless News*, June 10, 2008, available at https://www.rcrwireless.com/20080610/free-reports/patent-decision-could-have-wide-ranging-impact.

[196] "Qualcomm, Broadcom to Settle for $891 Million," *Deutsche Bank*, April 26, 2009, p. 1.

[197] "Operating Results," *Barclays*, April 27, 2009, p. 6.

by a Broadcom chip – so there is no lasting change to Qualcomm's royalty stream.[198]

**Bernstein Research, 2/11/2010**:  [I]f [MediaTek is] going to be selling 3G chips they're only actually able to sell under this agreement to licensed manufacturers.  So I think that one of the big drivers behind that deal [] is obviously, Qualcomm's not getting any royalties from it.  And it introduces a chipset competitor in there. But if MediaTek is going to have to sell that stuff they are only able to sell them to licensed end users.[199]

**Deutsche Bank, 2/22/2011**:  In 3G markets, [MediaTek] is constrained by the terms of its patent license from Qualcomm.  The terms of this license essentially require that any handset vendor who wants to use Mediatek's 3G chips has to already have a license from Qualcomm.  These are expensive to obtain and require stringent audit compliance; both of which are beyond the means of many Mediatek customers.  The gatekeeper to Mediatek's future is its largest competitor.[200]

94.    The Complaint cites to a report by BMO Capital Markets to support the claim that "when suggestions arose that the Company might not license to competitors, analysts, including BMO Capital Markets, found that the allegations 'don't make sense,' as Qualcomm supposedly does not 'decline[] to issue licenses to chipset suppliers' and does not 'prohibit[] these deals' with [] chipmakers."[201]  Plaintiffs cite an excerpt from the BMO Capital Markets report, but the report goes on to state that the allegation that Qualcomm refused to license chipmakers does not "make sense" because "[w]e know that QCOM has made deals with Intel, Broadcom, Texas Instruments, Mediatek, and several other semiconductor suppliers.  *We do not believe QCOM prohibits these deals, but rather would require a level of negotiation to get an agreement signed, similar to what transpired with Mediatek.*"[202]  As discussed previously, the MediaTek example

---

[198] "Q2 Wrap: Happy Days Are Here Again for the Chip Biz as Latest Bottom Is Found in San Diego, Reit. OW," *J.P. Morgan*, April 28, 2009, p. 3 (emphasis in original).  *See also* "Quick take: Our Initial Read on F2Q09 Results, Broadcom Settlement," *Cowen*, April 27, 2009, p. 1 ("There are two key (positive) outcomes for Qualcomm as a result of today's agreement.  First, Qualcomm was able to preserve its ability to enter into bilateral negotiations with Broadcom's mobile phone OEM customers, and thus maintain the huge revenue stream it sees from the makers of 3G phones globally.  Second, Qualcomm should see its legal costs and distractions cut substantially.  The positives are likely to be somewhat offset by the probable Broadcom entry into the 3G chip market in the next few quarters, perhaps creating a new competitor for QCT in 3G.  Still, our net right now is that the increased probability of Qualcomm's 3G licensing business emerging intact more than offsets the increased chip competition.").
[199] "Qualcomm: A Device ASP Post-Mortem – Transcript and Slides from Our February 5, 2010 Conference Call," *Bernstein Research*, February 11, 2010, p. 24.
[200] "Solidifying the Lead," *Deutsche Bank*, February 22, 2011, p. 5.
[201] Complaint, ¶ 72.
[202] "More Detail on China IPR Issues," *BMO Capital Markets*, August 14, 2014, p. 2 (emphasis added).

cited by BMO Capital Markets was a non-exhaustive patent arrangement with a chipmaker that explicitly did not provide pass-through rights.[203]  Likewise, the agreements with Intel, Broadcom, and Texas Instruments referenced in the BMO Capital Markets report were non-exhaustive and did not provide pass-through rights; that is, "[i]n every case, these agreements do not allow such integrated circuit suppliers to pass through rights under Qualcomm's patents to their customers."[204]  Moreover, the BMO Capital Markets report models Qualcomm's licensing revenue as a function of device sales, which also appears consistent with device-level licensing (see discussion in Section **VII.A.1.c**).[205]

95.     The other materials that are cited by Plaintiffs in the Complaint and Plaintiffs' 2020 Memorandum Opposing Defendants' Motion for Judgment on the Pleadings to support the claim that "contemporaneous analyst reports reflect that the market believed Defendants' misstatements and did not know that Qualcomm refused to license competitors" are not equity research analyst reports but press articles or other content such as from Trefis.[206, 207]

96.     Specifically, Plaintiffs cite the following quote from TheStreet.com—"QCOM openly licenses these innovations across the wireless industry, providing all companies big or small an equal opportunity to shape the future of wireless"—which is at best vague, as the author does not define what is meant by the wireless industry and whether the definition includes chipmakers.[208] Plaintiffs cite an additional six articles (three associated with Trefis), which contain a sentence

---

[203] "MediaTek and Qualcomm Enter into Patent Arrangement," MediaTek Press Release, November 20, 2009 ("MediaTek's customers do not receive rights to any of Qualcomm's patents and such customers will need to obtain a separate license from Qualcomm in order to receive rights to any of Qualcomm's patents.").

[204] *See, e.g.*, 2010 10-K, p. 8 ("In addition to licensing manufacturers of subscriber and network equipment, we have made our essential CDMA and OFDMA patents available to competitors of our QCT segment.  We have entered into such agreements with QCT competitors, including Broadcom, Fujitsu, Icera, Infineon (Intel recently announced an agreement to acquire Infineon's Wireless Solutions business), Mediatek, NEC, Renesas Electronics, Texas Instruments and VIA Telecom.  These agreements generally permit the manufacture of CDMA-based and/or OFDMA-based integrated circuits and/or baseband software for use on such integrated circuits.  In exchange for these rights, we receive rights that allow us to use certain intellectual property rights of these companies for specified purposes.  In every case, these agreements do not allow such integrated circuit suppliers to pass through rights under Qualcomm's patents to their customers for use in wireless devices manufactured or sold by such suppliers' customers, and such customers' sales of CDMA-, WCDMA- and OFDMA-based cellular devices into which such suppliers' integrated circuits are incorporated require separate licensing arrangements with us in order to use our patented technologies."); 2013 10-K, p. 6.

[205] "More Detail on China IPR Issues," *BMO Capital Markets*, August 14, 2014, p. 10.

[206] 2020 Memorandum, pp. 6–7, Exhibits 13–18 (and citations therein).

[207] The Complaint cites a Trefis article as evidence that market participants "trusted" Qualcomm's purported "willingness to license to competitors."  Trefis describes itself as an online "financial community" and not an equity research analyst or brokerage firm.  *See* "Getting Started with Trefis," *Trefis*, available at https://web.archive.org/web/20140209200717/http://www.trefis.com/faq#4; Complaint, ¶ 72.

[208] 2020 Memorandum, pp. 6–7, Exhibit 16.

that Qualcomm "licenses its technology to other chipmakers" (or variations thereof).[209] However, these articles generally include descriptions of Qualcomm's business practices that appear to be consistent with device-level licensing.[210]

97.     Moreover, even if, hypothetically, some equity research analysts held the incorrect view that Qualcomm provided exhaustive license agreements to chipmakers and provided chips to unlicensed device makers when in fact it did not, these views would not be consistent with the discussion of Qualcomm's licensing model in numerous other analyst reports and other sources that I reviewed in preparation of my report and cite extensively throughout my report.  Based on the materials I reviewed and cite, numerous equity research analysts correctly described Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers (**Section VII.A**), as well as Qualcomm's practice of not providing chips to unlicensed device makers (**Section VII.B**), and discussed the implications of these practices for Qualcomm's business model.  Accordingly, as previously discussed (**Section VI.A.3**), if the market for Qualcomm stock was efficient during the Proposed Class Period, as Dr. Tabak opines, then Qualcomm's stock price reflected all public information even if not all investors had accessed that information or understood its value implications.

### 3. Information Regarding Regulatory Actions and Litigation Concerning Device-Level Licensing and Non-exhaustive Licensing to Chipmakers Was Public before the First Alleged Corrective Disclosure

98.     As discussed in **Section V**, Qualcomm was the subject of regulatory actions and litigation concerning device-level licensing and non-exhaustive licensing to chipmakers prior to and

---

[209] The six articles cited are (i) a 2010 *MarketWatch* article, (ii) a 2012 *Trefis* article, (iii) a 2012 *Forbes* article (contributed by Trefis), (iv) a 2013 *Trefis* article, (v) a 2013 *Barron's* article, and (vi) a 2014 *Forbes* article.  *See* Complaint, ¶ 72; 2020 Memorandum, pp. 6–7, Exhibits 13–15, 17 (and citations therein).  This count excludes an article cited in the Complaint by *Teletimes International* that appears to be a copy of a Trefis January 19, 2012 article cited in the 2020 Memorandum.  *See* Complaint, ¶ 72; "Qualcomm's Got the Mobile Device Market Nailed," *Teletimes International*, January 23, 2012, available at https://teletimesinternational.com/2012/qualcomms-got-the-mobile-device-market-nailed.

[210] A 2012 Trefis article noted that Qualcomm "charge[s] a royalty from handset vendors for every mobile device sold that incorporates its technology."  A 2012 *Forbes* article (which was contributed by Trefis) noted that, Qualcomm "charge[s] a royalty from handset vendors for every mobile device sold that incorporates its technology."  A 2013 Trefis report noted that "typically" Qualcomm's royalty revenues are "a small percentage of the selling price of the price of the mobile device itself."  A 2013 *Barron's* article noted that Qualcomm's royalty revenues "are a function of the average selling price of the phones using its technology" and that "'[c]ome hell or high water [Qualcomm is] collecting 3% of the price of virtually every handset sold in the world.'"  A 2014 *Forbes* article noted that, through its royalties, "Qualcomm has turned into a toll collector for almost every smartphone manufactured."  *See* 2020 Memorandum, pp. 6–7, Exhibits 14–15, 17; Complaint, ¶ 72 (and citations therein); "Qualcomm Rides China's Smartphone Boom," *Forbes*, March 23, 2012, available at https://www.forbes.com/sites/greatspeculations/2012/03/23/qualcomm-rides-chinas-smartphone-boom.

during the Proposed Class Period.  As discussed in this section, the practice of device-level licensing by major owners of cellular SEPs was challenged through litigation and regulatory investigations and was publicly discussed by equity research analysts before the first alleged corrective disclosure on November 17, 2015.  In response to these legal actions, equity research analysts noted that any successful challenge to the device-level licensing model would have substantial revenue implications for Qualcomm and other major owners of cellular SEPs.

**Section VII.A.3.a** discusses regulatory actions and litigation involving Qualcomm that were publicly disclosed before the first alleged corrective disclosure while **Section VII.A.3.b** discusses litigation against Qualcomm's licensing peers concerning related issues that was also publicly known before the first alleged corrective disclosure.

### a) The Practice of Device-Level Licensing Was Discussed by Equity Research Analysts in the Context of Litigation Involving Qualcomm

99.     Before the first alleged corrective disclosure, market participants discussed challenges to device-level licensing practices in the context of litigation involving Qualcomm.

100.     As discussed in **Section V**, Qualcomm was the subject of regulatory investigations, including investigations prior to the first alleged corrective disclosure by the KFTC, EC, JFTC, and NDRC.  Qualcomm was also involved in litigation with both chipmakers and device makers to defend its device-level licensing practices.

101.     Beginning in 2005, Qualcomm and Broadcom, a competitor chipmaker, were involved in multiple lawsuits and countersuits related to Broadcom's claims against Qualcomm over "infringement of [] patents" and "violations of state and federal antitrust and unfair competition laws."[211]  Qualcomm agreed to pay Broadcom over $890 million in the settlement reached by the two companies in April 2009, and equity research analysts commented positively on the *lack* of change to Qualcomm's device-level licensing practices resulting from the settlement.[212]

---

[211] 2006 10-K, p. 40.

[212] For example, J.P. Morgan noted the "most important[]" part of the settlement was the lack of change to Qualcomm's royalty stream:  "Qualcomm pays Broadcom $200M upfront in June, followed by 16 easy payments of just $43M/quarter, summing to $891M.  And most importantly, Broadcom customers *do not* get pass through rights to Qualcomm's IP, meaning Qualcomm will continue to collect royalties on any CDMA or WCDMA phone powered by a Broadcom chip – so there is no lasting change to Qualcomm's royalty stream."  Likewise, Cowen commented that "[t]here are two key (positive) outcomes for Qualcomm as a result of today's agreement. First, Qualcomm was able to preserve its ability to enter into bilateral negotiations with Broadcom's mobile phone OEM customers, and thus maintain the huge revenue stream it sees from the makers of 3G phones globally.

102.    Also beginning in 2005, Qualcomm was in litigation with Nokia, a licensing competitor, related to claims of IP infringement whereby Nokia sought "declaratory and injunctive relief relating to alleged commitments made by [Qualcomm] to wireless industry standard setting organizations."[213]  Equity research analysts noted that "since [Nokia's] chip manufacturer … [was] already marketing chips under a license with Qualcomm [Nokia asserted that] Qualcomm's patents are thereby exhausted and therefore Nokia should not pay royalties on the same patents."[214]  The settlement reached by the two companies in July 2008 involved a new license agreement under which Nokia continued to make ongoing royalty payments to Qualcomm (*i.e.*, Nokia's chip supplier was not deemed to have an exhaustive license by which its licensing rights would pass through to Nokia).[215]

103.    In addition to the lawsuits involving chipmakers and device makers, in November 2013, China's NDRC began investigating Qualcomm for possible violations of Chinese Anti-Monopoly Law.[216]  Specifically, the NDRC investigated the following:

> [I]nteractions between the Company's licensing business and its chipset business, including how royalties are calculated in the Company's patent licenses, the value exchanged for cross-licenses to patents of the Company's licensees, whether the Company will offer license agreements limited to patents essential to certain standards, whether royalties are sought for the Company's expired patents, the Company's policy of selling chipsets only to the Company's patent licensees, *the alleged refusal of the Company to grant patent licenses to chipset manufacturers*, and certain other terms and conditions in the Company's patent license and chipset sale agreements.[217]

---

Second, Qualcomm should see its legal costs and distractions cut substantially.  The positives are likely to be somewhat offset by the probable Broadcom entry into the 3G chip market in the next few quarters, perhaps creating a new competitor for QCT in 3G.  Still, our net right now is that the increased probability of Qualcomm's 3G licensing business emerging intact more than offsets the increased chip competition."  Deutsche Bank also noted "[w]hile $891 million is a lot of money, we are glad to see this overhang removed.  Importantly we see no damage to Qualcomm's core licensing model.  The settlement does open the door to Broadcom to compete in the 3G baseband chipset market, but we continue to see Broadcom's prospects in this market as challenged."  *See* "Q2 Wrap: Happy Days Are Here Again for the Chip Biz as Latest Bottom Is Found in San Diego, Reit. OW," *J.P. Morgan*, April 28, 2009, p. 3; "Quick Take: Our Initial Read on F2Q09 Results, Broadcom Settlement," *Cowen*, April 27, 2009, p. 1; "Q2 Results; Raising Price Target to $50," *Deutsche Bank*, April 27, 2009, p. 4.

[213] 2006 10-K, p. 41.

[214] "Navigating the Legal Minefield," *Merrill Lynch*, October 12, 2007, p. 16.

[215] "Nokia and Qualcomm Enter into a New Agreement," Qualcomm Press Release, July 22, 2008.

[216] Q3 2014 10-Q, p. 12.

[217] Q3 2014 10-Q, pp. 12–13 (emphasis added).

The Company reached a resolution with the NDRC in February 2015, prior to the first alleged corrective disclosure, whereby Qualcomm agreed to pay a $975 million fine, to separate licensing of Qualcomm's essential vs. non-essential patents, and to reduce royalty rates on devices sold in China.[218]  However, Qualcomm retained the ability to license exhaustively at the device level.[219]

104.    The investigation by China's NDRC explicitly made public allegations of Qualcomm's "refusal [] to grant patent licenses to chipset manufacturers."[220]  Equity research analyst commentary following the NDRC investigation announcement noted the allegations regarding Qualcomm's alleged "refusal" to license chipmakers.  For example:

> **Bernstein Research, 9/16/2014**:  [A]ccusations included Qualcomm's practice of charging royalties based on the value of the device itself (rather than the mobile chipset), bundling standards-essential patents together with non-essential patents, requiring free cross-licensing of licensee IP, bundling practices (e.g. chipsets with licensing), and refusing to license chipset manufacturers, among other things.[221]

> **S&P Capital IQ, 8/22/2014**:  The investigation also reviews … [Qualcomm's] refusal to grant patent licenses to certain chipset manufacturers.[222]

105.    In response to the investigation, analysts noted the risk of changes to Qualcomm's licensing model and, in particular, the negative potential impact of reduced royalties due to any potential move away from device-level licensing.  For example:

> **Bernstein Research, 7/24/2014**:  [T]he bigger worry [of the investigation] would be demands to change business practices.  It is challenging to anticipate what kind of business model changes, if any, could potentially be in the works.  The most obvious would be a reduction in the royalty rate QCOM can charge (though we would argue that this could be a

---

[218] "Qualcomm and China's National Development and Reform Commission Reach Resolution," Qualcomm Press Release, February 9, 2015.
[219] *See, e.g.*, "Qualcomm Inc.: Thoughts on NDRC Resolution," *Susquehanna*, February 10, 2015, p. 2 ("QCOM appears to have structured a deal that achieves most of the Chinese government's objectives without significantly changing QCOM's business model.  We think the outcome clearly avoids the worst-case scenario of royalty payment based on chipset pricing.").
[220] 2014 10-K, p. 26.
[221] "QCOM: Parsing Recent Newsflow on NDRC Case – Entering 'Punishment Stage?' Will Business Changes Be Mandated?," *Bernstein Research*, September 16, 2014, p. 2.
[222] "Qualcomm Inc.," *S&P Capital IQ*, August 22, 2014, p. 2.

positive if a framework were put in place to ensure QCOM captures royalties on every device they deserve to).  More problematic changes are merely limited by the extent of one's imagination (for instance, royalty capture on chipset content rather than device ASP).[223, 224]

106.    Following the resolution with the NDRC in February 2015, before the first alleged corrective disclosure, analyst commentary highlighted the importance of having maintained Qualcomm's practice of device-level licensing:

> **Morningstar, 2/10/2015**:  The key takeaway from the decision, in our view, is that Qualcomm's licensing deals around its essential 3G and 4G patents remain intact, albeit negatively altered [to a royalty base of 65% of handset ASP].[225]

> **Cowen, 2/10/2015**:  [Qualcomm] has staved off the elephant in the room - possible erosion of the royalty base down to baseband chip-level licensing, an outcome that would require fundamental changes to its biz model.[226]

### b)  The Practice of Device-Level Licensing Was Public Information Discussed in the Context of Litigation Involving Qualcomm's Licensing Peers

107.    Litigation involving Qualcomm's licensing peers before the first alleged corrective disclosure contributed to the public information regarding device-level licensing.  For example, in 2010 one of Qualcomm's main licensing peers, Ericsson, sued D-Link (a networking equipment manufacturing company) for infringing several of its essential patents related to wireless standards.[227]  In a 2014 brief Qualcomm submitted on behalf of Ericsson, the Company stated that FRAND commitments "Do Not Require the Licensing of Components" and that

---

[223] "Qualcomm (QCOM): FQ314 Recap – Big Trouble in Little China?" *Bernstein Research*, July 24, 2014, p. 5.

[224] Equity research analysts also noted the risk of reduced royalty rates.  For example, UBS noted "the worst case scenario includes Chinese government's determination that Qualcomm's royalty rate is excessive and curbs competition which could permanently damage its royalty rates."  Pacific Crest Securities commented, "[the] biggest concern is that the NDRC's actions could ultimately pressure the royalty that QUALCOMM collects for its intellectual property."  *See* "China Starts Anti-Monopoly Investigation," *UBS*, November 25, 2013, p. 1; "Intel's Move to Foundry Not Necessarily Helpful; iPhone 5s Inventory Increasing but Still Low," *Pacific Crest Securities*, November 26, 2013, pp. 2–3.

[225] "China Antitrust Ruling Meets Our Expectations, Validates Qualcomm's IP, Maintaining Fair Value," *Morningstar*, February 10, 2015, p. 1.

[226] "Kissing the Ring, But Limiting Collateral Damage," *Cowen*, February 10, 2015, p. 1.

[227] Defendants asked the court to determine if Ericsson had breached its FRAND obligations by refusing to grant a license to Ericsson's chip supplier, Intel.  *See* "Federal Circuit Gives Guidance on Litigating RAND Royalty (Ericsson v. D-Link)," *Essential Patent Blog*, December 5, 2014, available at https://www.essentialpatentblog.com/2014/12/federal-circuit-gives-guidance-on-litigating-rand-obligation-ericsson-v-d-link.

device-level licensing was the "widespread industry practice."[228]  In its decision, the court noted Ericsson's practice of licensing "'fully compliant' products" (*i.e.*, products from "end product manufacturers"), that "other large companies ha[d] adopted similar policies of only licensing fully compliant products," and that there were no restrictions against such practices.[229]

### B.  Qualcomm's Practice of Not Providing Chips to Unlicensed Device Makers Was Public before the First Alleged Corrective Disclosure

108.    As discussed in **Section II**, I have been asked to evaluate the price impact of any alleged misrepresentations regarding Qualcomm's practice of not providing chips to unlicensed device makers.  **Section VII.B.1** discusses Qualcomm's disclosure of this policy, and **Section VII.B.2** discusses corresponding analyst commentary.

### 1.  Qualcomm Disclosed That It Would Not Provide Chips to Unlicensed Device Makers before the First Alleged Corrective Disclosure

109.    China's NDRC had investigated "interactions between the Company's licensing business and the Company's chipset business" starting in November 2013.[230]  Qualcomm disclosed the business practices under investigation by the NDRC in its SEC filings, noting, for example, in its July 23, 2014 10-Q that the NDRC investigation included "the Company's policy of selling chipsets only to the Company's patent licensees," among other topics.[231]  Qualcomm repeated a similar disclosure in its 2014 10-K.[232]

110.    After the resolution of the investigation in February 2015, Qualcomm issued a press release disclosing that the Company "agreed to implement a rectification plan that modifie[d] certain of its business practices in China."[233]  In particular, the rectification plan required Qualcomm to "not condition the sale of baseband chips on the chip customer signing a license

---

[228] Brief of Amicus Curiae Qualcomm Incorporated in Support of Affirmance on Rand Issues, *Ericsson, Inc. v. D-Link Systems, Inc.*, On Appeal from the United States District Court for the Eastern District of Texas, Case No. 10-cv-0473, March 12, 2014.
[229] Memorandum Opinion and Order, *Ericsson, Inc., et al. v. D-Link Systems, Inc., et al.*, United States District Court for the Eastern District of Texas, Tyler Division, Case No. 6:10-CV-473, August 6, 2013, pp. 46–47.
[230] Q3 2014 10-Q, p. 12; "China's National Development and Reform Commission Notifies Qualcomm of Investigation," Qualcomm Press Release, November 25, 2013.
[231] Q3 2014 10-Q, pp. 12–13.
[232] 2014 10-K, p. 26.
[233] "Qualcomm and China's National Development and Reform Commission Reach Resolution," Qualcomm Press Release, February 9, 2015.

agreement with terms that the NDRC found to be unreasonable or on the chip customer not challenging unreasonable terms in its license agreement."[234]   Qualcomm also noted in its disclosure that this modified policy "*does not require Qualcomm to sell chips to any entity that is not a Qualcomm licensee*, and does not apply to a chip customer that refuses to report its sales of licensed devices as required by its patent license agreement."[235]

111.    Further, the NDRC's announcement of its administrative sanction decision regarding its investigation of Qualcomm noted that "[d]uring the investigation, Qualcomm didn't deny its practice of imposing the condition that licensees should sign and not challenge a license agreement in its supply of baseband chips.  However, Qualcomm argues that such behavior was reasonable."[236]

112.    In its Q2 2015 10-Q, filed on April 22, 2015 after the NDRC resolution, Qualcomm repeated that "[t]he rectification plan does not require the Company to sell chipsets to any entity that is not a patent licensee of the Company."[237]

### 2. Equity Research Analysts Discussed Qualcomm's Practice of Not Providing Chips to Unlicensed Device Makers before the First Alleged Corrective Disclosure

113.    Equity research analyst commentary surrounding the NDRC investigation also noted the Company's practice of providing chips only to patent licensees.  Equity research analysts discussed both the allegations by the NDRC and the agreed-upon modifications to the Company's practices in China that were part of the resolution of the investigation.  For example:

> **Goldman Sachs, 7/24/2014**:  Qualcomm is still engaged with [China's] NDRC (National Development and Reform Commission), which is investigating the company's licensing business and its chipset business, including how royalties are calculated in Qualcomm's patent licenses, whether Qualcomm sells chipsets only to patent licensees, *the alleged*

---

[234] "Qualcomm and China's National Development and Reform Commission Reach Resolution," Qualcomm Press Release, February 9, 2015.
[235] "Qualcomm and China's National Development and Reform Commission Reach Resolution," Qualcomm Press Release, February 9, 2015 (emphasis added).
[236] "China's NDRC Publicizes Full Text of Qualcomm Decision (English version)," *MLex*, March 3, 2015, pp. 6–7.
[237] Q2 2015 10-Q, p. 13.

*refusal of Qualcomm to grant patent licenses to chipset manufacturers*, and other conditions.[238]

**S&P Capital IQ, 8/22/2014**:  The investigation also reviews QCOM's license agreements tied to its key patents, *the policy of selling chipsets only to its patent licensees*, and its refusal to grant patent licenses to certain chipset manufacturers.[239]

**Wells Fargo, 2/9/2015**:  Qualcomm will not condition the sale of baseband chips on the chip customer signing a license agreement with terms that the NDRC found to be unreasonable or on the chip customer not challenging unreasonable terms in its license agreement.  *However, this does not require Qualcomm to sell chips to any entity that is not a Qualcomm licensee*, and does not apply to a chip customer that refuses to report its sales of licensed devices as required by its patent license agreement.[240]

**Raymond James, 2/10/2015**:  Qualcomm announced this afternoon a resolution with China's National Development and Reform Commission (NDRC).  Key changes to Qualcomm's licensing terms in China include … *[r]etaining the ability to withhold chipset shipments to device manufacturers who do not sign a license* or who under-report shipments.[241]

**Susquehanna, 2/10/2015**:  In addition, QCOM has agreed to not condition the sale of baseband chips on the customer signing a license agreement with terms that the NDRC has found to be unreasonable.  *This does not require QCOM to sell chips to any entity that is not a QCOM licensee*, and does not apply to customers refusing to report its sales of licensed devices.[242]

---

[238] "Royalty Challenges in China Mar Outlook; Cutting Price Target to $88," *Goldman Sachs*, July 24, 2014, p. 5 (emphasis added).

[239] "Qualcomm Inc.," *S&P Capital IQ*, August 22, 2014, p. 2 (emphasis added).

[240] "QCOM: NDRC Investigation Resolved—Raising Estimates," *Wells Fargo*, February 9, 2015, p. 2 (emphasis added).

[241] "China Resolution a Positive, but Little Near Term Financial Impact," *Raymond James*, February 10, 2015, p. 1 (emphasis added).

[242] "Qualcomm Inc.: Thoughts on NDRC Resolution," *Susquehanna*, February 10, 2015, p. 1 (emphasis added).

**C.  Stock Price Changes Associated with the Alleged Corrective Disclosures Do Not Demonstrate the Price Impact of Alleged Misrepresentations Regarding Qualcomm's Licensing Practices**

114.    The five alleged corrective disclosures correspond to information regarding international regulatory investigations, a regulatory lawsuit by the FTC, and private litigation by Apple.

115.    As I discuss in this section, the price declines associated with these alleged corrective disclosures may in fact be associated with various regulatory actions and other litigation reflecting the potential for those regulatory actions or litigation to result in negative future outcomes for Qualcomm, but these price declines are not evidence of price impact of the alleged misrepresentations regarding Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, or its practice of not providing chips to unlicensed device makers.  This is because, as discussed in prior sections, information about these practices was already public before the first alleged corrective disclosure and would have been already incorporated in Qualcomm's share price before the first corrective disclosure in an efficient market, and therefore repetition of this information could not have caused the stock price to decline on the dates of the alleged corrective disclosures.

116.    In other words, a regulatory action or a civil lawsuit targeting previously known business practices may very well have resulted in price declines, but such declines could have been caused by the filing of the regulatory action or civil lawsuit, and would not have been the result of the market learning about the known business practices.  Instead, as I outline in this section, price declines associated with each of the alleged corrective disclosures are consistent with market commentary on the fact of the filing of the regulatory action or private lawsuit and the resulting possibility that the regulatory action or private lawsuit would result in changes to Qualcomm's business model or other negative consequences for the Company.

### 1.  November 18, 2015:  KFTC Case Examiner's Report

117.    After market hours on November 17, 2015, Qualcomm issued a press release disclosing that it had received a Case Examiner's Report from the KFTC.[243]  While the KFTC first

---

[243] Complaint, ¶ 212; "Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report," Qualcomm Press Release, November 17, 2015.  I understand that KFTC proceedings involve two stages.  The first stage involves review of

announced that it was considering investigating Qualcomm for misuse of its dominant market position on February 12, 2015, the specific allegations in the investigation were not disclosed until Qualcomm received the Case Examiner's Report on November 17, 2015.[244]  The Case Examiner's Report itself was not public, but Qualcomm issued a press release noting that the report had alleged that the Company did "not properly negotiate aspects of [its] licenses, and that [its] practice of licensing [its] patents only at the device level and requiring that [its] chip customers be licensed to [its] intellectual property violate[s] Korean competition law."[245]

118.    In particular, according to the Complaint, Qualcomm's press release revealed that:

   a.  "[Qualcomm] had recently received the KFTC Case Examiner's Report," and that "the Case Examiner's Report 'proposes remedies,' including modifying the Company's business practices and paying a substantial fine;"

   b.  "[T]he Case Examiner stated that Qualcomm's patent practices violate the competition laws and found that Qualcomm 'do[es] not properly negotiate aspects of [its] licenses;'" and

   c.  "[T]he KFTC Case Examiner's Report … stated that Qualcomm suppressed market competition by excluding competitors."[246]

119.    Based on my event study, the residual return of Qualcomm's stock on November 18, 2015, the impact date of alleged corrective disclosure, was -10.79%, which is statistically significant at the 95% confidence level.

120.    Of the 21 equity research analyst reports that I reviewed on or within five business days of the impact date of the KFTC disclosure, I did not identify any that stated that the KFTC Case Examiner's Report revealed new information regarding the facts of Qualcomm's business practices with respect to (i) licensing exhaustively at the device level and not providing

---

relevant documents and legal reviews.  If the examiner decides legal measures are required, a Case Examiner's Report presenting preliminary recommendations is presented to the committee, and the examinee is given an opportunity to object and respond. Only after the commissioners review the report as well as any opinions put forth by the examinee will the matter go into formal deliberation.  Following deliberation, the committee presents a written decision and resolution.  *See* "About KFTC: How We Handle Cases," KFTC, available at https://www ftc.go kr/eng/contents.do?key=495.

[244] "South Korea's Fair Trade Commission Considering Qualcomm Probe," *Wall Street Journal*, February 12, 2015, available at https://www.wsj.com/amp/articles/BL-KRTB-7414.

[245] "Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report," Qualcomm Press Release, November 17, 2015.

[246] Complaint, ¶ 212.

exhaustive licenses to chipmakers, or (ii) not providing chips to unlicensed device makers, which, as discussed previously, had been repeatedly discussed prior to this date.

121.   Instead, analyst commentary following the alleged corrective disclosure noted the similarities between the Case Examiner's allegations and the previously discussed NDRC investigation (that Plaintiffs do not allege as a corrective disclosure), which focused, in part, on the "alleged refusal of [Qualcomm] to grant patent licenses to chipset manufacturers"[247,248]  In addition, rather than commenting on any *new* information regarding the existence of these business practices following the announcement of the KFTC Case Examiner's Report, equity research analysts commented on the fact that the Case Examiner found violations and proposed remedies against Qualcomm and the possibility that Qualcomm would have to *change* its business practices in the future and the potential for resulting negative outcomes.  For example:

> **Bernstein Research, 11/18/2015**:  [T]he Examiner's report is likely going to cause additional angst among investors who are already worried about the long-term sustainability of Qualcomm's licensing business (in particular, the prospect of moving away from device-level royalty determination is of course among the doomsday scenarios for the business).[249]

> **Morningstar, 11/18/2015**:  In essence, the report recommends that Qualcomm's royalties within S. Korea (and large customers like Samsung and LG) should be based on the price of the baseband chip (roughly $10 or so today) that connects the phone to 3G and 4G networks, rather than the

---

[247] Q3 2014 10-Q, p. 13.

[248] Goldman Sachs noted that "[w]e would highlight China's recent investigation into Qualcomm's business model as a precedent for this case.  While the NDRC (National Development and Reform Commission) levied a $975mn fine and set new licensing terms for Chinese smartphones, it did not dispute Qualcomm's right to collect royalties on the device price.  If KFTC's ruling were to include amendments to licensing terms, we expect it to apply to shipments in Korea, similar to the resolution in China."  Likewise, Bank of America Merrill Lynch stated that "[s]imilar claims in the past about device-level royalties, including China's recent investigation, eventually maintained the structure.  …[W]e have seen similar claims relating to royalty practices in the past against Qualcomm.  In a recent dispute, Chinese regulators made similar claims, yet finally permitted Qualcomm to continue the longstanding practice of basing royalty payments on handset prices and not semiconductor prices."  Additionally, Nomura noted that "[a]lthough framed differently, we think these allegations could be similar to the challenges that the company faced from China NDRC.  And while Qualcomm settled with roughly $1bn in fines paid to China, the company continues to face collection challenges there."  Morningstar noted that "[a]t this point, similar to the China ruling, we'd suspect that any licensing modifications would be made to phones sold into the South Korean market."  Finally, Raymond James stated that:  "[t]his development follows a similar suit filed by the NDRC in China, which led to a $975 million fine and, as of the most recent quarter, lagging reported royalty revenue."  *See* "Lowering Price Target on Increased Regulatory Risk Post KFTC Report," *Goldman Sachs*, November 18, 2015, p. 3; "Deep Dive into Breakup Valuation, Korea Licensing, and QTL's Long-Term Position," *Bank of America Merrill Lynch*, November 19, 2015, pp. 1, 3; "Korea Report Creates More Uncertainty: Evaluating the Potential Impact on EPS," *Nomura*, November 18, 2015, p. 1; "South Korea's Investigation Report Is Troubling, but We Still See Qualcomm Pulling Through," *Morningstar*, November 18, 2015, p. 2; "Raymond James TMTalk: ARRS, CMCSA, MSI, QCOM," Raymond James, November 18, 2015, p. 1.

[249] "Quick Take - QCOM: Korea Kicks Qualcomm While They're Down…," *Bernstein Research*, November 18, 2015, p. 2.

price of the phone (which averages $186 for fiscal 2015).  The recommendation is concerning, as we see it as the greatest risk yet that Qualcomm's wide moat licensing business could be disrupted by litigation and regulators at the behest of large OEMs (Samsung is believed to make up about 20% of South Korea's total GDP and likely has hefty influence into the investigation).[250]

**Morgan Stanley, 11/18/2015**:  Qualcomm has long pursued licensing of its IP, and has generally pursued licensing agreements that encompass the entire device on the premise that its IP and its functionality and applicability is not limited just within its chips, but instead its IP is applicable to a wide range of functions in the phone.…  While the Korean FTC does not seem to have commented on the case or its findings, comments from Qualcomm that the Examiner's Report takes issue with the device-level licensing should be the most worrisome to investors.[251]

**Nomura, 11/18/2015**:  We believe Korea could also impose a fine and seek lower royalties per 3G/4G phone that China OEMs are expected to agree to.  Samsung is already paying a lower rate relative to other handset OEMs, but we can't discount the possibility of Samsung/LG negotiating a lower rate.[252]

**BMO Capital Markets, 11/18/2015**:  The Korean Fair Trade Commission (KTFC) [*sic*] put out an initial finding that alleges some fault with QCOM's licensing practices, and that QCOM violates Korean competitive law.…  Our view has been that government involvement in QCOM-related disputes generally come from companies in that region lobbying their government to try to help get a better deal with QCOM.  We discounted the Korean case because Samsung already has a preferential rate from the large cross-licensing deal signed a few years ago, which had a large up-front payment.…  Regardless, investigations like these will remain an overhang.[253]

---

[250] "South Korea's Investigation Report Is Troubling, but We Still See Qualcomm Pulling Through," *Morningstar*, November 18, 2015, p. 1.
[251] "Where's the Aspirin? Korean FTC Examiner's Report Makes Royalty Headaches Worse," *Morgan Stanley*, November 18, 2015, p. 1.
[252] "Korea Report Creates More Uncertainty: Evaluating the Potential Impact on EPS," *Nomura*, November 18, 2015, p. 1.
[253] "Lowering Estimates, Target on Industry Unit Weakness; Valuation at All-Time Low," *BMO Capital Markets*, November 18, 2015, p. 4.

### 2.   December 8, 2015:  EC and TFTC Investigations

122.    Before market hours on December 8, 2015, Qualcomm and the EC issued press releases disclosing that the EC had informed Qualcomm of its preliminary conclusions in two investigations that had commenced in July 2015.[254]  Specifically, the EC press release stated that Qualcomm had "illegally paid a major customer for exclusively using [its] chipsets and sold chipsets below cost with the aim of forcing its competitor Icera out of the market, in potential breach of EU antitrust rules."[255]

123.    Plaintiffs allege in the Complaint that the two press releases revealed that the EC "had charged Qualcomm with illegal anti-competitive practices, including paying a major customer to use Qualcomm chips exclusively" and had "preliminarily concluded that Qualcomm violated EU antitrust laws by paying a major customer, later identified as Apple, to exclusively use its chipsets, as a way of forcing competitor chipmakers out of the market."[256]

124.    In addition to disclosing the preliminary conclusions of the EC investigation, Qualcomm's press release on December 8, 2015 also disclosed that the TFTC had initiated an investigation into whether Qualcomm's "patent licensing arrangements violate the Taiwan Fair Trade Act."[257]  The specific violations alleged by the TFTC were not made public.[258]  According to Qualcomm's SEC filing, on December 4, 2015 Qualcomm learned that an investigation by the TFTC had been initiated, but did not learn the specific allegations from the TFTC until April 27, 2016.[259]

125.    According to my event study, the residual return of Qualcomm's stock on December 8, 2015, the day the EC investigation's preliminary conclusions and the fact of the TFTC

---

[254] Complaint, ¶ 216; "Qualcomm Comments on Regulatory Matters," Qualcomm Press Release, December 8, 2015; "Antitrust: Commission Sends Two Statements of Objections on Exclusivity Payments and Predatory Pricing to Qualcomm," European Commission Press Release, December 8, 2015.  Qualcomm noted in its press release that "[t]he matters were previously disclosed by the Company.  One [Statement of Objections] concerns the supply of Qualcomm's chipsets to a single customer under an existing agreement.  The other [Statement of Objections] concerns Qualcomm's sales to two customers from 2009 through 2011 of three chipsets incorporated into dongles – small USB devices that at the time were used to provide cellular connectivity for laptops."  *See* "Qualcomm Comments on Regulatory Matters," Qualcomm Press Release, December 8, 2015.
[255] "Antitrust: Commission Sends Two Statements of Objections on Exclusivity Payments and Predatory Pricing to Qualcomm," European Commission Press Release, December 8, 2015.
[256] Complaint, ¶ 216.
[257] "Qualcomm Comments on Regulatory Matters," Qualcomm Press Release, December 8, 2015.
[258] Complaint, ¶ 216.
[259] Qualcomm Incorporated, Form 10-Q for Q3 2016, filed July 20, 2016 ("Q3 2016 10-Q"), p. 17.  As noted, the Complaint alleges that allegations made by the TFTC constituted a corrective disclosure on December 8, 2015, although the specific allegations were in fact not made public until after that date.

investigation were disclosed, was -5.17%, which is statistically significant at the 95% confidence level.

126.    Consistent with the fact that the market did not learn the details of the TFTC allegations until substantially later than this alleged corrective disclosure date, of the 35 equity research analyst reports that I reviewed on or within five business days of the impact date of the EC and TFTC disclosures, I did not identify any that discussed specific allegations by the TFTC. Additionally, I did not identify any equity research analyst reports that stated that the EC press release revealed new information regarding the facts of Qualcomm's business practices with respect to (i) licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, or (ii) not providing chips to unlicensed device makers. As noted previously, these business practices had been repeatedly discussed by market participants prior to this date. Instead, while equity research analysts commented that the EC investigation was "unlikely to affect the company fundamentally in the long term,"[260] following disclosure of the EC's preliminary conclusions and TFTC investigation, equity research analysts also remarked on potential negative outcomes from regulatory investigations including that the licensing pressures were "metastasizing outside China."[261]

### 3.  December 28, 2016:  KFTC Investigation Results

127.    After market hours on December 27, 2016, the KFTC issued a press release announcing the results of its investigation against Qualcomm, including that Qualcomm had "refused or restricted the provision of cellular SEP licenses that are essential for the chipset manufacture and sales," that by "linking the chipset supply with patent license agreements," Qualcomm had

---

[260] For example, Bernstein noted that "[t]he EU complaints, while sounding worrisome, are in our opinion unlikely to affect the company fundamentally in the long term, as at this point there are really no European chipset or smartphone vendors left, and chipset issues are typically always secondary anyway.  We could see the potential for a fine (even a large one) at some point, but the company can deal with those, and we would be surprised to see business model changes that would prove onerous."  *See* "Quick Take – Qualcomm: EU Provides Details, Taiwan Joins the Party – Some Quick Thoughts," *Bernstein Research*, December 8, 2015, p. 1.
[261] For example, Bernstein stated that "[w]e actually found the disclosure of the Taiwan investigation (with accusations that licensing practices might violate the Taiwan Fair Trade Act) more interesting, and potentially more worrisome [than the EC investigation]. Not that Qualcomm does a tremendous amount of business there given the small size of the region, but rather that (together with Korea, and potentially the US) it is further evidence of licensing pressures metastasizing outside of China." Likewise, J.P. Morgan, noted that "[t]he charges against Qualcomm seem to be multiplying globally though we believe many of these investigations have been prompted by others.…  QCOM could face fines of up to 10% of its global revenue for each [EC] charge and be forced to change its business practices."  *See* "Quick Take – Qualcomm: EU Provides Details, Taiwan Joins the Party – Some Quick Thoughts," *Bernstein Research*, December 8, 2015, p. 1; "QCOM Regulatory Troubles, OLED Report, Taiwanese ODM Report and More…," *J.P. Morgan*, December 9, 2015, p. 1.

"coerced the execution and performance of unfair license agreements," that "[w]hile selling modem chipsets to handset companies," Qualcomm had "demand[ed] the execution and performance of license agreements with QTL," and that Qualcomm had "provided handset companies with only comprehensive portfolio licenses."[262]  The press release also announced an $853 million fine against the Company.[263]  An unofficial English translation of the press release was public in the U.S. and was discussed by equity research analysts.[264]

128.    In particular, Plaintiffs allege that the KFTC press release revealed that:

    a.  "[The KFTC's] two-year investigation into Qualcomm had culminated in findings that the Company had abused its market dominance;"

    b.  "Qualcomm had violated its FRAND commitments and Korean antitrust law by, among other things, refusing to license its cellular standards-essential patents;" and

    c.  "[T]he KFTC levied an $853 million fine on the Company for these violations."[265]

129.    According to my event study, the residual return of Qualcomm's stock on December 28, 2016, the impact date of the alleged corrective disclosure, was -0.70%, which is not statistically significant at the 95% confidence level.  Dr. Tabak reached a similar conclusion regarding significance and in fact stated that he would not assign inflation or damages stemming from this alleged corrective disclosure.[266]

130.    As discussed above, public information about Qualcomm's longstanding practice of licensing exhaustively at the device level, and its practice of not providing chips to unlicensed device makers, were repeatedly discussed by market participants prior to this date, and the allegations in the KFTC investigation were already public to the market, not least from the Company's disclosure of the KFTC Case Examiner's Report on November 17, 2015 (which

---

[262] "Strict Sanctions on Qualcomm's Abuse of Cellular SEPs," KFTC Press Release (unofficial English translation), December 28, 2016, pp. 2, 4–5 (emphasis removed).
[263] Complaint, ¶ 220; "Strict Sanctions on Qualcomm's Abuse of Cellular SEPs," KFTC Press Release (unofficial English translation), December 28, 2016.
[264] For example, a Bernstein Research report noted "the company helpfully posted an (unofficial) English translation of the finding (which can be found at https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december-28-2016-unofficial-english-translation) which allows a better read on the demands."  *See* "Qualcomm: Is Korea Trying to Kill QTL? What Does Qualcomm (Unofficial) Translation of the KFTC Order Suggest?," *Bernstein Research*, January 3, 2017, p. 1.
[265] Complaint, ¶ 220.
[266] Tabak Report, fn. 49.

Plaintiffs allege as the first corrective disclosure in this matter).[267]  Of the 24 equity research analyst reports that I reviewed on or within five business days of the impact date of the announcement of the KFTC investigation results, I did not identify any that stated that the investigation results had revealed new information regarding the facts of Qualcomm's business practices with respect to (i) licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, or (ii) not providing chips to unlicensed device makers, which had been repeatedly discussed prior to this date.

131.    Consistent with the fact that market participants had previously discussed Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, its practice of not providing chips to unlicensed device makers, *and* the previously disclosed KFTC Case Examiner Report that Plaintiffs allege as a corrective disclosure, following the announcement of the KFTC investigation findings, equity research analysts commented not on any new information regarding Qualcomm's allegedly concealed licensing practices, but on the fact that the KFTC issued investigative findings against Qualcomm and the resulting possibility that Qualcomm would have to *change* its business practices as a result of the KFTC's proposed remedies and potential negative outcomes for the Company.  For example:

> **Bernstein Research, 12/28/2016**:  Korea is fining Qualcomm 1.03 trillion won (about $865M), their largest fine ever delivered, and appears to be demanding business model changes, which (after reading the available news flow and speaking with the company) we believe may include at least 1) having QCOM separate out licensing for standards-essential and non-essential patents, and 2) requiring QCOM to license key IP to chipset competitors.… [B]usiness model changes are by far the bigger potential issue.… [O]ne could also read this as evidence of the "domino" effect that was once a primary concern following the initial disclosure of the China difficulties (and we note ongoing cases in the U.S., Taiwan, and the E.U.) which could further sit on the stock's multiple.[268]

---

[267] For example, a Citi report commented that "[w]e've seen this before:  We note that Qualcomm has faced similar investigations including an investigation with the European Commission in 2007.  The investigation was closed in 2009 after Qualcomm and Nokia reached a patent deal.  More recently, in February 2015, Qualcomm reached a resolution with China's National Development and Reform Commission and paid a fine of $975.0 million."  *See* "Alert: Korea Tries to Play Grinch to Qualcomm, Levies $865 Million Fine – No Impact to Our Thesis/Neutral Rating," *Citi*, December 29, 2016, p. 1.

[268] The report also noted that "Qualcomm will immediately appeal the findings (indeed, a read of the company's response is eye-opening in that regard); they will be seeking a stay of the corrective order (business model changes) during appeal.  For some context the prior KFTC decision against the company (from 2009) remains in appeal to this day (currently sitting at the Korean

**Morningstar, 12/28/2016**:  For Qualcomm, we are less concerned about the fine itself, as the firm has a substantial cash hoard ($32.4 billion at the end of September).  However, the existing licensing agreements held by Qualcomm are at risk, and we surmise South Korea's FTC could pursue revisions similar to those by China's National Development and Reform Commission in 2015, in which Qualcomm's royalties were calculated off a lower base and the firm's patent pool was separated between essential and nonessential patents.  This outcome would be significantly better than the alternative (royalties being calculated on certain components as opposed to the overall average selling price of the device).[269]

**Bank of America Merrill Lynch, 12/28/2016**:  [L]onger-term, we highlight risk to QTL if such remedies are applied outside of Korea.… While we have expected QTL pressures, this shift would likely be incrementally deflationary, especially if applied outside of the Korean market.  We note that the Korean market represents only 1.4% of global smartphones, but Samsung and LG have over 26% unit share globally (2015, per Strategy Analytics).  The KFTC has jurisdiction over the Korean market, but we question its ability to push QTL remedies elsewhere in the foreseeable future.[270]

**Bernstein Research, 1/3/2017**:  [D]emands to grant chipset competitors a license to QCOM's essential IP could conceivably be a QTL-killer if taken to the logical conclusion.[271]

### 4.  January 17, 2017:  FTC Complaint

132.    During market hours on January 17, 2017, the FTC filed a complaint against Qualcomm for violations of U.S. competition law.[272]  According to a redacted version of the FTC Complaint that became public that same day, Qualcomm allegedly "excluded competitors and harmed competition" by (i) "condition[ing] OEMs' access to its baseband processors on OEMs' acceptance of a license to Qualcomm's cellular SEPs on Qualcomm's preferred terms" (the so-

---

Supreme Court)."  *See* "Quick Take: Korea Gives Qualcomm $865M Worth of Coal in Their Stocking - Some Thoughts on Last Night's KFTC Decision," *Bernstein Research*, December 28, 2016, pp. 1–2.
[269] "South Korea Antitrust Ruling Consistent with Our Outlook for Qualcomm; Maintaining $72 FVE," *Morningstar*, December 28, 2016, p. 1.
[270] The report also noted that "Qualcomm's management strongly disagrees with the decision, and will appeal the remedies and fine to the Seoul High Court, per Qualcomm press release.  Nevertheless, we maintain our Buy and estimates, and note the impact is likely limited near-term."  *See* "South Korean Antitrust Agency Issues Fine, Outlines Licensing Changes," *Bank of America Merrill Lynch*, December 28, 2016, p. 1.
[271] "Qualcomm: Is Korea Trying to Kill QTL? What Does Qualcomm's (Unofficial) Translation of the KFTC Order Suggest?" *Bernstein Research*, January 3, 2017, p. 1.
[272] Complaint, ¶ 224.

called "no license-no chips" policy); (ii) "refus[ing] to license its cellular standard-essential patents to its competitors, in violation of Qualcomm's FRAND commitments;" and (iii) "enter[ing] into exclusive dealing arrangements with Apple Inc."[273]  The same day, FTC Commissioner Maureen K. Ohlhausen issued a public dissent against the enforcement action.[274]

133.    Plaintiffs allege that the FTC Complaint revealed that:

    a.  "[T]he FTC had commenced an antitrust enforcement action against Qualcomm for 'using unfair practices in the way it licenses its technology;'"

    b.  "[D]espite its commitment to license standard essential patents on FRAND terms, 'Qualcomm has consistently refused to license those patents to competing suppliers of chipsets;'" and

    c.  "Qualcomm precluded Apple from sourcing chipsets from Qualcomm's competitors from 2011 to 2016.  As set forth in the FTC complaint, 'Qualcomm recognized that any competitor that won Apple's business would become stronger, and used exclusivity to prevent Apple from working with and improving the effectiveness of Qualcomm's competitors.'"[275]

134.    According to my event study, the residual return of Qualcomm's stock on January 17, 2017 was -2.93%, which is statistically significant at the 95% confidence level.

135.    As discussed above, there was public information about Qualcomm's longstanding practice of licensing exhaustively at the device level prior to this date that had been repeatedly discussed by market participants.  Of the 59 equity research analyst reports that I reviewed on or within five business days of the impact date of the FTC Complaint, I did not identify any that stated that the FTC Complaint had revealed new information regarding the facts of Qualcomm's business practices with respect to (i) licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, or (ii) not providing chips to unlicensed device makers, which had been repeatedly discussed prior to this date.

---

[273] FTC Complaint, ¶¶ 3, 61.  *See also* "FTC Charges Qualcomm with Monopolizing Key Semiconductor Device Used in Cell Phones," Federal Trade Commission Press Release, January 17, 2017.

[274] Dissenting Statement of Commissioner Maureen K. Ohlhausen, *In the Matter of Qualcomm, Inc.*, File No. 141-0199, January 17, 2017.  The statement noted that Commissioner Ohlhausen felt there was "no robust economic evidence of exclusion and anticompetitive effects, either as to the complaint's core 'taxation' theory or to associated allegations like exclusive dealing."  *See also* "Qualcomm Responds to Complaint from U.S. Federal Trade Commission," Qualcomm Press Release, January 17, 2017.

[275] Complaint, ¶ 224.

136.    Instead, equity research analysts noted similarities between the FTC Complaint and the allegations in past and ongoing investigations, including the findings of the KFTC investigation.[276]  They commented on the fact that the FTC had instituted legal action against Qualcomm, the resulting possibility that Qualcomm would have to *change* its longstanding business practices in the future, and the potential for resulting negative outcomes for the Company, rather than any new information revealed about Qualcomm's licensing practices with respect to licensing chipmakers.  For example:

> **Bank of America Merrill Lynch, 1/18/2017**:  Without speculating on the outcome or remedies, we note that an industry shift to component-based licensing could pose significant risk to Qualcomm's licensing (QTL) model longer-term.…  Press reports and anticipation of the FTC's charges pressured Qualcomm's stock down over 4% as of the close yesterday, and we do expect regulatory headline risks to remain a headwind.[277]

> **Morgan Stanley, 1/18/2017**:  In this case, Qualcomm has built a business that successfully generates profits from primarily US developed IP, while protecting that IP around the world.  A potential push by the FTC to change that structure would almost certainly make collecting revenue on that IP more difficult in the future, devaluing not just Qualcomm's IP, but the IP of other companies.[278]

> **Bernstein Research, 1/18/2017**:  The third claim (a refusal to license standards-essential patents to chipset competitors) is the only one we

---

[276] For example, Morningstar, noted that "[the FTC Complaint was filed] [i]n the wake of South Korea's FTC concluding analogous practices were in violation of Korean competition law," and stated that "these types of rulings will continue to plague the firm.…  Our narrow moat and negative moat trend ratings incorporate the potential for regulatory agencies to continue to pile on to Qualcomm's business practices."  Citi observed: "[w]e note that Qualcomm has faced similar investigations including an investigation with the European Commission that was closed in 2009 and a settlement with China's National Development and Reform Commission in 2015.  More recently, the Korea Fair Trade Commission (KFTC) announced certain Qualcomm business practices are in violation of Korean competition law and intends to impose a fine of 1.0 trillion Korean Won, or roughly $865.0 million."  Credit Suisse stated:  "[w]e note that the company has recently faced scrutiny related to its high-margin licensing business (currently under investigation in Europe, already fined in Korea and China)."  Finally, Northland Capital Markets noted that "[t]he FTC is jumping on the coat-tails of China and now South Korea, which ruled against Qualcomm on December 28th, 2016 egged on by Samsung and LG.  Together, China and SK imposed fines approaching $2 billion, and Qualcomm is now facing similar rulings in the US, Europe and Taiwan."  *See* "The Hits Keep Coming: U.S. FTC Files Complaint against Qualcomm over Chipset and Licensing Practices," *Morningstar*, January 17, 2017, p. 1; "Alert: FTC Complaint against Qualcomm Could Put Pressure on Royalty Rates, Remain Neutral," *Citi*, January 17, 2017, p. 1; "US FTC Charges QCOM of Antitrust Practices," *Credit Suisse*, January 18, 2017, p. 1; "QCOM – The FTC Looking for Its Pound of Flesh," *Northland Capital Markets*, January 18, 2017, p. 1.
[277] "US FTC Files Antitrust Charges, Citing Licensing and Chipset Violations," *Bank of America Merrill Lynch*, January 18, 2017, p. 1.
[278] "FTC Move Unexpected; We See Several Uncertainties," *Morgan Stanley*, January 18, 2017, p. 1.

really find potentially troubling.  Similar to the recent KFTC case, we would view such a mandate as a potential QTL-killer.[279]

**Susquehanna, 1/18/2017**:  The FTC alleges that QUALCOMM only supplied its baseband processor to OEMs under the condition that handset manufacturers agree to the company's preferred licensing terms.  The FTC notes that other semiconductor suppliers do not implement this approach, and do not impose as onerous a royalty payment on their customers.  While this is an interesting (and very complicated) point, we note this has been QCOM's business practice for many years now.[280]

**Northland Capital Markets, 1/18/2017**:  Unfortunately, the barrage of suits against QCOM will most likely weigh on the stock, at least in the near term.  Investors may choose to ignore superior results in favor of further caution, and we can understand that given the potential financial impact.[281]

**Bank of America Merrill Lynch, 1/23/2017**:  The biggest risk to Qualcomm's business model is the demand for component-level licensing versus Qualcomm's practice of device-level licensing.  We have seen a similar approach applied to WiFi patents by the IEEE, yet Qualcomm claims the FTC does not have any power dealing with the issue of component vs. device-basis for licensing.[282]

### 5.  January 20, 2017:  Apple Lawsuit and Complaint

137.    During the last hour of trading on January 20, 2017, Apple filed a lawsuit against Qualcomm.[283]  Information regarding the allegations became public before the close of trading.[284]  According to a redacted version of the Apple Complaint,[285] Apple alleged that

---

[279] "Qualcomm (QOCM): The FTC Files – A Knife in the Heart, or Just a Paper Cut?" *Bernstein Research*, January 18, 2017, p. 3.

[280] "Qualcomm, Inc.: Is Their Business Model Too Good?," *Susquehanna Financial Group*, January 18, 2017, p. 1.

[281] "QCOM – The FTC Looking for Its Pound of Flesh," *Northland Capital Markets*, January 18, 2017, p. 2.

[282] "Worst Case Scenario Is Likely Better than Feared," *Bank of America Merrill Lynch*, January 23, 2017, p. 2.

[283] Complaint, ¶ 228.

[284] *See, e.g.*, "Apple Says It Is Suing Qualcomm over Licensing Practices," *Wall Street Journal*, January 20, 2017, available at https://www.wsj.com/articles/apple-sues-qualcomm-over-licensing-practices-1484944919?mod=article_inline ("The suit, which Apple said it filed Friday in federal district court in the Southern District of California, claims that Qualcomm leveraged its position as a manufacturer of a critical chip used in cellphones to seek 'onerous, unreasonable and costly' terms for patents and blocked Apple's ability to choose another supplier for chipsets.  The complaint seeks $1 billion in rebate payments that Apple says Qualcomm has withheld as retribution for Apple's participation in an investigation by South Korea's antitrust regulator.").

[285] Redacted Complaint for Damages, Declaratory Judgment and Injunctive Relief, *Apple Inc. v. Qualcomm Incorporated*, United States District Court for the Southern District of California, Case No. 17-CV-0108 GPCNLS, January 20, 2017 ("Apple Complaint"), ¶ 8.

Qualcomm had "breached its FRAND commitment" by "refusing to license its SEPs to competing chipset manufacturers, and by refusing to sell its chipsets to customers unless they first license Qualcomm's SEPs," entering into non-FRAND confidential licenses with Apple contract manufacturers, "double-dipping" royalties and chip sales ("no license-no chips"), conditioning rebates on "exclusivity or de facto exclusivity from Apple," restricting "Apple's ability to sue or induce certain kinds of lawsuits or enforcement actions against Qualcomm," leveraging its entire patent portfolio to "extort" royalties, charging "exorbitantly high" royalties based on the price of the finished device, and retaliating against Apple for its cooperation in the KFTC investigation by withholding nearly $1 billion, among 25 counts.[286]  Plaintiffs claim that the decline in Qualcomm's stock price on the subsequent trading day, January 23, 2017, is also attributable to the disclosure of the Apple suit.[287]

138.    Plaintiffs allege that the Apple Complaint disclosed new information about Qualcomm's licensing business practices.  Specifically, Plaintiffs allege that the Apple Complaint revealed that:

   a.   "Apple [] filed a lawsuit against Qualcomm … asserting that the Company used its monopoly position to seek onerous, unreasonable, and costly terms for its technology licenses;"

   b.   "Qualcomm had blocked Apple's ability to choose suppliers for chipsets by refusing to license to competitors;"

   c.   "Qualcomm had blocked Apple's ability to choose suppliers for chipsets by … conditioning billions of dollars of rebates on Apple's exclusive use of Qualcomm chipsets;" and

   d.   "Qualcomm had attempted to extort Apple into rescinding its truthful testimony to Korean antitrust authorities by withholding contractual royalty rebate payments due to Apple."[288]

---

[286] Apple Complaint, ¶¶ 51, 74, 86–87, 93, 103, 135, 142, 180, 204.
[287] Complaint, ¶ 230.  I am not endorsing the appropriateness of using a two-day price decline to measure the stock price impact of the disclosure of the Apple lawsuit, and an analysis of this issue is beyond the scope of my assignment at this time.
[288] Complaint, ¶ 228.

139.    According to my event study, the residual return of Qualcomm's stock on January 20, 2017 was -3.62%, and on January 23, 2017 (the next trading date) was -12.67%, both of which are statistically significant at the 95% confidence level.

140.    As discussed above, Qualcomm's practice of device-level licensing was publicly known and had been repeatedly discussed by market participants prior to the Apple Complaint.  Of the 76 equity research analyst reports that I reviewed on or within five business days of the impact date of the Apple Complaint, I did not identify any that stated that the Apple Complaint had revealed new information regarding the facts of Qualcomm's business practices with respect to (i) licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, or (ii) not providing chips to unlicensed device makers, which had been repeatedly discussed prior to this date.

141.    Instead, consistent with the fact that market participants had previously discussed Qualcomm's practices of licensing exhaustively at the device level and not providing exhaustive licenses to chipmakers, and its practice of not providing chips to unlicensed device makers, following the announcement of the Apple lawsuit, equity research analysts did not comment on new information regarding Qualcomm's licensing model.  Rather, they discussed the fact that Apple had brought suit, as well as the resulting possibility that Qualcomm would have to *change* its business practices in the future and the potential for resulting negative outcomes, including the loss of Apple as its largest chip customer, the possibility that Apple's contract manufacturers would withhold royalty payments, and the possibility that other device makers might take similar legal actions against Qualcomm.  For example:

> **Bernstein Research, 1/23/2017**:  AAPL is attempting a direct assault on Qualcomm's basic licensing business model, attacking the "essential" nature of their IP, and directly targeting QCOM's device-level royalty model.…  One could read this simply as AAPL trying to leverage a better deal in the wake of regulatory challenges.  But we have a hard time spinning a war with your largest customer as anything but a clear negative.[289]

> **Pacific Crest, 1/23/2017**:  [T]he most concerning aspect of Apple's lawsuit is its argument that QCOM should no longer be allowed to garner

---

[289] "Qualcomm, Apple:  The March to War?," *Bernstein Research*, January 23, 2017, pp. 1, 4.

license fees off the overall ASP of a smartphone, but rather off its patent/technology contribution to the platform.… [I]f Apple's claim is victorious, other licensees are likely to also follow and seek similar licensing terms.[290]

**Canaccord Genuity, 1/23/2017**:  [W]e believe the claims and suits are significant and create increased long-term risks to Qualcomm's QTL division or licensing business.  While the uncertainty could weigh on the share price, we believe the sell-off post the Apple and FTC news more than prices in a worst-case scenario in regards to Apple licensing.[291]

**CLSA, 1/23/2017**:  AAPL's action creates high uncertainty for QCOM's licensing business[.]  Since AAPL appears to be challenging not just QCOM's business practice, but the fairness of QCOM's royalties themselves, this presents a challenge to QCOM's licensing model, which could also spread to other licensees if AAPL were to prevail.  While it's impossible to know the outcome of AAPL's challenge, it represents a level of uncertainty similar to the previous China investigation, which caused significant pressure for the stock.[292]

**Cowen, 1/22/2017**:  On paper, we estimate the loss of its remaining AAPL modem biz at ~$400-500 MM risk to net income (~6% of EPS) but given a much bigger potential can of worms on the QTL side, we would expect a settlement.…  While $1B is a significant number, the largest impact will come from how these lawsuits impact QCOM's future licensing fee model (as % of handset ASP or based only on chips using QCOM patents).…  While we continue to see iPhone 10/X dual-sourcing modems from QCOM/INTC as QCOM's modems show superior performance in benchmarking, this lawsuit is clearly positive for [Intel] ($36.94, Market Perform) due to the deterioration of relationship between QCOM and AAPL which may result in greater [Intel] share.[293]

**RBC Capital Markets, 1/22/2017**:  We suspect investors at this point will wrestle with:  1) If AAPL is going public with their lawsuit could we see others follow (Samsung? Lenovo?)?  2) Would this even in a settlement scenario result in a lower royalty stream and structurally impact QTL revenues over time?  3) Could this accelerate the shift by AAPL to [Intel] for basebands and provide a roadmap for others?  4) Could international trade commissions force QCOM to revisit their business practice and

---

[290] "Apple Sues Qualcomm over Unfair Licensing Terms," *Pacific Crest Securities*, January 23, 2017, p. 1.

[291] "Sell-Off on Apple Litigation Overdone; Lower Price Target to $75 from $81 Based on Scenario Analysis," *Canaccord Genuity*, January 23, 2017, p. 1.

[292] "Downgrade to U-PF: Moving to Sidelines on Licensing Uncertainty," *CLSA*, January 23, 2017, p. 1.

[293] "Thinking Through This AAPL Lawsuit – Positive for INTC," *Cowen*, January 22, 2017, pp. 1–2.

separate their QTL segment against other segments including [NXP Semiconductors NV], as they review [NXP Semiconductors NV] transaction approval?[294]

**William Blair, 1/23/2017**:  We estimate that roughly 25% of Qualcomm's earnings per share are generated by Apple, the vast majority of which comes from the licensing segment.  Given this exposure, any unfavorable impact to Qualcomm's relationship with Apple, especially on the licensing front, has the potential to materially affect the company's earnings.[295]

**CLSA, 1/23/2017**:  We don't know if AAPL's contract manufacturers (who actually pay the royalties) will choose to withhold payments to QCOM as a result of AAPL's filing (but we think there's a good chance they will), and those license payments on behalf of AAPL account for about 25% of AAPL's licensing revenue, and much more in terms of profitability and cashflow.  And QCOM will have no choice but to fight AAPL vigorously both in court and in the media, since conceding to AAPL would impact the entire licensing model which supports the majority of QCOM's cashflow.  Again, this is not good.[296]

**Goldman Sachs, 1/23/2017**:  We see two key potential concerns for Qualcomm.  (1) This is a lawsuit filed by its single largest customer; we estimate Apple accounted for 25-30% of Qualcomm's revenues (and over one-third of its royalty revenues) over the last 3 years.  (2) An adverse ruling could set a worrisome precedent and have a broader impact on Qualcomm's business model given the allegations are not just for breach of contract but for violations of patent and monopoly law.[297]

142.    As noted previously, the allegation that Qualcomm had "refus[ed] to license competitors" had been included in the NDRC allegations and also as part of announcements that Plaintiffs allege as corrective disclosures (*i.e.*, the announcements regarding the KFTC investigation, the KFTC findings, and the FTC Complaint).  Likewise, the allegation that Qualcomm had refused to provide chips to device makers without a license had also been included in the NDRC allegations as well as in the FTC Complaint, and discussed in the KFTC investigation and findings announcements that Plaintiffs allege as corrective disclosures.  Moreover, in July 2016

---

[294] "Could NXPI Accretion Be Offset by New Challenges? AAPL, FTC & KFTC…. Who Is Next?," *RBC Capital Markets*, January 22, 2017, p. 1.
[295] "It's Never Good When a Top Customer Sues You for Aggressive Licensing Practices," *William Blair*, January 23, 2017, p. 1.
[296] "Downgrade to U-PF," *CLSA*, January 23, 2017, p. 2.
[297] "Apple Files Lawsuit against Qualcomm," *Goldman Sachs*, January 23, 2017, p. 1.

Qualcomm disclosed that the TFTC was examining whether Qualcomm had violated Taiwan's Fair Trade Act by allegedly "declining to grant licenses to chipset makers" and "[d]eclin[ing] to sell chipsets to unlicensed potential customers."[298]

143.    Indeed, analyst commentary regarding the announcement of the Apple lawsuit also noted parallels with previous challenges to Qualcomm's licensing model.[299]

## VIII.    Dr. Tabak Has Failed to Articulate a Damages Methodology That Can Measure Damages Resulting from the Specific Allegations in This Case

144.    I understand that at the class certification stage, securities class action plaintiffs must establish the existence of a methodology for calculating class-wide damages that is consistent with the specific allegations in the case.[300]    A damages model should have the ability to calculate inflation stemming from the alleged misrepresentations, and not from any other causes.    As discussed in this section, Dr. Tabak has not shown that he can ultimately develop such a damages model and overcome issues specific to the allegations in this litigation.

145.    _First_, **Section VIII.A** provides an overview of Dr. Tabak's proposed approach to damages in this case.    Critically, Dr. Tabak proposes a generic damages approach.    He fails to show that such an approach can address the challenging and unusual case-specific issues that arise in this litigation due to the existence of multiple categories of alleged misrepresentations

---

[298] 2016 10-K, p. F-27.

[299] For example, Morningstar stated:  "[t]he suit represents another strike against the chip provider, and comes at the heels of the U.S. Federal Trade Commission, or FTC, suing Qualcomm for anticompetitive tactics _in the same vein_ as allegations from the South Korea FTC and Apple."  BMO Capital Markets noted:  "[m]ultiple allegations are familiar.  Several of the points concern items that other companies and governments have focused on with QCOM and its business practice.…  [These assertions] include: … QCOM refuses to license SEPs (Standard-Essential Patents) to its chip competitors."  Likewise, Citi stated: "[w]e note that Qualcomm has faced similar investigations including an investigation with the European Commission that was closed in 2009 and a settlement with China's National Development and Reform Commission in 2015.  More recently, the Korea Fair Trade Commission (KFTC) announced certain Qualcomm business practices are in violation of Korean competition law and intends to impose a fine of 1.0 trillion Korean Won, or roughly $865.0 million."  Bank of America Merrill Lynch observed that "Qualcomm's licensing business (QTL) model is under scrutiny again, with Apple, US FTC, Korean FTC, and Taiwan FTC accusing or investigating Qualcomm of four key items:  1) Apple claims Qualcomm is charging excessive royalties, 2) The US Federal Trade Commission (FTC), and Korean FTC claim that Qualcomm withholds chipset supply in customer license negotiations, 3) Qualcomm refuses to license standard-essential patents (SEP) to chipset competitors, and 4) Qualcomm provides licensing discounts to chipset customers."  _See_ "Apple Formally Joins Fight against Qualcomm over the Latter's Business Practices," _Morningstar_, January 22, 2017, p. 1 (emphasis added); "Clash of the Smartphone Titans," _BMO Capital Markets_, January 22, 2017, pp. 1–2; "Alert: Apple Jumps on the Dog Pile, Sues Qualcomm; Another Potential Pressure Point on Royalty Rates – Reiterate Neutral," _Citi_, January 23, 2017, p. 1; "Worst Case Scenario Is Likely Better than Feared," _Bank of America Merrill Lynch_, January 23, 2017, p. 1.

[300] Dr. Tabak notes that "[w]hile [he] ha[s] not yet been asked to determine the level of inflation in Qualcomm's common stock, [he] ha[s] been asked to provide an opinion on whether such an analysis can be performed on a Class-wide basis."  _See_ Tabak Report, ¶ 57.

and Plaintiffs' allegations that the alleged corrective disclosures were materializations of understated risks.  An event study by itself cannot be used to compute damages given these issues.

146.   *Second*, as discussed in **Section VIII.B**, Dr. Tabak fails to explain how his proposed damages methodology can separately estimate inflation for the different categories of alleged misrepresentations alleged by Plaintiffs, if required, throughout the Proposed Class Period.  I understand from Counsel that Plaintiffs' allegations in this case encompass multiple categories of alleged misrepresentations, that the different categories of alleged misrepresentations are subject to being proven or disproven individually, and that each of the alleged corrective disclosure dates involves more than one of Plaintiffs' categories of alleged misrepresentations.

  a. Given these issues specific to the allegations in this litigation, Dr. Tabak has not shown that he can ultimately develop a damages model capable of calculating damages for a subset of the categories of alleged misrepresentations if the finder of fact determines that Qualcomm is not liable for some of the categories. Moreover, irrespective of how Dr. Tabak constructs his event study model, an event study alone—which is a specific technique used by financial economists, not a damages model—is not sufficient to separate the economic impact of corrective information concerning the different categories of alleged misrepresentations if such information was disclosed simultaneously, as is the case on the alleged corrective disclosure dates in this matter.

  b. Furthermore, Plaintiffs' categories of alleged misrepresentations, as an economic matter, appear not to be sufficiently interchangeable to support a claim that even if liability is found for only a subset of the categories of alleged misrepresentations, damages could still be measured using the entirety of residual stock price declines on the alleged corrective disclosure dates.  Therefore, if liability is only found with respect to some of the categories of alleged misrepresentations, damages cannot be measured using residual stock price declines on the alleged corrective disclosure dates without some methodology to apportion the residual declines to the different categories of alleged misrepresentations, and Dr. Tabak has not proposed such a methodology.

c.  Finally, Dr. Tabak does not propose a methodology that could account for potential changes in inflation (if any) resulting from the different categories of alleged misrepresentations over the five-year Proposed Class Period, even though equity research analysts commented on the evolving regulatory landscape during the Proposed Class Period, noting the "domino" effect of investigations by regulatory authorities.

147.   _Third_, as discussed in **Section VIII.C**, Dr. Tabak has not shown whether, nor how, a damages methodology in this case could measure damages associated with materialization of regulatory and litigation risk even though, as discussed in **Section III**, I understand that Plaintiffs claim that by allegedly misrepresenting its business practices, Qualcomm understated to the market the true risk of being subject to regulatory actions by "anti-competition regulators around the world."[301]

148.   A damages approach that can account for materialization of risk would need to include a methodology for separating the impact of previously understated risk (if any) from the impact that would have occurred upon the materialization of the risk, even if that risk had been fully disclosed.  Dr. Tabak does not describe any methodology that could accomplish this despite discussing the need for such a methodology in his previously published work.  Instead of articulating a methodology that could address allegations based on the materialization of previously understated risk, Dr. Tabak's proposed approach rests on the implausible assumption that Plaintiffs will be able to demonstrate that the actions by various regulators and litigation by Apple that actually occurred would have been assessed by the market as inevitable, had Qualcomm disclosed the alleged truth regarding its business practices at the beginning of the Proposed Class Period.  Dr. Tabak has not proposed any methodology to assess whether those events were in fact inevitable (and there is no basis to assume they were) or to calculate damages if the alleged corrective disclosures represented materialization of allegedly understated risks and the actions by various regulators and litigation by Apple on the alleged corrective disclosure dates were, in fact, not inevitable.

---

[301] 2020 Memorandum, pp. 24–25 ("Had investors known that Qualcomm was engaged in anti-competitive licensing practices—violating its commitments to the standard-setting bodies, worldwide anti-competition laws, and its affirmative representations to the market—investors would have understood the foreseeable risks that materialized across the globe.").

149.     I understand that at this stage of the litigation Dr. Tabak does not need to calculate damages.  Nor does he need to assess loss causation.[302]  However, I understand that he does need to establish the existence of a methodology for calculating class-wide damages that is consistent with the specific allegations in this case.  The generic approach that Dr. Tabak proposes to employ to measure damages at a later phase of the litigation does not address circumstances specific to this litigation, including the multiple categories of alleged misrepresentations Plaintiffs allege, and does not address how to estimate damages for disclosures that represent materialization of risk.  Therefore, his generic description cannot establish a basis for his conclusion that Plaintiffs will be able to measure damages on a class-wide basis that are attributable to their alleged misrepresentations.

### A.  Summary of Dr. Tabak's Proposed Approach

150.     Dr. Tabak proposes the following general steps for estimating damages at a later stage of the litigation:

   a.   First, he notes that the "starting point for calculating damages for an investor who both buys and sells shares of Qualcomm stock during the class period is determined by the amount of artificial inflation in the stock at the time of their purchase less the inflation in the stock when sold;"[303]

   b.   Second, he states that "[t]he inflation calculation … begins with an event study" and that damages would be calculated based on statistically significant residual stock price declines on four of the five alleged corrective disclosure events at issue;[304]

   c.   Third, he notes the need to account "for any causes of the price declines on the Event Dates unrelated to the allegations;"[305] and

   d.   Fourth, he notes that "[f]urther adjustments may be necessary if the amount of inflation declines for reasons other than a corrective disclosure (*e.g.*, if inflation

---

[302] Likewise, I am not providing opinions regarding loss causation in this report.
[303] Tabak Report, ¶ 59.
[304] Tabak Report, ¶¶ 60–61, 64.  Dr. Tabak finds that "[t]he December 27, 2016 disclosure is not associated with a statistically significant price movement in [his] analysis using the event-study model described earlier in [his] report.  Thus, [his] damages model will assign no inflation or damages as a result of that disclosure."  *See* Tabak Report, fn. 49.
[305] Tabak Report, ¶ 64.

changes due to market, industry, or company-specific reasons unrelated to the allegations)."[306]

151.    Dr. Tabak also asserts that if "Plaintiffs' loss-causation theory is viewed as 'materialization of the risk'"[307]—and assuming Plaintiffs can show that "Qualcomm's allegedly misrepresented licensing and bundling practices would inevitably lead to the regulatory and customer scrutiny from those practices that caused Plaintiffs' losses on the Event Dates"—then "the statistically significant declines in Qualcomm's stock price on the Event Dates would be used to measure investors' damages under the materialization-of-the-risk theory."[308]

152.    Finally, Dr. Tabak notes that "further discovery should aid in some of the exact parameterizations of the damages calculations," but nevertheless concludes that "a method for determining inflation at any date, and thus damages for any Class member, will be feasible."[309]

153.    Based on the above, Dr. Tabak appears to be proposing to calculate inflation using the observed residual stock price declines on the dates of alleged corrective disclosures, to the extent those declines are statistically significant.  He also appears to recognize the need to account for any confounding information on those dates, and to recognize that inflation may change over time.  Dr. Tabak also appears to acknowledge that, in the event Plaintiffs' allegations are viewed as a "materialization of the risk," his methodology would apply only if Plaintiffs establish the "inevitability" of the alleged corrective events.

154.    Dr. Tabak's generic discussion does not provide any explanation of how his approach could accommodate the specific circumstances and allegations in this litigation.  I understand that Plaintiffs must establish the existence of a damages methodology that measures damages stemming only from the specific allegations in the litigation.  Without having set out the implications of Plaintiffs' different categories of alleged misrepresentations for his proposed damages model (which he does not do), it is not clear how Dr. Tabak could have any basis to claim that he has articulated an economically-sound damages methodology that can be used to

---

[306] Tabak Report, ¶ 59.
[307] Note that the discussion of "materialization of risk" in my report is not addressing loss causation, nor what is required to establish loss causation, but is instead addressing the use of an event study to measure inflation when the alleged disclosure represents the materialization of a risk that investors were (at least partly) aware of.
[308] Tabak Report, ¶ 64.
[309] Tabak Report, ¶ 63.

estimate damages consistent with Plaintiffs' allegations.  I discuss this in more detail in **Section VIII.B**.

155.    It is further notable that all of the dates that Plaintiffs allege as corrective disclosures involve *regulatory or litigation developments*, as Dr. Tabak acknowledges,[310] yet Plaintiffs' allegations relate to the alleged concealment of Qualcomm's *business practices*, as discussed in **Section III**.  Dr. Tabak does not describe any methodology to calculate inflation to the extent that the corrective events (regulatory or litigation developments) represent materialization of risks (arising from the alleged failure to disclose business practices) that were not entirely "inevitable" to materialize.  I discuss this further in **Section VIII.C**.

156.    Importantly, as I discuss further below, an event study, such as the one proposed by Dr. Tabak, is a methodology that can be used to assess whether the totality of new information arriving to the market over a specific event window (*e.g.*, a day) affected the price of a stock.  However, an event study alone cannot isolate the impact of a certain piece of company-specific news if other company-specific news is disclosed within the same event window (*e.g.*, simultaneously).  An event study also does not provide a means to estimate the degree to which a risk was known to market participants (or to estimate the "true" degree of risk, if it was concealed).  Other analytical tools, which Dr. Tabak has not proposed, would be needed.[311]  Dr. Tabak thus fails to show that the generic approach he describes can address the challenging and unusual case-specific issues that arise in this litigation.

###    B.  Dr. Tabak Has Not Explained How His Damages Methodology Could Compute Inflation Separately for Each Category of Plaintiffs' Alleged Misrepresentations throughout the Proposed Class Period, If Some Categories Are Not Ultimately Proven

157.    As discussed in **Section II**, for the purposes of this report, I have been asked by Counsel to assume that Plaintiffs' allegations comprise several categories, namely (i) alleged misrepresentations regarding Qualcomm's "broad" and "non-discriminatory" licensing practices;

---

[310] Tabak Report, ¶ 61 ("All of the Event Dates associated with a statistically significant decline in Qualcomm's stock price involve the initiation of a legal or regulatory proceeding or the finding of certain facts by a regulatory body.").  *See also* Complaint, ¶¶ 212–230.

[311] Beyond the event study that Dr. Tabak proposes to use to estimate damages at a later stage of the case, he does not describe any other analytical tools to measure damages other than a vague reference to "valuations of different business practices and/or reviews of analyst reports to determine the relative importance of different aspects of an alleged corrective disclosure."  *See* Tabak Report, fn. 50.

(ii) alleged misrepresentations regarding Qualcomm's "decades"-long licensing practices; (iii) alleged misrepresentations regarding Qualcomm's "separate" business segments; and (iv) alleged misrepresentations regarding "pro-competitive" business practices.  I understand from Counsel that these categories of alleged misrepresentations represent distinct theories of liability.  I have also been asked to assume that the various categories of alleged misrepresentations subject to being proven or disproven individually, such that some may be proven while others may not.

158.   Additionally, I have been asked to assume that the alleged corrective disclosures include a combination of disclosures regarding the categories above.  For example, I understand that Plaintiffs allege that the January 17, 2017 alleged corrective disclosure involving the FTC filing a complaint against Qualcomm revealed information regarding all of Plaintiffs' categories of alleged misrepresentations as listed above.  On the other hand, I understand that Plaintiffs do *not* allege that the November 17, 2015 alleged corrective disclosure involving the KFTC Case Examiner's Report revealed information regarding the practice of allegedly providing royalty discounts to chip customers, while Plaintiffs do allege it revealed information regarding other categories of alleged misrepresentations.  If the finder of fact were ultimately to find Qualcomm liable for only a subset of the categories of alleged misrepresentations, I understand that a damages methodology would need to be capable of identifying the amount of inflation that is attributable to only the individual categories of alleged misrepresentations that remain.

159.   As I discuss in this section, Dr. Tabak fails to explain how his proposed damages methodology can separately estimate inflation for Plaintiffs' different categories of alleged misrepresentations, if required, throughout the Proposed Class Period.

   a.   *First*, as discussed in **Section VIII.B.1**, I understand that rulings by the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") and by the European General Court suggest that the Court or the finder of fact may indeed ultimately determine that Qualcomm is not liable for one or more of Plaintiffs' categories of alleged misrepresentations.  In this situation, an appropriate damages methodology would need to be capable of identifying inflation attributable only to the remaining categories of alleged misrepresentations.  Dr. Tabak has provided no guidance whatsoever with respect to how he would compute damages attributable only to Plaintiffs' *remaining* categories of alleged misrepresentations

using his proposed approach of measuring damages based on the residual stock price declines on the alleged corrective disclosure dates.

b. _Second_, as discussed in **Section VIII.B.2**, the event study methodology that Dr. Tabak proposes to estimate damages would not be sufficient to separate the impact of corrective information regarding different categories of alleged misrepresentations disclosed at the same time, as is the case on the alleged corrective disclosure dates in this matter. Thus, Dr. Tabak has not described any tools that would allow him to reliably account for simultaneous disclosures of Plaintiffs' different categories of alleged misrepresentations.

c. _Third_, as discussed in **Section VIII.B.3**, Plaintiffs' categories of alleged misrepresentations, as an economic matter, appear not to be sufficiently interchangeable to support a claim that even if liability is found for only a subset of the categories, damages could still be measured using the entirety of residual stock price declines on alleged corrective disclosure dates (_i.e.,_ without separating residual stock price declines by Plaintiffs' categories of alleged misrepresentations and removing the impact of categories for which liability has not been proven). On the contrary, using Plaintiffs' alleged misrepresentations regarding licensing and alleged royalty relief conditioned on chip sales as examples, I show that equity research analysts viewed the economic implications of these two categories of alleged misrepresentations as different and not interchangeable with one another in terms of value implications.

d. _Fourth_, as discussed in **Section VIII.B.4**, Dr. Tabak does not propose a methodology that could account for potential changes in inflation resulting from the different categories of alleged misrepresentations over the five-year Proposed Class Period. Indeed, equity research analysts commented on the evolving regulatory landscape during the Proposed Class Period, noting the "domino" effect of investigations by competition authorities. Dr. Tabak has failed to acknowledge this complication entirely.

1.  **The Rulings in the FTC and EC Cases Suggest the Potential Need for a Damages Methodology Capable of Computing Damages Separately for Each Category of Alleged Misrepresentations**

160.    I understand that the potential need to provide a methodology capable of computing damages separately for each category of alleged misrepresentations may be particularly relevant in light of the decision by the Ninth Circuit in the FTC case that is the subject of one of the alleged corrective disclosures at issue.  In particular, Plaintiffs allege that on January 17, 2017 (*i.e.*, the fourth of five alleged corrective disclosure dates), market participants learned that the FTC "brought [an] enforcement action to enjoin Qualcomm's anticompetitive licensing model," alleging that Qualcomm had "'us[ed] unfair practices in the way it licenses its technology.'"[312] However, on August 11, 2020, the Ninth Circuit issued a ruling that found that "Qualcomm's practice of licensing its SEPs exclusively at the OEM level *does not amount to anticompetitive conduct*."[313]  In fact, I understand that the Ninth Circuit decision indicated that Qualcomm's business practices were "*[h]ypercompetitive*" (*i.e.*, extremely competitive).[314]

161.    Subsequent to this ruling, equity research analysts noted the Ninth Circuit's findings that the FTC's allegations that Qualcomm's business practices were anti-competitive were unfounded.  For example:

> **Deutsche Bank, 8/11/20**:  The U.S. Court of Appeals found that Qualcomm's practice of licensing its SEPs exclusively at the OEM level *does not amount to anticompetitive conduct*, Qualcomm does not have antitrust duty to license to chip competitors, Qualcomm's royalties and "no license, no chips" policy do not impose an anticompetitive surcharge on modem chip sales by competitors and these aspects of the [Company]'s business model are "chip-supplier neutral" and do not undermine competition.[315]

---

[312] Complaint, ¶¶ 2, 224.

[313] *See* Opinion, *Federal Trade Commission v. Qualcomm Inc.,* United States Court of Appeals for the Ninth Circuit, No. 19-16122, August 11, 2020 ("*FTC v. Qualcomm* Appeals Court Opinion"), p. 56 (emphasis added).

[314] "Anticompetitive behavior is illegal under federal antitrust law.  Hypercompetitive behavior is not.  Qualcomm has exercised market dominance in the 3G and 4G cellular modem chip markets for many years, and its business practices have played a powerful and disruptive role in those markets, as well as in the broader cellular services and technology markets." *See FTC v. Qualcomm* Appeals Court Opinion, pp. 9, 55.

[315] "Appeal Victory in FTC Case Removes Final Major Legal Overhang," *Deutsche Bank*, August 11, 2020, p. 1 (emphasis added).

> **J.P. Morgan, 8/11/20**:  Appeals court found Qualcomm's practices not to be anti-competitive.[316, 317]

162.    Similarly, I understand that the European General Court's ruling in the EC case at issue on the second alleged corrective disclosure date also suggests that a methodology that would be capable of computing damages separately for each of the categories of alleged misrepresentations may be required.  That is, on June 15, 2022, the European General Court set aside the EC's ruling that had found that Qualcomm had "abused its dominant position" by paying "a key customer" for exclusive use of its LTE baseband chips.[318]  In its public June 2022 judgment, the European General Court wrote that "it could not legitimately conclude that the payments concerned had reduced Apple's incentives to switch to the applicant's competitors for all of its requirements covering all iPhones and iPads to be launched" and that "the Commission's conclusion … is based on an analysis which was not carried out in the light of all the relevant factual circumstances and which is, on that ground, unlawful."[319]

163.    I understand that the Ninth Circuit and European General Court rulings suggest that the Court or the finder of fact may ultimately determine that Qualcomm is not liable with regard to the alleged misrepresentations regarding Qualcomm's "pro-competitive" business practices, or, alternatively, that the FTC and EC actions did not, in fact, reveal to the market that Qualcomm's business practices were "anti-competitive."  If so, a damages methodology would need to be capable of reliably computing only those damages attributable to the *remaining* categories of alleged misrepresentations.

164.    Dr. Tabak has provided no guidance whatsoever with respect to how he would compute damages attributable only to Plaintiffs' *remaining* categories of alleged misrepresentations on each of these alleged corrective disclosure dates if the finder of fact determines Qualcomm is not

---

[316] "Favorable Ruling in Anti-Trust Case Open Doors for Long-Only Investor Interest in 5G Opportunity," *J.P. Morgan*, August 11, 2020, p. 1.

[317] On the date that Qualcomm and Apple reached a settlement in the dispute at issue in this matter, Bank of America likewise commented that "[w]e think the risk of changing the model to component-based licensing is muted now and going forward, the stock could start trading on its own fundamentals of strong semiconductor and licensing businesses."  *See* "Investor Patience Rewarded: Qualcomm and Apple Settle Global Litigation Battle," *Bank of America Merrill Lynch*, April 17, 2019, p. 1.

[318] Judgment of the General Court, *Qualcomm Inc. v. European Commission*, The General Court (Sixth Chamber, Extended Composition), Case T-235/18, June 15, 2022, ¶ 1, available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:62018TJ0235&from=GA; "Antitrust: Commission Fines Qualcomm €997 Million for Abuse of Dominant Market Position," EC Press Release, January 24, 2018.

[319] Judgment of the General Court, *Qualcomm Inc. v. European Commission*, The General Court (Sixth Chamber, Extended Composition), Case T-235/18, June 15, 2022, ¶¶ 414, 417, available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:62018TJ0235&from=GA.

liable for alleged misrepresentations regarding "pro-competitive" business practices or any other aspect of Plaintiffs' categories of alleged misrepresentations.

## 2. An Event Study Would Not Be Sufficient to Separate the Impact of the Different Categories of Alleged Misrepresentations

165.    Dr. Tabak states that his measure of inflation would "begin[] with an event study … on the dates of (or the trading dates following) the corrective disclosures alleged in this case."[320] However, he has not articulated how he would use an event study (which is a technique used by financial economists, not a damages methodology) to address Plaintiffs' different categories of alleged misrepresentations, as discussed above.  That is, Dr. Tabak has not described how he would use the company-specific residual stock price returns resulting from his event study to isolate the impact of the alleged corrective information associated with each of the categories of alleged misrepresentations, should such a calculation become necessary.  Because the alleged corrective disclosures include a *combination* of Plaintiffs' multiple categories of alleged misrepresentations, as noted above, Dr. Tabak could not achieve this by simply excluding a subset of disclosure dates from his proposed methodology that is based on using the observed residual stock price declines on the dates of alleged corrective disclosures.

166.    Moreover, because information concerning the various categories of alleged misrepresentations was disclosed simultaneously on the alleged corrective disclosure dates, an event study alone is insufficient to separate the impact of the various categories of alleged misrepresentations.  For instance, I understand from Counsel that for the alleged corrective disclosure on January 17, 2017 involving the FTC filing a complaint against Qualcomm, Plaintiffs allege that this corrective disclosure revealed information regarding all of Plaintiffs' categories of alleged misrepresentations.  In other words, I understand from Counsel that Plaintiffs allege that information regarding all categories of alleged misrepresentations was disclosed in the same document, namely the FTC Complaint.[321]

167.    As discussed in **Section VI.B**, to the extent that more than one piece of company-specific news enters the market at the same time, an event study, such as the one proposed by Dr. Tabak,

---

[320] Tabak Report, ¶ 60.
[321] Complaint, ¶ 224.

cannot isolate the effect of each individual company disclosure—it can only isolate the effect of the overall disclosure (all the information disclosed) during the event window.  In addition, there is no way to partition the event window when information is disclosed at the exact same time, for example, in the same document.[322]  Thus, even though he vaguely mentions "valuations of different business practices and/or reviews of analyst reports to determine the relative importance of different aspects of an alleged corrective disclosure,"[323] Dr. Tabak has not articulated any methodology that can reliably separate the impact of simultaneous disclosures in order to compute damages separately for each of the categories of alleged misrepresentations, if required.[324]

### 3. Dr. Tabak Fails to Acknowledge the Possibility That If Liability Is Not Found for Some of the Categories of Alleged Misrepresentations, Damages Cannot Be Measured without Separating Residual Stock Price Declines Due to the Remaining Categories of Alleged Misrepresentations

168.    As discussed above, Dr. Tabak has not proposed a methodology capable of disaggregating the impact of Plaintiffs' different categories of alleged misrepresentations on Qualcomm's stock price if liability is not found for some of their categories of alleged misrepresentations.  Furthermore, as discussed in this section, Plaintiffs' categories of alleged misrepresentations, as an economic matter, appear not to be sufficiently interchangeable to support a claim that even if liability is found for only a subset of the categories of alleged misrepresentations, damages could still be measured using the entirety of residual stock price declines on alleged corrective disclosure dates (*i.e.*, without separating residual stock price declines by Plaintiffs' different categories of alleged misrepresentations and removing the impact of categories for which liability has not been proven).  Such an approach could only apply if the categories of alleged misrepresentations were interchangeable as to their economic impact, such that the amount of the observed decline did not depend on the number of categories of alleged misrepresentations for which liability was proven (as long as it was proven for at least one).

---

[322] Note that an event study using intra-day trading data (which would allow event windows shorter than one day) can only help to isolate the effect of distinct disclosures made on a certain day if those disclosures are made at different times during the day, which is not applicable here.
[323] Tabak Report, fn. 50.
[324] This applies to the FTC Complaint, as discussed above, as well as all the other alleged corrective disclosure dates on which multiple pieces of company-specific information were disclosed in the same document or announced at the same time.

That appears not to be the case in this matter, as shown using examples based on Plaintiffs' alleged misrepresentations regarding Qualcomm's licensing practices and alleged royalty relief conditioned on chip sales.

169.   As discussed in **Section VII**, equity research analysts discussed that Qualcomm licensed at the device level and noted that Qualcomm's device-level licensing policy was central to its business model.  Also, as discussed in **Section VII**, throughout the Proposed Class Period equity research analysts commented that any decision that altered Qualcomm's longstanding practice of licensing at the device level would amount to a substantial change to Qualcomm's business model with implications for its expected cash flows.[325]  In contrast, the economic implications of alleged royalty relief conditioned on chip sales appear to have been less substantial.  In fact, when Qualcomm was subject to allegations of "unfairly [tying] chipset sales and royalties, offering discounted royalties to handset vendors that agree to purchase Qualcomm chipsets" as part of a 2007 EC investigation, equity research analysts observed that resolution of the allegations would likely have a limited impact on Qualcomm.[326]

170.   Some equity research analysts explicitly commented on the differences in implications of licensing allegations and alleged royalty relief conditioned on chip sales for Qualcomm's business.  For example, a Bernstein Research analyst report issued following the filing of the FTC Complaint commented on Qualcomm allegedly "providing licensing rebates to AAPL in exchange for exclusivity," and noted that "[w]ere this the only complaint in the suit, we would have few worries; we could see a fine (even a large one) stemming from it, but nothing major

---

[325] *See, e.g.*, "Quick Take - QCOM: Korea Kicks Qualcomm While They're Down…," *Bernstein Research*, November 18, 2015, p. 2 ("Nevertheless, the nature of the charges outlined in the Examiner's report is likely going to cause additional angst among investors who are already worried about the long-term sustainability of Qualcomm's licensing business (in particular, the prospect of moving away from device-level royalty determination is of course among the doomsday scenarios for the business)."); "Kissing the Ring, but Limiting Collateral Damage," *Cowen*, February 10, 2015, p. 1 ("Further, QTL has staved off the elephant in the room - possible erosion of the royalty base down to baseband chip-level licensing, an outcome that would require fundamental changes to its biz model.").

[326] "IPR Concerns a Buying Opportunity," *Banc of America Securities*, October 28, 2005, p. 1 ("While it's difficult to forecast outcomes in IPR matters, and we are unsure of the power of the EC in this matter, our initial reaction is that this event will not change the QC business model.  We note that many of these companies have already signed binding licensing contracts with QC and we do not see how bundling IPR and chipset sales is any different than bundling handsets and infra, base stations and microwave radio, baseband semis and RF, etc."); "Antitrust: Commission Initiates Formal Proceedings against Qualcomm," European Commission Press Release, October 1, 2007; "QCOM: Antitrust Attorney Sheds Light on EU Complaint; Process Likely to Take 2+ Years, with Little Near-Term Impact," *Prudential Equity Group*, November 8, 2005, p. 3; "Qualcomm: Expect QCOM to Beat Consensus; Various Legal Matters Distractions from Fundamentals; Outperform," *Bernstein Research*, October 31, 2006, p. 2 ("[W]e expect the commission to focus on the far less damaging allegations of product bundling [compared to unfair royalty rates], which in the worst case, would likely result in a manageable fine with no risk to royalty rates.").  The EC closed the investigation after the complainants withdrew their complaints.  *See* "Antitrust: Commission Closes Formal Proceedings against Qualcomm," European Commission Press Release, November 24, 2009.

otherwise would be likely."[327]  However, with respect to the allegations about not licensing chipmakers, the same Bernstein Research analyst report noted that it had "found a similar accusation in the recent Korean FTC decision troubling as when taken to its logical conclusion, it would be a QTL-killer (as handset manufacturers buying licensed chipsets would feel little need to pay QCOM twice)."[328]  Thus, the value implications for investors of Plaintiffs' alleged misrepresentations regarding licensing could be very different from that of misrepresentations regarding alleged royalty relief conditioned on chip sales.

171.   This implies that if information associated with licensing and alleged royalty relief conditioned on chip sales were assessed to be responsible for a certain amount of an observed residual stock price decline on a corrective disclosure date, it would not be the case that alleged royalty relief conditioned on chip sales alone would be expected to account for the same amount of decline in the event that no liability was found with respect to alleged misrepresentations regarding licensing.  Moreover, Dr. Tabak fails to articulate any methodology by which a finder of fact could take an observed residual stock price decline on a corrective disclosure date for which information associated with licensing and alleged royalty relief conditioned on chip sales was assessed to be responsible, and determine which portion of that decline was attributable either to licensing alone or to alleged royalty relief conditioned on chip sales alone (see **Section VIII.B.1**).

### 4.  Dr. Tabak Has Not Proposed a Damages Methodology That Can Measure Inflation Attributable to Each of Plaintiffs' Categories of Alleged Misrepresentations throughout the Proposed Class Period If the Amount of Inflation Changed over Time

172.   Additionally, even if Dr. Tabak had articulated a methodology to separately estimate price declines attributable to Plaintiffs' different categories of alleged misrepresentations on the days of the alleged corrective disclosures (he has not), Dr. Tabak has not shown he can account

---

[327] "Qualcomm (QCOM): The FTC Files Suit – A Knife in the Heart, or Just Paper Cut?," *Bernstein Research*, January 18, 2017, pp. 2–3.
[328] "Qualcomm (QCOM): The FTC Files Suit– A Knife in the Heart, or Just Paper Cut?," *Bernstein Research*, January 18, 2017, p. 3.  *See also* "Qualcomm, Apple: The March to War?" *Bernstein Research*, January 23, 2017, p. 1 ("While the $1B is what captured most of the headlines, in our opinion it is a sideshow.  Rather, AAPL is attempting a direct assault on Qualcomm's basic licensing business model, attacking the 'essential' nature of their IP, and directly targeting QCOM's device-level royalty model.").

for potential changes in inflation resulting from the categories of alleged misrepresentations over time.[329]  In other words, he does not provide any methodology by which changes in inflation other than those arising from the alleged removal of inflation on the alleged corrective disclosure dates would be measured.

173.    Dr. Tabak states that his damages methodology would "begin[] with an event study" analyzing the residual stock price declines on the alleged corrective disclosure dates, but he does not describe how he would then use those residual stock price declines to estimate inflation over the Proposed Class Period, which is almost five years long.[330]  Indeed, the same piece of information released at the end of the Proposed Class Period could have had different value implications, and thus different implications for inflation, if released at the beginning of the Proposed Class Period, especially given the length of the Proposed Class Period.  Dr. Tabak does not describe any methodology that could account for changes in the hypothetical value of the various alleged disclosures throughout the course of the Proposed Class Period.

174.    Calculating inflation throughout the whole Proposed Class Period in this matter would be complex because the hypothetical value implications of the various alleged disclosures earlier in the Proposed Class Period, as well as the regulatory environment, were likely changing over time.  Equity research analysts commented on the evolving regulatory landscape during the Proposed Class Period.  Indeed, equity research analysts noted the "domino" effect of investigations by regulatory authorities and that litigation risk was "metastasizing" in different countries following China's NDRC investigation.[331]  This suggests that to the extent there was any inflation because of allegedly undisclosed business practices, such inflation may have changed over time due to this "domino" effect.  Inflation may also have been affected by other factors changing over time.  For example, equity research analysts also noted changes in the competitive environment for Qualcomm and changes in the importance of its IP as cellular

---

[329] Dr. Tabak notes that "[f]urther adjustments may be necessary if the amount of inflation declines for reasons other than a corrective disclosure (*e.g.*, if inflation changes due to market, industry, or company-specific reasons unrelated to the allegations) in order to obtain what is known as the 'out-of-pocket' measure of damages."  However, he does not explain what "adjustments" might be necessary or describe a methodology for making those "adjustments."  *See* Tabak Report, ¶ 59.

[330] Tabak Report, ¶ 60.

[331] "Quick Take: Korea Gives Qualcomm $865M Worth of Coal in Their Stocking – Some Thoughts on Last Night's KFTC Decision," *Bernstein Research*, December 28, 2016, pp. 1–2; "Quick Take – Qualcomm: EU Provides Details, Taiwan Joins the Party – Some Quick Thoughts," *Bernstein Research*, December 8, 2015, Q61413_0007064, p. 1.  *See also* "QCOM Regulatory Troubles, OLED Report, Taiwanese ODM Report and More…," *J.P. Morgan*, December 9, 2015, p. 1 ("QCOM could face fines of up to 10% of its global revenue for each [EU] charge and be forced to change its business practices.…  The charges against Qualcomm seem to be multiplying globally though we believe many of these investigations have been prompted by others.").

standards evolved.[332]  Additional examples of these issues are discussed below (see **Section VIII.C.1.c**).

### C.  Dr. Tabak Has Not Presented a Damages Methodology That Can Measure Damages Associated with Materialization of Risk

175.    As noted in **Section III**, I understand that Plaintiffs have alleged that by misrepresenting its business practices, Qualcomm concealed the true risk of regulatory action by "anti-competition regulators around the world."[333]  As an economic matter, this would mean that the market underestimated the likelihood of such regulatory actions as compared to the true risk that would have been known absent the alleged misrepresentations.  In other words, it is alleged that Qualcomm failed to reveal the necessary information that, if it had been released, would have led the market to understand the true likelihood of the subsequent actions by various regulators and litigation by Apple that were ultimately disclosed on the alleged corrective disclosure dates.

176.    In his report, Dr. Tabak seeks to address the question of how, if required, he would account for the fact that the alleged corrective disclosure dates represented materialization of allegedly understated risks.[334]  However, as I discuss in **Section VIII.C.1**, Dr. Tabak does not actually articulate any methodology that could account for alleged corrective disclosures that reflect materialization of risk.  Instead, as I discuss in **Section VIII.C.2**, Dr. Tabak's proposed approach rests on the implausible assumption that Plaintiffs will be able to demonstrate that the actions by various regulators and litigation by Apple that actually occurred would have been understood by the market to be inevitable at the beginning of the Proposed Class Period had Qualcomm disclosed the alleged truth regarding its business practices at that time.  Dr. Tabak offers no methodology whatsoever to assess whether those events were in fact inevitable (and there is no basis to assume they were) or to calculate damages if the assumption of inevitability does not hold.

---

[332] *See, e.g.*, "Management Presentation at Growth Conference," *Canaccord Genuity*, August 10, 2016, p. 1 ("With Qualcomm's history of generating very strong market share for new industry standards, we view the ever changing wireless standards as a key driver for Qualcomm maintaining its leadership position.").

[333] 2020 Memorandum, pp. 24–25 ("Had investors known that Qualcomm was engaged in anti-competitive licensing practices—violating its commitments to the standard-setting bodies, worldwide anti-competition laws, and its affirmative representations to the market—investors would have understood the foreseeable risks that materialized across the globe.").

[334] Tabak Report, ¶ 64.

### 1. Dr. Tabak Has Not Proposed a Damages Methodology That Can Account for Alleged Corrective Disclosures That Represent Materialization of Risk

177.    As discussed in **Section VII.C**, all the dates that Plaintiffs allege as corrective disclosures involve regulatory or litigation developments.[335]  In **Section VIII.C.1.a**, I show that Qualcomm had disclosed the risk of potential challenges to its business model, including (i) the risk of litigation regarding its licensing practices as well as (ii) the possibility that other companies would use litigation as a means of challenging its business model.  Moreover, market participants discussed these risks before the alleged corrective disclosures, both before and during the Proposed Class Period.  Thus, the regulatory and litigation developments announced on the alleged corrective disclosure dates and the associated residual stock price declines represented materialization of risks that were at least partly known to the market, and therefore, at most, allegedly *understated* (as opposed to being concealed entirely), if Plaintiffs' allegations are correct.

178.    Dr. Tabak provides no basis whatsoever to conclude that Qualcomm could have disclosed to investors with certainty that regulators *would* investigate its licensing practices or that it *would* be subject to a lawsuit by Apple, its largest customer, at any point in time before the investigations began or before it found out that Apple's lawsuit was being filed; in other words, that the risk (the *could*) would actually materialize (and become the *would*).  This has significant implications here.  As discussed in **Section VIII.C.1.b**, when disclosures represent the materialization of a risk, a damages approach needs to include a methodology for separating the impact of the allegedly understated risk (if any) from the impact of the risk materializing (because some impact would have occurred regardless when the risk materialized, whether or not the risk had been fully disclosed or understated previously).  However, as discussed in **Section VIII.C.1.c**, Dr. Tabak does not propose a methodology capable of estimating the degree to which the risk of regulatory investigations and customer actions was understated, as Plaintiffs allege.

---

[335] Complaint, ¶¶ 212–230.  *See also* Tabak Report, ¶ 61 ("All of the Event Dates associated with a statistically significant decline in Qualcomm's stock price involve the initiation of a legal or regulatory proceeding or the finding of certain facts by a regulatory body.").

      a)      **The Risk of Potential Regulatory and Legal Challenges to Qualcomm's Business Model Was Disclosed by the Company and Discussed by Market Participants**

179.    The possibility that Qualcomm's licensing practices could be challenged by regulators or other companies, and the possibility (*i.e.*, risk) that such challenges could result in a negative impact on the Company, were disclosed by Qualcomm and discussed by market participants before the alleged corrective disclosures.  Furthermore, before the alleged corrective disclosures, Qualcomm had already experienced a series of regulatory actions and civil litigations related to its licensing practices (among other issues).

180.    In particular, prior to and throughout the Proposed Class Period, Qualcomm disclosed the possibility that the Company could face challenges to its licensing model from regulators and other companies.  For example, Qualcomm explained these risks in its SEC filings, noting annually in its Form 10-Ks from 2008 through 2017 that:

> A small number of companies [] have initiated various strategies in an attempt to renegotiate, mitigate and/or eliminate their need to pay royalties to us.…  These strategies have included (i) litigation, often alleging infringement of patents held by such companies, patent misuse, patent exhaustion and patent and license unenforceability, or some form of unfair competition, … (iii) appeals to governmental authorities, … (v) lobbying with governmental regulators and elected officials.…  A number of these strategies are purportedly based on interpretations of the policies of certain SDOs concerning the licensing of patents that are or may be essential to industry standards and our alleged failure to abide by these policies.[336]

181.    Additionally, the Company disclosed not only the risk of such legal and regulatory challenges, but also the existence of ongoing legal proceedings, and provided updates regarding those matters.  For example, in its 2015 and 2016 Form 10-Ks, Qualcomm disclosed that:

> We are currently subject to litigation and various governmental investigations and/or proceedings, some of which may arise out of the strategies described above.[337]

---

[336] *See, e.g.*, 2011 10-K, pp. 15–16.
[337] 2015 10-K, p. 20.

182.    Qualcomm also discussed the possibility of negative outcomes as a result of legal challenges.  For example, the Company disclosed in its Form 10-Ks from 2008 through 2017 that:

> Some companies or entities have proposed significant changes to existing intellectual property policies for implementation by SDOs and other industry organizations, some of which would require a maximum aggregate intellectual property royalty rate for the use of all essential patents owned by all of the member companies to be applied to the selling price of any product implementing the relevant standard.… There is a risk that relevant courts or governmental agencies will interpret some or all of those proposals in a manner adverse to our interests.[338]

> Efforts by some communications equipment manufacturers or their customers to avoid paying fair and reasonable royalties for the use of our intellectual property … may result in legal decisions and/or action by foreign governments, Standard Development Organizations (SDOs) or other industry groups that harm our business.[339]

> We cannot be certain that the laws and policies of any country, including the United States, or the practices of any of the standards bodies, foreign or domestic, with respect to intellectual property enforcement or licensing … will not be changed in a way detrimental to our licensing program or to the sale or use of our products or technology.[340]

183.    When providing updates on legal and regulatory challenges, the Company discussed their potential negative impact.  For example, in its 2015 and 2016 Form 10-Ks, Qualcomm disclosed that:

> The unfavorable resolution of one or more of these matters could have a material adverse effect on our business, results of operations, financial condition and/or cash flows.  Depending on the type of matter, various remedies that could result from an unfavorable resolution include, among others, injunctions, monetary damages or fines or other orders to pay

---

[338] *See, e.g.*, 2011 10-K, p. 16.
[339] *See, e.g.*, 2011 10-K, p. 15 (emphasis removed).
[340] *See, e.g.*, 2011 10-K, p. 16.

money and the issuance of orders to cease certain conduct and/or modify our business practices.[341]

184.    Additionally, the litigation and regulatory investigations that were public prior to the Proposed Class Period discussed in **Section V.D** illustrated the possibility of ongoing challenges to Qualcomm's licensing model and the potential for resulting negative outcomes arising from those challenges.

185.    Furthermore, equity research analysts also discussed past and ongoing challenges to Qualcomm's business model.  In particular, equity research analysts commented on the possibility of negative outcomes in future legal disputes negatively impacting the Company:

> **Wachovia, 10/3/2007**:  Due to the nature of its business, Qualcomm's history has been plagued with legal matters.  The company appears to be constantly being challenged by competitors and even customers over patent and royalty issues.[342]

> **Morgan Keegan, 7/7/2009**:  From time to time, Qualcomm may need to rely on litigation to protect its intellectual property rights or may be forced to defend its IPR against claims asserted by other companies in the industry.  In either situation, Qualcomm could incur significant legal expenses.  Should a negative outcome be rendered, Qualcomm could potentially face a disruption in its businesses that could adversely impact customer relationships and potentially lead to a decrease in chipset and/or licensing revenue.  Indirectly, the sheer time involved in a legal case could divert management's attention from Qualcomm's core operations to the detriment of the company's financial performance.[343]

> **J.P. Morgan, 3/26/2010**:  [Qualcomm's] trading history demonstrates that Qualcomm perpetually needs to legally defend its ability to monetize its intellectual property.  Qualcomm therefore continually faces the risk of adverse legal judgments or adverse outcomes from arbitration with licensees.[344]

> **Piper Jaffray, 12/9/2010**:  Claims by other companies that QCOM infringes on their intellectual property or that patents on which it relies are invalid could adversely affect the company's business.  If QCOM does not

---

[341] 2015 10-K, p. 20; 2016 10-K, p. 22.
[342] "QCOM: Initiating with a Market Perform Rating," *Wachovia*, October 3, 2007, p. 2.
[343] "Initiating Coverage of Qualcomm Incorporated," *Morgan Keegan*, July 7, 2009, p. 36.
[344] "2010: Year of the Mobile Computer," *J.P. Morgan*, March 26, 2010, pp. 69–70.

prevail, given the complex technical issues and inherent uncertainties in intellectual property litigation, there could be downside to estimates.  An adverse ruling could have a significant negative impact on the company's licensing business.[345]

**Mizuho, 11/18/2013**:  It has been clear to us for many years that the company considers its intellectual property to be the core of the company.  Its defense of its business model – and patents – through the years have led to myriad legal entanglements and threats to split the company into a pure licensing model on one side and its operating parts on the other.[346]

**Morgan Stanley, 7/24/2014**:  [T]he company is unable to determine what negative outcomes could be—ranging anywhere from fines to mandated changes in business practice.[347]

**Bank of America Merrill Lynch, 11/6/2014**:  Legal issues pose risks to Qualcomm's core business model[:]  We met with carriers and equipment vendors in Beijing this week, and they all seem unified in the quest to change (reduce) Qualcomm's licensing structure. … [T]he current dispute with local players is just the first accord in a process that could potentially reduce the royalty rates, in our view.[348]

186.    Thus, as a result of Qualcomm's disclosures, as well as litigation and regulatory investigations prior to and during the Proposed Class Period, before the first alleged corrective disclosure, the market had access to information regarding litigation and regulatory risks involving Qualcomm's business model.

        **b)**    **Stock Price Declines Associated with Materialization of Risk Overstate Declines Attributable to an Allegedly Understated Risk and Therefore Overstate Inflation**

187.    Dr. Tabak's proposed damages approach relies on the use of residual stock price declines following alleged corrective disclosure dates to measure inflation.  However, when disclosures represent the materialization of an allegedly understated risk, the residual stock price decline as

---

[345] "Leader in Next Wave of Computing; Assuming Coverage at Overweight & $60 PT," *Piper Jaffray*, December 9, 2010, p. 4.
[346] "Initiating Coverage with Buy; LTE-A, TDD Investment to Pay-Off with 2014 Margin Recovery," *Mizuho*, November 18, 2013, p. 11.
[347] "China Royalty Collections Remain Challenging; Long-Term Earnings Potential Remains Largely Intact," *Morgan Stanley*, July 24, 2014, p. 1.
[348] "Issues on Multiple Fronts; Spots of Weakness," *Bank of America Merrill Lynch*, November 6, 2014, p. 1.

estimated by an event study when the risk is realized will overstate the price decline that would have occurred had the true degree of the understated risk been disclosed earlier.  In other words, the residual stock price decline upon materialization of the risk will overstate inflation.  A damages approach to address the materialization of risk therefore needs to include a methodology for separating the impact of the allegedly understated risk (if any) from the impact of the materialization of the risk.

188.    I illustrate this point using a simple hypothetical example.  Assume that investors believe, based on a company's public disclosures, that there is a 20% chance of an adverse regulatory action against a company that will result in a $1 million fine.  Assume further that the company has fully disclosed the risk of regulatory actions and had not concealed any other information about its business practices.  Prior to learning the outcome, the company's market value would reflect the expected loss of $200,000 from the regulatory action (20% chance of a $1 million fine).  If the regulator then announced its investigation and the resulting fine, the company's stock price would decline to incorporate the additional $800,000 loss corresponding to the difference between the realized loss of $1 million due to the fine and the previously expected loss of $200,000.  In this example, the company disclosed the risk and the shareholders were informed of it.  The risk materialized, and the shareholders incurred a loss of $800,000. However, the observed loss is completely uninformative about damages to shareholders stemming from any alleged misrepresentations.  In fact, in this example, there were no misrepresentations, no damages, and nevertheless a loss of $800,000 occurred.  Suppose now that instead of fully disclosing the risk of the regulatory action, the company understated the risk by representing it to be only 10%.  Under this scenario, the company's market value would reflect the expected loss of only $100,000 from the regulatory action prior to the risk materializing.  Once the investigation is announced, the company's stock price would decline to incorporate not an $800,000 loss, but a $900,000 additional loss.  However, only the incremental loss of $100,000 would be caused by the company's understatement of the risk—in other words, without the risk being understated, there would still have been an $800,000 loss as above. Importantly, price inflation cannot be measured from the decline in the stock price when the risk materializes and becomes a certainty (the $900,000 decline), because the decline reflects both the price reaction to the materialization of the disclosed portion of the risk as well as the portion of

risk that was understated.  Further, any damages approach that uses only the decline in the stock price to measure the loss to shareholders ($900,000 in this example) would incorrectly conclude that damages were about nine times greater in this hypothetical example than the actual out-of-pocket inflation damages suffered by shareholders ($900,000 vs. $100,000).[349]

189.    Consistent with this example, in his prior writing, Dr. Tabak has noted that:

> To properly calculate the level of artificial inflation in a security's price at earlier points in time, it is necessary to adjust that price decline to reflect only the information that could have been revealed earlier.  Thus, if before the disclosure of the realization of a risk defendants could only have disclosed that such a risk existed, but not that it would necessarily come to pass, the price decline measured upon realization and disclosure of the risk must be adjusted for the prior probability that the risk would have eventually been realized.[350]

### c)    Dr. Tabak Has Not Proposed a Methodology That Could Estimate the Degree to Which Risk Was Understated

190.    Despite acknowledging in his prior writing that "the price decline measured upon realization and disclosure of the risk must be adjusted for the prior probability that the risk would have eventually been realized,"[351] Dr. Tabak offers no discussion whatsoever of how he might undertake such an adjustment.

191.    Indeed, in an article for the *Securities Reform Act Litigation Reporter*, Dr. Tabak describes in detail various analytical steps to estimate inflation associated with materialization of risk, including "(1) Determin[ing] which risks were required to be disclosed; (2) Measur[ing] the

---

[349] Another way to understand this is with an example of a random experiment.  Imagine that a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red.  If the company drew a red marble, it would have to pay $1 million.  Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000.  If the company subsequently drew a red marble, the market value would have fallen $990,000 to reflect the new information—the certainty of a $1 million loss.  If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would still have fallen when the company drew a red marble.  In order to understand the value implication of the company's misstatement that there was only one red marble, the relevant issue is what the market value would have been, prior to the drawing, had the company told the truth.  In this case, the market value would have reflected an expected loss of $20,000, only $10,000 lower than the actual market value, not the $990,000 less that would be implied by looking at the reaction to the drawing of a red marble.  It is important to note that this example holds even if the company stated that there were *no* red marbles, or if the company also misrepresented the dollar amount to be paid if it drew a red marble.

[350] D. Tabak (2006), "Risk Disclosures and Damages Measurement in Securities Fraud Cases," *Securities Reform Act Litigation Reporter*, 21(1), pp. 6–10, available at https://www.nera.com/content/dam/nera/publications/archive1/PUB_RiskDisclosures_1067.pdf ("Tabak (2006)") at p. 9.

[351] Tabak (2006), p. 9.

price decline on disclosure of the realization of the risk; (3) Estimat[ing] the probability at earlier dates that the risk would eventually be realized; and (4) Us[ing] the probability to estimate the artificial inflation in the security's price."[352]  On the other hand, in his report, Dr. Tabak does not describe how he would implement such an analysis given the particularities of this matter or whether doing so would even be possible.

192.    However, if, as Plaintiffs allege, Qualcomm understated the degree to which it was at risk of regulatory investigations and other legal actions, then in order to reliably estimate inflation an expert would need to assess (i) the true risk (probability) over time, and (ii) the degree to which the risk was known to market participants.  An event study, which is a methodology that can be used to assess whether the totality of new information arriving to the market over a specific event window affected the stock, does not provide a means to estimate either of these.  Moreover, in his prior writing, Dr. Tabak has noted the challenges in performing such an analysis, writing that "estimat[ing] the likelihood that the market would have assigned to the risk being realized, had all required information been properly disclosed" will require an analysis that is "highly case specific" and may involve "analysis of the frequency of similar events" and analysis of "[p]ost-disclosure analyst and news commentary."[353]

193.    Dr. Tabak has not proposed any methodology that could measure the degree to which the risk was allegedly understated here (if at all).  In addition, he establishes no basis to conclude that such allegedly understated risk would have remained constant over the Proposed Class Period, which presents a further complication to measuring the understated risk.

194.    Equity research analysts in fact commented on the evolving regulatory landscape during the Proposed Class Period, which is consistent with the risk not being constant over time, and noted that regulatory actions were becoming more likely following China's NDRC investigation.  For example, in response to the NDRC investigation, equity research analysts commented on the possibility of other regulators following China, and device makers pushing for similar deals.[354]

---

[352] Tabak (2006), p. 6.
[353] Tabak (2006), p. 8.
[354] In response to the reduced royalty rate in the settlement, a Morningstar report commented "the rate cut doesn't fully slam the door on the possibility of other regions trying to force Qualcomm into similar deals in the future."  Macquarie commented that "[w]hile the near term impact to financials appears to be limited, we expect the favourable licensing terms in China will likely be used as leverage in future negotiations by both OEMs and other governments which could pressure royalty rates in the future."  A report from CSLA noted that "[t]he question now is if government agencies will look at the NDRC settlement as a basis to push Qualcomm to lower the rates in other regions."  Northland Capital Markets also commented that "[t]here is considerable concern that the United States or the European Union, among others, may use this agreement to tackle QCOM in other courts."  *See*

Additionally, following the KFTC's announcement on February 12, 2015 that it was considering investigating Qualcomm for alleged misuse of its dominant market position, a Bernstein Research analyst commented that "it is likely that the China investigation sparked the renewed Korean effort (as well as the U.S. [effort])."[355]  The Bernstein Research analyst further noted that "investors should prepare themselves for the potential of more investigations to be announced down the road in other jurisdictions."[356]  Likewise, later in 2015, a J.P. Morgan report noted that the "charges against Qualcomm seem to be multiplying globally though we believe many of these investigations have been prompted by others."[357]  Similarly, in 2017 a Northland Capital Markets report noted that the "FTC is joining the worldwide chorus sparked by China."[358]

195.    Consistent with equity research analyst commentary, regulatory developments can impact the allegedly understated risk and the market's perception of risk.  In particular:

>   a.  Investigations in Japan, Korea, China, and the EU had all taken place prior to the investigations associated with the alleged corrective disclosures, and some of these earlier regulatory investigations included allegations similar to those at issue.[359]
>
>   b.  The alleged corrective disclosures were not the first time the market learned about some of the specific regulatory investigations regarding the alleged corrective disclosures in this matter.  The EC, FTC, and KFTC investigations had each been disclosed prior to the actual alleged corrective disclosure events.[360]

---

"China Antitrust Ruling Meets Our Expectations, Validates Qualcomm's IP, Maintaining Fair Value," *Morningstar*, February 10, 2015, p. 1; "If Only That Were the End to That Story," *Macquarie*, February 10, 2015, p. 1; "Settling with the NDRC," *CLSA*, February 10, 2015, p. 3; "The Chinese Resolution," *Northland Capital Markets*, February 10, 2015, p. 1.

[355] "South Korea's Fair Trade Commission Considering Qualcomm Probe," *Wall Street Journal*, February 12, 2015, available at https://www.wsj.com/amp/articles/BL-KRTB-7414; "Qualcomm (QCOM): TANSTAAFL?," *Bernstein Research*, February 19, 2015, p. 3.

[356] "Qualcomm (QCOM): TANSTAAFL?," *Bernstein Research*, February 19, 2015, p. 3.

[357] "QCOM Regulatory Troubles, OLED Report, Taiwanese ODM Report and More…," *J.P. Morgan*, December 9, 2015, p. 1.

[358] "QCOM – The FTC Looking for Its Pound of Flesh," *Northland Capital Markets*, January 18, 2017, p. 1.

[359] For example, the EC first began formal proceedings against Qualcomm in 2007, following earlier complaints from six companies alleging that Qualcomm had violated competition laws with its licensing practices.  The NDRC, China's regulatory authority, investigated Qualcomm in 2013 for potential breach of China's Anti-Monopoly Law, involving "the Company's licensing business and certain interactions between the Company's licensing business and its chipset business, including how royalties are calculated in the Company's patent licenses[,] … the Company's policy of selling chipsets only to the Company's patent licensees, the alleged refusal of the Company to grant patent licenses to chipset manufacturers, and certain other terms and conditions in the Company's patent license and chipset sale agreements."  *See* "Korea, Japan, and Europe – How Much Impact Might Recent Antitrust Rulings Have?," *Bernstein Research*, July 29, 2009, p. 6; Q3 2014 10-Q, pp. 12–13.

[360] On November 5, 2014, Qualcomm disclosed the EC and FTC investigations in its 2014 10-K, noting that the EC was investigating Qualcomm's financial incentives for chip customers and the FTC was investigating Qualcomm's licensing business and possible FRAND violations.  *See* 2014 10-K, pp. 25, 27.  Similarly, the KFTC investigation had been announced prior to the

c. The EC, TFTC, and KFTC actions that Plaintiffs allege as corrective disclosures
   earlier in the Proposed Class Period, and which preceded the FTC action and
   Apple litigation at the end of the Proposed Class Period, also included allegations
   related to the company's licensing and alleged bundling practices.[361]

196.   Furthermore, specific to the bundling practices Plaintiffs allege, Dr. Tabak has not
explained how his damages methodology can account for the public discussion of prior
allegations both before and during the Proposed Class Period and how this discussion would
have affected the extent, if at all, that the risk was understated and how that may have changed
over time.  For example:

a. The EC investigation into Qualcomm's business practices from 2007 to 2009
   investigated whether Qualcomm "unfairly tied chipset sales and royalties, offering
   discounted royalties to handset vendors that agree to purchase Qualcomm
   chipsets."[362]

b. Qualcomm's dispute with Broadcom from 2005 to 2009 involved, among other
   allegations, Broadcom's claim that Qualcomm engaged in "discrimination [of
   licensing terms] based on whether [] manufacturers also agree to purchase
   Qualcomm chipsets," and "provided cell phone manufacturers substantial
   payments or other economic incentives to not use chipsets from a competitor."[363]

c. In the 2009 KFTC investigation into possible anti-competitive practices, the
   KFTC found that "'[w]hen licensing its CDMA mobile technology, Qualcomm
   levied higher royalties on companies that used modem chips supplied by rival

---

first alleged corrective disclosure.  On November 4, 2015, in its Q2 2015 10-Q, Qualcomm noted that the KFTC was conducting an investigation into the Company's licensing business.  *See* Q2 2015 10-Q, p. 14.

[361]  For example, the EC investigation examined whether Qualcomm had "illegally paid a major customer for exclusively using its chipsets."  The TFTC investigation examined whether Qualcomm had "violated a FRAND licensing commitment by declining to grant licenses to chipset makers," "declined to sell chipsets to unlicensed potential customers," and "provided royalty rebates to certain companies in exchange for their use of the Company's chipsets."  The KFTC investigation had examined and found that Qualcomm "refused or restricted the provision of cellular SEP licenses that are essential for the chipset manufacture and sales," "coerced the execution and performance of unfair license agreements by linking the chipset supply with patent licensing agreements," in particular by "demand[ing] the execution and performance of license agreements with QTL … while selling modem chipsets to handset companies," and had "provided handset companies with only comprehensive portfolio licenses."  *See* "Antitrust: Commission Sends Two Statements of Objections on Exclusivity Payments and Predatory Pricing to Qualcomm," EC Press Release, December 8, 2015; 2016 10-K, p. F-27; "Strict Sanctions on Qualcomm's Abuse of Cellular SEPs," KFTC Press Release (Unofficial English translation), December 28, 2016, pp. 2, 5, 6.

[362]  "QCOM: Antitrust Attorney Sheds Light on EU Complaint; Process Likely to Take 2+ Years, with Little Near-Term Impact," *Prudential Equity Group*, November 8, 2005, p. 3.  The EC closed the investigation after the complainants withdrew their complaints.  *See* "Antitrust: Commission Closes Formal Proceedings against Qualcomm," EC Press Release, November 24, 2009.

[363]  Complaint, *In Re Broadcom Corporation v. Qualcomm Incorporated*, United States District Court for the District of New Jersey, Case No. 05-3350-MLC, July 1, 2005, ¶¶ 14, 16.

companies.'"[364]  The KFTC press release further specified that "[o]ne company purchased over 85% of the modem chips from Qualcomm, and the US-based chipmaker in turn offered a rebate of 3% on the purchase."[365]

d.  Discussion among market participants continued into and throughout the Proposed Class Period, in particular with the November 2013 NDRC investigation into Qualcomm's business practices.[366]  With respect to the NDRC investigation, Qualcomm disclosed in its SEC filings in 2014 that the investigation concerned "certain interactions between the Company's licensing business and its chipset business," including "the Company's policy of selling chipsets only to the Company's patent licensees."[367]

e.  Additionally, later in the Proposed Class Period, in July 2016 (*i.e.*, prior to the KFTC findings, FTC, and Apple alleged corrective disclosures), Qualcomm disclosed that one of the allegations from the TFTC was that "the Company provided royalty rebates to certain companies in exchange for their exclusive use of the Company's chipsets."[368]

197.  The discussion above strongly suggests that the allegedly understated risk (if any), which Plaintiffs assert was the driver of price inflation, would not have been constant over time through the Proposed Class Period.  Nevertheless, Dr. Tabak has not shown that he has a methodology that would allow him to assess whether there were changes in the allegedly understated risk and to account for such changes if they did occur.  More generally, despite acknowledging the potential challenges of estimating damages for materialization-of-risk events in his prior writing,

---

[364] "South Korea Fines Qualcomm $208 Million in Anti-Trust Case," *Reuters*, July 23, 2009, available at https://www.reuters.com/article/us-qualcomm-korea/south-korea-fines-qualcomm-208-million-in-anti-trust-case-idUKTRE56M29T20090723.

[365] "Qualcomm's Abuse of Market Dominance," KFTC Press Release, July 23, 2009, p. 2.

[366] "China's National Development and Reform Commission Notifies Qualcomm of Investigation," Qualcomm Press Release, November 25, 2013.  Following the announcement of the investigation, equity research analysts noted their belief that "bundling patents with chip sales" was one of the issues under investigation by the NDRC.  *See* "More Detail on China IPR Issues," *BMO Capital Markets*, August 14, 2014, p. 4.  *See also* "China Starts Anti-Monopoly Investigation," *UBS*, November 25, 2013, p. 1 ("The investigation was driven by the accusation that Qualcomm charged higher royalty to companies that did not use its chips.").  I understand that Qualcomm was not required to alter its policy with respect to this issue as part of the investigation's resolution.  *See* "Qualcomm and China's National Development and Reform Commission Reach Resolution," Qualcomm Press Release, February 9, 2015.

[367] Q3 2014 10-Q, pp. 12–13.

[368] Q3 2016 10-Q, p. 17.

Dr. Tabak does not even attempt to propose a methodology that could account for the particular circumstances of this case, including for the likely time variation in risk.

### 2. Dr. Tabak's Proposed Damages Approach Implausibly Relies on Plaintiffs Being Able to Demonstrate That the Actions by Various Regulators and Litigation by Apple Were Inevitable

198.    As I discuss below, instead of articulating a methodology that could address materialization-of-risk events, Dr. Tabak's proposed approach rests on the implausible assumption that Plaintiffs will be able to demonstrate that the actions by various regulators and litigation by Apple that actually occurred would have been assessed by the market to be inevitable at the beginning of the Proposed Class Period had Qualcomm disclosed the alleged truth regarding its business practices at that time.  Dr. Tabak offers no methodology whatsoever to assess whether those events were in fact inevitable (and there is no basis to assume they were) or to calculate damages if the assumption of inevitability does not hold.  Indeed, Dr. Tabak is *completely silent* with respect to describing a damages methodology that can accommodate materialization of risk if Plaintiffs cannot show that the actions by various regulators and litigation by Apple that actually occurred would have been inevitable and assessed as such by the market.

199.    Dr. Tabak states if "Plaintiffs' loss-causation theory is viewed as 'materialization of the risk,'" his understanding is that "Plaintiffs will attempt to show that Qualcomm's allegedly misrepresented licensing and bundling practices would *inevitably* lead to the regulatory and customer scrutiny from those practices that caused Plaintiffs' losses on the Event Dates."[369]  His proposed methodology therefore relies on "inevitability" being demonstrated.  He asserts that *if* "Plaintiffs are able to make such a showing," *then* "the statistically significant declines in Qualcomm's stock price on the Event Dates would be used to measure investors' damages under a materialization-of-the-risk theory, while once again accounting for any causes of the price declines on the Event Dates unrelated to the allegations."[370]

---

[369] Tabak Report, ¶ 64 (emphasis added).
[370] Tabak Report, ¶ 64.

200. That is, Dr. Tabak's proposed solution to the hypothetical under which "Plaintiffs' loss-causation theory is viewed as 'materialization of the risk'" is circular, essentially assuming that there *was no risk*, and instead there was only certainty. Put differently, Dr. Tabak effectively asserts that no change to the generic methodology he proposes would be necessary under the presumption that Plaintiffs can prove that the risks that materialized on the alleged corrective disclosure dates would have been predictable with 100% certainty had Qualcomm disclosed its allegedly concealed business practices at the beginning of the Proposed Class Period. Such an approach circumvents the need to assess the probability of risks materializing over time by simply assuming that the risks were not risks at all, but rather certainties.

201. Critically, Dr. Tabak does not offer any methodology to assess inevitability. He does not propose to assist the finder of fact with any economic analysis to evaluate the supposed inevitability of regulatory and customer legal actions against Qualcomm, even though the assumption of inevitability is critical to his proposed approach. Notably, in his prior writing Dr. Tabak has specifically highlighted the role for an expert in assisting the finder of fact in "[e]stimat[ing] the probability at earlier dates that the risk would eventually be realized."[371]

202. In fact, the circumstances of this case (alleged corrective disclosures comprising several regulatory actions and litigation by a major customer, all occurring at different points in time and in the context of an evolving and uncertain environment as discussed in **Section VIII.B.4**) make it implausible that the actions by various regulators and litigation by Apple that actually occurred *would* have been assessed by the market as *inevitable* had Qualcomm disclosed the alleged truth of its business practices at the beginning of the Proposed Class Period. In order for *inevitability* to be established, one would need to show that a hypothetical disclosure by Qualcomm of the alleged truth regarding its business practices at the start of the Proposed Class Period would have led the market price to immediately react in the manner it ultimately reacted following the alleged corrective disclosures years later.

---

[371] Tabak (2006), p. 8 ("With some effort, and perhaps luck, the information to make such a determination will be available. If not, one can allow the trier of fact to make such a determination in a subjective manner…. In that case, the goal is to provide the trier of fact with sufficient information to make an informed decision as to the general magnitude of the probability (e.g., was the realization of the risk nearly inevitable, close to 50:50, or trivially small?) and to allow them to come up with a probability that reasonably expresses this information.").

203.    However, this is at odds with commentary by market analysts.  Notably, far from being inevitable, equity research analysts noted the difficulty of predicting the outcomes of litigation and regulatory investigations.  For example:

    a.    Lazard noted in a 2006 report, "[l]itigation outcomes are difficult to predict.… Although we believe that Qualcomm generally has fair and reasonable business practices, the outcome of such litigation is always difficult to predict."[372]

    b.    Discussing the Broadcom and Nokia litigation in 2008, Credit Suisse noted that "[t]he resolution of these is hard to predict and could in the worst case disrupt the company's chipset business and licensing arm."[373]

    c.    An FBR Capital Markets report in 2009 noted that "the firm's legal front remains active, with Broadcom litigation and antitrust-related investigations in Europe, Korea, and Japan.  It is difficult to predict any legal outcome."[374]

204.    Further, even assuming that Plaintiffs *are* somehow able to show that actions by various regulators and litigation by Apple against Qualcomm regarding its allegedly misrepresented licensing and alleged bundling practices generally would have been inevitable in some form at some point in time, it does not follow that the *particular manifestations* of the events that materialized on the alleged corrective disclosure dates would have been assessed by the market with certainty.  In other words, for Dr. Tabak to be able to use the statistically significant residual price declines in Qualcomm's stock on the alleged corrective disclosure dates to measure investors' damages, if any, Dr. Tabak needs to assume (and Plaintiffs need to demonstrate) that had Qualcomm disclosed the at-issue practices at the beginning of the Proposed Class Period, the market would then have known with 100% certainty that the regulatory agencies and Apple would take the actions they did *and* what the impact of the actions would be—or alternatively would need to be able to reliably demonstrate that other hypothetical regulatory and litigation actions that would purportedly have been inevitable would have had the *same* value implications (and therefore impact on damages) as what actually occurred on the alleged corrective disclosure dates.

---

[372] "QCOM: Leading the Wireless Revolution; Initiating Coverage with BUY Rating; $63 Price Target," *Lazard Capital Markets*, April 26, 2006, p. 7.
[373] "Growth and Leverage… More to Come," *Credit Suisse*, June 26, 2008, p. 15.
[374] "Riding the 3G Wave – Initiating Coverage at Outperform," *FBR Capital Markets*, April 7, 2009, p. 6.

205.    Consistent with the above discussion showing that inevitability cannot be plausibly assumed, the FTC Complaint that is the subject of the fourth alleged corrective disclosure in this case was only filed following a reportedly contentious two-to-one vote of FTC commissioners.[375] In particular, Commissioner Maureen Ohlhausen issued a dissenting statement characterizing the decision to sue Qualcomm as "an enforcement action based on a flawed legal theory … that lacks economic and evidentiary support, that was brought on the eve of a new presidential administration, and that, by its mere issuance, will undermine U.S. intellectual property rights in Asia and worldwide."[376]  As discussed previously, on August 11, 2020, the Ninth Circuit found that "Qualcomm's practice of licensing its SEPs exclusively at the OEM level does *not* amount to anticompetitive conduct."[377]  In light of the lack of unanimous agreement by FTC commissioners that any FTC enforcement action should even have been taken against Qualcomm, and my understanding that the allegations themselves were later determined to be unfounded by the Ninth Circuit, there is no established basis for Dr. Tabak to suggest that it will be proven that the FTC action would be deemed by the market to be *inevitable* given some earlier hypothetical disclosure by Qualcomm.  Indeed, as discussed in **Section VIII.B.4**, rather than being constant (and inevitable), there is reason to conclude that the prospect of various global regulators pursuing action against Qualcomm was uncertain and that the probability of such action likely increased over the course of the Proposed Class Period due to changing regulatory sentiment following the action by China's NDRC.

206.    Under similar logic, Dr. Tabak has no basis to suggest that it will be proven that market participants would have judged the EC's ultimate actions to be inevitable, given some earlier hypothetical disclosure by Qualcomm, *especially* in light of the previously mentioned reversal of the EC's ruling by the European General Court in June 2022.[378]  The June 2022 judgment

---

[375] "FTC Charges Qualcomm with Monopolizing Key Semiconductor Device Used in Cell Phones," Federal Trade Commission Press Release, January 17, 2017.
[376] Dissenting Statement of Commissioner Maureen K. Ohlhausen, *In the Matter of Qualcomm, Inc.*, File No. 141-0199, January 17, 2017, p. 1.  *See also* "Our Take on the FTC's Anticompetitive Stand against Qualcomm," *William Blair*, January 18, 2017, p. 2 ("[T]he current FTC panel is currently made up of three commissioners and has two vacancies.…  In the Qualcomm complaint, the two Democratic commissioners supported the case and the lone Republican commissioner, Maureen Ohlhausen, voted against the complaint and published a rare dissenting statement."); "Qualcomm (QCOM): The FTC Files – A Knife in the Heart, or Just a Paper Cut?" *Bernstein Research*, January 18, 2017, p. 2 ("Interestingly, one of the Commissioners (Republican Maureen Ohlhausen) issued a rather scathing dissenting statement of the suit.").
[377] *FTC v. Qualcomm* Appeals Court Opinion, pp. 55–56 (emphasis added).
[378] Judgment of the General Court, *Qualcomm Inc. v. European Commission*, The General Court (Sixth Chamber, Extended Composition), Case T-235/18, June 15, 2022, ¶¶ 414, 417, available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:62018TJ0235&from=GA.

reversed the EC's December 8, 2015 finding that Qualcomm's payments to Apple for exclusive use of Qualcomm baseband chips "harmed competition and innovation in the markets for UMTS and LTE baseband chips."[379]  As discussed previously, in its public June 2022 judgment, the European General Court noted that "it could not legitimately conclude that the payments concerned had reduced Apple's incentives to switch to the applicant's competitors for all of its requirements covering all iPhones and iPads to be launched" and that "the Commission's conclusion … is based on an analysis which was not carried out in the light of all the relevant factual circumstances and which is, on that ground, unlawful."[380]  As with the FTC example, in light of my understanding that the allegations themselves were later determined to be unfounded by a court, Dr. Tabak does not address why it is reasonable to assume that it will be shown that the EC action would be deemed by the market to be *inevitable* given some earlier hypothetical disclosure by Qualcomm.

207.    It is also similarly unfounded for Dr. Tabak to suggest that it can be shown that market participants would have viewed the litigation by Apple as inevitable had Qualcomm disclosed the alleged truth of its business practices at the start of the Proposed Class Period.  For example, a number of equity research analysts discussed the Apple lawsuit as being related to Apple's license renegotiation process with Qualcomm, which had reached an impasse shortly before the Apple Complaint was filed.  A BMO Capital Markets analyst noted that "[b]oth sides seem to have offered deals, but no agreement has been reached" and that the expiration of licensing agreements "helped catalyze the lawsuit in question."[381]  An equity research analyst from Mizuho also noted that "after taking a look at the Apple litigation filing, we believe that QCOM's IP licensing or BCPA (Business cooperation and patent agreement) potentially expired on [December 31], 2016, positioning Apple for a renegotiation and hence the timing of the

---

[379] "Antitrust: Commission Sends Two Statements of Objections on Exclusivity Payments and Predatory Pricing to Qualcomm," EC Press Release, December 8, 2015.  The decision was officially adopted on January 24, 2018 when the Commission concluded that "Qualcomm held a dominant position in the global market for LTE baseband chipsets" and that Qualcomm "abused this market dominance by preventing rivals from competing in the market" and fined the Company €997 million.  *See* "Antitrust: Commission Fines Qualcomm €997 Million for Abuse of Dominant Market Position," EC Press Release, January 24, 2018.
[380] Judgment of the General Court, *Qualcomm Inc. v. European Commission*, The General Court (Sixth Chamber, Extended Composition), Case T-235/18, June 15, 2022, ¶¶ 414, 417, available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:62018TJ0235&from=GA.
[381] "Clash of the Smartphone Titans," *BMO Capital Markets*, January 22, 2017, pp. 1, 3.

litigation."[382]  Indeed, Apple and Qualcomm had a number of agreements over the years, one of which expired on December 31, 2016 (*i.e.*, less than one month before Apple filed its suit against Qualcomm).[383]  Therefore, to the extent the Apple litigation was at least in part driven by a renegotiation with Qualcomm, there is no basis for Dr. Tabak to suggest that it can be shown that the litigation would have been inevitable.  Additionally, Apple noted in its complaint that it was not able to use Intel as an alternative chip supplier until September 2016, and was wholly reliant on Qualcomm for its chips prior to that time, which raises a question of whether Apple's lawsuit would have been assessed as inevitable earlier in the Proposed Class Period, given some earlier hypothetical disclosure by Qualcomm.[384]  Furthermore, the Apple Complaint included allegations—such as the allegation that in 2016 Qualcomm "had attempted to extort Apple into rescinding its truthful testimony to Korean antitrust authorities by withholding contractual royalty rebate payments due to Apple"[385]—that followed from events that occurred *during* the Proposed Class Period and therefore *could not* have been inevitable at the start of the Proposed Class Period.

208.    Finally, Dr. Tabak has no basis to assume that the value implications of the various regulatory and civil actions would have been fully anticipated had the at-issue practices been disclosed at the beginning of the Proposed Class Period.  Since the impact of regulatory and civil actions is likely dependent on the size of the business being affected by these actions, Dr. Tabak's inevitability assumption essentially presupposes foresight regarding how Qualcomm would evolve as a business over the five-year Proposed Class Period.  In fact, the size of Qualcomm's business would be expected to depend, among other things, on the volume of handset sales from which Qualcomm accrued licensing revenues.  This changed during the Proposed Class Period—for example, Apple's iPhone sales more than doubled from the quarter ending March 31, 2012 (approximately the beginning of the Proposed Class Period) through the

---

[382] "A Second Take on the Apple Litigation," *Mizuho*, January 24, 2017, p. 1 ("In the case of Apple versus QCOM, after taking a look at the Apple litigation filing, we believe that QCOM's IP licensing or BCPA (Business cooperation and patent agreement) potentially expired on Dec-31, 2016, positioning Apple for a renegotiation and hence the timing of the litigation.")
[383] Apple Complaint, ¶¶ 101, 108–112.
[384] Apple Complaint, ¶ 94 ("It was only with the iPhone 7—released in September 2016—that Apple was able to use a competitor's chipsets (Intel's) as well as Qualcomm chipsets in its cellular-enabled devices."). *See also* FTC Complaint, ¶ 45 ("Intel has had even more limited LTE baseband processor sales and achieved modest success in premium LTE baseband processor supply only recently, when it began to supply a portion of Apple's baseband processor requirements for the iPhone 7.").
[385] Complaint, ¶ 228; Apple Complaint, ¶¶ 176–180.

quarter ending December 31, 2016, from 35.1 million units (corresponding to sales of $22.7 billion for Apple) to 78.3 million units (corresponding to sales of $54.4 billion for Apple).[386]  Dr. Tabak has no basis to assume that the evolution of Qualcomm's business, and the impact of this evolution on the value implications of the various regulatory and civil actions, would have been foreseeable at the start of the Proposed Class Period.

209.    In sum, as the above discussion illustrates, Dr. Tabak's suggestion that inevitability will be established is contradicted by the specific circumstances and allegations in this litigation, including market commentary regarding the inherent uncertainty of developments and outcomes in regulatory actions and litigation against Qualcomm.  Dr. Tabak has not proposed any methodology to calculate damages if the alleged corrective disclosures represented materialization of allegedly understated risks, and the actions by various regulators and litigation by Apple on the alleged corrective disclosure dates were, in fact, not inevitable.  This is a particularly problematic omission because Dr. Tabak's eventual inability to account for this means that the damages methodology would not account for the stock price impact of the alleged misrepresentations alone, as I understand it needs to do.

Executed this 22nd day of July, 2022

_____

René M. Stulz, Ph. D

---

[386] Apple, Inc., Form 10-Q for Q2 2012, filed February 25, 2012; Apple, Inc., Form 10-Q for Q1 2017, filed February 1, 2017.

**EXHIBIT 1**

**René M. Stulz**

Fisher College of Business
806 Fisher Hall
2100 Neil Avenue
Columbus, OH 43210-1144
Phone: (614) 292-1970
Fax:    (614) 292-2359
E-mail: stulz.1@osu.edu

Home Address:
3419 River Seine Street
Columbus, OH 43221
Phone: (614) 771-1110
Cell:   (614) 206-0265

## UNDERGRADUATE STUDIES

University of Neuchâtel, Switzerland, Licence es Sciences Économiques, 1975.

## GRADUATE STUDIES

London School of Economics, 1975-1976, Visiting Graduate Student.

Massachusetts Institute of Technology (MIT), 1976-1980, Ph.D. in Economics.

## ACADEMIC APPOINTMENTS

Ohio State University, Everett D. Reese Chair of Banking and Monetary Economics, 1996 to present.

University of Southern California, Visiting Professor, 2007.

University of Chicago, Visiting Professor, Stigler Center, 2003-2004.

Northwestern University, Visiting Scholar, Kellogg School of Management, 2003-2004.

Harvard University, Business School, August 1996 to July 1997, Bower Fellow.

Ohio State University, Director of the Dice Center for Research in Financial Economics, 1995 to present.

Ohio State University, Ralph Kurtz Chair in Finance, 1993-1996.

Ohio State University, Riklis Chair in Business and its Environments, 1988-1993.

Ohio State University, Professor of Finance, 1985 to present.

**EXHIBIT 1**

University of Chicago, Visiting Professor of Finance, 1986-1987.

Massachusetts Institute of Technology, Visiting Associate Professor of Finance, Fall 1985.

Ohio State University, Associate Professor of Finance, 1983-1985.

University of Rochester, Assistant Professor of Finance and Economics, 1980-1983.

## OTHER POSITIONS

Research Associate, National Bureau of Economic Research (Asset Pricing Group and Corporate Finance Group).

Director, NBER Group on the Risks of Financial Institutions, 2005 to present.

Chairman, Scientific Council, Swiss Finance Institute, 2006 to 2019.

Finance Research Advisory Committee, Office of Financial Research, U.S. Treasury, 2016 to 2019.

Board of Directors, American Finance Association, 1988 to 2000, 2002 to 2006.

Consultant to the World Bank, the IMF, the NYSE, Federal Reserve Bank of New York, corporations, and law firms.

Expert testimony in federal courts, state courts, and domestic and international arbitrations.

Taught executives in Europe, Asia and North America (open enrollment as well as for corporations, courses on risk management, banking, derivatives, corporate valuation, investments).

Advisory Committee, Morningstar, 2000-2002.

Director, Banque Bonhôte, 2002 to 2020.

Director, Wegelin Fund Management, 1999 to 2010.

President, Gamma Foundation, 2002 to 2013.

Director, Community First Financial Group, Inc., 2001 to 2010.

Director, Peninsula Banking Group, Inc., 2001 to 2010.

Trustee, Global Association of Risk Professionals, 2002-2020; executive committee, 2004-2011; chair of governance committee, 2011-2020; vice-chair, 2017-2019.

**EXHIBIT 1**

Vice-Chairman, Board of Trustees, Global Association of Risk Professionals, 2019-2020.

Chairman, Financial Risk Management Examination Certification Committee, Global Association of Risk Professionals, 2002 to 2020.

Chairman, New York Federal Reserve Bank/GARP Global Risk Forum (2011, 2013, 2016, 2019), Bank of England/GARP Global Risk Forum (2012, 2014, 2017, 2020), Hong Kong Monetary Authority/GARP Global Risk Forum (2013, 2015).

International Advisory Committee, NCCR, 2002 to 2011.

External Reviewer, London Business School Finance Department, 2005.

Financial Advisory Roundtable (FAR), Federal Reserve Bank of New York, 2006 to 2010.

Guest Contributor, Harvard Law School Corporate Governance Blog.

Squam Lake Group, member, 2008 to present.

Senior Academic Fellow, Asia Bureau of Finance and Economic Research, 2012 to present.

Fellow, Wharton Center for Financial Institutions, 2013 to present.

Nominating Committee, American Finance Association, 2016, 2018.


**HONORS, SCHOLARSHIPS AND FELLOWSHIPS**

Advanced Researcher Fellowship, Swiss National Science Foundation, 1978-1980.

Dean's Research Professorship, Ohio State University, Spring 1984.

Pacesetter Research Award, Ohio State University, April 1986.

President-Elect (1993) and President (1994), International Economics and Finance Society.

Docteur Honoris Causa, University of Neuchâtel, Switzerland, 1998.

Eastern Finance Association Scholar Award, 1998.

Selected keynote speeches: ABFER, Asia-Pacific Finance Association, Bank of the Netherlands Governance Conference, Bocconi Derivatives Annual Conference, Drexel Corporate Governance Conference, Eastern Finance Association, European Corporate Finance Institute, European Finance Association, Financial Management Association, European Financial Management Association, Financial Management Association European Conference, FDIC Annual Conference, Rising Stars Conference, Fourth Annual Conference on Asia-Pacific Financial

**EXHIBIT 1**

Markets of the Korean Securities Association, French Finance Association, German Finance Association, Infiniti Conference, Notre Dame/SEC Conference, Northern Finance Association, Swiss Banking Association 100th Anniversary Conference, Western Finance Association, World Finance Conference, China International Conference in Finance, South Carolina Conference on Banking and Fixed Income, Asian Finance Association Conference, Seoul Asian Financial Forum, Oklahoma University Energy and Commodities Finance Research Conference, ECGI Roundtable Riga, Institutional Investor Private Markets Summit, 7th HEC Paris Workshop.

Assurant Lecture, Georgia Tech University, 2004.

Fellow, Financial Management Association, 2000.

Fellow, American Finance Association, 2005.

Fellow, European Corporate Governance Institute, 2005.

Vice-President (2002), Program Chair, (2003), President (2004), Western Finance Association.

Vice-President (2002), President-elect (2003), President (2004), American Finance Association.

Who's Who in Banking and Finance; Who's Who in Economics.

Jensen Prize for best article in Corporate Finance in the Journal of Financial Economics, 2000, 2008, 2017; runner-up, 2011.

William F. Sharpe Award for the best paper published in the Journal of Financial and Quantitative Analysis during the year 2003.

Selected by the magazine Treasury and Risk Management as one of the 100 most influential people in finance (June 2004).

René M. Stulz Scholar Development Fund, created in 2005 by former Ph.D. students.

Fama/DFA Prize for best article in Capital Markets and Asset Pricing in the Journal of Financial Economics, 2005.

Nominated for a Brattle Prize for best paper in Corporate Finance in the Journal of Finance in 2005.

Risk Who's Who, Charter Member, 2006.

Best paper, First Asian-Pacific Capital Markets Conference, Seoul, 2006.

Outstanding Academic Contribution to Corporate Governance Award, Drexel University, 2009.

Risk Manager of the year award, Global Association of Risk Professionals, 2009.

**EXHIBIT 1**

Swiss Finance Institute/Banque Privée Espirito Santo Prize 2010.

Trailblazer in Finance Award, 2014.

Reuters, Highly-Cited Researchers, first time in 2014.

Ohio State University, Distinguished Scholar Award, 2016.

## CONGRESSIONAL TESTIMONY

"Over-the-Counter Derivatives Markets Act of 2009," testimony to the House of Representatives Committee on Financial Services, 2009.

"Oversight of the Mutual Fund Industry: Ensuring Market Stability and Investor Confidence," Subcommittee on Capital Markets and Government Sponsored Enterprises, House of Representatives Committee on Financial Services, 2011.

## BOOKS

Risk Management and Derivatives, Southwestern College Publishing, 2003.

Handbook of the Economics of Finance, volume 1, edited with George Constantinides and Milton Harris, North-Holland, 2003.

Handbook of the Economics of Finance, volume 2, edited with George Constantinides and Milton Harris, Elsevier, 2013.

International Capital Markets, 3 volumes, edited with Andrew Karolyi, Edward Elgar, 2003.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2004.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2005.

The Risks of Financial Institutions, edited with Mark Carey, University of Chicago Press, 2006.

The Squam Lake Report: Fixing the Financial System, co-authored with the Squam Lake Group, Princeton University Press, 2010.

**EXHIBIT 1**

## PUBLISHED PAPERS

"On the Effects of Barriers to International Investment," Journal of Finance, 1981, 36(4), 923-934; reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 1-36.

"A Model of International Asset Pricing," Journal of Financial Economics, 1981, 9(4), 383-406.

"The Forward Exchange Rate and Macroeconomics," Journal of International Economics, 1982, 12(3/4), 285-299.

"Options on the Minimum or the Maximum of Two Risky Assets: Analysis and Applications," Journal of Financial Economics, 1982, 10(2), 161-185, reprinted in Options Markets, vol. 2, George Constantinides and A. G. Malliaris, eds., Edward Elgar Publishing, 2001.

"On the Determinants of Net Foreign Investment," Journal of Finance, 1983, 38(2), 459-468.

"The Demand for Foreign Bonds," Journal of International Economics, 1983, 15(3/4), 225-238.

"Optimal Hedging Policies," Journal of Financial and Quantitative Analysis, 1984, 19(2), 127-140.

"Currency Preferences, Purchasing Power Risks and the Determination of Exchange Rates in an Optimizing Model," Journal of Money, Credit and Banking, 1984, 16(3), 302-316; reprinted in Monetary Policy and Uncertainty, Manfred J. M. Neumann, ed., Nomos, 1986.

"Pricing Capital Assets in an International Setting: An Introduction," Journal of International Business Studies (Winter 1984), 55-73; reprinted in International Financial Management: Theory and Applications, Donald R. Lessard, ed., John Wiley & Sons, 1985.

"Macroeconomic Time-Series, Business Cycles and Macroeconomic Policies," with Walter Wasserfallen, Carnegie-Rochester Conference Series on Public Policy (Spring 1985), 9-55.

"An Analysis of Secured Debt," with Herb Johnson, Journal of Financial Economics, 1985, 14(4), 501-522, reprinted in The Debt Market, vol. 3, Steve A. Ross, editor, Edward Elgar, 2000.

"The Determinants of Firm's Hedging Policies," with Clifford W. Smith, Journal of Financial and Quantitative Analysis, 1985, 20(4), 391-406; reprinted in Studies in Financial Institutions: Commercial Banks, C. James and C.W. Smith, eds., McGraw Hill, 1993, and in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L. Culp and Merton H. Miller, eds., Risk Publications, London, 1999.

"Asset Pricing and Expected Inflation," Journal of Finance, 1986, 41(1), 209-224.

"Risk Bearing, Labor Contracts and Capital Markets," with Patricia B. Reagan, Research in Finance, 1986, 6, 217-232.

**EXHIBIT 1**

"Interest Rates and Monetary Policy Uncertainty," Journal of Monetary Economics, 1986, 17(3), 331-348.

"Time-Varying Risk Premia, Imperfect Information and the Forward Exchange Rate," International Journal of Forecasting, 1987, 3(1), 171-178.

"The Pricing of Options with Default Risk," with Herb Johnson, Journal of Finance, 1987, 42(2), 267-280.

"An Equilibrium Model of Exchange Rate Determination and Asset Pricing with Non-Traded Goods and Imperfect Information," Journal of Political Economy, 1987, 95(5), 1024-1040.

"Managerial Control of Voting Rights: Financing Policies and the Market for Corporate Control," Journal of Financial Economics, 1988, 20(1/2), 25-54, reprinted in M.C. Jensen and C.W. Smith, eds., The Modern Theory of Corporate Finance, McGraw-Hill, 1989 (second edition).

"Risk and the Economy: A Finance Perspective," with K.C. Chan, Risk and the Economy, in C.C. Stone, ed., Financial Risk: Theory, Evidence and Implications, Proceedings of the Eleventh Annual Economic Conference of the Federal Reserve Bank of St. Louis, Kluwer Academic Publishers, 1988.

"Capital Mobility and the Current Account," Journal of International Finance and Money, 1988, 7(2), 167-180.

"The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," with Yong Cheol Kim, Journal of Financial Economics, 1988, 22(2), 189-205.

"Contracts, Delivery Lags, and Currency Risks," with Patricia Reagan, Journal of International Money and Finance, 1989, 8(1), 89-104.

"The Pricing of Stock Index Options in General Equilibrium," with Warren Bailey, Journal of Financial and Quantitative Analysis, 1989, 24(1), 1-12.

"Managerial Performance, Tobin's q, and the Gains from Successful Tender Offers," with Larry Lang and Ralph Walkling, Journal of Financial Economics, 1989, 24(1), 137-154.

"Real Exchange Rate Dynamics and the Financial Theory of the Trading Firm," in Recent Developments in International Banking and Finance, S. Khoury and A. Ghosh, eds., Probus Publishing Company,1989, 3, 247-262.

"Properties of Daily Stock Returns from the Pacific Rim Stock Markets: Evidence and Implications," with Warren Bailey and Edward Ng, in S.G. Rhee and R. Chang, eds., Pacific-Basin Capital Markets Research, North Holland, 1990, 155-171.

**EXHIBIT 1**

"The Pricing of Currency Options: A Review," in R. E. Schwartz and C. W. Smith, eds., Handbook of Currency and Interest Rate Risk Management, Simon & Schuster, 1990, 5/1-5/20.

"Stock Index Futures in Switzerland: Pricing and Hedging Performance," with Walter Wasserfallen and Thomas Stucki, Review of Futures Markets, 1990, 9(3), 576-592.

"The Distribution of Target Ownership and the Division of Gains in Successful Takeovers," with Ralph A. Walkling and Moon H. Song, Journal of Finance, 1990, 45(3), 817-834.

"Managerial Discretion and Optimal Financing Policies," Journal of Financial Economics, 1990, 26(1), 3-26, reprinted in The Theory of Corporate Finance, M.J. Brennan, ed., Edward Elgar, 1995.

"Benefits of International Diversification: The Case of Pacific Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management, 1990, 16(4), 57-61.

"A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," with Ralph A.Walkling and Larry H. Lang, Journal of Financial Economics, 1991, 29(2), 315-335.

"Is There a Global Market for Convertible Bonds?" with Yong-Cheol Kim, Journal of Business, 1992, 65(1), 75-92.

"Industry Contagion Effects of Bankruptcy and Firm Size," with Larry Lang, in Ed Altman, ed., Bankruptcy and Distressed Restructurings, Business One Irwin, 1992, 215-221.

"Contagion and Competitive Intra-Industry Effects of Bankruptcy Announcements," with Larry Lang, Journal of Financial Economics, 1992, 32(1), 45-60.

"Global Financial Markets and the Risk Premium on U.S. Equity," with K.C. Chan and Andrew Karolyi, Journal of Financial Economics, 1992, 32(2), 137-168.

"Portfolio Management and Exchange Rate Risks: New Theoretical and Empirical Perspectives," with Warren Bailey and Edward Ng, S. Khoury and A. Ghosh, eds., Recent Developments in International Banking and Finance, 1992, 6, 230-248.

"Optimal Hedging of Stock Portfolios Against Foreign Exchange Risks: The Case of the Nikkei 225," with Warren Bailey and Edward Ng, Global Finance Journal, 1992, 3(2), 97-114.

"Contracting Costs, Inflation and Relative Price Volatility," with Patricia Reagan, Journal of Money, Credit and Banking, 1993, 25(3), Part 2, 585-601.

"Tobin's q, Diversification, and Firm Performance," with Larry Lang, Journal of Political Economy, 1994, 102(6), 1248-1280, reprinted in Empirical Corporate Finance, vol. IV, Michael Brennan, ed., Edward Elgar, 2001.

"International Asset Pricing: An Integrative Survey," Handbook of Modern Finance, R. Jarrow, M. Maksimovic and W. Ziemba, eds., North Holland-Elsevier, 1995, 201-223.

"Asset Sales, Firm Performance and the Agency Costs of Managerial Discretion," with Larry Lang and Annette Poulsen, Journal of Financial Economics, 1994, 37(1), 3-37, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"The Cost of Capital in Internationally Integrated Markets," European Financial Management, European Financial Management, 1995, 11-22.

"An Analysis of the Wealth Effects of Japanese Offshore Dollar-Denominated Convertible and Warrant Bond Issues," with Jun-Koo Kang, Yong-Cheol Kim and Kyung-Joo Park, Journal of Financial and Quantitative Analysis, 1995, 30(2), 257-270.

"Globalization of Capital Markets and the Cost of Capital: The Case of Nestlé," Journal of Applied Corporate Finance, 1995, 8(3,Fall), 30-38.

"Foreign Equity Investment Restrictions, Capital Flight, and Shareholder Wealth Maximization," with Walter Wasserfallen, Review of Financial Studies, 1995, 8(4), 1019-1057.

"Leverage, Investment and Firm Growth," with Larry Lang and Eli Ofek, Journal of Financial Economics, 1996, 40(1), 3-29.

"How Different is Japanese Corporate Finance?", with Jun-Koo Kang, Review of Financial Studies, 1996, 9(1), 109-139.

"Information, Trading and Stock Returns: Lessons from Dually-Listed Securities," with K.C. Chan, Wai-Ming Fong, and Bong-Chan Kho, Journal of Banking and Finance,1996, 20(7), 1161-1187.

"Timing, Investment Opportunities, Managerial Discretion, and the Security Issue Decision," with Kooyul Jung and Yong-Cheol Kim, Journal of Financial Economics, 1996, 42(2), 159-185, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"Why Do Markets Move Together? An Investigation of U.S.-Japan Stock Return Comovements," with G. Andrew Karolyi, Journal of Finance, 1996, 51(3), 951-986.

"Rethinking Risk Management," Journal of Applied Corporate Finance, 1996 (Fall), 8-24. Reprinted in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L Culp and Merton H. Miller, eds., Risk Publications, London, 1999, and in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999.

"Why Is There a Home Bias? An Analysis of Foreign Portfolio Equity Ownership in Japan," with Jun-Koo Kang, Journal of Financial Economics, 1997, 46(1), 3-28.

**EXHIBIT 1**

"Are Internal Capital Market Efficient?" with Hyun-Han Shin, Quarterly Journal of Economics, 1998, 113(2), 531-552.

"The Determinants and Implications of Corporate Cash Holdings," with Tim Opler, Lee Pinkowitz, and Rohan Williamson, Journal of Financial Economics, 1999, 52(1), 3-46. A shortened version of this paper appeared as "Corporate Cash Holdings," Journal of Applied Corporate Finance, 2001, 14(1), 55-79.

"Do Foreign Investors Destabilize Stock Markets? The Korean Experience in 1997," with Hyuk Choe and Bong-Chan Kho, Journal of Financial Economics, 1999, 54(2), 227-264.

"The Underreaction Hypothesis and the New Issue Puzzle: Evidence from Japan," with Yong-Cheol Kim and Jun-Koo Kang, Review of Financial Studies, 1999, 12(3), 519-534.

"International Portfolio Flows and Security Markets," in International Capital Flows, edited by Martin Feldstein, University Chicago Press, 1999, 257-293, reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 387-423.

"Globalization, Corporate Finance and the Cost of Capital," Journal of Applied Corporate Finance, 1999, 12(3), 8-25.

"Do Banking Shocks Affect Firm Performance? An Analysis of the Japanese Experience," with Jun-Koo Kang, Journal of Business, 2000, 73(1), 1-23.

"Banks, the IMF, and the Asian crisis," with Bong-Chan Kho, Pacific Basin Finance Journal, 2000, 8(2), 177-216.

"U.S. Banks, Crises, and Bailouts: From Mexico to LTCM," with Bong-Chan Kho and Dong Lee, American Economic Review, 2000, 90(2), 28-31.

"Financial Structure, Corporate Finance and Economic Growth," International Review of Finance, 2000, 1(1), 11-38.

"Merton Miller and Modern Finance," Financial Management, 2000, 29(4), 119-131. Reprinted in the Journal of Applied Corporate Finance, 2001(Winter), 8-20.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis of Stock Returns," with John Griffin, Review of Financial Studies, 2001, 14(1), 215-241.

"Divestitures and the Liquidity of the Market for Corporate Assets," with Frederick Schlingemann and Ralph A. Walkling, Journal of Financial Economics, 2002, 64(1), 117-144, reprinted in Corporate Restructuring, vol. 2, John Campbell and David J. Denis, ed., Edward Elgar Publishing, 2005.

"Should we Fear Capital Flows?" in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer (Editor), University of Chicago Press, 2003, Chicago, Ill.

**EXHIBIT 1**

"Corporate Governance, Investor Protection, and the Home Bias," with Magnus Dahlquist, Lee Pinkowitz, and Rohan Williamson, Journal of Financial and Quantitative Analysis, 2003, 38(1), 87-110.

"Equity Market Liberalizations as Country IPOs," with Rodolfo Martell, American Economic Review, Papers and Proceedings, 2003, 93(2), 97-101.

"Culture, Openness, and Finance," with Rohan Williamson, Journal of Financial Economics, 2003, 70(3), 313-349.

"A New Approach to Measuring Financial Contagion," with Kee-Hong Bae and Andrew Karolyi, Review of Financial Studies, 2003, 16, 717-763. Pre-publication Working Paper

"Are Assets Priced Locally or Globally?" with Andrew Karolyi, in Constantinides, George, Milton Harris and René Stulz (eds.), The Handbook of the Economics of Finance, North Holland, 2003.

"Why are Foreign Firms that List in the U.S. Worth More?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2004, 71(2), 205-238.

"Daily Cross-Border Flows: Pushed or Pulled?" with Federico Nardari and John Griffin, Review of Economics and Statistics, 2004, 86(3), 641-657.

"Firm Size and the Gains from Acquisitions," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Financial Economics, 2004, 73, 201-228.

"Should we Fear Derivatives?" Journal of Economic Perspectives, 2004, 18(3), 173-192; reprinted in The ICFAI Journal of Derivatives Markets, 2005, 2(1), 42-53.

"Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Finance, 2005, 60(2), 757-782 (Reprinted in Mergers and Acquisitions, J. Harold Mulherin, ed., Edward Elgar Publishing, 2012).

"Do Domestic Investors have an Edge? The Trading Experience of Foreign Investors in Korea," with Hyuk Choe and Bong-Chan Kho, Review of Financial Studies, 2005, 18(3),795-829.

"The Limits of Financial Globalization," Journal of Finance, 2005, 60(4), 1595-1638; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 8-15.

"Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A Cross-Country Analysis," with Lee Pinkowitz and Rohan Williamson, Journal of Finance, 2006, 61(6) 2725-2751; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 81-87.

"Dividend Policy and the Earned/Contributed Capital Mix: A Test of the Life-cycle Theory," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2006, 81(2), 227-254.

"Enterprise Risk Management: Theory and Practice," with Brian W. Nocco, Journal of Applied Corporate Finance, Fall 2006, 18(8), 8-20.

"Do Investors Trade more when Stocks have Performed Well? Evidence from 46 Countries," with John M. Griffin and Federico Nardari, Review of Financial Studies, 2007, 20(3), 905-951.

"Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership," with Jean Helwege and Christo Pirinsky, Journal of Finance, 2007, 62 (3), 995-1028.

"Hedge Funds: Past, Present, and Future," Journal of Economic Perspectives, 2007, 21(2), 175-194.

"The Economics of Conflicts of Interests in Financial Institutions," with Hamid Mehran, Journal of Financial Economics, 2007, 85(2), 267-296.

"Why Do Countries Matter so much for Corporate Governance?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2007, 86, 1-39.

"How do Diversity of Opinion and Information Asymmetry Affect Acquirer Returns?" with Sara B. Moeller and Frederik P. Schlingemann, Review of Financial Studies, 2007, 20(6), 2047-2078.

"Do Local Analysts know more? A Cross-Country Study of Performance of Local Analysts and Foreign Analysts," with Kee-Hong Bae and Hongping Tan, Journal of Financial Economics, 2008, 88(3), 581-606.

"Why Do Private Acquirer Pay so Little Compared to Public Acquirers?" with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, Journal of Financial Economics, 2008, 89(3), 375-390

"Risk Management Failures: What Are They and When Do They Happen?" Journal of Applied Corporate Finance, 2008, 20(4), 39-48.

"Private Benefits of Control, Ownership, and the Cross-Listing Decision," with Craig Doidge, G. Andrew Karolyi, Karl V. Lins, and Darius P. Miller, Journal of Finance, 2009, 64(1), 425-466.

"Has New York Become Less Competitive than London in Global Markets?  Evaluating Foreign Listing Choices Over Time," with Craig Doidge, and G. Andrew Karolyi, Journal of Financial Economics, 2009, 91(3), 253-277.

"Differences in Governance Practices between U.S. and Foreign Firms: Measurement, Causes, and Consequences," with Reena Aggarwal, Isil Erel, and Rohan Williamson, Review of Financial Studies, 2009, 22(8), 3171-3209.

**EXHIBIT 1**

"Managerial Ownership Dynamics and Firm Value," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2009, 92(3), 342-361.

"How Much Do Banks Use Credit Derivatives to Hedge Loans?" with Bernadette Minton and Rohan Williamson, Journal of Financial Services Research, 2009, 35(1), 1-31.

"Securities Laws, Disclosure, and National Capital Markets in the Age of Financial Globalization," Journal of Accounting Research, 2009, 47(2), 349-390.

"Why Do U.S. Firms Hold so Much More Cash than they Used to?" with Thomas W. Bates, and Kathleen M. Kahle, Journal of Finance, 2009, 64(5), 1985-2021.

"Financial Globalization, Governance, and the Evolution of the Home Bias," with Bong-Chan Kho and Francis E. Warnock, Journal of Accounting Research, 2009, 47(2), 597-635.

"Seasoned Equity Offerings, Market Timing and the Corporate Lifecycle," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2010, 95(3), 275-295.

"Why do Firms Appoint CEOs as Outside Directors?" with Rüdiger Fahlenbrach and Angie Low, Journal of Financial Economics, 2010, 97(1), 12-32.

"Credit Default Swaps and the Credit Crisis," Journal of Economic Perspectives, 2010, 24(1), 73-92.

"Why Do Foreign Firms Leave U.S. Equity Markets?" with Craig Doidge and G. Andrew Karolyi, Journal of Finance, 2010, 65(4), 1507-1553.

"Hedge Fund Contagion and Liquidity Shocks," with Nicole M. Boyson and Christof W. Stahel, Journal of Finance, 2010, 65(5), 1789-1816.

"Bank CEO Incentives and the Credit Crisis," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2011, 99, 11-26 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"When Are Analyst Recommendation Changes Influential?" with Roger K. Loh, Review of Financial Studies, 2011, 24(2), 593-627.

"The Credit Crisis Around the Globe: Why Did Some Banks Perform Better?" with Andrea Beltratti, Journal of Financial Economics, 2012, 105(1), 1-17 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Why Are U.S. Stocks More Volatile?" with Söhnke M. Bartram and Gregory Brown, Journal of Finance, 2012, 67(4), 1329-1370.

**EXHIBIT 1**

"Market Institutions, Financial Market Risks, and The Financial Crisis," with Mark Carey, Anil K. Kashyap, and Raghuram Rajan, Journal of Financial Economics, 2012, 104(3),421-424.

"This Time Is the Same: Using Bank Performance in 1998 to Explain Bank Performance during the Recent Financial Crisis," with Rüdiger Fahlenbrach and Robert Prilmeier, Journal of Finance, 2012, 67(6), 2139-2185 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Access to Capital, Investment, and the Financial Crisis," with Kathleen Kahle, Journal of Financial Economics, 2013, 110(2), 280-299.

"The U.S. Left Behind? Financial Globalization and the Rise of IPOs Outside the U.S.," with Craig Doidge and G. Andrew Karolyi, Journal of Financial Economics, 2013, 110(3), 546-573.

"Why Did Holdings of Highly-Rated Securitization Tranches Differ So Much Across Banks?" with Isil Erel and Taylor Nadauld, The Review of Financial Studies, 2014, 27(2), 404-453.

"Liquid-Claim Production, Risk Management, and Bank Capital Structure: Why High Leverage is Optimal for Banks," with Harry DeAngelo, Journal of Financial Economics, 2015, 116, 219-236.

"Corporate Acquisitions, Diversification, and the Firm's Lifecycle" with Asli M. Arikan, Journal of Finance, 2016, 71(1), 139-194.

"Do U.S. Firms Hold More Cash than Foreign Firms?" with Lee Pinkowitz and Rohan Williamson, The Review of Financial Studies, 2016, 29(2), 309-348.

"Why Don't All Banks Practice Regulatory Arbitrage? Evidence from the Usage of Trust Preferred Securities," with Nicole Boyson and Rüdiger Fahlenbrach, The Review of Financial Studies, 2016, 29(7), 1821-1859.

"Risk Management, Governance, Culture and Risk-Taking in Banks," Economic Policy Review, Federal Reserve Bank of New York, 2016, 22(1), 43-59 (A shorter version was published as "Risk-Taking and Risk Management by Banks," Journal of Applied Corporate Finance, 2015, 27(1), 8-18).

"Firm Rigidities and the Decline of Growth Opportunities," with Claudio Loderer and Urs Wälchli, Management Science, 2016, 63(9), 3000-3020.

"Portable Country Governance and Cross-Border Acquisitions," with Jesse A. Ellis, Sara B. Moeller, and Frederik P. Schlingemann, Journal of International Business Studies, 2017, 48(2), 148-173.

"The U.S. Listing Gap," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2017, 123, 464-487.

**EXHIBIT 1**

"Is the US Public Corporation in Trouble?" with Kathleen Kahle, Journal of Economic Perspectives, 2017, 31(3), 67-88.

"Do Independent Director Departures Predict Future Bad Events?" with Rüdiger Fahlenbrach and Angie Low, 2017, The Review of Financial Studies, 30(7), 2131-2358.

"What Is the Shareholder Wealth Impact of Target CEO Retention in Private Equity Deals?" with Leonce Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, 2017, Journal of Corporate Finance, 46, 186-206.

"Why Does Fast Loan Growth Predict Poor Performance for Banks?" with Rüdiger Fahlenbrach and Robert Prilmeier, The Review of Financial Studies, 2017, 31(3), 1014-1063.

"Corporate Deleveraging and Financial Flexibility," with Harry DeAngelo and Andrei S. Gonçalves, The Review of Financial Studies, 2018, 31(8), 3122-3174.

"Eclipse of the Public Corporation or Eclipse of the Public Markets?" with Craig Doidge, Kathleen Kahle, and Andrew Karolyi, Journal of Applied Corporate Finance, 2018, 30(1), 8-16.

"Is Sell-Side Research More Valuable in Bad Times?" with Roger K. Loh, Journal of Finance, 2018, 73(3), 959-1013.

"Do Firms Issue More Liquidity When Markets Become More Liquid?" with Rogier M. Hanselaar and Mathijs A. van Dijk, Journal of Financial Economics, 2019,133(1), 64-82.

"Are the Largest Banks Valued More Highly?" with Bernadette Minton and Alvaro Taboada, Review of Financial Studies, 2019, 32(12), 4604-4652.

"FinTech, BigTech, and the Future of Banks," Journal of Applied Corporate Finance, 2019, 31(4), 86-97.

"Why Is Contagion Asymmetric During the European Sovereign Crisis?" with Andrea Beltratti, Journal of International Money and Finance, 2019, 99.

"Does the Stock Market Make Firms More Productive?" with Ben Bennett and Zexi Wang, Journal of Financial Economics, 2020, 136(2), 281-306.

"Public Versus Private Equity," Oxford Economic Policy Review, 2020, 36(2), 275-290.

"Risk Management, Firm Reputation, and the Impact of Successful Cyberattacks on Target Firms," with Shinichi Kamiya, Jun-Koo Kang, Jungmin Kim, and Andreas Milidonis, Journal of Financial Economics, 2021, 139(3), 719-749.

"Why Does Equity Capital Flow Out of High Tobin's q Industries," with Dong Wook Lee and Hyun-Han Shin, Review of Financial Studies, 2021, 24(4), 1867-1906.

**EXHIBIT 1**

"Why Are Firms with More Managerial Ownership Worth Less?" with Kornelia Fabisik, Rüdiger Fahlenbrach, and Jérôme Taillard, Journal of Financial Economics, 2021, 140(3), 699-725.

"How Valuable is Financial Flexibility when Revenue Stops? Evidence from the COVID-19 Crisis" with Rüdiger Fahlenbrach and Kevin Rageth, Review of Financial Studies, 2021, 34(11), 5474-5521.

"Where there Fire Sales in the RMBS Market?" with Craig B. Merrill, Taylor D. Nadauld, and Shane M. Sherlund, Journal of Monetary Economics, 2021, 122, 12-37.

"Why Are Corporate Payouts So High in the 2000s?" with Kathleen Kahle, Journal of Financial Economics, 2021, 142 (3), 1359-1380.

"Have Exchange-Listed Firms Become Less Important for the Economy?" with Frederik P. Schlingemann, Journal of Financial Economics, 2022, 143(2)927-958.

"Are Analyst Short-Term Trade Ideas Valuable?" with Justin Birru, Sinan Gokkaya, and Xi Liu, Journal of Finance, forthcoming.

"Leverage and Cash Dynamics," with Harry DeAngelo and Andrei Gonçalves, Review of Finance, forthcoming.

"Do Firms with Specialized M&A Staff Make Better Acquisitions?" with Sinan Gokkaya and Xi Liu, Journal of Financial Economics, forthcoming.

## PROFESSIONAL JOURNAL ARTICLES, BOOK REVIEWS, NOTES AND COMMENTS

Review of "Managing Foreign Exchange Risk," Richard J. Herring, ed., Journal of Money, Credit and Banking (February 1985), 124-125.

"On Capital Mobility in the World Economy," Carnegie-Rochester Conference Series on Public Policy (Spring, 1986), 105-114.

"Portfolio Management in International Capital Markets," Financial Markets and Portfolio Management (1, 1986), 18-23.

"Portfolio Insurance, Program Trading and the Crash of 1987," Financial Markets and Portfolio Management (1, 1988), 11-22.

"SMI Futures," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (4, 1989), 288-300.

**EXHIBIT 1**

"Benefits of International Diversification with Daily Data: The Case of Pacific-Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management (4, 1990), 57-61.

"Portfolio Insurance with Options and Futures on the SMI," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (2, 1990), 99-115.

"Securities Transaction Taxes: Lessons from the International Experience," in The Globalization of Equity Markets, Jeffrey Frankel, ed., University of Chicago Press, 1994.

"Identifying and Quantifying Exposures," with Rohan Williamson, in Financial Risk and the Corporate Treasury: New Developments in Strategy and Control, Robert Jameson, ed., Risk Publications, London, 1997, 33-51 (Reprinted in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999). Pre-publication Working Paper

"What's Wrong with Modern Capital Budgeting?" Financial Practice and Education, Fall/Winter 1999, p.5-9.

"Diminishing the Threats to Shareholder Wealth," Financial Times, Mastering Risk Series, April 25, 2000.

"Why Risk Management is not Rocket Science," Financial Times, Mastering Risk Series, June 27, 2000.

"An Emotional High for Stocks?" a review of "Irrational Exuberance" by Robert J. Shiller, Science (June 30, 2000), 2323.

"Demystifying Financial Derivatives," The Milken Institute Review, Third Quarter 2005, 20-31.

"Merton Miller," New Palgrave Dictionary, 2006.

"Financial Derivatives: Lessons from the Subprime Crisis," The Milken Institute Review, First Quarter 2009, 59-70.

"Six Ways Companies Mismanage Risk," Harvard Business Review, February 2009, 87(3), 86-94.

"In Defense of Derivatives and How to Regulate Them," Wall Street Journal, April 7, 2009.


**SELECTED RESEARCH IN PROGRESS AND WORKING PAPERS**

"Has the Bond Market Really Become Less Liquid?" with Mike Anderson.

"Why has there Been a Secular Decline in Idiosyncratic Risk since 2000?" with Söhnke Bartram and Gregory Brown.

**EXHIBIT 1**

"Who Benefits from Analyst 'Top Picks?" with Justin Birru, Sinan Gokkaya, and Xi Liu.

"Is Financial Globalization in Reverse After the 2008 Global Financial Crisis? Evidence from Corporate Valuations," with Craig Doidge and Andrew Karolyi.

"Does Joining the S&P 500 Index Hurt Firms?" with Benjamin Bennett and Zexi Wang.

"Why Do Bank Boards Have Risk Committees?" with James Tompkins, Rohan Williamson, and Zhongxia Ye.

"How Important is Moral Hazard for Distressed Banks?" with Itzhak Ben-David and Ajay A. Palvia.

"Why Did Small Business FinTech Lending Dry Up During the COVID-19 Crisis?" with Itzhak Ben-David and Mark Johnson.


## EDITORIAL AND REFEREEING ACTIVITIES

Advisory Board, ECGI Corporate Governance blog, 2021 to present.

Advisory Board, Journal of Risk and Financial Management, 2018 to present.

Editorial Board, Journal of Financial Intermediation, 2013 to present.

Advisory Editor, Journal of Investment Management, 2003 to present.

Advisory Editor, Journal of Financial Economics, 2000 to 2021.

Advisory Editor, Journal of Financial Services, 1999 to present.

Editor, Journal of Finance, 1988 to 2000.

Editor, Corporate Finance Abstracts, Social Science Research Network, 1998 to present.

Editor, Journal of Financial Economics, 1982 to 1987.

Board of Editors, Journal of Banking and Finance, 2008.

Co-Editor, Banking and Financial Institutions Abstracts, Social Science Research Network, 1998 to present.

Co-Editor, Financial Markets and Portfolio Management, 1999 to present.

Associate Editor, Journal of Risk, 2006 to present.

EXHIBIT 1

Board of Editors, Japan and the World Economy, 2006 to present.

Advisory Editor, The Review of Finance, 2003 to 2009.

Advisory Editor, Journal of Economic Perspectives, 2006 to 2008.

Associate Editor, Journal of Economic Perspectives, 2003 to 2005.

Associate Editor, Journal of Financial Abstracts, 1994 to 1998.

Associate Editor, Journal of Financial Economics, 1988 to 1999.

Associate Editor, Journal of International Finance and Accounting, 1988 to present.

Associate Editor, Global Finance Journal, 1988 to 2015.

Associate Editor, Journal of International Financial Markets, Institutions and Money, 1989 to present.

Associate Editor, Journal of Fixed Income, 1991 to present.

Associate Editor, Journal of International Trade and Finance, 1992 to present.

Associate Editor, Journal of Financial and Quantitative Analysis, 1983-1985.

Acted as an ad hoc referee for AER, JIE, JAE, JFE, JME, JMCB, JFQA, QJE, JF, JB, JPE, Canadian Journal of Economics, Management Science, Marketing Science, Journal of International Money and Finance, Journal of International Business Studies, the Canadian NSF and the NSF.

**EXHIBIT 2**

# Deposition and Trial Testimony of René M. Stulz
# During the Past Four Years

| | |
|---|---|
| **Case Name:** | William Sponn et al. v. Emergent Biosolutions, Inc. et al. |
| **Case No.:** | No. 8:16-cv-02625-RWT, United States District Court, Southern District of Maryland |
| **Date of Testimony:** | February 2018 (Deposition) |

| | |
|---|---|
| **Case Name:** | In Re BHP Billiton Limited Securities Litigation |
| **Case No.:** | No. 1:16-cv-01445-NRB, United States District Court, Southern District of New York |
| **Date of Testimony:** | June 2018 (Deposition) |

| | |
|---|---|
| **Case Name:** | Loreley Financing (Jersey) No. 28, Ltd. v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al. |
| **Case No.:** | No. 652732/2011, Supreme Court of the State of New York |
| **Date of Testimony:** | November 2018 (Deposition) |

| | |
|---|---|
| **Case Name:** | In Re Flowers Foods, Inc. Securities Litigation |
| **Case No.:** | No. 7:16-CV-00222-WLS, United States District Court, Middle District of Georgia |
| **Date of Testimony:** | November 2018 (Deposition) |

| | |
|---|---|
| **Case Name:** | SSA Bonds |
| **Case No.:** | A.T.40346, European Commission |
| **Date of Testimony:** | July 2019 (Oral Hearing) |

| | |
|---|---|
| **Case Name:** | In Re Equifax, Inc. Securities Litigation |
| **Case No.:** | No. 17-CV-3463-TWT, United States District Court, Northern District of Georgia |
| **Date of Testimony:** | September 2019 (Deposition) |

| | |
|---|---|
| **Case Name:** | Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corporation et al. |
| **Case No.:** | No. 16-112-MN, United States District Court, District of Delaware |
| **Date of Testimony:** | December 2019 (Deposition), June 2021 (Deposition) |

**EXHIBIT 2**

| | |
|---|---|
| **Case Name:** | Joseph Prause v. TechnipFMC PLC et al. |
| **Case No.:** | No. 4:17-cv-02368, United States District Court, Southern District of Texas |
| **Date of Testimony:** | February 2020 (Depositions) |

| | |
|---|---|
| **Case Name:** | In Re Volkswagen "Clean Diesel" Marketing Sales Practices, and Products Liability Litigation; BRS v. Volkswagen AG, et al., Case No. 16-cv-3435 ("Bondholders Securities Action") |
| **Case No.:** | MDL No. 2672-CRB (JSC), United States District Court, Northern District of California |
| **Date of Testimony:** | February 2020 (Deposition) |

| | |
|---|---|
| **Case Name:** | Mayagüez S.A. v. Citigroup, Inc., Citibank, N.A. |
| **Case No.:** | No. 1:16-cv-06788-PGG-JLC, United States District Court, Southern District of New York |
| **Date of Testimony:** | May 2020 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re WeWork Litigation |
| **Case No.:** | No. 2020-0258-AGB, Court of Chancery, Delaware |
| **Date of Testimony:** | February 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re Envision Healthcare Corporation Securities Litigation |
| **Case No.:** | No. 3:17-cv-01112, United States District Court, Middle District of Tennessee, Nashville Division |
| **Date of Testimony:** | May 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | In Re Navient Corporation Securities Litigation |
| **Case No.:** | No. 17-cv-08373-RBK-AMD, United States District Court, District of New Jersey |
| **Date of Testimony:** | June 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Evanston Police Pension Fund v. McKesson Corporation et al. |
| **Case No.:** | No. 3:18-cv-06525-CRB, United States District Court, Northern District of California |
| **Date of Testimony:** | July 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re Allergan PLC Securities Litigation |
| **Case No.:** | No. 18-cv-12089, United States District Court, Southern District of New York |
| **Date of Testimony:** | September 2021 (Deposition) |

**EXHIBIT 2**

| | |
|---|---|
| **Case Name:** | Gordon v. Vanda Pharmaceuticals Inc. et al. |
| **Case No.:** | No. 1:19-cv-01108-FB-LB, United States District Court, Eastern District of New York |
| **Date of Testimony:** | October 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Tollen v. Geron Corporation et al |
| **Case No.:** | No. 3:20-cv-00547-WHA, United States District Court, Northern District of California |
| **Date of Testimony:** | October 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Patrick McDermid v. Inovio Pharmaceuticals, Inc. et al. |
| **Case No.:** | No. 2:20-cv-01402-GJP, United States District Court, Eastern District of Pennsylvania |
| **Date of Testimony:** | November 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Strathclyde Pension Fund v. Bank OZK et al. |
| **Case No.:** | No. 4:18-cv-00793-DPM, United States District Court, Eastern District of Arkansas |
| **Date of Testimony:** | December 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Boston Retirement System v. Uber Technologies, Inc. et al. |
| **Case No.:** | No. 3:19-cv-06361-RS, United State District Court, Northern District of California |
| **Date of Testimony:** | February 2022 (Deposition) |

| | |
|---|---|
| **Case Name:** | Ahmad Odeh v. Immunomedics, Inc. et al. |
| **Case No.:** | No. 2:18-17645-MCA-ESK, United States District Court, District of New Jersey |
| **Date of Testimony:** | May 2022 (Deposition) |

**EXHIBIT 3**

# Materials Relied Upon

| Document Title | Document Date |
|---|---|
| **Case Pleadings** | |
| Consolidated Class Action Complaint for Violation of the Federal Securities Laws, *In Re Qualcomm Incorporated Securities Litigation*, United States District Court for the Southern District of California, Case No. 3:17-cv-00121-JAH-WVG | July 3, 2017 |
| Lead Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Judgment on the Pleadings, *In Re Qualcomm Incorporated Securities Litigation*, United States District Court for the Southern District of California, Case No. 3:17-cv-00121-JAH-WVG, and Exhibits | February 18, 2020 |
| Memorandum of Points and Authorities in Support of Defendants' Motion for Judgment on the Pleadings, *In Re Qualcomm Incorporated Securities Litigation*, United States District Court for the Southern District of California, Case No. 3:17-cv-00121-BEN-MSB, and Exhibits | January 15, 2020 |
| Reporter's Transcript of Motion Hearing Proceedings, *Shah v. Qualcomm Incorporated*, United States District Court for the Southern District of California, Case No. 3:17-cv-00121-JO-MSB | January 2, 2022 |
| **Legal Opinions** | |
| *Cammer v. Bloom*, 711 F. Supp. 1286-87 (D.N.J. 1989) | 1989 |
| *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008) | 2008 |
| **Other Legal Documents** | |
| Complaint, *In Re Broadcom Corporation v. Qualcomm Incorporated*, United States District Court for the District of New Jersey, Case No. 05-3350-MLC | July 1, 2005 |
| Brief of Amicus Curiae Qualcomm Incorporated in Support of Respondent, Quanta Computer, Inc. v. LG Electronics, Inc., On Writ of Certiorari to the United States Court of Appeals for the Federal Circuit, Case No. 06-937 | December 10, 2007 |
| Memorandum Opinion and Order, *Ericsson, Inc., et al. v. D-Link Systems, Inc., et al.*, United States District Court for the Eastern District of Texas, Tyler Division, Case No. 6:10-CV-473 | August 6, 2013 |
| Brief of Amicus Curiae Qualcomm Incorporated in Support of Affirmance on Rand Issues, *Ericsson, Inc. v. D-Link Systems, Inc.*, On Appeal from the United States District Court for the Eastern District of Texas, Case No. 10-cv-0473 | March 12, 2014 |
| Dissenting Statement of Commissioner Maureen K. Ohlhausen, *In the Matter of Qualcomm, Inc.,* File No. 141-0199 | January 17, 2017 |
| Redacted Federal Trade Commission's Complaint for Equitable Relief, *Federal Trade Commission v. Qualcomm Incorporated*, United States District Court for the Northern District of California, Case No. 5:17-cv-00220 | January 17, 2017 |
| Redacted Complaint for Damages, Declaratory Judgment and Injunctive Relief, *Apple Inc., v. Qualcomm Incorporated*, United States District Court for the Southern District of California, Case No. 3:17-cv-0108-GPC-NLS | January 20, 2017 |
| Opinion, *Federal Trade Commission v. Qualcomm Incorporated*, United States Court of Appeals for the Ninth Circuit, Case No. 19-16122 | August 11, 2020 |

**EXHIBIT 3**

| Document Title | Document Date |
|---|---|
| Judgment of the General Court, *Qualcomm Inc. v. European Commission*, The General Court (Sixth Chamber, Extended Composition), Case T-235/18, available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:62018TJ0235&from=GA | June 15, 2022 |
| **Expert Reports** | |
| Expert Report of David I. Tabak, Ph.D., and Exhibits | May 19, 2022 |
| **Data** | |
| CRSP | |
| NASDAQ | |
| Refinitiv | |
| | |
| **SEC Filings** | |
| Apple Inc., Form 10-Q for Q2 2012 | April 25, 2012 |
| Apple Inc., Form 10-Q for Q1 2017 | February 1, 2017 |
| Qualcomm Incorporated, Form 10-K for FY 2006 | November 2, 2006 |
| Qualcomm Incorporated, Form 10-K for FY 2007 | November 8, 2007 |
| Qualcomm Incorporated, Form 10-Q for Q3 2005 | July 20, 2005 |
| Qualcomm Incorporated, Form 10-K for FY 2005 | November 2, 2005 |
| Qualcomm Incorporated, Form 10-Q for Q1 2006 | January 25, 2006 |
| Qualcomm Incorporated, Form 10-Q for Q3 2006 | July 19, 2006 |
| Qualcomm Incorporated, Form 10-Q for Q1 2007 | January 24, 2007 |
| Qualcomm Incorporated, Form 10-Q for Q3 2008 | July 25, 2008 |
| Qualcomm Incorporated, Form 10-K for FY 2008 | November 6, 2008 |
| Qualcomm Incorporated, Form 10-Q for Q1 2009 | January 28, 2009 |
| Qualcomm Incorporated, Form 10-Q for Q2 2009 | April 29, 2009 |
| Qualcomm Incorporated, Form 10-K for FY 2009 | November 4, 2009 |
| Qualcomm Incorporated, Form 10-Q for Q1 2010 | January 27, 2010 |
| Qualcomm Incorporated, Form 10-Q for Q3 2010 | July 21, 2010 |
| Qualcomm Incorporated, Form 10-K for FY 2010 | November 3, 2010 |
| Qualcomm Incorporated, Form 10-K for FY 2011 | November 2, 2011 |
| Qualcomm Incorporated, Form 10-Q for Q2 2012 | April 18, 2012 |
| Qualcomm Incorporated, Form 10-Q for Q3 2012 | July 18, 2012 |
| Qualcomm Incorporated, Form 10-K for FY 2012 | November 7, 2012 |
| Qualcomm Incorporated, Form 10-Q for Q1 2013 | January 30, 2013 |
| Qualcomm Incorporated, Form 10-Q for Q2 2013 | April 24, 2013 |

**EXHIBIT 3**

| Document Title | Document Date |
|---|---|
| Qualcomm Incorporated, Form 10-Q for Q3 2013 | July 24, 2013 |
| Qualcomm Incorporated, Form 10-K for FY 2013 | November 6, 2013 |
| Qualcomm Incorporated, Form 10-Q for Q1 2014 | January 29, 2014 |
| Qualcomm Incorporated, Form 10-Q for Q2 2014 | April 23, 2014 |
| Qualcomm Incorporated, Form 10-Q for Q3 2014 | July 23, 2014 |
| Qualcomm Incorporated, Form 10-K for FY 2014 | November 5, 2014 |
| Qualcomm Incorporated, Form 10-Q for Q1 2015 | January 28, 2015 |
| Qualcomm Incorporated, Form 10-Q for Q2 2015 | April 22, 2015 |
| Qualcomm Incorporated, Form 10-Q for Q3 2015 | July 22, 2015 |
| Qualcomm Incorporated, Form 10-K for FY 2015 | November 4, 2015 |
| Qualcomm Incorporated, Form 10-Q for Q1 2016 | January 27, 2016 |
| Qualcomm Incorporated, Form 10-Q for Q2 2016 | April 20, 2016 |
| Qualcomm Incorporated, Form 10-Q for Q3 2016 | July 20, 2016 |
| Qualcomm Incorporated, Form 10-K for FY 2016 | November 2, 2016 |
| Qualcomm Incorporated, Form 10-Q for Q1 2017 | January 25, 2017 |
| Qualcomm Incorporated, Form 10-Q for Q2 2017 | April 19, 2017 |
| Qualcomm Incorporated, Form 10-K for FY 2017 | November 1, 2017 |
| Qualcomm Incorporated, Form 10-Q for Q1 2018 | January 31, 2018 |
| Qualcomm Incorporated, Form 10-Q for Q2 2018 | April 25, 2018 |
| Qualcomm Incorporated, Form 10-K for FY 2018 | November 7, 2018 |
| Qualcomm Incorporated, Form 10-Q for Q2 2019 | May 1, 2019 |
| Qualcomm Incorporated, Form 10-Q for Q3 2019 | July 31, 2019 |
| Qualcomm Incorporated, Form 10-Q for Q1 2020 | February 5, 2020 |
| Qualcomm Incorporated, Form 10-K for FY 2020 | November 4, 2020 |
| Qualcomm Incorporated, Form 10-K for FY 2021 | November 3, 2021 |

**Earnings Calls and Other Conference Calls**

| | |
|---|---|
| Q1 2008 Qualcomm Inc. Earnings Call | January 23, 2008 |
| Q2 2009 Qualcomm Inc. Earnings Call | April 27, 2009 |
| Q1 2015 Qualcomm Inc. Earnings Call | January 28, 2015 |
| Q1 2016 Qualcomm Inc. Earnings Call | January 27, 2016 |
| Licensing/IPR Overview Conference Call & Webcast | June 21, 2006 |
| QCOM – Qualcomm Inc. Analyst Meeting | November 14, 2007 |

**Equity Research Analyst Reports**

**EXHIBIT 3**

| Document Title | Document Date |
| --- | --- |
| "US Communications Technology: Wireline/Wireless Equipment," *Goldman Sachs* | June 6, 2005 |
| "IPR Concerns a Buying Opportunity," *Banc of America Securities* | October 28, 2005 |
| "QCOM: Antitrust Attorney Sheds Light on EU Complaint; Process Likely to Take 2+ Years, with Little Near-Term Impact," *Prudential Equity Group* | November 8, 2005 |
| "QCOM: Leading the Wireless Revolution; Initiating Coverage with BUY Rating, $63 Price Target," *Lazard Capital Markets* | April 26, 2006 |
| "Qualcomm: W-CDMA to Drive Growth; Minimal Risks from Nokia Renegotiation and CDMA Market," *Bernstein Research* | September 29, 2006 |
| "Expect QCOM to Beat Consensus; Various Legal Matters Distractions from Fundamentals; Outperform," *Bernstein Research* | October 31, 2006 |
| "3G Economics Update," *Credit Suisse* | March 26, 2007 |
| "Qualcomm & Nokia: Stakes Now Higher for Both Sides; Eventual Settlement Still More Likely than Long Legal Battle," *Bernstein Research* | April 9, 2007 |
| "Legal Issues Far from Being Resolved," *Merrill Lynch* | July 26, 2007 |
| "Fundamentally Strong; Previous Confident Tone Appears to Yield to Cautiousness on Legal Front," *William Blair & Company* | July 27, 2007 |
| "Qualcomm: Acute Myopia?," *Arete* | August 30, 2007 |
| "QCOM: Initiating with a Market Perform Rating," *Wachovia* | October 3, 2007 |
| "Navigating the Legal Minefield," *Merrill Lynch* | October 12, 2007 |
| "Supreme Court Patent Exhaustion Case Implicates Qualcomm, Yahoo!" *Stifel Nicolaus* | January 16, 2008 |
| "First Quarter 2008 Earnings Call: Results In Line With Expectations; Chipset Business Gaining Share," *William Blair & Company* | January 25, 2008 |
| "School of Hard NOKs," *Nomura* | April 28, 2008 |
| "Growth and Leverage… More to Come," *Credit Suisse* | June 26, 2008 |
| "Riding the 3G Wave – Initiating Coverage at Outperform," *FBR Capital Markets* | April 7, 2009 |
| "Qualcomm, Broadcom to Settle for $891 million," *Deutsche Bank* | April 26, 2009 |
| "Operating Results," *Barclays* | April 27, 2009 |
| "Q2 Results; Raising Price Target to $50," *Deutsche Bank* | April 27, 2009 |
| "QCOM / BRCM Settlement; Earnings Call at 5 am PT," *Broadpoint* | April 27, 2009 |
| "Quick Take: Our Initial Read on F2Q09 Results, Broadcom Settlement," *Cowen* | April 27, 2009 |
| "Q2 Wrap: Happy Days Are Here Again for the Chip Biz as Latest Bottom Is Found in San Diego, Reit. OW," *J.P. Morgan* | April 28, 2009 |
| "Initiating Coverage of Qualcomm Incorporated," *Morgan Keegan* | July 7, 2009 |
| "Korea, Japan, and Europe - How Much Impact Might Recent Antitrust Rulings Have?," *Bernstein Research* | July 29, 2009 |
| "Qualcomm: Short Term Headwinds, but Long Term Value; Q4 Preview – Monitor Guidance, Snapdragon, Samsung, Legal," *Bernstein Research* | October 29, 2009 |

**EXHIBIT 3**

| Document Title | Document Date |
|---|---|
| "Qualcomm: A Device ASP Post-Mortem – Transcript and Slides from Our February 5, 2010 Conference Call," *Bernstein Research* | February 11, 2010 |
| "2010: Year of the Mobile Computer," *J.P. Morgan* | March 26, 2010 |
| "QCOM: Initiating Coverage with a Neutral Rating; Worldwide Leader in 3G/4G, but Handset Pricing and New Competition Headwinds," *Sterne Agee* | May 17, 2010 |
| "Leader in Next Wave of Computing; Assuming Coverage at Overweight & $60 PT," *Piper Jaffray* | December 9, 2010 |
| "Solidifying the Lead," *Deutsche Bank* | February 22, 2011 |
| "Could Get More Positive after the 1H Smart Phone and Tab-Stravaganza," *Macquarie* | March 14, 2011 |
| "Decoupling Maintain Buy," *Nomura* | January 31, 2013 |
| "Strong Near-Term Momentum Continues; Reiterate Overweight," *Piper Jaffray* | March 20, 2013 |
| "Initiating with a Buy Rating; Leading Innovator Across Wireless Value Chain," *Stifel* | October 14, 2013 |
| "Initiating Coverage with Buy; LTE-A, TDD Investment to Pay-Off with 2014 Margin Recovery," *Mizuho* | November 18, 2013 |
| "China Starts Anti-Monopoly Investigation," *UBS* | November 25, 2013 |
| "Intel's Move to Foundry Not Necessarily Helpful; iPhone 5s Inventory Increasing but Still Low," *Pacific Crest Securities* | November 26, 2013 |
| "China Royalty Collections Remain Challenging; Long-Term Earnings Potential Remains Largely Intact," *Morgan Stanley* | July 24, 2014 |
| "Qualcomm (QCOM): FQ314 Recap – Big Trouble in Little China?" *Bernstein Research* | July 24, 2014 |
| "Royalty Challenges in China Mar Outlook; Cutting Price Target to $88," *Goldman Sachs* | July 24, 2014 |
| "More Detail on China IPR Issues," *BMO Capital Markets* | August 14, 2014 |
| "Qualcomm Inc.," *S&P Capital IQ* | August 22, 2014 |
| "QCOM: Parsing Recent Newsflow on NDRC Case – Entering 'Punishment Stage?' Will Business Changes Be Mandated?," *Bernstein Research* | September 16, 2014 |
| "Issues on Multiple Fronts; Reiterating our Neutral," *Bank of America Merrill Lynch* | November 6, 2014 |
| "QCOM: NDRC Investigation Resolved—Raising Estimates," *Wells Fargo* | February 9, 2015 |
| "China Antitrust Ruling Meets Our Expectations, Validates Qualcomm's IP, Maintaining Fair Value," *Morningstar* | February 10, 2015 |
| "China Resolution a Positive, but Little Near Term Financial Impact," *Raymond James* | February 10, 2015 |
| "If Only That Were the End to That Story," *Macquarie* | February 10, 2015 |
| "Kissing the Ring, but Limiting Collateral Damage," *Cowen* | February 10, 2015 |
| "Qualcomm Inc.: Thoughts on NDRC Resolution," *Susquehanna* | February 10, 2015 |
| "Settling with the NDRC," *CLSA* | February 10, 2015 |
| "The Chinese Resolution," *Northland Capital Markets* | February 10, 2015 |
| "Qualcomm (QCOM): TANSTAAFL?," *Bernstein Research* | February 19, 2015 |

# EXHIBIT 3

| Document Title | Document Date |
|---|---|
| "Communicating Equipment (9); Mobile IPR Getting Pressured, but Still Growing," *BMO Capital Markets* | June 8, 2015 |
| "Expert Meetings Support IPR Upside for Nokia & Ericsson," *Bank of America Merrill Lynch* | September 17, 2015 |
| "Korea Report Creates More Uncertainty: Evaluating the Potential Impact on EPS," *Nomura* | November 18, 2015 |
| "Lowering Estimates, Target on Industry Unit Weakness; Valuation at All-Time Low," *BMO Capital Markets* | November 18, 2015 |
| "Lowering Price Target on Increased Regulatory Risk Post KFTC Report," *Goldman Sachs* | November 18, 2015 |
| "Quick Take - QCOM: Korea Kicks Qualcomm While They're Down…," *Bernstein Research* | November 18, 2015 |
| "Raymond James TMTalk: ARRS, CMCSA, MSI, QCOM," *Raymond James* | November 18, 2015 |
| "South Korea's Investigation Report Is Troubling, but We Still See Qualcomm Pulling Through," *Morningstar* | November 18, 2015 |
| "Where's the Aspirin? Korean FTC Examiner's Report Makes Royalty Headaches Worse," *Morgan Stanley* | November 18, 2015 |
| "Deep Dive into Breakup Valuation, Korea Licensing, and QTL's Long-term Position," *Bank of America Merrill Lynch* | November 19, 2015 |
| "Patently Bullish Pt. II," *Bank of America Merrill Lynch* | December 3, 2015 |
| "Washed Out in San Diego: Initiating Coverage of QCOM at Overweight," *Pacific Crest Securities* | December 3, 2015 |
| "Key Takeaways from a Patent Conference; Implications for Qualcomm," *Bank of America Merrill Lynch* | December 7, 2015 |
| "Quick Take – Qualcomm: EU Provides Details, Taiwan Joins the Party – Some Quick Thoughts," *Bernstein Research* | December 8, 2015 |
| "QCOM Regulatory Troubles, OLED Report, Taiwanese ODM Report and More…," *J.P. Morgan* | December 9, 2015 |
| "We Are Lowering Our Qualcomm Moat Rating to Narrow Owing to Regulatory Uncertainty; Maintain $68 FVE," *Morningstar* | December 14, 2015 |
| "Valuation Becomes Difficult to Ignore.  Upgrading to Overweight," *J.P. Morgan* | December 17, 2015 |
| "Qualcomm (QCOM): A Conversation (and Q&A) with a Korean Antitrust Attorney—Conference Call Transcript & Slides," *Bernstein Research* | December 30, 2015 |
| "Management Presentation at Growth Conference," *Canaccord Genuity* | August 10, 2016 |
| "Quick Take: Korea Gives Qualcomm $865M Worth of Coal in Their Stocking Some Thoughts on Last Night's KFTC Decision," *Bernstein Research* | December 28, 2016 |
| "South Korea Antitrust Ruling Consistent with Our Outlook for Qualcomm; Maintaining $72 FVE," *Morningstar* | December 28, 2016 |
| "South Korean Antitrust Agency Issues Fine, Outlines Licensing Changes," *Bank of America Merrill Lynch* | December 28, 2016 |
| "Alert: Korea Tries to Play Grinch to Qualcomm, Levies $865 Million Fine – No Impact to Our Thesis/Neutral Rating," *Citi* | December 29, 2016 |
| "Qualcomm: Is Korea Trying to Kill QTL? What Does Qualcomm (Unofficial) Translation of the KFTC Order Suggest?," *Bernstein Research* | January 3, 2017 |
| "Alert: FTC Complaint against Qualcomm Could Put Pressure on Royalty Rates, Remain Neutral," *Citi* | January 17, 2017 |

**EXHIBIT 3**

| Document Title | Document Date |
| --- | --- |
| "The Hits Keep Coming: U.S. FTC Files Complaint against Qualcomm over Chipset and Licensing Practices," *Morningstar* | January 17, 2017 |
| "FTC Move Unexpected; We See Several Uncertainties," *Morgan Stanley* | January 18, 2017 |
| "Our Take on the FTC's Anticompetitive Stand against Qualcomm," *William Blair* | January 18, 2017 |
| "QCOM – The FTC Looking for Its Pound of Flesh," *Northland Capital Markets* | January 18, 2017 |
| "Qualcomm (QCOM): The FTC Files Suite - A Knife in the Heart, Or Just a Paper Cut?," *Bernstein Research* | January 18, 2017 |
| "Qualcomm Inc.: Is Their Business Model Too Good?," *Susquehanna Financial Group* | January 18, 2017 |
| "US FTC Charges QCOM of Antitrust Practices," *Credit Suisse* | January 18, 2017 |
| "US FTC Files Antitrust Charges, Citing Licensing and Chipset Violations," *Bank of America Merrill Lynch* | January 18, 2017 |
| "Apple Formally Joins Fight against Qualcomm Over the Latter's Business Practices," *Morningstar* | January 22, 2017 |
| "Clash of the Smartphone Titans," *BMO Capital Markets* | January 22, 2017 |
| "Could NXPI Accretion Be Offset by New Challenges? AAPL, FTC & KFTC….Who Is Next?," *RBC Capital Markets* | January 22, 2017 |
| "Thinking Through This AAPL Lawsuit – Positive for INTC," *Cowen* | January 22, 2017 |
| "Alert: Apple Jumps on the Dog Pile, Sues Qualcomm; Another Potential Pressure Point on Royalty Rates – Reiterate Neutral," *Citi* | January 23, 2017 |
| "Apple Files Lawsuit against Qualcomm," *Goldman Sachs* | January 23, 2017 |
| "Apple Sues Qualcomm over Unfair Licensing Terms," *Pacific Crest Securities* | January 23, 2017 |
| "Downgrade to U-PF: Moving to the Sidelines on Licensing Uncertainty," *CLSA* | January 23, 2017 |
| "It's Never Good When a Top Customer Sues You for Aggressive Licensing Practices," *William Blair* | January 23, 2017 |
| "Qualcomm, Apple: The March to War?," *Bernstein Research* | January 23, 2017 |
| "Sell-Off on Apple Litigation Overdone; Lower Price Target to $75 from $81 Based on Scenario Analysis," *Canaccord Genuity* | January 23, 2017 |
| "Worst Case Scenario Is Likely Better than Feared," *Bank of America Merrill Lynch* | January 23, 2017 |
| "A Second Take on the Apple Litigation," *Mizuho* | January 24, 2017 |
| "Reinstate with Hold as NXP in DBe, but Significant Uncertainties Persist," *Deutsche Bank* | June 18, 2017 |
| "IT HW and Telecom Equipment," *Credit Suisse* | August 4, 2017 |
| "Settlement Reached with Apple and Long-Term Licensing Model Remains Intact: Increasing PT to $89 and Reiterate BUY Rating," *Canaccord Genuity* | April 16, 2019 |
| "Investor Patience Rewarded: Qualcomm and Apple Settle Global Litigation Battle," *Bank of America Merrill Lynch* | April 17, 2019 |
| "Appeal Victory in FTC Case Removes Final Major Legal Overhang," *Deutsche Bank* | August 11, 2020 |

# EXHIBIT 3

| Document Title | Document Date |
|---|---|
| "Favorable Ruling in Anti-Trust Case Open Doors for Long-Only Investor Interest in 5G Opportunity," *J.P. Morgan* | August 11, 2020 |

**Note: In addition to the equity research analyst reports cited here, I relied on all equity research analyst reports cited in Exhibit 4.**

**Academic Text**

| | |
|---|---|
| Beaver, W., "Market Efficiency," *Accounting Review*, 56(1), pp. 23–27 | 1981 |
| Brealey, R., S. Myers, and F. Allen, *Principles of Corporate Finance*, 10th ed., New York, NY: McGraw-Hill/Irwin | 2011 |
| Fama, E. and K. French, "Industry Costs of Equity," *Journal of Financial Economics*, 43(2), pp. 153–193 | 1997 |
| Fama, E., "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 25(2), pp. 383–417 | 1970 |
| Fama, E., "Efficient Capital Markets: II," *Journal of Finance,* 46(5), pp. 1575–1617 | 1991 |
| Kim, Y. and R. Stulz, "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," Journal of Financial Economics, 22(2), pp. 189–205 | 1988 |
| MacKinlay, C., "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), pp. 13–39 | 1997 |
| Mishkin, F., *The Economics of Money, Banking, and Financial Markets*, 7th ed., Boston: Pearson Addison Wesley | 2004 |
| Ratliff, J. and D. Rubinfeld, "The Use and Threat of Injunctions in the RAND Context," *Journal of Competition Law & Economics*, pp. 1–22 | 2013 |
| Ross, S. et al., *Corporate Finance*, 13th ed., New York, NY: McGraw-Hill/Irwin | 2022 |
| Shliefer, A. and R. Vishny, "The Limits of Arbitrage," *Journal of Finance*, 52(1), pp. 35–55 | 1997 |
| Stock, J. and M. Watson, *Introduction to Econometrics*, 3rd ed., Pearson Education Limited, available at https://archive.org/details/introductiontoec0000stoc_l3e7 | 2012 |

**Press Releases**

| | |
|---|---|
| "Antitrust: Commission Initiates Formal Proceedings against Qualcomm," EC Press Release | October 1, 2007 |
| "Dutch and German Courts Dismiss Nokia's Patent Exhaustion Complaints," Qualcomm Press Release | November 14, 2007 |
| "Nokia and Qualcomm Enter into a New Agreement," Qualcomm Press Release | July 22, 2008 |
| "Qualcomm and Broadcom Reach Settlement and Patent Agreement," Qualcomm Press Release | April 26, 2009 |
| "Qualcomm's Abuse of Market Dominance," KFTC Press Release | July 23, 2009 |
| "MediaTek and Qualcomm Enter into Patent Arrangement," Qualcomm Press Release | November 19, 2009 |
| "Antitrust: Commission Closes Formal Proceedings against Qualcomm," EC Press Release | November 24, 2009 |
| "Joint Public Statement by MediaTek and Qualcomm," MediaTek Press Release | September 25, 2013 |
| "China's National Development and Reform Commission Notifies Qualcomm of Investigation," Qualcomm Press Release | November 25, 2013 |
| "Qualcomm and China's National Development and Reform Commission Reach Resolution," Qualcomm Press Release | February 9, 2015 |

**EXHIBIT 3**

| Document Title | Document Date |
|---|---|
| "Antitrust: Commission Opens Two Formal Investigations against Chipset Supplier Qualcomm," EC Press Release | July 16, 2015 |
| "Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report," Qualcomm Press Release | November 17, 2015 |
| "Antitrust: Commission Sends Two Statements of Objections on Exclusivity Payments and Predatory Pricing to Qualcomm," EC Press Release | December 8, 2015 |
| "Qualcomm Comments on Regulatory Matters," Qualcomm Press Release | December 8, 2015 |
| "Strict Sanctions on Qualcomm's Abuse of Cellular SEPs," KFTC Press Release (Unofficial English translation) | December 28, 2016 |
| "FTC Charges Qualcomm with Monopolizing Key Semiconductor Device Used in Cell Phones," Federal Trade Commission Press Release | January 17, 2017 |
| "Qualcomm Responds to Complaint from U.S. Federal Trade Commission," Qualcomm Press Release | January 17, 2017 |
| "Qualcomm Disagrees with Decision by Taiwan Fair Trade Commission and Intends to Seek a Stay and Appeal the Decision," Qualcomm Press Release | October 10, 2017 |
| "Antitrust: Commission Fines Qualcomm €997 Million for Abuse of Dominant Market Position," EC Press Release | January 24, 2018 |
| "JFTC Revokes Order, Finds Qualcomm Licensing Program Lawful," Qualcomm Press Release | March 13, 2019 |
| "Qualcomm and Apple Agree to Drop All Litigation," Qualcomm Press Release | April 16, 2019 |
| "Antitrust: Commission Fines US Chipmaker Qualcomm €242 Million for Engaging in Predatory Pricing," EC Press Release | July 18, 2019 |
| "Abuse of Dominance on the LTE Chipset Market: The General Court Annuls the Commission Decision Imposing on Qualcomm a Fine of Approximately €1 Billion," Court of Justice of the European Union Press Release | June 15, 2022 |

**Other Public Materials**

| | |
|---|---|
| "About ETSI," ETSI, available at https://www.etsi.org/about | |
| "About KFTC: How We Handle Cases," KFTC, available at https://www ftc.go kr/eng/contents.do?key=495 | |
| Additional Statement for the Record of Intel Corporation Prepared in Response to the July 30, 2013 Hearing on "Standard Essential Patent Disputes and Antitrust Law" before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Committee on the Judiciary of the United States Senate, available at available at https://www.judiciary.senate.gov/imo/media/doc/CHRG-113shrg88369.pdf | August 13, 2013 |
| Additional Statement of Donald J. Rosenberg Prepared in Response to the July 30, 2013, Hearing on "Standard Essential Patent Disputes and Antitrust Law" before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Committee on the Judiciary of the United States Senate, available at https://www.judiciary.senate.gov/imo/media/doc/CHRG-113shrg88369.pdf | September 3, 2013 |
| "Apple Says It Is Suing Qualcomm over Licensing Practices," Wall Street Journal, available at https://www.wsj.com/articles/apple-sues-qualcomm-over-licensing-practices-1484944919?mod=article_inline | January 20, 2017 |
| "Comments," IEEE, available at https://grouper.ieee.org/groups/pp-dialog/drafts_comments/PatCom_sort_by_comment_ID_260514.pdf | May 26, 2014 |

**EXHIBIT 3**

| Document Title | Document Date |
| --- | --- |
| "ETSI IPR Policy," ETSI, available at https://www.etsi.org/intellectual-property-rights | |
| "Federal Circuit Gives Guidance on Litigating RAND Royalty (Ericsson v. D-Link)," Essential Patent Blog, available at https://www.essentialpatentblog.com/2014/12/federal-circuit-gives-guidance-on-litigating-rand-obligation-ericsson-v-d-link | December 5, 2014 |
| "Getting Started with Trefis," Trefis, available at https://web.archive.org/web/20140209200717/http://www.trefis.com/faq#4 | 2014 |
| Hearing Transcript of "Standard Essential Patent Disputes and Antitrust Law" before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Committee on the Judiciary of the United States Senate, available at https://www.judiciary.senate.gov/imo/media/doc/CHRG-113shrg88369.pdf | July 30, 2013 |
| "IEEE at a Glance," IEEE, available at https://www.ieee.org/about/at-a-glance.html | |
| "Industry Giants Agree on LTE IPR; Qualcomm Notably Absent from List," RCR Wireless News | April 21, 2008 |
| "InterDigital and IEEE," InterDigital, available at https://www.interdigital.com/page/interdigital-and-ieee | |
| Letter from Renata B. Hesse, Acting Assistant Attorney General, to Michael A. Lindsay, Esq., Dorsey & Whitney LLP, Available at https://www.justice.gov/file/338591/download | February 2, 2015 |
| "Nvidia Acquires Icera for $367M," San Francisco Business Times, available at https://www.bizjournals.com/sanfrancisco/news/2011/05/09/nvidia-acquires-icera-for-367m html | May 9, 2011 |
| "Overview of IXTC," NASDAQ, available at https://indexes.nasdaqomx.com/Index/Overview/IXTC | |
| "Overview of SOX," NASDAQ, available at https://indexes nasdaqomx.com/index/overview/sox | |
| "Patent Decision Could Have Wide-Ranging Impact: Qualcomm Downplaying Significance of Decision," RCR Wireless, available at https://www.rcrwireless.com/20080610/free-reports/patent-decision-could-have-wide-ranging-impact | June 10, 2008 |
| "Patent Holders Fear Weaker Tech Role," Wall Street Journal, available at https://www.wsj.com/articles/patent-holders-fear-weaker-tech-role-1423442219 | February 9, 2015 |
| "Qualcomm Rides China's Smartphone Boom," Forbes, available at https://www forbes.com/sites/greatspeculations/2012/03/23/qualcomm-rides-chinas-smartphone-boom | March 23, 2012 |
| "Qualcomm Says It Won't Follow New Wi-Fi Rules on Patents," Bloomberg, available at https://www.bloomberg.com/news/articles/2015-02-11/qualcomm-says-new-wi-fi-standard-rules-unfair-may-not-take-part | February 11, 2016 |
| "Qualcomm Technology Licensing," Qualcomm, available at https://web.archive.org/web/20130123160834/http://www.qualcomm.com/about/businesses/qtl | January 23, 2013 |
| "South Korea's Fair Trade Commission Considering Qualcomm Probe," The Wall Street Journal, February 12, 2015, available at https://www.wsj.com/amp/articles/BL-KRTB-7414 | February 12, 2015 |
| "South Korea Fines Qualcomm $208 Million in Anti-Trust Case," Reuters, available at https://www reuters.com/article/us-qualcomm-korea/south-korea-fines-qualcomm-208-million-in-anti-trust-case-idUKTRE56M29T20090723 | July 23, 2009 |
| "South Korean Watchdog Cuts Fine on Qualcomm After Decade-Old Legal Battle," Reuters, available at https://www reuters.com/article/us-southkorea-qualcomm/south-korean-watchdog-cuts-fine-on-qualcomm-after-decade-old-legal-battle-idUSKCN1R203V | March 20, 2019 |
| "Standard-Setting Organization (SSO)," Thomson Reuters, available at https://content.next.westlaw.com/9-557-1858 | |

# EXHIBIT 3

| Document Title | Document Date |
|---|---|
| Tabak, D., "Risk Disclosures and Damages Measurement in Securities Fraud Cases," Securities Reform Act Litigation Reporter, 21(1), pp. 6–10, available at https://www.nera.com/content/dam/nera/publications/archive1/PUB_RiskDisclosures_1067.pdf | 2006 |
| "The World Changing Technology That Almost Wasn't," Qualcomm, available at https://www.qualcomm.com/research/stories/world-changing-technology | |
| "The World's Most Influential Scientific Minds," Thomson Reuters, available at https://www.ludwigcancerresearch.org/wp-content/uploads/2018/09/37a987a9-e378-4888-8baa-d4ba20efdbfd_tr_scientific_minds_online_final.pdf | December 2015 |
| "U.S. Patent Case Likely to Redefine Royalties," The New York Times, available at https://www.nytimes.com/2008/01/16/technology/16iht-patents.4.9274649 html | January 6, 2008 |
| "UPDATE 3-US Court Rules in Quanta's Favor in LG Patent Case," Reuters, available at https://www.reuters.com/article/quanta-lg/update-3-us-court-rules-in-quantas-favor-in-lg-patent-case-idUSN0925655120080609 | June 9, 2008 |
| "Qualcomm's Got The Mobile Device Market Nailed," Teletimes International, available at https://teletimesinternational.com/2012/qualcomms-got-the-mobile-device-market-nailed | January 23, 2012 |

**Note: In addition to the documents on this list, I relied on all documents cited in my report and my exhibits to form my opinions.**

**EXHIBIT 4**

# Equity Research Analyst Reports on or within Five Business Days Following Each Alleged Corrective Disclosure Impact Date

### November 18, 2015

1. "Korea FTC Update Highlights Ongoing QTL Risks," *UBS,* November 18, 2015

2. "Korea Report Creates More Uncertainty," *Nomura,* November 18, 2015

3. "Lowering Estimates, Target on Industry Unit Weakness; Valuation at All-Time Low," *BMO Capital Markets,* November 18, 2015

4. "Lowering Price Target on Increased Regulatory Risk Post KFTC Report," *Goldman Sachs,* November 18, 2015

5. "QCOM Confirms Receipt of KFTC's Case ER," *Credit Suisse,* November 18, 2015

6. "Quick Take - QCOM: Korea Kicks Qualcomm While They're Down…," *Bernstein Research,* November 18, 2015

7. "Raymond James TMTalk: ARRS, CMCSA, MSI, QCOM," *Raymond James,* November 18, 2015

8. "South Korea's Investigation Report Is Troubling, but We Still See Qualcomm Pulling Through," *Morningstar,* November 18, 2015

9. "South Korean Antitrust Regulator Recommends Undisclosed Fine against Qualcomm for Violations in IP Licensing Practices," *Stifel,* November 18, 2015

10. "Where's the Aspirin? Korean FTC Examiner's Report Makes Royalty Headaches Worse," *Morgan Stanley,* November 18, 2015

11. "Deep Dive into Breakup Valuation, Korea Licensing, and QTL's Long-Term Position," *Bank of America Merrill Lynch,* November 19, 2015

12. "Raymond James TMTalk: AAPL, GPRO, FIT, GRMN, QCOM, CSCO," *Raymond James,* November 19, 2015

13. "Royalty Self-Resolution - Part 2, And Korea," *Morgan Stanley,* November 19, 2015

14. "Semiconductors and Wireless: Conclusions from Recent Industry Interactions—Clean Sweep with XPliant While Thunder Roars On," *William Blair,* November 19, 2015

15. "Semiconductors: Technology and Market Primer 9.0," *Oppenheimer,* November 19, 2015

16. "China Telcos, Asian Semis, QCOM: October Tracker - Solid 3G/4G Net Adds; Handset Maintains YoY Lead but Weak MoM," *Bernstein Research,* November 20, 2015

17. "A Battle across Many Fronts; Though We See Some Stabilization," *RBC Capital Markets,* November 22, 2015

18. "Cisco Product and M&A Updates; Fine-Tuning Smartphone and PC Forecasts Post 3Q Data," *Goldman Sachs,* November 23, 2015

19. "Adding QCOM to US 1," *Bank of America Merrill Lynch*, November 24, 2015

20. "FBR's Accretion Index Reveals Some High Value Targets in November; Top Three Include LSCC, MRVL, and ON," *FBR & Co*, November 24, 2015

21. "2016 to Bring Few Prospects in Smartphones," *Nomura*, November 24, 2015

**EXHIBIT 4**

**December 8, 2015**

1. "CU and CT Jointly Call for Standardization of 4G Handsets; CU Launches 4G+ Strategy," *J.P. Morgan*, December 8, 2015

2. "Latest Regulatory Investigations Look Benign," *Morgan Stanley,* December 8, 2015

3. "Qualcomm: EU Provides Details, Taiwan Joins the Party - Some Quick Thoughts," *Bernstein Research,* December 8, 2015

4. "Virtual Reality: Feeling the Force (Semiconductors/Hardware)," *Arete,* December 8, 2015

5. "QCOM Regulatory Troubles, OLED Report, Taiwanese ODM Report and More…," *J.P. Morgan,* December 9, 2015

6. "Chip Data December 2015: Semiconductors," *Wells Fargo,* December 10, 2015

7. "Semiconductor Team Asia Trip Takeaways - Full Recap," *Sterne Agee,* December 11, 2015

8. "Joint Efforts to Build a Complete Local Semiconductor Eco-System," *Nomura*, December 14, 2015

9. "Weak iPhone Demand a Drag, but New Royalties Should at Least Offset," Morgan Stanley, December 14, 2015

10. "We Are Lowering Our Qualcomm Moat Rating to Narrow Owing to Regulatory Uncertainty, Maintain $68 FVE," *Morningstar*, December 14, 2015

11. "Status Quo Following Strategic Review; Slightly Increasing December Quarter Estimates," *Canaccord*, December 15, 2015

12. "No Change Is Not Good; Downgrading to Market Perform from Outperform," *BMO Capital Markets*, December 15, 2015

13. "Staying Together, Clearing Decks for M&A (NXPI/FSL?)," *Cowen*, December 15, 2015

14. "Adjusting Estimates for Raised Dec Q Outlook; Reiterate Buy," *Brean Capital*, December 15, 2015

15. "Keeping It Together after Review," *Barclays*, December 15, 2015

16. "Org Structure Is Optimal, but Business Model Will Continue to Lose Traction," *Charter Equity*, December 15, 2015

17. "Keeping Status Quo," *Northland Securities*, December 15, 2015

18. "Breaking Up Is Hard to Do," *UBS*, December 15, 2015

19. "QCOM: Maintains Current Corporate Structure – Lifts EPS Guidance," *Wells Fargo*, December 15, 2015

20. "Much Ado about Nothing," *Macquarie Research*, December 15, 2015

21. "Asia Trip Wrap-Up," *Susquehanna*, December 15, 2015

22. "Results Guided Better than Expected; Board Holds the Company Together," *FBR & Co*, December 15, 2015

23. "Qualcomm Stock Report," *S&P Capital IQ*, December 15, 2015

24. "After Strategic Review, Solving Royalty Headaches Remains Key," *Morgan Stanley*, December 15, 2015

25. "Passing through Splitsville," *RBC Capital Markets*, December 15, 2015

26. "Now What? Quick Note," *Nomura*, December 15, 2015

27. "Summit takeaway: What China Wants to Do?", December 15, 2015

**EXHIBIT 4**

28. "Quick Take - Qualcomm Completes Review - No Changes Were Expected, None Received, Slight Raise to Guidance," *Bernstein Research*, December 15, 2015

29. "We're Better Together; Strategic Review Outcome," *Oppenheimer*, December 15, 2015

30. "QCOM to Maintain Corporate/Financial Structure; Raised FQ1 Guidance Prompts Higher Estimates and PT," *Pacific Crest Securities*, December 15, 2015

31. "Let's Stay Together: Qualcomm Completes Strategic Review; Maintaining Our $68 Fair Value Estimate," *Morningstar*, December 15, 2015

32. "No Split, QTL Slightly Better on Sept. Shipments, Recent Data Not as Good," *Raymond James*, December 15, 2015

33. "Qualcomm Concludes Strategic Review," *Credit Suisse*, December 15, 2015

34. "Qualcomm to Remain Combined, Offers Positive Q1 View," *Stifel*, December 15, 2015

35. "Strategic Review Output Disappointing, FQ1 Guidance Increased - ALERT," *J.P. Morgan*, December 15, 2015

## December 28, 2016

1. "Alert: Qualcomm's Agreement with Gionee Could Be $0.10 Accretive to EPS – Reiterate Neutral," *Citi*, December 28, 2016

2. "Korea FTC Announces a Fine and Corrective Actions," *UBS*, December 28, 2016

3. "Korean Fair Trade Commission Fines QCOM," *Credit Suisse*, December 28, 2016

4. "QuickTake: Korea Gives Qualcomm $865M Worth of Coal in Their Stocking – Some Thoughts on Last Night's KFTC Decision," *Bernstein Research*, December 28, 2016

5. "South Korea Antitrust Ruling Consistent with Our Outlook for Qualcomm; Maintaining $72 FVE," *Morningstar*, December 28, 2016

6. "South Korean Antitrust Agency Issues Fine, Outlines Licensing Changes," *Bank of America Merrill Lynch*, December 28, 2016

7. "2017 Outlook: Still Healthy Growth Ahead," *Nomura*, December 29, 2016

8. "Alert: Korea Tries to Play Grinch to Qualcomm, Levies $865 Million Fine – No Impact to Our Thesis/ Neutral Rating," *Citi*, December 29, 2016

9. "Automotive Semiconductor Market Overview," *Wells Fargo*, December 29, 2016

10. "CES Preview: Expect AI, AR/VR & Self-Driving Cars, to Dominate the Spotlight," *Brean Capital*, December 30, 2016

11. "Chip Outlook 2017: Moving Further into Recovery," *Wells Fargo*, January 2, 2017

12. "Chip Stats: Recovery Continued in November," *Wells Fargo*, January 2, 2017

13. "November SIA: Above Seasonal - CQ4 Likely Above," *Cowen*, January 2, 2017

14. "Asian Semis & Semicap: What to Look Out For," *Bernstein Research*, January 3, 2017

15. "Qualcomm: Is Korea Trying to Kill QTL? What Does Qualcomm's (Unofficial) Translation of the KFTC Order Suggest?," *Bernstein Research*, January 3, 2017

16. "U.S. Semiconductors: November 2016 WSTS Tracker - November Sales Up 0.7% MoM, Slightly Better than Typical (-2.1%); Up 11% YoY," *Bernstein Research*, January 3, 2017

17. "Wrong Side of the 'Border,'" *Nomura*, January 3, 2017

18. "Daily Chip Clips," *Oppenheimer*, January 3, 2017

**EXHIBIT 4**

19. "Clarification on FX Impact," *Raymond James*, January 4, 2017

20. "Daily Chip Clips," *Oppenheimer*, January 4, 2017

21. "Meizu/Gionee Giveth, King Dollar Taketh Away," *Raymond James*, January 4, 2017

22. "Qualcomm Inc (QCOM) QCOM - CES Announcements," *Northland Securities*, January 4, 2017

23. "'Top 5' Takeaways from QCOM Meeting at CES," *RBC Capital Markets*, January 5, 2017

24. "Rosenblatt's Best Ideas for 2017," *Rosenblatt Securities*, January 5, 2017

### January 17, 2017

1. "4Q Earnings Preview: Expect a Broadly Strong Finish to 2016," *Goldman Sachs*, January 17, 2017

2. "Alert: FTC Complaint against Qualcomm Could Put Pressure on Royalty Rates, Remain Neutral," *Citi*, January 17, 2017

3. "C4Q/C1Q: Inline Consumer, Better I/A/I," *Credit Suisse*, January 17, 2017

4. "Our Thoughts on the FTC Complaint - ALERT," *J.P. Morgan*, January 18, 2017

5. "Semiconductors 4Q16 Earnings Preview: Upside to Estimates but Warning Signs on Handset Demand – Stay with TXN, Good M&A and DRAM," *Citi*, January 17, 2017

6. "The Hits Keep Coming: U.S. FTC Files Complaint against Qualcomm over Chipset and Licensing Practices," *Morningstar*, January 17, 2017

7. "US FTC Asserts Anti-Competitive Practices," *UBS*, January 17, 2017

8. "US FTC Decides to Sue: Our Take," *Cowen*, January 17, 2017

9. "Expecting In-Line Quarter; Weak FTC Complaint," *Stifel*, January 18, 2017

10. "FTC Complaint Concerning, but Pending FTC Changes Create Doubt That New Leadership Will Pursue the Complaint," *Canaccord Genuity*, January 18, 2017

11. "FTC Move Unexpected; We See Several Uncertainties," *Morgan Stanley*, January 18, 2017

12. "Our Take on the FTC's Anticompetitive Stand against Qualcomm," *William Blair*, January 18, 2017

13. "QCOM – the FTC Looking for Its Pound of Flesh," *Northland Capital Markets*, January 18, 2017

14. "Qualcomm Inc.: Is Their Business Model Too Good?," *Susquehanna*, January 18, 2017

15. "Qualcomm(QCOM): The FTC Files – a Knife in the Heart, or Just a Paper Cut?," *Bernstein Research*, January 18, 2017

16. "Raymond James TMTalk: QCOM," *Raymond James*, January 18, 2017

17. "US FTC Charges QCOM of Antitrust Practices," *Credit Suisse*, January 18, 2017

18. "US FTC Files Antitrust Charges, Citing Licensing and Chipset Violations," *Bank of America Merrill Lynch*, January 18, 2017

19. "Will the Good Times Keep Rolling in 2017?" *Pacific Crest Securities*, January 18, 2017

20. "ADTN EPS, QCOM FTC Update and User Suit, OCLR+ive Pre, PLXS EPS, TGT Warns and More…," *J.P. Morgan*, January 19, 2017

21. "China Telcos, Asian Semis, QCOM: Dec – China Mobile 4G Adds Jump; Smartphone Shipments +19% YoY/Mo; +14% YoY/Yr," *Bernstein Research*, January 20, 2017

22. "Implications from China Carriers' December KPIs," *Cowen*, January 20, 2017

23. "Making Semis Great Again (?): Assessing Risk from Trump's Reforms," *Cowen*, January 20, 2017

24. "Weekend Tech Byte – Bordering on Insanity," *Bernstein Research*, January 20, 2017

**EXHIBIT 4**

25. "Daily Chip Clips," *Oppenheimer,* January 20, 2017

26. "Apple Formally Joins Fight against Qualcomm over the Latter's Business Practices," *Morningstar,* January 22, 2017

27. "Chip Weekly: Expecting Good Chip Earnings Reports," *Wells Fargo,* January 22, 2017

28. "Clash of the Smartphone Titans," *BMO Capital Markets,* January 22, 2017

29. "Could NXPI Accretion Be Offset by New Challenges? AAPL, FTC & KFTC.... Who Is Next?," *RBC Capital Markets,* January 22, 2017

30. "Thinking Through This AAPL Lawsuit – Positive for INTC," *Cowen,* January 22, 2017

31. "AAPL vs. QCOM, JNPR Share Scenarios, Panel Pricing Holding Up and More," *J.P. Morgan,* January 23, 2017

32. "Alert: Apple Jumps on the Dog Pile, Sues Qualcomm; Another Potential Pressure Point on Royalty Rates – Reiterate Neutral," *Citi,* January 23, 2017

*33.* "Apple Breaks the Silence Over Royalty Fees," *UBS*, January 23, 2017

34. "Apple Files Lawsuit against Qualcomm," *Goldman Sachs,* January 23, 2017

35. "Apple Sues Qualcomm over Unfair Licensing Terms," *Pacific Crest Securities,* January 23, 2017

36. "Apple Suing Qualcomm over Royalties," *Credit Suisse,* January 23, 2017

37. "Daily Chip Clips," *Oppenheimer,* January 23, 2017

38. "Downgrade on NXPI Deal Timeline," *Nomura,* January 23, 2017

39. "Downgrade to U-PF," *CLSA,* January 23, 2017

40. "Earnings Previews for Juniper, Qualcomm, and F5 Networks," *Goldman Sachs,* January 23, 2017

41. "It's Never Good When a Top Customer Sues You for Aggressive Licensing Practices," *William Blair,* January 23, 2017

42. "Market Overreaction to the Lawsuit Overhang," *Stifel,* January 23, 2017

43. "Pullback Overdone in the Near-Term?," *Mizuho,* January 23, 2017

44. "Q1 2017 Earnings Preview," *Morgan Stanley,* January 23, 2017

45. "QCOM EPS Impact Is Severe If Apple Withholds Payments on Our Calculations - ALERT," *J.P. Morgan,* January 23, 2017

46. "QCOM, AAPL: Qualcomm/Apple Spat Highlights Changing Game Theory of Cellular IP Licensing," *Raymond James,* January 23, 2017

47. "Qualcomm Inc: The Plot Thickens," *Susquehanna,* January 23, 2017

48. "Qualcomm, Apple: The March to War," *Bernstein Research*, January 23, 2017

49. "Sell-Off on Apple Litigation Overdone; Lower Price Target to $75 from $81 Based on Scenario Analysis," *Canaccord Genuity,* January 23, 2017

50. "Surveying the 5G Landscape; A Sector View of What's to Come," *Cowen,* January 23, 2017

51. "Worst Case Scenario Is Likely Better than Feared," *Bank of America Merrill Lynch,* January 23, 2017

52. "A Second Take on the Apple Litigation," *Mizuho,* January 24, 2017

53. "AAPL, QCOM: Read-Throughs from Samsung and Verizon," *Raymond James,* January 24, 2017

54. "Apple Follow-Up: 3 Key Things to Watch + 5 Investor Questions & 2 Nuances," *Morgan Stanley,* January 24, 2017

55. "Daily Chip Clips," *Oppenheimer,* January 24, 2017

**EXHIBIT 4**

56. "FQ1'17 Preview: All Eyes on Apple Lawsuit - ALERT," *J.P. Morgan,* January 24, 2017

57. "Little Chance Apple Suit Will End Well or Be the Last Such Attack," *Charter Equity Research,* January 24, 2017

58. "More Thoughts on AAPL Lawsuit," *Cowen,* January 24, 2017

59. "Teardown Takeaways: Top Takeaways from the Chipworks Database," *Susquehanna,* January 24, 2017

### January 20, 2017 and January 23, 2017

1. "China Telcos, Asian Semis, QCOM: Dec – China Mobile 4G Adds Jump; Smartphone Shipments +19% YoY/Mo; +14% YoY/Yr," *Bernstein Research,* January 20, 2017

2. "Implications from China Carriers' December KPIs," *Cowen,* January 20, 2017

3. "Making Semis Great Again (?): Assessing Risk from Trump's Reforms," *Cowen,* January 20, 2017

4. "Weekend Tech Byte – Bordering on Insanity," *Bernstein Research,* January 20, 2017

5. "Daily Chip Clips," *Oppenheimer,* January 20, 2017

6. "Apple Formally Joins Fight against Qualcomm over the Latter's Business Practices," *Morningstar,* January 22, 2017

7. "Chip Weekly: Expecting Good Chip Earnings Reports," *Wells Fargo,* January 22, 2017

8. "Clash of the Smartphone Titans," *BMO Capital Markets,* January 22, 2017

9. "Could NXPI Accretion Be Offset by New Challenges? AAPL, FTC & KFTC.... Who Is Next?," *RBC Capital Markets,* January 22, 2017

10. "Thinking Through This AAPL Lawsuit – Positive for INTC," *Cowen,* January 22, 2017

11. "AAPL vs. QCOM, JNPR Share Scenarios, Panel Pricing Holding Up and More," *J.P. Morgan,* January 23, 2017

12. "Alert: Apple Jumps on the Dog Pile, Sues Qualcomm; Another Potential Pressure Point on Royalty Rates – Reiterate Neutral," *Citi,* January 23, 2017

*13.* "Apple Breaks the Silence Over Royalty Fees," *UBS*, January 23, 2017

14. "Apple Files Lawsuit against Qualcomm," *Goldman Sachs,* January 23, 2017

15. "Apple Sues Qualcomm over Unfair Licensing Terms," *Pacific Crest Securities,* January 23, 2017

16. "Apple Suing Qualcomm over Royalties," *Credit Suisse,* January 23, 2017

17. "Daily Chip Clips," *Oppenheimer,* January 23, 2017

18. "Downgrade on NXPI Deal Timeline," *Nomura,* January 23, 2017

19. "Downgrade to U-PF," *CLSA,* January 23, 2017

20. "Earnings Previews for Juniper, Qualcomm, and F5 Networks," *Goldman Sachs,* January 23, 2017

21. "It's Never Good When a Top Customer Sues You for Aggressive Licensing Practices," *William Blair,* January 23, 2017

22. "Market Overreaction to the Lawsuit Overhang," *Stifel,* January 23, 2017

23. "Pullback Overdone in the Near-Term?," *Mizuho,* January 23, 2017

24. "Q1 2017 Earnings Preview," *Morgan Stanley,* January 23, 2017

25. "QCOM EPS Impact Is Severe If Apple Withholds Payments on Our Calculations - ALERT," *J.P. Morgan,* January 23, 2017

**EXHIBIT 4**

26. "QCOM, AAPL: Qualcomm/Apple Spat Highlights Changing Game Theory of Cellular IP Licensing," *Raymond James,* January 23, 2017

27. "Qualcomm Inc: The Plot Thickens," *Susquehanna,* January 23, 2017

28. "Qualcomm, Apple: The March to War," *Bernstein Research*, January 23, 2017

29. "Sell-Off on Apple Litigation Overdone; Lower Price Target to $75 from $81 Based on Scenario Analysis," *Canaccord Genuity,* January 23, 2017

30. "Surveying the 5G Landscape; A Sector View of What's to Come," *Cowen,* January 23, 2017

31. "Worst Case Scenario Is Likely Better than Feared," *Bank of America Merrill Lynch,* January 23, 2017

32. "A Second Take on the Apple Litigation," *Mizuho,* January 24, 2017

33. "AAPL, QCOM: Read-Throughs from Samsung and Verizon," *Raymond James,* January 24, 2017

34. "Apple Follow-Up: 3 Key Things to Watch + 5 Investor Questions & 2 Nuances," *Morgan Stanley,* January 24, 2017

35. "Daily Chip Clips," *Oppenheimer,* January 24, 2017

36. "FQ1'17 Preview: All Eyes on Apple Lawsuit - ALERT," *J.P. Morgan,* January 24, 2017

37. "Little Chance Apple Suit Will End Well or Be the Last Such Attack," *Charter Equity Research,* January 24, 2017

38. "More Thoughts on AAPL Lawsuit," *Cowen,* January 24, 2017

39. "Teardown Takeaways: Top Takeaways from the Chipworks Database," *Susquehanna,* January 24, 2017

40. "Apple vs. Qualcomm – Messy Marriage," *Credit Suisse,* January 25, 2017

41. "GLW EPS, STX EPS, Samsung Hoarding Snapdragon 835, CSCO/APPD, IIVI/SEC/LGD EPS and More," *J.P. Morgan,* January 25, 2017

42. "Inline Guide; No Apple Impact Yet," *Mizuho,* January 25, 2017

43. "Legal Limbo," *Oppenheimer,* January 25, 2017

44. "Management Prepared for Apple Business Model Attacks; Reiterate Buy and $75 Pt," *Canaccord Genuity,* January 25, 2017

45. "Mixed Outlook and Guidance; Lowering Estimates on NXP Financing Costs," *Pacific Crest Securities,* January 25, 2017

46. "Outlook and Models before the Call; Expecting Higher Guide from QCOM and WDC," *BMO Capital Markets,* January 25, 2017

47. "Preparing to Vigorously Defend Its Business Model, Again," *Stifel,* January 25, 2017

48. "Putting QCOM on Catalyst Watch – Share Gains at Oppo/Vivo and Selloff Make for Good Short Term Opportunity," *Citi,* January 25, 2017

49. "QCOM: Earnings - Continuing Year/Year Sales Growth," *Wells Fargo,* January 25, 2017

50. "All the Big Answers Still to Come; Time to Wait," *Morgan Stanley,* January 26, 2017

51. "Apple Doomsday Scenario Avoided but Flaccid Results and Guidance – Reiterate Neutral," *Citi,* January 26, 2017

52. "Apple Litigation in Focus," *BNP Paribas,* January 26, 2017

53. "Brace for a Bumpy Litigation Ride; China Is Incrementally Better but the Apple Dangles Overhead," *William Blair,* January 26, 2017

54. "Estimates Moving Lower; Legal Proceedings in Focus," *Goldman Sachs,* January 26, 2017

**EXHIBIT 4**

55. "Executing on Strategic Transformation, but Legal Issues in the Forefront," *Brean Capital,* January 26, 2017

56. "FQ1'17 Wrap: All about Apple. Reiterate Neutral," *J.P. Morgan,* January 26, 2017

57. "Fundamentals In-Line, Apple Acrimony Creating Near-Term Uncertainty," *Raymond James,* January 26, 2017

58. "In-Line Results Overshadowed by Legal Issues," *Bank of America Merrill Lynch,* January 26, 2017

59. "Litigation Takes Center Stage; Reiterate Market Perform," *BMO Capital Markets,* January 26, 2017

60. "Love Is a Battlefield," *Cowen,* January 26, 2017

61. "On the Sidelines for Now," *CLSA,* January 26, 2017

62. "Plenty of Moving Parts, but NXPI on Track," *RBC Capital Markets,* January 26, 2017

63. "QCOM – In-Line Quarter & Guide," *Northland Capital Markets,* January 26, 2017

64. "QCOM EPS, FFIV EPS, WDC EPS, ERIC First Cut, T Capex, Keysight/XXIA, AAPL in India, LG Margin Trouble and More…," *J.P. Morgan,* January 26, 2017

65. "QCOM Makes Strong Case; Est Remain at Risk," *Nomura,* January 26, 2017

66. "Qualcomm Inc: After a So-So Quarter, They Use the Pulpit to State Their Case," *Susquehanna,* January 26, 2017

67. "Qualcomm Stock Report," *S&P Capital IQ,* January 26, 2017

68. "Qualcomm (QCOM): FQ17 Re- the Pressure Cooker," *Bernstein Research,* January 26, 2017

69. "Qualcomm's Solid First-Quarter Results Overshadowed by Attacks on Its Business Model," *Morningstar,* January 26, 2017

70. "Raymond James TMTalk: LMRK, TDS, VZ, CHTR, QCOM, AAPL," *Raymond James,* January 26, 2017

71. "Sour Apples?," *UBS,* January 26, 2017

72. "Stock Isn't Likely to Rally until NXP Closes," *Charter Equity Research,* January 26, 2017

73. "Apple vs. Qualcomm – Update Post-Earnings," *Credit Suisse,* January 27, 2017

74. "Interactive Model: Make Your Own Assumptions about the NXP Deal," *UBS,* January 27, 2017

75. "FQ1'17 10-Q Review: Possible Buyback Acceleration, POs Decline in Line with Chipment Guidance – ALERT," *J.P. Morgan*, January 30, 2017

76. "Risk/Reward in the Stock Is Starting to Look More Compelling," *Morgan Stanley*, January 30, 2017

**EXHIBIT 5**

## Qualcomm, Inc.
## Selected Litigation and Regulatory Actions as Summarized in SEC Filings

| Company/Regulatory Agency | Qualcomm Form 10-Q or 10-K Page Reference for First Disclosure | SEC Filing Quotes Summarizing Allegations and Developments | Qualcomm Form 10-K or 10-Q Page References for Summary of Allegations and Developments |
|---|---|---|---|
| 1. Broadcom Corporation | Q3 2005, pp. 14–15 | "On May 18, 2005, Broadcom filed two actions [] in the United States District Court for the Central District of California, each alleging infringement by the Company of five patents and seeking monetary damages and injunctive relief…. Broadcom also filed a complaint in the United States International Trade Commission (ITC) alleging infringement of the five patents at issue [and] seeking a determination and relief….  On July 1, 2005, Broadcom filed an action in the United States District Court for the District of New Jersey against the Company alleging violations of state and federal antitrust and unfair competition laws as well as common law claims, generally relating to licensing and chip sales activities, seeking monetary damages and injunctive relief based thereon….  On April 13, 2007, Broadcom filed a new complaint in California state court against the Company alleging unfair competition, breach of contract and fraud, and seeking injunctive and monetary relief.  On October 5, 2007, the court ordered the case stayed pending resolution of the New Jersey case []….  On October 7, 2008, Broadcom filed an action in the United States District Court for the Southern District of California seeking declaratory relief regarding patent misuse, patent exhaustion and patent and license unenforceability.  The Company has not yet responded to the complaint."[1]<br><br>"[O]n April 26, 2009, the Company entered into a Settlement and Patent License and Non-Assert Agreement (the Agreement) with Broadcom.  Under the Agreement, (i) the companies agreed to terminate all litigation between the parties; (ii) Broadcom agreed to assign certain patent rights to the Company; and (iii) the companies granted certain rights to each other under their respective patent portfolios, including agreements not to assert certain patents as well as an exhaustive license to certain patents that were the subject of litigation between the parties and to portions of related patents for integrated circuit and software products." | 2008 10-K, p. 37; 2009 10-K, p. F-27 |
| 2. Nokia Corporation/Nokia Inc. | Q1 2006, p. 15 | "On August 9, 2006, Nokia Corporation and Nokia Inc. filed a complaint in Delaware Chancery Court seeking declaratory and injunctive relief relating to alleged commitments made by the Company to wireless standards setting organizations….  On April 12, 2007 and June 5, 2007, the Company filed counterclaims seeking declarations that, among other things, the Company's 2001 license agreement with Nokia fulfilled and/or superseded any ostensible obligations to offer or grant patent licenses to Nokia allegedly arising from the Company's participa ion in certain standards setting organizations….  In March 2007, Nokia filed actions in Germany and the Netherlands alleging that certain of the Company's patents are exhausted with regards to Nokia's products placed on the European market that contain chipsets supplied to Nokia by Texas Instruments.  On October 23, 2007, the German court dismissed Nokia's claims.  On August 16, 2007, Nokia Corporation and Nokia Inc. filed a complaint with the United States International Trade Commission (ITC) alleging importation of products that infringe five Nokia patents and seeking an exclusionary order and a cease and desist order.  The ITC instituted an investigation on September 17, 2007.  The Company filed a motion to terminate the investigation pending resolution of the arbitration proceeding instituted by the Company on April 5, 2007.  On October 18, 2007, the ALJ issued an order recommending the Company's motion be granted."[2]<br><br>"On July 23, 2008, the Company announced that it had reached agreement with Nokia Corporation and Nokia Inc. to resolve all pending litigation between the parties, and the parties have either obtained dismissals or are in the process of seeking dismissal of all litigation between the parties.  The various litigation matters between the parties in different jurisdictions around the world that were terminated during the fourth quarter involved claims of patent infringement and breach of contract by each party against the other." | Q3 2008, p. 14; FY 2008, p. 37 |

**EXHIBIT 5**

| | Company/Regulatory Agency | Qualcomm Form 10-Q or 10-K Page Reference for First Disclosure | SEC Filing Quotes Summarizing Allegations and Developments | Qualcomm Form 10-K or 10-Q Page References for Summary of Allegations and Developments |
|---|---|---|---|---|
| 3. | Korean Fair Trade Commission | Q3 2006, p. 15 | "On January 4, 2010, the KFTC issued a written decision finding that the Company had violated South Korean law by offering certain discounts and rebates for purchases of its CDMA chips and for including in certain agreements language requiring the continued payment of royalties after all licensed patents have expired. The KFTC levied a fine, which the Company paid in the second quarter of fiscal 2010. The Company appealed to the Seoul High Court, and on June 19, 2013, the Seoul High Court affirmed the KFTC's decision." | Q3 2013, p. 12 |
| 4. | European Commission | FY 2005, p. 35 | "On October 28, 2005, it was reported that six companies (Broadcom, Nokia, Texas Instruments, NEC, Panasonic and Ericsson) filed complaints with the European Commission (EC), alleging that the Company violated European Union competition law in its WCDMA licensing practices. On December 22, 2009, the EC officially informed the Company that all complainants had withdrawn their complaints and the EC had closed its proceedings against the Company." | Q1 2010, pp. 14–16 |
| 5. | Japanese Fair Trade Commission | Q1 2007, p. 12 | "The JFTC received unspecified complaints alleging that our business practices are, in some way, a violation of Japanese law. On September 29, 2009, the JFTC issued a cease and desist order concluding that our Japanese licensees were forced to cross-license patents to us on a royalty-free basis and were forced to accept a provision under which they agreed not to assert their essential patents against our other licensees who made a similar commitment in their license agreements with us. The cease and desist order seeks to require us to modify our existing license agreements with Japanese companies to eliminate these provisions while preserving the license of our patents to those companies.… On March 13, 2019, the JFTC issued a decision revoking the cease and desist order against us in its entirety." | Q2 2019, p. 25 |
| 6. | Securities and Exchange Commission | FY 2010, p. 27 | "On March 13, 2014, the Company received a Wells Notice from the SEC's Los Angeles Regional Office indicating that the staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company for violations of the anti-bribery, books and records and internal control provisions of the FCPA. The bribery allegations relate to benefits offered or provided to individuals associated with Chinese state-owned companies or agencies. The Wells Notice indicated that the recommendation could involve a civil injunctive action and could seek remedies that include disgorgement of profits, the retention of an independent compliance monitor to review the Company's FCPA policies and procedures, an injunction, civil monetary penalties and prejudgment interest."<br><br>"On January 27, 2012, the Company learned that the U.S. Attorney's Office for the Southern District of California/Department of Justice (collectively, DOJ) had begun an investigation regarding the Company's compliance with the Foreign Corrupt Prac ices Act (FCPA).… On November 19, 2015, the DOJ notified the Company that it was terminating its investigation and would not pursue charges in this matter. On March 1, 2016, the Company entered into an administrative settlement with the SEC pursuant to which the Company paid a $7.5 million penalty and entered into a two-year period of self-monitoring and self-reporting with respect to FCPA compliance." | Q1 2016, pp. 15–16; Q2 2016, pp. 16–17 |

**EXHIBIT 5**

| Company/Regulatory Agency | Qualcomm Form 10-Q or 10-K Page Reference for First Disclosure | SEC Filing Quotes Summarizing Allegations and Developments | Qualcomm Form 10-K or 10-Q Page References for Summary of Allegations and Developments |
|---|---|---|---|
| 7. China National Development and Reform Commission | Q1 2014, p. 12 | "In November 2013, the NDRC notified the Company that it had commenced an investigation of the Company relating to the Chinese Anti-Monopoly Law (AML). The Company understands that the investigation concerns primarily the Company's licensing business and certain interactions between the Company's licensing business and its chipset business, including how royalties are calculated in the Company's patent licenses, the value exchanged for cross-licenses to patents of the Company's licensees, whether the Company will offer license agreements limited to patents essential to certain standards, whether royalties are sought for the Company's expired patents, the Company's policy of selling chipsets only to the Company's patent licensees, the alleged refusal of the Company to grant patent licenses to chipset manufacturers, and certain other terms and conditions in the Company's patent license and chipset sale agreements."<br><br>"On February 9, 2015, the Company announced that it had reached a resolution with the NDRC regarding the investigation. The NDRC issued an Administrative Sanction Decision finding that the Company had violated the AML, and the Company agreed to implement a rectification plan that modifies certain of its business practices in China. The NDRC has reviewed that plan and stated that it satisfies their decision. The Company will not pursue further legal proceedings contesting the NDRC's findings. The key terms of the rectification plan provide that the Company will offer licenses for devices under its current 3G and 4G essential Chinese patents separately from licenses to its other patents and will provide patent lists during the negotiation process. If the Company seeks a cross license from a Chinese licensee as part of such offer, it will negotiate with the licensee in good faith and provide fair consideration for such rights. For licenses of the Company's 3G and 4G essential Chinese patents for branded devices sold for use in China starting on January 1, 2015, the Company will charge running royalties of 5% for 3G CDMA or WCDMA devices (including multimode 3G/4G devices) and 3.5% for 4G devices that do not implement CDMA or WCDMA (including 3-mode LTE-TDD devices), in each case using a royalty base of 65% of the net selling price of the device. Consistent with the plan, the Company has offered its existing licensees the revised terms for sales of devices for use in China. The plan also provides that the Company will not condition the sale of baseband chipsets on the chipset customer signing a license agreement with terms that the NDRC found to be unreasonable or on the chipset customer not challenging unreasonable terms in its license agreement. The rectification plan does not require the Company to sell chipsets to any entity that is not a patent licensee of the Company." | Q3 2014 10-Q, pp. 12–13; Q2 2015, p. 13 |
| 8. Federal Trade Commission | FY 2014, p. 27 | "On September 17, 2014, the FTC notified us that it was conducting an investigation of us relating to Section 5 of the Federal Trade Commission Act (FTCA). On January 17, 2017, the FTC filed a complaint against us in the United States District Court for the Northern District of California alleging that we were engaged in anticompetitive conduct and unfair methods of competition in violation of Section 5 of the FTCA by conditioning the supply of cellular modem chipsets on the purchaser first agreeing to a license to our cellular standard-essential patents, paying incentives to purchasers of cellular modem chipsets to induce them to accept certain license terms, refusing to license our cellular standard-essential patents to our competitors and entering into alleged exclusive dealing arrangements with Apple Inc.… In May 2019 [] the district court issued an Order ruling against us and imposing certain injunctive relief. On August 11, 2020, on appeal, the Ninth Circuit reversed the district court's judgment, vacated its injunction and vacated its partial grant of summary judgment.… The Ninth Circuit stated that the district court erred in holding that we are under an antitrust duty to license rival chip manufacturers and noted that our practice of licensing our standard-essential patents exclusively at the OEM level does not violate the antitrust laws." | FY 2020, pp. F-30–F-31, 45 |

**EXHIBIT 5**

| Company/Regulatory Agency | Qualcomm Form 10-Q or 10-K Page Reference for First Disclosure | SEC Filing Quotes Summarizing Allegations and Developments | Qualcomm Form 10-K or 10-Q Page References for Summary of Allegations and Developments |
|---|---|---|---|
| 9. Icera Complaint to European Commission | Q3 2010, p. 16 | "On June 7, 2010, the EC notified and provided us with a redacted copy of a complaint filed with the EC by Icera, Inc. (subsequently acquired by Nvidia Corporation) alleging that we were engaged in anticompetitive activity.  On July 16, 2015, the EC announced that it had initiated formal proceedings in this matter.  On December 8, 2015, the EC announced that it had issued a Statement of Objections expressing its preliminary view that between 2009 and 2011, we were engaged in predatory pricing by selling certain baseband chipsets to two customers at prices below cost, with the intention of hindering competition.…  On July 18, 2019, the EC issued a decision confirming their preliminary view that between 2009 and 2011 we engaged in predatory pricing with respect to two customers and imposed a fine of approximately 242 million Euros (approximately $275 million based on the exchange rate at June 30, 2019), which was recorded as a charge to other expenses in the third quarter of fiscal 2019."[3] | Q3 2019, p. 22 |
| 10. European Commission | FY 2014, p. 25 | "On October 15, 2014, the EC notified the Company that it was conducting an investigation of the Company relating to Articles 101 and/or 102 of the Treaty on the Functioning of the European Union (TFEU).  On July 16, 2015, the EC announced that it had initiated formal proceedings in this matter.  On December 8, 2015, the EC announced that it had issued a Statement of Objections expressing its preliminary view that pursuant to an agreement with a customer, since 2011 the Company paid significant amounts to that customer on condition that it exclusively use the Company's baseband chipsets in its smartphones and tablets.  This conduct allegedly reduced the customer's incentives to source chipsets from the Company's competitors and harmed competition and innovation for certain baseband chipsets.  On January 24, 2018, the EC issued a decision finding that certain terms of that agreement violate EU competition law and imposed a fine of approximately 997 million Euros."[4] | Q2 2018, p. 22 |
| 11. Taiwan Fair Trade Commission | Q1 2016, p. 16 | "On December 4, 2015, the TFTC notified the Company that it is conducting an investigation into whether the Company's patent licensing arrangements violate the Taiwan Fair Trade Act (TFTA). On April 27, 2016, the TFTC specified that the allegations under investigation include whether: (i) the Company jointly licensed its patents rather than separately licensing standard-essential and non-standard-essential patents; (ii) the Company's royalty charges are unreasonable; (iii) the Company unreasonably required licensees to grant it cross-licenses; (iv) the Company failed to provide lists of licensed patents to licensees; (v) the Company violated a FRAND licensing commitment by declining to grant licenses to chipset makers; (vi) the Company declined to sell chipsets to unlicensed potential customers; and (vii) the Company provided royalty rebates to certain companies in exchange for their exclusive use of the Company's chipsets."<br><br>"On October 11, 2017, the TFTC announced that it had reached a decision in the investigation, finding that we violated the TFTA. On October 23, 2017, we received TFTC's formal written decision, which found that the following conducts violate the TFTA: (i) refusing to license and demanding restrictive covenants from chipset competitors; (ii) refusing to supply baseband processors to companies that do not have an executed license; and (iii) providing a royalty discount to Apple in exchange for its exclusive use of our chipsets.…  On December 22, 2017, we filed an Administrative Litigation Complaint in the Taiwan Intellectual Property Court (IPC) to revoke the TFTC's decision.…  On August 9, 2018, we announced that we had reached a settlement with the TFTC, which resolved the TFTC's investigation of us and our litigation challenging the TFTC's decision." | FY 2016, p. F-27; FY 2018, p. F-37 |

**EXHIBIT 5**

| | Company/Regulatory Agency | Qualcomm Form 10-Q or 10-K Page Reference for First Disclosure | SEC Filing Quotes Summarizing Allegations and Developments | Qualcomm Form 10-K or 10-Q Page References for Summary of Allegations and Developments |
|---|---|---|---|---|
| 12. | Korean Fair Trade Commission | Q2 2015, p. 14 | "On December 27, 2016, the KFTC announced that it had reached a decision in the investigation, finding that we violated provisions of the [Monopoly Regulation and Fair Trade Act by] … (i) refusing to license, or imposing restrictions on licenses for, cellular communications standard-essential patents with competing modem chipset makers; (ii)conditioning the supply of modem chipsets to handset suppliers on their execution and performance of license agreements with us; and (iii) coercing agreement terms including portfolio license terms, royalty terms and free cross-grant terms in executing patent license agreements with handset makers.… On February 21, 2017, we filed an action in the Seoul High Court to cancel the KFTC's decision.  The Seoul High Court held hearings concluding on August 14, 2019, and on December 4, 2019,announced its judgment affirming certain portions of the KFTC's decision and finding other portions of the KFTC's decision unlawful." | Q1 2020, pp. 12–13 |
| 13. | Apple Inc. (Joined by Compal Electronics, Inc. et al.)[5] | Q1 2017, p. 14 | "On January 20, 2017, Apple filed a complaint against the Company in the United States District Court for the Southern District of California seeking declarations with respect to several of the Company's patents and alleging that the Company breached certain agreements and violated federal antitrust and California state unfair competition laws.  [Apple sought] declaratory judgments of non-infringement by Apple of nine of the Company's patents, or in the alternative, a declaration of royalties Apple must pay for the patents … declaration that the Company's sale of baseband chipsets exhausts the Company's patent rights for patents embodied in those chipsets … to enjoin the Company from seeking excessive royalties from Apple and to disgorge royalties paid by Apple's contract manufacturers that the court finds were not fair, reasonable and non-discriminatory (FRAND).  Apple also claimed that that the Company's refusal to make certain payments to Apple under a Business Cooperation and Patent Agreement (Cooperation Agreement) constitutes a breach of contract in violation of California law … [and that Qualcomm had] refused to deal with competitors in contravention of the Company's agreements with applicable standard setting organizations, has used its market position to impose contractual obligations on Apple that prevented Apple from challenging the Company's licensing practices, has tied the purchase of the Company's CDMA-enabled and "premium" LTE-enabled chipsets to licensing certain of the Company's patents and has required Apple to purchase baseband chipsets exclusively from the Company as a condition of the Company's payment to Apple of certain rebates, in violation of Section 2 of the Sherman Act and the California Unfair Competition Law."<br><br>"A jury trial commenced on April 15, 2019, and on April 16, 2019, we entered into settlement agreements with Apple and its contract manufacturers to dismiss all outstanding litigation between the parties." | 2017 10-K, p. F-28; Q2 2019, pp. 19–24 |

Source:  Qualcomm, Inc., Forms 10-K and 10-Q, filed July 20, 2005–November 4, 2020

Note:

[1] Qualcomm also filed an action in the U.S. District Court for the Southern District of California against Broadcom alleging infringement of two patents.  *See* 2008 10-K, p. 37.

[2] Beginning in 2005, Qualcomm also filed several claims of patent infringement against Nokia.  *See* 2007 10-K, pp. 37–38.

[3] Qualcomm has appealed the decision.  *See* 2021 10-K,  p. F-26.

[4] In June 2022, the European Union General Court annulled the EC's 2018 finding and vacated the fine.  *See* "Abuse of Dominance on the LTE Chipset Market: The General Court Annuls the Commission Decision Imposing on Qualcomm a Fine of Approximately €1 Billion," Court of Justice of the European Union Press Release, June 15, 2022.

[5] Qualcomm and Apple entered numerous additional suits and countersuits.  *See* Q2 2019 10-Q, pp. 19–24.

**EXHIBIT 6**

## Qualcomm, Inc.
## Summary of Event Study Regression Results on
## Alleged Corrective Disclosure Impact Dates[1]

| Impact Date | Intercept Coefficient[2] | Market Index Return Coefficient[2][3] | SOX Index Return Coefficient[2][4] | NASDAQ Telecom Index Return Coefficient[2][5] | R-Squared | Root Mean Squared Error (RMSE) | Number of Observations |
|---|---|---|---|---|---|---|---|
| 11/18/15 | 0.0003 | 0.403 * | 0.343 * | 0.217 | 0.66 | 0.0085 | 124 |
| 12/8/15 | 0.0012 | 0.168 | 0.372 * | 0.354 * | 0.57 | 0.0101 | 123 |
| 12/28/16 | -0.0007 | 0.283 | 0.737 * | -0.139 | 0.44 | 0.0107 | 124 |
| 1/17/17 | -0.0003 | 0.338 | 0.713 * | -0.144 | 0.42 | 0.0107 | 123 |
| 1/20/17 | -0.0004 | 0.360 | 0.716 * | -0.165 | 0.42 | 0.0108 | 121 |
| 1/23/17 | -0.0004 | 0.360 | 0.716 * | -0.165 | 0.42 | 0.0108 | 121 |

Source:  Consolidated Class Action Complaint, filed July 3, 2017; *CRSP*; NASDAQ; *Refinitiv*

Note:
[1]  Regressions for each day are based on "rolling" estimation periods consisting of the 126 trading days immediately before the event date, excluding alleged corrective disclosure and misstatement impact dates.  The alleged corrective disclosure impact dates are 11/18/15, 12/8/15, 12/28/16, 1/17/17, 1/20/17, and 1/23/17.  The alleged misstatement impact dates are 2/2/12, 4/11/12, 4/19/12, 4/26/12, 7/19/12, 11/8/12, 11/27/12, 1/31/13, 2/25/13, 3/5/13, 4/25/13, 7/25/13, 11/7/13, 11/22/13, 1/30/14, 2/18/14, 4/24/14, 7/24/14, 11/6/14, 1/29/15, 3/16/15, 4/23/15, 7/23/15, 11/5/15, 11/18/15, 1/28/16, 4/21/16, 5/31/16, 6/24/16, 7/21/16, 11/3/16, and 11/18/17.
[2]  "*" denotes significance at the 95% confidence level.
[3]  The Market Index refers to the value-weighted NYSE/AMEX/NASDAQ/Arca Composite Index.
[4]  The Philadelphia Semiconductor Index (SOX) "is a modified market capitalization-weighted index composed of companies primarily involved in the design, distr bution, manufacture, and sale of semiconductors."  *See* "PHLX Semiconductor SOX," NASDAQ, https://indexes.nasdaqomx.com/index/overview/sox.  The index is reconstructed to exclude Qualcomm.
[5]  The NASDAQ Telecommunications Index "contains securities of NASDAQ-listed companies classified according to the Industry Classification Benchmark as Telecommunications and Telecommunications Equipment.  They include providers of fixed-line and mobile telephone services, and makers and distributors of high-technology communication products."  *See* "Nasdaq Telecommunications IXTC," NASDAQ, https://indexes.nasdaqomx.com/Index/Overview/IXTC.  The index is reconstructed to exclude Qualcomm.

**EXHIBIT 7**

## Qualcomm, Inc.
## Summary of Residual Returns on
## Alleged Corrective Disclosure Impact Dates[1]

| Impact Date | QCOM Closing Price | QCOM Return | Market Index Return[2] | SOX Index Return[3] | NASDAQ Telecom Index Return[4] | QCOM Predicted Return[5] | QCOM Residual Return[6] | t-statistic[7] |
|---|---|---|---|---|---|---|---|---|
| 11/18/15 | $48.00 | -9.40% | 1.53% | 1.69% | 0.76% | 1.39% | -10.79% | -12.38 * |
| 12/8/15 | $49.48 | -5.63% | -0.61% | -0.53% | -0.77% | -0.46% | -5.17% | -5.07 * |
| 12/28/16 | $65.75 | -2.23% | -0.80% | -1.87% | -1.03% | -1.53% | -0.70% | -0.65 |
| 1/17/17 | $64.19 | -4.02% | -0.37% | -1.42% | -0.55% | -1.09% | -2.93% | -2.72 * |
| 1/20/17 | $62.88 | -2.42% | 0.36% | 1.57% | 0.10% | 1.20% | -3.62% | -3.32 * |
| 1/23/17 | $54.88 | -12.72% | -0.19% | 0.18% | 0.42% | -0.05% | -12.67% | -11.64 * |

Source:  Consolidated Class Action Complaint, filed July 3, 2017; *CRSP*; NASDAQ; *Refinitiv*

Note:

[1]  Regressions for each day are based on "rolling" estimation periods consisting of the 126 trading days immediately before the event date, excluding alleged corrective disclosure and misstatement impact dates.  The alleged disclosure impact dates are 11/18/15, 12/8/15, 12/28/16, 1/17/17, 1/20/17, and 1/23/17.  The alleged misstatement impact dates are 2/2/12, 4/11/12, 4/19/12, 4/26/12, 7/19/12, 11/8/12, 11/27/12, 1/31/13, 2/25/13, 3/5/13, 4/25/13, 7/25/13, 11/7/13, 11/22/13, 1/30/14, 2/18/14, 4/24/14, 7/24/14, 11/6/14, 1/29/15, 3/16/15, 4/23/15, 7/23/15, 11/5/15, 11/18/15, 1/28/16, 4/21/16, 5/31/16, 6/24/16, 7/21/16, 11/3/16, and 1/18/17.

[2]  The Market Index refers to the value-weighted NYSE/AMEX/NASDAQ/Arca Composite Index.

[3]  The Philadelphia Semiconductor Index (SOX) "is a modified market capitalization-weighted index composed of companies primarily involved in the design, distribution, manufacture, and sale of semiconductors."  *See* "PHLX Semiconductor SOX," NASDAQ, https://indexes.nasdaqomx.com/index/overview/sox.  The index is reconstructed to exclude Qualcomm.

[4]  The NASDAQ Telecommunications Index "contains securities of NASDAQ-listed companies classified according to the Industry Classification Benchmark as Telecommunications and Telecommunications Equipment.  They include providers of fixed-line and mobile telephone services, and makers and distributors of high-technology communication products."  *See* "Nasdaq Telecommunications IXTC," NASDAQ, https://indexes.nasdaqomx.com/Index/Overview/IXTC.  The index is reconstructed to exclude Qualcomm.

[5]  Qualcomm Predicted Return is calculated as the sum of the Market Index Return multiplied by the Market Return Coefficient, the SOX Index Return multiplied by the SOX Index Return Coefficient, the Nasdaq Telecom Index Return multiplied by the Nasdaq Telecom Index Return Coefficient, and the Intercept Coefficient.

[6]  Qualcomm Residual Return is the difference between Qualcomm Return and Qualcomm Predicted Return.

[7]  "*" denotes significance at the 95% confidence level.