# Appendix of Selected Documents
# for René Stulz Report
# Volume 2

ΛB
BERNSTEIN RESEARCH

WEEKLY NOTES
SEPTEMBER 29, 2006

Qualcomm: W-CDMA to Drive Growth; Minimal Risks from Nokia Renegotiation and CDMA Market

*Paul Sagawa*
*Regina Possavino, CFA*
*Steve Yuan*

- Qualcomm's addressable units are poised to triple by decade-end, driven by W-CDMA

- Nokia renegotiation and CDMA market pose little risk, with W-CDMA driving roughly 75% of value

SEE DISCLOSURE APPENDIX OF THIS REPORT FOR IMPORTANT DISCLOSURES AND ANALYST CERTIFICATIONS

1

# Qualcomm: W-CDMA to Drive Growth; Minimal Risks from Nokia Renegotiation and CDMA Market

- Qualcomm's addressable units are poised to triple by decade-end driven by W-CDMA
- Nokia renegotiation and CDMA market pose little risk, with W-CDMA driving roughly 75% of value

| Stock | CUR | 09/28/06 Price | SCB Rating | YTD Rel. Perf. | 52-Week Range | Cash EPS | | | P/E | | Current Yield |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2005A | 2006E | 2007E | 2006E | 2007E | |
| QCOM | USD | 37.02 | O | -21.8% | 33 - 53 | 1.26 | 1.67 | 2.03 | 26.1x | 22.2x | 0.8% |

## Overview

*We believe Qualcomm is poised to well exceed consensus expectations for 2006 and 2007 and to deliver considerable share-price appreciation, based on our expectations for 100%+ annual W-CDMA unit growth and a relatively stable CDMA market, over the next two years.*

*W-CDMA is a vibrant market. Sales of 3G devices grew by 150%+ in 2006 and should see a 50%+ CAGR through 2010, when we expect unit sales to near 550 million and market revenue to top $100 billion. As such, we expect Qualcomm's addressable market to expand from roughly 28% of handset shipments in 2006 to about 55% by 2010, meaning that addressable units will essentially triple over that period.*

*Weighing on Qualcomm's share price are the company's upcoming royalty-rate renegotiation with Nokia and the CDMA market's prospects, with select emerging-market CDMA carriers considering a GSM technology transition. We do not believe either of these issues poses significant risks for Qualcomm. Nokia ultimately faces unacceptable risks if it pursues lower royalties in the legal realm, while Qualcomm may be willing to go to court to avoid even a 50 bp cut in its royalty rate to Nokia. Therefore, we believe this will be settled before the April 9, 2007, expiration of Nokia's contract at rates similar to the current level. We also believe the CDMA market will remain relatively stable, with only limited impact from emerging-market CDMA carriers potentially building GSM overlay networks, given the expense of such a transition and CDMA growth opportunities in the United States.*

*We expect Qualcomm to earn $2.03 per share (11% more than consensus expectations) in fiscal 2007. We rate the stock outperform, with a $60 DCF-based target share price, of which we expect 25% to be driven by CDMA and the remainder to be largely driven by W-CDMA.*

## Qualcomm's Addressable Units Likely to Triple by Decade-End

We expect global mobile device shipments to see year-over-year growth of 23% in 2006 and 16% in 2007, driven by subscriber growth in emerging markets and higher global replacement activity, especially given that multiple SIM card ownership overstates current penetration and replacement rates. Qualcomm's patent royalties and chipset sales now address roughly 28% of the wireless technology market. However, with the rest of the wireless world gradually shifting from technologies like GSM (where Qualcomm has little claim) to 3G W-CDMA (where it is well positioned), the company should see a threefold expansion in the number of mobile device units addressable by its technology.

W-CDMA units rose by 128% year-over-year in the first half of 2006, and we expect them to grow even faster in the second half as 3G begins to take hold more significantly worldwide, and particularly in Europe. W-CDMA shipments should see a 50%+ CAGR through 2010, with W-CDMA shipments roughly equaling GSM shipments then.

The CDMA handset market also saw strong first-half growth (19% year-over-year), with much of it driven by robust replacement activity in the CDMA-heavy U.S. market. We expect this growth to moderate considerably over the next couple of years, although the market should be stable at 4% CAGR in 2006-10.

## Nokia Royalty Renegotiation and CDMA Market Pose Little Risk to Qualcomm

Weighing on Qualcomm's share price are the company's upcoming royalty rate with Nokia and the CDMA market's prospects. We believe neither factor poses significant risks to Qualcomm. Nokia's royalty agreement with Qualcomm will end on April 9, 2007, at which point Nokia will have to negotiate another agreement if it is to continue using Qualcomm's essential CDMA and W-CDMA patents, or risk infringement. Despite aggressive posturing on both sides, we expect this contract to be settled before the expiration date at rates not significantly different from the current level.

BERNSTEIN RESEARCH

SEE DISCLOSURE APPENDIX OF THIS REPORT FOR IMPORTANT DISCLOSURES AND ANALYST CERTIFICATIONS.

SEPTEMBER 29, 2006

*Global Networking & Communications Equipment*

2        Qualcomm: W-CDMA to Drive Growth; Minimal Risks from Nokia Renegotiation and CDMA Market

Nokia has more essential W-CDMA patents than does Qualcomm. This is not surprising, since ETSI apportions votes based on each member's European revenue (see Exhibit 1). However, wireless royalty rates are set through private bilateral negotiations. In the end, the strength of each company's negotiating position is determined by the odds of winning or losing, the legal costs of allowing the dispute to go to court, damages that could be awarded in a losing case, and costs of business disruption during the legal process.

The risks to Nokia if it cannot reach agreement are substantial. First, Qualcomm's essential W-CDMA patent position is unassailable. Nokia is almost certain to lose a legal challenge from Qualcomm if it sells W-CDMA devices after the contract expires, obligating it to pay the legal fees for both companies. Second, U.S. and European courts rely heavily on market precedent to set IPR infringement damages. Given Nokia's past licensing terms and the similar terms accepted by the 60 other companies that have willingly licensed Qualcomm's IPR for W-CDMA, we can expect court-determined damages to follow suit. Finally, Qualcomm will likely press for



Exhibit 1    UMTS and CDMA Essential Patent Market Share

Source: Goodwin & Myers, "3G Cellular Standards and Patents," Fairfield Resources International, June 2005.

injunctions against sales of Nokia's W-CDMA products. Even if these requests are deferred or denied, their threat could spook carriers and other distributors, disrupting Nokia's market momentum in the critical growth phase of the W-CDMA market, yielding share loss and margin contraction.

Nokia could also sue for patent infringement should Qualcomm continue to ship W-CDMA chipsets beyond the contract expiration date. Setting aside that Nokia may have to pursue its legal challenges in the Asian countries where Qualcomm produces and delivers its chips, the potential damages on Qualcomm's chipset business are small. Nokia does not charge any chipset markets, including Qualcomm royalties, as technology patent holders typically apply their IPR to the end product (not to components). Since royalty-bearing IPR licenses generally allow pass-through to downstream customers, it is better to charge a royalty on a $200 handset than on a $20 chipset. The fact that Qualcomm does not produce or deliver its chips either in the United States or in Europe could make it harder for Nokia to gain an injunction.

Ultimately, the royalties mean much more to Qualcomm than to Nokia. Qualcomm has agreements with other licensees that could have "most favored nation" clauses that would allow them to reduce their payments should Qualcomm agree to a lower rate for Nokia. These royalty payments account for about 75% of our $60-per-share fair value target. As such, Qualcomm can be expected to fight for this battle (see Exhibit 2). In contrast, Nokia's W-CDMA products enjoy better-than-20% operating margins and 40% market share (excluding Japan), despite the roughly 4.2% royalty that we assume the company is now paying Qualcomm. A disruption to this momentum would be far more damaging to Nokia than giving up a chance at an additional 1-2% of margin from lower royalty payments.

Exhibit 2    Qualcomm Potential Impact on EPS and DCF Valuation of Lower W-CDMA Royalty Rates from Nokia and of Lower Overall W-CDMA Royalty Rates

|  | | 2005 | 2006E | 2007E | 2008E | 2009E | 2010E |
|---|---|---|---|---|---|---|---|
| Incremental 50 bp Royalty Loss from Nokia ($ million) | | $0 | $0 | -$82 | -$124 | -$165 | -$202 |
| Incremental 250 bp Royalty Loss from Nokia ($ million) | | $0 | $0 | -$410 | -$621 | -$827 | -$1,011 |
| After-Tax Impact of 50 bp Royalty Loss on EPS ($) | | $0.00 | $0.00 | -$0.03 | -$0.05 | -$0.07 | -$0.08 |
| After-Tax Impact of 250 bp Royalty Loss on EPS ($) | | $0.00 | $0.00 | -$0.17 | -$0.26 | -$0.35 | -$0.42 |
| Cash Flow Impact of 50 bp Royalty Loss ($ million) | | $0 | $0 | -$60 | -$92 | -$122 | -$150 |
| Cash Flow Impact of 250 bp Royalty Loss ($ million) | | $0 | $0 | -$300 | -$459 | -$612 | -$748 |
| DCF Impact per Share of 50 bp Royalty Loss ($) | -$1.25 | | | | | | |
| DCF Impact per Share of 250 bp Royalty Loss ($) | -$6.25 | | | | | | |
| **Assuming "Most Favored Nation" Clauses** | | | | | | | |
| W-CDMA Royalties, Assuming 25 bp Rate Reduction ($ million) | | $675 | $1,133 | $1,709 | $2,813 | $3,543 | $4,563 |
| After-Tax Impact of 25 bp W-CDMA Rate Reduction on EPS ($) | | $0.00 | $0.00 | -$0.06 | -$0.09 | -$0.12 | -$0.15 |
| Cash Flow Impact of 25 bp W-CDMA Rate Reduction ($ million) | | $0 | $0 | -$99 | -$164 | -$206 | -$266 |
| DCF Impact per Share of 25 bp Overall W-CDMA Royalty Loss ($) | -$2.21 | | | | | | |

Source: Corporate reports and Bernstein estimates and analysis.

BERNSTEINRESEARCH

While Nokia is aiming for a significant reduction in its royalty rates, the likelihood of it winning through legal challenges appears to us to be quite low. Rather, we think the likely court outcome could cost it over 10% of its market value due to disruptions in its 3G device business (see Exhibit 3). We believe a rational Nokia should even be willing to accept a 200 bp increase in royalties rather than risk this negative outcome. At the same time, the cost of providing a discount to Nokia on royalties, particularly if other licensees have "most favored nation" clauses that would kick in with a new Nokia agreement, should make Qualcomm willing to go to court rather than provide anything more than a 50 bp discount. A further issue is that a protracted legal battle between Nokia and Qualcomm could derail the long-term adoption of W-CDMA –an outcome that would be equally damaging to both combatants.

| Exhibit 3 | Nokia Potential Impact of W-CDMA Share Disruption on EPS and DCF Valuation | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | 2006E | 2007E | 2008E | 2009E | 2010E |
| Assumed W-CDMA Share | 20% | 31% | 33% | 35% | 36% | 38% |
| Assumed W-CDMA Revenue (€ million) | €2,158 | €6,966 | €13,135 | €19,857 | €25,760 | €31,519 |
| Assumed W-CDMA Operating Margin | 18.5% | 20.0% | 21.0% | 22.0% | 23.0% | 23.0% |
| **With W-CDMA Share Disruption** | | | | | | |
| Revised Nokia W-CDMA Share Assumption | 20% | 31% | 26% | 28% | 30% | 32% |
| Revised Nokia W-CDMA Revenue (€ million) | €2,158 | €6,966 | €10,470 | €16,059 | €21,686 | €26,796 |
| Revised Nokia W-CDMA Operating Margin | 18.5% | 20.0% | 14.0% | 16.0% | 17.0% | 18.0% |
| Incremental Operating Income Loss (€ million) | €0 | €0 | -€1,292 | -€1,799 | -€2,238 | -€2,426 |
| EPS Impact of W-CDMA Share Disruption (€) | €0.00 | €0.00 | €0.25 | €0.36 | €0.48 | €0.54 |
| Cash Flow Impact of Lost W-CDMA Share (€ million) | €0 | €0 | €937 | €1,295 | €1,611 | €1,747 |
| DCF Impact per Share of W-CDMA Loss (€) | €1.69 + Infringement Damages | | | | | |

Source: Corporate reports and Bernstein estimates and analysis.

Exhibit 4 provides Qualcomm's income statement.

| Exhibit 4 | Qualcomm Income Statement ($ million) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1Q:05 | 2Q:05 | 3Q:05 | 4Q:05 | 1Q 06 | 2Q 06 | 3Q:06 | 4Q 06E | 2005 | 2006E | 2007E |
| Revenue | $1,390 | $1,365 | $1,358 | $1,560 | $1,741 | $1,951 | $1,951 | $2,077 | $5,673 | $7,603 | $8,830 |
| YoY Growth | 15% | 12% | 1% | 40% | 25% | 34% | 44% | 33% | | | |
| Sequential Growth | 24% | -2% | -1% | 15% | 12% | 5% | 6% | 6% | 16% | 34% | 16% |
| COGS | $430 | $386 | $389 | $441 | $517 | $521 | $559 | $623 | $1,645 | $2,220 | $2,605 |
| Pro Forma COGS | $430 | $386 | $389 | $441 | $517 | $521 | $559 | $623 | $1,645 | $2,220 | $2,605 |
| Gross Profit | $960 | $979 | $969 | $1,119 | $1,224 | $1,313 | $1,392 | $1,454 | $4,028 | $5,383 | $6,225 |
| Gross Margin | 69% | 72% | 71% | 72% | 70% | 72% | 71% | 70% | 71% | 71% | 70% |
| Pro Forma Gross Profit | $960 | $979 | $969 | $1,119 | $1,224 | $1,313 | $1,392 | $1,454 | $4,028 | $5,383 | $6,225 |
| Pro Forma Gross Margin | 69% | 72% | 71% | 72% | 70% | 72% | 71% | 70% | 71% | 71% | 70% |
| SG&A | $148 | $155 | $150 | $178 | $239 | $263 | $293 | $270 | $631 | $1,065 | $948 |
| R&D | $228 | $252 | $259 | $271 | $340 | $390 | $395 | $395 | $1,011 | $1,520 | $1,472 |
| Operating Profit | $584 | $572 | $560 | $670 | $645 | $660 | $704 | $789 | $2,386 | $2,798 | $3,805 |
| Operating Margin | 42% | 42% | 41% | 43% | 37% | 36% | 36% | 38% | 42% | 37% | 43% |
| Other Income | $120 | $61 | $126 | $116 | $91 | $125 | $120 | $120 | $423 | $456 | $480 |
| Income-Tax Benefit | -$191 | -$101 | -$126 | -$248 | -$116 | -$192 | -$181 | -$236 | -$666 | -$725 | -$1,157 |
| Income from Continuing Operations | $513 | $532 | $560 | $538 | $620 | $593 | $643 | $673 | $2,143 | $2,529 | $3,128 |
| Net Income | $513 | $532 | $560 | $538 | $620 | $593 | $643 | $673 | $2,143 | $2,529 | $3,128 |
| GAAP EPS ($) | $0.30 | $0.31 | $0.33 | $0.32 | $0.36 | $0 34 | $0.37 | $0.39 | $1 26 | $1.47 | $1 80 |
| Pro Forma EPS ($) | $0.28 | $0.29 | $0.32 | $0.32 | $0.39 | $0.41 | $0.42 | $0.44 | $1.16 | $1.66 | $2 01 |
| Number of Diluted Shares (million) | 1,704 | 1,704 | 1,683 | 1,686 | 1,702 | 1,721 | 1,728 | 1,730 | 1,694 | 1,720 | 1,734 |

Source: Corporate reports and Bernstein estimates and analysis.

As to the CDMA market, there has been some investor concern after Nokia's June 22 announcement that it would exit the market due to challenging emerging-market dynamics, as well as reports of carriers like VIVO in Brazil and Reliance in India seeking a technology switch from CDMA to GSM. We think the risks associated with these moves are quite limited. First, the costs of implementing such a transition are extremely high and would be prohibitive in most areas. Not only would a second network need to be built and operated in parallel for some time, but users would have to be given new handsets as well. Reliance, VIVO and China Unicom account for 90 million CDMA subscribers —

BERNSTEINRESEARCH

Global Networking & Communications Equipment

4    **Qualcomm: W-CDMA to Drive Growth; Minimal Risks from Nokia Renegotiation and CDMA Market**

or roughly 28.5% of the total CDMA subscriber base. At worst, we would expect only a fraction of these subscribers to be transitioned. Offsetting this is a significant growth opportunity in the United States —where Sprint Nextel is likely to transition all 24.6 million existing iDEN subscribers to its CDMA network over the next few years, Verizon continues to be a significant share gainer, and replacement rates continue to rise.

### What About 4G?

While we are skeptical that a single 4G global standard can be established, we believe the 3GPP track led by Ericsson, Nokia and NTT is most likely to take the leading position. 3GPP has the strongest carrier support and is propelled by the companies with the strongest R&D programs in the industry. It also has the advantage of strong European Union industrial policy driving to a single continent-wide standard, ensuring scale. 3GPP2, led by Qualcomm, will accommodate current CDMA carriers with a compatible evolution path, but the company must rely on the strength of its patent base to maintain a stake in the rest of the market. Management claims to have IPR essential to the core OFDMA technology underlying all of the proposed 4G standards, but this will be tested.

### Valuation Methodology

We primarily set our target share price for Qualcomm using discounted free cash flow analysis. We supplement this with normalized relative multiple analysis versus the company's own history and the industry as a whole.

### Risks

The main risk factors to our analysis are the uncertainty of W-CDMA growth, a decline in the CDMA market, and threats to Qualcomm's royalty rates. We believe the transition from GSM to W-CDMA will increasingly gain momentum in 2007, with shipments of W-CDMA mobile devices exceeding GSM shipments by the end of the decade. Failure of W-CDMA carriers to price and promote their services aggressively could result in a slower ramp and, thus, slower sales and earnings growth for Qualcomm.

### Investment Conclusion

We expect Qualcomm's growth to well exceed consensus expectations in the near to mid-term, driven by accelerating growth in the W-CDMA market and relative stability in the CDMA market. W-CDMA is a vibrant market, with 3G device sales that we expect to grow by 150%+ in 2006 and to see a 50%+ CAGR through 2010. Over the same period, Qualcomm's addressable market should expand from roughly 28% of handset shipments in 2006 to roughly 55% by 2010, translating into triple the amount of current addressable units.

We think Qualcomm's share price has been punished on issues that bear little risk for the company —namely, the resolution of Qualcomm's IPR dispute with Nokia and the CDMA market's prospects. Qualcomm is in a far superior negotiating position than Nokia, as the latter faces unacceptable risks if it pursues lower royalties in the legal realm. While a couple of emerging-market CDMA carriers have indicated plans to transition to GSM, we do not think there will be any mass exodus from CDMA due to the high costs of such a transition. Moreover, roughly 75% of our Qualcomm valuation is driven by the W-CDMA market. We expect Qualcomm to earn $1.67 per share in fiscal 2006 and $2.03 per share in fiscal 2007, versus respective consensus EPS estimates of $1.63 and $1.82. We rate Qualcomm outperform, with a $60 DCF-based target share price.

**Paul Sagawa +1-212-407-5825**                                    **Regina Possavino, CFA +1-212-756-4569**
**paul.sagawa@bernstein.com**                                      **regina.possavino@bernstein.com**

**Steve Yuan +1-212-969-6744**
**steve.yuan@bernstein.com**

*Global Networking & Communications Equipment*

Disclosure Appendix

## SRO REQUIRED DISCLOSURES

- References to "Bernstein" relate to Sanford C. Bernstein & Co., LLC and Sanford C. Bernstein Limited, collectively.

- Bernstein analysts are compensated based on aggregate contributions to the research franchise as measured by account penetration, productivity and proactivity of investment ideas. No analysts are compensated based on performance in, or contributions to, generating investment banking revenues.

- Bernstein rates stocks based on forecasts of relative performance for the next 6-12 months versus the S&P 500 for U.S. listed stocks and versus the MSCI Pan Europe Index for stocks listed on the European exchanges —unless otherwise specified. We have three categories of ratings:

  Outperform: Stock will outpace the market index by more than 15 pp in the year ahead.

  Market-Perform: Stock will perform in line with the market index to within +/-15 pp in the year ahead.

  Underperform: Stock will trail the performance of the market index by more than 15 pp in the year ahead.

- As of 7/21/06, our ratings were distributed as follows: Outperform/Buy - 38.5%; Market-Perform/Hold - 50.3%; Underperform/Sell - 11.2%.

- Accounts over which Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, and/or their affiliates exercise investment discretion own more than 1% of the outstanding common stock of QCOM / Qualcomm Inc.

- Sanford C. Bernstein & Co., LLC currently makes a market in QCOM / Qualcomm Inc.

- The following companies are or during the past twelve (12) months were clients of Bernstein, which provided non-investment banking-securities related services and received compensation for such services QCOM / Qualcomm Inc.



## OTHER DISCLOSURES

**To our readers in the United States:** Sanford C. Bernstein & Co., LLC is distributing this report in the United States and accepts responsibility for its contents. Any U.S. person receiving this report and wishing to effect securities transactions in any security discussed herein should do so only through Sanford C. Bernstein & Co., LLC.

**To our readers in the United Kingdom:** This report has been issued or approved for issue in the United Kingdom by Sanford C. Bernstein Limited, authorised and regulated by the Financial Services Authority and located at Devonshire House, 1 Mayfair Place, London W1J 8SB, +44 (0)20-7170-5000.

**To our readers in member states of the EEA:** This report is being distributed in the EEA by Sanford C. Bernstein Limited, which is authorised and regulated in the United Kingdom by the Financial Services Authority and holds a passport under the Investment Services Directive.

**To our readers in Australia:** Sanford C. Bernstein & Co., LLC and Sanford C. Bernstein Limited are exempt from the requirement to hold an Australian financial services licence under the Corporations Act 2001 in respect of the provision of the following financial services to wholesale clients:

- providing financial product advice;

- dealing in a financial product;

- making a market for a financial product; and

- providing a custodial or depository service.

Sanford C. Bernstein & Co., LLC and Sanford C. Bernstein Limited are regulated by the Securities and Exchange Commission under U.S. laws and by the Financial Services Authority under U.K. laws, respectively, which differ from Australian laws.

One or more of the officers, directors, or employees of Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited and/or its affiliates may at any time hold, increase or decrease positions in securities of any company mentioned herein.

Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, or its or their affiliates may provide investment management or other services to the pension or profit sharing plans, or employees of any company mentioned herein, and may give advice to others as to investments in such companies. These entities may effect transactions that are similar to or different from those recommended herein.

## CERTIFICATIONS

• I/(we), Paul Sagawa, Senior Analyst(s), certify that all of the views expressed in this report accurately reflect my/(our) personal views about any and all of the subject securities or issuers and that no part of my/(our) compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views in this report.

*Global Networking & Communications Equipment*

Approved By: DSB

Copyright 2006, Sanford C. Bernstein & Co., LLC, a subsidiary of AllianceBernstein L.P. ~ 1345 Avenue of the Americas ~ NY, NY 10105 ~ 212/756-4400. All rights reserved.

This report is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of, or located in any locality, state, country or o her jurisdiction where such distribution, publication, availability or use would be contrary to law or regulation or which would subject Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited or any of their subsidiaries or affiliates to any registration or licensing requirement within such jurisdiction. This report is based upon public sources we believe to be reliable, but no representation is made by us that the report is accurate or complete. We do not undertake to advise you of any change in the reported information or in the opinions herein. This research was prepared and issued by Sanford C. Bernstein & Co., LLC and/or Sanford C. Bernstein Limited for distribution to market counterparties or intermediate or professional customers. This report is not an offer to buy or sell any security, and it does not constitute investment, legal or tax advice. The investments referred to herein may not be suitable for you. Investors must make their own investment decisions in consultation with their professional advisors in light of their specific circumstances. The value of investments may fluctuate, and investments that are denominated in foreign currencies may fluctuate in value as a result of exposure to exchange rate movements. Information about past performance of an investment is not necessarily a guide to, indicator of, or assurance of, future performance.

BernsteinResearch



**Paul Sagawa** • paul.sagawa@bernstein.com • +1-212-407-5825
**Regina Possavino, CFA** • regina.possavino@bernstein.com • +1-212-756-4569
**Steve Yuan** • steve.yuan@bernstein.com • +1-212-969-6744

## Qualcomm: Expect QCOM to Beat Consensus; Various Legal Matters Distractions from Fundamentals; Outperform

*Estimate Change in Bold*

| Ticker | Rating | CUR | 10/30/2006 Closing Price | Target Price | YTD Rel. Perf. | Cash EPS | | | P/E | | | Yield |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2005A | 2006E | 2007E | 2005A | 2006E | 2007E | |
| QCOM | O | USD | 36.74 | 60.00 | -25.1% | 1.26 | **1.66** | **1.95** | 29.2 | 25.9 | 22.0 | 0.8% |
| *OLD* | | | | | | | 1.67 | 2.03 | | | | |
| MSDLE15 | | | 1450.27 | | | 91.46 | 100.87 | 110.25 | 15.9 | 14.4 | 13.2 | 3.2% |
| SPX | | | 1377.93 | | | 76.50 | 85.00 | 89.00 | 18.0 | 16.2 | 15.5 | 1.8% |

O – Outperform, M – Market-Perform, U – Underperform

**Highlights**

∗ **4QFY06 results to beat company guidance.** We expect Qualcomm to report 4QFY06 sales of $2.08B and EPS of $0.43, above consensus estimates of sales and EPS at $1.97B and $0.41 respectively. As royalties derive from the previous quarter's handset sales, the extremely strong market unit volumes in both the June and September quarters bode well for 4QFY06 QTL results. While the excess chip inventories with Asian manufacturers noted on Qualcomm's 3QFY06 call and by Texas Instrument have likely reined in QCT sales in the quarter, we do not consider this more than a temporary adjustment and note the particularly strong results from Qualcomm chip customers Samsung and LG. With 27M industry WCDMA unit shipments in the September quarter called out by Nokia, we believe that we are still on pace to top 100M WCDMA unit shipments for CY06 and expect the market to grow about 80% in CY07, driving above consensus sales and earnings for the foreseeable future. Of course, the biggest concern weighing on Qualcomm is its ability to sustain its royalty rate in the face of a renegotiation with Nokia and a pending EC investigation. We believe Qualcomm's advantaged negotiating position and the ramifications to the EC of interfering in contracts amongst non-European companies make it unlikely that the royalty rate will materially change for 3G. Due to the possible softness in 4QFY06 chip shipments, we are reducing our EPS estimate from $0.44 to $0.43. We are also reducing '07 EPS estimate from $2.01 to $1.95 to reflect increased OPEX to strengthen its technical leadership and ongoing legal expenses on various fronts. We expect the management's 1QFY07 guidance will be characteristically conservative, but believe that the WCDMA market will continue strong growth for FY07. We reiterate our Outperform rating on Qualcomm with a $60 target price.

∗ **3Q06 handset market results suggest strong handset growth.** Top 5 handset vendors have reported their 3QCY06 results, with total unit shipments of 209.2M. This represents continuing strong handset market growth, with aggregate shipments up 12% QoQ and 30% YoY for these 5 players, suggesting total market shipments exceeding 255M and YoY growth approaching 25%. In the important WCDMA category, Nokia forecast total market sales of 27M for the quarter, in line with our estimate and on pace for better than 100M units for the full year. This bodes well for Qualcomm's QCT results this quarter and for Qualcomm's QTL results in 1QFY07. Since royalty revenue is reported in arrears, more than half of the earnings are already secured by strong handset growth in 2QCY06, which was up 25% YoY. Although Qualcomm didn't revise its initial guidance like what it has done in the past 11 quarters, we project the company to beat the high end of its initial guidance.

*Global Networking & Communications Equipment*

See Disclosure Appendix of this report for important disclosures and analyst certifications.

# BERNSTEIN RESEARCH

October  31, 2006

Paul  Sagawa  • paul.sagawa@bernstein.com • +1-212-407-5825

* **Incremental victory over Broadcom suggests sooner than expected settlement.** The Initial Determination from the Administrative Law Judge (ALJ) of the ITC dismissed much of the embargo risk overhanging the stock.  Since the ITC's sole jurisdiction is whether or not to recommend embargo, we see little risk in the near term.  In the long term, this determination suggests a similar finding in Federal court.  However, such a decision is likely years away and would almost certainly result in a modest fine rather than any real disruption of Qualcomm's business, in our view.  Moreover, yesterday's victory of court enjoining Broadcom represents an incremental leverage against Broadcom and we expect both parties to settle various disputes soon.

* **EC motion expected, but unlikely to change things.**  A report that the EC is likely to soon begin investigation of complaints against Qualcomm by Nokia and 5 other parties has pressured Qualcomm shares.  We note that this investigation has been expected and does not presume any particular finding.  Of the complaints against Qualcomm, only one has the potential to materially change the current royalty regime, which has been established through years of contract negotiations.  However, we believe that interfering in these bi-lateral contracts – most between non-European companies – would have severe ramifications for trade relations between the U.S., Korean and Chinese governments and the EC.  Moreover, we note that such a drastic step is unprecedented.  Free negotiation of contracts is a pillar of modern trade policy – the EC has never acted to invalidate international contracts in the past.  Instead, we expect the commission to focus on the far less damaging allegations of product bundling, which in the worst case, would likely result in a manageable fine with no risk to royalty rates.  We also note that any finding by the EC would likely take at least 2 years, pushing resolution to late 2008 at the earliest.

* **Nokia's motion to stay for further arbitration part of litigation practice.** Qualcomm's stock was also pressured when an Appeals court sent back for review a U.S. district court's decision to deny Nokia's motion to stay their patent dispute.  We note that this is just a standard practice of litigation, where legal proceedings can not go forward until both defendant and plaintiff have exhausted all of the arbitration options, whose outcome bears no force of law.  However, even if the Appeals court denies Nokia's motion, the decision from the federal court will be years away, thus having no impact on royalty renegotiations with Nokia.  In the end, we believe that all of these legal battles are just defensive measures before renegotiation in 2007.

* **Still believe Nokia/Qualcomm royalty agreement will be settled at rates similar to current levels.** On Nokia's 3Q06 conference call, Nokia came out more aggressively than we had expected on its current royalty rate renegotiations with Qualcomm, citing its belief that it is entitled to a much better royalty rate and that an injunction would be unlikely to occur.  Our view, however, is that an injunction is not actually needed for Nokia's bargaining position to be compromised.  Nokia would likely feel strong repercussions even if Qualcomm were simply to threaten suit against Nokia's customers – an action well within Qualcomm's legal rights.  As such, we do not expect a material change in Nokia's royalty rate to result from the renegotiation.  Instead, Qualcomm may offer concessions in the form of helping Nokia collect higher royalties from other handset vendors or paying royalties on Nokia technology – neither of which would have a significant impact on the balance of payments between the companies.  Also of note – the competitive benefits of a lower royalty rate could be short-lived for Nokia, assuming that other handset makers have 'most favored nations' clauses in their contracts, making the possible upside of taking on Qualcomm less attractive.  On a positive note, Nokia made it clear that its intent is to complete negotiations before the April 9, 2007 deadline.  We also note that Nokia's aggressive posturing with Qualcomm may be a precursor to more fruitful renegotiations between it and other handset makers, such as Motorola and Samsung.

**Investment Conclusion**

*Global Networking & Communications Equipment*

# BERNSTEIN RESEARCH

October 31, 2006

Paul Sagawa • paul.sagawa@bernstein.com • +1-212-407-5825

We expect Qualcomm to report strong 4QFY06 results, with sales and EPS coming in slightly above consensus. Our above consensus view is derived mainly from strong sales of CDMA and WCDMA devices in 2QCY06 and 3QCY06 (N.B. Qualcomm royalty revenues are derived from handsets sold in the previous quarter) and continuing development of WCDMA device shipments in the current quarter. Reports from the top five handset vendors point toward continued handset market momentum. As such, we expect Qualcomm to continue to beat consensus for the remainder of FY2006.

We think Qualcomm's share price has been unnecessarily punished recently on issues that we think bear little risk for the company – especially the resolution of Qualcomm's IPR dispute with Nokia. As to the Nokia/Qualcomm dispute, we believe Qualcomm is in a far superior negotiating position, since Nokia faces unacceptable risks should it choose to pursue lower royalties in the legal realm. Recent example of NTP outrivaling RIMM suggests the enormous pressure from equipment vendors' customers. As such, we think the issue will be settled at rates similar to current rates before the expiration of Nokia's agreement. We rate Qualcomm Outperform with a $60 DCF-based target price.

**Details**

*Expect 4QFY06 beat guidance and consensus estimates*

We expect Qualcomm to report 4QFY06 sales of $2.08B and EPS of $0.43, above consensus estimates of sales and EPS at $1.97B and $0.41 respectively (**Exhibit 1**). WCDMA remains a strong market, growing at estimated 23% QoQ, while general 3QCY06 handset market indicators to date suggest continued momentum.

Exhibit 1
**Sales and EPS estimates: Bernstein vs. consensus**

| Qualcomm | Dec-05 | Mar-06 | Jun-06 | Sep-06 | Full Fiscal Year | | |
|---|---|---|---|---|---|---|---|
| | 1Q06 | 2Q06 | 3Q06 | 4Q06E | 2005 | 2006E | 2007E |
| **Revenue ($ MM) SCB** | 1,741 | 1,834 | 1,951 | 2,077 | 5,673 | 7,603 | 8,830 |
| **Consensus (10/27)** | 1,741 | 1,834 | 1,951 | 1,970 | 5,673 | 7,495 | 8,637 |
| SCB Sequential | 11.6% | 5.3% | 6.4% | 6.5% | 16.3% | 34.0% | 16.1% |
| Consensus Sequential | 11.6% | 5.3% | 6.4% | 0.9% | 16.3% | 32.1% | 15.2% |
| Above (Bellow) Consensus | 0 | 0 | 0 | 108 | 0 | 108 | 193 |
| | | | | | | | |
| **EPS SCB PF** | 0.39 | 0.41 | 0.42 | 0.43 | 1.17 | 1.66 | 1.95 |
| **Consensus** | 0.39 | 0.41 | 0.42 | 0.41 | 1.17 | 1.63 | 1.82 |
| Above (Bellow) Consensus | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.03 | 0.13 |

Source: Thomson, Company Reports, Bernstein Estimates

Top 5 handset vendors, namely Nokia, Motorola, Samsung, SonyEricsson and LG, have reported their 3QCY06 results, with total unit shipments of 209.2M. This represents continuing strong handset market growth, with aggregate shipments up 12% QoQ and 30% YoY for these players. This bodes well for Qualcomm's QCT results this quarter and for Qualcomm's QTL results in 1QFY07. Since royalty revenue is reported in arrears, more than half of the earnings are already secured by strong handset growth in 2QCY06, which was up 25% YoY. Although Qualcomm didn't revise its initial guidance like what it has done in the past 11 quarters, we think the company can easily beat its initial guidance (**Exhibit 2**).

For 4QFY06, the chipset business may have stolen what could have been more significant upside in the quarter, due to inventory buildup at Chinese and Indian markets in 3QFY06. As a result, we are reducing our 4QFY06 EPS estimate from $0.44 to $0.43 due to lower sales in chipsets. We are also reducing '07 EPS estimate from $2.01 to $1.95 to reflect increased OPEX to defend its technical leadership in every wireless communication standard and ongoing legal expenses on various fronts. We expect the management will continue to give characteristically conservative guidance for 1QFY07, but we believe that

*Global Networking & Communications Equipment*

3

# BERNSTEIN RESEARCH

October 31, 2006

Paul Sagawa • paul.sagawa@bernstein.com • +1-212-407-5825

continued WCDMA development will reflect its rapid growth trajectory in 2006 and support our Qualcomm valuation.

**Exhibit 2**
**Qualcomm's guidance vs. results**

| | FY2004 | | | | FY2005 | | | | FY2006 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec | Mar | Jun | Sep | Dec | Mar | Jun | Sep | Dec | Mar | Jun | SepE |
| First Guidance | 1,036.5 | 1,090.0 | 1,313.3 | 1,400.8 | 1,371.0 | 1,400.0 | 1,310.0 | 1,480.0 | 1,720.0 | 1,680.0 | 1,820 | 1,930 |
| Second Guidance _(Revenue)_ | 1,193.3 | 1,189.1 | 1,336.3 | 1,400.8 | 1,400.0 | 1,375.0 | 1,310.0 | 1,530.0 | 1,740.0 | 1,785.0 | 1,820 | |
| Third Guidance | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 1,935 | |
| Actual | 1,242.6 | 1,244.6 | 1,340.5 | 1,371.0 | 1,390.0 | 1,365.0 | 1,358.0 | 1,560.0 | 1,741.0 | 1,834.0 | 1,951 | |
| _Upside from actual vs. first guidance_ | 19.9% | 14.2% | 2.1% | -2.1% | 1.4% | -2.5% | 3.7% | 5.4% | 1.2% | 9.2% | 7.2% | |
| First Guidance | 27.5 | 30.0 | 34.0 | 37.0 | 38.5 | 36.0 | 35.0 | 39.0 | 47.0 | 45.0 | 51.5 | 54.5 |
| Second Guidance _(MSM Shipments)_ | 32.5 | 31.5 | 34.5 | 38.5 | 39.0 | 36.5 | 35.0 | 40.0 | 47.0 | 47.5 | 54.5 | |
| Third Guidance | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 55.0 | |
| Actual | 32.0 | 32.0 | 35.0 | 38.0 | 39.0 | 37.0 | 36.0 | 40.0 | 47.0 | 49.0 | 55.0 | |
| _Upside from actual vs. first guidance_ | 16.4% | 6.7% | 2.9% | 2.7% | 1.3% | 2.8% | 2.9% | 2.6% | 0.0% | 8.9% | 6.8% | |
| First Guidance | 0.19 | 0.20 | 0.25 | 0.28 | 0.25 | 0.26 | 0.25 | 0.30 | 0.37 | 0.36 | 0.37 | 0.40 |
| Second Guidance _(FP EPS)_ | 0.24 | 0.25 | 0.26 | 0.29 | 0.27 | 0.27 | 0.25 | 0.33 | 0.39 | 0.41 | 0.39 | |
| Third Guidance | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 0.42 | |
| Actual | 0.25 | 0.26 | 0.29 | 0.29 | 0.28 | 0.29 | 0.28 | 0.32 | 0.39 | 0.41 | 0.42 | |
| _Upside from actual vs. first guidance_ | 31.7% | 34.0% | 17.1% | 4.5% | 11.3% | 9.9% | 10.5% | 7.4% | 5.9% | 14.0% | 13.5% | |
| Beat Revenue Guidance? | YES | YES | YES | No | YES | No | YES | YES | YES | YES | YES | |
| Beat EPS Guidance? | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | |

Note: We used mid point of guidance to derive our numbers. Since some guidance used vague language like high end estimation, we use our own judgement to put a reasonable number.
Shaded cells are calculated from upside from company's first guidance

Source: Company Reports, Bernstein Analysis

It is apparent that the market has been reacting strongly to recent developments in the legal realm rather than any quarterly sales or earning results. Even though the company has not revised its initial guidance, we don't view this as negative for the reasons mentioned above.

### Incremental victory over Broadcom suggests sooner than expected settlement

Three weeks ago, the Administrative Law Judge (ALJ) of the International Trade Commission issued an Initial Determination saying that Qualcomm infringed upon one of Broadcom's patents (patent # 6,714,983) but that it did not infringe upon two other patents (#6,374,311 and 6,583,675). More importantly, the ITC did NOT recommend that an embargo be placed upon downstream handsets using the chipsets that infringe the patent, which basically means that the decision will have minimal, if any, impact on Qualcomm in the near term.

In the near term, we don't see any financial impact on Qualcomm. We believe that ALJ's decision for not recommending embargo is deliberate and well supported by legal basis. Generally speaking, U.S. patents are comprised of utility patents and design patents. Infringement on design patents is typically less severe than on utility patents, because design patents typically deal with any designs that are not utilitarian to the fundamental technologies. Therefore, we are inclined to think that the infringement is likely to be related to a specific design. In the end, ITC's jurisdiction is whether or not to recommend embargo. The initial determination from ALJ has largely made that possibility negligible.

In the long term, we see two risks. The first risk is the reputation damage that could put a cloud over handset vendors' decision in choosing Qualcomm's chipsets. However, since Qualcomm dominates CDMA chipset market (approaching 100% market share after Nokia exits), we see most damages centered on WCDMA chipsets. Due to our original pessimistic view on Qualcomm's WCDMA chipset business, this has not changed our fundamental view about the company. The other risk is that the decision from ALJ has greatly increased the possibility that the federal judge determines Qualcomm infringing the same patent, as both judges are equivalently qualified to judge patent infringement cases. If the federal judge determines that Qualcomm has infringed Broadcom's patents, he/she will determine the monetary remedy based on "George-Pacific Factor".

_Global Networking & Communications Equipment_

4

# BERNSTEIN RESEARCH

October 31, 2006

Paul Sagawa • paul.sagawa@bernstein.com • +1-212-407-5825

Moreover, yesterday (10/30/06), the federal court in San Diego enjoined Broadcom from using Qualcomm's confidential WCDMA trade secrets, representing another incremental leverage Qualcomm has gained in the past month. We continue to believe the best course for both parties is to settle the case outside of the court, likely resulting in two parties reaching a royalty-free cross-licensing agreement. These wins are likely to accelerate negotiations between two parties, we believe resulting in sooner than expected settlement.

### EC motion well expected, but unlikely to change things

Qualcomm's stock took another undue beating when Bloomberg report indicated that EC will start a motion to investigation against Qualcomm on the complaint initiated by Nokia and 5 other parties. Qualcomm's defense centers on the 60 companies that have already signed WCDMA licenses. On a practical basis, we believe that it is unlikely that the EC would consider declaring freely negotiated license contracts between non-European companies invalid. Such an act would be completely unprecedented and would undoubtedly draw a stern response from the U.S., Korean and Chinese governments as an attack on their sovereignty. Given that WCDMA device prices for European consumers continue down a steep price decline and that Nokia is able to command better than 20% operating margins on its WCDMA products despite the supposedly unfair Qualcomm royalty, we expect the EC to focus on the far less damaging allegations of product bundling, which have no threat to the all important royalty rates.

### Nokia's motion to stay for further litigation part of standard litigation practice

The market punished Qualcomm's stock when an Appeals court sent back for review a U.S. district court's decision to deny Nokia's motion to stay their patent dispute. We note that this is just a standard practice of litigation, where legal proceedings can not go forward until both defendant and plaintiff have exhausted all of the arbitration options, whose outcome bears no force of law.

Typically speaking, legal contracts concerning patents have clauses regarding arbitration process should patent disputes arise. The clauses will articulate the arbitration process, including timeframe, place, language and arbitration panels. Arbitration panels are composed of three arbitrators. Two of them are separately specified by the plaintiff and defendant, with the last one agreed upon by both. The arbitration process is typically confidential, unlike federal case eventually becoming the public record. Any arbitration can *ONLY* be initiated regarding licensing agreements, vs. patent infringements or validities of patents. We are a little puzzled that Qualcomm directly filed the case in the federal court instead of going through the arbitration. Likely explanation is that there are no arbitration clauses in the original contracts. Another possible explanation is that it is very clear to Qualcomm that the infringed patents are not part of its licensing agreement with Nokia. We view the latter possible, with the theory that capture period of the contract with Nokia didn't include a lot of its later GSM patents, which were filed after 2000.

However, we don't think all these matter much. Even if the Appeals court denies Nokia's motion, the decision will be years away, thus having no impact on royalty renegotiations with Nokia. In the end, all of these legal battles are just defensive measures before renegotiation in 2007.

### Still believe Nokia/Qualcomm royalty agreement will be settled at rates similar to current levels

On Nokia's 3Q06 conference call, Nokia came out more aggressively than we had expected on its current royalty rate renegotiations with Qualcomm, citing its belief that it is entitled to a much better royalty rate and that an injunction would be unlikely to occur. Our view, however, is that an injunction is not actually needed for Nokia's bargaining position to be compromised. Nokia would likely feel strong repercussions even if Qualcomm were to simply decide to file suit against Nokia's customers. As such, we do not expect a material change in Nokia's royalty rate to result from the renegotiation. Instead, Qualcomm may offer concessions in the form of helping Nokia collect higher royalties from other handset vendors or paying royalties on Nokia technology – neither of which would have a significant impact on the balance of payments between the companies. Also of note – the competitive benefits of a lower royalty rate could be

BernsteinResearch

Paul Sagawa • paul.sagawa@bernstein.com • +1-212-407-5825

short-lived for Nokia, assuming that other handset makers have 'most favored nations' clauses in their contracts, making the possible upside of taking on Qualcomm less attractive.  On a positive note, Nokia made it clear that its intent is to complete negotiations before the April 9, 2007 deadline.  We also note that Nokia's aggressive posturing with Qualcomm may be a precursor to more fruitful renegotiations with other handset makers, such as Motorola and Samsung.

### WCDMA drives 75% of our Qualcomm valuation

We think continued development in the WCDMA market as well as moderate growth in the CDMA market supports our $60 DCF-based target price for Qualcomm.  Nokia estimated that 27M WCDMA phones were shipped in 3Q06, in-line with our expectation.  This also suggests that the industry is on track to ship ~100M WCDMA phones for 2006.  We note that WCDMA drives ~75% of our Qualcomm valuation, and we think this market can sustain a 50% unit growth CAGR through the end of the decade, by which time WCDMA units will likely exceed CDMA units by over 2.5 to 1.

*Global Networking & Communications Equipment*

**Exhibit 3**
**Qualcomm Income Statement**

| (in millions except EPS) | Dec 1Q05 | Mar 2Q05 | Jun 3Q05 | Sept 4Q05 | Dec 1Q06 | Mar 2Q06 | Jun 3Q06 | Sept 4Q06E | | 2005 | 2006E | 2007E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | 1,390 | 1,365 | 1,358 | 1,560 | 1,741 | 1,834 | 1,951 | 2,077 | | 5,673 | 7,603 | 8,830 |
| YoY Growth | 15% | 12% | 1% | 40% | 25% | 34% | 44% | 33% | | | | |
| Sequent. Growth | 24% | -2% | -1% | 15% | 12% | 5% | 6% | 6% | | 16% | 34% | 16% |
| COGS | 430 | 386 | 389 | 441 | 517 | 521 | 559 | 619 | | 1,645 | 2,216 | 2,574 |
| PF COGS | 430 | 386 | 389 | 441 | 517 | 521 | 559 | 619 | | 1,645 | 2,216 | 2,574 |
| Gross Profit | 960 | 979 | 969 | 1,119 | 1,224 | 1,313 | 1,392 | 1,458 | | 4,028 | 5,387 | 6,256 |
| GM % | 69% | 72% | 71% | 72% | 70% | 72% | 71% | 70% | | 71% | 71% | 71% |
| PF Gross Profit | 960 | 979 | 969 | 1,119 | 1,224 | 1,313 | 1,392 | 1,458 | | 4,028 | 5,387 | 6,256 |
| GM % | 69% | 72% | 71% | 72% | 70% | 72% | 71% | 70% | | 71% | 71% | 71% |
| SG&A | 148 | 155 | 150 | 178 | 239 | 263 | 293 | 301 | | 631 | 1,096 | 1,107 |
| R&D | 228 | 252 | 259 | 271 | 340 | 390 | 395 | 409 | | 1,011 | 1,534 | 1,623 |
| Operating Profit | 584 | 572 | 560 | 670 | 645 | 660 | 704 | 748 | | 2,386 | 2,757 | 3,525 |
| Operating Margin (%) | 42% | 42% | 41% | 43% | 37% | 36% | 36% | 36% | | 42% | 36% | 40% |
| Other inc./exp. | 120 | 61 | 126 | 116 | 91 | 125 | 120 | 120 | | 423 | 456 | 480 |
| Income Tax Benefit (Charge) | (191) | (101) | (126) | (248) | (116) | (192) | (181) | (226) | | (666) | (715) | (1,081) |
| Income from Continuing Operations | 513 | 532 | 560 | 538 | 620 | 593 | 643 | 642 | | 2,143 | 2,498 | 2,924 |
| Net Income | 513 | 532 | 560 | 538 | 620 | 593 | 643 | 642 | | 2,143 | 2,498 | 2,924 |
| **GAAP EPS** | $ 0.30 | $ 0.31 | $ 0.33 | $ 0.32 | $ 0.36 | $ 0.34 | $ 0.37 | $ 0.37 | | $ 1.26 | $ 1.45 | $ 1.69 |
| **PF EPS** | $ 0.28 | $ 0.29 | $ 0.28 | $ 0.32 | $ 0.39 | $ 0.41 | $ 0.42 | $ 0.43 | | $ 1.16 | $ 1.66 | $ 1.95 |
| Number of Diluted Shares | 1,704 | 1,704 | 1,683 | 1,686 | 1,702 | 1,721 | 1,728 | 1,730 | | 1,694 | 1,720 | 1,734 |

Source: Company Reports, Bernstein Estimates

### Valuation Methodology

We use DCF-based models to assess the fair value of each company in our coverage.  As we believe that demand for telecommunications infrastructure equipment is cyclical, we occasionally use price to normalized earnings, price to peak earnings and EV to sales relative to history and relative to peers to evaluate likely trading ranges.

### Risks

BernsteinResearch

October 31, 2006

Paul Sagawa • paul.sagawa@bernstein.com • +1-212-407-5825

The biggest risk factors to our call on Qualcomm include the uncertainty of WCDMA growth, a potential decline in CDMA, and threats to QTL's IPR royalty rates.  We believe the transition from GSM to WCDMA will gain momentum in 2006, with shipments of WCDMA mobile devices exceeding GSM by the end of the decade.  Failure of WCDMA carriers to price and promote their services aggressively could results in a slower ramp and, thus, slower sales and earnings growth for Qualcomm.

*Global Networking & Communications Equipment*

7

Disclosure Appendix

## SRO REQUIRED DISCLOSURES

∗   References to "Bernstein" relate to Sanford C. Bernstein & Co., LLC and Sanford C. Bernstein Limited, collectively.

∗   Bernstein analysts are compensated based on aggregate contributions to the research franchise as measured by account penetration, productivity and proactivity of investment ideas.  No analysts are compensated based on performance in, or contributions to, generating investment banking revenues.

∗   Bernstein rates stocks based on forecasts of relative performance for the next 6 -12 months versus the S&P 500 for U.S. lis ted stocks and versus the MSCI Pan Europe Index for stocks listed on the European exchanges  — unless otherwise specified.  We have three categories of ratings:

> Outperform: Stock will outpace the market index by more than 15 pp in the year ahead.

> Market-Perform: Stock will perform in line with the market index to within +/ -15 pp in the year ahead.

> Underperform: Stock will trail the performance of the market index by more than 15 pp in the year ahead.

∗   As of 9/29/06, our ratings were distributed as follows: Ou tperform/Buy - 38.5%; Market-Perform/Hold - 50.3%; Underperform/Sell - 11.2%.

∗   Accounts over which Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, and/or their affiliates exercise investment discretion own more than 1% of the outstanding comm on stock of QCOM / Qualcomm Inc.

∗   Sanford C. Bernstein & Co., LLC currently makes a market in QCOM / Qualcomm Inc.

∗   The following companies are or during the past twelve (12) months were clients of Bernstein, which provided non -investment banking-securities related services and received compensation for such services QCOM / Qualcomm Inc.



## OTHER DISCLOSURES

**To our readers in the United States:**  Sanford C. Bernstein & Co., LLC is distributing this report in the United States and accepts responsibility for its contents. Any U.S. person receiving this report and wishing to effect securities transactions in any security discussed herein should do so only through Sanford C. Bernstein & Co., LLC.

**To our readers in the United Kingdom:**  This report has been issued or approved for issue in the United Kingdom by Sanford C. Bernstein Limited, authorised and regulated by the Financial Services Authority and located at Devonshire House, 1 Mayfair Place, London W1J 8SB, +44 (0)20-7170-5000.

**To our readers in member states of the EEA:**  This report is being distributed in the EEA by Sanford C. Bernstein Limited, which is authorised and regulated in the United Kingdom by the Financial Services Authority and holds a passport under the Investment Services Directive.

**To our readers in Australia:**  Sanford C. Bernstein & Co., LLC and Sanford C. Bernstein Limited are exempt from the requirement to hold an Australian financial services licence under the Corporations Act 2001 in respect of the provision of the following financial services t o wholesale clients:

∗   providing financial product advice;

∗   dealing in a financial product;

∗   making a market for a financial product; and

∗   providing a custodial or depository service.

Sanford C. Bernstein & Co., LLC and Sanford C. Bernstein Limited are regulat ed by the Securities and Exchange Commission under U.S. laws and by the Financial Services Authority under U.K. laws, respectively, which differ from Australian laws.

One or more of the officers, directors, or employees of Sanford C. Bernstein & Co., LLC,  Sanford C. Bernstein Limited and/or its affiliates may at any time hold, increase or decrease positions in securities of any company mentioned herein.

Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, or its or their affiliates may provide inv estment management or other services to the pension or profit sharing plans, or employees of any company mentioned herein, and may give advice to others as to investments in such companies. These entities may effect transactions that are similar to or diff erent from those recommended herein.

## CERTIFICATIONS

* I/(we), Paul Sagawa, Senior Analyst(s), certify that all of the views expressed in this report accurately reflect my/(our) personal views about any and all of the subject securities or issuers and that no part of my/(our) compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views in this report.

Approved By: CDK

Copyright 2006, Sanford C. Bernstein & Co., LLC, a subsidiary of AllianceBernstein L.P. ~ 1345 Avenue of the Americas ~ NY, NY 10105 ~ 212/756 -4400. All rights reserved.

This report is not directed to, or intended for distribution to or use by, any person or entity who is a ci izen or resident of, or located in any locality, state, country, or other jurisdiction where such distribution, publication, availa or use would be contrary to law or regula ion or which would subject Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited or any of their subsidiaries or affiliates to any registration or licensing requirement within such jurisdiction. This report is based upon public sources we believe to be reliable, but no representation is made by us that the report is accurate or complete. We do not undertake to advise information or in the opinions herein. This research was prepared and issued by Sanford C. Bernstein & Co., LLC and/or Sanford C. Bernstein Limited for distribution to market counterparti customers. This report is not an offer to buy or sell any security, and it does not constitute investment, legal or tax advice. The investments referred to herein may not be suitable for you. Inve investment decisions in consultation with their professional advisor in light of their specific circumstances. The value of investments may fluctuate, and investments hat are denominated in foreign curre value as a result of exposure to exchange rate movements. Information about past performance of an investment is not necessarily a guide to, indicator of, or assurance of, future performance.



26 March 2007
Americas/United States
**Equity Research**
Telecommunications Equipment (Wireless Telecommunications Equipment) /
MARKET WEIGHT

# 3G Economics Update

**Research Analysts**
**Michael Ounjian**
212 325 5726
mike.ounjian@credit-suisse.com

**Karen Holthouse**
212 325 0863
karen.holthouse@credit-suisse.com

**European Telecom Equipment**
**Kulbinder Garcha**
44 20 7888 0737
kulbinder.garcha@credit-suisse.com

**Vivek Dovel**
44 20 7883 6886
vivek.dovel@credit-suisse.com

SECTOR REVIEW

## IPR Debate Heating Up

With the partial expiration of NOK's CDMA/WCDMA license agreement with QCOM approximately two weeks away (April 9), we believe it is worthwhile to reexamine the broader topic of IPR and, in particular, the ongoing dispute between NOK and QCOM. We would highlight the following key conclusions:

- **QCOM's WCDMA IPR position remains difficult to dispute.** Despite the controversy surrounding the renegotiation of QUALCOMM's licensing agreement with Nokia, we continue to believe that QCOM's 60+ independently negotiated WCDMA terminal licensing agreements, which include every major handset vendor globally, provide the most compelling evidence of the commercial value of its patent portfolio. While others made significant contributions to the WCDMA standard as well, QCOM's innovations are clearly fundamental to the technology and its contributions have increased significantly with the evolution to HSDPA/HSUPA.

- **Mutual self-interest will prevail, but agreement appears unlikely before April 9.** While neither company is likely to comment on progress in negotiations, it appears increasingly unlikely that QUALCOMM and Nokia will reach an agreement by April 9, with both sides still at polar opposite positions. Therefore, we expect litigation activity to increase significantly after April 9. However, we believe mutual self-interest is likely to prevail, and an agreement will eventually be reached, as the success of WCDMA is a common interest and remains a core growth driver for both companies.

- **QUALCOMM royalty rate unlikely to change; industry rates likely to rise.** Despite Nokia's hope that QUALCOMM will be forced to lower its WCDMA royalty rate, we believe that this is ultimately unlikely. However, we expect cumulative royalty rates to rise (as high as 10-15% for companies with no IPR to trade), as Nokia and others pursue IPR licensing more aggressively than in the past, which we expect to result in a sustainable cost advantage relative to peers.

- **QCOM share price still embeds overly pessimistic scenario.** Given the commercially established value of QUALCOMM's WCDMA IPR, we believe the WCDMA royalty rate scenario embedded in the current share price (which we estimate at ~30% less than current royalty rates) is too pessimistic. However, we expect additional share price volatility approaching April 9 and estimate that the potential impact to FQ4:07/FY08E EPS estimates is $0.04/$0.19 if the dispute with Nokia is prolonged. We maintain an Outperform rating and $52 price target (reflecting a more modest royalty rate discount of ~10%).

- **Ericsson IPR position appears surprising uncontroversial.** One conclusion from our analysis is that Ericsson's 3G IPR position looks strong based on studies funded by both Nokia and QCOM. This rare agreement from both camps supports our long-standing view that Ericsson's IPR portfolio remains an undervalued asset and could offer 10-15% earnings upside long term. Maintain Outperform rating and price target of SK33.

**IMPORTANT DISCLOSURES, ANALYST CERTIFICATIONS AND INFORMATION ON TRADE ALERTS AND ANALYST MODEL PORTFOLIOS ARE IN THE DISCLOSURE APPENDIX.** U.S. Disclosure: Credit Suisse does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the Firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers of Credit Suisse in the United States can receive independent, third party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.credit-suisse.com/ir or call 1 877 291 2683 or email equity.research@credit-suisse.com to request a copy of this research.



26 March 2007

# Table of Contents

| | |
|---|---|
| Executive Summary | 3 |
| Company Implications | 9 |
| QCOM Stock Continues to Embed Overly Pessimistic Royalty Rate Scenario | 10 |
| Ericsson IPR Position Surprisingly Uncontroversial | 11 |
| NOK Appears to Be at Competitive Advantage to Most Handset Vendors | 11 |
| MOT Disadvantage to NOK Less Clear Than Previously Believed | 14 |
| Summary of Nokia's Position on IPR | 16 |
| Royalty Rates Should Be Proportional to Each Company's Contribution to the Standard | 16 |
| QUALCOMM'S Proportional Contribution to the WCDMA Standard Is Far Lower than Its Contribution to the CDMA2000 Standard | 16 |
| QCOM's Current Royalty Rates Will Result in Higher Handset Prices and Create an Unreasonably High Cumulative Royalty Burden for Smaller Vendors | 18 |
| IPR Royalties Should Be Proportional to the Importance of the Technology to the Overall Product | 18 |
| Summary of QUALCOMM's Position on IPR | 20 |
| Commercially Negotiated Royalty Rates Are Fair and Reasonable and the Most Accurate Indicator of the Value of IPR | 20 |
| The Goodman & Myers Study Has Significant Methodological Flaws and Cannot Be Relied Upon | 21 |
| Patent Counting Is Not an Accurate Measure of Patent Value | 21 |
| The WCDMA Standard Is Based upon the Same Patented Innovations That Are Fundamental to the CDMA and CDMA2000 Standards | 23 |
| Nokia and Others Are Attempting to Thwart QUALCOMM Enabled Competition | 28 |
| Update on Key Events | 30 |
| An Injunction after April 9? | 31 |
| Mutual Self-Interest Will Prevail | 33 |
| What a Settlement Could Look Like | 33 |
| Appendix A: Commonalities in CDMA and WCDMA Technologies | 39 |
| Direct Sequence Spread Spectrum Multiple Access | 40 |
| Orthogonal Code Division Multiple Access | 40 |
| Derivation of Orthogonal Walsh Codes | 43 |
| Random Access | 44 |
| Uplink Power Control | 45 |
| Rake Receivers | 45 |
| Soft and Softer Handoff | 46 |
| Single Frequency Re-use | 46 |
| Speech Regulated Vocoders | 46 |
| Commonalities in CDMA2000 and WCDMA Technologies | 47 |
| Variable Length Orthogonal Codes | 47 |
| Dual-Event Downlink Paging | 49 |
| QCOM Contributions to High-Speed Packet-Switched Downlink Technologies | 51 |
| High-Speed Downlink Channelization Structure | 51 |
| Fast and Adaptive Modulation and Coding Schemes | 53 |
| Fast and Adaptive Packet Data Scheduling | 53 |
| Fast Hybrid ARQ in the Downlink | 53 |
| High-Speed Packet-Switched Uplink Technologies | 54 |
| Appendix B: QUALCOMM Broadcom Litigation | 35 |

S90



# Executive Summary

Over the last 18 months, the topic of intellectual property rights (IPR) related to 3G/WCDMA has come to the forefront in the wireless industry among both industry participants and investors. With the partial expiration of Nokia's CDMA/WCDMA cross-license agreement with QUALCOMM approximately two weeks away (expires April 9, 2007), we believe it is worthwhile to reexamine the broader topic of IPR and, in particular, the ongoing dispute between Nokia and QUALCOMM. We also note that a substantial amount of new information on the topic has come to light since we published our previous reports on this topic (see our reports entitled 3G Economics: IPR—Extending Competitive Advantage dated September 6, 2005, and 3G Economics Update: Share Consolidation to Accelerate dated September 7, 2006). In particular, we would note that a number of key details of QCOM's current licensing agreement with Nokia have been disclosed including:

- **Partial expiration on April 9.** At QCOM's London Investor Day and Nokia's Capital Markets Day in November, both companies disclosed that as of April 9, Nokia will have a fully paid-up license to a number of early QCOM patents covering key CDMA innovations such as rake receivers, soft handoff, spread/scramble, orthogonal spreading code tree, softer handoff, and closed loop power control. As a result, the current license agreement expires only in part on that date.

- **Nokia option to renew at current terms by December 2008.** At its London Investor Day, QCOM disclosed that Nokia previously asked for and received an option to extend the current license agreement with the same terms for several more years. This option is available to Nokia until the end of 2008.

- **Pass-through rights still unclear.** While Nokia has indicated that it has not granted pass-through rights to its patents, QCOM subsequently indicated that it has partial pass-through rights to Nokia IPR related to its BREW partners. As a result, the specifics of QCOM's pass-through rights to Nokia IPR remain somewhat unclear.

- **QCOM standard royalty disclosed.** While this disclosure was the least surprising, given it was generally in-line with our estimates and investor expectations, QCOM recently disclosed for the first time that its standard royalty rate is less than 5% of the wholesale selling price of a CDMA/WCDMA handset.

Separately, QCOM published a number of white papers over the last few months, including a detailed description of the commonalities between CDMA and WCDMA technology and a summary of the benefits of QCOM's business model for the wireless industry and consumers. In addition, two advisors to QCOM in the areas of competition law and intellectual property matters, Dr. Donald L. Martin and Carl De Meyer, recently published a white paper providing a detailed critique of patent counting as an indicator of patent value, the Goodman & Myers study in particular, and any conclusions about patent value derived from the Goodman & Myers study. We believe this last white paper effectively encapsulates QCOM's responses to Nokia's arguments regarding a proportional royalty rate structure for the industry.

In this report we summarize the available information about the current situation and Nokia's and QUALCOMM's respective positions and provide our views on the expected outcome of this dispute and its impact on QUALCOMM, Nokia, and other major industry participants. Based on our analysis of the relevant available information over the last two years, along with extensive conversations with a broad range of industry participants, including QUALCOMM and Nokia as well as Professor Goodman and Dr. Myers, we would highlight the following key conclusions:

1. **QCOM's WCDMA IPR position remains difficult to dispute.** Despite the controversy surrounding the renegotiation of QUALCOMM's licensing agreement with Nokia and QCOM's licensing business model in general, there is no dispute that



26 March 2007

QCOM has a substantial patent portfolio that is essential to the WCDMA standard and must be licensed by any WCDMA handset vendor. While the appropriate royalty rate has been raised as the more controversial issue, we continue to believe that it is difficult to credibly challenge a royalty rate that has been commercially established through 60+ independently negotiated WCDMA terminal licensing agreements that include every major handset vendor globally.

While it is fair to say that several other industry participants played an active role in developing the WCDMA standard and made significant technology contributions that are essential to the standard, there is little to no evidence that QCOM's innovations are any less fundamental to the WCDMA standard than they are to the CDMA2000 family of standards. In addition, QCOM's contribution continues to increase as WCDMA standards evolve to HSDPA and HSUPA, which we believe should alleviate any concerns about QCOM's IPR position weakening as early patents expire.

2. **Timing still difficult to predict—agreement appears unlikely before April 9.** We acknowledge that neither company is likely to make public statements about any progress in the negotiations, but with the partial expiration of QUALCOMM's cross-license agreement less than three weeks away, it appears increasingly unlikely that a new cross-licensing agreement will be reached by April 9. In particular, we would note that the two companies remain at polar opposite positions regarding most of the key issues, so it is reasonable to expect a drawn-out process with litigation activity likely to increase significantly after April 9.

We would also note that Nokia's option to extend the current licensing agreement does not expire until December 2008, which may limit Nokia's incentive to settle in the near term. In order to help put the debate in perspective and highlight the significant difference in opinions, we summarize our view of the key arguments for both Nokia's position and QUALCOMM's position in Exhibit 2.

While we have little/no information regarding each company's legal strategy after April 9, we provide a summary of key events to date and key upcoming dates related to existing legal actions in Exhibit 1.

**Exhibit 1: Timeline of Key Events in QUALCOMM-Nokia IPR Dispute**



Source: Company press releases, court filings.

3. **Mutual self-interest will prevail in the end.** Despite the two companies taking polar opposite positions, we do believe that mutual self-interest is likely to prevail and an agreement will eventually be reached without drawn-out arbitration or court proceedings. The success of WCDMA is a common interest for both QUALCOMM and Nokia, as it is crucial to the financial performance of the entire sector in the coming



26 March 2007

years. While each company would like to grow its own portion of the WCDMA pie through royalties, the prospect of high cumulative royalty rates, expensive and time-consuming litigation, and the uncertainty it creates are counter to the interests of every vendor.

We would note that most high-growth developing markets, such as China, India, Brazil, and Russia, have yet to issue 3G licenses or make official technology decisions. Although IPR disputes have not been explicitly raised as a decision factor, IPR has consistently been raised as an important issue surrounding 3G in our conversations with handset/equipment vendors and other industry participants in China. In addition, several major operators approached the EC in 2005 in regard to ETSI's (European Telecommunications Standards Institute) handling of patents during the WCDMA standards-setting process; while the direction of 3G technology paths in Europe is unable to change, we believe that operators may be able to exert leverage through their potential 4G technology paths.

4. **QUALCOMM royalty rate structure unlikely to change substantially, although cumulative royalty rate likely to rise.** While the timing of a settlement remains unclear, we believe a settlement is likely to have the following characteristics:

QUALCOMM WCDMA royalty rate unlikely to be reduced. Despite Nokia's hope that QUALCOMM will be forced to lower its royalty rate for WCDMA, we believe that this is unlikely. In addition to the commercial precedent established by QUALCOMM's 60+ other WCDMA terminal licensing agreements and the strength of QUALCOMM's patent portfolio, we believe that QUALCOMM will be motivated to avoid an agreement that would trigger any "most favored nation" clauses in other agreements and ultimately lower the royalty rate paid by other vendors. However, given that QUALCOMM has not historically pursued a GSM licensing program, we believe it is not likely to obtain a meaningful royalty-bearing license related to GSM/GPRS/EDGE handsets, particularly to the extent its WCDMA royalty rate structure does not change.

QUALCOMM no longer receives pass-through rights to Nokia IPR. At the heart of Nokia's complaint is that it holds a dominant position in IPR yet still remains a net royalty payer. Nokia attributes this to agreements that were signed while it was still building an IPR position (prior to a significant ramp in R&D spending starting in 2001). While we would not necessarily ascribe to Nokia's view of its overall share of WCDMA or CDMA2000 IPR, we still believe that a key issue is Nokia's market share of IPR being inconsistent with its current payments from competitors. We believe that one concession Nokia may achieve is the elimination of any of QUALCOMM's pass-through rights to Nokia's patents. This would allow Nokia to garner its own IPR royalties from handset customers that use QUALCOMM chipsets, lower its net royalty rates, and, most important, give Nokia a cost advantage versus its competitors. While the extent of QUALCOMM's pass-through rights remains unclear, QCOM appears to have obtained at least partial pass-through rights related to its BREW business.

Industry royalty rate to rise, but not to the level that is feared. We believe it is likely that smaller vendors with limited/no IPR to trade will need to pay royalties to key IPR holders beyond QUALCOMM, including Ericsson, Nokia, and potentially Motorola. However, we believe it is unlikely that royalty rates will approach the 25-30% level that is feared or that we will see a return to historical GSM royalty rates. However, we expect the cumulative rate for smaller vendors to be well above 5% and view 10-15% as a more likely long-term range. This would allow key IPR holders to make some return on historical R&D investments, while keeping rates low enough to minimize antagonizing the carriers.

5. **IPR favors large players, but relative royalty positions vary widely depending on methodology.** It is clear that leading handset vendors such as Nokia and Motorola are at an advantage in terms of IPR relative to most competitors, including Samsung and LG, which we believe will result in a sustainable cost advantage. However, we

S93



26 March 2007

would note the wide variance of opinions in the relative commercial value of IPR among the leading patent holders. On one hand, the Goodman & Myers study showed Nokia as the holder of the most essential patents, with a substantial lead over Motorola, which ranked a very distant fourth.

On the other hand, the analysis of non-self patent citations cited in the Martin and De Meyer white paper showed Motorola as having the third strongest WCDMA patent portfolio and a substantially stronger position than Nokia (which ranked seventh). As a result, while we expect to see Nokia and Motorola receive value for their respective patent portfolios from smaller vendors with weaker IPR positions, it appears unlikely that a cross-license agreement between Nokia and Motorola would result in significant monetary payments, particularly given that Nokia's higher market share would likely offset any relative strength in terms of its patent portfolio.

S94



26 March 2007

# Company Implications

## QUALCOMM (Outperform, FV of $52)—Share Price Still Embeds Overly Pessimistic Royalty Rate Scenario

We continue to expect WCDMA adoption to accelerate through 2007 and for QCOM to achieve revenue and EPS growth ahead of the overall market. At 22x/18x our 2007/2008 EPS estimates (26x/20x adjusted for net cash and options), we continue to view the risk/reward as attractive and we maintain our Outperform rating and $52 price target. We would highlight the following:

■ **QCOM's leading IPR position remains difficult to dispute.** Despite the widespread controversy surrounding the Nokia renegotiation, we believe QCOM's 60+ WCDMA terminal license agreements (including every major handset vendor) provide substantial validation of the commercial value of QCOM's WCDMA patent portfolio. While it is fair to say that several other industry participants played an active role in developing the WCDMA standard and made significant technology contributions that are essential to the standard, there is little to no evidence that QCOM's innovations are any less fundamental to the WCDMA standard than they are to the CDMA2000 family of standards. In addition, as the WCDMA standards evolve to HSDPA and HSUPA, QCOM's contribution continues to increase, which we believe should alleviate any concerns about QCOM's IPR position weakening as early patents expire.

■ **Overly pessimistic royalty rate scenario already priced in at the current valuation.** While the uncertainty surrounding the Nokia renegotiation is likely to continue for some time, we believe the current share price embeds a WCDMA royalty rate across all customers in the 3.0-3.25% range, as illustrated in Exhibit 5, which represents a reduction of ~30% from the current average royalty rate, which we estimate at ~4.5%. We believe our long-term forecast of 4% (a 10%+ reduction) already accounts for reasonable risk related to the Nokia renegotiation and regulatory actions that may occur in the next several years.

**Exhibit 5: QUALCOMM Target Price Sensitivity**

| QUALCOMM Target Price Sensitivity | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WCDMA MSM Share | Long-term WCDMA Royalty Rate | | | | | | | | | | | |
| | 2.50% | 2.75% | 3.00% | 3.25% | 3.50% | 3.75% | 4.00% | 4.25% | 4.50% | 4.75% | 5.00% | 5.25% | 5.50% |
| 20.0% | $38 | $39 | $41 | $43 | $44 | $46 | $48 | $50 | $52 | $54 | $56 | $58 | $60 |
| 22.5% | 38 | 40 | 41 | 43 | 45 | 47 | 49 | 50 | 52 | 54 | 56 | 58 | 60 |
| 25.0% | 39 | 40 | 42 | 44 | 46 | 47 | 49 | 51 | 53 | 55 | 57 | 59 | 61 |
| 27.5% | 39 | 41 | 43 | 45 | 46 | 48 | 50 | 52 | 54 | 56 | 58 | 60 | 62 |
| 30.0% | 40 | 42 | 43 | 45 | 47 | 49 | 51 | 53 | 55 | 57 | 59 | 61 | 63 |
| 32.5% | 41 | 42 | 44 | 46 | 48 | 50 | 51 | 53 | 55 | 57 | 59 | 62 | 64 |
| 35.0% | 41 | 43 | 45 | 47 | 48 | 50 | 52 | 54 | 56 | 58 | 60 | 62 | 65 |
| 37.5% | 42 | 44 | 45 | 47 | 49 | 51 | 53 | 55 | 57 | 59 | 61 | 63 | 65 |
| 40.0% | 43 | 44 | 46 | 48 | 50 | 52 | 54 | 56 | 58 | 60 | 62 | 64 | 66 |
| 42.5% | 43 | 45 | 47 | 49 | 50 | 52 | 54 | 56 | 58 | 60 | 63 | 65 | 67 |
| 45.0% | 44 | 46 | 47 | 49 | 51 | 53 | 55 | 57 | 59 | 61 | 63 | 66 | 68 |

Source: Company data, Credit Suisse estimates.

■ **Expect significant volatility around April 9.** Although we remain skeptical that QUALCOMM and Nokia will reach a resolution prior to April 9 and believe that QUALCOMM has been very clear that it also does not expect resolution in that time frame, we expect some share price volatility as April 9 approaches, particularly if speculation about a potential settlement increases. To the extent a resolution is not reached for a prolonged period of time and QCOM is unable to recognize revenues from Nokia for WCDMA royalties, we estimate the potential impact to QCOM's FY07/FY08 EPS to be $0.04/$0.19. This estimate does not include CDMA royalties



26 March 2007

given that Nokia has indicated intentions to work with partners, who have CDMA licenses with QCOM, for CDMA handsets following April 9; including CDMA, we estimate the impact would be $0.05/$0.20. However, given that we expect Nokia to begin paying WCDMA royalties at some point in the future, we believe a more appropriate analysis to consider is the impact of various WCDMA royalty rate scenarios (across all customers) and WCDMA chipset market share scenarios on FY08 EPS estimates. This is illustrated in Exhibit 6.

**Exhibit 6:** QUALCOMM Fiscal 2008 Sensitivity (Including Options Expenses of $0.19 per Share)

| QUALCOMM FY08 EPS Sensitivity (incl. option comp. Expense) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY08 WCDMA | | | | | | FY08 WCDMA Royalty Rate | | | | | | |
| MSM Share | 2.5% | 2.8% | 3.0% | 3.3% | 3.5% | 3.8% | 4.0% | 4.3% | 4.5% | 4.8% | 5.0% | 5.3% | 5.5% |
| 17.5% | $1.69 | $1.74 | $1.78 | $1.83 | $1.88 | $1.92 | $1.97 | $2.01 | $2.06 | $2.10 | $2.15 | $2.20 | $2.24 |
| 20.0% | $1.71 | $1.75 | $1.80 | $1.84 | $1.89 | $1.93 | $1.98 | $2.03 | $2.07 | $2.12 | $2.16 | $2.21 | $2.26 |
| 22.5% | $1.72 | $1.77 | $1.81 | $1.86 | $1.90 | $1.95 | $1.99 | $2.04 | $2.09 | $2.13 | $2.18 | $2.22 | $2.27 |
| 25.0% | $1.73 | $1.78 | $1.83 | $1.87 | $1.92 | $1.96 | $2.01 | $2.05 | $2.10 | $2.15 | $2.19 | $2.24 | $2.28 |
| 27.5% | $1.75 | $1.79 | $1.84 | $1.89 | $1.93 | $1.98 | $2.02 | $2.07 | $2.11 | $2.16 | $2.21 | $2.25 | $2.30 |
| 30.0% | $1.76 | $1.81 | $1.85 | $1.90 | $1.94 | $1.99 | $2.04 | $2.08 | $2.13 | $2.17 | $2.22 | $2.27 | $2.31 |
| 32.0% | $1.77 | $1.82 | $1.86 | $1.91 | $1.96 | $2.00 | $2.05 | $2.09 | $2.14 | $2.18 | $2.23 | $2.28 | $2.32 |
| 35.0% | $1.79 | $1.84 | $1.88 | $1.93 | $1.97 | $2.02 | $2.06 | $2.11 | $2.16 | $2.20 | $2.25 | $2.29 | $2.34 |
| 37.5% | $1.80 | $1.85 | $1.89 | $1.94 | $1.99 | $2.03 | $2.08 | $2.12 | $2.17 | $2.22 | $2.26 | $2.31 | $2.35 |
| 40.0% | $1.82 | $1.86 | $1.91 | $1.95 | $2.00 | $2.05 | $2.09 | $2.14 | $2.18 | $2.23 | $2.27 | $2.32 | $2.37 |
| 42.5% | $1.83 | $1.88 | $1.92 | $1.97 | $2.01 | $2.06 | $2.11 | $2.15 | $2.20 | $2.24 | $2.29 | $2.33 | $2.38 |

Source: Company data, Credit Suisse estimates.

## Ericsson (Outperform, FV of SKr 33)—IPR Position Surprisingly Uncontroversial

There seems to be no consensus between Nokia and QUALCOMM on the relative share of each others' patents in WCDMA, as evidenced by the reports endorsed by the companies; however, strikingly, both companies have a similar view as to the percentage of essential 3G IPR contributed by Ericsson. Whilst the Goodman & Myers report (endorsed by Nokia), claims that Ericsson contributes 22% of the essential IPR for WCDMA, the patent citation analysis in the Martin and De Meyer report (endorsed by QUALCOMM as a better indication of relative patent value), expects this number to be more in the range of 21%. In essence, this provides conclusive evidence in our view that Ericsson holds a very meaningful share of 3G IPR, and, going forth, this will start to become a meaningful contribution to the company's bottom line.



26 March 2007

# Summary of QUALCOMM's Position on IPR

QUALCOMM'S primary response to challenges to its currently royalty rate structure is, quite simply, that it is has been established and validated by 60+ commercially negotiated WCDMA terminal license agreements. To counter Nokia's arguments about proportionality, QUALCOMM argues that royalty rates set in arm's-length free-market negotiations are inherently fair and reasonable and provide the most accurate assessment of the commercial value of a patent portfolio. In response to Nokia's arguments, QUALCOMM also highlights the following key points.

- The Nokia funded Goodman & Myers report has significant methodological flaws and its conclusions cannot be relied upon as a measure of numerical contributions to the WCDMA and CDMA 2000 standards, let alone as an indication of patent value or royalty levels.

- In any event, patent counting does not account for the high degree of variance in the value of each patent to the technology/products. In addition, there is little to no academic support or precedent for patent counting as a methodology for establishing royalty rates. Further, no standards setting organization has adopted or supported patent counting as a means to determine fair, reasonable, and nondiscriminatory terms and conditions.

- QUALCOMM has been a major contributor of technology in 3GPP to the evolution of the WCDMA standard from Rev 99 through HSDPA/HSUPA.

- The WCDMA standard is not only based upon the same patented innovations that are fundamental to the CDMA2000 standards, but also the evolution path to HSDPA/HSUPA continues to incorporate more recently patented innovations from QCOM.

- QUALCOMM's business model enables competition, has provided access to a constantly expanding patent portfolio at a constant royalty rate, and helps handset vendors avoid "royalty stacking."

- The competition enabled by QCOM's licensing program has contributed to the rapid decline of WCDMA handset prices and the rapid growth of WCDMA subscribers over the last few years.

We provide a more detailed summary of QCOM's key arguments (although we would also refer to the series of whitepapers on QUALCOMM's Web site including "Commonalities between CDMA2000 and WCDMA Technologies," "QUALCOMM Business Model: A Formula for Innovation and Choice," and "Patent Counting, A Misleading Index of Patent Value: A Critique of Goodman & Myers and its Uses" for a more complete description).

**Commercially Negotiated Royalty Rates Are Fair and Reasonable and the Most Accurate Indicator of the Value of IPR**

QUALCOMM argues that royalty rates set in arm's-length free-market negotiations are the best indicator of what is fair and reasonable and represent the most accurate measure of the commercial value of a patent portfolio. QUALCOMM notes that it has signed over 120 CDMA2000 and over 70 WCDMA license agreements (over 60 for subscriber terminals) at QUALCOMM's standard rates, which is a testament to the actual and fair value of its patent portfolio. The Martin and De Meyer white paper also cited several court precedents for existing commercial agreements being cited as the best indicator of a reasonable royalty rate, and, in some cases, the minimum royalty rate a patent holder should receive.



26 March 2007

**The Goodman & Myers Study Has Significant Methodological Flaws and Cannot Be Relied Upon**

The Martin and De Meyer paper highlights a number of methodological flaws in the Goodman & Myer study, some of which are noted by the authors themselves, which Martin and De Meyer assert makes the study unreliable even as an evaluation of the number of essential patents contributed by each patent holder. Furthermore, they highlight that Goodman & Myers draw no inferences regarding patent value and appropriate royalty rates, and that the study offers no basis for drawing such conclusions. We list some of the flaws highlighted by Martin and De Meyer, as follows.

- **The methodology of "grouping" patents was flawed.** The Goodman & Myers study looked at 7,796 patents that were claimed essential, and classified them into 887 patent families. Each family represented patents covering a "single invention." One patent from each family was considered the representative of the family and reviewed; if that patent was judged essential, the entire family was considered essential, and, if it was not, the entire family was considered not essential. This approach does not take into account differences in claims in different jurisdictions or divisional applications (which basically involves splitting an application to file an application for only part of the initially covered invention).

- **The study did not allow enough time for sufficient analysis.** By only analyzing each patent for approximately one hour, the study did not leave sufficient time to consider the specification or prosecution histories of each patent or where a patent fit into the WCDMA or CDMA2000 technical specifications. The authors of the study even acknowledged that "determining the scope of a patent and its commercial value requires several days of effort by lawyers and engineers, and sometimes weeks or months of adjudication by judges and juries."

- **The study is dated.** The study used only the technical specifications for the standards that were published before 2004 and only looked at patents declared before February 2004, which does not account for the evolution of the standard since 2004 or the substantial number of patents that have been issued since February 2004. As an example, QUALCOMM highlights two patents related to HSDPA technology that were granted on or after the cut-off date used by Goodman & Myers. This limitation is also acknowledged by the authors and makes it difficult to rely on the findings of the study.

- **The study was funded entirely by Nokia.** QUALCOMM also notes that it has learned that the Goodman & Myers study was funded entirely by Nokia, calling into question its degree of independence.

**Patent Counting Is Not an Accurate Measure of Patent Value**

The Martin and De Meyer paper also notes that patent counting ignores the wide variance in the importance of the innovations protected by individual patents and cites substantial financial economics literature calling for a patent to be valued like any other financial asset (e.g., incorporating the expected cash flows from the practice of a patent relative to its next best alternative, the remaining life of the patent, etc.).

While not necessarily endorsing this approach as the definitive method to determine royalty rates, the paper also highlights empirical literature that supports the use of patent citation counts (i.e., counting the number of times a patent is cited by subsequent patents) as a better predictor of market value than simple patent counting.

The paper also included an analysis of the patents declared essential to WCDMA technology as of March 2006 and counted the number of citations each patent received from declared essential patents that belonged to another company (to avoid a company inflating its own patent citations). Exhibit 15 and Exhibit 16 show the relative shares of patents and citations, in which QUALCOMM holds only 14% of the declared patents but has received 46% of the non-self citations. This analysis therefore implies that

CREDIT SUISSE

26 March 2007

QUALCOMM is the clear leader in WCDMA intellectual property. At the same time, Nokia ranks seventh, with only 3% of patent citations, a very different outcome than the Goodman & Myers study, which implied that Nokia had the most WCDMA essential patents and 25% of the total.

**Exhibit 15: Shares of Declared Essential WCDMA Patents**



**Exhibit 16: Shares of Declared Essential WCDMA Citations**



Source: "Patent Counting, A Misleading Index of Patent Value: A Critique of Goodman & Myers"—Martin and De Meyer.

Source: "Patent Counting, A Misleading Index of Patent Value: A Critique of Goodman & Myers"—Martin and De Meyer.

The analysis also notes the intensity with which QUALCOMM's patents are cited; on average, each patent declared essential by QCOM is cited 62 times versus an overall average of 20 and an average of 9 for Nokia, as illustrated in Exhibit 17.

**Exhibit 17: QUALCOMM's Citation Density**



Source: "Patent Counting, A Misleading Index of Patent Value: A Critique of Goodman & Myers"—Martin and De Meyer.

It is worth noting that the paper does not endorse patent citations as the ideal methodology for valuing IPR, it only shows that it has relatively more academic support than patent counting. In fact, the study notes that, as measured by total citations, Ericsson's patent portfolio appears significantly stronger than that of AirTouch, while using citation density as a measure would point to the opposite conclusion. At the very least, the

S99

CREDIT SUISSE

26 March 2007

dramatic differences between the conclusions of these analyses and the Goodman & Myers study highlight the pitfalls in using numeric proportionality methods to determine patent value.

Finally, the paper highlights the likely inefficiencies created by using patent counting to determine royalty rates, as it would create incentives for companies to file excessive numbers of patents without regard to commercial value and to split patents into multiple pieces in order to inflate patent counts. These practices would obviously favor larger companies with more resources to devote to patent applications. It would also reduce the incentive for innovation, because the marginal value of new patents would decrease as the standard evolves and the patent pool grows.

**The WCDMA Standard Is Based upon the Same Patented Innovations That Are Fundamental to the CDMA and CDMA2000 Standards**

In response to claims that QUALCOMM's contribution to the WCDMA standard is less significant than its contribution to CDMA, the company argues that its development of spread spectrum multiple access is the foundation of any future version of CDMA technology, and that other technologies developed for CDMA networks are integral to CDMA's characteristic improvements in spectral efficiency and network capacity, voice quality, coverage areas for each base station, and device battery life. A summary of the IPR QUALCOMM claims surrounding these technologies is included in Exhibit 18. We provide more detailed descriptions of these technologies in Appendix A.

S100



26 March 2007

# Appendix A: QUALCOMM-Broadcom Litigation

Broadcom initially filed patent infringement claims against QUALCOMM in May 2005 in the Central District of California (Santa Ana) Federal Court. Since then, each company has filed several lawsuits claiming patent infringement, unfair trade practices, and misappropriation of trade secrets in both the U.S. Federal Court and The International Trade Commission. On March 17 both parties dismissed all of their pending claims in San Diego Federal District Court, leaving only the following cases:

- Broadcom case against QUALCOMM for patent infringement in Santa Ana Federal District Court.

- Broadcom case against QUALCOMM for patent infringement in International Trade Commission Court.

- Broadcom case against QUALCOMM alleging that QUALCOMM licensing practices violate U.S. antitrust laws.

A time line of the important events is included on the following page and a summary of each case follows that.

 CREDIT SUISSE

26 March 2007

**Exhibit 26:** Key Events in QUALCOMM Broadcom Litigation

| Date | Commentary |
|------|-----------|
| 19-May-05 | Broadcom files a complaint in the Central District of CA Federal District Court alleging that Qualcomm has infringed on 10 patents relating to wireless communications and multimedia processing. |
| 19-May-05 | Broadcomm files a complaint with the ITC alleging that Qualcomm has engaged in unfair trade practices by importing products that infringe on 5 of Broadcom's patents |
| 5-Jul-05 | Broadcomm begins litigation in the the District Court of New Jersey Federal District Court alleging that Qualcomm's licensing practices violate US anti-trust law. |
| 11-Jul-05 | Qualcomm files a complaint in US Federal District Court in San Diego against Broadcom for infringing on 12 patents that are alleged to be essential to GSM/GPRS/EDGE standards. |
| 28-Oct-05 | Broadcom, Ericsson, NEC, Nokia, Panasonic Mobile Communications and Texas Instruments filed complaints to the European Commission to investigate and stop Qualcomm's anti-competitive conduct in the licensing of essential patents for 3G technology.  The EC is currently considering the case. |
| 29-Mar-06 | Qualcomm files a complaint against Broadcom in US Federal District Court for patent infringement and misappropriation of trade secrets relating to WCDMA broadband integrated circuit products. |
| 2-Aug-06 | The Fed. District Court permanently enjoins Broadcom from pursuing patent infringement claims under 2 patents that are currently part of the ITC proceedings as an agreement between the companies requires that the dispute be litigated in San Deigo Federal District Court. |
| 1-Sep-06 | A Federal District Court dismisses Broadcom antitrust complaint in its entirety. |
| 29-Sep-06 | Broadcom files an appeal to the dismissal of its anti-trust case. |
| 2-Oct-06 | Federal District Court in San Diego rejcts Qualcomm's request for an injunction against Broadcom manufacturing or selling 3G chipsets. |
| 10-Oct-06 | An Administrative law Judge in ITC Court finds that Qualcomm did not violate two Broadcom patents and recommends that there by no downstream remedies against 3rd parties.  The ALJ also found that Qualcomm violated certain parts of a Broadcom patent and Qualcomm is researching designs that would replace the |
| 30-Oct-06 | US Federal Court enjoins Broadcom from further use or dissemination of Qualcomm's trade secrets relating to WCDMA technology, pending the outcome of a trial in the case |
| 11-Dec-06 | The ITC accepts the Administrative Law Judge's initial ruling that Qualcomm did not violate Broadcom patents pertaining to EV-DO and RF chips.  The determination that Qualcomm violated a patent regarding handset functionality when out of network range will stand, and a public hearing is scheduled for March 21st to determine |
| 26-Jan-07 | A Jury finds that Broadcom did not infringe on two Qualcomm patents relating to video encoding but determined that the patents are valid.  They are not patents that Qualcomm has licensed.  The jury also determined that the judge would have to decide if (I) Qualcomm had waived its rights to enforce the patents by participating in a video standards setting body and (ii) if Qualcomm engaged in conduct during the patent application process that would render either patent unenforceable. |
| 2-Feb-07 | A federal court in San Diego ruled that Qualcomm cannot assert an indirect infringement claim against Broadcom (which means that an accused acts alone do not infringe all elements of a patent claim, but meet the necessary claims when combined with the acts of others) when Broadcom sells devices to a Qualcomm licensee; however, this does not protect Broadcom from direct infringement claims. |
| 21-Mar-07 | The ITC held a public hearing which will allow presentations by groups affected by Broadcom's request that the Commission ban the importation of all Qualcomm CDMA2000 1xEV-DO handsets into the US. |
| 22-Mar-07 | Federal Judge Rules that QUALCOMM's conduct before the US Patent Office when obtaining two patents (included in Qualcomm's patent suit against Broadcom in San Deigo) was lawful but that Qualcomm did not meet the unwritten IPR Disclosure Expectations of the Standard Setting Group |
| May-07 | BRCM's case against QCOM in Santa Ana Federal District Court is set to go to trial. |
| 11-Dec-07 | The ITC court will consider the ALJ's recommendation in the dispute and rule on it. |

Source: Company data, Credit Suisse estimates.

- **Central District of California (Santa Ana) Federal District Court: BRCM v. QCOM for patent infringement.** Broadcom filed this suit on May 19, 2005, alleging that QUALCOMM had infringed on ten patents relating to wireless communications and multimedia processing. This is expected to go to trial in May 2007.

- **International Trade Commission Court: BRCM v. QCOM alleging unfair trade practices.** Broadcom initially field this suit on May 19, 2005, claiming that QUALCOMM was engaging in unfair trade practices by importing products into the U.S., which infringed on the five patents involved in the Central District of California litigation. Broadcom was later enjoined by a Federal District Court from pursuing claims regarding two of these patents as a contract between QUALCOMM and Broadcom required that any issues be litigated in San Diego Federal District Court.



CREDIT SUISSE

26 March 2007

The court later ruled that QUALCOMM had not infringed two of the other patents and that QUALCOMM EV-DO technology was infringing on a patent relating to handset functionality when it is out of network range. This past week (March 21 and 22) the ITC held hearings on the appropriate scope of the remedies against QUALCOMM. Broadcom is asking that there be an injunction against all infringing QUALCOMM products, and a variety of other industry participants, particularly carriers who have rolled out EV-DO networks, are expected to argue against an injunction. They believe that an injunction would hinder the migration to EV-DO networks in the U.S. and limit handset price reductions. We would also note that QUALCOMM is currently researching designs that would replace the infringing technology. A final ruling is expected in December 2007.

■ **New Jersey Federal District Court: BRCM v. QCOM claiming that QCOM licensing practices violate antitrust laws.** Broadcom initially filed this suit on July 5, 2005, alleging that QUALCOMM's licensing practices violated U.S. antitrust laws. This case was dismissed in its entirety on September 1, 2006, and Broadcom filed an appeal on September 29.

■ **San Diego Federal District Court: QCOM v. BRCM for patent infringement.** QUALCOMM initially filed this case on July 11, 2005, and claimed that Broadcom's GPS/GPRS/EDGE products were violating 11 patents belonging to QCOM and one belonging to Snaptrack, a wholly owned subsidiary of QUALCOMM. A list of the patents QUALCOMM alleges had been infringed is included in Exhibit 27, and note that the highlighted patents indicate those that have also been cited as essential to WCDMA standards.

**Exhibit 27: Patents QUALCOMM Claims Broadcom Is Infringing**
highlighted patents indicate those involved in Nokia litigation as well

| QCOM Patents<br>Title | Number | Date<br>Filed | Date<br>Issued |
|---|---|---|---|
| Spread spectrum transmitter power control method and system | 5,257,283 | 26-Oct-93 | 23-Aug-91 |
| Method and Apparatus for the formatting of data for transmission | 5,568,483 | 17-Jan-95 | 1-Oct-96 |
| Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System | 5,590,408 | 20-Mar-95 | 31-Dec-96 |
| Reverse Link, Transmit Power Correction and Limitation in a Radiotelephone System | 5,655,220 | 22-Sep-95 | 5-Aug-97 |
| Method for providing service and rate negotiation in a mobile communication system | 5,638,412 | 15-Jun-94 | 10-Jun-97 |
| Encoding rate selection in a variable rate vocoder | 5,742,734 | 10-Aug-94 | 21-Apr-98 |
| Variable rate vocoder | 5,778,338 | 23-Jan-97 | 7-Jul-98 |
| Wireless telephone airplane and alarm clock modes | 6,453,182 | 15-Feb-00 | 17-Sep-02 |
| Method and apparatus for providing high speed data communications in a cellular environment | 6,496,543 | 29-Oct-96 | 17-Dec-02 |
| Method and apparatus for high rate packet data transmission | 6,574,211 | 3-Nov-97 | 3-Jun-03 |
| Bit interleaving for orthogonal frequency division multiplexing in the transmission of digital signals | 6,717,908 | 10-May-01 | 6-Apr-04 |

Source: Company data, Credit Suisse estimates.

A jury found that Broadcom did not violate two QUALCOMM patents relating to video compression technology and said that a judge had to determine if QUALCOMM has waived its rights to enforce the patents by participating in a standards setting body and if QUALCOMM has engaged in conduct during the patent applications process that would render either patent unenforceable. Following this, a judge found that QUALCOMM's behavior while obtaining the patents was lawful but that QUALCOMM did not meet the unwritten IPR disclosure expectations of the Standard Setting Group.

The remaining patents were dismissed when both parties agreed to dismiss all of their claims and counterclaims regarding patent infringement and misappropriation of trade secrets that are pending in San Diego Federal District Court.

■ **San Diego U.S. Federal District Court: QCOM v. BRCM for the misappropriation of trade secrets.** QUALCOMM initially filed this complain on March 29, 2006, and claimed that Broadcom was misappropriating QUALCOMM trade secrets relating to WCDMA broadband integrated circuits. QUALCOMM asked for an injunction against the manufacture or sale of Broadcom's 3G chipsets, which was later denied; however, Broadcom was later enjoined from using or disseminating QUALCOMM's trade secrets

 26 March 2007

relating to WCDMA technology until the outcome of the trial. The case was dismissed when both parties agreed to dismiss all of their claims and counterclaims regarding patent infringement and misappropriation of trade secrets that are pending in San Diego Federal District Court.



Paul Sagawa • paul.sagawa@bernstein.com • +1-212-407-5825
Regina Possavino, CFA • regina.possavino@bernstein.com • +1-212-756-4569
Steve Yuan • steve.yuan@bernstein.com • +1-212-969-6744

April 9, 2007

# Qualcomm & Nokia: Stakes Now Higher for Both Sides; Eventual Settlement Still More Likely Than Long Legal Battle

*Estimate Change in Bold*

| Ticker | Rating | CUR | 4/5/2007 Closing Price | Target Price | YTD Rel. Perf. | Cash EPS | | | P/E | | | Yield |
|--------|--------|-----|-----------------------|--------------|----------------|----------|----------|----------|----------|----------|----------|-------|
| | | | | | | 2006A | 2007E | 2008E | 2006A | 2007E | 2008E | |
| QCOM | O | USD | 43.30 | 60.00 | 12.8% | 1.64 | **1.92** | **2.25** | 34.4 | 30.5 | 25.9 | 0.7% |
| *OLD* | | | | | | | 1.94 | | | | | |
| NOK1V.FH | O | EUR | 17.65 | 28.00 | 9.4% | 1.03 | 1.27 | 1.59 | 22.1 | 13.9 | 11.1 | 1.9% |
| NOK | O | USD | 23.54 | 34.00 | 14.1% | 1.30 | 1.62 | 1.98 | 24.3 | 14.5 | 11.9 | 1.5% |
| MSDLE15 | | | 1557.72 | | | 105.18 | 113.75 | 123.38 | 14.8 | 13.7 | 12.6 | 3.1% |
| SPX | | | 1443.76 | | | 86.75 | 91.00 | 97.00 | 16.6 | 15.9 | 14.9 | 1.8% |

O – Outperform, M – Market-Perform, U – Underperform

**Highlights**

* **Last-second actions.** Both Nokia and Qualcomm played new cards on the brink of the expiration of their cross-licensing agreement. Nokia announced that it would pay Qualcomm just $20M for 2Q07, far below the ~$120M that we calculate would have been due under the prior agreement. Nokia believes this is appropriate, claiming that Qualcomm's patents are exhausted in Europe based on Qualcomm's license with its base-band chip supplier TI, its assertion that it no longer owes for a subset of Qualcomm's earlier patents, and the technicality that not all of Qualcomm's patents have been filed in every country. Qualcomm, labeling the payment "arbitrary", filed for an arbitrator to rule whether Nokia shipments post April 9th would constitute an implicit election of an option to extend the current licensing terms. This adds to prior charges that Nokia owed royalties on its more than $100B in GSM device sales over the past few years. While these actions – Nokia's filing on patent exhaustion and Qualcomm's GSM gambit and arbitration requests – appear to be unlikely to succeed, an unexpected outcome on any of them could dramatically damage the position of one party or the other. We believe that this raising of stakes is a predictable step, but also points toward a negotiated settlement to avoid the risks and enormous legal costs of fighting a multi-year legal war. We also believe preliminary findings on any of these issues or other external catalysts may be necessary to force a final deal, which could take several months to play out. We have lowered our Qualcomm FY2007 EPS estimate from $1.94 to $1.92, reflecting slightly more WCDMA share gain by Nokia and Sony Ericsson, who already pay reduced royalty rates.

* **Nokia says:** Nokia plans to pay Qualcomm $20M to cover 2Q07– an amount that Qualcomm deemed arbitrary (even excluding European WCDMA units, this payment only equates to a ~1.3% royalty rate). We spoke with Nokia management, who stressed 3 elements: 1) It believes that Qualcomm's licensing agreement with baseband supplier Texas Instruments "exhausts" Qualcomm's patent claims in Europe, where Nokia asserts the law does not recognize an explicit clause that denies TI's customers such protection; 2) It plans to exploit the fact that Qualcomm, like almost all companies, has not filed its patents in every country – usually an unnecessary step given international respect for cross-border patents; and 3) the fact that a subset of Qualcomm's early patents are paid-up as of April 9th, as per the previous agreement, which, in Nokia's view, reduces the value of its patent portfolio.

* **Qualcomm says:** Tuesday, Qualcomm sued Nokia in U.S. courts, alleging infringement of GSM patents, adding to similar, previously filed suits in the U.K., France, Italy, Germany and China. Success

*Global Networking & Communications Equipment*

See Disclosure Appendix of this report for important disclosures and analyst certifications.

# BERNSTEIN RESEARCH

April 9, 2007

**Paul Sagawa** • paul.sagawa@bernstein.com • +1-212-407-5825

on these cases would obligate Nokia to past royalties on more than $100B in GSM sales over the past few years. On Thursday, Qualcomm filed an arbitration demand with the American Arbitration Association, requesting a ruling that Nokia's use of Qualcomm patents past April 9th would constitute an implicit election by Nokia to exercise its option to extend its current licensing agreement for a multi-year period. Qualcomm rejects Nokia's $20M payment as arbitrary and inadequate, but it also views this offer as an explicit admission that Nokia does indeed owe Qualcomm compensation for its IP and proof of foreknowledge should it continue shipping in violation of Qualcomm's rights. Finally, Qualcomm disclosed that Nokia pays it a WCDMA royalty rate of over 3%, despite Nokia's claim that it has paid a cumulative WCDMA royalty rate of less than 3%, which likely was net of any royalties it receives.

* **Patent exhaustion would be devastating to Qualcomm.** A valid finding on patent exhaustion would leave Qualcomm unable to collect royalties in Europe – nearly 50% of WCDMA units. We are skeptical that this is likely. We note that Nokia waited 5 years to file this argument, during which time, it has paid Qualcomm nearly $300M in royalties for European 3G. If patent exhaustion was likely to work, Nokia would likely have pursued it much earlier, as would have other parties that have been at odds over IPR – e.g. Sendo, Sagem and Vitelcom. We note that a legal finding that a low value component represents the full embodiment of system level patents would hurt Nokia as well. Nokia also intends to claim lower royalties due to the "paid up" status of a subset of Qualcomm's older patents and the fact that Qualcomm has not filed all of its patents in all the countries of the world. Qualcomm responded that it has added thousands of new patents since the prior agreement, including what it claims is the basis of HSPA technology, and that taking a small number of older patents off of the table in no way diminishes the value of its portfolio. As to the geographic concentration of Qualcomm's patents, we see this as a technicality that merely forces Qualcomm to begin filing its IPR in additional venues.

* **Qualcomm's actions put Nokia at risk.** If an arbitrator rules that Nokia has triggered its option, it would establish a legal opinion that Nokia should still be subject to its pre-April 9 obligations, including full royalty payments on 3G, likely requirement for 4G payments and the pass through of Nokia IPR to Qualcomm chip customers, for a multi-year period. While not binding, such a ruling would be significant evidence of a Qualcomm advantage in subsequent court cases. The cases already filed on GSM, if decided in Qualcomm's favor, could obligate Nokia to pay damages on over $100B in past sales, which could amount to more than $1B. We believe that these outcomes are unlikely, but possible.

* **Settlement still the most likely outcome.** The legal actions that have been launched and those that are still forthcoming have highly uncertain outcomes and significant monetary and business costs. While near term verdicts could tilt the negotiations to one side or the other, the lengthy appeals process and the multitude of legal vectors at work appear to eliminate the likelihood of a decisive victory by either party in the foreseeable future. Given the risks faced by both companies and appreciated by both management teams, neither should be willing to press the legal war beyond the first initial salvos. We continue to expect a negotiated agreement sooner, rather than later, with preliminary court findings or 3rd party pressure likely to catalyze a final deal. We do not expect such an agreement to entail a major cut to the base royalty rate, although a cap on royalty value per unit and a denial of pass-through rights could accompany some acknowledgement of IPR rights for 4G.

* **Maintaining our $60 QCOM target price.** While we believe that Nokia is unlikely to achieve a significant reduction in its already discounted royalty rate, we note that the company and SonyEricsson, which we believe has a similar discount, have been significant share gainers in WCDMA. As we expect this to continue for 2007 and 2008, we now project that the average blended royalty rate will be effected by this market share mix shift. As a result, we are reducing our '07 EPS by $0.02 to $1.92. However, Our DCF-based target price remains unchanged as we have become incrementally positive about the QCT and QSI segments, with Qualcomm's share in WCDMA chipsets poised to rise and the success of

2

# BERNSTEIN RESEARCH

April 9, 2007

**Paul Sagawa** • paul.sagawa@bernstein.com • +1-212-407-5825

MediaFLO.

**Investment Conclusion**

Nokia and Qualcomm played new cards in the final hours of their IPR licensing agreement which expires tonight at midnight. Nokia, which believes that its 2Q07 obligation is just $20M rather than the $120M that might have been due under the old agreement, has filed suit claiming that Qualcomm's licensing agreement with Texas Instrument negates its claims in Europe on handset vendors buying baseband chips from that supplier. Success in this suit - which we believe is unlikely, based on the hesitancy of Nokia to make this claim earlier despite paying nearly $300M in cumulative European royalties to Qualcomm to date – could eliminate nearly half of Qualcomm's WCDMA royalty base. Nokia has also indicated that it plans to argue that a clause in the current deal that completes its obligations to pay Qualcomm for a subset of its older patents materially reduces the value of Qualcomm's IPR portfolio, as does the fact that Qualcomm has not filed its patents in every relevant country.

Similarly, Qualcomm has sued Nokia in both Europe and the U.S. over infringement for GSM devices. In the unlikely event of full success, these suits could obligate Nokia to future royalties and damages on more than $100B in past sales. Qualcomm has also filed for an arbitrator's ruling that Nokia will have implicitly exercised its option to extend the current licensing tems should it continue shipping CDMA or WCDMA product beyond April 9. While not binding, such a ruling would confirm a legal basis for such claims and as such, greatly change the tenor of negotiations, as Nokia finds the existing terms– which have been interpreted to allow pass-through of Nokia IPR to Qualcomm chip customers - wholly unacceptable.

These legal actions carry great potential business risks for both sides of this dispute, while pursuing them across the many legal venues will entail extraordinary expense over the many years that it would take to exhaust the appeals process over the numerous initiatives. While more immediate findings could shift the balance of power in these negotiations, we do not expect these companies to shoulder the risks of a prolonged legal war. Given this, we continue to expect a negotiated resolution within short months rather than years. In our assessment, we believe that such a resolution is unlikely to significantly reduce Nokia's already discounted royalty rates to Qualcomm. That said, we believe there are several points of compromise in both directions, as well as areas of cooperation, that could lead to an agreement being materially beneficial to both sides.

We have lowered our Qualcomm FY2007 EPS estimate from $1.94 to $1.92, reflecting slightly more WCDMA share gain by leading vendors Nokia and Sony Ericsson, who already pay reduced royalty rates. We rate both Nokia and Qualcomm Outperform with respective DCF-based target prices of €28 and $60.

**Details**

*Nokia says:*

Nokia plans to pay Qualcomm $20M to cover 2Q07– an amount that Qualcomm deemed arbitrary (even excluding European WCDMA units, this payment only equates to a ~1.3% royalty rate). Assuming that the prior agreement specified a ~3.5% royalty rate, we estimate Nokia would have owed Qualcomm about $118M in royalty payments for 2Q07 CDMA and WCDMA volumes (**exhibit 1**).

We spoke with Nokia management, who stressed 3 elements: 1) It believes that Qualcomm's licensing agreement with baseband supplier Texas Instruments "exhausts" Qualcomm's patent claims in Europe, where Nokia asserts the law does not recognize an explicit clause that denies TI's customers such protection; 2) It plans to exploit the fact that Qualcomm, like almost all companies, has not filed its patents in every country – usually an unnecessary step given international respect for cross-border patents; and 3)

3

S107

BERNSTEIN RESEARCH

April 9, 2007

Paul Sagawa • paul.sagawa@bernstein.com • +1-212-407-5825

the fact that a subset of Qualcomm's early patents are paid-up as of April 9[th,] as per the previous agreement, which, in Nokia's view, reduces the value of its patent portfolio.

Exhibit 1
**Nokia's planned $20M payment to Qualcomm for 2Q07 volumes is far below the ~$120M that we calculate would have been due under the prior agreement**

| Assuming Prior agreement: | 2Q07 | | Implications of Nokia's $20M Payment: | 2Q07 | |
|---|---|---|---|---|---|
| Nokia - WCDMA Volumes | 10.3 | M | Nokia - WCDMA Volumes | 10.3 | M |
| Nokia - CDMA Volumes | 4.7 | M | Nokia - CDMA Volumes | 4.7 | M |
| | | | Nokia: Non-European WCDMA Volumes as a % of Total WCDMA Volumes (assumed) | 30% | |
| Assumed WCDMA ASP | $260 | | | | |
| Assumed CDMA ASP | $150 | | Nokia - Non-European WCDMA volumes | 3.1 | M |
| Relevant Sales: | $3,383 | | | | |
| Assumed Royalty Rate: | 3.50% | | Assumed WCDMA ASP | $260 | |
| **Implied Qualcomm royalty payments:** | **$118** | | Assumed CDMA ASP | $150 | |
| | | | Relevant Sales (ex-Europe): | $1,508 | |
| | | | **Implied Royalty Rate:** | **1.3%** | |

Source: Company reports, Strategy Analytics, Bernstein estimates

### Qualcomm says:

Tuesday, Qualcomm sued Nokia in U.S. courts, alleging infringement of GSM patents, adding to similar, previously filed suits in the U.K., France, Italy, Germany and China. Success on these cases would obligate Nokia to past royalties on more than $100B in GSM sales over the past few years. On Thursday, Qualcomm filed an arbitration demand with the American Arbitration Association, requesting a ruling that Nokia's use of Qualcomm patents past April 9th would constitute an implicit election by Nokia to exercise its option to extend its current licensing agreement for a multi-year period. Qualcomm rejects Nokia's $20M payment as arbitrary and inadequate, but it also views this offer as an explicit admission that Nokia does indeed owe Qualcomm compensation for its IP and proof of foreknowledge that it continue shipping in violation of Qualcomm's rights. Finally, Qualcomm disclosed that Nokia pays it a WCDMA royalty rate of over 3%, despite Nokia's claim that it has paid a cumulative WCDMA royalty rate of less than 3%, which likely was net of any royalties Nokia receives.

### Patent exhaustion would be devastating to Qualcomm

A valid finding on patent exhaustion would leave Qualcomm unable to collect royalties in Europe – nearly 50% of WCDMA units. We are skeptical that this is likely. We note that Nokia waited 5 years to file this argument, during which time, it has paid Qualcomm over $300M in royalties for European 3G (**exhibit 2**). If patent exhaustion was likely to work, Nokia would likely have pursued it much earlier, as would have parties that have been at odds over IPR – e.g. Sendo, Sagem and Vitelcom. We note that a legal finding that a low value component represents the full embodiment of system level patents would hurt Nokia as well. Nokia also intends to claim lower royalties due to the "paid up" status of a subset of Qualcomm's older patents and the fact that Qualcomm has not filed all of its patents in all the countries of the world. Qualcomm responded that it has added thousands of new patents since the prior agreement, including what it claims is the basis of HSPA technology, and that taking a small number of older patents off of the table in no way diminishes the value of its portfolio. As to the geographic concentration of Qualcomm's patents, we see this as a technicality that merely forces Qualcomm to begin filing its IPR in additional venues.

*Global Networking & Communications Equipment*

BERNSTEIN RESEARCH

April 9, 2007

**Paul Sagawa** • paul.sagawa@bernstein.com • +1-212-407-5825

Exhibit 2
**We estimate Nokia has already cumulatively paid Qualcomm over $300M in European WCDMA royalties**

| | 2Q04 | 3Q04 | 4Q04 | 1Q05 | 2Q05 | 3Q05 | 4Q05 | 1Q06 | 2Q06 | 3Q06 | 4Q06 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nokia - WCDMA Volumes | 0.3 | 0.2 | 0.7 | 0.7 | 1.6 | 2.3 | 4.1 | 5.2 | 7.4 | 9.0 | 10.3 |
| Nokia - Assumed WCDMA Revenues | $ 84 | $ 56 | $ 196 | $ 168 | $ 384 | $ 552 | $ 984 | $1,144 | $1,628 | $1,980 | $2,266 |
| Assumed royalty rate | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% |
| Nokia - Assumed WCDMA Royalties: | $ 3 | $ 2 | $ 7 | $ 6 | $ 13 | $ 19 | $ 34 | $ 40 | $ 57 | $ 69 | $ 79 |
| **Cumulative WCDMA Royalty Payment:** | $ 330 | | | | | | | | | | |

Source: Company reports, Strategy Analytics, Bernstein es imates

### *Qualcomm's actions put Nokia at risk*

If an arbitrator rules that Nokia has triggered its option, it would establish a legal opinion that Nokia should still be subject to its pre-April 9 obligations, including full royalty payments on 3G, likely requirement for 4G payments and the pass through of Nokia IPR to Qualcomm chip customers, for a multi-year period. While not binding, such a ruling would be significant evidence of a Qualcomm advantage in subsequent court cases. The cases already filed on GSM, if decided in Qualcomm's favor, could obligate Nokia to pay damages on over $100B in past sales, which could amount to more than $1B. We believe that these outcomes are unlikely, but possible.

### *Settlement still the most likely outcome*

The legal actions that have been launched and those that are still forthcoming have highly uncertain outcomes and significant monetary and business costs. While near term verdicts could tilt the negotiations to one side or the other, the lengthy appeals process and the multitude of legal vectors at work appear to eliminate the likelihood of a decisive victory by either party in the foreseeable future. Given the risks faced by both companies and appreciated by both management teams, neither should be willing to press the legal war beyond the first initial salvos. We continue to expect a negotiated agreement sooner, rather than later, with preliminary court findings or 3rd party pressure likely to catalyze a final deal. We do not expect such an agreement to entail a major cut to the base royalty rate, although a cap on royalty value per unit and a denial of pass-through rights could accompany some acknowledgement of IPR rights for 4G.

### Maintaining our $60 QCOM target price

Depending on negotiation leverage, different handset vendors typically pay different royalty rates to Qualcomm. We estimate Qualcomm receives a ~4.7% normalized CDMA royalty rate, which is based on the 2005 reported rate plus $300M of payments received following the end of Qualcomm's royalty sharing agreement with Motorola. Using actual market share data and same CDMA and WCDMA rates for each vendor (**Exhibit 3**), we calculate that the WCDMA royalty rate in 2005 was 4.75%, roughly in line with the CDMA royalty rate. However, since leading vendors paying lower rates took WCDMA market share in 2006 and will likely continue to do so 2007, this results in a lower reported WCDMA royalty rate. Our calculated '06 and '07 WCDMA rates drop to 4.4% and 4.2%, respectively (**Exhibit 4**). We think this rate could further decline to 3.9% in the future.

As a result, we are reducing our '07 EPS estimates by $0.02 to $1.92. However, our target price remains the same. This is mainly due to our incremental confidence in its QCT and QSI segment. QCT's operating margin has been hit by increased R&D, SG&A and legal expenses, dropping from high 38% in 2004 to the current 26% level in 1QFY07. However, we think the margin is poised to rise as Motorola will use QCT's solutions to fix its own woes in the WCDMA handset market. Meanwhile, legal expenses should decline

BERNSTEINRESEARCH

April 9, 2007

Paul Sagawa • paul.sagawa@bernstein.com • +1-212-407-5825

once the dispute with Nokia and other vendors settles down.  Furthermore, we think MediaFLO could bring significant value onto the table as it brings in subscription revenues and potential chipset lock-ins in the future.  We think MediaFLO potentially could be worth $3.5B (see our Feb 22nd call "*Qualcomm: Valuing MediaFLO USA at $3.5B; Strategic Value More Significant; Outperform*").

Exhibit 3
**Handset vendor share in CDMA and WCDMA**

|  | CDMA | | | WCDMA | | |
|---|---|---|---|---|---|---|
|  | **2004** | **2005** | **2006** | **2004** | **2005** | **2006** |
| **Samsung/LG** | 39% | 39% | 37% | 23% | 22% | 13% |
| **China** | 4% | 5% | 4% | 0% | 0% | 0% |
| **Nokia/Motorola/SE** | 24% | 25% | 30% | 27% | 35% | 53% |
| **Others** | 33% | 31% | 30% | 50% | 43% | 33% |

Source: Strategy Analy ics, Bernstein Analysis

Exhibit 4
**We estimate Qualcomm's blended WCDMA royalty rate will decline going forward, due to share gains by leading vendors like Nokia and Sony Ericsson, who pay reduced rates**

Royalty rate calculation based on 2005 results

|  | CDMA | | WCDMA | |
|---|---|---|---|---|
|  | % of total | % royalty | % of total | % royalty |
| **Samsung/LG** | 40 0% | 5 20% | 22 0% | 5 40% |
| **China** | 5 0% | 2 55% | 0 0% | 3 60% |
| **Nokia/Motorola/SE** | 25 0% | 3 36% | 35 0% | 3 36% |
| **Others** | 30 0% | 5 55% | 43 0% | 5 55% |
| **Total** | 100.0% | 4.71% | 100.0% | 4.75% |

Royalty rate calculation based on 2006 results

|  | CDMA | | WCDMA | |
|---|---|---|---|---|
|  | % of total | % royalty | % of total | % royalty |
| **Samsung/LG** | 37 0% | 5 20% | 13 0% | 5 40% |
| **China** | 5 0% | 2 55% | 0 0% | 3 60% |
| **Nokia/Motorola/SE** | 30 0% | 3 36% | 53 0% | 3 36% |
| **Others** | 28 0% | 5 55% | 34 0% | 5 55% |
| **Total** | 100.0% | 4.61% | 100.0% | 4.37% |

Royalty rate calculation based on 2007 results

|  | CDMA | | WCDMA | |
|---|---|---|---|---|
|  | % of total | % royalty | % of total | % royalty |
| **Samsung/LG** | 40 0% | 5 20% | 17 0% | 5 40% |
| **China** | 5 0% | 2 55% | 1 0% | 3 60% |
| **Nokia/Motorola/SE** | 35 0% | 3 36% | 60 0% | 3 36% |
| **Others** | 20 0% | 5 55% | 22 0% | 5 55% |
| **Total** | 100.0% | 4.49% | 100.0% | 4.19% |

Royalty rate calculation based on 2008 results

|  | CDMA | | WCDMA | |
|---|---|---|---|---|
|  | % of total | % royalty | % of total | % royalty |
| **Samsung/LG** | 40 0% | 5 20% | 20 0% | 5 40% |
| **China** | 5 0% | 2 55% | 3 0% | 3 60% |
| **Nokia/Motorola/SE** | 35 0% | 3 36% | 65 0% | 3 36% |
| **Others** | 20 0% | 5 55% | 12 0% | 5 55% |
| **Total** | 100.0% | 4.49% | 100.0% | 4.04% |

Future forecast

|  | CDMA | | WCDMA | |
|---|---|---|---|---|
|  | % of total | % royalty | % of total | % royalty |
| **Samsung/LG** | 40 0% | 5 20% | 20 0% | 5 40% |
| **China** | 5 0% | 2 55% | 5 0% | 3 60% |
| **Nokia/Motorola/SE** | 35 0% | 3 36% | 70 0% | 3 36% |
| **Others** | 20 0% | 5 55% | 5 0% | 5 55% |
| **Total** | 100.0% | 4.49% | 100.0% | 3.89% |

Source: Strategy Analy ics, Bernstein Analysis

*Global Networking & Communications Equipment*

6

BernsteinResearch

April 9, 2007

**Paul Sagawa** • paul.sagawa@bernstein.com • +1-212-407-5825

Exhibit 5
**Nokia – Income Statement**

| EUR Millions | FY2006 | | | | FY2007 (incl Siemens JV in 2Q07) | | | | 2006 | 2007E | 2008E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar | Jun | Sep | Dec | MarE | JunE | SepE | DecE | | | |
| Revenues | 9,507 | 9,813 | 10,100 | 11,701 | 10,646 | 13,105 | 13,730 | 15,706 | 41,121 | 53,187 | 59,985 |
| YoY Growth | 29% | 22% | 20% | 13% | 12% | 34% | 36% | 34% | 20% | 29% | 13% |
| Sequential Growth | -8% | 3% | 3% | 16% | -9% | 23% | 5% | 14% | | | |
| Cost of Goods Sold | (6,283) | (6,573) | (6,978) | (7,908) | (7,258) | (8,943) | (9,394) | (10,619) | (27,742) | (36,213) | (40,129) |
| Gross Margin | 3,224 | 3,240 | 3,122 | 3,793 | 3,388 | 4,162 | 4,336 | 5,087 | 13,379 | 16,973 | 19,856 |
| % of Sales | 33.9% | 33.0% | 30.9% | 32.4% | 31.8% | 31.8% | 31.6% | 32.4% | 32.5% | 31.9% | 33.1% |
| Operating Expenses: | | | | | | | | | | | |
| S,G&A | (853) | (1,019) | (919) | (1,189) | (1,011) | (1,350) | (1,263) | (1,398) | (3,980) | (5,022) | (5,568) |
| R&D | (946) | (981) | (905) | (1,065) | (1,033) | (1,258) | (1,291) | (1,414) | (3,897) | (4,995) | (5,531) |
| One time items | (58) | 262 | (198) | (20) | - | - | - | - | - | - | - |
| Total Operating Expenses | (1,857) | (1,738) | (2,022) | (2,274) | (2,044) | (2,608) | (2,554) | (2,811) | (7,877) | (10,017) | (11,099) |
| Operating Income | 1,367 | 1,502 | 1,100 | 1,519 | 1,344 | 1,554 | 1,782 | 2,275 | 5,488 | 6,956 | 8,757 |
| % of Sales | 14.4% | 15.3% | 10.9% | 13.0% | 12.6% | 11.9% | 13.0% | 14.5% | 13.3% | 13.1% | 14.6% |
| PF Operating Income | 1,425 | 1,240 | 1,228 | 1,607 | 1,344 | 1,554 | 1,782 | 2,275 | 5,500 | 6,956 | 8,757 |
| Gain on investments | 4 | 8 | 11 | 5 | 5 | 5 | 5 | 5 | 28 | 20 | 40 |
| Other Income, net | 74 | 55 | 34 | 44 | 52 | 50 | 49 | 47 | 207.0 | 197.9 | 175.2 |
| EBT & Minority Interest | 1,445 | 1,565 | 1,145 | 1,568 | 1,401 | 1,610 | 1,836 | 2,328 | 5,723 | 7,174 | 8,972 |
| Taxes | (381) | (334) | (321) | (302) | (364) | (418) | (477) | (605) | (1,338) | (1,865) | (2,422) |
| Minority Interest | (16) | (24) | (11) | (9) | (15) | (113) | (124) | (175) | (60.0) | (427.9) | (759.1) |
| effective tax rate | 26.4% | 21.3% | 28.1% | 19.3% | 26.0% | 26.0% | 26.0% | 26.0% | 23.4% | 26.0% | 27.0% |
| Net Income | 1,048 | 1,140 | 845 | 1,273 | 1,024 | 1,082 | 1,240 | 1,555 | 4,306 | 4,881 | 5,790 |
| % of Sales | 11.0% | 11.6% | 8.4% | 10.9% | 9.6% | 8.3% | 9.0% | 9.9% | 10.5% | 9.2% | 9.7% |
| PF Net Income | 1,106 | 945 | 941 | 1,345 | 1,024 | 1,082 | 1,240 | 1,555 | 4,337 | 4,881 | 5,790 |
| EPS as reported (EUR) | €0.25 | €0.28 | €0.21 | €0.32 | €0.26 | €0.28 | €0.32 | €0.41 | €1.06 | €1.27 | €1.59 |
| EPS w/o Extra. (EUR) | €0.27 | €0.23 | €0.23 | €0.33 | €0.26 | €0.28 | €0.32 | €0.41 | €1.06 | €1.27 | €1.59 |
| EPS w/o Extra, net option expense (EUR) | €0.27 | €0.24 | €0.24 | €0.36 | €0.26 | €0.28 | €0.33 | €0.42 | €1.05 | €1.25 | €1.56 |
| EPS as reported ($USD) | $ 0.31 | $ 0.35 | $ 0.26 | $ 0.41 | $ 0.33 | $ 0.35 | $ 0.41 | $ 0.53 | $ 1.33 | $ 1.62 | $ 1.98 |
| EPS w/o Extra. ($USD) | $ 0.32 | $ 0.29 | $ 0.29 | $ 0.43 | $ 0.33 | $ 0.35 | $ 0.41 | $ 0.53 | $ 1.34 | $ 1.62 | $ 1.98 |
| EPS w/o Extra, net option expense ($USD) | $ 0.31 | $ 0.28 | $ 0.28 | $ 0.40 | $ 0.32 | $ 0.35 | $ 0.41 | $ 0.52 | $ 1.32 | $ 1.60 | $ 1.95 |

Source: Company reports, Bernstein estimates

*Global Networking & Communications Equipment*

# BernsteinResearch

April 9, 2007

**Paul Sagawa** • paul.sagawa@bernstein.com • +1-212-407-5825

Exhibit 6
**Qualcomm – Income Statement**

| (in millions except EPS) | Dec 1Q06 | Mar 2Q06 | Jun 3Q06 | Sept 4Q06 | Dec 1Q07 | Mar 2Q07E | Jun 3Q07E | Sept 4Q07E | 2006 | 2007E | 2008E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | 1,741 | 1,834 | 1,951 | 1,999 | 2,019 | 2,295 | 2,241 | 2,279 | 7,525 | 8,833 | 10,381 |
| YoY Growth | 25% | 34% | 44% | 28% | 16% | 25% | 15% | 14% | 33% | 17% | 18% |
| Sequent. Growth | 12% | 5% | 6% | 2% | 1% | 14% | -2% | 2% | | | |
| | | | | | | | | | | | |
| COGS | 517 | 521 | 559 | 586 | 634 | 665 | 645 | 663 | 2,183 | 2,608 | 3,022 |
| PF COGS | 517 | 521 | 559 | 586 | 634 | 665 | 645 | 663 | 2,183 | 2,608 | 3,022 |
| | | | | | | | | | | | |
| Gross Profit | 1,224 | 1,313 | 1,392 | 1,413 | 1,385 | 1,629 | 1,596 | 1,616 | 5,342 | 6,225 | 7,359 |
| GM % | 70% | 72% | 71% | 71% | 69% | 71% | 71% | 71% | 71% | 70% | 71% |
| | | | | | | | | | | | |
| PF Gross Profit | 1,224 | 1,313 | 1,392 | 1,413 | 1,385 | 1,629 | 1,596 | 1,616 | 5,342 | 6,225 | 7,359 |
| GM % | 70% | 72% | 71% | 71% | 69% | 71% | 71% | 71% | 71% | 70% | 71% |
| | | | | | | | | | | | |
| SG&A | 239 | 263 | 293 | 321 | 369 | 383 | 352 | 330 | 1,116 | 1,434 | 1,411 |
| R&D | 340 | 390 | 395 | 411 | 440 | 466 | 439 | 428 | 1,536 | 1,773 | 1,935 |
| | | | | | | | | | | | |
| Operating Profit | 645 | 660 | 704 | 681 | 576 | 780 | 805 | 857 | 2,690 | 3,017 | 4,013 |
| Operating Margin (%) | 37% | 36% | 36% | 34% | 29% | 34% | 36% | 38% | 36% | 34% | 39% |
| | | | | | | | | | | | |
| Other inc./exp. | 91 | 125 | 120 | 129 | 203 | 144 | 144 | 144 | 465 | 636 | 600 |
| | | | | | | | | | | | |
| Income Tax Benefit (Charge) | (116) | (192) | (181) | (196) | (131) | (194) | (199) | (210) | (685) | (735) | (1,245) |
| | | | | | | | | | | | |
| Income from Continuing Operations | 620 | 593 | 643 | 614 | 648 | 730 | 750 | 791 | 2,470 | 2,919 | 3,367 |
| Net Income | 620 | 593 | 643 | 614 | 648 | 730 | 750 | 791 | 2,470 | 2,919 | 3,367 |
| | | | | | | | | | | | |
| **GAAP EPS** | $ 0.36 | $ 0.34 | $ 0.37 | $ 0.36 | $ 0.38 | $ 0.43 | $ 0.44 | $ 0.47 | $ 1.44 | $ 1.73 | $ 1.99 |
| **PF EPS** | $ 0.39 | $ 0.41 | $ 0.42 | $ 0.42 | $ 0.43 | $ 0.49 | $ 0.49 | $ 0.52 | $ 1.64 | $ 1.92 | $ 2.25 |
| | | | | | | | | | | | |
| Number of Diluted Shares | 1,702 | 1,721 | 1,728 | 1,693 | 1,685 | 1,687 | 1,688 | 1,690 | 1,711 | 1,688 | 1,694 |

Source: Company reports, Bernstein estimates

## Valuation Methodology

We primarily set our target prices using discounted free cash flow analysis, though we sometimes supplement this with normalized relative multiple analysis versus each company's own history and versus the industry as a whole, for comparative purposes.

## Risks

The biggest risk factors to our call on Qualcomm include the uncertainty of WCDMA growth, a potential decline in CDMA, and threats to QTL's IPR royalty rates – most notably, its current royalty renegotiations with Nokia. We believe the transition from GSM to WCDMA will gain momentum in 2007, with shipments of WCDMA mobile devices exceeding GSM by the end of the decade. Failure of WCDMA carriers to price and promote their services aggressively could result in a slower ramp and, thus, slower sales and earnings growth for Qualcomm.

The major risks to our call on Nokia involve shipment schedules and consumer reception to new handsets debuting during 2007 and 2008. Other risks include the speed of consumer adoption of new handset features and functionalities. Our company forecasts and, thus, our DCF valuation analyses are closely tied to our forecasts for overall handset market growth as well as individual share. Material changes to either of these factors could have a correspondingly material impact on valuation.

*Global Networking & Communications Equipment*

8

Disclosure Appendix

## SRO REQUIRED DISCLOSURES

* References to "Bernstein" relate to Sanford C. Bernstein & Co., LLC and Sanford C. Bernstein Limited, collectively.

* Bernstein analysts are compensated based on aggregate contributions to the resear ch franchise as measured by account penetration, productivity and proactivity of investment ideas. No analysts are compensated based on performance in, or contributions to, generating investment banking revenues.

* Bernstein rates stocks based on forecasts of relative performance for the next 6 -12 months versus the S&P 500 for U.S. listed stocks and versus the MSCI Pan Europe Index for stocks listed on the European exchanges — unless otherwise specified. We have three categories of ratings:

    Outperform: Stock will outpace the market index by more than 15 pp in the year ahead.

    Market-Perform: Stock will perform in line with the market index to within +/ -15 pp in the year ahead.

    Underperform: Stock will trail the performance of the market index by more than 15 pp in the year ahead.

* As of 3/12/2007, our ratings were distributed as follows: Outperform/Buy - 37.7%; Market-Perform/Hold - 50.3%; Underperform/Sell - 12.0%.

* Accounts over which Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, and/or their affiliates exercise investment discretion own more than 1% of the outstanding common stock of QCOM / Qualcomm Inc, NOK1V.FH / Nokia Corp.

* Sanford C. Bernstein & Co., LLC currently makes a market in QCOM / Qualcomm Inc.

* The following companies are or during the past twelve (12) months were clients of Bernstein, which provided non -investment banking-securities related services and received compensation for such services QCOM / Qualcomm Inc.



## OTHER DISCLOSURES

**To our readers in the United States:** Sanford C. Bernstein & Co., LLC is distr buting this report in the United States and accepts responsibility for its contents. Any U.S. person receiving this report and wishing to effect securities transactions in any security discussed herein should do so only through Sanford C. Bernstein & Co., LLC.

**To our readers in the United Kingdom:** This report has been issued or approved for issue in the United Kingdom by Sanford C. Bernstein Limited, authorised and regulated by the Financial Services Authority and located a t Devonshire House, 1 Mayfair Place, London W1J 8SB, +44 (0)20-7170-5000.

**To our readers in member states of the EEA:** This report is being distributed in the EEA by Sanford C. Bernstein Limited, which is authorised and regulated in the United Kingdom by th e Financial Services Authority and holds a passport under the Investment Services Directive.

**To our readers in Australia:** Sanford C. Bernstein & Co., LLC and Sanford C. Bernstein Limited are exempt from the requirement to hold an Australian financial services licence under the Corporations Act 2001 in respect of the provision of the following financial services to wholesale clients:

* providing financial product advice;

* dealing in a financial product;

* making a market for a financial product; and

* providing a custodial or depository service.

Sanford C. Bernstein & Co., LLC and Sanford C. Bernstein Limited are regulated by the Securities and Exchange Commission under U.S. laws and by the Financial Services Authority under U.K. laws, respectively, which differ fr om Australian laws.

One or more of the officers, directors, or employees of Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited and/or its affiliates may at any time hold, increase or decrease positions in securities of any company mentioned here in.

Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, or its or their affiliates may provide investment management or other services to the pension or profit sharing plans, or employees of any company mentioned herein, and may give advice to o thers as to investments in such companies. These entities may effect transactions that are similar to or different from those recommended herein.

## CERTIFICATIONS

* I/(we), Paul Sagawa, Senior Analyst(s), certify that all of the views expressed in this report  accurately reflect my/(our) personal views about any and all of the subject securities or issuers and that no part of my/(our) compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views in this report.

Approved By: CDK

Copyright 2007, Sanford C. Bernstein & Co., LLC, a subsidiary of AllianceBernstein L.P. ~ 1345 Avenue of the Americas ~ NY, NY 10105 ~ 212/756 -4400. All rights reserved.

This report is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of, or located in any locality, state, country or o her jurisdiction where such distribution, publication, availability or use would be contrary to law or regula ion or which would subject Sanford C. Bernstein & Co., Sanford C. Bernstein Limited or any of their subsidiaries or affiliates to any registration or licensing requirement within such jurisdiction. This report is based upon public sources we believe to be reliable, but no representation is made by us that the report is accurate or complete.  We do not undertake to advise you of any change in the reported information or in the opinions herein. This research was prepared and issued by Sanford C. Bernstein & Co., LLC and/or its affiliate Sanford C. Bernstein Limited solely for the use of our clients, market counterparties or intermediate or professional customers. This report is not an offer to buy or sell any security, and it does not constitute investment, legal or tax advice. The investments referred to herein may not be suitable for you. Investors must make their own investment decisions in consultation with their professional advisors in light of their specific circumstances. The value of investments may fluctuate, and investments that are denominated in foreign currencies may fluctuate in value as a result of exposure to exchange rate movements. Information about past performance of an investment is not necessarily a guide to, indicator of, or assurance of, future performance.