1

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

2

Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com

3

Richard D. Gluck (Bar No. 151675)
rich.gluck@blbglaw.com

4

Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com

5

2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067

6

Tel: (310) 819-3470

7

**MOTLEY RICE LLC**

8

Gregg S. Levin (*Pro Hac Vice*)
glevin@motleyrice.com

9

28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9000

10

11

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

12

[Additional Counsel Appear on
Signature Page]

13

14

15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

16

17

IN RE QUALCOMM
INCORPORATED SECURITIES
LITIGATION

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:17-cv-00121-JO-MSB

**LEAD PLAINTIFFS' REPLY IN
SUPPORT OF THEIR MOTION
FOR CLASS CERTIFICATION
AND APPOINTMENT OF CLASS
REPRESENTATIVES AND CLASS
COUNSEL**

Judge: Hon. Jinsook Ohta
Date: October 19, 2022
Time: 9:00 a.m.
Courtroom: 4C

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................1

II.   DEFENDANTS FAIL TO PROVE AN ABSENCE OF PRICE
      IMPACT .................................................................................................3

      A.   Defendants' Loss Causation And Truth-On-The-Market
           Contentions Are Premature Merits-Based Arguments........................3

      B.   Defendants Fail To Demonstrate No Price Impact ..............................5

           1.   Defendants' "Truth-On-The-Market" Arguments Fail...............5

                a.   Refusal To License Competitors ......................................6

                b.   Defendants' Extensive Bundling Tactics .......................11

           2.   Defendants' Loss Causation Arguments Fail ...........................13

III.  *COMCAST* DOES NOT DEFEAT CLASS CERTIFICATION ...................19

      A.   Plaintiffs' Proposed Damages Methodology Satisfies *Comcast*.........20

      B.   Defendants' *Comcast* Arguments Fail ...............................................21

IV.   LEAD PLAINTIFFS ARE TYPICAL CLASS REPRESENTATIVES .......23

V.    CONCLUSION.....................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4

*In re Allstate Corp. Sec. Litig.*,

5
   2020 WL 7490280 (N.D. Ill. Dec. 21, 2020)
   ..............................................................................................5, 9, 10, 13

6

7

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...................................13

8

9

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)...............................................................2, 4, 22

10

11

*In re Apollo Grp., Inc. Sec. Litig.*,
   2010 WL 5927988 (9th Cir. June 23, 2010) ......................................19

12

13

*In re Apple Inc. Sec. Litig.*,
   2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ....................................9, 15

14

15

*Apple Inc. v. Qualcomm Inc.*,
   2017 WL 3966944 (S.D. Cal. Sept. 7, 2017).......................................7

16

17

*In re AST Rsch. Sec. Litig.*,
   1994 WL 722888 (C.D. Cal. Nov. 8, 1994) ......................................25

18

*In re Auto. Parts Antitrust Litig.*,
   2019 WL 626143 (E.D. Mich. Jan 7, 2019) ...................................5, 23

19

20

*Baker v. SeaWorld Ent., Inc.*,
   2017 WL 5885542 (S.D. Cal. Nov. 29, 2017).....................................4

21

22

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).......................................................................24

23

24

*In re BofI Holding, Inc. Sec. Litig.*,
   2021 WL 3742924 (S.D. Cal. Aug. 24, 2021)......................17, 19, 20

25

26

*In re BP p.l.c. Sec. Litig.*,
   2014 WL 2112823 (S.D. Tex. May 20, 2014)....................................23

27

28

*In re CenturyLink Sales Prac. and Sec. Litig.*,
   337 F.R.D. 193 (D. Minn. 2020) .............................................................18

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent
   Biosolutions, Inc., HQ*,
   322 F. Supp. 3d 676 (D. Md. 2018).......................................................17

*City of Miami Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*,
   2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) ........................................21

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
   2022 WL 1459567 (N.D. Cal. May 9, 2022)...................................passim

*City of Sunrise Gen. Emps' Ret. Plan v. FleetCor Techs., Inc.*,
   2019 WL 3449671 (N.D. Ga. July 17, 2019) ..........................................22

*Comcast Corporation v. Behrend*,
   569 U.S. 27 (2013).............................................................................passim

*In re Cooper Cos. Inc. Sec. Litig.*,
   254 F.R.D. 628 (C.D. Cal. 2009)............................................................24

*Cooper v. Thoratec*,
   2018 WL 2117337 (N.D. Cal. May 8, 2018)...........................................14

*Di Donato v. Insys Theraps., Inc.*,
   333 F.R.D. 427 (D. Ariz. 2019) ..............................................................18

*Dickey v. Adv. Micro Devices, Inc.*,
   2019 WL 251488 (N.D. Cal. Jan. 17, 2019)............................................22

*Eng v. Edison Int'l*
   2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) ........................................23

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011).............................................................................1, 4

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ..................................................................17

*Gamco Invs. v. Vivendi, S.A.*,
   927 F. Supp. 2d 88 (S.D.N.Y. 2013) ......................................................24

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
   141 S. Ct. 1951 (2021)..................................................................................5, 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)..............................................................................5, 11, 24

*Hanon v. Dataproducts*,
   976 F.2d 497 (9th Cir. 1992) ......................................................................24

*Hatamian v. Adv. Micro Devices, Inc.*,
   2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ................................................23

*In re Intuitive Surg. Sec. Litig.*
   2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)...............................................24

*Junge v. Geron Corp.*,
   2022 WL 1002446 (N.D. Cal. Apr. 2, 2022).................................................passim

*Karinski v. Stamps.com, Inc.*,
   2020 WL 6572660 (C.D. Cal. Nov. 9, 2020) ..........................................3, 4, 6

*Knapp v. Ernst & Whinney*,
   90 F.3d 1431 (9th Cir. 1996) ......................................................................25

*Leyva v. Medline Industries, Inc.*,
   716 F.3d 510 (9th Cir. 2013) ......................................................................23

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .......................................................13, 15, 16

*Lomingkit v. Apollo Educ. Grp. Inc.*,
   2017 WL 633148 (D. Ariz. Feb. 16, 2017) ....................................................17

*Loritz v. Exide Technologies*,
   2015 WL 6790247 (C.D. Cal. July 21, 2015)................................................23

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) ......................................................................23

*Mandalevy v. BofI Holding, Inc.*,
   2018 WL 3032588 (S.D. Cal. June 19, 2018) ................................................11

*In re Mattel, Inc. Sec. Litig.*,
   2021 WL 4704578 (C.D. Cal. Oct. 6, 2021)....................................................3, 16

*In re Maxim Integrated Prod., Inc. Sec. Litig.*,
   639 F. Supp. 2d 1038 (N.D. Cal. 2009)..............................................................19

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ........................................................................13, 15

*In re Novatel Wireless Sec. Litig.*,
   830 F. Supp. 2d 996 (S.D. Cal. 2011)................................................................13

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, CA*,
   730 F.3d 1111 (9th Cir. 2013) .............................................................................23

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) .........................................................5, 6, 8, 10

*Purple Mountain Trust v. Wells Fargo & Co.*,
   2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) .......................................5, 17, 22

*Rougier v. Applied Optoelecs, Inc.*,
   2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ...................................................22

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
   404 F. Supp. 2d 605 (D.N.J. 2005) ....................................................................17

*SEB Inv. Mgt. AB v. Symantec Corp.*,
   335 F.R.D. 276 (N.D. Cal. 2020)...........................................................4, 5, 20

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084 (S.D.N.Y. July 10, 2019)
   ...............................................................................................5, 9, 19, 22

*Smilovits v. First Solar, Inc.*,
   2019 WL 6698199 (D. Ariz. Dec. 9, 2019) ........................................................25

*In re Snap, Inc. Sec. Litig.*,
   334 F.R.D. 209 (C.D. Cal. 2019)..................................................................22, 23

*Strougo v. Tivity Health, Inc.*,
   2022 WL 2037966 (M.D. Tenn. June 7, 2022) ..............................................9, 18

*In re Teva Sec. Litig.*,
    2021 WL 872156 (D. Conn. Mar. 9, 2021) ........................................................21

*Texas Grain Storage, Inc. v. Monsanto Co.*,
    2019 WL 4087430 (W.D. Tex. June 24, 2019) ...............................................23

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) .....................................................22

*Villella v. Chem. & Mining Co.*,
    2018 WL 2958361 (S.D.N.Y. June 13, 2018) ..................................................25

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011) ...............................................................25

STATUTES

15 U.S.C. §78u-4e(1) .................................................................................................17

## I.   __INTRODUCTION__

Plaintiffs' opening brief demonstrated why this case is ideally suited for class certification. *See* ECF No. 217 ("Br.").[1] Defendants primarily engage in a game of misdirection—distorting what this case is about, the relevant caselaw, and the factual record. They ignore the Court's February 3, 2022 decision denying their Motion for Judgment on the Pleadings, which rejected the same loss causation arguments—and the same evidence—that Defendants now restyle as a "price impact" challenge.

This Action concerns misstatements and omissions about Qualcomm's (1) blanket refusal to license competitor chipset manufacturers; and (2) bundling its licensing negotiations with special price or rebate terms for its chipsets to severely limit or end the business of its competitors. ¶¶64-79. These practices led to the KFTC, EC, and FTC regulatory actions and the *Apple* lawsuit, the announcements of which each caused the price of Qualcomm stock to plummet, wiping out over *$32 billion* in market capitalization. Those declines demonstrate price impact.

Indeed, Defendants do not actually contest price impact. They do not challenge Dr. Tabak's event study or his conclusion that the market for Qualcomm stock was efficient throughout the Class Period. They also do not dispute that Qualcomm's stock price declined by statistically significant amounts on each of the four corrective disclosure dates; or that those disclosures related to Defendants' alleged misrepresentations or omissions. *See* ECF No. 244 ("Opp.").

Instead, Defendants recycle "loss causation" and "truth-on-the-market" arguments that the Court previously rejected and that fail again now. To start, the Supreme Court has held that "loss causation" and "truth-on-the-market" are merits arguments and inappropriate for resolution at class certification. *Erica P. John*

---

[1] "Ex" refers to the exhibits attached to the Uslaner Declaration (ECF No. 217-1) and accompanying Boon Declaration; "Def. Ex" refers to Defendants' exhibits; "¶__" refers to paragraphs of the Complaint.  Unless otherwise indicated, internal citations and quotations are omitted, and emphasis is added.

*Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011); *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013).

Even if considered again, Defendants' arguments fail on the merits for the same reasons that they did before. Defendants told investors that they licensed *"broadly"* and to *"everyone"* and that the mere suggestion that Qualcomm refused to license competitors was *"nuts"* and *"crazy."* As late as June 2016, Qualcomm was *still* denying that it refused to license competitors, publicly stating ████ ██████████████████████████ Defendants also emphatically denied bundling, telling the market *"we do not bundle"* and that license and chip negotiations were *"kept separate."* Yet, Qualcomm's bundling with Apple alone amounted to *billions* of dollars of *license* discounts for exclusive *chipset* purchases.

Qualcomm's top executives testified ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ it is implausible that the market knew. And the market did *not* know, as evidenced by numerous analyst reports, including a contemporaneous report from Defendants' own analyst expert, Richard Windsor, who stated (incorrectly) that ██████████████████████████████ ████████████████ The market's harsh reaction further confirms that investors did not know the truth; as one analyst succinctly stated after the end of the Class Period, *"I thought Qualcomm had previously been licensing to modem suppliers."*

Defendants also concealed their bundling by including "gag provisions"—or NDAs—in their agreements, as well as by deliberately misclassifying ██ ██████████████████████ the massive royalty rebates they paid licensees that were conditioned on Qualcomm chip purchases. Defendant Aberle instructed his colleagues ██████████████████████████████████████ ██████████████████████████████████ Ex. 8.

For Defendants to carry their heavy burden to prove an absence of price

impact, they must show that *both*: (i) the market knew the full truth about Defendants' undisclosed practices prior to the corrective disclosures; and (ii) the admitted statistically significant price reactions to each of the corrective disclosures were caused by information wholly unrelated to the alleged misstatements. Defendants can prove neither. Defendants' prior "truth-revealing" disclosures can be easily rejected because, notwithstanding the confusion Defendants attempt to cause, those disclosures concern practices that have nothing to do with the actual issues in this case. *See* Ex. 6 (Reply Expert Report of Dr. Tabak) ¶¶6-11; Ex. 7 (Expert Declaration of Professor Simcoe) ¶¶19-33.

Defendants' contention that *Comcast Corporation v. Behrend*, 569 U.S. 27 (2013), precludes class certification also fails. Identical arguments have been routinely rejected. At least 80 post-*Comcast* securities fraud cases have endorsed the exact out-of-pocket methodology proposed by Dr. Tabak. *See* Ex. 9.

Finally, Defendants try to distort Plaintiffs' testimony and the discovery record to contend that Plaintiffs are "atypical" class representatives. They are not. Plaintiffs have fully participated in and facilitated discovery, going above and beyond what is required. They should be certified as class representatives.

## II.   <u>DEFENDANTS FAIL TO PROVE AN ABSENCE OF PRICE IMPACT</u>

Courts find "ample evidence" of price impact when, as here, plaintiff's expert "conducted a robust event study and determined that there were statistically significant share price declines following the alleged corrective disclosures." *Karinski v. Stamps.com, Inc.*, 2020 WL 6572660, at *6 (C.D. Cal. Nov. 9, 2020). "[A] statistically significant price adjustment following a corrective disclosure is evidence that the original misrepresentation did, in fact, affect the stock price." *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *5 (C.D. Cal. Oct. 6, 2021).

### A.   Defendants' Loss Causation And Truth-On-The-Market Contentions Are Premature Merits-Based Arguments

Defendants do not contest Plaintiffs' showing or Dr. Tabak's event study.

Instead, they rehash the same "loss causation" and "truth-on-the-market" contentions that previously failed. *See* ECF. No. 143-1. Defendants' arguments—which they improperly try to recast this time as "price impact" challenges—are premature merits arguments and, in any event, factually and legally incorrect.

The Supreme Court held a decade ago in *Halliburton* that "loss causation" arguments present common questions and courts "err[] by requiring [plaintiff] to show loss causation as a condition of obtaining class certification." 563 U.S. at 813. Likewise, the Supreme Court held in *Amgen* that the issue of whether "news of the truth credibly entered the market and dissipated the effects of prior misstatements" presents common questions and, thus, is "a matter for trial." 568 U.S. at 482. Thus, courts reject "loss causation" and "truth-on-the-market" challenges at this stage. *E.g.*, *Junge v. Geron Corp.*, 2022 WL 1002446, at *6 (N.D. Cal. Apr. 2, 2022) (rejecting challenge that "boil[ed] down" to loss causation because "plaintiffs need not show [loss causation] at this stage"); *Stamps.com*, 2020 WL 6572660, at *7 (whether "statements did not convey new information" is "a truth-on-the-market defense and is not properly considered at the class certification stage because materiality is assumed"); *Baker v. SeaWorld Ent., Inc.*, 2017 WL 5885542, at *12 (S.D. Cal. Nov. 29, 2017) (whether disclosure is corrective is a "premature" "loss causation argument").

Defendants cannot avoid this precedent by restyling their merits "loss causation" and "truth-on-the-market" arguments as a challenge to "price impact." Indeed, Defendants argue that there is no ***price impact*** because there is no ***loss causation*** because the market already knew the ***full truth*** prior to the corrective disclosures. *See SEB Inv. Mgt. AB v. Symantec Corp.*, 335 F.R.D. 276, 287 (N.D. Cal. 2020) ("[price impact] arguments present loss causation issues that need not be decided at the class certification stage"); *Baker*, 2017 WL 5885542, at *11 ("'truth-on-the-market defense may not be used at the class certification stage to prove an absence of price impact'"). As courts repeatedly emphasize, "[c]lass

certification is decidedly ***not*** an alternative form of summary judgment or an occasion to hold a mini-trial on the merits." *Purple Mountain Trust v. Wells Fargo & Co.*, 2022 WL 3357835, at *1 (N.D. Cal. Aug. 15, 2022) ("*Wells Fargo*").

## B. Defendants Fail To Demonstrate No Price Impact

At class certification, it is Defendants' "burden to show no price impact." *Symantec*, 335 F.R.D. at 287. They must "show the ***absence*** of price impact—not merely [] challenge plaintiff on the persuasiveness of [their] own price impact claim." *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019). Defendants bear the "burden of persuasion" to demonstrate by a "preponderance of the evidence" that they have "in fact sever[ed] the link" between ***all*** the alleged misrepresentations and ***any*** impact on the stock's price. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958-63 (2021). A "price impact" challenge at class certification "should impose no heavy toll on securities-fraud plaintiffs with tenable claims." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014) (Ginsburg, J.). Tellingly, Defendants cite just ***one*** case where class certification was denied due to lack of price impact, and there, plaintiff's expert ***admitted*** a lack of price impact. *See In re Auto. Parts Antitrust Litig.*, 2019 WL 626143, at *13-15 (E.D. Mich. Jan 7, 2019).

### 1. Defendants' "Truth-On-The-Market" Arguments Fail

Defendants assert that "by the time of the alleged corrective disclosures, the market was already fully aware of the allegedly omitted information." Opp. 17. "Defendants fail to explain how this conclusion is anything but a truth-on-the-market defense," which "'is a matter for trial.'" *In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at *7 (N.D. Ill. Dec. 21, 2020). Defendants also fail to explain how this argument is any different than the one previously rejected by the Court.

Defendants face a "heavy burden" of proof at trial on their merits-based "truth on the market" argument. *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996). They must prove that the true facts were disclosed to investors ***and***

"transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by" the defendants. *Id.*; *see Stamps.com*, 2020 WL 6572660, at *7 (rejecting truth-on-the-market class certification challenge that did not "unequivocally disclose[] the alleged prior misrepresentation"). If Defendants' premature "truth-on-the-market" arguments are considered now, Defendants do not meet their heavy burden of proof.

### a.   Refusal To License Competitors

Qualcomm's argument that the truth concerning its refusal to license competitors was on the market (Opp. 1) ignores the evidence to the contrary.

**_Defendants Told Investors That Qualcomm Never Refused To License_**. For years, Qualcomm repeatedly told investors that it never refused to license anyone:

- "***We've never refused to license*** our WCDMA essential patents to ***any company***" (Ex. 10; Ex. 11);
- Qualcomm "offers licenses on fair, reasonable and non-discriminatory terms ***to any interested company***" (Ex. 12 ¶25);
- "***We will license anyone***" (Ex. 13) and ███████████████ (Ex. 14);
- "[We] ***openly license*** these innovations ***across the wireless industry***, providing ***all companies … an equal opportunity***" (Exs. 15-17);
- "[Unlike any other company in the industry ***we have licensed everybody that wants a license … we license all comers***" (Ex. 18);
- "[W]e don't keep the technology to ourselves: ***our business model is to share that technology through licensing***" (Ex. 19);
- Qualcomm "created this unique business model of ***not holding our patents to ourselves*** to advantage our own products, but creating a product of them and ***broadly licensing them on a pro-active basis***" (Ex. 20); and
- Its "model was to actually focus on licensing the inventions, essentially through the standards bodies ***so that the entire market could play***" (Ex. 21; Exs. 22-30).

Qualcomm also adamantly denied accusations that it refused to license competitors, railing against them as ***"nuts"*** and ***"crazy,"*** like ***"saying McDonald's refuses to sell hamburgers."*** Ex. 31; *see* Exs. 10, 32, 35, 39. In 2016, Qualcomm was ***still*** issuing denials: ███████████████ Ex. 14.

**_Qualcomm Told Investors That It Did Not Discriminate_**. Defendants also misled investors by representing that Qualcomm complied with its FRAND

commitment to SSOs to license on a **"non-discriminatory"** basis, adhering to these same practices for "decades," and that "[w]e don't make a decision that we're going to license you and not license you because that would be discriminatory." Exs. 25-29, 33-36; *see also Apple Inc. v. Qualcomm Inc.*, 2017 WL 3966944, at *17 (S.D. Cal. Sept. 7, 2017) (Qualcomm's FRAND commitment "plainly states that **any willing licensee** is entitled to license Qualcomm's intellectual property").

### *Qualcomm Touted To Investors That Its Licensees Included Competitors*.

For years, Qualcomm stressed, "We license our CDMA intellectual property **to the competitors of our QCT [chip] segment**" and "we license to other companies, **including [QCT] competitors**." Exs. 37-38; *see* Exs. 12, 32. Licensees supposedly included **"[o]ther chip manufacturers that do compete with Qualcomm."** Ex. 39.

### *Defendants Told Investors That All Companies Need A License*.

In its Form 10-Ks, Qualcomm said, "The mobile communications industry generally recognizes that a company seeking to develop, manufacture and/or sell products that use CDMA- and/or LTE-based standards **will require a patent license from us**." Exs. 25-29. This squarely contradicts Defendants' argument that the industry knew that Qualcomm's competitors did **not** "require a patent license."

██████████████████████████ Qualcomm's own top executives—including named Defendants—testified under oath that ██████ ██████████████████████████ *See* Exs. 40-44. Qualcomm witnesses also testified that █████████████████████ ██████████████████████████ *See* Exs. 43-46. ███████████████████████ Qualcomm told industry participants, ██████████████████████████ ██████████████████████████ Ex. 47; *see* Exs. 48-49. In truth, as Defendants internally acknowledged, ██████████ ██████████████████████████

██████████████████████████████████████████████████████

Ex. 50; *see* Ex. 51 ████████████████; Ex. 52 ██████████████.

*<u>**The Market Believed Qualcomm**</u>*. Analyst reports and market commentary confirm that investors did not know that Qualcomm refused to license. For example, a March 2010 *MarketWatch* article stated that Qualcomm ***"licenses its technology to other chipmakers."*** Ex. 53. *Forbes* reported in March 2012 that Qualcomm "licenses out its 3G technology ***to other chipset manufacturers***." Ex. 54; *see* Ex. 55. *Trefis* reported in September 2013 that "Qualcomm licenses CDMA technology ***to other chipset manufacturers***." Ex. 56; *see also* Ex. 57.

Analysts' response to the corrective disclosures further undermines Defendants' argument. For example, a BMO analyst said after the Class Period, ***"I thought Qualcomm had previously been licensing to modem suppliers."*** Ex. 58.

Defendants ignore this evidence and point to cherry-picked documents that fail to prove the market knew the truth. *Provenz*, 102 F.3d at 1492-93.

*<u>**First**</u>,* Defendants recycle the same citations from their failed 12(c) motion. After reviewing this evidence, the Court found there was merely "some time frame in which mixed messages are happening," and it "doesn't find persuasive that Plaintiffs have not pled loss causation." ECF No. 193 at 12:9-10, 24:2-3.

*<u>**Second**</u>,* Defendants contend that investors understood that Defendants refused to license competitors because they publicly stated their "typical" "device-level licensing practice." Opp. 4-9, 21. But Defendants distort the meaning of these statements. Charging royalties at the "device-level" is a different concept than refusing to license competitors (even when asked), and disclosing one is simply not the same as disclosing the other. *See* Simcoe ¶¶20-24.

Defendants' tactic of pointing to disclosures about unchallenged practices is fatal to their effort to "sever the link." Courts criticize defendants when, as here, they fail to "test for whether the market knew of the actual" alleged omissions, finding that such arguments are "simply not responsive to the allegations in the

1    complaint" and "fail to convince the court that there was no price impact." *Allstate*,

2    2020 WL 7490280, at *6; *see Strougo v. Tivity Health, Inc.*, 2022 WL 2037966, at

3    *5 (M.D. Tenn. June 7, 2022) (rejecting truth-on-the-market defense where

4    disclosures "d[id] not address [p]laintiff's central allegation").

5        Defendants' authority is in accord. *See* Opp. 20 (citing *In re Apple Inc. Sec.*

6    *Litig.*, 2022 WL 354785, at *9 (N.D. Cal. Feb. 4, 2022) (rejecting truth-on-the-

7    market challenge at class certification where defendants' "arguments …

8    fundamentally misconstrue plaintiff's theory")).

9        ***Third*,** Defendants rely on articles discussing an investigation by the NDRC.

10   Opp. 21, 26-27. But the articles mention mere ***"allegations"*** and what "local

11   Chinese newsflows suggest[]" about results of a yet-undisclosed investigation. *Id.*;

12   Def. Exs. 25-26. Among other things, Defendants' emphatic ***denials***, which were

13   themselves misleading, blunted any theoretical "corrective" effect of these

14   supposed disclosures. *See Signet*, 2019 WL 3001084, at *16.

15       ***Fourth*,** Defendants rehash their narrative about the law of "patent

16   exhaustion," again contending that Qualcomm's *amicus* brief filed in *Quanta*

17   disclosed that it refused to license competitors. Opp. 5-6, 9, 24. It did not.

18   Qualcomm nowhere stated in that *amicus* brief (or anywhere else) that it refused to

19   license chipmakers. To the contrary, its *amicus* brief stated that it ***did*** license

20   chipmakers, telling the Court that one of its "primary sources of revenue" was

21   "licensing its intellectual property to entities that produce (non-Qualcomm) chips."

22   Def. Ex. 1 A12-A13. In fact, at deposition, Qualcomm's interim CFO admitted that

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ███████████████████████████████████ Ex. 43.

26       ***Fifth*,** Defendants point to a smattering of statements about what "ETSI

27   policy" supposedly "allows" as evidence that investors supposedly knew the truth.

28   Opp. 8. But those opinion statements nowhere stated that Qualcomm refused to

license chipmakers. And Defendants elsewhere publicly stated that a company violates FRAND by refusing to license competitors. *See* Exs. 12, 33, 59-62.

***Sixth*,** Defendants point to Mr. Windsor's opinion that analysts "understood that Qualcomm did not license chipmakers." Opp. 22. But before giving this litigation opinion, Mr. Windsor publicly stated that Qualcomm ***was*** required to—and ***did***—license competitors. In an analyst report issued by Mr. Windsor before this case, he stated (incorrectly) that ███████████████████████████████ █████████████████ Ex. 63. Mr. Windsor also acknowledged before this lawsuit that a FRAND commitment requires holders of SEPs, like Qualcomm, to license ██████████████████████████████████████████████ Exs. 64-68; *see also* Tabak ¶¶73-80; Simcoe ¶55.

Equally baseless is Mr. Windsor's assertion that his March 2007 Nomura analyst report shows he knew the truth. Windsor Decl. ¶20. Indeed, Qualcomm's former interim CFO admitted under oath ██████████████████████████ ████████████████████████████████████████████████ ████████████████ Ex. 43. And Mr. Windsor offers no basis for his sweeping opinions about what other analysts supposedly understood. His expert report does not identify a single analyst with whom he purportedly spoke about Qualcomm's refusal to license, and Mr. Windsor has no documents reflecting any such communications. Boon Decl. ¶95.

***Seventh*,** Defendants' economic expert, Professor Stulz, failed to look for, analyze, or acknowledge the evidence that the market did not know of Qualcomm's licensing practices. His failure to confront "analyst commentary that contradicts [his] conclusion" is an additional "shortcoming" that renders Defendants' rebuttal evidence insufficient. *Allstate*, 2020 WL 7490280, at *6.

***Finally*,** Qualcomm's supposed "risk warnings" (Opp. 11-12) nowhere revealed that it refused to license competitors. *See Provenz*, 102 F.3d at 1493-94 ("cautionary statements" that did not disclose underlying practices "too general" to

"immunize[] defendants"). Indeed, even if Defendants had shown that some Class members knew the truth, this ***still*** would not defeat class certification. As the Supreme Court has explained, "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton II*, 573 U.S. at 276.[2]

### b.   Defendants' Extensive Bundling Tactics

Defendants next attempt to defeat "price impact" by again urging the Court to find that investors somehow all knew that Qualcomm bundled the negotiations and sale of its licenses and chipsets. Opps. 23-24, 26-27, 29. This effort fails.

***Qualcomm Emphatically Denied Bundling***. When asked to respond to "critics" who accused Qualcomm of "bundling," Defendants replied, ***"[W]e do not enforce or insist on any kind of bundling."*** Ex. 69. When later pressed, Defendant Aberle similarly responded, ***"[W]e don't bundle those together."*** Ex. 70. When analysts inquired regarding the Company's chipset and licensing deals, Defendant Mollenkopf responded: "[W]e have been very clear that ***we keep those two things separate – separate propositions to the customer***." Ex. 71. Qualcomm steadfastly assured that its license agreements were ***"absolutely [] done without QCT's involvement."*** Ex. 72; *see also* Exs. 30, 73.

***Qualcomm Said It Did Not Discriminate***. Qualcomm reinforced its specific denials with false representations that it licensed on a ***"non-discriminatory"*** basis in accordance with FRAND, which prohibits royalty rebates and discounts tied to the purchase of another product. Simcoe ¶¶43, 53; Exs. 25-29, 36.

***Confidentiality And Gag Provisions***. Defendants' truth-on-the-market contentions also fail to account for the fact that Qualcomm's extensive bundling practices were kept highly confidential and subject to strict NDAs. *See* Exs. 39, 72, 74. Qualcomm executives have testified that ████████████████████████

---

[2] In *Mandalevy v. BofI Holding, Inc.*, 2018 WL 3032588, at *13 (S.D. Cal. June 19, 2018) (Opp. 18, 22), facts were publicly available through FOIA. By contrast, here, the facts were concealed, misrepresented, and denied by Qualcomm.

███████████████████████ *See* Exs. 46, 75. The Company's agreements with Apple and others included "gag provisions" requiring licensees to pay ***billions of dollars*** to Qualcomm if they publicly exposed its FRAND violations. *See* Ex. 76. Such provisions concealed the truth from investors until the corrective disclosures. *See also* Simcoe ¶¶44-45.

██████████████████████████████████████

Defendant Aberle and other Qualcomm executives instructed others ████████

█████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ Ex. 8; *see also* Exs. 77-80.

█████████████████████████████ Defendants' assertion that investors knew about Qualcomm's bundling ignores that the Company ████████

███████████████████ Apple testified that Qualcomm's █████████

████████████████████████████████████████

████████████████████ Ex. 81. ████████████████████

██████████████ *See* Ex. 82 ████████; Ex. 83 ████████████; Ex. 84 ████████

█████████████████████████████████████

***The Market Believed Qualcomm.*** When Qualcomm was accused of bundling, analysts (incorrectly) stated their understanding, based on Qualcomm's false denials, that the allegations ***"don't make sense to us,"*** explaining, ***"We do not believe that QCOM bundles chip sales with patent deals."*** Ex. 57. A year later, analysts again stated in the face of these allegations that ***"we do not think the company engages in this anti-competitive practice"*** (Ex. 85), again embracing Qualcomm's false assurances that "it would not tie baseband chip sales and licenses together, ***a practice it has always denied***" (Ex. 86).

In the face of this evidence, Defendants and their experts do not even attempt to show that the market was aware of Qualcomm's bundling practices. Rather, Defendants try to confuse the issue by focusing on an entirely different

licensing practice, disclosed by Qualcomm, that is **not** at issue in the case. That Qualcomm publicly stated that it sells "modem chips only to licensed OEMs" (Opp. 9-10) nowhere remotely disclosed that it bundled chip and licensing negotiations and terms. It is one thing to sell chips to Apple and other licensees only if they have a Qualcomm license. It is an entirely different thing to pay Apple **billions of dollars** of license royalty rebates only if it buys Qualcomm chipsets— and not chipsets from its competitor, Intel. Defendants' tactic—of concocting a "truth-on-the-market" defense by pointing to disclosures that are "simply not responsive to the allegations in the complaint"—neither establishes "truth-on-the-market" nor shows an absence of price impact. *Allstate*, 2020 WL 7490280, at \*7.

### 2. Defendants' Loss Causation Arguments Fail

As the Ninth Circuit explained in *Mineworkers' Pension Scheme v. First Solar Inc.*, loss causation involves "no more than the familiar test for proximate cause," and "there are an infinite variety of ways for a tort to cause a loss." 881 F.3d 750, 753 (9th Cir. 2018). A plaintiff must merely "show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *Id.* "The disclosure need **not** precisely mirror the earlier misrepresentation"; it need only "relate back to the misrepresentation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).[3]

Corrective disclosures may be "full" or (more often) "partial," with each disclosure providing a "fuller disclosure of the relevant truth." *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1011 (S.D. Cal. 2011). A defendant can slow the disclosure of the truth, leading to additional partial disclosures, by denying the information in a prior disclosure; by continuing to make misstatements relating to a disclosure; or by otherwise casting doubt on the disclosure's validity.

---

[3] Loss causation can also be shown where defendants' statements misrepresented or concealed a business practice that created a risk that ultimately materialized, diminishing the value of a company's stock. *See In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at \*20 (C.D. Cal. Aug. 4, 2014); *Junge*, 2022 WL 1002446, at \*8.

In those instances, a potentially "full" disclosure becomes a "partial" disclosure. *See Cooper v. Thoratec*, 2018 WL 2117337, at *6 (N.D. Cal. May 8, 2018).

Here, investors learned the truth over time; Defendants took steps to prevent—or at least delay—the full truth from becoming known; and, as Dr. Tabak demonstrated, Qualcomm's stock price reacted in a statistically significant way after each of the four disclosures at issue. *See* Ex. 1 ¶¶30-43. The corrective disclosures each revealed new and important information, including about the full nature, scope, and magnitude of Defendants' concealed conduct:

- **Nov. 17, 2015:** Qualcomm's press release disclosed for the first time that the KFTC issued a Case Examiner Report concerning Qualcomm's "licensing practices" that sought "modifications to certain [of its] business practices and monetary penalties." Qualcomm's stock plunged 9.4%, erasing $7.5 billion. The Report provided to Qualcomm (but kept hidden from investors) found that ███████████████████████████████████████████████████████ (Ex. 35; Ex. 87 at 3, 61).

- **Dec. 8, 2015:** Qualcomm's press release disclosed for the first time that (i) the EC issued a Statement of Objections against Qualcomm; and (ii) the TFTC initiated an investigation into Qualcomm's licensing practices. The EC's press release further disclosed that Qualcomm "illegally paid a major customer for exclusively using Qualcomm chipsets." Qualcomm's stock price plunged 5%, erasing $4.5 billion. The EC Statement provided to Qualcomm found it engaged in bundling, providing "rebates conditioned on exclusivity," with unidentified customers "unable to separate negotiations on baseband chipset supply from negotiations on IPR licensing." (Ex. 88; Ex. 89; Ex. 90 ¶¶244, 277).

- **Jan. 17, 2017:** The FTC publicly filed a 32-page complaint detailing for the first time how "Qualcomm has consistently refused to license its cellular standard-essential patents to its competitors, in violation of Qualcomm's FRAND commitments." The agency described for the first time how "Qualcomm extracted baseband processor exclusivity from Apple," its largest customer, in exchange for ***billions*** of dollars of "royalty relief," including through the previously concealed 2007, 2011, and 2013 exclusivity agreements. Qualcomm's share price dropped 4%, erasing nearly $4 billion. (Ex. 91 ¶¶3, 5, 112, 116-30).

- **Jan. 20, 2017:** Apple publicly filed a 97-page complaint providing its first-hand account of Qualcomm's refusal to license and bundling, with never-before disclosed facts, including that: (i) Qualcomm "deterred Apple from switching to

Intel's or others" through "rebates" whose "sole purpose" was to ensure "exclusivity"; (ii) Qualcomm utilized a "gag provision" that enabled it to withhold $1 billion in "BCP Payments" if Apple reported Qualcomm's FRAND violations to authorities; (iii) Qualcomm attempted to "extort Apple into changing its responses and providing false information to the KFTC," offering to pay Apple nearly $1 billion in withheld funds if Apple "recanted"; and (iv) the "unprecedented" nature of Qualcomm's licensing practices. Qualcomm's share price dropped 12% in response, erasing over $2.3 billion. (Ex. 92 ¶¶4, 70, 95-97, 103, 189, 193-94, 205, 350).

Each of these corrective disclosures "relates back" to Qualcomm's undisclosed fraud and immediately caused its stock price to drop. If considered now, Defendants' loss-causation challenges fail to show a lack of price impact.

***First*,** Defendants assert that the Court must eliminate the first two corrective disclosures at class certification because there is a supposed "mismatch." Opp. 23-26. According to Defendants, they cannot be held liable for investor losses suffered following their November 17 and December 8 press releases announcing, respectively, the KFTC Case Examiner's Report and the EC's Statement of Objections, because Qualcomm did not specifically admit in its press releases that it refused to license competitors or engaged in bundling.

The Ninth Circuit has squarely rejected Defendants' precise argument, holding that admission "of the fraud is ***not*** a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *First Solar*, 881 F.3d at 753.[4] An announcement of an investigation alone can (and often does) serve as a corrective disclosure when, as here, "more" is later revealed about the practices. *Lloyd*, 811 F.3d at 1210. "Indeed, any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false." *Id.*

---

[4] Defendants' own cases confirm that no such "match" is required. *See Apple*, 2022 WL 354785, at *9 ("This Court is not persuaded by arguments that 'this disclosure only mentioned [one thing]; discussion of that one thing in no way indicates or reveals a problem with this other thing [ ]; ergo, no revelation of fraud.'").

Defendants erroneously suggest that *Goldman* somehow overturned Ninth Circuit law and a perfect "matching" admission is now required for loss causation purposes. But *Goldman* does not require such a match. As courts in this Circuit and elsewhere have explained, the "Court does ***not*** read Goldman to contradict that a 'corrective disclosure need not be a 'mirror image' disclosure—a direct admission that a previous statement is untrue.'" *Mattel*, 2021 WL 4704578, at *5. "*Goldman* did ***not***, as Defendants suggest, hold that any 'corrective disclosure' must fully reveal the actionable fraud to support price impact at the class certification stage." *Id.* at *6. Indeed, "If the Court accepted Defendants' exceptional position, it would ostensibly be the first to hold that a disclosure which meets loss causation requirements cannot even be considered with respect to price impact." *Id.*

***Second***, Defendants contend that Qualcomm's statements denying that it engaged in bundling are too "generic" and the term "bundling" is unclear. Opp. 24-25. But Defendants made this ***same*** argument to Judge Houston at the motion to dismiss stage, which the Court soundly (and correctly) rejected. *See* ECF No. 40-1 at 12-13; ECF No. 59 at 10-11. In response to pointed accusations, Defendants made specific representations to investors that Qualcomm did ***not*** bundle the negotiations and terms of license and chipset deals. They represented that "we ***don't*** bundle those together"; Qualcomm's license agreements "***absolutely*** [] are done ***without*** QCT's involvement"; and ***"we keep those two things separate."*** There is nothing remotely "generic" about these specific denials. Exs. 69-73.

***Third***, Defendants assert that the Court should eliminate the second and third corrective disclosures because appellate courts years later overturned the FTC and EC penalties. Opp. 27. This argument fails for multiple reasons. To start, it ignores that the under the PSLRA, courts cannot look beyond 90 days in reducing investor damages. 15 U.S.C. §78u-4e(1). Thus, "any movement in the price of the security after the end of the 90-day look-back period" is "irrelevant to the calculation of damages." *In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp.

2d 605, 609 (D.N.J. 2005). Any other approach would unfairly penalize most Class members who likely sold their Qualcomm stock at a loss after the corrective disclosures and **33% price decline**. *See City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 690 n.4 (D. Md. 2018) (court need not "look so far beyond the identified corrective disclosure" when assessing "price impact").[5]

Additionally, there is no requirement that Qualcomm be found liable at the class certification stage. Liability issues present "common questions" to all Class members and are irrelevant at class certification. *Wells Fargo*, 2022 WL 3357835, at *6; *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *7 (S.D. Cal. Aug. 24, 2021); *see Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *19 (D. Ariz. Feb. 16, 2017) ("[T]o require ... a conclusive government finding of fraud merely to plead loss causation would effectively reward defendants who are able to successfully conceal their fraudulent activities by shielding them from civil suit.").

Defendants conflate the ultimate legal disposition of these issues with the issue relevant to price impact. Here, when the true facts were revealed, the price of Qualcomm stock declined by billions of dollars. ¶129. Reversals of law years later when mostly different investors held Qualcomm stock are irrelevant.

***Fourth***, Defendants assert that "class certification should be denied" because the price decline on December 27, 2016 was not "statistically significant." Opp. 28. But the lack of statistically significant change on one date is not proof that the misrepresentations "did not actually affect the stock price" and thus does not prove an absence of price impact. *Di Donato v. Insys Theraps., Inc.*, 333 F.R.D. 427, 444 (D. Ariz. 2019). Here, Plaintiffs are ***not*** pursuing damages based on the December 27, 2016 disclosure; thus, it is irrelevant. Indeed, courts

---

[5] The later EU and FTC decisions did not "vindicate" Qualcomm. The EU decision was primarily based on a procedural issue (Def. Ex. 42 at A908-09; 938). The FTC decision was limited to antitrust law issues, and the Ninth Circuit explicitly did not address whether Qualcomm violated FRAND. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 987, n.13 (9th Cir. 2020).

repeatedly hold that, to demonstrate a "complete lack of price impact," Defendants must show that **all** of the alleged declines are not statistically significant—not just one. *See In re CenturyLink Sales Prac. and Sec. Litig.*, 337 F.R.D. 193, 210 (D. Minn. 2020) ("Defendants' expert admits that there were statistically significant price drops following two of the three disclosure dates. This is sufficient to prevent Defendants from 'sever[ing] the link' between the alleged misrepresentations and any impact on [the] stock price."); *Strougo*, 2022 WL 2037966, at *9 (same).

**_Fifth_,** Defendants wrongly contend that nothing "new" was in the *FTC* or *Apple* complaints. Opp. 28-29. The FTC's 32-page complaint exposed for the first time that Qualcomm's bundling tactics and refusal to license extended to the U.S., where a huge percentage of Qualcomm's customers are based and impacted Apple, its largest customer. The FTC detailed how (1) under a 2007 agreement with Apple, Qualcomm provided royalty rebates in exchange for Apple's agreement not to use WiMax, a competing technology "championed by Intel"; (2) "Qualcomm's 2011 and 2013 agreements with Apple provided for **billions of dollars** in conditional rebates from Qualcomm to Apple" that "effectively penalized Apple's use of any baseband processors supplied by Qualcomm's competitors"; and (3) Qualcomm refused to license SEPs in violation of FRAND to Intel, its biggest competitor for Apple's business. Ex. 91 ¶¶112, 120, 124.

The 97-page *Apple* complaint provided even more shocking details about Qualcomm's "unprecedented" practices, including its (1) secretly insisting the parties call the "royalty rebates" by other "titles"; (2) conditioning nearly $1 billion in royalty rebates on obtaining chip "exclusivity" and Apple's agreement not to publicize Qualcomm's FRAND violations or report them to the regulators; and (3) "offer[ing] to repay Apple nearly $1 billion … if Apple **recanted** its true, and in many cases, sworn testimony before government agencies and instead g[i]ve false testimony favorable to Qualcomm." Exs. 92-93; *see also* Simcoe ¶¶17-31.

**_Sixth_,** Defendants also mistakenly argue that the FTC's and Apple's detailed

complaints supposedly contained no new information because Qualcomm noted in one paragraph of an SEC filing "allegations under investigation" by a Taiwanese regulator. Opp. 29; Def. Ex 20. But unlike the *FTC* and *Apple* complaints, this one paragraph about Taiwan did not remotely disclose that Qualcomm engaged in pervasive bundling, which extended to the U.S. and concerned Apple, its largest customer. Moreover, Qualcomm **denied** the merits of the Taiwan investigation in the very same paragraph. *Id.*; *see also Signet*, 2019 WL 3001084, at *16.

Additionally, even if the one paragraph disclosure about Taiwan could somehow be viewed as having provided some limited truth to investors (which it did not), it does not negate the corrective disclosures. Courts in this Circuit recognize that a corrective disclosure—even if based on previously-known information—is adequate if it "provid[es] additional or more authoritative fraud-related information that deflated the stock price." *In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010); *In re Maxim Integrated Prod., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1049 (N.D. Cal. 2009) (disclosure of previously-disclosed issue "corrective" because it "revealed new information regarding the scope and magnitude of defendants' fraudulent conduct").

## III.   *COMCAST* DOES NOT DEFEAT CLASS CERTIFICATION

*Comcast* requires that plaintiffs show at the class certification stage that "damages are **capable** of measurement on a classwide basis." 569 U.S. at 34. This "requirement does **not** pose a significant obstacle to class certification in securities litigation." *BofI Holding*, 2021 WL 3742924, at *7. Rather, *Comcast* poses a "minimal burden" in such cases because (given very active and efficient securities trading) damages are readily capable of measurement through the application of the "out-of-pocket" damages methodology and an "event study." *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *8 (N.D. Cal. May 9, 2022); *BofI Holding*, 2021 WL 3742924, at *7; *Junge*, 2022 WL 1002446, at *5-7.

### A.   Plaintiffs' Proposed Damages Methodology Satisfies *Comcast*

Plaintiffs and Dr. Tabak explain that they will use the "out-of-pocket" methodology to calculate per share damages for all Class members. Br. 19. This approach—which is employed in nearly every securities class action—relies on the well-established event study model. This methodology estimates the amount of artificial inflation in the market price of the security at issue and calculates how much of that inflation is due to the alleged fraud, as opposed to other factors. Ex. 1 ¶¶58-60. To measure the price reactions to the disclosures that allegedly revealed the truth, the event study focuses "on the dates of (or the trading dates following) the corrective disclosures." *Id.* ¶60.

To conduct an event study, an economist, here Dr. Tabak, "review[s] the alleged corrective disclosures to determine whether any of the information disclosed on the Event Dates related to practices unrelated to the allegations. If so, the effects of such practices on Qualcomm's stock price would be removed." *Id.* ¶62. Dr. Tabak's method allows him to "determin[e] inflation at any date, and thus damages for any Class member." *Id.* ¶63. "[T]he inflation in Qualcomm's stock will be determined in a common manner for all Class members. The resultant figures will then be applied to each Class members' transactions in a mechanical fashion to determine the appropriate claim for each member of the Class." *Id.*

Courts in the Ninth Circuit routinely certify securities fraud classes based on this exact approach. *See Oracle*, 2022 WL 1459567, at *8 ("*Comcast* does not require anything more than the damages-related evidence [plaintiff] provides here"); *Symantec*, 335 F.R.D. at 288 ("Plaintiff's proposed 'out of pocket' damages methodology, which uses an event study to determine the price inflation attributable to the alleged fraud, is widely accepted for calculating damages of a class of stockholders."); *City of Miami Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory

of liability under Section 10(b)"). In fact, at least 80 post-*Comcast* securities fraud cases have endorsed the same damages model. Ex. 9.

### B.  Defendants' *Comcast* Arguments Fail

Ignoring the legions of authority approving Dr. Tabak's model, Defendants recycle a series of oft-rejected arguments about why Plaintiffs have not satisfied *Comcast*'s minimal requirement. Each of their challenges fails.

***First,*** contrary to Defendants' assertions (Opp. 31), Plaintiffs allege a single, uniform theory of liability: Defendants made false and misleading statements about Qualcomm's licensing practices and, when the truth came out, its stock price declined. ¶¶210-34. *See Junge*, 2022 WL 1002446, at *6 ("plaintiffs' proposed damages model relies on just one theory of liability"); *In re Teva Sec. Litig.*, 2021 WL 872156, at *42 (D. Conn. Mar. 9, 2021) ("there is one theory of liability").

***Second,*** Defendants wrongly assert that, because there are multiple alleged corrective disclosures, Dr. Tabak's model is inadequate. *See* Opp. 31-32. But securities class actions almost always include multiple corrective disclosures, and Dr. Tabak has described how he will calculate damages using the out-of-pocket methodology and an event study to isolate "the effect of the five alleged corrective disclosure announcements." Ex. 1 ¶¶57-63. The same approach has been widely endorsed. *See Oracle*, 2022 WL 1459567, at *8-9 (crediting Dr. Tabak's model and collecting cases; certifying class over *Comcast* challenge with four corrective disclosures); *Junge*, 2022 WL 1002446, at *1, 5-7 (same with three corrective disclosures); *Teva*, 2021 WL 872156, at *40-42 (crediting Dr. Tabak's model).

***Third,*** Defendants suggest that Dr. Tabak's description of his damages methodology is too brief. Opp. 32-33. In rejecting this identical challenge, courts explain that "*Comcast* does not require anything more than the damages-related evidence [plaintiff] provides here in support of class certification … Since *Comcast*, several courts in this District have granted class certification in securities cases involving expert disclosures similar to Dr. Tabak's, including

disclosures that provide less detail." *Oracle*, 2022 WL 1459567, at *9; *see also* Ex. 94 (examples of similar expert damage descriptions approved by courts).

***Fourth***, Defendants' arguments concerning what statements will survive summary judgment given the Ninth Circuit's *FTC* decision (Opp. 33) are premature, at best. *See Dickey v. Adv. Micro Devices, Inc.*, 2019 WL 251488, at *3 (N.D. Cal. Jan. 17, 2019) ("To the extent Defendant contends that the evidence provided thus far does not support Plaintiffs' theory of liability, Defendant's arguments are premature …."). Contrary to Stulz's assertions, disaggregation is ***not*** required at class certification. *See, e.g.*, *Wells Fargo*, 2022 WL 3357835, at *5 (lack of disaggregation "is not a bar to certification"); *In re Snap, Inc. Sec. Litig.*, 334 F.R.D. 209, 217 (C.D. Cal. 2019) ("this is an inquiry to consider at the merits stage"); *City of Sunrise Gen. Emps' Ret. Plan v. FleetCor Techs., Inc.*, 2019 WL 3449671, at n.2 (N.D. Ga. July 17, 2019) (rejecting same argument by Stulz and certifying class). Further, there are standard techniques for disaggregation that Dr. Tabak would employ at a later appropriate time. Tabak ¶63.

***Fifth***, Defendants wrongly contend that class certification must be denied because Dr. Tabak's model does not account for "'materialization of the risk.'" Opp. 33-36. Courts have repeatedly rejected this argument: "The possible existence of such a theory does ***not*** contravene *Comcast* or defeat predominance." *Junge*, 2022 WL 1002446, at *8. "Materialization of the risk is not a theory of liability. It is a form of loss causation." *Id.* And "plaintiffs are not required to establish loss causation ... on class certification." *Amgen*, 568 U.S. at 475.[6]

***Finally***, ignoring the mountain of authority rejecting their arguments, Defendants rely on cases that are inapposite or undermine them. In *Loritz v. Exide Technologies*, "Plaintiffs failed to set forth ***any*** model of damages (let alone one

---

[6] *See In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *18-19 (E.D.N.Y. Jan. 11, 2022) (argument that "model must address the distinctions between corrective disclosures and materializations of the risk" is premature "loss causation argument in disguise"); *Signet*, 2019 WL 3001084, at *20 (same); *Rougier v. Applied Optoelecs., Inc.*, 2019 WL 6111303, at *18-19 (S.D. Tex. Nov. 13, 2019) (same).

tied to their theory of liability)." 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015). And in a subsequent decision, Judge Wilson distinguished his decision in *Loritz* and rejected *Comcast* arguments because the plaintiff proposed to use the same out-of-pocket model proposed by Dr. Tabak. *See Snap*, 334 F.R.D. at 217; *Oracle*, 2022 WL 1459567, at *10 ("the Court finds *Loritz* distinguishable").

Likewise, Defendants' reliance on the Fifth Circuit's decision in *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 688 (5th Cir. 2015) is misplaced. There, the plaintiffs ***"expressly eschew[ed]"*** the out-of-pocket model, and instead sought consequential damages, which Plaintiffs do not seek. *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *11-12 (S.D. Tex. May 20, 2014); *see Hatamian v. Adv. Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016) (distinguishing *BP* on the grounds that "all of Plaintiffs' theories of liability rest upon a fraud-on-the-market theory of reliance," just as they do in this case); *Oracle*, 2022 WL 1459567, at *10 (same). In fact, in endorsing the out-of-pocket method, the Fifth Circuit rejected Qualcomm's same argument—that a plaintiff must say how it will disaggregate any confounding information to satisfy *Comcast*—as "in tension with *Halliburton I*'s holding that no proof of loss causation is required at the class certification stage." *Ludlow*, 800 F.3d at 687-88.[7]

## IV.   **LEAD PLAINTIFFS ARE TYPICAL CLASS REPRESENTATIVES**

Defendants do not dispute that Plaintiffs' claims arise from the same conduct and theory, will be proven by the same evidence, and give rise to the same harm, as the rest of the Class. Defendants' myriad attacks on Plaintiffs are baseless.

**No Non-Reliance.** Defendants argue that Metzler did not rely on the price of

---

[7] Defendants' remaining cases are inapt. In *Leyva v. Medline Industries, Inc.* (Opp. 31), a wage-and-hour suit, the Ninth Circuit reversed and remanded the denial of class certification. 716 F.3d 510, 514 (9th Cir. 2013). *Texas Grain Storage, Inc. v. Monsanto Co.*, 2019 WL 4087430 (W.D. Tex. June 24, 2019) and *Auto. Parts*, 2019 WL 626143 (Opp. 32) are antitrust actions. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, CA*, 730 F.3d 1111, 1122 n.5 (9th Cir. 2013) and *Eng v. Edison Int'l* 2018 WL 1367419, at *3 (S.D. Cal. Mar. 16, 2018), merely noted that "district courts in the circuit have applied [the materialization of the risk theory]."

Qualcomm's stock because some of its IMs were "value" investors. Opp. 38-39. But value investors rely on the price of a company's stock because "[s]uch an investor implicitly relies on the fact that a stock's market price will eventually reflect material information." *See Halliburton II*, 573 U.S. at 273-74.

Defendants contend that one of Metzler's IMs (PanAgora) is "aytpical" because it did not read or rely upon the misstatements. But "[m]isleading statements will [] defraud purchasers of stock even if the purchasers do not directly rely on [them]." *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988); *see In re Intuitive Surg. Sec. Litig.* 2016 WL 7425926, at *6 (N.D. Cal. Dec. 22, 2016) (rejecting this argument). Investors rely on misstatements by trading "stock based on the belief that the market price will incorporate public information within a reasonable period." *Halliburton II*, 573 U.S. at 274. And PanAgora was ***not*** indifferent to the price of Qualcomm stock (Opp. 38); PanAgora specifically testified that ██████████████████████████████████ *See* Ex. 97.[8]

Defendants grossly distort the holding in *Hanon v. Dataproducts*, 976 F.2d 497, 508 (9th Cir. 1992), to suggest that the Court found the plaintiff atypical because of his investment strategy. In fact, the Court found the plaintiff atypical because he was a "professional plaintiff" who frequently made *de minimis* stock purchases to gain standing to file securities-fraud lawsuits. *Id.* Cases since *Hanon* have recognized its limited reach.[9] Defendants' reliance on *Gamco Invs. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 97 (S.D.N.Y. 2013), an individual opt-out case that went to trial after the court ***granted*** class certification, is equally unavailing.

Even if the strategies used by Metzler's IMs could somehow undermine the *Basic* presumption (they do not), they still would not render Metzler atypical. Rather, "issues of individual reliance" may be addressed in a separate trial after

---

[8] Both Invesco and Handelsbanken confirmed directly to defense counsel in writing that they relied on the price of Qualcomm common stock. Boon Decl. ¶93.

[9] *See In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 635-36 (C.D. Cal. 2009) (institutions typical who bought and sold stock for investment purposes based on public information, unlike professional plaintiff "so feared by the *Hanon* court.").

class-wide issues are determined. *See Smilovits v. First Solar, Inc.*, 2019 WL 6698199, at *7 (D. Ariz. Dec. 9, 2019).[10]

**No "Discovery Gamesmanship."** Defendants' distortions continue with false claims of "discovery gamesmanship." *See* Opp. 39-40. First, Defendants misrepresent Plaintiffs' testimony, claiming they lack evidence about the IMs' investment strategies. But AP7 testified extensively about those investment strategies, describing how AP7 asked each of its IMs whether they relied on the price of Qualcomm common stock in making their investment decisions and how each IM told AP7 that it did. Ex. 98. AP7 also asked each of its IMs whether they considered any material non-public information in making their decisions; they confirmed that they did not. *Id.* Similarly, Metzler testified that it confirmed with its IMs that, in making their investment decisions, the IMs relied on Qualcomm's stock price and did not rely on material non-public information. Ex. 99.

Next, Defendants falsely accuse Plaintiffs and the IMs of "resist[ing]" discovery. Opp. 39. In reality, they produced documents, provided written responses to questions, and prepared detailed interrogatory responses. Boon Decl. ¶93; Exs. 95-96. The IMs even offered to provide Defendants with sworn declarations. *Id.* Plaintiffs' efforts far exceed what is required. *See In re AST Rsch. Sec. Litig.*, 1994 WL 722888, at *3 (C.D. Cal. Nov. 8, 1994) (typicality requirement deemed satisfied where "plaintiffs … adequately cooperated in discovery").[11]

## V.   CONCLUSION

For the foregoing reasons and those stated in their opening brief, Plaintiffs' Motion for Class Certification should be granted.

---

[10] *See also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 584-85 (S.D.N.Y. 2011); *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1435 (9th Cir. 1996).

[11] *Compare with Villella v. Chem. & Mining Co.*, 2018 WL 2958361, at *7 (S.D.N.Y. June 13, 2018) (non-reliance rarely defeats typicality). Notably, Defendants *abandoned* many of their Hague requests, while others were denied. Boon Decl. ¶93.

Dated: August 22, 2022

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

By: */s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Richard D. Gluck (Bar No. 151675)
rich.gluck@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

-and-

Salvatore J. Graziano (*Pro Hac Vice*)
salvatore@blbglaw.com
Jeroen Van Kwawegen (*Pro Hac Vice*)
jeroen@blbglaw.com
Rebecca E. Boon (*Pro Hac Vice*)
rebecca.boon@blbglaw.com
Kate W. Aufses (*Pro Hac Vice*)
kate.aufses@blbglaw.com
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

**MOTLEY RICE LLC**
Gregg S. Levin (*Pro Hac Vice*)
glevin@motleyrice.com
William S. Norton (*Pro Hac Vice*)
bnorton@motleyrice.com
Meghan Oliver (*Pro Hac Vice*)
moliver@motleyrice.com
Christopher F. Moriarty (*Pro Hac Vice*)
cmoriarty@motleyrice.com
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450

-and-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

William H. Narwold (*Pro Hac Vice*)
bnarwold@motleyrice.com
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103

*Counsel for Lead Plaintiffs Sjunde AP-Fonden and Metzler Asset Management GmbH, and Lead Counsel for the Class*