# Exhibit 12

William J. O'Shaughnessy
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Richard S. Taffet
Philip L. Blum
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Robert N. Feltoon
CONRAD O'BRIEN GELLMAN &
ROHN, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA 19102
(215) 864-8064

Attorneys for Defendant/Counterclaim-Plaintiff Qualcomm Incorporated

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BROADCOM CORPORATION,

        Plaintiff/Counterclaim-Defendant,

        v.

QUALCOMM INCORPORATED,

        Defendant/Counterclaim-Plaintiff.

Civil Action No. 05-3350 (MLC) (JJH)

**COUNTERCLAIMS AND
AFFIRMATIVE DEFENSE**

## COUNTERCLAIMS AND AFFIRMATIVE DEFENSE OF
## DEFENDANT/COUNTERCLAIM-PLAINTIFF QUALCOMM INCORPORATED

Defendant/Counterclaim-Plaintiff QUALCOMM Incorporated

("Qualcomm"), by and through its undersigned counsel, alleges the following based upon

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
548

Q2014FTCBCM03412292
Q2017MDL5_03412292

personal knowledge as to its own actions and information and belief as to other matters

against Plaintiff/Counterclaim-Defendant Broadcom Corporation ("Broadcom").

## **INTRODUCTION**

1.      Broadcom's claims in this lawsuit are premised on the false

notions that Qualcomm has refused to license its patents to Broadcom on "fair,

reasonable and non-discriminatory" ("FRAND") terms, and that such refusal has violated

Federal antitrust laws and various California state laws.  However, not only are

Broadcom's allegations unfounded but, indeed, it is Broadcom that has intentionally and

unreasonably rejected offers for rights to Qualcomm's patents (and to grant rights under

its own patents to Qualcomm) on FRAND terms.  Instead, Broadcom has negotiated in

bad faith in an attempt to obtain non-FRAND terms that are more favorable to Broadcom

than the FRAND terms Qualcomm has offered to everyone else in the industry.

Broadcom calls its effort to extract such terms from Qualcomm "Project Koala".

2.      As part of its Project Koala efforts, Broadcom has participated in a

collective effort with several entrenched wireless companies, including Nokia

Incorporated ("Nokia") (the largest wireless device supplier in the world), Texas

Instruments Incorporated ("Texas Instruments"), Telefonaktiebolaget LM Ericsson

("Ericsson") (the largest wireless infrastructure equipment supplier in the world), NEC

Corporation ("NEC") and Panasonic Mobile Communications Company, Ltd.

("Panasonic") (which collectively refer to themselves as "Project Stockholm"), jointly to

attack Qualcomm's innovative business model and non-discriminatory licensing policy

2

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
549

Q2014FTCBCM03412293
Q2017MDL5_03412293

and reduce the competition that Qualcomm's business model and open licensing policy fosters. Broadcom, which has refused to accept Qualcomm's FRAND licensing offers, has brought this lawsuit in furtherance of Project Stockholm's goals—*i.e.*, to suppress the value and limit the availability of Qualcomm's technology and products for the purpose of weakening Qualcomm as a competitor, to constrain technological advancements in the wireless industry and to reduce output of competing wireless products based upon Qualcomm's technology.

3.      As a result of its conduct, including in combination with the other Project Stockholm companies, Broadcom has acted inequitably and is therefore barred from any relief in this case under the doctrine of unclean hands. In addition, Qualcomm is entitled to declaratory judgment that, contrary to Broadcom's allegations, Qualcomm's licensing offers to Broadcom satisfied any FRAND commitments Qualcomm may have and its disclosures of patents relating to the Universal Mobile Telecommunications System ("UMTS") standard were timely.

**Parties**

4.      Counterclaim-Plaintiff Qualcomm is a corporation organized under the laws of Delaware with its principal place of business in San Diego, California. Qualcomm is a leader in developing and delivering innovative wireless communications products and services.

5.      Counterclaim-Defendant Broadcom is a corporation organized under the laws of California with its principal place of business in Irvine, California.

3

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
550

Q2014FTCBCM03412294
Q2017MDL5_03412294

Among other things, Broadcom manufactures and sells wireless chipsets, which it sells and offers to sell within this judicial district and elsewhere in the United States.

## Jurisdiction and Venue

6.      Qualcomm asserts these counterclaims under the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1367.

## BACKGROUND

### A.      A Brief Overview of Wireless Telephone Communications

8.      A cellular phone call originates from a cellular telephone handset. One of the components of a handset is a chipset, which today typically includes a microprocessor/modulator/demodulator integrated circuit (a "baseband chip"), a power management chip and one or two radio frequency chips. A baseband chip is the handset's "brain" and controls most of its central functions. When a call is placed, the handset sends a signal across a particular band of electromagnetic spectrum that is received at a "base station" (also called a "cell site" or "cell tower") on the network of the wireless carrier to whose network the caller subscribes. The cell site contains servers, switches and other "network infrastructure" that recognize the signal and relay it to the handset of the call's recipient, other cell sites as necessary to reach the recipient, a different wireless network to which the recipient subscribes, a landline telephone network or some combination thereof.

4

ME1 7178196v.1

9.    Companies within the wireless industry can be classified in one or more of several categories, including: (i) technology developers and/or licensors, (ii) chipset and component suppliers, (iii) handset manufacturers, (iv) network infrastructure providers and (v) wireless network carriers.

10.    Wireless network carriers, such as Verizon Wireless, Sprint-Nextel, AT&T (formerly Cingular) and T-Mobile, provide wireless services to consumers, often called subscribers, which allow them to make and receive telephone calls and to send and receive data on their cellular phones and other devices.

11.    Network infrastructure providers, including Ericsson and Nokia, provide the components, such as base stations, that allow cellular calls to be transmitted on a wireless network, across networks or between a wireless network and a traditional landline network. Infrastructure manufacturers offer their products to wireless network carriers.

12.    Handset manufacturers sell handsets to subscribers or to wireless network carriers for resale to subscribers. Manufacturers include very large, established competitors, such as Nokia, Ericsson through its affiliate SonyEricsson, Motorola, NEC and Panasonic, as well as newer entrants, such as Huawei, ZTE and Kyocera, whose entry has been facilitated by Qualcomm.

13.    Chipset manufacturers such as Texas Instruments, Ericsson Mobile Platforms, Freescale, Qualcomm and Broadcom, among others, typically sell their chipsets to handset manufacturers for incorporation into cellular phones. Nokia and

5

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

552

Q2014FTCBCM03412296
Q2017MDL5_03412296

Ericsson design most of the chipsets used in their handsets and have committed to long-term chipset supply relationships with Texas Instruments to fabricate them. In addition, Broadcom recently announced an agreement to supply chipsets to Nokia, the world's largest handset supplier, and its intention to increase its share of chipset sales substantially over the next two years.

14.    Much of the technology incorporated into wireless handsets, chipsets and network infrastructure is patented and must be licensed by manufacturers of such products.

15.    Many firms in the wireless telecommunications industry operate at one or more levels of the distribution chain. Depending on its degree of vertical integration and position in the chain, a company's financial returns may be obtained from different sources. Firms that have both intellectual property rights and large handset and/or infrastructure revenue streams, such as Nokia and Ericsson, have powerful incentives to maximize their margins at the handset or infrastructure equipment supply level. As a result, Nokia, Ericsson and other patent holders with substantial handset or infrastructure revenues often agree to reduce or even forgo licensing royalties in favor of obtaining cross-licenses that protect their lucrative manufacturing and sales activities.

16.    Handset manufacturers without significant patent rights (including many of Qualcomm's customers) lack comparable bargaining leverage but also require a license from their competitors that have such rights. This can result in significant cost advantages for firms like Nokia and Ericsson and allow them to erect and support barriers

6

MEI 7178196v.1

to entry for companies that seek to manufacture handsets but do not hold significant patent rights. By contrast, Qualcomm, which has no handset or infrastructure equipment manufacturing business, enables downstream competition by openly and non-discriminatorily licensing its patent rights to handset or infrastructure equipment manufacturers.

### B. The Role of Standards Development Organizations

17.     The development of technical standards is a critical component in the wireless communications industry. Wireless phones and related products and services involve sophisticated and varied technologies offered by a myriad of companies. To complete a wireless communication, the network equipment (*e.g.*, base stations) and subscriber devices (*e.g.*, handsets), and components thereof, must interface seamlessly with each other, regardless of which company manufactured the equipment, devices and components. Standardization defines common technical criteria and specifications upon which providers and users of the products and services can rely to ensure interoperability. Standards development organizations ("SDOs"), made up of representatives of interested firms, provide the forum for the development of such technical standards.

18.     Several SDOs, including the European Telecommunications Standards Institute ("ETSI") in Europe, develop and establish technical standards for wireless communications.

7

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
554

Q2014FTCBCM03412298
Q2017MDL5_03412298

## C.   The Evolution of Wireless Technology

### (1)   The Introduction of Wireless Technology

19.   The first generation ("1G") analog wireless technology was launched in the United States in 1983.  Early cell phones could be used to make telephone calls, but quality and security were relatively poor and the phones themselves quite unwieldy by today's standards.  The industry quickly realized that analog systems were incapable of providing the necessary capacity and voice quality that consumers were demanding.

### (2)   Qualcomm's Pioneering Role in 2G Technology and the Evolution of CDMA

20.   In response to the recognized need for increased capacity, quality and reliability, second generation ("2G") wireless technology, based upon digital as opposed to analog signals, was developed in the late 1980s and first deployed in the 1990s.  2G offered increased voice quality and capacity over 1G.  Several 2G technologies emerged, including CDMA ("code division multiple access") and TDMA ("time division multiple access").

21.   The use of CDMA technology in commercial wireless networks and subscriber devices was made possible by Qualcomm's pioneering, patented innovations.  CDMA, and Qualcomm's innovations, significantly enhanced wireless capabilities by allowing multiple calls to be carried simultaneously over the same spectrum band.  When using CDMA, each transmitter is identified by a unique digital code and all may transmit their respective calls at the same time across the same frequency

8

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

555

Q2014FTCBCM03412299
Q2017MDL5_03412299

range. TDMA, adopted under the name GSM or "Global System for Mobile Communications" in the European Union (and alongside CDMA in the United States), also permits multiple users to transmit on a given frequency band. However, because TDMA allows the transmission of a particular call only in regular time slots on a single frequency, it is unable to provide as much capacity, for a given frequency range, as CDMA. CDMA therefore is a more efficient technology than TDMA. CDMA also allows for better voice quality and higher data speeds than TDMA.

22.     The first CDMA commercial systems were deployed in 1995. By 1999, the 2G CDMA standard, commonly known as cdmaOne, became the fastest growing technology in wireless communications, reaching 100 million subscribers. Since then, TDMA/GSM and CDMA have competed head-to-head in the United States, with the leading wireless network carriers divided between the two technologies. However, despite the significant inroads made by Qualcomm's CDMA technology, GSM remains the most widely deployed technology worldwide.

**(3)     The Evolution of GSM Networks**

23.     In the European Union, unlike the United States, a *de facto* closed regulatory environment was established, with the portion of spectrum allocated to 2G mobile telephony reserved exclusively for the GSM standard.

24.     The exclusive reservation of bandwidth for GSM in the EU protected GSM against competition from emerging alternative technologies such as CDMA, regardless of technical merit, commercial advantages or consumer demand for

9

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
**556**

Q2014FTCBCM03412300
Q2017MDL5_03412300

the alternatives. This environment directly benefited those companies that had developed and deployed GSM systems and technologies (*e.g.*, Nokia and Ericsson), to the detriment of those, such as Qualcomm, that had developed competing technologies. It further insulated such companies as Nokia, Texas Instruments and Ericsson from competition from new entrants that incorporated competing technologies in infrastructure, chipset and handset products. Once entrenched, they were able to maintain their dominant positions by cross-licensing their intellectual property to each other for little or no royalties, but charging high royalty rates to potential competitors in the manufacture of GSM handsets.

25.     In contrast, Qualcomm, which owns a large portion of the intellectual property covering CDMA technology, operates a pro-competitive licensing model, in which it offers licenses on fair, reasonable and non-discriminatory terms to any interested company.

### (4)     Qualcomm's Leading Role in 3G Wireless Technology

26.     In response to consumer demand for even further enhanced wireless service offerings, the development of third generation ("3G") technologies began in the 1990s. Qualcomm focused on developing 3G technology that would increase voice capacity and quality as well as data transmission rates and capacity, and which would be backward compatible with existing CDMA systems. In the United States, the Telecommunications Industry Association ("TIA") published a 3G CDMA-based standard, known as cdma2000, in 1999. It has been successfully deployed

10

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
**557**

Q2014FTCBCM03412301
Q2017MDL5_03412301

throughout the United States since 2000, and in many other countries as well, such as Japan, Korea, China and India.

27.    In Japan, which had its own 2G standard that was incompatible with other standards around the world, work on 3G was particularly important because Japan's carriers faced severe capacity constraints. After evaluating several alternatives, the Association of Radio Industries and Businesses ("ARIB"), a Japanese SDO, selected a species of CDMA technology known as "wideband" CDMA, or "WCDMA", to use in the air interface for one of the Japanese 3G standards.

28.    On or around 1997, NTT DoCoMo, the largest Japanese wireless network carrier, entered into agreements with several equipment manufacturers, including Nokia and Ericsson, to provide equipment for a WCDMA-based network in Japan.

29.    At around the same time, work began in earnest in ETSI to develop a 3G successor to GSM. Nokia and Ericsson strongly advocated that ETSI adopt WCDMA technology. Ultimately, Nokia and Ericsson were successful and ETSI adopted WCDMA for use in the ETSI 3G standard, which was called UMTS.

30.    Both primary 3G standards—cdma2000 and WCDMA/UMTS— use CDMA techniques for transmission between the handset and the base station (the "air interface") and offer more efficient capacity utilization, faster data transmission speeds and better service capabilities (such as e-mail and internet access) than earlier technologies.

11

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

Exhibit 12
558

Q2014FTCBCM03412302
Q2017MDL5_03412302

D.    **The ETSI IPR Policy**

31.    ETSI is an SDO with its headquarters in Sophia Antipolis, France.

32.    The ETSI IPR Policy sets forth procedures that apply when

patented technology is included in a standard or proposal for a standard. At all relevant

times, Qualcomm or its affiliates were members of ETSI.

33.    During the development of UMTS in ETSI, Section 4 of the ETSI

IPR Policy provided that:

> "4.1 Each MEMBER shall use its reasonable endeavours to timely inform
> ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a
> MEMBER submitting a technical proposal for a STANDARD shall, on a
> bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR
> which might be ESSENTIAL if that proposal is adopted.
>
> "4.2 The obligations pursuant to Clause 4.1 above do however not imply
> any obligation on MEMBERS to conduct IPR searches."

34.    For purposes of Clause 4.1 of the ETSI IPR Policy, the term

"timely" is not defined.

35.    This is explained in the ETSI Guide on Intellectual Property Rights

(the "ETSI Guide"), which is intended "to help ETSI Members and any other party

involved in ETSI's standardization activities . . . to understand and implement [ETSI's]

IPR Policy". The ETSI Guide states that "Definitions for 'Timeliness' or 'Timely'

cannot be agreed upon because such definitions would constitute a 'change to the

Policy'". The ETSI Guide was not formally adopted and endorsed by ETSI until 2004.

12

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

559

Q2014FTCBCM03412303
Q2017MDL5_03412303

36.     ETSI has not mandated or required the use of any particular form for purposes of disclosing intellectual property rights ("IPRs") that might be essential to an ETSI standard.

37.     Section 6.1 of the ETSI IPR Policy provides that:

"When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent:

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;
- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
- repair, use, or operate EQUIPMENT; and
- use METHODS.

"The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate."

38.     The ETSI IPR Policy contains no definition of the phrase "fair, reasonable and non-discriminatory terms and conditions" that appears in Clause 6.1.

39.     Clause 15 of the ETSI IPR Policy defines the term "ESSENTIAL" as follows:

"'Essential' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR.  For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical

13

ME1 7178196v.1

solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL."

### E.   Qualcomm's Compliance with the ETSI IPR Policy

40.    Broadcom has alleged that Qualcomm has failed to comply with the ETSI IPR Policy in two respects. *First*, Broadcom alleges that Qualcomm failed to disclose its "purportedly" essential UMTS patents in a timely manner. *Second*, Broadcom alleges that Qualcomm has refused to offer to license its essential patents on FRAND terms. Qualcomm seeks declaratory judgment with respect to both issues.

#### (1)   Qualcomm's Disclosure of Its Potentially Essential UMTS Patents to ETSI

41.    Beginning in 1997, Qualcomm repeatedly disclosed to ETSI that it held patents that might be essential to the UMTS standard. Such disclosure was made by Qualcomm both before and after the UMTS standard was first approved by ETSI, and well before the October 2001 date alleged by Broadcom in this case to be Qualcomm's first UMTS IPR disclosure. Qualcomm's disclosures were consistent with the applicable provisions of the ETSI IPR Policy and the practices of other ETSI members.

42.    Qualcomm first disclosed to ETSI its ownership of patents that might be essential to the UMTS standard in December 1997. At that time, consideration within ETSI was being given to candidate technologies for selection as the UMTS air interface, and ETSI asked Qualcomm on December 3, 1997, whether it held any IPRs that may be essential to any of those technologies. In that same letter, ETSI provided to Qualcomm an IPR disclosure form, but made clear that use of the form was optional:

14

MEI 7178196v.1

Exhibit 12
561

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

Q2014FTCBCM03412305
Q2017MDL5_03412305

"For the sake of convenience you will find in Annex 2 and 3 of this document two forms which can be used for the purposes of the IPR notification and the licensing declaration. Irrespective of the format, the declaration should reflect the provisions of Clause 6.1 [Availability of Licenses] of the ETSI IPR Policy."

43.   Qualcomm responded to ETSI's inquiry by letter dated December 29, 1997, from Steve Altman, then Qualcomm's Executive Vice President and General Counsel, in which he wrote:

"Qualcomm has been developing CDMA technology for over a decade and, as a result, owns more than 100 issued CDMA patents and has many hundreds of CDMA patents pending. Many of these patents cover features or functions that must necessarily be implemented in any commercially viable CDMA system . . . . Qualcomm has reviewed the current definition of the proposed ETSI 'W-CDMA' and 'TDMA/CDMA' system relative to whether they include Qualcomm IPR. Qualcomm believes that its IPR is clearly a part of the current definition of both systems."

44.   Qualcomm reiterated its IPR position at a January 1998 ETSI meeting, stating that:

"On behalf of Qualcomm, Ronald E. Foerster reported Qualcomm to have signed and to fully support the ANSI IPR policy, also Qualcomm to have IPR agreements with 50 to 60 manufacturers; Qualcomm to have concluded to have a strong IPR position in both the alpha and delta concept, but to need to investigate this and prepare an IPR position."

45.   In a letter dated May 7, 1998, ETSI acknowledged that Qualcomm had disclosed IPRs in relation to the UMTS standard in December 1997:

"We have taken note from your letter of 29 December 1997 that Qualcomm Incorporated was owning IPRs essential to the following technical proposed radio interfaces which were currently under discussion within the ETSI Project SMG. We have also understood from your letter presented to our SMG#25 meeting dated 16-20 March 1998 that these IPRs previously declared in December were still to be considered as

15

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
562

Q2014FTCBCM03412306
Q2017MDL5_03412306

essential for the newly proposed radio interface as adopted by the SMG#24 bis meeting in Paris."

46.     Qualcomm's general disclosure of IPRs to ETSI—a disclosure that did not identify particular patents—was consistent with the practices of other ETSI members at the time.

47.     In May 1998, ETSI, pursuant to Clause 6.1 of the ETSI IPR Policy, asked Qualcomm whether it would provide a FRAND undertaking for any patents essential to the UMTS standard. In June 1998, Qualcomm exercised in writing its right under Clause 6.1 to decline to give such an undertaking, in part because the proposed UMTS standard was—as a result of collusive action between Nokia and Ericsson—being developed purposefully to be incompatible with existing wireless technologies such as CDMA.

48.     In developing their proposals for the UMTS standard, Nokia and Ericsson had intentionally made the standard inconsistent and incompatible with the 3G cdma2000 standard, which incorporated technology developed by Qualcomm, so as to insulate themselves from competition from manufacturers of cdma2000 equipment. Qualcomm objected to this artificial incompatibility and announced to ETSI that it did not intend to license its patents for UMTS applications unless the incompatibility was reduced or eliminated. Qualcomm formally declined to give a FRAND undertaking to ETSI in June 1998. In retaliation, Ericsson announced that it would refuse to license its patents for cdma2000 applications.

16

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

**563**

Q2014FTCBCM03412307
Q2017MDL5_03412307

49.     On September 30, 1998, ETSI requested—for the first time—that Qualcomm identify the particular patents and patent applications it believed were potentially essential to the UMTS standard.

50.     On November 18, 1998, Qualcomm responded to ETSI's request by providing to ETSI a list of nearly 1,600 patents and patent applications that were potentially essential to the WCDMA technology that had been selected for inclusion in the UMTS standard.

51.     In March 1999, Qualcomm and Ericsson settled the dispute (and patent litigation between them) and entered into an agreement that provided, among other things, that Qualcomm would offer FRAND licenses for essential patents for UMTS applications and Ericsson would do the same for cdma2000 applications.

52.     On June 25, 1999, pursuant to that agreement, Qualcomm informed ETSI that it "hereby commits to the European Telecommunications Standards Institute to license its essential patents for such single CDMA standard or any of its modes on a fair and reasonable basis free from unfair discrimination". The "single CDMA standard" referred to and adopted by ETSI is the UMTS standard. This commitment did not identify any specific patents but instead applied to all patents that were, or would become, essential to the proposed UMTS standard. At the time, such general commitments with respect to the UMTS air interface were the norm in ETSI. Moreover, such general declarations were and are accepted by ETSI's members as sufficient to permit work on UMTS standards to be completed without further

17

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

**564**

Q2014FTCBCM03412308
Q2017MDL5_03412308

information regarding the declarant's IPR being disclosed before the constituent parts of the standard are published.

53.      The first version of the UMTS standard was released in December 1999—well after Qualcomm disclosed its patents to ETSI and after Qualcomm made its general FRAND commitment above.

54.      As the standard has been further developed and modified by ETSI, Qualcomm has made additional UMTS-related disclosures of patents to ETSI in 2001, 2003, 2004, 2005, 2006 and 2007.

55.      Consistent with its undertakings to ETSI, Qualcomm's patented technology is available to be licensed at rates and upon terms and conditions that allow efficient providers of network infrastructure equipment, chipsets and handsets to compete in those businesses.  Qualcomm has successfully negotiated over 100 licenses with over 80 companies granting rights to use patents in UMTS products.  Most of the agreements with chip suppliers contain cross-licenses that provide Qualcomm with an exhaustive license to such suppliers' patents and provide the supplier with non-exhaustive rights to Qualcomm patents that are technically necessary to practice the relevant standards.

**F.    Qualcomm's Licensing Negotiations with Broadcom**

56.      Qualcomm has repeatedly offered Broadcom license terms for Qualcomm's UMTS patents that comply with FRAND and are at least as favorable as the terms Qualcomm has offered to other chipset supplier licensees.

18

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

565

Q2014FTCBCM03412309
Q2017MDL5_03412309

(1)     **Initial Licensing Negotiations**

57.     The first licensing discussions between Qualcomm and Broadcom took place in 2000. In May 2000, Broadcom approached Qualcomm to initiate licensing discussions relating to Qualcomm's High Data Rate ("HDR") technology. HDR technology, which later became known as "CDMA2000 1x EV-DO", was an improvement on existing 3G cdma2000 technology. Qualcomm agreed to meet with Broadcom, but Broadcom unilaterally terminated the HDR licensing discussions in September 2000.

58.     In January 2001, Qualcomm attempted to revive licensing negotiations by offering Broadcom a fully paid up non-exhaustive license for Qualcomm's IS-95 (2G cdmaOne) and CDMA 3G technology (including cdma2000 and WCDMA) for a one-time fee of $25 million and no additional royalties. Broadcom did not respond to Qualcomm's offer, which expired on March 1, 2001.

59.     In June 2001, Broadcom proposed a scenario in which it would make *no* royalty payment to Qualcomm in return for a fully exhaustive license to Qualcomm's valuable intellectual property. Rather, Broadcom proposed that the parties enter into a broad royalty-free exhaustive cross-license encompassing both CDMA and non-CDMA technology. Qualcomm declined Broadcom's zero-royalty/fee proposal, but expressed its desire to continue working toward a license agreement.

19

MEI 7178196v.I

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
**566**

Q2014FTCBCM03412310
Q2017MDL5_03412310

**(2)    Qualcomm Revives Licensing Negotiations Following Broadcom's Acquisition of Zyray Wireless**

60.    In June 2004, Broadcom acquired Zyray Wireless, Inc. ("Zyray"), a manufacturer of products for wireless handsets that used WCDMA technology. The Zyray acquisition signaled Broadcom's commitment to WCDMA technology.

61.    After the Zyray acquisition was announced, Qualcomm approached Broadcom to revive licensing negotiations. In September 2004, Qualcomm offered Broadcom rates and terms that were substantially similar to rates and terms that Qualcomm had offered to Zyray before the acquisition and that Qualcomm was offering to other chipset suppliers at that time.

62.    The offer to Broadcom in September 2004 contemplated royalties of 8% of the net selling price of Broadcom chips if 1-400,000 units were sold during the term of the agreement, 7% of the net selling price if 401,000-1,200,000 units were sold during the term of the agreement and 6% of the net selling price if over 1,200,000 units were sold during the term of the agreement. Several Qualcomm licensees have accepted these rates and the other terms of the offered agreement, including the two companies that entered into chip patent agreements with Qualcomm closest in time to September 2004.

63.    The offer to Broadcom in September 2004 also contemplated a number of standard contractual provisions that were substantially similar to those set forth in the draft patent agreement sent by Qualcomm to Zyray in 2003 and in

20

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

Exhibit 12

567

Q2014FTCBCM03412311
Q2017MDL5_03412311

Qualcomm's agreements with several other chip suppliers. Some or all of these or substantially similar terms have been accepted by each of the parties to Qualcomm's other chip supplier patent agreements.

64.     Qualcomm and Broadcom met again in March 2005 to discuss licensing terms. At the meeting, Broadcom proposed for the first time that Qualcomm should make a balancing payment to Broadcom in addition to agreeing to a broad cross-license.

65.     On May 6, 2005, Broadcom sent Qualcomm a proposed term sheet for a cross-license in which Qualcomm would pay Broadcom an up-front licensing fee, as well as quarterly royalties—while Broadcom's license from Qualcomm would be fully paid up and royalty-free.

66.     On May 12, 2005, Qualcomm sent Broadcom a letter stating that it needed to "carefully analyze the patents that Broadcom presented" because Broadcom's license proposal suggested that "Broadcom views its wireless patent portfolio as significantly more valuable than QUALCOMM's".

67.     Six days later, Broadcom sued Qualcomm for patent infringement in the action styled *Broadcom Corporation v. Qualcomm Incorporated*, No. 8:05-cv-00467 (C.D. Cal.) (complaint filed May 18, 2005).

68.     The next day—May 19, 2005—Broadcom commenced a proceeding before the United States International Trade Commission, entitled *In the Matter of Certain Baseband Processor Chips and Chipsets, Transmitter and Receiver*

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
**568**

Q2014FTCBCM03412312
Q2017MDL5_03412312

*(Radio) Chips, Power Control Chips, and Products Containing Same, Including Cellular Telephone Handsets*, Investigation No. 337-TA-543, also alleging patent infringement and seeking to exclude the importation or sale for importation into the United States of Qualcomm's accused chipsets, as well as the downstream products of third parties that contained Qualcomm chipsets.

69.     On July 1, 2005, Broadcom filed the instant suit against Qualcomm.

70.     On October 26, 2005, Broadcom filed a complaint against Qualcomm before the European Commission alleging, *inter alia*, that Qualcomm had not offered to license its patents on FRAND terms.

71.     On or about June 23, 2006, Broadcom filed a complaint against Qualcomm before South Korea's Fair Trade Commission alleging that Qualcomm used its ownership of CDMA-related patents to seek excessive royalties.

72.     On April 12, 2007, Broadcom sued Qualcomm in state court in Orange County, California, alleging claims of unfair competition, fraud and breach of contract relating to, *inter alia*, Qualcomm's alleged failure to license its patents on FRAND terms.  On October 5, 2007, the Orange County case was stayed.

73.     Broadcom has alleged in this case, *inter alia*:  (a) that it is a third party beneficiary of alleged contracts between Qualcomm and SDOs (including ETSI) and that Qualcomm has breached those alleged contracts by not licensing its essential patents on FRAND terms; (b) that Qualcomm's alleged failure to license its patents on

22

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

Q2014FTCBCM03412313
Q2017MDL5_03412313

FRAND terms to Broadcom and to handset manufacturers (*e.g.*, Nokia and Ericsson) has resulted in monopolization by Qualcomm of certain alleged markets; and (c) that Qualcomm's alleged failure to license its patents on FRAND terms has resulted in violations of state antitrust, unfair competition and unfair trade practices laws and gives rise to actions for promissory estoppel and fraud.

74.     Broadcom seeks, *inter alia*, an injunction "requiring Qualcomm to grant Broadcom a license to [UMTS, GSM, GPRS, EDGE and H.264] patents and other IPR on FRAND terms".

75.     Qualcomm now knows that Broadcom was not negotiating in good faith in 2005, and has not negotiated in good faith since that time.  Rather, Broadcom conceived of and executed a strategy, code named "Project Koala", in which it uses actual and threatened litigation for leverage in licensing negotiations in an effort to obtain terms better than the FRAND terms available to others in the industry.

76.     As part of Project Koala, Broadcom developed detailed projections concluding that it would be financially advantageous to launch massive litigation against Qualcomm rather than negotiate in good faith for FRAND terms and conditions. Broadcom's negotiations with Qualcomm in early 2005, then, were not good faith attempts to reach agreement but rather were a sham.

23

ME1 7178196v.1

**(3)** **Licensing Negotiations Continue After Broadcom Sues Qualcomm**

77.     Even after Broadcom filed suit against Qualcomm, Qualcomm continued to offer to license its UMTS and other patents to Broadcom on FRAND terms that were at least as favorable as the terms to which other chip suppliers had agreed with Qualcomm. For example, in November 2006, Qualcomm offered Broadcom non-exhaustive royalty-free cross-covenants not to assert patents against the semiconductor products of both companies.

78.     On June 25, 2007, after Qualcomm and Broadcom had participated in a long series of unsuccessful settlement and licensing discussions beginning in March 2006, David Dull, General Counsel of Broadcom, wrote an open letter to Marv Blecker, Qualcomm Executive Vice President and President of Technology Licensing, copying several representatives of other companies in the industry, that discussed a Broadcom offer to license a single Broadcom patent to Qualcomm for $6 per chipset. The offer represented roughly a thirty percent (30%) royalty on each chipset sold by Qualcomm.

79.     On June 27, 2007, Mr. Blecker replied to Mr. Dull, stating that "[Qualcomm has] proposed settlement terms that would provide rights to Broadcom under QUALCOMM's valuable, extensive patent portfolio without Broadcom paying any fees or royalties to QUALCOMM and have asked only that Broadcom provide comparable rights to QUALCOMM for use of its patent portfolio". The letter also noted

24

MEI 7178196v.1

that Qualcomm had offered "to pay Broadcom $100M to achieve a settlement on [a] global basis".

80.    On June 29, 2007, Mr. Dull wrote another letter, in which he characterized Qualcomm as "unwilling to negotiate" and stated that, despite the many non-exhaustive agreements between Qualcomm and other semiconductor companies, fully exhaustive broad cross-licenses, which Broadcom sought, were "the standard among major semiconductor industry participants".

81.    On July 6, 2007, Mr. Blecker responded to the June 29 letter, stating that "[y]our assertion that fully exhaustive cross-licenses are 'the standard among major semiconductor industry participants' in the wireless industry is incorrect. In fact, QUALCOMM has entered into non-exhaustive patent agreements with the major wireless industry players that either now are, or in the past have been, semiconductor leaders including Agere, Infineon, Texas Instruments, LSI Logic (now VIA), Philips (now NXP), Motorola and others. A number of these semiconductor companies are doing quite well in the WCDMA chip business. QUALCOMM has proposed to Broadcom a royalty-free non-exhaustive patent agreement that is no less favorable to Broadcom than the best of those agreements. In addition, we have offered to pay Broadcom a significant amount of money."

82.    Qualcomm has continued to offer to license its IPR to Broadcom on FRAND terms, but Broadcom has rebuffed each such attempt, seeking instead to gain an unfair advantage over Qualcomm and its chip business.

25

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

**572**

Q2014FTCBCM03412316
Q2017MDL5_03412316

(4)   **Qualcomm's Offers to Broadcom Were FRAND**

83.    Qualcomm has repeatedly made FRAND licensing offers to

Broadcom.  Those offers have included, *inter alia*:

(a)   **January 2001**:  $25 million one-time payment by
Broadcom in return for a fully-paid up license for IS-95 and
3G standards.

(b)   **September 2004**:  Licensing terms and rates substantially
similar to those to which several other major chip suppliers
had already agreed.

(c)   **November 2006**:  Non-exhaustive royalty-free
cross-covenants not to assert patents against the
semiconductor products of both companies.

(d)   **April 2007**:  Payment to Broadcom of $100 million as part
of a global settlement including mutual non-exhaustive
cross-covenants not to assert and certain additional
exhaustive rights to Broadcom.

84.    Despite Qualcomm's repeated attempts to grant rights under its

intellectual property to Broadcom on FRAND terms, Broadcom has rejected every one of

Qualcomm's offers.  Broadcom has demanded that Qualcomm agree to substantially

worse terms than those in any agreement that Qualcomm has reached with any similarly

situated chip supplier, which would disadvantage Qualcomm's chip business in favor of

Broadcom's.

85.    Broadcom has refused to accept any of Qualcomm's FRAND

offers, and has refused to enter into a FRAND patent agreement with Qualcomm, as part

of its conspiracy with the other Project Stockholm companies.  Instead, Broadcom,

"carrying the torch" in the United States for the conspiracy, has brought this lawsuit

26

MEI 7178196v.1

against Qualcomm. Accordingly, Broadcom has insisted upon terms designed to damage Qualcomm's licensing business in order to benefit Broadcom and the other Project Stockholm conspirators.

### G. Broadcom's Participation in the Project Stockholm Conspiracy Against Qualcomm

#### (1) Project Stockholm's Collective Agreement To Protect Its Entrenched Position

86.     Qualcomm has upset the status quo for the Project Stockholm participants in two fundamental ways. *First*, Qualcomm makes its intellectual property available to any company that wishes to compete for 3G handset sales utilizing either the cdma2000 or the UMTS standard (or both). The GSM incumbents, such as Nokia, are therefore unable to control the number of competitors for the 3G successor technology to GSM. In fact, over the past seven years, Qualcomm has entered into more than 125 CDMA licenses, including over 50 WCDMA licenses (since 1990, over 200 licenses including over 85 WCDMA licenses). Through its open, fair and non-discriminatory approach to licensing, Qualcomm has enabled the entry (and expected entry) of companies such as Samsung, Kyocera, BenQ/Siemens, LG Electronics, ZTE, Huawei, Amoi and others, undermining the Project Stockholm firms' oligopolistic position. In fact, Samsung, enabled by Qualcomm, recently became the world's second largest handset supplier, behind only Nokia.

87.     *Second*, the Project Stockholm co-conspirators must use Qualcomm's core patented technology to maintain their positions as wireless technology

27

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

**574**

Q2014FTCBCM03412318
Q2017MDL5_03412318

transitions to 3G. Accordingly, they seek through concerted action to drive down the price they pay for Qualcomm's technology and to eliminate Qualcomm's technology, notwithstanding its superior technical characteristics, from industry standards. Further, by reducing Qualcomm's licensing revenues, the Project Stockholm co-conspirators intend to reduce the funds available to Qualcomm for expenditures on research and development, and to weaken Qualcomm as a competitor in the development of wireless technology and as an enabler of competitive handset and infrastructure suppliers.

88.     Because Qualcomm's superior technology and pro-competitive business model pose a threat to the entrenched Project Stockholm companies, they have conspired to attack Qualcomm through, among other things, concerted global litigation, improper SDO activities and coordinated licensing strategies. The group has even gone so far as to adopt a code name for their anticompetitive conspiracy. An e-mail dated November 18, 2005, from a representative of the Brunswick Group, a public relations firm jointly retained by Nokia, Broadcom, Ericsson, Texas Instruments, NEC and Panasonic, identifies the group as "Project Stockholm".

89.     Broadcom's Project Koala is in furtherance of Project Stockholm's concerted attack on Qualcomm.

90.     The Project Stockholm members (*i.e.*, Broadcom, Nokia, Ericsson, Texas Instruments, Panasonic and NEC) have agreed to act, and have acted, collectively against Qualcomm through coordinated business tactics, standards development activities and worldwide litigation, all with the common motive and intent to weaken or eliminate

28

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

575

Q2014FTCBCM03412319
Q2017MDL5_03412319

competition from Qualcomm and its downstream customers, as more fully described below.

**(2)    Project Stockholm's Public Acknowledgment of Its Conspiracy**

91.     In November 2002, Nokia and Ericsson disseminated a press release announcing their "mutual understanding" to introduce licensing arrangements with a maximum royalty rate for WCDMA products. The press release also noted its support by two other Project Stockholm participants, NEC and Panasonic.

92.     According to the press release, "the intention [of the group agreement] is to set a benchmark for all patent holders". The press release openly admitted that the group's goal was to "keep[] [the] cumulative royalty rate below 5%"— *i.e.*, collectively to fix licensing rates below their competitively determined levels.

93.     In the press release, Yrj Neuvo, Executive Vice President of Nokia, described the group's goal, declaring that the group's "targetted cumulative 5% level" would ensure "that cumulative royalty rates are kept at a healthy level", as opposed to a level achieved by competitive market forces. Indeed, the licensing practices of the Project Stockholm conspirators (including the royalties they have sought for their own patents) contradict these pronouncements.

94.     In the November 2002 press release, the group also sought to "introduce licensing arrangements whereby essential patents for W-CDMA are licensed at rates that are proportional to the number of essential patents owned by each company". The proposed scheme of numeric "proportionality"—in addition to ignoring the fact that

29

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
**576**

Q2014FTCBCM03412320
Q2017MDL5_03412320

some patents (such as Qualcomm's fundamental CDMA technology) are more valuable than others—would fix the licensing fees paid to each patent owner at a fraction of the cartel's "targetted cumulative 5% level".

### (3) Project Stockholm's Concerted SDO Activity Against Qualcomm

95.     In addition to their clear public statements endorsing attempts to fix prices for Qualcomm's intellectual property, the collusive activity of the Project Stockholm companies is evidenced by their coordinated efforts to impede Qualcomm's effective participation in SDOs and to use the standards development process to carry out their announced plan.

96.     For example, Nokia and Ericsson jointly sponsored an effort within ETSI, known as "Minimum Change Optimum Impact", to redefine what constitutes a FRAND license. The proposal advocated concepts called "proportionality" (*i.e.*, a method of calculating royalties by comparing the number of essential patents held by a patent owner to the total number of essential patents identified under the standard) and "aggregated reasonable royalty", which requires that cumulative royalties be capped at some unspecified amount to be determined through coordinated action by the cartel members and other licensees. The proposal, like the November 2002 press release, explicitly touts price-fixing—albeit at a purportedly "reasonable" self-serving rate—as a replacement for bilateral negotiations on a FRAND basis.

30

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL
**Exhibit 12**
**577**
Q2014FTCBCM03412321
Q2017MDL5_03412321

97.     Nokia, supported by Broadcom's vote, also recently launched a coordinated attack to exclude from standardization in ETSI Qualcomm's MediaFLO technology, raising a pretextual and false accusation that somehow the standardization might raise antitrust concerns because "public statements by the major patent holder . . . reveal that its licensing strategy concerning the FLO patents is discriminatory". The thinly veiled reference to Qualcomm was another purposeful and improper effort (which ETSI rejected out of hand as procedurally improper and itself a potential antitrust violation) to stifle standardization and adoption of technological innovations developed by Qualcomm that would compete against the Project Stockholm group's technology.

### (4)     Project Stockholm's Coordinated Global Litigation Against Qualcomm

98.     On October 26, 2005, the six Project Stockholm members filed almost simultaneous complaints with the European Union's antitrust authority attacking Qualcomm's royalty rates. Indeed, three of the companies—Nokia, Texas Instruments and Broadcom—shared the same law firm, Cleary Gottlieb Steen & Hamilton LLP ("Cleary"). As a Nokia representative made clear, this group action was simply a coordinated business tactic. The goal of the complaints was "to bring them [Qualcomm] back to the table"—*i.e.*, to coerce Qualcomm to lower its negotiated royalty rates. Experienced industry analysts agreed, and at the time viewed "these complaints possibly as *concerted efforts* by vendors with strong IPR positions and whose contracts with

31

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
**578**

Q2014FTCBCM03412322
Q2017MDL5_03412322

Qualcomm are coming up for renegotiation (namely Nokia . . . and Ericsson) to gain

further concessions from Qualcomm in these upcoming negotiations". (Emphasis added.)

99.     On October 28, 2005, on a joint press conference call with

representatives from Nokia (represented during the call by Maurits Dolmans of Cleary,

who represents Broadcom as legal counsel in the EU proceeding), Ericsson, Broadcom,

Texas Instruments (represented during the call by George Cary of Cleary), NEC and

Panasonic, the Project Stockholm participants again advocated the use of proportionality

in licensing fee arrangements.

100.     During the call, Mr. Dolmans (on behalf of Nokia) endorsed the

proportionality method of determining licensing fees, noting that the companies objected

to Qualcomm's licensing practices because the royalties it sought were

"disproportionate". He highlighted the intertwined nature of Project Stockholm's

coordinated litigation, including Broadcom's challenges in this case to Qualcomm's

patent declarations and licensing offers, stating that "the important thing is that the issues

are being addressed and *whether it's one or six companies litigating doesn't really

matter*". (Emphasis added.)

101.     Mr. Dolmans further admitted explicitly Broadcom's role in

advancing, through this case, Project Stockholm's concerted global war against

Qualcomm, stating that "Broadcom is now carrying the torch in the U.S. and we [*i.e.*, the

other five Project Stockholm companies] have now raised this issue in the European

Union".

32

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**
**579**

Q2014FTCBCM03412323
Q2017MDL5_03412323

102.    Broadcom's position as standard-bearer for Project Stockholm is borne out by its own complaint in this action, which explicitly endorses the price-fixing agenda set by Nokia and Ericsson in November 2002.  Paragraph 121 of Broadcom's Second Amended Complaint criticizes Qualcomm for not agreeing to royalties based solely upon the "proportion" of UMTS essential patents owned by Qualcomm and alleges that "Qualcomm has rejected attempts by other WCDMA essential patent holders to set a government or SDO-approved ceiling on the royalty rate at which all WCDMA technology for cell phones would be licensed"—*i.e.*, to fix prices for WCDMA technology.

103.    The Project Stockholm companies' statements in other proceedings—which often contradict their allegations against Qualcomm—demonstrate that their coordinated litigation is merely a pretextual attempt to devalue Qualcomm's technology and otherwise commercially harm Qualcomm, rather than a legitimate effort to seek redress for a legal claim.  For example, Nokia, during the European Commission's contemporaneous review of the merger of Nokia and Siemens' infrastructure equipment businesses, adopted positions in fundamental areas such as market definition, competition between technologies and standards, and the role of CDMA in Europe that were opposite to those contained in its EU complaint against Qualcomm.  Similarly, Broadcom has asserted technology-specific relevant markets in this case, but sought an injunction against Qualcomm from a California Federal district court based upon allegations of inter-technology competition.

33

MEI 7178196v.1

104. Nokia also made statements in a lawsuit against another company pending in Spain that were expressly and directly contrary to its positions in the EU relating to the definition of FRAND, the propriety of "royalty stacking" and the appropriate basis for the calculation of royalties. Ericsson has similarly taken positions inconsistent with its EU action in litigation with Samsung regarding what constitutes a reasonable royalty, and specifically whether proportionality and royalty stacking should be significant considerations. These expedient inconsistencies provide further evidence that Project Stockholm's litigation positions, and specifically Broadcom's position in this case given its refusal to engage in good faith licensing negotiations, are nothing more than concerted business tactics intended to enable Project Stockholm to use Qualcomm's technology without paying the market-established value of such technology.

105. The Project Stockholm members' public statements confirm the common motive and intent of their collective efforts to use the litigation process to influence industry development in a way that serves their own commercial interests. Indeed, Ericsson has admitted that it filed its EU complaint against Qualcomm despite the fact that royalty rates are "not an issue between Ericsson and Qualcomm per se [because] we have a licensing agreement in place"—and therefore that Ericsson has no legitimate independent interest in the EU's response to Ericsson's complaint. Instead, Ericsson claims that the purpose of its EU action is to promote its view as to proper industry growth and "that is what the industry is sort of addressing [sic] Qualcomm". Similarly, Texas Instruments has acknowledged that it brought its EU complaint against Qualcomm

34

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

Exhibit 12
581

Q2014FTCBCM03412325
Q2017MDL5_03412325

not for its own interests but on the theory that Qualcomm's activities would allegedly be "detrimental to the growth of the market eventually".

106.     While Broadcom is "carrying the torch" in the United States, the other Project Stockholm members have actively supported Broadcom's efforts to advance their group litigation strategy.  Although they have no direct stake in the present action, Nokia, Ericsson and Texas Instruments filed an unprecedented joint "amicus letter" with this Court, claiming that their common "experience[s] . . . in the marketplace" demonstrate that "Qualcomm discriminates in the licensing terms for its patents essential to adopted mobile phone standards".  The Court, upon recognizing that the unsolicited letter was not submitted by a party, declined to consider or even read it.  Undeterred, Nokia, Ericsson and Texas Instruments filed a joint amicus brief in support of Broadcom's appeal, claiming jointly to have a "special ability" to provide the Court with "relevant knowledge and insight" about Qualcomm's allegedly anticompetitive licensing practices.

### (5)     Project Stockholm's Coordinated Licensing Behavior

107.     In addition to their coordinated litigation and SDO-based attacks against Qualcomm, Broadcom and other members of Project Stockholm have refused to agree to or honor FRAND licensing rates with Qualcomm.

108.     Nokia has withheld royalties owed to Qualcomm pursuant to the July 2, 2001, Subscriber Unit License Agreement ("SULA") between Nokia and Qualcomm.  Instead of paying the bargained-for royalty—to which Nokia agreed after

35

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

Exhibit 12
582

Q2014FTCBCM03412326
Q2017MDL5_03412326

years of arm's-length negotiations—Nokia, which continues to use Qualcomm's technology, has offered Qualcomm only a fraction of the royalties to which Qualcomm is entitled and to which Nokia agreed in 2001.

109.    As discussed herein, Qualcomm has repeatedly made—and Broadcom has rejected—offers to license its technology to Broadcom on FRAND terms. In addition, Broadcom has refused to license its patents to Qualcomm on fair, reasonable and non-discriminatory terms.  Indeed, as the court found in *Broadcom Corporation v. Qualcomm Incorporated*, No. 05-cv-00467, slip op. at 6 (C.D. Cal. Dec. 31, 2007), "Broadcom has pursued a policy of not generally licensing its patents".  Instead, Broadcom, consistent with Project Koala, "has used licensing as a tool to settle pending or threatened litigation".  *Id.*

**(6)    Broadcom's Motive To Participate in Project Stockholm**

110.    By participating in Project Stockholm's campaign against Qualcomm, Broadcom stands to gain business from handset manufacturers—particularly Nokia—who might otherwise have chosen different chipset suppliers.  Broadcom was recently rewarded for its support of Project Stockholm with a chipset supply contract from Nokia.

**H.    Broadcom's Unclean Hands**

111.    As alleged herein, Broadcom, inequitably and in bad faith, has refused to agree to FRAND licensing terms and instead has brought this lawsuit against Qualcomm.

36

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

**583**

Q2014FTCBCM03412327
Q2017MDL5_03412327

112.     The principal subject matter of this lawsuit—*i.e.,* Qualcomm's alleged failure to license its patents on FRAND terms and its alleged assertion of those patents against Broadcom and its current and potential customers—is directly related to Broadcom's refusal, in furtherance of its Project Koala and as part of Project Stockholm, to agree to FRAND terms with Qualcomm.  Granting Broadcom any relief as a result of its bad faith actions would be inequitable.

113.     Accordingly, Broadcom has unclean hands in connection with the relief it seeks and is barred from recovering on its claims against Qualcomm.

## COUNTERCLAIMS FOR RELIEF

### COUNT I
### DECLARATORY JUDGMENT

114.     Qualcomm incorporates paragraphs 1 through 113 inclusive, as though fully set forth herein.

115.     This case presents a controversy involving the rights or other legal relations of Qualcomm in relation to Plaintiff/Counterclaim-Defendant Broadcom under Clause 4 of the ETSI IPR Policy.

116.     The parties' interests are real and adverse.  On July 1, 2005, Broadcom filed this action in the New Jersey Federal court, in which Broadcom asserts (including through amended pleadings), *inter alia,* that Qualcomm's disclosure to ETSI of IPR that might be essential to the UMTS standard was improper and untimely.

37

MEI 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

584

Q2014FTCBCM03412328
Q2017MDL5_03412328

117.    Accordingly, Qualcomm seeks a declaration that Qualcomm's disclosure of IPR was timely, as set forth in the ETSI IPR Policy.

## COUNT II
## DECLARATORY JUDGMENT

118.    Qualcomm incorporates paragraphs 1 through 117 inclusive, as though fully set forth herein.

119.    This case presents a controversy involving the rights or other legal relations of Qualcomm in relation to Plaintiff/Counterclaim-Defendant Broadcom under Clause 6 of the ETSI IPR Policy.

120.    The parties' interests are real and adverse.  On July 1, 2005, Broadcom filed this action in the New Jersey Federal court, in which Broadcom asserts (including through amended pleadings), *inter alia*, that Qualcomm did not offer to license its patents to Broadcom on FRAND terms.

121.    Accordingly, Qualcomm seeks a declaration that the terms offered by Qualcomm to Broadcom for rights to Qualcomm's UMTS patents are "fair, reasonable and non-discriminatory", as those terms are used in the ETSI IPR Policy.

### AFFIRMATIVE DEFENSE

Qualcomm asserts the following affirmative defense.  Qualcomm reserves the right to assert additional affirmative defenses when it answers Broadcom's Second Amended Complaint, which Qualcomm does not answer now because its Motion To Dismiss Claims Four Through Eight of Plaintiff's Second Amended Complaint is *sub*

38

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

Q2014FTCBCM03412329
Q2017MDL5_03412329

**Exhibit 12**

**585**

*judice.* In asserting this defense, Qualcomm does not assume the burden of proof with respect to any issue as to which applicable law places the burden of proof upon Broadcom.

### First Defense

As alleged in paragraphs 1 through 121 above, Broadcom's claims are barred by the doctrine of unclean hands.

### Prayer for Relief

WHEREFORE, Defendant/Counterclaim-Plaintiff Qualcomm Incorporated respectfully requests that this Court enter judgment in its favor and grant the following relief:

(1) A declaratory judgment that Qualcomm's disclosure of IPR was timely, as set forth in the ETSI IPR Policy;

(2) A declaratory judgment that the terms offered by Qualcomm to Broadcom for rights to Qualcomm's UMTS patents are "fair, reasonable and non-discriminatory", as those terms are used in the ETSI IPR Policy;

(3) Dismissal with prejudice of Broadcom's complaint in its entirety;

(4) Attorneys' fees, costs and expenses; and

(5) Such other and further relief as the Court deems equitable, just and proper.

39

MEI 7178196v.1

**Exhibit 12**

586

Q2014FTCBCM03412330
Q2017MDL5_03412330

Dated: February 29, 2008

McCARTER & ENGLISH, LLP

By:  s/ William J. O'Shaughnessy
    William J. O'Shaughnessy
    Four Gateway Center
    100 Mulberry Street
    Newark, NJ 07102
    (973) 622-4444

Evan R. Chesler
Peter T. Barbur
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Richard S. Taffet
Philip L. Blum
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Robert N. Feltoon
CONRAD O'BRIEN GELLMAN &
ROHN, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA 19102
(215) 864-8064

*Attorneys for Defendant/Counterclaim-Plaintiff
Qualcomm Incorporated*

ME1 7178196v.1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
CONFIDENTIAL

**Exhibit 12**

Q2014FTCBCM03412331
Q2017MDL5_03412331