# Exhibit 22

# INTERNATIONAL PATENT ISSUES: PROMOTING A LEVEL PLAYING FIELD FOR AMERICAN INDUSTRY ABROAD

## HEARING

BEFORE THE

### SUBCOMMITTEE ON INTELLECTUAL PROPERTY, COMPETITION, AND THE INTERNET

OF THE

### COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ONE HUNDRED TWELFTH CONGRESS

SECOND SESSION

———

APRIL 26, 2012

———

**Serial No. 112–115**

———

Printed for the use of the Committee on the Judiciary



Available via the World Wide Web: http://judiciary.house.gov

———

U.S. GOVERNMENT PRINTING OFFICE

73–965 PDF                    WASHINGTON : 2012

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104  Mail: Stop IDCC, Washington, DC 20402–0001

Exhibit 22
760

LP_0000628

I truly appreciate the opportunity to participate in this hearing and look forward to any chance to support the work of the Committee in the future.

15

---

Mr. GOODLATTE. Thank you, Mr. Israel. Mr. Murphy, welcome.

**TESTIMONY OF SEAN P. MURPHY, VICE PRESIDENT AND COUNSEL, INTERNATIONAL GOVERNMENT AFFAIRS, QUALCOMM INCORPORATED**

Mr. MURPHY. Good morning, Chairman Goodlatte, Ranking Member Watt, and other Members of the Subcommittee. It is an honor to testify this morning. I am grateful for the opportunity.

39

My name is Sean Murphy and I manage international policy issues at Qualcomm, including intellectual property and international trade. Let me begin by thanking Members of the Subcommittee for your important efforts to support American innovation through strong intellectual property laws. Thank you also for your recognition of the challenges that U.S. patent holders confront in other countries which threaten America's competitive edge, technology leadership, and jobs.

The patent system has been critical to Qualcomm's success. Founded in 1985, Qualcomm started with seven engineers in a living room with ideas to improve mobile communications. At the time, mobile technologies were expensive, unreliable, and limited only to voice calls. Our founders were determined to do better and pioneered a new digital communications technology called code division multiple access, or CDMA. Today we are a successful global company of more than 23,000 employees, 65 percent of whom are engineers, with 73 locations in the U.S. and 172 locations worldwide. More than 90 percent of our global revenues are earned outside the United States but nearly 70 percent of our employees work here.

The adoption of CDMA has exceeded our expectations and helped to drive a global revolution in mobile technologies and services. Today there are 6 billion mobile connections in a world of 7 billion people.

==Qualcomm's business model concentrates on two key areas.== First, we design state-of-the-art semiconductors and software which are the brains of today's advanced mobile phones, tablets, e-readers, and other mobile devices.

Second, ==we broadly license our portfolio of U.S. and foreign patents to virtually every manufacturer in the mobile industry.== We reinvest approximately 20 percent of annual global revenues in R&D, which equated to about $3 billion last year and over $19 billion since our founding.

These investments produce new inventions that drive what we call a virtuous cycle of innovation. Our business model enables a $1.3 trillion global ecosystem, promotes competition and choice, and benefits consumers. Qualcomm is one of countless innovative technology companies that rely on strong patent protections to drive U.S. jobs, economic growth, and exports.

According to the Department of Commerce report that Congressman Watt mentioned, IP-intensive industries account for over one-third of U.S. GDP and 40 million American jobs. IP licensing generated a trade surplus of $84 billion last year. To sustain this impressive growth, American innovators need fair market opportunities and adequate patent protections globally. However, foreign governments and industries try to achieve unfair competitive advantage through a variety of protectionist policies. These measures aim to promote indigenous innovation or exclude, minimize, or devalue American technologies.

A few examples: pressure to reduce licensing fees or royalty rates and make other concessions; local working requirements, such as local manufacturing in order to preserve patent rights; exclusion of certain technologies from patent protection; the use of homegrown technical standards to benefit domestic technology or industry; and

Exhibit 22
762
LP_0000670

40

the threat of antitrust enforcement to force the transfer of patented technologies on unfair terms.

Beyond these specific practices, which are not adequately addressed by existing treaties or trade agreements, we see a growing trend worldwide to weaken patent protection. It is imperative that the United States lead by example and send consistent messages to our trading partners about strong patent laws and fair market access for American innovators. Governments, including our own, should not favor or discriminate against any particular business model, technology, or means of commercializing intellectual property. In sum, policymakers should refrain from picking winners and losers, and laws and policies should be "business model-neutral" in their design and their effect. Yet the opposite is the norm in many countries critical to U.S. companies.

We should vigorously expand and enforce international agreements and trade policy dialogues in order to promote a level playing field for American innovators and job creation. This approach will serve us well today, while also encouraging the next generation of U.S. inventors and U.S. employment.

Thank you again for the opportunity to appear today to share Qualcomm's perspectives. I welcome your questions. Thank you.

[The prepared statement of Mr. Murphy follows:]

Exhibit 22

763

LP_0000671