# Exhibit 39

## Licensing/IPR Overview Conference Call & Webcast

SAN DIEGO Jul 10, 2006 (Thomson StreetEvents) -- Edited Transcript of Qualcomm Inc conference call or presentation Wednesday, June 21, 2006 at 5:00:00pm GMT

CORPORATE PARTICIPANTS
  Christine Trimble, QUALCOMM - Sr. Director, Corp. Communications
  Kanwalinder Singh, QUALCOMM - President, QUALCOMM India and SAARC
  Mike Hartogs, QUALCOMM - VP & Division Counsel, QUALCOMM Technology Licensing
  Jeffrey Belk, QUALCOMM - SVP, Marketing
CONFERENCE CALL PARTICIPANTS
  Dehendra Tribadi, - Analyst
  Sadil Jaferi, - Analyst
  Radish Alir, - Analyst

## PRESENTATION

**Operator**

Good morning. My name is Alene and I will be your conference operator today. At this time, I would like to welcome everyone to the licensing program overview conference call. All lines have been placed on mute to prevent any background noise. After the speakers' remarks, there will be a question and answer session. (OPERATOR INSTRUCTIONS). I would now like to turn the conference over to Ms. Christine Trimble, Senior Director of Corporate Communications. Ms. Trimble, please go ahead.

**Christine Trimble**, QUALCOMM - Sr. Director, Corp. Communications

Thank you. Good morning and welcome to QUALCOMM's webcast. Thank you for joining us today. There has been a lot of interest recently in QUALCOMM's business model and licensing program, so this presentation is designed to give you an overview.

I'd first like to introduce the QUALCOMM executives who will be participating in today's event. We have Kanwalinder Singh, President of QUALCOMM India; Mike Hartogs, Vice President and Division Counsel for QUALCOMM Technology Licensing; and Jeff Belk, Senior Vice President of Marketing for QUALCOMM.

We will start today with introductory remarks from Kanwalinder Singh followed by a presentation by Mike Hartogs and then we will open it up to Q&A. The presentation should take approximately 30 to 35 minutes and then we will have about 20 minutes for a question-and-answer period.

Before we start the presentation, I would like to mention that we may make forward-looking statements in this presentation and that for more information on QUALCOMM, I encourage you to visit our website and view our reports filed with the Securities and Exchange Commission.

Now I would like to turn it over to Kanwalinder Singh.

**Kanwalinder Singh**, QUALCOMM - President, QUALCOMM India and SAARC

Thanks, Christine. Hello, everybody. We at QUALCOMM are very excited about the growth of the wireless industry in India and within that, the growth of CDMA over the last few years. Let me review a few quick facts with you before we start.

CDMA was a later start around 2002, 2003 now has 30% market share in the market. Some quick numbers. India today is at about 107 million wireless subscribers out of which CDMA is about 32 million and GSM is about 75 million. And like I said, we're extremely excited for having contributed to the growth of the wireless industry in India and we look forward to the goals that have been set by the government to very quickly reach 250 million and then 500 million subscribers. Very quickly, let's review why this has happened. Again, the catalyst has been CDMA. CDMA operators, operators like Reliance Communications, and [Padatella] Services, BS&L and others, use the advantages offered by CDMA to introduce service innovations, both in terms of value added services and world leading tariffs. As a result, India went from being among the highest tariffs in the world to among the lowest today. This caused subscribers to come in but still the challenge was handset pricing. QUALCOMM, working with its partners, operators, handset manufactures and the rest of the ecosystem worked this issue to. And today, the handset yet ASP's, average selling prices, these are prices that manufactures sell the handsets to operators, [BVSB's] for CDMA operators are now among the lowest in the world. Recent numbers indicate that we are now very close to $40 wholesale ASP for all manufactures to the operators. These two factors together, leveraging the CDMA advantages on an effort side and as a technology for service innovations and tariff innovations, coupled with world leading handset average selling prices, has created the growth for CDMA, not only the growth for CDMA, but also forced the GSM operators to come from very high tariffs and very high handset prices to where things are.

This kind of competition is very good for the market. We think this kind of competition that QUALCOMM business model enables is what is necessary to now look ahead to cause the 250 million mark to be crossed and beyond that, the 500 million mark to be crossed.

And with those brief remarks, I would like to repeat Christine's comment that over the last few weeks, there have been reports which indicate misunderstandings and perhaps some misinformation about QUALCOMM's business model and the licensing program and this particular call is intended to walk you through the QUALCOMM license model and answer any questions that you might have. Thank you very much.

**Christine Trimble**, QUALCOMM - Sr. Director, Corp. Communications

And now, Mike Hartogs will be giving the presentation.

**Mike Hartogs**, QUALCOMM - VP & Division Counsel, QUALCOMM Technology Licensing

Δ π EXHIBIT 59
Deponent Hartogs
Date 6/24/22  Rptr. [initials]
WWW.DEPOBOOKPRODUCTS.COM

LP_0000162

Exhibit 39
836

Thanks, Christine, pardon me. As Christine indicated, I am the Vice President and Division Counsel for QUALCOMM's Technology Licensing business and we found that the kind of misunderstanding and reports you have been seeing in the press and in India aren't the first such occurrences and it's been useful to try and provide some both general background about QUALCOMM's overall business model, clear up some misconceptions are misunderstandings about intellectual property and licensing generally, and then go into some of the details specifically about QUALCOMM's licensing business and how it's end result is actually to create a pro-competitive environment with the effective driving down prices everywhere that our licensees and customers have been active in the marketplace.

The slide presentation that we are going to be discussing is a somewhat short instead of a longer program where we spend quite a bit of time talking about the overall business model of QUALCOMM. In this case, we reduced it to a couple of slides so I will only speak to sort of the highest levels about what the non licensing businesses do. But it's important to understand that the revenues generated from the licensing business are pumped back into our corporate research and development efforts, our chipset development efforts, our standards development efforts, all of the efforts in which our company seeks to advance the technology of wireless communications, bring those advances to our customers at the lowest possible prices for the most efficient and interesting feature sets to ultimately end up in the hands of consumers with wireless devices accessible for everyone.

This first slide basically lays out this model. There's a cycle of innovation that goes on at QUALCOMM and has since our founding in '85. Our founders were early on convinced that a better way existed for wireless communications, particularly in the digital arena, when the first efforts were being looked at for time division multiple accesses. The QUALCOMM founders realized that with CDMA, you can get far more efficient use of the available spectrum and proceeded to develop and deploy the first commercial systems, demonstrating the efficacy of CDMA system and the superior features and capabilities resulting therefrom.

Early on, it was discovered and understood that QUALCOMM itself could not provide all of the equipment, all of the handsets, all of the chips and all of the necessary services to provide wireless communications and cellular communications so an ecosystem was developed with partner companies. Technology was licensed; chips and software made available to many companies in order to allow them to actually support the CDMA ecosystem.

The revenues generated by QUALCOMM from those were as I just previously said, pumped back into the R&D and product development efforts to continue furthering and advancing the onward march of CDMA technology. And this has continued from the beginning until today with ever increasing capacity of CDMA systems, lower prices of feature rich and useful wireless devices.

This next slide sort of shows both the acceleration of our R&D expenditures in pushing not only basic CDMA technology but also if there was a CDMA technology, non CDMA technology such as wireless LAN, broadcast technologies and continuous evolution of wireless communications. As indicated, through 2005, we've spent billions of dollars, having spent over $1 billion alone in 2005 just on research and development.

This does not include acquisition costs, which are indicated on the next slide, which shows additional and significant expenditures by QUALCOMM to acquire more technologies to bring to bear on the CDMA market.

This proliferation of technologies and development of technologies and acquisition of technologies has resulted in QUALCOMM not only providing significantly advanced technology resources to our customers but we have also developed a significant patent portfolio associated with the underlying technologies.

Not surprisingly, the patent portfolio -- pulling up the next slide there. The patent portfolio has seen dramatic growth over the history of QUALCOMM's research and development efforts. Let me pause for a second while we try and get the next slide up.

Today, QUALCOMM has more than 1600 issued patents in the U.S., an additional 4300 total patents and patent applications pending worldwide. It's a portfolio that has grown to 6000 issued and granted patents around the world with more than 22,000 patent applications pending. All of these are made available through our licensing program, which I'll discuss further ahead to the benefit of our customers and licensees to enable them to practice the fruits of QUALCOMM's innovative efforts.

It is useful to take a quick high-level primer on intellectual property generally and more specifically on patents. Primarily because there are a few misconceptions about what patents provide and more importantly what they don't provide. The current slide is the basis for the patent acts that exists under U.S. law, which actually was embedded in our original and founding Constitution, where Congress of the U.S. was given the power to promote the progress of science in the useful arts. And under the offices of the Constitution, the first patent acts were passed shortly after the founding of our country. My understanding is in India, the first patent act came into being in 1856, modeled largely on what had been the English patent system of the earlier 1850's. The primary motivation of the patent acts in all countries is to allow an inventor to obtain a fair return for his investments to encourage such investments and drive innovation throughout the world.

Sort of basic question but one that is surprisingly misunderstood or at least not completely understood is that a patent does not give an inventor the right to actually do something. It gives the inventor the right to include others or exclude others from making, using, offering for sale, selling or importing inventions covered by his patent. This is an important fundamental distinction in what is generally understood by many people about what a patent confers on you rather than what it actually does.

An analogy we have used in some examples is that you might patent the car for example. That doesn't give you the right to make the car if you don't have rights from the person who has the patents for wheels. It's sort of that right. You may need multiple patents in order to manufacture the complete car and your patent on the car doesn't preclude you from meeting the patents for the other constituent parts of the car that make it work.

Once a company or an individual has secured a patent for his invention, he is faced with several sort of practical alternatives to consider about how best to exploit his rights under that patent. A decision may be made to exclusively practice a patent yourself. It is the right to exclude others from doing it and securing for yourself a market under products made with respect to your patent for a limited time period. That is in exchange for having divulged what your patent covers to the patent system.

Other companies may choose never to practice their own patents but in fact to license their patents to third parties to practice those patents, to spread the technology in a way that an individual company may not. Some companies might do both. Most practice their patents themselves and license them to others.

So having described what a patent is, sort of the next basic question is what is a license. So I have a patent and I've granted a license to somebody, what have I actually given them? And again, this is fairly basic concept that is commonly misunderstood but at its core what a license is is a promise from the licensor to the licensee not to be sued for the user or infringement of the licensor's patents. It is not a right to necessarily practice everything under the patent. The licensee may need patent licenses from

Exhibit 39
837

LP_0000163

multiple license patent holders. But it is a promise that I or I as a patent holder won't sue you as a practitioner of the patent under the agreement.

Patent licenses can take many forms. They can be exclusive. You may take one person to practice your patent or one in each given geography. You may give nonexclusive licenses to anybody that wants to practice it. You may give worldwide licenses or limit them to particular geographies as indicated, and specify what products can be sold under the patents, which patents are licensed if you have multiple patents and in what field those might be used.

[Enumeration] under most license agreements can take the forms of both monetary compensation in the form of licensing fees and running royalties in addition to nonmonetary considerations, such as licenses back from the licensees in order to protect the licensor's business from patents that the licensee may have. This is commonly referred to as a cross license and is fairly typical in the licensing business.

A question that's come up recently with respect to QUALCOMM's licensing practices are notions of something called pass through rights. Pass through rights are rights that QUALCOMM's customers for example have to use third-party patents who have licensed those patents to QUALCOMM in order for QUALCOMM to manufacture and sell chipsets and software under such third parties' patents. The illustration in this slide somewhat graphically tries to depict that if company A licenses company B under its patents and then company B subsequently sells products using those patents to its customers, 1, 2 and 3, in this instance, customers 1, 2 and 3 are free from claims of infringement by company A because company B had the right to use Company A's patents. And upon the sale of its products to the customers, exhausted those patent rights.

Patent exhaustion is really the correct term for what many in the press have been referring to as pass-through right. It is the ability of a licensee to sell a product to its customers with the benefit of the patents that it has inbound licensed. An example which we will talk about further ahead in QUALCOMM's licensing business, when we license handset manufactures under our patent portfolio to sell CDMA handsets to a CDMA operator, QUALCOMM collects a royalty from the CDMA handset manufacture but receives no compensation from the wireless operator, the CDMA operator. QUALCOMM's patents are exhausted by the sale from the manufacturer to the operator and the manufacturer has the responsibility for paying the associated royalties to QUALCOMM. They're complicated concepts but they're important to understanding because additional benefits will flow to QUALCOMM's customers because of the large number of cross licenses we have developed under our licensing program, which I will discuss further ahead.

One additional topic before we discuss actual nuts and bolts of licensing negotiations, is the concept of essential patents. Obviously, in wireless communications and in many other arenas, standards development efforts play a large part in determining interoperability and other cooperative technology developments. To the process of collective development of technologies, it is almost certain in every field that companies participating will develop patents will be essential to practice the fruits of that technology. That is the patents for which it won't be possible to practice the technology without a license. Typically, standard setting organizations ask their members to make a commitment that if they have any patents essentiality. There are those, indicated here as fundamental patents. Those without which the standard wouldn't exist. That is, we view QUALCOMM's patent portfolio with respect to CDMA technologies as a portfolio of patents, without which CDMA or WCDMA would in fact not be possible standards to have. Whereas there are also patents that may be essential for a standard that derive their essentiality solely through a selection process within a standards setting organization. They may cover basic details such as how many bits are going to be in a certain piece of information. But they're not fundamental to how the standard works and alternatives might have been selected in their place. In addition, patents may be essential for optional features or services within a standard but themselves not be essential for every application of the standard.

The reason for this explanation is there's a value proposition that comes with the different types of essential patents that a company may have and those of a fundamental nature may in fact be -- are in fact more valuable generally than the others.

Moving into a discussion about how licenses negotiated. Once you have made for example your commitment to license your essential patents under the standard, what is the process? Typically other members of the standard-setting organization or companies who want to manufacture products based on the standards will approach the patent holders or be approached by the patent holders for bilateral negotiations for rights to use the patent holder's patents. In addition to the different aspects of a license agreement described above with respect to regional scope, worldwide scope, types of products, fields of use and things like that, also discussed extensively will be other issues such as a license back to the licensor from the licensee for its patents. As we described above, what we refer to as a cross license.

In addition to those things, compensation issues, dispute resolution issues, assignment issues, auditing issues, all of those are generally hashed out in the process of forming up a license agreement between a licensor and licensee.

Generally the result is a license agreement that enables the licensee to proceed with manufacturing products under the licensor's patents. There may be times when a particular company decides not to take a license and try to challenge the patents of the licensor. This has not been a frequent occurrence for QUALCOMM. Although not unheard of, it is more common in other standards where fewer patents are involved.

And finally, the licensor may be forced with a decision if people are practicing its patents without licenses or without the rights to use them to enforce its patents and seek either to enjoin the infringing company or convince them that a license agreement is in fact necessary.

So, as we discussed, a licensor has a number of choices with what to do with its licenses. And clearly, QUALCOMM has made a decision and made it very early that QUALCOMM would be in the business of licensing and enabling as many companies as possible to produce products under its patent portfolio and focus its efforts on continuing development and innovations that allow such products to optimally and aggressively compete with one another. We are not -- at QUALCOMM, we are not in the business of producing or selling CDMA handsets. We're not in the infrastructure business today. We were initially to help start the markets but ceded our positions there to more advanced manufacturers. We have continued to focus on the driving technologies such as chipsets and software and the enabling underlying technologies associated with standards and other wireless communications. The benefit of this is to speed the wide adoption of QUALCOMM's technologies by many companies who have elected to take licenses and participate in the growing CDMA market.

As indicated earlier on in the business model slide, the R&D investments that QUALCOMM pumps into developing its enabling technologies and related software and chips are sources of the revenue cycle that then continue to be circulated back into more R&D for more revenue generating opportunities and proliferation of more enhanced wireless communications equipment.

Who are our licenses? Primarily our licensees are the equipment manufacturers. Four or five typical categories that we discuss are

the infrastructure manufacturers, the subscriber equipment manufacturers, which includes both handsets and modem devices and fixed wireless terminals, test equipment manufacturers and other chip manufacturers that do compete with QUALCOMM in the chip market for wireless telephones. Our licensees represent some of the largest companies in the world and some of the smallest startups. We always seek to work with our licensees and prospective licensees to get them into the market by providing them licenses that work for their business goals, provide them with the availability of our chips and software, technical support, reference designs, anything it takes in order to make our licensees and customers successful since our revenues derive from their success.

Our efforts are global. We participate with licensees all over the world and then support their customers. Their operators who purchase from the licensee manufacturers of QUALCOMM are the network operators around the world and QUALCOMM has a large service group that has been signed with network operators, optimizing their networks, helping them get up and running, working with new equipment and driving the further spread of CDMA.

Today, QUALCOMM has more than 130 license agreements for the foregoing categories of equipment. As indicated on this slide, you will see the logos represented from all of the major manufacturers in the world and most of the minor ones and in addition, on the slide after this, almost impossible to read the long list of all of our licensees. This can be found on our website for a more comprehensive read.

The next slide just depicts graphically the sort of various categories of license agreements we enter into with manufacturers. As indicated, a subscriber really takes two forms, three, if you count fixed wireless and mobile handsets as separate products as well as modems, infrastructure manufacturers, other chip or ASIC manufacturers and test equipment manufacturers, who support the development and launch of networks and the development of equipment to operate on those.

Having established license agreements for WCDMA and CDMA 2000 with all the manufacturers in the world, it's important to understand that as our patent portfolio has grown over the last 15 to 20 years, QUALCOMM has in fact not raised its royalty rates. It has grown nearly geometrically if not exponentially in that timeframe, particularly over the last few years, and QUALCOMM's royalties (indiscernible) program has remained static.

In addition, when new or additional technologies or features are added into products using QUALCOMM's patents, we have not sought to seek additional royalties. Once a license agreement is entered into with a company for CDMA products, that CDMA product may incorporate and use any of QUALCOMM's patented technologies.

As indicated, as handset prices have come down, QUALCOMM's average royalty per handset have come down commensurately since our royalty is typically -- is generally a percentage, a small percentage of the selling price of the actual handset, notwithstanding the additional number of patents that are made available to the manufacturers who use those patents.

One of the important facets of our licensing program was alluded to earlier in the discussion in reference to cross-licensing. Under our license agreements, we generally receive back from our licensee a license under our licensee's patents to use their patents in the production of our chips and software. And as described in the section on pass-through rights or patent exhaustion, the effect this has had is that our customers of chips and software are free from infringement claims from many of the world's largest patent holders. This has produced substantial royalty savings to QUALCOMM's customers with them receiving in addition to the chips and software they purchase the rights under more than 100 companies patents for use in their products. The effect is to reduce the overall stacking of royalties for our customers.

In addition to the licenses we receive from our cross -- our licensees, the cross licenses, QUALCOMM has actually sought out third-party patent rights from some companies in order to provide the benefits of those patents to our customers of chips and software. And without doing so, an additional royalty charge to our licensees who use those.

One of the large misconceptions we have seen recently is this notion that CDMA is burdened by a royalty overhead that doesn't exist in GSM. And this just isn't the case. GSM royalty structure is not an easy thing to find a lot of information about but there is anecdotal information that we have received, we've heard from a number of our licensees who are both in the CDMA and WCDMA businesses, as well as GSM and they report that substantial royalties are in fact sought from them from a number of key companies that were early participants in the GSM business.

The early effects of this GSM royalty structure were in fact to create a situation in which only a few companies were able to penetrate the GSM handset market, whereas in CDMA, we see something different. This slide shows sort of the landscape -- this is global information -- the landscape of competitors in the various technologies. And referred to on the very left column was the analog wireless standard existent in the U.S. prior to the digital age of wireless communications. Obviously, there were two very dominant players in that market and a very small share left for their competitors.

In 2000/2001 timeframe, the dominant digital technologies were TDMA and a TDMA based technology called GSM. Again, you can see there were substantial market shares secured by a few key participants and very little opportunity for the non early GSM players to get in.

As certain companies began to develop expertise in CDMA and develop an ability to negotiate with the other large GSM patent holders, we began to see some penetration in GSM but even as late as 2005, the landscape was relatively unchanged on a global basis.

It's not reflected on here but in fact, the allocation of the GSM market in India is starkly represented by a very strong and dominant single company.

If you look to the right two columns of the slide, you see the effects of QUALCOMM's licensing program and its enabling innovator technology business. Multiple companies participated in CDMA 2000, providing products at aggressively and continuing competitive pricing on a price curve that has continued to come down. And in the early days of WCDMA, unlike GSM, we're actually seeing a similar distribution facilitated largely by QUALCOMM's ability to provide a complete R&D package to new entrants. The effect has been to greatly reduce the influence of the GSM players in the WCDMA arena and not surprisingly hasn't been particularly popular with them.

As indicated, CDMA 2000 -- these are global numbers -- we have seen a steady reduction in pricing of CDMA phones. The numbers indicated in here look to the lowest end phones, either the average price for the bottom 10% or the price below which the bottom 10% are priced and then the lowest end, for which at least 150,000 units are sold. And we're seeing a continuing drop in pricing at the low end with today handsets as Kanwalinder mentioned earlier, CDMA handsets available in the $40 price range and below.

One of the things that is interesting, we have been hearing also a lot of information in the press about comparisons between CDMA

Exhibit 39
839

LP_0000165

and GSM pricing. This slide recently made available through research by the industry analyst group, Yankee Group, that looked at both the distribution of sales of below $50 low-priced handsets for both GSM and CDMA.

Now while admittedly, there is a small price differential for CDMA and GSM handsets, it's on the order of about $4? And notwithstanding that, the sales volume of CDMA handsets under $50 have far exceeded the number of GSM handsets at that level. In fact, nearly two-thirds of all CDMA handsets sold into India today are priced below $50 and over 98% of them are priced below $75. Not shown in this slide is the comparison of the overall average market selling prices for GSM. And CDMA and they're interestingly enough the average selling price for the GSM phone in India far exceeds the average selling price of CDMA phones. It is I think more than a $30 differential. That number I think Yankee has in their report.

One quick aside, as WCDMA, which is going to be the successor technology for many of the GSM networks, has been proliferating, we have seen a rapid price decline there that in fact has shown faster and greater declines than GSM did even in its early days. And as indicated, we believe this is due in large part to the competitive landscape that has been able by QUALCOMM's licensing programs and availability of its enabling technologies. On a global basis, we're seeing low-end phones now in WCDMA on the order of $140 and continuing to come down to where WCDMA begins to look price competitive with even GSM at least in the mid range.

So in summary, QUALCOMM, while hearing a lot of things about our licensing program that aren't entirely flattering actually believes and has demonstrated that QUALCOMM's licensing program promotes vibrant competition in the wireless industry. We have never increased our standard royalty rate although our patent portfolio has grown substantially. And the ultimate effect of our licensing and cross licensing program is the actual reduction in overall royalty stacking. We continue to develop new products and technologies funneling revenues generated back into R&D as evidenced by the $1 billion R&D investment in 2005, enhancing a number of different interface technologies, chip developments and software, which are made available to all of our customers and licensees. And we continue driving this process into 2006.

**Christine Trimble**, QUALCOMM - Sr. Director, Corp. Communications

Thanks, Mike. We're now going to move to the question-and-answer section. We will first answer a few of the questions that were submitted prior to this webcast and then we will open the line up and take questions from the Web and from the phone line. We'll try to get through as many of the questions as we can and our apologies if we're not able to get to each and every question.

The first question is from Mike and it is, can you explain the royalty structure for CDMA handsets sold in India?

**Mike Hartogs**, QUALCOMM - VP & Division Counsel, QUALCOMM Technology Licensing

Thanks, Christine. Yes, as I think we walked through in some detail and I can be more specific about it is the QUALCOMM licenses manufacturing companies. We don't license operators to use our equipment. We provide handset manufactures the right to use QUALCOMM patents, which patents are then exhausted by the sale of those handsets by the manufactures to the operators. We can't go into the details of our license agreements, each of which are confidential with our respective licensees. But it is important to understand that we charge a royalty on the sale of handsets based on the wholesale price of the handset to the operator and no subsequent royalty is charged to the wireless operator. As indicated we are aware of significant media coverage distorting and misrepresenting QUALCOMM's licensing and royalty practices and it's very important to understand that in fact the royalty revenues paid per handset in India are actually the lowest in the world. We have seen frequent comparisons to China but in fact the average royalty per handset sold in India is about 15% lower than the average royalty paid for handsets sold in China.

==We don't comment specifically on our license agreement royalty terms because of the confidentiality issues.== A number of analysts have speculated or suggested that they would be in the 4 to 5% range. Unless without confirming whether these are or not the numbers, it's pretty easy to tell that at the price points we're seeing in India, the effect of a 4 to 5% royalty on a $40 phone is rather negligible, particularly as compared to what it would be if the royalty rate were only half of that, it references a possible drop between $2 and $1. But hardly a significant driver of cost reductions. And the fact that we're seeing continuing and aggressive price reductions, these are both available and driven by non royalty factors and our efforts have been to continue working on the price drivers.

**Christine Trimble**, QUALCOMM - Sr. Director, Corp. Communications

Our next question received is, would QUALCOMM be willing to negotiate with Reliance on royalties?

**Mike Hartogs**, QUALCOMM - VP & Division Counsel, QUALCOMM Technology Licensing

As I just indicated, we don't have a royalty agreement with Reliance. Reliance buys equipment for manufactures with whom we do have agreements. And as I indicated previously, the overall contributor of royalty to the cost structure of a handset is relatively small, particularly with respect to the pricing of handsets we're seeing in the CDMA networks in India.

**Christine Trimble**, QUALCOMM - Sr. Director, Corp. Communications

Our next question is for Jeff Belk. What is QUALCOMM's reaction to the speculation that Reliance's plans to deploy GSM?

**Jeffrey Belk**, QUALCOMM - SVP, Marketing

Well again, we won't comment specifically on any operator's decisions. We suggest folks speak directly with the operators, but what is clear is that there are some unique situations within the spectrum policy that makes the contemplation of GSM attractive because the regulators are providing twice as much spectrum for GSM as CDMA.

The disadvantages of a move are numerous. If there is a cost of deploying a new network and the long-term challenge of having moved back to 2G1 operators around the world are rapidly moving forward toward 3G. And this is a key point because the growth worldwide is on both of the 3G variants. CDMA 2000 is currently deployed by Reliance and the WCDMA version as well. In fact, recently, in the last couple of weeks, in Japan, it was announced that both Japanese operators, DoKoMo with WCDMA and KDDI with CDMA 2000 have gotten to the point where the majority of Japanese wireless subscribers are on 3G networks. So there' (indiscernible) for any operator currently running a 3G network to continue to evolve that 3G network because it's more especially efficient, both for low and high-end users and gives the operator the ability to evolve to deliver ever more compelling advanced services.

**Christine Trimble**, QUALCOMM - Sr. Director, Corp. Communications

Exhibit 39
840
LP_0000166

Our next question is from -- has been sent through the Web and the question is, for long, we have been under the impression that the Chinese market has had the best licensing tariffs. Now QUALCOMM says it's India that has the lowest rates. Could you please elaborate.

**Mike Hartogs**, QUALCOMM - VP & Division Counsel, QUALCOMM Technology Licensing

Yes, when I was discussing the royalty revenues generated by handset sales in India, it's admittedly a factor, a function of the low selling prices of CDMA phones in India and the amount of competition participating in the handset market in India. So the handset prices in India are substantially lower due to such competition and the effect has been to lower the royalties on a per unit basis paid to QUALCOMM as compared to the royalties received on a per unit basis from China. At the end of the day, the royalty is a function of price and the prices in India are lower, resulting in lower royalty payments to QUALCOMM.

**Christine Trimble**, QUALCOMM - Sr. Director, Corp. Communications

Okay, operator, could you please open up the line for questions?

## QUESTIONS AND ANSWERS

**Answer – Operator:** (OPERATOR INSTRUCTIONS). [Sadil Jafarri], QUALCOMM.

**Analyst:** Unidentified Speaker

**Question – Unidentified Speaker:** Next question please, operator?

**Answer – Operator:** (OPERATOR INSTRUCTIONS).

**Answer – Christine Trimble:** We'll take another question from the Web while the queue is lining up. The next question is for Kanwalinder Singh. Is QUALCOMM planning to invest in India?

**Answer – Kanwalinder Singh:** (multiple speakers)

**Answer – Christine Trimble:** And are there plans to set up a facility in Chennai? Kanwalinder?

**Answer – Kanwalinder Singh:** Okay, QUALCOMM has made significant investments in India, both in terms of business development resources, as well as two design centers, one in [Hajabob] and Bangalore. These design centers supplement our worldwide resources to do software and hardware development for our chipsets. So QUALCOMM's investment in India, the result has been significant and continues to grow as this market grows as well as India provides the talent to supplement our worldwide resources. Beyond that at this point, we are not ready to divulge any details of future plans that we might have on investment in India.

**Answer – Christine Trimble:** Operator, are there other questions on the phone?

**Answer – Operator:** At this time, there are no audio questions.

**Answer – Christine Trimble:** We'll continue to take questions from the Web. For Mike, is the license fee different for various licensees and does it different geographically?

**Answer – Mike Hartogs:** The cash or monetary compensation of the license agreement takes two forms. As we indicated, the royalty rates are fairly uniform across licensees. One of the ways we work with prospective licensees is on upfront licensing fees. We view those as sort of a function addressable market and types of products a company wants to get into, geographies in which they want to participate. And so we do work with companies to enable them to meet the upfront licensing fee obligations in a way that most able suits both their business model and financial systems. While amounts may not vary for equally situated companies, we do work with accommodating companies in both time of payments where necessary to address for example new startup cash flow issues, to addressing regions in which they want to sell and expanding those as their market opportunities grow.

**Answer – Christine Trimble:** Our next question from the Web is are infringement subject to U.S. laws?

**Answer – Mike Hartogs:** No patent infringement is a subject of where the infringement occurs. So for example, if an infringement occurs in England, that lawsuit would need to be filed in England based on an English patent. Likewise, if an infringement occurs in the U.S., an infringement action would have to be brought in the U.S. under the use of a U.S. patent. So it's a requirement of both an infringement and a territory and the presence of a patent in that territory as well.

**Answer – Christine Trimble:** Our next question is, is the royalty for India versus China lower in absolute terms or in percentage terms?

**Answer – Mike Hartogs:** As I described, it is lower in absolute terms.

**Answer – Christine Trimble:** The next question is, who gets the royalty for GSM handsets?

**Answer – Mike Hartogs:** So, as I indicated earlier in the discussion, there are reports but the most are anecdotal as to who are the GSM royalty collectors. Not surprisingly, the large participants in the GSM equipment market are the ones most commonly reported to be the ones seeking royalties from their competitors and companies that seek to enter that market.

It is not unfortunately a lot of information available about who they are and what their cumulative effect is other than at least it's been reported as had a charting effect in the development of the early stages of a competitive landscape in the GSM arena.

**Answer – Jeffrey Belk:** I think the key point here is we are giving a very strong overview of what QUALCOMM's licensing policy is and again it is a licensing program that is the most broadly licensed patent portfolio in the wireless industry with over 130 licensees. There is a licensing scheme within GSM and if you folks go out and reach out to any manufacturers who are attempting to manufacture GSM devices, I'm sure you'll find out more of it. There's anecdotal information if folks have the Internet there and search on [Sendo] Ericsson 2005 there is a dispute between one GSM handset manufacture and Sendo, where their royalty rates described on the Internet as being where one manufacture is trying to enter the market as double-digit royalty. Amongst some of the core GSM players, core European GSM folks, there is cross rating of intellectual property that somewhat negates the amount

Exhibit 39
841
LP_0000167

of licensing fees that they pay one another but for new entrants into the market, the anecdotes that we find show that there is definitely a licensing structure to GSM as well.

**Answer – Christine Trimble:** Our next question from the Web is for Kanwalinder Singh and it's, are you waiving off royalty on the India government's [U.S.O.] rule obligation?

**Answer – Kanwalinder Singh:** I think I would go back to what Mike said before. What we are doing in this country is enabling competition so that the average selling price from our licensees to operators, CDMA operators, is the lowest in the world. CDMA with better functionality, CDMA manufacturers with better phones, are outperforming GSM phones both in price as well as in volumes and we will continue to do that. As Mike said, what is important is that that average selling price continued to come down so that every user, urban and rural, gets advantage of CDMA technology, which as you know supports not just voice teledensity increase, as has been witnessed over the last few years, but also for information connectivity, which is critical for the world's subscribers so that we lift the rural population beyond the digital divide that we currently see. So in that regard we will continue to drive the wholesale pricing down and as was explained before by Mike, when you take the wholesale average selling price with our worldwide standard royalty rate, the royalty overhead would continue to come down and this happens throughout the world, this happens throughout urban areas and this happens throughout rural areas and that will continue.

**Answer – Christine Trimble:** Kanwalinder, another question from the Web. Is Reliance contemplating an entry into GSM because of the availability of spectrum in the 2 GHz instead of 1900 MHz. How does QUALCOMM plan to address this issue?

**Answer – Kanwalinder Singh:** Well we do -- I think that question is really appropriate for Reliance to answer so I cannot comment on what the reasons are. But I can repeat what was said before by Jeff, that clearly in India, we have a distortion caused by the current spectrum policy, where an operator can apply for GSM spectrum and whether it's a new operator or an existing operator, they can get double the spectrum than if they continued CDMA operations or started new CDMA operations. And we believe that this is the reason why we're seeing the distortion that is reported in the press, that a CDMA operator like Reliance reportedly, can stand on the GSM line and get double the spectrum than is possible for them in the CDMA line.

**Answer – Christine Trimble:** Operator, we'll take the audio question please?

**Answer – Operator:** [Dehendra Tribadi].

---

**Analyst:** Dehendra Tribadi, - Analyst

**Question – Dehendra Tribadi:** Sorry for not (indiscernible) login earlier. I would just like to know the kind of the range of royalty that is being charged by QUALCOMM across various countries. Whether it is 2 to 8% or 3 to 9%. And you're saying that over a period of time that the royalty is going to come down. What is going to be the mechanism that will see -- that this (indiscernible) going down over the years? Third question, last one, the royalty and this high-end percentage (indiscernible) in India, why is it so? What were the conditions appearing here that made QUALCOMM charge a higher royalty in India?

**Answer – Kanwalinder Singh:** I'm not sure -- our electronics here are making a little difficult to hear. But I think one of the questions asked was that I may have stated that we have a higher royalty rate that comes down over time. That actually is not what I said. Our royalty rates do not change. Once established, they remain the same and that's notwithstanding how many additional patents we accumulate and how many of our patents are used by our licensees.

The royalty amount paid to QUALCOMM in absolute dollars per handset has come down and continues to come down as selling prices and average selling prices continue to come down. And selling prices continue to come down through both additional and aggressive competition amongst many manufacturers that QUALCOMM enables to participate in the handset market as well as our own efforts to drive pricing down on both our own chips and software and working with advanced design methods for our licensees.

**Answer – Jeffrey Belk:** And I would like to build upon what Kanwalinder started talking and describing is this combination of the prices of the handsets coming down in India extremely quickly to the point where the Indian consumer has access on a -- to the lowest priced handsets in the world combined with the innovative low-cost services of the CDMA operators is what is causing this massive uptake in subscribers.

Again, as Kanwalinder mentioned, India just recently joined a very select group of countries that have passed 100 million subscribers. So the competition, both within the CDMA handset subscribers and between the CDMA and GSM technologies, is benefiting the Indian consumer and its being evidenced by the tremendous uptake in subscribers in India.

**Answer – Christine Trimble:** Operator, we'll take the audio question.

**Answer – Operator:** [Sadil Jaferi]. Sadil, your line is open?

---

**Analyst:** Sadil Jaferi, - Analyst

**Question – Sadil Jaferi:** Hello?

**Answer – Christine Trimble:** Yes, can you go ahead with your question?

**Question – Sadil Jaferi:** Hello, can I say? Hello? I am (indiscernible).

**Answer – Christine Trimble:** Can you go ahead with your question?

---

**Analyst:** Radish Alir, - Analyst

**Question – Radish Alir:** Hello, I am [Radish Alir] from the (indiscernible) Economic Times. I would like to ask one question. How much does India contribute to QUALCOMM's revenue? How much do the royalties from India contribute to QUALCOMM's revenues?

**Answer – Mike Hartogs:** While we don't break it down strictly in dollar figures, I can tell you that last year, royalty revenues generated from handset sales in India represented 2.2% or about 2.2% of our royalty revenue. And that is actually considering the

Exhibit 39
842
LP_0000168

fact that 8% of the volume of handsets sold in the world were sold -- CDMA handsets sold in the world were sold in India. Again, showing that the royalty as a function of handsets sold in India is much smaller than anywhere else on the world on a weighted average.

**Question – Radish Alir:** Could you tell us the comparison for China? I mean the numbers for China and Korea?

**Answer – Mike Hartogs:** I don't have the numbers for the other jurisdictions as a percent of total royalties or with respect to how they compare to their percent of total units sold in those countries. But as I indicated, the royalties on a per unit basis paid by or handsets sold in India are at least 15% lower than the royalty paid on handsets sold -- average handsets sold in China. I don't have the specific information for other jurisdictions.

**Answer – Jeffrey Belk:** Again, as Mike had said, the royalty is a constant rate in low single digits and the fact that pricing is coming down so rapidly in India as Kanwalinder Singh has said many times in the press, this means that on the lowest ASP's, average selling price of the handsets in India, it means that the royalty per unit is actually coming down. Again, if you apply that constant percentage.

**Question – Radish Alir:** I also wanted to know one thing. This summer you said you might be making an announcement of waiving of royalties of the U.S.O. for (indiscernible) telephony under the U.S. obligations. And also, you're planning a reduction in royalties for the commercial usage. Is there any truth to this?

**Answer – Christine Trimble:** Kanwalinder?

**Answer – Kanwalinder Singh:** I think I answered that question before and I just want to repeat what Mike and Jeff are saying. There's two things here. One, our royalty rate is in the single - low single digits as a percentage of the wholesale selling price. We are going to continue to drive the wholesale selling price down, working with our ecosystem, working with our partners and enabling competition. As a result of that ASP coming down and as Jeff said, multiplied by a low single digit royalty rate in absolute dollar terms, the royalty per unit will continue to come down. This is automatic and part of the way that QUALCOMM royalty system works. So there's no question that we will in absolute dollars continue to drive the numbers down by driving the ASP's down.

**Answer – Mike Hartogs:** I guess another way to look at, if you want to look at it from a historical perspective, the first CDMA handsets that were sold in volume were in the middle 90s and they were $600 plus each, weighed about 250 grams and the royalty that was paid to QUALCOMM was the same low single digit number that we are describing now. The handsets that are being -- the low-cost handsets being sold in India today are what [well sub] 100 grams, very advanced handsets with often with SMS capability, data capability, high voice quality, much more capable handsets than those handsets of many years ago, yet the wholesale cost is less than $50 with the same low single digit royalty applied to it.

So the cost of the handsets, as all of you are witnessing in the new market over the last 12 to 18 months, is coming down dramatically, has come down dramatically and that competition, both amongst handset manufacturers in the CDMA world and between the CDMA handsets and the GSM handsets, is driving a market dynamic that is both bringing costs down and allowing adoption rates in India to increase rapidly.

**Answer – Kanwalinder Singh:** Let me also add to that. Let me also give you another statistic that was briefly referenced by Mike before. If you look at the average weighted prices, wholesale prices, of handsets coming into India in totality for all of GSM and all of CDMA, you will find and this is referenced from the Yankee Report that just came out, that average selling prices of GSM handsets in totality in India is about $38 more than the average selling prices of CDMA handsets coming into India. So you can then see how the effect of QUALCOMM reducing, working with this ecosystem to reduce the prices is actually reducing in dollar terms to the operators and consumers the overhead. It's actually in fact GSM vendors who are bringing in handsets in totality, which are much higher priced than CDMA handsets.

**Answer – Mike Hartogs:** Yes, in fact to amplify what Kanwalinder just said, if you look at the distribution of GSM handset providers in India, you'll actually find that one very strong provider of handsets dominates the markets has in fact probably the lowest cost structure of any company and yet achieves the greatest premium pricing. Royalties play no function there and clearly as we're trying to demonstrate, the continuing and ongoing reduction in pricing we're seeing in CDMA are not a function of royalties but a function of the continuing and aggressive competition amongst the number of companies that we have been able to enter into the market there with a much fairer distribution of sales than you see in GSM today.

**Answer – Kanwalinder Singh:** Just to finish up, that is an example of when you have a large dominant vendor with a very large market share, it actually keeps prices up. And when you have competition and a large number of manufacturers participating, you see pricing low. In the former case, that is a GSM case; in the latter case, that's a CDMA case.

**Answer – Christine Trimble:** Operator, are there any questions in the queue?

**Answer – Operator:** There is a follow-up question from Dehendra Tribadi:

**Analyst:** Dehendra Tribadi, - Analyst

**Question – Dehendra Tribadi:** Hi, the thing on the royalty coming down in dollar terms, does that mean you're (indiscernible) out percentage terms of royalty?

**Answer – Christine Trimble:** Could you please repeat your question? We're having trouble hearing you.

**Question – Dehendra Tribadi:** You have been distressing on the royalty coming down in dollar terms. You have been talking about that you'll be working with various operators and you know working in a given environment, which will see the royalty coming down in dollar terms. So do we assume that you are actually totally ruling out a cut in percentage terms?

**Answer – Mike Hartogs:** We don't contemplate any reductions in royalty rates as a percentage term. Preferring to focus our efforts on continuing to drive pricing down by more integrated products, software, capabilities, simpler handsets that achieve greater functionality at lower prices.

**Answer – Kanwalinder Singh:** Just to add to that, as has been said before, reducing the average selling price of the handsets as has been evidenced causes much more growth in a marketplace and has much higher leverage than adjusting the royalty rate in any way.

Exhibit 39
843
LP_0000169

**Answer – Jeffrey Belk:** And I would like to add to that as well, is this is -- we're focused a lot on low end handsets but one thing that's being proved globally in all markets is as systems migrate to 3G and market segments, there's a need for the low end handsets people that want primarily voice but uniformly, over time, there's more of a move toward wanting more robust data services, more robust video capabilities, etc. And the same dynamic of driving cost out of those handsets and reducing the cost of the mid and high tier handsets is occurring as well. So, again, folks can go on and look at Verizon wireless's site or Sprint site or KDDI's site and get a sense of the types of mid and high tier handsets that are being sold and understanding that those handsets will be coming down the cost curve as well. So the functionality is increasing of all of the handsets at the same time as the overall cost of the handsets is decreasing.

**Answer – Christine Trimble:** Thanks, Jeff. That concludes the Q&A portion of this webcast. I would like to turn it over to Kanwalinder Singh for some closing remarks.

**Answer – Kanwalinder Singh:** Thanks, Christine. I would like to close just the way we started, that we here at QUALCOMM are extremely excited about having enabled India to join the elite club of 100 million plus subscribers. And as I noted in my opening remarks, this has been primarily caused by the service innovations caused by the CDMA advantages on the network side, as well as the hard work that QUALCOMM and its partners have done in driving the wholesale handset prices down so that very highly functional handsets, very capable value added services are available to the Indian consumer at very affordable prices. And this is what has caused the growth that we have witnessed in India over the last few years and we are very excited to continue to participate in the government's goal of 250 million subscribers by 2008 and then 500 million subscribers by 2010, where QUALCOMM will continue to make the contributions that it is making, as well as ensuring that the service capabilities and the value added services that are available to consumers continue to grow and this would not only happen on the CDMA 2000 side but also on the WCDMA side, where the GSM operators would migrate to WCDMA, so that across the board, Indian consumers can get advantage of very highly functional value added services at affordable prices.

I appreciate everybody's time in attending this conference call. Hopefully this has addressed some of the misconceptions and the misinformation that has been present in the press over the last few weeks. We will continue to answer any questions that may be available as a follow-up in over e-mail or over the phone call. Thank you very much.

**Answer – Christine Trimble:** Thank you. And the rebroadcast of this call will be available in a few hours. So if you would like to revisit it, the slides and audio will be available on our website. Thank you very much for joining us today.

**Answer – Operator:** Ladies and gentlemen, we thank you for your participation. This concludes today's conference. You may now disconnect.

StreetEvents transcripts content provided by Thomson Reuters  THOMSON REUTERS

Exhibit 39

844

LP_0000170