# Exhibit 90

# Exhibit 31

**Redacted per Court Order (Doc. No. 172), dated 8/27/20**

Exhibit 90
1594



EUROPEAN COMMISSION
DG COMPETITION

The Director-General

QUALCOMM

DEC 11 2015

Corp. Legal Dept.

Brussels, 9.12.2015
SG-Greffe (2015) D/15233
C(2015) 9023 final

**By courier service**

**Qualcomm Incorporated**
5775 Morehouse Drive
San Diego
California 92121
United States of America

Subject:     **Case AT.40220 – Qualcomm (exclusivity payments)**
             **Statement of Objections**

Dear Madam, dear Sir,

The Commission has adopted a Statement of Objections against your undertaking relating to a proceeding under Article 102 of the Treaty on the Functioning of the European Union ("the Treaty") and Article 54 of the EEA Agreement.

**Request for access to the file:**

With reference to the documentary evidence relied on in the Statement of Objections and to assist you in preparing your comments, the Commission will give you access to the file upon request in accordance with the Notice on access to the file.[1] You can request a CD-ROM/DVD containing a full copy of all the documents in the Commission's file on this case excluding information identified as business secrets, other confidential information and internal documents. The CD-ROM/DVD itself also includes a list of the documents identifying their degree of accessibility and an explanatory note on the CD-ROM/DVD.

Should you wish to exercise your right to have access to the file, you may make a written request to the Commission **within five working days** of the receipt of the Statement of Objections. You can either collect the CD-ROM/DVD containing the accessible parts of the file at DG Competition's premises or request to receive the CD-ROM/DVD by express courier.

---

[1]   Notice on the rules for access to the Commission file in case pursuant to Articles 81 and 82 of the EC Treaty, Articles 53, 54 and 57 of the EEA Agreement and Council regulation (EC) No 139/2004 : OJ C 325 of 22.12.2005, p. 7.

Commission européenne, DG COMP GREFFE ANTITRUST, 1049 Bruxelles, BELGIQUE
Europese Commissie, DG COMP GREFFE ANTITRUST, 1049 Brussel, BELGIË
Tel. +32 229-91111. Fax +32 229-50128. E-Mail:

Exhibit 31
342
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Exhibit 90**
**1595**

Q2014FTC02128603
Q2017MDL1_03133196

<u>**Confidentiality of this Statement of Objections**</u>

This Statement of Objections has been sent to enable you to defend yourself in the present proceedings. You should use the information contained in this Statement of Objections solely for the purpose of judicial or administrative proceedings for the application of Article 101 and Article 102 of the Treaty on the Functioning of the European Union, including proceedings before national courts.[2] Any such use outside the present proceedings should only be made after the Commission has by decision or otherwise terminated its proceedings against all parties under investigation.[3]

The above paragraph also applies to your reply to the Statement of Objections in so far as it contains information derived from the Statement of Objections or obtained through access to the file.

**Submission of comments to the Statement of Objections:**

You are entitled[4] to make known in writing to the Commission your views on the matters to which the Commission has taken objection. Your comments must reach the Commission within the time limit indicated below at <u>the following address:</u>

   European Commission
   DG Competition
   COMP GREFFE Antitrust
   B-1049 Brussels

<u>**Please supply your reply to the Statement of Objection in pdf format (on a CD-ROM/DVD/USB stick).[5]**</u>

In your written comments, you may set out all matters relevant to your defence and may attach any relevant documents in proof of these facts.

If you wish to claim confidentiality for any business secret or other confidential information contained in your comments or documents you submit in support of these, you must submit a non-confidential version thereof.[6]

---

[2] Article 16a(1) of Commission Regulation (EC) 773/2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty, as amended by Commission Regulation (EU) 2015/1348, OJ L 208, 5.8.2015, p. 3.

[3] See Article 16a(3) Commission Regulation (EC) 773/2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty, as amended by Commission Regulation (EU) 2015/1348, OJ L 208, 5.8.2015, p. 3.

[4] Article 27(1) of Regulation No 1/2003, read in conjunction with Article 10 of Regulation (EC) No 773/2004, OJ L 123, 27.4.2004, p. 18.

[5] See Recommendations for the Use of Electronic Document Submissions in Antitrust and Cartel Case Proceedings (http://ec.europa.eu/competition/contacts/electronic_documents_en.pdf) for more detailed information.

[6] Pursuant to Article 16(3) of Regulation (EC) No 773/2004, you are required:
   • To identify the documents or parts of documents which you consider to contain business secrets or other confidential information;
   • To substantiate your claim for confidentiality with regard to each individual document or part of the document;

2

Exhibit 31
343
Exhibit 90
1596

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128604
Q2017MDL1_03133197

**Time limit to submit your written comments:**

To make known in writing to the Commission your views on the objections, you will have **3 months.** This takes into account the size and nature of the file, the content of the Statement of Objections, the fact that on the same day a Statement of Objections against your undertaking in case AT.39711 – Qualcomm (predation) has been adopted, and the forthcoming holiday period.

- If you request access to the file within 5 working days after the receipt of the Statement of Objections, this time limit starts running from the day following the receipt of the CD-ROM/DVD with the accessible part of the file;

- If you do not request access to the file within 5 working days after the receipt of the Statement of Objections, this time limit starts running after five working days following the receipt of the Statement of Objections.

**Deadline for submitting confidentiality claims**

The Commission may disclose a non-confidential version of the Statement of Objection to interested third parties in this proceeding. If you consider information included in the Statement of Objections as confidential, you are requested to submit your confidentiality claims to the Commission by **Monday, 11 January 2016.**

**Request for an oral hearing:**

If you so request in your written comments, the Commission will give you the opportunity to express your views orally at a hearing.[7] Any hearing will be held following your reply to the Statement of Objections. You will be informed of the precise date by the Hearing Officer,[8] who can be contacted by e-mail (hearing.officer@ec.europa.eu) or by fax (+32 2 29 69578).

By letter to the Hearing Officer you may also request that the Commission hear persons who may corroborate the facts you set out. If your request is granted, those persons will be heard at the same hearing.

---

- To provide the Commission with a separate non-confidential version of the document in which confidential passages are deleted and including a concise description of each piece of deleted information.

Pursuant to Article 16(4) of Regulation (EC) No 773/2004, the Commission may assume that the documents do not contain confidential information if you fail to comply with the above request.

[7] Article 12 of Regulation (EC) No 773/2004.

[8] Article 12(1) of Decision 2011/695/EU of the President of the European Commission of 13 October 2011 on the function and terms of reference of the hearing officer in certain competition proceedings, OJ L 275, 20.10.2011, p. 29,.

3

Exhibit 31

344

**Exhibit 90**

**1597**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128605
Q2017MDL1_03133198

Should you have any question concerning the present procedure and the time limit of the reply, you may contact the case managers: Nicholas Banasevic (tel. +32.2.296.6569, e-mail: nicholas.banasevic@ec.europa.eu) and Brice Allibert (tel. +32-2-29-99396; e-mail: brice.allibert@ec.europa.eu), or one of the responsible case handlers: Viktória Bognár (tel.: +32-2-29-80949, e-mail: viktoria.bognar@ec.europa.eu), Massimiliano Kadar (tel.: +32-2-29-89483, e-mail: massimiliano.kadar@ec.europa.eu) or Katarzyna Tosza (tel.: +32-2-29-54413, e-mail: katarzyna.tosza.@ec.europa.eu).

Yours faithfully,

Johannes LAITENBERGER

Enclosure:       Statement of Objections

c.c.:            **COMPETITION HEARING OFFICER**

4

Exhibit 31
345

**Exhibit 90
1598**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128606
Q2017MDL1_03133199



EUROPEAN
COMMISSION

Brussels, 8.12.2015
C(2015) 9023 final

**STATEMENT OF OBJECTIONS**

**of 8.12.2015**

**relating to a proceeding under Article 102 of the Treaty on the Functioning of the
European Union and Article 54 of the EEA Agreement**

**Case AT.40220 - Qualcomm (Exclusivity payments)**

(Text with EEA relevance)

(Only the English text is authentic)

**EN**

**EN**

Exhibit 31
346

**Exhibit 90
1599**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128607
Q2017MDL1_03133200

# TABLE OF CONTENTS

1. Introduction ...................................................................................................... 6
2. The Undertaking concerned ............................................................................. 7
3. Procedure .......................................................................................................... 7
4. Standards, standard-setting organisations and standard essential patents ...... 7
4.1. Standards .......................................................................................................... 7
4.2. Standard-setting organisations ........................................................................ 8
4.3. Standard essential patents ................................................................................ 8
5. The technology and products concerned by the Statement of Objections ....... 9
5.1. The evolution of cellular communication standards ........................................ 9
5.1.1. GSM .................................................................................................................. 9
5.1.2. UMTS ............................................................................................................... 9
5.1.3. LTE ................................................................................................................. 10
5.1.4. Other cellular and wireless communication standards .................................. 11
5.2. Baseband chipsets .......................................................................................... 11
5.2.1. Functions ........................................................................................................ 11
5.2.2. Customers and applications............................................................................ 12
5.2.3. Production process .......................................................................................... 13
5.2.4. Main suppliers ................................................................................................ 14
5.2.4.1. Infineon / Intel ............................................................................................... 14
5.2.4.2. ST-Ericsson .................................................................................................... 14
5.2.4.3. MediaTek........................................................................................................ 14
5.2.4.4. Marvell ........................................................................................................... 15
5.2.4.5. Huawei / HiSilicon ......................................................................................... 15
5.2.4.6. Nokia / Texas Instruments.............................................................................. 15
5.2.4.7. Renesas ........................................................................................................... 15
5.2.4.8. Broadcom ....................................................................................................... 16
5.2.4.9. Samsung / LSI ................................................................................................ 16
5.2.4.10. Nvidia ............................................................................................................. 16
5.2.4.11. Sequans .......................................................................................................... 16
6. Qualcomm's activities in relation to baseband chipsets ................................ 17
6.1. Product range .................................................................................................. 17
6.2. Qualcomm's participation in the standardisation of cellular technology standards ... 17
6.2.1. CDMA ............................................................................................................ 17
6.2.2. UMTS.............................................................................................................. 18

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Q2014FTC02128608
Q2017MDL1_03133201

| 6.2.3. | LTE | 19 |
| 6.3. | Qualcomm's patent portfolio | 19 |
| 7. | Qualcomm's agreements with Apple | 20 |
| 7.1. | The Transition Agreement | 21 |
| 7.2. | The First Amendment to the Transition Agreement | 23 |
| 7.3. | Summary of the Agreements | 25 |
| 7.4. | Apple's purchases of baseband chipsets during the period under investigation | 26 |
| 8. | Market Definition | 27 |
| 8.1. | Principles | 27 |
| 8.2. | Relevant Product Market | 28 |
| 8.2.1. | Principles relating to product market definition | 28 |
| 8.2.2. | Application to this case | 28 |
| 8.2.3. | The substitutability of GSM chipsets, UMTS chipsets, LTE chipsets and single-mode LTE chipsets | 29 |
| 8.2.3.1. | The substitutability of GSM chipsets and UMTS chipsets or LTE chipsets | 29 |
| 8.2.3.2. | The substitutability of UMTS chipsets and LTE chipsets | 30 |
| 8.2.3.3. | The substitutability of single-mode LTE chipsets and UMTS or LTE chipsets | 32 |
| 8.2.4. | The substitutability of baseband chipsets that comply with different iterations of UMTS and LTE technology | 32 |
| 8.2.5. | The substitutability of chipsets supporting UMTS and chipsets that support CDMA but not UMTS | 33 |
| 8.2.6. | The substitutability of chipsets supporting UMTS-FDD and chipsets supporting UMTS-TDD but not UMTS-FDD | 34 |
| 8.2.7. | The substitutability of UMTS or LTE baseband chipsets and baseband chipsets supporting WiFi and WiMAX but not UMTS | 35 |
| 8.2.8. | The substitutability of slim modems and integrated baseband chipsets | 36 |
| 8.2.9. | The substitutability of chipsets sold in the merchant and captive markets | 37 |
| 8.3. | Relevant Geographic Market | 37 |
| 8.3.1. | Principles relating to geographic market definition | 37 |
| 8.3.2. | Application to this case | 38 |
| 9. | Dominance | 38 |
| 9.1. | Principles | 38 |
| 9.2. | Application to this case | 39 |
| 9.3. | Market shares | 39 |
| 9.3.1. | Market for UMTS baseband chipsets | 40 |
| 9.3.1.1. | Value-based market shares | 40 |
| 9.3.1.2. | Volume-based market shares | 41 |

Exhibit 31

**Exhibit 90**

348

**1601**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128609
Q2017MDL1_03133202

| | | |
|---|---|---|
| 9.3.2. | Market for LTE baseband chipsets | 43 |
| 9.3.2.1. | Value-based market shares | 43 |
| 9.3.2.2. | Volume-based market shares | 45 |
| 9.4. | Barriers to entry and expansion | 47 |
| 9.5. | Countervailing buyer power | 54 |
| 10. | Abuse | 56 |
| 10.1. | Principles | 56 |
| 10.2. | The abusive conduct | 57 |
| 10.3. | The payments conditional upon Apple obtaining all of its requirements of UMTS and LTE baseband chipsets from Qualcomm | 57 |
| 10.4. | Potential anti-competitive effects of Qualcomm's conduct | 58 |
| 10.4.1. | Qualcomm's conduct has reduced Apple's incentives to switch to Qualcomm's competitors | 58 |
| 10.4.2. | Evidence provided by Apple confirms that Qualcomm's conduct has reduced Apple's incentives to switch to Qualcomm's competitors | 61 |
| 10.4.3. | Qualcomm's conduct is capable of foreclosing an appreciable part of the UMTS and LTE chipset markets | 64 |
| 10.4.4. | Qualcomm's conduct is capable of foreclosing competing suppliers of UMTS and LTE baseband chipsets | 65 |
| 10.4.5. | Qualcomm's conduct may have contributed to the exit from the relevant markets of certain of Qualcomm's competitors | 68 |
| 10.5. | Objective justification and efficiencies | 68 |
| 10.6. | Single and continuous infringement | 69 |
| 10.6.1. | Principles | 69 |
| 10.6.2. | Application to this case | 69 |
| 10.7. | Duration of the infringement | 70 |
| 11. | Jurisdiction | 70 |
| 11.1. | Principles | 70 |
| 11.2. | Application to this case | 71 |
| 12. | Effect on trade | 72 |
| 12.1. | Principles | 72 |
| 12.2. | Application to this case | 72 |
| 13. | Remedies and fines | 72 |
| 13.1. | Article 7 of Regulation 1/2003 | 72 |
| 13.2. | Fines | 72 |
| 13.3. | Calculation of the fines | 73 |
| 13.3.1. | Principles | 73 |

**EN**

4

Exhibit 31

349

**Exhibit 90**

**1602**

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128610
Q2017MDL1_03133203

13.3.2.  Determination of the basic amount of the fine ............................................................. 73

13.3.3.  The value of sales ................................................................................................. 74

13.3.4.  Gravity ................................................................................................................. 74

13.3.5.  Duration ............................................................................................................... 75

13.3.6.  Additional amount ................................................................................................ 75

13.3.7.  Adjustments to the basic amount .......................................................................... 75

13.3.7.1. Aggravating and mitigating circumstances ......................................................... 75

13.3.7.2. Deterrence ......................................................................................................... 76

13.3.8.  Application of the 10% turnover limit .................................................................. 76

14.      Conclusion ........................................................................................................... 76

Exhibit 31

**Exhibit 90**

350

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**1603**

Q2014FTC02128611
Q2017MDL1_03133204

STATEMENT OF OBJECTIONS

of 8.12.2015

relating to a proceeding under Article 102 of the Treaty on the Functioning of the
European Union and Article 54 of the EEA Agreement

Case AT.40220 - Qualcomm (Exclusivity payments)

(Text with EEA relevance)

(Only the English text is authentic)

1. **INTRODUCTION**

(1)     This Statement of Objections ("SO") sets out the preliminary conclusions of the
European Commission (the "Commission") regarding the compatibility with Article
102 of the Treaty on the Functioning of the European Union ("TFEU") and Article
54 of the Agreement on the European Economic Area ("EEA Agreement") of certain
conduct by Qualcomm Inc. ("Qualcomm").

(2)     Since 25 February 2011, Qualcomm has granted payments to Apple Inc. ("Apple")
on condition that it obtains all of its future requirements of baseband chipsets
compliant with the Universal Mobile Telecommunications System ("UMTS"[1]) and
the Long-Term Evolution ("LTE") standards from Qualcomm.

(3)     The Commission has reached the preliminary conclusion that Qualcomm's conduct
constitutes an infringement of Article 102 of the TFEU and of Article 54 of the EEA
Agreement.

(4)     The Commission therefore intends to adopt a decision against Qualcomm as
provided for in Articles 7 and 23(2) of Council Regulation (EC) No 1/2003 of 16
December 2002 on the implementation of the rules on competition laid down in
Articles 81 and 82 of the Treaty ("Regulation 1/2003").[2]

(5)     Qualcomm will be given the opportunity to be heard on these matters before the
Commission adopts any decision, in accordance with Article 27(1) of Regulation
1/2003.

---

[1]     UMTS technology has two variants: UMTS-FDD (W-CDMA and its evolutions) and UMTS-TDD
(mainly TD-SCDMA). As explained in paragraph (29), unless specified otherwise, all references in this
SO to "UMTS" are to "UMTS-FDD" only.

[2]     OJ L 1, 4.1.2003, page 1 as amended by Regulation (EC) No 411/2004 (OJ L 68, 8.3.2004, page 1).
With effect from 1 December 2009, Articles 81 and 82 of the EC Treaty have become Articles 101 and
102, respectively, of the Treaty on the Functioning of the European Union. The two sets of provisions
are, in substance, identical. For the purposes of this Statement of Objections, references to Articles 101
and 102 TFEU should be understood as references to Articles 81 and 82, respectively, of the EC Treaty
when appropriate. The TFEU also introduced certain changes in terminology, such as the replacement
of "Community" by "Union" and "common market" by "internal market". Where the meaning remains
unchanged, the terminology of the TFEU will be used throughout this Statement of Objections.

**EN**                                          6                                          **EN**

Exhibit 31
351
Exhibit 90
1604

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128612
Q2017MDL1_03133205

## 2. THE UNDERTAKING CONCERNED

(6)     The addressee of the present Statement of Objections is Qualcomm, a leading developer of wireless technology products and services headquartered in San Diego, California (USA). Qualcomm holds essential intellectual property rights (IPRs) in a number of mobile telephony standards including the third generation ("3G") UMTS and the fourth generation ("4G") LTE standards and is the leading supplier of chips and chipsets used in mobile handsets and other devices.

(7)     Qualcomm conducts business primarily through its business units Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing ("QTL"), which are operated by Qualcomm and its direct and indirect subsidiaries.[3]

## 3. PROCEDURE

(8)     In August 2014, the Commission started an *ex officio* investigation into certain conduct by Qualcomm.

(9)     Between 12 August 2014 and 23 July 2015, the Commission sent requests for information pursuant to Articles 18(2) and 18(3) of Regulation 1/2003 to Qualcomm, its customers and its competitors.

(10)    On 16 July 2015, the Commission initiated proceedings against Qualcomm with a view to adopting a decision under Chapter III of Regulation No 1/2003.

(11)    On 3 September 2015, a State of Play meeting was held. The services of the Directorate General of Competition also met with Qualcomm on 29 September 2015.

## 4. STANDARDS, STANDARD-SETTING ORGANISATIONS AND STANDARD ESSENTIAL PATENTS

### 4.1. Standards

(12)    Standards ensure compatibility and interoperability between related products. This has many benefits.[4] Standards can encourage innovation and lower costs by increasing the volume of manufactured products. Standards can strengthen competition by enabling consumers to switch more easily between products from different manufacturers. Standards may also further the Treaty objective of achieving the integration of national markets through the establishment of an internal market. The European Union has accordingly promoted standardisation as a tool for European competitiveness.[5]

---

[3]     At the beginning of fiscal year 2013, Qualcomm completed a corporate reorganisation in which certain of its assets as well as the stock of certain of its direct and indirect subsidiaries were contributed to its wholly-owned subsidiary Qualcomm Technologies, Inc. (QTI). QTL continues to be operated directly by Qualcomm, which continues to own the vast majority of Qualcomm's patent portfolio. Substantially all of Qualcomm's products and services businesses, including QCT, and substantially all of Qualcomm's engineering, research and development functions, are operated by QTI and its subsidiaries. For more information on Qualcomm's corporate structure, see Qualcomm's 2014 10-K Report, available at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-14-320&CIK=804328.

[4]     Guidelines on the applicability of Article 101 of the Treaty on the Functioning of the European Union to horizontal co-operation agreements ("the Horizontal Guidelines"), OJ C 11, 14.1.2011, p. 1, paragraph 263.

[5]     See Communication from the Commission of 11 March 2008 to the Council, the European Parliament and the European Economic and Social Committee, "Towards an increased contribution from

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM        Q2014FTC02128613
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                Q2017MDL1_03133206

## 4.2. Standard-setting organisations

(13) Standard-setting organisations ("SSOs") are organisations whose primary activity is to develop and maintain standards by bringing together industry participants to evaluate competing technologies for inclusion in standards.

(14) SSOs also seek to ensure that industry participants contribute technology that will create valuable standards and that these standards are widely adopted. The broader the implementation of a standard, the greater the interoperability benefits.

(15) Participants in a standard-setting process can obtain significant benefits if their technology becomes part of a standard. These include potential royalties from licensees, a large base of licensees, increased demand for their products and improved compatibility with other products using the standard.

(16) The European Union and the European Free Trade Association (EFTA) have recognised three SSOs as official European standardisation bodies:[6] the European Committee for Standardisation (CEN), the European Committee for Electrotechnical Standardisation (CENELEC) and the European Telecommunications Standards Institute (ETSI).[7]

## 4.3. Standard essential patents

(17) Standards frequently make reference to technologies that are protected by patents, especially in industries such as telecommunications. Hundreds or even thousands of patents may read on a single standard. Thus, when a user of a standard (also known as an "implementer") manufactures standard-compliant products, it cannot avoid that its products use technologies that are covered by such patents.

(18) Patents that are essential to a standard are those that cover technology to which a standard makes reference and that implementers of the standard cannot avoid using in standard-compliant products. These patents are known as standard-essential patents (SEPs). SEPs are different from patents that are not essential to a standard ("non-SEPs"). This is because it is generally technically possible for an implementer to design around a non-SEP to comply with a standard. By contrast, an implementer has to use the technology protected by a SEP when manufacturing a standard-compliant product.

(19) The major SSOs in the field of wireless communications (ETSI, IEEE, ITU) require their members to license their SEPs on (fair,) reasonable and non-discriminatory ("(F)RAND") terms.

---

standardisation to innovation in Europe", COM(2008) 133 final; and Communication from the Commission of 1 June 2011 to the European Parliament and the European Economic and Social Committee: "A strategic vision for European standards: Moving forward to enhance and accelerate the sustainable growth of the European economy by 2020", COM(2011) 311 final. See also Regulation (EU) No 1025/2012 of the European Parliament and of the Council of 25 October 2012 on European standardisation, amending Council Directives 89/686/EEC and 93/15/EEC and Directives 94/9/EC, 94/25/EC, 95/16/EC, 97/23/EC, 98/34/EC, 2004/22/EC, 2007/23/EC, 2009/23/EC and 2009/105/EC of the European Parliament and of the Council and repealing Council Decision 87/95/EEC and Decision No 1673/2006/EC of the European Parliament and of the Council, OJ L 316, 14.11.2012, p. 12.

[6]   See Annex I of Regulation (EU) No 1025/2012, OJ L 316, 14.11.2012, p. 12.

[7]   The European Telecommunications Standards Institute produces globally-applicable standards for Information and Communications Technologies (ICT), including fixed, mobile, radio, converged, broadcast and Internet technologies. It includes more than 800 member organizations worldwide, drawn from 64 countries and five continents.

**EN**

8

Exhibit 31
353

**Exhibit 90**
**1606**

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128614
Q2017MDL1_03133207

5. **THE TECHNOLOGY AND PRODUCTS CONCERNED BY THE STATEMENT OF OBJECTIONS**

(20)    This Statement of Objections concerns baseband chipsets that implement and comply with: (i) the UMTS standard for mobile communications ("UMTS-compliant (baseband) chipsets"); and (ii) the LTE standard for mobile communications ("LTE-compliant (baseband) chipsets").

## 5.1.    The evolution of cellular communication standards

### 5.1.1.    GSM

(21)    Global System for Mobile Communications ("GSM") is a standard developed by ETSI to describe technologies for second generation ("2G") digital cellular networks. Developed as a replacement for first generation ("1G") analogue cellular networks, the GSM standard originally described a network optimized for voice telephony. The standard was expanded over time to include packet data transport via General Packet Radio Services ("GPRS") and Enhanced Data rates for GSM Evolution ("EDGE"). Later technology generations build on the principles established by this standard.

(22)    In the following sections, references to GSM include GPRS and EDGE.

### 5.1.2.    UMTS

(23)    UMTS is a 3G wireless and mobile communications standard capable of supporting multimedia services, beyond the capability of second generation systems such as GSM.

(24)    The beginning of the UMTS standard setting process dates back to the early 1990s when the concept of UMTS emerged from European research programmes. ETSI established a technical working group[8] in 1992 specifically to investigate the UMTS concept. By January 1998, the decision was made to adopt two alternative technologies, Wideband-Code Division Multiple Access ("W-CDMA") and Time Division -(Synchronous) Code Division Multiple Access ("TD-(S)CDMA"),[9] as options for the radio part of the UMTS standard.

(25)    In December 1998, following a decision of the ETSI General Assembly, the work on UMTS was moved to a new group which included delegations from the US, South Korea and Japan as full members. It became known as the 3rd Generation Partnership Project or "3GPP". The aim of 3GPP was to create a globally applicable 3G mobile phone system standard.

(26)    In December 1999, 3GPP completed what was known as "Release 99". This marked the first iteration of the UMTS standard. Release 99 was then transposed by ETSI into formal European standards throughout 2000. In line with the requirements of Decision 128/1999/EC, the UMTS standard was implemented in most Member States during the following years.

(27)    3GPP has further evolved the W-CDMA variant of UMTS in order to provide improved characteristics, including higher data rates. Notable evolutions of W-

---

[8]    Technical Committee Special Mobile Group (TC SMG).
[9]    The two variants (TD-CDMA and TD-SCDMA) are collectively also known as UMTS Time Division Duplexing ("UMTS-TDD").

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM          **1607**          Q2014FTC02128615
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    Q2017MDL1_03133208

CDMA include High Speed Packet Access ("HSPA")[10], HSPA+[11] and Dual Carrier HSPA ("DC-HSPA").[12] These evolutions formed part of subsequent 3GPP Releases.

(28)   The major breakthroughs in the market evolution of UMTS-compliant baseband chipsets are related to the support of increasingly high data rates of broadband connectivity: before HSPA technology, UMTS supported data rates up to 0.384Mbps, which was inadequate to support typical broadband applications like full internet browsing and video streaming. HSPA technology (3GPP Release 4 and 3GPP Release 5) enabled data rates up to 3.6Mbps providing true broadband connectivity. Subsequent iterations of HSPA+ in 3GPP Releases 7 and 8 increased the data rates even further to 28Mbps and 42Mbps respectively.

(29)   In the following sections and for purposes of convenience, unless otherwise specified,[13] the term UMTS will be generally used to describe only the W-CDMA variant of the radio interface as well as its evolutions i.e. HS(D/U)PA, HSPA+, DC-HSPA, etc. These technologies are also known as UMTS Frequency Division Duplexing ("UMTS-FDD").[14]

*5.1.3.   LTE*

(30)   LTE is based on the GSM and UMTS standards, increasing the capacity and speed using a different radio interface together with core network improvements. This standard was also developed by 3GPP.

(31)   LTE is commonly referred to as a 4G standard, although strictly speaking the requirements set for 4G are satisfied only by its later iterations (known as LTE-Advanced or LTE-A).

(32)   According to Qualcomm, *"Along with carrier aggregation, LTE Advanced brings many more enhancements, including advanced antenna techniques and optimization for small cells. LTE Advanced continues to evolve[.][...]. The evolution of LTE will significantly expand the role of LTE Advanced in the future of communications [...].*[15] This is also shown by the extending of LTE Advanced to unlicensed spectrum.[16]

(33)   The maximum downlink data rate supported by LTE increased about 260-fold compared to the first iterations of the UMTS standards (from 0.384 Mbps to 100 Mbps). This facilitates faster browsing experience, file downloads, music and video streaming, etc.

(34)   In the following sections, the term LTE will be used to refer to LTE, LTE-A, and further iterations of the LTE technology.

---

[10]   HSPA is a technology that provides enhanced data rates in UMTS (W-CDMA) networks. It is the combination of High Speed Downlink Packet Access (HSDPA) and High Speed Uplink Packet Access (HSUPA) technologies.

[11]   HSPA+, formally known as Evolved High Speed Packet Access is an evolution of HSPA that provides data rates up to 28 Mbps (Megabit per second).

[12]   D(ual)C(arrier)-HSPA is a technology that combines data transmissions from two carriers (cells). The concept is enhanced further in M(ulti)C(arrier)-HSPA.

[13]   In certain sections where UMTS-TDD is discussed, the designations UMTS-FDD and UMTS-TDD are used explicitly, for reasons of clarity.

[14]   As opposed to the alternative technology, UMTS-TDD.

[15]   See page 4 of Qualcomm's 2014 10-K Report, available at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-14-320&CIK=804328

[16]   https://www.qualcomm.com/#/invention/technologies/lte/advanced

Exhibit 31
355

**Exhibit 90
1608**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128616
Q2017MDL1_03133209

### 5.1.4.  Other cellular and wireless communication standards

(35)    In addition to GSM, UMTS and LTE, there are other cellular communication standards such as Code Division Multiple Access ("CDMA"). Moreover, there are standards for wireless communication which do not make use of cellular technology, such as Worldwide Interoperability for Microwave Access ("WiMAX") and Wireless Local Area Network ("WLAN", also commonly called WiFi).

(36)    These standards are standardised by SSOs like the Third Generation Partnership Project 2 ("3GPP2")[17] and the Institute of Electrical and Electronics Engineers ("IEEE").

### 5.2.  Baseband chipsets

### 5.2.1.  Functions

(37)    Mobile devices such as smartphones, tablets, portable PCs and e-book readers require mobile broadband[18] connectivity to the internet through cellular mobile telecommunication networks ("mobile networks").[19]

(38)    The core component providing mobile connectivity in a device is the baseband processor. Its main task is to perform the signal processing functionality according to communication protocols described by cellular standards. Baseband processors can be embedded directly in mobile devices, or in external modules (e.g. a USB stick, also called a "dongle"), which are in turn plugged into a device.

(39)    A baseband processor typically consists of both hardware and software. The hardware consists of an integrated circuit, made of semiconductor material ("silicon die") and packaged into a chip ("baseband chip") using ceramic or plastic material.

(40)    In addition to the baseband processor, certain types of mobile devices require an application processor, used for running the operating system and applications (like messaging, internet browsing, imaging and games). This application processor can either be provided as a standalone product, packaged into a separate chip or can be integrated with the baseband processor into the same silicon die and packaged into the same chip.

(41)    Based on the above distinction, baseband chips can be divided into two categories:

    (1)    Standalone baseband chips, where no application processor is included; and

    (2)    Integrated baseband chips, where the baseband processor has been integrated with an application processor, usually onto a single silicon die, and is packaged in the same chip.

(42)    Regardless of the presence of an application processor, a baseband processor is typically paired with two additional components to complete its functionality: the

---

[17]    3GPP2 is the standardization group for CDMA2000, a CDMA based technology alternative to UMTS for 3G networks. The organisation is unrelated, but similar to 3GPP.

[18]    According to the Commission's Digital Agenda Glossary, mobile broadband is the name used to describe various types of wireless high-speed internet access through a portable modem, telephone or other device. See https://ec.europa.eu/digital-agenda/en/broadband-glossary#S

[19]    A cellular network is a radio network distributed over land through cells where each cell includes a fixed location transceiver known as base station. These cells together provide radio coverage over larger geographical areas. User equipment, such as mobile phones, is therefore, able to communicate even if the equipment is moving through cells during transmission.

356
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM         **1609**         Q2014FTC02128617
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                  Q2017MDL1_03133210

Radio Frequency (RF) integrated circuit (or RF transceiver)[20] and the Power Management (PM) integrated circuit.[21] All three functionalities (baseband processor, RF transceiver and PM circuitry) are necessary for mobile connectivity and their resulting combination is called a "baseband chipset".[22] The three components of baseband chipsets are usually purchased from the same supplier, either as a bundle or separately.[23]

(43)  Throughout this SO, the term "integrated baseband chipset(s)" or simply "integrated chipset(s)" will be used for chipsets that include an integrated baseband chip. The term "standalone baseband chipset(s)" or "slim modem(s)" will be used for chipsets that include a standalone baseband chip without an application processor.

(44)  Baseband chipsets, whether standalone or integrated, implement one or multiple wireless standards, from the same or from different technology families and generations. For example, a baseband chipset might implement only the GSM standard, or it might implement a combination of the GSM, UMTS and LTE standards (see in more detail Section 8.2.3).

(45)  Baseband chipsets of a given generation tend to be backwards compatible with earlier cellular communication technology of the same technology family. For example, baseband chipsets compliant with UMTS generally provide support for GSM.[24] In addition, the vast majority of baseband chipsets compliant with LTE technology also provide support for UMTS and GSM.[25] In this SO, backwards compatibility with older technology will be assumed for any given baseband chipset, unless otherwise specified.

*5.2.2.  Customers and applications*

(46)  Baseband chipsets are typically sold to original equipment manufacturers ("OEMs" – also called "device manufacturers"), which incorporate them into devices that make use of mobile connectivity. OEMs include Apple, HTC Corporation ("HTC"), Huawei Technologies Co. Ltd. ("Huawei"), LG Corp ("LG"), Nokia Corporation ("Nokia"),[26] Samsung Group ("Samsung"), and ZTE Corporation ("ZTE").

(47)  OEMs incorporate baseband chipsets in a variety of devices, which can be grouped in two broad categories:

---

[20]  RF integrated circuits contain analog circuitry which allows the operation of the device at the frequencies allocated to mobile communications.

[21]  PM integrated circuits manage the power requirements of the mobile device.

[22]  Typically the three components (baseband, RF, PM) are implemented on separate pieces of silicon and reside in different chips. In a few cases, either the RF transceiver, or the PM component, or both, may be packaged in the same chip as the baseband processor. The term "baseband chipset" will be used throughout the text in a broader sense that covers also these cases.

[23]  See for instance Qualcomm's lines of products as described below in Section 6.1.

[24]  This support is indispensable in the case of mobile phones, as for most mobile network operators ("MNOs"), GSM is still important for voice transmission, in terms of coverage and capacity. GSM may also be useful for devices different from phones, although it does not provide broadband connectivity: via its basic connectivity support, it can ensure service continuity in case of gaps in UMTS coverage.

[25]  This is because, as discussed in Section 5.2.2, LTE is primarily used for data transmission and LTE-based smartphones will normally use UMTS and GSM for voice transmission. Moreover, UMTS can also be used for data transmission in areas where there is no LTE network coverage.

[26]  In April 2014, Microsoft Corp. completed the acquisition of the Nokia Devices and Services business of Nokia. See https://news.microsoft.com/2014/04/25/microsoft-officially-welcomes-the-nokia-devices-and-services-business/

Exhibit 31
357
Exhibit 90
1610

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128618
Q2017MDL1_03133211

(a) Mobile phones (also called "handsets"), usually further classified into:

   (1) Basic phones (phones providing only basic functionality like voice and messaging);

   (2) Feature phones (phones providing more advanced functionality, like multimedia applications and internet connectivity); and

   (3) Smartphones (phones providing advanced functionality, comparable to the functionality provided by a personal computer).

(b) Mobile broadband devices ("MBB devices"), which cover devices with mobile connectivity, other than mobile phones, and include in particular:

   (1) Tablets with cellular access;[27]

   (2) Data cards with cellular access, typically in the form of USB sticks (also called "dongles");

   (3) Wireless routers that rely on cellular networks to act as WiFi hotspots (also called "MiFi" devices); and

   (4) Other devices (e.g. laptops) using embedded modules with cellular access.

(48) While all of the above devices incorporate baseband chipsets, they do not all require the exact same functionalities.

(49) Voice telephony is an absolute requirement for mobile phones. Mobile phones typically use a number of interoperable technologies, in order to provide a seamless voice experience to users. For most European mobile networks, this means the capability to use both GSM and UMTS technologies for traditional voice telephony.[28]

(50) By contrast, the main purpose of cellular access in MBB devices is broadband data connectivity, based on UMTS or LTE technology.[29] These devices therefore, do not provide traditional voice telephony (also called "circuit switched"[30] voice), or do so only exceptionally.

*5.2.3.*   *Production process*

(51) Baseband chipset suppliers typically design and develop their products themselves[31] The majority however do not "fabricate" them in their own facilities.[32] Instead, they

---

[27]  The distinction between smartphones and tablets is no longer clear-cut: devices with full voice capabilities and increased screen size are commonly called "phablets", combining the characteristics of both. Smartphones, tablets and phablets are also collectively referred to as "smart devices".

[28]  LTE technology is primarily used for data transmission; however a gradual uptake of Voice over LTE (VoLTE) has started.

[29]  GSM can also provide data connectivity; however the data rates achieved in practice are insufficient for many data intensive applications (e.g. video streaming). GSM is therefore, not considered a mobile broadband technology.

[30]  Circuit switching is a methodology of implementing a telecommunications network in which two network nodes establish a dedicated communications channel (circuit) through the network before the nodes may communicate. The circuit guarantees the full bandwidth of the channel and remains connected for the duration of the communication session. The circuit functions as if the nodes were physically connected as with an electrical circuit.

[31]  See non-confidential answers to question 1 of the request for information of 8 January 2015 to baseband chipset suppliers.

**EN**

13

**EN**

Exhibit 31
358

**Exhibit 90
1611**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128619
Q2017MDL1_03133212

outsource the "fabrication" to specialised manufacturers called "foundries" which aggregate demand from multiple semiconductor suppliers. The baseband chipset suppliers that outsource the production of chipsets are called "fabless" suppliers.

5.2.4.    *Main suppliers*

(52)    Apart from Qualcomm, a number of other suppliers have been active in the supply of UMTS- and LTE-compliant baseband chipsets since 2011 to the present day (hereinafter referred to as the "period under investigation").

5.2.4.1. Infineon / Intel

(53)    Infineon Technologies AG ("Infineon") is a Germany based company active in a broad range of semiconductor solutions.

(54)    On 29 August 2010 Intel Corporation ("Intel"), a U.S. multinational, announced the acquisition of the Wireless Solution business of Infineon,[33] which included its baseband chipsets. The acquisition was completed on 31 January 2011.[34] Since then, Intel has taken over and developed the business of Infineon in the baseband chipset space.

(55)    The Wireless Solution business of Infineon was selected by Apple as the baseband chipset supplier for the iPhone and iPad devices launched before 2011.[35]

5.2.4.2. ST-Ericsson

(56)    ST-Ericsson NV ("ST-Ericsson") was a multinational manufacturer of wireless products and semiconductors headquartered in Geneva, Switzerland and established on 3 February 2009 as a 50/50 joint venture between Telefonaktiebolaget L. M. Ericsson ("Ericsson") and ST Microelectronics N.V. ("ST Microelectronics").[36] ST-Ericsson supplied its baseband chipsets to OEMs such as Sony-Ericsson, Nokia, LG and Samsung.

(57)    The ST-Ericsson Joint Venture was dissolved on 2 August 2013,[37] with its baseband assets being transferred to Ericsson. Eventually, on 14 September 2014, Ericsson decided to exit the baseband market.[38]

5.2.4.3. MediaTek

(58)    MediaTek Inc. ("MediaTek") is a fabless semiconductor company for wireless communications and digital multimedia solutions headquartered in Taiwan.

(59)    It is mainly focussed on the low- and mid-range segments of baseband chipsets and on sales in China.[39] It started to produce UMTS-compliant baseband chipsets in 2010 and LTE-compliant baseband chipsets in 2014.[40]

---

[32]   See non-confidential answers to questions 4, 10 and 11 of the request for information of 30 April 2015 to baseband chipset suppliers. In particular, Broadcom, Ericsson, HiSilicon, Intel, Marvell, MediaTek, Nokia, NVidia and Qualcomm indicated that they been using external suppliers (foundries), whereas Freescale, Renesas and Samsung stated that they operate own production facilities.

[33]   http://newsroom.intel.com/docs/DOC-1173

[34]   http://newsroom.intel.com/community/intel_newsroom/blog/2011/01/31/intel-completes-acquisition-of-infineon-s-wireless-solutions-business

[35]   See Apple's answer to question 7 to the request for information of 4 November 2014 to baseband chipset customers (Doc ID 1032).

[36]   http://www.drivermax.com/driver-download/0/Ports/ST-Ericsson/ST-Ericsson+TD-HSPA+AT

[37]   http://www.ericsson.com/thecompany/press/releases/2013/08/1721084

[38]   http://www.ericsson.com/news/1856711

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Q2014FTC02128620
Q2017MDL1_03133213

#### 5.2.4.4. Marvell

(60)     Marvell Technology Group Ltd. ("Marvell") is a U.S.-based fabless semiconductor supplier. It has historically focused on the smartphone market, being the supplier of Blackberry Limited ("Blackberry").[41]

#### 5.2.4.5. Huawei / HiSilicon

(61)     HiSilicon Technologies Co., Ltd. ("HiSilicon") is a China-based fabless semiconductor supplier.[42]

(62)     It is a 100% subsidiary of the Chinese device manufacturer Huawei and produces baseband chipsets almost exclusively for use by its mother company in mobile devices.[43]

#### 5.2.4.6. Nokia / Texas Instruments

(63)     Nokia, a multinational company based in Finland, was traditionally self-supplying its devices with baseband chipsets. Design and development was typically carried-out in house, tailored to the specific requirements of its mobile devices. Baseband chipset manufacturing was outsourced to Texas Instruments Inc. ("Texas Instruments"), a U.S. company that was operating as a foundry for Nokia.[44]

(64)     Gradually, however, Nokia moved away from self-supply and relied on baseband chipsets purchased from third parties.[45]

(65)     In July 2010, Nokia stopped the development of new chipsets and sold its baseband assets to Renesas.[46]

#### 5.2.4.7. Renesas

(66)     Renesas Mobile Corporation was a wholly-owned subsidiary of Renesas Electronics Corporation ("Renesas"), headquartered in Japan. It was active in the design and development of platforms for mobile phones and other mobile devices. It mainly supplied Japanese OEMs such as Fujitsu, Sharp, NEC, Sony and Panasonic.[47]

---

[39]   See for example http://technews.co/2015/03/03/no-showdown-between-qualcomm-and-mediatek-in-2015/. This was confirmed by a number of OEMs. Nokia, for instance, stated that *"MediaTek has traditionally provided chipsets for lower end devices mainly."* (see Nokia's non-confidential answer to question 3 of the request for information of 4 November 2014 to baseband chipset customers (Doc ID 991)). Nvidia stated: *"MediaTek's principal focus today appears to be the mid-market and low-end smart mobile segments, where it offers an Integrated Chipset."* (see Nvidia's non-confidential answer to question 2 of the request for information of 8 January 2015 (Doc ID 593)).

[40]   Strategy Analytics, Baseband Market Share Tracker Q1 2015 (Doc ID 1153).

[41]   http://www.marvell.com/solutions/mobile/200-million/

[42]   Huawei's non-confidential answer to question 9 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1274).

[43]   See Section 8.2.8.

[44]   Texas Instruments' non-confidential answer to question 2 of the request for information of 8 January 2015 (Doc ID 505).

[45]   See for example http://company.nokia.com/en/news/press-releases/2009/02/17/nokia-and-qualcomm-plan-to-develop-advanced-mobile-devices

[46]   http://www.renesas.com/press/news/2010/news20100706.jsp

[47]   https://www.strategyanalytics.com/strategy-analytics/blogs/components/handset-components/handset-components/2010/07/06/nokia-partnership-could-help-renesas-expand-outside-japan#.Vbot-f4w9fw.

**EN**                          15                          **EN**
                        Exhibit 31           **Exhibit 90**
                           360
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY        **1613**        Q2014FTC02128621
                                                    Q2017MDL1_03133214

(67) In 2010, Renesas expanded its activities in baseband chipsets by acquiring the baseband assets of Nokia.[48]

(68) In 2013, Renesas sold its baseband assets to Broadcom.[49]

### 5.2.4.8. Broadcom

(69) Broadcom Corporation ("Broadcom") is a U.S. based fabless semiconductor company that designs solutions for a broad range of wired and wireless communications markets. The company's customers included smartphone manufacturers like Samsung and Nokia.[50]

(70) In 2013, Broadcom acquired the baseband assets of Renesas.

(71) In July 2014, Broadcom announced the wind-down of its baseband business.[51]

### 5.2.4.9. Samsung / LSI

(72) Samsung Systems LSI ("LSI") is a South Korean-based foundry semiconductor company that designs and manufactures baseband chipsets to be incorporated in mobile devices such as smartphones and tablets.

(73) LSI is a fully-owned subsidiary of Samsung and does not sell baseband chipsets to any OEMs other than Samsung.[52]

### 5.2.4.10. Nvidia

(74) Nvidia Corporation ("Nvidia") is a US-based manufacturer of graphics processing units as well as of system-on-a-chip units for the mobile computing segment.

(75) It was active in the supply of baseband chipsets since its acquisition in 2012 of Icera Inc. ("Icera"), a UK-based manufacturer of baseband chipsets.

(76) In May 2015, Nvidia announced its exit from the baseband chipset industry.[53]

### 5.2.4.11. Sequans

(77) Headquartered in France, Sequans Communications S.A. ("Sequans") is a fabless semiconductor company specialising in the development of single-mode LTE chipset solutions i.e. baseband chipsets that are exclusively compliant with LTE.[54] Its customers include Asus, HTC, Huawei and ZTE.[55]

---

[48] http://www.electronicsweekly.com/news/design/communications/renesas-to-buy-nokias-baseband-chip-business-2010-07/

[49] http://www.renesas.com/press/news/2000/news20130904.jsp

[50] http://articles.latimes.com/2011/apr/27/business/la-fi-broadcom-earns-20110427

[51] http://www.forbes.com/sites/greatspeculations/2014/06/04/rising-competition-forces-broadcom-to-exit-the-baseband-market/

[52] Samsung's non-confidential answer to question 1 of the request for information of 8 January 2015 (Doc ID 1306).

[53] http://www.forbes.com/sites/greatspeculations/2015/05/07/nvidia-to-sell-its-icera-business-exit-the-mobile-chip-market/

[54] Sequans' non-confidential answer to question 1 of the request for information of 8 January 2015 (Doc ID 501).

[55] http://www.sequans.com/company/ecosystem/customers/

**EN**

16

Exhibit 31

361

**Exhibit 90**

**1614**

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128622
Q2017MDL1_03133215

## 6. QUALCOMM'S ACTIVITIES IN RELATION TO BASEBAND CHIPSETS

### 6.1. Product range

(78)   Qualcomm has a broad product portfolio ranging from low- and mid-cost baseband chipsets for the mass-market to leading-edge baseband chipsets implementing the latest standards.[56] Being active also in the development of application processors, it offers both standalone and integrated chipsets.

(79)   Qualcomm markets, or has marketed, its baseband chips (and by extension chipsets) mainly under the following product family names:[57]

    (a)   The MDM (Mobile Data Modem) product family, which includes standalone baseband chips, namely baseband chips that mainly provide baseband processing (connectivity);

    (b)   The MSM (Mobile Station Modem) product family, which includes integrated baseband chips, namely chips that provide both application processing and baseband processing (connectivity);

    (c)   The QSC (Qualcomm Single Chip) product family, which includes integrated baseband chips. QSC products incorporate the RF and PM functionalities in the same chip, in addition to the baseband and application processors;[58] and

    (d)   The QSD (Qualcomm SnapDragon) product family, which includes a specific range of integrated chips, featuring a "Snapdragon" application processor. The QSD designation was withdrawn in 2010 and replaced by MSM.

### 6.2. Qualcomm's participation in the standardisation of cellular technology standards

(80)   Qualcomm develops, commercialises and actively supports third and fourth generation cellular communication technologies, including CDMA2000, WCDMA, HSDPA, HSUPA, HSPA+, TD-SCDMA and LTE.

(81)   Qualcomm's research and development expenditures in recent years have been significant. In fiscal years 2014, 2013, 2012 and 2011, they amounted to USD 5.5 billion, USD 5.0 billion, USD 3.9 billion and USD 3.0 billion respectively.[59]

(82)   As explained in the following sections, Qualcomm played an important role in the development of cellular technology standards, and in particular CDMA, UMTS and LTE.

#### 6.2.1. CDMA

(83)   In 1986, Qualcomm filed its first patent application in the area of the CDMA technology. This patent, together with other patents, would become the basis of CDMA technologies in mobile networks.[60]

---

[56]   See Qualcomm's answer to the request for information of 14 January 2015 (Doc ID 574).

[57]   Qualcomm's reply to Article 18(2) request of 14 January 2015, Questions 1-27, Doc ID 610.

[58]   For reasons of convenience, the term "baseband chipset" should be understood to include also the QSC products, even if all functionality is provided in a single chip, rather than in separate chips (together forming a chipset).

[59]   See page 10 of Qualcomm's 2014 10-K Report, available at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-14-320&CIK=804328. See also page 9 of Qualcomm's 2013 10-K report, available at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-13-483.

Exhibit 31
362

Exhibit 90
1615

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128623
Q2017MDL1_03133216

(84) According to Qualcomm, "*[o]ther companies had invested vast sums in developing TDMA technologies (including GSM) and argued that CDMA was technically and commercially impossible to develop. Qualcomm developed a complete end-to-end system, including infrastructure and handset equipment, to ensure the early supply of CDMA equipment and to demonstrate that CDMA technology actually worked*".[61]

(85) In 1990, Qualcomm's early funding agreements and licenses with AT&T and Motorola established the framework for subsequent licenses. This way, the CDMA technology was successfully tested. In 1993, one year after Qualcomm's first licence agreement with Nokia, the Telecommunication Industry Association ("TIA") adopted and published the IS-95 CDMA Standard, based on Qualcomm's technology. In the meantime, Qualcomm entered into licence agreements with Matsushita (Panasonic), Samsung, LG, Hyundai and NEC. [62]

(86) Up to date, Qualcomm leads the development of CDMA-based technologies.[63] Qualcomm owns significant intellectual property applicable to products that implement any version of CDMA, including patents, patent applications and trade secrets.[64] The mobile communications industry generally recognises that a company seeking to develop manufacture and/or sell products that use CDMA technology will require a patent licence from Qualcomm.[65]

*6.2.2.    UMTS*

(87) Qualcomm also had a strong impact on the development of UMTS technology, namely on the WCDMA standard. UMTS is a 3G CDMA-based technology, and Qualcomm owned an extensive intellectual property rights ('IPR') portfolio in relation to CDMA. This granted Qualcomm a significant advantage in relation to UMTS and WCDMA technology, which is based on CDMA technology.[66]

(88) According to Qualcomm, "*WCDMA [...] is based on [its] underlying CDMA technology*"*[...].*[67] Qualcomm explained that "*[a]s second-generation (2G) networks make the transition to advanced wireless systems, the WCDMA (UMTS) market [was] gaining impressive momentum, presenting an additional opportunity for [Qualcomm]. As of November 2006, there were more than 90 million WCDMA subscribers worldwide.[...]*"[68] Qualcomm stated that "*[its] expertise and continued*

---

[60]    See page 3 of Qualcomm's presentation of 20 February 2013 "The Qualcomm Technology Licensing Program and the Licensing of Standard-Essential Patents" (Doc ID 666)

[61]    *Ibid.*

[62]    See page 5 of Qualcomm's presentation of 20 February 2013 "The Qualcomm Technology Licensing Program and the Licensing of Standard-Essential Patents" (Doc ID 666).

[63]    See Page 3 of Qualcomm's 2014 10-K Report, available at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-14-320&CIK=804328

[64]    See Page 1 of Qualcomm's 2014 10-K Report, available at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-14-320&CIK=804328

[65]    *Ibid.*

[66]    See http://www.forbes.com/sites/panosmourdoukoutas/2012/07/18/qualcomms-problem/; See also http://www.download3k.com/articles/Qualcomm-Dominating-In-Mobile-Processors-Still-Powerful-in-Intellectual-Property-Rights-00641

[67]    See page 9 of Qualcomm's 2005 10-K Report, available at https://www.qualcomm.com/#/documents/investor-2005-annual-report

[68]    See page 2 of Qualcomm's 2006 10-K Report, available at https://www.qualcomm.com/#/documents/qualcomm-2006-annual-report

**EN**                                                                                                                            **EN**

Exhibit 31
363

Exhibit 90
1616

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128624
Q2017MDL1_03133217

*innovation in CDMA technology have brought [it] to a leading position in both CDMA2000 and WCDMA next-generation innovations.*[69]

(89) Moreover, "*[l]everaging [its] expertise in CDMA, [Qualcomm has] also developed integrated circuits for manufacturers and wireless operators deploying the WCDMA version of 3G for manufacturers of wireless devices.*"[70] As a result, "*[t]he majority of the world's wireless device and infrastructure manufacturers (more than 125 and including all leading suppliers) have licensed [its] technology for use in WCDMA products.*"[71]

*6.2.3.* *LTE*

(90) Qualcomm has sought to invest early in LTE technology.

(91) Already in 2006, Qualcomm announced that "*[a]n optimised OFDMA system* [which includes LTE] *designed to provide high performance in a mobile environment, including advanced techniques such as MIMO*" would have been commercialised as of 2010."[72]

(92) In 2007, Qualcomm stated that "*[it] ha[s] also informed standards bodies that [it] may hold essential intellectual property rights for certain standards that are based on OFDMA technology, e.g. [...] LTE.*"[73]

(93) In 2008, Qualcomm explained that "*[its] considerable expertise with OFDMA technology is now focused on the development of Qualcomm's LTE program and the creation of innovative next generation air interface technologies.*".[74] Still in 2011, Qualcomm declared that "*[it] continue[s] to invest significant resources toward the development of technologies and products for voice and data communications, primarily in the wireless industry, including advancements to [...] 4G LTE networks wireless baseband chips.*"[75]

(94) Today, Qualcomm "*continues to play a significant role in the development of LTE and LTE Advanced, which are predominant 4G technologies*".[76]

**6.3.** **Qualcomm's patent portfolio**

(95) Qualcomm is the largest IPR holder active in the supply of baseband chipsets. As of 6 August 2015, it owns more than 100,000 distinct patents.[77] Between 1 January 2008 and 27 February 2014, Qualcomm made disclosures with respect to

---

[69]  *Ibid.*

[70]  See page 6 of Qualcomm's 2011 10-K Report, available at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-11-360

[71]  See page 4 of Qualcomm's 2011 10-K Report, available at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-11-360.

[72]  See page 8 of Qualcomm's 2006 10-K Report, available at https://www.qualcomm.com/documents/qualcomm-2006-annual-report.

[73]  See page 14 of Qualcomm's 2007 10-K Report, available at https://www.qualcomm.com/#/documents/investor-2007-annual-report

[74]  See page 12 of Qualcomm's 2008 10-K Report, available at https://www.qualcomm.com/#/documents/investor-2008-annual-report

[75]  See page 32 of Qualcomm's 2011 10-K Report, available at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-11-360

[76]  See page 4 of Qualcomm's 2014 10-K Report, available at http://investor.qualcomm.com/secfiling.cfm?filingID=1234452-14-320&CIK=804328

[77]  https://www.qualcomm.com/invention/licensing/qualcomm-patent-lists

Exhibit 31
364

**Exhibit 90**

**1617**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128625
Q2017MDL1_03133218

approximately 500 amended patent families as potentially essential to UMTS and 809 amended patent families as potentially essential to LTE.[78]

### 7.   QUALCOMM'S AGREEMENTS WITH APPLE

(96)   Apple incorporates baseband chipsets into its smartphones ("iPhone") and its tablets with cellular connection ("iPad").

(97)   Apple has outsourced all manufacturing processes in relation to iPhones and iPads to third party contract manufacturers.[79] Apple gives instructions to its contract manufacturers as to the components that they have to buy for incorporation into Apple end-products.[80] These contract manufacturers are also referred to as "authorised purchasers".

(98)   Apple has direct contracts with the suppliers of components for iPhone and iPad, but these suppliers ship and sell those components directly to the contract manufacturers for assembly into the finished products.[81]

(99)   Regarding the supply of Qualcomm baseband chipsets, on 16 December 2009, Apple concluded a framework agreement with Qualcomm (the Strategic Terms Agreement, "STA"), which amongst other things, contains certain terms and conditions relating to the sale of Qualcomm chipsets to authorised purchasers.[82]

(100)  Pursuant to the STA, Apple and Qualcomm have entered into Statements of Works (SOWs) setting out the terms and conditions for the supply of Qualcomm baseband chipsets, including the price of those chipsets. Qualcomm ships baseband chipsets directly to Apple's contract manufacturers for assembly into iPhones and iPads. While contract manufacturers pay Qualcomm for the purchase of baseband chipsets, Apple is then reimbursed by Qualcomm under the STA and each SOW for the difference between the applicable price between the contract manufacturer and Qualcomm, and the agreed price between Apple and Qualcomm.[83]

(101)  In addition, Apple and Qualcomm entered into a "Transition Agreement" on 25 February 2011.[84] The Transition Agreement was amended on 28 February 2013 (the "First Amendment to the Transition Agreement"). It is scheduled to expire in December 2016.

---

[78]   See Qualcomm's response to the request for information of 13 February 2014 in Case AT.39711 Qualcomm (predation), (Doc ID 862). On 20 April 2015, Qualcomm informed the Commission that it did not object to the use of the response to the request for information of 13 February 2014 in Case 40220.

[79]   Apple's non-confidential answer to question 4 of the request for information of 23 July 2015 (Doc ID 1033). See also the Strategic Terms Agreement between Apple and Qualcomm, effective as of 16 December 2009, and the Amended and Restated Strategic Terms Agreement between Apple and Qualcomm, effective as of 28 February 2013 (Doc ID 36).

[80]   Apple's non-confidential answer to question 4 of the request for information of 23 July 2015 (Doc ID 1033). See also the Strategic Terms Agreement between Apple and Qualcomm, effective as of 16 December 2009, and the Amended and Restated Strategic Terms Agreement between Apple and Qualcomm, effective as of 28 February 2013 (Doc ID 36).

[81]   Apple's non-confidential answer to question 4 of the request for information of 23 July 2015 (Doc ID 1033).

[82]   See Transition Agreement (Doc ID 42), under "Purpose".

[83]   Apple's non-confidential answer to question 4 of the request for information of 23 July 2015 (Doc ID 1033).

[84]   Transition Agreement, (Doc ID 42).

**EN**                          20                                           **EN**
                          Exhibit 31          Exhibit 90
                          365               1618

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128626
Q2017MDL1_03133219

(102) The content of the Transition Agreement and the First Amendment to the Transition Agreement (together, the "Agreements") is outlined further in the following sections.

## 7.1. The Transition Agreement

(103) The purpose of the Transition Agreement is to set out certain terms and conditions regarding the payment by Qualcomm to Apple of "*certain funds related to Apple's transition to using Qualcomm Chipsets in Apple products (the "Transition")*".[85]

(104) The Transition Agreement establishes three different payment schemes: (i) the 4-Year Transition Fund;[86] (ii) the Marketing and Development Fund;[87] and (iii) the Variable Incentive Fund.[88]

(105) Under the 4-Year Transition Fund, "*in consideration of Apple's substantial resource investment associated with the Transition*", Qualcomm commits to pay to Apple USD 250 million in two instalments of USD 125 million each,[89] the first on 31 March 2012 and the second on 31 March 2013.[90]

(106) If, however, during 2011, the volume of Qualcomm baseband chipsets that implement CDMA, UMTS and/or LTE used in Apple products does not meet a certain threshold, or if, during any quarter of 2012, the volume of UMTS-compliant baseband chipsets does not meet certain thresholds, Qualcomm is entitled to reduce the first or the second instalment respectively. Further, if during any quarter of 2013 or the first quarter of 2014, the volume of UMTS-compliant baseband chipsets does not meet certain thresholds, Apple shall reimburse some of the previously paid 4-Year Transition Fund to Qualcomm.[91]

(107) Under the Marketing and Development Fund, designed "*to contribute to the costs of Apple's marketing efforts*", Qualcomm commits to pay USD 150 million in six quarterly instalments of USD 25 million dollars. Each instalment is due before the end of each of six consecutive calendar quarters, beginning with the third quarter of 2011.[92]

(108) If, however, Apple does not launch at least one Apple product with a UMTS carrier that incorporates a Qualcomm baseband chipset by 31 December 2012, Apple shall reimburse all payments previously paid pursuant to the Marketing and Development Fund.[93]

(109) Under the Variable Incentive Fund, "*in consideration of Apple's use of Qualcomm Chipsets*", Qualcomm commits to pay to Apple up to USD 600 million in yearly payments of up to USD 200 million each, over four consecutive years. The exact value of each yearly payment moves on a scale of USD 0 to USD 200 million, depending on the volume of Qualcomm baseband chipsets incorporated in Apple products in the preceding twelve months. The applicable yearly volume requirements gradually increase over time. The lowest threshold that triggers the payment of USD 100 million increases from 80 million units in 2012 to 100 million units in 2015,

---

[85]   *Ibid.*
[86]   See Clause 1.1 of the Transition Agreement (Doc ID 42).
[87]   See Clause 1.2 of the Transition Agreement (Doc ID 42).
[88]   See Clause 1.3 of the Transition Agreement (Doc ID 42).
[89]   See Clause 1.1(a) of the Transition Agreement (Doc ID 42).
[90]   See Clause 1.1(b) of the Transition Agreement (Doc ID 42).
[91]   See Clauses 1.1(c), (d), (e) of the Transition Agreement (Doc ID 42).
[92]   See Clause 1.2 of the Transition Agreement (Doc ID 42).
[93]   See Clause 1.2(b) of the Transition Agreement (Doc ID 42).

**EN**

21

Exhibit 31

Exhibit 90

366

1619

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EN**

Q2014FTC02128627
Q2017MDL1_03133220

while the highest threshold that triggers the payment of USD 200 million increases from 100 million units in 2012 to 150 million units in 2015.[94]

(110)   For example[95], the annual volume thresholds set out for the years 2014 and 2015[96] are as follows[97]:

| Payment Amount | Annual Volume |
|---|---|
| USD 200,000,000 | ≥ 150 million units |
| USD 150,000,000 | ≥ 120 million and < 150 million units |
| USD 100,000,000 | ≥ 100 million and < 120 million units |
| no payment | < 100 million units |

(111)   Qualcomm's commitment to make the payments envisaged under each the above three schemes is subject to the conditions laid down in Clause 1.5 of the Transition Agreement.[98]

(112)   Pursuant to Clause 1.5 of the Transition Agreement, *"if after October 1, 2011, Apple sells an Apple product commercially that incorporates a non-Qualcomm cellular baseband modem,[99] this Agreement shall automatically terminate and Qualcomm shall not be obligated to make any of the payments that are due and payable after the date of such sale."* In addition, if such sales take place in calendar year 2013, Apple will be liable to reimburse within 45 days:

(1)   The second instalment of the Transition Fund; and

(2)   The second instalment of the Variable Incentive Fund.[100]

(113)   The above provisions of Clause 1.5 *"shall not apply to continued sales by Apple of any Apple product that incorporates a non-Qualcomm cellular baseband modem which Apple is selling commercially as of October 1, 2011 and minor modifications thereto but not including Major Releases"[101].*[102] Apple may thus continue to sell its legacy products that incorporate Intel baseband chipsets.

---

[94]   See Clause 1.3(a) of the Transition Agreement (Doc ID 42).
[95]   The annual volume thresholds set out for 2012 and 2013 follow a similar structure, with the payment amounts being the same and the annual volume thresholds being slightly lower.
[96]   As the total amount payable under the Variable Incentive Fund is capped at USD 600 million for four years, the payment due in the last year of 2015 *"shall be the lesser of (i) the unpaid balance of the Variable Incentive Fund, or (ii) the payment amount set forth [...] for the applicable Annual Volume."*
[97]   See Clauses 1.3(a)(iii) and (iv) of the Transition Agreement (Doc ID 42).
[98]   See Clauses 1.1(a), 1.2(a) and 1.3(a) of the Transition Agreement (Doc ID 42).
[99]   "Baseband modem" should be read in this context as "baseband chipset".
[100]   See Clause 1.5 of the Transition Agreement (Doc ID 42).
[101]   Pursuant to Clause 1.5 of the Transition Agreement (Doc ID 42), *"A "Major Release" is any Apple product for commercial sale that includes a substantial change in industrial design when compared to the model it replaced or a change in the non-Qualcomm cellular base band modem in such device. The differences in the industrial design in iPhone 4 and its predecessor iPhone 3GS is an example of substantial change in industrial design. Minor modifications, for example, to address regional or carrier requirements, shall not constitute a Major Release."*
[102]   See Clause 1.5 of the Transition Agreement (Doc ID 42).

EN

EN

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128628
Q2017MDL1_03133221

## 7.2.  The First Amendment to the Transition Agreement

(114)  The First Amendment to the Transition Agreement took effect as of 1 January 2013. The Transition Agreement and the First Amendment to the Transition Agreement will be hereinafter referred to as the "Agreements".

(115)  Qualcomm entered into the First Amendment to the Transition Agreement as it wished *"to provide additional marketing incentives to Apple in order to help drive demand for global sales of Apple Phones and Apple Tablets with advanced cellular technologies."*[103]

(116)  The First Amendment to the Transition Agreement establishes two different payment schemes, in addition to the three existing ones established by the Transition Agreement. These are: i) the Marketing Fund;[104] and ii) the Additional Variable Incentive Funds.[105]

(117)  Under the Marketing Fund, for the period beginning 1 January 2013 and ending upon termination or expiry of the First Amendment to the Transition Agreement on 31 December 2016,[106] Qualcomm commits to pay USD 2.50 for each Apple phone sold at a price of at least USD 200[107] and USD 1.50 for each Apple tablet sold at a price of at least USD 180 that incorporate a Qualcomm baseband chipset.[108] Qualcomm will also pay the same amount for all Apple phones or all Apple tablets if the above conditions are not met but if the quarterly average sale price of these devices reaches USD 200 and USD 180 respectively.[109] Payments are accounted on a quarterly basis[110] but due 45 days after the end of each calendar year.[111]

(118)  Clause 1.3A(c) provides, however, that *"if [...] Apple or any of its Affiliates sells a Non-QC Device commercially (i.e., more than 1000 units)"*, Apple will be liable to reimburse:

  (1)  All Marketing Fund amounts previously paid by Qualcomm in full, if such sales take place in calendar years 2013 or 2014; or

  (2)  All Marketing Fund amounts paid in the previous 15-month period, if such sales take place in calendar year 2015.[112]

(119)  The above-mentioned provisions of Clause 1.3A(c) do not apply to the continued sales of the iPhone 4 product that incorporates a non-Qualcomm baseband chipset and its minor modifications.[113]

---

[103]  See the Recitals of the First Amendment to the Transition Agreement (Doc ID 38).
[104]  See Clause 2 of the First Amendment to the Transition Agreement (Doc ID 38).
[105]  See Clause 3 of the First Amendment to the Transition Agreement (Doc ID 38).
[106]  See Clause 1.3A(a) of the Transition Agreement (Doc ID 42) as added by Clause 2 of the First Amendment to the Transition Agreement (Doc ID 38).
[107]  See Clause 1.3A(a)(i) of the Transition Agreement (Doc ID 42) as added by Clause 2 of the First Amendment to the Transition Agreement (Doc ID 38).
[108]  See Clause 1.3A(a)(ii) of the Transition Agreement (Doc ID 42) as added by Clause 2 of the First Amendment to the Transition Agreement (Doc ID 38).
[109]  See Clause 1.3A(a)(i) and (ii) of the Transition Agreement (Doc ID 42) as added by Clause 2 of the First Amendment to the Transition Agreement (Doc ID 38).
[110]  See Clause 1.3A(a) of the Transition Agreement (Doc ID 42) as added by Clause 2 of the First Amendment to the Transition Agreement (Doc ID 38).
[111]  See Clause 1.3A(b) of the Transition Agreement (Doc ID 42) as added by Clause 2 of the First Amendment to the Transition Agreement (Doc ID 38).
[112]  See Clause 1.3A(c) of the Transition Agreement (Doc ID 42) as added by Clause 2 of the First Amendment to the Transition Agreement (Doc ID 38).

**EN**

Exhibit 31
368

**Exhibit 90**

**1621**

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128629
Q2017MDL1_03133222

(120) Under the Additional Variable Incentive Funds, Qualcomm commits to pay to Apple up to USD 400 million in yearly payments of up to USD 200 million each, in 2015 and 2016.[114] The First Amendment to the Transition Agreement specifies that these payments are in addition to any amounts due under the Variable Incentive Fund established by the Transition Agreement.[115] The exact value of each yearly payment moves on a scale of USD 0 to USD 200 million, depending on the volume of Qualcomm baseband chipsets incorporated in Apple products in the preceding twelve months.[116]

(121) The annual volume thresholds set out for each of the years 2015 and 2016 are as follows:[117]

| Payment Amount | Annual Volume |
|---|---|
| USD 200,000,000 | ≥ 150 million units |
| USD 150,000,000 | ≥ 120 million and < 150 million units |
| USD 100,000,000 | ≥ 100 million and < 120 million units |
| no payment | < 100 million units |

(122) Clause 1.3B(b) provides, however, that *"if Apple or any of its Affiliates sells a non-QC device commercially (i.e. more than 1000 units)"*, Apple will be liable to reimburse:

    (1) The Additional Variable Incentive Fund payment of 2015, if such sales take place in calendar year 2015; or

    (2) The Additional Variable Incentive Fund payment of 2016, if such sales take place in calendar year 2016.[118]

(123) The above-mentioned provisions of Clause 1.3B(b) do not apply to the continued sales of the iPhone 4 product that incorporates a non-Qualcomm baseband chipset and its minor modifications.[119]

(124) The First Amendment to the Transition Agreement maintains the provisions regarding Apple's reimbursement of certain funds envisaged in Clause 1.5 of the Transition Agreement (Clause 5 of the First Amendment to the Transition Agreement).[120]

---

[113] *Ibid.*

[114] See Clause 1.3B(a) of the Transition Agreement (Doc ID 42) as added by Clause 3 of the First Amendment to the Transition Agreement (Doc ID 38).

[115] *Ibid.*

[116] See Clauses 1.3B (a)(i) and (ii) of the Transition Agreement (Doc ID 42) as added by Clause 3 of the First Amendment to the Transition Agreement (Doc ID 38).

[117] *Ibid.*

[118] See Clause 1.3B(b) of the Transition Agreement as added by Clause 3 of the First Amendment to the Transition Agreement (Doc ID 38).

[119] *Ibid.*

[120] See Clause 1.5 of the Transition Agreement (Doc ID 42) as amended by Clause 5 of the First Amendment to the Transition Agreement (Doc ID 38).

Exhibit 31
369

**Exhibit 90**

**1622**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128630
Q2017MDL1_03133223

(125)    In addition, a new Clause 1.5A is added to the Transition Agreement, pursuant to which: *"if during the Term Apple or any of its Affiliates sells a Non-QC Device commercially (i.e., more than 1000 units)"*, the Transition Agreement shall automatically terminate and Qualcomm shall not be obligated to make any of the payments that are due and payable after the date of such sale (including the payments envisaged by the Transition Agreement and those added by the First Amendment to the Transition Agreement).

(126)    As before, the above provisions of Clause 1.5A *"shall not apply to continued sales by Apple of any Apple product that incorporates a non-Qualcomm cellular baseband modem which Apple was selling commercially as of October 1, 2011 and minor modifications thereto but not including Major Releases."*[121]

## 7.3.   Summary of the Agreements

(127)    In summary, the Agreements provide that:

(a)    Qualcomm will pay to Apple certain funds, which include lump-sum, volume-based and per-device payments (together, the "Incentive Payments");

(b)    The Incentive Payments are conditional upon Apple exclusively sourcing baseband chipsets from Qualcomm:

(1)    in the event that Apple commercially releases a product that incorporates a non-Qualcomm baseband chipset, the Agreements will terminate and Qualcomm will not make any of the Incentive Payments that are due and payable after the date of such release (the "Termination Clause");[122]

(2)    in the event that Apple commercially releases a product that incorporates a non-Qualcomm baseband chipset in 2013 or later, Apple will reimburse part of the Incentive Payments previously received from Qualcomm (the "Repayment Mechanism").[123]

---

[121]    See Clause 1.5 of the Transition Agreement (Doc ID 42) as amended by Clause 5 of the First Amendment to the Transition Agreement (Doc ID 38) and Clause 1.5A of the Transition Agreement (Doc ID 42) as added by Clause 6 of the First Amendment to the Transition Agreement (Doc ID 38). Pursuant to Clause 1.5A of the Transition Agreement (Doc ID 42) as added by Clause 6 of the First Amendment to the Transition Agreement (Doc ID 38), *"A "Major Release" is any Apple product for commercial sale that includes a substantial change in industrial design when compared to the model it replaced or a change in the non-Qualcomm cellular base band modem in such device. The differences in the industrial design in iPhone 4 and its predecessor iPhone 3GS is an example of substantial change in industrial design. Minor modifications, for example, to address regional or carrier requirements, shall not constitute a Major Release."*

[122]    See Clause 1.5 of the Transition Agreement (Doc ID 42) and Clause 1.5A as added to the Transition Agreement (Doc ID 42) by Clause 6 of the First Amendment to the Transition Agreement (Doc ID 38). Moreover, see footnote 118 as regards the applicability to legacy products.

[123]    See Clause 1.5 of the Transition Agreement (Doc ID 42); See also Clauses 1.3A(c) of the Transition Agreement (Doc ID 42) as added by Clause 2 of the First Amendment to the Transition Agreement (Doc ID 38) and Clause 1.3B(b) of the Transition Agreement (Doc ID 42) as added by Clause 3 of the First Amendment to the Transition Agreement (Doc ID 38) and Clause 1.5 as amended by Clause 5 of the First Amendment to the Transition Agreement (Doc ID 38). The Repayment Mechanism is not triggered by *"continued sales by Apple of any Apple product that incorporates a non-Qualcomm cellular baseband modem which Apple was selling commercially as of October 1, 2011 and minor modifications thereto but not including Major Releases"*.

**EN**                                                          **EN**

25
Exhibit 31                **Exhibit 90**
370
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**1623**

Q2014FTC02128631
Q2017MDL1_03133224

### 7.4.    Apple's purchases of baseband chipsets during the period under investigation

(128)    Apple purchased its first Qualcomm UMTS-compliant baseband chipsets in 2011 for incorporation in the CDMA version of the iPhone 4 launched in February 2011. The first Apple device to incorporate a Qualcomm LTE-compliant chipset was the third generation iPad launched in March 2012.[124] Since 2015, Apple has been purchasing exclusively Qualcomm baseband chipsets.

(129)    The following table shows the Qualcomm baseband chipsets that were purchased by Apple during the period 2011-2015, and which were therefore covered by the provisions of the Agreements.

**Table 1 – Qualcomm baseband chipsets purchased by Apple during the period 2011-2015 ('000 Units)**

| Chipset model | Standards supported[125] | 2011 | 2012 | 2013 | 2014 | 2015* |
|---|---|---|---|---|---|---|
| **MDM6600** | CDMA | | | | | |
| **MDM6610** | UMTS/CDMA | | | | | |
| **MDM9600 /MDM9610** | UMTS/CDMA /LTE | | | | | |
| **MDM9615** | UMTS/CDMA /LTE | | | | | |
| **MDM9615** | UMTS/CDMA /LTE | | | | | |
| **MDM9625** | UMTS/CDMA /LTE | | | | | |
| **MDM9635** | UMTS/CDMA /LTE | | | | | |
| **Total** | | | | | | |

Source: Apple[126]

\* Estimates

---

[124]    See Apple's non-confidential answer to question 3 of the request for information of 23 July 2015 (Doc ID 1033).

[125]    This is not an exhaustive list as additional standards may be supported.

[126]    See non-confidential Annex Q4,1 attached to Apple's response to the request for information of 23 July 2015 (Doc ID 1085)

Exhibit 31
371

**Exhibit 90
1624**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128632
Q2017MDL1_03133225

Table 2 – Qualcomm baseband chipsets purchased by Apple during the period 2011-2015 ('000 USD)

| Chipset model | Standards supported | 2011 | 2012 | 2013 | 2014 | 2015* |
|---|---|---|---|---|---|---|
| MDM6600 | CDMA | | | | | |
| MDM6610 | UMTS/CDMA | | | | | |
| MDM9600 /MDM9610 | UMTS/CDMA /LTE | | | | | |
| MDM9615 | UMTS/CDMA /LTE | | | | | |
| MDM9615 | UMTS/CDMA /LTE | | | | | |
| MDM9625 | UMTS/CDMA /LTE | | | | | |
| MDM9635 | UMTS/CDMA /LTE | | | | | |
| Total | | | | | | |

Source: Apple[127]

* Estimates

(130)   During the period 2011-2014, Apple was also purchasing baseband chipsets from Intel to satisfy its baseband chipset requirements for legacy products launched before Apple entered into the Transition Agreements with Qualcomm. These volumes declined over time as these legacy products were gradually phased out.[128]

(131)   During the period covered by the Agreements, therefore, Apple has adhered to the relevant conditions as regards the exclusive sourcing of its baseband chipsets from Qualcomm contained in the Agreements.

8.   **MARKET DEFINITION**

8.1.   **Principles**

(132)   The definition of the relevant market is carried out, in the context of the application of Article 102 TFEU, in order to define the boundaries within which it must be assessed whether a given undertaking is able to behave to an appreciable extent independently of its competitors and its customers.[129]

(133)   The concept of the relevant market implies that there can be effective competition between the products or services which form part of it and this presupposes that there is a sufficient degree of interchangeability between all the products or services

---

[127]   See non-confidential Annex Q4,1 attached to Apple's response to the request for information of 23 July 2015 (Doc ID 1085)

[128]   See non-confidential Annex Q4,1 attached to Apple's response to the request for information of 23 July 2015, Doc ID (Doc ID 1085).

[129]   Case C-457/10 P *AstraZeneca* v *Commission*, EU:T:2012:770, paragraph 175; Case C-549/10 P *Tomra* v *Commission*, EU:C:2012:221, paragraph 38.

**EN**

27

**EN**

Exhibit 31
372
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Exhibit 90
1625

Q2014FTC02128633
Q2017MDL1_03133226

forming part of the same market in so far as a specific use of such products or services is concerned.[130]

(134)   An examination to that end cannot be limited solely to the objective characteristics of the relevant products and services, but the competitive conditions and the structure of supply and demand on the market must also be taken into consideration.[131]

**8.2.     Relevant Product Market**

*8.2.1.    Principles relating to product market definition*

(135)   The identification of relevant product markets by the Commission derives from the existence of competitive constraints. Undertakings are subject to three main sources of competitive constraints: demand-side substitution, supply-side substitution and potential competition. From an economic point of view, for the definition of the relevant market, demand-side substitution constitutes the most immediate and effective disciplinary force on the suppliers of a given product.[132]

(136)   Supply-side substitution may also be taken into account when defining markets in those situations in which its effects are equivalent to those of demand-side substitution in terms of effectiveness and immediacy. There is supply-side substitution when suppliers are able to switch production to the relevant products and market them in the short term without incurring significant additional costs or risks in response to small and permanent changes in relative prices. When these conditions are met, the additional production that is put on the market will have a disciplinary effect on the competitive behaviour of the companies involved.[133]

(137)   Supply-side substitution is, however, not taken into account for the definition of a relevant market each time it would entail the need to adjust significantly existing tangible and intangible assets, additional investments, strategic decisions or time delays.[134]

*8.2.2.    Application to this case*

(138)   The Commission preliminarily concludes that the relevant product markets for the purpose of these proceedings are:

(a)   a market comprised of slim and integrated chipsets that are compliant with different iterations of both the UMTS and LTE standards. This product market, which is limited to the merchant market, will be referred to as the "LTE (baseband) chipsets market"; and

(b)   a market comprised of slim and integrated chipsets that are compliant with different iterations of the UMTS standard. This product market, which is limited to the merchant market, will be referred to as the "UMTS (baseband) chipsets market".

---

[130]   Case 85/76 *Hoffmann-La Roche* v *Commission*, EU:C:1979:36, paragraph 28; Case C-1/12 *Ordem dos Técnicos Oficiais de Contas*, EU:C:2013:127, paragraph 77. See also the Commission's Notice on the definition of relevant market for the purposes of Community competition law ("Notice on market definition"), OJ C 372, 9.12.1997, p. 5.

[131]   Case 322/81 *Nederlandsche Banden Industrie Michelin v Commission*, EU:C:1983:313, paragraph 37; Case T-556/08 *Slovenská pošta v Commission*, EU:T:2015:189, paragraph 112.

[132]   Notice on market definition, paragraph 13.

[133]   Notice on market definition, paragraph 20.

[134]   Notice on market definition, paragraph 23.

**EN**

28

Exhibit 31

373

**Exhibit 90**

**1626**

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128634
Q2017MDL1_03133227

(139)   The Commission has reached this preliminary conclusion based on the following factors:

    (a)   Baseband chipsets that comply with any technology other than the UMTS and LTE standards, such as GSM, CDMA, TD-SCDMA (UMTS-TDD), WiFi and WiMAX, do not exert a competitive constraint on chipsets that are compliant with the UMTS and/or LTE standards (Sections 8.2.3.1, 8.2.5 and 8.2.6);

    (b)   Baseband chipsets that comply with different iterations of the UMTS standard but not with the LTE standard do not exert a competitive constraint on chipsets that are compliant with both the UMTS and LTE standards (Section 8.2.3.2);

    (c)   Baseband chipsets that comply only with the LTE standard do not exert a competitive constraint on chipsets that are compliant with the UMTS and/or LTE standards (Section 8.2.3.3);

    (d)   Baseband chipsets that comply with certain iterations of the UMTS and LTE standards exert a competitive constraint on chipsets compliant with other iterations of the UMTS and LTE standards (Section 8.2.4);

    (e)   Integrated baseband chipsets exert a competitive constraint on standalone baseband chipsets (slim modems) (Section 8.2.7); and

    (f)   Captive production of baseband chipsets does not exert a competitive constraint on merchant market sales of baseband chipsets (Section 8.2.8).

*8.2.3.   The substitutability of GSM chipsets, UMTS chipsets, LTE chipsets and single-mode LTE chipsets*

(140)   This section assesses the substitutability of four different types of chipsets: (i) chipsets that comply with different iterations of the GSM standard but not with the UMTS and LTE standard ("GSM (baseband) chipsets"); (ii) chipsets that comply with different iterations of the GSM and UMTS standard but not with the LTE standard ("UMTS (baseband) chipsets"); (iii) chipsets that comply with different iterations of the GSM, UMTS and LTE standards ("LTE (baseband) chipsets"); and (iv) chipsets that comply only with different iterations of the LTE standard and not with other standards such as GSM and UMTS ("single-mode LTE (baseband) chipsets").

8.2.3.1.   The substitutability of GSM chipsets and UMTS chipsets or LTE chipsets

(141)   During the period under investigation, GSM chipsets represented a relatively large proportion of total sales of baseband chipsets. For example, in 2014, GSM chipsets represented 33% of worldwide shipments of all baseband chipsets.[135]

(142)   The Commission's preliminary conclusion is that GSM chipsets are not substitutable for UMTS chipsets or LTE chipsets. This is for the following reasons.

(143)   First, the data rates achieved by GSM chipsets are inadequate for data-transfer intensive applications like video streaming. For an operator or mobile OEM wishing to enable these services, GSM chipsets, with a practical data rate limit of approximately 100 kbps, are not a viable alternative. For instance, Lenovo stated: *"[i]n most markets with widespread 3G adoption (including the EEA), neither MNOs nor end consumers would be likely to accept devices limited to GSM as alternatives*

---

[135]   Strategy Analytics, Baseband Market Share Tracker Q1 2015 (Doc ID 1153).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**1627**

Q2014FTC02128635
Q2017MDL1_03133228

*to devices supporting more modern mobile standards. In addition, OEMs (including Lenovo) tend to market the smallest number of devices possible which could serve the majority of the markets in which they are present. Since the majority of the markets are 3G/4G, [...]UMTS chipsets are usually the bare minimum."*[136] Similarly, Apple stated that "*it requires* [baseband chipset] *suppliers to support multi-mode functionality. (LTE, WCDMA, CDMA, and GSM). Apple would not use a chipset in any of its devices that supports anything less than GSM/UMTS/LTE."*[137]

(144) Second, UMTS and LTE technologies are more efficient than GSM chipsets in the use of spectrum for data.[138] UMTS technologies and LTE technologies (to the extent that they are used to transfer voice) are also more efficient than GSM chipsets in the use of spectrum for voice.

(145) Third, suppliers of GSM chipsets are unable to switch to the supply of UMTS or LTE chipsets in a short time frame and without incurring significant additional investments or risks.[139] Nvidia, for instance, stated: "*GSM chipsets do not allow easy transition to UMTS. Indeed, a number of* [baseband chipset] *suppliers have attempted unsuccessfully to make this switch - for example, Texas Instruments, a* [baseband chipset] *supplier who has since exited the market, failed to make the switch from GSM to UMTS despite their strength in GSM chipsets".*[140] Equally, Intel indicated that "*In order to switch from supplying GSM chipsets to chipsets supporting GSM/UMTS, a supplier must undertake significant additional investments, because little of the original GSM investment can be leveraged into UMTS development. As much as 80% of the GSM/UMTS chipset is specific to UMTS, including the physical layer of the chipset, as well as the access stratum, which is a functional layer responsible for transporting data over the wireless connection and managing radio resources. Further, the UMTS standard also requires the use of many additional components as compared to GSM hardware. Accordingly, Intel estimates the total time needed for such a switch as approximately between three and five years."*[141]

8.2.3.2. The substitutability of UMTS chipsets and LTE chipsets

(146) During the period under investigation, UMTS chipsets represented a relatively large proportion of total sales of baseband chipsets. For example, in 2014, UMTS chipsets represented 33% of worldwide shipments of all baseband chipsets.[142]

(147) The Commission's preliminary conclusion is that UMTS chipsets do not exert a competitive constraint on LTE chipsets and that, therefore, LTE chipsets constitute a separate product market. This is for the following reasons.

[136] Lenovo's non-confidential answer to question 2 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1255).
[137] Apple's non-confidential answer to question 2 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1036).
[138] See for instance UMTS Forum, "3G/UMTS Evolution: towards a new generation of broadband mobile services" (December 2006); Khandekar, A.; Bhushan, N.; Ji Tingfang; Vanghi, V., "LTE-Advanced: Heterogeneous networks," in EW2010: European Wireless 2010, pp.978-982, 12-15 April 2010.
[139] See answers to question 2 of the request for information of 30 April 2015 to baseband chipset suppliers.
[140] Icera/NVIDIA's non-confidential answer to question 2 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 711).
[141] Intel's non-confidential answer to question 2 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).
[142] Strategy Analytics, Baseband Market Share Tracker Q1 2015 (Doc ID 1153).

EN    30    EN
Exhibit 31    **Exhibit 90**
375    **1628**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM    Q2014FTC02128636
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    Q2017MDL1_03133229

(148)    First, a majority of customers of LTE chipsets would not find it commercially feasible to switch from LTE chipsets to UMTS chipsets.[143]

(149)    Apple, for example stated: "[…], *consumers expect Apple's devices to include the most recent technologies. For example, it would not be a commercially viable option for Apple to replace GSM/UMTS/LTE chipsets with chipsets that are only enabled with UMTS and earlier generation standards in its most recent devices. LTE is a requirement for most of the world's largest carriers and consumers. There is no alternative standard to LTE for devices designed for sale in markets that demand LTE connectivity, which includes all European markets.*" [144] In addition, Lenovo stated: "*In most markets that Lenovo operates, the majority of MNOs support (and require) LTE access. Therefore, LTE has generally become a necessary configuration even for low-end smartphones. Thus, in general Lenovo would prefer [...]LTE chipsets over [...]UMTS. Similarly the MNOs that purchase Motorola devices in the EEA and the United States already require, in many cases, that the Motorola devices support LTE.*" [145]

(150)    Second, suppliers of UMTS chipsets are not able to switch to the supply of LTE chipsets in a short time frame and without incurring significant additional investments or risks.[146] This is because the addition of LTE functionalities to a UMTS chipset entails substantial costs and time. Texas Instruments, for instance, stated: "*There would be new complex software and algorithms, different protocol stack, radio frequencies and reference design. At chip level, switching to a different standard would be a ground-up new chip design to an entirely new block diagram; at least that was the case in the custom segment when we were a foundry to Nokia. For those suppliers with the requisite 3G + 4G capability switching would in our view be possible but not in a short timeframe. In the foundry model for Nokia, embracing a new 3G standard was a new chip development and not possible without Nokia 3G designs and capabilities. TI would support Nokia on new standards based chips by adapting to Nokia's requirement specification the MCU, DSP and memory integrated circuitry but Nokia would provide the 3G wireless capability in the form of logic gates and algorithms for on-chip integration and execution of Nokia proprietary software for Nokia's RF and reference design validation.*" [147] In addition, Intel stated: "*With the move to GSM/UMTS/LTE, the number of use cases that must be predicted and tested during the design process again increases exponentially. Therefore, just as the switch from GSM to GSM/UMTS requires significant time and investment as a result of increased complexity, so too does the switch to GSM/UMTS/LTE.*"[148]

(151)    As for the competitive constraint that LTE chipsets exert on UMTS chipsets, this can be left open in the present case. Given that Qualcomm's market share would be

---

[143]    See answers to question 4 of the request for information of 30 April 2015 to baseband chipset customers.

[144]    Apple's non-confidential answer to question 4 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1036).

[145]    Lenovo's non-confidential answer to question 4 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1255).

[146]    See answers to question 5 of the request for information of 30 April 2015 to baseband chipset suppliers.

[147]    Texas Instruments' non-confidential answer to question 6 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 724).

[148]    Intel's non-confidential answer to question 6 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).

**EN**                                                    **EN**

31

Exhibit 31          **Exhibit 90**

376                 **1629**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128637
Q2017MDL1_03133230

substantially higher in a possible UMTS chipset market that includes LTE chipsets, the definition of a narrower market for UMTS chipsets that excludes LTE chipsets is more favourable to Qualcomm. Accordingly, the analysis of Qualcomm's market position is carried out on the basis of this approach.

8.2.3.3. The substitutability of single-mode LTE chipsets and UMTS or LTE chipsets

(152)    During the period under investigation, single-mode LTE chipsets have been adopted only by a small number of customers, and represent a negligible part of the total number of baseband chipsets incorporating LTE technology (approximately 1% in 2014).[149]

(153)    The Commission's preliminary conclusion is that single-mode LTE chipsets are not substitutable for either UMTS or LTE chipsets. This is for the following reasons.

(154)    First, single-mode LTE chipsets are unable to transmit voice. Moreover, due to the limited deployment of LTE networks, single-mode LTE chipsets are unable to ensure service continuity for voice and data services, which is normally provided using networks based on previous generations of technology, such as GSM and UMTS. A large majority of customers therefore, source chipsets that are backwards-compatible (i.e. LTE chipsets) rather than LTE-single mode chipsets.[150]

(155)    Second, because of the inclusion of additional standards in the baseband chipset, suppliers of single-mode LTE chipsets are unable to switch to the supply of UMTS or LTE chipsets in a short time frame and without incurring significant additional investments or risks.[151] Ericsson, for instance, stated that *UMTS is a very complex system and adding it (including multimode handling between the systems) to LTE single mode will require significant investments both in R&D and equipment. Processes for both development and certification will have to be adjusted while interactions with foundries most likely can be similar. This would also open up a complete new field related to IPR".*[152] Similarly, Sequans indicated that *"Our historical experience and competency in signal processing for OFDMA and MIMO techniques led to our focus on single mode LTE, which uses these technologies. The high IP licensing costs associated with 3G UMTS and HSPA technologies, and of 2G GSM/GPRS/EDGE technologies was a barrier for us to consider integrating with our LTE technology."*[153]

8.2.4.    *The substitutability of baseband chipsets that comply with different iterations of UMTS and LTE technology*

(156)    The Commission's preliminary conclusion is that baseband chipsets that comply with certain iterations of UMTS technology are substitutable for chipsets compliant with other iterations of that technology. Equally, baseband chipsets that comply with

---

[149]    See Strategy Analytics, Baseband Market Share Tracker Q1 2015 (Doc ID 1153). Altair, GCT, and Sequans are the only players supplying single-mode LTE chipsets (see below, Section 9.3.2).

[150]    See answers to question 18 of the request for information of 4 November 2014 to baseband chipset customers.

[151]    See answers to question 20 of the request for information of 8 January 2015 to baseband chipset suppliers.

[152]    Ericsson's non-confidential answer to question 21 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 530).

[153]    Sequans's non-confidential answer to question 21 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 501).

EN

Exhibit 31

Exhibit 90

1630

EN

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128638
Q2017MDL1_03133231

certain iterations of LTE technology are substitutable for chipsets compliant with other iterations of that technology. This is for the following reasons.

(157)   First, higher speed UMTS and LTE chipsets can be substituted to a certain extent by chipsets of lower performance. For example, Huawei stated that: *"It takes time for advanced standards to substitute less advanced standards in the market. Telecom Operators take into account the operation cost and maturity of the standard when choosing a standard. When MAS* [Most Advanced Standard] *is not mature enough, Telecom Operator would choose the less advanced but mature standard for their wireless network. Thus, products with chipsets supporting less advanced standards, which are mature, could be a good alternative as long as Telecom Operators require (only) the mature standard (which is also less expensive for the Telecom Operators). However, once a standard has matured, and it has been adopted by Telecom Operators, products with* [baseband chipsets] *supporting the less advanced standard would not be a good alternative. At that point, these* [baseband chipsets] *would not match customers' requirements."* Qualcomm also stated that chipsets that enable end-devices to implement one or more iterations of the UMTS standard, including W-CDMA, HSPA, and HSPA+, and DC-HSPA+, constrain the pricing of chips or chipsets that support all other iterations of that standard. [154]

(158)   Second, barriers to switching between different iterations of standards are likely to be lower than barriers to switch between different generations. This is because new iterations of standards within a certain technology generation are to a large extent based on previous iterations. For instance, HSPA+ is based on HSPA.

*8.2.5.   The substitutability of chipsets supporting UMTS and chipsets that support CDMA[155] but not UMTS*

(159)   The Commission's preliminary conclusion is that CDMA chipsets that do not support UMTS are not substitutable for chipsets that support UMTS. This is for the following reasons.

(160)   First, a majority of customers of baseband chipsets supporting UMTS would not find it technically or commercially feasible to switch to CDMA chipsets that do not support UMTS.[156]

(161)   The majority of mobile networks and 3G-enabled devices in the EEA use UMTS technology. CDMA compliant devices are not compatible with UMTS networks. A 3G device that does not implement UMTS cannot therefore, access the vast majority of 3G networks in the EEA.

(162)   This was confirmed by a large number of customers that responded to the requests for information. For example, Blackberry stated that *"[t]he requirement for which standard is supported by the product is driven by the individual carrier".* Moreover, *"CDMA is only used by a limited number of carriers in the world."*[157] Similarly, Samsung indicated that it *"does not consider CDMA* [baseband chipsets] *to be technically and commercially potential substitutes for UMTS/LTE* [baseband

---

[154]   Qualcomm's reply to the request for information of 12 January 2015, Doc ID 577.
[155]   CDMA refers to both 2G standards (cdmaOne or IS-95) and 3G standards (CDMA2000)
[156]   See answers to questions 12 and 13 of the request for information of 4 November 2014 to baseband chipset customers.
[157]   Blackberry's non-confidential answer to question 12.1 of the request for information of 4 November 2014 to baseband chipset customers (Doc ID 1368-5).

Exhibit 31
378
Exhibit 90
1631
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Q2014FTC02128639
Q2017MDL1_03133232

chipsets]. *Technically, CDMA [baseband chipsets] cannot operate on the UMTS/LTE network. [...] The cellular networks (operated by the regional telecom operators) define what wireless standard is required and in most regions (except in the US and in China) the CDMA standard is not supported by the networks.*"[158] Moreover, according to Huawei, *"[c]ustomers want products that support UMTS/LTE. If Huawei were to switch to using chipsets supporting only CDMA or other non-3GPP wireless standards (e.g. WiMax, WiFi, etc), its devices would no longer match customers' requirements."*[159]

(163)  Second, suppliers of CDMA baseband chipsets that do not support UMTS cannot switch or expand their supply to UMTS baseband chipsets in a short time frame and without incurring significant additional investments or risks.[160]

*8.2.6.  The substitutability of chipsets supporting UMTS-FDD[161] and chipsets supporting UMTS-TDD but not UMTS-FDD*

(164)  The Commission's preliminary conclusion is that UMTS-TDD chipsets that do not support UMTS-FDD are not substitutable for chipsets that support UMTS-FDD. This is for the following reasons.

(165)  First, the majority of mobile networks and 3G enabled devices in the EEA use UMTS-FDD technology. Only limited frequencies have been assigned in some Member States to UMTS-TDD technology[162] and UMTS-TDD compliant devices are not compatible with UMTS-FDD networks. A 3G device that does not implement UMTS-FDD cannot access the vast majority of 3G networks in the EEA.

(166)  This was supported by a large number of baseband chipset customers that responded to the requests for information.[163] For example, Huawei stated: *"UMTS-TDD is only used in China. UMTS-FDD is required by Telecom Operators outside of China. Chipsets supporting only UMTS-TDD, therefore, would not satisfy the requirements of Telecom Operators outside of China, making them commercially unfeasible."*[164] In addition, according to HTC: *"[...] UMTS-TDD is only used in China. [...] It is not commercially feasible for HTC to replace the [baseband chipsets] supporting UMTS-FDD with [baseband chipsets] supporting UMTS-TDD if UMTS-TDD is not supported by local carrier."*[165]

---

[158]  Samsung's non-confidential answer to question 13.1 of the request for information of 4 November 2014 to baseband chipset customers (Doc ID 1305).
[159]  Huawei's non-confidential answer to question 13.1 of the request for information of 4 November 2014 to baseband chipset customers (Doc ID 1276).
[160]  See answers to questions 13 and 14 of the request for information of 8 January 2015 to baseband chipset suppliers. In any case, even if this were possible, Qualcomm's market shares in the market for UMTS chipsets would only increase, due to Qualcomm's strong position in the supply of CDMA chipsets.
[161]  In this section, the difference between the two variants of UMTS is made explicit using the terms UMTS-FDD and UMTS-TDD. In the rest of the document, the term UMTS is generally used to describe only UMTS-FDD compliant chipsets.
[162]  http://www.spectrummonitoring.com/frequencies/
[163]  See answers to questions 15 and 16 of the request for information of 4 November 2014 to baseband chipset customers.
[164]  Huawei's non-confidential answer to question 16.1 of the request for information of 4 November 2014 to baseband chipset customers (Doc ID 1276).
[165]  HTC's non-confidential answer to question 16.1 of the request for information of 4 November 2014 to baseband chipset customers (Doc ID 1245).

Exhibit 31
379
**Exhibit 90**
**1632**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Q2014FTC02128640
Q2017MDL1_03133233

(167) Second, suppliers of UMTS-TDD baseband chipsets that do not support UMTS-FDD cannot switch or expand their supply to UMTS-FDD baseband chipsets in a short time frame and without incurring significant additional investments or risks.[166] This is because, as stated by Samsung: *"A switch from the supply of UMTS-TDD chipsets to chipsets supporting UMTS-FDD requires the development of technology under the new standard. This requires a very significant investment in R&D, including many 100s if not 1,000s of man-years of R&D work. Such switch will require a multi-year development phase."*[167] In addition, Marvell stated that: *"Although the actual time and expense involved will vary, we believe that it is extremely unlikely that a supplier of a chipset supporting one standard could switch to the supply of a chipset supporting another standard in less than two years (in fact, we believe that two years would be an unusually rapid development timeframe), and for a total expenditure of less than hundreds of millions, if not billions, of dollars."*[168]

8.2.7. *The substitutability of UMTS or LTE baseband chipsets and baseband chipsets supporting WiFi and WiMAX but not UMTS*

(168) The Commission's preliminary conclusion is that chipsets supporting WLAN (commonly known as WiFi) but not UMTS or LTE and chipsets supporting WiMAX but not UMTS or LTE are not substitutable for UMTS chipsets or LTE chipsets. This is for the following reasons.

(169) First, neither WiFi nor WiMAX can offer the mobility aspect of a mobile broadband service. This is because user access is restricted to a limited number of venues, typically including their home, place of work and selected public "hot spots".

(170) Second, in contrast to WiFi, the adoption of WiMAX in the EEA has been minimal. By 2014, there were only about 2.5 million WiMAX subscribers in the EU.[169]

(171) Third, a large number of customers that responded to the requests for information stated that chipsets incorporating WiMAX and WiFi are not substitutable for UMTS and LTE chipsets.[170] Huawei, for instance, stated: *"Customers want products that support UMTS/LTE. If Huawei were to switch to using chipsets supporting only [...] non-3GPP wireless standards (e.g. WiMax, WiFi, etc), its devices would no longer match customers' requirements."*[171]

---

[166] See answers to questions 16-18 of the request for information of 8 January 2015 to baseband chipset suppliers. The Commission notes that in its answer to question 16, Ericsson (Doc ID 530) has answered that a switch would be possible. Ericsson, however, appears to have interpreted the question as if it were related to a switch from UMTS-FDD to UMTS-TDD, whereas the question was referring to a switch from UMTS-TDD to UMTS-FDD. In any event, Ericsson stated that *"If a supplier has a commercial UMTS-FDD solution on market then the time-frame required to introduce and commercialize a UMT-TDD would require at least 2.5-3 years of development from design start to available on market"*. Therefore, the time horizon considered by Ericsson is excessive for the purposes of the assessment of supply side in the context of product market definition.

[167] Samsung's non-confidential answer to question 18 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 1306).

[168] Marvell's non-confidential answer to question 17 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 1215).

[169] Electronic communications market indicators collected by Commission services, through National Regulatory Authorities, for the Communications Committee (COCOM).

[170] See answers to questions 12 and 13 of the request for information of 4 November 2014 to baseband chipset customers.

[171] Huawei's non-confidential answer to question 13 of the request for information of 4 November 2014 to baseband chipset customers (Doc ID 1276).

Exhibit 31
380

**Exhibit 90
1633**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128641
Q2017MDL1_03133234

(172) Fourth, suppliers of baseband chipsets supporting WiFi and WiMAX cannot switch or expand their supply to baseband chipsets compliant with UMTS and LTE standards in a short time frame and without incurring significant additional investments or risks as the addition of these cellular standards would entail significant time and costs. This was confirmed by the majority of baseband chipset suppliers.[172]

(173) This is not altered by the fact that Sequans switched from WiMAX to LTE and released its first single-mode LTE chipsets in 2012.[173]

(174) In the first place Sequans switched from the supply of WiMAX chips to the supply of single-mode LTE chipsets, i.e. chipsets that do not support UMTS or GSM and that are not part of the relevant markets for UMTS chipsets and LTE chipsets.

(175) In the second place, Sequans itself acknowledges that a switch to 2G and 3G technologies, which would be required to enter the relevant markets at stake, would be more difficult. In particular, Sequans stated that: *"The high IP licensing costs associated with 3G UMTS and HSPA technologies, and of 2G GSM/GPRS/EDGE technologies was a barrier for us to consider integrating with our LTE technology"*.[174]

(176) In third place, Sequans confirmed that switching from WiMAX to LTE would take a considerable amount of time and resources, and in particular *"between 16 and 22 months, and between $18 and $24M in OpEx and CapEx."*.[175]

8.2.8. *The substitutability of slim modems and integrated baseband chipsets*

(177) The Commission's preliminary conclusion is that integrated chipsets are substitutable for standalone chipsets (slim modems). This is for the following reasons.

(178) First, customers often buy both integrated chipsets and slim modems[176] as in many cases they consider an architecture based on an integrated chipset as an alternative to an architecture based on a slim modem combined with an application processor (and vice-versa).[177]

(179) Second, there are relatively few requirements that must be met in order for a hypothetical supplier of only integrated baseband chipsets to start supplying slim modems.[178] For example, Qualcomm indicated that it does not consider that the requirements would generally be any greater than for a supplier of integrated chipsets to add another chipset to its portfolio.[179] A number of suppliers responding to the

---

[172] See answers to question 12 of the request for information of 8 January 2015 to baseband chipset suppliers.

[173] See Sequans' non-confidential answers to question 15 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 501).

[174] See Sequans' non-confidential answer to question 21 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 501).

[175] See Sequans' non-confidential answer to question 14 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 884).

[176] See answers to question 32 of the request for information of 4 November 2014 to baseband chipset customers.

[177] See answers to question 34 of the request for information of 4 November 2014 to baseband chipset customers.

[178] As for the requirements that a hypothetical supplier of slim modems would need to meet in order to start supplying integrated baseband chipsets, this can be left open in the present case. This is because Apple purchased only slim modems during the period under investigation.

[179] Qualcomm's answer to question 37 of the request for information of 14 January 2015 (Doc ID 592).

**EN**

36

Exhibit 31

381

**Exhibit 90**

**1634**

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128642
Q2017MDL1_03133235

requests for information also stated that switching from the supply of integrated chipsets to the supply of slim modems would be relatively straightforward. Ublox, for instance, stated: *"This seems to us mostly a cut-out exercise. If the more complex product exists, it should be fairly straightforward to design a feature-reduced version. The question is what sort time and low investment means. For sure both is an order of magnitude smaller/shorter than developing a new modem."*[180] Sequans also stated: *"This exercise is relatively simple, and would not consume considerable resources or time."*[181]

*8.2.9.  The substitutability of chipsets sold in the merchant and captive markets*

(180)  The Commission preliminarily concludes that captive production of baseband chipsets by certain OEMs (Huawei, Motorola, Nokia and Samsung) does not exert a competitive constraint on merchant market sales of UMTS chipsets.

(181)  This is because the production of Huawei,[182] Motorola[183] and Samsung[184] is meant for self-supply, and that except for limited quantities, no portion is sold to third parties. Furthermore, Texas Instruments, which operated as a foundry for Nokia, indicated that *"The* [baseband chipsets] *manufactured by TI or its external foundries were essentially to Nokia's design and representing Nokia's 3G capabilities and as such were custom devices sold only to Nokia".*[185]

(182)  Moreover, even customers which have captive production such as Nokia and Samsung still rely or relied to a significant extent on sales of baseband chipsets by independent suppliers.[186] This means that even customers with captive production may not be able to use such production to avoid a small but significant non-transitory price increase on the merchant market.

**8.3.  Relevant Geographic Market**

*8.3.1.  Principles relating to geographic market definition*

(183)  The relevant geographic market comprises an area in which the undertakings concerned are involved in the supply and demand of the relevant products or services, in which area the conditions of competition are similar or sufficiently

---

[180]  Ublox's non-confidential answer to question 39 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 517).

[181]  Sequans's non-confidential answer to question 40 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 501).

[182]  Huawei confirmed that HiSilicon supplies almost exclusively to Huawei and does not generally sell on the merchant market (see Huawei's non-confidential answer to question 13 (footnote 2) of the request for information of 30 April 2015 to baseband chipset suppliers, Doc ID 1274). Indeed, HiSilicon sold minimal volumes (i.e. less than 150,000 baseband chipsets) of its production during 2009-2013 to third parties (see Huawei's non-confidential response to the request for information of 19 November 2014, Doc ID 1273).

[183]  Lenovo's non-confidential answer to question 3 of the request for information of 29 July 2015 (Doc ID 1116).

[184]  Samsung's non-confidential answer to question 1 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 1306).

[185]  Texas Instruments' non-confidential answer to question 2 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 505).

[186]  See for example https://www.qualcomm.com/#/news/releases/2009/02/17/nokia-and-qualcomm-plan-develop-advanced-mobile-devices and http://blogs.wsj.com/digits/2015/04/03/samsungs-chip-choice-is-a-mixed-verdict-for-qualcomm/.

Exhibit 31

382

**Exhibit 90**

**1635**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128643
Q2017MDL1_03133236

homogeneous and which can be distinguished from neighbouring areas in which the prevailing conditions of competition are appreciably different.[187]

(184)    The definition of the geographic market does not require the conditions of competition between traders or providers of services to be perfectly homogeneous. It is sufficient that they are similar or sufficiently homogeneous, and accordingly, only those areas in which the conditions of competition are 'heterogeneous' may not be considered to constitute a uniform market.[188]

*8.3.2.    Application to this case*

(185)    For the reasons set out below, the Commission's preliminary conclusion is that the market for UMTS baseband chipsets and the market for LTE baseband chipsets are both worldwide in scope.

(186)    First, with few exceptions, UMTS baseband chipset suppliers, LTE baseband chipset suppliers and OEMs all offer their products throughout the world.

(187)    Second, UMTS and LTE baseband chipset supply agreements are typically global in scope. This is confirmed by the agreements with OEMs provided by Qualcomm in response to a request for information.[189]

(188)    Third, transport costs can be expected to be negligible in comparison to the value of the products, given their physical characteristics.[190]

## 9.    DOMINANCE

### 9.1.    Principles

(189)    Dominance is *"a position of economic strength enjoyed by an undertaking, which enables it to prevent effective competition being maintained on the relevant market by affording it the power to behave to an appreciable extent independently of its competitors, its customers and ultimately of consumers."*[191]

(190)    The existence of a dominant position derives from a combination of several factors which, taken separately, are not necessarily determinative.[192]

(191)    One important factor is the existence of very large market shares, which are in themselves, save in exceptional circumstances, evidence of the existence of a

---

[187]    Case 27/76 *United Brands vs. Commission*, EU:C:1978:22, paragraph 44; Case 322/81, *Michelin v Commission*, EU:C:1983:313, paragraph 26, Case 247/86, *Alsatel v Novasam*, EU:C:1988:469, paragraph 15.

[188]    See for example Case 27/76 *United Brands*, EU:C:1978:22, paragraphs 11 and 53.

[189]    See Qualcomm's response to the request for information of 13 October 2014, and in particular Microsoft Component Purchase Agreement (DOC ID 422-8400), as amended by the Amendment to the Microsoft Component Purchase Agreement Between Microsoft Corporation and Qualcomm Atheros, Inc (Doc ID 422-8974); HP's WWAN Notebook Marketing Agreement (Doc ID 422-2577), as amended by Amendment One to the WWAN Notebook Marketing Agreement (Doc ID 422-2922); Samsung's Component Supply Agreement (Doc ID 422-812), as amended by (Doc ID 422-1940).

[190]    The dimensions of baseband chips are typically less than 15mm x 15mm (see for example http://www.anandtech.com/show/6541/the-state-of-qualcomms-modems-wtr1605-and-mdm9x25/3), while their average selling price is above $10 (See Strategy Analytics, Baseband Market Share Tracker Q1 2015, (Doc ID 1153)).

[191]    Case 27/76 *United Brands*, EU:C:1978:22, paragraph 65.

[192]    Case 27/76 *United Brands*, EU:C:1978:22, paragraph 66; and Case 85/76 *Hoffmann-La Roche*, paragraph 39.

Exhibit 31

383

**Exhibit 90**

**1636**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128644
Q2017MDL1_03133237

dominant position.[193] An undertaking which has a very large market share and holds it for some time is in a position of economic strength which makes it an unavoidable trading partner and which, because of this alone, secures for it, at the very least during relatively long periods, that freedom of action which is the special feature of a dominant position.[194] A market share of 50% constitutes in itself, save in exceptional circumstances, evidence of the existence of a dominant position.[195] Likewise, a market share of between 70% and 80% is in itself a clear indication of the existence of a dominant position in a relevant market.[196]

(192)   Another important factor for assessing dominance is the existence of barriers preventing potential competitors from having access to the market and actual competitors from expanding their activities on the market.[197]

(193)   In addition, in a situation where a supplier holds a dominant position, the presence of one or more large customers is not capable of affecting the dominant position of the supplier where the demand side is composed of a number of customers that are not equally strong and which cannot be aggregated.[198]

## 9.2.   Application to this case

(194)   For the reasons set out below, the Commission's preliminary conclusion is that Qualcomm has held a dominant position in the worldwide market for UMTS baseband chipsets and in the worldwide market for LTE baseband chipsets since 2011 to date.

## 9.3.   Market shares

(195)   For the purpose of the calculation of market shares in the two relevant worldwide markets for UMTS baseband chipsets and LTE baseband chipsets, the Commission has used two datasets. The first dataset is from an independent industry analyst, Strategy Analytics. It refers to sales revenues (value)[199] and covers the years from 2010 to 2014. The second dataset has been prepared by the Commission in light of data provided by Qualcomm and its competitors. It is based on shipments (volume) and covers the years from 2010 to 2013. The market shares obtained from both datasets are similar.

---

[193]   Case 85/76 *Hoffmann-La Roche*, EU:C:1979:36, paragraphs 39 and 41; and Case T-65/98 *Van den Bergh Foods v Commission*, ECLI:EU:T:2003:281, paragraph 154.

[194]   Joined Cases C-395/96 P and C-396/96 P   *Compagnie maritime belge transports and Others v Commission*, EU:C:2000:132, paragraph 132; Case T-336/07 *Telefónica and Telefónica de España v Commission*, EU:T:2012:172, paragraph 149; Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraph 40.

[195]   Case C-62/86 *Akzo v Commission*, EU:C:1991:286, paragraph 60; Case T-340/03 *France Télécom*, paragraph 100; and Case T-336/07, *Telefónica and Telefónica de España v Commission*, EU:T:2012:172, paragraph 150.

[196]   Case C-62/86 *Akzo v Commission*, C-62/86, EU:C:1991:286, paragraph 60; and Case T-336/07 *Telefónica*, EU:T:2012:172, paragraph 150.

[197]   Case 27/76 *United Brands*, EU:C:1978:22, paragraphs 91 and 122; and Case 85/76 *Hoffmann-La Roche*, EU:C:1979:36, paragraph 48.

[198]   Case T-228/97 *Irish Sugar v Commission*, EU:T:1999:246, paragraphs 97-98.

[199]   Strategy Analytics (Doc ID 1153) also provides volume-based estimates, which are however calculated based on the revenue figures collected from baseband chipset suppliers.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM          Q2014FTC02128645
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                 Q2017MDL1_03133238

### 9.3.1. Market for UMTS baseband chipsets

9.3.1.1. Value-based market shares

(196) The annual revenues of Qualcomm and its main competitors in the worldwide market for UMTS baseband chipsets from 2010 to 2014, are estimated by Strategy Analytics as follows.[200]

**Table 3: Estimated revenues in the worldwide market for UMTS baseband chipsets, 2010-2014[201]**

| UMTS Baseband Revenues (USD million) | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Qualcomm | 2,666 | 4,083 | 4,138 | 4,015 | 3,611 |
| MediaTek | 38 | 172 | 910 | 1,152 | 2,308 |
| Intel | 843 | 1,244 | 1,278 | 876 | 280 |
| Spreadtrum | - | - | 0 | 69 | 545 |
| ST-Ericsson | 396 | 267 | 581 | 256 | 9 |
| Broadcom | 75 | 288 | 793 | 695 | 350 |
| Marvell | 177 | 224 | 115 | 319 | 215 |
| Freescale | 27 | 19 | 9 | - | - |
| Nvidia | 68 | 89 | 48 | 5 | 1 |
| Renesas Mobile | 175 | 142 | 44 | 4 | 0 |
| RDA | - | - | - | - | 41 |
| Others | 2 | 3 | 3 | 18 | 10 |
| Total Revenues | 4,468 | 6,530 | 7,918 | 7,409 | 7,369 |

(197) Based on Table 3, the shares by value in the worldwide market for UMTS chipsets are as follows.

---

[200] Strategy Analytics (Doc ID 1153) also reports relevant revenues for Texas Instruments and HiSilicon. However, as discussed above in Section 8.2.8, these sales are not part of the relevant market. Therefore, these suppliers have been excluded for the purposes of this analysis.

[201] Source: Strategy Analytics Baseband Market Share Tracker Q1 2015 (Doc ID 1153). Intel includes Infineon. ST-Ericsson data includes STMicro, NXP and EMP. Renesas Mobile includes Renesas and NEC.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Q2014FTC02128646
Q2017MDL1_03133239

**Table 4: Estimated shares in the worldwide market for UMTS baseband chipsets by value, 2010-2014[202]**

| UMTS Baseband Market Shares (by revenue) | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Qualcomm | 59.7% | 62.5% | 52.3% | 54.2% | 49.0% |
| MediaTek | 0.9% | 2.6% | 11.5% | 15.5% | 31.3% |
| Intel | 18.9% | 19.0% | 16.1% | 11.8% | 3.8% |
| Spreadtrum | - | - | 0.0% | 0.9% | 7.4% |
| ST-Ericsson | 8.9% | 4.5% | 7.3% | 3.5% | 0.1% |
| Broadcom | 1.7% | 4.4% | 10.0% | 9.4% | 4.7% |
| Marvell | 4.0% | 3.4% | 1.4% | 4.3% | 2.9% |
| Freescale | 0.6% | 0.3% | 0.1% | 0.0% | - |
| Nvidia | 1.5% | 1.4% | 0.6% | 0.1% | 0.0% |
| Renesas Mobile | 3.9% | 2.2% | 0.6% | 0.1% | 0.0% |
| RDA | - | - | - | - | 0.5% |
| Others | 0.0% | 0.0% | 0.0% | 0.2% | 0.1% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

(198)  The market share of Qualcomm on the basis of revenues has been between 49% and 63% throughout the period under investigation. Moreover, between 2010 and 2013, all of Qualcomm's competitors had a market share of less than one third of Qualcomm's, with no competitor exceeding 20%. As for 2014, MediaTek's market share by value overstates its competitive strength in the EEA as MediaTek is focussed on sales in China (see section **Error! Reference source not found.**).

9.3.1.2.  Volume-based market shares

(199)  The Commission has also obtained data from the major UMTS chipset suppliers regarding their UMTS baseband chipset units shipped from 2010 to 2013. Based on the responses submitted, the shipment volumes are shown in Table 5.

(200)  Since the Commission's market reconstruction covered only the years between 2010 and 2013, the table below also includes the relevant volumes of 2014, as estimated by Strategy Analytics.

---

[202]  Source: Strategy Analytics Baseband Market Share Tracker Q1 2015 (Doc ID 1153). Intel includes Infineon. ST-Ericsson data includes STMicro, NXP and EMP. Renesas Mobile includes Renesas and NEC.

**EN**                                                     41                                                     **EN**

Exhibit 31
386

Exhibit 90
1639

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128647
Q2017MDL1_03133240

**Table 5: Estimated volumes shipped in the worldwide market for UMTS baseband chipsets, 2010-2014[203]**

| UMTS Baseband Volumes (million units) | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Qualcomm | 212.3 | 390.8 | 371.5 | 347.0 | 314.6 |
| MediaTek | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Intel | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Spreadtrum | - | - | 0.0 | 10.0 | 97.0 |
| ST-Ericsson | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Broadcom | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Marvell | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Freescale | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Nvidia | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Renesas | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Total | 367.1 | 598.9 | 696.0 | 763.2 | 785.1 |

(201)    Based on Table 5, the shares of the suppliers in the worldwide market of UMTS baseband chipsets are shown in the table below.

---

[203]    Source: Commission analysis of data provided by Qualcomm in response to Question 56.1 of the request for information of 14 January 2015 and by MediaTek, Intel, ST-Microeletronics, Broadcom, Marvell, Freescale, NVIDIA, Renesas in response to the request for information of 19 November 2014. As Spreadtrum did not respond to the request for information, Strategy Analytics' volume estimates have been used for this company (Doc ID 1153).

**EN**                                   42                                   **EN**
                                  Exhibit 31
                          **Exhibit 90**
                                    387
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
                          **1640**
                                                        Q2014FTC02128648
                                                        Q2017MDL1_03133241

Table 6: Estimated shares in the worldwide market for UMTS baseband chipsets by volume, 2010-2014[204]

| UMTS Baseband Market Shares (by volume) | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Qualcomm | 57.8% | 65.3% | 53.4% | 45.5% | 40.1% |
| MediaTek | [0-5]% | [0-5]% | [5-10]% | [10-20]% | [30-40]% |
| Intel | [10-20]% | [20-30]% | [10-20]% | [10-20]% | [5-10]% |
| Spreadtrum | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [10-20]% |
| ST-Ericsson | [5-10]% | [0-5]% | [5-10]% | [5-10]% | [0-5]% |
| Broadcom | [0-5]% | [0-5]% | [10-20]% | [10-20% | [5-10]% |
| Marvell | [5-10]% | [5-10]% | [5-10]% | [0-5]% | [0-5]% |
| Freescale | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Nvidia | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Renesas | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

(202) Qualcomm's market share on the basis of volume has been between 40% and 65% throughout the period under investigation. Moreover, between 2010 and 2013, all of Qualcomm's competitors had a market share of less than half of Qualcomm's, with no competitor exceeding 20%. As for 2014, MediaTek's market share by volume overstates its competitive strength in the EEA as it is focussed on the low- and mid-range segments of baseband chipsets and on sales in China (see section **Error! Reference source not found.**).

*9.3.2.* *Market for LTE baseband chipsets*

9.3.2.1. Value-based market shares

(203) The LTE revenues of Qualcomm and its main competitors in the worldwide market for LTE baseband chipsets from 2010 to 2014, are estimated by Strategy Analytics as follows.[205]

---

[204] Source: Commission analysis of data provided by Qualcomm in response to Question 56.1 of the request for information of 14 January 2015 and by MediaTek, Intel, ST-Microelectronics, Broadcom, Marvell, Freescale, NVIDIA, Renesas in response to the request for information of 19 November 2014. As Spreadtrum did not respond to the request for information, Strategy Analytics' volume estimates have been used for this company (Doc ID 1153).

[205] Strategy Analytics also reports relevant revenues for GCT, Sequans, Motorola and Altair. All four of these market players supply or supplied exclusively single-mode LTE chipsets, which are not part of the relevant market (for Altair, see http://altair-semi.com/about/; for GCT, see http://www.gctsemi.com/html/LTE.html; for Motorola, see Lenovo's non-confidential answer to question 3 of the request for information of 29 July 2015 (Doc ID 1116); for Sequans, see Sequans' non-confidential answers to question 2 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 501). In addition, Strategy Analytics also reports relevant revenues for HiSilicon and

EN 43 EN
Exhibit 31
388
Exhibit 90
1641
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Q2014FTC02128649
Q2017MDL1_03133242

**Table 7: Revenues in the worldwide market for LTE baseband chipsets, 2010-2014[206]**

| LTE Baseband Revenues (USD million) | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Qualcomm | 6.6 | 156.9 | 3,116.0 | 6,608.0 | 10,220.2 |
| MediaTek | - | - | - | - | 492.6 |
| Intel | - | - | - | 48.3 | 150.2 |
| Spreadtrum | - | - | 0.1 | 0.8 | 33.3 |
| ST-Ericsson | 0.0 | 0.0 | 0.0 | 0.0 | 3.8 |
| Broadcom | - | - | - | 0.4 | 15.2 |
| Marvell | - | - | - | 13.2 | 398.2 |
| Nvidia | - | - | 0.1 | 0.1 | 11.2 |
| Renesas Mobile | - | - | - | 1.2 | - |
| Others | - | 4.5 | 15.8 | 8.5 | 6.8 |
| Total Revenues | 6.6 | 161.4 | 3,131.9 | 6,680.4 | 11,331.5 |

(204)   Certain suppliers included in the above table may also produce a limited volume of baseband chipsets that are not UMTS compliant because (i) they support only the LTE standard or (ii) they support LTE and other standards, e.g. CDMA. These chipsets are excluded from the relevant market (see Sections 8.2.5 and 8.2.6). MediaTek, Intel, and Marvell, however, confirmed[207] that their LTE-compliant baseband chipsets provide full backwards compatibility to UMTS. Qualcomm also stated that in 2013, 99.9% and in previous years, 100% of its "multi-mode LTE baseband chipsets"[208] were UMTS-compliant. In addition, its only LTE single-mode chipset (MDM9310) was *"in fact, a "defeatured" LTE multimode chip insofar as it was created by taking a multimode chip (i.e., the MDM9610), and shutting off the other modes by fusing out (de-featuring) parts of the die".*[209]

(205)   Based on Table 7, the shares by value in the worldwide market for LTE baseband chipsets are as follows.

---

Samsung. However, as discussed above in Section 8.2.6, these sales are not part of the relevant market. Therefore, these suppliers have also been excluded for the purposes of this analysis.

[206]   Source: Strategy Analytics Baseband Market Share Tracker Q1 2015 (Doc ID 1153). Intel includes Infineon. ST-Ericsson data includes STMicro, NXP and EMP. Renesas Mobile includes Renesas and NEC.

[207]   See answers to question 25 of the request for information of 8 January 2015 to baseband chipset suppliers.

[208]   Qualcomm seems to refer to baseband chipsets that support multiple wireless standards, including LTE as "multimode LTE baseband chipsets".

[209]   Qualcomm's answer to question 24 of the request for information of 14 January 2015 (Doc ID 577).

**EN**

Exhibit 31
389

**Exhibit 90
1642**

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128650
Q2017MDL1_03133243

**Table 8: Estimated shares in the worldwide market for LTE baseband chipsets by value,
2010-2014[210]**

| LTE Baseband Market Shares (by revenue) | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Qualcomm | 99.9% | 97.2% | 99.5% | 98.9% | 90.2% |
| MediaTek | - | - | - | - | 4.3% |
| Intel | - | - | - | 0.7% | 1.3% |
| Spreadtrum | - | - | 0.0% | 0.0% | 0.3% |
| ST-Ericsson | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| Broadcom | - | - | - | 0.0% | 0.1% |
| Marvell | - | - | - | 0.2% | 3.5% |
| Nvidia | - | - | 0.0% | 0.0% | 0.1% |
| Renesas Mobile | - | - | - | 0.0% | 0.0% |
| Others | - | 2.8% | 0.5% | 0.1% | 0.1% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

(206)   Qualcomm's market share on the basis of revenues has been above 90% throughout
the period under investigation. Moreover, none of Qualcomm's competitors has had
a market share exceeding 5% during that period.

9.3.2.2.   Volume-based market shares

(207)   The Commission has also obtained from the major LTE chipset suppliers data on
their LTE baseband chipset units shipped from 2010 to 2013.

(208)   Since the Commission's market reconstruction did not cover 2014, the table below
also includes the relevant revenues of 2014, as estimated by Strategy Analytics.

---

[210]   Source: Strategy Analytics Baseband Market Share Tracker Q1 2015 (Doc ID 1153). Intel includes
Infineon. ST-Ericsson data includes STMicro, NXP and EMP. Renesas Mobile includes Renesas and
NEC.

Exhibit 31
**Exhibit 90**
390
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
**1643**
Q2014FTC02128651
Q2017MDL1_03133244

**Table 9: Volumes shipped in the market for LTE baseband chipsets, 2010-2014[211]**

| LTE Baseband Volumes (million units) | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Qualcomm | 2.2 | 14.7 | 162.9 | 335.7 | 518.3 |
| MediaTek | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Intel | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Spreadtrum | - | - | 0.0 | 0.1 | 2.9 |
| ST Ericsson | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Broadcom | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Marvell | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Nvidia | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Renesas | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] | [CONFIDENTIAL] |
| Total | 2.8 | 17.1 | 169.8 | 338.3 | 596.3 |

(209)   Based on Table 9, the shares of the suppliers in the market for LTE baseband chipsets are shown in the table below.

---

[211]   Source: Commission analysis of data provided by Qualcomm in response to Question 56.1 of the request for information of 14 January 2015 and by MediaTek, Intel, ST-Ericsson, Broadcom, Marvell, Freescale, NVIDIA, Renesas in response to the request for information of 19 November 2014. As Spreadtrum did not respond to the request for information, Strategy Analytics' volume estimates have been used for this company (Doc ID 1153).

**EN**

**Exhibit 90
1644**

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128652
Q2017MDL1_03133245

**Table 10: Estimated shares in the market for LTE baseband chipsets by volume, 2010-2014[212]**

| LTE Baseband Market Shares (by volume) | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Qualcomm | 76.3% | 86.3% | 95.9% | 99.2% | 86.9% |
| MediaTek | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [5-10]% |
| Intel | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Spreadtrum | - | - | [0-5]% | [0-5]% | [0-5]% |
| ST Ericsson | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Broadcom | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Marvell | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Nvidia | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5% |
| Renesas | [20-30]% | [10-20]% | [0-5]% | [0-5]% | - |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

(210)   Qualcomm's market share on the basis of volume has been above 75% throughout the period under investigation. Moreover, between 2010 and 2014, all of Qualcomm's competitors had a market share of less than one third of Qualcomm's, with no competitor exceeding approximately 5% since 2012.

**9.4.   Barriers to entry and expansion**

(211)   The worldwide markets for both UMTS and LTE baseband chipsets are characterised by the existence of a number of barriers to entry and expansion.

(212)   First, before a new supplier can launch its first product in the relevant market, it needs to undertake significant investments in research and development (R&D) activities related to the design of baseband chipsets.

(213)   For example, Broadcom, which exited the market in 2014, stated that: *"Our company invested billions of dollars in organic R&D since 2007, as well as making several acquisitions, in an effort to develop a cellular baseband business. [...] We ultimately determined that the* [baseband chipset] *market did not offer economic returns sufficient to justify the large investment required to continue to develop* [baseband chipsets]. *[...] Currently, Qualcomm dominates the market particularly at the high*

---

[212]   Source: Commission analysis of data provided by Qualcomm in response to Question 56.1 of the request for information of 14 January 2015 and by MediaTek, Intel, ST-Ericsson, Broadcom, Marvell, Freescale, NVIDIA, Renesas in response to the request for information of 19 November 2014. As Spreadtrum did not respond to the request for information, Strategy Analytics' volume estimates have been used for this company (Doc ID 1153).

**EN**

47

Exhibit 31
392

**Exhibit 90
1645**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EN**

Q2014FTC02128653
Q2017MDL1_03133246

*end, with Intel maintaining a small share due to a very large investment, and MediaTek and smaller China players having a presence in the China market.*[213]

(214)   In addition, MediaTek submitted that *"more than 70% of the company's total [baseband chipset] investment goes to R&D, design and physical infrastructure costs."*[214] Similarly, Nvidia explained that *"[t]he current operating cost of the Icera modem business is approximately $135 million a year. Approximately 85% of that sum is spent on R&D related to UMTS and LTE [baseband chipset] production."*[215]

(215)   Moreover, as R&D activities for the development of baseband chipsets are in large part specific to a certain wireless standard, established suppliers of chipsets in cellular technologies other than UMTS and LTE would have to undertake significant R&D investments in order to enter the worldwide markets for UMTS and LTE baseband chipsets.

(216)   Second, baseband chipset suppliers such as Qualcomm that have played an active role in the development of the technology that was incorporated into the UMTS and LTE standards, have a competitive advantage over other baseband chipset suppliers. This was confirmed both by Qualcomm and by other suppliers:

(a)   according to Qualcomm, its *"share of supply of chips that support LTE can be attributed to the fact that it has invested significant R&D resources in developing LTE chips, and was, in fact, the first company to have designed, certificated, and commercialised such chips. Qualcomm has, in no small measure, created the demand for LTE chips".*[216]

(b)   according to Sequans, *"[h]olders of meaningful standards-essential IPR use it as an argument that because they 'invented' parts of the standard, they are somehow more trusted implementers of the standard."*[217]

(217)   Third, Qualcomm holds a large portfolio of patents[218] and, since 2008, it has refused to enter into licence agreements with competing chipset suppliers relating to CDMA, UMTS/W-CDMA and LTE technologies that would allow those suppliers to pass through rights under Qualcomm's patents to their customers.[219]

(218)   Several competing baseband chipset suppliers, including Samsung, Intel, MediaTek, Broadcom and Sequans, have sought to conclude licence agreements that would

---

213   Broadcom's non-confidential answer to question 2 of the request for information of 9 February 2015 to baseband chipset suppliers (Doc ID 1241).

214   MediaTek's non-confidential answer to question 11 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1293).

215   Nvidia's non-confidential answer to question 12 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 711).

216   See Qualcomm's response to question 32 of the request for information of 20 January 2014 in Case AT.39711 (Doc ID 861).On 20 April 2015, Qualcomm informed the Commission that it did not object to the use of the response to the request for information of 20 January 2014 in Case 40220.

217   Sequans's non-confidential answer to question 7.1 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 501).

218   See for example p.10 of Qualcomm's Form-10K report for the fiscal year 2011 (section "Patents, Trademarks and Trade Secrets"). http://investor.qualcomm.com/secfiling.cfm?filingid=1234452-11-360&cik=. In addition, the majority of the respondents to the Commission's market investigation stated that Qualcomm's IPRs constitute a competitive advantage over its competitors (see answers to question 28 of the request for information of 30 April 2015 to baseband chipset suppliers).

219   See Page 10 of Qualcomm's 2008 Form 10 –K Report, available at https://www.qualcomm.com/documents/investor-2008-annual-report

Exhibit 90
1646

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128654
Q2017MDL1_03133247

allow them to pass through rights under Qualcomm's patents to their customers. Qualcomm has, however, consistently refused to enter into such agreements.[220] Instead, Qualcomm agrees either to grant licences limited to the manufacture of chipsets (without pass through rights), or not to assert its patents against competing chipset suppliers on the condition that those suppliers sell baseband chipsets exclusively to Qualcomm licensees.[221]

(219) As a result, competing chipset suppliers cannot:

   (1) offer a 'one-stop-shop' to their customers since they cannot sell them baseband chipsets with coverage of Qualcomm's IPRs. This means that they can only sell baseband chipsets to a customer if that customer has already obtained a licence from Qualcomm;[222]

   (2) create a "grant-back network" similar to that of Qualcomm (see next section) as they do not have access to Qualcomm's IPR portfolio; and

   (3) develop business relationships with prospective customers, in particular new end-device manufacturers, without Qualcomm's knowledge or involvement. This is because Qualcomm enjoys the advantage of having a first contact with customers that need to enter into licence agreements with Qualcomm separately before they can purchase baseband chipsets from competing baseband chipset suppliers.[223]

(220) Fourth, when it agrees cross-licenses with other holders of IPR in the UMTS and LTE standards, Qualcomm systematically requests and obtains the right of pass-through of the other party's IPR to its chipset customers. This can be either in the form of sub-license rights or by agreeing to a non-assert covenant, whereby the licensee agrees not to assert its IPRs against any Qualcomm chipset customer with regard to Qualcomm baseband chipsets.

(221) This network of contractual clauses, known as the "Grant-back network", constitutes a barrier to entry and expansion for competing suppliers of baseband chipsets.

(222) This was underlined by Qualcomm's President and Vice Chairman Steve Altman in his speech at a conference in 2005: *"over 100 companies have provided us with some set of pass-through rights. That means that when I sell my chips and software to a*

---

[220] See Samsung's non-confidential answer to questions 19 and 22 (Doc ID 1308), Intel's non-confidential answer to question 20 (Doc ID 1258), MediaTek's non-confidential answer to question 19, Broadcom's non-confidential answer to question 20 (Doc ID 1242) and Sequans's non-confidential answer to question 19 (Doc ID 636) of the request for information of 30 April 2015 to baseband chipset suppliers.

[221] See Page 10 of Qualcomm's 2008 Form 10 –K Report, available at https://www.qualcomm.com/documents/investor-2008-annual-report, and Qualcomm's presentation of 20 February 2013 "The Qualcomm Technology Licensing Program and the Licensing of Standard-Essential Patents" (Doc ID 666).

[222] For example Apple stated that *"Qualcomm uses its portfolio of patents, particularly those standards essential patents associated with UMTS, as a competitive weapon in the market for [baseband chipsets]."* [...] *"Qualcomm's refusal to license other* [baseband chipset] *suppliers makes those suppliers less attractive."* (Apple's non-confidential answer to questions 9 and 18 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1036).

[223] For example, Marvell stated that *"The result is that Qualcomm blocks the chipset competition that its own FRAND commitment should have allowed. This harms not only Marvell and other chipset makers, but also OEMs and consumers, who are deprived of the free and open chipset competition that FRAND licensing should make possible, increasing costs and decreasing technology options and differentiation."* (Marvell's non-confidential answer to question 8 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1358).

**Exhibit 90**
**1647**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128655
Q2017MDL1_03133248

company, they get access to Qualcomm's IP, and they get access to more than 100 companies' IP as a result of that. That eliminates a great deal of potential royalty stacking, because otherwise, if they were to acquire chips from another company or didn't have these pass-through rights, they would be in a position where they'd have to individually negotiate with each of these other companies and potentially have to pay royalties to each of these other companies".[224]

(223)  This was also confirmed by respondents to the market investigation.[225] For example, ZTE stated that "[i]f other conditions are similar, customer will surely give up rival [baseband chipset] suppliers' products as it is much safer from IPR perspective to choose Qualcomm [baseband chipsets]."[226] Samsung, Apple, Microsoft, HTC and Blackberry made similar statements.[227]

(224)  Certain respondents to the market investigation estimated the value that the Grant-back network represented to a chipset customer. For instance, HTC estimated this value to be USD [5-10] per baseband chipset by aggregating the royalties claimed by major SEP holders.[228] Similarly, MediaTek "understands from customers" that the grant-back value (including patent royalties of a number of licensors) is USD [1-5] per baseband chipset.[229] These estimated figures are significant when compared to the average sale price of USD 9.28 for a UMTS baseband chipset and USD 18.84 for a LTE baseband chipset in 2014.[230]

(225)  By contrast, competing chipset suppliers are unable to offer similar protection. This is because these covenants are effective only for products that incorporate a Qualcomm chipset: if a customer were to buy a baseband chipset from a different supplier, it would have to pay royalties to some or all of these third party IPR holders (to fill the so called "IPR gap"). This was also confirmed by respondents to the market investigation:

(a)  According to Broadcom, "While it is very difficult to quantify the precise impact, the grantback network would pose a significant barrier to entry. In addition, we would often times be requested by customers to cut prices to compensate for the lack of a grant-back network. Finally, we would lose many designs due to our lack of a grant-back network."[231]

---

[224]  Transcript of Qualcomm London Investor Day Presentation, 8 Nov. 2005, p. 15 (Doc ID 749).

[225]  See answers to questions 29 and 33 of the request for information of 30 April 2015 to baseband chipset suppliers; answers to questions 18 and 20 of the request for information of 30 April 2015 to baseband chipset customers.

[226]  See ZTE's non-confidential answer to question 18 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1181).

[227]  See Apple's non-confidential answer to question 8.1 of the request for information of 4 November 2014 to baseband chipset customers (Doc ID 1032); Samsung's non-confidential answer to question 33 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1308); Microsoft's (Doc ID 951), HTC's (Doc ID 1246) and Blackberry's (Doc ID 1368-6) non-confidential answers to question 18 of the request for information of 30 April 2015 to baseband chipset customers.

[228]  HTC's non-confidential answer to question 19 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1246).

[229]  MediaTek's non-confidential answer to question 31 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1293).

[230]  Strategy Analytics Baseband Market Share Tracker Q1 2015 (Doc ID 1153).

[231]  Broadcom's non-confidential answer to question 31 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1242).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128656
Q2017MDL1_03133249

(b) Intel notes that "*In some instances, customers including* [MAJOR OEM] *have cited the greater patent protection that they believe that Qualcomm offers as a basis for demanding a lower price from Intel to compensate for the perceived disparity in patent protection. [...]*[232] *During these negotiations,* [MAJOR OEM] *sought indemnity from Intel from claims that Intel's* [baseband chipsets], *alone or as used in* [MAJOR OEM] *products, infringed on a third party's IPRs.* [MAJOR OEM] *claimed that Qualcomm offered significant pass-through rights because of its grant-back network, and indicated that Intel's proposal was at a disadvantage relative to Qualcomm's unless Intel offered to indemnify* [MAJOR OEM] *against claims from which* [MAJOR OEM] *would have been protected by using Qualcomm* [baseband chipsets]."[233]

(c) Apple explained that "*Qualcomm uses its grant-back network as a marketing tool for its* [baseband chipsets], *and a competitive advantage over other* [baseband chipset] *suppliers.*[234] *[...] Qualcomm seeks to leverage the existence of this network in its commercial negotiations for chip supply to justify its (higher) component pricing and to differentiate its component offering from other would-be suppliers (such as Intel) who have not been able to secure (and therefore offer) such third party rights as a benefit for choosing to engage with Qualcomm in a commercial relationship for its* [baseband chipsets]."[235]

(226) Fifth, baseband chipsets need to be certified by MNOs on their networks and by OEMs in their devices. While the certification process of a new baseband chipset typically takes about 6 to 12 months,[236] established suppliers of baseband chipsets such as Qualcomm can benefit from time savings due to: (i) similarities between older and newer chipset models of the same supplier; and (ii) previous supplier-specific investments made by customers, such as in know-how.

(227) Regarding similarities between older and newer chipset models of the same supplier, qualifying a new feature on an existing reference design may take a few months, whereas the certification of a genuinely new baseband chipset design may take up to a year or two.[237]

(228) Regarding previous supplier-specific investments, Sequans submits that "*[p]rospective customers have made major investments over the years in designing*

---

[232] Intel's non-confidential answer to question 28 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).

[233] Intel's non-confidential answer to question 31 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).

[234] Apple's non-confidential answer to question 18 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1036).

[235] Apple's non-confidential answer to question 15 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1036).

[236] Intel's non-confidential answer to question 34 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258); Acer's non-confidential answer to question 21 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1283); Huawei's non-confidential answer to question 21 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1275); Toshiba's non-confidential answer to question 21 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 651); ZTE's non-confidential answer to question 21 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1181).

[237] Broadcom's (Doc ID 1242) and Renesas's (Doc ID 1311) non-confidential answers to question 34 of the request for information of 30 April 2015.

Exhibit 31

**Exhibit 90**

396

**1649**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128657
Q2017MDL1_03133250

*devices using* [baseband chipsets] *of established chipset providers, creating an incumbent's advantage, making it difficult to displace."*[238]

(229)   Intel also submits that *"A* [baseband chipset] *customer undertakes significant capital investments when it adopts a given* [baseband chipset] *supplier's chipset kit, as a result of technical enabling requirements and testing processes that are specific to that* [baseband chipset] *supplier. Therefore, a* [baseband chipset] *customer must undertake additional investment and risk if it switches* [baseband chipset] *suppliers.* [239] *[...] many companies have exited the market because they have not been able to develop the relationships with OEMs and MNOs needed to gain market acceptance and operate profitably—a fact that, in turn, makes it more difficult for new entrants to raise the necessary funds."* [240]

(230)   Sixth, recent entrants or smaller players may find it challenging to build up scale, due to the brand image, reputation and strong business relationships that Qualcomm benefits from. The majority of respondents to the Commission's market investigation considered that establishing relationships with customers is important for the success of a baseband chipset.[241] For example, MediaTek explained that *"to be considered by larger OEMs, a* [baseband chipset] *supplier needs to have proven records, shipment records, or formal approvals from major carriers worldwide."*[242]

(231)   Recent entrants or smaller players may therefore need to compensate their customers for their less well-known brand. As Intel explained, *"[baseband chipset] customers are very hesitant to adopt untested platforms, given both the resources required to adopt a new chipset [...] and the attendant risk due the large volume of distribution of many mobile telephony SKUs* [Stock Keeping Unit].[243] *Accordingly, when negotiating with a* [baseband chipset] *customer that is comparing Intel against its incumbent* [baseband chipset] *supplier, Intel must provide the customer with a strong incentive, in terms of both price and features, to make the switch to Intel."*[244]

(232)   The majority of market players also believe that Qualcomm has already built strong relationships with a number of MNOs globally.[245] According to MediaTek, *"Qualcomm makes effort to build relationships with MNOs, helping them drive adoption of new features in their networks. To the best of MediaTek's understanding, Qualcomm Engineering Services ("QES"), a former (and possibly current) division*

---

[238]   Sequans's non-confidential answer to question 8 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 636).

[239]   Intel's non-confidential answer to question 33 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).

[240]   Intel's non-confidential answer to question 8 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).

[241]   See answers to question 37 of the request for information of 30 April 2015 to baseband chipset suppliers.

[242]   MediaTek's non-confidential answer to question 8 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1293).

[243]   Stock Keeping Unit is a separate item in an inventory.

[244]   Intel's non-confidential answer to question 32 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).

[245]   See answers to question 38 of the request for information of 30 April 2015 to baseband chipset suppliers.

**EN**

52

Exhibit 31

397

**EN**

**Exhibit 90**

**1650**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128658
Q2017MDL1_03133251

*of Qualcomm Technology Licensing ("QTL"), may have offered engineering services to MNOs."*[246]

(233)  Some market players also note that Qualcomm's relationship with certain MNOs is so close that it might make it difficult for other chipset suppliers to compete in order to supply these MNOs. *"Marvell has observed that when an operator issues an RFI/RFQ*[247]*, the entire process may be skewed in Qualcomm's favour such that the operators and OEM would not be likely to choose a competitor of Qualcomm."*[248] According to Blackberry, *"Qualcomm often dictates or influences the carriers' choices, and thus Qualcomm has a significant advantage in having its* [baseband chipsets] *certified by the carriers."*[249]

(234)  Seventh, because OEMs often sell the same devices throughout the world, they expect that suppliers are able to provide baseband chipsets that support a variety of standards used across all geographic areas. For example, two of the largest carriers in the USA (Verizon and Sprint) as well as several Chinese carriers own mobile networks based on the CDMA standard. Accordingly, the majority of baseband chipset customers that responded to the Commission's questionnaire stated that it is important that a supplier is able to supply CDMA-enabled chipsets.[250]

(235)  There are, however, only two players active in the production of CDMA baseband chipsets: Qualcomm and VIA Telecom and the latter does not have UMTS or LTE production capabilities. Qualcomm's share of supply is estimated to have exceeded 85% in volume and 90% in value terms in this product area in each year since 2008.[251]

(236)  As a result, if an OEM seeks to launch a new device worldwide, in practice it has the choice to either: (i) use Qualcomm chipsets in its devices globally; or (ii) use Qualcomm or VIA Telecom chipsets in its CDMA devices and other chipsets in its UMTS devices.

(237)  According to a number of OEMs (e.g. Apple,[252] HTC,[253] Lenovo,[254] Samsung[255]), VIA Telecom's CDMA chipsets are not a realistic alternative to Qualcomm's chipsets. For this reason, Samsung believes that *"Qualcomm is an unavoidable trading partner for Samsung, in particular for LTE Integrated chipsets, CDMA*

---

[246]  MediaTek's non-confidential answer to question 38 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1293).

[247]  Telecommunication operators who sell phones normally issue a RFI (Request for Information) and a RFQ (Request for Quote of devices) to select suppliers.

[248]  Marvell's non-confidential answer to question 37 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1214).

[249]  Blackberry's non-confidential answer to question 20 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1368-6).

[250]  See answers to question 31 of the request for information of 30 April 2015 to baseband chipset customers.

[251]  Strategy Analytics, Baseband Market Share Tracker Q1 2015, (Doc ID 1153).

[252]  Apple's answer to question 3 of the request for information of 4 November 2014 (Doc ID 1032).

[253]  HTC's non-confidential answer to question 29 of the request for information of 30 April 2015 (Doc ID 1246).

[254]  Lenovo's non-confidential answer to question 29 of the request for information of 30 April 2015 (Doc ID 1255).

[255]  Samsung's non-confidential answer to question 28 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1308).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128659
Q2017MDL1_03133252

*chipsets and high-end baseband chipsets in general."* [256] Ericsson also stated in this regard that *"Qualcomm has with [above 90%] market share [...]. No one can challenge Qualcomm when it comes to multi-RAT integration including CDMA."* [257]

(238)    In addition, Intel submits that *"[s]maller OEMs such as Sony or LG do not have the scale to support investment in multiple regional platforms, and therefore tend to develop a single platform for global deployment that operates on both CDMA and non-CDMA networks. [...] As a result, a* [baseband chipset] *supplier's inability to support CDMA results in being shut out of sales opportunities at those OEMs not only for devices for the CDMA-network carriers but for all devices on a worldwide basis, even at carriers that do not support CDMA."* [258] MediaTek also expressed a similar opinion with regard to larger OEMs. [259]

(239)    This view is also confirmed by Lenovo, which highlights that *"[...] it would be cost-prohibitive for Motorola to develop and support one technology stack for CDMA-compatible networks and another for GSM-family networks.* [260] *[...] That effectively makes CDMA capabilities necessary to compete in the EEA as well."* [261]

(240)    Besides the cost implications, the inability to provide a uniform product globally may also deter OEMs from sourcing baseband chipsets from multiple suppliers. According to Intel, *"some major OEMs, such as Samsung, have required the same multimode chipset with LTE plus 3G for both CDMA networks and UMTS networks in the same country, so as to maintain the identical LTE performance on the same handset models across different carriers."* [262]

**9.5.    Countervailing buyer power**

(241)    The Commission's preliminary conclusion is that the commercial strength of Qualcomm's baseband chipset customers is not capable of affecting the dominant position of Qualcomm. This is for the following reasons.

(242)    First, customers typically must accept the standard terms proposed by Qualcomm in its template agreements, including those in relation to price and to the right of its licensees to assert their IP against Qualcomm and Qualcomm's baseband chipset customers. For example, HP submits that *"HP and Qualcomm are currently negotiating an agreement where Qualcomm refuses to utilize the HP template that other competitors have utilized without objection."* [263] Similarly, Lenovo submits that

---

[256]    Samsung's non-confidential answer to question 28 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1307).

[257]    Ericsson's non-confidential answer to question 42 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1060).

[258]    Intel's non-confidential answer to question 45 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).

[259]    MediaTek's non-confidential answer to question 8 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1293).

[260]    Lenovo's non-confidential answer to question 25 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1255).

[261]    Lenovo's non-confidential answer to question 31 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1255).

[262]    Intel's non-confidential answer to question 42 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).

[263]    HP's non-confidential answer to question 28 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1296).

**EN**                                          54                                          **EN**

Exhibit 31
399
Exhibit 90
1652
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Q2014FTC02128660
Q2017MDL1_03133253

> *"Qualcomm primarily operates using standard terms and only rarely deviates from them, and even then only after extensive negotiation."*[264]

(243)    Second, owing to its portfolio of SEPs (see Section 9.4), Qualcomm can obtain royalties for SEPs that a customer may not use or that have expired. For example, Lenovo explained in this regard that *"Qualcomm required, as a prerequisite for the supply of the* [baseband chipsets]*, royalties for LTE-TDD IPRs despite the fact that such IPRs are not used by Lenovo. [...] Qualcomm has previously requested Lenovo to pay royalties for TD-SCDMA IPRs that Lenovo did not use and which were not covered by the Licensing Agreement."*[265] According to Huawei, *"Qualcomm's royalty rates are not adjusted to reflect the expiry of fundamental patents. Similarly, they are not adjusted if one or several of Qualcomm's patents are successfully challenged as being invalid or not infringed."*[266]

(244)    Third, customers seem unable to separate negotiations on baseband chipset supply from negotiations on IPR licensing. For example, Apple notes that it *"has constantly tried to separate discussions about (i) the supply to Apple of Qualcomm's* [baseband chipsets]*, and (ii) Qualcomm patent licensing. Apple has done so in a transparent effort to separate Qualcomm's chips and patents so that Qualcomm cannot use the leverage it has from dominance in* [baseband chipset] *supply to demand higher patent royalties from Apple than the patents themselves may deserve. [...] Qualcomm has repeatedly refused to accept this request, alleging that this would break its business model."*[267]

(245)    Fourth, all of Qualcomm's customers that responded to the Commission's request for information consider that Qualcomm is able to exercise significantly more leverage compared to other baseband chipset suppliers.[268] The majority of respondents also stated that when negotiating with Qualcomm, they are unable to exercise significant pressure regarding price and other key elements.[269] For example according to Apple, *"Qualcomm's dominant market positions in [baseband chipsets] and SEPs make it extremely difficult to exert pressure on the company concerning price and other key elements during negotiations."*[270] Samsung also explained that *"[it] has no significant leverage to negotiate the prices of certain baseband chipsets. For example, LTE Integrated chipsets (e.g. "Snapdragon") and CDMA chipsets are relatively high-priced since Qualcomm is the sole supplier of LTE baseband chipsets and the de facto sole supplier of CDMA chipsets."*[271]

---

[264]    Lenovo's non-confidential answer to question 24 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1255).

[265]    Lenovo's non-confidential answer to question 24 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1255).

[266]    Huawei's non-confidential answer to question 12 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1274).

[267]    Apple's non-confidential answer to question 24 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1036).

[268]    See answers to question 28 of the request for information of 30 April 2015 to baseband chipset customers.

[269]    See answers to question 27 of the request for information of 30 April 2015 to baseband chipset customers.

[270]    Apple's non-confidential answer to question 27 of the Commission's request for information of 30 April 2015 to baseband chipset customers (Doc ID 1036).

[271]    Samsung's non-confidential answer to question 27 of the Commission's request for information of 30 April 2015 to baseband chipset customers (Doc ID 1307).

**EN**                                                                                    **EN**

Exhibit 31                    **Exhibit 90**
400                           **1653**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM                    Q2014FTC02128661
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                          Q2017MDL1_03133254

## 10.    ABUSE

### 10.1.    Principles

(246)    The concept of abuse is an objective concept relating to the behaviour of an undertaking in a dominant position which is such as to influence the structure of a market where, as a result of the very presence of the undertaking in question, the degree of competition is weakened and which, through recourse to methods different from those which condition normal competition, has the effect of hindering the maintenance of the degree of competition still existing in the market or the growth of that competition.[272]

(247)    A dominant undertaking has a special responsibility not to impair, by conduct falling outside the scope of competition on the merits, genuine undistorted competition in the internal market.[273] It follows from the nature of the obligations imposed by Article 102 TFEU that, in specific circumstances, an undertaking in a dominant position may be deprived of the right to adopt a course of conduct or take measures which are not in themselves abuses and which would even be unobjectionable if adopted or taken by non-dominant undertakings.[274]

(248)    Article 102 TFEU and Article 54 of the EEA Agreement prohibit abusive practices which may cause damage to consumers directly, but also those which harm them indirectly through their impact on an effective competition structure.[275]

(249)    Regarding the grant of payments conditional upon a customer obtaining - whether the quantity of its purchases be large or small - all or most of its requirements from the undertaking in a dominant position ("exclusivity payments"), such payments, when applied by an undertaking in a dominant position, are incompatible with the objective of undistorted competition within the internal market, because they are not based — save in exceptional circumstances — on an economic transaction which justifies this burden or benefit but are designed to remove or restrict the purchaser's freedom to choose its sources of supply and to deny other producers access to the market. Such payments are designed, through the grant of a financial advantage, to prevent customers from obtaining their supplies from competing producers.[276]

(250)    The question whether exclusivity payments can be categorised as abusive does not depend on an analysis of the circumstances of the case aimed at establishing an

---

[272]    Case C-549/10 P *Tomra v Commission*, EU:C:2012:221, paragraph 17; Case C-457/10 P *AstraZeneca v Commission*, EU:C:2012:770, paragraph 74.

[273]    Case 322/81 *Nederlandsche Banden Industrie Michelin v Commission*, EU:C:1983:313, paragraph 57; Case C-209/10 *Post Danmark A/S v Konkurrencerådet*, EU:C:2012:172, paragraph 23; Case C-457/10 P *AstraZeneca v Commission*, EU:C:2012:770, paragraph 134.

[274]    Case 322/81 *Nederlandsche Banden-Industrie Michelin v Commission*, EU:C:1983:313, paragraph 57; Case T-111/96 *ITT Promedia v Commission* [1998] ECR II-2937, EU:T:1998:183, paragraph 139.

[275]    Case C-286/13 P *Dole Food and Dole Fresh Fruit Europe v Commission*, EU:C:2015:184, paragraph 125, where the Court of Justice recently stated that "*Article 81 EC, like the other competition rules of the Treaty, is designed to protect not only the immediate interests of individual competitors or consumers but also to protect the structure of the market and thus competition as such*". See in the same vein Case C-202/07 P *France Télécom v Commission*, EU:C:2009:214, paragraph 105; Joined Cases C-501/06 P, C-513/06 P, C-515/06 P and C-519/06 P *GlaxoSmithKline Services and Others v Commission and Others*, EU:C:2009:610, paragraph 63; and Case C-52/09 *Konkurrensverket v TeliaSonera Sverige AB*, EU:C:2011:83, paragraph 24.

[276]    Case 85/76 *Hoffmann-La Roche*, EU:C:1979:36, paragraph 89; Case T-286/09 *Intel Corp. v Commission*, EU:T:2014:472, paragraphs 169 and 178; and Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraph 27.

Exhibit 31

401

Exhibit 90

1654

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128662
Q2017MDL1_03133255

actual[277] or potential anti-competitive effect.[278] The anti-competitive nature of exclusivity payments also does not depend on the precise amount of the portion of the payments that are conditional upon exclusivity. Rather it depends on the exclusivity which was granted in consideration for those payments.[279]

(251)   While the Commission is not required to analyse the capability of exclusivity payments to restrict competition, the presence of certain factors can suggest that such payments are capable of restricting competition. These, for example, may include whether the payments are granted to certain strategically important beneficiaries[280] and whether they were actually taken into account in the commercial decisions of those benefiting from them.[281]

(252)   It is open to a dominant undertaking to justify the use of exclusivity payments, in particular by showing that its conduct is objectively necessary or that the potential foreclosure effect that it brings about may be counterbalanced, outweighed even, by advantages in terms of efficiency that also benefit consumers.[282]

(253)   Although the burden of proof of the existence of circumstances that constitute an infringement of Article 102 TFEU is borne by the Commission, it is for a dominant undertaking to raise any plea of objective justification or efficiency defence and to support it with arguments and evidence.[283]

## 10.2.   The abusive conduct

(254)   The Commission has reached the preliminary conclusion that, absent any objective justification or efficiency gains, Qualcomm's grant of payments to Apple on condition that it obtains all of its requirements of UMTS and LTE baseband chipsets from Qualcomm constitutes an abuse of a dominant position (Section 10.3).

(255)   The Commission also preliminarily concludes that: (i) Qualcomm's conduct is capable of having anti-competitive effects (Section 10.4); (ii) there is no objective justification or efficiency gains to justify Qualcomm's conduct (Section 10.5); (iii) Qualcomm's conduct constitutes a single and continuous infringement of Article 102 TFEU and Article 54 of the EEA Agreement (Section 10.5); and (iv) Qualcomm's conduct has taken place since 25 February 2011 (Section 10.7).

## 10.3.   The payments conditional upon Apple obtaining all of its requirements of UMTS and LTE baseband chipsets from Qualcomm

(256)   The Commission's preliminary conclusion is that, absent any objective justification or efficiency gains, Qualcomm's grant of payments to Apple on condition that it obtains all of its requirements of UMTS and LTE baseband chipsets from Qualcomm constitutes an abuse of a dominant position.

---

[277]   Case T-286/09 *Intel Corp. v Commission*, EU:T:2014:472, paragraph 177.
[278]   Case T-286/09 *Intel Corp. v Commission*, EU:T:2014:472, paragraph 171.
[279]   Case T-286/09 *Intel Corp. v Commission*, EU:T:2014:472, paragraph 1500.
[280]   Case T-286/09 *Intel Corp. v Commission*, EU:T:2014:472, paragraphs 1506 and 1507.
[281]   Case T-286/09 *Intel Corp. v Commission*, EU:T:2014:472, paragraph 1512.
[282]   Case C-95/04 P *British Airways*, EU:C:2007:166, paragraph 74 above, paragraphs 85 and 86; Case C-209/10 *Post Danmark A/S v Konkurrencerådet*, EU:C:2012:172, paragraphs 40 and 41 ; Case C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraphs 47 and 48.
[283]   Case T-201/04 *Microsoft Corporation v Commission*, EU:T:2007:289, paragraph 688; Case C-209/10 *Post Danmark A/S v Konkurrencerådet*, EU:C:2012:172, paragraph 42; Case-C-23/14 *Post Danmark A/S v Konkurrencerådet*, EU:C:2015:651, paragraph 49.

**EN**                                              **EN**

**Exhibit 90**

**1655**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128663
Q2017MDL1_03133256

(257) As outlined in Section 7, pursuant to the Agreements, Qualcomm has, since 25 February 2011, granted payments to Apple on condition that it obtains all of its requirements of UMTS and LTE baseband chipsets from Qualcomm.

(258) More specifically, the Agreements provide that Qualcomm will pay to Apple the Incentive Payments, which are subject to a number of exclusivity provisions:

    (1) in the event that Apple releases a product commercially that incorporates a non-Qualcomm baseband chipset, the Agreements will terminate and Qualcomm will not make any of the Incentive Payments that are due and payable after the date of such release, due to the inclusion in the Agreements of the Termination Clause;[284] and

    (2) in the event that Apple releases a product commercially that incorporates a non-Qualcomm baseband chipset in 2013 or later, Apple will reimburse part of the Incentive Payments previously received from Qualcomm, due to the inclusion in the Agreements of the Repayment Mechanism.[285]

(259) This conclusion is not affected by the fact that the Agreements allowed Apple to continue to procure UMTS and LTE baseband chipsets for legacy products from existing suppliers (see paragraph (113)).

(260) First, competing baseband chipset suppliers ought to have been able to compete on the merits for the entire market and not just for a part of it.[286]

(261) Second, Apple legacy products were decreasing over time in terms of their relative importance in Apple's supply requirements, and, as of 2015, Apple has been purchasing baseband chipsets exclusively from Qualcomm.

(262) Third, competition in the baseband chipset industry mainly takes place on future models as it is burdensome for OEMs to change baseband chipset suppliers for existing smartphone or tablet models.[287]

**10.4. Potential anti-competitive effects of Qualcomm's conduct**

(263) While not legally required to do so, the Commission has also reached the preliminary conclusion that Qualcomm's conduct is capable of having anti-competitive effects. These are discussed in the following sections.

*10.4.1. Qualcomm's conduct has reduced Apple's incentives to switch to Qualcomm's competitors*

(264) The table below shows that between 2011 and 2014, Apple has received from Qualcomm a total of USD 1.9 billion of Incentive Payments. Apple also expects to receive a further USD 850 million of Incentive Payments in 2015. The Incentive

---

[284] See Clause 1.5 of the Transition Agreement (Doc ID 42) and Clause 1.5A as added to the Transition Agreement by Clause 6 of the First Amendment to the Transition Agreement (Doc ID 38).

[285] See Clause 1.5 of the Transition Agreement; See also Clauses 1.3A(c) as added by Clause 2 of the First Amendment to the Transition Agreement (Doc ID 38) and Clause 1.3B(b), as added by Clause 3 of the First Amendment to the Transition Agreement and Clause 1.5, as amended by Clause 5 of the First Amendment to the Transition Agreement (Doc ID 38).

[286] Case C-549/10 P *Tomra and Others v Commission*, EU:C:2012:221, paragraph 42..

[287] See for example LG Electronics' non-confidential answer to question 6.1 of the request for information of 4 November 2014 (Doc ID 344), and Apple's non-confidential answer to question 6.1 of the request for information of 4 November 2014 (Doc ID 1032). See also above, Section 9.4.

Exhibit 31
403

Exhibit 90
1656

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128664
Q2017MDL1_03133257

Payments represent between ▮% and ▮% of Apple's yearly expenditure for baseband chipsets.

**Table 11 – Amount of Incentive Payments received by Apple per year between 2011 and 2015**

| Year | Amount of Incentive Payment received by Apple from Qualcomm (USD) | Payments as % of yearly Apple expenditure for baseband chipsets | Payments as % of yearly Apple expenditure for Qualcomm baseband chipsets[288] |
|---|---|---|---|
| 2011 | 50,000,000 | | |
| 2012 | 425,000,000 | | |
| 2013 | 718,000,000 | | |
| 2014 | 719,000,000 | | |
| 2015* | 850,000,000 | | |

Source: Apple[289]

* Estimates

(265) Due to their magnitude, the Incentive Payments have reduced Apple's incentives to purchase baseband chipsets from competing baseband chipset suppliers, considering that as a result of such a purchase, Apple would have lost the right to obtain these payments from Qualcomm, including certain payments already received.

(266) The loyalty-enhancing effect of the Incentive Payments is reinforced by the Repayment Mechanism. The table below shows the amounts that Apple would have had to reimburse to Qualcomm in case of breach of exclusivity in the years 2013-2015 and what percentage they would represent of Apple's yearly expenditure for baseband chipsets.[290]

---

[288]   Even if the Transition Agreement was effective as of February 2011, Apple had continued to purchase baseband chipsets from Intel necessary for the manufacture of legacy products until 2014. For this reason, there is a difference in the percentage represented by the Incentive Payments over total purchases of baseband chipsets or over purchases of baseband chipsets from Qualcomm.

[289]   See non-confidential Annexes Q4.1 and Q5 attached to Apple's response to the request for information of 23 July 2015 (Doc IDs 1085 and 1035) attached to Apple's response to the request for information of 23 July 2015.

[290]   As stated above in Section 7.2, no repayment is due in case of breach in the years 2011 and 2012.

**EN**                                                                                    **EN**

Exhibit 31                    **Exhibit 90**

**1657**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128665
Q2017MDL1_03133258

**Table 12 – Amount to be reimbursed to Qualcomm under the Repayment Mechanism in case of breach of exclusivity by Apple in a given year between 2013 and 2015**

| Year of breach for exclusivity requirement | Amount to be reimbursed by Apple to Qualcomm pursuant to the Repayment Mechanism (USD) | Reimbursement as % of yearly Apple expenditure for baseband chipsets[291] |
|---|---|---|
| 2013 | 125,000,000 | |
| 2014 | 393,000,000 | |
| 2015* | 260,000,000 | |

Source: Apple[292]

* Estimates

(267) The cumulative effect of the Termination Clause and the Repayment Mechanism if Apple were to cease or have ceased exclusively sourcing baseband chipsets from Qualcomm in any given year of the period under investigation is also shown in the table below.

---

[291] The Repayment Mechanism is only established starting from 2013. Given that starting from 2013, Apple shipped only a small volume of legacy products incorporating Intel chipsets, there is no meaningful difference between these figures and the percentage represented by the yearly reimbursement over Apple's expenditure for Qualcomm's chipsets.

[292] See non-confidential Annexes Q4.1 and Q5 attached to Apple's response to the request for information of 23 July 2015 (Doc IDs 1085 and 1035) attached to Apple's response to the request for information of 23 July 2015.

**EN**

**EN**

Exhibit 31
405

**Exhibit 90
1658**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128666
Q2017MDL1_03133259

**Table 13 – Cumulative effect in case of breach of exclusivity by Apple in a given year between 2011 and 2015**

| Year | Incentive Payments foregone by Apple due to the Termination Clause (USD) | Amount to be reimbursed by Apple to Qualcomm pursuant to the Repayment Mechanism (USD) | Total loss due to Termination Clause and Repayment Mechanism (USD) |
|---|---|---|---|
| 2011 | 1,000,000,000 | - | 1,000,000,000 |
| 2012[293] | 775,000,000 | - | 775,000,000 |
| 2013 | 3,127,000,000 | 125,000,000 | 3,252,000,000 |
| 2014 | 2,209,000,000 | 393,000,000 | 2,602,000,000 |
| 2015* | 1,409,000,000 | 260,000,000 | 1,669,000,000 |

Source: Apple[294]

\* Estimates

**10.4.2.** *Evidence provided by Apple confirms that Qualcomm's conduct has reduced Apple's incentives to switch to Qualcomm's competitors*

(268) Since entering into the Transition Agreement in 2011, Apple has sought to try a second alternative supplier in one of its non-CDMA iPad models, due to the smaller volumes and commercial risk.[295] As explained by Isabel Mahe, Apple's Vice-President for Wireless Technologies, in an internal email dated 20 February 2014 *"From vendor bring up perspective, it's much better to bring up the alternate vendor on iPad before we do an iPhone with them. [...] If the objective is to launch an iPhone in 2016, we need to seriously consider a 2015 iPad first."*[296]

---

[293] Figures for 2012 reflect a switch in September 2012, i.e. in occasion of the launch of the new iPhone model. A switch in March 2012, i.e. in occasion of the launch of the new iPad model, would have caused Apple additional losses for approximately USD 200 million.

[294] See non-confidential Annexes Q4.1 and Q5 attached to Apple's response to the request for information of 23 July 2015 (Doc IDs 1085 and 1035) attached to Apple's response to the request for information of 23 July 2015. The figures in the table reflect Apple's estimates as to the expected loss due to the switch in any given year. The amount of the Incentive Payments that would have been foregone as indicated in this table may be different from the amounts resulting from the addition of the figures in Table 11 because of: (i) the signing of the First Amendment to the Transition Agreement (Doc ID 38), which provided for further payments additional to the ones foreseen in the Transition Agreement, and which were not known by Apple at the time of the Transition Agreement; and (iii) the inclusion in the figures of the expected Incentive Payments for 2016, which are not reported in Table 11.

[295] Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

[296] Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00056 (Doc ID 1070).

**EN**     61     **EN**

Exhibit 31

406

**Exhibit 90**

**1659**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128667
Q2017MDL1_03133260

(269)   The first time that Apple sought to try a second alternative supplier in one of its non-CDMA iPad models was in summer 2011, relating to the launch in 2014 of the non-CDMA versions of the iPad Air 2 and the iPad Mini 3. Apple drew up on 9 August 2011 a technical shortlist of the three alternative baseband chipset suppliers to Qualcomm it considered to be most competitive: ST-Ericsson, Broadcom and Intel.[297] Apple then engaged in a series of discussions with at least Intel and Broadcom for over a year.[298]

(270)   Apple found the June 2012 proposal of Intel to be particularly competitive as *"the overall contract is more favourable with IMC [Intel]"*, including the per-unit chipset price. Moreover, *"there is no apparent technical KPI[299] and feature advantage of a Q solution except C2K availability"*.[300] Apple therefore, *"began serious consideration of using an Intel baseband chipset for Apple's 2014 mobile devices"*.[301]

(271)   After further assessment, however, Apple's procurement team calculated on 29 June 2012 that the June 2012 proposal of Intel would be insufficient to compensate Apple for the loss of Qualcomm's last payment under the Variable Incentive Fund: *"If we assume 40m cellular based iPads, we'd need a $5 cheaper solution just to break even on the last payment of the transition agreement ($200m) which would likely be lost. We'll need $6-$7 additional reduction as break even."*[302] As a result, Apple's procurement team considered closing the negotiations with Intel for the 2014 models: *"Start to dis-engage IMC (at a point to be determined) so they wake up and be a more competitive threat for 2015 programs."*[303]

(272)   In July 2012, Intel came back with an improved price offer. Following assessment of that proposal, Apple's procurement team concluded on 26 July 2012 that *"We are at a point where we have an interesting commercial proposal [...] These are measurable savings."*[304] Apple's procurement team also considered that the *"Overall contract is more favourable with IMC. [...] IMC MDSA is better than Qualcomm STA [Strategic Terms Agreement]."*[305]

(273)   A number of internal strategy documents prepared by Apple's procurement team in September 2012 discuss the possibility and the costs and benefits of using Intel's baseband chipsets in iPads instead of Qualcomm's ones.[306] Apple's procurement team

---

[297]   Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00001 (Doc ID 1063).

[298]   Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

[299]   Key Performance Indicator.

[300]   Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00012 (Doc ID 1064).

[301]   Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

[302]   Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00036 (Doc ID 1066).

[303]   Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00036 (Doc ID 1066).

[304]   Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00040 (Doc ID 1067).

[305]   Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00084 (Doc ID 1073).

[306]   Non-confidential versions of Apple's internal documents submitted in response to the request for information of 12 March 2015, AAPL00082; AAPL00099; and AAPL00111 (Doc IDs 1072, 1074 and 1075).

Exhibit 31
407

Exhibit 90
1660

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128668
Q2017MDL1_03133261

analysed the cost savings that it could achieve by using Intel's baseband chipsets in some of its iPads in 2014 and the entirety of its cellular iPad portfolio in 2015. The presentation indicated that while *"IMC7160 is on par with Eureka [Qualcomm] 9x15"* in terms of technology, *"The IMC7160 savings vs. Eureka chipset would be [$6.5-$10.00]"*. The presentation therefore, concludes that *"with Transition plan to 100% iPad Cellular by Spring 2015 [...] 2014 Transition Agreement payment at risk but long term savings opportunity outweighs the TA payment."*[307]

(274)    Similarly, in Apple's Modem Roadmap circulated internally by Apple's procurement team on 4 September 2012, Intel's baseband chipsets are indicated as alternative options to Qualcomm's ones for the 2014 and 2015 iPad models as well as the 2015 iPhone model.[308] Apple explained that *"Assumptions were also created showing that [25-50%] of Spring 2014 iPad chipset volume was allocated to Intel, with the plan to move all iPad baseband chipsets to Intel by 2015."*[309]

(275)    Equally, a presentation of 11 September 2012 circulated by Apple's procurement team concludes that the transition of iPads to Intel baseband chipsets could be achieved by the third or fourth quarter of 2015 and would yield to Apple cumulative savings of [USD 400-550 million] over a 2-year period.[310]

(276)    At the beginning of 2013, however, *"Qualcomm offered Apple significant incentives to use its chipsets exclusively in Apple devices."*[311] This led Qualcomm and Apple to conclude the First Amendment to the Transition Agreement on 28 February 2013.

(277)    According to Apple, but for the First Amendment to the Transition Agreement, it *"would likely have selected Intel baseband chipsets for its 2014 iPad models but for Qualcomm's rebates conditioned on exclusivity. It is also likely to have selected Intel baseband chipsets for the 2015 iPad models, and, if Intel had demonstrated its capabilities in the 2014 iPad models, the non-CDMA iPhone models in 2015."*[312] Moreover, according to Apple, *"Qualcomm's insistence on exclusivity led Apple to cease all consideration of alternative baseband chipset vendors to Qualcomm for 2014 and 2015 mobile devices. [...] Despite earlier plans to use non-Qualcomm chipsets, in 2015 Apple did not even issue an RFI or RFP to chipset vendors for the 2015 iPhone and iPad lineup."*[313] Apple also *"began requiring certain executives to review a "clawback checklist" at the end of each quarter and certify that no triggering events (i.e., use of non-Qualcomm chipsets) had taken place that would have required reimbursements to Qualcomm."*[314]

---

[307]    Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00045 (Doc ID 1068).

[308]    Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00079-80 (Doc ID 1071).

[309]    Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

[310]    Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00084 (Doc ID 1073).

[311]    Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

[312]    Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

[313]    Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

[314]    Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

**EN**                                                                 **EN**

**Exhibit 90
1661**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128669
Q2017MDL1_03133262

(278)   Unaware of the terms of the Agreements, engineers within Apple continued to advocate for the use of Intel as an alternative baseband chipset supplier.[315] For example, an internal e-mail exchange from 18 February 2014 indicated that an Apple engineer suggested using Intel's baseband chipset in the Autumn 2015 iPad model, as it *"has feature parity"* with Qualcomm's chipset.[316]

(279)   This suggestion was, however, rejected by Apple's procurement team because, as explained by Isabel Mahe in an email of 20 February 2014, Tony Blevins, Apple's VP for iPhone and iPad procurement had some *"commercial penalty concerns"* about using non-Qualcomm baseband chipsets. [317] According to Tony Blevins's e-mail of the same day, the commercial launch of an iPad with a competing baseband chipset supplier in 2015 would be *"commercially untenable".*[318]

(280)   Indeed, on 29 January 2014, Apple's procurement team had assessed the costs and benefits for Apple of a potential breach of its exclusivity requirement with Qualcomm by shifting [70-90%] of Apple's demand for non-CDMA baseband chipsets to an alternative supplier in 2015.[319] The procurement team's analysis indicated that the potential costs of Apple breaching the Agreements would outweigh the potential benefits even in the *"unrealistically aggressive"*[320] scenario of shifting [70-90%] of Apple's non-CDMA baseband chipset needs to Intel.

(281)   When considering alternative baseband chipset suppliers for 2015 device models, Apple thus overall concluded that it *"stood to lose over $2 billion in payments and reimbursements to Qualcomm if it used a non-Qualcomm chipset in its fall 2015 lineup of mobile devices. These financial penalties ensured Apple would be exclusive to Qualcomm through at least 2015, despite the attractiveness of competitive alternatives."*[321]

*10.4.3.   Qualcomm's conduct is capable of foreclosing an appreciable part of the UMTS and LTE chipset markets*

(282)   The following table illustrates the size of Apple's purchases from Qualcomm of baseband chipsets in the UMTS and LTE chipset markets, both in absolute terms and relative to the size of those markets.

---

[315]   Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

[316]   Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00056 (Doc ID 1070).

[317]   Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00056 (Doc ID 1070).

[318]   Non-confidential version of Apple's internal document submitted in response to the request for information of 12 March 2015, AAPL00056 (Doc ID 1070).

[319]   Non-confidential versions of Apple's internal documents submitted in response to the request for information of 12 March 2015, AAPL00050; and AAPL00129 (Doc IDs 1202 and 1076).

[320]   Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

[321]   Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1201).

Exhibit 31                **Exhibit 90**

409
FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**1662**

Q2014FTC02128670
Q2017MDL1_03133263

**Table 14 – Apple's purchases of UMTS and LTE baseband chipsets from Qualcomm, 2011-2014[322]**

|  | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| **Apple's purchases in market for UMTS baseband chipsets** | | | | |
| **Units** | | | | |
| **As % of total UMTS baseband chipsets** | | | | |
| **Apple's purchases in market for LTE baseband chipsets** | | | | |
| **Units** | | | | |
| **As % of total LTE baseband chipsets** | | | | |

(283)  The size of Apple's demand confirms that Qualcomm's conduct is capable of foreclosing an appreciable part of the UMTS and LTE chipset markets, which historically was up to a maximum of ▮% of the market for UMTS chipsets and ▮% of the market for LTE chipsets.

(284)  This has likely contributed to Qualcomm's ability to keep persistently high shares of supply in the relevant markets. As noted above, Qualcomm's market share in the UMTS baseband chipsets market has generally exceeded 50% during the period under investigation, whereas Qualcomm's market share in the LTE baseband chipsets market in the same period has remained in the region of 90%.

*10.4.4.  Qualcomm's conduct is capable of foreclosing competing suppliers of UMTS and LTE baseband chipsets*

(285)  Qualcomm's conduct is capable of foreclosing competing suppliers of UMTS and LTE baseband chipsets because Apple is an attractive customer for suppliers. This is for several reasons.

(286)  First, the high volume of Apple's purchases of baseband chipsets can help competing suppliers achieve scale. This is confirmed by the fact that Apple's purchases of baseband chipsets accounted for 5.5%, 22.6% and 17.5% of Qualcomm's revenues in 2011, 2012 and 2013 respectively.[323]

(287)  This was also confirmed by Intel and Broadcom:

(a)  According to Intel, "*the adoption of a* [baseband chipset] *supplier's technology by a trend setter* [such as Apple] *significantly increases that supplier's volume and, as a result, market share. Likewise, this increase in volume leads the*

---

[322]  Data on Apple's purchases from Qualcomm was provided by Apple in non-confidential answer to question 4 of the request for information of 12 March 2015 (Doc ID 1085). Data on the size of the relevant markets is based on the Commission's market reconstruction for 2011-2013, and on Strategy Analytics for 2014.

[323]  Qualcomm's answer to question 57 of the request for information of 14 January 2015, Table 5 (Doc ID 592).

Exhibit 31
410

**Exhibit 90
1663**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128671
Q2017MDL1_03133264

> *supplier to use more wafers starts in producing* [baseband chipset] *chips, which improves the supplier's bargaining position with its external foundry. As foundry costs improve, the* [baseband chipset] *supplier is then able to offer lower costs to additional customers, feeding a virtuous cycle."*[324]

    (b)    According to Broadcom, "[...] [baseband chipset] development requires an extremely large R&D investment with thousands of highly skilled engineers. [...] In order to support the required investment (which requires scale), and with the consolidation of the mobile device market meaning that there are very few successful device manufacturers, a [baseband chipset] manufacturer needs to either have a significant share of high-end designs at Apple and Samsung or a significant share in China, or both."[325]

(288)    Second, supplying Apple with baseband chipsets can reduce the R&D expenditure that competing suppliers have to incur in relation to each device design of an OEM. Because Apple typically releases only one or two iPhone and one or two iPad models each year, its purchases of baseband chipsets are spread across a limited number of designs. This was confirmed by Ericsson and Apple:

    (a)    According to Ericsson, *"To supply to Apple has significant scale advantages as they have so limited number of models in portfolio and with premium reputation also an important quality confirmation."* [326]

    (b)    According to Apple, *"Apple [...] represents a unique opportunity for a* [baseband chipset] *supplier to demonstrate that it has the ability to produce quality* [baseband chipsets] *in volume. Apple's global SKU strategy and the fact that it introduces only a handful of models each year make it a particularly attractive reference customer."*[327]

(289)    Third, supplying Apple with baseband chipsets will allow competing suppliers to increase their ability to compete as Apple seeks to source high-end components that are more profitable. This is confirmed by Broadcom, Microsoft, Sony and Apple:

    (a)    According to Broadcom, "[m]arket participants who can offer chipsets at both the very high end and the medium to low end tend in our experience to cut price aggressively for the latter; at the high end there may be only one or two [baseband chipsets] that support all the requirements, so pricing there remains high."[328]

    (b)    According to Microsoft, "[c]hipsets enabling new leading edge features are typically more expensive than more mature technologies. Overall, competition has an impact on the pricing."[329]

---

[324]  Intel's non-confidential answer to question 41 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).

[325]  Broadcom's non-confidential answer to question 2 of the request for information of 9 February 2015 to baseband chipset suppliers (Doc ID 1241).

[326]  Ericsson's non-confidential answer to question 41 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1060).

[327]  Apple's non-confidential answer to question 8 of the request for information of 30 April 2015, Doc ID 1036.

[328]  Broadcom's non-confidential answer to question 4 of the request for information of 9 February 2015 to baseband chipset suppliers (Doc ID 1241).

[329]  Microsoft's non-confidential answer to question 5.1.1 of the request for information of 4 November 2014 to baseband chipset customers (Doc ID 951).

Exhibit 31
411

Exhibit 90
1664

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128672
Q2017MDL1_03133265

(c) According to Sony, "[p]roducts with cutting edge technology are to our experience more expensive than others."[330]

(d) According to Apple, "[t]he prices within each segment are primarily a function of competition (or a lack thereof). For non-LTE enabled [baseband chipsets], there are more suppliers and as a result pricing is lower. For LTE-enabled [baseband chipsets], there is less competition and as a result Qualcomm has more pricing power."[331]

(290) Fourth, because of its reputation and role in the development of innovative products,[332] supplying Apple with baseband chipsets will allow competing suppliers to improve their credibility and reputation and thereby gain a competitive advantage compared to competitors.[333] This was confirmed by Huawei, Samsung and ZTE, Intel and Sequans:

(a) According to Huawei, "*Apple and Samsung are widely perceived as market leaders and trend setters in the production of end devices.*"[334]

(b) According to Samsung, "*the launch of Apple's newest models is always observed by the industry.*"[335]

(c) According to ZTE, "if a market leader or trend setter is supplied [...], especially in their flagship and premium product, this means that the OEM confirms the quality of the chipset and trust its supplier and definitely help the [baseband chipset] suppliers to increase its reputation."[336]

(d) According to Intel, "the adoption of a [baseband chipset] supplier's technology by a trend setter boosts that supplier's credibility with other OEMs, suggesting to them that the supplier's technology is up to the task of functioning in a market-leading device. Adoption by a market leader signals to other OEMs that the [baseband chipset] supplier's chip is able to provide the kind of performance, power consumption, and price point demanded by the leading OEMs (and therefore, by MNOs and end users)".[337]

---

[330] Sony's non-confidential answer to question 5.1.1 of the request for information of 4 November 2014 to baseband chipset customers (Doc ID 1186).

[331] Apple's non-confidential answer to question 5 of the request for information of 4 November 2014 (Doc ID 1032).

[332] See answers to question 6 of the request for information of 30 April 2015 to baseband chipset customers, and answers to question 39 of the request for information of 30 April 2015 to baseband chipset suppliers.

[333] See answers to question 8 of the request for information of 30 April 2015 to baseband chipset customers, and answers to question 41 of the request for information of 30 April 2015 to baseband chipset suppliers.

[334] Huawei's non-confidential answer to question 39 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1274).

[335] Samsung's non-confidential answer to question 39 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1307).

[336] ZTE's non-confidential answer to question 8 of the request for information of 30 April 2015 to baseband chipset customers (Doc ID 1181).

[337] Intel's non-confidential answer to question 41 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 1258).

Exhibit 90
1665

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128673
Q2017MDL1_03133266

(e) According to Sequans, "*Success with a leading OEM can have a 'halo' effect with other OEMs of similar devices.*"[338]

*10.4.5. Qualcomm's conduct may have contributed to the exit from the relevant markets of certain of Qualcomm's competitors*

(291)    Qualcomm's conduct may have contributed to the exit from the relevant markets of certain of Qualcomm's competitors such as Broadcom and ST-Ericsson.[339] This is because the Incentive Payments and the Reimbursement Mechanism made it more difficult for these competitors to meet the price target that Apple was seeking to obtain from baseband chipset suppliers in 2014.[340]

(292)    Regarding Broadcom:

(a) according to Apple, "Broadcom, for example, exited the baseband chipset market shortly after being informed that they did not win Apple's chipset business in 2014."[341]

(b) according to Broadcom, Apple's decision not to source baseband chipsets from Broadcom in 2014 "had an immediate and direct impact on our business decision to exit the market. In order for the business to yield a positive return, we needed to win both this opportunity and a share of Samsung's business; it was understood by our management and our Board of Directors that if we were unable to win a modem design from Apple then we would not be able to remain in the baseband market. As soon as we received Apple's decision, we began the process to unwind our cellular baseband business." [342]

(293)    Regarding ST-Ericsson:

(a) according to Apple, Ericsson [...] decided to dissolve its cellular modem business in a similar timeframe [as Broadcom]".[343]

(b) according to Ericsson, it dissolved the ST-Ericsson joint venture and exited the market in 2014 "due to a decreased addressable market for two-chipset architecture and fierce price competition".[344]

**10.5.    Objective justification and efficiencies**

(294)    Qualcomm has, to date, not advanced any structured objective or efficiency-based justification for its conduct.

(295)    In light of Qualcomm's submissions to date,[345] the Commission's preliminary conclusion is, however, that Qualcomm's conduct cannot be justified as a necessary

---

[338] Sequans' non-confidential answer to question 41 of the request for information of 30 April 2015 to baseband chipset suppliers (Doc ID 636).

[339] Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1081).

[340] In the case of Broadcom, this price target amounted to USD 5-10 (see Broadcom's non-confidential answer to question 1 of the request for information of 18 June 2015 (Doc ID 1243).

[341] Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1081).

[342] Broadcom's non-confidential answer to question 3 of the request for information of 18 June 2015 (Doc ID 1243).

[343] Apple's non-confidential answer to question 1 of the request for information of 12 March 2015 (Doc ID 1081).

[344] Ericsson's non-confidential answer to question 2 of the request for information of 8 January 2015 to baseband chipset suppliers (Doc ID 530).

Exhibit 31
413

**Exhibit 90**

**1666**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128674
Q2017MDL1_03133267

means for Qualcomm to recoup investments specific to Apple. This is for the following reasons.

(296)  First, a large majority of customers seem to purchase baseband chipsets from multiple suppliers.[346] This suggests that, to the extent that other baseband chipset suppliers make customer-specific investments, they are able to recoup these investments other than by granting exclusivity payments.

(297)  Second, Qualcomm has, to date, failed to demonstrate that it could not recoup investments specific to Apple in less restrictive ways, such as quantity-based rebates.

(298)  Third, even if Qualcomm were to have made investments that are specific to one Apple product, such investments would not justify the grant of exclusivity payments relating either to other products or to successive models of the same product.

**10.6.  Single and continuous infringement**

*10.6.1.  Principles*

(299)  The concept of a single and continuous infringement relates to a series of actions which form part of an overall plan because their identical object distorts competition within the common market. For the purposes of characterising various instances of conduct as a single and continuous infringement, it is necessary to establish whether they complement each other inasmuch as each of them is intended to deal with one or more consequences of the normal pattern of competition and, by interacting, contribute to the realisation of the objectives intended within the framework of that overall plan. In that regard, it will be necessary to take into account any circumstance capable of establishing or casting doubt on that complementary link, such as the period of application, the content (including the methods used) and, correlatively, the objective of the various actions in question.[347]

*10.6.2.  Application to this case*

(300)  The payments granted by Qualcomm to Apple conditional upon the latter obtaining all of its requirements of baseband chipsets from Qualcomm relate to two different markets: the worldwide market for UMTS baseband chipsets, and the worldwide market for LTE baseband chipsets.

(301)  The Commission therefore, preliminarily concludes that the grant of exclusivity payments with regard to respectively UMTS baseband chipsets and LTE baseband chipsets constitutes separate infringements of Article 102 TFEU and Article 54 of the EEA Agreement in their own right.

(302)  The Commission has also reached the preliminary conclusion that Qualcomm's conduct constitutes a single and continuous infringement. They are the result of the same Agreements, which apply to both UMTS and LTE chipsets, and they pursue an identical object, since they are both aimed at foreclosing competing baseband chipset suppliers from the worldwide UMTS and LTE baseband chipset markets.

(303)  In addition, the two infringements have the same start and duration. In the period under investigation, Apple has progressively shifted its requirements from UMTS

---

[345]  See presentation of 29 September 2015 by Qualcomm (Doc ID 831), and letter of 21 October 2015 (Doc ID 1043).

[346]  See Strategy Analytics, Tab 5 (Doc ID 1153) and non-confidential answers to question 2 of the request for information to baseband chipset customers of 4 November 2014.

[347]  Case T-321/05 *AstraZeneca v Commission*, EU:T:2010:266, paragraph 892.

**EN**

69

Exhibit 31

414

**Exhibit 90**

**1667**

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128675
Q2017MDL1_03133268

baseband chipsets to LTE baseband chipsets. Such a shift highlights the dynamic interactions between the two infringements, and reinforces the conclusion that those infringements should be seen as part of a single and continuous infringement.

**10.7. Duration of the infringement**

(304) The Commission preliminarily concludes that the duration of the infringement to date is 4 years, 9 months and 13 days.

(305) The start date of the infringement is 25 February 2011, the date on which Qualcomm and Apple entered into the Transition Agreement.

(306) As for the end date, the infringement is still ongoing. The Agreements are set to expire in December 2016 and there is no evidence in the Commission's file indicating that the Agreements are no longer being applied.

**11. JURISDICTION**

**11.1. Principles**

(307) In order to justify the Commission's jurisdiction, it is sufficient that conduct is either implemented in the EEA or is liable to have immediate, substantial and foreseeable effects in the EEA.[348]

(308) The criterion of implementation is satisfied by mere sale within the Union, irrespective of the location of sources of supply and of production plants.[349] It follows that direct sales of the products covered by the conduct to customers in the EEA are not the only means of implementation. For example, a conduct can be considered as implemented in the territory of the EEA where a customer of a dominant undertaking, which is present and makes sales in the internal market, receives payments from the dominant undertaking conditional upon that customer obtaining all of its requirements of certain inputs from the dominant undertaking. This is because such payments ensure that the customer will exclusively sell products incorporating the dominant undertaking's inputs in question throughout the world, including in the EEA.[350]

(309) The criterion of immediate, substantial and foreseeable effects of conduct in the EEA is satisfied when the conduct in question is capable of having such an effect, there being no need to show actual effects.[351] A relevant factor in conducting this assessment is whether the conduct was intended to produce effects within the internal market.[352]

---

[348] Joined Cases 89/85, 104/85, 114/85, 116/85, 117/85 and 125/85 to 129/85 *Ahlström Osakeyhtiö and Others* v *Commission*, EU:C:1988:447, paragraphs 11 to 18; Case T-102/96 *Gencor* v *Commission* EU:T:1999:65, paragraphs 89 to 101.

[349] Joined Cases 89/85, 104/85, 114/85, 116/85, 117/85 and 125/85 to 129/85 *Ahlström Osakeyhtiö and Others (Wood Pulp)* v *Commission*, EU:C:1988:447, paragraph 17; Case T-102/96 *Gencor* v *Commission* EU:T:1999:65, paragraph 87.

[350] Case T-286/09 *Intel Corp.* v *Commission*, EU:T:2014:472, paragraphs 311-314.

[351] Case T-286/09 *Intel Corp.* v *Commission*, EU:T:2014:472, paragraphs 251-252 and 296.

[352] Case T-286/09 *Intel Corp.* v *Commission*, EU:T:2014:472, paragraphs 253-255.

**EN**

Exhibit 31

415

Exhibit 90

1668

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128676
Q2017MDL1_03133269

## 11.2. Application to this case

(310) The Commission's preliminary conclusion is that it has jurisdiction to apply Article 102 TFEU and Article 54 of the EEA Agreement to Qualcomm's conduct described in this Statement Objections.

(311) First, Qualcomm's conduct is implemented in the EEA because Apple had during the period under investigation direct or indirect sales within the EEA of products incorporating Qualcomm's UMTS and LTE baseband chipsets. Qualcomm's conduct ensured that when Apple sold its products in the EEA, irrespective of the location of sources of supply and of production plants, those sales necessarily included devices that exclusively incorporated Qualcomm's UMTS and LTE baseband chipsets.

(312) Second, Qualcomm's conduct is capable of having substantial, immediate and foreseeable effects in the EEA.

(313) In the first place, the potential effects of Qualcomm's conduct are substantial for two main reasons:

    (a) Sales of Apple devices in the EEA incorporating Qualcomm UMTS and LTE baseband chipsets amounted to approximately 22% of Apple's world sales;[353] and

    (b) Qualcomm's conduct is capable of foreclosing competing suppliers of UMTS and LTE baseband chipsets and may have contributed to the exit from the relevant markets of certain of these suppliers (see sections 10.4.4 and 10.4.5).

(314) In the second place, Qualcomm's conduct is capable of producing, and intended to produce, an immediate effect in the EEA. Qualcomm's conduct is intended to ensure, and is capable of having, the immediate effect that, during the period under investigation, no new Apple model available on the market anywhere in the world, including in the EEA, will incorporate a baseband chipset of a competitor of Qualcomm. The fact that Apple obtains all[354] its UMTS and LTE baseband chipset requirements from Qualcomm during the period under investigation means directly and necessarily that it cannot sell any product incorporating a UMTS or LTE baseband chipset of a competitor. Qualcomm's conduct is, therefore, liable to affect the competitive structure in the EEA by foreclosing other suppliers of UMTS and LTE baseband chipsets which have as their customers other OEMs selling such devices within the EEA.[355]

(315) In the third place, Qualcomm knew, or could reasonably have foreseen, that the effect of its conduct would be that:

    (a) No new Apple model incorporating UMTS or LTE baseband chipsets anywhere in the world, including in the EEA, would incorporate a UMTS or LTE baseband chipset of a competitor; and

---

[353] See Apple's Form 100-K report, available at http://investor.apple.com/secfiling.cfm?filingid=1193125-14-383437&cik=

[354] Regarding Apple legacy products, see paragraphs (130) and (259)-(262) above.

[355] Changes to the structure of the market must be taken into consideration when it comes to determining whether there are substantial effects within the EEA. See for example Case 6/73, *Instituto Chemioterapico Italiano and Commercial Solvents v Commission*, EU:C:1974:18, paragraph 33; and Case T-102/96 *Gencor* v *Commission* EU:T:1999:65, paragraphs 94 to 96..

416

1669

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128677
Q2017MDL1_03133270

(b)    As a result, competitors would be foreclosed from the worldwide UMTS and LTE baseband chipset markets.

## 12.    EFFECT ON TRADE

### 12.1.    Principles

(316)    In order for conduct to be capable of affecting trade between Member States, it must be possible to foresee with a sufficient degree of probability, on the basis of a set of facts and points of law, that it may have an influence, direct or indirect, actual or potential, on the pattern of trade between Member States in such a way as to cause concern that it might hinder the attainment of a single market between Member States. Moreover, that effect must not be insignificant.[356]

### 12.2.    Application to this case

(317)    The Commission's preliminary conclusion is that the conduct covered by this Statement of Objections has an appreciable effect on trade between Member States within the meaning of Article 102 of the Treaty and between the Contracting Parties within the meaning of Article 54 of the EEA Agreement.

(318)    First, the Agreements apply to the worldwide procurement of baseband chipsets by Apple. Those Agreements, therefore, also apply to baseband chipsets incorporated in products sold by Apple in the EEA.

(319)    Second, the conduct affects the competitive structure of the internal market by eliminating or threatening to eliminate suppliers of baseband chipsets which have as their customers OEMs selling devices within the EEA.

## 13.    REMEDIES AND FINES

### 13.1.    Article 7 of Regulation 1/2003

(320)    Article 7(1) of Regulation No 1/2003 provides that where the Commission finds that there is an infringement of Article 102 of the TFEU and Article 54 of the EEA Agreement, it may require by decision that the undertaking concerned brings such an infringement to an end in accordance with Article 3 of Council Regulation 1/2003. For this purpose, it may also impose on the undertaking concerned any behavioural or structural remedies which are proportionate to bring the infringement effectively to an end.

(321)    At this stage of the procedure, the Commission intends to require Qualcomm to bring the infringement to an end, if it has not already done so, and to refrain from any conduct which may have the same or similar object or effect.

(322)    The Commission may also impose any other remedy which would be necessary and proportionate to bring the infringement effectively to an end.

### 13.2.    Fines

(323)    Pursuant to Article 23(2)(a) of Regulation No 1/2003 and Article 5 of Council Regulation (EC) No 2894/94 of 28 November 1994 concerning arrangements for

---

[356]    Case C-1/12 *Ordem dos Técnicos Oficiais de Contas*, EU:C:2013:127, paragraph 65 and the case law cited therein.

**EN**

72

Exhibit 31

417

**Exhibit 90**

**1670**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EN**

Q2014FTC02128678
Q2017MDL1_03133271

implementing the Agreement on the European Economic Area,[357] the Commission may by decision impose fines on undertakings, where, either intentionally or negligently, they infringe Article 102 TFEU or Article 54 of the EEA Agreement.

(324)    In the present case, the Commission has reached the preliminary conclusion that the payments to Apple conditional upon the latter obtaining all of its requirements exclusively from Qualcomm (see Section 10.3 above) constitute an abuse of dominant position within the meaning of Article 102 TFEU and of Article 54 of the EEA Agreement. The Commission therefore intends to impose a fine on Qualcomm for this infringement.

(325)    The Commission considers that, based on the facts described in this Statement of Objections, Qualcomm committed the infringement intentionally or, at the very least, negligently.

### 13.3.   Calculation of the fines

#### 13.3.1.   *Principles*

(326)    Pursuant to Article 23(3) of Regulation No 1/2003, in fixing the amount of the fines, the Commission must have regard to all relevant circumstances and particularly to the gravity and the duration of the infringement. In doing so, the Commission will set the fines at a level sufficient to ensure deterrence. The Commission will reflect in the fines imposed any aggravating or mitigating circumstances.

(327)    In setting the fines to be imposed, the Commission will refer to the principles laid down in its Guidelines on the method of setting fines imposed pursuant to Article 23(2)(a) of Regulation No 1/2003 ("the Fining Guidelines").[358]

(328)    First, the Commission will define the basic amount of the fine (see Section 12.3.2. below).[359] Second, where applicable, the Commission will adjust the basic amount upwards or downwards (see Section 12.3.7. below).[360]

(329)    The Commission may depart from the methodology set out in the Fining Guidelines where it is justified by the particularities of a given case or the need to achieve deterrence in a particular case.[361]

(330)    Pursuant to Article 23(2) of Regulation No 1/2003, the fine for an infringement shall not exceed 10% of the undertaking's total turnover in the preceding business year (see Section 12.3.8. below).

#### 13.3.2.   *Determination of the basic amount of the fine*

(331)    The basic amount of the fine to be imposed on the undertaking concerned is to be set by reference to the value of sales,[362] that is, the value of the undertaking's sales of goods or services to which the infringement directly or indirectly relates in the relevant geographic area in the EEA (see Section 12.3.3. below).

---

[357]  OJ L 305, 30.11.1994, p. 6.
[358]  OJ C 210, 1.9.2006, p. 2.
[359]  Paragraph 10 of the Fining Guidelines.
[360]  Paragraph 11 of the Fining Guidelines.
[361]  Paragraph 37 of the Fining Guidelines.
[362]  Paragraph 13 of the Fining Guidelines.

**EN**         73         **EN**

Exhibit 31

**Exhibit 90**

418

**1671**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128679
Q2017MDL1_03133272

(332) The amount of the value of sales taken into account will correspond to a percentage which may be set at a level of up to 30% of the value of sales.[363] The choice of a given percentage will depend on the degree of gravity of the infringement (see Section 12.3.4. below). The proportion of the value of sales resulting from that percentage will then be multiplied by the duration of the infringement (see Section 12.3.5. below).[364] The Commission may also include in the basic amount an additional amount which corresponds to a percentage which may be set at a level from 15% to 25% of the value of sales (see Section 12.3.6. below).[365]

### 13.3.3.   *The value of sales*

(333) In determining the basic amount of the fine to be imposed, the Commission takes the value of the undertaking's sales to which the infringement directly or indirectly relates in the relevant geographic area within the EEA. The Commission also normally takes into account the sales made by the undertaking during the last full business year of the occurrence of the infringement.[366] If the last year is not sufficiently representative because the value of sales in that year differs significantly from the yearly value achieved over the first years of the infringement, the Commission may take into account another year and/or other years for the determination of the value of sales. The value of sales will be assessed before VAT and other taxes directly related to the sales.[367]

(334) Based on the foregoing, the Commission intends to take into account Qualcomm's direct and indirect sales of all UMTS and LTE baseband chipsets to third parties in the EEA. Indirect sales include all UMTS and LTE baseband chipsets sold by Qualcomm to third parties outside the EEA and incorporated in end products sold directly or indirectly by third parties in the EEA as there is a sufficiently close link between Qualcomm's conduct, these sales and the EEA.[368]

(335) As a proxy for the value of Qualcomm's indirect sales, the Commission may consider applying Qualcomm's worldwide market share on the UMTS and LTE baseband chipset markets to all UMTS and LTE compliant devices sold in the EEA and multiplying it with the average sales price of all Qualcomm's UMTS and LTE baseband chipsets in the relevant year.

(336) The Commission also intends to use Qualcomm's relevant sales in the last available full business year of the infringement. As the infringement is still ongoing, the last full business year can be determined only at the time of adoption of a potential decision in the present case. If this method proves not to be sufficiently representative, the Commission intends to use Qualcomm's average annual sales during the period under investigation.

### 13.3.4.   *Gravity*

(337) The gravity of the infringement determines the percentage amount (to be set at a level of up to 30%) to calculate the proportion of the value of sales to be taken into

---

[363]   Paragraph 21 of the Fining Guidelines.
[364]   Paragraph 19 of the Fining Guidelines.
[365]   Paragraph 25 of the Fining Guidelines.
[366]   Paragraph 13 of the Fining Guidelines.
[367]   Paragraph 17 of the Fining Guidelines.
[368]   Cases T-56/09 and T-73/09 *Saint-Gobain Glass France and Others v Commission*, EU:T:2014:160, paragraph 476; Case T-128/11 *LG Display and LG Display Taiwan v Commission*, EU:T:2014:88, paragraph 141. See also section 11.2 above.

**EN**

74

Exhibit 31

419

**Exhibit 90**

**1672**

**EN**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128680
Q2017MDL1_03133273

account in setting the fine. In assessing the gravity of the infringement, the Commission will have regard to a number of factors, such as the nature of the infringement, the market shares of the undertaking concerned, the geographic scope of the infringement and whether or not the infringement has been implemented.[369]

(338)   In the present case, the Commission intends to take into account the following factors.

(339)   First, the worldwide markets for UMTS and LTE baseband chipsets are of significant economic importance. This means that any anticompetitive conduct on these markets is likely to have had a considerable impact.

(340)   Second, exclusivity payments by undertakings in a dominant position have already been repeatedly condemned by the Commission and the Court of Justice.[370]

(341)   Third, Qualcomm not only held a dominant position in the market for UMTS baseband chipsets during the period under investigation but between 2010 and 2013 all of Qualcomm's competitors had a market share of less than one third of Qualcomm's by value and less than half of Qualcomm's by volume, with no competitor exceeding 20%.

(342)   Fourth, Qualcomm not only held a dominant position in the market for LTE baseband chipsets during the period under investigation but its market share has been above 90% by value and above 75% by volume throughout the period under investigation.

(343)   Fifth, Qualcomm's conduct was worldwide in scope. This means that the whole EEA was covered by Qualcomm's conduct.

(344)   Sixth, Qualcomm's conduct was implemented with respect to the totality of Apple baseband chipset requirements for devices launched after February 2011.

*13.3.5.   Duration*

(345)   In its assessment of the duration of the infringement, the Commission will multiply the amount determined on the basis of the value of sales by the number of years of the duration of the infringement.[371]

(346)   In the present case, the Commission preliminarily considers that the duration of the infringement to date is 4 years, 9 months and 13 days (see Section 10.7 above).

*13.3.6.   Additional amount*

(347)   In the present case, the Commission may include an additional amount in the basic amount of any fine.[372]

*13.3.7.   Adjustments to the basic amount*

13.3.7.1. Aggravating and mitigating circumstances

(348)   The Commission may take into account circumstances that result in an increase or a decrease in the basic amount.[373] These circumstances are listed in a non-exhaustive way in points 28 and 29 of the Fining Guidelines.

---

[369]   Paragraph 22 of the Fining Guidelines.
[370]   See for example Case 85/76 *Hoffmann-La Roche*, EU:C:1979:36, and Case T-286/09 *Intel Corp. v Commission*, EU:T:2014:472.
[371]   Paragraph 24 of the Fining Guidelines.
[372]   Paragraph 25 of the Fining Guidelines.

**EN**                                                                                                    **EN**

Exhibit 31
420

**Exhibit 90
1673**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128681
Q2017MDL1_03133274

(349)   In the present case, the Commission does not intend to take into account any circumstance that would result in an increase or a decrease in the basic amount of any fine.

13.3.7.2. Deterrence

(350)   The Commission will pay particular attention to the need to ensure that fines have a sufficiently deterrent effect. To that end, the Commission may increase the fine to be imposed on an undertaking which has a particularly large turnover beyond the sales of goods or services to which the infringement relates.[374]

(351)   In the present case, the Commission may apply a multiplier increase on any fine for deterrence.

13.3.8.   *Application of the 10% turnover limit*

(352)   In the present case, the fine will not exceed 10% of Qualcomm's total turnover relating to the business year preceding the date of adoption of a Commission's decision.

## 14.   CONCLUSION

(353)   In light of the considerations set out above and subject to the opportunity of Qualcomm to be heard pursuant to Article 27(1) of Regulation 1/2003, the Commission intends by a decision to:

(a)   establish that Qualcomm has infringed Article 102 of the TFEU and Article 54 of the EEA Agreement by granting payments to Apple on condition that it obtains all of its requirements of UMTS and LTE baseband chipsets from Qualcomm;

(b)   require Qualcomm to bring the infringement to an end and to refrain from any conduct having an equivalent object or effect;

(c)   impose on Qualcomm suitable remedies to the extent that they are necessary and proportionate to bring the infringement effectively to an end; and

(d)   impose a fine on Qualcomm pursuant to Article 23(2)(a) of Regulation 1/2003 for the said infringement.

---

[373]   Paragraph 27 of the Fining Guidelines.
[374]   Paragraph 30 of the Fining Guidelines.

Exhibit 31
421

**Exhibit 90
1674**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128682
Q2017MDL1_03133275

Done at Brussels, 8.12.2015

*For the Commission*

*Carlos MOEDAS*
*Member of the Commission*

CERTIFIED COPY
For the Secretary-General,

**Jordi AYET PUIGARNAU**
Director of the Registry
**EUROPEAN COMMISSION**

**EN**

77

**EN**

Exhibit 31
422

**Exhibit 90
1675**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128683
Q2017MDL1_03133276



```
┌ To  Qualcomm Incorporated            ┌ ─ ─ ─ ─ ─ ─ ─ ┐
│      Mr Donald J. Rosenberg          │ Phone:          │
│      5775 Morehouse Drive            │ +1-858 845 405  │
│      California                      │ 9               │
│      92121 SAN DIEGO California       └ ─ ─ ─ ─ ─ ─ ─ ┘
│      US United States of America
└
```

Exhibit 31
423

Exhibit 90
1676

FOIA CONFIDENTIAL TREATMENT REQUESTED BY QUALCOMM
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q2014FTC02128684
Q2017MDL1_03133277