# Sur-Reply Exhibit 1

**CRAVATH, SWAINE & MOORE LLP**
ANTONY L. RYAN (*pro hac vice*)
(aryan@cravath.com)
RACHEL G. SKAISTIS (*pro hac vice*)
(rskaistis@cravath.com)
YONATAN EVEN (*pro hac vice*)
(yeven@cravath.com)
JUSTIN C. CLARKE (*pro hac vice*)
jcclarke@cravath.com
M. BRENT BYARS (*pro hac vice*)
(mbyars@cravath.com)
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

**COOLEY LLP**
STEVEN M. STRAUSS (99153)
(sms@cooley.com)
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
CHRISTOPHER DURBIN (218611)
(cdurbin@cooley.com)
PETER M. ADAMS (243926)
(padams@cooley.com)
4401 Eastgate Mall
San Diego, CA 92121-9109
Telephone: (858) 550-6000
Facsimile: (858) 550-6420

*Attorneys for Defendants Qualcomm Incorporated, Derek K. Aberle, Steven R. Altman, William F. Davidson, Paul E. Jacobs, Steven M. Mollenkopf and Donald J. Rosenberg*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE QUALCOMM INCORPORATED SECURITIES LITIGATION | No. 17-cv-0121-JO-MSB<br><br>**[PROPOSED] SUR-REPLY IN OPPOSITION TO CLASS CERTIFICATION**<br><br>Judge: Hon. Jinsook Ohta<br>Date: October 19, 2022<br>Time: 9:30 a.m.<br>Courtroom: 4C |

## **TABLE OF CONTENTS**

Page

ARGUMENT ........................................................................................................... 1

I. The Court Should Analyze Defendants' Price Impact Evidence. ....... 1

II. All Public Information Must Have Been Rapidly Incorporated into Qualcomm's Stock Price, and This Proposition Operates Both Ways. ................................................................................................... 2

III. Qualcomm's Device-Level Licensing Practice Was Already Incorporated into Qualcomm's Price Before the Corrective Disclosures. .......................................................................................... 4

IV. The Alleged Misstatements and Corrective Disclosures Do Not Match. ................................................................................................... 9

V. Because the FTC Complaint and the Apple Complaint Did Not Disclose New News, They Do Not Prove Price Impact. ................... 10

CONCLUSION ..................................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013) ................................................................................. 3

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ................................................................................. 3

*FTC v. Qualcomm*,
    411 F. Supp. 3d 658 (N.D. Cal. 2019) ..................................................... 8

*FTC v. Qualcomm*,
    969 F.3d 974 (9th Cir. 2020) .......................................................... 8, 9, 10

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    141 S. Ct. 1951 (2021) ..................................................................... 1, 2, 9

*Gomez v. Rossi Concrete, Inc.*,
    270 F.R.D. 579 (S.D. Cal. 2010) .............................................................. 1

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ................................................................................. 2

*In re MiMedx Grp., Inc. Sec. Litig.*,
    2021 WL 7210372 (N.D. Ga. Mar. 25, 2021) ......................................... 2

*Mandalevy v. BofI Holding, Inc.*,
    2018 WL 3032588 (S.D. Cal. June 19, 2018) ......................................... 3

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ........................................................... 2, 4

*Quanta Comput., Inc. v. LG Elecs., Inc.*,
    553 U.S. 617 (2008) ........................................................................ 5, 7, 8

**Statutes & Rules**

Fed. R. Civ. P. 12 ............................................................................................ 1

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Apple | Apple Inc. |
| Bernstein Decl. | Expert Declaration of Bruce G. Bernstein (Dkt. 248) |
| Class Period | February 1, 2012 through January 20, 2017 |
| Compl. | Consolidated Class Action Complaint (Dkt. 32) |
| EC | European Commission |
| FTC | U.S. Federal Trade Commission |
| KFTC | Korea Fair Trade Commission |
| Longman Ex. __ | Exhibit to the Declaration of Christopher Longman (Dkt. 246) |
| Mot. | Lead Plaintiffs' Memorandum of Points and Authorities in Support Thereof (Dkt. 217) |
| Opp. | Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification (Dkt. 244) |
| Opp. Ex. __ | Exhibit to the Declaration of Yonatan Even (Dkt. 245) |
| QCT | Qualcomm CDMA Technologies |
| QTL | Qualcomm Technology Licensing |
| Reply | Lead Plaintiffs' Reply in Support of their Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Dkt. 255) |
| Reply Ex. __ | Exhibit to the Declaration of Rebecca E. Boon (Dkt. 255-1) |
| Stulz Report | Expert Report of René Stulz, Ph.D. (Dkt. 250) |
| Sur-Reply Ex. __ | Exhibit to the Declaration of Yonatan Even, filed contemporaneously herewith |
| TFTC | Taiwan Fair Trade Commission |

Defendants file this sur-reply to aid the Court in evaluating Plaintiffs' price impact arguments, which they proffered for the first time on reply. Plaintiffs first erroneously suggest that this Court cannot consider Defendants' price impact arguments at the class certification stage. They next misconstrue and misapply the efficient market hypothesis, offering a novel view of an efficient market that fails to incorporate all available information into a stock price. And they fail to rebut Defendants' arguments that the alleged misstatement either fail to match the alleged corrective disclosures or fail to disclose anything new to the market.

## ARGUMENT

### I. The Court Should Analyze Defendants' Price Impact Evidence.

Plaintiffs invite the Court to summarily reject Defendants' price impact showing because it implicates some of the "same evidence" that would support Defendants' merits argument on loss causation or a truth-on-the market defense. (Reply 1, 3-5.) That invitation is contrary to law. "In assessing price impact at class certification, courts 'should be open to *all* probative evidence on that question'", "regardless whether the evidence is also relevant to a merits question". *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1960 (2021). To the extent the evidence here overlaps with merits evidence, "a district court may not use the overlap to refuse to consider the evidence". *Id.* at 1961 & n.2.

Nor do this Court's prior rulings *on the pleadings* preclude Defendants' price impact argument against *class certification*, as Plaintiffs suggest. (Reply 1, 8.) Unlike a Rule 12 motion, "a court is not bound to accept a plaintiff's allegations as true if they relate to class certification issues". *Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 585 (S.D. Cal. 2010). At this stage, "the district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact". *Goldman*, 141 S. Ct. at 1963. Plaintiffs' allegations now carry no weight, and the evidence shows a lack of price impact.

| DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES | CASE NO. 17-CV-0121-JO-MSB |
|---|---|

## II. All Public Information Must Have Been Rapidly Incorporated into Qualcomm's Stock Price, and This Proposition Operates Both Ways.

Plaintiffs rely on the proposition that the market for Qualcomm stock was efficient to satisfy the reliance element of their claim. (Motion at 13-19.) Indeed, market efficiency, and the presumption of reliance it gives rise to, are essential predicates of Plaintiffs' attempt to certify a class. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014). Plaintiffs' expert agrees that ▮▮▮▮▮ ▮▮▮▮▮ (Sur-Reply Ex. 3 at 34-36.) ▮▮▮▮▮ ▮▮▮▮▮ (*Id.* at 40-41.) But this proposition is not a one-way street. There can be no dispute that, before the corrective disclosures, publicly available information included numerous disclosures of Qualcomm's licensing practices and the regulatory scrutiny Qualcomm was facing. EMH negates the possibility that stock price drops on the alleged corrective disclosure dates were caused by revelations of such previously disclosed licensing practices. This is fatal to Plaintiffs' motion, which offers no evidence of price impact apart from those price declines.

Plaintiffs ask the Court to disregard the consequences of EMH by ignoring prior disclosures about the relevant Qualcomm business practices that multiple financial analysts plainly understood. (*See* Reply 9-10.) Plaintiffs have cited no case embracing their version of market efficiency, where an efficiently trading public company's stock price selectively incorporates *some* publicly available information but not *other* such information. To the contrary, courts reject plaintiffs' attempts to escape the consequences of EMH, reasoning that it "is a Delphic sword: it cuts both ways". *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013); *see also In re MiMedx Grp., Inc. Sec. Litig.*, 2021 WL 7210372, at *6

(N.D. Ga. Mar. 25, 2021); *Mandalevy v. BofI Holding, Inc.*, 2018 WL 3032588, at *13 (S.D. Cal. June 19, 2018).

  Plaintiffs point to the Court's suggestion at the pleading stage that Plaintiffs alleged "some time frame in which mixed messages are happening" regarding Qualcomm's licensing practices. (Reply 8.) But allegations no longer suffice. Defendants have shown, and demonstrate further below, that Qualcomm's prior disclosures, including its practice of only licensing complete devices, were far more specific, widely distributed and to-the-point than the general and vague alleged misstatements Plaintiffs rely upon. *Compare, e.g.*, Opp. Ex. 3 at A166 ("[I]t is and has long been the industry norm for substantial patent holders to license at the level of complete standard-compliant devices, not parts and components.") *with* Reply Ex. 19 ("[W]e don't keep the technology to ourselves: our business model is to share that technology through licensing." (quoted in Reply 6)).

  Moreover, even assuming the presence of conflicting signals, an efficient market *by definition* does not permit such ambiguity to persist on a material matter where the truth is knowable. ████████████ (Sur-Reply Ex. 3 at 42.) EMH "presumes that interested, 'information-hungry' market participants are actively and continuously trading a company's stock". *Mandalevy*, 2018 WL 3032588, at *13 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 249 n.29 (1988)). These participants include, as Plaintiffs concede, "market makers and arbitrageurs" (Mot. 14), who are ████████████████████████ ████████████████████████████████████████ ████████████████████████████████ (Sur-Reply Ex. 3 at 29.) By seeking out unappreciated public information and aggressively trading based on full information, arbitrageurs drive the stock price to reflect *all* publicly available data. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 461-62 (2013). For example, an arbitrageur who had obtained complete

1  information about Qualcomm's practices and fully appreciated its impact on the
2  stock price would seek to trade with investors who lacked that information or were
3  misinformed, exploiting the knowledge differential to make advantageous trades.
4  The arbitrageur would continue such trading for so long as it was profitable, until
5  the stock was correctly priced.  It is this process of arbitrage that *makes* the market
6  for a stock efficient in the first place.  (Sur-Reply Ex. 3 at 29, 38, 46; *accord* Stulz
7  Report ¶¶ 42-43.)
8    Faced with Qualcomm's many public disclosures regarding its licensing
9  practices, Plaintiff's expert opined for the first time on reply that when mixed
10 signals exist in the market, the stock price reflects ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Reply Ex. 6 ¶ 42.)
12 Plaintiffs cannot have it both ways: either the market is efficient (as they allege to
13 invoke the presumption of reliance), meaning that the stock price reflected all
14 accurate information, or else the stock price reflected various investors' beliefs, in
15 which case the market is inefficient and the presumption evaporates.  Plaintiffs
16 cannot avoid EMH's "Delphic sword". *Meyer*, 710 F.3d at 1198.

### III. Qualcomm's Device-Level Licensing Practice Was Already Incorporated into Qualcomm's Price Before the Corrective Disclosures.

19    Plaintiffs argue that the market never knew, before the corrective
20 disclosures, that Qualcomm does not license components such as modem chips.
21 Not so.  Just a handful of examples:  In February 2013, QTL Senior Vice
22 President Eric Reifschneider made a public presentation to the Licensing
23 Executives Society explicitly stating that Qualcomm's "**[c]urrent practice is not**
24 **to assert against or collect royalties from chipset suppliers**" and that "chipset
25 suppliers" were one of the "Groups Outside our Standard Licensing Program"
26 (Sur-Reply Ex. 4 at 146.)  Then, in a May 2013 presentation at the University of
27 Texas, Mr. Reifschneider told industry participants and members of the public that
28 FRAND commitments have "**never been understood to mean that a patent**

| DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES | 4 | CASE NO. 17-CV-0121-JO-MSB |

1  holder must offer licenses at the component level" and thus that "**Qualcomm's**
2  **practice**" and "**the industry practice for the last 15 to 20 years has been to**
3  **license at the handset level.**" (Sur-Reply Ex. 7 at 238.) Two months later, on
4  July 30, 2013, Qualcomm's General Counsel told a Senate Subcommittee that "**it**
5  **is and has long been the industry norm for substantial patent holders to**
6  **license at the level of complete standard-compliant devices, not parts and**
7  **components**". (Opp. Ex. 3 at A166.) This was an unambiguous statement made
8  to Congress, responding to regulatory scrutiny of Qualcomm's practices that had
9  been going on *for years* prior to any corrective disclosure.
10      These statements were clearly delivered "with a degree of intensity and
11  credibility sufficient to effectively counterbalance" any misimpression (Reply 6),
12  and investors and industry members received and understood them. ▇▇▇▇▇
13  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
14  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
15  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
16  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
17  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
18  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
19  ▇▇▇▇▇▇▇▇▇▇▇▇▇  These statements were made mere months before the
20  first alleged corrective disclosure, demonstrating awareness of Qualcomm's
21  licensing practice in the time leading up to it.
22      Plaintiffs purport to offer contrary evidence, but it fails scrutiny. **_First_**,
23  Plaintiffs overwhelmingly rely on statements dating years before the Class Period
24  (which starts in 2012) and, indeed, predating *Quanta*, the 2008 Supreme Court
25  decision that eliminated non-exhaustive licensing as a legal concept and thus
26  compelled single-level (here, device-level) licensing. (*See* Reply 6-8 & Reply
27  Exs. 10, 11, 12, 13, 18, 31, 32, 37, 38, 39, 47, 48, 49, 53, 55.) Plaintiffs also
28  misleadingly cite (without mentioning its date) a **pre-_Quanta_** analyst report from

Defendants' financial analyst expert Richard Windsor stating that "Qualcomm licenses all of its IPR openly to anyone who wants it". (Reply 10.) Plaintiffs offer no explanation how these pre-2008 (or any pre-2012) statements could rebut evidence of what the market actually knew during the Class Period, and specifically in the months immediately preceding the first corrective disclosure.

*Second*, Plaintiffs cherry-pick snippets of generic quotations to fit their narrative of market confusion (Reply Exs. 15-17, 19) while ignoring Qualcomm's more specific statements making clear that its practice was to license at the device level, not the chip level. For example, Plaintiffs trot out vague statements from Qualcomm's website such as "our business model is to share that technology through licensing" (Reply 6), while failing to acknowledge that *all* of Qualcomm's 10-Ks *during the Class Period* clearly described Qualcomm's practices, stating that "separate and apart from licensing", "we have entered into *certain patent arrangements*"—not "license" agreements—with some competing chipmakers. On this point, one of Plaintiffs' own corrective disclosures—Apple's Complaint itself—attributes its allegations that Qualcomm does not license modem chips to those very 10-Ks. Opp. Ex. 11 at A533 ("**Qualcomm's 2014 10-K stated that Qualcomm's policy was to enter into 'arrangements,' but not exhaustive licenses, with competing chipset manufacturers**.").

*Third*, Plaintiffs misrepresent a smattering of articles and internet posts written by and for lay audiences to suggest that "investors did not know" during the Class Period that Qualcomm licensed at the device level rather than at the chip level. (Reply 8.) Reply Exhibit 53 is a *MarketWatch* article from before the Class Period. Reply Exhibits 55 and 56 are both blog posts from Trefis.com, which describes itself as an online "financial community" (*see* Stulz Report ¶ 96 & n.207), with the latter being user-generated content submitted "as part of [Trefis's] contributors program". Reply Exhibit 54 is a Forbes.com blog post that was likewise submitted by a "Trefis Team Contributor" (Sur-Reply Ex. 8 at 239),

| DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES | 6 | CASE NO. 17-CV-0121-JO-MSB |
|---|---|---|

1 although Plaintiffs submitted a version of this post that omits that fact.  None of
2 these are even remotely analyst reports, which is important because, as Plaintiffs'
3 expert agrees, ███████████████████████████████████████████████
4 ████████████████████████████████████████ (Sur-Reply
5 Ex. 3 at 79-80.)

6      It is notable, then, that Reply Exhibit 57, a 2014 BMO Capital Markets
7 analyst report—the only equity analyst report of the bunch—provides a correct
8 analysis of Qualcomm's post-*Quanta* arrangements with chipset suppliers.
9 Specifically, it references "**deals** with Intel, Broadcom, Texas Instruments,
10 Mediatek, and several other semiconductor suppliers".  (Reply Ex. 57 at 982.)
11 The analyst astutely calls these *deals* (*i.e.*, "arrangements") rather than licenses
12 and lists many of the arrangements disclosed in the prior year's 10-K as "separate"
13 from licensing.  Notably, in 2013, Qualcomm also issued a joint press release with
14 MediaTek stating explicitly their agreements "were not" and "are not 'license' or
15 'licensing' agreements".  (Sur-Reply Ex. 13; *see also* Sur-Reply Exs. 14, 15.)

16      Indeed, the record shows that the vast majority of sophisticated market
17 participants understood that Qualcomm's post-*Quanta* practice was to license at
18 the device level, not the chip level.  Analyst reports demonstrated this fact.  (*See,*
19 *e.g.*, Opp. Ex. 23 at A695 (April 26, 2009:  "Qualcomm **does not collect royalty**
20 **payments from chip vendors**, they collect them from chip vendors' customers
21 (handset makers)"); Opp. Ex. 25 at A714 (August 22, 2014:  Qualcomm
22 "**refus[es] to grant patent licenses to certain chipset manufacturers**"); Opp.
23 Ex. 26 at A725 (September 16, 2014:  "accusations included Qualcomm's practice
24 of . . . **refusing to license chipset manufacturers**"); *see also* Reply Exhibit 57.)

25      *Fourth*, Plaintiffs argue that some of Qualcomm's evidence of public
26 knowledge relates to Qualcomm's practice of not licensing modem chips ████
27 ████████████████████████ which Plaintiffs argue is "a different concept"
28 from not licensing chipmakers at all.  (*See* Reply 8 & Reply Ex. 7 ¶¶ 25-28.)  That

1  argument fails for two reasons.  *First*, following *Quanta*, licensing on a "less than
2  fully exhaustive basis" became legally and commercially untenable; simply put,
3  post-*Quanta*, a license is by definition exhaustive.  (Bernstein Decl. ¶¶ 41-44.)
4  Consequently, post-*Quanta*, the distinction Plaintiffs wish to draw between not
5  licensing exhaustively and not licensing at all fails; not licensing exhaustively
6  means not licensing at all and vice versa.  *Second*, the various regulatory and legal
7  actions that Plaintiffs deem "corrective" in fact took issue only with Qualcomm's
8  failure to provide *exhaustive* licenses to modem chipmakers.  Apple's Complaint,
9  for example, made clear that a non-exhaustive agreement "is not a substitute" for
10 an exhaustive license, and identified the failure to license *exhaustively* as the
11 alleged anticompetitive conduct Apple was challenging.  (Opp. Ex. 11 ¶ 158.)
12 The FTC too sought to force Qualcomm to license *exhaustively*.  *FTC v.*
13 *Qualcomm*, 411 F. Supp. 3d 658, 821 (N.D. Cal. 2019); *see also* Seoul
14 Godeungbeobwon [Seoul High Ct.], Dec. 4, 2019, 2017Nu48 (S. Kor.).
15      Plaintiffs also attack as irrelevant Defendants' evidence (Opp. 8 & Opp.
16 Exs. 6, 28, 33) showing that the market knew Qualcomm calculated royalties
17 based on the price of the device, not its modem chip (*i.e.*, the "royalty base").
18 (*See* Reply 8 & Reply Ex. 7 ¶¶ 20-24.)  Plaintiffs' argument suggests there is no
19 relationship between the royalty base—which affects how much money
20 Qualcomm collects—and the level of licensing.  But the Ninth Circuit specifically
21 found that device-level licensing was "far more lucrative" than chip-level
22 licensing, *FTC v. Qualcomm*, 969 F.3d 974, 994 (9th Cir. 2020), meaning the
23 licensing level affected the licensing base.  The market's awareness that
24 Qualcomm charged device-level royalties thus entails its awareness that
25 Qualcomm engaged in device-level licensing.
26      And ***Fifth***, Plaintiffs' suggestion that Qualcomm's ▓▓▓▓▓▓▓
27 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is misleading.
28 (Reply 7.)  Several of the deposition transcripts Plaintiffs selectively excerpt in

| DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES | 8 | CASE NO. 17-CV-0121-JO-MSB |
|---|---|---|

1  fact prove that those executives understood Qualcomm's device-level licensing
2  practice and its implications for chipmakers. Paul Jacobs testified that "through
3  the licensing of device manufacturers . . . we were providing the opportunity for
4  chipset manufacturers to make products freely and do so without concerns as long
5  as they were selling to a licensed manufacturer". (Sur-Reply Ex. 10 at 264.)
6  Steve Mollenkopf testified that "we don't require [competing chipset
7  manufacturers] to have a license" because "[w]e license our portfolio at the end
8  market device level". (Sur-Reply Ex. 11 at 268.) Witnesses' denials to questions
9  about Qualcomm's purported "refusal to license" chips prove nothing because the
10 questions implied that Qualcomm denied chipmakers access to its technologies,
11 which is contrary to fact. *See FTC*, 969 F.3d at 995 (Qualcomm's "policy toward
12 rival chipmakers could be characterized as 'no license, no problem'").

**IV.   The Alleged Misstatements and Corrective Disclosures Do Not Match.**

Price impact requires evidence that the alleged misstatements affected the stock's price *when made*. *Goldman*, 141 S. Ct. at 1959. Here, Plaintiffs rely on ▮▮▮▮▮ *Goldman* therefore requires Plaintiffs to show congruence between the corrective disclosures and the alleged misstatements. 141 S. Ct. at 1961. Plaintiffs fail to do so.

*First*, in the case of the EC, there is a complete disconnect between the disclosure—which speaks to an exclusive dealing arrangement involving *only* QCT (Qualcomm's chip business)—and the alleged misstatements that Qualcomm "**tend**[s] **to keep** the licensing and the chip business very separate" (Compl. ¶¶ 142-143) and does not "bundle" licensing and chips (*id.*). Nothing in the press release suggests that the separateness of Qualcomm's businesses was at issue.

*Second*, Plaintiffs suggest that the KFTC, FTC and Apple announcements, by allegedly disclosing Qualcomm's device-level-licensing practice, somehow

---

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES         9         CASE NO. 17-CV-0121-JO-MSB

1  corrected the generic statements that Qualcomm licensed "broadly", had a "pro-
2  competitive" business model and did not discriminate.  But the evidence is clear
3  that not one financial analyst identified these (supposedly bombshell) disclosures
4  as contradicting Qualcomm's previous statements.  (Stulz Report ¶¶ 120, 126,
5  130, 135, 140.)  The reasons for this are twofold.  One, as noted above, the market
6  had been informed repeatedly about Qualcomm's licensing practices.  (*See*
7  *generally supra* Section III.)  And two, as the evidence confirms, Qualcomm's
8  licensing program was in fact exceedingly broad (*see* Sur-Reply Ex. 16 at 286);
9  "hypercompetitive", *FTC*, 969 F.3d at 1005; and treated similarly all similarly-
10 situated counterparties, consistent with industry practice, *id.* at 994-95.

**V.   Because the FTC Complaint and the Apple Complaint Did Not Disclose New News, They Do Not Prove Price Impact.**

Plaintiffs wrongly argue that the FTC and Apple Complaints contained new corrective disclosures that can support a causal link to the alleged misstatements. Any supposedly corrective information, however, had already been disseminated several times over in the first three corrective disclosures, as well as the public disclosures related to the TFTC investigation and at the public KFTC hearings. (*See* Opp. 28-30.)

For example, in July 2016, Qualcomm reported that the TFTC investigated whether "the Company provided royalty rebates to certain companies in exchange for their exclusive use of the Company's chipsets" (Sur-Reply Ex. 12 at 273), and in August 2016, Apple made a public presentation accusing Qualcomm of exclusive dealing and bundling involving "loyalty-based royalty rebates". (Longman Ex. 3 at L127.)  Even based on Plaintiffs' Complaint, by the time of the FTC and Apple Complaints, there was nothing left to "correct".

## CONCLUSION

The Court should deny class certification.

| | | |
|---|---|---|
| 1 | Dated: September 28, 2022 | Respectfully submitted, |
| 2 | | By:  /s/ Antony L. Ryan |

**CRAVATH, SWAINE & MOORE LLP**
ANTONY L. RYAN (*pro hac vice*)
(aryan@cravath.com)
RACHEL G. SKAISTIS (*pro hac vice*)
(rskaistis@cravath.com)
YONATAN EVEN (*pro hac vice*)
(yeven@cravath.com)
JUSTIN  C. CLARKE (*pro hac vice*)
jcclarke@cravath.com
M. BRENT BYARS (*pro hac vice*)
(mbyars@cravath.com)
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

**COOLEY LLP**
STEVEN M. STRAUSS (99153)
(sms@cooley.com)
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
CHRISTOPHER DURBIN (218611)
(cdurbin@cooley.com)
PETER M. ADAMS (243926)
(padams@cooley.com)
4401 Eastgate Mall
San Diego, CA 92121-9109
Telephone:  (858) 550-6000
Facsimile:  (858) 550-6420

*Attorneys for Defendants Qualcomm Incorporated, Derek K. Aberle, Steven R. Altman, William F. Davidson, Paul E. Jacobs, Steven M. Mollenkopf and Donald J. Rosenberg*