# Sur-Reply Exhibit 10

Paul Jacobs, Ph.D. Volume II Highly Confidential Under The Protective Order
April 18, 2018

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 5:17-cv-00220-LHK-NMC |
| Plaintiff, | |
| v. | |
| QUALCOMM INCORPORATED, a Delaware corporation, | Case No. 5:17-md-02773-LHK |
| Defendant. | |
| _____ | |
| IN RE: QUALCOMM ANTITRUST LITIGATION | |
| _____ | |

*** TRANSCRIPT DESIGNATED HIGHLY CONFIDENTIAL UNDER THE

PROTECTIVE ORDER ***

VIDEOTAPED DEPOSITION OF PAUL JACOBS, PH.D., VOLUME II

Wednesday, April 18, 2018, 9:06 a.m.

4655 Executive Drive, Suite 1500, San Diego, California

Reported by:

Harry Alan Palter

CSR No. 7708, Certified LiveNote Reporter

U.S. Legal Support | www.uslegalsupport.com

Paul Jacobs, Ph.D. Volume II Highly Confidential Under The Protective Order
April 18, 2018

Page 294

1  Cravath.
2       MR. HARRIS:  Marc Harris, Scheper Kim &
3  Harris, on behalf of the witness.
4       MS. LAM:  Carol Lam from Qualcomm.
5       MR. PARROTT:  Matthew Parrott on behalf
6  of the contract manufacturers.
7       MS. MILICI:  Jennifer Milici on behalf of
8  the FTC.
9       MS. SRINIVASAN:  Kalpana Srinivasan of
10 Susman Godfrey on behalf of the MDL plaintiffs.
11      MS. TANG:  Fiona Tang, Boies, Schiller,
12 Flexner, for Apple.
13      MR. ISAACSON:  Bill Isaacson, Boies,
14 Schiller, Flexner, Apple.
15      THE VIDEOGRAPHER:  The certified court
16 reporter is Harry Palter.
17      Will you please swear in the witness.
18
19
20           PAUL JACOBS, PH.D.,
21 having been previously duly administered an oath in
22 accordance with the California Code of Civil
23 Procedure Section 2094, was examined and testified
24 further as follows:
25 ///

Page 295

1              EXAMINATION
2  BY MR. ISAACSON:
3     Q    Good morning, Mr. Jacobs.
4     A    Good morning.
5     Q    We put in front of you a document marked
6  Paul Jacobs 1, which is -- hand those out -- which
7  is Bates-stamped Q2017MDL5_05759950 through -965.
8  This is a conference-call transcript of an earnings
9  conference call from November 2005.
10         (Exhibit Paul Jacobs 1 marked)
11 BY MR. ISAACSON:
12    Q    And I want to ask you about a statement
13 that's found on page 954 of the document.  And
14 you'll see just at the bottom of the previous page
15 that this is Mr. Altman speaking.
16    A    Okay.
17    Q    And you're there because he begins with,
18 "Thanks, Paul."  And he says at the bottom of that
19 -954, "We have never refused to license our
20 essential patent to any company to supply chips,
21 handsets, infrastructure, or test equipment."
22         So in November 2005, was that a true
23 statement?
24    A    I -- I'm not sure.  I don't know, sitting
25 here.  I assume Steve wouldn't have said it if it

Page 296

1  wasn't true, but I don't have specific knowledge to
2  say whether that's true or not.
3     Q    Was there a time period where Qualcomm
4  was willing to license its essential patents to
5  companies that supplied chips?
6     A    Well, certainly, there were some
7  companies that were making chips that had licenses
8  from us.  I assume that they were able to sell into
9  the market.  But I don't know the details of it.
10    Q    All right.  When you say you don't know
11 the details of it, meaning you don't know which
12 companies that were making chips that had licenses
13 from Qualcomm?
14    A    Yes.  I don't know sitting here today,
15 back in 2005, the details of that.
16    Q    All right.  Do you -- do you have it in
17 your mind that Qualcomm made any changes in its
18 policy with respect to whether it was willing to
19 license chipset competitors over any -- over anytime
20 period?
21    A    I know that there was a period of time
22 when we were in discussions with MediaTek.  And we
23 changed the way that we were -- what our agreements
24 were with them.  I don't know whether they were full
25 licenses or exactly what, but we had agreements with

Page 297

1  them around audit rights and so forth that we
2  modified upon their request.  That's -- that's
3  really one that I remember the most.
4     Q    All right.  What's your understanding of
5  how you modified your agreements with MediaTek?
6     A    That we agreed not to have audit rights.
7  I don't remember whether there was money that
8  changed hands anymore or not.
9     Q    All right.  Other than changes with
10 respect to audit rights, do you remember any changes
11 in policy that your company did with respect to its
12 willingness to license chipset competitors?
13         MR. RYAN:  Objection to form.
14         THE WITNESS:  I think we -- we certainly
15 felt like through the licensing of device
16 manufacturers and have made rights that we were
17 providing the opportunity for chipset manufacturers
18 to make products freely and do so without concerns
19 as long as they were selling to a licensed
20 manufacturer.  So when did we come up with that
21 policy, I don't -- I don't recall exactly.
22 BY MR. ISAACSON:
23    Q    All right.  Was there a time period
24 where, in your memory, your company was willing to
25 directly license chipset manufacturers?

Paul Jacobs, Ph.D. Volume II Highly Confidential Under The Protective Order
April 18, 2018

Page 298

1  A   What -- so we licensed companies like
2  Motorola, and Ericsson, and so forth that made --
3  that did make chips.  Certainly some of them -- I --
4  but I don't know whether those licenses were
5  specifically for the chip or it was a more general
6  license.  I guess I don't know the details of that.
7  Q   All right.  Do you recall any time period
8  where the company changed its policy with -- with
9  regards to its willingness to directly license
10 chipset manufacturers?
11 A   Nothing --
12     MR. RYAN:  Object to form.
13     THE WITNESS:  Nothing than I've said so
14 far.
15 BY MR. ISAACSON:
16 Q   All right.  I'm going to have the next
17 one -- mark this as No. 2.
18     (Exhibit Paul Jacobs 2 marked)
19 BY MR. ISAACSON:
20 Q   Okay.  Paul Jacobs Exhibit 2 is
21 Bates-stamped QNDCAL01873760 and -61.  This is a
22 June 3rd, 2008, statement from -- of Qualcomm at an
23 Oppenheimer & Company annual communications and
24 technology conference.
25     And there's a statement at the bottom

Page 299

1  there from Mr. Davidson that, "We will license
2  anyone who wants to go and have a license in CDMA."
3  Do you know if that was true in 2008?
4  MR. RYAN:  So let me just note, this
5  appears to be an excerpt from a larger document,
6  maybe looking at the numbers in yellow on the
7  bottom -- maybe it's pages 4 and 5 from a larger
8  document.  Mr. Davidson's name doesn't appear on it.
9  This does appear to be an incomplete transcript.
10 MR. ISAACSON:  I appreciate that.  My
11 notes indicate this was a statement by Mr. Davidson.
12 We can't see the date, so -- the -- but the
13 statement -- we will license anyone who wants to go
14 and have a license in CDMA.
15 BY MR. ISAACSON:
16 Q   Do you know whether that was a true
17 statement in June of 2008?
18     MR. RYAN:  Take your time, obviously,
19 Paul to look at the context of this document.
20     THE WITNESS:  (Examining document) All
21 right.  So what I'm understanding from the thread of
22 your question is that you're trying to find out
23 whether I believe that we were denying licenses to
24 chip manufacturers to manufacture CDMA equipment.
25 And I actually don't know the answer to that at this

Page 300

1  timeframe.  I guess I would fall back to what I said
2  before, which we believe that manufacturers are
3  able -- the chip manufacturers are able to be
4  licensed by the right of having licenses from the
5  device manufacturers, and that gives them the
6  ability to operate without fear of being attacked by
7  Qualcomm, as long as they're selling to licensed
8  manufacturers.
9  BY MR. ISAACSON:
10 Q   So based on that -- based on that answer,
11 is it the case that you don't know whether or not it
12 was true in June of 2008 that your company was
13 willing to license anyone who wants to go and have a
14 license in CDMA?
15     MR. RYAN:  Objection.
16     THE WITNESS:  I guess it depends on how
17 you -- you talk about it.  If -- if by what --
18 what -- if you are accepting what I say as a license
19 -- meaning that a chip manufacturer is licensed by
20 means of selling to a licensed handset manufacturer
21 -- then I suspect the answer is we were willing to
22 do that.  But I don't remember whether there was an
23 active policy to or not to license chipset
24 manufacturers at that point.
25     MR. ISAACSON:  Okay.  All right.  Mark as

Page 301

1  Exhibit 3 -- Oh, previously marked as Lupin 4.
2  Never mind.  You can just hand that to him.
3  BY MR. ISAACSON:
4  Q   All right.  Lupin 4 is the Form 10-K for
5  Qualcomm, Inc., for the fiscal year ended
6  September 24th, 2006.  And this is a document that
7  you signed at page 68 -- is that right? -- as CEO of
8  the company?
9  A   (Examining document) Hmm-hmm.  Okay.  69.
10 Q   69?
11 A   Oh, 68.
12 Q   And then on page 18, there's a -- there's
13 a discussion for the QCT Segment and the QTL
14 segment.  Do you see that?
15 A   Yes.
16 Q   Okay.  And the last paragraph of the QCT
17 Segment -- and this is the end of fiscal year 2006.
18 A   Okay.
19 Q   At the end of -- last paragraph of the
20 QCT Segment, the second -- in the third to last
21 sentence, it says, "We license our CDMA intellectual
22 property."  Do you see that sentence?
23 A   Yes.
24 Q   Okay.  That sentence says, "We license
25 our CDMA intellectual property to the competitors of

Paul Jacobs, Ph.D. Volume II Highly Confidential Under The Protective Order
April 18, 2018

```
                                                    Page 602
 1                 REPORTER'S CERTIFICATE

 2

 3            I, Harry A. Palter, CSR No. 7708, California
 4   Certified Shorthand Reporter, certify:
 5            That the foregoing proceedings were taken
 6   before me at the time and place therein set forth, at
 7   which time the witness was put under oath by me;
 8            That the testimony of the witness, the
 9   questions propounded, and all objections and statements
10   made at the time of the examination were recorded
11   stenographically by me and were thereafter transcribed;
12            That a review of the transcript by the
13   deponent was requested; that the foregoing is a true and
14   correct transcript of my shorthand notes so taken.
15            I further certify that I am neither counsel
16   for, nor related to, any party to said proceedings, nor
17   in any way interested in the outcome thereof,
18   financially or otherwise.
19            I declare under penalty of perjury under the
20   laws of the State of California that the foregoing is
21   true and correct.
22   Dated: 4.19.2018
23
24   _____
25   HARRY ALAN PALTER, CSR No. 7708
```