**CERTIFIED COPY**

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3                  BEFORE THE HONORABLE
          JINSOOK OHTA, DISTRICT JUDGE PRESIDING

4  _____

5  SHAH, ET AL.,                 )  Case No: 3:17-cv-00121-JO-MSB
                                 )
6  Plaintiffs,                   )  Motion Hearing
                                 )  Department 4C
7           v.                   )
                                 )  Date: 10/19/2022
8  QUALCOMM INCORPORATED, ET AL., )
                                 )
9  Defendants.                   )
                                 )
10 _____

11          **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

12                 Page 1 through 86

13 APPEARANCES:

14 For the Plaintiff        BERNSTEIN LITOWITZ BERGER &
   Shah:                    GROSSMAN, LLP
15                          2121 Avenue of the Stars, Suite 2575
                            Los Angeles, California 90067
16                          By:  SALVATORE J. GRAZIANO, ESQ.
                            By:  JONATHAN D. USLANER, ESQ.
17                          By:  LAUREN M. CRUZ, ESQ.
                            By:  REBECCA E. BOON, ESQ.
18
   For the Plaintiff        MOTELY RICE, LLC
19 Metzler Asset Mgmt.:     ATTORNEYS AT LAW
                            28 Bridgeside Boulevard
20                          Mount Pleasant, South Carolina 29464
                            By:  CHRISTOPHER MORIARTY, ESQ.
21 _____
   REPORTED BY:             Abigail R. Torres, CSR, RPR, RMR, FCRR
22                          CSR No. 13700
                            United States District Court
23                          Southern District of California
                            333 West Broadway, Suite 420
24                          San Diego, California 92101

25     ----- **appearances continued on the following page** -----

```
1   APPEARANCES:

2   For the Defendant        CRAVATH SWAINE & MOORE, LLP
    Qualcomm, Inc.:          Worldwide Plaza
3                            825 Eighth Avenue
                             New York City, New York 10019
4                            By:  YONATAN EVEN, ESQ.
                             By:  ANTONY L. RYAN, ESQ.
5                            By:  KOJI F. FUKUMURA, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   <u>**SAN DIEGO, CALIFORNIA; WEDNESDAY, OCTOBER 19, 2022; 9:45 A.M.**</u>

2                                    -oOo-

3          THE CLERK:  Calling Matter No. 2 on calendar,

4   17-cv-0121, *Shah v. Qualcomm, Incorporated, et al.,* for a

5   motion hearing.

6          THE COURT:  Good morning, everyone.  We'll take

7   appearances.

8              Plaintiffs' side first.

9          MR. GRAZIANO:  For the Plaintiffs, good morning, Your

10  Honor.  Salvatore Graziano from Bernstein Litowitz.

11         MR. USLANER:  Good morning, Your Honor.

12             Jonathan Uslaner also from Bernstein Litowitz for the

13  Plaintiffs.

14         MR. BOON:  Good morning, Your Honor.

15             Rebecca Boon with Bernstein Litowitz.

16         MS. CRUZ:  Good morning, Your Honor.

17             Lauren Cruz also from Bernstein Litowitz.

18         MR. MORIARTY:  Good morning, Your Honor.

19             Chris Moriarty on behalf of Metzler Asset Management.

20         THE COURT:  Okay.  Good morning, everyone.

21             Defendants?

22         MR. EVEN:  Good morning, Your Honor.

23             Yonatan Even from Cravath for all Defendants.

24         MR. RYAN:  Good morning, Your Honor.

25             Antony Ryan also from Cravath, representing

1    Defendants.

2         MR. FUKUMURA:  Good morning, Your Honor.

3         Koji Fukumura from Cooley representing Defendants.

4         MS. PHOU:  Good morning, Your Honor.

5         Eileen Phou from Cravath, representing Defendants.

6         THE COURT:  Okay.  Good morning.

7         MR. GRAZIANO:  Good morning.

8         MR. EVEN:  Good morning.

9         THE COURT:  So thank you for responding to the Court's

10   e-mail yesterday.  The Court sent out an e-mail with some

11   questions that it had for the oral argument, and it had

12   requested Plaintiffs to -- in order to assist with the oral

13   argument, to provide a comprehensive chart of what its alleged

14   material statements are with its corresponding new corrective

15   information that it claims caused the drop in prices at the

16   point that this information hit the market.  And I did receive

17   that chart.

18         And I also appreciate that you answered the questions

19   that we had for you in advance of the hearing.  Helps make

20   things clearer both for the Court, and I'm sure it helps makes

21   things clearer for Defendants so that they know where to direct

22   their arguments.

23         With regard to the -- the Court also received a stack

24   of papers this morning when it walked into the office,

25   submitted by Plaintiffs.  It looked like it was an additional

1    chart and some other exhibits.  The Court did not review that

2    information for two reasons:  It understood that it received

3    the answers to its questions in the chart that it requested

4    yesterday before the close of business, and that looked like it

5    was a communication that went to both sides by -- via e-mail.

6         The submissions this morning, the Court -- it didn't

7    have any indicia that it had gone to both sides, and it was

8    material that wasn't directly responsive to anything that the

9    Court had requested.  So it didn't look at it.  It has it, but

10   it has not opened it.

11        If it was material that you were planning to use as a

12   demonstrative during the arguments today, then that's totally

13   fine, which means that the Court and Defendants will see it at

14   the same time, because whatever you submitted to us, the Court

15   has not examined in any way.

16        The -- so with that housekeeping out of the way, let

17   me start by confirming -- so it looks like, at least for

18   Plaintiffs, that your theory of the case has at least -- I

19   don't know if "change" is too strong a word, but has been

20   modified, or it's shifted somewhat from what's set forth in

21   your Complaint, and even what it was at the time when we had

22   our argument on the judgment on the pleadings.

23        And I understand that to mean you're no longer

24   pursuing a theory that the market was unaware that Qualcomm

25   licensed or did not license at the chip level.  And it's now

1   more of a theory that it was selectively licensing or not

2   licensing to all its competitors, and then -- as well as the

3   bundling practices.

4          So given that, and we did get your -- we did get your

5   clarifying answers, what I will do at this point is, we'll let

6   Defendants argue first.  We'll let Defendants argue first,

7   responding to this new comprehensive chart that I requested

8   yesterday and that we all got some time yesterday afternoon or

9   yesterday evening, depending on whether you were already in

10  California or still in New York at the time.

11         And the -- if you want to address now that we all have

12  a clearer sense of what the allegations and what the theories

13  are and what the alleged material misstatements, along with the

14  corrective information -- corresponding corrective information

15  is, if you want to give me argument on whether this information

16  was already on -- was already on the market, whether this

17  information is -- and I know from your briefing that you would

18  also have arguments as to the contrast between the level of

19  specificity in terms of the alleged misstatements and

20  the -- you know, that the misstatements were on some general

21  level, or as the new corrective information was more on a

22  specific level such that the misstatement could not have had

23  the price impact.

24         So -- and I know there are other issues to be

25  resolved, but let's just start with the price-impact argument

1    first, and we'll get argument just on that, and now all working

2    off of this latest chart.

3            MR. EVEN:  Okay.  Thank you, Your Honor.

4            Your Honor, if I may approach --

5            THE COURT:  Yes.

6            MR. EVEN:  -- and provide the Court some materials.

7            So thank you, Your Honor.

8            And I think Your Honor captured it correctly.  We have

9    a relatively simple argument that says that in this market,

10   which is an efficient market, and the parties agree on that,

11   the misstatements -- alleged misstatements and alleged

12   corrective disclosures could not have had price impact either

13   with respect to the licensing issue or with respect to the

14   bundling issue.

15           And I want to start, really, with the licensing part,

16   if I may.  And on the licensing part, I want to focus on what

17   the market actually knew at the relevant time.  The relevant

18   time here is starting when the class period started and all the

19   way up to the first corrective disclosure for this matter,

20   which is November 2015; so between 2012 and late 2015, what the

21   market knew.

22           And for that, I want to take a look at what Qualcomm

23   actually told the market during that specific period that

24   Plaintiffs alleged the market was misled.

25           And what we have shown, I think -- and I'll go through

1    some of the documents in a second -- is that very clearly

2    Qualcomm told the market that its practice is very clear.  It

3    licensed OEMs, the people who make phones.  It did not grant

4    licenses to chipmakers.  It never prevented any chipmaker from

5    having access to the technology or from selling chips or from

6    developing chips or anything like that.

7         And when a chipmaker said, "But I want some kind of

8    assurances," Qualcomm entered into negotiations and had some

9    agreements, but those agreements were not called "licenses."

10   They were not licenses; they were some other kind of

11   patent-piece agreement.

12        If Your Honor turns to Slide 2, that is the first

13   document.  This is from February 2013, and this is a

14   presentation made by Eric Reifschneider.  Eric Reifschneider

15   was, at the time, the head of Qualcomm's licensing business.

16   And this is what Mr. Reifschneider says in these slides, and

17   you can also find it in the binder, if you would like to look

18   at the entire document.  It's Tab 15.

19        And you can see there on the side that after

20   Mr. Reifschneider goes over the licensing policy, he goes and

21   speaks to groups that are outside our standard licensing

22   program, chipset suppliers.

23        "Current practice is not to assert against or collect

24   royalties from chipset suppliers.  When necessary QTL will

25   enter into patent-piece agreements with chipset suppliers that

1    are carefully designed not to result in exhaustion of either

2    parties' patents."

3         It's a very clear statement.  We license at one level.

4    We don't license at the other level.  We can enter into

5    patent-piece agreements.

6         Now, this entire slide deck talks about licensing

7    except this one slide.  So there is a clear distinction between

8    a license and a patent-piece agreement, and that is fully

9    explained.

10         Now, what is this document?  If you turn to the

11    binder, Tab 15, if you look at page B747, it was explained that

12    this was given --

13         You have it, Your Honor?

14         So on page 747, that's the cover e-mail.  And on 747,

15    you see there's an e-mail at 1254 that explains that this was a

16    webinar, meaning there was no geographic limitation.  Anybody

17    could dial in from anywhere in the world.

18         If you go a couple of pages before that, later in the

19    chain, you see an e-mail that says that the invite is going to

20    go out to 2,000 people.  Who are those 2,000 people?  These are

21    2,000 members of LES, the Licensing Executive Society.  That's

22    the most important association -- trade association for

23    licensing professionals in the United States.  Has members from

24    anyone in high tech, in Pharma, in GE -- anyone like that who

25    ever dealt with licensing and, obviously, people from other

1    industries were interested.

2         So it will go out to 2,000 people, the invite, and

3    they expect substantially more than 200 people to actually dial

4    in into the live webinar.

5         If we then go up to page 742, which is the first page,

6    you see that after the webinar is done, the presentation and

7    the recording will be placed online for anyone to access on the

8    LES website.

9         If we can now turn to Slide 3, that is, again, a

10   statement by Qualcomm; this time, Qualcomm's general counsel,

11   the highest-ranking lawyer in the company, Mr. Don Rosenberg,

12   who happens to be a Defendant here.

13        Mr. Rosenberg went to testify before the Senate

14   Judiciary Committee and prepared some comments for his

15   testimony.  And Mr. Rosenberg's response in his

16   testimony -- let's look at the bottom half under "first" -- he

17   says very clearly, "At least in the 3G/4G wireless

18   communications sector, it is and has long been the industry

19   norm for substantial patent holders to license at the level of

20   complete standard-compliant devices, not parts and components.

21        "In other words, we license phones.  We do not license

22   the manufacture and sales of chips and components."

23        Now, if you go up, you see that this was not done in a

24   vacuum.  This was done in response to specific allegations from

25   Mr. Doug Millament, who testified in the same hearing, and he

1    was the GC for Intel, the world's largest chip manufacturer.

2         And he stood before Senator Klobuchar and others, and

3    said, "SEP licensors, decline" -- "refuse" is the word he

4    used -- "refuse to license chipmakers."  They think that it's

5    good enough that they license our customers, the makers of PCs

6    and other devices, but don't license the chipmakers.

7         And you can see that -- this is Tab 1 of your binder,

8    if you want to see the entire document, and Mr. Millament's

9    specific allegations are on page 9 of the document.  And

10   Mr. Rosenberg in his response, he doesn't say, "No, we don't do

11   any of that.  We, in fact, license."  No.  He says Intel's

12   proposal that we have to license chipmakers is contrary to what

13   the SSOs think of FRAND.  It's contrary to what the industry

14   has always done, it is contrary to common sense, and it's

15   contrary to what a court has just ruled in the case where Intel

16   was involved.  We don't license chips.  We license devices.

17        Going back to the -- going to the next one, that's

18   Slide -- Slide 4, and this is a press release.  This time it's

19   September 2013.  And this is a press release by MediaTek, a

20   chipmaker, and Qualcomm.  And they jointly say, "The original

21   agreements between MediaTek and Qualcomm were not, and the

22   amended agreements are not" -- quote/unquote -- "license or

23   licensing agreements."

24        Why?  Because Qualcomm doesn't license chipmakers

25   because of the issue of exhaustion that we saw

1     Mr. Reifschneider talk about.  In other words, this is a

2     patent-piece agreement.

3              And if we turn to the next slide --

4              THE COURT:  Sorry.  I'm going to just pause you for

5     just one second.  You can stay at the podium.

6              Plaintiffs' Counsel, so when you answered the Court's

7     question yesterday -- I asked you, "Are Plaintiffs currently

8     alleging that the market did not know that Qualcomm licensed

9     only at the device level as opposed to at the chip level?"  And

10    you replied, "No.  The market understood that Qualcomm based

11    its royalties on device-level pricing, but this is different

12    than refusing to license chipset competitors at any pricing

13    level."

14             So I just want to make sure.  Are you and Defense

15    counsel saying two different things or saying the same thing?

16    He's saying right now, "Yes.  We only licensed at the phone

17    level or at the device level."

18             And you're saying, "That's not what we're saying.

19    We're saying that they refused to license to certain

20    competitors," if I'm understanding you correctly.

21             But do those certain competitors that they refused to

22    license to, were they the chipmakers, as opposed to the types

23    of competitors that would be in the position to get the license

24    at the phone level?  Does that make sense?

25             Basically, I'm asking if the refusal to license to

1    chipmakers and your alleged refusal to license to chipset

2    competitors, whether it's actually the same thing we're talking

3    about here.

4          MR. GRAZIANO:  Okay.  So, Your Honor, we are talking

5    about two different things, and I think if I could just briefly

6    give some context, it may help the Court.

7          The entities that are going to Qualcomm and requesting

8    a license and are being refused are other entities that make

9    chips, so they are the competing chipmakers.  That is correct

10    in terms of the first question.

11          THE COURT:  Okay.  So I'm going to pause you there.

12          Are there any competitors -- you were saying

13    Qualcomm -- so Qualcomm is -- do you have any competitors that

14    Qualcomm refuses to license to that sought a license at the

15    device level, not chip level?

16          MR. GRAZIANO:  The answer to that is, actually, yes,

17    as well.  But they are still the chipmakers we are talking

18    about.  If I could just briefly explain, Your Honor.

19          So my colleague is not focusing on what Qualcomm said

20    during the class period.  He's not focusing on the statements

21    in our Complaint.  And the statements in the chart have

22    Qualcomm repeatedly telling the world they are following FRAND.

23    They are licensing --

24          THE COURT:  So -- sorry.  You'll have a chance to make

25    your general arguments, but right now --

```
 1              MR. GRAZIANO:  Sure.

 2              THE COURT:  -- I'm seeking very specific answers to

 3    specific questions.

 4              MR. GRAZIANO:  I understand.

 5              THE COURT:  So if we look at the identity of people in

 6    the category -- so we have Defense counsel saying here, "We

 7    don't license at the chip level."  And you're saying, "They're

 8    not licensing to certain competitors."

 9              Are the competitors that they are not licensing to the

10    same people that Defense counsel is saying that they don't

11    license to because they're the people that would be seeking

12    licenses at the chip level?  Are we really just talking about

13    the same thing?

14              MR. GRAZIANO:  We are -- most likely are not.  These

15    companies by name --

16              THE COURT:  Okay.  So who is someone that Qualcomm has

17    refused to license to at the device level?

18              MR. GRAZIANO:  Sure.  These companies went to Qualcomm

19    and sought a license: Samsung, HiSilicon, Intel, VIA, Texas

20    Instruments, MediaTek.  Qualcomm would not engage them in any

21    kind of discussion as to how to even price the license they

22    were seeking.  So whether or not these companies --

23              THE COURT:  So all those people that you named, were

24    they seeking licenses at the chip level or at the device level?

25              MR. GRAZIANO:  They didn't get that far with Qualcomm.
```

1    They were seeking licenses to make chips, but the pricing of

2    those licenses was never discussed because Qualcomm would not

3    talk to them.  Qualcomm refused to talk to them about this

4    topic.

5           THE COURT:  Because they were seeking licensing at the

6    chip level?

7           MR. GRAZIANO:  Because they were seeking licensing,

8    put aside what pricing level, and they were chip competitors.

9    What level the license would have been priced at wasn't even

10   discussed between these companies.  It broke down before that

11   even happened.  They were competitors seeking licenses.

12          Mentioning the level is, sort of, mentioning the

13   price.  And it gets very -- and I will explain this during my

14   argument, so maybe I shouldn't do it now.

15          But they went to Qualcomm.  They were seeking FRAND

16   licenses.  They said, "FRAND requires you to deal with us."

17          Qualcomm refused to deal with them.

18          THE COURT:  Okay.

19          MR. GRAZIANO:  That's our position.

20          THE COURT:  I actually would like to hear the

21   explanation right now just because then it will help me

22   understand everything else, and it would be -- the Court would

23   be doing a disservice to the parties if it was laboring under

24   some misapprehension the whole time both of you are talking.

25          So let's just say a company like Intel, do they -- do

1    they have a business model such that they would be seeking to

2    license a phone or a computer or a laptop or a tablet?

3            MR. GRAZIANO:  They -- they were seeking to have those

4    discussions with Qualcomm, and Qualcomm would not entertain

5    those discussions.

6            THE COURT:  Okay.  So -- but do they have -- I'm

7    asking a really simple question here.  So, you know, some

8    people sell phones and tablets, so they might be seeking

9    licenses for phones or tablets.  Some businesses -- and I know

10   I'm putting this very simplistically.  But some people are just

11   in the business of selling or working at the chip level.

12           So I understand what you're saying in terms of "the

13   discussion couldn't even get there."  But I think with some

14   companies, you can know the answer to that before the

15   discussion gets there if that company -- their business model

16   is such that they -- you know from the outset that they're not

17   seeking licensing at the chip -- at the device level.  You know

18   they're seeking the licensing at the chip level because that's

19   what they do.

20           Are there -- so what I'm trying to clarify in my head

21   is -- am I under some misunderstanding?  Because you're making

22   it sound like it's just prices, but I'm thinking of it

23   as -- I'm thinking of it as, no, I think a company would go in

24   and be talking about either licensing devices or some larger

25   component versus the very small, basic component -- not basic;

 1   very complicated, I know.  Very complicated.  But at the very

 2   micro level, at the chip level.

 3          So how is that just a pricing issue as opposed to

 4   something fundamental about the negotiation?  You know, when a

 5   company like Qualcomm says, "No, we don't sell" -- "We don't

 6   sell X; we only sell Y."  And somebody comes to them and says,

 7   "Well, I'm someone who's in the business of X, and let's talk

 8   about X," and they get a "no."  I think that's how I'm thinking

 9   of it.  But you seem to be telling me that this is really more

10   of a pricing issue.

11          Can you -- could Qualcomm have priced at the device

12   level?  And then Intel walks away and then uses it just at the

13   chip level, even though Intel doesn't make phones?  Is that

14   what you're telling me?

15          MR. GRAZIANO:  No.  It would work the other way

16   around.  So Intel -- so let's just use one phone company just

17   to make this easy.  Okay?

18          Apple paid a specific dollar amount per device; $7.50,

19   that's what they pay.  So Intel could have negotiated with

20   Qualcomm, paid Qualcomm the 7.50, and then Intel would have the

21   freedom now to put its chips in Apple phones and not be

22   stumped, because they would have a full license from Qualcomm.

23          I know, Your Honor, that HiSilicon went to Qualcomm

24   multiple times, and I know that HiSilicon said, "Let's talk

25   about a FRAND license."  And I know that HiSilicon started with

```
 1    the position that their license should be cheaper because
 2    they're making chips.  But they never engaged them.
 3             That's what happened with Samsung.  That's what
 4    happened with VIA.  That's what --
 5             THE COURT:  Okay.  So what you're telling me is,
 6    basically, somebody could have gone, negotiated, bought a car,
 7    taken home that car so that you could strip it for parts, and
 8    do whatever you wanted with the parts, and that's the
 9    conversation that Qualcomm refused to have with these
10    companies?
11             MR. GRAZIANO:  No, it's not like that.  It's the other
12    way around.  So imagine if you can just buy the engine of the
13    car, and then you have the freedom to sell a complete
14    Mercedes-Benz car at Mercedes-Benz pricing.  There's --
15             THE COURT:  No.  I get that's what Intel wanted to do.
16             MR. GRAZIANO:  Right.
17             THE COURT:  They just wanted to buy the engine.  I
18    think we're all on the same page there.
19             MR. GRAZIANO:  Okay.
20             THE COURT:  But what Qualcomm is saying is, "We only
21    sell cars.  We don't sell engines and transmissions and" -- I
22    can't even go further with this analogy, so I'm going to stop.
23             "We only sell cars.  We're not going to just sell you
24    an engine."  And then as relevant to this motion and to this
25    case, then we're going to get to the part about, "And it was
```

1    known that we only sell cars."

2          But I just want to clear up this fundamental point

3    because I've been a little bit confused as to your theory of

4    the case, which explains the questions that went out yesterday

5    and which explains the request for the chart.

6          And as the parties were talking, I thought I had

7    clarification on how a theory had changed, but maybe it was

8    starting to sound to me like maybe the theory hadn't changed;

9    just the words around it had changed.

10         MR. GRAZIANO:  Just --

11         THE COURT:  And so I understand that's what

12   Intel -- well, that's what you're saying Intel wanted.  They

13   wanted just the engine.

14         But what I'm asking you is:  Do you know of any

15   competitors that wanted to license the whole car but Qualcomm

16   shut down those discussions?

17         MR. GRAZIANO:  Just a brief response.

18         I believe some of them, the companies I named, did

19   want to have those discussions with Qualcomm, and as I said,

20   they never went further.

21         But, Your Honor, I don't agree with the Court that

22   Qualcomm said this and made it clear.  I know what Qualcomm

23   said.

24         THE COURT:  We'll get there.

25         MR. GRAZIANO:  It's in the chart.

```
 1            THE COURT:  Yes.  And that's --
 2            MR. GRAZIANO:  They said something different.
 3            THE COURT:  Exactly.  That's -- we will get there.
 4  And I'm fully aware that that really is the heart of this case,
 5  not only just this motion but the heart of this case, which is,
 6  how much was the public aware of this practice of just
 7  licensing the whole device as opposed to the chips.
 8            But what I wanted to make crystal clear before I let
 9  Defense counsel proceed with his argument is, I just wanted to
10  know, really, is there any -- when you're saying you're no
11  longer talking about knowledge of chip level versus device
12  level, you're talking about public knowledge of not selling to
13  some competitors at all, it sounds to me we're still talking
14  about, essentially, the same thing; that what you're
15  complaining of is that Qualcomm was not licensing to
16  chipmakers.
17            MR. GRAZIANO:  Correct.  We do not believe our theory
18  has changed at all from the actual Complaint.  It's consistent.
19  And we do look at these slides as talking about a different
20  case.  And I'll save it for my argument.
21            Thank you, Your Honor.
22            THE COURT:  Okay.  Thank you.
23            Go ahead.  I'm sorry about the interruption, but it's
24  helpful to me to get some fundamental --
25            MR. EVEN:  So I --
```

1          THE COURT:  -- confusions cleared up before --

2          MR. EVEN:  I -- so I -- great.  Thank you, Your Honor.

3          So I will -- I will try to clarify one thing.  I don't

4    think the theory has changed, as far as I understand it.  We

5    were as surprised as Your Honor last night to see the response.

6    What I think the response is trying to say, as far as I can

7    understand it, is that having gone through five years of

8    litigation now, last night the Plaintiffs decided that the

9    words "device-level licensing" somehow refers not to where the

10   license is going to be granted and what the license will

11   allow -- meaning whether it's the making of chips or the making

12   of phones -- but, rather, what is going to be the price of the

13   license, whether it's going to be based on the price of the

14   phone or on the price of the chip.

15         That is not at all what anyone in the industry talks

16   about what device-level licensing is.  This is not what

17   Mr. Rosenberg was talking about.  As you've seen, this is not

18   what Mr. Millament was complaining to Senator Klobuchar about.

19         This is what he said:  "Some SEP holders refuse to

20   license component manufacturers like Intel.  They insist

21   instead that it's okay for them just to license our customers,

22   manufacturers of PCs and other end products."

23         And Mr. Rosenberg's response was a response to this

24   allegation, saying, "In this industry, no one licenses at the

25   chip level.  Everyone licenses only the end-device makers for

1    complete phones."

2         With that, I'd like to move to the next slide, if I

3    may, which is Slide five.  So we've seen what the head of

4    licensing said, we've seen what the GC of the company said, and

5    now we're talking about what the company said in its most

6    central SEC disclosure, the 10-K.

7         And in our 10-K, what we have here -- let me start

8    with the things that are relevant, and then I'll go back to the

9    top part.  But, first off all, let's focus on the middle.

10        The middle part says, "These are the people we

11   license.  Our licensees manufacture the following things:

12   wireless products such as mobile devices, also known as

13   subscriber units, which include handsets."  Okay.  Those are

14   just phones.

15        "Other consumer devices like tablets, laptops,

16   e-readers, et cetera, machine-to-machine devices" -- so these

17   are things that, you know, you have in meters and, like, your

18   electricity meter if it sends it to ConEd rather than have

19   someone coming.

20        "Plug-in end-user data modem cards" -- those are like

21   the dongles you stick into your laptop.  "Certain imbedded

22   modules for incorporation into end-user products like cars.

23   The infrastructure equipment required to establish and operate

24   the network" -- so the people who actually build cell towers --

25   "and the equipment to test all of this."

1          Not a word about licensing chipmakers.

2          Then they go and say, "Separate and apart from

3    licensing, we have entered into certain arrangements with

4    competitors over our QCT segment."

5          QCT is the part of Qualcomm that makes chips.  Your

6    Honor asked whether there's any competitors who are not

7    chipmakers.  Qualcomm only makes chips.  Qualcomm doesn't make

8    phones.  A maker of phones is not a competitor of Qualcomm

9    unless it's vertically integrated.

10         So if Your Honor's question is:  What does Qualcomm do

11   with Samsung?  Qualcomm absolutely licenses Samsung to make

12   phones, but it wouldn't give it a license to make chips because

13   it only licenses at the device level for fear of exhaustion.

14         Same goes for HiSilicon that Mr. Graziano mentioned.

15   HiSilicon is an in-house manufacturer of chips for Huawei.

16   Huawei is a Qualcomm licensee for the making of complete

17   devices.  That's not disputed.

18         HiSilicon came and said, "I want the license for the

19   making of chips."  And by the way, they -- it always comes with

20   "and I want it for a lesser price, et cetera, et cetera.  And

21   by the way, it's going to exhaust your ability to go after the

22   device maker."

23         Now, so Qualcomm says, "Separate and apart, we've

24   entered into agreements with competitors like Broadcom,

25   MediaTek, Texas Instruments, VIA Telecom."

1              Then they explain the rationale.  And at the end, they

2    explain why these are agreements, not licenses.  Right?

3    Qualcomm specifically talked about licenses in the paragraph

4    above.  Here it talks about arrangements or agreements.

5              In every case, these agreements expressly reserve the

6    right for QTL to seek royalties from their customers of such

7    integrated circuit suppliers with respect to such suppliers'

8    customers; sales of phones, essentially.  This is what the rest

9    is.  Right?

10             Whatever we enter with the chipmaker, it's not going

11   to be a license, and it is going to be very clear in the

12   agreement that we can go after your customers, and they are not

13   going to come back and say, "You can't sue me because you've

14   exhausted your rights with whatever you gave the chipmaker."

15   That would kill the goose that lays the golden eggs.  Right?

16   That's Qualcomm's core businesses, licensing device makers, and

17   that's how Qualcomm makes its money.

18             Now, going back to your question, Your Honor, let's go

19   to the first paragraph.  The first paragraph talks about QCT 's

20   current competitors.  That means, who are the people in the

21   space that make chips just like QCT?  And those include

22   Broadcom, Ericsson, HiSilicon, Intel, Lantiq, Marvell, Maxine,

23   MediaTek, Nvidia, Realtek, Samsung, Spreadtrum, Texas

24   Instruments, and VIA.

25             So we give here -- I think it's 13, if I'm counting

1  correctly; maybe I missed one -- that are actually selling

2  chips that, by definition, use Qualcomm's standard-essential

3  patents.  They have access to the technology.  But we only say

4  that we entered into agreements -- not licenses; agreements --

5  with four of them: Broadcom, MediaTek, Texas Instruments, and

6  VIA.

7           Anybody reading this carefully will understand there's

8  a delta there.  There are 11 people who just make these chips

9  and have access without any agreement.  Qualcomm is not saying

10  they have an agreement, let alone a license.  We just don't

11  have -- we live and let live.  And those people have access.

12  We don't assert against them.  We didn't assert against them

13  ever.  And that's the way the market worked.

14           Now, any one of these -- any single one of the four

15  disclosures we've just seen, in our view, completely serve as

16  the link and means that there cannot be price impact from

17  somebody coming in November 2015 and saying, "Qualcomm doesn't

18  license chipmakers."

19           Qualcomm told the market that it doesn't license

20  chipmakers.

21           THE COURT:  Okay.  May I pause you again --

22           MR. EVEN:  Sure.

23           THE COURT:  -- again here?

24           So Plaintiffs' Counsel, when Qualcomm's counsel just

25  says, "So we did enter into these agreements with four of the

```
1     people at the chip level, but not the other seven," is that
2     your theory, that the market didn't know that it was not freely
3     licensing or freely entering into this type of agreement,
4     whether you want to call it licensing or not, that Qualcomm
5     wasn't -- wasn't equally treating all its competitors?
6             It entered into this type of agreement with four of
7     them, but not with the other seven.  Is that what you were
8     trying to tell me in terms of refusing to license chips at
9     competitors at any pricing level?
10            MR. GRAZIANO:  Your Honor, it concerns that same
11    subject matter.  But does this disclosure make it clear?  We
12    asked two Qualcomm CEOs who signed these 10-K's --
13            THE COURT:  Okay.  So not about disclosure, making it
14    clear.  Just in terms of the fundamental -- your theory of --
15            MR. GRAZIANO:  Our theory fundamentally --
16            THE COURT:  You said to me -- this is the question:
17    "Are Plaintiffs currently alleging market did not know that
18    Qualcomm licensed only at the device level?"
19            And then you said, "No.  The market understood that it
20    only based its royalties on device-level pricing, but this is
21    different than refusing to license chips at competitors at any
22    pricing level."
23            So when you say this, are you talking about those
24    other seven that couldn't enter some kind of deal with
25    Qualcomm?
```

```
 1              MR. GRAZIANO:  We are talking about all 11, not
 2   just -- not 7 out of the 11, but all 11 --
 3              THE COURT:  You're talking about all 11 --
 4              MR. GRAZIANO:  All 11 were refused license, and
 5   they're -- under any terms --
 6              THE COURT:  At the chip level?
 7              MR. GRAZIANO:  At the chip level --
 8              THE COURT:  At any time?
 9              MR. GRAZIANO:  -- in violation of FRAND.
10              THE COURT:  Okay.  Thank you.  Go ahead.
11              So, yes, nothing has changed.  This is exactly the
12   case that I thought it was and that was in the Complaint.
13              Let's go ahead.
14              MR. EVEN:  Okay.  So having seen all that, what did
15   the market think?  The market understood what is happening.
16              And then, Your Honor, if you go -- there are several
17   slides.  I want to be brief, so let's jump, for instance, to
18   Slide 8.
19              So Slide 6 and 7, you see that there are analysts who
20   say there are allegations and investigations into Qualcomm's
21   stated practice of licensing at one level and not the others.
22              And Slide 8, this is something that came after the
23   NDRC, the Chinese antitrust enforcer at the time, went after
24   Qualcomm and investigated.  And all the market was very
25   concerned, what's going to happen to Qualcomm's practice of
```

1    licensing at one level and not the other?

2         The entire market understood that if a Chinese

3    regulator came in and said, "Qualcomm must license at the chip

4    level," that may have huge repercussions for Qualcomm's

5    business because that would undermine the licensing of OEMs.

6         And so Qualcomm reached a resolution with the NDRC

7    that did not require licensing at the chip level.  And Cleary

8    Gottlieb is saying, "Qualcomm has avoided a duty to license at

9    the chip level, which could, in turn, have led to patent

10   exhaustion."  So they understand exactly what the practice is,

11   they understand what the ramifications are, and they're

12   commenting on that.

13        The next slide is an FCC filing by three, sort of,

14   think tanks in the space.  They're filing comments to the FCC.

15   They say the ETSI policy allows companies like Qualcomm to deny

16   patent licenses to chipmakers and only offer licenses to users

17   of those chips, the people who make phones.

18        The next one, Your Honor, I can't put on the screen.

19   But if Your Honor turns to surreply Exhibit 5, which is Tab 18

20   in the binder that you have, this was under seal.

21        And if Your Honor turns to Question 9, and that's on

22   page 18 of this surreply, and it says 175 at the very bottom,

23   if you see it; surreply Exhibit 5 at 175.  And this is a

24   response from an OEM that I can't name, to a regulator that I

25   can't name, to the question:  Does Qualcomm license chipmakers?

1    And you can see the response.

2          And on the next page, you can see "please explain."

3    And they explain that Qualcomm has publicly stated its policy.

4    And they cite specifically to Mr. Reifschneider's LES

5    presentation that we've just seen.

6          They don't say, "Oh, we're in the business.  We're a

7    big OEM.  We discussed it with Qualcomm.  We have some inside

8    information."  No.  They say Qualcomm publicly stated that.

9          Now, our expert, Dr. Stulz, looked at 215 analysts'

10   reports that came within five days after the -- after the

11   allegedly corrected disclosures.  He found that none of them

12   voiced surprise at the fact that Qualcomm licenses phones and

13   not devices.

14         Now, Plaintiffs actually take issue with that, and

15   they find two that, in their version of things, did think there

16   was some surprised voice of that.  I'm going to talk about why

17   the surprise was there to the extent there was surprise in a

18   second, if I get to it.  But the important thing is, it doesn't

19   matter if 213 understood it or all 215 understood it.

20         The point here is that anyone who saw Mr. Rosenberg's

21   presentation or Mr. Reifschneider's presentation, and anyone

22   who read the MediaTek press release and anyone who read closely

23   our -- our 10-K understood what Qualcomm is doing.

24         Now, the comeback to that from the Plaintiffs is to

25   say, "Well, gee, even if some people understood and some people

1    didn't understand, the market price would be elevated at some

2    weighted average."  That's just wrong.  That's wrong as a

3    matter of law, it's wrong as a matter of policy, and it's wrong

4    as a matter of economics in a market where Plaintiffs are

5    alleging the market is efficient.

6            In an efficient market, the whole theory stands on the

7    assumption that the market is going to reflect -- the market

8    price is going to reflect all publicly available information

9    that comes from Amgen.

10           Dr. Tabak, who's here today, has claimed that and has

11   admitted that in his deposition.  I don't think it's disputed.

12           How does the market take in the information?  How does

13   the price reflect the information?  Pretty simple.  It's

14   explained in Basic and in other cases.  Whenever there's an

15   information gap, you're going to have market makers or

16   arbitrageurs -- some cases call it one; some cases call it the

17   other -- who are going to trade on that information gap,

18   meaning if they think that Qualcomm's stock is worth 40 bucks

19   because they understand Qualcomm's licensing policy.  And there

20   are people out there who think that Qualcomm's stock is worth

21   50 bucks because Qualcomm does license chipmakers.  Right?

22           If those people think that that actually matters to

23   Qualcomm's value, the moneymakers who think that Qualcomm is

24   only worth 40 bucks are going to start selling Qualcomm stock

25   to these people at huge capacity, including short sales, until

1    the market price falls to 40.  This doesn't take five years, as

2    the theory here seems to happen -- seems to be.  This takes

3    five minutes.  That's what an efficient market is.

4         And this is what Amgen -- the Supreme Court in Amgen

5    explained.  And in Amgen, Judge Ginsburg said -- Justice

6    Ginsburg said, "Few investors, if any, can consistently achieve

7    above-market returns by trading based on publicly available

8    information.  If such above market returns were readily

9    attainable, it would mean that market prices were not

10   officially incorporating the full supply of public

11   information."

12        Here we have public information about a knowable fact.

13   Right?  This is an objective fact, that Qualcomm does or

14   doesn't license these chipmakers.  And some people, clearly,

15   who paid attention knew about it.  They would trade on it until

16   the market price reflected that information, and they wouldn't

17   stop trading on it until the market price went to that level.

18        Now, if moneymakers thought that there are other

19   statements out there, something is unclear, maybe something is

20   ambiguous, they would ask.  They had plenty of people to ask.

21   They could ask Qualcomm.  They could ask other large licensors.

22   They could ask the people we had agreements with.  We mentioned

23   four of them in the 10-K.  They could ask the nine people we

24   didn't have agreements with.  They could ask OEMs.  They could

25   ask people like Cleary Gottlieb, lawyers who are in the space.

1    They could ask any of these people.

2              And that's how market makers make a living.  Right?

3    They are information hungry, as the Supreme Court said in

4    Basic.  They go out there and try and find information that

5    would give them an edge for five minutes.  In that five

6    minutes, they're going to make a killing.  But for five

7    minutes, they want to have information no one else has.

8              So to think that they thought something is unclear for

9    five years and nobody found out, that is not what the

10   market -- market efficient theory posits.  And that is exactly

11   where we get to what the Eleventh Circuit called in Meyer, "the

12   Delphic sword."  Plaintiffs have to live and die by the

13   efficient market.  If the efficient market reflects all the

14   information, it must reflect this information.

15             Now, what if Plaintiffs also say, is that they come up

16   and say, "Well, look at all these other statements."  Right?

17   And they put in these documents, and I'm sure my colleague is

18   going to go over a whole litany of things that Qualcomm said.

19             The important thing is, there is not one of them that

20   says, "Forget about what Mr. Rosenberg said.  He's just wrong.

21   He doesn't know.  Qualcomm licenses chipmakers.  It's fine."

22             There isn't a single statement from Qualcomm within

23   the class period where a Qualcomm person stood up and said, "We

24   license chipmakers."  Instead, they are talking about

25   inferential stuff.  They want to come to this Court and say,

1    "Well, people in the market, when Qualcomm said it licenses

2    broadly or pro-competitively or in FRAND-complying manner, that

3    means people in the market would understand that to mean that

4    Qualcomm's licenses chips."

5            THE COURT:  Okay.  So I'm going to pause you for just

6    one second and ask the same question of both of you.

7            Before I do that, for the benefit of the court

8    reporter, "Amgen" is A-m-g-e-n.  That's for the realtime

9    transcription.

10           The -- so the FRAND commitments, what exactly does it

11   require as relevant to this licensing to chipmakers at the

12   component level versus device licensing and et cetera?  If --

13   what -- as relevant to what we're dealing with here, if someone

14   was firmly under the belief that Qualcomm is a plus 100 percent

15   with regard to its FRAND commitments, what would it be thinking

16   about?  What would it be assuming Qualcomm is doing with regard

17   to this licensing question?

18           And I'll ask Plaintiffs' counsel the same exact

19   question.

20           MR. EVEN:  So what I would say is this.  Qualcomm was

21   very frank about what it did and why it thought that that is

22   completely FRAND compliant, as were multiple others in the

23   industry.  Right?  Ericsson held the same belief.  Nokia held

24   the same belief.  We have some slides about that as well.

25           THE COURT:  Okay.  Is there some wording?  Is it some

1    kind of --

2            MR. EVEN:  Sure.

3            THE COURT:  -- canon or some kind of, you know --

4            MR. EVEN:  Absolutely.

5            THE COURT:  So what does the wording of the FRAND

6    requirement or benchmark, what does it say?

7            MR. EVEN:  So the benchmark is that it says that you

8    must license -- this is the ETSI policy.  Right?  FRAND is not

9    a uniform thing.  Different SSOs have different ones.  The most

10   important one is ETSI.  That is the one that every member of

11   3GPP, which is this conglomerate of -- an amalgamation of

12   standard-setting organization from all over the world sit

13   together and make the cellular standards that are relevant

14   here.

15           And what ETSI says in its IPR policy is that you must

16   license Equipment.  That's capitalized "Equipment."  It's a

17   defined term.  An "Equipment" is defined as devices that are

18   fully compliant or fully conforming to the standard.  And the

19   position has always been -- and there's been a lot of testimony

20   and a lot of fighting about this, and a lot of back-and-forth

21   about this -- is that -- including in ETSI's own testimony, and

22   that is -- if I may.  This is Slide 15.

23           This is Dirk Weiler, who is a Nokia person, but also

24   the chair of ETSI.  And he says that everybody implements this

25   policy by licensing at the device level with the understanding

1   that a chip is not a fully conforming device, A, because it's

2   not a device; and, B, because it's not fully conforming in the

3   sense that the standards are not written to chips.

4          Standards are written to two units.  Right?  Standards

5   write technical specifications of how an end-user device will

6   work and how a cell tower will work.

7          THE COURT:  Okay.  And is there a "to"?  "Must

8   license," defined term, "Equipment to"?

9          MR. EVEN:  So it's not "must license."  It is -- it is

10  will -- will offer licenses on a -- and I can give you the

11  exact text after.

12         THE COURT:  On a nondiscriminatory, et cetera, basis.

13         And is there a "to"?  To competitors?  To --

14         MR. EVEN:  To make Equipment.  That's it.

15         THE COURT:  Okay.  So it doesn't identify to whom --

16         MR. EVEN:  It must --

17         THE COURT:  -- to whom the --

18         MR. EVEN:  -- to anyone who makes Equipment.

19         THE COURT:  For anyone who makes Equipment --

20         MR. EVEN:  And so "Equipment" is the defined term.

21         And so this is not a question of who, Your Honor; this

22  is a question of what.  Right?  The licensing is the license to

23  make phones.  Intel has nothing to do with the license to make

24  phones because it doesn't make phones.

25         Samsung has something to do with the license to make

1    phones and will be licensed to make phones, even though it also

2    makes chips.  But the license has a field-of-use element to it,

3    and that field of use is to make phones, or to make

4    infrastructure, or to make any of these other things that in

5    our 10-K we talked about.

6                THE COURT:  Okay.  Thank you.

7                And your answer to the same question?

8                MR. GRAZIANO:  Yes.

9                THE COURT:  So when you say -- I believe part of your

10   theory is Qualcomm advertised that it complies with FRAND

11   requirements.

12               What would someone understand the FRAND requirements

13   to mean?

14               MR. GRAZIANO:  A duty to fairly negotiate with all

15   comers in the industry.  And we disagree with Qualcomm's

16   definition.  And the folks that agree with us are the FTC, the

17   KFTC, and Apple.  You will see all three of them in the

18   corrective disclosures announce the same view of FRAND as what

19   we are announcing.

20               THE COURT:  Okay.  So --

21               MR. GRAZIANO:  And we do have a disagreement about

22   FRAND.

23               THE COURT:  Okay.  Can you point me to the FRAND

24   language that you are hanging this argument on for the ETSI?

25   Whatever the --

```
 1              MR. GRAZIANO:  Sure.  Sure.  FRAND is --

 2              THE COURT:  -- the standard language is.

 3              MR. GRAZIANO:  I don't have it at my fingertips, but

 4   it is in the chart that we gave you.  The FRAND citations are

 5   there.

 6              THE COURT:  Hold on.  I'll look them up.

 7          So I have, shorthand, "made FRAND commitments

 8   requiring it to license competitors."  And I understand that to

 9   be your interpretation of what FRAND requires.

10          Do you have verbiage drawn from --

11              MR. GRAZIANO:  Yeah.  We -- we actually don't

12   disagree.  ETSI is one example of a definition of FRAND.  There

13   are a number of standard bodies.  But the language is

14   essentially the same as what my colleague outlined.

15              THE COURT:  Okay.  And you agree that's the language.

16   And now --

17              MR. GRAZIANO:  That is one -- one standard body's use

18   of language.  ETSI had us include the word "Equipment," so they

19   like that one the best.  Others don't use the word "Equipment."

20   But, essentially, the language is pretty similar across these

21   different bodies.

22              THE COURT:  Have you put language that you prefer

23   before the Court?  Is it in your briefing?

24              MR. GRAZIANO:  It's in our Complaint, and in it's the

25   corrective disclosures.
```

```
 1              THE COURT:  Okay.  And if it's in the Complaint, could
 2     you read that to me right now?
 3              MR. GRAZIANO:  It says:  "License essential patents
 4     for these standards on a fair and reasonable basis free from
 5     unfair discrimination."
 6              MR. EVEN:  The point, I think, I'm trying to make,
 7     Your Honor, is that there clearly was a debate at the time.  We
 8     think it was posturing by the other side.  But, regardless,
 9     there clearly was a very public debate on what FRAND means.
10              And so I don't think anybody could come in and say,
11     "Well, when Qualcomm said 'FRAND,' we assumed it means one
12     thing or another."  Qualcomm stated what its belief of FRAND is
13     very clearly, as did others in the industry.  And you can see
14     that in Slides -- for instance, Slide 15, as I said, is for
15     Nokia and ETSI itself.
16              Slide 14 is, again, for Nokia in an amicus brief.
17              Slide 13 is from Ericsson, who said the same thing.
18              THE COURT:  Okay.  I think I have a good handle now on
19     this device-versus-chip level and FRAND.  If you want to move
20     on to the bundling piece of things now.
21              MR. EVEN:  Sure.  So on bundling, we have the same
22     price impact, Your Honor, but it is offset slightly
23     different -- so in bundling, what we have is this claim that
24     Qualcomm stated that it keeps the business and chip things
25     separate, or tries to keep them separate.
```

1          And if Your Honor turns to Slide 19, and that shows on

2     the left side, the two statements that Plaintiffs hang their

3     hat on as to actually talking about separateness.  Then they

4     say, "Oh, my God.  There's, like, all kinds of statements about

5     FRAND, and FRAND means that it has to be separate."

6          But setting those aside, something where Qualcomm

7     actually talked about separateness, those are the two on the

8     left side.  And what they're alleging is the corrective

9     disclosure, the first one, is the EC, and that one is on the

10    right side.

11         And the problem there is a complete mismatch because

12    the EC statement on December 8th of 2016 talks about exclusive

13    dealing on the chip side.  It doesn't mention the word

14    "royalty."  It doesn't mention licensing.  It doesn't mention

15    royalty rebates.  It does none of those things.

16         Now, the EC actually litigated the case as an

17    exclusive-dealing case, and it lost.  Qualcomm prevailed.

18         But the important thing is, nobody in the market read

19    that to mean bundling.  Plaintiffs put out one analyst that

20    they say thought this is bundling, but the analyst says this is

21    about the chip business.  And what he's talking about, we

22    think, is bundling in the sense that all the chips are going to

23    be from Qualcomm as opposed to just some of the chips.  But

24    nobody ever thought that this is about bundling.

25         And so what they hang their head on instead -- and you

1    see that in the chart that they gave you last night -- is

2    verbiage in one paragraph in the underlying statement of

3    objections from the EC; in one paragraph that is not under the

4    abusive conduct, by the way.  It's not the -- the EC never said

5    that's abusive conduct.  But in another section of the SO that

6    talks about countervailing buyer power, the EC makes this

7    statement about "Customers seem unable to separate negotiations

8    on baseband chipset supply from negotiations on IPR licensing,"

9    and it quotes an Apple Complaint on that.

10           Now, the thing about the SO --

11           THE COURT:  So where do you -- sorry.  Where are you

12   reading from?

13           MR. EVEN:  This is from the SO, which is Exhibit 87 of

14   Plaintiffs' reply, I'm guessing.

15           THE COURT:  Okay.  So, sorry.

16           With regard to -- with regard to this 2015 EC press

17   release, "Qualcomm has paid significant amounts to a major

18   smartphone and tablet manufacturer on condition that it

19   exclusively use Qualcomm baseband chipsets in its smartphones

20   and tablets."

21           So what --

22           MR. EVEN:  Sorry.  I just want to correct, Your Honor.

23   I said Exhibit 87.  It's Exhibit 90.

24           THE COURT:  90.  Okay.

25           But just on this Slide 19, what the --

1          MR. EVEN:  Yes.

2          THE COURT:  -- EC press release is saying or what this

3     alleged corrective disclosure is saying, Plaintiffs are saying

4     so the market finds out for the first time that you have this

5     exclusivity deal with this major smartphone and tablet

6     manufacturer.

7          So what exactly was that exclusivity deal?

8          And then I will then ask Plaintiff's counsel why that

9     means bundling to them.

10          MR. EVEN:  Okay.  So the exclusive -- so-called

11     exclusivity deal, there was a deal between -- well, a couple of

12     deals between Qualcomm and Apple where Qualcomm agreed to give

13     Apple a heavy discount on the chips if Apple met certain volume

14     and other commitments.

15          Apple wanted a lot of the money upfront.  Qualcomm

16     said, "Well, in that case, I need to have the money back in

17     case you actually don't meet the volumes."  And there was a

18     whole back-and-forth.

19          That deal was heavily litigated as an exclusive --

20     exclusivity deal both in the FTC and in the EC.  Qualcomm

21     prevailed in both jurisdictions that there was no antitrust

22     issue with that deal.

23          But importantly --

24          THE COURT:  Okay.  So --

25          MR. EVEN:  -- there is -- sorry.  Go ahead.

1          THE COURT:  So the deal was, then Qualcomm licenses at

2     the device level?

3          MR. EVEN:  No.  No, Your Honor.  The deal hadn't --

4          THE COURT:  No.  Okay.  So they do have a

5     chip -- okay.  Go ahead.

6          MR. EVEN:  The deal had nothing to do with licensing.

7     Apple was not a Qualcomm licensee at the time.  Apple was not a

8     Qualcomm licensee until 2019.

9          The way Apple dealt with Qualcomm is, Apple had people

10    who were licensees, and they made phones for Apple.  And they

11    had a standard phone or, hence, a device-level license.

12         This deal was about chips, and it was litigated as an

13    exclusive-dealing arrangement, and it -- and Qualcomm prevailed

14    that that was not an anticompetitive deal in any way, shape, or

15    form, both in the EU and in the U.S.

16         THE COURT:  So I get that.  I get what other tribunals

17    have concluded with regard to the legality of that deal.  I'm

18    just trying to understand the -- just the nuts and bolts of

19    that deal.

20         So this isn't about licensing at the device level.

21    This is -- so now you're licensing chips to Apple.

22         MR. EVEN:  No, no.  We're not -- sorry.

23         THE COURT:  I think you're going to have to -- I think

24    I'm asking a much more fundamental question that you're trying

25    to answer.

```
 1              MR. EVEN:  Okay.

 2              THE COURT:  So Plaintiffs' counsel is telling me this

 3    shows there was bundling going on.  And I'm trying to figure

 4    out what exactly happened here --

 5              MR. EVEN:  Okay.

 6              THE COURT:  -- and then figure out whether it matches

 7    bundling.

 8              MR. EVEN:  All right.  So let me take a step back,

 9    Your Honor.

10              THE COURT:  Yes.

11              MR. EVEN:  And try if I can explain it in a way that

12    I'm -- that will make myself more clear.

13              So Qualcomm has two separate businesses.  Right?

14    Qualcomm licenses its IP.  That's what we talked about before,

15    whether that business went out and agreed to license

16    chipmakers.  Qualcomm has a separate business called QCT that

17    makes chips, actual hardware.  And it goes out and sell those

18    chips to device makers.  Right?  And the device makers use the

19    chips in their phone, and the phone then works.

20              There's no license associated with that sale of chips.

21    The chips comes without any IP.  If the person wants the IP,

22    they have to sign a license with the licensing business.

23              Now, there is one connection between the two that I

24    think Your Honor asked about and I think Plaintiffs have

25    disclaimed, which is Qualcomm will not sell chips to people who
```

 1   don't have a license.

 2          It only -- you -- first, you have to have a license,

 3   and then you can buy chips from whoever.  You can buy from

 4   Qualcomm; you can buy from MediaTek; you can buy from Intel.

 5   But first you need a license in order to buy our chips because

 6   Qualcomm strongly believes that if you don't have a license and

 7   you're an OEM, you are infringing our patents, and we're -- we

 8   don't want to help you make phones that infringe our patents.

 9          THE COURT:  Okay.  So you sold Apple chips, and then

10   you were negotiating, fundamentally, a volume discount with

11   them.

12          MR. EVEN:  Correct.  Exactly.

13          THE COURT:  But where licensing or alleging bundling

14   comes into the picture is, but you only sell to people who have

15   a license.  So Apple had a license for the device level like

16   where --

17          MR. EVEN:  Okay.

18          THE COURT:  Go ahead.

19          MR. EVEN:  So what they claim and what Apple claimed

20   was Apple gave -- sorry.  Qualcomm had a historical agreement

21   with Apple where it provided Apple certain marketing

22   incentives, rebates, and those were calculated on the basis of

23   how much royalty the people who actually made the phones paid

24   to Qualcomm.

25          And so Qualcomm had an agreement dating back to 2007

1    before it sold any chips to Qualcomm.  And when Apple wanted to

2    buy chips, they came in and said, "Okay, and we want more

3    marketing incentives and we want you to pay us rebates and we

4    want the volume discount."

5            And there was a whole back-and-forth, at the end of

6    which there was an agreement about a volume discount.  The

7    marketing incentives continued for a while under the old

8    agreement, and then there was a new agreement on the licensing

9    side.  But Apple's argument and Plaintiffs' argument here was

10   that, essentially, Qualcomm said, "We will keep the marketing

11   incentives in place -- or the stuff that the licensing business

12   gave you, we'll keep that only if you accept chip exclusivity."

13           And Qualcomm has always said no, the two are

14   unrelated.  The licensing business will give you what you

15   deserve as somebody who markets our technology, et cetera.  The

16   chip business will give you volume discount if you actually buy

17   large volumes.  And that was the deal.

18           Now, in the SO, there was no discussion in the press

19   release that we just talked about -- there was no discussion at

20   all about that royalty side or what the licensing business was

21   doing, or anything like that, which is part of what they're

22   arguing is bundling.  They're whole bundling allegations is,

23   "We gave royalty discount if you agreed to buy our chips."

24   There was no discussion of that in the SO --

25           THE COURT:  Okay.

1          MR. EVEN:  -- in the press release.

2          There was one oblique reference to something -- to an

3   allegations by Apple in the SO, the statement of objections

4   itself.  That's a big document, 100-and-something pages.

5   What's unique about this document and really relevant for our

6   investigation today of pricing is that that document was given

7   to Qualcomm.  It is not a public document.  Plaintiffs didn't

8   have it until they got discovery in this case.  The market

9   didn't have it.  No one saw it.  And no one in the market --

10          THE COURT:  So do we -- let's make sure I understand

11   before we go on.  It's an SO, and the --

12          MR. EVEN:  It's a little complicated.  And, Your

13   Honor, there's a very good discussion of the --

14          THE COURT:  Hold on.  Hold on.

15          MR. EVEN:  -- exclusivity deal in the FTC case.

16   Sorry.

17          THE COURT:  Hold on.  This is going to be much more

18   helpful if you assist me with attaining a basic understanding

19   of what's going.

20          MR. EVEN:  Sure.

21          THE COURT:  I understand the arguments you're trying

22   to make about the SO and whether it's a public statement or

23   not.

24          So you negotiated this volume deal with Apple.  Help

25   me understand the part about you only sell these chips to

```
 1   someone who already has a license.  So Apple had a device-level
 2   license; they had a chip-level license.
 3           What type of license did they have and for what,
 4   exactly?
 5           MR. EVEN:  Apple did not have any license from us.
 6   Apple had these -- what's called "contract manufacturers."
 7   Foxconn is the most known one.  It's a huge Chinese company
 8   that makes devices for Apple.  So Apple -- sorry.  Apple
 9   designs the iPhone, and then Foxconn actually builds them.
10           THE COURT:  Okay.  So the manufacturer had the
11   license?
12           MR. EVEN:  So the manufacturer had the license, and we
13   sold the chips to the manufacturer based on pricing that was
14   agreed with Apple.
15           THE COURT:  Okay.  I see.  So --
16           MR. EVEN:  Because Apple then needs to pay the
17   manufacturer back, plus some percentage.
18           THE COURT:  Okay.  So now I'm understanding.  It's the
19   manufacturer that both had the license and also received the
20   chips.
21           MR. EVEN:  Correct.
22           THE COURT:  And that was your policy, that you don't
23   sell the chips to people without the license for IP
24   implications.  That, I do understand.
25           And so Plaintiffs' Counsel, is that requirement what
```

1     you're claiming is the bundling?  Or where exactly is the

2     bundling coming in here?

3            MR. GRAZIANO:  It's not the bundling at all.  And I

4     don't actually think this should be so complicated.

5            Basically, the way it worked is if the -- if the

6     chips -- it's about royalties and then whose chips you're

7     selling.  So the position that Qualcomm took to Apple was, "You

8     want a royalty per chip.  It's going to be $10 per phone, $9

9     per iPad.  But if you buy Qualcomm chips and only Qualcomm

10    chips, we're going to lower it to $7.50 cents royalty."  That's

11    what happened.

12           So now they are tying the license term, the royalty,

13    7.50 or $10, to whose chips they're using.  If they only use

14    Qualcomm chips, they get a 7.50 royalty, not a $10 royalty.

15           What does Apple do?  They only use Qualcomm chips

16    because there's bundling going on.  They're tying license terms

17    to -- to whose chips you're buying.

18           Then Apple eventually decides, no, it should move to

19    Intel chips, and Qualcomm wants billions of dollars back, and

20    they have a litigation.  And that's the bundling.  It's not

21    this whole complicated discussion that's being presented.  It's

22    really that simple.  There are two different license prices.

23    You want to buy our chips?  And they did this not just with

24    Apple.  We have a whole list of companies they did this to; you

25    know, a whole list of OEMs in the U.S., in Korea, in China.

1    This was their practice:  "We are the licensor.  We get to set

2    the license price.  And if you want to use our chips, we'll

3    give you a better license price."

4           That is what we mean by "bundling."  It's not you need

5    a license to buy a chip; it's not that.  That's what they want

6    to throw in there also to make it more confusing.  It's very

7    simple.  "If you buy our chips, you'll get a better license

8    price."  They're combining two different parts of their

9    business illegally.

10          THE COURT:  Okay.  And in this instance that is being

11   talked about in the EC press release, was it just a volume

12   discount as in more chips, the lower price?  Or did the price

13   on the licensing become part of that package deal?

14          MR. EVEN:  So Qualcomm's position was that this was an

15   exclusive deal with our -- not even exclusive deal, but a deal

16   with volume discounts depending on how much Apple bought.

17          THE COURT:  Okay.  But the discounts, did the

18   discounts take the form of just the pricing on the chips?

19          MR. EVEN:  They did.

20          THE COURT:  Or was the pricing on the royalties, did

21   that enter into the package deal that you were offering people?

22          MR. EVEN:  So they did not.  There was litigation

23   around that.  The important thing here, Your Honor, is less so

24   about the structure and more so about what was actually

25   disclosed in the securities case, and what was actually

```
 1    litigated and disclosed through that.

 2              This deal, Apple jumped up and down and said, "This is

 3    a royalty discount."  Qualcomm said, "We think this is just a

 4    volume discount."  But the way this was litigated --

 5              THE COURT:  Did the price of the royalty go down as a

 6    result of the deal?

 7              MR. EVEN:  The price of the royalty did not go down as

 8    a result of the deal.  In fact, there were two deals.  The

 9    first one maintained the historical price of the royalty that

10    was decided before there was any chip sales, and in the second

11    deal, in fact, the price went up.  But it --

12              THE COURT:  But it was a part of the -- it was a part

13    of the negotiations?  It was a factor?

14              MR. EVEN:  I wouldn't say it was a factor at all in

15    terms of the chip choice or the fact that Apple decided to go

16    with Qualcomm's chips.  Qualcomm was the only one that could

17    offer chips that Apple thought were sufficiently good, and

18    that's part of the reason why both courts in the U.S. and the

19    EU found there was no --

20              THE COURT:  No.  Let's --

21              MR. EVEN:  -- competitive harm.  That's not the issue

22    here.

23              THE COURT:  Counsel?

24              MR. EVEN:  Sorry.

25              THE COURT:  So I fully understand where those
```

1    tribunals came out.  I'm just trying to ask you a factual

2    question.

3              MR. EVEN:  Sure.

4              THE COURT:  Because here is what is going on.  There

5    are two questions.  There are misstatements about what

6    happened, there is what actually happened, and there's what the

7    public knew about what happened.  So I'm just on that second

8    piece here.  So in this negotiation -- I'm not asking for some

9    opinion as to what mattered more in the negotiation or not.

10             But was the price of the royalties one of the moving

11   pieces along with volume and the sale of chips?

12             MR. EVEN:  So there were agreements that were entered

13   at the same time with both the licensing side and the chip

14   side.  There were demands by Apple for a royalty discount that

15   the licensing side declined.

16             And what happened is then Apple came back and said,

17   "Well, if the licensing side is not going to give me this

18   money, then you must give it to me on the chip side."

19             And Apple -- and Qualcomm relented on that and gave

20   them the money they wanted on the chip side.

21             THE COURT:  Okay.  Thank you.

22             What we're going to do at this point is take a

23   ten-minute break so that everyone can stretch their legs and we

24   can give Madam Court Reporter a little bit of a rest because

25   we've been going for a long time.  We're going to reconvene at

1    11:10 and go till noon.

2            When we come back, Defense Counsel, if you want to

3    wrap up on the bundling, then we'll hear from Plaintiffs.  I

4    know that it may seem like we've spent a lot more time here,

5    but there have been a lot of breaks to go back and forth.  So

6    this hasn't all been Defendant's time, as you're aware.

7            We'll let you make arguments, and then we will -- but,

8    actually, before we break, I just want to give at least a brief

9    tentative on the motion-in-limine issue.  That one seems fairly

10   straightforward, and I don't want to spend argument time on it

11   because we have more complex issues on the table before the

12   Court.  I've read the papers.  It doesn't look like there's an

13   agreement.

14           And, Plaintiffs, if you're trying to get that

15   testimony in through the Federal Rules of Evidence for how you

16   deal with testimony from unavailable witnesses when the

17   testimony is obtained in a prior different proceeding with

18   opportunity from the Defendants to cross-examine, and same

19   motive, et cetera, et cetera, then you're going to have to do

20   that on a case-by-case basis.  It's not -- those factors are

21   not something that the Court can look at en masse to decide

22   whether that motive and opportunity was there.

23           Obviously, it's a fact-intensive inquiry as far as

24   asking the Court to rule on it.  Just as a matter of agreement

25   between the parties, we've looked at that meet-and-confer

1   history.  It's meet-and-confer history.  I don't see a

2   definitive moment of offer and acceptance.  It looks like you

3   tried to reach an agreement but didn't reach one.  And so now

4   we're looking at whether this comes in under the Federal Rules

5   of Evidence, and that needs to be done case by case because --

6   just because it happens within the context of an action, it may

7   be -- I'm guessing that for almost all of those witnesses, that

8   same motive and opportunity to cross-examine was there.  But

9   there may be instances where certain witnesses -- you know,

10  certain incentives might be different, given the tenor and the

11  crux of that case versus this case.  But the bottom line is

12  that I don't know.

13          So that's the Court's tentative.  And I just wanted to

14  let you know that before the break so that if you wanted to use

15  your time after the break on it, you'd at least have the option

16  to do so.  I myself would prefer to stay on the more

17  substantive issues, but if you feel a burning need to spend

18  some of your time that way, then you may.

19          We'll reconvene at 11:10, and we'll let Defense

20  counsel wrap up in a few minutes, and then we'll turn to you,

21  Plaintiffs.

22          MR. GRAZIANO:  Thank you, Your Honor.

23          MR. EVEN:  Thank you, Your Honor.

24          (Brief recess was taken.)

25          THE COURT:  Okay.  So you can -- I think you were

 1    starting to tell me about how the statement of objections

 2    wasn't a public document.  We'll let Plaintiffs counter that,

 3    and if you want to wrap up with the rest of your argument.

 4            MR. EVEN:  Yes, Your Honor.  Thank you.

 5            So I want to really come back to the main point here.

 6    This is about price impact and securities case.

 7            In December of 2015, there was no public disclosure of

 8    any kind that is related to bundling.  The only thing that

 9    there is, is this EC stuff about a pure chip deal, not a

10    licensing deal.

11            And Plaintiffs have pointed to a -- a document that

12    was -- never become -- never became public.  And last night

13    they added another one for the first time, which is the

14    examiner's report.  They found some footnote there.  And they

15    say that, too, alerted the market.  Those documents never saw

16    the light of day, not back in 2015, not since.

17            When did -- allegations of bundling did become public?

18    They became public in the summer of 2016 before the next set of

19    allegedly corrective disclosures.  That was in the next slide,

20    Your Honor.  That's Slide 20.  Who reported it?  Qualcomm

21    itself reported it in the 10-Q.  Qualcomm said the TFTC

22    [verbatim] allegations -- about the FTC allegations under

23    investigation include whether the company provided royalty

24    rebates to certain companies in exchange for their exclusive

25    use of the company's chipset.

1              That is bundling, Your Honor.  That is the bundling

2    they're talking about.  Now, we don't think even that would be

3    legal bundling, but that is the bundling that they're talking

4    about.  And that was then again disclosed when Apple previewed

5    its Complaint in a KFTC hearing in Korea in the open.  And we

6    submitted that to Your Honor as well.  That is Longman

7    Exhibit 3.  That's Docket 2463, and in your binder, it's

8    Tab 13, and that's the next slide.

9              And the slide I brought is -- only has one thing where

10   it says over Apple's objection, Qualcomm insisted on

11   exclusionary terms in exchange for renewed royalty limits.  But

12   the slide deck is replete with references to -- on page 10 out

13   of 56, it's imperative to reduce royalty -- because of the

14   imperative to reduce royalty burden, it gave Qualcomm leverage

15   over chipset supply, Apple says.

16             Qualcomm refuses -- allegedly refuses to separate

17   licenses and purchase agreement terms.  Qualcomm is bundling

18   products.  Requires bundling of IPR and chipset.  All kinds of

19   statements throughout that presentation.

20             Those two are public presenta- -- are public

21   statements.  What did the market do when those came out?

22   Nothing.  Zero.  No price movement whatsoever.

23             And then in January 2017, the FTC filed a Complaint

24   that had an oblique allegations about Apple -- the Apple deal

25   including a royalty rebate.  Apple said the same thing,

1    regurgitated the allegations that it made in Korea six months

2    earlier.  And that is what Plaintiffs say is the corrective

3    disclosure.

4           That can't be a corrective disclosure, Your Honor.

5    Confirmatory information about these allegations is not

6    corrective disclosure and can't be as a matter of law.

7           One last word of that.  So Plaintiffs have raised now

8    all kinds of allegations that they have other companies where

9    Qualcomm did that, and they're talking about strategic funds

10   and all kinds of things like that.

11          That, Your Honor, they just have no corrective

12   disclosure on.  That was not part of any public document filed

13   throughout the period.  Not the FTC Complaint as publicly filed

14   in January 2017, not the Apple Complaint, not the EC, not the

15   KFTC.  That's just an invention of a new theory that was never

16   disclosed to anyone.

17          With that, Your Honor, I will leave with a question,

18   which is whether Your Honor wants to hear anything about the

19   Comcast argument?  I know Your Honor said we're going to start

20   with pricing, but I don't know if Your Honor wishes to hear

21   about that at some point, but I'll clear the podium otherwise.

22          THE COURT:  In terms of price impact, are you talking

23   about the legal standards?

24          MR. EVEN:  I'm talking about Comcast and whether

25   Plaintiffs have managed to put forward a model that actually

1   withstands scrutiny for class-wide damages.

2          THE COURT:  The -- yes, if you want to briefly address

3   that.

4          MR. EVEN:  Sure, Your Honor.

5          And so the issue there, Your Honor, is that under

6   Comcast -- if you recall, in Comcast what happened was

7   Plaintiffs came in with four theories, and the Supreme -- but

8   only one theory of damages, and the Supreme Court said that's

9   not good enough.  Some of these theories, there it was the

10  theories already died, and only one theory remained.  And the

11  Supreme Court said, well, then the model is not good enough

12  because it cannot disaggregate the living theories from the

13  theories that have gone by the wayside.

14         And the courts in this district, including the

15  Lawrence court that we cited in our briefing, said the same

16  thing.  And, Your Honor, you want to turn to Slide 23 on that.

17  That tries to -- essentially, graphically explains it.  Sorry.

18  It's -- sorry -- 22.  My apologies, Your Honor.

19         It says, essentially, setting aside other reasons for

20  why a price decline occurred, Plaintiffs claim -- for instance,

21  this is as example from the FTC, that there was a decline of

22  $2.32 based on at least two huge buckets of -- that we

23  discussed today.  One is bundling, and one is refusal to

24  license; two completely separate theories, right, with respect

25  to Qualcomm's negotiation with different people, different

1    business, et cetera.  And that then is, again, going into

2    multiple buckets of kinds of alleged misstatements.

3         Qualcomm said it's pro-competitive.  Qualcomm said

4    it's FRAND-compliant.  If any of these go out, that means that

5    some of the 232 must have happened because of something else.

6    Plaintiffs have offered no way at all to disaggregate these

7    damages.  And under Comcast, that means that they fail

8    predominance and they fail to meet the requirements for class

9    certification.

10        We have the same thing about materialization of risk,

11   but Your Honor wanted me out of here, so I will oblige.

12        Thank you, Your Honor.

13        THE COURT:  So, Plaintiffs, before you get started,

14   the way I read Goldman and the related cases is at this stage,

15   unlike at previous stages where the Court was largely looking

16   at the pleadings under a pleading standard, we are here, and

17   this Court is under direction by the Supreme Court to consider

18   all the facts before it on whether there's predominance,

19   especially with regard to the reliance factor.  And this

20   Court -- even if it is intertwined with other issues like

21   materiality that need to happen at a later stage.

22        The underlying facts that go towards price impact and

23   reliance and whether we can do this on a class basis or whether

24   we need to do this on a person-by-person basis, I understand

25   that I need to consider all of those facts.  I need to consider

```
 1   all the information that was or wasn't on the market.  I need
 2   to consider the relative generality or the specificity of
 3   certain disclosures as opposed to certain later corrective
 4   facts that come to light; and that this is something that
 5   Defendant has the burden on, but to a preponderance standard.
 6          Do you agree with all of that, or are there parts of
 7   that that you want to further gloss on?
 8          MR. GRAZIANO:  No, I agree -- I agree with all of
 9   that.
10          THE COURT:  Okay.  Go ahead with your argument.
11          MR. GRAZIANO:  And I do -- and I do want to get back
12   to Goldman as fast as possible because I think a lot of what we
13   talked about today is beyond what Goldman would direct this
14   Court to consider, and I will explain why I say that.  But let
15   me just begin with one final attempt at clarity and
16   clarification because I do feel that there's been a lot of
17   confusion today.
18          So let me just say this at the most basic level.
19   Qualcomm, before a decision called Quanta in 2008, licensed to
20   chip companies.  They licensed to nine of them.  Then this
21   Quanta decision came out in 2008, and Qualcomm said, "Quanta is
22   not going to change our business."  And then during our class
23   period, Qualcomm, in a PR campaign, said repeatedly that they
24   complied with FRAND.  They licensed broadly.
25          What happened, Your Honor?
```

1          So, many chip companies went to Qualcomm and asked for

2     a license.  Why would they do that if Qualcomm's position was

3     so clear that there's no confusion in the market as to what's

4     going on?  Qualcomm refused every one of those companies, and I

5     listed their names before.  And those companies in turn

6     complained.  They complained to Qualcomm; they complained to

7     regulators around the world.

8          What happens next is after thorough investigations,

9     the regulators around the world act.  And the KFTC is first,

10    and then the EC, and then the United States FTC, and then Apple

11    itself.  And each one of these regulatory bodies and Apple

12    files a Complaint that says Qualcomm violated FRAND because

13    they refused to license chipmakers.

14         So, yes, while Qualcomm was also saying and hoping

15    that it could continue having the most lucrative royalty at the

16    end-device level, they said they were following FRAND.

17         The chip companies were confused by this.  The analyst

18    community, the securities analysts who followed Qualcomm, were

19    confused by this.  Qualcomm's own executives were shown these

20    10-K's that we were looking at today, the men who signed them

21    as a CEO of the company, and they couldn't answer.  They said,

22    "No, we did license chip companies."  Even after Quanta, even

23    sitting in their depositions, they said, "Well, I can't answer

24    that."

25         And we have a whole series of examples.  I think it's

about six or seven senior executives of this company who, in
their depositions in this case, could not tell us that Qualcomm
refused to license chip companies.  They didn't want to say
that.  They just wanted to keep it vague and confusing and
misleading because they were struggling with how to fix their
business after Quanta.

And that is a lot of what this case is about.  And we
have our expert here today, Professor Simco, and I think he can
succinctly explain what I just said to the Court, if the Court
needs it.  But the point is the market didn't know.

So now let me please go backwards and talk about
Goldman and what Goldman requires.

Goldman, for them to succeed, would have them meet
their burden of proof, as Your Honor just described it, to show
a complete absence of price impact.  How do they do that?
Because we have four different drops that they admit in
efficient market were statistically significant.  They have to
show that what was being disclosed in the date of those drops
was a complete mismatch from what the false statements were.

Yesterday we submitted to the Court charts that we
tried to keep as concise as possible.  But there was a complete
match.  You have, on the left side of the chart, what Qualcomm
is saying; and then you have, on the right side of the chart,
what comes out in each of the four disclosures.  And it is a
complete match.  It is not a mismatch.

1          So the other thing they can do under Goldman is they
2     can say, well, all of their statements were so generic that
3     they would have not been the kind of statements that cause
4     price impact.  Because in Goldman, the statement was "Our
5     customers always come first."
6          But in this case, that is not the nature of the
7     statements.  The statements in this case were "We follow FRAND.
8     We license broadly.  We don't bundle."  And in fact, it was the
9     combination of all of those things that came out in the
10    corrective disclosures.  And the first one is the KFTC, and
11    there you do have a press release summarizing the KFTC's
12    examiner's report, but Qualcomm had the examiner's report at
13    the time of the press release.
14         So this is very much like --
15         THE COURT:  So I'm going to pause you there.
16         So you say Qualcomm had the report at the time of the
17    press release.  But did the public?  You're quoting language
18    here in your chart:  "Qualcomm employs a strategy where it ties
19    the chipset purchases and license agreements by providing
20    certain discounts to mobile device makers who purchase larger
21    quantities of its own chipsets."
22         How did this language hit the public on that date?
23         MR. GRAZIANO:  It doesn't have to.  There's a case
24    directly on point in this -- in this -- in the Ninth Circuit in
25    the Central District of California called Matell.  Okay.  We're

```
 1    talking about the proximate cause.  So let me first tell you

 2    what happened in Matell, and let me tell you why it doesn't

 3    have to.  In Matell, the company received a whistleblower

 4    letter.  They announced to the market only that they received a

 5    whistleblower letter, not its contents.  The stock dropped.

 6            There was a Goldman hearing in that case, and we have

 7    the decision, and it's 2021 Westlaw 4704578.  And the court

 8    said, "We are talking about" --

 9            THE COURT:  What court was this?

10            MR. GRAZIANO:  Central District of California applying

11    Goldman to a class-certification hearing.

12            THE COURT:  Okay.

13            MR. GRAZIANO:  Literally the same issue as what we

14    have here, but there I would say it was one step worse because

15    all Matell said is "We have a whistleblower letter."

16            THE COURT:  Okay.  So the Court has and will further

17    consider Matell, but in light of the fact that it's not binding

18    authority and it's only persuasive to the extent that the Court

19    is persuaded by its reasoning, with all due respect to my

20    colleagues in the Central District, tell me about this -- so

21    this language didn't hit the public.  Qualcomm employs a

22    strategy where it ties the chipset purchases -- that part that

23    I read from.

24            So you're not alleging that this language went out

25    onto the broader market?
```

1           MR. GRAZIANO:  What went out to the broader market was

2    that the KFTC, in a short press release, sent Qualcomm a case

3    examiner's report that said they were not, quote, properly

4    negotiating, quote, their licenses.  That's a broad statement.

5           And what I'm telling you, Your Honor, about Matell is

6    not that Matell is binding on this Court, but Matell is relying

7    on First Solar from the Ninth Circuit.

8           And the question we are talking about now is what is

9    proximate cause.  Just imagine with me for a minute that

10   Qualcomm said, "We received a sealed indictment."  Stock price

11   drops.  Then a week later, they describe the contents of the

12   indictment.  That drop, when they said, "We have a sealed

13   indictment," is enough for proximate cause.

14          We have another expert here, Dr. David Tabak, who is

15   also eager to explain this to Your Honor if we have the time

16   today, which I don't know if we do.

17          But the point here is you don't need a mirror-image

18   disclosure for loss causation.  You need a proximate cause.

19   You need -- it's just a classic test of proximate cause:  Did

20   the undisclosed fact cause the harm?  So when Qualcomm says,

21   "We've received a case examiner's report accusing us of not

22   properly behaving," that's enough.

23          And we know the underlying reason includes bundling,

24   and that's our point, and that's the same point with regard to

25   the EC.  When you get to the FTC, it's much more clear because

the FTC files a Complaint in public court.  Everybody sees the

bundling allegations in there, which by the way, are not

limited to Apple.  Apple is an egregious case of bundling.  But

Qualcomm bundled so many companies this way because --

THE COURT:  I'm sorry.  So as a matter of law, so

let's say Qualcomm didn't do any bundling; there's no

misstatements about lack of bundling out there; but this big

scary FTC press release happens.

Wouldn't the stock price have dropped anyway?

MR. GRAZIANO:  It would, and there's Ninth Circuit

case law on this, too, which says that that drop doesn't count

if it's a mere investigation and that there's no facts behind

it.  And that's what the Matell judge writes about as well.

You know, you have the drop, but otherwise any company could

separate this out:  "We have bad news to report.  We'll tell

you next week."  The stock will drop, and then next week they

tell you the bad news, and there's suddenly no loss causation?

That is not the law.  That is -- it's a proximate-cause

standard.

So I think in our chart what we try to do is concisely

show that there's no mismatch.  We don't accept that we're

limited to a brief press release that Qualcomm, on its own,

wrote.  That would be an improper application of the

proximate-cause doctrine; that that concept of looking at the

underlying charging document applies both to the KFTC and the

1  EC, but it doesn't apply to the FTC or Apple Complaints because

2  the entire Complaints in those cases were filed and the drop

3  happened within -- you know, the same day.

4        Each one of these drops, Your Honor, sticking with

5  price impact on these four disclosures, was very large.  They

6  were all admittedly statistically significant.  They were

7  unusually heavy trading.  There was absolutely no other

8  negative news on these days to explain any of these drops.  We

9  have so much price impact in this case, it makes the case

10 enormous.  It's a $33 billion price impact here.

11       Now, they also then say, well, you know, the -- they

12 do make the argument, maybe not today in court, but in their

13 papers, that the statements were generic.  But these

14 statements, Your Honor, were nothing of the kind that the

15 Goldman court was concerned with.  They are not "Our customers

16 come first."  They are, "In every Form 10-K, we follow FRAND."

17       The FTC, KFTC, and Apple Complaints all alleged, after

18 thorough investigation, they did not follow FRAND, and that's

19 in our chart.  They are -- we don't bundle.  In paragraphs 142

20 and 146 of the Complaint, all four of the corrective

21 disclosures concern bundling:  The KFTC, the EC, the FTC, and

22 Apple.  They are repeated statements, "We license broadly,"

23 without ever saying -- and there is no dispute, because they

24 have an expert called Windsor, and he admits -- and we will

25 show the Court a timeline in a few moments.  He admits that

```
 1   they never said they refused to license competitors.  That's
 2   the whole problem in -- in this case.
 3          The -- what they want to say was known to the market,
 4   is such a dispute between us that the Court can satisfy the
 5   Goldman test.  Is there -- is there a mismatch?  Are there
 6   generic statements?  And Goldman says this Court should
 7   ultimately use common sense.
 8          And I think common sense dictates what we have today
 9   and what we will continue to have in this case, is a terrible
10   dispute between the parties.  We -- the FTC, the KFTC, Apple
11   say they violated FRAND.  They say -- and maybe some of their
12   similar-situated companies in the industry like maybe Ericsson
13   or Nokia will say, no, that was exactly what FRAND wanted.
14          And this is ongoing dispute, but this is also a
15   company that said many times that it licensed everyone, and
16   we'll show you that in the timeline.  This is a company that
17   specifically said, "Here's a list of nine chip companies we are
18   licensing."
19          Then Quanta happened, and then the fraud happens, and
20   then you have all of this confusion by design on their part
21   because they are trying to make sure their business stays on
22   track and doesn't get really hurt by Quanta.
23          There is a case that we cite also, unfortunately, now
24   I see from the Central District of California called
25   Stamps.Com, but that case looks at truth in the market after
```

1   Goldman in the context of class certification.  And it's cited

2   in our brief.  And it explains that going into the full

3   truth-in-the-market analysis at this stage is not what the

4   Goldman court intended.  And we also know that, Your Honor, for

5   another reason.

6       Goldman was decided by the same court that decided

7   Amgen, and Amgen said that truth in the market is not a matter

8   for class certification.  So what Goldman is really advising --

9   and I know it's not perfectly clear, and other commentators

10  have commented that it's not perfectly clear.  But what Goldman

11  is advising is look at this to the extent you have to, to see

12  if there are common issues, to see if there's price impact.

13  Because if we're talking about a case where nothing the

14  defendant said really mattered in terms of the corrective

15  disclosures because they're completely not matching the alleged

16  fraud, or what they said was so generic, then the court should

17  take a serious issue with certifying a class.  That is

18  not -- that is not this case.

19      And I do want to now mention one more case which is,

20  again, outside of this Court.  However, Goldman was decided

21  something like last year.  So this is a newly developing area

22  of the law.  But it's the Allstate case, which is in Chicago,

23  and it was first considered by the Seventh Circuit, and the

24  Seventh Circuit struggles, but I think comes out exactly right

25  with how you'd line up Halliburton II, Amgen.  And they go

1    over, well, how much is a court supposed to do in terms of

2    today's analysis?  How much is reserved for the trier of fact?

3    And then the case goes back to the district court, and there

4    the district court says, "As we feel is happening today, that

5    what the defendant company is doing is creating truth in the

6    market and confusion about an issue that is not aligned with

7    the actual allegations made by the plaintiffs."

8            And as I said, our allegations are now in the chart,

9    and we appreciate the opportunity yesterday to put that chart

10   together because I think the chart makes this quite clear.  We

11   have -- we have in the chart focused on both refusal to license

12   competitors, and bundling.  We believe that the bundling,

13   beyond everything we've talked about, was hidden behind

14   confidentiality agreements and NDAs.  They, within Qualcomm,

15   used terms to disguise the bundling.  Even within the company,

16   they used terms like "strategic funds," "market development

17   funds."  These were all ways for the Qualcomm company to lower

18   the royalty prices if the OEM used only Qualcomm chips.

19           The market absolutely did not know about bundling, and

20   we have many exhibits in our submission mission that show

21   analysts not understanding what -- what -- what Qualcomm was

22   really doing.

23           We -- if Your Honor allows us, we'd like to hand up

24   the other document Your Honor talked about this morning.  What

25   that was, was a submission like a demonstrative we were

1   planning to use today.  And we sent it to the Court and to

2   Defense counsel on Monday to give early disclosure; we want to

3   use these timelines in court.

4           Unfortunately, Your Honor didn't get it.  But if I can

5   hand it up, I'll just briefly just touch on some of the items

6   in that timeline.

7           THE COURT:  Defense Counsel, you've seen this

8   timeline?

9           MR. EVEN:  We have, Your Honor.

10          THE COURT:  Any objections?

11          MR. EVEN:  No objection, Your Honor.

12          THE COURT:  Thank you.

13          MR. GRAZIANO:  So what we had submitted by letter to

14  the Court on Monday were two timelines.  One concerns the

15  evidence that the investor did not know Qualcomm refused to

16  license chip competitors, and the other one concerned bundling.

17  And I think today I'll just focus on the refusal to license.

18  And I just want to highlight very -- a few examples there just

19  to make my point clear.

20          But I would like to begin with:  That title is

21  consistent with the letter we sent to the Court.  It's

22  consistent with the brief we filed three years ago in

23  Exhibit 41, in ECF 41 where the way we answered Your Honor's

24  question is the way we answered it three years ago.  There is

25  no change in the way we're presenting our case.

1          And what I'm referring to specifically is our motion

2    to dismiss opposition filed by -- filed in front of Judge

3    Houston.  And there in ECF 41 in Footnote 14, we said exactly

4    what we said to Your Honor in the letter we submitted

5    yesterday, which is what the case is about with regard to the

6    chipset competitors, is the refusal to license.  That is what

7    this document is entitled that we sent to Your Honor on Monday,

8    again, before we received Your Honor's inquiry.

9          But what this document does, this timeline, is it goes

10   through -- it starts pre-Quanta.  Of all the examples where it

11   is completely, at the very least, unclear to the market that

12   Qualcomm is refusing to license all competitor chipset makers.

13         And if I direct Your Honor, specifically using the

14   pages on the bottom, to turn to page 5, I can jump right into

15   the class period, because some of it is pre-class period, but

16   we think that that narrative is consistent and important for

17   investors.  But it's jumping right to the class period, and I

18   start looking on November 23rd of 2013.  I see Barron's, an

19   industry investor publication, believing incorrectly that, in

20   addition to manufacturing its own chips, Qualcomm licenses its

21   technology to other chipmakers.

22         If I go down to August 14 of 2014, right during our

23   class period, I see BMO Capital Markets.  The analyst there is

24   literally an industry veteran.  His name is Timothy Long.  He

25   has been in this industry for decades.  He says that there's a

1   statement that Qualcomm declines to issue licenses to chipset

2   suppliers.  We do not believe Qualcomm prohibits these deals.

3        If I turn to the next page and I look at November 17th

4   of 2015, I see Qualcomm doing something very deceptive.  And

5   this is actually one of our false statements, and it's in the

6   chart we submitted, which is a November 17th of 2015, Qualcomm

7   says, "They've maintained their patent license practices for

8   almost two decades."

9        Well, that's not true, Your Honor, because two decades

10  would be 1995.  And I can tell Your Honor that they licensed

11  nine chipset competitors before Quanta, and they absolutely

12  changed after Quanta because we heard that from Defense counsel

13  today.  But they never made that clear to the market.  Instead,

14  they went on this PR campaign where they repeatedly said they

15  followed FRAND.  They confused the chipset makers; they

16  confused the analysts; they confused the market.

17       If we just now -- just two more examples.  If we look

18  at page 7 of this document and we look at April 18th of 2018,

19  that's one of Qualcomm's two CEOs during the class period.  His

20  name is Paul Jacobs.  He's asked if Qualcomm was no longer

21  willing to license competitors, and he said before the FTC --

22  he later says to me in this case, but he said it before the

23  FTC, "I don't know that."

24       Look at November 7th of 2018.  There's Timothy Long

25  again, the same analyst I mentioned, saying, "I thought" -- and

1    this is after the Apple Complaint.  So now he's seeing the

2    truth.  "I thought Qualcomm had previously been licensing to

3    modem suppliers since they're shipping in the market."

4              And if we turn the page, now on page 8, you will see a

5    whole number of Qualcomm executives including -- maybe I'll

6    just call out one, which is Mollenkopf, because now he's the

7    next CEO during the class period, who signs the 10-K's, and

8    he's asked, "Did you understand, as a part of your working

9    knowledge, whether or not QTL was granting licenses to QCT

10   competitors?"

11             The answer, "That, I don't know."

12             So you have the CEO of the company saying he doesn't

13   know whether or not they're licensing competitors or they're

14   refusing to license competitors.  I don't see how today even

15   though -- yes, Goldman absolutely opens the door.  It modifies

16   Halliburton I and Halliburton II and Amgen to allow more

17   inquiry.  I don't see today how they can meet their heavy

18   burden of showing that there was no impact.  I mean, they have

19   to disprove all of it: bundling, refusal to license.  They have

20   to show you that all four drops in an admittedly efficient

21   market, massive loss in value, has nothing to do with these

22   allegations.  They can't do that today, Your Honor.

23             THE COURT:  So I have a question for you.

24             MR. GRAZIANO:  Yes.

25             THE COURT:  The way I understand Goldman, and I

 1    appreciate you walking me through these material misstatements.

 2    But the way I'm reading Goldman isn't -- doesn't seem to be

 3    that the law is saying we'll see if there were more

 4    misstatements rather than correct statements on the market.

 5            What we're trying to do today is, unlike an individual

 6    case where somebody has to say, "I relied on this newspaper

 7    clipping, and I chose to buy stock in Qualcomm, and then,

 8    therefore, I sustained this loss," you're asking this Court to

 9    do this on a class level.

10            On a class level, we have many, many people.  And so

11    there's no way to do that efficiently on a class level unless

12    we make use of the efficient-market theory, which is that

13    information gets absorbed into the stock price pretty much

14    seamlessly as a matter of theory.

15            And so if you -- no matter how many statements you

16    have, given the size of the class, I don't think it's something

17    that you can win numerically.  You still would need to latch

18    onto that efficient-market theory.  And according to that

19    theory, let's say there are lots of misstatement, and then

20    let's say there are fewer statements where Qualcomm does say

21    clearly in a public forum, "We do not license at the chip

22    level.  We only license at the device level."

23            How does that -- how do those -- if I have to assume

24    that all information gets absorbed into the market, I'm not

25    seeing a situation where, if you have more on your side or if

```
 1   you have 17 and they only have 2, that it makes a difference.

 2   It really is a matter of where we can no longer use that

 3   efficient-market theory to show that there is a class-wide

 4   reliance.  And then we find ourselves in a -- if we can't make

 5   use of that assumption that the law gives us, then we're in a

 6   place where we do have to ask Investor 1, "So what did you look

 7   at?  Was it material to you?  So you relied on it, you bought

 8   stock prices at this price, and then you took a beating by this

 9   much money, and that's what you are owed."

10           So if you can try to help me with that, I think with

11   the way that I'm seeing it right now, I'm giving you the

12   opportunity to help me with that because I don't think Defense

13   counsel would disagree with what I'm saying right now.  But

14   maybe you have a way that I can see this differently --

15           MR. GRAZIANO:  Sure.

16           THE COURT:  -- at least with regard to the

17   device-level licensing.

18           MR. GRAZIANO:  Sure.  And I --

19           THE COURT:  Qualcomm says, "We have one unequivocal

20   public statement, and that also was absorbed into the stock

21   price, and that's what breaks that link that lets us use this

22   efficient-market theory."

23           MR. GRAZIANO:  Yes, absolutely.  Okay.

24           So two points on this: first, on the efficient-market

25   level, and then on the actual facts of this case.
```

1              Number one, even if the hypothetical is true that

2    Qualcomm said something that was clear and then said a lot of

3    things that were not clear or false, the efficient market

4    should not be confused with an all-knowing market.  When we say

5    "efficient market" -- and Dr. Tabak is here and can explain

6    this -- what we're talking about is a market that efficiently

7    responds to information.  The market is unable to know is the

8    one statement Qualcomm made on Tuesday the 15th true, or is the

9    ten they made on the 12th through the 30th false?  The market

10   cannot find the truth.  It can efficiently set prices.

11             So that's why Dr. Tabak, in his rebuttal report,

12   points this out, and he's here as well today.  And that's why

13   we have even today -- okay, today no one knows how high

14   interest rates are going to be.  The market is all over the

15   place.  It's efficient.

16             THE COURT:  So if the market can't know the truth, how

17   can we do this on a class-wide basis?

18             MR. GRAZIANO:  Because the market can efficiently

19   respond to all the information it's given.  They concede that,

20   and we agree.  This market was absolutely efficient.  This

21   market moved within minutes of the corrective disclosures.  So

22   the market is efficient, but the market is not all-knowing.

23   The market doesn't know what is true from false.  The market

24   reacts to the information it's given in a realtime basis.

25             And here -- let me get to the second prong, because I

1    think this is important.

2              THE COURT:  How am I supposed to know that the market

3    is reacting to the times when Qualcomm is saying -- seems to be

4    saying, according to you, that they do license at the chip

5    level, versus the times that it says that it doesn't license at

6    the chip level?

7              MR. GRAZIANO:  Okay.  So --

8              THE COURT:  How am I supposed to weigh that right now?

9              MR. GRAZIANO:  So, number one, I don't believe you

10   will find a single statement in their --

11             THE COURT:  Let's say that I find Defense counsel's

12   argument about that testimony and the Intel case to be

13   persuasive and that it is a public-forum statement?

14             MR. GRAZIANO:  In the Intel case, Ericsson was the

15   defendant, and on the next page of the testimony, Ericsson

16   said, "But we offered Intel a license, a chipmaker."  It's the

17   same testimony.

18             What exhibit is that?

19             And they did that because they didn't want to get in

20   trouble with FRAND.  So even that case fails, Your Honor.  They

21   got -- they got alleged for filing FRAND.

22             And then in the next page of the testimony --

23             MR. USLANER:  This is for the clerk's reference.  This

24   is B410 of the submission, and it's ECF 248-2 at line 17

25   through the following page on 150 of the transcript, line 2.

1          MR. GRAZIANO:  But what I'm saying, Your Honor, is

2     they said followed FRAND.  In that case, Ericsson decided to

3     make a license offer to Intel --

4          THE COURT:  Counsel, you're going to -- trust me,

5     you're going to best help your case by answering my question,

6     which is:  Let's say I find that convincing.  Let's say I find

7     that Qualcomm made that statement in a public forum.  How can I

8     use the efficient-market theory to find that we can do this on

9     a class-wide basis with regard to the first half of your

10    case --

11         MR. GRAZIANO:  Okay.

12         THE COURT:  -- the chip licensing versus the --

13         MR. GRAZIANO:  Okay.

14         THE COURT:  -- device licensing?

15         MR. GRAZIANO:  I think what Your Honor has found, if

16    you find that -- and, obviously, you know I'm strongly

17    disputing it, but let's put that aside.

18         What Your Honor has found now is a common issue.  Your

19    Honor has not found an issue that breaks up the class.  Your

20    Honor has found a potential defense that Qualcomm may offer.

21         But given that everyone agrees the market is

22    efficient, that we see price impact, they can come in and try

23    to disprove what the price was really responding to.  But do we

24    have price impact?  Of course we do.  We have price drops when

25    the corrective disclosures came out.  The corrective

1   disclosures are not mismatched from the alleged fraud.  They

2   want to prove the alleged fraud didn't happen because there was

3   truth in the market.

4         Amgen -- the same Trilogy, a Supreme Court case says,

5   Well, that's for trial.  And they absolutely will press that

6   argument at trial; they will.

7         But Your Honor doesn't need to end class certification

8   now for what would be a common issue.  All class members would

9   be hurt by that.  Your Honor said it; it would be game over.

10  So that's not an individualized issue.  The individuals in our

11  case will still rely on the efficient market.

12        And I hope I'm being clear that, you know, when a

13  market is efficient, it means it's responding rapidly to

14  information, usually within one day.  It doesn't mean that the

15  market says, "Okay, well, Qualcomm said this thing four times.

16  They said that thing once.  That thing once maybe is more

17  valuable.  So we're going to go with that one time."

18        There are people in the market who will try to do

19  that.  They're arbitrageurs.  They will try.  They will help

20  make the market more efficient, but ultimately the market is

21  the collective wisdom of all investors.

22        We're allowed to rely on the efficient-market

23  hypothesis.  That argument does not end the efficient market.

24  It raises a common defense.

25        Your Honor, I would -- and we're really --

1          THE COURT:  In your remaining time, if you want to

2     address -- let's say the Court accepts your theory of the case

3     with regard to the bundling, but it doesn't accept your theory

4     of the case with regard the device level versus chip level.

5          If you want to want to respond to his -- Defense

6     counsel's Comcast argument in that scenario.

7          MR. GRAZIANO:  Yes, I would like to respond to Comcast

8     in that scenario, but I also would like to point out that I

9     don't know if Goldman would be directing this Court to start

10    parsing the allegations in that way.  I think Goldman requires

11    them to come forward with a complete lack of price impact, and

12    if they fail, I don't think it's a time for them to relitigate

13    certain aspect of the case.

14          I think in fairness, because we can show price impact,

15    that's a question reserved for the jury, and that's what Amgen

16    says.  But going to Comcast --

17          THE COURT:  Is it really a complete lack of price

18    impact, or is it something that just rebuts the

19    efficient-market theory by showing that there was other

20    information out there or a mismatch between --

21          MR. GRAZIANO:  Okay.  Well, if that's -- if that's

22    true, Your Honor, then we're not talking Goldman and we're

23    talking Amgen, and what Your Honor described would not be

24    consistent with Amgen.  Amgen covers this point.

25          In Amgen, the defendants went and said, "The market

81

1    knew the full truth," and the Supreme Court said, "No, that's

2    an issue for trial."  I mean, that's, clearly, completely

3    covered by Amgen.

4            So I thought we were talking about price impact

5    because the Supreme Court said, "Okay, we took lost causation

6    off the table in Halliburton.  We took materiality or -- or

7    truth in the market off the table in Amgen.  In Halliburton 2

8    and in Goldman, we are letting in some limited evidence on the

9    merits that we otherwise want to save for trial on price

10   impact."  They didn't say in Goldman, Amgen is overruled.  And

11   I don't think that would be a proper reading of Goldman.

12           In terms of Comcast, Comcast was this antitrust case

13   where there was no efficient market.  There were 16 different

14   counties with, the Supreme Court said, endless permutations of

15   which theories of liability affected which counties in

16   different ways.  We have one market in this case; it's

17   efficient.

18           So if we have to parse out the allegations, and we

19   will, no matter what, between bundling and refusal to license,

20   we can use the efficient market.  And I think now it's 82 out

21   of -- 82 times district courts have said Comcast does not apply

22   to securities cases with efficient markets.  And that's an

23   exhibit we submitted.

24           One last point on refusal to license.  I said this

25   last time on the 12C.  It goes hand in hand with bundling

```
 1    because without one, you can't have the other.  When Qualcomm

 2    refused to let other chipmakers license its chips, it then had

 3    the power to bundle.  Without that, it couldn't bundle because

 4    what it did, for example, with Apple, it could have charged

 5    chipmakers $7.50 per chip and, therefore, the chipmakers would

 6    have that price.

 7            Instead, it -- because it got to set the prices at the

 8    chipset level, it used its power to refuse to license to

 9    bundle.  Those two things operate together.  You'll see that in

10    the KFTC corrective disclosure.  You'll see that in the -- in

11    the FTC.  You'll see that in Apple.  Those two things go hand

12    in hand.

13            Okay.  I think I've made myself clear, and I

14    think -- my colleagues are directing me back to the timeline.

15            And just one last point.  In the timeline, I think

16    they want me to look at the very last page of it, and that's

17    page 9, and this is October 14th of this year, because it was

18    the most recent deposition in this case.

19            Mr. Windsor is Defendant's expert, and he's supposedly

20    an expert on what the market knew.  And he's asked:  Did

21    Qualcomm ever disclose to investors that engaged in the

22    practice of refusing to license chipset competitors?

23            His answer is, "I don't remember that it did," because

24    that's how we see the case, and that's how we've always seen

25    the case.  And, you know, my offer for either Professor Simco
```

1    or Dr. Tabak to take the stand remains, but their reports are

2    before the Court as well.  Thank you, Your Honor.

3              THE COURT:  Okay.  Thank you.

4              MR. EVEN:  May I?

5              THE COURT:  Is there something -- we're, actually,

6    going to wrap up.  Is there something specific that you'd like

7    to address in a just a few minutes?

8              MR. EVEN:  There are a couple of things, but at least

9    one that I think I must address.

10             THE COURT:  Okay.  Two minutes.

11             MR. EVEN:  Thank you, Your Honor.

12             So I want to talk about this point about refusal,

13   because they put refusal, refusal, refusal in all these

14   statements.  Refusal is something that chipmakers called this

15   very same conduct that Qualcomm told the market engaged with.

16   Qualcomm told the market, "We license at the OEM level.  We

17   don't license chipmakers."  MediaTek came in.  Intel came in.

18   They called that "refusal."  We saw that in Mr. Millament's

19   testimony and Mr. Rosenberg answered that specific allegation.

20   This was all about refusal.

21             Now, why is refusal a problem here?  Because the use

22   of the term "refusal" by these chipmakers and by Apple and

23   eventually by regulators really threw everyone for a loop

24   because everyone read that to suggest that Qualcomm -- that

25   when the allegation is made, that means that Qualcomm denies

```
 1    access to the technology, and that's what everybody thought

 2    refusal is.

 3            And, therefore, everybody was saying, like, "Why is

 4    the FTC saying that?  We see all these people selling chips."

 5    Because Qualcomm never did that.  It never denied anyone

 6    selling chips.

 7            This is very clear in the Ninth Circuit decision.  The

 8    Ninth Circuit passed judgment on that, reviewed that, and

 9    essentially said the use of the word "refusal" is just the

10    wrong nomenclature, and it's going to confuse everyone.  And it

11    says, "Qualcomm declines to enforce its patents against these

12    rivals even though they practiced Qualcomm's patents

13    royalty-free."

14            And it says, "Qualcomm's practice in this is like a

15    refusal in Aspen skiing," meaning that the skiers don't get a

16    lift ticket but can actually use the lifts.  And then it says,

17    "Qualcomm's policy toward rival chipmakers could be

18    characterized as no license, no problem."  And that is what

19    threw everyone for a loop.

20            And so, for instance, in the timeline, Mr. Graziano

21    quoted this Mr. Long, the analyst.  The analyst is very clear

22    about what he's confused about.  He didn't say Qualcomm doesn't

23    allow licenses.  He said there is also a statement that

24    Qualcomm declines to issue licenses to chip suppliers.

25            We know that Qualcomm has made deals, not licenses,
```

1    with Intel, Broadcom, Texas Instruments, MediaTek, and several

2    others.  That's what's in RK.  We do not believe Qualcomm

3    prohibits these deals but rather would require a level of

4    negotiation to get an agreement signed similar to what

5    transpired with MediaTek.

6         MediaTek, we just saw, Your Honor, in my opening, this

7    is the company that said, to be clear, everyone, this agreement

8    is not a, quote/unquote, license nor a, quote/unquote,

9    licensing agreement.

10        So the thing that people were confused about is not

11   Qualcomm's practice.  It is the allegation that Qualcomm

12   refused, because everybody thought when the KFTC says

13   "refused," when the FTC says "refused," they must mean denial

14   of access, and that was the confusion about the allegations.

15        I promised two minutes, Your Honor, so I will...

16        THE COURT:  Thank you.

17        Thank you very much, everyone.  We're going to take

18   this matter under submission, and you'll get a written ruling

19   from me.

20        MR. GRAZIANO:  Thank you very much, Your Honor.

21        MR. EVEN:  Thank you, Your Honor.

22        THE COURT:  Before we conclude the hearing, the Court

23   is going to -- unless there is any objections from Defendants,

24   the Court is going to order the filing of that chart, not the

25   demonstrative from this morning, but that chart with the

1   material misstatements and the new corrective information, as a

2   part of Plaintiffs' briefing.

3           Any objections to that?

4           MR. EVEN:  No objection, Your Honor.

5           THE COURT:  Okay.  Thank you.

6           (The proceedings were adjourned at 12:00 p.m.)

7                        -oOo-

8                     **CERTIFICATE**
            I, Abigail R. Torres, certify that I am a duly
9   qualified and acting Official Court Reporter for the United
    States District Court; that the foregoing is a true and
10  accurate transcript of the proceedings as taken by me in the
    above-entitled matter on October 19, 2022, and that the format
11  used complies with the rules and requirements of the United
    States Judicial Conference.

12
    DATED:  October 20, 2022, San Diego, California
13  /S/ABIGAIL R. TORRES
    _____
14  ABIGAIL R. TORRES
    U.S. Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25