1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE QUALCOMM INCORPORATED SECURITIES LITIGATION | Case No.:  17cv121-JO-MSB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

Plaintiffs Sjunde AP-Fonden ("AP7") and Metzler Asset Management GMbH ("Metzler) (collectively, "Plaintiffs" or "Lead Plaintiffs") filed a class action alleging violations of federal securities laws against Defendants Qualcomm Inc. ("Qualcomm") and several of its executives, Derek K. Aberle, Steven R. Altman, Donald J. Rosenberg, William F. Davidson, Jr., Paul E. Jacobs, and Steven Mollenkopf (collectively, "Defendants").  On May 16, 2022, Plaintiffs filed a motion to certify the class pursuant to Federal Rule of Civil Procedure 23.  Dkt. 217.  For the reasons stated below, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion for class certification.

# I. BACKGROUND

Qualcomm is a leading technology company that owns patents for components inside of cell phones, handsets, and other devices. Qualcomm does not manufacture the end-product—*e.g.*, cell phones and handsets—but, rather, it patents and sells the components, such as chips, to the companies that make the end-products. As relevant to this action, Qualcomm operates two primary lines of business: (1) a licensing business through which Qualcomm licenses to device manufacturers the right to make and use its patented components, such as chips; and (2) a chip-supply[1] business through which Qualcomm directly sells its patented chips to device manufacturers.

Since at least 2008, Qualcomm has operated its licensing business at the "device level" only.[2] Qualcomm sells other companies a license that allows them to insert Qualcomm's technology components in certain end-product devices, such as cell phones. Qualcomm licenses at the device level only, meaning that Qualcomm licenses the use of its components in a specific end-product device (*e.g.*, the cell phone) rather than licensing the use of the component (*e.g.*, the cell phone chip). Qualcomm operates in this fashion because if it licensed at the component level, other companies might be able use those components however they wanted, including selling them downstream. *See, e.g.*, *Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). Device-level licensing allows Qualcomm to control how its patented components are used and to collect higher royalties based on a percentage of the end-product sales as opposed to the value of the smaller

---

[1] Qualcomm's modem chips are technological components that determine call quality and data transmission speeds in cell phones, handsets, and other devices.

[2] Qualcomm submits evidence to show that it has, since its inception, only granted full licenses at the device level. *See, e.g.*, Dkt. 246, Longman Decl., Ex. 1 at L8. Qualcomm states that, prior to 2008, it "occasionally" granted limited chip licenses to make and sell chips, but never to *use* chips in full devices like handsets. *See* Opp. at 5–6. Qualcomm points to evidence showing that it entered into only three such agreements prior to 2008. *See also* Longman Decl., Ex. 4 at L167–69. Plaintiffs do not comment on this distinction but agree that Qualcomm has only licensed at the device level since 2008. *See, e.g.*, Compl. ¶¶ 53–61, 63, 73, 86.

17cv121-JO-WVG

components.  Due to similar concerns, Qualcomm only sells its chips to companies that license Qualcomm patents at the device level.

While Qualcomm maintains that it has openly engaged in the above licensing and chip-supply practices, Plaintiffs allege that Defendants deceived the public about Qualcomm's business model in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  *See* Dkt. 32 ("Compl.").  Specifically, Plaintiffs allege that Qualcomm misled the market through two categories of deceptive statements.  First, Plaintiffs allege Qualcomm touted that it "broadly license[d]" its technology throughout the industry when, in fact, Qualcomm did not license at the chip level and refused to license competing chipmakers.  *See, e.g.*, Compl. ¶¶ 10–11, 131.  Second, Plaintiffs allege that Qualcomm misled the market by stating that it kept its licensing and chip-supply businesses separate when, in fact, Qualcomm regularly bundled the two in negotiations and agreements.  *See, e.g.*, *id.* ¶¶ 14–15, 131.

**A. Qualcomm's Alleged Licensing Misrepresentations**

Plaintiffs point to three rough categories of misrepresentations that Defendants made between February 1, 2012 and January 20, 2017, regarding Qualcomm's licensing practices.  In the first category, on at least ten instances, Defendants said that Qualcomm licensed "broadly," had a "broad licensing" model, or otherwise described the breadth of Qualcomm's licensing practices.  *See, e.g.*, Compl. ¶ 134 (April 11, 2012: Defendant Rosenberg was quoted in an article describing "Qualcomm's business model" as "broadly licensing our technology"); ¶ 149 (March 5, 2013: Defendant Jacobs said at a stockholder meeting that Qualcomm "license[d] broadly" and was "an enabler for the rest of the industry"); ¶ 155 (November 6, 2013: Defendant Mollenkopf referred to Qualcomm's "broad licensing program" during an investors' conference call).[3]  In the second category,

---

[3] *See also* Compl. ¶ 136 (April 26, 2012: a high-ranking executive stated at a hearing before the House that "we broadly license our portfolio of U.S. and foreign patents to virtually every manufacturer in the mobile industry"); ¶¶ 141, 154, 165, 172, 185 (in SEC filings, Qualcomm stated that its "strategy to make [Qualcomm's] patented technologies broadly available has been a catalyst for industry growth"

Plaintiffs point to at least eight instances where Defendants said that Qualcomm licensed on a "fair," "reasonable," or "non-discriminatory" basis. *See e.g.*, ¶¶ 138, 151 (SEC filings on November 7, 2012, and November 6, 2013, stating that, "[w]e have licensed or otherwise provided rights to use our patented technologies to companies on terms that are fair, reasonable and free from unfair discrimination.").[4]   Finally, Plaintiffs point to more than a dozen instances where Defendants described Qualcomm's long-standing licensing model as facilitating competition in the industry. *See, e.g.*, ¶ 157 (November 22, 2013: Qualcomm "make[s] [its patents] available to the industry through its licensing program."); ¶¶ 140, 153, 164, 171, 184 (in SEC filings from 2012–2016, Qualcomm stated: "[w]e have facilitated competition in the wireless communications industry by licensing and enabling a large number of manufacturers.").[5]

## B. Qualcomm's Alleged Bundling Misrepresentations

Plaintiffs point to four rough categories of misrepresentations that Defendants made between February 1, 2012 and January 20, 2017, regarding Qualcomm's bundling practices.   In the first category, Plaintiffs point to two instances where Qualcomm executives described the licensing and chip-supply businesses as separate and represented

---

on November 7, 2012, November 6, 2013, November 5, 2014, November 5, 2015, and November 2, 2016); ¶ 161 (February 18, 2014: Defendant Davidson said in a "Powertalk" interview that Qualcomm "broadly" licensed its patents "on a proactive basis.").

[4] *See also* Compl. ¶¶ 138, 151, 163, 170, 183 (on November 7, 2012, November 6, 2013, November 5, 2015, June 24, 2016, and November 2, 2016, Qualcomm stated in SEC filings that "we will offer to license our essential patents for these CDMA standards on a fair and reasonable basis free from unfair discrimination."); ¶ 186 (January 17, 2017: Qualcomm similarly stated that it licensed its patents on "fair, reasonable and non-discriminatory terms." ).

[5] *See also* Compl. ¶¶ 132, 144, 159, 166, 175 (in SEC filings from 2012, 2013, 2014, 2015, and 2016, that Defendants described the following: "the benefits of our business model ... in promoting a highly competitive ... wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."); ¶ 173 (November 17, 2015: Qualcomm stated in a press release that "[o]ur patent licensing practices, which we . . . have maintained for almost two decades . . . are pro-competitive."); ¶ 177 (January 27, 2016: during an earnings conference call, Defendant Rosenberg stated that Qualcomm's licensing model "has been in effect for quite a few decades."); ¶ 179 (May 28, 2016: Defendant Aberle said at an investors' forum that "we don't keep the technology to ourselves: our business model is to share that technology through licensing.").

that Qualcomm did not bundle, even though Qualcomm allegedly bundled its licensing and chip-supply businesses in multiple ways. *See* Compl. ¶ 142 (November 27, 2012: Defendant Aberle said at an investors' conference that Qualcomm "tend[ed] to keep the licensing and chip business very separate . . . And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and we don't bundle those together."); ¶ 146 (February 25, 2013: Defendant Mollenkopf said during an investors' presentation that the licensing and chip-supply businesses were "really separate businesses. I mean we have been very clear that we keep those two things separate—separate propositions to the customer. So, really, two different things."). Second, on November 17, 2015, Qualcomm issued a press release stating that the Korean Fair Trade Commission's "allegations and conclusions" were "not supported by the facts," when, according to Plaintiffs, the agency's allegations about bundling were true. *See id.* ¶ 173. In the third category, Plaintiffs point to the instances already discussed above where Defendants said that Qualcomm licensed on a "fair," "reasonable," or "non-discriminatory" basis, when Qualcomm was allegedly engaged in unfair bundling practices.[6] Finally, Plaintiffs point to the instances discussed above where Defendants said that its business model facilitated competition in the industry, even though Qualcomm was allegedly stifling competition by bundling.[7]

///

///

---

[6] *See* Compl. ¶¶ 138, 151 (SEC filings on November 7, 2012, and November 6, 2013 stating that: "[w]e have licensed or otherwise provided rights to use our patented technologies to companies on terms that are fair, reasonable and free from unfair discrimination."); ¶¶ 138, 151, 163, 170, 181, 183 (on November 7, 2012, November 6, 2013, November 5, 2015, June 24, 2016, and November 2, 2016, Qualcomm stated in SEC filings that "we will offer to license our essential patents for these CDMA standards on a fair and reasonable basis free from unfair discrimination."); ¶ 186 (January 17, 2017: Qualcomm similarly stated that it licensed its patents on "fair, reasonable and non-discriminatory terms.").

[7] *See* Compl. ¶¶ 140, 153, 164, 171, 184 (in SEC filings in 2012–2016, Qualcomm stated: "[w]e have facilitated competition in the wireless communications industry by licensing and enabling a large number of manufacturers."); ¶¶ 132, 144, 159, 166, 175 (in SEC filings in 2012, 2013, 2014, 2015, and 2016, Defendants described the following: "the benefits of our business model ... in promoting a highly competitive ... wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products.").

17cv121-JO-WVG

## C. The Alleged Corrective Disclosures

Plaintiffs allege that the market remained in the dark about Qualcomm's selective licensing and bundling practices until the truth was revealed in four corrective disclosures:

**The First Corrective Disclosure**

**November 17, 2015** – Qualcomm's press release in response to an antitrust investigation initiated by the Korean Fair Trade Commission ("KFTC") (Compl. ¶ 212; Defs. Ex.[8] 35 at A815):

> [KFTC] alleges, among other things, that we do not properly negotiate aspects of our licenses, and that our practice of licensing our patents only at the device level and requiring that our chip customers be licensed to our intellectual property violate Korean competition law.

**The Second Corrective Disclosure**

**December 8, 2015** – The European Commission's press release announcing that it was investigating Qualcomm for violating European competition law (Compl. ¶ 216; Defs. Ex. 7 at A423):

> The European Commission has informed Qualcomm of its preliminary conclusions that the chipset company illegally paid a major customer for exclusively using Qualcomm chipsets and sold chipsets below cost with the aim of forcing its competitor Icera out of the market, in potential breach of EU antitrust rules . . . The first Statement of Objections outlines that since 2011, Qualcomm has paid significant amounts to a major smartphone and tablet manufacturer on condition that it exclusively use Qualcomm baseband chipsets in its smartphones and tablets. The Commission takes the preliminary view that this conduct has reduced the manufacturer's incentives to source chipsets from Qualcomm's competitors and has harmed competition and innovation in the markets for UMTS and LTE baseband chipsets. The contract between Qualcomm and the manufacturer containing the exclusivity clauses is still in force.

---

[8] "Defs. Ex." refers to Defendants' exhibits in support of their opposition to class certification, which can be found at Dkt. 245.

**The Third Corrective Disclosure**

**January 17, 2017** – A Complaint publicly filed by the Federal Trade Commission ("FTC") (Compl. ¶ 224; Defs. Ex. 9):

> Qualcomm has consistently refused to license its cellular standard-essential patents to its competitors, in violation of Qualcomm's FRAND[9] commitments . . . Qualcomm has consistently refused to license its SEPs to competing suppliers of baseband processors. Several of Qualcomm's former and current competitors, including Intel, MediaTek, and Samsung, have sought SEP licenses from Qualcomm. In each instance, Qualcomm refused to grant a SEP license.

> Qualcomm withholds its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm, including elevated royalties that the customer must pay when using competitors' processors ('no license-no chips').

> Qualcomm entered into exclusive dealing arrangements with Apple Inc., a particularly important cell phone manufacturer . . . When Apple sought relief from Qualcomm's excessive royalty burden, Qualcomm conditioned partial relief on Apple's exclusive use of Qualcomm baseband processors.

> Qualcomm has also used its dominant position to negotiate supply terms that leave OEMs vulnerable to a supply disruption in the event of a license dispute . . . Qualcomm has induced certain OEMs to accept its preferred license terms using [] the "stick" of supply disruption.

**The Fourth Correction Disclosure**

**January 20, 2017** – A Complaint filed by Apple alleging antitrust violations (Compl. ¶ 228; Defs. Ex. 11):

> Qualcomm inserted a gag order that prevented an aggrieved party from seeking relief that could curb Qualcomm's illegal conduct, in an effort to keep courts and regulators in the dark and its coerced customers quiet.

---

[9] "FRAND" stands for fair, reasonable, and non-discriminatory.

17cv121-JO-WVG

> Among Apple's damages are nearly $1 billion that Qualcomm owes Apple . . . Qualcomm claims that Apple has forfeited those amounts by responding to [KFTC] requests . . . Qualcomm then attempted to extort Apple into changing its responses and providing false information to the KFTC in exchange for Qualcomm's release of those payments to Apple.
>
> Qualcomm illegally double-dips by selling chipsets . . . and then separately licensing (but never to competitors) the purportedly necessary intellectual property. By tying together the markets for chipsets and licenses to technology in cellular standards, Qualcomm illegally enhances and strengthens its monopoly in each market . . . Qualcomm leverages its market power to extract exorbitant royalties, later agreeing to reduce those somewhat only in exchange for additional anticompetitive advantages.

Plaintiffs point to the First, Third, and Fourth Corrective Disclosures as corrections of Qualcomm's licensing misrepresentations. Plaintiffs allege that the market learned for the first time that Qualcomm did not license its chip components to chipmakers on November 17, 2015, when Qualcomm announced in a press release that the Korean Fair Trade Commission was investigating it, in part, for Qualcomm's practice of "licensing [its] patents only at the device level." *See* First Corrective Disclosure; Compl. ¶ 212; Defs. Ex. 35 at A815. Plaintiffs also allege that the market learned more information regarding Qualcomm's refusal to license chips to chipmakers on January 17, 2017, when the Federal Trade Commission filed a public complaint accusing Qualcomm of refusing to license chipset competitors. *See* Third Corrective Disclosure; Defs. Ex. 9 ¶¶ 3, 112 ("Qualcomm has consistently refused to license its cellular standard-essential patents to its competitors"). Finally, Plaintiffs point to a public complaint filed by Apple three days later on January 20, 2017, similarly accusing Qualcomm of refusing to license chipset competitors. *See* Fourth Corrective Disclosure; Defs. Ex. 11 ¶ 51 (Qualcomm "refus[ed] to license its [standard-essential patents] to competing chipset manufactures").

Plaintiffs also point to all four corrective disclosures as corrections of Qualcomm's bundling misrepresentations. According to Plaintiffs, the market first began to learn about Qualcomm's unfair bundling practices on November 17, 2015, when Qualcomm

8

announced in the First Corrective Disclosure that the Korean Fair Trade Commission had accused it of not "properly negotiat[ing]" its licenses. *See* First Corrective Disclosure; Defs. Ex. 35 at A815. The market then allegedly learned more about the truth of Qualcomm's bundling practices through the Second Corrective Disclosure on December 8, 2015, when the European Commission accused Qualcomm of "illegally pa[ying] a major customer for exclusively using Qualcomm chipsets." *See* Second Corrective Disclosure; Pltfs. Ex. 89.[10] Then, in the Third Corrective Disclosure on January 17, 2017, the FTC filed a civil complaint against Qualcomm, alleging that Qualcomm offered incentive payments tied to chipset purchases and provided conditional royalty payments that operated as penalties for using other chip suppliers. *See* Third Corrective Disclosure; Pltfs. Ex. 91 ¶¶ 124–30. Finally, in the Fourth Corrective Disclosure on January 20, 2017, Apple accused Qualcomm of deterring it from switching to other chip suppliers via royalty rebates. *See* Fourth Corrective Disclosure; Pltfs. Ex. 92 ¶¶ 95–97.

Plaintiffs contend that when the market learned the truth about Qualcomm's business practices through the four corrective disclosures above,[11] Qualcomm's artificially inflated stock price dropped, causing investors harm. *See generally* Compl. Under this "inflation maintenance" theory,[12] Plaintiffs seek to prove that Defendants' misstatements and omissions maintained Qualcomm's stock at an artificially inflated price until the truth was revealed. When the market finally learned the information withheld from them,

---

[10] "Pltfs. Ex." refers to Plaintiffs' exhibits in support of their motion for class certification, which can be found at Dkts. 217 and 255.

[11] Plaintiffs originally identified five corrective disclosures in their complaint but appear to concede on class certification that the Korean Fair Trade Commission's press release announcing the findings of its investigation on December 27, 2016, did not have a statistically significant impact on stock prices and thus, is not a corrective disclosure. *See* Dkt. 217, Pltfs. Ex. 1 ("Tabak Report") ¶ 61 n.49 ("[t]he December 27, 2016 disclosure is not associated with a statistically significant price movement in my analysis using the event-study model described earlier in this report. Thus, my damages model will assign no inflation or damages as a result of that disclosure").

[12] *See generally Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021) (describing inflation maintenance theory of price impact); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 232 (2d Cir. 2016) (same).

Qualcomm's stock price dropped by a commensurate amount. *See id.* ¶¶ 10–11, 14–15, 131. As proof of inflation maintenance, Plaintiffs point to the price declines following the four corrective disclosures to demonstrate that the stock price had been artificially inflated prior to that point due to Defendants' alleged misstatements and omissions.

**D. Public Information Regarding Qualcomm's Licensing Practices Prior to the Corrective Disclosures**

Prior to the First Corrective Disclosure in 2015, it appears that the following information regarding Qualcomm's licensing practices was publicly available. In 2009, a Deutsche Bank company alert stated that "Qualcomm does not collect royalty payments from chip vendors, they collect them from chip vendors' customers (handset makers)," suggesting that market participants understood Qualcomm did not license chips to chipmakers. Defs. Ex. 23 at A695. In 2014, the China National Development and Reform Commission's ("NDRC") investigation into Qualcomm made Qualcomm's device-level licensing practice public. On July 23, 2014, Qualcomm disclosed in its Form 10-Q that the NDRC was investigating the company for refusing to license its chips to chipmakers. *See* Defs. Ex. 16 at A651 (disclosing that the NDRC was investigating Qualcomm for "the alleged refusal of the Company to grant patent licenses to chipset manufacturers."). After this disclosure, market makers and analysts reported on the investigation and the agency's eventual censure of Qualcomm. *See* Defs. Exs. 6, 25, 26, 28, 33. For example, analyst reports in August and September 2014 noted that the agency was reviewing Qualcomm's "practice of . . . refusing to license chipset manufacturers." *See* Defs. Ex. 25 at A714; Ex. 26 at A725. Then, after the NDRC's investigation concluded in March 2015, analysts and legal sources reported that Qualcomm would be able to maintain its device-level licensing practice and could continue to refuse to license at the chip level. *See* Defs. Ex. 6 at A417 ("Qualcomm retained its ability to calculate royalties based on the wholesale price of the entire device" and "avoided a duty to license at the chip level"); Defs. Ex. 28 at A739 (Qualcomm "ha[d] staved off the elephant in the room" of chip-level licensing, which "would [have] require[d] fundamental changes to [Qualcomm's] biz model"); Defs. Ex. 33

at A783 ("Qualcomm agreed to pay a $975 million fine" but "can still base licensing fees on devices, not components").

Prior to the corrective disclosures, it was also public knowledge that device-level licensing was a common industry practice, and, in fact, there was a public debate occurring in the industry regarding the continuation of that practice. *See* Defs. Exs. 3–5. Qualcomm participated in this debate by publicly defending device-level licensing in several forums, including at a hearing before Congress on July 30, 2013, during which industry participants testified about patenting standards and practices. *See generally* Defs. Ex. 3. There, Qualcomm repeatedly stated that it licensed device manufacturers, *see id.* at A75, A144, and argued that companies like Qualcomm should not be required to license at the component level. *See id.* at A166–68 (arguing that FRAND commitments do not require licensing components to component makers and that requiring companies to do so "would be inconsistent with widely accepted industry practice"; "it is and has long been the industry norm . . . to license at the level of complete standard-compliant devices, not part and components"). Other witnesses at the hearing confirmed patent holders "often go to great lengths to avoid licensing upstream component (*e.g.*, chip) manufacturers and choose instead to license . . . at . . . the device (*e.g.*, computer) level" and "refuse to license chip makers so that they can seek excessive royalties." *Id.* at A74, A85, A117, A,126, A129, A131.[13]

Qualcomm also engaged in this public debate by filing an amicus brief in the Federal Circuit arguing in favor of device-level licensing and by filing objections to a standard setting organization's proposed policy change. On February 27, 2014, Qualcomm filed a public amicus brief in *Ericsson Inc. v. D-Link Sys., Inc.*, after the defendant appealed to the Federal Circuit. *See* Defs. Ex. 4. There, Qualcomm argued that companies have the right

---

[13] Defendants also highlight a variety of court and regulatory filings reflecting similar notions, including that, "large companies have adopted [] policies of only licensing fully compliant products," (*see Ericsson Inc. v. D-Link Sys., Inc.*, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013)), and that device-level licensing is a "widespread industry licensing practice." *See* Defs. Ex. 4.

17cv121-JO-WVG

to license devices instead of components and are not required to license chips to chip suppliers. *See id.* at A344–48 ("[companies] regularly set royalties" based on "wholesale price of handset[]"; there is "nothing inherently wrong or unfair" with the practice of licensing "fully compliant products"; standard-setting-organization commitments "do not require the licensing of components").[14]   Then, on May 26, 2014, Qualcomm filed public objections to the proposed policy of a standard setting organization.  *See* Defs. Ex. 5. Standard setting organizations are "global collaborations of industry participants" that collectively establish standards in the field.  *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 982–83 (9th Cir. 2020).  When one of these organizations that Qualcomm participated in proposed a policy that would have required companies like Qualcomm to "license exhaustively" at the component level, Qualcomm objected in a public filing, arguing that it would constitute "a disruptive change to existing licensing practices." *See* Defs. Ex. 5 at A370.  Defendants argue that this public information illustrates that device-level licensing was a well-known, industry-wide practice.

**E. Public Information Regarding Qualcomm's Bundling Practices Prior to the Corrective Disclosures**

Prior to the First Corrective Disclosure in 2015, it appears that the following information regarding Qualcomm's bundling practices was publicly available.  From December 10, 2007 to March 16, 2015, third-parties publicly stated that Qualcomm had a policy of only selling its chips to licensees.[15]  Qualcomm was also publicly investigated by various regulatory agencies for allegedly bundling its licensing and chipset businesses and for offering royalty rebates in exchange for exclusive use of Qualcomm's chips. *See* Defs. Exs. 20, 24, 26; Dkt. 246, Longman Decl., Ex. 3 at L115, L120.  On August 14, 2014, an

---

[14] *See also id.* at A320 ("Qualcomm has licensed its portfolio to essentially all major *handset* manufacturers") (emphasis added).

[15] *See* Defs. Ex. 1 at A15 (December 10, 2007: Qualcomm's Supreme Court amicus brief stating that it "typically sells chips only to those handset manufacturers that are licensed"); Defs. Ex. 16 at A651 (July 23, 2014: in its SEC filing, Qualcomm stated that the NDRC was investigating its "policy of selling chipsets only to the Company's patent licensees"); *see also* Defs. Exs. 6, 18, 27, 29–30 (similar).

analyst reported that the China National Development and Reform Commission was investigating whether Qualcomm "bundl[ed] patents with chip sales." *See* Defs. Ex. 24 at A699, Ex. 26 at A725. Then, on June 26, 2016—after the first two corrective disclosures but before the third—Qualcomm disclosed in its SEC filing that the Taiwan Fair Trade Commission was accusing Qualcomm of providing "royalty rebates" to certain companies in exchange for exclusive use of Qualcomm's chipsets. *See* Defs. Ex. 20 at A680. A month later, also before the Third Corrective Disclosure, Apple made a presentation before the Korean Fair Trade Commission, alleging that Qualcomm "require[d] bundl[ing] of IPR and chipset" and "insist[ed] on exclusionary terms in exchange for renewed royalty limits." *See* Dkt. 246, Longman Decl., Ex. 3 at L115, L120. Based on this public information, Defendants argue that the market was already aware that Qualcomm only sold its chips to licensees and had been accused of improper bundling, such that the information in the corrective disclosures was not new. *See* Opp. at 10–11, 23–24, 28–30.

Plaintiffs seek to certify a class of investors who were injured by the deception-induced inflation and consequent price drops described above. They define this class as follows: "[a]ll persons or entities who purchased or otherwise acquired the common stock of Qualcomm between February 1, 2012 and January 20, 2017, inclusive, and who were damaged." Dkt. 217, Notice of Motion at 1. The two Lead Plaintiffs who seek to represent the class are institutions that purchased Qualcomm stock during the class period at prices that were allegedly inflated due to Defendants' material misstatements and omissions. *See id.*

## II. LEGAL STANDARD

To certify a class, the plaintiffs bear the burden of proving by a preponderance of the evidence that the class meets all four requirements of Federal Rule of Civil Procedure 23(a). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). Rule 23(a) sets out four prerequisites for a certifiable class: (1) numerosity, (2) commonality, (3) typicality, and (4)

adequacy.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011).  If the proposed class meets the four prerequisites of Rule 23(a), the Court must then decide whether the class action is maintainable under Rule 23(b).  Under Rule 23(b)(3), a class may be certified if the Court finds that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting Fed. R. Civ. P. 23(b)(3)).

At the class certification stage, the Court must take the substantive allegations of the complaint as true, but it "also is required to consider the nature and range of proof necessary to establish those allegations."  *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982).  The court must engage in a "rigorous analysis" of each Rule 23(a) factor, which often "will entail some overlap with the merits of the plaintiff's underlying claim."  *Dukes*, 564 U.S. at 351.  If the Court concludes that the moving party has carried its Rule 23 burden, then the court is afforded "broad discretion" to certify the class.  *Zinser*, 253 F.3d at 1186.

Because Plaintiffs bring claims for securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act, the Court considers whether class certification is warranted with respect to those claims.  Plaintiff's Section 10(b) claim contains the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Erica P. John Fund, Inc. v. Halliburton Co.("Halliburton I")*, 563 U.S. 804, 809–10 (2011) (citation and internal quotations omitted).  Plaintiff's Section 20(a) claim contains the following elements: (1) "a primary violation of federal securities law" and (2) "that the defendant exercised actual power or control over the primary violator."  *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (citation and internal quotations omitted).

# III. DISCUSSION

The Court will first examine whether Plaintiffs have met their burden to establish that their proposed class meets the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy. It will then turn to the predominance and superiority requirements of Rule 23(b).

## A. Plaintiffs Have Satisfied Rule 23(a)

### 1. The Class is Sufficiently Numerous

First, the Court finds that Plaintiffs' proposed class of investors is sufficiently numerous. To establish numerosity, Plaintiffs must show that the represented class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although the numerosity requirement is not tied to a strict numerical threshold, trial courts have generally found that classes of at least 40 members satisfy the requirement. *See, e.g.*, *West v. Cal. Servs. Bureau*, *Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. 2017) (class of more than 40 "raises a presumption of impracticability of joinder") (quotation and alterations omitted); *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *2 (S.D. Cal. Aug. 24, 2021) (finding that "millions of shares trading on NASDAQ during the Class Period" allowed the court to "infer that the number of shareholders . . . would be far too numerous to join"); *In re Bridgepoint Educ., Inc. Sec. Litig.*, 2015 WL 224631, at *4 (S.D. Cal. Jan. 15, 2015) (finding 51.3 million outstanding shares and trading volume of 160.4 million shares during the class period sufficient to show numerosity). Here, Plaintiffs allege that Qualcomm had 1.69 billion outstanding shares of common stock and a weekly traded average of 24.6 million shares during the Class Period. Dkt. 217 ("Mot.") at 7. Defendants do not challenge numerosity in their opposition to class certification. *See generally* Dkt. 244 ("Opp."); *see also Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) (noting that defendants "understandably" did not contest numerosity where the class period encompassed "about 120,000 transactions involving some 21,000,000 shares"). Because

numerosity can be properly inferred from the number of outstanding shares and the rate of shares traded during the class period, Plaintiffs have met their burden to show numerosity.

### 2. There are Questions of Law and Fact Common to the Class

Second, both common questions of law and fact exist with respect to the class. To satisfy the commonality requirement, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("[t]he commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3) [predominance]"); *Blackie*, 524 F.2d at 902 ("[c]onfronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest"). Here, common questions abound, including whether Defendants made misrepresentations and whether class members suffered damages. Because Plaintiffs point to one set of misrepresentations to which the entire class was exposed, whether those statements were misleading can be resolved in one stroke by evaluating the statements themselves and common evidence of their falsity. *See* Mot. at 4, 8; Compl. ¶¶ 138–87. Additionally, because Plaintiffs seek to measure their financial injury via a drop in Qualcomm's stock price, all class members will rely on evidence of Qualcomm's historical stock prices to demonstrate damages. Because the above common evidence will resolve issues central to the securities fraud claims of the entire class— whether Qualcomm made misrepresentations and the amount of Plaintiffs' damages—the Court finds that the commonality requirement is met.

### 3. The Lead Plaintiffs are Typical

Third, the Court finds that the Lead Plaintiffs are typical of the class. Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Thus, the Court considers "whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Evon v. Law Offices of*

1   *Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (internal citation and quotations

2   omitted); *Ellis*, 657 F.3d at 984 (typicality inquiry focuses on "the nature of the

3   claim . . . and not . . . the specific facts from which it arose") (citation omitted).  Here, the

4   Lead Plaintiffs' claims are essentially the same as that of the proposed class members:

5   investors purchased stock at an allegedly inflated price due to Defendants' material

6   misrepresentations and omissions regarding Qualcomm's licensing and bundling practices,

7   and investors suffered damages when the truth was revealed.  Thus, the Lead Plaintiffs'

8   claims are typical of the class.

9            Despite Defendants' argument to the contrary, the Court concludes that Lead

10  Plaintiff Metzler is not subject to a unique defense that threatens to overwhelm the

11  litigation.  When a lead plaintiff "is subject to unique defenses which threaten to become

12  the focus of the litigation," then "class certification is inappropriate."  *Hanon v.*

13  *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).  The mere

14  presence of a defense, however, is not a basis to deny class certification unless it is unique

15  and threatens to overwhelm other issues.  *Compare id.* (finding unique reliance defense

16  threatened to overwhelm litigation where plaintiff had a practice of buying nominal shares

17  to sue defendants), *with In re Novatel Wireless Sec. Litig.*, 2010 WL 11470156, at *5 (S.D.

18  Cal. May 12, 2010) (finding reliance defense was not unique where other class members

19  could be subject to the same defense and the issue did not "threaten to become the focus").

20  Defendants contend that Lead Plaintiff Metzler is not typical because 70% of its Qualcomm

21  stock purchases were performed by its investment manager, who used a proprietary "value

22  investment" method and did not rely on the integrity of the market.  *See* Opp. at 38–39.

23  The mere presence of this defense—without more to indicate whether it is unique to Lead

24  Plaintiff Metzler or has the potential to overwhelm the litigation—is not a basis to find that

25  Lead Plaintiff Metzler is not typical.  At present, there is no evidence that this defense will

26  not also be asserted against other class members who similarly used investment managers.

27  Nor does the Court have any indication that this defense will not be a relatively cabined

28  issue.  Should later developments in the case reveal that this defense is indeed unique to

Lead Plaintiff Metzler and does threaten to overwhelm the litigation, the Court retains the authority to modify the class. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation"). Currently, however, the existence of this defense against Lead Plaintiff Metzler does not undermine the typicality of its claims against Qualcomm. Accordingly, this requirement is met under Rule 23(a).

### 4. The Lead Plaintiffs are Adequate

Fourth, the Court finds that Lead Plaintiffs and proposed class counsel are adequate representatives of the putative class. In determining adequacy, the Court considers whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court focuses on two questions: (1) whether "the representative plaintiffs and their counsel have any conflicts of interest with other class members," and (2) whether "the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Here, neither party has raised concerns about Lead Plaintiffs' ability to adequately represent the class in question. Lead Plaintiffs' interests appear to be aligned with the class because their losses and those of the class members were caused by the same allegedly unlawful conduct. *See generally* Mot. Moreover, proposed class counsel's resume and related materials indicate it has extensive experience litigating securities class actions in federal court. *See generally* Opp.; *see also* Pltfs. Exs. 3–4. Lead Plaintiffs also point to their vigorous prosecution of this action to date, including opposing Defendants' motions to dismiss and for judgment on the pleadings, and conducting extensive discovery. *See* Mot. at 10–11. Defendants have not identified any actual or potential conflicts between Lead Plaintiffs and the putative class and do not dispute the adequacy of Lead Plaintiffs or their counsel. *See generally* Opp. Accordingly, Plaintiffs have met their burden on adequacy.

## B. Whether Plaintiffs Have Satisfied Rule 23(b)

Having concluded that Plaintiffs have met Rule 23(a)'s requirements, the Court turns to whether common questions will predominate over individual ones under Rule 23(b)(3).

17cv121-JO-WVG

The Rule 23(b)(3) inquiry looks to whether the putative class is "sufficiently cohesive to warrant adjudication by representation." Fed. R. Civ. P. 23(b)(3); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Where "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citing C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)). Plaintiffs bear the burden to demonstrate that common questions will predominate over individual ones under Rule 23(b)(3) by a preponderance of the evidence before the Court may certify a class. *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 665 (adopting preponderance burden of proof). The Court considers whether Plaintiffs have demonstrated that "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof," or if "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods*, 577 U.S. at 453. The predominance inquiry "begins . . . with the elements of the underlying cause of action." *Halliburton I*, 563 U.S. at 809 (quoting Fed. R. Civ. P. 23(b)(3)).

Here, whether the predominance requirement of Rule 23(b) is satisfied hinges on whether reliance can be resolved on a class-wide basis. As discussed above, the class shares several common questions, such as the deceptiveness of Defendants' statements and the measurement of Plaintiffs' damages. The parties dispute, however, whether common questions or individualized issues will predominate. Defendants argue that class members' reliance on the alleged misrepresentations, an essential element of Plaintiffs' Section 10(b) securities fraud claim, will need to be proved separately for each class member and these

individualized inquiries would overwhelm the common questions described above.[16] *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (noting reliance is an essential element under Section 10(b)).  Therefore, the Court examines below whether questions regarding reliance can be addressed on a class-wide basis such that a class action is the appropriate vehicle for Plaintiffs' claims.

### 1. Basic's Presumption of Reliance

Plaintiffs argue that reliance can be resolved in one stroke for all class members because investors that buy stock in an efficient market are presumed to have relied on all publicly available information, including Defendants' alleged misrepresentations.  Although reliance is generally an individualized issue, Plaintiffs need not show individual reliance if they can invoke a rebuttable presumption of class-wide reliance.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–247 (1988).  In *Basic*, the Supreme Court held that, based on the fraud-on-the-market theory, the price of a security traded in an efficient market will reflect all publicly available information, including any public, material misrepresentations.  *See id.*  Thus, if the market is efficient, the stock price will reflect the alleged misrepresentations and all buyers "may be presumed to have relied" on those misrepresentations at the time of purchase.  *See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 458 (2013).   To invoke *Basic's* rebuttable presumption, Plaintiffs must show the following: "(1) the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time when the misrepresentations were made and when the truth was revealed."  *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 277–78 (2014).  Here, Defendants do not dispute that Qualcomm's stock traded in an efficient market such that the *Basic* presumption of class-

---

[16] Although Plaintiffs argue that reliance can be resolved on a class-wide basis here, Plaintiffs do not dispute that if it cannot, individualized issues would predominate, and class certification would be inappropriate.

wide reliance can be invoked in the first instance for class certification purposes.[17]    The Court will, therefore, proceed to the crux of the parties' dispute on reliance—whether Defendants have successfully rebutted *Basic's* presumption, thereby defeating Plaintiffs' argument that common questions predominate.

### 2. *How Basic's Presumption Can be Rebutted*

Rather than disputing that the *Basic* presumption has been successfully invoked, Defendants instead argue that their evidence on class certification rebuts the presumption. Because the theory that misrepresentations are baked into the stock price in an efficient market is the premise of *Basic's* presumption, Defendants can rebut that presumption by showing that the misrepresentations in question did not actually impact price.    *See Halliburton II*, 573 U.S. at 268, 278–82; *see also Halliburton I*, 563 U.S. at 814 ("'[p]rice impact' simply refers to the effect of a misrepresentation on a stock price."). Such evidence rebuts *Basic's* presumption because "[i]n the absence of price impact, *Basic's . . .* presumption of reliance collapse[s]." *Halliburton II*, 573 U.S. at 278. "[T]he defendant bears the burden of persuasion to prove a lack of price impact" by a "preponderance of the evidence." *Goldman*, 141 S. Ct. at 1960, 1963 (directing courts to

---

[17] Based on the evidence submitted with Plaintiffs' motion for class certification, the Court finds that Plaintiffs have successfully invoked *Basic's* presumption of class-wide reliance. *See, e.g., In re USA Talks.com Sec. Litig.*, 2000 WL 1887516, at *5 (S.D. Cal. Sept. 14, 2000) (considering *Cammer* factors when deciding whether *Basic's* presumption applied); *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989) (factors include, (1) whether stock traded at a high weekly volume; (2) whether securities analysts reported on stock; (3) whether stock had market makers; (4) whether the company is eligible to file SEC registration Form S-3; and (5) whether there are empirical facts showing a cause-and-effect relationship between company news and an immediate response in a stock price). The evidence submitted by Plaintiffs demonstrates that Qualcomm's stock traded on a national exchange at a high weekly volume and was reported on by securities analysts. Moreover, Qualcomm had a high number of institutional investors, and was eligible to file an SEC Form S-3. Dr. Tabak's study also suggests that the market did efficiently digest news about Qualcomm and that the news was reflected in Qualcomm's stock price. Given this evidence and the fact that Defendants do not dispute market efficiency at this juncture, *Basic's* rebuttable presumption applies.

"determine whether it is more likely than not that the alleged misrepresentations had a price impact.").

At this stage, the Court considers all probative evidence to determine whether Defendants have met their burden to rebut *Basic's* presumption by a preponderance of the evidence. At class certification, the Court's "rigorous analysis" will often "entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351. With respect to securities fraud cases specifically, the Supreme Court has recently instructed that "a court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact," "regardless [of] whether that evidence overlaps with materiality or any other merits issue." *Goldman*, 141 S. Ct. 1960–61 (remanding with instructions to consider all price-impact evidence prior to certification) (emphasis in original). Thus, where a defendant submits evidence to rebut *Basic's* presumption of class-wide reliance, "[t]he district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 1963.

The Court will first examine whether it is more likely than not that Defendants' alleged misrepresentations about Qualcomm's licensing practices had an impact on Qualcomm's stock price. It will then conduct the same inquiry with regard to Defendants' alleged misrepresentations about Qualcomm's bundling practices. In doing so, the Court keeps in mind the Supreme Court's instruction to consider all evidence of price impact, "regardless [of] whether that evidence overlaps with materiality *or any other merits issue*," to decide whether *Basic's* presumption holds. *Goldman*, 141 S. Ct. 1960–61 (emphasis added).

### 3. Defendants Have Shown a Lack of Price-Impact with Respect to the "Chip Licensing" Misrepresentations

Plaintiffs' invocation of *Basic's* presumption rests on a link between Qualcomm's alleged misrepresentations and its later stock-price drops—a link Defendants attempt to rebut. Plaintiffs theorize the market was unaware that Qualcomm did not license at the

chip level such that when Qualcomm made representations like, "we license broadly," the market interpreted those statements to mean "we license chips." *See, e.g.*, Compl. ¶¶ 64–72. Plaintiffs argue that these misrepresentations falsely inflated Qualcomm's stock price and that when the market learned for the first time through the corrective disclosures that Qualcomm did not license chips, Qualcomm's stock price dropped. *See id.* ¶¶ 64–72, 121–29, 210–34.

Defendants attempt to rebut *Basic's* presumption by undermining the connection between Qualcomm's alleged misrepresentations and its stock prices. Defendants first argue that sweeping statements about the "broad," "fair," or "non-discriminatory" nature of Qualcomm's licensing practices were not specific enough to make the market believe that Qualcomm engaged in specific, chip-level licensing. *See* Opp. at 19, 23. Defendants further argue that their statements about Qualcomm's licensing practices could not have impacted the stock price as Plaintiffs claim because the market already knew that Qualcomm did not license chips. *See* Opp. at 21–23, 28–30.

Defendants argue that their generic statements about Qualcomm's licensing would not have impacted Qualcomm's stock price because those statements were not specific enough to create the misimpression that Qualcomm licensed at the chip level. In *Goldman*, the Supreme Court noted that "when the earlier misrepresentation is generic (e.g., 'we have faith in our business model') and the later corrective disclosure is specific (e.g., 'our fourth quarter earnings did not meet expectations')," then "there is a mismatch between the contents of the misrepresentation and the corrective disclosure." 141 S. Ct. at 1961. The Court noted that this evidence was relevant to price impact because such a mismatch meant there was "less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *See id.*

The Court therefore compares the information in the alleged misrepresentations to the information in the corrective disclosures to determine whether there is such a mismatch. Plaintiffs allege that the corrective disclosures between November 17, 2015 and January 20, 2017, revealed the information that Qualcomm, (1) only licensed at the device level,

and (2) did not license at the chip level to competing chipmakers.  *See* Defs. Ex. 35 at A815.[18]  Although Plaintiffs parse these as two separate pieces of revelatory information, the notion that Qualcomm only licensed at the device level to device manufacturers and did not license chips to chipmakers are two sides of the same coin.  This information—that Qualcomm licensed at the device level and not the chip level—is far more specific than Defendants' generic statements assigning the adjectives "broad," "fair," "reasonable," and "non-discriminatory" to Qualcomm's overall licensing model.  Although Plaintiffs argue that the market interpreted these generic statements to mean that Qualcomm licensed chips to chipmakers and that this inflated Qualcomm's stock price, that conclusion is not apparent when the alleged misrepresentations and corrective disclosures are viewed side by side.  Thus, the Court finds that the generic nature of the alleged misrepresentations makes it less likely that those misrepresentations deceived the market in the way Plaintiffs theorize, and therefore, less likely that they caused "front-end price inflation."  *See Goldman*, 141 S. Ct. at 1961.

The Court now turns to Defendants' argument that the information in the corrective disclosures was publicly available prior to the corrective disclosures.  The three relevant corrective disclosures—The First, Third, and Fourth Corrective Disclosures on November 17, 2015, January 17, 2017, and January 20, 2017, respectively—allegedly revealed that Qualcomm only licensed devices and did not license chips to chipmakers.  The First Corrective Disclosure on November 17, 2015 stated that Qualcomm had a "practice of licensing [] patents at the device level."  First Corrective Disclosure; Compl. ¶ 212; Defs. Ex. 35 at A815.  But, in the years prior to the First Corrective Disclosure, Qualcomm's device-level licensing policy was made public multiple times.  For example, in 2009, an analyst reported that Qualcomm licensed at the device level: "Qualcomm does not collect

---

[18] The Court notes that the allegedly revelatory nature of this information is belied by Plaintiffs' own submission to the Court in advance of oral argument admitting that "the market understood that Qualcomm based its royalties on device-level pricing."  *See* Pltfs. 10/18/22 Submission.

royalty payments from chip vendors, they collect them from chip vendors' customers (handset makers)," Defs. Ex. 23 at A695. In 2014 and 2015, multiple publications discussed that the China National Development and Reform Commission was investigating Qualcomm for its device-level licensing policy. *See* Defs. Exs. 6, 16, 25–26, 28, 33. For instance, in March 2015, in the wake of this investigation, several analysts and legal sources reported that Qualcomm would be able to continue its device-level licensing practice and continue to refuse to license at the chip level. *See* Defs. Ex. 6 at A417 ("Qualcomm retained its ability to calculate royalties based on the wholesale price of the entire device" and "avoided a duty to license at the chip level"); Defs. Ex. 28 at A739 (Qualcomm "ha[d] staved off the elephant in the room" of chip-level licensing, which "would [have] require[d] fundamental changes to [Qualcomm's] biz model"); Defs. Ex. 33 at A783 ("Qualcomm agreed to pay a $975 million fine" but "can still base licensing fees on devices, not components"). During the 2013 to 2014 time period, Qualcomm also defended its device-level licensing policy on the public stage at a time when the pros and cons of this commonplace industry practice were being debated before Congress, the courts, and standard-setting organizations. *See* Defs. Exs. 3–5. Thus, the information in the First Corrective Disclosure on November 17, 2015, was publicly stated prior to that point in 2009, 2014, and 2015, against the backdrop of an industry that was widely licensing at the device level and debating whether that practice could continue.

Similarly, Plaintiffs allege that the Third and Fourth Corrective Disclosures revealed that Qualcomm refused to license chips to competing chipmakers, but this information was already public. These January 2017 disclosures—civil complaints brought against Qualcomm by the FTC and Apple—accused Qualcomm of refusing to license chips to chipmakers.[19] *See* Third Corrective Disclosure; Defs. Ex. 9 ¶¶ 3, 112 ("Qualcomm has

---

[19] The Court notes that Plaintiffs appeared to acknowledge at oral argument that Qualcomm's "device-level licensing" and "refusal to license chips and chip competitors" are essentially two sides of the same coin. *See* Dkt. 276 at 20.

consistently refused to license . . . its competitors"); *see also* Fourth Corrective Disclosure; Defs. Ex. 11 ¶ 51 (Qualcomm "refus[ed] to license . . . competing chipset manufactures"). But the FTC's and Apple's accusations in January 2017 were not new.  Indeed, the same exact accusations had been publicly levied by two regulatory agencies years prior to that date.  First, in July 2014, the China National Development and Reform Commission investigated Qualcomm's alleged refusal to license chips to chipmakers.  *See* Defs. Ex. 16 ("the alleged refusal of the Company to grant patent licenses to chipset manufacturers."); *see also* Defs. Exs. 25–26 (Qualcomm's "practice of . . . refusing to license chipset manufacturers.").  Then, in December 2016, the Korean Fair Trade Commission announced that "Qualcomm [] refused to license competing chipset companies." *See* Defs. Ex. 8 at A426.  Therefore, the information in the Third and Fourth Corrective Disclosures in January 2017, was disclosed prior to that point in 2014 and 2016.

The Court finds that Defendants' evidence that Qualcomm's device-level licensing practice and refusal to license chipmakers was public prior to the corrective disclosures makes price impact less likely.  *See Amgen*, 568 U.S. at 458 (under the *Basic* presumption, "the price of a security traded in an efficient market will reflect all publicly available information").  The fact that there was public information available from 2009–November 17, 2015, that Qualcomm licensed only at the device level and, thus, did not license chips to competing chipmakers, makes it less likely that the market interpreted Defendants' generic statements from February 1, 2012, and January 20, 2017 to mean that Qualcomm licensed chips.  If the market was not misled by the alleged misrepresentations in this manner under Plaintiffs' theory, then there is less reason to infer that the alleged misrepresentations caused front-end stock price inflation.  In addition, the fact that there was public information available from November 2009–December 2016 that mirrors the corrective disclosures makes it less likely that the corrective disclosures were actually curative.  If the corrective disclosures did not actually contain new information correcting the alleged misrepresentations, it becomes less likely that their announcement caused the

17cv121-JO-WVG

back-end price drops and less reasonable to assume that Defendants' alleged misrepresentations caused front-end inflation in the first place.

The Court finds that, together, Defendants' evidence discussed above is enough to demonstrate a lack of price impact by a preponderance of the evidence with respect to Defendants' alleged licensing misrepresentations. As a whole, the evidence suggests that––prior to the alleged corrective disclosures—the market was exposed to statements about Defendants' "broad" and "competitive" licensing practices while also privy to information that Defendants licensed only at the device level and refused to license chips to chipmakers. The alleged corrective disclosures only repeated already public information—that Qualcomm licensed only at the device level and refused to license competing chipmakers. At a "common sense," level, this evidence makes it less likely that Defendants' alleged misrepresentations inflated Qualcomm's stock price on the front end and the information in the disclosures caused the price drop on the back end. *See Goldman*, 141 S. Ct. 1960.

This inference is further supported by evidence that at least one disclosure that Qualcomm "refused to license to competitors" did not impact Qualcomm's stock price. Plaintiffs admit that the Korean Fair Trade Commission's December 2016 announcement—which is virtually identical to the licensing information in the Third and Fourth Corrective Disclosures—had no impact on Qualcomm's stock price. *See* Defs. Ex. 8 at A426 (KFTC: "Qualcomm [] refused to license competing chipset companies."); *see also* Pltfs. Ex. 1 ("Tabak Report") ¶ 61 n.49. The fact that the market did not react to this announcement makes it more likely that the market was already aware of Qualcomm's device-level licensing practice by the date of this announcement in December 2016— before the Third and Fourth Corrective Disclosures in January 2017. In light of this evidence, the Court cannot say that it is more likely than not that Defendants' statements about "broad" licensing practices inflated Qualcomm's stock price because the market did not know until the corrective disclosures that Qualcomm licensed only at the device level. Accordingly, the Court finds that Defendants have rebutted *Basic's* class-wide presumption of reliance by a preponderance of the evidence.

Because Defendants have rebutted the class-wide presumption of reliance, a factfinder would have to conduct individualized inquiries regarding each class member's reliance on the various alleged misrepresentations. *See Amgen*, 568 U.S. at 462–63 ("Absent the fraud-on-the-market theory . . . reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class."). Without *Basic's* presumption, Plaintiffs would have to demonstrate that each class member was aware of Defendants' misrepresentations and purchased Qualcomm stock in reliance on them. Given the thousands of investors that fit the class definition, class resolution of this question would be untenable under Rule 23(b). Individual issues of reliance, rather than common questions, would predominate. *See id.* at 461. Accordingly, the Court will not certify a class of investors with respect to Qualcomm's alleged misrepresentations regarding its device-level licensing practice or refusal to license chips to chipmakers.

### 4. Defendants have Not Shown a Lack of Price-Impact with Respect to the "Bundling" Misrepresentations

Next, the Court turns to Plaintiffs' allegations that Defendants misled the market about the extent to which Qualcomm bundled its licensing and chip-supply businesses. *See* Reply at 12–13. Plaintiffs posit that the market was misled when Defendants made representations about the separateness of Qualcomm's licensing and chip-supply businesses when, in fact, Qualcomm was bundling the two businesses in multiple, undisclosed ways. *See id.* Under Plaintiffs' theory, these misrepresentations artificially inflated Qualcomm's stock price. *See id.* Then, when the corrective disclosures revealed the truth about the extent to which Qualcomm bundled its licensing and chip-supply businesses, Qualcomm's stock price dropped. *See id.* Similar to Defendants' arguments with respect to licensing, Defendants attempt to rebut price impact in two ways. First, Defendants argue that their generalized statements about the "separateness" of Qualcomm's licensing and chip-supply businesses were not specific enough to make the market believe that Qualcomm did not bundle terms and negotiations, practices that were

later revealed in the corrective disclosures.  *See* Opp. at 24–26.  Second, Defendants also argue that their statements about bundling could not have impacted the stock price in the way Plaintiffs theorize because the market already knew that Qualcomm did bundle in certain ways, including by only selling chips to licensed companies and offering royalty rebates in exchange for exclusive use of Qualcomm chips.  *See id.* at 10–11, 26–29.

Defendants argue that their generic statements about the separateness of Qualcomm's licensing and chip-supply businesses did not impact Qualcomm's stock price because they were not specific enough to make the market believe that Qualcomm did not engage in the bundling practices revealed in the corrective disclosures.  *See Goldman*, 141 S. Ct. at 1961.  As noted above, Defendants' alleged misstatements regarding bundling include statements like the following: (1) "we tend to keep the licensing and the chip business very separate . . . we don't bundle those together," Compl. ¶ 142; (2) "they are really separate businesses . . . we have been very clear that we keep those two things separate," *Id.* ¶ 146.  The foregoing statements are admittedly more general than the specific disclosures that Qualcomm "[withheld] its baseband processors unless a customer accept[ed] a license . . . on terms preferred by Qualcomm," or "induced certain OEMs to accept its preferred license terms using [] the 'stick' of supply disruption."  *See* Defs. Ex. 9 ¶¶ 3, 102.  Nevertheless, Defendants' alleged misstatements are not at such a high level of generality that one cannot discern the inherent contradiction between those statements and the information in the corrective disclosures when viewed side by side.  *See Goldman*, 141 S. Ct. 1960.  The fact that Qualcomm allegedly bundled the terms and negotiations of the two businesses and leveraged them against one another does directly contradict the statements that the businesses were "separate."  Thus, while the more general nature of the alleged misrepresentations makes price impact slightly less likely, it does not rebut the presumption of price impact by a preponderance of the evidence.

Further, the Court finds that the corrective disclosures contained information regarding bundling that was not publicly available prior to the corrective disclosures.  The corrective disclosures revealed the following new information about the company's

bundling practices: (1) the First Corrective Disclosure allegedly revealed that Qualcomm did not "properly negotiate" its licenses; (2) the Second Corrective Disclosure allegedly revealed that Qualcomm "illegally paid a major customer for exclusively using Qualcomm chipsets" to force competitors out of the market; (3) the Third Corrective Disclosure allegedly revealed that Qualcomm "withh[eld] its baseband processors unless a customer accept[ed] a license . . . on terms preferred by Qualcomm," "conditioned partial [royalty] relief on [] exclusive use," and "induced certain OEMs to accept its preferred license terms using [] the 'stick' of supply disruption"; and (4) the Fourth Corrective Disclosure allegedly revealed that Qualcomm "illegally leverage[d] its market power to extract exorbitant royalties." *See* Compl. ¶¶ 212, 216, 224, 228; Defs. Exs. 7, 9, 11, 35. Defendants have not pointed to evidence that this precise information was publicly available prior to the corrective disclosures. Although Defendants submit evidence that Qualcomm's practice of only selling chips to licensees was public, the corrective disclosures allegedly revealed far more than just this one practice. Further, although bundling and royalty rebate accusations had been levied against Qualcomm prior to the corrective disclosures, those prior allegations do not mirror the corrective disclosures quoted above. The latter disclosed far more detail regarding the alleged bundling, including the way it occurred, the customers involved, and Qualcomm's alleged abuse of market power. Accordingly, Defendants' evidence in this regard does not sever the link between Defendants' alleged misrepresentations and their impact on the stock price.

Because Defendants cannot rebut *Basic's* presumption by demonstrating a lack of price impact, reliance can be resolved on a class-wide basis. *Goldman*, 141 S. Ct. at 1958–59 (noting the *Basic* "presumption allows class-action plaintiffs to prove reliance through evidence common to the class."); *see also Halliburton II*, 573 U.S. at 276. Because the *Basic* presumption applies, Plaintiffs will not need to show that individual class members were aware of, and relied upon, Defendants' alleged misrepresentations about bundling. Instead, class members may be presumed to have relied on the integrity of Qualcomm's stock price, and reliance can be resolved in one stroke.

17cv121-JO-WVG

1          *5. Damages*

2          The Court next addresses Defendants' argument that Plaintiffs have not presented a

3  viable method for determining class-wide damages, precluding the ability to proceed as a

4  class action.  To satisfy predominance, a plaintiff must propose a plausible methodology

5  for proving damages on a class-wide basis.  *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811,

6  818 (9th Cir. 2019) (finding predominance where plaintiff's proposed out-of-pocket

7  damages method was routinely recognized as "a reasonable basis of computation" for

8  CLRA claims); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal.

9  2010) ("[a]t class certification, plaintiff must present a likely method for determining class

10  damages though it is not necessary to show that his method will work with certainty at this

11  time") (cleaned up).  This damages method must be capable of measuring the harm caused

12  by a defendant's illegal conduct.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (a

13  damages model that "does not even attempt" to measure the harm alleged by the plaintiffs

14  does not satisfy predominance requirement); *see also Vaquero v. Ashley Furniture Indus.,

15  Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016) (interpreting "*Comcast* to mean that plaintiffs

16  must be able to show that their damages stemmed from the defendant's actions that created

17  the legal liability.") (internal quotations and citation omitted).  The Court thus considers

18  whether Plaintiffs have proposed a plausible damages methodology that is linked to their

19  liability case.

20          The parties do not dispute that the event study Plaintiffs' expert proposes is a

21  plausible method for measuring class-wide damages in a securities case such as this one.

22  An event study is a statistical method that examines whether a specific event had an impact

23  on a public company's stock price.  Courts have consistently held that an event study is an

24  appropriate method for measuring stock price inflation caused by alleged

25  misrepresentations and therefore, satisfies the predominance requirement.  *City of Miami

26  Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc.*, 2018 WL 4931543, at *3

27  (N.D. Cal. Oct. 11, 2018) (the "event study[] method is the standard measurement of

28  damages in Section 10(b) securities cases") (collecting cases)); *see also In re Diamond*

*Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 251 (N.D. Cal. 2013).  Here, Plaintiff's damages expert, Dr. Tabak, proposes to calculate damages on a class-wide basis using an event study to estimate "the amount of artificial inflation in the market price at issue and calculate[] how much of that inflation is due to the alleged fraud, as opposed to other factors."  Reply at 20; Tabak Report ¶¶ 58–60.  Consistent with the consensus of the parties in this matter, the Court finds that Plaintiffs' expert has proposed a plausible methodology.

While Defendants do not challenge the plausibility of the model, they do argue that Plaintiffs' damages model fails under *Comcast* because it cannot measure the harm resulting from Plaintiffs' multiple theories of liability.  *See Comcast*, 569 U.S. 27.  Defendants point to the fact that Plaintiffs posit different categories of misrepresentations—*i.e.*, that Qualcomm's businesses were (1) fair and non-discriminatory, (2) procompetitive, and (3) not bundled.  *See* Opp. at 31–33.  Defendants hypothesize that if a jury were to find Defendants liable for some of these statements but not all, Plaintiffs' damages model would be unable to determine "what portion of the stock price decline on a given corrective disclosure date was caused" by which alleged misrepresentation.  *See id.* at 32.

The Court finds that Plaintiffs' proposed damages methodology is sufficient under *Comcast* because the methodology can isolate different categories of misrepresentations and measure the damages stemming from each.  The Court in *Comcast* found that a damages model failed because the completed "model assumed the validity of all four theories of antitrust impact" even though only one theory remained in the case.  *See Comcast*, 569 U.S at 36.  The model thus calculated damages that were not caused by the defendant's illegal conduct.  *See id.* at 36–37.  No such issue exists here because Dr. Tabak proposes a model that can isolate and separately measure the impact of each category of misrepresentation.  *See* Tabak Report ¶¶ 59–63; *see also* Pltfs. Ex. 6 ("Tabak Reply Report") ¶ 63.  He explains that his model accounts for the following factors that may have impacted Qualcomm's stock price and removes them from his damages calculation using "standard [disaggregation] techniques": (1) inflation declines for reasons other than the

17cv121-JO-WVG

corrective disclosures, (2) changes in the market and industry effects, and (3) information in the corrective disclosures that is unrelated to the alleged misrepresentations.  Tabak Report ¶¶ 59–63.  Dr. Tabak also opines that he can use standard techniques to disaggregate the impact of different categories of information, and ultimately, "determine the relative importance of different aspects of [the] alleged corrective disclosure[s]."  *See id.* ¶ 62 n.50; Tabak Reply Report ¶ 63.  Accordingly, contrary to Defendants' assertions, the damages model proposes to parse out the effects that different categories of alleged misrepresentations had on Qualcomm's stock price.  Because Dr. Tabak proposes a damages model that will be designed to measure the damages caused solely by Defendants' alleged misrepresentations and to disaggregate the damages caused by each type of misrepresentation, Plaintiffs' damages model satisfies *Comcast* at this stage.[20]  Plaintiffs' have proposed a plausible method of determining class-wide damages in a manner consistent with *Comcast*.

For the reasons set forth above, the Court concludes that common questions predominate over individual ones with respect to Defendants' bundling misrepresentations, but not with respect to Defendants' licensing misrepresentations.  Because Defendants' have successfully rebutted the presumption that all class members relied on Defendants' licensing misrepresentations, the factfinder would need to make individualized determinations of reliance for each class member in a class of thousands.  These individualized inquiries would undoubtedly overwhelm any common questions.  Accordingly, as stated above, the Court will not certify a class based on this category of

---

[20] The Court notes that the concerns in *Comcast* were, in part, due to the procedural posture of the case—where the damages model was completed based on four theories of liability and the district court dismissed three of those theories afterwards.  569 U.S. at 35–39.  Here, Dr. Tabak has yet to implement his proposed model and so can perform his disaggregation techniques as necessary pursuant to this opinion certifying only Plaintiffs' bundling allegations.  Should Defendants believe, after Dr. Tabak has completed his currently proposed model, that the completed damages model is insufficiently linked to Plaintiffs' theory of liability under *Comcast*, Defendants can and should raise that in an appropriate motion before the Court.  At present, however, Dr. Tabak's proposed model satisfies *Comcast*.

misrepresentations.  Conversely, because Defendants have not rebutted the presumption that all class members relied on Defendants' bundling misrepresentations, the issue of reliance can be resolved in one stroke for all class members using common evidence. Deceptiveness, materiality, and damages are also capable of class-wide resolution because Plaintiffs point to one body of evidence common to all class members such that these elements can be resolved in one stroke.  *See supra* Section III.A.2.  Therefore, the Court concludes that common questions predominate over individual ones with respect to Defendants' alleged bundling misrepresentations such that predominance is satisfied.

### 6. Superiority

Having determined that questions of law or fact common to the class predominate with respect to Plaintiffs' "bundling" allegations, the Court also finds that a class action is the superior method of resolving this controversy.  Under Rule 23(b)(3), a class action may be superior if "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  In evaluating superiority, courts examine (a) the class members' interests in individually controlling separate actions, (b) the extent and nature of any preexisting related litigation, (c) the desirability of concentrating the litigation of the claims in the forum; and (d) manageability.  Fed. R. Civ. P. 23(b)(3).  "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser*, 253 F.3d at 1190.

Here, the putative class includes thousands of investors who purchased Qualcomm's stock between February 1, 2012, and January 20, 2017.  The claim for all investors is the same; that each purchased Qualcomm stock at artificially inflated prices which were caused by Defendants' same alleged misrepresentations.  Because the elements of the class's claims—whether Defendants' statements were false and material, whether the class relied on an efficient market, and whether the class suffered damages—are class-wide questions susceptible to common proof, the Court concludes that trying the claims as a class will be

more efficient and cost-effective than trying the claims on an individual basis. Accordingly, the Court finds that a class action is the superior method of resolving the controversy regarding the alleged bundling practices.

## IV. CONCLUSION AND ORDER

For the reasons set out above, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion for class certification [Dkt. 217]. Plaintiffs' motion is DENIED to the extent Plaintiffs seek to certify their claims regarding Defendants' alleged licensing misrepresentations. With respect to Plaintiffs' remaining claims regarding Defendants' alleged bundling misrepresentations, the Court CERTIFIES a class of investors defined as follows:

> All persons or entities who purchased or otherwise acquired the common stock of Qualcomm between February 1, 2012 and January 20, 2017, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Qualcomm at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

The Court appoints Lead Plaintiffs as class representatives and Bernstein Litowitz Berger & Grossmann LLP and Motley Rice LLC as class counsel.

**IT IS SO ORDERED**.

Dated:  March 20, 2023

Hon. Jinsook Ohta
United States District Judge

17cv121-JO-WVG