No. -

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

## SHAH ET AL. v. QUALCOMM INCORPORATED

———————————

Petition for Review of Order Granting Certification of Class from the United
States District Court Southern District of California
Case No. 3:17-cv-00121-JO-MSB, The Honorable Jinsook Ohta, Presiding

———————————

## PETITION FOR PERMISSION TO APPEAL
## PURSUANT TO RULE 23(F) FROM AN ORDER
## GRANTING CLASS CERTIFICATION

———————————

ROBERT A. VAN NEST
EUGENE M. PAIGE
LAURIE CARR MIMS
CODY S. HARRIS
KEKER, VAN NEST & PETERS LLP          Additional counsel listed on
633 Battery Street                                 signature page
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile:  415 397 7188

*Attorneys for Petitioners-Defendants*
*Qualcomm Incorporated, Derek K. Aberle, Steven R. Altman,*
*Donald J. Rosenberg, William F. Davidson, Jr., Paul E. Jacobs and*
*Steven M. Mollenkopf*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................... iv

I.      QUESTION PRESENTED ............................................................1

II.     INTRODUCTION ....................................................................1

III.    STATEMENT OF FACTS..........................................................7

        A.      The Alleged Misrepresentations.......................................8

        B.      The Alleged "Corrective Disclosures".............................10

        C.      The Class Certification Motion.......................................12

        D.      The Class Certification Order .........................................15

IV.     REASONS FOR GANTING THE PETITION ..........................16

        A.      Plaintiffs' claim rests on the materialization-of-
                the-risk theory. ................................................................17

        B.      If the materialization-of-the-risk theory is viable
                in this Circuit, then *Comcast* demands that
                Plaintiffs present a classwide damages model
                that accounts only for unknown risks. ...........................19

        C.      In an effort to sidestep their obligation to align
                their damages model with their liability theory,
                Plaintiffs implausibly assume that the risks
                would "inevitably" materialize. ......................................25

V.      RELIEF SOUGHT ..................................................................29

CERTIFICATE OF COMPLIANCE..........................................32

ADDENDUM.................................................................................33

CERTIFICATE OF SERVICE....................................................41

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AAC Holdings, Inc.,*
2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) ............................. 24, 29

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ........................................................... 13

*In re BP p.l.c. Sec. Litig.,*
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ................................. 23, 24

*In re BP p.l.c. Sec. Litig.,*
2014 WL 2112823 (S.D. Tex. May 20, 2014) ......................... 22, 24, 26

*Chamberlan v. Ford Motor Co.,*
402 F.3d 952 (9th Cir. 2005) ................................................ 6, 7, 16, 18

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013) ..................................................... *passim*

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005) ........................................................... 29

*Eng v. Edison Int'l,*
2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) ...................................... 5

*Federal Trade Commission v. Qualcomm Inc.,*
969 F.3d 974 (9th Cir. 2020) ..................................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.,*
573 U.S. 258 (2014) .................................................. 13, 15

*Ludlow v. BP, P.L.C.,*
800 F.3d 674 (5th Cir. 2015) ................................................ 24

*Microsoft Corp. v. Baker,*
582 U.S. 23 (2017) ............................................................. 16

*Nuveen Mun. High Income Opportunity Fund v. City of*
    *Alameda,*
    730 F.3d 1111 (9th Cir. 2013) ..................................................... 4, 5, 19

*In re: Qualcomm Litig.,*
    No. 3:17-cv-00108 (S.D. Cal. Apr. 24, 2019) ....................................... 12

*Stromberg v. Qualcomm Inc.,*
    14 F.4th 1059 (9th Cir. 2021) ......................................................... 2, 12

*Van v. LLR, Inc.,*
    61 F.4th 1053 (9th Cir. 2023) ............................................................ 17

*In re Vivendi Universal, S.A. Sec. Litig.,*
    634 F. Supp. 2d 352 (S.D.N.Y. 2009) .......................................... 19, 20

## Federal Statutes

Securities Exchange Act § 10(b) ................................................................ 1

## Rules

Fed. R. Civ. P. 23 ............................................................................ *passim*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner-Defendant Qualcomm Incorporated states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated:  April 3, 2023                      KEKER, VAN NEST & PETERS LLP


                                           *s/Robert A. Van Nest*
                                           ROBERT A. VAN NEST
                                           633 Battery Street
                                           San Francisco, CA 94111
                                           Tel: (415-391-5400
                                           Fax: (415) 397-7188
                                           rvannest@keker.com

iv

# I.   QUESTION PRESENTED[1]

In this securities fraud action, did the district court erroneously certify a Rule 23(b)(3) class where Plaintiffs pursued a "materialization-of-the-risk" theory of liability (an approach this Court has thus far declined to endorse) while failing to provide a methodology capable of calculating classwide damages that is consistent with that theory, as is required under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)?

# II.   INTRODUCTION

This Court is well acquainted with the facts underlying this securities fraud case against Qualcomm, having twice reversed district court decisions that had allowed antitrust lawsuits predicated on them to proceed against the company. Although this case is styled as a securities fraud lawsuit under Section 10(b) of the Securities Exchange Act, it is really a follow-on of the FTC's antitrust case against

---

[1] Throughout this Petition, "Order" refers to the district court's March 20, 2023 Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification (ECF 279), attached hereto as Exhibit 1; "Qualcomm" refers to all defendants collectively; and unless otherwise indicated, emphases were added to quotations while internal quotation marks, citations, and the like were omitted from them.

Qualcomm: Plaintiffs' claim concerns alleged misrepresentations about essentially the same business practices that this Court found lawful in *Federal Trade Commission v. Qualcomm Inc.* ("*FTC*"), 969 F.3d 974 (9th Cir. 2020), and about which this Court previously vacated class certification in *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059 (9th Cir. 2021).[2]

In *FTC*, the Court rejected the FTC's attack on Qualcomm's business practices, describing them as "*hyper*competitive," and noting that Qualcomm "has asserted its economic muscle with vigor, imagination, devotion, and ingenuity," while "act[ing] with sharp elbows—as businesses often do." *FTC*, 969 F.3d at 982, 1005 (emphasis in original). Ignoring the fact that Qualcomm's hypercompetitive conduct likely ***increased*** shareholder value—and that this Court found the conduct lawful—Plaintiffs nonetheless attempt to transform general statements concerning Qualcomm's lawful business practices into a fraud perpetrated by Qualcomm's executives to shareholders' detriment.

---

[2] The Court ultimately vacated the class certification order in *Stromberg* and remanded the case for a wholesale reevaluation of the action's viability. *See Stromberg*, 14 F.4th at 1074–75.

2

In essence, this is a case about alleged failures to disclose practices that turned out to be perfectly legal.

Plaintiffs allege that Qualcomm and its executives made misstatements about Qualcomm's business model that concealed certain regulatory and litigation risks. Specifically, Plaintiffs point to two categories of alleged misstatements: alleged misstatements relating to (1) device-level licensing, and (2) interactions between Qualcomm's licensing and chip businesses—what Plaintiffs refer to as "bundling." Order at 3. With respect to the first category, Plaintiffs claim that Qualcomm hid from investors the fact that it licenses its standard-essential patents ("SEPs")[3] at the device level, while "refusing to license chipset competitors." *Id.* at 8. In its Order certifying Plaintiffs' proposed class in part, the district court precluded class treatment of those allegations, holding that the market understood that Qualcomm

---

[3] "Cellular SEPs are patents on technologies that international standard-setting organizations ('SSOs') choose to include in technical standards practiced by each new generation of cellular technology. . . . Cellular SEPs are necessary to practice a particular cellular standard." *FTC*, 969 F.3d at 982–83.

declined to issue exhaustive licenses to its SEPs at the chip level. *Id.* at 35.

That leaves Plaintiffs with their so-called "bundling" allegations. Their misguided theory is that Qualcomm secretly courted increased antitrust risk and regulatory scrutiny by failing to disclose that there were interactions between its chip and licensing businesses, such that when the regulatory scrutiny and litigation materialized, the market was surprised and the stock price suffered. But it is indisputable that Qualcomm routinely disclosed regulatory and litigation risks to investors—including the threat of future regulatory actions and lawsuits. Thus, any decline in Qualcomm's stock price following the institution of regulatory and litigation events must have been caused, at least in part, by the materialization of a ***known*** risk.

This case thus presents a "materialization-of-the-risk" theory of liability. That "approach, adopted by some circuits," allows a plaintiff to proceed with a securities fraud action if the plaintiff "shows that misstatements and omissions concealed" a risk that later "materialized" and caused a stock price to decline. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013). Notably, this Court "has not adopted the materialization of the

4

risk approach[.]" *Id.* at 1122 n.5; *Eng v. Edison Int'l*, 2018 WL 1367419, at *3 (S.D. Cal. Mar. 16, 2018) ("The materialization of the risk approach has not been adopted by the Ninth Circuit, although it has been applied by some district courts in the Ninth Circuit."). With the theory's applicability unsettled in this Circuit, this Court has not yet evaluated how to apply *Comcast*'s requirements to a claim based on materialization of the risk.

Qualcomm argued to the district court that, even if the materialization-of-the-risk approach is viable in this Circuit, then to satisfy *Comcast*, Plaintiffs must limit their claim to price declines caused by actionable materialization of an unknown or understated risk and cannot rely on a damages model that would include losses from the materialization of an inactionable known risk. This requirement flows directly from *Comcast*, which holds that where class-action plaintiffs try to meet Rule 23(b)(3)'s "predominance" requirement by arguing that they will use a classwide damages model, "any model supporting a plaintiff's damages case must be consistent with its liability case," and that "[i]f the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." 569 U.S. at 34–35. Plaintiffs

were therefore required to present to the district court a methodology
for calculating classwide damages that distinguishes between any
(inactionable) decline caused by the materialization of ***known*** risks and
any (actionable) decline caused by the materialization of an ***unknown***
or understated risk.

Plaintiffs offer no such methodology. What's more, their attempt
to evade their obligation to offer a damages model that disentangles
known from unknown risks depends upon the wildly unreasonable
assumption that Qualcomm's practices "would ***inevitably*** lead to the
regulatory and customer scrutiny" that led to the stock price declines on
the "corrective disclosure" dates in question. Dr. David I. Tabak Expert
Report ("Tabak Report") ¶ 64, ECF 217-2.

The district court's class certification Order makes no reference
whatsoever to materialization of the risk. By ignoring materialization of
the risk altogether, the district court certified a class based on a
damages model that is inconsistent with Plaintiffs' liability theory,
contravening *Comcast*'s holding. That was manifest error, warranting
Rule 23(f) review. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959
(9th Cir. 2005).

## III.   STATEMENT OF FACTS

As a global leader in both the patent licensing and chip-supply businesses, Qualcomm operates in an industry beset with regulatory and commercial risks. That being so, Qualcomm's SEC filings repeatedly warned shareholders that regulators could attack Qualcomm's business model as anticompetitive, or that major customers could sue Qualcomm over its business practices. ECF 245-19; ECF 245-21. For example, Qualcomm warned investors that various market participants' efforts to undermine Qualcomm's business model "may result in legal decisions and/or actions by governments, courts, regulators or agencies, Standards Development Organizations (SDOs) or other industry organizations that harm our business." ECF 245-21 at A688. Qualcomm further warned investors that companies sometimes "initiate various strategies in an attempt to" reduce or eliminate their royalty payments to Qualcomm, including by commencing "litigation, often alleging . . . some form of unfair competition, . . . appeal[ing] to governmental authorities, [and] . . . lobbying governmental regulators and elected officials" to take action against Qualcomm. *Id.* And Qualcomm timely disclosed *actual* challenges to its business model that it faced even before the events at issue in this case. *See, e.g.*, ECF 245-

7

20 at A680 (disclosing that the FTC was investigating the company for alleged antitrust violations before the FTC filed suit).

Those risks—which Qualcomm had disclosed—materialized between 2015 and 2017, when various regulatory bodies and one customer (Apple) alleged that Qualcomm was behaving anticompetitively. Plaintiffs first filed this putative securities class action in January 2017, six days after the FTC filed its complaint against Qualcomm in *FTC v. Qualcomm* and three days after Apple filed its own lawsuit against Qualcomm. Plaintiffs alleged that Qualcomm had been secretly violating antitrust laws, such that the "truth" came out when regulators and Apple made their allegations, causing Qualcomm's stock price to fall.

A.   **The Alleged Misrepresentations**

As summarized by the district court, Plaintiffs allege that Qualcomm "misled the market through two categories of deceptive statements." Order at 3. The first category (the device-level-licensing theory) concerns Qualcomm's statements that it "broadly license[s]" its technology. *Id.* Plaintiffs argue that such statements were misleading because Qualcomm licenses its patents only at the end-device level (e.g., a cellphone), and "refused to" license chipmakers. *Id.*

8

The second category (the bundling theory) concerns statements indicating that Qualcomm "kept its licensing and chip-supply businesses separate when, in fact, Qualcomm regularly bundled the two in negotiations and agreements." *Id.*

The alleged misstatements about "bundling" did nothing more than tell investors what Qualcomm had disclosed routinely in its SEC filings: that Qualcomm has two separate and distinct businesses (a chip business and licensing business) that are part of the same overall company. ECF 245-21. As this Court put it, "Qualcomm's patent licensing business is very profitable, representing around two-thirds of the company's value. But Qualcomm is no one-trick pony. The company also manufactures and sells cellular modem chips, the hardware that enables cellular devices to . . . communicate with each other across cellular networks." *FTC*, 969 F.3d at 983.

Making those same points, in 2012, Defendant Derek Aberle said: "And within the company, we ***tend*** to keep the licensing and the chip business very separate. Obviously, our view is that companies need a license if they are doing 3G or 4G devices, sort of irrespective of whose chip they use. And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and we don't bundle those together."

9

ECF 32 ¶76. Defendant Steve Mollenkopf similarly said: "Well they are really separate businesses. I mean we have been very clear that we keep those two things separate—separate propositions to the customer. So, really two different things." *Id.* ¶77.

Plaintiffs characterize the above statements as lies. And they claim that the truth about Qualcomm's business practices was revealed in four "corrective disclosures," all of which are announcements of regulatory investigations or civil lawsuits in which Qualcomm's allegedly concealed antitrust risk materialized.

## B.    The Alleged "Corrective Disclosures"

The first alleged corrective disclosure occurred in November 2015, when Qualcomm announced that the Korean Fair Trade Commission ("KFTC") was alleging "among other things that [Qualcomm did] not properly negotiate aspects of [its] licenses, and that [its] practice of licensing [its] patents only at the device level" violated Korean law. Order at 6. The second alleged corrective disclosure occurred in December 2015, when the European Commission ("EC") announced that it was investigating whether Qualcomm had "illegally paid a major customer for exclusively using Qualcomm chipsets[.]" Order at 6. The third alleged corrective disclosure occurred in January 2017, when the

10

FTC filed its doomed antitrust action, alleging that Qualcomm refused to license its SEPs at the chip level, that it withheld its chips unless a customer licensed its SEPs, and that it entered into exclusive dealing arrangements with Apple by allegedly conditioning royalty relief on exclusive use of Qualcomm's baseband processors. Order at 7. And the final alleged corrective disclosure occurred three days later when Apple sued Qualcomm, alleging antitrust violations that mirrored those in the FTC complaint. Order at 7–8.

Even at the time, these antitrust actions stood on shaky legal footing. For example, the FTC commissioners split 2-1 when deciding whether to initiate its action against Qualcomm, with one commissioner issuing a "rare" public dissent that called the FTC's complaint a "flawed legal theory" lacking "economic and evidentiary support." Dissenting Statement of Comm'r Maureen K. Ohlhausen, *In re Qualcomm, Inc.*, Jan. 17, 2017. That warning did not deter Plaintiffs from filing this securities fraud action a week later.

Far from secretly believing that it was behaving anticompetitively, Qualcomm has steadfastly maintained that its conduct is lawful. ECF 245-20. And Qualcomm has repeatedly been proven right—the company has been vindicated in various forums around the globe.

11

For example, in 2020, this Court unanimously reversed a district court order that had concluded that Qualcomm's licensing and chip sale practices (including practices Plaintiffs characterize as bundling) violated the FTC Act. *See FTC*, 969 F.3d at 1005. In 2021, a separate panel of this court vacated a class certification order that had certified a class of indirect purchasers of cellphones pursuing the same flawed antitrust theories. *See Stromberg*, 14 F.4th at 1075. And in 2022, the European Union General Court similarly reversed the EC's finding that Qualcomm's chip-supply agreements with Apple, which included various incentives and rebates (again, including conduct Plaintiffs characterize as bundling), were anticompetitive. ECF 245-42.[4] Unfortunately for Plaintiffs, their theory that Qualcomm had been hiding unlawful practices from the market didn't bear out.

## C.   The Class Certification Motion

Even as Qualcomm successfully defended its business model in the United States and abroad, Plaintiffs' securities fraud lawsuit

---

[4] Apple and Qualcomm settled their dispute with no finding of liability. *See In re: Qualcomm Litig.*, No. 3:17-cv-00108, ECF 1187 (S.D. Cal. Apr. 24, 2019).

lumbered on, an orphaned case whose underpinnings had since rotted
away. On May 23, 2022, Plaintiffs moved to certify a class of investors
who purchased Qualcomm stock between February 1, 2012 and
January 20, 2017, asserting that they had been misled by both
categories of alleged misrepresentations. To establish the necessary
element of reliance, Plaintiffs invoked the class-wide "presumption of
reliance" that arises under the "fraud on the market theory." *Basic Inc.
v. Levinson*, 485 U.S. 224, 241–42 (1988).[5]

Qualcomm made two arguments in opposition. First, Qualcomm
argued that it had rebutted the fraud-on-the-market presumption of
reliance by showing that the alleged misrepresentations did not
actually impact the stock price. *See Halliburton Co. v. Erica P. John
Fund, Inc.,* 573 U.S. 258, 268 (2014). Specifically, Qualcomm pointed to
public statements and events that revealed the allegedly concealed
information before the so-called "corrective disclosures" took place.

Second, Qualcomm argued that Plaintiffs had failed to

---

[5] The fraud-on-the-market theory dictates that "the price of a security
traded in an efficient market will reflect all publicly available
information, including any public, material misrepresentations." Order
at 20.

demonstrate that their damages are measurable on a classwide basis using a common methodology that is consistent with their theory of liability, as is required under *Comcast*. Although Qualcomm identified two distinct *Comcast* problems, only one is at issue here: Plaintiffs failed to present any damages model capable of calculating damages consistent with their materialization-of-the-risk theory.[6] In other words, Plaintiffs made no effort to disentangle or isolate the stock price decline caused by the mere filing of regulatory actions or customer lawsuits against Qualcomm—i.e., the materialization of the known risk of such actions—from the disclosure of the allegedly concealed information about Qualcomm's business practices that appeared as allegations in those actions.

Plaintiffs' sole effort to deal with this problem was to have Dr. Tabak assume that the KFTC investigation, the EC investigation, the FTC action, and the Apple lawsuit were the "*inevitabl[e]*" result of

---

[6] Plaintiffs' expert also failed sufficiently to explain how he could disentangle damages caused by one set of alleged misrepresentations from the other—i.e., he proposed no method for attributing a portion of each stock decline to a particular misrepresentation or category of misrepresentations.

Qualcomm's business practices. Tabak Report ¶ 64. In other words, according to Plaintiffs, the risk of these actions materializing was 100%. *Id.* As Qualcomm explained to the district court, that assumption is wildly implausible in the abstract and impossible to credit in light of the factual record in this case. ECF 244 at 33–37.

### D.   The Class Certification Order

The district court granted in part and denied in part Plaintiffs' class certification motion. Order at 35. With respect to the device-level-licensing theory, the district court concluded that Qualcomm had rebutted the fraud-on-the-market presumption of reliance by showing that "[t]he alleged corrective disclosures only repeated already public information" about Qualcomm's licensing practices, thus negating any price impact caused by the alleged misstatements. Order at 27.

With respect to the bundling theory, however, the court found that Qualcomm had failed to show a lack of price impact, finding that the alleged corrective disclosures had revealed "far more detail" about Qualcomm's "bunding" practices than the information previously available to the market. Order at 28–30.

The court also rejected ***one of*** Qualcomm's *Comcast* arguments, namely that Plaintiffs had failed to present a method for determining

classwide damages that could disentangle the dismissed device-level-licensing liability theory from the bundling liability theory left in the case. Order at 31–34.

But the district court failed even to acknowledge, let alone address, Qualcomm's second *Comcast* argument—that Plaintiffs' proposed damages model does not align with Plaintiffs' materialization of the risk theory of liability.

## IV.   REASONS FOR GANTING THE PETITION

Rule 23(f) grants the courts of appeals "unfettered" discretion to grant or deny permission to appeal from a Rule 23 class-certification ruling "on the basis of *any* consideration." *Microsoft Corp. v. Baker*, 582 U.S. 23, 32–33 (2017) (emphasis in original). Rule 23(f) review is "most appropriate" when the certification decision is either (1) "manifestly erroneous" or (2) "presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review[.]" *Chamberlan*, 402 F.3d at 959.[7]

_____

[7] If review is granted, this Court will review the district court's class-certification decision for abuse of discretion but will apply de novo

16

Both factors are present here. By failing to address whether and how Plaintiffs could calculate classwide damages under their materialization-of-the-risk theory, the district court committed manifest error, and that error concerns an unsettled and fundamental issue of law relating to class actions—one that other courts have already decided in a manner contrary to the district court's ruling.

### A.   Plaintiffs' claim rests on the materialization-of-the-risk theory.

Plaintiffs' claim is unquestionably based on a materialization-of-the-risk theory. Plaintiffs allege that Qualcomm concealed two business practices that eventually caused "[a]nti-competition regulators across three continents [to charge or find] Qualcomm liable for violating competition laws," and caused Apple to sue as well. ECF 32 at ¶ 2. Under Plaintiffs' theory, when regulators brought these challenges, the risks that Qualcomm had allegedly concealed materialized. And it is

---

review to the district court's determination of any "underlying determinations of law." *Van v. LLR, Inc.*, 61 F.4th 1053, 1062 (9th Cir. 2023). Whether a class-action damages model is capable of satisfying Rule 23(b)(3)'s predominance requirement is a legal question. *See Comcast*, 569 U.S. at 36 n.5.

only these regulatory and litigation events that are alleged to have harmed Qualcomm's investors by causing declines in the stock price.

Plaintiffs have long acknowledged that materialization of the risk forms the basis of their claims. In opposing Qualcomm's motion for judgment on the pleadings, Plaintiffs argued that "[h]ad investors known that Qualcomm was engaged in anti-competitive licensing practices . . . ***investors would have understood the foreseeable risks that materialized across the globe***." ECF 166 at 24.[8] When these antitrust risks "eventually materialized," Plaintiffs argued that this "caused the value of Qualcomm's shares to plummet by billions of dollars." *Id.* At the hearing on Qualcomm's motion for judgment on the pleadings, Plaintiffs agreed with the district court that the only "independent significance" of the allegedly concealed business practices to the market was whether Qualcomm was on "dicier" ground from an antitrust perspective than the market understood based on Qualcomm's

---

[8] Qualcomm includes citations to Plaintiffs' briefing in the district court solely to demonstrate their reliance on the materialization-of-the-risk theory of liability. Plaintiffs have at times suggested that it is an "alternative" theory of liability, ECF 166 at 24, but in truth, it is their only theory.

statements. ECF 193 at 33–35. In other words, Plaintiffs' theory is that Qualcomm's allegedly misleading statements about "bundling" led investors to underestimate the antitrust risk facing the company—a risk that allegedly materialized with the regulatory and litigation events that later occurred.

**B.   If the materialization-of-the-risk theory is viable in this Circuit, then *Comcast* demands that Plaintiffs present a classwide damages model that accounts only for unknown risks.**

This Court has not decided whether plaintiffs can proceed on *any* theory predicated on a "materialization of risk." *Nuveen,* 730 F.3d at 1122 n.5. But courts that have recognized the materialization-of-the-risk theory have held that the materialization of a *known* risk is not actionable. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009). That is so because securities fraud plaintiffs are entitled to recover only losses caused by the fraud; they must therefore "disaggregate the declines" that resulted "from other, non-fraud-related events." *Id.*

Accordingly, if the materialization-of-the-risk theory is viable in this Circuit, then to satisfy *Comcast*, Plaintiffs must present a methodology for calculating classwide damages that can measure the

19

difference between the amount of risk that the market *believed*

Qualcomm faced and the amount of risk that the market would have

understood Qualcomm to *actually* face, had it known the allegedly

undisclosed facts.

The following hypothetical example illustrates the issue: suppose

investors believe that Company A has a 20% risk of having to pay a $1

million fine. ECF 250 ¶188. In an efficient stock market, prior to the

fine having been levied, Company A's stock price would reflect the

expected value of the possible loss, namely $200,000 (20% of $1 million).

*Id.* If Company A is later fined $1 million, then after the fine is

announced, the stock price would adjust to reflect the value of the

actual $1 million loss, meaning it would incorporate the remaining

$800,000 in loss, causing Company A's stock price to fall accordingly. *Id.*

If, however, Company A disclosed only ***half*** the regulatory risk it

was facing—*i.e.*, a 10% risk of a $1 million fine—then Company A's

stock price would incorporate the expected value of a possible loss of

only $100,000 (10% of $1 million). *Id.* This time, after Company A's fine

is announced, the stock price would incorporate a loss of value of

$900,000 rather than $800,000. *Id.* The actionable amount of damages

would be limited to the difference between $900,000—the loss that

occurred based on the materialization of both concealed and known risks—and $800,000—the loss that would have occurred if Company A had fully disclosed the risks it faced. The concealment caused Company A's value to be inflated by $100,000, an amount reflecting that difference and no more.

Here, it cannot be disputed that Qualcomm disclosed, and that Qualcomm's investors understood, that Qualcomm faced regulatory and litigation risks related to its business model. Qualcomm included explicit and detailed warnings about potential and extant regulatory investigations, actions, and litigations in its annual reports and other communications to shareholders. *See, e.g.*, ECF 245-19 at A672; ECF 245-20 at A680; ECF 245-21 at A688. And even Plaintiffs would have to concede that Qualcomm disclosed at least *some* of the business practices that underlie those regulatory and litigation risks. Indeed, Plaintiffs conceded before the class certification hearing that "the market understood that Qualcomm based its royalties on device-level pricing," and that the market further understood "that Qualcomm had a policy of only selling its chips to licensees"—two practices that formed the core of three of the four regulatory actions and lawsuits alleged to constitute "corrective disclosures." Order at 12, 24 n.18. Thus, any decline in

Qualcomm's stock price following the institution of regulatory and litigation events must have been caused, at least in part, by the materialization of a *known* risk.

Plaintiffs fail to explain how their damages model would account for this problem on a classwide basis. Although this presents an issue of first impression for this Court, other courts have rejected event studies like the one that Plaintiffs propose here, because such studies fail to show how the damages model will account for materialization of known risks that cannot be attributed to any alleged misrepresentations.

The securities fraud litigation concerning the Deepwater Horizon oil spill is instructive. There, a sub-class of investors who purchased BP stock before the oil spill sought class certification, alleging that they were harmed when the stock price fell immediately after the disaster. *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *2 (S.D. Tex. May 20, 2014). Similar to Plaintiffs' allegations here, the pre-spill plaintiffs argued that BP's statements about safety improvements "lulled the market into believing that BP was a safer company than it actually was." *Id.* The risk of an oil spill materialized when the Deepwater Horizon rig exploded. *Id.*

22

In 2013, the district court denied class certification, agreeing with BP that the plaintiffs' "damages methodology is inconsistent with Plaintiff's theories of liability," because, among other things, it improperly granted investors "the full value of the stock price drop from the materialization" of a "known risk." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *16–17 (S.D. Tex. Dec. 6, 2013). As here, the plaintiffs "claim[ed] that their event study—which . . . ha[d] not yet been created"—would allow the jury to perform the necessary disaggregation, separating unrecoverable losses from those caused by the alleged fraud. *Id.* at *17. The court demanded more. "Prior to *Comcast*," the district court held, "the Court may have been satisfied that Plaintiffs' invocation of the event study methodology alone showed the predominance of common issues." *Id.* But under *Comcast*, plaintiffs needed to provide "a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the various theories of liability[.]" *Id.*[9]  In a unanimous opinion, the Fifth

---

[9] The plaintiffs tried again in 2014, but again the court denied class certification, finding that the plaintiffs' proposed damages model could not "quantify the injury caused by Defendants' alleged wrongful

Circuit affirmed, concluding that the plaintiffs had failed to "provide an adequate measure of class-wide damages under *Comcast*." *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690 (5th Cir. 2015).

Other recent cases have similarly rejected damages models that fail to satisfy *Comcast*'s holding. For example, in *Indiana Public Retirement System v. AAC Holdings, Inc.*, the plaintiff alleged that the defendants made "misleading statements related to [its] marketing practices that were revealed to investors as the industry and Congress began to investigate and cast light upon such deceptive practices." 2023 WL 2592134, at *1 (M.D. Tenn. Feb. 24, 2023). As is true here—the plaintiff's expert report "omit[ted] any consideration of how to factor in the risk on which Plaintiff bases its materialization-of-the-risk theory." *Id.* at *24. Accordingly, the court denied class certification, concluding that the plaintiffs had failed to present a damages model that satisfied *Comcast*. The same is true here.

By ignoring the materialization-of-the-risk issue entirely, the district court in this case parted ways with these well-reasoned cases

_____

conduct." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *2 (S.D. Tex. May 20, 2014).

and certified a class based on a fatally flawed damages model that fails to isolate losses caused by the alleged misrepresentations. That error warrants interlocutory review by this Court.

> **C.  In an effort to sidestep their obligation to align their damages model with their liability theory, Plaintiffs implausibly assume that the risks would "inevitably" materialize.**

Rather than providing a damages model that disaggregates known from unknown risk, Plaintiffs assumed the problem away. They directed their expert to declare that his model need not engage in such disaggregation because "Plaintiffs will attempt to show that Qualcomm's allegedly misrepresented licensing and bundling practices would ***inevitably*** lead to the regulatory and customer scrutiny from those practices that caused Plaintiffs' losses on the Event Dates." Tabak Report ¶ 64. It's a neat trick: when it is *inevitable* that a risk will come to pass, then the entire drop in stock price that accompanies the materialization of that risk may be attributable to the concealed information.[10]

---

[10] To return to the hypothetical presented above, consider a situation where Company A has provided information suggesting that its risk of a $1,000,000 fine is 10% even though the fine is actually inevitable. In these circumstances, Company A has understated its risk by the entire

In making this assumption, Plaintiffs seize on the *BP* district court's statement that "when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (i.e., on the date that the risk materialized)" would "equate to inflation on the date of purchase" only if "the probability of the risk materializing was 100 percent." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10. In *BP*, "not even Plaintiffs argue[d] that the risk of a[n] . . . oil spill was 100 percent." *Id.*

Plaintiffs in this case are bolder. They argue that "the licensing and bundling practices would ***inevitably*** lead to the" regulatory actions and litigation that materialized. Tabak Report ¶ 64.[11] Based on that implausible assumption, Plaintiffs seek damages based on the entire

---

$900,000 of value that will be lost upon the inevitable imposition of the fine—and that full amount is attributable to the understated risk.

[11] Dr. Tabak states that the "licensing ***and*** bundling practices"— together—"would inevitably lead to the regulatory and customer scrutiny" that form the basis of Plaintiffs' claims. Tabak Report ¶ 64. But Plaintiffs have nowhere suggested that the "bundling practices," standing alone, made regulatory action or lawsuits inevitable. And any such contention would make little sense: the regulatory actions and lawsuits at issue focused far more intently on Qualcomm's device-level licensing practices than on any so-called "bundling practices." *See generally FTC*, 969 F.3d 974.

loss of value on the alleged corrective disclosure days. But that assertion of inevitability is patently frivolous, and Plaintiffs' reliance on such "arbitrary" and "speculative" assumptions defies the "rigorous analysis" that *Comcast* demands *before* a class can be certified. *See* 569 U.S. at 35–36 (faulting the Court of Appeals for failing to decide whether the proposed "methodology [was] a just and reasonable inference or speculative").

Apart from death and taxes, few things in life can be said to be truly *inevitable*. And few things are as unpredictable as regulatory enforcement actions and civil litigation. Regulators face resource constraints, political considerations, and different ideological or jurisprudential leanings that may tilt them toward or away from taking action against a particular company. Similarly, a customer or competitor may decide to seek or refrain from seeking legal remedies for any number of business, economic, political, or even personal reasons. Plaintiffs' assumption—that the alleged interactions between Qualcomm's chip and licensing businesses, even if true, caused *inevitable* regulatory action—is frankly absurd.

Consider one of the events at issue in this case, the FTC's January 2017 lawsuit against Qualcomm. Far from "inevitable," the FTC filed its

27

complaint only after a narrow 2-1 vote among the Commissioners, over a published dissent. Dissenting Statement of Comm'r Maureen K. Ohlhausen, *In re Qualcomm, Inc.*, Jan. 17, 2017. When the case reached this Court, the Department of Justice's Antitrust Division submitted an amicus brief urging the Court to side with Qualcomm. ECF 245-13 at A596; ECF 245-40 at A841–42. And, in reversing the district court's judgment for the FTC, this Court described the FTC's case as "an improper excursion beyond the outer limits of the Sherman Act" and held that Qualcomm had not violated the antitrust laws. *FTC*, 969 F.3d at 982. Indeed, no case **anywhere in the world** has ultimately found Qualcomm liable for an antitrust violation based on the alleged "bundling" that is the basis of Plaintiffs' only remaining claim. Clearly, there was nothing "inevitable" about the *FTC* case—or the other regulatory and litigation risks that Plaintiffs claim were concealed.

*   *   *

Plaintiffs' failure to even try to isolate losses stemming from the materialization of known risks from losses attributable to the allegedly unknown risk violates *Comcast*'s holding. The securities laws permit Plaintiffs to seek compensation only for damages resulting from misstatements; those laws do not "provide investors with broad

28

insurance" entitling Plaintiffs to coverage for every loss that results from bad news. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Accordingly, Plaintiffs must show that their classwide damages model is "consistent with [their] liability case" and that their damages are "attributable to that theory of liability." *Comcast*, 569 U.S. at 35. Because Plaintiffs have "failed to do so here with respect to [their] materialization-of-the-risk theory," the district court's Order certifying the class was manifestly erroneous. *AAC Holdings*, 2023 WL 2592134, at *25.

## V.   RELIEF SOUGHT

Plaintiffs' securities fraud claim presents a novel and unsettled issue of law, namely, how district courts should apply *Comcast* to a materialization-of-the-risk theory of liability. By failing to address that issue, the district court allowed a class case fundamentally predicated on antitrust theories this Court has twice rejected to proceed on the basis of a flawed damages theory. That error warrants Rule 23(f) review. The Court should grant this Petition and permit Qualcomm to appeal from the Order.

////

Dated:  April 3, 2023                    Respectfully submitted,

                                         KEKER, VAN NEST & PETERS LLP


                                         *s/Robert A. Van Nest*
                                         ROBERT A. VAN NEST
                                         EUGENE M. PAIGE
                                         LAURIE CARR MIMS
                                         CODY S. HARRIS
                                         KEKER, VAN NEST & PETERS LLP
                                         633 Battery Street
                                         San Francisco, CA 94111
                                         Tel: (415-391-5400
                                         Fax: (415) 397-7188
                                         rvannest@keker.com

                                         CRAVATH, SWAINE & MOORE LLP
                                         ANTONY L. RYAN (pro hac vice)
                                         (aryan@cravath.com)
                                         RACHEL G. SKAISTIS (pro hac vice)
                                         (rskaistis@cravath.com)
                                         YONATAN EVEN (pro hac vice)
                                         (yeven@cravath.com)
                                         JUSTIN C. CLARKE (pro hac vice)
                                         (jcclarke@cravath.com)
                                         M. BRENT BYARS (pro hac vice)
                                         (mbyars@cravath.com)
                                         825 Eighth Avenue
                                         New York, NY 10019
                                         Telephone: (212) 474-1000
                                         Facsimile: (212) 474-3700

                                         COOLEY LLP
                                         STEVEN M. STRAUSS (99153)
                                         (sms@cooley.com)
                                         KOJI F. FUKUMURA (189719)
                                         (kfukumura@cooley.com)
                                         CHRISTOPHER DURBIN (218611)

(cdurbin@cooley.com)
PETER M. ADAMS (243926)
(padams@cooley.com)
4401 Eastgate Mall
San Diego, CA 92121-9109
Telephone: (858) 550-6000
Facsimile: (858) 550-6420

Attorneys for Petitioners-Defendants
QUALCOMM INCORPORATED.
DEREK K. ABERLE, STEVEN R.
ALTMAN, DONALD J. ROSENBERG,
WILLIAM F. DAVIDSON, JR.,
PAUL E. JACOBS and STEVEN M.
MOLLENKOPF

## CERTIFICATE OF COMPLIANCE

I certify that this petition contains 5,583 words and therefore complies with the word limitation established by Ninth Circuit Rule 5-2(b)–(c), which sets a 20-page limit on petitions for permission to appeal (excluding the accompanying documents required by Rule 5(b)(1)(E)), in conjunction with Ninth Circuit Rule 32-3(2), which allows the filing of a proportionally spaced brief "in which the word count divided by 280 does not exceed the designated page limit."

This petition also complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportional typeface using Microsoft Word 2023 in 14-point Century Schoolbook font.

Dated:  April 03, 2023                      KEKER, VAN NEST & PETERS LLP


                                            *s/Robert A. Van Nest*
                                            ROBERT A. VAN NEST
                                            633 Battery Street
                                            San Francisco, CA 94111
                                            Tel: (415-391-5400
                                            Fax: (415) 397-7188
                                            rvannest@keker.com

# ADDENDUM

FED. R. CIV. P. Rule 23- Class Actions

(a) PREREQUISITES. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) TYPES OF CLASS ACTIONS. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.

(1) *Certification Order.*

(A) *Time to Issue.* At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

(B) *Defining the Class; Appointing Class Counsel.* An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

(C) *Altering or Amending the Order.* An order that grants or denies class certification may be altered or amended before final judgment.

(2) *Notice.*

(A) *For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

(B) *For (b)(3) Classes.* For any class certified under Rule 23(b)(3)— or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means. The notice must clearly and concisely state in plain, easily understood language:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

(3) *Judgment.* Whether or not favorable to the class, the judgment in a class action must:

(A) for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

(B) for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

(5) *Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

(d) CONDUCTING THE ACTION.

(1) *In General.* In conducting an action under this rule, the court may issue orders that:

(A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

(B) require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of:

(i) any step in the action;

(ii) the proposed extent of the judgment; or

(iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

(C) impose conditions on the representative parties or on intervenors;

(D) require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

(E) deal with similar procedural matters.

(2) *Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

(e) SETTLEMENT, VOLUNTARY DISMISSAL, OR COMPROMISE. The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) *Notice to the Class.*

(A) *Information That Parties Must Provide to the Court.* The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

(B) *Grounds for a Decision to Give Notice.* The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

(i) approve the proposal under Rule 23(e)(2); and

(ii) certify the class for purposes of judgment on the proposal.

(2) *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

(3) *Identifying Agreements.* The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) *New Opportunity to Be Excluded.* If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) *Class-Member Objections.*

(A) *In General.* Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

(B) *Court Approval Required for Payment in Connection with an Objection.* Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with:

(i) forgoing or withdrawing an objection, or

(ii) forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

(C) *Procedure for Approval After an Appeal*. If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

(f) APPEALS. A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1). A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered or within 45 days after the order is entered if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

(g) CLASS COUNSEL.

(1) *Appointing Class Counsel*. Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

(E) may make further orders in connection with the appointment.

(2) *Standard for Appointing Class Counsel.* When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

(3) *Interim Counsel.* The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

(4) *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

(h) ATTORNEY'S FEES AND NONTAXABLE COSTS. In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

////

////

////

////

Dated:  April 03, 2023                KEKER, VAN NEST & PETERS LLP


                                      *s/Robert A. Van Nest*
                                      ROBERT A. VAN NEST
                                      633 Battery Street
                                      San Francisco, CA 94111
                                      Tel: (415-391-5400
                                      Fax: (415) 397-7188
                                      rvannest@keker.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of April, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and caused a copy of the foregoing Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) to be electronically served via email on the following :

| | |
|---|---|
| Jonathan D. Uslaner<br>Richard D. Gluck<br>Bernstein Litowitz Berger and Grossmann LLP<br>2121 Avenue of the Stars, Suite 2575<br>Los Angeles, CA  90067 | jonathanu@blbglaw.com<br>rich.gluck@blbglaw.com |
| Gregg S. Levin<br>Motley Rice LLC<br>28 Bridgeside Blvd.<br>Mount Pleasant, SC  29464 | glevin@motleyrice.com |
| William H. Narwold<br>Motley Rice LLC<br>One Corporate Center<br>20 Church Street, 17th Floor<br>Hartford, CT  06103 | bnarwold@motleyrice.com |

*s/Robert A. Van Nest*
ROBERT A. VAN NEST

# EXHIBIT 1

Pursuant to Federal Rule of Appellate Procedure 5(b)(1)(E)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE QUALCOMM INCORPORATED SECURITIES LITIGATION | Case No.:  17cv121-JO-MSB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

Plaintiffs Sjunde AP-Fonden ("AP7") and Metzler Asset Management GMbH ("Metzler) (collectively, "Plaintiffs" or "Lead Plaintiffs") filed a class action alleging violations of federal securities laws against Defendants Qualcomm Inc. ("Qualcomm") and several of its executives, Derek K. Aberle, Steven R. Altman, Donald J. Rosenberg, William F. Davidson, Jr., Paul E. Jacobs, and Steven Mollenkopf (collectively, "Defendants").  On May 16, 2022, Plaintiffs filed a motion to certify the class pursuant to Federal Rule of Civil Procedure 23.  Dkt. 217.  For the reasons stated below, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion for class certification.

# I. BACKGROUND

Qualcomm is a leading technology company that owns patents for components inside of cell phones, handsets, and other devices. Qualcomm does not manufacture the end-product—*e.g.*, cell phones and handsets—but, rather, it patents and sells the components, such as chips, to the companies that make the end-products. As relevant to this action, Qualcomm operates two primary lines of business: (1) a licensing business through which Qualcomm licenses to device manufacturers the right to make and use its patented components, such as chips; and (2) a chip-supply[1] business through which Qualcomm directly sells its patented chips to device manufacturers.

Since at least 2008, Qualcomm has operated its licensing business at the "device level" only.[2] Qualcomm sells other companies a license that allows them to insert Qualcomm's technology components in certain end-product devices, such as cell phones. Qualcomm licenses at the device level only, meaning that Qualcomm licenses the use of its components in a specific end-product device (*e.g.*, the cell phone) rather than licensing the use of the component (*e.g.*, the cell phone chip). Qualcomm operates in this fashion because if it licensed at the component level, other companies might be able use those components however they wanted, including selling them downstream. *See, e.g.*, *Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). Device-level licensing allows Qualcomm to control how its patented components are used and to collect higher royalties based on a percentage of the end-product sales as opposed to the value of the smaller

---

[1] Qualcomm's modem chips are technological components that determine call quality and data transmission speeds in cell phones, handsets, and other devices.

[2] Qualcomm submits evidence to show that it has, since its inception, only granted full licenses at the device level. *See, e.g.*, Dkt. 246, Longman Decl., Ex. 1 at L8. Qualcomm states that, prior to 2008, it "occasionally" granted limited chip licenses to make and sell chips, but never to *use* chips in full devices like handsets. *See* Opp. at 5–6. Qualcomm points to evidence showing that it entered into only three such agreements prior to 2008. *See also* Longman Decl., Ex. 4 at L167–69. Plaintiffs do not comment on this distinction but agree that Qualcomm has only licensed at the device level since 2008. *See, e.g.*, Compl. ¶¶ 53–61, 63, 73, 86.

17cv121-JO-WVG

components.  Due to similar concerns, Qualcomm only sells its chips to companies that license Qualcomm patents at the device level.

While Qualcomm maintains that it has openly engaged in the above licensing and chip-supply practices, Plaintiffs allege that Defendants deceived the public about Qualcomm's business model in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  *See* Dkt. 32 ("Compl.").  Specifically, Plaintiffs allege that Qualcomm misled the market through two categories of deceptive statements.  First, Plaintiffs allege Qualcomm touted that it "broadly license[d]" its technology throughout the industry when, in fact, Qualcomm did not license at the chip level and refused to license competing chipmakers.  *See, e.g.*, Compl. ¶¶ 10–11, 131.  Second, Plaintiffs allege that Qualcomm misled the market by stating that it kept its licensing and chip-supply businesses separate when, in fact, Qualcomm regularly bundled the two in negotiations and agreements.  *See, e.g., id.* ¶¶ 14–15, 131.

**A. Qualcomm's Alleged Licensing Misrepresentations**

Plaintiffs point to three rough categories of misrepresentations that Defendants made between February 1, 2012 and January 20, 2017, regarding Qualcomm's licensing practices.  In the first category, on at least ten instances, Defendants said that Qualcomm licensed "broadly," had a "broad licensing" model, or otherwise described the breadth of Qualcomm's licensing practices.  *See, e.g.*, Compl. ¶ 134 (April 11, 2012: Defendant Rosenberg was quoted in an article describing "Qualcomm's business model" as "broadly licensing our technology"); ¶ 149 (March 5, 2013: Defendant Jacobs said at a stockholder meeting that Qualcomm "license[d] broadly" and was "an enabler for the rest of the industry"); ¶ 155 (November 6, 2013: Defendant Mollenkopf referred to Qualcomm's "broad licensing program" during an investors' conference call).[3]  In the second category,

---

[3] *See also* Compl. ¶ 136 (April 26, 2012: a high-ranking executive stated at a hearing before the House that "we broadly license our portfolio of U.S. and foreign patents to virtually every manufacturer in the mobile industry"); ¶¶ 141, 154, 165, 172, 185 (in SEC filings, Qualcomm stated that its "strategy to make [Qualcomm's] patented technologies broadly available has been a catalyst for industry growth"

Plaintiffs point to at least eight instances where Defendants said that Qualcomm licensed on a "fair," "reasonable," or "non-discriminatory" basis. *See e.g.*, ¶¶ 138, 151 (SEC filings on November 7, 2012, and November 6, 2013, stating that, "[w]e have licensed or otherwise provided rights to use our patented technologies to companies on terms that are fair, reasonable and free from unfair discrimination.").[4] Finally, Plaintiffs point to more than a dozen instances where Defendants described Qualcomm's long-standing licensing model as facilitating competition in the industry. *See, e.g.*, ¶ 157 (November 22, 2013: Qualcomm "make[s] [its patents] available to the industry through its licensing program."); ¶¶ 140, 153, 164, 171, 184 (in SEC filings from 2012–2016, Qualcomm stated: "[w]e have facilitated competition in the wireless communications industry by licensing and enabling a large number of manufacturers.").[5]

## B. Qualcomm's Alleged Bundling Misrepresentations

Plaintiffs point to four rough categories of misrepresentations that Defendants made between February 1, 2012 and January 20, 2017, regarding Qualcomm's bundling practices. In the first category, Plaintiffs point to two instances where Qualcomm executives described the licensing and chip-supply businesses as separate and represented

---

on November 7, 2012, November 6, 2013, November 5, 2014, November 5, 2015, and November 2, 2016); ¶ 161 (February 18, 2014: Defendant Davidson said in a "Powertalk" interview that Qualcomm "broadly" licensed its patents "on a proactive basis.").

[4] *See also* Compl. ¶¶ 138, 151, 163, 170, 183 (on November 7, 2012, November 6, 2013, November 5, 2015, June 24, 2016, and November 2, 2016, Qualcomm stated in SEC filings that "we will offer to license our essential patents for these CDMA standards on a fair and reasonable basis free from unfair discrimination."); ¶ 186 (January 17, 2017: Qualcomm similarly stated that it licensed its patents on "fair, reasonable and non-discriminatory terms." ).

[5] *See also* Compl. ¶¶ 132, 144, 159, 166, 175 (in SEC filings from 2012, 2013, 2014, 2015, and 2016, that Defendants described the following: "the benefits of our business model ... in promoting a highly competitive ... wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."); ¶ 173 (November 17, 2015: Qualcomm stated in a press release that "[o]ur patent licensing practices, which we . . . have maintained for almost two decades . . . are pro-competitive."); ¶ 177 (January 27, 2016: during an earnings conference call, Defendant Rosenberg stated that Qualcomm's licensing model "has been in effect for quite a few decades."); ¶ 179 (May 28, 2016: Defendant Aberle said at an investors' forum that "we don't keep the technology to ourselves: our business model is to share that technology through licensing.").

that Qualcomm did not bundle, even though Qualcomm allegedly bundled its licensing and chip-supply businesses in multiple ways. *See* Compl. ¶ 142 (November 27, 2012: Defendant Aberle said at an investors' conference that Qualcomm "tend[ed] to keep the licensing and chip business very separate . . . And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and we don't bundle those together."); ¶ 146 (February 25, 2013: Defendant Mollenkopf said during an investors' presentation that the licensing and chip-supply businesses were "really separate businesses. I mean we have been very clear that we keep those two things separate—separate propositions to the customer. So, really, two different things."). Second, on November 17, 2015, Qualcomm issued a press release stating that the Korean Fair Trade Commission's "allegations and conclusions" were "not supported by the facts," when, according to Plaintiffs, the agency's allegations about bundling were true. *See id.* ¶ 173. In the third category, Plaintiffs point to the instances already discussed above where Defendants said that Qualcomm licensed on a "fair," "reasonable," or "non-discriminatory" basis, when Qualcomm was allegedly engaged in unfair bundling practices.[6] Finally, Plaintiffs point to the instances discussed above where Defendants said that its business model facilitated competition in the industry, even though Qualcomm was allegedly stifling competition by bundling.[7]

///

///

---

[6] *See* Compl. ¶¶ 138, 151 (SEC filings on November 7, 2012, and November 6, 2013 stating that: "[w]e have licensed or otherwise provided rights to use our patented technologies to companies on terms that are fair, reasonable and free from unfair discrimination."); ¶¶ 138, 151, 163, 170, 181, 183 (on November 7, 2012, November 6, 2013, November 5, 2015, June 24, 2016, and November 2, 2016, Qualcomm stated in SEC filings that "we will offer to license our essential patents for these CDMA standards on a fair and reasonable basis free from unfair discrimination."); ¶ 186 (January 17, 2017: Qualcomm similarly stated that it licensed its patents on "fair, reasonable and non-discriminatory terms.").

[7] *See* Compl. ¶¶ 140, 153, 164, 171, 184 (in SEC filings in 2012–2016, Qualcomm stated: "[w]e have facilitated competition in the wireless communications industry by licensing and enabling a large number of manufacturers."); ¶¶ 132, 144, 159, 166, 175 (in SEC filings in 2012, 2013, 2014, 2015, and 2016, Defendants described the following: "the benefits of our business model ... in promoting a highly competitive ... wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products.").

17cv121-JO-WVG

## C. The Alleged Corrective Disclosures

Plaintiffs allege that the market remained in the dark about Qualcomm's selective licensing and bundling practices until the truth was revealed in four corrective disclosures:

**The First Corrective Disclosure**

**November 17, 2015** – Qualcomm's press release in response to an antitrust investigation initiated by the Korean Fair Trade Commission ("KFTC") (Compl. ¶ 212; Defs. Ex.[8] 35 at A815):

> [KFTC] alleges, among other things, that we do not properly negotiate aspects of our licenses, and that our practice of licensing our patents only at the device level and requiring that our chip customers be licensed to our intellectual property violate Korean competition law.

**The Second Corrective Disclosure**

**December 8, 2015** – The European Commission's press release announcing that it was investigating Qualcomm for violating European competition law (Compl. ¶ 216; Defs. Ex. 7 at A423):

> The European Commission has informed Qualcomm of its preliminary conclusions that the chipset company illegally paid a major customer for exclusively using Qualcomm chipsets and sold chipsets below cost with the aim of forcing its competitor Icera out of the market, in potential breach of EU antitrust rules . . . The first Statement of Objections outlines that since 2011, Qualcomm has paid significant amounts to a major smartphone and tablet manufacturer on condition that it exclusively use Qualcomm baseband chipsets in its smartphones and tablets. The Commission takes the preliminary view that this conduct has reduced the manufacturer's incentives to source chipsets from Qualcomm's competitors and has harmed competition and innovation in the markets for UMTS and LTE baseband chipsets. The contract between Qualcomm and the manufacturer containing the exclusivity clauses is still in force.

---

[8] "Defs. Ex." refers to Defendants' exhibits in support of their opposition to class certification, which can be found at Dkt. 245.

17cv121-JO-WVG

**The Third Corrective Disclosure**

**January 17, 2017** – A Complaint publicly filed by the Federal Trade Commission ("FTC") (Compl. ¶ 224; Defs. Ex. 9):

> Qualcomm has consistently refused to license its cellular standard-essential patents to its competitors, in violation of Qualcomm's FRAND[9] commitments . . . Qualcomm has consistently refused to license its SEPs to competing suppliers of baseband processors. Several of Qualcomm's former and current competitors, including Intel, MediaTek, and Samsung, have sought SEP licenses from Qualcomm. In each instance, Qualcomm refused to grant a SEP license.

> Qualcomm withholds its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm, including elevated royalties that the customer must pay when using competitors' processors ('no license-no chips').

> Qualcomm entered into exclusive dealing arrangements with Apple Inc., a particularly important cell phone manufacturer . . . When Apple sought relief from Qualcomm's excessive royalty burden, Qualcomm conditioned partial relief on Apple's exclusive use of Qualcomm baseband processors.

> Qualcomm has also used its dominant position to negotiate supply terms that leave OEMs vulnerable to a supply disruption in the event of a license dispute . . . Qualcomm has induced certain OEMs to accept its preferred license terms using [] the "stick" of supply disruption.

**The Fourth Correction Disclosure**

**January 20, 2017** – A Complaint filed by Apple alleging antitrust violations (Compl. ¶ 228; Defs. Ex. 11):

> Qualcomm inserted a gag order that prevented an aggrieved party from seeking relief that could curb Qualcomm's illegal conduct, in an effort to keep courts and regulators in the dark and its coerced customers quiet.

---

[9] "FRAND" stands for fair, reasonable, and non-discriminatory.

17cv121-JO-WVG

> Among Apple's damages are nearly $1 billion that Qualcomm owes Apple . . . Qualcomm claims that Apple has forfeited those amounts by responding to [KFTC] requests . . . Qualcomm then attempted to extort Apple into changing its responses and providing false information to the KFTC in exchange for Qualcomm's release of those payments to Apple.
>
> Qualcomm illegally double-dips by selling chipsets . . . and then separately licensing (but never to competitors) the purportedly necessary intellectual property. By tying together the markets for chipsets and licenses to technology in cellular standards, Qualcomm illegally enhances and strengthens its monopoly in each market . . . Qualcomm leverages its market power to extract exorbitant royalties, later agreeing to reduce those somewhat only in exchange for additional anticompetitive advantages.

Plaintiffs point to the First, Third, and Fourth Corrective Disclosures as corrections of Qualcomm's licensing misrepresentations. Plaintiffs allege that the market learned for the first time that Qualcomm did not license its chip components to chipmakers on November 17, 2015, when Qualcomm announced in a press release that the Korean Fair Trade Commission was investigating it, in part, for Qualcomm's practice of "licensing [its] patents only at the device level." *See* First Corrective Disclosure; Compl. ¶ 212; Defs. Ex. 35 at A815. Plaintiffs also allege that the market learned more information regarding Qualcomm's refusal to license chips to chipmakers on January 17, 2017, when the Federal Trade Commission filed a public complaint accusing Qualcomm of refusing to license chipset competitors. *See* Third Corrective Disclosure; Defs. Ex. 9 ¶¶ 3, 112 ("Qualcomm has consistently refused to license its cellular standard-essential patents to its competitors"). Finally, Plaintiffs point to a public complaint filed by Apple three days later on January 20, 2017, similarly accusing Qualcomm of refusing to license chipset competitors. *See* Fourth Corrective Disclosure; Defs. Ex. 11 ¶ 51 (Qualcomm "refus[ed] to license its [standard-essential patents] to competing chipset manufactures").

Plaintiffs also point to all four corrective disclosures as corrections of Qualcomm's bundling misrepresentations. According to Plaintiffs, the market first began to learn about Qualcomm's unfair bundling practices on November 17, 2015, when Qualcomm

17cv121-JO-WVG

announced in the First Corrective Disclosure that the Korean Fair Trade Commission had accused it of not "properly negotiat[ing]" its licenses. *See* First Corrective Disclosure; Defs. Ex. 35 at A815. The market then allegedly learned more about the truth of Qualcomm's bundling practices through the Second Corrective Disclosure on December 8, 2015, when the European Commission accused Qualcomm of "illegally pa[ying] a major customer for exclusively using Qualcomm chipsets." *See* Second Corrective Disclosure; Pltfs. Ex. 89.[10] Then, in the Third Corrective Disclosure on January 17, 2017, the FTC filed a civil complaint against Qualcomm, alleging that Qualcomm offered incentive payments tied to chipset purchases and provided conditional royalty payments that operated as penalties for using other chip suppliers. *See* Third Corrective Disclosure; Pltfs. Ex. 91 ¶¶ 124–30. Finally, in the Fourth Corrective Disclosure on January 20, 2017, Apple accused Qualcomm of deterring it from switching to other chip suppliers via royalty rebates. *See* Fourth Corrective Disclosure; Pltfs. Ex. 92 ¶¶ 95–97.

Plaintiffs contend that when the market learned the truth about Qualcomm's business practices through the four corrective disclosures above,[11] Qualcomm's artificially inflated stock price dropped, causing investors harm. *See generally* Compl. Under this "inflation maintenance" theory,[12] Plaintiffs seek to prove that Defendants' misstatements and omissions maintained Qualcomm's stock at an artificially inflated price until the truth was revealed. When the market finally learned the information withheld from them,

---

[10] "Pltfs. Ex." refers to Plaintiffs' exhibits in support of their motion for class certification, which can be found at Dkts. 217 and 255.

[11] Plaintiffs originally identified five corrective disclosures in their complaint but appear to concede on class certification that the Korean Fair Trade Commission's press release announcing the findings of its investigation on December 27, 2016, did not have a statistically significant impact on stock prices and thus, is not a corrective disclosure. *See* Dkt. 217, Pltfs. Ex. 1 ("Tabak Report") ¶ 61 n.49 ("[t]he December 27, 2016 disclosure is not associated with a statistically significant price movement in my analysis using the event-study model described earlier in this report. Thus, my damages model will assign no inflation or damages as a result of that disclosure").

[12] *See generally Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021) (describing inflation maintenance theory of price impact); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 232 (2d Cir. 2016) (same).

Qualcomm's stock price dropped by a commensurate amount. *See id.* ¶¶ 10–11, 14–15, 131. As proof of inflation maintenance, Plaintiffs point to the price declines following the four corrective disclosures to demonstrate that the stock price had been artificially inflated prior to that point due to Defendants' alleged misstatements and omissions.

**D. Public Information Regarding Qualcomm's Licensing Practices Prior to the Corrective Disclosures**

Prior to the First Corrective Disclosure in 2015, it appears that the following information regarding Qualcomm's licensing practices was publicly available. In 2009, a Deutsche Bank company alert stated that "Qualcomm does not collect royalty payments from chip vendors, they collect them from chip vendors' customers (handset makers)," suggesting that market participants understood Qualcomm did not license chips to chipmakers. Defs. Ex. 23 at A695. In 2014, the China National Development and Reform Commission's ("NDRC") investigation into Qualcomm made Qualcomm's device-level licensing practice public. On July 23, 2014, Qualcomm disclosed in its Form 10-Q that the NDRC was investigating the company for refusing to license its chips to chipmakers. *See* Defs. Ex. 16 at A651 (disclosing that the NDRC was investigating Qualcomm for "the alleged refusal of the Company to grant patent licenses to chipset manufacturers."). After this disclosure, market makers and analysts reported on the investigation and the agency's eventual censure of Qualcomm. *See* Defs. Exs. 6, 25, 26, 28, 33. For example, analyst reports in August and September 2014 noted that the agency was reviewing Qualcomm's "practice of . . . refusing to license chipset manufacturers." *See* Defs. Ex. 25 at A714; Ex. 26 at A725. Then, after the NDRC's investigation concluded in March 2015, analysts and legal sources reported that Qualcomm would be able to maintain its device-level licensing practice and could continue to refuse to license at the chip level. *See* Defs. Ex. 6 at A417 ("Qualcomm retained its ability to calculate royalties based on the wholesale price of the entire device" and "avoided a duty to license at the chip level"); Defs. Ex. 28 at A739 (Qualcomm "ha[d] staved off the elephant in the room" of chip-level licensing, which "would [have] require[d] fundamental changes to [Qualcomm's] biz model"); Defs. Ex. 33

at A783 ("Qualcomm agreed to pay a $975 million fine" but "can still base licensing fees on devices, not components").

Prior to the corrective disclosures, it was also public knowledge that device-level licensing was a common industry practice, and, in fact, there was a public debate occurring in the industry regarding the continuation of that practice. *See* Defs. Exs. 3–5. Qualcomm participated in this debate by publicly defending device-level licensing in several forums, including at a hearing before Congress on July 30, 2013, during which industry participants testified about patenting standards and practices. *See generally* Defs. Ex. 3. There, Qualcomm repeatedly stated that it licensed device manufacturers, *see id.* at A75, A144, and argued that companies like Qualcomm should not be required to license at the component level. *See id.* at A166–68 (arguing that FRAND commitments do not require licensing components to component makers and that requiring companies to do so "would be inconsistent with widely accepted industry practice"; "it is and has long been the industry norm . . . to license at the level of complete standard-compliant devices, not part and components"). Other witnesses at the hearing confirmed patent holders "often go to great lengths to avoid licensing upstream component (*e.g.*, chip) manufacturers and choose instead to license . . . at . . . the device (*e.g.*, computer) level" and "refuse to license chip makers so that they can seek excessive royalties." *Id.* at A74, A85, A117, A,126, A129, A131.[13]

Qualcomm also engaged in this public debate by filing an amicus brief in the Federal Circuit arguing in favor of device-level licensing and by filing objections to a standard setting organization's proposed policy change. On February 27, 2014, Qualcomm filed a public amicus brief in *Ericsson Inc. v. D-Link Sys., Inc.*, after the defendant appealed to the Federal Circuit. *See* Defs. Ex. 4. There, Qualcomm argued that companies have the right

---

[13] Defendants also highlight a variety of court and regulatory filings reflecting similar notions, including that, "large companies have adopted [] policies of only licensing fully compliant products," (*see Ericsson Inc. v. D-Link Sys., Inc.*, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013)), and that device-level licensing is a "widespread industry licensing practice." *See* Defs. Ex. 4.

17cv121-JO-WVG

to license devices instead of components and are not required to license chips to chip suppliers. *See id.* at A344–48 ("[companies] regularly set royalties" based on "wholesale price of handset[]"; there is "nothing inherently wrong or unfair" with the practice of licensing "fully compliant products"; standard-setting-organization commitments "do not require the licensing of components").[14]  Then, on May 26, 2014, Qualcomm filed public objections to the proposed policy of a standard setting organization.  *See* Defs. Ex. 5. Standard setting organizations are "global collaborations of industry participants" that collectively establish standards in the field.  *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 982–83 (9th Cir. 2020).  When one of these organizations that Qualcomm participated in proposed a policy that would have required companies like Qualcomm to "license exhaustively" at the component level, Qualcomm objected in a public filing, arguing that it would constitute "a disruptive change to existing licensing practices."  *See* Defs. Ex. 5 at A370.  Defendants argue that this public information illustrates that device-level licensing was a well-known, industry-wide practice.

## E. Public Information Regarding Qualcomm's Bundling Practices Prior to the Corrective Disclosures

Prior to the First Corrective Disclosure in 2015, it appears that the following information regarding Qualcomm's bundling practices was publicly available.  From December 10, 2007 to March 16, 2015, third-parties publicly stated that Qualcomm had a policy of only selling its chips to licensees.[15]  Qualcomm was also publicly investigated by various regulatory agencies for allegedly bundling its licensing and chipset businesses and for offering royalty rebates in exchange for exclusive use of Qualcomm's chips.  *See* Defs. Exs. 20, 24, 26; Dkt. 246, Longman Decl., Ex. 3 at L115, L120.  On August 14, 2014, an

---

[14] *See also id.* at A320 ("Qualcomm has licensed its portfolio to essentially all major *handset* manufacturers") (emphasis added).

[15] *See* Defs. Ex. 1 at A15 (December 10, 2007: Qualcomm's Supreme Court amicus brief stating that it "typically sells chips only to those handset manufacturers that are licensed"); Defs. Ex. 16 at A651 (July 23, 2014: in its SEC filing, Qualcomm stated that the NDRC was investigating its "policy of selling chipsets only to the Company's patent licensees"); *see also* Defs. Exs. 6, 18, 27, 29–30 (similar).

17cv121-JO-WVG

analyst reported that the China National Development and Reform Commission was investigating whether Qualcomm "bundl[ed] patents with chip sales." *See* Defs. Ex. 24 at A699, Ex. 26 at A725.  Then, on June 26, 2016—after the first two corrective disclosures but before the third—Qualcomm disclosed in its SEC filing that the Taiwan Fair Trade Commission was accusing Qualcomm of providing "royalty rebates" to certain companies in exchange for exclusive use of Qualcomm's chipsets. *See* Defs. Ex. 20 at A680.  A month later, also before the Third Corrective Disclosure, Apple made a presentation before the Korean Fair Trade Commission, alleging that Qualcomm "require[d] bundl[ing] of IPR and chipset" and "insist[ed] on exclusionary terms in exchange for renewed royalty limits." *See* Dkt. 246, Longman Decl., Ex. 3 at L115, L120.  Based on this public information, Defendants argue that the market was already aware that Qualcomm only sold its chips to licensees and had been accused of improper bundling, such that the information in the corrective disclosures was not new. *See* Opp. at 10–11, 23–24, 28–30.

Plaintiffs seek to certify a class of investors who were injured by the deception-induced inflation and consequent price drops described above.  They define this class as follows: "[a]ll persons or entities who purchased or otherwise acquired the common stock of Qualcomm between February 1, 2012 and January 20, 2017, inclusive, and who were damaged." Dkt. 217, Notice of Motion at 1.  The two Lead Plaintiffs who seek to represent the class are institutions that purchased Qualcomm stock during the class period at prices that were allegedly inflated due to Defendants' material misstatements and omissions. *See id.*

## II. LEGAL STANDARD

To certify a class, the plaintiffs bear the burden of proving by a preponderance of the evidence that the class meets all four requirements of Federal Rule of Civil Procedure 23(a). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022).  Rule 23(a) sets out four prerequisites for a certifiable class: (1) numerosity, (2) commonality, (3) typicality, and (4)

adequacy.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011).  If the proposed class meets the four prerequisites of Rule 23(a), the Court must then decide whether the class action is maintainable under Rule 23(b).  Under Rule 23(b)(3), a class may be certified if the Court finds that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting Fed. R. Civ. P. 23(b)(3)).

At the class certification stage, the Court must take the substantive allegations of the complaint as true, but it "also is required to consider the nature and range of proof necessary to establish those allegations."  *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982).  The court must engage in a "rigorous analysis" of each Rule 23(a) factor, which often "will entail some overlap with the merits of the plaintiff's underlying claim."  *Dukes*, 564 U.S. at 351.  If the Court concludes that the moving party has carried its Rule 23 burden, then the court is afforded "broad discretion" to certify the class.  *Zinser*, 253 F.3d at 1186.

Because Plaintiffs bring claims for securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act, the Court considers whether class certification is warranted with respect to those claims.  Plaintiff's Section 10(b) claim contains the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Erica P. John Fund, Inc. v. Halliburton Co.("Halliburton I")*, 563 U.S. 804, 809–10 (2011) (citation and internal quotations omitted).  Plaintiff's Section 20(a) claim contains the following elements: (1) "a primary violation of federal securities law" and (2) "that the defendant exercised actual power or control over the primary violator."  *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (citation and internal quotations omitted).

1
2                                    **III. DISCUSSION**

3          The Court will first examine whether Plaintiffs have met their burden to establish

4    that their proposed class meets the four prerequisites of Rule 23(a): numerosity,

5    commonality, typicality, and adequacy.    It will then turn to the predominance and

6    superiority requirements of Rule 23(b).

7    **A. Plaintiffs Have Satisfied Rule 23(a)**

8                     *1.  The Class is Sufficiently Numerous*

9          First, the Court finds that Plaintiffs' proposed class of investors is sufficiently

10   numerous.   To establish numerosity, Plaintiffs must show that the represented class is "so

11   numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Although

12   the numerosity requirement is not tied to a strict numerical threshold, trial courts have

13   generally found that classes of at least 40 members satisfy the requirement.  *See, e.g.*, *West*

14   *v. Cal. Servs. Bureau*, *Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. 2017) (class of more than 40

15   "raises a presumption of impracticability of joinder") (quotation and alterations omitted);

16   *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *2 (S.D. Cal. Aug. 24, 2021)

17   (finding that "millions of shares trading on NASDAQ during the Class Period" allowed the

18   court to "infer that the number of shareholders . . . would be far too numerous to join"); *In*

19   *re Bridgepoint Educ., Inc. Sec. Litig.*, 2015 WL 224631, at *4 (S.D. Cal. Jan. 15, 2015)

20   (finding 51.3 million outstanding shares and trading volume of 160.4 million shares during

21   the class period sufficient to show numerosity).  Here, Plaintiffs allege that Qualcomm had

22   1.69 billion outstanding shares of common stock and a weekly traded average of 24.6

23   million shares during the Class Period.   Dkt. 217 ("Mot.") at 7.   Defendants do not

24   challenge numerosity in their opposition to class certification.  *See generally* Dkt. 244

25   ("Opp."); *see also Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) (noting that

26   defendants "understandably" did not contest numerosity where the class period

27   encompassed "about 120,000 transactions involving some 21,000,000 shares").  Because

28

numerosity can be properly inferred from the number of outstanding shares and the rate of shares traded during the class period, Plaintiffs have met their burden to show numerosity.

### 2. There are Questions of Law and Fact Common to the Class

Second, both common questions of law and fact exist with respect to the class.  To satisfy the commonality requirement, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("[t]he commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3) [predominance]"); *Blackie*, 524 F.2d at 902 ("[c]onfronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest").  Here, common questions abound, including whether Defendants made misrepresentations and whether class members suffered damages.  Because Plaintiffs point to one set of misrepresentations to which the entire class was exposed, whether those statements were misleading can be resolved in one stroke by evaluating the statements themselves and common evidence of their falsity.  *See* Mot. at 4, 8; Compl. ¶¶ 138–87.  Additionally, because Plaintiffs seek to measure their financial injury via a drop in Qualcomm's stock price, all class members will rely on evidence of Qualcomm's historical stock prices to demonstrate damages.  Because the above common evidence will resolve issues central to the securities fraud claims of the entire class— whether Qualcomm made misrepresentations and the amount of Plaintiffs' damages—the Court finds that the commonality requirement is met.

### 3. The Lead Plaintiffs are Typical

Third, the Court finds that the Lead Plaintiffs are typical of the class.  Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Thus, the Court considers "whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Evon v. Law Offices of*

*Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (internal citation and quotations omitted); *Ellis*, 657 F.3d at 984 (typicality inquiry focuses on "the nature of the claim . . . and not . . . the specific facts from which it arose") (citation omitted). Here, the Lead Plaintiffs' claims are essentially the same as that of the proposed class members: investors purchased stock at an allegedly inflated price due to Defendants' material misrepresentations and omissions regarding Qualcomm's licensing and bundling practices, and investors suffered damages when the truth was revealed. Thus, the Lead Plaintiffs' claims are typical of the class.

Despite Defendants' argument to the contrary, the Court concludes that Lead Plaintiff Metzler is not subject to a unique defense that threatens to overwhelm the litigation. When a lead plaintiff "is subject to unique defenses which threaten to become the focus of the litigation," then "class certification is inappropriate." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). The mere presence of a defense, however, is not a basis to deny class certification unless it is unique and threatens to overwhelm other issues. *Compare id.* (finding unique reliance defense threatened to overwhelm litigation where plaintiff had a practice of buying nominal shares to sue defendants), *with In re Novatel Wireless Sec. Litig.*, 2010 WL 11470156, at *5 (S.D. Cal. May 12, 2010) (finding reliance defense was not unique where other class members could be subject to the same defense and the issue did not "threaten to become the focus"). Defendants contend that Lead Plaintiff Metzler is not typical because 70% of its Qualcomm stock purchases were performed by its investment manager, who used a proprietary "value investment" method and did not rely on the integrity of the market. *See* Opp. at 38–39. The mere presence of this defense—without more to indicate whether it is unique to Lead Plaintiff Metzler or has the potential to overwhelm the litigation—is not a basis to find that Lead Plaintiff Metzler is not typical. At present, there is no evidence that this defense will not also be asserted against other class members who similarly used investment managers. Nor does the Court have any indication that this defense will not be a relatively cabined issue. Should later developments in the case reveal that this defense is indeed unique to

1    Lead Plaintiff Metzler and does threaten to overwhelm the litigation, the Court retains the

2    authority to modify the class.  *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)

3    ("[e]ven after a certification order is entered, the judge remains free to modify it in the light

4    of subsequent developments in the litigation").  Currently, however, the existence of this

5    defense against Lead Plaintiff Metzler does not undermine the typicality of its claims

6    against Qualcomm.  Accordingly, this requirement is met under Rule 23(a).

7                        *4.  The Lead Plaintiffs are Adequate*

8            Fourth, the Court finds that Lead Plaintiffs and proposed class counsel are adequate

9    representatives of the putative class.  In determining adequacy, the Court considers whether

10   "the representative parties will fairly and adequately protect the interests of the class."  Fed.

11   R. Civ. P. 23(a)(4).  The Court focuses on two questions: (1) whether "the representative

12   plaintiffs and their counsel have any conflicts of interest with other class members," and

13   (2) whether "the representative plaintiffs and their counsel prosecute the action vigorously

14   on behalf of the class."  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  Here,

15   neither party has raised concerns about Lead Plaintiffs' ability to adequately represent the

16   class in question.  Lead Plaintiffs' interests appear to be aligned with the class because their

17   losses and those of the class members were caused by the same allegedly unlawful conduct.

18   *See generally* Mot.  Moreover, proposed class counsel's resume and related materials

19   indicate it has extensive experience litigating securities class actions in federal court.  *See*

20   *generally* Opp.; *see also* Pltfs. Exs. 3–4.  Lead Plaintiffs also point to their vigorous

21   prosecution of this action to date, including opposing Defendants' motions to dismiss and

22   for judgment on the pleadings, and conducting extensive discovery.  *See* Mot. at 10–11.

23   Defendants have not identified any actual or potential conflicts between Lead Plaintiffs

24   and the putative class and do not dispute the adequacy of Lead Plaintiffs or their counsel.

25   *See generally* Opp.  Accordingly, Plaintiffs have met their burden on adequacy.

26   **B. Whether Plaintiffs Have Satisfied Rule 23(b)**

27           Having concluded that Plaintiffs have met Rule 23(a)'s requirements, the Court turns

28   to whether common questions will predominate over individual ones under Rule 23(b)(3).

The Rule 23(b)(3) inquiry looks to whether the putative class is "sufficiently cohesive to warrant adjudication by representation." Fed. R. Civ. P. 23(b)(3); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Where "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citing C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)). Plaintiffs bear the burden to demonstrate that common questions will predominate over individual ones under Rule 23(b)(3) by a preponderance of the evidence before the Court may certify a class. *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 665 (adopting preponderance burden of proof). The Court considers whether Plaintiffs have demonstrated that "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof," or if "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods*, 577 U.S. at 453. The predominance inquiry "begins . . . with the elements of the underlying cause of action." *Halliburton I*, 563 U.S. at 809 (quoting Fed. R. Civ. P. 23(b)(3)).

Here, whether the predominance requirement of Rule 23(b) is satisfied hinges on whether reliance can be resolved on a class-wide basis. As discussed above, the class shares several common questions, such as the deceptiveness of Defendants' statements and the measurement of Plaintiffs' damages. The parties dispute, however, whether common questions or individualized issues will predominate. Defendants argue that class members' reliance on the alleged misrepresentations, an essential element of Plaintiffs' Section 10(b) securities fraud claim, will need to be proved separately for each class member and these

17cv121-JO-WVG

individualized inquiries would overwhelm the common questions described above.[16] *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (noting reliance is an essential element under Section 10(b)). Therefore, the Court examines below whether questions regarding reliance can be addressed on a class-wide basis such that a class action is the appropriate vehicle for Plaintiffs' claims.

### 1. Basic's Presumption of Reliance

Plaintiffs argue that reliance can be resolved in one stroke for all class members because investors that buy stock in an efficient market are presumed to have relied on all publicly available information, including Defendants' alleged misrepresentations. Although reliance is generally an individualized issue, Plaintiffs need not show individual reliance if they can invoke a rebuttable presumption of class-wide reliance. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–247 (1988). In *Basic*, the Supreme Court held that, based on the fraud-on-the-market theory, the price of a security traded in an efficient market will reflect all publicly available information, including any public, material misrepresentations. *See id.* Thus, if the market is efficient, the stock price will reflect the alleged misrepresentations and all buyers "may be presumed to have relied" on those misrepresentations at the time of purchase. *See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 458 (2013). To invoke *Basic's* rebuttable presumption, Plaintiffs must show the following: "(1) the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time when the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 277–78 (2014). Here, Defendants do not dispute that Qualcomm's stock traded in an efficient market such that the *Basic* presumption of class-

---

[16] Although Plaintiffs argue that reliance can be resolved on a class-wide basis here, Plaintiffs do not dispute that if it cannot, individualized issues would predominate, and class certification would be inappropriate.

wide reliance can be invoked in the first instance for class certification purposes.[17]  The Court will, therefore, proceed to the crux of the parties' dispute on reliance—whether Defendants have successfully rebutted *Basic's* presumption, thereby defeating Plaintiffs' argument that common questions predominate.

## 2.  *How Basic's Presumption Can be Rebutted*

Rather than disputing that the *Basic* presumption has been successfully invoked, Defendants instead argue that their evidence on class certification rebuts the presumption. Because the theory that misrepresentations are baked into the stock price in an efficient market is the premise of *Basic's* presumption, Defendants can rebut that presumption by showing that the misrepresentations in question did not actually impact price.  *See Halliburton II*, 573 U.S. at 268, 278–82; *see also Halliburton I*, 563 U.S. at 814 ("'[p]rice impact' simply refers to the effect of a misrepresentation on a stock price.").  Such evidence rebuts *Basic's* presumption because "[i]n the absence of price impact, *Basic's* . . . presumption of reliance collapse[s]." *Halliburton II*, 573 U.S. at 278.  "[T]he defendant bears the burden of persuasion to prove a lack of price impact" by a "preponderance of the evidence." *Goldman*, 141 S. Ct. at 1960, 1963 (directing courts to

---

[17] Based on the evidence submitted with Plaintiffs' motion for class certification, the Court finds that Plaintiffs have successfully invoked *Basic's* presumption of class-wide reliance.  *See, e.g.*, *In re USA Talks.com Sec. Litig.*, 2000 WL 1887516, at *5 (S.D. Cal. Sept. 14, 2000) (considering *Cammer* factors when deciding whether *Basic's* presumption applied); *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989) (factors include, (1) whether stock traded at a high weekly volume; (2) whether securities analysts reported on stock; (3) whether stock had market makers; (4) whether the company is eligible to file SEC registration Form S-3; and (5) whether there are empirical facts showing a cause-and-effect relationship between company news and an immediate response in a stock price). The evidence submitted by Plaintiffs demonstrates that Qualcomm's stock traded on a national exchange at a high weekly volume and was reported on by securities analysts.  Moreover, Qualcomm had a high number of institutional investors, and was eligible to file an SEC Form S-3.  Dr. Tabak's study also suggests that the market did efficiently digest news about Qualcomm and that the news was reflected in Qualcomm's stock price.  Given this evidence and the fact that Defendants do not dispute market efficiency at this juncture, *Basic's* rebuttable presumption applies.

17cv121-JO-WVG

1    "determine whether it is more likely than not that the alleged misrepresentations had a price

2    impact.").

3    At this stage, the Court considers all probative evidence to determine whether

4    Defendants have met their burden to rebut *Basic's* presumption by a preponderance of the

5    evidence. At class certification, the Court's "rigorous analysis" will often "entail some

6    overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351. With

7    respect to securities fraud cases specifically, the Supreme Court has recently instructed that

8    "a court cannot conclude that Rule 23's requirements are satisfied without considering *all*

9    evidence relevant to price impact," "regardless [of] whether that evidence overlaps with

10   materiality or any other merits issue." *Goldman*, 141 S. Ct. 1960–61 (remanding with

11   instructions to consider all price-impact evidence prior to certification) (emphasis in

12   original). Thus, where a defendant submits evidence to rebut *Basic's* presumption of class-

13   wide reliance, "[t]he district court's task is simply to assess all the evidence of price

14   impact—direct and indirect—and determine whether it is more likely than not that the

15   alleged misrepresentations had a price impact." *Id.* at 1963.

16   The Court will first examine whether it is more likely than not that Defendants'

17   alleged misrepresentations about Qualcomm's licensing practices had an impact on

18   Qualcomm's stock price. It will then conduct the same inquiry with regard to Defendants'

19   alleged misrepresentations about Qualcomm's bundling practices. In doing so, the Court

20   keeps in mind the Supreme Court's instruction to consider all evidence of price impact,

21   "regardless [of] whether that evidence overlaps with materiality *or any other merits issue*,"

22   to decide whether *Basic's* presumption holds. *Goldman*, 141 S. Ct. 1960–61 (emphasis

23   added).

24   ### 3. Defendants Have Shown a Lack of Price-Impact with Respect to the "Chip
25   Licensing" Misrepresentations

26   Plaintiffs' invocation of *Basic's* presumption rests on a link between Qualcomm's

27   alleged misrepresentations and its later stock-price drops—a link Defendants attempt to

28   rebut. Plaintiffs theorize the market was unaware that Qualcomm did not license at the

17cv121-JO-WVG

chip level such that when Qualcomm made representations like, "we license broadly," the market interpreted those statements to mean "we license chips." *See, e.g.*, Compl. ¶¶ 64–72. Plaintiffs argue that these misrepresentations falsely inflated Qualcomm's stock price and that when the market learned for the first time through the corrective disclosures that Qualcomm did not license chips, Qualcomm's stock price dropped. *See id.* ¶¶ 64–72, 121–29, 210–34.

Defendants attempt to rebut *Basic's* presumption by undermining the connection between Qualcomm's alleged misrepresentations and its stock prices. Defendants first argue that sweeping statements about the "broad," "fair," or "non-discriminatory" nature of Qualcomm's licensing practices were not specific enough to make the market believe that Qualcomm engaged in specific, chip-level licensing. *See* Opp. at 19, 23. Defendants further argue that their statements about Qualcomm's licensing practices could not have impacted the stock price as Plaintiffs claim because the market already knew that Qualcomm did not license chips. *See* Opp. at 21–23, 28–30.

Defendants argue that their generic statements about Qualcomm's licensing would not have impacted Qualcomm's stock price because those statements were not specific enough to create the misimpression that Qualcomm licensed at the chip level. In *Goldman*, the Supreme Court noted that "when the earlier misrepresentation is generic (e.g., 'we have faith in our business model') and the later corrective disclosure is specific (e.g., 'our fourth quarter earnings did not meet expectations')," then "there is a mismatch between the contents of the misrepresentation and the corrective disclosure." 141 S. Ct. at 1961. The Court noted that this evidence was relevant to price impact because such a mismatch meant there was "less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *See id.*

The Court therefore compares the information in the alleged misrepresentations to the information in the corrective disclosures to determine whether there is such a mismatch. Plaintiffs allege that the corrective disclosures between November 17, 2015 and January 20, 2017, revealed the information that Qualcomm, (1) only licensed at the device level,

and (2) did not license at the chip level to competing chipmakers. *See* Defs. Ex. 35 at A815.[18]  Although Plaintiffs parse these as two separate pieces of revelatory information, the notion that Qualcomm only licensed at the device level to device manufacturers and did not license chips to chipmakers are two sides of the same coin.  This information—that Qualcomm licensed at the device level and not the chip level—is far more specific than Defendants' generic statements assigning the adjectives "broad," "fair," "reasonable," and "non-discriminatory" to Qualcomm's overall licensing model.  Although Plaintiffs argue that the market interpreted these generic statements to mean that Qualcomm licensed chips to chipmakers and that this inflated Qualcomm's stock price, that conclusion is not apparent when the alleged misrepresentations and corrective disclosures are viewed side by side.  Thus, the Court finds that the generic nature of the alleged misrepresentations makes it less likely that those misrepresentations deceived the market in the way Plaintiffs theorize, and therefore, less likely that they caused "front-end price inflation."  *See Goldman*, 141 S. Ct. at 1961.

The Court now turns to Defendants' argument that the information in the corrective disclosures was publicly available prior to the corrective disclosures.  The three relevant corrective disclosures—The First, Third, and Fourth Corrective Disclosures on November 17, 2015, January 17, 2017, and January 20, 2017, respectively—allegedly revealed that Qualcomm only licensed devices and did not license chips to chipmakers.  The First Corrective Disclosure on November 17, 2015 stated that Qualcomm had a "practice of licensing [] patents at the device level."  First Corrective Disclosure; Compl. ¶ 212; Defs. Ex. 35 at A815.  But, in the years prior to the First Corrective Disclosure, Qualcomm's device-level licensing policy was made public multiple times.  For example, in 2009, an analyst reported that Qualcomm licensed at the device level: "Qualcomm does not collect

---

[18] The Court notes that the allegedly revelatory nature of this information is belied by Plaintiffs' own submission to the Court in advance of oral argument admitting that "the market understood that Qualcomm based its royalties on device-level pricing."  *See* Pltfs. 10/18/22 Submission.

royalty payments from chip vendors, they collect them from chip vendors' customers (handset makers)," Defs. Ex. 23 at A695. In 2014 and 2015, multiple publications discussed that the China National Development and Reform Commission was investigating Qualcomm for its device-level licensing policy. *See* Defs. Exs. 6, 16, 25–26, 28, 33. For instance, in March 2015, in the wake of this investigation, several analysts and legal sources reported that Qualcomm would be able to continue its device-level licensing practice and continue to refuse to license at the chip level. *See* Defs. Ex. 6 at A417 ("Qualcomm retained its ability to calculate royalties based on the wholesale price of the entire device" and "avoided a duty to license at the chip level"); Defs. Ex. 28 at A739 (Qualcomm "ha[d] staved off the elephant in the room" of chip-level licensing, which "would [have] require[d] fundamental changes to [Qualcomm's] biz model"); Defs. Ex. 33 at A783 ("Qualcomm agreed to pay a $975 million fine" but "can still base licensing fees on devices, not components"). During the 2013 to 2014 time period, Qualcomm also defended its device-level licensing policy on the public stage at a time when the pros and cons of this commonplace industry practice were being debated before Congress, the courts, and standard-setting organizations. *See* Defs. Exs. 3–5. Thus, the information in the First Corrective Disclosure on November 17, 2015, was publicly stated prior to that point in 2009, 2014, and 2015, against the backdrop of an industry that was widely licensing at the device level and debating whether that practice could continue.

Similarly, Plaintiffs allege that the Third and Fourth Corrective Disclosures revealed that Qualcomm refused to license chips to competing chipmakers, but this information was already public. These January 2017 disclosures—civil complaints brought against Qualcomm by the FTC and Apple—accused Qualcomm of refusing to license chips to chipmakers.[19] *See* Third Corrective Disclosure; Defs. Ex. 9 ¶¶ 3, 112 ("Qualcomm has

---

[19] The Court notes that Plaintiffs appeared to acknowledge at oral argument that Qualcomm's "device-level licensing" and "refusal to license chips and chip competitors" are essentially two sides of the same coin. *See* Dkt. 276 at 20.

consistently refused to license . . . its competitors"); *see also* Fourth Corrective Disclosure; Defs. Ex. 11 ¶ 51 (Qualcomm "refus[ed] to license . . . competing chipset manufactures"). But the FTC's and Apple's accusations in January 2017 were not new. Indeed, the same exact accusations had been publicly levied by two regulatory agencies years prior to that date. First, in July 2014, the China National Development and Reform Commission investigated Qualcomm's alleged refusal to license chips to chipmakers. *See* Defs. Ex. 16 ("the alleged refusal of the Company to grant patent licenses to chipset manufacturers."); *see also* Defs. Exs. 25–26 (Qualcomm's "practice of . . . refusing to license chipset manufacturers."). Then, in December 2016, the Korean Fair Trade Commission announced that "Qualcomm [] refused to license competing chipset companies." *See* Defs. Ex. 8 at A426. Therefore, the information in the Third and Fourth Corrective Disclosures in January 2017, was disclosed prior to that point in 2014 and 2016.

The Court finds that Defendants' evidence that Qualcomm's device-level licensing practice and refusal to license chipmakers was public prior to the corrective disclosures makes price impact less likely. *See Amgen*, 568 U.S. at 458 (under the *Basic* presumption, "the price of a security traded in an efficient market will reflect all publicly available information"). The fact that there was public information available from 2009–November 17, 2015, that Qualcomm licensed only at the device level and, thus, did not license chips to competing chipmakers, makes it less likely that the market interpreted Defendants' generic statements from February 1, 2012, and January 20, 2017 to mean that Qualcomm licensed chips. If the market was not misled by the alleged misrepresentations in this manner under Plaintiffs' theory, then there is less reason to infer that the alleged misrepresentations caused front-end stock price inflation. In addition, the fact that there was public information available from November 2009–December 2016 that mirrors the corrective disclosures makes it less likely that the corrective disclosures were actually curative. If the corrective disclosures did not actually contain new information correcting the alleged misrepresentations, it becomes less likely that their announcement caused the

17cv121-JO-WVG

1    back-end price drops and less reasonable to assume that Defendants' alleged
2    misrepresentations caused front-end inflation in the first place.

3         The Court finds that, together, Defendants' evidence discussed above is enough to
4    demonstrate a lack of price impact by a preponderance of the evidence with respect to
5    Defendants' alleged licensing misrepresentations.  As a whole, the evidence suggests that–
6    –prior to the alleged corrective disclosures—the market was exposed to statements about
7    Defendants' "broad" and "competitive" licensing practices while also privy to information
8    that Defendants licensed only at the device level and refused to license chips to chipmakers.
9    The alleged corrective disclosures only repeated already public information—that
10   Qualcomm licensed only at the device level and refused to license competing chipmakers.
11   At a "common sense," level, this evidence makes it less likely that Defendants' alleged
12   misrepresentations inflated Qualcomm's stock price on the front end and the information
13   in the disclosures caused the price drop on the back end.  *See Goldman*, 141 S. Ct. 1960.

14        This inference is further supported by evidence that at least one disclosure that
15   Qualcomm "refused to license to competitors" did not impact Qualcomm's stock price.
16   Plaintiffs admit that the Korean Fair Trade Commission's December 2016
17   announcement—which is virtually identical to the licensing information in the Third and
18   Fourth Corrective Disclosures—had no impact on Qualcomm's stock price.  *See* Defs. Ex.
19   8 at A426 (KFTC: "Qualcomm [] refused to license competing chipset companies."); *see*
20   *also* Pltfs. Ex. 1 ("Tabak Report") ¶ 61 n.49.  The fact that the market did not react to this
21   announcement makes it more likely that the market was already aware of Qualcomm's
22   device-level licensing practice by the date of this announcement in December 2016—
23   before the Third and Fourth Corrective Disclosures in January 2017.  In light of this
24   evidence, the Court cannot say that it is more likely than not that Defendants' statements
25   about "broad" licensing practices inflated Qualcomm's stock price because the market did
26   not know until the corrective disclosures that Qualcomm licensed only at the device level.
27   Accordingly, the Court finds that Defendants have rebutted *Basic's* class-wide
28   presumption of reliance by a preponderance of the evidence.

17cv121-JO-WVG

Because Defendants have rebutted the class-wide presumption of reliance, a factfinder would have to conduct individualized inquiries regarding each class member's reliance on the various alleged misrepresentations. *See Amgen*, 568 U.S. at 462–63 ("Absent the fraud-on-the-market theory . . . reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class."). Without *Basic's* presumption, Plaintiffs would have to demonstrate that each class member was aware of Defendants' misrepresentations and purchased Qualcomm stock in reliance on them. Given the thousands of investors that fit the class definition, class resolution of this question would be untenable under Rule 23(b). Individual issues of reliance, rather than common questions, would predominate. *See id.* at 461. Accordingly, the Court will not certify a class of investors with respect to Qualcomm's alleged misrepresentations regarding its device-level licensing practice or refusal to license chips to chipmakers.

### 4. Defendants have Not Shown a Lack of Price-Impact with Respect to the "Bundling" Misrepresentations

Next, the Court turns to Plaintiffs' allegations that Defendants misled the market about the extent to which Qualcomm bundled its licensing and chip-supply businesses. *See* Reply at 12–13. Plaintiffs posit that the market was misled when Defendants made representations about the separateness of Qualcomm's licensing and chip-supply businesses when, in fact, Qualcomm was bundling the two businesses in multiple, undisclosed ways. *See id.* Under Plaintiffs' theory, these misrepresentations artificially inflated Qualcomm's stock price. *See id.* Then, when the corrective disclosures revealed the truth about the extent to which Qualcomm bundled its licensing and chip-supply businesses, Qualcomm's stock price dropped. *See id.* Similar to Defendants' arguments with respect to licensing, Defendants attempt to rebut price impact in two ways. First, Defendants argue that their generalized statements about the "separateness" of Qualcomm's licensing and chip-supply businesses were not specific enough to make the market believe that Qualcomm did not bundle terms and negotiations, practices that were

later revealed in the corrective disclosures. *See* Opp. at 24–26. Second, Defendants also argue that their statements about bundling could not have impacted the stock price in the way Plaintiffs theorize because the market already knew that Qualcomm did bundle in certain ways, including by only selling chips to licensed companies and offering royalty rebates in exchange for exclusive use of Qualcomm chips. *See id.* at 10–11, 26–29.

Defendants argue that their generic statements about the separateness of Qualcomm's licensing and chip-supply businesses did not impact Qualcomm's stock price because they were not specific enough to make the market believe that Qualcomm did not engage in the bundling practices revealed in the corrective disclosures. *See Goldman*, 141 S. Ct. at 1961. As noted above, Defendants' alleged misstatements regarding bundling include statements like the following: (1) "we tend to keep the licensing and the chip business very separate . . . we don't bundle those together," Compl. ¶ 142; (2) "they are really separate businesses . . . we have been very clear that we keep those two things separate," *Id.* ¶ 146. The foregoing statements are admittedly more general than the specific disclosures that Qualcomm "[withheld] its baseband processors unless a customer accept[ed] a license . . . on terms preferred by Qualcomm," or "induced certain OEMs to accept its preferred license terms using [] the 'stick' of supply disruption." *See* Defs. Ex. 9 ¶¶ 3, 102. Nevertheless, Defendants' alleged misstatements are not at such a high level of generality that one cannot discern the inherent contradiction between those statements and the information in the corrective disclosures when viewed side by side. *See Goldman*, 141 S. Ct. 1960. The fact that Qualcomm allegedly bundled the terms and negotiations of the two businesses and leveraged them against one another does directly contradict the statements that the businesses were "separate." Thus, while the more general nature of the alleged misrepresentations makes price impact slightly less likely, it does not rebut the presumption of price impact by a preponderance of the evidence.

Further, the Court finds that the corrective disclosures contained information regarding bundling that was not publicly available prior to the corrective disclosures. The corrective disclosures revealed the following new information about the company's

1    bundling practices: (1) the First Corrective Disclosure allegedly revealed that Qualcomm
2    did not "properly negotiate" its licenses; (2) the Second Corrective Disclosure allegedly
3    revealed that Qualcomm "illegally paid a major customer for exclusively using Qualcomm
4    chipsets" to force competitors out of the market; (3) the Third Corrective Disclosure
5    allegedly revealed that Qualcomm "withh[eld] its baseband processors unless a customer
6    accept[ed] a license . . . on terms preferred by Qualcomm," "conditioned partial [royalty]
7    relief on [] exclusive use," and "induced certain OEMs to accept its preferred license terms
8    using [] the 'stick' of supply disruption"; and (4) the Fourth Corrective Disclosure allegedly
9    revealed that Qualcomm "illegally leverage[d] its market power to extract exorbitant
10   royalties." *See* Compl. ¶¶ 212, 216, 224, 228; Defs. Exs. 7, 9, 11, 35. Defendants have
11   not pointed to evidence that this precise information was publicly available prior to the
12   corrective disclosures. Although Defendants submit evidence that Qualcomm's practice
13   of only selling chips to licensees was public, the corrective disclosures allegedly revealed
14   far more than just this one practice. Further, although bundling and royalty rebate
15   accusations had been levied against Qualcomm prior to the corrective disclosures, those
16   prior allegations do not mirror the corrective disclosures quoted above. The latter disclosed
17   far more detail regarding the alleged bundling, including the way it occurred, the customers
18   involved, and Qualcomm's alleged abuse of market power. Accordingly, Defendants'
19   evidence in this regard does not sever the link between Defendants' alleged
20   misrepresentations and their impact on the stock price.

21       Because Defendants cannot rebut *Basic's* presumption by demonstrating a lack of
22   price impact, reliance can be resolved on a class-wide basis. *Goldman*, 141 S. Ct. at 1958–
23   59 (noting the *Basic* "presumption allows class-action plaintiffs to prove reliance through
24   evidence common to the class."); *see also Halliburton II*, 573 U.S. at 276. Because the
25   *Basic* presumption applies, Plaintiffs will not need to show that individual class members
26   were aware of, and relied upon, Defendants' alleged misrepresentations about bundling.
27   Instead, class members may be presumed to have relied on the integrity of Qualcomm's
28   stock price, and reliance can be resolved in one stroke.

17cv121-JO-WVG

### 5. Damages

The Court next addresses Defendants' argument that Plaintiffs have not presented a viable method for determining class-wide damages, precluding the ability to proceed as a class action. To satisfy predominance, a plaintiff must propose a plausible methodology for proving damages on a class-wide basis. *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 818 (9th Cir. 2019) (finding predominance where plaintiff's proposed out-of-pocket damages method was routinely recognized as "a reasonable basis of computation" for CLRA claims); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) ("[a]t class certification, plaintiff must present a likely method for determining class damages though it is not necessary to show that his method will work with certainty at this time") (cleaned up). This damages method must be capable of measuring the harm caused by a defendant's illegal conduct. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (a damages model that "does not even attempt" to measure the harm alleged by the plaintiffs does not satisfy predominance requirement); *see also Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016) (interpreting "*Comcast* to mean that plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.") (internal quotations and citation omitted). The Court thus considers whether Plaintiffs have proposed a plausible damages methodology that is linked to their liability case.

The parties do not dispute that the event study Plaintiffs' expert proposes is a plausible method for measuring class-wide damages in a securities case such as this one. An event study is a statistical method that examines whether a specific event had an impact on a public company's stock price. Courts have consistently held that an event study is an appropriate method for measuring stock price inflation caused by alleged misrepresentations and therefore, satisfies the predominance requirement. *City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (the "event study[] method is the standard measurement of damages in Section 10(b) securities cases") (collecting cases)); *see also In re Diamond*

31

*Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 251 (N.D. Cal. 2013). Here, Plaintiff's damages expert, Dr. Tabak, proposes to calculate damages on a class-wide basis using an event study to estimate "the amount of artificial inflation in the market price at issue and calculate[] how much of that inflation is due to the alleged fraud, as opposed to other factors." Reply at 20; Tabak Report ¶¶ 58–60. Consistent with the consensus of the parties in this matter, the Court finds that Plaintiffs' expert has proposed a plausible methodology.

While Defendants do not challenge the plausibility of the model, they do argue that Plaintiffs' damages model fails under *Comcast* because it cannot measure the harm resulting from Plaintiffs' multiple theories of liability. *See Comcast*, 569 U.S. 27. Defendants point to the fact that Plaintiffs posit different categories of misrepresentations—*i.e.*, that Qualcomm's businesses were (1) fair and non-discriminatory, (2) procompetitive, and (3) not bundled. *See* Opp. at 31–33. Defendants hypothesize that if a jury were to find Defendants liable for some of these statements but not all, Plaintiffs' damages model would be unable to determine "what portion of the stock price decline on a given corrective disclosure date was caused" by which alleged misrepresentation. *See id.* at 32.

The Court finds that Plaintiffs' proposed damages methodology is sufficient under *Comcast* because the methodology can isolate different categories of misrepresentations and measure the damages stemming from each. The Court in *Comcast* found that a damages model failed because the completed "model assumed the validity of all four theories of antitrust impact" even though only one theory remained in the case. *See Comcast*, 569 U.S at 36. The model thus calculated damages that were not caused by the defendant's illegal conduct. *See id.* at 36–37. No such issue exists here because Dr. Tabak proposes a model that can isolate and separately measure the impact of each category of misrepresentation. *See* Tabak Report ¶¶ 59–63; *see also* Pltfs. Ex. 6 ("Tabak Reply Report") ¶ 63. He explains that his model accounts for the following factors that may have impacted Qualcomm's stock price and removes them from his damages calculation using "standard [disaggregation] techniques": (1) inflation declines for reasons other than the

corrective disclosures, (2) changes in the market and industry effects, and (3) information in the corrective disclosures that is unrelated to the alleged misrepresentations.  Tabak Report ¶¶ 59–63.  Dr. Tabak also opines that he can use standard techniques to disaggregate the impact of different categories of information, and ultimately, "determine the relative importance of different aspects of [the] alleged corrective disclosure[s]."  *See id.* ¶ 62 n.50; Tabak Reply Report ¶ 63.  Accordingly, contrary to Defendants' assertions, the damages model proposes to parse out the effects that different categories of alleged misrepresentations had on Qualcomm's stock price.  Because Dr. Tabak proposes a damages model that will be designed to measure the damages caused solely by Defendants' alleged misrepresentations and to disaggregate the damages caused by each type of misrepresentation, Plaintiffs' damages model satisfies *Comcast* at this stage.[20]  Plaintiffs' have proposed a plausible method of determining class-wide damages in a manner consistent with *Comcast*.

For the reasons set forth above, the Court concludes that common questions predominate over individual ones with respect to Defendants' bundling misrepresentations, but not with respect to Defendants' licensing misrepresentations.  Because Defendants' have successfully rebutted the presumption that all class members relied on Defendants' licensing misrepresentations, the factfinder would need to make individualized determinations of reliance for each class member in a class of thousands.  These individualized inquiries would undoubtedly overwhelm any common questions.  Accordingly, as stated above, the Court will not certify a class based on this category of

---

[20] The Court notes that the concerns in *Comcast* were, in part, due to the procedural posture of the case—where the damages model was completed based on four theories of liability and the district court dismissed three of those theories afterwards. 569 U.S. at 35–39. Here, Dr. Tabak has yet to implement his proposed model and so can perform his disaggregation techniques as necessary pursuant to this opinion certifying only Plaintiffs' bundling allegations. Should Defendants believe, after Dr. Tabak has completed his currently proposed model, that the completed damages model is insufficiently linked to Plaintiffs' theory of liability under *Comcast*, Defendants can and should raise that in an appropriate motion before the Court.  At present, however, Dr. Tabak's proposed model satisfies *Comcast*.

17cv121-JO-WVG

1   misrepresentations.  Conversely, because Defendants have not rebutted the presumption

2   that all class members relied on Defendants' bundling misrepresentations, the issue of

3   reliance can be resolved in one stroke for all class members using common evidence.

4   Deceptiveness, materiality, and damages are also capable of class-wide resolution because

5   Plaintiffs point to one body of evidence common to all class members such that these

6   elements can be resolved in one stroke.  *See supra* Section III.A.2.  Therefore, the Court

7   concludes that common questions predominate over individual ones with respect to

8   Defendants' alleged bundling misrepresentations such that predominance is satisfied.

9                  *6. Superiority*

10          Having determined that questions of law or fact common to the class predominate

11  with respect to Plaintiffs' "bundling" allegations, the Court also finds that a class action is

12  the superior method of resolving this controversy.  Under Rule 23(b)(3), a class action may

13  be superior if "classwide litigation of common issues will reduce litigation costs and

14  promote greater efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th

15  Cir. 1996).  In evaluating superiority, courts examine (a) the class members' interests in

16  individually controlling separate actions, (b) the extent and nature of any preexisting

17  related litigation, (c) the desirability of concentrating the litigation of the claims in the

18  forum; and (d) manageability.  Fed. R. Civ. P. 23(b)(3).  "A consideration of these factors

19  requires the court to focus on the efficiency and economy elements of the class action so

20  that cases allowed under subdivision (b)(3) are those that can be adjudicated most

21  profitably on a representative basis."  *Zinser*, 253 F.3d at 1190.

22          Here, the putative class includes thousands of investors who purchased Qualcomm's

23  stock between February 1, 2012, and January 20, 2017.  The claim for all investors is the

24  same; that each purchased Qualcomm stock at artificially inflated prices which were caused

25  by Defendants' same alleged misrepresentations.  Because the elements of the class's

26  claims—whether Defendants' statements were false and material, whether the class relied

27  on an efficient market, and whether the class suffered damages—are class-wide questions

28  susceptible to common proof, the Court concludes that trying the claims as a class will be

more efficient and cost-effective than trying the claims on an individual basis. Accordingly, the Court finds that a class action is the superior method of resolving the controversy regarding the alleged bundling practices.

## IV. CONCLUSION AND ORDER

For the reasons set out above, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion for class certification [Dkt. 217]. Plaintiffs' motion is DENIED to the extent Plaintiffs seek to certify their claims regarding Defendants' alleged licensing misrepresentations. With respect to Plaintiffs' remaining claims regarding Defendants' alleged bundling misrepresentations, the Court CERTIFIES a class of investors defined as follows:

> All persons or entities who purchased or otherwise acquired the common stock of Qualcomm between February 1, 2012 and January 20, 2017, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Qualcomm at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

The Court appoints Lead Plaintiffs as class representatives and Bernstein Litowitz Berger & Grossmann LLP and Motley Rice LLC as class counsel.

**IT IS SO ORDERED**.

Dated: March 20, 2023

Hon. Jinsook Ohta
United States District Judge

17cv121-JO-WVG