# PX 81

## (Filed Under Seal)

# PX 82

## (Filed Under Seal)

# PX 83

## (Filed Under Seal)

# PX 84

## (Filed Under Seal)

# PX 85

## (Filed Under Seal)

# PX 86

## (Filed Under Seal)

# PX 87

## (Filed Under Seal)

# PX 88

## (Filed Under Seal)

# PX 89

## (Filed Under Seal)

# PX 90

## (Filed Under Seal)

# PX 91

## (Filed Under Seal)

# PX 92

## (Filed Under Seal)

# PX 93

## (Filed Under Seal)

# PX 94

## (Filed Under Seal)

# PX 95

## (Filed Under Seal)

# PX 96

## (Filed Under Seal)

# PX 97

## (Filed Under Seal)

# PX 98

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | C-17-00220 LHK |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| VS. | ) | JANUARY 11, 2019 |
| QUALCOMM INCORPORATED, A DELAWARE CORPORATION, | ) | VOLUME 4 |
| | ) | PAGES 637-857 |
| DEFENDANT. | ) | SEALED PAGES 739 - 740 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LUCY H. KOH
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF: FEDERAL TRADE COMMISSION
BY: JENNIFER MILICI
DANIEL J. MATHESON
WESLEY G. CARSON
KENT COX
NATHANIEL M. HOPKIN
PHILIP J. KEHL
MIKA IKEDA
JOSEPH BAKER
600 PENNSYLVANIA AVENUE, NW
WASHINGTON, D.C. 20580

APPEARANCES CONTINUED ON NEXT PAGE

OFFICIAL COURT REPORTERS: LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595
IRENE RODRIGUEZ, CSR, CRR, RMR
CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER





APPEARANCES (CONTINUED)

FOR THE DEFENDANT: KEKER, VAN NEST & PETERS
BY: ROBERT A. VAN NEST
JUSTINA K. SESSIONS
EUGENE M. PAIGE
CHRISTINA BLAIS
MATAN SHACHAM
CODY HARRIS
KRISTIN HUCEK
633 BATTERY STREET
SAN FRANCISCO, CALIFORNIA 94111

CRAVATH, SWAINE & MOORE
BY: GARY A. BORNSTEIN
MICHAEL BRENT BYARS
YONATAN EVEN
JORDAN D. PETERSON
MING-TOY TAYLOR
DEREK SUTTON
ANDREW HUYNH
ANTONY RYAN
825 EIGHTH AVENUE
NEW YORK, NEW YORK 10019

ALSO PRESENT: MARK SNYDER
JEFF DAHM
KEN KOTARSKI





INDEX OF WITNESSES


PLAINTIFF'S

**AICHATOU (AICHA) EVANS**
CROSS-EXAM BY MR. RYAN (RES.) P. 654
REDIRECT EXAM BY MR. CARSON P. 662
RECROSS-EXAM BY MR. RYAN P. 664
FURTHER REDIRECT BY MR. CARSON P. 665

**MARK DAVIS**
VIDEOTAPED DEPOSITION P. 667

**TONY BLEVINS**
DIRECT EXAM BY MR. BAKER P. 669
CROSS-EXAM BY MS. SESSIONS P. 715
REDIRECT EXAM BY MR. BAKER P. 733

**INJUNG LEE**
VIDEOTAPED DEPOSITION P. 737

**TODD MADDEROM**
VIDEOTAPED DEPOSITION P. 746

**STEVE MOLLENKOPF**
DIRECT EXAM BY MS. MILICI P. 755
CROSS-EXAM BY MR. VAN NEST P. 802
REDIRECT EXAM BY MS. MILICI P. 842
RECROSS-EXAM BY MR. VAN NEST P. 845






INDEX OF EXHIBITS


| | MARKED | ADMITTED |
|---|---|---|
| PLAINTIFF'S | | |
| 8295, 1770, 1771, 6552 1774 & 1785 | | 677 |
| 0507 | 679 | |
| 8261 | 686 | |
| 0531 | 694 | |
| 0853 | 699 | |
| 0578 | 701 | |
| 0856 | 702 | |
| 0597 | 706 | |
| 0534 | 710 | |
| 11:43:29 11:43:39 2564A, 2568A, 2639A, 2641A, 2642A & 2643A | | 737 |
| 01:27:56 01:28:04 2018, 2060, 2065, 2123, 2124, 2125 & 2168 | | 746 |
| 8287 | 756 | |
| 5376 | 757 | |
| 8190 | 758 | |
| 8191 | 762 | |
| 8198 | 765 | |
| 8197 | 766 | |
| 5913 | 767 | |
| 6439 | 768 | |
| 7559 | 770 | |
| 6381 | 773 | |
| 5348 | 774 | |
| 5357 | 776 | |
| 5360 | 777 | |
| 5425 | 784 | |
| 7668 | 785 | |
| 7592 | 786 | |
| 5378 | 787 | |
| 5381 | 789 | |
| 5739 | 791 | |
| 7910 | 792 | |
| 5389 | 795 | |
| 5391 | 796 | |
| 5527 | 799 | |
| 7257 | 800 | |
| 7824 | 811 | |




PX98

10:01:06 THE RECORD.
10:01:06 THE WITNESS: YES. MY NAME IS TONY BLEVINS, AND THE
10:01:08 LAST NAME IS SPELLED B-L-E-V-I-N-S.
10:01:13 THE COURT: ALL RIGHT. TIME IS 10:01. GO AHEAD,
10:01:16 PLEASE.

10:01:16 **DIRECT EXAMINATION**

10:01:17 BY MR. BAKER:
10:01:17 Q. GOOD MORNING, MR. BLEVINS.
10:01:19 A. **GOOD MORNING, SIR.**
10:01:20 Q. WHERE DO YOU WORK?
10:01:21 A. **I WORK AT APPLE IN CUPERTINO, CALIFORNIA.**
10:01:24 Q. WHAT IS YOUR TITLE?
10:01:25 A. **MY TITLE IS VICE PRESIDENT OF PROCUREMENT.**
10:01:30 I'M SORRY. VICE PRESIDENT OF PROCUREMENT.
10:01:32 Q. WHAT ARE YOUR RESPONSIBILITIES IN THAT ROLE?
10:01:34 A. **ESSENTIALLY MY TEAM IS RESPONSIBLE FOR ACQUIRING GOODS,**
10:01:38 **MATERIALS, LABOR, OTHER SERVICES THAT APPLE NEEDS TO ASSEMBLE**
10:01:41 **AND SHIP ITS FINAL PRODUCTS TO CONSUMERS.**
10:01:44 Q. WHEN DID APPLE LAUNCH ITS FIRST IPHONE?
10:01:47 A. **MY RECOLLECTION IS WE ANNOUNCED IT IN JANUARY OF 2007, AND**
10:01:52 **THEN WE SHIPPED IT IN JUNE OF THAT YEAR.**
10:01:54 Q. AND HOW MANY COMPONENTS ARE IN AN IPHONE?
10:01:57 A. **EACH IPHONE WOULD VARY. BUT YOU CAN SAFELY SAY THAT THERE**
10:02:01 **ARE APPROXIMATELY, PLUS OR MINUS, 1,000 COMPONENTS PER IPHONE.**
10:02:04 Q. AND HAVE YOUR RESPONSIBILITIES SINCE 2007 INCLUDED





10:02:08 PURCHASING MODEM CHIPS FOR APPLE IPHONES?
10:02:10 A. **YES, THAT IS CORRECT, SIR.**
10:02:12 Q. WHAT SORT OF FACTORS DOES APPLE TAKE INTO CONSIDERATION
10:02:15 WHEN MAKING MODEM CHIP PROCUREMENT DECISIONS?
10:02:18 A. **THERE ARE MANY FACTORS. WE STRIVE FOR OVERALL BEST VALUE.**
10:02:22 **SO WE'LL LOOK AT TECHNICAL ATTRIBUTES AND CHARACTERISTICS OF A**
10:02:27 **PARTICULAR OFFERING; WE WILL EXAMINE VARIOUS COST FACTORS,**
10:02:32 **TOTAL COST OF OWNERSHIP IS CERTAINLY IMPORTANT; WE'LL LOOK AT**
10:02:35 **THE QUALITY OF THE COMPONENTS.**
10:02:36 SO WE TRY TO LOOK AT THE TOTAL OWNERSHIP EXPERIENCE AND
10:02:39 ACHIEVE OVERALL BEST VALUE IT WOULD BE SAFE TO SAY.
10:02:43 Q. DO YOU TAKE INTO ACCOUNT ASSOCIATED I.P. LICENSING COSTS
10:02:49 IN MAKING MODEM CHIP PROCUREMENT DECISIONS?
10:02:52 A. **YES. AS A MATTER OF FACT, WE LOOK AT WHAT WE TERM TOTAL**
10:02:55 **COST OF OWNERSHIP.**
10:02:56 Q. HOW OFTEN DOES APPLE CHOOSE TO BUY A SINGLE COMPONENT FROM
10:03:02 MULTIPLE SUPPLIERS?
10:03:05 A. **INFREQUENTLY. I CAN TELL YOU THAT WE REALLY VALUE MARKET**
10:03:09 **COMPETITION AND LEVERAGE. WE THINK THAT'S A VERY IMPORTANT**
10:03:11 **CONCEPT FOR US TO ACHIEVE OVERALL BEST VALUE.**
10:03:13 **SO AS WE SOURCE COMPONENTS, WE TYPICALLY STRIVE TO GET AT**
10:03:17 **LEAST TWO SOURCES, PROBABLY NOT MORE THAN SIX FOR EFFICIENCY**
10:03:21 **REASONS. AND IT VARIES CIRCUMSTANTIALLY. BUT WE ALWAYS TRY TO**
10:03:24 **GENERATE ENOUGH SOURCES TO ESTABLISH SOME COMPETITION. IN SOME**
10:03:28 **CASES THAT'S NOT POSSIBLE AND WE WIND UP WITH ONE SOURCE, WHICH**





10:03:32 **IS CERTAINLY A LOT MORE CHALLENGING.**
10:03:33 Q. JUST TO BE CLEAR, IT'S INFREQUENT FOR APPLE TO HAVE A
10:03:36 SINGLE SOURCE FOR A GIVEN COMPONENT?
10:03:37 A. **YES, IT'S INFREQUENT. IT DOES HAPPEN UNFORTUNATELY ON**
10:03:40 **OCCASION.**
10:03:41 Q. WHEN APPLE DOES SOLE SOURCE ON IPHONE COMPONENT, DOES
10:03:44 APPLE GENERALLY AGREE TO BUY THAT COMPONENT EXCLUSIVELY FROM
10:03:48 THAT SOLE SUPPLIER?
10:03:48 A. **NO. MY EXPERIENCE OVER THE COURSE OF THE LAST 18 YEARS IS**
10:03:53 **WE HAVE ONLY AGREED TO DO THAT ONCE.**
10:03:55 Q. WHY IS IT UNCOMMON FOR APPLE TO AGREE TO EXCLUSIVITY?
10:03:59 A. **WELL, AS I MENTIONED EARLIER, THAT WE THINK MARKET**
10:04:02 **COMPETITION AND MARKET FORCES ARE VERY IMPORTANT FOR US TO**
10:04:05 **ACHIEVE OVERALL BEST LEVERAGE. AND SO FOR THAT REASON, YOU**
10:04:09 **WOULDN'T WANT TO LIMIT YOURSELF TO ONE SOURCE BECAUSE YOU**
10:04:12 **ESSENTIALLY EVISCERATE THAT COMPETITION.**
10:04:14 AND FOLLOWING THAT, YOU CERTAINLY WOULDN'T WANT TO ENTER
10:04:17 INTO AN EXCLUSIVITY AGREEMENT UNLESS YOU ABSOLUTELY HAD TO
10:04:21 BECAUSE THERE WOULD BE ABSOLUTELY NO COMPETITION AT THAT POINT.
10:04:24 Q. DO YOU UNDERSTAND THE TERMS GSM, CDMA, UMTS, AND LTE?
10:04:29 A. **YES, I HEAR THOSE TERMS AS A PART OF MY WORK AT APPLE.**
10:04:33 Q. AND WHAT IS YOUR UNDERSTANDING OF WHAT THOSE TERMS REFER
10:04:36 TO?
10:04:37 A. **EACH OF THEM ARE DIFFERENT WIRELESS STANDARDS.**
10:04:40 Q. DOES APPLE SELL IPHONES THAT ARE COMPATIBLE WITH BOTH CDMA





10:04:45 AND UMTS?
10:04:46 A. **YES, WE DO.**
10:04:48 Q. WERE THE EARLIEST IPHONES COMPATIBLE WITH CDMA?
10:04:52 A. **THE EARLIEST ONES WERE NOT.**
10:04:54 Q. WHAT STANDARDS DID THEY EMPLOY?
10:05:00 A. **THE VERY EARLIEST PHONES WERE GSM AND GSM EDGE. THEN**
10:05:06 **LATER UMTS, AND IT WASN'T UNTIL MUCH LATER, I BELIEVE JANUARY**
10:05:11 **OF 2011, THAT WE MADE OUR FIRST CDMA OFFERING.**
10:05:14 Q. WHAT CAUSED APPLE TO START MAKING CDMA PHONES?
10:05:17 A. **WE DESIRED TO SELL PRODUCTS ON THE VERIZON NETWORK IN**
10:05:22 **PARTICULAR, AND THERE WERE SOME OTHERS AROUND THE WORLD, JAPAN,**
10:05:25 **FOR EXAMPLE.**
10:05:26 SO THERE WERE SOME NETWORKS THAT WE DESIRED TO SELL
10:05:29 PRODUCTS ON, AND THE ONLY WAY THAT WE COULD DO THAT WAS TO
10:05:31 DESIGN CDMA CAPABLE OFFERING BECAUSE THAT'S WHAT THEIR NETWORKS
10:05:36 OVER THE INTERFACE WAS.
10:05:37 Q. WHEN DID APPLE FIRST LAUNCH AN IPHONE THAT SUPPORTED 4G
10:05:41 LTE STANDARDS?
10:05:42 A. **MY RECOLLECTION IS OUR FIRST LTE PRODUCT OFFERING WOULD**
10:05:46 **HAVE BEEN FALL 2012.**
10:05:47 Q. SINCE LAUNCHING THE FIRST LTE BASED IPHONE, HAS APPLE
10:05:51 LAUNCHED ANY NEW CELLULAR DEVICES THAT DO NOT SUPPORT LTE?
10:05:55 A. **NO. AFTER THAT LAUNCH, ALL SUCCESSFUL LAUNCHES HAVE ALSO**
10:06:00 **SUPPORTED LTE.**
10:06:01 Q. HAVE YOU HEARD THE TERM PREMIUM LTE USED IN RELATION TO

MODEM CHIPS?

A. **YES, I HAVE.**

Q. WHAT IS YOUR UNDERSTANDING OF WHAT PREMIUM MODEM LTE CHIPS ARE?

A. **PREMIUM LTE CHIPS WOULD BE A SUPERIOR OFFERING AS COMPARED TO STANDARD.**

Q. IN YOUR VIEW, WHAT CHARACTERISTICS DISTINGUISH PREMIUM LTE CHIPS FROM NON-PREMIUM LTE CHIPS?

A. **THERE ARE MANY. BUT IN ESSENCE, I WOULD SAY THAT THE SPEED OF THE CHIPS, THE UPLINK AND DOWNLINK PERFORMANCE, CERTAINLY THE CHARACTERISTICS, QUALITY IS VERY IMPORTANT, SIZE, MINIATURIZATION BEING FAR PREFERABLE IS IMPORTANT, POWER CONSUMPTION OF THE CHIP. IN A MOBILE DEVICE, PEOPLE LIKE THEIR BATTERIES TO LAST LONGER.**

SO THOSE WOULD BE SOME OF THE HIGH LEVEL ATTRIBUTES THAT WOULD DISTINGUISH A PREMIUM CHIP FROM SOMETHING WE WOULD CONSIDER NON-PREMIUM.

Q. IS THERE A PRICE DIFFERENCE BETWEEN PREMIUM AND NON-PREMIUM LTE CHIPS?

A. **GENERALLY SPEAKING, THERE'S A PRICE DIFFERENCE. IT WOULD VARY BY QUARTER AND BY SUPPLIER, BUT A PREMIUM CHIP WOULD COST ROUGHLY DOUBLE WHAT WE DETERMINE A NON-PREMIUM CHIP WOULD COST.**

Q. DOES APPLE BUY PREMIUM LTE CHIPS?

A. **YES. WE FOCUS EXCLUSIVELY ON PREMIUM CHIPS. OUR PERCEPTION IS THAT THE IPHONE IS A PREMIUM SMARTPHONE, SO**





**THEREFORE ALL OF ITS COMPONENTS NEED TO BE THE BEST THAT WE CAN POSSIBLY DESIGN OR ACQUIRE.**

Q. WHEN APPLE FIRST BEGAN BUYING LTE CHIPS FOR THE 2012 IPHONE, WHICH COMPANIES WERE CAPABLE OF SUPPLYING CHIPS THAT MET APPLE'S NEEDS?

A. **MY RECOLLECTION IS OUR ASSESSMENT WAS THAT QUALCOMM HAD A SUPERIOR OFFERING, AND SO THEREFORE, WE NARROWED OUR CHOICE TO QUALCOMM FOR THAT FIRST OFFERING.**

Q. DID THAT EVER CHANGE?

A. **IT CHANGED LATER. I THINK AROUND 2016, WE SOURCED WITH BOTH QUALCOMM AND INTEL.**

Q. AND IN BETWEEN 2012 AND 2016, WERE OTHER SUPPLIERS CAPABLE OF SUPPLYING PREMIUM LTE CHIPS THAT MET APPLE'S NEEDS?

A. **YES. IN PARTICULAR, WE FELT THAT INTEL HAD CAPABILITY IN THAT INTERIM PERIOD.**

Q. FOR THE FIRST IPHONE LAUNCHED IN 2007, WHEN DID YOU START COMMUNICATING WITH POTENTIAL MODEM CHIP SUPPLIERS?

A. **WE STARTED APPROXIMATELY TWO YEARS IN ADVANCE OF THE LAUNCH. AND SO AROUND SPRING TO SUMMER OF 2005 IS WHEN MOST OF THAT WORK WAS GOING ON.**

Q. WHAT TYPE OF MODEM CHIPS WAS APPLE SEEKING AT THAT TIME?

A. **AT THAT POINT IN TIME, WE WERE LOOKING AT GSM EDGE FOR WHAT WOULD BE THE FIRST IPHONE IN 2007; AND WE WERE ALSO THINKING ABOUT WHAT WOULD BECOME ITS SUCCESSOR IN 2008, WHICH WAS A 3G IPHONE.**





Q. AND WHOSE MODEM CHIPS DID YOU END UP USING IN THAT FIRST IPHONE?

A. **IN THE FINAL ANALYSIS, WE SELECTED INFINEON OF MUNICH, GERMANY.**

Q. DID APPLE CONSIDER QUALCOMM AT THAT TIME?

A. **WE ATTEMPTED TO CONSIDER THEM, YES.**

Q. WHAT WAS THE RESULT OF THAT?

A. **IT WAS UNSUCCESSFUL, THAT IN THIS CASE, AS IS STANDARD PROTOCOL FOR US, WE WOULD GO OUT TO POTENTIAL SUPPLIERS, WE WOULD ASK FOR SAMPLES, WE WOULD ASK FOR TECHNICAL SPECIFICATIONS SO THAT WE CAN BEGIN TO DO THE VALUE ANALYSIS THAT I MENTIONED.**

WE DIDN'T HAVE ANY EXPERIENCE WITH QUALCOMM AT THAT POINT, AND WE WERE SURPRISED THAT INSTEAD OF OFFERING US SAMPLES AND SPECIFICATIONS, WE GOT A LETTER INDICATING THAT THEY HAD A LICENSING AGREEMENT THAT HAD TO BE COMPLETED PRIOR TO THEM SHIPPING US ANY SAMPLES OR HAVING ANY ENGAGEMENT.

Q. I'D LIKE YOU TO LOOK IN THE BINDER OF EXHIBITS THAT YOU HAVE AT TAB 2, PLEASE. THAT'S JX 0032.

THIS IS AN E-MAIL FROM JEFF ALTMAN TO SOMEBODY NAMED B. CORLETT.

I WANT TO ASK YOU, YOU'RE NOT NAMED ON THIS E-MAIL, BUT HAVE YOU EVER SEEN IT?

A. **YES, I RECALL THIS SPECIFICALLY. B. CORLETT WAS BARRY CORLETT. HE WAS THE ENGINEER IN CHARGE OF DOING THE WORK THAT**





**I DESCRIBED. HE RECEIVED THIS LETTER IN SUBSTITUTE OF SAMPLES HE WAS EXPECTING, AND SO HE IMMEDIATELY BROUGHT IT TO ME AND ASKED ME WHAT I THOUGHT ABOUT THIS AND REQUESTED SOME GUIDANCE.**

AND I TOLD HIM THAT UNFORTUNATELY, I'D SPENT 20 YEARS IN THE INDUSTRY, I HAD NEVER SEEN A LETTER LIKE THIS. IT WAS GOING TO TAKE ME SOME TIME TO EVALUATE, BUT IT LOOKED LIKE THERE WAS A REQUIREMENT FOR AN AGREEMENT BEFORE WE GOT SAMPLE.

MR. BAKER: YES. YOUR HONOR, I MOVE THE ADMISSION OF JX 0032.

MS. SESSIONS: NO OBJECTION.

THE COURT: IT'S ADMITTED.

(JOINT EXHIBIT JX 0032 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.

BY MR. BAKER:

Q. MR. BLEVINS, IF YOU COULD FOCUS ON THE PARAGRAPH NEAR THE BOTTOM OF THE PAGE THAT BEGINS "ONCE THIS PATENT LICENSE HAS BEEN COMPLETED."

CAN YOU EXPLAIN WHAT YOU UNDERSTOOD QUALCOMM TO BE COMMUNICATING TO APPLE IN THIS LETTER.

A. **OUR INTERPRETATION WAS THAT THIS ESSENTIALLY MEANT NO LICENSE, NO CHIPS, THAT YOU COULDN'T BUY ANY CHIPS WITHOUT A LICENSE. IN FACT, YOU COULDN'T GET ANY SAMPLES OF CHIPS, YOU COULDN'T GET ANY SPECIFICATIONS OF CHIPS.**

**THAT THE FIRST ORDER OF BUSINESS WAS TO COMPLETE A LICENSE, AND WE LATER LEARNED THAT LICENSE ALSO REQUIRED APPLE**



PX98

10:11:12 TO CROSS-LICENSE ITS I.P. BACK TO QUALCOMM, WHICH WE FOUND
10:11:16 UNSETTLING.
10:11:17 Q. WHAT WAS YOUR REACTION TO THIS?
10:11:19 A. WE WERE TAKEN ABACK. WE DIDN'T EXACTLY KNOW WHAT TO MAKE
10:11:24 OF IT.
10:11:25 BUT WE KNEW THAT WE WEREN'T GOING TO CROSS-LICENSE ALL OF
10:11:28 OUR I.P. BACK TO QUALCOMM. WE WERE SIMPLY TRYING TO BUY A
10:11:34 CHIP.
10:11:34 SO AT THIS POINT WE ESSENTIALLY ELIMINATED QUALCOMM FROM
10:11:38 FURTHER CONSIDERATION. WE NEEDED TO MAKE A CHIP DECISION, AND
10:11:41 WE KNEW THIS WAS GOING TO TAKE TOO LONG TO UNRAVEL.
10:11:44 Q. HAS ANY OTHER MODEM CHIP SUPPLIER DEMANDED THAT APPLE
10:11:47 ENTER INTO A LICENSE BEFORE SENDING ENGINEERING SAMPLES TO
10:11:51 APPLE?
10:11:52 A. NO, NO NEVER.
10:11:53 Q. HAVE YOU EVER HAD ANY COMPONENT SUPPLIER IN THE IPHONE
10:11:57 MAKE SUCH A DEMAND?
10:11:59 A. ACTUALLY, YES. I CAN THINK OF ONE INSTANCE A COUPLE OF
10:12:02 YEARS BACK, THE REASON I RECALL THIS ONE, I HAPPENED TO BE ON
10:12:06 VACATION DURING A DATE THAT NXP SEMICONDUCTOR HAD A MEETING
10:12:10 WITH MY TEAM AND CAME IN AND SAID THAT THEY HAD A LICENSING
10:12:13 REQUIREMENT FOR THEIR NFC CHIP.
10:12:16 SO I RECALL BEING REALLY TAKEN ABACK BY THAT, AND SO
10:12:20 DESPITE THE FACT THAT I WAS ON VACATION THAT DAY, I CALLED
10:12:23 THEIR CEO THAT VERY DAY AND WE QUASHED IT. WE TOLD THEM THAT





10:12:26 IF THEY WANTED MORE MONIES FROM APPLE, THEY SHOULD PRICE IT
10:12:29 INTO THEIR HARDWARE. AND IF THEIR HARDWARE WERE COMPETITIVE,
10:12:35 WE WOULD CONTINUE TO BUY IT. IF WE WERE UNCOMPETITIVE, WE
10:12:39 WOULD GO TO SONY OR SOMEONE ELSE. THEY WITHDREW THEIR LICENSE
10:12:42 THAT DAY. WE QUASHED IT. OTHER THAN THAT, I CAN'T THINK OF
10:12:45 ANOTHER INSTANCE.
10:12:46 Q. HAVE YOU EVER HAD A SUPPLIER REQUEST A CROSS-LICENSE TO
10:12:48 APPLE'S I.P. BEFORE THEY WOULD AGREE TO SEND ENGINEERING
10:12:53 SAMPLES TO APPLE?
10:12:53 A. THIS IS THE ONLY ONE THAT I'VE EVER PERSONALLY SEEN.
10:12:56 Q. DID APPLE ENTER INTO A LICENSE AGREEMENT WITH QUALCOMM?
10:12:58 A. NO. TO THIS DATE, WE'VE NOT ENTERED INTO A LICENSE
10:13:03 AGREEMENT WITH THEM.
10:13:04 Q. WHY NOT?
10:13:04 A. THERE HAVE BEEN A NUMBER OF STUMBLING BLOCKS. THE BIGGEST
10:13:09 ONE IS WE DON'T UNDERSTAND WHY, IN ORDER TO BUY A COMPONENT
10:13:13 FROM THEM, WE HAVE TO ENTER INTO A LICENSING AGREEMENT THAT
10:13:18 CROSS-LICENSES ALL OF APPLE'S I.P. BACK TO THEM. WE SIMPLY
10:13:23 DON'T UNDERSTAND WHY THAT'S FAIR OR WHY IT'S IN ANYONE'S BEST
10:13:26 INTEREST, OTHER THAN QUALCOMM.
10:13:27 Q. I'D LIKE YOU TO TURN TO TAB 3 IN YOUR BINDER, PLEASE.
10:13:34 THIS IS EXHIBIT CX 0507.
10:13:37 A. YES.
10:13:37 Q. THIS IS AN E-MAIL FROM QUALCOMM TO YOU DATED
10:13:42 SEPTEMBER 11TH, 2006.





10:13:44 DO YOU RECOGNIZE THIS DOCUMENT?
10:13:45 A. YES, I RECALL SEEING THIS DOCUMENT.
10:13:47 Q. WHAT IS IT?
10:13:47 A. AT THAT POINT IN TIME, WE SENT OUT AN RFQ, OR REQUEST FOR
10:13:52 QUOTATION. WE WERE LOOKING FOR A PROPOSAL FROM VARIOUS
10:13:55 SUPPLIERS TO PROVIDE APPLE BASEBAND MODEMS. SO THIS WOULD
10:14:02 APPEAR TO BE QUALCOMM'S RESPONSE TO THAT REQUEST.
10:14:05 MR. BAKER: YOUR HONOR, I MOVE TO ADMIT CX 0507.
10:14:09 MS. SESSIONS: NO OBJECTION.
10:14:09 THE COURT: IT'S ADMITTED.
10:14:10 (PLAINTIFF'S EXHIBIT CX 0507 WAS ADMITTED IN EVIDENCE.)
10:14:10 THE COURT: GO AHEAD, PLEASE.
10:14:11 BY MR. BAKER:
10:14:13 Q. MR. BLEVINS, TURNING TO PAGE 3 OF THIS EXHIBIT, IT LOOKS
10:14:16 LIKE THERE'S AN ATTACHMENT TO THE E-MAIL. CAN YOU TELL ME WHAT
10:14:19 THIS ATTACHMENT IS?
10:14:21 A. YES. AS I RECALL, THIS IS WHAT QUALCOMM CALLED A SULA, OR
10:14:24 A SUBSCRIBER UNIT LICENSE AGREEMENT. SO ONCE AGAIN, THEY WERE
10:14:28 REITERATING THAT YOU HAVE TO SIGN THIS LICENSE AGREEMENT IF YOU
10:14:31 WANT TO BUY CHIPS.
10:14:33 SO IT WAS A CONTINUATION OF THE POLICY THAT WE DETERMINED
10:14:35 NO LICENSE, NO CHIPS.
10:14:36 Q. AND TURNING TO PAGE 49 OF THIS EXHIBIT, PLEASE, THERE'S
10:14:39 ANOTHER ATTACHMENT. IT'S TITLED SUMMARY OF THIRD PARTY I.P.
10:14:45 RIGHTS BENEFITING CUSTOMERS OF QUALCOMM'S MSM'S AND SOFTWARE.





10:14:50 DO YOU SEE THAT?
10:14:50 A. YES.
10:14:51 Q. CAN YOU TELL ME WHAT THAT IS?
10:14:54 A. YES. APPLE'S PHILOSOPHY IS WHEN WE WANT TO BUY HARDWARE,
10:14:59 THAT AMONG OTHER THINGS WE WANT TO BUY IT EXHAUSTIVELY, AND WE
10:15:02 ALSO WANT INDEMNIFICATION, MEANING WE WANT FREEDOM OF USE ONCE
10:15:07 WE PURCHASE THE HARDWARE.
10:15:08 QUALCOMM SAID THAT INSTEAD OF PROVIDING US THE INDEMNITY
10:15:11 THAT WE THOUGHT WAS CRITICAL, THEY WOULD INSTEAD SUMMARIZE A
10:15:15 BUNDLE OF I.P. RIGHTS THAT MIGHT COME WITH USE OF THEIR CHIPS,
10:15:18 IMPLYING THAT OTHERS MAY HAVE SIGNED AGREEMENTS THAT WERE
10:15:21 SIMILAR OR SAME AS THE ONE THEY SENT US.
10:15:25 Q. AND THIS DOCUMENT WAS SUBMITTED BY QUALCOMM IN CONNECTION
10:15:27 WITH ITS RESPONSE TO APPLE'S MODEM CHIP RFP; IS THAT RIGHT?
10:15:31 A. YES, THAT'S CORRECT.
10:15:32 Q. DID APPLE EVENTUALLY ENTER INTO AGREEMENTS WITH QUALCOMM?
10:15:37 A. YES, WE DID ENTER INTO A DIRECT LICENSING AGREEMENT. BUT
10:15:40 WE HAVE ENTERED INTO AGREEMENTS WITH THEM SINCE.
10:15:46 Q. ARE YOU FAMILIAR WITH A 2007 AGREEMENT BETWEEN APPLE AND
10:15:51 QUALCOMM CALLED THE MARKETING INCENTIVE AGREEMENT?
10:15:54 A. YES. I WAS NOT THE SIGNATOR OF THAT AGREEMENT. BUT SINCE
10:15:59 THAT POINT IN TIME, I HAVE BECOME FAMILIAR WITH IT.
10:16:02 Q. IF YOU TURN TO TAB 4 IN YOUR EXHIBIT BINDER, PLEASE.
10:16:06 THAT'S EXHIBIT JX 0040.
10:16:10 IS THAT THE 2007 MARKETING INCENTIVE AGREEMENT?



PX98

A. YES. I'VE SEEN THIS DOCUMENT MANY TIMES.

MR. BAKER: PORTIONS OF THIS DOCUMENT HAVE BEEN SEALED, YOUR HONOR. I MOVE ITS ADMISSION, JX 0040.

MS. SESSIONS: NO OBJECTION.

THE COURT: IT'S ADMITTED.

(JOINT EXHIBIT JX 0040 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.

BY MR. BAKER:

Q. MR. BLEVINS, ARE YOU FAMILIAR WITH THE 2009 AGREEMENT BETWEEN APPLE AND QUALCOMM CALLED THE STRATEGIC TERMS AGREEMENT?

**A. YES. I WAS NOT THE SIGNATOR OF THAT AGREEMENT. BUT I'M VERY FAMILIAR WITH THE AGREEMENT.**

Q. IF YOU TURN TO TAB 5 IN YOUR BINDER AND LOOK AT EXHIBIT JX 0052. IS THAT THE 2009 STRATEGIC TERMS AGREEMENT?

**A. PARDON, BUT I MAY BE MISSING TAB 5.**

MR. BAKER: YOUR HONOR, MAY I APPROACH?

THE COURT: GO AHEAD, PLEASE.

THE WITNESS: THANK YOU.

YES, I'M VERY FAMILIAR WITH THIS DOCUMENT.

MR. BAKER: YOUR HONOR, I MOVE TO ADMIT JX 0052. PORTIONS OF THIS DOCUMENT ALSO HAVE BEEN SEALED.

MS. SESSIONS: NO OBJECTION.

THE COURT: OKAY. IT'S ADMITTED.

(JOINT EXHIBIT JX 0052 WAS ADMITTED IN EVIDENCE.)





BY MR. BAKER:

Q. MR. BLEVINS, ARE YOU FAMILIAR WITH THE 2011 AGREEMENT BETWEEN APPLE AND QUALCOMM CALLED THE TRANSITION AGREEMENT?

**A. YES. ONCE AGAIN, I WAS NOT THE SIGNATOR, BUT I HAVE BECOME VERY FAMILIAR WITH THE AGREEMENT SINCE THAT TIME.**

Q. AND ARE YOU FAMILIAR WITH THE 2013 AGREEMENT BETWEEN APPLE AND QUALCOMM CALLED THE FIRST AMENDMENT TO TRANSITION AGREEMENT?

**A. YES, I AM. ONCE AGAIN, I WAS NOT THE SIGNATOR, BUT I'M VERY FAMILIAR WITH IT.**

Q. IS THERE A DOCUMENT CALLED JX 0057 BEHIND TAB 6 IN YOUR BINDER?

**A. YES.**

Q. DOES THE 2011 TRANSITION AGREEMENT APPEAR AT PAGES 1 THROUGH 5 OF THIS EXHIBIT?

**A. YES, IT DOES.**

Q. AND DOES THE 2013 FIRST AMENDMENT TO TRANSITION AGREEMENT APPEAR AT PAGES 6 THROUGH 13 OF THE AGREEMENT? OF THE EXHIBIT?

**A. YES, IT DOES.**

MR. BAKER: YOUR HONOR, I MOVE THE ADMISSION OF JX 0057. PORTIONS OF THIS DOCUMENT ALSO HAVE BEEN SEALED.

MS. SESSIONS: NO OBJECTION.

THE COURT: IT'S ADMITTED.

(JOINT EXHIBIT JX 0057 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.





BY MR. BAKER:

Q. MR. BLEVINS, ARE YOU FAMILIAR WITH THE 2013 AGREEMENT BETWEEN APPLE AND QUALCOMM CALLED THE BUSINESS COOPERATION AND PATENT AGREEMENT?

**A. YES, I'M FAMILIAR WITH THAT DOCUMENT.**

Q. IS THAT AGREEMENT SOMETIMES REFERRED TO AS THE BCPA?

**A. YES, IN FACT, IT IS.**

Q. IF YOU TURN TO TAB 7 IN YOUR BINDER, WHICH WOULD BE EXHIBIT JX 0078. IS THAT THE 2013 BCPA?

**A. YES, IT IS.**

MR. BAKER: YOUR HONOR, I MOVE TO ADMIT JX 0078, ALSO PARTIALLY REDACTED.

MS. SESSIONS: NO OBJECTION.

THE COURT: IT'S ADMITTED.

(JOINT EXHIBIT JX 0078 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.

BY MR. BAKER:

Q. MR. BLEVINS, AS I'VE NOTED, EACH OF THOSE AGREEMENTS THAT WE'VE JUST DISCUSSED HAS BEEN PARTIALLY SEALED BY THE COURT, AND I WOULD ASK IN OUR DISCUSSIONS TODAY OF THIS AGREEMENTS, IF YOU COULD AVOID PROVIDING ANY SPECIFIC PERCENTAGE AMOUNTS, SPECIFIC DOLLAR AMOUNTS FROM THOSE AGREEMENTS AS WE DISCUSS THEM?

**A. YES, I UNDERSTAND.**

Q. THANK YOU.





AS APPLE WAS PREPARING TO LAUNCH ITS FIRST CDMA IPHONE, DID IT EVALUATE CDMA MODEM CHIP SUPPLIERS.

**A. WE ATTEMPTED TO, BUT WE VERY RAPIDLY CAME TO THE CONCLUSION THAT OUR ONLY ALTERNATIVE WAS QUALCOMM.**

Q. WHAT DID APPLE DO AS A RESULT OF THAT CONCLUSION?

**A. AS A RESULT OF THAT, WE ENTERED INTO AN AGREEMENT WITH US THAT WOULD GIVE OUR AUTHORIZED PURCHASERS THE ABILITY TO BUY THOSE MODEMS.**

Q. DOES APPLE TYPICALLY SEEK TO PUT IN PLACE SUPPLY AGREEMENTS WITH ITS COMPONENT SUPPLIERS?

**A. YES, OF COURSE. WE DO THAT, AND IT'S VERY IMPORTANT TO US.**

Q. WHAT ARE SOME OF THE IMPORTANT TERMS THAT APPLE TYPICALLY INCLUDES IN THESE AGREEMENTS?

**A. THERE ARE MANY IMPORTANT TERMS THAT WE WANT TO MAKE CERTAIN THE PERFORMANCE SPECIFICATIONS ARE WELL KNOWN, WE WANT TO ENSURE THAT WE'RE GETTING VERY HIGH QUALITY PRODUCTS, WE WANT TO BUY THE HARDWARE EXHAUSTIVELY, WE REQUIRE INDEMNIFICATION, WE WANT VERY STRICT QUALITY STANDARDS TO BE HONORED.**

WE WANT THE PRICING TO BE COMPETITIVE, WE WANT SUPPLY CONTINUITY ASSURANCES.

SO THERE ARE MANY THINGS THAT WE REQUEST IN THOSE AGREEMENTS.

Q. WHY IS SUPPLY CONTINUITY IMPORTANT TO APPLE?



PX98

A. SUPPLY CONTINUITY IS ABSOLUTELY CRITICAL TO US, THAT WE DESIGN OUR PRODUCTS IN CUPERTINO, CALIFORNIA, BUT APPLE DOESN'T OWN ITS OWN MANUFACTURING FACILITIES. WE CAN'T MAKE THOSE PARTS OR COMPONENTS. THEREFORE, WE ARE VERY DEPENDENT ON A SUPPLIER NETWORK TO MAKE THOSE COMPONENTS, SHIP THEM IN ORDER FOR US TO HAVE CONTINUOUS SUPPLY TO CUSTOMERS AND TO RECEIVE REVENUES THAT WE NEED TO FUEL FURTHER DEVELOPMENT.

AND SO IF THERE IS A DISRUPTION IN SUPPLY OF A SINGLE COMPONENT, BEARING IN MIND THERE'S AROUND 1,000 COMPONENTS PER IPHONE, WE DON'T SHIP IPHONE, WE DON'T COLLECT ANY REVENUE. SO THAT IS A HUGE PROBLEM FOR US.

Q. DID APPLE EVENTUALLY ENTER INTO A SUPPLY AGREEMENT WITH QUALCOMM PRIOR TO BEGINNING TO BUY MODEM CHIPS FROM QUALCOMM?

A. YES, WE DID.

Q. WAS THAT THE STRATEGIC TERMS AGREEMENT THAT WE LOOKED AT EARLIER?

A. THAT IS CORRECT, SIR.

Q. GENERALLY SPEAKING, HOW DID THE BUSINESS TERMS OF THE 2009 STRATEGIC TERMS AGREEMENT COMPARE TO APPLE'S SUPPLY AGREEMENTS WITH OTHER SUPPLIERS?

A. THEY ARE VERY, VERY DISSIMILAR. THEY'RE NOT WHAT WE TYPICALLY WANT. EXAMPLES I CAN GIVE YOU IS WE WANT TO BUY PARTS EXHAUSTIVELY; THE AGREEMENT DOESN'T PROVIDE FOR THAT. WE WANT INDEMNIFICATION; THE AGREEMENT DOESN'T PROVIDE FOR THAT. WE WANT VERY STRINGENT QUALITY STANDARDS; THE AGREEMENT DOESN'T





PROVIDE FOR THAT. WE WANT VERY STRONG SUPPLY ASSURANCES, AS I MENTIONED BEFORE FOR OBVIOUS REASONS; THE AGREEMENT DOESN'T PROVIDE FOR THAT.

SO THE TWO ARE SO DISSIMILAR, IT WOULD BE DIFFICULT TO COMPARE THEM BRIEFLY OTHER THAN TO SAY THAT THEY'RE VERY DISSIMILAR, AND THEY DON'T MATCH THE OBJECTIVES THAT WE ACHIEVE WITH OTHER SUPPLIERS.

Q. IF YOU COULD TURN TO TAB 8 IN YOUR EXHIBIT BINDER, PLEASE.

A. YES.

Q. LOOKING AT THE -- THIS IS EXHIBIT CX 8261, AND THE SECOND E-MAIL DOWN IS AN E-MAIL FROM ERIC KOLIANDER OF QUALCOMM TO YOU DATED FEBRUARY 22ND, 2008.

DO YOU SEE THAT?

A. YES, I SEE IT.

Q. DO YOU RECOGNIZE THIS E-MAIL?

A. YES, I RECOGNIZE AND RECALL THIS E-MAIL.

Q. WAS THIS DOCUMENT RELATED TO THE NEGOTIATION OF THE 2009 STRATEGIC TERMS AGREEMENT?

A. YES, IT IS.

MR. BAKER: YOUR HONOR, I MOVE TO ADMIT CX 8261.

MS. SESSIONS: NO OBJECTION.

THE COURT: IT'S ADMITTED.

(PLAINTIFF'S EXHIBIT CX 8261 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.

BY MR. BAKER:





Q. IF YOU COULD TURN TO PAGE 4 OF THIS EXHIBIT, PLEASE, SECOND PAGE OF THE ATTACHMENT.

THE COURT: IS ANY OF THIS SEALED? ANY OF THE DOCUMENT SEALED.

MR. BAKER: THIS IS NOT SEALED TO MY KNOWLEDGE.

THE COURT: OKAY.

BY MR. BAKER:

Q. THERE'S A DIAGRAM WITH AN ARROW POINTING FROM QCT PRODUCTS TO MAVERICK?

A. YES, SIR.

Q. WHAT IS MAVERICK?

A. MAVERICK IN THIS CASE WAS A CODE NAME THAT QUALCOMM USED TO REFER TO APPLE.

Q. ARE YOU ABLE TO EXPLAIN THE DIAGRAM ON THE LEFT SIDE OF THIS PAGE?

A. YES. WE HAD MANY MEETINGS ON THIS TOPIC. THIS WAS A QUALCOMM CHART THAT SUMMARIZED THEIR POSITION. SO THEY WERE MAKING A COUPLE OF POINTS HERE, THAT UNDERNEATH MAVERICK, YOU CAN SEE A BOX CALLED WAN AND A BOX CALLED NON WAN. ONE REPRESENTED CELLULAR PRODUCTS, THINGS LIKE MODEMS. NON WAN REPRESENTED NON CELLULAR PRODUCTS, THINGS LIKE WI-FI, BECAUSE THEY HAD A BROADER PORTFOLIO.

WHAT THEY WERE TRYING TO TELL US IN THIS CHART IS FOR NON WAN, THINGS LIKE WI-FI, NO SEPARATE PRODUCTS WERE REQUIRED, THE PRODUCTS WERE SOLD ON A SEPARATE BASIS, THEY WOULD GIVE US





STRONG REPS AND WARRANTIES ON USE AND FREEDOM OF USE.

AND SO THEY WERE ESSENTIALLY SAYING THAT FOR THESE TYPES OF PRODUCTS WHERE THERE WAS COMPETITIVE ALTERNATIVES, THEY WOULD MATCH WHAT OTHER COMPETITORS WOULD PROVIDE AND THEY WOULD MATCH APPLE'S OBJECTIVES. SO THIS IS WHAT WE WANTED, THIS BOX THAT SAID NON WAN. AND I CONTRAST THAT WITH THE BOX ON THE LEFT THAT SAYS WAN, WHICH IS CELLULAR, THEY SAID THIS IS AN ENTIRELY DIFFERENT STORY. WE DON'T OFFER YOU THOSE KINDS OF ASSURANCES AND PROTECTIONS ON WAN, AND YOU START BY BEING A LICENSEE IN GOOD STANDING.

SO THIS WAS REITERATION OF NO LICENSE, NO CHIPS.

Q. AND THIS PRESENTATION WAS PROVIDED TO APPLE BY QUALCOMM; IS THAT RIGHT?

A. YES, THIS IS A QUALCOMM DOCUMENT. THEY WERE SIMPLY SUMMARIZING THEIR POSITION.

Q. I'D LIKE TO ASK SOME QUESTIONS ABOUT THE 2011 TRANSITION AGREEMENT AND THE 2013 FIRST AMENDMENT TO TRANSITION AGREEMENT NOW.

A. OKAY.

Q. YOU TESTIFIED EARLIER THAT YOU'RE FAMILIAR WITH THESE TWO TRANSITION AGREEMENTS. HOW DID YOU GAIN THAT FAMILIARITY?

A. I GAINED THAT FAMILIARITY OVER TIME AS WE EXECUTED AND COMPLIED WITH THE AGREEMENTS, AND I SOUGHT THE ADVICE OF COUNSEL WITHIN APPLE ON WHAT CERTAIN TERMS MAY MEAN AND HOW WE COMPLIED WITH THOSE TERMS.

Q. ARE YOU ABLE TO GIVE ME A VERY HIGH LEVEL DESCRIPTION OF HOW THESE AGREEMENTS FUNCTION FROM THE BUSINESS PERSPECTIVE?

A. **YES. THE TRANSITION AGREEMENT WAS INTENDED TO PROVIDE FOR APPLE TO HAVE AN APPROPRIATE LICENSE AS WE WOULD NEED TO SHIP CDMA CHIPS, AND THAT THE LATER FIRST AMENDED TRANSITION AGREEMENT GAVE US SIMILAR ABILITY TO SHIP UMTS AND LTE CHIPS.**

HOWEVER, AND IMPORTANTLY, THERE WOULD BE LARGE REBATES ASSOCIATED WITH THE NOMINAL ROYALTY PAYMENTS IF WE WERE TO USE QUALCOMM CHIPS EXCLUSIVELY.

Q. SO THESE AGREEMENTS PROVIDED REBATES FROM QUALCOMM TO APPLE IN CONNECTION WITH CHIP PURCHASES; IS THAT RIGHT?

A. **YES. SPECIFICALLY WE WERE REQUIRED TO USE THEIR CHIPS EXCLUSIVELY. AT A POINT IN TIME WHERE WE USED ANYONE ELSE'S CHIP, THEN WE WOULD FORFEIT THOSE REBATES THAT WERE OTHERWISE EARNED WHICH WERE QUITE LARGE.**

Q. DO YOU HAVE AN UNDERSTANDING OF HOW THESE AGREEMENTS IMPACTED APPLE'S MODEM CHIP PROCUREMENT DECISIONS?

A. **YES, I DO. THEY MADE IT VERY UNATTRACTIVE FOR US TO CHOOSE A DIFFERENT CHIPSET SUPPLIER. I WON'T MENTION THE NUMBERS, BUT THESE REBATES WERE VERY, VERY LARGE.**

**SO WHEN WE FACTORS IN THE REBATES THAT WE WOULD FORFEIT BY USING A DIFFERENT CHIP SUPPLIER, IT SERVED AS A VERY STRONG DISINCENTIVE FOR US TO DO SO. IT WAS NO LONGER A LEVEL PLAYING FIELD AS IT WAS BEFORE.**

Q. YOU MENTIONED EARLIER THAT AT SOME POINT BETWEEN 2012 AND





2016, APPLE CONSIDERED INTEL AS A POSSIBLE SUPPLIER OF MODEM CHIPS.

DID APPLE EVER CONSIDER INTEL MODEM CHIPS FOR ANY 2014 APPLE CELLULAR DEVICES?

A. **YES, WE DID. AS I RECALL, AT ONE POINT IN TIME WE HAD AN OFFICIAL PLAN OF RECORD WITHIN APPLE THAT WE WOULD IMPLEMENT INTEL ON AN IPAD PRODUCT LAUNCH, AND THEN THAT WOULD GIVE US CONFIDENCE TO EXTEND THEIR PRESENCE INTO AN IPHONE. WE FELT THAT IPAD WAS A SIMPLER TRANSITION BECAUSE IT WAS DATA ONLY, AND THEN WE WOULD ADD VOICE AS WE MOVED TO PHONE.**

Q. CAN YOU PLEASE TURN TO TAB 10 IN YOUR EXHIBIT BINDER, EXHIBIT JX 0074.

A. **YES, SIR.**

Q. THIS IS AN E-MAIL FROM OCTOBER 2, 2012.

DO YOU RECOGNIZE THIS DOCUMENT?

A. **YES, I RECALL SEEING THIS DOCUMENT.**

Q. WHAT IS THIS DOCUMENT?

A. **THIS WAS AN UPDATE ON A MEETING THAT WE HAD AT APPLE AND A SUMMARY OF OUR DECISION TO PROCEED WITH INTEL ON THE IPAD THAT I MENTIONED PREVIOUSLY.**

MR. BAKER: YOUR HONOR, I MOVE TO ADMIT JX 0074.

MS. SESSIONS: NO OBJECTION.

THE COURT: IT'S ADMITTED.

(JOINT EXHIBIT JX 0074 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.





MR. BAKER: THERE ARE PORTIONS OF THIS DOCUMENT THAT ARE SEALED. I DO NOT PLAN TO SHOW THEM TODAY OR TO ASK ABOUT THEM.

THE COURT: OKAY.

BY MR. BAKER:

Q. ON THE THIRD LINE OF THIS E-MAIL, THERE ARE SOME NAMES LISTED ON THE SIDE.

WHO IS JEFF?

A. **JEFF WOULD BE MY MANAGER, JEFF WILLIAMS, WHO WAS PREVIOUS OPERATIONS OFFICER OF APPLE.**

Q. WHO'S TONY?

A. **THAT WOULD BE ME.**

Q. AND WHO'S ISABEL?

A. **ISABEL IS MY COLLEAGUE WHO WAS VICE PRESIDENT OF SOFTWARE ENGINEERING.**

Q. WHAT PRODUCTS WAS APPLE CONSIDERING INTEL FOR AT THIS POINT?

A. **IN THIS PARTICULAR E-MAIL CHAIN, THIS WAS A DECISION THAT WE WERE MEMORIALIZING WHERE WE INTENDING TO GO WITH INTEL FOR OUR NEXT IPAD LAUNCH IN SPRING 2014.**

Q. AND HOW WOULD AN IPAD SLOT HELP INTEL PROGRESS TOWARDS AN IPHONE SLOT?

A. **WE FELT THAT WAS A LESS SEVERE LEARNING CURVE FOR THEM BECAUSE THEY HAD BEEN OUT OF OUR PRODUCTS FOR A NUMBER OF YEARS, THAT WE FELT TECHNICALLY AND OPERATIONALLY, IF WE COULD**





**USE THEIR PRODUCT IN AN IPAD, WHICH WAS DATA ONLY, NO VOICE, THAT WE WOULD GET A GREAT DEAL OF LEARNING FROM THAT EXERCISE AND THEN WE WOULD BE ABLE TO MUCH MORE SMOOTHLY AND WITH LESS RISK IMPLEMENT THEM INTO AN IPHONE LATER.**

Q. TURN TO PAGE 2 OF THE EXHIBIT, PLEASE, ABOUT EIGHT LINES DOWN. THE E-MAIL READS, "ALL AGREED IN THE MEETING THAT IMC FOR J86 WAS A GOOD PLAN."

CAN YOU TRANSLATE THAT STATEMENT FOR ME?

A. **YES. J86 IS AN INTERNAL CODE NAME THAT REFERRED TO THE IPAD MINI 2. AND SO THIS ESSENTIALLY SAYS EVERYONE IN THE MEETING, AND AS YOU'LL RECALL FROM THE DISTRIBUTION LIST, THAT WAS HARDWARE ENGINEERING, SOFTWARE ENGINEERING, OPERATIONS, ALL OF US AGREED WE WANTED TO USE THE INTEL MODEM IN THE IPAD MINI 2. SO THIS WAS THE OFFICIAL PLAN OF RECORD FOR US.**

Q. AS OF OCTOBER 2012, WAS APPLE MOVING FORWARD WITH AN ENGINEERING ENGAGEMENT WITH INTEL FOR THE IPAD MINI 2?

A. **YES, THAT IS CORRECT.**

Q. CAN YOU DESCRIBE WHAT LEVEL OF COMMITMENTS SUCH AN ENGINEERING ENGAGEMENT ENTAILED BY APPLE?

A. **IT'S A LARGE COMMITMENT. IT'S A LARGE COMMITMENT ON OUR BEHALF, BOTH HARDWARE AND SOFTWARE ENGINEERING, AND IT'S A LARGE COMMITMENT ON BEHALF OF THE SUPPLIER, WHICH IN THIS CASE WAS IMC.**

Q. WAS THAT ENGAGEMENT SUCCESSFUL IN GETTING AN INTEL MODEM CHIP INTO A 2014 IPAD?

A. IN NET, NO, IT WAS NOT. WE ABORTED THAT PLAN AFTER THIS OCTOBER MEETING.

Q. WHY DID YOU DO THAT?

A. WE FOUND THAT IT WASN'T IN APPLE'S BEST OVERALL INTEREST.

AROUND MID-JANUARY OF THE FOLLOWING YEAR, 2013, WE REACHED AN AGREEMENT WITH QUALCOMM WHEREBY THAT WE WOULD OBTAIN VERY, VERY LARGE REBATES IF WE USED THEM EXCLUSIVELY.

AND SO IT WAS JUST NOT ECONOMICALLY VIABLE FOR US TO USE INTEL IN AN IPAD MINI, EVEN THOUGH WE THOUGHT THEIR PERFORMANCE WAS SIMILAR AND THEIR PRICE WAS MUCH LESS, WHICH OFFERED US ADDITIONAL VALUE.

IT WOULD CAUSE US TO FORFEIT THOSE REBATES THAT WE HAD OTHERWISE EARNED. SO IT WAS A LOSING PROPOSITION FROM A FINANCIAL STANDPOINT. SO THE PLANS WERE CHANGED.

Q. SO ARE THOSE THE 2013 AGREEMENTS THAT WE DISCUSSED EARLIER?

A. THAT IS CORRECT, SIR.

Q. THE BCPA AND THE FIRST AMENDMENT TO THE TRANSITION AGREEMENT?

A. YES, I BELIEVE THEY WERE SIGNED AROUND FEBRUARY OF 2013.

Q. WHEN DID THE NEGOTIATIONS OCCUR?

A. THE NEGOTIATIONS HAD BEEN ONGOING FOR AT LEAST ABOUT SIX MONTHS PRIOR TO SIGNATURE.

HOWEVER, A DATE THAT I DO SPECIFICALLY RECALL, BECAUSE IT WAS IMPORTANT, WE HAD A BIG MEETING WITH THE TOP EXECUTIVES





BETWEEN APPLE AND QUALCOMM IN CUPERTINO IN MID-JANUARY.

I SPECIFICALLY RECALL THAT BECAUSE ALL OF THE MAJOR BUSINESS PRINCIPLES WERE AGREED. IT THEN TOOK THE ATTORNEYS FROM BOTH SIDES A FEW WEEKS TO STRAIGHTEN OUT SOME OF THE DETAILS.

BUT THE REASON I RECALL THAT MEETING, IT WAS ON A SUNDAY AND I HAD PLANNED TO HAVE SOME FRIENDS OVER TO WATCH THE 49ERS GAME, AND I MISSED THAT. I WAS ABLE TO GO BACK THROUGH MY NOTES AND DETERMINE THAT DATE WAS JANUARY 12TH.

Q. WHAT WERE THE KEY TERMS THAT WERE HAMMERED OUT?

A. THE KEY TERMS WERE, IN ESSENCE, THAT APPLE WOULD RECEIVE VERY, VERY LARGE REBATES FROM THE LICENSE PAYMENTS IF WE AGREED TO BUY OUR CHIPSETS EXCLUSIVELY FROM QUALCOMM.

Q. IF YOU COULD TURN TO TAB 11, PLEASE, IN YOUR BINDER, CX 0531. THIS IS A JANUARY 29TH, 2013 E-MAIL FROM YOU, MR. BLEVINS, TO JEFF WILLIAMS?

A. YES, THAT IS CORRECT.

MR. BAKER: YOUR HONOR, I NOVEMBER TO ADMIT CX 0531.

MS. SESSIONS: NO OBJECTION, YOUR HONOR.

THE COURT: OKAY. IT'S ADMITTED.

(PLAINTIFF'S EXHIBIT CX 0531 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.

BY MR. BAKER:

Q. WHAT WERE YOU COMMUNICATING WITH MR. WILLIAMS ABOUT?

A. WELL, THE TIMELINE HERE WAS WE HAD REACHED AGREEMENT IN





PRINCIPLE WITH QUALCOMM ON OR ABOUT JANUARY THE 12TH. THE AGREEMENT WAS IN FINAL STAGES OF BEING SIGNED, AND THIS WOULD CAUSE US TO CHANGE OUR PLANS FROM INTEL TO QUALCOMM.

AND OUR THOUGHTS WERE INTEL WERE CONTINUING TO USE SIGNIFICANT ENGINEERING RESOURCES ON OUR PROJECT THAT WASN'T GOING TO HAPPEN. SIMILARLY, APPLE ENGINEERING TEAM WAS EXERTING EFFORT THERE, THEY WANTED TO ABORT THOSE EFFORTS. AND SO THE TASK FELL TO ME TO GO BACK TO HERMANN EUL IN THIS CASE, WHO AT THE TIME WAS PRESIDENT OF IMC, AND TELL HIM THAT THE PROJECT WAS AWARDED, THAT HE SHOULD STOP, OUR PLANS HAD CHANGED.

AND I WAS EXPRESSING HERE THAT HAD SOME MISGIVINGS ABOUT THAT, WE HAD AWARDED THE BUSINESS TO THEM, THEY HAD WORKED VERY HARD, THEY HADN'T DONE ANYTHING TO CAUSE THEM TO LOSE THE BUSINESS SPECIFICALLY, IT WAS JUST THAT WE HAD AN AGREEMENT WITH QUALCOMM NOW THAT MADE THIS VERY FINANCIALLY UNATTRACTIVE FOR US.

SO THAT'S WHY I MADE THE COMMENT THAT WE HAVE ACCIDENTALLY MISLED HERMANN. IF WE KNEW WHERE WE WERE GOING TO LAND WITH QUALCOMM, WE WOULD HAVE NEVER STARTED THEM ON THIS PROJECT. IT WASN'T THE RIGHT THING TO DO.

Q. IN LINE 3, YOU REFER TO A NEW QC STRATEGY. WHAT IS THAT REFERRING TO?

A. THAT'S THAT I KNEW WE HAD AN AGREEMENT IN PRINCIPLE WITH QUALCOMM THAT MADE ALL THOSE REBATES CONTINGENT ON EXCLUSIVITY.





SO WE HAD A NEW PLAN. WE WERE GOING TO ATTEMPT TO ACQUIRE THOSE REBATES AND THAT REQUIRED THAT WE WORK EXCLUSIVELY WITH QUALCOMM, WHICH LED TO DISENGAGEMENT WITH IMC.

Q. FROM A TECHNICAL OR ENGINEERING STANDPOINT IN EARLY 2013, HAD THERE BEEN CONCERNS ABOUT INTEL'S PERFORMANCE WITHIN APPLE?

A. YES. THERE ARE ALWAYS CONCERNS. I SHOULD PROBABLY DESCRIBE TO YOU THAT APPLE'S ENGINEERING TEAM ARE SOME OF THE MOST DETAILED OBSESSED, INSANELY PASSIONATE PEOPLE ON THIS PLANET. THEY HOLD THEMSELVES TO HIGH STANDARDS. THEY HOLD THEIR SUPPLIERS TO HIGH STANDARDS. NO ONE CAN MEET ALL OF THEIR REQUIREMENTS EVER, AND THAT'S WHY I LOVE WORKING WITH THOSE GUYS. THEY'RE THE BEST IN THE WORLD IN MY VIEW.

SO IN EVERY SUPPLIER ENGAGEMENT I'VE EVER BEEN INVOLVED IN, NO ONE EVER MEETS ALL OF THEIR REQUIREMENTS. I'M NOT SURE IT'S POSSIBLE. SO I DO HAVE SOME SYMPATHY FOR OUR SUPPLIERS.

BUT CLEARLY INTEL WASN'T MEETING ALL OF OUR REQUIREMENTS. I'M NOT CERTAIN THEY'VE EVER MET ALL OF OUR REQUIREMENTS ON ANY PRODUCT, AND I'M NOT CERTAIN QUALCOMM HAS EITHER OR EVEN EVER WILL. THAT'S THE NATURE OF THE GAME FOR US. WE THINK THAT'S WHAT MAKES APPLE PRODUCTS GREAT. IT'S WHERE A REASONABLE PERSON MIGHT STOP AND SAY GOOD ENOUGH IS GOOD ENOUGH. OUR ENGINEERING TEAM CONTINUES.

Q. WERE ANY OF THE TECHNICAL CONCERNS ABOUT INTEL CHIPSETS DEAL BREAKERS FROM YOUR PERSPECTIVE?

A. NOT FROM MY PERSPECTIVE. I MONITORED THIS CLOSELY ON A



PX98



Page 3688

WEEKLY BASIS. AGAIN, THERE WERE ALL SORTS OF CONCERNS WITH INTEL, JUST AS THERE WERE ALL SORTS OF CONCERNS AT THAT STAGE WITH LCD WE WOULD HAVE BEEN USING, WITH THE FLASH MEMORY. THAT'S THE NATURE OF THE GAME FOR US. THE ENGINEERING TEAM IS JUST WORKING INSANELY PASSIONATELY TO IMPROVE EVERYBODY'S PERFORMANCE, AND NOBODY IS EVER GOOD ENOUGH.

Q. IN PARTICULAR, DID APPLE ENGINEERS RAISE ANY CONCERNS ABOUT INTEL'S ABILITY TO SUPPORT A FEATURE AT THAT TIME CALLED CARRIER AGGREGATION?

A. I RECALL THAT WE WERE IN EARLY STAGES OF CARRIER AGGREGATION DISCUSSIONS AT THAT POINT IN TIME. THE IPAD MINI 2 ARCHITECTURE ITSELF DIDN'T SUPPORT CARRIER AGGREGATION. SO WHETHER THE CHIP WAS CAPABLE OR NOT WAS IRRELEVANT. THE ARCHITECTURE OF THE SYSTEM DIDN'T SUPPORT IT IN THAT PERIOD.

Q. WHEN WAS THE IPAD MINI 2 ULTIMATELY RELEASED?

A. AS I RECALL, WE WERE ORIGINALLY TARGETING IT FOR THE MARCH/APRIL TIMEFRAME.

WE -- OUR PLANS, BY THE WAY, CHANGE VERY FREQUENTLY. THEY'RE VERY FLUID, DYNAMIC DOCUMENTS. SO I'LL TELL YOU THAT THE MAJOR CHECKPOINTS THAT I RECALL, IT MOVED FROM THE MARCH/APRIL OF 2013 TIMEFRAME TO THE SEPTEMBER 2012 TIMEFRAME.

IT LATER MOVED TO OCTOBER OF 2012, AND MY RECOLLECTION IS WE FINALLY LANDED ON NOVEMBER OF 2012.

Q. YOU MEAN 2013?

A. YES, EXCUSE ME, 2013.





Q. WHAT SUPPLIER PROVIDED THE MODEM FOR THAT DEVICE WHEN IT WAS ULTIMATELY LAUNCHED?

A. IT WAS QUALCOMM.

Q. DID THE QUALCOMM MODEM IN THE IPAD MINI 2 SUPPORT CARRIER AGGREGATION?

A. NO. THE SYSTEM ITSELF, THE ARCHITECTURE DIDN'T SUPPORT CARRIER AGGREGATION, AND I DON'T BELIEVE THE QUALCOMM CHIP ITSELF SUPPORTED CARRIER AGGREGATION, ALTHOUGH I'M NOT CERTAIN. BUT I KNOW THAT THE SYSTEM WAS NOT CARRIER AGGREGATION ENABLED.

Q. WERE ANY IPAD MINI MODELS RELEASED IN 2014?

A. YES, WE RELEASED A NEW MODEL IN 2014.

Q. WHO WAS THE MODEM SUPPLIER FOR THAT DEVICE?

A. THAT WAS ALSO QUALCOMM.

Q. DO YOU KNOW IF THE MODEM IN THAT DEVICE SUPPORTED CARRIER AGGREGATION?

A. I KNOW FOR A FACT THE SYSTEM DID NOT. THE SYSTEM ARCHITECTURE WAS NOT DESIGNED TO ENABLE CARRIER AGGREGATION.

Q. MOVING FORWARD IN TIME FROM A PROCUREMENT STANDPOINT, DID APPLE SERIOUSLY CONSIDER SUPPLIERS OTHER THAN QUALCOMM FOR ITS 2015 CELLULAR DEVICE MODELS?

A. WE CONTINUED TO DO EVALUATIONS, BUT IT WAS VERY APPARENT TO US THAT THE VERY, VERY LARGE REBATES THAT I MENTIONED EARLIER WOULD MAKE IT A COMPLETE NONSTARTER TO WORK WITH SOMEONE ELSE, THAT WE COULDN'T ACHIEVE THE VALUE THAT I CITED EARLIER THAT FORFEITING THOSE REBATES THAT WOULD OTHERWISE BE





EARNED WOULD MAKE ANYONE ELSE JUST A FAR TOO EXPENSIVE PROPOSITION TO SERIOUSLY CONSIDER.

Q. IF YOU COULD TURN TO TAB 12 IN YOUR BINDER, PLEASE. IT'S EXHIBIT CX 0853.

A. YES, I SEE IT.

Q. THIS IS A FEBRUARY 20TH, 2014, E-MAIL EXCHANGE BETWEEN YOU AND ISABEL MAHE?

A. YES.

Q. DO YOU RECOGNIZE THIS DOCUMENT?

A. YES, I RECOGNIZE IT AND REMEMBER IT.

MR. BAKER: YOUR HONOR, I MOVE TO ADMIT CX 0853.

MS. SESSIONS: NO OBJECTION.

THE COURT: IT'S ADMITTED.

(PLAINTIFF'S EXHIBIT CX 0853 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.

BY MR. BAKER:

Q. WHO IS MS. MAHE?

A. MS. MAHE WAS ONE OF MY COLLEAGUES THAT WAS SPECIFICALLY RESPONSIBLE FOR SOFTWARE ENGINEERING. IN FACT, SHE WAS VICE PRESIDENT OF SOFTWARE ENGINEERING.

Q. AT THE TOP OF PAGE 1 OF THIS EXHIBIT YOU WRITE, "IN NET, THERE IS NO WAY THAT WE WOULD FOREGO OTHERWISE EARNED INCENTIVES IN FAVOR OF LAUNCHES IPAD ONLY IN 15."

CAN YOU EXPLAIN WHAT YOU MEANT BY THAT?

A. YES. YOU SEE IN THIS E-MAIL EXCHANGE, ISABEL WAS POINTING





OUT THAT FROM AN ENGINEERING STANDPOINT, THE PRUDENT APPROACH WAS TO LAUNCH IN AN IPAD FIRST AND THEN USE THAT LEARNING TO CONTINUE ON TO AN IPHONE.

FROM A PURELY TECHNICAL PERSPECTIVE, SHE WAS ABSOLUTELY RIGHT, THERE WAS NO QUESTION, EVERYONE AGREED WITH THAT PERSPECTIVE, WITHIN APPLE AGREED WITH WHAT SHE SAID FROM A TECHNICAL PERSPECTIVE.

SO MY E-MAIL IN RESPONSE TO HER WAS I DIDN'T DISAGREE WITH HER, BUT THERE IS NO -- I USED THE TERM, THERE'S NO WAY WE WOULD FORGO OTHERWISE EARNED INCENTIVES IN FAVOR OF LAUNCHING AN IPAD IN 2015. IT JUST SIMPLY WASN'T AN ECONOMIC PROPOSITION FOR US.

Q. AND THE OTHERWISE EARNED INCENTIVES YOU'RE REFERRING TO ARE THE INCENTIVES UNDER THE AMENDED TRANSITION AGREEMENT?

A. I WAS SPECIFICALLY REFERRING TO THE QUALCOMM REBATES THAT WOULD BE DUE PER THAT AGREEMENT, YES.

Q. COULD YOU TURN TO TAB 13 IN YOUR BINDER, PLEASE, EXHIBIT CX 0578.

THIS IS ANOTHER E-MAIL FROM THIS PERIOD DATED FEBRUARY 24TH, 2014.

DO YOU RECOGNIZE THIS DOCUMENT?

A. YES, I DO.

MR. BAKER: YOUR HONOR, I MOVE TO ADMIT CX 0578.

MS. SESSIONS: NO OBJECTION.

THE COURT: IT'S ADMITTED.



PX98

(PLAINTIFF'S EXHIBIT CX 0578 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.

BY MR. BAKER:

Q. AND THE PARAGRAPH THAT BEGINS "IN AN IDEAL WORLD," YOU WRITE, "WE'D LIKE TO HAVE THE FREEDOM TO EITHER CHOOSE QUALCOMM CHIPSETS OR NOT ON THE BASIS OF OUR OVERALL VALUE."

AND YOU END, "AND NOT ENTANGLE THE LICENSING ISSUES."

WHAT DO YOU MEAN BY THAT?

A. **WHAT I MEANT SPECIFICALLY IS AS WE PURCHASE HARDWARE, WE'D LIKE TO EVALUATE EVERYONE ON A LEVEL PLAYING FIELD, AND WE WOULD LIKE TO CHOOSE THE SUPPLIERS THAT OFFER US OVERALL BEST VALUE.**

AND TO BE SPECIFIC, I WAS EXPLAINING TO THAT THE VALUE WOULD INCLUDE THE TECHNICAL SPECIFICATIONS, IT WOULD BE THEIR SCHEDULE, IT WOULD BE THE KINDS OF TERMS WHICH WOULD INCLUDE SUPPLY CONTINUITY PROTECTION, IT WOULD INCLUDE PRICE SPECIFICALLY, AND I WAS SUGGESTING TO HER THAT IN AN IDEAL WORLD THAT'S HOW I'D LIKE TO CHOOSE THESE CHIPSETS AND I DID NOT WANT TO, QUOTE-UNQUOTE, "ENTANGLE THE LICENSING ISSUES."

BUT I WENT ON TO EXPLAIN TO HER, IN THIS CASE THE LICENSING ISSUES WERE HOPELESSLY ENTANGLED, THAT WE'D ENTERED INTO AGREEMENTS THAT OFFERED APPLE VERY SIGNIFICANT SUMS OF MONEY FOR USING THEIR CHIPSETS EXCLUSIVELY. SO IT WASN'T THE KIND OF FREE MARKET THAT WOULD GIVE US FREEDOM TO CHOOSE WHOMEVER WE MIGHT WANT BASED ON A LEVEL PLAYING FIELD.





SO THAT WAS THE ESSENCE OF MY E-MAIL.

Q. HOW WERE THESE AGREEMENTS RELATED TO LICENSING?

A. **THE AGREEMENTS THAT WE DID WITH QUALCOMM, THERE WAS A SERIES OF AGREEMENTS THAT WE REFERENCED EARLIER THAT OFFERED APPLE VERY SUBSTANTIAL REBATES, BUT A CONDITION OF THAT IS WE HAD TO USE THEIR CHIPSETS EXCLUSIVELY.**

AND SO ON THE BASIS OF THAT, WHEN I WOULD EVALUATE THEIR CHIPSET VERSUS INTEL, DESPITE HOW INTEL MIGHT LOOK BETTER IN ANY OR ALL ASPECTS, I ALSO HAD TO FACTOR IN THE POTENTIAL OF LOSING THOSE VERY LARGE REBATES, AND THAT SERVED AS A DISINCENTIVE TO PURSUE INTEL OR ANYONE ELSE.

SO THESE LICENSING ISSUES WERE HOPELESSLY ENTANGLED FROM OUR PERSPECTIVE.

Q. SO YOU CONSIDERED THOSE REBATES TO BE ROYALTY REBATES?

A. **OH, THEY WERE ABSOLUTELY ROYALTY REBATES, YES.**

Q. TURN TO TAB 14 IN YOUR BINDER, PLEASE. THIS IS A SEALED DOCUMENT.

THIS IS CX 0856. THIS IS A SEPTEMBER 10TH, 2014 E-MAIL FROM YOU TO MR. WILLIAMS.

DO YOU RECOGNIZE THIS E-MAIL?

A. **YES, I RECOGNIZE IT AND RECALL IT.**

MR. BAKER: YOUR HONOR, I MOVE TO ADMIT CX 0856.

MS. SESSIONS: NO OBJECTION.

THE COURT: IT'S ADMITTED.

(PLAINTIFF'S EXHIBIT CX 0856 WAS ADMITTED IN EVIDENCE.)





THE COURT: GO AHEAD, PLEASE.

BY MR. BAKER:

Q. I'D LIKE TO LOOK AT THE FOURTH PARAGRAPH DOWN, THE ONE THAT BEGINS WITH DEREK'S ARGUMENT, AND I'D LIKE TO BE SENSITIVE, AGAIN, NOT TO MENTION ANY DOLLAR AMOUNTS.

A. **OKAY.**

Q. AND I'LL TRY TO READ IT WITHOUT MENTIONING THOSE DOLLAR AMOUNTS.

YOU WRITE, "DEREK'S ARGUMENT IS THAT TODAY'S ACTUAL ROYALTY IS, X AND THE CHIPSET PRICE IS CRISTIANO'S BUSINESS. ONLY IF WE BRING TO THEM SOME ADDITIONAL VALUE (E.G., CHIPSET EXCLUSIVITY), WOULD HE CONSIDER A REDUCTION OF THE X."

A. **YES.**

Q. CAN YOU GIVE ME JUST A YES OR NO ANSWER ON THIS ONE. IS THIS SOMETHING THAT DEREK ABERLE SAID TO YOU?

A. **IN THIS INSTANCE, BOTH DEREK AND CRISTIANO SAID IT TO ME.**

BUT, YES.

Q. CAN YOU DESCRIBE FOR ME THE CONTEXT OF THIS STATEMENT?

A. **THE CONTEXT WAS THAT IF WE WANTED ANY TYPE OF ROYALTY LESS THAN $10, THE ONLY WAY HE COULD ENVISION DOING THAT, HE BEING DEREK, WOULD BE IF WE BROUGHT SOME ADDITIONAL VALUE TO THE TABLE.**

AND HIS SPECIFIC EXAMPLE WAS EXCLUSIVITY, IF HE GAVE ME EXCLUSIVE CHIPSET, THEN MAYBE I'LL THINK ABOUT DOING SOMETHING LESSER.





Q. WHY WERE YOU TALKING TO MR. ABERLE IN YOUR CAPACITY AS A PROCUREMENT OFFICIAL SEEKING MODEM CHIPS?

A. **I GENERALLY DON'T. I'M GENERALLY NOT INVOLVED IN SEPARATE AND DISTINCT INTELLECTUAL PROPERTY LICENSING DISCUSSIONS. WE HAVE A SEPARATE TEAM AT APPLE THAT DOES THAT.**

HOWEVER, IN THIS CASE, THESE TWO ISSUES, THEY WERE JUST HOPELESSLY ENTANGLED. THE CHIP PRICE WAS DEPENDENT ON THE REBATE.

SO WHEN I MET WITH QUALCOMM, I VERY OFTEN MET WITH EACH AT THE SAME TIME. SO THEY WERE ENTANGLED TO THE DEGREE THAT I SPENT A GREAT DEAL MORE TIME ON THIS TOPIC THAN I DID WITH ANY OTHER SUPPLIER.

THE COURT: I'M SORRY TO INTERRUPT, BUT IT'S 10:45. SO LET'S GO AHEAD AND TAKE OUR BREAK NOW. WE'LL TAKE A 15 MINUTE BREAK TO 11:00 O'CLOCK.

MR. BAKER: THANK YOU.

THE COURT: ALL RIGHT. THANK YOU. YOU MAY STEP DOWN DURING THE BREAK.

THE CLERK: COURT IS IN RECESS.

(RECESS FROM 10:46 A.M. UNTIL 11:01 A.M.)

THE COURT: OKAY. WELCOME BACK. PLEASE TAKE A SEAT. ARE YOU READY?

MR. BAKER: YES.

THE COURT: OKAY. 11:01. GO AHEAD, PLEASE.

BY MR. BAKER:

11:01:53 Q. MR. BLEVINS, BEFORE THE BREAK WE WERE LOOKING AT CX 0756.
11:01:58 DO YOU REMEMBER THAT?
11:01:59 A. YES, SIR.
11:02:00 Q. IN YOUR PROCUREMENT ROLE, WAS IT COMMON FOR TO YOU DEAL
11:02:03 WITH QUALCOMM'S I.P. LICENSING EXECUTIVES FROM QTL?
11:02:07 A. IT WAS UNCOMMON IN GENERAL FOR ME TO DEAL WITH ANY
11:02:10 COMPANY'S I.P. LICENSING. THAT'S NOT MY DOMAIN. BUT IN THE
11:02:14 CASE OF QUALCOMM, IT WOUND UP BEING VERY COMMON.
11:02:17 Q. DID YOU EVER MEET TOGETHER WITH REPRESENTATIVES OF BOTH
11:02:21 QCT AND QTL?
11:02:22 A. YES, OF COURSE, MANY, MANY TIMES.
11:02:24 Q. WHAT DYNAMICS DID YOU OBSERVE BETWEEN QCT AND QTL IN THESE
11:02:29 MEETINGS?
11:02:29 A. I CAN RECALL ONE INSTANCE IN PARTICULAR, I CAN'T RECALL
11:02:33 EVERY MEETING, BUT THERE WAS ONE INSTANCE THAT WAS QUITE
11:02:36 MEMORABLE TO ME. I WAS IN SAN DIEGO AT THE TOP EXECUTIVE FLOOR
11:02:43 OF THEIR MAIN BUILDING. I WAS MEETING WITH CRISTIANO AMON AND
11:02:48 HIS COUNTERPART WHO RAN QTL AT THAT TIME PERIOD, I BELIEVE THE
11:02:53 GENTLEMEN'S NAME WAS ERIC REIFSCHNEIDER, AND THE THING THAT
11:02:55 MADE THAT CONVERSATION MEMORABLE TO ME IS CRISTIANO WAS
11:02:58 SPEAKING DIRECTLY TO ME AND ERIC STOPPED HIM, CUT HIM OFF, GAVE
11:03:03 HIM THE HAND, AND SAID, "STOP TALKING. I RUN THE DIVISION THAT
11:03:08 GENERATES TWO-THIRD'S OF THIS COMPANY'S PROFITS. YOU RUN A
11:03:12 DIVISION THAT MAKES ONE-THIRD. SO LET'S GET THAT STRAIGHT
11:03:15 WHO'S DOING THE TALKING."





11:03:16 AND SO THE FACTS OF THAT CIRCUMSTANCE DIDN'T SURPRISE ME,
11:03:21 I ALREADY KNEW THAT.
11:03:22 WHAT DID SURPRISE ME, I THOUGHT IT WAS INAPPROPRIATE IN
11:03:27 FRONT OF A CUSTOMER TO MAKE SUCH A STATEMENT; AND, SECONDLY, I
11:03:30 ACTUALLY FELT SOME SYMPATHY FOR CRISTIANO. I DIDN'T THINK IT
11:03:34 WAS THE RIGHT WAY FOR TWO PEOPLE IN THE SAME COMPANY TO BEHAVE
11:03:40 IN FRONT OF A CUSTOMER. SO THAT'S MEMORABLE TO ME.
11:03:44 Q. CAN YOU TURN TO TAB 15, PLEASE, EXHIBIT CX 0597.
11:03:48 THIS IS A SEALED DOCUMENT. THE FIRST PAGE, I BELIEVE, HAS
11:03:50 NOT BEEN SEALED.
11:03:53 AND THAT'S THE ONLY PAGE WE'LL BE LOOKING AT.
11:03:56 THIS IS AN E-MAIL CHAIN BETWEEN YOU AND JEFF WILLIAMS WITH
11:03:59 THE TOP E-MAIL DATED DECEMBER 2, 2013.
11:04:02 DO YOU RECALL THIS E-MAIL.
11:04:04 A. YES, I SPECIFICALLY RECALL THIS E-MAIL.
11:04:06 MR. BAKER: YOUR HONOR, I MOVE TO ADMIT CX 0597.
11:04:10 MS. SESSIONS: NO OBJECTION.
11:04:11 THE COURT: IT'S ADMITTED.
11:04:12 (PLAINTIFF'S EXHIBIT CX 0597 WAS ADMITTED IN EVIDENCE.)
11:04:13 THE COURT: GO AHEAD, PLEASE.
11:04:14 BY MR. BAKER:
11:04:16 Q. IN THIS E-MAIL, YOU REFERENCE A CONVERSATION YOU HAD WITH
11:04:21 CRISTIANO AMON. DO YOU RECALL THIS CONVERSATION?
11:04:22 A. YES, I RECALL THIS CONVERSATION VERY WELL. IT WAS A BIT
11:04:25 OF A WATERSHED MOMENT, IF YOU WILL.





11:04:29 Q. CAN YOU RECOUNT THAT CONVERSATION FOR THE COURT AS WELL AS
11:04:32 YOU REMEMBER?
11:04:32 A. YES, THERE'S A BIT OF BACKGROUND I SHOULD MENTION SO IT
11:04:36 MAKES SENSE. THE POINT IN TIME WHERE APPLE ENTERED INTO OUR
11:04:40 RELATIONSHIP WITH QUALCOMM WHERE OUR REBATES WERE CONTINGENT ON
11:04:43 BUYING THE CHIPSETS EXCLUSIVELY, IT WAS NOT MY BELIEF THAT WE
11:04:47 WOULD GET THE BEST PRICING FROM THEM IN SUCH A CIRCUMSTANCE. I
11:04:53 DIDN'T DELUDE MYSELF.
11:04:55 HOWEVER, I THOUGHT THAT OVER TIME WE COULD AVOID BEING
11:04:58 GOUGED, THAT THE THOUGHT BEING THAT QUALCOMM WOULD PROBABLY
11:05:01 WANT THIS RELATIONSHIP TO BE CORDIAL AND COPACETIC, AND SO THEY
11:05:05 WOULD CHARGE ME A HIGHER PRICE IN A NONCOMPETITIVE ENVIRONMENT
11:05:09 THEN THEY WOULD A COMPETITIVE ONE CLEARLY, BUT I THOUGHT I
11:05:13 COULD GET TO A NUMBER THAT WAS SOMETHING THAT APPLE COULD LIVE
11:05:15 WITH.
11:05:16 SO MY NEGOTIATION STRATEGY, GIVEN THESE CIRCUMSTANCES, WAS
11:05:20 THAT WITHIN APPLE WE WOULD DO VERY DETAILED COST MODELING OF
11:05:23 WHAT IT COST QUALCOMM TO HAVE THEIR CHIPSETS FABRICATED AT
11:05:28 TSMC, AND WE WERE ABLE TO DO THAT BECAUSE APPLE ALSO PURCHASES
11:05:31 SILICON DIRECTLY, DIRECTLY FROM TSMC, FROM THE SAME FOUNDRIES.
11:05:37 SO WE ALREADY HAD THE TEAMS, THE COST MODELS.
11:05:40 AND MY THOUGHTS WERE IF WE COULD AGREE UPON THE COST,
11:05:43 WHICH SHOULD BE A STRAIGHTFORWARD MATHEMATICAL EXERCISE, I
11:05:47 WOULD THEN APPROACH HIM AND SAY, WELL, I'D LIKE TO PAY YOU A
11:05:49 GROSS MARGIN SOMEWHERE AROUND THE AVERAGE OF WHAT YOU CHARGE





11:05:52 OTHERS.
11:05:53 AS I MENTIONED, I'M NOT GOING TO GIVE THE BEST PRICE,
11:05:57 OBVIOUSLY I'M NOT GOING TO GET AS AGGRESSIVE A PRICE AS I MIGHT
11:06:01 OTHERWISE GET, BUT I CAN AT LEAST AVOID GETTING GOUGED. AND WE
11:06:06 HAD A NUMBER OF CONVERSATIONS, DOZENS.
11:06:08 FINALLY, OUT OF SOME DEGREE OF FRUSTRATION, CRISTIANO
11:06:11 LEVELED WITH ME, HE AND I HAD A FAIRLY OPEN AND DIRECT
11:06:14 CONVERSATION AT THAT POINT IN TIME AND HE SAID, LOOK, I'M JUST
11:06:17 COMING BACK FROM AN INVESTOR CONFERENCE IN NEW YORK. I'M UNDER
11:06:21 INTENSE PRESSURE AND SCRUTINY TO MONETIZE THIS ADVANTAGE IN
11:06:25 LTE, THAT I'M GOING TO CHARGE ABSOLUTELY ANYTHING AND
11:06:27 EVERYTHING THE MARKET WILL BEAR. I KNOW YOU HAVE THIS
11:06:29 EXCLUSIVE AGREEMENT WITH ME, AND BY THE WAY, APPLE CAN AFFORD
11:06:35 TO PAY THIS. SO REALLY THE ONLY FACTORS WE NEED TO TALK ABOUT
11:06:38 ARE NOT COST AND NOT MARGINS. I KNOW THAT I'M YOUR ONLY
11:06:42 CHOICE. AND I ALSO KNOW APPLE CAN AFFORD TO PAY IT.
11:06:45 SO THAT WAS A WATERSHED MOMENT. I SAID THIS RELATIONSHIP
11:06:49 IS GOING IN A VERY DIFFERENT DIRECTION THAN WE'D HOPED. THAT
11:06:53 WAS MEMORABLE TO ME BECAUSE I RECALL CANCELLING THE REST OF THE
11:06:56 MEETINGS ON MY CALENDAR THAT DAY AND PULLING THE TEAM TOGETHER
11:07:00 AND SAYING WE NEED A DIFFERENT PLAN OR STRATEGY. THERE'S A LOT
11:07:03 OF MONEY INVOLVED HERE, AND WE HAVE ALMOST NO LEVERAGE AT ALL.
11:07:06 WE NEED TO DO SOMETHING DIFFERENT OR THIS IS HEADED TOWARDS A
11:07:10 VERY, VERY BAD PLACE. SO THAT WAS A MEMORABLE CONVERSATION FOR
11:07:12 ME.

11:07:12 Q. SO WHAT DID APPLE DO NEXT?
11:07:14 A. WE KICKED OFF A PROJECT WHERE WE WANTED TO FIND AN 11:07:17 ADDITIONAL SOURCE FOR MODEMS SO THAT WE COULD ADD SOME 11:07:20 COMPETITION TO THE MIX, THAT CRISTIANO HAD ALL BUT TOLD ME HE 11:07:24 KNEW I DIDN'T HAVE AN ALTERNATIVE, THEREFORE, COMPETITIVE 11:07:27 CIRCUMSTANCES DOESN'T EXIST, HE WOULD CHARGE ME EVERYTHING THAT 11:07:31 HE POSSIBLY COULD.
11:07:33 SO I REACTED BY SAYING I MUST HAVE A COMPETITIVE 11:07:37 ALTERNATIVE. IT'S QUITE OBVIOUS.
11:07:40 Q. TURN TO TAB 16 IN YOUR BINDER, PLEASE, IT'S EXHIBIT 11:07:44 CX 0534.
11:07:46 PORTIONS OF THIS DOCUMENT HAVE ALSO BEEN SEALED, YOUR 11:07:48 HONOR, AND WE'RE GOING TO STAY ON THE FIRST THREE PAGES, WHICH 11:07:51 HAVE NOT.
11:07:52 THIS IS A PRESENTATION DATED APRIL 24TH, 2014.
11:07:56 DO YOU RECOGNIZE THIS PRESENTATION, MR. BLEVINS.
11:07:58 A. YES, I RECALL IT.
11:07:59 Q. THE TITLE IS PROJECT ANTIQUE; IS THAT RIGHT?
11:08:03 A. THAT'S CORRECT.
11:08:04 MR. BAKER: YOUR HONOR, I MOVE THE ADMISSION OF 11:08:08 CX 0534.
11:08:09 MS. SESSIONS: ARE YOU -- COUNSEL, ARE YOU SEEKING TO 11:08:11 ADMIT THIS DOCUMENT FOR THE TRUTH OF THE MATTER? IF SO, I 11:08:14 WOULD ASK THAT YOU LAY A FOUNDATION.
11:08:16 THE COURT: I'M SORRY. CAN YOU REPEAT THAT? I





11:08:18 COULDN'T HEAR YOU.
11:08:18 MS. SESSIONS: SORRY, YOUR HONOR. FOR WHAT PURPOSE 11:08:22 ARE YOU SEEKING TO ADMIT THIS DOCUMENT?
11:08:24 MR. BAKER: I'LL LAY A BUSINESS RECORD FOUNDATION.
11:08:33 Q. MR. BLEVINS, DOES APPLE ORDINARILY MAINTAIN SLIDE DECKS 11:08:40 REFLECTING ITS BUSINESS PLANNING ACTIVITY?
11:08:44 A. YES.
11:08:44 Q. WAS THIS SLIDE DECK CREATED IN THE COURSE OF APPLE'S 11:08:47 BUSINESS PLANNING ACTIVITIES?
11:08:49 A. YES, IT WAS.
11:08:51 Q. IT WAS CREATED AT THE TIME OF APPLE'S BUSINESS PLANNING 11:08:55 ACTIVITIES?
11:08:55 A. YES.
11:08:57 Q. WAS IT STORED AND KEPT BY APPLE IN ITS RECORDS?
11:09:00 A. I WOULD ASSUME SO, YES.
11:09:03 MR. BAKER: YOUR HONOR, I MOVE THE ADMISSION OF 11:09:07 CX 0534.
11:09:08 MS. SESSIONS: NO OBJECTION, YOUR HONOR.
11:09:08 THE COURT: IT'S ADMITTED.
11:09:11 (PLAINTIFF'S EXHIBIT CX 0534 WAS ADMITTED IN EVIDENCE.)
11:09:11 THE COURT: GO AHEAD, PLEASE.
11:09:12 BY MR. BAKER:
11:09:13 Q. WHAT WAS PROJECT ANTIQUE?
11:09:14 A. AS I MENTIONED, WE IMMEDIATELY KICKED OFF A PROJECT TO 11:09:17 FIND A SUPPLEMENTAL SOURCE TO QUALCOMM FOR MODEMS, AND WE GAVE





11:09:21 THAT PROJECT AN INTERNAL CODE NAME TO PROTECT CONFIDENTIALITY 11:09:25 AND CALLED IT ANTIQUE.
11:09:26 Q. TURN TO THE SECOND PAGE OF THE EXHIBIT, PLEASE. I'LL ASK 11:09:29 YOU ABOUT THE BOTTOM BULLET POINT.
11:09:32 IT READS, "IMPROVE OUR ROYALTY LEVERAGE."
11:09:36 CAN YOU EXPLAIN WHAT THAT MEAN ITSELF.
11:09:38 A. YES. AS I TALKED ABOUT EARLIER, BY THIS POINT IN TIME IT 11:09:41 HAD BECOME OBVIOUS TO US THAT THE LICENSE ISSUES AND THE CHIP 11:09:45 ISSUES WERE HOPELESSLY ENTANGLED. SO OUR VIEW WAS THAT IF WE 11:09:51 COULD ESTABLISH A SUPPLEMENTAL CHIP SOURCE, WE WOULD NOT ONLY 11:09:54 GIVE SOME LEVERAGE ON CHIPSET PRICING, BUT WE WOULD REDUCE THE 11:09:58 STRANGLEHOLD THAT QUALCOMM HAS ON US RELATIVE TO ROYALTY 11:10:01 LEVERAGE, THAT THE POINT IN TIME THEY KNEW WE HAD TO BUY THEIR 11:10:05 CHIP, WE FELT IT PUT US IN A VERY UNFAVORABLE POSITION ON 11:10:09 LICENSING.
11:10:09 SO WE THOUGHT THIS PROJECT HAD POTENTIALLY BROAD BENEFITS 11:10:13 TO APPLE.
11:10:14 Q. I'D LIKE TO END WITH A FEW QUESTIONS ABOUT THE MORE RECENT 11:10:21 TIME PERIOD, MR. BLEVINS.
11:10:23 I'D LIKE TO CAUTION YOU, IF YOU WOULD, TO LIMIT YOUR 11:10:26 STATEMENTS TO KNOWLEDGE THAT YOU HELD AT OR BEFORE MARCH 30TH 11:10:32 OF 2018.
11:10:33 HAS APPLE BEEN ABLE TO CHALLENGE QUALCOMM'S ROYALTIES 11:10:36 SINCE INTRODUCING INTEL MODEM CHIPS INTO ITS IPHONES?
11:10:39 A. YES, WE HAVE RECENTLY CHALLENGED THEM.





11:10:42 Q. HOW DID APPLE DO THAT?
11:10:45 A. THERE ARE COURT PROCEEDINGS WHERE WE'RE TRYING TO 11:10:51 ESTABLISH WHAT IS A FRAND RATE FOR ROYALTY.
11:10:53 Q. FROM YOUR PERSPECTIVE AS VICE PRESIDENT OF PROCUREMENT FOR 11:10:56 APPLE, HAD THE BUSINESS RELATIONSHIP BETWEEN APPLE AND QUALCOMM 11:11:01 CHANGED AT ALL AS A RESULT OF THE ONGOING LITIGATION BETWEEN 11:11:05 THE COMPANIES?
11:11:05 A. OH, YES, IT'S CHANGED IN A VERY PROFOUND AND NEGATIVE 11:11:09 MANNER, UNFORTUNATELY.
11:11:10 Q. HOW SO?
11:11:11 A. THERE ARE MANY, MANY REASONS. THE TWO THAT I WOULD CITE, 11:11:14 IN THE INTERESTS OF BREVITY, AT THE TIME WE MADE THOSE 11:11:18 CHALLENGES, QUALCOMM WAS NO LONGER WILLING TO SELL US CHIPS. 11:11:23 THAT WAS VERY OBVIOUS, VERY APPARENT TO US. AND SO WE WENT 11:11:27 RIGHT BACK TO THE NO LICENSE, NO CHIPS, THAT WE WERE FACING 11:11:32 BACK IN 2005.
11:11:34 AND THEN IN ADDITION TO THAT, I THINK THEY WERE TRYING TO 11:11:37 ESTABLISH ADDITIONAL LEVERAGE BECAUSE THEY HAD FILED 11:11:41 INJUNCTIONS AGAINST APPLE AND LAWSUITS ON NON SEP'S, AGAIN, TO 11:11:45 IMPROVE THEIR POSITION, IN MY POSITION, ON THE SEP'S.
11:11:49 AND SO IT'S LED TO VERY NEGATIVE CIRCUMSTANCES, AND WE 11:11:53 HAVE FACED REPERCUSSIONS FROM CHALLENGING THEIR LICENSING 11:11:56 MODEL. BUT, AGAIN, IT FEELS LIKE WE'VE CIRCLED ALL THE WAY 11:12:00 BACK TO 2005.
11:12:01 Q. SO FROM YOUR PERSPECTIVE, HAS QUALCOMM BEEN UNWILLING TO

11:12:05 PARTICIPATE IN SUPPLYING MODEM CHIPS TO APPLE?
11:12:07 **A. YES, ABSOLUTELY.**
11:12:09 Q. AS OF MARCH 2018, WAS APPLE SATISFIED WITH THE STATE OF
11:12:13 COMPETITION IN THE MODEM CHIP MARKET?
11:12:16 **A. NO, NOT AT ALL. WE HAVEN'T IMPROVED OUR POSITION AT ALL.**
11:12:19 **THE ENTIRE CONCEPT OF PROJECT ANTIQUE WAS TO ADD A SECOND**
11:12:22 **SUPPLIER. WE WANTED SOME COMPETITIVE LEVERAGE, AND WE WORKED**
11:12:26 **VERY HARD TO ADD A SECOND SUPPLIER, AND WE IMPLEMENTED THAT IN**
11:12:29 **2016, AND WE ENJOYED THE BENEFITS OF THAT COMPETITION.**
11:12:32 HOWEVER, ONCE QUALCOMM ELECTED TO NOT PARTICIPATE ANY
11:12:36 FURTHER, WE WERE DOWN TO ONE SUPPLIER, WHICH IS IMC, AND NO
11:12:40 OFFENSE TO IMC, BUT WE DON'T WANT TO BE SO DEPENDENT ON THEM.
11:12:45 WE WANT MARKET COMPETITION. WE WANT MULTIPLE SOURCES SO THAT
11:12:48 WE CAN GET BEST OVERALL VALUE.
11:12:50 SO WE VERY MUCH WANTED BOTH QUALCOMM AND IMC IN THE MIX.
11:12:56 COMPETITION LEADS TO VERY, VERY GOOD BEHAVIOR FROM OUR
11:13:00 STANDPOINT. IT'S NOT JUST PRICING, WHICH IS SIGNIFICANT, BUT
11:13:03 PEOPLE PRODUCE BETTER QUALITY PRODUCT, THEY'RE MORE DILIGENT
11:13:06 ABOUT HITTING TECHNICAL SCHEDULES, THEY INNOVATE. THE IDEA OF
11:13:10 COMPETITION IS JUST INVALUABLE TO US AS WE WORK THROUGH OUR
11:13:13 BUSINESS PLANS. AND WITHOUT COMPETITION, WE JUST CAN'T BE
11:13:16 SUCCESSFUL ON A COMPONENT BASIS.
11:13:19 Q. THANK YOU, MR. BLEVINS. I JUST HAVE TWO QUICK
11:13:21 HOUSEKEEPING QUESTIONS AND THEN I THINK WE'RE DONE.
11:13:24 JUST TO MAKE -- THERE MAY BE SOME CONFUSION IN THE





11:13:28 TRANSCRIPT, AND I JUST WANT TO REPEAT A QUESTION I ASKED
11:13:30 EARLIER.
11:13:31 HAS APPLE EVER ENTERED INTO A DIRECT LICENSE WITH
11:13:34 QUALCOMM?
11:13:35 **A. NO.**
11:13:39 THE COURT: WHAT DOES THAT MEAN? BECAUSE MY NOTES
11:13:43 ARE ALSO A LITTLE UNCLEAR ON THIS, THAT THERE WAS NO LICENSE IN
11:13:46 2005, BUT THEN THERE WAS A LICENSE IN 2007. WHAT'S -- I DON'T
11:13:50 UNDERSTAND THE RELEVANCE OF THIS.
11:13:51 BY MR. BAKER:
11:13:55 Q. MR. BLEVINS, CAN YOU DESCRIBE FOR THE COURT THE NATURE OF
11:13:58 THE AGREEMENT, THE MARKETING INCENTIVE AGREEMENT THAT WAS
11:14:02 ENTERED INTO IN 2007?
11:14:03 **A. YES, I CAN. SO QUALCOMM PROPOSED A LICENSE AGREEMENT TO**
11:14:06 **APPLE BACK IN 2005. WE HAVE YET TO EVER ENTER INTO A DIRECT**
11:14:11 **LICENSING AGREEMENT.**
11:14:12 HOWEVER, WHAT HAS BEEN A SUBSTITUTE FOR THAT IS QUALCOMM
11:14:16 HAS TOLD US THEY HAVE DIRECT LICENSING AGREEMENTS WITH OUR
11:14:19 CONTRACT MANUFACTURERS. AND SO THOSE CONTRACT MANUFACTURERS
11:14:23 WERE USING THE QUALCOMM LICENSE TO SHIP APPLE PRODUCTS.
11:14:28 THE SERIES OF AGREEMENTS I MENTIONED WOULD REBATE SOME OF
11:14:32 THOSE ROYALTIES BACK TO APPLE SO THAT THE NET ROYALTIES WE PAID
11:14:36 WERE STILL EXORBITANT, BUT THEY WEREN'T AS HIGH AS THEY WOULD
11:14:40 HAVE OTHERWISE BEEN. SO WE DID GET SOME RELIEF, STILL LANDING
11:14:44 IN AN EXORBITANT PLACE, BUT THOSE AGREEMENTS WERE DESIGNED TO





11:14:48 GIVE US SOME RELIEF RELATIVE TO THE NOMINAL ROYALTIES OUR CM'S
11:14:53 WOULD OTHERWISE PAY.
11:14:55 Q. AND THAT MARKETS INCENTIVE AGREEMENT, THAT EXPIRED AT THE
11:14:58 END OF 2012; IS THAT RIGHT?
11:15:00 **A. YES, THAT IS CORRECT.**
11:15:01 Q. AND THE TRANSITION AGREEMENTS, HAVE THEY EXPIRED?
11:15:04 **A. THEY EXPIRED AT THE END OF 2016.**
11:15:06 MR. BAKER: NO FURTHER QUESTIONS. THANK YOU.
11:15:08 THE COURT: OKAY. TIME IS 11:15.
11:15:10 THE WITNESS: THANK YOU, SIR.
11:15:21 (PAUSE IN PROCEEDINGS.)
11:15:39 THE COURT: ARE YOU READY?
11:15:41 MS. SESSIONS: I AM, YOUR HONOR.
11:15:42 THE COURT: OKAY. GO AHEAD, PLEASE. GO AHEAD,
11:15:44 PLEASE.

11:15:44 **CROSS-EXAMINATION**

11:15:44 BY MS. SESSIONS:
11:15:45 Q. GOOD MORNING, MR. BLEVINS. MY NAME IS JUSTINA SESSIONS,
11:15:49 AND I REPRESENT QUALCOMM.
11:15:50 **A. GOOD MORNING, MA'AM.**
11:15:51 Q. APPLE DESIGNED THE ORIGINAL IPHONE TO BE COMPATIBLE IN THE
11:15:54 UNITED STATES WITH AT&T'S NETWORK; CORRECT?
11:15:56 **A. YES, THAT IS MY RECOLLECTION.**
11:15:58 Q. AND AT&T'S NETWORK AT THE TIME USED THE UMTS AIR
11:16:02 INTERFACE?





11:16:02 **A. YES, THAT'S CORRECT.**
11:16:03 Q. THE FIRST DISCUSSIONS THAT YOU HAD WITH POTENTIAL BASEBAND
11:16:08 PROCESSOR SUPPLIERS WERE THE FIRST IPHONE WERE IN 2005?
11:16:13 **A. YES, THAT IS ALSO CORRECT.**
11:16:14 Q. AND IN 2005, YOU SPOKE TO AT LEAST QUALCOMM, SONY
11:16:20 ERICSSON, TEXAS INSTRUMENTS, AND INFINEON ABOUT SUPPLYING
11:16:24 BASEBAND PROCESSORS FOR THE FIRST IPHONE?
11:16:27 **A. YES, THAT IS CORRECT.**
11:16:28 Q. AND IN 2005, APPLE LEARNED THAT QUALCOMM HAD A POLICY OF
11:16:33 REQUIRING A LICENSE OR A LICENSE CONTRACT MANUFACTURER BEFORE
11:16:40 IT WOULD SELL MODEM CHIPS; CORRECT?
11:16:42 **A. YES, THAT IS ALSO CORRECT.**
11:16:44 Q. APPLE CHOSE INFINEON AS THE BASEBAND SUPPLIER FOR THE
11:16:46 FIRST IPHONE; CORRECT?
11:16:48 **A. YES.**
11:16:48 Q. AND APPLE CHOSE INFINEON EVEN THOUGH INFINEON DID NOT HAVE
11:16:52 THE LOWEST PRICED OFFERING?
11:16:55 **A. YES. MY RECOLLECTION WAS WE THOUGHT INFINEON OFFERED US**
11:16:59 **OVERALL BEST VALUE, BUT NOT NECESSARILY ABSOLUTE LOWEST PRICE.**
11:17:03 Q. INFINEON WAS DECLARED TO BE THE BEST TECHNICAL ALTERNATIVE
11:17:06 AND IT HAD A COMPETITIVE PRICE?
11:17:09 **A. I THINK THAT'S A FAIR SUMMARY, YES.**
11:17:10 Q. APPLE DID NOT CONSIDER BUYING BASEBAND PROCESSORS FOR THE
11:17:15 FIRST IPHONE FROM MORE THAN ONE SUPPLIER; CORRECT?
11:17:19 **A. THAT IS ALSO CORRECT.**

DO RECALL IT.
Q. AND QUALCOMM DID AGREE TO PROVIDE APPLE WITH CONTINUITY OF SUPPLY?
A. FINALLY IN THE FINAL ANALYSIS, THEY DID.
Q. AND QUALCOMM HONORED ITS AGREEMENT TO PROVIDE APPLE WITH CONTINUITY OF SUPPLY; CORRECT?
A. YES, THEY DID.
MS. SESSIONS: THANK YOU. NO FURTHER QUESTIONS.
THE WITNESS: THANK YOU, MA'AM.
THE COURT: OKAY. TIME IS 11:39.
DO YOU HAVE ANY REDIRECT?
MR. BAKER: JUST A COUPLE QUESTION, YOUR HONOR.
THE COURT: OKAY. LET ME KNOW WHEN YOU'RE READY.
MR. BAKER: I'M READY.
THE COURT: OKAY. 11:39. GO AHEAD, PLEASE.

REDIRECT EXAMINATION

BY MR. BAKER:
Q. MR. BLEVINS, BETWEEN 2011 AND THE SPRING OF 2016, DID APPLE USE ANY NON-QUALCOMM MODEM CHIPS IN ANY OF ITS NEWLY LAUNCHED DEVICES?
A. NO, SIR.
Q. MR. BLEVINS, YOU TESTIFIED JUST NOW ABOUT THE FACTORS INFLUENCING APPLE'S DESIRE TO ENTER INTO THE 2013 AMENDED TRANSITION AGREEMENT.
WAS A DESIRE TO OBTAIN ROYALTY RELIEF A FACTOR INFLUENCING





APPLE TO ENTER INTO THAT AGREEMENT?
A. WELL, YES, OBVIOUSLY. THOSE ROYALTY REBATES WERE HUGE AND THEY LESSENED WHAT THAT, THAT VIEW, WHICH WE CONSIDERED EXORBITANT, TO BE OTHERWISE.
Q. AND FINALLY, YOU JUST WERE TESTIFYING ABOUT THE SEPTEMBER 2015 SUPPLY CONTINUITY AGREEMENT BETWEEN APPLE AND QUALCOMM. DO YOU RECALL THAT?
A. YES, I RECALL THAT.
Q. DOES THAT SUPPLY CONTINUITY AGREEMENT PROVIDE ASSURANCE TO APPLE FOR FUTURE DEVICE MODELS?
A. NO, IT SPECIFICALLY DID NOT.
WE DESIRED THAT IT WOULD. BUT AS I MENTIONED, WE SPENT 15 MONTHS NEGOTIATING THIS AGREEMENT AND THE BEST THAT WE COULD DO WAS SECURE A SUPPLY CONTINUITY FOR THINGS THAT HAD ALREADY BEEN LAUNCHED AT THAT POINT IN TIME.
WE TRIED VERY AGGRESSIVELY TO GET THE SAME CONDITIONS IN FUTURE CHIP, BUT WE WERE UNSUCCESSFUL IN NEGOTIATING SUCH A CONDITION.
MR. BAKER: THANK YOU.
NO FURTHER QUESTIONS, YOUR HONOR.
THE COURT: OKAY. TIME IS 11:41.
IS THERE ANY FURTHER --
MS. SESSIONS: NO FURTHER QUESTIONS, YOUR HONOR.
THE COURT: OKAY. AND IS THIS WITNESS EXCUSED SUBJECT TO RECALL, OR NOT SUBJECT TO RECALL?





MR. BAKER: NOT SUBJECT TO RECALL.
MS. SESSIONS: NOT SUBJECT TO RECALL, YOUR HONOR.
THE COURT: OKAY. THEN YOU HAVE COMPLETED YOUR TRIAL TESTIMONY AND YOU ARE FREE TO LEAVE.
THE WITNESS: THANK YOU, YOUR HONOR.
THE COURT: YOUR NEXT WITNESS IS A VIDEO ONE. IS THAT RIGHT?
MR. MATHESON: YES, YOUR HONOR. WITH THE COURT'S PERMISSION, WE'D LIKE TO BEGIN THE VIDEO OF MR. LEE. YOUR HONOR HAS SEALED A PORTION OF THAT VIDEO.
THE COURT: OKAY.
MR. MATHESON: IF IT'S CONVENIENT FOR THE COURT, OUR PROPOSAL WOULD BE TO PLAY THE UNSEALED PORTION.
THE COURT: OKAY.
MR. MATHESON: WHICH IS ABOUT EIGHT MINUTES LONG AND THEN IF YOUR HONOR WANTED TO SEAL THE ROOM AND DISMISS EVERYONE EXCEPT FOR THE LAWYERS, WE CAN COMPLETE THE SEALED PORTION BEFORE LUNCH AND THAT WOULD HOPEFULLY MINIMIZE THE DISRUPTION ON THE AUDIENCE SHUFFLING IN AND OUT BECAUSE WE COULD COME BACK AFTER LUNCH IN OPEN SESSION.
THE COURT: OH, OKAY.
MR. MATHESON: THAT WOULD END US RIGHT AROUND NOON IF THAT'S CONVENIENT.
THE COURT: THAT'S FINE WITH ME.
OKAY. SO LET'S PLAY THE PUBLIC VERSION. AND DO YOU WANT





TO ADMIT ANY EXHIBITS THROUGH THIS WITNESS?
MR. MATHESON: YES, YOUR HONOR. AND ONE POINT OF CLARIFICATION.
THE COURT: YES.
MR. MATHESON: WE HAD AGREED IN THE JOINT PRETRIAL STATEMENT THAT WE MIGHT PLAY SOME VIDEO WITH THE TRANSCRIPT, OR THE TRANSCRIBED ANSWERS IN ENGLISH. THAT'S HOW WE HAVE PREPARED THIS ONE.
THAT IS NOT THE CASE FOR FUTURE VIDEOS IN FOREIGN LANGUAGE IN WHICH WE HAVE CAPTURED THE QUESTION IN ENGLISH, THE QUESTION IN THE SPEAKER'S NATIVE LANGUAGE, AND THE ANSWER IN BOTH THE SPEAKER'S NATIVE LANGUAGE AND ENGLISH.
THE COURT: OKAY.
MR. MATHESON: FOR THIS ONE, IT'S JUST THE QUESTION IN ENGLISH, THE ANSWER IN THE NATIVE LANGUAGE AND THE TRANSCRIPT.
IF YOUR HONOR DOESN'T LIKE THAT PRESENTATION, WE CAN ADJUST THAT AND CHANGE IT.
THE COURT: THAT'S -- I MEAN, YOU SAID THAT'S THE ONLY CASE FOR THIS ONE; RIGHT?
MR. MATHESON: CORRECT.
THE COURT: THAT'S FINE.
MR. MATHESON: THANK YOU VERY MUCH.
THE COURT: ALL RIGHT. SO YOU WANT TO INTRODUCE EXHIBITS?



PX98

# PX 99

## (Filed Under Seal)

# PX 100

## (Filed Under Seal)

# PX 101

## (Filed Under Seal)

# PX 102

## (Filed Under Seal)

# PX 103

## (Filed Under Seal)

# PX 104

## (Filed Under Seal)

# PX 105

## (Filed Under Seal)

# PX 106

## (Filed Under Seal)

# PX 107

## (Filed Under Seal)

# PX 108

## (Filed Under Seal)

# PX 109

## (Filed Under Seal)

# PX 110

## (Filed Under Seal)

# PX 111

## (Filed Under Seal)

# PX 112

## (Filed Under Seal)

# PX 113

## (Filed Under Seal)

# PX 114

## (Filed Under Seal)

# PX 115

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | C-17-00220 LHK |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | JANUARY 14, 2019 |
| | ) | |
| QUALCOMM INCORPORATED, A DELAWARE CORPORATION, | ) | VOLUME 5 |
| | ) | PAGES 858-1111 |
| DEFENDANT. | ) | SEALED PAGES 946-949, 1004, 1024-1042, 1081-1083 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LUCY H. KOH
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF: FEDERAL TRADE COMMISSION
BY: JENNIFER MILICI
DANIEL J. MATHESON
WESLEY G. CARSON
KENT COX
NATHANIEL M. HOPKIN
PHILIP J. KEHL
MIKA IKEDA
600 PENNSYLVANIA AVENUE, NW
WASHINGTON, D.C. 20580

APPEARANCES CONTINUED ON NEXT PAGE

OFFICIAL COURT REPORTERS: LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595
IRENE RODRIGUEZ, CSR, CRR, RMR
CERTIFICATE NUMBER 8074

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER





APPEARANCES (CONTINUED)

FOR THE DEFENDANT: KEKER, VAN NEST & PETERS
BY: ROBERT A. VAN NEST
JUSTINA K. SESSIONS
EUGENE M. PAIGE
CHRISTINA BLAIS
MATAN SHACHAM
CODY HARRIS
KRISTIN HUCEK
633 BATTERY STREET
SAN FRANCISCO, CALIFORNIA 94111

CRAVATH, SWAINE & MOORE
BY: GARY A. BORNSTEIN
MICHAEL BRENT BYARS
YONATAN EVEN
JORDAN D. PETERSON
MING-TOY TAYLOR
DEREK SUTTON
ANDREW HUYNH
ANTONY RYAN
825 EIGHTH AVENUE
NEW YORK, NEW YORK 10019

ALSO PRESENT: MARK SNYDER
JEFF DAHM
KEN KOTARSKI





INDEX OF WITNESSES


PLAINTIFF'S

JEFF WILLIAMS
DIRECT EXAM BY MR. BAKER P. 864
CROSS-EXAM BY MR. PAIGE P. 893
REDIRECT EXAM BY MR. BAKER P. 917
RECROSS-EXAM BY MR. PAIGE P. 917

HWI-JAE CHO
DEPOSITION READING P. 922

RICHARD DONALDSON
DIRECT EXAM BY MS. GILLEN P. 959
CROSS-EXAM BY MR. PAIGE P. 978
REDIRECT EXAM BY MS. GILLEN P. 994

CHRISTINA PETERSSON
VIDEOTAPED DEPOSITION P. 1002

BRIAN CHONG
VIDEOTAPED DEPOSITION P. 1110

MATTHEW LASINSKI
DIRECT EXAM BY MR. ROSS P. 1006
CROSS-EXAM BY MR. BORNSTEIN P. 1041
REDIRECT EXAM BY MR. ROSS P. 1093
RECROSS-EXAM BY MR. BORNSTEIN P. 1100
FURTHER REDIRECT EXAM BY MR. ROSS P. 1103
FURTHER RECROSS-EXAM BY MR. BORNSTEIN P. 1106






INDEX OF EXHIBITS


| | MARKED | ADMITTED |
|---|---|---|
| **PLAINTIFF'S** | | |
| 0617 | | 873 |
| 0599 | | 876 |
| 5363 | | 878 |
| 0526 | | 882 |
| 861 | | 913 |
| 10:18:16 0531, 0853, 6803, 10:18:24 6816, 8117, 10:18:30 6774, PAGES 5 THROUGH 9, AND 10:18:51 6809, PAGES 2 THROUGH 24 | | 921 |
| 0853 (REMOVED FROM ADMISSION) | | 953 |
| 101 | | 973 |
| 4103, 4104, 4155 | | 1002 |
| 7218 | | 1018 |
| 7492 | | 1073 |
| **DEFENDANT'S** | | |
| 9070 | | 900 |
| 9074 | | 902 |
| 6457 | | 1067 |
| 2053 | | 1109 |
| **JOINT** | | |
| 37 | | 905 |
| 59 | | 907 |
| 10:18:06 0025, 0026, 0110 AND 0111 | | 921 |
| 0120 | | 1002 |
| 116 | | 1025 |
| 0042 | | 1110 |




PX115

SAN JOSE, CALIFORNIA JANUARY 14, 2019
P R O C E E D I N G S
09:03:24 (COURT CONVENED AT 9:03 A.M.)
09:03:24 THE COURT: GOOD AFTERNOON AND WELCOME.
09:03:28 MR. VAN NEST: GOOD MORNING.
09:03:29 THE COURT: GOOD MORNING, I SHOULD SAY.
09:03:31 OKAY. CALL YOUR NEXT WITNESS, PLEASE.
09:03:35 MR. BAKER: GOOD MORNING, YOUR HONOR. JOE BAKER FOR
09:03:38 THE FTC.
09:03:39 BEFORE WE CALL OUR NEXT WITNESS, I JUST WANTED TO BRING TO
09:03:42 YOUR ATTENTION TO ONE SEALING MATTER RELATED TO THIS WITNESS.
09:03:45 THE COURT: OKAY. WHAT'S THAT?
09:03:46 MR. BAKER: OVER THE WEEKEND, THE PARTIES HAVE
09:03:48 CONFERRED AND QUALCOMM HAS AGREED TO WITHDRAW ITS SEALING
09:03:52 REQUEST AS TO THE $7.50 AND $10 NUMBERS THAT ARE RELATED TO THE
09:03:56 APPLE AGREEMENTS WITH QUALCOMM.
09:03:57 THE COURT: OKAY.
09:03:58 MR. BAKER: SO WE INTEND TO ELICIT TESTIMONY ABOUT
09:04:01 THOSE NUMBERS AND THOSE NUMBERS WILL COME IN VARIOUS DOCUMENTS
09:04:04 TODAY.
09:04:04 THE COURT: OKAY. THEN ALL THOSE DOCUMENTS NEED TO
09:04:07 BE REFILED WITH ALL THAT INFORMATION UNREDACTED. OKAY. WHEN
09:04:10 IS THAT GOING TO HAPPEN? GIVE ME A DEADLINE, PLEASE.
09:04:13 MR. BAKER: WE CAN DO THAT LATER TODAY.
09:04:15 THE COURT: OKAY.





09:04:18 THE FTC CALLS JEFF WILLIAMS.
09:04:20 THE COURT: ALL RIGHT. THE $10 AND THE $7.50, WHAT
09:04:34 DO THEY REPRESENT?
09:04:36 MR. BAKER: THE $7 --
09:04:38 THE COURT: AND I'M CHARGING THIS ALL TO YOUR TIME.
09:04:41 9:03 IS WHEN THIS CONVERSATION STARTED. GO AHEAD.
09:04:45 WHERE IS HE? BRING THE WITNESS IN. WHERE IS HE? WHY HE
09:04:49 IS NOT COMING FORWARD.
09:04:51 MS. MILICI: I BELIEVE HE'S COMING IN.
09:04:52 THE COURT: OH, OKAY.
09:04:53 WHAT ARE THOSE NUMBERS?
09:04:55 MR. BAKER: THE $7.50 NUMBER IS THE MARKETING
09:05:00 INCENTIVE AGREEMENT FROM 2007.
09:05:04 THE COURT: OKAY.
09:05:05 MR. BAKER: THE $10 FIGURE IS IN THE BUSINESS
09:05:07 COOPERATION AND PATENT AGREEMENT FROM 2013.
09:05:10 THE COURT: OKAY. AND THEN YOU SAW MY ORDER,
09:05:13 MR. VAN NEST HAD REPRESENTED THAT THE $1 BILLION NUMBER WAS
09:05:16 PUBLIC, WHICH WAS NOT TRUE, AND ALSO THAT IT HAD NOT BEEN
09:05:20 SEALED.
09:05:21 I HAD SEALED IT AT THE REQUEST OF QUALCOMM. QUALCOMM HAD
09:05:23 REPRESENTED THAT THAT WAS COMPETITIVE PRICING INFORMATION. I
09:05:26 TOOK THEIR REPRESENTATION AS CORRECT, AND I SEALED IT.
09:05:29 BUT THAT SHOULD ALL BE UNSEALED NOW.
09:05:31 MR. BAKER: OKAY.





09:05:31 THE COURT: SO YOU'RE WELCOME TO GO INTO IT WITH THIS
09:05:34 WITNESS IF YOU WANT.
09:05:35 MR. BAKER: OKAY.
09:05:35 THE COURT: GO AHEAD, PLEASE. IT'S 9:05. LET'S GET
09:05:37 HIM SWORN IN, PLEASE.
09:05:43 **(PLAINTIFF'S WITNESS, JEFF WILLIAMS, WAS SWORN.)**
09:05:45 THE WITNESS: YES.
09:05:46 THE CLERK: THANK YOU. PLEASE BE SEATED.
09:05:50 WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST
09:05:52 NAME FOR THE RECORD.
09:05:53 THE WITNESS: JEFF WILLIAMS.
09:05:57 THE CLERK: SPELL YOUR LAST NAME FOR THE RECORD.
09:05:59 THE WITNESS: W-I-L-L-I-A-M-S.
09:06:02 THE COURT: OKAY. 9:05. GO AHEAD, PLEASE.
09:06:05 **DIRECT EXAMINATION**
09:06:06 BY MR. BAKER:
09:06:06 Q. GOOD MORNING, MR. WILLIAMS.
09:06:09 A. **GOOD MORNING.**
09:06:10 Q. WHERE ARE YOU CURRENTLY EMPLOYED?
09:06:11 A. **APPLE.**
09:06:12 Q. WHEN DID YOU JOIN APPLE?
09:06:14 A. **1998.**
09:06:15 Q. WHAT IS YOUR PRESENT POSITION?
09:06:16 A. **CHIEF OPERATING OFFICER.**
09:06:18 Q. WHAT OTHER POSITIONS HAVE YOU HELD THERE SINCE 2005?





09:06:22 A. **I WAS IN CHARGE OF COMMODITY PROCUREMENT, THEN VICE**
09:06:25 **PRESIDENT OF WORLDWIDE PROCUREMENT, VICE PRESIDENT OF IPOD**
09:06:28 **OPERATIONS, THEN IPHONE OPERATIONS, THEN SENIOR VICE PRESIDENT**
09:06:31 **OF OPERATIONS, AND THEN COO.**
09:06:34 Q. DOES TONY BLEVINS REPORT TO YOU?
09:06:36 A. **HE DOES.**
09:06:39 Q. AND TO WHOM DO YOU REPORT?
09:06:40 A. **TIM COOK.**
09:06:41 Q. WHEN DID APPLE LAUNCH ITS FIRST IPHONE?
09:06:43 A. **2007.**
09:06:45 Q. WHAT, IF ANY, WAS YOUR INVOLVEMENT IN THE DEVELOPMENT OF
09:06:48 THE ORIGINAL IPHONE?
09:06:49 A. **I WAS PART OF THE SMALL TEAM THAT WORKED ON THE IPHONE IN**
09:06:55 **THE BEGINNING.**
09:06:57 Q. PRIOR TO THE LAUNCH OF THE IPHONE, DID APPLE HAVE ANY
09:07:00 EXPERIENCE IN THE CELLULAR TELEPHONE SPACE?
09:07:03 A. **NONE.**
09:07:03 Q. AT A HIGH LEVEL, HOW DID APPLE ENVISION THE IPHONE
09:07:06 COMPARED TO OTHER CELLULAR PHONES THAT WERE ON THE MARKET AT
09:07:09 THE TIME?
09:07:09 A. **WE WERE, WE WERE SELLING THE IPOD AND CUSTOMERS LOVED IT,**
09:07:14 **AND THEY WERE CARRYING IPODS, AND THEY WERE ALSO CARRYING A**
09:07:19 **PHONE, BASICALLY A FEATURE PHONE AT THAT TIME.**
09:07:22 AND WE SAW AN OPPORTUNITY TO NOT ONLY MERGE THOSE, BUT
09:07:25 OFFER SOMETHING EVEN, EVEN BIGGER AND DIFFERENT.



PX115

09:07:29 AND PEOPLE DIDN'T LOVE THE USER INTERFACE OF THEIR PHONES.
09:07:33 THEY -- IT WAS PRETTY FUNCTIONAL FOR MAKING PHONE CALLS, BUT WE
09:07:37 SAW A CHANCE TO COMPLETELY CHANGE THAT, AND THAT WAS THE
09:07:39 BEGINNING OF THE IPHONE. IT WAS A REALLY EXCITING TIME.
09:07:42 Q. HAVE YOU BEEN INVOLVED IN NEGOTIATING CONTRACTS WITH
09:07:45 QUALCOMM OVER THE YEARS?
09:07:47 A. **I HAVE.**
09:07:48 Q. I'D LIKE TO PUT UP A DEMONSTRATIVE ON THE SCREEN THAT'S
09:07:53 CDX 501. THIS SLIDE LISTS FIVE AGREEMENTS BETWEEN APPLE AND
09:07:57 QUALCOMM THAT HAVE BEEN PREVIOUSLY ADMITTED INTO EVIDENCE.
09:08:00 THEY ARE THE 2007 MARKETING INCENTIVE AGREEMENT, JX 40; THE
09:08:04 2009 STRATEGIC TERMS AGREEMENT, JX 52; THE 2011 TRANSITION
09:08:10 AGREEMENT, JX 57; THE 2013 FIRST AMENDMENT TO TRANSITION
09:08:15 AGREEMENT, ALSO JX 57; AND THE 2013 BUSINESS COOPERATION AND
09:08:21 PATH AGREEMENT, JX 78.
09:08:25 YOU ALSO HAVE COPYING OF THESE IN YOUR EXHIBIT BINDER IN
09:08:29 CASE YOU NEED TO REFER TO THEM.
09:08:31 ARE YOU FAMILIAR WITH EACH OF THESE AGREEMENTS?
09:08:33 A. **I AM.**
09:08:34 Q. WERE YOU INVOLVED IN THE NEGOTIATION OF EACH OF THESE
09:08:36 AGREEMENTS?
09:08:36 A. **I WAS.**
09:08:37 Q. DID YOU SIGN EACH OF THESE AGREEMENTS ON BEHALF OF APPLE?
09:08:40 A. **I DID.**
09:08:40 Q. DOES THIS CHART LOOK ACCURATE TO YOU?





09:08:42 A. **IT DOES.**
09:08:44 MR. BAKER: YOUR HONOR, IF I MAY APPROACH WITH A
09:08:46 BINDER FOR THE WITNESS?
09:08:47 THE COURT: GO AHEAD, PLEASE.
09:08:51 MR. BAKER: HERE YOU GO (HANDING).
09:08:53 THE WITNESS: THANKS.
09:08:55 BY MR. BAKER:
09:08:55 Q. HOW DID APPLE FIRST COME TO HAVE DISCUSSIONS WITH QUALCOMM
09:09:01 ABOUT I.P. LICENSING?
09:09:03 A. **WE LEARNED THERE WERE I.P. HOLDERS IN THE SPACE THAT**
09:09:07 **CHARGED LICENSES AND QUALCOMM WAS ONE OF THOSE, AND WE ENGAGED**
09:09:12 **IN DISCUSSIONS WITH THEM.**
09:09:13 Q. DID APPLE TAKE A DIRECT LICENSE TO QUALCOMM'S CELLULAR
09:09:16 STANDARD ESSENTIAL PATENTS?
09:09:18 A. **WE DID NOT.**
09:09:19 Q. WHY NOT?
09:09:19 A. **QUALCOMM SAID THAT THE PRACTICE WAS WE HAD TO**
09:09:24 **CROSS-LICENSE ALL OF OUR I.P. TO THEM. SO IN ESSENCE, THEY**
09:09:28 **WANTED US TO PAY THEM FOR THEIR SEPS AND, IN ADDITION, WE WOULD**
09:09:34 **CROSS-LICENSE ALL OF OUR I.P., SO ALL OF OUR MAC, IPOD, IPHONE,**
09:09:39 **ALL OF THE I.P. THEY WOULD HAVE A LICENSE TO AND THAT STRUCK US**
09:09:43 **AS PATENTLY UNFAIR, AND WE CHOSE NOT TO PURSUE THAT ROUTE.**
09:09:47 Q. WHEN YOU SAY "CROSS-LICENSE," APPLE WOULD BE GRANTING A
09:09:50 LICENSE TO QUALCOMM TO USE ALL OF APPLE'S I.P.; IS THAT RIGHT?
09:09:54 A. **RIGHT, AND AT THE SAME TIME WE PAY THEM.**





09:09:57 Q. RATHER THAN TAKE A DIRECT LICENSE TO QUALCOMM'S STANDARD
09:10:00 ESSENTIAL PATENTS, WHAT DID APPLE DO INSTEAD?
09:10:03 A. **INSTEAD WE REACHED AN AGREEMENT WHERE WE WOULD GET A NET**
09:10:10 **LICENSE THAT WAS LOWER THAN THE STANDARD CONTRACT RATE. SO THE**
09:10:15 **WAY IT WORKED IS QUALCOMM HAD A STANDARD AGREEMENT WITH**
09:10:19 **CONTRACT MANUFACTURERS AND THE CONTRACT MANUFACTURERS PAID**
09:10:23 **QUALCOMM, AND WE REIMBURSE THE CONTRACT MANUFACTURERS, AND THEN**
09:10:29 **QUALCOMM GAVE US A REBATE DOWN TO A LOWER RATE.**
09:10:31 Q. SO WAS THAT ARRANGEMENT INITIALLY IMPLEMENTED UNDER THE
09:10:35 2007 MARKETING INCENTIVE AGREEMENT?
09:10:39 A. **IT WAS.**
09:10:39 Q. YOU MENTIONED CONTRACT MANUFACTURERS. JUST TO BE SURE
09:10:41 IT'S CLEAR, CAN YOU BRIEFLY EXPLAIN APPLE'S CONTRACT
09:10:45 MANUFACTURING MODEL?
09:10:46 A. **SURE. WE DESIGN OUR PRODUCTS, AND WE DESIGN THE PROCESSES**
09:10:51 **THAT MAKE OUR PRODUCTS, BUT THE FINAL ASSEMBLY FOR ALMOST ALL**
09:10:55 **OF OUR PRODUCTS ARE DONE BY OTHER COMPANIES WHO EMPLOY THE**
09:11:00 **LABOR AND DO THE ACTUAL FINAL ASSEMBLY. WE CALL THEM CONTRACT**
09:11:05 **MANUFACTURERS.**
09:11:05 Q. DID APPLE'S CONTRACT MANUFACTURERS HAVE DIRECT LICENSE
09:11:09 AGREEMENTS WITH QUALCOMM BEFORE APPLE STARTED MAKING THE
09:11:12 IPHONE?
09:11:12 A. **THEY DID.**
09:11:13 Q. WHAT DID THESE EXISTING LICENSE REQUIREMENTS THE CONTRACT
09:11:16 MANUFACTURERS TO PAY?





09:11:17 A. **5 PERCENT OF THE COST OF THE PHONE IS WHAT WE WERE TOLD --**
09:11:21 **WE COULDN'T SEE THE AGREEMENTS DIRECTLY, BUT QUALCOMM TOLD US,**
09:11:25 **AND OTHERS, QUALCOMM TOLD US THAT IT WAS 5 PERCENT OF THE COST**
09:11:29 **OF THE PHONE, AND THAT'S ACTUALLY WHAT WE ENDED UP REIMBURSING**
09:11:32 **THE CONTRACT MANUFACTURERS FOR.**
09:11:34 Q. WHAT IS THAT IN DOLLARS?
09:11:35 A. **DEPENDS ON THE PHONE AT THE POINT IN TIME, BUT IT'S IN THE**
09:11:41 **TEENS. SO ANYWHERE FROM, YOU KNOW, $12 TO $20 RANGE.**
09:11:46 Q. ASIDE FROM THE SHEER DOLLAR AMOUNT, DID APPLE HAVE ANY
09:11:49 VIEWS REGARDING THE STRUCTURE OF THE CM'S EXISTING LICENSES
09:11:53 WITH QUALCOMM?
09:11:54 A. **YES.**
09:11:54 Q. WHAT WERE THOSE?
09:11:55 A. **THE WHOLE IDEA OF A PERCENTAGE OF THE COST OF THE PHONE**
09:12:01 **DIDN'T MAKE SENSE TO US. IT STRUCK AT OUR VERY CORE OF SENSE**
09:12:05 **OF FAIRNESS.**
09:12:08 IT -- WE -- YOU KNOW, AT THE TIME WE WERE MAKING SOMETHING
09:12:11 REALLY, REALLY DIFFERENT. WE WERE BRINGING SOME INNOVATION.
09:12:15 AND, FOR EXAMPLE, WE WERE ONE OF THE FIRST AND LED THE CHARGE
09:12:19 TO EMBED A LOT OF NAND MEMORY. WE DID THIS ON OUR IPODS, AND
09:12:25 WE WERE GOING TO DO IT ON OUR IPHONES, AND IF WE PUT ANOTHER
09:12:29 $100 OF COST IN NAND MEMORY, PER THE QUALCOMM AGREEMENT, THEY
09:12:33 WOULD GET $5 OF THAT EVEN THOUGH THEIR I.P. HAD NOTHING TO DO
09:12:37 WITH THAT.
09:12:38 OR APPLE -- AS YOU KNOW, APPLE SPENDS A LOT OF TIME MAKING



PX115

ITS PRODUCTS REALLY BEAUTIFUL, SO WE'LL SPEND AN EXTRA $60 ON THE STAINLESS STEEL AND ALUMINUM ENCLOSURES AND THINGS LIKE THAT. AND PER THE AGREEMENT, IF WE SPENT COST ON THAT, SAY THAT EXTRA $60, IT HAS NOTHING TO DO WITH OUR I.P., THE QUALCOMM ARRANGEMENT WOULD HAVE HAD THEM COLLECT $3.

SO THAT, THAT DIDN'T MAKE SENSE TO US, AND STILL DOESN'T TODAY.

Q. AND SO THE AGREEMENT YOU'VE BEEN DESCRIBING IS THE CONTRACT MANUFACTURERS --

**A. CORRECT.**

Q. -- EXISTING LICENSE; IS THAT RIGHT?

**A. CORRECT.**

Q. SO BACK TO THE MARKETING INCENTIVE AGREEMENT. UNDER THE REBATE ARRANGEMENT THAT YOU ULTIMATELY PUT IN PLACE WITH QUALCOMM IN 2007, WHAT WAS THE NET ROYALTY PAID TO QUALCOMM THROUGH THIS ARRANGEMENT?

**A. 7.50. SO THE CONTRACT MANUFACTURERS PAID THE 5 PERCENT, AND THEN QUALCOMM REBATED US DOWN TO THE 7.50.**

Q. AND HOW DID THE PARTIES ARRIVE AT THE $7.50 FIGURE?

**A. WE ORIGINALLY PROPOSED 5 PERCENT OF THE COST OF THE BASEBAND CHIP, WHICH IS $30, SO WE ORIGINALLY PROPOSED A DOLLAR 50. WE FLEW DOWN TO SAN DIEGO AND PROPOSED THAT. THAT WAS REJECTED.**

AND WE ULTIMATELY LANDED ON 7.50. QUALCOMM SAID THAT THAT WAS THE AVERAGE PRICE THAT EVERYBODY ELSE WAS PAYING PER UNIT,





AND THAT'S WHERE WE LANDED.

Q. WHAT DID YOU THINK OF THAT IN TERMS OF ITS FAIRNESS FOR APPLE -- FOR QUALCOMM'S I.P.?

**A. I THOUGHT IT WAS TOO HIGH. WE HAD STARTED TO LEARN ABOUT OTHER RATES AND IT WAS EXCESSIVE. QUALCOMM CHARGES US MORE THAN EVERYBODY ELSE PUT TOGETHER.**

Q. WHY DID APPLE AGREE TO $7.50 IN 2007?

**A. WE DIDN'T HAVE A LOT OF ALTERNATIVES. IF WE DIDN'T AGREE, THEN WE WOULD BE PAYING THE CONTRACT MANUFACTURER RATE, WHICH WAS IN THE HIGH TEENS; OR IF WE SOMEHOW CHALLENGED IT, WE STOOD THE RISK OF OUR BRAND NEW IPHONE WE WERE WORKING ON GETTING ENJOINED.**

AND SO NOT A LOT OF GREAT OPTIONS. AND QUALCOMM HAD REPRESENTED IT WAS THE AVERAGE PRICE EVERYBODY WAS PAYING, AND SO WE ENDED UP SETTLING ON THAT.

Q. WE'RE GOING TO PUT ON THE SCREEN DEMONSTRATIVE CDX 502, WHICH IS AN EXCERPT FROM SECTION 5 OF THE 2007 MARKETING INCENTIVE AGREEMENT.

IS THIS THE PROVISION THAT PROVIDED REBATES OF ROYALTY PAYMENTS OVER $7.50?

**A. IT IS.**

Q. THIS SECTION REFERS TO MARKETING INCENTIVES. DID YOU VIEW THIS AS A FUND TO BE USED FOR MARKETING?

**A. NO.**

Q. WHO DECIDED TO CALL IT A MARKETING INCENTIVE?





**A. QUALCOMM.**

Q. HOW DID YOU VIEW THIS?

**A. OH, IT WAS VERY SIMPLE. WE NEGOTIATED A RATE DOWN TO 7.50, AND THIS WAS AN INSTRUMENT TO GET IT DOWN TO THE 7.50. THIS WAS OUR LICENSING RATE. THIS WAS THE REBATE THAT TOOK US FROM THE CONTRACT MANUFACTURING RATE TO THE 7.50 WE DISCUSSED.**

Q. IN NEGOTIATING THE 2007 MARKETING INCENTIVE AGREEMENT, DID QUALCOMM DEMAND ANYTHING FROM APPLE IN EXCHANGE FOR THE ROYALTY REBATES DOWN TO $7.50?

**A. THEY DID.**

Q. WHAT DID THEY DEMAND?

**A. THAT WE NOT SHIP ANY WIMAX PRODUCTS.**

THEY ALSO ASKED US TO MAKE A STATEMENT SAYING THAT WE WERE SUING GSM AND NOT WIMAX FOR THE FUTURE.

Q. I'D LIKE YOU TO TURN IN YOUR BINDER TO TAB 6, PLEASE. THIS IS AN EXHIBIT CX 0617.

THIS IS AN E-MAIL EXCHANGE BETWEEN MARV BLECKER AND YOU. WHO IS MARV BLECKER?

**A. MARV BLECKER WORKED FOR QUALCOMM, AND HE WAS IN THE LICENSING GROUP, AND HE LED THE NEGOTIATIONS ON THE MARKETING INCENTIVE AGREEMENT.**

Q. DOES THIS E-MAIL RELATE TO THOSE NEGOTIATIONS?

**A. YES, IT DOES.**

MR. BAKER: YOUR HONOR, THE FTC MOVES TO ADMIT CX 0617.





MR. PAIGE: NO OBJECTION.

THE COURT: IT'S ADMITTED.

(PLAINTIFF'S EXHIBIT CX 0617 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.

BY MR. BAKER:

Q. MR. WILLIAMS, IF YOU LOOK IN PARAGRAPH 2 MUCH THIS EXHIBIT, MR. BLECKER WRITES TO YOU?

**A. "MOTIVATING APPLE TO SELECT WCDMA TO THE EXCLUSION OF WIMAX IS OUR PRIMARY MOTIVATION FOR ENTERING INTO THIS AGREEMENT. OTHERWISE, WE WOULD NOT BE DOING IT."**

WHAT WAS WIMAX?

**A. WIMAX WAS A COMPETING STANDARD TO CDMA AND GSM. I DON'T KNOW ALL THE DETAILS ABOUT IT. IT WAS EMERGING AT THE TIME.**

I KNOW INTEL WAS SUPPORTING IT. I KNOW STEVE WAS INTERESTED IN IT. I DON'T KNOW A TON ABOUT IT.

Q. DID QUALCOMM SAY IT WANTED APPLE TO RENOUNCE WIMAX?

**A. NO.**

Q. IN THE 2007 MARKETING INCENTIVE AGREEMENT, DID APPLE AGREE TO QUALCOMM'S DEMAND RELATING TO WIMAX?

**A. WE DID.**

Q. AND FOLLOWING THE EXECUTION OF THAT AGREEMENT, DID APPLE PURSUE WIMAX FURTHER?

**A. NO. IN ESSENCE, IT WAS KILLED IN THE CRADLE FOR US. WE DID NOT.**

Q. FOR THE FIRST IPHONE IN 2007, WHAT TYPE OF MODEM CHIPS DID





PX115

09:18:06 APPLE USE?
09:18:07 A. **GSM.**
09:18:08 Q. AND WHO DID YOU PROCURE THOSE FROM?
09:18:11 A. **INFINEON.**
09:18:12 Q. DID THERE COME A TIME WHEN APPLE NEEDED TO PURCHASE CDMA
09:18:15 MODEM CHIPS?
09:18:16 A. **YES.**
09:18:16 Q. WHEN WAS THAT?
09:18:17 A. **WE SHIPPED OUR FIRST CDMA PHONE IN 2011.**
09:18:22 Q. WHY DID APPLE NEED TO CHIP CDMA PHONES?
09:18:28 A. **WELL, CUSTOMERS, CUSTOMERS LOVED THE IPHONE, AND WE WANTED**
09:18:33 **TO GET IPHONES INTO MORE CUSTOMERS' HANDS, AND THERE WERE**
09:18:39 **SEVERAL MARKETS IN THE WORLD WHERE THE INFRASTRUCTURE WORKED ON**
09:18:44 **CDMA, LIKE ABOUT HALF OF THE U.S., VERIZON, FOR EXAMPLE, AND**
09:18:49 **OTHER COUNTRIES AROUND THE WORLD.**
09:18:52 AND WE FOUND OUT THAT CUSTOMERS WERE ACTUALLY REALLY
09:18:55 STICKING TO THEIR CARRIER, AND SO WE WANTED TO EXPAND INTO THE
09:19:00 CDMA OPPORTUNITIES.
09:19:02 Q. WHAT VENDORS WERE AVAILABLE TO SUPPLY CDMA MODEM CHIPS FOR
09:19:08 APPLE'S 2011 IPHONE?
09:19:10 A. **QUALCOMM. WE ALSO LOOKED -- THERE WAS ALSO A SMALL**
09:19:14 **COMPANY IN TAIWAN, VIA, THAT WE LOOKED AT, BUT CONCLUDED THEY**
09:19:19 **WEREN'T TECHNICALLY READY OR CAPABLE. SO JUST QUALCOMM.**
09:19:24 Q. CAN YOU TELL US ABOUT THE ORIGIN OF THE 2011 TRANSITION
09:19:30 AGREEMENT BETWEEN APPLE AND QUALCOMM?





09:19:32 A. **YEAH. YES, I CAN.**
09:19:36 TWO THINGS: ONE, WE DISCOVERED THAT THE 7.50 ROYALTY
09:19:45 AGREEMENT THAT WE HAD REACHED WAS NOT GOING TO APPLY TO CDMA
09:19:51 PHONES OR IPADS, AND THIS REALLY UPSET US.
09:19:56 WE FLEW DOWN TO SAN DIEGO AND HAD A HEATED DISCUSSION
09:20:00 ABOUT THIS BECAUSE THE RATES WERE GOING TO BE MUCH HIGHER FOR
09:20:04 THE CDMA PHONES, WHICH MADE NO SENSE TO US.
09:20:07 IF YOU SHIP A PHONE THAT'S GOT SOMEBODY ELSE'S CHIP IN IT,
09:20:12 YOU PAY 7.50. IF YOU SHIP A PHONE THAT HAS QUALCOMM'S CDMA
09:20:17 CHIP IN IT, WE PAY FOR THE CHIP, PLUS MORE THAN THE 7.50. SO
09:20:22 IT DIDN'T MAKE ANY SENSE TO US. SO WE WERE TRYING TO GET
09:20:25 RELIEF FOR THAT.
09:20:26 AND THROUGH THE PROCESS, RELIEF WAS DISCUSSED IN THE FORM
09:20:31 OF A BROADER DEAL. SO THAT WAS ONE PIECE.
09:20:34 THE OTHER PIECE IS WE WERE GOING TO MOVE OUR BUSINESS FROM
09:20:36 INFINEON TO QUALCOMM. WE NEEDED THEIR CDMA AND LTE TECHNOLOGY.
09:20:41 WE WERE INTERESTED IN WORKING WITH THEM. THEY HAD GOOD
09:20:43 ENGINEERING LEADERSHIP IN THAT SPACE, AND WE ASKED FOR
09:20:50 TRANSITION FUNDS ASSOCIATED WITH MOVING BUSINESS TO THEM.
09:20:53 Q. I'D LIKE YOU TO LOOK AT TAB 7 IN YOUR BINDER, PLEASE,
09:20:57 EXHIBIT CX 0599.
09:21:04 IN THIS EXHIBIT, YOU ARE FORWARDING AN E-MAIL CHAIN
09:21:06 BETWEEN PAUL JACOBS OF QUALCOMM AND TIM COOK OF APPLE.
09:21:10 DID YOU SEND THIS E-MAIL?
09:21:11 A. **I DID.**





09:21:15 MR. BAKER: YOUR HONOR, THE FTC MOVES TO ADMIT
09:21:19 CX 0599.
09:21:19 MR. PAIGE: NO OBJECTION.
09:21:20 THE COURT: IT'S ADMITTED.
09:21:21 (PLAINTIFF'S EXHIBIT CX 0599 WAS ADMITTED IN EVIDENCE.)
09:21:21 THE COURT: GO AHEAD, PLEASE.
09:21:22 MR. BAKER: THERE'S SEALED MATERIAL ON PAGE 2 OF THIS
09:21:29 EXHIBIT, YOUR HONOR, BUT WE'RE ONLY GOING TO BE LOOKING AT PAGE
09:21:32 1 TODAY.
09:21:32 THE COURT: OKAY.
09:21:33 BY MR. BAKER:
09:21:34 Q. NEAR THE BOTTOM OF PAGE 1 MR. JACOBS WRITES, "WE DID
09:21:38 DISCUSS POTENTIALLY PROVIDING APPLE WITH A REBATE ON LARGER
09:21:40 SCREEN DEVICES LIKE THE IPAD, BUT AS PART OF A LARGER BUSINESS
09:21:44 RELATIONSHIP BETWEEN THE COMPANY, INCLUDING APPLE'S USE OF
09:21:47 QUALCOMM CHIPS IN ITS IPHONES AND DEVICES LIKE THE IPAD."
09:21:50 DOES THIS RELATE TO APPLE'S DESIRE TO HAVE THE MARKETING
09:21:54 INCENTIVE AGREEMENT ROYALTY REBATES APPLY TO IPADS THAT YOU
09:21:57 WERE JUST DISCUSSING?
09:21:59 A. **YES.**
09:21:59 Q. MR. JACOBS REFERS IN HIS E-MAIL TO A LARGER BUSINESS
09:22:03 RELATIONSHIP. WHAT SORT OF LARGER BUSINESS RELATIONSHIP WAS
09:22:06 QUALCOMM SEEKING IN RETURN?
09:22:07 A. **CHIP BUSINESS.**
09:22:08 Q. IF YOU COULD TURN TO THE NEXT TAB IN YOUR BINDER, PLEASE,





09:22:16 TO TAB EXHIBIT, EXHIBIT CX 5363.
09:22:22 A. **OKAY.**
09:22:26 MR. BAKER: YOUR HONOR, PORTIONS OF THIS EXHIBIT AS
09:22:28 WELL HAVE BEEN SEALED, AND WE DO NOT INTEND TO LOOK AT THOSE
09:22:31 PORTIONS.
09:22:31 THE COURT: ALL RIGHT. GO AHEAD, PLEASE.
09:22:32 BY MR. BAKER:
09:22:33 Q. IS THIS A DECEMBER 2010 E-MAIL EXCHANGE BETWEEN YOU AND
09:22:36 STEVE MOLLENKOPF OF QUALCOMM?
09:22:38 A. **YES.**
09:22:41 Q. AND IN PARTICULAR ON PAGE 17 OF THIS EXHIBIT, IS THIS
09:22:51 E-MAIL PART OF THE NEGOTIATION OF 2011 TRANSITION AGREEMENT?
09:22:55 A. **I SEE VERY LITTLE HERE. IT LOOKS LIKE A, A LOT OF IT HAS**
09:23:01 **BEEN REDACTED.**
09:23:02 BUT I SEE VERY LITTLE LANGUAGE HERE.
09:23:13 MR. BAKER: YOUR HONOR, IF I MAY APPROACH THE WITNESS
09:23:15 AND PROVIDE A SEPARATE COPY?
09:23:16 THE COURT: THAT'S FINE. GO AHEAD, PLEASE.
09:23:19 MR. BAKER: HERE IS PAGE 17 (HANDING).
09:23:27 THE WITNESS: GOT IT. THANK YOU.
09:23:28 BY MR. BAKER:
09:23:30 Q. TURNING TO PAGE 17 OF EXHIBIT CX 5363, WAS THIS E-MAIL
09:23:35 PART OF THE NEGOTIATION OF THE 2011 TRANSITION AGREEMENT?
09:23:38 A. **YES.**
09:23:4? MR. BAKER: YOUR HONOR, THE FTC MOVES TO ADMIT



PX115

09:23:43 CX 5363.
09:23:45 MR. PAIGE: YOUR HONOR, THIS IS SUBJECT TO AN HPO. I BELIEVE IT'S ONLY PAGES 6 THROUGH 18 OF THE EXHIBIT BEING ADMITTED; IS THAT CORRECT?
09:23:52 MR. BAKER: THAT'S CORRECT.
09:23:53 MR. PAIGE: NO OBJECTION.
09:23:53 THE COURT: OKAY. 6 THROUGH 18 IS WHAT YOU'RE SEEKING TO ADMIT?
09:23:57 MR. BAKER: YES, YOUR HONOR.
09:23:58 THE COURT: ALL RIGHT. THEY'RE ADMITTED.
09:23:59 (PLAINTIFF'S EXHIBIT 5363 WAS ADMITTED IN EVIDENCE.)
09:24:00 THE COURT: GO AHEAD, PLEASE.
09:24:00 BY MR. BAKER:
09:24:01 Q. IN THE E-MAIL FROM STEVE MOLLENKOPF TO YOU AT THE TOP OF PAGE 17 OF CX 5363 HE WRITES, "WE ARE UNWILLING TO HAVE THE MARKETING AGREEMENT APPLY TO CDMA IPHONES AS PART OF THIS DEAL BUT WE ARE WILLING TO PROVIDE A SEPARATE, SIGNIFICANT SUM OF MONEY AS PART OF THE CHIP DEAL."
09:24:19 CAN YOU EXPLAIN THIS?
09:24:22 A. **WE HAD BEEN GOING BACK AND FORTH, THERE WERE A LOT OF BID ASKS THROUGH THE PROCESS OF THE TRANSITION AGREEMENT. WE WERE LOOKING FOR THE CDMA RELIEF.**
09:24:30 **AT ONE POINT IN TIME, WE THOUGHT THAT WAS GOING TO COME THROUGH THE QTL, THE LICENSING GROUP AT QUALCOMM, AND THIS IS STEVE SAYING WE'RE NOT GOING TO DO THAT, EVERYTHING IS GOING TO**





09:24:39 **FLOW THROUGH THE CHIP SIDE.**
09:24:40 Q. SO LONG AS APPLE WAS GOING TO BE USING QUALCOMM CHIPS, DID APPLE CARE WHETHER THE REBATE CAME AS A ROYALTY REBATE FOR A CHIP DISCOUNT?
09:24:50 A. **NO, WE DID NOT.**
09:24:51 Q. WHAT WERE QUALCOMM'S MAIN ASKS AS PART OF THE CHIP DEAL IN THE 2011 TRANSITION AGREEMENT?
09:25:02 A. **THEY WANTED OUR BUSINESS. THEY WANTED EXCLUSIVITY.**
09:25:08 Q. IN 2010, DID APPLE PROPOSE TO QUALCOMM THAT IT WANTED TO GIVE QUALCOMM 100 PERCENT OF ITS BUSINESS IN ANY EVENT?
09:25:16 A. **NO. WHAT WE -- WE PROPOSED THAT WE WERE GOING TO GIVE THEM 100 PERCENT OF THE BUSINESS IN THE SHORT TERM. WE SAID WE WOULD SOLE SOURCE IN THE SHORT TERM. WE DIDN'T HAVE AN ISSUE WITH THAT.**
09:25:27 IN THE LONG TERM -- AND WE WANTED TO MOVE OUR BUSINESS TO QUALCOMM IN THE SHORT TERM.
09:25:31 IN THE LONG TERM, THAT WASN'T OUR PLAN. WE ULTIMATELY WANTED TO BRING UP A SECOND SOURCE.
09:25:36 Q. CAN YOU ELABORATE ON THE DIFFERENCE BETWEEN THIS SHORT TERM SOLE SOURCE AND LONG TERM EXCLUSIVITY?
09:25:41 A. **YEAH. IN 2010 WHEN WE WERE DISCUSSING THIS AGREEMENT THAT WE SIGNED IN 2011, WE HAD PLANNED TO DO A MULTIMODE CHIP WITH CDMA. THEY WERE THE ONLY SUPPLIERS OF CDMA. AND THEY HAD LEADERSHIP IN LTE.**
09:25:57 AND SO WHEN WE MET WITH THEM WE SAID, LOOK, WE'RE GOING TO





09:26:01 MOVE OUR BUSINESS TO YOU FROM INFINEON, AND INITIALLY YOU'LL BE SOLE SOURCE. WE'LL PUT OUR ENERGY IN ONE SUPPLIER. AND YOU'RE GOING TO GET A LOT OF BUSINESS FOR THAT.
09:26:13 AND THAT WAS THE BEGINNING OF THE TRANSITION.
09:26:15 THE EXCLUSIVITY, WHEN YOU'RE TALKING ABOUT THINGS LIKE PENALTIES AND CLAWBACKS FOR BRINGING UP ANOTHER SOURCE, THAT'S DIFFERENT. AND THAT WAS FROM QUALCOMM.
09:26:24 Q. DID APPLE PROPOSE THAT QUALCOMM PAY APPLE $1 MILLION IN EXCLUSION FOR EXCLUSIVITY?
09:26:31 A. **NO. WE -- WE PROPOSED -- AGAIN, THERE WERE TWO THINGS WE WERE TRYING TO SOLVE. ONE WAS RELIEF, FINANCIAL RELIEF ASSOCIATED WITH THIS CDMA PRICE HIKE; AND THE OTHER IS TRANSITION FUNDS FOR MOVING BUSINESS OVER.**
09:26:48 WE DID SAY, SHORT TERM, THAT THEY WOULD BE THE ONLY SUPPLIER SOLE SOURCE. BUT LONG TERM EXCLUSIVITY WITH CLAWBACKS AND THAT, NO.
09:26:58 Q. AND DID THESE LONG TERM EXCLUSIVITY PROVISIONS END UP IN THE AGREEMENT?
09:27:02 A. **THEY DID.**
09:27:02 Q. I'D LIKE TO PUT UP A DEMONSTRATIVE, CDX 505, PLEASE. THIS IS PARAGRAPH 1.5 OF THE 2011 TRANSITION AGREEMENT.
09:27:15 DOES THIS PROVISION RELATE TO THE EXCLUSIVITY THAT YOU'VE BEEN REFERRING TO?
09:27:19 A. **CORRECT.**
09:27:27 Q. I'D LIKE YOU TO LOOK AT THE FIRST SENTENCE, THE ONE THAT





09:27:29 CONTAINS THE WORDS "AUTOMATICALLY TERMINATE."
09:27:33 CAN YOU EXPLAIN WHAT THAT SENTENCE PROVIDES?
09:27:37 A. **THAT JUST MEANS THAT IF WE SHIP A COMPETITOR'S BASEBAND MODEM IN ANY OF OUR PRODUCTS, THE AGREEMENT IS TERMINATED.**
09:27:49 Q. NOW, THE SECOND SENTENCE OF THIS PROVISION CONTAINS THE WORD "REIMBURSE."
09:27:56 WHAT DOES THIS SENTENCE STATE?
09:27:58 A. **THIS, IN ESSENCE, IS A CLAWBACK. SO IN THE FIRST INSTANCE, IF WE'RE DOING BUSINESS AND WE START SHIPPING SOMEBODY ELSE'S MODEM, THE AGREEMENT STOPS.**
09:28:12 IN THE SECOND INSTANCE, THE CLAWBACK IS EVEN IF WE WERE COMPLIANT THE WHOLE TIME, IF WE ULTIMATELY SHIP SOMEBODY ELSE'S MODEM, WE OWE THEM MONEY BACK IN TIME. THAT'S THE CLAWBACK.
09:28:25 Q. WITH WHOM DID YOU DISCUSS THESE PROVISIONS AT QUALCOMM?
09:28:29 A. **STEVE MOLLENKOPF.**
09:28:31 Q. WHO PROPOSED THE TERMINATION AND CLAWBACK PROVISIONS OF THIS AGREEMENT?
09:28:35 A. **STEVE.**
09:28:35 Q. HOW DO YOU KNOW THAT?
09:28:39 A. **IT WOULD BE CONSTRAINING TO US, AND WE WOULD NOT WANT CLAWBACK PROVISIONS. IT'S NOT SOMETHING THAT WE'VE EVER DONE THAT I'M AWARE OF.**
09:28:53 Q. IF YOU COULD TURN TO TAB 9 OF YOUR BINDER, PLEASE. IT SHOULD BE AN EXHIBIT LABELED CX 0526?
09:29:?? YOUR HONOR, THIS IS A PARTIALLY SEALED DOCUMENT. WE'VE

PX115

09:29:10 REDACTED SOME INFORMATION ON PAGE 2. OTHERWISE WE WILL NOT BE
09:29:13 REFERRING TO SEALED INFORMATION.
09:29:19 ON PAGE 2 OF CX 0526, IS THIS AN E-MAIL THAT
09:29:25 STEVE MOLLENKOPF SENT TO YOU IN WHICH HE WRITES, "ATTACHED IS A
09:29:28 DECK EXPLAINING THE CHANGES WE WOULD LIKE TO MAKE TO THE MOST
09:29:31 RECENT DRAFT"?
09:29:32 A. **YES.**
09:29:33 Q. WAS HE REFERRING TO THE DRAFT TRANSITION AGREEMENT?
09:29:36 A. **YES.**
09:29:37 Q. DOES THE DECK ATTACHED BY MR. MOLLENKOPF TO HIS E-MAIL
09:29:42 APPEAR AT PAGE 8 OF THIS EXHIBIT?
09:29:44 A. **YES.**
09:29:55 MR. BAKER: YOUR HONOR, THE FTC MOVES TO ADMIT
09:29:58 CX 0526.
09:29:59 MR. PAIGE: NO OBJECTION.
09:30:00 THE COURT: IT'S ADMITTED.
09:30:01 (PLAINTIFF'S EXHIBIT CX 0526 WAS ADMITTED IN EVIDENCE.)
09:30:01 THE COURT: GO AHEAD, PLEASE.
09:30:06 BY MR. BAKER:
09:30:07 Q. WHAT WAS THE PURPOSE OF THE SLIDE DECK THAT APPEARS AT
09:30:09 PAGE 8 OF THIS EXHIBIT?
09:30:11 A. **IT LOOKS LIKE, OR IT IS, THE LATEST VOLLEY IN THE**
09:30:14 **DISCUSSIONS BACK AND FORTH IN TRYING TO REACH AGREEMENT ON THE**
09:30:17 **TRANSITION AGREEMENT.**
09:30:17 Q. AND WHO PREPARED THIS DECK?





09:30:19 A. **THIS WAS FROM QUALCOMM.**
09:30:22 Q. AT PAGE 14 OF EXHIBIT 0526 TOWARDS THE END OF THE DECK,
09:30:27 THERE'S A PAGE TITLED ADDITIONAL REQUIREMENTS.
09:30:31 DO YOU SEE THAT?
09:30:31 A. **I DO.**
09:30:36 Q. WHY IS SOME LANGUAGE UNDERLINED HERE?
09:30:38 A. **IT'S A RED LINE. IT'S -- IT'S THE BACK AND FORTH. SO**
09:30:43 **THIS IS THE LATEST CHANGES TO THE PREVIOUS VERSION.**
09:30:45 Q. SO THESE ARE CHANGES THAT QUALCOMM IS PROPOSING?
09:30:49 A. **CORRECT.**
09:30:49 Q. DO YOU SEE THE SECOND AND THIRD BULLET POINTS ON THIS
09:30:53 PAGE?
09:30:53 A. **I DO.**
09:30:53 Q. ARE THOSE DRAFT VERSIONS OF THE TRANSITION AGREEMENT
09:30:56 PROVISION, PARAGRAPH 1.5, THAT WE WERE JUST LOOKING AT?
09:31:01 A. **YES.**
09:31:02 Q. WERE THESE PROVISIONS BEING PROPOSED BY QUALCOMM AS
09:31:07 ADDITIONS TO THE DOCUMENT?
09:31:09 A. **THEY WERE.**
09:31:09 Q. AND JUST LOOKING AT THE BOTTOM LEFT CORNER OF THIS PAGE.
09:31:13 IT READS PAGE 7.
09:31:16 DO YOU SEE THAT?
09:31:16 A. **I DO.**
09:31:17 Q. TURN BACK TO PAGE 2 OF THIS EXHIBIT. AT THE BOTTOM OF THE
09:31:24 PAGE AT END OF MR. MOLLENKOPF'S E-MAIL HE WRITES, "LASTLY, WE





09:31:29 ADDED BACK IN THE LANGUAGE ON GENERAL DESIGN COMMITMENTS (SEE
09:31:32 OUR PAGE 7) THAT FELL OUT OF THIS DRAFT. THEY WERE IN EARLIER
09:31:37 ONES AND ARE IMPORTANT TO US."
09:31:39 WHAT DID YOU UNDERSTAND MR. MOLLENKOPF TO BE REFERRING TO
09:31:42 HERE?
09:31:43 A. **THOSE WERE THE RED LINES WE JUST LOOKED AT, THE**
09:31:48 **TERMINATION AND CLAWBACK PROVISIONS.**
09:31:51 Q. AND MR. MOLLENKOPF WAS TELLING YOU THAT THEY WERE
09:31:53 IMPORTANT TO QUALCOMM?
09:31:54 A. **HE WAS.**
09:31:55 Q. IS THAT CONSISTENT WITH YOUR DISCUSSIONS WITH
09:31:58 MR. MOLLENKOPF AT THAT TIME?
09:31:59 A. **IT WAS. IT IS.**
09:32:02 Q. WAS THE CLAWBACK PROVISION ULTIMATELY INCORPORATED INTO
09:32:06 THE FINAL TRANSITION AGREEMENT?
09:32:09 A. **IT WAS.**
09:32:10 Q. ONE LAST THING ON THIS EXHIBIT. ON PAGE 3 OF THE EXHIBIT,
09:32:13 MR. MOLLENKOPF HAD WRITTEN IN AN EARLIER JANUARY 21ST, 2011
09:32:19 E-MAIL, "I STILL REMAIN CONCERNED ABOUT THE LACK OF ANY TEETH
09:32:23 IN THE DEAL IN THE OUT-YEARS BUT UNDERSTAND YOUR CLAWBACK
09:32:26 CONCERNS."
09:32:27 DO YOU SEE THAT?
09:32:29 A. **I DO.**
09:32:29 Q. HAD YOU EXPRESSED CONCERNS TO QUALCOMM ABOUT THE CLAWBACK
09:32:33 PROVISION?





09:32:34 A. **I HAD.**
09:32:34 Q. WHEN DID THE $7.50 REBATE PROGRAM UNDER THE MARKETING
09:32:46 INCENTIVE AGREEMENT EXPIRE?
09:32:48 A. **2012.**
09:32:49 Q. DID APPLE NEGOTIATE ANY NEW AGREEMENTS WITH QUALCOMM AT
09:32:52 THAT TIME?
09:32:52 A. **WE DID.**
09:32:53 Q. WHAT AGREEMENTS WERE THOSE?
09:32:55 A. **WE NEGOTIATED AN AMENDMENT TO THE TRANSITION AGREEMENT AND**
09:32:59 **A BCPA.**
09:33:02 Q. LOOKING AT CDX 501 AGAIN BRIEFLY. ARE YOU REFERRING TO
09:33:07 THE 2013 AGREEMENTS ON THIS SLIDE?
09:33:09 A. **I AM.**
09:33:10 Q. WERE THE BCPA AND THE FIRST AMENDMENT TO TRANSITION
09:33:15 AGREEMENT NEGOTIATED IN PARALLEL?
09:33:16 A. **THEY WERE.**
09:33:17 Q. WERE THEY SIGNED AT THE SAME TIME?
09:33:18 A. **THEY WERE.**
09:33:19 Q. WERE THEY PART OF A PACKAGE DEAL?
09:33:21 A. **THEY WERE.**
09:33:21 Q. WHAT WAS APPLE'S OBJECTIVE IN ENTERING INTO THESE
09:33:27 AGREEMENTS?
09:33:27 A. **WE WERE -- WHAT WE WERE STARING AT IS AT THE END OF 2012,**
09:33:31 **OUR 7.50 ARRANGEMENT WITH QUALCOMM WAS COMING TO AN END AND THE**
09:33:35 **DEFAULT WAS THAT OUR ROYALTY RATE WAS GOING TO GO UP TO THE**

09:33:40 **HIGH TEENS BECAUSE IT WAS JUST GOING TO FLOW THROUGH THIS, THIS**
09:33:45 **CRAZY CONTRACT MANUFACTURING ARRANGEMENT.**
09:33:48 AND SO ON TOP OF THE CHIPS WE'RE BUYING, ON TOP OF THE
09:33:53 7.50 WE'RE ALREADY PAYING, THERE WAS GOING TO BE ANOTHER $8 OR
09:33:57 $10, WE WERE SELLING A HUNDRED MILLION PHONES, IT WOULD BE
09:34:00 ANOTHER BILLION DOLLARS A YEAR IN ROYALTY FOR, FOR NO EXTRA
09:34:05 VALUE FROM QUALCOMM.
09:34:07 AND SO WE WERE SEEKING RELIEF FOR THAT. WE WERE TRYING TO
09:34:09 FIND A WAY TO GET OUR ROYALTY DOWN TO SOMETHING REASONABLE,
09:34:13 BELOW 7.50 IDEALLY. BUT WE ENDED UP STRIKING A DEAL TO GET IT
09:34:18 DOWN TO 7.50.
09:34:19 Q. SO APPLE WAS ABLE TO EFFECTIVELY ACHIEVE AN EXTENSION OF
09:34:23 ITS ROYALTY REBATES UNDER THE 2013 BCPA AND AMENDED TRANSITION
09:34:28 AGREEMENT?
09:34:28 **A. THROUGH SIGNING UP FOR CHIPS AND EXCLUSIVITY, YES.**
09:34:33 Q. DID THE 2013 AMENDED TRANSITION AGREEMENT CONTAIN
09:34:46 TERMINATION AND CLAWBACK PROVISIONS SIMILAR TO THOSE THAT WE
09:34:49 LOOKED AT EARLIER IN THE TRANSITION AGREEMENT?
09:34:51 **A. IT DID, EXCEPT THEY WERE MORE ONEROUS THIS TIME. THEY**
09:34:55 **WERE LARGER VOLUMES, MORE MONEY AT STAKE.**
09:34:59 Q. AND WHO PROPOSED THE EXCLUSIVITY AT THIS STAGE OF THE
09:35:02 NEGOTIATION?
09:35:03 **A. QUALCOMM.**
09:35:04 Q. DID APPLE OBJECT?
09:35:05 **A. WE DID, BUT WE -- AGAIN, WE WERE STARING AT AN INCREASE OF**





09:35:12 **OVER A BILLION DOLLARS A YEAR ON LICENSING. SO WE -- WE HAD A**
09:35:20 **GUN TO OUR HEAD.**
09:35:22 Q. CAN YOU DESCRIBE THE DIFFERENCE BETWEEN THE BCPA AND THE
09:35:24 FIRST AMENDMENT TO TRANSITION AGREEMENT?
09:35:26 **A. THE BCPA WAS FROM THE LICENSING GROUP AND THE TRANSITION**
09:35:35 **AGREEMENT WAS FROM THE CHIP GROUP. IN OTHER WORDS, WE WERE**
09:35:39 **TRYING TO GET TO A NET 7.50.**
09:35:42 **IN DISCUSSIONS WITH QUALCOMM, THE LICENSING GROUP WAS**
09:35:45 **GOING TO CONTRIBUTE SOME, THE CHIP GROUP WAS GOING TO**
09:35:46 **CONTRIBUTE SOME.**
09:35:48 THE BCPA TOOK THE CONTRACT MANUFACTURING RATE DOWN TO $10
09:35:52 AND THEN THE CHIP SIDE PROVIDED THE REST TO GET TO 7.50.
09:35:56 Q. IN ADDITION TO THE EXCLUSIVITY THAT YOU MENTIONED UNDER
09:36:01 THE TRANSITION AGREEMENT, DID QUALCOMM MAKE ANY DEMANDS OF
09:36:05 APPLE UNDER THE BCPA?
09:36:06 **A. YES. WE -- WE HAD DEMANDS THAT WE WERE -- THE BCPA WOULD**
09:36:20 **TERMINATE IF WE PURSUED LEGAL ACTION AGAINST QUALCOMM, IF WE**
09:36:24 **CHALLENGED FRAND, IF WE -- IF WE BROUGHT UP EXHAUSTION, IF WE**
09:36:30 **INDUCED ANYBODY ELSE, THEN THE BCPA WOULD TERMINATE.**
09:36:36 Q. AND LET'S PUT ON THE SCREEN BRIEFLY CDX 0507, WHICH IS
09:36:42 SECTION 7 OF THE BCPA.
09:36:44 IS THIS THE PROVISION OF THE BCPA THAT YOU'RE REFERRING
09:36:46 TO?
09:36:47 **A. YES.**
09:36:48 Q. SO ONE OF THE CONDITIONS OF THIS PACKAGE SEAL IN 2013 WAS





09:36:53 THAT APPLE AGREE NOT TO CHALLENGE OR INDUCE OTHERS TO CHALLENGE
09:36:57 QUALCOMM'S ROYALTY RATES?
09:36:58 **A. CORRECT.**
09:36:59 Q. WHAT EFFECT, IF ANY, DID APPLE'S SIGNING OF THE TRANSITION
09:37:11 AGREEMENT AND THE AMENDED TRANSITION AGREEMENT HAVE ON APPLE'S
09:37:15 ONGOING WORK WITH OTHER MODEM CHIP SUPPLIERS?
09:37:17 **A. IN THE SHORT TERM, NO EFFECT BECAUSE WE WERE MOVING OUR**
09:37:22 **BUSINESS TO QUALCOMM.**
09:37:24 IN THE LONG TERM, IT MADE IT PROHIBITIVELY EXPENSIVE TO
09:37:29 WORK WITH SOMEONE ELSE. FOR EXAMPLE, WHEN WE SIGNED -- OR WHEN
09:37:34 WE WERE -- WE KNEW WE WERE GOING TO CLOSE THE 2013 AGREEMENT,
09:37:39 WE CUT OFF THE WORK WE WERE DOING WITH INTEL ON AN IPAD.
09:37:43 Q. FOLLOWING EXECUTION OF THE ORIGINAL TRANSITION AGREEMENT
09:37:49 IN 2011, WHAT VENDORS SUPPLIED APPLE WITH MODEM CHIPS FOR NEW
09:37:54 PRODUCTS BETWEEN 2011 AND THE SPRING OF 2016?
09:37:57 **A. QUALCOMM.**
09:37:58 Q. ANYONE ELSE?
09:37:59 **A. NOT UNTIL '16.**
09:38:02 Q. YOU MENTIONED EARLIER THAT YOU CONSIDERED EVEN THE $7.50
09:38:08 ROYALTY LEVEL TOO HIGH; IS THAT RIGHT?
09:38:11 **A. YES.**
09:38:11 Q. WHY DID YOU THINK THAT?
09:38:14 **A. YOU KNOW, THROUGH TIME WE ENDED UP CLOSING AGREEMENTS WITH**
09:38:17 **ALL THE OTHER LICENSE HOLDERS AND QUALCOMM WAS CHARGING US MORE**
09:38:23 **THAN EVERYONE ELSE PUT TOGETHER. AND 7.50 MAY NOT SOUND LIKE A**





09:38:27 **LOT, BUT WE'RE SELLING HUNDREDS OF MILLIONS OF PHONES AND IT'S**
09:38:31 **BILLIONS OF DOLLARS A YEAR AND IT'S -- IT'S JUST NOT FRAND, IN**
09:38:40 **OUR VIEW, COMPARED TO EVERYBODY ELSE.**
09:38:42 Q. YOU TESTIFIED EARLIER ABOUT THE REASONS THAT APPLE
09:38:46 ACCEPTED THAT 7.50 AMOUNT WHEN IT WAS FIRST LAUNCHING THE
09:38:51 IPHONE IN 2007.
09:38:52 WHY DID APPLE CONTINUE TO ACCEPT IT IN 2011, 2013?
09:38:57 **A. WELL, THE ALTERNATIVE WAS IF YOU DON'T ACCEPT IT, IT JUST**
09:39:03 **DEFAULTS TO THE CONTRACT MANUFACTURING RATE OF $18 OR $17.**
09:39:10 AND WE NEEDED THEIR CHIP SUPPLY, AND IF WE TRIED TO PURSUE
09:39:16 THEM LEGALLY, THEN WE WOULDN'T HAVE ACCESS TO THE CHIPS.
09:39:20 AND SO WE DIDN'T HAVE A LOT OF OPTIONS, SO WE LIVED WITH
09:39:24 IT.
09:39:25 Q. DID THERE COME A TIME WHEN APPLE DECIDED TO DUAL SOURCE
09:39:28 MODEM CHIPS IN THE IPHONE?
09:39:29 **A. YES.**
09:39:30 Q. WHEN IPHONE DID APPLE DUAL SOURCE MODEM CHIPS FOR?
09:39:34 **A. IPHONE 7 AND 7 PLUS, 2016.**
09:39:37 Q. AND WHAT FIRMS DID YOU DUAL SOURCE WITH?
09:39:41 **A. QUALCOMM AND INTEL.**
09:39:44 Q. HAS INTEL REQUIRED EXCLUSIVITY TO SUPPLY MODEM CHIPS TO
09:39:49 APPLE?
09:39:50 **A. THEY HAVE NOT.**
09:39:51 Q. HAVE THEY REQUIRED VOLUME COMMITMENTS?
09:39:5? **A. THEY HAVE NOT.**

Q. AS OF MARCH 2018 -- AND I'M GOING TO ASK YOU A COUPLE QUESTIONS NOW ABOUT RELATIVELY RECENT TIME PERIODS AND I'D LIKE YOU TO TRY TO LIMIT YOUR ANSWERS TO THE KNOWLEDGE YOU POSSESSED IN MARCH OF 2018, IF POSSIBLE.

AS OF MARCH 2018, WAS IT APPLE'S STRATEGY TO LIMIT ITSELF TO ONE SUPPLIER OF CHIPSETS GOING FORWARD, INCLUDING FOR 5G?

**A. ABSOLUTELY NOT. OUR STRATEGY HAS BEEN TO DUAL SOURCE.**

Q. DID APPLE FILE A LAWSUIT AGAINST QUALCOMM IN JANUARY 2017?

**A. WE DID.**

Q. AND AGAIN, LIMITING YOURSELF TO MARCH 2018, IF YOU CAN, WHAT HAPPENED TO THE APPLE/QUALCOMM CHIP SUPPLY RELATIONSHIP WHEN APPLE FILED ITS LAWSUIT AGAINST QUALCOMM?

**A. QUALCOMM HAS CONTINUED TO SHIP US PRODUCT ON THE DESIGN WINS THAT THEY HAVE AND HAD AT THE TIME. AND SO THEY HAVE CONTINUED TO SELL US CHIPS.**

WE HAVE BEEN UNABLE TO GET THEM TO SUPPORT US ON NEW DESIGN WINS PAST THAT TIME, AND THIS HAS BEEN A CHALLENGE.

FOR EXAMPLE, IN -- FOR 2018 -- WE WERE DUAL SOURCED IN 2016 AND 2017, AND OUR STRATEGY WAS TO DUAL SOURCE IN 2018 AS WELL, AND WE WERE WORKING TOWARDS DOING THAT WITH QUALCOMM.

BUT IN THE END, THEY WOULD NOT SUPPORT US AND SELL US CHIPS. WE -- I CONTACTED QUALCOMM, I CONTACTED STEVE, I SENT HIM E-MAILS, I CALLED. WE TRIED TO GET THEM TO SELL US CHIPS, AND THEY WOULD NOT.

AND I ENDED UP -- IN 2018, I ENDED UP ACTUALLY HAVING TO





GO TO BRIAN KRZANICH, THE CEO OF INTEL AND SAY, KIND OF LAST MINUTE, HEY, SORRY, BUT INSTEAD OF 50 PERCENT OF OUR VOLUME, I NEED YOU TO SUPPORT 100 PERCENT. AND HE HAD TO SCRAMBLE. HE TOLD ME HE HAD TO GO TO THE BOARD AND GET APPROVAL FOR AN EXTRA ALMOST BILLION DOLLARS IN CAPITAL TO SUPPORT OUR VOLUMES.

SO WE WERE LEFT, INSTEAD OF HAVING TWO SUPPLIERS, WITH ONE.

AND SO WE WOULD LOVE TO CONTINUE TO HAVE ACCESS TO QUALCOMM'S TECHNOLOGY.

Q. HAS QUALCOMM TAKEN ANY ADVERSE ACTIONS AGAINST APPLE SINCE APPLE FILED ITS LAWSUIT?

**A. YEAH. THEY'RE SUING US IN COURTS ALL OVER THE WORLD. THEY'RE SUING US ON NON-ESSENTIAL PATENTS, NON-SEPS, NEPS.**

THEY'RE SUING US AND WHAT THEY'RE TRYING TO DO IS GET A HIT IN ANY ONE OF THOSE COURTS TO CAUSE AN INJUNCTION THAT WILL CAUSE ENOUGH PAIN THAT WE'LL HAVE TO PAY THE TENS OF BILLIONS OF DOLLARS RANSOM ON THEIR SEP PROGRAM. TO USE THEIR LANGUAGE THEY USED WITH ME, WE HAVE TO BASICALLY RUN THE TABLE. WE HAVE TO WIN IN EVERY ONE OF THESE COURTS OR ELSE WE'RE -- WHAT THEY SAID IS YOU'RE AN IDEAL TARGET BECAUSE YOUR VOLUMES ARE SO BIG THAT YOU LOSE SO MUCH MONEY THAT UNLESS YOU RUN THE TABLE, THEN THEY KIND OF WIN.

AND WE'VE GOT NO CHOICE BUT TO PAY THE RANSOM.

Q. ONE LAST QUESTION. YOU MENTIONED THAT QUALCOMM IS CONTINUING TO SUPPLY CHIPS FOR PRIOR PRODUCTS FOR WHICH IT HAD





DESIGN WINS?

**A. THEY ARE, YES.**

Q. HAS APPLE EVER STOPPED PAYING QUALCOMM FOR THOSE MODEM CHIPS THAT APPLE HAS PURCHASED FROM QUALCOMM?

**A. WELL, THE CHIPS ARE ACTUALLY BOUGHT FROM THE CONTRACT -- BY THE CONTRACT MANUFACTURER. SO THE CONTRACT MANUFACTURER PAYS QUALCOMM, AND WE REIMBURSE THE CONTRACT MANUFACTURER FOR THE CHIPS. SO THEY'RE GETTING PAID FOR THOSE CHIPS, BUT WE DON'T PAY THAT DIRECTLY. IT'S INDIRECT.**

Q. AND APPLE HASN'T CEASED PAYMENTS TO THE CONTRACT MANUFACTURERS FOR THOSE CHIPS; RIGHT?

**A. WE HAVE NOT.**

MR. BAKER: NO FURTHER QUESTIONS AT THIS TIME, YOUR HONOR.

THE COURT: ALL RIGHT. IT'S 9:43.

AND WHEN ARE YOU GOING TO REFILE THOSE DOCUMENTS WITH THE $10 AND 7.50 UNREDACTED?

MR. BAKER: OUR GOAL WOULD BE TO DO SO TODAY, YOUR HONOR.

THE COURT: OKAY. GREAT.

MR. BAKER: WE WILL NEED TO COORDINATE WITH QUALCOMM, SO WE'LL DO OUR BEST TO DO THAT TODAY.

THE COURT: OKAY, GREAT. THANKS.

(PAUSE IN PROCEEDINGS.)

THE COURT: OKAY. ARE YOU READY?





MR. PAIGE: YES, YOUR HONOR. MAY I PROCEED?

THE COURT: 9:44. GO AHEAD, PLEASE.

**CROSS-EXAMINATION**

BY MR. PAIGE:

Q. GOOD MORNING, MR. WILLIAMS.

**A. GOOD MORNING.**

Q. APPLE DECIDED TO START WITH ONE GEOGRAPHY WHEN IT LAUNCHED THE IPHONE; CORRECT?

**A. YES.**

Q. AND APPLE CHOSE TO START WITH ONE NETWORK OPERATOR FOR THE IPHONE?

**A. CORRECT.**

Q. AND THE CARRIER WAS AT&T; RIGHT?

**A. CORRECT.**

Q. STEVE JOBS MADE THE DECISION TO START WITH AT&T; RIGHT?

**A. CORRECT, ALONG WITH THE TEAM. BUT YES.**

Q. APPLE FELT THAT IT HAD THE BANDWIDTH AND ENERGY TO GO WORK WITH ONLY ONE CARRIER IN THE BEGINNING; RIGHT?

**A. CORRECT.**

Q. AT&T, THEY OPERATED A GSM, WCDMA NETWORK AT THAT TIME, DID THEY NOT?

**A. CORRECT.**

Q. AND CDMA DEVICES WOULDN'T WORK ON AT&T'S NETWORK; RIGHT?

**A. CORRECT.**

Q. SO APPLE HAD NO NEED FOR CDMA CHIPS IN ORDER TO LAUNCH THE

CONTRACT MANUFACTURERS FOR QUALCOMM ROYALTIES, QUALCOMM HAS CONTINUED TO SHIP CHIPS FOR APPLE PRODUCTS; HASN'T IT?
A. **YES, PER THE AGREEMENT WE STRUCK WITH QUALCOMM.**
Q. YOU BELIEVE THAT QUALCOMM'S CHIP PRICING IS ALMOST ALWAYS HIGHER THAN OTHER SUPPLIERS; CORRECT?
A. **CORRECT.**
Q. IN FACT, IN YOUR VIEW, YOU PAY QUALCOMM SUBSTANTIALLY MORE THAN INTEL FOR WHAT YOU BELIEVE TO BE ESSENTIALLY THE SAME SOLUTION; RIGHT?
A. **CORRECT.**
Q. YOU STATED IN RESPONSE TO QUESTIONS FROM THE FTC THAT APPLE COULDN'T ENTER INTO A DIRECT LICENSING AGREEMENT WITH QUALCOMM IN THE 2000'S BECAUSE QUALCOMM WOULD REQUIRE APPLE TO CROSS-LICENSE ALL OF ITS I.P. TO QUALCOMM.
DO YOU RECALL THAT TESTIMONY?
A. **I DO.**
Q. BUT NOBODY FROM QUALCOMM TOLD YOU WHETHER AND TO WHAT EXTENT THEY NEEDED A CROSS-LICENSE BACK FROM APPLE; RIGHT?
A. **NO, THAT'S NOT CORRECT.**
Q. OKAY. COULD I PLEASE PLAY THE DEPO AT 311:23 THROUGH 312-4.
(A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)
THE COURT: HOW IS THAT IMPEACHMENT? WHY DO YOU ALL KEEP DOING THIS? THESE ARE NOT REALLY IMPEACHMENT, BUT YOU -- ANYWAY, GO AHEAD, PLEASE. THIS HAS BEEN GOING ON WITH MULTIPLE





QUALCOMM CROSS-EXAMINATIONS THAT THESE ARE NOT IMPEACHMENT.
BY MR. PAIGE:
Q. I ASKED --
THE COURT: CAN YOU ANSWER MY QUESTION? WHY IS THAT IMPEACHMENT?
MR. PAIGE: I JUST ASKED HIM WHETHER ANYONE FROM QUALCOMM TOLD HIM WHETHER AND TO WHAT EXTENT THEY NEED A CROSS-LICENSE BACK FROM APPLE.
THE COURT: WHAT WAS HIS ANSWER?
MR. PAIGE: THAT SAME QUESTION WAS ASKED AND HE SAID I DID NOT ENGAGE IN ANY DISCUSSIONS WITH QUALCOMM ON THE CROSS-LICENSING.
THE COURT: OKAY. SO HOW IS THAT IMPEACHMENT? ANYWAY, GO AHEAD, PLEASE.
BY MR. PAIGE:
Q. WERE YOU ASKED THAT QUESTION AND DID YOU GIVE THAT ANSWER?
A. **I WAS.**
Q. DO YOU STAND BY THAT TESTIMONY TODAY?
A. **I DO. I INTERPRETED YOUR QUESTION AS WE GOT VERY CLEAR INFORMATION FROM QUALCOMM ON THE REQUIREMENTS OF THE CROSS-LICENSE. THAT WAS WHETHER I HAD THE DIRECT CONVERSATIONS. SO I MIGHT HAVE MISINTERPRETED YOUR QUESTION. I WAS ANSWERING MORE BROADLY. SO NOT AN ISSUE.**
Q. OKAY. YOU DIDN'T HEAR FROM QUALCOMM ITSELF; RIGHT? YOU HEARD FROM THE LEGAL DEPARTMENT AT APPLE; IS THAT RIGHT?





A. **BOTH THE LEGAL AND THE CHIP TEAM.**
Q. OKAY.
A. **AND I -- AND I THINK I SAW A STANDARD AGREEMENT THAT WAS GIVEN TO US OR THAT WAS WRITTEN IN IT. SO KIND OF IN ALL THREE PLACES.**
Q. IF YOU COULD TURN TO EXHIBIT 9070 IN THE BINDER THAT I'VE GIVEN YOU. IT'S THE THIRD FROM THE LAST DOCUMENT, SIR.
DO YOU HAVE THAT IN FRONT OF YOU?
A. **I DO.**
Q. OKAY. THIS IS AN E-MAIL FROM MR. MOLLENKOPF TO YOU IN JANUARY OF 2013?
A. **YES.**
MR. PAIGE: YOUR HONOR, MOVE THE ADMISSION OF QX 9070.
THE COURT: ANY OBJECTION?
MR. BAKER: NO OBJECTION.
THE COURT: IT'S ADMITTED.
(DEFENDANT'S EXHIBIT QX 9070 WAS ADMITTED IN EVIDENCE.)
THE COURT: GO AHEAD, PLEASE.
BY MR. PAIGE:
Q. TURNING TO PAGE 4 OF THE DOCUMENT, SIR, DO YOU SEE AN E-MAIL THERE FROM MR. TIM COOK TO PAUL JACOBS?
A. **YES.**
Q. DO YOU SEE WHERE MR. TIM COOK SAID, "I'VE ASKED JEFF TO MAKE ONE LAST ATTEMPT TO CLOSE WITH STEVE AND HAVE ASKED THE





TEAM TO HOLD A PLANNED AWARD TO AN ALTERNATE SOURCE FOR A COUPLE OF DAYS WHILE THIS OCCURS."
A. **YES, I DO.**
Q. AND THAT WAS JUST A FEW WEEKS BEFORE APPLE AND QUALCOMM ENTERED INTO THE FIRST AMENDMENT TRANCE -- FIRST AMENDMENT TO THE TRANSITION AGREEMENT AND THE BCPA; CORRECT?
A. **YES.**
Q. APPLE DOESN'T HAVE AN AWARD PLAN TO ANOTHER COMPANY AT THAT TIME, DID IT?
A. **NO, WE DID. WE WERE WORKING WITH -- WE WERE DEFINITELY WORKING WITH INTEL, AND WE HAD THE IPAD THAT WE WERE WORKING ON FOR 2014. AND IF WE WEREN'T ABLE TO CLOSE THIS TRANSITION AGREEMENT, WHICH WE KNEW REQUIRED EXCLUSIVITY, WE WERE GOING TO GO DOUBLE DOWN AND DO EVEN MORE WITH THEM.**
Q. STEVE JOBS WAS A HANDS-ON BOSS WHEN IT CAME TO THE IPHONE; CORRECT?
A. **YES.**
Q. HE WASN'T SHY ABOUT SHARING HIS OPINIONS, WAS HE?
A. **NO.**
Q. HE WOULD INVOLVE HIMSELF IN DISCUSSING VARIOUS ISSUES RELATING TO THE IPHONE'S DESIGN AND MANUFACTURE; RIGHT?
A. **YES, FROM TIME TO TIME.**
Q. AND WHEN APPLE WAS WORKING ON -- WELL, LET'S TURN TO THE NEXT DOCUMENT IN YOUR EXHIBIT, PLEASE, 9074.
THAT'S AN E-MAIL FROM STEVE JOBS TO YOU, AMONG OTHERS?



PX115

A. I DO.
Q. NOW, QUALCOMM ARGUED IT WAS APPROPRIATE TO SPREAD THE FULL AMOUNT OF THE MONEY ACROSS THE ENTIRE FIVE YEAR PERIOD WITH THE INCENTIVES GROWING AS APPLE'S VOLUMES GREW; CORRECT?
A. CORRECT.
Q. THAT WAS BECAUSE STEVE MOLLENKOPF WAS CONCERNED THAT THE IMPACT TO HIS QCT FINANCIALS FOR THE INCENTIVE PAYMENT WOULD BE VERY MATERIAL IN 2011 AND 2012 WHEN OUR CHIP BUSINESS TOGETHER IS JUST GETTING STARTED; RIGHT?
A. RIGHT.
Q. AND IN RESPONSE, APPLE PROPOSED A VOLUME BASED PLAN THAT ALLOWS US TO EARN TRANSITION FUNDS IN 2011 AND 2012 IF APPLE'S VOLUMES ARE STRONG AND SPREAD THINGS LATER IF NOT; RIGHT?
A. CORRECT.
Q. AND THAT ALLOWED QUALCOMM TO AVOID THE RISK OF A LARGE LUMP SUM PAYMENT AGAINST SMALL INCREMENTAL REVENUE FROM APPLE; RIGHT?
A. CORRECT.
Q. MR. MOLLENKOPF TOLD YOU, IN FACT, THAT THE $1 BILLION VALUE OF THE DEAL WAS FAR BEYOND THE COMFORT ZONE WE ASSUMED GOING INTO THE ORIGINAL DISCUSSIONS; RIGHT?
A. CORRECT.
Q. AND THAT'S IN CX 5363 THAT YOU LOOKED AT BEFORE WITH THE FTC'S COUNSEL, CORRECT, PAGE 18 OF THAT DOCUMENT?
A. PAGE 18.





Q. THIS IS IN EVIDENCE, YOUR HONOR.
A. CORRECT.
Q. OKAY. YOU SEE EARLIER ON PAGE 17, MR. MOLLENKOPF EXPRESSED CONCERNS THAT THE EARLIER STRUCTURE THAT APPLE HAD PROPOSED HAD ALMOST THE ENTIRE INCENTIVE PAID BEFORE THE END OF 2012; RIGHT?
A. CORRECT.
Q. AND DO YOU SEE THE TOP OF THAT E-MAIL WHERE MR. MOLLENKOPF SAID THE $1 BILLION IS A HUGE NUMBER FROM QUALCOMM'S PERSPECTIVE?
A. YES, I DO SEE THAT.
Q. OKAY.
A. BUT THAT BILLION DOLLARS IS ASSOCIATED WITH WINNING MANY, MANY, MANY BILLIONS OF DOLLARS OF BUSINESS.
Q. IN OTHER WORDS, THE TRANSITION AGREEMENT ALLOWED QUALCOMM TO PROTECT ITSELF FROM HAVING TO MAKE LARGE INCENTIVE PAYMENTS TO APPLE IF APPLE DIDN'T BUY A LOT OF CHIPS; RIGHT?
A. THAT'S CORRECT. WHAT WE ACTUALLY PUT IN PLACE, THE VAST MAJORITY OF THE FUNDS IN THE TRANSITION AGREEMENT WERE A PRICE VOLUME REBATE, MEANING IF WE DID A LOT OF BUSINESS WITH QUALCOMM, THEY GAVE US FUNDS. IF WE DIDN'T DO A LOT OF BUSINESS WITH QUALCOMM, THEY DIDN'T. NO RISK TO QUALCOMM. UPSIDE TO QUALCOMM.
THAT'S A STANDARD PRACTICE WE DO WITH LOTS OF SUPPLIERS. IT ADDED UP TO A LOT OF MONEY, BUT IT WAS FOR BILLIONS AND





BILLIONS OF DOLLARS OF BUSINESS. THAT'S STANDARD.
Q. NOW, YOU SAID THAT APPLE NEEDED TO GET THE MONEY UNDER THE TRANSITION AGREEMENT BECAUSE APPLE VIEWED QUALCOMM'S ROYALTY RATES AS TOO HIGH; RIGHT?
A. I SAID THERE WERE TWO PIECES, IF YOU REMEMBER. A PIECE OF IT WAS WE WERE TRYING TO GET RELIEF FOR THIS CDMA TAX, THIS ROUGHLY $250 MILLION OR SO THAT WE WERE GOING TO GET CHARGED IN ADDITION TO THE 7.50 ROYALTY IN ADDITION TO PAYING FOR THE CHIPS. SO THAT'S A PIECE.
AND THE OTHER IS QUALCOMM HAD HIGH PRICES, WE WERE MOVING A BUNCH OF BUSINESS, AND WE WANTED TRANSITION FUNDS.
Q. AND QUALCOMM CHARGED THAT 7.50 ROYALTY FROM THE BEGINNING OF THE TIME YOU STARTED SELLING PHONES; RIGHT?
A. THEY DID.
Q. FOR YEARS BEFORE YOU BOUGHT CHIPS FROM QUALCOMM; RIGHT?
A. CORRECT.
Q. YOU NEVER CHOSE TO CHALLENGE THAT IN COURT, DID YOU, SIR, BEFORE 2017?
A. WE, WE CERTAINLY DID NOT. WE CERTAINLY DID NOT, BECAUSE --
MR. PAIGE: NOTHING FURTHER AT THIS TIME, YOUR HONOR.
THE WITNESS: -- BECAUSE WE --
THE COURT: ALL RIGHT. TIME IS 10:14. ARE YOU READY?
MR. BAKER: YES.





THE COURT: OKAY. 10:14. GO AHEAD, PLEASE.

**REDIRECT EXAMINATION**

BY MR. BAKER:
Q. MR. WILLIAMS, WOULD YOU LIKE TO FINISH THE ANSWER YOU WERE JUST TRYING TO GIVE. WHY DID YOU NOT CHALLENGE QUALCOMM'S ROYALTIES PRIOR TO 2017?
A. WELL, IF WE CHALLENGED THE ROYALTY -- WE NEEDED THEIR CDMA CHIPS. THEY WERE THE ONLY SUPPLIER OF CHIPS, THEY HAD THE LEAD IN LTE MODEMS, WE NEEDED THEIR CHIPS. AND IF WE CHALLENGED THEM, THEN WE WERE -- THE AGREEMENT WOULD TERMINATE, AND WE WOULD NOT HAVE SUPPLY, THEY WOULD SHUT OFF SUPPLY OF OUR IPHONES, WHICH IS -- CARRIES MOST OF THE COMPANIES REVENUE AND PROFIT.
WE WEREN'T IN A GOOD POSITION TO CHALLENGE THEM.
MR. BAKER: NO FURTHER QUESTIONS, YOUR HONOR.
THE COURT: OKAY. ANY FURTHER RECROSS? 10:15?

**RECROSS-EXAMINATION**

BY MR. PAIGE:
Q. YOU WEREN'T BUYING CDMA CHIPS UNTIL 2011; RIGHT, SIR?
A. CORRECT.
Q. YOU HAD FOUR YEARS TO CHALLENGE THOSE AGREEMENTS BEFORE THEN; CORRECT?
A. CORRECT.
MR. PAIGE: NO FURTHER QUESTIONS.
THE COURT: ALL RIGHT. 10:15.



PX115

# PX 116

## (Filed Under Seal)

# PX 117

## (Filed Under Seal)

# PX 118

## (Filed Under Seal)

# PX 119

## (Filed Under Seal)

# PX 120

## (Filed Under Seal)

# PX 121

## (Filed Under Seal)

# PX 122

## (Filed Under Seal)

# PX 123

## (Filed Under Seal)

# PX 124

## (Filed Under Seal)

# PX 125

## (Filed Under Seal)

# PX 126

## (Filed Under Seal)

# PX 127

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

# China's NDRC publicizes full text of Qualcomm decision (English version)

Jurisdiction : - **Asia /China /North East Asia**

3 Mar 15 | 10:05 GMT

Author: MLex Staff

**IN BRIEF**
China's National Development and Reform Commission Monday published the full text of its penalty decision in a case where US chipmaker Qualcomm was fined 6.088 billion yuan ($975 million) for abuse of dominance. An investigation by the NDRC found Qualcomm abused its market dominance by charging excessive or unreasonable royalty fees on its standard-essential patents, bundling the sales of non-wireless communications standard-essential patents, and imposing unfair conditions on the sale of baseband chips. The penalty was announced on Feb. 10.

*An English version of the decision, provided by MLex, follows. The original decision in Chinese can be found here.*

**NDRC's administrative penalty decision on Qualcomm's monopolistic conduct**

In accordance with the Antimonopoly Law of China (AML) and relevant regulations, the National Development and Reform Commission in November 2013 launched an investigation into Qualcomm's suspected abuse of dominance in the licensing market for standard-essential patent for CDMA, WCDMA and LTE wireless communications (hereinafter referred as "SEP licensing market") and the market for baseband chip for CDMA, WCDMA and LTE wireless communications (hereinafter "baseband chip market). The decision of the NDRC is hereby announced:

**I. Qualcomm holds dominant positions in the SEP licensing market and the baseband chip market**

**1. Qualcomm is in a dominant position in the SEP licensing market**

The NDRC held that each SEP licensing market constituted an independent relevant product market. On account of Qualcomm's package licensing of its SEPs, the relevant product market in this case should be defined as a collection of every independent licensing market of SPEs held by Qualcomm.

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

Owing to the attribute of territoriality in patent licensing, exploitation and protection, the relevant geographic market is a collection of countries or regions where Qualcomm holds on to its SEPs.

a. The multiple SEPs, as patent portfolios, constitute technical standards for CDMA, WCDMA and LTE wireless communications. Qualcomm holds a 100-percent market share in every licensing market where it owns SEPs, and there is no competition in that relevant SEP licensing market. Pursuant to Article 19 Paragraph 1 Subparagraph 1 of the AML, the NDRC presumed Qualcomm was in a dominant position in the SEP licensing market.

b. Qualcomm is capable of controlling the SEP licensing market. The only option for potential licensees is to conclude SEP licensing agreements with Qualcomm; otherwise, they are likely to encounter infringement lawsuits or injunctions filed by Qualcomm, and are not able to compete in the manufacture or sale of terminal devices in conformity with the technical standards for CDMA, WCDMA and LTE wireless communications. In addition, Qualcomm unilaterally determines the terms under its licensing agreements with the majority of the licensees. Therefore, Qualcomm has the potential to control royalty rates and licensing conditions, and then impede the ability of other business operators to enter the relevant market.

c. Terminal device manufacturers are highly reliant on Qualcomm's patent portfolios, because every single SEP in the domain of CDMA, WCDMA and LTE wireless technology is indispensable and irreplaceable for terminal device makers.

d. It's quite difficult for other business operators to enter the relevant market. Once a patent is incorporated as a SEP under CDMA, WCDMA and LTE wireless technical standards, other competing technologies will be excluded from those standards. It involves unbearable costs for telecom carriers and relevant manufacturers to switch to other technical standards, which actually makes it difficult for other business operators to enter the relevant market.

During this probe, Qualcomm didn't demonstrate evidence proving that it was not in a dominant position in the SEP licensing market. In accordance with Article 18 under the AML, the NDRC concluded that Qualcomm was in a dominant market position in the wireless communication SEP licensing market.

**2. Qualcomm's dominance in the baseband chip market**

Baseband chips are crucial parts for wireless communication terminal devices. Terminal device makers have to employ the baseband chips that are compatible with the corresponding technical standards. Moreover, there are solid technical barriers blocking new market entrants, and distinct baseband chips are hardly substitutable for each other. Consequently, the baseband chip market can be subdivided into three separate relevant product markets, namely the CDMA baseband chip market, the WCDMA baseband chip market and the LTE baseband chip market.

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

Baseband chipmakers sell their products and compete on a global scale, while terminal devices manufacturers purchase baseband chips worldwide, taking into consideration factors such as product function, price, quality and brand. So, in this case, the geographic market for baseband chips should be the global market.

a. Based on the data from a report by Strategy Analytics, in 2013, the market shares of Qualcomm in the CDMA, WCDMA and LTE baseband chip markets all exceeded 50 percent. Pursuant to Article 19 Paragraph 1 Subparagraph 1 of the AML, the NDRC presumed Qualcomm was in a dominant position in the above baseband chip markets.

b. The NDRC made reference to the data from Strategy Analytics and held that Qualcomm was able to control the baseband chip market. Qualcomm has ranked first in the global sales of baseband chips for six consecutive years since 2007. Qualcomm holds overwhelmingly larger market share compared with its rivals in the CDMA, LTE baseband chip markets. So, Qualcomm has a relatively high ability to control these markets. As regards the WCDMA baseband chip market, other competitors' market shares are far less than Qualcomm's 53.9 percent, and Qualcomm's products are much more competitive than the counterparts made by other competitors. Therefore, Qualcomm is capable of controlling the WCDMA baseband chip market to a certain extent.

c. Major wireless communication terminal device makers are highly dependent on Qualcomm's baseband chips. Qualcomm has the largest market share, respectively, in the CDMA, WCDMA and LTE baseband chip markets on a global scale. Terminal device manufacturers have limited options in selecting a baseband chipmaker from a relatively small number of suppliers. Qualcomm excels particularly in the middle-level and high-end baseband chip markets in aspects of technology, product function and brand. Many device makers are inclined to choose Qualcomm's chips to gain more competitive advantages in the manufacture and sale of their products.

d. The baseband chip industry is technology-intensive, which means new market entrants have to meet various eligibility requirements involving R&D and manufacture, terminal operating system support, carrier testing, network access licensing, export control over technology and long periods of R&D and market launch. Therefore, it's difficult for other business operators to enter and effectively compete in the baseband chip market.

During this investigation, Qualcomm didn't provide evidence proving that it was not in a dominant position in the CDMA and LTE baseband chip markets.

However, Qualcomm alleged that it didn't have dominance in the WCDMA baseband chip market, because Qualcomm's market share was less than 50 percent, and there was effective competition in the WCDMA baseband chip market. The NDRC held that the percentage of sales revenue was more convincing than the market share in reflecting Qualcomm's strength in the relevant market. Qualcomm's 2013 sales revenue exceeded 50 percent in the overall sales

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

revenue of the WCDMA baseband chip market, which indicated that the average prices of Qualcomm's WCDMA baseband chips were higher than those of other competitors, and further verified that Qualcomm did have controlling power in the WCDMA baseband chip market. Also, the NDRC held that market share is not the only indicator of market dominance, and the evidence provided by Qualcomm couldn't prove that Qualcomm wasn't in a dominant position in the WCDMA baseband chip market.

In line with Article 18 of the AML, the NDRC concluded that Qualcomm had market dominance in all three markets of CDMA, WCDMA and LTE baseband chips.

**II. Qualcomm abused its market dominance**

**1. Qualcomm charged unfairly high royalties**

a. Charging for expired SEPs

It was verified that Qualcomm included some expired CDMA SEPs in its patent licensing agreements with licensees, and Qualcomm failed to prove that these expired SEPs equaled the newly-added patents in value. In the meantime, Qualcomm refused to provide patent lists to licensees, and set a constant rate of royalties in the long-term or open-ended licensing agreements with licensees. On account of the fact that the expired SEPs were incorporated in the patent portfolios, licensees had no opportunity to avoid paying for expired patents through fair negotiations.

Qualcomm alleged that there was a greater quantity of new patents being included in the patent portfolios, and it didn't charge for expired patents. However, the NDRC held that it was unreasonable per se for Qualcomm to fail to provide the licensees with patent lists. Even though the quantity of patents in those portfolios increased, the newly-added patents couldn't counteract the expired patent in value. Actually, Qualcomm's practice obscured the specific objects being licensed, and the licensees had to keep paying for the expired SEPs.

b. Requiring licensees to grant back their patents free of charge

Some licensees were forced to license their relevant wireless communication non-SEPs back to Qualcomm; some were forced to do royalty-free grant-back licensing; and some were asked to give consent to waive their litigation rights over their patents against Qualcomm and Qualcomm's clients.

The NDRC rejected Qualcomm's defense of its practice and held the royalty-free grant-back licensing was unfair to the licensees. The NDRC said Qualcomm should take the value of innovations by the licensees into account when negotiating grant-back licensing terms. Qualcomm should not restrict the legitimate claims and litigation rights of the licensees with the excuse of protecting its business and clients. There was no evidence showing that Qualcomm paid any consideration for the licensees' patents. Also, Qualcomm's allegation that

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

the royalty-free grant-back licensing served as a part of the overall value exchange couldn't be justified without supporting facts and evidence.

Besides, the patent portfolios of Qualcomm contain non-SEPs for wireless communications, as well. Licensees who are forced to accept the packaged patent licensing are charged excessive and unfairly high royalties by Qualcomm, whose royalty rates are based on the wholesale net selling prices of terminal devices.

In conclusion, Qualcomm was held liable for directly or indirectly charging the licensees at an unfairly high royalty rate. The practices of royalty-free grant-back licensing discouraged licensees from technical innovation, impeded development and innovation of wireless communications, and restricted or eliminated market competition. Also, Qualcomm obtained improper competitive advantages against other baseband chipmakers by means of free grant-back licensing. Terminal device manufacturers had to bear additional costs for the unfairly high royalties and consumer welfare was harmed in the end.

The NDRC held that Qualcomm violated Article 17 Paragraph 1 Subparagraph 1 of the AML, which prohibited business operators holding market dominance from selling products at unfairly high prices.

**2. Qualcomm abused its market dominance by bundling the sale of non-SEPs with SEPs without reasonable causes**

The NDRC found manufacturers of wireless communication terminal devices have no choice but to acquire a license from holders of SEPs. Non-SEPs aren't required to be enforced. Manufacturers can design the product to circumvent such patents, or choose freely from different competitive alternative designs according to the advantages and disadvantages of the patent technology and other factors. Therefore, non-SEPs and SEPs are different in nature and independent from each other. To license the two separately doesn't affect the application and value of the two types of patents. In licensing its patents, Qualcomm didn't differentiate SEPs from non-SEPs or provide patent lists to licensees, but bundled the sale of non-SEPs by setting a constant licensing rate and licensing its patents as a package.

During the investigation, Qualcomm came up with three reasons for its bundling the sale of non-SEPs.

a. Qualcomm provided the choice of only licensing SEPs, but most licensees independently chose the whole package.

b. It's difficult to differentiate SEPs from non-SEPs. Licensees may be at risk of being involved in litigation if they only acquire wireless SEPs.

c. Bundling the sale of non-SEPs won't restrict market competition and the licensees are still free to choose competitors' technology.

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

The NDRC is of the opinion that the above reasons weren't well-founded and there is no reasonable cause for bundling the sale of non- SEPs with SEPs. According to evidence provided by the licensees, Qualcomm's assertion that it has provided licensees with the choice to only acquire licenses for SEPs was inconsistent with the facts. The NDRC found that although some licensees would voluntarily ask for the license of Qualcomm's entire patent portfolio, some others had to accept the licensing of non-SEPs in order to acquire the licenses for SEPs. This should be on the premise that Qualcomm provides lists of SEPs and non-SEPs and that the licensees independently decide whether to sign a licensing agreement for the whole package of patents. Qualcomm has been refusing to provide patent lists and usually doesn't provide licensing that only covers SEPs. SEPs and non-SEPs can be differentiated and be licensed separately. It is a common practice to define the scale of SEPs in licensing agreements. That to provide separately licensing agreements for SEPs and non-SEPs may have a certain cost and could increase the complexity of licensing negotiation doesn't constitute a reasonable cause for the bundling.

The NDRC is of the opinion that by taking advantages of its dominant position in the market for the licensing of SEPs, Qualcomm, without reasonable causes, bundled the sale of non-SEPs with SEPs. For non-SEPs, licensees can take into consideration factors including infringement and litigation risks and freely decide whether to seek licenses or whom to seek licenses from. Because Qualcomm forcibly bundled the sale of non-SEPs, licensees must pay for the licenses for non-SEPs. Rational licensees usually won't pay extra costs for a design of circumventing patent or look for other alternative technologies. As a result, alternative technologies that are in a competitive relationship with Qualcomm's non-SEPs lose the opportunity or possibility to compete. Such a practice severely eliminated and restricted competition in the relevant market for licensing of non-SEPs, hampered technological innovation, and did harm to consumer interests.

The NDRC is of the opinion that the above behavior of Qualcomm violated Article 17 Paragraph 1 Subparagraph 5 of the AML regarding the prohibition of bundled sale without reasonable causes by undertakings in dominant market positions.

**3. Qualcomm abused of it dominant market position by imposing unfair conditions on the sale of baseband chips**

An investigation by the NDRC found Qualcomm conditioned the sale of baseband chips to its licensees on signing and not challenging a license agreement. If a potential licensee didn't sign the license agreement that contained unreasonable conditions, Qualcomm would refuse to sign the sales contract for baseband chips and refuse to supply baseband chips to the licensee. If a licensee who had already signed the license agreement had a disagreement with Qualcomm and filed a lawsuit, Qualcomm would stop the supply of baseband chips to the licensee.

During the investigation, Qualcomm didn't deny its practice of imposing the condition that

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

licensees should sign and not challenge a license agreement in its supply of baseband chips. However, Qualcomm argued that such behavior was reasonable.

The NDRC is of the opinion that manufacturers of wireless communication terminal devices should pay a fair and reasonable fee for using Qualcomm's SEPs. However, Qualcomm imposed unfair conditions, such as the charging of expired patents, a requirement to grant back licenses for free and the bundled sale of non-SEPs without appropriate causes. Taking advantage of its dominant position in the market for baseband chips, Qualcomm forced licensees to sign a license agreement that contained unfair conditions and threatened the licensees with the termination of the supply of baseband chips. Such behavior wasn't reasonable.

At the same time, licensees have the right to have disagreements with Qualcomm regarding the license agreement and file a lawsuit. By imposing the above unfair conditions, Qualcomm essentially deprived the licensees of the right to take legal action. There is no reasonable cause for Qualcomm to condition the supply of baseband chips on an agreement by the licensees not to challenge the license agreement.

The NDRC is of the opinion that Qualcomm is in a dominant position in the market for baseband chips. Potential and actual licensees are highly dependent on Qualcomm's baseband chips. If Qualcomm refuses to supply baseband chips, potential or actual licensees are likely to be unable to enter or would have to withdraw from the relevant market and couldn't compete effectively.

Taking advantage of its dominant position in the market for baseband chips, Qualcomm required potential licensees to sign a license agreement that contained unfair conditions, restricted the licensees' rights to have disagreements regarding the agreement and take legal action. Such behavior drove out potential or actual licensees who didn't accept the conditions and thus eliminated and restricted competition.

The NDRC is of the opinion that Qualcomm violated Article 17 Paragraph 1 Subparagraph 5 of the AML regarding the prohibition of imposing unfair conditions during transactions by undertakings in dominant market positions.

The above reasoning only applies to Qualcomm's practices of SEP licensing and baseband chip sales regarding the wireless communication terminal devices manufactured or sold within the territory of China that are closely related to the market competition and consumer interests in China.

**III. Administrative penalty decision and reasoning**

According to Article 47 and Article 49 of AML, the NDRC orders as follows:

**1. Qualcomm shall cease its illegal behavior of abuse of dominance**

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

a. If Qualcomm licenses its SEPs to manufacturers of wireless communication terminal devices within the territory of China, it shall provide its patent lists and shall not charge for expired patents.

b. . If Qualcomm licenses SEPs to manufacturers of wireless communication terminal devices within the territory of China, it shall not, against the will of the licensees, require the licensees to grant back their non-SEPs to Qualcomm and shall not force the licensee to grant back relevant patents without providing reasonable consideration.

c. For wireless communication terminal devices sold for use within the territory of China, Qualcomm shall not use a royalty base of the wholesale net selling price of the devise while adopting a relatively high royalty rate.

d. . If Qualcomm licenses SEPs to manufacturers of wireless communication terminal devices within the territory of China, Qualcomm shall not bundle the sale of non-SEPs without reasonable causes.

e. If Qualcomm sells baseband chips to manufacturers of wireless communication terminal devices within the territory of China, it shall not impose unfair conditions, such as potential licensees accepting charges for expired patents, granting back patents for free and bundling the sale of non-SEPs without reasonable causes. Qualcomm shall not condition the supply of its baseband chips on an agreement that the licensees won't challenge the patent licensing agreement.

The above decision applies to Qualcomm's subsidiaries and other companies that Qualcomm actually controls. If Qualcomm transfers its SEPs, it should require the transferee to abide by the above restrictions.

Qualcomm's SEP licensing practices that don't have the effect of eliminating and restricting the competition in the domestic market of China aren't subject to the above decision.

**2. Qualcomm is fined 8 percent of its annual revenue of 2013**

Qualcomm's annual revenue within the territory of China for 2013 was 76.102 billion yuan. The NDRC considers that Qualcomm's behavior of abuse of dominance is serious in nature, spread over a wide extent and has lasted for a long time. The NDRC thus decided to impose a fine of 6.088 billion yuan, or 8 percent of its annual revenue in China for 2013.

Qualcomm shall pay the fine within 15 days from receiving the order.

If not satisfied with the order, Qualcomm can apply for an administrative review to the National Development and Reform Commission within 60 days from receiving the order or file a lawsuit to the court within three months from receiving the order. The order won't be

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

suspended during the period of administrative review or lawsuit.

**Related case file(s)**

Antitrust - NDRC - Qualcomm

Printed on 03/03/2015 by **Carola Emelius-Swartz (Qualcomm Incorporated)**
Redistribution authorized only in accordance with applicable MLex terms & conditions. All rights reserved. Copyright MLex 2015

# PX 128

## (Filed Under Seal)

# PX 129

## (Filed Under Seal)

# PX 130

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KEVIN MURPHY, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

PRECISION CASTPARTS CORP., MARK DONEGAN, and SHAWN R. HAGEL,

Defendants.

Case No. 3:16-cv-00521-SB

**OPINION AND ORDER**

**[REDACTED VERSION]**

---

**BECKERMAN, U.S. Magistrate Judge.**

AMF Pensionsförsäkring AB and the Oklahoma Firefighters Pension and Retirement System (hereinafter, "Lead Plaintiffs") filed an Amended Class Action Complaint for Violation of the Federal Securities Laws on behalf of all persons or entities who purchased or otherwise acquired the publicly traded securities of Precision Castparts Corporation ("PCC") between May 9, 2013 and January 15, 2015 (hereinafter, the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Lead Plaintiffs allege that PCC, PCC's Chairman and Chief Executive Officer ("CEO") Mark Donegan ("Donegan"), and PCC's Executive Vice



**PX130**

**Page 4124**

President and Chief Financial Officer ("CFO") Shawn Hagel ("Hagel") (collectively, "Defendants"), violated Sections 10(b) and 20(a) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

Lead Plaintiffs and Defendants filed cross motions for summary judgment pursuant to FED. R. CIV. P. 56. The Court has jurisdiction over this matter under 28 U.S.C. § 1331, and all remaining parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636. For the reasons discussed below, the Court denies Lead Plaintiffs' motion for partial summary judgment, grants in part and denies in part Defendants' motion for summary judgment, and denies Defendants' motion to exclude the expert testimony of Chad Coffman.

## INTRODUCTION

Lead Plaintiffs allege that Defendants made forty-four statements during the Class Period that were materially false and misleading, primarily with respect to PCC's earnings guidance for Fiscal Year 2016 ("FY16"). Lead Plaintiffs' theory of liability is that Defendants always knew that the FY16 earnings guidance was unattainable because their financial projections were based on unrealistic assumptions, and Defendants knew throughout the Class Period that PCC was failing to achieve the organic growth necessary to meet the target in part because PCC's practice of pulling in sales to earlier quarters was unsustainable and a large customer was continuing to destock its inventory. Lead Plaintiffs allege that Defendants nevertheless made statements throughout the Class Period misrepresenting that PCC was achieving anticipated benchmarks en route to its FY16 target, which created an impression of a state of affairs materially different from the one that existed.

In denying Defendants' motion to dismiss earlier in this case, the Court held that the PSLRA's Safe Harbor for forward-looking statements does not protect all of Defendants'

statements because not all of the statements were forward-looking in their entirety. The Court now concludes that the Safe Harbor protects twenty-two of the forty-four statements, and four additional statements are not actionable because they are vague statements of puffery.

Of the remaining eighteen statements, all are Donegan's unscripted oral statements, which absolves Hagel of liability. However, there are disputed issues of material fact regarding whether Donegan's statements were materially false and misleading, whether he knew his statements were false and misleading, and whether his statements caused economic loss to class members. Those are questions a jury must resolve, and therefore the Court denies the cross motions for summary judgment with respect to those eighteen statements.

## BACKGROUND[1]

### I. PCC

PCC is an Oregon corporation headquartered in Portland. (Defs.' Mot. Summ. J. Ex. 4 at 1.) Operating approximately 160 plants, PCC is a leading supplier of metals and parts for the aerospace, energy, military, and general industrial sectors. (Decl. of Mark Donegan ("Donegan Decl.") ¶¶ 27-29, ECF No. 237.)

///

///

///

///

[1] The Court grants Defendants' unopposed requests for judicial notice of various SEC filings, press releases, earnings call transcripts, earnings call presentations, analyst reports, and the Europe Brent Spot Price FOB, Daily. (ECF Nos. 242, 290.) The Court overrules Defendants' evidentiary objections to Lead Plaintiffs' exhibits for lack of proper foundation and failure to comply with the "best evidence" rule and Defendants' objection to Lead Plaintiffs' demonstrative exhibit, with leave to renew at trial.

## II. CHALLENGED STATEMENTS

In January 2013, PCC announced an earnings per share ("EPS") target of $15.50-$16.50 for its 2016 fiscal year (the "Target" or "FY16 Target" or "FY16 Framework"). (Defs.' Ex. 39 at 19.)[2]

Throughout the Class Period, PCC issued earnings releases at the end of every quarter and hosted a webcast ("Earnings Call"), during which Donegan reviewed PowerPoint slides presenting key metrics and significant quarterly developments and answered questions from analysts. (Defs.' Mot. Summ. J. at 7) (citing Defs.' Exs. 21-29; 39-47.) Donegan's statements during these calls and at investor conferences, along with PCC's press releases during the Class Period, are the subject of this action and described below. *See* App. 1 to Defs.' Reply ("App. 1") (listing all forty-four statements) (the "Challenged Statements" or "Statements").

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| 1. | 5/9/2013 | ***In our fourth quarter, we started to realize the solid benefits of a long-term plan for continued profitable growth.*** [. . .] We have focused on and have been diligent in acquiring the right assets over the last few years, and now those acquisitions have started to deliver on the value we anticipated. ***Our fourth quarter performance is only an initial data point on a long continuum for improved sales and earnings*** | Press Release | PCC |

[2] Hereafter, the Court refers to Defendants' exhibits in support of their motion for summary judgment as "Defs.' Ex."

[3] The Court adopts the numbering system that Defendants use to refer to the Challenged Statements. *See* App. 1. According to Defendants, this chart is a comprehensive list of the statements that Lead Plaintiffs alleges are false or misleading in Lead Plaintiffs' Supplemental Responses and Objections to Defendant Precision Castparts Corp.'s Second Set of Interrogatories. *Id.* Plaintiffs indicated that the bold italicized font denotes those portions of the statements that they allege are false or misleading, and Defendants have added the full statements for context. *Id.*

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | ***performance in the future.*** (App. 1 at 1; First Am. Compl. ("FAC") ¶ 122.) | | |
| 2. | 5/9/2013 | ***[W]hat we've tried to do [with our EPS target of $15.50 to $16.50 by fiscal year 2016] is tell you that what we do is we think of the business, we think of that number, we think of the opportunities in pieces. And what I mean by that is if I get a business where growth isn't growing at mid- or mid- to high-single digits, you know what, I should expect to see a better performance out of the operations.*** (App. 1 at 1; FAC ¶ 125.) | Earnings Call | Donegan |
| 3.<br><br>(Pls.' No. 1)[4] | 5/9/2013 | ***What I would say is, we tend to be pretty linear-thinking type of people. So I think that you will kind of move around that. But I don't think we're going to set ourselves up to have some giant run towards the end***, that's just not our mentality. So what I drive this business to is if the organic growth slows, I better see a lot more operationally. If the organic growth picks up and I get – and these platforms come in, I'm going to drive the living hell out of you to make sure that you're – you may not be getting as much, but you better be getting a subsequent drop-through on the volume drop-through we get. But again, ***I would say, in total, we tend to be more linear in thinking and I wouldn't – my mentality wouldn't allow me to say I'm going to be marginal, marginal and then, make this huge run towards the end.*** (App 1. at 1-2; FAC ¶ 125.) | Earnings Call | Donegan |
| 4. | 5/9/2013 | [Robert Spingarn (Credit Suisse analyst):] I'd like to go back to the long-term question [. . .] with your trajectory toward your guidance. I'm going to | Earnings Call | Donegan |

[4] The Court cross-references herein the numbering system that Lead Plaintiffs use in their motion for partial summary judgment. (*See* Pls.' Mot. at 21) (seeking summary judgment on eight statements).

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | throw out a couple of numbers but hopefully, you can help me here. To get from here to there, and I'm taking the midpoint of the guidance you've given, so $16 in fiscal '16. It's about a 3.5% sequential earnings growth rate from here to there by quarter. But it seems to me not so much that it's back-end loaded, but maybe it's a little front-end loaded with the combination of the Timet synergies in the near term, next several quarters, and the 787 doubling in rate. So is it truly linear or is it front-end loaded with back-end conservatism?<br><br>[Answer:] Well, I think it's a valid question. ***I think that directionally your math is very appropriate.*** What I would say, and if I think of our processes – so we tend to look at casting or forging, whatever it is, and you obviously look at any metric or any model and you plot a straight line. You do see ups and downs to that. But directionally, they average, kind of, out at that particular number. [. . .] I do think you see ups and downs. And when you get something like a 787 kicking in or whatever it is, it may move up above that, and when you get a stall into Q2 because of outages and European shutdowns, it may go a little bit below that. (App. 1 at 2-3; FAC ¶ 126.) | | |
| 5. | 5/9/2013 | [Joe Nadol (JP Morgan analyst):] So Mark, your organic growth, I know there's a lot of moving parts here, particularly the third-party sales of your metal businesses that – because pricing was down this quarter. But the organic growth, overall, was about kind of flattish this quarter and pretty flattish for the year. Just – and I know there's the press issue looking backwards, there's the selling prices of the metal and increased intercompany sales. But | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | putting all that together and looking forward, when do you think that reaccelerates, at least back into the mid single digits?<br><br>[Answer:] [. . .] [I]f I look at it, if you kind of say what we said where you got 787 rates coming through, you got the 737 rates coming through, ***I think you start getting to the back half of this year is when I think you start seeing kind of those type of numbers that you were asking about.*** (App. 1 at 3; FAC ¶ 127.) | | |
| 6. | 5/9/2013 | [Joe Nadol (JP Morgan analyst):] When I look at, sort of, the yearon-year or what your [organic] growth rates were a year ago. I mean, you were pretty much up or down 2% every quarter this past year. Prior year was higher than that. So I know you don't want to overpromise, but do you see it picking up a little more near term?<br><br>[Answer:] ***[T]here's nothing wrong with your logic. But again, when you start saying – it tends to be when you start saying into the mid, kind of, surrounding the mid, you need to get that 787. But I would agree with you that, if you start looking at comps, yes, you should start to see organic moving in the right direction. I would agree with that.*** (App. 1 at 3; FAC ¶ 128.) | Earnings Call | Donegan |
| 7. | 7/25/2013 | ***We are achieving strong earnings growth on stable commercial aircraft schedules, gaining share on new airframe and engine development programs,*** maintaining a steady drumbeat to meet or exceed our cost-reduction targets, and continuing to set an aggressive pace in integrating our new acquisitions. [. . .]<br><br>Looking ahead, we have secured solid positions on all major production and | Press Release | PCC |



PX130

Page 4130

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | development commercial aircraft programs, and our casting and forging operations will ramp up or level out as the OEM schedules dictate. [. . .] Beginning in the back half of calendar 2014, many of our operations will be ramping up to handle increased volumes, as the new aircraft and engine development programs roll out. (App. 1 at 4; FAC ¶ 140.) | | |
| 8. | 7/25/2013 | [I]n aerospace, we had overall growth of 30% versus last year. We saw very solid contribution from our acquisitions. Our base sales were flat. But again, this does have in it the lower metal pricing. We also had a union-related disruption in our Portland operations [. . .]. ***We have seen some modest destocking by some engine customers, but it is important to note the demand is there, the contracts are there, the schedules are there. It is simply an inventory realignment that we experienced, and the demand does show back in the future.*** (App. 1 at 4; FAC ¶ 142.) | Earnings Call | Donegan |
| 9. | 7/25/2013 | [Joe Nadol (JP Morgan analyst):] Mark, the destocking you're talking about that you're seeing, is it multiple customers, or is it 1 major engine customer? And what do you think is behind this? Is it aftermarket related on their end, or what's driving it? And then you say it might last a couple of quarters, 2 or 3 quarters. Typically, these things tend to last a little longer than that. I would say 12 to 18 months, if it's a real destocking cycle. What gives you the sense that it's really only a couple of quarters?<br><br>[Answer:] ***[M]aybe destocking is not the proper terminology. I mean, it is at a couple of engine primes, and it appears to be an inventory reduction in this calendar year. And why I say that is we do see the demand sitting in our Q4*** | Earnings Call | Donegan |



PX130

Page 4131

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | ***[i.e., the quarter ended March 31, 2014]. So if I kind of look at what it wants to do, it wants to remain stable and then it wants to jump up in Q4.*** Now our challenge will be to go back and say we can't jump up in that manner. It has to be spread out. ***So do I think it's anything longer than that? No, I do not. It appears to be just an inventory for whatever reasons, in a very specific time frame that does want to re-accelerate going into next calendar year.*** So it does appear to be a yearly number, not some general spares or fall, but it does appear to be an inventory objective. [Joe Nadol (JP Morgan analyst):] When you look at the part numbers and just the types of parts, and it seems like you have visibility to the other end of it that would schedule filling up in the fourth quarter, your fourth quarter. [. . .] [D]o you get the sense that it's a 1 or 2 types of engines, or is this really just kind of broadbased?<br><br>[Answer:] I'd say that it's falling in a couple of different categories. And on the material obviously we don't – so if I look at the Cannon, that's going into some of the engine primes. I don't know exactly what engines it's going into, but it is – it's not a broad swept across everything. ***It is more of a specific realignment in a – in 2 or 3 engine types. So it's not like an overall reduction of x percent. It does appear to be very specific.*** The only thing I would add to that, too, is it's not dragging out of us. The metal side did for a quarter, but that recovers kind of back almost this quarter. It really is just that, that growth we're seeing wants to reside in Q4 and Q1, take a step-up, and we're just trying to claw and pull it back into this particular period. ***So like I said, it*** | | |



PX130

Page 4132

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | ***appears to be an inventory-related on a very specific target on a couple of programs.*** (App. 1 at 5-6; FAC ¶ 143.) | | |
| 10. | 7/25/2013 | [Noah Poponak (Goldman Sachs analyst)]: [I]t does sound like, without quantifying it directionally, the next couple of quarters, excluding metal price movements, are closer to flat organically for the step-up in 4Q and continuing into '15?<br>[Answer:] Yes, I would say that – I mean, when you get into these inventory movements, there tends to be some unpredictability. But I'd say seeing what I see today, the next couple of quarters, you're probably right and then it wants to get a lot of steam. Again it moves. When you get these, it's not as though it's necessarily the market doing anything, the end market. It can be more volatile. ***I don't think it will be worse at all because I think we've seen what the customer wants.*** (App. 1 at 6; FAC ¶ 144.) | Earnings Call | Donegan |
| 11.<br><br>(Pls.' No. 2) | 7/25/2013 | [Noah Poponak (Goldman Sachs analyst)]: Mark, I'm wondering if you might be willing to at least attempt to quantify what you think total company organic revenue growth is going to look like for the full year. Because it sounds like a few more quarters of this aerospace engine destock, a few more quarters of IGT not really changing, a little bit more impact from the press, and it's negative in the first quarter. It sort of sounds like, all in, it's going to be difficult for it to be much different than flat for fiscal '14. And then, if I could take you out a little further into the future, in order – if that is true, in order to get into your previously stated longer term fiscal '16 targets, the 15%, 16% organic [growth] looks like it needs to really step up into the low double-digits or even midteens to get into that. Is that | Earnings Call | Donegan |



PX130

Page 4133

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | really the more L-shaped path that we're looking at here? Or am I missing something?<br><br>[. . .]<br><br>[Answer:] [I]t becomes somewhat difficult, the way I think of it, going out to the 16% number is either with more volume, performance. ***I have to kind of get a drumbeat of what I need to put through for kind of quarter over quarter over quarter in terms of EBIT dollars. If I look at Q1, we're pretty much on that drumbeat.*** So it becomes difficult because there are many, many pieces. Now let me answer the 2 or 3 quarter. I think that we are – what I'd like to see it be 1.5, my goal is I can't – I'm going to struggle to step up in the manner at which they wanted to do. So again, the fact that it looks like it is an inventory goal, the demand is there and they want to step back up in my Q4. Obviously, I'm going try to pull it back. So let's say metals are a constant. Let me – maybe I can answer the question from that standpoint. Metals are a constant. Then I would expect to see that organic growth come our Q4, to start to pick up from that standpoint as it comes through. But I do not look at this as a, "I only get it one way." ***Again, I look at it as, I get to generate EBIT dollars at a rate over the next 2 years and 3 quarters, either through operational improvement, more volume, organic growth, new product introduction, new engines. It doesn't matter to me where I get it from. I have to get it. And if I look at where we were in Q1 from Q4, we're on that slope. And we are on that slope.*** Now does it make your job any easier? No, it doesn't because you – I understand. I understand you're trying to find the A plus B equals | | |



PX130
Page 4134

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | C. I have A, B, C, D, E, F. I have all these dynamics that I get to incorporate them on. So I really focus on that EBIT dollar improvement. (App. 1 at 6-8; FAC ¶ 144; App. A at 1.) | | |
| 12. | 9/17/2013 | [Jason Gursky (Citigroup analyst):] Then on the engine destocking with the new programs that you talked about in the most recent quarter, can you just give us an update on how that's going and whether that March quarter still is the quarter where we kind of get back on track?<br><br>[Answer:] Yes. Again, I – the way I look at it, certainly we have – I mean, I guess, I need to back up to if you look at what makes us kind of tick, what do we look for? ***We have long-term contracts that are in play that basically guide and direct our market share, our pricing. Those are in place, and those all have very strong content on. And then you look at the rollout of the new programs, we have extremely strong – probably our best positions we've ever had on those new programs as they are rolling out.*** We see often on these, based on whatever a particular customer has, these moments where they're just doing a temporary destocking, it could be on the raw material side, it could be on the component side, and what there really is, is kind of that what we would see is the acceleration kind of process for a usually 2- to 3-quarter period time. I would say that what we're seeing that it is playing out pretty much as our customers had told us it was going to go. ***And as we go into Q4, Q1, we go back where that destocking kind of goes away and comes back to the normal rates.*** (App. 1 at 8; FAC ¶ 152.) | Citi Global Industries Conference | Donegan |
| 13. | 10/24/2013 | So if I basically look, Q2, as with Q1 before, ***establishes just another data*** | Earnings Call | Donegan |



PX130

Page 4135

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | ***point on a long road of steady expansion of shareholder value. It's the type of performance we and you should expect from the company for the foreseeable future.*** (App. 1 at 8; FAC ¶ 155.) | | |
| 14. | 10/24/2013 | [Noah Poponak (Goldman Sachs analyst)]: Well, just – and then just maybe an update on the engine destocking that you were talking about last quarter.<br><br>[Answer:] Well, that's what I'm saying. I think that it's held where it was on that investment cast side of the equation. And so that's all what the – that it came through there. That's the . . .<br><br>[Noah Poponak (Goldman Sachs analyst)]: But it sounds like that hasn't really changed at all since . . .<br><br>[Answer:] No. And again, we – if you kind of go back to what we said, we expected to see it kind of stay at this stable level for kind of our Q2 and Q3. ***And then as we move the back half of 4 and into 1, that's when we start seeing kind of that coming back. But it's important to note, though, in that, large commercial, we're seeing good demand from large commercial. I mean, large commercial wasn't almost in that double-digit territory***. So it really is kind of in that – we coat it all together in Investment Cast Products, certainly is that military and that aftermarket side of the equation. (App. 1 at 9; FAC ¶ 157.) | Earnings Call | Donegan |
| 15.<br><br>(Pls.' No. 3) | 10/24/2013 | [David Strauss (UBS analyst):] You mentioned that these results were just kind of one data point on the long road towards your '16 dollar target. Just curious, were the results actually ahead of your internal plan? | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | [Answer:] No, no. [. . .] ***[T]he way I expect us to have the contracts, the positions, the programs we have, we are positioned extremely well.*** Now you come down to how can we digest it? How can we grow, how can we effectively manage the cost. ***So from our standpoint, the way we think of this road, the way we think of this path, it is a kind of a continuum. So [. . .] I'll just I say, we don't have the ability to make these giant pops.*** It just – we can't man, we can't move the product, we can't get it through in that manner. So, it will follow more of a – so when I think of it, I do think of it as a – we are very – our whole mindset, ***we always talk about staying on the line. You'll hear from almost anybody in the company, our whole world is staying online. We wanted to – we want to move products through online. We want to drive variable costs through down the line. We want to – everything we do is that "staying on the line" drumbeat. So we have a line. So if I go from where we were and blow my way out to that '16 time frame, I go to the line. So we hover around that line.*** So no, this was not, from my vantage point, internally where we thought we could get. No, it wasn't that far off. (App. 1 at 9-10; FAC ¶ 158; App. A at 1.) | | |
| 16. | 10/24/2013 | So are the margins higher than they were in that overall? Yes, they are. Are they way above where we expected to get at where some of these businesses are now? No, they're not. Again, we tend to be a very data-driven group of people. But there are going to be moments where they probably won't run as high because we will be aggressively training and bringing people on, and revert levels won't be as high. But are they in the range we're expecting to be in the | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | segments? Yes, they are. And then again, you have on top of that, we've been very open about it, certainly TIMET is outstripping where we thought they'd be. And there are other acquisitions that are performing more rapidly than we expected then to do. So yes, ***there are elements in there that are outperforming what we originally thought***, but we don't expect to take our foot off the accelerator on those either. (App. 1 at 10; FAC ¶ 159.) | | |
| 17. | 10/24/2013 | [Robert Stallard (RBC analyst)]: I thought I'd follow up on David's question, actually, about your run rate to 2016 because, if I remember right, the buildup for that target assumed an incremental margin, for example, which is significantly lower than what you achieved in Airframe Products. And also investment cast is kind of hit with a very strong margin. So where do you think we're tracking maybe on your margin expectations even if sales have perhaps come in a bit light, thanks to destocking?<br><br>[Answer:] […] We expect – and I'm just not saying we sit back in pull these items out of the sky. When you have these pauses, you get – you should become more efficient. You are training as aggressively. You're not bringing in as many new people. You should get a productivity pop, you should just get it. Revert utilization should go up. There should be more revert available when you're – you get this time when there's more product on the marketplace being cut, you pull it back, and revert levels go up. ***So when we say we expect, there's reasons as to why we expect. We got a history of what we know we should get.*** So yes, the margins are running ahead of where they would be in the long haul, but no, it's not unexpected of what we | Earnings Call | Donegan |



PX130
Page 4138

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | wanted to get. (App. 1 at 11; FAC ¶ 159.) | | |
| 18. | 12/3/2013 | I think that, again, there has certainly been – one of the engine guys has been pretty vocal about what they've been doing. ***I think the bottom line is there was just a large amount of inventory that they put in the system is that – pretty much I'd say that the main was – the 787 was make sure that everything was protected. And I think as it's now starting to balance itself out, I think it's mainly a correction of that particular program. So that's the kind of – I think as we get into next year, our schedules show it's gone. And we know it has to be gone, because there is a – it's – there's – the growth that we would have expected to see compared to – we're underbuilding for the current level. So I think as soon as that goes away, the schedule shows that it comes back up. So it's been more of – rather than – destocking a lot of times mean that you fall off. It's been more of holding at a flat level, not taking a step up. And I think that step up does start coming in, in the middle of next year.*** But I think it was just basically a bunch of inventory was put in the system to make sure that there was no misses when there was all the fluctuation of the 787. (App. 1 at 11-12; FAC ¶ 167.) | Credit Suisse Global Industrials Conference | Donegan |
| 19.<br><br>(Pls.' No. 4) | 12/3/2013 | [Unknown Analyst:] You have lots of levers to pull [to achieve the FY16 EPS Target], top line, bottom line and in between, right? But should we think – those numbers are going to fluctuate to some extent, and market demand's going to play a role, internal things and so on. How do we think about – if we look out over the next few quarters, where should we be focused? [. . .] | Credit Suisse Global Industrials Conference | Donegan |



PX130

Page 4139

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | [Answer:] [. . .] ***[W]e are a linear-thinking group of people. We're financially driven. Everything we do breaks down to a financial model. Let there be no mistake. It breaks itself down to the core components. So it's not a hope and a prayer.*** And if you would sit through a quarterly review, you'd hear somebody, when they start talking about a hope and a prayer, I'll say, "Put up Page 3." Now when you're speaking to me, point to that line, because that's all I care about. Show me that line, or Page 5. I mean, we have all these things. ***So our mindset is going to be linear. You're going to see different movements. I didn't shirk when we didn't get the acceleration from – because of the destocking. You know what, we pull the other levers. We got cost takeout. We've got these acquisitions. I know all the levers that are there.*** (App. 1 at 12; FAC ¶ 168; App. A at 2.) | | |
| 20. | 1/23/2014 | Our aerospace operations are supporting a historically high commercial aircraft build rate, and, as the customers take the rates to the next level, ***our sales should track that upward slope.*** [. . .]<br><br>During the quarter, we were hit harder than we have ever been before by last-minute customer schedule shifts, and ***we do not expect to see them again to this degree in the foreseeable future [. . .]. We came to grips with these late-quarter challenges immediately, and we dealt with them as effectively as possible. Going forward, we see upside opportunities,*** and our operations continue to deliver increased value on higher volumes. (App. 1 at 13; FAC ¶ 170.) | Press Release | PCC |
| 21. | 1/23/2014 | Returning back to Forged [Products]. In the outlook, ***if I look at aerospace, as*** | Earnings Call | Donegan |



PX130

Page 4140

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | ***with Cast Parts, it is product that is contracted for, have in place and will be driven as those rates increase. In this particular area, we certainly will also recover the Q3 schedule shift in Q4.*** Again, we had a very solid position coming into Q3 on the re-engining and platforms, the best we've had on an engine of this size. And in the quarter, we won additional share, so we continue to expand that presence on that narrow body. And we went over TIMET, and certainly, they had a long runway on all fronts. (App. 1 at 13; FAC ¶ 171.) | | |
| 22.<br><br>(Pls.' No. 5) | 1/23/2014 | ***So on one hand, we're accelerating beyond those organic sequential growth range,*** as a benefit of the top line. It usually comes back on the downside when it comes to that range. This is how we think of our business.<br><br>I want to make sure you understand. This is not guidance. This is clearly trying to define how we think of the movement, quarter-to quarter and sequentially. ***This is very consistent in the way we broke apart, defined and gave the framework for our fiscal year '16. Contracts are in place. It's all intact. It was put there to give that framework that this is how we kind of get there, and it is done in this manner. So I wanted to have that conversation again in the way we think about our business. Again, it's consistent with where we are in that '16 framework. And that '16 framework looking at where the market is and the contracts and the price line, right now, that framework still feels very done, very – in the ability to get so intact.*** (App. 1 at 13-14; FAC ¶ 171; App. A at 2.) | Earnings Call | Donegan |
| 23. | 1/23/2014 | [Gautam Khanna (Cowen and Company analyst):] And then just expand on your comments on destocking into the year | Earnings Call | Donegan |



PX130

Page 4141

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | end. Did this extend beyond the 787 engine programs? And if you can just update us on whether you still expect to be shipping in line on those programs with underlying consumption by the March, June quarters, kind of do still expect . . .?<br><br>[Answer:] Yes, I think – ***this I wouldn't even almost consider destocking. I think there was – kind of if I go through the course of mid-last year, there was probably a realignment and a balancing as the 787 started getting some drumbeat to it. So I think that there was a more specific – this to me felt more like a year-end shift, moving product 2 to 3 weeks to the right versus what would have come into some customers' fiscal year end. So it did not feel like a destocking.*** It felt more like an objective, a cash flow, financial targets, working capital. It felt like it was more of that. ***It just moved and shifted 2 or 3 days in some cases. It just got 2 or 3 days beyond kind of our end,*** so filling more in. If I look at kind of the remaining – what I consider the remaining destocking, it probably falls in a couple categories. I think if falls into that fastener side of the business. And right now at the burn rates – and we do – we can monitor the burn rates. The way that kind of – we have the access to what they're pulling We have access to their inventory levels. So you can start to plot kind of that crossover point. Again, that June through July, August, that's kind of the quarter that we cross on that 787 hardware. And then I think a lot depends on what is our end customer basically in the case of 787, as Boeing moves towards production of that, then obviously I think they'll keep pulling the Airframe side of the business. So I think | | |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | that's kind of the last piece of the puzzle. And then certainly, the engine side, I expect to get pickup from the – as we are not at 10 yet on the engine side of business either. So as the true production goes to 10, I expect to see that come through more in that – our mid-calendar year '15. So that's kind of what it feels like today. (App. 1 at 14; FAC ¶ 172.) | | |
| 24.<br><br>(Pls.' No. 5) | 1/23/2014 | [Joe Nadol, JP Morgan analyst:] Are there pluses and minuses to consider when we think about your target?<br><br>[Answer:] There's always pluses and minuses. I mean, every day, when we wake up, you got to realize my job is pretty clear. My job is only to deal with the crap. So yes, every day presents itself with minuses. What I would say to that is we get paid to manage those minuses. So as a shareholder, shareholders look at me and say, we don't really care about the minuses you manage and we only want the upside. And I understand that. So yes, there were minuses. If I look at the one thing that I would say has delayed, it's probably been the fastener side of the equation in terms of the closure to the 787 rate. So in the short haul, it's not been what I wanted it to be. And that's when it becomes difficult for me to say I'm going to go manufacture that. When I look at the framework in the long haul, I get contracts. I have share. I see where they are. I see the endpoint. It's going to come. So when I say the framework is still intact, are there things that go day to day, like did I see the Q3 quarter shifts? I did not see the Q3 quarter shifts the last 2 weeks. I did not. But again, if I look at what I consider framework, contracts, build rates, share gains, all that, and you get out so that, that – so ***no, nothing's gone negative from that standpoint in*** | Earnings Call | Donegan |



PX130
Page 4143

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | ***terms of the framework, not at all.*** (App. 1 at 15; FAC ¶ 174; App. A at 3.) | | |
| 25. | 1/23/2014 | [Jason Gursky (Citigroup analyst):] I want to just stick with this 2016 outlook and maybe just ask it at a different way and put it this way. If we're sitting here 25 months from now and you don't reach the target, why would that have been the case? [Answer:] Well, from my standpoint, why wouldn't that have been the case is something fundamentally changed with the overall dynamics. Build rates didn't step up. Something happened in the new product introductions. Yes, China melting down in terms of GDP, more macro dynamics. ***If you look at what our line of sight to is, again, my contracts are in place. I got share. I know what it is. The build rates are announced.*** The engine people are marching down. The framers are going at a pretty reasonable drumbeat right now. ***Yes, there's some puts and takes. The destocking, the destocking goes away. You close the gap. It has an end to it.*** And like I said, in terms of 787 fasteners, you see the end and then there will be that step-up. So I think what the framework was meant to do was to whack off the quarter-to quarter events and stay focused on the dynamics of the long haul. So from a standpoint of aerodynamics, they're sound. If I look at power dynamics, we weren't considering some wild growth rates. So right now for us, power's playing – I mean, IGT's playing okay. Power, I think when I look, it's sitting in front of us now. Interconnect pipe's come back to about the rates we thought it would come back. And if I look at where we are looking at the oil and gas, I think we're positioned right. So it would have to be something more in the macro level is what I'd say, or some | Earnings Call | Donegan |



PX130

Page 4144

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | catastrophic event that occurred in one of our – again, could catastrophic events occur? Sure, but it would have to be something like that. But from that standpoint, it would fall into those categories. It's not going to be a quarter 3 fiscal year '14 schedule shift, it's not going to be that. That's what the framework was meant to say is, hey, some of these things move quarter – that was the whole goal of doing what we did. (App. 1 at 16-17; FAC ¶ 174.) | | |
| 26.<br><br>(Pls.' No. 5) | 1/23/2014 | [Robert Spingarn (Credit Suisse analyst):] I'm wondering if you haven't had a number of positives since you first offered that [EPS] guidance. You've doubled that TIMET synergies in the period that would really encompass '16. You've got a couple more acquisitions, which were not included in the initial guidance. And you've talked about share gains, some of which you hit by then. So shouldn't that target be better than intact, but actually higher at this point?<br><br>[Answer:] Well, let me – I have to be careful because sometimes, the things I say tend to come across in a wise manner. You have understand sitting where we sit, sometimes, talking about the upside of things just get grabbed onto in reports and print pretty quick. So when we typically – if you kind of – let me use TIMET as a baseline. When we put that out there, did we know we were going to do better than that? ***We had a high degree of belief that we were going to be able to do better than that.*** Now the rate that they accelerated is better than we thought. So if you look at what we do, I think ***when we put something out there, it typically tends to be a number that we are committed to, have multiple ways to get there. It is not a hope and a prayer. So when we say the*** | Earnings Call | Donegan |



PX130

Page 4145

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | ***framework is intact, that basic framework had in it the things that we talked about.*** There was certainly TIMET in there that – that was all. But to your point, there are things we didn't say were in there. We didn't say that there was going to be – we went up through the acquisitions of TIMET. So we didn't say that the additional M&A we said – we were clear to say it wasn't in there. So if you start saying intact, the framework is intact, to me, that is the baseline of what I told you back then. So to your comment, other things would have a value, to some degree, and that's kind of the way it looks. So again, ***when I talked to framework, it goes back to that original baseline of what we said.*** Now that might – and again, I don't want somebody going on jacking in $100 million. I mean, my number and my framework on TIMET was certainly more than we put out there as original synergies. So – but TIMET is doing very well. That TIMET team is doing very well. So I hope that gives you some clarity. ***Again, when I talk to framework, it's the original framework.*** (App. 1 at 17-18; App. A at 3.) | | |
| 27. | 5/8/2014 | [Robert Spingarn (Credit Suisse analyst):] Just following onto what Gautam asked you about, you do have somewhat easier comps now as we get into '15 given how '14 trended. And is a 4% to 5% organic growth rate doable in '15 on the revenue side?<br><br>[Answer:] ***Yes***, I think your comments are great. We had some very tough comps coming off. Obviously that military spares was, in Investment Cast, was a big number. I mean, so I do agree with you, as we start moving in the comps become much more reasonable. So yes, I think your statement from that | Earnings Call | Donegan |



PX130
Page 4146

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | standpoint is 100% correct. We also expect some of that to come back, too. So let me be clear. And we expect the military spares to come back. Again, they are an active program. So it's not as though that spares falloff is on dead programs. They are very active programs that we've had conversations with our customers that we all know they're going to come back. I think the pipe side of the equation, there's a lot of demand coming in the pipe side of the equation. I do think IGT, we will see another run of spares from that standpoint. So if you put all that in against kind of the comps, I think as you kind of get into that back side of the year, it lines itself up to be strong. Now again, I want to make sure it's clear that when I look at this business, I'm just not going to sit back. And we kind of of – we discuss this off and on. I look at this company as every opportunity that I leave on every front. So we're not, just not going to sit back and wait for the organic growth, or we're going to drive kind of where I started this whole conversation at the beginning. ***We are going to drive after every opportunity on every single aspect of this corporation. So I think from that standpoint, yes, I feel really solid about kind of what we're looking at in this corporation, absolutely.*** (App. 1 at 18-19; FAC ¶ 183.) | | |
| 28.<br><br>(Pls.' No. 6) | 5/8/2014 | [Robert Spingarn (Credit Suisse analyst):] When we think about the comments you've made in the past, you've been very clear, Mark, that you've got lots of levers to get to your long-term guidance range. But again, with Permaswage, ADI sounds very interesting, a lot of opportunity there. You've had outperformance at TIMET, and you've been buying back stock. What should investors and – what do you | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | need to have happen for you to update the guidance? What is the catalyst or the milestone that we should be looking for?<br><br>[Answer:] I think you are correct. I mean, TIMET has done extremely well. Obviously, the delta gap between what you think they're doing well and kind of us think we're doing well is not as great from that standpoint. ***We – typically we have a pattern that we will when we – we under-commit and over-deliver. That's pretty much kind of what our motto is from that standpoint.*** So I do agree that TIMET's doing very well, and they're just – what they're basically doing is pulling everything kind of to the left very aggressively. So I have to give TIMET kind of their due. (App. 1 at 19-20; FAC ¶ 184; App. A at 3.) | | |
| 29.<br><br>(Pls.' No. 6) | 5/8/2014 | If I look at the other ones [PCC acquisitions], ADI, yes, I feel ADI is an asset that – it is a world-class asset. They've got great contractual positions. They've got a great presence on programs that certainly we're looking to grow on. And there is – it is a very good business we feel solid about. ***In terms of the whole – it's not guidance – the targets, whatever you want to call it. I think what I would say is that we obviously feel very, very, very solid about kind of what's out there.*** And again, that baseline is – doesn't include ADI, it doesn't include Permaswage. And any buyback kind of over the non-dilutive would be in there, too. So I'd say that at this point in time, we feel very confident with what we have out there. You'd have to add to that kind of the benefits of ADI and Permaswage, but any formal redoing at this point in time, probably not going to do anything from that standpoint right now. (App. 1 at 20; FAC ¶ 184; App. A at 3.) | Earnings Call | Donegan |



PX130

Page 4148

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| 30. | 7/24/2014 | Our order books began to fill in rapidly, and customer demand for accelerated delivery increased. As a result, ***we now have a clear line of sight to the steady growth we are anticipating in the second half of our fiscal year.*** (App. 1 at 20; FAC ¶ 193.) | Press Release | PCC |
| 31. | 7/24/2014 | Commercial aerospace activity is and will continue to be the single biggest driver of our growth in fiscal 2015. [. . .] ***Across the Company, base aircraft production continues to be solid***. Production of 787 components in the majority of our aerospace operations now supports the original goal of 10 aircraft per month, and ***we now have orders in hand that will close the gap completely. In addition, some Airframe Products' customers significantly accelerated their ordering activity during the quarter. These higher volumes, along with further share gains, are driving the segment's operations*** to take steps right now to be ready for the increased production that we can expect later this fiscal year. (App. 1 at 20-21; FAC ¶ 193.) | Press Release | PCC |
| 32. | 7/24/2014 | TIMET. As we move into the back half of '15, we have a couple of dynamics that are going on. There was some destocking that was occurring from some of the European customers. ***That goes away and gives us a step-up.*** (App. 1 at 21; FAC ¶ 194.) | Earnings Call | Donegan |
| 33. | 7/24/2014 | [Gautam Khanna (Cowen and Company analyst):] It sounds like Rolls is still destocking. Is that right? [. . .]<br><br>[Answer:] ***The destocking coming out of Rolls, yes, I'd say we do definitely see that coming to an end. To be fair to Rolls, they've been very consistent when they said where we're going to see it come to an end. And as we move into our Q4, that's when it comes to an end.*** | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | In terms of the spares business of the military, I think we do start to see some of it coming back into Q4. We're still working to see if we can potentially get more of that pulled in, to not face kind of the dynamics we think we could potentially face as we move into next year. We're probably – we've got – still got some more work to do to see if we can work to get that pulled in. And then the TIMET orders, again, that's kind of that Rolls-Royce piece of the equation that we do have the orders at this point in time on hand. It shows that going away. I think I answered all your questions. (App. 1 at 21; FAC ¶ 194.) | | |
| 34.<br><br>(Pls.' No. 7) | 7/24/2014 | ***I want to be clear in regards to the fiscal '16 targets. I want to reaffirm a target and a framework is in place.*** We've also completed several acquisitions, a couple of larger ones, Permaswage and ADI, that would be additive to that, as well as any reduced share count. (App. 1 at 22; FAC ¶ 196; App. A at 3.) | Earnings Call | Donegan |
| 35.<br><br>(Pls.' No. 7) | 7/24/2014 | ***We have said numerous times, and it's clear as I can say it today, that, that original target we gave, we are committed to that and feel confident in it, and we'll move beyond it based on the things we talked about.*** (App. 1 at 22; App. A at 4.) | Earnings Call | Donegan |
| 36. | 7/24/2014 | ***I think we are looking at organic moving in a more aggressive manner.*** We've been waiting for the fasteners to come through. We've been waiting for the Airframe to come through. We've kind of get those orders sitting on top of us now. We've kind of talked about the huge load we have sitting on top of us on the interconnect pipe that we've got to move through. So I do think that we've been able to stay on that continuum. ***I think it's important to note, too, we've been able to stay on that continuum*** | Earnings Call | Donegan |



PX130

Page 4150

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | ***without strong organic growth, and now we're starting to see the organic orders being placed on top of us,*** but I think it's still a blended-in rate. (App. 1 at 22.) | | |
| 37. | 10/23/2014 | Overall in Forged segment, the aerospace sales were stable. The key drivers in there: large commercial overall was flat, but a ***key driver in that was destocking, primarily by a single engine customer.*** The value of that in the quarter negatively impacted Forged Products' growth overall by 2.5 percentage points. So the destocking that went on from that single customer was a large number in the aerospace side of the equation. (App. 1 at 22; FAC ¶ 203.) | Earnings Call | Donegan |
| 38. | 10/23/2014 | Going forward, our markets remain strong, and customer demand has ***given us a clear line of sight to sustained growth.*** (App. 1 at 22; FAC ¶ 206.) | Press Release | PCC |
| 39.<br><br>(Pls.' No. 8) | 10/23/2014 | Before I quickly review our '17 to '20 framework, ***I want to make sure that it's clearly understood that we remain fully committed to our fiscal '16 framework.*** There are a number of factors that are sitting on top of us now that certainly support that confidence. The destocking that we experienced, which I kind of gave a value of that, goes away. The TIMET market shares we have start kicking in and drive their way through '16. The IGT demand is on us right now, and we have to move that through '16. The new engine programs, our content, our value that we've gotten is at an unprecedented level. And again, that has to transition now through the production – through the development and into production again through our '16. And the aerostructures wins that we already have in hand that we have got to get out with the new equipment coming in, those are just to name a few, along with the general updemand we've seen in the fasteners as well as others. So that '16 | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | framework is still well intact, and we will move through to that.<br><br>Off of that, we showed last quarter kind of this '17 through '20 framework. The only real comment I want to make at this point in time, ***there is no change to the framework we laid out.*** (App. 1 at 23; FAC ¶ 207; App. A at 4.) | | |
| 40. | 10/23/2014 | [David Strauss (UBS analyst):] The destocking that you talked about specifically at Forged, I think the 2.5% or whatever it was, how much further can this go out of this customer? [. . .]<br><br>[Answer:] I would tell you that right now, the schedules that we have on us says ***that it ends and starts to recover in our Q4 and fully recovers in Q1. We have orders on us that say that.*** And at this point in time that's all I can go for. But I would agree with you, it has been a redo with this customer probably 2 to 3 times it has been. I do believe that it is getting to the point that it cannot be reduced anymore. ***So I guess I'd say that my confidence at this point in time is higher that it will in fact stick to the current schedules than it has in the past.*** (App. 1 at 23-24; FAC ¶ 208.) | Earnings Call | Donegan |
| 41. | 10/23/2014 | [Robert Stallard (RBC analyst)]: One of your customers over here in the U.K. has made it clear they think there's a lot they can still do on inventory. Are they sort of saying one thing to us and saying something different to you? And ultimately, is there still some downward risk here as they look to further destock not just in Q3 but going forward over the next 12 months?<br><br>[Answer:] Yes, I obviously can't answer for any of my customers as to what they do or don't do. The only thing I can do is take the existing dynamics that we've | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | seen. And if I compare what we saw in the Forged Products world, that would be both in terms of the alloy on the nickel and the titanium side and the Forged shapes, and that would be on, again, the titanium, fan side and the closeddie side. It has been a very aggressive long takeout, different from what we've seen on so many other parts of our business. So all that I can answer at this point in time is the demand we've seen shuts – or the **destocking that we've seen just kind of bottoms out and closes off in the Q3 time frame, and then the orders on top of us start to recover**. What that customer may be referring to, to you, I can't answer that for you. I can just tell you kind of what we're seeing from our standpoint. But I will tell you that the overall Forged has seen it sustain for a long period of time. Again, it tends to be an area to go after. It's large, it's expensive and it's costly. So it's no surprise. It's got the longest lead times. It's no surprise that it's #1 where you go and attack to go drive inventories down. And in the flip side, it's going to have the longest lead times coming back, much more so than a fastener or a structural casting. I mean, your lead times are double or triple when you go all the way back to melting metal to deliver an end product. (App. 1 at 24-25; FAC ¶ 209.) | | |
| 42. | 12/3/2014 | [Unknown Analyst:] Quickly, you alluded to the destocking that you've had to work against. You've said that, that should alleviate in the second half of this fiscal year. We're most of the way through the third quarter here. Are you seeing that?<br><br>[Answer:] Yes. We are – ***yes, we are seeing it.*** It's not – I would tell you it's not – I've now got 100% order on me. | Credit Suisse Global Industrials Conference | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | What we are seeing as you move into Q4 and to Q1, you are seeing a more normal rate that brings you back up. So have we seen the bottom of it? Yes. Are we seeing an increase in order rate? Yes. And I'd say we really get out of it completely by Q1 is about when we get out of it completely. (App. 1 at 25; FAC ¶ 216.) | | |
| 43. | 12/3/2014 | [Unknown Analyst:] So to be clear on this, because what some people have been concerned about was whether this was a destock or whether the customer was either going elsewhere or bringing some work inside, it's a straight destock.<br><br>[Answer:] Yes, there's a lot of product where we got hit on the destock where the application is kind of a – right now we're kind of sole sourced. So we were able to look at a position where we are the only avenue and you could just – you can track. There's a huge disconnect in terms of what they've pulled out of – you can look at here's the delivery rates, here's what they're ordering, you could see it, you could match it up to a part where we're the only solution and say, okay, it matches out. ***On the flip side, when you get to the back half you can start seeing the increase going back towards the build rate.*** (App. 1 at 25; FAC ¶ 216.) | Credit Suisse Global Industrials Conference | Donegan |
| 44. | 12/3/2014 | So with that, are we done? So I just took a snapshot of the last 2.5 years. We look at fiscal year '13, we saw sales growth of 16%. We turned that 16% sales growth into 19% improvement in EBIT. Our operating margins for this period expanded 70 basis points, but we were bringing in a number of businesses at the time that had lower performing margins. So we absorbed that, overcame that and still delivered an upside in the margins. It delivered EPS of 15% up and it | Credit Suisse Global Industrials Conference | Donegan |



PX130

Page 4154

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | delivered free cash of roughly 1.4 – $1.14 billion.<br><br>Moved into next year, '14. On top of the 16%, another 14% sales growth. We turned that 14% sales growth into 23% EBIT improvement. We drove EBIT margins up 200 basis points in a 12-month period of time, still acquiring other businesses that had a natural drag on that. The EPS went up 22%. Free cash, just under $1.53 billion.<br><br>First half of '15. Another 8% up in sales, turned that into EBIT up 12%, continued to expand margins of 120. EPS grew by 14% so far and free cash flow was $562 million. In this time, in this 2.5- year period of time, you've seen a huge development in loads that run through our factories with the re-engining. So all of the development costs came through there, all the downhole casing development is in there. You saw volatile material prices from $5 to $8 a nickel and we had a number of businesses that we brought in. So the acquisition model is very robust at lower. Even given all that volatility, we've been able to see these type results.<br><br>And in this first half of the year, in our Q2, we had also a customer destocking that was in there, but we brought down another set of assets in TIMET that we had not brought down the year before and that's in those numbers, too. So you look again at this model that, against a backdrop of a number of things that would be headwind, ***we're still able, with the robustness of what we have available to us, this is kind of the drumbeat of what we'll deliver as an ongoing basis.*** (App. 1 at 26-27; FAC ¶ 217.) | | |

## III. FY16 EARNINGS GUIDANCE

### A. Undisputed Facts

In January 2013, PCC announced its $15.50-$16.50 EPS Target. (Defs.' Ex. 39 at 19.) The FY16 Target referred only to organic EPS, i.e., it excluded the effects of acquisitions and share repurchases. (*Id*.)

PCC retracted its FY16 guidance on January 22, 2015. (Decl. of Richard A. Russo ("Russo Decl.") Ex. 58, ECF No. 226-3.) On an earnings call that day, PCC's Vice President of Investor Relations Jay Khetani ("Khetani") explained to investors that PCC had not provided investors with "insight into our original FY16 discussion[,]" including the "sensitivities and assumptions" underlying the guidance, and Khetani acknowledged that PCC "went two years without updating" its guidance and "things changed during that timeframe." (Russo Decl. Ex. 59 at 9.) On that same call, Donegan also acknowledged that he had reaffirmed the guidance despite changed circumstances, and that he "accept[ed] the responsibility wholeheartedly." (*Id*. at 10.)

### B. Disputed Facts

#### 1. Lead Plaintiffs' Version of the Facts

To develop the FY16 Target leading up to the January 2013 issuance, Hagel and Khetani directed financial analyst Ray Phillips ("Phillips") to create a financial model for their review. *See* Russo Decl. Ex. 8 at 5 ("In developing the [Target] . . . . [Phillips], acting at the direction of Khetani and/or Hagel, prepared and revised a set of Excel spreadsheets to generate projected [profit and loss] statements[.]"). Phillips spent several months developing a financial projection of PCC's earnings based on PCC's internal data, historical drop-through rates by division, external third-party forecasts, Wall Street opinions, and PCC's then-existing contracts. *See* Russo Decl. Ex. 5 (Dep. of Ray Phillips ("Phillips Dep.")) at 32:2-15 (Phillips testified that "there [were] hundreds of factors and people that [he] talked to in order to" come up with the most

accurate FY16 EPS projection possible). Phillips concluded in January 2013 that the "best financial data available" to him confirmed that the FY16 EPS would be between $13.30 and $13.80. *See* Phillips Dep. at 66:22-67:4. According to Phillips, this EPS figure reflected the "internal consensus" within PCC regarding where EPS could be by FY16. *See* Phillips Dep. at 65:5-9 (Phillips responding "oh, yeah" in response to whether he had "conversations with [Khetani and Hagel] . . . arriving at the 13.30 to 13.80 range"). Consistent with Phillips' figures, Hagel and Donegan had presented an FY16 EPS projection of $13.72 to PCC's Board of Directors in November 2012. *See* Russo Decl. Exs. 13-14.

Defendants internally recognized that the FY16 EPS guidance "must top street view[.]" (Russo Decl. Ex. 9 at 5.) Donegan directed that the FY16 model incorporate a 10% per year earnings before interest and taxes ("EBIT") growth rate, but such a growth rate was inconsistent with available economic data. *See* Russo Decl. Ex. 4 (Dep. of Shawn Hagel ("Hagel Dep.")) at 162:9-10 (Hagel responding that "[y]es. There was a phone call" during which Donegan instructed that the FY16 model should assume a 10% per year EBIT growth); Hagel Dep. at 158:6-13 (Hagel agreeing that "projections for fiscal '14, '15, and '16 . . . . are dismal because [they show] declining growth"). Nevertheless, Hagel instructed Phillips to "force" the 10% growth rate into the FY16 Model. *See* Russo Decl. Ex. 17 (email dated January 18, 2013 where Phillips explains that "[Hagel] asked me to send you the latest projections to include at least a 10% EBIT CAGR [compound annual growth rate]"). Phillips had to "finagle" revenues to "make them look at least somewhat defensible" and go against what finance executives instructed him to do in order to incorporate the 10% growth rate. (Phillips Dep. at 151:6-9.) Even with the forced 10% growth rate, EPS for FY16 was projected to be only $14.67. (Russo Decl. Ex. 22.)

Hagel next directed Phillips to "force" both the 10% growth rate and an incremental margin (i.e., "drop through") rate of 40% into the model. *See* Hagel Dep. at 336:18-337:8 (Hagel testifying that she asked Phillips to run a scenario assuming a 40% drop through rate and a 10% growth rate). Donegan and Hagel directed the input of these assumptions even though a 40% drop through rate "for some of [the divisions] had never been achieved and was very unlikely" and a 10% growth rate across all divisions "when the market demand [was] possibly dropping" was also unlikely. (Phillips Dep. at 73:17-23.) With these "forced assumptions" input into the model, Phillips ran a scenario where "EPS [was] in the range of $15.50 to $16.50[.]" *See* Phillips Dep. at 87:14-20; *see also* Suppl. Decl. of Richard A. Russo ("Russo Suppl. Decl.") Ex. 89, ECF No. 271-1 (Hagel email to Khetani on March 27, 2015, noting that "Mark add[ed] his own opinion" to FY16 earnings guidance). Phillips "tried to reason with" Khetani that the range of $15.50 to $16.50 was "$3 above what we knew to be the appropriate range[.]" (Phillips Dep. at 77:19-78:5.)

PCC developed an internal tracking mechanism to "assess[] where [PCC's] performance was relative to just a very simple linear progression" toward the FY16 Target. (Russo Decl. Ex. 7 at 51:17-24.) Donegan had requested the tracking document, referred to internally as the "FY16 Progression" or "TOC line," which included a constant 3.4% sequential earnings growth rate to the FY16 Target. *See* Russo Decl. Ex. 32 at 4 (the tracking document); *id.* at 1 (April 17, 2013 email to Hagel stating "Mark asked me to put this together").

Donegan, Hagel, and Khetani met every quarter, and discussed PCC's performance "against that simple linear progression" to the FY16 Target. (Russo Decl. Ex. 7 ("Khetani Dep.") 52:12-53:6.) Quarter after quarter, PCC's EPS results fell below the "line" identified in the FY16 Progression. *See* Russo Decl. Ex. 33; *see also* Hagel Dep. at 300:20-301:7 ("Q: [D]espite

including M&A and stock repo . . . you're below the line every quarter, right? A: These lines [in the exhibit] show that it is below, yes. Q: Every quarter for five quarters here, right? A: Yes.").

Khetani recognized in April 2014 that PCC should "[a]mend [the] FY16 target" to provide additional information (Russo Decl. Ex 10 at Slide 3), and was aware in July 2014 that PCC was "coming further off the line[.]" (Russo Decl. Ex. 49 at Slide 15.) In September 2014, Khetani and Hagel provided an "Investor Relations Roadmap" to Donegan, recommending that he "[m]oderate the use of overly enthusiastic language[.]" (Russo Decl. Ex. 51 at 9308-09; Ex. 52 at 143-44.) In October 2014, Hagel instructed Phillips to prepare an EPS "bridge" because PCC was "so far off the mark," which was the "result of forcing a top line that is much higher than the end markets dictated[.]" (Phillips Dep. at 156:24-157:22; 166:25-167:12; 290:21-291:8.) The EPS bridge reflected an organic FY16 EPS forecast of $13.86. (Russo Decl. Ex. 53 at 7604.)

**2. Defendants' Version of the Facts**

Donegan, Hagel, and Khetani "took the lead in developing the Framework and FY16 Target" and they "each performed [their] own analyses of PCC's operational and financial opportunities and collaborated to develop an EPS range for [PCC's] FY16 Target." (Donegan Decl. ¶ 33.) Hagel hired Phillips to "work in developing an estimate of FY16 earnings." (Decl. of Shawn Hagel ("Hagel Decl.") ¶ 52, ECF No. 239.) However, Hagel "believed that [Phillips'] Five-Year Forecast was overly conservative and was not an appropriate starting point for [PCC's] modeling of the FY16 Target." (Hagel Decl. ¶ 53.) Hagel then "directed [Phillips] to adopt a new modeling approach to forecast FY16 results[.]" (Hagel Decl. ¶ 54.) The assumptions Hagel directed Phillip to "use in these models were the result of [her] own analysis and knowledge of PCC's operations, close collaboration with Mr. Khetani, conversations with [other PCC employees], and conversations with [Donegan.]" (Hagel Decl. ¶ 55.) Phillips input the assumptions at Hagel's direction, and several scenarios he ran reflected "FY16 EPS of $14.90,

$15.65, [] $16.39 . . . . $15.45[,] and $16.91." (Hagel Decl. ¶ 56.) Donegan never spoke with Phillips directly about the FY16 model. (Phillips Dep. at 60:11-18.)

Donegan, Hagel, and Khetani concluded that PCC's organic FY16 EPS would likely be $15.50-$16.50. (Donegan Decl. ¶ 45.) Donegan believed that the EPS would be even higher, but agreed that $15.50-$16.50 was a reasonable forecast. (*Id.*)

Throughout the Class Period, Donegan acknowledged to investors that PCC's growth would not track a precise, straight line. *See, e.g.*, Defs.' Ex. 31 at 15 ("[Y]ou obviously look at any metric or any mode and you plot a straight line. You do see ups and downs to that."); Defs.' Ex. 36 at 20 ("So is it ever going to be a straight line? The answer to that question is no."). Donegan, Hagel, and Khetani met before each quarterly earnings call to discuss the FY16 earnings guidance, and their judgment was that the FY16 Framework remained intact and PCC would achieve the FY16 Target. (Donegan Decl. ¶¶ 46-50; Hagel Decl. ¶¶ 58-60.) A critical factor in PCC's decision to withdraw the guidance in January 2015 was a precipitous decline in the price of oil. (Decl. of Christin Hill ("Hill Decl.") ¶ 49, ECF No. 235; Defs.' Ex. 63.)

## IV. PULL-IN SALES

### A. Undisputed Facts

When a customer accepts early shipment of a product and PCC ships the product to the customer before it was originally due, the transaction is sometimes referred to as a "pull-in." (Donegan Decl. ¶ 65.) PCC, throughout the Class Period, regularly engaged in pull-in sales. *See* Defs.' Ex. 97 (Dep. of Thomas McDonnell ("McDonnell Dep.")) at 99:14-100:9 (explaining that pull-in sales were a routine aspect of PCC's operations).

To induce customers to accept early delivery, some PCC plants offered customers discounts and extended payment terms. *See* Decl. of Eli R. Greenstein ("Greenstein Decl.") Ex. 68, ECF No. 260-1 ("We are significantly behind . . . . We have been trying to pull forward with

customer agreement as much as possible. This particular customer has used this to his advantage."); Greenstein Decl. Ex. 69 (Hagel granting "standing approval" for extended payment terms for pull-ins); Greenstein Decl. Ex. 70 (PCC customer negotiating and securing a 13% discount in exchange for accepting pull in).

### B. Disputed Facts

#### 1. Lead Plaintiffs' Version of the Facts

According to Lead Plaintiffs, pull-ins comprised 16.67% to 27.65% of reported sales throughout the Class Period at various PCC plants:

| Fiscal Quarter | Plant | Pull-ins | Reported Sales | % of Reported Sales | Exhibit(s) |
|---|---|---|---|---|---|
| 2013 Q4 | Tilton | $1,800,000 | $10,010,00 | 17.98% | Greenstein Decl. Ex. 3 at 7; Greenstein Decl. Ex. 7. |
| 2013 Q4 | HBE | $25,504,000 | $143,367,000 | 17.79% | Greenstein Decl. Ex. 4. |
| 2014 Q1 | Cherry | $6,176,000 | $22,340,000 | 27.65% | Greenstein Decl. Ex. 5; Russo Decl. Ex. 47, ECF No. 226-3. |
| 2014 Q1 | Tilton | $1,500,000 | $8,720,000 | 17.20% | Greenstein Decl. Ex. 7; Russo Decl. Ex. 47. |
| 2014 Q2 | Progressive | $2,545,000 | $13,119,000 | 19.40% | Greenstein Decl. Ex. 8. |
| 2014 Q4 | Schlosser | $4,379,000 | $17,080,000 | 25.64% | Greenstein Decl. Ex. 12; Russo Decl. Ex. 47. |
| FY2014 | Shur-Lok | $20,000,000 | $91,034,000 | 21.97% | Greenstein Decl. Ex. 6; Russo Decl. Ex. 47. |
| 2015 Q1 | Grafton | $14,000,000 | $84,001,000 | 16.67% | Greenstein Decl. Ex. 18; Russo Decl. Ex. 48. |
| 2015 Q2 | Carson City | $2,275,000 | $14,492,000 | 16.68% | Greenstein Decl. Ex. 19; Russo Decl. Ex. 48. |



PX130

Page 4161

| Fiscal Quarter | Plant | Pull-ins | Reported Sales | % of Reported Sales | Exhibit(s) |
|---|---|---|---|---|---|
| 2015 Q3 | Carson City | $3,249,000 | $14,598,000 | 22.26% | Greenstein Decl. Ex. 23; Russo Decl. Ex. 48. |

Some PCC employees worried that shipping parts and obtaining payment early meant that a customer's future demand would decrease and ultimately result in missing quarterly earnings targets. *See* Greenstein Decl. Ex. 49 ("Problem is BL is not strong enough in Q3/Q4 to pull without damaging those [quarters]."); Greenstein Decl. Ex. 50 ("This can't go on and be a viable company . . . . we both agreed how can PCC keep on pulling in . . . . The house is built on twigs[.]"); Greenstein Decl. Ex. 44 at 116:17-23 (acknowledging that after pulling in sales the next quarter would yield lower sales).

Due to the general acceptance that pull-ins negatively impacted future earnings, some divisions sought to curtail their reliance on pull-ins during the Class Period. *See* Greenstein Decl. Ex. 54 ("I will be participating at Kevin's GM meeting . . . presenting a detailed plan on how we will grow the business and eliminate the need for pull-ins."). PCC's managers recognized that without pulling in sales, PCC would fall further off the trajectory and be less likely to achieve the FY16 Target. *See* Greenstein Decl. Ex. 56 ("I also heard rumors that Kevin S wants us to stop pulling from future quarters—if this is the case then the only way to do that is to not keep increasing the sales forecast."); Phillips Dep. 178:21-186:3 (Phillips testifying that Hagel and Donegan regularly opined that PCC needed to stop pull-ins); Greenstein Decl. Ex. 75 ("[T]he obvious concern is that we are driving over the edge of a cliff").

PCC ignored the negative impact of pull-in sales, and instead increased pull-ins to mask sluggish organic growth. *See* Greenstein Decl. Ex. 57 (explaining that "sales goals and objectives are based on new sales opportunities and pull ins . . . . this is becoming our standard practice").

Case 3:16-cv-00580-AC Document 308 Filed 10/17/20 PgID 23140 of 81

### 2. Defendants' Version of the Facts

Throughout the Class Period, pull-ins were a routine aspect of PCC's business and resulted in benefits to PCC. *See* McDonnell Dep. at 99:14-100:9 (explaining that it "doesn't make any sense . . . to have the parts on the shelf" when they were completed early, and "reaching out [was] a normal course of commercial activities" because plants wanted to "turn [parts] into cash"); Defs.' Ex. 84 ("Buck Dep.") 117:4-13 ("[W]e have done pull-ins probably for 20 years."); Defs.' Ex. 98 ("Morley Dep.") 158:15-159:1 ("We used pull forwards at any time. I keep repeating. If we had—if there was finished material on the dock that was early, then we would always attempt to try to get the customer to take it."); Defs.' Ex. 105 at 37:19-24 (the Rolls-Royce 30(b)(6) deponent testified that "I would say [pull-ins] were consistent through the entire period 2012 to 2015"). Pull-ins resulted from strategic decisions by PCC plant managers who scheduled production to avoid operating below peak plant capacity one month and above it another month. *See* Buck Dep. at 31:2-23 (explaining that PCC scheduled production so that a plant manager could make full use of the available resources). When a plant completed a part early, it would seek customer approval to ship it early. *See* McDonnell Dep. at 99:14-100:9 (explaining that pull-ins had to be accepted by customers).

During the Class Period, pull-ins had only a -0.55 to 0.78% net impact on reported sales. (Defs.' Mot. Summ. J. at 17) (citing Hill Decl. ¶ 64). Pull-ins were sustained at low levels throughout the Class Period and had no negative impact on PCC's overall business. *See* Donegan Decl. ¶ 66 ("[T]he impact of pull-ins requested by PCC's facilities was [immaterial] to PCC's reported financial results.").

///

///

///

## V. DESTOCKING

### A. Undisputed Facts

During the Class Period, Rolls-Royce, a key PCC customer, began an "inventory reduction program within the civil aerospace division[.]" (Decl. of Michael Mosley ("Mosley Decl.") ¶ 16, ECF No. 241.) Mosley, Rolls-Royce's Chief Operating Officer ("COO"), informed Donegan in 2013 that Rolls-Royce would be reducing its inventory, otherwise known as "destocking." (Mosley Decl. ¶ 17.)

### B. Disputed Facts

#### 1. Lead Plaintiffs' Version of the Facts

PCC expected destocking to continue throughout the Class Period. *See* Greenstein Decl. Ex. 83 (explaining that "[Rolls-Royce] future demand" would be "reducing from 250 in 2013 to 226 in 2014 to 99 in 2015"); Greenstein Decl. Ex. 84 (email to Donegan and Hagel showing a decline in Rolls-Royce demand from FY2014 to FY2015); Greenstein Decl. Ex. 78 (email in May 2014 acknowledging that Rolls-Royce is "going to continue to reduce inventory so [PCC] will see more volume reductions"). Rolls-Royce never told Donegan that destocking was only temporary. *See* Greenstein Decl. Ex. 79 at 70:9-20 (Rolls-Royce employee testifying that based on his review of internal communications between Rolls-Royce and PCC, no one told Donegan that destocking was temporary).

#### 2. Defendants' Version of the Facts

When Rolls-Royce began destocking in early May 2013, Mosley expected destocking to conclude by the end of 2013. (Mosley Decl. ¶ 16.) Mosley shared this information with Donegan during meetings throughout 2013. (Mosley Decl. ¶ 17.)

By early 2014, Mosley achieved his inventory reduction goal, but to his surprise he was instructed to reduce inventory even further. (Defs.' Ex. 99 (Dep. of Michael Mosley ("Mosley

Dep.”)) at 212:21-214:7.) Mosley undertook this additional inventory reduction program, which he expected to conclude at the end of 2014, and shared his plan with Donegan. (Mosley Dep. at 212:21-214:7.)

PCC plant executives also informed Donegan that destocking would be temporary, and that they expected that Rolls-Royce demand would rebound by the end of FY15. *See, e.g.*, Defs.’ Ex. 81 (showing that sales to Rolls-Royce would begin to recover in Q4 of FY15). However, in late 2014 and early 2015, “additional market conditions unexpectedly reduced or temporarily delayed demand for Rolls-Royce engines further” and “[t]hese unexpected developments caused Rolls-Royce to again re-evaluate its inventory position and extend [destocking] into 2015.” (Mosley Decl. ¶ 22.)

Mosley informed Donegan in “late 2014 or early 2015 that Rolls-Royce was unexpectedly continuing” its destocking program into 2015. (Mosley Decl. ¶ 23.) Donegan disclosed this development to investors on the January 22, 2015, earnings call, which took place after the close of the Class Period. *See* Defs.’ Ex. 38 at 6 (“[W]e are assuming that a single customer who [has] been destocking continues that activity and that demand steps down from Q3 to Q4[.]”).

Despite the destocking, PCC’s market share increased from [redacted] of Rolls-Royce’s total expenditures in 2011-12 to [redacted] in 2015-2016. (Mosley Dep. at 205:11-206:2.)

## VI. MARKET REACTION

On January 22, 2015, PCC acknowledged that its “FY16 results will be below previously stated EPS targets of $15.50 to $16.50[.]” (Russo Decl. 59 at 6.) Lead Plaintiffs’ expert posits four distinct corrective disclosure events: January 23, 2014, July 24, 2014, October 23, 2014, and January 16-20, 2015. (Russo Decl. Ex. 68 at 2.)

### A. January 23, 2014

On January 23, 2014, PCC "issued a press release announcing third quarter fiscal 2014 results." *Id.* at 52. PCC reported sales of $2.36 billion, which was below the analyst estimate of $2.46 billion. *Id.* Sales reflected 1% growth, while "[a]nalysts were expecting higher organic growth in the 4% to 5% range." *Id.* PCC reported an EPS of $2.95, which missed the consensus analyst estimate of $3.03 to $3.04. *Id.*

Lead Plaintiffs' expert's review of "analyst commentary confirms that, despite [PCC's] continued attempts to reassure the market that it would meet the FY16 EPS Target, there was additional skepticism in the market about whether" that would be possible. *Id.* at 53. The 2013 third quarter results caused PCC stock "to decline by 2.28%, or $6.16 per share[.]" *Id.* at 64. This decline was a "signal that the market was becoming skeptical of the Company's reassurances that it was still on track to meet its FY16 EPS Target." *Id.* Additionally, "there was heavy trading volume of 3.0 million shares on this day, which is more than four times greater than the average daily trading volume of 0.7 million shares during the Class Period." *Id.* at 64-65.

### B. July 24, 2014

On July 24, 2014, PCC held an earnings call and issued a press release announcing its first quarter 2015 results. *Id.* It announced $2.53 billion in sales which "was below consensus expectations by approximately $69 million (or about 2.67%)." *Id.* PCC reported an EPS of $3.32 which was $0.03 below analyst expectations. *Id.*

PCC stock declined by 4.89% on July 24, 2014, or $12.23 a share. *Id.* at 73. Additionally, there "was heavy trading volume of 4.4 million shares on this day, which is more than six times greater than the average daily trading volume of 0.7 million shares during the Class Period." *Id.* at 74.

///

**C. October 23, 2014**

On October 23, 2014, PCC announced its second quarter 2015 earnings before the market opened, and held a conference call with investors later that morning. *Id.* at 75. PCC reported $2.52 billion in sales, which missed analysts' consensus by $20 million. *Id.* PCC reported an EPS of $3.24, and missed analysts' expectations by $0.08. *Id.* "Even though [PCC] reported a year-over-year increase in sales and EPS, [its] results once again fell short of analysts' expectations[.]" *Id.*

On October 23, 2014, "negative earnings information caused [PCC common stock] to decline by 3.18%, or $7.20 per share[.]" *Id.* at 87. Additionally, "there was heavy trading volume of 2.8 million shares on this day, which is nearly four times greater than the average daily trading volume of 0.7 million shares during the Class Period." *Id.*

**D. January 16-20, 2015**

PCC announced its preliminary third quarter 2015 financial results after the market closed on January 15, 2015. *Id.* at 90. PCC "reported revenues of $2.42 billion to $2.47 billion and earnings per share of $3.05 to $3.10, which fell below analyst expectations of $2.56 billion in revenue and EPS of $3.40, respectively." *Id.*

On January 16, 2015, "the negative pre-announcement caused [PCC common stock] to decline by 10.24%, or $22.50 per share[.]" *Id.* at 95. Additionally, "there was heavy trading volume of 14.4 million shares on this day, which is nearly twenty times greater than the daily average daily trading volume of 0.7 million shares during the Class Period." *Id.* On January 22, 2015, PCC announced its third quarter earnings in full and held a conference call withdrawing its FY16 guidance. *Id.* at 97.

///

///

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

### II. THE SAFE HARBOR

Defendants argue that the Court should grant their motion for summary judgment on the ground that forty-two of the forty-four statements are protected by one of the prongs of the Safe Harbor for forward-looking statements. *See* Defs.' Mot. Summ. J. at 30 (listing Statements 1-7, 11-17, 19-31, 34-36, 38-39, and 44) and 43 (listing Statements 9-10, 12, 14, 18, 25, 32-33, and 40-43.) The Court agrees in part.

#### A. Legal Framework

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). SEC Rule 10b–5, promulgated under the authority of Section 10(b), in turn, provides:

> It shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The elements of a Rule 10b-5 claim are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) in connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

"Even where a plaintiff has properly pleaded all six elements of a Section 10(b) violation, the allegedly false or misleading statement may be shielded from liability by the 'safe harbor' provision of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017). A defendant is not liable for any statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or if the plaintiff fails to prove the statement was made "with actual knowledge . . . that [it] was false or misleading." 15 U.S.C. § 78u-5(c)(1). In other words, a defendant is not liable for a statement that is forward looking that "*either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *In re Quality Sys.*, 865 F.3d at 1141.

Forward-looking statements include "'any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (quoting *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003)).

"[M]ixed" statements contain "non-forward looking statements about current and past facts as well as forward looking statements about projected growth and revenue in earnings." *In re Quality Sys.*, 865 F.3d at 1141. The Safe Harbor "is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events[,]" but "'[t]he mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward looking aspects of the statements.'" *Id.* at 1142 (quoting *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005)). Accordingly, when faced with a "mixed" statement, the Court must examine whether, "as a whole, the challenged statements relate[] to future expectations and performance." *Intuitive Surgical*, 759 F.3d at 1059.

Under the Safe Harbor, "'forward looking statements' are not actionable as a matter of law if they are identified as such and accompanied by 'meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward looking statement.'" *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 990 (N.D. Cal. 2017) (citing 15 U.S.C. §78u-5(c)(1)(A)(i)). The "cautionary language also must have consisted of non-boilerplate warnings that were tailored to the forward-looking statements." *Zaghian v. Farrell*, 675 F. App'x 719, 720 (9th Cir. 2017). A defendant's cautionary language is not meaningful if it does not sufficiently address the harm that resulted. *See id.* (holding that a "boilerplate warning [that] pertained to a discussion regarding potential product defects and supply chain disruption, neither of which occurred in this instance" was not meaningful cautionary language).

Importantly, "if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement

is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

### B. Safe Harbor's First Prong

Defendants assert that forty-two of the forty-four statements are forward-looking (all but Statements 8 and 37), and that all but Statements 12, 18, and 19 were accompanied by meaningful cautionary language.

#### 1. Forward-Looking Statements

##### a. "On the Line" Statements

In its order denying Defendants' motion to dismiss, the Court examined whether the Safe Harbor protects certain statements regarding the FY16 Target, and concluded that some of those statements "do not fit within the PSLRA's definition of a forward-looking statement because they contain representations of present fact and omit material information." *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2017 WL 3084274, at *13 (D. Or. June 27, 2017); *see also In re Quality Sys.*, 865 F.3d at 1142 (holding that "the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts[,] [n]or is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement"); *In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *12 (N.D. Cal. June 2, 2020) ("[S]tatements involving future predictions are actionable when they make representations about the past or present that 'can demonstrably be proven false.'") (citations omitted). The Court stands by its prior ruling with respect to all but one of those statements:

- We're pretty much on that drum beat. (Statement 11)



PX130
Page 4171

- [W]e have a line. If I go from where we were and blow my way out to that 2016 timeframe, I get a line. We hover around that line. (Statement 15)
- [T]he framework for our FY16 [EPS target] . . . is all intact. (Statement 22)
- Nothing has gone negative . . . in terms of the [EPS] framework, not at all. (Statement 24)
- I want to be clear in regards to FY16 targets. I want to reaffirm the target and the framework is in place. (Statement 34)
- [W]e remain fully committed to our FY16 framework and there is no change to the [2016 EPS] framework we laid out. (Statement 39)

*Murphy*, 2017 WL 3084274, at *13. The one exception is Statement 29, which the Court acknowledges is a forward-looking statement: "we obviously feel very, very, very solid about kind of what's out there." In context, Donegan said that he feels "solid" about the FY16 Target, which is merely a reaffirmation of the FY16 Target without a representation of current conditions, like the other mixed statements.

Although many of the mixed statements reaffirm the FY16 Target (which would qualify as forward-looking), each statement also suggests that PCC was *currently* positioned within the Framework, or on "the line," or on the "drumbeat," suggesting that PCC was currently meeting its anticipated benchmarks on the road to the FY16 Target. *See In re Quality Sys.*, 865 F.3d at 1142 (citing cases in which courts held that statements such as "[the company] has on hand and has access to sufficient sources of funds to meet its anticipated [needs]" and "sales [a]re 'still going strong'" were mixed statements not protected by the Safe Harbor) (quoting *In re Stone & Webster*, 414 F.3d at 211-13 and *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)); *Kipling v. Flex Ltd.*, No. 18-CV-02706-LHK, 2020 WL 2793463, at *10 (N.D. Cal. May 29, 2020) (finding that challenged statements from earnings calls and investor conferences "constitute 'mixed statements'" that "contain forward-looking portions and non-

forward-looking portions"); *NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, No. 3:16-cv-01756-YY, 2017 WL 4453561, at *11-12 (D. Or. Oct. 3, 2017) (holding that although the challenged "statement relates to the forecasts, the statement is properly construed as a present assessment of the company's intentions at the time of the proposed merger" and was therefore not a forward-looking statement), *adopted*, 2018 WL 533912 (D. Or. Jan. 24, 2018).

Defendants compare Donegan's "on the line" statements to cases in which courts have held that the Safe Harbor protects statements that a company is "on track" to meet an anticipated future event. (Defs.' Mot. Summ. J. at 31-32.) In fact, courts are split on whether such "on track" statements are forward-looking. *See Szymborski v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191, 1198-99 (D. Nev. 2011) ("The authority on whether statements that a company is 'on track' are forward-looking statements is split[.]"); *compare Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543, 546-47 (9th Cir. 2018) ("'[O]n track' falls within the safe harbor of forward-looking statements. It discusses 'plans and objectives of management for future operations[.]'" (quoting *Intuitive Surgical, Inc.*, 759 F.3d at 1058)); *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, No. 15-07952 CASR, 2017 WL 114401, at *5-6 (C.D. Cal. Jan. 9, 2017) (holding that statement that company was "on track" to complete migration to a new platform was forward-looking); and *In re ECOtality, Inc. Sec. Litig.*, No. 13-3791 SC, 2014 WL 4634280, at *5-7 (N.D. Cal. Sept. 16, 2014) (holding that "on track to begin delivery in the third quarter" was a forward-looking statement); *with Bielousov v. GoPro, Inc.*, No. 16-cv-06654-CW, 2017 WL 3168522, at *5 (N.D. Cal. July 26, 2017) (holding that "[w]e believe we're still on track to make [our revenue guidance] as well" was a "statement of present opinion [that] is not forward-looking, and therefore is not covered by the PSLRA safe harbor provision"); *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 964-65 (N.D. Cal. 2014) (finding

that "on track" was a representation of current fact); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) (holding that statement "on track" to meet future goals was not forward-looking "to the extent that such statement[] rested upon a characterization of the present state of the company"); *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) ("on track to meet analysts' earnings expectations" was not forward-looking); *cf. In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017) ("[A]lleged optimistic statements indicating that a company is 'on track' to meet a certain goal are, without more, inactionable puffery." (citing *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168-69 (C.D. Cal. 2007) and *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d at 880)).

On the one hand, "on track" suggests that the company's current condition is as the company had anticipated when it issued the guidance. On the other hand, investors could also reasonably interpret "on track" merely to mean that the company continues to believe that it will reach its target in the future. But in any event, the "on track" cases present a closer call than the statements at issue here. Donegan's statements that PCC was "on the line," or "on the drumbeat," or that the "framework" is intact provide more specific information than "on track." The statements at issue here more forcefully suggest that PCC is currently positioned right where it anticipated it would be when it issued the guidance, i.e., that it had achieved an incremental benchmark. *See Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017) ("[T]he question is whether a reasonable investor would understand [the statements], in context, to communicate only a general optimism, or a factual representation about the actual condition of [the company's] business[.]").

Thus, the Court holds that the mixed statements excerpted above (Statements 11, 15, 22, 24, 34, and 39) are not forward-looking, and that Statements 26 ("the framework is intact") and

36 ("we've been able to stay on that continuum") also fall in this same category of mixed statements not subject to Safe Harbor protection.

**b. Other Mixed Statements**

Three other Challenged Statements contain present facts combined with forward-looking statements: Statement 9 (including statements about current as well as future destocking); Statement 14 ("we're seeing good demand from large commercial"); and 25 ("[M]y contracts are in place. I got share. I know what it is. The build rates are announced."). These statements similarly do not qualify for Safe Harbor protection. *See Rodriguez v. Gigamon, Inc.*, 325 F. Supp. 3d 1041, 1050-51 (N.D. Cal. 2018) (holding that where the defendant "made mixed statements containing forward-looking and non-forward-looking statements[,]" including "facts regarding the present state of the Company[,]" the "non-forward-looking portions of [his] statement are not protected by the Safe Harbor Provisions of the PSLRA" (citing *In re Quality Sys.*, 865 F.3d at 1141)).

**c. Not Forward-Looking**

Several of the Challenged Statements are not forward looking at all: Statement 7 ("We are achieving strong earnings growth on stable commercial aircraft schedules, gaining share on new airframe and engine development programs . . . ."); 23 ("[T]his I wouldn't even almost consider destocking. I think there was—kind of if I go through the course of mid-last year, there was probably a realignment and a balancing as the 787 started getting some drumbeat to it . . . this to me felt more like a year-end shift, moving product 2 to 3 weeks to the right versus what would have come into some customers' fiscal year end. So it did not feel like a destocking."); 28 ("We—typically we have a pattern that we will when we—we under-commit and over-deliver. That's pretty much kind of what our motto is from that standpoint."); and 42 ("[Y]es, we are seeing [destocking alleviating].").

In sum, the Court finds that Statements 7, 9, 11, 14-15, 22-26, 28, 34, 36, 39, and 42 are not forward-looking when viewed as a whole and are therefore not protected by the Safe Harbor.

**d. Forward-Looking**

The Court agrees with Defendants that the statements reaffirming the FY16 Target that do not also reflect PCC's current position, as well as the statements predicting that destocking was only temporary (i.e., will end in the future), are entitled to Safe Harbor protection as forward-looking statements, regardless of whether the speaker believed the statements to be true at the time. *See Intuitive Surgical*, 759 F.3d at 1058 ("The alleged misstatements in analyst calls are classic growth and revenue projections, which are forward-looking on their face." (citing *In re Cutera Sec. Litig.*, 610 F.3d at 1111)); *City of Hialeah Empls. Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1173 (D. Or. 2018) ("Expressing confidence or lack thereof in a given projection is not different from making a projection. Every statement of a future projection carries at least the implicit assertion that the speaker or writer of that statement believes it."); *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1046 (N.D. Cal. 2007) ("Here, each of the financial forecast statements identified by defendants as forward-looking falls squarely within 15 U.S.C. § 78u-5(i)(1)(A)-(D) as each is a statement predicting the company's future expected sales or other financial results."). The Court finds that the following statements are forward-looking when viewed as a whole: 1-6, 10, 13, 20-21, 27, 29-33, 35, 38, 40-41, and 43-44.[5]

**2. Meaningful Cautionary Language**

Defendants argue that all of these forward-looking statements were accompanied by meaningful cautionary language. (Defs.' Mot. Summ. J. at 33.) Lead Plaintiffs respond that

[5] Of note, many of these statements are also nonactionable because they include only "puffery" type of language, such as "moving in the right direction" (Statement 6), "very, very, very solid" (Statement 29), and "solid" (Statement 31).

Defendants' cautionary language was boilerplate and not sufficiently meaningful. (Pls.' Opp. at 25.)

**a. Forward-Looking Statements**

The parties do not dispute that each earnings call began with a Safe Harbor warning, stating: "Information included within this presentation describing the projected growth and future results and events constitutes forward-looking statements, within the meaning of the [PSLRA] of 1995," and "[a]ctual results in future periods may differ materially from the forward-looking statements because of a number of risks and uncertainties." (Defs. Mot. Summ. J. at 7.) PCC's warning identified a wide array of risks:

> [I]ncluding but not limited to fluctuations in the aerospace, power generation, and general industry cycles; the relative success of our entry into new markets; competitive pricing; the financing viability of our significant customers; the concentration of a substantial portion of our business with a relatively small number of key customers; the impact on the Company of customer or supplier labor disputes; demand, timing, and market acceptance of new commercial and military programs, including the Boeing 787; the availability and cost of energy, raw materials, supplies, and insurance; the cost of pension and postretirement medical benefits; equipment failures; product liability claims; relations with our employees; our ability to manage our operating costs and to integrate acquired businesses in an effective manner, including the ability to realize expected synergies; misappropriation of our intellectual property rights; governmental regulations and environmental matters; risks associated with international operations and world economies; the relative stability of certain foreign currencies; the impact of adverse weather conditions or natural disasters; the availability and cost of financing; and implementation of new technologies and process improvements.

Russo Decl. Ex. 24 at Slide 2.

Courts have consistently held that similar cautionary language is sufficiently meaningful. *See, e.g.*, *Intuitive Surgical*, 759 F.3d at 1059 (holding that warning that "[a]ctual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties[,]" accompanied by "[t]hese risks and uncertainties are described in detail in the company's [SEC] filings" and "[p]rospective investors are cautioned not to place undue reliance on such forward-

looking statements" was sufficiently meaningful); *In re Solarcity*, 274 F. Supp. 3d at 993 (holding that the statement "[f]orward-looking statements should not be considered a guarantee of future performance or results, and reflect information that may change over time" with a cross-reference to the defendant's shareholder letter, slides, and SEC filings was sufficiently meaningful).

Consistent with this precedent, the Court concludes that PCC's cautionary language was sufficiently meaningful to qualify the forward-looking statements identified above for Safe Harbor protection. *See Empls. Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F. 3d 1125, 1133 (9th Cir. 2004) (holding that where "sufficient warnings accompanied the [statements at issue] . . . Clorox [was] protected from liability under the safe harbor provision"). Accordingly, the Court enters summary judgment in favor of Defendants with respect to Statements 1-6, 10, 13, 20-21, 27, 29-33, 35, 38, 40-41, and 43-44.

**b. Mixed Statements**

With respect to the mixed statement identified above, the Ninth Circuit has instructed that "[w]here a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement." *In re Quality Sys.*, 865 F.3d at 1146. Accordingly, "[i]f the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be 'sufficiently meaningful' to qualify for the safe harbor." *In re Quality Sys.*, 865 F.3d at 1146-47.

In *In re Quality Systems*, the Ninth Circuit held that "[w]here, as here, forward-looking statements are accompanied by non-forward-looking statements about current or past facts, that the non-forward-looking statements are, or may be, untrue is clearly an 'important factor' of

which investors should be made aware." *In re Quality Sys.*, 865 F.3d at 1148 (holding that "[t]he cautionary language used by Defendants failed to correct these materially false and misleading non-forward-looking statements").

Similarly here, if Defendants' statements about PCC's current state of affairs were materially false and misleading, the cautionary statements were not adequate to protect the forward-looking portions of those mixed statements. *See In re Quality Sys.*, 865 F.3d at 1148 ("Because Defendants made materially false or misleading non-forward-looking statements about the state of QSI's sales pipeline, virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate."). Therefore, the Safe Harbor provides no protection for the mixed statements.

**C. Safe Harbor's Second Prong**

Forward-looking statements that were not accompanied by meaningful cautionary language may nevertheless find protection under the Safe Harbor if Lead Plaintiffs fail to prove that any statement was made "with actual knowledge . . . that [it] was false or misleading." 15 U.S.C. § 78u-5(c)(1); *see also In re Cutera Sec. Litig.*, 610 F.3d at 1112 ("Those statements [unaccompanied by meaningful cautionary language] fall outside the safe harbor if the plaintiff can allege facts that would create a strong inference that the defendants made the forecast(s) at issue with 'actual knowledge . . . that the statement was false or misleading.'" (quoting 15 U.S.C. § 78u–5(c)(1)(B)(i))); *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756, at *8 (N.D. Cal. Nov. 27, 2018) ("Actual knowledge is a higher standard than the deliberate recklessness standard applied to non-forward-looking statements. A company that makes forecasts knowing that a problem exists is not liable if it could still have believed that the problem was surmountable and the forecast could still be met.") (citations omitted).

Here, the parties agree that Donegan's statements at the Citi Global Industries Conference were not accompanied by any cautionary language: Statements 12, 18, and 19. Portions of those statements were forward-looking, and for those portions, Lead Plaintiffs must prove that Donegan made the statement with actual knowledge that it was false and misleading. These statements relate to whether PCC was tracking the anticipated FY16 Framework, or the "line" to its FY16 Target, and whether destocking would continue. As discussed below, disputed issues of material fact remain as to whether Donegan was aware when he made the statements that they were materially false or misleading, and therefore the Court cannot determine whether Statements 12, 18, and 19 are protected by the Safe Harbor's second prong. *See In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182, 1192 (D. Nev. 1999) (denying summary judgment on second prong of the Safe Harbor in light of "triable issues as to the existence of actual knowledge of falsity" with respect to the statement at issue).

## III. OTHER NONACTIONABLE STATEMENTS

Defendants move for summary judgment on Statements 1-7, 11-17, 19-31, 34-36, 38-39, and 44, arguing that they are nonactionable puffery or mere statements of opinion. (Defs.' Mot. Summ. J at 39.) Of those statements, the only that remain at issue are Statements 7, 11-12, 14-17, 19, 22-26, 28, 34, 36, and 39.

Non-actionable "puffery" involves "expressions of opinion, as opposed to knowingly false statements of fact[.]" *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). Investors "do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.*, 610 F.3d at 1111 ("[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporative executives."). Generally, statements "that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Or. Pub. Emps.*, 774 F.3d at 606. "Interpretation

of the 'mere puffery' rule has distinguished cases of 'definitive positive projections' from statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years.'" *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see also Stearns v. Select Comfort Retail Corp.*, No. 08-CV-02746 JF, 2009 WL 1635931, at *11 (N.D. Cal. June 5, 2009) ("'The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions.'" (quoting *Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1399 (E.D. Cal. 1994))).

Nevertheless, what makes the "mere puffery" analysis particularly challenging, and its results inconsistent, is that "[i]t is true that 'optimistic statements, when taken in context, might constitute a basis for a claim under section 10(b) and rule 10b-5.'" *In re Cisco Sys. Inc. Sec. Litig.*, No. C 11-1568 SBA, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). Even vague, "feel good" statements *may* be actionable if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also In re Quality Sys.*, 865 F.3d at 1143-44 (holding that statements such as "'[t]here is nothing drying up and there is nothing slowing down[,]'" "'[o]ur pipeline continues to build to record levels[,]'" and "'[o]ur pipeline is deep[,]'" "went beyond 'feel good' optimistic statements" because "[t]hey repeatedly reassured investors during the class period that the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters"); *Warshaw*, 74 F.3d at 959 (finding that reassuring investors that "everything [was] going fine" when the company knew otherwise was materially misleading); *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *14-15 (holding that "[t]he XS

and XS Max got off to a really great start" was an actionable statement, and noting that "[a]lthough investors understand that corporate optimism may be unreliable, a party cannot affirmatively create a positive impression of an area it knows to be doing poorly" (citing *In re Quality Sys.*, 865 F.3d at 1143)).

District courts in this circuit have found the following statements to be nonactionable statements of corporate optimism:

- "'[T]here is very, very strong demand for our commercial business[.]'" *In re Sunpower Corp. Sec. Litig.*, No. 16-cv-04710-RS, 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018).
- "'[W]e've got a strong brand, we've got a great product experience for consumers and businesses[.]" *Azar*, 2018 WL 6182756, at *10.
- "We are very pleased with the learning from our pilot launch," "so far we're getting really great feedback," and "we are very pleased with our progress to date[.]" *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012).
- "This is going to be a very big second half for us." *In re Leapfrog*, 527 F. Supp. 2d at 1050.
- "[S]trong demand metrics and good momentum[.]" *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012).
- "We are actually extremely bullish for the US markets"; "Our growth profile is going to be pretty darn big compared to most companies that are out there"; "I'm very happy with our continued ability to scale and [unbelievably] incredibly strong sales." *In re Solarcity*, 274 F. Supp. 3d at 995.

- "[C]onsumers love our service[.]" *In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005).

*See also Intuitive Surgical*, 759 F.3d at 1060 (holding that statements "(i) that the opportunity for system placement at hospitals 'is still very, very large'; (ii) that there is potential for growth in the *dVP* market; (iii) that the company is 'reservedly optimistic' about sales; and (iv) wishing it had 'a crystal ball,' that Intuitive 'will come out stronger' and 'in a pretty good position' despite the economic crisis" are "the antithesis of facts" and "represent the 'feel good' speak that characterizes 'non-actionable puffing'" (quoting *In re Cutera Sec. Litig.*, 610 F.3d at 1111)).

Consistent with these holdings, the Court finds that of the remaining Statements, Statements 7, 14, and 16-17 contain statements that are sufficiently vague that they are not actionable as securities fraud. *See* Statement 7 (referring to "strong" growth); Statement 14 ("good demand"); Statement 16 ("there are elements in there that are outperforming what we originally thought"); and 17 ("When we say 'expect,' there [are] reasons as to why we expect. We got a history and we know what we should get."). *See Intuitive Surgical*, 759 F.3d at 1060 (holding that vague statements of optimism such as "solid" "confident" "committed" are non-actionable puffery); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d. 809, 835 (N.D. Cal. 2019) (holding that statements expressing general satisfaction with a company's financial condition without specific detail are nonactionable puffery); *In re Rackable Sys., Inc. Sec. Litig.*, No. 09-0222 CW, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010) ("pretty strong" and "solid" not actionable); *In re Splash Tech Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (holding that statements about a company's "strong demand" and "solid" position are puffery).

///



PX130

Page 4183

Some of the Challenged Statements that are somewhat vague on their face take on a more specific meaning when viewed in context with the question that prefaced the statement. *See, e.g.*, Statement 28 (Q: "When we think about the comments you've made in the past, you've been very clear, Mark, that you've got lots of levers to get to your long term guidance range . . . . What do you need to have happen for you to update the guidance? What is the catalyst or the milestone that we should be looking for?" A: "You know typically we have a pattern that we will, when we under commit and over deliver. That's pretty much what our motto is from that standpoint."). Although "we under commit and over deliver" is vague in a vacuum, it takes on a more specific meaning when following a question about what catalyst or milestone would require PCC to update its guidance. *See Azar*, 2018 WL 6182756, at *12 (holding that statements are not puffery because "Defendants assured investors that 'the fundamentals are all in place and really strong' in the context of responding to a specific question about the local advertising program"); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *12 (S.D.N.Y Nov. 26, 2018) (holding that statements are not puffery when "in response to direct questions about Signet's credit portfolio").

Similarly, "we are a linear-thinking group of people" and "it's not a hope and a prayer" (Statement 19) are vague statements, but in the context of the question asking Donegan where analysts should be focused over the next few quarters, and in the context of Donegan's answer also stating that the financial model "breaks itself down to the core components," that he "didn't shirk when [PCC] didn't get the acceleration from—because of the destocking[,]" and that PCC can "pull the other levers," the statement as a whole in response to the question provided reassurances that were misleading if false.

///

The Court finds that Statements 7, 14, and 16-17 are so vague that they are nonactionable, and therefore the Court enters summary judgment for Defendants on those statements. The remaining statements contain sufficiently specific factual information that is capable of objective verification. *See Or. Pub. Emps.*, 774 F.3d at 606 ("Statements by a company that are capable of objective verification are not 'puffery[.]'").

## IV. FALSITY, MATERIALITY, AND SCIENTER

Of the eighteen Challenged Statements that remain at issue (Statements 8-9, 11-12, 15, 18-19, 22-26, 28, 34, 36-37, 39, and 42), Lead Plaintiffs argue that there are no material issues of disputed fact with respect to the falsity, materiality, or scienter relating to Statements 11, 15, 19, 22, 24, 26, 28, 34, and 39, and Defendants argue that Lead Plaintiffs have not established falsity, materiality, or scienter with respect to any of the statements at issue.

The Court finds that there remain disputed factual issues with respect to the FY16 Target, pull-in sales, and destocking, and therefore a jury must determine falsity, materiality, and scienter with respect to the remaining eighteen statements.

### A. Legal Standards

To establish falsity, a plaintiff "must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1216 (S.D. Cal. 2010).

"[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic*, 485 U.S. at 240. "For an omission to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information

made available.'" *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1189 (D. Or. 2015) (quoting *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 970 (9th Cir. 2014)).

Plaintiffs can prove the scienter element with evidence that "defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010) (citations omitted). Courts "may analyze falsity and scienter together, even though they are separate elements, because they generally depend upon the same set of facts." *In re REMEC*, 702 F. Supp. 2d at 1216.

"Materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact." *In re Apple Comput. Sec. Litig.*, 886 F.2d at 1113 (citing *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) and *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (per curiam)). "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) ("[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.").

**B. Challenged Statements**

**1. "On the Line"**

Lead Plaintiffs assert that the "on the line" statements were objectively false when made because PCC was never on the "line" but instead was always below PCC's own linear trajectory to the FY16 Target. *See, e.g.*, Hagel Dep. at 301:5-7 (responding that PCC fell below the "line" for each quarter during the Class Period). According to Lead Plaintiffs, Defendants' references to a "line" referred to the specific trajectory required to achieve the FY16 Target. *See* Russo Decl. Ex. 32 (email from Khetani to Hagel titled "FY16 progression" showing a "TOC approach to

$16/sh in FY16" and assuming a "constant rate of [sequential growth] in EPS from Q413 onward"); Russo Decl. Ex. 35 (showing Donegan's handwritten notes on the FY16 trajectory suggesting that Donegan knew PCC was not meeting the quarterly targets). Defendants respond that Donegan's "line" statements merely referred to a general upward trajectory, or a steady incline toward the FY16 Target, and none of Donegan's statements about the "line" were false. (Defs.' Mot. Summ. J. at 37.)

The Court finds that a reasonable juror could conclude that the statements referencing PCC on "the line" or performing consistent with the "Framework" meant that PCC's actual performance was consistent with the "line" to the FY16 Target that Donegan referenced, and that therefore the Statements were false. However, a reasonable juror could also conclude that Donegan was simply using the "line" language to describe a general upward trajectory, and therefore his statements were not false. Thus, whether Donegan's statements were materially false, and whether he knew they were false, is an issue that this Court may not resolve on summary judgment.[6] *See Azar*, 2018 WL 6182756, at *13 ("In this case, once Defendants chose to tout Yelp's local advertising model as 'fairly proven,' omitting any mention of the churn issues that would likely significantly and negatively impact revenue 'affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually

[6] With respect to materiality, the Court agrees with Defendants that the "test for materiality . . . is not whether the subject matter of the statements was important to investors[,]" but "[r]ather, it is whether the alleged fraudulently misrepresented or concealed information 'significantly altered to the total mix of information' available to investors at the time the statements was made.'" (Defs.' Opp. at 9.) Lead Plaintiffs emphasize the inherently material nature of the earnings guidance, but materiality is established when the omitted facts—not the general subject matter of the statement—would tend to alter the total mix of information available to investors. *See Basic*, 485 U.S. at 231-32 ("[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'") (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

exist[ed].” (quoting *Brody*, 280 F.3d at 1006)); *In re Cooper Sec. Litig.*, 691 F. Supp. 2d 1105, 1116 (C.D. Cal. 2010) (finding that when the defendant stated that the corporation looked “pretty strong[]” the court could not enter summary judgment on the falsity element of the statement because “what [the declarant of the statement at issue] meant is an issue of fact”).

Although not asserting a “truth on the market” defense, Defendants also argue that the “on the line” statements could not have been misleading because all of PCC’s relevant financial information was publicly available. (Defs.’ Mot. Summ. J. at 36.) For context, a “truth-on-the-market” affirmative defense provides that “a defendant’s failure to disclose material information may be excused where information was made credibly available to the market by other sources.” *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008). However, to avoid liability, “any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by insiders’ one-sided representations.” *In re Apple Comput. Sec. Litig.*, 886 F.2d at 1116.

Defendants have not established that PCC disclosed sufficient financial information to allow investors to conclude where PCC was situated on its “line” in any given quarter. For example, Defendants have not pointed to evidence that PCC disclosed its quarter-over-quarter organic growth each quarter of the Class Period. Further, Khetani acknowledged at the time PCC withdrew its guidance that PCC had failed to disclose the “sensitivities and assumptions” underlying the guidance, and the market reaction to the withdrawal of guidance supports Lead Plaintiffs’ theory that the market was not aware of the relevant metrics. In any event, the Court cannot conclude on this record that PCC disclosed information sufficient to show its position vis-à-vis the “line” with the same intensity and credibility to counteract the alleged falsity of

Donegan's statements that PCC remained on the "line" each quarter. *See In re Amgen Sec. Litig.*, No. CV 07-2536 PSG (PLAx), 2014 WL 12585809, at *15 (C.D. Cal. Aug. 4, 2014) (holding that the "mere fact that the FDA posted its briefing book on its website, or that the briefing book was made public, is not enough to shield Defendants from liability"); *cf. Nguyen v. Radient Pharms. Corp.*, 946 F. Supp. 2d 1025, 1039 n.18 (C.D. Cal. 2013) ("To the extent that Defendants' discussion of prior statements and press releases is a truth-on-the-market affirmative defense, that defense fails at the summary judgment stage because such an 'intensely factual' defense requires a showing that any corrective statements were made with intensity and credibility as any false statements.").

**2. Omission of Internal Projections**

Lead Plaintiffs also allege that the Statements relating to the FY16 Target were materially misleading because Donegan never disclosed that PCC's "internal consensus" contradicted the FY16 Target, nor that anticipated "dismal economic data" was not reflected in the FY16 Target. Lead Plaintiffs present evidence that before announcing the FY16 Target, Defendants reached an "internal consensus" that EPS could only reach $13.30 to $13.80 for FY16, but nevertheless announced that it could achieve $15.50 to $16.50 EPS. (Pls.' Mot. Summ. J. at 24.) Lead Plaintiffs also present evidence that Defendants knew that the assumptions underlying the FY16 Target "'would not be achievable' given the 'dismal economic data'" discussed in an email between Khetani and Hagel before Defendants announced the FY16 Target. (*Id*.)

Defendants respond that there was no such "internal consensus" and that Donegan, Hagel, and Khetani collaborated and ultimately concluded that the FY16 Target of $15.50 to $16.50 EPS was reasonable. (Defs.' Opp. at 16-20.) Defendants point out that no senior executives testified in support of the "internal consensus," and the only support for such a consensus is from Phillips, who was a junior analyst. (Defs.' Opp. at 19.) Defendants also

contend that the email in question, when read in context, demonstrates that Khetani was discussing dismal market rates but emphasized that PCC would outperform the market. *See* Russo Decl. Ex. 20 at 1 ("So we may find that dismal market view is bailed out by a strong view on PCC unique outperf issues. And that is just fine to me and makes the case for peer/market outperf[.]").

There is a genuine dispute of material fact as to the existence of an "internal consensus" that contradicted PCC's earnings guidance, and if the "dismal economic data" known to PCC was appropriately reflected in the guidance. Accordingly, the Court denies the parties' motions for summary judgment on the falsity, materiality, and scienter elements with respect to statements about the FY16 Target.

### 3. Pull-In Sales

Lead Plaintiffs' theory of liability includes the allegation that PCC relied on the practice of pulling in sales to meet its quarterly targets, and Defendants' failure to disclose PCC's reliance on pull-ins rendered their statements materially false and misleading. Defendants argue that they are entitled to summary judgment because: (1) Lead Plaintiffs cannot prove that PCC's pull-in practice was an unsustainable practice that temporarily inflated sales only to create a "massive hole" in future demand, and (2) even if the Lead Plaintiffs "could prove that pull-ins distorted PCC's publicly reported financial results . . . [Lead] Plaintiffs could not prove materiality." (Defs.' Mot. Summ. J. at 27.)

The parties present conflicting evidence on the financial impact of PCC's practice of pulling in sales. Defendants submit evidence that the percentage ranged from -0.55% to 0.78% net impact on reported sales companywide during the Class Period. (Defs.' Mot. Summ. J. at 17.) Lead Plaintiffs present evidence that pulling in sales impacted PCC's largest plants on the order of 16.67% to 27.65% of sales. (Pls.' Opp. at 10.) Lead Plaintiffs also point to an email from a

Vice President of Finance stating that pull-ins accounted for 20.5% of sales company-wide. (Pls.' Opp. at 10.)

In light of these disputed facts, a jury must determine which figure more accurately reflects the impact of PCC's pull-in practices, and whether Defendants' statements were materially false and misleading in light of PCC's practice of pulling in sales. *See Anderson*, 477 U.S. at 255 ("[T]he weighing of the evidence, and the drawing of a legitimate inferences from the facts are jury functions, not those of a judge[.]"). Accordingly, the Court denies Defendants' motion for summary judgment on the ground that Lead Plaintiffs cannot prove their pull-in theory. *See Azar*, 2018 WL 6182756, at *12 ("Given the importance of local advertising revenue to Yelp's financial health, Defendants' omission was material because there was 'a substantial likelihood that the disclosure of the [churn issues] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." (quoting *Basic*, 485 U.S. at 231-32)); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1139 (N.D. Cal. Oct. 16, 2017) ("In the absence of [daily average user] data, investors interpreted Defendants' statements are reassurances that the Company had experienced and would continue to experience positive growth and engagement trends.").

**4. Destocking**

Defendants also seek summary judgment with respect to the Challenged Statements about destocking (Statements 12, 18-19, and 37 of those that remain at issue), because Lead Plaintiffs cannot establish a genuine issue of material fact with respect to falsity or scienter of those statements. (Defs.' Mot. Summ. J. at 41.) Lead Plaintiffs disagree. (Pls.' Opp. at 38.)

Plaintiffs' theory of falsity with respect to the destocking statements is that Donegan repeatedly assured investors that Rolls-Royce's destocking of inventory was only a temporary setback, when in fact he was aware that PCC was experiencing a decline in demand from Rolls-

Royce. (Pls.' Opp. at 38.) Based on the parties' conflicting evidence about what information Rolls-Royce shared with Donegan, there are disputed material facts as to whether Donegan's statements about the impact of destocking were materially false and misleading. Accordingly, the Court denies Defendants' motion for summary judgment on the elements of falsity, materiality, and scienter with respect to the destocking statements. *See In re REMEC*, 702 F. Supp. 2d at 1216 (explaining that courts "may analyze falsity and scienter together, even though they are separate elements, because they generally depend upon the same set of facts"); *cf. S.E.C. v. Platforms Wireless*, 559 F. Supp. 2d 1091, 1102 (S.D. Cal. 2008) ("In light of the holding that a genuine issue of material fact exists as to whether Martin's statement was materially false, the court need not address whether Martin possessed the requisite scienter.").

## V. LOSS CAUSATION

Defendants also seek summary judgment on the ground that Lead Plaintiffs cannot prove loss causation or quantify damages. (Defs.' Mot. Summ. J. at 46.) Lead Plaintiffs counter that "[t]o prevail at summary judgment, Defendants must establish that, as a matter of undisputed fact, the depreciation in the value of [PCC stock] could not have resulted from the alleged false statement or omission of the defendant[,]" and "Defendants do not even attempt to prove that stock declines on the corrective disclosure dates were unrelated to their misstatements." (Pls.' Opp. at 43) (citations and quotation marks omitted).

### A. Legal Standards

#### 1. Loss Causation

Loss causation "refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (citing *Dura Pharm.*, 544 U.S. at 342). To establish loss causation, a plaintiff must show "proximate" or "legal" cause. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,

*Cal.*, 730 F.3d 1111, 1118 (9th Cir. 2013); *see also* 15 U.S.C. § 78u–4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). "Put another way, a plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss.'" *Nuveen*, 730 F.3d at 1120 (citing *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007)).

"Loss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (citing *Metzler Inv. GMBH v. Corinthian Colls.*, 540 F.3d 1049, 1063 (9th Cir. 2008)). In addition, "[a] plaintiff may . . . prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) (citing *Berson v. Applied Signal Tech.*, 527 F.3d 982, 989-90 (9th Cir. 2008) and *In re Daou Sys. Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005)). "The 'ultimate issue' . . . 'is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *First Solar*, 881 F.3d at 754 (citing *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)). However, "[a] plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value in order to establish loss causation." *In re Daou*, 411 F.3d at 1025. "'[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery[.]'" *Id.* (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n. 5 (11th Cir. 1997)).



PX130

Page 4193

Typically, at the summary judgment stage, "defendants must prove, as a matter of law, that the depreciation value of [the stock] resulted from factors other than the alleged false and misleading statements." *Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996); *see also In re REMEC*, 702 F. Supp. 2d at 1266 ("[P]laintiff can survive the motion if the defendant is unable 'to establish that, as a matter of undisputed fact, the depreciation in the value of the [stock] could not have resulted from the alleged false statement or omission of the defendant.'") (citation omitted). However, here Defendants move to exclude the expert testimony of Chad Coffman, Lead Plaintiffs' loss causation expert (ECF No. 230), and argue that because Coffman's expert report and testimony is Lead Plaintiffs' only evidence on loss causation, Defendants are entitled to summary judgment on all claims because Lead Plaintiffs cannot establish loss causation if the Court excludes Coffman's report and testimony. (Defs.' Mot. Summ. J. at 47-48.) Thus, the Court must evaluate Defendants' *Daubert* motion to determine if Lead Plaintiffs have adduced sufficient admissible evidence to create a genuine issue of material fact on loss causation. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("Because plaintiffs bear the ultimate burden of proof on causation, Merrell had only to point to the absence of a genuine issue of material fact; it wasn't required to produce any evidence at all."); *see also Nuveen*, 730 F.3d at 1123 (affirming district court's entry of summary judgment where the plaintiff failed to establish "a triable issue on loss causation"); *In re REMEC*, 702 F. Supp. 2d at 1275 ("Without [the expert's] report and testimony, Plaintiffs are left with only their allegations and cannot withstand Defendants' motion for summary judgment as to loss causation. Because loss causation is an element Plaintiffs must prove to succeed on either of their two causes of action, dismissal of both claims is appropriate.").

///

2. ***Daubert***

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" FED. R. EVID. 702(a). Expert testimony under Rule 702 must be both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The Supreme Court has provided a list of factors that courts may consider: (1) whether the theory or technique is generally accepted within a relevant scientific community, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory or technique can be tested. *Daubert*, 509 U.S. at 593-94.

The Ninth Circuit recently articulated the reliability standards to determine the admissibility of expert testimony. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014). As explained by the Ninth Circuit:

> The test of reliability is flexible. The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. But these factors are 'meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case.' The test 'is not the correctness of the expert's conclusions but the soundness of his methodology,' and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

*Id.* at 1044 (citations and quotation marks omitted).

**B. Analysis**

In their motion to exclude Coffman's expert testimony, Defendants argue that Coffman's opinions do not "fit" Lead Plaintiffs' claims, and that his methodologies for determining loss causation and damages are unreliable. The Court disagrees.



PX130

Page 4195

The Court agrees with Lead Plaintiffs that courts have consistently accepted the general methodologies Coffman applies here—including the "event study," statistical regression, and "out of pocket" damages models—as reliable methods to determine loss causation and damages. *See, e.g.*, *Baker v. Seaworld Ent'mt, Inc.*, 423 F. Supp. 3d 878, 901-09 (S.D. Cal. 2019) (denying the defendant's motion to exclude the testimony of Coffman in a securities fraud class action and rejecting many of the same arguments Defendants raise here, the Court held that "Coffman's testimony regarding the alleged corrective disclosure will be helpful to a jury and exclusion of his testimony on this basis is improper"; "Coffman's analysis of the market's reaction to the . . . statements is not subject to exclusion under *Daubert*"; and "Defendants' challenges to Coffman's [Constant Dollar Inflation] method do not support exclusion under *Daubert*"); *In re Novatel Wireless Sec. Litig.*, No. 08cv1689 AJB (RBB), 2013 WL 12144150, at *5 ("Event studies are crucial to demonstrate loss causation, and indeed some courts describe them as 'almost obligatory.'" (citing *In re Vivendi Universal, S.A. Sec. Lit.*, No. 02 Civ. 5571 (RJH)(HBP), 2009 WL 1066254, at *10 (S.D.N.Y. Apr. 21, 2009))).

Although the Court agrees with Defendants that Coffman's opinion does not fit squarely with Lead Plaintiffs' theories specific to pull-in sales and destocking standing alone, his opinion is consistent with Lead Plaintiffs' primary theory of liability that Defendants falsely assured investors that PCC was hitting benchmarks along the way to reaching the FY16 Target while omitting material information about PCC's organic growth, reliance on pull-in sales, and the impact of destocking.

In addition, Coffman's methodology of evaluating analyst reports to identify corrective disclosures is consistent with Ninth Circuit guidance. *See, e.g.*, *First Solar,* 881 F.3d at 754 ("A plaintiff may . . . prove loss causation by showing that the stock price fell upon the revelation of

an earnings miss, even if the market was unaware at the time that fraud had concealed the miss."); *Baker*, 423 F. Supp. 3d at 901-02 ("Contrary to Defendants' assertion that Coffman simply lists and summarizes these reports and articles, Coffman's opinion of how the market interpreted SeaWorld's statements from the August 13, 2014 press release will assist the trier of fact in determining loss causation."); *In re Novatel Wireless*, 2013 WL 12144150, at *7 ("As the financial results, press releases, conference calls from the Company's officers, and analyst reports clearly concern revenue and guidance shortfalls due to Novatel's inability to meet the demands of its customers and loss of market share; Plaintiffs have shown the requisite link between those disclosures and earlier alleged misrepresentations to survive a *Daubert* motion.").

To the extent that Coffman's method of identifying analyst skepticism could have been more sophisticated, or to the extent he failed to account for all potentially confounding information, those are issues that go to the weight of Coffman's opinions, not admissibility. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987))); *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013) ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").

Finally, although Defendants disagree with Coffman's application of constant dollar inflation ("CDI") here, that disagreement does not undermine the reliability of Coffman's analysis but rather takes issue with the amount of damages, which the jury will evaluate at trial. *See Baker*, 423 F. Supp. 3d at 908 (noting that "the jury is ultimately responsible for deciding whether CDI, or another calculation, is a reasonable measurement of damages" and therefore

holding that "Coffman's decision to use the CDI method in this case is sufficiently reliable for purposes of *Daubert*") (citation omitted); *In re Novatel Wireless*, 2013 WL 12144150, at *11 ("To the extent that Defendants suggest there is the possibility that Plaintiffs would recover losses that are non-fraud related [pursuant to the expert's out-of-pocket damages calculation], Defendants have not shown the risk undermines the reliability of the analysis as a whole. This argument tends to go towards the probative value of the testimony to be addressed at trial for the jury to consider.").

Coffman's methodologies and opinions are consistent with proof of loss causation and damages requirements set by the Supreme Court and the Ninth Circuit, and the Court finds that Coffman's testimony will be helpful to the jury. The Court therefore denies Defendants' motion to exclude Coffman's testimony. Accordingly, there remains a genuine dispute of material fact regarding whether Defendants' alleged misrepresentations were the proximate cause of the decline in PCC's stock price and, if so, the amount of damages the class members suffered. *See Nguyen*, 946 F. Supp. 2d at 1040 ("A[t] the summary judgment stage, a defendant would need to show that depreciation of a stock was the result of factors other than alleged false and misleading statements to prevail." (citing *Provenz*, 102 F.3d at 1492)). As a result, the Court denies Defendants' motion for summary judgment on the issues of loss causation and damages.

## VI. HAGEL'S LIABILITY

Both Lead Plaintiffs and Defendants move for summary judgment on Hagel's Rule 10b-5(b) and Section 20(a) liability. Lead Plaintiffs argue that "Hagel has admitted that she had ultimate authority or control over Defendants' statements concerning the FY16 Target[,]" and therefore Hagel was a "maker" of the statements on which Lead Plaintiffs move for partial summary judgment. (Pls.' Mot Summ. J. at 34.) Defendants respond that because "[e]ach of the FY16 Statements was an unscripted, oral statement by Donegan[,]" and Lead Plaintiffs have not

established that "Hagel somehow used Donegan as a mouthpiece to deliver her own messages to the market[,]" Hagel is not a "maker" under Rule 10b-5(b). (Defs.' Opp. at 32-33.)

Important to the Court's analysis of Hagel's liability, all of the eighteen statements that remain at issue (Statements 8-9, 11-12, 15, 18-19, 22-26, 28, 34, 36-37, 39, and 42), are Donegan's oral statements on quarterly earnings calls or at investor conferences.

**A. Maker Liability**

Lead Plaintiffs argue that Hagel had ultimate authority over Donegan's oral statements, pointing to Hagel's testimony that her job was to ensure that Donegan did not misstate "whether [Defendants] were on track to hit the fiscal '16 target or not," and that she "absolutely" had the authority to correct Donegan's statements. (Pls.' Mot. Summ. J. at 34.) At her deposition, Hagel described the process to prepare for the quarterly earnings calls:

> Each quarter, as part of our process to getting our slide deck prepared and our press release, we would revisit whether or not we still believed that we were on track to hit the target. And then we would put into the slide deck the things that were driving our performance which were a lot of the main reasons why we concluded we were still on track during the time period that we did. And then Mark would communicate that during the investor call, that we were on track.

(Pls.' Reply at 34.) According to Lead Plaintiffs, Donegan's statements were "far from being off-cuff-statements[,]" and were instead the "memorializ[ation] of a carefully crafted (and false) narrative that was collectively developed by Donegan, Khetani and Hagel." (Pls.' Reply at 34.)

The "maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Although Hagel helped prepare Donegan for earnings calls, the Supreme Court in *Janus* rejected the argument that a Rule 10b-5(b) "maker" is someone significantly involved in preparing a statement. *See Janus*, 564 U.S. at 148

("Although JCM, like a speechwriter, may have assisted Janus Investment Fund with crafting what Janus Investment Fund said in the prospectuses, JCM itself did not 'make' those statements[.]"). Even if Hagel assisted in developing the message that Donegan shared during earnings calls, the content of Donegan's statement was entirely within his control. *See Janus*, 564 U.S. at 143 ("Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said."); *see also M & M Hart Living Tr. v. Global Eagle Entm't, Inc.*, No. CV 17-1479 PA (MRWx), 2017 WL 5635424, at *12 (C.D. Cal. Aug. 20, 2017) ("[O]ral statements in earnings calls are not 'group-published,' and therefore can be attributed to the speaker only."); *In re CytRx Corp. Sec. Litig.*, No. CV 14-1956-GHK (PJWx), 2015 WL 5031232, at *6 (C.D. Cal. July 13, 2015) ("Courts since *Janus* have applied [*Janus*] to disallow Rule 10b-5(b) claims against defendants who merely requested, influenced, helped create, or supplied information for the relevant false or misleading statements."); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1092 (C.D. Cal. May 19, 2008) ("In seeking to attribute Mr. Tomkinson's oral statements regarding solid loan acquisition to the other individual Defendants, Plaintiffs ignore the well-established rule that even under the 'group published doctrine,' oral statements cannot be attributed to a group.").

Accordingly, the Court grants Defendants' motion for summary judgment, and denies Lead Plaintiffs' motion for partial summary judgment, on the issue of whether Hagel is a "maker" subject to liability under Section 10(b) or Rule 10b-5(b).

///

///

///

**B. Control Person Liability**

Lead Plaintiffs also argue that they are entitled to summary judgment as to Hagel's control person liability.[7] (Pls.' Mot. Summ. J. at 35.) Lead Plaintiffs argue that Hagel's interrogatory responses establish her "knowledge of and involvement in PCC's day-to-day operations[,]" and identify "regular reports generated by or distributed to . . . Hagel." (Pls.' Mot. Summ. J. at 35) (citing Russo Decl. Ex. 15 at 10-12, Ex. 71 at 8-9.)

Defendants also move for summary judgment on Lead Plaintiffs' Section 20(a) claim against Hagel, arguing that Hagel is not a control person under Section 20(a) because "statements attributable to a specific individual are presumed to be actions of that individual only." (Defs.' Mot. Summ. J. at 49.) Lead Plaintiffs counter that "control over the individual who uttered the statement (as opposed to PCC itself) is not required under Section 20(a)." (Pls.' Opp. at 48.) Lead Plaintiffs argue that "[a]ll that is required is proof of a primary violation and that defendant exercised actual power or control over the primary violator." (Pls.' Opp. at 49) (citation and quotation marks omitted).

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under . . . this chapter . . . shall also be liable . . . to the same extent as such controlled person." 15 U.S.C. § 78t(a). "In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or control over the primary violator[.]" *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990)).

---

[7] Defendants do not oppose Lead Plaintiffs' argument that Donegan is a "control person" relative to PCC.

Although the record supports a conclusion that Hagel, as CFO, exercised control over certain aspects of PCC's operations, here the only statements that remain at issue are Donegan's oral statements. *See Howard*, 228 F.3d at 1067 (affirming district court's grant of summary judgment on Section 20(a) claim where "Plaintiff [] points to [the defendant's] general level of control but provides no specific indication that [the defendant] supervised or had any responsibility for preparation of the [challenged] financial statements").

Although Hagel assisted Donegan in preparing for the earnings calls, the evidence does not support a conclusion that she had any meaningful control over what words came out of Donegan's mouth during those calls.[8] Accordingly, the Court denies Lead Plaintiffs' motion for partial summary judgment, and grants Defendants' motion for summary judgment, with respect to Hagel's Section 20(a) liability.

**VII. DEFENDANTS' STOCK SALES**

Defendants seek summary judgment on the issue of whether their stock sales during the Class Period support an inference of scienter. (Defs.' Mot. Summ. J. at 44-46.) Lead Plaintiffs argue that a reasonable jury could find that Defendants' stock sales support Lead Plaintiffs' theory of scienter here. (Pls.' Opp. at 41-42.)

"[T]hree factors that must be considered to determine whether stock sales raise a strong inference of [scienter]: '(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (citation omitted).

---

[8] The Court's conclusion would be different if the statements in PCC's press releases remained at issue. *See* Hagel Decl. ¶ 23 (explaining that Hagel conducted a final review of PCC's quarterly press releases); Hagel Dep. 322:12-323:4 (explaining that after various PCC employees collaborated on quarterly press releases, Hagel was the one to "sign[] off on it").

"[T]he court must compare pre-class period activity to activity during the class period in order to decide if, in fact, trading in the latter period is suspicious." *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1367 (C.D. Cal. 2014); *see also Zucco Partners*, 552 F.3d at 1005 (same).

Donegan sold 90,000 shares at the allegedly inflated price during the Class Period, out of a total of 750,000 he owned at the time (i.e., approximately 12%).[9] (Defs.' Mot. Summ. J. at 45.) Standing alone, the percentage of shares Donegan sold is not suspicious. *See Rodriguez*, 325 F. Supp. 3d at 1057 ("'The Ninth Circuit has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter.'" (quoting *Wozniak v. Align Techs., Inc.*, No. 09-3671 MMC, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011))); *cf. In re Galena Biopharma*, 117 F. Supp. 3d at 1167 (finding that the defendant's stock sales of 87% of his shares during the class period supported an inference of scienter). Furthermore, Defendants contend (and Lead Plaintiffs do not appear to refute) that Donegan "sold less stock during the 20 months of the Class Period than [he] did during the 20 months preceding it." (Defs.' Mot. at 45.)

In light of this evidence, Donegan's trading history does not support an inference of scienter, and will therefore be excluded at trial.[10] *See In re Apple Comput. Sec. Litig.*, 886 F.2d at 1117 ("[T]he pattern of stock trading by Apple's insiders is insufficient to raise an issue for the jury. The defendants collectively sold a slightly greater number of shares during an equal period of time just before the class period than they did during the class period."); *In re Apple Inc. Sec.*

---

[9] In light of the entry of summary judgment on Lead Plaintiffs' claims against Hagel, the Court does not address Hagel's stock sales.

[10] Nevertheless, there remains a genuine dispute of material fact regarding whether Donegan acted with scienter in connection with the eighteen allegedly materially false and misleading statements.

*Litig.*, 2020 WL 2857397, at *21-22 (finding that where defendants "sold more shares during the Control Period than during the Class Period" the evidence of stock sales did not evidence scienter); *cf. Provenz*, 102 F.3d at 1491 (finding that the trading history of the defendants supported an inference of scienter where defendants sold approximately six times more stock in the twelve month class period than they had during the preceding twelve months).

**CONCLUSION**

For the reasons set forth above, the Court DENIES Lead Plaintiffs' Motion for Partial Summary Judgment (ECF Nos. 224 and 225), GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment (ECF Nos. 233 and 234), GRANTS Defendants' Requests for Judicial Notice (ECF Nos. 242 and 290), and DENIES Defendants' Motion to Exclude Expert Testimony of Chad Coffman (ECF No. 230).

**IT IS SO ORDERED.**

DATED this 3rd day of July, 2020.



# PX 131

## (Filed Under Seal)

# PX 132

S&P Global
Market Intelligence

# QUALCOMM Incorporated
# NasdaqGS:QCOM
# FQ3 2015 Earnings Call Transcripts

## Wednesday, July 22, 2015 8:45 PM GMT

### S&P Global Market Intelligence Estimates

| | -FQ3 2015- | | | -FQ4 2015- | -FY 2015- | -FY 2016- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | 0.95 | 0.99 | ▲4.21 | 1.08 | 4.79 | 5.10 |
| **Revenue (mm)** | 5851.72 | 5832.00 | ▼(0.34 %) | 6129.70 | 25944.32 | 26667.34 |

Currency: USD
Consensus as of Jul-21-2015 4:14 AM GMT




- EPS NORMALIZED -

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| **FQ4 2014** | 1.31 | 1.26 | ▼1 (3.82 %) |
| **FQ1 2015** | 1.25 | 1.34 | ▲2 7.20 % |
| **FQ2 2015** | 1.33 | 1.40 | ▲3 5.26 % |
| **FQ3 2015** | 0.95 | 0.99 | ▲4 4.21 % |

COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence



PX132
Page 4226

Exhibit: 869
Witness: LEHN
Date: 2/15/24
CSR# 12019: Ashley Soevyn

Q121SEC00949025

# Table of Contents


Call Participants .................................................................................... 3

Presentation .................................................................................... 4

Question and Answer .................................................................................... 11


COPYRIGHT © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Call Participants

**EXECUTIVES**

**Derek K. Aberle**
*Former President*

**George S. Davis**
*Former CFO & Executive VP*

**Paul E. Jacobs**
*Former Executive Chairman*

**Steven M. Mollenkopf**
*CEO & Director*

**Warren Kneeshaw**
*Former Vice President of Investor Relations*

**ANALYSTS**

**Blayne Peter Curtis**
*Barclays Bank PLC, Research Division*

**Brett William Simpson**
*Arete Research Services LLP*

**David Michael Wong**
*Wells Fargo Securities, LLC, Research Division*

**Edward Francis Snyder**
*Charter Equity Research*

**James Eugene Faucette**
*Morgan Stanley, Research Division*

**Kulbinder S. Garcha**
*Crédit Suisse AG, Research Division*

**Mark Sue**
*RBC Capital Markets, LLC, Research Division*

**Roderick B. Hall**
*JP Morgan Chase & Co, Research Division*

**Srinivas Reddy Pajjuri**
*CLSA Limited, Research Division*

**Stacy Aaron Rasgon**
*Sanford C. Bernstein & Co., LLC., Research Division*

**Tal Liani**
*BofA Merrill Lynch, Research Division*

**Tavis Christian McCourt**
*Raymond James & Associates, Inc., Research Division*

**Thomas Michael Walkley**
*Canaccord Genuity Limited, Research Division*

**Timothy Michael Arcuri**
*Cowen and Company, LLC, Research Division*

**Timothy Patrick Long**
*BMO Capital Markets Equity Research*

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

the costs of our use of that supply chain over time. And we had cited as part of the reason why we would be off on margins at the start of this year that we are really coming out of a situation where we had a 20-nanometer, less than optimal COGS situation. That being said, volume matters, and we've seen some of the issues that came with lower-than-expected volume, so we're not quite seeing some of the benefits. As volume recovers, we would expect to see that. But the basic structural changes that we need to make in terms of working with a broad range, a very capable foundry partners, is part of our existing plan. So we're not really making a change to that. That being said, of course, it's critical that we get both margin expansion as well as improvement in the OpEx areas. And we'll be very focused on that, it's just -- and we'll -- as we make progress beyond what is in our base plan already, we'll keep you informed.

**Steven M. Mollenkopf**
*CEO & Director*

And Brett, this is Steve. With respect to the low tier, I think the entire industry is actually challenged in terms of making money at the low tier. We're probably in a better position than most because of the ability to leverage our IP road map across the tiers. We're making some changes in this realignment plan where we're doing work to try to get the cost per head more in alignment with some of our competitors, but we still think it's still an interesting opportunity for us to go after. And as George mentioned, we are assuming that this aggressive price environment continues with respect to our planning assumption on the realignment plan. So we're probably better than most in terms of where we're going and we think it's an important market to contribute in. It will also be a market that will move more toward 4G. Today, it is split between 3G single-mode. It will move to multi-mode 4G, which should advantage us worldwide. We just need to get ourselves better set up to address it.

**Operator**

Your next question comes from line of Edward Snyder with Charter Equity Research.

**Edward Francis Snyder**
*Charter Equity Research*

There was several mentions of a more focused look at expanding into markets that are already in products you have or very closely adjacent to products you are going to develop. It seems to make sense. Where does that put you on the RF side of the business? I know RF360 has been a big initiative for you for the last several years and you're still working on that. Does that change your view about moving into that vertical? And then, in terms of investment in QTL, I know that you put out a notice about more regulatory action from Europe. What's your thinking now on the settlement that you had in China spreading to other geographies? Although the laws are different, it seems like there's still a lot of interest from other regulatory agencies in maybe changing Qualcomm's licensing agreements. If you can comment on that, I'd appreciate it.

**Steven M. Mollenkopf**
*CEO & Director*

This is Steve. The opportunity to grow content in the device we think still exists, particularly in an environment where the LTE band proliferation continues to be very wide. We're actually quite pleased with the RF360. It's still early days. I think we have something like 350 OEM designs already on the parts and we think that, that will build over time as we start to add more capability. But the environment for growing content in the phone we still think is a good opportunity for us.

**Derek K. Aberle**
*Former President*

Ed, this is Derek. On the regulatory question. Actually, the European Union investigations that were, I think, announced this last week or so really is just a new phase of the proceeding and it's still relatively early in their process. But it's focused really not on the licensing program of the company. It's really focused on the chipset pricing and rebate-type agreements. So again, as we look at it, we've commented on this quite a bit over the last couple of calls. We do believe that the result in China is unique to China.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And although we could very well have other regulatory proceedings to deal with, we're very confident in our ability to defend against those.

**Operator**

Your next question comes from line of Srini Pajjuri with CLSA Securities.

**Srinivas Reddy Pajjuri**
*CLSA Limited, Research Division*

Just a question on the China comment. You said it's taking little longer than expected to improve the collections. I'm just curious, what actions, if any, can you take locally in China to improve collections going forward?

**Derek K. Aberle**
*Former President*

Yes, this is Derek. Actually, there are a couple of drivers here. As we said coming out of the resolution with NDRC, we were going to need to go through this process of offering new terms to our licensees. We're getting pretty far along in that process. We've made progress, but as we noted last time, this is going to take some time, and it's a bit hard to predict. We've given you our best view on the timing of when we'll be able to conclude agreements. But some of these things take a bit longer than others. And so that's going to probably have some impact. We now think that just pushing some units out of our fiscal year into next year that we thought we may be able to get earlier. But again, it's not a change in our view as to whether we'll be able to ultimately collect royalties on those units. This is more a question of timing. So really the process is to get these new agreements in place and get companies that were previously unlicensed for 3-mode devices signed up. And again, we're going through that process now and have companies that have signed agreements and are reporting royalties to us now on 3-mode, but we still have some work to do there. And then beyond that, it's a lot things we've talked about in the past in terms of ratcheting up the level of auditing and compliance activities in China. And ultimately, if necessary, which we always try to do everything we can to avoid this, but if we have to, enforcing the terms of our contracts that are in place there. So we're going through that process now and we'll be updating you as we continue to progress there.

**Operator**

This ends our allotted time for questions and answers. Mr. Mollenkopf, do you have anything further to add before adjourning the call?

**Steven M. Mollenkopf**
*CEO & Director*

I'd like to thank everyone for being on the call today. We are excited about our growth prospects and the major initiatives announced today will put us in an even better position to lead the next wave of growth for the company and our industry and enhance value for our stockholders. Implementation of the plan is underway, and I look forward to updating you on our progress on a regular basis.

**Operator**
Ladies and gentlemen, this concludes today's conference call. You may now disconnect.

Copyright © 2019 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.