# PX 196

## (Filed Under Seal)

# PX 197

## (Filed Under Seal)

# PX 198

## (Filed Under Seal)

# PX 199

## (Filed Under Seal)

# PX 200

## (Filed Under Seal)

# PX 201

## (Filed Under Seal)

# PX 202

## (Filed Under Seal)

# PX 203

## (Filed Under Seal)

# PX 204

## (Filed Under Seal)

# PX 205

## (Filed Under Seal)

# PX 206

## (Filed Under Seal)

# PX 207

## (Filed Under Seal)

# PX 208

## (Filed Under Seal)

# PX 209

## (Filed Under Seal)

# PX 210

## (Filed Under Seal)

# PX 211

## (Filed Under Seal)

# PX 212

## (Filed Under Seal)

# PX 213

## (Filed Under Seal)

# PX 214

## (Filed Under Seal)

# PX 215

## (Filed Under Seal)

# PX 216

## (Filed Under Seal)

# PX 217

## (Filed Under Seal)

# PX 218

## (Filed Under Seal)

# PX 219

## (Filed Under Seal)

# PX 220

## (Filed Under Seal)

# PX 221

## (Filed Under Seal)

# PX 222

## (Filed Under Seal)

# PX 223

## (Filed Under Seal)

# PX 224

## (Filed Under Seal)

# PX 225

## (Filed Under Seal)

# PX 226

## (Filed Under Seal)

# PX 227

## (Filed Under Seal)

# PX 228

## (Filed Under Seal)

# PX 229

## (Filed Under Seal)

# PX 230

## (Filed Under Seal)

# PX 231

## (Filed Under Seal)

# PX 232

## (Filed Under Seal)

# PX 233

## (Filed Under Seal)

# PX 234

## (Filed Under Seal)

# PX 235

## (Filed Under Seal)

# PX 236

## (Filed Under Seal)

# PX 237

## (Filed Under Seal)

# PX 238

## (Filed Under Seal)

# PX 239

## (Filed Under Seal)

# PX 240

## (Filed Under Seal)

# PX 241

## (Filed Under Seal)

# PX 242

## (Filed Under Seal)

# PX 243

## (Filed Under Seal)

# PX 244

## (Filed Under Seal)

# PX 245

## (Filed Under Seal)

# PX 246

## (Filed Under Seal)

# PX 247

## (Filed Under Seal)

# PX 248

## (Filed Under Seal)

# PX 249

## (Filed Under Seal)

# PX 250

## (Filed Under Seal)

# PX 251

## (Filed Under Seal)

# PX 252

## (Filed Under Seal)

# PX 253

## (Filed Under Seal)

# PX 254

## (Filed Under Seal)

# PX 254

## (Filed Under Seal)

# PX 256

## (Filed Under Seal)

# PX 257

## (Filed Under Seal)

# PX 258

## (Filed Under Seal)

# PX 259



ICLG

The International Comparative Legal Guide to:

# Product Liability 2019

**17th edition**

A practical cross-border insight into product liability work

EXHIBIT
897
2/20/24

**Published by Global Legal Group, with contributions from:**

Advokatfirmaet Ræder AS
Allen & Gledhill LLP
Arnold & Porter
AZB & Partners
Bae, Kim & Lee LLC
Bahas, Gramatidis & Partners
Blake, Cassels & Graydon LLP
Clayton Utz
Cornerstone Research
Drinker Biddle & Reath LLP
Eversheds Sutherland
Faus & Moliner Abogados
Hamdan AlShamsi Lawyers & Legal Consultants
Herbert Smith Freehills LLP
Iwata Godo Law Offices
Kellerhals Carrard
Lee and Li, Attorneys-at-Law
Legaltree
Matheson
Noerr LLP
Pinheiro Neto Advogados
Sidley Austin LLP
Squire Patton Boggs
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
Wolf Theiss

glg
global legal group

# An Assessment of Analytical Tools in Product Liability Matters – Perspectives from Economics, Marketing, and Consumer Behaviour

Cornerstone Research

Samid Hussain, Vildan Altuglu, Matteo Li Bergolis and Andrea Cardani

## 1. Introduction

The *Comcast* ruling in 2013 and U.S. case law since then raised the bar for plaintiffs to establish a causal link between their theories of liability and actual harm.[1] In particular, the ruling requires that plaintiffs show, on a common basis, that consumers suffered harm attributable to the conduct of the defendant, and that plaintiffs are capable of determining harm in a way that is consistent with the particular theory of liability offered.[2]

In product liability matters, plaintiffs typically claim that the defendant *misrepresented* the true characteristics and qualities of the products at issue (either through false claims on product labels/advertising communications, or through lack of proper disclosures/omissions). Plaintiffs then claim that, because of such misrepresentations, they did not receive the *benefit of their bargain* and overpaid for the products they purchased, and/or the purchased products *diminished in value* following disclosures of the alleged misrepresentations.[3] In these cases, plaintiffs need to show that individuals who purchased the at-issue products (1) saw the alleged misrepresentations (exposure), (2) relied on the alleged misrepresentations in making their purchase decisions (reliance), or in the case of allegedly omitted information, that the failure to disclose omitted information materially impacted their purchase decisions (materiality), and (3) as a result, buyers paid higher market prices or would have purchased a different product if they were provided with the relevant information at the time of product purchase (impact).

In the following sections, we describe and discuss strengths and weaknesses of empirical tools from the fields of marketing, consumer behaviour, and economics that are typically employed by plaintiffs and defendants in product liability litigation in addressing issues relating to *exposure, reliance, materiality,* and *impact*, including analytical tools usually employed to assess economic harm according to *overpayment* and *diminution in value* theories of harm.

## 2. Survey Methods

Survey methods have been heavily employed in product liability matters.[4] They are typically conducted by experts who specialise in the fields of marketing, consumer behaviour, and survey methodologies. Below we provide specific examples of the types of surveys that have been used in these matters.

### Surveys Relating to Consumer Behaviour and Purchase Decisions

Research in marketing and consumer behaviour sets out a framework to assess the effects of a disclosure or omission of an alleged misrepresentation on consumers' purchase decisions. Specifically, this research indicates that consumers can vary in their purchase processes and reasons.[5] For example, some consumers may perform significant research and consider multiple information sources prior to purchasing a given product, while others may not. Furthermore, while some consumers might rely on information from the manufacturer or from the sales representatives, others might rely on information from third parties (e.g., Edmunds.com, CNET, Consumer Reports ratings, etc.), friends and family, or their own past experiences with a given brand.[6] As a result, while some purchasers of the at-issue product may have been exposed to the manufacturer's communications containing the alleged misrepresentations, others may not.

Similarly, research in consumer behaviour indicates that consumers have different preferences for different features of the same product.[7] This variation (or heterogeneity) in consumer preferences implies that certain product features may be strongly valued by some consumers, but not by others (who may prefer other product features). For example, while buyers of a specific car model may value speed and horsepower above all other features, other buyers may consider fuel economy most important. As a result, disclosure of information about specific features of a product may affect each buyer differently, and for buyers who do not consider these features important, such disclosures may not change their purchase decisions.

Given this setting, in a product liability consumer class action, a marketing expert can review industry sources and product reviews (e.g., Edmunds.com, CNET, Consumer Reports), defendants' internal marketing studies, and existing customer surveys (conducted by defendants in their normal course of business) to empirically assess the information sources and purchase factors considered by putative class members.

When these sources are not available or are inadequate, the marketing expert can also design a survey using a representative sample of buyers of the product at issue. The purpose of the survey would be to (1) uncover the sources of information consumers relied on in their purchase decisions and relative importance of these alternative sources of information, and (2) uncover the factors that consumers considered in their purchase decisions and the relative importance of each of those factors. The results of these surveys can

be used to assess whether and to what extent manufacturer advertising influenced purchasers' decisions to buy the product at issue, the reasons individuals purchased this product, and whether and to what extent the purchasers cared about the misrepresented or allegedly defective feature.

## Surveys Relating to Contested Marketing Communications

Research in marketing and consumer behaviour further indicates that the interpretation of marketing communications may differ considerably across consumers.[8] As a result, consumers may take away different messages from the defendant's communications, such as advertisements and product labels. Using a representative set of the defendant's advertisements or other marketing communications, a marketing expert can design surveys to empirically assess consumers' perceptions of the main messages conveyed by the contested advertising.

A marketing expert can also design a survey to assess whether the allegedly false advertising messages were material to consumers' purchase decisions. This typically involves a survey design that includes a treatment group and a control group. Respondents in the control group are typically shown the original advertisement or label, while respondents in the test group are typically shown the same advertisement or label *without the challenged message* (or in cases where defendants allegedly omitted material information, a test group can be shown the same stimulus but *with* the message included that has allegedly been omitted in the contested advertisement or label). After reviewing the stimuli, the respondents in both groups are asked to indicate purchase intent (e.g., indicate their likelihood of purchasing the product based on a scale). If the survey design is robust, any difference in purchase intent measures across test and control groups would likely be due to test group respondents' exposure to the challenged messages. If purchase intent is not different across the two groups, the challenged messages or omitted information is unlikely to be material.

## Conjoint

Recently plaintiffs' marketing and economic experts in product liability matters have increasingly proposed conjoint analysis as a method to estimate damages based on theories of harm, such as the benefit of the bargain, overpayment damages, and/or damages from the diminution in the product's value following the disclosure of an alleged misrepresentation.[9]

The use of conjoint analysis has varied across cases. In certain cases, the plaintiffs' expert opinion was limited to a proposal for a conjoint analysis, which outlined the general contours of the conjoint survey instrument without a formal implementation.[10] In other cases, the plaintiffs' expert executed the survey, conducted the conjoint analysis, and presented empirical results.[11] In such instances, these experts attempted to measure the alleged "price premium" plaintiffs paid for the at-issue product because purchasers were not aware of the alleged defect or misrepresentation at the time of purchase.

### i. Definition of Conjoint

Conjoint analysis is a survey-based methodology used to analyse consumer preferences for products and product features.[12] The main premise of this methodology is that products are comprised of a multitude of features called "attributes". For example, cars have a myriad of attributes such as brand, body style, engine power, transmission type, fuel economy, and so on. The theoretical underpinning of conjoint analysis is that consumers' utility stemming from the purchase of a product is the sum of the utilities (or "part-worths") originating from each of the attributes that comprise such a product. The goal of conjoint analysis is to measure consumers' preferences for each product attribute.

A conjoint survey contains questions requiring respondents to choose among hypothetical product profiles which vary across the product attributes specified in the conjoint.[13] By examining respondents' choices, conjoint attempts to estimate respondents' stated preferences for each product attribute relative to other attributes, and the rate at which respondents are willing to trade off these attributes with each other and with price. This procedure, if done correctly, ultimately delivers estimates of respondents' willingness to pay (or WTP) for each product attribute, expressed in monetary values.[14]

### ii. Challenges in the Use of Conjoint in Product Liability Cases

In the following sections, we identify the main challenges relating to the use of conjoint analysis in product liability matters. First, we explain that while conjoint analysis, if done correctly, can provide average willingness to pay estimates, it is an inappropriate method to estimate an alleged "price premium". Then, we identify the typical flaws that may affect the implementation of conjoint analysis in estimating WTP.

*Conjoint Does Not Model the Supply Side of the Market and, at Best, Can Generate Willingness to Pay, Not Market Price Estimates*

As we explain above, conjoint analysis was developed to estimate consumers' stated preferences for products and their attributes. There are two fundamental issues that need to be addressed in applying conjoint analysis to estimate harm in product liability matters. First, conjoint analysis reveals stated preferences of the at-issue product and not actual preferences based on actual purchase transactions of the at-issue product. Second, if done correctly, conjoint analysis can at best estimate willingness to pay and not market price. The distinction between these two concepts is crucial – willingness to pay is determined by analysing consumers' demand for a product, while market price is determined based on the interaction between demand and supply in the marketplace.

The fact that conjoint can at best measure demand and willingness to pay, and not market prices, is well established in the literature:

- *"Choice-based conjoint (CBC) surveys ... have become widely used ... to predict the demand for consumer products."*[15]
- *"WTP measures only a shift in the demand curve and not what the change in equilibrium price will be as the feature is added or enhanced."*[16]
- *"In general, the WTP measure will overstate the change in equilibrium price."*[17]

Consequently, conjoint analysis is an inherently inappropriate methodology to determine the market price of a product without an alleged defect or alleged misrepresentation. In conclusion, the results from a conjoint analysis cannot and should not be used to determine economic damages according to the benefit of plaintiffs' bargain or overpayment damages in product liability class actions.

In recent years, courts have reached contrasting conclusions when considering the validity of the conjoint analysis put forward by the plaintiffs' experts and their assumptions regarding supply-side factors. Among others, a number of recent court rulings have recognised that conjoint analysis does not account for the supply-side of the market and, therefore, cannot be reliably used to calculate damages. For example, in *Saavedra v. Eli Lilly & Co.*, the court did not certify the putative class and concluded that:

- *"[The] model looks only to the demand side of the market equation. By looking only to consumer demand while*



PX259

Page 5453

*ignoring supply, Dr. Hay's [the plaintiffs' expert] method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants.*"[18]

In *Morales et al. v. Kraft Foods Group, Inc., et al.* the court de-certified the class and reached the following conclusion:

- "*It is uncontested here that the conjoint analysis conducted by Bodapati [the plaintiffs' expert] did not measure the market value of the Product either with the 'natural cheese' label or without it ... [T]he evidence provided by Plaintiffs about their potential willingness to pay a premium due to the use of the 'natural cheese' label is insufficient to establish a basis for calculating restitution.*"[19]

In other product liability class actions, however, courts accepted conjoint analysis. For example, in *In re MyFord Touch Consumer Litigation*, the court appears to have misunderstood accounting for supply-side factors with assuming a fixed quantity of supplied products.[20] As mentioned earlier, a conjoint cannot account for *any* supply-side factors such as costs of production or competitors' reactions, nor does it account for any of the actions that manufacturers could undertake in response to disclosure of an alleged defect instead of lowering prices, such as offering free repairs and recalls, or extending warranties.

*Aggregate WTP Estimates from Conjoint Can Mask Individual Responses of No Impact or Irrational Preferences*

Conjoint studies performed in product liability litigation can typically provide estimates for each respondent's preferences and willingness to pay for the product features in the survey.[21] However, in many circumstances, the plaintiffs' experts measure the loss by calculating an *average* or *median* willingness to pay measure across respondents. Even if an aggregate willingness to pay estimate may indicate that willingness to pay declines due to disclosure of an alleged defect, this may not be the case for many or most individual respondents. In particular, some consumers may not be affected by the challenged conduct because, for example, they do not attach any value to the allegedly defective feature of the product. An analysis of individual-level willingness to pay estimates can therefore demonstrate lack of common impact if, for many or most respondents, the estimated decline in willingness to pay due to the challenged conduct is zero.

Furthermore, an analysis of individual-level willingness to pay can reveal that some respondents exhibit an *increase*, rather than a decrease, in willingness to pay due to the challenged conduct, (for example, all else equal, these respondents would be willing to pay a higher price for a defective product compared to a non-defective one). Such irrational preferences would call into question the reliability of the data generated by the conjoint survey.

*Selection of the Relevant Population*

As explained by Dr. Shari Diamond in the *Reference Guide on Survey Research*, identifying the appropriate population is a key step for every survey.[22] In particular, it is important that the conjoint relies on a representative sample of the target population to whom conjoint results should be extrapolated. Disregarding this basic principle creates a fundamental disconnect between the plaintiffs' theory of liability and the findings presented by the expert.

*Realism, Confusion, and Bias in Conjoint*

For the conjoint analysis to provide reliable estimates of consumers' preferences, the conjoint survey instrument should be able to reasonably replicate the consumers' purchase decision-making process. In order to achieve this goal, certain fundamental conditions must be met. First, the product attributes included in the conjoint must contain important drivers of consumers' purchase decisions in the real world.[23] In other words, "the menus of products and their descriptions [should be] designed to realistically mimic a market experience".[24] Exclusion of salient product attributes and inclusion of attributes that consumers do not consider important in real markets creates a so-called "focusing bias", whereby the relative importance of the lesser valued attributes are increased. In such cases, the estimated valuations for these attributes are inflated.[25]

Second, the choice questions included in the survey instrument must be clear and unambiguous. Failure to meet this basic requirement undermines the validity and reliability of the data generated by the survey.[26] Third, no aspect of a survey instrument should be leading or suggestive in a way that would unduly influence respondents' responses.[27] If respondents' attention is drawn towards a particular attribute or attribute level (e.g., because the language used to describe an attribute makes it stand out from the others), the data generated by the conjoint survey may be biased.

## 3. Content Analysis

Plaintiffs and defendants can also perform a "content analysis" of advertising materials and other communications disseminated by the defendant in order to assess the pervasiveness and uniformity of the alleged misrepresentations in these communications. Content analysis is the systematic, objective, and quantitative analysis of the characteristics of various forms of communication (including advertising messages), and is a well-accepted methodology used by academics in various fields, including consumer research.[28]

This analysis is typically performed by two or more human coders, who are "blind" to the purpose of the project. Content analysis may also be performed by a computer-aided text analysis. In either case, the content of advertising materials and other communications are categorised according to a set of objective rules (or a coding scheme) developed by the expert prior to the coding exercise. Content analysis is suitable for expert testimony in litigation because it is replicable and has an error rate that can be measured.[29] The use of content analysis in litigation has expanded in recent years with frequent implementations in false advertising and product misrepresentation claims as well as in other areas such as defamation and securities fraud.[30] For example, the plaintiff in *Beef Products, Inc. et al. v. American Broadcasting Companies Inc. et al.*, a prominent defamation case, relied on an expert testimony, which included several content analyses that contributed to the plaintiff's causation evidence.[31]

## 4. Regression Methods

Regression methods can be used in product liability matters in measuring economic loss or damages. It is important to note that these approaches can estimate, at best, only an *average* effect, and do not address the question of whether a particular individual was harmed, especially in situations where there is wide dispersion in the prices paid for the at-issue products (as is the case in the automobile industry and other industries, such as consumer packaged goods and consumer electronics). Below we focus on two specific regression methods that are commonly used: "diff-in-diffs" regression models and synthetic control method; and hedonic regression models.

### "Diff-in-Diffs" Regression and Synthetic Control Method

In order to assess diminished value and benefit of bargain theories, economics experts may rely on statistical analyses of market data. For example, in cases where an alleged misrepresentation is revealed to the public, an expert may analyse whether the prices of at-issue products declined in response to such information revelation through a methodology called "diff-in-diffs" or difference in differences regression.[32] This methodology requires identifying a product (or a set of products) that is similar to the at-issue product but is not affected by the alleged misrepresentation, and whose price trajectory tracks that of the at-issue product before disclosure (i.e., a "control product").[33] In order to isolate the average change in price that is due to the alleged misrepresentation from normal changes in prices that are due to unrelated reasons (e.g., macroeconomic factors, industry specific factors), one may measure the average change in price after a disclosure for both the at-issue product and the "control product", and then measure the difference across these price changes (thus, difference in differences).

A critical assumption for the diff-in-diffs methodology to yield meaningful results is that at-issue products and "control" products are similar in all ways, except for the alleged misrepresentation. In other words, the diff-in-diffs methodology requires a set of benchmark or comparison products against which to compare the at-issue product, and the methodology assumes that, but for the disclosure, the price of the product at issue would have evolved the same way as the benchmark products.

In many circumstances, it may be hard or impossible to find suitable benchmark products or to fully account for all of the differences between the product at issue and the benchmark products. In these cases, experts can resort to another method closely related to diff-in-diffs, called the "synthetic control" method.[34] The main difference between the synthetic control method and the diff-in-diffs method is that the benchmark product is not just one product but a basket of products. In other words, this method attempts to find the mix of benchmark products that most closely approximates the product at issue (in terms of price and other characteristics) prior to the event or disclosure at issue.

Again, it's important to note that these approaches, if done correctly, only estimate an average effect and cannot answer the question of whether a particular individual was harmed by the challenged conduct.

### Hedonic Regression

Hedonic regression methodology is based on the premise that a product is made of a multitude of attributes or features, and each of these features contributes to customers' overall utility for a product. Hedonic regression uses econometrics techniques to determine the price premium or discount determined by the attributes or features of the product at issue.[35] Hedonic regression relies on actual sales data and product features and exploits the variation in products' market prices and actual features to estimate how the presence or absence of these features adds to or subtracts from the market price of a product.

In the context of product liability matters, there are several challenges in using hedonic regression methods to estimate benefit of the bargain or overpayment damages, and/or damages from the alleged diminution in the product's value. For example, one needs to carefully consider and decide which product features to include since many products have a large number of features. If one or more critical features are omitted, hedonic regression models have been found to generate estimates that are biased and unreliable.[36]

In addition, in many settings, it may not be possible to estimate a hedonic regression due to market data limitations. Specifically, in cases where the available market data does not offer sufficient variation to allow the model to isolate the value of product features, use of hedonic regression is not feasible. Further, similar to the diff-in-diffs regression methodology, hedonic regression can, at best, if implemented correctly, identify an *average* value associated with the specific product feature. Thus, use of hedonic regression models in the context of a consumer class action or cases where is there is significant heterogeneity in the circumstances of buyers and sellers is challenging, because such models cannot be used to calculate the amount each individual overpaid due to the challenged conduct. Lastly, in certain product liability matters, there is no specific product feature that can be used to isolate the alleged defect. In such cases, damages estimation based on a hedonic regression model cannot be tied with the theory of harm and would fail to meet the requirements set forth by the *Comcast* ruling. In conclusion, hedonic regression methodology is sensitive to modelling assumptions and specifications. Consequently, one needs to carefully consider the context these models are applied to, integrity of the market data, and the model specifications.

## Endnotes

1. *See*, for example, Order Denying Motion for Class Certification, *Davidson et al. v. Apple, Inc.*, United States District Court for the Northern District of California, No. 16-CV-04942-LHK, May 7, 2018, pp. 19–20; Order Denying Plaintiffs' Amended Motion for Class Certification, *In re NJOY, Inc. Consumer Class Action Litigation*, United States District Court for the Central District of California, No. CV 14-428-JFW, February 2, 2016, pp. 6–8.
2. At the class-certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case . . . [and] courts must conduct a rigorous analysis to determine whether that is so". *Comcast Corp. et al. v. Behrend et al.*, 133 S. Ct. 1426, 1433 (2013).
3. *See*, for example, Fourth Amended Class Action Complaint, *Davidson et al. v. Apple, Inc.*, United States District Court for the Northern District of California, No. 5:16-cv-4942-LHK, January 3, 2018, ¶ 165; Second Amended Class Action Complaint, *Elizabeth Callaway et al. v. Mercedes-Benz, LLC*, United States District Court for the Central District of California, No. 8:14-cv-02011 JVS, June 8, 2015, ¶¶ 17, 53–54; Amended Class Action Complaint, *Flynn et al. v. FCA US LLC et al.*, United States District Court for the Southern District of Illinois, No. 3:15-cv-855, December 22, 2015, ¶¶ 72–74; Second Amended Consolidated Class Action Complaint, *In Re Chrysler-Dodge-Jeep Ecodiesel® Marketing, Sales Practices and Products Liability Litigation*, United States District Court for the Northern District of California San Francisco Division, No. 3:17-md-02777-EMC, May 16, 2018, ¶¶ 255–257; Third Amended Class Action Complaint, *In re MyFord Touch Consumer Litigation*, United States District Court for the Northern District of California San Francisco Division, No. 13-cv-3072-EMC, October 13, 2015, ¶¶ 323, 359, 373; First Amended Class Action Complaint for Damages, *Oula Zakaria v. Gerber Products Co.*, United States District Court for the Northern District of California, No. 2:15-cv-0200-JAK, February 27, 2015, ¶ 91.
4. Diamond, S. S. (2011), "Reference Guide on Survey Research", in *Reference Manual on Scientific Evidence 3rd Edition*, Washington, DC: The National Academies Press, 359–424 at p. 366.



PX259

Page 5455

5. Peter, J. P., and J. C. Olson (2010), "Affect and Cognition and Marketing Strategy", in *Consumer Behavior and Marketing Strategy*, New York, NY: McGraw-Hill, 36–65.
6. Peter, J. P., and J. C. Olson (2010), "Affect and Cognition and Marketing Strategy", in *Consumer Behavior and Marketing Strategy*, New York: McGraw-Hill, 36–65.
7. Winer, R. S., and R. Dhar (2011), "Analyzing Consumer Behavior", in *Marketing Management*, Upper Saddle River, NJ: Pearson Education, Inc., 87–123.
8. *See*, for example, Mitchell, A. and J. Olson (1981), "Are Product Attribute Beliefs the Only Mediator of Advertising Effects on Brand Attitude?" *Journal of Marketing Research* 18, no. 3, 318–332; Mackenzie, S. (1986), "The Role of Attention in Mediating the Effect of Advertising on Attribute Importance", *Journal of Consumer Research* 13, no. 2, 174–195; Krishnamurthi, L. and S.P. Raj (1985), "The Effect of Advertising on Consumer Price Sensitivity", *Journal of Marketing Research* 22, no. 2, 119–129; Ford, G., D. Smith, and J. Swasy (1990), "Consumer Skepticism of Advertising Claims: Testing Hypotheses from Economics of Information", *Journal of Consumer Research* 16, no. 4, 433–441.
9. *See*, for example, conjoint analysis has been proposed or implemented in recent product liability class actions in the auto industry (*In re GM Ignition Switch MDL Litigation*, *In re FCA EcoDiesel Litigation*, *Callaway et al. v. Mercedes-Benz*, *In re MyFord Touch Consumer Litigation*, and *Flynn v. FCA US LLC*), in the food industry (*Oula Zakaria v. Gerber Products Co.* and *Morales v. Kraft Foods Group Inc.*), and in the consumer electronics industry (*Davidson v. Apple Inc.*).
10. *See*, for example, Order Granting in part and Denying in part Defendants' Motions for Summary Judgement and Plaintiffs' Motion to Certify Class, *Flynn v. FCA US LLC*, United States District Court for the Southern District of Illinois, No. 15-CV-0855-MJR-DGW, July 5, 2018.
11. For example, in the case *Morales v. Kraft Foods Group Inc.*, the plaintiff expert proposed a conjoint analysis during the class certification stage and implemented the conjoint analysis after class certification was granted. (In Chambers) Order Re Plaintiff's Motion for Class Certification (DKT. 47), *Claudia Morales, et al. v. Kraft Foods Group., Inc., et al.*, United States District Court for the Central District for California, No. LACV1404387JAKPJWX, June 23, 2015; (In Chambers) Order Re Defendant's Motion to Exclude Plaintiff's Survey and Expert Testimony of Dr. Anand V. Bodapati (Redacted DKT. 284, Unsealed DKT. 297); Defendants' Motion for Decertification (Redacted DKT. 285, Unsealed DKT. 294); Defendants' Motion for Partial Summary Judgement (Redacted DKT. 286, Unsealed DKT. 295), *Claudia Morales, et al. v. Kraft Foods Group., Inc., et al.*, United States District Court for the Central District of California, No.LACV1404387JAKPJWX, June 9, 2017. Ultimately, the Court decertified the class in this case.
12. Rao, V. R., *Applied Conjoint Analysis*, New York, NY: Springer.
13. This form of conjoint analysis is known as Choice-Based Conjoint (or CBC).
14. Ben-Akiva, M., D. McFadden, and K. Train (2018), Working Paper, "*Foundations of Stated Preference Elicitation – Consumer Behavior and Choice Based Conjoint Analysis*", 1–144 at pp. 92–93.
15. Ben-Akiva, M., D. McFadden, and K. Train (2018), Working Paper, "*Foundations of Stated Preference Elicitation – Consumer Behavior and Choice Based Conjoint Analysis*", 1–144 at p. 9.
16. Allenby, G., J. Brazell, J. Howell, and P. Rossi (2013), "Using Conjoint Analysis to Determine the Market Value of Product Features", *Proceedings of the Sawtooth Software Conference*, October 2013, p. 342.
17. Allenby, G., J. Brazell, J. Howell, and P. Rossi (2013), "Using Conjoint Analysis to Determine the Market Value of Product Features", *Proceedings of the Sawtooth Software Conference*, October 2013, p. 342.
18. Order Denying Plaintiffs' Motions for Class Certification Pursuant to federal Rules of Civil Procedure 23(b)(3) or 23(c)(4) [73,74], *Saavedra v. Eli Lilly & Co.*, United States District Court for the Central District of California, No. 2:12-CV-9366-SVW, Dec. 18, 2014, p. 5.
19. (In Chambers) Order Re Defendant's Motion to Exclude Plaintiff's Survey and Expert Testimony of Dr. Anand V. Bodapati (Redacted DKT. 284, Unsealed DKT. 297); Defendants' Motion for Decertification (Redacted DKT. 285, Unsealed DKT. 294); Defendants' Motion for Partial Summary Judgement (Redacted DKT. 286, Unsealed DKT. 295), *Claudia Morales, et al. v. Kraft Foods Group., Inc., et al.*, United States District Court for the Central District of California, No. LACV1404387JAKPJWX, June 9, 2017, pp. 28-29.
20. Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgement, *In re MyFord Touch Consumer Litigation*, United States District Court for the Northern District of California, Case No. 13-cv-03072-EMC, February 14, 2018.
21. For example, "Choice-Based Conjoint" is a popular type of conjoint that can estimate individual-level preferences and willingness to pay. Rao, V. R., *Applied Conjoint Analysis*, New York, NY: Springer, pp. 127–183.
22. "One of the first steps in designing a survey or in deciding whether an existing survey is relevant is to identify the target population (or universe). The target population consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent." Diamond, S. S. (2011), "Reference Guide on Survey Research", in *Reference Manual on Scientific Evidence 3rd Edition*, Washington, DC: The National Academies Press, 359–424 at p. 376.
23. "[S]election of attributes and levels is a very crucial step in the design of conjoint studies … The scientific aspects arise from an understanding of the consumer's choice process, more specifically salient attributes involved in the choice of an alternative by a majority of target consumers." Rao, V. R., *Applied Conjoint Analysis*, New York, NY: Springer, p. 43.
24. Ben-Akiva, M., D. McFadden, and K. Train (2018), Working Paper, "*Foundations of Stated Preference Elicitation – Consumer Behavior and Choice Based Conjoint Analysis*", 1–144 at p. 11.
25. *See*, for example, Schkade, D. A. and D. Kahneman (1998), "Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction", *Psychological Science*, 9, 340–346; Kahneman, D., *et al.* (2006), "Would You Be Happier If You Were Richer? A Focusing Illusion", *Science*, 312, 1908–1910.
26. Dr. Shari Diamond's *Reference Guide on Survey Research* states that: "When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question. If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey." Diamond, S. S. (2011), "Reference Guide on Survey Research", in *Reference Manual on Scientific Evidence 3rd Edition*, Washington, DC: The National Academies Press, 359–424 at p. 388.
27. "[T]he wording of a question … can be leading or non-leading, and the degree of suggestiveness of each question must be considered in evaluating the objectivity of a survey." Diamond, S. S. (2011), "Reference Guide on Survey



PX259

Page 5456

Research", in *Reference Manual on Scientific Evidence*, 359–424 at p. 393. "[I]n assessing the validity of a survey, the judge should take into account the following factors: whether the questions asked were … not leading." Federal Judicial Center (2004), *Manual for Complex Litigation, Fourth Edition*, S. Marcus *et al.* eds., Washington, DC: Federal Judicial Center, p. 103.

28. Neuendorf, K. (2016), *The Content Analysis Guidebook*, Second Edition, Los Angeles, CA: Sage Publications, pp. 1–3; Gross, B. L., and J. N. Sheth (1989), "Time-Oriented Advertising: A Content Analysis of United States Magazine Advertising, 1890-1988", *Journal of Marketing* 53, no. 4, 76–83.
29. Tichy, L.K. and A. Shakotko, "Litigators, Wrangle That Data With Content Analysis", *Law360*, (November 2017).
30. Tichy, L.K. and A. Shakotko, "Litigators, Wrangle That Data With Content Analysis", *Law360*, (November 2017).
31. Tichy, L.K. and A. Shakotko, "Litigators, Wrangle That Data With Content Analysis", *Law360*, (November 2017); *Beef Products Inc. v. American Broadcasting Companies Inc.*, No. 12-cv-292, South Dakota Circuit Court, First Circuit, Union County.
32. *See*, for example, Woolridge, J.M., *Introductory Econometrics: A Modern Approach*, Fourth Edition, Mason, OH; South-Western Cengage Learning, at pp. 450–454.
33. Abadie, A., A. Diamond and J. Hainmueller (2010), "Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program", *Journal of the American Statistical Association* 105, no. 490, 493–505 at p. 493. *See also*, Card, D. and A. B. Krueger (1994), "Minimum Wages and Employment: A Case Study of the Fast-Food Industry in New Jersey and Pennsylvania", *The American Economic Review* 84, no. 4, 772–793.
34. Abadie, A., A. Diamond and J. Hainmueller (2010), "Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program", *Journal of the American Statistical Association* 105, no. 490 493–505.
35. *See*, for example, de Haan, J. and E. Diewert (2013), "Hedonic Regression Methods", in OECD, *et al.*, *Handbook on Residential Property Price Indices*, Eurostat, Luxembourg.
36. Greene, W. H. (2012), *Econometric Analysis*, Seventh Edition, New Jersey: Pearson, pp. 96–97; de Haan, J. and E. Diewert (2013), "Hedonic Regression Methods", in OECD, *et al.*, *Handbook on Residential Property Price Indices*, Eurostat, Luxembourg, p. 51.

## Note

The views expressed in this chapter are solely those of the authors, who are responsible for the content, and do not necessarily represent the views of Cornerstone Research.



PX259

Page 5457



**Samid Hussain, Ph.D.**

Cornerstone Research
599 Lexington Avenue
40th Floor
New York, NY 10022-7642
USA

*Tel:* *+1 212 605 5320*
*Email:* *shussain@cornerstone.com*
*URL:* *www.cornerstone.com*

Samid Hussain heads the consumer fraud and product liability practice at Cornerstone Research. He specialises in analysing economic, marketing, and statistical (econometrics) issues in competition, consumer fraud, product liability, data privacy & breach, antitrust, life sciences & healthcare, breach of contract, and intellectual property matters. Dr. Hussain consults on economic and marketing issues related to class actions, including liability, class certification, and damages. He has also conducted and applied survey analyses in complex market settings. Dr. Hussain has experience in a variety of industries, including automobiles, high technology, oil and gas, airlines, telecommunications, food & beverage, genetically modified crops, and herbicides. He has published articles on class certification and damages issues and taught courses as a visiting lecturer at Stanford University and instructor at Cornell University.



**Vildan Altuglu, Ph.D.**

Cornerstone Research
599 Lexington Avenue
40th Floor
New York, NY 10022-7642
USA

*Tel:* *+1 212 605 5006*
*Email:* *valtuglu@cornerstone.com*
*URL:* *www.cornerstone.com*

Vildan Altuglu applies economic analysis and marketing research techniques to matters involving product liability, product misrepresentation, false advertising, antitrust, intellectual property, and general business litigation. She is a leader of the firm's consumer fraud and product liability practice. Dr. Altuglu has expertise addressing class certification and liability issues using economic, marketing, and consumer behaviour data. She has experience in cases involving data breaches and allegations of unauthorised access to personally identifying data. Dr. Altuglu's industry experience includes automobiles, consumer financial products, consumer packaged goods, technology products, and pharmaceuticals.



**Matteo Li Bergolis, Ph.D.**

Cornerstone Research
599 Lexington Avenue
40th Floor
New York, NY 10022-7642
USA

*Tel:* *+1 212 605 5462*
*Email:* *mlibergolis@cornerstone.com*
*URL:* *www.cornerstone.com*

Matteo Li Bergolis focuses on economic, marketing, and statistical matters related to product liability, data privacy, and antitrust litigation. Dr. Li Bergolis has expertise applying sophisticated econometric analyses and survey methods to assess class certification, liability, and damages issues. Dr. Li Bergolis has led teams supporting experts in several high-profile cases involving allegations of product defect, false advertising, data privacy violation, and price fixing.



**Andrea Cardani, M.B.A.**

Cornerstone Research
599 Lexington Avenue
40th Floor
New York, NY 10022-7642
USA

*Tel:* *+1 212 605 5398*
*Email:* *acardani@cornerstone.com*
*URL:* *www.cornerstone.com*

Andrea Cardani has over a decade of experience providing economic and financial analysis and expert support in all phases of commercial litigation. Mr. Cardani specializes in international arbitration cases involving valuation and damages and in class certification issues related to consumer fraud and product liability. Mr. Cardani's industry experience includes agriculture, automotive, computer software, consumer products, energy, financial markets and services, mining, oil and gas, pharmaceuticals, real estate, semiconductors, and transportation services. He was retained as a testifying expert in a high-stakes ICC arbitration related to an oil project in Central America.

CORNERSTONE RESEARCH

Cornerstone Research provides economic and financial consulting and expert testimony in all phases of complex litigation and regulatory proceedings. The firm works with an extensive network of prominent faculty and industry practitioners to identify the best-qualified expert for each assignment. Cornerstone Research has earned a reputation for consistent high quality and effectiveness by delivering rigorous, state-of-the-art analysis for 30 years. The firm has 700 staff and offices in Boston, Chicago, London, Los Angeles, New York, San Francisco, Silicon Valley, and Washington.

## Current titles in the ICLG series include:

- Alternative Investment Funds
- Anti-Money Laundering
- Aviation Law
- Business Crime
- Cartels & Leniency
- Class & Group Actions
- Competition Litigation
- Construction & Engineering Law
- Copyright
- Corporate Governance
- Corporate Immigration
- Corporate Investigations
- Corporate Recovery & Insolvency
- Corporate Tax
- Cybersecurity
- Data Protection
- Employment & Labour Law
- Enforcement of Foreign Judgments
- Environment & Climate Change Law
- Family Law
- Financial Services Disputes
- Fintech
- Franchise
- Gambling
- Insurance & Reinsurance
- International Arbitration
- Investor-State Arbitration
- Lending & Secured Finance
- Litigation & Dispute Resolution
- Merger Control
- Mergers & Acquisitions
- Mining Law
- Oil & Gas Regulation
- Outsourcing
- Patents
- Pharmaceutical Advertising
- Private Client
- Private Equity
- Product Liability
- Project Finance
- Public Investment Funds
- Public Procurement
- Real Estate
- Securitisation
- Shipping Law
- Telecoms, Media & Internet
- Trade Marks
- Vertical Agreements and Dominant Firms

glg global legal group

59 Tanner Street, London SE1 3PL, United Kingdom
Tel: +44 20 7367 0720 / Fax: +44 20 7407 5255
Email: info@glgroup.co.uk

www.iclg.com

# PX 260

## (Filed Under Seal)

# PX 261

## (Filed Under Seal)

# PX 262

## (Filed Under Seal)

# PX 263

## (Filed Under Seal)

# PX 264

## (Filed Under Seal)

# PX 265

## (Filed Under Seal)

# PX 266

## (Filed Under Seal)

# PX 267

# Qualcomm Announces Leadership Change and Promotions

04 Oct, 2011, 07:30 ET from Qualcomm Incorporated

SAN DIEGO, Oct. 4, 2011 /PRNewswire-FirstCall/ -- Qualcomm Incorporated (NASDAQ: QCOM) today announced that Steve Altman will become vice chairman, Steve Mollenkopf has been promoted to president & chief operating officer and Derek Aberle has been promoted to executive vice president & group president.

"I would like to congratulate all three gentlemen on their new positions and thank them for their many years of service to the Company. Their leadership has been instrumental in Qualcomm's success and I look forward to working with them in their expanded roles," said Dr. Paul E. Jacobs, chairman & CEO of Qualcomm.

The changes will be effective November 12, 2011. In his new role, Altman will continue as a member of Qualcomm's executive committee and provide direction and guidance on key initiatives across all areas of the business, as well as on overall vision and strategy. In his expanded role, Mollenkopf will oversee Qualcomm's divisions, business operations, and market expansion and development areas. He also will continue in his role as president of Qualcomm CDMA Technologies (QCT). Both Altman and Mollenkopf will continue to report to Dr. Jacobs. In addition to continuing to serve as president of the Qualcomm Technology Licensing (QTL) division, Aberle will oversee Qualcomm's core services businesses, as well as the standards and global marketing activities. He will report directly to Mollenkopf.

**Executive Bios**

Over the past six years serving as Qualcomm president, and through his 22 years with the company, Steve Altman's leadership and contributions have helped enable the Company's successful growth, evolution and expansion. He has served as president of QTL and has been a member of the executive committee since 1992. Altman joined Qualcomm in 1989 and is the chief architect of the Company's licensing business model. He graduated from Northern Arizona University in 1983 with a bachelor's degree in criminal justice and received his Juris Doctor from the University of San Diego School of Law in 1986.

Steve Mollenkopf's outstanding technical and operational leadership, depth of business strategy and experience, strong focus on execution and exceptional customer focus make him ideally suited for the role of Qualcomm president & COO. He began his career at Qualcomm in 1994 as an engineer and joined the QCT team in 1999. Serving in various capacities within QCT, Mollenkopf's technical and business leadership have been critical to the development and implementation of multiple industry-leading innovations. Mollenkopf holds two electrical engineering degrees, including a BSEE from Virginia Tech and an MSEE from the University of Michigan at Ann Arbor.

Derek Aberle has provided exceptional leadership and oversight for all activities associated with Qualcomm's technology and IP licensing business, and, as a member of the executive committee, has helped to formulate and drive business strategies across the company. After representing Qualcomm as outside counsel for several years, Aberle joined Qualcomm in 2000. Prior to becoming president of QTL, he held several roles within QTL, including SVP & general manager. He has been instrumental to the success and growth of QTL, playing a leading role in structuring, negotiating and finalizing key license agreements with the Company's leading licensees. Aberle holds a bachelor's degree in business economics from the University of California, Santa Barbara. He also holds a Juris Doctor from the University of San Diego School of Law.

**About Qualcomm**

Qualcomm Incorporated (NASDAQ: QCOM) is the world leader in 3G and next-generation mobile technologies. For more than 25 years, Qualcomm ideas and inventions have driven the evolution of wireless communications, linking people more closely to information, entertainment and each other. Today, Qualcomm technologies are powering the convergence of mobile communications and consumer electronics, making wireless devices and services more personal, affordable and accessible to people everywhere. For more information, visit Qualcomm around the Web:

**www.qualcomm.com** *Corporate Blog: www.qualcomm.com/blog Twitter: www.twitter.com/qualcomm Facebook: www.facebook.com/qualcomm*

Qualcomm is a registered trademark of Qualcomm Incorporated. All other trademarks are the property of their respective owners.

Qualcomm Contacts: Tina Asmar, Corporate Communications Phone: 1-858-845-5959 Email: corpcomm@qualcomm.com

# PX 268

## (Filed Under Seal)

# PX 269

## (Filed Under Seal)

# PX 270

## (Filed Under Seal)

# PX 271

EXHIBIT
898
2/20/24

LAW360

Portfolio Media. Inc. | 111 West 19th Street, 5th Floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Litigators, Wrangle That Data With Content Analysis

By **Lisa K. Tichy and Anna Shakotko**
November 2, 2017, 12:24 PM EDT



Lisa Tichy



Anna Shakotko

In recent years, the quantity of rich data generated by the internet and social media has exploded, leaving courts with an unprecedented volume of potential evidence to consider. A research field that is well-established in academia can help make sense of this wealth of information: the field of "content analysis."

Content analysis is a set of scientific methods that can be introduced as evidence by a qualified expert witness. These methods can be used to systematically and reliably address even apparently nebulous topics such as the tone of consumer comments or the messages communicated by an online video.

**What Is Content Analysis and How Is It Performed?**

Content analysis is defined as the "systematic, objective, quantitative analysis of message characteristics."[1] A "message" can be as varied as a Twitter post, a news article or a television advertisement, while "message characteristics" can similarly encompass a wide range of features of varying complexity.

In analyzing a set of newspaper articles, for example, one can consider more basic characteristics, such as the length of the article or the number of times a certain word is mentioned, or more complex characteristics, such as the tone of the article, its main theme or the nature of any images that accompany it.[2]

In practice, content analysis can be performed by human coders, who evaluate each piece of content independently and according to well-specified rules, or by computer-aided text analysis (CATA). While CATA is efficient and gives the researcher complete control of the coding algorithm, even sophisticated computer software is still not as skilled as humans at executing certain tasks.

Text interpretation occasionally requires human judgment. A Twitter post as simple as the exclamation "Yum!" could, for example, express enthusiasm or be a sarcastic expression of disgust, depending on the context. Computers are also limited in their ability to process and interpret images or video. Some limitations of computers can be overcome by machine learning strategies that "train" computers using samples of the relevant content. But for now, human coding still tends to be the preferred method for complex content analyses that center on themes or tone, or that involve images or video footage.

**Content Analysis in Expert Testimony**

Content analysis is suitable for expert testimony because it is a well-established research discipline that follows the scientific method, is replicable and (at least in some applications) has an error rate that can be measured. It has a decades-long history as a research field and has been widely used in disciplines including marketing, economics, psychology, finance, business and law.

As of this writing, a Google Scholar search for the term "content analysis" yields about 1.9 million hits. Content analysis has been used to analyze the impact of nutrition or food safety information on consumer behavior and product demand,[3] the impact of consumer reviews on product prices[4] and the impact of the sentiment of financial news on asset prices,[5] to mention just a few examples.

As required by the scientific method, content analysis relies on a set of rules, which the researcher specifies before any content is coded. It is not an ad hoc process, in which the rules of the game are defined as the coding proceeds. Instead, the researcher relies on an "a priori" design, which guides the selection of the content and its analysis.

In the case of human coding, this a priori design includes a detailed codebook of instructions for the coders as well as a training regimen to ensure that the coders are able to follow these instructions. In the case of CATA, much of the design centers on the choice or development of the coding algorithm.

Content analysis is objective in the sense that the researcher typically does not perform any of the actual coding of content.[6] In the case of human coding, it is considered best practice for the coders to be "blind" to the purpose of the project. Further, because a content analysis has an a priori design, and because codebooks and training materials, or computer algorithms, are disclosed, it is possible for an opposing party to replicate a given content analysis, or to perform sensitivity analyses by changing certain instructions or assumptions.

Importantly, it is possible to assess the reliability or error rate of a coding project. In the case of human coding, each piece of content should be coded independently by two different coders. The researcher can then compare the coders' respective decisions to ensure that the coding instructions were clear and did not allow for substantial discretion, which would cause the coders to deviate from each other.

Often, the researcher will report certain inter-coder reliability metrics, which are standard in the field. In a CATA project, a researcher or opposing party can review and evaluate the computer algorithm itself for accuracy. It can also be helpful to have human coders code a sample of the same content to determine whether the computer algorithm worked reliably, particularly on more complicated projects where theme or tone evaluations are at issue.

**Examples of Content Analysis in Litigation**

A search of case law on Google Scholar reveals that expert witnesses have provided testimony that includes content analyses in a few different contexts. Change of venue argument is one notable area where content analysis has provided insight into whether and how media coverage of a case in a local area differs from coverage in an alternative trial location.[7]

With respect to liability issues, content analysis has been used the context of false advertising and product cases.[8] Content analysis has also been accepted as evidence in trademark infringement cases,

where consumer confusion can be ascertained from customer call recordings, consumer commentary on websites or postings on social media.[9] In light of the proliferation of such digital content and social media in recent years, the use of content analysis in expert testimony is on the rise.

The value of content analysis is perhaps most readily apparent in the context of false advertising and product misrepresentation cases, where it has been used with some regularity. In these cases, content analysis can be used to systematically review relevant television, print or online advertisements and track any themes or claims. For example, in an automobile product misrepresentation case involving claims related to safety, independent coders can analyze relevant commercials to determine whether safety is indeed a feature highlighted by the manufacturer.

In a more novel application, content analysis can provide direct market-based evidence on consumer opinion. It is, for example, possible to analyze media articles or online consumer reviews about a product and assess whether consumers find at-issue product features to be relevant or important.

While consumer reviews or media articles do not provide a representative sample of consumer opinion, they do offer direct evidence from a real-world setting. This market-based evidence can then be used to confirm the results of a consumer survey whose data were collected in a more controlled setting.

In the context of securities fraud cases, content analysis has attracted some attention, as reflected in the Daubert decision in Bricklayers et al. v. Credit Suisse. In that case, the court excluded an expert and suggested that the expert's analysis could have been improved with content analysis.[10]

In a more basic content analysis in a securities case, counts of relevant keywords in news headlines or news articles can serve as proxies for the relative importance of new disclosures to the market and inform materiality analyses — assuming that more important issues are discussed more frequently in the media, which may not always be the case. For example, an expert can compare counts of different sets of keywords to parse the relative materiality of different pieces of news released on the same day.[11] Content analysis can also help determine when a particular piece of information first became available in the public domain, or where the news originated.

In a more complex scenario, content analysis in a securities case could code news, analyst reports or even relevant social media content in detail to understand what information about a company was in the public domain at a certain date. If a disclosure about a clinical trial of a pharmaceutical was at issue, a content analysis could, for example, identify any media discussions of the trial's success probability and understand the market's predictions.

Content analysis featured prominently in BPI v. ABC News, one of the largest defamation cases in U.S. history, which went to trial in South Dakota in the summer of 2017.[12] BPI's content analysis expert, Professor Kimberly Neuendorf of Cleveland State University, testified at trial about a number of different content analyses that contributed to BPI's causation evidence. Her analyses showed that ABC News's coverage of BPI's beef product, lean finely textured beef or LFTB, was unprecedented both compared to other prior media coverage of the product and ABC's own coverage of food-related events.

Professor Neuendorf also performed an attribution analysis of Twitter posts on the term ABC News used in its reports to refer to BPI's product: "pink slime." Human coders reviewed various characteristics of the Twitter posts, such as the text, any hyperlinks and the presence or absence of certain themes, to determine whether a given Twitter post was responding to ABC News coverage. This attribution analysis showed that ABC News drove the conversation about the term "pink slime" in the wake of its

broadcasts, and did not merely report on an already trending topic.

**Conclusion**

While content analysis is a nascent tool in litigation, its use by expert witnesses has the potential to transform the type and scale of evidence that can be considered by courts.

Content analysis techniques can allow the court to rely on real-world data to determine the materiality of key case issues to consumers or investors. As data become richer and more abundant, and computer analysis becomes more sophisticated, content analysis promises to become a key technique to help courts navigate the copious available evidence.

---

*Lisa K. Tichy is a principal and Anna Shakotko is a senior manager with Cornerstone Research in New York.*

***Disclosure: Cornerstone Research was retained by counsel for BPI in the BPI v. ABC News matter.***

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firm, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] K. Neuendorf, The Content Analysis Guidebook, 2nd Edition (Thousand Oaks, CA: Sage Publications, 2017), p. 1.

[2] Note that more straightforward content analyses based on word counts are sometimes described as "quantitative," while more complex analyses of tone or themes are described as "qualitative." This distinction is incorrect. All content analyses, simple or complex, described in this article are quantitative in that they summarize content in the form of counts, amounts, ratings or rankings. Researchers in content analysis use the term "qualitative content analysis," primarily for more subjective analyses carried out by the researcher himself or herself — for example, in studying the rhetorical or narrative structure of a text.

[3] D. Fan and C. Shaffer, "Effects of the Mass Media Newson Trends in the Consumption of Caffeine-Free Colas," Advances in Consumer Research 17 (1990): 406–414; N. Piggott and T. Marsh, "Does Food Safety Information Impact U.S. Meat Demand?," American Journal of Agricultural Economics 86, no. 1 (2004): 154.

[4] N. Archak, A. Ghose and P. Ipeirotis, "Deriving the Pricing Power of Product Features by Mining Consumer Reviews," Management Science 57, no. 8 (2011): 1485–1509.

[5] D. Garcia, "Sentiment During Recessions," Journal of Finance 68, no. 3 (2013): 1267–1300.

[6] The researcher does, of course, shape the content analysis by creating the research design. One can imagine instances in which the results of the project could change based on the precise content selected for analysis, and the instructions conveyed in a codebook. However, as in any scientific research project, these choices are disclosed and can be examined and critiqued by an opposing party.

[7] See for example, Denial of motions to dismiss in U.S. v. Lindh, No. Crim. 02-37-A, U.S. District Court,

Eastern District of Virginia, Alexandria Division, 2002.

[8] Order to partially admit the opinion of Dr. Yoram Wind in LG Electronics USA, Inc. v. Whirlpool Corp., No. 08 C 242, U.S. District Court, Northern District of Illinois, Eastern Division, 2010.

[9] Order granting E. Mishan & Sons summary judgment in Hearthware Inc. v. E. Mishan & Sons Inc., Civil Action No. 11 C 5233, U.S. District Court, Northern District of Illinois, Eastern Division, 2012.

[10] Decision on the admissibility of the opinion of Dr. Scott D. Hakala in Bricklayers and Trowel Trades v. Credit Suisse LLC, No. 12-1750, U.S. Court of Appeals, First Circuit, 2014.

[11] G. Breton and R. J. Taffler (2001), "Accounting Information and Analyst Stock Recommendation Decisions: A Content Analysis Approach," Accounting and Business Research, Vol. 31, No. 2, pp. 91–101, at p. 95; F. C. Dunbar and A. Sen, (2009), "Counterfactual Keys to Causation and Damages in Shareholder Class-Action Lawsuits," Wisc. Law Review, Vol. 2009, No. 2, pp. 199–242 at 242.

[12] Beef Products Inc. v. American Broadcasting Companies Inc., No. 12-cv-292, South Dakota Circuit Court, First Circuit, Union County.

---

All Content © 2003-2017, Portfolio Media, Inc.

# PX 272

## (Filed Under Seal)

# PX 273

## (Filed Under Seal)

# PX 274

## (Filed Under Seal)

# PX 275

## (Filed Under Seal)

# PX 276




Routledge
Taylor & Francis Group

Accounting and Business Research

ISSN: 0001-4788 (Print) 2159-4260 (Online) Journal homepage: https://www.tandfonline.com/loi/rabr20

# Fad or future? Automated analysis of financial text and its implications for corporate reporting

Craig Lewis & Steven Young

**To cite this article:** Craig Lewis & Steven Young (2019) Fad or future? Automated analysis of financial text and its implications for corporate reporting, Accounting and Business Research, 49:5, 587-615, DOI: 10.1080/00014788.2019.1611730

**To link to this article:** https://doi.org/10.1080/00014788.2019.1611730

© 2019 The Author(s). Published by Informa UK Limited, trading as Taylor & Francis Group

Published online: 01 Jun 2019.

Submit your article to this journal

Article views: 17969

View related articles

View Crossmark data

Citing articles: 34 View citing articles

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=rabr20

*Accounting and Business Research*, 2019
Vol. 49, No. 5, 587–615, https://doi.org/10.1080/00014788.2019.1611730

Routledge
Taylor & Francis Group

Check for updates

# Fad or future? Automated analysis of financial text and its implications for corporate reporting

CRAIG LEWIS[a*] and STEVEN YOUNG[b]

[a]*Owen Graduate School of Management, Vanderbilt University, Avenue South, Nashville, TN 37203, USA;* [b]*Lancaster University Management School, Lancaster University, Lancaster, UK*

This paper describes the current state of natural language processing (NLP) as it applies to corporate reporting. We document dramatic increases in the quantity of verbal content that is an integral part of company reporting packages, as well as the evolution of text analytic approaches being employed to analyse this content. We provide intuitive descriptions of the leading analytic approaches applied in the academic accounting and finance literatures. This discussion includes key word searches and counts, attribute dictionaries, naïve Bayesian classification, cosine similarity, and latent Dirichlet allocation. We also discuss how increasing interest in NLP processing of the corporate reporting package could and should influence financial reporting regulation and note that textual analysis is currently more of an afterthought, if it is even considered. Opportunities for improving the usefulness of NLP processing are discussed, as well as possible impediments.

**Keywords:** textual analysis; natural language processing; automated analysis; corporate reporting

## 1. Introduction

Financial accountants and economists have traditionally relied on quantitative metrics derived from financial statements as a basis for decision making. There is nevertheless increasing recognition that financial statement metrics provide limited insights, either because they do not allow one to infer nuances that may be contained in verbal discussions of financial performance, or because key aspects of organizational performance and value are not reflected in financial statement results in a timely manner. The qualitative (language) content that accompanies periodic financial statements therefore forms an integral component of the information set that financial market participants use for valuation, monitoring, and stewardship.

Consider, for example, the annual report. Are investors content to simply review the financial statements (balance sheet, income statement, statement of shareholders' equity, and statement of

*Corresponding author. Email: craig.lewis@vanderbilt.edu

© 2019 The Author(s). Published by Informa UK Limited, trading as Taylor & Francis Group
This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

cash flows) and the accompanying footnote disclosures? This seems unlikely. Rather, given that the vast majority of the content is textual, it seems more plausible that users also review accompanying qualitative disclosures so that, at a minimum, they can better understand management's interpretation of results. While users may in fact process qualitative (unstructured) data in this manner on an individual firm basis, there is increasing interest in converting qualitative content into structured data so that users can employ analytic techniques designed to systematically process large amounts of text. The desire to systematically evaluate unstructured content, coupled with advances in computing power and increasingly sophisticated natural language processing (NLP) methods, has led to an explosion in the number of academic studies and financial market applications that exploit financial text resources.

Elliot (1998) forecasted that the importance of unstructured data for financial decision making would far outweigh its structured counterpart by the end of the twentieth century. Consistent with this forecast, the last two decades have witnessed rapid expansion in the volume of unstructured data available to financial market participants. Examples include: narrative elements of firms' periodic reporting package; corporate press releases; webpage content; analyst reports; social media posts by a variety of corporate stakeholders including corporate insiders, investors, customers, suppliers, pressure groups and politicians; media commentary; and speeches by policymakers, regulators and politicians. This expansion in the volume of unstructured data creates opportunities and challenges for financial market participants and academic researchers alike. Our goal in this paper is to assess how the scope for automated processing of qualitative data is impacting current research and practice in financial reporting and shaping future agendas. Although we offer our views on methodologies that seem the most promising, our aim is to encourage debate within the finance and accounting communities, rather than promote a particular vision of how best to proceed.

We begin by illustrating how international corporate reporting developments involve the provision of increasing amounts of unstructured data. Examples include reporting on strategy and business models (European Commission 2017), key performance indicators and alternative performance measures [European Securities Market Association (ESMA) 2015], value creation and capitals [International Integrated Reporting Council (IIRC) 2013], supply chains in high-risk areas [Organisation for Economic Cooperation and Development (OECD) 2017], emissions and environmental impact [Global Reporting Initiative (GRI) standards], employees, society, and human rights (United Nations 2017), and bribery and corruption (OECD 2017). Reflecting this general reporting trend, we document significant growth in the size and complexity of U.K. annual report narratives. For example, the median annual report increased from 14,954 to 33,193 words (122%) over the 14-year period from 2003 to 2016 for a sample of 19,426 PDF annual reports published by 3252 firms listed on the London Stock Exchange. The rate of growth is similar to that reported by Dyer et al. (2017) for 10-K filings by U.S. registrants. Increases are evident for both the financial statements component of U.K. reports (particularly following the mandatory adoption of International Financial Reporting Standards) and the narratives component, where the number of items reported in the median table of contents increased by 50% over this period.

We highlight two generic benefits of applying NLP methods to analyze outputs from the corporate reporting process. The first generic benefit is the ability to process large volumes of content at relatively low cost, thereby helping to mitigate concerns about information overload as the quantum of disclosures increase to reflect preparers' wider social responsibilities. The second generic benefit is the ability of NLP methods to detect latent features in the data that even the closest manual analysis may struggle to identify. We discuss these two properties of NLP in the context of academic research and financial reporting regulation in Sections 4 and 5, respectively. Critically, however, we stress how the increasing adoption of NLP methods does not render



Confidential

manual analysis redundant. Rather, we argue that effective analysis of unstructured corporate disclosures requires a combination of manual and automated approaches.

The growth in unstructured data presents a challenge and an opportunity for capital markets research in financial reporting where the spotlight has traditionally focused on financial statement data and other quantitative outputs, despite the veracity of Elliot's (1998) prediction. Only recently have top-tier journals in accounting and finance started to embrace research agendas that systematically examine the properties of financial text and their capital market implications.[1] Extant papers have relied on relatively unsophisticated methods such as word counts, with journals and authors appearing unaware of developments in the NLP literature. This may stem from the view that textual analysis is an impenetrable 'black box.' We disagree with this perspective and note that sophisticated text analytic approaches utilize established methods such as maximum likelihood estimation. In our view, the primary barriers to wider adoption reflect concerns over familiarity, accessibility, and replication. Increased familiarity can only be achieved by demonstrating the ability of these approaches to provide new insights, their ability to address problems in novel ways, and the possibility of studying issues that cannot be addressed using standard quantitative datasets. Given easy access to open source access applications on platforms like Python and R, as well as commercial platforms like SAS, MATLAB and the WRDS SEC Analytics platform, researcher access is not a significant constraint. The most significant obstacle to wider adoption is replicability. The only way to systematically address this concern is for researchers to report the procedures used to develop a corpus with sufficient granularity. This includes, for example, explaining how graphic files are stripped, how stop words are eliminated, how numbers are treated, and how (and why) stemming is applied.[2]

More recent work has started to employ mainstream NLP techniques including cosine similarity to measure document similarity, supervised machine learning to identify document content, and unsupervised learning methods to identify topic structure in individual documents and across a wider corpus. Collectively, these approaches have helped shed light on important associations between unstructured data and corporate actions. The words selected by managers and the language used by media to report on firms have been shown to correlate with future stock returns, earnings, and even future fraudulent activities of management. Clearly, financial market participants incorporate more than just quantitative data in their decision models, but as the accounting and finance literature seeks to harness the full potential of the NLP toolkit, researchers must proceed with caution to ensure methods are applied transparently to study economically important questions.

The proliferation of unstructured information represents a major challenge for financial market participants, many of whom are concerned about overlooking relevant information (Financial Reporting Council Lab 2015). Such is the volume of available data and the frequency with which it is updated that comprehensive manual scrutiny of all potentially relevant content by human experts is already bordering on the impossible. Not surprisingly, therefore, practitioners and information users are looking increasingly towards technological solutions to assist with the task of analyzing unstructured data and harnessing the opportunities that big data applications provide. We explore how changes in the way users access and process information impacts various aspects of corporate reporting and communication including the nature of the disclosure problem as defined by the International Accounting Standards Board (IASB) in its Disclosure Initiative (IASB 2017), the definition of materiality, and the implications for standards governing the form and structure of corporate disclosures. We highlight the paradox that while the increasing volume of unstructured data intensifies the demand for technical processing solutions, it also reduces viability because ever-more sophisticated techniques are required to combat the lack of standardization in reporting formats.

A key policy-relevant theme to emerge from our analysis is that it is becoming increasingly hard for policymakers and regulators to justify divorcing debate about content from matters of presentation. This is because the form in which data are presented and stored fundamentally affects their usefulness in settings where increasing reliance is placed on automated processing. We also believe that structured data requirements can improve the content of verbal discussions because they limit managerial discretion and implicitly force the discussions to address issues that are important to users. We review the structural barriers that restrict the opportunities to process unstructured corporate disclosures automatically and offer suggestions for making corporate disclosures more amenable to automated processing.

## 2. The corporate reporting landscape

### 2.1. *The growth in unstructured data*

The IASB advances the notion of the corporate reporting package. The reporting package: comprises one or more documents published at approximately the same time as the entity's financial statements; communicates the entity's results to users of its financial statements; and is publicly available on the company's website or in its regulatory filings (IASB 2017: para 4.23). This definition includes press releases, earnings announcements, investor presentations and regulatory filings, and is therefore broader than the mandated financial statements and associated commentary. A large fraction of the content involves text (or verbal communication transcribed into text in the case of conference calls and management presentations), much of which also incorporates quantitative information (Siano and Wysocki 2018). These data are classified as unstructured because the elements are not amenable to rapid automated retrieval in a consistent manner across entities and over time.

The annual report and accounts form the centerpiece of the corporate reporting package consists largely of unstructured content. International Financial Reporting Standards involve high levels of unstructured financial statement data (Morunga and Bradbury 2012, El-Haj et al. 2019b). Auditor commentary on key audit matters is also increasing in jurisdictions such as the U.K. and U.S. (Gutierrez et al. 2018). Beyond the financial statements and audit report, expansion of the reporting model to incorporate a broader stakeholder perspective is leading to further growth in the volume of unstructured data. Table 1 provides a (non-exhaustive) summary of key international reporting initiatives issued since 2010 relating to aspects other than the financial statements. The majority of these disclosure developments involve unstructured narrative commentary. This trend is compounded by reporting developments at the country- and market-level.[3]

### 2.2. *Case study: U.K. annual reports*

Dyer et al. (2017) document dramatic growth over the last two decades in the size and content of annual reports filed on Form 10-K by U.S. securities market registrants. While informative, the standardized nature of the 10-K reporting template means that the analysis is not necessarily representative of changes in other regimes where annual reporting is less standardized, more stakeholder-oriented, and influenced to a larger degree by international reporting guidelines. The U.K. provides a good example of a setting where: core reporting requirements include a broader set of corporate themes than the 10-K; requirements of supranational bodies shape reporting outcomes to a larger degree; and preparers enjoy almost unlimited discretion over the inclusion of non-mandated content. U.K. annual reports therefore provide a useful alternative barometer with which to measure changes in the volume and scope of corporate reporting.

Table 1. Examples of international reporting initiatives relating to aspects of the financial reporting package other than the financial statements involving a significant element of unstructured (text-based) content.

| Reporting initiative | URL to organization or document |
|---|---|
| International Accounting Standards Board (IASB) (2010). *IFRS Practice Statement 1: Management Commentary* | https://www.ifrs.org/issued-standards/management-commentary-practice-statement/ |
| The International Integrated Reporting Council (<IIRC>) (2013) *International (<IR>) Framework* | https://integratedreporting.org/wp-content/uploads/2015/03/13-12-08-THE-INTERNATIONAL-IR-FRAMEWORK-2-1.pdf |
| European Securities and Markets Authority (ESMA) (2015). *ESMA Guidelines on Alternative Performance Measures* | https://www.esma.europa.eu/sites/default/files/library/2015/10/2015-esma-1415en.pdf |
| European Commission (EC) (2014). *Directive 2014/95/EU amending Directive 2013/34/EU as regards disclosure of non-financial and diversity information by certain large undertakings and groups* | https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32014L0095&from=EN |
| European Parliament Council of European Union (2012). *Directive 2012/17/EU amending Council Directive 89/666/EEC and Directives 2005/56/EC and 2009/101/EC of the European Parliament and of the Council as regards the interconnection of central, commercial and companies registers (Business Registers Directive)* | https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2012:156:0001:0009:en:PDF |
| European Parliament Council of European Union (2013). *Directive 2013/36/EU on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms* (*Capital Requirements Directive)* | https://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2013:176:0338:0436:En:PDF |
| OECD (2011). *OECD Guidelines for Multinational Enterprises* | https://www.oecd.org/daf/inv/mne/48004323.pdf?_ga=2.45268260.1897114088.1546178890-1898414720.1542015530 |
| OECD (2013), *OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas: Second Edition* | |
| Global Reporting Initiative (GRI) (2015). *GRI G4 Guidelines Part 1 Reporting Principles And Standard Disclosures* | https://www.globalreporting.org/resourcelibrary/GRIG4-Part1-Reporting-Principles-and-Standard-Disclosures.pdf |
| United Nations (UN) Global Compact *Integrating the Sustainable Development Goals into Corporate Reporting: A Practical Guide*: | https://www.unglobalcompact.org/library/5628 |
| United Nations Human Rights Council (2011) *'Protect, Respect and Remedy' Framework and Guiding Principles* | https://www.business-humanrights.org/sites/default/files/media/documents/ruggie/ruggie-guiding-principles-21-mar-2011.pdf |
| Sustainability Accounting Standards Board (SASB). Various industry-specific standards. | https://www.sasb.org/standards-overview/download-current-standards/ |

(*Continued*)

Table 1. Continued.

| Reporting initiative | URL to organization or document |
|---|---|
| United Nations Sustainable Stock Exchanges (SSE) Initiative (2017). *How Stock Exchanges Can Grow Green Finance. A Voluntary Action Plan.* | https://www.sseinitiative.org/wp-content/uploads/2017/11/SSE-Green-Finance-Guidance-.pdf |
| United Nations Sustainable Stock Exchanges (SSE) Initiative (2017). *How Stock Exchanges Can Advance Gender Equality. Gender Equality* | https://www.sseinitiative.org/wp-content/uploads/2018/10/How-stock-exchanges-can-advance-gender-equality.pdf |
| Climate Disclosure Standards Board (2018) *CDSB Framework for reporting environmental information, natural capital and associated business impacts* | https://www.cdsb.net/sites/default/files/cdsb_framework_2.1.pdf |
| Eco-Management and Audit Scheme (EMAS) Regulation 1836/93 (2009) plus Commission Regulation (EU) 2017/1505 (2017) amending Annexes I, II and III | https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32017R1505&from=EN and https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32017R1505&from=EN |

Figures 1–3 document growth in unstructured data for a sample of 19,542 U.K. annual reports published between 2003 and 2016 by 3252 firms listed on the London Stock Exchange (LSE) main market and Alternative Investment Market (AIM). Annual sample sizes range from a low of 1074 reports in 2003 to a high of 1659 reports in 2007. Panels A and B in Figure 1 report median page count and median word count, respectively, for the following three series: the entire annual report; the narratives component of the annual report; the financial statements component.[4] A monotonic upward trend is evident for all three series. The number of pages in the median report increased by 57% from 47 pages in 2003 to 74 pages in 2016, while total word count increased by 122% from 14,954 words in 2003 to 33,193 words in 2016. Significant growth in unstructured content is evident in both the narratives and financial statements components, although the catalysts differ. Most of the increase in financial statements content occurs between 2006 and 2008, corresponding to mandatory IFRS adoption by LSE Main Market and AIM firms (El-Haj et al. 2019a). In contrast, growth in the narratives component is more linear and reflects continuous development in stakeholder reporting. Figure 2 presents equivalent statistics for four common elements of the narrative component: the chair's letter, management commentary, governance statement, and remuneration report. A significant increase in the textual content is evident for all sections other than the chair's letter, with performance commentary displaying the most pronounced growth at 131%.

Significant growth in the unstructured text is accompanied by substantial complexity in both content and the way it is presented. Figure 3 reports a 50% increase in the number of separate sections highlighted in the median annual report table of contents. Assuming the number of sections proxies for the range of distinct high-level topics discussed, these results demonstrate the increasing scope of disclosures in firms' reporting package. Increasing scope in coverage is underpinned by substantial presentational complexity. First, untabulated results suggest increasing fragmentation of the reporting package as management carve out elements of non-financial information as separate documents (e.g. corporate and social responsibility reports). Second, the nomenclature used to describe similar core report components varies dramatically across firms and time. For example, our sample contains over 20 distinct names for the chair's letter to shareholders and over 50 different headers for management commentary. This lack of standardization impedes the comparability of unstructured data (Figure 4).

Case 3:17-cv-00121-JO-MSB Doc 377-6 Filed 05/07/24 PgID.33470 Pg 104 of 177



*Panel A*: Page count




*Panel B*: Word count




Figure 1. Median annual report length for a sample of 19,542 U.K. annual reports published between 2003 and 2016 by 3252 firms listed on the London Stock Exchange (LSE) main market and Alternative Investment Market (AIM). Annual sample sizes range from a low of 1074 reports in 2003 to a high of 1659 reports in 2007. *Panel A*: Page count; *Panel B*: Word count. *Notes*: U.K. annual reports are decomposed into the *Narratives* and *Financials* components according to the approach described in El-Haj et al. (2019a). The *Financials* component of the annual report includes the primary financial statements, accompanying notes, the auditor's report, the statement of directors' responsibilities, and generic shareholder information including financial calendar and form of proxy, The *Narratives* component of the annual report includes all remaining sections including the chair's letter to shareholder, management commentary, report of directors, governance statement, remuneration report, principal risk and uncertainties, and other stakeholder disclosures such as environmental and social responsibility commentary. Annual report text is retrieved and processed using the software tool developed by El-Haj et al. (2019a).

## 3. The benefits of NLP

Academics and practitioners are united in the belief that structured quantitative data are insufficient for economic decision-making (KPMG 2014, p. 4, Lev and Gu 2016). Corresponding growth in the volume and perceived relevance of unstructured textual content in the reporting package creates a demand for efficient and effective processing methods from researchers and financial market participants alike. We highlight two generic processing benefits that NLP methods offer users of the corporate reporting package. The first benefit is the ability to process large volumes of content at relatively low cost. The second benefit is the ability to detect latent features in the data. We discuss these two general contributions in further detail

PX276
Page 5552
Confidential QUALCOMM-TABAK-0021029
Q121SEC00954608

Case 3:17-cv-00121-JO-MSB Doc 377-6 Filed 05/07/24 PgID.33471 Pg 105 of 177



*Panel A*: Page count




*Panel B*: Word count




Figure 2. Median length of enduring annual report sections for a sample of 19,542 U.K. annual reports published between 2003 and 2016 by 3252 firms listed on the London Stock Exchange (LSE) main market and Alternative Investment Market (AIM). Annual sample sizes range from a low of 1074 reports in 2003 to a high of 1659 reports in 2007. *Panel A*: Page count; *Panel B*: Word count. *Notes*: U.K. annual report content is retrieved, classified and processed using the software tool developed by El-Haj et al. (2019a).

below, followed in Sections 4 and 5 by an assessment of their impact on (and implications for) financial reporting research and regulation.

Before outlining each generic NLP contribution in more detail, we offer two general observations on the use of automated processing techniques to analyse the reporting package. Our first observation is that while automated methods provide significant opportunities for researchers and practitioners, in neither case do we see NLP replacing detailed manual analysis, not least because the development of machine learning applications often relies on extensive manual analysis to train and validate models (El-Haj et al. 2019b). Instead, we believe that effective approaches to analyzing unstructured financial reporting data will continue to involve a combination of manual and automated methods, with the relative weights attached to each approach varying according to the particular research question or decision setting.

Our second observation relates to the inherent paradox of using NLP methods to analyze unstructured components in the corporate reporting package. While rapid growth in unstructured content increases demand for NLP solutions to assist with analyzing reporting outcomes, the same trend increases the cost and reduces the viability of developing fine-grained NLP solutions. Realizing the full benefits of NLP is conditional on low cost, reliable access to financial text on a large



Confidential QUALCOMM-TABAK-0021030
Q121SEC00954609

Case 3:17-cv-00121-JO-MSB Doc 377-6 Filed 05/07/24 PgID.33472 Pg 106 of 177






Figure 3. Number of narrative sections listed in table of contents of the median annual report for sample of 19,542 U.K. annual reports published between 2003 and 2016 by 3252 firms listed on the London Stock Exchange (LSE) main market and Alternative Investment Market (AIM). Annual sample sizes range from a low of 1074 reports in 2003 to a high of 1659 reports in 2007. *Notes*: The table of contents in U.K. annual reports is retrieved and processed using the software tool developed by El-Haj et al. (2019a).




Figure 4. Text-based articles published in *The Accounting Review*, *Journal of Accounting Research*, *Journal of Accounting and Economics*, *Journal of Finance*, *Journal of Financial Economics*, and *Review of Financial Studies* during the period 2010-2018.

scale. An emerging challenge for financial reporting regulators is how to ensure demands for firms to report more unstructured content results in disclosures that are also capable of being processed automatically and at low cost. We return to this theme in Section 5 when we discuss the implications of NLP for accounting regulation, and in Section 6 where we review the impediments to further progress.

### 3.1. *Generic benefits of NLP: Addressing overload concerns*

Section 2 highlights the dramatic growth in unstructured corporate data. Despite continuing concern over the size of the reporting package (FRC 2011, 2015), growing pressure for corporate accountability suggests that further expansion of the aggregate reporting package is the most likely direction of travel. The proliferation of information represents a major challenge for users in the form of information overload. Users are naturally concerned about the risk

PX276
Page 5554
Confidential
QUALCOMM-TABAK-0021031
Q121SEC00954610

of overlooking relevant information (FRC Lab 2015) and the quantum of data is at such a level that the feasibility of analyzing it in a timely fashion using only manual methods is questionable.

Holding the volume of data constant, the corporate reporting package is also fragmented by its nature (IASB 2017); and the fragmentation problem is growing as preparers and regulators explore ways of shrinking the annual report while simultaneously providing accountability to a widening stakeholder group. One solution involves removing non-mandatory content from the annual report and placing it in a separate document or on a website, with signposting in the annual report to the location of the supplementary content (FRC 2014, FRC Lab 2014, IASB 2017).[5] Fragmentation compounds the overload problem for a human reader because tracking information across multiple reporting channels and evaluating the consistency of content and messaging is challenging. Consider, for example, the Management, Discussion, and Analysis section of a 10-K report. Filers are permitted to supply this information through the proxy statement, provided the 10-K includes a statement that it is incorporating the information from the proxy statement by reference. The simple act of directing readers to another document likely renders these important discussions less transparent.

NLP offers a way to alleviate problems of disclosure overload. Automated retrieval and analysis of text allows financial report users to process much larger volumes of data than is possible via manual reading. At the simplest level, NLP methods can be used to filter content relevant to a particular decision problem. The filtering process can involve varying levels of complexity ranging from a naïve keyword search, to named entity recognition (NER) methods, to more advanced retrieval tasks targeting specific sections in an unstructured document (El Haj et al. 2019a). An extension to this simple filtering approach is a decision support system that 'red flags' specific cases for further analysis. In both applications, NLP technology is supplemented by further manual scrutiny by domain experts. The initial automated step adds value by concentrating scarce manual resources on the most relevant disclosures and firms. The approach is relevant for academic researchers and financial market practitioners alike. In practice, for example, the Securities and Exchange Commission (SEC) in the U.S. applies a text-based risk assessment system to Tips, Complaints, and Referrals (TCRs) with the aim of efficiently identifying cases that are more likely to result in successful litigation. The SEC has also used NLP methods to extract data from registration statements to assess how emerging growth companies avail themselves of JOBS Act provisions (Bauguess 2016). In research, Li (2010a) uses an algorithm to extract forward-looking sentences from the Management Discussion and Analysis (MD&A) section of 10-K filings for subsequent manual coding. More generally, Li (2010b), highlights how NLP methods help to improve generalizability and expand the set of research questions that can be feasibly addressed.

### 3.2. *Generic benefits of NLP: Identifying latent features*

A fundamental objective of NLP and data science methods more generally is the detection of patterns in large datasets that are not evident to human readers operating at the individual firm or document level. At the heart of the methodology is the recognition that statistical analysis of a large corpus can identify primitive characteristics in the data that are not observable when studying small parts of the corpus in isolation. Such approaches have been applied successfully in the NLP and corpus linguistics fields to detect diverse features including early onset of degenerative brain diseases such as dementia and Alzheimer's (Le et al. 2011) and adults masquerading as children in online chatrooms (Rashid et al. 2013).

Li (2010b) highlights the potential of NLP for identifying latent features in unstructured financial reporting data. Examples from the extant accounting literature include: detecting financial

reporting irregularities from conference call dialogue (Larcker and Zakolyukina 2012) and annual report commentary (Goel et al. 2010, Purda and Skillicorn 2015, Brown et al. 2017); identifying inconsistencies in reporting style across documents issued by the same entity (Davis and Tama-Sweet 2012, Dikolli et al. 2017); identifying managerial obfuscation in conference calls (Bushee et al. 2018); and measuring CEO personality traits using conference call dialogue (Gow et al. 2016).

NLP methods for detecting latent features have also been successfully employed by financial market professionals. For example, the SEC employs a range of techniques including text similarity and topic modeling to identify common features emphasized by tippees in TCRs that correlate with fraudulent corporate activity. Meanwhile, portfolio managers are using unsupervised artificial intelligence systems to build text-based models that predict stock returns over short windows (Balakrishnan et al. 2010, Lee et al. 2014). Commercial products are also emerging that evaluate corporate communications, news wire feeds, and web article aggregators on a range of dimensions including relevance and sentiment (e.g. RavenPack and Calcbench https://www.calcbench.com).

## 4. Financial reporting research

There are a number of excellent survey papers that discuss the use of text analytics in the accounting literature. Li (2010b) describes some of the manual approaches used by researchers and surveys the academic literature in the context of the research questions being asked. Kearney and Liu (2014) provide a more recent survey of methods and literature with a focus on textual sentiment. Das (2013) provides an overview of different methodologies and seeks to help researchers that are unfamiliar with textual analysis to familiarize themselves with some of the available software that has been developed using the R programming language. Loughran and McDonald (2016) survey methodological approaches under the general heading of 'bag-of-words' techniques. El-Haj et al. (2019b) critique extant research analyzing unstructured financial reporting content. They conclude current work risks overstating the incremental contribution of NLP approaches relative to manual analysis.

Closer inspection of papers employing textual analysis methods published in leading accounting and finance journals over the period 2010 to 2018 reveals the application of a variety of analytic techniques to determine whether textual attributes are correlated with firm fundamentals.[6] Typical of areas that explore new methodologies, we find that published papers overwhelmingly rely on simple approaches such as keyword searches (17), word counts (29), and dictionaries that measure specific attributes such as tone (17), and readability scores like the FOG index (7). Only 12 papers embrace more powerful techniques like cosine similarity, naïve Bayes classification, and topic modeling approaches (e.g. latent Dirichlet allocation).

Due to the widespread adoption of different methodologies, particularly those that are relatively unsophisticated, some of our discussion overlaps that contained in existing surveys. We not only discuss these methods but provide intuitive descriptions of some of the more sophisticated methodologies that have not been surveyed elsewhere. Our paper does not attempt to be comprehensive in its coverage. Similar to existing surveys, we focus on quantitative methodologies that have proven to be the most popular in accounting and finance.

We are not the first to emphasize that sophistication for sophistication's sake can be counterproductive. The same is true for overreliance on simplistic methods that are incapable of addressing document nuance. It is important to keep in mind that one size does not fit all and that the choice of methodology depends on the nature of the problem being examined. We believe that methodologies should be employed in settings that are most appropriate and that there is room for all. Different techniques do not compete with one another, but should be viewed as a set of

tools that are available to the researcher depending on the specific research question. Just because one understands how to use a specific methodology, it does not imply that it should be used to answer every relevant question.

The methods we focus on attempt to distill meaning from the message. It may be surprising that, given the inherent nuance conveyed through verbal expression, all of the widely used techniques rely on the critical assumption of independence to reduce the extraordinary dimensionality of a document. In this context, independence implies that the order, and thus direct context, of a word is unimportant. Methods where word sequence is ignored are typically labeled as 'bag-of-words' techniques. Many of these are based on collapsing a document into a term-document matrix consisting of rows of words and columns of word counts. Given the extensive set of available methodological tools, tabulating word counts appears to be a baby step in the science of applying textual analysis.

The critical question is whether important incremental information can be extracted by more deeply parsing documents for contextual meaning (Loughran and McDonald 2016). This is essentially a signal-to-noise tradeoff, where contextual nuance is the signal and the increasing imprecision of deep parsing is the noise.

### 4.1. *Key word searches and word counts*

Text analytic methodologies typically start by parsing a set of documents into word counts. Less sophisticated approaches rely on a dictionary comprised of all of the words contained in the corpus to then perform keyword searches, while others combine keyword searches with word counts to measure the intensity of specific attributes. For example, Hoberg and Moon (2017) identify keywords related to offshore activities in 10-K filings to determine whether their frequencies are related to operational hedging. Loughran et al. (2009) consider the frequency of the word 'ethic' along with the phrases 'corporate responsibility,' 'social responsibility,' and 'socially responsible' in 10-K filings to determine if these counts are associated with 'sin' stocks, corporate governance measures, and class action lawsuits.

### 4.2. *Attribute dictionaries*

One of the most popular applications of word counts is the use of key word dictionaries that are associated with specific attributes. There are a number of dictionaries that are commonly used in natural language processing applications such as the Harvard-IV, Jockers-Rinker, and Loughran-McDonald (LM 2011). In particular, LM have created a number of dictionaries that classify words into specific categories that include tone, uncertainty, litigious, or weak modal.

The application of dictionary-based textual analysis is straightforward. Consider, for example, the assessment of a document's tone. One first counts the number of positive or negative words based on a specific dictionary and then typically scales the counts to create word proportions. Documents with a relatively high frequency of positive words are considered optimistic and likewise those with a relatively high percentage of negative words are labeled pessimistic. A commonly used measure of tone is the difference between the scaled positive and negative tone words.

A limitation of the dictionary-based approach is that general purpose dictionaries tend to misclassify words that may have one context in general settings but a different context in specific settings. For example, words like 'liability' and 'depreciation' are common financial terms that would be viewed as having a neutral tone in the context of a 10-K filing, but would be generally associated with negative tone elsewhere. The possible misclassification of document attributes motivated LM to develop a number of finance-specific dictionaries that are calibrated to the

research question. This concern is broadly applicable and should be a consideration as researchers considering applying dictionaries in other settings.

Recent work by Grossetti et al. (2019) provides a set of 'best practices' when using dictionary-based approaches They show that the methods used to construct a dedicated dictionary may lead to a loss of wider textual meaning thus, creating a need to clearly summarize how different dictionaries identify different words as key determinants of narrative tone. They argue that a set of careful diagnostics can be used to help identify the effects of opaque value judgments applied to build dedicated dictionaries.

The primary advantages of this approach are that the results are easy to interpret and it is replicable. A drawback is that results are conditional on the dictionary being used and there can be a tendency to overclaim a non-finding. While a significant finding indicates an unambiguous association between a corpus and tone, a non-finding cannot be used to conclude that the attribute does not matter.[7]

### 4.3. *Naïve Bayes classification*

Naïve Bayes classification (NBC) is an important technique that has seen wide application in accounting and finance that falls under the category of supervised learning models. Supervised learning models are so-named because they require manual 'training' and 'testing' before they can be implemented.

The goal of NBC is to use Bayes' rule to measure how likely the words in a corpus of documents convey a specific attribute. The first step is to convert the corpus into a document-term matrix. (A document-term matrix is a matrix where the elements correspond to word frequencies and documents are designated by rows and words by columns.)

The next step is to develop the training and testing data. This involves manually classifying the unit of measure (sentence, paragraph, or document) into categories. For example, Li (2010a) manually classifies 30,000 randomly selected sentences into four *tone* categories (positive, neutral, negative, and uncertain) and twelve *content* categories.[8]

The next step is to select a sample of manually classified documents (the 'training' sample) and calculate the frequency that the words contained in the corpus vocabulary are associated with documents that have positive and negative tone. Intuitively, documents with negative tone use more negative words. The classification rule is then constructed by calculating the average frequency that the vocabulary words appear in training documents that have a specific attribute.

The validity of the algorithm must then be tested. The first step is to calculate the within-sample classification error rate. Despite being downward biased, this is a useful diagnostic tool. Its main attribute is to provide the researcher with an initial assessment of how well the classification algorithm can be expected to perform. If the error rate is unacceptably high, it may indicate that the training model was not carefully constructed.

The researcher further evaluates model validity using out-of-sample data by calculating the likelihood that the 'test' documents have either positive or negative tone. To determine the tone of a test document, the researcher calculates the likelihood that it has both positive and negative tone. The classifier then determines the document's tone by selecting the attribute that has the highest likelihood.

To calculate the likelihood a test document has positive tone, each word is multiplied by the average frequency it appears in training documents with positive tone. These individual frequencies are then multiplied together (under the independence assumption) to calculate the likelihood that the test document has positive tone. The process is repeated under the assumption the test document has negative tone.

There are a number of approaches for implementing tests of model validity. In addition to the implicit 50–50 split described above, another approach divides the sample into training and testing subsamples where $N$% is assigned to the training sample and $(100 - N)$% is reserved for testing. In this $N$-fold cross-validation test, the data is randomly partitioned into $N$ equal parts. $N$ experiments are performed and in each experiment one part is taken as the testing data while the remaining $(N - 1)$ parts are used for training. At the end, the results over the $N$ experiments are averaged.

One of the main limitations associated with NBC is that the building of training and testing data sets is costly and time consuming. The ultimate success of the model also depends on the care that the researcher uses to classify the training and testing data because careless classification may result in unacceptably high false classification rates.[9]

### 4.4. *Cosine similarity approaches*

Cosine similarity is a standard metric that is used to compare document similarity (See Sebastiani (2002)). Given two documents that have been converted into word *distribution* vectors, *the cosine similarity between documents m and n is calculated as their inner product, i.e.*

where $\boldsymbol{D}_m$ and $\boldsymbol{D}_n$ are word distribution vectors.

$$CS_{i,j} = \frac{\boldsymbol{D}_m}{\sqrt{\boldsymbol{D}_m \cdot \boldsymbol{D}_m}} \cdot \frac{\boldsymbol{D}_n}{\sqrt{\boldsymbol{D}_n \cdot \boldsymbol{D}_n}}.$$

The word distribution vector $\boldsymbol{D}_d$ sums to one, and each element indicates the relative frequency of the given word in document $d$. We recommend that researchers normalize word vectors to have unit length because $CS_{m,n}$ has the desirable property that it only correlates modestly with document length.

Mathematically, cosine similarity is the cosine of the angle between documents $m$ and $n$. Since the elements of the word distribution vectors are non-negative, the cosine similarity lies between 0 and 1. This makes $CS_{m,n}$ easy to interpret, as two documents with no overlap have a cosine similarity of zero, whereas two identical documents have a cosine similarity of 1.

If one mean-adjusts $\boldsymbol{D}_d$, it is equal to a Pearson correlation coefficient. This prompts Loughran and McDonald (2016) to conclude that 'there seems little reason in business disciplines to use this measure instead of the simple correlation.' Given the simplicity of calculating a dot product and its widespread use in natural language processing applications, it is difficult to understand why the use of standard terminology is confusing.

Hoberg and Lewis (2017) show that is possible to extend the cosine similarity framework to create a measure of document similarity relative to a specific attribute. Examples of attributes could be accounting fraud, earnings guidance, or initial public offering underpricing. And the relevant documents that comprise the associated corpus could include Management Discussion and Analysis sections from company 10-K filings, conference call transcripts, and offering prospectuses.

The idea is to calculate a measure of Attribute Similarity (*AttSim*) that determines whether the Abnormal Discussion (*AD*) contained in a specific document is similar to the abnormal discussions of documents that share a common attribute. *AttSim* focuses on abnormal discussion to control for possible spurious similarity that could be attributable to common discussion among comparable documents, such as boiler plate. For example, if documents released by companies in the same industry discuss common themes, it can cause cosine similarity scores to be high even though the documents themselves may not contain significant incremental information.

Once the researcher has identified the treatment attribute, say accounting fraud, the next step is to compute the abnormal discussion for each document $d$ ($AD_d$) by netting a specific word distribution vector $\boldsymbol{D}_d$ against an average word distribution vector derived from a set of control documents ($CD_d$), i.e.

$$AD_d = \boldsymbol{D}_d - CD_d.$$

The control documents are designed to address document commonality that is independent of the discussion attribute. For example, the documents contained in $CD_d$ could be those released by firms in the same industry.[10] The resulting vector sums to zero, as $\boldsymbol{D}_d$ and $CD_d$ each sum to one.

One can then create a measure of document similarity relative to a specific treatment attribute ($AT_d$) by identifying a set of documents that have been treated and calculate the average abnormal discussion vector ($AT_d$). The average abnormal discussion vector for a specific attribute has a document specific subscript because $\boldsymbol{D}_d$ is excluded from the calculation of $AT_d$ to avoid mechanistic correlation.

We then define an attribute similarity score ($AttSim_d$) as the cosine similarity between $AD_d$ and $AT_d$ as follows:

$$AttSim_d = \frac{AD_d}{\sqrt{AD_d \cdot AD_d}} \cdot \frac{AT_d}{\sqrt{AT_d \cdot AT_d}}.$$

### 4.5. *Topic models*

One of the most exciting developments in text analytics has been the growing use of topic modeling and in particular Latent Dirichlet Allocation (LDA), in accounting and finance. Most of the attention to date has focused on whether verbal discussions in 10-K filings, most notably the Management Discussion and Analysis (M&DA) section, contain incremental information beyond that contained in the basic financial statements and accompanying footnotes.

LDA is a generative statistical model that identifies verbal topics from a corpus of text documents (See Blei et al. (2003)). The generative-nature of LDA is a key advantage because it is a statistical approach that does not require researcher pre-judgment and is replicable. In this sense, it differs from supervised learning approaches, like naïve Bayes estimation, that require the researcher to train models so that they are able to classify documents by specific attributes.

LDA uses a likelihood approach to discover clusters of text, namely ‘topics’ that frequently appear in a corpus. This approach assumes that the document generation process arises from an underlying topic distribution rather than a distribution over individual words. A particular topic can be characterized as a distribution over a common vocabulary of words where the relative probability weight assigned to each word indicates its relative importance to that topic.

For a given topic, we refer to the weights assigned to specific words as Topic Word Weights (**TWW**). A topic is thus a word vector where each **TWW** indicates that word’s relative importance. For example, the words ‘oil’ and ‘electricity’ might be important to topics associated with Natural Resources and Manufacturing, but one might expect oil to receive a higher weighting than electricity in the Natural Resources topic. The opposite might be true for the Manufacturing topic.

Each document is then represented as a weighted average of different topics. We refer to the weights applied to each topic within a specific document as a Document Topic Weight (**DTW**).

PX276

Page 5560

A limitation of LDA is that the optimal number of topics is unknown *a priori*. This is problematic because different specifications will likely lead to different interpretations of the corpus. Since researchers using LDA must pre-specify the number of topics, selecting an insufficient number of topics may result in a model that is too coarse to be useful in uncovering the underlying structures that are being discussed in the corpus. An excessive number of topics could result in uninformative or possibly redundant topics.

## 5. Financial reporting regulation

This section assesses the implications for accounting regulators of the increasing trend to process unstructured data in the financial reporting package using NLP methods. We use the IASB Discussion Paper *Disclosure Initiative – Principles of Disclosure* (IASB 2017) as an organizing framework for our discussion, with a particular focus on the following three aspects: the definition of financial reporting users, the nature of the disclosure problem as defined by the IASB, and the properties of effective communication. We examine the implications of NLP for each aspect with the aim of illustrating how technology changes the traditional approach to thinking about disclosure. By way of context, we note that no reference is made to NLP methods or technology more generally throughout the entire 107-page Discussion Paper, suggesting that regulators may be blind to the opportunities and could be blindsided by the consequences that widespread adoption of such technology can have on financial reporting.

### 5.1. *The definition of users*

The IASB currently defines users of the reporting package along a single dimension reflecting the information needs associated with their contractual relation with the entity (IASB 2018a).[11] However, increasing interest in NLP approaches suggests a second, cross-cutting dimension that reflects users' approach to retrieving and processing data. Consistent with this view, the IASB (2018b, Item G, para. 26) acknowledges the need to distinguish between traditional and digitally sophisticated users. Traditional users adopt a manual reading strategy and typically view documents as a linear narrative or a key reference source. Digitally sophisticated users operate on a larger scale, with the aim of extracting and processing content automatically to realize the generic benefits of NLP outlined in Section 3.[12]

The distinction between users based on their approach to processing financial data foregrounds debate over the format and delivery of the financial reporting package, and in particular whether it is possible to satisfy both groups' information needs through a single reporting model. The emerging view is that digitally sophisticated users require a different approach to preparing and delivering financial information that emphasizes the ability to access content flexibly and at low cost. While IASB staff argue that advances in technology are unlikely to eliminate the need to access information contained in financial statements through traditional sources such as paper or PDF (at least in the near term), they acknowledge that these formats may not continue as the predominant means of providing and reporting financial information (IASB 2018b, para. 25). The role, format and future of the annual report is at the center of this debate. Aside from notable exceptions such as the U.S., Canada and Australia, annual reports are normally designed and distributed with a traditional user in mind. While discretion over content and the order in which that content is presented enables management to tailor the reporting narrative to the unique aspects of their entity and approach to value creation, the highly unstructured nature of the resulting report severely constrains the opportunities to apply NLP methods. These problems are compounded when the annual report is distributed in PDF format.

### 5.2. *The disclosure problem*

The IASB (2017, 13, para 1.5) characterizes the disclosure problem as a function of (a) insufficient relevant information, (b) too much irrelevant information, and (c) inefficient communication of the information provided. The use of NLP methods has important implications for the disclosure problem as defined by the IASB. For example, the problem of too much irrelevant information may be less of an issue in the context of automated analysis because information overload is less of a concern for NLP applications (IASB 2018b, Item 11G, para 15).[13] Indeed, the filtering role of NLP highlighted in Section 3 may offer a more effective and efficient way of addressing this aspect of the disclosure problem than is possible through regulation (at least for digitally sophisticated users).

Provision of (ir)relevant information is central to the IASB's perspective on the disclosure problem. This view implicitly assumes that the relevance threshold can be objectively determined ex ante by stakeholder groups including preparers and users. However, the potential for NLP to detect latent features in unstructured data raises serious questions about this ex ante view of relevance. Consistent with this concern, FEE (2015, p. 29) argues that management are not necessarily best placed to make judgements about what is and is not relevant to stakeholders. For example, management repeatedly argue that the cost of complying with the SEC's XBRL mandate is excessively burdensome despite the fact that out-of-pocket costs are relatively modest. Big data NLP methods simply take this logic a step further, with relevance ultimately being determined by algorithms and statistical analysis rather than the priors of regulators, preparers and users. The same argument holds for the debate over materiality.[14] Moreover, the filtering role of NLP also suggests the problem of too much irrelevant information may be easier to resolve than the problem of insufficient relevant information. We therefore believe that growing interest in NLP approaches to analyzing the financial reporting package raises questions about both the IASB's representation of the disclosure problem in its 2017 Discussion Paper and the most appropriate ways of addressing it.

### 5.3. *The properties of effective communication*

Effective communication is defined by the IASB as being: (a) entity-specific (absence of boilerplate); (b) simple and direct (absence of technical jargon); (c) organized in a way that highlights important matters; (d) linked to other relevant information to highlight relations and improve navigation; (e) free from unnecessary duplication; presented in a way that optimizes cross-sectional and temporal comparability; and (f) presented in an appropriate format (IASB 2017, para 2.6).

NLP has several implications for the issue of effective communication. First, NLP methods offer a (partial) means of overcoming certain features of ineffective communication. For example, NLP tools can be designed to identify and filter-out boilerplate disclosure, translate technical jargon, highlight links between relevant information (either within the same document or across different documents), and identify key reporting themes. Further, these solutions are equally relevant for digitally sophisticated users (as part of a big data methodology) and traditional users (as part of a decision support system designed to assist manual analysis).

Accordingly, NLP can help to enhance the effectiveness of financial communication and thereby (partially) resolve the disclosure problem.

A critical part of the reporting challenge with unstructured data is that it is traditionally viewed as static, hence regulators' concerns about organization, duplication, signposting and cross-referencing, and comparability. This static perspective on narrative commentary contrasts with financial statement data, where reformulation is commonplace. Examples include alternative

performance measures and non-GAAP earnings reported by management (ESMA 2015), and street earnings measures defined by analysts (Young 2014). NLP offers the potential to fundamentally change the way decision-makers use unstructured data by introducing a dynamic dimension where users are able to reorganize and select (i.e. normalize) as-reported content conditional on the specific decision context faced.

Use of NLP methods also has implications for the definition of effective communication. Specifically, since NLP applications rely on reliable, low-cost access to source data, the focus of effective communication expands to include delivery as well as content. All else equal, information that cannot be accessed in a way that supports decision making is not useful regardless of the specific content. In an NLP setting, therefore, delivery (i.e. format, degree of standardization, file type, etc.) is as important for determining communication effectiveness as content. This view contrasts with the IASB's stated position as revealed in the minutes from the July 2018 Board meeting where members argued that users ultimately care about useful content and as a consequence the focus of its disclosure initiative should center on content, rather than the process by which content is delivered and consumed (IASB 2018b, para. 27). While we are sympathetic to the IASB's view, we believe that divorcing content from delivery is no longer appropriate because the two aspects are inherently linked where NLP applications are concerned. Instead, we believe there exists an urgent need to integrate debate about the provision of useful content with consideration of how best to deliver that content. This is particularly true for digitally sophisticated users and serves to highlight how the definition of effective communication is likely to vary depending on user group.[15]

## 6. Impediments to further progress

The last decade has witnessed significant progress applying NLP methods to the outputs of the financial reporting package, albeit from a low base. As outlined in Section 3, the majority of mainstream financial reporting research uses simple content analysis techniques such as word counts and readability measures applied to a relatively narrow range of documents comprising primarily of U.S., registrants' EDGAR filings, conference calls, and corporate press releases. To ensure continued progress, the next phase of work for both academic researchers and financial market professionals will involve applying more sophisticated NLP methods to a wider set of mainstream textual resources. However, a series of structural impediments risk derailing progress in this second phase. We highlight six impediments relating to two core themes of data access and collaboration:

(a) *Access to text resources (repositories and metadata)*: In most countries, the opportunity to harness the full benefits of NLP is constrained by the absence of a comprehensive repository from which elements of the financial reporting package can be harvested and collated automatically at low cost [ideally via a reliable application programming interface (API)]. Standardized electronic filing systems similar to EDGAR are rare. Exceptions include SEDAR in Canada and DART in Singapore. Where such systems do exist, they typically capture only a subset of the corporate reporting package, making data collection and matching extremely costly. [See El-Haj et al. (2019a) for a description of the process for matching U.K. PDF annual reports to financial and market data from Thomson Reuters Datastream.]

(b) *Access to text resources (inaccessible file formats)*: Provision of corporate reports as PDF files is standard practice in most jurisdictions. Even U.S. firms produce glossy PDF annual reports to shareholders that sit alongside their mandatory 10-K filing.[16] Although there are sound reasons why firms distribute content in this format, a major downside is

that the scope for automated text processing is severely inhibited. Although tagging procedures can be used to enhance the accessibility of PDF files (e.g. Atalan 2011), implementation is time-consuming and consistency is hard to achieve. Ultimately, the PDF file type is unfit for purpose where NLP applications are concerned.

(c) *Access to text resources (lack of standardization)*: Lack of standardization is a pervasive feature of corporate reporting and a major barrier to automated text processing in many institutional settings, particularly when combined with PDF file format. Management typically view the ability to flex disclosure format as an essential part of communicating their entity's 'own story' effectively. While the validity of this argument is hard to dispute, we offer the following three observations in the interest of balance. First, we are not aware of any reliable evidence to indicate that firms operating in jurisdictions where standardized corporate reporting is mandatory (e.g. the U.S.) face communication challenges or competitive disadvantages that systematically harm valuations, or that markets in such settings face lower liquidity. Indeed, anecdotal evidence from (some) professional investors suggests a preference for 10-K style reporting because it helps reduce search costs. Second, it is conceivable that the positive externalities realized by the financial community from big data text applications outweigh aggregate firm-level costs of a more standardized reporting model approach. Third, increasing the degree of standardization in corporate reporting does not mean abandoning reporting discretion; it simply requires discretion to be applied within well-defined reporting constructs.

(d) *Access to text resources (diversity of media)*: Entities are increasingly seeking to leverage technology to enhance dissemination through nontraditional channels such as social media and video (FEE 2015). While such approaches offer advantages for traditional users of the reporting package, they also raise challenges for NLP applications in terms of collecting and integrating source data, and processing the resulting content.

(e) *Collaboration (interdisciplinary)*: Applying NLP to financial reporting output is an inherently interdisciplinary process requiring the marriage of domain expertise from financial reporting with advanced NLP skills from computational linguistics. Neither discipline is capable of delivering step-change on its own. However, structures supporting interdisciplinary collaboration are limited. Distinct academic research fields tend to evolve in parallel due to different publication and career progression norms. Where cross-fertilization does occur, it tends to be limited to sharing data and importing established methods rather than true collaborative endeavor. Opportunities for researchers to publish work at the highest level that speaks directly to multiple disciplines are extremely limited, as are formal arrangements for bringing researchers from disparate disciplines together to work on joint problems.

(f) *Collaboration (intersectoral)*: Developing NLP solutions to address financial reporting problems is an inherently applied process. Financial market participants are often best placed to identify opportunities where NLP can add value. They may also control proprietary data resources that form a core input into such applications. Academic researchers, on the other hand, bring cutting-edge knowledge required to address these problems. Progress therefore requires intersectoral collaboration in addition to interdisciplinary cooperation. The chasm between the professional and academic research communities in financial reporting represents a significant barrier to progress, which is reinforced by the incentive structure in financial reporting research that makes publication in international peer-reviewed journals the rational choice over more timely applied work (particularly for early-career researchers).

Overcoming these impediments requires coordinated action by a range of key stakeholders including governments, financial market regulators, preparers, users and academic researchers from various fields. The foresight and investment demonstrated by the SEC in the U.S. stands as a model for other regulators and government departments to replicate. Only through significant developments in data availability and collaborative approaches will the returns to enhanced financial reporting and transparency be realized fully in a digital age.

## 7. Summary and conclusions

Financial and corporate reporting involves a high degree of natural language content. Moreover, narrative disclosures sit at the heart of evolving reporting areas including governance, remuneration, risk, strategy and business models, climate, and social impact. Such is the scope and multichannel nature of the corporate reporting package that manual processing of disclosures by domain experts is challenging when operating at the individual entity level and practically impossible when analysing a portfolio of stocks. While natural language processing (NLP) methods developed in computer science and corpus linguistics have been widely applied in areas such as medicine and education, uptake in the financial reporting domain has been surprisingly slow. At the most basic level, NLP technology helps relax human processing constraints and facilitates detection of information that might otherwise be unobservable to a manual reader operating at the individual document level. The increasing application of NLP methods to the outputs of the corporate reporting process creates opportunities and challenges for researchers and financial market professionals alike.

We reflect on the increasing adoption of NLP methods in financial reporting research and discuss the implications for financial reporting regulation of the widespread adoption of this technology. With respect to research, we note that the accounting and finance literature has been slow to adopt mainstream NLP methods, preferring instead to concentrate on research questions involving low-tech measures based on simple bag-of-words approaches, including word counts and readability scores. We highlight the small but growing body of work applying more established NLP techniques including machine learning classifiers and statistical methods for identifying topic structure at the document or corpus level. We review the key aspects of some of the more popular NLP methods applied in the accounting literature including cosine similarity measures of text, supervised classification using Naïve Bayes models, and topic modeling using latent Dirichlet allocation. We emphasize the dangers of researchers adopting a 'black box' approach to implementing these methods and stress the importance of transparency when describing the steps and choices involved in applying these techniques.

Increasing adoption of NLP techniques raises fundamental issues for accounting practitioners and regulators. The IASB (2018b), for example, stress the need to distinguish between traditional and digitally sophisticated users of financial information. While traditional users view documents as a linear narrative or a key reference source to be scrutinized manually, digitally sophisticated users apply NLP methods to support analysis on a larger scale. The distinction is important because it highlights the difficulty of servicing users' diverse information needs via a single reporting model and delivery format. We use the IASB's Disclosure Initiative (IASB 2017) as a framework for illustrating some of these issues. We discuss how the adoption of NLP technology raises fundamental questions about the nature of the disclosure problem as portrayed by the IASB. For example, NLP methods may provide a partial solution to the problem of information overload (too much irrelevant information). Automated text processing may also change how relevant and material information are defined given that relevance is a data-driven construct in an NLP setting where a key goal involves uncovering features in the communication process that are either empirically unobservable at the individual document level or conceptually unclear.



Confidential 

We also review how NLP methods affect the definition of effective communication. A key conclusion emerging from our discussion is that policymakers must do more to integrate debate over report content with consideration of how content is best presented because the form in which data are presented and stored fundamentally affects usefulness in a digital setting. More generally, we highlight the importance of low cost and reliable access to digital data as a key factor constraining the benefits of applying NLP methods to process outputs of the financial reporting package.

Finally, growth in automated text processing raises important questions for accounting and finance education. The value of rigorous training in digital data is already clear, with average U.K. graduate salaries in the digital sector exceeding investment banking for the first time in the 2018.[17] Professional bodies' syllabi are evolving in recognition of the skills demanded by practitioners. For example, the Institute of Chartered Accountants in England and Wales (ICAEW) revised its curriculum in 2018/19 to expand coverage of business analytics, while the Chartered Financial Analyst (CFA) Association added machine learning and artificial intelligence to its candidate body of knowledge from 2019.[18] Such changes create opportunities and challenges for university programmes in accounting and finance. Opportunities include capitalizing on new growth options in an increasingly competitive marketplace, enhancing graduate employability outcomes (which in turn support national and international rankings), and promoting research-informed teaching. Challenges include inertia, a lack of accounting and finance faculty with appropriate skills, a dearth of textbook options, and how best to integrate such material with core topics such as financial reporting, auditing, and financial statement analysis.

## Notes

1. Automated analysis of text is not new to the accounting literature. An active stream of research using automated content analysis methods has featured in leading European journals such as *Accounting and Business Research*, *European Accounting Review*, *Journal of Business Finance and Accounting* and *British Accounting Review* for several decades. See Merkl-Davies and Brennan (2007) for a review of this body of work. Many of the issues addressed in this European-based stream of literature such as tone and readability are similar to the questions examined in more recent papers published in leading U.S. journals. See El-Haj, Alves, Rayson, Walker and Young [hereinafter, El-Haj et al. (2019a)] for further discussion.
2. We agree with Loughran and MacDonald's (2016) recommendation that researchers need to be concerned about replicability, regardless of the methodology employed, and that a well-defined set of 'best practices' would be an important development. An excellent example of a 'best practice' with respect to corpus replicability is the 10-K and its variants data repository of Bill McDonald (https://sraf.nd.edu/data/stage-one-10-x-parse-data/). This corpus is particularly helpful because each filing document has been cleaned of extraneous text such as HTML code as well as embedded PDF and image files.
3. For example, firms with a primary listing on the London Stock Exchange (LSE) are required by law to include a strategic report in their annual report and accounts [Financial Reporting Council (FRC) 2014], together with detailed descriptions of risk management practices, corporate governance arrangements, and executive remuneration policies (FRC 2018). Larger LSE-listed firms are also encouraged by stakeholder representative bodies to comply with best guidelines in areas such as workforce reporting (Pensions and Lifetime Savings Association 2016).
4. We decompose the annual report into narrative and financial statement components following El-Haj et al. (2019a). The financial statements component includes the primary financial statements, accompanying notes, the auditor's report, the statement of directors' responsibilities, and generic shareholder information including financial calendar and form of proxy, The narratives component includes all remaining sections including the chair's letter to shareholder, management commentary, report of directors, governance statement, remuneration report, principal risk and uncertainties, and other stakeholder disclosures such as environmental and social responsibility commentary.
5. Signposting is different to cross-referencing (FRC Lab 2014, p. 16). Signposted information may be located either within or outside the annual report whereas cross-referenced information must be located within the annual report. An annual report component must meet its legal and regulatory requirements

without reference to signposted information. Accordingly, signposting is designed to draw shareholders' attention to complementary information that is related to a matter disclosed in a component of the annual report.

6. For the purpose of this review we define the set of leading journals as *The Accounting Review*, *Journal of Accounting Research*, *Journal of Accounting and Economics*, *Journal of Finance*, *Journal of Financial Economics*, and *Review of Financial Studies*.
7. For example, a statistically significant association related to tone and an attribute of interest is sufficient to conclude relevance, but it is not necessary. By contrast, a non-finding does not allow the researcher to draw a definitive conclusion about the association between tone and the attribute of interest. It is possible that an alternative dictionary could find a significant association.
8. The twelve content categories identified by Li (2010a) are Group 1 (Revenues, Cost, Profits, Operations), Group 2 (Liquidity Investing, Financing), and Group 3 (Litigation, Employees, Regulation, Accounting, Other). These categories are not mutually exclusive. A specific sentence may be classified as belonging to more than one category.
9. Another limitation is that the ability of a model to accurately classify a corpus is based on the assumption that the underlying features in a dataset are independent – an assumption that is frequently violated in practice. The good news is that Rish (2001) demonstrates that NBC tends to perform well even when the independence assumption is invalid.
10. Hoberg and Lewis (2017) use industry and size to identify the set of control documents.
11. The primary users of general purpose financial reporting are present and potential investors, lenders and other creditors, who use that information to make decisions about buying, selling or holding equity or debt instruments and providing or settling loans or other forms of credit (IASB 2018a, F OB2). The IASB *Conceptual Framework* notes that other parties, including prudential and market regulators, employees, customers and suppliers, may also find general purpose financial reports useful, although they are not defined as primary users (IASB 2018a, F OB10 and F BC1.20-BC 1.23).
12. The extent to which regulators should actively seek to narrow the gap between digitally sophisticated and traditional investors in this area is an open question. Insofar as the costs of analysing very large corpora are, to a large extent fixed, private investors' capacity to fully exploit the information in narrative disclosures may be limited, placing them at a disadvantage relative to institutional investors with greater resources. The same concern holds for big data applications more generally and in many respects is nothing new: institutional investors have long enjoyed advantages associated with processing capacity and access to information. We also see scope for growth in third-party providers of text analytics designed specifically to support decision making by unsophisticated investors.
13. For example, Paredes (2003) discusses information overload in the context of regulatory filings.
14. The potential filtering role of NLP should not be interpreted as an invitation for management to pursue a full, unfettered disclosure policy. Bauguess (2016) highlights the risks posed by big data and NLP in terms of encouraging lazy reporting and analysis. We view NLP as a means of improving aspects of financial reporting and analysis, rather than as a panacea for the disclosure problem. Technology cannot solve the disclosure problem by converting inherently poor disclosures into effective communication.
15. The distinction between effective communication viewed from the perspective of a traditional user versus a digitally sophisticated user can be illustrated through the example of infographics. A high proportion of firms use infographics in their annual report to communicate complex ideas such as business models and the value creation process in a simple and intuitive manner. While infographics are encouraged by regulators and advisors as a way of improving reporting quality for traditional users (FEE 2015), these features create major problems for NLP applications (particularly where they are embedded in a PDF file format) because the content and relations are hard to preserve when analyzing the data automatically. Paradoxically, therefore, digitally sophisticated users may view simple plain text as more effective communication than richer visual representations.
16. SEC rules require companies to send an annual report to shareholders prior to annual meetings involving election of boards of directors; and proxy rules require reporting companies to post their proxy materials, including their annual reports, on their company website in addition to filing their 10-K with the SEC. Some companies use their annual report filed on Form 10-K to shareholders in lieu of a separate annual report to shareholders. However, many companies produce a separate report which typically contains less detail than the 10-K but usually also includes supplementary material such as a letter to shareholders from the CEO (Dikolli et al. 2017), along with context for recent financial performance, infographics and photographs.

17. Based on data supplied by TARGETjobs. See https://targetjobs.co.uk/careers-advice/choosing-an-employer/320357-which-graduate-career-offers-the-best-pay for further details.
18. Details of syllabus changes made by the ICAEW are summarized at https://www.icaew.com/learning-and-development/aca/aca-employers/the-future-professional/technology-and-the-aca/big-data-and-data-analytics. Students registered for CFA exams in 2019 will study a new fintech section that includes topics such as robo advisors, big data, and artificial intelligence (see https://www.cfainstitute.org/en/about/press-releases/2018/aspiring-charterholders-to-see-next-generation-cfa-program-curriculum-in-2019).
19. Various algorithms such as variational inference or Markov Chain Monte Carlo are typically used for inference (see Jordan (1998)).

## Acknowledgements

We are grateful for comments and suggestions provided by the editors, Robert Hodgkinson and participants at the ICAEW's 2018 PD Leake Lecture.

## Funding

Lewis acknowledges support provided by the Research Board of the Institute of Chartered Accountants in England and Wales (ICAEW). Young acknowledges funding provided by the Economic and Social Research Council (contracts ES/J012394/1, ES/K002155/1, ES/R003904/1 and ES/S001778/1).

## References

Atalan, 2011. *Making PDF Documents Accessible with Adobe Acrobat Pro*. Available from: www.accede.info/en/manuals/.

Balakrishnan, R., Qiu, X.Y., and Srinivasan, P., 2010. On the predictive ability of narrative disclosures in annual reports. *European Journal of Operational Research*, 202, 789–801.

Bauguess, S.W., 2016. Has big data made us lazy? Speech at Midwest Region Meeting, American Accounting Association (AAA), Chicago, IL. Available from: https://www.sec.gov/news/speech/bauguess-american-accounting-association-102116.html.

Blei, D.M., Ng, A.Y., and Jordan, M.I., 2003. Latent dirichlet allocation. *Journal of Machine Learning Research*, 3, 993–1022.

Brown, N., Crowley, R., and Elliott, W. B., 2017. What are you saying? Using topic to detect financial misreporting. Working paper. Available from: https://ssrn.com/abstract=2803733 or https://dx.doi.org/10.2139/ssrn.2803733.

Bushee, B. J., Gow, I. D., and Taylor, D. J., 2018. Linguistic complexity in firm disclosures: obfuscation or information? *Journal of Accounting Research*, 56, 85–121.

Das, S.R., 2013. Text and context: language analytics in finance. *Foundations and Trends in Finance*, 8, 145–261.

Davis, A.K. and Tama-Sweet, I., 2012. Managers' use of language across alternative disclosure outlets: earnings press releases versus MD&A. *Contemporary Accounting Research*, 29 (3), 804–837.

Dikolli, S., Keusch, T., Mayew, W., and Steffen, T., 2017. Using shareholder letters to measure CEO integrity. Available from: SSRN: https://ssrn.com/abstract=2131476.

Dyer, T., Lang, M., and Stice-Lawrence, L., 2017. The evolution of 10-K textual disclosure: evidence from latent dirichlet allocation. *Journal of Accounting and Economics*, 64, 221–245.

Elliot, R., 1998. Accounting in the 21st century. *Saxe Lectures in Accounting*, 2 November 1998 Available from: https://www.baruch.cuny.edu/library/alumni/online_exhibits/digital/saxe/saxe_1998/elliott_98.htm.

El-Haj, M., Alves, P., Rayson, P., Walker, M., and Young, S., 2019a. Retrieving, classifying and analysing narrative commentary in unstructured (glossy) annual reports published as PDF files. *Accounting and Business Research*, forthcoming.

El-Haj, M., Rayson, P., Simaki, V., Walker, M., and Young, S., 2019b. Computational analysis of financial narratives: overview, critique, resources and future directions. Working paper.

European Commission, 2017. Guidelines on non-financial reporting (methodology for reporting non-financial information (2017/C 215/01). Available from: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52017XC0705(01)&from=EN.

European Securities and Markets Authority, 2015. *Guidelines on the Use of Alternative Performance Measures*. Available from: https://www.esma.europa.eu/system/files/2015-esma-1057_final_report_on_guidelines_on_alternative_performance_measures.pdf.
FEE, 2015. *Cogito Series. The Future of Corporate Reporting – Creating the Dynamics for Change*. Brussels: FEE Federation of European Accountants.
Financial Reporting Council, 2011. *Cutting the Clutter. Combating the Clutter in Annual Reports*. London: Financial Reporting Council. Available from: https://www.frc.org.uk/getattachment/8250571d-4c6d-4d0a-9aa6-ef6a19c1fab2/Cutting-clutter-report-April-20112.pdf.
Financial Reporting Council, 2014. *Guidance on the Strategic Report*. London: Financial Reporting Council. Available from: https://www.frc.org.uk/Our-Work/Publications/Accounting-and-Reporting-Policy/Guidance-on-the-Strategic-Report.pdf.
Financial Reporting Council, 2015. *Clear and Concise. Developments in Narrative Reporting*. London: Financial Reporting Council. Available from: https://frc.org.uk/Our-Work/Publications/Accounting-and-Reporting-Policy/Clear-Concise-Developments-in-Narrative-Reporti.aspx.
Financial Reporting Council, 2018. *UK Corporate Governance Code 2018*. London: Financial Reporting Council.
FRC Lab, 2014. *Lab Insight Report. Towards Clear and Concise Reporting*. London: Financial Reporting Council. Available from: https://www.frc.org.uk/getattachment/4c45a275-cdda-4af0-8676-1fafa78af3bd/FRC-Lab-Towards-Clear-Concise-Reporting.pdf.
Financial Reporting Council Lab, 2015. *Lab Project Report. Digital Present – Current Use of Digital Media in Corporate Reporting*. London: Financial Reporting Council. Available from: https://www.frc.org.uk/getattachment/ae48f2db-eb9a-47e5-87f7-d60866a64ae9/Lab-digital-present-report.pdf.
Goel, S., Gangolly, J., Faerman, S., and Uzuner, O, 2010. Can linguistic predictors detect fraudulent financial filings? *Journal of Emerging Technologies in Accounting*, 7, 25–46.
Gow, I. D., Kaplan, S., Larcker, D., and Zakolyukina, A., 2016. *CEO Personality and Firm Policies*. Available from: SSRN: https://ssrn.com/abstract=2805635.
Griffiths. T. and Steyvers, M., 2004. Finding scientific topics. *Proceedings of the National Academy of Sciences*, 101, 5228–5235.
Grossetti, F., Gietzmann, M., Lewis, C., and Pündrich, G., 2019. *When Less is Not Necessarily More: Losing Meaning with Dedicated Dictionaries*. Unpublished Working Paper.
Gutierrez, E.F., Minutti-Meza, M., Tatum, K.W., and Vulcheva, M., 2018. Consequences of adopting an expanded auditor's report in the United Kingdom. *Review of Accounting Studies*, in press.
Hoberg, G. and Lewis, C., 2017. Do fraudulent firms produce abnormal disclosure? *Journal of Corporate Finance*, 43, 58–85.
Hoberg, G. and Moon, K., 2017. Offshore activities and financial vs operational hedging. *Journal of Financial Economics*, 125 (2), 217–244.
International Accounting Standards Board, 2017. *Disclosure Initiative – Principles of Disclosure*. Discussion Paper PD/2017/1. London: IFRS Foundation.
International Accounting Standards Board, 2018a. *Conceptual Framework for Financial Reporting*. London: IFRS Foundation.
International Accounting Standards Board, 2018b. *Board Minutes. July 2018. Item 11G (Technology and Digital Reporting Considerations)*. London: IFRS Foundation.
The International Integrated Reporting Council, 2013. *Business Model Background Paper for <IR>. International Integrated Reporting Council*. International Integrated Reporting Council. Available from: https://integratedreporting.org/wp-content/uploads/2013/03/Business_Model.pdf.
Jordan, M., 1998. *Learning in Graphical Models*, volume 89. *Springer Science & Business Media*.
Kearney, C. and Liu, S., 2014. Textual sentiment in finance: a survey of methods and models. *International Review of Financial Analysis*, 33, 171–185.
KPMG, 2014. *The KPMG Survey of Business Reporting*. Available from: https://assets.kpmg.com/content/dam/kpmg/pdf/2014/06/kpmg-survey-business-reporting.pdf.
Larcker, D. and Zokolyukina, A., 2012. Detecting deceptive discussions in conference calls. *Journal of Accounting Research*, 50 (2012), 495–540.
Le, X., Lancaster, I., Hirst, G., and Jokel, R., 2011. Longitudinal detection of dementia through lexical and syntactic changes in writing: a case study of three British novelists. *Literary and Linguistic Computing*, 26 (4), 1–27.
Lee, H., Surdeanu, M., MacCartney, B., and Jurafsky, D., 2014. On the importance of text analysis for stock price prediction. *Proceedings of the 9th International Conference on Language Resources and*

*Evaluation, LREC* 2014. Reykjavik, Iceland. Available at: https://nlp.stanford.edu/pubs/lrec2014-stock.pdf.

Lev, B. and Gu, F., 2016. *The End of Accounting and the Path Forward for Investors and Managers*. New Jersey: Wiley.

Li, F., 2010a. The information content of forward-looking statements in corporate filings - a naive Bayesian machine learning approach. *Journal of Accounting Research*, 48 (5), 1049–1102.

Li, F., 2010b. Textual analysis of corporate disclosures: a survey of the literature. *Journal of Accounting Literature*, 29, 143–65.

Loughran, T. and McDonald, B., 2011. When is a liability not a liability? Textual analysis, dictionaries, and 10-Ks. *Journal of Finance*, 66, 35–65.

Loughran, T. and McDonald, B., 2016. Textual analysis in accounting and finance: a survey. *Journal of Accounting Research*, 54 (4), 1187–1230.

Loughran, T., McDonald, B., and Yun, H., 2009. A wolf in sheep's clothing: the use of ethics-related terms in 10-K reports. *Journal of Business Ethics*, 89, 39–49.

Merkl-Davies, D. and Brennan, N., 2007. Discretionary disclosure strategies in corporate narratives: incremental information or impression management? *Social Science Electronic Publishing*, 26, 116–196.

Morunga, M. and Bradbury, M.E., 2012. The impact of IFRS on annual report length. *Australasian Accounting, Business and Finance Journal*, 6(5), 47–62.

Organisation for Economic Cooperation and Development, 2017. *Guidelines for Multinational Enterprises*. Available from: https://www.oecd.org/daf/inv/mne/48004323.pdf?_ga=2.45268260.1897114088.1546178890-1898414720.1542015530.

Paredes, T. A., 2003. *Blinded by the Light: Information Overload and Its Consequences for Securities Regulation*, 81 Wash. U. L. Q. 417.

Pensions and Lifetime Savings Association, 2016. *Understanding the Worth of the Workforce: A Stewardship Toolkit for Pension Funds*. Available from: https://www.plsa.co.uk/portals/0/Documents/0591-Understanding-the-worth-of-the-workforce-a-stewardship-toolkit-for-pension-funds.pdf.

Purda, I. and Skillicorn, D, 2015. Accounting variables, deception, and a Bag of words: assessing the tools of fraud detection.". *Contemporary Accounting Research*, 32 (3), 1193–1223.

Rashid, A., Baron, A, Rayson, P., May-Chahal, C., Greenwood, P., and Walkerdine, J., 2013. Who am I? analyzing digital personas in cybercrime investigations. *Computer*, 46, 54–61.

Rish, I, 2001. An empirical study of the naive Bayes classifier. *In IJCAI 2001 Workshop on Empirical Methods in Artificial Intelligence*, 3, 41–46.

Sebastiani, F, 2002. Machine learning in automated text categorization. *ACM Computing Surveys*, 34 (1), 1–47.

Siano, F. and Wysocki, P., 2018. *The Primacy of Numbers in Financial and Accounting Disclosures: Implications for Textual Analysis Research*. Working paper, available at: https://ssrn.com/abstract=3223757.

United Nations, 2017. *UN Guiding Principles Reporting Framework*. Shift Project Ltd. and 2015 Mazars LLP. Available from: https://www.ungpreporting.org/wp-content/uploads/UNGPReportingFramework_2017.pdf.

Young, S., 2014. The drivers, consequences and policy implications of non-GAAP earnings reporting. *Accounting and Business Research*, 44 (4), 444–465.

## Appendices

### *Appendix 1. Naïve Bayes Classification (NBC)*

NBC is a maximum likelihood estimate that is based on an application of Bayes' rule. To better motivate the underlying intuition for how the classifier works, it is instructive to revisit Bayes' rule in the context of category classification.

Suppose, for example, that we reduce a document $\boldsymbol{d}$ to a list of words, where $\boldsymbol{D_d} = (w_{1d}, w_{2d}, \ \ldots, w_{Id})$ is a vector of the frequency that words associated with the 'vocabulary' of $I$ words appear in document $\boldsymbol{d}$. This 'bag-of-words' approach implicitly assumes that context is unimportant and that the actual words counts are sufficient to characterize a document.

The goal of NBC is to classify the document into a specific category ($c_j$) from a set of $J$ possible categories ($C_J$). The probability that $w_{id}$ reflects category $j$ can be defined in terms of conditional probabilities as

$$p(c_j, w_{id}) = p(c_j|w_{id})p(w_{id}) \tag{A1}$$

and

$$p(c_j, w_{id}) = p(w_{id}|c_j)p(c_j) \tag{A2}$$

Equations (A1) and (A2) can be equivalently written as the probability of attribute $c_j$ conditional on observing word $i$ in document $d$:

$$p(c_j|w_{id}) = \frac{p(w_{id}|c_j)p(c_j)}{p(w_{id})} \ . \tag{A3}$$

Consider the simple case where we want to classify the tone of document into one of two categories: positive ($pos$) or negative ($neg$) having observed word $w_{id}$. The probability that word $\boldsymbol{i}$ is associated with a positive tone is:

$$p(pos|w_{id}) = \frac{p(w_{id}|pos)p(pos)}{p(w_{id}|pos)p(pos) + p(w_{id}|neg)p(neg)} \ , \tag{A4}$$

and the corresponding probability that word $\boldsymbol{i}$ has negative tone is:

$$p(neg|w_{id}) = \frac{p(w_{id}|neg)p(neg)}{p(w_{id}|pos)p(pos) + p(w_{id}|neg)p(neg)} \ , \tag{A5}$$

where

$$p(w_{id}) = p(w_{id}|pos)p(pos) + p(w_{id}|neg)p(neg) \ . \tag{A6}$$

Since classification takes place at the document level, the basic decision rule is to evaluate the probability associated with observing all of the $\boldsymbol{I}$ words in document $\boldsymbol{d}$ conditional on the document's tone:

$$p(\boldsymbol{D_d}|c_j)p(c_j) = p(c_j)\prod_{i=1}^{I} p(w_{id}|c_j) \tag{A7}$$

The representation in Equation (A6) reflects the assumption that words are generated independently and that $p(c_j)$ has the same value for each word *conditional* on attribute $c_j$. For example, the probability that

document $\boldsymbol{d}$ has positive tone is expressed as

$$p(pos|\boldsymbol{D}_d) = \frac{p(pos)\prod_{i=1}^{I} p(w_{id}|pos)}{p(pos)\prod_{i=1}^{I} p(w_{id}|pos) + p(neg)\prod_{i=1}^{I} p(w_{id}|neg)}. \quad (A8)$$

A document is classified as having positive tone if:

$$p(pos|\boldsymbol{D}_d) > p(neg|\boldsymbol{D}_d); \quad (A9)$$

otherwise the document is classified as having negative tone. More generally, if there are $J$ categories, the classification problem for document $\boldsymbol{d}$ is to identify the optimal category by solving

$$\boldsymbol{c}_{jd}^{*} = \underset{c_j \in \widehat{C_J}}{argmax}\, p(c_j|\boldsymbol{D}_d). \quad (A10)$$

### *A1.#Numerical example*

This section illustrates the implementation of a Naïve Bayes Classifier using a simple example that involves a vocabulary of 3 words, a training set of 10 documents and a testing set of 6 documents. Table A1 reports the characteristics of the training set. For example, document **1** has 83 words and is classified as having negative tone. Words 1, 2 and 3 in document **1** respectively occur with proportions of 11%, 63% and 27%.

Based on Table A1, the unconditional probability of observing a document with negative tone is 40% (4/10) and one with positive tone is 60% (6/10). We also calculate the probability of observing word $\boldsymbol{i}$ conditional on a document with negative tone as

$$p(w_i|neg) = \sum_{d=1}^{D} p(w_{id}|neg)/D$$

For example, the probability of observing word $\boldsymbol{1}$ for documents that are classified as having negative tone in the training set is:

$$p(w_1|neg) = \sum_{d=1}^{D} p(w_{id}|neg)/D = (0.11 + 0.23 + 0.01)/3 = 0.18$$

Table A1. Likelihood table for training data.

| | | Training likelihood | | | |
|---|---|---|---|---|---|
| Document | Tone | $w_1$ | $w_2$ | $w_3$ | Total words |
| 1 | *neg* | 0.11 | 0.63 | 0.27 | 83 |
| 2 | *neg* | 0.23 | 0.74 | 0.03 | 87 |
| 3 | *neg* | 0.01 | 0.63 | 0.35 | 71 |
| 4 | *neg* | 0.39 | 0.41 | 0.20 | 44 |
| 5 | *pos* | 0.57 | 0.18 | 0.25 | 91 |
| 6 | *pos* | 0.22 | 0.31 | 0.47 | 83 |
| 7 | *pos* | 0.44 | 0.27 | 0.29 | 55 |
| 8 | *pos* | 0.31 | 0.10 | 0.59 | 97 |
| 9 | *pos* | 0.70 | 0.20 | 0.10 | 105 |
| 10 | *pos* | 0.66 | 0.25 | 0.09 | 91 |

Table A2. Conditional probability of observing words conditional on document tone for training data.

| | $w_1$ | $w_2$ | $w_3$ |
|---|---|---|---|
| $p(w_i\|neg)$ | 0.18 | 0.60 | 0.21 |
| $p(w_i\|pos)$ | 0.48 | 0.22 | 0.30 |

Replicating this calculation for all words in the corpus conditional on tone, we obtain Table A2.

The next step is to calculate $p(\boldsymbol{D}_d|neg)p(neg)$ and $p(\boldsymbol{D}_d|pos)p(pos)$ for each document in the training sample. The calculations for document 1 are:

$$p(\boldsymbol{D}_1|neg)p(neg) = p(neg)\prod_{i=1}^{83} p(w_{i1}|neg) = 0.4 \times 0.18^9 \times 0.59^{52} \times 0.21^{22} = 6.06177\,\mathrm{e} - 34$$

and

$$p(\boldsymbol{D}_1|pos)p(pos) = p(pos)\prod_{i=1}^{83} p(w_{i1}|pos) = 0.6 \times 0.48^9 \times 0.22^{52} \times 0.29^{22} = 1.29545\,\mathrm{e} - 49$$

The probability that document 1 has negative tone is

$$p(neg|\boldsymbol{D}_1) = \frac{p(\boldsymbol{D}_1|neg)p(neg)}{p(\boldsymbol{D}_1|pos)p(pos) + p(\boldsymbol{D}_1|neg)p(neg)} = \frac{6.06177\,\mathrm{e} - 34}{1.29545\,\mathrm{e} - 49 + 6.06177\,\mathrm{e} - 34} = 1.0.$$

and the probability it has positive tone is $(neg|\boldsymbol{D}_1) = 0.0$. A simple comparison of the two estimates indicates that the document 1 is correctly classified as having negative tone. Table A3 provides tone estimates for all of the documents in the training data and reports that the naïve Bayes classifier has a 90% correct classification rate in sample. Note that the naïve Bayes classifier incorrectly assesses the probability that document 4 has negative tone as only 11% even though it was determined to actually have negative tone.

Next, we evaluate how well the naïve Bayes classifier performs out-of-sample. Table A4 reports the word counts for the testing data.

Using the word counts in Table A4, we calculate the analogous tone estimates reported in Table A3 for the testing data. The out-of-sample tests are based on the assumption that the documents in the training data occur with the same probability as were observed in the testing data, i.e. $p(neg) = 0.4$ and $p(pos) = 0.60$). In addition, we also use the same probability of observing specific words conditional on document tone as reported in Table A2. Table A5 reports that the naïve Bayes classifier has an 83% correct classification rate, indicating that the model works well out-of-sample.

Table A3. Tone estimates for training data.

| | Negative tone | | Positive tone | | |
|---|---|---|---|---|---|
| Document | $p(\boldsymbol{D}_d\|neg)\ p(neg)$ | $p(neg\|\boldsymbol{D}_d)$ | $p(\boldsymbol{D}_d\|pos)\ p(pos)$ | $p(pos\|\boldsymbol{D}_d)$ | Predicted classification |
| 1 | 6.06177E−34 | 1.000 | 1.29545E−49 | 0.000 | *neg* |
| 2 | 6.0597E−32 | 1.000 | 5.52821E−51 | 0.000 | *neg* |
| 3 | 1.54576E−28 | 1.000 | 4.66902E−44 | 0.000 | *neg* |
| 4 | 1.34711E−23 | 0.110 | 6.52956E−23 | 0.829 | *pos* |
| 5 | 3.34322E−58 | 0.000 | 4.97091E−40 | 1.000 | *pos* |
| 6 | 3.49794E−46 | 0.008 | 2.7016E−44 | 0.987 | *pos* |
| 7 | 9.3533E−33 | 0.000 | 7.77781E−27 | 1.000 | *pos* |
| 8 | 1.68071E−63 | 0.000 | 4.92575E−47 | 1.000 | *pos* |
| 9 | 9.65179E−67 | 0.000 | 1.98829E−43 | 1.000 | *pos* |
| 10 | 1.41721E−55 | 0.000 | 2.88262E−39 | 1.000 | *pos* |

Table A4. Frequency table for testing data.

| Document | Tone | Test frequency w1 | w2 | w3 | Total words |
|---|---|---|---|---|---|
| 11 | neg | 3 | 37 | 9 | 49 |
| 12 | neg | 7 | 28 | 24 | 59 |
| 13 | neg | 1 | 3 | 19 | 23 |
| 14 | pos | 16 | 35 | 75 | 126 |
| 15 | pos | 60 | 2 | 13 | 75 |
| 16 | pos | 6 | 1 | 7 | 14 |

Table A5. Tone estimates for testing data.

| | Negative tone | | Positive tone | | |
|---|---|---|---|---|---|
| Document | p(Dd\|neg) p(neg) | p(neg\|Dd) | p(Dd\|pos) p(pos) | p(pos\|Dd) | Predicted classification |
| 11 | 1.58963E−17 | 1.000 | 5.38062E−31 | 0.000 | neg |
| 12 | 1.63409E−28 | 1.000 | 3.10189E−34 | 0.000 | neg |
| 13 | 3.05837E−15 | 0.006 | 3.02086E−13 | 0.990 | pos |
| 14 | 8.33748E−71 | 0.003 | 1.50684E−68 | 0.994 | pos |
| 15 | 2.77802E−54 | 0.000 | 4.4854E−28 | 1.000 | pos |
| 16 | 1.96524E−10 | 0.000 | 3.44159E−07 | 0.999 | pos |

## *Appendix 2. Latent Dirichlet Allocation (LDA)*

LDA assumes that the words in different documents are drawn from **K** topics. The distribution of words can then be characterized as a mixture of these topics such that the probability of observing word $w_i$ is:

$$P(w_i) = \sum_{k=1}^{K} P(w_i|z_i = k)P(z_i = k) \quad \text{with} \quad i = 1, \ \ldots, I.$$

where $z_i$ is a latent variable that indicates the topic from which $w_i$ was drawn. $P(w_i|z_i = k)$ is the probability of $w_i$ in the $k$th topic, and $P(z_i = k)$ is the probability that that the word is drawn from that same $k$th topic (see Griffiths and Steyvers 2004).

The observable data are contained in a corpus denoted by $\mathfrak{D}$ made by $D$ documents such that $\mathfrak{D} = \{\boldsymbol{D}_1, \boldsymbol{D}_2, \cdots, \boldsymbol{D}_D\}$. Each document $\boldsymbol{D}_d$ is a sequence of $I$ words such that $\boldsymbol{D}_d = \{w_1, w_2, \ldots, w_I\}$. Conceptually, a document $\boldsymbol{D}_d$ is generated by drawing a topic $k$ from the topic distribution and then word $w_i$ from the word distribution conditional on topic $k$.

The model is formalized by assuming that for each document $\boldsymbol{D}_d$ there is a multinomial distribution over the $K$ topics with parameter vector $\theta_d^K$. This implies that word $w_i$ in document $\boldsymbol{D}_d$ is selected from topic $k$ with probability $P(z_i = k) = \theta_{dk}^K$. Intuitively, when we aggregate this probability to the corpus level, we obtain a $D \times K$ matrix $\boldsymbol{\theta}^K$ which represents **DTW**s. For each topic $k$ there is a multinomial distribution over $I$ words with parameter vector $\phi_I^k$ such that $P(w_i|z_i = k) = \phi_i^k$. By aggregating the parameter vector, we obtain a $K \times I$ matrix $\phi^K$which represents the **TWW**s. LDA estimation is conducted by choosing the optimal values of $\boldsymbol{\theta}^K$ and $\phi^K$. To make predictions about the corpus $\mathfrak{D}$, we assume that both $\boldsymbol{\theta}^K$ and $\phi^K$ have Dirichlet prior distributions. The Dirichlet distribution is a natural choice because it is conjugate prior to the multinomial distribution. The output of an LDA estimation that pre-specifies $K$ topics is represented by a $J \times K$ **DTW** matrix and a $K \times P$ **TWW** matrix.[19]

PX276

Page 5574

# PX 277

## (Filed Under Seal)

# PX 278

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

SCHEDULE 14A INFORMATION

PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934

(AMENDMENT NO.__)

Filed by the Registrant [X]

Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ] Preliminary Proxy Statement
[ ] Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
[X] Definitive Proxy Statement
[ ] Definitive Additional Materials
[ ] Soliciting Material Pursuant to Section 240.14a-12

QUALCOMM INCORPORATED

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.
[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

[ ] Fee paid previously with preliminary materials.
[ ] Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

QUALCOMM

January 19, 2012

Dear Fellow Stockholder:

You are cordially invited to attend Qualcomm's Annual Meeting on Tuesday, March 6, 2012. The meeting will begin promptly at 9:30 a.m. Pacific Time at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121**. I invite you to arrive early at 8:30 a.m. to preview our product displays. We will begin the Annual Meeting with a discussion and vote on the matters set forth in the Notice of Annual Meeting of Stockholders, followed by presentations and a report on Qualcomm's fiscal 2011 performance.

This year, we are again furnishing the proxy materials to stockholders primarily over the Internet. Therefore, most stockholders will not receive paper copies of our proxy materials. We will instead send these stockholders a notice with instructions for accessing the proxy materials and voting via the Internet. The notice also provides information on how stockholders may obtain paper copies of our proxy materials if they so choose. This method expedites the receipt of your proxy materials, lowers the costs of our Annual Meeting and helps to conserve natural resources.

Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. As an alternative to voting in person at the Annual Meeting, you may vote via the Internet, by telephone or, if you receive a paper proxy card in the mail, by mailing the completed proxy card. Voting by any of these methods will ensure your representation at the Annual Meeting.

**Your vote is very important to us. I urge you to vote as we recommend.**

I look forward to seeing you in San Diego at the **Irwin M. Jacobs Qualcomm Hall** on March 6, 2012.

Sincerely,

Paul E. Jacobs
*Chairman and Chief Executive Officer*

Bloomberg Law
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

QUALCOMM®

5775 Morehouse Drive
San Diego, California 92121-1714

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
## To Be Held On March 6, 2012

**To the Stockholders of QUALCOMM Incorporated:**

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders (Annual Meeting) of QUALCOMM Incorporated (the Company), a Delaware corporation, will be held at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121**, on Tuesday, March 6, 2012 at 9:30 a.m. Pacific Time for the following purposes:

1. To elect 12 directors to hold office until the next annual stockholders' meeting and until their respective successors have been elected or appointed.
2. To ratify the selection of PricewaterhouseCoopers LLP as our independent public accountants for our fiscal year ending September 30, 2012.
3. To hold an advisory vote on executive compensation.
4. To approve an amendment to the Company's Restated Certificate of Incorporation to eliminate the plurality voting provision.
5. To transact such other business as may properly come before stockholders at the Annual Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on January 9, 2012 as the record date for the determination of stockholders entitled to notice of and to vote at this Annual Meeting and at any adjournment or postponement thereof.

By Order of the Board of Directors,

Donald J. Rosenberg
*Executive Vice President,*
*General Counsel and Corporate Secretary*

San Diego, California
January 19, 2012

Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## How To Vote

If your shares are held by a broker, bank or other stockholder of record, in nominee name or otherwise, exercising fiduciary powers (typically referred to as being held in "street name"), you may receive a separate voting instruction form with this proxy statement, or you may need to contact your broker, bank or other stockholder of record to determine whether you will be able to vote electronically via the Internet or by telephone.

If you are a stockholder with shares registered in your name, you may vote by one of the following three methods:

- **Vote via the Internet.** Go to the web address *http://www.proxyvote.com* and follow the instructions for Internet voting shown on the proxy card mailed to you.
- **Vote by Telephone.** Dial 1-800-690-6903 and follow the instructions for telephone voting shown on the proxy card mailed to you.
- **Vote by Proxy Card mailed to you.** Complete, sign, date and mail the proxy card in the envelope provided. If you vote via the Internet or by telephone, please do not mail your proxy card.

PLEASE NOTE THAT IF YOUR SHARES ARE HELD BY A BROKER, BANK OR OTHER STOCKHOLDER OF RECORD AND YOU WISH TO VOTE AT THE ANNUAL MEETING, YOU MUST FIRST OBTAIN A LEGAL PROXY ISSUED IN YOUR NAME FROM THE RECORD HOLDER. OTHERWISE, YOU WILL NOT BE PERMITTED TO VOTE IN PERSON AT THE MEETING.

In this document, the words "Qualcomm," "the Company," "we," "our," "ours" and "us" refer only to QUALCOMM Incorporated and its consolidated subsidiaries and not any other person or entity.

**IMPORTANT NOTICE REGARDING THE AVAILABILITY OF PROXY MATERIALS FOR THE STOCKHOLDER MEETING TO BE HELD ON MARCH 6, 2012**

**This proxy statement and our Annual Report on Form 10-K for fiscal 2011 are available at *http://www.qualcomm.com***

We are furnishing proxy materials to our stockholders primarily via the Internet under rules adopted by the U.S. Securities and Exchange Commission (SEC), instead of mailing printed copies of those materials to each stockholder. On January 19, 2012, we mailed to our stockholders (other than those who previously requested electronic or paper delivery) a Notice of Internet Availability of Proxy Materials containing instructions on how to access our proxy materials, including our proxy statement. The Notice of Internet Availability of Proxy Materials also provides instructions on how to access your proxy card to vote via the Internet or by telephone.

This process is designed to expedite stockholders' receipt of proxy materials, lower the cost of the Annual Meeting and help conserve natural resources. If you would prefer to continue to receive printed proxy materials, please follow the instructions included in the Notice of Internet Availability of Proxy Materials. If you have previously elected to receive our proxy materials electronically, you will continue to receive these materials via e-mail unless you elect otherwise.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## 2012 PROXY SUMMARY

*This summary highlights information contained elsewhere in our proxy statement. This summary does not contain all of the information that you should consider, and you should read the entire proxy statement carefully before voting.*

### Annual Meeting of Stockholders

| | |
|---|---|
| **Time and date:** | 9:30 a.m., March 6, 2012 |
| **Place:** | Irwin M. Jacobs Qualcomm Hall<br>5775 Morehouse Drive<br>San Diego, CA 92121 |
| **Record date:** | January 9, 2012 |
| **How to vote:** | You may vote either in person at the Annual Meeting or by telephone, the Internet or mail. See the "Notice of Annual Meeting of Stockholders" for more detail regarding how you may vote if you are a registered holder or a beneficial owner of shares held in "street name." |

### Voting Matters

| Proposals | Board Voting Recommendation | Page Reference (for more detail) |
|---|---|---|
| Election of directors | FOR EACH DIRECTOR NOMINEE | 8 |
| Ratification of PricewaterhouseCoopers LLP as our independent public accountants for fiscal 2012 | FOR | 12 |
| Advisory vote on executive compensation | FOR | 13 |
| Approval of an amendment to the Company's Restated Certificate of Incorporation to eliminate the plurality voting provision | FOR | 15 |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Board Nominees

| Name | Age | Director Since | Occupation | Independent | Committee Memberships | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | AC | CC | GC | FC |
| Barbara T. Alexander | 63 | 2006 | Independent consultant | X | X | X | | |
| Stephen M. Bennett* | 57 | 2008 | Chairman of Symantec Corporation | X | | C | | |
| Donald G. Cruickshank | 69 | 2005 | Chairman of Audioboo Ltd. | X | X | | | X |
| Raymond V. Dittamore | 68 | 2002 | Retired Audit Partner, Ernst &Young LLP | X | C | | | |
| Thomas W. Horton | 50 | 2008 | Chairman, Chief Executive Officer and President, AMR Corporation | X | X | | | |
| Paul E. Jacobs | 49 | 2005 | Chairman of the Board and Chief Executive Officer | | | | | |
| Robert E. Kahn | 73 | 1997 | Chairman, Chief Executive Officer and President, Corporation for National Research Initiatives | X | | | | X |
| Sherry Lansing | 67 | 2006 | Founder and Chair of the Sherry Lansing Foundation | X | | | C | |
| Duane A. Nelles | 68 | 1988 | Self-Employed, Personal Investment Business | X | | | | C |
| Francisco Ros | 61 | 2010 | Founder and President of First International Partners, S.L. | X | | | X | |
| Brent Scowcroft | 86 | 1994 | President, The Scowcroft Group | X | | | X | |
| Marc I. Stern | 67 | 1994 | Vice Chairman and Chief Executive Officer of The TCW Group, Inc. and Chairman of Société Générale's Global Investment Management and Services North America Unit | X | | X | | |

AC Audit Committee
CC Compensation Committee
GC Governance Committee
FC Finance Committee
C Committee Chair
* Presiding Director



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Fiscal 2011 Business Performance and Executive Pay Highlights

- We achieved record revenues and earnings, driven by the popularity of smartphones, continued adoption of 3G technologies, particularly in emerging regions, and our industry-leading chipset and patent portfolio.
- We expanded our licensing base and resolved several licensing disputes, completed the $3.1 billion acquisition of Atheros Communications, Inc. and continued to build strong strategic partnerships.
- The Compensation Committee funded the fiscal 2011 annual cash incentive plan at 190% of target, driven by above-target Non-GAAP revenues and Non-GAAP operating income. The Compensation Committee awarded payouts to the named executive officers (NEOs), which are summarized in the graph on page 24. The graph on page 25 shows the relationship between the Company's financial performance and the CEO's compensation.
- The table below summarizes the key components of our NEOs' compensation for fiscal 2011 and highlights the significant portion that is variable.

| | Variable Compensation | | | | | | | | Fixed Compensation | | Total Direct Compensation (TDC) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cash Earned by the NEOs for Fiscal 2011 Performance | | Grant Date Fair Values of Equity Awards (1) | | | | | | | | | |
| Name | Non-Equity Incentive Plan Compensation ($) | + | Performance Stock Units ($) | + | Restricted Stock Units ($) | = | Total Variable Amount ($) | + | Salary Earned during Fiscal 2011 ($) | = | Amount for Fiscal 2011 ($) | Variable Amount as a % of TDC |
| Paul E. Jacobs | 5,500,000 | | 7,458,249 | | 6,864,080 | | 19,822,329 | | 1,150,591 | | 20,972,920 | 95% |
| Steven R. Altman | 2,000,000 | | 4,302,737 | | 3,959,991 | | 10,262,728 | | 828,285 | | 11,091,013 | 93% |
| William E. Keitel | 1,600,000 | | 2,696,365 | | 2,481,537 | | 6,777,902 | | 684,632 | | 7,462,534 | 91% |
| Steven M. Mollenkopf | 2,000,000 | | 2,639,132 | | 2,428,719 | | 7,067,851 | | 801,706 | | 7,869,557 | 90% |
| Donald J. Rosenberg | 1,350,000 | | 2,294,708 | | 2,112,043 | | 5,756,751 | | 641,925 | | 6,398,676 | 90% |

(1) The actual amounts that may be realized vary based on the Company's stock price performance and relative Total Shareholder Return (TSR).



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## PROXY STATEMENT
## TABLE OF CONTENTS


| | |
|---|---|
| GENERAL MATTERS | 1 |
| Voting Rights and Outstanding Shares | 1 |
| Broker Non-Votes | 1 |
| Revocability of Proxies | 1 |
| Solicitation | 1 |
| Stockholder Proposals | 2 |
| Financial Information | 2 |
| Corporate Directory | 2 |
| CORPORATE GOVERNANCE | 2 |
| Code of Ethics | 2 |
| Board Leadership Structure | 2 |
| Board Meetings, Committees and Attendance | 3 |
| Board’s Role in Risk Oversight | 5 |
| Director Nominations | 5 |
| Majority Voting, Stock Ownership Guidelines and Other Matters | 7 |
| Communications with Directors | 7 |
| Annual Meeting Attendance | 8 |
| Director Independence | 8 |
| PROPOSAL 1: ELECTION OF DIRECTORS | 8 |
| Nominees for Election at this Meeting | 9 |
| Required Vote and Board Recommendation | 13 |
| PROPOSAL 2: RATIFICATION OF SELECTION OF INDEPENDENT PUBLIC ACCOUNTANTS | 13 |
| Fees for Professional Services | 13 |
| Required Vote and Board Recommendation | 14 |
| PROPOSAL 3: ADVISORY VOTE ON EXECUTIVE COMPENSATION | 14 |
| Required Vote and Board Recommendation | 15 |
| PROPOSAL 4: APPROVAL OF AN AMENDMENT TO THE RESTATED CERTIFICATE OF INCORPORATION TO ELIMINATE THE PLURALITY VOTING PROVISION | 16 |
| Background of Proposal | 16 |
| Required Vote and Board Recommendation | 16 |
| STOCK OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 17 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 19 |
| Compensation Committee Interlocks and Insider Participation in Compensation Decisions | 19 |
| Equity Compensation Plan Information | 19 |
| CERTAIN RELATIONSHIPS AND RELATED-PERSON TRANSACTIONS | 20 |
| COMPENSATION COMMITTEE REPORT | 21 |
| EXECUTIVE COMPENSATION AND RELATED INFORMATION | 21 |
| Executive Summary | 22 |
| Compensation Discussion and Analysis | 28 |
| Compensation Decisions for Our NEOs for Fiscal 2012 | 43 |
| Other Components of our Executive Compensation Programs | 45 |
| Post-Employment Compensation | 47 |
| Other Policies and Practices | 48 |
| Compensation Risk Management | 49 |
| Compensation Tables and Narrative Disclosures | 49 |
| Director Compensation | 60 |
| AUDIT COMMITTEE REPORT | 62 |
| OTHER MATTERS | 64 |
| APPENDIX 1 | A-1 |
| APPENDIX 2 | B-1 |
| APPENDIX 3 | C-1 |


Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

a Senior Project Manager. During fiscal 2011, Paul Nelles earned $105,244 in base salary and $19,300 in cash incentives and received restricted stock unit grants totaling 575 shares.

Steven R. Altman's brother, Jeffrey S. Altman, serves as Vice President, Business Development. Jeffrey Altman earned $210,646 in base salary and $60,000 in cash incentives during fiscal 2011 and received restricted stock unit grants totaling 6,100 shares.

Steven M. Mollenkopf's brother, James D. Mollenkopf, serves as Senior Director, Strategic Development. James Mollenkopf earned $192,614 in base salary and $72,500 in cash incentives during fiscal 2011 and received a stock option grant for 11,000 shares of our stock at an exercise price of $44.76 per share and a restricted stock unit grant for 1,875 shares.

Daniel L. Sullivan's daughter, Megan Delgado, serves as Senior Manager, Marketing. Megan Delgado earned $100,233 in base salary and $21,500 in cash incentives during fiscal 2011 and received restricted stock unit grants totaling 634 shares.

## COMPENSATION COMMITTEE REPORT

The Compensation Committee reviewed and discussed the Compensation Discussion and Analysis (CD&A) with management. Based on this review and discussion, the Compensation Committee recommended to the Board that the CD&A be included in our 2012 Proxy Statement.

COMPENSATION COMMITTEE

Stephen M. Bennett, Chair
Barbara T. Alexander
Marc I. Stern

## EXECUTIVE COMPENSATION AND RELATED INFORMATION

This section of the proxy statement includes the following:

- The Executive Summary highlights our pay-for-performance approach and key compensation programs and provides a brief overview of the factors that we believe are most relevant to stockholders as they consider their votes on Proposal 3 (advisory vote on executive compensation, or "Say-on-Pay").
- The Compensation Discussion and Analysis (CD&A) section describes and analyzes our compensation programs and the specific amounts of compensation paid to our Chief Executive Officer (CEO), Chief Financial Officer (CFO) and the other three most highly compensated executive officers for fiscal 2011. Collectively, we refer to these individuals as the "Named Executive Officers" or the "NEOs."
- The Compensation Risk Management section describes the process applied, and the factors considered by both the Company and the Compensation Committee, in an assessment that concluded that our compensation policies and practices do not encourage excessive and unnecessary risk taking that would be reasonably likely to have a material adverse effect on the Company.
- The Compensation Tables and Narrative Disclosure section reports the compensation and benefit amounts paid to our NEOs for fiscal 2011. The amounts attributable to long-term equity incentive awards represent the grant date fair value of those awards for which actual amounts earned or realized is dependent upon the Company's stock price performance and continued employment with Qualcomm.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Executive Summary

***Pay for Performance:*** In structuring our cash incentive award program, we use Non-GAAP revenues and Non-GAAP operating income as financial objectives because they (1) focus the executive officer team on overall business growth and profitability; (2) provide direct linkage between decisions and outcomes; and (3) are two key factors that influence stockholder value. The Compensation Committee determined that the Non-GAAP objectives better enable evaluation of operating results on a consistent and comparable basis than would objectives measured in conformity with GAAP. These Non-GAAP objectives exclude the Qualcomm Strategic Initiatives (QSI) reportable segment, certain estimated share-based compensation and certain acquisition-related items because we view such items as unrelated to our operational performance. Fiscal 2011 Non-GAAP revenues and Non-GAAP operating income and fiscal 2009 Non-GAAP operating income were adjusted to exclude certain items for calculating financial performance. See further discussion under the “Fiscal 2011 annual cash incentive program” section on page 33. The most directly comparable GAAP financial measures and information reconciling these adjusted Non-GAAP financial measures to our financial results prepared in accordance with GAAP are included in Appendix 3.

The two graphs below are intended to provide context for understanding the increased annual cash incentives our NEOs earned for fiscal 2011 as compared to the amounts they earned for fiscal 2010 and 2009. The “Percent Growth in Financial Objectives” graph on the left below shows that our fiscal 2011 financial objectives established targets of double-digit growth (14% in Non-GAAP revenues and 11% in Non-GAAP operating income) above our fiscal 2010 achievements. Our fiscal 2010 financial objectives established targets of single-digit growth (4% in Non-GAAP revenues and 2% in Non-GAAP operating income) above our fiscal 2009 achievements. The “Percent Growth in Financial Achievements” graph on the right below shows that our fiscal 2011 financial achievements exceeded the double-digit growth objectives (30% actual growth in Non-GAAP revenues and 35% actual growth in Non-GAAP operating income). Our fiscal 2010 financial achievements also exceeded the growth objectives (6% actual growth in Non-GAAP revenues and 5% in actual growth in Non-GAAP operating income), but not to the same extent that was achieved in fiscal 2011.






Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The “Percent of Financial Objectives Achieved and Resulting Incentive Multiple” graph below shows the relationship between our financial performance and the factor we used to determine the funds available for the annual cash incentive awards. In fiscal 2011, we achieved 114% of our Non-GAAP revenues objective and 122% of our Non-GAAP operating income objective, resulting in an Incentive Multiple of 1.90 (see the “Fiscal 2011 annual cash incentive program” and “Grants of Plan-Based Awards” sections for descriptions of the cash incentive program and formula). We place more relative weight on Non-GAAP operating income performance than on Non-GAAP revenues performance because we believe profit is slightly more important for stockholder value creation than top-line growth. In fiscal 2010, while we exceeded the objectives for fiscal 2010 to an extent similar to fiscal 2009, the funding rate for our cash incentive plan was slightly reduced from the fiscal 2009 rate because we achieved a higher percentage of our Non-GAAP operating income objective for fiscal 2009.

**Percent of Financial Objectives Achieved and Resulting Incentive Multiple**






Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Because of our strong financial performance in fiscal 2011, the Compensation Committee determined that, consistent with the incentive program design, the CEO's and the other NEOs' annual cash incentive awards for fiscal 2011 would be above the target amounts established at the beginning of fiscal 2011 and greater than the amounts received for fiscal 2010 and 2009, as illustrated in the "NEO Annual Cash Incentive Awards" graph below.

NEO Annual Cash Incentive Awards






Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

***CEO Compensation:*** Dr. Jacobs's 2011 total direct compensation (i.e., salary, cash incentive and long-term equity awards) was 24% more than each of his 2010 and 2009 amounts. The "CEO Pay for Performance" graph below presents Dr. Jacobs's total direct compensation (TDC) compared to the Non-GAAP revenues and Non-GAP operating income achievements for fiscal 2009 through 2011.

CEO Pay for Performance






Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The “CEO Pay Components” graph below compares Dr. Jacobs’s salary, cash incentive earned and long-term incentive award for fiscal 2011, 2010 and 2009. His fiscal 2011 equity award consisted of performance stock units (PSUs) and restricted stock units (RSUs), while his fiscal 2010 equity award consisted of stock options and PSUs, and his fiscal 2009 equity award consisted entirely of stock options.

Dr. Jacobs’s cash incentive award for fiscal 2011 of $5.5 million was 90% more than the target amount of $2.9 million, 63% more than his fiscal 2010 award of $3.4 million and 53% more than his fiscal 2009 award of $3.6 million. This reflects our fiscal 2011 results, which substantially exceeded the goals that we set at the beginning of the year, whereas our results for fiscal 2010 and 2009 were much closer to the goals set at the beginning of those years.

CEO Pay Components




*Current Status of our PSU Programs:* During fiscal 2011, there were two concurrent PSU programs in place: (1) the fiscal 2010 PSU program (described in the “Performance Stock Units” section under “Grants of Plan-Based Awards” in our proxy statement dated January 20, 2011); and (2) the fiscal 2011 PSU program (described in the “Fiscal 2011 Annual Long-Term Incentive Awards” section in the CD&A and the “Performance Stock Units” section under “Grants of Plan-Based Awards” in the “Compensation Tables and Narrative Disclosures” section of this proxy statement). Because two measurement periods have been completed for the fiscal 2010 PSU program and no measurement periods have yet been completed for the fiscal 2011 PSU program, we can provide a status update for only the fiscal 2010 PSU program in this proxy statement.

The first measurement period of our fiscal 2010 PSU program was completed during fiscal 2011, and the second measurement period was completed shortly after the end of fiscal 2011. The third measurement period will be completed on April 30, 2012, and the fourth (and final) measurement period will be completed on October 31, 2012. During the first measurement period, our Total Shareholder Return (TSR) was slightly below that of the NASDAQ 100, resulting in slightly fewer than target PSUs earned. Our TSR was above that of the NASDAQ 100



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

during the second measurement period, and PSUs above the target amount were earned. The “Summary of Fiscal 2010 PSU Program Performance” table below presents the results of these first two measurement periods.

### Summary of Fiscal 2010 PSU Program Performance

| Performance Period | Qualcomm TSR | ÷ | NASDAQ 100 TSR | = | Ratio of Qualcomm to NASDAQ 100 | Percent of Measurement Period Target Award Earned |
|---|---|---|---|---|---|---|
| 11/2/2009 - 4/29/2011 | 130.76% | | 134.72% | | 97.06% | 98.53% |
| 11/2/2009 - 10/31/2011 | 126.03% | | 119.25% | | 105.69% | 102.84% |

***Compensation Program Practices***: We have many practices that promote consistent leadership, decision-making and actions among our NEOs that are consistent with our values of innovation, execution and collaboration without taking inappropriate or unnecessary risks. These practices include:

- In fiscal 2011, a majority of the long-term incentive awards granted to our CEO, the other NEOs and other executive officers were in the form of performance-based awards. The mix of PSUs and RSUs rewards relative and absolute stock price appreciation, thereby aligning the interests of our stockholders and executive officers.
- On average, 77% of our NEOs’ fiscal 2011 annual target compensation was attributable to the grant date fair value of long-term incentive equity awards, and 91% of their fiscal 2011 annual target compensation was variable in the form of annual cash incentives and long-term incentive equity awards.
- We have a balance of short-term (Non-GAAP revenues and Non-GAAP operating income) and long-term (relative TSR) performance measures.
- We have a balance of time horizons for our ongoing incentive awards, including an annual cash incentive program, a three-year PSU program, RSUs that become fully vested three years after the grant date and stock options that become fully vested four years after the grant date with a seven-year term.
- We limit the potential annual cash incentive amounts that the NEOs may earn to 2.5 times the target amount. We introduced PSUs in fiscal 2010 and limited the potential number of shares of Qualcomm stock that our NEOs may earn to 2.0 times the target amount for the fiscal 2011 awards and 1.25 times the target amount for the fiscal 2010 awards. The higher maximum award for fiscal 2011 aligns relative earned compensation with relative performance (e.g., compensation in the top quartile is earned for performance achieved in the top quartile) consistent with our pay-for-performance philosophy. The fiscal 2010 awards included a minimum award of 75% of the target amount, whereas the fiscal 2011 awards did not include a minimum award amount.
- We continued the risk assessments for our compensation and benefit programs and human resources data management processes and practices relative to executive, non-executive and sales compensation programs that we initiated in fiscal 2010.
- We established stock ownership guidelines in September 2006. In October 2010, we increased the ownership guideline for the CEO from five times to six times annual base salary. Our CEO and two of the other NEOs were required to and have met their respective guidelines as of September 25, 2011, and the remaining NEOs are progressing towards their respective guidelines.
- We do not make tax gross-up payments on compensation or benefits, except where directly business-related and provided in a policy applicable to all eligible employees, such as relocation.
- We adopted a cash incentive compensation repayment (“claw back”) policy effective January 1, 2009, and we intend to amend the policy to comply with the additional requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) after the SEC adopts new regulations implementing those requirements.
- Our insider trading policy for executive officers and non-employee directors prohibits transactions involving “short-swing” profits, short sales and derivatives, including put and call options and forward sales contracts.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Our policy requires that a Qualcomm trading compliance officer first pre-clear complex transactions such as loans and other transactions that may be structured to monetize or otherwise obtain value for stock holdings.

- We employ our NEOs "at will," without severance agreements or employment contracts. Thus, our CEO and other NEOs do not have guaranteed arrangements for cash compensation or severance upon a change in control or excise tax gross-up for change-in-control payments. Furthermore, no outstanding unvested equity awards assumed by an acquirer in the event of a change in control would accelerate for employees, including NEOs, who were not involuntarily terminated or who did not terminate voluntarily "for good reason" during a specified period after the change in control (i.e., "double-trigger" treatment of unvested awards).

Our compensation programs are subject to a thorough process that includes Compensation Committee review and approval of program design and practices; the advice of an independent, third-party compensation consultant engaged by the Compensation Committee; and long-standing, consistently applied practices with respect to the timing and pricing of stock options.

### Compensation Discussion and Analysis

In this section, we discuss and analyze our compensation programs and the specific amounts of compensation paid to our Chief Executive Officer (CEO), Chief Financial Officer (CFO) and the other three most highly compensated executive officers for fiscal 2011. Collectively, we refer to these individuals as the "Named Executive Officers" or the "NEOs." They are:

- Dr. Paul E. Jacobs, Chairman and CEO, has 21 years of service with Qualcomm and has been CEO since July 2005 and Chairman since March 2009.
- Mr. William E. Keitel, Executive Vice President (EVP) and CFO, has 15 years of service with Qualcomm and has been CFO since February 2002.
- Mr. Steven R. Altman, Vice Chairman, has 22 years of service with Qualcomm and has been Vice Chairman since November 2011. During fiscal 2011, Mr. Altman served as President.
- Mr. Steven M. Mollenkopf, President and Chief Operating Officer, has 17 years of service with Qualcomm and has been President and Chief Operating Officer since November 2011. During fiscal 2011, Mr. Mollenkopf served as Executive Vice President and Group President.
- Mr. Donald J. Rosenberg, EVP, General Counsel and Corporate Secretary, has 4 years of service with Qualcomm.

***Compensation Program Objectives and What We Reward:*** Our compensation program has five primary objectives:

- Align the interests of our NEOs and long-term stockholders;
- Pay for performance: annual cash incentive amounts earned vary with performance compared to pre-established financial objectives, and amounts potentially realized from long-term equity incentive awards will vary with absolute stock price performance and relative TSR;
- Deliver pay that is competitively reasonable and appropriate for our business needs and circumstances;
- Reflect high standards for corporate governance and compensation-related risk management; and
- Be tax efficient for the Company.

***Key Components of Our NEO Compensation Program:*** We are including three tables to summarize the key components of our NEO compensation program. The first table, immediately below, includes the principal components of our pay-for-performance approach. The other two tables are included in the final section of the CD&A under the heading "Other Components of Our Executive Compensation Programs" on page 45. These two additional tables summarize benefit programs that are available only to our NEOs and other employees in vice president or senior vice president roles and benefit programs that are generally available to all of our U.S.-based employees, including our NEOs.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

### Principal Components of our Pay-for-Performance Approach (1)

| Component | Purpose | Form | Pay-for-Performance | Comment |
|---|---|---|---|---|
| Base salary | Provide sufficient competitive pay to attract and retain experienced and successful executives. | Cash | Adjustments to base salary consider individual performance, contributions to the business, competitive practices and internal comparisons. | Annual fixed cash compensation. Base salary reflects the employee's level of responsibility, expertise, skills, knowledge and experience. The Compensation Committee determines the amount in November and any adjustment to the annual rate is effective in late December. |
| Annual cash incentive | Encourage and reward contributions to our annual financial performance objectives. Engage executives in execution, collaboration and teamwork. Emphasize accountability for results. | Cash | The potential award amount varies with the degree to which we achieve our annual financial objectives and the extent to which the NEO contributes to strategic and operational objectives. | Annual variable cash compensation. The Compensation Committee, at its sole discretion, may adjust the amount of the annual cash incentive earned as calculated based on the pre-established formula. It determines the fiscal year target amount in November and approves the actual amount earned the following November, after the close of the fiscal year. |
| Long-term incentive | Encourage and reward building long-term stockholder value, employment retention and company stock ownership. Engage executives in innovation and align them with stockholder interests. We provide a mix of equity award types to balance specific objectives.<br>Stock options: Reward absolute stock price appreciation.<br>PSUs: Reward relative stock performance.<br>RSUs: Maintain retention value through short-term market volatility. | PSUs, RSUs and Stock options | PSUs: A variable amount of Qualcomm shares are awarded based on the relative performance of our TSR compared to that of the NASDAQ 100.<br>RSUs: Retain executives and align them with stockholders' interests by awarding a fixed number of Qualcomm shares upon vesting.<br>Stock Options: The potential appreciation in our stock price above the option exercise price motivates our NEOs to build stockholder value. NEOs may realize an amount only if our stock price appreciates over the option term. | Long-term variable share-based compensation. The Compensation Committee, at its sole discretion, determines the mix of equity awards (stock options, RSUs and PSUs) and the value of awards granted each year. It determines the value of the awards in November and the awards are granted on the date the Compensation Committee approves the awards. We encourage stock ownership through guidelines applicable to all of our executive officers. |

(1) All of our employees receive a base salary and are eligible to participate in our annual cash incentive program, and substantially all of our employees are eligible to participate in our long-term incentive program.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

***Determining the Amount of Compensation for Our NEOs***: The amount of compensation we provide our NEOs is intended to be:

*Competitively reasonable and appropriate for our business needs and circumstances*. We consider competitive compensation practices by other companies as reference points that the Compensation Committee may use for comparative purposes. We do not target specific benchmark percentiles.

*Internally fair and equitable relative to roles, responsibilities and work relationships*. Management and the Compensation Committee may consider certain business and individual factors to evaluate internal fairness and equity. We do not attempt to establish specific internal relationships among the NEOs.

*Variable from year-to-year based on the Company's performance and individual performance ("pay-for-performance")*. Our annual cash incentive program and long-term incentive awards deliver compensation to our NEOs when we achieve our financial performance objectives; the price of our stock appreciates above the stock option exercise price during the option term; and our TSR, relative to the NASDAQ 100 Total Return Index (NASDAQ 100), meets or exceeds a minimum threshold.

In determining the compensation amounts and opportunities, we consider several factors, including (1) competitive compensation practices, (2) business and individual factors, (3) the perspectives provided by the Compensation Committee's independent compensation consultant, Frederic W. Cook & Co., Inc. (FWC), and (4) the CEO's evaluations and recommendations for the other executive officers. We discuss each of these factors in the following sections.

**Competitive compensation practices.** We conduct analyses using compensation data disclosed in SEC filings to establish reference points (i.e., the statistical median and the 75th percentile) that we use to compare our NEOs' compensation to that provided by peer companies.

*Peer companies for fiscal 2011*. The Compensation Committee objectively identified the peer group companies, taking into account FWC's recommendations, based on the following characteristics with regard to Qualcomm:

- Principal business in a technology, media or telecommunications industry segment;
- Generally comparable in market capitalization (guideline of one-quarter to four-times Qualcomm);
- Comparable performance-based compensation model; and
- Commonly used as peers of peers (i.e., the peer companies disclosed by the companies we used as peers).

**Peer Companies for Fiscal 2011**

| | | |
|---|---|---|
| Adobe Systems | Amazon | Apple |
| Applied Materials | AT&T | Broadcom |
| Cisco | Comcast | Corning |
| Dell | DirecTV | eBay |
| EMC | Google | Hewlett Packard |
| IBM | Intel | Microsoft |
| Motorola | Oracle | Texas Instruments |
| Time Warner | Time Warner Cable | United Technologies |
| Verizon | Viacom | Walt Disney |
| Yahoo! | | |



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Changes from the fiscal 2010 peer companies included the addition of Time Warner Cable because it was (1) comparable in terms of net income and market capitalization, (2) a recent spin-off from another peer company and (3) a potential competitor for executive talent. Sprint Nextel was excluded for fiscal 2011 because they were below the minimum values established for peer company profitability and market capitalization.

**Peer Company Data (1) (Dollars in billions)**

| | Range | Median | Qualcomm | Qualcomm's Rank |
|---|---|---|---|---|
| Market Capitalization | $15.5 - $252.6 | $41.3 | $ 61.4 | 12 of 29 |
| Revenues (trailing four quarters) | $ 2.9 - $123.0 | $24.1 | $ 10.6 | 22 of 29 |
| Net Income (trailing four quarters) | $(0.1) - $ 16.3 | $ 2.4 | $ 2.1 | 16 of 29 |
| 1-year TSR (2) | 8% - 129% | 71% | 11% | 27 of 29 |
| 3-year TSR (2) | (28%) - 45% | (3%) | (2%) | 13 of 29 |

(1) Qualcomm and the peer company data reported was as of February 2010, the time at which FWC prepared the peer company selection analysis. At its April 2010 meeting, the Compensation Committee determined the peer companies that were used for the competitive analyses prepared by FWC. The Compensation Committee reviewed the competitive analyses at its September 2010 meeting, prior to making fiscal 2011 compensation decisions at its November 2010 meeting.

(2) TSR includes increases in stock price and assumes reinvestment of any dividends paid. The percentage is calculated by dividing (a) the increase or decrease in the stock price and the dividends paid during the period by (b) the stock price at the beginning of the period.

**Business and individual factors.** In addition to compensation amounts that are competitively reasonable and appropriate, we intend for our compensation amounts to be internally fair and equitable relative to roles, responsibilities and relationships among our NEOs. Accordingly, we also consider many other factors in the process of determining compensation levels for each NEO, including:

- The Compensation Committee's evaluation of the CEO and other NEOs;
- Individual performance and contributions to financial goals, such as Non-GAAP revenues, profitability, free cash flow and Non-GAAP operating expenses;
- Labor market conditions, the need to retain and motivate the NEO and the NEO's potential to assume increased responsibilities and long-term value contribution to the Company;
- Management succession plans and bench strength;
- Operational management, such as project milestones and process improvements;
- Internal working and reporting relationships and our desire to encourage collaboration and teamwork among our NEOs;
- Individual expertise, skills, knowledge and tenure in position; and
- Leadership, including developing and motivating employees, collaborating within Qualcomm, attracting and retaining employees and personal development.

We do not have a predefined framework that determines which of these factors may be more or less important, and the emphasis placed on specific factors may vary among the NEOs. Ultimately, it is the Compensation Committee's judgment of these factors, along with competitive data, that form the basis for determining the CEO's, the other NEO's and executive officers' compensation.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

**Other factors considered in determining NEO compensation.**

*Results from the 2011 Annual Meeting advisory vote on executive compensation.* At our 2011 Annual Meeting, the ballot included our first advisory vote on executive compensation, commonly known as “Say-on-Pay.” The vote was not binding upon the Company, the Board of Directors or the Compensation Committee. Of the votes cast, including abstentions, 94.4% were “FOR” the compensation of the executive officers as disclosed in the “Executive Compensation and Related Information” section of the proxy statement. The Compensation Committee was cognizant of this result in its considerations to continue the key components, design, implementation and amounts of our compensation programs.

*Prior compensation or amounts realized or realizable from prior equity compensation*. FWC prepared and reviewed with the Compensation Committee an analysis of the NEOs’ equity holdings based on the current and potential values of their equity awards and ownership of our stock. The Compensation Committee and the CEO reviewed these analyses as part of their broader consideration of alignment with stockholder interests, succession planning and retention of executive officers. The Compensation Committee also determined not to include the amounts of annual cash incentives for fiscal 2010 (paid in fiscal 2011) and the amounts realized or realizable from prior equity awards in establishing compensation amounts for fiscal 2011 because we award cash incentives for fiscal year performance, and equity awards are forward-looking long-term incentives granted as part of the direct compensation that the Compensation Committee establishes each year. The Compensation Committee believes that reducing equity award grant values because of prior gains and ownership could penalize our executive officers for their long-term service and past and future performance.

*CEO involvement in compensation decisions*. After the end of the fiscal year, the Compensation Committee and the CEO discussed our business performance, his performance and his evaluation of and compensation recommendations for the other NEOs. The Compensation Committee, without the CEO present, determined the CEO’s base salary, annual cash incentive and long-term equity awards. The Compensation Committee also approved the CEO’s recommendations for base salaries, annual cash incentives and long-term equity awards for the other NEOs.

**The Compensation Committee’s independent consultants and advisors.**

*Consultants and advisors*. The Compensation Committee has the authority to retain and terminate any independent, third-party compensation consultant and to obtain independent advice and assistance from internal and external legal, accounting and other advisors. During fiscal 2011, the Compensation Committee engaged an independent executive compensation consulting firm, FWC, to advise it on compensation matters. FWC reported directly to the Compensation Committee. We did not engage FWC for any additional services during fiscal 2011 beyond its support of the Compensation Committee. The engagement did not raise any conflicts of interest, and pursuant to this engagement, FWC:

- Provided information, insights and advice regarding compensation philosophy, objectives and strategy;
- Recommended peer group selection criteria and identified and recommended potential peer companies;
- Provided analyses of competitive compensation practices for executive officers and non-employee directors;
- Provided analyses of potential risks arising from our executive, non-executive and sales compensation programs;
- Provided analyses of aggregate equity compensation spending;
- Reviewed and commented on recommendations regarding NEO compensation; and
- Advised the Compensation Committee on specific issues as they arose.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Representatives from FWC attended all Compensation Committee meetings during fiscal 2011 and interacted with the Committee Chair, members of our human resources staff and outside legal counsel prior to and following Compensation Committee meetings. We paid $261,512 in fees to FWC during fiscal 2011, all for work that was directly in support of the Compensation Committee and execution of the Committee's responsibilities under its charter.

The Compensation Committee also sought and received advice from our outside legal counsel, DLA Piper. The total rewards management department within our human resources organization supported the Compensation Committee in its work, collaborated with FWC and DLA Piper, conducted analyses and managed our compensation and benefit programs.

*Discussion of NEO Compensation for Fiscal 2011*

In the first quarter of fiscal 2011, the Compensation Committee determined base salaries, target annual cash incentives and the grant date fair value of long-term incentive awards for the NEOs. The Compensation Committee considered information from FWC's competitive analysis, the business and individual factors described above, tax efficiency and the CEO's recommendations for the other NEOs in determining these amounts. The two graphs below summarize the total direct compensation profiles for our NEOs.

The "NEO Annual TDC for Fiscal 2011" graph below compares the target TDC amount for each NEO relative to the 50th (the triangle-shaped markers) and 75th (diamond-shaped markers) percentiles of competitive practice.

NEO Annual TDC for Fiscal 2011




(1) Excludes the $3.2 million value of a special retention equity award granted to Mr. Rosenberg in fiscal 2011 in the form of RSUs that cliff-vest four years from the grant date. The value of this equity award was excluded because the Compensation Committee views it as a special amount related to Mr. Rosenberg's key leadership at a time of complex and critical global legal affairs and government relations.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The “Relationship of TDC between CEO and Other NEOs” graph below presents the relationship of the CEO’s TDC as a multiple of the TDC for each of the four other NEOs. For example, Dr. Jacobs’s TDC is 1.8 times greater than Mr. Altman’s TDC. These relationships may be useful when considering succession planning as well as alignment and engagement among the NEOs. The CEO reviewed these relationships in making his recommendations for the other NEOs to the Compensation Committee, but the Compensation Committee did not establish specific internal compensation relationships among the NEOs when determining TDC for the other NEOs for fiscal 2011.

**Relationship of TDC between CEO and Other NEOs**




(1) Excludes the $3.2 million value of a special retention equity award granted to Mr. Rosenberg in fiscal 2011 as noted above.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

The “Contribution of Each Pay Component to TDC for Fiscal 2011” graph below illustrates the proportionate contribution of each pay component to TDC. For the NEOs, 94% of Dr. Jacobs’s TDC varies based on performance (the sum of the target annual cash incentive and the grant date fair value of long-term equity incentive awards divided by TDC). On average, 77% of our NEOs’ fiscal 2011 annual target TDC was attributable to the grant date fair value of long-term incentive equity awards, and 91% of their fiscal 2011 annual target TDC was variable in the form of annual cash incentives and long-term incentive equity awards. These proportionate contributions are substantially the same as in fiscal 2010.

**Contribution of Each Pay Component to TDC for Fiscal 2011**




(1) Excludes the $3.2 million value of a special retention equity award granted to Mr. Rosenberg in fiscal 2011 as noted above.

(2) The fair values of the RSUs were determined using the closing price of Qualcomm stock on the grant date.

(3) The fair values of the PSUs were determined using a Monte-Carlo simulation (a form of a binomial option-pricing model) with the following assumptions: expected volatility of 40.91% for Qualcomm and 30.31% for the NASDAQ 100; expected volatility of 32.80% for Qualcomm’s ending stock price; a correlation coefficient of 0.7347; risk-free rates of return of 0.39%, 0.51%, 0.64% and 0.77% for the 18-, 24-, 30- and 36- month performance periods, respectively; and a dividend rate of 1.5%.

*Fiscal 2011 annual cash incentive program*. During the first quarter of fiscal 2011, the Compensation Committee, after consultation with the CEO and review by the Board of Directors, established Non-GAAP revenues and Non-GAAP operating income objectives for the fiscal 2011 annual cash incentive program. The Non-GAAP revenues and operating income objectives for fiscal 2011 were $1.5 billion (14%) and $470 million (11%) more than the Non-GAAP revenues and operating income achieved for fiscal 2010, respectively. We applied a relative weighting of 40% to Non-GAAP revenues and 60% to Non-GAAP operating income to emphasize the relative importance of operating income on stockholder value creation.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The “Fiscal 2011 Annual Cash Incentive Calculation” table below reports our Non-GAAP revenues and Non-GAAP operating income objectives and results for fiscal 2011. We achieved 114% and 122% of our Non-GAAP revenues and Non-GAAP operating income objectives for fiscal 2011, respectively. These levels of performance, when applied to the formula approved by the Compensation Committee at the beginning of fiscal 2011, resulted in an incentive target multiple of 1.90 before any CEO and Compensation Committee discretion was applied. (See the narrative under “Grants of Plan-Based Awards” that provides a detailed description of the cash incentive program and formula.)

### Fiscal 2011 Annual Cash Incentive Calculation

| | Results ($000s) | ÷ | Target ($000s) | = | Achievement Ratio | x | Relative Weight | | Weighted Achievement Ratio |
|---|---|---|---|---|---|---|---|---|---|
| Non-GAAP revenues (1) | 14,319,587 | | 12,527,901 | | 114% | | 40% | | 45.7% |
| Non-GAAP operating income (1) | 5,818,845 | | 4,786,176 | | 122% | | 60% | | 72.9% |
| | | | | | | | Sum | = | 118.6% |
| | | | | | Incentive Multiple(2)(3) | | | | 1.90 |

(1) Fiscal 2011 Non-GAAP revenues and Non-GAAP operating income were adjusted to exclude certain items for calculating financial performance. See further discussion below.

(2) See the “Annual Cash Incentive Program” section under “Grants of Plan-Based Awards” for a discussion of how we calculate the incentive multiple.

(3) The incentive multiple has been rounded to the nearest hundredth.

Consistent with past practice, the fiscal 2011 annual cash incentive program authorized the Compensation Committee to adjust reported Non-GAAP revenues and Non-GAAP operating income for calculating financial performance on which fiscal 2011 cash incentives were determined to eliminate the distorting effect of certain unusual income or expense items on year-over-year growth percentages. As a result, $637 million and $265 million were excluded from Non-GAAP revenues and Non-GAAP operating income, respectively, for this purpose. The Compensation Committee determined that it was appropriate to exclude the items listed below in order to align award payments more closely with underlying business growth trends and eliminate volatile swings (up or down) caused by these unusual items. For fiscal 2011, the Compensation Committee adjusted Non-GAAP revenues and Non-GAAP operating income to exclude the following:

- Certain revenues resulting from agreements with two licensees to settle ongoing disputes;
- Revenues and operating income related to Atheros Communications, Inc., which was renamed Qualcomm Atheros, Inc. (Atheros) that were included in Qualcomm’s Non-GAAP results since the date Atheros was acquired in May 2011.
- Charitable contributions resulting from the establishment of the Qualcomm Charitable Foundation.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The “Fiscal 2011 Company Performance-Adjusted and Actual Cash Incentive Award Amounts” table below shows, for each NEO, the target annual cash incentive established at the beginning of fiscal 2011, the performance-adjusted incentive amount that is the product of multiplying the target annual cash incentive by the incentive multiple of 1.90, the actual incentive award amount approved by the Compensation Committee and the variance between the award and performance-adjusted amounts.

### Fiscal 2011 Company Performance-Adjusted and Actual Cash Incentive Award Amounts

| Name | Target Annual Cash Incentive ($) | Performance-Adjusted Incentive Amount ($) (1) | Amount Awarded by Compensation Committee ($) | Variance of Award Amount vs. Performance-Adjusted Amount |
|---|---|---|---|---|
| Jacobs | 2,900,000 | 5,510,000 | 5,500,000 | -0.2% |
| Altman (2) | 1,169,000 | 2,221,100 | 2,000,000 | -10.0% |
| Mollenkopf (2) | 975,000 | 1,852,500 | 2,000,000 | 8.0% |
| Keitel | 862,500 | 1,638,750 | 1,600,000 | -2.4% |
| Rosenberg | 715,000 | 1,358,500 | 1,350,000 | -0.6% |

(1) The Performance-Adjusted Incentive Amount is the product of the Target Annual Cash Incentive multiplied by the Target Incentive Multiple of 1.90 and represents a reference point that the Compensation Committee considers along with individual accomplishments in determining the NEOs’ annual cash incentive awards.

(2) The incentive awards for Messrs. Altman and Mollenkopf reflect the CEO’s and Compensation Committee’s consideration of their individual achievements described below and the CEO’s recommendation and the Compensation Committee’s decision to award them equivalent amounts for fiscal 2011.

*Fiscal 2011 annual long-term incentive awards*. The Compensation Committee exercises its discretion in approving long-term incentive award amounts. A key consideration is the resulting target direct compensation relative to competitive practices and internal pay relationships. Our compensation philosophy and practice is that total direct compensation is reasonable and appropriate when relative competitive pay is fairly aligned with relative competitive performance. After it has considered the resulting position of total direct compensation relative to competitive practice, the Compensation Committee then considers individual performance and contributions, long-term potential and retention, internal fairness and equitability and the business and individual factors described earlier.

In fiscal 2010, the Compensation Committee established a strategy to de-emphasize stock options in favor of other types of long-term equity incentives for executive officers by including grants of PSUs and RSUs in addition to stock options. We structured an ongoing PSU program to award a variable amount of Qualcomm shares based on the relative performance of our TSR compared to that of the NASDAQ 100. In this way, PSUs reward relative stock performance, including dividends; stock options reward absolute stock price appreciation; and RSUs reward stock performance while maintaining retention value through short-term market volatility. We selected the NASDAQ 100 because it (1) represents a broader capital market with which we compete for talent and capital investments, (2) is representative of the broad range of our business operations, which includes licensing of intellectual property and sales of products and services, (3) is both objectively determined and readily available, and our performance compared to the index can be evaluated at any time, (4) provides transparency for participants and stockholders and (5) facilitates the tracking and administration of the plan. (See the “Performance Stock Units” section under “Grants of Plan-Based Awards” for a description of the PSU program.)

During the first quarter of fiscal 2011, the Compensation Committee awarded a combination of PSUs and RSUs to our executive officers, and, excluding the special retention RSUs awarded to Mr. Rosenberg, each



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

executive officer received a majority of his equity awards in the form of PSUs. We made adjustments to the fiscal 2010 PSU program (described in our last proxy statement) in establishing the fiscal 2011 PSU program. The design of the fiscal 2011 PSU program is depicted in the "Fiscal 2011 PSU Award Structure" table below.

### Fiscal 2011 PSU Award Structure

| Qualcomm TSR relative to the NASDAQ 100 | Percent of Target Award Amount that may be Earned |
|---|---|
| Maximum: 133% and above | 200% |
| Target: 100% | 100% |
| Threshold: 66% | 33% |
| Less than 66% | 0% |

The total award amount that may be earned may not exceed the target award amount if Qualcomm's TSR for the three-year performance period is negative. The performance period is the three-year period from November 1, 2010 to October 31, 2013, with four separate measurement periods of 18, 24, 30 and 36 months. We determined that four separate measurement periods would encourage and reward sustained and continuous growth over the three years and align with stockholders' interests. The PSUs will not vest until the end of the performance period and include dividend equivalent rights. The dividend equivalents will accrue, in the form of additional shares of Qualcomm stock, on earned shares with vesting and distribution on the third anniversary of the grant date. The cliff-vest provision provides a retention component and aligns with the three-year performance period. The RSUs vest annually in equal amounts over three years and include dividend equivalent rights. The PSUs and RSUs are consistent with our long-term incentive program because they align the interests of our NEOs and our stockholders by rewarding relative and absolute stock price performance, and they provide the additional advantage of being retention tools under certain circumstances.

Awarding a mix of PSUs and RSUs to our NEOs and other employees enables us to address certain strategic compensation objectives, including:

- Better managing our equity burn rate (the number of shares subject to equity awards granted during the year divided by total common shares outstanding) while we increase our staffing levels and maintain a broad-based equity program in which substantially all of our employees are eligible to receive equity awards;
- Better managing our overhang (the number of outstanding unexercised stock options and unvested PSUs and RSUs);
- Better balancing of our NEOs' equity compensation portfolios, especially in times of high market volatility and when increases to our stock price may be constrained by external factors, such as legal challenges to our business model; and
- Reinforcing our already strong capability to attract, retain and engage highly talented executives.

***Discussion of compensation for Dr. Paul Jacobs, Chairman and CEO.***

| | Fiscal 2011 | Fiscal 2010 | Change |
|---|---|---|---|
| Salary | $ 1,150,591 | $ 1,146,644 | 0.3% |
| Annual cash incentive earned | 5,500,000 | 3,370,000 | 63.2% |
| Total cash compensation | 6,650,591 | 4,516,644 | 47.2% |
| Annual long-term incentive award grant date fair value | 14,322,329 | 12,375,102 | 15.7% |
| Total direct compensation (TDC) | $20,972,920 | $16,891,746 | 24.2% |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Dr. Jacobs's TDC for fiscal 2011 was 24% more than the fiscal 2010 amount primarily due to the increases in his annual cash incentive and the grant date fair value of his long-term incentive award. The Company's financial performance exceeded its objectives to a greater extent in fiscal 2011 as compared to fiscal 2010 resulting in a larger annual cash incentive amount. The PSUs included in the long-term incentive award become fully vested at the end of the three-year performance period, and the RSUs vest annually and become fully vested on the third anniversary of the grant date. The actual amount realized is dependent upon relative and absolute TSR for PSUs and absolute TSR for RSUs.

Dr. Jacobs received a bonus award of $7,125 from Qualcomm's patent award program in fiscal 2011. He received similar amounts from the patent award program in fiscal 2010 and 2009.

The Compensation Committee increased the amount of Dr. Jacobs's equity award (comprised of both PSUs and RSUs) so that his resulting TDC for fiscal 2011 would be between the median and 75th percentile of competitive practice. The amount of his equity award aligned with the 75th percentile of competitive practice, and slightly more than 50% of the shares awarded were PSUs.

After the end of fiscal 2011, the Compensation Committee awarded Dr. Jacobs an annual cash incentive of $5.5 million, which was 63% more than the amount he received for fiscal 2010. This amount is 0.2% less than the performance-adjusted incentive amount due to a nominal "rounding off" and is not a negative reflection of his performance. In determining his annual cash incentive award, the Compensation Committee considered the performance-adjusted incentive amount and his leadership in accomplishing the following:

- Dr. Jacobs led the Company to achieve fiscal 2011 strategic initiatives and operational plans, resulting in record earnings per share, record MSM chipset volumes, record CDMA-based device shipments, record QCT and QTL revenues, a record $15.0 billion in total revenues (an increase of 36% year-over-year) and a record $5.0 billion in operating income (an increase of 35% year-over-year). Additionally, under Dr. Jacobs's leadership, we returned $1.5 billion to shareholders in the form of cash dividends totaling $1.4 billion and share repurchases totaling $142 million. The Company ended the fiscal year well-positioned with a strong balance sheet, including $20.9 billion in cash, cash equivalents and marketable securities.
- Dr. Jacobs was successful with the overall development and implementation of fiscal 2011 strategies and initiatives aimed at growing revenue, increasing shareholder value and positioning Qualcomm for continued success in the market. Some of the significant highlights included expanding Qualcomm's licensing base, solidifying the Company's position in Windows Phone 7, achieving industry success with Snapdragon and demonstrating LTE leadership with the introduction of the world's first LTE multimode, standards-compliant chipset. He also continued to strengthen relationships with key industry players and a broad range of global operators, especially in the emerging regions of China and India. We completed the $3.1 billion acquisition of Atheros Communications, Inc., providing one of the broadest portfolios of mobile, connectivity and networking solutions in the industry. Additionally, through personal relationships with senior executives and oversight of the Company's legal strategy, he helped resolve licensing disputes and reached a $1.9 billion spectrum sale agreement with AT&T, helping to optimize shareholder value from the wind down of the FLO TV business.
- Dr. Jacobs continued to build very positive strategic partnerships across the industry with customers, partners, investors, analysts, government officials and other key constituencies.
- Our capabilities and capacity for continued growth and success lie in our Company values (innovation, execution and partnership), leadership, employee development, engagement and retention and our culture of high performance. We were named to Fortune Magazine's "100 Best Companies to Work for in America" for the 13th consecutive year, and we received the Global Business Leadership Award from the National Committee on American Foreign Policy.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

***Discussion of compensation for Mr. William Keitel, EVP & CFO.***

| | Fiscal 2011 | Fiscal 2010 | Change |
|---|---|---|---|
| Salary | $ 684,632 | $ 670,010 | 2.2% |
| Annual cash incentive earned | 1,600,000 | 950,000 | 68.4% |
| Total cash compensation | 2,284,632 | 1,620,010 | 41.0% |
| Annual long-term incentive award grant date fair value | 5,177,902 | 4,707,265 | 10.0% |
| Total direct compensation (TDC) | $7,462,534 | $6,327,275 | 17.9% |

Mr. Keitel's TDC for fiscal 2011 was 18% more than fiscal 2010 primarily due to the increases in his annual cash incentive and the grant date fair value of his long-term incentive award. The Company's financial performance exceeded its objectives to a greater extent in fiscal 2011 as compared to fiscal 2010 resulting in a larger annual cash incentive amount.

Mr. Keitel's salary for fiscal 2011 as reported above and in the "Summary Compensation Table" reflects an increase awarded by the Compensation Committee that was effective during the first quarter of fiscal 2011.

The Compensation Committee increased the amount of Mr. Keitel's equity award (comprised of both PSUs and RSUs) to position his resulting TDC for fiscal 2011 between the median and 75th percentile of competitive practice. The amount of his equity award was between the median and 75th percentile of competitive practice, and slightly more than 50% of the shares awarded were PSUs.

After the end of fiscal 2011, the Compensation Committee awarded Mr. Keitel an annual cash incentive of $1.6 million, which was 68% more than the amount he received for fiscal 2010. This amount is 2.4% less than the performance-adjusted incentive amount due to a nominal rounding off and is not a negative reflection of his performance. In determining his annual cash incentive award, the Compensation Committee considered the performance-adjusted incentive amount and his leadership in accomplishing the following:

- We continued excellence in the quality of our accounting and reporting practices, including transparent and robust disclosures. We filed all of our quarterly SEC reports simultaneously with our earnings releases. In addition, we successfully maintained membership in the Internal Revenue Service's (IRS) elite Compliance Assurance Process program, under which Qualcomm's federal tax returns are fully audited at the time of filing its tax returns, eliminating the need to file amended state returns for IRS adjustments.
- We achieved excellent returns on our cash holdings and investments in marketable securities during another period of record low interest rates and volatile markets, while generating sufficient cash flows to return capital to stockholders and to fund our acquisitions.
- Mr. Keitel led negotiations with the California Franchise Tax Board that generated substantial tax savings in California and negotiations that will result in a tax holiday for the relocation of our Qualcomm CDMA Technologies (QCT) segment's non-U.S. headquarters to Singapore starting in fiscal 2012.
- Mr. Keitel provided leadership and oversight to our investor relations organization. We upheld best practices on earnings conference calls, analyst meetings and financial disclosures. Institutional Investor recognized Qualcomm for "Best Investor Relations" in the Telecommunications sector of the Technology, Media & Telecommunications category.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

***Discussion of compensation for Mr. Steven Altman, Vice Chairman.***

| | Fiscal 2011 | Fiscal 2010 | Change |
|---|---|---|---|
| Salary | $ 828,285 | $ 810,014 | 2.3% |
| Annual cash incentive earned | 2,000,000 | 1,225,000 | 63.3% |
| Total cash compensation | 2,828,285 | 2,035,014 | 39.0% |
| Annual long-term incentive award grant date fair value | 8,262,728 | 7,248,303 | 14.0% |
| Total direct compensation (TDC) | **$11,091,013** | **$9,283,317** | 19.5% |

Mr. Altman's TDC for fiscal 2011 was 20% more than the fiscal 2010 amount primarily due to the increases in his annual cash incentive and the grant date fair value of his long-term incentive award. The Company's financial performance exceeded its objectives to a greater extent in fiscal 2011 as compared to fiscal 2010 resulting in a larger annual cash incentive amount.

Mr. Altman's salary for fiscal 2011 as reported above and in the "Summary Compensation Table" reflects an increase awarded by the Compensation Committee that was effective during the first quarter of fiscal 2011.

The Compensation Committee increased the amount of Mr. Altman's equity award (comprised of both PSUs and RSUs) so that his resulting TDC for fiscal 2011 would be between the median and 75th percentile of competitive practice. The amount of his equity award was between the median and 75th percentile of competitive practice, and slightly more than 50% of the shares awarded were PSUs.

After the end of fiscal 2011, the Compensation Committee awarded Mr. Altman an annual cash incentive of $2.0 million, which was 63% more than the amount he received for fiscal 2010 and 10% less than the performance-adjusted incentive amount. The amount of his cash incentive award was lower than the performance-adjusted incentive amount to reflect (1) the CEO's and Compensation Committee's decision to award Mr. Altman a cash incentive award amount equivalent to that of Mr. Mollenkopf for internal equitability, (2) his transition from President to Vice Chairman (see the "Compensation Decisions for Our NEOs for Fiscal 2012" section) and (3) his leadership in accomplishing the following:

- We preserved the model, structure and integrity of our licensing program.
- Mr. Altman provided leadership, counsel and input relating to licensing matters and other major transactions for the Company.
- Mr. Altman contributed to our continued global growth through his oversight of our services businesses.

***Discussion of compensation for Mr. Steven Mollenkopf, President and Chief Operating Officer.***

| | Fiscal 2011 | Fiscal 2010 | Change |
|---|---|---|---|
| Salary | $ 801,706 | $ 691,158 | 16.0% |
| Annual cash incentive earned | 2,000,000 | 1,000,000 | 100.0% |
| Total cash compensation | 2,801,706 | 1,691,158 | 65.7% |
| Annual long-term incentive award grant date fair value | 5,067,851 | 4,200,556 | 20.6% |
| Total direct compensation (TDC) | **$7,869,557** | **$5,891,714** | 33.6% |

Mr. Mollenkopf's TDC for fiscal 2011 was 34% more than his fiscal 2010 amount primarily due to the increases in his annual cash incentive and the fair value of his long-term incentive award. The Company's financial performance exceeded its objectives to a greater extent in fiscal 2011 as compared to fiscal 2010 resulting in a larger annual cash incentive amount. In addition, the Compensation Committee increased Mr. Mollenkopf's fiscal 2011 annual cash incentive target from 110% to 125% of his base salary to position it



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

between the median and 75th percentile and to recognize the additional leadership responsibilities that he assumed for our Qualcomm MEMS Technologies, Inc. subsidiary and our Qualcomm Internet Services division during fiscal 2010.

Mr. Mollenkopf's salary for fiscal 2011 as reported above and in the "Summary Compensation Table" reflects a 4% increase awarded by the Compensation Committee that was effective during the first quarter of fiscal 2011.

The Compensation Committee increased the amount of Mr. Mollenkopf's equity award (comprised of both PSUs and RSUs) so that his resulting TDC for fiscal 2011 would be slightly below the median of competitive practice. The amount of his equity award was slightly above the median of competitive practice, and slightly more than 50% of the shares awarded were PSUs.

After the end of fiscal 2011, the Compensation Committee awarded Mr. Mollenkopf an annual cash incentive of $2.0 million, which was twice the amount he received for fiscal 2010 and reflects the increase to his cash incentive target as well as company and individual performance for fiscal 2011. This amount is 8% more than the performance-adjusted incentive amount and reflects the CEO's and Compensation Committee's decision to award Mr. Mollenkopf a cash incentive amount equivalent to that of Mr. Altman and to recognize his leadership in accomplishing the following:

- QCT continued its strong financial performance, shipping 483 million Mobile Station Modems (21% growth from fiscal 2010) and delivering $8.9 billion in revenues and $2.1 billion in earnings before tax, representing 32% and 21% growth from fiscal 2010, respectively.
- We continued QCT's industry leadership by being recognized as the top fabless semiconductor company, the top wireless chip company and one of the top ten semiconductor companies.
- Mr. Mollenkopf continued to identify and implement strategies to increase future revenues. QCT is positioned to expand its business and continue to lead in technology. QCT also completed the acquisitions of Atheros and certain assets of Gesturetek, Inc., Bigfoot Networks, Inc. and others.
- We maintained smartphone system on chip market leadership with Android, Blackberry OS and Windows Phone and grew presence in Android tablet devices.
- We continued the momentum of our Snapdragon product line and added new and expanded existing customer relationships.

***Discussion of compensation for Mr. Donald Rosenberg, EVP, General Counsel and Corporate Secretary.***

| | Fiscal 2011 | Fiscal 2010 | Change |
|---|---|---|---|
| Salary | $ 641,925 | $ 620,006 | 3.5% |
| Annual cash incentive earned | 1,350,000 | 950,000 | 42.1% |
| Total cash compensation | 1,991,925 | 1,570,006 | 26.9% |
| Annual long-term incentive award grant date fair value | 4,406,751 | 4,049,361 | 8.8% |
| Subtotal | 6,398,676 | 5,619,367 | 13.9% |
| Special retention RSU grant date fair value | 3,232,618 | — | |
| Total direct compensation (TDC) | $9,631,294 | $5,619,367 | 71.4% |

Mr. Rosenberg's TDC for fiscal 2011 was 71% more than his fiscal 2010 amount primarily because of a special retention equity award granted in the form of RSUs that cliff-vest four years from the grant date.

Mr. Rosenberg's salary for fiscal 2011 as reported above and in the "Summary Compensation Table" reflects an increase awarded by the Compensation Committee that was effective during the first quarter of fiscal 2011.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The Compensation Committee increased the amount of Mr. Rosenberg's annual equity award (comprised of both PSUs and RSUs) so that his resulting TDC for fiscal 2011 would be above the 75th percentile of competitive practice. The amount of this equity award was above the 75th percentile of competitive practice and slightly more than 50% of the shares awarded were PSUs. In addition to the annual equity awards that vest three years from the grant date, the Compensation Committee also awarded Mr. Rosenberg a special retention equity award of $3.2 million in the form of RSUs that cliff-vest four years from the grant date. The Compensation Committee and Dr. Jacobs wanted to increase Mr. Rosenberg's retention incentive because he provides key leadership at a time of complex and critical global legal affairs and government relations.

After the end of fiscal 2011, the Compensation Committee awarded Mr. Rosenberg an annual cash incentive of $1.4 million, which was 42% more than the amount he received for fiscal 2010. This amount is 0.6% less than the performance-adjusted incentive amount due to a nominal rounding off. The percentage increase in the cash incentive earned for fiscal 2011 as compared to fiscal 2010 is less than that of the other NEOs because the Compensation Committee awarded him more than the performance-adjusted incentive amount for fiscal 2010 when it did not do so to the same extent for the other NEOs. Neither of these is a negative reflection on Mr. Rosenberg's performance. In determining his annual cash incentive award, the Compensation Committee considered the performance-adjusted incentive amount and his leadership in accomplishing the following:

- Mr. Rosenberg oversaw continued excellence in the quality of our litigation management and outcomes, discovery management practices and protection of our intellectual property and confidential information.
- We continue to be a party to numerous legal matters. Our discovery management organization collected nearly twice the terabytes of electronically stored information in fiscal 2011 as compared to fiscal 2010.
- We established an intellectual property leak response team that requested removal of company documents posted without permission on public internet websites.
- We implemented a new patent foreign filing strategy that resulted in immediate cost savings in fiscal 2011.
- We succeeded in slowing the future expense growth trajectory for patent filings.
- Mr. Rosenberg supported the successful outcome in licensing disputes.
- Mr. Rosenberg continued his efforts to educate governments and regulators about the value of intellectual property and its fundamental role in encouraging innovation and economic development.

### Compensation Decisions for Our NEOs for Fiscal 2012

This section provides an update to compensation decisions and actions we made after the end of fiscal 2011.

On October 4, 2011, we announced leadership and organizational changes that included changes to the roles for Steven Altman and Steven Mollenkopf that were effective on November 14, 2011. Mr. Altman was appointed Vice Chairman, and Mr. Mollenkopf was appointed President and Chief Operating Officer. On November 9, 2011, the Compensation Committee met and approved compensation amounts that reflect these changes. In addition, the Compensation Committee approved compensation amounts for the CEO and the other NEOs for fiscal 2012 that were consistent with competitive practices among the peer companies. The Compensation Committee exercised its discretion in determining the annual, ongoing long-term incentive award amounts. We continued our transition to a more performance-based approach for equity compensation that we began in fiscal 2010 by granting RSUs and PSUs, with at least 50% of the annual equity shares awarded to each NEO in the form of PSUs. We will continue to align our annual long-term incentive awards with our strategic objectives and intend to grant at least 50% of such awards in the form of performance-based equity awards and the remainder in the form of RSUs and/or stock options. We designed the PSU program to award a variable amount of shares of Qualcomm stock based on the relative performance of our TSR compared to that of the NASDAQ 100. The key elements of the fiscal 2012 PSU program are the same as the fiscal 2011 program. Furthermore, the RSUs granted to the CEO, the other NEOs and other executive officers include a performance-based vesting provision such that the RSUs will vest only upon the achievement of objectives that equal or exceed a pre-established performance target and the satisfaction of time-based service requirements.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

***Fiscal 2012 compensation for Dr. Paul Jacobs, Chairman and CEO.*** The Compensation Committee increased Dr. Jacobs's base salary by 3.4%, from $1,160,000 to $1,200,000, maintained his annual cash incentive target at 250% of base salary and approved equity awards with an aggregate grant date fair value of $15 million. Of the equity shares awarded, slightly more than 50% were in the form of PSUs with the remainder in the form of RSUs. The PSUs cliff-vest on the third anniversary of the grant date, and the RSUs will vest annually over three years contingent upon the achievement of objectives that equal or exceed a pre-established performance target.

***Fiscal 2012 compensation for Mr. William Keitel, EVP and CFO.*** The Compensation Committee increased Mr. Keitel's base salary by 2.9%, from $690,000 to $710,000, maintained his annual cash incentive target at 125% of base salary and approved equity awards with an aggregate grant date fair value of $5 million. Of the equity shares awarded, slightly more than 50% were in the form of PSUs with the remainder in the form of RSUs. The PSUs cliff-vest on the third anniversary of the grant date, and the RSUs will vest annually over three years contingent upon the achievement of objectives that equal or exceed a pre-established performance target.

***Fiscal 2012 compensation for Mr. Steven Altman, Vice Chairman.*** The Compensation Committee reduced Mr. Altman's base salary by 28%, from $835,000 to $600,000, reduced his annual cash incentive target to 100% of base salary and approved equity awards with an aggregate grant date fair value of $4 million. Of the equity shares awarded, slightly more than 50% were in the form of PSUs the remainder in the form of RSUs. The PSUs cliff-vest on the third anniversary of the grant date, and the RSUs will cliff-vest on the third anniversary of the grant date contingent upon the achievement of objectives that equal or exceed a pre-established performance target.

***Fiscal 2012 compensation for Mr. Steven Mollenkopf, President and COO.*** The Compensation Committee increased Mr. Mollenkopf's base salary by 4.5%, from $780,000 to $815,000, increased his annual cash incentive target to 140% of base salary and approved annual equity awards with an aggregate grant date fair value of $7 million. Of the equity shares awarded, slightly more than 50% were in the form of PSUs with the remainder in the form of RSUs. The PSUs cliff-vest on the third anniversary of the grant date, and the RSUs will vest annually over three years contingent upon the achievement of objectives that equal or exceed a pre-established performance target. The Compensation Committee also approved a special promotion equity award with an aggregate grant date fair value of $5 million, also with slightly more than 50% in the form of PSUs and the remainder in the form of RSUs. The PSUs and RSUs vest annually in equal installments over the three-year period following the second anniversary of the grant date, becoming fully vested on the fifth anniversary of the grant date.

***Fiscal 2012 compensation for Mr. Donald Rosenberg, EVP, General Counsel and Corporate Secretary.*** The Compensation Committee increased Mr. Rosenberg's base salary by 3.8% from $650,000 to $675,000, maintained his annual cash incentive target at 110% of base salary and approved equity awards with an aggregate grant date fair value of $4.4 million. Of the equity shares awarded, slightly more than 50% were in the form of PSUs with the remainder in the form of RSUs. The PSUs cliff-vest on the third anniversary of the grant date, and the RSUs will vest annually over three years contingent upon the achievement of objectives that equal or exceed a pre-established performance target.

We designed the PSU programs to award a variable amount of shares of Qualcomm stock based on the relative performance of our TSR compared to the NASDAQ 100. The table below summarizes the percentage of the PSU award amount that a NEO would earn at different levels of relative TSR performance.

| Qualcomm TSR relative to the NASDAQ 100 | Percent of Target Award Amount that may be Earned |
|---|---|
| Maximum: 133% and above | 200% |
| Target: 100% | 100% |
| Threshold: 66% | 33% |
| Less than 66% | 0% |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The performance period is three years, from September 26, 2011 (the beginning of fiscal 2012) through September 26, 2014, with four separate measurement periods of 18, 24, 30 and 36 months. The earned PSUs will not vest until the end of the performance period. The PSU awards include dividend equivalents that may accrue, in the form of additional shares of Qualcomm stock, on earned units, but are not paid out on unearned PSUs and vest at the same time as the underlying earned PSUs.

### Other Components of our Executive Compensation Programs

On page 28, we noted that there are additional aspects of our executive compensation program. This section discusses those additional aspects.

**Components of Our Compensation Program Available to U.S.-Based Executive-Level Employees**

| Component | Purpose | Form | Comment |
|---|---|---|---|
| Nonqualified deferred compensation | Provide a competitive, tax-efficient defined contribution retirement program for employees deemed to be "highly compensated." Encourage building long-term stockholder value through a Company contribution in the form of Qualcomm stock (Match Shares). | Qualcomm stock (Match Shares) | We do not have a pension plan or other defined benefit retirement program. See the Nonqualified Deferred Compensation table, footnote 2, for a description of the Match Shares. |
| Financial planning reimbursement | Attract and retain executive-level employees. Assist NEOs to efficiently manage their time. | Reimbursement of actual expenses incurred for financial, estate and tax planning | Annual maximum reimbursement of up to $12,500 for the Chairman and CEO and the President and up to $8,000 for the other NEOs. |
| Additional life insurance | Attract and retain executive-level employees. | Additional coverage, above the amount provided to all employees | The additional coverage is $1 million for the Chairman and CEO and $750,000 for the other NEOs. |
| Use of corporate aircraft for personal travel | Facilitate flexible travel arrangements and provide security. | Imputed taxable income for W-2 reporting and incremental cost to the Company for reporting the perquisite in this proxy statement. | We do not allow our NEOs to reimburse the Company for the cost for personal flights or for the incremental cost of non-business guests because we do not operate our aircraft on a "for hire" basis under applicable Federal Aviation Administration regulations. |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

**Components of Our Compensation Program Available to All U.S.-Based Employees**

| Component | Purpose | Form | Comment |
|---|---|---|---|
| Tax qualified deferred compensation | Provide a tax-efficient retirement savings opportunity. Attract and retain employees. | 401(k) Plan | The 401(k) Plan is a voluntary, tax-qualified deferred compensation plan. We match employee contributions in cash using a tiered structure in order to encourage participation among all employees. |
| Employee Stock Purchase Plan (ESPP) | Encourage long-term stock ownership and align employee and stockholder interests. Attract and retain employees. | Qualcomm stock | A tax-qualified, voluntary ESPP available to all U.S.-based employees. (We also make a non-tax-qualified ESPP available to employees based in other countries provided we are able to comply with local regulations.) Annual purchases are limited to $25,000 per employee, through payroll deductions, including the purchase price discount. The purchase price is equal to 85% of the lower of: (1) the fair market value (FMV) on the first day of the offering period or (2) the FMV on the last day of the offering period. |
| Charitable contribution match | Encourage and extend employees' support of cultural, educational and community non-profit organizations. | Matching cash paid to the charitable organization | We match 100% of employee contributions, up to pre-defined maximum amounts, to qualified tax-exempt non-profit organizations, excluding organizations that further religious doctrine, exclusionary organizations and/or political non-profit organizations. The maximum annual amount we will match is based on the employee's job level. We will match up to $125,000 for our Chairman and CEO and the President and up to $100,000 annually for the other NEOs. |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

In addition to the programs identified above, we offered a supplemental health care program that provided limited coverage above the basic health care plan to approximately 3,600 senior-level U.S.-based employees. The purpose of this program was to attract and retain experienced technical talent. For each NEO and eligible dependent, the supplemental health plan provided a maximum annual coverage limit of $7,500 above the basic health plan coverage. Effective January 1, 2011, we discontinued the supplemental health benefit coverage and now provide supplemental coverage for dental and vision expenses only, with an annual coverage limit of $4,250.

### Post-Employment Compensation

***We do not have employment agreements.*** We employ almost all U.S.-based employees, including all of our NEOs, “at will,” without severance agreements or employment contracts. This is consistent with our objective of providing compensation related to individual contributions that improve our market leadership, competitive advantage and stockholder value. It enables our Board to terminate employment with discretion as to the terms and conditions of any separation.

***We do not have a pre-defined severance plan.*** We do not have a pre-defined severance plan covering the involuntary termination of employees, including the NEOs. We do not accelerate unvested stock options, RSUs or PSUs in the event of an involuntary “for cause” termination. Such terminations may involve theft, dishonesty, falsification, actions that are detrimental to the Company, conviction of a criminal act that impairs the performance of duties required by the Company or violation of a material Company policy.

The table below summarizes the treatment of unvested stock options, RSUs and PSUs following involuntary terminations without cause and the “double trigger” provisions for terminations after a change in control.

**Treatment of Unvested Equity Awards in Certain Termination Situations**

| Situation | Stock Options | RSUs | PSUs |
|---|---|---|---|
| Treatment of unvested awards after involuntary terminations without cause. | 10% of the total amount granted is automatically accelerated, and up to an additional 10% may be accelerated using a pre-defined formula, subject to execution of a general release of claims. | For RSUs that vest less frequently than annual graded vesting, a prorated portion (that does not exceed one-third of the total amount granted) may be vested using a pre-defined formula, subject to execution of a general release of claims. | All unvested PSUs are immediately forfeited. The Compensation Committee, in its sole discretion, may waive the automatic forfeiture of all or any portion of the award. This is consistent with the above-mentioned practice that allows our Board to terminate employment with discretion as to the terms and conditions of separation. |
| “Double trigger” treatment of unvested awards. | If, within 24 months after a change in control, the recipient is involuntarily terminated for any reason other than for cause or if the recipient voluntarily resigns “for good reason” (as defined in the award agreements), then vesting of stock options and RSUs is accelerated in full. | | Vesting of PSUs that remained outstanding after a change in control is accelerated but the number of shares of stock that may be issued will be prorated using a pre-defined formula. |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Other Policies and Practices

***We have a cash incentive compensation repayment ("claw back") policy.*** Effective January 1, 2009, we adopted a policy that would require an executive officer, including a NEO, to repay to us the amount of any annual cash incentive that an executive officer received to the extent that:

- The amount of such payment was based on the achievement of certain financial results that were subsequently the subject of a restatement that occurs within 12 months of such payment;
- The executive officer had engaged in theft, dishonesty or intentional falsification of our documents or records that resulted in the obligation to restate our financial results; and
- A lower annual cash incentive would have been paid to the executive officer based upon the restated financial results.

The Compensation Committee is responsible for the interpretation and enforcement of this repayment policy. We plan to amend our repayment policy to comply with the additional requirements of the Dodd-Frank Act after the SEC adopts new regulations implementing those requirements.

***We have long-standing practices regarding the timing, grant date and exercise price for equity awards.*** We have a long-standing and consistent practice of awarding annual equity awards to the NEOs at the first Compensation Committee meeting held in the first quarter of our fiscal year. The Compensation Committee meetings for the year are scheduled in advance, and we schedule the first meeting for the fiscal year to take place after the earnings release and the filing of our Annual Report on Form 10-K for the prior fiscal year. The Compensation Committee approves base salaries, annual cash incentives and equity awards at the same time to facilitate consideration of total direct compensation to NEOs. We may award stock options and/or RSUs upon hiring a new NEO, and we may award stock options and/or RSUs upon a promotion or change in roles and responsibilities of a NEO. The exercise price of all stock options is the fair market value (i.e., closing price) on the grant date, and the number of shares subject to the options is fixed on the grant date.

***We have stock ownership guidelines.*** Our stock ownership guidelines for all of our executive officers, including our NEOs, help ensure that they maintain an equity stake in the Company, and by doing so, appropriately link their interests with those of other stockholders. Only shares actually owned and deferred stock units under the Executive Retirement Matching Contribution (ERMC) Plan count towards the equity ownership requirement. Outstanding unexercised stock options and unvested RSUs and PSUs do not count towards the requirement. Dr. Jacobs and Messrs. Altman and Keitel were required to achieve these stock ownership levels by September 2011 (five years after the Board of Directors adopted the guidelines) and met the ownership guidelines as of September 25, 2011. Mr. Mollenkopf is required to achieve his stock ownership guideline of 2 times his base salary by May 2013, five years after becoming an executive officer in May 2008, and his stock ownership guideline of 3 times his base salary by November 2016, five years after his appointment as President in November 2011. Mr. Rosenberg is required to achieve his guideline by October 2012, five years after becoming an executive officer. Messrs. Mollenkopf and Rosenberg are progressing towards their ownership guidelines. If a NEO has not met the guidelines by the deadline, we will require that the NEO, upon a stock option exercise, hold at least 50% of the net shares remaining after required tax withholdings until they meet the minimum guideline. The guidelines are as follows:

| Role | Multiple of Base Salary |
|---|---|
| CEO | 6x |
| President | 3x |
| All other executive officers | 2x |

***Tax regulations.*** A goal of the Compensation Committee is to comply with the requirements of Internal Revenue Service Code Sections 162(m) and 409A. Section 162(m) places a $1 million annual limit on the amount that a public company may deduct for compensation paid to the CEO and the other three most highly compensated NEOs, excluding the CFO. The $1 million limit does not apply if the compensation meets



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Section 162(m) requirements for performance-based compensation. We designed and administered our fiscal 2010 cash incentive program as cash-denominated performance units granted under the 2006 LTIP to be eligible for tax deductions to the extent permitted by the relevant tax regulations, including Section 162(m). Compliance with Section 162(m) did not influence the allocation of compensation among base salary, target annual cash incentives and long-term incentives for fiscal 2011. Stock options granted under the 2006 LTIP also qualify as performance-based compensation. Only actual shares distributed that are above the PSU target amount will qualify as deductible compensation under Section 162(m). From time-to-time, we may pay compensation to our Section 162(m) covered officers that may not be tax deductible if there are compelling business reasons to do so. Beginning in November 2011, RSUs granted to our executive officers are structured to satisfy the performance-based compensation exception of the 162(m) limit on deductible compensation.

Under Section 409A, a nonqualified deferred compensation plan (such as our ERMC Plan), must comply with certain requirements related to the timing of deferral and distribution decisions, otherwise amounts deferred under the plan could be included in gross income when earned and be subject to additional penalty taxes. Nonqualified stock options are generally exempt from Section 409A if the option satisfies certain requirements. RSUs and PSUs are also generally exempt from Section 409A. We administer the ERMC Plan and equity awards in accordance with Section 409A requirements.

### Compensation Risk Management

The Compensation Committee engaged its independent compensation consultant, FWC, to collaborate with Qualcomm's human resources staff to conduct an assessment of potential risks that may arise from our compensation programs. Based on this assessment, the Compensation Committee concluded that our policies and practices do not encourage excessive and unnecessary risk taking that would be reasonably likely to have a material adverse effect on Qualcomm. The assessment included executive, non-executive and sales incentive programs and focused on the variable components of cash incentives and equity awards. Our compensation programs are designed and administered through a centralized, corporate total rewards management office and are substantially identical among business units, corporate functions and global locations (with modifications to comply with local regulations as appropriate.) The risk-mitigating factors considered in this assessment included:

- The alignment of pay philosophy, peer group companies and compensation amounts relative to competitive practices to support our business objectives;
- Effective balance of cash and equity, short- and long-term performance periods, caps on performance-based award schedules and financial metrics with individual factors and Compensation Committee and management discretion; and
- Ownership guidelines, claw back policy, insider trading policy, equity award approval authorization policy and independent Compensation Committee oversight.

### Compensation Tables and Narrative Disclosures

The following tables, narratives and footnotes describe the total compensation and benefits for our NEOs for fiscal 2011. The values presented in the tables do not always reflect the actual compensation received by our NEOs during the fiscal year because some portion of an NEO's base salary and cash incentive compensation may have been deferred pursuant to our nonqualified deferred compensation plan.

#### *Summary Compensation Table*

***Salary***. We have a long-standing practice of establishing NEOs' base salaries concurrent with the calendar year. Salary increases during fiscal 2011 were effective on December 25, 2010. Thus, the salaries reported in this table reflect approximately three months of earnings at the calendar 2010 rates and approximately nine months of earnings at the calendar 2011 rates. We used the calendar year 2011 base salaries in the CD&A when calculating target annual cash and target direct compensation. Salary for NEOs as presented in this table includes vacation match payments payable under our vacation policy, if any.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

***Bonus***. The amounts in this column represent bonuses to the NEOs including amounts received under our patent award program and new hire bonuses, if any. We disclose the annual cash incentives in the “Non-Equity Incentive Plan Compensation” column.

***Stock Awards***. Stock awards granted to NEOs include annual grants and may include special grants for new hire, promotion and/or retention grants. The amounts in this column represent the estimated grant date fair value of RSUs and PSUs granted during the fiscal year. The estimated RSU grant date fair values were determined based on the fair value of our stock on the date of grant. The estimated PSU grant date fair values were determined based on a Monte Carlo simulation. The amounts are not indicative of whether the NEO has or will realize the estimated fair value or any financial benefits from the award. See the “Grants of Plan-Based Awards” table for details on the PSUs granted to the NEOs during fiscal 2011.

***Option Awards***. Option awards granted to NEOs include annual grants and may include special grants for new hire, promotion grants and/or retention grants. The amounts in this column represent the estimated fair value of stock option awards granted during the fiscal year. The estimated fair value amounts were determined on the date of grant using an option-pricing model and are not indicative of whether the NEO has or will realize the estimated fair value or any financial benefit from the award. We did not grant any stock option awards to the NEOs during fiscal 2011.

***Non-Equity Incentive Plan Compensation***. The amounts in this column represent cash awards under our annual cash incentive program. The relevant performance period was fiscal 2011. The Compensation Committee approved the annual cash incentives after the end of fiscal 2011; the NEOs received payment of their fiscal 2011 annual cash incentives in November 2011. See the CD&A section and the “Grants of Plan-Based Awards” table and narrative for a description of the incentive program mechanics.

***Change in Pension Value and Nonqualified Deferred Compensation Earnings***. We do not offer a pension plan or other defined benefit retirement plan to our NEOs. We do not provide above-market or preferential earnings on deferred compensation, nor do we provide dividends on stock in the ERMC Plan at a rate higher than dividends on our common stock. As a result, this column has been omitted from the “Summary Compensation Table.”

***All Other Compensation***. See the “All Other Compensation” table for an itemized account of all other compensation reported in the “Summary Compensation Table.” Any individual item of compensation exceeding $10,000, except as discussed below under “Perquisites and Other Personal Benefits,” have been identified and quantified in accordance with SEC requirements.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Bonus ($) (2) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Paul E. Jacobs, | 2011 | 1,150,591 | 7,125 | 14,322,329 | — | 5,500,000 | 742,288 | 21,722,333 |
| Chairman and Chief | 2010 | 1,146,644 | 7,500 | 6,983,378 | 5,391,724 | 3,370,000 | 727,693 | 17,626,939 |
| Executive Officer | 2009 | 964,427 | 6,750 | — | 12,243,249 | 3,600,000 | 616,462 | 17,430,888 |
| William E. Keitel, | 2011 | 684,632 | — | 5,177,902 | — | 1,600,000 | 254,303 | 7,716,837 |
| Executive Vice President | 2010 | 670,010 | — | 2,656,296 | 2,050,984 | 950,000 | 192,790 | 6,520,080 |
| and Chief Financial Officer | 2009 | 684,004 | — | — | 5,017,725 | 950,000 | 264,197 | 6,915,926 |
| Steven R. Altman, | 2011 | 828,285 | 4,125 | 8,262,728 | — | 2,000,000 | 344,249 | 11,439,387 |
| Vice Chairman (1) | 2010 | 810,014 | — | 4,090,342 | 3,157,961 | 1,225,000 | 360,031 | 9,643,348 |
| | 2009 | 708,045 | — | — | 7,292,427 | 1,260,000 | 388,633 | 9,649,105 |
| Steven M. Mollenkopf, | 2011 | 801,706 | — | 5,067,850 | — | 2,000,000 | 68,614 | 7,938,170 |
| President and Chief Operating | 2010 | 691,158 | — | 2,370,575 | 3,933,684 | 1,000,000 | 61,249 | 8,056,666 |
| Officer (1) | 2009 | 637,123 | — | 2,176,800 | 3,947,277 | 950,000 | 61,487 | 7,772,687 |
| Donald J. Rosenberg, | 2011 | 641,925 | — | 7,639,369 | — | 1,350,000 | 208,890 | 9,840,184 |
| Executive Vice President General Counsel and Corporate | 2010 | 620,006 | — | 2,284,859 | 1,764,515 | 950,000 | 219,466 | 5,838,846 |
| Secretary | 2009 | 614,625 | — | — | 3,746,568 | 950,000 | 263,553 | 5,574,746 |

(1) During fiscal 2011, Mr. Altman served as President and Mr. Mollenkopf served as Executive Vice President and Group President. Mr. Altman became Vice Chairman and Mr. Mollenkopf became President and Chief Operating Officer on November 14, 2011.

(2) Fiscal 2011 amounts include $7,125 for Dr. Jacobs and $4,125 for Mr. Altman from our patent award program.

### *All Other Compensation*

*Perquisites and Other Personal Benefits.* The amounts disclosed represent the full amount of perquisites if the aggregate annual value exceeded $10,000, and each perquisite and other personal benefit is identified by type. If the aggregate annual value of perquisites was less than $10,000, no disclosure was made. We have identified and quantified individual perquisite amounts that exceeded the greater of $25,000 or 10% of the aggregate amount of all perquisites for any NEO.

*Executive Retirement Matching Contribution Plan.* The amounts disclosed represent the dollar values of common stock used to match up to 10% of the aggregate of the participant's base salary plus annual cash incentives, less any 401(k) contributions, deferred on a pre-tax basis under the ERMC Plan. The dollar values are based on the average of the fair market value of the stock over the 200 trading days preceding the match date. (See the "Voluntary Retirement Savings Plans" section in the CD&A for a description of the ERMC Plan.)

*Charitable Match.* The amounts disclosed represent our matching contributions for NEO contributions to qualified, tax-exempt non-profit organizations.

*Company Match on 401(k) Contributions.* The amounts disclosed represent the cash value of our matches to employee contributions to the 401(k) plan.

*Life Insurance Premiums.* The amounts disclosed represent the premiums paid for group term life insurance greater than $50,000 and executive life insurance.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## All Other Compensation

| Name | Perquisites and Other Personal Benefits ($) (1) (2) | Executive Retirement Matching Contribution Plan ($) | Charitable Match ($) | Company Matching 401k Contributions ($) | Life Insurance Premiums ($) | All Other Compensation Total ($) |
|---|---|---|---|---|---|---|
| Paul E. Jacobs | 259,097 | 395,337 | 75,000 | 5,325 | 7,529 | 742,288 |
| William E. Keitel | 45,995 | 128,685 | 60,791 | 4,900 | 13,932 | 254,303 |
| Steven R. Altman | 40,066 | 165,088 | 125,000 | 5,325 | 8,770 | 344,249 |
| Steven M. Mollenkopf | — | 50,014 | 10,035 | 5,325 | 3,240 | 68,614 |
| Donald J. Rosenberg | 22,218 | 130,605 | 31,256 | 5,875 | 18,936 | 208,890 |

(1) The amounts in this column include: Dr. Jacobs – $228,817 for the personal use of our corporate aircraft, $25,000 for financial planning and $5,280 for other insurance premiums; Mr. Keitel – $33,038 for the personal use of our corporate aircraft and $12,957 for financial planning and other insurance premiums; Mr. Altman – for financial planning, other insurance premiums and the personal use of our corporate aircraft; and Mr. Rosenberg – for financial planning, other insurance premiums and the personal use of our corporate aircraft. Under certain limited circumstances, NEOs may use the corporate aircraft for personal purposes. In those instances, the value of the benefit is based on the aggregate incremental cost to the Company. The incremental cost is calculated based on the variable costs to the Company, including fuel costs, mileage, trip-related maintenance, universal weather-monitoring costs, on-board catering, landing/ramp fees and other miscellaneous variable costs. Fixed costs that do not change based on usage, such as pilot salaries and the cost of maintenance not related to specific flights, are excluded.

(2) We purchase tickets to various sporting, civic, cultural, charity and entertainment events. We use these tickets for business development, partnership building, charitable donations and community involvement. If not used for business purposes, we may make these tickets available to our employees, including our NEOs, as a form of recognition and reward for their efforts. Because we had already purchased these tickets, we do not believe that there is any aggregate incremental cost to us if a NEO uses a ticket for personal purposes.

### *Grants of Plan-Based Awards*

***Annual Cash Incentive Program***. The Compensation Committee approved a target annual cash incentive, expressed as a percentage of base salary, for each NEO. The target annual cash incentive was the potential earnings opportunity for the NEO if we achieved 100% of our financial objectives for Non-GAAP revenues and Non-GAAP operating income. We structured the annual cash incentive program to provide different potential incentive earnings opportunities at various levels of financial performance. The table below shows the relationship between the percentage of financial performance that is achieved (the Weighted Achievement Ratio) and the potential cash incentive opportunity as a percentage of the target annual cash incentive (the Target Incentive Multiple). The Target Incentive Multiple increases 2.2 percentage points for each one percent improvement in the Weighted Achievement Ratio from 80% to 95%; 7.4 percentage points for each one percent improvement from 95% to 110%; and 1.9 percentage points for each one percent improvement from 110% to 150%. The maximum Target Incentive Multiple is 2.5 and applies to Weighted Achievement Ratios of 150% and above. The annual cash incentive program is not funded if the Weighted Achievement Ratio is below 80%.

## Potential Non-Equity Incentive Plan Payout and Associated Financial Performance Levels

| Potential Payout Level | Weighted Achievement Ratio (1) | Target Incentive Multiple (2) |
|---|---|---|
| Maximum | 150% | 2.50 |
| | 110% | 1.74 |
| Target | 100% | 1.00 |
| | 95% | 0.63 |
| Threshold | 80% | 0.30 |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

(1) The Weighted Achievement Ratio is the result of actual financial results achieved for the fiscal year divided by financial objectives established during the first quarter of the fiscal year.

(2) The Target Incentive Multiple is the percentage of the potential cash incentive award relative to the target annual cash incentive. The target incentive multiple is applied to each NEO's target annual cash incentive to calculate the company-performance-adjusted incentive amount. For example, if we achieve 80% of our financial objectives, the NEOs' target annual cash incentives would be multiplied by 0.30 to calculate the company-performance-adjusted incentive amounts.

***Equity Awards***. At its previously scheduled meeting in November 2010, the Compensation Committee approved long-term equity awards granted under the 2006 LTIP. The awards consisted of PSUs and RSUs. The grant date for both the PSUs and RSUs was the date that the Compensation Committee met and approved the awards.

***Stock Option Awards***. Nonqualified stock options are granted under the 2006 LTIP. Twelve and one-half (12.5%) percent of the shares vest six months after the grant date, and the remaining shares vest in equal semi-annual installments over the next 42 months, becoming fully vested four years after the grant date. Options granted prior to September 10, 2010 have a ten-year term, and options granted on or after September 10, 2010 have a seven-year term. Generally, vesting is contingent upon continued service with Qualcomm. We did not grant any stock option awards to the NEOs during fiscal 2011.

***Performance Stock Units (PSUs)***. The PSUs provide for a variable number of Qualcomm shares based on the relative performance of our TSR compared to that of the NASDAQ 100. For the PSUs granted during fiscal 2011, there are four separate measurement periods, all of which began on November 1, 2010. The first measurement period is 18 months and ends on April 30, 2012; the second is 24 months and ends on October 31, 2012; the third is 30 months and ends on April 30, 2013; and the fourth is 36 months and ends on October 31, 2013. We allocated 25% of the target PSU amount disclosed in the "Grants of Plan-Based Awards" table to each measurement period. Our TSR is compared to that of the NASDAQ 100 at the end of each measurement period, and an award amount is determined according to the schedule below. The total award amount may not exceed the target award amount if Qualcomm's TSR for the three-year performance period is negative. Between the levels specified, the percent of award amount earned is interpolated linearly. The number of shares of Qualcomm stock to be distributed to each participant at the end of the three-year measurement period is the sum of the shares earned for each of the four performance periods. The shares become fully vested at the end of the three-year performance period. The PSU awards include dividend equivalents that may accrue, in the form of additional shares of Qualcomm stock, on earned units, but are not paid out on unearned performance awards and would vest at the same time as the underlying earned PSUs. The table below summarizes the percentage of the PSU award amount that a NEO would earn at different relative TSRs.

| Qualcomm TSR vs. NASDAQ 100 TSR | Award Level | Percent of PSU Award Amount Earned |
|---|---|---|
| 133% and above | Maximum | 200% |
| 125% | | 175% |
| 110% | | 130% |
| 100% | Target | 100% |
| 90% | | 80% |
| 75% | | 50% |
| 66% | Threshold | 33% |
| Less than 66% | | 0% |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Grants of Plan-Based Awards (1) (2)

| Name | Type of Award | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards Threshold ($) | Target ($) | Maximum ($) | Estimated Future Payouts Under Equity Incentive Plan Awards Threshold (#) | Target (#) | Maximum (#) | All Other Stock Awards: Number of Shares of Stock or Units (#) | Grant Date Fair Value of Stock and Option Awards ($) (3) |
|---|---|---|---|---|---|---|---|---|---|---|
| Paul E. Jacobs | Annual cash incentive program | | 870,000 | 2,900,000 | 7,250,000 | | | | | |
| | Restricted Stock Units | 11/8/2010 | | | | | | | 143,600 | 6,864,080 |
| | Performance Stock Units | 11/8/2010 | | | | 47,949 | 145,300 | 290,600 | 145,300 | 7,458,249 |
| William E. Keitel | Annual cash incentive program | | 258,750 | 862,500 | 2,156,250 | | | | | |
| | Restricted Stock Units | 11/8/2010 | | | | | | | 51,915 | 2,481,537 |
| | Performance Stock Units | 11/8/2010 | | | | 17,335 | 52,530 | 105,060 | 52,530 | 2,696,365 |
| Steven R. Altman | Annual cash incentive program | | 350,700 | 1,169,000 | 2,922,500 | | | | | |
| | Restricted Stock Units | 11/8/2010 | | | | | | | 82,845 | 3,959,991 |
| | Performance Stock Units | 11/8/2010 | | | | 27,662 | 83,825 | 167,650 | 83,825 | 4,302,737 |
| Steven M. Mollenkopf | Annual cash incentive program | | 292,500 | 975,000 | 2,437,500 | | | | | |
| | Restricted Stock Units | 11/8/2010 | | | | | | | 50,810 | 2,428,718 |
| | Performance Stock Units | 11/8/2010 | | | | 16,967 | 51,415 | 102,830 | 51,415 | 2,639,132 |
| Donald J. Rosenberg | Annual cash incentive program | | 214,500 | 715,000 | 1,787,500 | | | | | |
| | Restricted Stock Units | 11/8/2010 | | | | | | | 111,813 | 5,344,661 |
| | Performance Stock Units | 11/8/2010 | | | | 14,753 | 44,705 | 89,410 | 44,705 | 2,294,708 |

(1) Unless indicated otherwise, the Compensation Committee approved all grants on the grant date.

(2) We did not award any stock options to any NEOs in fiscal 2011; therefore, we did not include the “All Other Option Awards” column in this table.

(3) The amounts for RSUs represent the grant date fair value based on the closing stock price of the Company’s stock on the date of grant. For additional information on the valuation assumptions, refer to “Note 1—Basis of Presentation” of Qualcomm’s consolidated financial statements included in Appendix 1. The amounts for PSUs represent the grant date fair value as determined using a Monte Carlo simulation.

### *Outstanding Equity Awards at Fiscal Year End*

The “Outstanding Equity Awards at Fiscal Year End” table provides information on the current holdings of equity awards by the NEOs. All stock options awarded to the NEOs were nonqualified stock options; options granted prior to September 10, 2010 are exercisable for ten years from the grant date, and options granted on or after September 10, 2010 are exercisable for seven years from the grant date.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Outstanding Equity Awards at Fiscal Year End

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options Exercisable # (1) | Number of Securities Underlying Unexercised Options Unexercisable # | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | Market Value of Shares or Units of Stock That have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That have Not Vested (#) (3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Paul E. Jacobs | 1,041 | — | 17.47 | 11/7/2012 | | | | |
| | 600,000 | — | 43.62 | 12/2/2014 | | | | |
| | 900,000 | — | 44.02 | 11/3/2015 | | | | |
| | 560,333 | 25,667 | 34.83 | 11/9/2016 | | | | |
| | 728,333 | 221,667 | 37.29 | 11/11/2017 | | | | |
| | 493,810 | 396,500 | 35.66 | 11/6/2018 | | | | |
| | 148,218 | 247,032 | 44.75 | 11/8/2019 | | | | |
| | | | | | 145,860 | 7,335,293 | | |
| | | | | | | | 300,951 | 15,134,809 |
| Total | 3,431,735 | 890,866 | | | 145,860 | 7,335,293 | 300,951 | 15,134,809 |
| William E. Keitel | 37,000 | 12,334 | 34.83 | 11/9/2016 | | | | |
| | 42,500 | 99,167 | 37.29 | 11/11/2017 | | | | |
| | 37,500 | 162,500 | 35.66 | 11/6/2018 | | | | |
| | 18,794 | 93,970 | 44.75 | 11/8/2019 | | | | |
| | | | | | 52,732 | 2,651,892 | | |
| | | | | | | | 111,693 | 5,617,054 |
| Total | 135,794 | 367,971 | | | 52,732 | 2,651,892 | 111,693 | 5,617,054 |
| Steven R. Altman | 600,000 | — | 43.62 | 12/2/2014 | | | | |
| | 620,000 | — | 44.02 | 11/3/2015 | | | | |
| | 465,500 | 19,000 | 34.83 | 11/9/2016 | | | | |
| | 301,333 | 134,167 | 37.29 | 11/11/2017 | | | | |
| | 36,333 | 236,167 | 35.66 | 11/6/2018 | | | | |
| | 86,812 | 144,688 | 44.75 | 11/8/2019 | | | | |
| | | | | | 84,149 | 4,231,841 | | |
| | | | | | | | 174,974 | 8,799,431 |
| Total | 2,109,978 | 534,022 | | | 84,149 | 4,231,841 | 174,974 | 8,799,431 |
| Steven M. Mollenkopf | 416 | 834 | 37.99 | 10/26/2016 | | | | |
| | 1,167 | 4,667 | 44.63 | 4/26/2017 | | | | |
| | 2,000 | 14,000 | 41.33 | 10/25/2017 | | | | |
| | 24,999 | 22,167 | 43.24 | 4/24/2018 | | | | |
| | 13,333 | 6,667 | 47.35 | 5/18/2018 | | | | |
| | 123,333 | 76,667 | 52.87 | 8/3/2018 | | | | |
| | 34,416 | 127,834 | 35.66 | 11/6/2018 | | | | |
| | 50,305 | 83,845 | 44.75 | 11/8/2019 | | | | |
| | 46,250 | 138,750 | 40.42 | 9/9/2017 | | | | |
| | | | | | 68,475 | 3,443,583 | | |
| | | | | | | | 104,284 | 5,244,447 |
| Total | 296,219 | 475,431 | | | 68,475 | 3,443,583 | 104,284 | 5,244,447 |
| Donald J. Rosenberg | 317,666 | 108,334 | 40.31 | 10/18/2017 | | | | |
| | 32,666 | 121,334 | 35.66 | 11/6/2018 | | | | |
| | 48,505 | 80,845 | 44.75 | 11/8/2019 | | | | |
| | | | | | 113,573 | 5,711,568 | | |
| | | | | | | | 95,588 | 4,807,113 |
| Total | 398,837 | 310,513 | | | 113,573 | 5,711,568 | 95,588 | 4,807,113 |

(1) Includes 670,142 options exercisable by a Grantor Retained Annuity Trust for the benefits of Dr. Jacobs and his spouse and 623,470 options exercisable by Dr. Jacobs's spouse. Includes 466,460 options exercisable by a Grantor Retained Annuity Trust for the benefits of Mr. Altman and his spouse and 119,478 options exercisable by Mr. Altman's spouse.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

(2) Includes dividend equivalent shares that have not vested: 2,260 shares for Dr. Jacobs, 817 shares for Mr. Keitel, 1,304 shares for Mr. Altman, 1,665 shares for Mr. Mollenkopf and 1,760 shares for Mr. Rosenberg.

(3) Includes dividend equivalent shares that have not vested: 2,236 for Dr. Jacobs, 808 shares for Mr. Keitel, 1,290 shares for Mr. Altman, 791 shares for Mr. Mollenkopf and 688 shares for Mr. Rosenberg.

### *Option Exercises and Stock Awards Vested During Fiscal 2011*

The “Option Exercises and Stock Awards Vested” table provides information on stock option exercises by the NEOs during fiscal 2011.

#### Option Exercises and Stock Awards Vested

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized Upon Exercise ($) | Number of Shares Acquired on Vesting (#) (1) | Value Realized on Vesting ($) (2) |
| Paul E. Jacobs | 1,310,681 | 28,926,669 | — | — |
| William E. Keitel | 1,724,252 | 20,156,220 | — | — |
| Steven R. Altman | 697,500 | 14,480,515 | — | — |
| Steven M. Mollenkopf | 479,885 | 8,884,052 | 8,397 | 396,795 |
| Donald J. Rosenberg | 200,000 | 3,777,023 | — | — |

(1) Amounts include dividend equivalents on vested shares and shares withheld for the payment of taxes.

(2) This amount represents the dollar value of such shares based on the fair market value of Qualcomm stock on the vest date. Such amount includes the value of shares withheld for the payment of taxes.

### *Nonqualified Deferred Compensation*

The “Nonqualified Deferred Compensation” table provides information on the nonqualified deferred compensation of the NEOs. See the “Retirement Savings Plans” section in the CD&A for a description of the ERMC Plan.

Under the ERMC Plan, we match participants’ contributions to the ERMC Plan with our stock. We amended the ERMC Plan, effective January 1, 2011. Prior to the amendment, we provided the match at the end of each calendar quarter for eligible contributions made during that quarter, and the number of shares for the match was based on the average closing price of our stock for the last ten trading days in the quarter. Effective January 1, 2011, we match eligible participants’ contribution for a calendar year annually only if he or she is actively employed on the first day of the next calendar year or is terminated without cause during the calendar year and had satisfied the vesting eligibility requirement. The number of shares for the match is now based on the average closing price of Qualcomm stock during a 200-trading-day period preceding the date on which the matching contributions are credited. Under the amendment, effective September 27, 2010, all matching amounts vest in full upon an eligible employee’s death, disability, attainment of age 65 while employed with the Company, involuntary termination of employment without Cause or voluntary termination of employment for Good Reason (in both cases within 24 months after a change in control of the Company), or completion of two continuous years of service with the Company commencing with the employee’s date of hire. Also under an amendment, effective September 27, 2010, cash dividends on Qualcomm’s common stock are credited to an



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

eligible employee's account in the form of cash, which is subject to the same terms and vesting and payment dates as the matching amounts to which they relate. Prior to the amendment, cash dividends on Qualcomm's common stock were credited in the form of additional shares of stock. The amounts reported as registrant contributions in the last fiscal year in the table below reflect the cash value of the Match Shares and dividends that we made for the calendar quarters ending in September 2010 and December 2010.

The amounts reported as total aggregate earnings in the last fiscal year in the table below are the sum of the ERMC Plan aggregate earnings plus the Match Shares aggregate earnings. The Match Shares aggregate earnings in the last fiscal year reflect the difference in the cash value of all vested and unvested Match Shares at the end of fiscal 2011 less their value at the end of fiscal 2010 and the Company's contributions in fiscal 2011.

## Nonqualified Deferred Compensation

| Name | Executive Contributions in Last Fiscal Year ($) (1) | Registrant Contributions in Last Fiscal Year ($) | Aggregate Earnings in Last Fiscal Year ($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last Fiscal Year End ($) (2) |
|---|---|---|---|---|---|
| Paul E. Jacobs | 887,618 | 395,337 | 642,599 | — | 12,684,146 |
| William E. Keitel | 314,676 | 128,685 | 412,667 | — | 5,980,389 |
| Steven R. Altman | 394,157 | 165,088 | 397,256 | 635,111 | 7,654,945 |
| Steven M. Mollenkopf | 100,000 | 50,014 | 29,915 | — | 674,542 |
| Donald J. Rosenberg | 296,385 | 130,605 | 54,716 | — | 1,644,263 |

(1) The amounts disclosed in this column are also reported in the "Summary Compensation Table" with some of the amounts included in the "Salary" column for the current year and the remaining amounts included in the "Non-Equity Incentive Plan Compensation" column for the previous fiscal year.

(2) Includes all vested and unvested amounts under the Match Plan.

### *Potential Post-Employment Payments*

As noted in the CD&A, Qualcomm employs almost all U.S.-based employees, including all of our NEOs, "at will," without employment contracts or severance agreements. We do not have a pre-defined involuntary termination severance plan or policy for employees, including the NEOs. Our practice in an involuntary termination situation may include:

- Salary continuation dependent on the business reason for the termination;
- Lump-sum payment based on job level and years of service with Qualcomm;
- Paid health care coverage and COBRA payments for a limited time; and
- Outplacement services.

The information in the "Potential Payments Upon Termination or Change in Control" table below describes the compensation that would be payable under specific circumstances if the NEO's employment had terminated on the last day of fiscal 2011.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

PX278
Page 5629

Table of Contents

The following table summarizes the terms that our equity award plans and nonqualified deferred compensation ERMC Plan establish for how unvested options, RSUs, PSUs and Match Shares would be treated in the event of death, long-term disability, a change in control, involuntary termination and normal retirement age.

## Summary of the Treatment of Unvested Equity Awards and Match Shares

| Termination Scenario | Treatment of Unvested Stock Options and RSUs | Treatment of Unvested PSUs | Treatment of Unvested Match Shares in the ERMC Plan (1) |
|---|---|---|---|
| Death | All unvested stock options and RSUs would become fully vested. Stock options would remain exercisable up to one year from the date of death or the expiration date of the grant, whichever is earlier. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the award agreement. | All unvested Match Shares would become fully vested. |
| Long-Term Disability (LTD) | Stock options and RSUs would continue to vest per the original vesting schedule. Stock options would remain exercisable until the expiration date of the grant. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the award agreement. | All unvested Match Shares would become fully vested. |
| Change in Control | Double trigger: If no stock options and RSUs were assumed, all unvested stock options and RSUs would become fully vested. | If no PSUs were assumed, all unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the award agreement. | All unvested Match Shares would become fully vested if at any time within twenty-four months of the change in control, the participant's employment is involuntarily terminated by the employer without cause, or if such employment is voluntarily terminated by the participant with good reason. |
| Involuntary Termination | Stock options: 10% of the total amount granted is automatically accelerated, and up to an additional 10% may be accelerated using a pre-established formula, subject to execution of a general release of claims if the involuntary termination is not for cause. The accelerated vested stock options could then be exercised up to six months after termination, but in no event later than the expiration date of such options.<br>RSUs: For RSUs that vest less frequently than annual graded vesting, a prorated portion (that does not exceed one-third of the total amount granted) would be accelerated using a pre-established formula, subject to execution of a general release of claims. | All unvested PSUs are immediately forfeited. | All vested shares would be distributed to the ERMC Plan participant. There would be no accelerated vesting of unvested shares. |
| Normal Retirement Age (2) | All vested stock options may be exercised at any time prior to the expiration of twelve (12) months, but in no event later than the expiration date of such options. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the award agreement. | All unvested Match Shares would become fully vested. |

(1) Effective in fiscal 2011, Match Shares are fully vested upon the completion of two years of continuous service with Qualcomm.

(2) Normal Retirement Age is the date on which a Participant has attained the age of 60 years and has completed ten years of continuous service for stock options, RSUs and PSUs.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Potential Payments Upon Termination or Change in Control (1)

| | | | Equity Awards | | |
|---|---|---|---|---|---|
| Name | Termination Scenario | Accrued Vacation ($) (2) | Stock Options ($) (3) (4) (5) (6) | Restricted Stock Awards/ Restricted Stock Units ($) | Total ($) |
| Paul E. Jacobs | Death | 159,586 | 10,447,835 | 22,470,102 | 33,077,523 |
| | LTD | 159,586 | 10,447,835 | 22,470,102 | 33,077,523 |
| | Change-in-Control | — | 10,447,835 | 12,728,694 | 23,176,529 |
| | Involuntary Termination | 159,586 | 1,044,796 | — | 1,204,382 |
| | Normal Retirement Age | 159,586 | — | 5,393,401 | 5,552,987 |
| William E. Keitel | Death | 125,753 | 4,377,823 | 8,268,946 | 12,772,522 |
| | LTD | 125,753 | 4,377,823 | 8,268,946 | 12,772,522 |
| | Change-in-Control | — | 4,377,823 | 4,673,701 | 9,051,524 |
| | Involuntary Termination | 125,753 | 437,796 | — | 563,549 |
| | Normal Retirement Age | 125,753 | — | 2,021,809 | 2,147,562 |
| Steven R. Altman | Death | 98,448 | 6,294,606 | 13,031,272 | 19,424,326 |
| | LTD | 98,448 | 6,294,606 | 13,031,272 | 19,424,326 |
| | Change-in-Control | — | 6,294,606 | 7,376,978 | 13,671,584 |
| | Involuntary Termination | 98,448 | 629,470 | — | 727,918 |
| | Normal Retirement Age | 98,448 | — | 3,145,137 | 3,243,585 |
| Steven M. Mollenkopf | Death | 130,819 | 4,042,167 | 8,688,030 | 12,861,016 |
| | LTD | 130,819 | 4,042,167 | 8,688,030 | 12,861,016 |
| | Change-in-Control | — | 4,042,167 | 5,297,121 | 9,339,288 |
| | Involuntary Termination | 130,819 | 404,240 | — | 535,059 |
| | Normal Retirement Age | 130,819 | — | 1,853,539 | 1,984,358 |
| Donald J. Rosenberg | Death | 72,788 | 3,304,171 | 10,518,681 | 13,895,640 |
| | LTD | 72,788 | 3,304,171 | 10,518,681 | 13,895,640 |
| | Change-in-Control | — | 3,304,171 | 7,445,466 | 10,749,637 |
| | Involuntary Termination | 72,788 | 330,435 | — | 403,223 |
| | Normal Retirement Age | 72,788 | — | 1,733,899 | 1,806,687 |

(1) Match Shares are fully vested upon the completion of two years of continuous service with Qualcomm. All of the NEOs fulfilled the continuous service requirement as of September 25, 2011, and all of the Match Shares credited to their accounts are vested. The potential amount of payment upon termination or change in control related to the ERMC Plan is provided in the "All Other Compensation Table," and as a result, we did not include the "Nonqualified Deferred Compensation" column in this table.

(2) All U.S.-based employees, including the NEOs, are entitled to payouts of accrued vacation upon termination, including death. These amounts are as of September 25, 2011.

(3) Amounts related to the death, LTD and change-in-control termination scenarios are based on the intrinsic value of unvested options that would have become exercisable on September 25, 2011 based on the fair market value of the stock on such date.

(4) Amounts related to the termination scenario of involuntary termination that is not for cause are based on the intrinsic value of 10% of unvested options assuming acceleration on September 25, 2011.

(5) For the change-in-control termination scenario, we have assumed 100% acceleration of unvested shares under the "double trigger" provision described in the "Summary of the Treatment of Unvested Equity Awards and Match Shares" table. The valuation of unvested shares is presented as of September 25, 2011.

(6) The share-based compensation expense recorded for accounting purposes may differ from the intrinsic value as disclosed in this column.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Director Compensation

The Compensation Committee reviews annually our non-employee director compensation practices, which includes an analysis of reported non-employee director compensation practices at the same peer companies used for the Compensation Committee's evaluation of NEO compensation. The analysis, prepared by FWC, includes prevalent practices for retainers, fees, equity-based compensation and ownership guidelines. The analysis conducted for 2011 affirmed that the structural provisions that we introduced for calendar 2010 continue to be aligned with best practices as follows:

- No fees are provided for Board meeting attendance.
- Where applicable, directors receive an annual award of Deferred Stock Units (DSUs) that are defined under a fixed-value formula, have short vesting terms and include a mandatory three-year holding period. Directors based in certain non-U.S. locations in which DSUs are not available under local tax code receive RSUs that are also defined under a fixed-value formula and have short vesting terms but do not have the three-year holding period.
- Directors are subject to a meaningful stock ownership guidelines. In December 2011, the stock ownership requirement was increased from three times to five times the annual retainer for U.S.-based directors.

The following table, narrative and notes describe the total compensation and benefits for our non-employee directors for fiscal 2011.

***Fees earned or paid in cash.***

*Annual retainer.* Directors who are U.S. residents receive an annual retainer of $100,000 paid in equal installments in arrears at the end of each calendar quarter. The annual retainer for directors who are non-U.S. residents is $120,000 in consideration of the increased travel time. If available under the applicable tax code, directors may elect to receive all, or a portion of, the annual retainer in cash and/or in DSUs granted under the 2006 LTIP. The number of DSUs received is based on the fair market value of our common stock (as defined by the 2006 LTIP) on the last trading day of the last month of the calendar quarter. The DSUs generally settle three years from the grant date, unless the director elects to defer further.

*Board committee chair retainer.* The chair of the audit committee receives an annual retainer of $20,000; the chair of the compensation committee receives an annual retainer of $15,000; and the chairs of the other committees receive annual retainers of $10,000. The Compensation Committee increased the annual retainer for the chairs of the audit and compensation committees to $25,000, effective January 1, 2012.

*Meeting fees.* Directors receive $1,500 for each committee meeting attended (in person or telephonic attendance). Directors do not receive a fee for attending Board meetings.

***Equity compensation.*** We do not grant equity awards at the time a director is elected to the Board. The Compensation Committee approves annual DSU awards to each director that resides in the U.S. and Spain. Annual RSU awards are granted to the director that resides in the U.K. because in the U.K. there is no opportunity to further defer taxes on DSUs beyond the vest date. The grant date is the date of the annual stockholders' meeting, and the number of DSUs and RSUs awarded is determined by dividing $200,000 by the closing price of Qualcomm stock on the grant date. The DSUs vest at the subsequent annual meeting (generally a one-year cliff vesting) and are settled in shares of Qualcomm stock three years following the grant date (or later if voluntarily elected by the director). The RSUs vest in April of the calendar year following the grant date so as to defer the taxable event to the following tax year in the U.K. A director may elect to receive a partial cash payment to pay estimated taxes upon vest. The DSUs and RSUs include dividend equivalent rights. The dividend equivalents will accrue in the form of additional shares of Qualcomm stock with vesting and distribution at the same time as the underlying DSUs and RSUs.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

***Nonqualified deferred compensation earnings.*** Directors may defer any cash portion of their retainer and meeting fees under the ERMC Plan. Directors who contribute to the ERMC Plan are not eligible to receive Match Shares or any interest that is above the market rate.

***All other compensation.*** See the "Director All Other Compensation" table for an itemized account of all other compensation.

***Stock ownership requirement.*** As discussed under "Majority Voting, Stock Ownership Guidelines and Other Matters," non-employee directors are subject to a stock ownership requirement that is three times the $100,000 annual retainer paid to U.S. residents. In December 2011, the stock ownership requirement was increased to five times the annual retainer.

**Director Compensation (1)**

| Name | Fees Earned or Paid in Cash ($)(2)(3) | Stock Awards ($)(4) | Nonqualified Deferred Compensation Earnings ($)(5) | All Other Compensation ($)(6) | Total ($) |
|---|---|---|---|---|---|
| Barbara T. Alexander | 134,500 | 200,025 | — | 50,000 | 384,525 |
| Stephen M. Bennett | 125,500 | 200,025 | — | 27,500 | 353,025 |
| Donald G. Cruickshank | 144,000 | 200,025 | — | 50,000 | 394,025 |
| Raymond V. Dittamore | 142,500 | 200,025 | — | — | 342,525 |
| Thomas W. Horton | 121,000 | 200,025 | — | 50,000 | 371,025 |
| Irwin M. Jacobs | 112,000 | 200,025 | 103,994 | 50,000 | 466,019 |
| Robert E. Kahn | 112,000 | 200,025 | (7,633) | — | 304,392 |
| Sherry Lansing | 120,500 | 200,025 | — | 50,000 | 370,525 |
| Duane A. Nelles | 123,500 | 200,025 | — | — | 323,525 |
| Francisco Ros | 101,570 | 200,025 | — | — | 301,595 |
| Brent Scowcroft | 109,000 | 200,025 | — | 50,000 | 359,025 |
| Marc I. Stern | 116,500 | 200,025 | (13,348) | 50,000 | 353,177 |

(1) We did not award any stock options to any directors in fiscal 2011; therefore, we did not include the "Option Awards" column in this table.

(2) Amounts include the value of DSUs issued in lieu of payment of cash retainer fees pursuant to elections by directors Ms. Alexander, Messrs. Bennett and Stern and Dr. Jacobs. DSUs awarded to Ms. Alexander and Dr. Jacobs are fully vested and will be settled in three years. DSUs awarded to Mr. Bennett are fully vested and will be settled on December 31, 2020. DSUs awarded to Mr. Stern are fully vested and will be settled upon retirement from the Board.

(3) Amounts to Mr. Nelles are paid to his consulting company.

(4) These amounts represent the fair value of the awards as determined based on the fair value of our stock on the date of grant.

(5) The amount for Dr. Jacobs represents earnings through our ERMC Plan whereby amounts remained in the plan after he was no longer an employee of the Company, but continued as a non-employee director. Dr. Jacobs continues to defer his fees earned as a non-employee director into the ERMC Plan. Nonqualified deferred compensation earnings attributable to amounts deferred as a non-employee director and as an employee were $1,452 and $102,542, respectively.

(6) All other compensation represents payments made under our charitable gifts matching program where we will match 100%, up to $50,000 annually, of a director's contribution to a qualified, tax-exempt non-profit organization. We did not provide any other compensation with an aggregate annual value in excess of $10,000 for any individual director, and therefore, we did not include the "All Other Compensation" table.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service