# PX 279

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

SCHEDULE 14A INFORMATION

PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE
SECURITIES EXCHANGE ACT OF 1934

(AMENDMENT NO.__)

Filed by the Registrant [X]

Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ] Preliminary Proxy Statement
[ ] Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
[X] Definitive Proxy Statement
[ ] Definitive Additional Materials
[ ] Soliciting Ma`terial Pursuant to Section 240.14a-12

QUALCOMM INCORPORATED

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.
[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

[ ] Fee paid previously with preliminary materials.
[ ] Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

QUALCOMM®

January 17, 2013

Dear Fellow Stockholder:

You are cordially invited to attend Qualcomm's Annual Meeting of Stockholders (Annual Meeting) on Tuesday, March 5, 2013. The meeting will begin promptly at 9:30 a.m. Pacific Time at the Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121. I invite you to arrive early at 8:30 a.m. to preview our product displays. We will begin the Annual Meeting with a discussion and vote on the matters set forth in the Notice of Annual Meeting of Stockholders, followed by presentations and a report on Qualcomm's fiscal 2012 performance.

This year, we are again furnishing the proxy materials to stockholders primarily over the Internet. Therefore, most stockholders will not receive paper copies of our proxy materials. We will instead send these stockholders a notice with instructions for accessing the proxy materials and voting via the Internet. The notice also provides information on how stockholders may obtain paper copies of our proxy materials if they so choose. This method expedites the receipt of your proxy materials, lowers the costs of our Annual Meeting and helps to conserve natural resources.

Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. As an alternative to voting in person at the Annual Meeting, you may vote via the Internet, by telephone or, if you receive a paper proxy card in the mail, by mailing the completed proxy card. Voting by any of these methods will ensure your representation at the Annual Meeting.

**Your vote is very important to us. I urge you to vote as we recommend.**

I look forward to seeing you in San Diego at the **Irwin M. Jacobs Qualcomm Hall** on March 5, 2013.

Sincerely,



Paul E. Jacobs
*Chairman and Chief Executive Officer*

Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

PX279

Table of Contents

5775 Morehouse Drive
San Diego, California 92121-1714

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
## To Be Held On March 5, 2013

**To the Stockholders of QUALCOMM Incorporated:**

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders (Annual Meeting) of QUALCOMM Incorporated (the Company), a Delaware corporation, will be held at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121**, on Tuesday, March 5, 2013 at 9:30 a.m. Pacific Time for the following purposes:

1. To elect 11 directors to hold office until the next annual stockholders' meeting and until their respective successors have been elected or appointed.
2. To approve the 2006 Long-Term Incentive Plan, as amended, which includes an increase in the share reserve by 90,000,000 shares.
3. To ratify the selection of PricewaterhouseCoopers LLP as our independent public accountants for our fiscal year ending September 29, 2013.
4. To hold an advisory vote on executive compensation.
5. To transact such other business as may properly come before stockholders at the Annual Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on January 7, 2013 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and at any adjournment or postponement thereof.

By Order of the Board of Directors,

Donald J. Rosenberg
*Executive Vice President,*
*General Counsel and Corporate Secretary*

San Diego, California
January 17, 2013

Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## How To Vote

If your shares are held by a broker, bank or other stockholder of record, in nominee name or otherwise, exercising fiduciary powers (typically referred to as being held in "street name"), you may receive a separate voting instruction form with this proxy statement, or you may need to contact your broker, bank or other stockholder of record to determine whether you will be able to vote electronically via the Internet or by telephone.

If you are a stockholder with shares registered in your name, you may vote by one of the following three methods:

- **Vote via the Internet.** Go to the web address *http://www.proxyvote.com* and follow the instructions for Internet voting shown on the proxy card mailed to you.
- **Vote by Telephone.** Dial 1-800-690-6903 and follow the instructions for telephone voting shown on the proxy card mailed to you.
- **Vote by Proxy Card mailed to you.** Complete, sign, date and mail the proxy card in the envelope provided. If you vote via the Internet or by telephone, please do not mail your proxy card.

PLEASE NOTE THAT IF YOUR SHARES ARE HELD BY A BROKER, BANK OR OTHER STOCKHOLDER OF RECORD AND YOU WISH TO VOTE AT THE ANNUAL MEETING, YOU MUST FIRST OBTAIN A LEGAL PROXY ISSUED IN YOUR NAME FROM THE RECORD HOLDER. OTHERWISE, YOU WILL NOT BE PERMITTED TO VOTE IN PERSON AT THE MEETING.

In this document, the words "Qualcomm," "the Company," "we," "our," "ours" and "us" refer only to QUALCOMM Incorporated and its consolidated subsidiaries and not any other person or entity.

**IMPORTANT NOTICE REGARDING THE AVAILABILITY OF PROXY MATERIALS FOR THE STOCKHOLDER MEETING TO BE HELD ON MARCH 5, 2013**

**This proxy statement and our Annual Report on Form 10-K for fiscal 2012 are available at *http://www.qualcomm.com***

We are furnishing proxy materials to our stockholders primarily via the Internet under rules adopted by the U.S. Securities and Exchange Commission (SEC), instead of mailing printed copies of those materials to each stockholder. On January 17, 2013, we mailed to our stockholders (other than those who previously requested electronic or paper delivery) a Notice of Internet Availability of Proxy Materials containing instructions on how to access our proxy materials, including our proxy statement. The Notice of Internet Availability of Proxy Materials also provides instructions on how to access your proxy card to vote via the Internet or by telephone.

This process is designed to expedite stockholders' receipt of proxy materials, lower the cost of the Annual Meeting and help conserve natural resources. If you would prefer to continue to receive printed proxy materials, please follow the instructions included in the Notice of Internet Availability of Proxy Materials. If you have previously elected to receive our proxy materials electronically, you will continue to receive these materials via e-mail unless you elect otherwise.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## 2012 PROXY SUMMARY

*This summary highlights information contained elsewhere in our proxy statement. This summary does not contain all of the information that you should consider, and you should read the entire proxy statement carefully before voting.*

### Annual Meeting of Stockholders

| | |
|---|---|
| **Time and date:** | 9:30 a.m., March 5, 2013 |
| **Place:** | Irwin M. Jacobs Qualcomm Hall<br>5775 Morehouse Drive<br>San Diego, CA 92121 |
| **Record date:** | January 7, 2013 |
| **How to vote:** | You may vote either in person at the Annual Meeting or by telephone, the Internet or mail. See the "Notice of Annual Meeting of Stockholders" for more detail regarding how you may vote if you are a registered holder or a beneficial owner of shares held in "street name." |

### Voting Matters

| Proposals | Board Voting Recommendation | Page Reference (for more detail) |
|---|---|---|
| Election of directors | "FOR" EACH DIRECTOR NOMINEE | 8 |
| Approval of the 2006 Long-Term Incentive Plan, as amended, which includes an increase in the share reserve by 90,000,000 shares | "FOR" | 13 |
| Ratification of PricewaterhouseCoopers LLP as our independent public accountants for fiscal 2013 | "FOR" | 27 |
| Advisory vote on executive compensation | "FOR" | 29 |



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Board Nominees

| Name | Age | Director Since | Occupation | Independent | Committee Memberships AC | CC | GC | FC |
|---|---|---|---|---|---|---|---|---|
| Barbara T. Alexander | 64 | 2006 | Independent Consultant | X | X | X | | |
| Donald G. Cruickshank | 70 | 2005 | Chairman, Audioboo Ltd. | X | X | | | X |
| Raymond V. Dittamore | 69 | 2002 | Retired Audit Partner, Ernst &Young LLP | X | C | | | |
| Susan Hockfield | 61 | 2012 | President Emerita and Professor of Neuroscience, Massachusetts Institute of Technology | X | | | | |
| Thomas W. Horton | 51 | 2008 | Chairman, Chief Executive Officer and President, AMR Corporation | X | | | | |
| Paul E. Jacobs | 50 | 2005 | Chairman of the Board and Chief Executive Officer | | | | | |
| Sherry Lansing | 68 | 2006 | Founder and Chair, The Sherry Lansing Foundation | X | | | C | |
| Duane A. Nelles | 69 | 1988 | Self-Employed, Personal Investment Business | X | | | | C |
| Francisco Ros | 62 | 2010 | Founder and President, First International Partners, S.L. | X | | | X | |
| Brent Scowcroft | 87 | 1994 | President, The Scowcroft Group | X | | | X | |
| Marc I. Stern | 68 | 1994 | Vice Chairman, The TCW Group, Inc. and Chairman, Société Générale’s Global Investment Management and Services North America Unit | X | | X | | |

AC Audit Committee
CC Compensation Committee
GC Governance Committee
FC Finance Committee
C Committee Chair (1)
* Presiding Director (1)
(1) Steven M. Bennett serves as Chair of the Compensation Committee and Presiding Director until he concludes his service as a director at the Annual Meeting. A new Chair of the Compensation Committee and Presiding Director will be appointed at the annual meeting of the Board of Directors immediately following the Annual Meeting.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Fiscal 2012 Business Performance and Executive Pay Highlights

- In fiscal 2012, we delivered record revenues, earnings and Mobile Station Modem (MSM) integrated circuit shipments as we continued to drive smartphone growth and innovation, enable growth of 3G/4G technologies in emerging regions and create new mobile computing opportunities. We invested in and executed on these strategic priorities to further position our broad licensing program and industry-leading 3G/4G integrated circuit roadmap for the many opportunities ahead.
- Amounts available for award under the fiscal 2012 annual cash incentive plan (performance-adjusted amounts) were at 117% of target (compared to 190% of target for fiscal 2011), driven by continued above-target Non-GAAP revenues and Non-GAAP operating income. The amounts awarded by the Compensation Committee to the named executive officers (NEOs) are summarized in the graph on page 43. The graph on page 44 shows the relationship between the Company's financial performance and the CEO's compensation.
- The table below summarizes the key components of our NEOs' compensation for fiscal 2012 and highlights the significant portion that is variable.

| | Variable Compensation | | | | | | | | Fixed Compensation | | Total Direct Compensation (TDC) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Grant Date Fair Values of Equity Awards (1) | | | | | | | | | |
| Name | Annual Cash Incentive ($) | + | Performance Stock Units ($)(2) | + | Restricted Stock Units ($)(3) | = | Total Variable Amount ($) | + | Salary ($) | = | Amount for Fiscal 2012 ($) | Variable Amount as a % of TDC |
| Paul E. Jacobs | 3,400,000 | | 8,099,999 | | 6,899,986 | | 18,399,985 | | 1,189,246 | | 19,589,231 | 94% |
| Steven M. Mollenkopf | 1,300,000 | | 3,779,974 | | 3,219,986 | | 8,299,960 | | 805,582 | | 9,105,542 | 91% |
| Derek K. Aberle | 1,100,000 | | 2,700,000 | | 2,300,014 | | 6,100,014 | | 720,548 | | 6,820,562 | 89% |
| William E. Keitel | 1,000,000 | | 2,700,000 | | 2,300,014 | | 6,000,014 | | 731,934 | | 6,731,948 | 89% |
| Donald J. Rosenberg | 850,000 | | 2,375,995 | | 2,024,016 | | 5,250,011 | | 668,270 | | 5,918,281 | 89% |

(1) The actual amounts that may be realized vary based on the Company's stock price performance and relative Total Shareholder Return (TSR).
(2) Excludes $2,700,000 and $2,160,013 in value from special promotion equity awards granted to Messrs. Mollenkopf and Aberle, respectively.
(3) Excludes $2,300,014 and $1,840,000 in value from special promotion equity awards granted to Messrs. Mollenkopf and Aberle, respectively.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

PROXY STATEMENT

TABLE OF CONTENTS


| | |
|---|---|
| GENERAL MATTERS | 1 |
| Voting Rights and Outstanding Shares | 1 |
| Broker Non-Votes | 1 |
| Revocability of Proxies | 1 |
| Solicitation | 2 |
| Stockholder Proposals | 2 |
| Financial Information | 2 |
| Corporate Directory | 2 |
| CORPORATE GOVERNANCE | 2 |
| Code of Ethics | 2 |
| Board Leadership Structure | 2 |
| Board Meetings, Committees and Attendance | 3 |
| Board's Role in Risk Oversight | 5 |
| Director Nominations | 5 |
| Majority Voting | 7 |
| Stock Ownership Guidelines | 7 |
| Communications with Directors | 7 |
| Annual Meeting Attendance | 8 |
| Director Independence | 8 |
| PROPOSAL 1: ELECTION OF DIRECTORS | 8 |
| Nominees for Election | 9 |
| Required Vote and Board Recommendation | 12 |
| PROPOSAL 2: APPROVAL OF THE 2006 LONG-TERM INCENTIVE PLAN, AS AMENDED, WHICH INCLUDES AN INCREASE IN THE SHARE RESERVE BY 90,000,000 SHARES | 13 |
| Key Features of the 2006 LTIP and Awards | 14 |
| Significant Historical Award Information | 14 |
| Background for the Current Request to Increase the Share Reserve | 15 |
| Summary of the 2006 LTIP | 15 |
| Equity Compensation Plan Information | 25 |
| Required Vote and Board Recommendation | 26 |
| PROPOSAL 3: RATIFICATION OF SELECTION OF INDEPENDENT PUBLIC ACCOUNTANTS | 27 |
| Fees for Professional Services | 27 |
| Required Vote and Board Recommendation | 28 |
| PROPOSAL 4: ADVISORY VOTE ON EXECUTIVE COMPENSATION | 29 |
| Required Vote and Board Recommendation | 30 |
| STOCK OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 31 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 33 |
| Compensation Committee Interlocks and Insider Participation in Compensation Decisions | 33 |
| CERTAIN RELATIONSHIPS AND RELATED-PERSON TRANSACTIONS | 33 |
| COMPENSATION COMMITTEE REPORT | 34 |
| EXECUTIVE COMPENSATION AND RELATED INFORMATION | 35 |
| I. Key Highlights and Overview | 35 |
| II. Executive Summary | 38 |
| III. Compensation Discussion and Analysis | 46 |
| IV. Compensation Risk Management | 68 |
| V. Compensation Tables and Narrative Disclosures | 69 |
| DIRECTOR COMPENSATION | 80 |
| AUDIT COMMITTEE REPORT | 83 |
| OTHER MATTERS | 85 |
| APPENDIX 1: Financial Information | A-1 |
| APPENDIX 2: Corporate Directory | B-1 |
| APPENDIX 3: Reconciliation of Adjusted Non-GAAP Results to GAAP Results | C-1 |
| APPENDIX 4: 2006 Long-Term Incentive Plan | D-1 |


Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## EXECUTIVE COMPENSATION AND RELATED INFORMATION

This section of the Proxy Statement includes the following:

I. The **Key Highlights and Overview** section, which introduces the factors that we believe are most relevant to stockholders as they consider their votes on Proposal 4 (advisory vote on executive compensation, or "Say-on-Pay"), including:

   A. The **Key Changes** section, which summarizes key changes we are making to our compensation programs and practices for our named executive officers (NEOs) in response to the March 2012 advisory vote on executive compensation;

   B. The **Pay for Performance** section, which provides an overview of how we paid for performance for fiscal 2012;

   C. The **Key Compensation Practices** section, which highlights best practices of our compensation programs.

II. The **Executive Summary**, which more fully describes:

   A. The **key changes to our compensation programs and practices** that our Compensation Committee has approved for fiscal 2013;

   B. Our **fiscal 2012 pay for performance;** and

   C. Our **key compensation program practices**.

III. The **Compensation Discussion and Analysis** (CD&A) section, which describes and analyzes our compensation programs and the specific amounts of compensation paid to our NEOs, namely:

   1. Paul E. Jacobs, Chairman and Chief Executive Officer (CEO);
   2. Steven M. Mollenkopf, President and Chief Operating Officer (COO);
   3. Derek K. Aberle, Executive Vice President (EVP) and Group President;
   4. William E. Keitel, EVP and Chief Financial Officer (CFO); and
   5. Donald J. Rosenberg, EVP, General Counsel and Corporate Secretary.

IV. The **Compensation Risk Management** section, which describes the process applied and the factors considered by both the Company and the Compensation Committee in concluding that our compensation programs and practices do not encourage excessive and unnecessary risk taking that would be reasonably likely to have a material adverse effect on the Company.

V. The **Compensation Tables and Narrative Disclosure** section, which reports the compensation and benefit amounts paid to our NEOs during fiscal 2012.

### I. KEY HIGHLIGHTS AND OVERVIEW

### A. Key Changes to our Compensation Programs and Practices

A decline in the percentage of our stockholders voting in favor of the compensation of our NEOs (from 95% in fiscal 2011 to 69% in fiscal 2012), prompted the Compensation Committee, after a thorough review and discussion, to approve several changes to our compensation philosophy, programs and practices. The key changes include:

1. the addition of revenues (within the range of one-quarter to four times Qualcomm's revenues) as a second quantitative criterion (in addition to market capitalization) for selecting peer companies;
2. a reduction in the maximum amount that could be earned under the Annual Cash Incentive Plan (ACIP) from 2.5 times target to 2.0 times target;



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

3. a reduction in the rate of increase in the funding for financial performance that exceeds objectives;
4. a change to the timing of equity awards to permit a "look back" on annual performance and the ability to consider "Say-on-Pay" vote results prior to granting awards; and
5. prohibition of the future pledging of our common stock

The Executive Summary provides a thorough description of our prior practices, the practices for fiscal 2013 and the impact of these changes.

### B. Pay for Performance

- Our annual cash incentive plan (ACIP) is a program that includes two financial performance objectives. Funding for the ACIP is determined by a pre-established formula that compares achievements to the objectives approved by the Board. The ACIP amounts earned by our CEO and other NEOs are subject to the Compensation Committee's negative discretion within the definition of Internal Revenue Code Section 162(m).
- We established financial objectives for fiscal 2012 that reflected year-over-year double-digit growth.

The growth reflected in the financial objectives was at or above our peer company $75_{th}$ percentile of actual financial growth.

- We exceeded the financial objectives established for fiscal 2012, and thus the ACIP amounts earned by our CEO and other NEOs were more than the target amounts and ranged from 35% to 38% less than their fiscal 2011 ACIP amounts.

Our fiscal 2012 Non-GAAP achievements represented a second consecutive year of record performance. Because our ACIP funding rate is determined by comparing achievements to objectives for the fiscal year (and not year-over-year comparisons), it is possible to have different ACIP funding rates for two consecutive years of record performance because the extent to which we exceed our objectives from one year to the next may differ. This is what occurred in fiscal 2012, as compared to fiscal 2011.

For fiscal 2011, we exceeded our Non-GAAP revenues and Non-GAAP operating income objectives by 14% and 22%, respectively. For fiscal 2012, even though we surpassed our fiscal 2011 achievements, we exceeded our Non-GAAP revenues and Non-GAAP operating income objectives by 3% and 2%, respectively. Accordingly, the fiscal 2012 ACIP funding rate and the amounts earned by our CEO and other NEOs were less than the funding rate and the amounts earned for fiscal 2011.

- The CEO's performance-based compensation (i.e., salary, ACIP amounts and grant date fair value of equity awards) for fiscal 2012 was $19.6 million, which was 6.6% less than his fiscal 2011 performance-based compensation.
  - Dr. Jacobs's fiscal 2012 ACIP amount of $3.4 million was 38% less than the fiscal 2011 ACIP amount of $5.5 million.
  - During the first quarter of fiscal 2012, the Compensation Committee increased his base salary by 3.4%, from $1.16 million to $1.2 million. His base salary for fiscal 2013 has not been increased.
  - Also during the first quarter of fiscal 2012, the Compensation Committee increased Dr. Jacobs's annual equity award by 4.7%, from $14.3 million to $15 million. The increase was made to recognize the Company's record fiscal 2011 financial performance and the strength of fiscal 2012 financial objectives that reflected double-digit growth in Non-GAAP revenues and Non-GAAP operating income.
  - The increases to Dr. Jacobs's base salary and grant date fair value of performance-based equity awards were more than offset by the 38% reduction in his fiscal 2012 ACIP earnings.

The Executive Summary provides a thorough description of fiscal 2012 pay for performance.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

### C. Key Compensation Practices

Our compensation programs are subject to a thorough process of review by the Compensation Committee and the outside legal advisors and independent compensation consultants engaged by the Compensation Committee. Some of our compensation best practices include:

- a majority of long-term equity awards granted in the form of performance-based awards;
- a balance of short-term and long-term performance measures and time horizons for incentive awards;
- limits to the potential ACIP amounts and quantity of performance stock units that may be earned;
- stock ownership guidelines;
- an annual assessment of compensation risk management;
- a cash incentive claw-back policy;
- tax gross-up payments on compensation or benefits only where directly business-related and provided in a policy applicable to all eligible employees (e.g., relocation);
- a “double-trigger” for the acceleration of vesting of equity awards in the event of a change in control;
- an insider trading policy prohibiting transactions involving shorting, puts, calls, other derivatives and buying company shares on margin or using owned shares as collateral;
- employment of NEOs “at will” without severance agreements or employment contracts;
- a compensation committee comprised of independent directors; and
- the compensation committee’s use of an independent consultant that is not retained by the Company or any of its subsidiaries.

The Executive Summary, which follows immediately below, provides a thorough description of our compensation programs and practices.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## II. EXECUTIVE SUMMARY

This section more fully describes (1) the changes to our compensation programs and practices that our Compensation Committee has approved for fiscal 2013, (2) our fiscal 2012 pay for performance and (3) our executive compensation programs and practices.

### A. Key Changes to our Compensation Programs and Practices for Fiscal 2013

The Compensation Committee has approved several modifications to the compensation programs and practices for our NEOs that will be implemented for fiscal 2013. The changes are in response to the advisory vote on executive compensation ("Say-on-Pay") at the 2012 annual meeting. The impact of these changes is not reflected in this proxy statement because the Compensation Committee determined our executive officers' fiscal 2012 base salary and equity compensation amounts (including the plan designs for the fiscal 2012 non-equity cash incentive and performance stock unit plans) during the first quarter of fiscal 2012, which was prior to the March 2012 annual meeting.

- Qualcomm began conducting advisory votes on executive compensation at the 2011 annual meeting. At the first advisory vote held on March 8, 2011, 95% of stockholders approved the compensation of our NEOs for fiscal 2011. We did not change our compensation programs or practices from fiscal 2011 to 2012, in part because of the highly favorable results of the advisory vote at the 2011 annual meeting.
- At the second advisory vote held on March 6, 2012, 69% of stockholders approved the compensation of our NEOs for fiscal 2012. The decline in the percentage of our stockholders voting in favor of the compensation of our NEOs prompted the Compensation Committee to review our compensation programs and practices and the feedback of certain advisors to institutional investors. In addition, prior to and following the 2012 annual meeting, the Company's management sought feedback from stockholders regarding the rationale for their votes and the areas in which they believed the executive compensation program could be improved. The results of management's outreach were varied, as many investors were unwilling or unable to discuss specific reasons as to why the firm voted as they did on our "Say-on-Pay" proposal. Among stockholders that were available and able to comment, their reasons for a negative vote were varied and generally related to voting policies established by the stockholder. Other investors stated that they followed the recommendations of advisors to institutional investors. The results of management's outreach were reported to the Compensation Committee in its deliberations regarding the manner in which the future program may change.
- As a result of this review, the Compensation Committee approved several modifications to the compensation programs and practices for our NEOs that will be implemented for fiscal 2013 and more fully disclosed in the proxy statement for the 2014 annual meeting. These changes are not reflected in the compensation for fiscal 2012 disclosed in the Compensation Discussion and Analysis section because, consistent with historical practices, the Compensation Committee determined the fiscal 2012 base salary and equity compensation, the fiscal 2012 non-equity ACIP and the fiscal 2012 performance stock unit program for our executive officers during the first quarter of fiscal 2012, while the advisory vote on executive compensation occurred later at the annual meeting held in the second quarter of fiscal 2012. Accordingly, it was not possible for the Compensation Committee to take into account the results of the 2012 advisory vote when determining the fiscal 2012 base salary and equity compensation amounts, the fiscal 2012 non-equity ACIP and the fiscal 2012 performance stock unit program.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

We will continue to structure our compensation programs and practices to promote leadership, decision-making and actions among our executives that are consistent with our values of innovation, execution and partnership without taking inappropriate or unnecessary risks. The following table summarizes the key changes the Compensation Committee is implementing for fiscal 2013. Additional commentary is provided below.

| Key Change | Prior Practice | Fiscal 2013 Practice | Impact |
|---|---|---|---|
| Added revenues as a second quantitative criterion for selecting peer companies for executive compensation comparisons. | Market capitalization was the single quantitative criterion for selecting peer companies. | Revenues, within the range of one-quarter to four times Qualcomm's revenues, were added as a second quantitative criterion for selecting peer companies. | Five companies included in the fiscal 2012 peer group are excluded from the fiscal 2013 peer group. |
| Reduced the maximum Annual Cash Incentive Plan (ACIP) amount. | The maximum ACIP maximum amount was 2.5 times the target amount. | The maximum ACIP amount is 2.0 times the target amount. | The CEO's target ACIP amount remains at 250% of base salary. Accordingly, the CEO's maximum ACIP amount is reduced from 625% of base salary to 500% of base salary. |
| Reduced the rate of increase to the ACIP funding rate for financial results that exceed the objectives. | For each one percent improvement in financial performance that was between 95% to 110% of the financial objectives, the ACIP funding rate increased 7.4 percentage points. | For each one percent improvement in financial performance between 100% to 125% of the financial objectives, the ACIP funding rate increases 4.0 percentage points. | For example, for financial performance that is 110% of the financial objectives, the funding rate is reduced from 1.74 times the target ACIP amount for fiscal 2012 to 1.4 times the target ACIP amount for fiscal 2013, a nearly 20% reduction in the ACIP funding rate. |
| Changed the timing of equity awards to executive officers. | The Compensation Committee granted equity awards to the CEO, other NEOs and other executive officers during the first quarter of the fiscal year. | The Compensation Committee will grant equity awards to the CEO, other NEOs and other executive officers during the fourth quarter of the fiscal year. | The Compensation Committee is provided maximum flexibility to consider current fiscal year performance, the results of the annual stockholder advisory vote on executive compensation and feedback from stockholders. |
| Prohibited the future pledging of our common stock. | Our policy allowed for stock pledges and the use of our common stock in a margin account provided such transactions were pre-cleared by a trading compliance officer of the Company. | During fiscal 2012, the Company adopted a new policy that prohibits the future pledging of our common stock. | The new policy provides up to five years to comply for any shares of our common stock that had been pledged prior to policy adoption. |



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

**1. Added revenues as a second quantitative criterion for selecting peer companies.**

We continue to believe that market capitalization is appropriate as a primary quantitative criterion for the following reasons:

- Market capitalization, a key component of which is stock price, is the key driver of equity compensation grant value, and equity compensation grant value is the single largest component of CEO compensation among technology companies with large market capitalizations;
- Market capitalization is directly correlated to stockholder benefit; and
- A significant portion of Qualcomm's business is technology licensing, which is a high-margin business, and as such, Qualcomm typically has higher market capitalization and profit than companies with similar revenues.

We included revenues as a second quantitative criterion for the following reasons:

- Revenues are commonly used as a selection criterion by our peer companies, independent, third-party compensation survey providers and proxy advisory services; and
- Revenues provide an additional screening criterion so that companies with comparable market capitalization but with revenues in excess of four times Qualcomm's revenues are excluded from the final group of peer companies.

**2. Reduced the maximum Annual Cash Incentive Plan (ACIP) amount from 2.5 times to 2.0 times the target amount.**

**3. Reduced the rate of increase to the funding rate (Incentive Multiple) for financial performance that exceeds objectives.**

The graph below depicts the relationship between financial performance (how well we performed as compared to the financial objectives the Board approved during the first quarter of the fiscal year) and the Incentive Multiple (the Funding Line). The Incentive Multiple is calculated based on financial performance and applied to a target ACIP amount to determine a performance-adjusted ACIP amount before the application of discretion by the Compensation Committee, as warranted.)

**Relationship between Financial Performance and ACIP Incentive Multiple**






Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

4. **Changed the timing of equity awards to permit a "look back" on annual performance and the ability to consider "Say-on-Pay" vote results prior to granting awards.**

Changing the timing of the equity awards from the first quarter (Q1) to the fourth quarter (Q4) of the fiscal year provides the Compensation Committee maximum flexibility to consider current fiscal year performance when determining equity amounts. Within the context of the nearly complete fiscal year, the Compensation Committee will have the capability to consider absolute and relative total shareholder return (TSR) and anticipated year-over-year growth in addition to performance against our annual objectives. Further, since equity compensation is the largest part of our NEOs' annual compensation, granting awards after the annual meeting of stockholders (which takes place during the second quarter of the fiscal year) allows consideration of stockholders' "Say-on-Pay" feedback to be reflected in the annual equity grants. The Compensation Committee will consider an alternative to the three-year annual vesting schedule used for prior equity awards so that the change in the timing of the grants does not result in a delay of compensation from the vesting of equity awards.

5. **Prohibited the future pledging of our common stock.**

During fiscal 2012, the Governance Committee adopted a new policy that prohibits the future pledging of our common stock and provides up to five years to comply for any stock that had been pledged prior to policy adoption. The five-year period to comply with the pledging of our common stock is consistent with the five-year period to comply with our stock ownership guidelines. Currently, all of our executive officers and all but one of our directors are in compliance with this new pledging policy.

### B. Fiscal 2012 Pay for Performance

Our pay for performance philosophy includes two basic programs that provide a balance of shorter- and longer-term performance and a mix of cash and equity.

1. The Annual Cash Incentive Plan (ACIP)

The ACIP is an annual program that includes two Non-GAAP financial performance objectives, revenues and operating income, that are approved by the Board during the first quarter of the fiscal year.

*Why we used Non-GAAP objectives*. We used Non-GAAP revenues and Non-GAAP operating income as financial objectives because they:

- are the key metrics we use to manage the business;
- focus the executive team on the performance and efficiency of our core operating businesses, including our QCT, QTL and QWI segments;
- provide a direct link between decisions and outcomes; and
- are key factors that influence stockholder value.

We place more relative weight on Non-GAAP operating income performance (60% relative weight) than on Non-GAAP revenues performance (40% relative weight) because we believe profit is more important for stockholder value creation than top-line growth. These Non-GAAP objectives exclude the QSI segment (which makes strategic investments), certain estimated share-based compensation, certain acquisition-related items and certain tax items because we view such items as unrelated to the operating activities and performance of our ongoing core businesses, which is consistent with the performance focus of the ACIP.

*Non-GAAP amounts used for determining ACIP funding*. For fiscal 2012, the Compensation Committee used the most recent estimates of fiscal 2012 Non-GAAP results at the time it approved the fiscal 2012 ACIP amounts for the CEO and the other NEOs during the fourth quarter of fiscal 2012. See further discussion under the "Fiscal 2012 Annual Cash Incentive Plan" section.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

*Pre-established formula and the Compensation Committee's use of negative discretion*. Funding for the ACIP amounts is determined by a pre-established formula that results in the target amount of cash if the Company achieves its financial performance objectives. The ACIP amounts earned by each NEO is subject to the Compensation Committee's negative discretion.

**2. Performance-based equity awards.**

Equity awards are long-term rewards that include both performance stock units (PSUs) and restricted stock units (RSUs). The number of PSUs that may be earned by the NEOs is determined by multi-year relative and absolute TSR. The vesting of RSUs was contingent on the Company achieving or exceeding a fiscal 2012 operating income growth objective approved by the Compensation Committee during the first quarter of fiscal 2012.

The "Percent of Financial Objectives Achieved and Resulting Incentive Multiple" graph below shows the relationship between our financial performance and the Incentive Multiple we used to determine the funds available for the ACIP amounts.

- The Incentive Multiple is based on financial achievement compared to the financial objectives approved by the Board during the first quarter of the fiscal year. The Incentive Multiple is applied to each NEO's individual target ACIP amount to determine the performance-adjusted ACIP amount before the Compensation Committee applies its discretion, as warranted. Note that the Incentive Multiple, and thus the ACIP amounts that may be earned by the NEOs, varies according to the extent to which financial achievement varies compared to the objective, though not in a direct linear fashion. As noted earlier, for fiscal 2013, the Compensation Committee reduced the rate of increase to the Incentive Multiple for achievement that exceeds objectives.
- In fiscal 2012, we achieved 103% of our Non-GAAP revenues objective and 102% of our Non-GAAP operating income objective, resulting in an Incentive Multiple of 1.17. Fiscal 2011 Non-GAAP revenues and Non-GAAP operating income were adjusted to exclude certain items for calculating financial performance. No adjustments were made to fiscal 2012 or 2010 Non-GAAP revenues and Non-GAAP operating income. The most directly comparable GAAP financial measures and information reconciling these adjusted Non-GAAP financial measures to our financial results prepared in accordance with GAAP are included in Appendix 3.

**Percent of Financial Objectives Achieved and Resulting Incentive Multiple**




(1) Fiscal 2011 Non-GAAP revenues and Non-GAAP operating income were adjusted to exclude certain items for calculating financial performance.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

In considering the fiscal 2012 ACIP amounts earned by our CEO and other NEOs, the Compensation Committee used the most recent estimates of fiscal 2012 Non-GAAP results during the fourth quarter of fiscal 2012, and use of these estimates resulted in an Incentive Multiple of 1.16 as compared to the 1.17 Incentive Multiple that resulted from the use of actual Non-GAAP results. In considering the 1.16 Incentive Multiple, the Compensation Committee determined that (1) the amounts earned by our CEO, President & COO, CFO and General Counsel should be nominally rounded downward from the performance-adjusted amounts yielded by the 1.16 Incentive Multiple and (2) the amount earned by our Group President should be rounded upward from the performance-adjusted amount yielded by the 1.16 Incentive Multiple to reflect the strong financial performance of our licensing business. The ACIP amounts earned by the NEOs for fiscal 2010 through 2012 are illustrated in the “NEO ACIP Amounts” graph below.

## NEO ACIP Amounts




*CEO Compensation for Fiscal 2012*. Dr. Jacobs’s total direct compensation (TDC) for fiscal 2012 (i.e., salary, ACIP amount and long-term equity awards) of $19.6 million was 6.6% less than his fiscal 2011 amount of $21.0 million. The “CEO Pay for Performance” graph below presents Dr. Jacobs’s TDC compared to the Non-GAAP revenues and Non-GAAP operating income achievements for fiscal 2010 through 2012. Dr. Jacobs’s TDC was lower in fiscal 2012 in spite of the considerably higher Non-GAAP revenues and Non-GAAP operating income. We exceeded our financial objectives and achieved record Non-GAAP revenues and Non-GAAP operating income for fiscal 2012, though not to the same extent as in fiscal 2011. Thus, the performance-adjusted ACIP amount included in his total compensation was lower than the fiscal 2011 amount.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

CEO Pay for Performance




(1) Fiscal 2011 Non-GAAP revenues and Non-GAAP operating income were adjusted to exclude certain items for calculating financial performance.

### C. Key Compensation Program Practices

Our compensation programs are subject to a thorough process that includes Compensation Committee review and approval of program design and practices and the advice of an independent, third-party compensation consultant engaged by the Compensation Committee. We have many practices that promote consistent leadership, decision-making and actions among our executives that are consistent with our values of innovation, execution and partnership without taking inappropriate or unnecessary risks. These practices include:

- ***We emphasize performance-based equity awards.*** In fiscal 2012, a majority of the long-term incentive awards granted to our CEO, the other NEOs and other executive officers were in the form of performance-based awards that align the interests of our stockholders and executive officers. The PSUs reward relative and absolute stock performance. The PSU program restricts the amount of PSUs that may be earned to the target amount if Qualcomm's relative TSR is better than the NASDAQ while our absolute TSR is negative for the 3-year performance period. Thus, no more than the target amount of PSUs may be earned when our relative TSR exceeds the NASDAQ-100 during difficult market conditions. The RSUs included a fiscal 2012 operating income threshold to ensure tax deductibility under Section 162(m) of the Internal Revenue Code, which benefits stockholders.
- ***A significant portion of our NEOs' compensation varies with Company performance.*** On average, 76% of our NEOs' fiscal 2012 annual target compensation was attributable to the grant date fair value of long-term incentive equity awards, and 89% of their fiscal 2012 annual target compensation was variable in the form of ACIP amounts and long-term incentive equity awards.
- ***We have a balanced approach to incentive programs.*** We have a balance of short-term (Non-GAAP revenues and Non-GAAP operating income) and long-term (relative TSR) performance measures. We



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

have a balance of time horizons for our ongoing incentive awards, including an annual cash incentive program, a three-year PSU program and RSUs that become fully vested three years after the grant date (provided a pre-determined operating income threshold for fiscal 2012 was met or exceeded).

- ***We have limits on the amounts of variable compensation that may be earned.*** We limited the potential ACIP amounts that the NEOs may earn to 2.5 times the target amount, and for fiscal 2013, we are reducing the limit to 2.0 times the target amount. We introduced PSUs in fiscal 2010 and limited the potential number of shares of our common stock that our NEOs may earn to 2.0 times the target amount for the fiscal 2011 and 2012 awards and 1.25 times the target amount for the fiscal 2010 awards. The higher maximum award for fiscal 2011 and 2012 aligned relative earned compensation with relative performance (e.g., compensation in the top quartile is earned for performance achieved in the top quartile), consistent with our pay-for-performance philosophy. The fiscal 2010 awards included a minimum award of 75% of the target amount, whereas the fiscal 2011 and 2012 awards did not include a minimum award amount (i.e., if TSR is not high enough, the PSUs are forfeited).
- ***We have a risk management process.*** We continued the annual risk assessments for our compensation and benefit programs and human resources data management processes and practices relative to executive and non-executive compensation programs that we initiated in fiscal 2010. These reviews included an assessment by the Compensation Committee's independent compensation consultant.
- ***We have stock ownership guidelines.*** We established stock ownership guidelines in September 2006. In October 2010, we increased the ownership guideline for the CEO from five times to six times annual base salary. Our CEO and two of the other NEOs were required to and have met their respective guidelines as of September 30, 2012, and the remaining NEOs are progressing toward their respective guidelines.
- ***We do not provide special tax gross-up for executive perquisites.*** We do not provide tax gross-up payments on compensation or benefits, except where directly business-related and provided in a policy applicable to all eligible employees, such as relocation.
- ***We have a cash incentive compensation claw back policy.*** We adopted a cash incentive compensation repayment ("claw back") policy effective January 1, 2009, and we intend to amend the policy to comply with any additional requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) after the SEC adopts new regulations implementing those requirements.
- ***Our insider trading policy includes a prohibition on pledging of stock.*** Our insider trading policy for executive officers and non-employee directors prohibits transactions involving "short-swing" profits, short sales and derivatives, including put and call options and forward sales contracts. Our policy requires that a trading compliance officer of the Company first pre-clear complex transactions such as loans and other transactions that may be structured to monetize or otherwise obtain value for stock holdings. During fiscal 2012, the Governance Committee adopted a new policy that prohibits the future pledging of our common stock which provides up to five years to comply for any shares that had been pledged prior to the policy being adopted. The five-year period to comply with the pledging of stock is consistent with the five-year period to comply with our stock ownership guidelines.
- ***Our NEOs do not have severance agreements or employment contracts, and our equity acceleration in the event of a change-in-control is "double-trigger."*** We employ our NEOs "at will," without severance agreements or employment contracts. Thus, our CEO and other NEOs do not have guaranteed arrangements for cash compensation or severance upon a change in control or excise tax gross-up for change-in-control payments. Furthermore, no outstanding unvested equity awards assumed by an acquirer in the event of a change in control would accelerate for employees, including NEOs, who were not involuntarily terminated or who did not terminate voluntarily "for good reason" during a specified period after the change in control (i.e., "double-trigger" treatment of unvested awards).



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## III. COMPENSATION DISCUSSION AND ANALYSIS

In this section, we discuss and analyze our compensation programs and the specific amounts of compensation paid to our CEO, CFO and the other three most highly compensated executive officers for fiscal 2012. Collectively, we refer to these individuals as the "Named Executive Officers" or the "NEOs." They are:

1. Dr. Paul E. Jacobs, Chairman and CEO, has 22 years of service with Qualcomm and has been CEO since July 2005 and Chairman since March 2009.
2. Mr. Steven M. Mollenkopf, President and COO, has 18 years of service with Qualcomm and has been President and COO since November 2011.
3. Mr. Derek K. Aberle, EVP and Group President, has 12 years of service with Qualcomm and has been Group President since November 2011.
4. Mr. William E. Keitel, EVP and CFO, has 16 years of service with Qualcomm and has been CFO since February 2002.
5. Mr. Donald J. Rosenberg, EVP, General Counsel and Corporate Secretary, has 5 years of service with Qualcomm.

### A. Compensation Program Objectives and What We Reward

Our compensation program has five primary objectives:

1. align the interests of our NEOs and long-term stockholders;
2. pay for performance: annual cash incentive amounts earned vary with performance compared to pre-established financial objectives, and amounts potentially realized from long-term equity incentive awards will vary with absolute stock price performance and relative TSR;
3. deliver pay that is competitively reasonable and appropriate for our business needs and circumstances;
4. reflect high standards for corporate governance and compensation-related risk management; and
5. be tax efficient for the Company.

### B. Key Components of Our NEO Compensation Program

We are including three tables to summarize the key components of our NEO compensation program. The first table, immediately below, includes the principal components of our pay-for-performance approach. The other two tables are included in the final section of the CD&A under the heading "Other Components of Our Executive Compensation Programs" on page 65. These two additional tables summarize benefit programs that are available only to our NEOs and other employees in vice president or senior vice president roles and benefit programs that are generally available to all of our U.S.-based employees, including our NEOs.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

### Principal Components of our Pay-for-Performance Approach (1)

| Component | Form and Purpose | Pay for Performance | Comment |
|---|---|---|---|
| Base salary | Annual fixed cash compensation. Provide sufficient competitive pay to attract and retain experienced and successful executives. | Adjustments to base salary consider individual performance, contributions to the business, competitive practices and internal comparisons. | Base salary reflects the employee's level of responsibility, expertise, skills, knowledge and experience. The Compensation Committee determines the amount during the first quarter of the fiscal year. |
| Annual cash incentive | Annual variable cash compensation. Encourage and reward contributions to our annual financial performance objectives. Engage executives in execution, partnership and teamwork. Emphasize accountability for results. | The potential award amount varies with the degree to which we achieve our annual financial objectives and the extent to which the NEO contributes to strategic and operational objectives. | The Compensation Committee determines the target amount during the first quarter of the fiscal year and approves the actual amount earned at the end of the fiscal year. |
| Long-term incentive | Long-term variable share-based compensation. Encourage and reward building long-term stockholder value, employment retention and company stock ownership. Engage executives in innovation and align them with stockholder interests. We provide a mix of equity award types to balance specific objectives.<br>PSUs: Reward relative stock performance versus other potential similar investments.<br>RSUs: Maintain retention value during periods of market volatility. | PSUs: A variable amount of shares of our common stock are awarded based on the relative performance of our TSR compared to that of the NASDAQ-100.<br>RSUs: Retain executives and align them with stockholders' interests by awarding a fixed number of Qualcomm shares upon vesting.<br>Stock Options: The potential appreciation in our stock price above the option exercise price motivates our NEOs to build stockholder value. NEOs may realize an amount only if our stock price appreciates over the option term. | The Compensation Committee, at its sole discretion, determines the mix of equity awards (stock options, PSUs and RSUs) and the value of awards granted each year. The Compensation Committee determines the value of the awards in November, and the awards are granted on the date it approves the awards. We encourage stock ownership through guidelines applicable to all of our executive officers. |

(1) All of our employees receive a base salary and are eligible to participate in our annual cash incentive program, and substantially all of our employees are eligible to participate in our long-term incentive program.

### C. Determining the Amount of Compensation for Our NEOs: Our Overall Objectives

The amount of compensation we provide to our NEOs is intended to be:

- ***Competitively reasonable and appropriate for our business needs and circumstances.*** We consider competitive compensation practices by other companies as reference points that the Compensation Committee may use for comparative purposes. We do not target specific benchmark percentiles.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- ***Internally fair and equitable relative to roles, responsibilities and work relationships.*** The Compensation Committee may consider certain business and individual performance factors to evaluate internal fairness and equity. We do not attempt to establish specific internal relationships among the NEOs.
- ***Variable from year-to-year based on the Company's performance and individual performance ("pay for performance").*** Our annual cash incentive program and long-term incentive awards deliver compensation to our NEOs when we achieve our financial performance objectives; the price of our common stock appreciates above the stock option exercise price during the option term; and our TSR, relative to the NASDAQ-100 Total Return Index (NASDAQ-100), meets or exceeds a minimum threshold.

### D. Determining the Amount of Compensation for Our NEOs: The Factors We Consider

In determining the compensation amounts and opportunities, we consider several factors, including:

- competitive compensation practices;
- business and individual performance factors;
- other factors, including (1) results from stockholder advisory votes on executive compensation; (2) succession planning and retention; and (3) the CEO's evaluation and recommendations for the other executive officers; and
- the perspectives provided by the Compensation Committee's independent advisors, including its compensation consultant, Frederic W. Cook & Co., Inc. (FWC).

We discuss each of these factors in the following sections.

#### 1. Competitive compensation practices.

We conduct analyses using compensation data disclosed in SEC filings to establish reference points (i.e., the statistical median and the 75th percentile) that we use to compare our NEOs' compensation to that provided by peer companies.

*Peer companies for fiscal 2012*. In the spring of calendar 2011, the Compensation Committee objectively identified the fiscal 2012 peer group companies to use for its compensation planning and competitive analyses for fiscal 2012, taking into account FWC's recommendations, based on the following characteristics with regard to Qualcomm:

- principal business in a technology, media or telecommunications industry segment based on the Global Industry Classification System (GICS);
- generally comparable in market capitalization (guideline of one-quarter to four-times Qualcomm);
- comparable performance-based compensation model; and
- commonly used as peers of peers (i.e., the peer companies disclosed by the companies we used as peers).

The Compensation Committee emphasized market capitalization as the primary quantitative criterion for selecting companies for the following reasons:

- Market capitalization, a key component of which is stock price, is the key driver of equity compensation grant value, and equity compensation grant value is the single largest component of NEOs' compensation among large market capitalization technology companies.
- Market capitalization is directly correlated with stockholder benefit. Our market capitalization is supported more by our levels of net income and net income margin than by the amount of our revenues, which in turn reinforces the appropriateness of the peer group selection criterion.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- A significant portion of Qualcomm's business is technology licensing, which is a high margin business, and as such, we typically have higher market capitalization and profit than companies with similar revenues.

**Peer Companies for Fiscal 2012**

| | | |
|---|---|---|
| ADP | Amazon | Apple |
| AT&T | Broadcom | Cisco |
| Comcast | Corning | Dell |
| DirecTV | eBay | EMC |
| Google | Hewlett Packard | IBM |
| Intel | Microsoft | Motorola Mobility |
| Oracle | | Time Warner Cable |
| | Texas Instruments | |
| United Technologies | Verizon | Yahoo! |

Changes from the fiscal 2011 peer companies (1) included the addition of ADP because it met the Compensation Committee's selection criteria and is a potential competitor for executive talent; (2) excluded Adobe, Applied Materials and Motorola Solutions because they were below the minimum values established for peer company market capitalization; and (3) excluded Walt Disney, Time Warner and Viacom because they are media content companies and are limited potential competitors for executive talent. The Compensation Committee retained media distribution companies (i.e., Comcast, DirecTV and Time Warner Cable) because they are technology-driven and more likely potential competitors for executive talent.

**Fiscal 2012 Peer Company Data (1) (Dollars in billions)**

| | Range | Median | Qualcomm | Qualcomm's Rank |
|---|---|---|---|---|
| Market Capitalization | $7.2 - $321.0 | $81.20 | $89.60 | 10 of 22 |
| GAAP Revenues (trailing four quarters) | $6.3 - $127.2 | $34.40 | $11.70 | 16 of 22 |
| GAAP Net Income (trailing four quarters) | $(0.1) - $20.6 | $ 3.60 | $ 3.60 | 11 of 22 |
| EBITDA | $0.086 - $39.0 | $ 9.20 | $ 4.30 | 14 of 22 |
| EBITDA Margin | 1% - 46% | 26% | 37% | 6 of 22 |

(1) Qualcomm and the peer company data reported in the most recent Standard & Poor's Compustat reports as of March 2011, the time at which FWC prepared the peer company selection analysis. At its May 2011 meeting, the Compensation Committee determined the peer companies that were used for the competitive analyses prepared by FWC. The Compensation Committee reviewed the competitive analyses at its September 2011 meeting, prior to making fiscal 2012 compensation decisions at its November 2011 meeting.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

**Changes to Peer Companies for Fiscal 2013**

During fiscal 2012, the Compensation Committee determined the peer companies to use in its fiscal 2013 planning and competitive analyses and in doing so considered the results of the "Say-on-Pay" vote at the 2012 annual meeting and feedback from proxy advisory services. The characteristics of the fiscal 2013 peer companies include:

- principal business in a technology, media (non-content oriented) or telecommunications industry segment based on the Global Industry Classification System (GICS);
- generally comparable in both market capitalization and revenues between one-quarter to four-times Qualcomm's size (only market capitalization was used in prior years);
- comparable performance-based compensation model; and
- commonly used as peers of peers (i.e., the peer companies disclosed by the companies we use as peers).

As a result of these changes to the screening criteria, five of the larger fiscal 2012 peer companies (i.e., Apple, AT&T, Hewlett Packard, IBM and Verizon) were excluded for fiscal 2013 because they had revenues more than four times Qualcomm's revenues. Meanwhile, four of the smaller peer companies (i.e., Broadcom, Corning, Time Warner Cable and Yahoo) did not meet the minimum market capitalization threshold but were left in the group of fiscal 2013 peer companies by the Compensation Committee to ensure that the fiscal 2013 peer group remains sufficiently robust and to promote continuity.

**2. Business and individual performance factors**

In addition to compensation amounts that are competitively reasonable and appropriate, we intend for our compensation amounts to be internally fair and equitable relative to roles, responsibilities and relationships among our NEOs. Accordingly, we also consider other factors in the process of determining compensation levels for each NEO, including:

- the Compensation Committee's evaluation of the CEO and other NEOs;
- individual performance and contributions to financial goals, such as Non-GAAP revenues, Non-GAAP operating expenses, Non-GAAP operating income and free Non-GAAP cash flow;
- labor market conditions, the need to retain and motivate the NEOs and each NEO's potential to assume increased responsibilities and contribute long-term value to the Company;
- management succession plans and bench strength;
- operational management, such as project milestones and process improvements;
- internal working and reporting relationships and our desire to encourage partnership and teamwork among our NEOs;
- individual expertise, skills, knowledge and tenure in position; and
- leadership, including developing and motivating employees, collaborating within Qualcomm, attracting and retaining employees and personal development.

We do not have a predefined framework that determines which of these factors may be more or less important, and the emphasis placed on specific factors may vary among the NEOs. Ultimately, it is the Compensation Committee's judgment of these factors, along with competitive data, that form the basis for determining the CEO's, the other NEOs' and executive officers' compensation.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

### 3. Other factors considered in determining NEO compensation

*Results from the 2011 and 2012 Annual Meeting advisory votes on executive compensation*. We noted in the Executive Summary (1) the results of the advisory votes at the 2011 and 2012 annual meetings; (2) the decline in the percentage of our stockholders voting in favor of the compensation of our NEOs as compared to 2011, as well as feedback from stockholders that was provided by management, which prompted the Compensation Committee to review our compensation philosophy, programs and practices; and (3) the modifications to the compensation programs for our NEOs that will be implemented for fiscal 2013 and more fully disclosed in the proxy statement for the 2014 annual meeting.

*Prior compensation or amounts realized or realizable from prior equity compensation*. FWC prepared and reviewed with the Compensation Committee an analysis of the NEOs' equity holdings based on the current and potential values of their equity awards and ownership of our common stock. The Compensation Committee and the CEO reviewed these analyses as part of their broader consideration of alignment with stockholder interests, succession planning and retention of executive officers. The Compensation Committee determined not to include the ACIP amounts for fiscal 2011 (paid in fiscal 2012) and the amounts realized or realizable from prior equity awards in establishing compensation amounts for fiscal 2012 because we award cash incentives for fiscal year performance, and equity awards are forward-looking long-term incentives granted as part of the direct compensation that the Compensation Committee establishes each year. The Compensation Committee believes that reducing equity award grant values because of prior gains and ownership could penalize our executive officers for their long-term service and past performance.

*CEO involvement in compensation decisions*. After the end of the fiscal year, the Compensation Committee and the CEO discussed our business performance, his performance and his evaluation of and compensation recommendations for the other NEOs. The Compensation Committee, without the CEO present, determined the CEO's base salary, ACIP amount and long-term equity awards and approved the CEO's recommendations for base salaries, ACIP amounts and long-term equity awards for the other NEOs.

### 4. The Compensation Committee's independent consultants and advisors

The Compensation Committee has the authority to retain and terminate any independent, third-party compensation consultant and to obtain independent advice and assistance from internal and external legal, accounting and other advisors. During fiscal 2012, the Compensation Committee engaged an independent executive compensation consulting firm, FWC, to advise it on compensation matters. FWC reported directly to the Compensation Committee. We did not engage FWC for any additional services during fiscal 2012 beyond its support of the Compensation Committee. The engagement did not raise any conflicts of interest, and pursuant to this engagement, FWC:

- provided information, insights and advice regarding compensation philosophy, objectives and strategy;
- recommended peer group selection criteria and identified and recommended potential peer companies;
- provided analyses of competitive compensation practices for executive officers and non-employee directors;
- provided analyses of potential risks arising from our executive and non-executive programs;
- provided analyses of aggregate equity compensation spending;
- reviewed and commented on recommendations regarding NEO compensation; and
- advised the Compensation Committee on specific issues as they arose.

Representatives from FWC attended all Compensation Committee meetings during fiscal 2012 and interacted with the Committee Chair, members of our human resources staff and outside legal counsel prior to and following Compensation Committee meetings. We paid $347,541 in fees to FWC during fiscal 2012, all for work that was directly in support of the Compensation Committee and execution of the Committee's responsibilities under its charter.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The Compensation Committee also sought and received advice from our outside legal counsel, DLA Piper LLP. Our human resources department supported the Compensation Committee in its work, collaborated with FWC and DLA Piper, conducted analyses and managed our compensation and benefit programs.

### E. NEO Compensation for Fiscal 2012

In this section, we discuss the:

- relationships of TDC to competitive practices and between the CEO and other NEOs;
- contribution of each pay component to TDC;
- results of our ACIP financial performance measures and the resulting funding for amounts earned by the NEOs;
- ACIP amounts that were granted during the first quarter of fiscal 2012; and
- TDC for the CEO and each other NEO.

#### 1. Relationships of TDC to competitive practices and between the CEO and other NEOs

In the first quarter of fiscal 2012, the Compensation Committee determined base salaries, ACIP amounts and the grant date fair value of long-term incentive awards for the NEOs. The Compensation Committee considered information from FWC's competitive analysis, the business and individual factors described above, tax efficiency and the CEO's recommendations for the other NEOs in determining these amounts. The timing of the fiscal 2012 NEO compensation decisions was consistent with Qualcomm's historical practice. The two graphs below summarize the TDC profiles for our NEOs.

The "NEO TDC for Fiscal 2012" graph below compares the TDC amount for each NEO relative to the 50th (the triangle-shaped markers) and 75th (diamond-shaped markers) percentiles of our fiscal 2012 peer companies.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## NEO TDC for Fiscal 2012




(1) Excludes $5 million and $4 million in value from special promotion equity awards granted to Messrs. Mollenkopf and Aberle, respectively, in the form of PSUs and RSUs that vest in equal amounts on the third, fourth and fifth anniversaries of the grant dates. The value of these equity awards was excluded from the amounts above because the Compensation Committee views these equity awards as special, one-time awards made in connection with Messrs. Mollenkopf's and Aberle's promotions in November 2011. The value of these equity awards is included in the Summary Compensation Table.

The "Relationship of TDC between CEO and Other NEOs" graph below presents the relationship of the CEO's TDC as a multiple of the TDC for each of the four other NEOs. For example, Dr. Jacobs's TDC is 2.1 times greater than Mr. Mollenkopf's TDC. We consider these relationships to be useful when considering succession planning and alignment and engagement among the NEOs. The CEO reviewed these relationships in making his recommendations for the other NEOs to the Compensation Committee, but the Compensation Committee did not establish specific internal compensation relationship targets among the NEOs when determining TDC for the NEOs for fiscal 2012.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

**Relationship of TDC between CEO and Other NEOs**




(1) Excludes $5 million and $4 million in value from special promotion equity awards granted to Messrs. Mollenkopf and Aberle, respectively, as noted above.

### 2. Contribution of each pay component to TDC

The “Contribution of Each Pay Component to TDC for Fiscal 2012” graph below illustrates the proportionate contribution of each pay component to TDC. The portion of TDC that varies based on performance (the sum of the ACIP amount and the grant date fair value of long-term equity incentive awards divided by TDC) is 94% for the CEO and averages 89% for the other NEOs. These proportionate contributions were substantially the same as in fiscal 2010 and 2011.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

### Contribution of Each Pay Component to TDC for Fiscal 2012




(1) Excludes $5 million and $4 million in value from special promotion equity awards granted to Messrs. Mollenkopf and Aberle, respectively, in fiscal 2012 as noted above.

(2) The fair values of the RSUs were determined using the closing price of our common stock on the grant date.

(3) The fair values of the PSUs were determined using a Monte-Carlo simulation (a generally accepted statistical technique used, in this instance, to simulate a range of possible future stock prices for Qualcomm and the NASDAQ-100 Index) with the following assumptions: expected volatility of 31.36% for Qualcomm and 23.38% for the NASDAQ-100; expected volatility of 33.99% for Qualcomm's ending stock price; a correlation coefficient of 0.7440; risk-free rates of return of 0.23%, 0.28%, 0.37% and 0.45% for the 18-, 24-, 30- and 36- month performance periods, respectively; and a dividend rate of 1.50%.

### 3. Results of our ACIP financial performance measures and the resulting funding for amounts earned by the NEOs

During the first quarter of fiscal 2012, the Compensation Committee, after consultation with the CEO and review by the Board of Directors, established Non-GAAP revenues and Non-GAAP operating income objectives for the fiscal 2012 annual cash incentive plan (ACIP). The Non-GAAP revenues and Non-GAAP operating income objectives for fiscal 2012 were $4.2 billion (29.7%) and $1.1 billion (19.7%) more than the Non-GAAP revenues and Non-GAAP operating income achieved for fiscal 2011, respectively. We applied a relative weighting of 40% to Non-GAAP revenues and 60% to Non-GAAP operating income to emphasize the relative importance of operating income on stockholder value creation.

The "Fiscal 2012 ACIP Amount Calculation" table below reports our Non-GAAP revenues and Non-GAAP operating income objectives and results and the calculation of the Incentive Multiple that is used by the Compensation Committee in determining the performance-adjusted ACIP amounts. During the fourth quarter of fiscal 2012, the Compensation Committee used the most recent estimates of fiscal 2012 results when it approved



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

the fiscal 2012 ACIP amounts for the CEO and the other NEOs. The estimates used resulted in an Incentive Multiple of 1.16, as compared to the 1.17 Incentive Multiple shown in the table below based on actual Non-GAAP results. We achieved 103% and 102% of our Non-GAAP revenues and Non-GAAP operating income objectives for fiscal 2012, respectively. Our fiscal 2012 performance reflected growth of 34% and 22% in Non-GAAP revenues and Non-GAAP operating income, respectively, over fiscal 2011, which was itself a record year with Non-GAAP revenues and Non-GAAP operating income growth of 30% and 35%, respectively, over fiscal 2010. The fiscal 2012 year-over-year Non-GAAP revenues objective was above the peer company 75th percentile actual revenues growth and the year-over-year Non-GAAP operating income objective was at the peer company 75th percentile actual operating income growth. These levels of performance, when applied to the formula approved by the Compensation Committee at the beginning of fiscal 2012, resulted in an Incentive Multiple of 1.17. (See the narrative under "Grants of Plan-Based Awards" for a detailed description of the cash incentive program and formula.)

## Fiscal 2012 ACIP Amount Calculation

| | Results ($000s) | ÷ | Target ($000s) | = | Achievement Ratio | x | Relative Weight | | Weighted Achievement Ratio |
|---|---|---|---|---|---|---|---|---|---|
| Non-GAAP revenues | 19,120,822 | | 18,566,639 | | 103% | | 40% | | 41.2% |
| Non-GAAP operating income | 7,100,050 | | 6,967,868 | | 102% | | 60% | | 61.1% |
| | | | | | | | Sum | = | 102.3% |
| | | | | | Incentive Multiple (1) (2) | | | | 1.17 |

(1) See the "Annual Cash Incentive Plan" section under "Grants of Plan-Based Awards" for a discussion of how we calculate the Incentive Multiple.

(2) The Incentive Multiple has been rounded to the nearest hundredth.

Consistent with past practice, the fiscal 2012 ACIP authorized the Compensation Committee to adjust reported Non-GAAP revenues and Non-GAAP operating income for calculating financial performance on which fiscal 2012 cash incentives were determined to eliminate the distorting effect of certain unusual income or expense items on year-over-year growth percentages if the Compensation Committee determined, in its discretion, that the items do not reflect a fair measurement of our operating performance. The Compensation Committee did not make any such adjustments for fiscal 2012.

The "Fiscal 2012 Performance-Adjusted and Actual ACIP Amounts" table below shows, for each NEO, the target ACIP amount established at the beginning of fiscal 2012, the performance-adjusted ACIP amount that is the product of multiplying the target ACIP amount by the Incentive Multiple of 1.17, the actual ACIP amount approved by the Compensation Committee and the variance between the actual ACIP amounts and the performance-adjusted amounts.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

### Fiscal 2012 Performance-Adjusted and Actual ACIP Amounts

| Name | Target ACIP Amount ($) | Performance-Adjusted ACIP Amount ($) (1) | ACIP Amount Awarded by Compensation Committee ($) | Variance of Actual ACIP Amount vs. Performance-Adjusted Amount |
|---|---|---|---|---|
| Jacobs | 3,000,000 | 3,510,000 | 3,400,000 | -3% |
| Mollenkopf | 1,141,000 | 1,334,970 | 1,300,000 | -3% |
| Aberle | 900,000 | 1,053,000 | 1,100,000 | 4% |
| Keitel | 887,500 | 1,038,375 | 1,000,000 | -4% |
| Rosenberg | 742,500 | 868,725 | 850,000 | -2% |

(1) The Performance-Adjusted ACIP Amount is the product of the Target ACIP Amount multiplied by the Target Incentive Multiple of 1.17 and represents a reference point that the Compensation Committee considered along with individual accomplishments in determining the NEOs' actual ACIP amounts.

**4. Annual long-term incentive awards that were granted during the first quarter of fiscal 2012**

*Factors we consider for determining equity award amounts*. The Compensation Committee exercises its discretion in approving long-term incentive award amounts. A key consideration is the resulting target direct compensation relative to competitive practices and internal pay relationships. Our compensation philosophy and practice is that total direct compensation is reasonable and appropriate when it is fairly aligned with relative competitive performance and with our fiscal 2012 goals. After the Compensation Committee has considered the resulting position of total direct compensation relative to competitive practice, it then considers individual performance and contributions, long-term potential and retention, internal fairness and equity, the business and individual factors described earlier and the performance required by the ACIP financial objectives, which required 30% year-over-year Non-GAAP revenues growth and 20% year-over-year Non-GAAP operating income growth.

*Additional factors we will consider for fiscal 2013 equity awards*. For fiscal 2013, the Compensation Committee has determined that it will also consider absolute and relative TSR and year-over-year growth in addition to performance against annual objectives. Further, it has changed the timing of equity awards from the first quarter to the fourth quarter of the fiscal year. Changing the timing provides the Compensation Committee maximum flexibility to consider fiscal year performance and the stockholders' annual "Say-on-Pay" advisory vote when determining equity awards, and by doing so, the amounts of the equity awards will be more clearly aligned with the performance for the fiscal year in which the awards are granted and with the feedback provided by the stockholders through the advisory vote.

*We provided a mix of performance-based equity awards*. During the first quarter of fiscal 2012, the Compensation Committee awarded a combination of PSUs and RSUs to the NEOs, including special promotion PSUs and RSUs to Messrs. Mollenkopf and Aberle, and each NEO received a majority of his equity awards in the form of PSUs. The PSUs and RSUs are consistent with our long-term incentive program because they align the interests of our NEOs and our stockholders by rewarding relative and absolute stock price performance, and they provide the additional advantage of being retention tools under certain circumstances. Awarding PSUs and RSUs to our NEOs and other employees enables us to address certain strategic compensation objectives, including to:

- reduce our equity burn rate (the number of shares subject to equity awards granted during the year divided by total common shares outstanding), while we increase our staffing levels and maintain a broad-based equity program in which substantially all of our employees are eligible to receive equity awards;
- reduce our overhang (the number of outstanding unexercised stock options and unvested PSUs and RSUs);



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- balance our NEOs' equity compensation portfolios, especially in times of high market volatility and when increases to our stock price may be constrained by external factors; and
- reinforce our already strong capability to attract, retain and engage highly talented executives.

*RSUs require that the Company meet or exceed an operating income objective in order to vest.* We structured the RSU program such that the RSUs would vest subject to the Company attaining at least 70% of the Non-GAAP operating income objective ($4.9 billion) for fiscal 2012. If we did not equal or exceed this amount the RSUs would not vest, and if we did equal or exceed this amount, the RSUs would vest annually over three years. This performance criterion ensured alignment with our pay-for-performance philosophy, as well as the tax deductibility of the RSUs under IRC Section 162(m). The Compensation Committee certified that the $4.9 billion objective was achieved. The RSUs include dividend equivalent rights.

*The number of shares distributed through our PSU program is based on both relative and absolute TSR.* We structured the PSU program to award a variable amount of shares of our common stock based on the relative performance of our TSR compared to that of the NASDAQ-100. We selected the NASDAQ-100 because it (1) represents a broader capital market with which we compete for talent and capital investments; (2) is representative of the broad range of our business operations, which includes licensing of intellectual property and sales of products and services; (3) is both objectively determined and readily available, and our performance compared to the index can be evaluated at any time; (4) provides transparency for participants and stockholders; and (5) facilitates the tracking and administration of the plan. (See the "Performance Stock Units" section under "Grants of Plan-Based Awards" for a description of the PSU program.)

The design of the fiscal 2012 PSU program is depicted in the "Fiscal 2012 PSU Award Structure" table below.

**Fiscal 2012 PSU Award Structure**

| Qualcomm TSR relative to the NASDAQ-100 | Percent of Target Award Amount that may be Earned |
|---|---|
| Maximum: 133% and above | 200% |
| Target: 100% | 100% |
| Threshold: 66% | 33% |
| Less than 66% | 0% |

*Qualcomm's TSR for the 3-year performance period must be positive to earn more than the target award amount.* The total award amount earned may not exceed the target award amount if Qualcomm's TSR for the three-year performance period is negative. This feature limits compensation for positive performance against the peer group, when stockholders are still losing a portion of their investment over the period (as may occur in a volatile or depressed securities market). The performance period is the three-year period from September 26, 2011 to September 26, 2014, with four separate measurement periods of 18, 24, 30 and 36 months. We determined that four separate measurement periods would encourage and reward sustained and continuous growth over the three years and align our executive officers' interests with our stockholders' interests. The PSUs will not vest until the end of the performance period and include dividend equivalent rights. The dividend equivalents will accrue, in the form of additional shares of our common stock, on earned shares with vesting and distribution on the third anniversary of the grant date. The cliff-vest provision provides a retention component and aligns with the three-year performance period.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

### 5. TDC for the CEO and each other NEO

***Dr. Paul Jacobs, Chairman and CEO.***

| | Fiscal 2012 | Fiscal 2011 | Change |
|---|---|---|---|
| Salary | $ 1,189,246 | $ 1,150,591 | 3.4% |
| ACIP amount | 3,400,000 | 5,500,000 | -38.2% |
| Total cash compensation | 4,589,246 | 6,650,591 | -31.0% |
| Long-term incentive grant date fair value | 14,999,985 | 14,322,329 | 4.7% |
| TDC | $19,589,231 | $20,972,920 | -6.6% |

Dr. Jacobs's TDC for fiscal 2012 was 7% less than the fiscal 2011 amount primarily due to a lower ACIP amount. The Company's fiscal 2012 financial performance exceeded its objectives, albeit to a lesser extent as compared to fiscal 2011 resulting in a lower ACIP amount.

Dr. Jacobs's salary for fiscal 2012 as reported above and in the "Summary Compensation Table" reflects an increase awarded by the Compensation Committee that was effective during the first quarter of fiscal 2012.

Any PSUs earned during the three-year performance period become fully vested at the end of the performance period, and the RSUs vest annually, provided the Company meets or exceeds the operating income objectives approved by the Compensation Committee, and become fully vested on the third anniversary of the grant date. The actual amount realized at the time of vest is dependent upon relative and absolute TSR for PSUs and the price of our common stock and the number of dividend equivalents credited for RSUs.

Dr. Jacobs received a bonus award of $2,775 from Qualcomm's patent award program in fiscal 2012. He received similar amounts from the patent award program in fiscal 2009, 2010 and 2011. This amount is disclosed in the "Summary Compensation Table" but is not considered as part of his total direct compensation.

In November 2011, the Compensation Committee increased the amount of Dr. Jacobs's equity award (comprised of both PSUs and RSUs) to (1) recognize the Company's outstanding fiscal 2011 financial performance and (2) to align his TDC for fiscal 2012 with the 75th percentile of the fiscal 2012 peer group. Slightly more than 50% of the shares awarded were PSUs.

During the fourth quarter of fiscal 2012, the Compensation Committee awarded Dr. Jacobs an ACIP amount of $3.4 million, which was 38% less than the amount he received for fiscal 2011. This amount is 3% less than the performance-adjusted amount due to a nominal "rounding-off" and is not a negative reflection of his performance. In determining his actual ACIP amount, the Compensation Committee also considered the following:

- Dr. Jacobs led the Company to record revenues, earnings and Mobile Station Modem (MSM) integrated circuit shipments, driven by increasing global consumption of wireless data across a wide range of devices, particularly smartphones. The Company achieved a record $19.1 billion in Non-GAAP revenues (up 28% year-over-year), a record $7.1 billion in Non-GAAP operating income (up 17% year-over-year) and 590 million MSM integrated circuit shipments (up 22% year-over-year). Additionally, we returned $2.9 billion to stockholders in the form of $1.6 billion in cash dividends and $1.3 billion through repurchases of our common stock.
- Dr. Jacobs successfully positioned Qualcomm for double-digit growth again in fiscal 2013 as we continued to invest in and execute on our strategic priorities, our broad licensing program and industry-leading Snapdragon and 3G/LTE integrated circuit roadmap. He continued to strengthen relationships with key industry players and a broad range of global operators, especially in the growth markets of China, India and Brazil. Additionally, we supported advocacy efforts on corporate tax reform, high-skilled immigration reform, spectrum policy and funding basic research.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- Our capabilities and capacity for continued growth and success lie in our values (innovation, execution and partnership), leadership and employee development, engagement and retention and in our culture of high performance. We were named to Fortune Magazine's 100 Best Companies to Work for in America for the 14th consecutive year, and we received the Humanitarian Award from the Grameen Foundation for our Wireless Reach initiative's dedication to creating business opportunities for underserved communities globally.

***Mr. Steven Mollenkopf, President and Chief Operating Officer.***

| | Fiscal 2012 | Fiscal 2011 | Change |
|---|---|---|---|
| Salary | $ 805,582 | $ 801,809 | 0.5% |
| ACIP amount | 1,300,000 | 2,000,000 | -35.0% |
| Total cash compensation | 2,105,582 | 2,801,809 | -24.8% |
| Long-term incentive grant date fair value | 6,999,960 | 5,067,851 | 38.1% |
| TDC | 9,105,542 | 7,869,660 | 15.7% |
| Promotion PSU/RSU grant date fair value | 5,000,000 | — | |
| TDC plus promotion PSU/RSU | $14,105,542 | $7,869,660 | 79.2% |

Mr. Mollenkopf's TDC for fiscal 2012 (before his promotion PSU/RSU grants) was 16% higher than fiscal 2011 primarily due to an increase in the fair value of his annual long-term incentive award, partially offset by a lower ACIP amount. The Company's fiscal 2012 financial performance exceeded its objectives, albeit to a lesser extent as compared to fiscal 2011 resulting in a lower ACIP amount.

Mr. Mollenkopf's salary for fiscal 2012 as reported above and in the "Summary Compensation Table" reflects an increase awarded by the Compensation Committee that was effective during the first quarter of fiscal 2012.

Any PSUs earned during the three-year performance period become fully vested at the end of the performance period, and the RSUs vest annually, provided the Company meets or exceeds the operating income objectives approved by the Compensation Committee, and become fully vested on the third anniversary of the grant date. The actual amount realized at the time of vest is dependent upon relative and absolute TSR for PSUs and the price of our common stock and the number of dividend equivalents credited for RSUs.

The Compensation Committee increased the amount of Mr. Mollenkopf's equity award (comprised of both PSUs and RSUs) to be consistent with his expanded role following his promotion to President & COO and to position his resulting TDC for fiscal 2012 between the median and 75th percentile of the fiscal 2012 peer group. The amount of his equity award was between the median and 75th percentile of the fiscal 2012 peer group, and slightly more than 50% of the shares awarded were PSUs. In addition, the Compensation Committee granted a special, one-time equity award (comprised of both PSUs and RSUs) to recognize his promotion as well as to increase his retention incentive. The one-time, special PSUs and RSUs vest on the third, fourth and fifth anniversaries of the grant dates.

During the fourth quarter of fiscal 2012, the Compensation Committee awarded Mr. Mollenkopf an ACIP amount of $1.3 million, which was 35% less than the amount he received for fiscal 2011. This amount is 3% less than the performance-adjusted amount due to a nominal "rounding off" and is not a negative reflection of his performance. In determining his actual ACIP amount, the Compensation Committee also considered the following:

- In his new role of President and COO, Mr. Mollenkopf led initiatives aiming the Company toward a unified branding and marketing strategy and consolidating operations and leadership in Europe, China and Japan to better meet the needs of our customers and partners as well as to support continued growth.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- Mr. Mollenkopf led our QCT segment to a record $12.1 billion in revenues (up 37% year-over-year) and a record $2.3 billion in earnings before taxes (up 12% year-over-year). In addition, QCT shipped approximately 590 million MSM integrated circuits for CDMA- and OFDMA-based wireless devices (up 22% year-over-year).
- Mr. Mollenkopf continued to scale our QCT segment through acquisitions, organic growth and internal realignments and execute our strategy to drive our smartphone leadership into adjacent opportunities.

***Mr. Derek Aberle, EVP & Group President.***

| | Fiscal 2012 | Fiscal 2011 | Change |
|---|---|---|---|
| Salary | $ 720,548 | $ 646,543 | 11.4% |
| ACIP amount | 1,100,000 | 1,750,000 | -37.1% |
| Total cash compensation | 1,820,548 | 2,396,543 | -24.0% |
| Long-term incentive grant date fair value | 5,000,014 | 4,627,368 | 8.1% |
| TDC | 6,820,562 | 7,023,911 | -2.9% |
| Promotion PSU/RSU grant date fair value | 4,000,000 | — | |
| TDC plus promotion PSU/RSU | $10,820,562 | $7,023,911 | 54.1% |

Mr. Aberle's TDC for fiscal 2012 (before his promotion PSU/RSU grants) was 3% less than fiscal 2011 primarily due to a lower ACIP amount. The Company's fiscal 2012 financial performance exceeded its objectives, albeit to a lesser extent as compared to fiscal 2011 resulting in a lower ACIP amount.

Mr. Aberle's salary for fiscal 2012 as reported above and in the "Summary Compensation Table" reflects an increase awarded by the Compensation Committee that was effective during the first quarter of fiscal 2012 in conjunction with his promotion to Group President.

Any PSUs earned during the three-year performance period become fully vested at the end of the performance period, and the RSUs vest annually, provided the Company meets or exceeds the operating income objectives approved by the Compensation Committee, and become fully vested on the third anniversary of the grant date. The actual amount realized at the time of vest is dependent upon relative and absolute TSR for PSUs and the price of our common stock and the number of dividend equivalents credited for RSUs.

The Compensation Committee increased the amount of Mr. Aberle's equity award (comprised of both PSUs and RSUs) to be consistent with his expanded role following his promotion and to position his resulting TDC for fiscal 2012 between the median and 75th percentile of the fiscal 2012 peer group. The amount of his equity award was between the median and 75th percentile of the fiscal 2012 peer group, and slightly more than 50% of the shares awarded were PSUs. In addition, the Compensation Committee granted a special, one-time equity award (comprised of both PSUs and RSUs) to recognize his promotion as well as to increase his retention incentive. The one-time, special PSUs and RSUs vest on the third, fourth and fifth anniversaries of the grant dates.

During the fourth quarter of fiscal 2012, the Compensation Committee awarded Mr. Aberle an ACIP amount of $1.1 million, which was 37% less than the amount he received for fiscal 2011. This amount is 4% more than the performance-adjusted amount and reflects the Compensation Committee's decision to recognize the strong financial performance of our licensing business. In determining his actual ACIP amount, the Compensation Committee also considered the following:

- In his new role as EVP & Group President, Mr. Aberle continued to lead our QTL segment and also provided leadership and guidance for our services businesses (including our Firethorn, QES, QGOV, Qualcomm Life and Snaptracs divisions) as well as our display businesses.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- Mr. Aberle led our QTL segment to another record year with $6.3 billion in revenues (up 17% year-over-year) and a record $5.6 billion in earnings before taxes (up 18% year-over-year). He led and provided strategic guidance for all significant license agreement negotiations and drove the creation of several new licensing opportunities, including acquisitions related to display and wireless charging technologies.
- Mr. Aberle also played a leading role in shaping the Company's intellectual property policy and strategy initiatives as well as provided leadership and guidance to the standards team.

***Mr. William Keitel, EVP & CFO*.**

| | Fiscal 2012 | Fiscal 2011 | Change |
|---|---|---|---|
| Salary | $ 731,934 | $ 684,632 | 6.9% |
| ACIP amount | 1,000,000 | 1,600,000 | -37.5% |
| Total cash compensation | 1,731,934 | 2,284,632 | -24.2% |
| Long-term incentive grant date fair value | 5,000,014 | 5,177,902 | -3.4% |
| TDC | $6,731,948 | $7,462,534 | -9.8% |

Mr. Keitel's TDC for fiscal 2012 was 10% less than fiscal 2011 primarily due to a lower ACIP amount. The Company's fiscal 2012 financial performance exceeded its objectives, albeit to a lesser extent as compared to fiscal 2011 resulting in a lower performance-adjusted ACIP amount.

Mr. Keitel's salary for fiscal 2011 as reported above and in the "Summary Compensation Table" reflects an increase awarded by the Compensation Committee that was effective during the first quarter of fiscal 2012.

Any PSUs earned during the three-year performance period become fully vested at the end of the performance period, and the RSUs vest annually, provided the Company meets or exceeds the operating income objectives approved by the Compensation Committee, and become fully vested on the third anniversary of the grant date. The actual amount realized at the time of vest is dependent upon relative and absolute TSR for PSUs and the price of our common stock and the number of dividend equivalents credited for RSUs.

The Compensation Committee determined the amount of Mr. Keitel's equity award (comprised of both PSUs and RSUs) to position his resulting TDC for fiscal 2012 between the median and 75th percentile of the fiscal 2012 peer group. The amount of his equity award was between the median and 75th percentile of the fiscal 2012 peer group, and slightly more than 50% of the shares awarded were PSUs.

During the fourth quarter of fiscal 2012, the Compensation Committee awarded Mr. Keitel an ACIP amount of $1.0 million, which was 38% less than the amount he received for fiscal 2011. This amount is 2% less than the performance-adjusted amount due to a nominal "rounding off" and is not a negative reflection of his performance. In determining his actual ACIP amount, the Compensation Committee also considered the following:

- Mr. Keitel provided financial leadership in support of achieving record Non-GAAP revenues and Non-GAAP operating income in fiscal 2012 as well as continued cash dividends and repurchases of our common stock. He partnered with Qualcomm's executive leadership to develop a five-year plan and annual operating plan for continued strong growth in revenues, operating income and cash flows.
- We continued excellence in the quality of our accounting and reporting practices, including transparent and robust disclosures and quarterly SEC reports filed simultaneously with our earnings releases. IR magazine recognized Qualcomm for "Best Financial Reporting" in the U.S. in 2012. In addition, we continued to participate in the Internal Revenue Service Compliance Assurance Process, a program where we endeavor to agree on the treatment of all tax issues prior to our tax return being filed.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

- Mr. Keitel provided leadership and oversight to our investor relations organization. We upheld best practices on earnings conference calls, analyst meetings and financial disclosures. Institutional Investor recognized Qualcomm for “Best Investor Relations” in the Telecommunications sector of the Technology, Media & Telecommunications category.

***Mr. Donald Rosenberg, EVP, General Counsel and Corporate Secretary.***

| | Fiscal 2012 | Fiscal 2011 | Change |
|---|---|---|---|
| Salary | $ 668,270 | $ 641,925 | 4.1% |
| ACIP amount | 850,000 | 1,350,000 | -37.0% |
| Total cash compensation | 1,518,270 | 1,991,925 | -23.8% |
| Long-term incentive grant date fair value | 4,400,011 | 4,406,751 | -0.2% |
| TDC | 5,918,281 | 6,398,676 | -7.5% |
| Special retention RSU grant date fair value | — | 3,232,618 | |
| TDC plus special retention RSU | $5,918,281 | $9,631,294 | -38.6% |

Mr. Rosenberg’s TDC for fiscal 2012 was 8% less than fiscal 2011 (before his special retention RSU grant) primarily due to a lower ACIP amount. The Company’s fiscal 2012 financial performance exceeded its objectives, albeit to a lesser extent as compared to fiscal 2011 resulting in a lower performance-adjusted ACIP amount.

Mr. Rosenberg’s salary for fiscal 2012 as reported above and in the “Summary Compensation Table” reflects an increase awarded by the Compensation Committee that was effective during the first quarter of fiscal 2012.

Any PSUs earned during the three-year performance period become fully vested at the end of the performance period, and the RSUs vest annually, provided the Company meets or exceeds the operating income objectives approved by the Compensation Committee, and become fully vested on the third anniversary of the grant date. The actual amount realized at the time of vest is dependent upon relative and absolute TSR for PSUs and the price of our common stock and the number of dividend equivalents credited for RSUs.

The Compensation Committee determined the amount of Mr. Rosenberg’s equity award (comprised of both PSUs and RSUs) to position his resulting TDC for fiscal 2012 above the 75th percentile of the fiscal 2012 peer group. The amount of his equity award was above the 75th percentile of the fiscal 2012 peer group, and slightly more than 50% of the shares awarded were PSUs. The Compensation Committee and Dr. Jacobs determined that Mr. Rosenberg’s above 75th percentile TDC is appropriate because he provides key leadership at a time of complex and critical global legal affairs and government relations.

During the fourth quarter of fiscal 2012, the Compensation Committee awarded Mr. Rosenberg an ACIP amount of $850,000, which was 37% less than the amount he received for fiscal 2011. This amount is 0.5% less than the performance-adjusted amount due to a nominal “rounding off” and is not a negative reflection of his performance. In determining his actual ACIP amount, the Compensation Committee also considered the following:

- Mr. Rosenberg oversaw continued excellence in the quality of our litigation management and outcomes, discovery management practices and protection of our intellectual property.
- We implemented new procedures and upgraded software to increase the quality and efficiency of patent filing and prosecuting processes and reduced the backlog of unfiled patent applications despite an increase in invention submissions.
- We achieved important spectrum policy outcomes, including FCC approval for the sale of spectrum to AT&T and European regulatory support for access to underutilized spectrum in higher bands and 3G/4G spectrum aggregation.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## F. Compensation Decisions for Our NEOs for Fiscal 2013

This section provides an update to compensation decisions and actions we made after the end of fiscal 2012. Regarding the CEO and the other NEOs, the Compensation Committee determined the following:

- ***No increases to base salaries.*** The Compensation Committee and management agreed to maintain the current base salaries for the CEO, other NEOs and all other executive officers at the fiscal 2012 amounts.
- ***No increases to target ACIP amounts.*** The Compensation Committee and management also agreed to maintain the current target ACIP amounts at the fiscal 2012 percent of base salary amounts.
- ***Reduced the maximum amount that may be earned in the annual cash incentive plan and reduced the rate of increase in the payout formula.*** For the fiscal 2013 ACIP, the Compensation Committee reduced the maximum award amount from 2.5 times to 2.0 times of the target ACIP amount. Accordingly, the CEO's maximum ACIP amount has been reduced from 625% of base salary to 500% of base salary. The Compensation Committee also modified the funding formula to reduce the rate of increase to the funding rate for each one percent improvement in financial performance that is greater than the financial objectives.
- ***Changed the timing of equity awards***. For fiscal 2013, the Compensation Committee changed the timing of the equity awards from the first quarter (Q1) to the fourth (Q4) quarter of the fiscal year. Changing the timing from Q1 to Q4 provides the Compensation Committee maximum flexibility to consider current fiscal year performance and the most recent "Say-on-Pay" stockholder vote when determining equity amounts, including absolute and relative TSR and year-over-year growth in addition to performance against our annual objectives and knowledge of objectives for the upcoming year.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## G. Other Components of our Executive Compensation Programs

On page 46, we noted that there are additional aspects of our executive compensation program. This section discusses those additional aspects.

### Components of Our Compensation Program Available to U.S.-Based Executive-Level Employees

| Component | Form and Purpose | Comment |
|---|---|---|
| Nonqualified deferred compensation (ERMC Plan) | Qualcomm stock (Match Shares). Provide a competitive, tax-efficient defined contribution retirement program for employees deemed to be "highly compensated." Encourage building long-term stockholder value through a Company contribution in the form of Qualcomm stock. | We do not have a pension plan or other defined benefit retirement program. See the Nonqualified Deferred Compensation table, footnote 2, for a description of the Match Shares. |
| Financial planning reimbursement | Reimbursement of actual expenses incurred for financial, estate and tax planning. Attract and retain executive-level employees. Assist NEOs with managing their time. | Annual maximum reimbursement of up to $12,500 for the Chairman and CEO and the President and up to $8,000 for the other NEOs. |
| Additional life insurance | Additional coverage, above the amount provided to all employees. Attract and retain executive-level employees. | The additional coverage is $1 million for the Chairman and CEO and $750,000 for the other NEOs. |
| Use of corporate aircraft for personal travel | Imputed taxable income for W-2 reporting and incremental cost to the Company for reporting the perquisite in this proxy statement. Facilitate flexible travel arrangements and provide security. | In fiscal 2012 and prior years, we did not allow our NEOs to reimburse the Company for the cost for personal flights or for the incremental cost of non-business guests because we do not operate our aircraft on a "for hire" basis under applicable Federal Aviation Administration regulations. During fiscal 2013, we intend to implement a timesharing arrangement for non-business air travel that would allow our NEOs to reimburse the Company for personal flights such that the amount of compensation reported would be limited to $250,000 for any individual and $650,000 for all NEOs in the aggregate. |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

### Components of Our Compensation Program Available to All U.S.-Based Employees

| Component | Form and Purpose | Comment |
| --- | --- | --- |
| Tax qualified deferred compensation | 401(k) Plan. Provide a tax-efficient retirement savings opportunity. Attract and retain employees. | The 401(k) Plan is a voluntary, tax-qualified deferred compensation plan. We match employee contributions in cash using a tiered structure in order to encourage participation among all employees. |
| Employee Stock Purchase Plan (ESPP) | Qualcomm stock. Encourage long-term stock ownership and align employee and stockholder interests. Attract and retain employees. | A tax-qualified, voluntary ESPP available to all U.S.-based employees. (We also make a non-tax-qualified ESPP available to employees based in other countries provided we are able to comply with local regulations.) Annual purchases are limited to $25,000 per employee, through payroll deductions, including the purchase price discount. The purchase price is equal to 85% of the lower of: (1) the fair market value (FMV) on the first day of the offering period or (2) the FMV on the last day of the offering period. |
| Charitable contribution match | Matching cash paid to the charitable organization. Encourage and extend employees' support of cultural, educational and community non-profit organizations. | We match 100% of employee contributions, up to pre-defined maximum amounts, to qualified tax-exempt non-profit organizations, excluding organizations that further religious doctrine, exclusionary organizations and/or political non-profit organizations. The maximum annual amount we will match is based on the employee's job level. We will match up to $125,000 for our Chairman and CEO, Vice Chairman and President and up to $100,000 annually for the other NEOs. |

In addition to the programs identified above, we offered a supplemental dental and vision program that provided limited coverage above the basic dental and vision plans to approximately 3,900 senior-level U.S.-based employees. The purpose of this program is to attract and retain experienced technical talent. For each NEO and eligible dependent, the supplemental dental and vision plan provides a maximum annual coverage limit of $4,250 above the basic dental and vision plan coverage.

### H. Post-Employment Compensation

***We do not have employment agreements.*** We employ almost all U.S.-based employees, including all of our NEOs, "at will," without severance agreements or employment contracts. This is consistent with our objective of providing compensation related to individual contributions that improve our market leadership, competitive advantage and stockholder value. It enables our Board to terminate employment with discretion as to the terms and conditions of any separation.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

***We do not have a pre-defined severance plan.*** We do not have a pre-defined severance plan covering the involuntary termination of employees, including the NEOs. We do not accelerate unvested stock options, RSUs or PSUs in the event of an involuntary "for cause" termination. Such terminations may involve theft, dishonesty, falsification, actions that are detrimental to the Company, conviction of a criminal act that impairs the performance of duties required by the Company or violation of a material Company policy.

The table below summarizes the treatment of unvested stock options, PSUs and RSUs following involuntary terminations without cause and the "double trigger" provisions for terminations after a change in control.

**Treatment of Unvested Equity Awards in Certain Termination Situations**

| | Stock Options | RSUs | PSUs |
|---|---|---|---|
| Treatment of unvested awards after involuntary terminations without cause. | 10% of the total amount granted is automatically accelerated, and up to an additional 10% may be accelerated using a pre-defined formula, subject to execution of a general release of claims. | For RSUs that vest less frequently than annual graded vesting, a prorated portion (that does not exceed one-third of the total amount granted) may be vested using a pre-defined formula, subject to execution of a general release of claims. | All unvested PSUs are immediately forfeited. The Compensation Committee, in its sole discretion, may waive the automatic forfeiture of all or any portion of the award. This is consistent with the above-mentioned practice that allows our Board to terminate employment with discretion as to the terms and conditions of separation. |
| "Double trigger" treatment of unvested awards. | If, within 24 months after a change in control, the recipient is involuntarily terminated for any reason other than for cause or if the recipient voluntarily resigns "for good reason" (as defined in the award agreements), then vesting of stock options and RSUs is accelerated in full. | | Vesting of PSUs that remained outstanding after a change in control is accelerated but the number of shares of stock that may be issued will be prorated using a pre-defined formula. |

## I. Other Policies and Practices

***We have a cash incentive compensation repayment ("claw back") policy.*** We require an executive officer, including an NEO, to repay to us the amount of any annual cash incentive that an executive officer received to the extent that:

- the amount of such payment was based on the achievement of certain financial results that were subsequently the subject of a restatement that occurred within 12 months of such payment;
- the executive officer had engaged in theft, dishonesty or intentional falsification of documents or records that resulted in the obligation to restate our financial results; and
- a lower annual cash incentive would have been paid to the executive officer based upon the restated financial results.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The Compensation Committee is responsible for the interpretation and enforcement of this claw back policy. We plan to amend this policy as needed to comply with the additional requirements of the Dodd-Frank Act after the SEC adopts new regulations implementing those requirements.

***Practices regarding equity awards.*** We may award PSUs, RSUs and/or stock options upon hiring a new NEO, and upon a promotion or change in roles and responsibilities of an NEO. The exercise price of all stock options is the fair market value (i.e., closing price) on the grant date, and the number of shares subject to the options is fixed on the grant date.

***We have stock ownership guidelines.*** Our stock ownership guidelines for all of our executive officers, including our NEOs, help ensure that they maintain an equity stake in the Company, and by doing so, appropriately link their interests with those of other stockholders. Only shares actually owned and deferred stock units under the Executive Retirement Matching Contribution (ERMC) Plan count toward the stock ownership requirement. Outstanding unexercised stock options and unvested PSUs and RSUs do not count toward the requirement. Dr. Jacobs and Messrs. Keitel and Rosenberg have met their ownership guidelines. Messrs. Aberle and Mollenkopf are not yet required to meet their ownership guidelines and are progressing toward these guidelines. If an NEO has not met the guidelines by the deadline, we will require that the NEO retain at least 50% of the net shares remaining after required tax withholdings upon payment of any PSU or RSU or upon stock option exercise until they meet the minimum guideline. The guidelines are as follows:

| Role | Multiple of Base Salary |
|---|---|
| CEO | 6x |
| President | 3x |
| All other executive officers | 2x |

***Tax regulations.*** A goal of the Compensation Committee is to comply with the requirements of Internal Revenue Service Code Sections 162(m) and 409A. Section 162(m) places a $1 million annual limit on the amount that a public company may deduct for compensation paid to the CEO and the other three most highly compensated NEOs, excluding the CFO. The $1 million limit does not apply if the compensation meets Section 162(m) requirements for performance-based compensation. We designed and administered our fiscal 2012 ACIP as cash-denominated performance units granted under the 2006 LTIP to be eligible for tax deductions to the extent permitted by the relevant tax regulations, including Section 162(m). Compliance with Section 162(m) did not influence the allocation of compensation among base salary, target annual cash incentives and long-term incentives for fiscal 2012. Only actual shares distributed that are above the PSU target amount will qualify as deductible compensation under Section 162(m). From time to time, we may pay compensation to our Section 162(m) covered officers that may not be tax deductible if there are compelling business reasons to do so. Beginning in November 2011, RSUs granted to our executive officers are structured to satisfy the performance-based compensation exception of the 162(m) limit on deductible compensation.

Under Section 409A, a nonqualified deferred compensation plan (such as our ERMC Plan) must comply with certain requirements related to the timing of deferral and distribution decisions, otherwise amounts deferred under the plan could be included in gross income when earned and be subject to additional penalty taxes. Nonqualified stock options are generally exempt from Section 409A if the option satisfies certain requirements. PSUs and RSUs are also generally exempt from Section 409A. We administer the ERMC Plan and equity awards in accordance with Section 409A requirements.

## IV. COMPENSATION RISK MANAGEMENT

The Compensation Committee engaged its independent compensation consultant, FWC, to collaborate with Qualcomm's human resources staff to conduct an assessment of potential risks that may arise from our compensation programs. Based on this assessment, the Compensation Committee concluded that our policies and practices do not encourage excessive and unnecessary risk taking that would be reasonably likely to have a



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

material adverse effect on Qualcomm. The assessment included executive, non-executive and sales incentive programs and focused on the variable components of cash incentives and equity awards. Our compensation programs are designed and administered through a centralized, corporate total rewards management office and are substantially identical among business units, corporate functions and global locations (with modifications to comply with local regulations as appropriate.) The risk-mitigating factors considered in this assessment included:

- the alignment of pay philosophy, peer group companies and compensation amounts relative to competitive practices to support our business objectives;
- effective balance of cash and equity, short- and long-term performance periods, caps on performance-based award schedules and financial metrics with individual factors and Compensation Committee and management discretion; and
- ownership guidelines, a claw back policy, an insider trading policy, an equity award approval authorization policy and independent Compensation Committee oversight.

## V. COMPENSATION TABLES AND NARRATIVE DISCLOSURES

The following tables, narratives and footnotes describe the total compensation and benefits for our NEOs for fiscal 2012. The values presented in the tables do not always reflect the actual compensation received by our NEOs during the fiscal year because some portion of an NEO's base salary and annual cash incentive may have been deferred pursuant to our nonqualified deferred compensation plan.

### *A. Summary Compensation Table*

***Salary.*** We have a long-standing practice of establishing NEOs' base salaries concurrent with the calendar year. Salary increases during fiscal 2012 were effective on December 24, 2011. Thus, the salaries reported in this table reflect approximately three months of earnings at the calendar 2011 rates and approximately nine months of earnings at the calendar 2012 rates. We used the calendar year 2012 base salaries in the CD&A when calculating target annual cash and target direct compensation. Salary for NEOs as presented in this table includes vacation match payments payable under our vacation policy, if any.

***Bonus.*** The amounts in this column represent bonuses to the NEOs including amounts received under our patent award program and new hire bonuses, if any. We disclose the annual cash incentives in the "Non-Equity Incentive Plan Compensation" column.

***Stock Awards.*** Stock awards granted to NEOs include annual grants and may include special grants for new hire, promotion and/or retention grants. The amounts in this column represent the estimated grant date fair value of PSUs and RSUs granted during the fiscal year. The estimated RSU grant date fair values were determined based on the fair value of our common stock on the date of grant. The estimated PSU grant date fair values were determined based on a Monte Carlo simulation. The amounts are not indicative of whether the NEO has or will realize the estimated fair value or any financial benefits from the award. See the "Grants of Plan-Based Awards" table for details on the PSUs granted to the NEOs during fiscal 2012.

***Option Awards.*** Option awards granted to NEOs include annual grants and may include special grants for new hire, promotion grants and/or retention grants. The amounts in this column represent the estimated fair value of stock option awards granted during the fiscal year. The estimated fair value amounts were determined on the date of grant using an option-pricing model and are not indicative of whether the NEO has or will realize the estimated fair value or any financial benefit from the award. We did not grant any stock option awards to the NEOs during fiscal 2012.

***Non-Equity Incentive Plan Compensation.*** The amounts in this column represent cash awards under our annual cash incentive plan (ACIP). The relevant performance period was fiscal 2012. The Compensation



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Committee approved the ACIP amounts at the end of fiscal 2012; the NEOs received payment of their fiscal 2012 ACIP amounts in November 2012. See the CD&A section and the "Grants of Plan-Based Awards" table and narrative for a description of the incentive program mechanics.

***Change in Pension Value and Nonqualified Deferred Compensation Earnings.*** We do not offer a pension plan or other defined benefit retirement plan to our NEOs. We do not provide above-market or preferential earnings on deferred compensation, nor do we provide dividends on stock in the ERMC Plan at a rate higher than dividends on our common stock. As a result, this column has been omitted from the "Summary Compensation Table."

***All Other Compensation.*** See the "All Other Compensation" table for an itemized account of all other compensation reported in the "Summary Compensation Table." Any individual item of compensation exceeding $10,000, except as discussed below under "Perquisites and Other Personal Benefits," have been identified and quantified in accordance with SEC requirements.

### Fiscal 2012 Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Paul E. Jacobs, | 2012 | 1,189,246 | 2,775 | 14,999,985 | — | 3,400,000 | 1,138,867 | 20,730,873 |
| Chairman and Chief | 2011 | 1,150,591 | 7,125 | 14,322,329 | — | 5,500,000 | 742,288 | 21,722,333 |
| Executive Officer | 2010 | 1,146,644 | 7,500 | 6,983,378 | 5,391,724 | 3,370,000 | 727,693 | 17,626,939 |
| William E. Keitel, | 2012 | 731,934 | — | 5,000,014 | — | 1,000,000 | 306,556 | 7,038,504 |
| Executive Vice President | 2011 | 684,632 | — | 5,177,902 | — | 1,600,000 | 254,303 | 7,716,837 |
| and Chief Financial Officer | 2010 | 670,010 | — | 2,656,296 | 2,050,984 | 950,000 | 192,790 | 6,520,080 |
| Derek K. Aberle, | 2012 | 720,548 | — | 9,000,026 | — | 1,100,000 | 308,884 | 11,129,458 |
| Executive Vice President and | | | | | | | | |
| Group President | | | | | | | | |
| Steven M. Mollenkopf, | 2012 | 805,582 | — | 11,999,974 | — | 1,300,000 | 143,960 | 14,249,516 |
| President and Chief | 2011 | 801,706 | — | 5,067,850 | — | 2,000,000 | 68,614 | 7,938,170 |
| Operating Officer | 2010 | 691,158 | — | 2,370,575 | 3,933,684 | 1,000,000 | 61,249 | 8,056,666 |
| Donald J. Rosenberg, | 2012 | 668,270 | — | 4,400,011 | — | 850,000 | 274,153 | 6,192,434 |
| Executive Vice President | 2011 | 641,925 | — | 7,639,369 | — | 1,350,000 | 208,890 | 9,840,184 |
| General Counsel and Corporate Secretary | 2010 | 620,006 | — | 2,284,859 | 1,764,515 | 950,000 | 219,466 | 5,838,846 |

(1) Fiscal 2012 amounts include $2,775 for Dr. Jacobs from our patent award program.

***All Other Compensation***

*Perquisites and Other Personal Benefits.* The amounts disclosed represent the full amount of perquisites and personal benefits if the aggregate annual value exceeded $10,000, and each such perquisite or other personal benefit is identified by type. If the aggregate annual value of perquisites was less than $10,000, no disclosure was made. We have identified and quantified individual perquisite amounts that exceeded the greater of $25,000 or 10% of the aggregate amount of all perquisites for any NEO.

*Executive Retirement Matching Contribution Plan.* The amounts disclosed represent the dollar values of common stock used to match up to 10% of the aggregate of the participant's base salary plus ACIP amounts, less any 401(k) contributions, deferred on a pre-tax basis under the ERMC Plan. The dollar values are based on the average of the fair market value of the stock over the 200 trading days preceding the match date. (See the "Voluntary Retirement Savings Plans" section in the CD&A for a description of the ERMC Plan.)



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

*Charitable Match*. The amounts disclosed represent our matching contributions for NEO contributions to qualified, tax-exempt non-profit organizations.

*Company Match on 401(k) Contributions*. The amounts disclosed represent the cash value of our matches to employee contributions to the 401(k) plan.

*Life Insurance Premiums.* The amounts disclosed represent the premiums paid for group term life insurance greater than $50,000 and executive life insurance.

**All Other Compensation**

| Name | Perquisites and Other Personal Benefits ($) (1) (2) | Executive Retirement Matching Contribution Plan ($) | Charitable Match ($) (3) (4) | Company Matching 401k Contributions ($) | Life Insurance Premiums ($) | All Other Compensation Total ($) |
|---|---|---|---|---|---|---|
| Paul E. Jacobs | 291,720 | 657,794 | 175,000 | 5,375 | 8,978 | 1,138,867 |
| William E. Keitel | 21,069 | 220,791 | 43,910 | 6,854 | 13,932 | 306,556 |
| Derek K. Aberle | 43,230 | 232,755 | 24,300 | 5,375 | 3,224 | 308,884 |
| Steven M. Mollenkopf | 13,238 | 100,022 | 21,860 | 5,375 | 3,465 | 143,960 |
| Donald J. Rosenberg | 8,503 | 191,798 | 46,650 | 5,925 | 21,277 | 274,153 |

(1) The amounts in this column include: Dr. Jacobs – $286,882 for the personal use of our corporate aircraft, $4,838 for home office costs, other insurance premiums and personal travel & entertainment; Mr. Keitel – for financial planning, other insurance premiums and the personal use of our corporate aircraft; Mr. Aberle – $34,170 for the personal use of our corporate aircraft, $9,060 for financial planning, other insurance premiums, home office costs and personal travel and entertainment; and Mr. Mollenkopf – for the personal use of our corporate aircraft and other insurance premiums; Mr. Rosenberg – for financial planning, other insurance premiums and the personal use of our corporate aircraft. Under certain limited circumstances, NEOs may use the corporate aircraft for personal purposes. In those instances, the value of the benefit is based on the aggregate incremental cost to the Company. The incremental cost is calculated based on the variable costs to the Company, including fuel costs, mileage, trip-related maintenance, universal weather-monitoring costs, on-board catering, landing/ramp fees and other miscellaneous variable costs. Fixed costs that do not change based on usage, such as pilot salaries and the cost of maintenance not related to specific flights, are excluded.

(2) We purchase tickets to various sporting, civic, cultural, charity and entertainment events. We use these tickets for business development, partnership building, charitable donations and community involvement. If not used for business purposes, we may make these tickets available to our employees, including our NEOs, as a form of recognition and reward for their efforts. Because we had already purchased these tickets, we do not believe that there is any aggregate incremental cost to us if an NEO uses a ticket for personal purposes.

(3) Amounts include matching contributions made by the Company in fiscal 2012 for contributions made by the NEO in fiscal 2011 as follows: $50,000 for Dr. Jacobs, $11,300 for Mr. Aberle, $10,610 for Mr. Mollenkopf and $19,600 for Mr. Rosenberg.

(4) Amounts exclude matching contributions made by the Company in fiscal 2013 for contributions made by the NEO in fiscal 2012 as follows: $40,120 for Mr. Keitel, $12,600 for Mr. Mollenkopf and $8,485 for Mr. Rosenberg. These amounts will be reported in the All Other Compensation table in the proxy statement for the 2014 annual meeting.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

### *B. Grants of Plan-Based Awards*

***Annual Cash Incentive Plan (ACIP).*** The Compensation Committee approved a target ACIP amount, expressed as a percentage of base salary, for each NEO. The target ACIP amount was the potential earnings opportunity for the NEO if we achieved 100% of our financial objectives for Non-GAAP revenues and Non-GAAP operating income. We structured the ACIP to provide different potential incentive earnings opportunities at various levels of financial performance. The table below shows the relationship between the percentage of financial performance that is achieved (the Weighted Achievement Ratio) and the potential ACIP amount opportunity as a percentage of the target ACIP amount (the Target Incentive Multiple). The Target Incentive Multiple increases 2.2 percentage points for each one percent improvement in the Weighted Achievement Ratio from 80% to 95%; 7.4 percentage points for each one percent improvement from 95% to 110%; and 1.9 percentage points for each one percent improvement from 110% to 150%. The maximum Target Incentive Multiple is 2.5 and applies to Weighted Achievement Ratios of 150% and above. The ACIP is not funded if the Weighted Achievement Ratio is below 80%.

**Potential Non-Equity Incentive Plan Payout and Associated Financial Performance Levels**

| Potential Payout Level | Weighted Achievement Ratio (1) | Target Incentive Multiple (2) |
|---|---|---|
| Maximum | 150% | 2.50 |
| | 110% | 1.74 |
| Target | 100% | 1.00 |
| | 95% | 0.63 |
| Threshold | 80% | 0.30 |

(1) The Weighted Achievement Ratio is the result of actual financial results achieved for the fiscal year divided by financial objectives established during the first quarter of the fiscal year.

(2) The Target Incentive Multiple is the percentage of the potential ACIP amount relative to the target ACIP amount. The Target Incentive Multiple is applied to each NEO's target ACIP amount to calculate the company-performance-adjusted ACIP amount. For example, if we achieve 80% of our financial objectives, the NEOs' target ACIP amounts would be multiplied by 0.30 to determine the ACIP amounts.

***Equity Awards.*** At its November 2011 meeting, the Compensation Committee approved long-term equity awards granted under the 2006 LTIP. The awards consisted of PSUs and RSUs. The grant dates for both the PSUs and RSUs was the date that the Compensation Committee met and approved the awards.

***Stock Option Awards*.** Nonqualified stock options are granted under the 2006 LTIP. Twelve and one-half (12.5%) percent of the shares vest six months after the grant date, and the remaining shares vest in equal semi-annual installments over the next 42 months, becoming fully vested four years after the grant date. Options granted prior to September 10, 2010 have a ten-year term, and options granted on or after September 10, 2010 have a seven-year term. Generally, vesting is contingent upon continued service with Qualcomm. We did not grant any stock options to the NEOs during fiscal 2012.

***Restricted Stock Units (RSUs)*.** RSUs were granted under the 2006 LTIP. The RSUs granted as part of the ongoing annual equity awards vest annually over three years after the grant dates (provided a pre-determined operating income threshold for fiscal 2012 was met or exceeded.) The RSUs granted to Messrs. Mollenkopf and Aberle as promotion grants vest on the third, fourth and fifth anniversaries of the grant date.

***Performance Stock Units (PSUs)*.** The PSUs provide for a variable number of shares of our common stock based on the relative performance of our TSR compared to that of the NASDAQ-100. For the PSUs granted during



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service


PX279

Page 5679

Table of Contents

fiscal 2012, there are four separate measurement periods, all of which began on September 26, 2011. The first measurement period is 18 months and ends on March 29, 2013; the second is 24 months and ends on September 27, 2013; the third is 30 months and ends on March 28, 2014; and the fourth is 36 months and ends on September 26, 2014. We allocated 25% of the target PSU amount disclosed in the "Grants of Plan-Based Awards" table to each measurement period. Our TSR is compared to that of the NASDAQ-100 at the end of each measurement period, and an award amount is determined according to the schedule below. The total award amount may not exceed the target award amount if Qualcomm's TSR for the three-year performance period is negative. Between the levels specified, the percent of award amount earned is interpolated linearly. The number of shares of our common stock to be distributed to each participant at the end of the three-year measurement period is the sum of the shares earned for each of the four performance periods. The PSUs include dividend equivalents that may accrue, in the form of additional shares of our common stock, on earned units, but are not paid out on unearned performance awards and would vest at the same time as the underlying earned PSUs. The table below summarizes the percentage of the PSU award amount that an NEO would earn at different relative TSRs.

| Qualcomm TSR vs. NASDAQ-100 TSR | Award Level | Percent of PSU Award Amount Earned |
|---|---|---|
| 133% and above | Maximum | 200% |
| 125% | | 175% |
| 110% | | 130% |
| 100% | Target | 100% |
| 90% | | 80% |
| 75% | | 50% |
| 66% | Threshold | 33% |
| Less than 66% | | 0% |

## Fiscal 2012 Grants of Plan-Based Awards (1) (2)

| | | | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Type of Award | Grant Date | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | All Other Stock Awards: Number of Shares of Stock or Units (#) | Grant Date Fair Value of Stock and Option Awards ($) (3) |
| Paul E. Jacobs | ACIP amount | | 900,000 | 3,000,000 | 7,500,000 | | | | | |
| | Restricted Stock Units | 11/9/2011 | | | | | | | 124,526 | 6,899,986 |
| | Performance Stock Units | 11/9/2011 | | | | 41,423 | 125,523 | 251,046 | 125,523 | 8,099,999 |
| William E. Keitel | ACIP amount | | 266,250 | 887,500 | 2,218,750 | | | | | |
| | Restricted Stock Units | 11/9/2011 | | | | | | | 41,509 | 2,300,014 |
| | Performance Stock Units | 11/9/2011 | | | | 13,808 | 41,841 | 83,682 | 41,841 | 2,700,000 |
| Derek K. Aberle | ACIP amount | | 270,000 | 900,000 | 2,250,000 | | | | | |
| | Restricted Stock Units | 11/9/2011 | | | | | | | 74,716 | 4,140,014 |
| | Performance Stock Units | 11/9/2011 | | | | 24,854 | 75,314 | 150,628 | 75,314 | 4,860,012 |
| Steven M. Mollenkopf | ACIP amount | | 342,300 | 1,141,000 | 2,852,500 | | | | | |
| | Restricted Stock Units | 11/9/2011 | | | | | | | 99,621 | 5,520,000 |
| | Performance Stock Units | 11/9/2011 | | | | 33,138 | 100,418 | 200,836 | 100,418 | 6,479,974 |
| Donald J. Rosenberg | ACIP amount | | 222,750 | 742,500 | 1,856,250 | | | | | |
| | Restricted Stock Units | 11/9/2011 | | | | | | | 36,528 | 2,024,016 |
| | Performance Stock Units | 11/9/2011 | | | | 12,151 | 36,820 | 73,640 | 36,820 | 2,375,995 |

(1) Unless indicated otherwise, the Compensation Committee approved all equity grants on the grant dates.

(2) We did not award any stock options to any NEOs in fiscal 2012; therefore, we did not include the "All Other Option Awards" or "Exercise or Base Price of Option Awards" columns in this table.

(3) The amounts for RSUs represent the grant date fair values based on the closing stock price of the Company's stock on the date of grants. For additional information on the valuation assumptions, refer to "Note 1—Basis of Presentation" of Qualcomm's consolidated financial statements included in Appendix 1. The amounts for PSUs represent the grant date fair value as determined using a Monte Carlo simulation.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

### *C. Outstanding Equity Awards at Fiscal Year End*

The "Outstanding Equity Awards at Fiscal Year End" table provides information on the current holdings of equity awards by the NEOs. All stock options awarded to the NEOs were nonqualified stock options; options granted prior to September 10, 2010 are exercisable for ten years from the grant date, and options granted on or after September 10, 2010 are exercisable for seven years from the grant date.

### Outstanding Equity Awards at September 30, 2012

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options Exercisable # (1) | Number of Securities Underlying Unexercised Options Unexercisable # | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Paul E. Jacobs | 600,000 | — | 43.62 | 12/2/2014 | — | — | — | — |
| | 900,000 | — | 44.02 | 11/3/2015 | — | — | — | — |
| | 306,792 | — | 34.83 | 11/9/2016 | — | — | — | — |
| | 918,333 | 31,667 | 37.29 | 11/11/2017 | — | — | — | — |
| | 102,456 | 213,500 | 35.66 | 11/6/2018 | — | — | — | — |
| | 247,031 | 148,219 | 44.75 | 11/8/2019 | — | — | — | — |
| | — | — | — | | 225,256 | 14,071,716 | — | — |
| | — | — | — | | — | — | 444,192 | 27,748,704 |
| Total | 3,074,612 | 393,386 | — | | 225,256 | 14,071,716 | 444,192 | 27,748,704 |
| William E. Keitel | 49,334 | — | 34.83 | 11/9/2016 | — | — | — | — |
| | 127,500 | 14,167 | 37.29 | 11/11/2017 | — | — | — | — |
| | 112,500 | 87,500 | 35.66 | 11/6/2018 | — | — | — | — |
| | 56,382 | 56,382 | 44.75 | 11/8/2019 | — | — | — | — |
| | — | — | — | | 77,870 | 4,864,526 | — | — |
| | — | — | — | | — | — | 159,864 | 9,986,714 |
| Total | 345,716 | 158,049 | — | | 77,870 | 4,864,526 | 159,864 | 9,986,714 |
| Derek K. Aberle | 32,000 | — | 51.48 | 4/13/2016 | — | — | — | — |
| | 1,667 | — | 44.63 | 4/26/2017 | — | — | — | — |
| | 26,000 | 1,000 | 41.33 | 10/25/2017 | — | — | — | — |
| | 7,233 | 7,234 | 43.24 | 4/24/2018 | — | — | — | — |
| | 72,000 | 36,000 | 47.92 | 9/15/2018 | — | — | — | — |
| | 23,250 | 52,500 | 35.66 | 11/6/2018 | — | — | — | — |
| | 15,763 | 47,288 | 44.75 | 11/8/2019 | — | — | — | — |
| | — | — | — | | 107,803 | 6,734,423 | — | — |
| | — | — | — | | — | — | 178,196 | 11,131,902 |
| Total | 177,913 | 144,022 | — | | 107,803 | 6,734,423 | 178,196 | 11,131,902 |



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service



PX279

Table of Contents

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options Exercisable # (1) | Number of Securities Underlying Unexercised Options Unexercisable # | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Steven M. Mollenkopf | 1,000 | 1,000 | 41.33 | 10/25/2017 | — | — | — | — |
| | 1,167 | 8,167 | 43.24 | 4/24/2018 | — | — | — | — |
| | 333 | 2,667 | 47.35 | 5/18/2018 | — | — | — | — |
| | — | 36,667 | 52.87 | 8/3/2018 | — | — | — | — |
| | — | 68,834 | 35.66 | 11/6/2018 | — | — | — | — |
| | — | 50,307 | 44.75 | 11/8/2019 | — | — | — | — |
| | 7,758 | 92,500 | 40.42 | 9/9/2017 | — | — | — | — |
| | — | — | — | | 144,435 | 9,022,872 | — | — |
| | — | — | — | | — | — | 211,865 | 13,235,211 |
| Total | 10,258 | 260,142 | — | | 144,435 | 9,022,872 | 211,865 | 13,235,211 |
| Donald J. Rosenberg | 367,666 | 8,334 | 40.31 | 10/18/2017 | — | — | — | — |
| | 38,666 | 65,334 | 35.66 | 11/6/2018 | — | — | — | — |
| | 80,843 | 48,507 | 44.75 | 11/8/2019 | — | — | — | — |
| | — | — | — | | 137,267 | 8,575,069 | — | — |
| | — | — | — | | — | — | 137,810 | 8,608,987 |
| Total | 487,175 | 122,175 | — | | 137,267 | 8,575,069 | 137,810 | 8,608,987 |

(1) Includes 700,000 options exercisable by a Grantor Retained Annuity Trust for the benefits of Dr. Jacobs and his spouse and 594,311 options exercisable by Dr. Jacobs's spouse.

(2) Includes dividend equivalent shares that have not vested: 4,996 shares for Dr. Jacobs, 1,751 shares for Mr. Keitel, 2,157 shares for Mr. Aberle, 2,940 shares for Mr. Mollenkopf and 3,654 shares for Mr. Rosenberg.

(3) Includes dividend equivalent shares that have not vested: 6,952 for Dr. Jacobs, 2,458 shares for Mr. Keitel, 2,790 shares for Mr. Aberle, 3,336 shares for Mr. Mollenkopf and 2,111 shares for Mr. Rosenberg.

### *D. Option Exercises and Stock Awards Vested During Fiscal 2012*

The "Option Exercises and Stock Awards Vested" table provides information on stock option exercises and stock awards vested by the NEOs during fiscal 2012.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Option Exercises and Stock Awards Vested during Fiscal 2012

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized Upon Exercise ($) | Number of Shares Acquired on Vesting (#) (1) | Value Realized on Vesting ($) (2) |
| Paul E. Jacobs | 853,562 | 23,030,736 | 48,619 | 2,772,742 |
| William E. Keitel | — | — | 17,577 | 1,002,416 |
| Derek K. Aberle | 380,165 | 7,097,677 | 15,708 | 895,827 |
| Steven M. Mollenkopf | 501,250 | 8,109,867 | 25,732 | 1,509,737 |
| Donald J. Rosenberg | 100,000 | 2,442,220 | 14,959 | 853,112 |

(1) Amounts include dividend equivalents on vested shares and shares withheld for the payment of taxes.

(2) This amount represents the dollar value of such shares based on the fair market value of our common stock on the vest date. Such amount includes the value of shares withheld for the payment of taxes.

### *E. Nonqualified Deferred Compensation*

The “Nonqualified Deferred Compensation” table provides information on the nonqualified deferred compensation of the NEOs. See the “Retirement Savings Plans” section in the CD&A for a description of the ERMC Plan.

Under the ERMC Plan, we match participants’ contributions to the ERMC Plan with our common stock (Match Shares). We match eligible participants’ contributions for a calendar year annually only if he or she is actively employed on the first day of the next calendar year or is terminated without cause during the calendar year and had satisfied the vesting eligibility requirement. The number of shares for the match is based on the average closing price of our common stock during a 200-trading-day period preceding the date on which the matching contributions are credited. All matching amounts vest in full upon an eligible employee’s death, disability, attainment of age 65 while employed with the Company, involuntary termination of employment without Cause or voluntary termination of employment for Good Reason (in both cases within 24 months after a change in control of the Company), or completion of two continuous years of service with the Company commencing with the employee’s date of hire. Cash dividends on shares of our common stock are credited to an eligible employee’s account in the form of cash, which is subject to the same terms and vesting and payment dates as the Match Shares to which they relate. The amounts reported as registrant contributions in the last fiscal year in the table below reflect the cash value of the Match Shares granted in fiscal 2012 for the 2011 calendar year and dividend payments that we made during fiscal 2012.

The amounts reported as total aggregate earnings in the last fiscal year in the table below are the sum of the ERMC Plan aggregate earnings plus the Match Shares aggregate earnings. The Match Shares aggregate earnings in the last fiscal year reflect the difference in the cash values of all vested and unvested Match Shares at the end of fiscal 2012 less their cash values at the end of fiscal 2011 and the Company’s contributions during fiscal 2012.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Fiscal 2012 Nonqualified Deferred Compensation

| Name | Executive Contributions in Last Fiscal Year ($) (1) | Registrant Contributions in Last Fiscal Year ($) | Aggregate Earnings in Last Fiscal Year ($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last Fiscal Year End ($) (2) |
|---|---|---|---|---|---|
| Paul E. Jacobs | 1,320,849 | 657,794 | 3,459,590 | — | 18,172,970 |
| William E. Keitel | 444,079 | 220,791 | 1,471,180 | — | 8,146,121 |
| Derek K. Aberle | 494,110 | 232,755 | 492,676 | — | 2,907,222 |
| Steven M. Mollenkopf | 200,000 | 100,022 | 147,664 | — | 1,125,772 |
| Donald J. Rosenberg | 386,654 | 191,798 | 394,072 | — | 2,625,072 |

(1) The amounts disclosed in this column are also reported in the “Summary Compensation Table” with some of the amounts included in the “Salary” column for the current year and the remaining amounts included in the “Non-Equity Incentive Plan Compensation” column for the previous fiscal year.

(2) Includes all amounts under the ERMC Plan.

### *F. Potential Post-Employment Payments*

As noted in the CD&A, Qualcomm employs almost all U.S.-based employees, including all of our NEOs, “at will,” without employment contracts or severance agreements. We do not have a pre-defined involuntary termination severance plan or policy for employees, including the NEOs. Our practice in an involuntary termination situation may include the following non-equity benefits:

- salary continuation dependent on the business reason for the termination;
- lump-sum payment based on job level and years of service with Qualcomm;
- paid health care coverage and COBRA payments for a limited time; and
- outplacement services.

The information in the “Potential Payments Upon Termination or Change in Control” table below describes the compensation that would be payable under specific circumstances if the NEO’s employment had terminated on the last day of fiscal 2012.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The following table summarizes the terms that our equity award plans and agreements and nonqualified deferred compensation ERMC Plan establish for how unvested options, PSUs, RSUs and Match Shares would be treated in the event of death, long-term disability, a change in control, involuntary termination and normal retirement age.

## Summary of the Treatment of Unvested Equity Awards and Match Shares

| Termination Scenario | Treatment of Unvested Stock Options and RSUs | Treatment of Unvested PSUs | Treatment of Unvested Match Shares in the ERMC Plan (1) |
|---|---|---|---|
| Death | All unvested stock options and RSUs would become fully vested. Stock options would remain exercisable up to one year from the date of death or the expiration date of the grant, whichever is earlier. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the award agreement. | All unvested Match Shares would become fully vested. |
| Long-Term Disability (LTD) | Stock options and RSUs would continue to vest per the original vesting schedule. Stock options would remain exercisable until the expiration date of the grant. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the award agreement. | All unvested Match Shares would become fully vested. |
| Change in Control | If no stock options and RSUs were assumed, all unvested stock options and RSUs would become fully vested. | If no PSUs were assumed, all unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the award agreement. | All unvested Match Shares would become fully vested if at any time within twenty-four months of the change in control, the participant's employment is involuntarily terminated by the employer without cause, or if such employment is voluntarily terminated by the participant with good reason. |
| Involuntary Termination | Stock options: 10% of the total amount granted is automatically accelerated, and up to an additional 10% may be accelerated using a pre-established formula, subject to execution of a general release of claims and if the involuntary termination is not for cause. The accelerated vested stock options could then be exercised up to six months after termination, but in no event later than the expiration date of such options.<br>RSUs: For RSUs that vest less frequently than annual graded vesting, a prorated portion (that does not exceed one-third of the total amount granted) would be accelerated using a pre-established formula, subject to execution of a general release of claims. | All unvested PSUs are immediately forfeited. | All vested shares would be distributed to the ERMC Plan participant. There would be no accelerated vesting of unvested shares. |
| Normal Retirement Age (2) | All vested stock options may be exercised at any time prior to the expiration of 12 months, but in no event later than the expiration date of such options. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the award agreement. | All unvested Match Shares would become fully vested. |

(1) Match Shares are fully vested upon the completion of two years of continuous service with Qualcomm.

(2) Normal Retirement Age is the date on which a participant has attained the age of 60 years and has completed 10 years of continuous service for stock options, RSUs and PSUs.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Potential Payments Upon Termination or Change in Control (1)

| Name | Termination Scenario | Accrued Vacation ($) (2) | Equity Awards: Stock Options ($) (3) (4) (5) (6) | Equity Awards: Restricted Stock Awards/ Restricted Stock Units ($) (5) | Total ($) |
|---|---|---|---|---|---|
| Paul E. Jacobs | Death | 178,935 | 9,147,751 | 41,820,420 | 51,147,106 |
| | LTD | — | 9,147,751 | 41,820,420 | 50,968,171 |
| | Change in Control | — | 9,147,751 | 30,735,241 | 39,882,992 |
| | Involuntary Termination | 178,935 | 914,784 | — | 1,093,719 |
| | Normal Retirement Age | 178,935 | — | 16,663,525 | 16,842,460 |
| William E. Keitel | Death | 102,088 | 3,701,689 | 14,851,240 | 18,655,017 |
| | LTD | — | 3,701,689 | 14,851,240 | 18,552,929 |
| | Change in Control | — | 3,701,689 | 11,029,451 | 14,731,140 |
| | Involuntary Termination | 102,088 | 370,191 | — | 472,279 |
| | Normal Retirement Age | 102,088 | — | 6,164,925 | 6,267,013 |
| Derek K. Aberle | Death | 138,464 | 2,929,518 | 17,866,325 | 20,934,307 |
| | LTD | — | 2,929,518 | 17,866,325 | 20,795,843 |
| | Change in Control | — | 2,929,518 | 12,433,266 | 15,362,784 |
| | Involuntary Termination | 138,464 | 292,967 | — | 431,431 |
| | Normal Retirement Age | 138,464 | — | 5,698,843 | 5,837,307 |
| Steven M. Mollenkopf | Death | 124,151 | 5,347,024 | 22,274,734 | 27,745,909 |
| | LTD | — | 5,347,024 | 22,274,734 | 27,621,758 |
| | Change in Control | — | 5,347,024 | 15,295,250 | 20,642,274 |
| | Involuntary Termination | 124,151 | 534,737 | — | 658,888 |
| | Normal Retirement Age | 124,151 | — | 6,255,728 | 6,379,879 |
| Donald J. Rosenberg | Death | 68,996 | 2,795,830 | 17,184,056 | 20,048,882 |
| | LTD | — | 2,795,830 | 17,184,056 | 19,979,886 |
| | Change in Control | — | 2,795,830 | 13,866,490 | 16,662,320 |
| | Involuntary Termination | 68,996 | 279,618 | — | 348,614 |
| | Normal Retirement Age | 68,996 | — | 5,291,422 | 5,360,418 |

(1) Match Shares are fully vested upon the completion of two years of continuous service with Qualcomm. All of the NEOs fulfilled the continuous service requirement as of September 30, 2012, and all of the Match Shares credited to their accounts are vested. The potential amount of payment upon termination or change in control related to the ERMC Plan is provided in the “All Other Compensation Table,” and as a result, we did not include these amounts in this table.

(2) All U.S.-based employees, including the NEOs, are entitled to payouts of accrued vacation upon termination, including death. These amounts are as of September 30, 2012.

(3) Amounts related to the death, LTD and change-in-control termination scenarios are based on the intrinsic value of unvested options that would have become exercisable on September 30, 2012 based on the fair market value of the stock on such date.

(4) Amounts related to the termination scenario of involuntary termination that is not for cause are based on the intrinsic value of 10% of unvested options assuming acceleration on September 30, 2012.

(5) For the change-in-control termination scenario, we have assumed 100% acceleration of unvested shares as described in the “Summary of the Treatment of Unvested Equity Awards and Match Shares” table. The valuation of unvested shares is presented as of September 30, 2012.

(6) The share-based compensation expense recorded for accounting purposes may differ from the intrinsic value as disclosed in this column.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Director Compensation

The Compensation Committee reviews annually our non-employee director compensation practices, which includes an analysis of reported non-employee director compensation practices at the same peer companies used for the Compensation Committee's evaluation of NEO compensation. The analysis, prepared by FWC, includes prevalent practices for retainers, fees, equity-based compensation and stock ownership guidelines. The analysis conducted for fiscal 2012 affirmed that the structural provisions that we introduced for calendar 2010 continue to be aligned with best practices as follows:

- No fees are provided for Board meeting attendance.
- Where applicable, directors receive an annual award of deferred stock units (DSUs) that are defined under a fixed-value formula, have vesting terms of approximately one year and include a mandatory three-year holding period. Directors based in certain non-U.S. locations in which DSUs are not available under local tax code receive RSUs that are also defined under a fixed-value formula and have vesting terms of approximately one year but do not have the three-year holding period.
- Directors are subject to meaningful stock ownership guidelines.

The following narrative, table and notes describe the total compensation and benefits for our non-employee directors for fiscal 2012.

### *Fees earned or paid in cash.*

*Annual retainer*. Directors who are U.S. residents receive an annual retainer of $100,000 paid in equal installments at the end of each calendar quarter. The annual retainer for directors who are non-U.S. residents is $120,000 in consideration of the increased travel time. If available under the applicable tax code, directors may elect to receive all, or a portion of, the annual retainer in cash and/or in DSUs granted under the 2006 LTIP. The number of DSUs received is based on the fair market value of our common stock (as defined by the 2006 LTIP) on the last trading day of the last month of the calendar quarter. The DSUs generally settle three years from the grant date, unless the director elects to defer further.

*Board committee chair retainer*. The chairs of the audit and compensation committees receive annual retainers of $25,000; and the chairs of the other committees receive annual retainers of $10,000. The Compensation Committee increased the annual retainer for the chairs of the governance and finance committees to $15,000, effective January 1, 2013.

*Presiding director retainer*. The Compensation Committee added a $25,000 annual retainer for the presiding director, effective January 1, 2013.

*Meeting fees*. Directors receive $1,500 for each committee meeting attended (in person or telephonic attendance). Directors do not receive a fee for attending Board meetings.

***Equity compensation***. The Compensation Committee approves annual DSU awards to each director that resides in the U.S. and Spain. Annual RSU awards are granted to the director that resides in the U.K. because in the U.K. there is no opportunity to further defer taxes on DSUs beyond the vest date. The grant date is the date of the annual stockholders' meeting, and the number of DSUs and RSUs awarded is determined by dividing $200,000 by the closing price of our common stock on the grant date. Directors who join the Board between the dates of the annual stockholders' meetings receive DSUs or RSUs with a value on the grant date reduced (from the $200,000 that would have been awarded for a full year of service) on a pro rata basis to reflect the partial year of service until the next stockholders' meeting. The DSUs vest at the subsequent annual meeting (generally a one-year cliff vesting) and are settled in shares of our common stock three years following the grant date (or later if voluntarily elected by the director). The RSUs vest in April of the calendar year following the grant date so as to defer the taxable event to the following tax year in the U.K. A director may elect to receive a partial cash



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

payment to pay estimated taxes upon vest. The DSUs and RSUs include dividend equivalent rights. The dividend equivalents accrue in the form of additional shares of our common stock with vesting and distribution at the same time as the underlying DSUs and RSUs.

***Nonqualified deferred compensation earnings.*** Directors may defer any cash portion of their retainer and meeting fees under the ERMC Plan. Directors who contribute to the ERMC Plan are not eligible to receive Match Shares or any interest that is above the market rate.

***All other compensation.*** See the "Director All Other Compensation" table for an itemized account of all other compensation.

***Stock ownership requirement.*** As discussed under "Majority Voting, Stock Ownership Guidelines and Other Matters," non-employee directors are subject to a stock ownership requirement that is five times the $100,000 annual retainer paid to U.S. residents. All non-employee directors, except for Drs. Hockfield and Ros, have met the requirement. Drs. Hockfield and Ros are not yet required to meet their ownership guidelines and are progressing toward their requirement.

### Fiscal 2012 Director Compensation (1)

| Name | Fees Earned or Paid in Cash ($)(2)(3)(4) | Stock Awards ($)(5) | Nonqualified Deferred Compensation Earnings ($)(6) | All Other Compensation ($)(7) | Total ($) |
|---|---|---|---|---|---|
| Barbara T. Alexander | 137,500 | 200,008 | — | 50,000 | 387,508 |
| Stephen M. Bennett | 137,000 | 200,008 | — | 62,500 | 399,508 |
| Donald G. Cruickshank | 154,500 | 200,008 | — | 50,000 | 404,508 |
| Raymond V. Dittamore | 150,500 | 200,008 | — | 10,000 | 360,508 |
| Susan Hockfield | 23,098 | 116,670 | — | — | 139,768 |
| Thomas W. Horton | 107,500 | 200,008 | — | 50,000 | 357,508 |
| Irwin Mark Jacobs | 56,632 | — | 1,283,392 | 50,000 | 1,390,024 |
| Robert E. Kahn | 113,500 | 200,008 | 54,638 | 100,000 | 468,146 |
| Sherry Lansing | 122,000 | 200,008 | — | 60,000 | 382,008 |
| Duane A. Nelles | 123,500 | 200,008 | — | 95,000 | 418,508 |
| Francisco Ros | 132,000 | 200,008 | — | — | 332,008 |
| Brent Scowcroft | 109,000 | 200,008 | — | 50,000 | 359,008 |
| Marc I. Stern | 112,000 | 200,008 | 79,301 | 50,000 | 441,309 |

(1) We did not award any stock options to any directors in fiscal 2012; therefore, we did not include the "Option Awards" column in this table.

(2) Amounts include the value of DSUs issued in lieu of payment of cash retainer fees pursuant to elections by directors Ms. Alexander and Messrs. Bennett and Stern. DSUs awarded to Ms. Alexander are fully vested and will be settled in three years. DSUs awarded to Mr. Bennett are fully vested and will be settled after he concludes his Board service at the Annual Meeting. DSUs awarded to Mr. Stern are fully vested and will be settled upon retirement from the Board.

(3) Amounts for Mr. Nelles are paid to his consulting company.

(4) Amounts include $6,000 paid for Irwin Mark Jacobs's attendance at Board meetings as Director Emeritus after his retirement from the Board on March 6, 2012. Directors Emeriti receive $2,000 for each Board meeting attended.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

(5) These amounts represent the fair value of the awards as determined based on the fair value of our common stock on the date of grant.

(6) These amounts represent earnings through our ERMC Plan. The amount for Dr. Jacobs represents earnings for amounts that remained in the plan after he was no longer an employee of the Company, but continued as a non-employee director. Dr. Jacobs continued to defer his fees earned as a non-employee director into the ERMC Plan through March 6, 2012, his retirement date from the Board. Nonqualified deferred compensation earnings attributable to amounts deferred as a non-employee director and as an employee for Dr. Jacobs were $23,538 and $1,259,854, respectively.

(7) All other compensation represents payments made under our charitable gifts matching program where we will match 100%, up to $50,000 annually, of a director's contribution to a qualified, tax-exempt non-profit organization. Amounts include matching contributions made by the Company in fiscal 2012 for contributions made by the director in fiscal 2011 as follows: $12,500 for Mr. Bennett, $10,000 for Mr. Dittamore, $50,000 for Dr. Kahn and $45,000 for Mr. Nelles. We did not provide any other compensation with an aggregate annual value in excess of $10,000 for any individual director, and therefore, we did not include the "All Other Compensation" table.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

# PX 280

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

SCHEDULE 14A INFORMATION

PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE
SECURITIES EXCHANGE ACT OF 1934

(AMENDMENT NO.__)

Filed by the Registrant [X]

Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ] Preliminary Proxy Statement
[ ] Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
[X] Definitive Proxy Statement
[ ] Definitive Additional Materials
[ ] Soliciting Material Pursuant to Section 240.14a-12

QUALCOMM INCORPORATED

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.
[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

[ ] Fee paid previously with preliminary materials.
[ ] Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents




# QUALCOMM INCORPORATED

# NOTICE OF 2014 ANNUAL MEETING OF STOCKHOLDERS AND PROXY STATEMENT

Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

QUALCOMM

# LETTER TO STOCKHOLDERS

Dear Fellow Stockholder:

You are cordially invited to attend Qualcomm's Annual Meeting of Stockholders (Annual Meeting) on Tuesday, March 4, 2014. The meeting will begin promptly at 9:30 a.m. Pacific Time at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121.** I invite you to arrive early at 8:30 a.m. to preview our product displays. We will begin the Annual Meeting with a discussion and vote on the matters set forth in the Notice of Annual Meeting of Stockholders, followed by presentations and a report on Qualcomm's fiscal 2013 performance.

This year, we are again furnishing the proxy materials to stockholders primarily over the Internet. Therefore, most stockholders will not receive paper copies of our proxy materials. We will instead send these stockholders a notice with instructions for accessing the proxy materials and voting via the Internet. The notice also provides information on how stockholders may obtain paper copies of our proxy materials if they so choose. This method expedites the receipt of your proxy materials, lowers the costs of our Annual Meeting and helps to conserve natural resources.

Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. As an alternative to voting in person at the Annual Meeting, you may vote via the Internet, by telephone or, if you receive a paper proxy card in the mail, by mailing the completed proxy card. Voting by any of these methods will ensure your representation at the Annual Meeting.

**Your vote is very important to us. I urge you to vote as we recommend.**

I look forward to seeing you in San Diego at the **Irwin M. Jacobs Qualcomm Hall** on March 4, 2014.

Sincerely,

Paul E. Jacobs
*Chairman and Chief Executive Officer*

Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

5775 Morehouse Drive
San Diego, California 92121-1714

# NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

## To Be Held On March 4, 2014

**To the Stockholders of QUALCOMM Incorporated:**

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders (Annual Meeting) of QUALCOMM Incorporated (the Company), a Delaware corporation, will be held at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121**, on Tuesday, March 4, 2014 at 9:30 a.m. Pacific Time for the following purposes:

1. To elect 14 directors to hold office until the next annual stockholders' meeting and until their respective successors have been elected and qualified.

2. To ratify the selection of PricewaterhouseCoopers LLP as our independent public accountants for our fiscal year ending September 28, 2014.

3. To hold an advisory vote to approve our executive compensation.

4. To hold an advisory vote on the frequency of future advisory votes on executive compensation.

5. To transact such other business as may properly come before stockholders at the Annual Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on January 6, 2014 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and at any adjournment or postponement thereof.

By Order of the Board of Directors,



Donald J. Rosenberg
*Executive Vice President,*
*General Counsel and Corporate Secretary*

San Diego, California
January 16, 2014

Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

# PROXY STATEMENT
# TABLE OF CONTENTS

| | |
|---|---|
| Letter to Stockholders | |
| NOTICE OF ANNUAL MEETING OF STOCKHOLDERS | |
| PROXY STATEMENT TABLE OF CONTENTS | i |
| PROXY SUMMARY | 1 |
| 2014 Annual Meeting of Stockholders | 1 |
| Voting Matters and Board Recommendations | 1 |
| Director Nominees | 2 |
| Executive Compensation Highlights | 3 |
| PROXY STATEMENT | 7 |
| Meeting Information | 7 |
| Voting Rights and Outstanding Shares | 7 |
| Notice of Internet Availability of Proxy materials | 7 |
| Voting Methods | 8 |
| How Your Shares Will Be Voted | 8 |
| Broker Non-Votes | 8 |
| Revocability of Proxies | 9 |
| Proxy Solicitation | 9 |
| Stockholder Proposals | 9 |
| Householding | 9 |
| Financial Information | 10 |
| Corporate Directory | 10 |
| CORPORATE GOVERNANCE | 11 |
| Code of Ethics and Corporate Governance Principles and Practices | 11 |
| Board Leadership Structure | 11 |
| Board Meetings, Committees and Attendance | 12 |
| Board’s Role in Risk Oversight | 14 |
| Director Nominations | 15 |
| Majority Voting | 16 |
| Stock Ownership Guidelines | 16 |
| Communications with Directors | 17 |
| Annual Meeting Attendance | 17 |
| Director Independence | 17 |
| PROPOSAL 1: ELECTION OF DIRECTORS | 18 |
| Election of Directors | 18 |
| Nominees for Election | 18 |
| Required Vote and Board Recommendation | 25 |
| PROPOSAL 2: RATIFICATION OF SELECTION OF INDEPENDENT PUBLIC ACCOUNTING FIRM | 26 |
| Fees for Professional Services | 26 |
| Policy on Audit Committee Pre-Approval of Audit and Non-Audit Services of Independent Public Accountants | 27 |
| Representation from PricewaterhouseCoopers at the Annual Meeting | 27 |
| Required Vote and Board Recommendation | 27 |
| PROPOSAL 3: ADVISORY VOTE FOR APPROVAL OF OUR EXECUTIVE COMPENSATION | 28 |
| Pay and Performance Alignment | 28 |



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

| | |
|---|---|
| Compensation Program Best Practices | 28 |
| Modifications to our Compensation Programs | 29 |
| Effect of this Resolution | 29 |
| Board Recommendation | 29 |
| PROPOSAL 4: ADVISORY VOTE ON THE FREQUENCY OF ADVISORY VOTE ON EXECUTIVE COMPENSATION | 30 |
| Reason for the Proposal at this time | 30 |
| Effect of this Resolution | 30 |
| Board Recommendation | 30 |
| STOCK OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 31 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 33 |
| Compensation Committee Interlocks and Insider Participation in Compensation Decisions | 33 |
| Equity Compensation Plan Information | 33 |
| CERTAIN RELATIONSHIPS AND RELATED-PERSON TRANSACTIONS | 35 |
| COMPENSATION COMMITTEE REPORT | 37 |
| EXECUTIVE COMPENSATION AND RELATED INFORMATION | 38 |
| COMPENSATION DISCUSSION AND ANALYSIS | 38 |
| Executive Summary | 39 |
| Discussion and Analysis | 45 |
| Compensation Program Best Practices | 67 |
| COMPENSATION RISK MANAGEMENT | 75 |
| COMPENSATION TABLES AND NARRATIVE DISCLOSURES | 76 |
| Summary Compensation Table | 77 |
| All Other Compensation | 78 |
| Grants of Plan-Based Awards | 79 |
| Outstanding Equity Awards at Fiscal Year End | 82 |
| Option Exercises and Stock Awards Vested During Fiscal 2013 | 86 |
| Nonqualified Deferred Compensation | 86 |
| Potential Post-Employment Payments | 87 |
| DIRECTOR COMPENSATION | 93 |
| All Other Compensation | 95 |
| AUDIT COMMITTEE REPORT | 97 |
| OTHER MATTERS | 99 |
| APPENDIX 1: Financial Information | A-1 |
| APPENDIX 2: Corporate Directory | B-1 |
| APPENDIX 3: Reconciliation of Adjusted Non-GAAP Results to GAAP Results | C-1 |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

# EXECUTIVE COMPENSATION AND RELATED INFORMATION

## COMPENSATION DISCUSSION AND ANALYSIS

### Our Named Executive Officers for Fiscal 2013.

Our Named Executive Officers, or "NEOs," for fiscal 2013 are as follows:

| | | | |
|---|---|---|---|
|  | Dr. Paul E. Jacobs, Chairman and Chief Executive Officer (CEO), has 23 years of service with Qualcomm and has been CEO since July 2005 and Chairman since March 2009. |  | Mr. George S. Davis, Executive Vice President and Chief Financial Officer (CFO), joined Qualcomm as CFO in March 2013. |
|  | Mr. Steven M. Mollenkopf, President and Chief Operating Officer, has 19 years of service with Qualcomm and has been President and COO since November 2011. |  | Mr. Donald J. Rosenberg, Executive Vice President, General Counsel and Corporate Secretary, has 6 years of service with Qualcomm. |
|  | Mr. Derek K. Aberle, Executive Vice President and Group President, has 13 years of service with Qualcomm and has been Group President since November 2011. |  | Mr. William E. Keitel, former Executive Vice President and CFO, retired from Qualcomm in November 2013, following 17 years of service and having served as CFO from February 2002 to March 2013. |

Dr. Jacobs will step down as the Company's Chief Executive Officer following the Annual Meeting. Dr. Jacobs will remain an employee of the Company, and will continue to serve as the Company's Chairman of the Board of Directors, as Executive Chairman. Throughout fiscal 2013, Mr. Mollenkopf served as our President and Chief Operating Officer. On December 12, 2013, the Company's Board of Directors appointed Mr. Mollenkopf to the position of Chief Executive Officer-elect. Mr. Mollenkopf continues to serve as our President, and will commence his service as our Chief Executive Officer following the Annual Meeting.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## EXECUTIVE SUMMARY

The executive summary includes (1) business highlights, (2) a summary of our compensation program, (3) a summary of our pay and performance alignment, (4) a review of key changes we made to our executive compensation program for fiscal 2013 and (5) highlights of our compensation program best practices.

### Business Highlights

Figure 1 illustrates the Company's Non-GAAP revenues and Non-GAAP operating income results for fiscal 2011, 2012 and 2013. Our Non-GAAP revenues grew by 30%, 34% and 30%, and our Non-GAAP operating income grew by 35%, 22% and 22%, in fiscal 2011, 2012 and 2013, respectively. The most directly comparable GAAP financial measures and information reconciling these Non-GAAP financial measures to our financial results prepared in accordance with GAAP are included in Appendix 3.

*Figure 1: Non-GAAP Financial Performance and Year-over-Year Growth*




(1) Fiscal 2011 Non-GAAP revenues and Non-GAAP operating income were adjusted to exclude certain items for calculating financial performance.

***Our fiscal 2013 business highlights include:***

- Our Qualcomm Snapdragon products were prominent in a broad set of flagship smartphones, and 3G/4G device average selling prices were stronger than expected.
- We focused on return of capital to stockholders and increased our stock repurchases and dividends paid during the year. We repurchased and retired 71.7 million shares of common stock for $4.6 billion.
- Non-GAAP net income was $7.9 billion (up 22% year-over-year).
- Non-GAAP diluted earnings per share were $4.51 (up 22% year-over-year).



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- Free cash flow (defined as net cash from operating activities less capital expenditures) was $8.1 billion (up 55% year-over-year); 32% of revenues.
- We shipped approximately 716 million Mobile Station Modem (MSM) integrated circuits (up 21% year-over-year).
- Total reported device sales were approximately $231.2 billion (up 23% year-over-year).
- Cash, cash equivalents and marketable securities totaled $29.4 billion at the end of fiscal 2013.

## Our Total Compensation Program

Figure 2 depicts the key components of our compensation program and each component's relationship to broader compensation terms such as "Total Cash Compensation," "Direct Compensation" and ultimately the total compensation amounts disclosed in the Fiscal 2013 Summary Compensation Table. Discussions of these specific components are included in later sections of this Compensation Discussion and Analysis (CD&A).

*Figure 2: Graphic Representation of Our Compensation Program*




## Pay and Performance Alignment

Direct compensation includes amounts determined by the Compensation Committee that are intended to align the interests of our NEOs' with our stockholders by aligning the NEOs' compensation with Company and individual performance. Between 87% and 94% of direct compensation is variable (ACIP earnings and long-term incentive awards). The long-term incentive awards comprise 73% to 84% of our NEOs' direct compensation.

We provide an annual cash incentive plan (ACIP) in which the potential amount that the NEOs may earn varies by the extent to which we achieve our annual Non-GAAP revenues (weighted 40%) and Non-GAAP operating income (weighted 60%) objectives. Figure 3 illustrates how our CEO's ACIP earnings have varied by the extent to which our financial performance exceeded the objectives for fiscal 2011, 2012 and 2013. Additional information about the ACIP is included in later sections of this CD&A and in the "Fiscal 2013 Grants of Plan-Based Awards" table.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The CEO's fiscal 2013 total direct compensation was less than 1% above the amount he earned in fiscal 2012.

In fiscal 2013, we exceeded the Non-GAAP revenues objective by 5% and the Non-GAAP operating income objective by 3%, resulting in an overall weighted financial performance that exceeded objectives by 4%. Our CEO's ACIP amount for fiscal 2013 was $3.5 million, which was 2% greater than his 2012 ACIP amount when we exceeded objectives by 2%.

*Figure 3: Non-GAAP Financial Performance Compared to Objectives and CEO's ACIP Amount.*




(1) Fiscal 2011 Non-GAAP revenues and Non-GAAP operating income were adjusted to exclude certain items for calculating financial performance.

Later in this CD&A, we provide additional information about the factors that the Compensation Committee considered in determining the long-term incentive equity awards for the CEO. These factors included our fiscal 2013 financial performance, our financial growth, our absolute total shareholder return (TSR) for 1- and 3-year periods and our TSR for 1- and 3-year periods relative to our peer companies. In addition to exceeding our fiscal 2013 financial performance objectives, our financial growth (i.e., percentage increases in Non-GAAP revenues and Non-GAAP operating income) has been in the top quartile relative to our peer companies, yet our TSR has been below the median relative to our peers. TSR is not an operating metric and is not in our executive team's direct control. The Compensation Committee considered our strong operating performance and growth and the fact that TSR percentile rankings were not as high relative to operating measures and determined that it would be appropriate to award the CEO a combination of PSUs and RSUs with an aggregate grant date fair value of $15 million, the same amount that he received in fiscal 2012. Our CEO's direct compensation (salary, ACIP earnings and aggregate grant date fair value of PSUs and RSUs) was within 1% of his direct compensation for fiscal 2012, and his fiscal 2013 total compensation as disclosed in the Fiscal 2013 Summary Compensation Table was 1% less than his total compensation for fiscal 2012.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Key Changes to Our Executive Compensation Program

The Compensation Committee approved several modifications to the compensation program and practices for our NEOs. The changes, as described below, were implemented in fiscal 2013 in response to the 69% "FOR" voting results on the non-binding advisory vote on executive compensation ("Say-on-Pay") at the March 2012 annual meeting (relating to the fiscal year ended September 25, 2011), compared to the 95% "FOR" voting results at the March 2011 annual meeting.

**Added revenues as a secondary quantitative criterion for selecting peer companies.**

We continue to believe that market capitalization is appropriate as the primary quantitative criterion. However, we now include revenues as a secondary quantitative criterion to provide additional screening so that companies with comparable market capitalization but with revenues in excess of four times (or below one-quarter of) our revenues would generally be excluded from the peer group. Relative to our peer companies, we are below the median for revenue and above the median for profit, margin and market capitalization (see Figures 7 through 10).

**Reduced the maximum Annual Cash Incentive Plan (ACIP) amount from 2.5 times to 2.0 times the target amount.**

Based on feedback from stockholders and a review of prevalent practices, the Compensation Committee reduced the maximum ACIP amount in order to limit incentive earnings for the NEOs. The CEO's ACIP amount is limited to 5x his base salary, and 2x the ACIP target amounts, in the event we significantly exceed our financial performance objectives.

**Reduced the rate of increase to the funding rate (Incentive Multiple) for financial performance that exceeds objectives.**

Figure 4 illustrates the reduced rate of increase to the Incentive Multiple compared to prior fiscal years. The Incentive Multiple is calculated based on the weighted financial performance ratio and is applied to a target ACIP amount to determine the performance-adjusted ACIP amount for individual awards.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

*Figure 4: Fiscal 2013 ACIP Funding vs. Prior Fiscal Years*




**Changed the timing of equity awards to the fourth quarter to better align the disclosure of the awards with the fiscal year financial performance for which they were earned.**

Our prior practice resulted in a perceived disconnect between the disclosure of equity awards and the fiscal year financial performance for which they were earned. The Compensation Committee had granted equity awards to the executive officers after the fiscal year's financial performance was finalized and reported, but because of this timing the equity awards were disclosed the following fiscal year. Although for many years this has been the prevalent practice, it makes proxy statement disclosure tables difficult to understand. Hence, to enhance clarity and alignment, no equity awards were granted to executive officers in November 2012 based on fiscal 2012 reported results. As a result, the equity awards for the CEO, the other NEOs and other executive officers were effectively postponed until late in fiscal 2013, and the disclosure of the equity awards is now more clearly aligned with the fiscal year for which they are awarded.

**Prohibited the pledging of our common stock.**

The Governance Committee adopted a policy that prohibits the pledging of our common stock . All of our executive officers and directors are in compliance with this new pledging policy.

## Compensation Program Best Practices

Our compensation program reflects what we believe are best practices, including:

- We emphasize performance-based long-term incentive equity awards.
- A significant portion of our CEO's and other NEOs' compensation varies with Company performance.
- We have a balance of short-term and long-term performance measures.
- We have limits on the amounts of variable compensation that may be earned.
- We have a risk management process.
- We have stock ownership guidelines.
- We do not provide tax gross-ups for executive perquisites, except for benefits provided in a policy applicable to all eligible employees.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- We have a cash incentive plan clawback policy.
- Our insider trading policy includes a prohibition on the pledging of our common stock.
- Our NEOs do not have severance agreements or employment contracts, and our equity acceleration in the event of a change-in-control is “double-trigger.”
- The largest pay decision (equity awards) is made late in our fiscal year when we can anticipate financial performance results and we know the results of the “Say-on-Pay” advisory vote.

This concludes the Executive Summary section of the CD&A. We invite you to continue reading the following sections of the CD&A, which provide additional information, discussion and analysis of our executive compensation program.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Discussion and Analysis

This section of the CD&A provides additional information about our compensation program. Figure 5 illustrates the topical structure of this section.

*Figure 5: Topical Structure of the Discussion and Analysis Section*




### The Objectives of Our Compensation Program

Our compensation program is designed to support the Company's objectives to attract, retain, motivate and engage highly talented and experienced NEOs by focusing on the following six objectives:

Align the interests of our NEOs and long-term stockholders.

The majority of compensation we deliver to our NEOs is in the form of long-term equity awards. Ultimately, the value that each NEO may realize at the time equity awards vest increases with the appreciation in our stock price, thus motivating our NEOs to build stockholder value.

Variable compensation from year to year based on the Company's performance ("pay for performance").

Our NEOs' Annual Cash Incentive Plan (ACIP) earnings vary with our financial performance compared to our objectives. The amount of compensation delivered with RSUs varies with the price of our common stock and dividends earned, and the amount of compensation delivered with PSUs varies when our TSR, relative to the NASDAQ-100, meets or exceeds a minimum threshold.

Competitively reasonable and appropriate compensation for our business needs and circumstances.

The Compensation Committee considers competitive compensation practices by other companies as reference points for comparative purposes. The Compensation Committee does not target specific benchmark percentiles.

Internally fair and equitable compensation relative to roles, responsibilities and work relationships.

The Compensation Committee may consider certain business and individual performance factors to evaluate internal fairness and equity and may monitor the internal compensation relationships among the NEOs, but it does not attempt to establish specific internal relationships.

Reflect high standards for corporate governance and compensation-related risk management.

Our compensation programs are subject to a thorough evaluation process that includes Compensation Committee review and approval of program design and practices and advice of an independent, third-party compensation consultant engaged by the Compensation Committee. We have many practices that promote sound leadership, decision-making and actions among our executives that are consistent with our values of innovation, execution and partnership without taking inappropriate or unnecessary risks.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service


PX280

Page 5703

Table of Contents

Tax efficiency for the Company.

Our compensation program is designed to comply with the requirements of Internal Revenue Service Code Sections 162(m) and 409A.

## The Key Components of Our Compensation Program and How They Align With These Objectives

The key components of our compensation program align with the objectives outlined above:

- The ACIP program and equity awards align the interests of our NEOs with stockholders, provide compensation that varies from year-to-year based on Company and individual performance and are tax efficient for the Company.
- Salary, the ACIP program and equity awards provide reasonable and appropriate compensation that is internally fair and equitable in order to attract and retain experienced and successful executives.
- Non-incentive plan bonus payments align the interests of our NEOs with stockholders and help to attract and retain experienced and successful executives and All Other Compensation amounts help to provide programs to attract, retain and engage executives.
- We believe all components of our compensation program are designed and administered to reflect high standards of corporate governance and compensation-related risk management.

**Salary.** In setting base salary, the Compensation Committee considers competitive practices, internal comparisons and individual performance. Salary amounts reflect each NEO's level of responsibility, expertise, skills, knowledge and experience. Base salary amounts are effective at the beginning of the fiscal year.

**Annual Cash Incentive Plan (ACIP).** Potential award amounts vary by the extent to which we achieve our annual financial performance objectives. To maximize tax deductibility, amounts earned under the terms of the ACIP were designed to qualify as performance-based compensation under Section 162(m) of the Internal Revenue Code (IRC). The actual amounts earned were based on the Company's achievement of the ACIP financial performance metrics, and the Compensation Committee's consideration of other strategic and operational achievements and its exercise of negative discretion to pay amounts that are less than the maximum amounts it established for Section 162(m) purposes.

**Performance Stock Units (PSUs).** A variable number of shares of common stock are awarded based on relative performance of our TSR compared to that of the NASDAQ-100. Eligible participants must also satisfy time-based service requirements. The PSUs are designed to qualify as performance-based compensation under IRC Section 162(m). At its sole discretion, the Compensation Committee determines the mix of equity awards, the target value of PSUs, the achievement of the performance measures and the potential maximum number of PSUs that may be earned.

**Restricted Stock Units (RSUs).** A fixed number of shares of common stock may be awarded subject to eligible participants satisfying time-based service requirements. At its sole discretion, the Compensation Committee determines the mix of equity awards and, subject to the exercise of negative discretion to pay amounts that are less than the maximum amounts it established for Section 162(m) purposes, determines the value of equity awards granted each year.

**Bonus (non-incentive plan awards).** Employees, including NEOs, as part of an offer of employment, may receive a cash payment to encourage acceptance of the offer. The Compensation Committee approves all offers of employment to executive officers. All employees, including the NEOs, are also eligible to receive cash payments under the terms of our patent award program that encourages and rewards innovation.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

**All Other Compensation.** These programs offer tax-deferred retirement savings, financial planning services, insurance, flexible travel arrangements and travel security. The Compensation Committee is responsible for the design of all compensation and benefit plans.

## How We Determine the Amount of Compensation for Each NEO

We consider several factors to determine the compensation amounts and opportunities, including:

- Competitive practices;
- Business and individual performance factors;
- The results of stockholder advisory votes on executive compensation and communications with stockholders;
- The CEO's recommendations for the other NEOs; and
- The perspectives provided by the Compensation Committee's independent advisors.

The Compensation Committee does not have a predefined framework that determines which of these factors may be more or less important, and the emphasis placed on specific factors may vary among the NEOs. Ultimately, it is the Compensation Committee's judgment about these factors, along with the other factors discussed in this section, that forms the basis for determining the CEO's, the other NEOs' and other executive officers' compensation.

We discuss each of these factors in the following sections.

### *We review the compensation practices of other companies with whom we compete.*

The Compensation Committee identified the peer companies to use for competitive analyses, taking into account the recommendations made by Frederic W. Cook and Co., Inc. (FWC), based on the following characteristics:

- Principal business in technology, telecommunications and media (excluding those that are primarily content producers) based on the Global Industry Classification System (GICS);
- Generally comparable in market capitalization and revenues (using a guideline of one-quarter to four times our amounts);

We believe that market capitalization is appropriate as the primary quantitative criterion because:

  - Market capitalization, a key component of which is stock price, is the key driver of equity compensation grant value, and equity compensation grant value is the single largest component of CEO compensation among technology companies with large market capitalization;
  - Market capitalization is directly related to stockholder benefit;
  - A significant portion of our business is technology licensing, which is a high-margin business, and as such Qualcomm typically has higher market capitalization and profit than companies with similar revenues; but



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

We include revenues as a secondary quantitative criterion because:

- Revenues are commonly used as a selection criterion by our peer companies, independent, third-party compensation survey providers and proxy advisory services.

- Comparable performance-based compensation model;
- Commonly used as peers of peers (i.e., the peer companies disclosed by the companies we use as peers).

At its May 2013 meeting, the Compensation Committee selected the following as peer companies:

*Figure 6: Current Peer Companies*

| | | |
|---|---|---|
| ADP | Amazon.com | Broadcom |
| Cisco | Comcast | Corning |
| DirecTV | eBay | EMC |
| Google | Honeywell | Intel |
| Lockheed Martin | Microsoft | Oracle |
| Texas Instruments | Time Warner Cable | United Technologies |
| Yahoo! | | |

Broadcom, Corning and Yahoo! had market capitalization values slightly below the one-quarter of Qualcomm threshold but are included in the current peer group for continuity with the prior group and to maintain a sufficiently robust sample size. Changes from the peer companies we disclosed in our proxy statement for 2013 are:

- The exclusion of Apple, AT&T, Hewlett Packard, IBM and Verizon because they had revenues more than four times our revenues;
- The exclusion of Motorola Mobility and Dell because of completed or pending corporate transactions; and
- The additions of Honeywell and Lockheed Martin because they fulfill the selection criteria and are broadly comparable as large-scope technology companies.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Figures 7 through 10 set forth our relative ranking among the peer companies and illustrate that our market capitalization is strongly supported by our levels of net income and margin, which in turn reinforces the prioritization of the peer selection criteria. Relative to our peer companies, we are below the median for revenue and above the median for profit, margin and market capitalization. The Company and peer company data reflected in these figures was reported in the Standard & Poor's Compustat reports as of March 2013, the time at which FWC prepared the peer company selection analysis used by the Compensation Committee.

*Figure 7: Revenues Ranking among Peers*




*Figure 8: Net Income Ranking among Peers*




*Figure 9: EBITDA Margin Ranking among Peers*




*Figure 10: Market Capitalization Ranking among Peers*




***We consider business and individual performance factors.***

The Compensation Committee intends our compensation amounts to be internally fair and equitable relative to roles, responsibilities and relationships among our NEOs, in addition to being competitively reasonable and appropriate. Accordingly, the Compensation Committee also considers the following factors in the process of determining compensation levels for each NEO:

- The Compensation Committee's evaluation of the CEO and the other NEOs;
- Individual performance and contributions to financial goals;
- Labor market conditions, the need to retain and motivate the NEOs and each NEO's potential to assume increased responsibilities and contribute long-term value to the Company;
- Management succession plans and bench strength;
- Operational management, such as project milestones and process improvements;
- Internal working and reporting relationships and our desire to encourage partnership and teamwork among our NEOs;



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service



PX280

Page 5707

Table of Contents

- Individual expertise, skills, knowledge and tenure in position; and
- Leadership, including developing and motivating employees, collaborating within Qualcomm, attracting and retaining employees and personal development.

### *We consider the results of stockholder advisory votes on executive compensation.*

During fiscal 2013, the Compensation Committee implemented the following changes in response to the 69% "FOR" voting result on the non-binding advisory vote on executive compensation ("Say-on-Pay") at the 2012 annual meeting, compared to the 95% "FOR" voting result at the 2011 annual meeting:

- Added revenues as a secondary quantitative criterion for selecting peer companies;
- Reduced the maximum ACIP amount from 2.5 times to 2.0 times the target amount;
- Reduced the rate of increase to the ACIP funding rate (Incentive Multiple) for financial performance that exceeds objectives;
- Changed the timing of equity awards to better align the disclosure of the awards with the fiscal year for which they were earned; and
- Prohibited the pledging of our common stock.

### *We discuss with the CEO his recommendations for the other NEOs and other executive officers.*

The Compensation Committee and the CEO discussed (a) our business performance, (b) our CEO's performance and (c) our CEO's evaluation of and compensation recommendations for the other NEOs. The Compensation Committee, without the CEO present, determined the CEO's base salary for fiscal 2014 and his ACIP amount and equity awards for fiscal 2013, and approved the base salaries, ACIP amounts and long-term equity awards for the other NEOs and other executive officers.

### *We engage independent compensation consultants and other advisors to obtain advice and assistance.*

The Compensation Committee has the authority to retain and terminate any third-party compensation consultant and to obtain advice and assistance from external legal, accounting and other advisors. During fiscal 2013, the Compensation Committee engaged an independent executive compensation consulting firm, Frederic W. Cook & Co., Inc. (FWC), to advise it on compensation matters. FWC reported directly to the Compensation Committee. We did not engage FWC for any additional services during fiscal 2013 beyond its support of the Compensation Committee. The engagement did not raise any conflicts of interest. Pursuant to this engagement, FWC:

- Provided information, insights and advice regarding compensation philosophy, objectives and strategy;
- Recommended peer group selection criteria and identified and recommended potential peer companies;
- Provided analyses of competitive compensation practices for executive officers and non-employee directors;
- Provided analyses of potential risks arising from our executive and non-executive programs;



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- Provided analyses of aggregate equity compensation spending and related dilution;
- Reviewed and commented on recommendations regarding NEO compensation; and
- Advised the Compensation Committee on specific issues as they arose.

Representatives from FWC attended all Compensation Committee meetings during fiscal 2013 and interacted with the Committee Chair, members of our human resources staff and outside legal counsel prior to and following Compensation Committee meetings. We incurred $242,810 in fees to FWC during fiscal 2013 (compared to $347,541 during fiscal 2012), all for work that was directly in support of the Compensation Committee and execution of the Committee's responsibilities under its charter.

The Compensation Committee also sought and received advice from our outside legal counsel, DLA Piper LLP. Our human resources department supported the Compensation Committee in its work, collaborated with FWC and DLA Piper, conducted analyses and managed our compensation and benefit programs.

## The Amounts of Compensation Our NEOs Received For Fiscal 2013

At its September 2012 meeting, the Compensation Committee approved the fiscal 2013 base salary amounts and ACIP target amounts as a percentage of base salary for our executive officers. Based on its consideration of competitive practices and discussions with the CEO and FWC, the Compensation Committee maintained the same base salary and ACIP target amounts from fiscal 2012 for fiscal 2013. The Committee observed that base salaries and ACIP target amounts were appropriate in the context of competitive practices at that time and that the design of our ACIP program provided reasonable opportunities to earn additional cash compensation. Maintaining base salary amounts was not a negative reflection of the performance of the Company or the individual NEOs.

The Compensation Committee determined the NEOs' ACIP earnings and long-term incentive equity awards for fiscal 2013. Specific details on these amounts are provided in the following sections. Figure 11 provides an overview of the contribution of each pay component to the total compensation amounts disclosed in the Fiscal 2013 Summary Compensation Table (excluding Mr. Keitel). A few relationships to note include:

- Of the CEO's total compensation, 73% is in the form of long-term compensation (the grant date fair value of PSUs and RSUs) and 90% is variable (ACIP earnings, PSUs and RSUs ); and
- Among the other NEOs' total compensation, an average of 78% is in the form of long-term compensation and 90% is variable.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

*Figure 11: Contribution of Each Pay Component to Total Compensation for Fiscal 2013 (1)(2)*




(1) Excludes Mr. Keitel because he stepped down from his role as CFO in March 2013.

(2) Sums may not equal totals due to rounding.

(3) Excludes special, one-time payments related to Mr. Davis's employment offer.

## How Our Company Performance Affected Our CEO's and Other NEOs' Compensation

### *Fiscal 2013 financial performance and ACIP earnings*

During the first quarter of fiscal 2013, the Compensation Committee, after consultation with the CEO and review by the Board of Directors, established Non-GAAP revenues and Non-GAAP operating income objectives for the fiscal 2013 ACIP. Figure 12 illustrates the double-digit growth in our Non-GAAP financial objectives compared to the prior fiscal year results. The fiscal 2013 objectives reflected 23% and 18% growth over fiscal 2012 Non-GAAP revenues and Non-GAAP operating income, respectively. These growth objectives were above the 90th percentile of our peer companies' financial performance results. We believe that this demonstrates the Compensation Committee's desire to set financial performance objectives that genuinely reflect high performance. The most directly comparable GAAP financial measures and information reconciling these Non-GAAP financial measures to our financial results prepared in accordance with GAAP are included in Appendix 3.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

*Figure 12: Non-GAAP Revenues and Operating Income Targets and Actual Results*




(1) Fiscal 2011 Non-GAAP revenues and Non-GAAP operating income were adjusted to exclude certain items for calculating financial performance.

To maximize tax deductibility, amounts earned under the terms of the fiscal 2013 ACIP are intended to qualify as performance-based compensation under Section 162(m) of the Internal Revenue Code. The Compensation Committee applied negative discretion in determining the ACIP earnings for each NEO that were less than the maximum amounts it established for Section 162(m) purposes.

Figure 13 illustrates the calculation of the performance-adjusted ACIP amount that is the foundation upon which the Compensation Committee determines the ACIP earned amounts for each NEO, and Figure 14 discloses the calculations for determining the fiscal 2013 performance-adjusted amounts and earned amounts for each NEO.

*Figure 13: Process for Determining ACIP Amounts (1)*




(1) Sums may not equal totals due to rounding.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

*Figure 14: Fiscal 2013 ACIP Target, Performance Adjusted and Earned Amounts*

| Name | ACIP Target Award ($) | x | Incentive Multiple | = | Performance Adjusted Amount ($) | Earned Amount Awarded by Compensation Committee ($) | Variance of Earned Amount vs. Performance Adjusted Amount |
|---|---|---|---|---|---|---|---|
| Paul E. Jacobs | 3,000,035 | | 1.16 | | 3,480,001 | 3,480,000 | 0.0% |
| Steven M. Mollenkopf | 1,141,008 | | 1.16 | | 1,323,570 | 1,325,000 | 0.1% |
| Derek K. Aberle | 900,016 | | 1.16 | | 1,056,065 | 1,045,000 | -1.0% |
| George S. Davis (1) | 510,417 | | 1.16 | | 592,084 | 590,000 | -0.4% |
| Donald J. Rosenberg | 742,502 | | 1.16 | | 861,303 | 860,000 | -0.2% |
| William E. Keitel (2) | 671,394 | | 1.16 | | 778,817 | 775,000 | -0.5% |

(1) Mr. Davis's ACIP target amount was prorated to reflect his partial year of employment with Qualcomm during fiscal 2013.

(2) Mr. Keitel's ACIP target amount was prorated to reflect his partial year of service as CFO and as Senior Advisor during fiscal 2013.

Consistent with past practice, we applied a relative weighting of 40% to Non-GAAP revenues and 60% to Non-GAAP operating income to emphasize the relative importance of operating income on stockholder value creation. We use Non-GAAP financial objectives because they:

- Are the key metrics we use to manage the business;
- Focus the executive team on the performance and efficiency of our core reporting businesses, including our QCT, QTL and QWI segments;
- Provide a direct link between decisions and outcomes; and
- Are key factors that influence stockholder value.

These Non-GAAP objectives exclude the Qualcomm Strategic Initiatives (QSI) segment and certain share-based compensation, acquisition-related items and tax items because we view such items as unrelated to the operating activities and performance of our ongoing core businesses, which is consistent with the focus of the ACIP.

The Compensation Committee considered fiscal 2013 Non-GAAP revenues and Non-GAAP operating income when it determined the fiscal 2013 ACIP amounts for the CEO and other NEOs. Our financial performance resulted in an Incentive Multiple of 1.16, which is reflected in Figure 13 that discloses actual Non-GAAP results.

The Compensation Committee is authorized under the fiscal 2013 ACIP to adjust reported Non-GAAP revenues and Non-GAAP operating income for calculating financial performance on which fiscal 2013 cash incentives were determined. Adjustments are intended to eliminate the distorting effect of certain unusual income or expense items on year-over-year growth percentages if the Compensation Committee determines, in its discretion, that the items do not reflect a fair measurement of our operating performance. The Compensation Committee did not make any such adjustments for fiscal 2013.

## Long-Term Financial and TSR Performance and Fiscal 2013 Equity Awards

The Compensation Committee granted equity awards during the fourth quarter of fiscal 2013. Within the context of the nearly completed fiscal year, the Compensation Committee was able to consider anticipated absolute and relative financial performance, absolute and relative total shareholder returns, and anticipated year-over-year growth for fiscal 2014. Further, since equity compensation is the largest part of our NEOs'



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

annual compensation, granting awards after the annual meeting of stockholders (which takes place during the second quarter of the fiscal year) allowed consideration of stockholders' "Say-on-Pay" feedback. By changing the timing of equity award grants to near the end of the fiscal year, the equity award amounts are more clearly aligned with performance for the fiscal year in which the awards are granted and with the feedback provided by stockholders through the advisory vote.

The Compensation Committee considered the following financial and TSR performance results in determining equity awards for the CEO and other NEOs:

- Our fiscal 2013 financial performance exceeded the objectives for the year;

- Our revenues and operating income growth for 1- and 3-year periods were at or above the 95th percentile among our peer companies. (See Figures 15 and 16. The Company and peer company data reflected in these figures was reported in the Standard & Poor's Compustat reports as of March 2013, the time at which FWC prepared the peer company selection analysis used by the Compensation Committee.);

*Figure 15: 1-Year Relative Financial Growth*




*Figure 16: 3-Year Relative Financial Growth*




- We believe our absolute 1-and 3-year TSRs do not reflect the financial growth we have experienced in recent years. At September 30, 2013, the last trading day of the month in which fiscal 2013 ended, our 1-and 3-year TSRs were 9.8% and 16.2%, respectively. This TSR does not align with our financial performance growth rates; and

- Compared to our peer companies, our relative 1- and 3-year TSRs ranked 16th out of 20 and 12th out of 20, respectively.

The Compensation Committee noted the disparities between our financial results and TSR performance. The Compensation Committee acknowledged the Company's sustained, record-breaking financial performance, strong relative growth among its peer companies and market leadership in high-tier mobile devices. With regard to TSR, the Compensation Committee noted that, while some stockholders and third-party advisory firms may emphasize TSR as the preferred measure of stockholder value creation, it may also be a volatile metric in that it is calculated by stock price (and reinvested dividends, if any) on two specific dates. Relative TSR may also be distorted if there were, among the peers, companies that had experienced stock price declines or no growth followed by accelerated price appreciation relative to consistent, less volatile companies.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Figure 17 sets forth the grant date fair values of the PSUs and RSUs awarded to our NEOs in fiscal 2013. The ongoing awards represent the amounts the Compensation Committee considers appropriate for annual total direct compensation, and the special awards represent the amounts the Compensation Committee considered appropriate to recognize Messrs. Mollenkopf's and Aberle's contributions to our record-breaking financial performance and to certain strategic initiatives.

*Figure 17: Fiscal 2013 PSU and RSU Awards*

| | | Fiscal 2013 Equity Awards | | | | |
|---|---|---|---|---|---|---|
| Name | Fiscal 2012 Aggregate Grant Date Fair Value ($) | Grant Date Fair Value of Ongoing PSU Award ($) (1) | Grant Date Fair Value of Ongoing RSU Award ($) (2) | Grant Date Fair Value of Special PSU Award ($) (1) | Grant Date Fair Value of Special RSU Award ($) (3)(4) | Total Aggregate Grant Date Fair Value ($) |
| Paul E. Jacobs | 14,999,985 | 8,100,020 | 6,900,049 | - | - | 15,000,069 |
| Steven M. Mollenkopf (5) | 11,999,974 | 4,860,000 | 4,140,029 | 1,620,040 | 1,380,010 | 12,000,079 |
| Derek K. Aberle (5) | 9,000,026 | 3,240,020 | 2,760,020 | 1,080,007 | 920,006 | 8,000,053 |
| George S. Davis (6) | - | 2,700,046 | 2,300,016 | - | 6,500,048 | 11,500,110 |
| Donald J. Rosenberg | 4,400,011 | 2,430,030 | 2,070,048 | - | - | 4,500,078 |

(1) The PSUs cliff-vest on September 27, 2015.

(2) Except for Mr. Davis, the RSUs vest in equal amounts on November 20, 2013, 2014 and 2015. Mr. Davis's RSUs vest in equal amounts on September 29, 2014, 2015 and 2016.

(3) Except for Mr. Davis, the RSUs vest in equal amounts on November 20, 2014, 2015 and 2016.

(4) Mr. Davis received a new hire grant of RSUs in March 2013 that vest in equal amounts on March 11, 2014, 2015 and 2016.

(5) Fiscal 2012 amounts include promotion grants of PSUs and RSUs with aggregate grant date fair values of $5 million for Mr. Mollenkopf and $4 million for Mr. Aberle.

(6) Mr. Davis was not a Qualcomm employee in fiscal 2012.

The fiscal 2013 equity grants to the CEO, the other NEOs and the other executive officers reflected a combination of Performance Stock Units (PSUs) and Restricted Stock Units (RSUs), with a majority of the equity awards in the form of PSUs. The PSUs and RSUs are consistent with our long-term incentive program because they align the interests of our NEOs and our stockholders by rewarding absolute and relative stock price performance, and they provide additional retention value. Awarding PSUs and RSUs to our executive officers and other employees also enables us to address certain strategic compensation objectives, such as:

- Reducing our equity burn rate (the number of shares subject to equity awards granted during the year divided by total shares outstanding), while we increase our staffing levels and maintain a broad-based equity program in which substantially all of our employees are eligible to receive equity awards; and

- Reducing our overhang (the number of outstanding unexercised stock options and unvested PSUs and RSUs).

The number of shares distributed through our PSU program is based on both relative and absolute TSR. For fiscal 2013, we modified the structure of the PSU program. Prior programs (granted in fiscal 2010, 2011 and 2012) were structured to award a variable number of shares of our common stock based on the comparison of our TSR relative to the NASDAQ-100 TSR. For example, if the ratio of Qualcomm's TSR to the NASDAQ-100 TSR was 1.00, the program would award 100% of the target PSUs. If the ratio was 1.33, the program would award 200% of the target PSUs. The comparison is now in terms of our TSR percentile rank among the companies comprising the NASDAQ-100 at the end of each of two measurement periods. For example, if our TSR is at the



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

60th percentile, the program would award 100% of the target PSUs, and if the TSR is at the 90th percentile, the program would award 200% of the target PSUs. Below the 33rd percentile, no PSUs would be earned. The fiscal 2013 PSU award structure is set forth below in Figure 18. We modified the basis for comparison because:

- We believe the percentile rank comparison provides a more readily communicated and understood structure; and
- As the more prevalent design structure, it facilitates comparisons to other programs.

We continue to use the NASDAQ-100 as the basis of comparison because it:

- Represents a broader capital market with which we compete for talent and capital investments;
- Represents the broad range of our business operations, which include licensing of intellectual property and sales of products and services; and
- Is both objectively determined and readily available, and our performance compared to the index can be evaluated by an independent, third party.

*Figure 18: Fiscal 2013 PSU Award Structure*




We noted in the proxy statement for the 2013 annual meeting that the change in timing of granting equity awards caused the Compensation Committee to consider an alternative to the 3-year annual vesting schedule used for prior awards so that the change in the timing of the grants did not result in a delay of the vesting of equity awards. The change in timing resulted in a 22-month period (rather than the historical 12-month period) between grants of equity awards (from November 2011 to September 2013) for our NEOs (except Mr. Davis, who joined Qualcomm in March 2013). Accordingly, the Compensation Committee reduced the PSU performance period from the 36-month period established in prior PSU programs to a 24-month performance period from the grant date (i.e., from the beginning of fiscal 2014 (9/30/2013) through the end of fiscal 2015 (9/27/2015)). Any PSUs earned will cliff vest on September 27, 2015, following completion of the performance period and will be distributed following certification by the Compensation Committee. This generally aligns the vest date with what would have been the vest date had the PSUs been granted under the former schedule.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Other features of the fiscal 2013 PSU program include:

- Our TSR for the performance period must be positive to earn more than the target award amount. The total award amount earned may not exceed the target amount if our TSR for the performance period is negative. This feature limits compensation for positive relative performance against the peer group, when stockholders may incur a loss on their investment over the period (as may occur in a volatile or depressed securities market).

- The performance period has two separate measurement periods of 18 and 24 months. Both measurement periods begin on September 30, 2013 (the first day of fiscal 2014). Measurement Period 1 concludes on March 29, 2015, and Measurement Period 2 concludes on September 27, 2015. Separate measurement periods encourage and reward sustained and continuous growth throughout the performance period and align our executive officers' interests with our stockholders' interests.

- The PSUs will not vest until the end of the performance period and include dividend equivalent rights. The dividend equivalents will accrue, in the form of additional shares of common stock, on earned shares with vesting and distribution consistent with the vesting and distribution of the underlying shares. No dividends are paid on unvested and unearned PSUs.

The RSU program design for fiscal 2013 was intended to qualify the RSUs for tax deductibility under Section 162(m) of the Internal Revenue Code. The Compensation Committee established (1) an adjusted GAAP operating income goal for the first nine months of fiscal 2013, (2) a service condition that required the executive officer be employed by Qualcomm from the beginning of fiscal 2013 through the date on which the RSUs were granted (i.e., September 29, 2013) and (3) a maximum grant date fair value that each recipient would be eligible to receive provided the operating income goal and recipient service requirements had been satisfied. The 3-year service period for vesting purposes began on October 1, 2012 (the first day of fiscal 2013). The RSUs vest annually in three equal tranches commencing in November 2013. The special RSUs granted to Messrs. Aberle and Mollenkopf were also intended to qualify for tax deductibility under Section 162(m). For the special RSUs, the Compensation Committee established an adjusted GAAP operating income goal for the first nine months of fiscal 2014 that the Company must meet or exceed in order for the RSUs to vest and a service condition that requires that the executive officer be employed by Qualcomm on the vesting dates set forth in footnote 3 of Figure 17.

In establishing compensation amounts for fiscal 2013, the Compensation Committee excluded from consideration the ACIP amounts for fiscal 2012 and the amounts realized or realizable from prior equity awards because we award cash incentives for fiscal year performance, and equity awards are forward-looking long-term incentives granted as part of the direct compensation that the Compensation Committee establishes each year. The Compensation Committee believes that reducing equity award grant values because of prior gains and ownership could penalize our executive officers for their long-term service and past performance and for exceeding our stock ownership guidelines.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Compensation for Dr. Paul E. Jacobs, Chairman and Chief Executive Officer

*Figure 19: Compensation for Dr. Paul E. Jacobs – Fiscal 2011 - 2013*




Our CEO's total compensation has been relatively consistent for fiscal 2011 through 2013. His total compensation for fiscal 2013 was approximately 1% less than fiscal 2012 while our Non-GAAP revenues and Non-GAAP operating income grew by 30% and 22%, respectively, and our TSR was up 10% during fiscal 2013.

The Compensation Committee considered the following as part of its determination of the ACIP earnings and equity awards for Dr. Jacobs.

- He led the Company to record Non-GAAP revenues, Non-GAAP operating income and MSM integrated circuit shipments. Additionally, we continued our commitment of returning capital to stockholders in the form of cash dividends and repurchases of our common stock and introduced a new $5 billion stock repurchase program.

- He successfully positioned Qualcomm for growth again in fiscal 2014 as we continued to invest in and execute on our strategic priorities, including our broad licensing program and industry-leading Snapdragon and 3G/LTE integrated circuit roadmap. He continued to strengthen relationships with key industry players and a broad range of global operators, especially in the emerging regions of China, India and Brazil. Additionally, we supported advocacy efforts on corporate tax reform, high-skilled immigration reform, spectrum policy and funding basic research.

- Our capabilities and capacity for continued growth and success lie in our values (innovation, execution and partnership), leadership, employee development, engagement and retention and in our culture of high performance, ethical standards and code of business conduct. We were named to Fortune Magazines' 100 Best Companies to Work for in America for the 15th consecutive year.

- Relative to our peer companies, we sustained upper-quartile financial growth and below-median TSR for both 1- and 3-year periods.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Accordingly, the Compensation Committee approved the following amounts:

- Fiscal 2013 ACIP earnings of $3.5 million, which were 2% above the amount he received for fiscal 2012.

- A combination of PSUs and RSUs with an aggregate grant date fair value of $15.0 million. The Compensation Committee considered the fact that TSR percentile rankings were not as high relative to operating measures and approved fiscal 2013 equity awards with the same aggregate grant date fair value as he received in fiscal 2012.

Dr. Jacobs's total direct compensation (salary, ACIP earnings and aggregate grant date fair value of equity awards) was essentially the same as he received in fiscal 2012, and his total compensation, as reported in the Fiscal 2013 Summary Compensation Table, was 1% less than in fiscal 2012 because of reduced amounts of All Other Compensation.

Figures 20 and 21 show the percentile ranking of our CEO's total compensation relative to our peer companies' 1-year percentile ranking for revenue growth and operating income, respectively. Our Company's financial growth was in the top (fourth) quartile yet our CEO's total compensation was in the third quartile. The same relationships were found for 3-year average total compensation and 3-year revenue and operating income growth (which are not displayed here). The Company and peer company data reflected in these figures was reported in the Standard & Poor's Compustat reports as of March 2013, the time at which FWC prepared the peer company selection analysis used by the Compensation Committee.

*Figure 20: Qualcomm and Peer Companies CEOs' 1-Year Total Compensation Percentile Ranking Relative to 1-Year Revenues Growth*




*Figure 21: Qualcomm and Peer Companies CEOs' 1-Year Total Compensation Percentile Ranking Relative to 1-Year Operating Income Growth*






Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Compensation for Mr. Steven M. Mollenkopf, President and Chief Operating Officer

*Figure 22: Compensation for Mr. Steven M. Mollenkopf – Fiscal 2011 – 2013*




The Compensation Committee considered the following as part of its determination of the ACIP earnings and equity awards for Mr. Mollenkopf.

- In his role as President & COO, Mr. Mollenkopf provided leadership and oversight to our QCT and QTL segments. Our QCT segment exceeded its revenue, earnings and units objectives for the fiscal year, and our QTL segment grew its licensee base and achieved record revenue and earnings.
- Mr. Mollenkopf developed and executed strategies to enhance our business operations and strengthen relationships with key customers and partners.
- Mr. Mollenkopf continued to provide guidance related to the development of new products and expansion of new industry segments.

Accordingly, the Compensation Committee approved the following amounts:

- Fiscal 2013 ACIP earnings of $1.3 million, which were 2% above the amount he received for fiscal 2012.
- A combination of ongoing PSUs and RSUs with an aggregate grant date fair value of $9.0 million, which represents a 29% increase from the aggregate grant date fair value of the ongoing equity awards he received in fiscal 2012. In addition, the Compensation Committee granted Mr. Mollenkopf a special award of PSUs and RSUs with an aggregate grant date fair value of $3.0 million to recognize his contributions to fiscal 2013 financial performance and strategic initiatives.

Excluding special awards, Mr. Mollenkopf's total direct compensation for fiscal 2013 was 22% above the fiscal 2012 amount primarily due to the $2.0 million increase in aggregate grant date fair value of ongoing awards of PSUs and RSUs he received, and his total compensation, as reported in the Fiscal 2013 Summary Compensation Table, was essentially the same as he received in fiscal 2012.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Compensation for Mr. Derek K. Aberle, EVP & Group President

*Figure 23: Compensation for Mr. Derek K. Aberle – Fiscal 2012 – 2013 (1)*




(1)Mr. Aberle was not an NEO in fiscal 2011.

The Compensation Committee considered the following as part of its determination of the ACIP earnings and equity awards for Mr. Aberle.

- In his role as EVP & Group President, Mr. Aberle led the QTL segment to another year of record revenues and earnings and led the negotiations of significant license and patent agreements. He also provided strategic guidance and oversight of our new licensing opportunities.

- Mr. Aberle provided leadership in our Company's strategy to sharpen the focus on our portfolio businesses to maximize technology, product and service investments, including the sale of our North and Latin American operations of Omnitracs and strategic leadership of our display and mobile health initiatives.

- Mr. Aberle also provided leadership and guidance in our initiatives to influence patent reform and intellectual property rights policy and enforcement.

Accordingly, the Compensation Committee approved the following amounts:

- Fiscal 2013 ACIP earnings of $1.1 million, which were 5% less than the amount he received for fiscal 2012.

- A combination of ongoing PSUs and RSUs with an aggregate grant date fair value of $6.0 million, which represents a 20% increase from the aggregate grant date fair value of the ongoing equity awards he received in fiscal 2012. In addition, the Compensation Committee granted Mr. Aberle a special award of PSUs and RSUs with an aggregate grant date fair value of $2.0 million to recognize his contributions to fiscal 2013 financial performance and strategic initiatives.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

Excluding special equity awards, Mr. Aberle's total direct compensation for fiscal 2013 was 14% above the fiscal 2012 amount primarily due to the $1.0 million increase in aggregate grant date fair value of ongoing PSUs and RSUs he received, and his total compensation, as reported in the Fiscal 2013 Summary Compensation Table, was 10% less than he received in fiscal 2012.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Compensation for Mr. George S. Davis, EVP & Chief Financial Officer

*Figure 24: Compensation for Mr. George S. Davis – Fiscal 2013*




Mr. Davis joined Qualcomm in March 2013 as our EVP & CFO. His offer of employment included a base salary of $700,000, an RSU award with a grant date fair value of $6.5 million that vests in three equal installments on the first, second and third anniversaries of the grant date and a $1.0 million new hire bonus. The Compensation Committee considered the following as part of its determination of the ACIP earnings and equity awards for Mr. Davis.

- In his role as CFO, Mr. Davis provided leadership and oversight to our record-breaking financial performance.
- He provided leadership and oversight to our investor relations organization. He led an investor outreach initiative to gain more in-depth insight into and understanding of their investment views of the Company. We upheld best practices on earnings conference calls, analyst meetings and financial disclosures.
- He continued our excellence in the quality of our accounting and reporting practices, including transparent and robust disclosures and quarterly SEC reports filed simultaneously with our earnings releases. In addition, we continued to participate in the Internal Revenue Service Compliance Assurance Program, a process where we endeavor to agree on the treatment of all tax issues prior to our tax return being filed.
- Mr. Davis provided leadership and guidance to the portfolio businesses review and helped guide negotiation teams and on the process for the sale of our North and Latin American operations of Omnitracs and our India spectrum assets.

Accordingly, the Compensation Committee approved the following amounts:

- Fiscal 2013 ACIP earnings of $590,000, which represents the performance-adjusted ACIP amount prorated for his partial year of service as CFO during fiscal 2013.
- A combination of PSUs and RSUs with an aggregate grant date fair value of $5.0 million.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Compensation for Mr. Donald J. Rosenberg, EVP, General Counsel and Corporate Secretary

*Figure 25: Compensation for Mr. Donald J. Rosenberg – Fiscal 2011 – 2013*




The Compensation Committee considered the following as part of its determination of the ACIP earnings and equity awards for Mr. Rosenberg.

- He oversaw continued excellence in the quality of our litigation management, discovery management practices and protection of our intellectual property.
- We continued to implement new procedures and upgraded software to increase the quality and efficiency of patent filing and prosecuting processes and continued to reduce the backlog of unfiled patent applications despite an increase in invention submissions. We also continued to optimize the strength of our worldwide patent portfolio.
- Mr. Rosenberg also provided leadership and guidance in our initiatives to influence patent reform and intellectual property rights policy and enforcement.

Accordingly, the Compensation Committee approved the following amounts:

- Fiscal 2013 ACIP earnings of $860,000, which were 1% above the amount he received for fiscal 2012.
- A combination of PSUs and RSUs with an aggregate grant date fair value of $4.5 million, which was 2% above the aggregate grant date fair value of the ongoing equity awards he received in fiscal 2012.

Mr. Rosenberg's total direct compensation for fiscal 2013 was 2% above the amount he received for fiscal 2012, and his total compensation, as reported in the Fiscal 2013 Summary Compensation Table, was essentially the same as he received in fiscal 2012.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Compensation for Mr. William E. Keitel, Former EVP and Chief Financial Officer

*Figure 26: Compensation for Mr. William E. Keitel – Fiscal 2011—2013*




Mr. Keitel stepped down from his role as CFO in March 2013 and retired from Qualcomm in November 2013. In March 2013, he assumed the role of Senior Advisor to assist in the transition of CFO responsibilities and to complete other projects. At that time, the Compensation Committee reduced his base salary from $710,000 to $500,000, reduced his target ACIP percent from 125% to 100% and approved a method for prorating his target ACIP amount to account for his service in each role. The Compensation Committee considered the following as part of its determination of the ACIP earnings for Mr. Keitel.

- He partnered with Qualcomm's executive leadership to develop the fiscal 2013 annual operating plan for continued strong growth in revenues, operating income and cash flows.
- During his service as CFO, he continued our excellence in the quality of our accounting and reporting practices, including transparent and robust disclosures and quarterly SEC reports filed simultaneously with our earnings releases. In addition, we continued to participate in the Internal Revenue Service Compliance Assurance Program, a process where we endeavor to agree on the treatment of all tax issues prior to our tax return being filed.
- He provided leadership and oversight to our investor relations organization. We upheld best practices on earnings conference calls, analyst meetings and financial disclosures.

Accordingly, the Compensation Committee approved fiscal 2013 ACIP earnings of $775,000, which represents the performance-adjusted ACIP amount prorated for his partial year of service as CFO and as Senior Advisor.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Compensation Decisions for the NEOs for Fiscal 2014

In November 2013, the Compensation Committee approved fiscal 2014 base salary and ACIP targets (as a percentage of base salary) for our executive officers.

- The base salary and ACIP target increases reflect the Compensation Committee's consideration of current competitive practices and its intent that while base salaries should be competitive, increases in earnings opportunities should emphasize variable compensation components. To ensure continued competitive total cash compensation opportunities, the Compensation Committee approved the base salary and target ACIP amounts set forth in Figure 27.

*Figure 27: Fiscal 2014 Base Salary and ACIP Targets*

| | Base Salary | | ACIP Target % | | ACIP Target $ | | Target Total Cash | |
|---|---|---|---|---|---|---|---|---|
| Name | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 |
| Paul E. Jacobs | $1,200,000 | $1,250,000 | 250% | 250% | $3,000,035 | $3,125,000 | $4,200,000 | $4,375,000 |
| Steven M. Mollenkopf | 815,000 | 865,000 | 140% | 150% | 1,141,008 | 1,297,500 | 1,956,000 | 2,162,500 |
| Derek K. Aberle | 720,000 | 750,000 | 125% | 130% | 900,016 | 975,000 | 1,620,000 | 1,725,000 |
| George S. Davis | 700,000 | 725,000 | 125% | 130% | 510,417 | 942,500 | 1,210,417 | 1,667,500 |
| Donald J. Rosenberg | 675,000 | 700,000 | 110% | 110% | 742,502 | 770,000 | 1,417,500 | 1,470,000 |

Effective December 12, 2013, in connection with Mr. Mollenkopf's appointment to the position of Chief Executive Officer-elect, the Compensation Committee increased his 2014 base salary to $1.1 million and increased his 2014 ACIP target percentage to 200% of his base salary. Also on December 12, 2013, the Compensation Committee granted Mr. Mollenkopf two promotion grants of restricted stock units (RSUs). The promotion grants consist of (i) special retention RSUs with a grant date fair value of $20 million, which will vest in three equal installments on the third, fourth and fifth anniversaries of the date of grant, and (ii) additional RSUs with a grant date fair value of $30 million, which will vest annually in five equal installments with the first installment vesting on December 12, 2014. This latter grant is a "multi-year" grant, which front-loaded the annual RSU grants that the Compensation Committee anticipated that it would have granted to Mr. Mollenkopf in his role as CEO over the next five years.

## COMPENSATION PROGRAM BEST PRACTICES

The preceding discussion and analysis of the components and total compensation for our CEO and other NEOs reflects what we believe to be compensation program best practices. We listed these best practices in Proposal 3, the Advisory vote on executive compensation and in the Executive Summary of the CD&A. In this section, we provide a more thorough description of these best practices.

***We emphasize performance-based equity awards***. In fiscal 2013, a majority of the long-term incentive awards granted to our CEO, the other NEOs and other executive officers were in the form of performance-based awards that align the interests of our stockholders and executive officers. The awards included a mix of performance stock units (PSUs) and restricted stock units (RSUs).

***A significant portion of our NEOs' compensation varies with Company performance.*** On average, 77% of our NEOs' fiscal 2013 target compensation was attributable to the aggregate grant date fair value of long-term incentive equity awards, and 90% of their fiscal 2013 target compensation was variable in the form of ACIP amounts and long-term incentive equity awards.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

***We have a balanced approach to incentive programs.*** We have a balance of short-term (Non-GAAP revenues and Non-GAAP operating income) and long-term (relative TSR) performance measures. We have a balance of time horizons for our ongoing incentive awards, including an annual cash incentive program (ACIP), overlapping multi-year PSU performance periods with interim measurement periods, and RSUs that generally require three years of service to become fully vested.

***We have limits on the amounts of variable compensation that may be earned.*** We limit the potential ACIP amounts that the NEOs may earn to 2.0 times the target amount. We limit the potential number of shares of our common stock that our NEOs may earn under the PSU program to 2.0 times the target amount.

***We have a risk management process.*** We perform annual risk assessments for our executive compensation program. This review includes an assessment by the Compensation Committee's independent compensation consultant, FWC.

***We have stock ownership guidelines.*** Our stock ownership guidelines for our executive officers, including our NEOs, help ensure that they maintain an equity stake in the Company, and by doing so, appropriately link their interests with those of other stockholders. Only shares actually owned and deferred stock units under the Qualcomm Non-Qualified Deferred Compensation (QNQDC) Plan count toward the stock ownership requirement. Outstanding unexercised stock options and unvested PSUs and RSUs do not count toward the requirement.

- Dr. Jacobs and Messrs. Mollenkopf, Aberle and Rosenberg have met their ownership guidelines.
- Mr. Davis will be required to meet his ownership guideline in March 2018, on the fifth anniversary of his date of employment with Qualcomm.

If an NEO has not met the guidelines by the deadline, we require that the NEO retain at least 50% of the net shares remaining after required tax withholdings upon payment of any full-value award or upon stock option exercise until they meet the minimum guideline. The guidelines are as follows:

*Figure 28: Stock Ownership Guidelines for Executive Officers*

| Role | Multiple of Base Salary |
|---|---|
| CEO | 6x |
| President | 3x |
| All other executive officers | 2x |

***We do not provide tax gross-up for executive perquisites.*** We do not provide tax gross-up payments on executive perquisites, such as financial planning reimbursements, except for benefits provided in a policy applicable to all eligible employees, such as relocation.

***We have a cash incentive compensation repayment ("clawback") policy.*** We require an executive officer, including an NEO, to repay to us the amount of any annual cash incentive that an executive officer received to the extent that:

- The amount of such payment was based on the achievement of certain financial results that were subsequently the subject of a restatement that occurred within 12 months of such payment;
- The executive officer had engaged in theft, dishonesty or intentional falsification of documents or records that resulted in the obligation to restate our financial results; and



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- A lower annual cash incentive would have been paid to the executive officer based upon the restated financial results.

The Compensation Committee is responsible for the interpretation and enforcement of this clawback policy. We plan to amend this policy as needed to comply with the additional requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) after the SEC adopts new regulations implementing those requirements.

***Our insider trading policy includes a prohibition on pledging of our common stock.*** Our insider trading policy for executive officers and non-employee directors prohibits the pledging of our common stock and transactions involving "short-swing" profits, short sales and derivatives, including put and call options.

***Our compensation arrangements for the NEOs do not include severance agreements or employment contracts, and our equity acceleration in the event of a change-in-control is "double-trigger."*** We employ almost all U.S.-based employees, including all our NEOs, "at will" without severance agreements or employment contracts. This is consistent with our objective of providing compensation related to individual contributions that improve our market leadership, competitive advantage and stockholder value. It enables our Board to terminate employment with discretion as to the terms and conditions of any separation. Our CEO and other NEOs do not have guaranteed arrangements for cash compensation or severance upon a change-in-control or excise tax gross-up for change-in-control payments. In the event of a change-in-control in which the acquirer assumed outstanding unvested equity awards, the vesting of an NEO's awards would accelerate only if the NEO was involuntarily terminated or the NEO voluntarily resigns "for good reason" during a specified period after the change-in-control (i.e., "double-trigger" treatment of unvested awards).

***We do not have a pre-defined severance plan.*** We do not have a pre-defined severance plan covering the involuntary termination of employees, including the NEOs. We do not accelerate unvested stock options, RSUs or PSUs in the event of an involuntary "for cause" termination. Such terminations may involve theft, dishonesty, falsification, actions that are detrimental to the Company, conviction of a criminal act that impairs the performance of duties required by the Company or violation of a material Company policy.

Figure 29 summarizes the treatment of unvested stock options, PSUs and RSUs following involuntary terminations without cause and the "double-trigger" provisions for terminations after a change-in-control.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

*Figure 29: Treatment of Unvested Equity Awards in Certain Termination Situations*

| Termination Situation | Stock Options | RSUs | PSUs |
| --- | --- | --- | --- |
| Involuntary terminations without cause. | 10% of the total amount granted is automatically accelerated, and up to an additional 10% may be accelerated using a pre-defined formula, subject to execution of a general release of claims. | All unvested awards are forfeited. | All unvested PSUs are forfeited. The Compensation Committee, in its sole discretion, may waive the automatic forfeiture of all or any portion of the award. This is consistent with the above-mentioned practice that allows our Board to terminate employment with discretion as to the terms and conditions of separation. |
| Involuntary terminations without cause or voluntary resignation for good reason after a change-in-control. | "Double-trigger" treatment of unvested awards: If, within 24 months after a change in control, the recipient is involuntarily terminated for any reason other than for cause or if the recipient voluntarily resigns "for good reason" (as defined in the award agreements), then vesting of stock options and RSUs is accelerated in full. | | Accelerate the vesting of PSUs that remain outstanding after a change-in-control. The number of shares of stock that may be issued will be prorated using a pre-defined formula. |

## We Design and Administer Compensation Programs So That They Are Tax Efficient

A goal of the Compensation Committee is to comply with the requirements of Internal Revenue Service Code (IRC) Sections 162(m) and 409A.

### Section 162(m)

IRC Section 162(m) places a $1 million annual limit on the amount that a public company may deduct for compensation paid to the CEO and the other three most highly compensated NEOs, excluding the CFO. The $1 million limit does not apply if the compensation meets Section 162(m) requirements for performance-based compensation. Compliance with Section 162(m) did not influence the allocation of compensation among base salary, target annual cash incentives and long-term incentives for fiscal 2013. From time to time, we may pay compensation to our Section 162(m) covered officers that may not be tax deductible if there are compelling business reasons to do so.

- We designed and administered our fiscal 2013 ACIP as cash-denominated performance units granted under the 2006 LTIP to be eligible for tax deductions to the extent permitted by the relevant tax regulations, including Section 162(m).
- Only actual shares distributed that are above the target PSU amount will qualify as deductible compensation under Section 162(m).
- The RSUs granted to our executive officers in fiscal 2013 are structured to satisfy the performance-based compensation exception of the Section 162(m) limit on deductible compensation.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

### Section 409A

Under IRC Section 409A, a nonqualified deferred compensation plan (such as our QNQDC Plan) must comply with certain requirements related to the timing of deferral and distribution decisions. Otherwise amounts deferred under the plan could be included in gross income when earned and be subject to additional penalty taxes. We administer the QNQDC Plan and equity awards in accordance with Section 409A requirements. Nonqualified stock options are generally exempt from Section 409A if the options satisfy certain requirements. PSUs and RSUs are also generally exempt from Section 409A.

## Other Components of the Executive Compensation Program

When we introduced the summary of the key components of our compensation program for NEOs, we noted that additional aspects of our executive compensation program would be summarized in this section.

- Figure 30 highlights the components that are available to U.S.-Based Executive Level Employees.
- Figure 31 highlights the components that are available to all U.S.-Based Employees.

*Figure 30: Components of Our Compensation Program Available to U.S.-Based Executive-Level Employees*

| Component | Form and Purpose | Comment |
|---|---|---|
| Nonqualified deferred compensation program Company match (QNQDC Plan) | Company match on employees' deferred contributions up to a predefined formula maximum amount. Provide a competitive, non-qualified, tax-efficient defined contribution retirement program for employees deemed to be "highly compensated." | We do not have a pension plan or other defined benefit retirement program. See the "Fiscal 2013 Nonqualified Deferred Compensation" table for a description of the Company match program. |
| Financial planning reimbursement | Reimbursement of actual expenses incurred for financial, estate and tax planning. Attract and retain executive-level employees. Assist NEOs with managing their time. | Annual maximum reimbursement of up to $12,500 for the Chairman and CEO and the President and up to $8,000 for the other NEOs. |
| Additional life insurance | Additional coverage, above the amount provided to all employees. Attract and retain executive-level employees. | The additional coverage is $1 million for the Chairman and CEO and $750,000 for the other NEOs. |
| Use of corporate aircraft for personal travel | Imputed taxable income for W-2 reporting and incremental cost to the Company for reporting the perquisite in this proxy statement. Facilitate flexible travel arrangements and provide security. | In fiscal 2013, we implemented a timesharing program that limits the amount of compensation reported to $250,000 for the CEO and $650,000 for all NEOs in the aggregate. |



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

*Figure 31: Components of Our Compensation Program Available to All U.S.-Based Employees*

| Component | Form and Purpose | Comment |
|---|---|---|
| Tax qualified deferred compensation | 401(k) Plan. Provide a tax-efficient retirement savings opportunity. Attract and retain employees. | The 401(k) Plan is a voluntary, tax-qualified deferred compensation plan. We match employee contributions in cash using a tiered structure in order to encourage participation among all employees. |
| Employee Stock Purchase Plan (ESPP) | Qualcomm stock. Encourage long-term stock ownership and align employee and stockholder interests. Attract and retain employees. | The tax-qualified, voluntary ESPP is available to all U.S.-based employees. We also make a non-tax-qualified ESPP available to employees based in other countries provided we are able to comply with local regulations. Purchases through payroll deductions are limited to $12,500 in fair market value (FMV) of the stock per 6-month offering period (determined on the first day of each offering period). The purchase price is equal to 85% of the lower of: (1) the FMV on the first day of the offering period or (2) the FMV on the last day of the offering period. |
| Charitable contribution match | Matching cash paid to the charitable organization. Encourage and extend employees' support of cultural, educational and community non-profit organizations. | We match 100% of employee contributions, up to pre-defined maximum amounts, to qualified tax-exempt non-profit organizations, excluding organizations that further religious doctrine, exclusionary organizations and/or political non-profit organizations. The maximum annual amount we will match is based on the employee's job level. We will match up to $125,000 for our Chairman and CEO, Vice Chairman and President and up to $100,000 annually for the other NEOs. |

In addition to the programs identified above, we offer a supplemental dental and vision program that provides limited coverage above the basic dental and vision plans to senior-level, U.S.-based employees. The purpose of this program is to attract and retain experienced talent.



Bloomberg Law®

© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## Summary of PSU Programs.

Our PSU programs provide for a variable number of shares of common stock based on the relative performance of our TSR compared to that of the NASDAQ-100. In this section, we provide a summary of the key design features of our PSU programs, the payout multiples for completed measurement periods, and for each NEO except Mr. Davis, the shares earned and the values of shares earned for completed measurement periods. Mr. Davis joined Qualcomm in March 2013 and thus did not participate in the programs prior to fiscal 2013. Figure 32 provides an overview of the key design features of all four PSU programs.

*Figure 32: Overview of PSU Program Key Design Features*

| | Fiscal 2010 | Fiscal 2011 | Fiscal 2012 | Fiscal 2013 |
|---|---|---|---|---|
| Status as of 12/31/13 | Completed | Completed | 1st and 2nd measurement periods completed. | Awards approved by Compensation Committee |
| Performance Period | 11/2/2009 – 10/31/2012 | 11/1/2010 – 10/31/2013 | 9/26/2011 – 9/26/2014 | 9/30/2013 – 9/27/2015 |
| Interim Measurement Periods End Dates | 1. 4/29/2011<br>2. 10/31/2011<br>3. 4/30/2012<br>4. 10/31/2012 | 1. 4/30/2012<br>2. 10/31/2012<br>3. 4/30/2013<br>4. 10/31/2013 | 1. 3/29/2013<br>2. 9/27/2013<br>3. 3/28/2014<br>4. 9/26/2014 | 1. 3/29/2015<br>2. 9/27/2015 |
| Maximum Award | 125% of target award if relative TSR is 150% or above the NASDAQ-100 | 200% of target award if relative TSR is 133% or above the NASDAQ-100 | | 200% of target award if relative TSR is at or above the 90th percentile among NASDAQ-100 |
| Target Award | 100% of the target award if relative TSR is 100% of the NASDAQ-100 | 100% of the target award if relative TSR is 100% of the NASDAQ-100 | | 100% of target award if relative TSR is at the 60th percentile among NASDAQ-100 |
| Threshold Award | n/a | 33% of target award if relative TSR is 66% of the NASDAQ-100 | | 33% of target award if relative TSR is at the 33rd percentile among NASDAQ-100 |
| Minimum Award | 75% of target award if relative TSR is 50% or below the NASDAQ-100 | 0% if relative TSR is less than 66% of the NASDAQ-100 | | 0% of target award if relative TSR is below the 33rd percentile among NASDAQ-100 |
| Absolute TSR Provision | None | If our TSR for the 3-year period is negative then the total award may not exceed the target amount so that high relative performance is not over-rewarded in a down market. | | |
| Dividend Equivalents | None | Provides dividend equivalent rights that accrue, in the form of additional shares of our common stock, on earned units, but are not paid out on unearned performance awards and that vest at the same time as the underlying earned PSUs. | | |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

The fiscal 2010, 2011 and 2012 PSU programs included four measurement periods of 18-, 24-, 30- and 36-months. We allocated 25% of the target PSU award disclosed in the "Fiscal 2013 Grants of Plan-Based Awards" table for the respective fiscal year proxy statement to each measurement period. Our TSR was compared to that of the NASDAQ-100 at the end of each measurement period, and an award was determined according to the relevant payout schedule. The number of shares of our common stock earned for a completed measurement period is considered "banked" but could be adjusted if our absolute TSR for the entire performance period was negative. The number of shares of our common stock to be distributed to each participant at the end of the three-year performance period is the sum of the shares earned for each of the four measurement periods and may include dividend equivalents as described above.

The fiscal 2010 and 2011 PSU programs are 100% complete, and earned shares, including dividend equivalents on earned shares for the 2011 program, are vested and settled. The fiscal 2012 program is 50% complete, and no earned shares or dividend equivalents are vested yet. The percentages of target awards earned for each measurement period that was complete as of December 31, 2013 are presented in Figure 33 and the PSU award amounts, shares earned and the values of the shares earned as of the end of fiscal 2013 are presented in Figure 34.

*Figure 33: Summary of Percent of Target Award Earned for Completed Measurement Periods*

| | Earned Awards | | | | |
|---|---|---|---|---|---|
| | Percent of Target Award Earned | | | | |
| Fiscal Year of Grant | 1st Measurement Period | 2nd Measurement Period | 3rd Measurement Period | 4th Measurement Period | Total |
| 2012 | 112.0% | 90.0% | TBD | TBD | TBD |
| 2011 | 139.0% | 112.0% | 127.0% | 96.0% | |
| 2010 | 98.0% | 97.0% | 100.5% | 96.0% | 98.0% |

*Figure 34: Summary of PSU Awards and Earned Shares for Completed Measurement Period (1)*

| Name | Fiscal Year of Grant | Target Shares Granted (#) | Grant Date Fair Value of Target Shares ($) | Shares Earned through Completed Measurement Periods (#) | Value of Shares Earned at September 29, 2013 ($) |
|---|---|---|---|---|---|
| Paul E. Jacobs | 2012 | 125,523 | 8,099,999 | 63,389 | 4,271,151 |
| | 2011 | 145,300 | 7,458,249 | 172,181 | 11,601,556 |
| | 2010 | 153,980 | 6,983,378 | 150,711 | 10,154,907 |
| Steven M. Mollenkopf (2) | 2012 | 58,577 | 3,779,974 | 29,582 | 1,993,235 |
| | 2012 | 41,841 | 2,700,000 | 21,130 | 1,423,739 |
| | 2011 | 51,415 | 2,639,132 | 60,928 | 4,105,329 |
| | 2010 | 52,270 | 2,370,575 | 51,161 | 3,447,228 |
| Derek K. Aberle (2) | 2012 | 41,841 | 2,700,000 | 21,130 | 1,423,739 |
| | 2012 | 33,473 | 2,160,013 | 16,905 | 1,139,059 |
| | 2011 | 46,945 | 2,409,687 | 55,632 | 3,748,484 |
| | 2010 | 49,120 | 2,227,715 | 48,078 | 3,239,496 |
| Donald J. Rosenberg | 2012 | 36,820 | 2,375,995 | 18,595 | 1,252,931 |
| | 2011 | 44,705 | 2,294,708 | 52,977 | 3,569,590 |
| | 2010 | 50,380 | 2,284,859 | 49,312 | 3,322,643 |
| William E. Keitel | 2012 | 41,841 | 2,700,000 | 21,130 | 1,423,739 |
| | 2011 | 52,530 | 2,696,365 | 62,249 | 4,194,338 |
| | 2010 | 58,570 | 2,656,296 | 57,328 | 3,862,761 |

(1) Excludes Mr. Davis because he joined Qualcomm in fiscal 2013.

(2) In fiscal 2012, the Compensation Committee granted to Messrs. Mollenkopf and Aberle both annual, ongoing equity awards and special, one-time equity awards (comprised of both PSUs and RSUs) to recognize their promotions to President & COO and EVP & Group President, respectively. These annual, ongoing PSUs cliff vest at completion of the 3-year performance period. These one-time, special equity awards vest on the third, fourth and fifth anniversaries of the grant dates.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

# COMPENSATION RISK MANAGEMENT

The Compensation Committee engaged its independent compensation consultant, FWC, to collaborate with Qualcomm's human resources staff to conduct an assessment of potential risks that may arise from our compensation programs. Based on this assessment, the Compensation Committee concluded that our policies and practices do not encourage excessive and unnecessary risk taking that would be reasonably likely to have a material adverse effect on Qualcomm. The assessment included executive, non-executive and sales incentive programs and focused on the variable components of cash incentives and equity awards. Our compensation programs are designed and administered through a corporate total rewards management office and are substantially identical among business units, corporate functions and global locations (with modifications to comply with local regulations as appropriate). The risk-mitigating factors considered in this assessment included:

- The alignment of pay philosophy, peer group companies and compensation amounts relative to competitive practices to support our business objectives;
- Effective balance of cash and equity, short- and long-term performance periods, limits on performance-based award schedules and Company financial metrics with individual performance factors and Compensation Committee and management discretion; and
- Ownership guidelines, a clawback policy, an insider trading policy, an equity award approval authorization policy and independent Compensation Committee oversight.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

# COMPENSATION TABLES AND NARRATIVE DISCLOSURES

The following tables, narratives and footnotes describe the total compensation and benefits awarded to, earned by, or paid to our NEOs for fiscal 2013.

## SUMMARY COMPENSATION TABLE

***Salary.*** Salaries for NEOs as presented in this table may include vacation match payments payable under our vacation policy. Some portion of the NEOs' salaries may have been deferred pursuant to the Qualcomm Non-Qualified Deferred Compensation (QNQDC) Plan (see "Fiscal 2013 Nonqualified Deferred Compensation" table).

***Bonus.*** The amounts in this column represent amounts received under our patent award program and/or for new hire bonuses. We disclose annual cash incentives in the "Non-Equity Incentive Plan Compensation" column.

***Stock Awards.*** Stock awards granted to NEOs include annual grants and may include special grants for new hires, promotions and/or retention. The amounts in this column represent the estimated grant date fair values of PSUs and RSUs granted during the fiscal year. The estimated RSU grant date fair values were determined based on the fair value of our common stock on the date of grant. The estimated PSU grant date fair values were determined based on a Monte Carlo simulation (which probability weights multiple potential outcomes). The amounts are not indicative of whether the NEO has or will realize the estimated fair value or any financial benefits from the award. See the "Fiscal 2013 Grants of Plan-Based Awards" table for details on the PSUs granted to the NEOs during fiscal 2013.

***Non-Equity Incentive Plan Compensation.*** The amounts in this column represent cash awards under our annual cash incentive plan (ACIP). The relevant performance period was fiscal 2013. The Compensation Committee approved the ACIP amounts at the end of fiscal 2013; the NEOs received payment of their fiscal 2013 ACIP amounts in November 2013. See the "Compensation Discussion and Analysis" (CD&A) section and the "Fiscal 2013 Grants of Plan-Based Awards" table and related narrative for a description of the ACIP. Some portion of the NEOs' ACIP amounts may have been deferred pursuant to our QNQDC Plan (see "Fiscal 2013 Nonqualified Deferred Compensation" table).

***All Other Compensation.*** See the "Fiscal 2013 All Other Compensation" table for an itemized account of all other compensation reported in the Fiscal 2013 Summary Compensation Table.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

# FISCAL 2013 SUMMARY COMPEN SATION TABLE (1)(2)

| Name and Principal Position | Year | Salary ($) | Bonus ($) (6) | Stock Awards ($) (7) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Paul E. Jacobs, Chairman and Chief Executive Officer | 2013 | 1,200,014 | 8,325 | 15,000,069 | 3,480,000 | 760,532 | 20,448,940 |
| | 2012 | 1,189,246 | 2,775 | 14,999,985 | 3,400,000 | 1,138,867 | 20,730,873 |
| | 2011 | 1,150,591 | 7,125 | 14,322,329 | 5,500,000 | 742,288 | 21,722,333 |
| George S. Davis, Executive Vice President and Chief Financial Officer (3) | 2013 | 363,463 | 1,000,000 | 11,500,110 | 590,000 | 192,023 | 13,645,596 |
| | 2012 | - | - | - | - | - | - |
| | 2011 | - | - | - | - | - | - |
| William E. Keitel, Executive Vice President and Senior Advisor (Former Chief Financial Officer) (4) | 2013 | 600,971 | - | - | 775,000 | 345,956 | 1,721,927 |
| | 2012 | 731,934 | - | 5,000,014 | 1,000,000 | 306,556 | 7,038,504 |
| | 2011 | 684,632 | - | 5,177,902 | 1,600,000 | 254,303 | 7,716,837 |
| Derek K. Aberle, Executive Vice President and Group President (5) | 2013 | 728,321 | - | 8,000,053 | 1,045,000 | 284,061 | 10,057,435 |
| | 2012 | 720,548 | - | 9,000,026 | 1,100,000 | 308,884 | 11,129,458 |
| | 2011 | - | - | - | - | - | - |
| Steven M. Mollenkopf, President and Chief Operating Officer | 2013 | 815,006 | 1,500 | 12,000,079 | 1,325,000 | 166,481 | 14,308,066 |
| | 2012 | 805,582 | - | 11,999,974 | 1,300,000 | 143,960 | 14,249,516 |
| | 2011 | 801,706 | - | 5,067,850 | 2,000,000 | 68,614 | 7,938,170 |
| Donald J. Rosenberg, Executive Vice President General Counsel and Corporate Secretary | 2013 | 675,002 | - | 4,500,078 | 860,000 | 256,411 | 6,291,491 |
| | 2012 | 668,270 | - | 4,400,011 | 850,000 | 274,153 | 6,192,434 |
| | 2011 | 641,925 | - | 7,639,369 | 1,350,000 | 208,890 | 9,840,184 |

(1) We did not grant any stock option awards to our NEOs during fiscal 2013. As a result, the “Option Awards” column has been omitted from the Fiscal 2013 Summary Compensation Table.

(2) We do not offer a pension plan or other defined benefit retirement plan to our NEOs. We do not provide above-market or preferential earnings on deferred compensation, nor do we provide dividends on stock in the QNQDC Plan at a rate higher than dividends on our common stock. As a result, the “Change in Pension Value and Nonqualified Deferred Compensation Earnings” column has been omitted from the Fiscal 2013 Summary Compensation Table.

(3) Mr. Davis joined Qualcomm as EVP and CFO in March 2013.

(4) The 2013 amounts represent compensation for Mr. Keitel through March 11, 2013 as Executive Vice President and CFO and from March 11, 2013 through September 29, 2013 as Executive Vice President and Senior Advisor. Mr. Keitel’s salary was decreased in March 2013 when he stepped down from his role as CFO.

(5) Mr. Aberle was not an NEO in fiscal 2011.

(6) The amounts for Dr. Jacobs and Mr. Mollenkopf represent bonuses received under our patent award program, and the amount for Mr. Davis represents his new hire bonus.

(7) Fiscal 2013 amounts in this column represent the estimated grant date fair values of PSUs and RSUs granted during the fiscal year. The RSU grant date fair values were determined based on the closing price of our common stock on the date of grant. The estimated PSU grant date fair values were determined using a Monte Carlo simulation (which probability weights multiple potential outcomes). For additional information on the valuation assumptions, refer to “Note 1—Basis of Presentation” of Qualcomm’s consolidated financial statements included in Appendix 1. If we assume that the highest level of performance conditions will be achieved with respect to the PSUs (and thus the maximum number of shares will be issued under the PSUs), using the fair value of our common stock on the grant date for such shares, the fiscal 2013 stock awards would be as follows: $23,100,089 for Dr. Jacobs; $14,200,158 for Mr. Davis; $12,320,079 for Mr. Aberle; $18,480,119 for Mr. Mollenkopf; and $6,930,108 for Mr. Rosenberg.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

## ALL OTHER COMPENSATION

*Perquisites and Other Personal Benefits*. Perquisites and personal benefits for a named executive officer are excluded if the total value of all of his perquisites and personal benefits is less than $10,000. If the total value of all perquisites and personal benefits for a named executive officer is $10,000 or more, then each perquisite or personal benefit, regardless of its amount, is identified by type. Each perquisite or personal benefit that exceeds the greater of $25,000 or 10% of the total amount of perquisites and personal benefits for that named executive officer is identified and quantified.

*Nonqualified Deferred Compensation*. The amounts disclosed represent the dollar values of common stock used to match up to 8% of the aggregate of the participant's base salary plus ACIP amounts deferred on a pre-tax basis under the QNQDC Plan. The dollar values are based on the average of the fair market value of the stock over the 200 trading days preceding the match date.

*Charitable Match*. The amounts disclosed represent our matching contributions for NEO contributions to qualified, tax-exempt non-profit organizations.

*Company Match on 401(k) Contributions*. The amounts disclosed represent the cash value of our matches to employee contributions to the 401(k) plan.

*Life Insurance Premiums.* The amounts disclosed represent the premiums paid for group term life insurance greater than $50,000 and executive life insurance.

*Payment of HSR Act Fees.* During fiscal 2013, Dr. Jacobs submitted a filing under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, (the HSR Act), based on the acquisitions of our common stock through the vesting of previously granted RSUs and PSUs. The Compensation Committee reviewed the legal requirements under the HSR Act, the stock acquisitions triggering the filing requirement and the practices of other public companies with respect to HSR Act filings. Based on this review, the Compensation Committee approved the payment by the Company of the HSR Act filing fee otherwise payable by Dr. Jacobs. The Compensation Committee determined that this payment was appropriate because of the unavailability of an HSR Act exemption for acquisitions of stock by officers and directors and because the filing obligations arose as a direct result of Dr. Jacobs's position as an officer of the Company.

*Tax Gross-Ups.* We pay tax liabilities associated with certain perquisites and other personal benefits that are provided in a policy applicable to all eligible employees, such as relocation.

## FISCAL 2013 ALL OTHER COMPENSATION

| Name | Perquisites and Other Personal Benefits ($) (1) | Nonqualified Deferred Compensation Plan Match ($) | Charitable Match ($) (2) | Company Matching 401k Contributions ($) | Life Insurance Premiums ($) | Payment of HSR Act Fees ($) | Tax Gross-Ups ($) (3) | All Other Compensation Total ($) |
|---|---|---|---|---|---|---|---|---|
| Paul E. Jacobs | 123,000 | 451,511 | 124,800 | 6,525 | 9,696 | 45,000 | - | 760,532 |
| George S. Davis | 90,798 | - | 43,170 | 4,520 | 5,943 | - | 47,592 | 192,023 |
| William E. Keitel | 28,734 | 165,281 | 129,218 | 5,357 | 17,366 | - | - | 345,956 |
| Derek K. Aberle | 66,804 | 175,492 | 33,100 | 5,425 | 3,240 | - | - | 284,061 |
| Steven M. Mollenkopf | 36,800 | 65,061 | 54,350 | 5,425 | 4,845 | - | - | 166,481 |
| Donald J. Rosenberg | 19,680 | 144,002 | 65,370 | 5,975 | 21,384 | - | - | 256,411 |

(1) The amounts in this column include: Dr. Jacobs – $87,658 for the personal use of our corporate aircraft and $35,342 for other insurance premiums and financial planning; Mr. Davis – $86,679 for relocation and



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service


PX280
Page 5736

Table of Contents

$4,119 for other insurance premiums; Mr. Keitel – for financial planning, other insurance premiums and the personal use of our corporate aircraft; Mr. Aberle – $40,099 for the personal use of our corporate aircraft and $26,705 for financial planning, other insurance premiums, home office costs and personal travel and entertainment; Mr. Mollenkopf – for the personal use of our corporate aircraft, financial planning and other insurance premiums; and Mr. Rosenberg – for financial planning, other insurance premiums and the personal use of our corporate aircraft. Under certain circumstances, NEOs may utilize our corporate aircraft for personal use. In those instances, the value of the benefit is based on the aggregate incremental cost to the Company. Incremental cost is calculated based on the variable costs to the Company, including fuel costs, mileage, certain maintenance, universal weather-monitoring costs, on-board catering, landing/ramp fees and certain other miscellaneous costs. Fixed costs that do not change based on usage, such as pilot salaries, are excluded. In 2013, the Company and Dr. Jacobs entered into aircraft time-sharing agreements pursuant to which Dr. Jacobs may use certain Company aircraft for his personal use and reimburse the Company for the expenses of each flight operated under such an agreement up to the maximum amount permitted under Federal Aviation Administration rules. Dr. Jacobs has discretion over which flights are operated under a time-sharing agreement. The amounts shown for Dr. Jacobs's personal use of our corporate aircraft reflect the total aggregate incremental costs to the Company of his personal use of our corporate aircraft, less any payments made by Dr. Jacobs to the Company under a time-sharing agreement.

(2) The amounts in this column include (i) matching contributions we made in fiscal 2013 for contributions made by an NEO in fiscal 2012 as follows: $40,120 for Mr. Keitel, $13,700 for Mr. Mollenkopf and $18,235 for Mr. Rosenberg; and (ii) $500 in matching contributions we made in fiscal 2014 for contributions made by Mr. Aberle in fiscal 2013.

(3) The amount in this column represents the estimated tax liability associated with relocation costs incurred by Mr. Davis.

## GRANTS OF PLAN-BASED AWARDS

***Annual Cash Incentive Plan (ACIP).*** The Compensation Committee approved a target ACIP amount, expressed as a percentage of base salary, for each NEO. The target ACIP amount was the earnings opportunity for the NEO if we achieved 100% of our financial objectives for Non-GAAP revenues and Non-GAAP operating income. We structured the ACIP to provide different earnings opportunities at different levels of financial performance. The table below shows the relationship between various levels of our financial performance and the potential ACIP amount.

**Potential Non-Equity Incentive Plan Payout and Associated Financial Performance Levels**

| Potential Payout Level | Weighted Financial Performance Ratio (1) | ACIP Incentive Multiple (2) |
|---|---|---|
| Maximum | 125% | 2.0 |
| | 110% | 1.4 |
| Target | 100% | 1.0 |
| | 90% | 0.5 |
| Threshold | 80% | 0.0 |

(1) The Weighted Financial Performance Ratio is the result of actual financial results achieved for the fiscal year divided by the financial objectives established during the first quarter of the fiscal year.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

(2) The ACIP Incentive Multiple is the percentage of the potential ACIP amount relative to the target ACIP amount. The ACIP Incentive Multiple is applied to each NEO's target ACIP amount to calculate the company-performance-adjusted ACIP amount. For example, if we achieve 125% of our financial objectives, the NEOs' target ACIP amounts would be multiplied by 2 to determine the NEOs' ACIP payout.

The ACIP Incentive Multiple increases five percentage points for each one percentage point improvement in the Weighted Financial Performance Ratio from 80% to 100%, and four percentage points for each one percentage point improvement from 100% to 125%. The maximum ACIP Incentive Multiple is 2x and applies to Weighted Financial Performance Ratios of 125% and above. The ACIP is not funded if the Weighted Financial Performance Ratio is below 80%.

***Equity Awards.*** The Compensation Committee approved equity awards granted under the 2006 LTIP. The awards consisted of PSUs and RSUs. The grant dates for both the PSUs and RSUs was the date that the Compensation Committee met and approved the awards.

***Restricted Stock Units (RSUs)***. RSUs were granted under the 2006 LTIP. Except for the RSUs granted to Mr. Davis, the Compensation Committee established (1) an adjusted GAAP operating income goal for the first nine months of fiscal 2013, (2) a service condition that required the executive officer be employed by the Company from the beginning of fiscal 2013 through the date on which the RSUs were granted (September 29, 2013) and (3) a maximum grant date fair value that each recipient is eligible to receive provided the operating income goal and recipient service requirements are satisfied. The RSUs vest annually in three equal tranches with the first tranche vesting on November 20, 2013. For the special RSUs granted to Messrs. Aberle and Mollenkopf to recognize contributions to fiscal 2013 financial performance and strategic initiatives, the Compensation Committee established an adjusted GAAP operating income goal for the first nine months of fiscal 2014 that the Company must meet or exceed in order for the RSUs to vest. These RSUs vest annually in three equal tranches with the first tranche vesting on November 20, 2014. The new hire RSUs granted to Mr. Davis vest in three equal tranches on the first, second and third anniversaries of the grant date (March 11, 2013). The ongoing RSUs granted to Mr. Davis vest in three equal tranches on the first, second and third anniversaries of the grant date (September 29, 2013).

***Performance Stock Units (PSUs)***. The PSUs provide for a variable number of shares of our common stock based on the relative performance of our TSR compared to that of the NASDAQ-100 (see table below). The performance period for the PSUs granted during fiscal 2013 has two separate measurement periods of 18 and 24 months. Both measurement periods began on September 30, 2013 (the first day of fiscal 2014). Measurement Period 1 concludes on March 29, 2015, and Measurement Period 2 concludes on September 27, 2015. The PSUs will not vest until the end of the performance period and include dividend equivalent rights. The dividend equivalent rights will accrue, in the form of additional shares of common stock, on earned shares with vesting and distribution consistent with the vesting and distribution of the underlying shares. No dividends are paid on unvested and unearned PSUs. The total award amount may not exceed the target award amount if our TSR for the performance period is negative. The percent of PSU award amount earned between award levels interpolates linearly with our TSR percentile ranking.

| Qualcomm TSR Percentile Ranking among NASDAQ-100 | Award Level | Percent of PSU Award Amount Earned |
|---|---|---|
| 90th percentile and above | Maximum | 200% |
| 75th percentile | | 150% |
| 60th percentile | Target | 100% |
| 33rd percentile | Threshold | 33% |
| Less than 33rd percentile | Minimum | 0% |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

# FISCAL 2013 GRANTS OF PLAN-BASED AWARDS (1)(2)

| Name | Type of Award | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards: Threshold ($) | Estimated Future Payouts Under Non-Equity Incentive Plan Awards: Target ($) | Estimated Future Payouts Under Non-Equity Incentive Plan Awards: Maximum ($) | Estimated Future Payouts Under Equity Incentive Plan Awards: Threshold (#) | Estimated Future Payouts Under Equity Incentive Plan Awards: Target (#) | Estimated Future Payouts Under Equity Incentive Plan Awards: Maximum (#) | All other Stock Awards: Number of shares of stock or units (#) | Grant Date Fair Value of Stock Awards ($) (6) |
|---|---|---|---|---|---|---|---|---|---|---|
| Paul E. Jacobs | ACIP | | 30,000 | 3,000,035 | 6,000,070 | | | | | |
| | RSUs | 9/29/2013 | | | | | | | 102,405 | 6,900,049 |
| | PSUs | 9/29/2013 | | | | - | 135,952 | 271,904 | | 8,100,020 |
| George S. Davis | ACIP | | 5,104 | 510,417 | 1,020,833 | | | | | |
| | RSUs (3) | 3/11/2013 | | | | | | | 97,452 | 6,500,048 |
| | RSUs | 9/29/2013 | | | | | | | 34,135 | 2,300,016 |
| | PSUs | 9/29/2013 | | | | - | 45,318 | 90,636 | | 2,700,046 |
| William E. Keitel | ACIP | | 6,714 | 671,394 | 1,342,788 | | | | | |
| Derek K. Aberle | ACIP | | 9,000 | 900,016 | 1,800,033 | | | | | |
| | RSUs | 9/29/2013 | | | | | | | 40,962 | 2,760,020 |
| | RSUs (4) | 9/29/2013 | | | | | | | 13,654 | 920,006 |
| | PSUs | 9/29/2013 | | | | - | 54,381 | 108,762 | | 3,240,020 |
| | PSUs (5) | 9/29/2013 | | | | - | 18,127 | 36,254 | | 1,080,007 |
| Steven M. Mollenkopf | ACIP | | 11,410 | 1,141,008 | 2,282,017 | | | | | |
| | RSUs | 9/29/2013 | | | | | | | 61,443 | 4,140,029 |
| | RSUs (4) | 9/29/2013 | | | | | | | 20,481 | 1,380,010 |
| | PSUs | 9/29/2013 | | | | - | 81,571 | 163,142 | | 4,860,000 |
| | PSUs (5) | 9/29/2013 | | | | - | 27,191 | 54,382 | | 1,620,040 |
| Donald J. Rosenberg | ACIP | | 7,425 | 742,502 | 1,485,004 | | | | | |
| | RSUs | 9/29/2013 | | | | | | | 30,722 | 2,070,048 |
| | PSUs | 9/29/2013 | | | | - | 40,786 | 81,572 | | 2,430,030 |

(1) Unless indicated otherwise, the Compensation Committee approved all equity grants on the grant dates.

(2) We did not award any stock options to any NEOs in fiscal 2013. Therefore, we did not include the “All Other Option Awards” or “Exercise or Base Price of Option Awards” columns in this table.

(3) Represents a new hire RSU grant, which vests annually in three equal tranches with the first tranche vesting one year after the grant date.

(4) Represents special RSU grants as described in the narrative preceding this table.

(5) Represents special PSU grants to recognize contributions to fiscal 2013 financial performance and strategic initiatives. These special PSUs have the same terms as the PSUs described in the narrative preceding this table.

(6) The amounts for RSUs represent the grant date fair values based on the closing stock price of the Company’s stock on the dates of grant. The amounts for PSUs represent the grant date fair value as determined using a Monte Carlo simulation (which probability weights multiple potential outcomes). For additional information on the valuation assumptions, refer to “Note 1—Basis of Presentation” in Qualcomm’s consolidated financial statements included in Appendix 1.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

# OUTSTANDING EQUITY AWARDS AT FISCAL YEAR END

The "Outstanding Equity Awards at Fiscal Year End" table provides information on the current holdings of equity awards by the NEOs. The market value of stock reported is based on the closing price of the Company's common stock at the end of the fiscal year. All stock options awarded to the NEOs were nonqualified stock options; stock options granted prior to September 10, 2010 are exercisable for ten years from the grant date, and stock options granted on or after September 10, 2010 are exercisable for seven years from the grant date.

## OUTSTANDING EQUITY AWARDS AT SEPTEMBER 29, 2013(1)

| | | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Grant Date | Number of Securities Underlying Unexercised Options (# Exercisable) | Number of Securities Underlying Unexercised Options (# Unexercisable) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Paul E. Jacobs | 12/3/2004 | 600,000 | - | 43.62 | 12/2/2014 | | | | |
| | 11/4/2005 | 900,000 | - | 44.02 | 11/3/2015 | | | | |
| | 11/10/2006 | 211,218 | - | 34.83 | 11/9/2016 | | | | |
| | 11/12/2007 | 632,230 | - | 37.29 | 11/11/2017 | | | | |
| | 11/7/2008 | 9,000 | 30,500 (5) | 35.66 | 11/6/2018 | | | | |
| | 11/9/2009 | 345,843 | 49,4079 (6) | 44.75 | 11/8/2019 | | | | |
| | 11/8/2010 | | | | | 50,311 (8) | 3,389,933 | | |
| | 11/9/2011 | | | | | 85,904 (9) | 5,788,230 | | |
| | 9/29/2013 | | | | | 102,405 (10) | 6,900,049 | | |
| | 11/8/2010 | | | | | | | 227,687 (16) | 15,341,583 |
| | 11/9/2011 | | | | | | | 197,903 (17) | 13,334,701 |
| | 9/29/2013 | | | | | | | 271,904 (18) | 18,320,892 |
| Total | | 2,698,291(4) | 79,907 | | | 238,620 | 16,078,212 | 697,494 | 46,997,176 |
| George S. Davis | 3/11/2013 | | | | | 98,508 (11) | 6,637,445 | | |
| | 9/29/2013 | | | | | 34,135 (12) | 2,300,016 | | |
| | 9/29/2013 | | | | | | | 90,636 (18) | 6,107,054 |
| Total | | - | - | | | 132,643 | 8,937,461 | 90,636 | 6,107,054 |
| William E. Keitel | 11/7/2008 | 6,250 | 12,500 (5) | 35.66 | 11/6/2018 | | | | |
| | 11/9/2009 | - | 18,794 (6) | 44.75 | 11/8/2019 | | | | |
| | 11/8/2010 | | | | | 18,188 (13) | 1,225,537 | | |
| | 11/9/2011 | | | | | 28,635 (9) | 1,929,433 | | |
| | 11/8/2010 | | | | | | | 82,316 (16) | 5,546,479 |
| | 11/9/2011 | | | | | | | 65,969 (17) | 4,444,971 |
| Total | | 6,250 | 31,294 | | | 46,823 | 3,154,970 | 148,285 | 9,991,450 |
| Derek K. Aberle | 4/14/2006 | 32,000 | - | 51.48 | 4/13/2016 | | | | |
| | 4/27/2007 | 1,667 | - | 44.63 | 4/26/2017 | | | | |
| | 4/25/2008 | 14,467 | - | 43.24 | 4/24/2018 | | | | |
| | 9/16/2008 | 108,000 | - | 47.92 | 9/15/2018 | | | | |
| | 11/7/2008 | 3,750 | 7,500 (5) | 35.66 | 11/6/2018 | | | | |
| | 11/9/2009 | 47,288 | 15,763 (6) | 44.75 | 11/8/2019 | | | | |
| | 11/8/2010 | | | | | 16,255 (13) | 1,095,229 | | |
| | 11/9/2011 | | | | | 28,635 (9) | 1,929,433 | | |
| | 11/9/2011 | | | | | 34,362 (14) | 2,315,278 | | |
| | 9/29/2013 | | | | | 40,962 (10) | 2,760,020 | | |
| | 9/29/2013 | | | | | 13,654 (15) | 920,007 | | |
| | 11/8/2010 | | | | | | | 73,566 (16) | 4,956,881 |
| | 11/9/2011 | | | | | | | 65,969 (17) | 4,444,971 |
| | 11/9/2011 | | | | | | | 52,776 (19) | 3,556,073 |
| | 9/29/2013 | | | | | | | 36,254 (18) | 2,442,795 |
| | 9/29/2013 | | | | | | | 108,762 (18) | 7,328,384 |
| Total | | 207,172 | 23,263 | | | 133,868 | 9,019,967 | 337,327 | 22,729,104 |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

| Name | Grant Date | Option Awards: Number of Securities Underlying Unexercised Options (# Exercisable) | Option Awards: Number of Securities Underlying Unexercised Options (# Unexercisable) | Option Awards: Option Exercise Price ($) | Option Awards: Option Expiration Date | Stock Awards: Number of Shares or Units of Stock That Have Not Vested (#) (2) | Stock Awards: Market Value of Shares or Units of Stock That Have Not Vested ($) | Stock Awards: Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | Stock Awards: Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
|---|---|---|---|---|---|---|---|---|---|
| Steven M. Mollenkopf | 11/7/2008 | - | 9,834 (5) | 35.66 | 11/6/2018 | | | | |
| | 11/9/2009 | - | 16,769 (6) | 44.75 | 11/8/2019 | | | | |
| | 9/10/2010 | - | 46,250 (7) | 40.42 | 9/9/2017 | | | | |
| | 11/8/2010 | | | | | 17,802 (13) | 1,199,476 | | |
| | 11/9/2011 | | | | | 40,089 (9) | 2,701,193 | | |
| | 11/9/2011 | | | | | 42,952 (14) | 2,894,115 | | |
| | 9/29/2013 | | | | | 61,443 (10) | 4,140,029 | | |
| | 9/29/2013 | | | | | 20,481 (15) | 1,380,010 | | |
| | 11/8/2010 | | | | | | | 80,569 (16) | 5,428,766 |
| | 11/9/2011 | | | | | | | 92,355 (17) | 6,222,902 |
| | 11/9/2011 | | | | | | | 65,969 (19) | 4,444,971 |
| | 9/29/2013 | | | | | | | 54,382 (18) | 3,664,259 |
| | 9/29/2013 | | | | | | | 163,142 (18) | 10,992,508 |
| Total | | - | 72,853 | | | 182,767 | 12,314,823 | 456,417 | 30,753,406 |
| Donald J. Rosenberg | 10/19/2007 | 1,000 | - | 40.31 | 10/18/2017 | | | | |
| | 11/7/2008 | 94,666 | 9,334 (5) | 35.66 | 11/6/2018 | | | | |
| | 11/9/2009 | 113,181 | 16,169 (6) | 44.75 | 11/8/2019 | | | | |
| | 11/8/2010 | | | | | 15,481 (13) | 1,043,105 | | |
| | 11/8/2010 | | | | | 71,080 (8) | 4,789,404 | | |
| | 11/9/2011 | | | | | 25,199 (9) | 1,697,885 | | |
| | 9/29/2013 | | | | | 30,722 (10) | 2,070,048 | | |
| | 11/8/2010 | | | | | | | 70,056 (16) | 4,720,355 |
| | 11/9/2011 | | | | | | | 58,052 (17) | 3,911,548 |
| | 9/29/2013 | | | | | | | 81,572 (18) | 5,496,321 |
| Total | | 208,847 | 25,503 | | | 142,482 | 9,600,442 | 209,680 | 14,128,224 |

(1) There were no unexercised, unearned options at September 29, 2013. Therefore, we did not include the "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" column in this table.

(2) Represents RSUs that have not vested at fiscal year end and includes dividend equivalent shares that have not vested as follows: 5,330 shares for Dr. Jacobs; 1,056 shares for Mr. Davis; 1,846 shares for Mr. Keitel; 3,655 shares for Mr. Mollenkopf; 2,906 shares for Mr. Aberle; and 5,051 shares for Mr. Rosenberg.

(3) Represents PSUs that have not vested at fiscal year end and includes dividend equivalent shares that have not vested as follows: 26,718 shares for Dr. Jacobs; 9,406 shares for Mr. Keitel; 13,465 shares for Mr. Mollenkopf; 11,122 shares for Mr. Aberle; and 8,092 shares for Mr. Rosenberg.

(4) Includes 721,763 options exercisable by a Grantor Retained Annuity Trust for the benefits of Dr. Jacobs and his spouse and 701,753 options exercisable by Dr. Jacobs's spouse.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

| Type of Grant | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|
| (5) Stock Options | 11/7/2008 | 10% vests on the six-month anniversary of the date of grant and the remaining balance vests monthly thereafter. | 5/7/2009 and each month thereafter through 11/7/2013 | Continued employment through vesting date required. |
| (6) Stock Options | 11/9/2009 | 12.5% vests on each six-month anniversary after the date of grant until fully vested four years from the date of grant. | 5/9/2010<br>11/9/2010<br>5/9/2011<br>11/9/2011<br>5/9/2012<br>11/9/2012<br>5/9/2013<br>11/9/2013 | Continued employment through vesting date required. |
| (7) Stock Options | 9/10/2010 | 12.5% vests on each six-month anniversary after the date of grant until fully vested four years from the date of grant. | 3/10/2011<br>9/10/2011<br>3/10/2012<br>9/10/2012<br>3/10/2013<br>9/10/2013<br>3/10/2014<br>9/10/2014 | Continued employment through vesting date required. |
| (8) Restricted Stock Unit | 11/8/2010 | 33-1/3% per year | 11/8/2011<br>11/8/2012<br>11/8/2013 | Continued employment through vesting date required. |
| (9) Restricted Stock Unit | 11/9/2011 | 33-1/3% per year | 11/9/2012<br>11/9/2013<br>11/9/2014 | Vesting was conditioned on the Compensation Committee's determination of satisfactory attainment of performance goals for fiscal 2012.<br>Continued employment through vesting date required. |
| (10) Restricted Stock Unit | 9/29/2013 | 33-1/3% per year | 11/20/2013<br>11/20/2014<br>11/20/2015 | Continued employment through vesting date required. |
| (11) Restricted Stock Unit | 3/11/2013 | 33-1/3% per year | 3/11/2014<br>3/11/2015<br>3/11/2016 | Continued employment through vesting date required. |
| (12) Restricted Stock Unit | 9/29/2013 | 33-1/3% per year | 9/29/2014<br>9/29/2015<br>9/29/2016 | Continued employment through vesting date required. |
| (13) Restricted Stock Unit | 11/8/2010 | 33-1/3% per year | 11/8/2011<br>11/8/2012<br>11/8/2013 | Continued employment through vesting date required. |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

| Type of Grant | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|
| (14) Restricted Stock Unit | 11/9/2011 | 33-1/3% per year | 11/9/2014<br>11/9/2015<br>11/9/2016 | Vesting was conditioned on the Compensation Committee's determination of satisfactory attainment of performance goals for fiscal 2012.<br>Continued employment through vesting date required. |
| (15) Restricted Stock Unit | 9/29/2013 | 33-1/3% per year | 11/20/2014<br>11/20/2015<br>11/20/2016 | Vesting is conditioned on adjusted GAAP operating income performance for the first nine months of fiscal 2014.<br>Continued employment through vesting date required. |
| (16) Performance Stock Unit | 11/8/2010 | 100% cliff vesting | 10/31/2013 | As September 29, 2013, three of the four measurement periods were complete. The number of shares represents the sum of (i) the number of shares earned for the completed measurement periods and (ii) the potential maximum shares that may be earned for the fourth measurement period.<br>Continued employment through vesting date required. |
| (17) Performance Stock Unit | 11/9/2011 | 100% cliff vesting | 11/9/2014 | As of September 29, 2013, two of the four measurement periods were complete. The number of shares represents the sum of (i) the number of shares earned for the completed measurement periods and (ii) the potential maximum number of shares that may be earned for the third and fourth measurement periods.<br>Continued employment through vesting date required. |
| (18) Performance Stock Unit | 9/29/2013 | 100% cliff vesting | 9/27/2015 | As of September 29, 2013, none of the measurement periods were complete. The number of shares represents the potential maximum number of shares that may be earned for the two measurement periods.<br>Continued employment through vesting date required. |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

| Type of Grant | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|
| (19) Performance Stock Unit | 11/9/2011 | 33-1/3% per year | 11/9/2014<br>11/9/2015<br>11/9/2016 | As of September 29, 2013, two of the four measurement periods were complete. The number of shares represents the sum of (i) the number of shares earned for the completed measurement periods and (ii) the potential maximum number of shares that may be earned for the third and fourth measurement periods.<br>Continued employment through vesting date required. |

## OPTION EXERCISES AND STOCK AWARDS VESTED DURING FISCAL 2013

The "Option Exercises and Stock Awards Vested During Fiscal 2013" table provides information on stock options exercised by the NEOs and NEO stock awards that vested during fiscal 2013.

### Option Exercises and Stock Awards Vested during Fiscal 2013

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized Upon Exercise ($) | Number of Shares Acquired on Vesting (#) (1) | Value Realized on Vesting ($) (2) |
| Paul E. Jacobs | 690,000 | 20,083,321 | 240,086 | 14,294,986 |
| George S. Davis | - | - | - | - |
| William E. Keitel | 466,221 | 12,553,120 | 88,469 | 5,262,463 |
| Derek K. Aberle | 91,500 | 2,485,931 | 77,379 | 4,608,687 |
| Steven M. Mollenkopf | 197,547 | 4,413,744 | 95,468 | 5,749,853 |
| Donald J. Rosenberg | 375,000 | 8,880,869 | 76,216 | 4,534,009 |

(1) Amounts include dividend equivalents on vested shares and shares withheld for the payment of taxes.

(2) This amount represents the dollar value of such shares based on the fair market value of our common stock on the vest date.

## NONQUALIFIED DEFERRED COMPENSATION

The "Fiscal 2013 Nonqualified Deferred Compensation" table provides information on the nonqualified deferred compensation of the NEOs.

Under the QNQDC Plan, we match a portion of participants' contributions to the QNQDC Plan with our common stock (Match Shares). We match up to 16% of the aggregate of the participant's base salary plus ACIP amounts, less any contributions they make to our 401(k) plan. We match eligible participants' contributions for a calendar year annually only if he or she is actively employed on the first day of the next calendar year or is terminated without cause during the calendar year and had satisfied the vesting eligibility requirement. The number of shares for the match is based on the average closing price of our common stock during a 200-trading-day period preceding the date on which the matching contributions are credited. All matching amounts vest in full upon an



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

eligible employee's death, disability, attainment of age 65 while employed with the Company, involuntary termination of employment without Cause or voluntary termination of employment for Good Reason (in both cases within 24 months after a change in control of the Company), or completion of two continuous years of service with the Company commencing with the employee's date of hire. Cash dividends on shares of our common stock are credited to an eligible employee's account in the form of cash, which is subject to the same terms and vesting and payment dates as the Match Shares to which they relate. The amounts reported as registrant contributions in the last fiscal year in the table below reflect the cash value of the Match Shares granted in fiscal 2013 for the 2012 calendar year and dividend payments that we made during fiscal 2013. Beginning with contributions made in calendar 2014, the Company match to participants' contributions will be in the form of cash rather than our common stock.

The amounts reported as total aggregate earnings in the last fiscal year in the table below are the sum of the QNQDC Plan aggregate earnings plus the Match Shares aggregate earnings. The Match Shares aggregate earnings in the last fiscal year reflect the difference in the fair market values of all vested and unvested Match Shares at the end of fiscal 2013 less their fair market values at the end of fiscal 2012 and the Company's contributions during fiscal 2013.

## FISCAL 2013 NONQUALIFIED DEFERRED COMPENSATION

| Name | Executive Contributions in Last Fiscal Year ($) (1) | Registrant Contributions in Last Fiscal Year ($) (2) | Aggregate Earnings in Last Fiscal Year ($) (3) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last Fiscal Year End ($) (4) |
|---|---|---|---|---|---|
| Paul E. Jacobs | 879,425 | 451,511 | 3,964,759 | - | 23,468,666 |
| George S. Davis | 210,001 | - | 2,547 | - | 212,548 |
| William E. Keitel | 320,448 | 165,281 | 1,907,212 | - | 10,539,061 |
| Derek K. Aberle | 371,203 | 175,492 | 360,073 | - | 3,813,990 |
| Steven M. Mollenkopf | 130,000 | 65,061 | 39,330 | - | 1,360,162 |
| Donald J. Rosenberg | 289,423 | 144,002 | 302,268 | - | 3,360,765 |

(1) All amounts disclosed in this column are also reported in the Fiscal 2013 Summary Compensation Table with some of the amounts included in the "Salary" column for the current year and the remaining amounts included in the "Non-Equity Incentive Plan Compensation" column for the current fiscal year.

(2) All amounts disclosed in this column are also reported in the Fiscal 2013 Summary Compensation Table under "All Other Compensation."

(3) The amounts in this column are not included in the Fiscal 2013 Summary Compensation Table.

(4) This column includes all amounts in the QNQDC Plan for the NEOs. The following amounts were reported as compensation to the NEOs in our summary compensation tables for previous years (since fiscal 2002): Dr. Jacobs — $10,603,029; Mr. Keitel — $4,679,118; Mr. Aberle — $726,865; Mr. Mollenkopf — $712,560; and Mr. Rosenberg — $1,540,204.

## POTENTIAL POST-EMPLOYMENT PAYMENTS

As noted in the CD&A, Qualcomm employs almost all U.S.-based employees, including all of our NEOs, "at will," without employment contracts or severance agreements. We do not have a pre-defined involuntary termination severance plan or policy for employees, including the NEOs. Our practice in an involuntary termination situation may include the following non-equity benefits:

- salary continuation dependent on the business reason for the termination;
- lump-sum payment based on job level and years of service with Qualcomm;



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

- paid health care coverage and COBRA payments for a limited time; and
- outplacement services.

The information in the “Potential Payments Upon Termination or Change-in-Control” table below describes the compensation that would be payable under the various scenarios if the NEO’s employment had terminated on the last day of fiscal 2013.

The following table summarizes the terms of our equity award plans and agreements and nonqualified deferred compensation plan regarding how unvested options, PSUs, RSUs and Match Shares would be treated in the event of death, long-term disability, a change in control, certain involuntary terminations and normal retirement age.

Summary of the Treatment of Unvested Equity Awards and Match Shares

| Termination Scenario | Treatment of Unvested Stock Options and RSUs | Treatment of Unvested PSUs | Treatment of Unvested Match Shares in the QNQDC Plan (1) |
|---|---|---|---|
| Death | All unvested stock options and RSUs would become fully vested. Stock options would remain exercisable up to one year from the date of death or the expiration date of the grant, whichever is earlier. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the applicable award agreement. | All unvested Match Shares would become fully vested. |
| Long-Term Disability (LTD) | Stock options would continue to vest per its original vesting schedule. Stock options would remain exercisable until the expiration date of the grant. All unvested RSUs would become fully vested. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the applicable award agreement. | All unvested Match Shares would become fully vested. |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

| Termination Scenario | Treatment of Unvested Stock Options and RSUs | Treatment of Unvested PSUs | Treatment of Unvested Match Shares in the QNQDC Plan (1) |
|---|---|---|---|
| Involuntary Termination | Stock options: 10% of the total amount granted is automatically accelerated, and up to an additional 10% may be accelerated using a pre-established formula as described in the applicable award agreement, subject to execution of a general release of claims and if the involuntary termination is not for cause. The accelerated vested stock options could then be exercised up to six months after termination, but in no event later than the expiration date of such options.<br>RSUs: All unvested RSUs are forfeited. | All unvested PSUs are forfeited. | All vested shares would be distributed to the QNQDC Plan participant. There would be no accelerated vesting of unvested shares. |
| Voluntary Termination | Stock options: All vested stock options may be exercised for the number of days set forth in the terms of the applicable award agreement(s), but in no event later than the expiration date of such stock options. All unvested stock options are forfeited.<br>Note: Retirement provision applies to stock options if retirement eligible at termination.<br>RSUs: All unvested RSUs are forfeited. | All unvested PSUs are forfeited.<br>Note: Retirement provision applies if retirement eligible at termination. | All vested shares would be distributed to the QNQDC Plan participant. There would be no accelerated vesting of unvested shares. |



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

| Termination Scenario | Treatment of Unvested Stock Options and RSUs | Treatment of Unvested PSUs | Treatment of Unvested Match Shares in the QNQDC Plan (1) |
|---|---|---|---|
| Retirement (2) | Stock Options: All vested stock options may be exercised at any time prior to the expiration of 12 months, but in no event later than the expiration date of such options. All unvested stock options are forfeited.<br>RSUs: All unvested RSUs are forfeited. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the applicable award agreement. | All unvested Match Shares would become fully vested. |

(1) Match Shares are fully vested upon the completion of two years of continuous service with Qualcomm.

(2) Retirement (for stock options, RSU and PSUs) is the date on which a participant has attained the age of 60 years and has completed 10 years of continuous service with the Company.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

# POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE-IN-CONTROL (1)

| Name | Termination Scenario | Accrued Vacation ($) (2) | Equity Awards: Stock Options ($) (3)(4)(5)(6) | Equity Awards: Performance Stock Units/Restricted Stock Units ($) (5)(7)(8) | Total ($) |
|---|---|---|---|---|---|
| Paul E. Jacobs | Death | 160,473 | 2,085,540 | 41,750,742 | 43,996,755 |
| | LTD | - | 2,085,540 | 41,750,742 | 43,836,282 |
| | Change-in-Control | - | 2,085,540 | 41,642,241 | 43,727,781 |
| | Involuntary Termination | 160,473 | 208,561 | - | 369,034 |
| | Voluntary Termination | 160,473 | - | - | 160,473 |
| | Retirement | 160,473 | - | 25,564,028 | 25,724,501 |
| George S. Davis | Death | 5,593 | - | 10,464,225 | 10,469,818 |
| | LTD | - | - | 10,464,225 | 10,464,225 |
| | Change-in-Control | - | - | 8,937,461 | 8,937,461 |
| | Involuntary Termination | 5,593 | - | - | 5,593 |
| | Voluntary Termination | 5,593 | - | - | 5,593 |
| | Retirement | 5,593 | - | - | 5,593 |
| William E. Keitel | Death | 54,585 | 821,808 | 10,532,520 | 11,408,913 |
| | LTD | - | 821,808 | 10,532,520 | 11,354,328 |
| | Change-in-Control | - | 821,808 | 12,091,671 | 12,913,479 |
| | Involuntary Termination | 54,585 | 82,194 | - | 136,779 |
| | Voluntary Termination | 54,585 | - | 8,936,700 | 8,991,285 |
| | Retirement | 54,585 | - | 8,936,700 | 8,991,285 |
| Derek K. Aberle | Death | 138,464 | 594,617 | 20,713,404 | 21,446,485 |
| | LTD | - | 594,617 | 20,713,404 | 21,308,021 |
| | Change-in-Control | - | 594,617 | 20,280,885 | 20,875,502 |
| | Involuntary Termination | 138,464 | 59,478 | - | 197,942 |
| | Voluntary Termination | 138,464 | - | - | 138,464 |
| | Retirement | 138,464 | - | 11,260,919 | 11,399,383 |
| Steven M. Mollenkopf | Death | 121,017 | 1,938,317 | 27,366,938 | 29,426,272 |
| | LTD | - | 1,938,317 | 27,366,938 | 29,305,255 |
| | Change-in-Control | - | 1,938,317 | 26,196,171 | 28,134,488 |
| | Involuntary Termination | 121,017 | 193,853 | - | 314,870 |
| | Voluntary Termination | 121,017 | - | - | 121,017 |
| | Retirement | 121,017 | - | 13,881,349 | 14,002,366 |
| Donald J. Rosenberg | Death | 99,452 | 661,979 | 17,338,086 | 18,099,517 |
| | LTD | - | 661,979 | 17,338,086 | 18,000,065 |
| | Change-in-Control | - | 661,979 | 17,310,708 | 17,972,687 |
| | Involuntary Termination | 99,452 | 66,219 | - | 165,671 |
| | Voluntary Termination | 99,452 | - | - | 99,452 |
| | Retirement | 99,452 | - | 7,710,265 | 7,809,717 |

(1) Match Shares are fully vested upon the completion of two years of continuous service with the Company. All of the NEOs fulfilled the continuous service requirement as of September 29, 2013, and all of the Match Shares credited to their accounts are vested. The potential amount of payment upon termination or change-in-control related to the QNQDC Plan is provided in the “Fiscal 2013 Nonqualified Deferred Compensation” table,” and as a result, we did not include these amounts in this table.

(2) All U.S.-based employees, including the NEOs, are entitled to payouts of accrued vacation upon termination, including death. These amounts are as of September 29, 2013.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

(3) Amounts related to the death, LTD and change-in-control termination scenarios are based on the intrinsic value of unvested options that would have become exercisable on September 29, 2013 based on the fair market value of the stock on such date.

(4) Amounts related to the termination scenario of involuntary termination that is not for cause are based on the intrinsic value of 10% of unvested options assuming acceleration on September 29, 2013.

(5) For the change-in-control termination scenario, we have assumed 100% acceleration of unvested restricted stock units. For the performance stock units, we assumed a prorated amount earned during the measurement period in which the change-in-control occurs based on the maximum amount, plus any amounts previously earned. The valuation of unvested units is presented as of September 29, 2013.

(6) The share-based compensation expense recorded for accounting purposes may differ from the intrinsic value as disclosed in this column.

(7) Amounts related to the voluntary termination scenario include amounts payable to NEOs that are retirement eligible under the applicable plan and award agreements at September 29, 2013.

(8) For the retirement scenario, we have assumed that all of the NEOs were retirement eligible under the applicable plan and award agreements at September 29, 2013.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

# DIRECTOR COMPENSATION

The Compensation Committee reviews our non-employee director compensation practices annually, including consideration of an analysis of reported non-employee director compensation practices at the same peer companies used for the Compensation Committee's evaluation of NEO compensation. The analysis, prepared by FWC, includes prevalent practices for retainers, fees, equity-based compensation and stock ownership guidelines. The analysis conducted for fiscal 2013 affirmed that our structural provisions continue to be aligned with best practices as follows:

- No fees are provided for Board meeting attendance.
- Where applicable, directors receive an annual award of deferred stock units (DSUs) that are defined under a fixed-value formula, have vesting terms of approximately one year, include a mandatory three-year holding period from the grant date, and settle three years from the date of grant. Directors based in certain non-U.S. locations in which DSUs are not available under local tax code receive RSUs that are also defined under a fixed-value formula and have vesting terms of approximately one year but do not have the three-year holding period.
- Directors are subject to meaningful stock ownership guidelines. As discussed under "Stock Ownership Guidelines," non-employee directors are required to hold a number of shares of our common stock with a value equal to five times the annual retainer for Board service paid to U.S. residents. Non-employee directors are required to achieve this ownership level within five years of joining the Board (or in the case of non-employee directors serving on the Board on September 18, 2009, by September 18, 2014). Until September 18, 2014, non-employee directors who were serving on September 18, 2009 are required to hold a number of shares of the Company's common stock with a value equal to three times the annual cash retainer for Board service paid to U.S. residents. All of our non-employee directors have met this guideline except for Drs. Hockfield and Ros, and Messrs. Randt and Rubinstein, who have not served on the Board for five years and thus are not yet required to meet this guideline. In addition to the preceding ownership guidelines, all directors are expected to own shares of our common stock within one year of joining the Board. All of our non-employee directors have met this guideline except for Mr. Randt, who has not served on the Board for one year and thus is not yet required to meet this guideline.

The following narratives, tables and notes describe the total compensation and benefits for our non-employee directors for fiscal 2013.

***Annual retainer.*** Directors who are U.S. residents receive an annual retainer of $100,000 paid in equal installments at the end of each calendar quarter. Directors who are non-U.S. residents receive an annual retainer of $120,000 in consideration of the increased travel time, also paid in equal installments at the end of each calendar quarter. If available under the applicable tax code, directors may elect to receive all, or a portion of, the annual retainer in cash and/or in DSUs granted under the 2006 LTIP. The number of DSUs received is based on the fair market value of our common stock (as defined by the 2006 LTIP) on the last trading day of the last month of the calendar quarter. The DSUs vest immediately but are subject to a three-year holding period and generally settle three years from the grant date, unless the director elects to defer further.

***Board committee Chair retainer.*** The Chairs of the audit and compensation committees receive annual retainers of $25,000. The Compensation Committee increased the annual retainer for the Chairs of the governance and finance committees from $10,000 to $15,000, effective January 1, 2013.

***Presiding director retainer.*** The Compensation Committee added a $25,000 annual retainer for the presiding director, effective January 1, 2013.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

***Meeting fees.*** Directors receive $1,500 for each committee meeting attended (in person or telephonic attendance). Directors do not receive a fee for attending Board meetings. Directors Emeriti receive $2,000 for each Board meeting attended in person ($1,000 for telephonic attendance).

***Equity compensation.*** The Compensation Committee approves annual DSU awards to each director that resides in the U.S. and Spain. Annual RSU awards are granted to directors that reside in jurisdictions where DSUs are not permitted. The grant date is the date of the annual stockholders' meeting, and the number of DSUs and RSUs awarded is determined by dividing $200,000 by the closing price of our common stock on the grant date. Directors who join the Board between annual stockholders' meetings receive DSUs or RSUs with a value on the grant date reduced (from the $200,000 that would have been awarded for a full year of service) on a pro rata basis to reflect the partial year of service until the next annual stockholders' meeting. The DSUs vest at the subsequent annual meeting (generally a one-year cliff vesting) and are settled in shares of our common stock three years following the grant date (or later if voluntarily elected by the director). The RSUs vest in April of the calendar year following the grant date so as to defer the taxable event to the following tax year. A director may elect to receive a partial cash payment to pay estimated taxes upon vest. The DSUs and RSUs include dividend equivalent rights. The dividend equivalent rights accrue in the form of additional shares of our common stock with vesting and distribution at the same time as the underlying DSUs and RSUs.

***Nonqualified deferred compensation earnings.*** Directors may defer any cash portion of their retainer and meeting fees under the QNQDC Plan. Directors who contribute to the QNQDC Plan are not eligible to receive Match Shares or any interest that is above the market rate. The amounts reported in the table below are the investment earnings on the deferred cash portion.

***All other compensation.*** See the "Fiscal 2013 Director All Other Compensation" table for an itemized account of all other compensation.

## FISCAL 2013 DIRECTOR COMPENSATION (1)

| Name | Fees Earned or Paid in Cash ($) (4)(5) | Stock Awards ($)(6) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) (7) | Total ($) |
|---|---|---|---|---|---|
| Barbara T. Alexander | 140,500 | 200,036 | - | 50,000 | 390,536 |
| Stephen M. Bennett (2) | 52,875 | - | - | 2,000 | 54,875 |
| Donald G. Cruickshank | 153,000 | 200,036 | - | 50,000 | 403,036 |
| Raymond V. Dittamore | 139,875 | 200,036 | - | 10,000 | 349,911 |
| Susan Hockfield | 107,500 | 200,036 | - | 12,150 | 319,686 |
| Thomas W. Horton | 106,000 | 200,036 | - | 50,000 | 356,036 |
| Robert E. Kahn (2) | 47,000 | - | 57,238 | 50,000 | 154,238 |
| Sherry Lansing | 132,000 | 200,036 | | 50,000 | 382,036 |
| Duane A. Nelles | 119,125 | 200,036 | - | 50,000 | 369,161 |
| Clark T. Randt, Jr. (3) | - | - | - | - | - |
| Francisco Ros | 127,500 | 200,036 | - | 5,000 | 332,536 |
| Jonathan J. Rubinstein | 50,000 | 150,007 | - | 50,000 | 250,007 |
| Brent Scowcroft | 107,500 | 200,036 | - | 50,000 | 357,536 |
| Marc I. Stern | 126,375 | 200,036 | 118,706 | 50,000 | 495,117 |

(1) We did not award any stock options or provide any non-equity incentive plan compensation to any directors in fiscal 2013. Therefore, we did not include the "Option Awards" or "Non-Equity Incentive Plan Compensation" columns in this table.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

(2) Mr. Bennett and Dr. Kahn concluded their service as members of the Board at our 2013 annual meeting of stockholders on March 5, 2013.

(3) Mr. Randt joined the Board on October 6, 2013, and therefore did not receive any compensation in fiscal 2013.

(4) Amounts include the value of DSUs issued in lieu of payment of cash retainer fees pursuant to elections by Ms. Alexander and Messrs. Bennett and Stern. DSUs awarded to Ms. Alexander are fully vested and will be settled in three years. DSUs awarded to Mr. Bennett were fully vested and settled after he concluded his Board service at our 2013 annual meeting of stockholders. DSUs awarded to Mr. Stern are fully vested and will be settled upon his retirement from the Board.

(5) Amounts for Messrs. Nelles and Rubinstein are paid to their respective consulting companies.

(6) These amounts represent the fair value of the awards as determined based on the fair market value of our common stock on the date of grant.

(7) The "Fiscal 2013 Director All Other Compensation" table provides detail regarding these amounts.

The following table shows the number of outstanding stock options and the aggregate number of outstanding RSU and DSU awards held by each of our non-employee directors as of September 29, 2013.

| Name | Number of Outstanding Options (#) | Number of Outstanding RSUs/DSUs (#) (1) |
|---|---|---|
| Barbara T. Alexander | 40,000 | 12,722 |
| Donald G. Cruickshank | 10,000 | 21,844 |
| Raymond V. Dittamore | 20,000 | 20,583 |
| Susan Hockfield | - | 5,143 |
| Thomas W. Horton | 2,500 | 9,975 |
| Sherry Lansing | 7,334 | 9,975 |
| Duane A. Nelles | - | 9,975 |
| Clark T. Randt, Jr. | - | - |
| Francisco Ros | - | 9,975 |
| Jonathan J. Rubinstein | - | 2,374 |
| Brent Scowcroft | 18,000 | 9,975 |
| Marc I. Stern | 20,000 | 15,469 |

(1) The information in this column includes dividend equivalent rights and amounts deferred under the director compensation program. See the narrative above under "Director Compensation" for detailed information on RSUs and DSUs granted to our non-employee directors.

## ALL OTHER COMPENSATION

*Perquisites and Other Personal Benefits.* Perquisites and personal benefits for a director are excluded if the total value of all of his or her perquisites and personal benefits is less than $10,000. If the total value of all perquisites and personal benefits for a director is $10,000 or more, then each perquisite or personal benefit, regardless of its amount, is identified by type. Each perquisite or personal benefit that exceeds the greater of $25,000 or 10% of the total amount of perquisites and personal benefits for that director is identified and quantified. We offer a new cellular phone to each director each year as a personal benefit, and these amounts are included as perquisites if required to be disclosed as provided above. All of the above apply to Directors Emeriti as well.

*Charitable gifts matching program.* We will match 100%, up to $50,000 annually, of a director's or Director Emeritus's contribution to a qualified, eligible IRS recognized non-profit organization.



Bloomberg Law® © 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Table of Contents

# FISCAL 2013 DIRECTOR ALL OTHER COMPENSATION

| Name and Principal Position | Perquisites and Other Personal Benefits ($) | Charitable Matching Grant ($) (3) | Other ($) | All Other Compensation Total ($) |
|---|---|---|---|---|
| Barbara T. Alexander | - | 50,000 | - | 50,000 |
| Stephen M. Bennett (1) | - | 2,000 | - | 2,000 |
| Donald G. Cruickshank | - | 50,000 | - | 50,000 |
| Raymond V. Dittamore | - | 10,000 | - | 10,000 |
| Susan Hockfield | - | 12,150 | - | 12,150 |
| Thomas W. Horton | - | 50,000 | - | 50,000 |
| Robert E. Kahn (1) | - | 50,000 | - | 50,000 |
| Sherry Lansing | - | 50,000 | - | 50,000 |
| Duane A. Nelles | - | 50,000 | - | 50,000 |
| Clark T. Randt, Jr. (2) | - | - | - | - |
| Francisco Ros | - | 5,000 | - | 5,000 |
| Jonathan J. Rubinstein | - | 50,000 | - | 50,000 |
| Brent Scowcroft | - | 50,000 | - | 50,000 |
| Marc I. Stern | - | 50,000 | - | 50,000 |

(1) Mr. Bennett and Dr. Kahn concluded their service as members of the Board at our 2013 annual meeting of stockholders on March 5, 2013.

(2) Mr. Randt joined the Board on October 6, 2013, and therefore did not receive any compensation in fiscal 2013.

(3) Amounts include matching contributions we made in fiscal 2014 for contributions made by the director in fiscal 2013 as follows: $200 for Dr. Hockfield.



Bloomberg Law®
© 2015 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

# PX 281

DEF 14A 1 proxy2015.htm DEF 14A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**SCHEDULE 14A INFORMATION**

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**(AMENDMENT NO.__)**

Filed by the Registrant [X]

Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ] Preliminary Proxy Statement
[ ] Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
[X] Definitive Proxy Statement
[ ] Definitive Additional Materials
[ ] Soliciting Material Pursuant to Section 240.14a-12

**QUALCOMM INCORPORATED**

**(Name of Registrant as Specified In Its Charter)**
**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.
[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:
(2) Aggregate number of securities to which transaction applies:
(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
(4) Proposed maximum aggregate value of transaction:
(5) Total fee paid:
[ ] Fee paid previously with preliminary materials.
[ ] Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
(1) Amount Previously Paid:
(2) Form, Schedule or Registration Statement No.:
(3) Filing Party:
(4) Date Filed:

PX281

Page 5755

QUALCOMM®

January 22, 2015

Dear Fellow Stockholder:

You are cordially invited to attend Qualcomm's 2015 Annual Meeting of Stockholders (the Annual Meeting) on **Monday, March 9, 2015**. The meeting will begin promptly at **2:00 p.m. Pacific Time** at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121**. I invite you to arrive early at 1:00 p.m. to preview our product displays. We will begin the Annual Meeting with a discussion and vote on the matters set forth in the Notice of Annual Meeting of Stockholders, followed by presentations and a report on Qualcomm's fiscal 2014 performance.

This year, we are again furnishing the proxy materials to stockholders primarily over the Internet. Therefore, most stockholders will not receive paper copies of our proxy materials. We will instead send these stockholders a notice with instructions for accessing the proxy materials and voting via the Internet. The notice also provides information on how stockholders may obtain paper copies of our proxy materials if they so choose. This method expedites the receipt of your proxy materials, lowers the costs of our annual meeting and helps to conserve natural resources.

Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. As an alternative to voting in person at the Annual Meeting, you may vote via the Internet, by telephone, or if you receive a paper proxy card in the mail, by mailing the completed proxy card. Voting by any of these methods will ensure your representation at the Annual Meeting.

**Your vote is very important to us. I urge you to vote as we recommend.**

I look forward to seeing you in San Diego at the **Irwin M. Jacobs Qualcomm Hall** on **Monday, March 9, 2015**.

Sincerely,

Steven M. Mollenkopf
*Chief Executive Officer*

---

PX281
Page 5756

QUALCOMM

**5775 Morehouse Drive**
**San Diego, California 92121-1714**

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

### To Be Held On March 9, 2015

**To the Stockholders of QUALCOMM Incorporated:**

NOTICE IS HEREBY GIVEN that the 2015 Annual Meeting of Stockholders (Annual Meeting) of QUALCOMM Incorporated, a Delaware corporation (the Company), will be held at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121**, on **Monday, March 9, 2015 at 2:00 p.m. Pacific Time** for the following purposes:

1. To elect 15 directors to hold office until the next annual meeting of stockholders and until their respective successors have been elected and qualified.
2. To ratify the selection of PricewaterhouseCoopers LLP as our independent public accountants for our fiscal year ending September 27, 2015.
3. To approve an amendment to the 2001 Employee Stock Purchase Plan to increase the share reserve by 25,000,000 shares.
4. To hold an advisory vote to approve our executive compensation.
5. To transact such other business as may properly come before stockholders at the Annual Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on January 12, 2015 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and at any adjournment or postponement thereof.

By Order of the Board of Directors,

Donald J. Rosenberg
*Executive Vice President,*
*General Counsel and Corporate Secretary*

San Diego, California
January 22, 2015

PX281

## TABLE OF CONTENTS


| | |
|---|---|
| LETTER TO STOCKHOLDERS | |
| NOTICE OF ANNUAL MEETING OF STOCKHOLDERS | |
| PROXY STATEMENT TABLE OF CONTENTS | i |
| PROXY SUMMARY | 1 |
| 2015 Annual Meeting of Stockholders | 1 |
| Voting Matters and Board Recommendations | 1 |
| Director Nominees | 2 |
| Executive Compensation Highlights | 3 |
| PROXY STATEMENT | 9 |
| Meeting Information | 9 |
| Voting Rights and Outstanding Shares | 9 |
| Notice of Internet Availability of Proxy Materials | 9 |
| Voting Methods | 9 |
| How Your Shares Will Be Voted | 10 |
| Broker Non-Votes | 10 |
| Revocability of Proxies | 10 |
| Proxy Solicitation | 11 |
| Stockholder Proposals | 11 |
| Householding | 11 |
| Financial Information | 12 |
| Performance Measurement Comparison of Stockholder Return | 12 |
| Corporate Directory | 12 |
| CORPORATE GOVERNANCE | 12 |
| Code of Ethics and Corporate Governance Principles and Practices | 12 |
| Board Leadership Structure | 12 |
| Board Meetings, Committees and Attendance | 13 |
| Board's Role in Risk Oversight | 15 |
| Director Nominations | 15 |
| Majority Voting | 16 |
| Stock Ownership Guidelines | 17 |
| Communications with Directors | 17 |
| Annual Meeting Attendance | 17 |
| Director Independence | 17 |
| PROPOSAL 1: ELECTION OF DIRECTORS | 18 |
| Election of Directors | 18 |
| Nominees for Election | 18 |
| Required Vote and Board Recommendation | 26 |
| PROPOSAL 2: RATIFICATION OF SELECTION OF INDEPENDENT PUBLIC ACCOUNTANTS | 27 |
| Fees for Professional Services | 27 |
| Policy on Audit Committee Pre-Approval of Audit and Non-Audit Services of Independent Public Accountants | 27 |
| Representation from PricewaterhouseCoopers LLP at the Annual Meeting | 28 |


PX281

Required Vote and Board Recommendation 28

PROPOSAL 3: APPROVAL OF AMENDMENT TO THE 2001 EMPLOYEE STOCK PURCHASE PLAN TO INCREASE THE SHARE RESERVE BY 25,000,000 SHARES 29

| | |
|---|---|
| Summary of the ESPP | 29 |
| Plan Benefits Table | 32 |
| Required Vote and Board Recommendation | 32 |
| PROPOSAL 4: ADVISORY VOTE FOR APPROVAL OF OUR EXECUTIVE COMPENSATION | 33 |
| Special Compensation Actions in Response to Unique Challenges | 33 |
| Compensation Program Best Practices | 33 |
| Effect of this Resolution | 34 |
| Board Recommendation | 34 |
| STOCK OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 35 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 37 |
| Compensation Committee Interlocks and Insider Participation in Compensation Decisions | 37 |
| Equity Compensation Plan Information | 37 |
| CERTAIN RELATIONSHIPS AND RELATED-PERSON TRANSACTIONS | 38 |
| COMPENSATION COMMITTEE REPORT | 39 |
| EXECUTIVE COMPENSATION AND RELATED INFORMATION | 40 |
| COMPENSATION DISCUSSION AND ANALYSIS | 40 |
| Our Named Executive Officers for Fiscal 2014 | 40 |
| Unique Challenges in Fiscal 2014 and Special Compensation Actions | 40 |
| Our Total Compensation Program | 42 |
| The Objectives of Our Compensation Program | 47 |
| How the Key Components of Our Compensation Program Align With These Objectives | 49 |
| How We Determine the Amount of Compensation for Each NEO | 49 |
| The Amounts of Compensation Our NEOs Received for Fiscal 2014 | 52 |
| Compensation Decisions for the NEOs for Fiscal 2015 | 55 |
| Compensation Program Best Practices | 55 |
| COMPENSATION RISK MANAGEMENT | 57 |
| COMPENSATION TABLES AND NARRATIVE DISCLOSURES | 59 |
| Summary Compensation Table | 59 |
| All Other Compensation | 60 |
| Grants of Plan-Based Awards | 62 |
| Outstanding Equity Awards at Fiscal Year End | 63 |
| Option Exercises and Stock Awards Vested During Fiscal 2014 | 67 |
| Nonqualified Deferred Compensation | 68 |
| Potential Post-Employment Payments | 69 |
| DIRECTOR COMPENSATION | 74 |
| AUDIT COMMITTEE REPORT | 77 |
| OTHER MATTERS | 78 |
| APPENDIX 1: Financial Information | A-1 |
| APPENDIX 2: Performance Measurement Comparison of Stockholder Return | B-1 |

PX281

Page 5760

# EXECUTIVE COMPENSATION AND RELATED INFORMATION

# COMPENSATION DISCUSSION AND ANALYSIS

## OUR NAMED EXECUTIVE OFFICERS FOR FISCAL 2014

Our Named Executive Officers, or "NEOs," for fiscal 2014 were as follows:

| | | | |
|---|---|---|---|
|  | Mr. Steven M. Mollenkopf, Chief Executive Officer (CEO), has 20 years of service with Qualcomm and has been CEO since March 2014. |  | Mr. George S. Davis, Executive Vice President and Chief Financial Officer (CFO), has 2 years of service with Qualcomm. |
|  | Dr. Paul E. Jacobs, Executive Chairman, has 24 years of service with Qualcomm and has been Executive Chairman since March 2014. He served as CEO from July 2005 to March 2014. Dr. Jacobs has also been Chairman of the Board since March 2009. |  | Mr. Cristiano R. Amon, Executive Vice President, Qualcomm Technologies, Inc. & Co-President, QCT, has 17 years of service with Qualcomm and has been Co-President, QCT since October 2012. |
|  | Mr. Derek K. Aberle, President, has 14 years of service with Qualcomm and has been President since March 2014. |  | Dr. Venkata S. M. Renduchintala, Executive Vice President, Qualcomm Technologies, Inc. & Co-President, QCT, has 10 years of service with Qualcomm and has been Co-President, QCT since October 2012. |

## UNIQUE CHALLENGES IN FISCAL 2014 AND SPECIAL COMPENSATION ACTIONS

In early fiscal 2014, the Board appointed Mr. Mollenkopf to the position of Chief Executive Officer-elect, and he commenced his service as Chief Executive Officer (CEO) immediately following the 2014 annual meeting of stockholders on March 4, 2014. At the same time, Dr. Jacobs stepped down as CEO and assumed the role of Executive Chairman, remaining an employee of the Company and continuing to serve as Chairman of the Board of Directors. On March 10, 2014, Mr. Aberle was appointed President. The Board is pleased to have the talents of these three world-class executives who have worked together building Qualcomm for nearly 14 years and who will continue to grow the Company.

Qualcomm is an established leader in mobile communications. The Company's competitors are implementing mobile strategies and investing significantly in the mobile communications industry. These efforts include attempts to recruit members of Qualcomm management who are essential to the Company's long-term success. Based on their aggressive recruiting efforts, companies with interests in the mobile communications industry appear to view Qualcomm's senior management team as an attractive source of talent. As a result, Qualcomm lost several senior level employees to other companies. Accordingly, the Compensation Committee, at the Board's request, initiated strategies, consistent with our overall compensation philosophy, to meet these challenges by taking aggressive retention-related compensation actions for key talent.

The Compensation Committee, in consultation with its independent compensation consultants, initially considered utilizing employment contracts for retention purposes. However, the Compensation Committee ultimately affirmed our long-standing practice of employing all U.S.-based employees, including all our NEOs, "at will," without severance agreements or employment contracts. Instead, the Compensation Committee strongly favored equity-based compensation to achieve its objectives to incentivize and retain the management team while aligning the compensation with stockholders' interests. The Compensation Committee's retention actions included:

- Maintaining annualized total compensation targets for the NEOs while changing the timing of certain of their equity compensation in a way that increases retention without paying above our annualized total compensation targets (by using front-loaded restricted stock units), and

- In some cases, further strengthening retention with additional, special equity awards that were determined after considering the competitive practices and the value of sign-on awards offered by potential competitors for executive talent.

**Front-Loaded Restricted Stock Units (RSUs)**. Under the retention strategy, the annual equity compensation targets for each NEO remained the same, only the timing of the anticipated grants was accelerated, and the vesting schedules were restructured to provide for annual vesting over five years rather than the typical three years. The single grant represents the value of the annual RSUs that the Compensation Committee anticipated it would have granted to each NEO over the next three or five years. The three and five year amounts were determined by considering the need to provide meaningful amounts that would also increase potential competitors' costs to recruit while maintaining a near-term retention focus. The Compensation Committee anticipates that it will again grant RSUs to the NEOs in either three or five years, depending on the time period the front-loaded RSUs were intended to cover for each individual. This approach strengthens the incentives for the NEOs to remain at Qualcomm by increasing the amount of equity that would be forfeited if an NEO was to depart, without increasing the value of compensation paid by the Company over this timeframe. Any unvested RSUs will be forfeited if an NEO voluntarily leaves Qualcomm.

- Messrs. Mollenkopf and Aberle received front-loaded RSUs with grant date fair values of $30 million and $16.1 million, respectively. These values reflect five years of annual RSU awards and vest in five equal annual installments beginning on the first anniversary of the grant date, contingent upon continued employment with the Company. These grants represent annual values of $6 million for Mr. Mollenkopf and $3.2 million for Mr. Aberle. They will be eligible to receive RSUs again in fiscal 2019.

- Dr. Renduchintala and Messrs. Davis and Amon received front-loaded RSUs with grant date fair values of $6.9 million for Dr. Renduchintala and Mr. Davis and $4.1 million for Mr. Amon. These values reflect three years of annual RSU awards and vest in five equal annual installments beginning on the first anniversary of the grant date, contingent upon continued employment with the Company. These grants represent annual values of $2.3 million for Dr. Renduchintala and Mr. Davis and $1.4 million for Mr. Amon. They will be eligible to receive RSUs again in fiscal 2017.

**Additional, special RSUs.** These RSUs delay the vesting two years longer than our historical practice of annual vesting over three years. These RSUs are intended to further strengthen retention incentives, alignment with stockholders' interests and the potential cost for a competitor to recruit key executives who possess unique and critical skills. As with the front-loaded RSUs, unvested special RSUs will be forfeited if an NEO voluntarily leaves Qualcomm.

PX281

- Messrs. Mollenkopf and Aberle received special RSUs with grant date fair values of $20 million and $10.5 million,

respectively, and Dr. Renduchintala and Mr. Amon each received special RSUs with a grant date fair value of $3

million. The RSUs vest in equal installments on the third, fourth and fifth anniversaries of the grant dates, contingent upon continued employment with the Company.

**Compensation arrangement for Dr. Jacobs, Executive Chairman.** Dr. Jacobs's new compensation arrangement is equity-based with an annual salary of $1 and no annual cash incentive opportunity. The $45 million grant date fair value of his front-loaded RSUs considers his new role and new compensation structure. The Compensation Committee does not anticipate providing Dr. Jacobs with additional RSUs for the next five years. This grant represents an annual value of $9 million when spread over the five-year service period. The RSU award vests in equal installments on the third, fourth and fifth anniversaries of the grant date, contingent upon continued employment with the Company. Dr. Jacobs will forfeit any unvested RSUs if he leaves Qualcomm voluntarily, creating strong incentive for him to remain with Qualcomm. Dr. Jacobs must hold the net shares remaining after required taxes are paid upon vesting (net after-tax shares) from this RSU award until at least one year following his retirement or earlier separation of service from Qualcomm. The award provides for prorated vesting for the number of full years worked from the grant date should he terminate for "good reason" or should the Company terminate him without cause because in those cases he will be deemed to have earned a portion of the front-loaded RSUs.

**Alignment with stockholders' interests.** At the times the Compensation Committee approved these compensation arrangements, it affirmed its intent to continue to grant annual performance stock units (PSUs) to the NEOs. PSUs allow the recipient to earn a variable number of shares of our common stock based on the relative performance of our total shareholder return (TSR) compared to that of the NASDAQ-100. The total amount of shares may not exceed the target amount if our TSR for the entire performance period is negative. In determining the annual PSU award amounts, the Compensation Committee may consider anticipated absolute and relative financial performance, absolute and relative TSR, anticipated year-over-year growth for fiscal 2015, results of the stockholders' "Say on Pay" vote and investor feedback.

Except for the RSUs awarded to Mr. Mollenkopf, the front-loaded RSUs include a requirement that the Company must meet an adjusted GAAP operating income objective in order for them to vest, which is intended to qualify the RSUs for tax deductibility under Section 162(m) of the Internal Revenue Code (Section 162(m)). The RSU awards granted to Mr. Mollenkopf did not include such an objective because the Compensation Committee wanted the award to Mr. Mollenkopf to be absolute and unconditional and to compare favorably to potential competitive offers.

## OUR TOTAL COMPENSATION PROGRAM

Figure 7 depicts the key components of our compensation program.

*Figure 7: Graphic Representation of Our Compensation Program*




PX281

Page 5764

**Salary.** In setting base salary, the Compensation Committee considers competitive practices, internal comparisons and individual performance. Salary amounts reflect each NEO's level of responsibility, expertise, skills, knowledge and experience. Generally, base salary amounts are effective at the beginning of the fiscal year. The Compensation Committee may adjust base salary amounts during the fiscal year, as it did during fiscal 2014, to reflect changes in roles and responsibilities.

**Annual Cash Incentive Plan (ACIP).** Cash incentives are based on the Company's achievement of the ACIP financial performance metrics, the Compensation Committee's consideration of other strategic and operational achievements and its exercise of negative discretion to pay amounts that are less than the maximum amounts it established for Section 162(m) purposes. To maximize tax deductibility, amounts earned under the ACIP are designed to qualify as performance-based compensation under Section 162(m).

Figure 8 illustrates the calculation of the performance-adjusted ACIP amount that is the foundation upon which the Compensation Committee determined the fiscal 2014 ACIP earned amounts for each NEO.

*Figure 8: Process for Determining ACIP Amounts (1)*




(1) Sums may not equal totals due to rounding.

During the first quarter of fiscal 2014, the Compensation Committee, after consultation with the CEO and review by the Board of Directors, established Non-GAAP revenues and Non-GAAP operating income objectives for the fiscal 2014 ACIP. Figure 9 illustrates the following:

- The growth in our Non-GAAP financial objectives compared to the prior fiscal year results. The fiscal 2014 objectives reflected 8% and 13% growth over fiscal 2013 Non-GAAP revenues and Non-GAAP operating income, respectively. These growth objectives approximate the 75th percentile of our peer companies' financial performance results for the last 4-quarter performance (as of June 30, 2014). We believe that this demonstrates the Compensation Committee's desire to set financial performance objectives that reflect robust performance. The most directly comparable GAAP financial measures and information reconciling these Non-GAAP financial measures to our financial results prepared in accordance with GAAP are included in Appendix 4.

- The alignment of the Incentive Multiple with overall weighted financial performance. The Incentive Multiple is calculated based on the weighted financial performance and is applied to the target ACIP amount to determine the performance-adjusted ACIP amount for individual awards.-

*Figure 9: Non-GAAP Revenues and Operating Income Targets and Actual Financial Performance*




| | Fiscal 2012 | Fiscal 2013 | Fiscal 2014 |
|---|---|---|---|
| Non-GAAP Revenues Objective | 18.57 | 23.59 | 26.73 |
| Non-GAAP Revenues Performance | 19.12 | 24.87 | 26.49 |
| Non-GAAP Op Income Objective | 6.97 | 8.41 | 9.81 |
| Non-GAAP Op Income Performance | 7.10 | 8.66 | 8.93 |
| Incentive Multiple | 1.17 | 1.16 | 0.71 |

Consistent with past practice, we applied a relative weighting of 40% to Non-GAAP revenues and 60% to Non-GAAP operating income to emphasize the relative importance of operating income to stockholder value creation. We use Non-GAAP financial objectives because they: (1) are the key metrics we use to manage the business; (2) focus the executive team on the performance and efficiency of our core businesses, including our QCT and QTL segments; (3) provide a direct link between decisions and outcomes; and (4) are key factors that influence stockholder value.

These Non-GAAP objectives exclude the Qualcomm Strategic Initiatives (QSI) segment and certain share-based compensation, acquisition-related items and tax items because we view such items as unrelated to the operating activities and performance of our core businesses, which is consistent with the focus of the ACIP.

**Performance Stock Units (PSUs).** PSUs allow the recipient to earn a variable number of shares of our common stock based on the relative performance of our total shareholder return (TSR) compared to that of the NASDAQ-100. Eligible participants must also satisfy time-based service requirements. The PSUs are designed to qualify as performance-based compensation under Section 162(m). At its sole discretion, the Compensation Committee determines the mix of equity awards, the target value of PSUs, the achievement of the performance measures and the potential maximum number of PSUs that may be earned.

The number of shares earned through our PSU program is based on both relative and absolute TSR. Relative TSR compares our TSR percentile rank among the companies comprising the NASDAQ-100 within a three-year period. If our TSR is at the 60th percentile, the program would award 100% of the target PSUs, and if our TSR is at the 90th percentile, the program

PX281

would award 200% of the target PSUs. Below the 33rd percentile, no PSUs would be earned. The percent of the PSU target award amount earned between award levels interpolates linearly with our TSR percentile ranking. If our absolute TSR for the entire three-year performance period is negative, the total number of shares earned may not exceed the target number of shares. We continue to use the NASDAQ-100 as the basis of comparison because it: (1) represents a broader capital market with which we compete for talent; (2) represents the broad range of our business operations, which include licensing of intellectual property and sales of products and services; and (3) is both objectively determined and readily available, and our performance compared to the index can be evaluated by a third party.

Below we provide a summary of the key design features of our PSU programs, the payout multiples for the completed fiscal 2012 - 2014 program and for each NEO except Mr. Davis, Mr. Amon and Dr. Renduchintala, the number and values of shares earned for the fiscal 2012 - 2014 program. Mr. Davis joined Qualcomm in March 2013, and Mr. Amon and Dr. Renduchintala were not executive officers at the time the fiscal 2012 - 2014 program PSUs were awarded, and thus they did not participate in the fiscal 2012 - 2014 program. Figure 10 provides an overview of the key design features of the fiscal 2012 - 2014, fiscal 2014 - 2015 and fiscal 2015 - 2017 PSU programs.

Key features of the fiscal 2015 - 2017 PSU program include:

- Our TSR for the performance period must be positive to earn more than the target award amount. The total award amount earned may not exceed the target amount if our TSR for the performance period is negative. This feature limits compensation for positive relative performance against the peer group when stockholders may incur a loss on their investment over the period (as may occur in a volatile or depressed securities market).

- The performance period has four separate measurement periods of 18, 24, 30 and 36 months. All measurement periods begin on September 29, 2014 (the first day of fiscal 2015). Measurement Period 1 concludes on March 27, 2016; Measurement Period 2 concludes on September 25, 2016; Measurement Period 3 concludes on March 26, 2017; and Measurement Period 4 concludes on September 24, 2017 (the last day of fiscal 2017). Separate measurement periods help to average volatility, encourage and reward sustained and continuous growth throughout the performance period and align our NEOs' interests with our stockholders' interests.

- The PSUs will not vest until 10 days after the end of the performance period and until the Compensation Committee has certified the performance results. The PSUs include dividend equivalent rights, which accrue, in the form of additional shares of common stock, on earned shares with vesting and distribution consistent with the vesting and distribution of the underlying shares. No dividends are paid on unvested and unearned PSUs.

*Figure 10: Overview of PSU Programs Key Design Features*

| | Fiscal 2012 - 2014 Program | Fiscal 2014 - 2015 Program | Fiscal 2015 - 2017 Program |
|---|---|---|---|
| Status as of 9/28/14 | Completed | Awards approved by Compensation Committee. No completed measurement periods. | Awards approved by Compensation Committee. No completed measurement periods. |
| Performance Period | Fiscal 2012 - 2014 (9/26/2011 - 9/26/2014) | Fiscal 2014 - 2015 (9/30/2013 - 9/27/2015) | Fiscal 2015 - 2017 (9/29/2014 - 9/24/2017) |
| Interim Measurement Periods End Dates | 3/29/2013<br>9/27/2013<br>3/28/2014<br>9/26/2014 | 3/29/2015<br>9/27/2015 | 3/27/2016<br>9/25/2016<br>3/26/2017<br>9/24/2017 |
| Maximum Award | 200% of target award if relative TSR is 133% or more of the NASDAQ-100 | 200% of target award if relative TSR is at or above the 90th percentile among the NASDAQ-100 | |
| Target Award | 100% of target award if relative TSR is 100% of the NASDAQ-100 | 100% of target award if relative TSR is at the 60th percentile among the NASDAQ-100 | |
| Threshold Award | 33% of target award if relative TSR is 66% of the NASDAQ-100 | 33% of target award if relative TSR is at the 33rd percentile among the NASDAQ-100 | |
| Minimum Award | 0% of target award if relative TSR is less than 66% of the NASDAQ-100 | 0% of target award if relative TSR is below the 33rd percentile among the NASDAQ-100 | |
| Absolute TSR Provision | If our TSR for the Performance Period is negative, the total award may not exceed the target amount so that high relative performance is not over-rewarded in a down market. | | |
| Dividend Equivalents | Provides dividend equivalent rights that accrue, in the form of additional shares of our common stock, on earned PSUs (but not on unearned PSUs) and that vest at the same time as the underlying earned PSUs. | | |

The fiscal 2012 - 2014 and fiscal 2015 - 2017 PSU programs included four measurement periods of 18, 24, 30 and 36 months, and the fiscal 2014 - 2015 PSU program included two measurement periods of 18 and 24 months. For the fiscal 2012 - 2014 and 2015 - 2017 PSU programs, we allocated 25% of the target PSU award to each measurement period, and for the fiscal 2014 - 2015 program, we allocated 50% of the target PSU award to each measurement period. For the fiscal 2014 - 2015 program, the Compensation Committee changed the timing of granting PSUs from the first quarter to the fourth quarter of the fiscal year, which resulted in a 22-month period (rather than the historical 12-month period) between PSU grants (from November 2011 to September 2013) for our NEOs. Accordingly, the Compensation Committee reduced the PSU period from the 36-month period established in prior PSU programs to a 24-month period to align the vest date with what would have been the vest date had the PSUs been granted under the former schedule. For the fiscal 2015 - 2017 program, we resumed the 36-month performance period. Our TSR is compared to that of the NASDAQ-100 at the end of each measurement period, and an award is determined according to the relevant payout schedule. The number of shares of our common stock earned for a completed measurement period could be adjusted if our absolute TSR for the entire performance period is negative. The number of shares of our common stock to be distributed to each participant at the end of the multi-year performance period is the sum of the shares earned for each measurement period and may include dividend equivalents as described above.

The fiscal 2012 - 2014 PSU program is 100% complete, and earned shares, including dividend equivalents on earned shares for the program, are vested and settled. The percentages of target awards earned for each completed measurement period for the fiscal 2012 - 2014 program are presented in Figure 11, and the PSU award amounts, including the number and values of shares earned as of the end of fiscal 2014, are presented in Figure 12. No measurement periods have been completed for the fiscal 2014 - 2015 and 2015 - 2017 programs.



PX281

*Figure 11: Summary of Percent of Target Award Earned for Completed Measurement Periods*

| PSU Measurement Period Results | | | | | |
|---|---|---|---|---|---|
| | Percent of Target Award Earned | | | | |
| Fiscal Years Program | 1st Measurement Period | 2nd Measurement Period | 3rd Measurement Period | 4th Measurement Period | Overall |
| 2015 - 2017 | not yet completed | not yet completed | not yet completed | not yet completed | not yet completed |
| 2014 - 2015 | not yet completed | not yet completed | n/a | n/a | not yet completed |
| 2012 - 2014 | 112.0% | 90.0% | 84.0% | 66% | 88% |

*Figure 12: Summary of PSU Awards and Earned Shares for the Fiscal 2012 -2014 Program (1)*

| Name | Fiscal Year of Grant | Target Shares Granted (#) | Grant Date Fair Value of Target Shares ($) | Shares Earned for the fiscal 2012 - 2014 Program (#) | Value of Shares Earned at Fiscal 2014 Year End ($) |
|---|---|---|---|---|---|
| Steven M. Mollenkopf | 2012 | 58,577 | 3,779,974 | 51,549 | 3,869,268 |
| | 2012 (2) | 41,841 | 2,700,000 | 36,822 | 2,763,859 |
| Paul E. Jacobs | 2012 | 125,523 | 8,099,999 | 110,462 | 8,291,278 |
| Derek K. Aberle | 2012 | 41,841 | 2,700,000 | 36,822 | 2,763,859 |
| | 2012 (2) | 33,473 | 2,160,013 | 29,459 | 2,211,193 |

(1) Excludes Mr. Davis because he joined Qualcomm in fiscal 2013 and Dr. Renduchintala and Mr. Amon because they were not executive officers at the time the fiscal 2012 - 2014 program PSUs were awarded.

(2) In fiscal 2012, the Compensation Committee granted to Messrs. Mollenkopf and Aberle annual PSUs and additional, special PSUs to recognize their promotions to President & Chief Operating Officer and Executive Vice President & Group President, respectively. These additional, special PSUs vest on the third, fourth and fifth anniversaries of the grant dates, whereas the annual PSUs cliff vest upon completion of the 3-year performance period.

**Restricted Stock Units (RSUs).** A fixed number of shares of common stock may be earned subject to eligible participants satisfying time-based service requirements and, for some awards, performance conditions. At its sole discretion, the Compensation Committee determines the mix of equity awards, the value of RSU awards granted each year and any provisions to qualify for tax deductibility under Section 162(m).

**All Other Compensation.** These programs include tax-deferred retirement savings, financial planning services, insurance and personal use of a corporate jet, among others. The Compensation Committee is responsible for the design of all compensation and benefit plans.

## THE OBJECTIVES OF OUR COMPENSATION PROGRAM

Our compensation program is designed to attract, retain, motivate and engage highly talented and experienced executives by focusing on the following six objectives:

## Align the interests of our NEOs and long-term stockholders

The majority of compensation we deliver to our NEOs is in the form of long-term equity awards. Ultimately, the value that each NEO may realize at the time equity awards vest increases with the appreciation in our stock price, thus motivating our NEOs to build stockholder value.

## Variable compensation from year to year based on the Company's performance ("pay for performance")

Our NEOs' ACIP earnings vary with our financial performance compared to our annual financial goals. The amount of compensation delivered with RSUs varies with the price of our common stock. The amount of compensation delivered with PSUs varies with our TSR relative to the NASDAQ-100 and includes threshold, target and maximum amounts.

## Competitively reasonable and appropriate compensation for our business needs and circumstances

The Compensation Committee considers competitive compensation practices of other companies as reference points for comparative purposes. The Compensation Committee does not target specific benchmark percentiles.

## Internally fair and equitable compensation relative to roles, responsibilities and work relationships

The Compensation Committee considers certain business and individual performance factors to evaluate internal fairness and equitibility and monitors the internal compensation relationships among the NEOs, but it does not attempt to establish specific internal relationships.

## Reflect high standards for corporate governance and compensation-related risk management

Our compensation programs are subject to a thorough evaluation process that includes Compensation Committee review and approval of program design and practices as well as advice from an independent compensation consultant engaged by the Compensation Committee. We have many practices that promote sound leadership, decision-making and actions among our executives that are consistent with our values of innovation, execution and partnership without taking inappropriate or unnecessary risks.

## Tax efficiency for the Company

Our compensation program is designed with the intent of complying with the requirements of Sections 162(m), except where noted, and 409A of the Internal Revenue Code.

**Section 162(m).** Section 162(m) places a $1 million annual limit on the amount that a public company may deduct for compensation paid to the NEOs, excluding the CFO. The $1 million limit does not apply if the compensation meets Section 162(m) requirements for performance-based compensation. Compliance with Section 162(m) did not influence the allocation of compensation among base salary, target annual cash incentives and long-term incentives for fiscal 2014. From time to time, we may pay compensation to our Section 162(m) covered officers that may not be tax deductible if there are compelling business reasons to do so.

- We designed and administered our fiscal 2014 ACIP as cash-denominated performance units granted under the 2006 Long Term Incentive Plan (LTIP) to be eligible for tax deductions to the extent permitted by the relevant tax regulations, including Section 162(m).

- All shares distributed or to be distributed under the fiscal 2012 - 2014, fiscal 2014 - 2015 and fiscal 2015 -2017 PSU programs are structured to be performance-based compensation, and therefore qualify as deductible compensation under Section 162(m).

- Except for the grants to Mr. Mollenkopf, the RSUs granted to our executive officers in fiscal 2014 are structured to be performance-based compensation, and therefore qualify as deductible compensation under Section 162(m).

**Section 409A.** Under Section 409A, a nonqualified deferred compensation plan (such as our Qualcomm Non-Qualified Deferred Compensation (QNQDC) Plan) must comply with certain requirements related to the timing of deferral and distribution decisions. Otherwise, amounts deferred under the plan could be included in gross income when earned and be subject to additional penalty taxes. We administer the QNQDC Plan and equity awards in accordance with Section 409A requirements. Nonqualified stock options are generally exempt from Section 409A if the options satisfy certain requirements. PSUs and RSUs have been designed to be exempt from Section 409A.

## HOW THE KEY COMPONENTS OF OUR COMPENSATION PROGRAM ALIGN WITH THESE OBJECTIVES

The key components of our compensation program align with the objectives outlined above:

- The ACIP and equity awards align the interests of our NEOs with stockholders, provide compensation that varies from year to year based on Company and individual performance and are tax efficient for the Company. These programs provide a balance of annual and long-term performance focus using different performance metrics.

- Salary, ACIP earnings and equity awards provide reasonable and appropriate compensation that is internally fair and equitable in order to attract and retain experienced and successful executives.

- We believe all components of our compensation program are designed and administered to reflect high standards of corporate governance and compensation-related risk management.

## HOW WE DETERMINE THE AMOUNT OF COMPENSATION FOR EACH NEO

We consider several factors in determining the compensation levels of our executive officers, including: (1) competitive practices and retention considerations; (2) internal relationships and equitibility in light of business and individual performance factors; (3) the results of stockholder advisory votes on executive compensation and communications with stockholders; (4) the CEO's recommendations for the other NEOs; and (5) the perspectives provided by the Compensation Committee's independent compensation consultant.

The Compensation Committee does not have a predefined framework that determines which of these factors may be more or less important, and the emphasis placed on specific factors may vary among the NEOs. Ultimately, it is the Compensation Committee's judgment about these factors along with the other factors discussed in this section that forms the basis for determining our executive officers' compensation.

We discuss each of these factors in the following sections.

### We review the compensation practices of other companies with whom we compete.

The Compensation Committee identified the peer companies to use for competitive analyses, taking into account the recommendations made by the Compensation Committee's independent compensation consultant. The peer companies were identified based on the following characteristics:

- Principal business in technology, telecommunications and media (excluding those that are primarily content producers) based on the Global Industry Classification System (GICS);
- Generally comparable in both market capitalization and revenues using a guideline of one-quarter to four times our market capitalization and revenues;

We believe that market capitalization is appropriate as the primary quantitative criterion because:

- Market capitalization, a key component of which is stock price, is the key driver of equity compensation grant value, and equity compensation grant value is the single largest component of CEO compensation among technology companies with large market capitalization;

- ◦ Market capitalization is directly related to stockholder benefit; and
- ◦ A significant portion of our business is technology licensing, which is a high-margin business, and as such, Qualcomm typically has higher market capitalization and profit than companies with similar revenues.

We also include revenues as a secondary quantitative criterion because revenues are commonly used as a selection criterion by our peer companies, third-party compensation survey providers and proxy advisory services.

- Comparable compensation model; and
- Peers of peers (i.e., the peer companies disclosed by the companies we use as peers).

In May 2014, the Compensation Committee selected the following peer companies:

*Figure 13: Peer Companies*

| | | | |
|---|---|---|---|
| ADP | Amazon.com | Broadcom | Cisco |
| Comcast | DirecTV | eBay | EMC |
| Facebook (new) | Google | Honeywell | IBM (new) |
| Intel | Lockheed Martin | Microsoft | Oracle |
| Texas Instruments | Time Warner Cable | United Technologies | Yahoo! |

Compared to the prior year's peer group, Corning was removed because its market capitalization was below the threshold, and it is not considered a relevant labor-market competitor. Broadcom and Yahoo! had market capitalization values slightly below the threshold but were retained in the peer group for continuity and to maintain a sufficiently robust sample size. Facebook and IBM were added because they meet the selection criteria and are prominent technology companies and potential labor-market competitors.

Figure 14 sets forth Qualcomm's percentile rankings among the peer group and illustrates that our market capitalization is strongly supported by our net income and EBITDA margin, which in turn reinforces the prioritization of the peer selection criteria. Relative to our peer companies, we are below median for revenues and above median for the other metrics. Data reflected in Figure 14 represents the latest four quarters of data available on March 31, 2014 reported in Standard & Poor's Compustat reports as of March 31, 2014, the time at which Frederic W. Cook & Co., Inc. (FWC), our independent executive compensation consulting firm, prepared the peer company selection analysis used by the Compensation Committee.

*Figure 14: Qualcomm's Relative Rankings Among Peer Companies as of March 31, 2014*

| **Metric** | **Qualcomm's Percentile Ranking** | **Metric** | **Qualcomm's Percentile Ranking** |
|---|---|---|---|
| Revenues (latest available 4 quarters) | 38th percentile | EBITDA Margin (latest available 4 quarters) | 76th percentile |
| GAAP Net Income (latest available 4 quarters) | 68th percentile | Market Capitalization (3/31/14) | 69th percentile |
| EBITDA (latest available 4 quarters) | 60th percentile | Market Capitalization (12-month average from 4/30/13 - 3/31/14) | 62nd percentile |

FWC provides analyses of peer company competitive practices. The Compensation Committee considers these peer company competitive analyses, along with the other factors described in this section, when determining the base salaries, ACIP targets, long-term equity grant date fair values and the total direct compensation for the CEO, other NEOs and the other executive officers.

PX281

**We consider internal relationships and equitibility in light of business and individual performance factors.**

The Compensation Committee intends our compensation amounts to be internally fair and equitable relative to roles, responsibilities and relationships among our NEOs, in addition to being competitively reasonable and appropriate.

Accordingly, the Compensation Committee also considers the following factors in the process of determining compensation levels for each NEO: (1) the Compensation Committee's evaluation of the NEO; (2) individual performance and contributions to financial goals; (3) labor market conditions, the need to retain and motivate the NEOs and each NEO's potential to assume increased responsibilities and contribute long-term value to the Company; (4) management succession plans and bench strength; (5) operational management, such as project milestones and process improvements; (6) internal working and reporting relationships and our desire to encourage partnership and teamwork among our NEOs; (7) individual expertise, skills, knowledge and tenure in position; (8) leadership and compliance with our Code of Ethics and our Code of Business Conduct; and (9) leadership, including developing and motivating employees, collaborating within Qualcomm, attracting and retaining employees and personal development.

**We consider the results of stockholder advisory votes on executive compensation and communication with stockholders.**

The Compensation Committee considered the 95% "FOR" voting results of the non-binding advisory vote on executive compensation ("Say-on-Pay") at the 2014 annual meeting of stockholders on March 4, 2014 (relating to the fiscal year ended September 29, 2013) and determined that the modifications to the compensation program and practices implemented in fiscal 2013 had the intended outcomes and that the "Say-on-Pay" vote suggested that no further changes to our compensation programs and practices were appropriate at this time.

**We discuss with the CEO his recommendations for the other NEOs and other executive officers.**

The Compensation Committee and the CEO discuss (1) our business performance; (2) the CEO's performance; and (3) the CEO's evaluation of and compensation recommendations for the other NEOs and other executive officers. The Compensation Committee, without the CEO present, determines the base salaries, ACIP amounts and RSU and PSU awards for the CEO, other NEOs and other executive officers.

**We engage independent compensation consultants and other advisors to obtain advice and assistance.**

The Compensation Committee has the authority to engage and terminate any independent compensation consultant and to obtain advice and assistance from external legal, accounting and other advisors. During fiscal 2014, the Compensation Committee engaged an independent executive compensation consulting firm, FWC, to advise it on compensation matters. FWC reports directly to the Compensation Committee. We did not engage FWC for any additional services during fiscal 2014 beyond its support of the Compensation Committee, and the engagement did not raise any conflicts of interest. Pursuant to this engagement, FWC:

- Provided information, insights and advice regarding compensation philosophy, objectives and strategy;
- Recommended peer group selection criteria and identified and recommended potential peer companies;
- Provided analyses of competitive compensation practices for executive officers and non-employee directors;
- Provided analyses of potential risks arising from our executive and non-executive compensation programs;
- Provided analyses of aggregate equity compensation spending and related dilution;
- Reviewed and commented on recommendations regarding NEO compensation;

PX281

- Advised the Compensation Committee on specific issues as they arose, including retention strategies and compensation for our Executive Chairman and our new CEO; and

- Kept the Compensation Committee informed of executive compensation trends and regulatory and governance considerations related to executive compensation.

Representatives from FWC attended all Compensation Committee meetings during fiscal 2014 and interacted with the Committee Chair, members of our human resources staff and outside legal counsel prior to and following Compensation

Committee meetings. We incurred $435,000 in fees for FWC's services during fiscal 2014 (compared to $242,810 during fiscal 2013), all for work that was directly in support of the Compensation Committee and the Committee's execution of its responsibilities under its charter.

The Compensation Committee also sought and received advice from our outside legal counsel, DLA Piper LLP. Our human resources department supported the Compensation Committee in its work, collaborated with FWC and DLA Piper, conducted analyses and managed our compensation and benefit programs.

## THE AMOUNTS OF COMPENSATION OUR NEOs RECEIVED FOR FISCAL 2014

Members of the Compensation Committee, in their committee and Board of Director roles, regularly engage with our executive officers through various briefings and discussions, providing them opportunities to consider the leadership the CEO and the other NEOs contribute to the Company's annual and longer-term performance. In July 2014, the Compensation Committee conducted its regularly scheduled annual review of our peer companies' compensation practices, noting FWC's analysis that our executive officers' salaries and target total cash incentives are in a median range and that the annualized equity grants are generally positioned between the median and 75th percentile of our peer companies. Following this review, the CEO, in collaboration with the EVP of Human Resources, prepared recommendations for the fiscal 2014 ACIP earnings and PSU amounts and the fiscal 2015 base salary and ACIP targets. In September 2014, the Compensation Committee reviewed these recommendations and also considered the CEO's and the other NEOs' self-evaluations, which highlight key strategic and operational accomplishments and leadership actions that communicate, promote and support Qualcomm's ethical standards and compliance culture. The CEO also provided the Compensation Committee an oral assessment of his and the other NEOs' accomplishments and opportunities for improvement, including an assessment of each NEO's overall performance and potential for future roles. It is with these perspectives that the Compensation Committee, in executive session without the CEO present, considered the CEO's and the other NEOs' fiscal 2014 PSU award amounts (for the fiscal 2015 - 2017 performance period), any application of negative discretion for the fiscal 2014 ACIP earned amounts and any adjustments to base salaries and ACIP targets for fiscal 2015.

### Contribution of certain pay components to annualized total compensation for fiscal 2014

Figure 15 provides an overview of the contribution of certain pay components to each NEO's annualized total compensation (salary, ACIP earnings and annualized value of front-loaded RSUs and PSUs). In fiscal 2014, 83% of Mr. Mollenkopf's annualized total compensation was in the form of long-term compensation (the annualized grant date fair value of RSUs and the grant date fair value of PSUs), and 92% was variable (ACIP earnings, annualized grant date fair value of front-loaded RSUs and grant date fair value of PSUs). Of the other NEOs' annualized total compensation, an average of 81% was in the form of long-term compensation, and an average of 89% was variable.



PX281

*Figure 15: Contribution of Certain Pay Components to Annualized Total Compensation for Fiscal 2014 (1)*




(1) All other compensation was less than 3% of annualized total compensation for each NEO.

(2) The grant date fair values of front-loaded RSUs have been annualized, and the grant date fair values of special RSUs have been excluded.

## Fiscal 2014 salaries

In September 2013, the Compensation Committee approved the fiscal 2014 base salaries for our executive officers, including the base salaries for our NEOs, as follows: $865,000 for Mr. Mollenkopf; $1,250,000 for Dr. Jacobs; $725,000 for Mr. Davis; $750,000 for Mr. Aberle; $475,000 for Mr. Amon; and $650,000 for Dr. Renduchintala. At the time the Compensation Committee approved these amounts, the base salaries were in the median to 75th percentile of peer company competitive practices, except for Dr. Renduchintala, whose base salary was set above the 75th percentile as part of a strategy to strengthen retention. Effective December 12, 2013, in connection with Mr. Mollenkopf's appointment to the position of CEO-elect, the Compensation Committee increased his base salary to $1,100,000. Effective May 5, 2014, following Dr. Jacobs's appointment to the position of Executive Chairman, the Compensation Committee approved an all-equity compensation arrangement for him and reduced his base salary to $1. Effective March 10, 2014, in connection with Mr. Aberle's appointment to the position of President, the Compensation Committee increased his base salary to $780,000. Except for Dr. Jacobs, base salaries at the end of fiscal 2014 did not exceed the 75th percentile of peer company competitive practices. Dr. Jacobs's $1 base salary precludes meaningful comparison to competitive practices.

## Fiscal 2014 ACIP earnings

PX281

Figure 16 discloses the calculations for determining the fiscal 2014 performance-adjusted amounts and earned amounts for each NEO.

*Figure 16: Fiscal 2014 ACIP Target, Performance-Adjusted Amounts and Earned Amounts*

| Name | ACIP Target Award $ | X | Incentive Multiple | = | Performance-Adjusted Amount $ | Earned Amount Awarded by Compensation Committee $ | Variance of Earned Amount vs Performance-Adjusted Amount % |
|---|---|---|---|---|---|---|---|
| Steven M. Mollenkopf (1) | 2,200,000 | | 0.71 | | 1,562,000 | 1,550,000 | -1% |
| Paul E. Jacobs (2) | 1,862,981 | | 0.71 | | 1,322,717 | 1,300,000 | -2% |
| George S. Davis | 942,500 | | 0.71 | | 669,175 | 665,000 | -1% |
| Derek K. Aberle (3) | 1,018,500 | | 0.71 | | 723,135 | 720,000 | 0% |
| Cristiano R. Amon | 475,000 | | 0.71 | | 337,250 | 460,000 | 36% |
| Venkata S. M. Renduchintala | 650,000 | | 0.71 | | 461,500 | 460,000 | 0% |

(1) The target amount for Mr. Mollenkopf (200% of his base salary of $1,100,000) was approved by the Compensation Committee in December 2013.

(2) The target amount for Dr. Jacobs was approved by the Compensation Committee in May 2014 and is prorated to reflect his service as CEO with an ACIP target of $3,125,000 (250% of his base salary of $1,250,000) from September 30, 2013 through May 4, 2014 and $0 from May 5, 2014 through September 28, 2014.

(3) The target amount for Mr. Aberle was approved by the Compensation Committee in May 2014 and is prorated to reflect his service as President with ACIP targets of $975,000 (130% of his base salary of $750,000) from September 30, 2013 through May 4, 2014 and $1,053,000 (135% of his base salary of $780,000) from May 5, 2014 through September 28, 2014.

The Compensation Committee is authorized under the fiscal 2014 ACIP to adjust reported Non-GAAP revenues and Non-GAAP operating income for calculating financial performance on which fiscal 2014 cash incentives were determined. Adjustments are intended to eliminate the distorting effect of certain unusual income or expense items on year-over-year growth percentages if the Compensation Committee determines, in its discretion, that the items do not reflect a fair measurement of our operating performance. The Committee did not make any such adjustments for fiscal 2014. For both Mr. Amon and Dr. Renduchintala, the ACIP target is 100% of base salary, but their base salaries differ resulting in initial ACIP target amounts of $475,000 and $650,000, respectively. Because they serve as co-presidents of QCT, the Compensation Committee, at its discretion, adjusted Mr. Amon's ACIP award to align with that of Dr. Renduchintala.

## Fiscal 2014 equity awards

**RSU Awards.** See our discussion regarding special compensation actions that included front-loaded and special RSUs in the "Unique Challenges in Fiscal 2014 and Special Compensation Actions" section.

**PSU awards.** The Compensation Committee approved PSU awards it considered appropriate for annual equity compensation, taking into consideration the annualized value of the front-loaded RSUs awarded to the NEOs earlier in the fiscal year (see Figure 1) as well as anticipated absolute and relative financial performance, absolute and relative TSR and anticipated year-over-year growth from fiscal 2014 to fiscal 2015.

*Figure 17: Grant Date Fair Values of PSUs Awarded to NEOs*

| Name | Grant Date Fair Value of Annual PSUs |
|---|---|
| Steven M. Mollenkopf | 8,000,146 |
| Paul E. Jacobs | 9,000,164 |
| George S. Davis | 2,700,019 |
| Derek K. Aberle | 3,780,209 |
| Cristiano R. Amon | 3,620,169 |
| Venkata S. M. Renduchintala | 2,700,019 |

## COMPENSATION DECISIONS FOR THE NEOs FOR FISCAL 2015

In September 2014, the Compensation Committee approved the fiscal 2015 base salary and ACIP targets (as a percentage of base salary) for our executive officers as set forth in Figure 18. The base salary increases reflect the Compensation Committee's consideration of current competitive practices and its intent that base salaries and total target cash compensation should be competitive.

*Figure 18: Fiscal 2014 and 2015 Base Salary and ACIP Targets (1) (2)*

| Name | Base Salary | | ACIP Target % | | ACIP Target $ | | Target Total Cash | |
|---|---|---|---|---|---|---|---|---|
| | 2014 ($) | 2015 ($) | 2014 (%) | 2015 (%) | 2014 ($) | 2015 ($) | 2014 ($) | 2015 ($) |
| Steven M. Mollenkopf | 1,100,000 | 1,130,000 | 200% | 200% | 2,200,000 | 2,260,000 | 3,300,000 | 3,390,000 |
| Paul E. Jacobs | 1 | 1 | — | — | 1,862,981 | — | 2,832,965 | 1 |
| George S. Davis | 725,000 | 760,000 | 130% | 130% | 942,500 | 988,000 | 1,667,500 | 1,748,000 |
| Derek K. Aberle | 780,000 | 800,000 | 135% | 135% | 1,018,500 | 1,080,000 | 1,798,500 | 1,880,000 |
| Cristiano R. Amon | 475,000 | 525,000 | 100% | 100% | 475,000 | 525,000 | 950,000 | 1,050,000 |
| Venkata S. M. Renduchintala | 650,000 | 670,000 | 100% | 100% | 650,000 | 670,000 | 1,300,000 | 1,340,000 |

(1) The fiscal 2014 base salaries and ACIP targets for Dr. Jacobs and Messrs. Mollenkopf and Aberle are the rates that were in effect at the end of fiscal 2014. See the sections "Fiscal 2014 Salaries" and "Fiscal 2014 ACIP Earnings" for discussions of changes to base salaries and ACIP targets approved by the Compensation Committee during fiscal 2014.

(2) The fiscal 2014 target total cash amounts for Dr. Jacobs and Mr. Aberle reflect the prorated amounts that were approved by the Compensation Committee and that are described in the footnotes for Figure 16.

## COMPENSATION PROGRAM BEST PRACTICES

The preceding discussion and analysis of the components and total compensation for our CEO and other NEOs reflects what we believe to be compensation program best practices. We listed these best practices in Proposal 4, the advisory vote on executive compensation. In this section, we provide a more thorough description of these best practices.

**A significant portion of our NEOs' compensation varies with the Company's performance.**

On average,79% of our NEOs' fiscal 2014 annualized total compensation was attributable to the annualized grant date fair value of the front-loaded RSUs and the grant date fair value of PSUs, and 87% of their fiscal 2014 annualized total compensation was variable in the form of ACIP amounts, the annualized grant date fair value of the front-loaded RSUs and the grant date fair value of PSUs.

**We have a balanced approach to incentive programs with differentiated measures.**

We have both short-term (Non-GAAP revenues and Non-GAAP operating income) and multi-year (relative TSR) performance measures. We have a balance of time horizons for our annual incentive awards, including an annual cash incentive program (ACIP), overlapping multi-year PSU performance periods with interim measurement periods and RSUs that generally require three years of service to become fully vested, except for the front-loaded and additional, special RSUs granted to the executive officers in fiscal 2014, which vest over five years.

**We have limits on the amounts of variable compensation that may be earned.**

We limit the potential ACIP amounts that the NEOs may earn to 2x the target amount. We limit the potential number of shares of our common stock that our NEOs may earn under the PSU program to 2x the target amount and 1x if absolute TSR is negative over the three-year performance period regardless of the level of relative TSR.

**We have a cash incentive compensation repayment ("clawback") policy.**

We require executive officers, including NEOs, to repay to us the amount of any earned annual cash incentive that was paid to the extent that:

- The amount of such payment was based on the achievement of certain financial results that were subsequently the subject of a restatement that occurred within 12 months of such payment;
- The executive officer had engaged in theft, dishonesty or intentional falsification of documents or records that resulted in the obligation to restate our financial results; and
- A lower annual cash incentive would have been paid to the executive officer based upon the restated financial results.

The Compensation Committee is responsible for the interpretation and enforcement of this clawback policy. We plan to amend this policy as needed to comply with the additional requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) after the SEC adopts new regulations implementing those requirements.

**We have robust stock ownership guidelines.**

Our stock ownership guidelines for our executive officers, including our NEOs, help ensure that they maintain an equity stake in the Company, and by doing so, provide another link of their interests with those of other stockholders. Only shares actually owned and deferred stock units under the QNQDC Plan count toward the stock ownership requirement. Outstanding unexercised stock options and unvested PSUs and RSUs do not count toward the requirement. NEOs have five years from the applicable date (i.e., date of hire, appointment as an executive officer or appointment to an executive officer position with a different ownership guideline) to meet the applicable ownership guideline amount.

- Dr. Jacobs has met his ownership guidelines.

- Messrs. Mollenkopf and Aberle had met their applicable ownership guidelines prior to their promotions to CEO and President, respectively. They will be required to meet their respective new ownership guidelines by March 2019, the fifth anniversary of commencing their roles as CEO and as President, respectively. Dr. Renduchintala and Mr. Amon will be required to meet their ownership guidelines by October 2017. Mr. Davis will be required to meet his ownership guidelines by March 2018.

If an NEO has not met the applicable guideline by the deadline, we require that the NEO retain at least 50% of the net shares remaining after required tax withholdings upon payment of any full-value award or upon stock option exercise until they meet the minimum guideline. The guidelines are as follows:

*Figure 19: Stock Ownership Guidelines for Executive Officers*

| Role | Multiple of Base Salary |
|---|---|
| CEO | 6x |
| President | 3x |
| All other executive officers | 2x |

The stock ownership guideline for Dr. Jacobs is 6x his base salary when he stepped down as CEO. The net after-tax shares from Dr. Jacobs's fiscal 2014 RSU award must be held until at least one year following retirement or earlier separation of service from Qualcomm.

## Our insider trading policy includes a prohibition on pledging of our common stock.

Our insider trading policy as applicable to executive officers and non-employee directors prohibits the pledging of our common stock and trading in put and call options or other types of derivative transactions.

## Our compensation arrangements for the NEOs do not include severance agreements or employment contracts, and our equity acceleration in the event of a change in control is "double-trigger."

We employ almost all U.S.-based employees, including all of our NEOs, "at will" without severance agreements or employment contracts. This is consistent with our objective of providing compensation related to individual contributions that improve our market leadership, competitive advantage and stockholder value. It enables us to terminate employment with discretion as to the terms and conditions of any separation. Our CEO and other NEOs do not have guaranteed arrangements for cash compensation or severance upon a change in control or excise tax gross-ups for change-in-control payments. In the event of a change in control in which the acquirer assumed outstanding unvested equity awards, the vesting of an NEO's awards would accelerate only if the NEO was involuntarily terminated or the NEO voluntarily resigned for "good reason" during a specified period after the change in control.

## We manage potential compensation-related risks to the Company.

We perform annual risk assessments for our executive compensation program, as well as incentive arrangements below the executive level. This review includes an assessment by the Compensation Committee's independent compensation consultant, FWC.

## We do not provide tax gross-ups for non-business related benefits.

There are no tax gross-up payments on executive perquisites, such as financial planning reimbursements, except for benefits provided in a policy applicable to all eligible employees, such as relocation.

## COMPENSATION RISK MANAGEMENT

The Compensation Committee engaged FWC to collaborate with Qualcomm's human resources staff to conduct an assessment of potential risks that may arise from our compensation programs. Based on this assessment, the Compensation Committee concluded that our policies and practices do not encourage excessive and unnecessary risk taking that would be reasonably likely to have a

material adverse effect on Qualcomm. The assessment included executive, non-executive and sales incentive programs and focused on the variable components of cash incentives and equity awards. Our compensation programs are designed and administered through a corporate total rewards management office and are substantially identical among business units, corporate functions and global locations (with modifications to comply with local regulations as appropriate). The risk-mitigating factors considered in this assessment included:

Case 3:17-cv-00121-JO-MSB Doc 377-7 Filed 05/07/24 PgID.33701 Pg 158 of 181

- The alignment of pay philosophy, peer group companies and compensation amounts relative to competitive practices to support our business objectives;

- Effective balance of cash and equity, short- and long-term performance periods, limits on performance-based award schedules, Company financial metrics with consideration of individual performance factors and Compensation Committee discretion; and

- Ownership guidelines, a clawback policy, an insider trading policy, an equity award approval authorization policy and independent Compensation Committee oversight.



PX281
Page 5788

## COMPENSATION TABLES AND NARRATIVE DISCLOSURES

The following tables, narratives and footnotes describe the total compensation and benefits awarded to, earned by or paid to our NEOs during fiscal 2014.

## SUMMARY COMPENSATION TABLE

The following table shows information regarding compensation of each named executive officer for fiscal 2014, 2013 and 2012, except in the cases of Mr. Davis, who joined the Company in fiscal 2013 and thus was not a named executive officer in fiscal 2012, and Mr. Amon and Dr. Renduchintala, who were not named executive officers in fiscal 2013 or 2012.

### Fiscal 2014 Summary Compensation Table (1)(2)

| Name and Principal Position | Year | Salary ($) (3) | Bonus ($) (4) | Stock Awards ($) (5) | Non-Equity Incentive Plan Compensation ($) (6) | All Other Compensation ($) (7) | Total ($) |
|---|---|---|---|---|---|---|---|
| Steven M. Mollenkopf<br>Chief Executive Officer (8) | 2014 | 1,069,239 | — | 58,000,203 | 1,550,000 | 121,150 | 60,740,592 |
| | 2013 | 815,006 | 1,500 | 12,000,079 | 1,325,000 | 166,481 | 14,308,066 |
| | 2012 | 805,582 | — | 11,999,974 | 1,300,000 | 143,960 | 14,249,516 |
| Paul E. Jacobs<br>Executive Chairman (9) | 2014 | 969,984 | 21,375 | 54,000,175 | 1,300,000 | 650,458 | 56,941,992 |
| | 2013 | 1,200,014 | 8,325 | 15,000,069 | 3,480,000 | 760,532 | 20,448,940 |
| | 2012 | 1,189,246 | 2,775 | 14,999,985 | 3,400,000 | 1,138,867 | 20,730,873 |
| George S. Davis<br>Executive Vice President and Chief Financial Officer | 2014 | 724,043 | — | 9,600,019 | 665,000 | 167,555 | 11,156,617 |
| | 2013 | 363,463 | 1,000,000 | 11,500,110 | 590,000 | 192,023 | 13,645,596 |
| | 2012 | — | — | — | — | — | — |
| Derek K. Aberle<br>President | 2014 | 772,734 | — | 30,380,219 | 720,000 | 230,706 | 32,103,659 |
| | 2013 | 728,321 | — | 8,000,053 | 1,045,000 | 284,061 | 10,057,435 |
| | 2012 | 720,548 | — | 9,000,026 | 1,100,000 | 308,884 | 11,129,458 |
| Cristiano R. Amon<br>Executive Vice President, Qualcomm Technologies, Inc. and Co-President, QCT | 2014 | 474,048 | — | 10,760,281 | 460,000 | 9,973 | 11,704,302 |
| | 2013 | — | — | — | — | — | — |
| | 2012 | — | — | — | — | — | — |
| Venkata S. M. Renduchintala<br>Executive Vice President, Qualcomm Technologies, Inc. and Co-President, QCT | 2014 | 659,808 | — | 12,600,067 | 460,000 | 110,244 | 13,830,119 |
| | 2013 | — | — | — | — | — | — |
| | 2012 | — | — | — | — | — | — |

(1) We did not grant any stock option awards to our NEOs during fiscal 2014. As a result, the "Option Awards" column has been omitted from the Fiscal 2014 Summary Compensation Table.

(2) We do not offer a pension plan or other defined benefit retirement plan to our NEOs. We do not provide above-market or preferential earnings on deferred compensation, nor do we provide dividends on stock in the Qualcomm Non-Qualified Deferred Compensation (QNQDC) Plan at a rate higher than dividends on our common stock. As a result, the "Change in Pension Value and Nonqualified Deferred Compensation Earnings" column has been omitted from the Fiscal 2014 Summary Compensation Table.



PX281

(3) Salaries for NEOs as presented in this column may include vacation match payments payable under our vacation policy. This column includes portions of the NEOs' salaries that they may have deferred pursuant to the QNQDC Plan (see "Fiscal 2014 Nonqualified Deferred Compensation" table).

(4) The amounts in this column represent amounts received under our patent award program, and for Mr. Davis, his new hire bonus. We disclose annual cash incentives in the "Non-Equity Incentive Plan Compensation" column.

(5) Stock awards granted to NEOs include annual grants and may include special grants for new hires, promotions and/or retention. The amounts in this column represent the grant date fair values of PSUs and RSUs granted during the fiscal year. The grant date fair values of RSUs were determined based on the fair value of our common stock on the date of grant. The PSU grant date fair values were determined based on a Monte Carlo simulation (which probability weights multiple potential outcomes). For additional information on the valuation assumptions, refer to "Notes to Consolidated Financial Statements, Note 1. The Company and Its Significant Accounting Policies" included in Appendix 1. The amounts may not be indicative of the realized value of the awards if and when they vest. See the "Fiscal 2014 Grants of Plan-Based Awards" table for details on the stock awards granted to the NEOs during fiscal 2014. If we assume that the highest level of performance conditions will be achieved with respect to the PSUs (and thus the maximum number of shares will be issued under the PSUs), using the fair value of our common stock on the grant date for such shares, the fiscal 2014 stock awards would be as follows: $66,000,349 for Mr. Mollenkopf; $63,000,339 for Dr. Jacobs; $12,300,038 for Mr. Davis; $34,160,429 for Mr. Aberle; $14,380,450 for Mr. Amon; and $15,300,086 for Dr. Renduchintala.

(6) The amounts in this column represent cash awards under our annual cash incentive plan (ACIP). The relevant performance period was fiscal 2014. The Compensation Committee approved the fiscal 2014 ACIP amounts on November 30, 2014, and the NEOs received payment in December 2014. See the "Compensation Discussion and Analysis" (CD&A) section and the "Fiscal 2014 Grants of Plan-Based Awards" table for a description of the ACIP and the payments made thereunder. This column includes portions of the NEOs' ACIP amounts that they may have deferred pursuant to the QNQDC Plan (see "Fiscal 2014 Nonqualified Deferred Compensation" table).

(7) See the "Fiscal 2014 All Other Compensation" table for an itemized account of all other compensation reported in this column.

(8) The 2014 salary amount represents compensation for Mr. Mollenkopf from September 30 through December 11, 2013 as President and Chief Operating Officer, from December 12, 2013 through March 3, 2014 as Chief Executive Officer-elect and President and from March 4, 2014 through September 28, 2014 as Chief Executive Officer.

(9) The 2014 amounts represent compensation for Dr. Jacobs from September 30, 2013 through March 3, 2014 as Chief Executive Officer and from March 5, 2014 through September 28, 2014 as Executive Chairman. Dr. Jacobs's salary and non-equity incentive plan target were reduced on March 4, 2014 when he stepped down as our Chief Executive Officer and assumed his current role of Executive Chairman.

## ALL OTHER COMPENSATION

We provide our NEOs with other compensation components that are reasonable and consistent with our executive compensation program and support our efforts to attract and retain executive-level employees. The cost of these benefits are disclosed in the All Other Compensation column of the Fiscal 2014 Summary Compensation Table and are itemized in the Fiscal 2014 All Other Compensation table below.

## Fiscal 2014 All Other Compensation

| Name | Perquisites and Other Personal Benefits ($) (1) | Non-Qualified Deferred Compensation Plan ($) (2) | Charitable Match ($) (3) | Company Matching 401k Contributions ($) (4) | Life Insurance Premiums ($) (5) | Tax Gross-Ups ($) (6) | All Other Compensation Total ($) |
|---|---|---|---|---|---|---|---|
| Steven M. Mollenkopf | 18,648 | 66,267 | 25,500 | 5,425 | 5,310 | — | 121,150 |
| Paul E. Jacobs | 136,339 | 375,355 | 125,000 | 5,975 | 7,789 | — | 650,458 |
| George S. Davis | 19,105 | 91,841 | 36,000 | 5,791 | 11,862 | 2,956 | 167,555 |
| Derek K. Aberle | 40,822 | 143,122 | 38,097 | 5,425 | 3,240 | — | 230,706 |
| Cristiano R. Amon | — | — | 2,000 | 5,425 | 2,548 | — | 9,973 |
| Venkata S. M. Renduchintala | — | — | 100,000 | 5,513 | 4,731 | — | 110,244 |

(1) Perquisites and personal benefits for a named executive officer are excluded if the total value of all of his perquisites and personal benefits is less than $10,000. If the total value of all perquisites and personal benefits for a named executive officer is $10,000 or more, then each perquisite or personal benefit, regardless of its amount, is identified by type. Each perquisite or personal benefit that exceeds the greater of $25,000 or 10% of the total amount of perquisites and personal benefits for that named executive officer is identified by type and quantified.

The amounts in this column include: Mr. Mollenkopf - for the personal use of our corporate aircraft, financial planning and other insurance premiums; Dr. Jacobs - $130,483 for the personal use of our corporate aircraft and the remainder for other insurance premiums; Mr. Davis - for relocation, financial planning and other insurance premiums; and Mr. Aberle - $31,345 for the personal use of our corporate aircraft and the remainder for other insurance premiums, financial planning and home office costs. Under certain circumstances, NEOs may utilize our corporate aircraft for personal use. In those instances, the value of the benefit is based on the aggregate incremental cost to the Company. Incremental cost is calculated based on the variable costs to the Company, including fuel costs, mileage, certain maintenance, universal weather-monitoring costs, on-board catering, landing/ramp fees and certain other miscellaneous costs. Fixed costs that do not change based on usage, such as pilot salaries, are excluded. The Company and Dr. Jacobs entered into aircraft time-sharing agreements pursuant to which Dr. Jacobs may use certain Company aircraft for his personal use and reimburse the Company for the expenses of each flight operated under such an agreement up to the maximum amount permitted under Federal Aviation Administration rules. Dr. Jacobs has discretion over which flights are operated under time-sharing agreements. The amounts shown for Dr. Jacobs's personal use of our corporate aircraft reflect the total aggregate incremental costs to the Company of his personal use of our corporate aircraft, less any payments made by Dr. Jacobs to the Company under the time-sharing agreement.

(2) See the Nonqualified Deferred Compensation discussion for a description of the QNQDC Plan and the Company match program thereunder. The amounts disclosed represent the dollar values of common stock used to effectively match up to 8% of the aggregate of the participant's base salary plus ACIP amounts deferred on a pre-tax basis under the QNQDC Plan. The dollar values are based on the average of the fair market value of the stock over the 200 trading days preceding the match date.

(3) We match 100% of an employee's contributions, up to predetermined maximum amounts, to encourage and extend employees' support of qualified tax exempt non-profit organizations, excluding organizations that further religious doctrine, exclusionary organizations or political organizations. The amounts disclosed represent our matching contributions for NEO contributions to cultural, education and community non-profit organizations. We will match up to $125,000 for our Executive Chairman, CEO and President and up to $100,000 for other NEOs.

(4) The 401(k) plan is a voluntary, tax-qualified deferred compensation plan. We match employee contributions in cash using a tiered structure in order to encourage participation among our U.S.-based employees. This program provides a tax-efficient retirement savings opportunity. The amounts disclosed represent the cash value of the Company matches to employee contributions to the 401(k) plan.

(5) We provide our executive officers additional life insurance above the amounts provided to other employees. The additional coverage is $1 million for the Executive Chairman, the CEO and the President and $750,000 for the other

NEOs. The amounts disclosed represent the premiums paid for group term life insurance greater than $50,000 and executive life insurance.

(6) The amount in this column represents the estimated tax liability associated with relocation costs incurred by Mr. Davis.

## GRANTS OF PLAN-BASED AWARDS

The following table shows information regarding the incentive awards granted to our named executive officers for 2014. See “Compensation Discussion and Analysis” (CD&A) in the “Executive Compensation and Related Information” section for detailed information regarding our annual cash incentive plan and equity award programs.

### Fiscal 2014 Grants of Plan-Based Awards (1)(2)

| Name | Type of Award | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All other Stock Awards: Number of shares of stock or units (#) | Grant Date Fair Value of Stock Awards ($) (3) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | |
| Steven M. Mollenkopf | ACIP | | 22,000 | 2,200,000 | 4,400,000 | | | | | |
| | RSUs (4) | 12/12/2013 | | | | | | | 274,990 | 20,000,023 |
| | RSUs (5) | 12/12/2013 | | | | | | | 412,485 | 30,000,034 |
| | PSUs | 9/16/2014 | | | | 34,774 | 105,376 | 210,752 | | 8,000,146 |
| Paul E. Jacobs | ACIP | | 18,630 | 1,862,981 | 3,725,962 | | | | | |
| | RSUs (4) | 5/5/2014 | | | | | | | 565,611 | 45,000,011 |
| | PSUs | 9/16/2014 | | | | 39,121 | 118,548 | 237,096 | | 9,000,164 |
| George S. Davis | ACIP | | 9,425 | 942,500 | 1,885,000 | | | | | |
| | RSUs (5) | 5/5/2014 | | | | | | | 86,727 | 6,900,000 |
| | PSUs | 9/16/2014 | | | | 11,736 | 35,564 | 71,128 | | 2,700,019 |
| Derek K. Aberle | ACIP | | 10,185 | 1,018,500 | 2,037,000 | | | | | |
| | RSUs (5) | 5/5/2014 | | | | | | | 202,363 | 16,100,000 |
| | RSUs (4) | 5/5/2014 | | | | | | | 131,976 | 10,500,011 |
| | PSUs | 9/16/2014 | | | | 16,431 | 49,792 | 99,584 | | 3,780,209 |
| Cristiano R. Amon | ACIP | | 4,750 | 475,000 | 950,000 | | | | | |
| | RSUs (5) | 5/5/2014 | | | | | | | 52,037 | 4,140,064 |
| | RSUs (4) | 5/5/2014 | | | | | | | 37,708 | 3,000,048 |
| | PSUs | 9/16/2014 | | | | 15,736 | 47,684 | 95,368 | | 3,620,169 |
| Venkata S. M. Renduchintala | ACIP | | 6,500 | 650,000 | 1,300,000 | | | | | |
| | RSUs (5) | 5/5/2014 | | | | | | | 86,727 | 6,900,000 |
| | RSUs (4) | 5/5/2014 | | | | | | | 37,708 | 3,000,048 |
| | PSUs | 9/16/2014 | | | | 11,736 | 35,564 | 71,128 | | 2,700,019 |

(1) Unless indicated otherwise, the Compensation Committee approved all equity grants on the grant dates.

(2) We did not award any stock options to any NEOs in fiscal 2014. Therefore, we did not include the “All Other Option Awards” or “Exercise or Base Price of Option Awards” columns in this table.

(3) The amounts for RSUs represent the grant date fair values based on the closing stock price of the Company’s common stock on the dates of grant. The amounts for PSUs represent the grant date fair value of the Company’s common stock

as determined using a Monte Carlo simulation (which probability weights multiple potential outcomes). For additional information on the valuation assumptions, refer to "Notes to Consolidated Financial Statements, Note 1. The Company and Its Significant Accounting Policies" included in Appendix 1.

(4) Represents a one-time RSU grant as described in the CD&A. The grant vests in equal one-third amounts on the third, fourth and fifth anniversaries of the grant date.

(5) Represents front-loaded RSU grants as described in the CD&A. The grants vest annually in five equal amounts commencing on the first anniversary of the grant date.

## OUTSTANDING EQUITY AWARDS AT FISCAL YEAR END

The "Outstanding Equity Awards at Fiscal Year End" table below provides information on the current holdings of equity awards by the NEOs. The market value of stock reported is based on the closing price of the Company's common stock at the end of the fiscal year. All stock options awarded to the NEOs were nonqualified stock options; stock options granted prior to September 10, 2010 are exercisable for ten years from the grant date, and stock options granted on or after September 10, 2010 are exercisable for seven years from the grant date.

### Outstanding Equity Awards at Fiscal Year End (1)

| | | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Steven M. Mollenkopf | 11/9/2011 | | | | | 20,452 (6) | 1,535,147 | | |
| | 11/9/2011 | | | | | 43,826 (7) | 3,289,579 | | |
| | 9/29/2013 | | | | | 41,795 (8) | 3,137,160 | | |
| | 9/29/2013 | | | | | 20,898 (9) | 1,568,580 | | |
| | 12/12/2013 | | | | | 279,235 (10) | 20,959,400 | | |
| | 12/12/2013 | | | | | 418,853 (11) | 31,439,100 | | |
| | 11/9/2011 | | | | | | | 54,426 (21) | 4,085,247 |
| | 11/9/2011 | | | | | | | 38,877 (22) | 2,918,135 |
| | 9/29/2013 | | | | | | | 55,480 (23) | 4,164,334 |
| | 9/29/2013 | | | | | | | 166,436 (23) | 12,492,695 |
| | 9/16/2014 | | | | | | | 210,752 (24) | 15,819,045 |
| Total | | — | — | | | 825,059 | 61,928,966 | 525,971 | 39,479,456 |
| Paul E. Jacobs | 11/4/2005 | 286,586 | — | 44.02 | 11/3/2015 | | | | |
| | 11/10/2006 | 211,218 | — | 34.83 | 11/9/2016 | | | | |
| | 11/12/2007 | 195,168 | — | 37.29 | 11/11/2017 | | | | |
| | 11/9/2009 | 233,226 | — | 44.75 | 11/8/2019 | | | | |
| | 11/9/2011 | | | | | 43,826 (6) | 3,289,579 | | |
| | 9/29/2013 | | | | | 69,659 (8) | 5,228,600 | | |
| | 5/5/2014 | | | | | 571,787 (12) | 42,918,356 | | |
| | 11/9/2011 | | | | | | | 116,628 (21) | 8,754,089 |
| | 9/29/2013 | | | | | | | 277,394 (23) | 20,821,210 |
| | 9/16/2014 | | | | | | | 237,096 (24) | 17,796,426 |
| Total | | 926,198 (4) | — | | | 685,272 | 51,436,535 | 631,118 | 47,371,725 |

| | | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| George S. Davis | 3/11/2013 | | | | | 67,008 (13) | 5,029,608 | | |
| | 9/29/2013 | | | | | 34,829 (14) | 2,614,300 | | |
| | 5/5/2014 | | | | | 87,674 (15) | 6,580,813 | | |
| | 9/29/2013 | | | | | | | 92,466 (23) | 6,940,505 |
| | 9/16/2014 | | | | | | | 71,128 (24) | 5,338,868 |
| Total | | — | — | | | 189,511 | 14,224,721 | 163,594 | 12,279,373 |
| Derek K. Aberle | 9/16/2008 | 38,000 | — | 47.92 | 9/15/2018 | | | | |
| | 11/9/2009 | 63,051 | — | 44.75 | 11/8/2019 | | | | |
| | 11/9/2011 | | | | | 14,609 (6) | 1,096,579 | | |
| | 11/9/2011 | | | | | 35,061 (7) | 2,631,647 | | |
| | 9/29/2013 | | | | | 27,864 (8) | 2,091,440 | | |
| | 9/29/2013 | | | | | 13,932 (9) | 1,045,720 | | |
| | 5/5/2014 | | | | | 204,573 (15) | 15,355,231 | | |
| | 5/5/2014 | | | | | 133,417 (12) | 10,014,291 | | |
| | 11/9/2011 | | | | | | | 38,877 (21) | 2,918,135 |
| | 11/9/2011 | | | | | | | 31,103 (22) | 2,334,619 |
| | 9/29/2013 | | | | | | | 36,986 (23) | 2,776,172 |
| | 9/29/2013 | | | | | | | 110,958 (23) | 8,328,515 |
| | 9/16/2014 | | | | | | | 99,584 (24) | 7,474,775 |
| Total | | 101,051 | — | | | 429,456 | 32,234,908 | 317,508 | 23,832,216 |
| Cristiano R. Amon | 10/23/2009 | 20,625 | — | 40.70 | 10/22/2019 | | | | |
| | 7/6/2012 | 34,000 | 34,000 (5) | 55.31 | 7/5/2019 | | | | |
| | 09/28/2011 | | | | | 4,329 (16) | 324,924 | | |
| | 03/28/2012 | | | | | 3,495 (17) | 262,315 | | |
| | 08/20/2012 | | | | | 5,540 (18) | 415,804 | | |
| | 09/30/2012 | | | | | 7,824 (19) | 587,274 | | |
| | 09/30/2012 | | | | | 11,624 (19) | 872,523 | | |
| | 09/29/2013 | | | | | 13,932 (8) | 1,045,720 | | |
| | 09/29/2013 | | | | | 6,966 (9) | 522,860 | | |
| | 05/05/2014 | | | | | 52,605 (15) | 3,948,549 | | |
| | 05/05/2014 | | | | | 38,120 (12) | 2,861,269 | | |
| | 9/29/2013 | | | | | | | 18,494 (23) | 1,388,162 |
| | 9/29/2013 | | | | | | | 55,480 (23) | 4,164,334 |
| | 9/16/2014 | | | | | | | 95,368 (24) | 7,158,322 |
| Total | | 54,625 | 34,000 | | | 144,435 | 10,841,238 | 169,342 | 12,710,818 |



PX281
Page 5795

| | | Option Awards | | | | | Stock Awards | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Venkata S. M. Renduchintala | 4/24/2009 | 16,667 | — | | 41.36 | 4/23/2019 | | | | | | |
| | 10/23/2009 | 19,500 | — | | 40.70 | 10/22/2019 | | | | | | |
| | 7/6/2012 | 34,000 | 34,000 | (5) | 55.31 | 7/5/2019 | | | | | | |
| | 9/28/2011 | | | | | | 4,576 | (16) | 343,469 | | | |
| | 3/28/2012 | | | | | | 3,495 | (17) | 262,315 | | | |
| | 8/20/2012 | | | | | | 5,540 | (18) | 415,804 | | | |
| | 9/30/2012 | | | | | | 7,824 | (19) | 587,274 | | | |
| | 9/30/2012 | | | | | | 11,624 | (19) | 872,523 | | | |
| | 9/29/2013 | | | | | | 13,932 | (8) | 1,045,720 | | | |
| | 9/29/2013 | | | | | | 9,288 | (20) | 697,172 | | | |
| | 5/5/2014 | | | | | | 87,674 | (15) | 6,580,813 | | | |
| | 5/5/2014 | | | | | | 38,120 | (12) | 2,861,269 | | | |
| | 9/29/2013 | | | | | | | | | 36,986 | (23) | 2,776,172 |
| | 9/29/2013 | | | | | | | | | 55,480 | (23) | 4,164,334 |
| | 9/16/2014 | | | | | | | | | 71,128 | (24) | 5,338,868 |
| Total | | 70,167 | 34,000 | | | | 182,073 | | 13,666,359 | 163,594 | | 12,279,374 |

(1) There were no unexercised, unearned options at September 28, 2014. Therefore, we did not include the "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" column in this table.

(2) Represents RSUs that have not vested at fiscal year end and includes dividend equivalent shares that have not vested at fiscal year end as follows: 16,240 shares for Mr. Mollenkopf; 11,978 shares for Dr. Jacobs; 4,192 shares for Mr. Davis; 7,809 shares for Mr. Aberle; 3,611 shares for Mr. Amon; and 4,061 shares for Dr. Renduchintala.

(3) Represents PSUs that have not vested at fiscal year end and includes dividend equivalent shares that have not vested at fiscal year end as follows: 9,203 shares for Mr. Mollenkopf; 11,504 shares for Dr. Jacobs; 1,830 shares for Mr. Davis; 6,537 shares for Mr. Aberle; 1,464 shares for Mr. Amon; and 2,745 shares for Dr. Renduchintala.

(4) Includes 168,428 options exercisable by a Grantor Retained Annuity Trust for the benefits of Dr. Jacobs and his spouse; 41,981 options exercisable by Dr. Jacobs's spouse; and 692,972 options exercisable by the trust of Dr. Jacobs's children for which he disclaims beneficial ownership.

| Type of Grant | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|
| (5) Stock Options | 7/6/2012 | 25% vests on the first anniversary of the date of grant and the remaining balance vest equally on each six-month anniversary thereafter until fully vested four years from the date of grant. | 7/6/2013<br>1/6/2014<br>7/6/2014<br>1/6/2015<br>7/6/2015<br>1/6/2016<br>7/6/2016 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (6) Restricted Stock Unit | 11/9/2011 | 33-1/3% per year | 11/9/2012<br>11/9/2013<br>11/9/2014 | Vesting was conditioned on the Compensation Committee's determination that the Company attained the relevant performance goals for fiscal 2012. |

PX281

Page 5796

| | | | | |
|---|---|---|---|---|
| | | | | Vesting is also conditioned upon continued employment through the vesting date(s). |

| Type of Grant | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|
| (7) Restricted Stock Unit | 11/9/2011 | 33-1/3% per year | 11/9/2014<br>11/9/2015<br>11/9/2016 | Vesting was conditioned on the Compensation Committee's determination that the Company attained the relevant performance goals for fiscal 2012.<br>Vesting is also conditioned upon continued employment through the vesting date(s). |
| (8) Restricted Stock Unit | 9/29/2013 | 33-1/3% per year | 11/20/2013<br>11/20/2014<br>11/20/2015 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (9) Restricted Stock Unit | 9/29/2013 | 33-1/3% per year | 11/20/2014<br>11/20/2015<br>11/20/2016 | Vesting was conditioned on the Compensation Committee's determination that the Company attained the relevant performance goals for the first nine months of fiscal 2014.<br>Vesting is also conditioned upon continued employment through the vesting date(s). |
| (10) Restricted Stock Unit | 12/12/2013 | 33-1/3% per year | 12/12/2016<br>12/12/2017<br>12/12/2018 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (11) Restricted Stock Unit | 12/12/2013 | 20% per year | 12/12/2014<br>12/12/2015<br>12/12/2016<br>12/12/2017<br>12/12/2018 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (12) Restricted Stock Unit | 5/5/2014 | 33-1/3% per year | 5/5/2017<br>5/5/2018<br>5/5/2019 | Vesting is conditioned on the Compensation Committee's determination that the Company attained the relevant performance goals for the first six months of fiscal 2015.<br>Vesting is also conditioned upon continued employment through the vesting date(s). |
| (13) Restricted Stock Unit | 3/11/2013 | 33-1/3% per year | 3/11/2014<br>3/11/2015<br>3/11/2016 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (14) Restricted Stock Unit | 9/29/2013 | 33-1/3% per year | 9/29/2014<br>9/29/2015<br>9/29/2016 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (15) Restricted Stock Unit | 5/5/2014 | 20% per year | 5/5/2015<br>5/5/2016<br>5/5/2017<br>5/5/2018<br>5/5/2019 | Vesting is conditioned on the Compensation Committee's determination that the Company attained the relevant performance goals for the first six months of fiscal 2015.<br>Vesting is also conditioned upon continued employment through the vesting date(s). |
| (16) Restricted Stock Unit | 9/28/2011 | 33-1/3% per year | 11/20/2012<br>11/20/2013<br>11/20/2014 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (17) Restricted Stock Unit | 3/28/2012 | 33-1/3% per year | 5/20/2013<br>5/20/2014<br>5/20/2015 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (18) Restricted Stock Unit | 8/20/2012 | 33-1/3% per year | 8/20/2013<br>8/20/2014<br>8/20/2015 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (19) Restricted Stock Unit | 9/30/2012 | 33-1/3% per year | 11/20/2013<br>11/20/2014<br>11/20/2015 | Vesting is conditioned upon continued employment through the vesting date(s). |



PX281
Page 5798

| Type of Grant | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|
| (20) Restricted Stock Unit | 9/29/2013 | 33-1/3% per year | 11/20/2013<br>11/20/2014<br>11/20/2015 | Vesting for two-thirds of the grant was conditioned on the Compensation Committee's determination that the Company attained the relevant performance goals for the first nine months of fiscal 2014. Vesting is also conditioned upon continued employment through the vesting date(s). |
| (21) Performance Stock Unit | 11/9/2011 | 100% cliff vesting | 11/9/2014 | As of 9/28/14, all four measurement periods were complete. Number of shares is the total earned for the four measurement periods. Vesting is also conditioned upon continued employment through the vesting date(s). |
| (22) Performance Stock Unit | 11/9/2011 | 33-1/3% per year | 11/9/2014<br>11/9/2015<br>11/9/2016 | As of 9/28/14, all four measurement periods were complete. Number of shares is the total earned for the four measurement periods. Vesting is also conditioned upon continued employment through the vesting date(s). |
| (23) Performance Stock Unit | 9/29/2013 | 100% cliff vesting | 9/27/2015 | As of 9/28/14, none of the two measurement periods were complete. Number of shares is the potential maximum shares that may be earned for the two measurement periods. Vesting is also conditioned upon continued employment through the vesting date(s). |
| (24) Performance Stock Unit | 9/16/2014 | 100% cliff vesting | 10/4/2017 | As of 9/28/14, none of the four measurement periods were complete. Number of shares is the potential maximum shares that may be earned for the four measurement periods. Vesting is also conditioned upon continued employment through the vesting date(s). |

## OPTION EXERCISES AND STOCK AWARDS VESTED DURING FISCAL 2014

The "Option Exercises and Stock Awards Vested During Fiscal 2014" table provides information on stock options exercised by the NEOs and NEO stock awards that vested during fiscal 2014.

### Option Exercises and Stock Awards Vested During Fiscal 2014

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized Upon Exercise ($) | Number of Shares Acquired on Vesting (#) (1) | Value Realized on Vesting ($) (2) |
| Steven M. Mollenkopf | 72,853 | 2,346,982 | 122,365 | 8,649,634 |
| Paul E. Jacobs | 1,852,000 | 63,313,267 | 308,368 | 21,833,779 |
| George S. Davis | — | — | 32,994 | 2,531,012 |
| Derek K. Aberle | 129,384 | 3,596,669 | 102,697 | 7,270,536 |
| Cristiano R. Amon | 64,202 | 2,021,358 | 40,084 | 2,954,010 |
| Venkata S. M. Renduchintala | 134,167 | 4,598,667 | 44,876 | 3,294,393 |

(1) Amounts include dividend equivalents on vested shares and shares withheld for the payment of taxes.

(2) Amounts represent the dollar value of shares acquired upon vesting based on the fair market value of our common stock on the vest date.

## NONQUALIFIED DEFERRED COMPENSATION

The "Fiscal 2014 Nonqualified Deferred Compensation" table provides information on the nonqualified deferred compensation of the NEOs.

Under the QNQDC Plan, we match a portion of participants' contributions to the QNQDC Plan with cash. We effectively match up to 8% of the aggregate of the participant's base salary plus ACIP amounts. We match eligible participants' contributions for a calendar year annually only if he or she is actively employed on the first day of the next calendar year or is terminated without cause during the calendar year and had satisfied the vesting eligibility requirement. Prior to calendar 2014, the Company matched participants' contributions with our common stock (Match Shares). The number of Match Shares was based on the average closing price of our common stock during a 200-trading-day period preceding the date on which the matching contributions were credited. All matching amounts vest in full upon an eligible employee's death, disability, attainment of age 65 while employed with the Company, involuntary termination of employment without "Cause" or voluntary termination of employment for "Good Reason" (in both cases within 24 months after a change in control of the Company), or completion of two continuous years of service with the Company commencing with the employee's date of hire. Cash dividends on shares of our common stock were credited to an eligible employee's account in the form of cash, which is subject to the same terms and vesting and payment dates as the Match Shares to which they relate. The amounts reported as Company contributions in the last fiscal year in the table below reflect the cash value of the Match Shares granted in fiscal 2014 for the 2013 calendar year and dividend payments on the Match Shares that we made during fiscal 2014.

The amounts reported as aggregate earnings in the last fiscal year in the table below are the sum of the QNQDC Plan aggregate earnings plus the Match Shares aggregate earnings. The Match Shares aggregate earnings in the last fiscal year reflect the difference in the fair market values of all vested and unvested Match Shares at the end of fiscal 2014 less their fair market values at the end of fiscal 2013 and the Company's contributions during fiscal 2014.

### Fiscal 2014 Nonqualified Deferred Compensation

| Name | Executive Contributions in Last Fiscal Year ($) (1) | Registrant Contributions in Last Fiscal Year ($) (2) | Aggregate Earnings in Last Fiscal Year ($) (3) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last Fiscal Year End ($) (4) |
|---|---|---|---|---|---|
| Steven M. Mollenkopf | 132,500 | 66,267 | 110,893 | — | 1,669,822 |
| Paul E. Jacobs | 711,998 | 375,355 | 4,172,213 | — | 28,728,232 |
| George S. Davis | 811,356 | 91,841 | 72,074 | — | 1,171,636 |
| Derek K. Aberle | 363,547 | 143,122 | 449,100 | — | 4,764,220 |
| Cristiano R. Amon | 55,540 | — | 7,701 | — | 133,089 |
| Venkata S. M. Renduchintala | 78,400 | — | 821 | — | 79,221 |

(1) All amounts disclosed in this column are also reported in the Fiscal 2014 Summary Compensation Table with some of the amounts included in the "Salary" column for the current year and the remaining amounts included in the "Non-Equity Incentive Plan Compensation" column for the current fiscal year.

(2) All amounts disclosed in this column are also reported in the Fiscal 2014 Summary Compensation Table under "All Other Compensation."

(3) The amounts in this column are not included in the Fiscal 2014 Summary Compensation Table.

(4) This column includes all amounts in the QNQDC Plan for the NEOs. The following amounts were reported as compensation to the NEOs in our summary compensation tables for previous years (since fiscal 2002): Mr. Mollenkopf - $907,621; Dr. Jacobs - $11,933,965; Mr. Davis - $210,001; and Mr. Aberle - $1,273,560.

## POTENTIAL POST-EMPLOYMENT PAYMENTS

As noted in the CD&A, the Company employs almost all U.S.-based employees, including all of our NEOs, "at will," without employment contracts or severance agreements. We do not have a pre-defined severance plan covering the involuntary termination of employees, including our NEOs. We do not accelerate unvested stock options, RSUs or PSUs in the event of an involuntary "for cause" termination. Such terminations may involve theft, dishonesty, falsification, actions that are detrimental to the Company, conviction of a criminal act that impairs the performance of duties required by the Company or violation of a material Company policy. Our practice in an involuntary termination situation may include the following non-equity benefits:

- Salary continuation dependent on the business reason for the termination;
- Lump-sum payment based on job level and years of service with Qualcomm;
- Paid health care coverage and COBRA payments for a limited time; and
- Outplacement services.

Figure 20 summarizes the general terms of our equity award plans and agreements and nonqualified deferred compensation plan regarding how unvested options, PSUs, RSUs and Match Shares would be treated in the event of death, long-term disability, a change in control, certain involuntary terminations and normal retirement age. Any variations from the below are set forth in the CD&A.

*Figure 20: Treatment of Unvested Equity Awards in Certain Termination Situations*

| Termination Situation | Treatment of Unvested Stock Options and RSUs | Treatment of Unvested PSUs | Treatment of Unvested Match Shares in the QNQDC Plan (1) |
|---|---|---|---|
| Death | All unvested stock options and RSUs would become fully vested. Stock options would remain exercisable up to one year from the date of death or the expiration date of the grant, whichever is earlier. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the applicable award agreement. | All unvested Match Shares would become fully vested. |
| Long-Term Disability (LTD) | Stock options would continue to vest per its original vesting schedule. Stock options would remain exercisable until the expiration date of the grant. All unvested RSUs would become fully vested. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the applicable award agreement. | All unvested Match Shares would become fully vested. |



PX281
Page 5802

| Termination Situation | Treatment of Unvested Stock Options and RSUs | Treatment of Unvested PSUs | Treatment of Unvested Match Shares in the QNQDC Plan (1) |
|---|---|---|---|
| Involuntary termination without cause | Stock options: 10% of the total amount granted is automatically accelerated, and up to an additional 10% may be accelerated using a pre-established formula as described in the applicable award agreement, subject to execution of a general release of claims. The accelerated vested stock options could then be exercised up to six months after termination, but in no event later than the expiration date of such options.<br><br>RSUs: All unvested RSUs are forfeited. | All unvested PSUs are forfeited. | All vested Match Shares would be distributed to the QNQDC Plan participant. There would be no accelerated vesting of unvested Match Shares. |
| Involuntary termination after a change in control - without cause or voluntary resignation for good reason | "Double-trigger" treatment of unvested awards: If, within 24 months after a change in control, the recipient's employment is involuntarily terminated for any reason other than for cause or if the recipient voluntarily resigns for "good reason" (as defined in the award agreements), then vesting of stock options and RSUs is accelerated in full. | Accelerate the vesting of PSUs that remain outstanding after a change in control. The number of shares of stock that may be issued will be prorated using a pre-defined formula. | All Match Shares would become fully vested. |
| Voluntary termination | Stock options: All vested stock options may be exercised for the number of days set forth in the terms of the applicable award agreement(s), but in no event later than the expiration date of such stock options. All unvested stock options are forfeited.<br><br>Note: Retirement provision applies to stock options if retirement eligible at termination.<br><br>RSUs: All unvested RSUs are forfeited. | All unvested PSUs are forfeited.<br><br>Note: Retirement provision applies if retirement eligible at termination. | All vested Match Shares would be distributed to the QNQDC Plan participant. There would be no accelerated vesting of unvested Match Shares. |

| Termination Situation | Treatment of Unvested Stock Options and RSUs | Treatment of Unvested PSUs | Treatment of Unvested Match Shares in the QNQDC Plan (1) |
|---|---|---|---|
| Retirement (2) | Stock Options: All vested stock options may be exercised at any time prior to the expiration of 12 months, but in no event later than the expiration date of such options. All unvested stock options are forfeited.<br><br>RSUs: All unvested RSUs are forfeited. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the applicable award agreement. | All vested Match Shares would be distributed to the QNQDC Plan participant. There would be no accelerated vesting of unvested Match Shares. |

(1) Match Shares are fully vested upon the completion of two years of continuous service with the Company.

(2) Retirement (for stock options, RSU and PSUs) is the date on which a participant has attained the age of 60 years and has completed 10 years of continuous service with the Company.

The information in the "Potential Payments Upon Termination or Change in Control" table below describes the compensation that would be payable under various scenarios if the NEO's employment had terminated on the last day of fiscal 2014.

## Potential Payments Upon Termination or Change In Control (1)

| Name | Termination Scenario | Accrued Vacation ($) (2) | Equity Awards | | Total ($) |
|---|---|---|---|---|---|
| | | | Stock Options ($) (3)(4)(5)(6) | Performance Stock Units/Restricted Stock Units ($) (5)(7) | |
| Steven M. Mollenkopf | Death | 185,177 | — | 75,074,688 | 75,259,865 |
| | Long Term Disability | — | — | 75,074,688 | 75,074,688 |
| | Change In Control | — | — | 74,485,678 | 74,485,678 |
| | Involuntary Termination | 185,177 | — | — | 185,177 |
| | Voluntary Termination | 185,177 | — | — | 185,177 |
| | Retirement | 185,177 | — | — | 185,177 |
| Paul E. Jacobs | Death | — | — | 67,621,261 | 67,621,261 |
| | Long Term Disability | — | — | 67,621,261 | 67,621,261 |
| | Change In Control | — | — | 67,132,094 | 67,132,094 |
| | Involuntary Termination | — | — | — | — |
| | Voluntary Termination | — | — | — | — |
| | Retirement | — | — | — | — |
| George S. Davis | Death | 44,828 | — | 16,627,467 | 16,672,295 |
| | Long Term Disability | — | — | 16,627,467 | 16,627,467 |
| | Change In Control | — | — | 16,538,570 | 16,538,570 |
| | Involuntary Termination | 44,828 | — | — | 44,828 |
| | Voluntary Termination | 44,828 | — | — | 44,828 |
| | Retirement | 44,828 | — | — | 44,828 |
| Derek K. Aberle | Death | 150,000 | — | 41,198,674 | 41,348,674 |
| | Long Term Disability | — | — | 41,198,674 | 41,198,674 |
| | Change In Control | — | — | 41,189,958 | 41,189,958 |
| | Involuntary Termination | 150,000 | — | — | 150,000 |
| | Voluntary Termination | 150,000 | — | — | 150,000 |
| | Retirement | 150,000 | — | — | 150,000 |
| Cristiano R. Amon | Death | 91,348 | 2,552,040 | 13,124,398 | 15,767,786 |
| | Long Term Disability | — | 2,552,040 | 13,124,398 | 15,676,438 |
| | Change In Control | — | 2,552,040 | 12,692,424 | 15,244,464 |
| | Involuntary Termination | 91,348 | 255,204 | — | 346,552 |
| | Voluntary Termination | 91,348 | — | — | 91,348 |
| | Retirement | 91,348 | — | — | 91,348 |
| Venkata S. M. Renduchintala | Death | 111,153 | 2,552,040 | 16,069,180 | 18,732,373 |
| | Long Term Disability | — | 2,552,040 | 16,069,180 | 18,621,220 |
| | Change In Control | — | 2,552,040 | 15,980,361 | 18,532,401 |
| | Involuntary Termination | 111,153 | 255,204 | — | 366,357 |
| | Voluntary Termination | 111,153 | — | — | 111,153 |
| | Retirement | 111,153 | — | — | 111,153 |

(1) Match Shares are fully vested upon the completion of two years of continuous service with the Company. All of the NEOs, except Mr. Davis, fulfilled the continuous service requirement as of September 28, 2014, and all of the Match Shares credited to their accounts are vested. The potential payments upon termination or change in control related to the QNQDC Plan are equal to the Aggregate Balance column in the "Fiscal 2014 Nonqualified Deferred Compensation" table, and as a result, we did not include these amounts in this table.

(2) All U.S.-based employees, including the NEOs, are entitled to payouts of accrued vacation upon termination, including death. These amounts are as of September 28, 2014.

(3) Amounts related to the death, LTD and change-in-control termination scenarios are based on the intrinsic value of unvested options that would have become exercisable on September 28, 2014 based on the fair market value of the stock on such date.

(4) Amounts related to the involuntary termination scenario that is not for cause are based on the intrinsic value of 10% of unvested options assuming acceleration on September 28, 2014.

(5) For the change-in-control termination scenario, we have assumed 100% acceleration of unvested shares. The valuation of unvested shares is presented as of September 28, 2014.

(6) The share-based compensation expense recorded for accounting purposes may differ from the intrinsic value as disclosed in this column.

(7) None of the NEOs were retirement eligible under the applicable plan and award agreements at September 28, 2014.

## DIRECTOR COMPENSATION

The Compensation Committee reviews our non-employee director compensation practices annually, including an analysis of reported non-employee director compensation practices at the same peer companies used for the Compensation Committee's evaluation of NEO compensation. The analysis, prepared by FWC, includes prevalent practices for retainers, fees, equity-based compensation and stock ownership guidelines. The analysis conducted for fiscal 2014 affirmed that our structural provisions continue to be aligned with best practices as follows:

- No fees are provided for Board meeting attendance.

- Where applicable, directors receive an annual award of deferred stock units (DSUs) that are defined under a fixed-value formula, have vesting terms of approximately one year, include a mandatory three-year holding period from the grant date, and settle three years from the date of grant. Directors based in certain non-U.S. locations in which DSUs are not available under local tax code receive RSUs that are also defined under a fixed-value formula and have vesting terms of approximately one year but do not have the three-year holding period.

- Directors are subject to meaningful stock ownership guidelines. As discussed under "Stock Ownership Guidelines," non-employee directors are required to hold a number of shares of our common stock with a value equal to five times the annual retainer for Board service paid to U.S. residents. Non-employee directors are required to achieve this ownership level within five years of joining the Board. All of our non-employee directors who have served on the Board for five years have met this guideline. Dr. Hockfield and Messrs. Manwani, Randt and Rubinstein have not served on the Board for five years and thus are not yet required to meet this guideline. In addition to the preceding ownership guidelines, all directors are expected to own shares of our common stock within one year of joining the Board. All of our non-employee directors who have served on the Board for one year have met this guideline. Mr. Manwani has not served on the Board for one year and thus is not yet required to meet this guideline.

The following narratives, tables and footnotes describe the total compensation and benefits awarded to, earned by or paid to our non-employee directors during fiscal 2014.

### SUMMARY

**Annual retainer.** Directors who are U.S. residents receive an annual retainer of $100,000 paid in equal one-fourth installments at the end of each calendar quarter. Directors who are non-U.S. residents receive an annual retainer of $120,000 in consideration of the increased travel time, also paid in equal one-fourth installments at the end of each calendar quarter. If available under the applicable tax code, directors may elect to receive all, or a portion, of the annual retainer in cash and/or in DSUs granted under the 2006 LTIP. The number of DSUs received is based on the fair market value of our common stock (as defined by the 2006 LTIP) on the last trading day of the last month of the calendar quarter. The DSUs vest immediately but are subject to a three-year holding period and generally settle three years from the grant date, unless the director elects to defer further.

**Board committee Chair retainer.** The Chairs of the Audit and Compensation Committees receive annual retainers of $25,000. Chairs of the Governance and Finance Committees receive annual retainers of $15,000.

**Presiding director retainer.** The presiding director receives an annual retainer of $25,000.

**Meeting fees.** Directors receive $1,500 for each committee meeting attended (in person or telephonic attendance). Directors do not receive a fee for attending Board meetings. Directors Emeriti receive $2,000 for each Board meeting attended in person ($1,000 for telephonic attendance).

PX281

Case 3:17-cv-00121-JO-MSB Doc 377-7 Filed 05/07/24 PgID.33722 Pg 179 of 181

**Equity compensation.** The Compensation Committee grants annual DSUs to directors who reside in jurisdictions where DSUs are permitted. The Compensation Committee grants annual RSU awards to directors who reside in jurisdictions where DSUs are not permitted. The grant date is the date of the annual meeting of stockholders, and the number of DSUs and RSUs awarded is determined by dividing $200,000 by the closing price of our common stock on the grant date. Directors who join the Board between annual meetings of stockholders receive DSUs or RSUs with a value on the grant date reduced (from the $200,000 that would have been awarded for a full year of service) on a pro rata basis to reflect the partial year of



PX281
Page 5809

service until the next annual meeting of stockholders. The DSUs vest at the subsequent annual meeting (generally a one-year cliff vesting) and are settled in shares of our common stock three years following the grant date (or later if voluntarily elected by the director). The RSUs vest in April of the calendar year following the grant date so as to defer the taxable event to the following tax year. A director may elect to receive a partial cash payment to pay estimated taxes upon vest. The DSUs and RSUs include dividend equivalent rights. The dividend equivalent rights accrue in the form of additional shares of our common stock with vesting and distribution at the same time as the underlying DSUs and RSUs.

**Nonqualified deferred compensation earnings.** Directors may defer any cash portion of their retainer and meeting fees under the QNQDC Plan. Directors who contribute to the QNQDC Plan are not eligible to receive the Company cash match or any interest that is above the market rate. The amounts reported in the table below are the investment earnings on the deferred cash portion.

**Charitable gifts matching program.** We will match 100%, up to $50,000 annually, of a director's or Director Emeritus's contribution to qualified, eligible IRS recognized non-profit organizations.

**Perquisites and other personal benefits.** Perquisites and other personal benefits for a director are excluded if the total value of all of his or her perquisites and personal benefits is less than $10,000. If the total value of all perquisites and personal benefits is $10,000 or more, then each perquisite or personal benefit, regardless of its amount, is identified by type. Each perquisite or personal benefit that exceeds the greater of $25,000 or 10% of the total amount of perquisites and personal benefits for that director is identified by type and quantified. We offer a new cellular phone to each director each year as a personal benefit, and these amounts are included as perquisites if required to be disclosed as provided above.

## Fiscal 2014 Director Compensation (1)

| Name | Fees Earned or Paid in Cash ($) (2) | Stock Awards ($) (3) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) (4) | Total ($) |
|---|---|---|---|---|---|
| Barbara T. Alexander | 118,000 | 200,017 | — | 50,000 | 368,017 |
| Donald G. Cruickshank | 139,500 | 200,017 | — | 50,000 | 389,517 |
| Raymond V. Dittamore | 138,500 | 200,017 | — | 10,000 | 348,517 |
| Susan Hockfield | 107,500 | 200,017 | — | 16,550 | 324,067 |
| Thomas W. Horton | 113,500 | 200,017 | — | 50,000 | 363,517 |
| Sherry Lansing | 149,000 | 200,017 | — | 50,000 | 399,017 |
| Harish Manwani (5) | 49,121 | 150,002 | — | — | 199,123 |
| Duane A. Nelles | 127,000 | 200,017 | — | 50,000 | 377,017 |
| Clark T. Randt, Jr. | 101,641 | 266,737 | — | — | 368,378 |
| Francisco Ros | 130,500 | 200,017 | — | 10,000 | 340,517 |
| Jonathan J. Rubinstein | 106,000 | 200,017 | — | 50,000 | 356,017 |
| Brent Scowcroft | 109,000 | 200,017 | — | 50,000 | 359,017 |
| Marc I. Stern | 135,500 | 200,017 | 85,707 | 50,000 | 471,224 |

(1) We did not award any stock options or provide any non-equity incentive plan compensation to any directors in fiscal 2014. Therefore, we did not include the "Option Awards" or "Non-Equity Incentive Plan Compensation" columns in this table.

(2) These amounts include cash retainers and meeting fees. For Ms. Alexander, these amounts also include the value of DSUs issued in lieu of payment of cash retainer fees. DSUs awarded to Ms. Alexander are fully vested and will be settled in three years.

(3) These amounts represent the fair value of the awards as determined based on the fair market value of our common stock on the date of grant.

(4) These amounts represent the Company's match of directors' contributions to qualified, eligible IRS recognized non-profit organizations. Perquisites and personal benefits have been excluded as the total value for each director was less than $10,000.

(5) Mr. Manwani joined the Board on May 4, 2014.

The following table shows the number of outstanding stock options and the aggregate number of outstanding RSU and DSU awards held by each of our non-employee directors as of September 28, 2014.

| **Name** | **Number of Outstanding Options (#) (1)** | **Number of Outstanding RSUs/DSUs (#) (2)** |
|---|---|---|
| Barbara T. Alexander | 22,000 | 11,558 |
| Donald G. Cruickshank | 70,000 | 2,669 |
| Raymond V. Dittamore | 78,000 | 19,837 |
| Susan Hockfield | — | 7,916 |
| Thomas W. Horton | 2,500 | 9,121 |
| Sherry Lansing | 26,755 | 9,121 |
| Harish Manwani | — | 1,920 |
| Duane A. Nelles | — | 9,121 |
| Clark T. Randt, Jr. | — | 2,669 |
| Francisco Ros | — | 9,121 |
| Jonathan J. Rubinstein | — | 5,091 |
| Brent Scowcroft | 78,000 | 9,121 |
| Marc I. Stern | 78,000 | 18,039 |

(1) All outstanding stock options referenced in this column are fully vested.

(2) The information in this column includes dividend equivalent rights and amounts deferred under the director compensation program. See the narrative above under "Director Compensation" for detailed information on RSUs and DSUs granted to our non-employee directors.



PX281