# PX 282

DEF 14A 1 proxy2016.htm DEF 14A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**SCHEDULE 14A INFORMATION**

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**(AMENDMENT NO.__)**

Filed by the Registrant [X]

Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ] Preliminary Proxy Statement
[ ] Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
[X] Definitive Proxy Statement
[ ] Definitive Additional Materials
[ ] Soliciting Material Pursuant to Section 240.14a-12

**QUALCOMM INCORPORATED**

**(Name of Registrant as Specified In Its Charter)**
**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.
[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:
(2) Aggregate number of securities to which transaction applies:
(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
(4) Proposed maximum aggregate value of transaction:
(5) Total fee paid:
[ ] Fee paid previously with preliminary materials.
[ ] Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
(1) Amount Previously Paid:
(2) Form, Schedule or Registration Statement No.:
(3) Filing Party:
(4) Date Filed:

---

PX282

QUALCOMM

# QUALCOMM INCORPORATED
# Notice of 2016 Annual Meeting of Stockholders and Proxy Statement

QUALCOMM®

January 21, 2016

Dear Fellow Stockholder:

You are cordially invited to attend Qualcomm's 2016 Annual Meeting of Stockholders (the Annual Meeting) on **Tuesday, March 8, 2016**. The meeting will begin promptly at **9:30 a.m. Pacific Time** at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121**. I invite you to arrive early at 8:30 a.m. to preview our product displays. We will begin the Annual Meeting with a discussion and vote on the matters set forth in the Notice of Annual Meeting of Stockholders, followed by presentations and a report on Qualcomm's fiscal 2015 performance.

I would like to highlight Proposal 3, Approval of the 2016 Long-Term Incentive Plan. We offer a broad-based equity compensation program that is critical to attracting, retaining and engaging the finest people in our industry and ensuring alignment among our employees and stockholders. Our program of providing broad merit-based grants of restricted stock units to our employees has been a central part of our compensation and benefits mix, and we believe it has helped to create Qualcomm's inclusive and results-oriented culture. Without this program, we believe Qualcomm's competitiveness would be negatively impacted and would place Qualcomm at a disadvantage in its efforts to attract and retain the most talented and skilled individuals in the industry.

Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. As an alternative to voting in person at the Annual Meeting, you may vote via the Internet, by telephone, or if you receive a paper proxy card in the mail, by mailing the completed proxy card. Voting by any of these methods will ensure your representation at the Annual Meeting.

**Your vote is very important to us. I urge you to vote as our Board of Directors recommends.**

Thank you for your support and continued interest in Qualcomm. I look forward to seeing you in San Diego at the **Irwin M. Jacobs Qualcomm Hall** on **Tuesday, March 8, 2016**.

Sincerely,

Steve Mollenkopf

*Chief Executive Officer*

PX282

5775 Morehouse Drive
San Diego, California 92121-1714

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

### To Be Held On March 8, 2016

**To the Stockholders of QUALCOMM Incorporated:**

NOTICE IS HEREBY GIVEN that the 2016 Annual Meeting of Stockholders (Annual Meeting) of QUALCOMM Incorporated, a Delaware corporation (the Company), will be held at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121**, on **Tuesday, March 8, 2016 at 9:30 a.m. Pacific Time** for the following purposes:

1. To elect 12 directors to hold office until the next annual meeting of stockholders and until their respective successors have been elected and qualified.
2. To ratify the selection of PricewaterhouseCoopers LLP as our independent public accountants for our fiscal year ending September 25, 2016.
3. To approve the 2016 Long-Term Incentive Plan.
4. To hold an advisory vote to approve our executive compensation.
5. To act on a stockholder proposal, if properly presented at the Annual Meeting.
6. To transact such other business as may properly come before stockholders at the Annual Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on January 11, 2016 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and at any adjournment or postponement thereof.

By Order of the Board of Directors,



Donald J. Rosenberg
*Executive Vice President,*
*General Counsel and Corporate Secretary*

San Diego, California
January 21, 2016

## TABLE OF CONTENTS


LETTER TO STOCKHOLDERS

NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

TABLE OF CONTENTS i

PROXY OVERVIEW 1
- 2016 Annual Meeting of Stockholders 1
- Voting Matters and Board Recommendations 1
- Director Nominees 2
- Executive Compensation Highlights 3

PROXY STATEMENT 7
- Meeting Information 7
- Voting Rights and Outstanding Shares 7
- Notice of Internet Availability of Proxy Materials 7
- Voting Methods 7
- How Your Shares Will Be Voted 8
- Broker Non-Votes 8
- Revocability of Proxies 8
- Proxy Solicitation 9
- Stockholder Proposals 9
- Householding 9
- Financial Information 10
- Performance Measurement Comparison of Stockholder Return 10
- Corporate Directory 10

CORPORATE GOVERNANCE 11
- Code of Ethics and Corporate Governance Principles and Practices 11
- Board Leadership Structure 11
- Board Meetings, Committees and Attendance 12
- Board's Role in Risk Oversight 13
- Director Nominations 14
- Majority Voting 15
- Stock Ownership Guidelines 15
- Communications with Directors 16
- Annual Meeting Attendance 16
- Director Independence 16

PROPOSAL 1: ELECTION OF DIRECTORS 17
- Election of Directors 17
- Nominees for Election 17
- Required Vote and Board Recommendation 24

PROPOSAL 2: RATIFICATION OF SELECTION OF INDEPENDENT PUBLIC ACCOUNTANTS 25


PX282

Page 5816

| | |
|---|---|
| Fees for Professional Services | 25 |
| Policy on Audit Committee Pre-Approval of Audit and Non-Audit Services of Independent Public Accountants | 25 |
| Representation from PricewaterhouseCoopers LLP at the Annual Meeting | 26 |
| Required Vote and Board Recommendation | 26 |
| PROPOSAL 3: APPROVAL OF THE 2016 LONG-TERM INCENTIVE PLAN | 27 |



PX282

| | |
|---|---|
| Summary of the 2016 Long-Term Incentive Plan | 27 |
| Equity Compensation Plan Information | 37 |
| Required Vote and Board Recommendation | 38 |
| PROPOSAL 4: ADVISORY VOTE FOR APPROVAL OF OUR EXECUTIVE COMPENSATION | 39 |
| Compensation Program Best Practices | 39 |
| Changes to Our Compensation Programs | 39 |
| Required Vote and Effect of this Resolution | 40 |
| Board Recommendation | 40 |
| Proposal 5: STOCKHOLDER PROPOSAL | 41 |
| Stockholder Proposal | 41 |
| The Company's Statement in Opposition to Proposal 5 | 41 |
| Required Vote and Effect of this Resolution | 43 |
| Board Recommendation | 43 |
| STOCK OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 44 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 46 |
| Compensation Committee Interlocks and Insider Participation in Compensation Decisions | 46 |
| CERTAIN RELATIONSHIPS AND RELATED-PERSON TRANSACTIONS | 47 |
| COMPENSATION COMMITTEE REPORT | 48 |
| EXECUTIVE COMPENSATION AND RELATED INFORMATION | 49 |
| COMPENSATION DISCUSSION AND ANALYSIS | 49 |
| Our Named Executive Officers for Fiscal 2015 | 50 |
| Compensation Components | 51 |
| The Amounts and Mix of NEO Compensation for Fiscal 2015 | 53 |
| Process and Rationale for NEO Compensation Decisions | 61 |
| Performance Measures | 65 |
| COMPENSATION RISK MANAGEMENT | 67 |
| COMPENSATION TABLES AND NARRATIVE DISCLOSURES | 68 |
| Summary Compensation Table | 68 |
| All Other Compensation | 69 |
| Grants of Plan-Based Awards | 70 |
| Outstanding Equity Awards at Fiscal Year End | 71 |
| Option Exercises and Stock Awards Vested During Fiscal 2015 | 74 |
| Nonqualified Deferred Compensation | 75 |
| Potential Post-Employment Payments | 76 |
| DIRECTOR COMPENSATION | 80 |
| AUDIT COMMITTEE REPORT | 84 |
| OTHER MATTERS | 85 |
| APPENDIX 1: Financial Information | A-1 |
| APPENDIX 2: Performance Measurement Comparison of Stockholder Return | B-1 |


PX282

| | |
|---|---|
| APPENDIX 3: Corporate Directory | C-1 |
| APPENDIX 4: Reconciliation of Non-GAAP Measures to GAAP Results | D-1 |
| APPENDIX 5: 2016 Long-Term Incentive Plan | E-1 |

# EXECUTIVE COMPENSATION AND RELATED INFORMATION

## COMPENSATION DISCUSSION & ANALYSIS

This section of the proxy statement explains how the Compensation Committee of the Board of Directors oversees our executive compensation programs and discusses the compensation earned by our named executive officers (NEOs), as presented in the tables below under "Compensation Tables and Narrative Disclosures."

**This Compensation Discussion and Analysis is composed of six sections:**


| | Page |
|---|---|
| Our Named Executive Officers (NEOs) for Fiscal 2015 | 50 |
| Compensation Components | 51 |
| The Amounts and Mix of NEO Compensation for Fiscal 2015 | 53 |
| Process and Rationale for NEO Compensation Decisions | 61 |
| Performance Measures | 65 |


Detailed compensation tables that quantify and further explain our NEOs' compensation follow this Compensation Discussion and Analysis.

## OUR NAMED EXECUTIVE OFFICERS (NEOs) FOR FISCAL 2015

Our NEOs for fiscal 2015 were as follows:

Steve Mollenkopf



Current position

- Chief Executive Officer (CEO), since March 2014

Prior Qualcomm positions include:

- CEO-Elect and President, 2013 - 2014
- President and Chief Operating Officer, 2011 - 2013

21 years of service with Qualcomm

George S. Davis



Current position

- Executive Vice President and Chief Financial Officer (CFO), since March 2013

3 years of service with Qualcomm

Derek K. Aberle



Current position

- President, since March 2014

Prior Qualcomm positions include:

- Executive Vice President and Group President, 2011 - 2014
- Executive Vice President and President, QTL, 2008 - 2011

15 years of service with Qualcomm

Cristiano R. Amon



Current position

- Executive Vice President, Qualcomm Technologies, Inc. and President QCT since November 2015

Prior Qualcomm positions include:

- Executive Vice President, Qualcomm Technologies, Inc. and Co-President QCT from October 2012 to November 2015 Senior Vice President and Co-President, 2012
- Senior Vice President, Product Management, 2007 - 2012

18 years of service with Qualcomm

Paul E. Jacobs

Current position

PX282



- Executive Chairman and Chairman of the Board, since March 2014

Prior Qualcomm positions include:

- Chairman of the Board and CEO, 2009 - 2014
- CEO, 2005 - 2009

25 years of service with Qualcomm

## COMPENSATION COMPONENTS

**Figure 3** is an overview of the primary components of total direct compensation (TDC) for fiscal 2015 that include base salary, earnings under the Annual Cash Incentive Plan (ACIP), Performance Stock Units (PSUs) and Restricted Stock Units (RSUs). It also highlights how each component aligns with the objectives of our compensation program. In structuring our cash and long-term equity incentive award programs, we continue to use variations of non-GAAP performance measures as financial objectives. (See page 65 for definitions of the various performance measures used in determining our cash and long-term equity incentives.)

***Figure 3: Fiscal 2015 TDC Overview***

| | Salary | ACIP | Performance Stock Units | Restricted Stock Units |
|---|---|---|---|---|
| **Key Features** | | | | (Not granted in fiscal 2015) |
| Form | Cash | Cash | Equity | Equity |
| Type | Fixed Compensation | Variable Compensation | | |
| Performance Period | • Set at the beginning of fiscal 2015<br>• Earned for fiscal 2015 | • Set at the beginning of fiscal 2015<br>• Earned for performance in fiscal 2015 | • Awarded at the end of fiscal 2015<br>• To be earned for performance in fiscal 2016 - 2018 | • A portion of the fiscal 2014 award replaced the grant that would otherwise have been made in fiscal 2015 |
| Measures and relative weightings | • Individual performance, experience, expertise, skills, competitive practices and internal comparisons | • Adjusted Revenues performance (weighted 40%)<br>• Adjusted Operating Income performance (weighted 60%) | • Relative total shareholder return (TSR) compared to NASDAQ-100 (50% of total PSU awards) (RTSR PSUs)<br>• Average annual Adjusted Return On Invested Capital (ROIC) (50% of total PSU awards) (ROIC PSUs) | • Award vests based on continued service |
| **Objectives** | | | | |
| Align interests of NEOs and stockholders | • Competitive amounts that attract and retain executives who execute the business strategy | • Aligns approximately 9% of NEOs' aggregate TDC to achieving Company's annual financial objectives | • Aligns approximately 86% of NEOs' aggregate TDC to long-term absolute and relative TSR performance and efficient use of capital for the fiscal 2016 - 2018 performance period | |
| Pay for performance - amounts earned vary with performance | • Individual contributions are considered when adjusting salary amounts | • Payouts vary from 0 (performance at or below 80% of objective) to 2x target (performance at or above 125% of objective)<br>• Funding rate for fiscal 2015 was 0.48x of target award for performance at 90% of objective | • Earned shares vary from 0 to 2x of target award, depending on relative stock price performance and achieving ROIC objective<br>• Earned shares for both awards capped at target if absolute TSR is negative | • Fair value of award varies depending on stock price performance |
| Tax efficient for the Company | • Deductible except for portion of CFO's salary in excess of $1 million, if any | • Designed with intent to comply with the requirements for tax deductibility under Internal Revenue Code Section 162(m) | | |
| Internally fair and equitable | • The Compensation Committee considers business and individual factors to evaluate internal fairness and equitability and monitors the internal compensation relationships among the NEOs but does not set specific internal relationships. | | | |
| Competitive for the business | • Competitive levels to attract, motivate, engage and retain executives. The Compensation Committee considers competitive practices of peer companies as reference points for comparative purposes but does not set specific benchmark percentile objectives. | | | |
| High standards for governance and risk management | • The Compensation Committee reviews annually the amounts of all components of compensation and obtains industry and peer data in consultation with Frederic W. Cook Co., Inc. (FWC), the Compensation Committee's independent consultant. | | | |
| | | • Cash incentive compensation repayment ("clawback") policy | | • The Executive Chairman must hold net after-tax shares from the front-loaded RSUs for one |

PX282

| | | | | |
|---|---|---|---|---|
| | | | | year after termination of service. |

In addition to TDC, we have competitive health and welfare benefits that are generally structured the same for all U.S. employees, plus several other benefits. **Figure 4** describes the other benefits that are generally available to U.S.-based executives, and **Figure 5** describes the other benefits that are generally available to all U.S.-based employees, including executives.

***Figure 4: U.S. Executive Benefits***

| Component | Form and Purpose | Comment |
|---|---|---|
| Nonqualified deferred compensation program Company match (NQDC Plan) | • Company match on employees' deferred contributions up to a predefined formula maximum amount<br>• Provide a competitive, nonqualified, tax-efficient defined contribution retirement program for employees deemed to be "highly compensated" | We do not have a pension plan or other defined benefit retirement program. See the "Fiscal 2015 Nonqualified Deferred Compensation" table for a description of the Company match program. |
| Financial planning reimbursement | • Reimbursement of actual expenses incurred for financial, estate and tax planning<br>• Attract and retain executive-level employees<br>• Assist NEOs with managing their time | We reimburse up to $12,500 for the Executive Chairman, the CEO and the President and up to $8,000 for the other NEOs. |
| Additional life insurance | • Additional coverage, above the amount provided to all employees<br>• Attract and retain executive-level employees | The additional coverage is $1 million for the Executive Chairman and the CEO and $750,000 for the other NEOs. |
| Use of corporate aircraft for personal travel | • Facilitate flexible travel arrangements and provide security | We have a program that limits the amount of compensation reported in the Summary Compensation Table to $250,000 for the CEO and $650,000 for all NEOs in the aggregate. |

***Figure 5: U.S. All-Employee Benefits***

| Component | Form and Purpose | Comment |
|---|---|---|
| Tax qualified deferred compensation | • 401(k) Plan<br>• Provide a tax-efficient retirement savings opportunity<br>• Attract and retain employees | The 401(k) Plan is a tax-qualified deferred compensation plan. We match employee contributions in cash using a tiered structure in order to encourage participation among all employees. |
| Employee Stock Purchase Plan (ESPP) | • Qualcomm stock<br>• Encourage stock ownership and align employee and stockholder interests<br>• Attract and retain employees | The ESPP is a tax-qualified plan available to all U.S.-based employees. Purchases through payroll deductions are limited to $12,500 in fair market value (FMV) of the stock per 6-month offering period (determined on the first day of each offering period). The purchase price is equal to 85% of the lower of: (1) the FMV on the first day of the offering period or (2) the FMV on the last day of the offering period. |
| Charitable contribution match | • Matching cash paid to the charitable organization<br>• Encourage and extend employees' support of cultural, educational and community non-profit organizations | We match 100% of employee contributions, up to pre-defined maximum amounts, to qualified tax-exempt non-profit organizations, excluding organizations that further religious doctrine, exclusionary organizations and/or political non-profit organizations. The maximum annual amount we will match is based on the employee's job level. We will match up to $125,000 for the Executive Chairman, the CEO and the President and up to $100,000 annually for the other NEOs. |



PX282

In addition to the programs identified above, we offer supplemental dental and vision programs that provide limited coverage above the basic dental and vision plans to senior-level, U.S.-based employees. The purpose of this program is to attract and retain experienced talent.

## THE AMOUNTS AND MIX OF NEO COMPENSATION FOR FISCAL 2015

### Performance-Based Incentives

**Figure 6** is an overview of Mr. Mollenkopf's target TDC, and **Figure 7** is a similar overview of the aggregate target TDC for our other NEOs. Target TDC includes base salary, the ACIP target award that would be paid for 100% achievement of our financial objectives, target PSUs awarded on September 25, 2015 and the annualized value of the front-loaded RSUs awarded in fiscal 2014 (see the discussion under "RSU Awards for Fiscal 2015" for further explanation). **Figure 6** shows that approximately 94% of Mr. Mollenkopf's fiscal 2015 target TDC was attributable to performance-based incentive compensation that varies with financial metrics, including relative and absolute TSR and ROIC.

***Figure 6: CEO Compensation Mix***



*Figure 7: Other NEOs' Aggregate Compensation Mix*




## Fiscal 2015 Salaries

In September 2014, the Compensation Committee approved the fiscal 2015 salaries for our NEOs (see **Figure 8**). These increases positioned their salaries within 5% of the median of our peer companies, excluding Dr. Jacobs's salary, which is $1 annually and precludes meaningful comparison. Prior to the increases, Mr. Mollenkopf's salary was slightly below the competitive median, and Mr. Aberle's salary was aligned with the competitive median. Prior to their increases, Messrs. Davis's and Amon's salaries were at least 10% below the competitive median, and the increases positioned their salaries approximately 5% below the competitive medians.

*Figure 8: Fiscal 2015 Salaries for the CEO and Other NEOs*

| Name | Base Salary | | |
|---|---|---|---|
| | **2014 ($)** | **2015 ($)** | **Increase %** |
| Steve Mollenkopf | 1,100,000 | 1,130,000 | 2.7% |
| George S. Davis | 725,000 | 760,000 | 4.8% |
| Derek K. Aberle | 780,000 | 800,000 | 2.6% |
| Cristiano R. Amon | 475,000 | 525,000 | 10.5% |
| Paul E. Jacobs | 1 | 1 | —% |
| **Total** | **3,080,001** | **3,215,001** | **4.4%** |

## Fiscal 2015 ACIP Earnings

*In Fiscal 2015, we achieved 90% of our weighted financial performance objectives, and our NEOs earned 45% of their aggregate target amounts.*

PX282

**Figure 9** shows the objectives and performance levels for Adjusted Revenues and Adjusted Operating income, which were the measures that the Compensation Committee established during the first quarter of fiscal 2015 for determining earned ACIP awards. The fiscal 2015 weighted financial performance was 90% of our objectives, resulting in an ACIP funding rate of

0.48 (compared to a funding rate of 1.0 had we achieved our financial objectives). See page 65 for definitions of the various performance measures used in determining our cash incentives.

***Figure 9: Fiscal 2015 ACIP Financial Objectives and Performance***




The funding rate was determined through the following steps:

- Adjusted Revenues performance was 90% of the objective and Adjusted Operating Income performance was 88% of the objective. Consistent with the ACIP, we applied a relative weighting of 40% to Adjusted Revenues and 60% to Adjusted Operating Income to emphasize the relative importance of operating income to stockholder value creation. Accordingly, our weighted financial performance was 89% [(90% x 40%) + (89% x 60%)].

- The funding rate is based on the weighted financial performance, such that:

  - For each one percent that the weighted financial performance exceeds the objective, the funding rate increases by 0.04 from the target funding rate of 1.00 up to a maximum of 2.00.

  - For each one percent that the weighted financial performance falls short of the objective, the funding rate decreases by 0.05 from the target funding rate of 1.00, which would reach zero for weighted financial performance at or below 80% of the objective.

- Our fiscal 2015 weighted financial performance was 89%, or 11 percent short of the objective, resulting in a 0.52 reduction from the target funding rate of 1.00. Accordingly, the fiscal 2015 ACIP funding rate was 0.48 (1.00 - 0.52).

In addition to the funding rate determined by fiscal 2015 Adjusted Revenues and Adjusted Operating income, the Compensation Committee considered other strategic and operational achievements by the NEOs. Some examples of these achievements include resolution with China's National Development and Reform Commission (NDRC), execution of the initial phase of the Company's plan to reduce operating expenses and numerous business acquisition and strategic investment

transactions, including the acquisition of CSR plc. To maximize tax deductibility, amounts earned under the ACIP are designed to qualify as performance-based compensation under Section 162(m). This design provides that if certain financial objectives are met, the NEOs may receive up to 2x of their target amounts, subject to the Compensation Committee's negative discretion to pay any amount less than that maximum.

**Figure 10** shows the calculations for determining the fiscal 2015 performance-adjusted amounts and earned amounts for each NEO.

***Figure 10: Fiscal 2015 ACIP Target, Performance-Adjusted and Earned Amounts***

| Name | ACIP Target ($) | x | Funding Rate | = | Performance-Adjusted Amount ($) | Earned Amount Awarded by Compensation Committee ($) | Variance of Earned Amount vs Performance-Adjusted Amount (%) |
|---|---|---|---|---|---|---|---|
| Steve Mollenkopf | 2,260,000 | | 0.48 | | 1,084,800 | 1,025,000 | -6% |
| George S. Davis | 988,000 | | 0.48 | | 474,240 | 400,000 | -16% |
| Derek K. Aberle | 1,080,000 | | 0.48 | | 518,400 | 520,000 | 0% |
| Cristiano R. Amon | 525,000 | | 0.48 | | 252,000 | 320,000 | 27% |
| Paul E. Jacobs | — | | n/a | | — | n/a | n/a |
| **Total** | **4,853,000** | | | | **2,329,440** | **2,265,000** | **-3%** |

The Compensation Committee was authorized under the fiscal 2015 ACIP to modify Adjusted Revenues and Adjusted Operating Income in calculating financial performance on which fiscal 2015 cash incentives were determined. Modifications are intended to eliminate the distorting effect of certain unusual income or expense items if the Compensation Committee determines, in its discretion, that the items do not reflect a fair measurement of our operating performance. The Committee did not make any such modifications for fiscal 2015.

## Fiscal 2015 ACIP Compared to Previous Years

**Figure 11** summarizes ACIP performance for fiscal years 2013 - 2015 and illustrates the alignment of Company financial performance and ACIP earnings. (See page 65 for definitions of the various performance measures as those terms were used in calculating ACIP amounts.)

- In fiscal 2013, the Company exceeded the Adjusted Revenues and Adjusted Operating Income objectives by 5% and 3%, respectively, resulting in an ACIP funding rate of 1.16 (16% above the target amount).
- In fiscal 2014, the Company fell short of the Adjusted Revenues and Adjusted Operating Income objectives, resulting in an ACIP funding rate of 0.71 (29% below the target amount).
- In fiscal 2015, the Company fell short of the Adjusted Revenues and Adjusted Operating Income objectives, resulting in an ACIP funding rate of 0.48 (52% below the target amount).

*Figure 11: ACIP Financial Objectives and Performance*




## Fiscal 2016 Changes to the ACIP

Based on stockholder input and the Compensation Committee's own review, the Compensation Committee changed the ACIP metrics for fiscal 2016 by replacing the Adjusted Operating Income measure used in fiscal 2015 with the new Adjusted Earnings Per Share (EPS) measure that includes share-based compensation expense and excludes certain items to the extent that they were not anticipated in establishing the ACIP target. (See page 65 for the definitions of performance measures used in calculating ACIP amounts.)

## Fiscal 2015 Long-Term Incentives

In fiscal 2015, all equity granted to the NEOs was in the form of PSUs, and the potential number of shares of our common stock that may be earned at the end of the three-year performance period varies from 0 to 2x of the target amount. The Compensation Committee determines in its sole discretion the appropriate mix of equity awards, the target values of these awards, the achievement of the performance measures and the potential maximum number of equity awards that may be earned. The Compensation Committee approved PSU awards for each NEO in fiscal 2015, taking into consideration the annualized value of front-loaded RSUs it awarded to the NEOs in fiscal 2014. (See further discussion on page 59 under "Annualized Portion of Fiscal 2014 Front-Loaded RSU Awards Attributable to Fiscal 2015.") The Compensation Committee approved two separate PSU awards for each NEO as described below.

***Relative TSR PSUs (RTSR PSUs)***

PX282

The RTSR PSU award allows the NEOs to earn a variable number of shares of our common stock based on the relative performance of our total shareholder return (TSR) compared to that of the companies comprising the NASDAQ-100. The

NEOs must also satisfy time-based service requirements. The Compensation Committee selected relative TSR because it aligns directly with stockholder value creation.

Relative TSR compares our TSR percentile rank among the companies comprising the NASDAQ-100 over a three-year period according to the payout schedule set forth in **Figure 12**.

***Figure 12: RTSR PSUs Payout Schedule***

| Award Level | Qualcomm's TSR Percentile Rank Among the NASDAQ-100 | Multiple of Target RTSR PSUs Earned (1) |
|---|---|---|
| Maximum Award Level | 90th percentile and above | 2x |
| Target Award Level | 60th percentile | 1x |
| Threshold Award Level | 33rd percentile | 0.33x |
| Below Threshold | Below 33rd percentile | No shares would be earned |

(1) The multiple of target RTSR PSUs earned between the award levels interpolates linearly with our TSR percentile ranking.

The RTSR PSUs also provide that the total number of shares earned may not exceed the target number of shares if our absolute TSR for the entire three-year performance period is negative. This provision considers stockholder's interests by limiting the number of shares that may be earned in the event relative TSR performance is strong despite a declining stock price.

***Return On Invested Capital PSUs (ROIC PSUs)***

The Compensation Committee introduced Adjusted ROIC PSUs to tie a portion of our NEOs' awards to efficient use of capital. The ROIC PSU awards allow the NEOs to earn a variable number of shares of our common stock based on the achievement of a three-year ROIC objective established by the Compensation Committee at the time of grant in September 2015. Eligible participants must also satisfy time-based service requirements.

ROIC is a common financial term, and there are numerous methods for calculating ROIC. We calculate our Adjusted ROIC by averaging over the three-year performance period (a) Adjusted After-Tax Operating Income divided by (b) the sum of average Adjusted Debt and average Adjusted Equity for the relevant year. (See page 65 for the definitions of performance measures to be used in determining the number of PSUs for the 2016 - 2018 performance period.) The payout schedule is set forth in **Figure 13**.

***Figure 13: ROIC PSU Payout Schedule***

| Award Level | Average Annual ROIC for Fiscal 2016 - 2018 | Multiple of Target ROIC PSUs Earned (1) |
|---|---|---|
| Maximum Award Level | ROIC is at or above 120% of Target | 2x |
| Target Award Level | ROIC is at Target | 1x |
| Threshold Award Level | ROIC is 80% of Target | 0.33x |
| Below Threshold | ROIC is less than 80% of Target | No shares would be earned |

(1) The multiple of target ROIC PSUs earned between the award levels interpolates linearly with our average annual Adjusted ROIC.

The ROIC PSUs also provide that the total number of shares earned may not exceed the target number of shares if our average annual Adjusted ROIC for the entire three-year performance period is negative.

**Figure 14** shows the grant date fair values of the PSUs the Compensation Committee awarded to the NEOs on September 25, 2015.

*Figure 14: Grant Date Fair Values of PSUs Awarded to NEOs in Fiscal 2015*

| Name | Grant Date Fair Value | | |
|---|---|---|---|
| | RTSR PSUs ($) | ROIC PSUs ($) | Aggregate PSU Awards ($) |
| Steve Mollenkopf | 4,000,019 | 4,000,015 | 8,000,034 |
| George S. Davis | 1,350,014 | 1,350,032 | 2,700,046 |
| Derek K. Aberle | 1,890,052 | 1,890,002 | 3,780,054 |
| Cristiano Amon | 1,810,048 | 1,810,012 | 3,620,060 |
| Paul E. Jacobs | 4,500,028 | 4,500,017 | 9,000,045 |
| **Total** | **13,550,161** | **13,550,078** | **27,100,239** |

## Annualized Portion of Fiscal 2014 Front-Loaded RSU Awards Attributable to Fiscal 2015

In fiscal 2014, we granted front-loaded RSUs, which accelerated future years' RSU grant values into fiscal 2014, to encourage retention without making above-market grants and increasing related costs and dilution over time. Since we attributed a portion of the front-loaded RSUs granted in fiscal 2014 to fiscal 2015, the Compensation Committee considered the annualized value of the fiscal 2014 RSU grants in determining fiscal 2015 total equity grant values (i.e., the Compensation Committee reduced the total equity value that they would have otherwise granted to the NEOs in fiscal 2015 by the amount of the RSUs granted in fiscal 2014 which were attributable to fiscal 2015). There will be similar annual offsets for Messrs. Mollenkopf and Aberle and Dr. Jacobs through fiscal 2018 as their RSUs were front-loaded for five years. The RSUs granted to Messrs. Davis and Amon were front-loaded for three years and consequently will have annual offsets through 2016. The structure of the fiscal 2014 awards is summarized below in **Figure 15** for clarity on this point.

*Figure 15: Fiscal 2014 Front-Loaded NEO RSU Grants*

| Name | Grant Date Fair Value ($ millions) | Periods Covered By Grant Value | Vesting |
|---|---|---|---|
| Steve Mollenkopf | 30.0 | Fiscal 2014 through 2018 | Five equal annual installments |
| George S. Davis | 6.9 | Fiscal 2014 through 2016 | Five equal annual installments |
| Derek K. Aberle | 16.1 | Fiscal 2014 through 2018 | Five equal annual installments |
| Cristiano R. Amon | 4.1 | Fiscal 2014 through 2016 | Five equal annual installments |
| Paul E. Jacobs | 45.0 | Fiscal 2014 through 2018 | Three equal installments on the 3rd, 4th and 5th anniversaries of the grant date |

With respect to Messrs. Mollenkopf and Aberle and Dr. Jacobs, one-fifth of the fiscal 2014 RSUs are treated as attributable to fiscal 2015. With respect to Messrs. Davis and Amon, one-third of the fiscal 2014 RSUs are treated as attributable to fiscal 2015.

## PSU Performance in Previous Years

The number of shares of our common stock earned by the NEOs has varied based on the relative performance of our TSR compared to that of the NASDAQ-100 during applicable measurement periods. The Compensation Committee has awarded RTSR PSUs to our NEOs and other executive officers annually since fiscal 2010. The four performance periods for RTSR PSUs granted in fiscal 2010, 2011, 2012 and 2013 have been completed, the number of shares of our common stock earned for each of these four performance periods have been determined, and the shares have been issued to the recipients.

**Figure 16** summarizes the TSRs for Qualcomm relative to the NASDAQ-100 and the percent of target shares earned for our relative TSR performance.

PX282

Our TSR out-performed the NASDAQ-100 TSR for one of the four performance periods and under-performed for the other three performance periods. The RTSR PSUs earned as a percent of the target shares were aligned with our relative performance.

- Our relative TSR for the fiscal 2010 RTSR PSU awards (for the three-year performance period from 11/2/2009 - 10/31/2012) underperformed the NASDAQ-100 TSR, resulting in a payout of 98% of the target shares.



PX282

- Our relative TSR for the fiscal 2011 RTSR PSU awards (for the three-year performance period from 11/1/2010 - 10/31/2013) out-performed the NASDAQ-100 TSR, resulting in a payout of 119% of the target shares.
- Our relative TSR for the fiscal 2012 RTSR PSU awards (for the three-year performance period from 9/26/2011 - 9/26/2014) underperformed the NASDAQ-100 TSR, resulting in a payout of 88% of the target shares.
- Our relative TSR for the fiscal 2013 RTSR PSU awards (for the two-year performance period from 9/30/2013 - 9/27/2015) was below the 33rd percentile threshold compared to the NASDAQ-100, and as a result, no shares were earned or issued.

***Figure 16: Qualcomm and NASDAQ-100 3-Year Total Shareholder Returns for PSUs Granted in Fiscal 2010 - 2013 (1)***




(1) We are providing information on PSUs granted prior to fiscal 2015 to illustrate the historical performance of PSUs and the strong relationship between the percent of target PSUs earned and our TSR relative to the NASDAQ-100.



PX282
Page 5838

## PROCESS AND RATIONALE FOR NEO COMPENSATION DECISIONS

We consider several factors in determining the compensation levels of our NEOs. The Compensation Committee does not have a predefined framework that determines which of these factors may be more or less important, and the emphasis placed on specific factors may vary among the NEOs. Ultimately, it is the Compensation Committee's judgment about these factors that forms the basis for determining our NEOs' compensation.

### We review the compensation practices of other companies with which we compete.

The Compensation Committee identified peer companies to use for competitive analyses, taking into account recommendations made by FWC, the Compensation Committee's independent compensation consultants. The peer companies were identified based on the following characteristics:

- Technology, telecommunications and media companies (excluding those that are primarily content producers) based on Global Industry Classification Standard (GICS) codes;
- Companies of comparable size, with both market capitalization and revenues between 0.25x to 4.0x Qualcomm's size;

  We believe that market capitalization is appropriate as the primary quantitative criterion because:

  - Market capitalization, a key component of which is stock price, is the key driver of equity compensation grant value, and equity compensation grant value is the single largest component of CEO compensation among technology companies with large market capitalizations;
  - Market capitalization is directly related to stockholder benefit; and
  - A significant portion of our business is technology licensing, which is a high-margin business, and as such, Qualcomm typically has higher market capitalization and profit than companies with similar revenues.

  We also include revenues as a secondary quantitative criterion because revenues are commonly used as a selection criterion by our peer companies, third-party compensation survey providers and proxy advisory services.

- Comparable compensation model;
- Consistent and on-going data availability; and
- Peers of peers, which are the peer companies often disclosed by our peer companies.

**Figure 17** identifies the peer companies the Compensation Committee selected in May 2015. The peer companies and Qualcomm are ranked, high-to-low, on revenues, net income, EBITDA, EBITDA margin and market capitalization. Compared to the prior year's peer group, the Compensation Committee removed Yahoo!, which fell below the revenue threshold. The Compensation Committee added Micron Technology and Visa, both prominent technology companies that fit the criteria. Broadcom's market capitalization was below the threshold, but was retained to maintain continuity and a sufficiently robust peer company sample size. (The proposed acquisition of Broadcom by Avago was announced after the Compensation Committee approved the peer companies.)

Qualcomm's percentile rankings among the peer companies illustrate that, relative to our peer companies, we are below median for revenues and above median for the other metrics, and our market capitalization is strongly supported by the other metrics.

*Figure 17: Qualcomm's Relative Rankings Among Peer Companies as of March 31, 2015 (1)*

| Revenue | | | Net Income | | EBITDA | | EBITDA Margin | | Market Cap | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Company* | *Ticker* | *$ Millions* | *Ticker* | *$ Millions* | *Ticker* | *$ Millions* | *Ticker* | | *Ticker* | *$ Millions* |
| Microsoft | MSFT | 93,074 | MSFT | 20,675 | MSFT | 34,150 | V | 68% | GOOG | 372,734 |
| IBM | IBM | 92,793 | GOOG | 14,444 | INTC | 24,191 | FB | 50% | MSFT | 334,103 |
| Amazon.com | AMZN | 88,988 | IBM | 12,022 | CMCSA | 23,160 | ORCL | 46% | FB | 229,955 |
| Comcast | CMCSA | 68,775 | INTC | 11,704 | IBM | 22,833 | INTC | 43% | ORCL | 188,695 |
| Google | GOOG | 66,001 | ORCL | 10,827 | GOOG | 21,476 | TXN | 39% | AMZN | 173,027 |
| United Technologies | UTX | 64,270 | CSCO | 8,653 | ORCL | 17,856 | MSFT | 37% | V | 161,161 |
| Intel | INTC | 55,870 | CMCSA | 8,380 | CSCO | 13,434 | **QCOM** | **36%** | IBM | 158,979 |
| Cisco | CSCO | 48,083 | **QCOM** | **8,064** | UTX | 11,231 | TWC | 36% | INTC | 148,470 |
| Lockheed Martin | LMT | 45,600 | UTX | 6,220 | **QCOM** | **9,687** | MU | 35% | CMCSA | 143,494 |
| Honeywell | HON | 40,306 | V | 5,600 | V | 8,759 | CMCSA | 34% | CSCO | 140,570 |
| Oracle | ORCL | 38,840 | HON | 4,239 | DTV | 8,489 | GOOG | 33% | **QCOM** | **114,688** |
| DirecTV | DTV | 33,260 | MU | 3,690 | TWC | 8,228 | CSCO | 28% | UTX | 106,579 |
| **Qualcomm** | **QCOM** | **26,964** | LMT | 3,614 | HON | 7,353 | EBAY | 28% | HON | 81,591 |
| EMC | EMC | 24,440 | FB | 2,940 | LMT | 6,368 | DTV | 26% | EBAY | 70,600 |
| Time Warner Cable | TWC | 22,812 | TXN | 2,821 | EMC | 6,323 | EMC | 26% | LMT | 63,729 |
| eBay | EBAY | 17,902 | DTV | 2,756 | FB | 6,225 | IBM | 25% | TXN | 59,851 |
| Micron Technology (+) | MU | 16,889 | EMC | 2,714 | MU | 5,898 | ADP | 23% | EMC | 50,737 |
| Texas Instruments | TXN | 13,045 | TWC | 2,031 | TXN | 5,135 | BRCM | 19% | DTV | 42,783 |
| Visa (+) | V | 12,929 | ADP | 1,437 | AMZN | 5,057 | HON | 18% | TWC | 42,086 |
| Facebook | FB | 12,466 | BRCM | 652 | EBAY | 5,039 | UTX | 17% | ADP | 40,859 |
| ADP | ADP | 11,629 | EBAY | 46 | ADP | 2,650 | LMT | 14% | MU | 29,165 |
| Broadcom | BRCM | 8,428 | AMZN | -241 | BRCM | 1,631 | AMZN | 6% | BRCM | 25,934 |
| 75th percentile | | 64,270 | | 8,653 | | 17,856 | | 37% | | 161,161 |
| 50th percentile | | 38,840 | | 3,690 | | 8,228 | | 28% | | 106,579 |
| 25th percentile | | 16,889 | | 2,714 | | 5,898 | | 23% | | 50,737 |
| QCOM percentile rank | | 41% | | 69% | | 62% | | 69% | | 51% |

(1) Data reflected in Figure 17 represents the latest four quarters of data available on March 31, 2015 reported in Standard & Poor's Compustat reports as of March 31, 2015, the time at which FWC prepared the peer company selection analysis, and therefore does not reflect the acquisition of DirecTV by AT&T or Google's new operating structure under the name Alphabet, Inc.

FWC provides analyses of peer company competitive practices. The Compensation Committee considers these peer company competitive practices, along with the other factors described in this section, when determining the salaries, ACIP targets, long-term equity grant date fair values and the TDC for the CEO, other NEOs and the other executive officers.

## We consider internal pay equitability in light of business and individual performance.

The NEOs' compensation levels are intended to be internally fair and equitable relative to roles, responsibilities and relationships, in addition to being competitively reasonable. Accordingly, the Compensation Committee also considers the following factors in the process of determining NEO compensation:

- The Committee's evaluation of the NEO's individual performance and contributions to financial objectives;

PX282

- Labor market conditions, the need to retain and motivate the NEO and the NEO's potential to assume increased responsibilities (which may be part of the Company's leadership succession plans) and contribute long-term value to the Company;
- Operational management, such as project milestones, process improvements and expense management;
- Internal working and reporting relationships, and our desire to encourage partnerships and teamwork among our NEOs (for example, using the same ACIP financial metrics and objectives for all NEOs promotes teamwork and collaboration and our NEO's contribution to company-wide initiatives, such as our commitment to reduce operating expenses);
- Individual expertise, skills, knowledge and tenure in position;
- Leadership actions that communicate, promote and support compliance with our Code of Ethics and our Code of Business Conduct (such as discussing ethics at breakfast meetings our NEOs have with employees, participating in an internal video series on compliance and establishing a review board to oversee internal investigations); and
- Developing and motivating employees (such as establishing processes for identifying and assessing high potential employees) and attracting and retaining employees (such as initiatives to increase the pipeline of women in leadership roles).

With respect to Dr. Jacobs, the Executive Chairman and the Chairman of the Board, the review process recognizes that his responsibilities are significantly greater than that of a typical employee board of directors' chair. Prior to becoming Executive Chairman in 2014 in accordance with a pre-established management succession process in which Mr. Mollenkopf became the CEO, Dr. Jacobs had 25 years of service with Qualcomm and had been regularly recognized by institutional investors as a top CEO in our sector throughout his nine-year tenure as CEO. Dr. Jacobs agreed to relinquish the CEO title and assume a different role, which we elected to call Executive Chairman after looking to companies such as Google, Oracle, Cisco and others for precedent. In this capacity, Dr. Jacobs focuses on long-term opportunities in emergent areas and manages certain of our relationships with key partners around the world, in addition to his responsibilities managing the Board. Those in the industry know him as a genuine pioneer and visionary, having been a key factor in the development of mobile communications technology.

As an example of the value our stockholders derived from this executive partnership during fiscal 2015, Dr. Jacobs played a key role in securing our resolution of the antitrust dispute in China, which was well received by the market. He was critical to this successful outcome in a complex geopolitical and legal landscape, benefiting from high-level relationships he has developed over many years with senior industry and government contacts.

Looking ahead, companies across all sectors are urgently trying to figure out ways to monetize the opportunities that are arising as their customers increasingly interact with them through mobile devices. Dr. Jacobs, as a full-time employee, focuses on long-term opportunities in emergent areas and certain key relationships around the world, while Mr. Mollenkopf sets corporate strategy, leads the operations of the Company, oversees product development and manages global relationships.

### We consider the results of stockholder advisory votes on executive compensation as well as stockholder feedback.

Prior to the March 9, 2015 annual meeting of our stockholders, the Chairman of our Compensation Committee and executives from our investor relations department engaged in discussions with institutional stockholders, who in aggregate owned approximately 50% of our outstanding shares.

Many of our institutional stockholders commented on the metrics upon which we based our executives' incentives. The Compensation Committee, working with its independent consultants and our senior executives, determined that changes to our executive compensation program and practices were appropriate based on the feedback from these discussions, as well as stockholders holding more than 40% of the shares voted were against the non-binding advisory vote on executive compensation ("Say-on-Pay") at the 2015 annual meeting. The Compensation Committee approved changes to the ACIP for fiscal 2016 and PSUs awards granted in fiscal 2015. We described these modifications in the executive compensation highlights section of the proxy overview.

### We confer with the CEO on his recommendations for the other NEOs.

The Compensation Committee and the CEO discuss our business performance, the CEO's performance and the CEO's evaluation of and compensation recommendations for the other NEOs and other executive officers. The CEO, other NEOs and other executive

officers prepare self-evaluations, which highlight key strategic and operational accomplishments and

leadership actions that communicate, promote and support Qualcomm's ethical standards and compliance culture. The Compensation Committee and the CEO meet in executive session to review the self-evaluations and the CEO's oral assessment of his and the other NEOs' accomplishments and opportunities for improvement, including an assessment of each NEO's overall performance and potential for future roles. Members of the Compensation Committee, in their Committee and Board of Director roles, regularly engage with our executive officers through various briefings and discussions, providing opportunities for the Compensation Committee to consider the leadership contributions of the CEO and other NEOs on the Company's annual and longer-term performance. It is with these perspectives that the Compensation Committee, in executive session without the CEO present, decided and approved the CEO's and other NEOs' fiscal 2015 PSU award amounts (for the fiscal 2016 - 2018 performance period), any application of negative discretion for the fiscal 2015 ACIP earned amounts and any adjustments to base salaries and ACIP targets for fiscal 2016.

## We maintain policies to mitigate compensation risk.

Our current clawback policy requires an executive officer to repay any ACIP amount paid to them to extent that: (1) the amount of the ACIP payment was based on the achievement of certain financial results that were subsequently the subject of a restatement that occurred within 12 months of such payment; (2) the executive officer had engaged in theft, dishonesty or intentional falsification of documents or records that resulted in the obligation to restate our financial results; and (3) a lower annual cash incentive would have been paid to the executive officer based upon the restated financial results. We plan to amend this policy as needed to comply with any additional requirements of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) after the SEC adopts new regulations implementing those requirements.

Our executive officers, including the NEOs, and our nonemployee directors are long-term stockholders. The CEO is required to own 6x his salary, our President is required to own 3x his salary, and our other NEOs and executive officers are required to own 2x their respective salaries in our common stock. The ownership guideline for our Executive Chairman, whose annual salary is $1, is 6x his prior salary as CEO. Nonemployee directors have a guideline of 5x the annual cash Board retainer. NEOs have five years from the date of hire, appointment as an executive officer or appointment to an executive officer position with a different ownership guideline to comply with the applicable guideline. Nonemployee directors have five years from joining the Board to comply with the applicable guideline. In addition, all nonemployee directors are expected to own shares within one year of joining the Board.

If an NEO, other executive officer or nonemployee director is not in compliance by the deadline, we require that the individual retain 100% of the net shares remaining after required tax withholdings upon payment of any deferred stock units and 50% of the net shares remaining after required tax withholdings upon payment of any other full-value award or upon stock option exercise until the applicable guideline is met. Only shares actually owned, vested deferred stock units and shares under the NQDC Plan count toward the guideline. Outstanding unexercised stock options and unvested PSUs and RSUs do not count. Dr. Jacobs and Messrs. Aberle, Davis and Mollenkopf have met their ownership guidelines. Mr. Amon is required to meet his ownership guideline by October 2017.

We also have an insider trading policy that applies to executive officers, including NEOs, and nonemployee directors. The policy prohibits the hedging and pledging of our common stock and trading in put and call options and other types of equity derivatives.

## We engage independent advisors.

The Compensation Committee has the authority to engage and terminate any independent compensation consultant and to obtain advice and assistance from external legal, accounting and other advisors. As previously described, the Compensation Committee engaged FWC, an independent executive compensation consulting firm, to advise it on compensation matters during fiscal 2015. George Paulin, who is Chairman of FWC, leads the FWC team that assists the Compensation Committee and generally attends all Compensation Committee meetings. FWC reports directly to the Compensation Committee. The Company did not engage FWC for any additional services during fiscal 2015 beyond its support of the Compensation Committee, and the engagement did not raise any conflicts of interest. Pursuant to the engagement, FWC:

- Provided information, insights and advice regarding compensation philosophy, objectives and strategy;
- Recommended peer group selection criteria and identified and recommended potential peer companies;
- Provided analyses of competitive compensation practices for executive officers and nonemployee directors;
- Provided analyses of potential risks arising from executive and non-executive compensation programs;

- Provided analyses of aggregate equity compensation spending and related dilution;

- Reviewed and commented on recommendations regarding NEO compensation;
- Advised the Compensation Committee on specific issues as they arose, including engagement with stockholders; and
- Kept the Compensation Committee informed of executive compensation trends and regulatory and governance considerations related to executive compensation.

The Compensation Committee also sought and received advice from our outside legal counsel, DLA Piper LLP. Our human resources department supported the Compensation Committee in its work, collaborated with FWC and DLA Piper, conducted additional analyses and managed our compensation and benefit programs.

## PERFORMANCE MEASURES

We use non-GAAP financial information (i) to evaluate, assess and benchmark our operating results on a consistent and comparable basis; (ii) to measure the performance and efficiency of our ongoing core operating businesses, including the QCT (Qualcomm CDMA Technologies) and QTL (Qualcomm Technology Licensing) segments; and (iii) to compare the performance and efficiency of these segments against each other and against competitors.

We are able to assess what we believe is a more meaningful and comparable set of financial performance measures by using non-GAAP information. As a result, management compensation decisions and the review of executive compensation by the Compensation Committee of the Board of Directors focus primarily on non-GAAP financial measures.

The various performance measures used throughout this Proxy Statement are defined below. The most directly comparable GAAP performance measures and information reconciling non-GAAP performance measures to our reported financial results prepared in accordance with GAAP are included in Appendix 4.

### *Adjusted Revenues and Adjusted Operating Income*

For purposes of determining earnings under the ACIP for fiscal 2013, 2014 and 2015, GAAP revenues and operating income were adjusted to exclude (1) the QSI segment, (2) certain share-based compensation, (3) certain acquisition-related items and (4) certain tax items that were unrelated to the fiscal year in which they were recorded. Acquisition-related items included amortization of certain intangible assets, recognition of the step-up of inventories to fair value and expenses related to the termination of contracts that limited the use of the acquired intellectual property. Starting in fiscal 2015, we also excluded third-party acquisition and integration services costs.

### *Adjusted Earnings Per Share (EPS)*

For purposes of determining earnings under the ACIP for fiscal 2016, GAAP earnings per share will be adjusted to exclude the after tax impact of the following items:

- the QSI segment;
- acquisition-related items, which may include (i) third-party acquisition and integration services costs, (ii) amortization of certain intangible assets, (iii) recognition of the step-up of inventories to fair value, (iv) expenses related to the termination of contracts that limit the use of the acquired intellectual property, and (v) and the related tax effects of these items;
- certain tax items that are unrelated to the fiscal year in which they are recorded;
- certain other items, which may include major restructuring and restructuring-related costs, goodwill and long-lived asset impairments and litigation settlements and/or damages; and
- to the extent that they were not anticipated in establishing the ACIP target: (i) the impact of share repurchases and (ii) the operating results of acquisitions completed in the relevant year for which the purchase price exceeds $500 million.

### *Adjusted Return On Invested Capital (ROIC)*

PX282

We calculate our Adjusted ROIC by averaging over the three-year performance period (a) Adjusted After-Tax Operating Income for the relevant year divided by (b) the sum of average Adjusted Debt and average Adjusted Equity for the relevant year.

For purposes of calculating Adjusted After-Tax Operating Income for use in the Adjusted ROIC calculation, GAAP operating income will be adjusted to (a) include the relevant tax effects of the components of operating income and (b) exclude the after tax impact of the following items:

- the QSI segment;
- certain acquisition-related items, including (i) third-party acquisition and integration services costs, (ii) amortization of certain intangible assets, (iii) recognition of the step-up of inventories to fair value, (iv) expenses related to the termination of contracts that limit the use of the acquired intellectual property;
- tax items exceeding $10 million that are unrelated to the fiscal year in which they are recorded;
- certain other items, including restructuring and restructuring-related costs; impairments of goodwill and indefinite- and long-lived assets; litigation settlements and/or damages; and gains and losses on divestitures and sales of certain assets.

In addition, both the numerator and the denominator in the Adjusted ROIC calculation may be adjusted to exclude the impacts of certain items that were not anticipated in establishing the ROIC PSU target, which may include but are not limited to: (i) share repurchases; (ii) the financing of acquisitions with a purchase price greater than $5 billion; and (iii) changes in in tax law, accounting principles or other such laws or provisions.



PX282

## COMPENSATION RISK MANAGEMENT

The Compensation Committee engaged FWC to collaborate with Qualcomm's human resources staff to conduct an assessment of potential risks that may arise from our compensation programs. Based on this assessment, the Compensation Committee concluded that our policies and practices do not encourage excessive and unnecessary risk taking that would be reasonably likely to have a material adverse effect on Qualcomm. The assessment included executive and non-executive programs and focused on the variable components of cash incentives and equity awards. Our compensation programs are designed and administered through a corporate total rewards management office and are substantially identical among business units, corporate functions and global locations (with modifications to comply with local regulations as appropriate). The risk-mitigating factors considered in this assessment included:

- The alignment of pay philosophy, peer group companies and compensation amounts relative to competitive practices to support our business objectives;
- Effective balance of cash and equity, short- and long-term performance periods, limits on performance-based award schedules, Company financial metrics with consideration of individual performance factors and Compensation Committee discretion; and
- Ownership guidelines, a clawback policy, an insider trading policy, an equity award approval authorization policy and independent Compensation Committee oversight.

## COMPENSATION TABLES AND NARRATIVE DISCLOSURES

The following tables, narratives and footnotes describe the total compensation and benefits awarded to, earned by or paid to our NEOs during fiscal 2015.

## SUMMARY COMPENSATION TABLE

The following table shows information regarding compensation of each named executive officer for fiscal 2015, 2014 and 2013, except in the case of Mr. Amon, who was not a named executive officer in fiscal 2013.

### Fiscal 2015 Summary Compensation Table (1)(2)

| Name and Principal Position | Year | Salary ($) (3) | Bonus ($) (4) | Stock Awards ($) (5) | Non-Equity Incentive Plan Compensation ($) (6) | All Other Compensation ($) (7) | Total ($) |
|---|---|---|---|---|---|---|---|
| Steve Mollenkopf<br>Chief Executive Officer (8) | 2015 | 1,141,886 | — | 8,000,034 | 1,025,000 | 205,405 | 10,372,325 |
| | 2014 | 1,069,239 | — | 58,000,203 | 1,550,000 | 121,150 | 60,740,592 |
| | 2013 | 815,006 | 1,500 | 12,000,079 | 1,325,000 | 166,481 | 14,308,066 |
| George S. Davis<br>Executive Vice President and Chief Financial Officer | 2015 | 758,665 | — | 2,700,046 | 400,000 | 159,606 | 4,018,317 |
| | 2014 | 724,043 | — | 9,600,019 | 665,000 | 167,555 | 11,156,617 |
| | 2013 | 363,463 | 1,000,000 | 11,500,110 | 590,000 | 192,023 | 13,645,596 |
| Derek K. Aberle<br>President (9) | 2015 | 805,394 | — | 3,780,054 | 520,000 | 237,474 | 5,342,922 |
| | 2014 | 772,734 | — | 30,380,219 | 720,000 | 230,706 | 32,103,659 |
| | 2013 | 728,321 | — | 8,000,053 | 1,045,000 | 284,061 | 10,057,435 |
| Cristiano R. Amon<br>Executive Vice President, Qualcomm Technologies, Inc. and President, QCT | 2015 | 523,090 | — | 3,620,060 | 320,000 | 102,305 | 4,565,455 |
| | 2014 | 474,048 | — | 10,760,281 | 460,000 | 9,973 | 11,704,302 |
| | 2013 | — | — | — | — | — | — |
| Paul E. Jacobs<br>Executive Chairman and Chairman of the Board (10) | 2015 | 1 | 5,375 | 9,000,045 | — | 309,392 | 9,314,813 |
| | 2014 | 969,984 | 21,375 | 54,000,175 | 1,300,000 | 650,458 | 56,941,992 |
| | 2013 | 1,200,014 | 8,325 | 15,000,069 | 3,480,000 | 760,532 | 20,448,940 |

(1) We did not grant any stock option awards to our NEOs during fiscal 2015. As a result, the "Option Awards" column has been omitted from the Fiscal 2015 Summary Compensation Table.

(2) We do not offer a pension plan or other defined benefit retirement plan to our NEOs. We do not provide above-market or preferential earnings on deferred compensation, nor do we provide dividends on stock in the Non-Qualified Deferred Compensation (NQDC) Plan at a rate higher than dividends on our common stock. As a result, the "Change in Pension Value and Nonqualified Deferred Compensation Earnings" column has been omitted from the Fiscal 2015 Summary Compensation Table.

(3) Salaries for NEOs as presented in this column may include vacation match payments payable under our vacation policy. This column also includes portions of the NEOs' salaries that they may have deferred pursuant to the NQDC Plan (see "Fiscal 2015 Nonqualified Deferred Compensation" table).

(4) The amounts in this column, with the exception of Mr. Davis who received a new hire bonus, represent amounts received under our patent award program. We disclose annual cash incentives in the "Non-Equity Incentive Plan Compensation" column.



PX282

(5) Stock awards granted to NEOs include annual grants and may include special grants for new hires, promotions and/or retention. The amounts in this column represent the grant date fair values of PSUs and RSUs granted during the fiscal year. The grant date fair values of RSUs were determined based on the fair value of our common stock on the date of grant. The PSU grant date fair values were determined based on a Monte Carlo simulation (which probability weights multiple potential outcomes). The amounts may not be indicative of the realized value of the awards if and when they vest. See the "Fiscal 2015 Grants of Plan-Based Awards" table for details on the stock awards granted to the NEOs during fiscal 2015. If we assume that the highest level of performance conditions will be achieved with respect to the PSUs (and thus the maximum number of shares will be issued under the PSUs), using the fair value of our common stock on the grant date for such shares, the fiscal 2015 stock awards would be as follows: $16,000,068 for Mr. Mollenkopf; $5,400,092 for Mr. Davis; $7,560,108 for Mr. Aberle; $7,240,120 for Mr. Amon; and $18,000,090 for Dr. Jacobs.

(6) The amounts in this column represent cash awards earned under our annual cash incentive plan (ACIP) for performance during fiscal 2015. The Compensation Committee approved the fiscal 2015 ACIP amounts on December 1, 2015, and the NEOs received payment in December 2015. See the "Compensation Discussion and Analysis" (CD&A) section and the "Fiscal 2015 Grants of Plan-Based Awards" table for a description of the ACIP and the payments made thereunder. This column includes portions of the NEOs' ACIP amounts that they may have deferred pursuant to the NQDC Plan (see "Fiscal 2015 Nonqualified Deferred Compensation" table).

(7) See the "Fiscal 2015 All Other Compensation" table for an itemized account of all other compensation reported in this column.

(8) The 2014 salary amount represents compensation for Mr. Mollenkopf from September 30 through December 11, 2013 as President and Chief Operating Officer, from December 12, 2013 through March 3, 2014 as Chief Executive Officer-elect and President and from March 4, 2014 through September 28, 2014 as Chief Executive Officer.

(9) The 2014 salary amount represents compensation for Mr. Aberle from September 30, 2013 through March 9, 2014 as Executive Vice President and Group President and from March 10, 2014 through September 28, 2014 as President.

(10) The 2014 amounts represent compensation for Dr. Jacobs from September 30, 2013 through March 3, 2014 as Chief Executive Officer and from March 5, 2014 through September 28, 2014 as Executive Chairman. Dr. Jacobs's salary and non-equity incentive plan target were reduced on March 4, 2014 when he stepped down as our Chief Executive Officer and assumed his current role of Executive Chairman.

## ALL OTHER COMPENSATION

We provide our NEOs with other compensation that is reasonable and consistent with our executive compensation program and supports our efforts to attract and retain executive-level employees. The cost of these benefits are disclosed in the All Other Compensation column of the Fiscal 2015 Summary Compensation Table and are itemized in the Fiscal 2015 All Other Compensation table below.

### Fiscal 2015 All Other Compensation

| Name | Perquisites and Other Personal Benefits ($) (1) | Nonqualified Deferred Compensation Plan ($) (2) | Charitable Match ($) (3) | Company Matching 401k Contributions ($) (4) | Life Insurance Premiums ($) (5) | All Other Compensation Total ($) |
|---|---|---|---|---|---|---|
| Steve Mollenkopf | — | 77,500 | 117,120 | 5,475 | 5,310 | 205,405 |
| George S. Davis | — | 111,847 | 30,845 | 5,052 | 11,862 | 159,606 |
| Derek K. Aberle | 35,658 | 119,539 | 72,707 | 5,475 | 4,095 | 237,474 |
| Cristiano R. Amon | 17,713 | 75,724 | — | 5,475 | 3,393 | 102,305 |
| Paul E. Jacobs | 24,819 | 154,829 | 125,000 | — | 4,744 | 309,392 |

(1) Perquisites and other personal benefits for a named executive officer are excluded if the total value of all of such perquisites and personal benefits is less than $10,000. If the total value of all perquisites and personal benefits for a named executive officer is $10,000 or more, then each perquisite or personal benefit, regardless of its amount, is

identified by type. Each perquisite or personal benefit that exceeds the greater of $25,000 or 10% of the total amount of perquisites and personal benefits for that named executive officer is identified by type and quantified.

The amounts in this column include: Mr. Aberle - $21,397 for the personal use of our corporate aircraft and the remainder for other insurance premiums, financial planning and home office costs; Mr. Amon - for insurance premiums and financial planning; and Dr. Jacobs - $18,834 for the personal use of our corporate aircraft and the remainder for other insurance premiums. Under certain circumstances, NEOs may utilize our corporate aircraft for personal use. In those instances, the value of the benefit is based on the aggregate incremental cost to the Company. Incremental cost is calculated based on the variable costs to the Company, including fuel costs, mileage, certain maintenance, universal weather-monitoring costs, on-board catering, landing/ramp fees and certain other miscellaneous costs. Fixed costs that do not change based on usage, such as pilot salaries, are excluded. The Company and Dr. Jacobs entered into aircraft time-sharing agreements pursuant to which Dr. Jacobs may use certain Company aircraft for his personal use and reimburse the Company for certain expenses of each flight operated under such an agreement up to the maximum amount permitted under Federal Aviation Administration rules. Dr. Jacobs has discretion over which flights are operated under time-sharing agreements. The amounts shown for Dr. Jacobs's personal use of our corporate aircraft reflect the total aggregate incremental costs to the Company of his personal use of our corporate aircraft, less any payments made by Dr. Jacobs to the Company under such time-sharing agreements.

(2) See the Nonqualified Deferred Compensation discussion for a description of the NQDC Plan and the Company match program thereunder. The amounts disclosed represent the Company's match, in cash, of up to 8% of the aggregate of the participant's base salary plus ACIP amounts deferred on a pre-tax basis under the NQDC Plan.

(3) We match 100% of an employee's contributions, up to predetermined maximum amounts, to encourage and extend employees' support of qualified tax exempt non-profit organizations, excluding organizations that further religious doctrine, exclusionary organizations or political organizations. The amounts disclosed represent our matching contributions for NEO contributions to cultural, education and community non-profit organizations. We will match up to $125,000 for our Executive Chairman, CEO and President and up to $100,000 for other NEOs.

(4) The 401(k) plan is a voluntary, tax-qualified deferred compensation plan available to all U.S. employees. We match employee contributions in cash, up to certain limits, using a tiered structure in order to encourage participation among our U.S.-based employees. This program provides a tax-efficient retirement savings opportunity. The amounts disclosed represent the cash value of the Company matches of our NEO's contributions to the 401(k) plan.

(5) We provide our executive officers additional life insurance above the amounts provided to other employees. The additional coverage is $1 million for the Executive Chairman, the CEO and the President and $750,000 for the other NEOs. The amounts disclosed represent the premiums paid for group term life insurance greater than $50,000 and executive life insurance.

## GRANTS OF PLAN-BASED AWARDS

The following table shows information regarding the incentive awards granted to our named executive officers for 2015. See "Compensation Discussion and Analysis" (CD&A) in the "Executive Compensation and Related Information" section for detailed information regarding our annual cash incentive plan and equity award programs.

## Fiscal 2015 Grants of Plan-Based Awards (1)(2)

| Name | Type of Award | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All other Stock Awards: Number of shares of stock or units (#) | Grant Date Fair Value of Stock Awards ($) (3) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | |
| Steve Mollenkopf | ACIP | | 22,600 | 2,260,000 | 4,520,000 | | | | | |
| | RTSR PSUs | 9/25/2015 | | | | 24,172 | 73,247 | 146,494 | | 4,000,019 |
| | ROIC PSUs | 9/25/2015 | | | | 24,803 | 75,160 | 150,320 | | 4,000,015 |
| George S. Davis | ACIP | | 9,880 | 988,000 | 1,976,000 | | | | | |
| | RTSR PSUs | 9/25/2015 | | | | 8,158 | 24,721 | 49,442 | | 1,350,014 |
| | ROIC PSUs | 9/25/2015 | | | | 8,371 | 25,367 | 50,734 | | 1,350,032 |
| Derek K. Aberle | ACIP | | 10,800 | 1,080,000 | 2,160,000 | | | | | |
| | RTSR PSUs | 9/25/2015 | | | | 11,421 | 34,610 | 69,220 | | 1,890,052 |
| | ROIC PSUs | 9/25/2015 | | | | 11,719 | 35,513 | 71,026 | | 1,890,002 |
| Cristiano R. Amon | ACIP | | 5,250 | 525,000 | 1,050,000 | | | | | |
| | RTSR PSUs | 9/25/2015 | | | | 10,938 | 33,145 | 66,290 | | 1,810,048 |
| | ROIC PSUs | 9/25/2015 | | | | 11,223 | 34,010 | 68,020 | | 1,810,012 |
| Paul E. Jacobs | ACIP | | — | — | — | | | | | |
| | RTSR PSUs | 9/25/2015 | | | | 27,193 | 82,403 | 164,806 | | 4,500,028 |
| | ROIC PSUs | 9/25/2015 | | | | 27,903 | 84,555 | 169,110 | | 4,500,017 |

(1) The Compensation Committee approved all equity grants on the grant dates.

(2) We did not award any stock options to any NEOs in fiscal 2015. Therefore, we did not include the “All Other Option Awards” or “Exercise or Base Price of Option Awards” columns in this table.

(3) The amounts for ROIC PSUs represent the grant date fair values based on the closing price of the Company’s common stock on the dates of grant. The amounts for RTSR PSUs represent the grant date fair value of the Company’s common stock as determined using a Monte Carlo simulation (which probability weights multiple potential outcomes).

## OUTSTANDING EQUITY AWARDS AT FISCAL YEAR END

The “Outstanding Equity Awards at Fiscal Year End” table below provides information on the current holdings of equity awards by the NEOs. The market value of stock reported is based on the closing price of the Company’s common stock at the end of the fiscal year. All stock options awarded to the NEOs were nonqualified stock options; stock options granted prior to September 10, 2010 are exercisable for ten years from the grant date, and stock options granted on or after September 10, 2010 are exercisable for seven years from the grant date.



PX282

## Outstanding Equity Awards at Fiscal Year End (1)

| Name | Grant Date | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Steve Mollenkopf | 11/09/11 | | | | | 30,053 (6) | 1,599,405 | | |
| | 09/29/13 | | | | | 21,495 (7) | 1,143,960 | | |
| | 09/29/13 | | | | | 14,330 (8) | 762,640 | | |
| | 12/12/13 | | | | | 287,216 (9) | 15,285,619 | | |
| | 12/12/13 | | | | | 344,659 (10) | 18,342,742 | | |
| | 11/09/11 | | | | | | | 26,947 (17) | 1,434,113 |
| | 09/16/14 | | | | | | | 216,712 (18) | 11,533,430 |
| | 09/25/15 | | | | | | | 146,494 (19) | 7,796,411 |
| | 09/25/15 | | | | | | | 150,320 (19) | 8,000,030 |
| Total | | — | — | | | 697,753 | 37,134,366 | 540,473 | 28,763,984 |
| George S. Davis | 03/11/13 | | | | | 34,461 (11) | 1,834,038 | | |
| | 09/29/13 | | | | | 23,884 (12) | 1,271,085 | | |
| | 05/05/14 | | | | | 72,143 (13) | 3,839,458 | | |
| | 09/16/14 | | | | | | | 73,140 (18) | 3,892,489 |
| | 09/25/15 | | | | | | | 49,442 (19) | 2,631,303 |
| | 09/25/15 | | | | | | | 50,734 (19) | 2,700,063 |
| Total | | — | — | | | 130,488 | 6,944,581 | 173,316 | 9,223,855 |
| Derek K. Aberle | 09/16/08 | 38,000 | — | 47.92 | 09/15/18 | | | | |
| | 11/09/09 | 63,051 | — | 44.75 | 11/08/19 | | | | |
| | 11/09/11 | | | | | 24,042 (6) | 1,279,501 | | |
| | 09/29/13 | | | | | 14,330 (7) | 762,640 | | |
| | 09/29/13 | | | | | 9,554 (8) | 508,445 | | |
| | 05/05/14 | | | | | 168,335 (13) | 8,958,791 | | |
| | 05/05/14 | | | | | 137,230 (14) | 7,303,388 | | |
| | 11/09/11 | | | | | | | 21,559 (17) | 1,147,376 |
| | 09/16/14 | | | | | | | 102,400 (18) | 5,449,747 |
| | 09/25/15 | | | | | | | 69,220 (19) | 3,683,888 |
| | 09/25/15 | | | | | | | 71,026 (19) | 3,780,004 |
| Total | | 101,051 | — | | | 353,491 | 18,812,765 | 264,205 | 14,061,015 |
| Cristiano Amon | 10/23/09 | 20,625 | — | 40.70 | 10/22/19 | | | | |
| | 07/06/12 | 51,000 | 17,000 (5) | 55.31 | 07/05/19 | | | | |
| | 09/30/12 | | | | | 4,024 (15) | 214,177 | | |
| | 09/30/12 | | | | | 5,979 (15) | 318,193 | | |
| | 09/29/13 | | | | | 7,165 (16) | 381,320 | | |
| | 09/29/13 | | | | | 4,777 (8) | 254,251 | | |

PX282

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 05/05/14 | | | | | 43,286 (13) | 2,303,697 | | |
| | 05/05/14 | | | | | 39,209 (14) | 2,086,714 | | |
| | 09/16/14 | | | | | | | 98,065 (18) | 5,219,026 |
| | 09/25/15 | | | | | | | 66,290 (19) | 3,527,954 |
| | 09/25/15 | | | | | | | 68,020 (19) | 3,620,024 |
| Total | | 71,625 | 17,000 | | | 104,440 | 5,558,352 | 232,375 | 12,367,004 |

| | | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Paul E. Jacobs | 11/04/05 | 286,586 | — | 44.02 | 11/03/15 | | | | |
| | 11/10/06 | 211,218 | — | 34.83 | 11/09/16 | | | | |
| | 11/12/07 | 195,168 | — | 37.29 | 11/11/17 | | | | |
| | 11/09/09 | 9,570 | — | 44.75 | 11/08/19 | | | | |
| | 09/29/13 | | | | | 35,825 (16) | 1,906,600 | | |
| | 05/05/14 | | | | | 588,129 (14) | 31,300,210 | | |
| | 09/16/14 | | | | | | | 243,801 (18) | 12,975,109 |
| | 09/25/15 | | | | | | | 164,806 (19) | 8,770,975 |
| | 09/25/15 | | | | | | | 169,110 (19) | 9,000,034 |
| Total | | 415,956 (4) | — | | | 623,954 | 33,206,810 | 577,717 | 30,746,118 |

(1) There were no unexercised, unearned options at September 27, 2015. Therefore, we did not include the "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" column in this table.

(2) Represents RSUs that have not vested at fiscal year end and includes dividend equivalent shares that have not vested at fiscal year end as follows: 33,568 shares for Mr. Mollenkopf; 8,431 shares for Mr. Davis; 16,651 shares for Mr. Aberle; 5,339 shares for Mr. Amon; and 24,902 shares for Dr. Jacobs.

(3) Represents PSUs that have not vested at fiscal year end and includes dividend equivalent shares that have not vested at fiscal year end as follows: 8,359 shares for Mr. Mollenkopf; 2,012 shares for Mr. Davis; 4,735 shares for Mr. Aberle; 2,697 shares for Mr. Amon; and 6,705 shares for Dr. Jacobs.

(4) Represents options exercisable by the trust of Dr. Jacobs's children for which he disclaims beneficial ownership.

| | Type of Grant | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|---|
| (5) | Stock Options | 7/6/2012 | 25% vests on the first anniversary of the date of grant and the remaining balance vests on each six-month anniversary after the date of grant until fully vested four years from the date of grant. | 7/6/2013<br>1/6/2014<br>7/6/2014<br>1/6/2015<br>7/6/2015<br>1/6/2016<br>7/6/2016 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (6) | Restricted Stock Units | 11/9/2011 | 33-1/3% per year | 11/9/2014<br>11/9/2015<br>11/9/2016 | Vesting was conditioned on the Compensation Committee's determination that the Company attained the relevant performance goals for fiscal 2012.<br>Vesting is also conditioned upon continued employment through the vesting date(s). |
| (7) | Restricted Stock Units | 9/29/2013 | 33-1/3% per year | 11/20/2013<br>11/20/2014<br>11/20/2015 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (8) | Restricted Stock Units | 9/29/2013 | 33-1/3% per year | 11/20/2014<br>11/20/2015<br>11/20/2016 | Vesting was conditioned on the Compensation Committee's determination that the Company attained the relevant performance goals for the first nine months of fiscal 2014. |

PX282
Page 5857

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Vesting is also conditioned upon continued employment through the vesting date(s). |
| (9) | Restricted Stock Units | 12/12/2013 | 33-1/3% per year | 12/12/2016<br>12/12/2017<br>12/12/2018 | Vesting is conditioned upon continued employment through the vesting date(s). |

| | Type of Grant | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|---|
| (10) | Restricted Stock Units | 12/12/2013 | 20% per year | 12/12/2014<br>12/12/2015<br>12/12/2016<br>12/12/2017<br>12/12/2018 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (11) | Restricted Stock Units | 3/11/2013 | 33-1/3% per year | 3/11/2014<br>3/11/2015<br>3/11/2016 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (12) | Restricted Stock Units | 9/29/2013 | 33-1/3% per year | 9/29/2014<br>9/29/2015<br>9/29/2016 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (13) | Restricted Stock Units | 5/5/2014 | 20% per year | 5/5/2015<br>5/5/2016<br>5/5/2017<br>5/5/2018<br>5/5/2019 | Vesting was conditioned on the Compensation Committee's determination that the Company attained the relevant performance goals for the first six months of fiscal 2015.<br>Vesting is also conditioned upon continued employment through the vesting date(s). |
| (14) | Restricted Stock Units | 5/5/2014 | 33-1/3% per year | 5/5/2017<br>5/5/2018<br>5/5/2019 | Vesting was conditioned on the Compensation Committee's determination that the Company attained the relevant performance goals for the first six months of fiscal 2015.<br>Vesting is also conditioned upon continued employment through the vesting date(s). |
| (15) | Restricted Stock Units | 9/30/2012 | 33-1/3% per year | 11/20/2013<br>11/20/2014<br>11/20/2015 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (16) | Restricted Stock Units | 9/29/2013 | 33-1/3% per year | 11/20/2013<br>11/20/2014<br>11/20/2015 | Vesting is conditioned upon continued employment through the vesting date(s). |
| (17) | Performance Stock Units | 11/9/2011 | 33-1/3% per year | 11/9/2014<br>11/9/2015<br>11/9/2016 | As of 9/27/15, all four measurement periods were complete. Number of shares is the total earned for the four measurement periods.<br>Vesting is also conditioned upon continued employment through the vesting date(s). |
| (18) | Performance Stock Units | 9/16/2014 | 100% cliff vesting | 10/4/2017 | As of 9/27/15, none of the measurement periods were complete. Number of shares is the potential maximum shares that may be earned for the four measurement periods.<br>Vesting is also conditioned upon continued employment through the vesting date(s). |
| (19) | Performance Stock Units | 9/25/2015 | 100% cliff vesting | 10/10/2018 | As of 9/27/15, the measurement period was incomplete. Number of shares is the potential maximum shares that may be earned for the measurement period.<br>Vesting is also conditioned upon continued employment through the vesting date(s). |

## OPTION EXERCISES AND STOCK AWARDS VESTED DURING FISCAL 2015

The "Option Exercises and Stock Awards Vested During Fiscal 2015" table below provides information on stock options exercised by the NEOs and NEO stock awards that vested during fiscal 2015.

## Option Exercises and Stock Awards Vested During Fiscal 2015

| Name | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| | Number of Shares Acquired on Exercise (#) | Value Realized On Exercise ($) | Number of Shares Acquired on Vesting (#) (1) | Value Realized on Vesting ($) (2) |
| Steve Mollenkopf | — | — | 214,560 | 15,256,802 |
| George S. Davis | — | — | 63,409 | 4,369,016 |
| Derek K. Aberle | — | — | 135,522 | 9,555,614 |
| Cristiano R. Amon | — | — | 43,171 | 2,963,030 |
| Paul E. Jacobs | 223,656 (3) | 6,312,656 (3) | 195,283 | 14,000,353 |

(1) Amounts include dividend equivalents on vested shares and shares withheld for the payment of taxes.

(2) Amounts represent the dollar value of shares acquired upon vesting based on the fair market value of our common stock on the vest date.

(3) Amounts include 79,429 shares acquired on exercise with a value realized on exercise of $2,157,694 by Dr. Jacobs's children for which he disclaims beneficial ownership.

## NONQUALIFIED DEFERRED COMPENSATION

The "Fiscal 2015 Nonqualified Deferred Compensation" table below provides information on the nonqualified deferred compensation of the NEOs.

Under the NQDC Plan, we match a portion of participants' contributions to the NQDC Plan with cash. We effectively match up to 8% of the aggregate of the participant's base salary plus ACIP amounts. We match eligible participants' contributions for a calendar year annually only if he or she is actively employed on the first day of the next calendar year or is terminated without cause during the calendar year and had satisfied the vesting eligibility requirement. Prior to calendar 2014, the Company matched participants' contributions with our common stock (Match Shares). All matching amounts vest in full upon an eligible employee's death, disability, attainment of age 65 while employed with the Company, involuntary termination of employment without "Cause" or voluntary termination of employment for "Good Reason" (in both cases within 24 months after a change in control of the Company), or completion of two continuous years of service with the Company commencing with the employee's date of hire. Effective for the 2016 Plan Year, the Company match was reduced from 8% to 4% of the aggregate of the participant's base salary plus ACIP amounts.

The amounts reported as Company contributions in the last fiscal year reflect the cash match in fiscal 2015 for the NEOs' contributions in the 2014 calendar year.

## Fiscal 2015 Nonqualified Deferred Compensation

| Name | Executive Contributions in Last Fiscal Year ($) (1) | Registrant Contributions in Last Fiscal Year ($) (2) | Aggregate Earnings in Last Fiscal Year ($) (3) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last Fiscal Year End ($) (4) |
|---|---|---|---|---|---|
| Steve Mollenkopf | 155,000 | 77,500 | (154,446) | — | 1,747,876 |
| George S. Davis | 455,666 | 111,847 | (33,714) | — | 1,705,435 |
| Derek K. Aberle | 305,079 | 119,539 | (425,020) | — | 4,763,818 |
| Cristiano R. Amon | 157,294 | 75,724 | (27,769) | — | 338,338 |
| Paul E. Jacobs | 208,000 | 154,829 | (1,267,332) | — | 27,823,729 |

(1) All amounts disclosed in this column are also reported in the Fiscal 2015 Summary Compensation Table with some of the

amounts included in the "Salary" column for the current year and the remaining amounts included in the "Non-Equity Incentive Plan Compensation" column for the current fiscal year.

(2) All amounts disclosed in this column are also reported in the Fiscal 2015 Summary Compensation Table under "All Other Compensation."

(3) The amounts in this column are not included in the Fiscal 2015 Summary Compensation Table.

(4) This column includes all amounts in the NQDC Plan for the NEOs. The following amounts were reported as compensation to the NEOs in our summary compensation tables for previous years (since fiscal 2002): Mr. Mollenkopf - $1,106,388; Mr. Davis - $1,113,198; Mr. Aberle - $1,780,229; Mr. Amon - $55,540 and Dr. Jacobs - $13,021,318.

## POTENTIAL POST-EMPLOYMENT PAYMENTS

As noted in the CD&A, the Company employs almost all U.S.-based employees, including all of our NEOs, "at will," without employment contracts or severance agreements. We do not have a pre-defined severance plan covering the involuntary termination of employees, including our NEOs. We do not accelerate unvested stock options, RSUs or PSUs in the event of an involuntary "for cause" termination. Such terminations may involve theft, dishonesty, falsification, actions that are detrimental to the Company, conviction of a criminal act that impairs the performance of duties required by the Company or violation of a material Company policy. Our practice in such an involuntary termination situation may include the following non-equity benefits:

- Salary continuation dependent on the business reason for the termination;
- Lump-sum payment based on job level and years of service with Qualcomm;
- Lump-sum payment to assist with health care coverage for a limited time; and
- Outplacement services.

**Figure 18** summarizes the general terms of our equity award plans and agreements and nonqualified deferred compensation plan regarding how unvested options, PSUs, RSUs and Match Shares would be treated in the event of death, long-term disability, a change in control, certain involuntary terminations and normal retirement age. Any variations from the below are set forth in the CD&A.

*Figure 18: Treatment of Unvested Equity Awards in Certain Termination Situations*

| Termination Situation | Treatment of Unvested Stock Options and RSUs | Treatment of Unvested PSUs |
|---|---|---|
| Death | All unvested stock options and RSUs would become fully vested. Stock options would remain exercisable up to one year from the date of death or the expiration date of the grant, whichever is earlier. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the applicable award agreement. |
| Long-Term Disability (LTD) | Stock options would continue to vest per their original vesting schedule. Stock options would remain exercisable until the expiration date of the grant. All unvested RSUs would become fully vested. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the applicable award agreement. |
| Involuntary termination without cause | Stock options: 10% of the total amount granted is automatically accelerated, and up to an additional 10% may be accelerated using a pre-established formula as described in the applicable award agreement, subject to execution of a general release of claims. The accelerated vested stock options could then be exercised up to six months after termination, but in no event later than the expiration date of such options.<br><br>RSUs: All unvested RSUs are forfeited. | All unvested PSUs are forfeited. |
| Involuntary termination after a change in control - without cause or voluntary resignation for good reason | "Double-trigger" treatment of unvested awards: If, within 24 months after a change in control, the recipient's employment is involuntarily terminated for any reason other than for cause or if the recipient voluntarily resigns for "good reason" (as defined in the award agreements), then vesting of stock options and RSUs is accelerated in full. | Accelerate the vesting of PSUs that remain outstanding after a change in control. The number of shares of stock that may be issued will be prorated using a pre-defined formula. |
| Voluntary termination | Stock options: All vested stock options may be exercised for the number of days set forth in the terms of the applicable award agreement(s), but in no event later than the expiration date of such stock options. All unvested stock options are forfeited.<br><br>Note: Retirement provision applies to stock options if retirement eligible at termination.<br><br>RSUs: All unvested RSUs are forfeited. | All unvested PSUs are forfeited.<br><br>Note: Retirement provision applies if retirement eligible at termination. |
| Retirement (2) | Stock Options: All vested stock options may be exercised at any time prior to the expiration of 12 months, but in no event later than the expiration date of such options. All unvested stock options are forfeited. | All unvested PSUs would become fully vested, but the number of shares issued would be prorated based on a pre-established formula described in the applicable award agreement. |

PX282
Page 5863

| | | |
|---|---|---|
| | RSUs: All unvested RSUs are forfeited. | |

(1) Match Shares are fully vested upon the completion of two years of continuous service with the Company.

(2) Retirement (for stock options, RSU and PSUs) is the date on which a participant has attained the age of 60 years and has completed 10 years of continuous service with the Company.

The information in the "Potential Payments Upon Termination or Change in Control" table below describes the compensation that would be payable under various scenarios if the NEO's employment had terminated on the last day of fiscal 2015.

## Potential Payments Upon Termination or Change In Control (1)

| | | Equity Awards | | | |
|---|---|---|---|---|---|
| Name | Termination Scenario | Accrued Vacation ($) (2) | Stock Options ($) (3)(4)(5)(6) | Performance Stock Units/Restricted Stock Units ($) (5)(7) | Total ($) |
| Steve Mollenkopf | Death | 207,268 | — | 40,188,756 | 40,396,024 |
| | Long Term Disability | — | — | 40,188,756 | 40,188,756 |
| | Change In Control | — | — | 40,669,492 | 40,669,492 |
| | Involuntary Termination | 207,268 | — | — | 207,268 |
| | Voluntary Termination | 207,268 | — | — | 207,268 |
| | Retirement | 207,268 | — | — | 207,268 |
| George S. Davis | Death | 66,333 | — | 7,431,284 | 7,497,617 |
| | Long Term Disability | — | — | 7,431,284 | 7,431,284 |
| | Change In Control | — | — | 7,593,536 | 7,593,536 |
| | Involuntary Termination | 66,333 | — | — | 66,333 |
| | Voluntary Termination | 66,333 | — | — | 66,333 |
| | Retirement | 66,333 | — | — | 66,333 |
| Derek K. Aberle | Death | 153,848 | — | 20,784,028 | 20,937,876 |
| | Long Term Disability | — | — | 20,784,028 | 20,784,028 |
| | Change In Control | — | — | 21,011,203 | 21,011,203 |
| | Involuntary Termination | 153,848 | — | — | 153,848 |
| | Voluntary Termination | 153,848 | — | — | 153,848 |
| | Retirement | 153,848 | — | — | 153,848 |
| Cristiano R. Amon | Death | 90,476 | 904,740 | 6,210,918 | 7,206,134 |
| | Long Term Disability | — | 904,740 | 6,210,918 | 7,115,658 |
| | Change In Control | — | 904,740 | 6,428,459 | 7,333,199 |
| | Involuntary Termination | 90,476 | 90,474 | — | 180,950 |
| | Voluntary Termination | 90,476 | — | — | 90,476 |
| | Retirement | 90,476 | — | — | 90,476 |
| Paul E. Jacobs | Death | — | — | 34,829,169 | 34,829,169 |
| | Long Term Disability | — | — | 34,829,169 | 34,829,169 |
| | Change In Control | — | — | 35,369,955 | 35,369,955 |
| | Involuntary Termination | — | — | 6,260,042 | 6,260,042 |
| | Voluntary Termination | — | — | — | — |
| | Retirement | — | — | — | — |

(1) Match Shares are fully vested upon the completion of two years of continuous service with the Company. All of the NEOs fulfilled the continuous service requirement as of September 27, 2015, and all of the Match Shares credited to their accounts are vested. The potential payments upon termination or change in control related to the NQDC Plan are equal to the Aggregate Balance column in the "Fiscal 2015 Nonqualified Deferred Compensation" table, and as a result, we did not include these amounts in this table.

(2) All U.S.-based employees, including the NEOs, are entitled to payouts of accrued vacation upon termination, including death. These amounts are as of September 27, 2015.



PX282

Page 5865

(3) Amounts related to the death, LTD and change-in-control termination scenarios are based on the intrinsic value of unvested options that would have become exercisable on September 27, 2015 based on the fair market value of the stock on such date.

(4) Amounts related to the involuntary termination scenario that is not for cause are based on the intrinsic value of 10% of unvested options assuming acceleration on September 27, 2015.

(5) For the change-in-control termination scenario, we have assumed 100% acceleration of unvested shares. The valuation of unvested shares is presented as of September 27, 2015.

(6) The share-based compensation expense recorded for accounting purposes may differ from the intrinsic value as disclosed in this column.

(7) None of the NEOs were retirement eligible under the applicable plan and award agreements at September 27, 2015. The amounts shown assume retirement eligibility for illustration purposes.

## DIRECTOR COMPENSATION

The Compensation Committee reviews our nonemployee director compensation practices annually, including an analysis of reported nonemployee director compensation practices at the same peer companies used for the Compensation Committee's evaluation of NEO compensation. The analysis, prepared by FWC, includes prevalent practices for retainers, fees, equity-based compensation and stock ownership guidelines. The analysis conducted for fiscal 2015 affirmed that our structural provisions continue to be aligned with best practices as follows:

- No fees are provided for Board meeting attendance.

- Where applicable, directors receive an annual award of deferred stock units (DSUs) that are defined under a fixed-value formula, have vesting terms of approximately one year, include a mandatory three-year holding period from the grant date, and settle three years from the date of grant. Directors based in certain non-U.S. locations in which DSUs are not available under the local tax code receive restricted stock units (RSUs) that are also defined under a fixed-value formula and have vesting terms of approximately one year but do not have the three-year holding period.

  The Compensation Committee approved a change to the vesting terms, effective with the annual equity awards granted on or after the March 2016 Annual Meeting. The DSUs will be fully vested at grant and delivered on the third anniversary of the grant date, regardless of continued Board service, or upon death, disability or a change in control. A director may elect to defer the distribution, and the taxable event, beyond the 3-year mandatory period.

- Directors are subject to meaningful stock ownership guidelines. As discussed under "Stock Ownership Guidelines," nonemployee directors are required to hold a number of shares of our common stock with a value equal to five times the annual retainer for Board service paid to U.S. residents. Nonemployee directors are required to achieve this ownership level within five years of joining the Board. All of our nonemployee directors who have served on the Board for five years have met this guideline, except Sir Donald Cruickshank who is not standing for re-election at the Annual Meeting. Dr. Hockfield and Messrs. Manwani, McLaughlin, Randt, Rubinstein and Vinciquerra have not served on the Board for five years and thus are not yet required to meet this guideline. In addition to the preceding ownership guidelines, all directors are expected to own shares of our common stock within one year of joining the Board. All of our nonemployee directors who have served on the Board for one year have met this guideline.

The following narratives, tables and footnotes describe the total compensation and benefits awarded to, earned by or paid to our nonemployee directors during fiscal 2015.

### SUMMARY

**Annual retainer.** Directors who are U.S. residents receive an annual retainer of $100,000 paid in equal one-fourth installments at the end of each calendar quarter. Directors who are non-U.S. residents receive an annual retainer of $120,000 in consideration of the increased travel time, also paid in equal one-fourth installments at the end of each calendar quarter. If available under the applicable tax code, directors may elect to receive all, or a portion, of the annual retainer in cash and/or in DSUs granted under the 2006 LTIP. The number of DSUs received is based on the fair market value of our common stock (as defined by the 2006 LTIP) on the last trading day of the last month of the calendar quarter. The DSUs vest immediately but are subject to a three-year holding period and generally settle three years from the grant date, unless the director elects to defer further.

**Board committee Chair retainer.** The Chairs of the Audit and Compensation Committees receive annual retainers of $25,000. Chairs of the Governance and Finance Committees receive annual retainers of $15,000. The Board may appoint special committees from time-to-time, and retainers, if any, for the chairs of such committees are determined by the Compensation Committee in its discretion.

**Presiding director retainer.** The presiding director receives an annual retainer of $25,000.

**Meeting fees.** Directors receive $1,500 for each standing committee meeting attended (in person or by telephone ). Directors do not receive a fee for attending Board meetings. Directors Emeriti receive $2,000 for each Board meeting attended in person ($1,000 for telephonic attendance). Meeting fees, if any, for special committees are determined by the Compensation Committee in its discretion.

PX282

**Equity compensation.** The Compensation Committee grants annual DSUs to directors who reside in jurisdictions where DSUs are permitted. The Compensation Committee grants annual RSUs to directors who reside in jurisdictions where DSUs are not permitted. The grant date is the date of the annual meeting of stockholders, and the number of DSUs and RSUs awarded is determined by dividing $200,000 by the closing price of our common stock on the grant date. Directors who join the Board between annual meetings of stockholders receive DSUs or RSUs with a value on the grant date determined on a pro rata basis to reflect the partial year of service until the next annual meeting of stockholders. The DSUs vest at the subsequent annual meeting (generally a one-year cliff vesting) and are settled in shares of our common stock three years following the grant date (or later if voluntarily elected by the director). The RSUs vest in April of the calendar year following the grant date . A director may elect to receive a partial cash payment to pay estimated taxes upon vest. The DSUs and RSUs include dividend equivalent rights. The dividend equivalent rights accrue in the form of additional shares of our common stock with vesting and distribution at the same time as the underlying DSUs and RSUs.

The Compensation Committee reviewed best practices in 2015 and made certain changes to the the equity compensation program. Effective January 1, 2016, the annual DSUs and RSUs awarded to our directors will be fully vested on the grant date and will settle in shares of our common stock a minimum of three years following the grant date (or later if voluntarily elected by the director) regardless of continued Board service, or upon death, disability or a change in control. A director may continue to elect to receive a partial cash payment to pay estimated taxes upon vest. The DSUs and RSUs will continue to include dividend equivalent rights, and the dividend equivalent rights will continue to accrue in the form of additional shares of our common stock with vesting and distribution at the same time as the underlying DSUs and RSUs.

**Nonqualified deferred compensation earnings.** Directors may defer any cash portion of their retainer and meeting fees under the NQDC Plan. Directors who contribute to the NQDC Plan are not eligible to receive the Company cash match or any interest that is above the market rate.

**Charitable gifts matching program.** We will match 100%, up to $50,000 annually, of a director's or Director Emeritus's contribution to qualified, eligible IRS recognized non-profit organizations.

**Perquisites and other personal benefits.** Perquisites and other personal benefits for a director are excluded if the total value of all of his or her perquisites and personal benefits is less than $10,000. If the total value of all of his or her perquisites and personal benefits is $10,000 or more, then each perquisite or personal benefit, regardless of its amount, is identified by type. Each perquisite or personal benefit that exceeds the greater of $25,000 or 10% of the total amount of perquisites and personal benefits for that director is identified by type and quantified. We offer a new cellular phone to each director each year as a personal benefit, and these amounts are included as perquisites if required to be disclosed as provided above.

## Fiscal 2015 Director Compensation (1)(2)

| Name | Fees Earned or Paid in Cash ($) (3) | Stock Awards ($) (4) | All Other Compensation ($) (5) | Total ($) |
|---|---|---|---|---|
| Barbara T. Alexander | 114,458 | 200,011 | 50,000 | 364,469 |
| Donald G. Cruickshank | 141,000 | 200,011 | 50,000 | 391,011 |
| Raymond V. Dittamore | 140,000 | 200,011 | — | 340,011 |
| Jeffrey W. Henderson (6) | — | — | — | — |
| Susan Hockfield | 122,500 | 200,011 | 14,200 | 336,711 |
| Thomas W. Horton | 207,597 | 200,011 | 50,000 | 457,608 |
| Sherry Lansing | 129,444 | 200,011 | 50,000 | 379,455 |
| Harish Manwani | 123,000 | 200,011 | — | 323,011 |
| Mark D. McLaughlin (7) | 28,565 | 117,057 | — | 145,622 |
| Duane A. Nelles (8) | 99,661 | 200,011 | 50,000 | 349,672 |
| Clark T. Randt, Jr. | 176,958 | 200,011 | — | 376,969 |
| Francisco Ros | 133,500 | 200,011 | 3,000 | 336,511 |
| Jonathan J. Rubinstein | 193,500 | 200,011 | 50,000 | 443,511 |
| Brent Scowcroft (8) | 88,620 | 200,011 | 50,000 | 338,631 |
| Marc I. Stern | 135,500 | 200,011 | 50,000 | 385,511 |
| Anthony J. Vinciquerra (7) | 25,565 | 117,057 | — | 142,622 |

(1) We did not award any stock options or provide any non-equity incentive plan compensation to any directors in fiscal 2015. Therefore, we did not include the “Option Awards” or “Non-Equity Incentive Plan Compensation” columns in this table.

(2) We do not offer a pension plan or other defined benefit retirement plan to our nonemployee directors. We do not provide above-market or preferential earnings on deferred compensation, nor do we provide dividends on stock in the Non-Qualified Deferred Compensation (NQDC) Plan at a rate higher than dividends on our common stock. As a result, the “Nonqualified Deferred Compensation Earnings” column has been omitted from the Fiscal 2015 Director Compensation Table.

(3) These amounts include cash retainers and meeting fees. For Ms. Alexander and Mr. Vinciquerra, these amounts also include the value of DSUs issued in lieu of payment of cash retainer fees. DSUs awarded to Ms. Alexander are fully vested and will be settled in three years. DSUs awarded to Mr. Vinciquerra are fully vested and will be settled in January 1, 2019.

(4) These amounts represent the fair value of the awards as determined based on the fair market value of our common stock on the date of grant. DSUs issued in lieu of payment of cash retainer fees are not included in this column.

(5) These amounts represent the Company’s match of directors’ contributions to qualified, eligible IRS recognized non-profit organizations. Perquisites and personal benefits have been excluded as the total value for each director was less than $10,000.

(6) Mr. Henderson joined the Board on January 12, 2016.

(7) Mr. McLaughlin and Mr. Vinciquerra joined the Board on July 21, 2015.

(8) On July 17, 2015, General Scowcroft and Mr. Nelles retired from the Board. In connection with the conclusion of their lengthy service on the Board, the Compensation Committee accelerated the vesting of their annual DSUs granted in March 2015.

The following table shows the number of outstanding stock options and the aggregate number of outstanding RSUs and DSUs held by each of our nonemployee directors as of September 27, 2015.

## Outstanding Equity Awards Held by Directors at Fiscal Year End

| Name | Number of Outstanding Options (#) (1) | Number of Outstanding RSUs/DSUs (#) (2) |
|---|---|---|
| Barbara T. Alexander | 22,000 | 10,946 |
| Donald G. Cruickshank | 60,000 | 2,796 |
| Raymond V. Dittamore | 60,000 | 19,547 |
| Jeffrey W. Henderson (3) | — | — |
| Susan Hockfield | — | 8,675 |
| Thomas W. Horton | 2,500 | 8,675 |
| Sherry Lansing | 26,755 | 8,675 |
| Harish Manwani | — | 4,771 |
| Mark D. McLaughlin | — | 1,813 |
| Duane A. Nelles (4) | — | — |
| Clark T. Randt, Jr. | — | 5,541 |
| Francisco Ros | — | 8,675 |
| Jonathan J. Rubinstein | — | 8,033 |
| Brent Scowcroft (4) | 60,000 | — |
| Marc I. Stern | 60,000 | 21,350 |
| Anthony J. Vinciquerra | — | 1,813 |

(1) All outstanding stock options referenced in this column are fully vested.

(2) The information in this column includes dividend equivalent rights and amounts deferred under the director compensation program. See the narrative above under "Director Compensation" for detailed information on RSUs and DSUs granted to our nonemployee directors.

(3) Mr. Henderson joined the Board on January 12, 2016.

(4) On July 17, 2015, General Scowcroft and Mr. Nelles retired from the Board.



PX282

# PX 283

DEF 14A 1 proxy2017.htm DEF 14A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**SCHEDULE 14A INFORMATION**

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**(AMENDMENT NO.__)**

Filed by the Registrant [X]

Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ] Preliminary Proxy Statement
[ ] Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
[X] Definitive Proxy Statement
[ ] Definitive Additional Materials
[ ] Soliciting Material Pursuant to Section 240.14a-12

**QUALCOMM INCORPORATED**

**(Name of Registrant as Specified In Its Charter)**
**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.
[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
(1) Title of each class of securities to which transaction applies:
(2) Aggregate number of securities to which transaction applies:
(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
(4) Proposed maximum aggregate value of transaction:
(5) Total fee paid:
[ ] Fee paid previously with preliminary materials.
[ ] Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
(1) Amount Previously Paid:
(2) Form, Schedule or Registration Statement No.:
(3) Filing Party:
(4) Date Filed:

---

PX283



# QUALCOMM INCORPORATED

## Notice of 2017 Annual Meeting of Stockholders and Proxy Statement



PX283

January 19, 2017

Dear Fellow Stockholder:

You are cordially invited to attend Qualcomm's 2017 Annual Meeting of Stockholders (the Annual Meeting) on **Tuesday, March 7, 2017**. The meeting will begin promptly at **9:30 a.m. Pacific Time** at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121**. I invite you to arrive early at 8:30 a.m. to preview our product displays. We will begin the Annual Meeting with a discussion and vote on the matters set forth in the Notice of Annual Meeting of Stockholders, followed by presentations and a report on Qualcomm's fiscal 2016 performance.

Whether or not you plan to attend the Annual Meeting, please vote as soon as possible. As an alternative to voting in person at the Annual Meeting, you may vote via the Internet, by telephone, or if you receive a paper proxy card in the mail, by mailing the completed proxy card. Voting by any of these methods will ensure your representation at the Annual Meeting.

**Your vote is very important to us. I urge you to vote as our Board of Directors recommends.**

Thank you for your support and continued interest in Qualcomm. I look forward to seeing you in San Diego at the **Irwin M. Jacobs Qualcomm Hall** on **Tuesday, March 7, 2017**.

Sincerely,

Steve Mollenkopf

*Chief Executive Officer*

---

PX283

5775 Morehouse Drive
San Diego, California 92121-1714

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS

### To Be Held On March 7, 2017

**To the Stockholders of QUALCOMM Incorporated:**

NOTICE IS HEREBY GIVEN that the 2017 Annual Meeting of Stockholders (Annual Meeting) of QUALCOMM Incorporated, a Delaware corporation (the Company), will be held at the **Irwin M. Jacobs Qualcomm Hall, 5775 Morehouse Drive, San Diego, California 92121**, on **Tuesday, March 7, 2017 at 9:30 a.m. Pacific Time** for the following purposes:

1. To elect 11 directors to hold office until the next annual meeting of stockholders and until their respective successors have been elected and qualified.
2. To ratify the selection of PricewaterhouseCoopers LLP as our independent public accountants for our fiscal year ending September 24, 2017.
3. To approve, on an advisory basis, our executive compensation.
4. To vote on a stockholder proposal to amend the proxy access provision of our Amended and Restated Bylaws, if properly presented at the Annual Meeting.
5. To transact such other business as may properly come before stockholders at the Annual Meeting or any adjournment or postponement thereof.

The Board of Directors has fixed the close of business on January 9, 2017 as the record date for the determination of stockholders entitled to notice of and to vote at the Annual Meeting and at any adjournment or postponement thereof.

By Order of the Board of Directors,

Donald J. Rosenberg
*Executive Vice President,*
*General Counsel and Corporate Secretary*

San Diego, California
January 19, 2017

---

PX283

## TABLE OF CONTENTS


| | |
|---|---|
| LETTER TO STOCKHOLDERS | |
| NOTICE OF ANNUAL MEETING OF STOCKHOLDERS | |
| TABLE OF CONTENTS | i |
| PROXY OVERVIEW | 1 |
| 2017 Annual Meeting of Stockholders | 1 |
| Voting Matters and Board Recommendations | 1 |
| Director Nominees | 2 |
| PROXY STATEMENT | 3 |
| Meeting Information | 3 |
| Voting Rights and Outstanding Shares | 3 |
| Notice of Internet Availability of Proxy Materials | 3 |
| Voting Methods | 3 |
| How Your Shares Will Be Voted | 4 |
| Broker Non-Votes | 4 |
| Revocability of Proxies | 4 |
| Proxy Solicitation | 5 |
| Stockholder Proposals | 5 |
| Householding | 5 |
| Financial Information | 6 |
| Performance Measurement Comparison of Stockholder Return | 6 |
| Corporate Directory | 6 |
| CORPORATE GOVERNANCE | 7 |
| Code of Ethics and Corporate Governance Principles and Practices | 7 |
| Board Leadership Structure | 7 |
| Board Meetings, Committees and Attendance | 8 |
| Board's Role in Risk Oversight | 9 |
| Director Nominations | 9 |
| Majority Voting | 11 |
| Stock Ownership Guidelines | 11 |
| Communications with Directors | 11 |
| Annual Meeting Attendance | 12 |
| Director Independence | 12 |
| PROPOSAL 1: ELECTION OF DIRECTORS | 13 |
| Election of Directors | 13 |
| Nominees for Election | 13 |
| Required Vote and Board Recommendation | 18 |
| PROPOSAL 2: RATIFICATION OF SELECTION OF INDEPENDENT PUBLIC ACCOUNTANTS | 19 |
| Fees for Professional Services | 19 |


PX283

| | |
|---|---|
| Policy on Audit Committee Pre-Approval of Audit and Non-Audit Services of Independent Public Accountants | 19 |
| Representation from PricewaterhouseCoopers LLP at the Annual Meeting | 20 |
| Required Vote and Board Recommendation | 20 |
| PROPOSAL 3: ADVISORY VOTE FOR APPROVAL OF OUR EXECUTIVE COMPENSATION | 21 |
| Compensation Program Best Practices | 21 |




PX283

| | |
|---|---|
| Required Vote | 21 |
| Effect of this Resolution | 22 |
| Board Recommendation | 22 |
| PROPOSAL 4: STOCKHOLDER PROPOSAL TO AMEND THE PROXY ACCESS PROVISION OF OUR AMENDED AND RESTATED BYLAWS | 23 |
| Stockholder Proposal | 23 |
| The Company's Statement in Opposition to Proposal 4 | 23 |
| Required Vote | 26 |
| Effect of this Resolution | 27 |
| Board Recommendation | 27 |
| STOCK OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 28 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 29 |
| Compensation Committee Interlocks and Insider Participation | 30 |
| Equity Compensation Plan Information | 30 |
| CERTAIN RELATIONSHIPS AND RELATED-PERSON TRANSACTIONS | 31 |
| COMPENSATION COMMITTEE REPORT | 32 |
| EXECUTIVE COMPENSATION AND RELATED INFORMATION | 33 |
| COMPENSATION DISCUSSION AND ANALYSIS | 33 |
| Summary | 33 |
| Our Named Executive Officers for Fiscal 2016 | 36 |
| Program Overview | 37 |
| Fiscal 2016 Target Amounts and Compensation Mix | 41 |
| Fiscal 2016 Actual Amounts and Pay for Performance Analysis | 44 |
| Process and Rationale for NEO Compensation Decisions | 48 |
| Compensation Program Best Practices | 52 |
| Other Compensation Components | 53 |
| COMPENSATION RISK MANAGEMENT | 55 |
| COMPENSATION TABLES AND NARRATIVE DISCLOSURES | 56 |
| Summary Compensation Table | 56 |
| All Other Compensation | 57 |
| Grants of Plan-Based Awards | 58 |
| Outstanding Equity Awards at Fiscal Year End | 59 |
| Option Exercises and Stock Awards Vested During Fiscal 2016 | 63 |
| Nonqualified Deferred Compensation | 63 |
| Potential Post-Employment Payments | 64 |
| DIRECTOR COMPENSATION | 67 |
| AUDIT COMMITTEE REPORT | 70 |
| OTHER MATTERS | 71 |
| APPENDIX A: Financial Information | A-1 |

PX283

| | |
|---|---|
| APPENDIX B: Performance Measurement Comparison of Stockholder Return | B-1 |
| APPENDIX C: Corporate Directory | C-1 |
| APPENDIX D: Performance Measures | D-1 |
| APPENDIX E: Reconciliation of Non-GAAP Measures to GAAP Results | E-1 |

# EXECUTIVE COMPENSATION AND RELATED INFORMATION

## COMPENSATION DISCUSSION & ANALYSIS

The Compensation Committee oversees our executive compensation program. This Compensation Discussion and Analysis section discusses this program and the compensation earned by or paid to our Named Executive Officers (NEOs) for fiscal 2016.

## Summary

### Fiscal 2016 Business Highlights

Fiscal 2016 was a year of transition as we executed on our Strategic Realignment Plan announced in fiscal 2015 and continued to invest in technology leadership and new growth areas. Our Qualcomm CDMA Technologies (QCT) and Qualcomm Technology Licensing (QTL) segments made progress in fiscal 2016 as QCT delivered on its improved operating margin target and QTL continued to execute new license agreements in China.

**Strategic Realignment Plan.** In the fourth quarter of fiscal 2015, we announced a Strategic Realignment Plan designed to improve execution, enhance financial performance and drive profitable growth as we work to create sustainable long-term value for stockholders. As part of this plan, we implemented a cost reduction plan, which included a series of targeted reductions across our businesses, particularly in QCT, and a reduction to annual share-based compensation grants. These cost reduction initiatives were achieved by the end of fiscal 2016.

**Expanding Opportunities for Growth.** We took steps to accelerate our technology positions in our priority growth segments of Internet of Things (IoT), automotive and networking. In January 2016, we announced our planned joint venture with TDK Corporation to enable delivery of radio frequency (RF) front-end modules and RF filters into fully integrated products for mobile devices and IoT applications, among others. Shortly after the end of fiscal 2016, we announced a definitive agreement to acquire NXP Semiconductors N.V. NXP is a leader in high-performance, mixed-signal semiconductor electronics in automotive, broad-based microcontrollers, secure identification, network processing and RF power products.

### Executive Compensation Highlights

**Responsive to Stockholders**. In fiscal 2016, we continued the executive compensation program that received 94% support from our stockholders at the March 2016 annual meeting. The changes we described in last year's proxy statement were made in response to stockholder feedback and further focused the Company on growing per share net income, reducing our share count, managing our share-based compensation expense and value-creating capital allocation. We continue to engage with our stockholders and to implement "best in class" compensation practices that align pay delivery with performance, set rigorous goals for delivering performance-based incentives and carve-out the value of special front-loaded equity awards granted for retention purposes in fiscal 2014 to maintain reasonable annualized total compensation opportunities.

**Heavy Emphasis on Performance-Based Incentive Compensation**. Approximately 94% of the target total direct compensation (TDC) for fiscal 2016 for our CEO and other NEOs was allocated to variable compensation that is at risk based on performance, including short- and long-term incentive compensation (as highlighted by the blue-shaded sections in the chart below).



PX283




- **Annual Cash Incentive Plan (ACIP)**. Our ACIP for fiscal 2016 was based 40% on Adjusted Revenues and 60% on Adjusted Earnings Per Share (EPS). We placed greater weight on EPS to emphasize its relative importance to stockholder value creation. Performance during fiscal 2016 was strong relative to the goals that we set based on our internal budgets and forecasts. We achieved 99% of our Adjusted Revenues goal and exceeded our Adjusted EPS goal by 7%. Although we exceeded our combined budget-based financial goals, the ACIP payout rate for our NEOs was 78% of the target amount because the Compensation Committee increased the level of financial performance necessary for our executive officers to earn the ACIP target amounts as compared to prior years to recognize that the fiscal 2016 ACIP Adjusted Revenues objective was below the corresponding level of performance for fiscal 2015.
- **Long-Term Equity Awards.** For fiscal 2016, as part of our regular, annual on-going program, we granted our NEOs performance-based stock unit awards (PSUs) based on return on invested capital (ROIC) and relative total shareholder return (TSR) to focus on strategic financial results, and time-vested restricted stock units (RSUs) for ownership and retention. The grant-date fair values of these awards were based on a number of factors, including the competitive labor markets, the NEO's roles and responsibilities and the NEO's performance and contributions to financial and strategic objectives, and. except for Mr. Modoff, were reduced by the annualized value of front-loaded amounts from fiscal 2014 that were attributable to fiscal 2016. Actual earned or realized value from these grants will reflect our performance for fiscal 2017 through fiscal 2019 that will be heavily dependent on our relative TSR, capital-allocation decisions, Strategic Realignment Plan accomplishments, initiatives to expand growth and continued progress with our licensing program.
- **Real Pay Delivery Aligned with Performance.** Figure 10 on page 45 summarizes the relationship between our NEOs' actual delivered compensation and Company performance. In the aggregate, our CEO's pay delivery from the fiscal 2016 ACIP, relative TSR PSUs granted in fiscal 2014 with performance measures tied to fiscal 2016 and stock price performance for RSUs granted in fiscal 2014 was 57% of the aggregate target award amount. Our other NEOs' (excluding Mr. Modoff) aggregate pay delivery was 55% of the aggregate target award amount. Actual earn outs of PSUs granted in fiscal 2014 that were based on performance for fiscal 2015 through 2016 were zero (as were PSUs granted in fiscal 2013 that were based on performance for fiscal 2014 through 2015), and the CEO's realized value of RSUs granted in fiscal 2014 was 14% lower than the grant date values that were previously reported at the fiscal year-end stock price.



PX283

**This Compensation Discussion and Analysis is composed of the following sections:**


| | Page |
|---|---|
| 1. Our Named Executive Officers (NEOs) for Fiscal 2016 | 36 |
| 2. Program Overview | 37 |
| 3. Fiscal 2016 Target Amounts and Compensation Mix | 41 |
| 4. Fiscal 2016 Actual Amounts and Pay for Performance Analysis | 44 |
| 5. Process and Rationale for Executive Compensation Decisions | 48 |
| 6. Compensation Program Best Practices | 52 |
| 7. Other Compensation Components | 53 |


Detailed compensation tables that quantify and further explain our NEOs' compensation follow this Compensation Discussion and Analysis.

## OUR NAMED EXECUTIVE OFFICERS (NEOs) FOR FISCAL 2016

**Steve Mollenkopf**



**Current position:**

- Chief Executive Officer (CEO), since March 2014

**Prior Qualcomm positions include:**

- CEO-Elect and President, 2013 - 2014
- President and Chief Operating Officer, 2011 - 2013

22 years of service with Qualcomm

**George S. Davis**



**Current position:**

- Executive Vice President and Chief Financial Officer (CFO), since March 2013

4 years of service with Qualcomm

**Derek K. Aberle**



**Current position:**

- President, since March 2014

**Prior Qualcomm positions include:**

- Executive Vice President and Group President, 2011 - 2014
- Executive Vice President and President, QTL, 2008 - 2011

16 years of service with Qualcomm

**Paul E. Jacobs**



**Current position:**

- Executive Chairman and Chairman of the Board, since March 2014

**Prior Qualcomm positions include:**

- Chairman of the Board and CEO, 2009 - 2014
- CEO, 2005 - 2009

26 years of service with Qualcomm

**Brian Modoff**

**Current position:**

PX283

Page 5883



- Executive Vice President, Strategy and Mergers & Acquisitions, since October 2015

1 year of service with Qualcomm

## PROGRAM OVERVIEW

### *Primary Compensation Components*

The Compensation Committee designed our fiscal 2016 executive compensation program to include salaries, bonuses (pursuant to our Annual Cash Incentive Plan (ACIP)) and long-term equity incentive awards. **Figure 1** is an overview of the primary components of our fiscal 2016 executive compensation program, including the form, type and objective of each component. Collectively, these components comprise an executive's total direct compensation (TDC). In structuring our cash and long-term equity incentive award programs, the Compensation Committee continued to use variations of non-GAAP performance measures as financial objectives. (See Appendix D for definitions of the various performance measures used in determining our cash and long-term equity incentive awards.)

***Figure 1: Fiscal 2016 Executive Compensation Program Overview***

| | Salary | Annual Cash Incentive Plan | Performance Stock Units | Restricted Stock Units |
|---|---|---|---|---|
| **Form** | Cash | Cash | Equity | Equity |
| **Type** | Fixed Compensation | Variable Compensation | | |
| **Objective - Attract and Retain Talent** | Competitive amounts that attract and retain executives who develop and execute business strategy | Provides an annual incentive by aligning a portion of our executive officers' TDC to achieving the Company's annual financial objectives | Provides a longer-term incentive by aligning a portion of our executive officers' TDC to long-term absolute and relative Total Shareholder Return (TSR) and efficient use of capital | Provides a longer-term incentive by aligning a portion of our executive officers' TDC to long-term absolute TSR |
| **Objective - Pay Delivery Aligned with Stockholders Interests** | | Payouts may vary from 0 to 2x target amount based on performance targets aligned with financial metrics | Payouts may vary from 0 to 2x target amount based on performance targets aligned with stock price performance or financial metrics | Realized value of award amount varies with stock price performance and dividends |
| **Objective - Performance Measures that Support or Result from the Execution of Strategy** | | • Adjusted Revenues performance (weighted 40%)<br>• Adjusted Earnings Per Share (EPS) performance (weighted 60%) | • Relative TSR compared to NASDAQ-100 (50% of total PSU awards) (RTSR PSUs)<br>• Average Annual Adjusted Return On Invested Capital (ROIC) (50% of total PSU awards) (ROIC PSUs) | Vests based on continued service or satisfying Normal Retirement requirements and achievement of an adjusted GAAP operating income objective |
| **Objective - Performance Periods that in total Balance Short- and Long-Term** | | Fiscal 2016 | 3 year performance period with 3 year cliff vest | 6-month performance objective with annual vesting over 3 years |

Other objectives of our executive compensation program include:

- **Tax efficiency for the Company**. Salaries are deductible, except for the portion of the CEO's salary in excess of $1 million. The Compensation Committee designs the ACIP and executive equity awards to comply with the requirements for tax deductibility under Internal Revenue Code Section 162(m) (Section 162(m)).

- **Internally fair and equitable**. The Compensation Committee considers business and individual factors to evaluate internal fairness and equitability of compensation and monitors the internal compensation relationships among our executive officers. However, the Compensation Committee does not use predetermined formulas as part of this evaluation and monitoring (e.g., formulas that set other executive officers' pay as a percentage of our CEO's pay or the CEO's pay as a multiple of our other executive officers' pay).

- **Competitive for the business**. The Compensation Committee attempts to set our executive compensation at competitive levels to attract, motivate, engage and retain executives. The Compensation Committee considers competitive practices of peer companies as reference points for comparative purposes, but does not set specific benchmark percentile objectives.

- **High standards for governance and risk management**. The Compensation Committee designs our executive compensation to achieve high standards of governance and risk management. It reviews annually the amounts of all components of compensation and conducts a risk mitigation review. In addition, the ACIP includes a cash incentive compensation repayment ("clawback") policy. Further, the Executive Chairman must hold net after-tax shares from the fiscal 2014 front-loaded RSUs past the one-year anniversary of the date he reaches normal retirement age, defined in the 2006 Long-Term Incentive Plan as age 60 and completion of ten consecutive years of service. See the discussion titled *"Fiscal 2014 Front-loaded Restricted Stock Units to Maintain Leadership Continuity/Impact on Equity Compensation in Subsequent Years"* under the section "Process and Rationale for Executive Compensation Decisions" on page 50 for a description of the fiscal 2014 front-loaded RSUs.

In addition to TDC, we have competitive health and welfare benefits that are generally structured in the same manner for all U.S. executives and/or employees, plus several other benefits. A summary of these benefits begins on page 53 with **Figures 15 and 16.**

## *Additional Detail Regarding Certain Compensation Components*

### Annual Cash Incentive Plan (ACIP)

The ACIP provides for a cash bonus based on the Company's achievement of specified financial objectives, namely Adjusted Revenues and Adjusted EPS. Consistent with prior years, the Compensation Committee used the Adjusted Revenues measure because top-line growth is an important factor in stockholder value creation. In fiscal 2016, the Compensation Committee used the Adjusted EPS measure, which includes share-based compensation expense, rather than the adjusted operating income measure used in prior years, because it believes that an Adjusted EPS metric encourages our executive officers to focus on (1) growing per share net income (a perspective not captured by operating income alone); (2) reducing our outstanding share count; and (3) managing our share-based compensation expense. In addition, as a stockholder safeguard, the Adjusted EPS calculation excludes any share repurchases that were not anticipated in establishing the ACIP target. The Adjusted Revenues measure is weighted 40%, and the Adjusted EPS measure is weighted 60% to emphasize the relative importance of EPS to stockholder value creation.

The Compensation Committee increased the level of financial performance necessary for our executive officers to earn the ACIP target amounts as compared to prior years because the fiscal 2016 ACIP Adjusted Revenues objective, while in line with the budget approved by the Board, was below the corresponding level of financial performance for fiscal 2015. The fiscal 2016 ACIP financial objectives were set based on the anticipation that the QCT business would continue to be negatively impacted by a shift in share among our customers within the premium tier, a decline in share at a large customer and increased competition in China. In addition, despite the resolution with the China National Development and Reform Commission in fiscal 2015, we expected our QTL business would continue to be impacted by certain licensees in China not fully complying with their contractual obligations to report their sales of licensed products to us, and certain companies, including unlicensed companies, delaying execution of new license agreements. We believed that the conclusion of new agreements with these licensees would result in improved reporting by these licensees, however, litigation and/or other actions may be necessary.

As a result, the Company needed to achieve 110.5% of these financial objectives in order for our executive officers to earn the fiscal 2016 ACIP target amounts, compared to fiscal 2015 when the Company needed to achieve 100% of the relevant financial objectives to earn the ACIP target amounts. Achieving 100% of the financial objectives in fiscal 2016 would have

PX283

resulted in our executive officers earning 65% of the ACIP target amounts. Specifically, our fiscal 2016 ACIP Adjusted Revenues objective was $23.7 billion, which was below the $25.3 billion in Adjusted Revenues achieved in fiscal 2015. Accordingly, the Compensation Committee adjusted the payout structure so that the target revenue payout would be achieved if Adjusted Revenues for fiscal 2016 were $26.2 billion, which is 3.8% above the $25.3 billion revenue result for fiscal 2015 (110.5% of the revenue objective). We cannot compare the fiscal 2016 ACIP Adjusted EPS objective to fiscal 2015 performance because it was not a measure in fiscal 2015.

The funding rate is based on the weighted financial performance, such that for each one percent that the weighted financial performance exceeds 100% of the objective, the funding rate increases by 0.0333 from the funding rate of 0.65 up to a maximum of 2.00 if weighted financial performance is 140.5% of the objective. For each one percent that the weighted financial performance falls short of the 100% objective, the funding rate decreases by 0.05 from the funding rate of 0.65, which would reach zero for weighted financial performance at or below 87% of the objective.

To maximize tax deductibility, amounts earned under the ACIP are designed to qualify as performance-based compensation under Section 162(m). This design provides that if certain financial objectives are met, our executive officers may receive up to 2x their target amounts, subject to the Compensation Committee's negative discretion to pay any amount less than that maximum.

The Compensation Committee was authorized under the fiscal 2016 ACIP to modify Adjusted Revenues and Adjusted EPS in calculating the financial performance on which fiscal 2016 ACIP awards were determined. Modifications are intended to eliminate the distorting effects of certain unusual income or expense items if the Compensation Committee determined, in its discretion, that the items did not reflect a fair measurement of our operating performance. The Compensation Committee did not make any such modifications for fiscal 2016.

## Long-Term Equity Incentives

In fiscal 2016, the Compensation Committee granted equity to our executive officers in the form of Relative Total Shareholder Return (RTSR) Performance Stock Units (PSUs), Return On Invested Capital (ROIC) PSUs and Restricted Stock Units (RSUs), as described below. Both the RTSR and ROIC PSUs include dividend equivalent rights that accrue in the form of additional shares with vesting and distribution at the same time as the underlying PSUs.

### *Performance Stock Units*

The RTSR PSUs allow the recipients to earn a variable number of shares of our common stock based on the relative performance of our TSR compared to that of the companies comprising the NASDAQ-100 over a three-year period according to the payout schedule set forth in **Figure 2**. The RTSR PSUs have a robust performance schedule that requires achievement of performance in the 60th percentile in order to earn the target number of shares, and no shares would be earned if performance is below the 33rd percentile. The RTSR PSUs also provide that the total number of shares earned may not exceed the target number of shares if our absolute TSR for the entire three-year performance period is negative. This provision considers stockholders' interests by limiting the number of shares that may be earned in the event relative TSR performance is strong despite a declining stock price.

***Figure 2: RTSR PSUs Payout Schedule***

| Award Level | Qualcomm's TSR Percentile Rank Among the NASDAQ-100 | Multiple of Target RTSR PSUs Earned (1) |
|---|---|---|
| Maximum Award Level | 90th percentile and above | 2x |
| Target Award Level | 60th percentile | 1x |
| Threshold Award Level | 33rd percentile | 0.33x |
| Below Threshold | Below 33rd percentile | No shares earned |

(1) The multiple of target RTSR PSUs earned between the award levels interpolates linearly with our TSR percentile ranking.

The ROIC PSUs allow the recipients to earn a variable number of shares of our common stock based on the achievement of a three-year Adjusted ROIC objective established by the Compensation Committee at the time of grant. While ROIC is a common financial

term, there are numerous methods for calculating ROIC-based measures. We calculate our Adjusted ROIC by averaging over the three-year performance period (a) Adjusted After-Tax Operating Income divided by (b) the sum of average Adjusted Debt and average Adjusted Equity for the relevant year. (See Appendix D for the definitions of



PX283

performance measures to be used in determining the number of PSUs for the relevant performance period.) The payout schedule is set forth in **Figure 3**. The Compensation Committee intended that the target chosen for measuring performance under the ROIC PSUs would generally present a similar degree of difficulty for achievement in comparison to the target chosen in recent years. The process for determining the target included consideration of our strategic plans, historical performance and peer company benchmarking.

***Figure 3: ROIC PSU Payout Schedule***

| Award Level | Average Annual Adjusted ROIC for the 3-year Performance Period | Multiple of Target ROIC PSUs Earned (1) |
|---|---|---|
| Maximum Award Level | Adjusted ROIC is at or above 120% of Target | 2x |
| Target Award Level | Adjusted ROIC is at Target | 1x |
| Threshold Award Level | Adjusted ROIC is 80% of Target | 0.33x |
| Below Threshold | Adjusted ROIC is less than 80% of Target | No shares earned |

(1) The multiple of target ROIC PSUs earned between the award levels interpolates linearly with our average annual Adjusted ROIC.

### *Restricted Stock Units*

RSUs generally vest in equal annual installments over three years and include reinvested dividend equivalent rights. The RSUs also include a requirement that the Company must meet an adjusted GAAP operating income objective in order for them to vest, which is intended to qualify the RSUs for tax deductibility under Section 162(m). The Compensation Committee intended that the targets chosen for measuring performance under the RSUs would generally present a similar degree of difficulty for achievement in comparison to the targets chosen in recent years.

## *Compensation Related Changes*

### Retirement Provisions

Effective for equity awards granted beginning in the fourth quarter of fiscal 2016, the Compensation Committee adopted the following retirement-related provisions for our executive officers:

"Normal Retirement" is defined to be age 55 with a minimum of 10 years continuous service. Upon termination of employment under Normal Retirement, for grants that have been outstanding for at least six months:

- RSUs will become fully vested and distributed according to the original vesting schedule.
- PSUs will become fully vested and paid out at the end of the performance period, based upon and subject to achievement of the relevant performance objectives.

These provisions encourage continuous employment (a) until achieving Normal Retirement so as to benefit from the favorable vesting and (b) after achieving Normal Retirement so as to benefit from additional equity awards that may be granted with the more favorable vesting provisions.



PX283

## FISCAL 2016 TARGET AMOUNTS AND COMPENSATION MIX

### *Target Compensation Amounts*

**Steve Mollenkopf (CEO), George Davis (CFO) and Paul Jacobs (Executive Chairman)**

The Compensation Committee maintained Messrs. Mollenkopf's and Davis's and Dr. Jacobs's fiscal 2016 target TDC amounts at fiscal 2015 levels (see **Figure 4**). In doing so, the Compensation Committee considered the Company's 2016 outlook and fiscal 2015 performance, retention actions the Compensation Committee took in fiscal 2014 and our peer company practices.

***Figure 4: Target Total Direct Compensation for CEO, CFO and Executive Chairman***

| | Fiscal 2016 Compensation | | | Fiscal 2014 Front-Loaded RSUs (1) | |
|---|---|---|---|---|---|
| **Name** | **Base Salary ($)** | **ACIP Target ($)** | **Aggregate Value of Equity Granted ($)** | **Annualized Grant Date Fair Value Attributed to Fiscal 2016 ($)** | **Total Target Direct Compensation ($)** |
| Steve Mollenkopf | 1,130,000 | 2,260,000 | 8,000,000 | 6,000,000 | 17,390,000 |
| George S. Davis | 760,000 | 988,000 | 2,700,000 | 2,300,000 | 6,748,000 |
| Paul E. Jacobs | 1 | N/A | 9,000,000 | 9,000,000 | 18,000,001 |

(1) See the discussion titled "*Fiscal 2014 Front-loaded Restricted Stock Units to Maintain Leadership Continuity/Impact on Equity Compensation in Subsequent Years*" under the section "Process and Rationale for Executive Compensation Decisions" on page 50 for a description of the fiscal 2014 front-loaded RSUs.

#### *Dr. Paul Jacobs's Role as Executive Chairman*

As previously disclosed, in 2014, the Compensation Committee revised compensation packages for our senior leaders to protect the Company from the increasingly competitive environment for executive talent in our industry. As part of these retention efforts, the Board also accelerated our executive management succession plan, which resulted in new roles for Paul Jacobs, who became Executive Chairman, and Steve Mollenkopf, who was promoted to CEO. In the Board's view, it was imperative to find a way to continue the long-term partnership between Dr. Jacobs, Mr. Mollenkopf and Derek Aberle, and to keep Dr. Jacobs engaged and involved in the leadership of the business.

A key element of retaining Mr. Mollenkopf was Dr. Jacobs's agreeing to relinquish the CEO title and adopt the role of Executive Chairman. In this capacity, Dr. Jacobs focuses on long-term opportunities in emergent areas and manages certain of our relationships with key partners around the world, in addition to his responsibilities as Chairman of the Board. Those in the industry know him as a genuine pioneer and visionary, having been a key factor in the development of mobile communications technology. Dr. Jacobs was regularly recognized by Institutional Investor as a top CEO in our sector throughout his tenure. The Compensation Committee believes that investors have embraced the value of our executive team structure and appreciate that we are able to keep Dr. Jacobs focused on these long-term opportunities, while Mr. Mollenkopf sets corporate strategy, leads the operations of the Company, oversees product development and manages global relationships.

As an example of the value our stockholders derived from this executive partnership during fiscal 2016, Dr. Jacobs served in a key role on the Board's special committee that conducted a comprehensive review of the Company's corporate and financial structure, the Board's special committee on mergers and acquisitions that recommended the proposed acquisition of NXP, and focused and facilitated initiatives on compliance.

Dr. Jacobs's compensation package was specifically designed, in consultation with the Compensation Committee's independent compensation consultant, to be entirely performance-based and at a reasonable cost to stockholders in actual pay delivery for their continued benefit from his contributions. Dr. Jacobs's annual salary is $1, and he has no annual cash incentive opportunity. The

Compensation Committee does not presently anticipate providing Dr. Jacobs with additional cash compensation or RSUs until he is again eligible to receive RSUs in fiscal 2019.

**Derek Aberle (President)**

During fiscal 2016, the Compensation Committee reviewed Mr. Aberle's compensation relative to peer companies and other executive officers in light of his evolving role that requires increased focus on licensing agreements with device manufacturers, particularly in China, and strategy development for our emerging businesses. As a result, the Compensation Committee increased his base salary effective February 16, 2016 and increased his ACIP target effective for the full fiscal year. The Compensation Committee also increased his target equity, which included RTSR and ROIC PSUs granted in February 2016 with an aggregate grant date fair value of $1,025,000, as well as RTSR and ROIC PSUs with an aggregate grant date fair value of $3,780,000 granted at the end of September 2016 consistent with our normal equity grant cycle for executive officers.

Further, in July 2016, the Compensation Committee granted Mr. Aberle a Performance Unit Award (PUA) pursuant to which he is eligible to earn aggregate cash payments of up to $10 million if the Company executes certain agreements with certain licensees or unlicensed companies, and if Mr. Aberle continues to provide services to the Company through October 1, 2017. The Compensation Committee granted the PUA to reflect, among other things, the significant financial and business benefits to the Company of executing new license agreements with some of the largest device manufacturers in Asia, particularly China; that licensing compliance is a strategic focus, and critical to the success, of the Company; and Mr. Aberle's anticipated important contributions toward achieving these goals. In general, 50% of the amount attributable to the achievement of a performance goal is payable when the performance goal is satisfied, and the remaining 50% is payable on October 1, 2017, subject to Mr. Aberle's continued employment with the Company through such date. Earned but unpaid amounts would also be paid upon a termination without cause or for good reason, or upon death or disability.

**Figure 5** summarizes the increases to Mr. Aberle's target compensation, excluding potential amounts under his PUA because it is a one-time arrangement that is not part of his ongoing, target direct compensation.

***Figure 5: Target Total Direct Compensation for President***

| | Fiscal 2016 Compensation | | | Fiscal 2014 Front-Loaded RSUs (2) | |
|---|---|---|---|---|---|
| Fiscal Year | Base Salary ($) (1) | ACIP Target ($) | Aggregate Value of Equity Granted ($) | Annualized Grant Date Fair Value Attributed to Fiscal 2016 ($) | Total Target Direct Compensation ($) |
| 2015 | 800,000 | 1,080,000 | 3,780,000 | 3,220,000 | 8,880,000 |
| 2016 | 925,000 | 1,618,750 | 4,805,000 | 3,220,000 | 10,568,750 |

(1) Represents the annualized base salary rate in place at the end of the fiscal year.

(2) See the discussion titled "*Fiscal 2014 Front-loaded Restricted Stock Units to Maintain Leadership Continuity/Impact on Equity Compensation in Subsequent Years*" under the section "Process and Rationale for Executive Compensation Decisions" on page 50 for a description of the fiscal 2014 front-loaded RSUs.

**Brian Modoff (EVP, Strategy and M&A)**

Mr. Modoff joined Qualcomm in October 2015 with (a) a base salary of $600,000, (b) a fiscal 2016 ACIP target of 100% of his base salary, (c) a new hire equity package with an aggregate grant date fair value of $2,750,018, which provided an inducement to join Qualcomm and (d) a sign-on retention bonus of $1,000,000, which was paid to him shortly after his employment commenced and has payback provisions should he voluntarily terminate employment prior to the second anniversary of his employment start date. The new hire equity package included RSUs that vest in three equal annual installments and RTSR and ROIC PSUs that cliff-vest in October 2018. In order to qualify as "performance-based compensation," the RSUs were subject to an additional performance objective adopted by the Compensation Committee on September 25, 2015, which has since been achieved. Mr. Modoff also received ongoing equity grants in the form of RTSR and ROIC PSUs and RSUs with an aggregate grant date fair value of $2,750,089 at the end of September 2016 consistent with our normal equity grant cycle for executive officers.

PX283

## *Target Compensation Mix*

**Figure 6** illustrates the relative contribution of each compensation component to our CEO's target TDC. The target TDC includes base salary, the ACIP target amount, the grant date fair value of RTSR and ROIC PSUs awarded in fiscal 2016 and the annualized value of the fiscal 2014 front-loaded RSUs. A substantial portion (94%) of Mr. Mollenkopf's target TDC was attributable to incentive compensation that varies with financial performance and stock price.

***Figure 6: CEO Target Total Direct Compensation Mix***




**Figure 7** illustrates the relative contribution of each compensation component to our other NEOs' aggregate target TDC. This figure excludes amounts that may be earned by Mr. Aberle under the PUA as well as Mr. Modoff's sign-on retention bonus and equity awards included in his new hire package because these are one-time arrangements that are not part of ongoing, target direct compensation.

***Figure 7: Other NEOs' Aggregate Target Total Direct Compensation Mix***

PX283


% of TDC
100
80
60
40
20
0
100%
6%
40%
8%
46%
94%
40%
8%
46%
54%
8%
46%
TDC
Performance or Stock-Based Compensation
Performance-Based Compensation
Performance-Based Stock
ACIP Target
Annualized Value of Front-Loaded RSUs
Base Salary



PX283

## FISCAL 2016 ACTUAL AMOUNTS AND PAY FOR PERFORMANCE ANALYSIS

### Compensation Awarded or Paid in Fiscal 2016

**Figure 8** is a summary of TDC earned by or granted to our NEOs in fiscal 2016. These amounts include annualized amounts of the fiscal 2014 front-loaded RSUs that we attribute to fiscal 2016 compensation, and thus the amounts below differ from the amounts shown in the Summary Compensation Table. The Compensation Committee, at its discretion, increased Mr. Davis's ACIP earnings by $100,000 to recognize his contributions to our Strategic Realignment Plan and the efforts that led to the definitive agreement to acquire NXP Semiconductors N.V. The other NEOs' ACIP earnings reflect the 78% of target payout rate noted in the Summary on page 34 and in Figure 11.

***Figure 8: Fiscal 2016 Compensation***

| | Fiscal 2016 Compensation | | | | Fiscal 2014 Front-Loaded RSUs (3) | |
|---|---|---|---|---|---|---|
| Name | Salary Earnings ($) (1) | ACIP Earnings ($) | Aggregate Value of Equity Granted ($) | Other Awards ($) (2) | Annualized Grant Date Fair Value Attributed to Fiscal 2016 ($) | Total Direct Compensation ($) |
| Steve Mollenkopf | 1,138,694 | 1,762,000 | 8,000,114 | — | 6,000,000 | 16,900,808 |
| George S. Davis | 760,011 | 870,640 | 2,700,080 | — | 2,300,000 | 6,630,731 |
| Derek Aberle | 889,438 | 1,262,625 | 4,805,111 | 3,375,000 | 3,220,000 | 13,552,174 |
| Paul E. Jacobs | 1 | N/A | 9,000,028 | — | 9,000,000 | 18,000,029 |
| Brian Modoff | 542,324 | 468,000 | 5,500,197 | 1,000,000 | N/A | 7,510,521 |

(1) The amount for Mr. Aberle reflects his salary increase from $800,000 to $925,000 effective February 16, 2016.

(2) The amount shown for Mr. Aberle reflects the portion of his Performance Unit Award (PUA) that was earned or paid in fiscal 2016. Specifically, during fiscal 2016, the Company achieved certain of the performance goals under the PUA by executing license agreements with four large device manufacturers identified in the PUA, which resulted in an aggregate of $6,750,000 of potential payments to Mr. Aberle, of which 50% ($3,375,000) has been paid. Of the amount paid, $1,375,000 was designated as a discretionary bonus because the performance goals relative to two of the device manufacturers were achieved prior to the actual execution of the PUA, and $2,000,000 was designated as Non-Equity Incentive Plan compensation. The other 50% ($3,375,000) will be paid to Mr. Aberle on October 1, 2017, subject to his continued employment with the Company through that date. As of the end of fiscal 2016, Mr. Aberle is eligible to earn up to the remaining $3,250,000 pursuant to the PUA upon achievement of the remaining performance goals and satisfaction of the service condition. The amount shown for Mr. Modoff reflects the sign-on bonus he received upon joining the Company in October 2015.

(3) See the discussion titled "*Fiscal 2014 Front-loaded Restricted Stock Units to Maintain Leadership Continuity/Impact on Equity Compensation in Subsequent Years*" under the section "Process and Rationale for Executive Compensation Decisions" on page 50 for a description of the fiscal 2014 front-loaded RSUs.

#### *Summary of Grant Date Fair Values of Fiscal 2016 Equity Awards*

**Figure 9** shows the grant date fair values of the equity awards approved by the Compensation Committee during fiscal 2016. As described on page 50, the equity compensation amounts for our NEOs, except Mr. Modoff, who was hired in October 2015, were lower in fiscal 2015 and 2016 as a result of front-loaded RSUs that were granted in fiscal 2014.

PX283

Page 5897

PX283

***Figure 9: Grant Date Fair Values of Equity Awarded to NEOs in Fiscal 2016***

| Name | RTSR PSUs ($) | ROIC PSUs ($) | RSUs ($) | Total ($) |
|---|---|---|---|---|
| Steve Mollenkopf | 4,000,069 | 4,000,045 | — | 8,000,114 |
| George S. Davis | 1,350,026 | 1,350,054 | — | 2,700,080 |
| Derek K. Aberle | 2,402,538 | 2,402,573 | — | 4,805,111 |
| Paul E. Jacobs | 4,500,017 | 4,500,011 | — | 9,000,028 |
| Brian Modoff | 1,485,079 | 1,485,081 | 2,530,037 | 5,500,197 |

## Pay for Performance

**Figure 10** illustrates the impact of fiscal 2016 Company performance on the cash and equity compensation awarded to our NEOs by comparing the target amounts to (a) the ACIP actual earnings, (b) the value of shares earned from fiscal 2014 RTSR PSUs with measurement periods completed in fiscal 2016 and (c) the annualized grant date fair value of front-loaded RSUs awarded in fiscal 2014. We excluded Mr. Modoff from the illustration because he did not receive fiscal 2014 RTSR PSUs or fiscal 2014 front-loaded RSUs, and we excluded Mr. Aberle's PUA because it is a one-time arrangement that is not part of his ongoing, direct compensation.

***Figure 10: Impact of Company Financial and Stock Performance on ACIP Earnings and Equity Compensation***

| Name | Pay Component | Effective Date / Grant Date | Target Amount / Annualized RSU Amount ($) (1) | Cash Earned / Value of Equity Awards at Fiscal 2016 Year End ($) (2) | Percent of Target / Annualized RSU Amount |
|---|---|---|---|---|---|
| Steve Mollenkopf | Fiscal 2016 ACIP | Fiscal 2016 | 2,260,000 | 1,762,000 | 78% |
| | Fiscal 2014 Front-Loaded RSUs | 12/12/2013 | 6,000,000 | 5,176,687 | 86% |
| | Fiscal 2014 RTSR PSUs | 9/16/2014 | 4,000,000 | — | — |
| | Total | | 12,260,000 | 6,938,687 | 57% |
| George S. Davis | Fiscal 2016 ACIP | Fiscal 2016 | 988,000 | 870,640 | 88% |
| | Fiscal 2014 Front-Loaded RSUs | 5/5/2014 | 2,300,000 | 1,814,040 | 79% |
| | Fiscal 2014 RTSR PSUs | 9/16/2014 | 1,350,000 | — | — |
| | Total | | 4,638,000 | 2,684,680 | 58% |
| Derek K. Aberle | Fiscal 2016 ACIP | Fiscal 2016 | 1,618,750 | 1,262,625 | 78% |
| | Fiscal 2014 Front-Loaded RSUs | 5/5/2014 | 3,220,000 | 2,539,656 | 79% |
| | Fiscal 2014 RTSR PSUs | 9/16/2014 | 1,890,000 | — | — |
| | Total | | 6,728,750 | 3,802,281 | 57% |
| Paul E. Jacobs | Fiscal 2016 ACIP | Fiscal 2016 | N/A | N/A | N/A |
| | Fiscal 2014 Front-Loaded RSUs | 5/5/2014 | 9,000,000 | 7,098,418 | 79% |
| | Fiscal 2014 RTSR PSUs | 9/16/2014 | 4,500,000 | — | — |
| | Total | | 13,500,000 | 7,098,418 | 53% |
| **Aggregate excluding CEO** | | | **24,866,750** | **13,585,379** | **55%** |

(1) Fiscal 2016 ACIP: Target amounts the NEOs would receive for achieving 110.5% of the relevant financial objectives.

PX283

Fiscal 2014 Front-Loaded RSUs: One-fifth of the grant date fair values for Messrs. Mollenkopf and Aberle and Dr. Jacobs, and one-third of the grant date fair value for Mr. Davis.

Fiscal 2014 RTSR PSUs: 50% of the target grant date fair values to reflect that two of the four interim measurement periods have been completed and each interim measurement period is allocated 25% of the grant date fair value.



PX283

Compensation Discussion & Analysis

(2) Fiscal 2016 ACIP: Amounts awarded by the Compensation Committee following completion of fiscal 2016.

Fiscal 2014 Front-Loaded RSUs: Fiscal year-end values for (i) one-fifth of the number of front-loaded RSUs granted to Messrs. Mollenkopf and Aberle and Dr. Jacobs and (ii) one-third of the number of front-loaded RSUs granted to Mr. Davis, excluding dividend equivalents.

Fiscal 2014 RTSR PSUs: The fiscal year-end values for one-half of the number of RTSR PSUs granted, excluding dividend equivalents.

### *Note: Impact of Fiscal 2014 Equity Awards*

The fiscal 2014 RTSR PSUs have a three-year performance period covering fiscal 2015 through 2017 that includes four interim measurement periods of 18, 24, 30 and 36 months. We allocated 25% of the target PSU award to each measurement period. The 18- and 24-month measurement periods were completed on March 27, 2016 and September 25, 2016, respectively. The NEOs who received a fiscal 2014 RTSR PSU award did not earn any shares of our common stock for the 18-month and 24-month performance periods.

### Fiscal 2016 ACIP Earnings

As previously noted, the Compensation Committee increased the level of financial performance necessary for our executive officers to earn the fiscal 2016 ACIP target amounts as compared to prior years because the fiscal 2016 ACIP financial objectives were below the corresponding level of financial performance for fiscal 2015. As a result, the Company needed to achieve 110.5% of the fiscal 2016 ACIP financial objectives in order for our executive officers to earn the fiscal 2016 ACIP target amounts, compared to fiscal 2015 when the Company needed to achieve 100% of the relevant financial objectives to earn the ACIP target amounts. Specifically, the fiscal 2016 Adjusted Revenues objective of $23.7 billion was below fiscal 2015 Adjusted Revenues performance of $25.3 billion. The Company needed to achieve 110.5% of the fiscal 2016 Adjusted Revenues objective, or $26.2 billion (which is 3.8% above fiscal 2015 Adjusted Revenues performance) for our executive officers to earn the target payout rate of 1.00.

*Figure 11: Fiscal 2016 ACIP Target, Performance-Adjusted and Earned Amounts*

| Name | ACIP Target ($) | Payout Rate | Performance-Adjusted Amount ($) | Earned Amount Approved by Compensation Committee ($) |
|---|---|---|---|---|
| Steve Mollenkopf | 2,260,000 | 0.78 | 1,762,800 | 1,762,000 |
| George S. Davis | 988,000 | 0.78 | 770,640 | 870,640 |
| Derek K. Aberle | 1,618,750 | 0.78 | 1,262,625 | 1,262,625 |
| Paul E. Jacobs | N/A | N/A | N/A | N/A |
| Brian Modoff | 600,000 | 0.78 | 468,000 | 468,000 |

### *How the Fiscal 2016 ACIP Earnings were Determined*

**Figure 12** shows the objectives and performance levels for Adjusted Revenues and Adjusted EPS and illustrates the following:

- The Compensation Committee applied a relative weighting of 40% to Adjusted Revenues and 60% to Adjusted EPS to emphasize the relative importance of EPS to stockholder value creation.
- The NEOs needed to achieve 110.5% of the weighted objectives to earn their ACIP target amounts; they would earn only 65% of their ACIP target amounts for achieving 100% of the weighted objectives.
- Adjusted Revenues performance was 99% of the objective and Adjusted EPS performance was 107% of the objective.
- Accordingly, our weighted performance was 104% [(99% x 40%) + (107% x 60%)], and the payout rate was 78%.

- The NEOs received ACIP amounts based on the 78% payout rate, except Dr. Jacobs, who was not eligible to participate. In addition, Mr. Davis received a discretionary award of $100,000 to recognize his contributions to our Strategic Realignment Plan and the efforts that led to the definitive agreement to acquire NXP Semiconductors N.V.

***Figure 12: Fiscal 2016 ACIP Financial Objectives and Performance***

| | Threshold | | Target | | | Maximum | Performance | Weight | | Wtg. Perf. |
|---|---|---|---|---|---|---|---|---|---|---|
| <u>Adjusted Revenues</u> | | | | | | | | | | |
| Performance Range | $20.65B | | $23.73B | | | $33.34B | 99% | 40% | | 39.6% |
| Actual Performance | | $23.51B | | | | | | | | |
| <u>Adjusted EPS</u> | | | | | | | | | | |
| Performance Range | $3.19 | | $3.67 | | | $5.16 | 107% | 60% | + | 64.4% |
| Actual Performance | | | | $3.94 | | | | | | |
| <u>Weighted Performance</u> | | | | | | | | | | |
| Performance Range | 87% | | 100% | | 110.5% | 140.5% | | | = | 104% |
| Actual Performance | | | | 104% | | | | | | |
| <u>Payout Rate</u> | | | | | | | | | | |
| Payout Range % of Target | —% | | 65% | | 100% | 200% | | | | |
| Payout Rate | | | | 78% | | | | | | |

Below Target Range
At Target
Above Target Range

## PROCESS AND RATIONALE FOR EXECUTIVE COMPENSATION DECISIONS

The Compensation Committee considers several factors in determining the compensation of our executive officers. The Compensation Committee does not have a predefined framework that determines which of these factors may be more or less important, and the emphasis placed on specific factors may vary among our executive officers. Ultimately, it is the Compensation Committee's judgment about these factors that forms the basis for determining our executive officers' compensation.

Late in the fourth quarter of each fiscal year, the Compensation Committee sets salaries and ACIP targets for the next fiscal year and makes annual equity awards with respect to performance for the nearly completed fiscal year. This allows the Compensation Committee to consider anticipated absolute and relative financial performance and total shareholder returns for that year. Since equity compensation is the largest component of compensation for our executive officers, granting awards after the annual meeting of stockholders (which takes place during the second quarter of the fiscal year) allows the Compensation Committee to consider feedback from stockholders (through the annual "Say-on-Pay" advisory vote) and to align annual equity awards more closely with the performance for the fiscal year in which the awards are granted.

Based on the following factors, the Compensation Committee, in executive session without the CEO present, decided and approved the CEO's and other executive officers' fiscal 2016 equity award amounts, any application of negative discretion for the fiscal 2016 ACIP earned amounts and any adjustments to base salaries and ACIP targets for fiscal 2017.

### The Compensation Committee reviews the Executive Officers' performance using a multi-faceted process.

The Compensation Committee reviews the performance and compensation amounts for the CEO and other executive officers, as follows:

- Members of the Compensation Committee regularly engage with our executive officers, providing opportunities for the Compensation Committee to consider the leadership contributions of the CEO and other executive officers to the Company's annual and longer-term performance;
- The Compensation Committee and the CEO discuss our business performance, the CEO's performance and the CEO's evaluation of and compensation recommendations for the other executive officers (excluding Dr. Jacobs); and
- The CEO and other executive officers prepare self-evaluations, which highlight key strategic and operational accomplishments and leadership actions that communicate, promote and support Qualcomm's ethical standards and compliance culture. The Compensation Committee and the CEO meet in executive session to review the self-evaluations and the CEO's assessment of his and the other executive officers' (excluding Dr. Jacobs) accomplishments and opportunities for improvement, including an assessment of overall performance and potential for future roles.

### The Compensation Committee considers internal pay equitability in light of business and individual performance.

Our executive officers' compensation levels are intended to be internally fair and equitable relative to roles, responsibilities and relationships, in addition to being competitively reasonable. Accordingly, the Compensation Committee considers the following factors in determining our executive officers' compensation:

- The Committee's evaluation of the executive officer's individual performance and contributions to financial and strategic objectives;
- Labor market conditions, the need to retain and motivate the executive officer and the executive officer's potential to assume increased responsibilities (which may be part of the Company's leadership succession plans) and contribute long-term value to the Company;
- Operational management, such as project milestones, process improvements and expense management;
- Internal working and reporting relationships and partnership and teamwork among our executive officers (for example, using

the same ACIP financial metrics and objectives for all executive officers promotes teamwork and collaboration and our executive officer's contribution to company-wide initiatives, such as our commitment to reduce operating expenses);

- Individual expertise, skills, knowledge and tenure in position;
- Leadership actions that communicate, promote and support compliance with our Code of Ethics and our Code of Business Conduct (such as discussing ethics at meetings our executive officers have with employees, participating in an internal video series on compliance and establishing a review board to oversee internal investigations); and
- Developing and motivating employees (such as establishing processes for identifying and assessing high potential employees) and attracting and retaining employees (such as initiatives to increase the pipeline of women in leadership roles).

## The Compensation Committee reviews the compensation practices of other companies with which we compete.

The Compensation Committee identified peer companies to use for competitive analyses, taking into account recommendations made by Frederic W. Cook & Co., Inc. (FW Cook), the Compensation Committee's independent compensation consultant. The peer companies were identified based on the following characteristics:

- Technology, telecommunications and media companies (excluding those that are primarily content producers) based on Global Industry Classification Standard (GICS) codes;
- Companies of comparable size, with both market capitalization and revenues between 0.25x to 4.0x Qualcomm's market capitalization and revenues;

  The Compensation Committee uses market capitalization as the primary quantitative criterion because:

  - Market capitalization, a key component of which is stock price, is the key driver of equity compensation grant value, and equity compensation grant value is the single largest component of CEO compensation among technology companies with large market capitalizations;
  - Market capitalization is directly related to stockholder benefit; and
  - A significant portion of our business is technology licensing, which is a high-margin business, and as such, Qualcomm typically has higher market capitalization and profit than companies with similar revenues.

  The Compensation Committee also includes revenues as a secondary quantitative criterion because revenues are commonly used as a selection criterion by our peer companies, third-party compensation survey providers and proxy advisory services. Net income, EBITDA and EBITDA margin are also reviewed by the Compensation Committee as reference points for comparison.

- Comparable compensation models;
- Consistent and on-going data availability; and
- Peers of peers, which are the peer companies often disclosed by our peer companies.

**Figure 13** identifies the peer companies that the Compensation Committee selected in May 2016. The peer companies and Qualcomm are ranked, high-to-low, on revenues, net income, EBITDA, EBITDA margin and market capitalization. Compared to the prior year's peer group, the Compensation Committee replaced Honeywell, Lockheed Martin and United Technologies with HP Enterprise, Netflix and VMware because the latter set of companies are technology companies that fit the selection criteria and have greater business and labor market overlap with Qualcomm than the former set of companies. In addition, DirecTV was removed due its completed acquisition in 2015.

Qualcomm's percentile rankings among the peer companies illustrate that, relative to our peer companies, we approximated the median for revenues and market capitalization and were between the median and 60th percentile for the other metrics.



PX283

Compensation Discussion & Analysis

***Figure 13: Qualcomm's Relative Rankings Among Peer Companies as of March 31, 2016 (1)***

| **Revenue** | | | **Net Income** | | **EBITDA** | | **EBITDA Margin** | | **Market Cap** | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Company* | *Ticker* | *$ Millions* | *Ticker* | *$ Millions* | *Ticker* | *$ Millions* | *Ticker* | | *Ticker* | *$ Millions* |
| Amazon.com | AMZN | 107,006 | GOOG | 16,348 | MSFT | 30,463 | V | 67% | GOOG | 518,917 |
| Microsoft | MSFT | 88,084 | IBM | 13,190 | CMCSA | 24,876 | FB | 46% | MSFT | 436,831 |
| IBM | IBM | 81,741 | INTC | 11,420 | GOOG | 24,423 | AVGO | 42% | FB | 334,694 |
| Alphabet | GOOG | 74,989 | MSFT | 11,408 | INTC | 23,067 | INTC | 42% | AMZN | 279,511 |
| Comcast | CMCSA | 74,510 | CSCO | 10,333 | IBM | 20,082 | TXN | 41% | V | 183,663 |
| Intel | INTC | 55,355 | ORCL | 8,844 | ORCL | 14,908 | ORCL | 40% | ORCL | 169,771 |
| HP Enterprise | HPE | 51,778 | CMCSA | 8,163 | CSCO | 14,283 | MSFT | 35% | INTC | 152,821 |
| Cisco | CSCO | 49,589 | V | 6,700 | V | 9,479 | EBAY | 34% | CMCSA | 149,182 |
| Oracle | ORCL | 37,159 | **QCOM** | **4,797** | FB | 8,239 | **QCOM** | **34%** | IBM | 145,525 |
| EMC | EMC | 24,704 | FB | 3,688 | **QCOM** | **8,029** | CMCSA | 33% | CSCO | 143,264 |
| **Qualcomm** | **QCOM** | **23,957** | TXN | 2,986 | AMZN | 7,879 | TWC | 33% | **QCOM** | **76,449** |
| Time Warner Cable | TWC | 23,697 | HPE | 2,181 | TWC | 7,777 | GOOG | 33% | AVGO | 60,324 |
| Facebook | FB | 17,928 | EMC | 1,990 | HPE | 7,562 | MU | 31% | TWC | 57,963 |
| Visa | V | 14,063 | TWC | 1,844 | TXN | 5,300 | CSCO | 29% | TXN | 57,722 |
| Micron Technology | MU | 13,737 | EBAY | 1,725 | EMC | 4,855 | VMW | 27% | EMC | 51,889 |
| Texas Instruments | TXN | 13,000 | ADP | 1,504 | MU | 4,194 | IBM | 25% | NFLX | 43,763 |
| ADP | ADP | 11,240 | AVGO | 1,390 | AVGO | 2,950 | ADP | 21% | ADP | 41,038 |
| eBay | EBAY | 8,592 | MU | 1,071 | EBAY | 2,946 | EMC | 20% | HPE | 30,435 |
| Broadcom, Ltd. | AVGO | 6,960 | VMW | 997 | ADP | 2,332 | HPE | 15% | EBAY | 27,263 |
| Netflix | NFLX | 6,780 | AMZN | 596 | VMW | 1,776 | AMZN | 7% | VMW | 22,158 |
| VMware | VMW | 6,647 | NFLX | 123 | NFLX | 368 | NFLX | 5% | MU | 10,862 |
| 75th percentile | | 69,721 | | 9,961 | | 18,789 | | 41% | | 180,190 |
| 50th percentile | | 24,201 | | 2,584 | | 7,828 | | 33% | | 101,794 |
| 25th percentile | | 11,680 | | 1,418 | | 3,261 | | 22% | | 41,719 |
| QCOM percentile rank | | 49% | | 60% | | 55% | | 59% | | 48% |

(1) Data reflected in Figure 13 represents the latest four quarters of data available on March 31, 2016 reported in Standard & Poor's Compustat reports as of March 31, 2016, the time at which FW Cook prepared the peer company selection analysis.

FW Cook provides analyses of peer company competitive practices. The Compensation Committee considers these peer company competitive practices, along with the other factors described in this section, when determining the salaries, ACIP targets, long-term equity grant date fair values and the TDC for our CEO and other executive officers.

## The Compensation Committee considers the impact of compensation decisions made in prior years.

**Fiscal 2014 Front-loaded Restricted Stock Units to Maintain Leadership Continuity/Impact on Equity Compensation in Subsequent Years**

In fiscal 2014, the Board determined that strong defensive actions were necessary to retain our senior executive team in the intensely competitive mobile communications industry. Accordingly, in fiscal 2014, we granted front-loaded RSUs, which accelerated future years' RSU grant values into fiscal 2014, to encourage retention without making above-market grants and increasing related costs and dilution over time. Since we attributed a portion of the front-loaded RSUs granted in fiscal 2014 to fiscal 2016, the Compensation Committee considered the annualized value of the fiscal 2014 RSU grants in determining fiscal 2016 total equity grant values (i.e., the

Compensation Committee reduced the total equity value that it would have otherwise granted to the NEOs in fiscal 2016 by the amount of the RSUs granted in fiscal 2014 that was attributable to fiscal

2016). There will be similar annual offsets for Messrs. Mollenkopf and Aberle and Dr. Jacobs through fiscal 2018 as their RSUs were front-loaded for five years. The RSUs granted to Mr. Davis were front-loaded for three years, and consequently, he had annual offsets through 2016. Mr. Modoff, who was hired in fiscal 2016, did not receive a front-loaded RSU. **Figure 14** summarizes the grant date fair values and annualized values for these front-loaded RSUs.

**Only performance-based equity during period covered by front-loaded RSUs**

The Compensation Committee also committed that it would grant only performance-based equity to our executive officers during the period covered by the fiscal 2014 front-loaded RSUs. Mr. Modoff is excluded from this commitment because he did not receive front-loaded RSUs.

***Figure 14: Fiscal 2014 Front-Loaded RSU Awards***

| Name | Grant Date Fair Value ($ millions) | Covered Periods | Annualized Grant Date Fair Value | Vesting |
|---|---|---|---|---|
| Steve Mollenkopf | 30.0 | Fiscal 2014 - 2018 | $6.0 million annually for five years | Five equal annual installments |
| George S. Davis | 6.9 | Fiscal 2014 - 2016 | $2.3 million annually for three years | Five equal annual installments |
| Derek K. Aberle | 16.1 | Fiscal 2014 - 2018 | $3.2 million annually for five years | Five equal annual installments |
| Paul E. Jacobs | 45.0 | Fiscal 2014 - 2018 | $9.0 million annually for five years | Three equal installments on the 3rd, 4th and 5th anniversaries of the grant date |

## We engage independent advisors.

The Compensation Committee has the authority to engage and terminate any independent compensation consultant and to obtain advice and assistance from external legal, accounting and other advisors. As previously described, the Compensation Committee engaged FW Cook, an independent executive compensation consulting firm, to advise it on compensation matters during fiscal 2016. FW Cook reports directly to the Compensation Committee. The Company did not engage FW Cook for any additional services during fiscal 2016 beyond its support of the Compensation Committee, and the engagement did not raise any conflicts of interest. Pursuant to the engagement, FW Cook:

- Provided information, insights and advice regarding compensation philosophy, objectives and strategy;
- Recommended peer group selection criteria and identified and recommended potential peer companies;
- Provided analyses of competitive compensation practices for executive officers and nonemployee directors;
- Provided analyses of potential risks arising from executive and non-executive compensation programs;
- Provided analyses of aggregate equity compensation spending and related dilution;
- Reviewed and commented on recommendations regarding NEO compensation amounts;
- Advised the Compensation Committee on specific issues as they arose, including engagement with stockholders; and
- Kept the Compensation Committee informed of executive compensation trends and regulatory and governance considerations related to executive compensation.

The Compensation Committee also sought and received advice from our outside legal counsel, DLA Piper LLP. Our human resources department supported the Compensation Committee in its work, collaborated with FW Cook and DLA Piper, conducted additional

analyses and managed our compensation and benefit programs.

## COMPENSATION PROGRAM BEST PRACTICES

Our compensation program is market-based and supports our business strategy. We have avoided problematic pay practices and have implemented compensation plans that reinforce a performance-based company culture.

### What We Do

- ☑ A significant portion of our NEOs' compensation varies with the Company's performance. For fiscal 2016, approximately 94% of our NEOs' aggregate TDC was attributable to the grant date fair values of the performance-based stock awards, the portion of the grant date fair value of RSUs awarded in fiscal 2014 that we attribute to fiscal 2016, and target ACIP amounts (Figures 6 and 7 in the CD&A).
- ☑ We have a balanced approach to incentive programs with differentiated measures. Our ACIP is based on annual adjusted GAAP revenues and EPS performance, and PSUs are based on three-year relative TSR and ROIC performance periods.
- ☑ We have limits on the amounts of variable compensation that may be earned. Earned amounts under our ACIP are limited to 2x target amounts, and earned PSUs are limited to 2x the target shares. We further limit earned RTSR PSUs to no more than 1x the target shares if absolute TSR is negative over the three-year performance period regardless of the level of relative TSR.
- ☑ We have a cash incentive compensation repayment ("clawback") policy. We require executive officers to repay to us earned amounts under our ACIP if required by our clawback policy, SEC regulations or stock exchange rules.
- ☑ We have robust stock ownership guidelines. Our CEO is required to own 6x his salary, our President is required to own 3x his salary, and our other executive officers are required to own 2x their respective salaries, in our common stock. The ownership guideline for our Executive Chairman, whose annual salary is $1, is 6x his prior salary as CEO. Dr. Jacobs has met his stock ownership guideline. Messrs. Mollenkopf and Aberle are required to meet their stock ownership guidelines by March 2019, Mr. Davis is required to meet his stock ownership guideline by March 2018, and Mr. Modoff is required to meet his stock ownership guideline by October 2020. Additional information regarding stock ownership of management is contained in the "Stock Ownership of Certain Beneficial Owners and Management" section on page 28.
- ☑ We manage potential compensation-related risks to the Company. We perform annual risk assessments for our executive compensation program, as well as incentive arrangements below the executive level. This review is conducted by FW Cook, the Compensation Committee's independent consultant.
- ☑ Our 2006 Long-Term Incentive Plan (LTIP) and our 2016 LTIP include a "double-trigger" provision for vesting of equity in connection with a change in control. In the event of a change in control where the acquirer assumes our outstanding unvested equity awards, the vesting of an executive officer's awards would accelerate only if the executive officer was involuntarily terminated other than "for cause" or the executive officer voluntarily resigned for "good reason" during a specified period after the change in control.
- ☑ We engage independent advisors. We obtain advice and assistance from external legal, accounting and other advisors. Our independent compensation consultant, FW Cook, provides information, insights and advice regarding compensation philosophy, objectives and strategy, including trends and regulatory and governance considerations related to executive compensation.

### What We Don't Do

- ☒ Our executive officers are restricted in certain stock trading activities. Our insider trading policy, as applicable to executive officers, including NEOs and non-employee directors, prohibits the hedging and pledging of our common stock and trading in put and call options and other types of equity derivatives.
- ☒ Our executive officers do not have severance agreements or employment contracts. Generally, all U.S. employees, including all of our executive officers, have "at will" employment relationships without severance agreements or contracts. This enables us to terminate employment with discretion as to the terms and conditions of any separation.
- ☒ Our executive officers do not receive unique tax gross-ups. We do not provide tax gross-ups for benefits unless they are provided under a policy generally applicable to all U.S.-based employees, such as relocation.
- ☒ Our executive officers are not covered by change in control provisions. We do not have guaranteed severance arrangements upon a change in control (i.e., no "single trigger" payments) or excise tax gross-ups for change-in-control payments.

PX283

PX283

## OTHER COMPENSATION COMPONENTS

In addition to the primary compensation components summarized in **Figure 1** on page 37, we have competitive health and welfare benefits that are generally structured the same for all U.S.-based executives and/or employees, plus several other benefits. **Figure 15** describes the other benefits that are generally available to U.S.-based executives, and **Figure 16** describes the other benefits that are generally available to all U.S.-based employees, including executives.

***Figure 15: U.S. Executive Benefits***

| Component | Form and Purpose | Comment |
|---|---|---|
| Executive physicals | • A comprehensive exam designed to focus on wellness, prevention and early detection of potential health risks.<br>• The exam, medical results and any recommendations provided are strictly between the executive and the provider.<br>• Medical information is not shared with Qualcomm. | Charges are submitted by the provider directly to Qualcomm and paid by Qualcomm. To comply with IRS non-discrimination rules, this benefit is subject to imputed income that results in taxation on the value of the benefit. |
| Nonqualified Deferred Compensation Plan (NQDC Plan) Company match | • Company match on employees' deferred contributions up to a maximum amount based on a predefined formula.<br>• Provide a competitive, nonqualified, tax-efficient defined contribution retirement program for employees deemed to be "highly compensated." | We do not have a pension plan or other defined benefit retirement program. See the discussion titled "Fiscal 2016 Nonqualified Deferred Compensation" under the section "Comparative Tables and Narrative Disclosures" for a description of the Company match program. |
| Financial planning reimbursement | • Reimbursement of actual expenses incurred for financial, estate and tax planning.<br>• Attract and retain executive-level employees.<br>• Assist executives with managing their time. | We reimburse up to $12,500 for the Executive Chairman, the CEO and the President, and up to $8,000 for the other executive officers. |
| Additional life insurance | • Additional coverage, above the amount provided to all employees.<br>• Attract and retain executive-level employees. | The additional coverage is $1 million for the Executive Chairman and the CEO, and $750,000 for the other executive officers. |
| Use of corporate aircraft for personal travel (certain executives only) | • Facilitate flexible travel arrangements and provide security. | We have a program that limits personal travel on our corporate aircraft such that compensation reportable in the Summary Compensation Table does not exceed $250,000 for the CEO and $650,000 for all executive officers in the aggregate. |

***Figure 16: U.S. All-Employee Benefits***

| Component | Form and Purpose | Comment |
|---|---|---|
| Tax qualified deferred compensation | • 401(k) Plan.<br>• Provide a tax-efficient retirement savings opportunity.<br>• Attract and retain employees. | The 401(k) Plan is a tax-qualified deferred compensation plan. We match employee contributions in cash using a tiered structure in order to encourage participation among all employees. |
| Employee Stock Purchase Plan (ESPP) | • Qualcomm stock.<br>• Encourage stock ownership and align employee and stockholder interests.<br>• Attract and retain employees. | The ESPP is a tax-qualified plan available to all U.S.-based employees. Purchases through payroll deductions are limited to $12,500 in fair market value (FMV) of the stock per 6-month offering period (determined on the first day of each offering period). The purchase price is equal to 85% of the lower of: (1) the FMV on the first day of the offering period or (2) the FMV on the last day of the offering period. |
| Charitable contribution match | • Matching cash paid to the charitable organization.<br>• Encourage and extend employees' support of cultural, educational and community non-profit organizations. | We match 100% of employee contributions, up to pre-defined maximum amounts, to qualified tax-exempt non-profit organizations, excluding organizations that further religious doctrine, exclusionary organizations and/or political non-profit organizations. The maximum annual amount we will match is based on the employee's job level. We will match up to $125,000 for the Executive Chairman, the CEO and the President, and up to $100,000 for the other executive officers. |



PX283

## COMPENSATION RISK MANAGEMENT

The Compensation Committee engaged FW Cook to collaborate with Qualcomm's human resources staff to conduct an assessment of potential risks that may arise from our compensation programs. Based on this assessment, the Compensation Committee concluded that our policies and practices do not encourage excessive and unnecessary risk taking that would be reasonably likely to have a material adverse effect on Qualcomm. The assessment included executive and non-executive programs and focused on the variable components of cash incentives and equity awards. Our compensation programs are designed and administered through a corporate total rewards management office and are substantially identical among business units, corporate functions and global locations (with modifications to comply with local regulations as appropriate). The risk-mitigating factors considered in this assessment included:

- The alignment of pay philosophy, peer group companies and compensation amounts relative to competitive practices to support our business objectives;
- Effective balance of cash and equity, short- and long-term performance periods, limits on performance-based award schedules, Company financial metrics with consideration of individual performance factors and Compensation Committee discretion; and
- Ownership guidelines, a clawback policy, an insider trading policy, an equity award approval authorization policy and independent Compensation Committee oversight.

## COMPENSATION TABLES AND NARRATIVE DISCLOSURES

The following tables, narratives and footnotes describe the total compensation and benefits awarded to, earned by or paid to our NEOs during fiscal 2016.

## SUMMARY COMPENSATION TABLE

The following table shows information regarding compensation of each NEO for fiscal 2016, 2015 and 2014, except in the case of Mr. Modoff, who was not an NEO in fiscal 2014 and 2015.

### Fiscal 2016 Summary Compensation Table (1)(2)

| Name and Principal Position | Year | Salary ($) (3) | Bonus ($) (4) | Stock Awards ($) (5) | Non-Equity Incentive Plan Compensation ($) (6) | All Other Compensation ($) (7) | Total ($) |
|---|---|---|---|---|---|---|---|
| Steve Mollenkopf<br>Chief Executive Officer (8) | 2016 | 1,138,694 | — | 8,000,114 | 1,762,000 | 165,204 | 11,066,012 |
| | 2015 | 1,141,886 | — | 8,000,034 | 1,025,000 | 205,405 | 10,372,325 |
| | 2014 | 1,069,239 | — | 58,000,203 | 1,550,000 | 121,150 | 60,740,592 |
| George S. Davis<br>Executive Vice President and Chief Financial Officer | 2016 | 760,011 | — | 2,700,080 | 870,640 | 163,419 | 4,494,150 |
| | 2015 | 758,665 | — | 2,700,046 | 400,000 | 159,606 | 4,018,317 |
| | 2014 | 724,043 | — | 9,600,019 | 665,000 | 167,555 | 11,156,617 |
| Derek K. Aberle<br>President (9) | 2016 | 889,438 | 1,375,000 | 4,805,111 | 3,262,625 | 212,652 | 10,544,826 |
| | 2015 | 805,394 | — | 3,780,054 | 520,000 | 237,474 | 5,342,922 |
| | 2014 | 772,734 | — | 30,380,219 | 720,000 | 230,706 | 32,103,659 |
| Paul E. Jacobs<br>Executive Chairman and Chairman of the Board (10) | 2016 | 1 | — | 9,000,028 | — | 173,311 | 9,173,340 |
| | 2015 | 1 | 5,375 | 9,000,045 | — | 309,392 | 9,314,813 |
| | 2014 | 969,984 | 21,375 | 54,000,175 | 1,300,000 | 650,458 | 56,941,992 |
| Brian Modoff<br>Executive Vice President, Strategy and M&A | 2016 | 542,324 | 1,000,000 | 5,500,197 | 468,000 | 143,800 | 7,654,321 |
| | 2015 | — | — | — | — | — | — |
| | 2014 | — | — | — | — | — | — |

(1) We did not grant any stock option awards to our NEOs during fiscal 2016. Accordingly, the "Option Awards" column has been omitted from the Fiscal 2016 Summary Compensation Table.

(2) We do not offer a pension plan or other defined benefit retirement plan to our NEOs. We do not provide above-market or preferential earnings on deferred compensation, nor do we provide dividends on stock in the Non-Qualified Deferred Compensation (NQDC) Plan at a rate higher than dividends on our common stock. Accordingly, the "Change in Pension Value and Nonqualified Deferred Compensation Earnings" column has been omitted from the Fiscal 2016 Summary Compensation Table.

(3) Salaries for NEOs as presented in this column may include vacation match payments payable under our vacation policy. This column also includes portions of the NEOs' salaries that they may have deferred pursuant to the NQDC Plan. See "Fiscal 2016 Nonqualified Deferred Compensation" table.

(4) The amounts in this column for fiscal 2016 represent: Mr. Aberle - amounts paid for fiscal 2016 for performance goals achieved as of the date of grant under his Performance Unit Award and designated as a discretionary bonus; and Mr. Modoff - a new-hire bonus. We disclose annual cash incentives in the "Non-Equity Incentive Plan Compensation" column. See the "Compensation Discussion and Analysis" section for further details on these awards.

(5) Stock awards granted to NEOs include annual grants and may include special grants for new hires, promotions and/or retention. The amounts in this column represent the grant date fair values of PSUs and RSUs granted during the applicable fiscal year. The grant date fair values of RSUs and ROIC PSUs were determined based on the fair value of our common stock on the date of grant. The RTSR PSU grant date fair values were determined based on a Monte Carlo simulation (which probability weights multiple potential outcomes). The amounts may not be indicative of the realized value of the awards if and when they vest. See the "Compensation Discussion and Analysis" section and the "Fiscal 2016 Grants of Plan-Based Awards" table for details on the stock awards granted to the NEOs during fiscal 2016. If we assume that the highest level of performance conditions will be achieved with respect to the PSUs (and thus the maximum number of shares will be issued under the PSUs), using the fair value of our common stock on the grant date for such shares, the fiscal 2016 stock awards would be as follows: $16,000,228 for Mr. Mollenkopf; $5,400,160 for Mr. Davis; $9,610,222 for Mr. Aberle; $18,000,055 for Dr. Jacobs; and $5,940,319 for Mr. Modoff.

(6) The amounts in this column represent cash awards earned under our annual cash incentive plan (ACIP) for performance during the applicable fiscal year, as well as amounts paid to Mr. Aberle for fiscal 2016 for performance goals achieved under his Performance Unit Award and designated as Non-Equity Incentive Plan compensation. The Compensation Committee approved the fiscal 2016 ACIP amounts on December 4, 2016, and the NEOs received payment in December 2016. See the "Compensation Discussion and Analysis" section and the "Fiscal 2016 Grants of Plan-Based Awards" table for a description of the ACIP and the payments made thereunder. This column includes portions of the NEOs' ACIP amounts that they may have deferred pursuant to the NQDC Plan. See "Fiscal 2016 Nonqualified Deferred Compensation" table.

(7) See the "Fiscal 2016 All Other Compensation" table for an itemized account of all other compensation reported in this column for fiscal 2016.

(8) The 2014 salary amount represents compensation for Mr. Mollenkopf from September 30 through December 11, 2013 as President and Chief Operating Officer, from December 12, 2013 through March 3, 2014 as Chief Executive Officer-elect and President and from March 4, 2014 through September 28, 2014 as Chief Executive Officer.

(9) The 2014 salary amount represents compensation for Mr. Aberle from September 30, 2013 through March 9, 2014 as Executive Vice President and Group President and from March 10, 2014 through September 28, 2014 as President.

(10) The 2014 amounts represent compensation for Dr. Jacobs from September 30, 2013 through March 3, 2014 as Chief Executive Officer and from March 4, 2014 through September 28, 2014 as Executive Chairman. Dr. Jacobs's salary and non-equity incentive plan target were reduced on March 4, 2014 when he stepped down as our Chief Executive Officer and assumed his current role of Executive Chairman.

## ALL OTHER COMPENSATION

We provide our NEOs with other compensation that is reasonable and consistent with our executive compensation program and supports our efforts to attract and retain executive-level employees. The cost of these benefits are disclosed in the All Other Compensation column of the Fiscal 2016 Summary Compensation Table and are itemized in the Fiscal 2016 All Other Compensation table below.

### Fiscal 2016 All Other Compensation

| Name | Perquisites and Other Personal Benefits ($) (1) | Nonqualified Deferred Compensation Plan ($) (2) | Charitable Match ($) (3) | Company Matching 401k Contributions ($) (4) | Life Insurance Premiums ($) (5) | All Other Compensation Total ($) |
|---|---|---|---|---|---|---|
| Steve Mollenkopf | 35,049 | 51,250 | 68,120 | 5,475 | 5,310 | 165,204 |
| George S. Davis | — | 92,801 | 49,300 | 7,386 | 13,932 | 163,419 |
| Derek K. Aberle | 43,166 | 106,093 | 53,170 | 5,475 | 4,748 | 212,652 |
| Paul E. Jacobs | 48,265 | — | 120,000 | — | 5,046 | 173,311 |
| Brian Modoff | 14,236 | 8,308 | 100,000 | 9,050 | 12,206 | 143,800 |

(1) Perquisites and other personal benefits for an NEO are excluded if the total value of all of such perquisites and personal benefits

is less than $10,000. If the total value of all perquisites and personal benefits for an NEO is $10,000 or more, then each perquisite or personal benefit, regardless of its amount, is identified by type. Each perquisite or personal



PX283

benefit that exceeds the greater of $25,000 or 10% of the total amount of perquisites and personal benefits for that NEO is identified by type and quantified.

The amounts in this column include: Mr. Mollenkopf - $27,901 for the personal use of our corporate aircraft and the remainder for other insurance premiums; Mr. Aberle - $28,018 for the personal use of our corporate aircraft and the remainder for other insurance premiums and financial planning; Dr. Jacobs - $43,829 for the personal use of our corporate aircraft and the remainder for other insurance premiums and home office costs; and Mr. Modoff - for the personal use of our corporate aircraft, other insurance premiums and financial planning. Under certain circumstances, NEOs may utilize our corporate aircraft for personal use. In those instances, the value of the benefit is based on the aggregate incremental cost to the Company. Incremental cost is calculated based on the variable costs to the Company, including fuel costs, mileage, certain maintenance, universal weather-monitoring costs, on-board catering, landing/ramp fees and certain other miscellaneous costs. Fixed costs that do not change based on usage, such as pilot salaries, are excluded. The Company and Dr. Jacobs entered into aircraft time-sharing agreements pursuant to which Dr. Jacobs may use certain Company aircraft for his personal use and reimburse the Company for certain expenses of each flight operated under such an agreement up to the maximum amount permitted under Federal Aviation Administration rules. Dr. Jacobs has discretion over which flights are operated under time-sharing agreements. The amounts shown for Dr. Jacobs's personal use of our corporate aircraft reflect the total aggregate incremental costs to the Company of his personal use of our corporate aircraft, less any payments made by Dr. Jacobs to the Company under such time-sharing agreements.

(2) See the Nonqualified Deferred Compensation discussion for a description of the NQDC Plan and the Company match program thereunder. The amounts disclosed represent the Company's match, in cash, of up to 8% of the aggregate of the participant's base salary plus ACIP amounts deferred on a pre-tax basis under the NQDC Plan.

(3) We match 100% of an employee's contributions, up to predetermined maximum amounts, to encourage and extend employees' support of qualified tax exempt non-profit organizations, excluding organizations that further religious doctrine, exclusionary organizations or political organizations. The amounts disclosed represent our matching contributions for NEO contributions to cultural, education and community non-profit organizations. We will match up to $125,000 for our Executive Chairman, CEO and President and up to $100,000 for other NEOs.

(4) Our 401(k) plan is a voluntary, tax-qualified deferred compensation plan available to all U.S. employees. We match employee contributions in cash, up to certain limits, using a tiered structure in order to encourage participation among our U.S.-based employees. This program provides a tax-efficient retirement savings opportunity. The amounts disclosed represent the cash value of the Company match of our NEO's contributions to the 401(k) plan.

(5) We provide our executive officers additional life insurance above the amounts provided to other employees (executive life insurance). The additional coverage is $1 million for the Executive Chairman, the CEO and the President and $750,000 for the other NEOs. The amounts disclosed represent the premiums paid for such executive life insurance, as well as group term life insurance greater than $50,000.

## GRANTS OF PLAN-BASED AWARDS

The following table shows information regarding the incentive awards granted to our NEOs in 2016. See "Compensation Discussion and Analysis" (CD&A) in the "Executive Compensation and Related Information" section for detailed information regarding our annual cash incentive plan and equity award programs.



PX283

## Fiscal 2016 Grants of Plan-Based Awards (1)(2)(3)

| Name | Type of Award | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All other Stock Awards: Number of shares of stock or units (#) | Grant Date Fair Value of Stock Awards ($) (4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | |
| Steve Mollenkopf | ACIP | | 22,600 | 2,260,000 | 4,520,000 | | | | | |
| | RTSR PSUs | 9/22/2016 | | | | 18,952 | 57,431 | 114,862 | | 4,000,069 |
| | ROIC PSUs | 9/22/2016 | | | | 20,781 | 62,973 | 125,946 | | 4,000,045 |
| George S. Davis | ACIP | | 9,880 | 988,000 | 1,976,000 | | | | | |
| | RTSR PSUs | 9/22/2016 | | | | 6,396 | 19,383 | 38,766 | | 1,350,026 |
| | ROIC PSUs | 9/22/2016 | | | | 7,014 | 21,254 | 42,508 | | 1,350,054 |
| Derek K. Aberle | ACIP | | 16,188 | 1,618,750 | 2,160,000 | | | | | |
| | PUA (5) | 7/10/2016 | — | — | 7,250,000 | | | | | |
| | RTSR PSUs | 2/16/2016 | | | | 3,125 | 9,470 | 18,940 | | 512,516 |
| | ROIC PSUs | 2/16/2016 | | | | 3,619 | 10,968 | 21,936 | | 512,535 |
| | RTSR PSUs | 9/22/2016 | | | | 8,955 | 27,136 | 54,272 | | 1,890,022 |
| | ROIC PSUs | 9/22/2016 | | | | 9,819 | 29,755 | 59,510 | | 1,890,038 |
| Paul E. Jacobs | ACIP | | — | — | — | | | | | |
| | RTSR PSUs | 9/22/2016 | | | | 21,321 | 64,609 | 129,218 | | 4,500,017 |
| | ROIC PSUs | 9/22/2016 | | | | 23,379 | 70,844 | 141,688 | | 4,500,011 |
| Brian Modoff | ACIP | | 6,000 | 600,000 | 1,200,000 | | | | | |
| | RTSR PSUs | 10/19/2015 | | | | 3,640 | 11,030 | 22,060 | | 742,540 |
| | ROIC PSUs | 10/19/2015 | | | | 4,146 | 12,564 | 25,128 | | 742,532 |
| | RSUs | 10/19/2015 | | | | | | | 21,405 | 1,265,036 |
| | RTSR PSUs | 9/22/2016 | | | | 3,518 | 10,661 | 21,322 | | 742,539 |
| | ROIC PSUs | 9/22/2016 | | | | 3,858 | 11,690 | 23,380 | | 742,549 |
| | RSUs | 9/22/2016 | | | | | | | 19,915 | 1,265,001 |

(1) The Compensation Committee approved all equity grants on the grant dates.

(2) We did not award any stock options to any NEOs in fiscal 2016. Accordingly, we did not include the “All Other Option Awards” or “Exercise or Base Price of Option Awards” columns in this table.

(3) See the “Compensation Discussion and Analysis” (CD&A) section for a discussion of the Non-Equity Incentive Plan Awards and the Equity Incentive Plan Awards set forth in this table.

(4) The amounts for ROIC PSUs represent the grant date fair values based on the closing price of the Company’s common stock on the dates of grant. The amounts for RTSR PSUs represent the grant date fair value of the Company’s common stock as determined using a Monte Carlo simulation (which probability weights multiple potential outcomes).

(5) The amounts shown represent the Non-Equity Incentive Plan portion of Mr. Aberle’s Performance Unit Award.

## OUTSTANDING EQUITY AWARDS AT FISCAL YEAR END

PX283

The "Outstanding Equity Awards at Fiscal Year End" table below provides information on the current holdings of equity awards by the NEOs. The market value of equity awards reported is based on the closing price of the Company's common

stock at the end of the applicable fiscal year. All stock options awarded to the NEOs were nonqualified stock options. Stock options granted prior to September 10, 2010 are exercisable for ten years from the grant date.

## Outstanding Equity Awards at Fiscal Year End (1)

| | | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Steve Mollenkopf | 11/09/11 | | | | | 15,601 (5) | 978,971 | | |
| | 11/09/11 | | | | | 15,726 (6) | 986,824 | | |
| | 09/29/13 | | | | | 7,439 (7) | 466,783 | | |
| | 12/12/13 | | | | | 298,191 (8) | 18,711,496 | | |
| | 12/12/13 | | | | | 268,372 (9) | 16,840,346 | | |
| | 09/16/14 | | | | | | | 18,567 (14) | 1,165,102 |
| | 09/25/15 | | | | | | | 152,092 (15) | 9,543,775 |
| | 09/25/15 | | | | | | | 78,032 (16) | 4,896,516 |
| | 09/22/16 | | | | | | | 18,952 (17) | 1,189,252 |
| | 09/22/16 | | | | | | | 20,781 (17) | 1,304,013 |
| Total | | — | — | | | 605,329 | 37,984,420 | 288,424 | 18,098,658 |
| George S. Davis | 09/29/13 | | | | | 12,399 (10) | 778,017 | | |
| | 05/05/14 | | | | | 56,175 (11) | 3,524,997 | | |
| | 09/16/14 | | | | | | | 6,266 (14) | 393,217 |
| | 09/25/15 | | | | | | | 51,331 (15) | 3,221,042 |
| | 09/25/15 | | | | | | | 26,336 (16) | 1,652,607 |
| | 09/22/16 | | | | | | | 6,396 (17) | 401,373 |
| | 09/22/16 | | | | | | | 7,014 (17) | 440,117 |
| Total | | — | — | | | 68,574 | 4,303,014 | 97,343 | 6,108,356 |
| Derek K. Aberle | 09/16/08 | 38,000 | — | 47.92 | 09/15/18 | | | | |
| | 11/09/09 | 63,051 | — | 44.75 | 11/08/19 | | | | |
| | 11/09/11 | | | | | 12,480 (5) | 783,134 | | |
| | 11/09/11 | | | | | 12,583 (6) | 789,572 | | |
| | 09/29/13 | | | | | 4,960 (7) | 311,234 | | |
| | 05/05/14 | | | | | 131,076 (11) | 8,225,039 | | |
| | 05/05/14 | | | | | 142,474 (12) | 8,940,254 | | |
| | 09/16/14 | | | | | | | 8,773 (14) | 550,531 |
| | 09/25/15 | | | | | | | 71,865 (15) | 4,509,537 |
| | 09/25/15 | | | | | | | 36,870 (16) | 2,313,597 |
| | 02/16/16 | | | | | | | 19,467 (18) | 1,221,539 |
| | 02/16/16 | | | | | | | 11,273 (19) | 707,383 |
| | 09/22/16 | | | | | | | 8,955 (17) | 561,919 |

PX283

Page 5922

Case 3:17-cv-00121-JO-MSB Doc 377-8 Filed 05/07/24 PgID.33838 Pg 114 of 169

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 09/22/16 | | | | | | | 9,819 (17) | 616,152 |
| Total | | 101,051 | — | | | 303,573 | 19,049,233 | 167,022 | 10,480,658 |



PX283
Page 5923

| Name | Grant Date | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) (2) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (3) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Paul E. Jacobs | 11/12/07 | 195,168 (4) | — | 37.29 | 11/11/17 | | | | |
| | 11/09/09 | 9,570 (4) | — | 44.75 | 11/08/19 | | | | |
| | 05/05/14 | | | | | 610,603 (12) | 38,315,345 | | |
| | 09/16/14 | | | | | | | 20,888 (14) | 1,310,740 |
| | 09/25/15 | | | | | | | 171,104 (15) | 10,736,763 |
| | 09/25/15 | | | | | | | 87,786 (16) | 5,508,580 |
| | 09/22/16 | | | | | | | 21,321 (17) | 1,337,891 |
| | 09/22/16 | | | | | | | 23,379 (17) | 1,467,002 |
| Total | | 204,738 (4) | — | | | 610,603 | 38,315,345 | 324,478 | 20,360,976 |
| Brian Modoff | 10/19/15 | | | | | 22,223 (13) | 1,394,491 | | |
| | 10/19/15 | | | | | | | 22,903 (20) | 1,437,162 |
| | 10/19/15 | | | | | | | 13,044 (21) | 818,518 |
| | 09/22/16 | | | | | | | 19,915 (22) | 1,249,666 |
| | 09/22/16 | | | | | | | 3,518 (17) | 220,763 |
| | 09/22/16 | | | | | | | 3,858 (17) | 242,071 |
| Total | | — | — | | | 22,223 | 1,394,491 | 63,238 | 3,968,180 |

(1) There were no unexercised, unearned stock options at September 25, 2016. Accordingly, we did not include the "Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options" column in this table.

(2) Amounts include dividend equivalent shares that had not vested at fiscal year end as follows: 46,755 shares for Mr. Mollenkopf; 5,159 shares for Mr. Davis; 22,213 shares for Mr. Aberle; 44,992 shares for Dr. Jacobs; and 818 shares for Mr. Modoff.

(3) Amounts include dividend equivalent shares that had not vested at fiscal year end as follows: 9,651 shares for Mr. Mollenkopf; 3,257 shares for Mr. Davis; 5,392 shares for Mr. Aberle; 10,857 shares for Dr. Jacobs; and 1,323 shares for Mr. Modoff.

(4) Represents stock options exercisable by the trusts of Dr. Jacobs's children for which he disclaims beneficial ownership.

| Type of Grant | | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|---|
| (5) | Restricted Stock Units | 11/9/2011 | 33-1/3% per year | 11/9/2014<br>11/9/2015<br>11/9/2016 | Vesting was conditioned on the Compensation Committee's determination of satisfactory attainment of performance goals for fiscal 2012. Continued employment through vesting date required. |
| (6) | Performance Stock Units | 11/9/2011 | 33-1/3% per year | 11/9/2014<br>11/9/2015<br>11/9/2016 | As of 9/25/16, all measurement periods were complete. Number of shares is the total number of earned but unvested shares. Continued employment through vesting date required. |
| (7) | Restricted Stock Units | 9/29/2013 | 33-1/3% per year | 11/20/2014<br>11/20/2015<br>11/20/2016 | Vesting was conditioned on the Compensation Committee's determination of satisfactory attainment of performance goals for the first |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | nine months of fiscal 2014. Continued employment through vesting date required. |

Compensation Tables and Narrative Disclosures

| | Type of Grant | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|---|
| (8) | Restricted Stock Units | 12/12/2013 | 33-1/3% per year | 12/12/2016<br>12/12/2017<br>12/12/2018 | Continued employment through vesting date required. |
| (9) | Restricted Stock Units | 12/12/2013 | 20% per year | 12/12/2014<br>12/12/2015<br>12/12/2016<br>12/12/2017<br>12/12/2018 | Continued employment through vesting date required. |
| (10) | Restricted Stock Units | 9/29/2013 | 33-1/3% per year | 9/29/2014<br>9/29/2015<br>9/29/2016 | Continued employment through vesting date required. |
| (11) | Restricted Stock Units | 5/5/2014 | 20% per year | 5/5/2015<br>5/5/2016<br>5/5/2017<br>5/5/2018<br>5/5/2019 | Vesting was conditioned on the Compensation Committee's determination of satisfactory attainment of performance goals for the first six months of fiscal 2015. Continued employment through vesting date required. |
| (12) | Restricted Stock Units | 5/5/2014 | 33-1/3% per year | 5/5/2017<br>5/5/2018<br>5/5/2019 | Vesting was conditioned on the Compensation Committee's determination of satisfactory attainment of performance goals for the first six months of fiscal 2015. Continued employment through vesting date required. |
| (13) | Restricted Stock Units | 10/19/2015 | 33-1/3% per year | 10/19/2016<br>10/19/2017<br>10/19/2018 | Vesting was conditioned on the Compensation Committee's determination of satisfactory attainment of performance goals for first two quarters of fiscal 2016. Continued employment through vesting date required. |
| (14) | Performance Stock Units | 9/16/2014 | 100% cliff vesting | 10/4/2017 | As of 9/25/16, two of the four measurement periods were complete. Based on performance as of that date, the number of shares shown is the actual number of shares earned for the completed periods (0 shares) and the threshold number of shares that may be earned for the remaining periods. Continued employment through vesting date required. |
| (15) | Performance Stock Units | 9/25/2015 | 100% cliff vesting | 10/10/2018 | As of 9/25/16, the measurement period was incomplete. Based on performance as of that date, the number of shares shown is the maximum number of shares that may be earned under this award. Continued employment through vesting date required. |
| (16) | Performance Stock Units | 9/25/2015 | 100% cliff vesting | 10/10/2018 | As of 9/25/16, the measurement period was incomplete. Based on performance as of that date, the number of shares shown is the target number of shares that may be earned under this award. Continued employment through vesting date required. |
| (17) | Performance Stock Units | 9/22/2016 | 100% cliff vesting | 10/10/2019 | As of 9/25/16, the measurement period was incomplete. Based on performance as of that date, the number of shares shown is the threshold number of shares that may be earned under this award. Continued employment through vesting date required. |
| (18) | Performance Stock Units | 2/16/2016 | 100% cliff vesting | 4/7/2019 | As of 9/25/16, the measurement period was incomplete. Based on performance as of that date, the number of shares shown is the maximum number of shares that may be earned under this award. Continued employment through vesting date required. |

PX283

| | Type of Grant | Grant Date | Vesting Rate | Vesting Dates | Conditions |
|---|---|---|---|---|---|
| (19) | Performance Stock Units | 2/16/2016 | 100% cliff vesting | 4/7/2019 | As of 9/25/16, the measurement period was incomplete. Based on performance as of that date, the number of shares shown is the target number of shares that may be earned under this award. Continued employment through vesting date required. |
| (20) | Performance Stock Units | 10/19/2015 | 100% cliff vesting | 10/10/2018 | As of 9/25/16, the measurement period was incomplete. Based on performance as of that date, the number of shares shown is the maximum number of shares that may be earned under this award. Continued employment through vesting date required. |
| (21) | Performance Stock Units | 10/19/2015 | 100% cliff vesting | 10/10/2018 | As of 9/25/16, the measurement period was incomplete. Based on performance as of that date, the number of shares shown is the target number of shares that may be earned under this award. Continued employment through vesting date required. |
| (22) | Restricted Stock Units | 9/22/2016 | 33-1/3% per year | 11/20/2017<br>11/20/2018<br>11/20/2019 | Vesting is conditioned on the Compensation Committee's determination of satisfactory attainment of performance goals for first two quarters of fiscal 2017. Continued employment through vesting date required. |

## OPTION EXERCISES AND STOCK AWARDS VESTED DURING FISCAL 2016

The "Option Exercises and Stock Awards Vested During Fiscal 2016" table below provides information on stock options exercised by the NEOs and NEO stock awards that vested during fiscal 2016.

### Option Exercises and Stock Awards Vested During Fiscal 2016

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized On Exercise ($) | Number of Shares Acquired on Vesting (#) (1) | Value Realized on Vesting ($) (2) |
| Steve Mollenkopf | — | — | 144,052 | 7,167,144 |
| George S. Davis | — | — | 65,469 | 3,353,452 |
| Derek K. Aberle | — | — | 84,701 | 4,342,966 |
| Paul E. Jacobs | 497,804 (3) | 8,021,575 | 35,825 | 1,777,630 |
| Brian Modoff | — | — | — | — |

(1) Amounts include dividend equivalents on vested shares and shares withheld for the payment of taxes.

(2) Amounts represent the dollar value of shares acquired upon vesting based on the fair market value of our common stock on the vest date.

(3) All shares acquired on exercise by trusts for Dr. Jacobs's children for which he disclaims beneficial ownership.

## NONQUALIFIED DEFERRED COMPENSATION

The "Fiscal 2016 Nonqualified Deferred Compensation" table below provides information on the nonqualified deferred compensation of the NEOs.

Under the NQDC Plan, we match a portion of participants' contributions to the NQDC Plan with cash. For the calendar 2015 Plan Year, we effectively matched up to 8% of the aggregate of a participant's base salary plus ACIP amounts. We match a participant's contributions for a calendar year annually only if the participant is actively employed on the first day of the next calendar year or is terminated without cause during the calendar year and had satisfied the vesting eligibility requirement. Prior to calendar 2014, the Company matched participants' contributions with our common stock (Match



PX283

Shares). All matching amounts vest in full upon the participant's death, disability, attainment of age 65 while employed with the Company, involuntary termination of employment without "Cause" or voluntary termination of employment for "Good Reason" (in both cases within 24 months after a change in control of the Company), or completion of two continuous years of service with the Company commencing with the participant's date of hire. Effective for the calendar 2016 Plan Year, the Company match, which will be made in January 2017, has been reduced from 8% to 4% of the aggregate of the participant's base salary plus ACIP amounts. Participants my defer up to 60% of their annual salary and 85% of their ACIP earnings during a plan year.

## Fiscal 2016 Nonqualified Deferred Compensation

| Name | Executive Contributions in Last Fiscal Year ($) (1) | Registrant Contributions in Last Fiscal Year ($) (2) | Aggregate Earnings in Last Fiscal Year ($) (3) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last Fiscal Year End ($) (4) |
|---|---|---|---|---|---|
| Steve Mollenkopf | 102,500 | 51,250 | 171,128 | — | 2,072,754 |
| George S. Davis | 350,003 | 92,801 | 170,364 | — | 2,318,602 |
| Derek K. Aberle | 281,888 | 106,093 | 585,063 | — | 5,736,862 |
| Paul E. Jacobs | — | — | 4,135,527 | — | 31,959,256 |
| Brian Modoff | 162,466 | 8,308 | 9,184 | — | 179,958 |

(1) All amounts disclosed in this column are also reported in the Fiscal 2016 Summary Compensation Table with some of the amounts included in the "Salary" column for the current year and the remaining amounts included in the "Non-Equity Incentive Plan Compensation" column for the current fiscal year.

(2) The amounts reported in this column reflect the cash match in fiscal 2016 for the NEOs' contributions in the 2015 calendar year. All amounts disclosed in this column are also reported in the Fiscal 2016 Summary Compensation Table under "All Other Compensation."

(3) The amounts in this column are not included in the Fiscal 2016 Summary Compensation Table.

(4) This column includes all amounts in the NQDC Plan for the NEOs. The following amounts were reported as compensation to the NEOs in our summary compensation tables for previous years: Mr. Mollenkopf - $1,338,888; Mr. Davis - $1,680,711; Mr. Aberle - $2,204,847 and Dr. Jacobs - $13,384,147.

## POTENTIAL POST-EMPLOYMENT PAYMENTS

As noted in the CD&A, the Company employs almost all U.S.-based employees, including all of our NEOs, "at will," without employment contracts or severance agreements. We do not have a pre-defined severance plan covering the involuntary termination of employees, including our NEOs. We do not accelerate unvested stock options, RSUs or PSUs in the event of an involuntary "for cause" termination. Such terminations may involve theft, dishonesty, falsification, actions that are detrimental to the Company, conviction of a criminal act that impairs the performance of duties required by the Company or violation of a material Company policy. Our practice in such an involuntary termination situation may include the following non-equity benefits:

- Salary continuation dependent on the business reason for the termination;
- Lump-sum payment based on job level and years of service with Qualcomm;
- Lump-sum payment to assist with health care coverage for a limited time; and
- Outplacement services.

**Figure 17** summarizes the general terms of our equity award plans and agreements and nonqualified deferred compensation plan regarding how unvested stock options, PSUs, RSUs and Match Shares would be treated in the event of death, long-term disability, a change in control, certain involuntary terminations and retirement. Any variations from the below are set forth in the CD&A.

***Figure 17: Treatment of Unvested Equity Awards in Certain Termination Situations***

| Termination Situation | Treatment of Unvested Stock Options and RSUs | Treatment of Unvested PSUs |
|---|---|---|
| Death | All unvested stock options and RSUs become fully vested. Stock options remain exercisable up to one year from the date of death or the expiration date of the grant, whichever is earlier. | All unvested PSUs become fully vested, but the number of shares issued is prorated based on a pre-established formula described in the applicable award agreement. |
| Long-Term Disability (LTD) | Stock options continue to vest per their original vesting schedule. Stock options remain exercisable until the expiration date of the grant. All unvested RSUs become fully vested. | All unvested PSUs become fully vested, but the number of shares issued is prorated based on a pre-established formula described in the applicable award agreement. |
| Involuntary termination without cause | Stock options: 10% of the total amount granted is automatically accelerated, and up to an additional 10% may be accelerated using a pre-established formula as described in the applicable award agreement, subject to execution of a general release of claims. The accelerated vested stock options could be exercised up to six months after termination, but in no event later than the expiration date of such stock options.<br><br>RSUs: All unvested RSUs are forfeited. | All unvested PSUs are forfeited. |
| Involuntary termination after a change in control without cause or voluntary resignation for good reason | "Double-trigger:" If, within 24 months after a change in control, the recipient's employment is involuntarily terminated for any reason other than for cause or if the recipient voluntarily resigns for "good reason" (as defined in the award agreements), then vesting of stock options and RSUs is accelerated in full. | All unvested PSUs become fully vested, but the number of shares issued is prorated based on a pre-established formula described in the applicable award agreement. |
| Voluntary termination | Stock options: All vested stock options may be exercised for the number of days set forth in the terms of the applicable award agreement, but in no event later than the expiration date of such stock options. All unvested stock options are forfeited.<br><br>RSUs: All unvested RSUs are forfeited.<br><br>Note: Retirement provision applies if retirement eligible at termination. | All unvested PSUs are forfeited.<br><br>Note: Retirement provision applies if retirement eligible at termination. |
| Retirement (1) | Stock Options: All vested stock options may be exercised at any time prior to the expiration of 12 months, but in no event later than the expiration date of such stock options. All unvested stock options are forfeited.<br><br>RSUs: RSUs will become fully vested and distributed according to the original vesting schedule. | PSUs become fully vested and paid out at the end of the performance period based upon and subject to achievement of the relevant performance objectives. |

(1) For stock options, RSUs and PSUs granted prior to September 2016, Retirement is the date on which a participant has attained the age of 60 years and has completed 10 years of continuous service with the Company. For stock options, RSUs and PSUs granted beginning in September 2016, Retirement is the date on which a participant has attained the age of 55 years and has completed 10 years of continuous service with the Company.

The information in the "Potential Payments Upon Termination or Change in Control" table below describes the compensation that would be payable under various scenarios if the NEO's employment had terminated on the last day of fiscal 2016 and the price per share of our common stock is the closing market price as of that date.

## Potential Payments Upon Termination or Change In Control (1)

| Name | Termination Scenario | Accrued Vacation ($) (2) | Performance Unit Award/Performance Stock Units/Restricted Stock Units ($) (3)(4)(5) | Total ($) |
|---|---|---|---|---|
| Steve Mollenkopf | Death | 217,308 | 41,205,626 | 41,422,934 |
| | Long-Term Disability | — | 41,205,626 | 41,205,626 |
| | Change In Control | — | 41,205,626 | 41,205,626 |
| | Involuntary Termination | 217,308 | — | 217,308 |
| | Voluntary Termination | 217,308 | — | 217,308 |
| George S. Davis | Death | 80,612 | 5,390,229 | 5,470,841 |
| | Long-Term Disability | — | 5,390,229 | 5,390,229 |
| | Change In Control | — | 5,390,229 | 5,390,229 |
| | Involuntary Termination | 80,612 | — | 80,612 |
| | Voluntary Termination | 80,612 | — | 80,612 |
| Derek K. Aberle | Death | 155,990 | 24,385,578 | 24,541,568 |
| | Long-Term Disability | — | 24,385,578 | 24,385,578 |
| | Change In Control | — | 21,010,578 | 21,010,578 |
| | Involuntary Termination | 155,990 | 3,375,000 | 3,530,990 |
| | Voluntary Termination | 155,990 | 3,375,000 | 3,530,990 |
| Paul E. Jacobs | Death | — | 41,939,153 | 41,939,153 |
| | Long-Term Disability | — | 41,939,153 | 41,939,153 |
| | Change In Control | — | 41,939,153 | 41,939,153 |
| | Involuntary Termination | — | 15,326,138 | 15,326,138 |
| | Voluntary Termination | — | — | — |
| Brian Modoff | Death | 21,779 | 3,156,281 | 3,178,060 |
| | Long-Term Disability | — | 3,156,281 | 3,156,281 |
| | Change In Control | — | 3,156,281 | 3,156,281 |
| | Involuntary Termination | 21,779 | — | 21,779 |
| | Voluntary Termination | 21,779 | — | 21,779 |

(1) Company match under the NQDC Plan is fully vested upon the completion of two years of continuous service with the Company. All of the NEOs fulfilled the continuous service requirement as of September 25, 2016, except for Mr. Modoff who has an unvested Company match in the amount of $8,807 as of September 25, 2016 which would be paid out upon death, Long-Term Disability or a change in control. We have included all of the vested amounts for the other NEOs in the Aggregate Balance column in the "Fiscal 2016 Nonqualified Deferred Compensation" table, and as a result, we did not include these amounts in this table.

(2) All U.S.-based employees, including the NEOs, are entitled to payouts of accrued vacation upon termination, including death.

(3) Includes amounts payable under Mr. Aberle's Performance Unit Award (PUA). Earned amounts vest upon death, disability, termination of service by the Company without Cause or voluntary termination of service for Good Reason. See the discussion titled "Fiscal 2016 Target Amounts and Compensation Mix" for more details.

(4) For the Performance Stock Units and Restricted Stock Units change-in-control termination scenario, we have assumed 100% acceleration of unvested shares.

(5) None of the NEOs were retirement eligible under the applicable plan and award agreements as of September 25, 2016.

## DIRECTOR COMPENSATION

The Compensation Committee reviews our nonemployee director compensation program annually, including an analysis of reported nonemployee director compensation practices at the same peer companies used for the Compensation Committee's evaluation of executive compensation. The analysis, prepared by FW Cook, includes prevalent practices for retainers, fees, equity-based compensation and stock ownership guidelines. FW Cook also provides recommendations regarding potential changes to our director compensation program. The analysis conducted for fiscal 2016 affirmed that our director compensation program continues to be aligned with best practices as follows:

- No fees are provided for Board meeting attendance.
- Directors received an annual award of deferred stock units (DSUs) that are defined under a fixed-value formula, are fully vested on the grant date, include a mandatory three-year holding period from the grant date, and settle three years from the grant date, regardless of continued Board service, or upon death, disability or a change in control. A director may elect to defer the distribution, and the taxable event, beyond the 3-year mandatory period. The Compensation Committee approved the aforementioned vesting (fully vested on the grant date) effective January 1, 2016.
- Directors are subject to meaningful stock ownership guidelines. As discussed under "Stock Ownership Guidelines," nonemployee directors are required to hold shares of our common stock with a value equal to five times the annual retainer for Board service applicable to U.S. residents. Nonemployee directors are required to achieve this ownership level within five years of joining the Board. All of our nonemployee directors who have served on the Board for five years have met this guideline. Messrs. Henderson, Manwani, McLaughlin, Randt and Vinciquerra and Ms. Livermore have not served on the Board for five years and thus are not yet required to meet this guideline. In addition to the preceding ownership guidelines, all directors are expected to own shares of our common stock within one year of joining the Board. All of our nonemployee directors who have served on the Board for one year have met this guideline.

The following narratives, tables and footnotes describe the total compensation and benefits awarded to, earned by or paid to our nonemployee directors during fiscal 2016.

**Annual retainer.** Directors who are U.S. residents receive an annual retainer of $100,000 paid in equal one-fourth installments following the end of each calendar quarter. Directors who are non-U.S. residents receive an annual retainer of $120,000 in consideration of the increased travel time, also paid in equal one-fourth installments following the end of each calendar quarter. If available under the applicable tax code, directors may elect to receive all, or a portion, of the annual retainer in cash and/or in DSUs. The number of DSUs received is based on the fair market value of our common stock (as defined by the applicable equity plan) on the last trading day of the last month of the calendar quarter. The DSUs vest immediately but are subject to a three-year holding period and generally settle three years from the grant date, unless the director elects to defer further.

**Board committee chair retainer.** The Chairs of the Audit and Compensation committees receive annual retainers of $25,000. The Chair of the Governance Committee receives an annual retainer of $15,000. The Board may appoint special committees from time-to-time, and retainers, if any, for the chairs of such committees are determined by the Compensation Committee in its discretion.

**Presiding Director retainer.** The Presiding Director receives an annual retainer. Effective January 1, 2017, the Compensation Committee increased the annual retainer from $25,000 to $35,000.

**Meeting fees.** Directors receive $1,500 for each standing committee meeting attended (in person or by telephone). Directors do not receive a fee for attending Board meetings. Directors Emeriti receive $2,000 for each Board meeting attended in person ($1,000 for telephonic attendance). Meeting fees, if any, for special committees are determined by the Compensation Committee in its discretion.

**Equity compensation.** The Compensation Committee grants annual DSUs to directors with a grant date of the date of the annual meeting of stockholders, and the number of DSUs awarded is determined by dividing $200,000 by the fair value of a share of our common stock on the grant date. Directors who join the Board between annual meetings of stockholders receive DSUs on a pro rata basis to reflect the partial year of service until the next annual meeting of stockholders. The DSUs are fully vested on the grant date, include a mandatory three-year holding period from the grant date, and settle three years from grant date, regardless of continued Board service, or upon death, disability or a change in control. A director may elect to defer the distribution, and the taxable event, beyond the three-year mandatory period. The DSUs include dividend

PX283

equivalent rights. The dividend equivalent rights accrue in the form of additional shares of our common stock with vesting and distribution at the same time as the underlying DSUs.

**Nonqualified deferred compensation earnings.** Directors may defer any cash portion of their retainer and meeting fees under the NQDC Plan. Directors who contribute to the NQDC Plan are not eligible to receive the Company cash match or any interest that is above the market rate.

**Charitable gifts matching program.** We will match 100%, up to $50,000 annually, of a director's or Director Emeritus' contribution to qualified, eligible IRS recognized non-profit organizations.

**Perquisites and other personal benefits.** Perquisites and other personal benefits for a director are excluded if the total value of all of his or her perquisites and personal benefits is less than $10,000. If the total value of all of his or her perquisites and personal benefits is $10,000 or more, then each perquisite or personal benefit, regardless of its amount, is identified by type. Each perquisite or personal benefit that exceeds the greater of $25,000 or 10% of the total amount of perquisites and personal benefits for that director is identified by type and quantified. We offer a new cellular phone to each director each year as a personal benefit, and these amounts are included as perquisites if required to be disclosed as provided above.

## Fiscal 2016 Director Compensation (1)(2)

| Name | Fees Earned or Paid in Cash ($) (3) | Stock Awards ($) (4) | All Other Compensation ($) (5) | Total ($) |
|---|---|---|---|---|
| Barbara T. Alexander | 175,659 | 200,034 | 50,000 | 425,693 |
| Donald G. Cruickshank (6) | 73,088 | — | 50,000 | 123,088 |
| Raymond V. Dittamore | 140,000 | 200,034 | 10,000 | 350,034 |
| Jeffrey W. Henderson | 97,478 | 234,040 | 12,522 | 344,040 |
| Susan Hockfield (6) | 58,407 | — | 10,950 | 69,357 |
| Thomas W. Horton | 191,000 | 200,034 | 50,000 | 441,034 |
| Sherry Lansing (6) | 57,907 | — | — | 57,907 |
| Ann M. Livermore (7) | — | — | — | — |
| Harish Manwani | 129,000 | 200,034 | — | 329,034 |
| Mark D. McLaughlin | 130,000 | 200,034 | 60,000 | 390,034 |
| Clark T. Randt, Jr. | 157,000 | 200,034 | 11,400 | 368,434 |
| Francisco Ros | 154,500 | 200,034 | — | 354,534 |
| Jonathan J. Rubinstein (8) | 93,291 | 200,034 | 50,000 | 343,325 |
| Marc I. Stern (6) | 58,758 | — | — | 58,758 |
| Anthony J. Vinciquerra | 128,500 | 200,034 | 29,500 | 358,034 |

(1) We did not award any stock options or provide any non-equity incentive plan compensation to any directors in fiscal 2016. Therefore, we did not include the "Option Awards" or "Non-Equity Incentive Plan Compensation" columns in this table.

(2) We do not offer a pension plan or other defined benefit retirement plan to our nonemployee directors. We do not provide above-market or preferential earnings on deferred compensation, nor do we provide dividends on stock in the Non-Qualified Deferred Compensation (NQDC) Plan at a rate higher than dividends on our common stock. As a result, the "Nonqualified Deferred Compensation Earnings" column has been omitted from this table.

(3) These amounts include cash retainers and meeting fees. For Ms. Alexander and Messrs. McLaughlin and Vinciquerra, these amounts also include the value of DSUs issued in lieu of payment of cash retainer fees. DSUs awarded to Ms. Alexander and Mr. McLaughlin are fully vested and will be settled three years from the grant date. DSUs awarded to Mr. Vinciquerra are fully vested and will be settled upon termination of his Board service.

PX283

(4) These amounts represent the fair value of the awards on the grant date. DSUs issued in lieu of payment of cash retainer fees are not included in this column. The amount for Mr. Henderson also includes an initial DSU awarded on January 12, 2016 when he joined the Board.

(5) These amounts represent the Company's match of directors' contributions to qualified, eligible IRS recognized non-profit organizations. The amount for Mr. McLaughlin includes $10,000 in matching contributions we made in fiscal 2016 for contributions made in fiscal 2015. Perquisites and personal benefits have been excluded as the total value for each director was less than $10,000.

(6) Sir Donald Cruickshank, Dr. Hockfield, Ms. Lansing and Mr. Stern concluded their service as directors at the 2016 annual meeting of stockholders.

(7) Ms. Livermore joined the Board on October 9, 2016 (which was after the end of fiscal 2016).

(8) Mr. Rubinstein resigned from the Board on May 4, 2016.

The following table shows the number of outstanding stock options and the aggregate number of outstanding RSUs and DSUs held by each individual who served as a nonemployee director of the Company at any time during fiscal 2016, as of September 25, 2016.

## Outstanding Equity Awards Held by Directors at Fiscal Year End

| Name | Number of Outstanding Options (#) (1) | Number of Outstanding RSUs/DSUs (#) (2) |
|---|---|---|
| Barbara T. Alexander | 22,000 | 12,834 |
| Donald G. Cruickshank (3) | 42,000 | — |
| Raymond V. Dittamore | 28,000 | 21,460 |
| Jeffrey W. Henderson | — | 5,373 |
| Susan Hockfield (3) | — | — |
| Thomas W. Horton | 2,500 | 10,374 |
| Sherry Lansing (3) | 26,755 | — |
| Ann M. Livermore (4) | — | — |
| Harish Manwani | — | 9,575 |
| Mark D. McLaughlin | — | 7,471 |
| Clark T. Randt, Jr. | — | 10,374 |
| Francisco Ros | — | 10,374 |
| Jonathan J. Rubinstein (5) | — | 4,539 |
| Marc I. Stern (3) | 42,000 | — |
| Anthony J. Vinciquerra | — | 7,589 |

(1) All outstanding stock options referenced in this column are fully vested.

(2) The information in this column includes dividend equivalent rights and amounts deferred under the director compensation program. See the narrative above under "Director Compensation" for detailed information on RSUs and DSUs granted to our nonemployee directors.

(3) Sir Donald Cruickshank, Dr. Hockfield, Ms. Lansing and Mr. Stern concluded their service as directors at the 2016 annual meeting of stockholders.

(4) Ms. Livermore joined the Board on October 9, 2016 (which was after the end of fiscal 2016).

(5) Mr. Rubinstein resigned from the Board on May 4, 2016.

# PX 284

## (Filed Under Seal)

# PX 285

## (Filed Under Seal)

# PX 286

## (Filed Under Seal)

# PX 287

## (Filed Under Seal)

# PX 288

## (Filed Under Seal)

# PX 289

## (Filed Under Seal)

# PX 290

## (Filed Under Seal)

# PX 291

## (Filed Under Seal)

# PX 292

## (Filed Under Seal)

# PX 293

## (Filed Under Seal)

# PX 294

## (Filed Under Seal)

# PX 295

## (Filed Under Seal)

# PX 296

## (Filed Under Seal)

# PX 297

## (Filed Under Seal)

# PX 298

## (Filed Under Seal)

# PX 299

## (Filed Under Seal)

# PX 300

## (Filed Under Seal)

# PX 301

## (Filed Under Seal)

# PX 302

## (Filed Under Seal)

# PX 303

## (Filed Under Seal)

# PX 304

## (Filed Under Seal)

# PX 305

## (Filed Under Seal)

# PX 306

## (Filed Under Seal)

# PX 307

Journal of Financial Economics 133 (2019) 299–336

Contents lists available at ScienceDirect

Journal of Financial Economics

journal homepage: www.elsevier.com/locate/jfec

# How news and its context drive risk and returns around the world☆

Charles W. Calomiris[a,b,*], Harry Mamaysky[c]

[a] Columbia Business School, 3022 Broadway, Uris Hall 801, New York, NY 10027, United States
[b] National Bureau of Economic Research, 1050 Massachusetts Avenue, Cambridge, MA 02138, United States
[c] Columbia Business School, 3022 Broadway, Uris Hall 803, New York, NY 10027, United States

ARTICLE INFO

*Article history:*
Received 14 April 2017
Revised 1 March 2018
Accepted 27 March 2018
Available online 12 March 2019

*JEL classification:*
G12
G15
G17

*Keywords:*
Empirical asset pricing
International markets
Financial news media
Natural language processing

ABSTRACT

We develop a classification methodology for the context and content of news articles to predict risk and return in stock markets in 51 developed and emerging economies. A parsimonious summary of news, including topic-specific sentiment, frequency, and unusualness (entropy) of word flow, predicts future country-level returns, volatilities, and drawdowns. Economic and statistical significance are high and larger for year ahead than monthly predictions. The effect of news measures on market outcomes differs by country type and over time. News stories about emerging markets contain more incremental information. Out-of-sample testing confirms the economic value of our approach for forecasting country-level market outcomes.

© 2019 Elsevier B.V. All rights reserved.

## 1. Introduction

What is news and how is it associated with changes in stock market returns and risks? This is a fundamental question in asset pricing and has been the subject of decades of research (for example, Fama et al., 1969; Roll, 1984). Recently, financial economists have brought new tools to bear on this question, including the analysis of the relationships between market outcomes for individual stocks or US stock market indexes and various aspects of the words that appear in newspaper articles and other textual sources (for example, Tetlock 2007, 2010, 2011; Tetlock et al., 2008; Garcia 2013). The promising early work in the literature linking textual analysis and stock returns has raised more questions that it has answered. This paper addresses nine important sets of questions about the connections between news and market outcomes.

First, and perhaps most importantly, how should one best measure news using word flow? One approach, which

☆ We gratefully acknowledge support from the Program for Financial Studies and the Bank of England, and excellent research assistance from Yong Wang, Minchen Zheng, and Sirui Wang. We thank the Thomson Reuters Corp. for graciously providing the data that was used in this study. For helpful comments we thank the referee, Dmitry Livdan, Kent Daniel, Robert Hodrick, Leif-Anders Thorsrud, Diego Garcia, Sanjiv Das, and seminar participants at Catholic University of Chile, the 2016 RIDGE/Banco Central del Uruguay Workshop on Financial Stability, the AlphaSimplex Group, the 2017 News & Finance Conference at Columbia, Chapman University, Villanova University, Ohio State University, the Federal Reserve Bank of Kansas City, Arizona State University, University of Arizona, the Global Risk Institute, the University of Colorado, the Columbia Machine Learning in Finance Workshop, the 2017 Society for Economic Measurement Conference, Cornell University, and the 2017 Cleveland Fed and University of Maryland Financial Stability & FinTech Conference.

* Corresponding author at: Columbia Business School, 3022 Broadway, Uris Hall 801, New York, NY 10027, United States.
*E-mail addresses:* cc374@columbia.edu (C.W. Calomiris), hm2646@columbia.edu (H. Mamaysky).

https://doi.org/10.1016/j.jfineco.2018.11.009
0304-405X/© 2019 Elsevier B.V. All rights reserved.

we adopt here, is to apply atheoretical methods (i.e., those with no a priori position regarding which particular words should be the focus of the analysis) to organize the flow of words in a comprehensive and unconstrained manner to see which parts of word flow matter for market outcomes. An alternative approach (for example, BBD, 2016) is to identify, based on a priori criteria, key lists of words or combinations of key words to see how their presence matters for market outcomes. A major advantage of the former approach is that it does not require researchers to know in advance what aspects of word flow are most relevant. The atheoretical approach also avoids data mining risks by imposing discipline on the process by which text is analyzed.

Second, which aspects of word flow should be the focus of measurement? There is a large literature showing that "sentiment" has explanatory power for returns. Articles that contain words with preidentified positive sentiment value (as measured by a sentiment "dictionary") are associated with positive returns, while those with negative value are associated with negative returns. But sentiment is only one dimension of word flow. The frequency of the appearance of certain words or phrases (compared to their past frequency) may also be relevant, and it may also be that the context in which words appear (which we label "topics") is important to the meaning of word flow. In addition to measuring sentiment, the contextual frequency of word flow, and the way sentiment matters differently depending on context, other aspects of text flow may be relevant. Glasserman and Mamaysky (2019a) show that the unusualness (entropy) of word strings may have predictive power for market outcomes, especially when interacted with sentiment. As we show below, the effects of measured sentiment and frequency do vary across topic categories, so this decomposition of sentiment may be particularly useful in forecasting applications. Our empirical approach will include these various measures of text flow and their interactions and explore their incremental information content relative to nontextual variables often included in asset pricing studies.

Third, the patterns that link frequency, topics, sentiment, and entropy measures of word flow with market outcomes may vary over time. In this paper, we capture changes over time using a dividing point that is identified by principal components analysis. We show that the mapping from word flow measures to market outcomes changed somewhat after the global financial crisis. We present results for the entire sample period (1998–2015) and for two sub-periods (April 1998–February 2007, and March 2007–December 2015). We further explore dynamic changes in coefficients using a rolling elastic net regression which allows for model selection and coefficient shrinkage for out-of-sample forecasting. We find that allowing coefficients to change over time is important for out-of-sample forecasting.

Fourth, given the potential importance of identifying topical context, how should one identify topics? Within the set of atheoretical means of identifying topics there are two common methods, namely the Louvain (Blondel et al., 2008) and latent Dirichlet allocation (LDA, see Blei et al., 2003) approaches, as we discuss below. The Louvain method assigns salient words to mutually exclusive topic areas based on word co-occurrence (that is, each word belongs to only one topic area). The LDA method allows words to appear in more than one topic area (on a probabilistic basis). After verifying with some exploratory analysis that our regression findings are similar under either approach, we focus on the Louvain method. The Louvain approach, variants of which have been applied in diverse fields from sociology (Rule et al., 2015) to marketing (Netzer et al., 2012), has the major advantages of much faster computational speed, which results from the simplicity of a mutually exclusive approach to assigning words to topic areas, as well as greater ease of interpretability.[1]

Fifth, does the effect of our word flow measures operate through a risk channel? Our findings suggest that when a word flow measure predicts positive expected returns, it also predicts a reduction in risk. Word flow measures largely divide into "good" and "bad" news, where bad news implies lower expected returns and higher risk and good news implies the opposite. The fact that news tends to have opposite effects on expected returns and risk (e.g., expected returns higher, while risk lower) suggests that the factors captured by news flow are not priced risks (priced factors should affect expected returns and risk in the same direction).

Sixth, how should one measure risk? As is well known, if the returns process is characterized by Brownian motion and normality of the error term, then the standard deviation of returns (say, over a particular month) will be a sufficient statistic for risk. Those assumptions, however, generally are rejected, especially for emerging market (EM) countries, which exhibit pronounced momentum and nonnormality, both with respect to skew and kurtosis (see Bekaert et al., 1998; Karolyi, 2015, and Ghysels et al., 2016). Given those facts, to capture risk, in addition to using the standard deviation of returns (*sigma*), we also employ the "maximum one-year drawdown." This measures, at any point in time, the maximum percentage decline that occurs from the current index value during the next year. This measure also is intended to capture the fact that "downside risk" may be treated differently from "upside risk" (the standard deviation of returns treats them as identical).

Seventh, the existing literature typically focuses on short-term analysis of individual US companies or the US stock market as a whole.[2] Do empirical patterns that apply to individual company stocks or the aggregate U.S. index also apply to other countries? When analyzing news and stock market behavior, should countries be lumped together or analyzed separately? We analyze the aggregate monthly stock market returns and risks for 52 countries.[3] There is a great deal of evidence suggesting that returns

[1] Rule et al. (2015) discuss the pros and cons of various topic classification approaches and reach a conclusion similar to ours–that co-occurrence approaches are appealing due to their simplicity and the ease of interpretability of results.

[2] A notable exception is Froot et al. (2017), who analyze media reinforcement effects at the country index level.

[3] We only use 51 countries in our panel regressions because we exclude Iceland, which experienced a drawdown of 95%. Including this outlier affected coefficient magnitudes in our regression models, and therefore we excluded it.

PX307

Page 6319

processes differ between emerging markets (EMs) and developed markets (DMs). Furthermore, the amount of risk and the nature of the news that drives risk differ between EMs and DMs (Beim and Calomiris, 2001; Karolyi, 2015), which reflects differences in political contexts, the ranges of government policy choices, differences in information production for securities markets, different market liquidity (Calomiris et al., 2012), differences in legal environment and corporate governance (La Porta et al., 1998), different fiscal, monetary and exchange rate regimes (Calvo and Reinhart, 2002), differences in sovereign default risk (which is absent in most DMs but is relatively high in EMs, as described in Cruces and Trebesch, 2013), and differences in the frequency and severity of banking crises (Laeven and Valencia, 2010). EMs suffer larger and more frequent major drawdowns of stock returns than DMs (Kaminsky and Schmukler, 2008). For all these reasons, we divide countries into EMs and DMs and perform separate panel analyses of each group of countries.

Eighth, what source of news should one use? Given our global interest (across EMs and DMs) we need an English language news source covering many countries. Thomson Reuters generously provided their entire database of news articles from 1996 through 2015.

Finally, over what time frame should word flow predict risk and return? Much of the existing finance literature on the effects of sentiment on individual stocks' returns have focused on high-frequency predictions. Glasserman and Mamaysky (2019a) are an exception; using the US stock market index, they find word flow predicts risk over the course of several months. Similarly, Sinha (2016) and Heston and Sinha (2017) find that it can be useful to aggregate over longer periods of time when analyzing news for individual stocks. They find that when aggregating news over a week, rather than a day, one substantially lengthens the time horizon over which news forecasts returns. Weekly news predicts returns for 13 weeks, while daily news predicts returns for only two days. Motivated by these findings, we aggregate news at a monthly horizon, examine both one-month-ahead and one-year-ahead predictions, and show that our country-level measures exhibit stronger predictive power for one-year-ahead returns and drawdowns than for one-month-ahead forecasts of return and volatility.

Section 2 describes how we derive measures of word flow used in the study and provides a list of variables and sources for them. Section 3 presents regression results. Section 4 presents out-of-sample tests of our model. Section 5 concludes by summarizing our findings.

## 2. Data construction, variable definitions, and summary statistics

The analysis in this paper combines three types of data-market, macro, and news all of which are aggregated into a single data set at the month-country level. Our country-level stock market index data are obtained from Bloomberg. Table 1 shows the mapping from each of our DM and EM countries to the corresponding stock market index. All index returns are converted into US dollar terms using end-of-day exchange rates from Bloomberg. For a given country, we calculate its one-month ahead return (*return*), its one-year ahead return (*return*$^{12}$), its realized monthly volatility (*sigma*), and its one-year ahead drawdown (*drawdown*) using these US dollar returns. Our macro data, such as interest rates, GDP growth rates, and credit ratios, are obtained from a myriad of sources, like the World Bank and the International Monetary Fund, as detailed in the Appendix. Our textual data source is the Thomson Reuters Machine Readable News archive. This archive includes all Reuters News articles from 1996 to 2015, from which we use only the English language news. The measures of textual content we employ are constructed by us, as described below (also see the Appendix for more details).

Thomson Reuters News Analytics (TRNA) offers its own version of a sentiment measure as a commercial product, which has been used by Sinha (2016) and Heston and Sinha (2017), among others. The TRNA sentiment measure captures similar content to the sentiment measures we construct, but the TRNA sentiment measure is only available for a fraction of the articles in the Thomson Reuters database and only from 2003.[4] For this reason, we use our own sentiment measures constructed directly from the raw text of the Thomson Reuters Machine Readable News archive.

### 2.1. Construction of text measures

Our text processing can be broken up into four parts: (i) corpus selection and cleaning, (ii) construction of the document term matrix and topic classification, (iii) extraction of n-grams to allow for calculation of entropy, and (iv) calculation of article-level sentiment, topic, and entropy measures. Here we present a high-level overview of the process. The Appendix contains more technical and methodological detail.

In the first step, we select our text corpus and then clean and preprocess it. For the EM analysis, our corpus consists of all articles tagged by Thomson Reuters with the *N2:EMRG* code, which indicates an article about an emerging market country. Our EM corpus consists of 5 mm unique articles. Our DM corpus consists of all articles about the countries identified as developed market economies in Table 1. The DM corpus consists of 12 mm unique articles. All textual analysis in the paper is done separately for the EM and DM corpora.

In the second step, we calculate the document term matrix for the corpus under consideration. The document term matrix, with rows corresponding to articles and

[4] In response to a comment received after we completed our analysis, we purchased the TRNA sentiment data and compared regression results for the post-2003 period using our sentiment measure with those based on the TRNA sentiment measure. A detailed comparison is provided in Online Appendix Tables A5–A9. We find that the two measures are correlated (correlation coefficients of the two approaches to measuring sentiment are generally greater than 0.3 and less than 0.4, depending on topical context), and using the TRNA measure in our regression framework yields somewhat similar findings to those reported here, but the use of our measure generally results in more precise estimation and higher $R$-squared.

**Table 1**
List of EM and DM countries and their associated stock market index from Bloomberg (BBG index) as well as their country code (TR code) in the Thomson-Reuters Machine Readable News archive. The *EM* and *DM* rows refer to the MSCI EM and DM indexes, respectively, which are used to compute abnormal returns in the event study. Iceland text data is used in our event studies and in the topic clustering analysis but is excluded from all our panel and out-of-sample forecasting analysis.

| List of EM and DM countries | | | | | | | |
|---|---|---|---|---|---|---|---|
| EM countries | | | | DM countries | | | |
| | Country | BBG index | TR code | | Country | BBG index | TR code |
| 1 | Argentina | BURCAP | AR | 1 | Australia | AS52 | AU |
| 2 | Brazil | IBOV | BR | 2 | Austria | ATX | AT |
| 3 | Chile | IGPA | CL | 3 | Belgium | BELPRC | BE |
| 4 | China (PRC) | SHCOMP | CN | 4 | Canada | SPTSX | CA |
| 5 | Colombia | COLCAP | CO | 5 | Denmark | KAX | DK |
| 6 | Czech Republic | PX | CZ | 6 | DM | MXWO | – |
| 7 | EM | MXEF | EMRG | 7 | Finland | HEX | FI |
| 8 | Estonia | TALSE | EE | 8 | France | CAC | FR |
| 9 | Ghana | GGSECI | GH | 9 | Germany | DAX | DE |
| 10 | Hong Kong | HSI | HK | 10 | Greece | ASE | GR |
| 11 | Hungary | BUX | HU | 11 | Iceland | ICEXI | IS |
| 12 | India | SENSEX | IN | 12 | Ireland | ISEQ | IE |
| 13 | Indonesia | JCI | ID | 13 | Italy | ITLMS | IT |
| 14 | Israel | TA-25 | IL | 14 | Japan | NKY | JP |
| 15 | Kenya | NSEASI | KE | 15 | Luxembourg | LUXXX | LU |
| 16 | Malaysia | FBMKLCI | MY | 16 | Netherlands | AEX | NL |
| 17 | Mexico | INMEX | MX | 17 | New Zealand | NZSE | NZ |
| 18 | Nigeria | NGSEINDX | NG | 18 | Norway | OSEBX | NO |
| 19 | Peru | SPBL25PT | PE | 19 | Portugal | BVLX | PT |
| 20 | Philippines | PCOMP | PH | 20 | Singapore | STI | SG |
| 21 | Poland | WIG20 | PL | 21 | Spain | IBEX | ES |
| 22 | Russia | INDEXCF | RU | 22 | Sweden | OMX | SE |
| 23 | Slovakia | SKSM | SK | 23 | Switzerland | SPI | CH |
| 24 | Slovenia | SBITOP | SQ | 24 | United Kingdom | UKX | GB |
| 25 | South Africa | JALSH | ZA | 25 | United States | SPX | US |
| 26 | South Korea | KOSPI | KR | | | | |
| 27 | Thailand | SET50 | TH | | | | |
| 28 | Turkey | XU100 | TR | | | | |
| 29 | Ukraine | PFTS | UA | | | | |

columns corresponding to words, counts the number of times a given word appears in a given article. For a given document term matrix, let us write $D_{j,w}$ for the number of times word $w$ appears in article $j$. We restrict the words whose occurrences we count to our *econ word* list. This is a list of 1242 stemmed words, bigrams, and trigrams[5] that are descriptive of either market or economic phenomena (prestemming examples include *barriers*, *currency*, *parliament*, *macroeconomist*, and *World Bank*). This list was derived as follows: we began with the index from Beim and Calomiris' Emerging Financial Markets textbook. We then searched for words that co-occurred frequently in our articles database with the words in that list. The list itself, as well as the classification of each word into a topic, is available from the authors.

To define topic groups, we use the document term matrix to measure the tendency of groups of words to occur in articles together-we refer to this tendency as *co-occurrence*. Information about the co-occurrence of words, as measures by cosine similarity (see Appendix), is stored in the co-occurrence matrix (a symmetric matrix with a row and column for each of our econ words). The co-occurrence matrix defines a network of our 1242 econ words, to which we apply the Louvain community detection algorithm to find nonoverlapping clusters (i.e., a word can belong to only one cluster) of related words-we refer to these clusters as topics and label each one with what appears to us to be a natural topic title. Details of this procedure are given in the Appendix, but intuitively, we are looking for groups of words that tend to co-occur in articles more frequently than would be expected by chance. This procedure yields five topics for each of our DM and EM corpora.[6] Figs. 1 and 2 show the most frequently occurring words in each of our EM and DM topics.[7] For the EM corpus, we find five word-groupings, which we label as markets (*Mkt*), governments (*Govt*), commodities (*Comms*), corporate governance and structure (*Corp*), and macroeconomic topics (*Macro*). For the DM corpus, we find similar, but not identical topics: markets (*Mkt*), governments (*Govt*), commodities (*Comms*), corporate governance and structure (*Corp*), and the extension of credit (*Credit*).

[5] Bigrams and trigrams (or 3-g) are word phrases of length two and three, respectively.

[6] We found that recalculating topics over different subsamples of our data yielded very similar word groupings to those that were obtained over the entire sample. See the Appendix for more details.

[7] Fig. 3 shows that the original Louvain clustering produced over 40 word groupings for each corpus, yet only five of these contained more than just a few words. We place words from the smaller groupings into the five large ones for each corpus. This is discussed in greater detail in the Appendix.

PX307

Page 6321




**Fig. 1.** Word cloud plots for topics extracted from the developed markets corpus using the Louvain clustering algorithm. Each cluster shows the number of occurrences (in millions) of its constituent words in the corpus. Larger font indicates words that occur more frequently within a given cluster.

**Table 2**
Comparison of overlap between developed and emerging market clusters obtained via the Louvain network algorithm. For two clusters, $A$ and $B$, the corresponding entry in the table reports $\#(A \cap B)/\#(A \cup B)$, where $\#(X)$ is the number of elements in set $X$.

| Similarity of developed and emerging market clusters | | | | | |
|---|---|---|---|---|---|
| | Mkt (EM) | Govt (EM) | Corp (EM) | Comms (EM) | Macro (EM) |
| Mkt (DM) | 0.59 | 0.01 | 0.01 | 0.13 | 0.05 |
| Govt (DM) | 0.01 | 0.82 | 0.01 | 0.01 | 0.04 |
| Corp (DM) | 0.10 | 0.02 | 0.23 | 0.07 | 0.04 |
| Comms (DM) | 0.01 | 0.01 | 0.03 | 0.33 | 0.21 |
| Credit (DM) | 0.04 | 0.04 | 0.46 | 0.03 | 0.06 |

Table 2 shows that the word overlap between the topics we identify in our EM and DM corpora is often, though not always, sizable. Our measure of word overlap is the Jaccard index, which for two sets $A$ and $B$, reports how many elements there are in their intersection divided by the number of elements in their union. The rows of the table correspond to DM topics, and the columns correspond to EM topics. For example, we see when we compare the *Govt* topic between our EM and DM corpora that 82% of all words common to the two topics are present in each topic separately. This indicates that the words that tend to co-occur in government-related articles in our EM and DM samples are quite similar. Similarly, the Jaccard overlap between the *Mkt* topic in our EM and DM samples is 59%. There is some overlap in the *Comms* topic as well. We also note that there is a large overlap (of 46%) between the *Corp* topic in EM and the *Credit* topic in DM. Our EM *Macro* topic has no close analog in any of the DM topics (the closest is the DM *Comms* topic)–suggesting that news about EM economies tend to focus on topics of macroeconomic interest in a way that articles about DM economies do not. Perhaps this is because macroeconomic institutions in DM economies are more settled than their EM counterparts and therefore require less news coverage.

Tables 3 (for EM) and 4 (for DM) show four sample headlines of articles classified as belonging to each of the




**Fig. 2.** Word cloud plots for topics extracted from the emerging markets corpus using the Louvain clustering algorithm. Each cluster shows the number of occurrences (in millions) of its constituent words in the corpus. Larger font indicates words that occur more frequently within a given cluster.




**Fig. 3.** Number of words in original set of clusters identified by the Louvain algorithm for the emerging and developed markets corpora, respectively. We allocate all words belonging to clusters outside of the top five into one of the top five clusters so as to maximize the resulting network modularity, subject to the constraint that the network consists of five clusters.

**Table 3**
For each topic, we show sample articles *j* whose topic allocation, i.e., $e_{\tau,j}/e_j$, is between 80% and 90%. For all articles that satisfy this criterion, we show the top and bottom two articles by sentiment within each topic. The *Sent* column shows our sentiment measure $s_j$ for each article.

| Sample articles in each topic for emerging markets | | | |
|---|---|---|---|
| Topic | Date | Sent | Headline |
| Mkt | 1997-11-06 | -0.22 | Elbit Ltd <ELBT3.TA> <ELBTF.O> Q3 loss $0.11 per share |
| Mkt | 1996-02-16 | -0.22 | Uganda shilling weakens against dollar |
| Mkt | 1999-09-06 | 0.12 | Hungarian shares open higher on Dow gains |
| Mkt | 2015-03-05 | 0.12 | BUZZ-USD/THB eked out small gains |
| Govt | 2011-03-16 | -0.23 | US objects to ‘ excessive force’ in Bahrain |
| Govt | 1997-09-18 | -0.22 | Tehran mayor rejects resignations of 12 mayors |
| Govt | 2000-06-04 | 0.10 | Clinton says Putin can build strong, free Russia |
| Govt | 2008-04-03 | 0.11 | Mugabe’s party expects runoff, says he will win |
| Corp | 2011-01-19 | -0.25 | BRIEF-Moody’s downgrades Tunisia’s to Baa3, outlook negative |
| Corp | 2011-01-31 | -0.25 | BRIEF-Moody’s downgrades Egypt to Ba2, negative outlook |
| Corp | 2013-05-02 | 0.14 | CORRECTED-TABLE-Philippines’ sovereign credit rating history |
| Corp | 2013-03-27 | 0.16 | TABLE-Philippines’ sovereign credit rating history |
| Comms | 2008-09-12 | -0.13 | BP says Baku-Supsa oil pipeline remains shut |
| Comms | 1996-05-09 | -0.12 | Russia’s Novorossiisk oil port still shut by fog |
| Comms | 2006-12-27 | 0.08 | Great Offshore buys anchor-handling tug vessel |
| Comms | 1997-06-26 | 0.08 | Tunisia tender for 150,000 T U.S. wheat detailed |
| Macro | 1996-03-07 | -0.12 | Hungary 1995 C/A deficit falls to $2.48 billion |
| Macro | 2003-04-30 | -0.11 | Turkish Jan-Feb c/a deficit jumps to $1.178 bln |
| Macro | 2006-03-10 | 0.00 | Sao Paulo volta a registrar inflacao no comeco de marco |
| Macro | 2012-09-11 | 0.01 | CORRECTED-Lithuania current account surplus rises in June |

**Table 4**
For each topic, we show sample articles whose topic allocation, i.e. $e_{\tau,j}/e_j$, is between 80% and 90%. For all articles that satisfy this criteria, we show the top and bottom two articles by sentiment within each topic. The *Sent* column shows our sentiment measure $s_j$ for each article.

| Sample articles in each topic for developed markets | | | |
|---|---|---|---|
| Topic | Date | Sent | Headline |
| Mkt | 2012-05-21 | -0.20 | BRIEF-FINRA Panel awards John Galinsky $3.5 mln in compensatory damages for breach of contract against Advanced Equities |
| Mkt | 2003-03-25 | -0.20 | Euro rises above $1.07 against dollar on war |
| Mkt | 1996-01-18 | 0.12 | UK’s Clarke confident about inflation, growth |
| Mkt | 2010-11-02 | 0.12 | BRIEF-Metro CEO cautiously optimistic for good christmas |
| Govt | 2009-01-08 | -0.30 | BRIEF-UK Serious Fraud Office to probe Madoff’s UK operations |
| Govt | 2005-09-09 | -0.25 | Soccer-Former secretary’s claim against English FA dismissed |
| Govt | 2014-04-29 | 0.13 | BUZZ-GBP-4/5 on UKIP to win a seat in 2015 UK elections |
| Govt | 2013-09-20 | 0.13 | BUZZ-GBP-5/4 UKIP win most votes in European election |
| Corp | 2014-07-21 | -0.15 | BRIEF-Valeant Pharmaceuticals contacts Quebec and U.S. regulators about Allergan’s false and misleading statements |
| Corp | 2015-12-16 | -0.15 | BRIEF-NQ Mobile announces termination of proposed divestment of Beijing Tianya |
| Corp | 1996-05-26 | 0.13 | Rangatira has 9.77 pct stake in Advantage <ADV.NZ> |
| Corp | 2015-08-11 | 0.14 | BRIEF-Tom Tailor to improve earnings in 2016 - CEO |
| Comms | 2002-04-17 | -0.07 | Australasia port conditions - Lloyds |
| Comms | 2012-06-13 | -0.07 | Cooperatives cut German 2012 wheat crop forecast |
| Comms | 2006-10-10 | 0.13 | TAKE A LOOK- Weekly US state crop progress reports |
| Comms | 2006-10-16 | 0.13 | TAKE A LOOK- Weekly US state crop progress reports |
| Credit | 1998-11-16 | -0.29 | TABLE - NeoPharm Inc <NEO.A> Q3 net loss |
| Credit | 1998-07-10 | -0.27 | TABLE - NDC Automation Inc <AGVS.OB> Q2 loss |
| Credit | 2012-02-21 | 0.22 | BRIEF-Moody’s revises euramax’s outlook to stable from positive |
| Credit | 2011-04-21 | 0.23 | BRIEF-Moody’s revises Pulte’s outlook to stable from positive |

topics we identify in our analysis, which provide some examples of how our identified topics relate to articles used in our analysis.[8] For example, in the emerging market corpus an article titled “Clinton says Putin can build strong, free Russia” is classified as being in the *Govt* topic. A Portuguese language article entitled “Sao Paulo volta a registrar inflacao no comeco de marco” is classified seemingly correctly in the *Macro* topic. Presumably this article was included, despite the fact that it is not in English, because the relevant stemmed Portuguese words are identical to their stemmed English counterparts. While we explicitly select only English language articles from the Thomson Reuters data set, some of their language metadata is apparently incorrect. In the developed markets corpus, most of our sample articles seem to be classified correctly based on their headlines. For example “BRIEF-NQ Mobile announces termination of proposed divestment of Beijing Tianya” is in the *Corp* topic.

[8] In these tables an article is classified into topic $\tau$ if between 80 and 90% of its econ words belong to that topic.

Thomson Reuters's articles cover a wide range of topics. For example, sports articles are included, although they are often discussed from the perspectives of the economic or business implications of the sports-related event, which explains why sports articles have positive weights in the topic areas we identify. We consider restricting our sample of articles to those that were more narrowly focused on business, economics, and politics topics, but we find that doing so slightly reduces the explanatory power of news for stock returns and risk, and so we retain the full sample of news articles for our analysis.

The third step of our textual analysis is the extraction of n-grams. We use n-grams, or more specifically 4-g, to construct a measure of the entropy of a given article, following closely the methodology proposed in Glasserman and Mamaysky (2019a). An n-gram is a collection of $n$ contiguous words.[9] We do not allow n-grams to cross sentence boundaries so these are n-word phrases that appear entirely in a single sentence. For a given 4-g, we calculate the probability of observing the fourth word in the phrase conditional on seeing the first three words. This conditional probability is estimated from a training corpus as follows

$$m = \frac{\hat{c}(w_1, w_2, w_3, w_4) + 1}{\hat{c}(w_1, w_2, w_3) + 10}, \quad (1)$$

where $\hat{c}$ counts how frequently a given 4-g or 3-g occurred in a training corpus. Adding 1 to the numerator and 10 to the denominator is a simple way to handle cases in which the three-word phrase that begins the 4-g was not seen in the training corpus. In the Appendix, we discuss why this 1:10 rule is an appropriate choice.

For a given month $t$, the training corpus includes all articles from either the EM or DM corpus that appear from month *t-27* to *t-4* (we discuss this window choice in the Appendix). For example, consider the 4-g "central bank cuts interest." Our conditional probability measure for this 4-g would be high if the word "interest" very often followed the phrase "central bank cuts" in our training corpus. If many other words also followed the phrase "central bank cuts," then $m$ would be small, and we would consider this 4-g unusual. We extend the concept of entropy at the 4-g level to the article level by calculating the negative average log probability of all 4-g appearing in that article. For a given article $j$, this measure is given by

$$H_j = -\sum_i p_{j,i} \log m_i, \quad (2)$$

where $p_{j,i}$ is the fraction of all 4-g appearing in article $j$ represented by the $i$th 4-g, and $m_i$ is $i$'s conditional probability from the training corpus. This measure is also known as the cross-entropy of $m$ with respect to $p$, and we will often refer to it as *entropy* in our analysis.

Intuitively, we characterize an article as unusual if it contains language that is unlikely to have been seen in the past. We conjecture that such new language may be needed to describe new market or economic phenomena, and that the presence of the latter may indicate heightened (or perhaps reduced) market risks. In the same way that the context of a news story might matter for its market relevance, the entropy of the news story may matter as well.

Finally, we combine our topic analysis with article-level sentiment. Our article-level sentiment measure for article $j$ is defined as

$$s_j = \frac{POS_j - NEG_j}{a_j}, \quad (3)$$

where $POS_j$, $NEG_j$, and $a_j$ are the number of positive, negative, and total words in the article. We use the Loughran-McDonald (2011) sentiment word lists to classify words as being positive or negative. This is the standard measure of sentiment that has been used in the finance literature (see, for example, Garcia, 2013). Tables 3 (for EM) and 4 (for DM) show $s_j$ for the sample articles discussed earlier. In each topic, we report two sample articles with a very negative sentiment as well as two sample articles with a very positive sentiment. For example, in the DM corpus the article "Euro rises above $1.07 against dollar on war" in the *Mkt* topic plausibly receives a very negative sentiment value of −0.20.[10]

For topic $\tau$, let us define $e_{\tau,j}$ as the number of econ words in article $j$ that fall into topic $\tau$ and $e_j$ as the total number of econ words in article $j$. Then $f_{\tau,j} = e_{\tau,j}/e_j$ defines the fraction of article $j$'s econ words that fall into a specific topic (recall topics are defined as nonoverlapping sets of econ words). We refer to $f_{\tau,j}$ as the frequency of topic $\tau$ in article $j$. We can decompose an article's sentiment into a context-specific sentiment measure via

$$s_{\tau,j} = f_{\tau,j} \times s_j. \quad (4)$$

For example, an article with a sentiment measure of −3% that was mostly about government issues with $e_{Govt,j}/e_j = 90\%$ would have a government-specific sentiment of −2.7%. And its sentiment allocation to the other topics would be close to zero. Note also that since $\sum_j f_{\tau,j} = 1$ we'll have $\sum_\tau s_{\tau,j} = s_j$, which justifies our use of the term "decomposition."

In this paper, we are interested in testing whether topical context matters for the impact of news. Does negative or positive sentiment matter differently for forecasting future market outcomes when it occurs in news stories about governments than when it occurs in news stories about macroeconomics?

We also explored whether topic-specific sentiment interacts with entropy in its effects on market outcomes. Following Glasserman and Mamaysky (2019a), we compute article-level context-specific sentiment interacted with entropy as follows

$$SentEnt_{\tau,j} = f_{\tau,j} \times H_j \times s_j. \quad (5)$$

[9] The phrase "collection of $n$ contiguous" is an example of a 4-g.

[10] Sometimes the lack of semantic context causes our sentiment classification to assign an inappropriate value, given the actual meaning of the article. For example, the article "BRIEF-Moody's revises Pulte's outlook to stable from positive," which appears (appropriately) in the *Credit* topic, is assigned a very positive sentiment score of 0.23 because it contains words like "positive" and "stable"–both positive sentiment words in Loughran-McDonald though clearly being moved to stable outlook from a positive outlook is a mildly negative credit event. We regard these errors as inevitable noise in identifying sentiment that arises from the inherent complexity of combinations of words and the consequent difficulty in coding sentiment of phrases using sentiment values of individual words.

**Table 5**
Data definitions summary. More detailed information on variable construction and data sources is available in the Appendix. *Topic* is one of *government*, *markets*, *macroeconomics* (EM only), *credit* (DM only), *commodities*, or *corporate events*.

| Data definitions summary | |
|---|---|
| Variable | Definition |
| *return* | Total monthly stock returns (in %) including capital gains and dividend yield |
| $return^N$ | Cumulative stock returns from the start of month $t$ to the end of month $t+N-1$ |
| *sigma* | Rolling 20-day realized volatility reported in annualized terms |
| $drawdown^N$ | For a $100 initial investment, the maximum loss, potentially 0, experienced over the subsequent $N$-month period (for 12-month drawdowns, we often omit $N$) |
| *retmi* | Negative portion of returns (i.e., max($-return$, 0)) |
| *retpl* | Positive portion of returns (i.e., max($return$, 0)) |
| *value* | Average stock index level from 4.5 to 5.5 years ago divided by current index level |
| *gdp* | Rate of growth of real GDP |
| *gdpdeflator* | Rate of change of the GDP deflator |
| *cp* | Private sector credit-to-GDP ratio |
| *dcp* | First difference of credit-to-GDP ratio |
| *rate* | Local currency rate: deposit rate for EM and five- to ten-year government bond yields for DM |
| *dexch* | Percent change in value of US Dollar in terms of local currency (positive values are local currency depreciations), truncated at ±50% |
| *pre* | Dummy variable set to one if month $t$ is six or fewer months prior to an election |
| *post* | Dummy variable set to one if month $t$ is six of fewer months after an election |
| *entropy* | Daily word count weighted average of article level $H_j$ averaged over a month |
| *artcount* | Number of articles written about a country per day, averaged over a month |
| *s*[*Topic*] | Sentiment $s_\tau$ in a given month due to *Topic* |
| *f*[*Topic*] | Frequency $f_\tau$ of articles in a given month in *Topic* |

This measure – which differentiates between topic sentiment on usual or unusual news days – turns out to not be useful in our empirical results. We discuss later why this might be the case.

*2.1.1. Aggregation of article data at the daily and monthly level*

Once we have article-level data either entropy, context specific sentiment or entropy, or topic frequency we aggregate these into a country-level daily measure by weighting by the number of words (total, not just econ words) in the article in question divided by the total number of words in all articles about that country on a given day. For example, daily topic sentiment is

$$s_\tau \equiv \sum_j \frac{a_j}{a} \times s_{\tau,j}, \tag{6}$$

where $a$ is the total number of words in all articles mentioning a given country on a given day. The analogous definition is applied for article entropy and frequency. The monthly measure of either sentiment, entropy, or topic frequency for a given country is the simple average of that month's daily measures.

## 2.2. Data summary and preliminary analysis

Table 5 contains a brief description of the variables used in our analysis, and Table 6 contains summary statistics for those variables from 1998 to 2015. Compared to DM, EM returns were higher (1.04% versus 0.65% per month), more volatile (21.48% versus 19.20% annualized volatility), and subject to higher drawdowns (17.4% versus 15.3%). As reported by Ghysels et al. (2016), EM returns are also more right skewed as *retpl* (the positive portion of returns) averages 3.9% for EM and only 2.8% for DM, and *retpl* is also more persistent for emerging markets with an AR(1) coefficient of 0.12 versus 0.05 for developed markets. Emerging markets grew faster (*gdp*), had higher inflation (*gdpdefaltor*), higher nominal interest rates (*rate*), and lower private sector debt to GDP ratios (*cp*). The average number of articles per day (*artcount*) for EM countries is 26.0 and for DM countries is 106.7. The fraction of these articles dealing with *Corp*, *Govt*, and *Mkt* topics are similar, and EM countries have many more *Comms* articles (15.9% for EM versus only 2.7% for DM). Finally, the average article-level entropy for both corpora is roughly 2.45.

*2.2.1. Structural break around the financial crisis*

Figs. 4 and 5 provide factor loadings and plots for each topic category related to the first two principal components for the 140 EM (five series for 28 countries) and 120 DM (five series for 24 countries) time series of country-month-topic sentiment. The first principal component (both for EMs and DMs) tracks the aggregate time series of market sentiment. For both EMs and DMs, the second principal component appears as a step function with a break at the timing of the global financial crisis, and it has different factor loadings (both in sign and in absolute value) across different topic areas. *Govt* sentiment enters negatively and *Mkt* sentiment enters positively for the second principal component. That means that, prior to 2007, the sentiment score of market topic-related articles was more positive than government topic-related articles. That higher relative magnitude reversed after 2007, and the sentiment score of market topic-related articles became relatively negative in comparison with government topic-related articles. In our regression findings below, we find important breaks in regression coefficients (and some reversals in sign) that are related to this structural break in 2007–2008.

**Table 6**

Data summary using country-month observations from April 1998 to December 2015 (the time frame for our panel regressions). For each variable, the table shows the mean, standard deviation, and the 5th and 95th percentiles of the pooled observations. The one-lag autocorrelation coefficient $AR(1)$ is calculated at the country level and then averaged across all countries. $N$ is the number of country-month observations in the pooled sample. Variable definitions are given in Table 5. The text measures, which except entropy are normalized to mean zero/unit variance in the panels, are not normalized here.

| | Emerging markets data summary | | | | | | | Developed markets data summary | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | mean | sd | 5% | 95% | AR(1) | N | | mean | sd | 5% | 95% | AR(1) | N |
| *return* | 1.044 | 9.316 | -13.497 | 15.299 | 0.137 | 5549 | *return* | 0.646 | 6.671 | -10.939 | 10.783 | 0.113 | 4803 |
| $return^{12}$ | 16.796 | 42.392 | -41.367 | 89.574 | | 5549 | $return^{12}$ | 8.983 | 27.341 | -38.063 | 51.641 | | 4792 |
| $return^{24}$ | 35.742 | 73.016 | -44.931 | 170.380 | | 5297 | $return^{24}$ | 18.835 | 42.251 | -42.492 | 92.441 | | 4757 |
| *sigma* | 21.482 | 14.282 | 7.085 | 47.108 | 0.538 | 5476 | *sigma* | 19.197 | 11.427 | 7.470 | 41.669 | 0.627 | 4815 |
| $drawdown^{12}$ | 17.398 | 17.373 | -0.000 | 55.721 | | 5583 | $drawdown^{12}$ | 15.299 | 15.461 | -0.000 | 50.593 | | 4817 |
| $drawdown^{24}$ | 23.012 | 20.725 | -0.000 | 64.639 | | 5328 | $drawdown^{24}$ | 20.818 | 19.326 | -0.000 | 61.306 | | 4802 |
| *retmi* | 2.848 | 5.359 | 0.000 | 13.497 | 0.177 | 5549 | *retmi* | 2.188 | 4.096 | 0.000 | 10.939 | 0.211 | 4803 |
| *retpl* | 3.891 | 5.993 | 0.000 | 15.299 | 0.122 | 5549 | *retpl* | 2.835 | 3.914 | 0.000 | 10.783 | 0.049 | 4803 |
| *value* | 0.953 | 0.925 | 0.187 | 2.431 | 0.949 | 4917 | *value* | 0.936 | 0.624 | 0.317 | 1.836 | 0.982 | 4432 |
| *gdp* | 4.157 | 4.836 | -3.000 | 9.950 | 0.933 | 5964 | *gdp* | 2.083 | 3.450 | -3.490 | 6.680 | 0.933 | 4898 |
| *gdpdeflator* | 7.133 | 8.984 | -1.100 | 23.560 | 0.932 | 5964 | *gdpdeflator* | 1.917 | 2.762 | -1.473 | 5.650 | 0.925 | 4898 |
| *cp* | 55.657 | 44.713 | 10.688 | 145.941 | 0.988 | 5964 | *cp* | 113.275 | 41.235 | 55.687 | 188.754 | 0.990 | 4898 |
| *dcp* | 1.153 | 7.918 | -9.113 | 12.065 | 0.933 | 5964 | *dcp* | 2.503 | 11.916 | -9.540 | 13.744 | 0.926 | 4898 |
| *rate* | 7.451 | 7.384 | 0.580 | 19.985 | 0.977 | 5964 | *rate* | 3.947 | 2.025 | 1.030 | 6.221 | 0.986 | 4899 |
| *dexch* | 0.365 | 3.695 | -4.178 | 5.546 | 0.097 | 5955 | *dexch* | 0.025 | 3.037 | -4.773 | 4.782 | 0.009 | 4686 |
| *pre* | 0.162 | 0.369 | 0.000 | 1.000 | 0.810 | 5964 | *pre* | 0.126 | 0.333 | 0.000 | 1.000 | 0.813 | 4899 |
| *post* | 0.157 | 0.363 | 0.000 | 1.000 | 0.802 | 5964 | *post* | 0.122 | 0.327 | 0.000 | 1.000 | 0.806 | 4899 |
| *entropy* | 2.429 | 0.171 | 2.111 | 2.649 | 0.790 | 5964 | *entropy* | 2.455 | 0.170 | 2.125 | 2.666 | 0.841 | 4899 |
| *artcount* | 26.022 | 30.146 | 3.200 | 73.349 | 0.763 | 5964 | *artcount* | 106.700 | 214.462 | 12.787 | 316.793 | 0.547 | 4899 |
| *sMkt* | -0.005 | 0.002 | -0.009 | -0.002 | 0.693 | 5964 | *sMkt* | -0.004 | 0.002 | -0.007 | -0.002 | 0.745 | 4899 |
| *fMkt* | 0.334 | 0.080 | 0.195 | 0.460 | 0.637 | 5964 | *fMkt* | 0.350 | 0.055 | 0.271 | 0.450 | 0.715 | 4899 |
| *sGovt* | -0.007 | 0.004 | -0.016 | -0.002 | 0.565 | 5964 | *sGovt* | -0.004 | 0.002 | -0.008 | -0.001 | 0.619 | 4899 |
| *fGovt* | 0.290 | 0.096 | 0.163 | 0.480 | 0.596 | 5964 | *fGovt* | 0.236 | 0.055 | 0.150 | 0.328 | 0.613 | 4899 |
| *sCorp* | -0.002 | 0.001 | -0.004 | -0.001 | 0.635 | 5964 | *sCorp* | -0.002 | 0.001 | -0.003 | -0.001 | 0.636 | 4899 |
| *fCorp* | 0.169 | 0.034 | 0.124 | 0.229 | 0.587 | 5964 | *fCorp* | 0.220 | 0.050 | 0.159 | 0.314 | 0.750 | 4899 |
| *sComms* | -0.002 | 0.001 | -0.004 | -0.001 | 0.482 | 5964 | *sComms* | -0.000 | 0.000 | -0.001 | -0.000 | 0.464 | 4899 |
| *fComms* | 0.159 | 0.064 | 0.082 | 0.289 | 0.696 | 5964 | *fComms* | 0.027 | 0.013 | 0.012 | 0.052 | 0.554 | 4899 |
| *sMacro* | -0.001 | 0.000 | -0.002 | -0.000 | 0.636 | 5964 | *sCredit* | -0.002 | 0.001 | -0.004 | -0.001 | 0.682 | 4899 |
| *fMacro* | 0.048 | 0.028 | 0.025 | 0.105 | 0.620 | 5964 | *fCredit* | 0.167 | 0.023 | 0.137 | 0.208 | 0.576 | 4899 |

Case 3:17-cv-00121-JO-MSB Doc 377-8 Filed 05/07/24 PgID.33891 Pg 167 of 169





**Fig. 4.** The figure shows the two top factors from a principal components analysis of all country-topic sentiment series (i.e., #(*countries*) × #(*topics*)) from emerging market countries. The top row shows the topic loadings of each factor aggregated by topic. Each topic bar is the sum of that topic's factor loadings across all countries in the sample. All country-topic sentiment series used in the principal components analysis were normalized to unit variance.

## 3. Empirical findings

Here we present our empirical findings about the connections between various measures of word flow and our measures of expected *return*, the standard deviation of returns (*sigma*), and cumulative downside risk (*drawdown*). As a starting point for our analysis, following Tetlock et al. (2008) and Hendershott et al. (2015) analysis of company returns, we perform an event study of country stock returns around days in which sentiment scores for news for a given country are extremely positive or extremely negative. Specifically, we identify days for which positive or

PX307
Page 6328
QUALCOMM-TABAK-0021741




**Fig. 5.** The figure shows the two top factors from a principal components analysis of all country-topic sentiment series (i.e., #(*countries*) × #(*topics*)) from developed market countries. The top row shows the topic loadings of each factor aggregated by topic. Each topic bar is the sum of that topic's factor loadings across all countries in the sample. All country-topic sentiment series used in the principal components analysis were normalized to unit variance.

negative sentiment lies in the top decile of the historical distribution, and we do this for each of the five topical categories, separately for EMs and DMs. Figs. 6 and 7 plot cumulative abnormal returns (for EMs and DMs, respectively) for the ten days prior to and subsequent to the identified event dates (which appear as day 0 in the figures). Abnormal returns for each country are the residuals from regressing that country's US dollar returns on a constant




**Fig. 6.** Event studies of cumulative abnormal returns on days that are in the bottom, middle (45%-55%), and top deciles by sentiment for each topic. Topics are indicated by *s_[Topic]*, where *Topic* is one of *Mkt* (markets), *Govt* (government), *Corp* (corporate), *Comms* (commodities), and *Macro* (macro). Abnormal returns are the residuals from a regression of US dollar country index returns on a EM market index and a constant. Cumulative returns are shown in basis points, with two standard error bands, calculated under the assumption of independent observations. The cumulative return on the day prior to the event is labeled. The number of events in each study is shown on the plot. Events runs from January 1, 1996 to December 31, 2015.

and the appropriate MSCI index (either DM or EM) over the entire sample period.[11] We plot these abnormal returns separately for positive and negative news dates, along with standard error bands.[12] We also plot (in between the pos-

[11] When running lagged regressions prior to the event date as the control, we noticed that the pre-event estimated alpha was correlated with the news event itself. Positive (negative) news days tended to be preceded by positive (negative) alphas. Because of this, the pre-event window was not an appropriate baseline return model, and therefore we used a regression over the entire sample as the control.

[12] Our standard errors are calculated under the assumption of serial and cross-sectional independence of events. Both assumptions are problematic in our data. Furthermore, it is possible that the pre-event country index