# PX 336

# TWENTY SEVENTEEN

2017 ANNUAL REVIEW



EXHIBIT
896
2/20/24

CORNERSTONE RESEARCH

How Is Healthcare Changing? How Is the Government Responding? // Shadow Banking—The Potential Risks and Rewards // Securities Class Action Filings—Year in Review // Drafting Blow Provisions in Securities Class Settlements // *Trends in Merger Investigations and Enforcement at the U.S. Antitrust Agencies: FY 2006–2015* // The Role of Economic Analysis in the Assessment of Vertical Restraints // How to Handle SEC and PCAOB Investigations // Economics at DG Competition: Current Cases and Future Challenges // Who's in the Driver's Seat? Assessing Misrepresentation, Liability, and Injury in a World of Complex Automated Products // 2017 Intellectual Property Institute, USC Gould School of Law // 2017 George Washington University Corporate Antitrust Roundtable // ABA Section of Antitrust Law 2017 Spring Meeting // Securities Class Action Settlements—2017 Review and Analysis // How Do Franchise Termination Restrictions Affect Consumers? // New Risk in Energy 2017: Price Indices, Price Reporting, Price Reporting Agencies (PRAs), and Recent Changes in the Process // Fraud Day at Mendoza College of Business, University of Notre Dame // 11th Annual Juris Investment Treaty Arbitration Conference on Technology, IP, and Investor-State Arbitration: Remedies in IP Investment Arbitration // CDR Spring Arbitration Symposium // The Law and Economics of Competition Damages Actions // **2017 EVENTS + THOUGHT LEADERSHIP + SPEAKING ENGAGEMENTS** // Suffolk University/Merrill Lynch Wealth Management Symposium Spring 2017 // Asset Management Regulation under the New Administration // Accounting Class Action Filings and Settlements—2017 Review and Analysis // SEC Enforcement Activity—First Half FY 2017 Update // A Broader Perspective on Corporate Governance in Litigation // Approved Claims Rates in Securities Class Actions // Secondary Market for LP Investments in Private Equity // Reasonable Royalty in Patent Damages: What You Need to Know in 2017 // Testifying Experts Draw Lessons from Recent Healthcare Mergers: What Can We Expect for Merger Review Going Forward? // Securities Enforcement Forum West 2017: The Exploding Role of Big Data and Technology in Securities Enforcement, Regulation and Defense // 13th Annual University of Washington Financial Reporting Conference // Economic Evidence in Competition Law and the Future of the "More Economic" Approach // 27th Annual Meeting American Law and Economics Association // Society for Financial Studies Finance Cavalcade North America Conference // *Proof Agreements, Incentives and Liabilities in Hub-and-Spoke Antitrust Conspiracies: A 2017 Update: What Is a Hub-and-Spoke Conspiracy and Who Benefits?* // Private Enforcement: Different Parties, Different Objectives // WBA Centennial Celebration: Looking Back, and Moving Forward // Estimating Damages in Litigation—Beyond Discounted Cash Flow // Blurred Lines: Assessing Sherman Act Exposure for Hub-And-Spoke Agreements // Antitrust in the Financial Sector: Hot Issues and Global Perspectives // Cornerstone Research Women's Forum // Competition Law in the Financial Services Sector // SEC Enforcement Activity: Public Companies and Subsidiaries—Midyear FY 2017 Update // SEC's Renewed Focus on Non-GAAP Measures: 1 Year Later // GCR Live 3rd Annual Antitrust Litigation USA: Count-the-Moles: The Economist's View on the Management of Litigation // A Brave New World: What's in Store? // The Future of the Markets Regime // 2017 Shareholder Engagement Roundtable at Harvard Law School // 3rd Annual GAR Live Energy Disputes // Why Antitrust? NYSBA Annual Program for Law Students and Junior Lawyers // Stanford Directors' College 2017 // Use (and Misuse) of Statistical Sampling in False Claims Act and Private Reimbursement Disputes // FERC Technical Conference on Developments in Natural Gas Index Liquidity and Transparency // Spikes in Drug Prices: Outrageous or Legitimate? // Characteristics of U.S. Natural Gas Transactions: FERC Form 552 Submissions as of May 2017 // 2017 iHEA World Congress of Health Economics: Revolutions in the Economics of Health Systems // *Expert Testimony of the Future: Machine Learning and How It Will Impact Litigation* // Insider Trading after Salman // ABA Section of Litigation: Roundtable on Surveys and Statistics in Class Certification // CARE Conversation: The CMA Care Homes Market Study // Women Leaders in Life Sciences Law 2017 // Securities Class Action Filings—2017 Midyear Assessment // 2017 Guide to Damages in International Arbitration // The Use of Econometric and Statistical Analysis and Tools // Market Approach or Comparables // 44th Annual European Finance Association (EFA) Meeting // Estimating Damages in Settlement Outcome Modeling // A Deep Dive into Spokeo // The Anthem-Cigna & Aetna-Humana Mergers: A Post Mortem // Competition Law and Economics in Pharmaceutical Markets // Characteristics of U.S. Natural Gas Transactions, Commodity Futures Trading Commission // GCR Live 5th Annual New York // Not so "Rare": The Valuation Method behind the Tethyan Challenge // Economic Analysis in Damages Actions—Insights from Recent Proceedings in the UK // Economic Analysis in Class Certification // GCR Live 9th Annual Competition Litigation: Proving Passing on in a Post Sainsbury's World // Expert Witnesses: The Good, the Bad, and the Ugly // 2017 Corporate Governance Roundtable at Harvard Law School // Accountants' Liability Conference 2017: Emerging Trends in Accountant Litigation // Securities Enforcement Forum 2017: Litigating Securities Fraud Cases against the SEC and DOJ // *GAR Live London Autumn: A 360 Look at Damages: Counsel and Experts React* // Aetna-Humana and Algorithmic Market Definition in the Guidelines // Duty to Disclose, Cryptocoins, Blockchain, and Other SEC Challenges // Was It All That Bad? U.S. Federal Antitrust Policy since 1980: Antitrust Goals (and Is Big Bad?) // Advanced EU Competition Law Conferences // Thomson Reuters Practical Law // 6th Annual Damages in International Arbitration Conference // SEC Enforcement Activity: Public Companies and Subsidiaries—Fiscal Year 2017 Update // Litigators, Wrangle That Data with Content Analysis // Applying Monte Carlo Simulations in Litigation // Competition Law in the Pharmaceutical Sector // Spoofing and Manipulation: A Primer for Healthy Trading Practices // Trends in Securities Litigation Webinar // 18th Annual Berkeley-Stanford Advanced Patent Law Institute: Silicon Valley // Bitcoin Futures: A Closer Look at CME's Contract Design

2017 // TWENTY SEVENTEEN

*This review highlights a few of the matters we worked on last year. While this is only a brief summary of our work, these cases provide insight into issues that will continue to be important aspects of the litigation landscape in 2018 and beyond.*

cornerstone.com

**FEATURED AREAS //**

- Antitrust & Competition
- Merger Litigation
- Healthcare & Life Sciences
- Consumer Fraud & Product Liability
- Europe
- Data Analytics
- Valuation
- Financial Institutions
- Initial Coin Offering Disputes
- Securities Class Actions
- Pro Bono

# INTRODUCTION

At the start of 2017, we were awaiting a federal court decision in the proposed $37 billion Aetna and Humana merger. This was a closely watched case involving a controversial issue—affordable healthcare. We ended the year with a Section 10(b) case in which the judge denied the plaintiffs' motion for class certification. In both of these matters, and in others during the year, our experts' solid, thoughtful, and persuasive testimony is cited throughout the judges' decisions.

This 2017 review describes other selected matters that typify the complex and costly issues our clients face. Billions of dollars in product liability damages. The rapid rise of social media as a driver of consumer perceptions. And the continuing impact of disclosure-related issues in securities fraud class actions.

In these high-stakes matters, judges rely on experts who can provide robust qualitative and quantitative analyses. Sophisticated merger simulations, new content analysis tools, and advanced machine learning methods are tipping the scales in today's data-intensive environment.

We have much more to share and welcome the opportunity to provide you with additional information on our capabilities and expertise.

# ANTITRUST & COMPETITION

*Econometric models of demand are a key source of inputs for the hypothetical monopolist test used to define relevant product markets. When reinforced by qualitative evidence, such as ordinary course of business documents, such analyses can provide a basis for credible and persuasive expert testimony.*

FEATURED MATTER //

## UNITED STATES V. AETNA INC. AND HUMANA INC.

After a thirteen-day trial, the USDC for the District of Columbia enjoined the proposed $37 billion merger of health insurers Aetna and Humana. In accepting the plaintiffs' arguments, the court relied on the analyses and rebuttal critiques of Cornerstone Research experts and senior advisors Professor Aviv Nevo of the University of Pennsylvania and Ms. Christine Hammer, CPA. Following the ruling, the parties abandoned the merger.

Professor Nevo analyzed the likely effects of the proposed merger on competition involving Medicare Advantage plans and plans sold on the Affordable Care Act exchanges. He testified in the plaintiffs' case in chief and as a rebuttal witness. The court's opinion relied on Professor Nevo's testimony in multiple areas.

**Relevant Market:** "Professor Nevo has performed a battery of tests that all point to the same conclusion: the sale of individual Medicare Advantage plans satisfies the hypothetical monopolist test and thus is a relevant product market. That result generally holds up whether Nevo uses a critical loss analysis or a merger simulation, and whether he uses his own estimates, [the defendants' expert's estimates], or those from the academic literature."

**Competitive Effects:** "Nevo's (largely uncontroverted) analysis suggests that there is substantial competition between Aetna and Humana. Given Nevo's analysis, it is not surprising to find significant evidence of head-to-head competition between Aetna and Humana throughout the country."

**Entry:** "[Nevo's] analysis is persuasive, and alone is enough to conclude that entry is not likely to be sufficient."

Ms. Hammer evaluated whether the defendants' efficiency claims were verifiable and merger-specific, among other areas. The court found that Ms. Hammer "raised valid issues regarding several categories of claimed efficiencies" as well as "issues with the companies' analyses...that serve to further undermine the reliability of the efficiency claims."

**"On balance, the Court is unpersuaded that the efficiencies generated by the merger will be sufficient to mitigate the transaction's anticompetitive effects for consumers in the challenged markets."**

– Memorandum Opinion, USDC for the District of Columbia, January 23, 2017

ACCOLADES //

Matter of the Year Nomination *Global Competition Review*

Biggest Competition Cases of 2017 *Law360*

Outstanding Antitrust Litigation Achievement in Economics: Aviv Nevo, University of Pennsylvania
*Antitrust Enforcement Awards*

Women in Antitrust: Andrea Shepard, Cornerstone Research *Global Competition Review*

"A huge firm whose established presence in the UK and US allows it to work across borders for clients in major industries."
*GCR 100 Economics 21*

FEATURED MATTER //

## ANALOG DEVICES' ACQUISITION OF LINEAR TECHNOLOGY CORPORATION

Counsel for Analog Devices Inc. retained Cornerstone Research staff to evaluate the competitive effects and assist with regulatory reviews in the United States and China.

In July 2016, Analog Devices announced the agreement to acquire Linear Technology for $14.8 billion. The U.S. Federal Trade Commission granted approval without a second request. The parties completed the acquisition in March 2017, after approval by China's Ministry of Commerce (MOFCOM).

---

## TRENDS IN MERGER INVESTIGATIONS AND ENFORCEMENT AT THE U.S. ANTITRUST AGENCIES

This third edition of our annual study analyzes data from the most recent Hart-Scott-Rodino (HSR) Annual Report, released jointly by the U.S. Federal Trade Commission and the U.S. Department of Justice on October 4, 2017. The FY 2016 report covers October 1, 2015, through September 30, 2016.

### REPORTED TRANSACTIONS AND CLEARANCES

While the number of reported transactions increased in FY 2016, the number of clearances—transactions cleared for further agency investigation—declined. In fact, the FTC or DOJ received clearance to proceed with additional regulatory reviews in only 13 percent of reported merger transactions—the lowest level in the previous ten fiscal years.

### AGENCY CHALLENGES

Notably, even though clearances decreased, overall agency enforcement did not. On the contrary, the FTC and the DOJ issued more second requests and challenged more deals in FY 2016 than in FY 2015. Of the 47 mergers that the agencies challenged, eight of these, or 17 percent, resulted in court proceedings, more than double the historical average of three between FY 2007 and FY 2015.

*The report is available for download at www.cornerstone.com.*

# MERGER LITIGATION

*In merger challenges, parties may assert efficiency claims or "failing firm" defenses. Experts with financial statement or accounting experience can provide valuable input on issues related to merger-specific efficiencies, corporate financials, and asset valuations.*

**FEATURED MATTER //**

## UNITED STATES V. ENERGYSOLUTIONS INC.

The U.S. Department of Justice sought to enjoin the proposed $367 million merger of EnergySolutions and Waste Control Specialists (WCS), arguing that the merger would harm competition in the market for commercial disposal of low-level radioactive waste in 36 states. The agency retained Dr. Greg Eastman of Cornerstone Research as a testifying expert.

The defendants disputed the DOJ's characterization of the relevant product market and the deal's likely anticompetitive effects. They claimed that the proposed merger would result in greater operational efficiencies, and also asserted that WCS was a "failing firm" whose assets would exit the market absent the merger.

Dr. Eastman testified that the defendants had not provided sufficient information to reliably quantify the claimed efficiencies. He also testified that WCS was not facing imminent failure and that its key assets were not at risk of leaving the market absent the proposed merger.

In addition, Dr. Eastman opined that WCS's parent, Valhi Inc., had not undertaken good faith efforts to elicit reasonable alternative offers for WCS's assets, as required by the DOJ/FTC's Horizontal Merger Guidelines. He further opined that Valhi's efforts focused on maximizing the company's value, rather than on eliciting alternative offers above WCS's liquidation value.

After a ten-day trial, the court ruled in favor of the DOJ and prohibited the companies from proceeding with the deal. The judge's ruling was consistent with Dr. Eastman's analysis in several key areas, including efficiencies, good faith efforts, and reasonable alternative offers.

**"Under the facts presented here, defendants have not shown that Valhi/WCS made good faith efforts to elicit reasonable alternative offers that would pose a less severe danger to competition."**

– Opinion, USDC for the District of Delaware, July 13, 2017

**ACCOLADES //**

**Matter of the Year Nomination** *Global Competition Review*

**Biggest Competition Cases of 2017** *Law360*

# HEALTHCARE & LIFE SCIENCES

*Healthcare entities face evolving litigation and regulatory risks, including aggressive merger review, antitrust challenges to contracting and other business practices, and FCA investigations. Pharmaceutical companies saw a rise in litigation involving biologic patents, generic pricing, PBM rebates, and opioids.*

FEATURED MATTERS //

## CLASS ACTION RELATED TO CHANGES IN RETIREES' HEALTH INSURANCE PLANS

Defense counsel retained Cornerstone Research and Professor Laurence Baker of Stanford University in a class action related to retirees' health insurance plans. The plaintiffs alleged that the retirees were harmed by a multinational company's decision to transfer them from employer-sponsored supplemental Medicare insurance to a private healthcare exchange.

Professor Baker opined about the common use of private exchanges for supplemental Medicare coverage, their ability to provide a wider range of insurance plans that can better suit the preferences of diverse employees than many employer-sponsored plans with limited choices, and their ability to result in more competitive premiums for workers and employers.

Using publicly available healthcare expenditure and utilization data, Professor Baker conducted a simulation that showed the majority of retirees in the company would likely experience lower total expenses (premiums and out-of-pocket costs). He established that individualized inquiry would be necessary to assess any potential harm to retirees. Professor Baker also responded to the opinions on damages of the opposing expert, revealing calculation inaccuracies and flawed assumptions in the expert's conclusion of harm to the retirees.

A federal judge granted our client's motion for summary judgment.

---

## UNITED STATES V. CABELL HUNTINGTON HOSPITAL INC. AND ST. MARY'S MEDICAL CENTER INC.

Cornerstone Research worked with Professor Gautam Gowrisankaran of the University of Arizona on a matter involving the merger of two local hospitals. In its review, the West Virginia Health Care Authority was "persuaded by the common sense opinions" of Professor Gowrisankaran. The Authority approved the merger and extended state action immunity to the deal. The U.S. Federal Trade Commission subsequently dropped its challenge of the transaction.

---

## PHARMACEUTICAL PATENT CHALLENGES

### COMPANY STRATEGIES AND LITIGATION OUTCOMES

This most-read article in the *American Journal of Health Economics* investigates patent challenges and litigation outcomes based on a unique dataset of new drugs approved from 1994 to 2006.

### BIOSIMILARS ENTER THE COURTS: HOW WILL PATENT INFRINGEMENT SETTLEMENTS BE TESTED FOR VALIDITY UNDER ANTITRUST LAWS?

The authors examine why patent settlements between biologic and biosimilar companies will be different from those for small-molecule drugs and, thus, why the antitrust considerations may be different.

# CONSUMER FRAUD & PRODUCT LIABILITY

*Multidistrict litigation can be a common feature of large product liability matters. These cases often require quantitative analyses of very large datasets as well as a sophisticated understanding of markets and consumer behavior measurement techniques.*

**FEATURED MATTERS //**

## MULTIPLE CASES OF ALLEGED DEFECTS IN AUTOMOBILES

Cornerstone Research has worked on several prominent cases involving the world's largest automobile manufacturers. These matters typically involve multiple experts who can opine on economic loss claims, provide statistical analyses of complaint databases, and rebut conjoint analyses. Experts in content analysis and other data analytic tools have also played vital roles in these cases by quantifying media coverage and the extent to which it affected market outcomes.

## FALSE ADVERTISING AND PRODUCT MISREPRESENTATION MATTERS

We were retained in multiple class actions to address issues related to consumer perceptions, purchase intent, and willingness to pay. For example, in "all natural" labeling cases, our experts assessed the labels' impact on purchasing behavior compared to other factors such as brand, taste, and quality. In matters involving allegations of manufacturer misrepresentation, our experts analyzed data on consumer information sources, product features, return rates, customer satisfaction, and repeat purchases to rebut plaintiffs' proposed damages theories.

## BEEF PRODUCTS INC. V. AMERICAN BROADCASTING COMPANIES INC.

Beef Products Inc. (BPI) claimed $1.9 billion in damages in one of the largest defamation cases ever filed in the United States. Counsel for BPI retained Cornerstone Research and three experts to assess causation, damages, and media content issues.

BPI alleged that ABC News engaged in a disinformation campaign and made numerous false statements about BPI and its lean finely textured beef (LFTB) product. ABC News repeatedly described LFTB as "pink slime," and as a filler that was approved over the objections of USDA scientists.

Professor Ran Kivetz of Columbia University conducted four surveys to show the effect of ABC's broadcasts on consumers' perceptions. Professor Kimberly Neuendorf of Cleveland State University demonstrated that ABC's coverage of LFTB was unprecedented. She also performed an attribution analysis of tweets about "pink slime," showing that ABC News primarily drove the social media conversation on the topic.

Professor Daniel Sumner of the University of California, Davis, projected but-for shipments and prices absent the ABC coverage. He developed a regression model that controlled for various factors that could affect demand and supply, including other news and media coverage of the story.

BPI first filed suit in September 2012 and the case settled during trial in June 2017. Notably, the judge admitted the testimony of all three Cornerstone Research experts, and either excluded or limited the testimony of several opposing economics and marketing experts.

FEATURED EXPERTISE //

## CONSUMER SURVEYS IN CLASS ACTIONS

*Sophisticated conjoint surveys are a growing trend in high-profile consumer class actions.*
In class certification matters, key questions center on whether classwide impact and damages can be determined through common evidence and a common method. Consumer surveys are one of the analytical methods used by quantitative marketing and econometric experts to assess such issues.

Conjoint analysis is a survey-based technique that can examine the trade-offs that consumers make in their purchasing decisions. This method purports to "decompose" consumers' overall preferences for a product by measuring the value they place on specific product features. For example, in a false advertising or product liability case, conjoint surveys are sometimes used to assess to what extent the alleged misrepresentation may have factored into the proposed class members' purchase decisions.

Consumer surveys, however, can be susceptible to rebuttal. For example, conjoint analysis cannot assess the impact of alleged misrepresentations on market prices, as it focuses only on the demand side of the market. Furthermore, surveys can be subject to *Daubert* exclusion if they are shown to have design and execution flaws, such as nonrepresentative sampling, false assumptions, or cognitive biases.

---

## CONTENT ANALYSIS

*Content analysis is transforming the type and scale of evidence that courts can consider.*
Content analysis is the systematic, objective, quantitative assessment of message characteristics. Messages can be as varied as a Twitter post, a TV commercial, or a speech.

Computer algorithms can quickly and efficiently quantify message characteristics such as length, the number of times a word or phrase is mentioned, and correlations between certain words. For more nuanced or complex content, however, human coding tends to be the preferred method.

With the rise of the Internet, there is a vast amount of content for courts to consider, including social media, websites, and online archives of documents. Content analysis promises to become a key technique to help courts navigate this exploding volume of potential evidence.

# EUROPE

**INTERNATIONAL PERSPECTIVES ON KEY ISSUES IN COMPETITION, FINANCE, AND ARBITRATION**

*Through Cornerstone Research–hosted events, sponsorships, and thought leadership, our consulting experts shared insights into recent cases, evolving issues, and implications for future litigation.*

## COMPETITION DINNER SERIES

**ECONOMICS AT DG COMPETITION—CURRENT CASES AND FUTURE CHALLENGES**
Tommaso Valletti
Chief Competition Economist
European Commission

**SHADOW BANKING—THE POTENTIAL RISKS AND REWARDS**
Peter Andrews
Chief Economist
Financial Conduct Authority

**THE FUTURE OF THE MARKETS REGIME**
Rachel Merelie
Acting Executive Director, Markets and Mergers
Competition and Markets Authority

## EXPERT FORUMS

**COMPETITION LAW AND ECONOMICS IN PHARMACEUTICAL MARKETS**
*Reverse payments, product hopping, and excessive pricing claims*

**ESTIMATING DAMAGES IN LITIGATION—BEYOND DISCOUNTED CASH FLOW**
*Alternative approaches to the discounted cash flow (DCF) methodology*

**THE LAW AND ECONOMICS OF COMPETITION DAMAGES ACTIONS**
*Recent opt-in and opt-out damages actions and the likely evolution of competition damages actions*

**LNG DISPUTES—BEYOND HUB INDEXATION**
*Liquefied natural gas disputes landscape in Europe*

## SPEAKING ENGAGEMENTS

CDR Spring Arbitration Symposium: Latest Trends in Energy and Commodities Arbitrations

Economic Evidence in Competition Law and the Future of the "More Economic" Approach

Advanced EU Competition Law Conferences: Private Enforcement of Competition Law

Competition Law in the Financial Services Sector

Third Annual GAR Live Energy Disputes: Damages Claims in Investor-State Cases

CARE Conversation: The Competition Markets Authority Care Homes Market Study

GCR Live Ninth Annual Competition Litigation: Proving Passing on in a Post Sainsbury's World

GAR Live London Autumn: A 360 Look at Damages

Thomson Reuters Practical Law: Litigation Processes, Class Certification, and the Economics of Competition Litigation

Competition Law in the Pharmaceutical Sector

## THOUGHT LEADERSHIP

Not so "Rare": The Valuation Method behind the Tethyan Challenge, *Global Arbitration Review*

Reviewing DG Comp's Recent Investigative Activity, *Global Competition Review*

The Use of Econometric and Statistical Analysis and Tools, *2017 Guide to Damages in International Arbitration*

Economic Analysis in Damages Actions—Insights from Recent Proceedings in the UK, *Journal of European Competition Law & Practice*

Economic Analysis in Class Certification, *Thomson Reuters Practical Law Global Guide 2016/2017, Class Actions*

# DATA ANALYTICS

*Big data is not just big, it is complex. Expert testimony is increasingly relying on sophisticated techniques, such as advanced machine learning, text analytics, and geospatial analytics, to supplement traditional data analytics and statistical methods.*

**FEATURED MATTERS** //

## MACHINE LEARNING

- Explored machine learning approaches to healthcare risk adjustment models, which explained approximately twice as much variation in claims data as the status quo linear regression model.
- Designed and trained a neural network model to classify 140,000 documents based on appearance where reliable OCR was unavailable.

## TEXT ANALYTICS

- Applied fuzzy matching capabilities to match entity names across multiple product information databases.
- Extracted user patterns to determine overlapping permissions and summarize system access levels through a forensic analysis of more than 70 million access logs.

## GEOSPATIAL ANALYTICS

- Replicated and improved upon the market structure analysis produced by a merging party's in-house geospatial capability.
- Applied geospatial capabilities to map cities into the U.S. Census's Core Based Statistical Areas.

## DATA VISUALIZATION

- Automated the creation of thousands of market and trader-specific heat maps.
- Created national and regional maps with location and distance visualization features.

## WEB DATA COLLECTION

- Built a parallel, cloud-based web data collection infrastructure, scaling work across more than a hundred tasks, and reducing run time from several days to under an hour.
- Downloaded, converted to PDF file format, and performed robust text searches across thousands of SEC filings and dozens of filing form types.

## DATA EXTRACTION

- Generated an automated pipeline to collect, extract, and summarize the available history of accounting-related SEC and PCAOB enforcement releases.

## STATISTICS AND SIMULATIONS

- Developed an institutional damages model using Monte Carlo simulations to generate a confidence interval for damages in a securities class action.
- Ported code and used parallel processing to reduce the run time for comparing thousands of distributions from three days to less than 30 seconds.

# VALUATION

*Valuation issues are at the heart of most damages analyses. It is critical to evaluate the appropriate methodology for a given case. While DCF is most commonly used, comparable companies/transactions, regression analysis, and financial options analysis are other key methodologies to consider.*

**FEATURED MATTER //**

## ACP MASTER LTD. V. SPRINT CORPORATION

After a closely watched trial involving alleged breach of fiduciary duty and stock appraisal, the Delaware Court of Chancery found in favor of defendant Sprint Corp. in its $3.6 billion buyout of Clearwire Corp. Vice Chancellor J. Travis Laster opined that Sprint had presented sufficient evidence at trial to negate claims from a hedge fund company that Sprint improperly pushed its buyout at a low price.

Defense counsel retained Cornerstone Research and Dr. Scott Wallsten of the Technology Policy Institute to opine on Clearwire's spectrum holdings, one of the major assets at issue during both deposition and trial. To value the holdings, Dr. Wallsten conducted hedonic regression analysis using data from several U.S. Federal Communications Commission spectrum auctions and controlling for a variety of important characteristics.

In his testimony, Dr. Wallsten identified several flaws in the plaintiffs' evaluation methods. He showed that Clearwire's 2.5 GHz spectrum holdings were worth only $0.24 per MHz-pop, compared to $0.78 per MHz-pop, as calculated by the plaintiffs' expert.

Vice Chancellor Laster concluded that Dr. Wallsten's valuation "aligned closely...with other third-party offers for Clearwire's 2.5 GHz spectrum around the valuation date." The vice chancellor added that Dr. Wallsten's valuation also aligned with a later offer from DISH Network Corp., which initiated a bidding war after Clearwire's shareholders rejected Sprint's initial buyout. In his finding for Sprint, the vice chancellor opined that the plaintiffs' expert's result "relied on an extraordinary number of assumptions...starkly divorced from the market evidence."

*Note: On April 23, 2018, the Delaware Supreme Court affirmed the Chancery Court's ruling.*

## APPRAISAL LITIGATION

### HOW COURTS VIEW VALUATION METHODOLOGIES

Often in M&A-related appraisal claims cases, certain shareholders abstain from a merger offer and opt instead to let a court determine the "fair value" of their shares. Courts have long considered the discounted cash flow (DCF) approach as a standard method for valuing firms. Judges also consider a multiples approach that uses comparable companies or transactions as a valid valuation technique, but may discard it when the court does not find the comparables to be adequately similar.

The choice and implementation of an appropriate methodology requires judgment and thoughtful assessment. With valuation typically at the heart of these cases, it is important for experts and counsel to stay current on the key issues surrounding valuation methodologies and how the courts view these strategies.

# FINANCIAL INSTITUTIONS

*Under Section 11, an affirmative defense of negative loss causation, as used by the defendants in Barclays, asserts that certain stock price declines are not attributable to the misrepresentations alleged by plaintiffs.*

**FEATURED MATTER //**

## BARCLAYS BANK PLC SECURITIES LITIGATION

A U.S. district judge granted the defendants' motion for summary judgment in this Section 11 case involving a $2.5 billion offering of preferred American Depository Shares (ADS) in April 2008. Plaintiffs alleged that, in the offering documents, Barclays failed to disclose its exposure to various risky credit market assets and misrepresented its ability to manage the accompanying credit risk. The shares lost 80 percent of their value during the year following the offering, and plaintiffs claimed that all of those price declines were recoverable as damages caused by the alleged misrepresentations.

Barclays' counsel retained Dr. Allan Kleidon of Cornerstone Research, along with five other experts: Professor John Coates of Harvard Law School; John Dolan of Second Order Strategies Inc.; Professor Gary Lawrence of the Center for Advanced Due Diligence Studies; Patricia O'Malley, a founding member of the International Accounting Standards Board (IASB); and Professor René Stulz of The Ohio State University.

Dr. Kleidon conducted an event study to determine whether any declines in the price of the ADS were attributable to the misrepresentations alleged by the plaintiffs. His analysis supported a finding of negative loss causation—that is, no correction of any of the alleged misrepresentations was associated with a stock price decline, and all statistically significant stock price declines occurred on days when no corrective information was released.

In his opinion, Judge Paul Crotty of the Southern District of New York explicitly rejected all of the plaintiffs' criticisms of Dr. Kleidon's opinions, stating that their arguments "are speculative and insufficient to exclude Dr. Kleidon's testimony." Further, in granting Barclays' motion for summary judgment, the judge found "the results of Dr. Kleidon's event study persuasive," concluding that "the alleged misrepresentations in the Series 5 Offering did not cause the Series 5 ADS price declines."

Cornerstone Research also worked with experts who opined on various aspects of the plaintiffs' allegations. Professor Stulz examined the economics of preference shares and assessed aspects of Barclays' risk management policies and procedures. His analysis showed that these were consistent with industry standards and best practices.

Ms. O'Malley evaluated alleged material misstatements and omissions in Barclays' financial statements regarding asset impairments and related losses. Her analysis demonstrated that Barclays' disclosures complied with relevant accounting standards and SEC regulations.

Mr. Dolan concluded that Barclays' valuations of its credit market assets were reasonable based on what was known at the time they were conducted. Professor Lawrence examined issues related to due diligence and Professor Coates opined on SEC disclosure issues.

# INITIAL COIN OFFERING DISPUTES

*Understanding the economics of the crypto tokens at issue will likely be one of the first steps in evaluating future ICO-related claims.*

FEATURED TOPIC //

## THE ECONOMICS OF ICO LITIGATION AND REGULATION

Initial Coin Offerings (ICOs) are a rapidly growing method of raising capital for new ventures using blockchain technology. The money raised from ICOs has skyrocketed from approximately $100 million globally in 2016 to over $6 billion in 2017. In the first three months of 2018 alone, approximately $5 billion was raised.

Regulators across the world are scrambling to keep up with the growth of ICO fundraising, and guidance is continuously evolving. Typically, ICO disputes—either brought by civil litigation or regulatory enforcement actions—have involved allegations of business fraud and/or failure to register securities. As ICO structures and associated regulatory guidance continue to mature, these claims may give way to issues more commonly seen in traditional securities suits.

Going forward, a number of questions will likely require economic analysis in order to better inform regulatory investigations and assess private litigation.

**What are the economic benefits of the at-issue crypto tokens?**

Tokens can have more than one type of economic benefit that drives their value. They can have nonmonetary value or utility comparable to commodities. They can have asset-like features that change in value over time, like securities. Tokens can also be used as currency to pay for goods and services.

**How do those benefits drive the value of the at-issue crypto tokens?**

Token production and consumption factors can change the perceived value of utility tokens, leading to price movements. As is generally the case with commodities, the increased use of and demand for tokens is associated with higher prices. The prices of some crypto tokens can react to company-specific factors. For example, a positive news story about an issuer may be correlated with a price increase. Payment factors, such as the use of crypto tokens as a substitute currency, may cause the market value of a token to rise or fall.

**How has the value of the at-issue crypto tokens been affected by alleged wrongdoing?**

In future ICO-related disputes, understanding the economics of the crypto tokens at issue will likely be an important step in evaluating claims. For example, traditional securities issues may become prevalent in litigation involving registered tokens that derive their value, at least in part, from asset-like features.

While the economic tools required to evaluate issues in traditional suits are relatively well established, the economic landscape is still in flux for suits concerning crypto tokens. Despite the dearth of case precedent, relevant economic questions for ICO-related disputes will likely be informed by the underlying benefits and value drivers of the at-issue crypto tokens.

# SECURITIES CLASS ACTIONS

*Halliburton II found that defendants can introduce a direct price impact analysis, such as an event study, in cases where plaintiffs have demonstrated that the stock traded in an efficient market.*

**FEATURED MATTER //**

## FINISAR CORPORATION SECURITIES LITIGATION

A U.S. district judge denied plaintiffs' motion for class certification in this Section 10(b) case involving Finisar Corporation, a technology company. Plaintiffs alleged that on December 2, 2010, during market hours, a statement by Finisar's CEO misled investors to believe that the company's growth was the result of an increase in demand and not a build-up of inventory for future use.

Defense counsel retained Dr. Alexander "Sasha" Aganin of Cornerstone Research to assess the effect of the alleged misrepresentation on Finisar's stock price. In his expert report, Dr. Aganin opined that if the alleged misstatement had an impact on Finisar's stock price, as asserted by plaintiffs, one would expect the price impact to be discernible by market close on December 2, 2010.

Dr. Aganin conducted an event study to analyze Finisar's stock price. Specifically, he analyzed changes in Finisar's trading prices from the time just before the alleged misstatement through the remaining trading hours following the statement and to the end of the next trading day. He concluded that the alleged misstatement did not result in a statistically significant increase in Finisar's stock price.

Plaintiffs claimed Dr. Aganin's report was unreliable and criticized numerous aspects of his event study methodology. The judge cited Dr. Aganin's responses to these criticisms, and roundly rejected plaintiffs' arguments. "The [regression] results confirm Aganin's opinion that [the alleged misstatements] on December 2nd did not result in [a] statistically significant increase of Finisar's stock price on December 2 or 3."

In denying the motion for class certification, the judge again cited Dr. Aganin's report: "The Court finds Aganin's conclusion persuasive."

---

## EVENT STUDIES

*An event study is an objective, widely accepted methodology for measuring the effect of information on stock prices.*

Securities class actions often proceed under the assumption of an "efficient market." In an efficient market, stock prices reflect all publicly available information, including information about the market, the industry, and the company itself. Therefore, only new and unexpected information will cause stock price changes.

Quantifying recoverable damages in a securities class action requires, among other things, determining what part of a stock price decline, if any, can be reliably attributed to plaintiff allegations. When performed correctly, event studies can aid in the assessment of damages because they estimate the impact of company-specific news on stock prices by removing estimated market and industry effects.

Event studies do have limitations that often come into play in damages assessment. For example, they generally cannot disaggregate the price effects of multiple, simultaneous company-specific news items. In addition, they cannot isolate the impact of alleged misrepresentations that differ from any corrective information that was ultimately disclosed. In these cases, an expert can turn to a number of other financial economic tools to supplement an event study analysis.

FEATURED REPORTS //

## SECURITIES CLASS ACTION FILINGS

**RECORD NUMBER OF FILINGS FUELED BY M&A CASES**

By several measures, 2017 was the most active year since the enactment of the PSLRA, as plaintiffs filed a record 412 securities fraud class actions. Filings against companies with large market capitalizations, however, did not peak in the same manner, as smaller firms were relatively more common targets.

---

## SECURITIES CLASS ACTION SETTLEMENTS

**TOTAL SETTLEMENT DOLLARS DIP DRAMATICALLY**

While the number of settlements remained at a relatively high level, the average settlement size decreased from $72 million in 2016 to just over $18 million in 2017. More than half of 2017 settlements were for $5 million or less as the number of mid-range to large settlements declined significantly.

*Both reports are available for download at www.cornerstone.com.*

# PRO BONO

*Cornerstone Research's pro bono initiatives provide litigation support to a number of nonprofit legal services organizations. We also consult to a wide range of nonprofits on data management and analysis and conduct skills-based training seminars.*

FEATURED MATTERS //

## ACLU

- Analyzed data on behalf of inmates who allegedly did not receive adequate medical care.

## CENTER FOR EFFECTIVE GLOBAL ACTION (CEGA)

- Developed an agricultural research database and created data visualizations for various projects.

## CHILDREN'S RIGHTS

- Determined that children in Arizona's foster care system did not receive the medical and dental care to which they were entitled.

## ENACT

- Created a database and dashboard to efficiently store, query, and summarize survey data.

## LAWYERS' COMMITTEE FOR CIVIL RIGHTS (LCCR)

- Analyzed data to investigate alleged discrimination in disciplinary practices in a California public school district.
- Prepared research reports on political, religious, and ethnic persecution in Afghanistan and violence against women in Burkina Faso for lawyers taking up asylum cases.

## NAACP

- Assessed whether hiring practices for police and firefighters in Boston communities yielded sufficient racial diversity to match the racial diversity of the qualified workforce in the local communities.

## PAPER AIRPLANES

- Coached the organization on how to build a dynamic database and tools for visualizing survey response data.

## STUDENT SUCCESS NETWORK (SSN)

- Worked with SSN to automate its process of matching student data from various sources.
- Led Excel and statistics training seminars for the employees of member organizations.



FRONT COVER: *Data visualization by Sarah B. Cohn*

Bitcoin Futures: A Closer Look at CME's Contract Design // 18th Annual Berkeley-Stanford Advanced Patent Law Institute: Silicon Valley // Trends in Securities Litigation Webinar // Spoofing and Manipulation: A Primer for Healthy Trading Practices // Competition Law in the Pharmaceutical Sector // Applying Monte Carlo Simulations in Litigation // Litigators, Wrangle That Data with Content Analysis // SEC Enforcement Activity: Public Companies and Subsidiaries—Fiscal Year 2017 Update // 6th Annual Damages in International Arbitration Conference // Thomson Reuters Practical Law // *Advanced EU Competition Law Conferences* // Was It All That Bad? U.S. Federal Antitrust Policy since 1980: Antitrust Goals (and Is Big Bad?) // Duty to Disclose, Cryptocoins, Blockchain, and Other SEC Challenges // Aetna–Humana and Algorithmic Market Definition in the Guidelines // GAR Live London Autumn: A 360 Look at Damages: Counsel and Experts React // Securities Enforcement Forum 2017: Litigating Securities Fraud Cases against the SEC and DOJ // Accountants' Liability Conference 2017: Emerging Trends in Accountant Litigation // 2017 Corporate Governance Roundtable at Harvard Law School // Expert Witnesses: The Good, the Bad, and the Ugly // GCR Live 9th Annual Competition Litigation: Proving Passing on in a Post Sainsbury's World // Economic Analysis in Class Certification // Economic Analysis in Damages Actions—Insights from Recent Proceedings in the UK // Not so "Rare": The Valuation Method behind the Tethyan Challenge // GCR Live 5th Annual New York // Characteristics of U.S. Natural Gas Transactions, Commodity Futures Trading Commission // Competition Law and Economics in Pharmaceutical Markets // The Anthem–Cigna & Aetna–Humana Mergers: A Post Mortem // A Deep Dive into Spokeo // Estimating Damages in Settlement Outcome Modeling // 44th Annual European Finance Association (EFA) Meeting // Market Approach or Comparables // The Use of Econometric and Statistical Analysis and Tools // 2017 Guide to Damages in International Arbitration // Securities Class Action Filings—2017 Midyear Assessment // *Women Leaders in Life Sciences Law 2017* // CARE Conversation: The CMA Care Homes Market Study // ABA Section of Litigation: Roundtable on Surveys and Statistics in Class Certification // Insider Trading after Salman // Expert Testimony of the Future: Machine Learning and How It Will Impact Litigation // 2017 iHEA World Congress of Health Economics: Revolutions in the Economics of Health Systems // Characteristics of U.S. Natural Gas Transactions: FERC Form 552 Submissions as of May 2017 // Spikes in Drug Prices: Outrageous or Legitimate? // FERC Technical Conference on Developments in Natural Gas Index Liquidity and Transparency // Use (and Misuse) of Statistical Sampling in False Claims Act and Private Reimbursement Disputes // Stanford Directors' College 2017 // Why Antitrust? NYSBA Annual Program for Law Students and Junior Lawyers // 3rd Annual GAR Live Energy Disputes // 2017 Shareholder Engagement Roundtable at Harvard Law School // The Future of the Markets Regime // A Brave New World: What's in Store? // GCR Live 3rd Annual Antitrust Litigation USA: Count-the-Moles: The Economist's View on the Management of Litigation // SEC's Renewed Focus on Non-GAAP Measures: 1 Year Later // *SEC Enforcement Activity: Public Companies and Subsidiaries—Midyear FY 2017 Update* // Competition Law in the Financial Services Sector // Cornerstone Research Women's Forum // Antitrust in the Financial Sector: Hot Issues and Global Perspectives // Blurred Lines: Assessing Sherman Act Exposure for Hub-And-Spoke Agreements // Estimating Damages in Litigation—Beyond Discounted Cash Flow // WBA Centennial Celebration: Looking Back, and Moving Forward // Private Enforcement: Different Parties, Different Objectives // Proof Agreements, Incentives and Liabilities in Hub-and-Spoke Antitrust Conspiracies: A 2017 Update: What Is a Hub-and-Spoke Conspiracy and Who Benefits? // Society for Financial Studies Finance Cavalcade North America Conference // 27th Annual Meeting American Law and Economics Association // Economic Evidence in Competition Law and the Future of the "More Economic" Approach // 13th Annual University of Washington Financial Reporting Conference // Securities Enforcement Forum West 2017: The Exploding Role of Big Data and Technology in Securities Enforcement, Regulation and Defense // Testifying Experts Draw Lessons from Recent Healthcare Mergers: What Can We Expect for Merger Review Going Forward? // Reasonable Royalty in Patent Damages: What You Need to Know in 2017 // Secondary Market for LP Investments in Private Equity // Approved Claims Rates in Securities Class Actions // A Broader Perspective on Corporate Governance in Litigation // SEC Enforcement Activity—First Half FY 2017 Update // Accounting Class Action Filings and Settlements—2017 Review and Analysis // Suffolk University/Merrill Lynch Wealth Management Symposium Spring 2017: Asset Management Regulation under the New Administration // **2017 EVENTS + THOUGHT LEADERSHIP + SPEAKING ENGAGEMENTS** // The Law and Economics of Competition Damages Actions // CDR Spring Arbitration Symposium // 11th Annual Juris Investment Treaty Arbitration Conference on Technology, IP, and Investor-State Arbitration: Remedies in IP Investment Arbitration // Fraud Day at Mendoza College of Business, University of Notre Dame // New Risk in Energy 2017: Price Indices, Price Reporting, Price Reporting Agencies (PRAs), and Recent Changes in the Process // How Do Franchise Termination Restrictions Affect Consumers? // Securities Class Action Settlements—2017 Review and Analysis // ABA Section of Antitrust Law 2017 Spring Meeting // 2017 George Washington University Corporate Antitrust Roundtable // 2017 Intellectual Property Institute, USC Gould School of Law // *Who's in the Driver's Seat? Assessing Misrepresentation, Liability, and Injury in a World of Complex Automated Products* // Economics at DG Competition: Current Cases and Future Challenges // How to Handle SEC and PCAOB Investigations // The Role of Economic Analysis in the Assessment of Vertical Restraints // Trends in Merger Investigations and Enforcement at the U.S. Antitrust Agencies: FY 2006–2015 // Drafting Blow Provisions in Securities Class Settlements // Securities Class Action Filings—Year in Review // Shadow Banking—The Potential Risks and Rewards // How is Healthcare Changing? How is the Government Responding?

cornerstone.com

CORNERSTONE RESEARCH

Economic and Financial Consulting and Expert Testimony

©2018 BY CORNERSTONE RESEARCH. ALL RIGHTS RESERVED.

# PX 338

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| *In re Oracle Corporation Securities Litigation* | Case No. 18-cv-4844-BLF |
|---|---|

# EXPERT REPORT OF DAVID I. TABAK, PH.D.

## I. SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1. This report concerns a securities action brought on behalf of purchasers of shares of Oracle Corporation ("Oracle") common stock. It is my understanding that as a result of certain allegations being dismissed in the Opinion and Order in this matter dated March 22, 2021 ("Opinion"), Plaintiff is seeking to certify a class for the period from May 10, 2017 through June 19, 2018 (the "Class Period").

2. As discussed in this report, I find that Oracle's common stock traded in an efficient market over the Class Period.

3. In addition, it is my opinion that damages arising from Plaintiff's claim for violations of Section 10(b) of the Securities Exchange Act of 1934 can be calculated on a class-wide basis based on a common methodology.

## II. QUALIFICATIONS AND REMUNERATION

4. I received Bachelor's degrees in Physics and in Economics from the Massachusetts Institute of Technology and a Master's degree and a Ph.D. in Economics from Harvard University. I have appeared as an expert in federal district courts; state trial courts; bankruptcy court; and in arbitration forums, including the National

36. Because news about a company can arrive on days other than earnings-announcement dates, defining news days as days with earnings announcements represents an overly restrictive definition of "news days," and results in comparing (1) a set of particular news days with (2) a mixed set composed of both non-news days and days that would (but for the restrictive definition) be considered news days. Because the second set of days has a mix of types of days, this will tend to make it harder for a comparison of (1) and (2) to show that Oracle's stock prices responded to news.[25] Because such an analysis is biased against finding efficiency, a negative result would not undercut a finding that a stock's price reacts in a statistically significantly different fashion on earnings versus non-earnings days.

37. Although an analysis of earnings-announcement days may be considered sufficient to demonstrate market efficiency (if the evidence supports that conclusion), I also performed another analysis with five broader sets of news days, in which I define news days as days with stories published by the *Dow Jones Newswires*. First, I limited news stories to those that have references to "Oracle Corporation" as a company (a "company search" is an option in Factiva that picks up stories characterized by Factiva as related to Oracle).[26] Second, I considered only those stories from this group that occurred

[25] To see this, imagine that Oracle's stock price moved by ten percent on news days and by zero on non-news days. If we had perfectly identified news days and non-news days, we would be comparing a set of days with an average price movement of ten percent to another set of days with an average price movement of zero. If, instead, the second set of days includes some news days, we would wind up comparing a set of days with an average stock price movement of ten percent (some of the news days) to some positive figure such as five percent (if half of the second set consisted of news days). Thus, rather than a difference of ten percentage points, the difference would be only five percentage points, which would make it harder to prove that there is a meaningful difference between the two figures. One should note that under some circumstances (e.g., if non-earnings news has a very small impact on prices), grouping those with non-news days may make the average price impact of the remaining news stories on news days greater, which could aid in reaching a correct finding that a stock responds to earnings news.

[26] If a news story came out before 4 p.m. (i.e., before the close of trading), that day was characterized as a news day. If the story occurred at or after 4 p.m. but before midnight, or occurred on a non-trading day, then the following trading day was characterized as a (continued)

outside of trading hours on the NYSE (i.e., before 9:30 a.m. and at or after 4 p.m. Eastern time), to reduce concerns that large intraday price movements during trading hours may be leading to news stories being published on those days.[27] Third, I ran the news search for mentions of "Oracle Corp" or "ORCL" in the headline or lead paragraph of the news article (a "text search"), including both stories during and outside of market hours.[28] Fourth, as I did with the second set of news stories, I limited this third set of stories to those that occurred outside of NYSE trading hours. Finally, I looked at the last set of news days (i.e., "Oracle Corp" or "ORCL" in the headline or lead paragraph in stories published outside of market hours) and took the ten percent of days with the highest number of such news stories, as that would be a proxy for more material news.[29]

38. Exhibit 8a compares (A) the percentage of news days within the Class Period that are associated with statistically significant market-adjusted stock price movements with (B) the percentage of statistically significant market-adjusted stock price movements in

---

news day. If a news story was merely commenting on Oracle's stock price, volume, or order imbalance, it was excluded. (See Exhibit 8c for a list of such excluded stories.)

[27] This is mostly a theoretical concern. See Boudoukh, p. 1004 ("[W]e observe very little evidence of extreme price changes on news days when we cannot identify a specific event tied to the news: only 0.5% more than the expected fraction of our defined 'extreme' days. Ex ante, one might have imagined that large price moves would have generated 'news' stories, but this result shows no mechanical relation between news and firm volatility.")

[28] References to "Oracle Corporation" would be picked up by the search term "Oracle Corp" as that search term is a sequential portion of the full name of the corporation.

[29] The academic field of "content analysis" suggests that more material news will be reported more (e.g., by additional news sources or by repetitions of the same news in the same or different sources). Thus, the number of news stories on a day is a proxy for the materiality of news. This concept has been used in the analysis of price response to news, with, for example, a peer-reviewed article that looked at price response to news across different countries, stating, "Panel A in Figure 2 shows that most developed markets are to the left with a greater fraction of return volatility 'explained' by news days and article counts on those news days." (Griffin, John M., Nicholas H. Hirschey, and Patrick J. Kelly, "How Important Is the Financial Media in Global Markets?" *The Review of Financial Studies* 24.12 (2011): 3941-3992, p. 3964.)

# PX 339

**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ALIBABA GROUP HOLDING LIMITED SECURITIES LITIGATION | Civil Action No. 1:15-md-02631 (CM) |

# EXPERT REPORT OF DAVID I. TABAK, PH.D.

## I. SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1. This report concerns Plaintiffs' motion to certify a proposed class defined as "All persons and/or entities that purchased or otherwise acquired Alibaba Group Holding Limited American Depositary Shares ('ADS'), or purchased call options or sold put options on Alibaba ADS, during the period September 19, 2014, through January 28, 2015, inclusive (the 'Class Period'), other than those shares purchased directly in the September 19, 2014 Initial Public Offering. Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Alibaba at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a controlling interest at any time."[1]

[1] Quote provided by counsel. In ¶1 of the Consolidated Complaint ("Complaint"), the proposed class period was defined to include January 29, 2015. Because the disclosure on January 29, 2015 occurred before the market open, that date is not properly in the class period, and therefore is not included in my analysis of market efficiency.

2. Counsel for plaintiffs in this matter has asked me to examine whether Alibaba's ADSs and options traded in efficient markets during the Class. I have also been asked to determine whether there are methodologies that can be used to determine the damages for ADS purchasers, for purchasers of call options, and for sellers of put options.

3. As discussed below, the markets for Alibaba's ADSs showed overwhelming evidence of efficiency in the aftermarket (i.e., all trades following the company's initial public offering ("IPO") on September 19, 2014). In contrast, there is insufficient support for a finding that the offering price (i.e., the price of $68 per share at which shares were purchased in the IPO from the company via its underwriters) can be described as having been set in an efficient market. Based on the efficiency of the price for Alibaba shares in the aftermarket and on an examination of the relationship between Alibaba call and put prices to that price, the markets for Alibaba calls and puts were also efficient.

4. Damages for purchasers of Alibaba's ADSs in the aftermarket, for purchasers of Alibaba call options, and for sellers of Alibaba put options can be determined through common methodologies.

## II. Qualifications And Remuneration

5. I received Bachelor's degrees in Physics and in Economics from the Massachusetts Institute of Technology and a Master's degree and a Ph.D. in Economics from Harvard University. I have appeared as an expert in federal district courts; state trial courts; bankruptcy court; and in arbitration forums, including the National Association of Securities Dealers, the International Chamber of Commerce International Court of Arbitration, and the American Arbitration Association. I have published in my fields of expertise on subjects such as market efficiency, loss causation, statistics, and the analysis of stock price movements.

6. National Economic Research Associates ("NERA") was established in 1961 and now employs approximately 500 people in over twenty offices worldwide. NERA provides consulting for economic matters to parties for their internal use, to parties in

Case 1:15-md-02631-CM Document 54-1 Filed 03/12/18 Page 17 of 101

39. As noted above, the test of a stock price's response to news depends on classifying days into news days and non-news days. If not performed carefully, this classification may be somewhat subjective. Thus, one generally wishes to use an objective measure of news, or at least one where any subjective decisions have been made by others who are not part of the analysis of market efficiency.[32] To remove any possible subjectivity on my part as to which "news days" were selected for examination, I performed one analysis by defining news days as days with Alibaba earnings announcements. This is, of course, an overly restrictive definition of "news days," and results in comparing (1) a set of particular news days (though in this case, just a single day) with (2) a mixed set composed of both non-news days and days that would (but for the restrictive definition) be considered news days. Because the second set of days has a mix of types of days, this will tend to make it harder for a comparison of (1) and (2) to show that Alibaba's ADS price responded to news.[33] I performed another analysis with

[32] See, for example, *In re Countrywide Financial Corporation Securities Litigation*, 273 F.R.D. 586, 618 (C.D. Cal. 2009) ("It should be obvious, even to those without a background in statistics or econometrics, that the events for study should be selected using criteria that are as objective as possible. Further, those criteria should be determined before looking at the result to be studied (here, stock returns). Relatedly, unless the expert uses articulable objective criteria, it is difficult to evaluate the probative value of expert evidence without evaluating also the expert's own credibility.")

[33] To see this, imagine that Alibaba's ADS price moved by ten percent on news days and by zero on non-news days. If we had perfectly identified news days and non-news days, we would be comparing a set of days with an average price movement of ten percent to another set of days with an average price movement of zero. Because the second set of days includes some news days, we may wind up comparing a set of days with an average stock price movement of ten percent (some of the news days) to some positive figure such as five percent (if half of the second set consisted of news days). Thus, rather than a difference of ten percentage points, the difference would be only five percentage points, making it harder to prove that there is a meaningful difference between the two figures. One should note that under some circumstances (e.g., if non-earnings news has a very small impact on prices), then grouping those with non-news days may make the average price impact of the remaining news stories greater, which could aid in reaching a correct finding that a stock responds to earnings news.

broader sets of news days, in which I define news days as days with stories published by the *Dow Jones Newswires*. In each case, I limit news stories to those that use "Alibaba" or the BABA ticker in the headline.[34] As there was news on 69 out of 88 days in the Class Period, I also performed the analysis two more times by looking at a proxy for the amount of news each day by counting the number of stories in *Dow Jones Newswires*, a technique from the field of content analysis.[35] I then order the trading days by the number of news stories from high to low and create two proxies for days with high news content: (1) the days in the upper half of this ordered list and (2) the days in the top ten percent of this ordered list.[36] Finally, I performed an additional test, starting with the top ten percent of the news days as just defined. I reviewed the stories that appeared in the *Dow Jones Newswires* and removing any that were solely reporting on Alibaba's ADS price movements or volume (i.e., instances where the news was responding to the ADS price rather than the ADS price potentially responding to news), that appeared to be duplicates of previously reported news, or were deemed to be non-material because they reported data irrelevant to the value of the Company.[37]

---

[34] If a news story came out before 4 pm (i.e., before the close of trading on the New York Stock Exchange), that day was characterized as a news day. If the story occurred after 4 pm but before midnight, then the following trading day was characterized as a news day.

[35] Content analysis is based on the premise that the "*frequency* with which a symbol, idea, reference or topic occurs in a stream of messages is taken to indicate the *importance of, attention to,* or *emphasis on* that symbol, idea, reference, or topic in the messages." (Klaus Krippendorff, *Content Analysis: An Introduction to Its Methodology*, 2nd edition, 2004, p. 59. Emphases in original.) That is, the more often the news reports on a topic, the more important it is likely to be. The use of content analysis was endorsed by the First Circuit in *Bricklayers and Trowel Trades v. Credit Suisse LLC*, 752 F.3d 82 (1st Cir. 2014).

[36] Because there were a number of days with the same number of news stories, the analyses actually have more than half and more than ten percent of the trading days classified as news days.

[37] News was deemed to be non-material based on a review of the news story. For example, some stories referred to which shareholders were receiving Alibaba shares or to the effect of Alibaba on Yahoo. Because these are necessarily subjective determinations,
(continued)

# PX 340

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE BRIDGEPOINT EDUCATION, INC. SECURITIES LITIGATION | CASE NO. 12-cv-01737-JM (JLB) |

# EXPERT REPORT OF DAVID I. TABAK, PH.D.

## I. BACKGROUND AND SCOPE OF ANALYSIS

1. This is a "class action for violations of the federal securities laws on behalf of all purchasers or acquirers of Bridgepoint Education, Inc. ('Bridgepoint' or the 'Company') securities from ***May 3, 2011 through July 13, 2012*** (the 'Class Period'), and who were damaged thereby (the 'Class')."[1] Plaintiffs made numerous allegations relating to Bridgepoint and to Ashford University ("Ashford"), an institution run by Bridgepoint, with a focus on Ashford's application for accreditation from the Western Association of Schools and Colleges ("WASC").

2. On September 13, 2013, an Order Granting in Part and Denying in Part Defendant's Motion to Dismiss ("MTD Order") held that allegations related to "Ashford's student persistence initiatives" would remain in the case, while those related to "Ashford's application for WASC accreditation, … Ashford's quality of education, and … Bridgepoint's financial projections" were dismissed.[2]

3. On January 15, 2015, the Court certified a class in this matter ("Class Cert Order") based on Plaintiffs' motion "to certify a class consisting of all persons who purchased

[1] Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint") filed December 21, 2012, ¶2. Emphasis in original.

[2] MTD Order, p. 26. Following p. 26 of the MTD Order, I use the phrase "persistence initiatives" to refer to the remaining allegations. In some material in this case, the initiatives are referred to as "quality initiatives."

and 7b. The resulting calculations, again shown in Exhibit 6, are that 24.9% and 25.9% of the loss in value is attributable to the lost revenue from reducing churn or increasing persistence, with the remainder due to the costs of increasing instructional costs.[25]

46. The results of these two calculations are shown in Scenarios IV and VII in Exhibit 4, with the former showing a maximum effect of the persistence-related issues of $1.99 per share and the latter showing a maximum effect of the persistence-related issues of $2.07 per share as of immediately before the WASC Letter.

### 2. Damages Based on "Content Analysis" of Analyst Reports

47. The second category of analysis is based on what is known as "content analysis" applied to analyst reports following the WASC Letter. Content analysis is an academic tool that, in its simplest form, recognizes that the amount of attention given to a particular topic is often a rough indicator of the relative importance of or interest in the topic. For example, newspapers may devote a relatively large amount of space to election polls shortly before an election, when interest is high and the polls are more likely to accurately predict the results of the election, than far from an election when interest is lower and the accuracy of the polls is more doubtful. Content analysis is a well-established academic methodology was endorsed by the First Circuit in an opinion on a securities fraud matter as a means to help disaggregate the effects of different potential causes of a stock-price decline.[26]

---

[25] Again, we conservatively assume that there are no cost savings associated with the lost revenue. In these analyses, the tax rate does not matter, as both the foregone revenues and incremental costs are measured before taxes, leaving the ratio between these two categories unaffected by the tax rate on earnings.

[26] *Bricklayers and Trowel Trades v. Credit Suisse LLC*, 752 F.3d 82 (1st Cir. 2014). (The expert "could also have used content analysis. See, e.g., David Tabak, Making Assessments About Materiality Less Subjective Through the Use of Content Analysis (2007), available at http://www.nera.com/67_5197. htm; Esther Bruegger & Frederick C. Dunbar, Estimating Financial Fraud Damages with Response Coefficients, 35 J. Corp. L. 11, 25 (2009) ('"[C]ontent analysis" is now part of the tool kit for determining which among a number of simultaneous news events had effects on the stock price.').")

48. To apply content analysis to the analyst reports, we examined the prevalence of terms related to persistence versus the other five areas considered in the WASC Letter.[27] Specifically, Exhibit 8a shows the search terms related to each area of concern and how often each appeared in the five analyst reports issued on July 9 or 10, 2012 and that discussed the WASC Letter. There were a total of 52 terms related to the descriptions of the six different areas. To be conservative, we included the word "success," part of "support for student success" as being related to persistence, even though this could relate to other issues. Under this categorization, 13 of the 52 instances in which a term appeared, or 25.0% of the total, related to persistence. Using Prof. Feinstein's calculation of the stock-price decline following the July 9, 2012 news, this means that at most $2.00 is attributable to persistence issues under this analysis.

49. This result, a measure of how analysts responded to the July 9, 2012 news, is shown in Scenario V in Exhibit 4. The similarity of the results to those of Scenarios IV and VII discussed above (i.e., the $2.00 here compared to the $1.99 and $2.07 from the prior two analyses) adds to the confidence that one should have in these results.

### 3. Damages Based on "Content Analysis" of the WASC Letter

50. In addition to analyzing how analysts responded to the WASC Letter, we can apply content analysis to the WASC Letter itself. The first scenario we consider here is based on the WASC Letter's description of four Standards of Accreditation. The category of "Student retention and completion, methods of tracking student progress, and support for student success" only touched on Standard 2. However, there were also two other categories of issues that WASC found at Ashford that also touched on Standard 2. Thus,

[27] The concept that each category is preliminary thought of as of equal weight is a baseline assumption in content analysis. That is, the "*frequency* with which a symbol, idea, reference, or topic occurs in a stream of messages is taken to indicate the *importance of, attention to, or emphasis* on that symbol, idea, reference, or topic in the messages." (Klaus Krippendorff, Content Analysis: An Introduction to Its Methodology, 2nd edition, 2004, p. 59. Emphases in original.)

# PX 341

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

-------------------------------)

IN RE HD SUPPLY HOLDINGS, INC.) No 1-17-CV-02587-ELR

SECURITIES LITIGATION )

-------------------------------)

DEPOSITION of DR. DAVID I. TABAK, Expert Witness in the above-captioned matter, held at the offices of King & Spalding, 1185 Avenue of the Americas, New York, New York, on July 11, 2019, commencing at approximately at 11:11 a.m., before Eileen Mulvenna, CSR/RMR/CRR, Certified Shorthand Reporter, Registered Merit Reporter, Certified Realtime Reporter and Notary Public within and for the State of New York

literature on supply chains. There was a point when I was pretty deep into it. I'd have to go back, but I have a general understanding I think probably beyond certain -- I would say I'm certainly beyond the layperson on some of the economic effects of supply chains.

Q. I'd like to turn to Footnote 39 of your report.

A. Yes.

Q. This footnote begins, "Examining and counting references to certain ideas is known as content analysis." It states that "Properly implemented content analysis can be useful in understanding what factors may have affected the price of a security," and then you go on to list a few sources regarding content analysis. So --

A. Actually, it's just one source that itself lists two references. I cite one case that cites two references. So I only cite one source.

Q. Oh, I apologize. Yes. Yes. That's correct.

You cite a case which cites two articles in a journal; correct?

A. That is correct.

Q. And one of those articles is David

Tabak, "Making Assessments About Materiality Less Subjective Through the Use of Content Analysis."

That's your article; correct?

A. That is.

Q. And other article is Esther Bruegger and Frederick C. Dunbar, "Estimating Financial Fraud Damages with Response Coefficients"; correct?

A. Correct.

Q. So are you stating that your expert report is employing what you call content analysis in looking at analyst reports and news, company statements, et cetera?

A. Yes, it does.

Q. And is it employing content analysis -- withdraw.

How would you describe content analysis?

A. Typically, it's a review of certain set of materials to see how often references are made either to certain ideas or suggesting certain thoughts. And usually it would be in comparison to some other set of ideas or thoughts. So two-thirds of the references are to A and one-third are to B, for example. Simplistic, but gives you the general idea.

Q. Okay. Did you -- so you're talking about a quantitative kind of analysis, counting and comparing numbers of references; is that accurate?
A. Percentage.
Q. Percentages of references. Okay.
Did you do that anywhere in your report?
A. I think effectively, yes, in that I said that all of the references to the causes of the price decline, with one exception of RBC that changed -- essentially dropped its view, did not reference the FM supply chain issues.
And RBC basically speculated that -- actually, not the cause of the price decline, the cause of the earnings miss may have been due to the FM supply issues before the June conference call and then dropped that reference after the conference call.
So in terms of percentages, a hundred percent of the analysts describing the reasons for the miss did not reference new or unexpected issues with the supply chain other than RBC that dropped that once it went through the conference call.
Q. When you said "a hundred percent of the analysts," are you referring to a hundred

# PX 342

**THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TREVOR MILD, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PPG INDUSTRIES, INC., MICHAEL H. MCGARRY, VINCENT J. MORALES, and MARK C. KELLY,<br><br>Defendants. | Case No.: 2-18-cv-04231-RGK-JEM |

# REBUTTAL EXPERT REPORT OF DAVID I. TABAK, PH.D.

## *I. SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS*

1. This report concerns a securities action brought “on behalf of persons or entities who or which purchased or otherwise acquired PPG securities between January 19, 2017 through May 10, 2018, inclusive (the ‘Class Period’) and who were damaged thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the ‘Exchange Act’).”[1]

2. On March 8, 2019, I submitted a report (the “Tabak Report”) in this matter demonstrating that PPG’s common stock traded in an efficient market, that PPG’s bonds

---

[1] Amended Class Action Complaint for Violations of the Federal Securities Laws (“Complaint”), ¶1.



PX342
Page 8198

did not show substantial evidence of trading in an efficient market, and that there is a class-wide methodology for determining damages in this matter. On April 1, 2019, Defendants PPG, Michael H. McGarry, and Vincent J. Morales submitted a Memorandum of Points and Authorities in Opposition to Lead Plaintiff's Motion for Class Certification ("Defendants' Opposition") addressing, among other issues, the Tabak Report. One exhibit to Defendants' Opposition was a report by Paul Zurek (the "Zurek Report"), which comments on the Tabak Report.

3. Counsel for Plaintiff in this matter has asked me to respond to the sections of Defendants' Opposition related to the Tabak Report and to the Zurek Report.

4. As discussed below, Defendants' Opposition and the Zurek Report do not even challenge nine of the ten categories of tests that I perform that support a finding of market efficiency for PPG's stock. For the one category that they do challenge (*Cammer* Factor 5, or the price response to news), Defendants' Opposition and the Zurek Report do not reach a conclusion that this factor weighs against efficiency, but merely argue that some forms of inefficiency might not be detected by my tests in this category. Of course, if there were a test that could identify every form of inefficiency, there would be no need for multiple *Cammer* factors and other tests. Moreover, many of the reasons that Defendants' Opposition and the Zurek Report give for why my tests may not pick up certain forms of inefficiency are factually incorrect.

5. Finally, Defendants' Opposition and the Zurek Report argue that there might not be a common classwide methodology for quantifying damages in this case. Many of the arguments in those documents are wrong. Other arguments made in those documents are merely speculations that because damages have not yet been calculated, something might come up that would provide a challenge to the calculation of damages.

67. Nevertheless, in my deposition, I discussed one possible way of approaching the analysis of confounding news: the use of earnings-response coefficients.[44] This is similar to what Dr. Zurek attempts to evaluate in Exhibits 9.A and 9.B to his report, though his analysis is faulty because he improperly mixed split-adjusted and non-split-adjusted data on the same graph.[45] A second possible approach is to use content analysis, or a review of how much attention market participants gave to allegation-related and allegation-unrelated information, as a means of separating the effects of the two categories of news.[46] A determination of the most appropriate means of disaggregating allegation-related and allegation-unrelated news is best made after further discovery in this matter.

---

[44] Earnings-response coefficients are a standard tool in finance. A search on "earnings response coefficient" yields over 5,000 results on Google Scholar. (Search conducted on April 5, 2019.) Dr. Zurek exhibited at least some familiarity with this concept in his deposition. See Zurek Depo., 21:11-24. ("Q. Dr. Zurek can you describe what is an earnings response model or earnings response coefficient? A. I can give you a description at a high level. I don't – ultimately, different people might define these -- these terms slightly differently. My understanding at least in the economic literature an earnings response model is -- is a model of the relationship between price reactions in a security and information about earnings. And earnings response coefficient would presumably be some parameter inside -- inside such a model.")

[45] When shown clear evidence of this error, Dr. Zurek was forced to admit that he was not sure if his data were correct. See Zurek Depo., 32:20-33:3. ("Q. Does this statement suggest that your numbers for Q1 2015 and earlier as shown in Exhibit 8 [of the Zurek Report] were not adjusted for the company's 2-for-1 stock split? [Objection] THE WITNESS: I don't know. I'd have to go back and look at it. I think the numbers in Exhibit 8 are from the -- from the plaintiffs complaint. I -- I don't know.") I can confirm that the data are from the Complaint, but that Dr. Zurek and his team apparently copied those figures from the Complaint without reviewing them for accuracy, a standard practice that my staff and I employ.

[46] For judicial recognition of this technique, see *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 96 n.12 (1st Cir. 2014) ("[Plaintiffs' expert] could also have used content analysis. *See, e.g., David Tabak, Making Assessments About Materiality Less Subjective Through the Use of Content Analysis* (2007), *available at* http://www.nera.com/67_5197.htm; Esther Bruegger & Frederick C. Dunbar, *Estimating Financial Fraud Damages with Response Coefficients*, 35 J. Corp. L. 11, 25 (2009) ("'[C]ontent analysis" is now part of the tool kit for

(continued)

68. In summary, the analysis of classwide damages is common in securities fraud cases. It is even easier in accounting cases when a restatement has been made, because some quantitative measure of what the "truth" was supposed to have been is provided. Thus, a classwide damages methodology is particularly amenable to this matter. The Tabak Report discussed how such a methodology would be implemented and the premature critiques by Dr. Zurek are merely points that would ultimately go to what the final inflation figures would be, not whether such a methodology would exist.

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Defendants, that becomes available to me.

David I. Tabak
April 8, 2019

---

determining which among a number of simultaneous news events had effects on the stock price.').").

Dr. Zurek appears to have attempted a preliminary form of content analysis. In ¶64 of the Zurek Report, he states that of "the 21 [analyst] reports that were issued on April 19 and 20, 2018, only nine even referenced the accounting investigation. Not only did a minority of the reports mention the investigation, … ." However, Dr. Zurek's list of materials relied upon contains only 18 analyst reports during that period, matching the 18 analyst reports from that time period in his backup materials turned over to Plaintiffs. Thus, the claim about a "minority" was not correct based on what was in the Zurek Report. The day after Dr. Zurek's deposition, counsel for Defendants sent counsel for Plaintiff a letter explaining that both Dr. Zurek's Appendix B (the list of materials relied upon) and Dr. Zurek's production failed to include three analyst reports.

# PX 343

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

--------------------------------X

In RE RAYONIER INC. Case No.
SECURITIES LITIGATION 3:14-cv-1395-J-32JBT

--------------------------------X

VIDEOTAPED DEPOSITION
OF
DAVID I. TABAK, Ph.D.
Wednesday, February 8, 2017
1251 Avenue of the Americas
New York, New York

Reported by:
AYLETTE GONZALEZ, RPR, CLR, CCR
JOB NO. 117677

MR. STICKNEY: Yes, it's vague and ambiguous. The earliest date by which --

MR. McCONNELL: All right. I'll rephrase it. I just want to make sure we're clear on the record here.

Q. But the first date --

A. Starting from the end?

Q. Well, no, let me finish.

A. Okay.

Q. The first date by which all of the misrepresentations or omissions had been made is August 8, 2014, correct?

A. Taking your representation that's the date of the Q, I believe that is correct.

Q. Now, what have you done to disaggregate the losses caused by each of the misrepresentations or omissions alleged by plaintiffs that are referenced in paragraph 195 or anywhere else in the Complaint?

MR. STICKNEY: Object to form; lacks foundation.

A. Well, again you know, if you had a damages report due today or before today, I





would have an answer to that. My understanding is that damages report is not due until later so I have not actually calculated damages.

Q. Right. Well, how do you disaggregate?

A. In general?

Q. Yes.

A. There are a number of possibilities. One thing is to look at analysts, see how they may have changed any of their models. That's a possibility.

Another, for example, endorsed by the First Circuit is content analysis. Sometimes it may be financial analysis if you can essentially build your own model of the valuation of a company. Sometimes it may be through statistical analysis where you take a look at how certain statements have affected the stock price in the past so you can build the statistical model and say now I know the relationship, let me plug in the difference between the actually stated and what should have been stated in order to determine the





effect, so it depends.

Q. Right. In addition to disaggregating the alleged misrepresentation, you also have to take into consideration any other confounding nonfraud-related information just included in the corrective disclosure, correct?

A. If it's likely to be material information, yes.

Q. Well, how do you determine whether it's material or not?

A. Well, some of it is, you know, the time of the conference call, generally not material. You have to use judgment the way it's done in basically every securities class action. All of that stuff about disaggregating is done in, I think, any securities class action where there's more than one piece of news.

Q. Have you ever offered an opinion where you had been retained by defense counsel criticizing the manner by which a plaintiff's expert had attempted to disaggregate multiple misrepresentations corrected on the same date?





A. I probably have. No doubt often cases where I've disagreed with the opposing expert on the particular manner of disaggregation.

Q. And which cases were those?

A. Wow, you're asking me to remember a lot here. You have a list of my damages cases easier?

Q. I do. I can run through them. I'll try to be as quickly as I can on this. I have you as a defendant in the Rocket Fuel?

A. That's not --

Q. That's not damages, I apologize.

A. No, that's fair. It's not damages. It's separate parts again.

Q. I stand corrected, misread my own handwriting.

In Re: Symbols Technologies?

A. I believe yes.

Q. Bridgepoint?

A. Yes.

Q. Puda?

A. I believe, yes.

Q. Novatel?





PX343

# PX 344

International Review of Financial Analysis 33 (2014) 171–185

Contents lists available at ScienceDirect

International Review of Financial Analysis

Review

# Textual sentiment in finance: A survey of methods and models ☆

Colm Kearney [a,*], Sha Liu [b]

[a] Faculty of Business and Economics, Monash University, Sir John Monash Drive, Melbourne, Australia
[b] Business School, Trinity College Dublin, College Green, Dublin 2, Ireland

ARTICLE INFO

*Article history:*
Received 17 December 2013
Received in revised form 10 February 2014
Accepted 10 February 2014
Available online 21 February 2014

*JEL classification:*
D80
D82
G02
G10
G12
G14
G30
G34
G38
M41

*Keywords:*
Behavioral finance
Textual sentiment
Internet messages
News
Market efficiency

ABSTRACT

We survey the textual sentiment literature, comparing and contrasting the various information sources, content analysis methods, and empirical models that have been used to date. We summarize the important and influential findings about how textual sentiment impacts on individual, firm-level and market-level behavior and performance, and vice versa. We point to what is agreed and what remains controversial. Promising directions for future research are emerging from the availability of more accurate and efficient sentiment measures resulting from increasingly sophisticated textual content analysis coupled with more extensive field-specific dictionaries. This is enabling more wide-ranging studies that use increasingly sophisticated models to help us better understand behavioral finance patterns across individuals, institutions and markets.
© 2014 Elsevier Inc. All rights reserved.

**Contents**

1. Introduction . . . 172
2. Information sources . . . 172
   2.1. Corporation-expressed sentiment . . . 173
   2.2. Media-expressed sentiment . . . 173
   2.3. Internet-expressed sentiment . . . 174
   2.4. Comparing and contrasting the three main sentiment sources . . . 174
3. The methods of content analysis . . . 174
   3.1. The dictionary-based approach . . . 175
   3.2. Dictionaries and word lists . . . 175
   3.3. Term weighting . . . 175
   3.4. Machine learning . . . 175
   3.5. Comparing and contrasting the textual analysis methods . . . 176
4. Measuring textual sentiment . . . 176
   4.1. Measures using the dictionary-based approach . . . 176
   4.2. Measures using machine learning . . . 176
5. Econometric models and hypothesis testing . . . 177
   5.1. Linear regression models . . . 177

☆ The authors gratefully acknowledge financial support from *Enterprise Ireland* grant number CC-2011-2601-B.
* Corresponding author at: Faculty of Business and Economics, Monash University, Caulfield East, Melbourne, Australia. Tel.: +61 3 99031021.
*E-mail addresses:* colm.kearney@monash.edu (C. Kearney), lius2@tcd.ie (S. Liu).

http://dx.doi.org/10.1016/j.irfa.2014.02.006
1057-5219/© 2014 Elsevier Inc. All rights reserved.

5.2. Vector autoregression models . . . 178
5.3. Logistic and probit regressions . . . 179
5.4. Volatility models . . . 179
5.5. Textual sentiment based trading strategies . . . 179
6. Main findings to date . . . 180
6.1. Sentiment and security prices and returns . . . 180
6.2. Sentiment and other market variables . . . 180
6.3. Sentiment, firm fundamentals and market efficiency . . . 181
7. Summary and conclusions . . . 181
References . . . 185

## 1. Introduction

Almost half a century ago, Stone, Dunphy, Smith and Ogilvie (1966) described how words and sentences are quintessential human artifacts, the products of social constructs and experiences that provide essential evidence about individual and collective processes such as economic and financial activities and behaviors. They defined content analysis as any technique that enables inference by objectively and systematically identifying specified characteristics within text. By analyzing the raw data of words and sentences, behavioral scientists have become increasingly skilled at uncovering the evidence of sentiment or affect within text. Sentiment is now understood to be articulated in many forms of human discourse, public speeches, news reports, blogs and other forms of written, spoken and visual communication.

In behavioral finance, researchers have in the past decade intensified their efforts to understand how sentiment impacts on individual decision-makers, institutions and markets. Broadly speaking, two types of sentiment have been studied. The first is investor sentiment—beliefs about future cash flows and investment risks that are not justified by the facts at hand (Baker and Wurgler, 2007). A substantial body of this literature focuses on finding and quantifying the effects of investor sentiment on individual stocks and the overall market using various ways to measure investor sentiment. The second type of sentiment is text-based or textual sentiment—the degree of positivity or negativity in texts. In some studies, particularly those using corporate disclosures as the information source, the term 'tone' (positive or negative) is used to refer to sentiment. In broad terms, however, textual sentiment may also include affects other than positivity–negativity, such as strong–weak, and active–passive.

The fundamental difference between investor sentiment and textual sentiment is that the former captures the subjective judgments and behavioral characteristics of investors, while the latter can include the former, but also includes the more objective reflection of conditions within firms, institutions and markets. The connection between textual sentiment and investor sentiment is complex, and the extent to which they are causally related has not yet been thoroughly examined or understood. It is also unclear how investors interpret textual sentiment. The existing studies tend not to make assumptions about investor rationality, or about the relationship between textual sentiment and investor behavior. In this sense, they transcend the boundaries between behavioral and traditional finance. The inclusion of qualitative information from textual sentiment into equity asset pricing models, for example, provides another perspective and potentially complementary information to quantitative informational measures in the price formation process. Qualitative information in publicly available documents or media articles may contain additional hard-to-quantify information. Li (2006) suggests that text-based information can potentially provide a more independent test of market efficiency than the number-based measures, because many of the latter are highly correlated so different anomalies may reflect the same empirical regularity. More generally, however, textual sentiment analysis provides an increasingly important approach to address many pivotal questions in behavioral finance.

In this paper, we review the burgeoning literature that uses textual analysis to extract sentiment from sources such as corporate disclosures, media articles, and internet postings.[1] We describe the alternative content analysis methods including the dictionary-based approaches and the machine learning techniques that are commonly used to generate the sentiment series. Corporate disclosure studies usually aim to discover the fundamental relation between sentiment and future firm performance or other quantitative variables. Media articles and internet posting studies focus on the short-term effects of sentiment on market variables such as stock prices, returns, trading volumes and volatility. Each information source and linguistic method has its unique advantages and disadvantages which influence the research focus and limitations of each study. Because of the use of different types of sentiment and varied research focuses, a wide variety of models and methods has been used to test alternative hypotheses and to derive new findings.

Our paper is structured as follows. Section 2 describes and discusses the qualitative information sources used in the literature. Each of the most popular information sources – public corporate disclosures, news articles and internet messages – is described along with their unique features that are advantageous to others. Section 3 introduces and compares the most frequently used textual analysis methods: the dictionary-based approach and the machine learning approach. Sentiment measures derived from the different linguistic analysis methods are introduced in Section 4. Section 5 presents and reviews the empirical models that have been used in the literature to date, including contemporaneous linear regressions, univariate and multivariate time-series models, logistic regressions and volatility models. The general forms of models are summarized. This section also describes the ex-post sentiment-based trading strategies that are discussed in the literature. Section 6 summarizes the main findings of the literature to date. Section 7 summarizes the paper, draws together the most important conclusions and suggests future research directions.

## 2. Information sources

The qualitative information that has been analyzed by textual sentiment researchers in finance comes predominantly from three sources: public corporate disclosures/filings, media articles and internet messages. The sentiment expressed in these texts conveys market participants' and commentators' information and opinions about many aspects of developments in firms, institutions and markets. It also reflects how sentiment responds to these events. The most important work on sentiment analysis within corporate disclosures/filings includes Feldman, Govindaraj, Livnat and Segal (2008), Henry (2008), Henry and Leone (2009), Li (2006, 2010), Davis, Piger and Sedor (2011), Davis and Tama-Sweet (2011), Demers and Vega (2011), Doran, Peterson and Price (2010), Huang, Teoh and Zhang (2011), Loughran and McDonald (2011a, 2011b), Davis, Piger and Sedor (2011), Rogers, Van Buskirk and Zechman (2011), Ferris, Hao and Liao

[1] The studies we review are confined to those examining the role of positive and/or negative sentiment, or 'uncertain', 'deceptive' affects. Some other studies (e.g. Lehavy, Li and Merkley (2011), De Franco, Hope, Vyas and Zhou (2012) and Loughran and McDonald (2013b)) which investigate the complexity/readability of texts, are not included in this survey.

**Table 1**
Qualitative information sources.

| Corporation-expressed sentiment | | | Media-expressed sentiment | | Internet-expressed sentiment (board postings) | Mixed sources |
|---|---|---|---|---|---|---|
| Annual reports/10-Ks/10-Qs | Earnings press releases/earnings conference calls | Other/mixed | News stories and commentaries | Analyst reports | | |
| Li (2006) | Henry (2006) | Durnev and Mangen (2011) | Tetlock (2007) | Tetlock (2007) | Antweiler and Frank (2004) | Kothari et al. (2009) |
| Feldman et al. (2008) | Henry (2008) | Rogers et al. (2011) | Tetlock et al. (2008) | Engelberg (2008) | Das and Chen (2007) | Ozik and Sadka (2012) |
| Li (2010) | Henry and Leone (2009) | Ferris et al. (2013) | Engelberg (2008) | Tetlock et al. (2008) | Sinha (2010) | |
| Loughran and McDonald (2011a) | Doran et al. (2010) | Loughran and Mcdonald (2013) | Sinha (2010) | Carretta et al. (2011) | Chen et al. (2013) | |
| Loughran and Mcdonald (2011b) | Davis et al. (2011) | | Garcia (2012) | Engelberg et al. (2012) | | |
| Jegadeesh and Wu (2012) | Davis and Tama-Sweet (2011) | | Rees and Twedt (2012) | Ferguson et al. (2012) | | |
| | Demers and Vega (2011) | | Huang et al. (2013) | Garcia (2012) | | |
| | Huang et al. (2011) | | | Buehlmaier (2013) | | |
| | Davis et al. (2012) | | | Liu and McConnell (2013) | | |
| | Larker and Zakolyukina (2012) | | | | | |
| | Price et al. (2012) | | | | | |

Notes: This table summarizes the information sources used in the literature. They are corporate disclosures, news stories and analyst reports, and internet board postings.

(2013), Jegadeesh and Wu (2012), Price, Doran, Peterson and Bliss (2012), and Loughran and Mcdonald (2013). The literature that extracts sentiment from news articles or analyst's reports includes Tetlock (2007), Engelberg (2008), Tetlock, Saar-Tsechansky and Macskassy (2008), Sinha (2010), Carretta, Farina, Graziano and Reale (2011), Loughran and Mcdonald (2013), Ferguson, Guo, Lam and Philip (2012), Garcia (2012), Rees and Twedt (2012), and Huang et al. (2013). A small group of studies examines internet-posting sentiment, foremost among them being Antweiler and Frank (2004), Das and Chen (2007) and Chen, De, Hu and Hwang (2013). A summary of the information sources used in each of these papers (and papers that with a minor focus on sentiment analysis) is presented in Table 1. We now discuss each information source in turn.

### *2.1. Corporation-expressed sentiment*

Public corporate disclosures are a natural source of textual sentiment for researchers insofar as they are official releases that come from insiders who have better knowledge of the firm than outsiders. The linguistic style and tone in these texts might convey useful information about expected future firm performance over and above the numbers in financial statements. This corporation-expressed sentiment is particularly useful in examining the role of qualitative information about individual firm performance and stock pricing. Offsetting this, however, is the low frequency of the data, because firms usually make these disclosures on a quarterly or annual basis.

The corporation-expressed sentiment literature mainly studies corporate annual or interim reports, or earnings press releases and earnings conference calls. The former category includes, Feldman et al. (2008), Li (2006, 2010), Loughran and McDonald (2011a, 2011b), and Jegadeesh and Wu (2012). In particular, Feldman et al. (2008) and Li (2010) focus only on the MD&A sections of 10-Ks and 10-Qs. Loughran and McDonald (2011a) also use MD&A texts in one part of their analysis. The earnings disclosures category includes Henry (2006, 2008), Henry and Leone (2009), Doran et al. (2010), Davis et al. (2011, 2012), Davis and Tama-Sweet (2011), Demers and Vega (2011), Huang et al. (2011), Larker and Zakolyukina (2012), and Price et al. (2012). In these studies, textual sentiment is considered as a new factor in addition to the usual firm-level fundamentals that are analyzed in typical event studies. Feldman et al. (2008) show how MD&As might be a superior information source relative to earnings announcements because the preliminary earnings announcements were typically not filed with the SEC prior to 2003, hence not routinely scrutinized as periodic reports with the SEC. Moreover, MD&As contain more qualitative information from management than earnings announcements, because the purpose of MD&A is to provide a management perspective within the narrative on their firms' past performance, their current financial positions, and their future prospects.

### *2.2. Media-expressed sentiment*

Media-expressed sentiment is the positivity or negativity contained in news stories, in-depth commentaries or analyst reports. These texts are relevant to general economic conditions, to overall financial market conditions and prospects, and to individual industries and firms. Obviously, sentiment in media articles about general economic conditions or financial markets is an appropriate choice for studying market-wide price patterns and activities, while industry-specific or firm-specific news stories and analyst reports are more appropriate for analyzing firm-level stock prices, returns, trading volumes and other performance indicators and attributes.

In the media-expressed sentiment literature, Tetlock (2007) and Garcia (2012) study general economics and finance news in two major U.S. newspapers, the *Wall Street Journal* and the *New York Times*, respectively. Engelberg (2008), Tetlock et al. (2008), Sinha (2010), and Engelberg et al. (2012) employ much wider news sources, and

they all research firm-specific news. Engelberg (2008) collects news articles addressing earnings announcements of 4700 unique firms; Tetlock et al. (2008) and Engelberg et al. (2012) use the *Dow Jones News Service* in addition to the *Wall Street Journal*; and Sinha (2010) analyzes firm-level sentiment in 587,719 news articles provided by the *Thomson Reuters NewsScope* service. Using wider news sources rather than a small number of particular newspapers is generally more appropriate and preferred, because it decreases the probability of getting biased sentiment from some sources that do not represent the overall market. Ferguson et al. (2012) is the first study that extracts firm-specific sentiment for non-US stocks. Their sample consists of 264,647 firm-specific UK news media articles from *The Financial Times*, *The Times*, *The Guardian and Mirror*, covering FTSE 100 firms.

Rees and Twedt (2012) and Huang et al. (2013) are the only researchers to date that have examined sentiment in analyst reports relating to specific firms. Rees and Twedt (2012) argue that financial analysts perform a pivotal role in evaluating accounting data and disseminating their analysis to the public, and that this ensures their continued interest from investors and academic researchers.

### 2.3. Internet-expressed sentiment

Internet postings are a potentially useful source of textual sentiment because many people spend a considerable amount of time every day reading and writing internet postings about stocks. The message flows comprise potentially valuable insights, market sentiment, manipulative behavior, and reactions to other sources of news (Das and Chen, 2007), possibly causing a significant impact on financial markets. Internet-expressed sentiment is potentially 'noisier' than corporation-expressed or media-expressed sentiment, because it contains more views from individual traders. This can make it a potentially powerful source from which to extract small investor sentiment. Even if a high proportion of these messages contain noise or irrational sentiment, Black (1986) argues that the narratives around a large number of small events could generate more potent causal sentiment factors than the narratives around a smaller number of large events if the former have greater proportions of noise within them.

Antweiler and Frank (2004), Das and Chen (2007) and Chen et al. (2013) have conducted computational textual sentiment analysis on internet messages. Antweiler and Frank (2004) analyzes 1.5 million messages posted on *Yahoo!Finance*[2] and *Raging Bull*[3] about the 45 companies in the *Dow Jones Industrial Average* index and the *Dow Jones Internet Index*. Das and Chen (2007)'s sample consists of all messages posted on the *Yahoo!* message boards from July to August 2001 that relate to the 24 technology-sector stocks presented in the *Morgan Stanley High-Tech Index* (MSH), resulting in a total of 145,110 messages. Chen et al. (2013) analyze 79,142 single-ticker articles published between 2005 and 2011 and their commentaries written on the *Seeking Alpha*[4] website.

### 2.4. Comparing and contrasting the three main sentiment sources

The advantages and disadvantages of each information source are sixfold. *First*, to the extent that corporate disclosures convey sentiment from management – the insiders who know most about their firms – they are a potentially valuable textual source. But it is unlikely that management reveals 'the truth, the whole truth, and nothing but the truth', and it may be tempted to seek to manipulate investors' judgments. Because these narratives are firm-specific, they are particularly relevant to studying the role of qualitative information in individual firm performance and stock pricing. In contrast, textual sentiment from news stories can be used in the context of either market-level or firm-level analysis depending on the subject matter of the news stories. So although news stories are a more flexible information source than corporate disclosures, sentiment from outsiders is less likely to capture insiders' views and perspectives. The qualitative information in analyst reports is likely to sit somewhere between corporate disclosures and news stories. Analysts may have some insider information that is communicable to investors and other market participants and commentators through sentiment.

*Second*, news stories cover many different kinds of events. From the event-study perspective, researchers can potentially examine the impact of a whole range of events on firm earnings and stock returns. In this case news, stories are superior to corporate disclosures insofar as the latter contain limited event types such as earnings conference calls and annual reports. Tetlock et al. (2008) argue that 'examining all news-worthy events simultaneously limits the scope for dredging for anomalies' (Fama, 1998: 1438).

*Third*, news stories predominantly reflect hindsight rather than foresight. They are usually written about what has happened or what is scheduled to happen rather than what might happen in the future. In contrast, corporate disclosures such as the MD&A sections of 10-Ks, the transcripts of conference earnings calls, and analyst reports tend to contain more forward-looking statements. Sentiment in these narratives has more potential predictability on future outcomes such as firm performance and stock prices or returns.

*Fourth*, because corporate releases are usually on a quarterly or annual basis, the sentiment series extracted from them is not ideal for time-series modeling because of its low frequency. It is, however, appropriate for cross-sectional analysis and event studies that examine the effect of sentiment on stock returns around corporate releases. Once again, media articles are a more flexible information source for extracting textual sentiment that can be used in modeling monthly, weekly, daily and even intra-day levels, as long as the relevant texts are available at the required frequencies.

*Fifth*, because the online media tends to be open and unregulated, internet-expressed sentiment is likely to be noisier than corporation-expressed or media-expressed sentiment. It is also likely to contain little new information that is incremental to published public news. A large proportion of internet messages are written and posted by noise traders or uninformed investors who might be susceptible to particular opinions and sentiments, and their 'information' is likely to be less accurate or reliable. In other words, their comments and advice may have a low ratio of information to noise. It follows that internet postings are not an ideal source of information for testing market efficiency. Insofar as they better represent small investor sentiment, they might provide more evidence for the behavioral finance framework.

*Sixth*, the pre-processing of internet postings prior to content analysis is more costly than corporate disclosures and media articles, because people tend to write less accurately, clearly and formally on internet boards, and the meaning of the texts can be ambiguous. Corporate documents and media articles are written more professionally and require less pre-processing time. This is probably the reason why internet postings have been the least frequently studied source of textual sentiment analysis. Since each of the information sources has its advantages and disadvantages, the best practice may be to employ as many information sources as possible. Kothari, Li and Short (2009) investigate an extensive set of sources from the print media, including a combination of corporate disclosures, analyst reports and news stories in financial press. Their sample comprises all available disclosure texts for 887 firms, amounting to 326,357 texts in total.

## 3. The methods of content analysis

The most common content analysis methods in the textual sentiment literature are the *dictionary-based approach* and *machine learning*. Table 2 summarizes the methodology employed in each study in the textual sentiment literature in finance.

[2] http://finance.yahoo.com.
[3] http://www.ragingbull.com.
[4] http://seekingalpha.com.

### 3.1. The dictionary-based approach

The dictionary-based approach uses a mapping algorithm in which a computer program reads text and classifies the words, phrases or sentences into groups based on pre-defined dictionary categories (Li, 2010). This is often referred to as the 'bag-of-words' model in natural language processing. Documents are considered to be the bag of words, and the structure along with any linear ordering of words within the context is ignored (Manning & Schutze, 1999). There are two important issues in the dictionary-based approach. The first is the word lists, i.e. the words contained in each sentiment category; and the second is how each word in the word lists should be weighted. We discuss each of these in turn.

### 3.2. Dictionaries and word lists

The most popular word lists in the earlier studies are the General Inquirer (GI) built-in dictionary developed and used by Philip Stone, a specialist in social psychology (Stone et al., 1966). Most of its word lists come from the *Harvard IV-4* dictionaries.[5] and examples of GI word lists. A number of financial researchers have used the GI program and word lists (or the GI/Harvard word lists only) to derive sentiment in texts, including Tetlock (2007), Engelberg (2008), Feldman et al. (2008), Tetlock et al. (2008), Henry and Leone (2009), Kothari et al. (2009), Doran et al. (2010), Carretta et al. (2011), Demers and Vega (2011), Loughran and McDonald (2011a), Engelberg et al. (2012), Ferris et al. (2013), Ozik and Sadka (2012), Price et al. (2012), and Rees and Twedt (2012).

Another frequently used dictionary is built from the popular textual analysis program, *DICTION* (Hart, 2000), which was developed by Roderick Hart, a specialist in politics and mass media. *DICTION 5.0* counts words based on 33 separate dictionaries and two sets of variables, and produces outputs of raw frequencies, percentages, and standardized scores for these lists of words. Included with the dictionary scores are scores for five master variables – *activity*, *certainty*, *commonality*, *optimism* and *realism* – and other calculated variables. Henry and Leone (2009), Davis et al. (2011, 2012), Davis and Tama-Sweet (2011), Demers and Vega (2011), Durnev and Mangen (2011), Rogers et al. (2011), and Ferris et al. (2013) all employ *DICTION* in their research.

It is important to note that both the *GI* and *DICTION* are general English language linguistic dictionaries rather than dictionaries that are specific to the domain of financial disclosure. Li (2010) finds that the classification of tone based on the *GI/Harvard* does not provide sufficient accuracy. This is not surprising, because general word lists omit words that are considered positive or negative in the context of financial disclosure, and include other words that would not (Henry and Leone, 2009). For example, words such as 'tax' and 'liability' are on the negative wordlist of the *GI/Harvard*, but are not negative in the financial context. Loughran and McDonald (2011a) find that almost three-fourths (73.8%) of the negative word counts in the *GI/Harvard* list are attributable to words that are typically not negative in a financial context. To overcome this problem, dictionaries/word lists specific to the finance domain have been built by researchers so that more accurate and efficient sentiment scores can be generated. Studies that focus on comparing various dictionaries include Henry and Leone (2009) and Loughran and McDonald (2011a). The former uses three word lists – *DICTION*, *GI/Harvard* and Henry (2006, 2008) – to gauge the tone of earnings press releases. The authors find that the context-specific word list developed by Henry (2006, 2008) is more powerful than the general word lists used in previous research. Later research by Price et al. (2012) also concludes that the Henry (2008) dictionary is more powerful in detecting cumulative abnormal returns beyond the initial reaction window. Loughran and McDonald (2011a) use *GI/Harvard* negative words which have been expanded by inflecting each word to forms that retain the original meaning of the root word, and the finance-specific word lists developed by themselves (L&M lists) to assess sentiment in 10-Ks.[6] They argue that although the apparent power of the two negative word lists is similar, the use of the finance-specific list to avoid those words in the *GI/Harvard* list that might proxy for industry or other unintended effects. The L&M lists have become predominant in more recent studies by Doran et al. (2010), Huang et al. (2011), Ferguson et al. (2012), Garcia (2012), Jegadeesh and Wu (2012), Chen et al. (2013), Liu and McConnell (2013), and Loughran and Mcdonald (2013).

### 3.3. Term weighting

Most studies employ proportional weighting, which treats every word in the list to be equally important. Typical examples are the studies that use the *GI/Harvard*, which calculates simple frequencies for words appearing in the text that fall within each category. Term weighting, however, allows for the possibility that raw word counts are not the best measure of a word's information content (Loughran and McDonald, 2011a). Loughran and McDonald (2011a) use two weighting schemes, a simple proportional weighting and one that weights each word inversely proportional to its document frequency, or the frequency with which each it appears in the sample of documents. Jegadeesh and Wu (2012) argue that in the context of inferring tone, there is no reason to expect why words that are found in fewer documents should be more powerful than those found in more documents. These researchers use a weighting scheme that is particularly suitable for finance applications. They assign weights for each word based on how the market has reacted to them in the past. Their results indicate that the appropriate choice of term weighting is more important than a complete and accurate dictionary to which the weighting scheme is applied.

Fig. 1 shows a generic process of using the dictionary-based approach to extract sentiment from texts. The first step is to collect qualified texts to form the corpus. Pre-processing of the collected files is usually necessary in order to split the articles and group them by date. Subsequently, the sentiment categories (i.e. the word lists) in the content analysis program should be selected. Researchers can also write their own programs which allow the addition of customized word lists. Sentiment scores are obtained by selecting the text files and running the program. It is also possible to construct other sentiment measures based on the original sentiment scores. Finally, the sentiment measures and other variables can be used for financial modeling and hypothesis testing.

### 3.4. Machine learning

Pioneered by mathematicians and computer scientists, machine learning relies on statistical techniques to infer the content of documents and to classify them based on statistical inference (Li, 2010). The steps involved in this method are as follows. A proportion of the complete corpus of text to be analyzed is designated as the 'training set'. Each word in the training set is manually classified as 'positive', 'negative', or some other dimension of sentiment (such as 'strong', 'weak', 'active', 'passive'). A selection of sentiment analysis algorithms (e.g. the Naïve Bayesian algorithm) is then trained on the training corpus. The algorithms 'learn' the sentiment classification rules (or 'grammar') from the pre-classified data set, and apply these rules out-of-sample to the whole corpus. When all words in the complete corpus are classified, sentiment measures can be derived using various combinations of the classifications used in the training corpus. In essence,

[5] http://www.wjh.harvard.edu/~inquirer/3JMoreInfo.html.

[6] The L&M finance dictionary consists of all words that occur in 5% or more of the 10-Ks from 1994 to 2008 (Loughran and McDonald (2011a)).

machine learning involves one or more algorithms reading a training set and writing a 'model' containing its statistics, which is then applied to the whole corpus to derive textual sentiment scores.

Although machine learning can be carried out by customized programs, two established programs are worth mentioning. The first is the *Rainbow* package developed by McCallum (1996). *Rainbow* supports several alternative classification methods. The default is *Naive Bayes*, but k-nearest neighbor, *TFIDF*, and *probabilistic indexing* are all available. Another text-processing tool is the *Reuters NewsScope Sentiment Engine*.[7] This engine has three major processes: pre-processing; the lexical and sentiment pattern identifier; and the sentiment classifier. In the first two processes, documents are split into sentences which are further split into words; the subject of the sentence is identified; and each word is identified as a noun, verb, adjective, adverb, and intensifier. The last process, sentiment classification, is done by a three layer back-propagation neural network. It follows the general steps of machine learning, and produces as output the probability of the text being positive, negative, or neutral.

Antweiler and Frank (2004) use the default method *Naïve Bayesian* algorithm within the *Rainbow* package to classify messages into one of three categories: *buy*, *sell* and *hold*. The *Naïve Bayesian* algorithm is also employed by Li (2010) to classify sentences into one of four tones: *positive, neutral, negative*, and *uncertain*. Das and Chen (2007) use five algorithms to classify internet messages into *bullish*, *bearish* or *neutral*. Sinha (2010) uses the *Reuters NewsScope Sentiment Engine* to calculate the probabilities of news articles being positive, negative and neutral, respectively. Huang et al. (2013) use the Naïve Bayes machine learning approach to extract textual opinions from analyst reports about *S&P 500* firms.

### 3.5. Comparing and contrasting the textual analysis methods

The dictionary-based and machine learning approaches have their advantages and disadvantages. *First*, the dictionary-based approach is probably the easiest for business, economic and financial analysts to handle because the well-established programs like *GI* and *DICTION* are readily available and have been most frequently used in the literature. As discussed previously, however, the general dictionaries are not appropriate for textual analysis in financial contexts. This problem can be largely mitigated by applying finance-specific word lists such as the *L&M* lists, and the key issue with this methodology lies in the choice of the most appropriate weighting scheme. The latter most likely depends on the nature of the corpus being analyzed and the hypotheses being tested.

*Second*, implementing machine learning is more time-consuming and costly than the dictionary-based approach, because the text in the 'training set' must be manually classified. In addition, to ensure the highest quality of classification, the criteria for selecting appropriate people to read the texts are strict (e.g. native speakers with economic and finance backgrounds). The accuracy rate of machine learning is usually higher than the dictionary-based approach (Li, 2010). For example, the *Reuters NewsScope Sentiment Engine* boasts a 75% accuracy rate compared to the average assessment of human analysts (Sinha, 2010). Huang et al. also document that their classification accuracy achieved using the Naïve Bayes machine learning approach is 80.9% in the in-sample validation and 76.9% in the out-of-sample validation, which is substantially higher than that achieved using the dictionary-based approaches based on the general dictionaries (e.g. 48.4% for *GI* and 54.9% for *DICTION*).

[7] http://www2.reuters.com/productinfo/newsscopesentiment.

## 4. Measuring textual sentiment

Having extracted sentiment from a corpus of text, the construction of sentiment measures is relatively straightforward. Due to differences in the methods of content analysis, however, the characteristics of the resulting sentiment measure are correspondingly diverse. We now summarily describe and compare the most common measures of sentiment.

### 4.1. Measures using the dictionary-based approach

In studies using the dictionary-based approach with the *GI* or custom word lists and proportional weighting, the most common measure is the percentage of the number of words in a given sentiment category to the total number of words in the text (e.g. Kothari et al. (2009), Ferguson et al. (2012), Chen et al. (2013)), or the standardized percentage (Z-score) (e.g. Tetlock et al. (2008)). Standardization is necessary if the raw frequency of matched words in the total number of words is not stationary, which can happen when regime changes occur over time in the distribution of words in the text (Tetlock et al., 2008). This can happen, for example when the writing style changes with the author. The raw percentage of words is always greater or equal to 0, but the standardized percentage can be either greater or less than 0. Positive/negative Z-scores indicate that the degree of optimism/pessimism or other affects in the text is above/below average. Another relative measure in contrast to the absolute measure (i.e. raw percentage) is the count of positive words minus the count of negative words, divided by the sum of positive and negative word counts or total world count (e.g. Rees and Twedt (2012)) . With the relative measure, one can more easily identify whether a piece of text is relatively positive (if greater than 0) or relatively negative (if less than 0), and the magnitude of sentiment relative to the length of the text. In studies using *DICTION*, sentiment measures or their constituent factors are also raw frequencies and standardized scores given by the program. For example, because there is no direct sentiment category of 'positive' or 'negative', Davis et al. (2011) calculate the optimistic measure as the frequencies of words of praise, satisfaction and inspiration, and the pessimistic measure as the frequencies of words of blame, hardship and denial.

Tetlock (2007) constructs his sentiment measure by employing principle component analysis (PCA) to extract the most important semantic component from the $(77 \times 77)$ variance–covariance matrix of the categories in the *GI* dictionary. By doing this, he extracts an underlying media factor as the linear combination of all *GI* categories which accounts for the maximum variation in the total variance of all the categories. In fact, the first factor is approximately equal to a linear combination of only 4 *GI* categories: *Negative*, *weak*, *fail* and *fall*. The advantage of PCA is that it does not decide ex-ante what type of sentiment to extract, but objectively extracts the measures of sentiment that account for the greatest variation in the total variance of all categories. This principle factor thus represents the overall style of the text. Doran et al. (2010) and Price et al. (2012) also use PCA to define sentiment measures. However, if one wants to focus on a certain type of sentiment, PCA would not be appropriate.

### 4.2. Measures using machine learning

Studies that perform machine learning construct the sentiment measure based on the classification of the texts. For example, Li (2010) defines the affect of a sentence to be 1 if the learning algorithm predicts the sentence to be positive, 0 if neutral, and −1 if negative or uncertain. For each document, the author defines the overall affect as the average score of individual sentences. Das and Chen (2007) construct their daily sentiment series in a similar way. Sinha (2010) defines the sentiment score as the difference between the probability of the news article being positive and negative.

**Table 2**
Content analysis methods.

| Dictionary-based approach | | | | Machine learning |
|---|---|---|---|---|
| DICTION | GI/Harvard | Finance-specific words | Other | |
| Henry and Leone (2009)<br>Davis et al. (2011)<br>Davis and Tama-Sweet (2011)<br>Demers and Vega (2011)<br>Durnev and Mangen (2011)<br>Rogers et al. (2011)<br>Davis et al. (2012)<br>Ferris et al. (2013) | Tetlock (2007)<br>Engelberg (2008)<br>Feldman et al. (2008)<br>Tetlock et al. (2008)<br>Henry and Leone (2009)<br>Kothari et al. (2009)<br>Doran et al. (2010)<br>Carretta et al. (2011)<br>Demers and Vega (2011)<br>Loughran and McDonald (2011a)<br>Engelberg et al. (2012)<br>Ferris et al. (2013)<br>Ozik and Sadka (2012)<br>Price et al. (2012)<br>Rees and Twedt (2012) | Henry (2006)<br>Henry (2008)<br>Henry and Leone (2009)<br>Doran et al. (2010)<br>Demers and Vega (2011)<br>Huang et al. (2011)<br>Loughran and McDonald (2011a)<br>Rogers et al. (2011)<br>Davis et al. (2012)<br>Engelberg et al. (2012)<br>Ferguson et al. (2012)<br>Ferris et al. (2013)<br>Garcia (2012)<br>Jegadeesh and Wu (2012)<br>Ozik and Sadka (2012)<br>Price et al. (2012)<br>Chen et al. (2013)<br>Liu and McConnell (2013) | Li (2006)<br>Loughran and Mcdonald (2011b)<br>Larker and Zakolyukina (2012)<br>Buehlmaier (2013) | Antweiler and Frank (2004)<br>Das and Chen (2007)<br>Li (2010)<br>Sinha (2010)<br>Huang et al. (2013) |

Notes: This table summarizes the content analysis methods used in the literature. For the dictionary-based approach, the programs or dictionaries used include DICTION, General Inquirer (GI)/*Harvard IV-4* dictionaries, finance-specific word lists and other specific words.

## 5. Econometric models and hypothesis testing

Having decided on the information source from which to construct the measure of sentiment (most commonly from corporate disclosures, news articles or internet messages), and having decided upon the content analysis method (usually some variant of the dictionary-based or machine learning approaches), the researcher constructs one or more measures of sentiment. Armed with a relatively new kind of data, the next step is to investigate any number of hypotheses about how the sentiment interacts with the financial variables and vice versa. The range of modeling approaches is very wide, and in this section we present a summary review of what has been investigated to date. We shall see that this research agenda is very new, and that a great deal of innovative approaches, models and hypotheses remain to be examined.

### *5.1. Linear regression models*

The most common approach has been to employ the linear regression model on time series data comprising general market-level sentiment and stock index performance. Where cross-sectional sentiment and firm-level performance variables are available, some researchers have used panel regression methods to control for the individual heterogeneity of firms (e.g. Henry (2008), Demers and Vega (2011)). We can describe and summarize the general approach that has been adopted in single-equation studies within the sentiment-finance literature in Eq. (1) below.

$$y_t = \alpha_0 + \sum_{j=1}^{J} \alpha_{1,j}\, y_{t-j} + \sum_{j=0}^{J} \sum_{f=1}^{F} \alpha_{2,j}^{f} X_{t-j}^{f} + \sum_{j=0}^{J} \sum_{a=1}^{A} \alpha_{3,j}^{a} S_{t-j}^{a} + \varepsilon_t. \quad (1)$$

In Eq. (1), $y$ is the dependent variable, $\boldsymbol{X}$ is a vector of $f = 1 \ldots F$ control variables, and $\boldsymbol{S}$ is a vector of various measures of affect or sentiment. Eq. (1) states that firm-level or market-level performance in period $t$ depends on a constant term, $\alpha_0$; on $j = 1 \ldots J$ lagged dependent terms, $\sum_{j=1}^{J} \alpha_{1,j}\, y_{t-j}$; on $j = 0 \ldots J$ contemporaneous or lagged terms of $f = 1 \ldots F$ control variables in the $\boldsymbol{X}$ vector, $\sum_{j=0}^{J}\sum_{f=1}^{F} \alpha_{2,j}^{f} X_{t-j}^{f}$; on $j = 0 \ldots J$ contemporaneous or lagged terms of $a = 1 \ldots A$ affect or sentiment terms in the $\boldsymbol{S}$ vector, $\sum_{j=0}^{J}\sum_{a=1}^{A} a_{3,j}^{a} S_{t-j}^{a}$; and on a residual unexplained component, $\varepsilon_t$. In practice, the number of lagged terms can differ for each term on the right hand side of the equation, but we have set them all to $J$ here for notational convenience. The subscript $i = 1 \ldots N$ denoting the number of observations has also been omitted for notational convenience.

The dependent variable in the textual sentiment—finance literature is typically some type of firm-level or market-level performance measure such as future earnings (e.g. Li (2010), Demers and Vega (2011), Huang et al. (2011)), future earnings changes (e.g. Li (2006, 2010)), future returns on assets (e.g. Davis et al. (2011)) and future cash flows (e.g. Huang et al. (2011)). Tetlock et al. (2008) employ standardized unexpected earnings (SUE)[8] as the dependent variable. Other dependent variables have also been employed. For example, in Antweiler and Frank (2004), 15-minute interval stock returns, price volatilities, two measures of trading volumes[9] and a liquidity measure,[10] are each employed in turn as dependent variables. Kothari et al. (2009) investigate the impact of textual sentiment on three dependent variables: firms' costs of capital, the standard deviations of stock returns, and the standard deviations of analysts' forecast errors. Tetlock (2007) uses negative sentiment to attempt to predict the Small-Minus-Big (SMB) factor, the idea being that because small stocks have the highest individual investor ownership, if the pessimism factor proxies for small investor sentiment, it should predict the returns on small stocks. Li (2010) employs a future liquidity measure[11] as the dependent variable. Loughran and Mcdonald (2013) have used absolute value of revision (the percentage revision in the IPO offer price from the mid-point of the filing range) as the dependent variable.

Researchers using the event study methodology have also defined the dependent variable in Eq. (1) as the cumulative abnormal return (CAR) (or event period excess return) over some event window. Engelberg (2008), Feldman et al. (2008), Henry (2008), Henry and Leone (2009), Doran et al. (2010), Davis et al. (2011, 2012), Davis and Tama-Sweet (2011), Demers and Vega (2011), Huang et al. (2011), Loughran and McDonald (2011a, 2011b), Engelberg et al. (2012),

[8] $UE_t = E_t - E_{t-4}, SUE_t = (UE_t - \mu_{UE_t})/\sigma_{UE_t}$, where $E_t$ is the firm's earnings in quarter $t$, $UE_t$ is the unexpected earnings. The mean (μ) and standard deviation (σ) of unexpected earnings are calculated on the basis of previous 20 quarters data.

[9] The log number of small, medium and large trades and the log number of traded shares.

[10] The daily average of the bid–ask spread.

[11] i.e. Cash flow from operations in the next four quarters scaled by the book value of current liabilities at the end of that quarter.




**Fig. 1.** Sentiment extraction (dictionary-based approach).

Jegadeesh and Wu (2012), and Price et al. (2012) all employ the standard event study methodology to examine the extent to which sentiment in corporate disclosures (or news articles about disclosures) impacts on firms' cumulative abnormal returns around the 'event' or during a post-event period. The calculation of abnormal returns is critical in event studies. The abnormal return is the difference between the actual return on the security over the event window and the normal return on the firm. There are choices for modeling the latter. For example, Davis et al. (2011), Engelberg (2008), Feldman et al. (2008) and Demers and Vega (2011) follow Fama and French (1992) in constructing the book-to-market and size-sorted portfolios. Henry (2008) and Loughran and McDonald (2011a) choose the return of an equal-weighted or value-weighted market index as the normal return to calculate abnormal returns for each stock. Tetlock et al. (2008), Chen et al. (2013), Rees and Twedt (2012) and Huang et al. (2013) apply a method similar to event studies. Tetlock et al. (2008) and Chen et al. (2013) set the news stories date as the 'event', while Rees and Twedt (2012) and Huang et al. (2013) set the analyst reports publication date as the 'event'. They test whether the negative sentiment measure has real impact on the firm's next-day return or abnormal returns over a certain holding period.

The ***X*** vector of control variables has included firm characteristics and previous market variables such as the cash flow from operations, the book-to-market ratio, the market value of equity, accruals and leverage, current earnings surprises, analyst earnings forecast revisions and dispersions, recent and more distant stock prices, returns and volatilities, and stock market index returns and trading volumes. The idea is to test if the sentiment measure still has significant predictability on the dependent variable measuring firm-level or market-level performance after controlling for the vector of fundamental variables and previous market activities. In studies that examine textual sentiment in analyst reports (Huang et al., 2013; Rees and Twedt, 2012), the control variables typically include the deviation of analyst's earnings per share forecast, the deviation of analyst's stock recommendation, the revisions of recommendation, earnings forecast and target price, and the indicator variables for recommendation upgrades, reiterations and downgrades.

Some researchers have also considered and examined the possibility of reverse causation, whereby firm-level or market-level performance can impact on future measures of sentiment. Eq. (2) captures these possibilities in general form.

$$s_t = \beta_0 + \sum_{j=1}^{J}\beta_{1,j}\, s_{t-j} + \sum_{j=0}^{J}\sum_{f=1}^{F}\beta_{2,j}^{f}X_{t-j}^{f} + \sum_{j=0}^{J}\sum_{p=1}^{P}\beta_{3,j}^{p}Y_{t-j}^{p} + \varphi_t. \qquad (2)$$

Here, $s$ is the dependent variable obtained as some measure of affect or sentiment from the ***S*** vector in Eq. (1), and ***Y*** is a vector of firm-level or market-level performance variables from which the dependent variable in Eq. (1) is obtained. Eq. (2) states that sentiment in period $t$ depends on a constant term, $\beta_0$; on $j = 1 \ldots J$ lagged dependent terms, $\sum_{j=1}^{J}\beta_{1,j}\, s_{t-j}$; on $j = 0 \ldots J$ contemporaneous or lagged terms of $f = 1 \ldots F$ control variables in the ***X*** vector, $\sum_{j=0}^{J}\sum_{f=1}^{F}\beta_{2,j}^{f}X_{t-j}^{f}$; on $j = 0 \ldots J$ contemporaneous or lagged terms of $p = 1 \ldots P$ firm-level or market-level performance variables, $\sum_{j=0}^{J}\sum_{p=1}^{P}\beta_{3,j}^{p}Y_{t-j}^{p}$. As in Eq. (1), we have set the number of lagged terms to $J$ and omitted the subscript $i = 1 \ldots N$ for notational convenience.

Because corporate documents contain much information about firm-level fundamentals, it is natural to hypothesize that firm fundamentals also have impact on the sentiment of corporate disclosures. Antweiler and Frank (2004), Li (2006, 2010), Davis and Tama-Sweet (2011), Davis et al. (2012), Garcia (2012), Jegadeesh and Wu (2012) apply versions of Eq. (2) to test whether firm characteristics in the ***X*** vector (e.g. book-to-market equity ratio, the market value of equity, debt to asset ratio, earnings scaled by book value of assets, sales, accruals, stock return volatility) or the firm-level or market-level performance variables in the ***Y*** vector have explanatory power on their sentiment measure and changes in this.

### *5.2. Vector autoregression models*

The vector autoregression (VAR) model has also been used to capture the evolution and interdependencies between firm-level or market-level performance, control variables and sentiment. The VAR is

a more advanced time-series model than single equation models insofar as all variables in the VAR are determined endogenously by their own history and by the history of all the other variables in the model. The standard *p*-th order VAR is written as Eq. (3).

$$A(L)Z_t + BX_t = u_t \tag{3}$$

with

$$A(L) = 1 - A_1L - A_2L^2 - \ldots\ldots - A_pL^p$$
$$E(u_t) = 0, \quad E(u_t u'_t) = \Sigma, \quad E(u_t u'_s) = 0, \text{ for } t \neq s, \quad E(x_t u_t) = 0,$$
$$Z_t = (Y_t, S_t),$$

and $X_t$ being the vector of controls in Eqs. (1) and (2).

This is a standard VAR representation in which $Z$ is a $(1 \times n)$ vector of endogenous variables, with $n$ depending on how many measures of firm-level or market-level performance and semantic measures are included from the ***Y*** and ***S*** vectors in Eqs. (1) and (2). ***A*** is an $(n \times n)$ matrix of coefficients, $u$ is an $(n \times 1)$ vector of white noise disturbance terms, and $L$ denotes the lag operator (for example, $L^i x_t = x_{t-i}$). It is well established that this VAR model can be estimated by ordinary least squares, which yields consistent and asymptotically efficient estimates of the $A$ matrix because the right-hand-side variables are predetermined and are the same in each equation of the model.

Tetlock (2007) sets up a VAR model with 5 lags to investigate the interdependencies between negative sentiment, the *Dow Jones Industrial Average* (*DJIA*) returns, and the NEW York Stock Exchange (*NYSE*) trading volumes. By employing the VAR system, the author attempts to predict the *DJIA* returns using negative sentiment, to predict negative sentiment using the *DJIA* returns, and to predict *NYSE* volumes using negative sentiment. He finds that negative sentiment causes *DJIA* returns, which have feedback effects on negative sentiment, and that negative sentiment also causes trading volumes. There remains a great deal of research to be done on extending the range of variables included in VAR models, and in investigating more generally how the many variables within the ***Y***, ***S*** and ***X*** vectors interact.

### 5.3. Logistic and probit regressions

The logistic (logit) or probit regressions have been used in several studies to examine if textual sentiment helps predict or identify whether a specific event is likely to happen. These regressions do not assume a linear relationship between the dependent and independent variables, and the dependent variable must be a dichotomy (2 categories). The regressions are usually in the following form:

$$B_i = \gamma_0 + \gamma_1 s_i + \sum\nolimits_{f=1}^{F} \gamma_{2,f} X_{f,i}. \tag{4}$$

Here, the dependent variable $B$ is a binary variable, whose value is equal to 1 if a certain event has happened, and 0 otherwise. The textual sentiment measure $s$ is the degree of sentiment contained in one or more document(s) of firm $i = 1 \ldots N$. ***X*** is a vector of $f = 1 \ldots F$ other independent variables, including firm characteristics and dummy variables. The idea is to examine if textual sentiment is significantly associated with a certain event, after controlling for other relevant variables. Unlike linear regressions, the logit and probit regressions are estimated by the maximum likelihood method.

Huang et al. (2011), Loughran and McDonald (2011a, 2011b, 2013), Rogers et al. (2011), and Buehlmaier (2013) have all employed Eq. (4) in their research. For example, Loughran and McDonald (2011a) have employed two groups of logit regressions to examine if companies accused of accounting improprieties or firms that self-report material weaknesses in internal controls use different language from other firms in their 10-Ks. For the first group, the binary dependent variable is equal to 1 if the firm was accused of accounting fraud in the year after the 10-K filing date; for the second group, the dependent variable is equal to 1 if within 18 months of the 10-K file date a disclosure of material weakness is reported. They find that word lists (affects) can play a role in identifying firms experiencing unusual events. Loughran and Mcdonald (2013) have examined whether an overabundance of negative sentiment in the S-1 filing would lead to the withdrawal of an IPO. In the logit regressions, the dependent variable is set to 1 if the IPO has filed a Form RW (registration withdrawal request) and did not subsequently issue a Form 424. They find that there is no material difference in the S-1 texts between the withdrawn IPOs and completed IPOs.

### 5.4. Volatility models

Antweiler and Frank (2004) employ volatility models to test the effects of sentiment or sentiment-related variables on the second moment of stock returns. They employ both GARCH-type models and the ‘realized volatility’ approach, but only report results of the latter, as both results are consistent with each other. In their GARCH-type approach, they let the sentiment measure ‘bullishness’ enter the mean equation first, and they insert the ‘agreement’ measure, among other exogenous variables, into the volatility equation, making the model into GARCH-X, GJR–GARCH-X and EGARCH-X forms.[12] In the ‘realized volatility’ approach, the authors investigate the extent to which the internet postings have an impact on the realized volatility (proxied by the log of the standard deviation of intra-day returns) by incorporating the ‘agreement’ measure, the number of messages and the number of trades as explanatory variables. They find that the number of messages is a predictive factor of volatility, but agreement among the posted messages is not significant.

### 5.5. Textual sentiment based trading strategies

Another intuitive way to examine the extent to which positive and negative verbal information leads to significant differences in risk-adjusted stock returns is to design trading strategies based on textual sentiment. This methodology can be considered complementary to econometric modeling to examine the extent to which textual sentiment has financial market impacts. Tetlock et al. (2008) label all news stories with a fraction of negative words (Neg) in the previous year's top (bottom) quartile as negative (positive) stories. They consider a simple strategy that longs all firms with positive news stories on the prior trading day and shorts all firms with negative news stories. They model holding both the long and short portfolios for one full trading day and rebalancing at the end of the next trading day. They use the Fama and French (1993) and the DeGennaro and Shrieves (1997) models to adjust the trading strategy returns for the returns on the market, size, book-to-market, and momentum factors. Engelberg (2008) form a similar trading strategy which longs firms with articles that have no negative words and shorts firms with articles that have above 5% negative words. This author models holding the portfolio for 80 days after the earnings announcement, and examined portfolio returns for the first and second 40 days separately. The portfolio returns are risk-adjusted by the DeGennaro and Shrieves (1997) model. Li (2006), Feldman et al. (2008), Sinha (2010), Demers and Vega (2011), Loughran and McDonald (2011a), Engelberg et al. (2012), Ferguson et al. (2012), and Rees and Twedt (2012) have also constructed similar portfolios and examined their abnormal returns. Their results generally show that the textual-sentiment based strategies can produce

[12] The GARCH (Generalized Autoregressive Conditional Heteroskedasticity) model, introduced by Bollerslev (1986), is a process of the conditional variance (volatility) of the dependent variable (stock returns, in this case). The conditional variance is expressed as its own lags and lags of the squared error term. Compared with GARCH, the GJR–GARCH model (Glosten, Jagannathan and Runkle (1993)) also models asymmetry in the volatility process. The EGARCH model (Nelson (1991)) models the process of log conditional variance. In the GARCH-X, GJR–GARCH-X and EGARCH-X models, exogenous variable X is also incorporated in the volatility process.

significant abnormal returns. A strategy based on short selling and negative news by Engelberg et al. (2012) would have earned an astonishing 180% during their 2.5-year sample period. However, Loughran and McDonald (2011a) and Rees and Twedt (2012) do not find evidence of return predictability based on the trading strategies. Nevertheless, it appears from this analysis that further work on the relationship between textual sentiment and financial market activity might be useful to market participants as well as researchers.

## 6. Main findings to date

Table 3 summarizes the information source, time frame, content analysis method, models and main findings of the most significant and influential studies. Since space prevents a complete description of each paper, we instead point to the main topics and findings.

Engelberg (2008), Feldman et al. (2008), Henry (2008), Henry and Leone (2009), Doran et al. (2010), Davis et al. (2011, 2012), Davis and Tama-Sweet (2011), Demers and Vega (2011), Huang et al. (2011), Loughran and McDonald (2011a, 2011b), Jegadeesh and Wu (2012), Price et al. (2012), and Rees and Twedt (2012) all contribute to the analysis of announcement effects on asset prices, as they apply the standard event-study method to study the impact of textual sentiment in earnings announcement or financial reports on asset prices.

Li (2006, 2010), Tetlock (2007), Tetlock et al. (2008), Sinha (2010), Davis et al. (2011), Demers and Vega (2011), Huang et al. (2011), Ferris et al. (2013), and Chen et al. (2013) have all studied the connection between textual sentiment and future firm fundamentals or stock performance, contributing to the study of information and market efficiency. Tetlock (2007), Tetlock et al. (2008), Ferguson et al. (2012), and Garcia (2012) concentrate on the interrelations between news stories sentiment and immediate market response, adding knowledge about the role of media in financial markets. Garcia (2012) tries to compare the different market reactions during recession and non-recession periods.

Antweiler and Frank (2004), Das and Chen (2007) and Chen et al. (2013) concentrate on the connection between internet board posting activities and the stock market. They study not only sentiment in these messages, but also the degree of ‘agreement’ of opinions, ‘article attention’, the number of messages, and the number of words. Rees and Twedt (2012) and Huang et al. (2013) extract textual sentiment from financial analyst reports and examine whether sentiment in analyst reports has incremental information content. The latest research by Ferris et al. (2013) and Loughran and Mcdonald (2013) have focused on the effects of textual sentiment on IPO pricing and subsequent performance. They use IPO prospectus and S-1 filing texts as the information source, respectively. Davis and Tama-Sweet (2011), Huang et al. (2011), Rogers et al. (2011), and Larker and Zakolyukina (2012) have made novel contributions to the study of managers' strategic reporting, tone management or misreporting.

Henry and Leone (2009), Loughran and McDonald (2011a) and Jegadeesh and Wu (2012) endeavor to improve the accuracy of the dictionary-based approach to content analysis. The first two studies construct word lists that are appropriate in the finance domain, while the second and third studies question the use of the proportional term-weighting scheme that has been extensively used in earlier studies.

### 6.1. Sentiment and security prices and returns

Textual sentiment or the tone of qualitative information has been found to have important effects on stock prices and returns. Both the media-expressed and the internet-expressed sentiment literatures have found strong evidence of the *immediate* effects of sentiment. Particularly, negative sentiment has proved to be the strongest influence. Negative sentiment or a large increase in negative sentiment causes downward pressure on market prices immediately. Tetlock (2007), Tetlock et al. (2008) and Garcia (2012) have all concluded this. Chen et al. (2013) find that the negative sentiment in internet articles is negatively associated with both contemporaneous and next-day abnormal returns, but Antweiler and Frank (2004) discover that a positive shock to message board postings predicts negative returns on the next day. The corporation-expressed sentiment literature (e.g. Engelberg (2008), Doran et al. (2010), Davis et al. (2011), Demers and Vega (2011), Durnev and Mangen (2011), Jegadeesh and Wu (2012), Price et al. (2012)) concludes that the tone of corporate disclosures or changes in the tone from the recent past are significantly correlated with short window contemporaneous returns around the date that the disclosures are made, or drift excess returns,[13] even after controlling for firm financial information and earnings surprises. Abnormal market returns are higher as the tone of the press release becomes more positive. The latest research by Loughran and McDonald (2011a) shows that large amounts of uncertain text in an S-1 filing generally lead to higher IPO first-day returns.

Although negative sentiment seems to have the strongest influence, Jegadeesh and Wu (2012) claim that both their measures of positive and negative sentiment are associated with the 10-K filing date returns. Using a *net optimism* measure (the difference between the percentage of optimistic words and the percentage of pessimistic words), both Davis et al. (2011) and Demers and Vega (2011) have found that sentiment in the earning press releases significantly affects the announcement and/or post-announcement period returns. Ferguson et al. (2012) conclude that high-attention news (both positive and negative) affects subsequent trading period returns.

Considering the possibility of reverse causation, do stock prices or returns predict textual sentiment? Tetlock (2007) discovers that negative returns predict more pessimism in the next day's WSJ column. Garcia (2012) finds that stock returns are indeed important predictors of media sentiment, both the positive and the negative measures, and that as expected, positive market returns tend to increase positivity and decrease negativity in future news stories. However, Das and Chen (2007)'s finding is that the value of the stock index on a given day is not related to the sentiment level in internet messages on the next day.

### 6.2. Sentiment and other market variables

Studies have also found that textual sentiment has significant impacts on trading volumes. Tetlock (2007) finds that unusually high or low values of pessimism lead to temporarily high market trading volume. Antweiler and Frank (2004) discover that internet board postings can help predict trading volumes, and using daily data showed that the effect from message posting activities to trading volumes is more significant than the reverse direction. Das and Chen (2007) conclude that there is a strong contemporaneous relationship between sentiment and trading volume. Although these authors examined internet-posting sentiment, they conclude that sentiment has no predictability on future trading volumes.

Some studies have found the evidence of the connection between textual sentiment and stock market volatility. Antweiler and Frank (2004) find that internet message postings help predict volatility. Tetlock (2007) discovers that the conditional volatility of the Dow Jones appears to be higher when the pessimism factor is high. Kothari et al. (2009) find that both positive and negative news disclosures in the media have impact on firms' return volatility and that when management offers negative news disclosures, return volatility rises. Loughran and Mcdonald (2011b) also find that the use of the 13 phrases that appear on Barron's list of worrisome words is significantly related to subsequent return volatility. The findings of the latest research by Loughran and McDonald (2011a) show that large amounts of uncertain

[13] Excess returns in a long period (e.g. 80 days) following the event.

text in an S-1 filing generally lead to higher subsequent return volatility (60-day period after the IPO).

### 6.3. Sentiment, firm fundamentals and market efficiency

The literature to date shows that textual sentiment is correlated with future firm characteristics and performance. Li (2006) finds that an increase in the risk sentiment of annual reports is associated with significantly lower future earnings. Tetlock et al. (2008) show that negative words in news stories forecast low subsequent firm earnings. Li (2010) discovers that the average tone of the forward-looking statements in a firm's MD&A is positively correlated with its future earnings and has explanatory power incremental to other variables in predicting future performance. Davis and Tama-Sweet (2011) find that higher levels of pessimistic language in the MD&A are associated with lower future return on assets. Demers and Vega (2011) conclude that the net optimism and certainty expressed in managerial earnings announcements are associated with various proxies for future earnings and expected earnings uncertainty. Similarly, Huang et al. (2011) find that abnormal positive tone in earnings press releases is associated with poor future earnings. The results of Ferris et al. (2013) show that conservatism in IPO prospectus for non-technology IPOs contains useful information about the firm's future operating performance. Chen et al. (2013) find that negative sentiment 30 days to 3 days prior to earnings announcements is inversely associated with the earnings surprise. Both Rees and Twedt (2012) and Huang et al. (2013) have concluded that textual sentiment in analyst reports is informative about firms' future performance beyond quantitative measures. Meanwhile, the findings of Li (2006, 2010), Davis and Tama-Sweet (2011), Davis et al. (2012), and Jegadeesh and Wu (2012) suggest that firm fundamentals such as market value of equity, the book-to-market ratio, accruals, quarterly earnings scaled by the book value of assets, stock return volatility, debt to assets, and earnings surprise measures[14] are among the determinants of sentiment in corporate disclosures.

Does the linguistic style of corporate disclosures, news articles and internet messages contain useful incremental information over quantitative financial information is assessing market efficiency? Aggregating the results in the previous paragraph, we know that the answer is generally yes, although it must be noted that 'linguistic style' is not solely represented by sentiment. Tetlock et al. (2008) argue that the stock market is relatively efficient with respect to firms' hard-to-quantify fundamentals, although Tetlock (2007) finds little support for the hypothesis that textual sentiment represents additional fundamental information. Li (2006) concludes that the stock market does not fully reflect the information contained in the texts of annual reports about future profitability, and Sinha (2010) argues that the market underreacts to the tone of news articles. By and large, it has been clear that sentiment in texts does convey incremental information over quantitative financial information, and that it might have power in predicting market movements. Sentiment from qualitative information is mostly publicly available, or possibly partly private in some cases. In either case, according to the strongest form of the EMH, a good asset pricing model might well incorporate textual sentiment as a pricing factor in addition to risk premia and other firm-level characteristics.

## 7. Summary and conclusions

We have reviewed the textual sentiment literature in finance by focusing on three main aspects – the information sources, the content analysis methods, and the financial models that have been used to examine whether and how textual sentiment impacts on people, institutions and markets. The surveyed literature has made contributions to different areas of both behavioral and traditional finance. It has contributed to the analysis of announcement effects; to our understanding of the complementarity relation between qualitative and quantitative information regarding firm performance; it has improved the linguistic analysis methods in order to get more accurate and efficient sentiment measures; and has facilitated the study of market efficiency from a new perspective in contrast to the earlier work that used easily quantifiable aspects of news as a proxy for the news itself, such as the timing of news, the volume of news (the number of words), and the type of news (periodic announcements and general publicly available news).

What is agreed and what remains controversial? It is generally agreed that textual sentiment has potentially strong impacts on stock returns and trading volumes. The media-expressed sentiment literature demonstrates that textual sentiment has contemporaneous or short-term effects on stock prices, returns, abnormal returns, and trading volumes (e.g. Antweiler and Frank (2004), Tetlock (2007), Tetlock et al. (2008), Ferguson et al. (2012), Garcia (2012), Jegadeesh and Wu (2012), Chen et al. (2013)). The exception is Das and Chen (2007), who conclude that sentiment has no predictability on future trading volumes. Event studies in the corporation-expressed sentiment literature tend to exhibit significant market responses to sentiment in corporate disclosures, in a short window (1 day or 3 days) around the event date (e.g. Davis et al. (2011), Engelberg (2008), Feldman et al. (2008), Demers and Vega (2011), Jegadeesh and Wu (2012), Price et al. (2012)).

In the dictionary-based approach literature, particularly the studies which use the GI dictionary or L&M word lists, negative words are found to be the most powerful sentiment category in explaining market activities. Tetlock (2007) emphasizes that negative words summarize common variation in the entire set of GI word categories better than any other single category including positive words. Tetlock et al. (2008) find that using positive words as the sentiment measure produces much weaker results than using negative words. However, the more recent study by Jegadeesh and Wu (2012) has pointed out that by using a new term-weighting scheme, a significant relation between document tone and market reaction is discovered for positive words as well, so they emphasize the importance of choosing the appropriate term-weighting scheme.

Stock returns are found to predict textual sentiment by Tetlock (2007) and Garcia (2012), who use news stories as the information source. Yet Das and Chen (2007) reveal that the value of the stock index on a given day is not related to the sentiment level in internet messages on the next day. The work by Li (2006, 2010), Tetlock et al. (2008), Feldman et al. (2008), Davis and Tama-Sweet (2011), Demers and Vega (2011), Huang et al. (2011), Ferris et al. (2013), Garcia (2012), Price et al. (2012), Rees and Twedt (2012), Chen et al. (2013), and Huang et al. (2013) consistently shows that textual sentiment contains new value-relevant information. The exception is Tetlock (2007), who rejected the hypothesis that media content contains new information about fundamental asset values.

We conclude by suggesting the following directions for future research. *First*, the content analysis process can be further improved. Although the L&M word lists have been increasingly popular in the latest research, for the dictionary-based approach, the construction and availability of more authoritative and extensive field-specific dictionaries is desirable for future studies. There is also scope for the development of improved term-weighting schemes. Other content analysis approaches can also be developed and refined by linguists, psychologists and computer scientists. The purpose of improving the content analysis procedures is to obtain more accurate and efficient sentiment measures, and to examine whether other sentiment categories can be as powerful as negative words.

*Second*, there are still some qualitative information sources that have not yet been widely studied, such as business and political speeches, blogs, television news, videos and various social media. Speeches from the most influential individuals in the economics and finance fields

[14] The difference between quarterly EPS and the mean consensus analyst forecast deflated by stock price at the beginning of the quarter.

PX344

Page 8214

**Table 3**
Summary of each study.

| Research | Information sources | Time frame | Content analysis methods | Models | Key findings |
|---|---|---|---|---|---|
| Antweiler and Frank (2004) | Internet messages | 2000 | Machine learning | Linear regressions volatility models | A positive shock to message board postings predicts negative returns the next day; contemporaneous regressions show that disagreement induces trading; message posting helps predict volatility; stock messages reflect public information very rapidly. |
| Henry (2006) | Earnings press releases | 2002 | Dictionary-based *Custom words* | Data-mining algorithm | The inclusion of verbal variables (including 'tone') results in greater predictive accuracy beyond inclusion of financial information. |
| Li (2006) | Annual reports | 1994–2005 | Dictionary-based *Specific words (risk and uncertain)* | Linear regressions sentiment-based trading strategy | An increase in risk sentiment of annual reports is associated with significantly lower future earnings; the change in risk sentiment is also negatively related to cross-sectional future returns; the stock market does not fully reflect information contained in the texts of annual reports about future profitability. |
| Das and Chen (2007) | Internet messages | Jul.–Aug. 2001 | Machine learning | Linear regressions | Sentiment aggregated across stocks' tracks index returns; aggregation of sentiment reduces some of the noise from individual stock postings; market activity is related to small investor sentiment and message board activity. |
| Tetlock (2007) | News articles | 1984–1999 | Dictionary-based *GI/Harvard* | VAR | High values of media pessimism induce downward pressure on market prices; unusually high or low values of pessimism lead to temporarily high market trading volume; the changes in market returns that follow pessimistic media content are dispersed throughout the trading day; pessimism weakly predicts increases in market volatility. |
| Engelberg (2008) | News articles about firms' earnings announcement | 1999–2005 | Dictionary-based *GI/Harvard* | Linear regressions, including event-study method Sentiment-based trading strategy | Qualitative earnings information embedded in the news stories about firms' earnings announcement has additional predictability for asset prices beyond the quantitative information; qualitative information about positive fundamentals and future performance is most important for the prediction of future returns. |
| Feldman et al. (2008) | 10-Ks and 10-Qs | 1995–2006 | Dictionary-based *GI/Harvard* | Linear regressions, event-study methods, Sentiment-based trading strategy | Changes in the tone of the MD&A section from the recent past are significantly correlated with short window contemporaneous returns around SEC filing dates; the MD&A sections do have information content. |
| Henry (2008) | Earnings press releases | 1998–2002 | Dictionary-based *Custom words* | Linear regressions, including event-study method | Abnormal market returns are higher as the tone of the press release becomes more positive. |
| Tetlock et al. (2008) | News articles | 1980–2004 | Dictionary-based *GI/Harvard* | Linear regressions Sentiment-based trading strategy | Negative words convey negative information about firm earnings above and beyond stock analysts' forecasts and historical accounting data; stock market prices respond to the information embedded in negative words with a small, one-day delay; negative words in stories about fundamentals predict earnings and returns more effectively than negative words in other stories. |
| Henry and Leone (2009) | Earnings press releases | 2004–2006 | Dictionary-based *Henry DICTION GI/Harvard* | Linear regressions, including event-study method | Capital markets researchers aiming to measure the qualitative information in financial disclosure can significantly increase the power for their tests by using a domain-specific wordlist; the economic impact of positive tone is smaller compared to negative tone. |
| Kothari et al. (2009) | 10-Ks and 10-Qs, news articles, analyst reports | 1996–2001 | Dictionary-based *GI/Harvard* | Linear regressions | When management offers negative news disclosures, return volatility rises, and analyst forecast dispersion widens; both positive and negative news disclosures from analysts appear to be heavily discounted by the market; both positive and negative news disclosures in the business press impact the cost of capital, return volatility, and analyst forecast dispersion. |
| Doran et al. (2010) | Earnings conference calls | 2004–2007 | Dictionary-based *GI/Harvard L&M Henry* | Linear regressions, including event-study method | The overall tone of REIT earnings conference calls as a whole has significant explanatory power for the accompanying abnormal returns; a positive conference call tone nearly offsets the damaging effects of a negative earnings surprise; results are significantly stronger for measures which utilize the customized dictionary (Henry, 2008; Loughran and McDonald, (2011a, 2011b). |
| Li (2010) | 10-Ks and 10-Qs | 1994–2007 | Machine learning Dictionary-based (supplementary) | Linear regressions | Average tone of the forward-looking statements in a firm's MD&A is positively correlated with its future earnings and liquidity and has explanatory power incremental to other variables in predicting future performance; the tone of MD&As is related to the cross-sectional association of accruals with future stock returns; empirical results based on the dictionary-based approach do not support the hypothesis that MD&As contain information content about future performance. |
| Sinha (2010) | News articles | 2003–2010 | Machine learning | Linear regressions Sentiment-based trading strategy | The market underreacts to the tone of news articles; the portfolio resulting from the long-short sentiment-based trading strategy is highly correlated with the momentum factor; short-term reversal does not occur when returns are accompanied by information that matches the direction of returns. |
| Carretta et al. (2011) | News articles | 2004–2010 | Dictionary-based *GI/Harvard* | Structural VAR | A positive (negative) media sentiment in news spread before spin-off deals is associated with positive (negative) short term returns; an increase in investor attention determines an increase of trading volumes and volatility of spin-off firms in both the short and the long run. |

**Table 3** (*continued*)

| Research | Information sources | Time frame | Content analysis methods | Models | Key findings |
|---|---|---|---|---|---|
| Davis et al. (2011) | Earnings press releases | 1998–2003 | *DICTION* | Linear regressions, including event-study method | Managers' earnings press release language communicates credible information about expected future firm performance to the market and that the market responds to this information. |
| Davis and Tama-Sweet (2011) | Earnings press releases and corresponding MD&As | 1998–2003 | Dictionary-based *DICTION* | Linear regressions, including event-study method | Managers omit or shift pessimistic language from their earnings press releases when they have strong incentives to report strategically; alternative disclosure outlets provide managers with an opportunity for strategic reporting; higher levels of pessimistic language in the MD&A are associated with lower future return on assets |
| Demers and Vega (2011) | Earnings press releases | 1998–2006 | Dictionary-based *GI/Harvard DICTION L&M* | Linear regressions, including event-study method Sentiment-based trading strategy | The net optimism and certainty expressed in managerial earnings announcements are associated with various proxies for future earnings and expected earnings uncertainty; there is an inverse association between the certainty in management's diction and the idiosyncratic volatility in the company's share price during the announcement window; managerial language tone conveys information regarding the firm's valuation fundamentals. |
| Durnev and Mangen (2011) | Restatements of financial reports | 1997–2005 | Dictionary-based *DICTION* | Develop theoretical models Linear regressions, including event-study method | When restatement tone becomes more pessimistic, both restating firms and their competitors experience lower abnormal returns at restatement announcements; the tone of restatement texts decreases information asymmetry about restating firms and their competitors; restatement tone provides a signal about restating firms' private information regarding unknown investment payoffs; disclosure tone carries new information that is relevant for investment decisions. |
| Huang et al. (2011) | Earnings press releases and corresponding MD&As | 1997–2007 | Dictionary-based *L&M* | Linear regressions, including event-study method logit regressions | Abnormal positive tone in the earnings press release is associated with poor future earnings and operating cash flows in each of one-year to three-year ahead periods. Managers tend to use disclosure tone to complement quantitative earnings management. Tone manipulation succeeds in misleading investors. |
| Loughran and McDonald (2011a) | 10-Ks | 1994–2008 | Dictionary-based (include new term weighting scheme) *Custom dictionary GI/Harvard* | Linear regressions, including event-study method logit regressions Sentiment-based trading strategy | Almost three-fourths of negative word counts in 10-Ks based on the Harvard dictionary are typically not negative in a financial context; the authors create a list of words that typically have a negative meaning in financial reports, and create a term weighting scheme that can lower the noise introduced by word misclassifications; they suggest the use of their financial word lists to avoid those words in the Harvard list that might proxy for industry or other unintended effects. |
| Loughran and Mcdonald (2011b) | 10-Ks | 1994–2008 | Dictionary-based *13 suspicious phrases* | Linear regressions, including event-study method logit regressions | The use of the 13 phrases that appear on Barron's list of worrisome words is significantly related to excess filing period returns, analyst earnings forecast dispersion, subsequent return volatility, and fraud allegations. |
| Rogers et al. (2011) | A variety of corporate disclosures | Not applicable | Dictionary-based *DICTION Henry L&M* | Logit regressions | Sued firms use substantially more optimistic language in their earnings announcements than non-sued firms do; the interaction between optimism and abnormal insider selling is associated with an increased probability of being sued; managers can reduce litigation risk by dampening the tone of disclosure. |
| Davis et al. (2012) | Earnings conference calls | 2002–2009 | Dictionary-based *DICTION Henry L&M* | Linear regressions, including event-study method | Observable manager-specific characteristics (e.g., gender, age, educational and career experiences) explain variation in residual tone; managers' individual styles potentially impact the market reaction to earnings announcements. |
| Engelberg et al. (2012) | News articles | 2005–2007 | Dictionary-based *GI/HarvardL&M* | Linear regressions, including event-study method Sentiment-based trading strategy | The well-documented negative relation between short sales and future returns is twice as large on news days and four times as large on days with negative news; a strategy based on short selling and negative news would have earned an astonishing 180% during the authors' 2.5-year sample period. |
| Ferguson et al. (2012) | News articles | 1981–2010 | Dictionary-based *L&M* | Linear regressions Sentiment-based trading strategy | Positive as well as negative words in news media content display relevant information; predictive relationship between media content and firms' returns is significant for low visibility firms with low market capitalization and high book-to-market ratio; high-attention news (both positive and negative) affects subsequent trading period returns. |
| Ferris et al. (2013) | IPO prospectus | 1999–2005 | Dictionary-based *L&M DICTION GI/Harvard* | Linear regressions | Greater conservatism in the prospectus is related to increased underpricing; prospectus conservatism for non-technology IPOs contains useful information about the firm's future operating performance. |
| Garcia (2012) | News articles | 1905–2005 | Dictionary-based *L&M* | Linear and non-linear regressions | News content helps predict stock returns at the daily frequency, particularly during recessions; this asymmetric predictability is not driven by differences in reporting along the business cycle, and the effect is especially strong on Mondays and on days after holidays; investor sentiment has a prominent effect during bad times. |

(continued on next page)

**Table 3** (*continued*)

| Research | Information sources | Time frame | Content analysis methods | Models | Key findings |
|---|---|---|---|---|---|
| Jegadeesh and Wu (2012) | 10-Ks | 1995–2010 | Dictionary-based (include new term weighting scheme) L&M | Linear regressions, including event-study method | The authors' measure of document tone based on their new return-based term weighting scheme is reliably related to 10-K filing date returns for both positive and negative words; their approach can be extended to minimize the level of subjectivity required for content analysis; with their term weighting method, useful information can be extracted even if the underlying wordlists contain extraneous words or when they are incomplete; the market does not fully respond to the tone of 10-Ks during the filing period. |
| Larker and Zakolyukina (2012) | Earnings conference calls | 2003-2007 | Dictionary-based *LIWC* | Linear regressions | The linguistic features of CEOs and CFOs in conference call narratives can be used to identify financial misreporting; deceptive CEOs use significantly more extremely positive emotion words and fewer anxiety words; deceptive CFOs use significantly more words of negation and extremely negative emotion words. |
| Ozik and Sadka (2012) | A variety of news articles and corporate disclosures | 1999–2008 | Dictionary-based *GI/Harvard L&M* | Linear regressions | On average, when a fund is covered either simultaneously by multiple sources (i.e. General newspapers, Specialized magazines and Corporate communications) or exclusively by one of the three sources, the sentiment of Corporate news is most positive and that of General news is least positive, reflecting a reporting style bias and an editorial selection bias. |
| Price et al. (2012) | Earnings conference calls | 2004–2007 | Dictionary-based *GI/Harvard Henry* | Linear regressions, including event-study method | Earnings-specific dictionary is much more powerful in detecting relevant conference call tone; conference call discussion tone has highly significant explanatory power for initial reaction window abnormal returns as well as the post-earnings-announcement drift; conference call 'question and answer' tone matters more when firms do not pay dividends. |
| Rees and Twedt (2012) | Analyst reports | 2006 | Dictionary-based *GI/Harvard* | Linear regressions, including event-study method Sentiment-based trading strategy | Analyst reports complexity and tone provides incremental information content to the market beyond quantitative summary measures; there is no evidence that abnormal returns can be earned through long-term trading strategies based on these qualitative report attributes. |
| Buehlmaier (2013) | News articles | 2000–2006 | Machine learning | Develop theoretical models Linear regressions Logit regressions | Positive media content about the acquirer predicts takeover success. |
| Chen et al. (2013) | Internet messages | 2005–2011 | Dictionary-based *L&M* | Linear regressions, including event-study method | The fraction of negative words contained in the articles and comments on Seeking Alpha (SA) website negatively predict subsequent stock returns; articles and comments, as a system, predict future stock returns much more strongly than articles alone; the fraction of negative words in articles and comments prior to the earnings announcement strongly predict subsequent scaled earnings surprises. |
| Huang et al. (2013) | Analyst reports | 1995–2008 | Machine learning | Linear regressions, including event-study method | The classification accuracy achieved using the naive Bayes machine learning approach is substantially higher than that achieved using the dictionary-based content analysis approaches; investors place much more weight on negative than positive statements; report text is informative about a firm's short- and long-term performance; negative statements are more informative than positive ones about a firm's future performance. |
| Liu and McConnell (2013) | News articles | 1990–2010 | Dictionary-based *L&M* | Probit regressions | The level of media attention and the tone of media coverage play an important role in managers' decisions to abandon value-reducing acquisition attempts. |
| Loughran and McDonald (2013b) | S-1 filings | 1997–2010 | Dictionary-based *L&M* | Linear regressions Logit regressions | Large amounts of uncertain text in an S-1 filing generally lead to more valuation uncertainty and, in turn, higher IPO first-day returns, absolute offer price revisions, and subsequent return volatility (60-day period following the IPO). |

Notes: This table summarizes the information sources, content analysis methods and models employed in the literature, as well as their studying period and the key findings and insights. In the fourth column 'Content analysis methods', the specific programs, dictionaries, and word lists used for the dictionary-based approach are also listed. Among them, *GI/Harvard* indicates General Inquirer/*Harvard IV-4* dictionaries, *DICTION* is the textual analysis program and its self-contained dictionaries, *L&M* indicates Loughran and McDonald (2011a, 2011b) finance dictionaries, *Henry* indicates the finance word lists constructed by Henry (2006, 2008). The findings/insights listed are those relevant to the role of textual sentiment.

are particularly worth studying. *Third*, volatility models have rarely been used. For example, the GARCH-X and GARCH-M-X models can be applied to examine the direct and indirect relationships between sentiment and volatilities. They may also assist in discovering the mechanism through which sentiment in texts gets transmitted to asset prices and returns. *Fourth*, the extant textual sentiment studies tend to focus on the stock market. The same methodologies can be applied to other markets such bonds, commodities and derivatives. Meanwhile, it is interesting to study global financial markets other than the U.S., especially emerging markets, and to analyze qualitative information in other languages, as different markets may display differing cultural and other behavioral patterns. *Fifth*, with the further development of computer programs to source continuous flows of news and to analyze sentiment automatically, it will be increasingly possible to examine the effect of sentiment in real time. This is exciting because one can view and analyze the price movement and trading volume immediately following a piece of extremely positive or negative news. *Finally*, the complex and most probably time-varying relationship between textual

sentiment and investor behavior remains an important area of future study that promises to add many more insights into the theory, evidence and practice of behavioral finance.

## References


Antweiler, W., & Frank, M. Z. (2004). Is all that talk just noise? The information content of internet stock message boards. *Journal of Finance*, *59*, 1259–1294.

Baker, M., & Wurgler, J. (2007). Investor sentiment in the stock market. *Journal of Economic Perspectives*, *21*, 129–151.

Black, F. (1986). Noise. *Journal of Finance*, *41*, 529–543.

Bollerslev, T. (1986). Generalized autoregressive conditional heteroskedasticity. *Journal of Econometrics*, *31*, 307–327.

Buehlmaier, M. M. M. (2013). The role of the media in takeovers: Theory and evidence. Available at SSRN. http://ssrn.com/abstract=1673164

Carretta, A., Farina, V., Graziano, E. A., & Reale, M. (2011). Does investor attention influence stock market activity? The case of spin-off deals. Available at SSRN. http://ssrn.com/abstract=1930861

Chen, H., De, P., Hu, Y., & Hwang, B. (2013). Customers as advisors: The role of social media in financial markets. Available at SSRN. http://ssrn.com/abstract=1807265

Das, S. R., & Chen, M. Y. (2007). Yahoo! for Amazon: Sentiment extraction from small talk on the web. *Management Science*, *53*, 1375–1388.

Davis, A. K., Ge, W., Matsumoto, D. A., & Zhang, J. L. (2012). The effect of managerial 'style' on the tone of earnings conference calls. *CAAA Annual Conference 2012* (Available at SSRN: http://ssrn.com/abstract=1982259).

Davis, A. K., Piger, J. M., & Sedor, L. M. (2011). *Beyond the numbers: Measuring the information content of earnings press release language.* AAA 2008 Financial Accounting and Reporting Section (FARS) Paper (Available at SSRN: http://ssrn.com/abstract=875399).

Davis, A. K., & Tama-Sweet, I. (2011). Managers' use of language across alternative disclosure outlets: Earnings press releases versus MD&A. Available at SSRN. http://ssrn.com/abstract=1866369

De Franco, G., Hope, O., Vyas, D., & Zhou, Y. (2012). Analyst report readability. *Rotman School of Management Working Paper No. 1873424* (Available at SSRN: http://ssrn.com/abstract=1873424).

DeGennaro, R., & Shrieves, R. (1997). Public information releases, private information arrival and volatility in the foreign exchange market. *Journal of Empirical Finance*, *4*, 295–315.

Demers, E., & Vega, C. (2011). Linguistic tone in earnings announcements: News or noise? *FRB International Finance Discussion Paper 951* (Available at SSRN: http://ssrn.com/abstract=1152326).

Doran, J. S., Peterson, D. R., & Price, S. M. (2010). Earnings conference call content and stock price: The case of REITs. *Journal of Real Estate Finance and Economics*, *45*(2), 402–434.

Durnev, A., & Mangen, C. (2011). The real effects of disclosure tone: Evidence from restatements. Available at SSRN. http://ssrn.com/abstract=1650003

Engelberg, J. (2008). Costly information processing: Evidence from information announcements. *AFA 2009 San Francisco Meetings Paper* (Available at SSRN: http://ssrn.com/abstract=1107998).

Engelberg, J., Reed, A. V., & Ringgenber, M. C. (2012). How are shorts informed? Short sellers, news, and information processing. *Journal of Financial Economics*, *105*(2), 260–278.

Fama, E. F. (1998). Market efficiency, long-term returns, and behavioral finance. *Journal of Financial Economics*, *49*, 283–306.

Fama, E. F., & French, K. (1992). The cross-section of expected stock returns. *Journal of Finance*, *47*, 427–465.

Fama, E. F., & French, K. (1993). Common risk factors in the returns on bonds and stocks. *Journal of Financial Economics*, *33*, 3–56.

Feldman, R., Govindaraj, S., Livnat, J., & Segal, B. (2008). The incremental information content of tone change in management discussion and analysis. Available at SSRN. http://ssrn.com/abstract=1126962

N.J. Ferguson J. Guo H.Y.T. Lam D. Philip Media content and stock returns: The predictive power of press.

Ferris, S. P., Hao, G. Q., & Liao, M. (2013). The effect of issuer conservatism on IPO pricing and performance. *Review of Finance*, *7*(3), 993–1027.

Garcia, D. (2014). Sentiment during recessions. *Journal of Finance* (in press. Available at SSRN: http://ssrn.com/abstract=1571101).

Glosten, L., Jagannathan, R., & Runkle, D. (1993). On the relationship between the expected value and the volatility of the nominal excess return on stocks. *Journal of Finance*, *48*, 1779–1801.

Hart, R. (2000). DICTION 5.0. See. http://rhetorica.net/diction.htm

Henry, E. (2006). Market reaction to verbal components of earnings press releases: Event study using a predictive algorithm. *Journal of Emerging Technologies in Accounting*, *3*, 1–19.

Henry, E. (2008). Are investors influenced by how earnings press releases are written? *The Journal of Business Communication*, *45*(4), 363–407.

Henry, E., & Leone, A. J. (2009). Measuring qualitative information in capital markets research. Available at SSRN. http://ssrn.com/abstract=1470807

Huang, X., Teoh, S. H., & Zhang, Y. (2011). Tone management. Available at SSRN. http://ssrn.com/abstract=1960376

Huang, A., Zang, A. Y., & Zheng, R. (2013). Large sample evidence on the informativeness of text in analyst reports. Available at SSRN.

Jegadeesh, N., & Wu, A.D. (2012). Word power: A new approach for content analysis. *AFA 2012 Chicago Meetings Paper* (Available at SSRN: http://ssrn.com/abstract=1787273).

Kothari, S. P., Li, X., & Short, J. E. (2009). The effect of disclosures by management, analysts, and business press on cost of capital, return volatility, and analyst forecasts: A study using content analysis. *The Accounting Review*, *84*(5), 1639–1670.

Larker, D., & Zakolyukina, A. (2012). Detecting deceptive discussions in conference calls. *Journal of Accounting Research*, *50*(2), 495–540.

Lehavy, R., Li, F., & Merkley, K. (2011). The effect of annual report readability on analyst following and the properties of their earnings forecasts. *Accounting Review*, *86*, 1087–1115.

Li, F. (2006). Do stock market investors understand the risk sentiment of corporate annual reports? Available at SSRN. http://ssrn.com/abstract=898181

Li, F. (2010). The information content of forward-looking statements in corporate filings—A Naive Bayesian machine learning algorithm approach. *Journal of Accounting Research*, *48*, 1049–1102.

Liu, B., & McConnell, J. J. (2013). The role of the media in corporate governance: Do the media influence managers' capital allocation decisions? Available at SSRN. http://ssrn.com/abstract=2004567

Loughran, T., & McDonald, B. (2011). When is a liability not a liability? *Journal of Finance*, *66*, 35–65.

Loughran, T., & Mcdonald, B. (2011). Barron's red flags: Do they actually work? *Journal of Behavioral Finance*, *12*(2), 90–97.

Loughran, T., & McDonald, B. (2013). Measuring readability in financial disclosures. Available at SSRN. http://ssrn.com/abstract=1920411

Loughran, T., & Mcdonald, B. (2013). IPO first-day returns, offer price revisions, volatility, and Form S-1 language. *Journal of Financial Economics*, *109*(2), 307–326.

Manning, C., & Schutze, H. (1999). *Foundations of statistical natural language processing.* Cambridge, MA: The MIT Press.

McCallum, A. (1996). Bow: A toolkit for statistical language modeling, text retrieval, classification and clustering. *Working paper*: School of Computer Science, Carnegie-Mellon University.

Nelson, D. (1991). Conditional heteroskedasticity in asset returns: A new approach. *Econometrica*, *59*, 347–370.

Ozik, G., & Sadka, R. (2012). Media and investment management. Available at SSRN. http://ssrn.com/abstract=1633705

Price, S. M., Doran, J. S., Peterson, D. R., & Bliss, B.A. (2012). Earnings conference calls and stock returns: The incremental informativeness of textual tone. *Journal of Banking and Finance*, *36*(4), 992–1011.

Rees, L., & Twedt, B. (2012). Reading between the lines: An empirical examination of qualitative attributes of financial analysts' reports. *Journal of Accounting and Public Policy*, *31*, 1–21.

Rogers, J. L., Van Buskirk, A., & Zechman, S. L. C. (2011). Disclosure tone and shareholder litigation. *Accounting Review*, *86*(6), 2011.

Sinha, N. R. (2010). Underreaction to news in the US stock market. Available at SSRN. http://ssrn.com/abstract=1572614

Stone, P. J., Dunphy, D. C., Smith, M. S., & Ogilvie, D.M. (1966). *The general inquirer: A computer approach to content analysis.* Cambridge: MIT Press.

Tetlock, P. C. (2007). Giving content to investor sentiment: The role of media in the stock market. *Journal of Finance*, *62*, 1139–1168.

Tetlock, P. C., Saar-Tsechansky, M., & Macskassy, S. (2008). More than words: Quantifying language to measure firms' fundamentals. *Journal of Finance*, *63*, 1437–1467.

# PX 345

**2009 Wis. L. Rev. 199**

**Wisconsin Law Review**
2009

**The Continuing Evolution of Securities Class Actions**

**Symposium**
Frederick C. Dunbar [a1] Arun Sen [aa1]

Copyright (c) 2009 By the Board of Regents of the University of Wisconsin System; Frederick C. Dunbar; Arun Sen

# COUNTERFACTUAL KEYS TO CAUSATION AND DAMAGES IN SHAREHOLDER CLASS-ACTION LAWSUITS

Introducing quantitative rigor into the legal process has been proposed to reduce error and uncertainty in litigation. One area of law that would seem to be a candidate for such formalism would be proving causation. Yet most legal scholars balk at the idea that the legal principles of causation are based on anything as precise as, say, scientific causation. We believe that counterfactual analysis, a relatively recent trend in the philosophy of causation that is being applied in the social sciences, has a role in understanding causation in at least one important area of the law-- shareholder class-action lawsuits. The increasingly strict standards imposed by the Supreme Court of the United States over the past twenty years, culminating in the Dura Pharmaceuticals, Inc. v. Broudo decision, can be understood in the context of counterfactual analysis establishing loss causation. This approach then has important implications for estimating damages in shareholder class-action lawsuits.

| | | |
|---|---|---|
| | Introduction | 200 |
| I. | Why Shareholder Class-Action Lawsuits | 207 |
| | A. Shareholder Class-Action Lawsuits Share Common Features | 207 |
| | B. Application of Financial Economics | 208 |
| | C. Uncertain Policy Objectives and Judicial Hostility | 209 |
| II. | Conditions and Causation in Rule 10b-5 | 211 |
| | A. The “in Connection with” Requirement | 212 |
| | B. Reliance and Efficient Markets | 213 |
| | C. Economic Loss and Loss Causation | 213 |
| | D. Shareholder Litigation Evidentiary Paradigm Shift | 215 |
| III. | Counterfactual Dependence and the Meanings of Economic Loss and Loss Causation216 | |
| | A. Terminology | 216 |
| | B. The Meaning of Economic Loss | 218 |
| | C. Economic Losses Greater than the Drop in Stock Price on the Revelation of the Relevant Truth | 221 |
| IV. | Application to Recent Issues in Using the Event Study to Measure Damages | 227 |
| | A. Event Studies and Loss Causation | 228 |
| | B. Stock-Price Reaction: Loss Causation or Collateral Damage? | 231 |
| | 1. Causal Analysis of Revelation of the Relevant Truth | 232 |
| | 2. The Need for Factual Analysis | 237 |
| | a. Misrepresentation that Appears to Be Material Simply from the Fact that It Is a Misrepresentation | 237 |
| | b. News About Management Quality | 238 |
| | c. Increased Perceptions of Investment Risk | 239 |

PX345

(i) Inferences Regarding Management Job Security 239
(ii) Risk of Future Material Accounting-RelatedEarnings Surprises 239
d. Is Generalization About Collateral Damage Possible? 240
Conclusion 241

***200 Introduction**

Introducing mathematical rigor into the legal process has been proposed to reduce error and uncertainty in litigation. One process that would seem to be a candidate for formalism would be proving causation. As an area of study, the subject of causation has been tackled with particular vigor by philosophers and, more recently, by statisticians and computer scientists. At present, however, the prevailing legal views about causation are largely divorced from the current academic learning on the subject.

One of the reasons for lack of formal rigor in how lawsuits are resolved has been the sui generis nature of each case. The problem is illustrated by Palsgraf v. Long Island R.R. [1] Still a mainstay of first-year tort classes, even though decided eighty years ago, it involved a freakish set of circumstances that will never be repeated and, according to at least one commentator, is of questionable precedential value. [2] The generalization of this viewpoint to all Anglo-American law is amply described in the encyclopedic and influential Causation and the Law, by ***201** Professors H. L. A. Hart and Tony Honoré. [3] One lesson to be learned is that individualized determinations regarding who should bear responsibility for a legally cognizable injury occur in large part because circumstances vary a lot from case to case. A one-size-fits-all approach to causation in determining liability would be offensive to modern sensibilities of justice and due process. In reasoning by analogy, Hart and Honoré divide causal knowledge into two categories--one as the concept is used in litigation and historical research, and the other as it is used in the natural sciences. They conclude that philosophical causation, while applicable to the natural sciences, is not relevant to the law. [4]

In 1953, when the first edition of Causation and the Law was published, causation outside of the law was, following philosopher David Hume, thought of primarily in terms of empirical cause-and-effect regularities. [5] Although philosophers often use examples from everyday life to demonstrate their insights, the philosophically rigorous approach to causation seemed to work best for scientific enquiry. [6] Hart and Honoré observed, however, that litigation involves contexts far removed from clinical studies. [7] Instead, building on their analogy between a legal matter and a historical study, historical events occur in complicated contexts with multiple potential causes for the eventual outcomes of interest. Similarly, legal matters can involve a set of multiple human actions and inactions resulting in an injury; the fact finder will have to determine which subset is relevant for the purpose of determining who, and which conduct, is at fault under the relevant legal ***202** rules. Although Hart and Honoré do not define their perception of historical method as it was to be applied to legal matters, it is likely that it can be described as “historicism”--an approach that viewed quantitative approaches to history to be little more than window dressing.

Eleven years after Hart and Honoré's first edition, however, Professor Robert Fogel showed how historicism had led to a substantial misunderstanding of the causes of nineteenth-century American economic development. [8] Specifically, Fogel tested a hypothesis that had been universally accepted by historians--that the railroads had been indispensable to American growth. Statistically simulating what would have happened had the economy depended on substitutes for the railroads--mainly improved canals and roads--he showed that Americans would have achieved nearly the same standard of living as actually occurred. As Fogel stated:

> If statistical methods could be applied only in the study of trivial issues or if, when applied, they yielded substantially the same conclusions as were obtained by qualitative analysis, a reluctance to exploit these techniques would be understandable. But in the case of the issues examined in this book, statistical methods yield results different from those that were obtained by more traditional approaches. [9]

Fogel's contemporaries were similarly finding that statistical analysis overturned long-held beliefs in other areas of American history. [10] The durability of using quantitative methods in economic history has been demonstrated by his receiving the Nobel Prize in Economics in 1993.

The relevance of this observation lies in the similarity between civil litigation and exercises in economic history. Plaintiffs' claims are usually for a quantum of damages to redress an injury caused by the defendants' conduct, often in the context of


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

business dealings. If the approach to legal causation is analogous to history, then large, civil lawsuits would be most like economic history. In which case, the scientific approaches to historical methods that have proved successful in economic history may well be more relevant than the historicism analogy advocated by Hart and Honoré. [11]

***203** Perhaps not coincidentally, developments in philosophy mirrored developments in economic-history methodology. Fogel structured his inquiry by using a conditional counterfactual: if the railroads had not existed, then what would have been the effects on America? In 1973, the philosopher David Lewis wrote an influential article claiming that Hume had actually specified two ways to view causation: the commonly held regularist view, and a counterfactual analysis of causation that had, to that time, received little examination as a formal approach to causation. [12] Since the appearance of Lewis's article, counterfactual dependence has become the favored “key” to explaining causal facts. [13]

One way to frame a causation analysis using counterfactuals starts with the formal logical problem of whether a specific implication is true. This can be illustrated by the following: the existence of the railroads implied nineteenth-century American economic development if and only if, counterfactually, had the railroads not existed then American economic development would not have occurred at that time. But the counterfactual implication as stated is not true--it was shown by Fogel that America would have attained essentially the same level of economic development without the railroads. Fogel showed this by analyzing in detail a counterfactual, though similar, world--one that would have substituted other transportation modes and their impacts on geographic patterns of land use for the railroads and the actual patterns of land use. In the counterfactual world, America would have become virtually as prosperous as occurred in the actual world. Therefore, the causal dependence of American development on the railroads is rejected.

The relationship between this example and Lewis's theory can be illustrated from his definition of causal dependence: “Causal dependence among actual events implies causation. If c and e are two actual events such that e would have not occurred without c, then c is a ***204** cause of e.” [14] In the economic-history example, e is rapid American economic development, c is the construction and operation of the railroads, and “e not occurring without c” is the absence of American development without the railroads. According to Fogel, nineteenth-century American economic development would have proceeded without the railroads and, therefore, American economic development was not causally dependent on the railroads.

The term causal dependence as used here is due to Lewis; that event e would not have occurred without event c is causal dependence. Lewis develops a theory that if counterfactual dependence of event e on event c is shown, then causal dependence has also been shown. His analysis makes use of a concept of a similar but counterfactual world that includes “not c.”

It should be noted that counterfactuals are usually divided into two types: conditional and indicative. The following are examples of each type, respectively:

(1) If sophisticated investors would have known about Enron's accounting treatment for off-balance sheet entities, then they would have realized Enron's operating cash flows were negative at the time they bought their Enron shares.

(2) If sophisticated investors knew about Enron's accounting treatment of off-balance sheet liabilities, then they also realized that Enron's operating cash flows were negative when they bought their Enron shares. [15]

In the legal context, it can be seen that these two statements lead to two quite different inquiries. For our purposes, we employ only conditional counterfactuals. But, indicative counterfactuals like example (2) above are often developed in securities litigation to make inferences about, say, the reason for a stock-price drop if it was not due to the correction of a prior fraudulent misrepresentation.

Lewis's article was the beginning of an extensive exploration of the role of conditional counterfactuals in generalized theories of causation. Eventually the counterfactual rubric spilled over into other academic disciplines, including social-science research methodology and legal scholarship. [16]

***205** Nonetheless, legal scholars have not accepted an approach to legal causation based on counterfactuals. As suggested by Professor Michael Moore, legal scholarship accepts that counterfactuals are a synonym for “but for” or “sine qua non”


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

tests in liability. [17] But, relying on a variety of conceptual concerns raised in the philosophy literature, Moore concluded that counterfactual analysis was not up to the task of providing a general theory of legal causation. [18]

We propose that counterfactual analysis does have a role in causation, at least in circumscribed areas of the law. One of the reasons we differ from Moore is that the questions we will be answering are different from those that a more general theory of causation seeks to answer. A general theory would determine who, if anyone, is legally responsible for a cognizable harm. In contrast, we accept that there are other theories, such as those provided in the law-and-economics literature, for affixing who is the proper defendant. We are concerned with whether, as a result of the defendant's conduct, harm occurred and the proper measure of its extent.

Perhaps more importantly, we take as given the Supreme Court of the United States' multiple opinions on shareholder class-action lawsuits and confine what would be allowed in the analysis of causation given the Court's rules. It is not an oversimplification to state that Moore and others who have attempted metatheories of legal causation are analyzing multiple strands making up common-law patterns as they have developed over the past two centuries. In the area of shareholder class-action lawsuits, however, the Court has resolved, through fiat or otherwise, some of the indeterminacies associated with counterfactual analysis that concern legal and philosophy scholars. Indeed, as will be argued below, the Court's decisions have had the effect of creating a vocabulary for shareholder class-action liability and damages that differs from how common-law tort principles are typically described.

Another reason we differ from Moore is that philosophers' recent developments make the counterfactual theory of causation more realistic. One of the more relevant of these is Professor Peter Menzies's monograph, Difference-making in Context. [19] Menzies's theme is that Lewis's statement of the counterfactual principle does not give ***206** unambiguous answers to questions about the causes of events in a number of important situations. [20] Some of his examples are drawn from Hart and Honoré and thus are of special interest to the question of legal causation. To make the counterfactual paradigm more general, Menzies introduces a number of concepts including, importantly, distinguishing conditions from causes. [21] For example, assume that an investor decides on his or her own to purchase an exchange-traded security at a price that is inflated because of an intentional misrepresentation made by management. After the truth becomes known, the price falls and the investor incurs a loss. Under a relatively straightforward counterfactual analysis, if the investor had not bought the security, there would have been no loss incurred. But under the federal securities laws, causation of the loss is attributed to the revelation of the truth, and fault is found with management for not revealing the truth in a timely fashion. To reconcile these two interpretations, Menzies's approach would label the purchase of the security a condition rather than a cause. In fact, Menzies would probably go further and consider the purchase of the security part of what he calls "normal conditions." He uses this term to mean conditions that are assumed to generally hold in the context being studied, and as a result are not worthy of specific mention. Factors that fall outside the set of normal conditions would warrant particular attention as potential causes. [22]

In the Parts that follow, we will formalize and give other examples of counterfactual analysis in an attempt to show that it has a role in understanding causation in at least one important area of the law--shareholder class-action lawsuits. Moreover, we suggest that this trend will reduce error and uncertainty in litigation. This implies that the cold reception given to formalism in the law may be too sweeping.

Before proceeding to the substance of our analysis, we should note that proposals to use formal mathematical constructs in other areas of law, primarily procedure, have not fared well in legal-literature debates. [23] In response to early proposals to use probability to determine ***207** rules of evidence, Professor Lawrence Tribe wrote an influential treatise arguing that such attempts at quantification would do more harm than good. [24] We do not dispute Tribe's conclusion, mainly because we are dealing with a different subject. That being said, it might be productive to revisit Tribe's critiques as they relate to shareholder class-action lawsuits circa 2009. His argument depended to some extent on due-process protections accorded under criminal, rather than civil, law. As will be shown below, shareholder class-action lawsuits have features that make them different from the modal lawsuits that are often assumed in critiques of formalism.

### I. Why Shareholder Class-Action Lawsuits

There are a number of reasons why shareholder class-action lawsuits are a candidate for more formalism.

PX345

### A. Shareholder Class-Action Lawsuits Share Common Features

One of the aspects of litigation that has been a barrier to philosophical causation has been the distinctiveness of each individual claim. As mentioned above, Palsgraf is a prime example of a physical chain so unlikely that it will never be repeated. By comparison, shareholder class-action lawsuits have a number of similarities.[25] Some of these similarities are related to the requirements of class-action lawsuits. Class certification implies that issues common to all class members will predominate over individual issues at trial. One of the reasons that the class-action-lawsuit procedure is appropriate for securities fraud is that most claimants were not involved in personally negotiating and contracting with various counterparties for the securities at issue; plaintiffs in these lawsuits will have traded in an impersonal market. This makes it easier to show, but obviously does not guarantee, that individual issues do not predominate.

The typical rule 10b-5 class-action lawsuit arises out of an allegation of untimely disclosure of bad news. When the news becomes public, say at time $t_d$, the market impounds it into the stock price, causing a price decline equal to $P(t_{d-1}) - P(t_d)$, where, by convention, ***208** $P(t_x)$ is the closing price on date $t_x$, and the price change is material and not due to other known causes. Every shareholder experiences the same price decline. The allegation is that the defendants should have revealed the news at some earlier point, say $t_0$. The plaintiff class would then be defined as anyone who purchased in the interval $[t_0, t_{d-1}]$ and held until $t_d$ or later. Plaintiffs will claim damages related to the price decline commonly suffered when the bad news was released.[26]

### B. Application of Financial Economics

Through a series of decisions, starting with Blue Chip Stamps v. Manor Drug Stores,[27] to its most recent pronouncements in Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,[28] the Supreme Court has created an interpretation of rule 10b-5 litigation that has simultaneously segregated it from the common law of deceit and made the outcomes of the litigation more dependent on financial economics. Academic research in finance has been up to the task: a serendipitous union of high-quality data, sophisticated statistical techniques, and well-funded research agendas stretching back forty years has created a body of science that can be brought to bear on almost every aspect of the typical rule 10b-5 case.

One result of this has been a trend in rules concerning causation that is distinct from the so-called common-sense causation paradigm. Two Supreme Court decisions on causation --Basic Inc. v. Levinson[29] and Dura Pharmaceuticals, Inc. v. Broudo[30] -- homogenized the inquiry that will be made on causation in all rule 10b-5 cases. This inquiry is grounded squarely in financial economics theory and methods. In addition, lower courts have been using financial economics to examine other elements that are necessary for a plaintiff to prove liability. Evidence for the key elements of rule 10b-5 cases has become quantitative and statistical. Statistical hypothesis testing is, basically, proof by contradiction with a known rate of error. Although these developments invoke the philosophy of causation in its relevance to quantitative-data-analysis methods, our focus below is more on the use of causation to determine what is to be analyzed.

### *209 C. Uncertain Policy Objectives and Judicial Hostility

Because liability in securities fraud depends mostly on evidence grounded in sophisticated economics, it would be reasonable to assume that legal liability and damages satisfy the criteria of the law-and-economics standard of optimal deterrence, but such an assumption would be wrong--or, at least, half wrong. As the Supreme Court's majority observed in Stoneridge, the private right of action under rule 10b-5 is neither common law nor explicitly legislated.[31] The original grant of a private right of action was given by the courts. The result has been a legal history with a somewhat accidental policy objective. Although an argument can be made that common-law fraud remedies often result in optimal deterrence, there has never been a showing that outcomes from rule 10b-5 shareholder class-action lawsuits are anywhere near optimal.

This being said, affixing blame is likely consistent with a law-and-economics analysis of optimality. The law-and-economics prescription for liability in tort is to pass it on to the least-cost avoider of the event causing harm. Shareholder class-action lawsuits attempt to enforce the 1933 and 1934 laws mandating adequate disclosure of information to the public. The least-cost avoider in matters involving disclosure means those who can provide financial information about the issuer at lowest cost. Absent a clear conspiracy, liability almost always falls on the corporation, officers, and somewhat less often, independent board members and auditors. In the words of modern economics, financial markets are characterized by asymmetric information.

PX345

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

The insiders of an organization and their agents have more information than the outside investors. Absent publicly available information about an issuer, investors have an incentive to use resources to find out what is already known inside the firm. By imposing disclosure duties on the insiders, the securities laws reduce the overall transaction costs in capital markets.

It is in the area of damages where there is likely a divergence from optimal deterrence. The reason for this is that it is virtually impossible to quantify the social cost of fraud in the aftermarket. Reconsider the typical case mentioned above: if the untimely bad news had been released on $t_0$, the beginning of the class period, then there would have been a price drop at that time and a different set of shareholders would have suffered a loss. Indeed, because the news was not disclosed in a timely fashion, a large number of investors who are not part of the class received a benefit--they avoided a loss that would have occurred if the news had come out when they were holding their shares. The ***210** relationship between the members of the class and those who were holding their shares at time $t_0$ and sold before $t_d$ is like the relationship between players in a zero-sum game; the members of the class lost in the market what the others avoided losing.

This is not to say there are no social costs of fraud, but rather that the effects are indirect. Deterring fraud causes more complete and accurate disclosure, which has such benefits as improving corporate governance through increased transparency and reducing the riskiness (and therefore the cost) of private capital. It is extremely difficult to quantify these benefits and, to date, scholars have been unable to do so. Therefore, it is not clear whether the court-evolved damage theories bear any relationship to optimal deterrence effects.

What is clear, though, is that class-action-lawsuit damages are usually so large that they exceed the combined wealth of individuals named in class-action lawsuits. If individuals had to face such risks, there would be an adverse effect on the quality of boards of directors and managers of public firms, given the very real risks of error in legal judgments. To mitigate these risks, firms insure directors and officers and also indemnify employees and board members. But this has the opposite effect of reducing the incentive to be careful in avoiding misleading disclosures.

What we are left with is that deterrence may be an objective of rule 10b-5 class-action lawsuits, but optimal deterrence is not, or is at least so hard to achieve that it is not a practical objective at this point. An alternative theory, the corrective-justice goal of compensating defrauded investors, seems to be a better explanation of the approach to awarding damages. Indeed, this appears to be one of the main policy guidelines of the Securities and Exchange Commission (SEC) and is consistent with its looking favorably on rule 10b-5 class-action lawsuits.

One criticism of this policy directive is that those who are compensating the losers are not the same as those who committed the fraud. As a result of being able to name the firm as a defendant, the current shareholders end up compensating the class. This is akin to a special dividend for the class members.

It should be pointed out, however, that this is a criticism of the legal policy that a limited liability firm can be treated as a person under the law--a policy that economists sometimes have trouble understanding because, to the economist, there is not such a clear distinction between the firm and its shareholders. As a result of being able to sue the firm, current shareholders will pay penalties and damages for virtually any type of illegal conduct by management that benefited previous shareholders, whether or not they were shareholders at the time the wrongs occurred. An example is price fixing: when ***211** prices are high, current shareholders receive the benefits, but when the cartel is discovered, future shareholders will pay treble damages. [32]

For some of the above reasons, current sentiment in the judiciary, including the Supreme Court majority, is ambivalent to the rule 10b-5 shareholder class-action lawsuit. But the courts have yet to discard the private right of action that was judicially granted in 1970. Arguably, courts have instead tried to tame shareholder litigation. They have attempted to cabin what plaintiffs can plead and collect. The result has been that, other than issues related to intent, proof of virtually all the elements of rule 10b-5 will be based on finance theory and statistics.

In so doing, the courts have given more certainty to executives about what they can and cannot do, as well as what they can and cannot expect if they are served with a rule 10b-5 complaint. Though we should hasten to add that our focus is on Supreme Court decisions, federal district and appellate courts continue to adopt positions that are sometimes difficult for business people to interpret. Arguably, over the past few years these decisions have made it easier for parties to escape liability for concealing material information from the investing public. Legal uncertainty in either direction is usually not helpful. [33]


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

### II. Conditions and Causation in Rule 10b-5

Starting with Blue Chip Stamps and culminating with Stoneridge, the Supreme Court has made a series of rulings that have defined six elements that must be proved by plaintiffs in a rule 10b-5 class-action lawsuit. These decisions have also indirectly answered the question of how most of these must be proved, because the Court has framed the issues in ways that are best addressed with finance theory and statistics. The modern statement of the six elements was first articulated in Dura as follows: [34]

(1) material misrepresentation (or omission);

(2) scienter (i.e., a wrongful state of mind);

(3) purchase or sale of a security (must be made in connection with a material misrepresentation and scienter);

(4) reliance or transaction causation (which, since Basic, has been subject to a rebuttable presumption if the security ***212** traded in an efficient market (in which case material misinformation would have caused fraud on the market)); [35]

(5) economic loss;

(6) "loss causation" (i.e., a causal connection between the material misrepresentation and the loss). [36]

In Basic, the Court cited only five elements of proof under rule 10b-5, economic loss being absent from the list. [37]

The six conditions are conjunctive; if any one of them is falsified, then plaintiffs will not be able to carry their burden of proof. In this way, they are like links in a chain; if any link is broken, then plaintiffs will fail to carry their burden of proof. [38]

#### A. The "in Connection with" Requirement

In Blue Chip Stamps, the Court found that the "in connection with" (a purchase or sale) requirement meant that the plaintiff had to have engaged in a transaction. Merely holding a security and claiming that a misrepresentation prevented the plaintiff from engaging in a profitable trade was not enough under the Securities Exchange Act of 1934. For example, a plaintiff could not successfully claim that a misrepresentation prevented him or her from selling a security that was later sold for a loss, nor could a plaintiff claim that a misrepresentation prevented the purchase of a security that eventually went up in value.

The Blue Chip Stamps holding meant, in effect, there had to have been a transaction associated with the misrepresentation. It then followed that, because of the transaction-causation requirement, the plaintiff would have to show that the transaction satisfying the "in connection with" requirement also satisfied the "reliance" requirement. This meant that the in-connection-with and reliance requirements were collapsed into a single transaction-causation requirement.

#### ***213** B. Reliance and Efficient Markets


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Then, in Basic, the Court again made part of the vocabulary of shareholder class-action lawsuits redundant by essentially equating reliance with materiality in most circumstances. The holding in Basic was that actively traded liquid securities are presumed to have traded in an efficient market which, in turn, means that their price reflects all publicly available information. It follows that, if there is misinformation, it would be reflected in the price also. To the extent the misinformation is material, the security is mispriced. For example, if management has failed to disclose a negative earnings surprise that would cause a major reduction in expected future cash flows, then the security is priced higher than would otherwise be the case. Had a reasonable investor known the truth, he or she would not have purchased the security at the market price. [39]

But, in so doing, Basic added another requirement: a plaintiff needed to plead that the securities at issue traded in an efficient market. This requirement was framed as a rebuttable presumption, essentially shifting the burden of disproof to defendants. Though there may be more than one way for an individual to establish reliance under rule 10b-5, there has yet to be a case where class certification had been granted without plaintiffs proving that the class traded in an efficient market (or at least making an uncontested allegation on this point). For our purposes then, showing that the market is efficient is considered a necessary condition for a rule 10b-5 class-action lawsuit to proceed beyond the class-certification stage.

### C. Economic Loss and Loss Causation

In Dura, the Supreme Court ruled that it is necessary to establish that prices "fell significantly after the truth became known"; in other words, it is necessary to show loss causation. [40] Under Dura, the Court also required that the "defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." [41] As we will demonstrate in more detail below, it follows that losses suffered prior to the first alleged corrective disclosure (i.e., when a "relevant truth" became known) are not recoverable under Dura.

Dura is the last of the trio of cases to set up the causal structure in contemporary shareholder class-action lawsuits. As will be shown, the ***214** canonical essence of Dura is the following: first, it refined the in-connection-with standard so that a plaintiff could not sell out of his or her position before the revelation of the relevant truth and still have a claim; second, it limited losses to those caused by revelation of the relevant truth; and, third, it effectively combined the showing of materiality and loss causation into one condition (at least partially).

The third point--the typical equivalence of showing loss causation and materiality--may need more explanation. Recall from above that, when there is a revelation of the relevant truth at time $t_d$, the market impounds it into the stock price causing a price decline equal to $P(t_{d-1}) - P(t_d)$. Under the efficient-market hypothesis, if there are no other causes of the price decline, then the magnitude of the price decline is both the value of the news as well as the loss caused by the news. If there is no measurable price drop caused by the revelation of the relevant truth, then the value of the misrepresentation is not material [42] --that is, the materiality requirement for a securities-fraud claim cannot be proven. Similarly, if there is no measurable price drop caused by the revelation of the relevant truth, then loss causation cannot be proven.

In some circumstances it is possible that a timely disclosure would have been material--that is, would have caused a measurable price drop--while the untimely disclosure does not cause a price drop due to changes in economic conditions. The fact remains that absent a measurable drop in reaction to the actual (untimely) disclosure, loss causation cannot be proven. Consequently, showing materiality at the time of the misrepresentation would be moot because plaintiffs would not be able to carry their burdens of proof on one of the other elements of a shareholder fraud claim. Conversely, in other circumstances it is possible that the correct information would not have been material at the time of the misrepresentation but did cause a price drop due to changes in economic conditions. In those cases, unless there is a duty to update, there was no material misrepresentation (or omission). If there is a duty to update, then one must deal with the question of when the misrepresentation became material enough to require such an update, a complication that we assume away for the remainder of this Paper, but that can often be thought of as an adjustment to the date at which the misrepresentation is deemed to be made. [43]

### *215 D. Shareholder Litigation Evidentiary Paradigm Shift

The cumulative result of the Supreme Court decisions has been a paradigm shift in how the elements of liability are to be shown in a securities-fraud case. Though the language used by the Court in Dura was based on common-law notions of deceit, [44]

this is an atavism. The core set of findings needed to prove a rule 10b-5 shareholder class-action lawsuit can be described in a way that is more precise than the common-law approach to fraud and, other than the issue of intent, can be divorced from the traditional common-law vocabulary. [45]

The cumulative effect of the three decisions is that the six traditional elements described above, as a practical matter in most cases, are converted to the following five:

(conditional elements)

(1) scienter;

(2) transactions between the misrepresentation and the revelation of the relevant truth that result in a net long position upon revelation of the relevant truth (from Blue Chip Stamps and Dura); [46]

(3) efficient market (from Basic);

(causation elements)

(4) stock-price drop that is caused by revelation of the relevant truth (from Dura);

(5) inflation per share at the time of purchase that is greater than inflation per share at the time of sale.

***216** Based on Dura's distillation in the elements of proof, it should not be surprising that in the three-plus years since that decision, economic loss and loss causation seem to have been two of the more written-about and fought-over elements in shareholder class-action lawsuits. It would seem that more precision in the definition of these concepts would lead to more certainty in their application.

## III. Counterfactual Dependence and the Meanings of Economic Loss and Loss Causation

Some of the confusion in Dura's application is caused by its being built on an existing vocabulary of rule 10b-5 case law that is inadequate in light of the Court's discussion. Interpreting Dura with the old definitions leads to conceptual traps. As the most important example, in the past, if a case was not dismissed for lack of loss causation, inflation of a share that was purchased in reliance on a fraudulent misrepresentation or omission and held until after the fraud was cured was generally treated as identical to damage. Now, exclusive focus on the behavior of inflation over an investor's holding period will lead to a misapplication of the loss-causation standard and a miscalculation of damages.

In addition, the Court did not refer to any corrective disclosure, instead substituting revelation of relevant truth. The consequence of the new language is not cosmetic; the change in vocabulary has major implications for both whether the loss-causation standard has been satisfied and how damages are to be measured.

### A. Terminology

Loss causation ultimately relates to the question of how, if at all, damages were caused by the defendant's actionable conduct. Because loose use of vocabulary can lead to some confusion, it is important to review the key terms commonly used in explaining damages estimation in rule 10b-5 shareholder class-action lawsuits:


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

True value: the per-share market price of the stock (purchased by class plaintiffs) that would have prevailed in the counterfactual world absent of violative conduct by the defendant. [47]

Value line: the graph of the stock's true value over the course of the class period.

***217** Inflation per share: the difference between the amount paid for the stock by a plaintiff and the stock's true value at the time of purchase. [48]

Index method: an approach to estimating the value line. In its most common form, an index of the defendant company's peers is computed. This index is then anchored to the value of the defendant company's stock price on the first closing price after the final corrective disclosure (usually the day after the last day of the class period). The true value of defendant's stock is then estimated by substituting the daily return of the index for that of the defendant company's stock price throughout the class period. Inflation per share is then computed as the difference between the estimated value line and the market price of the stock.

Percent price inflation: an approach to estimating inflation per share. In a single disclosure case with no inflation buildup over time, the percent price drop of the defendant's stock price due to revelation of the relevant truth is the assumed percent inflation per share for every day of the class period. For example, if the defendant's share price lost one-quarter of its value because of the revelation of the relevant truth, then under this approach the inflation per share on every day of the class period would be 25 percent of the market price.

Dollar price inflation: an approach to estimating inflation per share. In a single disclosure case with no buildup of inflation over time, the dollar price drop of a defendant company's stock price due to the revelation of the relevant truth is the assumed inflation per share every day of the class period. For example, if the defendant company's share price declined by $5 because of revelation of the relevant truth, then under this approach the inflation per share on every day of the class period would be $5.

Retention shares: shares purchased during the class period that are held until after the end of the class period.

In-out shares: shares purchased during the class period that are sold before the end of the class period. The sum of damages to retention shares and in-out shares is equal to aggregate damages before the consideration of offsets.

One noncontroversial conclusion of Dura is that there should be no damage for a share that is sold before revelation of the relevant truth. Even if stock-price inflation falls over a plaintiff's holding period (i.e., from the date of purchase to the date of sale), no justifiable claim for damages exists if no alleged misrepresentation or omission is made public during that period (either explicitly or effectively).

***218 B. The Meaning of Economic Loss**

Before getting to loss causation, it is useful to deal with the notion of economic loss, which the Court brought up for the first time in Dura. Having used the phrase, however, the Court never defined it. Consequently, there is some disagreement about what is meant by economic loss. The vast majority of courts have used the proximate-cause standard, mentioned in Dura, and claimed economic loss is a loss as a result of the alleged misrepresentation. [49] Recently, however, two courts seem to have equated economic loss with realized loss (sale at a price lower than the price paid). [50] In these courts, realized loss in the securities holdings at issue has become a new requirement for a plaintiff to get to trial.

***219** To the economist, the interpretation of the majority of courts makes more sense. Realized loss is not the same as economic loss. [51] Perhaps more importantly, realized loss is remote from loss causation. [52]

Economic loss in the academic sense evokes the concept of opportunity cost. The notion of opportunity cost, in turn, is often consistent with legal concepts regarding how the consequences of the defendant's conduct should be evaluated. When an investor purchases a security infected by a material fraud, then obviously its true value is less than the amount paid. The funds used in payment for the security cannot be used for other investment opportunities. The expected value of an alternative use of these funds is at least equal to the cash price paid for the security and represents what the investor gave up at the time of purchase.

PX345

From the concept of opportunity cost there are two ways to view economic loss in the shareholder-litigation framework and neither is realized loss.

The first is based on an implication, described in more detail below, that the Basic Court ruled that the alternative use for the money that bought defendant's shares was to purchase the shares that were the closest substitute to the defendant's shares. This alternative basket of securities would have been expected to perform like the defendant's shares, but for losses caused by the fraud.

Thus, the relevant counterfactual is the following: if it were the case that plaintiffs had not purchased the defendant's shares, then the plaintiffs would have invested their money in a hypothetical basket of securities that would have behaved in every respect like the defendant's security except for excess returns caused by the fraud. In this counterfactual world, the plaintiff would have then avoided the losses, and only the losses, that occurred because of price drops on days of corrective disclosures of the relevant truth.[53] This does not seem like a ***220** very satisfying explanation, however, because it then would imply that economic loss and loss causation are redundant under Dura. The redundancy might be removed if the following were true: loss causation is the fact of loss caused by the revelation of the relevant truth, and economic loss is the magnitude of this loss. But this resolution is based primarily on a semantic difference.

A second realistic concept of economic loss starts with the counterfactual that, were the relevant truth revealed in a timely fashion, then the stock price would have dropped prior to plaintiff's purchase. In this counterfactual, the most similar world is one where the plaintiff makes a purchase of the same number of shares but at a lower price. This is an explanation of economic loss that is consistent with the in-connection-with transaction requirement--that is, the fact of a trade of the actual number of shares in the same security is assumed true in the counterfactual world. The counterfactual price is then the actual price less inflation per share, which is the value of the concealed or omitted information (assuming an efficient market, per Basic).

The relevant counterfactual in this case is the following: had management made timely disclosures, the plaintiff would have bought and sold his or her securities at different prices over the class period. For each transaction, the difference between the counterfactual price and the actual price is the inflation per share. From this, it follows that the economic loss is the difference between the inflation per share on purchase and the inflation per share on sale. This definition of economic loss is consistent with Professor Michael J. Kaufman's reading of Dura, though he admits the Court did not squarely address the issue.[54]

Viewed in this way, economic loss is not necessarily a measure of damages, but a cap on damages should economic loss be less than the quantum of loss causation. This interpretation is a more complete resolution of the redundancy between loss causation and economic loss observed in the first counterfactual above. As noted by Professor ***221** Kaufman, this interpretation is also consistent with the view of the Court that if an investor purchased a security and sold it immediately, he or she would not have suffered a loss.

But, under this theory it is also the case that an investor can sell a share at a higher price than he or she bought the share--having no realized losses-- and still incur an economic loss. In the counterfactual world, the price appreciation between purchase and sale could have been greater than in an actual world where there was some price appreciation, but not as much as in the counterfactual world because there was a corrective disclosure that caused a temporary price drop. Thus, even a plaintiff with no realized loss would be able to pursue his or her claim under this concept of economic loss. Be forewarned, however, that the Supreme Court did not resolve with any finality what economic loss means, and there is the potential for other interpretations.

### C. Economic Losses Greater than the Drop in Stock Price on the Revelation of the Relevant Truth

Most shareholder class-action litigation occurs over stocks that have fallen in price over the class period. Very often, plaintiffs' estimate of inflation per share also falls over the class period, meaning that the claimed economic losses, if measured as the difference between inflation on purchase and inflation on sale, are greater for purchasers at the beginning of the class period than for those who purchase just before the end of the class period. Damages are often claimed for retention shares, even after Dura, for the full amount of the inflation at the time of purchase, even if the inflation per share on purchase is greater than the drop in stock price when the truth is revealed. Such claims, though, are based on a theory of causation that is inconsistent with Dura. If the inflation per share drops to zero on the day of the disclosure of the truth, and if the inflation per share at the time of purchase was greater than the decline on the day the truth became known, then the inflation per share must have declined prior to the disclosure day. But this could only happen for reasons other than the revelation of the relevant truth. If there were

PX345

losses before the disclosure of the relevant truth, then some set of factors, other than the alleged fraud, were at work such that in their absence, there would not have been that decline in the price of the stock before the disclosure of the relevant truth. This component of the price decline represents an investment risk, other than fraud, which the investor took on when the security was purchased. The following hypothetical illustrates this principle.

***222** Consider two closed-end index funds that claim to be invested in a basket of securities to match the S&P 500. Suppose that one fund in fact invests its initial public offering (IPO) proceeds in such securities, while the managers of the other fund fraudulently pocket all of the cash it raised without investing in anything. After the subscription period is closed, each fund is traded on the New York Stock Exchange. Because the market believes that both funds are holding the S&P 500 portfolio, their share prices will be the same as long as the fraud in the second fund remains secret. Obviously, absent any revelation of fraud, both funds should track the S&P 500.

The figure below is a stylized depiction of the following hypothetical sequence of events: when trading begins, the share price of each fund is $10; over time, the S&P 500 loses 20 percent of its value; and when the share price of the funds is $8, the truth about the fraudulent fund is immediately revealed and its share price collapses to zero.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**Figure 1**

Most would agree that a shareholder class-action lawsuit is an appropriate response. In the instant hypothetical, we have specified that the managers have committed the fraud. A damages policy may depend on whose conduct is to be deterred by bringing the case. One of the main policy objectives of shareholder class-action lawsuits is to deter future managers from perpetrating frauds on investors--that is, to prevent frauds from arising. [55]

***223** Continuing with the numerical example, a shareholder who buys the fraudulent fund at the initial price of $10 and holds past the alleged corrective disclosure will have suffered an economic loss of $10. But of that loss, $2 was due to the decline in the S&P 500--an intervening factor occurring between the purchase of the shares and the disclosure of fraud-- making that $2 a loss the investor would have suffered whether he or she invested in the “real” or the “fraudulent” fund.

Consider the losses sustained by three members of the purported class:

(1)Plaintiff A buys stock on the first day of the class period for $10 per share and sells on the day before the corrective disclosure for $8 per share.

(2)Plaintiff B buys on the first day of the class period for $10 per share and retains all shares until after the corrective disclosure, when the stock price falls to $0 per share.

(3)Plaintiff C buys on the day before the corrective disclosure for $8 per share and retains all shares until after the corrective disclosure, when the stock price falls to $0 per share.

In the vocabulary of shareholder class-action lawsuits, plaintiff A is an in-out investor, one who purchases during the fraud period and sells before the end of that period. Plaintiffs B and C are buy-and-hold investors, who retain the shares they purchased during the period through the end of the fraud period.

Dura did not change prior doctrine on the measure of plaintiff C's loss attributable to the alleged fraud. Given liability, this individual would be entitled to compensation for loss incurred upon the corrective disclosure: in this case, $8 per share. If the court found the three conditions for liability for fraud related to the subject matter of the corrective disclosure, and if plaintiff C made no security sales that benefited from the fraud, such a damage claim would not be seriously disputed by a court.

The claims made on behalf of plaintiffs A and B, however, have become more clearly limited under Dura. To see this, we need to show how the plaintiffs would have estimated damages pre-Dura based on two possible approaches, which in this example give the same answer: plaintiff A's damages would be estimated as $2 per share, and plaintiff B's damages would be $10 per share.


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

(1) The index method: in this approach, we observe that on the day after the corrective disclosure, the stock price attains its true value of $0. If we were to anchor an S&P 500 index to this endpoint, the true value throughout the class period would also be $0. That is, the value of the fraudulent fund has always been $0.

(2) The percentage inflation method: in this approach, we observe that on the corrective-disclosure date, the fund lost 100 percent of its ***224** value. Thus, the inflation per share was 100 percent throughout the class period, again meaning that the value of the fraudulent fund has always been $0.

The plaintiffs would then argue for calculation of damages under either of these theories: the loss for plaintiff A would be the inflation per share on the purchase of the security less the inflation on the sale, which is equal to $2 in this example ($10 less $8); the loss for plaintiff B would be the inflation per share on purchase, or $10 in this example.

The defendant would admit that plaintiffs A and B would have suffered no losses due to the decline in the S&P 500 had they known the fund was a fraud and instead kept their money in a checking account. This counterfactual, however, is irrelevant. The shareholder purchased a stake in the S&P 500 and thereby assumed the market risk that materialized. The defendant caused neither plaintiffs' preference to assume market risk nor the decline in the stock market.

The resolution of this conflict can be obtained by using a counterfactual analysis to determine the extent of causal dependence of the plaintiffs' losses on the defendant's fraud. In this instance, the Supreme Court's most similar (implied) counterfactual world is one in which the plaintiffs' investment would have been a security not infected with fraud, but similar in all other ways.

This is consonant with Lewis's theory which is partially built on a more rigorous version of the legal concept of the “but-for” world. [56] One of the conceptual problems is that there is a vast number of but-for worlds where the fraud would not have occurred, but all such hypothetical worlds except a few are irrelevant for determining liability and damages. For example, one possible counterfactual is that the manager defendant was never born. In such a circumstance, neither the fraud nor disclosure-related investor losses would have occurred. [57] However, this does not mean that the manager's birth is a proximate cause of the fraud, nor are the manager's parents held responsible for investors' losses. Lewis's theory invokes the notion of history up to the antecedent event (in other words, history up to the time of the fraud is the same in the counterfactual world as it is in the actual world). [58] Then we ask whether in the world most similar to the actual world, in the ***225** absence of the fraudulent conduct of the defendant, there would have been as great an investor loss. If the answer is no, then shareholder losses would have been less in the closest counterfactual, no-fraud world due to the lack of dependence between fraud and market losses. In this closest counterfactual world, the investor would still suffer the market losses resulting from the risk assumed on the purchase of a security even if the fraud had not occurred. In the instant example, the difference between the losses in the actual world and the counterfactual world is limited to the share-price drop on disclosure of the fraud. Thus, in this case, an idealization of this closest world without the antecedent of fraud is the nonfraudulent fund--a counterfactual security. [59]

Consequently, to measure damages we can ask whether the plaintiffs would have sustained losses associated with the decline in the S&P 500 if they had purchased a counterfactual security (theoretically, the security not affected by the fraud but identical in all other respects). For plaintiffs A and B, the answer is clearly yes--both would have lost $2 per share because of the market decline. Therefore, the plaintiffs' damages theories would result in a $2-per-share windfall to both A and B solely because they unknowingly invested in the fraudulent, as opposed to the nonfraudulent, fund. [60] The only remaining candidate for loss caused by the fraud is the $8 decline in the share value that occurred on revelation of the relevant truth.

The same principle applies to the estimation of damages for common stock where operating assets, rather than securities, are backing the equity. The notion of market risk has had important applications in recent United States Court of Appeals for the Second Circuit decisions that have interpreted loss causation. For example, in the WorldCom litigation, Judge Denise Cote granted the defendants' motion to strike testimony on causation, citing the difference between ***226** economic losses that were the realization of risk associated with holding a stock in a declining market and those caused by a fraud: [61]

> A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public. As [the Second Circuit in] Merrill Lynch has formulated the test for loss causation, a plaintiff must show “both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk.” [62]

PX345


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

It may be argued, however, that the above counterfactual analyses showed only that the losses occurring prior to the revelation of the relevant truth were not caused by the fraud. This leaves open the possibility that other categories of losses, in addition to the reduction in inflation per share caused by revelation of the relevant truth, may be attributable to the fraud. [63]

The relevant counterfactual that would provide a more general theory is this: conditional on the plaintiffs' share purchase, were management to have made timely disclosures prior to the plaintiffs' share purchase, the plaintiffs would have avoided a reduction in inflation per share immediately following revelation of the relevant truth. This implies that the Court's loss-causation standard examines the difference in share price on the date of the corrective disclosure between the counterfactual security (never infected with fraud) and the actual security to gain insight into how much of the price drop is due to the removal of the inflation per share on the day of the plaintiffs' purchase. To the extent the price drop in the actual security is greater than the inflation per share without the disclosure, then some of the price drop is due to other factors. The plaintiffs' damages would then be capped at the amount only due to loss causation, where the loss-causation amount is the inflation per share in the plaintiffs' security that ***227** was present at the time of purchase and removed on the revelation of the relevant truth.

As is obvious from above, a key issue in a rule 10b-5 case is what happens to the stock price when the alleged relevant truth is revealed to the market. This has led to closer scrutiny of what constitutes the relevant truth and to whether there was some other cause of the stock- price behavior when the relevant truth was revealed. Examination of these questions in actual cases has uncovered issues that, if not novel, are at least taking on more importance. Also, doubts have arisen about the extent to which the event study, now at its peak in legal respectability, can resolve disputes about causation by itself in a growing number of circumstances. As a result, the event study is being viewed more as a starting point rather than providing the final answer. Additional analytical tools from the social sciences and finance are being applied in analyzing stock-price behavior in response to disclosures of misrepresentations and omissions to understand which of the information in the disclosure is actually moving the stock price.

**IV. Application to Recent Issues in Using the Event Study to Measure Damages**

We now examine in more detail the analytical approach taken to establish the counterfactual in shareholder class-action lawsuits. Given "normal conditions," such as market efficiency and appropriate purchases and sales by investors, the counterfactual that needs to be established can be described by the following diagram:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**Figure 2**

***228** The critical issue is to establish the first link in this causal chain. The second link is usually taken for granted. That is, as noted in the Section above on economic loss, it is assumed that if the stock price had not been inflated, investors either would not have invested in the stock at all (they may have looked for a substitute investment elsewhere), or at a minimum would not have been holding the stock when the price dropped after the (timely) revelation of the truth. This depends on the assumption that in reality, investors purchased the stock in reliance on the inflated price (that is, after inflation had come into the stock).

Confirming the first link in the causal chain relies on a combination of technical tools. The first and most prominent of these is the event study. An event study is a statistical tool that is used to determine whether a drop in the stock price on a given day is abnormal, given market and industry movements. If the drop is in fact abnormal, an event study can also calculate the excess return, that is, the amount by which the stock dropped beyond what would have been predicted by market and industry movements. An event study is usually the first step in showing loss causation due to an untimely disclosure.

While an event study can determine the abnormal stock-price drop on the day of a disclosure, it cannot be automatically assumed, however, that the entirety of this drop is due to the disclosure. It is first necessary to establish that no other negative news was released on the same day and, if negative news did become public simultaneously, that investors were not considering the non-fraud-related information when reacting to the disclosure. If it appears that other factors might have been relevant, then further steps have to be taken to identify them and ascertain their potential contribution to the price drop.

PX345

**A. Event Studies and Loss Causation**

The typical approach to estimating damages in a securities-fraud case involves performing an event study to determine both the materiality of the allegedly misleading information and the magnitude of the losses caused by the alleged fraud. Because of its wide acceptability, standards governing its operation, known rate of error, and ability to test hypotheses, the event-study technique provides a good example of scientific evidence. A proper approach must account for market-related events and trends that also could have affected the stock price. For example, in a pre-Dura decision, In re Executive Telecard, Ltd. Securities Litigation, [64] the court ruled that the plaintiffs' expert's report failed the Supreme Court's Daubert standard of ***229** admissibility [65] for neglecting to take into consideration other factors contributing to stock-price declines. The Executive Telecard decision said the following:

> Those principles--when applied within the damages valuation context--simply require elimination of that portion of the price decline that is the result of forces unrelated to the wrong . . . . Such forces can be broadly categorized into: (1) company risk--the unique risk that is peculiar to the particular stock at issue, and (2) market risk--the risk associated with market wide variations generally. [66]

Generally, testimony based on properly conducted event studies has been admitted in court proceedings while testimony based on other methods, such as the index approach, has been ruled inadmissible. [67] The event study has become a fixture as a tool for securities litigation and academic literature related to securities litigation. [68] Depending on the intended purpose, event studies of the type used in litigation rely on two well-accepted principles to provide meaningful evidence. The first is the semistrong version of the efficient-market hypothesis, which states that stock prices in an actively traded security usually reflect all publicly available information and respond quickly to new information, and was the basis for the Supreme Court's decision in Basic. The second is that the price of an efficiently traded stock is an optimal estimate of its fundamental value, namely the present discounted value ***230** of the expected future stream of free cash flow. [69] A properly performed event study can measure the extent of losses in response to an event under the following circumstances:

1. The event is a well-defined news item.

2. The time that the news reaches the market is known.

3. There is no reason to believe that the market anticipated the news.

4. It is possible to isolate the effect of the news from market, industry, and other firm-specific factors simultaneously affecting the firm's stock price. [70]

There have often been situations where some of the above conditions have not been present but the event study was used nonetheless in conjunction with additional analyses. For example, the corrective disclosure may have been in a news release that contained more than one news item that could have arguably influenced the market. Recently, however, there has been more focus on what actually happens when the truth is revealed and whether conditions one and four hold, even in the most seemingly well-isolated corrective disclosures.

***231 B. Stock-Price Reaction: Loss Causation or Collateral Damage?**

PX345

An event study of the effect of a corrective disclosure on the defendant firm's stock price is the most common way of determining the magnitude of the loss caused by the fraud. One can think of the revelation of the truth, even if belated, as an experiment performed by history. If there have been no changes in the nature of the fraud or its relationship with the stock price, the result is considered to be a best estimate of the stock-price impact, had the truth been revealed earlier.

A potential problem with naïve application of this approach is that the nature of an untimely, corrective disclosure might be different from that of a timely disclosure if the former causes the market to believe there has been fraud. For the most part, however, the price impact of the fraud-risk component of a corrective disclosure has been considered to be so slight that it can be ignored. But this is not always so, and in some cases a more fact-intensive inquiry may be necessary. In this Section we consider the possibility that a drop in a stock's price might be caused not by the facts revealed in a disclosure per se, but rather by ancillary effects arising from the disclosure, a category of factors that have already been referred to as collateral damage (we should be clear at this point that collateral damage refers to the factors which help lead to the price drop, not the associated price drop itself; this semantic distinction will be relevant below). These factors may create uncertainty or fear regarding the future of the company, and it is this uncertainty which might, in some cases, be responsible for the price drop.

It is interesting to consider the issue of collateral damage from the philosophical point of view. If we adopt Professor Menzies's distinction between causes and conditions, one question that arises is whether a factor that gives rise to collateral damage is truly a cause, or only a condition. As we shall see below, the answer may vary with the circumstances. In some cases, the secondary factors making up collateral damage might have been present even if the disclosure at issue had been made in a timely manner. In such instances, one might suppose that the collateral damage is more a condition inherently tied to the substance of the disclosure than a cause in its own right.

On the other hand, sometimes the collateral damage would not have occurred in the event of a timely disclosure. To merely dismiss these factors as a condition would seem to be misleading, then. An analogy can be made here with one of Menzies's examples. He discusses a situation where a fire occurs in an ordinary building. Trivially, there must have been oxygen present for the fire to start. Yet, it would seem foolish to call the presence of oxygen a cause in this case. The presence of some oxygen in the air might be considered part ***232** of the normal conditions, and is hardly noteworthy in an examination of what caused the fire. But if a fire takes place in a laboratory in a chamber that is supposed to be kept in a vacuum, the fact that some oxygen was present and enabled the fire to start becomes much more important. In this case, the oxygen might reasonably be considered one of the causes. Similarly, considering whether or not the collateral damage would be present under normal conditions can help lead to the correct counterfactual that should be considered in a litigation context.

The purpose of the remainder of this Section is to discuss situations where collateral damage is the more likely explanation of a price drop, and to analyze the resulting causation-related questions.

1. causal analysis of revelation of the relevant truth

One of the ways to visualize causation is through directed acyclic graphs (DAGs), which formalize the notion that the links in a diagram showing a causal chain flow in only one direction and hence demonstrate causation, as opposed to an ordinary flow chart. [71] These have analogs to the type of statistical evidence that is presented to determine materiality, loss causation, and damages. We consider the effect of an announcement of a negative earnings surprise on the stock price: the type of news that can trigger a claim. Abstracting from the question of scienter, whether the market infers fraud is based on the realization of a binary condition--either the announcement was timely or it was untimely. An untimely earnings surprise means there was a legal obligation to disclose the earnings (or the conditions that led to the unexpected earnings) at an earlier date, such as at the prior quarterly earnings announcement.

The graph of a timely, material earnings surprise where the market believes there is no adverse legal consequence would be the following:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

***233 Figure 3**

PX345

In its simplest form, the revelation of a material accounting restatement or untimely disclosure of other information that is used to estimate future cash flows would have an identical causation graph:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**Figure 4**

If this reflected the complete explanation of the observed excess return, then most analysts would feel comfortable using the results of an event study to address causation, materiality, and damages. There could be other consequences of an untimely announcement, however, that upon investigation might reveal that the event study is measuring more than one disclosure effect.

***234** For one, an untimely news announcement can differ because it can raise the suspicion--usually assumed to be immaterial--of a breach of a legal obligation, hence the potential for a shareholder class-action lawsuit. Theoretically, if the market simultaneously suspects grounds for legal action, then there will be an expectation of a class-action settlement that occurs at the same time as the untimely negative earnings surprise. [72]

The prospect of a shareholder class-action lawsuit should not have much practical impact, however, because its expected cash effect would be small relative to the defendant firm's capitalization. Most of these cases are settled or dismissed before trial, and the typical settlement has historically been less than 3 percent of investor losses. [73] Insurance typically pays the lion's share of settlement and defendants' legal expenses. If the prospect of a shareholder class-action lawsuit was the only confounding factor when the untimely earnings revision was announced, there would generally be no material concern about using the entire excess return as the measure of loss caused by the fraud.

But there may be other confounding effects when there is suspicion of fraud in an announcement. The recent experience with employee stock-option backdating is instructive. A number of option-backdating disclosures have been accompanied by a statistically significant stock-price decline, yet the accounting violation arguably had no material impact on the firm's cash-flow disclosures. Also, the number of employee stock options and estimates of their value has almost always been correctly and timely reported in the footnote disclosure; consequently, there should be no stock-price impact from fears of dilution on an option-backdating announcement. This means the estimates of future free cash flow per share and, therefore, the firm value per share would not be significantly affected by the corrective disclosure.

The remaining possible explanations for out-sized price drops are limited in number, though several of them have difficulties. One is that the market is not efficient, but this explanation would not be acceptable to plaintiffs because they are compelled to invoke the fraud-on-the-market theory to succeed at the class-certification phase. A second is ***235** that option backdating carries with it the possibility of invasive SEC and Department of Justice investigations. But, at least ex post, the out-of-pocket costs associated with expected defense and penalties have turned out to be relatively modest compared to the loss in capitalization when options backdating has been announced.

Other collateral effects of an options-backdating disclosure, however, might be more material to investors. Key employees involved in the practice may be dismissed, and official investigations may be a distraction for the remaining executives. In addition, there is the possibility, described further below, that an announcement of accounting violations in general, and options backdating in particular, causes increased uncertainty and risk in holding the firm's securities. Investors require a higher return for investing in riskier assets, and news that causes an increase in risk would also cause the price of the affected shares to fall.

A recent monograph by Professor Allen Ferrell and economist Atanu Saha also makes the point that, in addition to signaling serious legal issues, a corrective disclosure may be associated with a downgrade in the market's opinion of management. [74] More specifically, they argue that a stock-price decline on the day of a corrective disclosure may reflect a reassessment of how well the firm is run. Using an example of an accounting restatement that does not by itself add information about the firm's value, the authors caution, “Investors might infer that the quality of the firm's management and internal controls are lower than they had previously believed and revalue the firm downward accordingly.” [75]

In their view, the causation explanation can become more complicated than in the simple restatement case. The implication of their argument, which we explain below, is likely based on a spurious correlation. This can best be demonstrated with the hypothetical introduced earlier concerning an earnings surprise that is a noncash generally accepted accounting principal

PX345

(GAAP) violation (were it timely disclosed, there would have been no material impact on future expected operating cash flows). But, the collateral effects at the time of the announcement lead to a statistically significant stock-price decline. In this instance, the DAG could have multiple paths as shown below in Figure 5.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

***236 Figure 5**

Although Ferrell and Saha argue that there would be no liability under the circumstances represented by Figure 5, it is likely that plaintiffs would strenuously dispute such a claim. Referring first to the left-hand side of the graph, the question arises as to whether the information that there was a fraud, even if immaterial, matters for loss causation. The distinction between the information that was concealed (i.e., the actual, restated earnings in this example) versus the allegation that management was engaged in a cover-up is of critical importance. In the hypothetical presented by Ferrell and Saha, the misrepresentation is that the company was holding assets in cash when they were actually in treasury bills. The distinction gives rise to a balance-sheet accounting violation but has no effect on the value of the company. [76]

***237** The issue involves comparing the actual stock price to what it would have been had there been no fraud. [77] The hypothesis is that, had the truth been known in a timely fashion, the stock price would have been no lower so there would have been no damages. Whether the stock price would have been the same in the counterfactual world, however, is not always clear.

2. the need for factual analysis

In trying to assess materiality and loss causation, an immediate problem involves understanding the mechanism that is causing a downward revision of expected cash flows. Unfortunately, inspection of the corrective disclosure by itself will often not reveal the full explanation of the price decline. The history of shareholder class-action lawsuits shows that there are a number of possible explanations.

a. Misrepresentation that appears to be material simply from the fact that it is a misrepresentation

The fact that management is facing all the problems associated with accusations of participating in an accounting violation could, in certain circumstances, be enough to send the stock price tumbling. If this could be shown to be the only material piece of news, then it would appear that defendants might have the better argument. [78] This very issue was recently confronted in an SEC enforcement action arising over backdated options at Brocade Communications Systems, Inc. In ***238** deciding that the isolated fact of a fraud is not material, Judge Stephen Breyer made the following comment:

> For its part, the SEC has suggested that investors punished Brocade's stock simply because the company's financial statements had been inaccurate, or in other words, because they believed Brocade's executives had lied. This observation may be true, too, but it is a woefully insufficient basis for finding that the misrepresentations are “material” as a matter of law. If a misrepresentation is deemed material simply because it is a misrepresentation, then the law's materiality requirement is altogether meaningless. [79]

b. News about management quality

With regard to news about management quality, however, it is likely that plaintiffs have a potentially persuasive rebuttal. It is important to be clear about semantics on this issue. Usually what is meant by management quality is the ability to run the firm so as to maximize shareholder value. Consider a different hypothetical from the one above, where the firm's executives materially overstated earnings over several filing periods. A well-known reason for using accounting tricks is to cover up disappointing core earnings. In the but-for world of timely earnings announcements not violating GAAP, there still would have been one or more negative earnings surprises. In the but-for scenario, such news would signal that management was not performing up to market expectations. Consequently, negative inferences about management quality from a corrective disclosure are simply delayed inferences that would have also been made from timely disclosures. Put another way, in this case, concerns about

management quality might be considered conditions that generally accompany poor news about earnings, à la Professor Menzies. Management quality would not be considered a separate cause in its own right.

With regard to an immaterial accounting violation, one might wonder whether there are any inferences about management quality that would cause the price decline. Sometimes there is one: lack of adequate internal control mechanisms. Whether this is an issue, either in the allegation of a misrepresentation or in loss causation, would be a factual issue.

***239** c. Increased perceptions of investment risk

News of material accounting violations (i.e., disclosures that would cause investors to reduce their expectations of future free cash flow) would signal that management has been less than candid with the truth. To label this failing as management quality, though, is slippery. For this reason, in the above example we have excluded the possibility that management quality per se may also be measured along the dimension of integrity.

Nonetheless, if shareholders and the board of directors believe that the plaintiffs' allegations have merit, then this will have two repercussions: first, a higher-than-average expectation that the culpable executives will have limited tenure; second, a perceived risk that this is not the last piece of bad news about earnings. Each of these is discussed below.

(i) inferences regarding management job security

Losing executives may affect expectations of future cash flows if the market were to believe that replacements are not capable of filling the shoes of those who left. An announcement of an accounting violation that creates credibility problems for incumbent management could therefore contribute to a stock-price drop by causing a market reassessment of how long existing management is going to last, especially if a board-of-directors investigation is triggered by the disclosure. If management escapes being fired, however, then the stock price should recover the amount it lost. In any event, because the accounting change was not material (by assumption), there is an open question of whether management firings would have been foreseeable at the time the misrepresentation was originally made. Once again, the issue of loss causation may become one of a factual inquiry into the allegation. Simply because the stock price dropped on the news, though, is not enough by itself to trigger damages.

(ii) risk of future material accounting-related earnings surprises

Upon hearing a disclosure of an accounting violation, it is common for investors to expect the second shoe to drop. If there is an additional disclosure of a material accounting infraction that triggers fraud liability, then the part of the initial excess return caused by increased risk is certainly part of damage per share. The question is more complicated, however, if there (1) is additional news that affirms the accounting violation was not material, or (2) is no additional news that ***240** provides tacit guidance that the original accounting violation was not material.

Is an increased perception of risk that accompanies a disclosure a cause, or a condition, for the resultant price drop (assuming that the heightened risk does indeed contribute to the drop)? The answer, as alluded to above, at least partly depends on whether the first disclosure is complete or whether more disclosures follow. It might thus be possible to say that the completeness of the first disclosure should form part of the conditions for this example. In particular, since one might expect a complete disclosure to generate less risk and uncertainty, the normal conditions might constitute two distinct possibilities: either a disclosure is complete and generates little increased risk, or it is not, and risk increases substantially. Viewed this way, in the scenario where the initial disclosure is only partial (accompanied by greater uncertainty, and then followed by further disclosures that confirm the uncertainty), the presence of risk may be considered normal and hence not really a cause of the drop; a complete analysis would depend on the outcomes of subsequent disclosures. On the other hand, if it turns out that the disclosure was in fact complete, the presence of risk would not be normal and would merit consideration as collateral damage in a causation argument.

d. Is generalization about collateral damage possible?

Announcement of an immaterial accounting violation will often trigger a stock-price drop and shareholder class-action lawsuits. Assuming that the pure stock-valuation aspects of the violation--that is, its effect on the discounted present value of future cash flows--are not material, one may wonder what caused the price drop and whether any of it reflects information the market did not know before. In some cases, such as issues dealing with management quality or the first of a series of negative accounting


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

restatements, the answer is likely to be yes. Plaintiffs may then be able to construct a plausible case for loss causation by arguing that such information would have depressed the stock price during the class period.

As Judge Breyer recognized, however, there is a potential circularity to the argument that an otherwise immaterial violation becomes material only because the stock-price drop was caused by market-perceived implications of the fact of the infraction rather than its gravity. If courts were to accept such arguments, then immaterial violations would always become material only if their announcement causes a stock-price drop for a reason other than the substance of the misrepresentation.

***241** Even the hot-button issue of management integrity is not so clear cut. If an infraction in and of itself is not material to shareholders, then it may be reasonable for management to believe that a necessary condition for fraud is missing from their conduct. Indeed, the implication of an immaterial violation is that, were the truth known from the beginning, the share price would have been no lower over the class period than it actually was. If the stock price drops nonetheless because of uncertainty about management credibility, the market is arguably assuming there is more risk than is actually the case--i.e., the market is getting it wrong even though it may be rational to expect more negative news, such as firings or other accounting misstatements, because this has been a historical pattern for other stocks. If, in fact, internal and government investigations exonerate management and there are no more accounting restatements, then share prices will rise on positive news. Again, though there would not have been a lower price during the class period had the true financials been reported from the start, there would have been no change in perceptions of management integrity because the substance of the misrepresentation was immaterial (by assumption). The only way that plaintiffs could sustain an action is to argue that the relevant counterfactual is one where a violation occurs (which would make it not a counterfactual), and then management would have to reveal the violation instantaneously after the class period starts in order to induce a price reaction at the beginning of the class period that causes uncertainty about management integrity. Without assuming such a but-for world, there would be no inflation per share at the beginning of the class period and no damages. Such a theory of causation, however, would be a contrivance just to sustain a case where the materiality requirement would not otherwise be met.

Arguably, as a policy matter, there is merit to deterring willful misrepresentations even if the stock price would not have moved in the absence of the misrepresentation. It is likely, for example, that the SEC believes it should enforce civil and/or criminal penalties in such a case. This is not, however, necessarily the best fact pattern for traditional shareholder class-action lawsuits.

**Conclusion**

The Dura decision has shone the spotlight brightly on the issue of loss causation. Due to the stricter standards imposed by the Supreme Court, carefully establishing loss causation is now more crucial than ever in shareholder class-action lawsuits. It is now widely accepted that investor losses due to so-called intervening events, such as a drop in the S&P 500 during the class period prior to the revelation of the relevant truth, are to be excluded from damages. Such a result is consistent with ***242** the philosophical notion of the counterfactual world without liability being the one closest to the actual world; inflation per share and loss causation are then the difference between the stock prices in the actual world and the counterfactual world. In a simple case, damage per share then becomes equal to the lesser of loss causation or the decline in inflation per share between purchase and sale.

Complications arise when there is confounding news at the time of the revelation of the relevant truth. Although an event study can detect when a stock-price decline on such news is statistically significant, it cannot by itself determine which of simultaneous events caused the price drop. For example, is it the substance of the corrective disclosure or the uncertainty about the future caused by a revelation of wrongdoing? Sometimes, finance theory can be used to rule out some potential explanations of a price drop. Other times, an empirical analysis will be the best way to find out what piece of information caused the market to react. When available, the most telling information is often contained in analyst reports following the disclosure. A review of postdisclosure materials to determine which element of the news was material to the market should be done in such a way as to minimize bias. There is the danger that an expert is selectively quoting from the available sources. One method that is currently being used to reduce the chance of drawing an erroneous conclusion is content analysis.[80]

Although Dura arguably added clarity to the notion of loss causation, correctly showing loss causation has not become less complicated. Investigators are finding an increasing number of situations where careless application of the standard event study may yield the incorrect counterfactual. In such instances, a fact-intensive inquiry, perhaps using alternative or complementary approaches, may be needed to draw correct inferences about the causes and amount of shareholder losses.

## Footnotes

a1 Fred Dunbar is a Senior Vice President at NERA Economic Consulting.

aa1 Arun Sen is a Senior Consultant at NERA Economic Consulting. The authors would like to thank Larry Elliot, Jill Fisch, Salvatore Graziano, Gregg Jarrell, Richard Rapp, Donald Langevoort, David Tabak and the participants of the 2008 Institute for Law and Economics Policy Conference for helpful comments.

1 162 N.E. 99 (N.Y. 1928).

2 Richard A. Epstein, Two Fallacies in the Law of Joint Torts, 73 Geo. L.J. 1377, 1377 (1985). An interesting issue brought up by Palsgraf is the role of foreseeable causally dependent chains in establishing liability. That is not the subject of this Paper, however.

3 H.L.A. Hart & Tony Honoré, Causation in the Law 94-96 (2d ed. 1985).

4 Id. at 2 ("We attempt ... to show precisely why the past philosophical discussions of causation have seemed so irrelevant to the lawyer ...."); id. at 11 ("The Humean analysis ... offered to the scientist a more or less adequate account of those aspects of causation with which he is concerned .... There are, however, other difficulties connected with causation not touched by this analysis. They are felt by those who, like the historian and the lawyer, are not primarily concerned to discover laws or generalizations, but often apply known or accepted generalizations to particular cases.").

5 See, e.g., David Hume, An Enquiry Concerning Human Understanding 51 (Tom L. Beauchamp ed., 2000); John Collins et al., Counterfactuals and Causation: History, Problems, and Prospects, in Causation and Counterfactuals 1, 1 (John Collins et al. eds., 2004) ("Thirty-odd years ago, so-called regularity analyses (so-called, presumably, because they traced back to Hume's well-known analysis of causation as constant conjunction) ruled the day ....").

6 See, e.g., G.H. von Wright, On the Logic and Epistemology of the Causal Relation, in Logic, Methodology and Philosophy of Science IV 239, 307 (Patrick Suppes et al. eds., 1973) ("The idea which I have been discussing could be termed manipulative or experimentalist causation.").

7 See Hart & Honoré, supra note 3, at ii.

8 See generally Robert W. Fogel, Railroads and American Economic Growth (1964).

9 Id. at 237-38.

10 See id. at 238.

11 Technically, Professor Fogel did not show that the railroads had no effect, but that their existence was not essential to economic development. See id. One might claim that this is like showing that a defendant is a little bit liable, but liable nonetheless. In the applications below, though, we show that how causation is defined can have a major effect on damages as well as liability. That is, even if liability is shown, the quantum of damages will vary depending on alternative legal treatments of the cause of the plaintiff's loss.

PX345

12 David Lewis, Causation, 70 J. Phil. 556 (1973), reprinted in Causation 193, 194 (Ernest Sosa & Michael Tooley eds., 1993). The regularist approach was associated with the first of the following two sentences from Hume: "[W]e may define a cause to be an object, followed by another, and where all the objects, similar to the first, are followed by objects similar to the second. Or in other words, where, if the first object had not been, the second never had existed." Hume, supra note 5, at 60. Hume goes on to relate how we form ideas about causation: "[W]hen many uniform instances appear, and the same object is always followed by the same event; we then begin to entertain the notion of cause and connexion ...." Id. at 61.

13 Collins et al., supra note 5, at 1.

14 See Lewis, supra note 12, at 200.

15 See Ernest W. Adams, A Primer of Probability Logic 281 (1998).

16 See, e.g., Stephen L. Morgan & Christopher Winship, Counterfactuals and Causal Inference: Methods and Principles for Social Research 4-6 (2007). An indication of the general acceptance of the terminology in legal scholarship is given by a 2003 symposium. Symposium, Baselines and Counterfactuals in the Theory of Compensatory Damages: What Do Compensatory Damages Compensate?, 40 San Diego L. Rev. 1091 (2003).

17 Michael Moore, For What Must We Pay?: Causation and Counterfactual Baselines, 40 San Diego L. Rev. 1181, 1184 (2003).

18 Id. at 1258 (describing ten general cases in tort and contract law and concluding, "The counterfactual tests used by the law in these ten contexts cannot be justified on causal grounds.").

19 Peter Menzies, Difference-making in Context, in Causation and Counterfactuals, supra note 5, at 139. One of the key issues is the potential ambiguity of the counterfactual world. The Menzies article addresses this and other concerns.

20 Id. at 143.

21 Id. at 140.

22 Another reason we differ from Professor Moore is that he concludes that conditional counterfactuals cannot be a theoretical basis for determining legal causation when a defendant fails to take an action that there was a legal duty to take. The securities-fraud example would be a case where a defendant is accused of making a material omission in a Securities and Exchange Commission (SEC) filing. Our view is that a counterfactual analysis can be used to establish causal dependence in such circumstances. This is a less important issue, however, and may be just a semantic problem in circumstances where the duty is specified by statute.

23 Ronald J. Allen & Michael S. Pardo, The Problematic Value of Mathematical Models of Evidence, 36 J. Legal Stud. 107, 109 (2007) ("[T]he application of probability theory to juridicial proof .... suffers from a deep conceptual problem that makes ambiguous the lessons that can be drawn from it ...."); id. at 137 ("Conventional probability approaches are difficult to reconcile with the evidence concerning the structure of trials.").

24 Lawrence H. Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv. L. Rev. 1329, 1330 (1971).


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

25 Complaints used in one shareholder class-action lawsuit have been known to be recycled with global search-and-replace for the name of the defendant firm. Nell Minow, Time to Wake the Sleeping Bear, Legal Times, Feb. 13, 1995.

26 This is an oversimplification. As will be shown below, there are a number of constraints that could prevent the damage per share from being equal to the extent of the price drop on the revelation of the bad news.

27 421 U.S. 723 (1975).

28 128 S. Ct. 761 (2008).

29 485 U.S. 224 (1988).

30 544 U.S. 336 (2005).

31 128 S. Ct. at 771-73.

32 The authors are grateful to Professor Goldschmidt of Columbia Law School for this example.

33 Richard Craswell & John E. Calfee, Deterrence & Uncertain Legal Standards, 2 J.L. Econ. & Org. 279, 299 (1986).

34 The same six elements were repeated by the Supreme Court in Stoneridge. 128 S. Ct. at 768.

35 Basic Inc. v. Levinson, 485 U.S. 224, 250 (1988).

36 Dura Pharm, Inc. v. Broudo, 544 U.S 336, 342 (2005). Note that these are the requirements for either an individual or class-action fraud claim under the Securities Exchange Act of 1934. There are a number of other requirements that have to be met for a court to grant class-action status to a claim.

37 See Basic, 485 U.S. at 231-32.

38 These conditions should not be confused with a causal chain, however. Causation, as the term is being applied here, applies to the conditions and conduct that lead to plaintiffs' injury--not the efforts of plaintiffs' counsel that lead to a legal victory.

39 As described below, this also implies that the standard for materiality is that misinformation must have an effect on the price of the security. See infra Part II.C.

40 544 U.S. at 347 (emphasis added).

41 Id. at 346 (emphasis added).

42 There may be a price drop contemporaneous with the news but not caused by the news. For both materiality and loss causation, the requirement is that the price drop be caused by the news.


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

43 As an example, consider a company that announced that it had discovered a method to extract oil at a cost of $80 per barrel. If this announcement were made when the price of oil was $50 per barrel and was predicted to be steady enough such that a price of $80 was unlikely, the announcement would not be material. If the price of oil increased, at some point even before the price hit $80, the likelihood of the extraction methodology being profitable may become material, and it certainly would be if the price significantly exceeded $80 per barrel and was expected to remain high. Determining when any update was required is both a legal and economic inquiry that may determine which investors have a claim based on the relationship between the date of their purchase and the outcome of that inquiry, and thus can be thought of as an adjustment in the effective date of the misrepresentation.

44 544 U.S. at 343.

45 Perhaps as a result of the incremental nature of Supreme Court decisions, there has been relatively little commentary on how the traditional overall evidentiary burden in shareholder class-action lawsuits has been restructured. For an exception, see Jill E. Fisch, Cause for Concern: Causation and Federal Securities Fraud 44 (Inst. Law Econ., Research Paper No. 08-19, 2008), available at http://ssrn.com/abstract=1234021 ("If Basic has transformed securities fraud into a statutory claim, with a different scope and objectives, the rationale behind the common-law analogy is not compelling. There is no reason to believe that common-law principles can or should be transferred uncritically to the transactional context of the global-securities markets.").

46 We assume, as is the case with most class-action lawsuits, that the relevant truth is negative news. If instead it is positive news, then the plaintiff would have to have been a net seller upon the revelation of the relevant truth. Without loss of generality, the analysis that follows applies to the situation where the relevant truth is positive.

47 Note that this is the definition we use in this Paper, while others may define true value as the price that would have prevailed had prior wrongdoing been revealed prior to the plaintiffs' trading. The reasons for the difference in definitions and the import of this difference are discussed later in this Paper.

48 The concepts of true value and value line have become commonplace after their use in Judge Sneed's concurring opinion in Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1341-46 (1976) (Sneed, J., concurring).

49 See, e.g., In re Daou Sys., Inc. Sec. Litig., 411 F.3d 1006, 1027 (9th Cir. 2005) ("Plaintiffs' economic loss was not that they purchased stock at inflated prices; rather, their economic loss was the decline in their stock value that was the direct result of Daou's misrepresentations."); In re Unumprovident Corp. Sec. Litig., 396 F. Supp. 2d 858, 898 (E.D. Tenn. 2005) ("One method of pleading loss causation [under the Private Securities Litigation Reform Act] is to allege facts indicating the plaintiff's economic loss was suffered in close temporal proximity to the public disclosure of the alleged fraud. Where a significant stock-price decline immediately follows an announcement revealing fraud or prior misinformation to the public, it can reasonably be inferred that decline is fairly attributable to the conduct or information disclosed."); D.E. & J Ltd. P'ship v. Conaway, 284 F. Supp. 2d 719, 748-49 (E.D. Mich. 2003) ("[T]he majority view is that, although alleging that a security was artificially inflated may suffice to plead 'transaction causation,' 'loss causation' requires the plaintiff to point to some causal link between the alleged misrepresentations and a concrete decline in the value of the plaintiff's stock .... The most common 'causal link' pled under this rule is a showing that the plaintiff suffered an economic loss fairly attributable to the public airing of the alleged fraud, i.e., a significant stock price decline immediately following the announcement that reveals the fraud to the public.").

50 In re Veeco Instruments, Inc. Sec. Litig., No. 05-MDL-01695(CM), 2007 WL 4115809, at *10 (S.D.N.Y. Nov. 7, 2007) ("Plaintiffs' damages calculations could not include Class Members who purchased Veeco stock during the Class Period and either sold it at a profit, or retained it past the point after the Class Period when the stock price first recovered to the price at which the shares were purchased. This is because such Class Members can prove no economic loss that is attributable to any of the Defendants' alleged misrepresentations. This ruling diminished the number of damaged class members and, thus, the amount of the calculated damages."); In re Estee Lauder Co. Sec. Litig., No. 06-CIV-2505(LAK), 2007 WL 1522620, at *1 (S.D.N.Y. May 21, 2007) ("As it is perfectly plain that plaintiff would have profited if he

sold after September 11, 2006, may have profited even if he sold before September 11, 2006, and may well profit in the future if he has not yet sold, this complaint patently fails to plead loss causation for this reason alone."); id. at *1 n.5 ("Plaintiff's contention that an economic loss is sustained simply as a result of the fact that the price of the stock dropped following disclosure is unpersuasive.").

51 In this regard, the courts that have used realized loss as a cap on damages might be better grounded in the Private Securities Litigation Reform Act of 1995 (PSLRA), which some attorneys claim created an actual-damages constraint on what a plaintiff can recover. We do not deal with the concept of actual damages here because we are limiting our discussion to rules and terminology from the Supreme Court.

52 Realized loss can be attached to transaction causation, though. For example, prior to the PSLRA, section 12 securities cases allowed the plaintiff to be given rescission damages--the return of the security to the seller for the return of the purchase price to the buyer. See 15 U.S.C. §77*l*(2) (2006). As Judge Posner pointed out, however, this created windfall damages for plaintiffs. Bastian v. Petren Res. Corp., 892 F.2d 680, 685 (7th Cir. 1990). The rescission rule was modified by the PSLRA to allow the defendant to reduce the rescission amount by "negative causation"--the amount of the stock-price drop not explained by the alleged fraud. See 15 U.S.C. §77*l*(2).

53 But, the economic loss would exclude any losses associated with additional misrepresentations made after the stock purchases and their impact on the stock price when they were made and disclosed.

54 Michael J. Kaufman, Securities Litigation: Damages § 11A-40 (2006) ( "The soundest interpretation of the Court's concept of 'economic loss' is that it permits a showing that the investor suffered a loss by purchasing securities at an artificially inflated price without mitigating that loss by reselling those securities at the same inflated price. Only that definition of 'economic loss' gives any meaning to the Court's opinion. By that refined standard, the plaintiffs who purchase securities at an artificially inflated price of loss per share, cannot show 'economic loss' if they resell those shares the instant after the transaction at $100 per share. Those plaintiffs have fully mitigated their losses. Similarly, a plaintiff who purchases at $100, but resells at $125, may suffer an 'economic loss' in the court's sense if the sale price would have been higher in the absence of the fraud. Loss occurs when the dissemination of the misrepresented or nondisclosed facts causes a movement in the market price of the securities.").

55 In the event there are codefendants, such as accountants, brokers, etc., there are additional considerations, such as the time at which the codefendants' conduct contributed to the fraud. For the sake of exposition, we are not dealing with these complications.

56 The use of the but-for-world concept is common in estimating damages. See Robert Hall & Victoria Lazur, Reference Guide on Estimation of Economic Losses in Damages Awards, in Reference Manual on Scientific Evidence 277, 284 (2d ed. 2000) ("In cases where damages are calculated under the restitution-reliance principle, the 'but for' analysis posits that the harmful event did not occur."). Restitution-reliance-principle cases include securities-fraud actions. Id. at 325-26.

57 The issue of whether the disclosure or the fraud is the proximate cause is discussed in a separate Part. This problem was not considered by the Dura court.

58 See Collins et al., supra note 5, at 4-7.

59 In an efficient market, which is a condition precedent to this loss-causation analysis, there is always a substitute security. Note that we are not arguing that the investor would have necessarily invested in the nonfraudulent fund in every but-for world. Rather, as will be shown below, we are using this device as a way to illustrate the closest counterfactual world.


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

60 Not allowing these plaintiffs to recover the $2 from the loss due to market conditions that they willingly took on is consistent with the Court's statement in Dura that “the statutes make these ... actions available, not to provide investors with broad insurance against market losses.” Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005). If not, then plaintiffs A and B would recoup $2 because they invested in a fund that later turned out to be fraudulent, while investors who made the exact same investment decision but happened to select a fund that was not fraudulent would have no recovery.

61 See In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 2216, at *18-20 (S.D.N.Y. Feb. 17, 2005) (“Relying on another expert's opinion that WorldCom would not have been able to complete the 2000 Offering had its financial condition been accurately revealed, [plaintiffs' expert] opines that ‘[a]ccordingly there is no offset for negative causation for the May 2000 Notes.’ .... The parties agree that the negative causation defense in Section 11 and the loss causation element in Section 10(b) are mirror images; in the former, the burden of proving negative causation is on the defendant, and in the latter, the burden of proving the existence of loss causation is on the Plaintiff.”).

62 Id. at *21-22 (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005)).

63 In a later Section, we discuss one of the other types of losses often suffered by investors in a shareholder class-action lawsuit--so-called collateral damage. See infra Part IV.B.

64 979 F. Supp. 1021 (S.D.N.Y. 1997).

65 See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

66 Telecard, 979 F. Supp. at 1025.

67 See id. at 1021; see also In re Williams Sec. Litig., 496 F. Supp. 2d 1195, 1271-94(N.D. Okla. 2007) (explicitly ruling out the use of the index method in that case, but allowing for the analysis of damages based on event studies); Goldkrantz v. Griffin, No. 97 Civ. 9075(DLC), 1999 WL 191540, at *5 (S.D.N.Y. Apr. 6, 1999) (granting the defendants' summary judgment motion due to the plaintiffs' failure to contest the defendants' event-study analysis); In re Seagate Technology II Sec. Litig., 843 F. Supp. 1341, 1368-69 (N.D. Cal. 1994) (accepting some of the defendants' event studies, and dismissing certain claims on that basis, but ruling that defendants' other event studies were inadequate and denying their motion for summary judgment with regard to those issues; also finding plaintiffs' event studies lacking and therefore denied their cross-motion for summary judgment).

68 See, e.g., Janet C. Alexander, The Value of Bad News in Securities Class Actions, 41 UCLA L. Rev. 1421, 1426-27 (1994); Daniel R. Fischel, Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities, 38 Bus. Law. 1, 1-2 (1982); Jonathan R. Macey et al., Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson, 77 Va. L. Rev. 1017, 1028-43 (1991); A. Craig MacKinlay, Event Studies in Economics and Finance, 35 J. Econ. Literature 13, 13 (1997); Mark L. Mitchell & Jeffry M. Netter, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, 49 Bus. Law. 545, 545 (1994).

69 Robert J. Shiller, From Efficient Markets Theory to Behavioral Finance, 17 J. Econ. Persp. 83, 84-85 (2003).

70 These steps are amplified as follows in David Tabak & Frederick Dunbar, Materiality and Magnitude: Event Studies in the Courtroom 3-4 (Nat'l Econ. Research Ass'n, Working Paper No. 34, 1999):

The procedure for performing an event study has several well-defined steps:

PX345

First, one estimates a predicted stock price return, or percentage change, from the day before the news reaches the market to the day the stock price assimilates the news. In doing this estimation, one uses a model that takes into account market and industry effects on stock price returns.

Next, the predicted return is subtracted from the actual return to compute what is called the excess return. If the excess return is calculated as the sum of individual excess returns over a number of periods (usually individual trading days), the difference between the actual and predicted returns summed over all these periods is called the cumulative excess return (or "CAR").

Typically, the predicted return does not exactly equal the actual return even when no event has occurred. To determine whether the difference between the actual and the predicted return, the CAR, is just due to chance, the CAR is tested for statistical significance ....

The final step, if necessary, involves computing the relevant magnitude of the event. To do this, one calculates the change in stock price or capitalized value of the firm implied by the estimated CAR and thus attributable to the event in question.

Id.

71 See Judea Pearl, Causality: Models, Reasoning and Inference 12-21 (2000).

72 Janet C. Alexander, Rethinking Damages in Securities Class Actions, 48 Stan. L. Rev. 1487, 1504 n.68 (1996); see also Bradford Cornell & James C. Rutten, Market Efficiency, Crashes, and Securities Litigation, 81 Tulane L. Rev. 443, 467-08 (2006); Richard A. Booth, Who Should Recover What in a Securities Fraud Class Action? 4, 7 (University of Md. Legal Studies, Research Paper No. 2005-32, 2005), available at http:// papers.ssrn.com/sol3/papers.cfm?abstract_id=683197.

73 Todd Foster et al., Recent Trends in Shareholder Class Action Litigation: Filings Stay Low and Average Settlements Stay High--But Are These Trends Reversing? 15 (2007), available at http://www.nera.com/publication.asp? p_ID=3267.

74 Allen Ferrell & Atanu Saha, Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implications of Dura Pharmaceuticals, Inc. v. Broudo, 63 Bus. Law. 163, 181 (2007).

75 Id.

76 This example may seem stylized, but it is uncannily similar to what occurred to Refco, Inc. On October 10, 2005, a press release from the company stated the following:

Refco Inc. (NYSE: RFX) today announced that it had discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr.Bennett today repaid the receivable in cash, including all accrued interest .... This receivable from the entity controlled by Mr.Bennett was reflected on the Company's prior period financials, as well as on the Company's May31, 2005 balance sheet. The receivable was not shown as a related party transaction in any such financials.

Press Release, Refco, Inc., Refco Announces Undisclosed Affiliate Transaction (Oct. 10, 2005), available at http:// www.secinfo.com/d11MXs.z1eVu.d.htm.

Although revealing an accounting violation by not showing the debt as a related-party transaction, Refco was in a financially stronger position after the press release having exchanged, dollar for dollar, a finance receivable for cash. Yet, the stock price fell 45 percent on the announcement. See Peter A. McKay et al., Refco CEO Takes Leave Over Debt, Wall St. J., Oct. 11, 2005, at C1.

PX345

77 See, e.g., Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 154-55 (1972); In re Executive Telecard Ltd. Sec. Litig., 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997) ("In assessing the reliability of the Expert Witness's damages analysis we are mindful of the well-settled general principle that damages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions.").

78 See, e.g., In re Craftmatic Sec. Litig., 890 F.2d 628, 640 (3d Cir. 1989) ("Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts."); see also Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir. 1997) ("To plead loss causation, the plaintiff must allege that it was the very facts about which defendant lied which caused its injuries."); In re Citigroup, Inc., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("Plaintiff's allegation that Citigroup's failure to disclose that its revenues were derived from 'unsustainable and illegitimate sources' violated section 10(b) is likewise unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing.").

79 SEC v. Reyes, 491 F. Supp. 2d 906, 912 n.6 (N.D. Cal. 2007).

80 David Tabak, **MakingAssessmentsAboutMaterialityLessSubjectiveThrough** the **UseofContentAnalysis** 1 (2007), available at http:// www.nera.com/image/PUB_Tabak_Content_Analysis_SEC1646-FINAL.pdf; see, e.g., NAACP v. AcuSport, Inc., 271 F. Supp. 2d 435, 515 (E.D.N.Y. 2003) ("[An expert's] opinions were largely based on a study that he performed using 'content analysis.' [The expert] and several of his research assistants reviewed documents and deposition testimony from the various defendants in an attempt to draw inferences as to which defendants did or did not employ any one of 'countermarketing' strategies [the expert] had identified. The results of this analysis were presented to the jury on charts that were useful and reliable in supporting his conclusions.").

2009 WILR 199

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

PX345

# PX 346

**35 J. Corp. L. 11**

**Journal of Corporation Law**
Fall 2009

**Institute for Law and Economic Policy Symposium: Compensation of Plaintiffs in Mass Securities Litigation**

**Article**
Esther Bruegger, Frederick C. Dunbar [a1]

Copyright (c) 2009 University of Iowa (The Journal of Corporation Law); Esther Bruegger; Frederick C. Dunbar

# ESTIMATING FINANCIAL FRAUD DAMAGES WITH RESPONSE COEFFICIENTS

| | |
|---|---|
| I. Introduction | 12 |
| II. Event Studies and Regression Analysis | 15 |
| A. Event Study Methodology | 16 |
| B. Conditions Regarding Events that Affect Event Study Reliability | 24 |
| 1. Confounding Information | 25 |
| 2. Buildup of Inflation Per Share Over the Class Period | 26 |
| 3. Allocating Liability to Codefendants | 29 |
| III. Analyzing Price Reactions with Response Coefficients | 31 |
| A. Price Effects of Financial Results in Announcements with Confounding News | 31 |
| 1. The Nature of Financial Results Announcements | 31 |
| 2. Financial Results and Their Impact on Stock Prices | 32 |
| a. Earnings Response Coefficients | 33 |
| b. Analyst Forecast Revision Coefficient | 34 |
| 3. Using Response Coefficients to Parse Price Reactions | 35 |
| 4. Successive Price Effects of Misstatements that Occurred at Different Times in the Past | 38 |
| 5. Bounds on the Liability for an Individual Defendant that is Less than Aggregate Damages | 41 |
| IV. What Have We Learned from Research on Earnings Response Coefficients (ERC)? | 45 |
| A. Estimating the Basic ERC Equation | 47 |
| 1. The Variables in the Basic ERC Equation | 47 |
| a. Stock Price Return Window | 47 |
| b. Earnings Surprises | 49 |
| i. Expected Earnings from Time-Series Models | 49 |
| ii. Analyst Forecasts Used as Market Expectations | 50 |
| iii. Deflating the Earnings Surprise Variable | 51 |
| 2. Findings of Studies Estimating the Basic ERC Equation | 51 |
| B. Extending the ERC Equation with More Variables | 52 |
| 1. Including Additional Firm-Specific Variables | 53 |
| a. Other Accounting Variables | 53 |
| i. Income and Cash Flow Statement Variables | 53 |
| ii. Balance Sheet Variables | 55 |
| b. Other Firm-Specific Variables | 56 |
| 2. Including Macro Variables | 61 |
| C. Extending the ERC Equation with Variables Capturing Revisions in Expectations | 61 |
| 1. Including Earnings Forecast Revisions | 62 |
| 2. Including Measures for Permanency in Earnings Surprises | 63 |
| a. Breaking a Growth Trend | 63 |
| b. Transitory and Permanent Components of Earnings | 64 |
| D. Dealing with Measurement Error and Data Accuracy | 65 |

PX346

1. How to Deal with Measurement Error in the Earnings Surprise Variable 65
2. Pooled Versus Firm-Specific Estimation 66
V. The Academic Literature on Market Expectations and Analyst Forecast Revisions (ARC) 67
A. Estimating the Basic ARC Equation 67
B. Including Additional Variables in the Basic ARC Equation 68
C. ARCs in Response to Events Other than Earnings Surprises 69

***12 I. Introduction**

In this Article, we show how statistical analysis of the response of both share prices and investor expectations to new information can be used to improve the estimation of damages in shareholder litigation. Perhaps more controversially, we argue that the standard event study--a statistical shibboleth in securities litigation--is much more limited than is commonly accepted in estimating Rule 10b-5 damages. [1]

The iconic status of the event study is due to what it replaced: expert opinion based on unsupported assertions about materiality and loss causation, and as inflation-per-share ***13** estimates drawn from little more than junk science. Such testimony has been thrown out of courtrooms in the post-Daubert [2] clean-up of expert evidence. [3] It has been replaced with expert testimony based on the generally agreed-upon notion that a properly performed event study is an appropriate method for estimating damages in shareholder class action litigation. [4] As always, there have been heated disputes among experts over what was meant by proper application of the method. [5] What has been submerged in the debate, though, is that event studies as traditionally used in litigation are often incapable of providing by themselves accurate and unbiased estimates of shareholder damages. At best, the event study is a starting point of the analysis of damages, rather than the answer. In some cases, it may be unnecessary altogether.

As an expository device, the typical example of a shareholder class action claim involves a misstatement that leads investors to over-value the defendant firm's stock price followed by a corrective disclosure which causes the stock price to fall. An event study measures the magnitude of the price drop associated with the information in the disclosure. [6] This magnitude, then, becomes an estimate of inflation per share--the difference between reported price and the true value--during the time period the stock price was infected with the misstated information. The problem with such a simple example of securities fraud is that it is not all that common in practice. [7] Although often useful to demonstrate various principles involved in analyzing shareholder class actions, the vast majority of shareholder claims are more complex.

For example, the corrective disclosure can be part of a press release that includes material, timely information, which if negative would have an independent negative impact on the defendant's stock that would not be compensable. Alternatively, if the timely, confounding information were positive and material then it could mask the magnitude of the price drop that would have occurred had it not accompanied the corrective news. In either case, the event study by itself does not provide a reliable estimate of the value of the misrepresentations that have been corrected by the disclosure. [8]

A second complication is that many shareholder class action complaints allege a pattern of recurring misrepresentations extending over a number of financial reporting periods. Perhaps the most recognizable example is the prototypical accounting statement fraud that has built up in severity over time. Such a problem can start small with a minor ***14** GAAP violation to cover up disappointing performance. But, if the market expects continuing growth at a rate that is higher than can actually be attained, then attempting to make the firm's growth rate appear to meet the market's expectations requires increasingly creative ways to fix the numbers. Eventually, the truth comes out and it is found that the financial statements must be restated, extending, sometimes, over several prior fiscal years. But, a distinct corrective disclosure is not associated with one and only one past financial statement; rather, the disclosures will often be about the need to restate multiple past financial statements. Consequently, the observed stock price drop is due to information about the entire sequence of financial misstatements that were likely building up in magnitude over time. As such, the price reaction does not tell us the effect on the stock price of any single misstatement, nor of any combination of prior misstatements other than for the reporting periods specified in the corrective disclosure. As a consequence, the event study does not isolate the inflation per share at the earlier times in the class period before the various accounting violations had cumulated to a relatively large magnitude.

A third issue that arises in shareholder class actions is the apportionment of damages among codefendants. The Private Securities Litigation Reform Act of 1995 (PSLRA) contains a provision establishing proportionate liability for shareholder class action litigation. [9] Although many such cases have multiple defendants, there is relatively little in the way of well-accepted expert

PX346



WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

analysis that helps the finder of fact in dividing aggregate damages among the various defendants. The event study may provide some assistance if separate corrective disclosures relate to the misstatements of one and only one codefendant. This rarely seems to be the case. Even if a certain misrepresentation is attributed to one and only one codefendant, an event study of a corrective disclosure that simultaneously corrects both this misstatement and a material misstatement made by another codefendant will not be able to allocate the proportion of the observed price drop between the two misstatements.

In what follows, we will focus mainly on the estimation of inflation per share--arguably the most important step in computing damages in shareholder class actions. To orient the role of inflation per share, note that estimating damages in a shareholder class action builds on a number of elements that relate to plaintiffs' burden of proof in securities fraud actions. These include the following:

Materiality: testing which of the alleged omissions and/or misrepresentations are material. [10]

Loss causation: estimating the drop in the stock price, if any, that was caused by revelation of the material omissions and misrepresentations. [11]

Inflation per share: estimating the inflation per share on all trading days during the class period so as to determine the magnitude of the reduction in inflation ***15** per share between class member purchase and sale dates. [12]

An expert's evidence on damages typically incorporates findings from each of these steps. [13] In part this is because the same research tool, an event study, sheds light on all three. An additional reason is that findings in each of these areas have a role in the actual computation of damages. [14]

To see this, we start with the proposition that a plaintiff suffers an economic loss when she buys a security at an inflated price and sells the same security after some or all of the inflation has been wrung out of the stock price. [15] It is important, though, to establish that an alleged omission or misrepresentation is material. If, in the alternative, the truth were not material, then its disclosure should neither have had an impact on the share price during the class period nor contributed to inflation per share. Assuming, then, that materiality has been established, the measure of economic loss per share is the inflation per share at purchase less inflation per share at sale. This is not necessarily an estimate of damages, however, because plaintiffs also need to establish the loss causation element of damages. This was recently defined by the Supreme Court to be the price decline caused by revelation of "the relevant truth." [16] Consequently, it is not an oversimplification to say that a shareholder's damages are the lesser of the magnitude of economic loss and the magnitude of loss causation. [17] That being said, the issues described above affect the use of the event study for both inflation per share and loss causation.

In Part II, we show how experts have attempted to deal with these problems in the context of relying on an event study of corrective disclosures. Often, there comes a point in the analysis where arbitrary allocations are made. This is followed by Part III, which shows how statistical analyses from financial economics can be used in each of these circumstances to improve the accuracy of estimated inflation.

## II. Event Studies and Regression Analysis

An event study is an empirical technique used to measure the stock price impact of a specific event, such as a company's earnings announcement. [18] The technique examines stock price returns--the percentage change in stock prices from one day to the next--to determine how much of the price movement on a particular day is due to the event being examined, and how much is due to changes in conditions affecting the market in ***16** general. [19]

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

Event studies are widely used in litigation to measure the effect of alleged misconduct by examining the share price impact of relevant disclosures.[20] The event study method is commonly used in securities litigation for estimating the share price impact of events because it meets scientific standards. These standards include the following: it provides testable results that may be replicated by other analysts; it is supported by published literature; it produces estimates with a known rate of statistical error; and it has generally been accepted by the scientific community.[21]

### A. Event Study Methodology

Although there are multiple ways to perform an event study, among the academically sound methods, any differences in measurement of price reaction or determination of statistical significance are usually immaterial.[22] The approach used in this Article, which is also commonly used in the literature, can be described as follows:

> Step 1: Estimate a market model of share price returns that controls for the effect of market movements and news on the event dates;

> Step 2: Rule out causation of the impact due to random occurrence; and

> Step 3: Compute the monetary impact of the event-related news on the share price returns.

These steps are described in general terms below.

> Step 1: Estimate a market model of share price returns that controls for the effect of market movements and news on the event dates

The first step in performing an event study is to estimate a market model that allows calculating predicted share price returns.[23] The predicted share price returns are the returns expected in the absence of any significant company-specific event. While there are a number of academically accepted approaches to predicting the returns of a company's stock, most event studies use a "market model."[24] The market model is estimated by regression analysis (described below) and establishes the historical ***17** correlation between the company share price returns and market returns to account for market effects. One often uses a period of time prior to the alleged violation in order to estimate predicted share returns. But, an equally reasonable alternative is to use a period of time including the violations, and include "indicator" variables (defined below) for each date on which corrective disclosures enter the market. By convention we will label these methods Market Model (1) and Market Model (2) respectively.

Market Model (1) is the following equation:

> (1) Predicted company return = <<alpha>> + <<beta>> (Market index return)

In Market Model (2) the estimated equation can include an indicator variable for each date on which there was new revelation of the relevant truth reaching the market ("event dates"). There is one indicator variable for each event date. Thus, Market Model (2) takes the following form:

> (2) Predicted company return = <<alpha>> + <<beta>> (Market index return) + <<gamma>>$_1$ (event date 1) + <<gamma>>$_2$ (event date 2) + . . . + <<gamma>>$_N$ (event date N)

PX346

In either case, the generic market model predicts the company's daily share price returns as a constant "*a1* " plus a quantity which is the coefficient "<<beta>>" times the market index daily return. The "<<beta>>" coefficient, typically spelled out "beta," has come to have a special place in financial economics. Beta conveys a relationship between the market index and the volatility of a company's share prices. For example, for a company's share price to have a beta equal to 0.5 means that if the stock market index were to increase by 10% one would expect, everything else held constant, that the company's share price would increase by 5%. Alternatively, a more volatile stock, with a beta equal to 1.5, means that for every 10% increase in the stock market index, all else held constant, we would expect the company's share price to increase by 15%.

The "*a1* " coefficient, commonly spelled out "alpha," is an additional factor in the predicted return of an individual stock, though this factor is usually very small and statistically insignificant.[25] Alpha is interpreted as the expected return of the stock when there is no change in the market index and no event-related news. That is, on days when the index return equals zero and news indicator variables are equal to zero, alpha is the expected return of the stock.

The indicator variables in Market Model (2) each have a "<<gamma>>" coefficient ("gamma"), and there is one indicator variable for each event date. The gamma coefficients capture the effects of those days' news, isolating those effects from the effects on the share return due to general market movements.[26]

Often, for alpha, beta, and gamma (if Market Model (2) is used) the coefficients of the indicator variables are estimated simultaneously using regression analysis on a sample of daily returns.[27] Regression analysis is the most commonly used statistical technique in economics and finance.[28] It is accepted ubiquitously in academic research and is used in litigation in such areas as discrimination, residential property valuation, ***18** antitrust, and, of course, securities.[29]

Regression analysis is a statistical method that uses the co-movement between two or more variables to quantify the impact of a change in one variable (e.g., the daily return on the market index) on the other variable (in this case, the daily return on the company's stock price). One hypothesizes that the returns of the market index and the indicator event date variables will "explain" the changes in the company's stock price.[30]

In Figure 1 below, the estimation of the alpha and beta coefficients is represented graphically using illustrative sample data (not actual returns). Each data point on the chart shows the share price return and the market index return on a particular day. The vertical position of the data point measures the company's daily return, and the horizontal position of the data point measures the market index return. The straight, upward-sloping line through the data points represents equation (1) from above, Market Model (1). It can be seen that the data points do not all lie exactly on top of the line. The vertical distance between the line and an individual data point is a measure of the statistical error associated with the line on that day--it is the difference between the daily return predicted by the market model and the actual daily return on that day. These errors of the regression are variously called "abnormal returns," "excess returns," and "market adjusted returns," as they are the residual returns unexplained by the market return.[31] We will use these terms interchangeably.

Basic regression analysis estimates a market model that is the "best" fit to the data points; that is, it calculates the coefficients alpha, beta, and (if Market Model (2) is used) gamma, such that the sum of squared errors is as small as possible.[32] For this reason the basic regression methodology is sometimes called "ordinary least squares."[33]

***19 Figure 1. Estimating a Market Model Using Regression Analysis**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

In Figure 1, the slope of the market model line is the value of the beta coefficient. The slope is the vertical distance that a point on the line would travel if the index return would increase by 1%. This distance is represented by the large bracket to the right of the vertical axis. It tells us the expected amount by which the company's daily return would change if there was a change in the index return.

The value of alpha is the company's expected daily return assuming the index return is zero. This is the value of the point on the vertical axis at which the market model line crosses the vertical axis. This value is shown in Figure 1 by the small bracket to the left of the vertical axis. [34]

This picture does not depict indicator variables for event days. But, one can think of the coefficient on an indicator variable that is equal to one on a given day and zero on all other days as the vertical distance between (1) the estimated Daily Company Stock Return on that day (which itself depends on the Daily Index Return for that day) and (2) the actual Daily Company Return on the same day. That is, it is the difference between the predicted return and the actual return which, as we defined, is the excess return. ***20** Consequently, for Market Model (2) the value of the indicator variable is a measure of the excess return on an event day.

In performing an event study with Market Model (1), the estimated market model (equation (1) above) is used to predict the daily returns of the company's stock price over an event window that includes the day of the corrective disclosure. [35] The event window can be a single day or multiple days. [36] If the event window is more than one day, then a separate prediction for each day can be made with a version of Market Model (1) that has been estimated on daily returns. The prediction is a "conditional expectation." It is the expected daily return of the company's stock for a given daily market return.

Step 2: Rule out causation of the impact due to random occurrence

If, after statistically controlling for general market movements, a company experienced a negative stock price return on the same day that it issued a press release, it is tempting to automatically assume that the observed negative return was caused by the news. Consider, however, that all stocks experience price fluctuations from day to day, and one typically observes price movements even on days with no apparent news relevant to the company. In other words, even in the absence of any new information about a company, actual and predicted returns for the company's stock almost never exactly coincide except by the rarest of chances. Thus, it has become standard practice to test statistically whether a price movement is just as likely to be random as to be explained by the relevant news. [37]

This is most often done using the standard t-test. [38] In this context, the t-test provides a decision rule based on traditional statistical hypothesis testing. It starts with forming a "null" hypothesis of no effect on stock price from the event. This is equivalent to the statement that the expected excess return on the event day is zero. [39] The decision rule will be to reject the hypothesis, and therefore conclude that the event caused the stock ***21** price drop, or to fail to reject the hypothesis, and therefore conclude that the event did not have a causal influence on the stock price. There are two types of incorrect conclusions that we are concerned about in this framework: incorrectly rejecting the null hypothesis of no effect (note carefully the double negative in this description) when the news actually was not material (Type I error); or incorrectly accepting the null hypothesis of no effect when the news actually had an impact (Type II error, which is defined as one minus the power of the test). [40] Usually, Type I error is the more costly or serious of the two, and, therefore, decision rules with a low chance of committing a Type I error predominate. The de facto professional standard in economics (and a legal standard in the United States) [41] is to use a 5% level as the test for statistical significance. Another way of saying this is that we test whether the 95% confidence interval around the estimated parameter includes zero. Consequently, our decision rule will be that if we find that zero excess return lies outside of a 95% confidence interval centered around the estimate of the excess return on the event date, then we will reject the "no effect" hypothesis and conclude that the news was causally related to the observed excess return.

The next step is to implement the test resulting in an estimate of the confidence interval. If we are using Market Model (1), we start with the excess return of the stock price on the event day and the standard error of the excess return already calculated from the event study above. The standard error is a measure of the volatility of the stock price after controlling for movements in the market index; in other words, it is a measure of the dispersion of the actual returns around the predicted return based on a regression analysis as depicted in Figure (1).

We can use these measures of the excess return and dispersion in the following way. Assume that the excess return is negative, denoted by "-X" . The standard error can then be used to form a bell-shaped probability distribution centered around -X. This is usually called Student's t-distribution, or t-distribution for short. [42] A graph of the distribution would have excess returns along the horizontal axis. The area under the bell-shaped curve between any two values on the horizontal axis would be the

PX346

probability of observing an excess return in that range, assuming a draw of excess returns from the same distribution--that is, a distribution of returns with mean equal to -X. The point on the horizontal axis that denotes zero excess return would be to the right of -X. It is possible to create an interval of any size centered on -X. Consider, for example, an interval centered on -X that is constructed such that the area under the probability curve between each endpoint of the interval equals 95%. This would be our 95% confidence interval that would be used in a "two tail" test (the most common in event studies). If the zero point was outside this interval, then, using our decision rule, we would reject the hypothesis of no effect.

Correspondingly, the same standard error can then be used to form a bell-shaped probability distribution around zero. Then the excess return point -X would be on the part ***22** of the horizontal axis to the left of the zero excess return point. If it is far to the left of zero excess return then it will be in the tail of the distribution. That is, if the null hypothesis of zero effect was true, then the observed excess return on the event date would have had a low likelihood of occurring.

How low a likelihood? In the two tail test we are interested in whether the observed excess return is in either the positive or negative tail, so the likelihood is computed as the area under the curve from -8 to -X plus the area from X to 8. Assume that the sum of the area is equal to p. Then, consistent with zero being outside of the 95% confidence interval described above, p is less than 5%, the decision value for a Type I error. The interpretation of this result is that if we were to conduct this test many times, then the percentage of times we would make the mistake of rejecting the hypothesis of no effect would converge to 100xp percent. Assume, for instance, that we calculate a p-value of 0.04, indicating statistical significance based on the 0.05 decision rule given above. Then, if the null hypothesis of no effect were actually true, every time we did 100 event studies under these conditions we would expect that we would make the mistake of concluding that the event had no effect four times.

The t-distribution for a cumulative excess return extending over more than one day has a mean equal to the cumulative excess return, and a measure of dispersion equal to the standard error of the regression times the square root of the number of days over which the return was cumulated. The 95% confidence interval would then be constructed from this distribution.

Switching to Market Model (2) above, the t-statistic on the excess return for event day n is the same as the t-statistic on the coefficient <<gamma>>$_n$ that is used to test whether the value of this coefficient is significantly different from zero. Most regression software output will report both the value of the t-statistic and the p-value for each estimated regression coefficient.[43] Although this would seem to be a simplification over using Market Model (1), expanding the event window to multiple days and investigating the pattern of returns within the event window is more complicated with Market Model (2).[44] Moreover, selection of the proper days in Model (2) should be limited to those days on which there is an objective a priori conviction that the news qualifies as either a revelation of the relevant truth or an affirmative misrepresentation.[45]

Step 3: Compute the monetary impact of the event-related news on the share price returns

After estimating a market model, the third step of an event study is to calculate the monetary impact of the event-related news on the share price returns (or "excess returns") ***23** on the days of the news.[46] This monetary impact is calculated with the results of either of the market models calculated in Step 1. If Market Model (1) is used, the excess return on an event day can be treated as a percent, though not necessarily a simple percentage as will be explained below. In the same way, if Market Model (2) is used, the estimated coefficient for each indicator variable is used as if it was an excess return expressed as a percent.

In either model, to convert this percentage impact into a monetary impact, one multiplies the stock price on the day before the event-related news by the estimated percentage impact of the news on the event date. The way percentages are calculated in the market model, however, is different from the way they are computed by most people. Financial economists find it easier to work with the excess returns measured in natural logarithms as they have computation advantages over percentage returns.

Specifically, the daily return is computed as ln(today's price/yesterday's price); where ln(.) stands for the natural logarithm of the number inside the brackets. The result is a number that is approximately equal to a percentage change. For small values they are almost the same, but the approximation becomes worse the larger the difference between the two prices.

Natural logarithms have desirable properties that simple percentages lack. For example, assume that a three-day pattern of stock prices of $10, $5, and $10 was observed. Obviously, the difference between the day one price and the day three price is $0 ($10

PX346

minus $10) which also means that the difference between the day one and the day three price is 0%. Note, though, that the simple percent change from day one to day two, followed by the simple percent change from day two to day three, are -50% and 100%, respectively. If the two-day percent changes are cumulated, the result would be 50% (-50% plus 100%). That is, adding together the percent returns implies that the two-day return between day one and day three is 50%--which would imply that the difference between the day one price and the day three price is 50%, or $5 (= 0.5x$10) higher than the day one price. This is clearly incorrect. The reason for this incorrect result is that simple percentages cannot be added to recover cumulative percentages. Natural logarithms do not have this problem. Natural logarithms have the property that ln(day-two-price/day-one-price) + ln(day-three-price/day-two-price) = ln(day-three-price/day-one-price).

The following formula is used to convert the natural logarithm representation of excess return to a dollar price reaction:

> market adjusted price reaction = (price prior to alleged disclosure) x (exp [(cumulative excess return) + (nx$S^2$/2)] 1) where:
>
> exp[.] is the exponentiation function,
>
> S is the standard error of the market model regression, and
>
> n is the number of days over which the excess return is cumulated.

This formula is based on two features of the mathematics of the estimated return. ***24** First, the exponential of the natural logarithm of a number recovers the number: exp[ln(X)]=X. Because the daily excess return is represented by ln(today's price/yesterday's price), the exponential of this expression is the quantity today's price/yesterday's price. This value is a ratio--if the ratio is greater than (less than) one then today's price went up (down). When the quantity ((today's price/yesterday's price) minus one) is multiplied by yesterday's price, the result is the change in price from yesterday to today.

Second, we note that the quantity ln(today's price/yesterday's price) is normally distributed and this means that the quantity inside the parentheses is lognormally distributed. To convert the (normally distributed) excess return into a price effect, we need to deal with expected value of the (lognormally distributed) ratio of today's price to yesterday's price. The normal distribution of the daily excess return has mean equal to zero and variance equal to $S^2$/2. The term nx$S^2$/2 in equation (3) is the variance of daily returns cumulated over n days. To determine the expected price effect requires an adjustment to the expected excess return involving the variance of the excess return as shown in equation (3).[47] This completes the steps to a traditional event study used in securities litigation.

**B. Conditions Regarding Events that Affect Event Study Reliability**

As described above, the event study is a generic research tool. Its specific application in Rule 10b-5 shareholder class action litigation has been most frequent for event days on which the revelations of the relevant truth are disclosed to the market.[48] With certain conditions in place, the event study can be used to establish critical elements of liability, including materiality, loss causation, and inflation per share, and has been used in the following ways:

> Materiality: The materiality of the alleged fraud can be tested by determining whether the revelation of the corrected information had a statistically significant impact on the stock price.[49]

Loss causation: Similarly, the loss causation requirement can be determined by the same statistical test--that is, whether disclosure of the concealed information caused a statistically significant price drop.

Magnitude of loss causation: The magnitude of the price drop on a corrective disclosure date provides an estimate of loss causation, which provides a cap on the estimated inflation per share.

Magnitude of inflation per share: Similarly, the magnitude of the price drop ***25** can be viewed as a historical experiment of what the impact on the share price would have been were the correct information provided to the market in a timely fashion; inflation per share is another constraint on damages per share.[50]

For the findings of an event study to be relevant to shareholder class action stock-price inflations, however, certain conditions need to be satisfied. Specifically, the reliability of the event study in measuring the full effect of events on a share price is greater under the following circumstances:

1) the events are well-defined;

2) the days and times of day when the news reaches the market are known;

3) the market has not anticipated the news; and

4) it is possible to isolate the effect of the news from market, industry, and other company-specific factors simultaneously affecting the company's share price.[51]

In circumstances in which these criteria are not satisfied, additional information and steps may be needed to isolate the price reaction attributable to the event of interest.

1. Confounding Information

Of the above-cited conditions for reliability, the fourth condition is the most likely to be violated in practice.[52] A day on which there has been a revelation of the relevant truth is an obvious candidate for analysis--the event is linked to loss causation and measurement of inflation per share--but, as often occurs, this information may be contained in a news announcement that also contains information unrelated to the alleged misrepresentations.[53]

For such instances, there are techniques from empirical finance and social science that can be used to help resolve these issues.[54] For example, "content analysis" is now part of the tool kit for determining which among a number of simultaneous news events had effects on the stock price.[55] Content analysis, however, cannot always isolate the price impact of a significant piece of news if it was in the same announcement as other significant news.

***26** 2. Buildup of Inflation Per Share Over the Class Period

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

Another common problem that arises in application of the event study method is that defendants have made a series of misrepresentations over time. As a consequence, the inflation per share changes through the class period, usually increasing, but the revelation of the relevant truth does not correct each distinct misrepresentation in an isolated, separate announcement.

This situation is perhaps most apparent in accounting restatement cases. The corrective disclosure is a press release, likely attached to an SEC form 8-K filing, stating the financial statements for the prior, say, two years can no longer be relied upon and will be restated. Let us assume further that the restatements will cause downward revisions to reported net income in both years, and the amount and cause of the restatement for each year is material to the market.[56] The typical financial fraud class action will have a class period that commences on the date that the first, erroneous financial statement was released to the market, and ends on the date that the restated financials for both years are revealed. The revelation of the corrected financials will be the cumulative, two-year restated amount which, by assumption, will be larger than the first year's restated amount. The corrective disclosure, then, contains more information than could have been known during the early part of the class period, after the first erroneous financial statement was released but before the second erroneous financial statement was released. Specifically, the announcement that includes a quantification of the revisions to the net income for both years will inform the market of a larger cumulative impact than could have been known before the second year's misstated financials were made public.

To give an example, let us assume the following facts concerning E-Z Kredit, Inc. (E-Z), a financial services company, concerning the fiscal year earnings announcements.[57]

Example 1:

1) On March 30, 2007, E-Z files a 10-K for the fiscal year ending December 31, 2006, claiming earnings of $1.00 per share.

2) E-Z is silent about the FY 2007 financial results until March 30, 2008, when it files a 10-K for the fiscal year ending December 31, 2007 claiming earnings of $1.00 per share for FY 2007.

3) On May 1, 2008, E-Z issues a press release saying the following:

a) it is restating its FY 2006 earnings to $0.50 per share (implying that originally reported FY 2006 earnings were overstated by $0.50 per share);

b) it is restating its FY 2007 earnings to be a loss of $0.50 per share ***27** (implying that originally reported FY 2007 earnings were overstated by $1.50 per share); and

c) it is taking a substantial writedown of subprime related assets in FY 2008.

4) The stock price responds immediately, dropping a market-adjusted $10.00 per share.

PX346



WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

Shortly thereafter, an action is filed under section 10 of the 1934 Securities Exchange Act on behalf of a class of investors who purchased E-Z securities from March 31, 2007 through April 30, 2008. Defendants include E-Z, its officers and directors, and its auditor.

This example can be used to explore the problems in relying solely on an event study to measure inflation per share for class members. In this instance, an event study will show a $10.00 price drop simultaneously occurring with a revelation of the relevant truth. However, that is not the same thing as the full $10.00 drop being caused by the revelation of the relevant truth. If it is shown that the third item in the above disclosure, the writedown of assets for FY 2008, is timely and material, then the magnitude of the stock price drop has increased because of a confounding factor unrelated to the fraud. [58] Using the event study result of $10.00 per share, as described in the prior section, without adjustment, would lead to an overestimate of inflation per share. Of course, if the material timely news had been positive rather than negative, then the standard event study result could lead to an underestimate of inflation per share. In either case, the findings of such an event study should be adjusted, if possible, to increase the accuracy of the inflation-per-share estimates.

There is yet another problem illustrated in this example that relates to the specific topic of this Part. For anyone who bought between March 30, 2007 (when the erroneous FY 2006 10-K was released) and March 30, 2008 (when the erroneous FY 2007 10-K was released), the only misinformation in the market was the $0.50 overstatement of FY 2006 earnings; no misrepresentations regarding FY 2007 financials had occurred. Consequently, the $10.00 price drop at the end of the class period, by itself, says virtually nothing about the inflation in share price for these members of the class. It is extremely unlikely that shares purchased between the filing of the 2006 10-K and the 2007 10-K could be worth a $10.00 damage claim.

This issue is a variant of the confounding information problem when using the event study to measure inflation per share during the class period. Even if the corrective disclosure only contains information about the fraud, [59] it may contain too much negative information to measure the magnitude of the price drop that would be expected from correcting only the first financial statement.

To illustrate, let us suppose in the above example that the court finds that the only misrepresentations were those made about earnings in the 2006 and 2007 10-Ks. We also ***28** make the assumption that the experts agree that $8.00 of the $10.00 price drop is due to the corrective disclosures regarding the 2006 and 2007 restatements (leaving $2.00 of the price drop to have been caused by the timely announcement concerning the FY 2008 subprime writedowns). The following table shows what is known at this point about inflation per share:

**Table 1**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The typical approach to dealing with this issue is to use a buildup of the inflation per share over the class period that is proportional to cumulative financial overstatement. [60] The following table shows how this is done:

**Table 2**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

***29** If the earnings have been overstated for a large number of years, then calculation of the cumulative overstatement proceeds as follows: the cumulative overstatement of the first year is just the first year's overstatement; the cumulative overstatement of the second year is the sum of the first year overstatement and the overstatement of the second year; the cumulative overstatement of the third year is the sum of the cumulative overstatement of the second year (calculated in the prior step) and the overstatement of the third year; etc. The cumulative overstatement of the last year is always 100% of the total overstatement. Table 2 computes the cumulative overstatement for Example 1 in row D.

The next step is to compute the percentage of each year's cumulative overstatement to the total overstatement. In Example 1, the year 1 overstatement of $0.50 is 25% of the total overstatement of $2.00. The pro-rata allocation approach would therefore assign 25% of the price drop to the first year's overstatement. This amounts to $2.00 per share (0.25 x $8.00 per share). Under this allocation, purchasers who bought E-Z shares during the period March 31, 2007 through March 30, 2008 and retained these shares through the end of the class period would have estimated economic loss (reduction inflation between purchase and sale)

PX346

of $2.00 per share. Alternatively, class members who purchased after March 30, 2008 and held to the end of the class period would have estimated economic loss of $8.00 per share.

One of the key assumptions in the buildup approach presented here is that one can estimate the fraction of the observed $10.00 per share that is due to the accounting misrepresentations before building up the inflation per share over the class period. As will be shown below, this assumption is likely problematic.

On a related point, the pro-rata allocation approach may cause a distortion in the buildup because it does not take into account that the observed price drop is based on market expectations that would have been different in the counterfactual world. For example, market expectations for 2007 earnings would have been lower had the true 2006 earnings been reported. This has an effect on the buildup because in the counterfactual world, the 25% of cumulative overstatement will have had a different, often larger than pro-rata, effect on inflation per share.

3. Allocating Liability to Codefendants

It is often the case that different sets of codefendants--such as officers versus outside auditors--are alleged to be responsible for different misrepresentations that are, nonetheless, revealed together in corrective disclosures.[61] This is another species of confounding information. Consider that each misrepresentation is associated with a set of codefendants. Some misrepresentation may be associated with two codefendants, a second misrepresentation with one codefendant, etc. Were there a series of corrective disclosures and each was associated with one, and only one, of the misrepresentations, then there might be some hope that an event study would be able to assign an inflation per share to each misrepresentation. Then each codefendant would have an upper bound on their liability from the dollar drops associated with the corrective disclosures only for ***30** the misrepresentations for which they had some legal responsibility. Instead, corrective disclosures usually reveal the truth about a number of alleged misrepresentations, creating the problem that analysis of event study results is of limited value in helping to determine proportionate liability.

To give an example, let us change our example somewhat and assume the following facts concerning one of E-Z's backers, Asset Backed Lending, Inc. (ABL), whose net income is the same as E-Z, but unlike E-Z, files quarterly as well as annual financial statements:

Example 2:

1) On March 30, 2007, ABL files a 10-K for the fiscal year ending December 31, 2006, claiming earnings of $1.00 per share.

2) During 2007, ABL issues three 10-Qs as follows:

a) on May 15, the Q1 2007 10-Q states earnings per share for Q1 2007 are $0.20 per share;

b) on August 15, the Q2 2007 10-Q states earnings per share for Q1 2007 are $0.30 per share;

c) on November 15, the Q3 2007 10-Q states earnings per share for Q1 2007 are $0.30 per share.

PX346

3) On March 30, 2008, ABL files a 10-K for the fiscal year ending December 31, 2007 claiming earnings of $1.00 per share for FY 2007 and $0.20 per share for Q4 2007.

4) On May 1, 2008, ABL issues a press release stating:

a) it is restating its FY 2006 earnings to $0.50 per share (implying that originally reported FY 2006 earnings were overstated by $0.50 per share);

b) it is restating its FY 2007 earnings to be a loss of $0.50 per share (implying that originally reported FY 2007 earnings were overstated by $1.50 per share); and

c) it is taking a substantial writedown of subprime related assets in FY 2008.

5) The stock price responds immediately, dropping a market-adjusted $10.00 per share.

Consider the defense of the auditor codefendant that the only times it made any representations to the market was by certifying its audit of the financial statements in the two 10-Ks. Neither the quarterly earnings announcements nor the 2008 writedown announcement involved any statements made by the auditors. As a result, any inflation or loss causation attributable to the 10-Qs or the 2008 writedowns would not contribute to damages against the auditor. Alternatively, a portion of the inflation per share and loss causation from the misstatements in the10-Ks would be jointly attributable to the auditor and other codefendants involved in their preparation and dissemination. But, the event study by itself cannot distinguish which part of the $10.00 price drop is due to correction of misstatements in 10-Ks versus misstatements in the 10-Qs and revelations about the subprime writedowns.

### *31 III. Analyzing Price Reactions with Response Coefficients

In what follows, we extend our examples to demonstrate how response coefficients can be used to improve the accuracy of inflation estimates. These applications draw from 40 years of studies of the impact on stock prices of financial announcements published in the finance literature.[62] The specific topics covered include the following:

How a response coefficient can be used to separate the stock price impact of an announcement concerning the financial results of a company from the impact of other announcements made simultaneously: This application of response coefficients intends to separate the portion of a price reaction attributable to quantified financial results from the portion attributable to either quantitative or qualitative, confounding news.

The construction of a hypothetical price path, or "true value," over the class period based on the counterfactual that no misrepresentations were made:[63] This is particularly relevant if each of several misstatements occurred at different points in time.

PX346

Calculating bounds on damages for particular defendants when different parties share the liability for an alleged misconduct: The hypothetical price paths can be based on party-specific response coefficients and will therefore allow calculating a cap on inflation per share over the class period for a given party.

**A. Price Effects of Financial Results in Announcements with Confounding News**

1. The Nature of Financial Results Announcements

Quarterly announcements that inform investors about its financial results, especially the fourth quarter's, often contain the most eagerly awaited information a company releases over the course of a year. [64] For well-followed companies, security analysts will have published their expectations well in advance of such announcements and discussed the different factors that support their estimates. In some cases, analysts share their views about the implications that financial results above or below expectations would have on their valuation of the company. The anticipation of financial results by the wider investor community has also been documented; academic research has found that stock prices exhibit significantly higher volatility in the days before the announcements of financial results. [65]

***32** Announcements of financial results are rarely limited to financial statement data. Because they are crucial for the valuation of a stock by investors, financial results are generally a platform for more wide-ranging communications by management to investors. For example, in earnings calls with security analysts, management might make an earnings forecast for subsequent periods, [66] discuss their understanding of the company's growth opportunities, or respond to analysts' questions on a range of subjects beyond the reported financials. [67] Academic research has shown that concurrent, ancillary information, such as management forecasts, has significant stock price impacts. [68]

2. Financial Results and Their Impact on Stock Prices

Research concerned with stock price movements in reaction to financial results has been a subject of academic research for at least half a century. [69] The hypothesis that earnings announcements contain information that can move a stock price is based, in part, on a model that equates the value of equity to the expected present discounted value of the future stream of cash flows. [70] In the case of a stock, all free cash flow ultimately accrues to the equity holder in the form of distributions such as stock buy backs and dividends. [71] The argument is: were the price higher (lower) than the sum of discounted future distributions, an investor buying the stock would expect to make an economic loss (profit) in the long run. As a consequence, reduced (increased) demand would decrease (increase) the stock price towards the equilibrium where it equals the sum of expected discounted future dividends.

Expected distributions to equity holders depend on expected cash flow which, in turn, should bear a long-run relationship to expected earnings of a company. [72] Therefore, ***33** according to this model of stock price formation, in an efficient market, stock price is an unbiased estimate of the value of the stock based on all public information of future earnings. [73] It is therefore not surprising that the stock price generally reacts very little or not at all when a company announces earnings in line with the current market expectations. [74] Alternatively, stock prices have been found to react significantly to unexpected earnings numbers, or "earnings surprises." [75] The reason is that investors adjust their expectations of future earnings in the direction of the surprise.

a. Earnings Response Coefficients

Academic explorations have summarized the quantitative relationship between earnings surprises and stock price by estimating an earnings response coefficient (ERC). [76] For an intuitive explanation, consider the effect of an earnings surprise on a stock price return. Suppose, for example, that there is a surprise of negative earnings per share that is -10% of the stock price. Such an announcement will often cause a swift stock price drop. In the instant case, let us suppose that the observed stock price effect

PX346

is -30%. The price response coefficient in this case is equal to 3: it is the change in return divided by the change in the earnings surprise to price ratio. In this instance, it would be -30% divided by -10%.

Generally, the factor by which an earnings (per share) surprise transforms into a price change can be represented as: [77]

| | | | |
|---|---|---|---|
| Market-adjusted price reaction due to earnings surprise | = | ERC x | earnings surprise per share. |

The research on the magnitude of the price change in response to earnings surprises has developed a more rigorous representation to facilitate statistical estimates:

***34** An earnings surprise is defined as $\hat{e}_t - E(e_t)$, where:

$\hat{e}_t$ is the earnings per share announced on day t; and

$E(e_t)$ is the market's expectations of earnings per share on day t (usually represented as consensus analysts' forecasts).

The market-adjusted stock price return (excess return), $AR_t$, in response to this earnings news is assumed to be predicted by the following expression:

$AR_t = a + b\{[\hat{e}_t - E(e_t)]/p_{t-1}\}$, where:

$p_{t-1}$ is the prior day's share price;

b is the estimated earnings response coefficient; and

a is an estimated constant.

As a matter of experience, it is likely that the earnings response coefficient is not constant if there are multiple earnings surprises resulting from disclosures of false accounting. For a growth stock, the first announcement could be expected to have a disproportionately larger effect than subsequent announcements. That is, the earnings response coefficient for initial announcements would likely be larger than it is for follow-up announcements. This is because the initial price reaction would include a component that reassesses upward the risk of ensuing bad news. If that risk materializes in a subsequent earnings surprise that an investigation is related to the same violative conduct as the first disclosure, then losses caused by the conduct are the sum of the two excess returns.

b. Analyst Forecast Revision Coefficient

We have discussed above that a stock price will change when investors change their expectations of future earnings or revise their earnings forecasts. [78] Current academic research has converged to using securities analyst forecasts as approximations for


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

market expectations. We will discuss the reasons for this in Part IV. The factor by which analyst forecasts are revised due to an earnings surprise is called the analyst forecast revision coefficient, or ARC. The basic relationship between forecast revisions and earnings surprise can be thought of as:

Analyst forecast revision due to earnings surprise = ARC x earnings surprise per share.

Academic researchers have quantified these response coefficients for various samples of firms, industries, and time periods. [79] These calculations are based on historical data using regression analysis. Because this statistical technique uses many historical observations to estimate the response coefficients, the response coefficients will not be influenced by the possible confounding news of the single historical ***35** announcements. Large sample results produce unbiased and consistent estimates of response coefficients. [80] In other words, the effects of the confounding news cancel each other out in the estimation.

We discuss how to calculate or select the appropriate ERC and ARC for a company in our review of the academic literature on ERCs and ARCs in Parts IV and V, respectively. We will now turn to examples which demonstrate how these response coefficients can be used to analyze price reactions.

3. Using Response Coefficients to Parse Price Reactions

The importance of financial results and the fact that they are often announced simultaneously with other company specific news is the motivation for our first example using response coefficients. Before we can address all the complexities present in Example 1 of the previous section, we demonstrate the application of response coefficients in simplified situations. Consider the following case of a corrective disclosure of a misrepresentation announced simultaneously with a timely (i.e., nonfraudulent) earnings disappointment:

Example 3:

1) On March 4, 2008, amid market speculations that Acme Bank and Fidelity (Acme) will have to write down subprime related assets in 2008, Acme announced that it would not take any writedowns (when in fact management already knew they were inevitable).

2) On March 30, 2008, Acme announces that its 2007 earnings are $1.50 below the market's expectation (timely announcement) and that it would have to write down its subprime related assets substantially (correction of misrepresentation).

3) An event study shows that Acme's stock price declined by a market adjusted $10.00 on March 30, 2008.

Clearly, the price reaction on March 30, 2008 includes the combined effect that investors attribute to both the writedowns of subprime related assets and the disappointing earnings announcement. As a consequence, the event study on March 30, 2008 does not by itself allow one to determine the price decline exclusively due to the disclosure of the misrepresentation.

Instead we can make use of the academic research on price reactions in response to earnings announcements, which provides us with a technique to calculate the price reaction due to the $1.50 earnings disappointment. The technique uses the concept of an earnings response coefficient, or ERC, as introduced above.

Let us assume that either through a regression analysis or from the professional literature, we can infer that Acme has an ERC of 5 over the relevant time period. This implies that for every cent of an earnings surprise its stock price reacts by five cents.


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Using an ERC of 5 in our example gives the following result:

***36 Table 3**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

To parse the fraction of a price reaction due to an earnings surprise is not the only application of response coefficients. The technique can also be applied to calculate inflation in a stock price when the earnings themselves are misrepresented or overstated and later corrected in a disclosure of the correct numbers. This, in fact, may be the most relevant use of ERCs in securities litigation. While not all restatements result in litigation, restatements are in fact quite common and therefore an important application of response coefficients: The July 2006 report on financial restatements issued by the U.S. Government Accountability Office finds that 6.8% of all companies listed on major exchanges restated at least one financial statement in 2005.[81] This is the motivation for our next example, which again is a simplified version of our Example 1 in the previous section. Example 4 below deals with disclosure of overstated financial results simultaneously with confounding news:

Example 4:

1) On May 1, 2008, Big Investment Group (BIG) issues a press release informing investors that its 2007 earnings announced on March 30, 2008 had been overstated by $1.50, and that it will take substantial writedowns on its subprime related assets in 2008 (the writedowns are considered as timely information).

2) An event study on May 1, 2008 shows a price reaction of $10.00.

This, of course, is the mirror image of Example 3; similar to Example 3, the event study will not provide us with enough information to calculate inflation due to the overstated 2007 earnings. However, we can calculate the expected movement of the price on February 28, 2008 due to the earnings announcement alone by applying the ERC. Assume that BIG has an ERC of 5:

***37 Table 4**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Examples 3 and 4 show how an ERC can separate the impact of an earnings surprise from the impact of news announced simultaneously with the financial results. Four comments are in order.

First, if the timely news were positive rather than negative, then the predicted price using the ERC would be expected to be greater than the actual change in price. The difference between the predicted and the actual would be an estimate of the effect of the positive news alone on the stock price.

Second, the examples above could also have been based on response coefficients other than the ERC. As we will see in Part IV, the academic literature has studied many different response coefficients.[82] For instance, in young industries with considerable set-up costs, earnings are not likely to be considered a meaningful measure of performance as big initial investments imply that all competitors have negative earnings. In fact, it might even be the case that companies with bigger losses are expected to grow faster in the future, as they might invest faster and therefore build a client base sooner. In such a case, revenues may be a more reliable accounting measure for the performance of a company. Similarly, in some markets cost-cutting is the only viable survival strategy for companies. For those markets, cost response coefficients might be the most appropriate response coefficients to use.

Third, along these lines, in the examples above it would have been theoretically possible to use a "writedown response coefficient" to parse the stock price rather than an earnings response coefficient. But, this could create a situation where the sum of the expected price declines from the earnings response coefficient and the writedown response coefficient would be less

PX346

than or greater than the observed stock price decline of $10. Such a result would not be surprising because of the presence of statistical error in both the earnings and writedown response coefficients and in the event study itself. In such circumstances, the inflation per share estimate from using the earnings response coefficient would be different from the inflation per share estimate calculated from the writedown response coefficient. This would mean that the analyst would have to find a way to reconcile the three different statistical estimates. One approach would be to select one or the other inflation estimate, based on test statistics that would show which of the ***38** two response coefficients gives the lowest expected error. If the results of the event study show a price drop in excess of the price drop based on the selected response coefficient, then this would give a way to parse the price drop into two unique components using the approaches shown in Tables 3 and 4 above. In the alternative, there are sophisticated statistical techniques that can be used to combine various estimates into a single estimate based on the statistical errors in each of the separate estimates.[83] These methods, however, are beyond the scope of this Article.

Fourth, market expectations are the single most important factor influencing the stock price reaction to an earnings announcement. We have discussed that investors will adjust their expectations of future cash flows from holding a given stock if earnings announcements are not in line with their expectations. In the next Part we will use this fact to extend the situations to which we can apply response coefficients.

4. Successive Price Effects of Misstatements that Occurred at Different Times in the Past

In this Part we address the situation of several misstatements made at different points in time. Although our technique is applicable to many different kinds of misstatements, the most obvious application is to announcements revealing financial statement restatements involving several periods. This is not a small fraction of all the restatements announced. Professors Palmrose, Richardson, and Scholz show that almost one-third of all firms restating financial statements restate multiple years.[84]

To demonstrate our method, we now address Example 1 from above. We repeat the sequence of events in the example for convenience:

Example 5:

1) On March 30, 2007, E-Z files a 10-K for the fiscal year ending December 31, 2006, claiming earnings of $1.00 per share.

2) E-Z is silent about FY 2007 financial results until March 30, 2008, when it files a 10-K for the fiscal year ending December 31, 2007, claiming earnings of $1.00 per share for FY 2007.

3) On May 1, 2008, E-Z issues a press release stating the following:

a) it is restating its FY 2006 earnings to $0.50 per share (implying that originally reported FY 2006 earnings were overstated by $0.50 per share);

b) it is restating its FY 2007 earnings to be a loss of $0.50 per share (implying that originally reported FY 2007 earnings were overstated by $1.50 per share); and

c) it is taking a substantial writedown of subprime related assets in FY 2008.

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

***39** 4) The stock price responds immediately, dropping a market-adjusted $10.00 per share.

As discussed previously, it is important to separate the effects of the different news items announced on May 1, 2008. The reason is that the subprime-related asset writedowns may be timely events which did not inflate the stock price in the period from March 30, 2007 to May 1, 2008. In the prior incarnation of Example 5, it was assumed that the price impact corrective disclosure concerning the restatement alone was $8.00 per share. [85] But now we have a method of estimating the price reaction based on the ERC rather than simply assuming the price reaction.

Let us assume that we have estimated an ERC of four for E-Z. Naïve application of the ERC implies that E-Z's stock price would have dropped $2.00 (= 4 x $0.50) on March 30, 2007, and another $6.00 (= 4 x $1.50) on March 30, 2008. But, this is likely to be wrong because it neglects that the market often adjusts its expectations regarding future earnings if it experiences an earnings surprise. [86] Had E-Z announced lower 2006 earnings on March 30, 2007, investors would have expected lower earnings in 2007, and the earnings surprise would have been smaller than $1.50 on March 30, 2008.

We have discussed above that we can use an ARC to measure the extent to which expectations, which are our best approximation of the market's expectations, change when the market experiences an earnings surprise. Let's say that we have measured an ARC of 0.8 for E-Z. Consequently, the counterfactual world would have had the following cause and effect dynamic:

First, were the market to have learned on March 30, 2007, that correct earnings were $0.50 lower than expectations for 2006, it would have reacted with a price decrease of $2.00 (ERC of 4 times $0.50 lower earnings for 2006). Simultaneously, the market would have adjusted its expectations for the 2007 earnings downward by $0.40 (ARC of 0.8 times $0.50 lower earnings in 2006). As a result, were E-Z to have announced the lower, correct earnings on March 30, 2008, the market's expectations would have already been lower by $0.40 from the actual world expectations. Therefore, the market would only have experienced a $1.10 earnings surprise (= $1.50- $0.40) on March 30, 2008. This would have resulted in an additional price decrease of $4.40 (ERC of 4 times $1.10 lower than expected earnings for 2007).

The following table summarizes the methodology: [87]

***40 Table 5**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Row F of Table 5 shows, for comparison purposes, how a pro-rata buildup would have performed had a hypothetical event study isolated the impact of the restatement disclosure to be the same as was estimated from applying the ERC and ARC to build up the inflation (i.e., $6.40). As can be seen, the pro-rata buildup has a lower inflation per share in the early part of the class period than the inflation per share estimated using the ERC and ARC.

In this example, there is no ambiguity concerning the inflation per share attributable to the incorrectly stated financials because the estimate is less than the amount of the market-adjusted price drop, and the difference between the estimated inflation per share and the price drop can be attributed to timely news. But, suppose the example was changed so that the only news was the financial restatement. There is no guarantee that the market-adjusted price drop would be equal to the inflation per share estimated using the ERC and ARC. Similar to the prior example, statistical error will cause the estimates based on ERC/ARC buildup to vary from the estimate based on an unadjusted event study. The analyst will then have to decide how to employ the estimates in computing damages based on a number of factors, including the following:

> Loss causation. If the ERC/ARC method was considered the best evidence on inflation per share and if the inflation per share was greater than the market-adjusted price drop, then damages would be capped by the inflation-adjusted price drop, because this would reflect the loss causation constraint on damages.

PX346

A priori versus ex post damages. If the ERC/ARC estimates are based on data prior to the corrective disclosure, then they represent an a priori estimate of the inflation per share due to the incorrect financials. Alternatively, the market-adjusted price drop represents an ex post measure of the cumulative inflation per share. Although securities fraud litigation has not addressed this issue, there is a general presumption in the law and economics literature that the a priori measure of damages satisfies more closely the goal of optimal deterrence. [88]

***41** Statistical error. Weighing the statistical confidence in the two different estimates may also reveal a clear preference for one over the other. If there is a preference for the unadjusted event study in estimating the cumulative inflation per share at the time of the final restatement likely employing the ERC/ARC estimates, then the analyst would have to develop an alternative approach, though likely employing the ERC/ARC estimates, to the buildup of inflation over the class period.

It is worth mentioning that the buildup of inflation per share does not readily translate into loss causation. [89] For an ARC greater than zero, the lingering effect of a long-ago misstatement on today's price is lower than the inflation per share at the time of the misstatement. Courts have not addressed whether this has an indirect effect on reducing damages per share during the early part of the class period based on a loss causation argument. Moreover, it is a legal policy issue rather than an economics question. The economics of the damages estimate is clear; the class members have suffered an economic loss of the magnitude estimated in the ERC/ARC framework. But, the loss causation cap imposed by Dura will sometimes prevent recovery of full economic losses. [90] This being said, if the courts would reduce the damages for the early part of the class period based on a loss causation argument, it would have the perverse effect of rewarding those defendants who delay in restating their financials. Such a policy would likely increase the social costs of securities aftermarket fraud.

5. Bounds on the Liability for an Individual Defendant that is Less than Aggregate Damages

We now address the case in which different sets of codefendants are jointly responsible for alleged misrepresentations. For misrepresentations in financial statements, for example, auditors are oftentimes named as codefendants alongside officers, directors, and the issuing firm. As described above, except in unusual circumstances, the event study of the corrective announcements could not be used to apportion damages among defendants. [91]

Even though the auditor is a codefendant, there may be a number of misrepresentations in which the auditor did not participate. Usually, the only actionable statements auditors make are in 10-Ks. [92] Misrepresentations made by other codefendants, such as in 10-Qs and other news releases not associated with the audited financials, could result in inflation per share apart from that caused by misrepresentations in the 10-Ks. [93] This makes the case of an auditor codefendant a potentially noteworthy example of the problem of apportioning inflation per share. Specifically, a consequential portion of the ***42** inflation that cannot be attributed to the auditor is the price reaction to the alleged misrepresentations in which the auditor had no participation, i.e., had they exclusively been incorporated into unaudited financial statements. Regarding the distinction between responsibilities of the auditor and management, the Statement of Auditing Standards states that the financial statements are the management's responsibility, whereas it is the auditor's responsibility to express an opinion on the financial statements. [94]

While an event study cannot provide such a measure, response coefficients do allow for the estimation of inflation in audited versus unaudited financial statements. This is because the academic literature has found that the response coefficients measured on audited quarters (fourth quarters) differ from response coefficients measured on unaudited quarters (first to third quarters). [95] Below we exploit this finding statistically to estimate the effect of an audit opinion on misstated financials.

In summary, for the purpose of estimating a cap on the auditor's liability, we consider the effect of the alleged misstatements on the share price as a result of having these misstatements certified by the auditor, as opposed to having them in announcements of uncertified financials. To estimate this incremental effect, we estimate the difference between the inflation in the stock price entering as a result of the overstatements announced in audited financials, and the inflation that would have entered the stock had these misstatements occurred in unaudited financial statements.

PX346

We now provide an illustration of this method by adapting the previous example to a situation involving restatement of several financial statements with management as well as the outside auditor as codefendants.

Example 6:

On May 4, 2008, BIG issues a press release informing investors that the 2007 earnings announced on February 28, 2008, and the 2006 earnings announced on February 23, 2007 had been overstated by $0.40 and $0.80, respectively. BIG further informs investors that its CEO is leaving the company immediately and that it has lost a patent infringement lawsuit. Both management as well as auditors are named in a class action complaint filed a few weeks later. ***43** An estimation of the ERC on Company BIG's and its peers' data shows that the ERC estimated on the first three quarters of each fiscal year used is significantly different from the ERC estimated on the fourth quarter of each fiscal year used. A careful review using other variables [96] suggested in the academic literature shows that the entire difference can be attributed to the fact that the fourth quarter earnings are audited. The ERC for audited quarters is seven, while the ERC for unaudited quarters is three.

A similar effect is found for the ARC. The ARC for audited quarters is 0.8, while the ARC for unaudited quarters is 0.3. These response coefficients can now be used to calculate two distinct inflation series: the inflation in the stock price due to alleged misrepresentations made in audited financial statements (Inflation A), and the inflation that would have been in the stock price had the alleged misrepresentations been made in unaudited financial statements (Inflation B). Each inflation series can be calculated as shown in Table 6.

***44 Table 6**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Inflation A is the total inflation in the stock price. Inflation B is the inflation that cannot be attributed to the auditor, which implies that the difference between Inflation A and Inflation B is the inflation for which both the auditor and other codefendants are liable. As such, it is also a cap on the auditor's liability.

As an aside, it is also likely that the complaint in this matter would allege that the statements made in the quarterly 10-Q filings contained omissions and/or ***45** misrepresentations. If so, and if the misstatements were to be material, then there would be a within-fiscal-year, quarterly buildup of inflation. Oftentimes, this quarterly buildup can be estimated using the same ERC and ARC coefficients as are used for the fiscal year misstatements. If the auditors did not speak in the quarterly filings, then the relevant inflation per share for codefendants including the auditor is the inflation based only on fiscal year misstatements. In other words, the auditor's liability would exclude within-fiscal-year quarterly increments, but the auditor's liability would include the fiscal year increment at the time of announcement of fiscal year audited results (which, obviously, would incorporate the sum of four quarters' worth of misstatements).

## IV. What Have We Learned from Research on Earnings Response Coefficients (ERC)?

There is prolific academic literature on the estimation of response coefficients. The scope of the published research is quite broad and covers many, if not most, of the situations an expert would encounter in estimating financial fraud inflations. The methodologies and conclusions found in many of these articles can certainly be challenged, but they nonetheless point to standards in the estimation of response coefficients. The estimation techniques are usually multiple regression analyses, [97] and its more sophisticated variants. As such, estimated response coefficients will have a known rate of error. All three of these factors--general acceptance, methodological standards, and known rate of error--should lead to the admissibility under Daubert [98] of the professional application of response coefficients in litigation.

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

This Part presents a review of the literature, notifying analysts of the sources of information on various methodological issues confronted in the estimation of response coefficients. This should give some notion of both the scope and constraints of using response coefficients.

Response coefficients, at base, are attempts to understand how accounting information affects stock prices. Two academic papers are widely considered to represent the start of modern capital-markets-based accounting research, the first by Professors Ball and Brown, who studied whether the announcement of unexpected earnings affects stock prices, and the second by Professor Beaver, who studied the information content of earnings announcements and established that both trading volume and return volatility increase at the time of earnings announcements.[99]

At the time of these developments, academics generally were modeling the stock price of a company as the discounted expected dividend payments investors could expect from holding the stock.[100] However, capital-markets-based accounting research mainly focused on earnings, as opposed to dividends. This is supported by the "irrelevance proposition" of Professors Merton H. Miller and Franco Modigliani, which states that in well-functioning markets the value of a firm will not depend on its financing decisions or ***46** its dividend policy.[101] Consequently, investors will be indifferent between dividend payouts and reinvestments and only base their valuation of the stock on earnings. Of course, the theoretical concept of earnings used in the Modigliani-Miller proposition could be a far cry from Generally Accepted Accounting Principles (GAAP) earnings. This measurement problem is one of the central issues in accounting research and is one of the reasons there has been so much study of the relationship between reported earnings and firm value.[102]

Earnings are, or should be, an important information item in financial statements.[103] In most economic models, profits are assumed to be the signal directing the optimal allocation of capital. In valuation theory, as well as valuation models used in practice, expected cash flows, a metric that should be related to earnings, is one of the main input variables.[104] Accordingly, security analysts express their beliefs about future outcomes of many securities in the form of expected earnings.

Most academic studies accept the hypothesis that capital markets are efficient and that stock prices include all available information.[105] This hypothesis implies that the value of expected earnings is already incorporated in the stock price and that only the unexpected part of an earnings announcement, the earnings surprise, will have an effect on the stock price.

Ball and Brown used simple, non-parametric methods to assess whether earnings surprises were associated with unexpected stock returns; their research, therefore, did not result in parameters that could be used to determine inflation per share from an earnings misstatement, such as an ERC.[106] Subsequent studies addressing the same question, as well as the question of the magnitude of the association, refined their method.[107] It became popular to use a linear, statistical model, usually Equation (4) above, to capture the relationship between unexpected returns and earnings surprises.[108] Over the last forty years this type of model has been used to estimate ERCs on many different samples, using many different versions of the earnings surprise and the unexpected returns variables. It has also been widely used as a benchmark model against which to compare more sophisticated approaches including additional variables and more complicated ***47** functional forms.[109]

These enhancements to the simple model will improve the estimation of inflation per share depending on the facts of the case and the availability of data. We will start with reviewing the studies that estimate an ERC using the basic equation above and follow with a review of academic papers that study extended versions of the basic equation.

### A. Estimating the Basic ERC Equation

1. The Variables in the Basic ERC Equation

A researcher who intends to estimate an ERC using the basic equation presented above has to make several decisions on how to use the available data: (1) over which time period to measure the price change that is attributed to an earnings announcement; (2) how to measure the price change attributed to the earnings surprise; and (3) how to measure unexpected earnings. We discuss these variables in the following subsections.

PX346

a. Stock Price Return Window

The length of the window over which abnormal stock price returns are cumulated and attributed to an earnings announcement can have a major effect on the estimated stock price effect and the extent to which the estimate is contaminated by confounding factors. If a chosen window is too narrow, the stock price changes will understate the impact earnings surprises have. If stock price changes are measured over a window that is too long, the stock price changes might be convoluted by other information that has entered the market during this time. Unfortunately, standard practice has to contend with making sense of the fact that over time researchers have used many window lengths. [110] Fortunately, there is an explanation for this history with the result that a relatively short window, i.e., three days or less, is the most supportable. [111]

***48** In earlier studies, the main reason for long return windows was data constraints. Specifically, analyst forecasts, which are a popular approximation of market expectations, were only available once a month by providers such as Institutional Brokers Estimate System (I/B/E/S). [112] As a consequence, a longer time window was necessary to incorporate the impact of events prior to an announcement into the return variable because analyst expectations would have incorporated this extraneous information. [113] Over time, I/B/E/S and other providers of analyst forecasts have considerably updated their services and now provide daily analyst forecasts. [114] This allows an accurate determination of analyst forecasts on the day of the earnings announcement (or the day immediately prior to it).

For causal analysis, academics have converged to using shorter event windows when estimating ERCs, usually one to three days. [115] A narrow window allows the analyst to conclude that the cause of the price change is the information contained in the announcement rather than information coming into the market on days outside the window.

While some early studies have analyzed the percentage change in raw stock price as a result of an earnings announcement, [116] most studies have focused on some measure of unexpected price returns. There are several methods used to calculate unexpected returns over the window chosen as the event window. The most prominent method is to use the abnormal returns calculated from a market model as the unexpected returns. [117] These market-adjusted returns would be estimated as described above using, for example, Market Model (1) or (2). The cumulated returns over the event window chosen are the returns that are attributed to the earnings announcement. [118]

***49** b. Earnings Surprises

As shown in Equation (4) above, an earnings surprise is defined as announced earnings minus expected earnings. A researcher who wants to create an earnings surprise variable has to decide how to measure expected earnings. This is somewhat challenging as expected earnings cannot be observed.

The approaches to approximate the market's expectations of future earnings taken in the academic literature can be separated into two groups. First, academics have studied the time-series properties of earnings and used these models to estimate market expectations of future earnings. These studies are discussed below in Part IV.A.1.b.i. Second, and preferably, academics have used analyst forecasts of earnings to approximate the market's expectations of future earnings. These approximations are discussed below in Part IV.A.1.b.ii.

i. Expected Earnings from Time-Series Models

There is substantial literature on the time series properties of annual earnings numbers. [119] Similarly, quarterly earnings have been forecasted with sophisticated time series analysis. [120] Brown provides a more detailed summary of time series models for earnings forecasting. [121]

In the ERC context, a study of alternative time series models found that simple models did as well as more involved ones even though the latter had higher forecast accuracy. [122] One of the co-authors, an expert for the In re Tyco shareholder class action litigation, subsequently established that this approach could be used for building up inflation per share over the class period. [123]


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

***50** ii. Analyst Forecasts Used as Market Expectations

Research has shown that security analyst forecasts [124] are more accurate than time-series model predictions of earnings, [125] and that earnings surprises created from analyst forecasts are more strongly associated with abnormal market returns than earnings surprises created from time series forecasts. [126] The higher correlation between analyst forecast-based earnings surprises and abnormal stock returns implies that analyst forecasts are a better approximation of the market's expectations than time series models. The reasons for the better performance of analyst forecasts over time series forecasts are: (a) analysts incorporate more information than just the straight earnings numbers from past quarters, e.g., they are in a better position to distinguish between permanent and transitory earnings, and (b) analysts incorporate information that becomes available after the last earnings announcements. [127]

Over the past two decades, analyst forecasts became available electronically from sources such as I/B/E/S, Value Line, Standard and Poor's Earnings Forecasts, and Zacks Investment Research. [128] Initial efforts to compare the forecast accuracy of the aforementioned analyst data sources above found that Value Line and I/B/E/S provide comparable forecast data. [129] In their study, the authors emphasize the importance of using the appropriate reported earnings number. More recent research, though, finds that I/B/E/S earnings forecasts outperform Value Line forecasts in terms of accuracy and as proxies for market expectations. [130] The conflicting conclusions can be reconciled by improvements that I/B/E/S made to its data reporting.

The expert needs to be aware that analysts have increasingly relied on modified definitions of GAAP numbers--so-called Street numbers, which may reflect variations such as "operating" or "pro forma" earnings. [131] There has been an increase in the frequency and magnitude of cases in which GAAP and Street earnings differ. [132] As ***51** analysts forecast Street earnings, the reported earnings number has to be adjusted to represent the Street's definition because otherwise a measurement error is introduced into the ERC estimation. [133]

It is common in the literature to use either the mean or median analyst forecast across brokerage firms with the median generally being somewhat preferred as it is less prone to outliers and has a smaller bias. [134]

iii. Deflating the Earnings Surprise Variable

Once the earnings surprise has been calculated, it is often deflated or normalized. While some different deflators are used in the literature, the stock price at the beginning of the window, as in Equation (4) above, has been the most commonly used deflator and has been argued to be the econometrically correct deflator to use. [135]

In studies with short return windows, the stock price used to normalize the earnings surprise is often lagged by a few days. The reason is that many companies exhibit anomalous stock returns around earnings announcement dates. [136]

2. Findings of Studies Estimating the Basic ERC Equation

To assess the reasonableness of the estimates found by the analyst, it is worthwhile to review what has been found in the academic literature. One finding is that the correlation between earnings surprises and stock returns in large samples such as those used in the academic literature is not very high. Researchers who estimated the basic ERC equation usually estimate a regression with its R-squared in the range of 2% to 10%, which means that only 2% to 10% of the variance of the unexpected stock returns measured around earnings announcements can be explained by earnings surprises. [137] To put this in context, though, market models will typically have similar levels of R-squared. Although litigating attorneys often perceive a low R-squared as a significant problem, this usually reflects a misunderstanding of the importance of the R-squared statistic. [138] ***52** Without the R-squared from another model specification estimated on the same sample, the R-squared is not very meaningful as it critically depends on the properties of the analyzed data. [139] Of more importance is the test statistic on the estimated ERC.

One of the reasons for the relatively low R-squared is that accounting earnings are likely not the metric that contains all information that is relevant to investors regarding a specific firm. Researchers have therefore included additional variables in


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

the basic ERC equation and extended their research to the impact of variables other than earnings. We discuss this research in Part IV.B.

The second and third findings are the following: ERCs estimated in academic research are oftentimes lower than predicted by economic theory, and the estimated ERCs seem to vary over time and cross-sectionally and therefore depend on the sample used. [140] This may imply that the basic ERC equation is a "first-order approximation" to the true relationship between earnings surprise and share price. To reconcile it with the prevalent models of stock price formation in the finance literature, certain assumptions have to be made that may not do justice to second-order and indirect effects. Researchers have therefore attempted to estimate more general ERC equations that are derived from theoretical models. We discuss this research in Part IV.C.

Another reason for these findings may be that earnings could be measured with an error and therefore bias the estimates of ERCs. Researchers have therefore tried to understand how estimation techniques could be changed to correct for potential biases. We discuss this research in Part IV.D.

### B. Extending the ERC Equation with More Variables

Adjusting the ERC relationship should be done cautiously if the estimation sample includes data only from the subject firm or from judiciously chosen peers. If such a sample is available, then the estimation process will be simplified because each observation can be treated as a historical experiment. But circumstances can differ between the observed price reactions and the counterfactual price reactions that are to be predicted. Controlling for these differences will require more complicated specifications or estimation techniques. As the sample size expands to include observations that become even less comparable, the need for additional controls in the estimation process increases.

Among the ways to control for the differing conditions impacting the individual observations is to include more variables in the regression equation. We can split the studies that include additional variables in the basic ERC equation into research including additional firm-specific variables and research including macro variables. We will first address research including additional firm-specific variables.

***53** 1. Including Additional Firm-Specific Variables

One large subcategory of research includes tests of different accounting variables in ERC regressions. Some of these studies include additional variables in a way that measures their impact on the ERC. Other studies calculate separate response coefficients for these additional variables without quantifying the impact on the ERC, i.e., the variables are included to improve the overall fit of the model and to avoid omitted variable bias.

a. Other Accounting Variables

There are numerous studies that add different accounting variables to the basic ERC equation to measure their incremental information content beyond that provided by earnings by testing the statistical significance of the estimated coefficients. [141]

i. Income and Cash Flow Statement Variables

A firm's success will ultimately depend on its ability to generate cash in excess of its disbursements. Therefore, it is an obvious question whether cash flows are a superior metric for firm performance and could therefore better explain stock returns. Indeed, in financial fraud litigation, this implies a common defense against allegations of misstated GAAP income: such misstatements do not matter if expected cash flows are unaffected. However, because cash flows might not be concurrent with economic activity of the firm, they might not be representative for firm performance over short time periods. To resolve these timing and matching problems, firms can use accruals to alter the timing of cash flow recognition in earnings. Professor Dechow studies whether accruals improve earnings as an explanatory variable of stock returns and finds that indeed stock returns are more strongly associated with earnings than cash flows over periods up to a year. [142] She also finds that long-term operating accruals play a less important role than short-term working capital accruals. [143]

As is well-known by securities lawyers, management has some discretion over the recognition of accruals, which suggests that they can be misused for earnings management. [144] This is the motivation for Professors Kerstein and Rai to study working ***54** capital accruals. [145] They argue that the market is likely to perceive large working capital accruals in combination with small earnings changes as earnings management. [146] Consistent with this hypothesis they find that ERCs are approximately 20% lower when working capital accruals are large in combination with small earnings increases. [147]

Other studies have focused on the main components of cash flows, revenues and expenses, and have estimated revenue response coefficients (RRC) as well as expense response coefficients (EXRC), sometimes as additional parameters in the basic ERC equation. This issue will be important in those cases where the more important financial misstatement is of a financial statement item other than earnings. [148] Professors Swaminathan and Weintrop find a significant and positive RRC and a significant and negative EXRC in a regression of unexpected returns on unexpected revenues and expenses as independent variables. [149] Moreover, they find that unexpected revenues have information content beyond unexpected earnings. [150] Other studies confirm these results but point out that investors react significantly more strongly to a dollar of revenue surprise than to a dollar of cost savings. [151]

One potentially interesting specification for an expert studying inflation might be ***55** how meeting or missing the expected revenues affects the ERC. One study finds evidence that the unexpected returns to meeting or beating earnings forecasts are accentuated when revenue forecasts are also met. [152]

One of the most common events associated with securities litigation is a large, unexpected write-off. [153] Professors Elliott and Hanna show that the percentage of firms reporting large negative special items has increased significantly over time. [154] They study firms that announce multiple write-offs that are not further apart than a year (the paper tests various definitions). [155] They find that the ERC is higher for earnings before special items than earnings after special items, which is consistent with the hypothesis that special items are less relevant to estimating future firm performance than earnings before special items. [156] They further find that the ERC for earnings before special items declines significantly when companies announce write-offs. [157] The response coefficient of special items is positive and significant (write-offs are entered as negative numbers), but declines with the number of consecutive write-offs. [158] A companion piece finds differences in the response coefficients of different types of write-offs. [159] While inventory write-offs and unspecified or multi-asset write-offs result in negative stock price reactions, restructuring charges are followed by positive stock returns. [160]

ii. Balance Sheet Variables

Often, an earnings surprise triggering a shareholder class action will have implications for net equity and, perhaps, other items on the balance sheet. Professors Easton and Harris argue that not only the changes in income represented by the earnings surprise, but also changes in the book value of a firm, should influence the change in the ***56** value of a firm as represented by stock price returns. [161] They argue that changes in the book value are best approximated by the level of earnings and they therefore suggest including earnings deflated by the stock price at the beginning of the period into the ERC equation as an approximation of the changes in book value. [162] Their empirical results find significant coefficients for earnings levels. [163] Other research has made similar explorations into the use of book value relationships. [164]

These models have been extended by including additional variables, [165] including the magnitude of book and market value [166] and the important issue of capitalizing versus expensing research and development. [167]

b. Other Firm-Specific Variables

If the sample becomes larger and goes beyond the subject firm and its peers, then the analyst should be aware that certain firm characteristics may affect the size of the ERC. ***57** These characteristics include the following: where the stock is traded; [168] firm size; [169] funding sources (internal versus external); [170] managerial ownership; [171] systematic risk; [172] default risk and

PX346


© 2024 Thomson Reuters. No claim to original U.S. Government Works.

leverage; [173] seasonality; [174] and firm-specific standard deviation in analysts' forecasts. [175] Below we highlight additional findings that are of particular ***58** significance to securities fraud litigation.

Of special relevance when there is an auditor codefendant, the question of how the market response to an earnings surprise is related to the quality of the reported earnings numbers has been dealt with by a number of authors. [176] Professors Teoh and Wong test whether auditor quality differs, in terms of generating more or less credible earnings reports for investors, by looking at the difference in ERC between companies with Big 8 and non-Big 8 auditors. [177] They find that Big 8 (now Big 4) clients have statistically significantly larger ERCs than non-Big 8 clients. [178] Professors Francis and Ke take a different approach to the same question, looking at market perception of auditor independence before and after the SEC mandated in 2001 the disclosure of auditor fees paid by firms. [179] They find that ERCs were significantly lower after the mandated disclosure for firms paying high levels of nonaudit fees to their auditor. [180] They interpret this to mean that the market's perception of the independence of a company's auditor affects its perception of the quality of that company's earnings numbers. [181]

In light of these findings, it is not surprising that ERCs would decrease after restatements that could decrease the investors' perception of the reliability of a company's financial statements. It will often be observed in securities litigation that the first corrective disclosure of an accounting problem will have a larger impact than subsequent statements. The first mention of a need for a restatement may signal to the market more bad news is coming. Presumably, in those unusual instances where there is no further bad news, the stock price will have excess positive returns. Experts dealing with these situations will be confronted with time-varying ERCs that may have to be adjusted to be applicable to estimating the counterfactual, true value.

***59** Academic research is broadly consistent with these observations. Professor Wilson, for example, studied the ERCs of the companies that restated over the period from January 1997 to June 2002. [182] The ERC is smaller for the three quarters announced after the restatement compared to the quarter immediately before the restatement. [183] She also finds that the nature of the restatement matters with respect to its impact on subsequent ERCs. [184] Revenue recognition errors and restatement announcements that resulted in large stock price declines affect the number of subsequent ERCs that are smaller than the ERC in the quarter before the restatement. In a currently-unpublished study, Professors Cheng, Crabtree, and Smith test whether options backdating allegations decrease the ERC of a company. [185] They find that ERCs are lower after options backdating allegations become public and interpret this finding as evidence that the market's perception of a company's financial information credibility is changed by options backdating. [186]

Another event that gives rise to securities litigation is the issuance of a qualified audit opinion. Professors Choi and Jeter study the impact of qualified audit opinions on ERCs. [187] Their results demonstrate that ERCs drop by 56% to 70% after a qualified opinion, and the authors offer loss of credibility in financial statements as a possible explanation. [188]

A number of studies have found that the timeliness of an earnings announcement is informative for reported earnings. As securities litigators well know, managements that miss their own expected earnings report dates have, on average, negative earnings surprises--and the later the announcement, the more negative the surprise. [189] Professors Bagnoli, Kross, and Watts estimate that the average earnings surprise is more negative by approximately one cent for each day of delay. [190] The study also finds that returns cumulated over the expected report date and the next trading day are significantly negative and prices drop further if the report continues to be delayed. [191] The vast majority of analysts, however, do not revise their forecasts after the missed reporting date. [192] These findings have implications for ERC estimation if delayed announcements are included in the data; without adequate controls, an estimated ERC may be biased ***60** downwards as smaller price reactions to earnings surprises will be measured. [193]

A number of papers discuss the ERC of the first three quarters in comparison to the ERC of the fourth quarter. As mentioned above, these findings are of special importance to cases where there is an auditor codefendant; the fourth quarter is different from the first three in a fiscal year because it contains audited financial statements. Accounting research has also found that the fourth quarter is more likely to contain write-offs than the first three and that management tends to delay the disclosure of bad non-earnings news until the fiscal year-end. [194]

PX346

Professors Cornell and Landsman find that the fourth quarter ERC is significantly larger than the ERC of the first three quarters. The authors attribute this to the fact that only the fourth quarter results are audited and might contain corrections of earnings previously reported in prior quarters. [195]

Finally, there is a question of how market inefficiency affects the estimates of ERC. Professors Aboody, Hughes, and Liu provide evidence that standard value-relevance regressions, such as the market response to earnings announcements, are materially affected by market inefficiencies. [196] Related to this research is an attempt to examine the influence of institutional investors on earnings management by looking at R&D spending for firms that could avoid missing earnings expectations for a quarter by cutting R&D. [197] ***61** In general, high institutional ownership reduces the likelihood of this type of earnings management, implying that institutional investors serve a monitoring role in reducing these short-term earnings target pressures. [198] The exception to this is the case in which the institutions have high portfolio turnover and engage in momentum trading. In extension of these findings, Professors Hotchkiss and Strickland observe that returns following negative earnings surprises decrease as the proportion of momentum ownership to total institutional ownership increases. [199] Similarly, they also find that these returns decrease as the proportion of aggressive growth investors increases, and increase as the proportion of value investors increases. [200]

2. Including Macro Variables

The analyst should also be aware that an ERC estimate under one set of macroeconomic conditions may not provide the best prediction of stock price reaction when those conditions are no longer present. Professors Conrad, Cornell, and Landsman show that the price response to negative earnings surprises increases as the market level rises, supporting the hypothesis that the market responds most strongly to bad news in good times. [201] In related research, Professor Johnson finds that ERCs are larger in expansions than in recessions and larger in credit crunch periods than in reliquification periods. [202]

### C. Extending the ERC Equation with Variables Capturing Revisions in Expectations

There is enormous variation in the impact that earnings restatements will have on investor expectations. Some restatements are not material and others can cause a major stock price crash. One way to assess whether the alleged financial fraud is negligible, very serious, or somewhere in between is to return to first principles to derive a stock price reaction relationship that is more accurate than Equation (4) in a wider variety of circumstances. As mentioned above, the most widely accepted stock valuation theory is ***62** that the company's equilibrium stock price equals the present value of expected future cash flows accruing to the investor possessing the stock. [203] It follows from this model that, depending on how a specific earnings surprise affects the expectations of future income, the ERC will vary across announcements, firms, or other parameters.

Academics have addressed this issue in three different ways: studies that include forecast revisions into the basic ERC equation, studies that attempt to use a measure for the permanency of earnings surprises, and studies which alter the functional form of the basic ERC equation.

1. Including Earnings Forecast Revisions

Using the discounted dividend model as a starting point, Easton and Zmijewski argue that the magnitude of price reactions in response to earnings announcements will depend on the revisions of both expected dividends as well as the expected rate of return at which expected dividends are discounted. [204] They are among the first to show empirically that ERCs are positively correlated with higher revisions in expected earnings and negatively correlated with higher rates of return. [205] Although their findings are of interest, the applicability of their methodology to shareholder class actions is likely to be too complicated given data availability. [206]

Cornell and Landsman make the same point using a more practical methodology. [207] They include the analyst forecast revisions for the next quarter and the next fiscal year in their ERC regression and find significant coefficients for all three variables. [208] As mentioned above, they find that the fourth quarter plays a special role, which they attribute to the fact that fourth quarters

PX346

are audited.[209] This specification will not be an improvement on all samples constructed by experts because it can be the case that the analyst forecast revision variable is statistically insignificant.

In the same vein, Professors Liu and Thomas estimate an ERC model including several forward lags of analyst forecast revisions that have become available through I/B/E/S.[210] They find that these additional terms have significant explanatory power and ***63** improve the fit of the overall regression significantly.[211]

2. Including Measures for Permanency in Earnings Surprises

An interesting way of viewing the causal issue in the materiality and magnitude of a corrective disclosure is whether an earnings surprise is expected to be permanent. Only if an earnings surprise has a permanent component will it prompt the market to adjust expectations of future income and therefore have an impact on the stock price.[212] The two major ways of capturing the permanency effect include breaking a high growth trend (perhaps signalling a fundamental change in the firm) and breaking the earnings surprise into transitory and persistent earnings components.

a. Breaking a Growth Trend

It has been known for a long time that growth firms are more likely to have a shareholder class action filed against them than other firms. This is attributed, in part, to the volatility of their share price. Such a description is overly general, however, because volatility usually refers to a high value for beta. A more refined observation is that growth firms have high ERCs, at least for the first earnings surprise--an element of idiosyncratic risk rather than the systematic risk measured by beta.

A large number of studies have shown that stock returns and earnings growth are positively correlated with ERC.[213] In particular, Professors Skinner and Sloan find that growth stocks exhibit an asymmetrically large ERC to negative earnings surprises which explains the return differential between growth and value stocks.[214] These results are ***64** consistent with a well-known finding that the present value of revisions in expected future earnings are correlated with stock returns.[215]

b. Transitory and Permanent Components of Earnings

Another relevant consideration in financial fraud litigation is which component(s) of earnings needed to be restated. With regard to their impacts on investor expectations of future cash flows, not all components are created equal. Professors Ramakrishnan and Thomas argue that unexpected earnings need to be disaggregated into three different components, permanent, transitory and price-irrelevant unexpected earnings, and an ERC needs to be estimated for each component of unexpected earnings.[216] Other academics use a permanent versus transitory paradigm to classify earnings revisions.[217]

It has also been argued that big earnings surprises are more likely to be due to transitory unexpected earnings, implying that the ERC measured on a sample of big earnings surprises should be smaller than an ERC measured on a sample of small earnings surprises.[218] The empirical support found for this argument--along with studies on measurement error, sample selection and ERCs on losses--were among the reasons for a more recent focus of the literature on so-called "non-linear" ERC equations.[219]

***65 D. Dealing with Measurement Error and Data Accuracy**

Academics have studied how to improve the quality of the data used in ERC regressions and how to reduce measurement errors. Of particular interest is experimentation with the inherently unobservable market expectations of earnings.

1. How to Deal with Measurement Error in the Earnings Surprise Variable

Among studies that have investigated whether changes in data used to create the earnings surprise variable could improve an ERC estimation are those that focus on whether Street or GAAP numbers are more relevant to the investors.[220] Professors Bradshaw and Sloan find that GAAP and Street numbers have diverged increasingly from 1985 to 1997 with the GAAP

PX346



WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

number being increasingly relatively lower than the Street number.[221] The authors find that stock price returns are more highly associated with Street earnings than GAAP earnings.[222] Other studies have argued that this conclusion is driven by extreme tail observations for which Street numbers greatly exceed GAAP numbers and should be cautiously interpreted.[223]

These findings will only be of practical value if the analyst is using a data set where all observations are drawn from the same industry. Typically, the approach used by analysts to construct Street numbers will vary from industry to industry depending on what they view to be the most informative about underlying economic performance. Using Street numbers from different industries in the same sample would lead to apples versus oranges comparisons.

Academics have also attempted to improve the approximation of market expectations of earnings beyond analyst forecasts. One example is the so-called "whisper forecasts."[224] Professors Bagnoli, Beneish, and Watts describe whisper forecasts as ***66** unofficial forecasts of earnings reported in the press and on investors' web sites such as fool.com and techstocks.com.[225] On a small sample of firms, they find that whisper forecasts tend to be more accurate than First Call forecasts, a better approximation of market expectations of earnings, and contain additional information to analyst forecasts.[226]

Finally, several papers have suggested improving the estimation techniques to avoid biases from a possible measurement error in the earnings surprise variable.[227] Care should be taken in using these techniques, however, to confirm that the results are robust.

2. Pooled Versus Firm-Specific Estimation

One question that the expert will need to address is whether ERC estimates are accurate when measured across different companies. Professors Teets and Wasley find that short-window ERCs estimated from pooled time-series cross-sectional regressions are systematically smaller than corresponding averages of firm-specific coefficients estimated from time-series regressions.[228] The reason is that firms with higher earnings stability tend to have higher ERCs, but have less of an effect on the coefficient estimate when pooled with firms that have higher volatility in returns. This explanation does not preclude using peers in the sample, however, because peers are likely to have similar volatility characteristics to the subject firm. The authors suggest using firm-specific estimation instead of pooled estimation when a negative relation between firm-specific ERCs and unexpected earnings variances might exist.

## *67 V. The Academic Literature on Market Expectations and Analyst Forecast Revisions (ARC)

The literature on analysts' forecasts revisions is significant, though less voluminous than the ERC literature. One issue that is the same for both ERC and ARC estimation is how to construct the earnings surprise variable, and will not be repeated in this Part.

### A. Estimating the Basic ARC Equation

The dependent variable, the analyst forecast revisions, is calculated as the difference between the analyst forecast of earnings for a specific period immediately prior to an earnings announcement and the analyst forecast of earnings for the same period immediately after the earnings announcement. As it takes the analysts a few days to update their forecasts after an earnings announcement, academics usually use the forecasts a week after the announcement. This delay used to be much bigger as forecasts were only available monthly.[229] Again, researchers will normalize both variables with the stock price prior to the earnings announcement.[230]

The original estimation dates back to 1979 with the work of Professors Brown and Rozeff.[231] More recently, Professors Jin, Lee, and Huh estimate the ARCs of quarterly earnings surprises on the one- and two-quarter-ahead earnings forecasts.[232]

The behavioral foundation of the basic ARC equation for their model is a form of learning called adaptive expectations. They use the estimated ARCs to measure the predictive value of quarterly earnings announcements on annual earnings forecasts. First, consistent with prior research, they find that as additional quarterly announcements are made available the error of analysts' annual earnings forecasts decreases. Additionally, they hypothesize that the revision coefficients should be positively related

PX346


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

to the quality of information contained in the earnings announcements, leading to larger revision coefficients. They show empirically that larger revision coefficients are indeed positively related to the accuracy of annual earnings forecasts.

### *68 B. Including Additional Variables in the Basic ARC Equation

Academic research has tested adding a number of other variables to earnings surprise in efforts to improve the accuracy of the basic ARC equation. These have included the following: dividend information;[233] revenue surprises;[234] whether revenues and costs move in the same direction ("in-sync" versus "out-of-sync");[235] research and development expenses;[236] restructuring charges;[237] and whether firms meet market earnings expectations.[238]

Often, securities litigation will be triggered by stock price drops on pre-announcement surprises. Professor Miller analyzes the combined effect of preannouncement surprises and subsequent earnings announcement surprises on analysts' forecast revisions. He finds that when both surprises were of the same sign (either positive or negative) analysts made larger revisions to their one-year-ahead earnings forecasts than when both surprises were of opposite signs.

One question that might arise in sample construction is whether to use the data from defendant firms' earnings announcements during the class period. On point is a study by Professors Ettredge, Shane, and Smith. They match a sample of firms that announced, after an earnings announcement, that they had overstated the earnings with a control sample of firms.[239] They estimate separate ARCs for both samples. Their results show that analysts draw different conclusions from the sample that had reported earnings containing (unknown) overstatement errors than from the sample that had accurately reported earnings. This may imply that analysts identify some of the overstatement, at least on average. It might be worthwhile for experts to check whether there is a different estimated ARC for the defendant firm during the class period than for either the defendant firm before the class period or for peers.

### *69 C. ARCs in Response to Events Other than Earnings Surprises

Often, the allegations of financial fraud will relate to misstatements other than quarterly earnings announcements. Academics have also estimated ARC in response to variables other than such earnings surprises. We discuss two examples in this section, noting the list is not complete.

Professors Baginski and Hassell calculate an ARC for a measure of management earnings forecast news issued prior to analyst revisions and for a measure derived from the security market price reaction to that news.[240] Results indicate that security price reactions to management forecasts are useful in predicting subsequent analyst forecast revisions.[241]

Professors Lacina and Karim examine financial analysts' reactions to management earnings forecasts.[242] The findings show that analysts react less to management forecasts of improved earnings expectations than to management forecasts of bad earnings. But, consistent with the fraud on the market theory, results show that the stock market and analysts are unable to distinguish management forecasts of improved earnings expectations that come true from management forecasts of improved earning expectations that do not come true.

## Footnotes

a1 Senior Consultant and Senior Vice President, respectively, NERA Economic Consulting, 1166 Avenue of the Americas, New York, NY 10036, 212-345-3000. The authors would like to thank Gregg A. Jarrell, Bruce G. Vanyo, David Tabak, Marcia Kramer Mayer, and participants of the 15th Annual Institute for Law & Economic Policy Conference. The analysis and conclusions contained in this Article are those of the authors and do not necessarily reflect the views of NERA Economic Consulting or its staff.



WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

1 See infra Part II (describing the event study methodology).

2 Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).

3 See, e.g., In re Executive Telecard, Ltd. Sec. Litig., 979 F. Supp. 1021 (S.D.N.Y. 1997).

4 David I. Tabak & Frederick C. Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, in Litigation Services Handbook: The Role of the Financial Expert 19-21 (Roman L. Weil et al. eds., 1990) [hereinafter Tabak & Dunbar].

5 See, e.g., Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401 (5th Cir. 2009).

6 Tabak & Dunbar, supra note 4, at 19.3.

7 See Part II on event studies.

8 See Frank Partnoy, Dura Fraud 2 (Apr. 24, 2009) (unpublished manuscript presented at the 15th Annual Institute for Law and Economic Policy Conference: Compensation of Plaintiffs in Mass Securities Litigation, on file with The Journal of Corporation Law) (suggesting that the defendant's decision to "simultaneously disclose information other than information about the allegedly fraudulent conduct at the time of the corrective disclosure" is a conscious strategy aimed at winning a motion to dismiss for failure of plaintiff to plead loss causation adequately).

9 Private Securities Litigation Reform Act of 1995 § 101(b), 15 U.S.C. § 78u-4 (2006).

10 See generally Frederick C. Dunbar & Arun Sen, Counterfactual Keys to Causation and Damages in Shareholder Class-Action Lawsuits, 2009 Wis. L. Rev. 200, 200-42 (stating that counterfactual analysis has a role in understanding causation) [hereinafter Dunbar & Sen, Counterfactual Keys].

11 Id.

12 Id.

13 See generally Tabak & Dunbar, supra note 4.

14 See generally id.

15 See Dunbar & Sen, Counterfactual Keys, supra note 10 (stating that counterfactual analysis has a role in understanding causation); see also Madge S. Thorsen, Richard A. Kaplan & Scott Hakala, Rediscovering the Economics of Loss Causation, 6 J. Bus. & Sec. L. 93, 93-126 (2006) (advocating for a broad standard of loss causation rooted in economics); Michael J. Kaufman, 26 Securities Litigation: Damages § 11A:11, at 39 (2008) (discussing Dura Pharmaceuticals Inc. v. Broudo, 544 U.S. 336 (2005)). Note that, though this proposition appears to be relatively uncontroversial among economists and legal scholars, courts have adopted alternative and conflicting notions of economic loss in the context of shareholder class actions.

16 Dura, 544 U.S. at 342.

PX346

17 Dunbar & Sen, Counterfactual Keys, supra note 10, at 220-26.

18 A. Craig MacKinlay, Event Studies in Economics and Finance, 35 J. Econ. Literature 13-39 (1997).

19 Id.

20 See Tabak & Dunbar, supra note 4, at 19-21 (arguing that event studies are useful in quantifying damages).

21 See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993) (establishing a test for admissibility of expert testimony).

22 The event study methodology in use today was introduced in two seminal papers: Ray Ball & Philip Brown, An Empirical Evaluation of Accounting Income Numbers, 6 J. Acct. Research 159, 159-78 (1968), and Eugene F. Fama, Lawrence Fisher, Michael C. Jensen & Richard Roll, The Adjustment of Stock Prices to New Information, 10 Int'l Econ. Rev. 1, 1-21 (1969). It is commonly accepted in financial economics, see MacKinlay, supra note 18, at 13-39, and John J. Binder, The Event Study Methodology Since 1969, Rev. Quant. Fin. & Acct. 111, 111-37 (1989), and has been applied in numerous studies, see John Y. Campbell, Andrew W. Lo & A. Craig MacKinlay, The Econometrics of Financial Markets 149-50 (1996). In this overview, we will follow the commonly accepted methodology as discussed by, for example, Professor Craig MacKinlay.

23 Tabak & Dunbar, supra note 4, at 19.5.

24 Seth Armitage, Event Study Methods and Evidence of Their Performance, 8 J. Econ. Surveys 25-52 (1995).

25 See infra note 29.

26 Binder, supra note 22, at 124.

27 Stephen J. Brown & Jerold B. Warner, Using Daily Stock Returns, 14 J. Fin. Econ. 3, 3-31 (1985).

28 Alan B. Krueger, Symposium on Econometric Tools, 15 J. Econ. Persp., Fall 2001, at 3-10.

29 For example, the Federal Judicial Center, whose statutory mission is to "develop and conduct education programs for judicial branch employees," publishes a reference manual on scientific evidence that contains nine reference guides, including one devoted solely to regression analysis. Federal Judicial Center, Reference Manual on Scientific Evidence (2d ed. 2000), available at http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/ $file/sciman00.pdf [hereinafter Reference Manual].

30 William H. Greene, Econometric Analysis 8 (6th ed. 2007).

31 Tabak & Dunbar, supra note 4, at 19.6.

32 Greene, supra note 30, at 21.

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

33 Id. at 150.

34 Note that empirically, one often observes an alpha close to zero for stocks trading in liquid and efficient markets. The reason is that the estimated ordinary least squares results in a value of alpha equal to the average Daily Company Stock Return minus the average Daily Company Return multiplied by the estimated beta. Samprit Chatterjee, Ali S. Hadi & Bertram Price, Regression Analysis by Example 30 (3d ed. 1999). Both the average Daily Company Stock Return and the average Daily Company Return are usually small, see Eugene F. Fama, Efficient Capital Markets: II, 46 J. Fin. 1575, 1601 (1991), resulting in a small number for the estimated alpha.

35 Tabak & Dunbar, supra note 4, at 19.4.

36 MacKinlay, supra note 18, at 14-15.

37 It has become common to use the test of statistical significance on a disclosure as a test of materiality. See Tabak & Dunbar, supra note 4, at 3, 9. In this Article we focus on estimating inflation per share. In practice, the same event study can be used for both purposes. We argue below that the conditions under which the event study provides an unbiased estimate of inflation per share are often violated in practice. These same violations could also impair the ability of the event study to give an unbiased indication of materiality. Consequently, we will avoid using the term "materiality" as a substitute for either "significant" or "statistically significant."

38 Brown & Warner, supra note 27, at 8.

39 More formally, the hypothesis is that the excess return on the event day was drawn from the probability distribution of the sample of excess returns used to estimate the parameters of the market model. In the case of Market Model (1), this sample excludes the days being tested. It is a property of ordinary least squares that the distribution of the error term, which is the distribution of excess returns in this instance, has zero mean. Greene, supra note 30, at 25. For the purposes of statistical testing, it is also often assumed that the population of excess returns is normally distributed. Id. at 18, 52.

In the case of Market Model (2), the estimation sample includes the days being tested for statistical significance. But each of these days is represented with its own indicator variable. An indicator variable that equals 1 for a single day and 0 for all other days causes the values of the daily return of the stock and index on that day to have no impact on the estimation of any of the other parameters (specifically, ? and ?). In other words, it is as if that day is excluded from the sample used to estimate the market model and its only purpose is allow estimation of the value of the excess return on that day (?) and the test statistics (described below) associated with the estimate of the excess return.

40 Sometimes the tolerance levels for the probability of Type I and Type II error are denoted by a and (1-<<beta>>). Greene, supra note 30, at 1035. To restrict mathematical notation to only that which is essential, we will not be using these symbols for this purpose.

41 Reference Manual, supra note 29, at 168.

42 Phoebus J. Dhrymes, Seminar in Macroeconomic Theory: Event Studies, The Econometrics of Event Studies, in Seminar in Econometrics: Topic in Empirical Finance 103 (Columbia Univ. 2009).

43 The t-statistic computed this way for Market Model (1) would likely be slightly lower than the t-statistic estimated by regression software for Market Model (2). Professor Phoebus Dhrymes provides a rigorous development of the test statistics for Market Model (2). See Dhrymes, supra note 42, at 103.

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

44 In making our argument about the shortcomings of the event study technique, we do not need to discuss the pros and cons of different ways of performing traditional event studies. All standard event study methods have the problems that will be identified below.

45 See Stuebler v. Xcelera.com (In re Xcelera.com Sec. Litig.), No. 00-11649-RWZ, 2008 U.S. Dist. LEXIS 77807 (D. Mass. Apr. 25, 2008), in which an expert was prevented from testifying because indicator variables in the expert's model included 130 dates "on which any company news appears," and the expert failed to use indicator variables on "relevant event dates," meaning "his theory does not match the facts."

46 Tabak & Dunbar, supra note 4, at 19.6.

47 See J. Aitchison & J.A.C. Brown, The Lognormal Distribution: With Special References to Its Uses in Economics 8 (Cambridge Univ. Press 1969).

48 Tabak & Dunbar, supra note 4, at 19.4.

49 It should be stressed that this is an ex post measure of materiality of the correct information. Statistical significance on the disclosure date is not sufficient for determining whether the correct information was expected to be material by the defendants at the time of the original omission or would have been material at all times during the class period. Moreover, if the corrective disclosure is not statistically significant, then it does not necessarily follow that defendants with knowledge of the omission had a reasonable basis for assuming that it was not material when they made the omission.

50 Dunbar & Sen, Counterfactual Keys, supra note 10, at 231.

51 Tabak & Dunbar, supra note 4, at 19.2.

52 See, e.g., Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401 (5th Cir. 2009).

53 Id.

54 See generally Bradford Cornell & R. Gregory Morgan, Using Finance Theory to Measure Damages in Fraud on the Market Cases, 37 UCLA L. Rev. 883 (1990).

55 David I. Tabak, **MakingAssessmentsAboutMaterialityLessSubjectiveThrough** the **UseofContentAnalysis** (unpublished manuscript, available at http://www.nera.com/image/PUB_Tabak_Content_Analysis_SEC1646-final.pdf).

56 Materiality in this context implies that the revisions to the financial statements had a material impact on the market's consensus estimate of the present discounted value of the future free cash flows to be generated by the issuer of the security. This is based on the generally acknowledged thesis that the value of the equity interest of an enterprise is the expected present value of future free cash flow of the operating assets plus net liquid assets. See Richard A. Brealey & Stewart C. Myers, Principles Of Corporate Finance 88-114 (9th ed. 2008).

57 To keep the example easier to follow, we are assuming, contrary to U.S. regulations, that E-Z was not required to make quarterly financial filings.

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

58 A confounding factor is information that is different from, and unrelated to, the event under consideration in the event study, and that has a statistically significant impact on the company's stock price. We will also refer to such information as "confounding news."

59 Suppose, in our example, that the writedowns of assets were fraudulently covered up before May 1, 2008, so that every piece of information in the press release on that date was a corrective disclosure.

60 See In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235 (D.N.J. 2000); Aff. of Frank C. Dorkey, In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235 (D.N.J. 2000) (No. 98 Civ. 1664); Supp. Aff. of Frank C. Dorkey, In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235 (D.N.J. 2000) (No. 98 Civ. 1664); Supp. Decl. of Michael F. Koehn, In re Cendant Corp., Sec. Litig., 109 F. Supp. 2d 235 (D.N.J. 2000) (No. 98 Civ. 1664); In re Cal. Micro Devices Sec. Litig., 965 F. Supp. 1327 (N.D. Cal. 1997) (applying the test described in this section).

61 See, e.g., Complaint, Tyco Int'l Ltd. v. Walsh, No. 02-4633, 2003 WL 553580 (S.D.N.Y Feb. 27, 2003); Consolidated Amended Class Action Complaint, In re The Corp. Sec. Litig., 257 F.R.D. 101 (E.D. Va. 2009).

62 The literature review of response coefficients is presented infra in Part IV.

63 Oftentimes we will call these hypothetical prices the "but-for prices" or simply the "but-for world" if we refer to the assumption of no misrepresentations and the resulting price path conjunctively.

64 See William H. Beaver, The Information Content Of Annual Earnings Announcements, 6 J. Acct. Research (Supp.) 67, 84 (1968) (concluding that investors look directly to reported earnings when making their earnings forecasts).

65 See Ray Ball & S.P. Kothari, Security Returns Around Earnings Announcements, 66 Acct. Rev. 718, 718-38 (1991).

66 For price reactions to management forecasts, see Robert Jennings, Unsystematic Security Price Movements, Management Earnings Forecasts, and Revisions in Consensus Analyst Earnings Forecasts, 25 J. Acct. Research 90, 90-110 (1987); Gillian Hian Heng Yeo & David A. Ziebart, The Effect of Self-Selection Bias on the Testing of a Stock Price Reaction to Management Earnings Forecasts, 5 Rev. Quant. Fin. & Acct. 5, 5-25 (1995); Yoel Beniluz, Management Earnings Forecasts and Simultaneous Release of Earnings News, (Whitcomb Ctr. for Research in Fin. Servs., Working Paper No. 930723, 2007), available at http://business.rutgers.edu/download.aspx?id=1210.

67 For studies related to general information released simultaneously with financial results, see generally Robert E. Hoskin, John S. Hughes & William E. Ricks, Evidence on the Incremental Information Content of Additional Firm Disclosures Made Concurrently with Earnings, 24 J. Acct. Research (Supp.) 1, 27, app. A (1986) (concluding that disclosures released concurrently with earnings announcements have more information content than earnings alone); Elizabeth A. Demers & Clara Vega, Soft Information in Earnings Announcements: News or Noise? 29 (Fed. Reserve Bd. Int'l Fin. Discussion Paper No. 951, 2008), available at http://www.federalreserve.gov/pubs/ifdp/2008/951/ifdp951.pdf (concluding that "management-conveyed soft information['s]" role in the price discovery process is as informative as traditional hard earnings news).

68 Hoskin, Hughes & Ricks, supra note 67, at 27; Robert M. Conroy, Kenneth M. Eades & Robert S. Harris, A Test of the Relative Pricing Effects of Dividends and Earnings: Evidence from Simultaneous Announcements in Japan, 55 J. Fin. 1199, 1215 (2000); Jennings, supra note 66, at 109; Michael J. Lacina & Khondkar E. Karim, Tests of Market Reaction and Analysts' Forecast Revisions to the Disclosure of Improved Management Earnings Expectations: A Case of Concurrent Bad News Management Earnings Forecasts, 23 Rev. Quant. Fin. & Acct. 123 (2004); Yeo & Ziebart, supra note 66, at 5-25.

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

69 See infra Part IV for a discussion on this literature.

70 Brealey & Myers, supra note 56, at 88-114.

71 Id.

72 Bong-Soo Lee, Time-Series Implications of Aggregate Dividend Behavior, 9 Rev. Fin. Stud. 589, 589-618 (1996); John Y. Campbell & Robert J. Shiller, Stock Prices, Earnings, and Expected Dividends, 43 J. Fin. 661, 661-76 (1988); John Y. Campbell & Robert J. Shiller, The Dividend-Price Ratio and Expectations of Future Dividends and Discount Factors, 1 Rev. Fin. Stud. 195, 195-228 (1988); Terry A. Marsh & Robert C. Merton, Dividend Behavior for the Aggregate Stock Market, 60 J. Bus. 1, 1-40 (1987). In the short run, cash flows and accounting earnings can diverge. The reasons are that there are differences between (a) the timing of cash flows and the sales activity that initiates them and b) the cash outlay of long-lasting assets and the sales activities that use these assets as an input.

73 Brealey & Myers, supra note 56, at 88-114.

74 See Robert L. Hagerman, Mark E. Zmijewski & Pravin Shah, The Association Between the Magnitude of Quarterly Earnings Forecast Errors and Risk-Adjusted Stock Returns, 22 J. Acct. Research 526 (1984) for one of the first papers estimating an ERC, finding results that provide strong evidence of the association between the magnitude of earnings surprises with stock price returns.

75 Id.

76 See Ball & Kothari, supra note 65 (testing several hypotheses of effect of earnings announcements on security prices); Walter R. Teets & Charles E. Wasley, Estimating Earnings Response Coefficients: Pooled versus Firm-Specific Models, 21 J. Acct. & Econ. 279, 279-95 (1996) (suggesting pooled estimation may lead to incorrect coefficients).

77 Note that this formula needs to be adjusted depending on the estimation technique used to measure the ERC.

78 See supra Part III.A.2.

79 See the discussion of the academic literature infra in Part V.

80 Greene, supra note 30, ch. 4.9.

81 U.S. Gen. Acct. Office, Financial Restatements: Update of Company Trends, Market Impacts, and Regulatory Enforcement Activities 4 (2007), available at http://www.gao.gov/new.items/d06678.pdf.

82 See infra text accompanying note 141. There is also a literature that focuses on nonfinancial response coefficients. See, e.g., Eli Amir & Baruch Lev, Value-Relevance of Nonfinancial Information: The Wireless Communications Industry, 22 J. Acct. & Econ. 3 (1996); Stephen L. Leidtka, The Information Content of Nonfinancial Performance Measures in the Airline Industry, 29 J. Bus., Acct. & Fin. 1105 (2002).

83 For instance, statisticians have considered the linear combination of multiple estimators and determined the weights of each estimator as a function of the variances of all estimators such that the linear combination dominates the single estimators. Other statistical techniques use quadratic loss functions to determine the weights of each estimator.

PX346

84 Zoe-Vonna Palmrose, Vernon J. Richardson & Susan Scholz, Determinants of Market Reactions to Restatement Announcements, 37 J. Acct. & Econ. 59, 72 tbl.4 (2004).

85 Supra Part II.B.2, Example 1.

86 See infra Part V (providing relevant academic literature).

87 The real world of securities litigation is rarely as tidy as this example. To see an example based on ARC and time-varying ERC, see Report of Frederick C. Dunbar, Dorajay Pty Ltd. v. Aristocrat Leisure Ltd. (2005) 147 F.C.R. 394 (Austl.), and Reply Report of Frederick C. Dunbar, Dorajay Pty Ltd. v. Aristocrat Leisure Ltd. (2005) N.S.W. District Registry N362 of 2004.

88 See Franklin M. Fisher & R. Craig Romaine, Janis Joplin's Yearbook and the Theory of Damages, 5 J. Acct. Auditing & Fin. 145, 153-56 (1990) (illustrating why calculating damages as of the time of the violation is favored over using hindsight).

89 Dura stands for the proposition that inflation per share is different from loss causation.

90 Dunbar & Sen, Counterfactual Keys, supra note 10.

91 See supra Part II.B.3.

92 The opinion letter of the auditor usually states the scope of work and that it is restricted to the financial statements of the respective 10-K. See also SEC Regulation S-X, 17 C.F.R. § 210 (2009).

93 “The Form 10-Q includes unaudited financial statements and provides a continuing view of the company's financial position during the year. The report must be filed for each of the first three fiscal quarters of the company's fiscal year.” SEC, Form 10-Q, http://www.sec.gov/answers/form10q.htm (last visited Oct. 19, 2009) (emphasis added).

94 See AU § 110, Responsibilities and Functions of The Independent Auditor, Nov. 1972, available at http:// www.aicpa.org/download/members/div/auditstd/AU-00110.pdf (distinguishing between the duties of auditors and management); see also 17 C.F.R. § 210 (2009) (discussing the certification of income statements).

If, as a result of the examination and the conclusion reached, the accountant is not in a position to express an affirmative opinion as to the fairness of the presentation of earnings year by year, the registration statement is defective because the certificate does not meet the requirements of Rule 20-2 of Regulation S-X. If the accountant is not satisfied with the results of his examination he should not issue an affirmative opinion.

Id. See also Certification of Income Statements, Exchange Act Release No. 33-4458, 27 Fed. Reg. 2312 (Mar. 10, 1962).

95 See Bradford Cornell & Wayne R. Landsman, Security Price Response to Quarterly Earnings Announcements and Analysts' Forecast Revisions, 63 Acct. Rev. 680, 691 (1989) (acknowledging that only fourth quarter statements are audited and may contain corrections of earnings reported in earlier quarters). See also infra Part IV (providing a discussion of the fourth quarter effect). We discuss papers that have found other variables responsible for the fourth quarter effect, such as firm size and seasonality of returns. These additional explanations can be excluded by an estimation of the response coefficients that controls for these effects.

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

96 For instance, a researcher would check that the result is not caused by write-offs which are more likely to be contained in the fourth quarter, John A. Elliot & Wayne H. Shaw, Write-Offs as Accounting Procedures to Manage Perceptions, 26 J. Acct. Research (Supp.) 91 (1988), disclosures of bad non-earnings news, Victor Pastena & Joshua Ronen, Some Hypotheses on the Pattern of Management's Informal Disclosures, 17 J. Acct. Research 550 (1979), corrections of earnings previously reported in prior quarters, Cornell & Landsman, supra note 95, or the seasonality of the business.

97 1.See supra Part II (describing multiple regression analysis).

98 Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).

99 Ball & Brown, supra note 22; Beaver, supra note 64.

100 See John B. Williams, The Theory Of Investment Value 55 (North-Holland Publ'g Co. 1964) (1938) (defining a stock's investment value as the present worth of all dividends to be paid in the future).

101 See Merton H. Miller & Franco Modigliani, Dividend Policy, Growth and the Valuation of Shares, 34 J. Bus. 411 (1961) (explaining the effects of differences in dividend policy on price shares in perfect capital markets).

102 See generally Baruch Lev, On the Usefulness of Earnings and Earnings Research: Lessons and Directions from Two Decades of Empirical Research, 27 J. Acct. Research (Supp.) 153, 154-55 (1989); Campbell & Shiller, Stock Prices, Earnings, and Expected Dividends, supra note 72.

103 See Lev, supra note 102, at 154-55 (assessing earnings usefulness based on returns research evidence and applying this assessment to the accounting research agenda of the 1960s and 1970s).

104 See Brealey & Myers, supra note 56, at 88-114 (explaining business valuation).

105 See Lev, supra note 102, at 154-55; S. P. Kothari, Capital Markets Research in Accounting, 31 J. Acct. & Econ. 105, 114 (2001).

106 Ball & Brown, supra note 22.

107 See William H. Beaver, Roger Clarke & William F. Wright, The Association between Unsystematic Security Returns and the Magnitude of Earnings Forecast Errors, 17 J. Acct. Research 316, 317 (1979) (reporting results for 25 nonoverlapping forecast error groupings and conducting significance tests for hypotheses regarding ordinal relationships).

108 See Hagerman, Zmijewksi & Shah, supra note 74, at 527 (examining the association between the magnitude of quarterly earnings forecast errors and unsystematic returns).

109 See C. S. Agnes Cheng, William S. Hopwood & James C. McKeown, Non-Linearity and Specification Problems in Unexpected Earnings Response Regression Model, 67 Acct. Rev. 579 (1992) (testing for nonlinearity, heteroscedasticity, residual nonnormality, omitted variables, and interfirm systematic and rundown coefficient variation).

110 See, e.g., John S. Hughes & William E. Ricks, Associations Between Forecast Errors and Excess Returns Near to Earnings Announcements, 62 Acct. Rev. 158 (1987); G. Peter Wilson, The Relative Information Content of Accruals and Cash Flows: Combined Evidence at the Earnings Announcement and Annual Report Release Date, 24 J. Acct. Research(Supp.) 165 (1986); William S. Hopwood & James C. McKeown, The Incremental Informational Content of

PX346


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

Interim Expenses over Interim Sales, 23 J. Acct. Research161 (1985); William H. Beaver, Richard Lambert & Dale Morse, The Information Content of Security Prices, 2 J. Acct. & Econ. 3 (1980); Robert N. Freeman, Alternative Measures of Profit Margin: An Empirical Study of the Potential Information Content of Current Cost Accounting, 21 J. Acct. Research 42 (1983); Robert Jacobson, The Validity of ROI as a Measure of Business Performance, 77 Am. Econ. Rev. 470 (1987); see also Daniel W. Collins, S.P. Kothari & Judy Dawson Rayburn, Firm Size and the Information Content of Prices with Respect to Earnings, 9 J. Acct. & Econ. 111 (1987) (comparing event windows of different lengths, but not providing a theoretical or institutional reason for the window that produced the highest R-squared measure in their estimations).

111 There are also studies that do not presume a causal connection between accounting information and price changes. These studies are called association studies, and test whether accounting measures such as earnings capture changes in the information set that is reflected in security returns over a given period. Such an approach requires longer return windows and is not subject to our discussion. See Kothari, supra note 105.

112 See Robert N. Freeman & Senyo Y. Tse, A Nonlinear Model of Security Price Responses to Unexpected Earnings, 30 J. Acct. Research 185, 185-209 (1992).

113 See id.; Cornell & Landsman, supra note 95, at 691.

114 Compare product description of I/B/E/S from Thomson Reuters, available at http://thomsonreuters.com/content/financial/pdf/i_and_a/IBES_ Estimates.pdf, to description by Cornell and Landsman in 1989, Cornell & Landsman, supra note 95, at 691.

115 For studies published over the last two years using short stock price return windows, see Jeffrey S. Abarbanell & Reuven Lehavy, Letting the "Tail Wag the Dog": The Debate over GAAP versus Street Earnings Revisited, 24 Contemp. Acct. Research 675, 675-723 (2007), who use three-day returns, or Stefano DellaVigna & Joshua Pollet, Investor Inattention and Friday Earnings Announcements, 64 J. Fin. 709, 709-49 (2009), whose short-term measures are one-day returns.

116 Similarly, Jacobson, supra note 110, and William H. Beaver, Paul A. Griffin & Wayne R. Landsman, The Incremental Information Content of Replacement Cost Earnings, 4 J. Acct. & Econ. 15, 15-40 (1982), used raw returns, i.e., market unadjusted returns.

117 There are papers making a technical distinction between abnormal and unexpected returns. We will use the term unexpected returns as an umbrella term for abnormal and size-adjusted returns.

118 In Market Model (2) above, cumulated returns would require a change in the regression specification. For example, an estimate of ? for a two-day return window would require the dependent (left-hand side) variable in the market model to be two-day returns rather than the daily return; similarly, the market index return (right-hand side variable) would be over two days rather than daily. In certain circumstances, adjustments would have to be made to the test statistics of such an equation to correct for serial correlation in the error terms.

119 Of theoretical interest was the question of whether, like stock prices, earnings could be treated as a random walk. See Ray Ball & Ross Watts, Some Time Series Properties of Accounting Income, 27 J. Fin. 663, 663-81 (1972). Some later studies found evidence of weak mean reversion which has been explained by the non-sustainability of above-normal profitability, accounting conservatism, liquidation option of non-profitable firms, and the increased use of special items in accounting. See Kothari, supra note 105, at 152-60 & nn.46-52.

120 Specifically, academics have used different autoregressive integrated moving average processes. The most prominent specifications were developed by the following: George Foster, Quarterly Accounting Data: Time-Series Properties and Predictive-Ability Results, 52 Acct. Rev. 1, 1-21 (1977); Paul A. Griffin, The Time-Series Behavior of Quarterly

PX346

Earnings: Preliminary Evidence, 15 J. Acct. Research 71, 71-83 (1977); Ross Watts, The Time-Series Behavior of Quarterly Earnings, University of Newcastle Working Paper (1975); Lawrence D. Brown & Michael S. Rozeff, Adaptive Expectations, Time-Series Models, and Analyst Forecast Revision, 17 J. Acct. Research 341, 341-51 (1979).

121 See generally Lawrence D. Brown, Earnings Forecasting Research: Its Implications for Capital Markets Research, 9 Int'l J. Forecasting 295, 295-320 (1993).

122 See Lawrence D. Brown, Robert L. Hagerman, Paul A. Griffin & Mark E. Zmijewski, Security Analyst Superiority Relative to Univariate Time-Series Models in Forecasting Quarterly Earnings, 9 J. Acct. & Econ. 61, 61-87 (1987).

123 Aff. of Mark E. Zmijewski, In re Tyco Int'l Ltd. Multidistrict Litig., 535 F. Supp. 2d 249 (D.N.H. 2007).

124 Analyst forecasts are from sell-side analysts, as the buy-side analyst forecasts are usually not publicly available.

125 See Lawrence D. Brown & Michael S. Rozeff, The Superiority of Analyst Forecasts as Measures of Expectations: Evidence from Earnings, 33 J. Fin. 1, 1-16 (1978); Brown & Rozeff, supra note 121; William A. Collins & William S. Hopwood, A Multivariate Analysis of Annual Earnings Generated from Quarterly Forecasts of Financial Analysts and Univariate Time-Series Models, 18 J. Acct. Research 390, 390-406 (1980); Dov Fried & Dan Givoly, Financial Analysts' Forecasts of Earnings: A Better Surrogate for Market Expectations, 4 J. Acct. & Econ. 85, 85-107 (1982); Brown, Hagerman, Griffin & Zmijewski, supra note 122; Patricia C. O'Brien, Analysts' Forecasts As Earnings Expectations, 10 J. Acct. & Econ. 53, 53-83 (1988). But see Eugene A. Imhoff & Paul V. Pare, Analysis and Comparison of Earnings Forecast Agents, 20 J. Acct. Research 429, 429-39 (1982).

126 See Lawrence D. Brown, Paul A. Griffin, Robert L. Hagerman & Mark E. Zmijewski, An Evaluation of Alternative Proxies for the Market's Assessment of Unexpected Earnings, 9 J. Acct. & Econ. 159, 159-93 (1987); Brown, Hagerman, Griffin & Zmijewski, supra note 122. But see O'Brien, supra note 125.

127 See Fried & Givoly, supra note 125; Brown, supra note 121.

128 See Brown, supra note 121 for a summary of the literature.

129 See Donna R. Philbrick & William E. Ricks, Using Value Line and IBES Analyst Forecasts in Accounting Research, 29 J. Acct. Research 397, 397-417 (1991).

130 See Sundaresh Ramnath, Steve Rock & Philip Shane, Value Line and I/B/E/S earnings Forecasts, 21 Int'l J. Forecasting 185, 185-198 (2005).

131 See Mark T. Bradshaw & Richard G. Sloan, GAAP versus The Street: An Empirical Assessment of Two Alternative Definitions of Earnings, 40 J. Acct. Research 41, 41-66 (2002).

132 See id.

133 See Daniel A. Cohen, Rebecca N. Hann & Maria Ogneva, Another Look at GAAP Versus the Street: An Empirical Assessment of Measurement Error Bias, 12 Rev. Acct. Stud. 271, 271-303 (2007) (finding that measurement errors in earnings surprises contaminate the ERC divergence pattern).


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

134 See Kothari, supra note 111, at 153-54 (discussing analyst forecast bias).

135 See Andrew A. Christie, On Cross-sectional Analysis in Accounting Research, 9 J. Acct. & Econ. 231, 231-58 (1987) (discussing the type of deflators required by different econometric models); see also S.P. Kothari, Price-Earnings Regressions in the Presence of Prices Leading Earnings: Earnings Level Versus Change Specifications and Alternative Deflators, 15 J. Acct. & Econ. 173, 173-302 (1992) (discussing the technique when prices lead earnings).

136 See generally Brett Trueman, M.H. Franco Wong & Xiao-Jun Zhang, Anomalous Stock Returns Around Internet Firms' Earnings Announcements, 34 J. Acct. & Econ. 249, 249-71 (2003) (arguing that information-based explanations for returns are incorrect because they do not account for the pre-earnings-announcement runup or the post-announcement price reversal); Stephen E. Christophe, Michael G. Ferri & James J. Angel, Short-Selling Prior to Earnings Announcements, 59 J. Fin. 1845, 1845-75 (2004); Ball & Kothari, supra note 65, at 718-38.

137 For a review of both earlier and later studies, see Baruch Lev & James A. Ohlson, Market-Based Empirical Research in Accounting: A Review, Interpretation, and Extension, 20 J. Acct. Research 249, 249-322 (1982); Lev, supra note 102.

138 See generally Franklin M. Fisher, Multiple Regression in Legal Proceedings, 80 Colum. L. Rev. 702, 702-36 (1980).

139 See Greene, supra note 30, at 38.

140 See Kothari, supra note 105. For a short description of how the value of the ERC is derived for different theoretical models, see Nandkumar Nayar & Michael S. Rozeff, Earnings Response Coefficient Models: Synthesis and Extensions (unpublished manuscript, available at http:// papers.ssrn.com/sol3/papers.cfm?abstract_id=903300).

141 See Cheng, Hopwood & McKeown, supra note 109, at 579 (stating that this paradigm has become "so popular that it has become almost standard practice").

142 Patricia M. Dechow, Accounting Earnings and Cash Flows as Measures of Firm Performance: The Role of Accounting Accruals, 18 J. Acct. & Econ. 3, 3-42 (1994). Note that Dechow does not use earnings or cash flow surprises, but levels. Id. at 6.

143 Three earlier studies have found conflicting results on whether stock prices reacted more strongly to the cash flow part of earnings than the accruals part: Wilson, supra note 110, at 166 (finding that the earnings' cash and total accruals components of earnings "have incremental information content beyond earnings themselves"); G. Peter Wilson, The Incremental Information Content of the Accrual and Funds Components of Earnings after Controlling for Earnings, 62 Acct. Rev. 293, 293-322 (1987); Victor L. Bernard & Thomas L. Stober, The Nature and Amount of Information in Cash Flows and Accruals, 64 Acct. Rev. 624, 624-52 (1989).

144 See Gerald A. Feltham & Jinhan Pae, Analysis of the Impact of Accounting Accruals on Earnings Uncertainty and Response Coefficients, 15 J. Acct. Auditing & Fin. 199, 199-220 (2000) (proposing a theoretical model of management's ability to influence information received by investors through its choice of accruals and predicting that the ERC depends both on the persistence of earnings as well as the informativeness of reported earnings, both of which are a function of management's choice of accrual management).

145 Joseph Kerstein & Atul Rai, Working Capital Accruals and Earnings Management, 4 Inv. & Fin. Innovations 22, 33-47 (2007).


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

146 Id.

147 Id.

148 See Mark Bagnoli, Sanjay Kallapur & Susan G. Watts, Top Line and Bottom Line Forecasts: A Comparison of Internet Firms During and After the Bubble (unpublished manuscript, available at http:// papers.ssrn.com/sol3/papers.cfm?abstract_id=279178). The authors study the relative information content of revenue and earnings for internet firms during and after the bubble. Id. They find that stock prices of firms reporting losses respond to revenue, but not earnings, surprises both during and after the bubble. Id. For firms reporting profits, stock prices respond to earnings and revenue surprises during the bubble and only to earnings surprises after the bubble.

149 Siva Swaminathan & Joseph Weintrop, The Information Content of Earnings, Revenues, and Expenses, 29 J. Acct. Research 418, 418-27 (1991); William S. Hopwood & James C. McKeown, The Incremental Informational Content of Interim Expenses over Interim Sales, 23 J. Acct. Research 161, 161-74 (1985) (ranking correlations to study the impact of revenue and expense surprises on unexpected returns, and supporting Swamiwathan and Weintrop's 1991 result, but not that revenue surprises have incremental informational content over earnings). See Robert E. Hoskin, John S. Hughes & William E. Ricks, Evidence on the Incremental Information Content of Additional Firm Disclosures Made Concurrently with Earnings, 24 J. Acct. Research (Supp.) 1, 1-32 (1986) (using revenues as an explanatory variable in a regression).

150 See Zhaoyang Gu, Prem C. Jain & Sundaresh Ramnath, In-Sync or Out-of-Sync? The Joint Information in Revenues and Expenses (unpublished manuscript, available at http://ssrn.com/abstract=57938) (arguing that revenue and expenses should only be used jointly as they find that the joint "in-sync" or "out-of-sync" movement of revenues and costs is the variable that provides more information than revenues by itself).

151 See Yonca Ertimur, Joshua Livnat & Minna Martikainen, Differential Market Reactions to Revenue and Expense Surprises, 8 Rev. Acct. Stud. 185, 185-211 (2003) (investigating investors' "reactions to revenue and expense surprises around preliminary earnings announcements"); Philip G. Berger, Discussion of 'Differential Market Reactions to Revenue and Expense Surprises', 8 Rev. Acct. Stud. 213, 213-20 (2003) (discussing Ertimur, Livnat, and Martikainen's 2003 study). For a study that estimates a significantly positive RRC and information content in revenues exceeding the one in earnings, see Narasimhan Jegadeesh & Joshua Livnat, Revenue Surprises and Stock Returns, 41 J. Acct. & Econ. 147, 147-71 (2006) (also finding that earnings surprises that are accompanied by revenue surprises signal more persistent earnings growth than similar levels of earnings surprises not accompanied by matching revenue surprises).

152 Lynn Rees & K. Sivaramakrishnan, The Effect of Meeting or Beating Revenue Forecasts on the Association between Quarterly Returns and Earnings Forecast Errors, 24 Contemp. Acct. Research 259, 259-90 (2007); see also Aloke Ghosh, Zhaoyang Gu & Prem C. Jain, Sustained Earnings and Revenue Growth, Earnings Quality, and Earnings Response Coefficients, 10 Rev. Acct. Stud. 35, 35-57 (2005) (finding revenue-growth firms have higher quality earnings than cost-reduction firms).

153 Write-offs are part of special items that appear as a separate line in the income statements. Although the special items line must be included in earnings from continuing operations, the separate line allows investors to easily identify "earnings before special items." Special items are defined as either unusual or infrequent transactions. See John A. Elliott & J. Douglas Hanna, Repeated Accounting Write-Offs and the Information Content of Earnings, 34 J. Acct. Research 135, 135-55 (1996) (examining investors' views of earnings).

154 Id.

155 Id.

PX346

156 Id.

157 Id.

158 Elliott & Hanna, supra note 153.

159 Jennifer J. Francis, Douglas Hanna & Linda Vincent, Causes and Effects of Discretionary Asset Write-Offs, 34 J. Acct. Research 117, 117-34 (1996) (finding a significant response coefficient on overall write-offs, but their ERC in the same estimation is insignificant, and finding as a possible reason that the model does not use analyst forecasts as an approximation of market expectations).

160 Another study that has found a positive response coefficient for write-offs is Srinivasan Ragothaman & Bruce O. Bublitz, An Empirical Analysis of the Impact of Asset Writedown Disclosures on Stockholder Wealth, 35 Q.J. Bus. & Econ. 32, 32-47 (1996). This estimation equation is different, however, in that it contains sales and cost forecast errors as well as forecast errors of other expenses.

161 Peter D. Easton & Trevor S. Harris, Earnings as an Explanatory Variable for Returns, 29 J. Acct. Research 19, 19-36 (1991).

162 Id.

163 See id. Ashiq Ali & Paul Zarowin, The Role of Earnings Levels in Annual Earnings-Returns Studies, 30 J. Acct. Research 286-96 (1992), point out that as Easton and Harris, supra note 161, use change in earnings as an approximation for unexpected earnings, the more transitory the previous period's earnings are, the greater is the measurement error in the earnings change variable as a proxy for unexpected earnings. They argue that earnings levels act as an additional proxy for unexpected earnings when the previous period's earnings are not purely permanent and do therefore increase the ERC (being the sum of the coefficients on all the approximations for unexpected earnings). See Ali & Zarowin, supra.

164 Following the model in James A. Ohlson, Earnings, Book Values, and Dividends in Equity Valuation, 11 Contemp. Acct. Research 661, 661-87 (1995) (demonstrating that the price of a stock is a linear function of both earnings and book value); Daniel W. Collins, Edward L. Maydew & Ira S. Weiss, Changes in the Value-Relevance of Earnings and Book Values Over the Past Forty Years, 24 J. Acct. & Econ. 39, 39-67 (1997) (using a regression of yearly prices on earnings and book values with almost 120,000 observations over 40 years from 1953-1993 to find that: (a) combined value relevance of earnings and book values have not declined over this period; (b) earnings' value relevance has declined but was replaced by increasing value-relevance of book values; and (c) the reason is that more one-time items and negative earnings are reported along with changes in firm size).

165 See Peter D. Easton & Jinhan Pae, Accounting Conservatism and the Relation Between Returns and Accounting Data, 9 Rev. Acct. Studies 495, 495-521 (2004). They argue that accounting rules are inherently conservative and that value relevant items such as future payoffs from positive net present value projects are not recognized. Id. This implies that the balance sheet understates book value due to both the current as well as past application of conservative accounting rules. They suggest including the change in operating assets and change in cash investments to compensate for accounting conservatism and find that these variables have explanatory power for annual returns. Id.

166 Reza Espahbodi, On the Factors Influencing Return-Earnings Relationship (May 2000) (unpublished manuscript, available at http:// papers.ssrn.com/sol3/papers.cfm?abstract_id=239669) (testing a number of accounting and non-accounting firm-specific variables in a recursive partitioning analysis with annual returns as the dependent variable).

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

167 See Baruch Lev & Theodore Sougiannis, The Capitalization, Amortization, and Value-Relevance of R&D, 21 J. Acct. & Econ. 107, 107-38 (1996). They show that corrections to reported earnings and book values for research and development (R&D) capitalization were strongly associated with stock returns, and R&D capitalization therefore yields value-relevant information. They also show that R&D capital is not fully incorporated into the company's stock price immediately, as it is associated with future stock returns. Lev and Sougiannis posit two possible explanations for this: (1) There is a systemic mispricing of R&D capital; (2) This represents the compensation for an extra-market risk premium for R&D. Id.

168 Edward B. Grant, Market Implications of Differential Amounts of Interim Information, J. Acct. Research 255, 255-68 (1980) finds that these security price reactions were higher for over-the-counter (OTC) firms as compared to firms listed on the New York Stock Exchange (NYSE). Grant interpreted this to be a result of OTC firms having systematically less interim information available than NYSE firms, and therefore the earnings announcements of OTC firms contained relatively more information than those of NYSE firms. Mark Lang, Time-Varying Stock Price Response to Earnings Induced by Uncertainty About the Time-Series Process of Earnings, 29 J. Acct. Research 229, 243 (1991) (finding that the less market participants know about the earnings process of a firm, the higher its ERC).

169 See Rowland Kwame Atiase, Predisclosure Information, Firm Capitalization, and Security Price Behavior Around Earnings Announcements, 23 J. Acct. Research 21, 21-36 (1985); Collins, Kothari & Rayburn, supra note 110, at 111-38.

170 See Chul W. Park & Morton Pincus, Internal versus External Equity Funding Sources and Earnings Response Coefficients, 16 Rev. Quant. Fin. & Acct. 33, 48 (2001) (testing whether the lower financing costs of firms relying relatively more on internal funding translate into higher ERCs due to their reduced cost of capital lowering the discount rates, and finding empirical support for this hypothesis, and also showing that the effect is more extreme for high growth firms).

171 See Terry D. Warfield, John J. Wild & Kenneth L. Wild, Managerial Ownership, Accounting Choices, and Informativeness of Earnings, 20 J. Acct. & Econ. 61, 61-91 (1995) (finding that the informative value of earnings announcements for stock returns is systemically related to managerial ownership, with the ERC increasing by more than 400% for corporations with higher managerial ownership).

172 See Daniel W. Collins & S.P. Kothari, An Analysis of Intertemporal and Cross-Sectional Determinants of Earnings Response Coefficients, 11 J. Acct. & Econ. 143 (1989) (estimating a security's systemic risk by regressing monthly returns over 60 months on the CRSP equally weighted market return index); see also Peter D. Easton & Mark E. Zmijewski, Cross-Sectional Variation in the Stock Market Response to Accounting Earnings Announcements, 11 J. Acct. & Econ. 117, 117-41 (1989).

173 See Dan S. Dhaliwal & Stanley S. Reynolds, The Effect of the Default Risk of Debt on the Earnings Response Coefficient, 69 Acct. Rev. 412, 412-19 (1994) (claiming that default risk is an additional proxy for the discount rate, which is necessary because it is unlikely that the correct discount rate is fully captured by systematic risk). But see Bruce K. Billings, Revisiting the Relation Between the Default Risk of Debt and the Earnings Response Coefficient, 74 Acct. Rev. 509, 509-22 (1999) (arguing that part of the reason for the negative relationship between default risk and ERC in Dhaliwal & Reynolds, supra, is because their default risk proxies also reflect expected earnings growth). However, in Dan S. Dhaliwal, Kyung J. Lee & Neil L. Fargher, The Association Between Unexpected Earnings and Abnormal Security Returns in the Presence of Financial Leverage, 8 Contemp. Acct. Research 20, 20-41 (1991), the authors measure the default risk of a firm as its leverage and find that all equity firms have higher ERCs than leveraged firms and that low-leverage firms have higher ERCs than high-leverage firms. But see Yeo Hwan Kim, Roger J. Willett & Jee In Jang, Default Risk as a Factor Affecting the Earnings Response Coefficient (Jan. 30, 2002) (unpublished manuscript, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=300350) (arguing that this would suggest that issuance (redemption) of debt would decrease (increase) the ERC, but such a finding could not be confirmed empirically).

174 See Gerald L. Salamon & Thomas L. Stober, Cross-Quarter Differences in Stock Price Responses to Earnings Announcements: Fourth-Quarter and Seasonality Influences, 11 Contemp. Acct. Research 297, 297-330 (1994) (finding

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

that firms with seasonal sales have higher ERCs in peak sales quarters than in non-peak quarters). This is consistent with a greater resolution of uncertainty about seasonal firms' prospects in their peak sales quarters than in other quarters.

175 See Eugene A. Imhoff & Gerald J. Lobo, The Effect of Ex Ante Earnings Uncertainty on Earnings Response Coefficients, 67 Acct. Rev. 427, 427-39 (1992) (arguing that the greater the noise in a firm's earnings number, the less responsive the stock price will be to an earnings surprise). Standard deviation of analyst forecasts is deflated by stock price two days prior to the earnings announcement. For an analysis of the impact of dispersion of analyst forecasts on returns, see Cheolbeom Park, Stock Return Predictability and the Dispersion in Earnings Forecasts, 78 J. Bus. 2351, 2372 (2005). But see James S. Linck, Thomas J. Lopez & Lynn Rees, The Valuation Consequences of Voluntary Accounting Changes, 28 Rev. Quant. Fin. Acct. 327-52 (2007) (showing that voluntary accounting changes which could enhance noise in earnings announcements have not been found to significantly increase a firm's ERC).

176 See Robert W. Holthausen & Robert E. Verrecchia, The Effect of Sequential Information Releases on the Variance of Price Changes in an Intertemporal Multi-Asset Market, 26 J. Acct. Research 82, 92 (1988) (explaining a theoretical model of how credibility, i.e., the quality of information, affects security returns in reaction to the release of the information). See also Mark DeFond, Mingyi Hung & Robert Trezevant, Investor Protection and the Information Content of Annual Earnings Announcements: International Evidence, 43 J. Acct. & Econ. 37 (2007) (using a sample of earnings announcements in 26 countries to find support for their hypotheses that in countries with higher quality earnings and stronger enforcement of insider trading laws the market response to earnings announcements is greater, while more frequent interim financial reporting lessens the response). Additionally, they observe that, on average, earnings announcements are more informative and are incorporated into prices faster in countries with stronger investor protection institutions. Id.

177 Siew Hong Teoh & T.J. Wong, Perceived Auditor Quality and the Earnings Response Coefficient, 66 Acct. Rev. 346, 346-66 (1993).

178 Id.

179 See Jere R. Francis & Bin Ke, Disclosure of Fees Paid to Auditors and the Market Valuation of Earnings Surprises, 11 Rev. Acct. Stud. 495 (2006). But see Aloke Gosh & Doocheol Moon, Auditor Tenure and Perceptions of Audit Quality, 80 Acct. Rev. 585, 587 (2005) (showing that the ERC increases as the auditor-client relationship lengthens and arguing that investors perceive auditor tenure as enhancing earnings quality).

180 Francis & Ke, supra note 179, at 495.

181 Id.

182 Wendy M. Wilson, An Empirical Analysis of the Decline in the Information Content of Earnings Following Restatements, 83 Acct. Rev. 519, 529-30 (2008).

183 Id. at 540-41.

184 Id.

185 See Xiaoyan Cheng, Aaron Crabtree & David B. Smith, The Effects of Backdating on Earnings Response Coefficients (Dec. 14, 2007) (unpublished manuscript, available at http://ssrn.com/abstract=1094976).

PX346

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

186 Id. at 22.

187 Sung K. Choi & Debra C. Jeter, The Effects of Qualified Audit Opinions on Earnings Response Coefficients, 15 J. Acct. & Econ. 229, 229-30 (1992).

188 Id.

189 Expected report dates can be obtained, for example, from sources such as First Call Thompson Reuters.

190 Mark Bagnoli, William Kross & Susan G. Watts, The Information in Management's Expected Earnings Report Date: A Day Late, a Penny Short, 40 J. Acct. Research 1275, 1295 (2002).

191 Id.

192 See id. (finding that in their sample of 3430 missed report dates, in only 5% at least one analyst revised a prior forecast, and in 4% at least one analyst issued a new forecast after the missed report date).

193 See Anne E. Chambers & Stephen H. Penman, Timeliness of Reporting and the Stock Price Reaction to Earnings Announcements, 22 J. Acct. Research 21, 21-47 (finding lower ERCs for firms that report later than expected). Chambers and Penman's expected report date is approximated with last year's report date, which could introduce measurement error. Id. Nevertheless, their main findings coincide with those of Bagnoli, Kross, and Watts. Compare id. with Bagnoli, Kross & Watts supra note 190.

194 See Elliot & Shaw, supra note 96, at 93 (finding a correlation between firm size and large write-off disclosures--these larger firms are also more highly leveraged); Pastena & Ronen, supra note 96, at 550-64 (discussing management's attempt to delay the dissemination of negative information).

195 See Richard R. Mendenhall & William D. Nichols, Bad News and Differential Market Reactions to Announcement of Earlier-Quarters Versus Fourth-Quarter Earnings, 26 J. Acct. Research (Supp.) 63, 63-86 (1988) (arguing that managers have greater discretion over the first three quarters, and therefore, negative earnings surprises announced in the first three quarters might have more informational content than negative earnings surprises in the fourth quarter). But see William Kross & Douglas Schroeder, An Investigation of Seasonality in Stock Price Responses to Quarterly Earnings Announcements, 17 J. Bus. Fin. & Acct. 649 (arguing that auditors are present almost year-round in big firms while small firms have short interaction times with auditors at the end of the year). Management might therefore have great discretion to manage interim numbers which will be corrected in the fourth quarter. This implies that small firms have smaller fourth quarter ERCs as the audited fourth quarter numbers correct all the noise management introduced in the interim quarters which makes the fourth quarter numbers a low-precision signal for fourth quarter earnings. They confirm their hypothesis. See also Krishna G. Palepu, Discussion of Bad News and Differential Market Reactions to Announcements of Earlier-Quarters Versus Fourth-Quarter Earnings, 26 J. Acct. Research (Supp.) 87, 88 (1988) (pointing out that under Mendenhall and Nichols's argument, supra, they should also have tested a “good news management” hypothesis as it is to be expected that managements might also recognize positive news as early as possible which would result in a bigger fourth quarter ERC for good news); Stephen J. Dempsey, Interim Earnings Management and the Fourth Quarter Good News Effect, 21 J. Bus. Fin. & Acct. 889 (1994) (confirming Palepu's hypothesis).

196 See generally David Aboody, John Hughes & Jing Liu, Measuring Value Relevance in a (Possibly) Inefficient Market, 40 J. Acct. Research 965, 965-86 (2002).

PX346

197 See Brian J. Bushee, The Influence of Institutional Investors on Myopic R&D Investment Behavior, 73 Acct. Rev. 305 (1998) (finding that managers are less likely to cut research and development to reverse an earnings deadline when institutional ownership is high).

198 Id.

199 See generally Edith S. Hotchkiss & Deon Strickland, Does Shareholder Composition Matter? Evidence from the Market Reaction to Corporate Earnings Announcements, 58 J. Fin. 1469, 1469-98 (2003).

200 Id.

201 See Jennifer Conrad, Bradford Cornell & Wayne R. Landsman, When Is Bad News Really Bad News?, 57 J. Fin. 2507, 2507-32 (2002) (discussing that stock price response to negative earnings surprises is increasing as the market level rises).

202 See generally Marilyn F. Johnson, Business Cycles and the Relation between Security Returns and Earnings, 4 Rev. Acct. Stud. 93, 93-117 (1999); see also John E. Core, Wayne R. Guay & Andrew Van Buskirk, Market Valuations in the New Economy: An Investigation of what has Changed, 34 J. Acct. & Econ. 43, 43-67 (2003) (finding that a regression model of equity value on financial variables declined in explanatory power during the "New Economy" subperiod). But see S.P. Kothari & Jay Shanken, Time-series Coefficient Variation in Value-Relevance Regressions: A Discussion of Core, Guay, and Van Buskirk and New Evidence, 34 J. Acct. & Econ. 69, 69-87 (2003) (finding evidence to support the position that unambiguous inferences regarding the relevance and reliability of financial statement variables are not feasible solely on the basis of the type of regressions used by Core, Guay, and Van Buskirk). They find that the coefficient on earnings is significantly associated with proxies for aggregate growth and discount rates. Id. See also Trueman, Wong & Zhang, supra note 136, at 249-71 (2003) (looking specifically at internet firms, and finding that there is a price run-up days prior to the earnings announcements, which is followed by a price reversal lasting several days, and additionally finding little evidence that these returns are explained by earnings news or risk changes).

203 See Williams, supra note 100, at 55-58 (arguing that future dividends are the best measure of equilibrium stock price); see also Miller & Modigliani, supra note 101, at 430 (supporting that a change in dividend rate is often followed by a substantial change in market price).

204 See generally Easton & Zmijewski, supra note 172, at 117-41; see also Dan Gode & James Ohlson, Accounting-Based Valuation with Changing Interest Rates, 9 Rev. Acct. Stud. 419, 432-33 (2004) (allowing for stochastic interest rates and finding that the ERC decreases as the beginning-of-period (lagged) rate increases).

205 Easton & Zmijewski, supra note 172.

206 Id. They use a random coefficient regression model that jointly estimates several regression equations to show the correlations. Id. The revision parameters are estimated in two different ways: the first one uses analyst forecast revisions in response to an earnings surprise, the second one uses the Foster model. Id. The Foster model relates the increases in analyst expectations of a given quarter over the same quarter in the previous year to the increase in the subsequent quarter over the respective quarter of the previous year. Foster, supra note 120, at 1-21.

207 See Cornell & Landsman, supra note 95, at 691.

208 Id.

PX346

209 Id.

210 See generally Jing Liu & Jacob Thomas, Stock Returns and Accounting Earnings, 38 J. Acct. Research 71, 71-101 (2000).

211 Id.

212 All academic papers have to make an assumption of how the earnings of a company affect the cash flows, i.e., the dividends, paid to its shareholders. See, e.g., Roger Kormendi & Robert Lipe, Earnings Innovations, Earnings Persistence, and Stock Returns, 60 J. Bus. 323, 342-43 (1987) (discussing the impact of expected future earnings on stock price); see also Collins, Kothari & Dawson Rayburn, supra note 110, at 113-15 (suggesting market expectations for "one year in advance of the fiscal year end reflect a much broader information set than past earnings").

213 See Collins, Kothari & Rayburn, supra note 110 (discussing their generalized model and finding that ERCs are higher with higher growth opportunities, lower for more risky stocks, and higher when earnings are persistent). They measure economic growth opportunities by the market value to book value ratio. Id. See also William Cready, David N. Hurtt & Jim A. Seida, Applying Reverse Regression Techniques in Earnings-Returns Analyses, 30 J. Acct. & Econ. 227, 227-40 (2000) (describing Collins, Kothari, and Rayburn's econometrics technique). On the positive relationship between growth and ERC, see Gary Biddle & Gim S. Seow, The Estimation and Determinants of Associations between Returns and Earnings: Evidence from Cross-Industry Comparisons, 6 J. Acct. & Fin. 183-232 (1991); T. Harikumar & Charles I. Harter, Earnings Response Coefficient and Persistence: New Evidence using Tobin's Q as a Proxy for Persistence, 10 J. Acct., Auditing & Fin. 401, 401-20 (1995); Mary E. Barth, John A. Elliott & Mark W. Finn, Market Rewards Associated with Patterns of Increasing Earnings, 37 J. Acct. Research 387, 387-413 (1999). But see Anwer S. Ahmed, Accounting Earnings and Future Economic Rents, 17 J. Acct. & Econ. 377, 377-400 (1994) (not finding a significant relationship of firm-specific ERCs and a proxy for growth in a two stage procedure). This result has been suspected to be due to other variables in his second stage regression. See Jefferson P. Jones, Richard M. Morton & Thomas F. Schaefer, Valuation Implications of Investment Opportunities and Earnings Permanence, 15 Rev. Quant. Fin. & Acct. 21, 21-35 (2000).

214 Douglas J. Skinner & Richard G. Sloan, Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio, 7 Rev. Acct. Stud. 289, 289-312 (2002). But see Carla Hayn, The Information Content of Losses, 20 J. Acct. & Econ. 125, 125-53 (1995) (finding that ERCs nearly triple when observations with losses are excluded). For weak support, see Minna Martikainen, Accounting Losses and Earnings Response Coefficients: The Impact of Leverage and Growth Opportunities, 24 J. Bus. Fin. & Acct. 277, 277-91 (1997), and Sudipta Basu, The Conservatism Principle and the Asymmetric Timeliness of Earnings, 24 J. Acct. & Econ. 3, 3-37 (1997).

215 Kormendi & Lipe, supra note 212, at 323-45.

216 Ram T. S. Ramakrishnan & Jacob K. Thomas, Valuation of Permanent, Transitory, and Price-Irrelevant Components of Reported Earnings, 13 J. Acct., Auditing & Fin. 301, 301-49 (1998).

217 Peter D. Easton, Pervin Shroff & Gary Taylor, Permanent and Transitory Earnings, Accounting Recording Lag, and the Earnings Coefficient, 5 Rev. Acct. Stud. 281, 281-300 (2000). For other examples, see Jones, Morton & Schaefer, supra note 213, and Freeman & Tse, supra note 112.

218 See Freeman & Tse, supra note 112 (arguing that because persistent earnings have a higher valuation impact than transitory earnings, investors are expected to place greater emphasis on forecasting the persistent earnings and are therefore expected to forecast persistent earnings with higher accuracy). This argument implies that big earnings surprises are more likely to be due to transitory earnings and because transitory earnings have a smaller valuation impact than persistent earnings this results in a smaller ERC coefficient for big earnings surprises (non-linearity of stock returns to earnings surprise relationship). They find that there is evidence of nonlinearity in their empirical results and that

PX346

their non-linear model has higher explanatory power than the basic ERC equation. Id. For further support, see Cheng, Hopwood & McKeown, supra note 109. For a contradictory finding, see Zhi-Xing Lin & Michael Shih, Does the Stock Market See a Zero or Small Positive Earnings Surprise as a Red Flag? (Aug. 2006) (unpublished manuscript, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=929943) (finding that "the ERC of zero and small positive earnings surprises is smaller than those for earnings surprises in adjacent ranges for firm quarters in 1998-2004, but not for firm-quarters in 1992-1997").

219 See, e.g., Messod D. Beneish & Campbell R. Harvey, Measurement Error and Nonlinearity in the Earnings-Returns Relation, 11 Rev. Quant. Fin. & Acct. 219, 219-47 (1998); Hayn, supra note 214; Sudipta Basu, The Conservatism Principle and the Asymmetric Timeliness of Earnings, 24 J. Acct. & Econ. 3, 3-37 (1997).

220 Oftentimes Street numbers exclude expenses such as special items and non-cash items. See, e.g., Bradshaw & Sloan, supra note 131, at 41-66. For information content of items excluded in Street earnings, see Jeffrey T. Doyle, Russell J. Lundholm & Mark T. Soliman, The Predictive Value of Expenses Excluded from Pro Forma Earnings, 8 Rev. Acct. Stud. 145, 145-74 (2003). For a discussion of which firms are more likely to publish pro forma earnings, see Barbara A. Lougee & Carol A. Marquardt, Earnings Informativeness and Strategic Disclosure: An Empirical Examination of "Pro Forma" Earnings, 79 Acct. Rev. 769, 769-95 (2004). The Consolidated Amended Class Action Complaint, In Re Mills Corp. Sec. Litig., 257 F.R.D. 101 (E.D. Va. 2009) (1:06-cv-077), contains allegations regarding Funds From Operations (FFO) despite the fact that FFO is a non-GAAP earnings measure. The reason is that FFO contains relevant information for investors. Analysts following The Mills Corporation almost exclusively forecasted and discussed FFO. In the case of a Real Estate Investment Trust (REIT), FFO is a better proxy for business performance than GAAP earnings as the latter include depreciation and amortization which are big non-cash positions.

221 See Bradshaw & Sloan, supra note 131.

222 See Lawrence D. Brown & Kumar Sivakumar, Comparing the Value Relevance of Two Operating Income Measures, 8 Rev. Acct. Stud. 561, 561-72 (2003) (finding that Street earnings contain more information than a measure of operating income created from GAAP statements).

223 See Abarbanell & Lehavy, supra note 115, at 675-723. See also comments on this paper by Mark Bradshaw & Mark Soliman, Discussion of Letting the "Tail Wag the Dog": The Debate over GAAP versus Street Earnings Revisited, 24 Contemp. Acct. Research 725, 725-39 (2007) and Theodore E. Christensen, Discussion of "Letting the 'Tail Wag the Dog': The Debate over GAAP versus Street Earnings Revisited", 24 Contemp. Acct. Research 741, 741-62 (2007); see also Cohen, Hann & Ogneva, supra note 133.

224 See In re Abercrombie & Fitch Co. Sec. Litig., No. M2*l*-83 (TPG), 2003 U.S. Dist. LEXIS 20670 (S.D.N.Y. 2003).

225 See Mark Bagnoli, Messod D. Beneish & Susan G. Watts, Whisper Forecasts of Quarterly Earnings Per Share, 28 J. Acct. & Econ. 27, 27-50 (1999).

226 See Guy D. Fernando & William D. Brown Jr., Whisper Forecasts of Earnings per Share. Is Anyone Still Listening? (2005) (unpublished manuscript, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=817474) for contradictory evidence. See also Janis K. Zaima & Maretno Agus Harjoto, Conflict in Whispers and Analyst Forecasts: Which One Should Be Your Guide? (2005) (unpublished manuscript, available at http:// papers.ssrn.com/sol3/papers.cfm?abstract_id=886180). See also Rebecca Abraham, An Exploration of Earnings Whispers Forecasts as Predictors of Stock Returns, 32 J. Econ. Stud. 524, 524-39 (2005).

227 See Susan M. Machuga, Use of Fuller's Technique to Reduce Measurement Error in the Returns/Earnings Association, 14 Rev. Quant. Fin. & Acct. 219, 219-45 (2000); G. S. Maddala & M. Nimalendran, An Unobserved Component Panel Data Model to Study the Effects of Earnings Surprises on Stock Prices, Trading Volumes, and Spreads, 68 J. Econometrics 229, 299-342 (1995). See also Beneish & Harvey, supra note 219. They minimize the measurement error, among other

PX346

things, by choosing a sample of large firms. Id. Large firms are more widely followed by analysts, it is more likely that analyst forecasts approximate market expectations for large firms than it is for small firms, and there is less disagreement among the analysts for large firms. See Jeffery S. Abarbanell, William N. Lanen & Robert E. Verrechia, Analysts' Forecasts as Proxies for Investor Beliefs in Empirical Research, 20 J. Acct. & Econ. 31, 31-60 (1995) (finding that disagreement among analysts increases measurement error). Unfortunately, experts have to take their defendants as they find them and many are not large firms.

228 See Teets & Wasley, supra note 76. But see Robert Freeman, Adam Koch & Haidan Li, Can Firm-Specific Models Predict Price Responses to Earnings New?, 1-39 (McCombs Sch. of Bus., The Univ. of Tex. at Austin, McCombs Research Paper Series No.ACC-01-06, 2006), available at http:// papers.ssrn.com/so13/papers.cfm?abstract_id=877633 (using out-of-sample prediction errors to assess whether pooled models are more appropriate than firm-specific models). They find that pooled regressions provide more accurate out-of-sample predictions and that pooled non-linear models outperform linear ones (the opposite is true for firm-specific models). Id.

229 For examples, see Yuan Zhang, Analyst Responsiveness and the Post-Earnings-Announcement Drift, 46 J. Acct. & Econ. 201, 201-15 (2008), which examines the factors that influence how quickly analysts update their forecasts following earnings announcements. Zhang analyzed a sample of earnings announcements from 1996-2002 and found that between 26-53% of analysts revised their forecast either the day of the announcement or the following day. Id. She found that analysts are more likely to update their forecasts following earnings announcements when firms are larger, conference calls or managerial guidance is available to analysts, announcements are for fourth fiscal quarters, more resources and support are available (in the form of larger brokerage houses), and a high level of competition exists between the analysts. Id. Additionally she found that analysts are more likely to update their forecasts quickly for high technology or growth industries. Id.

230 1.See Part IV.

231 See Brown & Rozeff, supra note 120, at 341-51 (calling the ARC simply “gamma” reflecting the algebraic symbol in their equation); see also Easton & Zmijewski, supra note 172, at 117-41 (using a similar framework).

232 See Jongdae Jin, Kyungjoo Lee & Sung K. Huh, An Association Between the Revision Coefficient and the Predictive Value of Quarterly Earnings in Financial Analysts' Earnings Forecasts, 9 Acad. Acct. & Fin. Stud. 1, 1-16 (2005) (finding that annual earnings forecasts' accuracy increases as quarterly reports become available and that the revision coefficient is positively related to total improvement and relative improvement in earnings forecast accuracy).

233 See Kirsten M. Ely & Vivek Mande, The Interdependent Use of Earnings and Dividends in Financial Analysts' Earnings Forecasts, 13 Contemp. Acct. Research 435, 435-56 (1996). Their findings are equivocal. Id.

234 See Jegadeesh & Livnat, supra note 151, who find earnings surprises have a more significant impact on forecast revisions than revenue surprises; however, all the ARCs on revenue surprises are significant and positive. Moreover, analysts seem to expect revenue and earnings surprises to have a more persistent effect for value firms than for growth firms. Id.

235 See Gu, Jain & Ramnath, supra note 150 (finding that analysts recognize, and incorporate into their forecast revisions, the incremental persistence of in-sync earnings surprises relative to out-of-sync earnings surprises).

236 See Li-Chin Jennifer Ho, Chao-Shin Liu & Thomas F. Schaefer, Analysts' Forecast Revisions and Firms' Research and Development Expenses, 28 Rev. Quant. Fin. & Acct. 307, 307-26 (2007) (finding a positive and significant association between the level of research and development expenses and the magnitude of analysts' forecast revisions following quarterly announcements).

PX346

237 See Paul K. Chaney, Chris E. Hogan & Debra C. Jeter, The Effect of Reporting Restructuring Charges on Analysts' Forecast Revisions and Errors, 27 J. Acct. & Econ. 261, 261-84 (1999) (providing evidence that analysts expect declining performance for restructuring firms in the short run but possible improvement over the longer term).

238 See generally Ron Kasznik & Maureen McNichols, Does Meeting Earnings Expectations Matter? Evidence from Analyst Forecast Revisions and Share Prices, 40 J. Acct. Research 727, 727-59 (finding that forecast revision is not larger).

239 See generally Michael Ettredge, Philip B. Shane & David B. Smith, Overstated Quarterly Earnings and Analysts' Earnings Forecast Revisions, 26 Decision Sci. 781, 781-801 (1995).

240 See generally Stephen P. Baginski & John M. Hassell, The Market Interpretation of Management Earnings Forecasts as a Predictor of Subsequent Financial Analyst Forecast Revision, 65 Acct. Rev. 175, 175-90 (1990).

241 Id.

242 Lacina & Karim, supra note 68, at 123-48.

35 JCORPL 11

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# PX 347

**15 Stan. J.L. Bus. & Fin. 183**

**Stanford Journal of Law, Business & Finance**
Fall 2009

**Article**

Michael J. Kaufman [a1] John M. Wunderlich [aa1]

Copyright (c) 2009 The Board of Trustees of the Leland Stanford Junior University; Michael J. Kaufman; John M. Wunderlich

# REGRESSING: THE TROUBLING DISPOSITIVE ROLE OF EVENT STUDIES IN SECURITIES FRAUD LITIGATION.

**Abstract**

An event study is a statistical regression analysis that merely provides one method of examining the effect of an event, such as a disclosure of information on the market price of a security. Yet the law governing event studies has become inseparable from the substantive law governing securities fraud litigation. Courts have effectively collapsed securities fraud actions into a single question: Whether the defendant's misrepresentation or omission created a disparity between the transaction price of a security and its true value measured by the precise reaction of the market price to the disclosure of the concealed information. A misrepresentation or omission that creates that disparity is material. Plaintiffs who invest at a market price that communicates ***184** that disparity have shown reliance by the fraud on that market price. The disclosure of the previously concealed information alters the market price to create economic loss, so plaintiffs can establish loss causation. The measure of damages then quantifies that precise alteration or correction in the market price.

The interrelated questions of materiality, reliance, loss causation, and damages all require an event study for their resolution. As such, an investor who fails to offer an event study performed by a qualified expert has little chance of prevailing. The dispositive role now played by event studies, however, is inconsistent with the Seventh Amendment and the federal securities laws. Rather, an event study requirement poses an unconstitutional and unwarranted barrier to meritorious securities fraud suits.

| | | |
|---|---|---|
| I. | Introduction | 186 |
| II. | Event Studies and Securities Litigation | 188 |
| | A. Admitting an Event Study as Evidence and Conducting a Proper Analysis | 189 |
| | 1. Meeting the Daubert Standard | 189 |
| | 2. Conducting a Proper Event Study Analysis | 190 |
| | B. Event Studies as They Relate to Securities Fraud Actions | 194 |
| III. | The Essential Elements of Securities Fraud Claims Require Post-Disclosure Price Movement | 199 |
| | A. Materiality and Post-Disclosure Price Movement | 200 |
| | B. Reliance in Fraud-on-the-Market Cases | 201 |
| | C. Loss Causation and Damages | 204 |
| IV. | A Proper Event Study is an Essential Element: The Only Way to Show Price Movement Caused by Disclosure is Through an Event Study | 208 |
| | A. An Event Study is Necessary to Connect Post-Disclosure Price Movement to the Fraud | 208 |
| | B. Class Certification: The Fener v. Operating Engineers Example | 211 |

PX347

| | | |
|---|---|---|
| | 1. Dueling Experts | 211 |
| | 2. The Procedural Posture: Class Certification | 213 |
| | C. Summary Judgment: The In re Williams Example | 213 |
| | 1. The Rise and Fall of WCG: Fraudulent Spin-Offs? | 213 |
| | 2. The Plaintiffs' Expert and His Theories of Loss | 215 |
| | a. Scenario 1: The Leakage Theory | 216 |
| | b. Scenario 2: The Corrective Disclosure Theory | 218 |
| | c. The Notes and the Absent Regression Analysis | 218 |
| | 3. The Procedural Posture: Summary Judgment | 218 |
| | C. An Adequate Event Study May be Necessary and Sufficient | 219 |
| V. | The Event Study Requirement Is Inconsistent With the Seventh Amendment | 220 |
| | A. Materiality, Reliance, Loss Causation, and Damages Are Quintessential Fact Questions | 221 |
| | 1. A Jury Must Resolve Factual Determinations of Materiality, Reliance, Loss Causation, and Damages | 222 |
| | 2. Even a "Reasonableness" Standard is an Affront to the Jury's Role | 225 |
| | B. The Event Study Requirement Allows the Judge to Usurp the Jury's Power to Assess Otherwise Reliable Expert Analyses in Reaching its Factual Determinations | 227 |
| | 1. The Judge Precludes the Jury from Weighing Competing Expert Opinions | 227 |
| | 2. The Judge Precludes the Jury from Discounting the Testimony from Otherwise Reliable Experts | 228 |
| | C. An Event Study Assists a Trier of Fact; It Does Not Replace It | 230 |
| VI. | The "Event Study" Element is Inconsistent with the Federal Securities Laws | 233 |
| | A. The Federal Securities Laws Do Not Require a Post-Disclosure Decline as a Precondition to Recovery | 233 |
| | 1. The Plain Language of the PSLRA Does Not Require A Post-Transaction Decline and Event Study | 234 |
| | 2. The Common Law Distinguishes Between Out-of-Pocket Losses and Losses Resulting from a Post-Transaction Decline | 235 |
| | 3. Corporate Finance Theory Dictates that an Event Study Need Not Link a Post-Transaction Decline to the Defendant's Fraudulent Conduct to Demonstrate Loss | 236 |
| | B. Requiring an Event Study Imposes an Unjustified Barrier to Meritorious Securities Fraud Claims | 239 |
| | 1. The Fictional Underpinnings of the Event Study Requirement | 240 |
| | a. The In Terrorem Concept Is Illogical | 240 |
| | b. Abusive Discovery Concerns Are Insufficient to Justify an Event Study Analysis | 242 |
| | i. Discovery Abuse is Misperceived | 243 |
| | ii. Both Plaintiffs and Defendants Are Prone to Discovery Abuse | 246 |
| | iii. Discovery Promotes Merits Resolution | 247 |
| | iv. The Event Study Requirement Increases Discovery Costs | 248 |
| | 2. An Event Study Requirement Inflicts Significant Harm on Meritorious Actions | 249 |
| | a. Letting the Air out of the Inflation Balloon: Requiring Post-Transaction Decline Enables Concealment of Fraud | 249 |
| | b. Private Actions Supplement Otherwise Deficient SEC Actions | 250 |
| | c. Securities Class Actions Compensate Investor-Plaintiffs | 254 |
| | d. Additional Securities Fraud Suits Will Not Inevitably Result in a Flood of Expensive Suits | 258 |
| VII. | Conclusion | 260 |

***186 I. Introduction.**

An event study is a statistical regression analysis that merely provides one method of examining the effect of an event, such as the disclosure of information on the market price of a particular security. Yet the law governing event studies has become inseparable from the substantive law governing securities fraud litigation. Courts have effectively collapsed securities fraud actions into a single question:

> Whether the defendant's misrepresentation or omission created a disparity between the transaction price of a security and its true value measured by the precise reaction of the market price to the disclosure of the concealed information.

PX347

A misrepresentation or omission that creates that disparity is material. Plaintiffs who invest at a market price that communicates that disparity have shown reliance by the fraud on that market price. The disclosure of the previously concealed information alters the market price to create economic loss, so plaintiffs can establish loss causation. The measure of damages then quantifies that precise alteration or correction in the market price.

***187** The interrelated questions of materiality, reliance, loss causation, and damages all require an event study for their resolution. The overriding substantive issue in securities fraud cases has become whether an expert has proffered an opinion based on a reliable event study. Thus, event studies have become an indispensable element to securities fraud actions. [1] As such, a defrauded investor who fails to offer a reliable event study performed by a qualified expert has little chance of prevailing. The dispositive role now played by event studies, however, is inconsistent with the Seventh Amendment and the federal securities laws. Rather, an event study requirement poses an unconstitutional and unwarranted barrier to meritorious securities fraud suits.

This Article will show that a properly conducted event study [2] is not just a helpful way to present evidence of essential elements of a securities fraud action, it has become a substantive and essential element of a securities fraud claim itself. First, Part II of this Article details the steps necessary to conduct a proper and admissible event study for purposes of securities litigation. This Part also shows how the elements of securities actions uniquely lend themselves to event study analysis. [3] ***188** Part III of this Article next demonstrates that the elements of materiality, reliance in fraud-on-the-market cases, loss causation, and damages as defined by the federal courts all depend on a showing of post-disclosure price movement. [4] Then, as Part IV shows, courts have recently held that the only way to show that a stock price movement was caused by disclosure is through a properly conducted event study. [5] Nevertheless, as Part V establishes, requiring an event study at the initial stages of the plaintiffs' case takes fact questions regarding materiality, reliance, causation and damages from the province of the jury in contravention of the Seventh Amendment right to a jury trial. [6] Additionally, it imposes an unjustifiable barrier to meritorious claims inconsistent with the language of the securities laws. Moreover, any requirement that an expert be called to present a statistical regression analysis to establish materiality, reliance, loss causation, and damages is inconsistent with the policies underlying the federal securities laws. [7]

## II. Event Studies and Securities Litigation.

"The securities markets have grown increasingly complex." [8] This increasing complexity has created new challenges in prosecuting and defending securities fraud cases. [9] To meet these new challenges, securities fraud plaintiffs often employ experts armed with event studies. [10] Part of the resounding success of event study analysis in securities fraud actions is because event studies provide a metric for measuring a specific event's effect on stock prices. [11] Thus, there has been an overwhelming endorsement in the federal courts for the use of event studies in securities litigation. [12] ***189** This Section demonstrates that event studies, as a useful (and essential) tool in securities litigation, must first constitute admissible evidence. [13] In other words, event studies must meet the traditional Daubert test for scientific evidence. Next, this Part discusses what constitutes a proper event study. After detailing the requirements for a proper event study, this Part will provide a brief overview of the essential elements of a securities fraud claim to illuminate how a securities fraud claim is particularly well-suited for event study analysis. [14]

### A. Admitting an Event Study as Evidence and Conducting a Proper Analysis.

1. Meeting the Daubert Standard.

Under Federal Rule of Evidence 702 an expert is someone with specialized knowledge. [15] An expert may testify when it will assist the trier of fact in understanding the evidence or determining a fact in issue. [16] An expert can base his testimony on facts or data of three kinds, so long as they are of the kind reasonably relied upon by experts in the field: (1) an expert can rely on

PX347

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

facts or data learned by firsthand observation before the hearing; (2) an expert may rely on facts or data that he learns at the hearing; and (3) an expert may rely on what amounts to outside data, or information garnered by consulting other sources. [17]

In Daubert v. Merrill Dow Pharmaceuticals, the Supreme Court held that expert testimony set forth as scientific evidence must satisfy a special standard: the scientific ***190** evidence must be generally accepted in the pertinent community. [18] Under the Daubert test, the court must ascertain that: (1) the theory or technique has been appropriately tested and found valid; (2) the theory or technique has been subjected to peer review; (3) the error rate is low enough so that the theory or technique is reliable; and (4) the theory or technique is generally accepted within the profession. [19] When an expert employs an event study, his opinion: (1) becomes testable, (2) is supported by published literature / peer review, (3) is subject to a known or potential rate of error, and (4) follows procedures that derive from objective standards making it generally accepted. [20] In other words, through an event study, an expert's testimony can meet all the prongs of the Supreme Court's Daubert standard. [21]

2. Conducting a Proper Event Study Analysis.

For an event study to be admissible it has to be proper so as not to constitute junk science. The traditional definition of an event study is "a statistical regression analysis that examines the effect of an event, such as an allegedly fraudulent statement or omission, on a dependent variable, such as a company's stock price." [22] Event study methodology is founded on the efficient market hypothesis, [23] a hypothesis endorsed by the Supreme Court. [24] Under the efficient market hypothesis, a security's price reflects all publicly available information. [25] Thus, in terms of an event study, a change in stock price in light of a public announcement is owing to the arrival of new information in the market provided by that announcement. [26] A proper ***191** event study consists of four general steps:

Step One.Identify the Event. [27]

First, an event study must identify the "event" that causes investors to change their expectations about the value of the company. [28] Some examples of "events" include takeovers, equity offerings, change in the state of incorporation, adoption of antitakeover provisions, filing lawsuits, deaths of corporate executives, and product recalls to name a few. [29] In securities fraud, the "event" is the subject of the alleged fraud. After the event is identified, the expert must determine when the event was made known to the public, or the "announcement date." [30] This assessment requires that it be known when the news reached the market. Also, there must be no reason to believe that the market anticipated the news, otherwise it would not be the date upon which the market learned of the event.

Step Two. Establish an Event Window.

Once an event has been identified, the expert must select an "event window" or a period over which stock price movements are calculated. [31] Typically, this window starts at the end of the trading day, or before news of the event reached the public. [32] The difficulty in establishing an event window lies in determining the cut-off date for the window. [33] The longer an event window, the more likely it is to incorporate the release of the news and the market's reaction to it. But it is also then more likely that the market reaction will be related to other effects unrelated to the studied event. [34] Because information may leak several days before the actual fraudulent ***192** event, and because the market may take a day to react to the information if the announcement is made just after the market closes or late in the trading day, experts usually employ a three-day event window starting a day before and ending a day after the event. [35]

Step Three.Control for Market and Industry Effects to Get an Estimated Relationship Between the Company and the Market.

Third, the expert must examine the stock price performance around the event. [36] This requires that the expert isolate the effect of the event from other market, industry, or company-specific factors simultaneously affecting the company's stock price. [37]

> Suppose, for example, that defendants make a false, unexpected, and positive announcement about an issuer and the price of that issuer's stock rises on the next trading day. But suppose that the market generally improves on

PX347

> that day and that the prices of other stocks in the issuer's industry also enjoy gains on that day. The question that an event study examines is whether the false announcement caused the price of the issuer's stock to go up at all - instead of market and industry developments causing the entire price rise - and if the defendant's announcement did have some price effect, what part of the company's stock price increase was attributable to the announcement as opposed to other factors.[38]

After ruling out other factors, the expert attempts to determine whether the ***193** stock price movement is abnormal.[39] “A large abnormal stock price movement occurring at the same time the market receives news about an event suggests that the event caused the abnormal price movement.”[40]

To rule out other market and industry factors, the expert must calculate the relationship of the specific company's stock with the general market. The expert will measure the stock price's sensitivity to general market conditions.[41] To do this, an expert will run a “regression” of the company's stock price on a market and/or industry index over a period of time (“estimation window”). The period of time selected for the regression analysis is generally close to the event window.[42] The result of this regression analysis is a quantified relationship between the company and the market. The regression analysis will reveal a statistic measure of the strength of the relationship between the company's stock price movements and the market and industry indices.[43]

Step Four.Estimate the Effects of the Event.

Fourth, the estimated relationships achieved by the regression analysis are applied to control for market and industry movements in the event window.[44] Then, the predicted return is compared to the actual return in the event window. The difference between the two is the abnormal or excess return. This return must be statistically significant so the results are not because of mere chance. This excess return is multiplied by the company stock price to provide an estimate of the per-share dollar effect of the event.[45]

To summarize:

> [A]n event study is similar to a medical experiment in which there is a control group and a treatment group. The control group provides the benchmark against which the treatment group is compared to determine if the event being studied had any effect. In a securities setting, the control group is established by modeling the normal relationship of a stock's price movements to movements of a market and/or industry index. The difference between the stock ***194** price movement we actually observe and the movement we expected to observe (i.e. the difference between the treatment and the control group) that occurs upon the release of a particular piece of information is called the excess price movement of the stock at the time of the event. This excess price movement is tested for statistical significance to see whether the result is unusual or unlikely to be explained by the normal random variations of the stock price.[46]

As the following Subpart demonstrates, the event study methodology is particularly compatible with securities fraud actions.

**B. Event Studies as They Relate to Securities Fraud Actions.**

Securities fraud actions uniquely lend themselves to event study analysis. Securities fraud actions brought under Section 10 of the Securities Exchange Act[47] and the Securities and Exchange Commission's (“SEC”) Rule 10b-5[48] allow a private plaintiff to recover damages caused by an act or omission resulting in fraud or deceit in connection with the purchase or sale of any security.[49] To state a cause of action under Rule 10b-5, a plaintiff must allege and prove six elements: (1) that the defendant made a material misrepresentation or omission (materiality); (2) that the defendant acted with a wrongful state of mind (scienter[50]); (3) that the material misrepresentation ***195** or omission was made in connection with the purchase or sale of a security (in connection with); (4) that the plaintiff relied on the material misrepresentation (reliance); (5) that the plaintiff suffered an

PX347

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

economic loss as a result (economic loss); and (6) that the material misrepresentation actually caused the loss (loss causation).[51] Event studies have been a well-established method for calculating the effect of an event on stock prices for more than forty years.[52] Because event studies can isolate the effect of each false statement on a stock's price, they are used to establish materiality, reliance, damages, and loss causation.[53]

Materiality. A misrepresented or omitted fact is material if there is a substantial likelihood that it would be important to a reasonable investor.[54] The test for materiality is whether the subject fraud altered the total mix of information available to investors in such a way as to affect their investment decisions.[55] Definitions of materiality all tend to relate back to whether the decision by a reasonable investor to trade at a particular price would have been affected by knowing the omitted or misstated information.[56] The materiality standard is objective.[57] Thus, materiality can be objectively measured with an event study, as an event study can determine the likelihood that a stock price changed as a result of the fraud and not as a result of some other factor.[58] The event study method is an accepted method of evaluating materiality.[59]

***196** For instance, if the information causes more investors to want to buy the stock, the price will rise until the demand for the stock equals the supply.[60] Materially positive news causes a stock's price to rise, but if the information is immaterial, then investors' decisions to buy are unaffected.[61] Thus, an expert--usually an accountant, economist, or investment banker--may be used to track the movement of a stock's price in reaction to the disclosure of the allegedly material facts. The expert can then opine as to the probability that this movement was caused by the release of the material information or by events unrelated to the disclosure.[62] If the event study discloses no significant or abnormal change in the stock price, the information is deemed immaterial.[63]

Reliance in Fraud-on-the-Market Cases. Securities fraud plaintiffs must also demonstrate that they relied on the defendant's misrepresentation or omission. Reliance is an essential element for Rule 10b-5 liability because it ensures that there is the requisite causal connection between a defendant's misrepresentation and the injury.[64] Plaintiffs can either present direct evidence of their actual reliance, in which case there is no role for an expert or event study analysis, or they can invoke a presumption of reliance. In Stoneridge Investment Partners v. Scientific-Atlanta, the Court noted that there are two instances when a rebuttable presumption of reliance exists: (1) if there is an omission of a material fact by one with a duty to disclose; and (2) if the statement at issue becomes public, thereby falling under the fraud-on-the-market presumption.[65]

The second instance, the "fraud-on-the-market" presumption, presumes a plaintiff's reliance when the statement at issue becomes public. According to the presumption, because all public information is reflected in the market price of the security,[66] it can be assumed that an investor who buys or sells stock at the market price relies upon false statements made publicly.[67] Judge Richard A. Posner aptly illustrates ***197** the fraud-on-the-market presumption:

> Suppose . . . that a misrepresentation in a prospectus for a new issue of stock leads brokers who read the prospectus to buy large amounts of the stock and to recommend that their customers do likewise. As a result, the price rises. Suppose someone who has no knowledge of the prospectus - in fact no idea why the stock's price has risen - buys it at its higher price. Later the fraud is unmasked and the price falls. Should this someone be allowed to sue the issuer? The Supreme Court has announced yes, and this is the economically correct answer. The fraud is impounded in the market price, and the person who buys without knowledge of the prospectus is acting on false information to the same extent as those who buy with knowledge.[68]

The plaintiff is presumed to have relied on that information known by the market and incorporated into the market price. For the presumption to apply, the plaintiff must show: (1) that the defendant made public material misstatements; (2) that the defendant's shares were traded in an efficient market;[69] and (3) that the plaintiff traded shares between the time the misrepresentations were made and the time the truth was revealed.[70] Similar to materiality, an event study can show that a misrepresentation or corrective disclosure had a statistically significant effect on the price of a stock, thereby demonstrating that the market 'relied' on the misrepresentation.

PX347


© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Loss Causation. An event study is also useful to demonstrate loss causation. Loss causation is an essential element of Rule 10b-5 liability. [71] Loss causation refers ***198** to the direct causal link between the misstatement and the economic loss. [72] It requires that plaintiffs prove that the defendant's misrepresentations or omissions not only caused them to invest, but also were the cause of their actual economic losses. [73] In Dura Pharmaceuticals v. Broudo, the Supreme Court held that securities fraud plaintiffs could not adequately allege loss causation by alleging only that the plaintiffs purchased securities at an artificially high price. [74] Rather, according to the Court, the plaintiffs had to allege that they suffered an actual "economic loss" [75] proximately caused by the defendant's misrepresentation. [76] Post-Dura, because an event study can show the true value of the stock, event study analysis has been used to demonstrate both that the economic loss occurred and that this loss was proximately caused by the defendant's misrepresentation. [77] In other words, an event study is used to show the requisite causal link between the defendant's misstatement or omission and the plaintiffs' suffered loss.

Damages. In addition, to make a viable securities fraud claim, plaintiffs must establish damages. [78] The primary measure of damages in a securities fraud action is the plaintiffs' out-of-pocket losses. [79] It is the difference between the amount the plaintiffs would have paid and the "true value" of the stock. [80] That measure is calculated by the actual difference between the price at which the plaintiffs actually invested and the price at which they would have invested had the truth been known at the time of the transaction. [81] The hypothetical amount that the plaintiffs would have paid or received had the truth been known ("true value") is typically provided through an expert opinion and event study. [82] Experts employ event studies to arrive at the "true value." [83] Event studies answer, "what would the price of the stock have ***199** been during the class period but for the fraudulent behavior?" [84] Federal district courts often rely on expert testimony in computing damages. [85]

As the next Part demonstrates, each of these elements--materiality, reliance, loss causation, and damages--depends on a showing of post-disclosure price movement. Stated differently, the stock price must change in response to the disclosure of the fraud. An adequate demonstration of post-disclosure price movement as a result of the defendant's fraud in turn depends on the plaintiffs' ability to put forth an event study that can link this post-disclosure price movement to the fraud.

## III. The Essential Elements of Securities Fraud Claims Require Post-Disclosure Price Movement.

Since the Supreme Court's Dura decision in 2005, the key inquiry for securities fraud actions--particularly those dependent on the fraud-on-the-market presumption--is the amount by which the stock declined as a result of the market becoming aware of the alleged fraud. [86] Securities fraud plaintiffs must show a change in the value of their investment caused by the defendant's fraud. Event studies serve to link the subsequent stock price movement to the alleged fraud. Primarily, as this Part shows, the elements of materiality, reliance, loss causation, and damages all depend on an initial showing of post-disclosure price movement. [87]

### *200 A. Materiality and Post-Disclosure Price Movement.

If the plaintiffs invoke the fraud-on-the-market presumption and, in turn, the efficient market hypothesis, materiality can be proven by showing a post-transaction stock price decline. [88] In fact, "market impact" was once the dominant method of establishing materiality. [89] A court "committed to the efficient market hypothesis" will deem information material if, once the information is disclosed, there is post-transaction price movement. [90] For example, in In re Merck & Co., the plaintiffs brought a securities fraud class action against Merck Co. and its officers claiming that the company and its officers made material misstatements and omissions in registration statements for Merck's subsidiary spin-off's initial public offering ("IPO"). [91] Merck planned to spin off Medco Health Solutions Inc. ("Medco") in a 2002 IPO. [92] The plaintiffs alleged that Medco had been engaging in improper accounting practices which were not disclosed until after Merck filed an amended registration statement with the SEC. [93] The plaintiffs claimed that Merck and Medco had made misleading statements concerning the independence of Merck and Medco's IPO in violation of Section 10(b) of the Securities Exchange Act. [94]

In examining whether the alleged misstatements by the defendants were material and thus actionable, the Third Circuit stated that materiality is the "first step" for securities fraud plaintiffs. [95] According to the Third Circuit:

PX347

> Our Court . . . has one of the clearest commitments to the efficient market hypothesis. . . . [T]he materiality of disclosed information may be measured post hoc by looking to the movement in the ***201** period immediately following disclosure of the price of the firm's stock. [96]

Thus, information is material if its revelation causes post-disclosure price movement. Applying this standard, the Third Circuit held that even though Merck's stock dropped eventually, it was not within the period immediately following disclosure. Therefore, the information, as it resulted in no stock price movement immediately following disclosure, was immaterial. [97] The Third Circuit's Merck decision illustrates the general approach to assessing materiality. [98]

**B. Reliance in Fraud-on-the-Market Cases.**

Similarly, reliance in fraud-on-the-market cases can also be shown with post-transaction price movement. The Fifth Circuit in Oscar Private Equity Investments v. Allegiance Telecom, Inc. has required post-transaction price movement for both reliance and loss causation. [99] The Fifth Circuit held that a showing of movement in price is a prerequisite to reliance in fraud-on-the-market cases. [100]

In Oscar, Allegiance Telecom Inc. ("Allegiance") was a publicly traded, national telecommunications company. [101] In April 2001, Allegiance released its financial results for the first three quarters which indicated that Allegiance had outperformed analysts' estimates, raising the stock price. [102] Then in February 2002, ***202** Allegiance released its fourth-quarter financial results which fell short of analysts' earnings estimates, thereby restating its total installed-cable line count by over 100,000 lines. [103] The stock price fell twenty-eight percent. [104] Oscar Private Equity Investments filed suit in federal court alleging that Allegiance violated Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. [105] The plaintiffs alleged that Allegiance fraudulently misrepresented its line-installation count in its first three quarterly announcements in 2001. [106] As a result, the plaintiffs asserted that they purchased Allegiance shares at an artificially inflated price. [107] When Allegiance corrected its line count, the plaintiffs alleged they were injured because of the resulting stock decline. [108] The plaintiffs moved to certify a class of all individuals who purchased Allegiance's shares between its first- and fourth-quarter releases. [109] The district court certified the class, specifically allowing the plaintiffs to establish a rebuttable, class-wide presumption of reliance through the fraud-on-the-market theory. [110]

The Fifth Circuit vacated the proposed class "for wont of any showing that the market reacted to the corrective disclosure" [111] and insisted that class certification be supported by a showing of loss causation. [112] The Fifth Circuit required more than proof of a material misstatement for the plaintiffs to invoke the fraud-on-the-market presumption of reliance; rather the court required that the plaintiffs show that the misstatement actually move the market. [113] According to the court, plaintiffs must initially establish loss causation to trigger the-fraud-on-the-market presumption. [114] ***203** The court required: (1) that the misstatement actually move the market to prove loss causation; (2) that only when loss causation is established will the plaintiffs be entitled to the fraud-on-the-market presumption; (3) the plaintiff must establish this by a preponderance of the evidence; and (4) all this must be done on a motion for class certification. [115]

The court required that the plaintiffs show post-transaction price movement this early in the litigation because "[i]ts 'proof' is drawn from public data and public filings. . . . It is largely an empirical judgment that can be made [at class certification] as well as later in the litigation." [116] Ultimately, after weighing all the evidence--expert reports both for and against the plaintiffs--the court decided that the factual conclusion drawn by the plaintiffs' expert that linked the defendant's fraud to the stock price movement was "untenable," and because the plaintiffs had not established loss causation, the plaintiff class could not show reliance by way of the fraud-on-the-market theory. [117]


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

***204 C. Loss Causation and Damages.** [118]

Loss causation, originally a judge-made requirement, [119] was codified by Congress in the Private Securities Litigation Reform Act ("PSLRA"): "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." [120] Oscar illustrates that both loss causation and reliance in some cases depend on a proper showing of stock price movement linked to the defendant's fraud. The Oscar decision is quite mainstream in that respect; the federal courts generally require post-disclosure price movement linked to the defendant's fraud to establish essential elements such as loss causation and even damages. For example, in 2005, the Supreme Court in Dura Pharmaceuticals stated that an inflated purchase price will not itself cause economic loss. [121] After Dura, the federal courts interpreted this to mean that establishing loss causation and damages require that the plaintiff show post-transaction price movement. [122] For instance, a post-Dura decision from the Fourth Circuit, Glaser v. Enzo Biochem Inc., held that to adequately allege securities fraud, the plaintiffs must show that a corrective disclosure preceded a decline in the defendant's stock price. [123] In Glaser, the plaintiffs brought a common law fraud claim against Enzo Biochem Inc., a publicly traded ***205** biotechnology company doing research and development of treatments for HIV. [124] The plaintiffs alleged Enzo exaggerated the success of its HIV therapies through press releases and statements made by its officers. [125] The district court dismissed the plaintiffs' common law fraud claim holding that they failed to adequately allege loss causation. [126]

On appeal the Fourth Circuit interpreted Dura and held that the Supreme Court required that fraudulent conduct cause post-transaction price movement to establish loss causation. [127] The Fourth Circuit stated:

> It is only after the fraudulent conduct is disclosed to the investing public, followed by a drop in value of the stock, that the . . . investor has suffered a "loss" that is actionable after the Supreme Court's decision in Dura. In other words, so long as the fraud is undisclosed, normal fluctuations in price attendant to any market may have a direct effect on the value of the investor's portfolio, but cannot be said to be a "loss" that is actionable under the federal securities law . . . [128]

Applying Dura, the Fourth Circuit held that the plaintiffs failed to plead loss causation because they did not link any corrective disclosure to a subsequent drop in the stock price. [129] The Fourth Circuit reasoned that this result was required by Dura and employed the following hypothetical:

> Assume an investor purchased 100 shares of Enzo for $12 per share on January 12, 2000, after the alleged misrepresentations were made. If the market had known the truth . . . instead of trading for $12 per share, the stock would have traded for only $1 per share.
>
> Plaintiffs in this case would have stopped the analysis there, contending that, on the very day of purchase, the investor has suffered a loss of $1,100- the difference between the price paid ($1,200) and the price that would have been paid ($100) had the true facts been known. This analysis ignores the fact that the true facts are not yet ***206** known and the hypothetical investor has not yet suffered a loss.
>
> If the stock later drops, as a result of normal market fluctuations, to $6 per share (again assuming the fraud has not yet been disclosed), then the investor owns stock worth only one-half of what was paid for it. If he sells at this point, he has lost $600 of his initial $1,200 investment, to be sure, but this loss was not caused by the fraudulent conduct, because, under the hypothetical, the market is still unaware of the misrepresentations. [130]

PX347

Glaser illustrates the general approach to loss causation. The Seventh Circuit likewise requires post-transaction price movement to establish loss causation and damages. [131] For example, in Ray v. Citigroup Global Markets, the plaintiffs, a group of more than 100 retail investors, bought millions of dollars worth of stock in SmartServe Online ("SSOL") between 2000 and 2002. [132] SSOL was a small company in the wireless data business. [133] The value of its shares went from $1 to $170 per share from October 1999 to February 2000, and settled between $70 and $90 per share in April 2000. [134] Spatz, a stockbroker employed by Citigroup, worked with retail brokers who directly advised the plaintiffs to buy SSOL stock. [135]

The plaintiffs alleged that Spatz fraudulently induced the plaintiffs to buy ever-increasing amounts of SSOL stock during a general market decline because SSOL had signed substantial contracts with large corporations that would produce millions of dollars in revenue. [136] What Spatz did not disclose, however, was that SSOL had problems with its current contracts with other large companies. [137] The plaintiffs argued that Spatz's statements lured them into thinking that Citigroup genuinely believed that SSOL was a safe investment and that there was little risk. [138] Later, SSOL disclosed in public filings that it had yet to derive any significant revenue from its wireless data business. [139] After the truth emerged, the stock price, which was more than $80 in June 2000, plunged to only about $1 per share. [140] SSOL's competitors' share values likewise dropped. [141]

The district court dismissed the plaintiffs' claims, citing Dura for the proposition ***207** that the loss causation element was missing because plaintiffs had no evidence to show that the misrepresentations had a causal connection to the loss. [142] The Seventh Circuit affirmed the district court holding that the plaintiffs did not plead loss causation. [143] In doing so, the Seventh Circuit laid out three ways that plaintiffs could establish loss causation:

> The first is sometimes called the "materialization of risk standard." . . . requiring the plaintiff to prove that it was the very facts about which the defendant lied which caused his injuries. The second approach is the "fraud-on-the-market" scenario, . . . [whereby] plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception. Finally . . . loss causation might be shown if a broker falsely assures the plaintiff that a particular investment is "risk-free." [144]

The Seventh Circuit dismissed the materialization of the risk standard because no evidence existed to support a jury's conclusion that the drop in value of the stock was because of the alleged misrepresentations. [145] Rather, the court noted that the defendants introduced expert testimony claiming that the company lost its value because of market forces rather than fraud. [146] According to the Seventh Circuit, the plaintiffs did not rebut this evidence. [147] In addition, the Seventh Circuit dismissed the fraud-on-the-market theory because the stock had already collapsed by the time the market discovered the alleged misrepresentations. [148] In essence, loss causation required a post-transaction decline. [149] Thus, without this post-transaction price decline, ***208** the plaintiffs could not connect that stock decline to the defendant's fraud.

### IV. A Proper Event Study is an Essential Element: The Only Way to Show Price Movement Caused by Disclosure is Through an Event Study.

As shown above, in fraud-on-the-market cases in particular, for securities fraud plaintiffs to recover, they must show post-disclosure movement of the defendant company's stock price. [150] The essential elements of a securities fraud claim--materiality, reliance, loss causation, and damages--all require that the fraud result in some post-disclosure price movement. [151] Not only do courts require this post-disclosure price movement, the federal courts have held that the only way to link price movement to the defendant's fraud is through an event study analysis. [152] Thus, a proper event study is now a necessary element in a securities fraud claim. As this Section shows, absent a proper event study, a securities fraud plaintiff has little chance of success. To illustrate the critical importance of an event study in securities litigation, this Part will explore two recent decisions: Fener v. Operating Engineers from the Fifth Circuit, which illustrates that absent a reliable event study a plaintiff class will not be

PX347

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

certified, and In re Williams from the Tenth Circuit, which illustrates that a court will grant summary judgment in favor of the defendants if the plaintiffs fail to offer an adequate event study. [153]

**A. An Event Study is Necessary to Connect Post-Disclosure Price Movement to the Fraud.**

It is common practice for the federal courts to admit expert testimony based on an appropriate event study, but to exclude testimony based on infirm event studies. [154] In In re Seagate Technologies II, the federal district court granted summary ***209** judgment for the defendant where the defendant's expert armed with an event study was unopposed by the plaintiffs with an expert armed with an event study of his own. [155] Another federal court stated that, “[the plaintiff's] expert's testimony would be accorded no weight in [the] securities fraud action . . . where [the] expert did not perform an event study or similar analysis . . . and did not challenge [the] event study performed by the [defendant's] expert.” [156] One commentator has noted that even materiality depends on an event study. [157] Likewise, where the plaintiff fails to offer an expert with a proper event study as to market efficiency, the plaintiff will not be able to invoke the fraud-on-the-market theory of reliance. [158] In addition, the federal courts require an event study to establish loss causation and damages. [159] The Fifth Circuit in Oscar and Fener flatly stated that proof that a culpable disclosure moved the market (loss causation) should take the form of an event study. [160] The absence ***210** of an event study for damages, in particular, will often result in summary judgment in favor of the defendant. [161] “[D]amages are an element of a securities fraud claim which plaintiffs must prove, and that can be done only by expert testimony.” [162] Damages calculations require expert testimony accompanied with a reliable event study because to determine damages under the securities laws, the plaintiffs must distinguish between fraud-related and non-fraud-related influences on the stock's price. [163] “Over the years many courts in shareholder class actions have required that an expert's analysis of the effect of information be in the form of an event study or a similar analysis where possible.” [164]

To illustrate the effect of failing to include an event study, consider the following federal district court's statement:

> [T]he Court takes judicial notice of the fact that there were other events at the pertinent time - the third and fourth quarters of 1998- which might have influenced the drop in stock prices, . . . specifically the Russian default, the Asian crisis and the Long Term Capital default, and that these external events resulted in dramatic changes in interest rates, thereby affecting participants in the credit industry. . . . These are market events for which Defendants cannot be held responsible. However, absent an event study or similar analysis, Plaintiffs cannot eliminate that portion of the price decline . . . which is unrelated to the alleged wrong. . . . The Court therefore excludes [the expert report]. . . on the ground that its methodology is flawed. [165]

The absence of an event study allows the court to take judicial notice--meaning the defendant does not have to produce any evidence--of other existing market conditions and reject the expert's testimony as flawed. An event study links the fraud to the claimed loss and rules out other factors of the decline. Thus, per the federal courts, an expert armed with a reliable event study has become an indispensable element of securities fraud claims.

***211 B. Class Certification: The Fener v. Operating Engineers Example.**

Fener v. Operating Engineers illustrates that absent an event study that rules out other causes of a stock price decline, a court will deny class certification to the plaintiff class. [166] In Fener, the plaintiffs filed a Section 10(b) and Rule 10b-5 action against Belo Corporation, a media company that owned the Dallas Morning News. [167] The plaintiffs alleged that Belo inflated the Dallas Morning News' record circulation, rigged its audits, and implemented a no-return policy to inflate profits. [168] In March 2004, Belo announced that the Dallas Morning News' future circulation would be down. [169] Then, in August 2004, after the market closed, Belo issued a press release stating that Belo (1) admitted an internal investigation had revealed questionable circulation practices, (2) recognized that the disclosure was coupled with the March 9th reduction announcement, and (3) recognized that the disclosure was coupled with an industry-wide decline in newspaper circulation. [170] When the market opened the next day,

PX347

Belo's stock dropped from $23.21 to $18.00 and finished the day at $21.55. [171] "Several securities analysts lowered their earning estimates for Belo and downgraded its stock." [172]

1. Dueling Experts.

Originally, the plaintiffs submitted no expert testimony with their class certification motion, only excerpts from Belo's SEC Form 10-K for two years, Belo's historical stock prices, Belo's SEC S-3 forms from 1996-2006, financial data from Yahoo! Finance, and a chart of Belo's daily share price. [173] The defendants then responded with expert testimony and an event study that suggested the stock price decline was primarily related to the non-fraudulent disclosures in the press release relating to the March 9th announcement and the industry-wide decline. [174] The plaintiffs responded with expert testimony from Dr. Scott Hakala who conducted an event study and attributed much of the decline to the revelation of the fraud. [175] Specifically, the plaintiffs' ***212** expert concluded that the press release could not be separated into three separate disclosures, and even still, the market had already absorbed the non-fraudulent disclosures' information. [176]

The district court denied class certification and the Fifth Circuit affirmed. [177] The Fifth Circuit first stated that the plaintiffs' original motion without any expert testimony or event study was insufficient to show that the fraudulent disclosure caused a reduction in Belo's stock. [178] According to the Fifth Circuit, "[a]lthough analyst reports and stock prices are helpful in any inquiry, the testimony of an expert --along with some kind of analytical research or event study--is required to show loss causation." [179] Then, the court rejected the plaintiffs' expert's conclusion that the press release constituted a single corrective disclosure, not three distinct disclosures; rather, the Fifth Circuit accepted the defendant's expert's version. [180] The Fifth Circuit stated:

> Even considering the plaintiffs' analyst commentary and stock price information together with Hakala's testimony and event study, the motion for class certification still falls short. As the district court correctly held, Hakala's testimony was fatally flawed; he wedded himself to the idea that the press release was only one piece of news and conducted his event study based on that belief. We reject any event study that shows only how a stock reacted to the entire bundle of negative information, rather than examining the evidence linking the culpable disclosure to the stock-price movement. Because Hakala based his study on that incorrect assumption, it cannot be used to support a finding of loss causation. [181]

Once the court disregarded the event study as flawed, the court then stated that the plaintiffs' expert's testimony alone was insufficient to prove loss causation. [182]

***213** 2. The Procedural Posture: Class Certification.

Absent a demonstration of loss causation common to the class, the Fifth Circuit refused to certify the class. [183] The Fifth Circuit was particularly concerned that "Class certification creates insurmountable pressure on defendants to settle. . ." and that "[t]he risk of facing an all-or-nothing verdict presents too high a risk, even when the probability of an adverse judgment is low." [184] The Fifth Circuit then observed that securities class certification resembles "a shake-down or judicial blackmail." [185] Thus, without a reliable event study, the plaintiffs could not certify a class.

**C. Summary Judgment: The In re Williams Example.**

A recent decision from the Tenth Circuit Court of Appeals, In re Williams Securities Litigation, illustrates that a reliable event study is necessary to connect post-transaction stock movement to the defendant's fraud; absent an event study, a court will grant summary judgment for the defendant. [186] In Williams, a class of investors that purchased stock or notes issued by Williams Communications Group (WCG) brought a securities fraud class action alleging violations of Section 10(b) and Rule 10b-5. [187]

The Tenth Circuit affirmed the district court's grant of summary judgment in favor of the defendant because the plaintiffs' offered expert failed to conduct a "reliable" event study. [188]

1. The Rise and Fall of WCG: Fraudulent Spin-Offs?

Williams Companies, Inc. ("WMB") was an energy company that produced and transported natural gas. [189] As part of its business operations, WMB owned a large network of pipelines. [190] WMB transformed its decommissioned pipelines into a telecommunications subsidiary that later became known as WCG. [191]

***214** When WCG was formed in 1998, the NASDAQ U.S. Telecommunications Index ("Telecom Index") ended at 306.60, a forty-two percent increase from the previous year. [192] In 1999, the Telecom Index reached 616.80. [193] At this time, WCG conducted an IPO to raise capital for expansion. [194] The WCG 1999 IPO offered shares of common stock and high yield notes. [195] In March of 2000, WCG's share price peaked at $61.81 and the Telecom Index likewise peaked at 1248.06. [196] The amount raised from the IPO however, proved to be insufficient. When WCG updated its internal capital expenditure plans, it showed that capital expenditures would be almost a billion dollars higher than the previous year. [197]

By July 2000, WCG's stock price declined, falling more than fifty percent. [198] During this same period, the Telecom Index fell by twenty-eight. [199] At the end of July, WMB announced that it would spin-off WCG and make it a stand-alone company. [200] The plaintiffs alleged that WMB, WCG, and other corporate officers misrepresented the reasons for the spin-off, the prospects for WCG's survival, and the adequacy of WCG's capitalization. [201] For example, WMB issued a press release stating that the goal of the spin-off was to ensure effective and efficient access to capital to fuel growth, but private internal discussions within the WMB board indicated that WCG's growing capital needs were a drain on WMB's balance sheet. [202] The "gap" between the public representations and internal assessments continued until and after the spin-off in April 2001. [203]

Then, in January 2002, WMB issued a press release announcing that it would delay its 2001 earnings report pending an assessment of WMB's contingent obligations ***215** with respect to WCG. [204] Also that day, one of WCG's competitors wrote down $3.2 billion worth of assets, another competitor announced bankruptcy, and the plaintiffs' law firm of Milberg Weiss [205] filed suit against WCG. [206] WCG's stock fell from $1.63 to $1.34. [207] In February 2002, WCG announced to its lenders that it may default; the stock price fell from $1.42 to $1.00. [208] WCG then announced that it was considering Chapter 11 bankruptcy; the stock price fell to $0.22. [209] At the end of April 2002, WCG filed for bankruptcy; its stock bottomed out at $0.06 a share. [210]

The plaintiffs brought a securities fraud class action under Section 10(b) and Rule 10b-5 claiming that the defendants' statements painted a rosy view of WCG's future prospects when in reality, they were directly contrary to the situation: the reason for the spin-off was because WCG's future was in doubt. [211] The plaintiffs thus claimed that WCG's stock and note prices were artificially inflated.

2. The Plaintiffs' Expert and His Theories of Loss.

The plaintiffs offered expert testimony to link the stock price movement to the alleged fraud. [212] The defendants challenged the plaintiffs' expert with respect to materiality, market efficiency (reliance), loss causation, and damages. [213] But the district court found it necessary to only address the defendants' challenges relating to loss causation. [214] The plaintiffs' expert presented two scenarios in an attempt to demonstrate that the price decline was attributable (or linked) to the fraud: (1) a leakage theory; and (2) a corrective disclosure theory. [215] But because the plaintiffs could not produce an event study to the satisfaction of the court that linked the post-transaction price movement to the fraud, the Tenth Circuit ruled against the plaintiffs ***216** as a matter of law and granted summary judgment to the defendant. [216]

a. Scenario 1: The Leakage Theory.

PX347

First, in Scenario 1, the expert employed a leakage theory, which posited that the fraud was not revealed by a single corrective disclosure, but rather by a leakage of WCG's true financial condition during the class period.[217] In other words, losses were caused by the materialization of concealed risks.[218] Under Scenario 1, the plaintiffs' expert attributed ninety-eight-percent of WCG's value to fraud and claimed that almost the entire stock price decline was the result of the gradual revelation of this truth to the market.[219]

The district court rejected Scenario 1 for two reasons: (1) the expert failed to remove market and industry effects on the value of WCG stock and notes; and (2) the expert had not identified specific public disclosures that revealed the fraud.[220] The district court emphasized that there must be a showing of post-transaction price movement,[221] and that not only was an event study required, but that it had to link the culpable disclosure to the fraud rather than merely demonstrate that the stock reacted to an entire bundle of negative information.[222]

The Tenth Circuit agreed. The Tenth Circuit acknowledged that a leakage theory in itself does not run afoul of the Supreme Court's Dura decision.[223] Nevertheless, the Tenth Circuit required that the plaintiffs identify the ways in which the truth was revealed and how the market responded:

> To satisfy the requirements of Dura . . . any theory - even a leakage theory that posits a gradual exposure of the fraud rather than a full and immediate disclosure - will have to show some mechanism for how the truth was revealed. . . . A plaintiff cannot simply state that the market had learned the truth by a certain date, and ***217** because the learning was a gradual process, attribute all prior losses to the revelation of the fraud. The inability to point to a single corrective disclosure does not relieve the plaintiff of showing how the truth was revealed; he cannot say 'Well the market must have known.'[224]

More specifically, the Tenth Circuit rejected Scenario 1 because the expert failed to segregate the effects of company-specific and market- or industry-specific news, thus linking the fraud to the post-transaction decline.[225] The Tenth Circuit then intimated that had the plaintiffs offered a reliable event study, the result would have been different, stating:

> WCG's share price fell from $28.50 to $1.63 during that period, and while [the plaintiff's expert] could not explain how the market learned of the fraud over that year-and-a-half, he claimed that the decline must have resulted from its revelation and not from the 'tangle of factors' that affect a company's stock price - despite the fact that the same period witnessed the bankruptcies of WCG competitors, a decline in the telecommunications industry as a whole, and the overall market declines that followed the 9/11 terrorist attacks.[226]

The Tenth Circuit thus warned that the failure to show a causal connection between the fraud and the loss would turn the securities laws into "just the sort of broad insurance against market losses that Dura rejected."[227]

***218** b. Scenario 2: The Corrective Disclosure Theory.

The plaintiffs' expert's alternative second scenario ("Scenario 2"), fared no better. Under Scenario 2, the expert conducted a regression analysis, or event study, to connect the decline in value to four separate disclosures.[228] These disclosures were: (1) WMB's announcement that it was assessing its contingent obligations related to WGC; (2) WCG's informing lenders of the possibility of default; (3) WCG's statement that it was considering bankruptcy protection; and (4) WCG's announcement of bankruptcy.[229] The district court likewise rejected Scenario 2 because it failed to distinguish between declines attributable to disclosures of fraud and non-fraud related effects.[230] The district court stated that even though the plaintiffs' expert supported his testimony with a regression analysis, the testimony was unreliable because the expert failed to connect the alleged corrective disclosures to a specific price drop.[231] The Tenth Circuit likewise rejected Scenario 2 reasoning that the plaintiffs' expert failed to connect the price decline to any of the four disclosures.[232]


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

c. The Notes and the Absent Regression Analysis.

The district court's treatment of the plaintiffs' expert's event studies regarding the fraudulent notes is most telling. The plaintiffs' expert conducted an event study with respect to the sale of notes issued by WCG. Yet the district court flatly refused the plaintiffs' expert's testimony "because what [the plaintiffs' expert] calls an event study does not even purport to differentiate between forces related to the fraud and those not related to the fraud." [233] The district court stated, "[The expert] simply did not perform an event study with respect to the notes, and no assertion that 'yes, he found that note prices dropped on the disclosure dates can change that fact." [234] The district court aptly summarized its holding stating "[w]hat is required is an event study . . . ." [235] The issue surrounding the notes was not addressed by the Tenth Circuit.

3. The Procedural Posture: Summary Judgment.

Because the plaintiffs failed to offer a reliable event study (or an event study at all, with respect to the notes), the district court granted summary judgment in favor ***219** of all defendants. [236] In other words, as a matter of law, the plaintiffs could not prevail. The Tenth Circuit affirmed this decision. According to the Tenth Circuit, the plaintiffs had to link post-disclosure price movement to the defendant's fraud through an event study that sufficiently ruled out all other factors. [237]

As Williams demonstrates, because event studies can isolate the effect of each false announcement on the stock's price, the federal courts have held that event studies are a necessary device to prove loss causation, materiality, reliance or market efficiency, and damages. [238] Absent a reliable event study, a securities plaintiff's claim will likely fail.

**C. An Adequate Event Study May be Necessary and Sufficient.**

Nevertheless, while the absence of an event study is generally fatal to a plaintiff's securities fraud claim, the presence of one may serve to satisfy essential elements of securities fraud actions. [239] For instance, in In re Flag Telecom, the court found an expert's testimony admissible as to loss causation. [240] Using the testimony, the court traced when the expert employed an event study, identified material events, analyzed possible market indices and the most comparable companies in the specific industry, and used an integrated regression analysis to ultimately measure the effect of each event. [241] Additionally, a reliable event study can establish that a market was efficient and thus serve to invoke the fraud-on-the-market presumption of reliance that is usually vital to certifying a class. [242] To invoke the fraud-on-the-market presumption of reliance, the plaintiff must establish that the market was 'efficient.' [243] To establish an efficient market, the plaintiff must meet certain factors, [244] ***220** one of which is that the unexpected corporate events or financial releases caused an immediate response in the price of the security. [245] With the demonstration of the causal relationship, a court will easily presume that the market integrated the released information into its price. [246] According to the Second Circuit, "[a]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered prima facie evidence of the existence of such a causal relationship." [247] In addition, some courts hold by rote that if the plaintiffs offer an expert who conducts an event study as to market efficiency, the plaintiffs will have fulfilled the market efficiency requirement. [248]

**V. The Event Study Requirement Is Inconsistent With the Seventh Amendment.**

As shown above, the federal courts have made an event study an essential element of a securities fraud claim because they may serve to link subsequent price movement to the defendant's fraud. This event study requirement, however, is incompatible with the right of securities fraud plaintiffs to a trial by jury under the Seventh Amendment. A plaintiff seeking monetary damages under the anti-fraud provisions of the federal securities laws is entitled to a jury trial. [249] The event study requirement infringes on the Seventh Amendment jury trial right in two significant ways: (1) requiring an event study to establish essential elements of a securities fraud case removes quintessential factual determinations from the jury; and (2) the event study requirement allows the judge to usurp the jury's power to assess otherwise reliable expert analyses in reaching its factual determinations. These problems are compounded by the fact that event studies are not perfect science. As this Section shows, the results of event

PX347

studies are malleable to a large degree and thus, the results must be assessed by the factfinder and cannot be the basis for a determination as a matter of law.

### *221 A. Materiality, Reliance, Loss Causation, and Damages Are Quintessential Fact Questions.

Absent an event study, courts refuse to put a securities fraud case before a jury.[250] In essence, prohibiting a jury, absent an event study, from finding materiality, loss causation, or even damages, removes these factual determinations from the jury. Without an event study, a jury will never hear, nor decide these issues. This violates securities plaintiffs' right to have quintessential fact questions determined by the jury.

The Seventh Amendment provides that in suits at common law, the right to a trial by jury shall be preserved.[251] The right to a jury trial is not absolute.[252] Current Supreme Court Seventh Amendment jurisprudence requires only the preservation of the substance of the English common law jury trial as it existed in 1791.[253] In the English ***222** common law, juries decided only questions of fact and not questions of law.[254] Therefore, at present, questions of fact are reserved for the jury, not the court.[255] Issues of materiality, reliance and market efficiency, loss causation, and damages are quintessential fact questions for a jury to resolve. When the federal courts deny securities plaintiffs the opportunity to put their case before a jury because of the absence of an event study, the court invades the jury's exclusive role to determine quintessential fact questions.

1. A Jury Must Resolve Factual Determinations of Materiality, Reliance, Loss Causation, and Damages.

Materiality, reliance, loss causation, and damages are quintessential fact questions that must be resolved by the factfinder. The Supreme Court has consistently indicated that the jury function in securities litigation deserves more than flippant consideration. In TSC Industries v. Northway, Inc., where the Supreme Court defined materiality,[256] the Court stated that materiality could only be determined as a matter of law when the facts were not in dispute or no different inferences could be drawn from undisputed facts.[257] The TSC Court recognized that "the issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts."[258] But the Court qualified this broad pronouncement and delineated when materiality may be subject to summary judgment: "In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality."[259] Thus, a decision regarding materiality as a matter of law is only appropriate when the facts are undisputed. The Court reasoned that this is because "[t]he determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."[260] The Supreme Court affirmed this position in Basic v. Levinson, stating that courts would do well to recognize ***223** that materiality is inherently fact-specific and that courts should refrain from confining materiality to a formula or a specific fact or occurrence.[261] Therefore, according to the Supreme Court, the jury ought to determine whether the subject fraud is material--whether the information altered the total mix of information available to investors in such a way as to affect their investment decisions[262]--even if the plaintiff fails to offer an event study.

Similarly, the Supreme Court unequivocally stated in Basic v. Levinson that market efficiency or the fraud-on-the-market presumption of reliance is an issue to be determined by a jury.[263] Requiring plaintiffs to rule out other factors that may affect an efficient market is irreconcilable with Supreme Court precedent. The Court in Basic definitively established that the fraud-on-the-market presumption is rebuttable only at trial.[264] The Supreme Court stated:

> [I]f, despite petitioners' allegedly fraudulent attempt to manipulate market price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud.
>
> . . . We note there may be a certain incongruity between the assumption that Basic shares are traded on a well-developed, efficient, and information-hungry market, and the allegation that such a market could remain misinformed, and its valuation of Basic shares depressed . . . on the basis of the three public statements. Proof of

PX347

> that sort is a matter for trial, throughout which the District Court retains the authority to amend the certification order as may be appropriate.[265]

This statement implies that the defendant's burden of rebuttal to show that the market price was not affected by the misrepresentation is a matter for trial.[266] In other words, a defense of "non-reliance," or market inefficiency, should not be determined ***224** by the judge.[267]

Additionally, the Supreme Court's seminal loss causation decision, Dura Pharmaceuticals v. Broudo, is a case about pleadings.[268] While the Dura Court ultimately required a plaintiff to isolate the effect of all other factors and quantify the precise amount of the fraud with some specificity, Dura did not require the plaintiff to make this showing with experts armed with event studies at the pleading stage.[269] Neither did Dura suggest that the failure of a plaintiff's expert to isolate other factors with an event study is grounds for summary judgment. Rather, it is hornbook law that causation is generally a question of fact for the jury,[270] and Dura recognized this. Dura's citation to the Restatement (Second) of Torts suggests that proximate causation issues are issues of fact; issues not typically disposed of at the motion to dismiss or summary judgment stage.[271] Thus, decisions like Williams and Fener usurp the jury's function to determine fact questions regarding loss causation and market efficiency. For instance, in Williams, the plaintiffs' expert demonstrated that share prices fell as a result of fraud.[272] The Tenth Circuit rejected the plaintiffs' expert, though, because he failed to sufficiently rule out other factors.[273] The Fifth Circuit in Fener likewise disregarded the plaintiffs' expert because his event study failed to treat the press release as three separate disclosures.[274] To the extent other factors might explain this drop in value, however, they are to be introduced as part of a discrediting process at trial and not as a basis for dismissing the case at the summary judgment stage.[275]

To best illustrate how causation is a classic fact question for the jury, consider the following:

> Determining whether [the alleged fraud] is the but-for cause of [an adverse effect on stock price], then, requires postulating a likely ***225** course of events and asking whether [the negative effect on stock prices] would be likely to occur in the absence of [the alleged fraud]. Determining whether [the alleged fraud] is the proximate cause or legal cause of [the negative stock price effect] requires similar but more nuanced considerations. The decision maker must decide whether [the alleged fraud] is sufficiently extraordinary given the expected course of events to be designated a "cause" rather than a "condition" of [the negative stock price effect] for purposes of assigning fault. In their focus on the likely course of events, both questions of but-for cause and questions of proximate cause require probabilistic inferences about hypothetical conditions in the world - the events that were most likely to happen given the state of the world prior to the injury.[276]

Because materiality, reliance, and loss causation require probabilistic inferences, they lead to conjectural conclusions about the world, and hence to new knowledge, thus making them fact decisions reserved for the jury.[277] An event study seeks to determine what would have happened to the stock but-for the alleged fraud.[278] An assessment whether something would occur given some postulated set of circumstances is archetypal, inductive reasoning reserved for the fact-finding jury.[279]

2. Even a "Reasonableness" Standard is an Affront to the Jury's Role.

Even if courts couch the event study requirement as a finding that "no reasonable jury could find these elements absent a reliable event study," it is still an affront to the jury's role. Professor and noted Seventh Amendment scholar Suja A. Thomas has written extensively on Seventh Amendment implications involving procedural devices such as the motion to dismiss and the motion for summary judgment.[280] Her thesis--that both procedural devices as currently practiced are unconstitutional--is ***226** steadily gaining ground.[281] Professor Thomas maintains that the modern use of both summary judgment and the motion to dismiss in securities litigation is unconstitutional.[282] According to Thomas, the framework for determining the constitutionality of procedural devices in lieu of Seventh Amendment concerns is as follows: (1) under the common law, only the jury or the parties

PX347

determine the facts; (2) a court determines the sufficiency of the evidence only after a jury trial, and even then, if evidence is believed to be insufficient, the court orders a new trial; and (3) a jury decides a case with any evidence, however improbable.[283] The hallmark of her thesis is that the common law only allowed a judge to consider the sufficiency of the evidence after a jury trial and verdict.[284] Even a court considering only the reasonableness of inferences drawn from the evidence presented contravenes common law procedures, which require the judge to accept all allegations of the party as true, regardless of the improbability of those allegations.[285]

This view of the Seventh Amendment illustrates how the event study requirement is unconstitutional. In In re Williams, for example, the Tenth Circuit affirmed the district court's grant of summary judgment, reasoning that the plaintiffs "have failed to present evidence suggesting that the declines in price were the result of the revelation of the truth and not some other factor."[286] Yet the plaintiffs did in fact present a great deal of evidence showing the causal link between the price-decline and the revelation of the truth, including--but not limited to--the analysis of an expert whose qualifications were beyond challenge.[287] Nonetheless, the Tenth ***227** Circuit concluded that the jury should not be entitled to weigh that evidence because it did not include the judge's own preferred methodology - a statistical regression analysis. The plaintiffs in Fener likewise presented the defendant company's SEC Form 10-Ks for two years and SEC S-3 forms for ten years, historical stock price information, financial data, a chart of daily share price, and eventually expert testimony armed with an event study.[288] The Fifth Circuit, however, ruled that this evidence could not establish loss causation and denied class certification.[289] According to a proper reading of the Seventh Amendment, however, the jury must decide these facts. The judge could assess the sufficiency of the evidence only after a jury verdict; and then the judge could order a new trial. The plaintiffs' expert in Williams offered evidence on materiality, reliance, loss causation, and damages; the jury should have assessed that evidence, as improbable as it may have been in the Tenth Circuit's eyes.

**B. The Event Study Requirement Allows the Judge to Usurp the Jury's Power to Assess Otherwise Reliable Expert Analyses in Reaching its Factual Determinations.**

The event study requirement precludes the jury from assessing reliable expert testimony. The judge's decision to preclude the jury from assessing reliable expert testimony regarding factual issues also infringes on the Seventh Amendment by constituting an impermissible invasion of the jury's factfinding function in two discrete ways: (1) the judge precludes the jury from weighing competing expert opinions; and (2) the judge precludes the jury from discounting the testimony from otherwise reliable experts.

1. The Judge Precludes the Jury from Weighing Competing Expert Opinions.

An approach similar to Williams and Fener, where the court decides whether ***228** to believe the expert's testimony and preferences the defendant's expert over the plaintiff's, constitutes an impermissible invasion of the jury's factfinder function. A judge only determines whether the expert testimony can assist the trier of fact.[290] The jury determines which expert, if any, to believe.[291] In In re Williams, the court decided between two competing experts and found that as a matter of law, the plaintiffs' expert failed to demonstrate loss causation.[292] Similarly, in Oscar, the judged weighed competing expert reports both for and against the plaintiff, and then the court decided that the factual conclusion drawn by the plaintiff's expert was "untenable."[293] This occurred in Fener as well.[294] But which expert was correct - the plaintiffs' expert or the defendant's expert - is an issue for the jury, not the judge.[295] "The Court's role is not to determine whether [the expert's] testimony is correct, but rather whether it falls outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'"[296]

2. The Judge Precludes the Jury from Discounting the Testimony from Otherwise Reliable Experts.

Second, the jury ultimately decides whether to accept any expert testimony at all.[297] In In re Williams, the Tenth Circuit usurped the jury's role in evaluating the plaintiffs' expert opinion because the court dismissed the expert opinion for failure to include an event study that ruled out the effects of other market factors at the summary judgment stage.[298] This approach raises serious Seventh Amendment concerns. Whether the expert has ruled out the effects of other factors is a merit assessment that ***229** should be dealt with on cross-examination and rebuttal.[299] When a court, as the Tenth Circuit in Williams, requires that the

PX347

plaintiffs' expert rule out the effects of other factors, the court usurps the jury's function of determining facts. Professor Miller aptly describes the division between judge and jury with respect to expert witnesses:

> [Consider] the case of expert witnesses to fact. What is their function? It is just this, of judging facts. They are called in because they are men of skill and can interpret phenomena which other men cannot, or cannot safely interpret. . . . It is perfectly well settled in our law that such opinions or judgments are merely those of a witness, they are to aid the jury or the judge of fact, and not to bind them; the final judgment is for the jury, and unquestionably, the judgment is one of fact. [300]

The jury assesses the character of the expert, the expert's demeanor on the witness stand, the weight and process of the expert's reasoning, possible biases of the expert, and any other issues. In other words, evaluating an expert's testimony concerning issues such as materiality, reliance, loss causation, and damages falls within the jury's province to listen, weigh, accept, or reject expert testimony. [301] Professor Miller further explains:

> [t]here is a significant difference between allowing a judge to dispose of a case by applying a determinative legal principle to undisputed facts and allowing a judge to decide a factual issue because he or she believes the evidence allows only one conclusion. A judge always decides the former. As to the latter, if one or more facts are in dispute or different inferences may be drawn from undisputed facts, a jury should be allowed to find for either party. [302]

***230** This is the case with materiality, [303] loss causation, reliance, and damages--at best, different inferences can be drawn from undisputed facts. [304]

It has been suggested that requiring post-disclosure price movement is necessary because judges and juries cannot be trusted to sort out a misstatement's real financial fronts. [305] As an initial matter, our Constitution's framers and our nation's founders did not express such distrust of the jury system. [306] Moreover, by removing these kinds of cases from the jury's purview we may cause juror ignorance over these issues to persist. [307] Additionally, empirical studies refute the idea that jurors are incapable of grasping the nuances involved in complex cases. For example, empirical studies have found that there is no correlation between the complexity of a case and the likelihood of disagreement between a judge and jury as to the outcome. [308] Rather, empirical studies demonstrate that the case facts are the most important determinant of jury verdicts. [309] Moreover, to saddle a plaintiff with proving the generally indeterminable fact of what would have happened but for the omission or misrepresentation that skewed the market value of the stock would reduce the protection against fraud afforded by Section 10(b). [310]

### C. An Event Study Assists a Trier of Fact; It Does Not Replace It.

An event study must assist the trier of fact in reaching its ultimate conclusion; [311] an event study does not replace the trier of fact as the arbiter of ultimate issues. The jury must assess expert testimony based on an event study for two additional reasons: experts exercise substantial discretion in the process of conducting an event study which must be subject to the jury's review; and there is no magic talisman ***231** for what constitutes a correct event study under any given set of circumstances. [312] First, while there are general parameters within which an expert must exercise his discretion, an expert still exercises considerable discretion therein. For instance, the length of an event window can have a substantial effect on the amount of damages. While a general rule of thumb is that an event window should constitute three days, a different length does not automatically discredit the results of the event study. [313] A jury must decide whether to accept or reject the expert's discretion in this regard.

Second, determining a securities fraud action as a matter of law based on the absence or presence of an event study is flawed because an event study can be exploited in estimating what would have been the effect of the truth had it been told at the time it was covered up. [314] Thus, a jury must evaluate an event study and determine whether to accept or reject such expert evidence. For example, Esther Bruegger and Frederick C. Dunbar of NERA Economic Consulting insightfully demonstrate

PX347

how the standard event study in securities litigation is much more limited than is commonly accepted.[315] At best, according to Bruegger and Dunbar, the event study is a starting point, rather than a definitive resolution, and in some cases, it is unnecessary altogether.[316] Bruegger and Dunbar demonstrate that there often comes a point in event study analysis where arbitrary allocations are made by the experts.[317]

Bruegger and Dunbar isolate three conditions regarding a studied event that may affect event study reliability: (1) the presence of confounding information; (2) a buildup of inflation per share over the class period; and (3) allocating liability to codefendants.[318] First, as often occurs, the corrective disclosure which alerts the market to corporate fraud is contained in a news announcement that also contains material ***232** information unrelated to the alleged misrepresentation. This was the problem in Fener.[319] Factors other than the revelation of the fraud may simultaneously be affecting the stock price.[320] For instance, a defendant corporation may issue a press release in which it reveals the prior fraud, but also announces news favorable or unfavorable to the business wholly unrelated to the fraud. Therefore, the presence of confounding information in a studied event may skew reliability; a jury is required to weigh this evidence.

Next, there is the problem of a buildup of inflation per share. Usually defendants make a series of misrepresentations over time with the consequence that damages per share are increasing throughout the class period, but the corrective disclosure (or revelation of the truth) is not in a form that each distinct misrepresentation is corrected in an isolated and separate announcement.[321] An event study in this situation may overestimate or underestimate damages per share depending on whether confounding factors unrelated to the fraud have positive or negative effects on the stock price.[322]

Last, Bruegger and Dunbar note that in securities fraud cases different sets of codefendants are alleged to be responsible for different misrepresentations that are nonetheless revealed altogether in a solitary corrective disclosure.[323] According to Bruegger and Dunbar, an event study is usually of limited value in determining proportionate liability because the event study itself cannot distinguish between which part of a price decline is due to which defendant's fraud.[324] Thus, a factfinder must allocate liability and attribute price decline to the respective defendants.

Moreover, A.C. MacKinlay studied the power of the event study and concluded that the accuracy of the event study varies as the number of firms in the sample increase, as the number of days in the event window decrease, and as the alternative of a larger abnormal return is considered against a null hypothesis of zero abnormal return.[325] For example, MacKinlay finds that in a sample size of twenty-five companies, the probabilities of detecting an abnormal return (or an effect on the ***233** stock price) of 0.5%, 1% and 2% is 24%, 71% and 100% respectively.[326] But if the sample size is increased to 100 companies, the probabilities of detecting an abnormal return of 0.5%, 1%, and 2% is 71%, 94%, and 100% respectively.[327] Thus, there is significant difference in detecting an abnormal return, or effect on the stock price, depending on the size of the event study. Similarly, the power of an event study diminishes substantially as the event period is increased by just a single day.[328]

As shown, an event study is not perfect science. The adversary process must be used to mitigate the methodological concerns and gaps identified. Experts employed in litigation should highlight these methodological concerns and the jury must then assess and weigh such evidence.

### VI. The "Event Study" Element is Inconsistent with the Federal Securities Laws.

Apart from the Constitutional infirmities of treating an event study as an essential element of securities fraud claims, the event study requirement is inconsistent with the plain language of the federal securities laws. It is inconsistent with the language of the Private Securities Litigation Reform Act ("PSLRA"), the common law, and corporate finance theory. Moreover, requiring plaintiffs to produce an event study itself is inconsistent with the underlying purpose of the federal securities laws as it unjustifiably inhibits meritorious suits, weakening the integrity of our securities markets.

### A. The Federal Securities Laws Do Not Require a Post-Disclosure Decline as a Precondition to Recovery.

An event study as an essential element in securities fraud claims lacks support in the federal securities laws. Event studies should not be used as a round-about way to improperly require investors bringing securities fraud claims to prove that the defendants'

PX347

misrepresentations or omissions caused a post-transaction decline in the value of their investments. [329] Contrary to the Supreme Court's indication in Dura, such an approach is inconsistent with the federal securities laws. Moreover, the Private Securities Litigation Reform Act ("PSLRA") does not require that a plaintiff show that a defendant's conduct caused a post-transaction decline in the value of ***234** the plaintiff's investment. [330] This interpretation is required by the plain language of the statute, references to common law, and basic principles of corporate finance theory.

1. The Plain Language of the PSLRA Does Not Require A Post-Transaction Decline and Event Study.

The PSLRA specifically defines loss as the "loss for which the plaintiff seeks to recover damages." [331] Under the PSLRA, the plaintiff does not need to establish a causal link between the wrongdoing and any losses for which the plaintiffs do not seek to recover damages, let alone an event study establishing this. [332] Rather, the PSLRA has a defined recovery structure. First, under the PSLRA, the plaintiff must define the precise losses for which the plaintiff seeks damages. [333] Second, "[a]fter -- but only after --the losses for which [the] plaintiff seeks damages are defined with precision, can a determination be made regarding whether [the] plaintiff can establish a causal link between the defendants' challenged conduct and the losses." [334] The difference between the consideration paid by the plaintiffs and the consideration that they would have paid had the alleged misrepresentations not been made is a "loss" recoverable under the PSLRA; these losses are called "out-of-pocket losses." [335] For example, where the plaintiff purchases a security for $100 a share, but would have ***235** paid only $60 had the alleged misrepresentation not been made, the $40 difference is a loss recoverable under the PSLRA.

The plaintiff must establish a causal link to these out-of-pocket losses. Prior to Dura, the Supreme Court, federal courts, and Congress repeatedly declared that securities plaintiffs could recover these out-of-pocket losses. [336] If the plaintiff sought to recover out-of-pocket losses, the plaintiff needed only to establish a causal connection to this precise loss and the defendant's misrepresentation. [337] The plaintiff only needed to show that the defendant's misrepresentations caused a quantifiable artificiality in the purchase price, calculated as of the purchase date. [338] The plaintiff did not need to establish a causal link to the defendant's misrepresentation and any post-transaction decline in value. [339] While a post-transaction decline may serve as evidence of out-of-pocket losses, the post-transaction decline is not in and of itself an out-of-pocket loss. [340]

2. The Common Law Distinguishes Between Out-of-Pocket Losses and Losses Resulting from a Post-Transaction Decline.

This interpretation is also supported by the common law of fraud. [341] Under the common law of fraud, a plaintiff could recover both direct damages and consequential damages. [342] Consequential damages are damages the plaintiff seeks in addition to the direct damages from a fraudulent transaction. [343] Consequential damages were recoverable if, but only if, the plaintiff can establish that these consequential ***236** damages are related to the misrepresentation. [344] The concept of direct and consequential damages easily translates to securities fraud claims: (1) direct damages consist of the out-of-pocket loss suffered by the plaintiff; and (2) consequential damages consist of any post-transaction decline in value in the plaintiff's investment. [345] Therefore, under the common law of fraud, the plaintiff could recover his out-of-pocket loss as a direct damage of the fraud without any showing that the misrepresentation caused additional consequential damage, or post-transaction decline. [346] For example, where the plaintiff purchased a security for $100 a share, but would have paid only $60 but for the misrepresentation, the $40 difference is a loss recoverable under the PSLRA; they are direct out-of-pocket damages as a result of the defendant's fraud. If the stock price declines by $10 because of disclosure of the fraud, that additional $10 decline would represent consequential damages.

3. Corporate Finance Theory Dictates that an Event Study Need Not Link a Post-Transaction Decline to the Defendant's Fraudulent Conduct to Demonstrate Loss.

Corporate finance theory also dictates that economic loss can occur because of a purchase of stock at an artificially inflated price. [347] Requiring an event study that connects fraud to a post-transaction decline relies on an incoherent concept of economic loss because it fails to acknowledge that an investor who purchases securities at an artificially inflated price and resells those securities has suffered a loss simply through his initial purchase at the inflated price. [348]

PX347

> ***237** Under basic principles of corporate finance theory, the market price (the transaction price) of a security reflects the market's estimation of the company's future cash flow, discounted to the present at the company's cost of capital. Where a company falsely represents its present or past financial performance the market will use this information as an indicator of the company's future cash flows. If the purchasers of securities have purchased at a price that reflects expectations of future cash flow that have been artificially inflated by the defendant's fraud, the purchasers have suffered a recognizable loss. That economic loss is recognizable because the investors have purchased securities at a price which falsely inflated their expectations of the company's future cash flow. The loss exists even if there has been no subsequent corrective disclosure of the fraud followed by a decline in price. [349]

The attorneys who represented the plaintiffs before the Supreme Court in Dura similarly explain how stock price decline is not a necessary condition for establishing loss causation in fraud-on-the-market cases:

> Market valuations are based upon expected future cash flows discounted by the cost of capital. These cash flows are commonly referred to as discounted cash flows. Open market frauds commonly manipulate stock market price increases by artificially raising cash flow expectations. Conversely, cash-flow expectations just as easily can be lowered to reduce fraud-induced inflation without any overt disclosure of the fraud by defendants issuing further statements - true or false - that on their face may or may not appear to be directly related to the original fraud. [350]

Basic corporate finance principles dictate that a stock price is a reflection of the market's estimation of the company's future cash flows, discounted back to the ***238** present at the company's cost of capital. [351] Therefore, a plaintiff investor can suffer a loss even if the stock never declines below the purchase price or if it declines before the corrective disclosure. [352] "Under sound principles of corporate finance, where expectations of future cash flow have been artificially inflated because of fraud, then the resulting stock price also is artificially inflated by fraud . . . . [I]f the plaintiff can demonstrate that he or she overpaid for the stock as a result of the fraud, and the price of the stock declined as a result of an explicit (or implicit) disclosure of diminished further cash flow expectations, such a showing would be sufficient . . . even if the share price decline was prior to any explicit disclosure . . . ." [353] There need not be a post-transaction price drop for a plaintiff to suffer loss: inflating the price at the time of purchase reduces an investment's expected future rate of return at the time of purchase, causes an economic loss of the time value of the money associated with the inflationary purchase, and reduces the quality of the investment and increases the risk of loss associated with it. [354] Moreover, academic finance literature indicates that securities prices often incorporate new information before it is formally announced. [355] For example, prices may decline on rumors of insider trading before a formal release and disclosures of varying credibility may gradually become public throughout a lengthy period. [356] Scott D. Hakala, often a testifying expert in securities litigation, lucidly explains how an inflationary loss can occur regardless of the disclosure of bad news:

> [S]uppose an investor buys a share of stock for $100 and the company discloses a significant restatement one month later such that the share price falls from $100 to $50 on the corrective disclosure. We would all presumably agree that loss causation exists and the loss is $50 in this simple case. Suppose however, a month after the corrective disclosure, the company loses a major lawsuit and files for bankruptcy before the investor sells the share, with the value of ***239** the shares falling to zero. The investor has suffered a $100 investment loss, of which $50 is the inflationary loss in this example.
>
> . . . However, rearrange the order of the events in this example such that the news of the adverse legal decision follows one month after the purchase of the share and the share price falls to zero upon the filing of bankruptcy. Then the company discloses a month after the bankruptcy that it had committed fraud and needed to restate its prior financial reports. Applying the principles underlying the out-of-pocket theory of loss previously stated, the investor suffered a $100 investment loss and $50 inflationary loss.

> . . . Regardless of the timing of the two events following the fraud-induced inflation in the purchase price, the investor is in identically the same position at the end. Clearly, $50 of the $100 investment loss was solely caused by the fraud, in that, had the fraud not existed and the transaction still occurred the investor would have avoided $50 of the $100 loss. [357]

Regardless of the timing of the disclosure, the investor suffered inflationary loss.

Thus, requiring an event study that connects a post-transaction decline in stock price to the alleged fraud to establish a securities fraud claim is unsupported by the federal securities laws, common law concepts of recoverable loss, and corporate finance principles of economic loss. A plaintiff can suffer loss even absent a post-disclosure price movement.

**B. Requiring an Event Study Imposes an Unjustified Barrier to Meritorious Securities Fraud Claims.**

Besides lacking a textual basis, the event study requirement is inconsistent with the underlying purposes of the federal securities laws. As evidenced by the Supreme Court's recent Stoneridge decision, a policy justification in securities case law is exceedingly important. [358] Heightened pleading and evidentiary standards in securities laws are premised on the assumption that securities claims are frivolous, inefficient, and abusive [359] and that they present an in terrorem threat of settlement. [360] In ***240** fact, the Supreme Court's Dura decision--the catalyst for the event study requirement--sought to prevent a plaintiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence." [361] As this Subpart shows, however, the event study requirement--which is nothing short of a heightened pleading and evidentiary standard--lacks any legitimate policy objective. Rather, it inflicts serious harm on meritorious securities fraud actions.

1. The Fictional Underpinnings of the Event Study Requirement.

The event study requirement lacks policy support. The assumed harm averted by the event study requirement is illusory. The prevention of in terrorem securities fraud settlements is too weak in theory and in fact to justify a heightened pleading and evidentiary burden. As this Subpart shows, the in terrorem concept is illogical and concerns about abusive discovery do not warrant an event study requirement.

a. The In Terrorem Concept Is Illogical.

The in terrorem concept suffers from logical deficiencies. To complain that ***241** defendants are forced into settlement ignores the well-settled principle that the law favors settlement of merited claims. [362] Those that presume the frivolity of securities class actions generally argue that such actions force defendants in terrorem into settlement. If the action is not frivolous, but is merited, [363] the defendants' entering into a settlement is a good thing. [364] Settlement compensates the injured party, spares both parties litigation costs, and promotes judicial economy. [365] The main problem with the in terrorem policy concern is that it is inapplicable where a claim has merit. [366]

In addition, whether a claim is "frivolous" is an untestable rhetorical assertion ***242** insufficient to deny investors a remedy for harmful conduct. [367] Proponents of securities reform claim that securities actions cost millions of dollars in unnecessary legal expenses, and often are settled without regard to the merits solely to avoid the expense and risks of defending "frivolous" suits. [368] These claims, however, are based more on rhetoric than on empirical proof. [369] Additionally, there is the logistical problem that there is little substantial means by which to respond to the mantra that 'most securities class actions have little merit,' [370] as defendants require plaintiffs to enter into strict confidentiality agreements before engaging in document production and to return or destroy all documents on the closing of a case. [371] Thus, plaintiffs' attorneys are generally unable to respond to vague public attacks on the validity of securities fraud suits by pointing to specific evidence of uncovered fraud. [372]

PX347

b. Abusive Discovery Concerns Are Insufficient to Justify an Event Study Analysis.

Hand in hand with the in terrorem criticism is the concern that excessive and abusive discovery puts a gun to the head of corporate defendants and forces them to settle regardless of the merit of a claim.[373] Yet concerns about expensive securities class discovery do not warrant an event study requirement on the part of plaintiffs. As this Section shows, discovery abuse in general is not as rampant as the misperception of its abuse is. Moreover, discovery abuse is a two-way street: both plaintiffs ***243** and defendants impose costs and use discovery as a pressure tool. Additionally, discovery promotes merits resolution. Finally, and most important, requiring an event study actually increases securities litigation costs.

i. Discovery Abuse is Misperceived.

First, there is widespread sentiment that discovery is abusive and high discovery costs force defendants to settle.[374] This misperception is particularly acute in securities class action litigation.[375] Empirical research about discovery in civil litigation, however, has yielded results that differ from this conventional wisdom.[376] In other words, the concern about abusive discovery practices rests on prevailing sentiments that discovery is excessive and abusive rather than on actual hard data.[377] "Most studies measuring the incidence of discovery survey only opinions, impressions, ***244** or billable hours."[378] The Columbia Field Project study, the first major study into the actual effects of discovery practice, found that there was no widespread failing in the scope or availability of discovery.[379] Likewise, a 1978 study by the Federal Judicial Center found that in fifty-three percent of cases no discovery was requested at all, and fewer than five percent of these cases had more than ten discovery requests.[380] The Federal Judicial Center study also found that in seventy-two percent of the cases, there were no more than two discovery requests.[381] Similarly, a study by the National Center for State Courts found that only forty-two percent of the cases in the sample group conducted discovery.[382] Empirical data suggests that a majority of ordinary cases involve no discovery and that the majority of the cases that do conduct discovery generally involve only two discovery requests. Thus, abusive discovery is not widespread; rather what is widespread is the misperception that discovery is excessive and abusive.[383]

Admittedly securities class action litigation suffers, on average, from a higher incidence of discovery.[384] But securities class actions alone do not suffer from this higher incidence of discovery.[385] For example, intellectual property cases, trade regulation claims, tort claims, admiralty claims, contract cases, and antitrust cases all suffer from a higher volume of discovery.[386] In all larger and more complex cases discovery is used more extensively and intensively and thus consumes a dominant percentage of litigation resources.[387] Thus, more extensive and intensive discovery in ***245** higher stakes litigation may explain any existence of a higher incidence of discovery abuse.[388] In higher stakes litigation, there tends to be more involvement in the discovery process, i.e., privileges are invoked more frequently and clients play a more active role in discovery matters.[389] In other words, the higher incidence of discovery problems in larger class actions does not imply that more problems are likely to occur.[390] Instead, a high incidence of discovery problems for larger cases may just indicate that there is plainly more discovery in those cases.[391] And notably, a high incidence of discovery in all complex cases does not justify a heightened pleading or evidentiary standard for securities class actions alone.

Even if discovery data emerges finding that securities actions abound with high discovery costs more so than any other complex litigation, high discovery costs are to be expected in securities class actions which claim millions of dollars in investor losses. Discovery costs are proportional to both parties' needs and the stakes in the case.[392] One study found, quite intuitively, that the size of monetary stakes in the case had the strongest relationship to the total litigation costs more so than any other studied characteristic.[393] Litigation in general, not just securities fraud class actions, is an interactive investment process, which is influenced by actual and anticipated expenditures of both the litigant and his opponent.[394] The high costs of securities litigation ***246** are not attributable to frivolous litigation or abusive discovery, but rather this symbiotic relationship.

ii. Both Plaintiffs and Defendants Are Prone to Discovery Abuse.

PX347

Second, even if discovery abuse is prevalent, this two-edged criticism does not justify an event study requirement for plaintiffs alone. Courts have imposed barriers on plaintiffs because of discovery concerns, but "[d]efendant's attorneys (58%) were more likely than plaintiff's attorneys (42%) to report that they had no problems [with disclosure or discovery in their case]." [395] Consequently, plaintiffs have more problems with discovery than defendants. Also, discovery problems come from both sides. Defendants can assert that plaintiffs will use discovery as a club to impose costs on defendants just as easily as plaintiffs can assert that defendants use 'dump-truck' and warehouse discovery responses as methods of overwhelming the plaintiffs. [396] As one commentator explained:

> While companies claim that frivolous litigations result in unnecessary defense costs, what they fail to acknowledge is that frivolous defenses to valid claims have perhaps an even greater impact on the costs and delay inherent in litigation. Defense firms universally choose to file substantial motions to dismiss or for summary judgment, even for cases which clearly satisfy the pleading standards with valid underlying claims. Defense attorneys also oppose class certification even in the most routine situations and usually attempt to delay or stymie legitimate discovery efforts. As a result, cases involving even the most obvious frauds take years to litigate and often result in settlements below what investors should, in all fairness, receive. In response to the argument that plaintiffs' firms file frivolous suits in order to 'extort' settlements, it can just as easily be asserted that defendants delay litigation and file frivolous defenses in order to force plaintiffs to accept low settlements. [397]

In addition to the fact that discovery abuse is likely to occur on both sides of the fence, there is some indication that a lengthened discovery process will actually benefit defendants. For example, studies find that "[d]iscovery is not cost-effective for ***247** all parties. . . . [F]or plaintiffs, increased lawyer time spent on discovery was associated with decreased measures of success. . . . [D]iscovery is less profitable for plaintiffs. The more days plaintiffs spent in recovery, the lower their recovery relative to expectations." [398]

Another interesting paradox with the in terrorem and abusive discovery argument is that discovery studies find that cases with more discovery are actually less likely to settle. [399] The number of days spent in discovery was associated with both increases in the number of disagreements between sides concerning factual and legal issues and lower proportions of cases settling before trial. Cases where neither side engaged in discovery settled out of court in ninety-seven percent of cases. [400] Thus, it is inconsistent to claim that high discovery costs force defendants to settle when, in reality, higher incidences of discovery meant the parties were actually less likely to settle.

iii. Discovery Promotes Merits Resolution.

Third, discovery plays an important role in the litigation drama. There is no dispute that defendants incur substantial costs defending against securities actions. But the issue is not whether these defendants would have saved money by avoiding litigation expenses as they obviously could have. [401] "The real question is whether the benefits of a system that can adequately deter fraud outweigh the benefits of a system that discourages both frivolous and meritorious fraud suits." [402] "Discovery is designed to promote resolution of cases on the merits. Neither defendants nor plaintiffs could adequately assess the strength of their own claim or their opponent's claim ***248** absent discovery requests." [403] And neither can the court adequately assess the strength of the claims absent discovery. Full access to evidence through open discovery ends trial by ambush and promotes settlement. [404] Discovery is designed to facilitate a resolution on the merits.

iv. The Event Study Requirement Increases Discovery Costs.

Last, requiring an event study increases securities litigation costs. Expert discovery is the second most costly type of discovery. [405] If courts require securities plaintiffs to expend more time and money on the case by procuring event studies, plaintiffs will require greater settlements to recoup their costs. [406] An event study requirement precludes parties from entering into agreements to forgo costly types of discovery, such as expert discovery. [407] Additionally, in describing the two main sources of dissatisfaction with the use of expert witnesses, Judge Posner states that a battle of the experts creates added costs without any added benefits:

PX347

> First, because the experts are paid by the respective parties, it is feared that they are partisans of whoever hired them ("hired guns") rather than being disinterested, and hence presumptively truthful, witnesses. This of course does not distinguish them sharply from a number of other types of witness, notably the parties themselves . . . But, second, it is feared that expert witnesses can mislead judges and juries more readily than lay witnesses can because they are more difficult to pick apart on cross-examination; they can hide behind an impenetrable expertise expressed in an unintelligible jargon. A subordinate concern, though closely related to the concern with intelligibility, is that opposing experts often simply cancel each other out. The expected outcome is unaffected, and so the use of the experts creates costs without any benefits. [408]

***249** By mandating an event study, the federal courts impose a considerable cost on the parties, increasing the overall cost of securities litigation.

2. An Event Study Requirement Inflicts Significant Harm on Meritorious Actions.

Not only does the event study requirement serve illusory ends, but it also impedes meritorious actions unnecessarily. [409] As this Part shows, requiring post-transaction declines for securities fraud actions enables savvy defendants to conceal fraudulent conduct. Moreover, securities class actions serve the convenience of the parties, encourage efficient judicial administration, [410] and promote the market's integrity by supplementing otherwise deficient SEC enforcement. Also, private securities class actions compensate harmed investors, providing a much needed remedy when there has been a wrong. Last, it is important to note that increased securities trials may actually serve to lower securities litigation costs.

a. Letting the Air out of the Inflation Balloon: Requiring Post-Transaction Decline Enables Concealment of Fraud.

Requiring that plaintiffs offer an event study that links post-transaction price decline to the defendant's fraudulent conduct provides a ready tool with which defendants can conceal fraud. Because the plaintiffs must link the disclosure of the fraud to a drop in the stock price, sophisticated defendants can release information in such a way that their fraud will be revealed to the market through innocuous appearing announcements, and only then when the fraudulent information has been fully corrected in the market price, announce that a fraud occurred. [411] "If plaintiffs must establish that the defendants' fraud caused a post-disclosure price correction, then a savvy entity could escape liability for its fraud that clearly harmed investors." [412] Indeed, ***250** this was the exact allegation in a recent securities fraud case before the Eighth Circuit Court of Appeals in In re Ceridian. [413] In In re Ceridian, the plaintiffs alleged that the defendant corporation announced that it was restating its financial statements five times over two years and that it calibrated the restatements to "leak this information in bits and pieces to walk the stock price down, thereby avoiding the catastrophic impact of a single cumulative disclosure of massive accounting violations." [414]

Additionally, in cases of clear fraud, if the stock price substantially declines prior to a formal announcement of fraud, leaving little room for further decline after the fraud is announced, plaintiffs suffering from legitimate harm have no remedy. [415] An event study requirement assumes that "undisclosed fraud [is] an ordinary market risk that investors are expected to bear. This logic is entirely contrary to the purpose of the federal securities law--to prevent that particular risk from entering into the marketplace in the first instance." [416] As the Supreme Court in Basic stated, "a fundamental purpose of the various Securities Acts was to substitute a philosophy of full disclosure for a philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." [417]

b. Private Actions Supplement Otherwise Deficient SEC Actions.

Additionally, private causes of action for securities fraud serve two vital functions as they relate to the Securities and Exchange Commission ("SEC"): (1) they supplement enforcement efforts; and (2) they ensure against agency capture by the industry. [418]

PX347

First, private causes of action supplement the SEC's securities regulation enforcement power. [419] Private and public enforcement is complementary: both securities ***251** plaintiffs' attorneys and the SEC seek to recover damages on behalf of investors for violations of the securities laws. [420] Private securities class actions have been justified as a necessary supplement to SEC enforcement because the SEC cannot monitor the nation's markets alone. [421] Congress has recognized this through its enactment of the PSLRA. [422]

Moreover, the SEC, as a government organization, is limited by other bureaucratic ***252** barriers absent from private enforcement. [423] Until recently, bureaucratic constraints caused SEC investigations and subpoenas to logjam. [424] An additional vice of public enforcement-- absent from private attorneys general--is that the SEC as an enforcement agency has been hampered with inadequate funding. [425] The SEC is annually appropriated and apportioned, subjecting it to political pressures virtually year round. [426] As one SEC Commissioner noted: "In the last few years, the Enforcement Division of the SEC has been coping with less staff and fewer resources. This is clearly not what has been needed in a time of deregulation and clearly not what Congress had in mind when it enacted Sarbanes-Oxley." [427] Indeed, by 2006, SEC staff turnover was at its highest level in five years and the number of attorneys in well-staffed enforcement groups dwindled. [428] From 2005 to 2008, the total number of attorneys able to investigate fraud cases decreased by ten percent. [429] The SEC's budget allocation has been relatively flat from 2005 to 2008 as well. [430] A stagnant SEC budget has had severe consequences. [431] Compare the SEC's budget with that of the FDIC's:

> With often less than $900 million in hand and approximately ***253** 3,500 staff, the SEC is tasked with regulating tens of thousands of entities including public companies, investment advisers, broker-dealers, transfer agents, exchanges, credit rating agencies, and several SROs. . . . [T]he FDIC has a staff of 5,000 to oversee 8,300 FDIC insured banks with a budget in the range from $1.2 to $2.2 billion dollars. Moreover, the FDIC is independently funded and thus, has control over its own budget and long term projects. [432]

In 2009 SEC Commissioners acknowledged that the SEC has been disempowered and the focus of the SEC has been on cases with little market reach. [433] As a result, private enforcement fills this gap. A recent study from NERA Economic Consulting indicates that this is precisely what happens: "[M]ost SEC settlements do not parallel shareholder class actions. In 2007, only 22% of SEC settlements were with public companies or their employees and related to misstatements, and were therefore closely comparable to shareholder class actions." [434] Thus, where public enforcement stops, private enforcement picks up, providing holistic regulation of the securities markets.

Aside from bureaucratic barriers, there now exists some support for the tentative hypothesis that SEC officials may not engage in truly impartial enforcement; in other words, there is evidence of agency capture. [435] For example, a recent study concludes that the SEC pursues broker-dealer violations by initiating administrative proceedings as opposed to civil lawsuits to avoid courts because they are a worse forum ***254** for finance professionals. [436] In addition, in administrative cases, the study concludes that for the same violation and comparable levels of harm to investors, big firms and their employees are less likely to receive a ban from the securities industry when compared to small firms and their employees. [437] The study then discredits the possibility that these enforcement disparities can be explained by the arguably better compliance systems larger firms have in place by finding that small and big firm violations for failing to supervise subordinates were virtually indistinguishable. [438] Last, the study connects the enforcement disparity to post-SEC career trajectories of agency officials. [439] As a result, the study concludes that SEC officials may be responding to future employment prospects by giving prospective employers favorable treatment. [440]

The public/private partnership that has evolved contributes to a more comprehensive enforcement of the securities laws. [441] Corporate officials will have a strong desire to avoid accusations of fraud, even if they come only in the form of a private securities lawsuit. [442] Thus, private securities class actions empower an otherwise impotent class of harmed investors that may have been lost in the bureaucratic shuffle or self-serving aims of SEC officials. [443]

c. Securities Class Actions Compensate Investor-Plaintiffs.


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Private securities class actions supplement SEC enforcement, while also compensating injured investors. "With more investment opportunities available including increasingly complex financial products, and more investors relying on managers and other intermediaries, the need for honesty and integrity is greater than ever. Investor confidence has been badly shaken, and we need to reestablish stability by returning to the bedrock principle that the capital markets should be known for ***255** their integrity and honesty."[444] Yet "a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action."[445] As Justice Stevens has recognized, plaintiffs wronged in the market should have a remedy.[446] A recent news report claims that securities class-action plaintiffs claim that they have lost as much as $856 billion dollars.[447]

Despite these astounding losses, scholars criticize securities class actions, claiming that they serve no valid compensatory function.[448] The seminal criticism of securities fraud class actions claims that active traders with diversified portfolios are as likely to be on the gaining side of a transaction tainted by securities fraud as on the losing side.[449] In other words, as often as an investor loses five dollars on account of fraud, that same investor is just as likely to gain five dollars on account of fraud. Thus, under this portfolio theory diversified investors have no expected net losses from fraud because their expected losses will match their expected gains.[450] However, ***256** as Professor Alicia Davis Evans ascertains, "securities fraud can cause substantial injury to investors of all types. Compensation, therefore, is justified to make those investors whole."[451] Professor Evans first establishes that there is a fundamental asymmetry from a market's reaction to fraudulent announcements.[452] For gains and losses to be equivalent over time, according to Evans, an investor must find himself on the winning side of fraud-tainted trades more, by dollar volume, than the investor finds himself on the losing side because losses of investors on the losing side of trades tainted by fraud likely exceed the gains of the investors on the winning side of these trades.[453] An oversimplified explanation of Evans's assertion would be as follows: Gains from fraud-tainted trades amount to only five dollars, but losses from fraud-tainted transactions amount to ten dollars. Thus, for gains to equal losses, there must be twice as many fraud-tainted gains to offset the fraud-tainted losses.

Second, according to Evans, even large, diversified investors are not immune to this asymmetry and can suffer substantial losses.[454] Evans explains that the findings from a 2005 U.S. Chamber of Commerce Institute for Legal Reform indicate that it is possible for gains and losses to be significantly different for even large, diversified investors.[455] Moreover, even if a diversified institutional investor could come out ahead, at a minimum, this does not apply to the initial public offering and merger-and-acquisition contexts.[456] Third, Evans clarifies that even losses of buy-and-hold investors are likely to exceed any gains from fraud because one must sell stocks with prices that are inflated by fraud as often as one buys stocks with prices that are inflated by fraud.[457] Last, Evans notes that the portfolio theory only applies to diversified ***257** investors and that undiversified investors can suffer substantial harm from securities fraud.[458] Thus, concluding that there is an ascertainable wrong, there ought to be a remedy.[459]

Further, Congress has indicated that securities actions serve a compensatory purpose. In 2002, Congress enacted Section 308 of Sarbanes-Oxley ("SOX"), or the "Fair Fund Provision."[460] The Fair Fund Provision established a system whereby the SEC could distribute funds recovered from civil penalties for federal securities law violations.[461] The Fair Fund Provision has been used as a flagstaff for the business community's campaign against private actions; because the SEC can collect funds for injured investors, private litigation is unnecessary.[462] The presence of this Fair Fund Provision, however, actually aids the argument for private enforcement. The presence ***258** of this Fair Fund Provision indicates Congress's recognition that plaintiffs do indeed suffer damages and that securities actions serve a compensatory function. If securities actions did not compensate investors, this Fair Fund Provision of SOX would be just as futile and detrimental as private recovery. The Fair Fund Provision provides an emphatic "yes" to whether compensating investors is ever a worthwhile goal. This, taken together with the above assertion that private enforcement supplements otherwise deficient SEC actions, establishes a compelling compensatory basis for private securities fraud actions.[463]

d. Additional Securities Fraud Suits Will Not Inevitably Result in a Flood of Expensive Suits.


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Last, it is important to address the concern that absent heightened pleading and evidentiary requirements, such as the event study requirement, too many securities fraud actions will proceed to trial. Yet an increase in securities fraud trials and a proper interpretation of summary judgment - the one offered by Professor Thomas--would not result in the hyperbolic parade of horribles.[464] Professor Thomas notes that summary judgment is used in a limited set of cases and the presence or absence of summary judgment would not affect litigants' desire to settle.[465] The absence of the rigorous summary judgment standard currently in place may encourage settlement to remove the possibility of outlier jury verdicts from trials.[466] Yet there is a particular concern in securities cases that any procedural standard which is less than rigorous would encourage plaintiffs to file more cases with weak evidence. Thus, the absence of the current summary judgment device would lead to more frivolous claims. But the absence of summary judgment for securities actions in particular would not result in a deluge of meritless claims and excessive jury verdicts. Currently, more securities class actions are dismissed at the motion to dismiss stage.[467] The majority of remaining cases settles before getting to the summary judgment stage.[468] ***259** In other words, on a purely quantitative basis, the presence or absence of summary judgment will not have a significant effect.

Additionally, the absence of summary judgment may actually lower securities litigation and settlement costs. First, refusing summary judgment frees significant judicial resources.[469] The courts will no longer have to review evidence presented on motions for summary judgment and litigants will no longer have to go through the expense of preparing a motion for summary judgment. Second, by encouraging securities fraud actions to go to trial, settlement amounts may lower on average. In a recent article by Tom Baker and Sean J. Griffith, the authors insightfully demonstrate how additional verdicts can result in lower settlements.[470] Consider the following:

Current securities fraud settlements are based on available insurance coverage.[471]

Insurance policies cover expected losses, which in turn are based on predicted jury verdicts.

Additional securities verdicts resulting in findings for the defendants, or just lower than sought after damages, would add additional lower figures upon which insurers can base their coverage policies.[472]

Less available insurance coverage would translate into lower securities fraud settlements.

In other words, additional data--findings for the defendant or low verdicts-- can lower sought after damages. But because so few securities fraud lawsuits actually result in a verdict,[473] there is little data upon which to gauge the likelihood of ***260** success of an action.[474] The lack of securities fraud trials “skew[s] the process of settlement by which most cases have ended and continue to end. [The] loss is disorienting for lawyers seeking to value and settle cases: without trials we would have a context suffused with legal uncertainty because the disputing parties' assessment of both the merit and magnitude of their case would correspond only coincidentally.”[475] Thus, as of now, securities settlements and available insurance coverage may overestimate a securities plaintiff's true likelihood of recovery. Additional verdicts may set a lower benchmark for securities class action settlements. Therefore, additional securities fraud trials may lower securities litigation costs.

**VII. Conclusion.**

A reliable event study is now the crux of a securities fraud action. A reliable event study can demonstrate a material disparity, reliance on the market price, and economic loss and loss causation by subsequent price movement. The essential elements of a securities fraud claim have been folded into a single question: whether the plaintiff has offered a reliable event study. A plaintiff who fails to put forth an event study analysis by a qualified expert has little chance of success. Perhaps seduced by the illusion of certainty created by a statistical regression analysis, the federal courts have begun to bar victims of securities fraud from pursuing otherwise valid claims if they cannot produce this analysis before trial. As demonstrated by this Article, however, this event study requirement poses considerable Seventh Amendment concerns and is inconsistent with the federal securities laws. The requirement undoubtedly will preclude juries from assessing the proper measure of damages to award to the victims of securities fraud who have otherwise proven each of the essential elements of their securities fraud claims. It serves illusory aims at the expense of inhibiting merited securities claims.

PX347

## Footnotes

a1 Professor of Law and Associate Dean for Academic Affairs at Loyola University Chicago School of Law.

aa1 Staff law clerk for the United States Court of Appeals for the Seventh Circuit; J.D. Loyola University Chicago School of Law, May 2009.

1 This could just be further evidence of the federal courts' continuing hostility to the private Rule 10b-5 action. See, e.g., Joanne Doroshow, Gordon Gekko Justice Makes a Comeback, 132 Recorder 56 (Mar. 21, 2008) (arguing the Supreme Court in Stoneridge ushered in an era of "Gordon Gekko justice" whereby shareholders are more vulnerable and the integrity of American markets more exposed than in decades); Michael J. Kaufman & John M. Wunderlich, Congress, the Supreme Court, and the Proper Role of Confidential Informants in Securities Fraud Litigation, 36 Sec. Reg. L.J. 345, 354-57 (2008) (arguing that the federal courts have unjustifiably heightened the pleading standard for confidential informants in securities litigation making private recovery more difficult); Charles W. Murdock, Sarbanes-Oxley, Corporate Corruption, and the Complicity of Courts and Legislatures, 6 Berkeley Bus. L.J. (forthcoming 2009) (arguing Congress and the Supreme Court have been complicit in fraud from the late 1970s by gradually rescinding investor protections or outright enacting investor-hostile procedures); Matthew L. Mustokoff, Fraud Not on the Market: Rebutting the Presumption of Classwide Reliance Twenty Years After Basic Inc v. Levinson, 4 Hastings Bus. L.J. 225, 226 (2008) (stating, "In a wave of recent decisions, the courts have made it tougher for plaintiffs to demonstrate that a particular security trades in an efficient market for purposes of triggering the classwide presumption of reliance.... [A principal reason for this is that] the courts have interpreted Federal Rule of Civil Procedure 23 ... more stringently in recent years."); Samuel H. Rudman, Oscar: Misinterpretation of the Fraud-on-the-Market Theory, 240 N.Y.L.J. 3 (July 17, 2008) (stating that two recent federal court decisions are in direct conflict with controlling Supreme Court precedent and erroneously create a new class certification requirement by placing a burden on plaintiffs to prove the merits of their case before trial)..

2 Throughout this Article, the terms "event study," "regression analysis," and "event study analysis" will be used interchangeably. Event studies are used in a variety of other litigation settings outside of securities fraud cases.

3 See infra Part II (discussing requirements to admit an event study as evidence and what constitutes a "reliable" event study).

4 See infra Part III (discussing the elements of materiality, reliance in fraud-on-the-market cases, loss causation, and damages).

5 See infra Part IV (demonstrating how the federal courts have dismissed a securities fraud action absent a reliable event study).

6 See infra Part V (stating that the event study requirement takes factual determinations from the jury and also usurps the jury's function to preference competing experts).

7 See infra Part VI (showing that the securities laws do not require a post-transaction price decline or an event study for that matter; and that such a requirement unnecessarily impedes meritorious securities class actions).

8 Joseph W. Martini et al., The Need for Expert Testimony in Complex Securities Cases, Jurors Might Require Extra Help, 34 Conn. L. Trib. 20 (May 26, 2008).

PX347

9 Id.

10 See, e.g., Mark L. Mitchell & Jeffry M. Netter, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, 49 Bus. Law. 545, 545-46 (1994).

11 Sanjai Bhagat & Roberta Romano, Event Studies and the Law: Part II: Empirical Studies of Corporate Law, 4 Am. L. & Econ. Rev. 380 (2002).

12 See, e.g., Elaine Buckberg & Frederick Dunbar, Disgorgement: Punitive Demands and Remedial Offers, 63 Bus. Law. 347, 362 (2008) (stating that in securities litigation courts widely accept event studies); Madge S. Thorsen et al., Rediscovering the Economics of Loss Causation, 6 J. Bus. & Sec. L. 93 (2006) (describing the event study as the "gold standard" accepted by courts and economists).

13 See infra Part II.A.

14 See infra Part II.B.

15 Fed. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.").

16 Fed. R. Evid. 702. The standard is intended to be generous. Christopher B. Mueller & Laird C. Kirkpatrick, Evidence Under the Rules 603 (5th ed. 2004).

17 Fed. R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs theirprejudicial effect.").

18 Daubert v. Merrill Dow Pharm. Inc., 509 U.S. 579, 593-94 (1993); Mueller & Kirkpatrick, supra note 16, at 620. Whether an expert's scientific data is admissible only arises after it is established that the individual whose testimony is being offered is an expert in the particular field. In re Apollo Group, Inc., Sec. Litig., 527 F. Supp. 2d 957, 960 (D. Ariz. 2007).

19 Daubert, 509 U.S. at 593-94; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999) (extending Daubert to all expert testimony presenting technical or specialized material).

20 Michael J. Kaufman, The PSLRA's Damages Formula and Experts, in 26 Sec. Litig. Damages § 3:14.50 (Thomson/West 2008).

21 Morgan v. United Parcel Serv. of Am. Inc., 380 F.3d 459 (8th Cir. 2004) (stating that a regression analysis is subject to Daubert for expert scientific testimony); Tracinda Corp. v. DaimlerChrysler AG, 362 F. Supp. 2d 487, 494 (D. Del. 2005) (stating expert testimony was admissible under Daubert where experts employed standard regression analysis). "The Ninth Circuit has approved the use of regression analyses as 'common statistical tool[s].'" In re Apollo Group,

PX347

Inc., Sec. Litig., 527 F. Supp. 2d 957, 963 (D. Ariz. 2007) (quoting E.E.O.C. v. Gen. Tel. Co. of Nw., Inc., 885 F.3d 575, 577 n.3 (9th Cir. 1989)).

22 Michael J. Kaufman, Event Studies, in 26 Securities Litigation: Damages § 25:B (Thomson/West 2008) ("An event study combines principles of finance (e.g. what factors influence a company's stock price or the extent to which a company's stock price incorporates all publicly available information) with principles of statistics (e.g., collecting and analyzing data and identifying, isolating, and quantifying numerous variables that may account for the resulting pattern of data).").

23 Mitchell & Netter, supra note 10, at 557.

24 Basic v. Levinson, 485 U.S. 224, 245-47 (1989).

25 Mitchell & Netter, supra note 10, at 557.

26 Id. Studies support this hypothesis, showing that stock prices react quickly to the arrival of new information, often within a matter of seconds. Id.

27 This is generally the most important part of the event study methodology. It is not left up to the experts conducting the event study. Rather, the event is determined by the plaintiffs' attorneys. Linda Allen, Meeting Daubert Standards in Calculating Damages for Shareholder Class Action Litigation, 62 Bus. Law. 955, 958 (2007).

28 Mitchell & Netter, supra note 10, at 557.

29 Sanjai Bhagat & Roberta Romano, Event Studies and the Law: Part I: Technique and Corporate Litigation, 4 Am. L. & Econ. Rev. 141, 144 (2002).

30 Bhagat & Romano, Event Studies Part I, supra note 29, at 144. The Wall Street Journal Index, Lexis-Nexis, and Thompson Financial Securities Data are increasingly used as popular sources for announcement dates. Id. Some events may have several event dates or several announcement dates, i.e., through a leakage theory. Id. at 145.

31 David Tabak & Frederick Dunbar, Materiality and Magnitude: Event Studies in the Courtroom 7 (NERA Working Paper No. 34, (Apr. 1999), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=166408.

32 Tabak & Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, supra note 31 at 7.

33 Allen, supra note 27, at 958; see U.S. v. Ferguson, 584 F. Supp. 2d 447, 453 (D. Conn. 2008) (stating that an event study was not justified because the event window was too long).

34 Tabak & Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, supra note 31 at 8.

35 Allen, supra note 27, at 958; see also Janet Cooper Alexander, The Value of Bad News in Securities Class Actions, 41 UCLA L. Rev. 1421, 1435 (1994).

36 Mitchell & Netter, supra note 10, at 560.

PX347

37 In re Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1348 (N.D. Cal. 1994). To isolate the effect of market forces and industry factors, an event study will employ a comparative index model:

R = a + bMR + cMR = e

Where:

R = the return on the stock (i.e., its movement for each day in question)

a = "alpha"; the constant return on the stock regardless of market or industry forces (generally presumed to be zero)

b = "beta"; the percentage of linear correlation between the return of the stock price of a company and the return of the market, measured by an index. Indices include the S&P 500 Index for example. The beta is multiplied by the market return (MR).

c = the percentage of linear correlation between the return of the stock price of a company and the average return on the stock of a peer group (similar industry) measured by an index. This is multiplied by the industry return (IR).

e = "epsilon"; the error term of the regression.

Kaufman, Event Studies, supra note 22.

38 William O. Fisher, Does the Efficient Market Theory Help Us Do Justice in a Time of Madness?, 54 Emory L.J. 843, 872 (2005).

39 Mitchell & Netter, supra note 10, at 560.

40 Id.

41 Allen, supra note 27, at 957.

42 Tabak & Dunbar, supra note 31, at 9. Generally, an estimation window is placed slightly before the event window so it covers a "clean" period untainted by any fraud that may have affected the stock price. Id. Where multiple events are studied, the estimation window may encompass the event windows. Id.

43 Id. at 10.

44 Id. at 11.

45 Id.

46 David Tabak, NERA, **Making Assessments About Materiality Less Subjective Through** the **Use of Content Analysis** 694 (2007), http://www.nera.com/image/PUB_Tabak_Content_Analysis_SEC1646-FINAL.pdf. An event study is most useful in determining the effects of new information on security prices when: (1) there is a well-defined public disclosure or announcement; (2) the time that the news item reaches the market is known; (3) there is no reason to believe that the market anticipated the news item; and (4) it is possible to isolate the effect of the news item from market, industry, and other issuer-specific factors simultaneously affecting the price. Id.

47 Securities Exchange Act § 10, 15 U.S.C. §78j (1934) ("It shall be unlawful for any person ... to sue or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device in contravention of such

PX347

rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.").

48 17 C.F.R. § 240.10b-5. The Rule 10b-5 action is an implied right of action. See, e.g., Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196 (1976); Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 13 n.9 (1971). The availability of a Rule 10b-5 action is now beyond doubt because of legislative acquiescence, judicial consensus, and the test of time. Michael J. Kaufman, Conclusion, in 26A Sec. Litig. Damages §29:1 (Thomson/West 2009).

49 17 C.F.R. § 240.10b-5.

50 Scienter is a mental state embracing intent to deceive, manipulate, or defraud. Ernst & Ernst, 425 U.S. at 185 n.1. Currently, there are three different ways to establish scienter: (1) plaintiffs can state a claim by pleading either (a) motive and opportunity or (b) strong circumstantial evidence of recklessness or conscious misbehavior, Novak v. Kasaks, 216 F.3d 300, 309-10 (2d Cir. 2000), (2) plaintiffs can state a claim by pleading facts showing (a) simple recklessness or (b) a motive to commit fraud and opportunity, In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999), and (3) plaintiffs can state a claim by pleading enough facts that establish altogether a strong inference of scienter. see, e.g., Ottmann v. Hangar Orthopedic Group, Inc., 353 F.3d 338, 345 (4th Cir. 2003); Helwig v. Vencor, Inc., 251 F.3d 540, 550-52 (6th Cir. 2000). Scienter also must be established with a "strong inference." 15 U.S.C. § 78u-4(b)(2) (2009). The Supreme Court recently clarified that this strong inference requirement mandates a holistic assessment whereby courts weigh both culpable and nonculpable inferences on a Rule 12(b)(6) motion. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323-24 (2007).

51 Dura Pharm. Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

52 Allen, supra note 27, at 957.

53 Fisher, supra note 38, at 847; Mitchell & Netter, supra note 10, at 547-50.

54 TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 445 (1976). "Whether information is material ... depends on other information already available to the market; unless the statement 'significantly altered the total mix of information' available, it will not be considered material." In re Sprint Corp. Sec. Litig., 232 F. Supp. 2d 1193, 1215 (D. Kan. 2002).

55 Frederick C. Dunbar & Dana Heller, Fraud on the Market Meets Behavioral Finance, 31 Del. J. Corp. L. 455, 468 (2006).

56 Id. at 467.

57 TSC Indus. Inc., 426 U.S. at 445.

58 Tabak & Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, supra note 31, at 3. Puffing is a concept related to materiality. Soft "puffing" statements generally lack materiality because the market price of a share is not inflated by vague statements. John C. Coffee et al., Securities Regulation 984 (10th ed. 2007).

59 Gen. Elec. Co. v. Jackson, 595 F. Supp. 2d 8, 23-24 (D.D.C. 2009) (stating that a regression analysis is an acceptable method of demonstrating the effect of an event on stock price); In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003).

60 Dunbar & Heller, Fraud on the Market Meets Behavioral Finance, supra note 55, at 468.

PX347

61 In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock."); Dunbar & Heller, supra note 55, at 468.

62 Michael J. Kaufman, Materiality, in Expert Witnesses: Securities Cases §2:23 (Thomson/West 2008).

63 Peter B. Frank et al., Litigation Services Handbook: The Role of the Accountant as Expert Witness 167 (1990).

64 Stoneridge Inv. Partners v. Scientific-Atlanta, Inc. 552 U.S. 148, 159 (2008).

65 Id. (citing Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972) (presuming fraud where there is an omission and a duty to disclose) and Basic, Inc. v. Levinson, 485 U.S. 224 (1988) (presuming fraud under the fraud-on-the-market presumption)).

66 Basic, Inc., 485 U.S. at 241-42.

67 Jonathan Eisenberg, Beyond the Basics, Seventy-Five Defenses Securities Litigators Need to Know, 62 Bus. Law. 1281, 1323 (2007).

68 Richard A. Posner, Economic Analysis of Law 459 (6th ed. 2003).

69 Whether a market is an "efficient" market depends on certain factors including: (1) the average trading volume; (2) the number of securities analysts following the stock; (3) the number of market makers; (3) whether a company is entitled to file a registration statement for trading; and (5) certain evidence of a cause and effect relationship between news and stock-price changes. In re Nature's Sunshine Prods. Inc., Sec. Litig., No. 2:06-CV-267-TS, 2008 WL 436588, at *6 (D. Utah Sept. 25, 2008).

70 Oscar Private Equity Invs. v. Allegiance, 487 F.3d 261, 264 (5th Cir. 2007).

71 Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). It was codified as an element in the Private Securities Litigation Reform Act ("PSLRA"). 15 U.S.C. § 78u-4(b)(4). Loss causation has been called ungainly, exotic, confusing, and even unhappy. Michael J. Kaufman, Loss Causation: Exposing a Fraud on Securities Law Jurisprudence, 24 Ind. L. Rev. 357, 357 (1991). The very first court to employ the term "loss causation" accorded it relative insignificance. Id. at 360. Since its inception, loss causation has proven to be a muddied and misunderstood element, leading some to advocate for its outright abandonment. Id. at 359.

72 Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981).

73 Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 616 (S.D.N.Y. 2008).

74 Dura Pharm., Inc., 544 U.S. at 342-43. Justice Breyer delivered the opinion of a unanimous court. Id. at 337.

75 The term "economic loss" however does not appear in the PSLRA as an element of loss causation.

76 Dura Pharm., Inc., 544 U.S. at 343.

PX347

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

77 Michael J. Kaufman, Loss Causation, in Expert Witnesses: Securities Cases, §1:26 (Thomson/West 2008).

78 Courts do not hesitate to dismiss a claim where the plaintiff fails to prove damages. See, e.g., Law v. Medco Research, Inc., 113 F.3d 781, 786-87 (7th Cir. 1997); Bass v. Janney Montgomery Scott, Inc., 152 F. App'x 456, 459 (6th Cir. 2005).

79 Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972).

80 Eisenberg, supra note 67, at 1302.

81 Michael J. Kaufman, The PSLRA's Damages Formula and Experts, in 26 Securities Litigation: Damages § 3:14.50 (Thomson/West 2008).

82 Michael J. Kaufman, Damages, in Expert Witnesses: Securities Cases, § 1:27 (Thomson/West 2008).

83 An event study looks to how the price of the stock changed after the fraud was disclosed, but only as evidence of the amount by which it was inflated prior to disclosure. Allen, supra note 27, at 956. The "true value" concept is derived from Judge Sneed of the United States Court of Appeals for the Ninth Circuit in a concurring opinion in Green v. Occidental Petroleum Corp., where Judge Sneed stated that the best way to measure the loss proximately caused by the defendant's fraudulent conduct is to create a chart containing a "price line" and a "value line.," and then subtracting the true value of the stock on the date of purchase from the price actually paid. In re Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1346-47 (N.D. Cal. 1994); Jay W. Eisenhofer et al., Securities Fraud, Stock Price Valuation, and Loss Causation: Toward a Corporate Finance-Based Theory of Loss Causation, 59 Bus. Law. 1419, 1425 (2004).

84 Allen, supra note 27, at 956. See generally Jeffrey M. Goldman, Avoiding Blurred Lines: The Computation of Damages in Rule 10b-5 Securities Class Action Lawsuits in the Ninth Circuit and a Proposal for a More Sensible System, 2 Hastings Bus. L.J. 261 (2006).

85 Michael J. Kaufman, Expert Testimony, 26 Securities Litigation Damages § 24:7 (Thomson/West 2007); see, e.g., In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003); In re Oracle Sec. Litig., 829 F. Supp. 1176 (N.D. Cal. 1993); see also Allen, supra note 27, at 957-65 (discussing computing share price inflation using event studies).

86 Eisenberg, supra note 67, at 1300 (citing Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 478-79 (4th Cir. 2006)); see also Thorsen, supra note 12 ("In the immediate aftermath, courts started focusing on the nature and extent of 'corrective disclosures,' with an emphasis on the nature, size, and immediacy of stock price drops.") (emphasis added).

87 A corrective disclosure is an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful, and complete version of those statements. In re Vivendi Univ., S.A. Sec. Litig., 605 F. Supp. 2d 586, 598 (S.D.N.Y. 2009). The federal courts currently disagree over the extent to which this corrective disclosure must "reveal" the fraud. Some courts require that a corrective disclosure identify which prior representation is being corrected. See, e.g., In re Dell Sec. Litig., 591 F. Supp. 2d 877, 907-08 (W.D. Tex. 2008); In re Odyssey Health Care Inc. Sec. Litig., 424 F. Supp. 2d 880 n.4 (N.D. Tex. 2005). Other courts permit a corrective disclosure to be more indirect, including downwards earnings guidance by the company, reporting of financial statements in public filings, newspaper articles, announcements by a short-seller, and even in the form of a credit ratings downgrade. Matthew L. Fry, Pleading and Proving Loss Causation in Fraud-on-the-Market Based Securities Suits Post-Dura Pharmaceuticals, 36 Sec. Reg. L.J. 3 (2008); see also In re Vivendi Univ., S.A. Sec. Litig., 605 F. Supp. 2d at 598.

88 Arnold S. Jacobs, Objective Definition of Materiality - An Analysis of the Tests - Anticipated Change, in Market Price, in Disclosure and Remedies Under the Securities Laws § 12:34 (2009).

89 Jacobs, supra note 88, at § 12:34.

90 In re Merck & Co. Sec. Litig., 432 F.3d 261, 269 (3d Cir. 2005).

91 Id. at 263-64.

92 Id. at 264.

93 Id.

94 Id.

95 Id. at 268. Specifically, the Third Circuit stated that establishing materiality is the first step for a Section 10(b) claim. Id. (emphasis added). Section 10(b) and Rule 10b-5's concept of materiality, however, is the same throughout the various securities regulations. Thomas Lee Hazen, the Law of Securities Regulation 284 n.3 (5th ed. 2005).

96 In re Merck & Co. Sec. Litig., 432 F.3d at 269 (internal citations and quotations omitted).

97 Id. at 269-70.

98 See, e.g., In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir. 1989); Steiner v. Medquist, Inc., No. 04-5487 (JBS), 2006 WL 2827740, at *8 (D.N.J. Sept. 29, 2006); In re Home Health Corp. of Am. Inc. Sec. Litig., No. CIV A. 98-834, 1999 WL 78057, at *7 (E.D. Pa. Jan. 29.1999); In re Gaming Lottery Sec. Litig., No. 96 CIV 5567, 1998 WL 276177, at *7 n.10 (S.D.N.Y. May 29, 1998); Voit v. Wonderware Corp., 977 F. Supp. 363, 369 (E.D. Pa. 1997); Marksman Partners, L.P. v. Chantal Pharm. Corp. 927 F. Supp. 1297, 1306 (C.D. Cal. 1996); Jaroslewicz v. Engelhard Corp., 704 F. Supp. 1296, 1305 (D.N.J. 1989); see also David Tabak & Marcia Kramer Mayer, **Making Assessments About Materiality Less Subjective Through** the **Use of Content Analysis**, PLI Order No. 11072, at 693 (Sept. 2007).

99 Oscar Private Equity Invs. v. Allegiance Telecom Inc., 487 F.3d 261 (5th Cir. 2007).

100 Id. The Oscar decision has been heavily criticized, see Rudman, supra note 1, at 3 (stating that Oscar is in direct conflict with controlling Supreme Court precedent and erroneously creates a new certification requirement by placing a burden on plaintiffs to prove the merits of their case before trial), but it has been recently reaffirmed by the Fifth Circuit. Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 228 (5th Cir. 2009) (per curiam) and Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 412 (5th Cir. 2009).

101 Oscar Private Equity Invs., 487 F.3d at 262.

102 Id. at 263.

PX347

103 Id. Not only had Allegiance restated its installed-line count, it missed analysts' earnings per share expectations, and announced greater losses than analysts expected. Id. Allegiance missed its revenue covenants which put its credit lines in default, ultimately forcing Allegiance into bankruptcy. Id.

104 Id.

105 Id. at 262.

106 Id. at 263.

107 Id.

108 Id.

109 Id.

110 Id.

111 Id. at 262. The dissent characterized the majority's holding as a “breathtaking revision of securities class action procedure that eviscerates Basic's fraud-on-the-market presumption, creates a split from other circuits by requiring mini-trials on the merits of cases at the class certification stage, and effectively overrules legitimately binding circuit precedent.” Id. at 272 (Dennis, J., dissenting).

112 Id. at 262.

113 Id. at 265 (emphasis in original); but see In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 483 (2d Cir. 2008) (rejecting this “actually moved” language).

114 Oscar Private Equity Invs., 487 F.3d at 265, 269. The Oscar decision erroneously conflates reliance and loss causation. As Professor Michael J. Kaufman has noted, reliance is independent of loss causation. Michael J. Kaufman, At a Loss: Congress, The Supreme Court and Causation under the Federal Securities Laws, 2 N.Y.U. J.L. & Bus. 1, 37 (2005). Professor Kaufman states:

[R]eliance - even in a fraud-on-the-market case - is distinct from the element of loss causation. The Court in Basic declared that plaintiffs must also demonstrate the requisite causal connection between a defendant's misrepresentation and the plaintiff's injury. The causal connection required is that the defendants' misstatements or omissions created a quantifiable disparity between the transaction price and the true value of the securities on the date of the transaction. That particular causal connection can be broken by defendants by showing that the market price would not have been affected by their misrepresentations. Reliance requires proof that defendants' misrepresentations or omissions influenced plaintiff's' decision whether to invest at all. As developed by the Supreme Court in Basic, and as ultimately codified by Congress in the PSLRA, loss causation is proof that these misrepresentations or omissions created a measurable difference between the price which plaintiffs actually paid for their securities and the price that they would have paid in the absence of those misrepresentations or omissions.

Id. at 38. (internal citations and quotations omitted).

PX347

115 Oscar Private Equity Invs., 487 F.3d at 266. The Fifth Circuit's Oscar decision is evidence of the unjustified judicial creation of Rule 23 trials in securities fraud litigation. See Michael J. Kaufman & John M. Wunderlich, The Unjustified Judicial Creation of Rule 23 Trials in Securities Fraud Litigation, 43 U. Mich. J.L. Reform 331-34 (2010).

116 Oscar Private Equity Invs., 487 F.3d at 266.

117 Id. at 270. The majority found the evidence to be little more than well-informed speculation. Id. at 271. The plaintiff's expert, according to the majority, offered only raw opinion of the defendant's expert's analysis without a supporting study of the market at issue. Id. The dissent characterized the court's review as de novo, as opposed to abuse of discretion, and thus improper. Id. at 272 (Dennis, J., dissenting).

118 "Causation and damage rules are intertwined." Dane A. Holbrook, Measuring and Limiting Recovery Under Rule 10b-5: Optimizing Loss Causation and Damages in Securities Fraud Litigation, 39 Tex. J. Bus. 215, 226 (2003). Addressing the loss causation issue necessarily includes addressing the measure of damages in a Rule 10b-5 suit. Id.

Generally, securities damages must be proven with expert testimony coupled with a valid event study. Compare Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59 (D.D.C. 2008) (stating damages are an element of securities fraud that plaintiffs must prove only by expert testimony) and In re Sunbeam Sec. Litig., 176 F. Supp. 2d 1323 (S.D. Fla. 2001) (requiring expert testimony to establish damages) and In re Warner Commc'ns Sec. Litig., 618 F. Supp. 735 (S.D.N.Y. 1985) and In re Gen. Instrument Sec. Litig., 209 F. Supp. 2d 423 (E.D. Pa. 2001) with Wortley v. Camplin, 333 F.3d 284 (1st Cir. 2003) (stating that while expert testimony may be helpful, it is not required in every category of federal securities fraud case). "Many courts have found an event study is necessary for proof of damages in a securities fraud claim." Tabak, supra note 46, at 694; Holbrook, supra note 118, at 233-34.

119 See In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 511 (S.D.N.Y. 2009).

120 15 U.S.C. § 78u-4(b)(4).

121 Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005) (Breyer, J.).

122 Michael J. Kaufman, Pleading and Proving Loss Causation, 26A Sec. Litig. Damages §24:2:60 (Thomson/West 2009) (citing cases stating that loss causation requires post-transaction price movement); see also Metzler Invs. GMBH, v. Corinthian Coll., Inc., 540 F.3d 1049, 1063 (9th Cir. 2008); McCabe v. Ernst & Young, LLP, 494 F.2d 418, 426 (3d Cir. 2007); In re Impax Labs., Sec. Litig., No. C 04-04802, 2008 WL 1766943, at *3 (N.D. Cal. Apr. 17, 2008). Even before the Dura decision securities cases ... addressing the concept of 'loss causation' ... deviated from the basic principles of corporate finance. In particular certain courts and commentators have concluded that a stock drop following the disclosure of fraudulent activity is essential to establish loss causation, and hence, is a sine qua non for a plaintiff to prevail on the merits and ultimately recover damages. Eisenhofer, supra note 83, at 1425.

123 Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 479 (4th Cir. 2006).

124 Id. at 476.

125 The plaintiffs alleged Enzo exaggerated or made misstatements about its pre-clinical and clinical trials, its stealth vector, and its patent estate among other things. Id.

126 Id.

PX347

127 Id.

128 Glaser, 464 F.3d at 479; see also Catogas v. Cyberonics, Inc., 292 F. App'x 311, 316 (5th Cir. 2008) (holding plaintiffs failed to establish loss causation where even though statements revealed fraud and thus constituted corrective disclosures, the statements did not significantly effect the stock price).

129 Glaser, 464 F.3d at 479.

130 Id. at 478-79.

131 Ray v. Citigroup Global Mkts, Inc., 482 F.3d 991, 995 (7th Cir. 2007).

132 Id. at 992-93

133 Id. at 993.

134 Id.

135 Id. Citigroup is a global financial services firm. Id.

136 Such corporations included Microsoft, Swisscom, Qualcomm, Verizon Wireless, IBM, and Citigroup. Ray, 482 F.3d at 993.

137 SSOL had problems with its contracts with GoAmerica, Hutchison, Telecom, and Sunday Telecommunications. Id.

138 Id.

139 Id.

140 Id.

141 Id.

142 Id. at 994.

143 Id.

144 Id. at 995 (internal quotations and citations omitted and emphasis added). However, the Court left open the possibility that “risk-free” assurances may no longer survive Dura. Id. at 996. The lower federal courts have since adhered to Ray's three ways to allege loss causation. See In re Northfield Labs., Inc., Sec. Litig., No. 06-C-1493, 2008 WL 4372743, at *5 (N.D. Ill. Sept. 23, 2008).

145 Ray, 482 F.3d at 995.

PX347

146 Id.

147 Id.

148 Id. at 995-96. Last, the court dismissed the “risk free” concept because statements like “it was a certain money winner” made “against a backdrop of public available information suggesting that ... [it was] a volatile stock,” do not amount to assertions that the stock was risk free. Id. at 996.

149 See also Robbins v. Koger Properties, 116 F.3d 1441 (11th Cir. 1997) (holding that the plaintiffs failed to establish loss causation where there was disclosure after the stock price already declined); In re Warnaco Group Sec. Litig., 288 F. Supp. 2d 307, 317 (S.D.N.Y. 2005) (holding the same).

150 Eckstein v. Balcor Film Invs., 58 F.3d 1162, 1170 (7th Cir. 1995); In re Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1357 (N.D. Cal. 1994); In re Verifone Sec. Litig., 784 F. Supp. 1471, 1479 (N.D. Cal. 1994); Alon Brav & J.B. Heaton, Market Indeterminacy, 28 J. Corp. L. 517, 536 (2003) (stating that courts often dismiss cases where the plaintiff fails to offer an event study).

151 See supra Part III.

152 See Fisher, supra note 38, at 881 (2005) (citing numerous courts that have denied plaintiffs' experts because of failure to conduct or produce an event study).

153 See infra Part IV.B and Part IV.C.

154 Nicholas I. Crew et al., Federal Securities Acts and Areas of Expert Analysis, in § 18 Litigation Services Handbook: The Role of the Financial Expert 18 (Roman L. Weil et al., 2007). Compare In re Executive Telecard Ltd., Sec. Litig., 979 F. Supp. 2d 1021 (S.D.N.Y. 1997) (refusing to admit expert testimony in securities litigation because expert failed to conduct an event study) with Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59, 87-88 (D.D.C. 2008) (denying summary judgment to the defendant as to loss causation and damages where the plaintiff offered an expert who conducted an event study analyzing abnormal return and other indicators f efficient markets).

155 In re Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1368 (N.D. Cal. 1994). A problem with this approach, however, is that the relative resources of the parties in a given case could determine whose expert event study prevails. Cf. Samuel W. Buell, Reforming Punishment of Financial Reporting Fraud, 28 Cardozo L. Rev. 1611, 1633 (2007).

156 In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 461 (S.D.N.Y. 2000).

157 Dunbar & Heller, supra note 55, at 468 (citing cases); see also DeMarco v. Lehman Bros., 222 F.R.D. 243, 247-49 (S.D.N.Y. 2004) (denying class certification because the plaintiff's expert's conclusion on the materiality of a securities analyst's recommendations were ‘facially unreliable’ and ‘plainly irrelevant’ in the absence of an event study); Lynn A. Stout, The Mechanisms of Market Inefficiency: An Introduction to the New Finance, 28 J. Corp. L. 635, 652 (2003) (event studies are used to determine whether a statement or omission was material).

158 Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 310-11 (5th Cir. 2005); see also Ray v. Citigroup Global Mkts, Inc., 482 F.3d 991, 995 (7th Cir. 2007) (“There is no evidence from the record from which a jury could conclude that the drop in the value of the ... shares was attributable somehow to ... [the] alleged misrepresentations. The defendants introduced expert

PX347

evidence that SSOL lost its value because of market forces, and the plaintiffs have offered nothing to rebut that theory - no expert testimony suggesting that the collapse was caused by the lack of the fraudulently promised contracts ....").

159 Dunbar & Heller, supra note 55, at 469-71; see also Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 265 n.22 (5th Cir. 2007); Freeland, 545 F. Supp. 2d at 81 ("[D]amages are an element of a securities fraud claim which Plaintiffs must prove, and that can be done only by expert testimony."); Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("[P]roof of damages in a securities fraud case is always difficult and requires expert testimony."); In re Warner Commc'ns Sec. Litig., 618 F. Supp. 735, 744 (S.D.N.Y. 1985) ("[E]xpert testimony would be needed to fix not only the amount, but existence, of actual damages.").

160 See Oscar Private Equity Invs., 487 F.3d at 265 n.22; Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 409 (5th Cir. 2009). The Fifth Circuit stopped short of insisting on only event studies to establish loss causation. Oscar Private Equity Invs., 487 at 271. The Fener court was not so ambiguous however: "Although analyst reports and stock prices are helpful in any inquiry, the testimony of an expert - along with some kind of analytical research or event study - is required to show loss causation." Fener, 579 F.3d at 409.

161 See Freeland, 545 F. Supp. 2d at 81 (granting summary judgment for defendants where plaintiffs sought to establish damages based on lay opinion evidence).

162 Id. (citing Behrens v. Wometco Enters. Inc., 118 F.R.D. 534, 542 (S.D. Fla. 1988)).

163 In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003); see also In re N. Telecom Sec. Litig., 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000); In re Executive Telecard, Ltd., Sec. Litig., 979 F. Supp. 1021, 1024-26 (S.D.N.Y. 1997); In re Oracle Sec. Litig., 829 F. Supp. 1176, 1181 (N.D. Cal. 1993); Eisenhofer, supra note 83, at 1426; Stout, supra note 151, at 652 (stating event studies are necessary to determine damages)..

164 Tabak, supra note 46, at 693. "The actual effect of each false statement on a stock's price, as it fluctuated to incorporate new information within its efficient market, is often tested by an 'event study.'" Fisher, supra note 38, at 847.

165 In re Imperial Credit Indus., 252 F. Supp. 2d at 1015-16 (emphasis added).

166 Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 409-10 (5th Cir. 2009).

167 Id. at 404. Revenue from the Dallas Morning News makes up about 60% of Belo's publishing revenue and 30% of its total revenue. Id.

168 Id.

169 Id.

170 Id. at 405.

171 Id.

172 Id.

PX347

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

173 Id. at 408.

174 Id.

175 Id. at 408-09.

176 Id. at 409.

177 Id. at 408..

178 Id. at 409.

179 Id. at 409-10 (citing Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 271 (5th Cir. 2007)).

180 Id. at 409. The Fifth Circuit stated:

By its plain language, the press release consists of three separate pieces of information, and - contrary to plaintiffs [sic] and Hakala's belief - [the defendant's expert] did not invent the three-part classification. The press release first discusses the fraudulent 'overstatement' and the estimated 'decline in circulation related to this matter.' It then recognizes that the disclosure is 'coupled with' the earlier reduction announcement and the 'anticipated lower circulation' over a six-month period. Thus, the release divides the news into fraudulent and non-fraudulent information related to possible future circulation declines.

Id.

181 Id. at 410-11 (internal citations and quotations omitted).

182 Id.

183 Id. at 411.

184 Id. at 406.

185 Id.

186 In re Williams, Sec. Litig., 558 F.3d 1130, 1135 (10th Cir. 2009).

187 Id. at 1132. The plaintiffs also brought an action under Section 20(a) of the Securities Exchange Act. In re Williams Sec. Litig., 496 F. Supp. 2d 1195, 1230 (N.D. Okla. 2007). Under Section 20(a), or commonly referred to as "controlling person liability," every person who directly or indirectly controls any liable person under Section 10(b) or Rule 10b-5 is jointly and severally liable to the same extent as the controlled person. 15 U.S.C. § 78t.

188 In re Williams, Sec. Litig., 558 F.3d at 1132.

189 Id.

PX347

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

190 Id.

191 Id. Originally, Williams formed WilTel I in 1985, but sold this subsidiary in 1995 and entered into a temporary non-compete agreement preventing Williams from reentering the telecommunications industry until 1998. Id. After this non-compete agreement expired, Williams formed a new subsidiary using the decommissioned pipelines known as WCG. Id.

192 Id. The Telecom Index was at 215.71 at the beginning of 1997. Id. At the end of 1998, the Telecom Index closed at 500.91, an increase of sixty-three percent. In re Williams Sec. Litig., 496 F. Supp. 2d at 1205.

193 In re Williams, Sec. Litig., 558 F.3d at 1133.

194 Id.

195 In re Williams Sec. Litig., 496 F. Supp. 2d at 1206.

196 In re Williams, Sec. Litig., 558 F.3d at 1133.

197 In re Williams Sec. Litig., 496 F. Supp. 2d at 1206-07.

198 In re Williams, Sec. Litig., 558 F.3d at 1133. By July 21, 2000, WCG's stock price was at $29.38. Id.

199 Id.

200 Id. The stock price dropped by 2.98% after the announcement. In re Williams Sec. Litig., 496 F. Supp. 2d at 1211.

201 In re Williams, Sec. Litig., 558 F.3d at 1133.

202 Id. One of the defendant CEO's told shareholders that WCG was strongly positioned for success with sufficient financial resources and that WCG was pre-funded for its capital needs. Id. Other senior executives stated the spin-off better enabled each company to execute is business plain and optimized access to capital. Id. Internally however, officers warned that WCG was underfunded and that it would have to sell non-core assets. Id.

203 Id.

204 Id. at 1134.

205 The law firm of Milberg Weiss was recently embroiled in a kickback scandal where the infamous plaintiffs' firm is accused of "paid to play" tactics. Peter Elkind, Milberg Weiss Faces the Music, CnnMoney.com (Oct. 3, 2007), available at http://money.cnn.com/2007/10/01/news/companies/Melvyn_ weiss.fortune/index.htm.

206 In re Williams, Sec. Litig., 558 F.3d at 1134.

207 Id.

PX347



WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

208 Id.

209 Id.

210 Id.

211 Id.

212 Id. The plaintiffs' expert was retained to provide expert opinions on market efficiency, loss causation, materiality, and damages. In re Williams Sec. Litig., 496 F. Supp. 2d at 1252.

213 In re Williams Sec. Litig., 496 F. Supp. 2d at 1253.

214 Id.

215 In re Williams, Sec. Litig., 558 F.3d at 1134.

216 Id. at 1136.

217 Id. at 1138.

218 Id. The Seventh Circuit has recognized this as a viable method of establishing loss causation. Ray v. Citigroup Global Mkts, Inc., 482 F.3d 991, 995 (7th Cir. 2007).

219 In re Williams, Sec. Litig., 558 F.3d at 1135.

220 Id. The defendants' expert, Dr. David Tabak of NERA Economic Consulting, rebutted the plaintiffs' expert by arguing that the methods employed by the plaintiffs' expert failed to properly account for differences between fraud-related and other influences on the stock price. NERA Expert's Role in In re Williams Securities Litigation, 1 (2009), www.nera.com.

221 In re Williams Sec. Litig., 496 F. Supp. 2d at 1264 ("In a case (such as the case at bar) that presupposed an efficient market, as fraud-on-the-market cases must do ... the showing of causation which must be made ... is a showing that the fraud premium was removed from the price of the stock by way of the efficient market's reaction to a corrective disclosure that was responsive to the misstatement or omission that created the fraud premium in the first instance.").

222 Id.

223 In re Williams, Sec. Litig., 558 F.3d at 1138.

224 Id. (internal citations omitted).

225 Id. ("The majority of these allegedly corrective disclosures ... were actually either news that was generally applicable to the telecommunications industry as a whole, or was an upbeat rather than negative statement about WCG."). The Tenth Circuit stated:

PX347

While the truth could be revealed by the actual materialization of the concealed risk rather than by a public disclosure that the risk exists, see Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005) (loss can be caused by "materialization of the concealed risk"), any theory of loss causation would still have to identify when the materialization occurred and link it to a corresponding loss.

Id. But see RMED Int'l v. Sloan's Supermarkets, Inc., No. 94 Civ. 5587, 2000 WL 310352, at *6-*8 (S.D.N.Y. Mar. 24, 2000) (permitting leakage theory even in the absence of an event study because the company's entire trading history was tainted by fraud).

226 In re Williams, Sec. Litig., 558 F.3d at 1139.

227 Id. (internal quotations omitted).

228 Id. at 1139-40.

229 Id. at 1139.

230 Id. at 1136. The district court's analysis for Scenario 2, applies with equal force to the expert's "Scenario 2-alternative." In re Williams Sec. Litig., 496 F. Supp. 2d at 1270.

231 In re Williams Sec. Litig., 496 F. Supp. 2d at 1269 n.53.

232 In re Williams, Sec. Litig., 558 F.3d at 1136.

233 In re Williams Sec. Litig., 496 F. Supp. 2d at 1273.

234 Id. at 1274.

235 Id.

236 Id. at 1275-76.

237 In re Williams, Sec. Litig., 558 F.3d at 1137.

238 Fisher, supra note 38, at 847.

239 In re Flag Telecom Holdings, Ltd., Sec. Litig., 245 F.R.D. 147, 170 (S.D.N.Y. 2007).

240 Id. at 169.

241 Id.

242 In re Xcelera.com Sec. Litig., 430 F.3d 503 (1st Cir. 2005).

PX347

243 In re DVI Inc. Sec. Litig., 249 F.R.D. 196, 209 (E.D. Pa. 2008).

244 To establish the fraud-on-the-market presumption, the plaintiff must demonstrate that the market is efficient. Ten factors are relevant in determining whether a market is efficient: whether the securities are (1) traded on a public exchange; (2) had large trading volumes; (3) were followed by market analysts; (4) had several market makers; (5) could be registered on SEC Form S-3; and (6) responded quickly to the release of company-specific information. Cammer v. Bloom, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). Additionally, courts assess: (7) the size of market capitalization; (8) size of the public float for the stock; (9) the ability to short sell the stock; and (10) the level of autocorrelation. Krogman v. Sterritt, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001); see also In re Polymedica Corp. Sec. Litig., 453 F. Supp. 2d 260, 276-77 (D. Mass. 2006).

245 Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, 546 F.3d 196, 207 (2d Cir. 2008) (emphasis added). This has been deemed the "essence of an efficient market and the foundation for the fraud-on-the-market theory." Id. (citing Cammer, 711 F. Supp. at 1287).

246 Id.

247 Id. at 207-08 (citing In re Excelera.com, 430 F.3d at 512-14, 516); see also In re DVI Inc., 249 F.R.D. at 196 (certifying a class based on the fraud-on-the-market presumption as the plaintiff offered expert testimony as to the efficiency of the market); In re Parmalat Sec. Litig., No. 04 MD 1653 (LAK), 2008 WL 3895539, at *10 (S.D.N.Y. Aug. 21, 2008) (holding same); In re Nature's Sunshine Prods. Sec. Litig., 251 F.R.D. 656, 664 (D. Utah 2008).

248 In re Alstom SA Sec. Litig., 253 F.R.D. 266, 280 (S.D.N.Y. 2008); In re Xcelera.com, 430 F.3d at 503.

249 Mosesian v. Peat, Marwick, Mitchell, & Co., 727 F.2d 873, 876 n.4 (9th Cir. 1984), cert. denied, 469 U.S. 932.

250 See supra Part IV.

251 U.S. Const. amend. VII; see also Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n, 430 U.S. 442, 459-60 (1977). The Seventh Amendment ensures citizenship by preserving an active role for citizens in the administration of both civil and criminal justice. Cass Sunstein, The Second Bill of Rights, 113 (2004). "Jury trials give a continuing place to ordinary people in designing the content of law - especially when the stakes are very high." Id. Interestingly, the Seventh Amendment, through its invocation of "the common law," is the only part of the Constitution that explicitly through the text requires the application of originalism. Suja A. Thomas, The Unconstitutionality of Summary Judgment: A Status Report, 93 Iowa L. Rev. 1613, 1616 (2008) [hereinafter Thomas, Summary Judgment: A Status Report]. Our nations' founders and the states themselves were firmly committed to trial by jury. See generally Akhil Reed Amar, America's Constitution 233-42, 329-30 (2005). Jury trials protect litigants from oppressive judges. Suja A. Thomas, Why Summary Judgment is Still Unconstitutional: A Reply to Professors Brunet and Nelson, 93 Iowa L. Rev. 1667, 1680 (2008) [hereinafter Thomas, Why Summary Judgment is Still Unconstitutional: A Reply].

252 The Seventh Amendment does not create a right, but rather preserves the right to a trial by jury as it existed under the common-law in 1791. Suja A. Thomas, Why Summary Judgment is Unconstitutional, 93 Va. L. Rev. 139, 146 (2007) [hereinafter Thomas, Summary Judgment]. Traditionally, equity matters were not afforded a jury trial, but legal matters were. Parsons v. Bedford, 28 U.S. 433 (1830); see also Chevron v. Oubre, 93 F.R.D. 622, 623 (M.D. La. 1982) (holding an action to cancel a mineral lease is equitable and not subject to trial by jury). Rule 10b-5 claims are governed by the Seventh Amendment. See Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 327 (2007).

253 Markman v. Westview Instruments, Inc., 517 U.S. 370, 376 (1996) (Souter, J.). The Supreme Court has described the Seventh Amendment inquiry as a two step process:

PX347

[W]e ask, first, whether we are dealing with a cause of action that either was tried at law at the time of the founding or is at least analogous to one that was.... If the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791.

Id. (internal citations omitted).

See also Suja A. Thomas, The Seventh Amendment, Modern Procedure, and the English Common Law, 82 Wash. U. L. Q. 687, 700 (2004) [hereinafter Thomas, The Seventh Amendment, Modern Procedure].

254 Thomas, Summary Judgment, supra note 252, at 578.

255 In re Peterson, 253 U.S. 300, 310 (1920) ("[U]ltimate determination of issues of fact by the jury [should] not [be] interfered with."); Walker v. New Mexico, 165 U.S. 593, 596 (1897) (issues of fact in common-law actions are to be settled by the jury).

256 TSC Indus. Inc. v. Northway Inc., 426 U.S. 438 (1976) (Marshall, J.).

257 Id. at 450.

258 Id. (emphasis added).

259 Id. (emphasis added).

260 Id.; see also SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1466-67 (2d Cir. 1996).

261 Basic, Inc. v. Levinson, 485 U.S. 224, 236 (1988) (rejecting a bright-line rule that information concerning merger discussions is immaterial as a matter of law). "Whether merger discussions in any particular case are material therefore depends on the facts.... [A] factfinder will need to look to indicia of interest in the transaction at the highest corporate levels." Id. at 239.

262 Dunbar & Heller, supra note 55, at 468.

263 Basic Inc., 485 U.S. at 248 (emphasis added).

264 Id.

265 Id. at 248-49, 249 n.29.

266 Kaplan v. Rose, 49 F.3d 1363, 1368 n.3 (9th Cir. 1994); In re Micron Techs., Inc. Sec. Litig., 247 F.R.D. 627, 634 (D. Idaho 2007) (citing Basic, 485 U.S. at 249 n.29).

267 Rudman, supra note 1.

268 Dura Pharm. Inc. v. Broudo, 544 U.S. 336, 342 (2005) (assessing whether a plaintiff's complaint adequately alleged loss causation).

PX347

269 J. Robert Brown, Using Loss Causation to Repeal Rule 10b-5: In re Williams Securities Litigation (Part 4), (Mar. 23, 2009), http://www.theracetothebottom.org.

270 75A Am. Jur. 2d Trial § 657 Cause and Effect (2008). If the facts are disputed or if different inferences can be drawn from undisputed facts, the question of causation is one for the jury. Id. Proximate cause in particular is more often a question of fact than law. 65A C.J.S. Negligence § 857 (2008).

271 Scott D. Hakala, Current Economic and Expert Issues in Securities Litigation, at 4, https://plusweb.org/files/Events/all.star7Econ.%20Issues%20-%20Securities%20Lit.pdf (last visited Aug. 11, 2009).

272 In re Williams Sec. Litig., 496 F. Supp. 2d 1195, 1253 (N.D. Okla. 2007).

273 In re Williams Sec. Litig., 558 F.3d 1130, 1143 (10th Cir. Feb. 18, 2009).

274 Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 409 (5th Cir. 2009).

275 Brown, supra note 269; see also Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59, 88 (D.D.C. 2008) (stating that it is not proper for a court to exclude expert testimony because the factual bases for the expert's opinions are weak. Rather, that goes to the credibility of the testimony, making it a cross-examination issue and determination for the jury).

276 Paul F. Kirgis, The Right to a Jury Decision on Questions of Fact Under the Seventh Amendment, 64 Ohio St. L. J. 1125, 1156-57 (2003). The issue of damages is generally accepted as a question of fact as well. See, e.g., Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 437 (2001) (Stevens, J.) (stating that the measure of actual damages suffered presents a question of historical or predictive fact); Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 453 (1996) (stating that generally the proper measure of damages is a question of fact); Dimick v. Scheidt, 293 U.S. 474, 486 (1935) (recognizing that the measure of damages is a question of fact).

277 See Kirgis, supra note 276, at 1157.

278 Tabak, supra note 46, at 694.

279 Kirgis, supra note 276, at 1155.

280 See Suja A. Thomas, Why the Motion to Dismiss is Now Unconstitutional, 92 Minn. L. Rev. 1851 (2008) [hereinafter Thomas, The Motion to Dismiss]; Suja A. Thomas, Why Summary Judgment is Unconstitutional, 93 Va. L. Rev. 139 (2007); Suja A. Thomas, Why Summary Judgment is Still Unconstitutional: A Reply to Professors Brunet and Nelson, 93 Iowa L. Rev. 1667 (2008); Suja A. Thomas, The Unconstitutionality of Summary Judgment: A Status Report, 93 Iowa L. Rev. 1613 (2008); Suja A. Thomas, Judicial Modesty and the Jury, 76 Univ. Colo. L. Rev. 767 (2005); Suja A. Thomas, The Seventh Amendment, Modern Procedure, and the English Common Law, 82 Wash. Univ. L. Q. 687 (2004); Suja A. Thomas, Re-Examining the Constitutionality of Remittitur Under the Seventh Amendment, 64 Ohio State L. J. 731 (2003).

281 See generally Thomas, Summary Judgment: A Status Report, supra note 251, at 1621-23.

282 Thomas, Summary Judgment, supra note 252, at 140.

PX347


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

283 Id. at 180. Much of the debate in early nineteenth century focused on the jury's power to determine law, not fact, implicitly accepting that the jury was the sole arbiter of fact. Robert P. Burns, The Death of the American Trial, 53-68 (2009).

284 Thomas, Summary Judgment, supra note 252, at 161. Even then, where a judge found insufficient evidence, another jury would decide the second case, and not the judge. Id. Summary judgment was originally enacted with the expectation that it would be available only as a device for resolving commercial disputes relating to liquidated debt claims. Burns, supra note 283, at 66.

285 Thomas, Summary Judgment, supra note 252, at 159. While one may worry that such an approach would result in a wave of expensive securities fraud suits going to trial, Section VI.B.2.d explains how additional securities fraud suits will not a fortiori result in higher settlements or more expensive suits.

286 In re Williams, Sec. Litig., 558 F.3d 1130, 1143 (10th Cir. Feb. 18, 2009).

287 The plaintiffs' expert, Dr. Blaine Nye, has testified as an expert in numerous securities fraud actions. See, e.g., In re Vivendi Universal, S.A., Sec. Litig., No. 02 CIV.5571 RJH HBP, 2009 WL 886222 (S.D.N.Y. Mar. 31, 2009) (superseded by 634 F. Supp. 2d 352); In re Enron Corp. Sec., 529 F. Supp. 2d 644 (S.D. Tex. 2006); Schwab v. Philip Morris, USA, Inc., 449 F. Supp. 2d 992 (E.D.N.Y. 2006); In re Worldcom, Inc., Sec. Litig., No. 02 CIV. 3288 (DLC), 2005 WL 627720 (S.D.N.Y. Mar. 16, 2005); In re Physician Corp. of Am. Sec. Litig., No. 97-3678-CIV, 2002 WL 34477593 (S.D. Fla. July 24, 2002); In re Gen. Instrument Sec. Litig., 209 F. Supp. 2d 423 (E.D. Pa. 2001).

288 Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 408 (5th Cir. 2009).

289 Id. at 408-10.

290 Daubert v. Merrill Dow Pharm. Inc., 509 U.S. 579, 593-94 (1993).

291 Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 186 (S.D.N.Y. 2008).

292 See In re Williams, Sec. Litig., 558 F.3d at 1143; NERA Expert's Role in In Re Williams Securities Litigation, 1 (2009), www.nera.com (describing how the defendant's expert successfully rebutted the plaintiffs' expert at the summary judgment stage).

293 Oscar Private Equity Invs., 487 F.3d at 270.

294 Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 408-10 (5th Cir. 2009).

295 See, e.g., City of Mansion Hills v. Sexton, 160 P.3d 812 (Kan. 2007) (stating that the trier of fact resolves conflicting expert testimony); Miller v. Comm. Contractors Equip., Inc., 711 N.W.2d 893 (Neb. 2006) (stating same); Salerian v. Maryland State Bd. of Physicians, 932 A.2d 1225 (Md. App. Cat. 2007).

296 Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59, 88 (D.D.C. 2008).

297 See, e.g., Lange v. Freund, 855 N.E.2d 162 (Ill. App. Ct. 2006); Med. Review Panel v. Bernice Comm. Rehab. Hosp., 915 So.2d 254 (La. App. Ct. 2005); Gibson v. Ferguson, 562 S.W.2d 188 (Tenn. 1976) (stating that the jury decides whether to ultimately accept or reject expert testimony).

PX347

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

298 In re Williams, Sec. Litig., 558 F.3d 1130, 1143 (10th Cir. Feb. 18, 2009).

299 Brown, supra note 269; see also Tracinda Corp. v. DaimlerChrysler AG, 362 F. Supp. 2d 487, 494 (D. Del. 2005) (stating that whether an expert failed to consider other relevant factors is an issue for cross-examination and goes to the weight afforded to the expert's opinion).

300 Arthur R. Miller, The Pretrial Rush to Judgment: Are the 'Litigation Explosion,' 'Liability Crisis,' and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?, 78 N.Y.U. L. Rev. 982, 1104 n.622 (2003) (citing James B. Thayer, 'Law and Fact' in Jury Trials, 4 Harv. L. Rev. 147, 154-55 (1890)).

301 See Miller, supra note 300, at 1104.

302 Miller, supra note 300, at 1091-92. Abrogating the Seventh Amendment cannot be justified for securities class actions on the basis of efficiency and cost because the Seventh Amendment makes no such allowance; rather the Seventh Amendment gives power to the jury that cannot be eliminated by Congress or the courts. Thomas, The Motion to Dismiss, supra note 280, at 1887.

303 Materiality is generally an issue for the trier of fact. Oxford Asset Mgmt, Ltd. v. Jaharis, 297 F.3d 1182, 1189 (11th Cir. 2002); Marsh Group v. Prime Retail Inc., 46 F. App'x 140, 1444-45 (4th Cir. 2002).

304 See Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59, 80 (D.D.C. 2008) (stating that summary judgment is generally inappropriate where an expert's testimony supports a nonmoving party's case).

305 Patrick J. Coughlin, What's Brewing in Dura v. Broudo? The Plaintiffs' Attorneys Review the Supreme Court's Opinion and Its Import for Securities Fraud Litigation, 37 Loy. U. Chi. L.J. 1, 39-40 (2005) (quoting Professor John C. Coffee as stating that securities fraud losses require a visible market reaction to disclosure because judges and juries cannot be trusted to sort out a misstatement's real financial effect).

306 U.S. Const. amend. VII.

307 Sunstein, supra note 251, at 113-14 (stating that the Seventh Amendment serves to educate the public about law and policy).

308 Burns, supra note 283, at 20.

309 Id. at 21.

310 Du Pont v. Brady, 828 F.2d 75, 78 (2d Cir. 1987).

311 Fed. R. Evid. 702.

312 Indeed, even the term "statistically significant" has more than one meaning and is not a talismanic term. Hakala, supra note 271, at 13 n.21. Some suggest that event studies as currently performed should be categorically ruled inadmissible by judges on reliability grounds because error rates are unknown. Jonah Gelbach, Valid Inference in Single-Firm, Single-Event Studies Used in Scholarship and Securities Litigation: A Research Agenda, 4 (Searle Center on Law, Reg., and Econ. Growth, Working Paper, Feb. 12, 2009).

PX347

313 See Lehocky v. Tidel Techs., Inc., 220 F.R.D. 491, 506-07 (S.D. Tex. 2004) (concluding that plaintiff's expert's event study using a two-day window was sufficient to demonstrate that a cause and effect relationship between company-specific announcements and stock price may exist).

314 Esther Bruegger & Frederick C. Dunbar, Estimating Financial Fraud Damages with Response Coefficients, 35 J. Corp. L. (forthcoming 2009).

315 Id.

316 Id.

317 Id.

318 Id.

319 Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 408-10 (5th Cir. 2009).

320 Bruegger & Dunbar, supra note 314; see also Bhagat & Romano, supra note 11, at 399; Fisher, supra note 38, at 880.

321 This is the essence of the "true financial condition" theory. See In re Dell Sec. Litig., 591 F. Supp. 2d 877, 911-12 (W.D. Tex. 2008).

322 Bruegger & Dunbar, supra note 314.

323 Id.

324 Id.

325 Bhagat & Romano, supra note 29, at 149 (discussing the MacKinlay study); Hakala, supra note 271, at 10 n.16 ("Event studies can vary in practice, including differences in assumptions and levels of investigation and, consequently, different event studies can result in significantly different levels of precision.").

326 MacKinlay, A. C., "Event Studies in Economics and Finance," Journal of Economic Literature Vol. XXXV, Issue 1 (March 1997).

327 Id.

328 Bhagat & Romano, supra note 29, at 149-50.

329 See Michael J. Kaufman, Loss Causation Revisited, 32 Sec. Reg. L.J. 2 (2004).

330 Kaufman, At a Loss, supra note 114, at 6. This approach is analogous to other provisions contained in the securities laws. For example:

PX347

The express antifraud rights of action in the 1933 Act clearly do not require the plaintiffs to prove that the defendant's conduct caused their investments to decline in value. Section 11 of the 1933 Act expressly allows acquirers of securities offered pursuant to a registration statement containing a material misstatement or omission to obtain damages from the issuer, its officer, directors, and professionals. Section 11(e) contains an elaborate damage formula that allows plaintiffs to recover the difference between the offering price and either the 'value' of the security at the time of the suit or the price received if sold before suit.

Kaufman, Loss Causation: Exposing a Fraud on Securities Law Jurisprudence, supra note 71, at 366. However, in Section 11, to the extent that Congress has recognized the concept of loss causation, it has placed the burden on the defendant to prove the absence of causation. As one can see, Section 11 does not require the plaintiff to come forward, armed with an expert and a statistical regression analysis.

331 15 U.S.C. § 78u-4(b)(4).

332 Kaufman, At a Loss, supra note 114, at 6. But see Nathaniel Carden, Comment, Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency, 65 U. Chi. L. Rev. 879 (1998) (arguing the PSLRA indicates an essential distrust of the efficient market hypothesis).

333 Kaufman, At a Loss, supra note 114, at 6.

334 Id. at 7 n.19 (discussing Dura). But see Fry, supra note 87 (arguing that the Supreme Court's Dura decision was consistent with Congressional intent).

335 Kaufman, At a Loss, supra note 114, at 7.

336 Id. at 7-8. But see Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (stating that plaintiffs cannot recover by alleging artificial inflation at the time of purchase).

337 Kaufman, At a Loss, supra note 114, at 8. This interpretation is supported by the legislative history of the PSLRA and Congressional intent. Id. at 8-21.

338 Id. at 11.

339 Id. But see Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 478-79 (4th Cir. 2006) (arguing that because at the time of the purchase the fraud is not yet known, there is no loss under Virginia common law fraud).

340 Kaufman, Loss Causation Revisited, supra note 329.

341 Kaufman, At a Loss, supra note 114, at 20-21. The Restatement (Second) of Torts likewise supports this interpretation of the loss causation. Kaufman, Loss Causation: Exposing a Fraud on Securities Law Jurisprudence, supra note 71, at 381. The Dura Court neglected the common law difference between direct and consequential damages, instead relying solely on the common law requirement that there be some pecuniary loss. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 343-44 (2005). See Elizabeth Chamblee Burch, Reassessing Damages in Securities Fraud Class Actions, 66 Md. L. Rev. 348, 361-62 (2007) (discussing the confusing common law origins of securities fraud remedies).

342 Kaufman, At a Loss, supra note 114, at 20.


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

343 Id. (emphasis added).

344 Id.

345 Id.

346 Id. Indeed, share price declines are largely disconnected from the true value of the company. Baruch Lev & Meiring de Villiers, Stock Price Crashes and 10b-5 Damages: A Legal, Economic, and Policy Analysis, 47 Stan. L. Rev. 7, 10, 26-33 (1994) (arguing that market crashes--extreme stock price declines--are consequential damages at best, but should never be recoverable, even where there is a sufficient nexus between the defendant's conduct and the plaintiff's loss, as it would violate the spirit of the business judgment rule).

347 Kaufman, At a Loss, supra note 114, at 39-40. "Damages in securities class action litigation has increasingly become based upon principles of corporate finance." Eisenhofer, supra note 83.

348 Kaufman, At a Loss, supra note 114, at 39. The Supreme Court however flatly rejected this position in Dura, ignoring principles of corporate finance:

For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events, which taken separately or together account for some or all of that lower price.

Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342-43 (2005).

349 Kaufman, At a Loss, supra note 114, at 40.

350 Coughlin, supra note 305, at 23.

351 Eisenhofer, supra note 83, at 1442.

352 Kaufman, Loss Causation Revisited, supra note 329. Stock price reflects the market's estimation of the company's future cash flows, discounted back to the present at the company's cost of capital. Eisenhofer, supra note 83, at 1421.

Value = PV cash flows + PV terminal value.

Cash flows = cash flow forecasted during the projection period;

Terminal value = value of the firm at the end of the forecast period;

PV = present value as of the valuation date using the debtor's weighted average cost of capital as the discount rate.

Id. at 1422.

PX347

353 Eisenhofer, supra note 83, at 1420; see also Thorsen, supra note 12 ("Inflationary loss occurs whenever an investor who paid too much is unable to get that overpayment back in the marketplace.").

354 Hakala, supra note 271, at 6 n.7.

355 Coughlin, supra note 305, at 25.

356 Coughlin, supra note 305, at 25-26.

357 Hakala, supra note 271, at 7.

358 See Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 552 U.S. 148, 163 (2008); see also 26 Michael J. Kaufman, Examining Policy Implications in a Securities Fraud Action, in Securities Litigation: Damages § 15:7:05 (Thomson/West 2008).

359 The in terrorem criticism has been recognized by the legislature, S. Rep. No. 104-98, at 4 (1995) as reprinted in 1995 U.S.C.C.A.N. 679, 683 (discussing the purpose of the PSLRA was to curb perceived abuses); S. Rep. No. 104-98, at 5 (1995) as reprinted in 1995 U.S.C.C.A.N. 679, 684 (noting the system is being abused and misused); H.R. Rep. No. 104-369, at 31 (1995) (Conf. Rep.), as reprinted in 1995 U.S.C.C.A.N. 730, 730 (abusive practices include (1) routine filing of lawsuits against issuers whenever there is a significant change in the stock price without regard to culpability, (2) targeting deep pocket defendants and individuals covered by insurance, (3) imposing burdensome discovery costs to push a settlement, and (4) class action manipulation), the Supreme Court, Stoneridge Inv. Partners, 552 U.S. at 163-64 (stating securities fraud actions chill foreign investment); Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) (stating that securities fraud actions impose substantial costs on companies when employed abusively); Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005) (stating that securities actions present an in terrorem threat), the federal appellate courts, Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 757 (7th Cir. 2007) (distrusting plaintiff's attorneys by implying they fabricate witnesses); Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 267 (5th Cir. 2007), and commentators, U.S. Chamber Institute for Legal Reform, Securities Class Action Litigation: The Problem, its Impact, and the Path to Reform. (July 2008).

360 See Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 406 (5th Cir. 2009); Oscar Private Equity Invs., 487 F.3d at 267; Securities Litigation - Class Certification - Fifth Circuit Holds that Plaintiffs Must Prove Loss Causation Before Being Certified as a Class, 121 Harv. L. Rev. 890 (2008) (stating that courts have erected additional barriers to class certification in securities actions to guard defendants from settling frivolous claims). Despite the fact that this policy concern is insufficient to justify a rigorous standard, there is a competing policy concern that mandates against a rigorous standard: a rigorous standard can make it harder for victims to pursue smaller claims absent a class action device. David S. Evans, Class Certification, the Merits, and Expert Evidence, 11 Geo. Mason L. Rev. 1 (2002).

361 Dura Pharm., Inc., 544 U.S. at 347 (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741 (1975)).

362 See supra Part V.A.1.a.

363 Instances of legitimate corporate fraud--as opposed to plaintiff fear mongering--are not unheard of. For example, as Alan Greenspan, former Chairman of the Federal Reserve noted that modern corporate accounting practices responsible for the Enron and Worldcom debacles provided corporate management with broad discretion "to favorably bias their results to the edge of outright fraud. Some clearly went over the line." Alan Greenspan, The Age of Turbulence: Adventures in A New World 431 (2007); see also Bethany McLean & Peter Elkind, The Smartest Guys in the Room: The Amazing

PX347

Rise and Scandalous Fall of Enron (2003) (chronicling the massive Enron accounting scandal); Coughlin, supra note 305, at 27-31 (discussing real-world examples of corporate fraud and inflationary loss).

364 Courts recognize that there is a strong judicial policy in favor of settlement, and in particular, in the class action context. In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 784 (3d Cir. 1995); In re Pac. Enters. Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995); Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982); Piambino v. Bailey, 610 F.2d 1306, 1328 (11th Cir. 1980); In re Blech Sec. Litig., No. 94 CIV. 7696, 2000 WL 661680, at *1 (S.D.N.Y. May 19, 2000); Adair v. Bristol Tech. Sys., Inc., No. 97 CIV. 5874, 1999 WL 1037878, at *1 (S.D.N.Y. Nov. 16, 1999); In re Gulf Oil/Cities Serv. Tender Offer Litig., 142 F.R.D. 588, 590 (S.D.N.Y. 1992). "Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation. There is a strong public interest in quieting any litigation; this is particularly true in class actions." In re Prudential Sec. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 209 (S.D.N.Y. 1995).

365 Evans, supra note 360, at 3-6; see also In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 n.6 (3d Cir. 2008); Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 186 n.8 (1974) (Douglas, J., concurring in part, dissenting in part). Magistrate Judge Morton Denlow for the United States District Court for the Northern District of Illinois has gone so far as to suggest that both plaintiffs and defendants should include in their initial pleadings requests for a mediated settlement conference to facilitate settlement. Morton Denlow, Making Full Use of the Court: Come to Settle First, Litigate Second, 35 A.B.A. Litig. 28, 29 (Fall 2008).

366 Should defendants and other still be heard to complain of litigation costs where the claim has merit, a very simple, yet often overlooked, response exists: "'Why Not Tell the Truth?' Justice Brandeis observed that sunlight is a great disinfectant. If we focus on telling the truth, rather than obfuscating financial results, we can have the best of all worlds: an efficient market and minimal litigation." Charles W. Murdock, Sarbanes-Oxley Five Years Later: Hero or Villain, 39 Loy. U. Chi. L.J. 525, 568-69 (2008). Moreover, "[i]n a typical litigation scenario, the courts merely serve as a background for the bargaining between two parties to reach a settlement. Thus to single out settlements in securities litigation as nuisance-driven ignores the fact that most litigation is aimed at achieving settlement." John M. Wunderlich, Note, Tellabs v. Makor Issues & Rights, Ltd.: The Weighing Game, 39 Loy. U. Chi. L.J. 613, 658 (2007).

367 John C. Coffee, Jr., Reforming the Securities Class Action: An Essay on Deterrence and its Implementation, 106 Colum. L. Rev. 1534, 1536 n.5 (2006).

368 See Evans, supra note 360, at 36 ("Class actions can put a gun to the head of companies. Maybe the company will win, but maybe they will get a verdict that will kill them."); Robert E. Litan, U.S. Chamber of Commerce Inst. for Legal Reform, Through Their Eyes: How Foreign Investors View and React to the U.S. Legal System, 13 (Aug. 2007) (stating that "some defendants can feel financially pressured to settle even if they have done nothing wrong, believing it not to be worth betting their companies on a subsequent mistaken jury verdict that can be difficult to overturn on an appeal.").

369 D. Brian Hufford, Deterring Fraud vs. Avoiding the "Strike Suit": Reaching an Appropriate Balance, 61 Brook. L. Rev. 593, 633 (1995). As John C. Coffee, Jr., securities law expert, states:

The true 'strike suit' nuisance action, filed only because it was too expensive to defend, is, in this author's judgment, a beast like the unicorn, more discussed than directly observed. Although small settlements may have been impelled in part by the high cost of defense, the corresponding observation is that the small damages in these cases also did not justify much effort on the plaintiff's side. Neither side wanted to invest much effort in them - but this does not make them inherently frivolous. Similarly, the economic evidence that strike suits predominate also seems unpersuasive.

Coffee, Jr., supra note 367, at 1536 n.5.

370 Hufford, supra note 369, at 637.

PX347

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

371 Id.

372 Id.

373 See supra note 342 and accompanying text.

374 See Judith A. McKenna & Elizabeth C. Wiggins, Empirical Research on Civil Discovery, 39 B.C. L. Rev. 785, 787 (1998) (stating that the debate over discovery reform was based on salient personal experiences, and not with the benefit of empirical evidence); Linda S. Mullenix, Discovery in Disarray: The Pervasive Myth of Pervasive Discovery Abuse and the Consequences for Unfounded Rulemaking, 46 Stan. L. Rev. 1393 (1994) [hereinafter Mullenix, Discovery in Disarray] (documenting "Faludi-style," the myth of pervasive discovery abuse). However, there is still no working definition of what constitutes "appropriate" discovery. Linda S. Mullenix, The Pervasive Myth of Pervasive Discovery Abuse: The Sequel, 39 B.C. L. Rev. 683, 688 (1998) [hereinafter Mullenix, The Discovery Abuse Sequel].

375 Mullenix, Discovery in Disarray, supra note 374, at 1398 (citing Jonathan Racuh, The Parasite Economy, 24 Nat'l L.J. 980, 980 (1992) ("Like ticks on hounds, the lawyering and lobbying classes are sucking billions from the economy that might otherwise be used for productive investment. And the public is getting plenty sore about it.").

376 Thomas E. Willging et al., An Empirical Study of Discovery and Disclosure Practice under the 1993 Federal Rule Amendments, 39 B.C. L. Rev. 525, 527 (1998). The discovery reform agenda is based on "questionable social science, cosmic anecdote, and pervasive, media-perpetrated myths." Mullenix, Discovery in Disarray, supra note 374, at 1396 (internal quotations omitted). Discovery data has in fact remained constant over time. Mullenix, The Discovery Abuse Sequel, supra note 374, at 684.

377 Wunderlich, supra note 366, at 655. "Perceptions based on potentially unrepresentative experiences coalesced in a widely shared belief that discovery abuse was a pervasive and serious phenomena." McKenna & Wiggins, supra note 374, at 787. "Proposals for discovery reform are typically impelled by anecdotal evidence and rhetorical, but highly compelling, reports of discovery abuse. Mullenix, The Discovery Abuse Sequel, supra note 374, at 684. Similarly, Professor Charles Yablon argues that discovery is misperceived as zealous advocacy. Charles Yablon, Stupid Lawyer Tricks: An Essay on Discovery Abuse, 96 Colum. L. Rev. 1618, 1620 (1996). According to Yablon, this is because of the inherent tension between the cooperative nature of discovery and the adversarial nature of the litigation system. Id. at 1625. To remedy this over-zealous discovery advocacy, Professor Yablon suggests that courts treat lawyers much like a parent treats their kids on long car trips when they act up: tell them to "shut up and knock it off." Id. at 1619. This approach would have the effect of deterring abusive discovery by making it "less fun." Id. at 1640.

378 Charles W. Sorenson, Jr., Disclosure Under Federal Rule of Civil Procedure 26(a)--"Much Ado About Nothing?", 46 Hastings L.J. 679, 681 (1995) (referencing "[t]he widespread public and professional perception of a 'litigation explosion"' (citing Walter K. Olson, The Litigation Explosion: What Happened When America Unleashed the Lawsuit (1991)). One such study found that, in terms of time, discovery is what lawyers statistically spend most of their time on in the course of ordinary litigation. David M. Trubek et al., The Costs of Ordinary Litigation, 31 UCLA L. Rev. 72, 91 (1983) (surveying a random sample of cases and lawyers finding lawyers spend about 16.7% of their time on discovery matters).

379 McKenna & Wiggins, supra note 374, at 786-87 (citing the Columbia Project field survey).

380 Peggy E. Bruggman, Reducing the Costs of Civil Litigation: Discovery Reform, PLRI Hastings, Fall 1995, at 1, 12, available at http://w3.uchastings.edu/plri/fal95tex/discov.html. The Federal Judicial Center study examined 3,000 cases in six United States district courts. Id.


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

381 McKenna & Wiggins, supra note 374, at 790.

382 Bruggman, supra note 380, at 13.

383 Wunderlich, supra note 366, at 655.

384 Willging, supra note 376, at 578.

385 Kevin LaCroix, Private Securities Litigation: Important Deterrent or Wasteful Churn?, The D&O Diary, Oct. 26, 2008, http://www.dandodiary.com/2008/10/articles/securities-litigation/private-securities-litigation-important-deterrent-or-wasteful-churn/.

386 Willging, supra note 376, at 552; Wunderlich, supra note 366, at 656.

387 McKenna & Wiggins, supra note 374, at 801. Larger and more complex cases also are more influenced by tactical decisions. Id. However, massive amounts of discovery presents a clichéd "chicken-or-the-egg" type problem: "broad discovery can contribute to megalitigation in part by unearthing evidence that supports claims by many." Richard L. Marcus, Reassessing the Magnetic Pull of Megacases on Procedure, 51 DePaul L. Rev. 457, 470 (2001). Thus, whether a big case generates big discovery or whether big discovery generates a big case is an issue.

388 See Todd Foster et al., NERA Economic Consulting, Recent Trends in Shareholder Class Action Litigation: Filings Stay Low and Average Settlements Stay High--But are these Trends Reversing? 8 (Sept. 2007), http://www.nera.com/image/PUB_RecentTrends_Sep2007-FINAL_4color.pdf (listing top ten shareholder class actions in securities as all exceeding $1 billion in 2007).

389 McKenna & Wiggins, supra note 374, at 801.

390 Marcus, supra note 387, at 471 n.60.

391 Id.

392 Willging, supra note 376, at 531. Indeed, the likelihood of discovery problems increased as the stakes, factual complexity, and contentiousness increased. Mullenix, The Discovery Abuse Sequel, supra note 374, at 685-86.

393 Willging, supra note 376, at 532. Other factors studied included the percentage of litigation costs attributable to document production, the number of hours spent in depositions, the size of the law firm, the complexity and contentiousness of the case, and the type of the case. Id. High stakes also influenced the length of the litigation: the higher the stakes, the longer the case lasted. Id. at 533.

394 Trubek, supra note 378, at 76, 77 (discussing the idea that litigation is an investment of scarce resources to achieve a future result); see also Patrick E. Higginbotham, Judge Robert A. Ainsworth, Jr. Memorial Lecture, Loyola University School of Law: So Why do We Call Them Trial Courts?, 55 SMU L. Rev. 1405, 1412 (2002) (saying all decisions on whether to go to trial are based on cost concerns).

395 Willging, supra note 376, at 553.

PX347

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

396 Marcus, supra note 387, at 470.

397 Hufford, supra note 369, at 639; see also Mullenix, Discovery in Disarray, supra note 374, at 1401-02 ("Corporate defendants withhold necessary evidence or inundate requesting plaintiffs with thousands of documents (in either instance, imposing extra cost, harassment, and delay on requesting plaintiffs). When discovery abuse occurs, it seems equally likely to be an attempt by a corporate defendant to bankrupt a plaintiff and to induce abandonment of the lawsuit as a plaintiff's attempt to harass a defendant.").

398 McKenna & Wiggins, supra note 374, at 795-96 (emphasis added); see also Baker & Griffith, infra note 406, at 777-78 ("[T]he defendant's higher costs do not necessarily give the plaintiff an advantage, as defense costs reduce available insurance limits. Assuming that the claim will settle within insurance limits, this means that increasing defense costs also decreases the total pot available to plaintiffs in settlement. Thus plaintiffs may also have a strong incentive to avoid high discovery costs.").

399 McKenna & Wiggins, supra note 374, at 796.

400 Id.

401 Hufford, supra note 369, at 635. Ultimately, whether discovery is 'abusive' or 'wasteful' may just be a matter of perspective: "[F]rom the judge's perspective the lawyers have wasted a lot of time and energy on useless papers and gotten yelled at in the process. But from the plaintiff's counsel's perspective, plaintiff's deposition got postponed for at least two months while lawyers drafted and served new interrogatories and answers, and that obviously felt like a victory, even if it had little impact on the ultimate outcome of the case." Yablon, supra note 377, at 1622.

402 Hufford, supra note 369, at 636.

403 Wunderlich, supra note 366, at 658. In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096 (D. Nev. 1998), provides a good illustration of the difference discovery can make: Prior to discovery, the plaintiffs' initial complaint was dismissed, but after the benefit of discovery in a bankruptcy proceeding, the court granted leave to amend the complaint. Id.

404 McKenna & Wiggins, supra note 374, at 785-86 ("Full access to the evidence would end trial by ambush and surprise. Open discovery would promote settlements; with both sides obliged to turn over all their important cards, secrets would disappear and realistic negotiations would occur.") (internal citation omitted).

405 Willging, supra note 376, at 540.

406 Tom Baker & Sean J. Griffith, How the Merits Matter: Directors and Officers' Insurance and Securities Settlements, 157 U. Pa. L. Rev. 755, 771 (2009). It is generally recommended that where a case is significant enough, you should often employ two experts: one to testify and one to consult. Eric T. Chaffin, De-Escalate the Expert Discovery Wars, 44 Trial 36, 37 (June 2008).

407 See In re Parmalat Sec. Litig., 493 F. Supp. 2d 723 (S.D.N.Y. 2007).

408 Posner, Economic Analysis of Law, supra note 68, at 628.

409 See Rudman, supra note 1 ("The disadvantage that Oscar's holding causes to investors is evidenced by the decisions of the district courts in the Fifth Circuit that have followed Oscar's approach in requiring proof of loss causation at class


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

certification. These district court decisions have led to premature dismissal of potentially meritorious claims, thereby leaving injured plaintiffs without possibility of recovery.").

410 Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 185 (1974) (Douglas, J., concurring in part, dissenting in part).

411 Kaufman, Loss Causation Revisited, supra note 329.

412 Id. (internal citations omitted); see also Thorsen, supra note 12, at 120 (stating that this approach gives defendants a wild card and encourages companies to affirmatively guide down expectations to mute the effect of fraud); Coughlin, supra note 305, at 26 (warning of the risk of a sophisticated entity, adept at committing fraud, and adept at concealing it, walking down the stock price with selective disclosures to avoid a sudden stock-price reaction).

413 In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 245 (8th Cir. 2008); Coughlin, supra note 305, at 27-31 (discussing three additional real world problems focusing exclusively on disclosure-induced stock drops, including Enron, WorldCom, and HealthSouth).

414 In re Ceridian Corp. Sec. Litig., 542 F.3d at 245.

415 Eisenhofer, supra note 83, at 1441-42; see also Thorsen, supra note 12 (stating that requiring a disclosure that precisely reverses the prior misrepresentation deprives persons who actually suffered inflationary loss from any recovery).

416 Thorsen, supra note 12, at 120 (emphasis added).

417 Basic, Inc. v. Levinson, 485 U.S. 224, 234 (1988) (citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186 (1963)).

418 Samuel Issacharoff, Regulating After the Fact, 5 DePaul L. Rev. 375, 379 (2007).

419 In re Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1350 (N.D. Cal. 1994) ("[T]he class action device is viewed as a necessary and desirable supplement to enforcement efforts of the Securities and Exchange Commission."). The risk of restricting shareholders' ability to combat fraud through private litigation becomes especially critical in light of the heavy burden already placed on regulators who are not in a position to replace the efforts of private attorneys general. Hufford, supra note 369, at 638. "There is little dispute about the centrality of private actions in enforcing the complex web of securities law. Indeed, the most sophisticated critical assessments of securities laws turn not on the lack of public enforcement, but on the insufficiency of private enforcement to deter misconduct as a result of complicated incentive structures ...." Issacharoff, supra note 418, at 381.

420 Hufford, supra note 369, at 596; Luis A. Aguilar, SEC Commissioner, Speech at North American Securities Administrators Association's Winter Enforcement Conference: Empowering the Markets Watchdog to Effect Real Results (Jan. 10, 2009), available at http://www.sec.gov [hereinafter Aguilar, Empowering the Markets] ("The SEC's mission is very clear. It is to protect investors; maintain fair, orderly and efficient markets; and facilitate capital formation.").

421 See, e.g., Marcy Gordon, SEC Enforcement Chief Linda Thomsen Leaving Amid Criticism of Agency's Failure in Madoff Case, Chi. Trib., Feb. 9, 2009, available at www.chicagotribune.com/business/sns-ap-enforcement-chief-resignation,06505866.story (stating that the SEC Commission was a lightning rod of criticism for the SEC's failure to detect a fifty billion dollar Ponzi scheme despite red flags raised by outsiders over the course of a decade); Amit R. Paley & David S. Hilzenrath, SEC Chief Defends His Restraint, Wash. Post, Dec. 24, 2008, at A1, http://www.washingtonpost.com/wp-dyn/content/article/2008/12/23/AR2008122302765_pf.html (stating that the SEC failed


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

to detect the fraud of the largest Ponzi scheme in history); Theo Francis, SEC's Cox Catches Blame for Financial Crisis, Bus. Week, Sept. 19, 2008, available at http://www.businessweek.com/print/bwdaily/dnflash/content/sep2008/db20080918_ 764469.htm (quoting the former head of the Congressional Budget Office as stating that the SEC "failed in its most fundamental oversight and surveillance functions."); Nicholas Rummell, Tumble in Restatements Sparks Criticism of SEC, Fin. Week, Aug. 25, 2008, available at http://www.financialweek.com (stating that a steep decline in restatements and material weaknesses in 2008 was more to do with a sleepier securities watchdog than with compliance with the Sarbanes-Oxley Act). There is also evidence that the SEC suffers from certain behavioral biases. Stephen J. Choi & A.C. Pritchard, Behavioral Economics and the SEC, 56 Stan. L. Rev. 1, 20-37 (2003) (cataloguing behavioral biases, such as bounded search, bounded rationality, availability and hindsight, framing, overconfidence, confirmation, and group think biases, that plague the SEC). While there is no indication that these same biases do not also affect private enforcers, plural forms of enforcement of the securities laws lessens the likelihood that one bias will dominant effective enforcement.

422 See Geoffrey C. Rapp, Beyond Protection: Invigorating Incentives for Sarbanes-Oxley Corporate and Securities Fraud Whistleblowers, 94 B.U. L. Rev. 91, 105 (2007) ("Congress could have simply eliminated private rights of action with the PSLRA, but chose not to. Congress found that private securities litigation amounted to an indispensable tool that promotes public and global confidence in our capital markets and helps deter wrongdoing.") (quotations omitted).

423 Gordon, supra note 421 (stating that there were serious questions about the impartiality and fairness of the SEC's investigation of alleged insider trading scheme for a hedge fund and claiming there was alleged political interference into the investigation by agency officials); Paley & Hilzenrath, supra note 421, at A01 (describing how SEC Chief, Christopher Cox, agreed to three-week ban on short selling because of intense pressure from the Treasury Secretary and Federal Reserve Chairman); Issacharoff, supra note 418, at 381 (stating that private enforcement frees individuals from dependence on collective bureaucratic remedies and gives them a personal stake in administering justice).

424 Aguilar, Empowering the Markets, supra note 420. However, newly appointed Mary Schapiro has changed this bureaucratic structure by replacing antiquated approval orders with 'permission slips' to be approved by a single member of the Commission rather than all five. Mary L. Schapiro, SEC Chairman, Address to Practising Law Institute's 'SEC Speaks in 2009' Program (Feb. 6, 2009) (transcript available at http://www.sec.gov).

425 Paley & Hilzenrath, supra note 421, at A01 (quoting Colleen M. Kelly, the president of the National Treasury Employees Union, as stating that there have not been enough resources or staffing over the years for the SEC to oversee the number of companies for which it is responsible).

426 Aguilar, Empowering the Markets, supra note 420.

427 Id. The SEC has had to freeze hiring as well to keep pace with year-to-year expense increases. Id.

428 Id. (noting that enforcement groups composed of fifteen lawyers often had only seven or eight lawyers by 2006).

429 Id.

430 Id. (stating that the budget was 888 million in 2005, 888.1 in 2006, 888.6 in 2007, and 906 million in 2008).

431 Luis A. Aguilar, SEC Commissioner, Remarks at the 'SEC Speaks in 2009': Increasing Accountability and Transparency to Investors (Feb. 6, 2009) (transcript available at http://www.sec.gov) [hereinafter Aguilar, Increasing Accountability] (stating that a stagnant SEC budget results in a limited hiring ability, difficulty in retaining adequate staff, limited technological advancements, curbed development, and limited ability to initiate new programs and investigations).


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

432 Aguilar, Increasing Accountability, supra note 431.

433 Aguilar, Empowering the Markets, supra note 420 (calling for empowerment of enforcement staff and a concentration of resources on cases with greater market reach).

434 Jan Larsen et al., SEC Settlements: A New Era Post-Sox, NERA Economic Consulting, 7 (Nov. 2008), available at http://www.nera.com/image/Settlements_Report_8.5x11_1108.pdf. A recent study by Pricewaterhouse Coopers reports that there was a five percent decrease in SEC involvement with the filings of securities class actions. Pricewaterhouse Coopers, LLP, 2008 Securities Litigation Study, at 32, available at http://10b5.pwc.com/PDF/NY-09-0894%20SECURITIES%CC20LIT%CC20STUDY%20FINAL.PDF. In fact, the last time SEC involvement was as low as it has been in 2008 and 2007 was as far back as 1999. Id.

435 Stavros Gadinis, Is Investor Protection the Top Priority of SEC Enforcement? Evidence from Actions Against Broker-Dealers, 5 (Harv. John M. Olin Ctr. for Law, Econ., and Bus. Fellows, Working Discussion Paper No. 27, 2009, available at http://www.law.harvad.edu/programs/olin_center/). See also Lucian Arye Bebchuk & Zvika Neeman, Investor Protection and Interest Group Politics, 28-33 (Harv. John M. Olin Ctr. for Law, Econ., and Bus. Fellows, Working Discussion Paper No. 603, Nov. 1, 2008, http://ssrn.com/abstract=1030355) (discussing how lobbying by interest groups can affect the level of investor protection). The authors of this Article truly doubt that such behavior is intentional. Nevertheless, the fact that it occurs is disconcerting.

436 Gadinis, supra note 435, at 4.

437 Id.

438 Id. at 5.

439 Id.

440 Id. The problem of revolving doors in government practice comes as no surprise as even lawyer ethics rules address such concerns. See Model Rules of Prof'l Resp. 1.9, 1.10, 1.11. However, affording different SEC sanctions based on employment prospects does not serve any legitimate public policy.

441 LaCroix, supra note 385 (paraphrasing Professor James Cox's debate at the Forum for Institutional Investors).

442 LaCroix, supra note 385. Indeed, corporate officials have more of a desire to avoid private accusations of fraud as those accusations may raise the specter of SEC enforcement.

443 Nancy Trejos, Irate Investors Filing More Class-Action Lawsuits, L.A. Times, Jan. 20, 2009, available at http://www.latimes.com/business/la-fi-investsuits20-2009jan20,0,4581867,print.story ("To cut down on legal expenses and exert their power in numbers, investors are banding together in securities class-action lawsuits.").

444 Aguilar, Empowering the Markets, supra note 420. Commissioner Mary L. Schapiro noted in a speech given in February:

Trillions of dollars of wealth have been lost. Our economy is in recession. And investor confidence has been badly shaken. Middle-class families who were relying on that nest egg to send a son or daughter to college or for a secure retirement now don't know where to turn.

PX347

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

Schapiro, Address to Practising Law Institute, supra note 424.

445 Ala. Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 235 (5th Cir. 2009).

446 Stoneridge Invs. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 180 (2008) (Stevens, J., dissenting) ("Congress enacted § 10(b) with the understanding that federal courts respected the principle that every wrong would have a remedy.").

447 Trejos, supra note 443.

448 Alicia Davis Evans, The Investor Compensation Fund, 33 J. Corp. L. 223, 225 (2007) (discussing Frank Easterbrook and Daniel Fischel's article concerning the inefficiency of securities class action damages).

449 Frank H. Easterbrook & Daniel R. Fischel, Optimal Damages in Securities Cases, 52 U. Chi. L. Rev. 611, 642 (1985). The fact that a large number of sophisticated, well-informed and profit motivated institutional investors continue to actively participate in these cases however indicates that these institutions believe that litigation is within their financial interest. LaCroix, supra note 385. Indeed, in 2008, public and union pension funds were lead plaintiff in forty-eight percent of all cases filed during 2008. Pricewaterhouse Coopers, LLP, 2008 Securities Litigation Study, at 26, http://10b5.pwc.com/PDF/NY-09-0894%20SECURITIES%CC20LIT%CC20STUDY%20FINAL.PDF.

Other critics contend that the private action serves only to transfer wealth from one shareholder to the next. Coffee, supra note 367. However, studies demonstrate that securities settlements typically fall within available insurance coverage, indicating that money is not going from just shareholder to shareholder. Baker & Griffith, supra note 406, at 761 ("[T]he vast majority of securities claims settle within or just above the limits of the defendant corporation's D&O coverage."); see also James D. Cox, Making Securities Fraud Class Actions Virtuous, 39 Ariz. L. Rev. 497, 511-13 (1997).

450 Evans, The Investor Compensation Fund, supra note 448, at 225 (citing Frank H. Easterbrook & Daniel R. Fishel, Optimal Damages in Securities Cases, 52 U. Chi. L. Rev. 611, 641 (1985)).

451 Id. at 228.

452 Id. at 229. Consumers of all types, whether they are buying orange juice or eggs, exhibit this asymmetrical behavior, overacting to bad news. Ori Brafman & Rom Brafman, Sway: The Irresistible Pull of Irrational Behavior 17-19 (2008) (discussing purchasers' more intense reaction when the price of eggs and juice rises as compared with purchasers' reaction when the price drops).

453 Evans, The Investor Compensation Fund, supra note 448, at 229. Additionally, the "portfolio theory is not raised as an objection to other types of commercial litigation where one company sues another to recover damages. The same pocket shifting argument could be applied to all commercial litigation, but no one is suggesting that all commercial litigation be eliminated as unjustified under the portfolio theory." LaCroix, supra note 385 (paraphrasing Professor Cox).

454 Evans, The Investor Compensation Fund, supra note 448, at 230.

455 Id. at 231.

456 LaCroix, supra note 385 (discussing Professor Cox's statements at the Forum for Institutional Investors).

PX347

457 Evans, The Investor Compensation Fund, supra note 448, at 232. Professor Evans sets forth the following hypothetical to illustrate:

Imagine the extreme case of the buy-and-hold investor that buys, but never sells (i.e., she holds the stocks in her portfolio until infinity). If this investor purchases a stock with a price that is inflated by fraud, the amount of this overpayment will never be recouped by a gain from selling a stock that also has an inflated price. This investor never sells. It is, of course, somewhat unrealistic to speak of an investor that never sells stock. Liquidity needs prompt virtually every investor to sell some stock eventually. However, the net buyer (rare seller) is not likely to have equivalent gains and losses from fraud. Thus, it is clear that this type of investor, who is following rational investment strategy, is not going to be economically indifferent to the incidence of fraud.

Id.

458 Id. at 235-36. This point should not be readily dismissed. In an age where stock trading is within the keystrokes of almost every individual, see E*Trade, more and more unsophisticated investors will be able to dabble in market investment who lack the wherewithal to develop a diversified portfolio.

459 Evans, The Investor Compensation Fund, supra note 448, at 235-36.

460 Sarbanes-Oxley, § 308, 15 U.S.C. § 7246(a) (2002). Section 308(a) states that if in any judicial or administrative action brought by the SEC under the securities laws the SEC obtains an order requiring disgorgement against any person for violating any such securities laws or regulations, or such a person agrees in settlement of such actions to disgorgement, and the SEC obtains a civil penalty against such person, the amount of that penalty shall become part of a disgorgement fund for the benefit of the victims of such violations. Id.

461 Id.

462 Barbara Black, Should the SEC be a Collection Agency for Defrauded Investors?, 63 Bus. Law. 317, 319 (2008). Professor Black maintains that the recovery should not be a primary aim of the SEC's enforcement policy however, because the SEC has many other competing considerations--such as the enforcement of aiding and abetting liability, enforcement against small companies, and enforcement against individuals--that are essential to ensuring the integrity of American financial markets. Id. at 342-45.

Black's hypothesis appears to be supported by data. While during 2007 the SEC saw its first increase in new accounting-related litigation since the enactment of SOX in 2002, in 2008, the number of new accounting-related litigation releases fell once again. Pricewaterhouse Coopers, LLP, 2008 Securities Litigation Study 36 (2009), http://10b5.pwc.com/PDF/NY-09-0894%20SECURITIES%CC20LIT%CC20STUDY%20FINAL.PDF. Correlatively, in 2008, the SEC reached record settlements in the history of the SEC. Id. at 38.

463 See supra Part VI.B.2 (stating that the SEC is marred by bureaucratic red tape and other agency restrictions absent in private enforcement). The SEC as a source of compensation only makes sense in limited circumstances: (1) when no private right of action exists, or (2) when public enforcement is cheaper than a private action. Verity Winship, Fair Funds and the SEC's Compensation of Injured Investors, 60 Fla. L. Rev. 1103, 1131-41 (2008).

464 Thomas, Why Summary Judgment is Still Unconstitutional: A Reply, supra 251, at 1684.

465 Id.

466 Id.

PX347

467 Markedly, Cornerstone Research reports that among class actions resolved after filing in 2005, forty-one percent were dismissed. Cornerstone Research, Securities Class Action Filings: 2008 A Year in Review, 16 (2008), available at http://securities.cornerstone.com/pdfs/YIR2008.

468 Id.

469 Thomas, Summary Judgment, supra note 252, at 178-79.

470 Baker & Griffith, supra note 406.

471 Id. at 761 ("[T]he vast majority of securities claims settle within or just above the limits of the defendant corporation's D&O coverage.").

472 See id. at 786. "If, as is generally the case, D&O insurance limits are significantly lower than potential investor losses, then average settlements will tend to be pulled down to a range closer to typical policy limits. Average settlement amounts thus reflect trends in D&O insurance policies as much as they do the severity of corporate fraud." Id. at 805.

473 Tom Baker & Sean J. Griffith state:

Trial ... is virtually unheard of. In an empirical study going back to 1980, a period in which thousands of securities fraud cases were filed, Black, Cheffins, and Klausner found only thirty-seven securities law cases seeking damages they were tried to judgment. RiskMetrics' Securities Litigation Watch reports that only six cases have gone to trial since 1996. The JDS Uniphase trial in late 2007 would appear to be the exception that proves the rule. As a result, once a claim survives a motion to dismiss, all involved know the odds strongly favor an eventual settlement.

Id. at 776 (internal citations omitted).

474 Burns, supra note 283, at 89, 91.

475 Id. at 120.

15 STNJLBF 183

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# PX 348

THE JOURNAL OF FINANCE • VOL. LXIII, NO. 3 • JUNE 2008

# More Than Words: Quantifying Language to Measure Firms' Fundamentals

PAUL C. TETLOCK, MAYTAL SAAR-TSECHANSKY, and SOFUS MACSKASSY*

**ABSTRACT**

We examine whether a simple quantitative measure of language can be used to predict individual firms' accounting earnings and stock returns. Our three main findings are: (1) the fraction of negative words in firm-specific news stories forecasts low firm earnings; (2) firms' stock prices briefly underreact to the information embedded in negative words; and (3) the earnings and return predictability from negative words is largest for the stories that focus on fundamentals. Together these findings suggest that linguistic media content captures otherwise hard-to-quantify aspects of firms' fundamentals, which investors quickly incorporate into stock prices.

> Language is conceived in sin and science is its redemption
>
> —W. V. Quine, *The Roots of Reference*

A VOLUMINOUS LITERATURE EXAMINES the extent to which stock market prices incorporate quantitative information. Although few researchers study the impact of qualitative verbal information, there are compelling theoretical and empirical reasons to do so.[1] Theoretically, efficient firm valuations should be equal to the expected present discounted value of their cash flows conditional on investors' information sets, which include qualitative descriptions of firms' business environments, operations, and prospects in the financial press. Empirically, substantial movements in firms' stock prices do not seem to correspond to changes in quantitative measures of firms' fundamentals (e.g., Shiller (1981), Roll (1988), and Cutler, Poterba, and Summers (1989)), suggesting that qualitative variables may help explain stock returns.

*Tetlock is with the Finance Department and Saar-Tsechansky is with the Information, Risk, and Operations Management Department at the University of Texas at Austin, McCombs School of Business. Macskassy is with Fetch Technologies. The authors are grateful for assiduous research assistance from Jie Cao and Shuming Liu. We appreciate helpful comments from Brad Barber, John Griffin, Alok Kumar, Terry Murray, David Musto, Terrance Odean, Chris Parsons, Mitchell Petersen, Laura Starks, Jeremy Stein, and Sheridan Titman, and from seminar participants at Barclays, Goldman Sachs, INSEAD, the Texas Finance Festival, University of California at Berkeley, University of Oregon, and University of Texas at Austin. We also thank two anonymous referees. Finally, we are especially grateful to the editor, Cam Harvey, and an anonymous associate editor for their excellent suggestions. The authors are responsible for any errors.

[1] In Section I, we discuss several recent studies that examine qualitative verbal information.

In this paper we quantify the language used in financial news stories in an effort to predict firms' accounting earnings and stock returns. Our study takes as a starting point Tetlock (2007), who examines how qualitative information—in particular, the fraction of negative words in a widely read news column about the stock market—is incorporated in aggregate market valuations. We extend that analysis to address the impact of negative words in all *Wall Street Journal* (*WSJ*) and *Dow Jones News Service* (*DJNS*) stories about individual S&P 500 firms from 1980 to 2004.[2] In addition to studying individual firms' stock returns, we investigate whether negative words can be used to improve expectations of firms' future cash flows. Overall, this study sheds light on whether and why quantifying language provides novel information about firms' earnings and returns.

Before delving into our tests, we call attention to two significant advantages to using the language in everyday news stories to predict firms' earnings and returns. First, by quantifying language, researchers can examine and judge the directional impact of a limitless variety of events, whereas most studies focus on one particular event type, such as earnings announcements, mergers, or analysts' recommendations. Analyzing a more complete set of events that affect firms' fundamental values allows researchers to identify common patterns in firm responses and market reactions to events. Equally important, examining all newsworthy events simultaneously limits the scope for "dredging for anomalies"—the phrase used by Fama (1998) to describe running event studies on different types of events until one obtains "significant" results.

Second, linguistic communication is a potentially important source of information about firms' fundamental values. Because very few stock market investors directly observe firms' production activities, they get most of their information secondhand. Their three main sources are analysts' forecasts, quantifiable publicly disclosed accounting variables, and linguistic descriptions of firms' current and future profit-generating activities. If analyst and accounting variables are incomplete or biased measures of firms' fundamentals, linguistic variables may have incremental explanatory power for firms' future earnings and returns.

As an example of our linguistic quantification method, consider a January 8, 1999 *DJNS* article entitled "Consumer Groups Say Microsoft Has Overcharged for Software." We hypothesize that the fraction of negative words contained in the article is related to the impact of the news event on Microsoft's market value (Tetlock (2007)). The article's second sentence is: "The alleged 'pricing abuse will only get worse if Microsoft is not disciplined sternly by the antitrust court,' said Mark Cooper, director of research for Consumer Federal of America." Based on the classification dictionary that we use, this sentence's fraction of negative words ranks in the 99th percentile of sentences within our news

[2] As in Tetlock (2007), we use negative words from the General Inquirer's Harvard-IV-4 classification dictionary to measure qualitative information. Our results are similar for alternative measures that include positive words from this same dictionary. See Section II for further discussion.



CONFIDENTIAL 

database.[3] In this case, the abundance of negative words is consistent with an intuitive reading of the story, and with Microsoft's abnormally poor stock returns around the news event.[4]

We do not claim that our crude quantitative measure of language subsumes or dominates traditional accounting measures of firms' fundamentals. Rather, we investigate whether the fraction of negative words in firm-specific news stories can improve our understanding of firms' cash flows and whether firms' stock market prices efficiently incorporate linguistic information. Insofar as negative word counts are noisy measures of qualitative information, the coefficients in our regressions should be biased toward zero, understating the true importance of qualitative information.

Despite this large measurement error, our first main result is that negative words convey negative information about firm earnings above and beyond stock analysts' forecasts and historical accounting data. In other words, qualitative verbal information does not merely echo easily quantifiable traditional measures of firm performance. We also test whether stock market prices rationally reflect the effect of negative words on firms' expected earnings. Our second result is that stock market prices respond to the information embedded in negative words with a small, one-day delay. As a result, we identify potential profits from using daily trading strategies based on the words in a continuous intraday news source (*DJNS*), but not from strategies based on a news source updated less frequently (*WSJ*). Accounting for reasonable transaction costs could eliminate the profitability of the high-frequency trading strategy, suggesting that short-run frictions play an important role in how information is incorporated in asset prices. To interpret these results further, we separately analyze negative words in news stories whose content focuses on firms' fundamentals. We find that negative words in stories about fundamentals predict earnings and returns more effectively than negative words in other stories. Collectively, our three findings suggest that linguistic media content captures otherwise hard-to-quantify aspects of firms' fundamentals, which investors quickly incorporate into stock prices.

The layout of the paper is as follows. In Section I we conduct a brief review of related research on qualitative information. Section II discusses the properties of the news stories used in this study. Sections III and IV present the main tests for whether negative words predict firms' earnings and stock returns, respectively. In Section V, we assess whether earnings and return predictability is strongest for timely (*DJNS*) news articles that focus on firms' fundamentals. In Section VI, we present our conclusions and outline directions for further research on media content.

[3] There are five negative words (alleged, abuse, worse, sternly, and antitrust) among the 29 total words in the sentence, or 17.2%, which exceeds the cutoff for the 99th percentile of our 1998 news story data. The tone of the sentence is representative of the entire article, which also ranks in the top decile for 1998.

[4] Microsoft's cumulative abnormal stock returns were –42, –141, and –194 basis points for the three trading days surrounding the news event.

## I. Research on Qualitative Information

To create a quantitative variable from text documents such as news stories, one must devise a representation of the unstructured text. The most common representation is the Bag-of-Words scheme, which represents all words appearing in news stories as a document-term matrix—for example, a row could be the 1/8/99 Microsoft story above, and columns could be the terms "alleged," "abuse," "worse," "happy," and "neutral." The matrix elements are designed to capture the information value of each word in each news story, which could be the relative frequencies of the 5 words within the 29-word excerpt: [1/29, 1/29, 1/29, 0/29, 0/29]. The challenge in text analysis is to translate this term–document matrix into a meaningful conceptual representation of the story, such as the degree to which the story conveys positive or negative information.

In this paper, we collapse the document-term matrix into just two columns using domain knowledge from the positive and negative word categories in the Harvard-IV-4 psychosocial dictionary. For reasons explained below, our primary focus is the negative column. We make the simplifying assumption that all negative words in the predetermined dictionary are equally informative, and other words are uninformative. As in the example above, we measure a story's negativity according to the relative frequency of negative words in each news story. These procedures conform to Tetlock (2007) and many psychological studies using the Harvard-IV-4 dictionary. A well-known and widely used text analysis program called the General Inquirer features this same dictionary.[5]

A more sophisticated alternative to our approach would entail estimating the information value of each word's occurrence in a story, and determining which words are most likely to appear in negative stories. Unfortunately, these nuances have significant drawbacks. First, subjective human judgment may be necessary to assess whether a story is negative. Second, determining which words are more likely to have negative meanings requires the estimation of potentially thousands of likelihoods ratios—one for every word used in classification. By contrast, we rely on extensive psychological research to identify negative words, thereby avoiding this daunting estimation task and the need for subjective human judgment. Our resulting word count measures are parsimonious, objective, replicable, and transparent. At this early stage in research on qualitative information, these four attributes are particularly important, and give word count measures a reasonable chance of becoming widely adopted in finance.

In addition to Tetlock (2007), several new research projects investigate the importance of qualitative information in finance. Our study is most closely related to concurrent work by Li (2006) and Davis, Piger, and Sedor (2006), who analyze the tone of qualitative information using objective word counts from corporate annual reports and earnings press releases, respectively. Whereas

[5] The Harvard-IV-4 dictionary on the General Inquirer's Web site lists each word in the negative category: http://www.webuse.umd.edu:9090/tags/TAGNeg.html. See Riffe, Lacy, and Fico (1998) for a survey of content analysis and its application to the media.



CONFIDENTIAL Q121SEC00954668

Davis, Piger, and Sedor (2006) examine the contemporaneous relationships between earnings, returns, and qualitative information, Li (2006) focuses on the predictive ability of qualitative information as we do.

Li (2006) finds that the two words "risk" and "uncertain" in firms' annual reports predict low annual earnings and stock returns, which the author interprets as underreaction to "risk sentiment." Our study differs from Li (2006) in that we examine qualitative information in news stories at daily horizons rather than qualitative information in annual reports at annual horizons. Our predictability tests use over 80 quarters of earnings and over 6,000 days of returns data, as compared to 12 years of earnings and 12 years of returns data in Li (2006). Other differences between our studies, such as the measures used, do not seem to be as important. When we use the words "risk" and "uncertain" rather than the entire negative words category to measure qualitative information, we find similar albeit slightly weaker earnings and return predictability.

Some prior and contemporaneous research analyzes qualitative information using more sophisticated subjective measures, rather than simple objective word counts. However, most of this work focuses on firms' stock returns and ignores firms' earnings. For example, Antweiler and Frank (2004) and Das and Chen (2006) design algorithms to reproduce humans' "bullish," "neutral," or "bearish" ratings of internet chat room messages and news stories. Neither study finds any statistically significant return predictability in individual stocks. A recent study by Antweiler and Frank (2006), which uses an algorithm to identify news stories by their topic rather than their tone, does find some return predictability. For many of their topic classifications, Antweiler and Frank (2006) find significant return reversals in the 10-day period around the news, which they interpret as overreaction to news regardless of its tone.

## II. Stylized Facts about Firm-Specific News Stories

We concentrate our analysis on the fraction of negative words in *DJNS* and *WSJ* stories about S&P 500 firms from 1980 through 2004. We choose the S&P 500 constituent firms for reasons of importance and tractability. Firms in the S&P 500 index encompass roughly three-quarters of the total U.S. market capitalization, and appear in the news sufficiently often to make the analysis interesting.

We obtain S&P index constituents and their stock price data from the Center for Research on Security Prices (CRSP), analyst forecast information from the Institutional Brokers' Estimate System (I/B/E/S), and accounting information from Compustat. Merging the news stories and the financial information for a given firm requires matching firms' common names used in news stories to their permnos, CUSIPs, or gvkeys used in the above financial data sets. Although firms' common names usually resemble the firm names appearing in financial data sets, perfect matches are rare.

To obtain the common names that we use as search strings for news stories, we begin with the company name variable in the CRSP data for all S&P 500 index constituents during the relevant time frame. We use the CRSP company



CONFIDENTIAL 

name change file to identify situations in which a firm in the index changes its name. We focus on news stories featuring the company name most directly related to the stock. Thus, for conglomerates, we use the holding company name, not the subsidiary names—for example, PepsiCo, Inc., or Pepsi for short, rather than Gatorade or Frito-Lay. This means that we may miss news stories about some firms' major products, possibly weakening our results.

Our source for news stories is the Factiva database. To find the name that media outlets use to refer to a firm, we use a combination of four different methods that are described in detail in the Appendix. Because of the large number of firms and news stories, we implement an automated story retrieval system. For each S&P 500 firm, the system constructs a query that specifies the characteristics of the stories to be retrieved. The system then submits the query and records the retrieved stories.

In total, we retrieve over 350,000 qualifying news stories—over 260,000 from *DJNS* and over 90,000 from *WSJ*—that contain over 100,000,000 words. We find at least one story for 1,063 of 1,110 (95.8%) of the firms in the S&P 500 from 1980 to 2004 (see the Appendix for details). We include a news story in our analysis only if it occurs while the firm is a member of the S&P index and is within our 25-year time frame. We also exclude stories in the first week after a firm has been newly added to the index to prevent the well-known price increase associated with a firm's inclusion in the S&P 500 index from affecting our analysis (Shleifer (1986)).

Each of the stories in our sample meets certain requirements that we impose to eliminate irrelevant stories and blurbs. Specifically, we require that each firm-specific story mentions the firm's official name at least once within the first 25 words, including the headline, and the firm's popular name at least twice within the full story. In addition, we require that each story contains at least 50 words in total, and at least 5 words that are either "Positive" or "Negative," where at least 3 of the 5 must be unique. We impose these three word count filters to eliminate stories that contain only tables or lists with company names and quantitative information, and to limit the influence of outliers on the negative words measure described below.

Following Tetlock (2007), our primary measure of media content is the standardized fraction of negative words in each news story. In unreported tests, we find very similar results using combined measures of positive ($P$) and negative ($N$) words, such as $(P - N)/(P + N)$ and $\log((1 + P)/(1 + N))$. However, using positive words in isolation produces much weaker results, especially after controlling for negative words. These results are consistent with the general analysis of word categories in Tetlock (2007). That study shows that negative words summarize common variation in the entire set of General Inquirer word categories better than any other single category, including positive words—that is, negatives are most highly correlated with the first eigenvector of the $N$ by $N$ variance-covariance matrix for all $N$ word categories. Tetlock (2007) also finds that negative words have a much stronger correlation with stock returns than other words. These results are also consistent with a large body of literature in psychology—for example, Baumeister et al. (2001) and Rozin and Royzman (2001)—that argues negative information has more impact and



CONFIDENTIAL 

is more thoroughly processed than positive information across a wide range of contexts.

Before counting instances of negative words, we combine all qualifying news stories for each firm on a given trading day into a single composite story. We standardize the fraction of negative words in each composite news story by subtracting the prior year's mean and dividing by the prior year's standard deviation of the fraction of negative words. Formally, we define two measures of negative words:

$$Neg = \frac{\text{No. of negative words}}{\text{No. of total words}} \tag{1}$$

$$neg = \frac{Neg - \mu_{Neg}}{\sigma_{Neg}}, \tag{2}$$

where $\mu_{Neg}$ is the mean of *Neg* and $\sigma_{Neg}$ is the standard deviation of *Neg* over the prior calendar year. The standardization may be necessary if *Neg* is nonstationary, which could happen if there are regime changes in the distribution of words in news stories—for example, the *DJNS* or *WSJ* changes its coverage or style. The variable *neg* is the stationary measure of media content that we employ in our regression analyses.

Before analyzing the predictive power of linguistic media content, we document an important stylized fact: There are many more firm-specific news stories in the days immediately surrounding a firm's earnings announcement. For each firm-specific news story, we calculate the number of days until the firm's next earnings announcement and the number of days that have passed since the firm's previous earnings announcement. We plot a histogram of both variables back-to-back in Figure 1. Thus, each story is counted exactly twice in Figure 1, once after the previous announcement and once before the next announcement, except the stories that occur on the earnings announcement day.

Figure 1 provides striking evidence that news stories concentrate around earnings announcement days, as shown by the three adjacent spikes representing the firm-specific news stories one day before, on the same day as, and one day after a firm's earnings announcement. This finding suggests that news stories could play an important role in communicating and disseminating information about firms' fundamentals. In the next three sections, we provide further support for this interpretation of Figure 1.

## III. Using Negative Words to Predict Earnings

We now formally investigate whether the language used by the media provides new information about firms' fundamentals and whether stock market prices efficiently incorporate this information. In order to affect stock returns, negative words must convey novel information about either firms' cash flows or investors' discount rates (Campbell and Shiller (1987)). Our tests in this section focus on whether negative words can predict earnings, a proxy for cash flows,




**Figure 1. Media coverage around earnings announcements.** This figure depicts the relationship between the number of firm-specific news stories and the number of days away from a firm's earnings announcement. All stories included in the figure are about S&P 500 firms, appear in either *Dow Jones News Service* or *The Wall Street Journal* from 1980 through 2004, and meet basic minimum word requirements (see text for details). For each news story, we calculate the number of days until the firm's next earnings announcement and the number of days that have passed since the firm's last earnings announcement. We plot a histogram of both variables back-to-back in Figure 1. Thus, each story is counted twice in Figure 1, once before and once after the nearest announcement, except the stories occurring on the earnings announcement day.

and therefore permanent changes in prices. The return predictability tests in Section IV address the possibility that negative words proxy for changes in investors' discount rates, and therefore lead to return reversals. The idea underlying our earnings predictability tests is that negative words in a firm's news stories prior to the firm's earnings announcement could measure otherwise hard-to-quantify unfavorable aspects of the firm's business environment.

We use two measures of firms' quarterly accounting earnings as dependent variables in our predictability tests, as the quarterly frequency is the highest frequency for earnings data. Our main tests compute each firm's standardized unexpected earnings (*SUE*) following Bernard and Thomas (1989), who use a seasonal random walk with trend model for each firm's earnings:

$$UE_t = E_t - E_{t-4} \tag{3}$$

$$SUE_t = \frac{UE_t - \mu_{UE_t}}{\sigma_{UE_t}}, \tag{4}$$

PX348

Page 8371

CONFIDENTIAL Q121SEC00954672

where $E_t$ is the firm's earnings in quarter $t$, and the trend and volatility of unexpected earnings ($UE$) are equal to the mean ($\mu$) and standard deviation ($\sigma$) of the firm's previous 20 quarters of unexpected earnings data, respectively. As in Bernard and Thomas (1989), we require that each firm have nonmissing earnings data for the most recent 10 quarters and assume a zero trend for all firms with fewer than 4 years of earnings data.

We also use standardized analysts' forecast errors (*SAFE*) as an alternative measure of firms' earnings to ensure robustness. *SAFE* is equal to the median stock analyst's earnings forecast error divided by earnings volatility ($\sigma$), which is the same as the denominator of *SUE*. We use the median analyst forecast from the most recent statistical period in the I/B/E/S summary file prior to 3 days before the earnings announcement.[6] We winsorize *SUE* and all analyst forecast variables at the 1% level to reduce the impact of estimation error and extreme outliers, respectively. Despite the well-known biases in stock analysts' earnings forecasts, we find remarkably similar results using *SUE* and *SAFE*.[7]

We attempt to match the frequency of our news measure to the frequency of our quarterly earnings variable. Our measure of negative words ($neg_{-30,-3}$) is the standardized number of negative words in all news stories between 30 and 3 trading days prior to an earnings announcement divided by the total number of words in these news stories. That is, we construct the measure exactly analogous to the story-specific measure ($neg$) defined earlier, where we treat all the words in the [–30,–3] time window as though they form a single composite news story. We standardize $neg_{-30,-3}$ by subtracting the prior year's mean and dividing by the prior year's standard deviation.

The timing of $neg_{-30,-3}$ is designed to include news stories about the upcoming quarter's earnings announcement. Because 30 trading days is roughly one-half of a trading quarter, it is likely that most of the news stories in the [–30,–3] time window focus on the firm's upcoming announcement rather than its previous quarter's announcement. In addition, we allow for 2 full trading days between the last news story included in this measure and the earnings announcement because Compustat earnings announcement dates may not be exact. None of our qualitative results change if we set the beginning of the time window to 20 or 40 trading days before the announcement, or set the ending of the window to 1 or 5 trading days before the announcement.

In all earnings predictability regressions, we include control variables based on a firm's lagged earnings, size, book-to-market ratio, trading volume, three measures of recent stock returns, analysts' earnings forecast revisions, and analysts' forecast dispersion. We measure firms' lagged earnings using last quarter's *SUE* or *SAFE* measure, depending on which of these two variables is

[6] Based on our conversations with Wharton Research Data Services representatives, the median forecast comes from the distribution that includes only the most up-to-date forecasts from each brokerage.

[7] Several studies argue that analyst earnings forecasts are too optimistic (e.g., Easterwood and Nutt (1999)), overreact to certain pieces of information (e.g., De Bondt and Thaler (1990)), and underreact to other information (e.g., Abarbanell and Bernard (1992)), among other biases.



CONFIDENTIAL 

the dependent variable in the regression.[8] We measure firm size (*Log(Market Equity)*) and book-to-market (*Log(Book / Market)*) at the end of the preceding calendar year, following Fama and French (1992). We compute trading volume as the log of annual shares traded divided by shares outstanding (*Log(Share Turnover)*) at the end of the preceding calendar year.

Our three control variables for a firm's past returns are based on a simple earnings announcement event study methodology.[9] We estimate benchmark returns using the Fama-French (1993) three-factor model with an estimation window of [–252,–31] trading days prior to the earnings announcement. We include two control variables for a firm's recent returns, the cumulative abnormal return from the [–30,–3] trading day window ($FFCAR_{-30,-3}$) and the abnormal return on day –2 ($FFCAR_{-2,-2}$). These return windows end 1 trading day after our [–30,–3] news story time window to ensure that we capture the full price impact of the news stories. Our third control variable, $FFAlpha_{-252,-31}$, is the estimated intercept from the event study regression that spans the [–252,–31] time window. We interpret the $FFAlpha_{-252,-31}$ measure as the firm's in-sample cumulative abnormal return over the previous calendar year, skipping the most recent month. The $FFAlpha_{-252,-31}$ variable is related to the Jegadeesh and Titman (1993) return momentum effect, which is based on firms' relative returns over the previous calendar year excluding the most recent month.

In all our earnings regressions, we include control variables for the median analyst's quarterly forecast revision and analysts' quarterly forecast dispersion. We compute the median analyst's 3-month earnings forecast revision (*Forecast Revisions*) following Chan, Jegadeesh, and Lakonishok (1996). We use 3-month revision periods rather than 6-month periods because these revisions capture new information after the forecast preceding last quarter's earnings announcement, which is already included in our regressions as a separate control. This revision variable is equal to the 3-month sum of scaled changes in the median analyst's forecast, where the scaling factor is the firm's stock price in the prior month. We compute analysts' forecast dispersion (*Forecast Dispersion*) as the standard deviation of analysts' earnings forecasts in the most recent time period prior to the announcement scaled by earnings volatility ($\sigma$)—that is, the denominator of *SUE* and *SAFE*. We construct both of these control variables using quarterly analyst forecasts to match our dependent variables, which are based on quarterly earnings measures. Because analysts' quarterly forecasts are unavailable from I/B/E/S between 1980 and 1983 and for firms without analyst coverage, the earnings predictability regressions that we report do not include these observations.[10]

Even though the stock return control variable ($FFCAR_{-30,-3}$) includes all of the information embedded in news stories during the [–30,–3] time window, it

[8] The inclusion of additional lags of the dependent variables does not change the results.

[9] Controlling for alternative measures of past returns such as raw event returns and the past calendar year's return does not change our qualitative results.

[10] If we omit the two analyst variables and include these remaining observations in our regressions, we find very similar results.

PX348

Page 8373

CONFIDENTIAL Q121SEC00954674

is possible that these stories are more recent than the most recent analyst forecast data. Indeed, many *WSJ* and *DJNS* news stories explicitly mention stock analysts, suggesting negative words in these stories may draw some predictive power from analysts' qualitative insights. To guard against the possibility that negative words predict returns solely because they appear more recently than the *quantitative* analyst forecasts, we also calculate a "Before Forecasts" negative words measure ($neg_{-30,-3}$) that includes only the stories that occur at least 1 trading day prior to the date of the most recent consensus analyst forecast.[11]

We estimate the ability of negative words ($neg_{-30,-3}$) to predict earnings (*SUE* or *SAFE*) using pooled ordinary least squares (OLS) regressions and standard errors clustered by calendar quarter (Froot (1989)). The rationale is that the dependent variable (*SUE* or *SAFE*) is already standardized to remove any firm effect, but does exhibit a time effect because firms' realized earnings are undoubtedly correlated within calendar quarters. We confirm this reasoning using several diagnostic checks following Petersen (2007). These tests also suggest that, if anything, our coefficients and standard errors are conservative relative to a wide range of alternative estimation techniques.[12]

Table I reports estimates of the ability of negative words ($neg_{-30,-3}$) to predict quarterly earnings using six OLS regressions: two different dependent variables (*SUE*; *SAFE*) regressed on negative words computed based on four sets of news stories (*DJNS*, *WSJ*, "Before Forecasts," and "All Stories"). The key result is that negative words ($neg_{-30,-3}$) consistently predict lower earnings, regardless of whether we use the *SUE* or *SAFE* measure, and regardless of whether we use stories from *DJNS* or *WSJ* or from the time period before stock analysts state their earnings forecasts.

Although negative words ($neg_{-30,-3}$) from *WSJ* stories appear to predict *SUE* slightly better than $neg_{-30,-3}$ from *DJNS* stories, the *WSJ* coefficient estimates of $neg_{-30,-3}$ are not statistically different from the *DJNS* estimates. All six estimates of the dependence of earnings on negative words are negative and statistically significant at the 99% level. Because the independent and dependent variables are standardized, the rough economic interpretation of the "All Stories" *SUE* estimate is that the conditional expectation of *SUE* is $4 \times (0.064) = 0.255$ standard deviations lower as $neg_{-30,-3}$ increases from two standard deviations below to two standard deviations above its mean value.

We now analyze the *SUE* and *SAFE* regressions that compute negative words using stories from both news sources in greater detail. Columns 4 and 6 in

[11] Because I/B/E/S reviews and updates the accuracy and timing of analyst forecasts even after the consensus forecast date, it is unlikely that news stories from one trading day earlier contain information not reflected in the consensus. In addition, allowing three trading days does not change our qualitative results.

[12] If we use fixed-effects models instead, the point estimates of the key coefficients increase and the standard errors remain similar. This robustness is comforting because fixed-effects estimators and pooled OLS estimators for dynamic panel data models with lagged dependent variables show opposite small sample biases (see Nickell (1981)). We also find qualitatively similar estimates using quarterly cross-sectional Fama-MacBeth (1973) regressions and Newey-West (1987) standard errors for the coefficients. Including yearly time dummies in the pooled OLS regressions also does not affect our results.

**Table I**
## Predicting Earnings Using Negative Words

This table shows estimates of the ability of negative words ($neg_{-30,-3}$) to predict quarterly earnings (*SUE* or *SAFE*) using ordinary least squares (OLS) regressions. We display the regression coefficients and summary statistics from six regressions below: two different dependent variables (*SUE* and *SAFE*) regressed on negative words computed based on four sets of news stories (*Dow Jones News Service* (*DJNS*), *The Wall Street Journal* (*WSJ*), "Before Forecasts," and "All Stories"). *SUE* is a firm's standardized unexpected quarterly earnings; and *SAFE* is the standardized analysts' forecast error for the firm's quarterly earnings. The negative words variable ($neg_{-30,-3}$) is the standardized number of negative words in the news stories from 30 to 3 trading days prior to an earnings announcement divided by the total number of words in these news stories. The *DJNS* and *WSJ* regressions use only stories from these sources to compute $neg_{-30,-3}$. The two "Before Forecasts" regressions compute $neg_{-30,-3}$ using only stories that occur 1 trading day before the most recent consensus analyst forecast. All regressions include control variables for lagged firm earnings, firm size, book-to-market, trading volume, recent and distant past stock returns, and analysts' quarterly forecast revisions and dispersion (see text for details). Following Froot (1989), we compute clustered standard errors by calendar quarter. The robust $t$-statistics are in parentheses.

| | *SUE* | | | | *SAFE* | |
|---|---|---|---|---|---|---|
| Stories Included | *DJNS* | *WSJ* | Before Forecasts | All Stories | Before Forecasts | All Stories |
| $neg_{-30,-3}$ | −0.0584 | −0.1083 | −0.0640 | −0.0637 | −0.0192 | −0.0197 |
| | (−4.42) | (−5.28) | (−3.95) | (−4.69) | (−3.79) | (−4.44) |
| *Lag(Dependent Var)* | 0.2089 | 0.2082 | 0.2042 | 0.2101 | 0.2399 | 0.2523 |
| | (11.82) | (11.83) | (11.90) | (11.98) | (7.82) | (8.74) |
| *Forecast Dispersion* | −0.9567 | −1.0299 | −0.9634 | −0.9373 | −0.2984 | −0.3076 |
| | (−9.84) | (−9.59) | (−9.21) | (−10.20) | (−5.34) | (−6.34) |
| *Forecast Revisions* | 20.2385 | 18.0394 | 20.4855 | 19.5198 | 0.5111 | 0.7580 |
| | (8.89) | (7.91) | (8.51) | (8.94) | (0.68) | (1.19) |
| *Log(Market Equity)* | −0.0071 | 0.0003 | −0.0043 | −0.0037 | 0.0258 | 0.0289 |
| | (−0.40) | (0.01) | (−0.24) | (−0.21) | (4.79) | (5.32) |
| *Log(Book / Market)* | 0.0173 | 0.0182 | 0.0221 | 0.0204 | −0.0162 | −0.0110 |
| | (0.62) | (0.56) | (0.77) | (0.75) | (−1.97) | (−1.41) |
| *Log(Share Turnover)* | −0.1241 | −0.1348 | −0.1095 | −0.1261 | 0.0274 | 0.0254 |
| | (−3.09) | (−2.90) | (−2.75) | (−3.20) | (2.69) | (2.61) |
| $FFAlpha_{-252,-31}$ | 1.9784 | 1.9711 | 1.9770 | 2.0015 | 0.2199 | 0.2382 |
| | (9.14) | (9.90) | (10.01) | (9.50) | (4.17) | (4.36) |
| $FFCAR_{-30,-3}$ | 0.0119 | 0.0129 | 0.0117 | 0.0116 | 0.0062 | 0.0071 |
| | (6.76) | (6.33) | (6.28) | (6.64) | (10.17) | (11.38) |
| $FFCAR_{-2,-2}$ | 0.0104 | 0.0103 | 0.0177 | 0.0118 | 0.0053 | 0.0037 |
| | (1.65) | (1.37) | (2.40) | (1.91) | (2.30) | (1.89) |
| Observations | 16755 | 11192 | 13722 | 17769 | 12907 | 16658 |
| Clusters | 80 | 79 | 78 | 80 | 78 | 79 |
| Adjusted $R^2$ | 0.1177 | 0.1204 | 0.1158 | 0.1187 | 0.1163 | 0.1244 |

Table I display the coefficient estimates for all independent variables in these two regressions. As one would expect, several control variables exhibit strong explanatory power for future earnings. For example, lagged earnings, variables based on analysts' forecasts, and recent stock returns ($FFCAR_{-30,-3}$) are all powerful predictors of earnings.

To gain intuition on the importance of language in predicting fundamentals, we compare the abilities of negative words in firm-specific news stories ($neg_{-30,-3}$) and firms' recent stock returns ($FFCAR_{-30,-3}$) to predict future earnings. The logic of this comparison is that both variables capture potentially relevant firm-specific information over the same time horizon—their correlation is –0.05, and strongly statistically significant. This is a particularly challenging comparison for language because the firm's abnormal return measures the representative investor's interpretation of firm-specific news, which is undoubtedly based on a more sophisticated reading of the linguistic content that we quantify. In this respect, it is surprising that quantified language has any explanatory power above and beyond market returns. Indeed, one could view a firm's abnormal return ($FFCAR_{-30,-3}$) measured over the time horizon in which there is news ([–30,–3]) as an alternative quantification of the tone of news (e.g., Chan (2003)).

Surprisingly, Columns 4 and 6 in Table I reveal that negative words and recent stock returns have almost the same statistical impact and comparable economic impacts on future earnings. After standardizing the coefficients to adjust for the different variances of the independent variables, we find that the economic impact of past returns is 0.127 *SUE* and the impact of negative words is 0.063 *SUE*—roughly half as large. We infer that incorporating directly quantified language in earnings forecasts significantly improves upon using stock returns alone to quantify investors' reactions to news stories.

The "Before Forecasts" columns (3 and 5) in Table I show that negative words ($neg_{-30,-3}$) robustly predict both *SUE* and *SAFE* even after we exclude words from the most recent stories. Surprisingly, the respective $neg_{-30,-3}$ coefficients change in magnitude by less than 3% relative to Columns 4 and 6, and both remain strongly significant at any conventional level ($p$-values $< 0.001$).

In additional unreported tests, we run separate regressions for two subperiods, pre-1995 and 1995 to 2004, based on the idea that media coverage changed significantly in 1995 with the introduction of the Internet—for example, the *WSJ* officially launched WSJ.com on April 29, 1995. The main finding is that the significance and magnitude of all our results are quite similar for both subperiods. In summary, the evidence consistently shows that even a crude quantification of qualitative fundamentals ($neg_{-30,-3}$) can predict earnings above and beyond more recent measures of market prices and analysts' forecasts.

We now examine the long-run time-series behavior of earnings surrounding the release of negative words in firm-specific news stories. Figure 2 compares the earnings of firms with negative and positive news stories from 10 fiscal quarters prior to an earnings announcement up to 10 fiscal quarters after the earnings announcement. The dependent variable in Figure 2 is a firm's cumulative *SUE* beginning 10 quarters prior to the earnings announcement when the news was released. Our cumulative *SUE* computation does not discount earnings in different time periods. Using a positive discount rate would make the effect of negative words on earnings appear larger and more permanent.

PX348

Page 8376




**Figure 2. Firms' fundamentals around positive and negative news stories.** In this figure, we graph firms' cumulative standardized unexpected earnings (*SUE*) from 10 fiscal quarters preceding media coverage of an earnings announcement to 10 quarters after the media coverage. We define media coverage of the announcement as positive (negative) when it contains a fraction of negative words ($Neg_{-30,-3}$) in the previous year's top (bottom) quartile. The measure of negative words ($Neg_{-30,-3}$) is the fraction of words that are negative in the news stories from 30 trading days prior up to 3 trading days prior to an earnings announcement. We separately analyze the firms with positive and negative media coverage prior to their earnings announcements. We compute the cumulative *SUE* for both sets of firms, beginning 10 quarters prior to the news and ending 10 quarters after the news. To compute *SUE* values after the news stories, we use only unexpected earnings benchmarks known at the time of the news—that is, those based on earnings prior to quarter zero (see text for details).

To compute *SUE* values after the news stories in Figure 2, we use only benchmarks for unexpected earnings that are known at the time of the news—that is, those based on earnings information prior to quarter zero. We use the matching seasonal earnings figure from before quarter zero to compute unexpected earnings after quarter zero—for example, we subtract $E_{-3}$ from $E_1$, $E_5$, and $E_9$ to obtain $UE_1$, $UE_5$, and $UE_9$. To obtain *SUE* measures, we standardize these unexpected earnings values using the mean and volatility of unexpected

earnings as measured in quarter zero.[13] We define positive (negative) news as news in which the variable $Neg_{-30,-3}$ is in the bottom (top) quartile of the previous year's distribution of $Neg_{-30,-3}$.[14]

Figure 2 shows that firms with negative news stories before an earnings announcement experience large negative shocks to their earnings that endure for at least 4 quarters after the news. Although there are noticeable differences between firms with positive stories and those with many negative stories that appear before the news is released (0.772 cumulative *SUE*), the greatest discrepancy between the cumulative earnings of the two types of firms (1.816 cumulative *SUE*) appears in the sixth fiscal quarter after the news event. It appears as though most of the impact of negative words on cumulative earnings is permanent—1.764 cumulative *SUE* after 10 quarters, which is 0.992 cumulative *SUE* more than prior to the news. However, it is difficult to judge the magnitude and duration of the effect based on just 10 independent 10-quarter periods.

From the analysis above, we conclude that negative words in firm-specific stories leading up to earnings announcements significantly contribute to a useful measure of firms' fundamentals. One view is that this result is surprising because numerous stock analysts and investors closely monitor the actions of S&P 500 firms. Yet even after controlling for recent stock returns, analyst forecasts and revisions, and other measures of investors' knowledge, we find that a rudimentary linguistic measure of negative news still forecasts earnings. Furthermore, as we will demonstrate in Section V, it is possible to improve substantially upon this basic negative word count measure.

An alternative view is that negative words are informative measures of firms' fundamentals because they do not suffer from the same shortcomings as the quantitative variables that one can use to forecast earnings. For example, it is widely known that stock analysts' earnings forecasts exhibit significant biases that limit their forecasting power. In addition, stock market returns reflect revisions in investors' expectations of the present value of all future earnings as opposed to just next quarter's earnings, which is the dependent measure in our regressions. Even if investors and stock analysts are fully aware of the information embedded in negative words, negative words may have significant incremental explanatory power for future earnings because readily available quantitative variables are not accurate representations of investors' expectations.

[13] We correct for the longer time intervals ($T$ years) between the benchmark and unexpected earnings using the seasonal random walk assumption that the mean of unexpected earnings scales linearly ($\mu T$) and the volatility increases with the square root of the time interval ($\sigma T^{1/2}$). To mitigate any benchmarking biases, we also rescale *SUE* in each quarter so that its unconditional mean is zero, which affects the level of the lines in Figure 2 but has no impact on the difference between them.

[14] As one would expect, the fractions of positive and negative words in news stories are negatively correlated (–0.18, $p$-value $< 0.001$). For this reason, defining positive stories as those with relatively few negative words also produces stories with relatively more positive words.

## IV. Using Negative Words to Predict Stock Returns

We subject the two competing views described above to empirical scrutiny in our return predictability tests. Having established that negative words in news stories can predict firms' fundamentals, we now examine whether they provide novel information not already represented in stock market prices. Unfortunately, we cannot test this conjecture by looking at contemporaneous market returns. Although there is a significant negative relationship between negative words and concurrent market returns, it is difficult to know which variable causes the other. Instead, we hypothesize that investors do not immediately respond in full to the news embedded in negative words. To test this theory, we explore whether negative words predict firms' future stock returns.

### *A. Predicting Returns in Story Event Time*

In this subsection, we focus on OLS regression estimates of the effect of negative words on future stock returns in event time relative to the release of the news story. We use daily returns and news stories because these are the highest frequencies for which both data are reliably available—that is, all firms have daily returns for the entire sample, and the *WSJ* is a daily publication. Other benefits of this choice are that the news and return data frequency match each other and match the data frequency in Tetlock (2007).

Our main test assesses whether standardized fractions of negative words in firm-specific news stories on day zero predict firms' close-to-close stock returns on day one. For all *DJNS* stories, we obtain precise time stamp data to exclude stories that occur after 3:30 pm on day zero—that is, 30 minutes prior to market closing. To be conservative, we use the last time stamp for each story, which indicates when the story was most recently updated. Thus, in many cases, the negative words in *DJNS* stories became known to investors much earlier, often by 1 hour, than we assume. This ensures that traders have at least 30 minutes, and usually much longer, to digest and trade on the information in these stories. For all *WSJ* stories, we assume that stories printed in the morning's *WSJ* are available to traders well before the market close on the same day.

In each regression, we include several standard control variables to assess whether negative words predict returns above and beyond already-known sources of predictability, including both firms' characteristics (Daniel et al. (1997)) and firms' covariances with priced risk factors (Fama and French (1993)). We include all of the characteristic controls in the earnings predictability regressions, except the two analyst earnings forecast variables.[15] That is, we include the firm's most recent earnings announcement (*SUE*), along with its

[15] When we include the two analyst forecast variables, we find that both revisions and dispersion are statistically and economically insignificant predictors of returns in our sample. The coefficients on the key variables do not change materially. Thus, we omit the analyst variables to include any S&P 500 firms without analyst coverage and the first 4 years of our sample in the regression results.

Case 3:17-cv-00121-JO-MSB Doc 377-15 Filed 05/07/24 PgID.35650 Pg 229 of 342



close-to-close abnormal returns on the day of the news story ($FFCAR_{0,0}$), each of the previous 2 trading days ($FFCAR_{-1,-1}$ and $FFCAR_{-2,-2}$), the previous month ($FFCAR_{-30,-3}$), and the previous year ($FFAlpha_{-252,-31}$). These controls are designed to capture return predictability from past earnings (e.g., Ball and Brown (1968)) and past returns (e.g., Jegadeesh and Titman (1993)), which may be distinct phenomena (e.g., Chan, Jegadeesh, and Lakonishok (1996)). In addition, we control for firm size and book-to-market ratios using each firm's log of market capitalization and log of book-to-market equity measured at the end of the most recent June. These controls mimic the variables that Fama and French (1992) use to predict returns. We also control for trading volume using the log of share turnover.

We run two sets of regressions to ensure that firms' return covariances with priced risk factors do not drive our results. In the first set of regressions, we use each firm's next-day abnormal return as the dependent variable, where the Fama-French three-factor model is the benchmark for expected returns.[16] To ensure that our results do not depend heavily on the benchmarking process, we run a second set of regressions in which we use each firm's next-day raw return as the dependent variable.

Table II reports the results from six OLS regressions, two different dependent variables (raw and abnormal next-day returns) regressed on each of three different negative words measures (*DJNS*, *WSJ*, and "All Stories"). The table shows the coefficients on negative words in firm-specific news stories and their associated *t*-statistics. We compute clustered standard errors (Froot (1989)) to account for the correlations between firms' stock returns within trading days. The reasons for choosing OLS regression estimates and standard errors clustered by time period are analogous to those discussed in Section III and are not repeated here. Table II reports the number of clusters—that is, trading days—and the adjusted $R^2$ for each regression.

The main result in Table II is that negative words in firm-specific news stories robustly predict slightly lower returns on the following trading day. The coefficients on negative words (*neg*) are consistently significant in all four of the regressions where news stories from *DJNS* are included. The magnitude of the *DJNS* regression coefficient on *neg*, which is already standardized, implies that next-day abnormal returns ($FFCAR_{+1,+1}$) are 3.20 basis points lower after each one-standard deviation increase in negative words.

Interestingly, the coefficients on negative words are less than half as large and statistically insignificant in the two regressions where only *WSJ* stories are included. One interpretation is that *DJNS* releases intraday stories with extremely recent information before the information is fully priced. By contrast, many morning *WSJ* stories are recapitulations of the previous day's events—some of which appeared in the *DJNS*—that may already be incorporated in market prices.

[16] We also find that including time dummies for each trading day—that is, demeaning returns by trading day—does not change our results, suggesting an omitted common news factor is not driving our results.

PX348
Page 8380

CONFIDENTIAL Q121SEC00954681

**Table II**

## Predicting Returns Using Negative Words

This table shows the relationship between standardized fractions of negative words (*neg*) in firm-specific news stories and firms' stock returns on the following day ($Return_{+1,+1}$ or $FFCAR_{+1,+1}$). The coefficients on $neg_{-30,-3}$ and summary statistics from six regressions are displayed below: two different dependent variables ($Return_{+1,+1}$ and $FFCAR_{+1,+1}$) regressed on negative words from each of three sets of news stories (*Dow Jones News Service [DJNS], The Wall Street Journal [WSJ]*, and all stories). We exclude stories that occur after 3:30 pm (30 minutes prior to market closing). We assume that *WSJ* stories printed in the morning's *WSJ* are available to traders before the market close on the same day. The two dependent variables are the firm's raw close-to-close return ($Return_{+1,+1}$) and the firm's abnormal return ($FFCAR_{+1,+1}$). We use the Fama-French three-factor model with a [−252,−31] trading day estimation period relative to the release of the news story as the benchmark for expected returns. The key independent variable is *neg*, the fraction of negative words in each news story standardized using the prior year's distribution. Each regression also includes control variables for the firm's most recent earnings announcement (*SUE*), market equity, book-to-market equity, trading volume, and close-to-close returns on the day of the news story, each of the previous two trading days, and the previous calendar year. Following Froot (1989), we compute clustered standard errors by trading day. The robust *t*-statistics are in parentheses.

| | $Return_{+1,+1}$ | | | $FFCAR_{+1,+1}$ | | |
|---|---|---|---|---|---|---|
| Stories Included | *DJNS* | *WSJ* | All | *DJNS* | *WSJ* | All |
| *neg* | −0.0277 | −0.0105 | −0.0221 | −0.0320 | −0.0102 | −0.0253 |
| | (−3.67) | (−1.24) | (−3.72) | (−4.83) | (−1.37) | (−4.88) |
| $FFCAR_{0,0}$ | 0.0285 | 0.0229 | 0.0246 | 0.0259 | 0.0224 | 0.0226 |
| | (5.28) | (2.92) | (5.43) | (5.00) | (2.94) | (5.19) |
| $FFCAR_{-1,-1}$ | −0.0272 | −0.0154 | −0.0222 | −0.0254 | −0.0106 | −0.0190 |
| | (−3.63) | (−2.17) | (−4.21) | (−3.86) | (−1.68) | (−4.13) |
| $FFCAR_{-2,-2}$ | −0.0215 | −0.0094 | −0.0179 | −0.0207 | −0.0104 | −0.0183 |
| | (−3.16) | (−1.10) | (−3.39) | (−3.10) | (−1.22) | (−3.60) |
| $FFCAR_{-30,-3}$ | −0.0005 | 0.0016 | −0.0002 | 0.0004 | 0.0018 | 0.0005 |
| | (−0.30) | (0.73) | (−0.13) | (0.28) | (0.85) | (0.38) |
| $FFAlpha_{-252,-31}$ | 0.0559 | 0.1470 | 0.1046 | 0.1201 | 0.1686 | 0.1465 |
| | (0.57) | (1.29) | (1.27) | (1.36) | (1.67) | (2.02) |
| *Earnings (SUE)* | 0.0160 | 0.0082 | 0.0125 | 0.0152 | 0.0055 | 0.0115 |
| | (2.84) | (1.33) | (2.68) | (3.46) | (1.09) | (3.25) |
| *Log(Market Equity)* | −0.0152 | −0.0159 | −0.0154 | −0.0120 | −0.0121 | −0.0109 |
| | (−2.02) | (−1.99) | (−2.39) | (−2.19) | (−1.97) | (−2.51) |
| *Log(Book / Market)* | −0.0027 | 0.0087 | −0.0010 | −0.0246 | −0.0061 | −0.0201 |
| | (−0.18) | (0.60) | (−0.08) | (−2.12) | (−0.52) | (−2.22) |
| *Log(Share Turnover)* | −0.0324 | −0.0278 | −0.0300 | −0.0189 | −0.0167 | −0.0145 |
| | (−1.66) | (−1.43) | (−1.76) | (−1.35) | (−1.16) | (−1.27) |
| Observations | 141541 | 84019 | 208898 | 141541 | 84019 | 208898 |
| Clusters (Days) | 6260 | 6229 | 6272 | 6260 | 6229 | 6272 |
| Adjusted $R^2$ | 0.0024 | 0.0014 | 0.0018 | 0.0026 | 0.0014 | 0.0019 |

We now analyze the $Return_{+1,+1}$ and $FFCAR_{+1,+1}$ regressions that include stories from the *DJNS* (in Columns 2 and 5 of Table II) in greater detail. As one would expect in an efficient market, very few control variables predict next-day returns, which is why the $R^2$ statistics in Table II are so low. Aside from the daily news and returns variables, only firms' earnings (*SUE*) have predictive power at the 1% level.

PX348

Page 8381




**Figure 3. Firms' valuations around positive and negative news stories.** In this figure, we graph a firm's abnormal event returns from 10 trading days preceding a news story's release to 10 trading days following its release. All news stories focus on S&P 500 firms and come from either *Dow Jones News Service* or *The Wall Street Journal* between 1980 and 2004 inclusive. For all *DJNS* stories, we exclude stories that occur after 3:30 pm (30 minutes prior to market closing). For all *WSJ* stories, we assume that stories printed in the morning's *WSJ* are available to traders well before the market close on the same day. We use the Fama-French three-factor model with a [−252, −31] trading day estimation period relative to the release of the news story as the benchmark for expected returns. We label all news stories with a fraction of negative words (*Neg*) in the previous year's top (bottom) quartile as negative (positive) stories. We separately examine the market's response to positive and negative *DJNS* and *WSJ* stories. We also compute the difference between the reaction to positive and negative news stories for each source.

One pattern in these regressions is somewhat analogous to the main result in Chan (2003). He shows that stocks in the news experience annual return continuations, whereas those not in the news experience annual return reversals. Although Table II examines daily horizons, the interpretation of the day 0 (day-of-news), and day −1 and −2 (usually not news days) returns coefficients is quite similar. The positive coefficient on $FFCAR_{0,0}$ shows that news-day returns continue on the next day, whereas the negative coefficients on $FFCAR_{-1,-1}$ and $FFCAR_{-2,-2}$ show that non-news-day returns reverse themselves.

We now examine the market's apparently sluggish reaction to negative words in the 4 weeks surrounding the story's release to the public. Figure 3 graphs a firm's abnormal returns from 10 trading days before a story's release to 10 trading days after its release. Again, we use the Fama-French three-factor model to

estimate abnormal returns. We label all news stories with a fraction of negative words (*Neg*) in the previous year's top (bottom) quartile as negative (positive) stories. We separately examine the market's response to positive and negative *DJNS* and *WSJ* stories. We also compute the difference between the reaction to positive and negative news stories for each source.

Although Figure 3 shows that the market reacts quite efficiently to positive and negative news, there is some delayed reaction, particularly for the *DJNS* news stories. From the top line in Figure 3, one can see that the 12-day market reaction, from day −2 to day 10, to *WSJ* stories is virtually complete after the first 2 trading days—7.5 basis points (bps) of underreaction after day 1 and only 2.4 bps after day 2. By contrast, the second line in Figure 3 shows that more of the 12-day market reaction to *DJNS* stories persists beyond the first 2 days—16.8 bps after day 1 and 6.2 bps after day 2.

The *DJNS* lines in Figure 3 show the day 1 delayed reaction to positive *DJNS* news stories (6.6 bps) is somewhat larger than the delayed reaction to negative stories (4.0 bps).[17] Although the total day 1 delayed reaction to *DJNS* news stories is 10.6 bps (see the difference line), this magnitude is relatively small (17.2%) as a percentage of the total 12-day reaction of roughly 61.6 bps. The market appears even more efficient in its reaction to *WSJ* stories, where the 1-day delayed reaction (5.2 bps) is only 7.1% of the 12-day reaction (73.3 bps). However, there may be additional underreaction to *WSJ* stories within the trading day that encompasses the morning release of the newspaper.

### *B. Predicting Returns in Calendar Time*

The lingering difference between the abnormal returns of firms with positive and negative *DJNS* news stories suggests that a simple trading strategy could earn positive risk-adjusted profits. In this section, we explore this possibility, focusing on the apparent short-run underreaction to negative words in the *DJNS*.

Specifically, at the close of each trading day, we form two equal-weighted portfolios based on the content of each firm's *DJNS* news stories during the prior trading day.[18] We use the same definitions for positive and negative stories as before. We include all firms with positive *DJNS* news stories from 12:00 am to 3:30 pm on the prior trading day in the long portfolio, and put all firms with negative stories in the short portfolio. We hold both the long and short portfolios for 1 full trading day and rebalance at the end of the next trading day. To keep the strategy simple, we exclude the rare days in which either the long or the short portfolio contains no qualifying firms. Ignoring trading costs, the cumulative raw returns of this long-short strategy would be 21.1% per year.

[17] The contemporaneous reactions to positive news stories are also larger. We observe the opposite asymmetry for the positive and negative news stories about fundamentals that we examine in Section IV.

[18] Forming two story-weighted or value-weighted portfolios produces very similar results.

**Table III**

## Risk-Adjusted News-Based Trading Strategy Returns

This table shows the daily risk-adjusted returns (*Alpha*) from a news-based trading strategy for three different time periods (1980 to 1994, 1995 to 2004, and 1980 to 2004). The first three regressions use the Fama-French (1993) three-factor model to adjust the trading strategy returns for the impact of contemporaneous market (*Market*), size (*SMB*), and book-to-market (*HML*) factors. The last three regressions use the Carhart (1997) four-factor model to account for incremental impact of the momentum factor (*UMD*). Table III reports the alpha and loadings from the time-series regression of the long-short news-based portfolio returns on each of the four factors. We assemble the portfolio for the trading strategy at the close of each trading day. We form two equal-weighted portfolios based on the content of each firm's *Dow Jones News Service* stories during the prior trading day. We label all news stories with a fraction of negative words in the previous year's top (bottom) quartile as negative (positive) stories. We include all firms with positive news stories in the long portfolio and all firms with negative news stories in the short portfolio. We hold both the long and short portfolios for one full trading day and rebalance at the end of the next trading day. We exclude the rare days in which there are no qualifying firms in either the long or the short portfolio. We compute all coefficient standard errors using the White (1980) heteroskedasticity-consistent covariance matrix. The robust $t$-statistics are in parentheses.

| | 1980–1994 | 1995–2004 | 1980–2004 | 1980–1994 | 1995–2004 | 1980–2004 |
|---|---|---|---|---|---|---|
| *Alpha* | 0.0919 | 0.1175 | 0.1031 | 0.0952 | 0.1131 | 0.1013 |
| | (2.83) | (3.93) | (4.55) | (2.81) | (3.78) | (4.38) |
| *Market* | −0.0994 | −0.1087 | −0.0983 | −0.0831 | −0.1001 | −0.0999 |
| | (−0.93) | (−1.99) | (−1.86) | (−0.75) | (−1.87) | (−1.87) |
| *SMB* | −0.0767 | 0.0475 | −0.0081 | −0.0647 | 0.0341 | −0.0128 |
| | (−0.35) | (0.70) | (−0.08) | (−0.29) | (0.49) | (−0.12) |
| *HML* | −0.1869 | −0.2590 | −0.2372 | −0.1819 | −0.2500 | −0.2365 |
| | (−1.24) | (−2.81) | (−2.94) | (−1.20) | (−2.75) | (−2.93) |
| *UMD* | | | | −0.0911 | 0.0930 | 0.0444 |
| | | | | (−0.74) | (2.01) | (0.90) |
| Trading Days | 3398 | 2497 | 5895 | 3398 | 2497 | 5895 |
| Adjusted $R^2$ | 0.0003 | 0.0081 | 0.0026 | 0.0004 | 0.0106 | 0.0027 |

Table III shows the risk-adjusted daily returns from this daily news-based trading strategy for three different time periods (1980 to 1994, 1995 to 2004, and 1980 to 2004). We use the Fama-French three-factor (1993) and Carhart four-factor (1997) models to adjust the trading strategy returns for the returns of contemporaneous market, size, book-to-market, and momentum factors. Table III reports the alpha and factor loadings from the time series regression of the long-short news-based portfolio returns on the four factors. The first three columns report the results with the Fama-French benchmark, whereas the last three columns use the Carhart benchmark. We compute all coefficient standard errors using the White (1980) heteroskedasticity-consistent covariance matrix.

Consistent with Table II, Table III shows that the daily news-based trading strategy would earn substantial risk-adjusted returns in a frictionless world with no trading costs or price impact. Specifically, the average excess return (Fama-French alpha) from news-based trading would be 9.2 bps per day from 1980 to 1994 and 11.8 bps per day from 1995 to 2004. Using any return benchmark, the alpha from the trading strategy is highly significant in all three




**Figure 4. Distribution of daily abnormal returns for the news-based trading strategy.** For the 25 years from 1980 to 2004, the figure depicts the distribution of the average daily abnormal returns for the news-based trading strategy described below. Each frequency bin encompasses a 5% range of abnormal returns described by the two numbers adjacent to the bin—for example, the frequency of the leftmost return bin (4 years) is the number of years in which the trading strategy's average daily return is between –5 basis points and zero basis points. We assemble the portfolio for the news-based trading strategy at the close of each trading day. We form two equal-weighted portfolios based on the content of each firm's *Dow Jones News Service* stories during the prior trading day. We label all news stories with a fraction of negative words in the previous year's top (bottom) quartile as negative (positive) stories. We include all firms with positive news stories in the long portfolio and all firms with negative news stories in the short portfolio. We hold both the long and short portfolios for 1 full trading day and rebalance at the end of the next trading day. We exclude the rare days in which either the long or the short portfolio contains no qualifying firms. To adjust the returns for risk, we use the full-sample estimates of the Fama-French three-factor loadings of the news-based portfolio displayed in Table III.

time-periods. Interestingly, the returns from news-based trading are not strongly related to any of the Fama-French factors or the momentum factor.[19] The very low $R^2$ statistics show that nearly all of the trading strategy risk is firm-specific, as one might expect because we focus on firm-specific news stories.

For the 25 years between 1980 and 2004, Figure 4 depicts the distribution of the average daily abnormal returns for the news-based trading strategy. In the

[19] The strategy's negative loading on HML is a minor exception, possibly driven by the numerous positive news stories about growth firms during the late 1990s.



CONFIDENTIAL 

**Table IV**
## Sensitivity of News-Based Trading Returns to Trading Cost Assumptions

This table shows estimates of the impact of transaction costs on the news-based trading strategy's profitability (see the text or Table III for strategy details). We recalculate the trading strategy returns for 11 alternative assumptions about a trader's round-trip transaction costs: 0, 1, 2, 3 ... or 10 basis points (bps) per round-trip trade. The abnormal and raw annualized cumulative news-based strategy returns for each assumption appear below. The risk-adjustment is based on the full-sample Fama-French three-factor loadings of the news-based portfolio shown in Table III.

| Trading Costs (bps) | Abnormal Annualized Returns (%) | Raw Annualized Returns (%) |
|---|---|---|
| 0 | 23.17 | 21.07 |
| 1 | 20.30 | 18.25 |
| 2 | 17.50 | 15.49 |
| 3 | 14.76 | 12.80 |
| 4 | 12.09 | 10.17 |
| 5 | 9.47 | 7.60 |
| 6 | 6.92 | 5.09 |
| 7 | 4.43 | 2.64 |
| 8 | 1.99 | 0.25 |
| 9 | −0.39 | −2.09 |
| 10 | −2.71 | −4.37 |

median year, the strategy's abnormal return is 9.4 bps per day. In 21 out of 25 years, the news-based strategy earns positive abnormal returns. Thus, we can reject the null hypothesis that yearly news-based strategy returns follow the binomial distribution with an equal likelihood of positive and negative returns ($p$-value $< 0.0005$). There is only 1 year (1980) out of 25 in which the strategy lost more than 2 bps per day (–4.2 bps). By contrast, in 6 out of 25 years, the strategy gained more than 20 bps per day. This analysis suggests that the news-based trading strategy is not susceptible to catastrophic risks that second moments of returns may fail to capture.

Finally, we estimate the impact of reasonable transaction costs on the trading strategy's profitability. To judge the sensitivity of profits to trading costs, we recalculate the trading strategy returns under the assumption that a trader must incur a round-trip transaction cost of between zero and 10 bps. Table IV displays the abnormal and raw annualized cumulative news-based strategy returns under these cost assumptions.

From the evidence in Table IV, we see that the simple news-based trading strategy explored here is no longer profitable after accounting for reasonable levels of transaction costs—for example, 10 bps. Of course, we cannot rule out the possibility that more sophisticated trading rules that exploit the time-series and cross-sectional properties of news stories and economize on trading costs would be profitable. For example, the next subsection investigates a refined measure of negative words that predicts greater market underreactions to particular negative words.

## V. Interpreting the Earnings and Return Predictability

The key stylized facts documented thus far are: (1) news stories about firms are concentrated around their earnings announcements; (2) negative words in firm-specific stories predict low firm earnings in the next quarter; and (3) negative words about firms predict low firm stock returns on the next trading day. In this section, we explore further whether the ability of negative words to predict returns comes from underreaction to news about firms' fundamentals that is embedded in language.

Our specific hypothesis is that negative words in news stories that mention the word stem "earn" contain more information about firms' fundamentals than other stories. If this is the case, we should observe three effects. First, negative words in stories that include the word stem "earn" should be better predictors of earnings. Second, the contemporaneous relationship between negative words and returns should be stronger for stories that contain the word stem "earn." Third, because these stories better capture news about hard-to-quantify fundamentals, the magnitude of the market's underreaction to negative words should be greater for stories that contain the word stem "earn."[20]

Before testing these three predictions, we establish an intuitive property of this measure of fundamentals: the news stories near earnings announcements (see the spike in Figure 1) are far more likely to mention the word stem "earn"—for example, the word "earnings" or any form of the verb "earn." We construct a dummy variable (*Fund*) that indicates whether a news story contains any words beginning with "earn." We find that only 18.9% of the stories more than 1 day away from an earnings announcement contain the word stem "earn," compared to 72.5% of the stories within a day of an announcement.

We test whether negative words in stories containing the word stem "earn" predict earnings better than negative words in other stories. We add two new independent variables to the regressions for *SUE* and *SAFE* shown earlier in Columns 4 and 6 of Table I. The first new variable ($Fund_{-30,-3}$) is the total number of words in news stories between day −30 and day −3 that contain the word stem "earn" divided by the total number of words in all news stories between day −30 and day −3. This measure is designed to capture the fraction of words between day −30 and day −3 that are likely to provide relevant information about firms' fundamentals. The second new variable ($neg_{-30,-3} * Fund_{-30,-3}$) is the interaction between $Fund_{-30,-3}$ and the negative words measure ($neg_{-30,-3}$). The coefficient on the interaction term measures the extent to which negative words "about" fundamentals are more useful predictors of firms' earnings than other negative words.

Table V shows that the coefficients for both of the new independent variables in the *SUE* and *SAFE* regressions are strongly negative and statistically significant. The coefficient on the interaction term ($neg_{-30,-3} * Fund_{-30,-3}$) in the *SUE* regression shows that negative words that are "about" fundamentals are

[20] Pritamani and Singhal (2001) document a fact that may be related to this third hypothesis. Although they do not examine the tone of news stories, they do find return momentum following market reactions to earnings-related news stories.

**Table V**

## Predicting Earnings Using Negative Words about Fundamentals

This table reports the results from two OLS regressions with different dependent variables (*SUE* and *SAFE*) regressed on negative words ($neg_{-30,-3}$), fundamental words ($Fund_{-30,-3}$), and the interaction between these words ($neg_{-30,-3} * Fund_{-30,-3}$). *SUE* is a firm's standardized unexpected quarterly earnings; *SAFE* is the standardized analysts' forecast error for the firm's quarterly earnings. Both regressions include all news stories from both news sources (*Dow Jones News Service* and *The Wall Street Journal*) over the time period from 1984 through 2004. The measure of negative words ($neg_{-30,-3}$) is the standardized fraction of words that are negative in the news stories from 30 trading days prior up to 3 trading days prior to an earnings announcement. Fundamental words ($Fund_{-30,-3}$) is the fraction of words that are contained in news stories that mention the word stem "earn" from 30 trading days prior up to 3 trading days prior to an earnings announcement. All regressions include control variables for lagged firm earnings and numerous firm characteristics (see text for details). To allow for correlations among announced firm earnings within the same calendar quarter, we compute clustered standard errors (Froot (1989)). The robust $t$-statistics are in parentheses.

| | *SUE* | *SAFE* |
|---|---|---|
| $neg_{-30,-3}$ | −0.0167 | −0.0072 |
| | (−1.19) | (−1.65) |
| $neg_{-30,-3} * Fund_{-30,-3}$ | −0.3192 | −0.0824 |
| | (−8.00) | (−5.48) |
| $Fund_{-30,-3}$ | −0.4676 | −0.1033 |
| | (−7.27) | (−5.59) |
| *Lag(Dependent Var)* | 0.2080 | 0.2517 |
| | (12.22) | (8.69) |
| *Forecast Dispersion* | −0.9280 | −0.3049 |
| | (−10.32) | (−6.35) |
| *Forecast Revisions* | 19.1856 | 0.7068 |
| | (9.06) | (1.11) |
| *Log(Market Equity)* | −0.0062 | 0.0285 |
| | (−0.36) | (5.31) |
| *Log(Book / Market)* | 0.0126 | −0.0127 |
| | (0.48) | (−1.60) |
| *Log(Share Turnover)* | −0.1086 | 0.0299 |
| | (−2.89) | (3.08) |
| $FFAlpha_{-252,-31}$ | 1.9760 | 0.2317 |
| | (9.59) | (4.30) |
| $FFCAR_{-30,-3}$ | 0.0102 | 0.0067 |
| | (5.74) | (11.20) |
| $FFCAR_{-2,-2}$ | 0.0110 | 0.0036 |
| | (1.81) | (1.87) |
| Observations | 17769 | 16658 |
| Clusters | 80 | 79 |
| Adjusted $R^2$ | 0.1282 | 0.1285 |

much better predictors of firms' earnings. Because the $Fund_{-30,-3}$ variable is a fraction that ranges from zero to one, the regression coefficients have meaningful economic interpretations. The sum of the coefficient on the interaction ($neg_{-30,-3} * Fund_{-30,-3}$) and the coefficient on negative words alone ($neg_{-30,-3}$)

estimates the dependence of firm earnings on negative words for announcements in which all ($Fund_{-30,-3} = 1$) of the news stories between day −30 and day −3 contain the stem "earn." The coefficient on negative words ($neg_{-30,-3}$) now estimates the dependence of firm earnings on negative words when none ($Fund_{-30,-3} = 0$) of the news stories between day −30 and day −3 contain the stem "earn." Also, one can recover the direct effect of negative words in a typical set of news stories, where 26.3% of the words are about earnings ($Fund_{-30,-3} = 0.263$), by computing (coefficient on $neg_{-30,-3}$) + 0.263 × (coefficient on $neg_{-30,-3} * Fund_{-30,-3}$). This last quantity is directly comparable to the simple coefficients on $neg_{-30,-3}$ that appear in Table I.

The point estimate of the sum of the interaction term and the $neg_{-30,-3}$ coefficient (−0.3359 *SUE*) is over 10 times greater than the $neg_{-30,-3}$ coefficient (−0.0167 *SUE*), suggesting that negative words derive almost all of their predictive power for *SUE* from earnings-related stories. Negative words in stories unrelated to earnings (see coefficients on $neg_{-30,-3}$) only weakly predict lower earnings, and are much less important in economic terms. Yet the direct effect of negative words on earnings in a "typical" set of stories with 26.3% earnings-related words remains strongly statistically and economically significant at $-0.0167 + 0.263 \times (-0.3192) = -0.1006$ *SUE*. Similarly, negative words in earnings-related stories can predict analyst forecast errors (*SAFE*) better by an order of magnitude.

We now test the other two predictions of our hypothesis: Contemporaneous market reactions and subsequent market underreactions should be larger for stories that mention the word stem "earn" than for other stories. As before, we use pooled OLS regressions with clustered standard errors to estimate the relationship between negative words and returns. We also use the same set of firm characteristic and stock return control variables. To conserve space, we report only the results where we use firms' abnormal returns as the dependent variable and negative words in firm-specific stories from *DJNS* as the key independent variable. Again, we use the *DJNS* stories that occur more than 30 minutes before the market closes to explore the underreaction hypothesis because Table II reveals that there is only minimal underreaction to *WSJ* stories.

Column 1 in Table VI reports the contemporaneous (same-day) relationship between abnormal returns ($FFCAR_{+0,+0}$) and negative words (*neg*). There are two new independent variables in these regressions: the dummy variable that is equal to one if a story mentions the word stem "earn" (*Fund*) and the interaction ($neg * Fund$) between this dummy variable and standardized negative words (*neg*).

Column 1 in Table VI reveals that not only is there a strong relationship between negative words (*neg*) and contemporaneous returns ($FFCAR_{+0,+0}$), but also that this relationship is much stronger in stories that contain the "earn" word stem dummy. The sum of the coefficient on *neg* by itself (−8.57 bps) and the coefficient on the $neg * Fund$ term (−31.27 bps) provides an estimate of the contemporaneous market response to negative words in news stories that mention earnings (−39.84 bps). In economic terms, the coefficient magnitudes

PX348

Page 8389

**Table VI**

**Firms' Returns and Negative Words about Fundamentals**

This table shows the relationship between negative words in firm-specific news stories (*neg*) and firms' close-to-close abnormal stock returns on the same day ($FFCAR_{+0,+0}$) and the following day ($FFCAR_{+1,+1}$). The stories include all *Dow Jones News Service* articles from 1980 through 2004, but exclude stories that occur after 3:30 pm (30 minutes prior to market closing). The coefficients and summary statistics from two OLS regressions using two different dependent variables ($FFCAR_{+0,+0}$ and $FFCAR_{+1,+1}$) appear below. The key independent variable is negative words (*neg*), which is the fraction of negative words in each news story standardized using the prior year's distribution. The independent variable *Fund* is a dummy indicating whether a story mentions the word stem "earn"; and *neg* * *Fund* is the interaction between negative words (*neg*) and this dummy. All regressions include numerous control variables for lagged firm returns and other firm characteristics (see text for details). To allow for correlations among firms' returns within the same trading day, we compute clustered standard errors (Froot (1989)). The robust $t$-statistics are in parentheses.

| | $FFCAR_{+0,+0}$ | $FFCAR_{+1,+1}$ |
|---|---|---|
| *neg* | −0.0857 | −0.0161 |
| | (−11.16) | (−2.35) |
| *neg* * *Fund* | −0.3127 | −0.1036 |
| | (−10.75) | (−4.52) |
| *Fund* | −0.3250 | −0.0342 |
| | (−12.84) | (−1.96) |
| $FFCAR_{+0,+0}$ | | 0.0255 |
| | | (4.91) |
| $FFCAR_{-1,-1}$ | 0.0181 | −0.0256 |
| | (2.23) | (−3.89) |
| $FFCAR_{-2,-2}$ | −0.0220 | −0.0209 |
| | (−2.72) | (−3.13) |
| $FFCAR_{-30,-3}$ | 0.0020 | 0.0004 |
| | (1.17) | (0.23) |
| $FFAlpha_{-252,-31}$ | −0.1425 | 0.1136 |
| | (−1.36) | (1.29) |
| *Earnings (SUE)* | 0.0234 | 0.0146 |
| | (4.16) | (3.33) |
| Observations | 141633 | 141541 |
| Clusters | 6260 | 6260 |
| Adjusted $R^2$ | 0.0045 | 0.0028 |

mean that the market response to negative words in earnings-related stories is five times larger than the response to other negative words. This evidence supports the hypothesis that negative words convey otherwise hard-to-quantify information about firms' fundamentals.[21]

In Column 2 of Table VI, we repeat the previous regression, except we use firms' next-day abnormal returns ($FFCAR_{+1,+1}$) as the dependent variable. The main result is that the same variables that elicit the greatest contemporaneous market responses also predict the greatest subsequent market underreaction.

[21] The negative market responses to the presence of earnings-related words (*Fund*) could represent earnings warnings from firm management prior to earnings announcements.

For example, the coefficient on the interaction term (*neg* * *Fund*) is highly negative (Column 2 in Table VI), showing that negative words in earnings-related stories predict greater market underreactions than negative words in other stories (*neg*). In fact, the market's underreaction to negative words in stories not mentioning earnings is only one-seventh as large as its underreaction to negative words in stories about earnings (−1.61 bps vs. −11.97 bps = −1.61–10.36). The estimate of underreaction to negative words in "typical" stories that mention earnings with probability 28.0% lies between the two previous values at −4.33 bps = −1.61 bps + 0.280 × (−10.36) bps, and remains highly statistically significant.

We can gauge the degree of underreaction by comparing the sizes of the 1-day and 2-day reactions to negative words. Table VI allows us to make this comparison for negative words in earnings-related stories and those in other stories. The coefficients on *neg* in the first column (−8.57 bps) and second column (−1.61 bps) measure the day 0 and day 1 reactions for negative words unrelated to earnings. The sums of the coefficients on *neg* and *neg* * *Fund* in the first column (−39.84 bps) and second column (−11.97 bps) measure the day 0 and day 1 reactions for earnings-related words. From this, we can infer that the market's initial 1-day reaction to negative words comprises the vast majority of its 2-day reaction for stories unrelated (84.2%) and related (76.9%) to earnings. One interpretation is that investors remain almost equally attuned to the importance of linguistic information about fundamentals even during earnings announcements, when there is compelling quantitative information.

All three tests in this section suggest that negative words in stories about firms' fundamentals are driving the earnings and return predictability results. Although news stories that do not mention earnings can weakly forecast earnings and are associated with contemporaneous market returns, these stories have very little ability to forecast future market returns. Negative words in earnings-related stories evoke much greater initial market responses presumably because these stories are better predictors of firms' subsequent earnings. However, the initial market responses to negative words in earnings-related stories are insufficiently large to prevent return continuations on the next trading day. Investors seem to distinguish between earnings-related stories and others, but do not fully account for the importance of linguistic information about fundamentals.

## VI. Conclusion

Our first main result is that negative words in the financial press forecast low firm earnings. That is, the words contained in news stories are not redundant information, but instead capture otherwise hard-to-quantify aspects of firms' fundamentals. Our second result is that stock market prices incorporate the information embedded in negative words with a slight delay. We demonstrate potential profits from using a simple trading strategy based on the words in a timely news source (*DJNS*), but find that these profits could easily vanish after accounting for reasonable levels of transaction costs. Finally, we show that

negative words in stories about fundamentals are particularly useful predictors of both earnings and returns.

Our overall impression is that the stock market is relatively efficient with respect to firms' hard-to-quantify fundamentals. The market's underreaction to negative words after day 0 is typically small as compared to the market's initial reaction to negative words on day 0. Even if economists have neglected the possibility of quantifying language to measure firms' fundamentals, stock market investors have not.

Nevertheless, we do find that market prices consistently underreact to negative words in firm-specific news stories, especially those that relate to fundamentals. Although frictionless asset pricing models may not be able to explain these findings, models in which equilibrium prices induce traders to acquire costly information—for example, Grossman and Stiglitz (1980)—are broadly consistent with our results. Without some slight underreaction in market prices, traders would have no motivation to monitor and read the daily newswires. Future research on quantifying language has the potential to improve our understanding of how information is incorporated in asset prices.

## Appendix

To match firms' names in CRSP with their common names used in the media, we employ a combination of four methods. Our first method works well for firms that are currently members of the S&P 500 index. We download common names for these firms from the "S&P constituents" spreadsheet posted on Standard and Poor's Web site, http://www.standardpoor.com/. We match these common names to CRSP name strings, which we use in our Factiva news queries for the 473 firms in the S&P at the end of our data period (December 31, 2004) that remained in the index on the date that we downloaded the spreadsheet. We identify the common names of the other 27 S&P 500 firms at the end of 2004 using the methods described below.

The other three methods entail matching the CRSP name strings with common firm names from one of three Web-based data sources: Mergent Online, the Securities and Exchange Commission (SEC), or Factiva. For all companies that exist after 1993, we use the Mergent Online company search function to identify firms' common names (336 firms). For the few post-1993 companies without Mergent data, we use the SEC company name search function (20 firms). Finally, we identify the common names of firms prior to 1993 using the Factiva company name search function (285 firms).

In many cases, we manually tweak the CRSP names to improve the quality of the company search. For example, if we do a company search for the CRSP name string "PAN AMERN WORLD AWYS INC," Factiva returns no results. Logically, we look for "Pan American," which seems to retrieve the appropriate company name: "Pan American World Airways Inc." Although this matching process introduces the possibility of minor judgment errors, our searches uniquely identify matching firms in all cases, suggesting our methods are reasonable.

PX348

Page 8392

We construct search queries for news stories using the common names that we match to the CRSP name string. We spot-check all stories that mention S&P 500 firms in the *DJNS* and *WSJ* to ensure that our search criteria do not exclude too many stories that are relevant for firm valuation. For all firms with fewer than 10 news stories retrieved by our automatically constructed search queries, we manually search for common names using the Internet and other resources.

Ultimately, our search methods retrieve at least one news story for 1,063 of 1,110 (95.8%) of the firms in the S&P 500 from 1980 to 2004. In addition, we lose another 80 of the 1,063 firms with news stories (7.5%) because these firms did not make the news during the time in which they were in the S&P 500 between 1980 and 2004, which may be quite brief if a firm exits the S&P index shortly after 1980. Also, Factiva's coverage of news stories from 1980 to 1984 appears somewhat incomplete, possibly leading to missing news stories. Finally, after deleting all stories with fewer than three unique positive and negative words or fewer than five total positive and negative words, we lose another three firms, leaving us with 980 qualifying firms. The median firm has 156 news stories, and 929 of 980 firms have at least 10 news stories.

It is possible that we retrieve no news stories for the missing 47 of the initial set of 1,110 S&P 500 firms because of errors in our matching algorithm. Fortunately, although the exact magnitude of our results depends on the matching methodology employed, the sign and significance of all key coefficients does not change for the firms that have been matched using each of the four different processes. Thus, we infer that it is unlikely that matching errors introduce sufficient *systematic* errors in our tests that would significantly change the results. Moreover, our key results depend on cross-sectional and time-series variation in earnings and returns but not the levels of these variables, which could be affected by survivorship bias.

## REFERENCES

Abarbanell, Jeffrey S., and Victor L. Bernard, 1992, Tests of analysts' overreaction/underreaction to earnings information as an explanation for anomalous stock price behavior, *Journal of Finance* 47, 1181–1207.

Antweiler, Werner, and Murray Z. Frank, 2004, Is all that talk just noise? The information content of Internet stock message boards, *Journal of Finance* 59, 1259–1294.

Antweiler, Werner, and Murray Z. Frank, 2006, Do U.S. stock markets typically overreact to corporate news stories? Working paper, University of British Columbia.

Ball, Ray, and Philip Brown, 1968, An empirical examination of accounting numbers, *Journal of Accounting Research* 6, 159–178.

Baumeister, Roy F., Ellen Bratslavsky, Catrin Finkenauer, and Kathleen D. Vohs, 2001, Bad is stronger than good, *Review of General Psychology* 5, 323–370.

Bernard, Victor L., and Jacob K. Thomas, 1989, Post-earnings-announcement drift: Delayed price response or risk premium, *Journal of Accounting Research* 27, 1–36.

Campbell, John Y., and Robert J. Shiller, 1987, Cointegration and tests of present value models, *Journal of Political Economy* 95, 1062–1088.

Carhart, Mark M., 1997, On the persistence of mutual fund performance, *Journal of Finance* 52, 57–82.

Chan, Louis K. C., Narasimhan Jegadeesh, and Josef Lakonishok, 1996, Momentum strategies, *Journal of Finance* 51, 1681–1713.

Chan, Wesley S., 2003, Stock price reaction to news and no-news: Drift and reversal after headlines, *Journal of Financial Economics* 70, 223–260.

Cutler, David M., James M. Poterba, and Lawrence H. Summers, 1989, What moves stock prices? *Journal of Portfolio Management* 15, 4–12.

Daniel, Kent D., Mark Grinblatt, Sheridan Titman, and Russ Wermers, 1997, Measuring mutual fund performance with characteristic-based benchmarks, *Journal of Finance* 52, 1035–1058.

Das, Sanjiv, and Mike Chen, 2006, Yahoo! for Amazon: Sentiment extraction from small talk on the web, Working paper, Santa Clara University.

Davis, Angela K., Jeremy M. Piger, and Lisa M. Sedor, 2006, Beyond the numbers: An analysis of optimistic and pessimistic language in earnings press releases, Working paper, Federal Reserve Bank of St. Louis.

De Bondt, Werner F. M., and Richard H. Thaler, 1990, Do security analysts overreact? *American Economic Review* 80, 52–57.

Easterwood, John C., and Stacey R. Nutt, 1999, Inefficiency in analysts' earnings forecasts: Systematic misreaction or systematic optimism? *Journal of Finance* 54, 1777–1797.

Fama, Eugene F., 1998, Market efficiency, long-term returns, and behavioral finance, *Journal of Financial Economics* 49, 283–306.

Fama, Eugene F., and Kenneth R. French, 1992, The cross-section of expected stock returns, *Journal of Finance* 47, 427–465.

Fama, Eugene F., and Kenneth R. French, 1993, Common risk factors in the returns of stocks and bonds, *Journal of Financial Economics* 33, 3–56.

Fama, Eugene F., and James MacBeth, 1973, Risk and return: Some empirical tests, *Journal of Political Economy* 81, 607–636.

Froot, Kenneth A., 1989, Consistent covariance matrix estimation with cross-sectional dependence and heteroskedasticity in financial data, *Journal of Financial and Quantitative Analysis* 24, 333–355.

Grossman, Sanford J., and Joseph E. Stiglitz, 1980, On the impossibility of informationally efficient markets, *American Economic Review* 70, 393–408.

Jegadeesh, Narasimhan, and Sheridan Titman, 1993, Returns to buying winners and selling losers: Implications for stock market efficiency, *Journal of Finance* 48, 65–91.

Li, Feng, 2006, Do stock market investors understand the risk sentiment of corporate annual reports? Working paper, University of Michigan.

Newey, Whitney K., and Kenneth D. West, 1987, A simple positive semi-definite, heteroskedasticity and autocorrelation consistent covariance matrix estimator, *Econometrica* 55, 703–708.

Nickell, Stephen J., 1981, Biases in dynamic models with fixed effects, *Econometrica* 49, 1417–1426.

Petersen, Mitchell A., 2007, Estimating standard errors in finance panel data sets: Comparing approaches, Working paper, Northwestern University.

Pritamani, Mahesh, and Vijay Singal, 2001, Return predictability following large price changes and information releases, *Journal of Banking and Finance* 25, 631–656.

Quine, Willard VanOrman, 1974, *The Roots of Reference* (Open Court Publishing Company, La Salle, Illinois).

Riffe, Daniel, Stephen Lacy, and Frederick G. Fico, 1998, *Analyzing Media Messages: Using Quantitative Content Analysis in Research* (Lawrence Erlbaum Associates, London).

Roll, Richard W., 1988, *R*-squared, *Journal of Finance* 43, 541–566.

Rozin, Paul, and Edward B. Royzman, 2001, Negativity bias, negativity dominance, and contagion, *Personality and Social Psychology Review* 5, 296–320.

Shiller, Robert J., 1981, Do stock prices move too much to be justified by subsequent changes in dividends? *American Economic Review* 71, 421–436.

Shleifer, Andrei, 1986, Do demand curves for stocks slope down? *Journal of Finance* 41, 579–590.

Tetlock, Paul C., 2007, Giving content to investor sentiment: The role of media in the stock market, *Journal of Finance* 62, 1139–1168.

White, Halbert, 1980, A heteroskedasticity-consistent covariance matrix and a direct test for heteroskedasticity, *Econometrica* 48, 817–838.


PX348

Page 8394

Copyright of Journal of Finance is the property of Blackwell Publishing Limited and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# PX 349

**42 No. 3 Securities Regulation Law Journal ART 2**

Securities Regulation Law Journal | Fall 2014

Volume 42, Issue 3

Securities Regulation Law Journal
By Dan Gold and Richard Guiltinan[*]

# Fraud-on-the-Market Lives: Takeaways and Open Issues from *Halliburton II*

*Halliburton Co. v. Erica P. John Fund, Inc.*, decided by the Supreme Court on June 23, 2014, was perhaps the most closely watched securities fraud case in decades.[1] At issue in *Halliburton II* (it was the case's second trip to the Supreme Court) was the fraud-on-the-market presumption. That presumption, adopted by the Supreme Court's 1989 decision in *Basic Inc. v. Levinson*, is the lynchpin for class certification in most securities fraud cases. Without the presumption, securities fraud cases generally cannot be certified as class actions because each investor would have to individually prove reliance upon the defendant's alleged misrepresentation.

*Halliburton II* involved a direct assault on the fraud-on-the-market theory. The Supreme Court was asked to overrule *Basic* and eliminate the presumption of reliance in its entirety. Relying heavily on principles of *stare decisis*, the Court declined that invitation.

*Halliburton II* also involved the latest in a series of challenges to how the fraud-on-the-market presumption operates at the class certification stage. On that issue, the Court clarified what plaintiffs need and need not prove to invoke the presumption, and it made clear that defendants may rebut the presumption at the class certification stage through evidence that the alleged misstatements did not impact the issuer's stock price. Left unresolved are many issues about what that holding means, how it will operate in practice, and whether it will make a difference in most cases.

This article provides a brief overview of the fraud-on-the market presumption, the circuit split that developed around how the presumption operates at the class certification stage, and the Supreme Court's recent decisions in *Halliburton I* and *Amgen* touching on some of those issues. It then summarizes the decision in *Halliburton II* and discusses the takeaways and open issues that will play out as the lower courts apply this closely-watched decision.

## I. *Basic* and the Fraud-on-the-Market Presumption

In order to obtain class certification, plaintiffs in private securities fraud cases must show that common issues predominate over issues that are individual to each potential class member.[2] The analysis of whether common issues predominate begins with the elements of the underlying cause of action under Section 10(b) of the Securities and Exchange Act of 1934: (i) a material misrepresentation or omission by the defendant; (ii) scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance upon the misrepresentation or omission; (v) economic loss; and (vi) loss causation.[3]

The element of reliance is a focal point in the predominance analysis because a class cannot be certified if each individual will have to individually prove reliance upon the alleged misrepresentation. The most common way that plaintiffs seek to prove reliance on a class-wide basis is to take advantage of the fraud-on-the-market presumption first adopted by the Supreme Court in *Basic*.

PX349

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

**(a) *Basic*: the Supreme Court Adopts a Rebuttable Presumption of Reliance for Material Misstatements in an Efficient Market**

*Basic*, decided by the Supreme Court in 1989, was the first Supreme Court decision to adopt the fraud-on-the-market presumption of reliance.[4] As described in *Basic*, the fraud-on-the-market theory "is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."[5]

Rejecting the argument that the fraud-on-the-market theory effectively eliminates the reliance element, Justice Blackmun's plurality opinion in *Basic* reasoned that there is more than one way to prove the required causal connection between a defendant's misrepresentation and the plaintiff's decision to purchase or sell securities. "An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[6]

*Basic* made clear that the presumption of reliance is rebuttable. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[7] For example, if the truth had entered the market, "and thus [] the market price would not have been affected by their misrepresentation, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone."[8]

Justice White, joined by Justice O'Connor, dissented from the portion of the plurality opinion addressing the fraud-on-the-market theory. Citing concerns about the underlying economic theory and the courts' lack of expertise in such matters, the dissent predicted that "confusion and contradiction" would be inevitable as a result of the Court's decision to replace "traditional legal analysis" with economic theorization.[9] Pointing to the stricter reliance requirement of the express private right of action under Section 18 of the Exchange Act, the dissent also argued that it contravened congressional intent for the Court to adopt a relaxed reliance burden for the judicially-created private right of action under Section 10(b).[10]

**(b) Proving Market Efficiency: the *Cammer* Factors and Event Studies**

*Basic* suggested that to invoke the presumption of reliance, a plaintiff must allege and prove that: (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.[11]

Following *Basic*, the question of market efficiency became a battleground at the class certification stage in many cases. Courts generally relied on the *Cammer* factors to determine whether a stock traded in an efficient market: (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); and (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[12] Courts also looked at (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) stock's trading volume or float.[13]

Economists and many courts recognized that the cause-and-effect relationship between unexpected news and stock price movement is the ultimate test of market efficiency and the most important factor.[14] After all, that factor most closely aligns with the key issue of whether the defendant's alleged misrepresentation was transmitted through the stock price to the plaintiff. Parties accordingly began to submit competing expert opinions on whether the company's stock price moved quickly to reflect all new publicly available information.

The generally accepted methodology for analyzing whether a company's stock price quickly reflected all new publicly available information is an event study.[15] An event study uses a statistical regression analysis to measure the movement in a company's


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

stock price after adjusting for the movement in the overall market and/or industry. Once overall market and industry effects are controlled for, what is left (the "residual" stock price return) represents the company-specific portion of the stock price movements. Standard statistical tests are then run to measure whether the company-specific stock price movement was statistically significant or instead was within the range of normal expected daily movement.

**II. The Circuit Split**

As the fraud-on-the-market case law evolved, a circuit split developed around the operation of the presumption at the class certification stage. At one end of the spectrum was the Fifth Circuit, which required that plaintiffs prove loss causation to invoke the presumption at class certification. At the other end of spectrum, the Seventh Circuit and Ninth Circuit held that defendants could not rebut the reliance presumption at class certification by showing that the alleged misrepresentations did not impact the stock price. The Second and Third Circuits took an intermediate position and permitted defendants to rebut the fraud-on-the-market presumption at class certification by showing an absence of price impact.

**(a) The Fifth Circuit: Plaintiffs Must Prove Loss Causation**

In *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, the Fifth Circuit held that plaintiffs must prove loss causation to invoke the fraud-on-the-market presumption at the class certification stage. [16] This holding arose out of prior Fifth Circuit precedent requiring that, to use the fraud-on-the-market presumption to prove the element of reliance for merits purposes, plaintiffs must prove that the defendants' statements "actually affected the market price of the stock." [17] A class could not be certified without use of the fraud-on-the-market presumption, so the Fifth Circuit held that this requirement should be applied at the class certification stage.

Fifth Circuit precedent recognized that this stock price impact could be proven in one of two ways: (i) by showing that the misstatement impacted the stock price at the time the statement was made, or (ii) by showing that the stock price declined in response to the "truth" being revealed to the market (rather than in response to any other unrelated negative news that might have entered the market at the same time). [18] Because this second showing mirrors the separate element of loss causation that a plaintiff must prove to obtain any recovery, the Fifth Circuit held that plaintiffs must prove loss causation in order to obtain class certification. [19]

The plaintiffs in *Oscar* argued that the Fifth Circuit's rule "improperly shifts the burden, from a defendant's right of rebuttal to a plaintiff's burden of proof." [20] The Fifth Circuit disagreed, stressing that under *Basic* "*any* showing" that severs the link between the misrepresentation and the plaintiff's loss, even evidence that the corrective information was accompanied by other bad news, "rebuts on arrival the plaintiff's fraud-on-the-market theory." [21] So in the typical case involving the simultaneous disclosure of multiple pieces of negative information, the *Oscar* court reasoned, the presumption is rebutted and plaintiffs bear the burden of proving loss causation.

**(b) The Seventh and Ninth Circuits: No Rebuttal at Class Certification**

In *Schleicher v. Wendt*, the Seventh Circuit held that securities fraud defendants could not rebut the fraud-on-the-market presumption at class certification by showing that the alleged misstatements did not materially affect the stock price. [22] The Seventh Circuit reasoned that materiality, price impact and loss causation were "merits" issues that affect all putative class members equally. [23] Therefore, they do not bear on whether individual questions predominate over common ones—the threshold for certifying a class under Rule 23(b)(3)—and should not be analyzed at class certification. [24] The *Schleicher* court concluded that if a misstatement did not affect the stock price, then the proper approach would be to certify a class, which would then lose on the merits at summary judgment or trial. [25]

The Ninth Circuit followed the Seventh Circuit's approach when it decided *Connecticut Retirement Plans and Trust Funds v. Amgen Inc.* [26] The defendants argued that a plaintiff must prove that the alleged misstatements were material because, if they were immaterial, they by definition would not have affected the stock price or led to any plaintiff indirectly relying by purchasing at an inflated stock price. Citing *Schleicher* favorably, the Ninth Circuit rejected that argument because materiality is an element of a 10(b) claim. [27] Proving or disproving materiality would make every plaintiff's claim stand or fall together, the Ninth Circuit reasoned, leaving no individual issues of reliance. [28] Materiality therefore was considered irrelevant to whether

PX349

common issues predominate.[29] For the same reason, the Ninth Circuit held that the defendants could not rebut the fraud-on-the-market presumption with evidence that the alleged misrepresentations were not material.[30]

**(c) The Second and Third Circuits: Defendants Can Rebut the Presumption by Showing Lack of Price Impact**

The Second Circuit adopted an intermediate standard in *In re Salomon Analyst Metromedia Litigation*.[31] Relying on language in *Basic* about how defendants could rebut the presumption by showing the misrepresentation did not distort the stock price, the Second Circuit held that "plaintiffs do not bear the burden of showing an impact on price" at class certification.[32] But it was error, the Second Circuit held, for the district court to have denied defendants the opportunity to rebut the presumption at the class certification stage.[33] Courts are required to assess whether the requirements of Rule 23 are met before certifying a class, the court reasoned, and that "assessment cannot be made without determining whether defendants can successfully rebut the fraud-on-the-market presumption."[34]

The Third Circuit deepened the circuit split in *In re DVI Inc. Securities Litigation*.[35] The court rejected the Fifth Circuit's *Oscar* holding that plaintiffs must prove loss causation to invoke the fraud-on-the-market theory because it "appears to shift the burdens announced in *Basic*."[36] Like the Second Circuit in *Salomon*, the Third Circuit instead held that "rebuttal of the presumption of reliance falls within the ambit of issues that, if relevant, should be addressed by district courts at the class certification stage."[37]

**III. *Halliburton I*: the Supreme Court Holds Plaintiffs Need Not Prove Loss Causation to Invoke the Presumption**

The *Halliburton* case first went to the Supreme Court on the plaintiffs' appeal from a denial of class certification. The Supreme Court had the opportunity in *Halliburton I* to address many of the issues that were dividing lower courts but decided the case on narrow grounds. That set the stage for a continuing circuit split and the Supreme Court's subsequent fraud-on-the-market decisions in *Amgen* and *Halliburton II*.

**(a) The District Court and Fifth Circuit Deny Certification Because Plaintiffs Failed to Prove Loss Causation**

The plaintiffs in *Halliburton* claimed that defendants made misrepresentations about three topics: (1) Halliburton's estimates of potential liability in asbestos litigation; (2) changes to Halliburton's accounting methodology and their effect on earnings; and (3) the benefits to Halliburton of its merger with Dresser Industries.[38] The lead plaintiff claimed that it (and a class of shareholders that it sought to represent) bought stock at prices that were artificially inflated by these alleged misrepresentations and suffered losses when the "truth" was revealed in eight allegedly corrective disclosures.[39]

At the class certification stage there was no dispute that that Halliburton's stock traded in an efficient market.[40] The only reliance-related issue was whether the plaintiffs could satisfy the Fifth Circuit's *Oscar* requirement of proving loss causation, which the district court described as placing "an extremely high burden on plaintiffs seeking class certification in a securities fraud case."[41]

The district court held that the plaintiffs had not carried their burden of proving loss causation and therefore denied class certification.[42] The plaintiffs did not present evidence that the allegedly false statements caused a positive effect on the stock price, so the district court's analysis focused on whether plaintiffs had shown a decline in stock price caused by a corrective disclosure (a revelation of the "truth" regarding the earlier alleged misstatements).

The district court found that the plaintiffs and their expert had not actually linked the corrective disclosures to any earlier alleged misrepresentations.[43] In other words, there were stock price declines, but the plaintiffs failed to show those declines were caused by correction of the earlier alleged misstatements rather than negative news more generally. For example, when Halliburton announced it had increased its reserves for asbestos liabilities, the court found that those disclosures did not reveal that Halliburton's earlier estimates were fraudulent or incorrect; it was just as likely that circumstances had changed in the interim.[44]

PX349

The Fifth Circuit affirmed the denial of class certification, holding the district court had applied the correct legal standards and that the plaintiffs had failed to meet their burden of proving loss causation by a preponderance of the evidence.[45] As the Fifth Circuit articulated it, "[j]ust as merely lowering earnings estimates does not reveal that a defendant previously misrepresented those estimates, merely raising the asbestos reserves does not show that those prior reserve estimates were intentionally misleading."[46] The court declared that "a company is allowed to be proven wrong in its estimates," noting that such estimates may be revised due to non-fraud factors such as subsequent developments.[47] The court also held that plaintiffs and their expert had failed to differentiate between the stock price effect of negative news allegedly related to the fraud and other contemporaneous negative news unrelated to the alleged fraud.[48] This failure to differentiate or disaggregate "the entire bundle of negative information" meant that plaintiffs and their expert had "failed to provide the necessary linkage between the change in stock price and the *allegedly culpable* information."[49]

### (b) ***Halliburton I***: The Supreme Court's Narrow Holding

The *Halliburton* plaintiff petitioned for a writ of *certiorari*, asking the Supreme Court to reverse the Fifth Circuit's "substantial and unprecedented burden" on plaintiffs alleging securities fraud.[50] The plaintiff argued that the Fifth Circuit standard conflicted with the law applied in the other circuits as well as the Supreme Court's holding in *Basic*.[51]

The Supreme Court granted *certiorari* on two issues: (1) whether the Fifth Circuit correctly held that plaintiffs in securities fraud actions must establish loss causation at class certification by a preponderance of admissible evidence, and (2) whether the Fifth Circuit improperly considered the merits of the underlying claims at the class certification stage by holding that loss causation must be proven to invoke the fraud-on-the-market presumption even though reliance and loss causation are distinct elements.[52]

*Halliburton I* presented an opportunity for the Supreme Court to address not just the issue of whether plaintiffs need to prove loss causation to invoke the fraud-on-the-market presumption, but also the broader issues on which the lower courts differed regarding how the presumption operates at class certification. But the Court instead framed the issue narrowly in terms of proof of loss causation at class certification.

On June 6, 2011, the Supreme Court unanimously held that securities fraud plaintiffs do not need to prove loss causation at the class certification stage in order to invoke the fraud-on-the-market presumption of class-wide reliance.[53] The Supreme Court noted that proof of loss causation was not required to invoke *Basic*'s presumption because reliance and loss causation are two distinct requirements for a securities fraud claim.[54] The Court explained that under the fraud-on-the-market doctrine, "an investor presumptively relies on a defendant's misrepresentations if that 'information is reflected in [the] market price' of the stock at the time of the relevant transaction."[55] By contrast, loss causation "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss."[56] The Supreme Court held that the Fifth Circuit's rule contravened a fundamental premise of the fraud-on-the-market theory because "[t]he fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory."[57]

Although defense counsel argued that the Fifth Circuit's use of the phrase "loss causation" was "shorthand" for a price impact analysis, the Supreme Court declined to address that issue in *Halliburton I.* The Court did not adopt or reject the other approaches adopted by other circuits, holding that because the Fifth Circuit's standard incorrectly focused on loss causation, "we need not, and do not, address any other question about *Basic*, its presumption, or how and when it may be rebutted."[58]

## IV. *Amgen*: Materiality Not Relevant at Class Certification, But It May Be Time to Revisit The Fraud-on the-Market Theory

A year after deciding *Halliburton I*, the Supreme Court waded back into the fraud-on-the-market split by granting *certiorari* in the *Amgen* decision out of the Ninth Circuit, which had rejected proof of materiality as relevant to whether plaintiffs could take advantage of the fraud-on-the-market presumption to obtain class certification.

PX349

The Supreme Court affirmed in a 6-3 opinion by Justice Ginsburg.[59] The Court recognized that materiality is "an essential predicate of the fraud-on-the-market theory."[60] The Court nonetheless held that proof of materiality is not required to show that common questions predominate over individual issues at the class certification stage for two reasons. First, materiality can be established by common proof.[61] The Court observed that the materiality analysis—whether omitted or misrepresented information would have been significant to a reasonable investor—is an objective standard that applies equally to all members of the class.[62] Second, the Court reasoned that the failure to prove materiality would not leave individual issues predominating because materiality is an essential element of a Rule 10b-5 claim.[63] Plaintiffs who cannot establish the materiality of an alleged misstatement or omission cannot prevail in a securities fraud suit as a matter of law. A failure to prove materiality at the class certification stage would, the Court reasoned, extinguish the claim on the merits.[64] There would be no remaining claim and therefore no risk that individual issues would predominate.[65] Consequently, the Court held that proof of the statement's materiality does not bear on the district court's class certification predominance analysis under Rule 23(b)(3).[66]

For the same reasons, the Supreme Court further upheld the district court's decision not to allow Amgen to rebut the plaintiffs' allegations that the misstatements were material. "[J]ust as a plaintiff class's inability to prove materiality creates no risk that individual questions will predominate, so even a definitive rebuttal on the issue of materiality would not undermine the predominance of questions common to the class."[67]

Although *Amgen* is significant for its holding, it was the concurring opinion that sent a shockwave through the securities litigation bar. In a short, three-sentence concurring opinion, Justice Alito expressly suggested that reconsideration of the entire fraud-on-the-market theory might be appropriate:

> I join the opinion of the Court with the understanding that the petitioners did not ask us to revisit *Basic*'s fraud-on-the-market presumption. As the dissent observes, more recent evidence suggests that the presumption may rest on a faulty economic premise. In light of this development, reconsideration of the *Basic* presumption may be appropriate.[68]

### V. *Halliburton II*: *Basic* Survives, and Lack of Price Impact Rebuts the Presumption

*Amgen* did not directly answer the question of whether securities fraud defendants could rebut the fraud-on-the-market presumption by showing that the alleged misrepresentation did not impact the company's stock price. Unlike materiality, price impact is not one of the six elements of a Rule 10b-5 claim,[69] so much of the *Amgen* majority's reasoning would seem inapplicable. Could defendants rebut the presumption at the class certification stage by making a showing that did not fully overlap with one of the merits issues? Justice Alito's concurrence added a more far-reaching wrinkle: whether it was time to overrule or substantially modify *Basic*. These two issues would make their way back to the Supreme Court in *Halliburton II*.

#### (a) *Halliburton I* on Remand: the Class is Certified

After the Supreme Court vacated the *Halliburton* class certification order, the district court granted class certification in a short, five-page order. After noting that proof of loss causation—the sole ground on which certification had initially been denied—was no longer a requirement, the district court concluded that the fraud-on-the-market presumption of reliance was applicable.[70]

On appeal the Fifth Circuit again affirmed the district court, this time holding that class certification was appropriate and defendants could not rebut the presumption by showing a lack of price impact.[71] The Fifth Circuit's analysis relied heavily on the Supreme Court's *Amgen* decision, which had been issued shortly before the oral argument. The court started from the premise that "only those issues which bear directly on the pivotal inquiry of common question predominance and the propriety of class resolution should be addressed at class certification."[72] Following the analytical framework from *Amgen*, the Fifth Circuit first noted that price impact is "undoubtedly an objective inquiry" that applies to every member of the putative class.[73] The court then reasoned that, because "plaintiffs who cannot establish price impact cannot establish loss causation," a showing of no price impact by the defendants would mean that the claims of all individual plaintiffs would fail on the merits.[74] So under the logic of *Amgen*, the Fifth Circuit reasoned that price impact should not be an issue for consideration at class certification.[75]

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

**(b) *Halliburton II*: the Questions Presented**

Defendants petitioned for a writ of *certiorari*, which the Supreme Court granted. The petition presented two questions. [76] First, following-up on Justice Alito's concurrence in *Amgen*, defendants asked the Court to reconsider the entire fraud-on-the market theory:

> Whether this Court should overrule or substantially modify the holding of *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), to the extent that it recognizes a presumption of classwide reliance derived from the fraud-on-the-market theory.

This first issue drew heavy attention while *Halliburton II* was pending before the Court because of the potential impact on securities fraud class actions. *Basic*'s fraud-on-the-market presumption is the *sine qua non* of nearly all securities fraud class actions. It is not hyperbole to say that overruling *Basic* would have fundamentally changed securities fraud litigation even more than the Private Securities Litigation Reform Act of 1995.

Second, and less drastically, defendants sought a ruling on the price impact issue that had not been squarely addressed in *Halliburton I* or *Amgen* and continued to divide the lower courts:

> Whether, in a case where the plaintiff invokes the presumption of reliance to seek class certification, the defendant may rebut the presumption and prevent class certification by introducing evidence that the alleged misrepresentations did not distort the market price of its stock.

**(c) The Supreme Court Upholds *Basic* and the Fraud-on-the-Market Presumption**

On the first question presented, a majority of the Court declined to overturn *Basic* or modify the prerequisites for invoking the fraud-on-the-market presumption. [77]

Chief Justice Roberts, writing for the majority, began by noting that "overturning a long-settled precedent" like *Basic* requires "'special justification,' not just an argument that the precedent was wrongly decided." [78] The Court found that Halliburton did not make that showing.

The Chief Justice first addressed defendants' argument that the *Basic* presumption is inconsistent with congressional intent because the judicially created private right of action under Section 10(b) of the Exchange Act should require proof of direct reliance like the express private right of action under Section 18. Noting that the dissenting Justices in *Basic* had made the same argument, Chief Justice Roberts found no new reason to endorse that argument. [79]

The Chief Justice next addressed defendants' economic challenges to the efficient capital markets hypothesis that undergirds the fraud-on-the-market presumption. Pointing to academic case studies showing that public information is often not incorporated quickly into market prices, defendants argued that *Basic*'s view of market efficiency was incorrect or at least overly simplistic. The Chief Justice observed that although economists may debate the degree to which a stock's market price reflects public information about that company, the fraud-on-the-market theory was founded on the "fairly modest premise" that "public information generally affects stock prices." [80] Chief Justice Roberts did not find the criticism of the efficient capital markets hypothesis cited by defendants sufficient to refute that notion. [81]

For the same reason, Chief Justice Roberts rejected defendants' argument that *Basic* was wrongly decided because many investors, such as value investors who believe the stock is undervalued, do not rely on the integrity of the market price in deciding whether to buy or sell. [82] In language reminiscent of the distinction between "informational efficiency" (does the

PX349

market quickly incorporate new information) and "fundamental value efficiency" (does the market accurately incorporate new information),[83] the Chief Justice held that for an investor to rely "indirectly on a misstatement in the sense relevant for the *Basic* presumption, he need only trade stock based on the belief that the market price will incorporate public information within a reasonable period."[84]

The Chief Justice also rejected defendants' arguments that the *Basic* presumption is inconsistent with the Supreme Court's more recent securities decisions and class action decisions. The presumption, the Chief Justice reasoned, does not alter the reliance element or allow courts to presume that common issues of reliance predominate over individual issues; it merely provides an alternative means of proving reliance and sets forth the factual predicates they must prove to demonstrate predominance.[85]

In a concurring opinion that reads like a dissent, Justice Thomas (joined by Justices Alito and Scalia) explained that he would overrule *Basic* because "[l]ogic, economic realities, and our subsequent jurisprudence have undermined the foundations of the *Basic* presumption, and *stare decisis* cannot prop up the façade that remains."[86] According to Justice Thomas, *Basic*'s holding was based "on a questionable understanding of disputed economic theory and flawed intuitions about investor behavior."[87] Justice Thomas faulted *Basic* further for conflicting with the Supreme Court's recent class certification jurisprudence instructing that plaintiffs "must affirmatively demonstrate [their] compliance" with Rule 23 and concluded that "*Basic* thus exempts Rule 10b-5 plaintiffs from Rule 23's proof requirement."[88] Finally, Justice Thomas criticized the application of the fraud-on-the-market theory, which in practice renders "the so-called 'rebuttable presumption' … largely irrebuttable."[89]

**(d) The Supreme Court Holds That Plaintiffs Need Not Prove Price Impact To Invoke The Presumption, But Defendants May Rebut The Presumption Through Evidence of a Lack of Price Impact**

Turning to the issue of price impact, the Court held that plaintiffs are not required to prove price impact to invoke the presumption, but defendants may rebut the presumption "through evidence that the misrepresentation did not in fact affect the stock price."[90]

Chief Justice Roberts began by noting that the key factual predicates a plaintiff must prove to invoke the presumption—that the misrepresentations were public and material and that the stock traded in an efficient market—serve as a proxy for price impact.[91] "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse."[92]

The Chief Justice disagreed with defendants that plaintiffs should be required to prove price impact rather than just imperfect proxies for price impact. The Chief Justice conceptualized the *Basic* presumption as involving two constituent presumptions: (i) the misrepresentation affected the stock price, and (ii) that by purchasing stock during the relevant time, the plaintiff relied on the defendant's alleged misrepresentation.[93] Just as he was unwilling to overrule the *Basic* presumption in its entirety, the Chief Justice was unwilling to effectively overrule one of the constituent presumptions.[94]

The Chief Justice agreed, however, that defendants can rebut the presumption at the class certification stage through evidence that the alleged misrepresentation did not impact the stock price.[95] As an initial matter, the Chief Justice noted that plaintiffs often introduce evidence of the existence of price impact at the class certification stage to demonstrate that the market incorporates material public information about the company, and it would not make sense to preclude defendants from using such evidence to rebut the fraud-on-the-market theory.[96]

More fundamentally, the Chief Justice recognized that precluding defendants from rebutting the presumption would be inconsistent with *Basic* itself.[97] Under the fraud-on-the-market theory, price impact is "an essential precondition for any Rule 10b-5 class action." Without it individual issues of reliance would predominate. "[W]hile *Basic* allows plaintiffs to establish that precondition indirectly, it does not require courts to ignore a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply."[98] This aspect of *Halliburton II* is consistent with the Court's recent class action jurisprudence requiring that courts consider actual evidence from both sides before ruling on whether the requirements for class certification have been met.[99]

PX349

Justice Ginsburg, along with Justices Breyer and Sotomayor, joined the majority opinion in a separate concurrence. Justice Ginsburg stated that because "it is incumbent upon the defendant to show the absence of price impact," the Court's holding "should impose no heavy toll on securities-fraud plaintiffs with tenable claims." [100]

**VI. Takeaways and Open Issues After *Halliburton II***

So after two trips to the Supreme Court, what have we learned from *Halliburton*, and what are the open issues that must be fleshed out in the lower courts?

**Securities fraud class actions survive**. A decision overruling *Basic* and the fraud-on-the-market presumption would have fundamentally changed securities litigation. Section 10(b) claims alleging misrepresentations could not have been certified as class actions, leaving plaintiffs and the plaintiffs' bar to pursue Section 11 offering claims (which have no reliance requirement), pure omissions claims (assuming the *Affiliated Ute* presumption was still viable), and "opt-out" style individual or mass action claims. The Court's decision to retain the fraud-on-the-market presumption in large part maintains the status quo, and it is unlikely that *Basic* will face another serious judicial challenge anytime in the near future.

**Class certification will be a more expensive battle of the experts**. There is little doubt that class certification will often be more expensive for both sides as additional work is needed from economics experts earlier in cases. Economists have always played a role in analyzing market efficiency at the class certification stage, but in many cases that issue was not heavily litigated. Post-*Halliburton II* it is more likely that both plaintiffs and defendants will submit competing expert testimony analyzing whether the alleged misstatements impacted the stock price. In anticipation of this earlier expense, a leading carrier of Directors and Officers insurance has announced a new "Event Study endorsement" with a $0 retention toward the cost of class certification event study expenses at no additional premium. Along with competing expert opinions will come *Daubert* motions challenging the admissibility of expert analyses and an increasing focus on the standards by which district court should be screening expert opinions at the class certification stage. For district courts facing this "battle of the experts," class certification may resemble a mini-trial on causation issues.

**Beyond event studies**. Standard event studies (when conducted correctly) are a generally-accepted methodology for showing whether a stock price moved in response to company-specific news. But they are of limited use in disaggregating the impact of multiple pieces of company-specific news released at the same time. In cases with confounding news, experts will often have to go beyond standard event studies and use other methods to hone in on the cause of stock price movements. For example, experts may qualitatively review analyst reports and other market commentary to assess what news drove changes in stock prices. Or quantitative content analysis might be used to assess the same question. [101] Response coefficients might also be used to separate the stock price impact of an announcement of financial results from the impact of other news. [102] Fundamental financial analysis, such as a discounted cash flow model, may also be useful in analyzing what impact news would have on expected future cash flows, a metric that typically relates to a company's stock prices.

**Does *Halliburton II* lower the bar for market efficiency?** Some plaintiffs' lawyers and commentators have suggested that *Halliburton II* lowers the bar for proving market efficiency as a predicate for the fraud-on-the-market presumption. Pointing to references in the Court's opinion to "a generally efficient market" and the Court's rejection of defendants' arguments about the efficient market hypothesis as failing to "take *Basic* on its own terms," these commentators argue that lower courts should look for generalized efficiency rather than apply the more rigorous tests sometimes used by defense-side experts. The authors of this article (who approach the issue from the perspective of defending securities class actions) do not believe that lower courts should change their approach towards analyzing market efficiency where that was not at issue in *Halliburton II*. Nor would it make sense to deem a market efficient where it does not meet the standard economic definition of a market in which a company's stock price quickly reflects all new publicly available information. But this is definitely an issue we expect plaintiffs to press, and it may result in the filing of cases involving markets with more questionable efficiency.

**What is price impact?** It is now clear that defendants can rebut the fraud-on-the-market presumption through evidence that the alleged misstatement did not impact the stock price. But what does "price impact" mean? One possibility is to look at the closing price of the stock on the day the alleged misrepresentation (presumably an overly positive representation) is made. If the stock price goes up, there is price impact; if the stock price does not go up, there is no price impact. But that approach is likely too simplistic in many cases. Stock prices move up or down for all sorts of reasons. A mere increase in price could be due to the misstatement, or it could be due to market or industry factors (like a rising tide that lifts all boats), or it could be due to other, non-fraudulent positive information announced on the same day, or it could be statistically random. Merely looking

PX349

at closing prices will not tell us whether the alleged misstatement actually impacted the stock price in the sense needed for the investor to have indirectly relied on the statement through purchasing at a price artificially inflated by fraud. It is more likely that analyzing "price impact" under *Halliburton II* requires a more nuanced look, using event studies and other economic tools, for statistically significant, company-specific changes in stock price caused by the allegedly fraudulent statement. This will at least be analyzed at the "front end"—when the alleged misstatement is made. It may also be analyzed at the "back end"—when the truth is revealed to the market.

**What is defendants' burden and who has the burden of persuasion?** Perhaps the most important question in the wake of *Halliburton II* will be how the burdens are applied. After the plaintiffs prove the necessary predicates to invoke the presumption, it is clear that defendants bear some burden of coming forward with evidence that the alleged misstatement did not impact the stock price. The exact contours of that burden will be a major point of dispute. Plaintiffs will likely claim that defendants bear the burden of persuading the court that there was no price impact. Defendants will argue that they bear only a burden of production, not a burden of persuasion. Under this view, once defendants present evidence of an absence of price impact, the presumption is rebutted and plaintiffs have the burden of persuading the court that reliance can be proven on a class-wide basis. That is how presumptions operate under Federal Rule of Evidence 301, which the *Basic* court cited when discussing how presumptions are used to allocate burdens of proof between parties. [103] It is also consistent with plaintiffs' ultimate burden to show that the requirements of Rule 23 are met.

**Does the burden matter?** At the class certification stage judges must weigh competing evidence, resolve factual disputes, and determine by a preponderance of the evidence whether the class meets each of the requirements of Rule 23. So does it really matter who has the burden on price impact? Won't it only make a difference in the rare case where the evidence is in perfect equipoise? Plaintiffs will argue that it matters a lot. Because of the numerous factors impacting stock prices, it can be challenging to show whether a specific piece of news actually impacted the price. This is particularly true where there are multiples pieces of information announced at the same time. Plaintiffs and their experts have historically struggled with disaggregating the impact of various pieces of news on stock prices. [104] If the ultimate burden of persuasion is placed on defendants to prove the absence of price impact, plaintiffs will argue that defendants have an insurmountable burden of proving a negative.

**Will the opportunity to rebut make any difference?** Securities class actions are typically filed following significant stock price drops. Given this built-in selection bias and the issues discussed above, it is fair to ask whether defendants' newfound (in some circuits) ability to rebut the presumption will make any difference in the vast majority of cases. For the reasons discussed above the answer may depend in large part on how the burdens are allocated. Even then, in many cases a complete lack of price impact will not reasonably be in dispute. What is more likely is that defendants will be able to use rebuttal to narrow some cases at the class certification stage. Most cases assert numerous alleged misstatements. As reflected in a hypothetical from *Halliburton II*, some statements may impact the stock price while others may not. [105] The most common benefit of rebuttal may be to allow defendants to avoid certification of claims based on particular alleged misstatements, thereby narrowing the case and/or the scope of the class. Defendants will no longer have to defer the issue until later stages of the case, such as summary judgment or trial, which may never be reached due to settlement pressures.

**Cases that do get certified may be more expensive to settle.** In attempting to rebut the presumption of reliance at the class certification stage, a defendant will effectively be laying out its best arguments against the elements of reliance and loss causation. If the court finds against the defendant at class certification under the preponderance of the evidence standard, plaintiffs will argue that defendants will be unable to obtain summary judgment on those elements. In addition, the plaintiffs' counsel will have incurred the additional expense of fighting a rebuttal effort. Similar to the increased cost of settling cases that survived a motion to dismiss after the Private Securities Litigation Reform Act was passed, plaintiffs' lawyers are already claiming that a likely side effect of *Halliburton II* is that cases certified over a rebuttal attempt will be more expensive to settle.

Westlaw. © 2023 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**Footnotes**

* Dan Gold is a partner and Richard Guiltinan is an associate in the class action and securities and shareholder litigation practices of Haynes and Boone, LLP.

1 573 U.S. _ (2014).

2 FED. R. CIV. P. 23(b)(3).

3 Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005).

4 Basic Inc. v. Levinson, 485 U.S. 224 (1989).

5 *Basic*, 485 U.S. at 241–42 (quoting Peil v. Speiser, 806 F. 2d 1154, 1160–1161 (3d Cir. 1986) (internal citations and modifications omitted).

6 *Id.* at 248.

7 *Id.*

8 *Id.* at 248–49.

9 *Id.* at 253.

10 *Id.* at 257–58.

11 *Id*. at 248 n.27.

12 *E.g*. Unger v. Amedisys Inc., 401 F.3d 316, 323 (5th Cir. 2005) (citing Cammer v. Bloom, 711 F. Supp. 1264, 1286–87 (D.N.J.1989)); *In re Xcelera.com Sec. Litig.,* 430 F.3d 511–12 (1st Cir. 2005); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 368 (4th Cir. 2004).

13 *E.g. Unger*, 401 F.3d at 323; In re PolyMedica Corp. Sec. Litig., 453 F. Supp.2d 260, 266 n.2 (D. Mass. 2006).

14 Teamsters Local 445 Freight Div. Pension v. Bombardier Inc., 546 F.3d 196, 207 (2d Cir. 2008); *Xcelera.com*, 430 F.3d at 512.

15 *E.g.* In re Williams Sec. Litig., 496 F. Supp. 2d 1195, 1272–73 (N.D. Okla. 2007), In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003).

16 487 F.3d 261 (5th Cir. 2007).

17 Greenberg v. Crossroads Sys., Inc., 364 F.3d 657, 663 (5th Cir. 2004); *see also* Nathenson v. Zonagen Inc., 267 F.3d 400, 415 (5th Cir. 2001).

18 *Nathenson*, 267 F.3d at 418–19; *Greenberg*, 364 F.3d at 662.

19 *Oscar*, 487 F.3d at 269.

20 *Id.* at 265.

21 *Id.*

22 618 F.3d 679, 685 (7th Cir. 2010).

23 *Id.*

24 *Id.*

25 *Id.*

PX349

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

26 660 F.3d 1170 (9th Cir. 2011).

27 *Id.* at 1175–76.

28 *See id.* at 1175–77.

29 *Id.* at 1177.

30 *Id.*

31 In re Salomon Analyst Metromedia Litigation, 544 F.3d 474 (2d Cir. 2008).

32 *Id.* at 483.

33 *Id.* at 485–86.

34 *Id.* at 485.

35 In re DVI Inc. Securities Litigation, 639 F.3d 623 (3d Cir. 2011).

36 *Id.* at 636–37.

37 *Id.* at 638.

38 Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., No. 3:02-CV-1152, 2008 WL 4791492, at *1 (N.D. Tex. Nov. 4, 2008).

39 *Id.*

40 *Id.*

41 *Id.* at *20.

42 *Id.*

43 *Id.* at *4–20.

44 *Id.* at *7.

45 Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., 597 F.3d 330, 334 (5th Cir. 2010).

46 *Id.* at 339–40.

47 *Id.* at 340.

48 *Id.* at 336, 343–44.

49 *Id.* at 344 (emphasis in original).

50 Petition for a Writ of Certiorari at 12, Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I), 563 U. S. _ (2011) (No. 09-1403).

51 *Id.*

52 *Id.* at i.

53 Erica P. John Fund, Inc. v. Halliburton Co., 563 U. S. _, _, 131 S. Ct. 2179, 2183 (2011).

54 *Id.* at 2186 (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005)).

PX349

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

55 *Id*. (quoting *Basic*, 485 U.S. at 247).

56 *Id*. (emphasis in original).

57 *Id*.

58 *Id*. at 2187.

59 Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 568 U. S. _, 133 S. Ct. 1184 (2013).

60 133 S. Ct. at 1195.

61 *Id*. (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 445 (1976)).

62 *Id*.

63 *Id*. at 1196.

64 *Id*.

65 *Id*.

66 *Id*. at 1197.

67 *Id*. at 1204.

68 *Id*. (citations omitted).

69 *Dura*, 544 U. S. at 341–342.

70 *Erica P. John Fund, Inc. v. Halliburton Co.,* No. 3:02-cv-01152-M (N.D. Tex. Jan. 27, 2012) (Dkt. No. 470 at 1–2, 5).

71 Erica P. John Fund, Inc. v. Halliburton Co., 718 F.3d 423, 425 (5th Cir. 2013).

72 *Id*. at 431.

73 *Id*. at 433.

74 *Id*. at 434.

75 *Id*. at 433–34.

76 Petition for a Writ of Certiorari at (i), Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II), 573 U.S. _ (2014) (No. 13-317).

77 Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II), 573 U.S. _, _, 189 L. Ed. 2d 339, 349, 357 (2014).

78 *Id*. at 349 (citing Dickerson v. United States, 530 U.S. 428, 443 (2000)).

79 *Id*. at 352.

80 *Id*. at 353 (citations omitted).

81 *Id*.

82 *Id*. at 353–54.

83 *See* In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 14–17 (1st Cir. 2005).

PX349

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

84 Halliburton II, 573 U.S. at _, 189 L. Ed. 2d at 354.

85 *Id.* at 355–57.

86 *Id.* at 362.

87 *Id.* at 363.

88 *Id.* at 367–68.

89 *Id.* at 368.

90 *Id.* at 357, 358.

91 *Id.* at 357.

92 *Id.*

93 *Id.*

94 *Id.*

95 *Id.* at 358.

96 *Id.* at 358–59.

97 *Id.* at 359.

98 *Id.*

99 *See* Comcast Corp. v. Behrend, 569 U.S. _, _, 133 S. Ct. 1426, 1432 (2013); Wal-Mart Stores, Inc. v. Dukes, 564 U.S. _, _, 131 S. Ct. 2541, 2551 (2011).

100 *Halliburton II*, 573 U.S. at _, 189 L. Ed. 2d at 361.

101 *See* David I. Tabak, "**Making Assessments About Materiality Less Subjective Through** The **Use of Content Analysis**," NERA Economic Consulting Working Paper, 2007.

102 *See* Esther Bruegger and Fred Dunbar, "Estimating Financial Fraud Damages with Response Coefficients," NERA Economic Consulting Working Paper, 2009.

103 *Basic*, 485 U.S. at 245.

104 *E.g.* Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund (LOCAL 66), 579 F.3d 401 (5th Cir. 2009); In re Williams Sec. Litig., 558 F.3d 1130 (10th Cir.2009).

105 *Halliburton II*, 573 U.S. at _, 189 L. Ed. 2d at 358–59 ("Suppose a defendant at the certification stage submits an event study looking at the impact on the price of its stock from six discrete events … Suppose one of the six events is the specific misrepresentation asserted by the plaintiffs … [S]uppose the district court determines that, despite the defendant's study, the plaintiff has carried its burden to prove market efficiency, but that the evidence shows no price impact with respect to the specific misrepresentation challenged in the suit … [T]he fraud-on-the-market theory does not apply and common reliance thus cannot be presumed.").

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

PX349

# PX 350

**93 Wash. U. L. Rev. 583**

**Washington University Law Review**
2015

**New Directions for Corporate and Securities Litigation**
Alon Brav [a1] J.B. Heaton [aa1]

Copyright (c) 2015 Washington University; Alon Brav; J.B. Heaton

# EVENT STUDIES IN SECURITIES LITIGATION: LOW POWER, CONFOUNDING EFFECTS, AND BIAS

## ABSTRACT

*An event study is a statistical method for determining whether some event-- such as the announcement of earnings or the announcement of a proposed merger-- is associated with a statistically significant change in the price of a company's stock. The main inputs to an event study are historical stock returns for the companies under study, benchmark returns like the return to the broader stock market, and standard statistical tests like t-tests that are used to test for statistical significance. In securities litigation and regulation, event studies are used primarily to detect the impact of disclosures of alleged fraud on the price of a single traded security.*

*But are event studies in securities litigation reliable? What is interesting about the use of event studies in securities litigation is that the methodology litigants use in court differs from the methodology that economists apply in their research. With few exceptions, securities litigation event studies are single-firm event studies, while almost all academic research event studies are multi-firm event studies. Multi-firm event studies are generally accepted in financial economics research, and peer-reviewed journals contain them by the hundreds. By contrast, single-firm event studies--the mainstay of modern securities fraud litigation--are almost nonexistent in peer-reviewed journals.*

***584** *Importing a methodology that economists developed for use with multiple firms into a single-firm context creates three substantial difficulties. First, single-firm event studies suffer from a severe signal-to-noise problem in that they lack statistical power to detect price impacts unless the price impacts are quite large. Inattention to statistical power lowers the deterrent effect of the securities laws by giving a "free pass" to some economically meaningful price impacts and may encourage more small- and mid-scale fraud than is socially optimal given the costs of litigation. Second, single-firm event studies do not average away confounding effects. While this problem is well known, some courts have unrealistic expectations of litigants' ability to quantitatively decompose observed price impacts into those caused by alleged fraud and those unrelated to alleged fraud. Third, low statistical power and confounding effects combine to generate sizeable upward bias in detected price impacts and therefore in damages. To improve the accuracy of adjudication in securities litigation, we suggest that litigants report the statistical power of their event studies, that courts allow litigants flexibility to deal with the problem of confounding effects, and that courts and litigants consider the possibility of upward bias in the detection of price impacts and the estimation of damages.*

## TABLE OF CONTENTS

Introduction 585
I. Difficulty #1: Low Statistical Power 589
A. Abnormal Returns and Type I Error 589
B. Abnormal Returns and Type II Error 593
C. Statistical Significance and Likelihood Ratios 597
D. Low Power and Statistical Insignificance in Case Law 599
E. An Aside on Power and the MFES 603
II. Difficulty #2: Confounding Effects 605

PX350

A. The Problem 605
B. Confounding Effects in Case Law 606
III. Difficulty #3: Bias 608
Conclusion 612

***585 INTRODUCTION**

An event study is a statistical method for determining whether some event--such as the announcement of earnings or the announcement of a proposed merger--is associated with a statistically significant change in the price of a company's stock.[1] The main inputs to an event study are historical stock returns for the companies under study, benchmark returns like the return to the broader market, and standard statistical tests like *t*-tests that are used to test for statistical significance. In securities litigation and regulation, event studies are used primarily to detect the impact of disclosures of alleged fraud on the price of a traded security.

After the Supreme Court endorsed the fraud-on-the-market doctrine in *Basic Inc. v. Levinson*[2] in 1988, event studies became so entrenched in securities litigation that they are viewed as necessary in every case.[3] Based on the efficient markets hypothesis that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations,"[4] securities litigants use the event study to help answer two crucial questions. First, was there a price impact ***586** at the time of an alleged misrepresentation or corrective disclosure? Second, if there was a price impact, how much of it was caused by the alleged misrepresentation or corrective disclosure as opposed to other, unrelated factors?[5] In proposing answers to these questions, litigants have not been shy in asserting the event study's impressive academic pedigree.[6] But the methodology that litigants use in court differs from the methodology used in academic research. In particular, securities litigation event studies are almost always single-firm event studies ("SFESs") that examine the price moves of the security of the single firm involved in the litigation,[7] while almost all academic research event studies are multi-firm event studies ("MFESs") that examine large samples of securities from multiple firms.[8] Importing a methodology that economists developed for use with multiple firms into a single-firm context creates three substantial difficulties: low statistical power, confounding effects, and bias.

First, an SFES often has low statistical "power" to detect an economically meaningful price impact, which typically must be at least approximately twice as large as the standard deviation of daily (abnormal) returns for the examined firm. But requiring conventional levels of statistical significance when power is low effectively gives a "free pass" to economically meaningful securities fraud because the SFES simply cannot detect price impacts below a high threshold. Courts, ignoring low power, ***587** then conclude that some economically large price impacts are immaterial. Courts err because of their mistaken premise that statistical insignificance indicates the probable absence of a price impact. Overreliance on statistical significance without consideration of statistical power "leads to a decision-making regime in which the probability of an incorrect exoneration far exceeds the probability of an incorrect condemnation."[9] While it is possible that this regime reflects a rational policy judgment, we see no evidence such a judgment has been made deliberately.

Second, when an SFES does detect a price impact, it reflects confounding effects that are unrelated to the alleged fraud. Unfortunately, there is no fully reliable, mathematically precise way to decompose an observed event return in an SFES into component parts: the part related to alleged fraud and the part not related to alleged fraud. Financial economists have long understood that our ability to fully explain observed price moves is quite limited;[10] much price movement occurs for reasons unrelated to news, including as a result of the liquidity trades of investors in the market seeking to raise funds for other purposes and the (at least short-term) impact of "noise traders" who trade for irrational reasons.

Third, low statistical power and confounding effects combine to generate sizeable upward bias in detected price impacts and damages (i.e., overstating the magnitude of a price impact and damages). This upward bias problem means that we cannot leave confounding effects unaddressed in the hope that they are as likely to be on one side of the true price effect as on the other. For example, suppose the true price impact is -2.0%, but the requirement of statistical significance is such that price impacts less severe than -2.94% will be rejected as statistically insignificant. In that case, a price impact will be detected only when there are confounding effects that push the observed price impact past -2.94%. As we show later, the expected detected price impact in such situations is -3.9%, substantially higher than -2.0%, the true price impact.

PX350

These problems help explain why the SFES methodology is applied so infrequently in peer-reviewed research. But the same problems have not limited the use of the SFES in securities litigation. Securities litigants use SFESs to show that securities did or did not trade in an efficient market, to establish that alleged misrepresentations did or did not impact the stock price for purposes of materiality and reliance, and to determine the ***588** existence or absence of loss causation and amount of damages. We are not the first to point out that SFESs have low statistical power and are subject to problems with confounding effects (though we are, to our knowledge, the first to point out the bias problem in this context).[11] But especially since courts are increasingly required to address price impact evidence at the class certification stage by using event studies,[12] it is time to review the limitations of the single-firm event study in securities litigation-- particularly those limitations that arise from low power, confounding effects, and bias--in order to provide courts and litigants with a firmer basis for considering evidence based on single-firm event studies.

In Part I, we explain why the SFES as typically applied in securities litigation has low statistical power, in the sense that it cannot detect price impacts reliably unless they are large. In Part II, we explain the problem of confounding effects. In Part III, we explain how low statistical power and confounding effects combine to generate bias in detected price impacts. We conclude with proposals for improving the accuracy of adjudication involving SFESs. These include requiring litigants to report the power of their analyses, allowing litigants flexibility to address the problem of confounding effects, and encouraging courts and litigants to consider the possibility of upward bias in the detection of price impacts and the estimation of damages.[13]

## *589 I. DIFFICULTY #1: LOW STATISTICAL POWER

### *A. Abnormal Returns and Type I Error*

The main question addressed in an event study is whether a particular event was associated with a change in the price of a firm's securities. In securities litigation,

> [t]he classic example of a loss-inducing event is a corrective disclosure by the company itself. A corrective disclosure is traditionally an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful and complete version of those statements. The event need not take this form, however. The event could be a credit ratings downgrade, or the collapse of the company.[14]

Financial economists typically analyze price changes by analyzing returns (i.e., change in price, plus dividends or other distributions, divided by price, which is more easily comparable across firms than price). An event changes the value of the firm's securities if it changes the probability distribution of security returns.[15] Consider Figure 1, which shows an example probability distribution for the daily return of a hypothetical single stock, and which is reflective of the daily standard deviation and return of a typical large cap stock.

## *590 FIGURE 1: EXAMPLE PROBABILITY DISTRIBUTION FOR A SINGLE FIRM'S DAILY ABNORMAL STOCK RETURNS

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The mean of this probability distribution is at zero because we are interested in the part of a security's returns that are not explained by long-run average returns, returns in the broader market, or returns of the firm's industry or the like. When the market as a whole goes down, many securities tend to go down as well, since the market is just the collection of all securities. When all the other stocks in a firm's industry are moving in one direction on a given day (perhaps because of news in the market about the prospects for that industry), the returns of a firm in that industry will tend to move in that direction as well. In an event study, we want to remove the part of the returns of the examined firm that are explained by co-movement with market, industry, or other broader moves, so we can better isolate the firm-specific event we are studying. In essence, we are trying to remove any return that would have occurred anyway absent the event. The failure to make adjustments for the effect of market and industry moves nearly always dooms an analysis of securities prices in litigation.[16] Typically, parties remove co-movement using market indexes ***591** and industry indexes, but these methods can become quite sophisticated in practice.

PX350

What is left over after subtracting the return predicted by co-movement with other stocks is called the "abnormal return." On any given day, the abnormal return may fluctuate within a large range. For example, the standard deviation of the abnormal daily return in Figure 1 is 1.5%, so we would expect 95% of abnormal returns to occur between -2.94% and +2.94%. This is based on the normal distribution we've drawn here, normality still being the assumption of most work in practice. [17]

Now consider the occurrence of an event of interest like a corrective disclosure. The standard approach is to calculate a test statistic based on the observed abnormal return on the event day divided by the standard deviation of abnormal returns. [18] If the test statistic exceeds a "critical" value, [19] the return is said to be "statistically significant," in the sense that a return of that magnitude has a relatively small probability of occurring if the event did not have a price impact. [20] Consider Figure 2. The lower and upper critical values are the abnormal returns (1.96 standard deviations from zero) that generate values of the test statistic beyond which the abnormal return would be considered statistically significant. [21] In the usual ***592** case, we will say that an event day return is statistically significant if it is greater in magnitude than one of the critical values (i.e., if it falls in the darkened tails, which theoretically extend infinitely in both directions with increasingly small probability).

**FIGURE 2: STATISTICAL SIGNIFICANCE**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
The idea behind the selection of critical values is that, all else equal, we do not want to conclude that a price impact occurred from the event when what in fact happened is that we observed a routine return from the same abnormal return distribution centered at zero. In other words, we want to avoid improperly rejecting the possibility that the negative return reflected normal fluctuations and not the event. To address this problem, we require that the observed return be sufficiently extreme that we will make that mistake only a small percentage of the time. That percentage is called the significance level, or "size," of the test. Type I error is the probability of concluding that the event caused a price impact when it did not. [22] Ideally, we want a low probability of Type I error, and it is common to fix size at 5%, though other choices like 1%, 2.5%, or 10% are also used in research ***593** practice. [23] It is crucial to understand that statistical significance is simply describing a set of returns that would be unusual to observe if there was *no* price impact. Lack of statistical significance does *not* tell us that it is more probable than not that there was no price impact. [24]

### *B. Abnormal Returns and Type II Error*

Power is the ability to detect a true effect (e.g., a price impact due to fraud) when it exists. "Analysis of the power of statistical tests is an important part of planning any scientific research study . . . ." [25] As described above, a Type I error is the error of concluding that there was an effect when there was none. The second kind of mistake is the converse: failing to find an effect that exists. That is, we observe an abnormal return that is not statistically significant and conclude that there was no price impact, when in fact there was one. This is known as a Type II error. The "power" of a test is one minus the probability of a Type II error. [26]

Suppose that the true price impact of a corrective disclosure was - 2.0%, so that the abnormal distribution on the event date had the same standard deviation as the no-event distribution but with a -2.0% mean rather than a zero mean. Figure 3 illustrates why the SFES will miss detecting that price impact with high probability.

***594 FIGURE 3: POWER**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
We can refer to the mean zero distribution as the "no-price-impact distribution" and the mean -2.0% distribution as the "price-impact distribution." Having chosen the size of our test (which determines the areas of the darkened tails in the no-price-impact distribution), we can see that when the price-impact distribution generates the abnormal return (i.e., there is a price impact), we will make a Type II error anytime the return from the price-impact distribution is to the right of the lower critical value return but to the left of the upper critical value return. Our requirement of statistical significance leads us to the wrong inference in those cases where the price-impact distribution generated the return in that range. As we have drawn the distributions here, we will make a Type II error 73.4% of the time that there is a price impact, because 73.4% of the price-impact distribution is to

PX350

the right of the critical value generating return and to the left of the upper critical value. Obviously, the further away the price-impact distribution is from the no-price-impact distribution, the more power we have. So the SFES can detect very large price impacts reliably, but it cannot detect smaller price impacts reliably. Unless the price impact is large relative to the standard deviation of returns (i.e., more than about two standard deviations away from zero), an SFES can easily miss it.

***595** What is the likely importance of this problem in practice? In one review, power in the SFES context ranges from 5% to 17%, depending on assumptions of effect size and standard deviation.[27] But it may be easier to understand the power problem in dollar terms. In Table I, we use data from Wharton Research Data Services ("WRDS") to sort U.S. firms with ordinary common shares into deciles by size from smallest to largest. We use a four-factor model to estimate abnormal returns for 2014 for each of 4298 firms that had data available for all 252 trading days.[28]

**TABLE I: SFES MINIMUM DETECTABLE PRICE IMPACT USING 1.96X STANDARD DEVIATION TEST STATISTIC**

| Size Deciles | Avg. Mkt. Cap. ($ millions) | Avg. Std. Dev. (% return) | Min. Detectable Impact. ($ millions) |
|---|---|---|---|
| smallest 1 | 29 | 4.1 | 2.3 |
| 2 | 81 | 2.7 | 4.3 |
| 3 | 167 | 2.6 | 8.5 |
| 4 | 297 | 2.2 | 12.8 |
| 5 | 517 | 2.2 | 22.3 |
| 6 | 882 | 2.0 | 34.6 |
| 7 | 1,543 | 1.8 | 54.4 |
| 8 | 2,888 | 1.6 | 90.6 |
| 9 | 6,238 | 1.4 | 171.2 |
| largest 10 | 41,597 | 1.1 | 896.8 |

The first column gives the ten size deciles, with the 10% of firms that are smallest by beginning-of-year 2014 equity market capitalization being in the 1st decile and so on through the 10% of firms that are largest in the 10th decile. The second column is the average beginning of year equity market capitalization for firms in that decile. The third column is the average standard deviation of 2014 abnormal returns for each firm in that decile. The fourth column is the minimum price impact on the equity value of the average-sized firm in that decile that would be detectable with a ***596** 1.96 average standard deviation cut-off for that decile. Consider decile 8 firms--those in the top 30% of firms by size but not in the top 20%. These firms have an average beginning-of-year 2014 equity market capitalization of $2.888 billion. The standard deviation of their abnormal returns in 2014 was 1.6%. If the test statistic requires that a detected abnormal return on event day be 1.96 standard deviations from zero to be statistically significant, then the event day price impact must be at least $90.6 million for the SFES to detect it, assuming there are no confounding effects pushing it toward significance. For firms in decile 10--the biggest 10% of firms--the price impact must be nearly $900 million to be detectable by an SFES. Of course, if there were confounding effects going in the opposite direction (e.g., positive news announced with a corrective disclosure), then the price impact would have to be even bigger for the SFES to detect it.

This is a strange state of affairs. Suppose, for example, that an average decile 10 firm announced that a now-fired management team had fraudulently overstated its cash by $300 million, but the company could not recover against the management or the company's auditors who, we may assume, found the overstatement in the course of their audit. Suppose further that the market recognized the $300 million loss and the value of the firm fell a further $200 million on the belief that further problems might be forthcoming. All else equal, the value of the firm would decline $500 million. There would be little doubt that the fraud caused at least $300 million of that fall. But even the total price move ($300 million plus $200 million) would be statistically insignificant in an SFES because it falls below the approximately $900 million detectability threshold for decile 10 firms. It is hard to believe this is the right conclusion. And indeed, we would expect a court to look beyond event study evidence to the more direct measure of impact on value that would be available in this example.

In Table II, we present power for combinations of standard deviations and price impacts. We assume a two-tailed test statistic as in Figures 2 and 3, and a test statistic that is 1.96 standard deviations from zero on both sides (i.e., a standard two-tailed significance level of 5%).[29]

PX350

***597 TABLE II: POWER UNDER ALTERNATIVE ASSUMPTIONS FOR STANDARD DEVIATION AND MEAN PRICE IMPACT (5% SIGNIFICANCE LEVEL, NORMAL DISTRIBUTION, SAMPLE SIZE = 1)**

| | Mean Price Impact (%) | | | | | | |
|---|---|---|---|---|---|---|---|
| **Std. Dev. (%)** | **-1.0** | **-2.0** | **-3.0** | **-4.0** | **-5.0** | **-7.5** | **-10.0** |
| **4.0** | 5.7% | 7.9% | 11.7% | 17.0% | 24.0% | 46.6% | 70.5% |
| **3.0** | 6.3% | 10.2% | 17.0% | 26.6% | 38.5% | 70.5% | 91.5% |
| **2.0** | 7.9% | 17.0% | 32.3% | 51.6% | 70.5% | 96.3% | 99.9% |
| **1.5** | 10.2% | 26.6% | 51.6% | 76.0% | 91.5% | 99.9% | 100.0% |
| **1.0** | 17.0% | 51.6% | 85.1% | 97.9% | 99.9% | 100.0% | 100.0% |

Table II demonstrates how power is a function of effect size and standard deviation, holding significance level constant, given a normal distribution assumption for abnormal returns. The probability of Type II error is one minus power. So, for example, when standard deviation is 1.5% and the true price impact is -2.0%, power is only about 26.6%, thus making the probability of Type II error about 73.4%, as in Figure 3.

### *C. Statistical Significance and Likelihood Ratios*

Consider Figure 3 again. One reason to be concerned that the price impact of -2.0% will show up as statistically insignificant is that -2.0% is much more probable under the price-impact distribution than under the no-price-impact distribution. That is, the ratio of the height of the price-impact distribution to the height of the no-price-impact distribution, both evaluated at -2.0%, shows that it is more likely than not that there was a price impact. This ratio-- a likelihood ratio--is a standard calculation in statistics and may be particularly useful for the kinds of problems that arise in litigation.[30]

Table III presents likelihood ratio calculations for the price impact and standard deviation combinations presented in Table II. The number in each cell is the ratio of the probability of the price-impact distribution to the probability of the no-price-impact distribution at the posited price impact, where we assume normality of both distributions and where the mean of the price-impact distribution is the posited price impact and the mean of the no-price-impact distribution is zero. Asterisks denote that the observed ***598** return is at least 1.96 standard deviations from 0% (i.e., that the observed return is "statistically significant" at the two-tailed 5% level at that level of standard deviation).

**TABLE III: LIKELIHOOD RATIOS AND STATISTICAL SIGNIFICANCE (*) FOR PRICE IMPACT VERSUS NO PRICE IMPACT UNDER ALTERNATIVE ASSUMPTIONS FOR STANDARD DEVIATION AND PRICE IMPACT (NORMAL DISTRIBUTION, SAMPLE SIZE = 1)**

| | OBSERVED AND MEAN PRICE IMPACT (%) | | | | | | |
|---|---|---|---|---|---|---|---|
| **STD. DEV. (%)** | **-1.0** | **-2.0** | **-3.0** | **-4.0** | **-5.0** | **-7.5** | **-10.0** |
| **4.0** | 1.03 | 1.13 | 1.32 | 1.65 | 2.18 | 5.80 | 22.76* |
| **3.0** | 1.06 | 1.25 | 1.65 | 2.43 | 4.01 | 22.76* | 258.67* |
| **2.0** | 1.13 | 1.65 | 3.08 | 7.39* | 22.76* | 1.13E+03* | 2.68E+05* |
| **1.5** | 1.25 | 2.43 | 7.39* | 35.01* | 258.67* | 2.68E+05* | 4.48E+09* |
| **1.0** | 1.65 | 7.39* | 90.02* | 2.98E+03* | 2.68E+05* | 1.64E+12* | 5.18E+21* |

Table III demonstrates that an observed price impact is always more probable under a distribution centered at that price impact than under the no-price-impact distribution. This is the "maximum likelihood" estimate of the mean price impact that maximizes the likelihood at that point. It illustrates quite a different picture than significance levels provide. For instance, consider our example of a price impact of -2.0% when the standard deviation is 1.5%. Figure 3 demonstrates why the -2.0% return will fail a statistical significance test, which is shown by the absence of an asterisk for that entry. Figure 3 and Table II show, however, that the test statistic that failed to show statistical significance had only about 26.6% power to find the price impact centered at -2.0%. Table III illustrates a concern with this result: -2.0% is 2.43 times more likely under a price-impact distribution centered at -2.0% than under the no-price-impact distribution centered at 0%. Notwithstanding statistical insignificance, it is far more likely than not that there was a price impact centered at -2.0% than that there was no price impact.

Likelihood ratios are not, however, a panacea for the low power plaguing SFESs, because choosing a price impact based on likelihood ratios generates a higher probability of Type I error. For example, consider a -1.0% observed and mean price impact

PX350

when the standard deviation is 1.5%. According to Table II, power is only 10.2%, so the probability of a Type II error is 89.8%. The likelihood ratio evaluated at -1.0% is 1.25, which slightly favors price impact over no price impact. But the probability of Type I error at -1.0% is now just over 50% (which is the ***599** cumulative probability under the no price impact distribution up to -1.0% with standard deviation of 1.5% and assumed normality, times two (to reflect both tails)). So while the likelihood ratio recognizes that price impact may be more probable than no price impact even when there is statistical insignificance, a decision rule that replaced statistical significance with a likelihood ratio test based on picking the most likely state--price impact or no price impact--comes at the cost of higher probability of a Type I error (i.e., a greater chance of a false positive when testing for price impact). Nevertheless, the likelihood ratio--properly defined to balance Type I and Type II error--may have a better connection to evidentiary burdens than simple reliance on Type I error as it is unconnected to such burdens and insensitive to Type II error. [31]

### *D. Low Power and Statistical Insignificance in Case Law*

Many cases address statistical significance of event study results. Consider *Goldkrantz v. Griffin*, [32] where plaintiff shareholders brought a securities class action against defendants for an alleged misrepresentation. When the defendant company cured the alleged misrepresentation by corrective disclosure in a 10-K filing, the stock price fell by 2.64%. [33] Defendants' expert submitted an event study where the critical return for statistical significance was -4.41%, so the price impact of -2.64% was rejected as statistically insignificant. The Plaintiffs submitted a report of an expert criticizing the SFES as "highly suspect," but the court was unconvinced:

> Plaintiff's argument that adopting a different confidence interval [i.e., different lower and upper critical values] could make the 2.64% stock price change in March statistically significant is of course true. Plaintiff has, however, provided no explanation for why a 95% confidence interval [i.e., a size of 5%] is inappropriate, other than its failure to pick up the 2.64% price change. In particular, ***600** plaintiff has made no case for application of a different confidence level that would pick up 2.64% as statistically significant, without also picking up other statistically insignificant residual returns. As a result, defendants have met their burden of showing that any decline in stock price between March 20, 1997 and December 9, 1997, is not attributable to the revelation of the alleged misrepresentation. Plaintiff's conclusory critique of defendants' statistical analysis is insufficient to create a material question of fact. [34]

We should be concerned with this result. The critical value of -4.41% meant that any price impact less than that amount was rendered effectively non-actionable. But a price impact of -2.64% certainly seems *economically* significant. Assuming that -4.41% was 1.96 standard deviations from zero, the standard deviation was 2.25%. In that case, the power to detect a price impact of, say, -4.0% was only 42.8%, so that the probability of a Type I error was only 5% while the probability of a Type II error was 57.2%. The power to detect a price impact of -2.64%--the observed impact--was only 21.7%, with the same probability of Type I error of 5% but a probability of Type II error of 78.3%. The likelihood ratio in favor of a -2.64% price impact was 1.99. Thus, the court's decision exonerated the defendant by relying on a decision rule that was heavily stacked against the plaintiffs.

Even where defense experts have asserted that "a price decline would have to be greater than 6.3% in order to be statistically significant," [35] courts have not stopped to consider whether it is sensible to limit the application of the securities fraud laws to such large price moves. While courts have examined statistical power in cases from other areas of law where proper statistical practice is important, [36] serious consideration of statistical power is absent from opinions addressing event studies. [37] ***601** Instead, these opinions reject price impacts as statistically insignificant even though it is likely that the event study methodology had no power to detect highly probable and economically meaningful price impacts. [38]

Thus far, problems with power have so far shown up most noticeably in the use of SFESs to determine whether a market is "efficient" for purposes of invoking the fraud-on-the-market presumption of reliance. Judicial findings of market efficiency for fraud-on-the-market purposes have always been somewhat at odds with academic research. There is no generally accepted method in financial economics for determining whether a security trades in an efficient market, and the so-called *Cammer* factors that are important in the courts have no general acceptance--indeed, are not even used--in academic research for that purpose. [39] Nevertheless, under existing law, courts must decide when information transmission in markets is sufficient to

PX350


© 2024 Thomson Reuters. No claim to original U.S. Government Works.

allow the use of the fraud-on-the-market doctrine, and markets need not be efficient--as economists understand the term--for that doctrine to make sense.[40]

***602** In practice, this has meant, in part, that plaintiffs must show the existence of statistically significant price reactions to firm-specific news.[41] From the start, this is an odd test, and one that seems to assume that prices are not efficient unless price reactions are large enough to be statistically significant. This reflects a misunderstanding of efficiency. Prices can react efficiently to information even though the price reactions themselves are not so unusual in size as to approach statistical significance.[42] The question for efficiency is whether the price reaction accurately reflected the impact of the news on the value of the firm--whether that impact was .1, .5, 1, 1.96, 3, or more standard deviations of value change. Thus, while a statistically significant reaction to a firm-specific news event is evidence that information was reflected in the price (absent confounding effects), the converse is not true--the failure of the price to react so extremely as to be two standard deviations from average does not establish that the market is inefficient; it may mean only that the correctly-sized value impact that occurred was less than 1.96 standard deviations from the mean. While some courts have been sensitive to this distinction by rejecting bad arguments to the contrary,[43] other courts have remained inattentive to this fact, which has generated inaccurate findings in some securities cases. A troubling recent example is *In re American International Group, Inc.*,[44] a case where the court determined that defendants had rebutted the fraud-on-the-market presumption on certain dates because price moves were statistically significant only at the 10% level (size) but not the 5% level.[45]

***603** Similarly, when courts say things such as "[i]n an efficient market, stock prices should show statistically significant abnormal returns on days in which unexpected, material information is released into the market,"[46] they must recognize that they have implicitly *defined* materiality to mean a 1.96 standard deviation price move, so that, referring back to Table 1, a fraud of $700 million is not "material" for a $42 billion dollar company--a proposition with which many would disagree.

The Supreme Court has held that information is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[47] Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information,"[48] not on "statistical" significance.[49] In the model of informationally-responsive financial markets that underlies the fraud-on-the-market doctrine, materiality means "that there has been an effect on the market price."[50] To be sure, the Supreme Court has recognized that there could be such a thing as "too low a standard of materiality,"[51] but there is no reason to believe that the answer to that problem is to define the materiality threshold as 1.96 standard deviations from zero.

### *E. An Aside on Power and the MFES*

It may be helpful to understand why low statistical power does not plague the MFES like it does the SFES. Suppose we have not one but sixteen firms that experienced the event we studied above. We can assume that each firm is otherwise the same and can be represented on an individual-firm basis to have the probability distributions given in Figure 3. When we combine the abnormal returns from the sixteen firms into a ***604** sample average, the result is a very different set of distributions for the average, as shown in Figure 4.

**FIGURE 4: POWER WITH 16 FIRMS**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The distributions for the sample average abnormal return are now much tighter, because the standard deviation of a sample mean's distribution (as opposed to the standard deviation of a distribution generating a single abnormal return) falls as the number of observations reflected in the sample mean increases. Concentrating on the average abnormal return of 16 sample firms raises the "signal-to-noise ratio of the measured security price reaction to the studied event."[52] This greater precision (i.e., the lower standard deviation) shows up in excellent statistical power. With the same size test as before (5% chance of Type I error), our statistical power is now in excess of 99.9%. We are virtually certain to detect the existence of the price impact if it exists.

The problem is that we are unable to apply the multi-firm approach in securities litigation. While increasing the number of firms would increase power to detect the effect of events, the event at issue in securities litigation typically is unique to the firm in

PX350

the litigation. It is unlikely that a court would be satisified with an analysis that attempted to incorporate ripple effects of the event in the prices of related firms, or with an analysis that attempted to identify 'similar' instances of misrepresentation by other ***605** defendants in other litigation, because the incorporated events would not be probative enough of the price impact of the event at issue on the defendant firm in the securities litigation at hand.

## II. DIFFICULTY #2: CONFOUNDING EFFECTS

### *A. The Problem*

Causes of price impacts unrelated to the event under study are "confounding effects." Sometimes confounding effects are apparent, such as when, in an event study of dividend omissions, a firm simultaneously announces bad earnings, which makes it more difficult to determine how much of the observed price impact resulted from the dividend omission and how much from the negative earnings announcement. [53] But most stock movements on a given day are impossible to decompose into their constituent parts by individual causal factor, and the abnormal return of an event study is no exception. [54]

> Clearly, security returns react to causes other than the announcement under consideration. To assess the effect of the announcement itself . . . it would be useful to identify those causes and to remove their effects from the data. It is unlikely, however, that *all* relevant factors can be identified or, even if they could, that their cumulative effect on each observed return could be measured. [55]

In an MFES, this is of less concern because--as Figure 4 illustrates-- averaging numerous abnormal returns across firms tends to average away the effects of unrelated price movements (or, more precisely, average them to their mean of zero), which leaves a better estimate of the mean price impact of the event under study. The matter is much more difficult in an SFES because there is no averaging away of confounding effects. When we observe a single abnormal return of, say, -4.0%, we could have observed the actual price impact without contamination by confounding effects. But we also could have observed a combination of an event price impact of, say, -2.5% and an unrelated price impact of -1.5%. Or we could ***606** have observed a combination of an event price impact of -5.0% and an unrelated price impact of +1.0% in the other direction. In general, the abnormal return we observe is comprised of a component related to the event plus a component related to non-event movements, but we have no mathematically precise way to separate them from each other. [56]

### *B. Confounding Effects in Case Law*

Courts are well aware that confounding effects are "[a] recurring problem in event studies" in securities litigation. [57] For example, a key issue in securities fraud cases is loss causation--demonstrating that the defendant's misrepresentation caused the losses that plaintiff seeks to recover. [58] The event study plays a prominent role in addressing loss causation. As one court summarized:

> Sorting out which declines were caused by such extraneous factors and which were caused by [disclosure of the fraud] is generally the province of an expert. It is an expert that produces the almost obligatory 'event study' that begins by isolating stock declines associated with market-wide and industry-wide downturns from those specific to the company itself. Once plaintiff's expert has isolated days where the stock declines were statistically significant relative to these downturns, he must consider firm-specific events that might have caused those declines. [59]

Failing to distinguish the fraud versus non-fraud causes of a price decline is generally fatal, especially where there are obvious confounding events occurring on the same day. [60] As one group of commentators has observed, many cases involve defense expert witnesses

> ***607** parsing every announcement by a company to attempt to isolate factors that negatively impacted the stock price, but which were not related to the alleged fraud. Not surprisingly, plaintiffs' experts take a different approach,

PX350

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

> generally defining the fraud as broadly as possible so that all of a company's announcements that harmed the stock price are deemed to be fraud-related. This “battle of the experts” is at the heart of many of today's securities cases.[61]

While the event study itself is a first step in loss causation analyses, the expert must then work to decompose price effects outside the framework of the event study methodology.[62] Because that effort is necessarily partly subjective and less constrained by generally accepted quantitative methods, it has proven unsatisfactory to some courts. These courts have complained that such efforts are based on “unprovable and often unexplained assumptions,”[63] that they are no “more than observations and market rumors,”[64] and that they reflect little more than “a judgment call as to confounding information without any methodological underpinning.”[65] Courts have recognized the possibility of studying intraday returns when confounding events occur sequentially instead of overlapping, and other means of addressing the confounding effects problem have been suggested as well.[66] At the end of the day, however, most stocks “are routinely ***608** affected by events that may not be pinpointed by inspecting the media sources: generally, stock prices continuously change, while only rarely these changes may be linked to specific information releases.”[67] As a result, courts may have excessively high expectations of the ability of litigants-- whether plaintiff or defendant--to decompose an observed return into a component caused by fraud and a component caused by other factors.[68] There simply is no fully reliable, mathematically precise way to do so. Financial economists have long understood that our ability to fully explain observed price moves is quite limited;[69] much price movement probably occurs for reasons unrelated to news, including the liquidity trades of investors in the market seeking to raise funds for other purposes and the trades of noise traders who trade for irrational reasons.[70]

## III. DIFFICULTY #3: BIAS

When low statistical power meets confounding effects, the result is biased estimates of detected price impacts. When statistical power is low, small price impacts may get detected only *because* of confounding effects. Consider Figure 3 again. The true price impact was -2.0%, but the SFES had no power to detect that impact on its own; -2.0% is between the critical values and will show up as statistically insignificant if it occurs as a “clean” price move. The SFES will detect the price impact as statistically significant only when there are enough confounding effects to push the overall price impact past -2.94% (which is -1.96 multiplied by the standard deviation of 1.5%). When we detect a price impact in such situations, it is as if we are sampling from a truncated distribution, as shown below in ***609** Figure 5. Unfortunately, the expected value of that distribution is not the true price impact, which was cut off by our critical value.

**FIGURE 5: BIAS**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

As power improves--in other words, as the alternative distribution gets further away from the null distribution (i.e., the effect size we are looking for increases)-- the bias goes to zero, as shown below in Figures 6 and 7.

**FIGURE 6: BIAS**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

***610 FIGURE 7: BIAS**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

This bias problem is well known in scientific contexts. For example, in a leading neuroscience journal, authors described how the problem plagues neuroscience studies:

> [E]ven when an underpowered study discovers a true effect, it is likely that the estimate of the magnitude of that effect provided by that study will be exaggerated. This effect inflation is often referred to as the ‘winner's curse’

PX350

> and is likely to occur whenever claims of discovery are based on thresholds of statistical significance (for example, $p < 0.05$) or other selection filters (for example, a Bayes factor better than a given value or a false-discovery rate below a given value). Effect inflation is worst for small, low-powered studies, which can only detect effects that happen to be large. If, for example, the true effect is medium-sized, only those small studies that, by chance, overestimate the magnitude of the effect will pass the threshold for discovery. [71]

***611** But the bias problem seems to have gone unnoticed in the SFES context, despite its likely importance given the combination of low power and confounding effects. In Table IV, we present the expected value of truncated distributions. [72] In each case, the cutoff point is the point that is - 1.96 standard deviations from zero under the no-price-impact distribution.

**TABLE IV: EXPECTED VALUE OF TRUNCATED NORMAL DISTRIBUTIONS (TRUNCATION FROM ABOVE AT -1.96 X STD. DEV. FROM ZERO)**

| | Mean Price Impact (%) | | | | | | |
|---|---|---|---|---|---|---|---|
| **Std. Dev. (%)** | **-1.0** | **-2.0** | **-3.0** | **-4.0** | **-5.0** | **-7.5** | **-10.0** |
| **4.0** | -9.5% | -9.6% | -9.8% | -10.0% | -10.2% | -10.9% | -12.0% |
| **3.0** | -7.1% | -7.3% | -7.5% | -7.7% | -8.0% | -9.0% | -10.5% |
| **2.0** | -4.8% | -5.0% | -5.2% | -5.5% | -6.0% | -7.7% | -10.0% |
| **1.5** | -3.6% | -3.9% | -4.2% | -4.6% | -5.3% | -7.5% | -10.0% |
| **1.0** | -2.5% | -2.8% | -3.3% | -4.1% | -5.0% | -7.5% | -10.0% |

Continuing our example, consider again Figure 5, where the standard deviation is 1.5% and the alternative distribution was centered at a price impact of - 2.0%. The lower critical value of -2.94% is the upper cutoff of the alternative distribution. If the true price-impact distribution is centered at -2.0%, we will observe statistically significant results only when we get a return from the tail of the price-impact distribution to the left of -2.94%. The expected value (average draw) from that truncated distribution is -3.9%. That is, while low power (recall that power is 26.6% in this scenario) means we are unlikely to get a statistically significant result, the problem is that, when we do, the expected value of the statistically significant return we do see is -3.9%, which is significantly biased from -2.0%.

Note that as power improves in the lower right-hand corner of Table IV, the expected value converges on its true value. So, for example, when the true price impact is -10% and the standard deviation is 1.5%, the expected value is -10.0%. The large negative values in the upper left-hand corner may appear anomalous, but they are not. Consider the case when the standard deviation is 3.0% and the true price impact is -1.0%. In that case, it is unlikely that we will observe a statistically significant result; ***612** power is only 6.3% in Table II. But if we do get statistical significance, it is because we have observed a return that is at least -5.88% (3.0% x -1.96). The average of the values from minus infinity to -5.88% under the truncated probability distribution is indeed -7.1%.

These results demonstrate that we cannot leave confounding effects unaddressed in the hope that they are as likely to be on one side of the true price effect as on the other. To the contrary, when power is low and confounding effects are likely, the bias in price impacts--and therefore in damages--is upward (i.e., in the direction of more severe price impacts) and not downward. [73]

## CONCLUSION

The multi-firm event study was a breakthrough research method in financial economics, [74] but the single-firm event study differs from the multi-firm event study in a fundamental sense. By examining only one firm event at a time, the single-firm event study runs into trouble with low statistical power, confounding effects, and bias. No economic methodology is perfect, of course, and the questions that securities litigation presents need answers. Still, a review of the case law suggests that courts and litigants have often failed to recognize the special difficulties that the SFES presents, especially the problems that result from low power, and accuracy of securities litigation adjudication has suffered in some cases as a result.

We offer the following suggestions for improving the use of event study evidence in securities litigation. First, Courts should require litigants and their expert witnesses to report the results of a power analysis for all event studies. Financial economists

PX350

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

using event studies in their academic work take power seriously. As one prominent reviewer wrote of power in this context, "An important consideration when setting up an event study is the ability to detect the presence of a non-zero abnormal return. The inability to distinguish between the null hypothesis and economically ***613** interesting alternatives would suggest the need for modification of the design."[75] That same level of rigor should apply in litigation.[76] A power analysis will tell the court whether the litigant's event study was reliable for detecting price impacts of various sizes. Securities litigants should not be allowed to say that a misrepresentation or corrective disclosure caused no price impact based on a test that had little or no power to detect a price impact that the court determines to be material, and one could imagine a court excluding any such evidence under Federal Rule of Evidence 403 as misleading. Likelihood ratios may shed further light on event study results, though it is important to report probabilities of Type I and Type II error in doing so.

Second, to address the problem of confounding effects, courts should allow litigants flexibility to present other evidence to prove that a price impact from misrepresentation or corrective disclosure did or did not occur. Such evidence may include, as it does now, intraday analyses and analyses of other news about the firm that day and quantitative analysis of its potential effect on value, but also evidence from multi-firm event studies of similar events that may shed light on the magnitude of price impacts of that type, estimates of the effects of liquidity and noise traders, and opinions based on other valuation methods such as discounted cash flow to value posited confounding effects.

Third, Courts and litigants should recognize the potential effect of low statistical power and confounding effects on detected price impacts, considering the possibility that statistically significant price impacts are biased estimates of true price impacts. Because of bias, detected price impacts are more likely to overestimate price impact than underestimate it. It is especially important to consider this possibility in evaluating securities damages. Litigants should be permitted to present evidence of the upward bias phenomenon alongside their specific arguments regarding confounding factors, even if their evidence on confounding factors is insufficient to prove a complete lack of liability.

Finally, our analysis suggests a real need to more carefully consider tradeoffs between Type I and Type II error in this litigation setting. Currently, the use of statistical significance without attention to power implements a legal regime where the probability of incorrectly exonerating securities defendants is much higher than the probability of incorrectly ***614** finding securities defendants liable. As shown in Table I, the unspoken impact of the current situation is that courts are likely to ignore some non-negligible frauds if they are below the minimum detectable price impact in a low power SFES. This lowers the deterrent effect of the securities laws and may encourage more small- and mid-scale fraud on markets than is socially optimal given the costs of litigation. How that tradeoff should occur is beyond the scope of our Article, but addressing that important problem presents a challenge for future work.

## Footnotes

a1 Robert L. Dickens Professor, Duke University Fuqua School of Business and National Bureau of Economic Research. brav@duke.edu.

aa1 Partner, Bartlit Beck Herman Palenchar & Scott LLP. jb.heaton @bartlit-beck.com. The views expressed here are Heaton's own, and do not express the views of Bartlit Beck Herman Palenchar & Scott LLP, its attorneys, or its clients.

For very helpful comments and suggestions, we thank Josh Ackerman, Reid Bolton, Peter Clayburgh, Brad Cornell, Chris Culp, Kevin Dages, Tiago Duarte-Silva, Marc Gross, Chris Hagale, Jeff Hall, Mike Keable, Ashley Keller, Chris Landgraff, Dan McElroy, Katherine Minarik, Mark Mitchell, Steve Nachtwey, Martha Pacold, David Ross, Cindy Sobel, David Tabak, Sanjay Unni, David Wensel, and participants at the 21st Annual Institute for Law and Economic Policy Conference: New Directions for Corporate and Securities Litigation (co-sponsored by the *Washington University Law Review* and the Institute for Law and Economic Policy). We are especially grateful to Jim Cox for inviting us to think hard about single-firm event studies. All errors are our own.

1 Our description here assumes little familiarity with the basics of the event study methodology. A recent book covering event study methodology is DORON KLIGER & GREGORY GUREVICH, EVENT STUDIES FOR FINANCIAL RESEARCH (2014). Other good sources for those with an intermediate background on the subject are JOHN Y.

PX350

CAMPBELL, ANDREW W. LO, & A. CRAIG MACKINLAY, THE ECONOMETRICS OF FINANCIAL MARKETS 149-80 (1997) (chapter on event-study analysis); A.Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LIT. 13, 13-14 (1997); and S.P. Kothari & Jerold B. Warner, *Econometrics of Event Studies*, *in* HANDBOOK OF CORPORATE FINANCE 3 (B. Espen Eckbo ed ., 2007). A good introduction to the Single-Firm Event Study ("SFES") context is Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 BUS. LAW. 545 (1994); *see also* M. Laurentius Marais & Katherine Schipper, *Applications of Event Study Methods in Litigation Services*, *in* LITIGATION SERVICES HANDBOOK: THE ROLE OF THE ACCOUNTANT AS EXPERT 45.1 (Roman L. Weil ed., 2d ed. 1995); Charles J. Corrado, *Event Studies: A Methodology Review*, 51 ACCT. & FIN. 207 (2011); Frank Torchio, *Proper Event Study Analysis in Securities Litigation*, 35 J. CORP. L. 159 (2009).

2 485 U.S. 224 (1988).

3 *See, e.g.*, Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. LLC, 752 F.3d 82, 86 (1st Cir. 2014) ("The usual--it is fair to say 'preferred'--method of proving loss causation in a securities fraud case is through an event study, in which an expert determines the extent to which the changes in the price of a security result from events such as disclosure of negative information about a company, and the extent to which those changes result from other factors."); *In re* Oracle Sec. Litig., 829 F.Supp. 1176, 1181 (N.D. Cal. 1993) (citation omitted) ("Use of an event study or similar analysis is necessary ... to [more accurately] isolate the influences of information specific to Oracle which defendants allegedly have distorted. As a result of his failure to employ such a study, the results reached by [plaintiffs' expert] cannot be evaluated by standard measures of statistical significance. Hence, the reliability of the magnitude and direction of his value estimates are incapable of verification.").

4 *Basic*, 485 U.S. at 246.

5 *See, e.g.*, Marais & Schipper, *supra* note 1, at 45.1 (phrasing the two questions: as "Did the announcement cause a price reaction? What was the price reaction to the announcement alone?").

6 *See, e.g.*, *In re* Cendant Corp. Sec. Litig., 109 F.Supp. 2d 235, 253-54 (D.N.J. 2000) ("Here, according to [plaintiffs,] the methodology--'event study methodology'-- used to calculate shareholder damages during the class period 'has been used by financial economists since 1969 as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.'").

7 *See, e.g.*, *In re* Northern Telecom Ltd. Sec. Litig., 116 F.Supp.2d 446, 456 (S.D.N.Y. 2000) ("Defendants' expert ... conducted an 'event study' analysis to determine whether the six statements at issue had any impact on the trading price of Nortel's stock.").

8 *See, e.g.*, Kothari & Warner, *supra* note 1, at 8 ("An event study typically tries to examine return behavior for a sample of firms experiencing a common type of event (e.g., a stock split)."). SFESs are rare in the peer-reviewed literature. *See, e.g.*, Corrado, *supra* note 1, at 209 ("The skeletal econometric structure of an event study is well illustrated by the case of a single security-event date combination. While such studies rarely find their way into a research journal, they are common in certain legal proceedings."). One example of a single-firm event study in the peer-reviewed finance literature is Richard S. Ruback, *The Cities Service Takeover: A Case Study*, 38 J. FIN. 319 (1983). For applications of the single-firm event study methodology in law reviews and legal journals, see Jonathan Klick & Robert H. Sitkoff, *Agency Costs, Charitable Trusts, and Corporate Control: Evidence from Hershey's Kiss-Off*, 108 COLUM. L. REV. 749 (2008) (studying the announced sale and then cancellation of the sale of a controlling interest in Hershey Company), and Mark I. Weinstein, *Don't Buy Shares Without It: Limited Liability Comes to American Express*, 37 J. LEGAL STUD. 189 (2008) (studying the effect of transition from unlimited to limited liability on American Express stock).

PX350

9 Michael I. Meyerson & William Meyerson, *Significant Statistics: The Unwitting Policy Making of Mathematically Ignorant Judges*, 37 PEPP. L. REV. 771, 840 (2010).

10 *See, e.g.*, Richard Roll, $R^2$, 43 J. FIN. 541, 541 (1988) ("Even with hindsight, the ability to explain stock price changes is modest.").

11 *See* Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and Corporate Litigation*, 4 AM. LAW & ECON. REV. 141, 148-50 (2002). Others who have criticized the role of the event study in securities litigation on various grounds include Jill E. Fisch, *The Trouble With* Basic *: Price Distortion After* Halliburton, 90 WASH. U. L. REV. 895, 918-22 (2013); Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation*, 15 STAN. J.L. BUS. & FIN. 183, 230-33 (2009); William O. Fisher, *Does the Efficient Market Theory Help Us Do Justice in a Time of Madness?*, 54 EMORY L.J. 843, 880 (2005); Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. REV. 883, 906-11 (1990).

12 This is a result of the Supreme Court's decision in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2417 (2014) (holding defendants may defeat the fraud-on-the-market presumption of reliance at the class-certification stage through evidence that the misrepresentation did not in fact affect the stock price).

13 Another important problem of the SFES that we do not address here is non-normality in returns. That problem has been addressed to great extent elsewhere and is remedied by appropriate changes in statistical inference methods. *See* Jonah B. Gelbach et al., *Valid Inference in Single-Firm, Single-Event Studies*, 15 AM. L. & ECON. REV. 495 (2013).

14 *In re* Vivendi Universal, S.A. Sec. Litig., 605 F.Supp.2d 586, 598 (S.D.N.Y. 2009) (footnote omitted) (citations omitted).

15 *See, e.g.*, MacKinlay, *supra* note 1, at 14 (describing the question in an event study as whether "the event has no impact on the distributions of returns").

16 *See, e.g.*, Computer Aid, Inc. v. Hewlett-Packard Co., 56 F.Supp.2d 526, 540 (E.D. Pa. 1999) (rejecting expert's event study analysis as "dubious" where it did not account for apparent industry-wide negative returns); Carpe v. Aquila, Inc., No. 02-0388-CV-W-FJG, 2005 WL 1138833, at *4 (W.D. Mo. Mar. 23, 2005) (excluding plaintiffs' expert opinion because he did not perform a proper event study to exclude effects on price of market and industry movements and noting that "[f]ailure to conduct an event study comparing the stock's price to the market as a whole or a selected index of similar businesses is enough to cause an expert's opinion to be excluded").

17 We focus on the normal case because standard practice still rests heavily on the normality assumption, despite strong evidence that daily abnormal returns are non-normal. *See* Stephen J. Brown & Jerold B. Warner, *Using Daily Stock Returns: The Case of Event Studies*, 14 J. FIN. ECON. 3, 4 (1985) ( "The daily stock return for an individual security exhibits substantial departures from normality that are not observed with monthly data."); Gelbach et al., *supra* note 13, at 511 ("[F]ew firms' distributions are consistent with normality.").

18 *See, e.g.*, Corrado, *supra* note 8, at 211 (setting forth test statistic as the abnormal return divided by the square root of the variance of the abnormal return).

19 *Id.* ("Assuming returns are normally distributed, the test statistic ... is distributed as Student- *t* with *n*-2 degrees of freedom (df).").

PX350

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

20 *Id.* ("A test statistic larger than the upper-tail critical value ... provides statistical evidence that the merger announcement had a significant positive impact on the stock price on the event date. Similarly, a test statistic less than the lower-tail critical value ... would provide evidence that the announcement had a significant negative impact.").

21 Note that while we have represented a two-tailed test here, one-tailed tests may be more appropriate in testing for the alternative of a price impact that is less than zero (the usual case for a corrective disclosure) or greater than zero (the usual case at the time of a misrepresentation that allegedly inflates the security price). *See, e.g.*, Brown & Warner, *supra* note 17, at 12-13 (using a one-tailed 5% test for power analysis). There is usually no basis for objecting to an expert's analysis on the grounds that the expert used a one-tailed test. *Cf. In re* Novatel Wireless Sec. Litig., 910 F.Supp.2d 1209, 1214 (S.D. Cal. 2012) ("Defendants contend that [plaintiffs' expert] should have utilized a two-tailed test rather than a one-tailed test when considering the statistical significance of the stock price decline on July 20, 2007."), *vacated on other grounds*, Civil No. 08cv1689 AJB (RBB), 2013 WL 494361 (S.D. Cal. Feb. 7, 2013). Of course, using a two-tailed test at the same significance level makes it less likely to detect statistical significance against an alternative known to be negative, and this is no doubt what defendants hoped to accomplish when they argued against the one-tailed test. The court rejected the arguments. *Id.* at 1216 ("Whereas [defendants' expert] finds the use of the one-tailed test to be unreliable and [plaintiffs' expert] has provided a reasonable explanation for using the one-tailed test, the Court finds that it is not an issue of admissibility, but rather of probative value to be addressed at trial.").

22 *See generally* GEORGE CASELLA & ROGER L. BERGER, STATISTICAL INFERENCE 358-65 (1990).

23 *See, e.g.*, *id* . at 361 ("Experimenters commonly specify the level of the test they wish to use, with typical choices being [size] = .01, .05, and .10.").

24 Steven Goodman, *A Dirty Dozen: Twelve P-Value Misconceptions*, 45 SEMINARS IN HEMATOLOGY 135, 136 (2008) ("A nonsignificant [effect] merely means that a null effect [here, no price impact] is statistically consistent with the observed results, together with the range of effects included in the confidence interval. It does not make the null effect [i.e., the hypothesis of no price impact] the most likely. The effect best supported by the data from a given experiment is always the observed effect, regardless of its significance.").

25 Larry V. Hedges & Therese D. Pigott, *The Power of Statistical Tests in Meta-Analysis*, 6 PSYCHOL. METHODS 203, 216 (2001).

26 PAUL D. ELLIS, THE ESSENTIAL GUIDE TO EFFECT SIZES: STATISTICAL POWER, META-ANALYSIS, AND THE INTERPRETATION OF RESEARCH RESULTS 52 (2010) ( "Statistical power describes the probability that a test will correctly identify a genuine effect. Technically, the power of a test is defined as the probability that it will reject a false null hypothesis. Thus, power is inversely related to ...the probability of making a Type II error."); JACOB COHEN, STATISTICAL POWER ANALYSIS FOR THE BEHAVIORAL SCIENCES 5 (2d. ed. 1988) (describing Type II error as (1-power)).

27 *See* MacKinlay, *supra* note 1, at 29 tbl.2; *see also* Kothari & Warner, *supra* note 1, at 17-18 (providing charts appearing to show power starting at sample size of one).

28 Specifically, for each firm with available daily return data for the entire year we estimate a regression of the firm's daily return in excess of the daily risk free rate on four factors, obtained from Ken French's website at http://mba.tuck.dartmouth.edu/pages/faculty/ken.french/data_library.html. These factors are the market factor in excess of the risk free rate, portfolio factors meant to capture size, book-to-market effects in stock returns, and a portfolio factor meant to capture stock momentum effects. *See* KLIGER & GUREVICH, *supra* note 1, at 31 (four-factor model using Fama-French and Carhart factors "may allow for more precise measurement of [normal returns] and, consequently, more

accurate estimation of market reaction to the studied event"). For each firm, we then compute the residual standard deviation obtained from these least squares regressions.

29 In terms of Figure 3, power is the area to the left of the lower critical value under an alternative distribution centered at the price impact with the same standard deviation, plus the (tiny) area to the right of the upper critical value under the same alternative distribution. *See, e.g.*, MacKinlay, *supra* note 1, at 28 (presenting the power calculation formula).

30 For an example of the intriguing general analysis of likelihood ratios in a legal context, see Louis Kaplow, *Likelihood Ratio Tests and Legal Decision Rules*, 16 AM. L. & ECON. REV. 1 (2014). For a more general look at likelihood ratios in a Bayesian context, see Robert E. Kass & Adrian E. Raftery, *Bayes Factors*, 90 J. AM. STAT. ASS'N 773 (1995).

31 For an example of one court questioning the connection between conventional levels of statistical significance and evidentiary burden, see United States v. Hatfield, 795 F.Supp.2d 219, 234 (E.D.N.Y. 2011) (citations omitted) ("The Court recognizes that the 95% confidence interval is the threshold typically used by academic economists in their work. But the Court strongly questions whether its use is appropriate in a forfeiture hearing, where the Government's burden is by a preponderance of the evidence. Indeed, when the Government cross-examined [Defendant's expert], it raised similar concerns. Preponderance of the evidence does not anywhere near require 95% certainty, and [the Government's expert's] study should have made accommodations for this lower evidentiary burden.").

32 No. 97 Civ. 9075(DLC), 1999 WL 191540 (S.D.N.Y. Apr. 6, 1999).

33 *Id.* at *2.

34 *Id.* at *5.

35 *In re* Motorola Sec. Litig., 505 F.Supp.2d 501, 511 n.14 (N.D. Ill. 2007). According to data from the Center in Research on Security Prices ("CRSP") available on the Wharton Research Data Services ("WRDS"), Motorola had a market capitalization in excess of $45 billion in January 2001, the month at issue in the case. Therefore, the defense expert's claim was that fraud with a price impact of less than $2.8 billion was statistically insignificant.

36 *See, e.g.*, NRDC v. EPA., 658 F.3d 200, 218 (2d Cir. 2011) (addressing statistical power in risk assessment of pesticide; "[m]oreover, while the Gledhill study may have had sufficient statistical power to detect a cholinesterase inhibition greater than 0, EPA did not explain whether the 9-person study (six dosed subjects, 3 placebo subjects) had sufficient power to determine with any level of precision the magnitude of the cholinesterase inhibition.").

37 *See, e.g.*, Sanner v. Bd. of Trade, No. 89 C 8467, 2001 WL 1155277, at *5-6 (N.D. Ill. Sept. 28, 2001) (court declines to find expert's methodology unreliable in light of challenges that the study had insufficient power).

38 *See, e.g.*, *In re* Credit Suisse First Bos. Corp. Analyst Sec. Litig., 250 F.R.D. 137, 143 (S.D.N.Y. 2008) (describing an event study that showed no statistically significant price increases from disclosures of three analyst reports, where abnormal returns were -0.59%, 3.6%, and 2%).

39 *See* Cammer v. Bloom, 711 F.Supp. 1264, 1286-87 (D.N.J. 1989) (identifying five factors as ones to be considered in ascertaining whether a given security trades in an efficient market: (1) the average weekly trading volume of the security, (2) the number of securities analysts following and reporting on the security, (3) the extent to which market makers traded in the security, (4) the issuer's ability to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in prices of the security). We made this point in an earlier paper as well. *See* Alon Brav & J.B. Heaton, *Market Indeterminacy*, 28 J.Corp. L. 517, 535 (2003) ("[T]here is no reliable way to distinguish 'efficient' and 'inefficient' markets in fraud-on-the-market cases."). More

PX350


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

than ten years later, we are still aware of no peer-reviewed study in the finance literature that uses the *Cammer* factors to test whether a security traded in an efficient market or not. *See* Mukesh Bajaj et al., *Assessing Market Efficiency for Reliance on the Fraud-On-The-Market Doctrine After* Wal-Mart *and* Amgen, *in* THE LAW AND ECONOMICS OF CLASS ACTIONS 161, 183-90 (James Langenfeld ed., 2014) (criticizing the *Cammer* factors); Brad M. Barber et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285, 290 (1994) (demonstrating that several of the *Cammer* factors do not explain efficiency).

40 *See* Fisch, *supra* note 11, at 898 ("Although market efficiency is neither a necessary nor a sufficient condition to establish that misinformation has distorted prices, most courts have concluded that the threshold inquiry in *Basic* is satisfied by proof that the misrepresentations were publicly made and 'that the stock traded in an efficient market.'"); Jonathan R. Macey et al., *Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of* Basic v. Levinson, 77 VA. L. REV. 1017, 1018 (1991) ("We suggest that the focus of the Supreme Court's holding in *Basic* is misplaced: what determines whether investors were justified in relying on the integrity of the market price is not the efficiency of the relevant market but rather whether a misstatement distorted the price of the affected security."). For a discussion of how market efficiency could be better understood in the context of the fraud-on-the-market theory, see Lucian A. Bebchuk & Allen Ferrell, *Rethinking* Basic, 69 BUS. LAW. 671 (2014).

41 Defendants occasionally argue that market efficiency requires that any statistically significant price move be linked to firm specific news. This is wrong. Financial economists have long known that price changes are only partly explainable by identifiable news events, and courts have rejected the argument. *See, e.g.*, *In re* DVI Inc. Sec. Litig., 249 F.R.D. 196, 211-12 (E.D. Pa. 2008) (rejecting defendant's criticism that event study methodology showing market efficiency was flawed because 40% of statistically significant price moves could not be matched with identifiable news events).

42 *See, e.g.*, *supra* note 35.

43 In one reported case, counsel ignored this rudimentary fact, but the judge rejected their argument. *See In re* Nature's Sunshine Product's Inc., 251 F.R.D. 656, 664 (D. Utah 2008) (rejecting defendants' argument that market for stock was not efficient because "of the 93 event days chosen by [[plaintiffs' expert], only 23 of those days (or less than 25%) result in a statistically significant change to Nature's stock price," and according to defendants, "in an efficient market material news should result in a statistically significant change in Nature's stock price").

44 265 F.R.D. 157, 187 (S.D.N.Y. 2010), *vacated and remanded*, 689 F.3d 229 (2d Cir. 2012).

45 The court determined that the lack of a statistically significant price move at the 5% level on March 30 and 31, 2005, demonstrated that the fraud had not impacted the stock price. *Id.* at 185-87. The same court's determinations regarding AIG bonds have been severely criticized as well. *See* Michael Hartzmark et al., *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*, 2011 COLUM. BUS. L. REV. 654, 654-55 (criticizing the AIG court, which "found insufficient empirical evidence to hold that the $1.71 billion in AIG bonds, issued by the world's largest insurance company, traded in open, developed, and efficient markets.").

46 *In re* Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig., 281 F.R.D. 174, 178 (S.D.N.Y. 2012).

47 Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

48 *Id.* at 240.

49 *See* David Tabak & Frederick Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom* 16-17 (Nat'l Econ. Research Assocs., Working Paper No. 34, 1999), *available at* http://www.nera.com/content/dam/nera/publications/archive1/3841.pdf ("It is not clear what level of statistical significance corresponds to a legal definition of materiality.

PX350

As Mitchell and Netter [ *supra* note 1] point out, the 95% confidence level is commonly used, while the 90% and 99% levels are also options.").

50 Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 BUS. LAW. 1, 11 (1982).

51 *Basic*, 485 U.S. at 231.

52 KLIGER & GUREVICH, *supra* note 1, at 32.

53 *See* Roni Michaely et al., *Price Reactions to Dividend Initiations and Omissions: Overreaction or Drift?*, 50 J. FIN. 573, 585 (1995) (investigating the influence of concurrent earnings announcements on event study results of dividend omissions and noting that "[c]learly, there is some incremental (negative) information content in the earnings release").

54 *See generally* Roll, *supra* note 10.

55 Marais & Schipper, *supra* note 1, at 45.6.

56 In addition, the abnormal return will also contain a component related to the fact that there is measurement error in the estimation of the parameters of the model generating the expected return. *See* MacKinlay, *supra* note 1, at 21 (observing that the variance of abnormal returns contains components due to the sampling error in measuring predicted returns).

57 Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. LLC, 752 F.3d 82, 89 (1st Cir. 2014).

58 *See generally* Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005).

59 *In re* Vivendi Universal, S.A. Sec. Litig., 605 F.Supp.2d 586, 599 (S.D.N.Y. 2009) (citations omitted).

60 *See, e.g.*, Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 271 (5th Cir. 2007) (vacating class certification order and noting that "[t]he plaintiffs' expert does detail event studies supporting a finding that Allegiance's stock reacted to the *entire bundle* of negative information contained in the 4Q01 announcement, but this reaction suggests only market efficiency, not loss causation, for there is no evidence linking the *culpable* disclosure to the stock-price movement"), *abrogated by* Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179 (2011); *In re* Omnicom Grp., Inc., 541 F.Supp.2d 546, 554 (S.D.N.Y. 2008) (rejecting expert's event study which did not isolate effects of alleged corrective disclosures from other factors), *aff'd*, 597 F.3d 501 (2d Cir. 2010); Fener v. Belo Corp., 560 F.Supp.2d 502, 508 (N.D. Tex. 2008) (citation omitted) ("[Expert's] event study tends to establish that the market reacted to the bundle of August 5 news pieces with an August 6 stock price drop of 5.47% [but] ... fails to target the corrective disclosure at issue."), *aff'd*, 579 F.3d 401 (5th Cir. 2009).

61 Jay W. Eisenhofer et al., *Securities Fraud, Stock Price Valuation, and Loss Causation: Toward a Corporate Finance-Based Theory of Loss Causation*, 59 BUS. LAW. 1419, 1428 (2004).

62 *See, e.g.*, *Vivendi*, 605 F.Supp.2d at 591-93 (holding that expert's date-by-date subjective attribution of price moves to fraud and non-fraud causes created an issue of fact on loss causation sufficient to withstand summary judgment); *In re* Pfizer Inc. Sec. Litig., 936 F.Supp.2d 252, 266 (S.D.N.Y. 2013) (stating that after running an event study to identify statistically significant events, the expert "cited market commentary confirming that it was those events--not market forces or non-fraudulent Pfizer-specific news--that caused the price declines").

PX350

63 United States v. Olis, Crim. No. H-03-217-01, 2006 WL 2716048, at *8 (S.D. Tex. Sept. 22, 2006).

64 Hershey v. Pac. Inv. Mgmt. Co. LLC, 697 F.Supp.2d 945, 955 (N.D. Ill. 2010).

65 Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. LLC, 752 F.3d 82, 95 (1st Cir. 2014).

66 *See* Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos., 853 F.Supp.2d 181, 190 (D. Mass. 2012) (citing Laura Starks, *Discussion of Market Microstructure: An Examination of the Effects on Intraday Event Studies*, 10 CONTEMP. ACCT. RES. 355, 383-86 (1994)); *In re* Novatel Wireless Sec. Litig., 910 F.Supp.2d 1209, 1218-21 (S.D. Cal. 2012) (examining objections to expert's intraday causation analysis in detail and holding that the testimony was admissible); DAVID TABAK, **MAKING ASSESSMENTS ABOUT MATERIALITY LESS SUBJECTIVE THROUGH** THE **USE OF CONTENT ANALYSIS** (2007), *available at* http://www.nera.com/extImage/PUB_Tabak_Content_Analysis_SEC1646-FINAL.pdf); Esther Bruegger & Frederick C. Dunbar, *Estimating Financial Fraud Damages With Response Coefficients*, 35 J. CORP. L. 11, 13 (2009).

67 KLIGER & GUREVICH, *supra* note 1, at 32.

68 *See, e.g.*, *In re* Moody's Corp. Sec. Litig., No. 07 Civ. 8375(GBD), 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2013) (noting that Plaintiffs provided insufficient evidence of loss causation where "neither [[plaintiffs' expert's] report nor any other evidence proffered by Plaintiffs establish that market forces and other factors unrelated to Moody's alleged mismanagement of its conflicts of interest did not play a significant role in Plaintiffs' economic loss").

69 *See, e.g.*, Roll, *supra* note 10, at 541 ("Even with hindsight, the ability to explain stock price changes is modest.").

70 The idea that prices may move for reasons unrelated to news is well understood in the financial economics literature. *See, e.g.*, Fischer Black, *Noise*, 41 J. FIN. 529 (1986); J. Bradford De Long et al., *Noise Trader Risk in Financial Markets*, 98 J. POL. ECON. 703 (1990); Lawrence R. Glosten & Paul R. Milgrom, *Bid, Ask and Transaction Prices in a Specialist Market with Heterogeneously Informed Traders*, 14 J. FIN. ECON. 71 (1985); Albert S. Kyle, *Continuous Auctions and Insider Trading*, 53 ECONOMETRICA 1315 (1985).

71 Katherine S. Button et al., *Power Failure: Why Sample Size Undermines the Reliability of Neuroscience*, 14 NATURE REVIEWS: NEUROSCIENCE 365, 366 (2013) (footnote omitted); *see also* John P. A. Ioannidis, *Why Most Discovered True Associations Are Inflated*, 19 EPIDEMIOLOGY 640 (2008); Satish Iyengar & Joel B. Greenhouse, *Selection Models and the File Drawer Problem*, 3 STAT. SCI. 109 (1988); Robert Rosenthal, *The "File Drawer Problem" and Tolerance for Null Results*, 86 PSYCH. BULL. 638 (1979).

72 For the formulas to calculate the expected values, *see, e.g.*, WILLIAM H. GREENE, ECONOMETRIC ANALYSIS 836 (7th ed. 2012) (equation (19-3b)); Donald R. Barr & E. Todd Sherrill, *Mean and Variance of Truncated Normal Distributions*, 53 AM. STATISTICIAN 357, 359 (1999) (equation (8)).

73 One source of upward confounding effects at the time of a corrective disclosure is the effect of likely litigation. *See* Janet Cooper Alexander, *The Value of Bad News in Securities Class Actions*, 41 UCLA L. REV. 1421 (1994).

74 As Nobel Laureate Eugene Fama wrote in 1991: "Event studies are now an important part of finance, especially corporate finance. In 1970 there was little evidence on the central issues of corporate finance. Now we are overwhelmed with results, mostly from event studies." Eugene F. Fama, *Efficient Capital Markets: II*, 46 J. FIN. 1575, 1600 (1991). In 1997, Shleifer and Vishny wrote that event study analysis "has surely become the most common empirical methodology

PX350

of corporate governance and finance." Andrei Shleifer & Robert W. Vishny, *A Survey of Corporate Governance*, 52 J. FIN. 737, 746 (1997) (citation omitted).

75 MacKinlay, *supra* note 1, at 28.

76 *See generally* Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) (stating that an expert should employ in court "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

93 WAULR 583

End of Document © 2024 Thomson Reuters. No claim to original U.S. Government Works.



WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# PX 351

**46 Loy. U. Chi. L.J. 485**

**Loyola University Chicago Law Journal**
Spring 2015

**Conference Article**
Marc I. Gross [a1]

Copyright (c) 2015 Loyola University Chicago School of Law; Marc I. Gross

# THE ROAD MAP FOR CLASS CERTIFICATION POST- HALLIBURTON II

| | |
|---|---|
| BACKGROUND TO *HALLIBURTON II* | 485 |
| I. THE "UNANIMOUS" *HALLIBURTON II* DECISION | 488 |
| II. WHAT'S NEXT | 490 |
| *A. Measuring General Efficiency/Impact--Event Studies and Rapidity of Responses* | 491 |
| *B. Price Maintenance/Confirmatory Lies* | 492 |
| *C. Confounding Events* | 494 |
| *D. "Response Coefficients"* | 495 |
| *E. Forward-Casting* | 496 |
| *F. Content Analysis* | 497 |
| *G. "Intent to Induce" Reliance* | 497 |
| *H. Investors' Reliance on the "Integrity of Management"* | 498 |
| CONCLUSION--NEW MATH AND THE "UNANIMOUS DECISION" | 501 |

## BACKGROUND TO *HALLIBURTON II*

For over twenty-five years, defrauded investors' ability to invoke a presumption of reliance on the integrity of the market has been the linchpin for class certification of securities fraud class actions. The concept that defendants' misrepresentations create a "fraud on the market" ("FOM") was first coined nearly fifty years ago by Abe Pomerantz, the pioneer of shareholder rights litigation, in *Herbst v. Able*. [1]

> ***486** "The relevant impact of the misrepresentations was *on the market*. It was the artificially heightened market price, pure and simple, which operated on plaintiffs and other members of the class to induce conversion." If plaintiffs can prevail in their "fraud on the market" theory, this may be sufficient to sustain a recovery under Section 10(b) of the Securities Exchange Act . . . . [2]

Courts struggling to fashion a tool for class-wide proof of reliance thereafter embraced the FOM concept. [3]

A socialist at heart, Abe would have been appalled when academics, and then courts, linked FOM to the "Efficient Market Hypothesis" ("EMH") posited by Eugene Fama of the Chicago School of Economics and disciple of Milton Friedman. [4] Daniel Fischel first proposed the FOM/EMH marriage, just before joining the University of Chicago School of Law: "In an efficient capital market, such as American stock markets, however, the market price of a firm's stock will reflect all available information about the firm's prospects. Because the market price itself transmits all available information, investors have no incentive to study other available data." [5]

PX351

The Supreme Court thereafter consecrated FOM/EMH in *Basic, Inc. v. Levinson*: "Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." [6]

As Professor Donald Langevoort observed, *Basic*'s recognition of a ***487** class-wide presumption of reliance, based on proof of a well developed, rapidly reactive market, was an act of "juristic grace." [7] But the grant was not unanimous. Justice White's dissent reads like a "juristic curse," which we will see haunted FOM/EMH from its inception:

> The federal courts have proved adept at developing an evolving jurisprudence of Rule 10b-5 in such a manner. But with no staff economists, no experts schooled in the "efficient-capital-market hypothesis," no ability to test the validity of empirical market studies, we are not well equipped to embrace novel constructions of a statute based on contemporary microeconomic theory. [8]

Thereafter, some commentators asserted that the FOM/EMH marriage enabled securities fraud class actions to proliferate. [9] This was mildly ironic (though highly questionable), given that hitching EMH to securities fraud class actions was aimed at rationalizing, if not restraining, recoverable damages. [10]

In response to the increased number of securities class actions, Congress sought to reign them in by way of the Private Securities Litigation Reform Act ("PSLRA"), Class Action Fairness Act ("CAFA"), and Securities Litigation Uniform Standards Act ("SLUSA"). Nonetheless, as incidents of fraudulent misconduct exponentially increased, so too did securities fraud class actions. [11]

"Reform" efforts thereafter shifted from Congress to the courts, as the Supreme Court raised the bar for pleading misleading statements [12] ***488** and loss causation. [13] However, securities fraud class action procedures remained relatively unscathed as the Court deferred the determination of loss causation and materiality from class certification to summary judgment. [14]

## I. THE "UNANIMOUS" *HALLIBURTON II* DECISION

Nonetheless, it was with great trepidation that the class action bar viewed the Supreme Court's interest in revisiting the FOM/EMH marriage when it granted certiorari for *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*") in late 2013. The threat of an annulment loomed large, given the possibility that a strict textualist approach (such as that espoused by Justice Scalia in *Morrison v. Australia National Bank Ltd.* [15]) could reopen the genie bottle and give the current, more conservative court the chance to adopt Justice White's dissent in *Basic*. The concerns were heightened by the fact that the EMH was now under assault not just by jurists, but also by behavioral economists who insisted that investors, and hence markets, were rarely rational or efficient. These experts cited "irrational exuberance," "bubbles," and volatile "mood like" swings of market prices. It was clearly ironic that the 2013 Nobel Award for Economics had been awarded to Eugene Fama for proposing EMH, as well as to Robert Schiller, for debunking EMH.

Thus, it was with a collective sigh that the plaintiffs' bar read the Court's 9-0 decision in *Halliburton II*, [16] which re-endorsed the presumption of reliance where plaintiffs proved "market efficiency." [17] Plaintiffs could continue to trigger the presumption of reliance by ***489** demonstrating that the market for the company's securities was sufficiently robust (as indicated by, e.g., volume of trading the number of market makers, and the number of analysts who followed the stock), as well as by demonstrating that the securities reacted rapidly and in a statistically significant amount to "new" company-specific news [18] (through the use of "event studies"). [19]

Defendants could continue to rebut the presumption by demonstrating that a particular investor in fact did not "rely upon the market," but rather had access to non-public information or otherwise utilized an investment strategy that ignored the market entirely. However, this license to rebut reliance had proved to be pyrrhic. The Supreme Court, therefore, recalibrated the formula


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

for rebuttal, enabling defendants to demonstrate that despite the misrepresentations, the stock's price had not been "impacted" by the alleged misconduct.[20]

Frankly, Abe would not have been disappointed by this decision. This approach more closely linked fraud with price movement. Moreover, the decision clearly signaled a retreat from a rigidly orthodox view of efficient markets. The Court expressly rejected the "robust view of market efficiency" espoused by the petitioners,[21] and instead endorsed the view that the presumption of reliance could be triggered by a showing that the stock traded in a "generally" efficient manner. As Chief Justice Roberts observed, the question of a market's efficiency was not a yes or no "binary" question, but rather more a spectrum analysis:

> The markets for some securities are more efficient than the markets for others, and even a single market can process different kinds of information more or less efficiently, depending on how widely the information is disseminated and how easily it is understood. . . . *Basic* recognized that market efficiency is a matter of degree . . . .[22]

The Court also placed the burden of proving lack of price impact squarely on the defendants.[23] Arguably, this will require defendants to ***490** demonstrate at a ninety-five percent level of confidence that the market was *not* "impacted" by either of any of the "events," i.e., the misstatements or corrections thereof, because that is the same burden plaintiffs must meet to demonstrate "efficiency." Stated otherwise, so long as there is evidence of some impact--enough to preclude defendants' experts from opining with "statistical certainty" that there was *no impact*--plaintiffs should be able to thwart rebuttal efforts.

The Court also arguably settled the issue of whether index investors (i.e., those who invest in bundles of securities in an effort to imitate, but not beat, the market) can be deemed to have "relied on the market":

> As we recently explained, *Basic* concluded only that "it is reasonable to presume that *most* investors--knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information--will rely on the security's market price as an unbiased assessment of the security's value in light of all public information."[24]

Especially significant, the Court also opened the door to class certification *even where plaintiffs are unable to demonstrate efficiency*: "A misrepresentation can distort a stock market's price even in a generally inefficient market . . . ."[25] In so doing, the Court echoed a position pitched by academics that was cited in page thirty-nine of the Petitioners Brief: "if a company is trading in a market in which there are significant deviations from efficiency but the evidence shows fraudulent distortion in the situation actually at issue in the litigation, our approach would result in classwide reliance."[26]

Thus, "fraud on the market" has now come full circle since Abe's original insight, with price impact now restored to the formula to satisfy class-wide reliance by demonstrating that 'defendants' deceptive statements distorted the price of the stock in question, though now defendants would need to demonstrate the absence of such distortion.

## II. WHAT'S NEXT

Upon closer examination, there are now solutions to many of the conundrums observed by Professor Donald Langevoort in his oft-cited "*Basic* at Twenty: Rethinking Fraud on the Market," e.g., delays in the ***491** stock's reaction to new corporate specific information despite the fact that the securities were listed on "efficient markets" such as the New York Stock Exchange.[27]

### *A. Measuring General Efficiency/Impact--Event Studies and Rapidity of Responses*

Shortly after *Basic*, academics advocated borrowing tools developed by econometricians to measure the "efficiency" of the market for particular stocks.[28] In time, a cadre of experts emerged to battle at the class motion stage over whether market prices reacted sufficiently, if at all, to company-specific information, particularly where that information was "new" or different from

PX351

what was expected. According to the academics, not only was the degree of the reaction important, but so too was its rapidity, because the classic EMH model hypothesized that in a well-developed market, prices reacted so quickly that “value investors” and analysts could not beat the market.

Such studies clearly added costs to litigation. However, anyone who has conducted market price analyses for antitrust class actions will likely view securities-market event studies as a bargain. Among other things, the number of variables is far less.

Post- *Halliburton II*, plaintiffs will seize upon the Court's rejection of the “robust” efficiency model in favor of a more relaxed “generally” efficient model. It bears repeating that the Court recognized that “a single market can process different kinds of information more or less efficiently, depending on how widely the information is disseminated and how easily it is understood,” and that a value investor “implicitly relies on the fact that a stock's market price will *eventually* reflect material information . . . .”[29]

This observation should help drive different outcomes than those like *In re Merck & Co., Inc. Securities Litigation*,[30] where the company was buried in an S-1 filing stating that a major subsidiary had previously overstated revenues. This news went unnoticed by analysts, and there was no contemporaneous stock price reaction.[31] Several weeks later, a *Wall Street Journal* reporter identified and quantified the overstatement, ***492** resulting in an immediate and significant stock price decline.[32] Nonetheless, the Third Circuit held that such a delayed response would not be consistent with an efficient market.[33]

This reasoning was recently echoed in *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*,[34] where the First Circuit held that a price reaction following an analyst's change of recommendation (based on analysis of previously issued information) was not consistent with the EMH: “Accordingly, once a misstatement or corrective disclosure is publicly known in an efficient market, courts will assume that the stock price reacts immediately, and any claim that an event moved the stock price when the event was not actually a new disclosure will necessarily fail.”[35]

Post *Halliburton II*, a statistically significant price reaction should be sufficient regardless of whether the reaction followed the initial announcement of the news or occurred sometime later when an analysis turned the “spotlight” on the company's financial condition.

***B. Price Maintenance/Confirmatory Lies***

There should be little doubt that in advocating for consideration of “price impact” at the certification stage, defendants hoped to bury securities fraud class actions because stock prices often do not move in response to the initial dissemination of fraudulent statements. However, this misstates the issue-- merely because a stock price does not move or react does not mean that it has not been “distorted” by defendants' misconduct.

By way of example, assume that a company knows that analysts are expecting earnings of $1.10 per share. However, as the quarter closes, management identifies only $1.00 of reportable earnings. Nonetheless, through accounting machinations, the company reports $1.10 earnings per share, thereby meeting market expectations. In the absence of any earnings “surprise,” the market price will likely remain the same and be “maintained” by the “confirmatory lie.” As noted by Bebchuk and Ferrell, “[i]n such a situation, the confirmatory lie might prevent a stock price drop that would have occurred had the truth been told.”[36]

Further, assume that this pattern of meeting market expectations by ***493** inflating earnings ten percent to meet analyst expectations continues for the entire year, thus precluding any price movement in connection with reported earnings. However, at the end of the year, the auditors blow the whistle and the company is forced to admit that it overstated reported earnings by ten percent. The market will likely react by a significant decline, often in excess of ten percent. This decline clearly evidences the impact defendants' misconduct had upon the stock price all along. As Bebchuk and Ferrell observed, the price reaction when the market “learned the truth about the misstatement-- that is, at the time of a corrective disclosure . . . could be relevant to the question of whether the misstatement at the time it was made resulted in fraudulent distortion (even if it was a confirmatory lie).”[37]

PX351

Thus, experts will need to consider not only whether the price moved at the time of the original announcement, but the market expectations at the time. Moreover, so long as the price moves significantly at the time of the corrective disclosure, and the correction clearly relates to a series of prior statements, "impact" should be evident. [38]

The confirmatory lie and price maintenance issue was recently addressed by the Eleventh Circuit in *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Financial Corp.* [39] The plaintiffs asserted that the defendants' false statements simply confirmed the market's existing expectations about the company, thereby artificially maintaining the price of the stock. [40] As a result, none of the alleged misleading statements were accompanied by stock price increases. [41] The lone significant stock price change occurred following revelation of the fraud at the end of the class period. [42]

***494** Addressing market efficiency, the Eleventh Circuit refused to adopt any "mandatory analytical framework for market efficiency inquiries." [43] In language reminiscent of *Halliburton II*'s rejection of a "robust" view of market efficiency, the court explained that "[e]ven . . . general signs of an efficient market may not be required for a finding of an efficient market in every case. Stocks that trade on a smaller scale, or that are not widely followed, might trade on an efficient market." [44]

The court expressly rejected the defendant's argument "that a finding of market efficiency always requires proof that the alleged misrepresentations had an immediate effect on the stock price." [45] It observed that the lack of stock price movements in response to confirmatory misrepresentations was completely consistent with an efficient market, [46] and that a single decline following the corrective disclosure could be sufficient. [47]

### *C. Confounding Events*

No doubt defendants' counsels have long been cognizant of the perils of corrective disclosure, and have actively counseled clients how best to buffer their impact by orchestrating "soft landings" of such adverse news. One tack is to bundle the disclosure of past misconduct (the need to restate historical results) with other news (lowered forecasts due to competitive changes), thereby complicating measurement of the imbedded distortion. Leakage is undoubtedly another tool. (Michael Furchtgott and Frank Partnoy have conducted a study of soft landings. [48])

Regardless, economists' toolboxes contain several devices for disentangling these "confounding" events as discussed below.

### ***495** *D. "Response Coefficients"*

One methodology for disaggregating the impact of bundled news items was proposed by Esther Bruegger and Fred Dunbar. [49] The authors cited studies regarding "earnings response coefficients" ("ERC"), i.e., mathematical factors that can account for the relationship of a restatement of earnings to the likely price response. [50] Once the ERC factor has been computed, the portion of a stock price reaction attributable to the restatement can be isolated from other confounding news. [51]

The authors gave an example of a situation where, during the subprime mortgage meltdown, a company confidently asserted in mid-March 2008 that its mortgage portfolio was fine, only to turn around two weeks later and announce that a significant writedown was in fact necessary. The authors further hypothesized that simultaneous with announcement of the need to writedown the mortgage portfolio, the Company also disclosed an earnings shortfall for the prior year ended December 31, 2007 that totaled $1.50 per share (which presumably was due to factors unrelated to the portfolio writedown). In response to this disclosure of new "confounding" information, some of which was arguably fraud related (the belated portfolio writedown) and some of which arguably non-fraud related (the earnings shortfall for the prior year results), the stock price dropped $10 per share. [52]

The problem presented to a financial market expert was how to separate the impact of the two sources of information, and assign a portion of the $10 decline to each. The solution proposed by Bruegger and Dunbar was as follows:

PX351

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

> [T]he event study on March 30, 2008 does not by itself allow one to determine the price decline exclusively due to the disclosure of the misrepresentation.

> ***496** Instead we can make use of the academic research on price reactions in response to earnings announcements, which provides us with a technique to calculate the price reaction due to the $1.50 earnings disappointment. The technique uses the concept of an earnings response coefficient, or ERC . . . .

> Let us assume that either through a regression analysis or from the professional literature, we can infer that [the Company] has an ERC of 5[x] over the relevant time period. This implies that for every cent of an earnings surprise its stock reacts by five cents. [53]

Under this methodology, $7.50 of the $10 price drop would be attributable to the earnings surprise ($1.50 x 5) and the balance of the decline, and the remaining $2.50 would be attributable to the subprime writedown.

### *E. Forward-Casting*

Another analytic tool is to construct the "counterfactual" of how much the stock price would have reacted had the truth been told rather than the confirmatory lie. Thus, going back to the ten percent earnings inflation above, assume that the stock was trading at a price/earnings ratio of 15x. If the earnings were inflated to $1.10, the expected stock price would be $16.50. Had the company reported only $1.00 per share, the stock price would likely have been $15.00 (assuming for the moment that there was no decline in the "price earnings" ratio). [54] Hence, the amount by which the stock traded above $15 (in this case $1.50) would be the measure of distortion at the time of the wrongdoing.

Thus, upon announcement of the misstatement, it would be reasonable to expect that at least $1.50 (or ten percent) of the decline could be attributed to the original misconduct. Any additional decline beyond $1.50 could be attributed to other factors, though plaintiffs will likely argue that such additional decline is due to reassessment of the "integrity of management." [55]

### *F. Content Analysis*

A third means of disaggregating factors that contributed to the price decline is to identify key words in the company's press release and analyst reports relating to the fraud and to other subjects, and to ***497** apportion the price decline consistent with the ratio by which those terms appear. [56] This content methodology was endorsed in *N.A.A.C.P. v. AcuSport, Inc.* [57] :

> [An expert's] opinions were largely based on a study that he performed using "content analysis." [The expert] and several of his research assistants reviewed documents and deposition testimony from the various defendants in an attempt to draw inferences as to which defendants did or did not employ any one of 14 "countermarketing" strategies [the expert] had identified. The results of this analysis were presented to the jury on charts that were useful and reliable in supporting his conclusions. [58]

### *G. "Intent to Induce" Reliance*

When faced with confounding information, plaintiffs should also demand discovery of investor-relations personnel to demonstrate that the confounding was deliberately orchestrated to thwart demonstration of price impact. For instance, a company

PX351

may have uncovered the need to restate prior earnings, but waited to disclose that fact until it could also report the loss of a future contract that would have required lowered forecasts as well.[59]

This approach would be consistent with proof under the common law of "intent to induce reliance" (which is different from "intent to deceive" or scienter). It is the one element of the common-law tort of fraudulent misrepresentation that has not been incorporated into the federal securities laws.[60] The common law required proof that a company had a "reason to expect" investors would act in reliance on its ***498** misstatements, i.e., the company had "information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct."[61]

Evidence of such intent to induce reliance should be considered in determining whether defendants' conduct distorted the market price. It stands to reason that companies should be held accountable if they knowingly managed the release of news in the hopes of obscuring any distortion attributable thereto, whether to meet analyst expectations or to blunt the impact of corrective revelations. In this regard, any delay in the release of adverse news, or deliberate combination with other information, should be a red flag.

### *H. Investors' Reliance on the "Integrity of Management"*

In analyzing confounding events, it is also important to factor the market's risk assessment of the stock. It has long been recognized that market-price reactions to earnings restatements are often disproportionate to the size of the restatement.[62] Indeed, if one were to recast the actual earnings over the restated period, and use the same price/earnings multiplier, the reconstructed "true value" price of the stock would likely be quite different from the price reconstructed based on the price drop following the corrective disclosure. In other words, if the company had been forthright in the first instance, the stock would have been lower, but not as low as indicated by the post-corrective price.

The larger reaction to a corrective disclosure clearly involves an additional factor--the market's perception of management's reliability. After all, stock pricing is a function of future returns, the assessment of which requires confidence in management. As Professor Langevoort observed: "[p]resumably, most stock-price declines that follow a surprise revelation of fraud reflect not only the truth with respect to the specific facts misrepresented or omitted but also a readjustment in expectations regarding other matters on which management was ***499** previously thought credible."[63]

Bruegger and Dunbar also acknowledge that this loss of confidence by the market contributes to the price reaction:

> [I]t is likely that the earnings response coefficient is not constant if there are multiple earnings surprises resulting from disclosures of false accounting. For a growth stock, the first announcement could expected to have a disproportionately larger effect than subsequent announcements. . . . This is because the initial price reaction would include a component that reassesses the risk of ensuing bad news.[64]

Indeed, it is well established in the finance literature that the ramifications of financial fraud extend well beyond the direct dollar amount of the fraud, but also cause further loss on account of damage to a company's reputation:

> Risk/uncertainty likely increases and future prospects may well decrease when management integrity and competence are called into question.
>
> . . .
>
> Because fraud means intentional, non-GAAP financial reporting, it indicates a lack of management integrity that we expect to be associated with a more negative stock price reaction, incremental to any other impacts from revising reported results. This may be due to an increase in the discount rate because fraud creates uncertainty

PX351

about the reliability and credibility of management representations, which increases the perceived information asymmetry between management and stockholders.

. . .

Our results suggest a greater investor concern over restatements that carry negative implications for management integrity than those due to more technical accounting issues. [65]

Other studies have quantified the impact of management "reputation" on the value of securities.

One study quantified the impact of reputational impairment on the price of company stocks: "For each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed," *plus an additional $2.71, due to reputation loss*. [66] As the authors noted:

> ***500** Reputation can be lost if customers change the terms on which they are willing to do business with the firm because of an increased probability of cheating or the perception that the firm cannot support warranties or supply compatible parts in the future. Diminished reputation also can reflect an increase in the firm's cost of capital or trade credit, as input suppliers change the terms with which they do business with the firm. In addition, the firm can suffer real losses as managers are required to divert resources to the investigation and away from company business. The revelation of financial reporting problems could also force the firm to implement new monitoring and control policies, increasing the cost of operations. We group all such real effects on firm value into the reputation loss. [67]

Thus, investors should be entitled to recover this additional decline attributable to the market's reassessment of management's "risk." Just as courts have consistently recognized investors' entitlement to rely upon the "integrity of the market," so too should investors be entitled to rely upon the "integrity of management."

Indeed, courts have been moving in that direction. [68] Indeed, "[i] nvestors have a right to know--and would reasonably consider it important--when the head of a publicly-owned company is stealing any quantity of money from their company." [69]

The SEC has officially embraced this view: "[T]he tone set by top management--the corporate environment or culture within which financial reporting occurs--is the most significant factor contributing to the integrity of the financial reporting process." [70] So too has the Public Company Accounting Oversight Board ("PCAOB"): Auditing standards require that "[f]raud involving senior management . . . should be ***501** reported directly to the audit committee in a timely manner . . . ." [71]

**CONCLUSION--NEW MATH AND THE "UNANIMOUS DECISION"**

Thus, the landscape for securities fraud class actions has been altered, though there is an element of "déjà vu all over again" with the addition (or return) of price impact to the analysis. The decision will certainly keep testifying experts busy for the foreseeable future, and keep practitioners and judges scratching their heads as they attempt to fathom the "mind-numbing data." [72]

Lawyers will also undoubtedly argue over *Halliburton II*'s 9-0 final score. Justice Thomas's "concurrence" was more akin to Justice White's dissent in *Basic*. If Yogi Berra were a lawyer, he might insist that, like Roger Maris' home run record, his vote be recorded with an "*" .


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Footnotes**

a1 The author is the Managing Partner, Pomerantz LLP which specializes in representing investors in class action securities fraud lawsuits, and is an officer of the Institute of Law and Economic Policy ("ILEP") at which several of the papers cited herein were first presented. The author wishes to thank his colleagues at the firm who assisted in preparation and review of this article (including Patrick Dahlstrom, Jeremy Lieberman, Michael Wernke, Emma Gilmore, and Ann Marie Cavener), as well as Dean Michael Kaufman of Loyola University Chicago School of Law, at whose 2014 Institute for Investor Protection Conference the issues presented in this Paper were discussed.

1 47 F.R.D. 11, 16 (S.D.N.Y. 1969). Origination of "fraud on the market" by Abe Pomerantz was confirmed by Professor Jill Fisch in *The Trouble with* Basic *: Price Distortion After* Halliburton, 90 WASH. U. L. REV. 95, 907 (2013).

2 *Herbst*, 47 F.R.D. at 16 (citations omitted).

3 In 1975, Judge Koelsch of the Ninth Circuit stated:

Proof of subjective reliance on particular misrepresentations is unnecessary to establish a 10b-5 claim for a deception inflating the price of stock traded in the open market. Proof of reliance is adduced to demonstrate the causal connection between the defendant's wrongdoing and the plaintiff's loss. We think causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance. Materiality circumstantially establishes the reliance of some market traders and hence the inflation in the stock price-- when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case.

Blackie v. Barrack, 524 F.2d 891, 906 (9th Cir. 1975) (citations omitted).

4 *See* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383, 384 (1970) (linking the "fraud on the market" theory to the "efficient market hypothesis").

5 Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 BUS. LAW. 1, 4 (1982) (footnote omitted).

6 Basic, Inc. v. Levinson, 485 U.S. 224, 246 (1988). Fischel's article was cited in support of this observation at 485 U.S. at 246 n.24.

7 Donald C. Langevoort, Basic *at Twenty: Rethinking Fraud on the Market*, 2009 WIS. L. REV. 151, 161.

8 *Basic*, 485 U.S. at 253 (1988) (White, J., dissenting) (footnote omitted).

9 *See* Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 STAN. L. REV. 497, 499-501 (1991) (arguing that settlements in securities fraud class actions are neither voluntary nor accurate through studying a group of securities class actions involving similar claims of fraud in initial public offerings); Roberta Romano, *The Shareholder Suit: Litigation Without Foundation?*, 7 J.L. ECON. & ORG. 55, 56 (1991) (assessing the effectiveness of shareholder litigation as an incentive-alignment device by examining lawsuits brought against a randomly selected sample of publicly traded firms over several decades).

PX351

10 *See* Fischel, *supra* note 5, at 2 (stating that "fraud on the market" cases form the basis for rejection of the traditional method of determining injury and damages in open-market trading cases in favor of a more realistic economic approach).

11 *See, e.g.*, *In re* Worldcom, Inc. Sec. Litig., 219 F.R.D. 267 (S.D.N.Y. 2003); *In re* Enron Corp. Sec., Derivative & ERISA Litig., 258 F. Supp. 2d 576 (S.D. Tex. 2003). These cases involved massive accounting frauds that resulted in multi-billion dollar settlements for the benefit of defrauded investors. The size of the frauds prompted adoption of the Sarbanes-Oxley Act, which increased corporate accountability by requiring, among other things, that senior officers certify not only reported results, but also the adequacy of internal financial controls.

12 *See* Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (holding that the "plausibility" standard, for a complaint to survive a motion to dismiss for failure to satisfy the short-and-plain-statement requirement, is not akin to probability requirement, but asks for more than sheer possibility that the defendant acted unlawfully).

13 *See* Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005) (holding that an investor claiming securities fraud cannot satisfy the requirement of proving that the fraud caused an economic loss simply by alleging in the complaint, and subsequently establishing, that the price of the security on the date of purchase was inflated because of misrepresentation).

14 *See* Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1191 (2013) (determining that materiality of a corporation's alleged misrepresentations and omissions was a question common to all members of a class in a securities fraud action brought on a fraud-on-the-market theory, as materiality was judged according to an objective standard, and alleged misrepresentations and omissions would be equal for all investors composing the class); Erica P. John Fund, Inc. v. Halliburton Co. (*Halliburton I*), 131 S. Ct 2179, 2168 (2011) (holding that the court of appeals erred by requiring Erica P. John Fund, Inc. to show loss causation as a condition of obtaining class certification).

15 *See* Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 261-62 (2010) (holding that in terms of the scope of conduct prohibited by Rule 10b-5 and section 10(b), the text of the statute controls).

16 573 U.S.--, 134 S. Ct. 2398 (2014).

17 *See id.* at 2410 (reaffirming that *Basic*'s presumption of reliance does not rest on a binary view of market efficiency, but instead that *Basic* recognized that market efficiency is a matter of degree).

18 Lax v. First Merchs. Acceptance Corp., 170 No. 97 C 2715, 1997 U.S. Dist. LEXIS 11866, at *7-8 (N.D. Ill. Aug. 6, 1997).

19 Jonathan R Macey et al., *Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of* Basic v. Levinson, 77 VA. L. REV. 1017, 1018 (1991) (using event studies to determine whether false information caused a security to trade at an artificially high or low price).

20 *See* *Halliburton II*, 134 S. Ct. at 2417 ("[D]efendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock.").

21 *Id.* at 2409.

22 *Id.* at 2409-10.

PX351

23 *See id.* at 2417 (“Defendants may seek to defeat the *Basic* presumption at [the certification] stage through direct as well as indirect price impact evidence.”).

24 *Id.* at 2411 (citing Amgen v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1192 (2013)).

25 *Id.* at 2409.

26 Lucian A. Bebchuk & Allen Ferrell, *Rethinking* Basic, 69 BUS. LAW. 671, 690 (2014); *see* Brief for Petitioners at 39, Halliburton Co. v. Erica P. John Fund, Inc. (*Halliburton II*), 134 S. Ct. 2398 (2014) (No. 13-317) (citing the Bebchuck & Ferrell study for posing a price-distortion test and providing examples of price distortion in inefficient markets).

27 *See* Langevoort, *supra* note 7, at 161.

28 *See* Macey et al., *supra* note 19, at 1028-35 (describing the methods to measure how much a stock price reacts to news).

29 *Halliburton II*, 134 S. Ct. at 2409, 2411 (emphasis added).

30 432 F.3d 261 (3d Cir. 2005).

31 *See id.* at 264 (discussing the factual background that led to the claims that Merck & Co. had committed securities fraud and made material misstatements or omissions in the registration of statements).

32 *See id.* at 265 (stating that immediately after the *Wall Street Journal* article, Merck's stock lost $2.22 billion and that six days later Merck announced it was postponing the Medco IPO).

33 *See id.* at 269-71 (discussing the facts of the case and the relation to “the efficient market”).

34 752 F.3d 82 (1st Cir. 2014).

35 *Id.* at 89 (footnote omitted).

36 Bebchuk & Ferrell, *supra* note 26, at 692.

37 *Id.*

38 Defendants will undoubtedly argue that merely because a company announces that it must restate earnings for three years does not mean the price was distorted by the same amount for the entire three years. However, this is more an issue of measuring damages that trigger a presumption of reliance. For instance, in *In re* BP P.L.C. Sec. Litig., No. 4:10-md-2185, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014), the court denied class certification for investors who purchased BP shares prior to the Deepwater Horizon explosion on grounds that they could not credibly argue that the degree to which BP's stock price had been distorted by misrepresentation of its safety record was equivalent to the price drop when the explosion occurred. The court reasoned that “manifestation” of the previously concealed degree of the safety risk triggered a much larger price reaction than full disclosure of that risk would have. *Id.*; *see* David Tabak, *Risk Disclosures and Damages Measurement in Securities Fraud Cases*, 21 SEC. REFORM ACT LITIG. REP. 6 (2006)


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

(examining some of the issues relevant to determining the amount of artificial inflation in a stock price when the possible disclosure was only of a risk of an event that was later realized).

39 762 F.3d 1248 (11th Cir. 2014).

40 *Id.* at 1252.

41 *Id.*

42 *Id.*

43 *Id.* at 1255.

44 *Id.*

45 *Id.* at 1256.

46 *Id.*

47 The Court remanded the case to enable defendants to rebut impact. *Id.* at 1259. The decision represents an "about-face" for the Eleventh Circuit, which had previously expressed an extremely rigid view of market efficiency. For example, in 2013, in *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013), the Eleventh Circuit affirmed dismissal of a complaint for failure to adequately plead loss causation, holding that an analyst's new examination of previously disclosed facts could never be a corrective disclosure, noting that "[e]ither the market is efficient or it is not." This prior view of market efficiency cannot be reconciled with *Halliburton II*'s proclamation that "*Basic*'s presumption of reliance... does not rest on a 'binary' view of market efficiency." 573 U.S.--, 134 S. Ct. 2398, 2410 (2014).

48 Michael Furchtgott & Frank Partnoy, Disclosure Strategies and Shareholder Litigation Risk: Evidence from Restatements (May 13, 2012) (unpublished manuscript), *available at* http:// extranet.isnie.org/uploads/isnie2012/furchtgott_partnoy.pdf.

49 *See* Esther Bruegger & Frederick C. Dunbar, *Estimating Financial Fraud Damages with Response Coefficients*, 35 J. CORP. L. 11, 12 (2009) (showing how "statistical analysis of the response of both share prices and investor expectations to new information can be used to improve the estimation of damages in shareholder litigation").

50 *See, e.g.*, *id.* at 31 n.65 (citing Ray Ball & S. P. Kothari, *Security Returns Around Earnings Announcements*, 66 ACCT. REV. 718 (1991)); *id.* at 33 n.74 (citing Robert L. Hagerman, Mark E. Zmijewski & Pravin Shah, *The Association Between the Magnitude of Quarterly Earnings Forecast Errors and Risk-Adjusted Stock Returns*, 22 J. ACCT. RES. 526 (1984)); *id.* at 33 n.76 (citing Walter R. Teets & Charles R. Wasley, *Estimating Earnings Response Coefficients: Pooled Versus Firm-Specific Models*, 21 J. ACCT. & ECON. 279 (1996) ).

51 *See id.* at 35-36 (using ERCs to calculate price reactions).

52 *See id.* at 35 (demonstrating the application of response coefficients in a simplified situation).

PX351

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

53 *Id.*

54 The price earnings ratio is the multiple of reported earnings at which a stock trades, e.g., if the company reported $1 per share earnings and traded at $10 per share, its "p/e" ratio would be 10x.

55 *See infra* Part II.H.

56 *See* Frederick C. Dunbar & Arun Sen, *Counterfactual Keys to Causation and Damages in Shareholder Class-Action Lawsuits*, 2009 WIS. L. REV. 199, 242 ("When available, the most telling information is often contained in analyst reports following the disclosure."); David Tabak, ***Making Assessments About Materiality Less Subjective Through the Use of Content Analysis*** 11 (NERA, Mar. 13, 2007), *available at* http:// www.nera.com/publications/archive/2007/making-assessments-about-materiality-less-subjective-through-the.html (discussing how analyst report headlines are examined).

57 271 F. Supp. 2d 435 (E.D.N.Y. 2003).

58 *Id.* at 515.

59 A scenario similar to this played out years ago involving a company that was sued by our firm for securities fraud. The company internally identified side contracts that effectively converted sales into consignments, but did not make a disclosure (it claimed), because it was still investigating whether or not the practice was widespread. Before announcing any need to restate, the company disclosed the loss of a major contract, which drove its stock price down considerably. By the time the need to restate was announced, most of the inflation had already been removed from stock price.

60 All the elements of the common law tort of fraudulent misrepresentation, other than intent to induce reliance, have been incorporated in the proof of federal securities law violations under Rule 10(b). *See, e.g.*, Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 165 (2008).

61 Ernst & Young, LLP v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 581 (Tex. 2001) (citing RESTATEMENT (SECOND) OF TORTS § 531 cmt. d (1977)); *see* Enron Corp. Sec., Derivative & "ERISA" Litig. v. Enron Corp., Nos. H-01-3624, G-03-0481, 2010 WL 9077875, at *46 (S.D. Tex. Jan. 19, 2010) (applying Restatement § 531 to sustain fraud allegations in connection with open market purchases made in reliance on SEC filings because there was "an especial likelihood that SEC-filed [information]... will reach and influence potential investors to purchase the company's stock"); Berkowitz v. Baron, 428 F. Supp. 1190, 1196 (S.D.N.Y. 1977) (finding that the plaintiffs were in the class of persons that was reasonably expected to rely on the statements).

62 *See* Bruegger & Dunbar, *supra* note 49, at 34 ("For a growth stock, the first announcement could be expected to have a disproportionately larger effect than subsequent announcements.").

63 Langevoort, *supra* note 7, at 183 n.140.

64 Bruegger & Dunbar, *supra* note 49, at 34.

65 Zoe-Vonna Palmrose et al., *Determinants of Market Reactions to Restatement Announcements*, 37 J. ACCT. & ECON. 59, 63, 87 (2004).

PX351

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

66 Jonathan M. Karpoff, D. Scott Lee & Gerald S. Martin, *The Cost to Firms of Cooking the Books*, 43 J. FIN. & QUANTITATIVE ANALYSIS 581, 581 (2008).

67 *Id.* at 598-99 (footnote omitted).

68 *See* S.E.C. v. Das, No. 8:10CV102, 2010 WL 4615336, at *8 (D. Neb. Nov. 4, 2010) ("Investors may base their investment decisions, at least in part, on factors such as... management ethics and accountability."); Voit v. Wonderware Corp., 977 F. Supp. 363, 370-73 (E.D. Pa. 1997) (finding resignation of CEO material where CEO brings "'peculiarly valuable technical or business expertise to the company"' and the stock drops after resignation announcement (citing *In re* Numerex Corp. Sec. Litig., 913 F. Supp. 391, 401 (E.D. Pa. 1996))).

69 S.E.C. v. Pace, 173 F. Supp. 2d 30, 33 (D.D.C. 2001); *accord.* AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 237 (2d Cir. 2000) (Winter, J., dissenting) (finding that had the truth been told, the plaintiffs would have realized management's lack of credibility so that consequences of the dishonesty are within the zone of proximate cause); United States v. Hatfield, 724 F. Supp. 2d 321, 328 (E.D.N.Y. 2010) ("Here, a reasonable jury could find that [the defendant] spent millions of dollars of shareholders' money on his personal expenses, without proper authorization to do so.... This more than suffices to meet the Government's materiality burden."); *see also* Dunbar & Sen, *supra* note 56, at 237-38; Langevoort, *supra* note 7, at 183 n.140.

70 SEC Staff Accounting Bulletin No. 99, Materiality, 64 Fed. Reg. 45150, 45155 (Aug. 19, 1999) (to be codified at 17 C.F.R. pt. 211(B)), *cited in* Ganino v. Citizens Utils. Co, 228 F.3d 154, 163 (2d Cir. 2000).

71 PCAOB AU § 316.79, "Consideration of Fraud in a Financial Statement Audit," *available at* http://pcaobus.org/Standards/Auditing/pages/au316.aspx.

72 Langevoort, *supra* note 7, at 168.

46 LYUCHILJ 485

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

PX351

# PX 352

**31 Am. Rev. Int'l Arb. 55**

**American Review of International Arbitration**
2020

**Article**
Meloria Meschi [a1] Ravi Kanabar [d1]

Copyright © 2020 by JurisNet, LLC; Meloria Meschi, Ravi Kanabar

# *55 EVENT STUDIES IN INTERNATIONAL ARBITRATION: A PRIMER

## I. INTRODUCTION

In this note, we explain what an ‘event study’ is and how the technique can be used to assess liability and damages in an arbitration. The note was written following the 2019 Fordham International Arbitration and Mediation Conference in the context of a session on Economic Issues in International Arbitration, in which one of the authors, Dr. Meschi, co-presented an overview of event studies and their applications.

The note is organised as follows. First, we introduce the rationale for event studies, explaining the underlying economic and financial theory. Second, we move away from the theory to explain how an event study works in practice and how it is typically implemented. Third, we explain how confounding news events (which are some of the most common practical and conceptual issues encountered by practitioners) can be addressed and what implications they have for the use and reliability of event studies for the purpose of assessing damages.

## II. WHAT IS AN EVENT STUDY?

An event study is an empirical methodology used to measure the effect of new information on the equity value of a listed company. The roots of the methodology can be traced back through a now-extensive academic literature, [1] to two seminal studies: one by Ray Ball and Philip Brown, [2] in which the authors sought to measure the effect of earnings announcements on share prices, and another co-authored by Nobel Prize-winning economist Eugene Fama, [3] in which the authors considered the effect of stock-splits on share prices. These two papers, and the thousands of studies that have followed, explain the event methodology in detail and apply it to a range of research questions in economics and finance. [4] The purpose of this note is not to ***56** summarise that literature, [5] but instead to describe the methodology in simple and intuitive terms and to demonstrate how it is applied in contentious settings--with a focus on international arbitration.

Event studies involve performing statistical analysis of movements in the market price of shares in a listed company. They are therefore inextricably linked to economic and finance theory relating to what the market price of a share actually represents. This underlying theory is very well established and summarised particularly succinctly by Ball and Brown:

> An impressive body of theory supports the proposition that capital markets are both efficient and unbiased in that if information is useful in forming capital asset prices, then the market will adjust asset prices to that information quickly and without leaving any opportunity for further abnormal gain. If, as the evidence indicates, security prices do in fact adjust rapidly to new information as it becomes available, then changes in security prices will reflect the flow of information to the market. [6]

PX352

In other words, event studies rely on two principles: the first is that the market price of shares reflects the discounted value of expected future cash flows to investors, [7] and the second is that share prices fully reflect all available information. This is the so-called ‘efficient market hypothesis' (“EMH”).

There are three versions of the EMH. They vary according to the type of information that is assumed to be reflected in the share price. [8] The so-called ‘weak form’ EMH posits only that share prices fully incorporate information contained in historical prices. The ‘semi-strong form’ EMH sets a higher threshold: it posits that share prices fully incorporate not only the information contained in historical prices, but all publicly available information. Finally, the ‘strong form’ EMH sets a higher threshold still: it posits that share prices fully incorporate all existing public and all private information. Event studies typically assume that markets are semi-strong efficient--i.e., that “security prices do in fact adjust rapidly to new information as it becomes available.” [9] There is much debate among financial economists about the ***57** extent to which the EMH holds true, although the semi-strong EMH is generally assumed when applying event studies. [10]

The implication of these two principles is that by properly analyzing the movements in share prices following the release of new information into the public domain (i.e., the ‘event’), one is able to measure the market's assessment of the effect of this new information on the share price and therefore on the equity value of the company. Such measurements are interesting and important from the perspective of academic research in economics, finance and a range of other disciplines. However, such measurements can also provide decisive and influential evidence in relation to the assessment of factual causation (as part of establishing legal liability) and compensatory damages in arbitrations where the dispute relates to an event experienced by a listed company.

Event studies have been used extensively in securities litigation, [11] but they can and have been used in commercial arbitration to assess the effect of accounting errors, or misstatements, or fraud, by analysing share price movements following the revelation of news of those alleged infringements. In treaty arbitration, event studies have been used to assess damages arising from the unexpected expropriation of a company's assets or the cancellation of a contract, for example for a joint venture, by a foreign government. [12]

## III. HOW DO EVENT STUDIES WORK, AND HOW ARE THEY TYPICALLY IMPLEMENTED?

In this section, we explain how event studies work, and how they are typically implemented by use of an illustrative example, which we continue through to the end of the article. Suppose we are interested in measuring the effect of the revelation of some accounting fraud on the equity value of a company. A typical starting point in assessing the effect (and one which we often see employed in practice) is to simply compare the company's share price before and after an event, and to then assume that the movement in the share price over that time is caused by the event. For example, if news of the fraud was first revealed at 10:00 on Wednesday, November 6, 2019, and the market closing share prices before and after the revelation were $80 (at 16:00 on November 5, 2019), and $60 (at 16:00 on November 6, 2019), one might attribute ***58** the $20 fall in the share price to that fraud. This is illustrated in Figure 1 below. The vertical line represents the timings of the event.

**Figure 1: Simple before and after analysis**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Such simplistic ‘before-and-after’ analyses are quick and easy to perform. However, they can provide inaccurate, unreliable and potentially misleading assessments of causal effects and damages, because they rely on one particularly simplistic assumption: that if the event had not occurred, then the share price would not have changed at all. In other words, they assume the share price *before* an event is an appropriate estimate of the counterfactual (or but-for) share price *after* the event. In our experience, this simplistic assumption is rarely appropriate.

Share prices are notoriously volatile. They can fluctuate for a variety of reasons that coincide or overlap with the timing of the event in question but are otherwise unrelated to it. These fluctuations could be driven by forces that are specific to the company (e.g., multiple press releases on the same day, or a single press release with lots of new information within it); [13] that relate more broadly to the industry in which the company operates (e.g., a change in the regulatory rules for that industry); or that

PX352


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

relate even more broadly to the country in which it operates (e.g., a change to corporate tax rules), the overall stock market or the global economy (e.g., the global financial crisis of 2008).

If these 'confounding factors' would have influenced the company's share price irrespective of the event in question, then they should be taken into account in order ***59** to properly assess its causal effect. Event studies attempt to do this using statistical analysis--in particular a technique known as 'regression analysis' that is capable of explicitly distinguishing the movements in the company's share price that are caused by other non-company specific factors, with the aim of leaving only those movements that are attributable to the event. These 'leftover' or 'cleaned' share price movements form the basis of a more accurate and reliable assessment of the effect of the event in question, from which an estimate of compensatory damages could be derived.

A typical event study is implemented in four steps: (1) identify the event and the timing of its announcement; (2) develop a statistical model to estimate share price movements but-for the event; (3) estimate the causal effect of the event; and (4) perform formal tests for statistical significance. We explain each of these steps in turn.

### A. *Identify the Event and the Timing of Its Announcement*

The first step is to identify the event and the timing of its announcement. It is essential to perform a systematic review of relevant news around the relevant period of time to identify the *first* time that new information was released into the public domain: whether by means of a formal or informal announcement or a series of 'leaks'. [14] As part of this review, it is also important to identify any company specific news other than the event in question, as such news may complicate the interpretation of the results of the event study. [15] The day of the event and the subsequent few trading days, i.e., the 'event window', receive the most attention in this review. The event window is typically 1 to 3 days.

### B. *Develop a Statistical Model to Estimate Share Price Movements but-for the Event*

The second step is to develop a statistical model to estimate share price movements but-for the event. These movements are typically measured in terms of percentage changes or 'daily returns', i.e., the percentage difference between market closing share prices on consecutive days. [16] These but-for returns are, by their very nature, not observed in the data: they need to be estimated. [17] A variety of methods have been proposed in the literature to do so. The before-and-after approach discussed previously is the simplest of all methods: it assumes that but-for the event, the daily return would have been zero.

***60** However, the most common method is known as the 'market model'. [18] The market model assumes that the company share price generally moves in line with the market. [19] This is illustrated in Figure 2 below, which shows that prior to the event, the company's share price would tend to rise when the market index rose, and fall when the market index fell. The same relationship is seen in Figure 3 below, which expresses these same movements in terms of daily returns.

**Figure 2: Relationship between company share price and market index**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

***61 Figure 3: Relationship between company share price returns and market returns**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The nature and strength of the normal relationship between the company's share price returns and market returns (i.e., the relationship before the event occurs) is quantified using a statistical technique called 'regression modelling'. [20] This same regression is used to estimate what the company's share price returns in the event window would normally have been, if the event had not occurred. These are referred to as 'normal returns' or 'but-for returns' and are illustrated in Figure 4 ($ terms) and Figure 5 (% returns) below.

***62 Figure 4: But-for company share price**


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**Figure 5: But-for share price returns (normal returns)**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

***63** The figures also show why a simple before-and-after analysis can be misleading. In the hypothetical example shown, there was a decline in the overall market (the minor dashed lines) at around the same time as the event. The event study methodology takes this confounding factor into account explicitly to produce a better estimate of the but-for position (the dotted lines).

### C. *Estimate the Causal Effect of the Event*

The causal effect of the event is given by the difference between the actual share price and the but-for share price--or in terms of returns, the difference between the actual returns and the normal returns. This difference is commonly referred to as the 'abnormal return' or 'excess return'. It is indicated by the arrows in Figure 4 and Figure 5 above.

To continue the example above (in which the before-and-after estimate was a fall of 25%), if the market index declined by 10% on the same day (i.e. the market return was -10%), and the beta estimate was 1.2, then it is expected that the share price would normally have declined by 12% (i.e. 10% * 1.2) if the event did not occur. The abnormal return attributed to the event is -13% (i.e. the 12% normal return, less the 25% actual return).[21] This -13% is the component of the actual return that cannot be explained by the decline in the overall market. In this way, event studies can produce more accurate and reliable assessments of the effect of an event than those produced by a simplistic before-and-after analysis.

### D. *Perform Formal Tests for Statistical Significance*

The next step is to perform a formal statistical test to ascertain whether the estimated abnormal return is likely to be the result of random fluctuations in share prices or whether it is in fact due to the event. This is called a 'significance test', i.e., a statistical test of the hypothesis that the estimated abnormal return is equal to zero.[22]

If the result of the statistical test is that the abnormal return is *not* statistically significant, then this implies that (from a statistical perspective), there is not sufficiently strong evidence that the event had any effect. The event study methodology is therefore somewhat analogous to the burden of proof in law: there is a presumption of innocence (i.e., that the event did not have any effect) unless there is sufficiently compelling evidence of guilt (i.e., a statistically significant abnormal return).

***64** If, instead, the result of the statistical test is that the abnormal return *is* statistically significant, then it can be used as an estimate of the causal effect of the event on the share price, and on the equity value of the company. For example, if the market capitalisation of the company was $200 million just prior to the event and if the event study suggested that the abnormal return was minus 13%, then this represents a loss in equity value of $26 million.[23] This is a direct estimate of the market's assessment of the implications of the news (in this example, that there had been some fraudulent accounting) on the equity value of the company.

## IV. THE TREATMENT OF CONFOUNDING COMPANY-SPECIFIC NEWS EVENTS

In this section, we explain how confounding news events (which are one of the most commonly encountered practical and conceptual issues) can be addressed and what implications they have for the use and reliability of event studies for the purpose of assessing damages.

If there is some other company-specific news released around the same time as the event in question, then this can complicate the interpretation of the abnormal returns from an event study. Depending on the nature and timing of that confounding news, different approaches can be taken to address the problem, as we describe below.

PX352



WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

If the confounding news occurred *before* the event, then a question arises as to whether and to what extent the abnormal returns measured in the event study are due to any 'lingering effects' of this preceding news, instead of the event in question. For example, suppose that the hypothetical event discussed earlier in this note (the revelation of an accounting fraud at 10.00 on Wednesday, 6 November, 2019) was preceded by a press release at 16.00 on Tuesday, 5 November, 2019, stating that the company had been awarded a new contract with a large client. We would expect this 'good news' to cause the company's share price to increase. Some of that increase might occur with a delay (on the Wednesday) because it might take some time for investors to consider the news and act upon it--and if so, this lingering positive effect might offset and potentially conceal the true effect of the event the next day. In this example, one might be able to disentangle the two effects by considering intra-day movements in the share price on Tuesday evening and Wednesday morning, or the difference between the market closing price on Tuesday and the market opening price on Wednesday.

However, if the confounding news occurred *at the same time* as the event in question, then it is much more difficult to disentangle the effects. This is often the case when the event in question is announced as part of a broader release of information--for example, a periodic earnings announcement or the publication of an annual report. In such circumstances, the abnormal returns from the event study represent the 'net effect' of all the news contained in the announcement. Depending on the nature of that announcement, it might still be possible to disentangle the ***65** effects in an objective way, using a technique known as 'Quantitative Content Analysis'.[24] For example, if the announcement consists of two pieces of information--the first being the revelation of an accounting fraud and the second piece of 'bad news' being the unexpected loss of a significant customer--then one could perform a systematic review of the press coverage of this announcement to ascertain which of these two pieces of information were most influential, perhaps based on the number of times certain key words were used in that press coverage. The underlying principle of such an analysis is intuitive: the importance of a piece of news is related to the frequency with which it is reported.

If the confounding news occurred shortly *after* the event in question, then this can be far less problematic for the interpretation of the abnormal returns from the event study because, by definition, the effect of news always follows the announcement of the news. However, in practice this can restrict the amount of time over which the effect of the event in question can be observed, i.e., it can reduce the event window. For example, if the confounding news occurred at 10.00 on Friday, 8 November instead, then the abnormal returns of the event in question could only be considered for two days (Wednesday and Thursday), because the abnormal returns on Friday could be influenced by the confounding news.

These examples illustrate why the results of an event study should be considered very carefully, and by reference to a thorough review of relevant news around the time of the event.

## V. CONCLUSIONS

In this note, we have sought to explain what event studies are and how they can be used for the purpose of assessing damages in an arbitration. We believe that this technique can be used to provide intuitive and compelling quantitative evidence, relating to both liability and damages, in a wide range of disputes.

### Footnotes

a1 Meloria Meschi is Senior Managing Director at FTI Consulting.

d1 Ravi Kanabar is Senior Director at FTI Consulting.

1 For example, searching for the term "event study" on Google Scholar yields over 70,000 published articles.

2 Ray Ball & Philip Brown, *An Empirical Evaluation of Accounting Income Numbers,* 6 J. OF ACCT. RSCH. 159 (1968).

PX352

3 Eugene F. Fama et al., *The Adjustment of Stock Prices to New Information,* 10 INT'L ECON. REV. 1 (1969).

4 For example, new information subject to this methodology might include "earnings reports, dividend changes, stock splits, company press releases on current or projected revenues, regulatory rulings, acquisition bids, asset sales, tax legislation, or any other information that is relevant to investors' assessments of future cash flows". Frank Torchio, *Proper Event Study Analysis in Securities Litigation,* 35 J. OF CORP. L. 159, 160 (2009).

5 For readers interested in further details, we recommend the literature review in S. P. Khotari & Jerold B. Warner, *Econometrics of Event Studies*, *in* HANDBOOK OF CORPORATE FINANCE: EMPIRICAL CORPORATE FINANCE VOLUME 1 5, 5-36 (B. Espen Eckbo ed., 2006) and Jonah B. Gelbach et al., *Valid Inference in Single-Firm, Single-Event Studies*, 15 AM. L. & ECON. REV. 495, 495-541 (2013) for a specific application to securities fraud litigation.

6 Ball & Brown, *supra* note 2, at 160-161.

7 RICHARD A. BREALEY ET AL., PRINCIPLES OF CORPORATE FINANCE, 59-62 (5th ed. 1996).

8 Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work,* 25 J. OF FIN. 383 (1970).

9 Ball & Brown, *supra* note 2, at 160.

10 Event studies have also been redeployed to test for market efficiency by considering whether the speed and direction of market responses are consistent with what would be expected in an efficient market.

11 In *Halliburton Co. v. Erica P. John Fund Inc.,* 134 S. Ct. 2417, the Supreme Court ruled that "defendant must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." To this effect, the Court stated that defendants may present event studies.

12 *Cristallex v. International Corporation v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB(AF)/11/2. The Tribunal accepted an event study to determine the last clean date for the valuation noting that "the actual stock price of Crystallex became affected by the absence of positive news on permitting." (891)

13 We explain in Section 4 how such issues are accounted for using Quantitative Content Analysis.

14 Often there are a series of possible event dates. For example, if the information leaked incrementally in stages, each leak can be considered as a distinct event.

15 We assume for the purpose of this illustration that there is no confounding news. In practice, this might not be true, and we discuss in Section IV how confounding news events are treated.

16 In the example given previously, the daily return would be -25%, i.e. (60 - 80) / 80.

17 The simplest method is the before-and-after approach referred to above, in which the but-for returns are assumed to be equal to zero.

PX352


© 2024 Thomson Reuters. No claim to original U.S. Government Works.

18 For simplicity, we focus on this note on the market model. However, other methods in the literature include indices that take into account developments in the specific industries or countries in which the company operates, as well as a broad market index. These multiple factor models can sometimes improve on the accuracy and reliability of the results.

19 In particular, it assumes that there is generally a stable and linear relationship between the share price return on one hand and the return on a portfolio of shares that tracks the share market as a whole on the other. It also assumes that the event in question does not directly affect the market. If this assumption does not hold, for example, because the event has consequences that extend beyond the company to affect other companies, then more sophisticated statistical methods may be required.

20 A regression model expresses the relationship between one factor and another, using a mathematical equation. In mathematical terms, the market model is expressed using the following equation: $Share\ price\ return_t = \alpha + \beta(Market\ return_t) + error_t$. This equation implies that the return to a company's shares on day **t** is estimated as constant value (α, '*alpha*') plus an estimate of a coefficient (β, '*market beta*') multiplied by the return on the market index (the Market return) on the same day. There is also an error term, which reflects the extent to which the actual share price return differs from that predicted by the event model. The market beta describes the relationship between the market index returns and the company's share price returns. For example, if a company's market beta is equal to 1.2, then, if the market index were to increase by 1%, one would expect that the company's share price would increase by 1.2% (all else being equal). The values of alpha and beta are estimated using data for a period prior to the event, typically 120 trading days (approximately six months). These estimated values of alpha and market beta are then used in the equation above, together with the values of the market return at the relevant times, to calculate the normal returns.

21 In this example, we focus on the effect on the day of the event. Event studies can also be used to assess how the effect evolves over time, by estimating normal and abnormal returns on subsequent days, and cumulating these abnormal returns over time.

22 The statistic that is used to do so is called a 't-statistic'. The t-statistic measures the degree of confidence with which it can be inferred that the observed abnormal return is statistically different from zero. 5% is the most commonly used threshold for assessing statistical significance. T-statistics are calculated using complex but well-established formulae. If the result of this formal test is that the abnormal return is statically different from zero at the 5% significance level, the effect is said to be 'statistically significant'.

23 I.e. 13% of $200 million.

24 David Tabak, ***Making Assessments About Materiality Less Subjective Through** the **Use of Content Analysis***, NERA 7-10 (2007), https://www.nera.com/content/dam/nera/publications/archive1/PUB_Tabak_Content_Analysis_SEC1646-FINAL.pdf.

31 AMRIARB 55

End of Document © 2024 Thomson Reuters. No claim to original U.S. Government Works.

PX352

# PX 353

**62 B.C. L. Rev. 571**

**Boston College Law Review**
February, 2021

**Article**

Charles R. Korsmo [a1]

Copyright © 2021 by Charles R. Korsmo. All rights reserved.

# *571 INFORMATION BUNDLING, DISCLOSURE TIMING, AND JUDICIAL DEFERENCE TO MARKET VALUATIONS

| | |
|---|---|
| INTRODUCTION | 573 |
| I. THE USE OF MARKET REACTIONS IN LITIGATION | 578 |
| *A. Securities Fraud Litigation* | 578 |
| *B. Merger Litigation* | 583 |
| II. DISCLOSURE BUNDLING IN THE SECURITIES FRAUD CONTEXT | 590 |
| *A. The Incentive Effects of* Dura | 591 |
| *B. Empirical Evidence of Disclosure Bundling* | 593 |
| III. DISCLOSURE BUNDLING IN THE MERGER CONTEXT | 594 |
| *A. Disclosure Incentives in the Merger Context* | 594 |
| *B. Potential Empirical Evidence* | 599 |
| IV. POTENTIAL REGULATORY RESPONSES | 600 |
| *A. Private Ordering* | 600 |
| *B. The Traditional Role of Disclosure* | 602 |
| *C. Requiring Unbundled Disclosure* | 603 |
| V. POTENTIAL DOCTRINAL REFINEMENTS | 607 |
| *A. Refining* Dura's *Loss Causation Requirement* | 608 |
| *B. Using (and Rejecting) Market Evidence in Merger Litigation Valuation* | 610 |
| CONCLUSION | 612 |

***572 Abstract:** This Article examines strategic disclosure behavior in the context of merger announcements. Merger transactions are frequent targets of litigation, including both fiduciary duty class actions and statutory appraisal actions. In either type of litigation, the fair value of the target company as a going concern is at least a part of the measure of damages. In recent years, courts have increasingly looked to market evidence of valuation--including the trading price of the target company's stock prior to the announcement of the merger. This gives managers an incentive to minimize this trading price by strategically timing disclosures such that negative news is released prior to announcement of a merger while positive news is released simultaneously with or following a merger announcement. In many ways, the disclosure incentives managers face in the merger context mirror those they face in the securities fraud context. For years, securities fraud plaintiffs have typically been required to prove loss causation by using an event study to show a market decline upon corrective disclosure--a practice enshrined by the United States Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*. Managers can make this task more difficult by bundling corrective disclosures with other potentially material news. Combining the corrective disclosure with additional bad news can make it impossible to determine what portion of any resulting price drop to ascribe to the corrective disclosure. Combining the disclosure with offsetting good news can reduce or eliminate the price reaction altogether. These types of strategic disclosure behaviors have important implications for the design of federal disclosure rules and judicial doctrine. To the extent that courts and regulators ascribe legal significance to the market's reaction to information contained in corporate disclosures, those disclosures should be required to be made in a way that results in an informative market reaction. As such, this Article proposes that the Securities Exchange Commission should require several types of litigation-relevant information to be disclosed in standalone, unbundled fashion. In addition, this Article suggests refinements to judicial doctrine.

PX353

These refinements are designed to: (1) minimize the incentive for managers to employ opportunistic disclosure strategies; and (2) preserve the flexibility to employ non-market valuation evidence where market evidence has been corrupted or obscured.

***573 INTRODUCTION**

As a general rule, judges hate to perform financial valuations. They avoid it whenever possible. When faced with the need to calculate the value of a company, or of a piece of information relating to a company, judges are typically reluctant to attempt the kind of valuation calculations a securities analyst or investment professional might perform. Most would prefer to defer to the judgment of the market, when possible.

Although this reluctance is partly due in part to the legendary aversion of lawyers (including judges) to mathematics, it also reflects a wise sense of judicial modesty. [1] Few economic propositions are better established than that well-functioning securities markets, on average, perform far better at valuation than even the most sophisticated, motivated, and informed individuals. No doubt the advantages of market judgments are generally even greater vis-à-vis law-trained judges operating on information presented to them by adversarial litigants motivated by something other than the desire to reach an accurate, unbiased valuation.

Over the past several decades, judicial deference to market valuations has become increasingly formalized doctrinally. Perhaps most notably, for many years securities fraud plaintiffs have typically been required to prove loss causation by using an event study to show a market decline upon corrective disclosure of the alleged fraud--a practice enshrined by the United States Supreme Court's 2005 decision in *Dura Pharmaceuticals, Inc. v. Broudo*. [2] Rather than leaving it to a court to determine whether and how much a fraud injured investors by distorting the price of a security, plaintiffs must show that the market price itself reacted to the alleged fraud. The key to successfully doing so is the ability to detect a statistically significant abnormal movement in the relevant firm's stock price and to prove the price change was caused by the corrective disclosure rather than some other cause. [3]

Corporate managers, however, can make securities fraud plaintiffs' task more difficult--if not impossible--by strategic disclosure practices. Most obviously, they can “bundle” the corrective disclosure of a fraud together with other material news. Combining the corrective disclosure with additional bad news can make it impossible to determine what portion of ***574** any resulting price drop to ascribe to the corrective disclosure. Combining the disclosure with offsetting good news can reduce or eliminate the price reaction altogether. In either case, the “signal” of the market reaction to the revelation of the fraud will be obscured by the “noise” of the bundled information. This potential tactic for deterring securities fraud suits has been recognized in the academic literature [4] and subject to a number of empirical investigations. [5]

The literature is silent, however, with respect to the incentives of managers to engage in strategic disclosure practices surrounding merger transactions. Even in the absence of the threat of litigation, managers would have incentives to make an announced merger appear to be as good a deal as possible for the target stockholders. In part, the managers have a simple reputational interest in appearing to have secured a good price for the company. Further, managers must persuade stockholders that the deal price is attractive ***575** in order to secure the statutorily required stockholder approval. [6] As a result, managers have multiple incentives to have the merger take place at a large premium to the prevailing stock price prior to the announcement of the deal.

The possibility of litigation only heightens these incentives. Merger transactions are frequent targets of litigation, both fiduciary duty actions and statutory appraisal actions. Fiduciary duty actions are generally brought as a class, and these actions typically argue that the directors of the target company breached their duties of care or loyalty, resulting in a deal price that is lower than it otherwise would have been. [7] Appraisal is a statutory remedy allowing a stockholder to dissent from a merger and seek a judicial determination of the “fair value” of their stock. [8] To be successful at the end of the day, either type of claim requires a finding that the merger price was below fair value (though the approach to calculating fair value may be somewhat different in the two types of actions). In either type of litigation, the fair value of the target company as a going concern is at least a part of the measure of damages. Indeed, valuation cannot be avoided in appraisal litigation, where the fair value of the petitioner's stock is the sole merits issue. [9]

PX353

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

Like securities fraud litigation, merger litigation has seen courts increasingly look to market evidence in addition to--or even in lieu of-- performing their own valuation calculations. This doctrinal trend is most pronounced in appraisal. In Delaware, the leading corporate law jurisdiction and the venue for the bulk of appraisal activity, [10] the courts have responded ***576** to a spike in appraisal activity by increasingly eschewing traditional valuation methodologies (such as a discounted cash flow (DCF) analysis) in favor of deference to market evidence.

Traditionally, Delaware courts seek to award appraisal petitioners their "proportionate interest in [the] going concern" [11] --that is, their pro rata share of the value of the company as a going concern in the absence of the merger. The pre-announcement trading price of the target company's stock is a natural place to start in determining the company's going-concern value. After all, the stock price represents the market's judgment as to the value of the individual fractionalized equity interests--the shares of stock--in the company. And indeed, the Delaware courts, although thus far eschewing any general presumption, have increasingly looked to the pre-announcement trading price of the target company as persuasive evidence--or even dispositive evidence--of fair value. [12] This litigation dynamic heightens management's incentive to increase the size of the merger premium by pushing down the pre-announcement trading price.

Management has a wide array of potential tools for managing the pre-announcement price. Perhaps the simplest, however, is to simply time the announcement of the merger with the announcement of quarterly earnings. Management generally has ample discretion to time the signing of a merger agreement--and thus the accompanying disclosure. Likewise, the timing of quarterly earnings announcements is flexible.

Where the earnings news is negative--that is, where the news likely will lower the stock price and increase the merger premium--management may prefer to release the earnings news prior to announcing the merger, giving the market time to react to the negative news. Where earnings news is positive--that is, where it will likely raise the stock price and reduce the merger premium-- managers may instead choose to either bundle the earnings announcement with the merger announcement, or simply delay the earnings announcement until after the merger is announced. Either way, the ***577** market will not have a chance to react to the positive earnings before the merger price largely determines the trading price.

In either case, timing the disclosures makes life more difficult for potential plaintiffs and may deter litigation altogether. In the instance of early release of negative news, this is not particularly troubling--it allows the market to value the news prior to announcement of the merger. Delayed release of positive news, however, is potentially problematic. It ensures that the pre-announcement price does not incorporate the value of the positive information, and it thus makes the price less informative as to the standalone value of the company at the time.

In this Article, I extend the existing literature in two ways. First, I expand the prior literature on disclosure bundling in the securities fraud context to the merger context, analyzing how developments in Delaware doctrine have increased the incentive for management to bundle or time disclosures around merger announcements. Much as the early articles on disclosure bundling in the securities fraud context triggered numerous empirical studies, the analysis here identifies several potential targets for empirical investigation in the merger context. In particular, researchers should examine whether negative earnings are more likely to be disclosed prior to a merger announcement than positive earnings and whether this tendency has shifted in response to exogenous changes that make merger-related litigation more or less likely.

Second, earlier work on disclosure bundling was largely content to analyze the phenomenon. Although several authors implicitly suggested that *Dura*'s loss causation rule is sub-optimal and created perverse incentives, [13] they stopped short of specific doctrinal or regulatory prescriptions. In this Article, I more fully explore the significant implications of disclosure bundling and timing for the design of disclosure rules and judicial doctrine.

The guiding principle is straightforward. To the extent courts and regulators ascribe legal significance to market reactions to information contained in corporate disclosures, disclosures should be made in a way that results in a more informative market reaction. In particular, it may make sense to require that certain types of material information clearly relevant to litigation--such as corrective disclosures or merger announcements--be made in isolation, rather than bundled with other material disclosures. At a minimum, defendants who have obscured market signals via disclosure bundling or timing should not be permitted by courts to rely on those market signals (or lack thereof) as a defense. These proposals entail amending the loss causation rules announced in *Dura*, as well as refinements of Delaware's ***578** emerging appraisal jurisprudence. These reforms would impose

PX353

minimal burdens on issuers, while enhancing the quality of market information available to courts adjudicating securities fraud and merger claims and promoting the pricing efficiency of securities markets in general.

This paper proceeds in five parts. Part I briefly traces the doctrinal developments whereby courts have increasingly deferred to markets in valuation-related matters. [14] Part II introduces the prior literature on strategic disclosure bundling in securities fraud cases. [15] Part III extends the analysis to merger litigation, considering the possible forms of strategic disclosure bundling and timing. [16] Part IV suggests potential reforms to disclosure regulation to prevent the harmful disclosure practices that Parts II and III canvass. [17] Part V suggests doctrinal changes and refinements to minimize the incentives for strategic disclosure bundling and timing as well as to minimize the mischief caused when they occur. [18]

## I. THE USE OF MARKET REACTIONS IN LITIGATION

Although market-based evidence is potentially relevant in many types of litigation, it is particularly pertinent in securities fraud and merger litigation, and its use in these contexts has been enshrined in judicial doctrine. As such, this Part restricts itself to considering the reliance of courts on market evidence in these two contexts. [19] Specifically, Section A discusses market-based evidence in the context of securities fraud litigation, [20] and Section B examines market-based evidence in the context of merger litigation. [21]

### *A. Securities Fraud Litigation*

The modern securities fraud class action is, as the United States Supreme Court noted long ago, "a judicial oak which has grown from little more than a legislative acorn." [22] Though rooted in Section 10(b) [23] of the Securities Exchange Act of 1934, [24] neither the statute nor the Securities and ***579** Exchange Commission's (SEC) Rule 10b-5 implementing the statute create an express private cause of action. [25] Instead, starting in the 1940s, federal courts have recognized and shaped an implied cause of action. [26] Both the statute and the implementing rule are brief, catch-all provisions barring manipulation or deceit in connection with the purchase or sale of securities. [27]

Given these circumstances, it is perhaps unsurprising that courts have taken an essentially common law approach to doctrinal development. [28] Likewise, it is natural that courts have drawn on analogy to the common law tort of fraud in crafting the elements of securities fraud: materiality, scienter, reliance, and loss causation. [29] The tort analogy invites courts to assess a fraudulent statement in a securities fraud case in much the same way as in a case involving the sale of ordinary goods, such as a used car. That is, the court could assess materiality of a false statement of fact by asking ***580** whether "its existence or nonexistence is a matter to which a reasonable [person] would attach importance in determining [their] choice of action in the transaction in question." [30] The court could then assess reliance and causation by asking whether the plaintiff's "justifiable reliance upon the misrepresentation [was] a substantial factor in determining the course of conduct which result[ed] in [their] loss." [31] "Out-of-pocket" damages could then be calculated. [32]

In theory, these elements would ask the court to make direct judgments as to materiality and reliance. The measure of damages would also require the judge to directly calculate the "value" of the fraudulent information. Indeed, courts have long defined damages in securities fraud actions as "the difference between the price paid and the 'real' value of the security, *i.e.*, the fair market value absent the misrepresentations, at the time of the initial purchase." [33] This would seem to require the court to perform two valuations--the "true value" of the securities and the value of the securities if the fraudulent statements were true. [34]

In practice, these inquiries are both muddied and simplified by the nature of impersonal public securities markets:

> Such markets differ from more familiar markets for consumer goods and services where the common law of fraud developed, in that (1) prices are set by impersonal market mechanisms, rather than by face-to-face bargaining; and



WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

(2) securities are typically not being purchased for any form of personal consumption, instead of or in addition to for investment and resale. [35]

***581** The nature of reliance is somewhat muddied and the distinctions among the elements blurred. At the same time, however, questions of materiality, loss causation, and damages are potentially simplified by the ability to outsource inquiries to the market: Did the market regard the information as material? How did the market calculate the value of the misrepresentation? Indeed, an influential 1982 article argued "that there is no need in a[n open-market] securities fraud case for separate inquiries into materiality, reliance, causation, and damages"--the only "inquiry in open-market transactions should be whether the market price was in fact artificially affected by false information." [36]

Although the courts have not fully embraced a move away from the traditional elements of deceit in favor of a catch-all "market impact" inquiry, they have nonetheless gone a long way in that direction. For each element, courts now look largely, if not exclusively, to market impact as definitive evidence. First, and most famously, in 1988, the Supreme Court in *Basic Inc. v. Levinson* embraced the "fraud-on-the-market" presumption, effectively doing away with the reliance requirement by allowing it to be presumed for stocks traded on well-developed markets. [37] The Court reasoned that investors buying and selling stock "at the price set by the market do[] so in reliance on the integrity of that price" [38] and that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." [39] This approach necessarily puts the market impact of allegedly fraudulent statements front and center--if the market price was not distorted, the logic of *Basic* does not apply. [40]

Market impact has become the key inquiry for the other elements as well in the wake of *Basic*. [41] Courts have found market tests attractive because ***582** "they provide a convenient and reliable market test of all the elements of a Rule 10b-5 fraud action: reliance, materiality, causation, and the level of damages are evident in market reaction when the corrective information hits the market." [42] In *Dura Pharmaceuticals, Inc. v. Broudo*, the Supreme Court held that plaintiffs, in order to show loss causation, needed to show not only that the fraudulent information inflated the market price, but also that revelation of the truth caused the price to fall, injuring the plaintiffs. [43] In practice, this means that plaintiffs must allege--and ultimately prove--an impact on market price "both at the time of the misrepresentation and on the alleged corrective disclosure date." [44] In the wake of *Dura*, in 2014, the United States Court of Appeals for the First Circuit has noted that "[t]he usual--it is fair to say 'preferred'--method of proving loss causation in a securities fraud case is through an event study" showing a statistically significant price reaction to a corrective disclosure. [45]

Following *Basic* (and *Dura*), it is difficult to separate clearly the loss causation analysis from the other elements, all of which also turn on market impact. For materiality, rather than engage in the tradition abstract consideration of whether a piece of information is likely to be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," [46] courts now typically defer to the market itself. Changes in market prices are a direct reflection of what investors consider significant. If a fraudulent statement--or the emergence of the truth--has a measurable impact on the market price, courts treat it as strong evidence the fraudulent statement was material. [47] Conversely, the absence of any measurable price reaction is strong evidence of immateriality. [48]

***583** Courts also rely on market impact to establish economic loss and calculate damages. If the plaintiffs are unable to show any impact of the fraud on market prices, they will be unable to show they suffered an economic loss. Where plaintiffs can show such an impact, the extent of the change in market price will generally be the measure of damages. Courts routinely reject attempts to establish damages by valuing information directly, rather than by conducting an event study to determine market impact. [49]

In sum, if plaintiffs are ultimately unable to prove that a fraudulent statement had an impact on the market price, their claims will inevitably fail. Modern judicial practice requires plaintiffs to tie a price impact to the alleged fraud to establish materiality, loss causation, economic loss and damages, and even a presumption of reliance.


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

***B. Merger Litigation***

Market evidence of value also plays an increasingly large role in merger litigation. Stockholders seeking to challenge a merger transaction have two primary options for doing so. The first is the traditional fiduciary duty class action, wherein the plaintiffs allege that the officers and/or directors breached one or more of their fiduciary duties in the course of entering into the merger transaction.[50] The second is an appraisal action. Appraisal is a statutory action[51] allowing a stockholder to dissent from a merger, forgoing the merger consideration and instead filing a judicial proceeding to calculate the "fair value" of the dissenter's stock.[52]

***584** In both types of action, the fair value of the target company is generally the key variable in determining damages. Although courts in fiduciary duty class actions have broad equitable powers to craft appropriate remedies, the starting point is out-of-pocket loss as measured by the difference between the "fair value" of the plaintiffs' shares and the deal price.[53] Thus, at the damages stage, a fiduciary duty class action becomes largely indistinguishable from an appraisal action, where the fair value of the target company is the *only* merits issue.[54] Indeed, Delaware courts often refer to cash damages in a merger class action as a "quasi-appraisal" remedy.[55] The question ***585** of how to define "fair value" in appraisal is thus significant in both types of merger litigation.

Delaware courts have long held that appraisal petitioners are entitled to receive the "true or intrinsic value of [their] stock which has been taken by the merger," which is found by calculating the petitioners' "proportionate interest in a going concern."[56] That is, an appraisal petitioner holding 1% of the outstanding shares would be entitled to 1% of the value of company as a standalone entity as of the closing date of the merger, excluding any gain in value--such as potential synergies--from the merger itself.[57] As a result, the fair value of the target company on a standalone basis is the key issue in appraisal.

Because so few merger class actions reach the damages phase, it is primarily in appraisal that Delaware courts have developed their approach to calculating fair value.[58] Until the 1980s, Delaware had long employed ***586** what came to be known as the "Delaware block method"[59] (DBM), which entailed a fairly robotic calculation with three inputs: (1) the value of the company's assets, (2) the capitalized value of the company's average earnings over the past five years, and (3) the company's market value.[60] Although the court could weigh the three inputs as it saw fit, the method came to be seen as too restrictive with the rise of modern finance. Ultimately the Delaware Supreme Court moved away from the method in 1983 in the landmark case *Weinberger v. UOP, Inc.*, holding that, to the extent it "excludes other generally accepted techniques used in the financial community and the courts, it is now clearly outmoded."[61]

In particular, the DBM had precluded the use of the forward-looking DCF methodology--one of the most common and theoretically sound valuation methodologies employed by actual investment professionals.[62] The DCF methodology entails projecting the future cash flows of the company and discounting them back to present value.[63] In the wake of *Weinberger*, the DCF methodology quickly became the preferred valuation tool in Delaware and other courts.[64]

***587** The past few years have seen a shift in the Delaware courts' approach to valuation in appraisal. This shift has come, at least in part, in reaction to a dramatic increase in the level of appraisal activity and, in particular, in appraisal cases involving publicly traded target companies.[65] Although the Delaware courts had occasionally expressed trepidation about the reliability of their valuation calculations,[66] this self-doubt waxed as the volume of appraisal litigation spiked.[67]

Burdened by these doubts, and often facing competing expert DCF valuations reaching wildly different conclusions,[68] judges looked for a way ***588** out. One appealing way out was to look to the deal price itself as the best evidence of fair value. After all, for most kinds of assets, the best measure of financial value is simply the price that a willing buyer and willing seller would agree upon in the absence of compulsion.[69] As one frustrated Vice Chancellor concluded, "A law-trained judge ... would have no reason to second-guess the market price absent demonstration of self-dealing or a flawed sales process."[70] In a string of

PX353

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

opinions, the Delaware Court of Chancery found fair value to be equal to the negotiated deal price, where petitioners were unable to show that the deal process was sufficiently flawed.[71]

Ultimately, three recent Delaware Supreme Court decisions--involving Dell, DFC Global, and Aruba Networks--endorsed reliance on the deal price in the presence of an adequate sales process.[72] In 2017, in *DFC Global Corp. v. Muirfield Value Partners, L.P.*, the Delaware Supreme Court noted that "an economist would find that the fair market value of a company is what it would sell for when there is a willing buyer and willing seller without any compulsion to buy."[73] It went on to note that it had "little ***589** quibble with the economic argument that the price of a merger that results from a robust market check, against the back drop of a rich information base and a welcoming environment for potential buyers, is probative of the company's fair value."[74] It further cautioned that "second-guessing the value arrived upon by the collective views of many sophisticated parties with a real stake in the matter is hazardous."[75] In the face of statutory language requiring the courts to consider "all relevant factors" in determining fair value, the Delaware Supreme Court declined to create a judicial presumption that deal price equals fair value.[76] Nonetheless, in all three cases, the court found the deal price to deserve heavy or exclusive weight in determining fair value.[77]

In none of the three cases did the Delaware Supreme Court attempt to craft a general definition of when a process would lead to a deal price sufficiently reliable to justify judicial deference as to fair value.[78] In 2017, in both *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd*. and *DFC Global Corp. v. Muirfield Value Partners, L.P.*, however, the Delaware Supreme Court overruled trial court opinions that found the sales process was too flawed to generate a reliable deal price.[79] The strong message to the trial judges was that they courted reversal if they failed to sufficiently consider market valuation evidence.[80]

In the wake of these opinions from the Delaware Supreme Court, the Delaware Court of Chancery has, unsurprisingly, continued to defer to the ***590** negotiated deal price in many appraisal cases.[81] In a handful of cases, the trial courts have gone further. As noted above, fair value is to exclude prospective values associated with the merger, including synergies.[82] Reasoning that the negotiated deal price may itself reflect the value of expected synergies, the Delaware Supreme Court noted that the pre-announcement market trading price may be probative evidence of fair value.[83] Even in 2019, *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.*, where the Delaware Supreme Court overruled a trial court decision deferring to the pre-announcement price, it did so due to evidentiary concerns, suggesting that, in the right case, deference to pre-announcement prices may be appropriate.[84] So far, one trial court has taken up the invitation, awarding the pre-announcement market trading price to petitioners.[85] Others have acknowledged the evidentiary value of the pre-announcement price, even as they ultimately deferred to the deal price instead.[86]

Though the Delaware courts have not had recent occasion to opine on the relevance of market data in fiduciary duty class actions, in light of recent appraisal decisions it is reasonable to surmise that, all else being equal, a deal price is more likely to be considered "fair" if it is substantially above the pre-announcement trading price.

## II. DISCLOSURE BUNDLING IN THE SECURITIES FRAUD CONTEXT

In the wake of *Dura Pharmaceuticals, Inc. v. Broudo*, commentators quickly noted that the United States Supreme Court's loss causation rules would give unscrupulous managers an incentive to engage in strategic disclosure practices to obscure market reactions to corrective disclosures--in particular, bundling corrective disclosures with other material information. More recently, several empirical investigations have sought to investigate the prevalence of strategic disclosure bundling, and its effectiveness at deterring litigation. This Part provides a brief overview of this literature.[87] Section A discusses scholarship pertaining to the incentive effects of *Dura* ***591** .[88] Section B explores empirical studies pertaining to disclosure bundling.[89]

### *A. The Incentive Effects of* Dura

Following *Dura*, Professor James Spindler pointed out that, under many plausible circumstances, *Dura's* requirement of an ex post market decline will under-deter fraud:

PX353

> [T]he *ex post* rule excludes from recovery three cases of fraud: (1) when the lie is about a contingency that resolves favorably; (2) the contingency resolves unfavorably, but is bundled with positive news of projects that make up for it; and (3) the contingency resolves unfavorably, but is bundled with negative news of exogenous events that would have caused the loss anyhow. [90]

Because this Article's concern is strategic disclosure bundling and timing, I pass over the first scenario [91] and focus on the second and third. [92] As an example of the second, consider a firm where management had fraudulently claimed that a given project--worth $1 billion if successful--had a 50% chance of success when in fact they knew it really only had a 25% chance of success. The lie inflates the market price by $250 million. When the project fails, however, the fraud is revealed. If management, however, bundles disclosure of the failure and fraud together with news that another project has been unexpectedly successful to the tune of $500 million, the market price will actually go up. The offsetting positive news obscures the ***592** market reaction to revelation of the fraud, making it impossible for plaintiffs to show an ex post market decline. [93]

The third scenario also involves obscuring the market reaction, this time by bundling the corrective disclosure with other negative news. Consider again the same example of management fraudulently claiming a 50% chance of success for a $1 billion project that in reality has only a 25% chance of success. Again, the project fails and the fraud is on the cusp of being revealed. This time, however, management bundles the disclosure with news that another $1 billion project, which management had *truthfully* claimed had a 15% chance of success, has also failed. In this scenario, the corrective disclosure will be accompanied by a market drop, but it will be difficult or impossible for a plaintiff to prove what portion of the drop to ascribe to the fraudulent project as opposed to the honest failure. [94]

The difficulty in both scenarios is that the event study methodology favored post-*Dura* is generally unable to discern the independent price impacts of bundled news. [95] Although tools exist for attempting to tease apart the price impacts of simultaneous events, [96] "[w]hen multiple sources of news are released at exactly the same time ... no event study can by itself separate out the effects of the different news." [97] As a result, "judicial reliance on event studies creates an incentive for issuers and corporate officials to bundle corrective disclosures with other information in a single press release ***593** or filing." [98] Of course, the greater management's discretion to time disclosures, the greater their ability to engage in such bundling.

### *B. Empirical Evidence of Disclosure Bundling*

Recently, empirical studies have found evidence that managers have indeed responded to doctrinal developments by more often engaging in strategic disclosure bundling. As predicted, the evidence also suggests that bundling is often effective at deterring securities fraud litigation and makes it easier to get claims dismissed when they are brought. [99]

A 2016 study by Barbara A. Bliss, Frank Partnoy, and Michael Furchtgott examined bundling of both positive and negative information when a firm releases a restatement. [100] As discussed above, bundling in positive information can offset any decline associated with the restatement, making it impossible to satisfy *Dura*'s loss causation requirement. Bundling in additional negative information, meanwhile, will magnify the resulting market impact, but make it impossible to determine how much of the impact to ascribe to the restatement. [101] The study used the *Dura* decision as an exogenous shock. Prior to *Dura*, the United States Courts of Appeals for the Eighth and Ninth Circuits allowed plaintiffs to survive a motion to dismiss by simply asserting that alleged misstatements inflated the stock price. *Dura* forced these circuits into alignment with the rest of the country. [102] The authors found that positive and negative bundling were both effective at avoiding litigation pre- and post-*Dura* in most circuits [103] and became dramatically ***594** more effective in the Eighth and Ninth Circuits following *Dura*. [104] Moreover, they found that when restatements led to a lawsuit, cases involving bundled restatements were more likely to be dismissed and led to lower average settlement values. [105]

PX353

A 2015 study by two of the same authors, Michael Furchtgott and Frank Partnoy, examined whether firms were more likely to engage in bundling post-*Dura*. [106] Again, the authors used the Eighth and Ninth Circuits--where the *Dura* decision had worked a sudden change in the law--as their testing ground. In sum, they found that large firms--those most likely to be targeted in securities fraud actions--"were more likely to bundle news [with restatements] than they were before" *Dura*." [107] Moreover, "firms based in the jurisdictions of the Eighth and Ninth Circuits (whose loss causation standards were overturned in *Dura*) changed their disclosure behaviors more than firms in other locations." [108]

## III. DISCLOSURE BUNDLING IN THE MERGER CONTEXT

Whereas the literature on disclosure bundling has focused on the securities fraud context, bundling and strategic timing are perhaps even more likely in the merger context. Section A of this Part describes management's incentives and ability to engage in strategic disclosure practices surrounding a merger. [109] Section B provides preliminary empirical evidence that managers do, in fact, engage in such practices. [110]

### *A. Disclosure Incentives in the Merger Context*

Even if the pre-announcement market price and the size of the merger premium were irrelevant in litigation, managers would still have an incentive to make the merger premium look as large as possible. A merger must be approved by a majority vote of the target company's stockholders. [111] Managers may, quite sensibly, believe that a larger premium will make stockholder approval ***595** more likely and a smaller premium may make stockholder approval more challenging. [112]

Litigation risk only heightens these incentives. As detailed in Part I, judges in merger litigation increasingly look to market pricing as evidence of fair value, or as a "reality check" on valuations arrived at by other methodologies, such as a DCF analysis. [113] This is especially so in appraisal litigation. In recent cases, this has commonly resulted in courts deferring to the prices set by the deal market--the merger price itself. Occasionally, however, courts have also looked to the pre-announcement market trading price, particularly where there may be substantial synergistic value incorporated in the merger price. [114]

As a result, a large merger premium--the amount by which the merger consideration exceeds the pre-announcement price--can make it more difficult to establish a fair value above the deal price, thus serving as a deterrent to litigation. Indeed, in fiduciary duty litigation, Delaware courts, although they have repeatedly noted both that the *lack* of a substantial merger premium does not necessarily mean a deal price is unfair [115] and that the presence of a large premium does not necessarily establish fairness, [116] nonetheless ***596** frequently point to the presence of a substantial merger premium as *suggestive* of fairness. [117] As the Delaware Court of Chancery summarized, "Delaware law recognizes that, although market price should be considered in an appraisal, the market price of shares is not always indicative of fair value." [118] Even where courts do not explicitly place weight upon the market price, it may--consciously or otherwise--serve as a reference point anchoring the ultimate valuation. [119] In general, a larger merger premium will make a plaintiff's success at trial more difficult and may deter litigation altogether. [120]

If managers are afraid that a soon-to-be-announced merger is at an inadequate premium to the merger price, perhaps the most straightforward way to increase the premium is to release bad news prior to the announcement of the merger, driving the stock price lower. Similarly, the managers would want to delay release of any good news until after (or simultaneous with) the merger announcement, avoiding the risk of the stock price rising to near or above the merger price.

***597** Managers have a great deal of flexibility to time their disclosures in this fashion, particularly with respect to one of the most common types of good or bad news: quarterly earnings announcements. Quarterly earnings need not be released on a fixed schedule. Instead, most companies have a forty-day window from the end of their fiscal quarter during which to report their quarterly earnings on Form 10-Q. [121] Even this loose deadline can be extended by filing an NT 10-Q untimely filing form. [122] Similarly, depending on the dynamics of the merger process, the parties may have substantial flexibility in deciding when to announce the deal publicly. In fact, it is extremely common for the parties to a merger to bundle together the deal announcement with an earnings release, making it difficult or impossible to disentangle the market's reaction to the two pieces of material information. [123]

PX353

The recent 2019 *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.* appraisal case provides a nice example of how managers might respond to this mix of litigation and non-litigation incentives by using their ability to strategically time and bundle disclosures. In early 2015, Hewlett- ***598** Packard was in confidential negotiations to acquire Aruba Networks and made an offer of $23.25 per share. [124] While the offer was pending, analyst opinion of Aruba was largely negative, expecting reduced earnings going forward, and the stock price languished around sixteen dollars per share. [125] Internally, however, Aruba management knew that the company was "having an excellent quarter and would beat its guidance." [126] Nonetheless, Aruba management was determined to delay release of the positive earnings news until announcement of the merger. [127] Ultimately, the earnings and merger announcement were bundled together, and HP apparently leaked news of the merger a day early to further muddy the market reaction to Aruba's positive earnings. [128]

Aruba's management was apparently motivated both by litigation and non-litigation factors. As for non-litigation factors, "Aruba management believed that an increase in the stock price would hurt their chances of getting the deal approved." [129] At the same time, Aruba and Hewlett-Packard's management hoped to "blur the market's reaction to Aruba's strong quarterly results" [130] in a way the Delaware Supreme Court noted "might make it difficult for an expert to disentangle ... for purposes of an event study." [131] Indeed, bankers at Qatalyst--one of Aruba's deal advisors-- "speculated internally that HP had leaked the news [of the deal] so that Aruba's 'results and subsequent stock price reaction won't be easy to measure.'" [132]

### *599 *B. Potential Empirical Evidence*

It would be a relatively straightforward matter to test empirically whether parties to a merger engage in strategic bundling or timing of disclosures. One simple test would be to examine the timing of merger and earnings announcements. As noted above, the folk wisdom is that management often like to announce earnings in concert with a merger. One potential motivation for such bundling would be to bury especially bad earnings news by combining it with the (typically) good news of a merger. The incentives discussed above, however, point in the opposite direction. All else being equal, managers would like the merger to be as large a premium as possible to the pre-announcement trading price. The more likely the merger is to be the subject of either litigation or a contested stockholder vote, the stronger these countervailing incentives.

As a result, I would expect that the more likely litigation or a contested stockholder vote are, the less likely that negative earnings news would be bundled, and the more likely it would be released prior to the earnings announcement. The release of the negative earnings news in advance of the merger announcement would drive down the market price and maximize the apparent attractiveness of the merger premium. At the same time, I would expect that the more likely litigation or a contested stockholder vote are, the more likely positive earnings news would be released simultaneously with or after the merger announcement. Doing so would avoid an inconvenient increase in the trading price and correspondingly smaller merger premium.

Testing these propositions should be relatively simple. The hypothesis would be that the higher the litigation/approval risk, the greater the likelihood that negative earnings results are released before, and positive earnings simultaneously or after, a merger announcement. Testing this hypothesis would require an investigator to examine merger announcements and the nearest earnings announcement by the target company. The investigator would then need to characterize the earnings announcement as positive or negative by assessing whether it exceeded or fell short of analyst expectations. The investigator would also need to quantify the level of litigation/stockholder approval risk. [133] Finally, the investigator would calculate the relationship between this risk and the timing of earnings announcements.

## *600 IV. POTENTIAL REGULATORY RESPONSES

Earlier scholarship on disclosure bundling has been largely content to describe the issue. To the extent reforms are proposed, they have mostly been restricted to the tacit implication that *Dura Pharmaceuticals, Inc. v. Broudo*'s loss causation rules ought to be reconsidered. [134] In Parts IV and V, I provide more concrete proposals. [135] This Part considers potential regulatory responses to disclosure bundling and strategic disclosure timing--in particular, whether the SEC could and should require "unbundled" disclosures in certain contexts. [136] It consists of three sections. Section A considers the extent to which private ordering can be

PX353

expected to ameliorate strategic disclosure practices. [137] Section B reviews whether an unbundling requirement would conflict with the traditional design of SEC disclosure requirements. [138] Section C examines the potential design of unbundling rules. [139]

In short, I conclude (1) that private ordering is unlikely to be effective; (2) that unbundling rules would be a somewhat awkward fit with traditional SEC disclosure rules; and (3) that, nonetheless, there may be a role for disclosure unbundling rules. The limited potential for unbundling rules, however, means they will need to be supplemented by doctrinal modifications, which Part V discusses. [140]

### *A. Private Ordering*

Regulatory action would be unnecessary if private ordering could be expected to provide efficient incentives for management to refrain from strategic disclosure practices. It is theoretically possible that market incentives would encourage management to credibly commit to unbundled disclosures. As Parts II and III discuss, strategic disclosure practices appear to effectively allow managers to escape liability for securities fraud or a breach of a fiduciary duty. [141] The market may, therefore, discount the price ***601** of shares in firms that retain the ability to engage in such practices. Conversely, if a firm's managers can credibly commit that they will not engage in such practices, that firm's shares should be able to command a premium relative to other firms. [142] Because managers, in general, benefit from higher market valuations of the firms they manage, this dynamic could give them an incentive to commit to forbearing from abusive disclosure practices. [143]

The questions, then, are whether it is easy to credibly commit to unbundled disclosures and how powerful the incentives are to do so. Unfortunately, the answers to these two questions are intertwined and appear to be "no" and "not very," respectively. Taking the securities fraud context first, the main difficulty is that management itself will generally be the only party that knows when a material corrective disclosure is warranted. But at the time that happens, the possibility of avoiding securities fraud liability--which typically entails direct, personal liability for the managers--will almost always significantly outweigh any indirect, theoretical benefits from maintaining a credible commitment to unbundled disclosures. [144] Any suit for a breach of the promise to maintain unbundled disclosures would face the same evidentiary problems as the underlying securities fraud suit.

Management's incentives are even worse in the merger context. Mergers are, in game-theoretic terms, a "final period" decision. [145] Following a merger, the target company's stock will no longer trade and the managers will be cashed out along with the stockholders. As a result, market discipline ***602** of managerial opportunism melts away in the merger context. [146] By the time a merger agreement is in hand, the value to management of maintaining a credible commitment to wholesome disclosure practices is effectively zero. As a result, private ordering is unlikely to be effective. [147]

### *B. The Traditional Role of Disclosure*

"[F]ederal securities regulation has three principal components: (1) mandatory disclosure [requirements]; (2) prohibitions on securities fraud; and (3) restrictions on insider trading." [148] The key source of disclosure requirements is Regulation S-K, which has been promulgated by the SEC under the authority of the Securities Act of 1933. [149] Regulation S-K requires regular disclosure of numerous types of information, including both quantitative financial metrics and qualitative descriptions of the firm's business and assets. Other disclosure requirements are continuous. In particular, Form 8-K requires firms to promptly disclose--within four business days--certain types of material events. [150]

Historically, disclosure requirements have often been spoken of in terms of investor protection. The emerging consensus, however, is that investors can best protect themselves by simply ensuring the market has the information it needs to value securities accurately. [151] As a result, the primary goal of disclosure regulation is making sure the disclosures provide the market with the necessary information in as close to real time as possible. Sophisticated investors can then use that information to value the relevant securities, simultaneously protecting ordinary investors and promoting efficient ***603** allocation of capital. [152] Any rule requiring unbundled disclosure would be at least somewhat in tension with the goal of prompt disclosure of material information. Often, a firm will come into possession of multiple pieces of material information simultaneously. In

PX353

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

such circumstances, unbundled disclosure would require deliberately delaying disclosure of some information. The result is an inevitable trade-off of a requirement of unbundled disclosures and a requirement of prompt disclosure of new information.

Nonetheless, the conflict should not be overstated. Form 8-K already provides firms with the flexibility to delay the release of new material information by four days, and earnings releases--chock-full of material information--may be made at any time within a multi-week window. [153] Deterring securities fraud is also one of the core functions of securities regulation. A narrowly drawn unbundling rule may help to do so without unduly delaying the market's receipt of material information. Similarly, although the corporate governance concerns surrounding mergers are not a traditional focus of federal securities law, as Section C discusses, the necessary alterations to existing disclosure requirements would be minimal.

### *C. Requiring Unbundled Disclosure*

A rule that all material disclosures be unbundled is manifestly unworkable and would likely generate more problems than it solves. What is required to prevent opportunistic bundling of information, however, is much more limited. The guiding principle is straightforward: if market evidence is to be determinative at trial, measures should be taken to ensure that the market evidence is as clear and reliable as possible. As such, ideally, issuers would be required to make all corrective disclosures individually, disaggregated from other material information, such that the market reaction can provide a clear measure of the revealed fraud, unmuddied by bundled disclosures. The difficulty with such a requirement is two-fold: (1) that it would often require release of material information to be delayed; and (2) that it is difficult to clearly define "corrective disclosure."

The first difficulty is not so serious. It is certainly the case that where a firm comes into possession of multiple pieces of material information simultaneously, some corrective of earlier misstatements and some not, disclosure of one or more pieces of information would have to be delayed to release the corrective disclosure on its own. Yet, this is not out of the ordinary. As noted above, even the 8-K continuous disclosure obligations only require new information to be disclosed within four business days. This window ***604** provides ample room to separate corrective from non-corrective disclosures. Indeed, even for relatively complex information, the market reaction is often almost immediate, with prices reaching a new equilibrium in a matter of seconds or minutes. [154] As long as the corrective disclosure is made separately, it would rarely be problematic to release other information even later in the same day.

The second difficulty is more serious. The problem is two-fold. First, managers are rarely able and willing to simply admit that earlier misstatements are fraudulent. Second, the truth will often emerge in drips and drabs, with the market gradually decreasing the probability it attributes to the truth of a misstatement, thus muting the ultimate market impact of any eventual corrective disclosure. As a result, even though *Dura* ties the loss causation requirement to market impact upon a corrective disclosure, the lower courts have struggled to determine what exactly constitutes a corrective disclosure. [155] Indeed, during oral argument in *Dura* itself, Justice Stephen Breyer noted that the truth as to an earlier misstatement "might come out in many different ways," and not only "because [an executive] announces I'm a liar." [156]

Grabbing hold of Justice Breyer's suggestion, lower courts have--despite a lack of consensus as to what *does* constitute a corrective disclosure--consistently rejected the notion that it must be a "mirror image" of the fraudulent statements being corrected. [157] Although a "classic" corrective ***605** disclosure might be a frank admission of earlier misstatement accompanied by the truth, the whole truth, and nothing but the truth, in practice fraudulent misstatements will often be corrected in a piecemeal, haphazard fashion that defies easy definition. [158] As a result, any rule requiring unbundling of "corrective disclosures" will inevitably be underinclusive in its definition of "corrective disclosure."

Nonetheless, the perfect need not be the enemy of the good. Even a narrow, underinclusive unbundling rule--requiring unbundling of only clearly corrective disclosures--is better than no rule at all. It would impose few costs and be helpful in at least some cases, particularly the worst ones involving clear and uncontroversial fraud. As Part V details, less straightforward cases can be addressed by doctrinal adjustments to *Dura* that would allow plaintiffs to use alternative methods of showing loss causation in appropriate cases. [159]

Two types of disclosures are particularly well-suited to an unbundling requirement. The first is a financial restatement. A financial restatement is defined by the Financial Accounting Standards Board as a revision of a previously issued financial statement to correct an error. [160] Less serious errors can be corrected in a firm's periodic financial disclosures, but an error so

PX353

serious that earlier statements can no longer be relied upon must be disclosed in a 4.02-8K disclosure within four days of its discovery.[161] Such restatements often signal that earlier disclosures were potentially fraudulent, and they are frequently the trigger for securities fraud class actions.[162] To make the market reaction to the restatement as informative as possible, the SEC should ***606** require that 4.02-8K disclosures be made individually, unbundled with other disclosures. This should be easily achieved, given the four-day window within which the restatement may be announced.

The attraction of such a requirement is that, instead of needing to define the information it applies to, it would piggy-back on an existing disclosure requirement involving a defined set of obviously securities fraud-related information. Although the definitions of what must be required via 4.02-8K may not be as clear as we would like,[163] they are a good start. If combined with clearer definitions of the type of accounting errors that must be disclosed via a 4.02-8K disclosure, such an unbundling requirement would go a long way toward providing more reliable market evidence of the magnitude of an important class of securities fraud.

The second type of disclosure that could productively be subjected to an unbundling requirement is announcement of a government investigation or subpoena. Such an announcement, although not "corrective" in and of itself, can be a signal to the market that a corrective announcement is likely to follow, and it can produce a more dramatic market impact than the eventual corrective disclosure.[164] An unbundling rule for government investigations will undoubtedly be overinclusive--the opening of an investigation does not always portend liability. But the cost and difficulty of unbundling this limited universe of disclosures are minimal, and doing so will lead to a more reliably informative market reaction in that subset of cases where fraud is ultimately uncovered.

Unbundling in the merger context is at once simpler than in the securities fraud context, but less likely to be effective in ensuring accurate market evidence for courts. It is simpler because the disclosure to be unbundled is easy to define--the announcement that the target company's board has approved a merger agreement. It is less effective because it would still provide little assurance that the market price is fully informative in a future judicial proceeding. In addition to the problem of leaks and publicity prior to the merger announcement--factors that may also be present in the securities fraud context--any information that comes out *after* the merger announcement will not generate a meaningful market reaction. It is not uncommon ***607** for many months to pass between the announcement of a merger and its actual consummation. During this time, the market price is typically pegged more to the value of the merger consideration rather than the value of the underlying business as a standalone concern. Valuation for litigation purposes is generally as of the time of the closing--by explicit statutory command in the case of appraisal.[165] Thus, it is not enough that disclosure be unbundled. Even in the face of an unbundling rule, managers may simply wait to disclose earnings information until after the merger announcement, thus obscuring any market reaction.

For the market price to be as informative as possible, all material information known as of the *closing* of the merger would have to be disclosed prior to the *announcement* of the merger--an obvious impossibility absent substantial advances in time-travel technology (where progress has been notoriously slow). As a result, an unbundling requirement is merely an obstacle to the most blatantly opportunistic disclosure practices. The real work in the merger context must be done by doctrinal refinements, which Part V discusses.[166]

## V. POTENTIAL DOCTRINAL REFINEMENTS

As Part IV explains, regulatory unbundling requirements can only go so far in preventing opportunistic disclosure practices.[167] In the securities fraud context, any unbundling rule will inevitably be underinclusive. And in the merger context, management can achieve the same result--obscuring the market reaction to new information--by simply waiting to disclose until after the announcement of the merger. If opportunistic disclosure practices are to be discouraged, courts must have the doctrinal flexibility to use non-market valuation evidence in appropriate circumstances.

Section A sketches the doctrinal refinements to *Dura Pharmaceuticals, Inc. v. Broudo*'s loss causation requirement.[168] Section B discusses the implications of market evidence in the context of merger litigation valuation.[169] The guiding principles are, again, straightforward. Market evidence is, as current doctrine reflects, generally the best valuation evidence in securities fraud and merger litigation. Where market evidence is obscured, however, it may be necessary and appropriate to rely on other valuation evidence. Indeed, to the extent courts are unable or unwilling to look to non- ***608** market valuation evidence,

PX353

managers will have a strong incentive to deliberately obscure market evidence through the opportunistic disclosure practices discussed above. Thus, courts should maintain the ability to use non-market valuation evidence: both (1) to serve as a second-best solution in the absence of reliable market evidence; and (2) to discourage managers from avoiding the creation of reliable market evidence in the first place.

### *A. Refining* **Dura's** *Loss Causation Requirement*

The great advantage of *Dura Pharmaceuticals, Inc. v. Broudo*'s requirement of a market impact to show loss causation is that it will often provide a reliable measurement of damages, in the form of an event study showing the existence and magnitude of an abnormal price reaction to a corrective disclosure. [170] Where a corrective disclosure is bundled with other material information, however, this advantage is destroyed. As Professors Jill E. Fisch, Jonah B. Gelbach, and Jonathan Klick (Fisch et al.) note:

> When multiple sources of news are released at exactly the same time, however, no event study can by itself separate out the effects of the different news. The event study can only tell us whether the net effect of all the news was associated with an unusually large drop or rise. [171]

Although Fisch et al. state that "[t]he possibility of such strategic behavior raises important questions about the admissibility of non-event study evidence," [172] they do not go on to address those questions.

When faced with multiple bundled disclosures, such that an event study cannot isolate the impact of the corrective disclosure, courts have two basic choices. First, they could simply dismiss any securities fraud claim. Whereas this would systematically under-deter fraud, it may nonetheless be justified by concerns over false positives and ease of administration. [173] As argued above, however, this approach creates incentives for unfaithful managers to engage in strategic bundling behavior. In order to avoid creating these incentives, the approach must turn on the defendant-managers' behavior. Where the bundling was unintentional or unavoidable, trading off deterrence for reliability and ease of administration is likely appropriate.

***609** Where, however, plaintiffs are able to show that the bundling was intentional and/or avoidable, a different approach is necessary, and a court should allow plaintiffs to introduce non-event study evidence. The plaintiff's goal would remain the same: to value the fraudulent information. The first thing to note, however, is that this could be done in two ways. It could be done directly, by valuing the fraudulent information itself. Or, it could be done indirectly, by valuing the non-fraud-related information, and then subtracting it from the market reaction to the bundled disclosures. In any given case, one or the other might be more susceptible to valuation by non-event study means.

The form the non-market evidence could take would depend on the nature of the corrective disclosure and the type of the bundled non-fraud-related information. Fisch et al. give the example of earnings news, a common type of information bundled with a corrective disclosure. They note that "[e]xperts might be able to use historical price and earnings data for the firm to estimate the relationship between earnings news and the firm's stock price." [174] They then suggest that:

> If th[e] study controlled appropriately for market expectations concerning the firm's earnings (say, using analysts' predictions), it might provide a plausible way to separate out the component of the event date's estimated [abnormal] excess return that could reasonably be attributed to the earnings news, with the rest being due to the alleged corrective disclosure .... [175]

If, on the other hand, the information concerns the success or failure of a particular project, an expert might attempt to value it using a classic DCF methodology, or by any other methodology generally accepted in the financial community. More crudely, an expert could attempt to assess the relative importance of multiple pieces of bundled information by measuring the relative frequencies with which news stories or headlines refer to them in the wake of the disclosures. [176]


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

The allocation of the burden of proof can do useful work in this context. The United States Court of Appeals for the Seventh Circuit's approach in the *Glickenhaus & Co. v. Household International, Inc.* securities fraud 2015 case is instructive.[177] In *Glickenhaus & Co.*, the plaintiffs argued at ***610** trial that at least some of the price inflation due to the underlying fraud gradually "leaked out" as the market gradually learned the truth, as opposed to the price impact coming entirely from specific corrective disclosures.[178] The difficulty, of course, is that numerous non-fraud-related factors undoubtedly affected the stock price during the same period. On appeal, the defendants argued that the plaintiff's "loss-causation model must *itself* account for, and perfectly exclude, any firm-specific, nonfraud related factors that may have contributed to the decline in a stock price."[179] Just as with bundled disclosures, however, the appeals court pointed out that "[i]t may be very difficult, if not impossible, for any statistical model to do this."[180]

As a result, the court required the plaintiffs to first explain "in nonconclusory terms" how its valuation methodology excluded non-fraud-related information.[181] If they could do so, the burden would then shift to the defendant to identify "some significant, firm-specific, nonfraud related information that could have affected the stock price."[182] The burden would then shift back to the plaintiff to "account for that specific information or provide a loss-causation model that doesn't suffer from the same problem."[183]

In a case of disclosure bundling, where the defendants themselves *caused* the problem of confounding information--or, at the very least, could have avoided it--some degree of burden shifting is even more appropriate. Where the plaintiffs can provide nonconclusory evidence that the corrective disclosure had a discernible market impact--or *would have had* a discernable market impact absent the bundled disclosure--the burden should shift to the defendant to account for the bundled information. If they are unable to do so, then, in the case of bundled negative information, the plaintiffs should benefit from a presumption that the entire abnormal price reaction was due to the corrective disclosure. In the case of bundled positive (confounding) information, the defendants should not be able to use the lack of market impact as a defense.

### *B. Using (and Rejecting) Market Evidence in Merger Litigation Valuation*

The doctrinal lesson in merger litigation is at once more direct and more difficult for a judge to navigate. Any attempt to use unaffected market prices to measure the standalone value of a firm must reckon with information ***611** that was unavailable to the market prior to the announcement of the merger. Earnings or other material information bundled with the merger announcement--or deliberately released after the announcement--is only one particularly salient subset of such information. Where the plaintiff is able to show the existence of material information that was not available to the market, the court must either adjust the market price to take the information into account or determine whether another valuation methodology would be more reliable.

In its most recent pronouncement on appraisal litigation, the Delaware Supreme Court implicitly gave trial courts the discretion to do so. In its *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.* 2019 decision, the Delaware Supreme Court reversed the trial court's decision to rely on the pre-announcement price as the sole evidence of fair value.[184] In part, it reversed because the pre-announcement price did not reflect information that may have emerged between the announcement and the valuation date. In Delaware appraisal, the valuation is performed as of the date of the merger closing, which in *Aruba* was several months after the announcement of the merger agreement.[185] In addition, the court noted that the market lacked material information even as of the date of the announcement.[186] Of particular relevance here, as noted above, the parties had bundled Aruba's positive quarterly earnings with the merger announcement, a factor the Delaware Supreme Court suggested called into question the reliability of the pre-announcement market price.[187] The strong--and sensible--implication was that a court must either find a way to adjust the unaffected market price to reflect such information, or eschew reliance on the market price altogether.

One remaining wrinkle is whether deliberately bundled or delayed information should be treated any differently than any other type of information not available to the market pre-announcement. Arguably, the Delaware Supreme Court implied that it should be in its opinion in Dell's appraisal case. In 2017, in *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, the court suggested that the market price was reliable because the trial court had "found no evidence that information failed to flow freely ***612** or that management purposefully tempered investors' expectations for the [c]ompany so that it could eventually take

PX353

over the [c]ompany at a fire-sale price."[188] The implication is that management's deliberate withholding of information should be taken as especially strong evidence that the market price is not reliable.

The trial court in *Aruba* found surprising the apparent significance that the *Dell* court placed on management's intent.[189] Yet, the emphasis on managerial intent may be appropriate for two reasons. First, one purpose of the merger class action and the appraisal remedy--perhaps the primary purpose-- is to deter managerial opportunism in the merger context.[190] Strategic disclosure practices such as those catalogued above are themselves a species of destructive managerial opportunism that should be deterred. Second, managerial intent can serve as a red flag: powerful circumstantial evidence that management--who have a considerable informational advantage over the court-- believed that the withheld information was material and would undermine their argument that the market price (or even the merger price) was fair. Thus, bundling or delaying of material disclosures should trigger a presumption that the market price is not a reliable indicator of fair value. Furthermore, where the deal price was itself anchored on the merger price, strategic disclosure practices call into question the fairness of the deal price as well.[191]

## CONCLUSION

It is natural for courts to want to defer to market evidence of valuation. In most cases, they are right to do so. Market prices represent a consensus generated by the buying and selling decisions of thousands of market participants ***613** competing to identify any information relevant to the value of a security. In most circumstances, courts are correct to conclude that this price-forming process will generate a more reliable estimate of value than a judge struggling to reconcile the testimony of competing experts in an adversarial trial.

Market pricing, however, is only as good as the information available to the market. Courts must be cognizant of the information asymmetry between managers and the market. Furthermore, managers at least partly control the flow of information to the market. Where courts rely on market prices, managers can use this control strategically to gain an advantage in litigation. Where they are successful, the deterrence value of litigation is weakened. In particular, managers can--and do--use their ability to bundle or delay disclosure of material information to undermine the deterrence value of securities fraud and merger litigation.

To combat this possibility, the SEC should require that certain types of litigation-relevant information be disclosed to the market in as informative a form as possible--unbundled and before the price reaction is distorted by a pending merger. In addition, courts should be cautious to avoid creating incentives for strategic disclosure behavior. Where strategic disclosure behavior is possible, courts must preserve the flexibility to resort to non-market valuation evidence. Where it appears strategic disclosure behavior may have occurred, courts should not hesitate to use this flexibility. In sum, if courts are to defer to market valuation evidence, they must ensure that the market has received the relevant information in a fashion that makes market valuation evidence reliable.

### Footnotes

a1 Professor of Law, Case Western Reserve University School of Law. J.D., Yale Law School.

1 *See* Jackson v. Pollion, 733 F.3d 786, 788 (7th Cir. 2013) ("Innumerable are the lawyers who explain that they picked law over a technical field because they have a 'math block' ...." (quoting DAVID L. FAIGMAN ET AL., MODERN SCIENTIFIC EVIDENCE: STANDARDS, STATISTICS, AND RESEARCH METHODS, at v (student ed. 2008))).

2 544 U.S. 336 (2005).

3 *See, e.g.*, Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and Corporate Litigation*, 4 AM. L. & ECON. REV. 141, 143 (2002).

PX353

4 *See, e.g.*, Allen Ferrell & Atanu Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of Actions: The Implications of* Dura Pharmaceuticals, Inc. v. Broudo, 63 BUS. LAW. 163 (2007); James C. Spindler, *Why Shareholders Want Their CEOs to Lie More After* Dura Pharmaceuticals, 95 GEO. L.J. 653 (2007). Of course, these litigation-related incentives to bundle disclosures operate on top of other incentives--some as simple as the desire to bury bad news. *See, e.g.*, Mary Brooke Billings et al., *On Guidance and Volatility*, J. ACCT. & ECON., Nov.-Dec. 2015, at 161, 161-64, 177-78 (discussing the bundling of earnings forecasts with other announcements); Mary Brooke Billings & Matthew C. Cedergren, *Strategic Silence, Insider Selling and Litigation Risk*, 59 J. ACCT. & ECON. 119, 119-20, 140 (2015) (explaining bundling positive earnings guidance with earnings announcements before insider selling); John R. Graham et al., *The Economic Implications of Corporate Financial Reporting*, 40 J. ACCT. & ECON. 3, 10 (2005) (reporting that one-third of chief financial officers admit to trying to bundle bad news with other disclosures); S.P. Kothari et al., *Do Managers Withhold Bad News?*, 47 J. ACCT. RSCH. 241, 246 (2009) (discussing delaying the release of bad news to bury it with subsequent news); Jonathan L. Rogers & Andrew Van Buskirk, *Bundled Forecasts in Empirical Accounting Research*, 55 J. ACCT. & ECON. 43, 43 (2013) (examining the bundling of earnings forecasts with other announcements); Charles E. Wasley & Joanna Shuang Wu, *Why Do Managers Voluntarily Issue Cash Flow Forecasts?*, 44 J. ACCT. RSCH. 389, 389-92, 426 (2006) (reviewing certain announcements with the bundling of earnings forecasts); Benjamin N. Lansford, Strategic Coordination of Good and Bad News Disclosures: The Case of Voluntary Patent Disclosures and Negative Earnings Surprises 1 (July 17, 2006) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=830705 [https://perma.cc/Q8DG-CGBX] (discussing the bundling of both good and bad news).

5 *See, e.g.*, Barbara A. Bliss et al., *Information Bundling and Securities Litigation*, 65 J. ACCT. & ECON. 61, 61 (2018) (finding that the bundling of both positive and negative news with an earnings restatement reduces the incidence of securities fraud litigation and makes courts more likely to dismiss claims); Sebastien Gay, *Strategic News Bundling and Privacy Breach Disclosures*, 3 J. CYBERSEC. 91, 91 (2017) (finding that firms are more likely to release positive news on the same day as disclosure of privacy breaches); Michael Furchtgott & Frank Partnoy, *Disclosure Strategies and Shareholder Litigation Risk: Evidence from Restatements* 26-27 (Univ. San Diego Sch. L., Legal Stud. Rsch. Paper Series, Research Paper No. 15-186, 2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2585267 [https://perma.cc/222B-FVZD] (observing that managers were more likely to bundle other information with earnings restatements following *Dura Pharmaceuticals, Inc. v. Broudo*).

6 Management's desire to get stockholder approval is only heightened when the deal will trigger--as many do--valuable side-benefits such as change-of-control payments or golden parachutes. *See* Brian Broughman, *CEO Side Payments in Mergers and Acquisitions*, 2017 BYU L. REV. 67, 71 ("[T]he law already requires that any extra benefits--including side payments--received by senior management in an acquisition be disclosed to shareholders and that the entire transaction be subject to both board *and* shareholder approval.").

7 *See generally* Charles R. Korsmo & Minor Myers, *The Structure of Stockholder Litigation: When Do the Merits Matter?*, 75 OHIO ST. L.J. 829, 855-58 (2014) (discussing class actions alleging breach of directors' fiduciary duties in connection with mergers).

8 *See id.* at 859 ("Appraisal allows a stockholder to dissent from a merger and forego the merger consideration in favor of filing a judicial proceeding to calculate the 'fair value' of the stock cancelled in the merger." (first quoting DEL. CODE ANN. tit. 8, § 262(a) (2013); and then quoting 3 MODEL BUS. CORP. ACT ANN. § 13.02 (2008 & Supp. 2013) (AM. BAR ASS'N, amended 2016))).

9 *Id.* at 866 (explaining that in appraisal "[t]he only issue at stake is the fair value of the petitioner's shares, and the sole remedy available is cash").

10 *See* Charles R. Korsmo & Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 WASH. U. L. REV. 1551, 1553 (2015) ("Appraisal activity involving public companies is undergoing explosive growth in Delaware, driven by sophisticated parties who specialize in bringing appraisal claims."); Robert B. Thompson, *Exit, Liquidity, and*

PX353

*Majority Rule: Appraisal's Role in Corporate Law*, 84 GEO. L.J. 1, 10 (1995) (describing Delaware as the "leading corporate law jurisdiction").

11 Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1144 (Del. 1989) (quoting Tri-Cont'l Corp. v. Battye, 74 A.2d 71, 72 (Del. 1950)). In recent decisions, the Delaware Supreme Court has muddied the waters considerably by suggesting a somewhat different approach to defining "fair value," namely that dissenters are entitled to "what they deserve to receive based on what would fairly be given to them in an arm's-length transaction." DFC Glob. Corp. v. Muirfield Value Partners, L.P., 172 A.3d 346, 370-71 (Del. 2017). Elsewhere, Professor Minor Myers and I have argued that this approach to fair value is flawed. *See* Charles R. Korsmo & Minor Myers, *The Flawed Corporate Finance of* Dell *and* DFC Global, 68 EMORY L.J. 221 (2018). The dispute is not vital to my argument here and, in any event, trial courts continue to seek to determine the going-concern value in appraisal actions. *See* discussion *infra* Part I.B.

12 *See* discussion *infra* Part II.

13 *See* discussion *infra* Part II.A.

14 *See* discussion *infra* Part I.

15 *See* discussion *infra* Part II.

16 *See* discussion *infra* Part III.

17 *See* discussion *infra* Part IV.

18 *See* discussion *infra* Part V.

19 *See* discussion *infra* Part I.

20 *See* discussion *infra* Part I.A.

21 *See* discussion *infra* Part I.B.

22 Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737 (1975).

23 15 U.S.C. § 78j.

24 Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78a-78qq).

25 *See* 17 C.F.R. § 240.10b-5 (2020); *supra* notes 23-24.

26 The U.S. District Court for the Eastern District of Pennsylvania first recognized a private cause of action under Rule 10b-5 in 1946. *See* Kardon v. Nat'l Gypsum Co., 69 F. Supp. 512, 514 (E.D. Pa. 1946). Five years later, the prominent scholar Louis Loss noted that a private cause of action was recognized "in almost two score other cases" and that "[n]o judge has expressed [themselves] to the contrary." LOUIS LOSS, SECURITIES REGULATION 1049-50 (1951). The

PX353


© 2024 Thomson Reuters. No claim to original U.S. Government Works.

U.S. Supreme Court recognized the existence of a private cause of action for securities fraud in 1971, without discussion. *See* Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 13 & n.9 (1971).

27 Rule 10b-5 reads, in its entirety:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

28 *See, e.g.*, Charles R. Korsmo, *Market Efficiency and Fraud on the Market: The Danger of* Halliburton, 18 LEWIS & CLARK L. REV. 827, 832 (2014) ( "Unsurprisingly, this parsimonious statutory and regulatory framework, covering a vast array of potential activities, has yielded an almost common-law style interpretive approach by courts."); Louis Loss, Commentary, *The Assault on Securities Act Section 12(2)*, 105 HARV. L. REV. 908, 910-11 (1992) (noting that, because courts have essentially created a new federal tort from Rule 10b-5, "one should not be shocked to see them invoking *Erie*-resistant federal common law in order to invent appropriate qualifications of the new tort").

29 *See* Korsmo, *supra* note 28, at 833 ("The elements for 10b-5 securities fraud claims were derived by analogy to the common law tort of fraud."); Jeffrey L. Oldham, Comment, *Taking "Efficient Markets" Out of the Fraud-on-the-Market Doctrine After the Private Securities Litigation Reform Act*, 97 NW. U. L. REV. 995, 1003 (2003) ("Derived primarily from the common law of fraud, the basic elements of a Rule 10b-5 cause of action have become materiality, scienter, reliance, and loss causation." (footnotes omitted)).

30 RESTATEMENT (FIRST) OF TORTS § 538(2)(a) (AM. L. INST. 1938).

31 *Id.* § 546.

32 *See* Elizabeth Chamblee Burch, *Reassessing Damages in Securities Fraud Class Actions*, 66 MD. L. REV. 348, 363 (2007) (noting that the "out-of-pocket measure" of damages in securities fraud actions "originated in tort law").

33 Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 n.5 (11th Cir. 1997) (quoting Huddleston v. Herman & MacLean, 640 F.2d 534, 556 (5th Cir. 1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375 (1983)); *see also* Burch, *supra* note 32, at 364 n.78 (collecting cases).

34 *See* Burch, *supra* note 32, at 364 & n.79 (explaining the notion of "true value" in the context of out-of-pocket damages (first citing Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 249 (3d Cir. 2001); and then citing Janet Cooper Alexander, *Rethinking Damages in Securities Class Actions*, 48 STAN. L. REV. 1487, 1490-91 (1996))).

35 Korsmo, *supra* note 28, at 868; *see also* Burch, *supra* note 32, at 363-70 (noting the implications of the "disparities between face-to-face and open-market transactions" for calculating damages). Judge Easterbrook made the same general point in pungent fashion in *West v. Prudential Securities, Inc.*, 282 F.3d 935, 939 (7th Cir. 2002), noting there is not "an economic market in 'Jefferson Savings stock' as there is in dill pickles or fluffy towels .... [I]nvestors do not want Jefferson Savings *stock* (as if they sought to paper their walls with beautiful certificates); they want monetary returns (at given risk levels) ...."

PX353

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

36 Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 BUS. LAW. 1, 13 (1982); *see also* Jill E. Fisch et al., *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 TEX. L. REV. 553, 559 (2018) ("Fischel argued that the only relevant inquiry in a securities fraud case was the extent to which market prices were distorted by fraudulent information--it was unnecessary for the court to make separate inquiries into materiality, reliance, causation, and damages.").

37 485 U.S. 224, 241-42 (1988).

38 *Id.* at 247.

39 *Id.* at 246.

40 *See* Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 278 (2014) ("In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse."); Fisch et al., *supra* note 36, at 560 ("Price impact is a critical component of [*Basic*'s] approach because absent an impact on stock price, plaintiffs who trade in reliance on the market price are not defrauded.").

41 *See* Fisch et al., *supra* note 36, at 568 ("[P]roof of price impact is relevant to multiple elements of securities fraud. A single event study may provide evidence relating to materiality, reliance, loss causation, economic loss, and damages.").

42 Spindler, *supra* note 4, at 676; *see also id.* at 664 (noting that a market impact requirement "largely automate[s] the trier of fact's tests of materiality and damages, whereas '[j]uries generally do not have a clue' about *ex ante* valuations of fraudulent information" (second alteration in original) (quoting John C. Coffee, Jr., *Causation by Presumption? Why the Supreme Court Should Reject Phantom Losses and Reverse* Broudo, 60 BUS. LAW. 533, 538 (2005))).

43 544 U.S. 336, 339-40 (2005).

44 Fisch et al., *supra* note 36, at 561 (footnote omitted).

45 Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC, 752 F.3d 82, 86 (1st Cir. 2014).

46 Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

47 *See, e.g., In re* Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock."); *In re* Sadia, S.A. Sec. Litig., 269 F.R.D. 298, 302, 311 & n.104, 316 (S.D.N.Y. 2010) (relying on evidence of market impact in finding materiality); Fisch et al., *supra* note 36, at 562 ("Event studies can be used to demonstrate the impact of fraudulent statements on stock price, providing evidence that the statements are material.").

48 *See, e.g., In re* Merck & Co. Sec. Litig., 432 F.3d 261, 269 (3d Cir. 2005) (holding that a false disclosure was not material where it had "no negative effect" on the stock price); Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000) ("[I]n an efficient market 'the concept of materiality translates into information that alters the price of the firm's stock ....'" (quoting *Burlington Coat Factory*, 114 F.3d at 1425)).

49 *See, e.g., In re* Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003) (noting that "a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in

securities cases which fail to include event studies or something similar"), *aff'd sub nom*. Mortensen v. Snavely, 145 F. App'x 218 (9th Cir. 2005); *In re* N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000) (finding an expert's testimony "fatally deficient in that he did not perform an event study or similar analysis"); *In re* Exec. Telecard, Ltd. Sec. Litig., 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997) ("The reliability of the Expert Witness'[s] proposed testimony is called into question by his failure to indicate ... whether he conducted an 'event study' ....").

50 *See* Korsmo & Myers, *supra* note 7, at 855-58 (tracing the logic and structure of merger class actions).

51 *See generally* DEL. CODE ANN. tit. 8, § 262 (2020); MODEL BUS. CORP. ACT ANN. § 13.02 (AM. BAR ASS'N 2016).

52 *See generally* Korsmo & Myers, *supra* note 7, at 859-68 (first quoting DEL. CODE ANN. tit. 8, § 262(a) (2013); and then quoting 3 MODEL BUS. CORP. ACT ANN. § 13.02 (2008 & Supp. 2013) (AM. BAR ASS'N, amended 2016) (tracing the history and structure of the appraisal remedy). Appraisal rights of some kind have been available in some states since the mid-nineteenth century and became widely available in their modern form in the early twentieth century.

53 *See, e.g.*, Weinberger v. UOP, Inc., 457 A.2d 701, 714 (Del. 1983) (describing the notion of "fair value," while noting that "the Chancellor's powers are complete to fashion any form of equitable and monetary relief as may be appropriate" (quoting DEL. CODE ANN. tit. 8, § 262(h) (1983))); *In re* Orchard Enters., Inc. S'holder Litig., 88 A.3d 1, 38-42 (Del. Ch. 2014) (evaluating the damages available in a merger class action). Calculation of damages in merger class actions is a somewhat theoretical question, as the number of cases proceeding through trial is vanishingly small. *See* STEFAN BOETTRICH & SVETLANA STARYKH, NERA ECON. CONSULTING, RECENT TRENDS IN SECURITIES CLASS ACTION LITIGATION: 2016 FULL-YEAR REVIEW 41 (2017), https://www.nera.com/content/dam/nera/publications/2017/PUB_2016_Securities_Year-End_Trends_Report_0117.pdf [https://perma.cc/5SSW-R7BE] ("Very few securities class actions reach the trial stage and even fewer reach a verdict.").

54 *See, e.g., Weinberger*, 457 A.2d at 713-14 (equating "fair price" in a merger class action with "fair value" in appraisal (quoting DEL. CODE ANN. tit. 8, § 262(h) (1983))); Sterling v. Mayflower Hotel Corp., 93 A.2d 107, 114 (Del. 1952) (adopting for a fiduciary duty case the valuation standard for appraisal); *see also* Bershad v. Curtiss-Wright Corp., 535 A.2d 840, 845 (Del. 1987) (stating that the "fair price" measure in a class action "flow[s] from the statutory provisions permitting mergers and those designed to ensure fair value by an appraisal" (citation omitted)); Poole v. N.V. Deli Maatschappij, 243 A.2d 67, 69 (Del. 1968) (affirming the trial court's conclusion that, for damages purposes, "the stock is to be evaluated on a going-concern basis and not on a liquidation basis; that the actual or true value of the stock is to be determined by considering the various factors ... deemed relevant in a stock evaluation problem arising under ... 8 Del. C. § 262"); Del. Open MRI Radiology Assocs., P.A. v. Kessler, 898 A.2d 290, 342-44 (Del. Ch. 2006) (determining fair value and using it as the measure of damages in a breach of fiduciary duty case); *In re* Emerging Commc'ns, Inc. S'holders Litig., C.A. No. 16415, 2004 WL 1305745, at *9 (Del. Ch. June 4, 2004) (deciding monetary damages after determining fair value). It is worth noting that, conceptually, it might make sense to have a different measure of fair value in a fiduciary duty action than in an appraisal action. In particular, in a fiduciary duty action, it would be reasonable to award plaintiffs the amount they would have gotten in the merger absent the breach of duty. Sometimes--perhaps most of the time--this will be equivalent to fair value as a going concern. But sometimes it may be something else, such as the value they would have fairly gotten in an unconflicted, arm's-length transaction, which may be substantially different where there are significant synergies. Elsewhere, Professor Myers and I have criticized the Delaware Supreme Court's recent decisions for eliding the differences between the fiduciary duty and appraisal contexts. *See* Korsmo & Myers, *supra* note 11, at 269-73.

55 *See, e.g., Weinberger*, 457 A.2d at 714 (using the term "quasi-appraisal" first to describe the measure of damages for a breach of fiduciary duty in connection with a merger); *In re* Rural/Metro Corp. S'holders Litig., 102 A.3d 205, 224-25 (Del. Ch. 2014) ("The 'fair value' or 'intrinsic value' of the shares held by the class is determined by using the same methodologies employed in an appraisal, and this form of damages is sometimes colloquially called a 'quasiappraisal' remedy." (footnote omitted) (first quoting *Weinberger*, 457 A.2d at 713-14; and then quoting *Sterling*, 93 A.2d at 114));

Arnold v. Soc'y for Sav. Bancorp, Inc., No. 12883, 1995 WL 376919, at *4 (Del. Ch. June 15, 1995) (holding that damages for breach of fiduciary duty could be calculated through a "quasi-appraisal" remedy), *aff'd*, 678 A.2d 533 (Del. 1996); *see also In re* Ocean Drilling & Expl. Co. S'holders Litig., No. 11898, 1991 WL 70028, at *7 (Del. Ch. Apr. 30, 1991) (concluding that alleged breaches of fiduciary duty did not threaten irreparable harm because of the availability of "quasi-appraisal" damages); Steiner v. Sizzler Rests. Int'l, Inc., No. 11994, 1991 WL 40872, at *2 (Del. Ch. Mar. 19, 1991) (same).

56 Tri-Cont'l Corp. v. Battye, 74 A.2d 71, 72 (Del. 1950); *see also* Verition Partners Master Fund Ltd. v. Aruba Networks, Inc., 210 A.3d 128, 132-33 (Del. 2019) (en banc) (per curiam) ("[F]air value 'is ... the value of the company to the stockholder as a going concern," i.e., the stockholder's "proportionate interest in a going concern." (first quoting M.P.M. Enters., Inc. v. Gilbert, 731 A.2d 790, 795 (Del. 1999); and then quoting Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1144 (Del. 1989))); Montgomery Cellular Holding Co. v. Dobler, 880 A.2d 206, 222 (Del. 2005); *Cavalier Oil Corp.*, 564 A.2d at 1144.

57 *See, e.g., Cavalier Oil Corp.*, 564 A.2d at 1144 (noting that the company must be valued "without regard to post-merger events"); *Weinberger*, 457 A.2d at 714 (directing the Delaware Court of Chancery not to "take speculative effects of the merger into account" in calculating "fair value" (quoting DEL. CODE ANN. tit. 8, § 262(h) (1983))); *In re* Trados Inc. S'holder Litig., 73 A.3d 17, 74 (Del. Ch. 2013) (noting that valuations in appraisal must "back out any synergies"); Gearreald v. Just Care, Inc., C.A. No. 5233-VCP, 2012 WL 1569818, at *3 (Del. Ch. Apr. 30, 2012) ("Determining the value of a 'going concern' requires the Court to exclude any synergistic value ...." (quoting Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Grp., Ltd., 847 A.2d 340, 356 (Del. Ch. 2004))); *Union Ill. 1995 Inv. Ltd. P'ship*, 847 A.2d at 356 ("[T]his court must endeavor to exclude from any appraisal award the amount of any value that the selling company's shareholders would receive because a buyer intends to operate the subject company, not as a standalone going concern, but as a part of a larger enterprise, from which synergistic gains can be extracted.").

58 Although appraisal is available in one form or another in almost every state, the bulk of the decisional law is in Delaware, with many other state courts taking their doctrinal cues from Delaware. *See* Thompson, *supra* note 10, at 10 (describing Delaware as the "leading corporate law jurisdiction").

59 *See generally* William S. Allred, *Corporate Law--Chipping Away at the Delaware Block: A Critique of the Delaware Block Approach to the Valuation of Dissenters' Shares in Appraisal Proceedings*, 8 W. NEW ENG. L. REV. 191, 193 (1986) ("For roughly forty years, courts have commonly invoked the Delaware block approach to valuation ....").

60 *See id.* at 204-09 (describing the elements of the "Delaware block method").

61 *Weinberger*, 457 A.2d at 712.

62 *See, e.g., In re* PetSmart, Inc., C.A. No. 10782, 2017 WL 2303599, at *23 (Del. Ch. May 26, 2017) (noting "that DCF [discounted cash flow] is considered by many to be the 'gold standard' of valuation tools" (quoting Trial Transcript at 1241:3-:17, 1244:14-45:8, *id.* (No. 10782)); Samuel C. Thompson, Jr., *A Lawyer's Guide to Modern Valuation Techniques in Mergers and Acquisitions*, 21 J. CORP. L. 457, 461 (1996) (stating that prominent scholars "emphasize the importance of the DCF method of valuation"); Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 DUKE L.J. 613, 625-26 n.68 (1998) ("Despite its preeminent role in valuation, there was no place for discounted cash flow analysis under the Delaware block method; its use did not become permissible in Delaware until *Weinberger* discarded the block method as the exclusive means of valuation.").

63 *See In re* Radiology Assocs., Inc. Litig., 611 A.2d 485, 490 (Del. Ch. 1991) ("The DCF model entails three basic components: an estimation of net cash flows that the firm will generate and when, over some period; a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and finally a cost of capital with which to discount to a present value both the projected net cash

PX353

flows and the estimated terminal or residual value.” (quoting Cede & Co. Technicolor, Inc., C.A. No. 7129, 1990 WL 161084, at *7 (Del. Ch. Oct. 19, 1990))).

64 *See, e.g.*, Questrom v. Federated Dep't Stores, Inc., 84 F. Supp. 2d 483, 488 (S.D.N.Y. 2000) (concluding that the DCF is the “preeminent valuation methodology” (quoting Neal v. Ala. By-Products Corp., C.A. No. 8282, 1990 WL 109243, at *7 (Del. Ch. Aug. 1, 1990))), *aff'd*, 2 F. App'x 81 (2d Cir. 2001); Lippe v. Bairnco Corp., 288 B.R. 678, 689 (S.D.N.Y. 2003) (finding the DCF to be “the most reliable method for determining the value of a business”), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *In re* Bond, No. 11-bk-33849, 2012 WL 3867427, at *4 (Bankr. D. Ariz. Sept. 5, 2012) (noting that the valuation “method preferred in the Second and Seventh Circuits is discounted cash flow”); Andaloro v. PFPC Worldwide, Inc., C.A. Nos. 20289, 20336, 2005 WL 2045640, at *9 (Del. Ch. Aug. 19, 2005) (“The DCF model of valuation is a standard one that gives life to the finance principle that firms should be valued based on the expected value of their future cash flows, discounted to present value in a manner that accounts for risk. The DCF method is frequently used in this court and, I, like many others, prefer to give it great, and sometimes even exclusive, weight when it may be used responsibly.”); Dobler v. Montgomery Cellular Holding Co., C.A. No. 19211, 2004 WL 2271592, at *8 (Del. Ch. Oct. 4, 2004) (noting that DCFs are “routinely utilized by this court in appraisal actions”), *aff'd in part, rev'd in part on other grounds*, 880 A.2d 206 (Del. 2005); *see also* 1 DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 9-11[d]-[1] (2020) (“Since *Weinberger*, some type of [DCF] methodology has been considered in nearly all appraisals ....”).

65 *See generally* Korsmo & Myers, *supra* note 10 (documenting a dramatic increase in public company appraisal beginning in 2011).

66 *See, e.g., Andaloro*, 2005 WL 2045640, at *9 n.34 (“I stress [that DCFs should be] ‘used responsibly,’ for there are situations when the available data will not support the use of the DCF model.”); Finkelstein v. Liberty Dig., Inc., C.A. No. 19598, 2005 WL 1074364, at *12 (Del. Ch. Apr. 25, 2005) (“The judges of this court are unremittingly mindful of the fact that a judicially selected determination of fair value is just that, a law-trained judge's estimate that bears little resemblance to a scientific measurement of a physical reality.”).

67 *See, e.g.*, Blueblade Cap. Opportunities LLC v. Norcraft Cos., No. 11184, 2018 WL 3602940, at *22 n.251 (Del. Ch. July 27, 2018) (noting that “‘the judges of this Court’ have lamented the challenges posed by the appraisal statute for many years”); Laidler v. Hesco Bastion Env't, Inc., C.A. No. 7561, 2014 WL 1877536, at *1 (Del. Ch. May 12, 2014) (“This case presents a demand for a statutory appraisal, response to which should be a daunting task for a law-trained judge ....” (footnote omitted)); Glob. GT LP v. Golden Telecom, Inc., 993 A.2d 497, 518 n.126 (Del. Ch.) (explaining that “academics and professionals throw around ... ranges of value [that] are used by a law-trained judge to come to a single point estimate of value” and that “[t]he law-trained judges who must perform such analyses are more conscious than anyone of the inherent risk of error in such an endeavor”), *aff'd*, 11 A.3d 214 (Del. 2010).

68 *See, e.g.*, Kruse v. Synapse Wireless, Inc., C.A. No. 12392, 2020 WL 3969386, at *7 (Del. Ch. July 14, 2020) (noting that two experts “utilized the same three valuation techniques ... but reached very different conclusions”); *In re* Appraisal of Jarden Corp., C.A. No. 12456, 2019 WL 3244085, at *3 (Del. Ch. July 19, 2019) (“[B]oth parties proffered expert evidence regarding Jarden's fair value based on DCF and, not surprisingly, the experts' DCF analyses yielded results that were solar systems apart.”), *aff'd sub nom*. Fir Tree Value Master Fund, LP v. Jarden Corp., 236 A.3d 313 (Del. 2020); Huff Fund Inv. P'ship v. CKx, Inc., C.A. No. 6844, 2013 WL 5878807, at *1 (Del. Ch. Nov. 1, 2013) (“The parties have submitted expert valuations of the company, ranging from an amount below the sales price (submitted by the Respondents) to more than twice the sales price (submitted by the Petitioners).”), *aff'd*, No. 348, 2014, 2015 WL 631586 (Del. Feb. 12, 2015) (en banc).

69 *See Huff Fund Inv. P'ship*, 2013 WL 5878807, at *1 (“What is the fair value of an asset? For a simple asset--a piece of real property, for instance--it is the market value. If a trustee were to sell property held in trust, such a sale could be challenged by the beneficiary on a number of grounds. It would be odd, however, if the sale were an arms-length,

PX353

disinterested transaction after an adequate market canvas and auction, yet the challenge was that the price received did not represent 'fair' value.").

70 *Id.*

71 *See, e.g.*, Merion Cap. LP v. BMC Software, Inc., C.A. No. 8900, 2015 WL 6164771, at *14-15, *18 n.168 (Del. Ch. Oct. 21, 2015); Merlin Partners LP v. AutoInfo, Inc., C.A. No. 8509, 2015 WL 2069417, at *10 (Del. Ch. Apr. 30, 2015); *In re* Appraisal of Ancestry.com, Inc., C.A. No. 8173, 2015 WL 399726, at *17 (Del. Ch. Jan. 30, 2015); *Huff Fund Inv. P'ship*, 2013 WL 5878807, at *1.

72 *See* Verition Partners Master Fund Ltd. v. Aruba Networks, Inc., 210 A.3d 128, 135 (Del. 2019) (en banc) (per curiam); Dell, Inc., v. Magnetar Glob. Event Driven Master Fund Ltd., 177 A.3d 1, 23-24 (Del. 2017); DFC Glob. Corp. v. Muirfield Value Partners, L.P., 172 A.3d 346, 362 (Del. 2017).

73 *DFC Glob.*, 172 A.3d at 369. Professor Myers and I have cautioned elsewhere that the "willing buyer and willing seller" analogy should not be taken too far:

This might be true if the company were sold by a single owner into a thick market of potential buyers. But any analogy between a merger and a transaction between "a willing buyer and a willing seller" is virtually useless. In a public company merger, the firm will be sold by a board of directors with varying incentives, advised and assisted by inside managers and outside professionals with still different incentives, and then put to a stockholder plebiscite on a take-it-or-leave-it basis.

Korsmo & Myers, *supra* note 11, at 268. We go on to agree, however, that "under certain conditions--conditions that ... will likely be met in most arm's-length deals--the outcome of that process will be a price that serves as an adequate proxy for what the willing seller and buyer might have reached." *Id.*

74 *DFC Glob.*, 172 A.3d at 366.

75 *Id.*; *see also id.* at 369-70 (observing that "[m]arket prices are typically viewed [as] superior to other valuation techniques because, unlike, e.g., a single person's [DCF] ... model, the market price should distill the collective judgment of the many based on all the publicly available information about a given company and the value of its shares").

76 DEL. CODE ANN. tit. 8, § 262(h) (2020); *see Dell*, 177 A.3d at 21; *DFC Glob.*, 172 A.3d at 366-67.

77 *See Aruba Networks*, 210 A.3d at 135 (using the deal price as the exclusive basis for its determination of fair value); *Dell*, 177 A.3d at 30 ("Overall, the weight of evidence shows that Dell's deal price has heavy, if not overriding, probative value."); *DFC Glob.*, 172 A.3d at 349 (finding that deal price was "the best evidence of fair value").

78 *See In re* Stillwater Mining Co., C.A. No. 2017-0385, 2019 WL 3943851, at *22 (Del. Ch. Aug. 21, 2019) ("As with *Dell* and *DFC*, the *Aruba* decision did not have to address when a sale process was sufficiently bad that a trial court should decline to rely on the deal price."), *aff'd sub nom*. Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co., 240 A.3d 3 (Del. 2020).

79 *Dell*, 177 A.3d at 19; *DFC Glob.*, 172 A.3d at 388; *see* Korsmo & Myers, *supra* note 11, at 223.

80 As the Delaware Court of Chancery put it in a recent 2019 decision, *In re Appraisal of Jarden Corp.*, "I begin my fair value analysis where I believe I must--with the market evidence." C.A. No. 12456, 2019 WL 3244085, at *2 (Del. Ch. July 19, 2019), *aff'd sub nom*. Fir Tree Value Master Fund, LP v. Jarden Corp., 236 A.3d 313 (Del. 2020).

81 *Stillwater Mining Co.*, 2019 WL 3943851, at *19-20; *In re* Appraisal of Columbia Pipeline Grp., C.A. No. 12736, 2019 WL 3778370, at *13-20 (Del. Ch. Aug. 12, 2019).

82 *See supra* note 57 and accompanying text.

83 *See Dell*, 177 A.3d at 5-7, 24-27, 35 (concluding that both the trading price and the deal price were reliable indicators of value).

84 *See* Verition Partners Master Fund Ltd. v. Aruba Networks, Inc., 210 A.3d 128, 132 (Del. 2019) (en banc) (per curiam), *rev'g* No. 11448, 2018 WL 922139 (Del. Ch. Feb. 15, 2018).

85 *See, e.g., In re Jarden Corp.*, 2019 WL 3244085, at *2 (awarding "the unaffected market price").

86 *See, e.g., Stillwater Mining Co.*, 2019 WL 3943851, at *54-55; *In re Columbia Pipeline Grp.*, 2019 WL 3778370, at *38-39.

87 *See* discussion *infra* Part II.

88 *See* discussion *infra* Part II.A.

89 *See* discussion *infra* Part II.B.

90 Spindler, *supra* note 4, at 674.

91 An example of the first problem would be management falsely claiming that a project--worth $1 billion if it is successful--has a 50% chance of success, when in fact they know that it really has only a 25% chance of success. In theory, this lie would inflate the market price by $250 million. If the project, however, ended up succeeding, there would be no market decline upon revelation of the fraud. Nonetheless, allowing a suit in such a case would involve the court in estimating both the probabilities and payoffs associated with the success and failure of the project in question, neither of which they are particularly well-equipped to do. *See id.* at 676-77 (noting that "there is a greater chance that courts will get things horribly wrong with an *ex ante* rule"). Thus, *Dura Pharmaceuticals, Inc. v. Broudo*'s requirement of an ex post market drop is arguably justified in such a case, despite the resulting under-deterrence. *See, e.g.*, Coffee, *supra* note 42, at 538 (explaining the danger of frivolous litigation alleging "phantom loss").

92 Of course, in addition to the difficulties canvassed here, a host of other confounding factors can make it difficult or impossible to isolate the market impact of a fraud. *See, e.g.*, Ferrell & Saha, *supra* note 4, at 168 (discussing, among other issues, the problem of gradual or partial leakage of the truth, projects that succeed despite a fraud, market over- and under-reactions, and collateral damage from revelation of a fraud).

93 For similar examples, see Spindler, *supra* note 4, at 677-80.

94 *See, e.g.*, Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., No. 02-CV-1152, 2008 WL 4791492, at *11 (N.D. Tex. Nov. 4, 2008) (denying class certification because the relevant disclosure contained "two distinct components," a corrective disclosure of prior misstatements and new negative information, and the plaintiffs were unable to demonstrate that the former caused the stock price decline), *aff'd*, 597 F.3d 330 (5th Cir. 2010), *vacated sub nom*. Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804 (2011); Fener v. Belo Corp., 560 F. Supp. 2d 502, 505 (N.D. Tex. 2008) (denying class certification because the plaintiff was unable to untangle the effects of the fraudulent information

PX353

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

and "other unrelated negative statements" (quoting Oscar Priv. Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 266 (5th Cir. 2007), *abrogated by Erica P. John Fund*, 563 U.S. 804)), *aff'd sub nom*. Fener v. Operating Eng'rs Constr. Indus. & Miscellaneous Pension Fund (LOCAL 66), 579 F.3d 401 (5th Cir. 2009). For similar examples, see Spindler, *supra* note 4, at 680-82.

95 *See* Fisch et al., *supra* note 36, at 556 ("[I]n cases involving multiple 'bundled' disclosures, event studies have limited capacity to identify the particular contribution of each piece of information or the degree to which the effects of multiple disclosures may offset each other.")

96 *See, e.g.*, Esther Bruegger & Frederick C. Dunbar, *Estimating Financial Fraud Damages with Response Coefficients*, 35 J. CORP. L. 11, 25 (2009) (explaining that "'content analysis' is now part of the tool kit for determining which among a number of simultaneous news events had effects on the stock price" (quoting DAVID TABAK, NERA ECON. CONSULTING, **MAKING ASSESSMENTS ABOUT MATERIALITY LESS SUBJECTIVE THROUGH** THE **USE OF CONTENT ANALYSIS** 13 (2007), https://www.nera.com/content/dam/nera/publications/archive1/PUB_Tabak_Content_Analysis_SEC1646-FINAL.pdf [https://perma.cc/768L-FPGQ])).

97 Fisch et al., *supra* note 36, at 614.

98 *Id.*; *see also id.* ("If the presence of overlapping news makes it difficult or impossible for plaintiffs to marshal admissible and useful event study evidence, defendants may strategically structure their disclosures to impede plaintiffs' ability to establish price effect.").

99 The phenomenon is not limited to securities fraud litigation. For example, a 2015 study by Sebastien Gay examined bundling in the context of firms that had experienced customer privacy breaches--another situation likely to lead to litigation. Gay, *supra* note 5, at 99 (finding that firms make a larger than usual number of positive disclosures on the same day they disclose a privacy breach).

100 *See generally* Bliss et al., *supra* note 5.

101 *See id.* at 63 ("Piling bad or confounding news on top of bad news might seem counterproductive to the extent it amplifies the magnitude of a stock price decline .... However, noise bundling may generate countervailing benefits by making it difficult or impossible to unravel how much of the stock price decline is attributable to each piece of bad news ...." (citation omitted)).

102 *See id.* at 62, 63 ("The *Dura* ruling effectively raised the standard for the Eighth and Ninth Circuits to the same level that other courts previously imposed .... [W]e exploit an exogenous shock from the 2005 U.S. Supreme Court ruling on loss causation standards to achieve identification in our tests.").

103 *Id.* at 64 ("[O]ur matching estimator indicates that positive and noise bundling were associated with lower litigation occurrence for firms outside the Eighth and Ninth Circuits during both time periods.").

104 *Id.* at 63 (finding that in the U.S. Courts of Appeals for the Eighth and Ninth Circuits "the occurrence of litigation dropped from 6.7% to 0% for positive bundled restatements, and from 20.3% to 5.6% for noise bundled restatements after the tightening of loss causation standards").

105 *Id.* at 61 (noting that, among restatements that lead to lawsuits, "[b]undled restatements have 8.17 times higher dismissal rates and $21.17 to $23.45 million lower settlement amounts").

PX353

106 Furchtgott & Partnoy, *supra* note 5, at 1.

107 *Id.* at 34.

108 *Id.*

109 *See* discussion *infra* Part III.A.

110 *See* discussion *infra* Part III.B.

111 DEL. CODE ANN. tit. 8, § 251 (2020).

112 *See, e.g.*, Malcolm Baker et al., *The Effect of Reference Point Prices on Mergers and Acquisitions*, 106 J. FIN. ECON. 49, 64-65 (2012) (observing that deals with higher merger premiums tend to close more often); Sangwon Lee & Vijay Yerramilli, Relative Values, Announcement Timing, and Shareholder Returns in Mergers and Acquisitions 2 (May 2018) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2714572 [https://perma.cc/SW8Z-LGAZ] (adopting Malcolm Baker, Xin Pan, and Jeffrey Wurgler's finding that "key decision makers in the bidding and target firms and investors are known to use recent prices as reference points"); *see also* Verition Partners Master Fund Ltd. v. Aruba Networks, Inc., C.A. No. 11448, 2018 WL 922139, at *33 (Del. Ch. Feb. 15, 2018) (noting that "Aruba management believed that an increase in the [pre-announcement] stock price would hurt their chances of getting the deal approved"), *rev'd*, 210 A.3d 128 (Del. 2019) (en banc) (per curiam). *See generally* GUHAN SUBRAMANIAN, NEGOTIAUCTIONS: NEW DEALMAKING STRATEGIES FOR A COMPETITIVE MARKETPLACE 16-18 (2010) (explaining the anchoring dynamics in the merger context).

113 *See* discussion *supra* Part I.B.

114 *See* discussion *supra* Part I.B.

115 *See, e.g., In re* MeadWestvaco S'holders Litig., 168 A.3d 675, 687 (Del. Ch. 2017) ("Even if it were true that the premium was low, '[t]here is no rule that a low premium represents a bad deal, much less bad faith.'" (alteration in original) (quoting *In re* Crimson Expl. Inc. S'holder Litig., C.A. No. 8541, 2014 WL 5449419, at *23 (Del. Ch. Oct. 24, 2014))); *In re* BJ's Wholesale Club, Inc. S'holders Litig., C.A. No. 6623, 2013 WL 396202, at *11-12 (Del. Ch. Jan. 31, 2013) (granting a motion to dismiss in a case with a 6.6% merger premium); *In re* Dollar Thrifty S'holder Litig., 14 A.3d 573, 619 (Del. Ch. 2010) (denying a preliminary injunction in a case with a 5.5% merger premium); *In re* CompuCom Sys., Inc. S'holders Litig., C.A. No. 499, 2005 WL 2481325, at *8 (Del. Ch. Sept. 29, 2005) (granting a motion to dismiss where the deal price was at a discount to the pre-announcement trading price).

116 *See, e.g.*, Smith v. Van Gorkom, 488 A.2d 858, 875 (Del. 1985) ("[T]he fact of a premium alone does not provide an adequate basis upon which to assess the fairness of an offering price."), *overruled by* Gantler v. Stephens, 965 A.2d 695 (Del. 2009); *In re* Del Monte Foods Co. S'holders Litig., 25 A.3d 813, 818-19 (Del. Ch. 2019) (same, despite a 40% premium); *In re* El Paso Corp. S'holder Litig., 41 A.3d 432, 434-45 (Del. Ch. 2012) (noting a reasonable probability of success on the merits of a breach of fiduciary duty claim, despite a 47.8% merger premium); *In re* Telecommcn's, Inc. S'holders Litig., C.A. No. 16470, 2005 WL 3642727, at *1-2 (Del. Ch. Jan. 10, 2006) (explaining that the defendants had not demonstrated entire fairness at the summary judgment stage, despite a 37% merger premium); Gholl v. eMachines, Inc., C.A. No. 19444, 2004 WL 2847865, at *15 (Del. Ch. Nov. 24, 2004) (giving "little weight" to the "control premium argument," despite a merger premium of 96%), *aff'd*, 875 A.2d 632 (Del. 2005).

117 *See, e.g.*, Cinerama, Inc., v. Technicolor, Inc., 663 A.2d 1156, 1176-77 (Del. 1995) (pointing to the size of the merger premium as the first "reliable source[] ... indicat[ing] that the $23 per share received" constituted a fair price (quoting

PX353

Cinerama, Inc., v. Technicolor, Inc., 663 A.2d 1134, 1142 (Del. Ch. 1994), *aff'd, id.*)); *In re* Stillwater Mining Co., No. 2017-0385, 2019 WL 3943851, at *44 (Del. Ch. Aug. 21, 2019) (noting "the premium over market" as a reason for finding that the deal price represented fair value), *aff'd sub nom*. Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co., 240 A.3d 3 (Del. 2020); *In re* Morton's Rest. Grp. S'holders Litig., 74 A.3d 656, 662-63, 676 (Del. Ch. 2013) (explaining a merger's status as a "premium-generating transaction" and "a premium sale of a company" in dismissing a fiduciary duty claim); *Gholl*, 2004 WL 2847865, at *15 ("In many cases market indicia of value such as control premiums ... can provide informative checks on the reasonableness of financial valuation techniques.").

118 *In re* Emerging Commc'ns, Inc. S'holders Litig., C.A. No. 16415, 2004 WL 1305745, at *23 (Del. Ch. June 4, 2004).

119 *See* Colin Miller, *Anchors Away: Why the Anchoring Effect Suggests That Judges Should Be Able to Participate in Plea Discussions*, 54 B.C. L. REV. 1667, 1693 (2013) ("The 'anchoring effect' is a cognitive bias by which individuals evaluate numbers in relation to a reference point--the anchor--and then modify those numbers based on that 'anchor.' The bias manifests itself in three particular ways: (1) the selection of an anchor; (2) underadjustment; and (3) the fact that even arbitrary, random, or irrelevant numbers can serve as anchors and distort calculations." (footnote omitted) (quoting Stephanos Bibas, *Plea Bargaining Outside the Shadow of Trial*, 117 HARV. L. REV. 2463, 2516 (2004))).

120 *See, e.g.*, Korsmo & Myers, *supra* note 7, at 835 (finding that appraisal litigation becomes less likely as the size of the merger premium increases).

121 *See* Revisions to Accelerated Filer Definition and Accelerated Deadlines for Filing Periodic Reports, Securities Act Release No. 8644, Exchange Act Release No. 52,989, 70 Fed. Reg. 76,626 (Dec. 27, 2005).

122 *See* Adam Hayes, *SEC Form NT 10-Q*, INVESTOPEDIA, https://www.investopedia.com/terms/s/sec-form-nt-10-q.asp [https://perma.cc/G5BN-FH7D] (last updated July 5, 2020) ("SEC Form NT 10-Q is a Securities and Exchange Commission (SEC) filing required for companies that will not be able to submit their 10-Q filing (for quarterly financial results) by the SEC deadline or in a timely manner.").

123 *See, e.g.*, Verition Partners Master Fund Ltd. v. Aruba Networks, Inc., C.A. No. 11448, 2018 WL 922139, at *33 n.316 (Del. Ch. Feb. 15, 2018) ("[I]t's very customary, very, very customary, if you're pursuing an M & A transaction and it's close to being done, ... and you have an earnings release, to make the two concurrent, because these are two material events that will impact the stock price, and the last thing you want to do is release material information piecemeal to your shareholders." (alteration in original) (quoting Boutros Dep. at 203, *id.* (No. 11448))), *rev'd*, 210 A.3d 128 (Del. 2019) (en banc) (per curiam); *In re* Dollar Thrifty S'holder Litig., 14 A.3d 573, 591 (Del. Ch. 2010) (noting the "normal desire to announce the deal in conjunction with an earnings release"); *In re* Trans World Airlines, Inc. S'holders Litig., C.A. No. 9844, 1988 WL 111271, at *4 (Del. Ch. Oct. 21, 1988) ("The proposal now under consideration was announced ... the same day on which the [c]ompany announced very favorable financial results for the first quarter of 1988."), *abrogated by* Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110 (Del. 1994). Similarly, if management believes the merger premium is already adequate, they may be tempted to bury bad news by bundling it together with a merger announcement. *See, e.g., In re* Appraisal of DFC Glob. Corp., C.A. No. 10107, 2016 WL 3753123, at *13 (Del. Ch. July 8, 2016) ("[D]iscouraging financial results [were] issued on April 2, 2014, the same day the transaction was announced."), *rev'd sub nom*. DFC Glob. Corp. v. Muirfield Value Partners, L.P., 172 A.3d 346 (Del. 2017); *see also Dollar Thrifty*, 14 A.3d at 591 ("Dollar Thrifty's advisors were suspicious that Hertz wanted to use the deal to cover up what would be an otherwise disappointing earnings announcement ...."). In particular, a merger announcement may be the "good news" to offset a restatement in the securities fraud context. *See* discussion *supra* Part I.

124 *See Aruba Networks*, 2018 WL 922139, at *33 ("At the end of January 2015, HP offered to acquire Aruba for $23.25 per share.").


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

125 *Id.* (“During the first week of February, while Aruba was considering its response, another analyst report criticized [Aruba], and the stock price fell again, closing around $16.07 the day after the report.”).

126 *Id.*

127 *See id.* (“[R]ather than correcting the market's perception, Aruba management proposed to time the announcement of the merger to coincide with the announcement of Aruba's February 2015 earnings.”); *id.* at *33 n.315 (noting that “[t]he idea of announcing the merger along with Aruba's strong quarterly results came from Aruba management” and that management wanted to “get[] a deal announced by [Aruba's] earnings on Feb. 26” (third alteration in original) (quoting JX 454, internal Barclays email summarizing Johansson's relay of the call)).

128 *See id.* at *33 n.317 (“HP also may have leaked news of the deal to further mask the significance of Aruba's strong earnings. On February 25, 2015, one day before Aruba was scheduled to announce its earnings, Bloomberg News ran a story on the merger.”).

129 *Id.* at *33; *see also id.* *33 n.315 (stating that Aruba's bankers “‘emphasized that [Aruba would] like to announce [the] deal before the [Aruba] earnings announcement’ because Aruba was ‘afraid stock runs like Ubiquiti's did which could make the deal more challenging from the [Aruba] perspective’” (alterations in original) (quoting JX 491, email from Barclays to HP recounting exchange)).

130 *Id.* at *33.

131 *Id.* at *34.

132 *Id.* at *33 n.317 (quoting JX 510, internal Qatalyst email).

133 Quantifying litigation/stockholder approval risk would likely be the most difficult step. Nonetheless, a number of potential proxies are available. Among them are: (1) the size of the merger premium; (2) P/E ratios at the merger price; (3) Tobin's Q at the merger price; (4) the actual results of the eventual stockholder vote; and (5) the actual incidence of merger class actions or appraisal actions targeting the merger.

134 *See, e.g.*, Spindler, *supra* note 4, at 691 (concluding that *Dura Pharmaceuticals v. Broudo*'s rule “does not adequately internalize fraud losses when firms can bundle projects, when firms can wait before disclosing bad news, or when other factors may overlap with the fraud in causing a plaintiff's loss”); Furchtgott & Partnoy, *supra* note 5, at 34 (“Our results may have the normative implication that the courts should consider relaxing the *Dura* loss causation pleading requirements if there are multiple pieces of firm-specific news occurring simultaneously or if there is evidence of a pre-announcement downward drift in the share price.”).

135 *See* discussion *infra* Parts IV, V.

136 *See* discussion *infra* Part IV.

137 *See* discussion *infra* Part IV.A.

138 *See* discussion *infra* Part IV.B.


WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

139 *See* discussion *infra* Part IV.C.

140 *See* discussion *infra* Part V.

141 *See* discussion *supra* Parts II, III.

142 *See* Spindler, *supra* note 4, at 658 ("[I]f a firm values transparency or values the confidence that shareholders have when a firm is subject to strict antifraud penalties, firms can choose to unbundle their projects and disclosures."); *id.* at 685 ("We may suppose that, at equilibrium, a rational marketplace would discount securities of firms that have bundled projects and disclosures. A firm that can commit to disaggregating itself and its disclosures could therefore command a premium relative to aggregated firms.").

143 *See id.* at 685 ("Market incentives may therefore drive voluntary disaggregation.").

144 *See id.* at 658 ("The extent to which firms can unbundle themselves and their disclosures may, however, be limited, and the costs of doing so may be significant even where possible."); *id.* at 687 ("Is there any way for a firm to commit credibly beforehand not to bundle negative information with other information? This seems to be a significant problem, because the firm itself will likely be the only party that knows when it has come into new material information.").

145 *See generally* Stephen M. Bainbridge, *The Geography of* Revlon-*Land*, 81 FORDHAM L. REV. 3277, 3292 (2013) ("[S]tructural decisions--such as corporate takeovers--present a final period problem entailing an especially severe conflict of interest."); Sean J. Griffith, *Deal Protection Provisions in the Last Period of Play*, 71 FORDHAM L. REV. 1899, 1945 (2003) ("Another corporate law last period problem occurs when a company is sold ...."); Charles R. Korsmo, *Delaware's Retreat from Judicial Scrutiny of Mergers*, 10 U.C. IRVINE L. REV. 55, 90 (2019) ("[W]hile most managerial decisions take place in the context of on ongoing series of repeat transactions, the decision to approve a merger is, in game theoretic terms, a 'final period' transaction." (quoting Bainbridge, *supra*, at 3292)).

146 *See* Korsmo, *supra* note 145, at 90 ("For most decisions, managerial discretion is heavily constrained by a large number of legal and extra-legal constraints, including annual director elections, regular reports under securities law, product markets, capital markets, and labor markets, among others. Managers who behave foolishly or dishonestly in one period face the possibility of being found out, punished, or shamed in the next. Such constraints do not operate in the context of a final period transaction like a merger." (footnote omitted)).

147 *See* Spindler, *supra* note 4, at 685 (concluding that committing to disaggregated disclosure is "likely to be imperfect or costly").

148 Charles R. Korsmo, *The Audience for Corporate Disclosure*, 102 IOWA L. REV. 1581, 1590 (2017); *see, e.g.*, Zohar Goshen & Gideon Parchomovsky, *The Essential Role of Securities Regulation*, 55 DUKE L.J. 711, 716 (2006) ( "The law of securities regulation may be divided into three broad categories: disclosure duties, restrictions on fraud and manipulation, and restrictions on insider trading."); Kevin S. Haeberle & M. Todd Henderson, *Information-Dissemination Law: The Regulation of How Market-Moving Information Is Revealed*, 101 CORNELL L. REV. 1373, 1377 (2016) (describing "mandatory-disclosure, securities-fraud, and insider-trading law" as "the core of modern securities regulation").

149 *See generally* 17 C.F.R. § 229 (2020).

150 *See Form 8-K*, U.S. SEC. & EXCH. COMM'N, http://www.sec.gov/about/form8-k.pdf [https://perma.cc/79X2-J84Q].

PX353

151 *See* Korsmo, *supra* note 148, at 1586.

152 *Id.*

153 *See supra* note 121 and accompanying text.

154 *See* Grace Xing Hu et al., *Early Peek Advantage? Efficient Price Discovery with Tiered Information Disclosure*, J. FIN. ECON. 399, 402 (2017); Charles R. Korsmo, *High-Frequency Trading: A Regulatory Strategy*, 48 U. RICH. L. REV. 523, 524-25 (2014).

155 *See generally* Matthew L. Mustokoff & Margaret E. Mazzeo, *Loss Causation on Trial in Rule 10b-5 Litigation a Decade After* Dura, 70 RUTGERS U. L. REV. 175, 196-99 (2017) (discussing circuit court attempts to define "corrective disclosure" and concluding that "[t]he line delineating what type of information is and is not corrective is far from clear").

156 Transcript of Oral Argument at 38-39, Dura Pharms., Inc., v. Broudo, 544 U.S. 336 (2005) (No. 03-932).

157 *See, e.g.*, Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 230 (5th Cir. 2009) ("To be corrective, [a] disclosure need not precisely mirror [an] earlier misrepresentation." (alterations in original) (quoting *In re* Williams Sec. Litig.--WCG Subclass, 558 F.3d 1130, 1140 (10th Cir. 2009))); Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) ("[N]either the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure to be a 'mirror image' tantamount to a confession of fraud."); *In re* Bristol-Myers Squibb Sec. Litig., C.A. No. 00-1990, 2005 WL 2007004, at *20 (D.N.J. Aug. 17, 2005) (rejecting the "proposition that an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud"). *See generally* Mustokoff & Mazzeo, *supra* note 155, at 196-99 ("Notwithstanding divergence among the circuit courts on the question of what constitutes a corrective disclosure, there appears to be general agreement that to be corrective, a disclosure need not be a defendant's express admission or acknowledgement of the fraud; in other words, it need not be a 'mirror image' of the fraudulent statement(s) being 'corrected.'" (first quoting *Freudenberg*, 712 F. Supp. 2d at 202; and then quoting *Bristol-Myers Squibb*, 2005 WL 2007004, at *20)).

158 *See, e.g., In re* Vivendi Universal, S.A. Sec. Litig., 634 F. Supp. 2d 352, 363-65 (S.D.N.Y. 2009) (noting that a "corrective disclosure is traditionally an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful and complete version of those statements" but "[t]he [disclosure] event need not take this form" .in order "to prove loss causation").

159 *See* discussion *infra* Part V.

160 *See* ACCT. STANDARDS CODIFICATION § 250-10-50-7 (FIN. ACCT. STANDARDS BD. 2020).

161 *See* Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date, Securities Act Release No. 33-8400, Exchange Act Release No. 49,424, 69 Fed. Reg. 15,594 (Mar. 25, 2004); Philip Keunho Chung & Ronnie Cohen, *Hiding in Plain Sight: Stealth Restatements and Their Implication for Litigation Risk*, 15 N.Y.U. J.L. & BUS. 257, 266 (2019) ("After the SEC Final Rule mandating additional Form 8-K disclosures, firms must decide whether the past financial statements which contain material errors can still *be relied upon*; if not, the firm must disclose the errors and restatements using 4.02-8K disclosure within four business days of this decision.").

PX353

162 *See* Chung & Cohen, *supra* note 161, at 283 (finding that a 4.02-8K disclosure "is associated with higher securities class action suits risk"); Furchtgott & Partnoy, *supra* note 5, at 6 (noting that "nearly half" of their sample of securities fraud class actions were filed within two weeks of an accounting restatement).

163 *See generally* Chung & Cohen, *supra* note 161, at 284 (calling on the SEC to provide "more guidance as to the types of errors that warrant a non-reliance judgment and the attendant 4.02-8K disclosure" to "curb firms' opportunistic choices" to avoid making a 4.02-8K disclosure).

164 *See, e.g.*, Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1210-11 (9th Cir. 2016) (noting that the announcement of an SEC subpoena regarding potential misstatements caused the company's stock to "drop precipitously" although "the market reacted hardly at all" to the firm's eventual admission of its misstatements); Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc., 769 F.3d 313, 324-25 (5th Cir. 2014) (recognizing the sharp stock drops accompanying the announcement of government investigations into allegedly fraudulent practices).

165 *See* DEL. CODE ANN. tit. 8, § 262 (2020).

166 *See* discussion *infra* Part V.

167 *See* discussion *supra* Part IV.

168 *See* discussion *infra* Part V.A.

169 *See* discussion *infra* Part V.B.

170 *See, e.g.*, Spindler, *supra* note 4, at 687 ("Recall that, with a single project, fraud is perfectly internalized under both *ex post* and *ex ante* [loss causation] rules, the difference being that the *ex post* approach also provides a ready measurement of damages.").

171 Fisch et al., *supra* note 36, at 614.

172 *Id.* at 614-15.

173 *See* Spindler, *supra* note 4, at 688 ("Even taking into account the systemic underdeterrence of the *ex post* rule, one might think the ease of administration makes for a worthwhile tradeoff.").

174 Fisch et al., *supra* note 36, at 614.

175 *Id.*

176 *See id.* ("Alternatively, experts might use quantitative content analysis, e.g., measuring the relative frequencies of two types of news in headlines of articles published following the news."). *See generally* TABAK, *supra* note 96, at 13.

177 Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408 (7th Cir. 2015).

PX353

178 *See* Report of Daniel R. Fischel at 24-25, Jaffe Pension Plan v. Household Int'l, Inc., 756 F. Supp. 2d 928 (N.D. Ill. 2010) (No. 02-C-5893), 2007 WL 3192033.

179 *Glickenhaus & Co.*, 787 F.3d at 422.

180 *Id.*

181 *Id.*

182 *Id.*

183 *Id.*

184 *See* Verition Partners Master Fund Ltd. v. Aruba Networks, Inc., 210 A.3d 128, 130, 132 (Del. 2019) (en banc) (per curiam), *rev'g* C.A. No. 11448, 2018 WL 922139 (Del. Ch. Feb. 15, 2018).

185 *Id.* at 139 ("For starters, the unaffected market price was a measurement from three to four months prior to the valuation date, a time period during which it is possible for new, material information relevant to a company's future earnings to emerge.").

186 *See id.* ("Even more important, HP ... also had material, nonpublic information that, by definition, could not have been baked into the public trading price.").

187 *Id.* (noting that "HP knew about Aruba's strong quarterly earnings before the market did, and likely took that information into account when pricing the deal").

188 Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd., 177 A.3d 1, 25-26 (Del. 2017).

189 *See* Verition Partners Master Fund Ltd. v. Aruba Networks, Inc., C.A. No. 11448, 2018 WL 922139, at *34 (Del. Ch. Feb. 15, 2018) ("My prediction of the law before the Delaware Supreme Court's decision in *Dell* would have been that scienter did not matter for an appraisal case where the sole litigable question is valuation rather than culpability."), *rev'd*, 210 A.3d 128 (Del. 2019) (en banc) (per curiam).

190 *See generally* Charles Korsmo & Minor Myers, *Reforming Modern Appraisal Litigation*, 41 DEL. J. CORP. L. 279, 282 (2017) (noting that "[a]ppraisal now stands as a formidable mechanism of deterrence to opportunistic mergers").

191 In 2019, in *In re Appraisal of Columbia Pipeline Group*, the Delaware Court of Chancery recognized the possibility that "the reliability of the trading price" may reflect on the reliability of the negotiated "deal price." *See In re* Appraisal of Columbia Pipeline Grp., C.A. No. 12736, 2019 WL 3778370, at *49 (Del. Ch. Aug. 12, 2019) ("Based on these authorities, this decision does not have to make a finding regarding the reliability of the trading price as a condition to relying on the deal price. It remains conceivable that there could be a case where the parties anchored deal negotiations off the trading price, but this is not that case.").

62 BCLR 571

PX353

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

PX353

# PX 354

**This record has been produced natively.**


Second Edition
Content Analysis
An Introduction to Its Methodology
Klaus Krippendorff

about how much money politicians spend on campaigns, what candidates say to get elected, candidates' ethics and morals, and the proportion of negative ads used in political campaigns. Broder's (1940) adjective-verb ratio has been employed as an index of schizophrenia (Mann, 1944), and above-chance co-occurrences of nouns have been interpreted as indicators of associations in speakers' and receivers' minds (Osgood, 1959).

In mass communication research, five indices have had a long history of use:

- The *presence* or *absence* of a reference or concept is taken to indicate the source's *awareness* or *knowledge* of the object referred to or conceptualized.
- The *frequency* with which a symbol, idea, reference, or topic occurs in a stream of messages is taken to indicate the *importance of, attention to,* or *emphasis on* that symbol, idea, reference, or topic in the messages.
- The *numbers of favorable* and *unfavorable characteristics* attributed to a symbol, idea, or reference are taken to indicate the *attitudes* held by the writers, the readers, or their common culture toward the object named or indicated.
- The kinds of *qualifications*—adjectives or hedges—used in statements about a symbol, idea, or reference are taken to indicate the *intensity, strength,* or *uncertainty* associated with the *beliefs, convictions,* and *motivations* that the symbol, idea, or reference signifies.
- The frequency of co-occurrence of two concepts (excluding those that have grammatical or collocational explanations) is taken to indicate the *strength of associations* between those concepts in the minds of the members of a population of authors, readers, or audiences.

The use of such easily computable quantities as indices is not without its problems. Chomsky (1959) took Skinner to task for suggesting that promptness of response, repetition, and voice volume are natural indices of the intensity of motivation and that meanings can be discerned from the co-occurrence of words with the objects they refer to. He observed that most words are uttered in the absence of what they mean. Rapoport (1969) compares two hypothetical women, each of whom has just received a luxurious bouquet of flowers. The first woman, upon seeing the flowers, shouts, "Beautiful! Beautiful! Beautiful! Beautiful!" at the top of her lungs, thus giving evidence, according to Skinner's criteria, of a strong motivation to produce the response. The second woman says nothing for 10 seconds after she first sees the flowers, then whispers, barely audibly, "Beautiful." Frequency and voice volume would not be good indications of the importance of these flowers or, in Skinner's terms, the motivation to respond.

In content analysis, as in many social scientific inquiries, researchers often simply *declare* indices without demonstrating their empirical validity, especially when the phenomena to be indicated are abstract and far removed from validating