1  **BERNSTEIN LITOWITZ BERGER**
2  **& GROSSMANN LLP**
   JONATHAN D. USLANER (Bar No. 256898)
3  jonathanu@blbglaw.com
   LAUREN M. CRUZ (Bar No. 299964)
4  lauren.cruz@blbglaw.com
   2121 Avenue of the Stars, Suite 2575
5  Los Angeles, CA 90067
   Tel: (310) 819-3470
6
7  **MOTLEY RICE LLC**
8  GREGG S. LEVIN (*pro hac vice*)
   glevin@motleyrice.com
9  28 Bridgeside Blvd.
   Mount Pleasant, SC 29464
10 Tel: (843) 216-9000
11
12 *Counsel for Lead Plaintiffs and*
   *Lead Counsel for the Class*
13
14 [Additional Counsel Appear on Signature
   Page]
15
16         **UNITED STATES DISTRICT COURT**
           **SOUTHERN DISTRICT OF CALIFORNIA**
17
18 IN RE QUALCOMM               Case No. 3:17-cv-00121-JO-MSB
   INCORPORATED SECURITIES
19 LITIGATION                   **LEAD PLAINTIFFS' MOTION**
                                **FOR FINAL APPROVAL OF**
20                              **SETTLEMENT AND PLAN OF**
                                **ALLOCATION; AND**
21                              **MEMORANDUM OF POINTS AND**
                                **AUTHORITIES IN SUPPORT**
22
23                             Judge: Hon. Jinsook Ohta
24                             Date: September 27, 2024
                               Time: 9:00 a.m.
25                             Courtroom: 4C
26
27
28

## <u>NOTICE OF MOTION AND MOTION</u>

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 27, 2024 at 9:00 a.m., in Courtroom 4C of the Edward J. Schwartz United States Courthouse, 221 West Broadway, San Diego, California 92101, the Honorable Jinsook Ohta presiding, the Court-appointed Lead Plaintiffs and _Class Representatives Sjunde AP-Fonden ("AP7") and Metzler Asset Management GmbH ("Metzler") will and hereby do move, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for entry of (1) a judgment granting final approval of the proposed settlement of the above-captioned securities class action; and (2) an order granting approval of the proposed plan for allocating the net settlement proceeds.

This motion is made pursuant to the Court's June 27, 2024 Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 433) ("Preliminary Approval Order") and is based upon: (1) this Notice of Motion, (2) the supporting Memorandum of Points and Authorities set forth below, (3) the accompanying Joint Declaration of Jonathan D. Uslaner and Gregg S. Levin and the exhibits attached thereto, (4) the Stipulation and Agreement of Settlement dated June 17, 2024 (ECF No. 428-1) filed previously with the Court, (5) the pleadings and records on file in this action, and (6) other such matters and argument as the Court may consider at the hearing of this motion.

Pursuant to the Preliminary Approval Order, any objections to the Settlement or proposed Plan of Allocation must be received by September 6, 2024. To date, no objections have been received. Proposed orders will be submitted with Lead Plaintiffs' reply submission, which will be filed on September 20, 2024, after the deadline for objections has passed.

# **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................1

II.  THE SETTLEMENT WARRANTS FINAL APPROVAL ............................4

     A.  Lead Plaintiffs and Lead Counsel Have Adequately
         Represented the Class ..................................................6

     B.  The Settlement Was Negotiated at Arm's Length Following
         Completion of Substantial Fact and Expert Discovery............................7

     C.  The Relief Provided for the Class Is Adequate Considering
         the Costs, Risks, and Delay of Further Litigation and Other
         Relevant Factors........................................................9

         1.  The Amount Offered in the Settlement Weighs in
             Favor of Final Approval...........................................9

         2.  The Settlement Weighs the Strength of Lead
             Plaintiffs' Claims with the Substantial Risks of
             Continuing Litigation.............................................9

         3.  The Settlement Is Reasonable in Light of the
             Range of Potential Outcomes of the Litigation ......................15

         4.  The Proposed Method for Distributing Relief to
             the Class Is Effective ............................................17

         5.  Lead Counsel's Fee and Expense Request Is Fair
             and Reasonable ..................................................18

         6.  The Parties Have No Side Agreements Other Than
             a Supplemental Agreement Concerning Opt-Outs ..................18

         7.  All Class Members Are Treated Equitably...........................19

     D.  The Extent of Discovery Completed and the Stage of the
         Proceedings Favor Final Settlement Approval .......................................19

     E.  The Experience and Views of Counsel Favor Settlement ....................20

     F.  The Reaction of the Class ................................................21

III. THE PLAN OF ALLOCATION IS FAIR, REASONABLE AND
     ADEQUATE.........................................................................21

IV.  NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF
     RULE 23, DUE PROCESS, AND THE PSLRA .........................................23

V.   CONCLUSION.....................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re 3D Sys. Sec. Litig.*,
2024 WL 50909 (E.D.N.Y. Jan. 4, 2024) ............................................................. 16

*In re Amgen Inc. Sec. Litig.*,
2016 WL 10571773 (C.D. Cal. Oct. 25, 2016) ..................................................... 19

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ................................................................................................ 7

*Baker v. SeaWorld Ent., Inc.*,
2020 WL 4260712 (S.D. Cal. July 24, 2020) ................................................... 9, 14

*Baker v. SeaWorld Ent., Inc.*,
2020 WL 818893 (S.D. Cal. Feb. 19, 2020) ........................................................ 24

*In re Biolase, Inc. Sec. Litig.*,
2015 WL 12697736 (C.D. Cal. June 5, 2015) ........................................................ 6

*In re Biolase, Inc. Sec. Litig.*,
2015 WL 12720318 (C.D. Cal. Oct. 13, 2015) ............................................... 21, 22

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) .................................................................................. 8

*In re Celera Corp. Sec. Litig.*,
2015 WL 7351449 (N.D. Cal. Nov. 20, 2015) ..................................................... 14

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) ................................................................................. 14

*Churchill Vill., L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) .................................................................................. 5

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) .............................................................................. 21

*Elliott v. Rolling Frito-Lay Sales, LP*,
2014 WL 2761316 (C.D. Cal. June 12, 2014) ..................................................... 20

*In re Extreme Networks, Inc. Sec. Litig.*,
  2019 WL 3290770 (N.D. Cal. July 22, 2019) ...............................................9, 20

*Fleming v. Impax Lab'ys Inc.*,
  2021 WL 5447008 (N.D. Cal. Nov. 22, 2021) ......................................18

*Garner v. State Farm Mut. Auto. Ins. Co.*,
  2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ......................................10

*Gutierrez-Rodriguez v. R.M. Galicia, Inc.*,
  2018 WL 1470198 (S.D. Cal. Mar. 26, 2018) ......................................24

*Hall v. Marriott Int'l, Inc.*,
  2024 WL 3367518 (S.D. Cal. July 10, 2024) ......................................10

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ...............................................*passim*

*Hefler v. Wells Fargo & Co.*,
  2018 WL 6619983 (N.D. Cal. Dec. 18, 2018), *aff'd sub. nom.*
  *Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020) ......................................17

*In re Heritage Bond Litig.*,
  2005 WL 1594403 (C.D. Cal. June 10, 2005) ......................................21

*Hudson v. Libre Tech. Inc.*,
  2020 WL 2467060 (S.D. Cal. May 13, 2020) ......................................7

*In re Immune Response Sec. Litig.*,
  497 F. Supp. 2d 1166 (S.D. Cal. 2007) ......................................11

*Int'l Bhd. Of Elec. Workers Loc. 697 Pension Fund. Int'l Game Tech.,
  Inc.*, 2012 WL 5199742 (D. Nev. Oct. 19, 2012) ......................................17

*In re JDS Uniphase Corp. Sec. Litig.*,
  2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) ......................................14

*Khoja v. Orexigen Therapeutics, Inc.*,
  2021 WL 5632673 (S.D. Cal. Nov. 30, 2021) ......................................16

*In re LJ Int'l, Inc. Sec. Litig.*,
  2009 WL 10669955 (C.D. Cal. Oct. 19, 2009) ......................................17

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  2013 WL 6577020 (C.D. Cal. Dec. 5, 2013) ......................................20, 21

*Mild v. PPG Indus., Inc.*,
  2019 WL 3345714 (C.D. Cal. July 25, 2019).............................................9, 16, 19

*In re N. Dynasty Mins. Ltd. Sec. Litig.*,
  2024 WL 308242 (E.D.N.Y. Jan. 26, 2024)........................................................16

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004)...............................................................10, 15

*Nguyen v. Radient Pharms. Corp.*,
  2014 WL 1802293 (C.D. Cal. May 6, 2014).......................................................21

*Officers for Justice v. Civ. Serv. Comm'n of City & County of San
  Francisco*, 688 F.2d 615 (9th Cir. 1982).......................................................5, 6, 9

*In re Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008)...........................................................21

*In re Qualcomm Antitrust Litig.*,
  2023 WL 7393012 (N.D. Cal. Nov. 7, 2023).......................................................13

*Redwen v. Sino Clean Energy, Inc.*,
  2013 WL 12303367 (C.D. Cal. July 9, 2013)......................................................10

*In re Regulus Therapeutics Inc. Sec. Litig.*,
  2020 WL 6381898 (S.D. Cal. Oct. 30, 2020).......................................................8

*Rodriguez v. Bumble Bee Foods, LLC*,
  2018 WL 1920256 (S.D. Cal. Apr. 24, 2018) ....................................................6, 9

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) .....................................................................20

*Sudunagunta v. NantKwest, Inc.*,
  2019 WL 2183451 (C.D. Cal. May 13, 2019).......................................................15

*In re Syncor ERISA Litig.*,
  516 F.3d 1095 (9th Cir. 2008) ....................................................................5

*Velazquez v. Int'l Marine & Indus. Applicators, LLC*,
  2018 WL 828199 (S.D. Cal. Feb. 9, 2018).........................................................6

*Walters v. Target Corp.*,
  2019 WL 6696192 (S.D. Cal. Dec. 6, 2019).......................................................24

*In re Zynga Inc. Sec. Litig.*,
    2015 WL 6471171 (N.D. Cal. Oct. 27, 2015) ...............................................12, 19

**STATUTES**

15 U.S.C. § 78u-4(a)(7) ...............................................................................24

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(a)...................................................................................6

Fed. R. Civ. P. 23(c)..................................................................................24

Fed. R. Civ. P. 23(e)...........................................................................*passim*

Fed. R. Civ. P. 23(g) ...................................................................................6

LEAD PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF SETTLEMENT
    v
    Case No. 3:17-cv-00121-JO-MSB

**MEMORANDUM OF POINTS AND AUTHORITIES**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Court-appointed Lead Plaintiffs and Class Representatives Sjunde AP-Fonden ("AP7") and Metzler Asset Management GmbH ("Metzler") (together, "Lead Plaintiffs") respectfully submit this memorandum of law in support of their motion for final approval of the Settlement and approval of the proposed Plan of Allocation.[1]

## I.    INTRODUCTION

After seven years of hard-fought litigation—including the completion of extensive fact and expert discovery, certification of the Class, briefing of summary judgment and *Daubert* motions, and extended arm's-length negotiations between experienced counsel—Lead Plaintiffs have reached a proposed Settlement for $75,000,000 in cash. Subject to the Court's final approval, the Settlement will resolve all claims asserted in the Action. The Settlement is a favorable result for the Class and readily satisfies the standards for final approval under Rule 23(e)(2).

The Settlement confers a substantial, certain, and near-term benefit for the Class, while avoiding the significant risks and expense of continued litigation, including the substantial risks that the Class might recover nothing or less than the Settlement Amount after additional litigation and delay. The Settlement, if approved, would be the first time any U.S. plaintiff has achieved any recovery from Qualcomm

---

[1] Unless otherwise noted, capitalized terms have the meaning set forth in the Stipulation and Agreement of Settlement (ECF No. 428-1) (the "Stipulation") or the accompanying Joint Declaration of Jonathan D. Uslaner and Gregg S. Levin in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Joint Declaration" or "Joint Decl."). Lead Plaintiffs respectfully refer the Court to the Joint Declaration for a detailed description of the claims asserted, the procedural history of the Action, the negotiations resulting in the Settlement, the risks of continued litigation, compliance with the Court-approved notice plan, and the Plan of Allocation. Citations to "¶ __" herein refer to paragraphs in the Joint Declaration and citations to "Ex. __" herein refer to exhibits to the Joint Declaration.

in any of the proceedings related to the alleged anti-competitive conduct that was at issue in the Action.

The Settlement is particularly favorable in light of the significant risks of continued litigation. While Lead Plaintiffs had overcome Defendants' motion to dismiss and motion for judgment on the pleadings and had obtained certification of the Class, they recognized that there were still substantial risks to succeeding at summary judgment, at trial, and on any appeals after a successful trial. At each of these stages, Defendants would continue to argue that their challenged statements were not false, that Defendants did not act with the intent to mislead investors, and that Lead Plaintiffs would not be able to prove that the statements at issue were the cause of the declines in Qualcomm's common stock. ¶¶ 61-74.

One of the most significant risks was the possibility of no recovery based on developments in the actions that formed the basis of the corrective disclosures in this case. Since the time that the Complaint was filed, Qualcomm has successfully defeated nearly every other related action. For example, the Ninth Circuit held that Qualcomm's business practices at issue here complied with the competition laws and reversed a district court's decision in favor of the Federal Trade Commission ("FTC"). The Ninth Circuit also reversed a district order certifying a class of U.S. consumers alleging the same anti-competitive practices, after which the district court dismissed certain claims and granted summary judgment in favor of Qualcomm. Likewise, a court reversed the European Commission's ("EC") findings that Qualcomm's chip-selling practices to Apple had anticompetitive effects, and Apple voluntarily dismissed its suit against Qualcomm and agreed to pay Qualcomm billions of dollars, sending Qualcomm's stock price soaring. ¶¶ 66, 73. Meanwhile, the U.S. Securities and Exchange Commission ("SEC") has taken no action against any of the Defendants related to the alleged misstatements at issue in the case. ¶ 64.

Defendants have and would continue to assert that these developments disprove Lead Plaintiffs' core allegations and support Qualcomm's challenged

business practices, undermining Lead Plaintiffs' allegations of falsity, scienter, and loss causation. ¶¶ 62-68. Defendants would also assert that these developments in Qualcomm's favor mean that the alleged corrective disclosures in the Action did not reveal new information about Qualcomm's underlying conduct and that, instead, the negative price reactions on the corrective disclosure dates were due to the announcements of the meritless actions themselves and that those actions were based on previously disclosed risks. ¶¶ 66-68.

By the time the Parties agreed to the Settlement, Lead Plaintiffs had engaged in seven years of vigorous litigation, including through the briefing of Defendants' summary judgment motions and the parties' respective *Daubert* motions. Lead Plaintiffs and Lead Counsel had developed a robust understanding of the strengths and weaknesses of the claims and defenses as result of these extensive efforts, which included: (1) conducting a thorough investigation of the claims at issue, including a detailed review of public information such as filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, and news articles, and interviews with over 100 former Qualcomm employees; (2) preparing and filing a detailed Consolidated Class Action Complaint (the "Complaint"); (3) successfully opposing Defendants' motions to dismiss the Complaint and for judgment on the pleadings; (4) certifying the Class following a contested motion; (5) completing extensive fact discovery, including obtaining over 60 million pages of documents from Defendants and 17 non-party witnesses, serving and responding to extensive written discovery, and taking and defending 37 fact and expert deposition; (6) working extensively with experts in the fields of patent licensing, anticompetition laws, disclosure practices, damages, and market efficiency; (7) preparing and serving five expert reports and engaging in motion practice to exclude Defendants' six experts; (8) briefing in opposition to Defendants' motion for summary judgment; and (9) engaging in other pre-trial preparations, including consulting with a trial strategy consultant. ¶¶ 3, 7-54. In addition, the

Parties, though their experienced counsel, engaged in extensive arm's-length settlement negotiations. ¶¶ 55-57.

In light of the advanced stage of the litigation, the favorable result achieved, the significant risks of continuing to litigate this Action, and the costs and delay that would accompany continued litigation through trial and post-verdict appeals, Lead Plaintiffs and Lead Counsel believe that the Settlement is a highly favorable result for the Class. As discussed below, Lead Plaintiffs submit that each of the factors identified by the Ninth Circuit in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) and Rule 23(e)(2) supports final approval. The Settlement is endorsed by Lead Plaintiffs, who are sophisticated institutional investors with substantial financial stakes in the litigation. Accordingly, Lead Plaintiffs respectfully submit that the Court should approve the Settlement as fair, reasonable, and adequate.

Lead Plaintiffs also request that the Court approve the proposed Plan of Allocation for the Net Settlement Fund. The Plan of Allocation is designed to equitably distribute the proceeds of the Settlement to Class Members who submit valid Claim Forms on a *pro rata* basis based on damages they suffered as a result of the misconduct alleged in the Action. The Plan was prepared with the assistance of Lead Plaintiffs' damages expert, who calculated the estimated artificial inflation in the price of Qualcomm common stock during the Class Period, and is substantially similar to numerous other plans of allocation that have been approved in this District and around the country as fair and reasonable.

## II.    THE SETTLEMENT WARRANTS FINAL APPROVAL

Under Rule 23(e)(2), the Court should approve a proposed class action settlement if it finds it to be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In determining whether a proposed settlement is "fair, reasonable, and adequate," the Court considers whether: (1) the class representatives and counsel have adequately represented the class; (2) the proposed settlement was negotiated at arm's length; (3) the relief provided for the class is adequate; and (4) the proposed

settlement treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit also considers the following *Hanlon* factors in determining whether a proposed class action settlement is fair, reasonable, and adequate: (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *See Hanlon,* 150 F.3d at 1026; *see also Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civ. Serv. Comm'n of City & County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

The Court considers the settlement taken as a whole, rather than its individual component parts, and examines it for overall fairness. *See id*. at 628. The question is "not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027. The Court's assessment is "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Id*.

Moreover, in conducting this analysis, courts are guided by the Ninth Circuit's recognition that "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008). The Ninth Circuit has emphasized that "voluntary conciliation and settlement are the preferred means of dispute resolution," and that

this is "especially true in complex class action litigation." *Officers for Justice*, 688 F.2d at 625. Settlements of complex cases, such as this one, greatly contribute to the efficient utilization of scarce judicial resources and achieve the speedy resolution of claims. *See, e.g.*, *Velazquez v. Int'l Marine & Indus. Applicators, LLC*, 2018 WL 828199, at *4 (S.D. Cal. Feb. 9, 2018) ("Judicial policy favors settlement in class actions … where substantial resources can be conserved by avoiding the time, cost, and rigors of formal litigation."). As a court in this District recognized:

> The court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

*Rodriguez v. Bumble Bee Foods, LLC*, 2018 WL 1920256, at *2 (S.D. Cal. Apr. 24, 2018) (internal quotation marks omitted).

As discussed below, all of the Rule 23(e)(2) and *Hanlon* factors strongly support a finding that the proposed Settlement here is fair, reasonable, and adequate, and warrants final approval.

## A. Lead Plaintiffs and Lead Counsel Have Adequately Represented the Class

In determining whether to approve a class action settlement, the Court considers whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon,* 150 F.3d at 1020; *see also In re Biolase, Inc. Sec. Litig.*, 2015 WL 12697736, at *4 (C.D. Cal. June 5, 2015). The analysis of adequacy for Rule 23(e)(2) is "redundant" of the adequacy requirements that are set out in "Rule 23(a)(4) and Rule 23(g),

respectively.'" *Hudson v. Libre Tech. Inc.*, 2020 WL 2467060, at *5 (S.D. Cal. May 13, 2020).

As the Court found in its order certifying the Class, Lead Plaintiffs are adequate representatives of the Class. *See* ECF No. 279, at 18. Lead Plaintiffs are both sophisticated institutional investors with significant financial interest in the case. Lead Plaintiffs and the other Class Members all purchased Qualcomm common stock during the Class Period and were damaged by the same alleged false and misleading statements and Lead Plaintiffs have no conflicts with the other Class Members. If Lead Plaintiffs proved their claims at trial, they would also prove the Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

Further, Lead Plaintiffs and Lead Counsel have adequately represented the Class in their zealous prosecution of the Action over the past seven years and in their negotiation and achievement of the Settlement. Representatives of Lead Plaintiffs ably oversaw the prosecution of the Action; reviewed all major pleading; searched for and produced documents in response to Defendants' document requests; sat for depositions; and evaluated and approved the Settlement. *See* Bergström Decl. (Ex. 1), at ¶¶ 3-8; Hoffmann Decl. (Ex. 2), at ¶¶ 3-8. In addition, Lead Counsel are both highly qualified and experienced in securities litigation, as set forth in their firm resumes (*see* Exs. 4A-4 and 4B-3), and effectively led the prosecution of the litigation against skilled and experienced opposing counsel. Thus, this factor supports approval of the Settlement.

## B.   The Settlement Was Negotiated at Arm's Length Following Completion of Substantial Fact and Expert Discovery

As discussed in the Joint Declaration, the Settlement was reached after Lead Plaintiffs had conducted an extensive investigation of the claims and had completed an extensive fact and expert discovery process, which included the production of

over 60 million pages of documents from Defendants and non-parties and 37 fact and expert depositions. ¶¶ 10-11, 25-40. In addition, the Parties had briefed three rounds of dispositive motions (including Defendants' motion to dismiss the Complaint, motion for judgment on the pleadings, and motions for summary judgment); filed competing *Daubert* motions; and engaged in arm's-length settlement negotiations. ¶¶ 14-24, 49-57. As a result of all these efforts, Lead Plaintiffs and Lead Counsel possessed a firm understanding of the strengths and weaknesses of the Class's claims and Defendants' defenses by the time the Settlement was reached. These facts demonstrate the Parties' good-faith arm's-length negotiations and support approval of the Settlement. *See In re Regulus Therapeutics Inc. Sec. Litig.*, 2020 WL 6381898, at *4 (S.D. Cal. Oct. 30, 2020) (approving settlement that was the "product of arm's length negotiations through back-and-forth communications and bargaining of terms").

The Settlement, which was only reached after seven years of hard-fought litigation, is clearly not the product of any collusion between the Parties. Moreover, the proposed Settlement has none of the indicia of possible collusion identified by the Ninth Circuit (*see In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011)), such as a "clear-sailing" fee agreement or a provision that would allow settlement proceeds to revert to Defendants. *See* Stipulation ¶ 14 ("Lead Counsel's application for an award of attorneys' fees and/or Litigation Expenses is not the subject of any agreement between Defendants and Lead Plaintiff other than what is set forth in this Stipulation."); Stipulation ¶ 12 ("The Settlement is a non-recourse settlement. Upon the occurrence of the Effective Date, no Defendant, Defendants' Releasee, or any other person or entity who or which paid any portion of the Settlement Amount shall have any right to the return of the Settlement Fund or any portion thereof for any reason whatsoever . . . .").

**C.    The Relief Provided for the Class Is Adequate Considering the Costs, Risks, and Delay of Further Litigation and Other Relevant Factors**

  **1.    The Amount Offered in the Settlement Weighs in Favor of Final Approval**

The $75 million cash Settlement is a substantial and favorable recovery for the Class, taking into account the uncertainty, risks, and costs associated with attempting to obtain a greater amount. *See Mild v. PPG Indus., Inc.*, 2019 WL 3345714, at *6 (C.D. Cal. July 25, 2019) ("Based on the significant risks of continued litigation and the Settlement amount, the Court finds that the amount offered for settlement is fair."). "To determine whether the Settlement Agreement is fair, reasonable, and adequate, the Court must balance the continuing risks of litigation (including the strengths and weaknesses of Plaintiffs' case), with the benefits afforded to members of the Class, and the immediacy and certainty of a substantial recovery." *Baker v. SeaWorld Ent., Inc.*, 2020 WL 4260712, at *6 (S.D. Cal. July 24, 2020). In undertaking this analysis, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair." *Officers for Justice*, 688 F.2d at 628; *see also Rodriguez*, 2018 WL 1920256, at *4 (it "is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial").

  **2.    The Settlement Weighs the Strength of Lead Plaintiffs' Claims with the Substantial Risks of Continuing Litigation**

In assessing "the costs, risks, and delay of trial and appeal," Fed R. Civ. P. 23(e)(2)(C)(i), courts in the Ninth Circuit evaluate "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; [and] the risk of maintaining class action status throughout the trial." *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *8 (N.D. Cal. July 22, 2019) (citing *Hanlon*, 150 F.3d at 1026). Courts favor settlements as they conserve valuable

judicial resources and avoid further "protracted and uncertain litigation" and "subsequent appeals." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 527 (C.D. Cal. 2004); *see Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *10 (N.D. Cal. Apr. 22, 2010) ("Settlement avoids the complexity, delay, risk and expense of continu[ed] … litigation" and "produce[s] a prompt, certain, and substantial recovery for the … class."). "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Hall v. Marriott Int'l, Inc.*, 2024 WL 3367518, at *5 (S.D. Cal. July 10, 2024) (quoting *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 526).

Here, Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit. They recognize, however, the substantial risks the Class would face in establishing liability and complete damages through resolution of the motion for summary judgment, at trial, and in post-trial appeals—as well as the significant delay and expenses that would necessarily be incurred to pursue their claims through these additional stages. Indeed, Lead Plaintiffs faced substantial risks in establishing all the required elements of their claims, including falsity, scienter, loss causation, and damages. *See, e.g., Redwen v. Sino Clean Energy, Inc.*, 2013 WL 12303367, at *6 (C.D. Cal. July 9, 2013) ("Courts experienced with securities fraud litigation 'routinely recognize that securities class actions present hurdles to proving liability that are difficult for plaintiffs to clear.'").

With respect to falsity, Defendants have asserted, and would continue to assert that their statements were true—including their statements that Qualcomm "committed to" standard-setting organizations that it would license on FRAND terms and that its two business units were "separate." ¶ 62. In addition, Defendants have strong arguments that their statements that Qualcomm had "facilitated competition" were also literally true, as demonstrated by the Ninth Circuit's holding that Qualcomm "asserted its economic muscle 'with vigor, imagination, devotion,

and ingenuity'" and the European Court of Justice's reversal of the EC's findings that Qualcomm's practices had anticompetitive effects. *Id*. Indeed, in the Class Certification Order, the Court effectively dismissed an entire category of alleged misstatements. *Id*.

In seeking to dispose of the remaining misstatements at trial or on appeal, Defendants would also assert that the SEC has taken no action against Qualcomm, the Company has issued no restatements, and the Department of Justice ("DOJ") publicly endorsed Qualcomm's appeal to the Ninth Circuit. ¶ 63. Moreover, of the statements that remained at issue—concerning Qualcomm's alleged bundling of the negotiations and terms of its patent licenses and chipset agreements—the statements on which Lead Plaintiffs had the strongest arguments concerning falsity were contained in oral statements that were open to competing interpretations, and the other representations at issue were less specific about Qualcomm's bundling practices. *Id*. Accordingly, Lead Plaintiffs recognize that these issues presented unique challenges to establishing the falsity of the challenged statements.

Lead Plaintiffs faced additional challenges associated with proving scienter.[2] Defendants had substantial arguments that they reasonably believed Qualcomm's practices were lawful and their statements were truthful. In support of the reasonableness of their beliefs, Defendants were expected to point to the fact that the SEC has taken no action against any of the Defendants, the Ninth Circuit found that Qualcomm's actions complied with the competition laws, and the DOJ agreed with Qualcomm's position that its business practices were lawful. ¶ 64. Defendants were also expected to continue to argue that the Individual Defendants' personal stock trades were consistent with their honest belief: they did not sell a significant amount of their personal Qualcomm stocks during the Class Period and, in fact, held

---

[2] Scienter is notoriously "complex and difficult to establish at trial." *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1172 (S.D. Cal. 2007).

substantial Qualcomm stock at the time of the alleged corrective disclosures. ¶ 65. If a jury were to accept that Defendants did not act with the requisite state of mind, investors would have recovered nothing.

Lead Plaintiffs further recognized that Defendants had meaningful challenges to "loss causation" in this action. *See, e.g.*, *In re Zynga Inc. Sec. Litig.*, 2015 WL 6471171, at *9 (N.D. Cal. Oct. 27, 2015) ("[I]t [is] difficult for [plaintiff] to prove loss causation . . . at trial." (second and third alterations in original)). Each of the corrective disclosures in this case was an announcement related to either regulatory enforcement actions or a private lawsuit by Apple. Defendants strenuously argued that the corrective disclosures did not reveal "new" information about any of Qualcomm's alleged licensing and bundling practices, but merely disclosed developments in the regulatory investigations, the existence of which Defendants had already disclosed. ¶ 66. The Court already accepted Defendants' argument as to Qualcomm's Licensing Representations in its Class Certification Order, declining to certify a class with respect to a majority of the alleged misrepresentations that had been at issue in this case. *Id*. The same argument might have succeeded with respect to Qualcomm's Bundling Representations at summary judgment or at trial. Defendants would also contend that their public SEC filings repeatedly warned investors about the risks of regulatory action, as well as the initiation of the investigations that led to the enforcement actions forming the corrective disclosures at issue. *Id*.

Defendants would argue that for these reasons Lead Plaintiffs could not appropriately disaggregate the impact of information that was not related to the alleged false and misleading statements and omissions on the price declines at issue. ¶ 67. On that basis, Defendants had moved to decertify the Class through a motion that, if successful, would have precluded Lead Plaintiffs from prosecuting this action as a class action altogether. *Id*. In seeking to dispose of the remaining statements at summary judgment, Defendants presented arguments that the market was also

already aware of the alleged bundling practices. *Id.* Relatedly, Defendants had meaningful arguments that Qualcomm's stock price declined in response to the enforcement actions themselves—rather than any revelations about Qualcomm's practices. ¶ 68. Lead Plaintiffs recognized that the Class could recover nothing if the Court, a jury, or the Ninth Circuit accepted these loss causation challenges.

At the time the agreement to settle was reached, the Parties had fully briefed summary judgment and *Daubert* motions, which were set to be heard on June 12, 2024. ¶ 69. If Defendants prevailed on their summary judgment arguments in whole or in part, Lead Plaintiffs would have recovered nothing or substantially less. Likewise, if Defendants had succeeded on their *Daubert* motions, Lead Plaintiffs would have been severely limited in their ability to prove their case to a jury at trial.

Even if successful in prevailing at trial, Lead Plaintiffs recognized that they faced substantial appellate risk. The Ninth Circuit had already reversed entirely the FTC's post-trial victory against Qualcomm and denied a request to hear the appeal *en banc*. In so doing, the Ninth Circuit stated that Qualcomm did not unlawfully interfere with competition, but rather acted "hyper-competitively" and in accordance with the antitrust laws. ¶ 71. Additionally, the Ninth Circuit vacated a district court decision certifying a class of U.S. consumers alleging the same anti-competitive practices, after which the district court dismissed certain claims and granted summary judgment on all remaining claims in favor of Qualcomm. *See In re Qualcomm Antitrust Litig.*, 2023 WL 7393012, at *1 (N.D. Cal. Nov. 7, 2023).

Defendants also pressed threatening challenges that Lead Plaintiffs suffered no or little damages from the alleged misstatements. Qualcomm's stock price did not increase following any of the alleged misrepresentations, and its stock price fully rebounded following the reversal of the FTC and EC Actions and Apple's voluntary dismissal of its lawsuit. ¶ 72. Additionally, as noted, Defendants raised meaningful challenges that Lead Plaintiffs and their expert could not reliably "disentangle" the competing causes of investors' alleged damages, given the nature of the corrective

disclosures. *Id*. If Defendants prevailed at summary judgement, trial, or appeal on any of these arguments, investors would recover nothing.

While Lead Plaintiffs believe that they would have advanced strong arguments in response to each of Defendants' arguments, there was certainly a risk that a jury, the Court, or the Ninth Circuit could side with Defendants. *See In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (jury returned a verdict for defense after trial in securities fraud class action, finding that defendants were not liable for securities fraud).

In addition, the resolution of the disputed issues regarding loss causation and damages would have come down to a "battle of experts," and Defendants would invariably offer a well-qualified expert who would opine that the Class had little or no damages. As courts have long recognized, the uncertainty as to which side's expert's view might be credited by the jury presents a substantial litigation risk and supports the reasonableness of a settlement in a securities class action. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) (damages in a securities action would come down to a "'battle of experts' … with no guarantee whom the jury would believe"); *SeaWorld*, 2020 WL 4260712, at *7 (approving settlement where "Plaintiffs' ability to prove loss causation and damages would 'come down to an unpredictable battle of the experts,' the jury could have decided in Defendants' favor, resulting in Plaintiffs' claims being 'severely reduced, or eliminated'"); *In re Celera Corp. Sec. Litig.*, 2015 WL 7351449, at *6 (N.D. Cal. Nov. 20, 2015) (risks related to the "battle of the experts" supported approval of settlement).

Moreover, absent settlement now, the Parties might face additional years litigating this Action to a final resolution, including trial and likely post-trial appeals. *See SeaWorld*, 2020 WL 4260712, at *7 (noting that even plaintiffs prevailed at trial they would have likely "faced vigorous post-trial motion practice, potential individual trials for Class Members whom Defendants challenged in the claims process, and likely appeals to the Ninth Circuit—delaying any recovery for years

with the possibility of eliminating it entirely"); *Sudunagunta v. NantKwest, Inc.,* 2019 WL 2183451, at *4 (C.D. Cal. May 13, 2019) (finding the likelihood of "further deposition and expert discovery, motion practice, trial, and potentially appeals following trial" to favor settlement); *Nat'l Rural Telecomms.*, 221 F.R.D. at 527 ("even if [a jury] did reach unanimous verdicts, it is likely that an appeal would have followed").

### 3.    The Settlement Is Reasonable in Light of the Range of Potential Outcomes of the Litigation

The Settlement is also reasonable when considered in relation to the range of potential recoveries for the Class, even if Lead Plaintiffs overcame Defendants' summary judgment motions, prevailed at trial, and defeated any appeals. Lead Plaintiffs consulted extensively with damage experts in connection with this case. If investors prevailed on all aspects of their claims, throughout the entire Class Period, and on all corrective disclosures at trial, the absolute maximum amount of aggregate damages were approximately $3.6 billion, accounting only for disaggregation based on confounding non-fraud news and investors' offsetting gains. This estimate aggressively assumes that the jury would accept Dr. Tabak's content-analysis disaggregation calculations. It further assumes that the jury would accept Lead Plaintiffs' argument that no further disaggregation is required based on the materialization of a known risk, accepting instead that both that the enforcement actions and the Apple litigation were certain to occur (*i.e.*, 100% likely) based on Qualcomm's practices and that the market did not believe that they would ever occur (*i.e.*, investors believed there was zero chance they would occur).

Lead Plaintiffs recognize that damages would likely be significantly reduced or eliminated altogether in this case if the Court or the jury were to accept Defendants' challenges to Dr. Tabak's content analysis, found that any of the enforcement actions were not foreseeable, or determined that investors already appreciated the risks of such enforcement actions. Moreover, as discussed above in

connection with liability risks, Defendants and their experts had many substantial arguments that large parts or all of the declines following the alleged corrective disclosures were not related to the sustained alleged misstatements concerning bundling. For example, Defendants would point out that the EC's decision was subsequently reversed, thus undercutting that disclosure; and that the disclosures concerning the FTC action and Apple's lawsuit concerned a wide variety of conduct beyond just bundling.

Maximum recoverable damages would be significantly reduced in this Action if the Court or jury rejected any of the alleged corrective disclosures—which was a real possibility in this case. ¶ 73. As noted, Qualcomm successfully defeated all of the enforcement actions and the Apple lawsuit that were the subject of the corrective disclosures, with the lone exception of a portion of the KFTC Action. If damages were limited to the corrective disclosure concerning the KFTC Action—*i.e.*, the only enforcement action that was successfully brought against Qualcomm—damages in this case would be reduced to approximately $351 million. *Id.* Indeed, even this amount could be challenged because Defendants had substantial arguments that the KFTC disclosure did not relate to the sustained bundling claims. Nonetheless, under this potential (and more realistic) scenario, the Settlement represents a recovery of 21% of total maximum damages.

Judged by any of these benchmarks, the $75 million Settlement is consistent with the percentage recovery typically achieved in securities class actions. *See Khoja v. Orexigen Therapeutics, Inc.*, 2021 WL 5632673, at *6 (S.D. Cal. Nov. 30, 2021) ("the median settlement recovery for all securities cases in 2020 represented just 1.7% of investor losses"); *In re N. Dynasty Mins. Ltd. Sec. Litig.*, 2024 WL 308242, at *13 & n.11 (E.D.N.Y. Jan. 26, 2024) (finding 2.3% reasonable because it was consistent with "the median settlement for cases with similar estimated losses" of 1.8% for cases settled in 2022); *In re 3D Sys. Sec. Litig.*, 2024 WL 50909, at *12 & n.11 (E.D.N.Y. Jan. 4, 2024) (finding 1% reasonable for the same reasons); *PPG*,

2019 WL 3345714, at *6 (approving settlement representing "approximately 5.8% of the total maximum damages potentially available"); *Int'l Bhd. Of Elec. Workers Loc. 697 Pension Fund. Int'l Game Tech., Inc.*, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving settlement where recovery was 3.5% of maximum damages); *In re LJ Int'l, Inc. Sec. Litig.*, 2009 WL 10669955, at *4 (C.D. Cal. Oct. 19, 2009) (approving securities class action settlement where recovery was 4.5% of maximum damages).

### 4. The Proposed Method for Distributing Relief to the Class Is Effective

In evaluating a Settlement, the Court may also consider "the effectiveness of [the] proposed method of distributing relief to the class." Fed. R. Civ. P. 23(e)(2)(C)(ii). Here, the method for processing Class Members' claims and distributing relief to eligible claimants includes well-established, effective procedures for processing claims submitted by potential Class Members and efficiently distributing the Net Settlement Fund. In the Preliminary Approval Order, the Court approved A.B. Data, Ltd. ("A.B. Data")—which previously served as notice administrator for dissemination of the Class Notice—to serve as the Claims Administrator for the Settlement. A.B. Data is a highly experienced class action administrator.

With the oversight of Lead Counsel, A.B. Data will process the claims received, allow claimants an opportunity to cure any deficiencies in their claims or request the Court to review a denial of their claims, and, lastly, mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund after Court-approval. This type of claims processing is standard in securities class actions and has long been used and found to be effective. *See Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018) ("The Court further finds that the proposed claims process provides an effective method of implementing that plan by ensuring that the claimant provides sufficient information to calculate the recognized

loss amount. Therefore, this factor weighs in favor of approval."), *aff'd sub. nom. Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020). This claim procedure is necessary because neither Lead Plaintiffs nor Defendants possess data regarding investors' transactions in Qualcomm common stock that would allow the Parties to create a claims-free process to distribute Settlement funds.

**5.    Lead Counsel's Fee and Expense Request Is Fair and Reasonable**

The relief provided by the Settlement is also adequate upon consideration of the terms and timing of the proposed award of attorneys' fees. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii). As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 23% of the Settlement Fund, net of Litigation Expenses, to be paid upon the Court's approval, are reasonable in light of the substantial efforts devoted by Plaintiffs' Counsel, the recovery obtained for the Class, and the significant risks that counsel confronted. Moreover, the request for attorneys' fees is below the Ninth Circuit's 25% "benchmark" award in common fund cases and is within range of fee percentages awarded to counsel in comparable class actions in this Circuit. *See* Fee Memorandum at 5-8. Neither Lead Plaintiffs nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. Stipulation ¶ 15.

**6.    The Parties Have No Side Agreements Other Than a Supplemental Agreement Concerning Opt-Outs**

Lastly, as previously disclosed, the only agreement that the Parties entered into, other than the Stipulation itself, was a standard confidential Supplemental Agreement providing Qualcomm with the right to terminate the Settlement if the number of Class Members who requested exclusion from the Class exceeded a certain threshold (the "Termination Threshold"). *See* Stipulation ¶¶ 1(rr), 33. Such agreements are common in securities class action settlements, and do not weigh against final approval. *See Fleming v. Impax Lab'ys Inc.*, 2021 WL 5447008, at *11

(N.D. Cal. Nov. 22, 2021) ("The existence of a termination option triggered by the number of class members or shares that opt out of the Settlement does not by itself render the Settlement unfair.").

### 7.    All Class Members Are Treated Equitably

Rule 23(e) also includes consideration of whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). As discussed below, the proposed Plan of Allocation is fair, reasonable and adequate because provides an equitable method of allocating the Settlement Fund based on damages related to the alleged fraud and does not treat Lead Plaintiffs or any other Class Member preferentially. *See Zynga*, 2015 WL 6471171, at *10 (finding the plan of allocation "distributes the funds without giving undue preferential treatment to any class members"). Under the Plan of Allocation, Class Members who submit timely claims will receive payments based on the timing and number of shares they purchased and the extent of their injury related to the alleged fraud. Lead Plaintiffs, just like all other Class Members, will be subject to the same formula for distribution of the Settlement. Thus, this factor weighs in favor of approval. *See PPG*, 2019 WL 3345714, at *6.

### D.    The Extent of Discovery Completed and the Stage of the Proceedings Favor Final Settlement Approval

In assessing a class action settlement, courts also consider whether plaintiffs and their counsel had sufficient information to "make an informed decision about the merits of their case." *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *4 (C.D. Cal. Oct. 25, 2016). Here, Lead Plaintiffs' decision to enter into the Settlement was based on their thorough understanding of the strengths and weaknesses of their claims and Defendants' defenses after seven years of litigation. Lead Plaintiffs and Lead Counsel had a comprehensive understanding of the case and evidence through their (1) extensive pre-suit investigation, which included interviews with over 100 former Qualcomm employees; (2) preparing and filing the detailed Complaint;

(3) successfully opposing Defendants' motions to dismiss the Complaint and for judgment on the pleading; (4) obtaining certification of the Class through a contested class certification motion; (5) conducting extensive fact and expert discovery, including obtaining and reviewing over 60 million pages of documents from Defendants and 17 subpoenaed non-parties; (6) taking or defending 37 depositions; (7) working extensively with experts; and (8) briefing Defendants' motions for summary judgment as well as *Daubert* motions. ¶¶ _____.

In sum, when the Settlement was reached, Lead Plaintiffs and Lead Counsel had more than ample information to assess the strengths and weaknesses of their case and "to effectively evaluate […] the advantages of the settlement." *Elliott v. Rolling Frito-Lay Sales, LP*, 2014 WL 2761316, at *8 (C.D. Cal. June 12, 2014). This factor weighs in favor of final approval of the Settlement.

### E.    The Experience and Views of Counsel Favor Settlement

"In reviewing a settlement for final approval, courts accord 'great weight' to the recommendation of counsel. Counsel 'are most closely acquainted with the facts of the underlying litigation' and are therefore in an ideal position to assess the fairness of the settlement offer." *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2013 WL 6577020, at *15 (C.D. Cal. Dec. 5, 2013); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("This circuit has long deferred to the private consensual decision of the parties."). Both Lead Counsel firms have significant experience in securities and other complex class action litigation and have negotiated numerous other substantial class action settlements throughout the country.[3] Lead Counsel believe that the Settlement is an excellent result because it provides the Class with genuine and substantial relief. *See Extreme Networks*, 2019 WL 3290770, at *9 ("That such experienced counsel advocate in favor of the

---

[3] *See* firm resumes of BLB&G and Motley Rice are attached as Exhibits 4A-4 and 4B-3 to the Uslaner Declaration.

settlement weighs in favor of approval"); *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *5 (C.D. Cal. Oct. 13, 2015) ("recommendations of plaintiffs' counsel should be given a presumption of reasonableness").

### F.   The Reaction of the Class

In evaluating class action settlements, courts also consider the reaction of class members to the proposed settlement. *See Hanlon,* 150 F.3d at 1026. Here, the deadline for submission of objections to the Settlement is September 6, 2024. To date, no objections have been received. ¶ 81. Lead Plaintiffs will address any objections that may be received in their reply brief due September 20, 2024.

Moreover, both Lead Plaintiffs—sophisticated institutional investors that were closely involved throughout the litigation and the settlement negotiations—strongly support final approval of the Settlement. *See* Bergström Decl. (Ex. 1), at ¶¶ 2-8; Hoffmann Decl. (Ex. 2), at ¶¶ 2-8. *See Countrywide*, 2013 WL 6577020, at *16 (granting final approval and stating that "[c]ourts afford special weight to the opinions of class representatives").

In sum, as discussed in detail above, each of the Rule 23(e)(2) and *Hanlon* factors support a finding that the Settlement is fair, reasonable, and adequate. Final approval is, therefore, appropriate.

## III.   THE PLAN OF ALLOCATION IS FAIR, REASONABLE AND ADEQUATE

The standard for approval of a plan of allocation in a class action under Rule 23 is the same as the standard applicable to the settlement as a whole: the plan must be "fair, reasonable, and adequate." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992); *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1040 (N.D. Cal. 2008). An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced class counsel. *See Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *11 (C.D. Cal. June 10,

2005). Courts hold that "[a] plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *Biolase*, 2015 WL 12720318, at *5.

The Plan of Allocation is set forth in Appendix A to the Settlement Notice. *See* Ewashko Decl. Ex. B, at pp. 17-22. In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per-share closing price of Qualcomm common stock allegedly caused by Defendants' alleged misrepresentations and material omissions. Settlement Notice ¶ 73. In calculating the estimated alleged artificial inflation, Lead Plaintiffs' damages expert considered price changes in Qualcomm common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces and adjusting to disaggregate the portions of the price declines on those days that were unrelated to the alleged fraud, based on Lead Plaintiffs' damages expert's analysis. *Id*.

Under the Plan of Allocation, Recognized Loss Amounts are generally the lesser of: (i) the difference between the amount of alleged artificial inflation in Qualcomm common stock at the time of purchase or acquisition and the time of sale, or (ii) the difference between the actual purchase price and the sale price. Settlement Notice ¶¶ 75, 77. To have a Recognized Loss Amount, claimants must have held the shares they purchased or acquired during the Class Period through at least one of the dates where allegedly new corrective information was released to the market and allegedly partially removed the artificial inflation from the price of Qualcomm common stock. *Id*. ¶¶ 74, 75. In addition, in accordance with the PSLRA, Recognized Loss Amounts for shares of Qualcomm common stock sold during the 90-day period after the end of the Class Period (or held until the end of that period) are further limited to the difference between the purchase price and the average

closing price of the stock from the end of the Class Period to the date of sale. *Id.* ¶¶ 77.C(ii), 77.D(ii).

The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of Qualcomm common stock during the Class Period is the Claimant's "Recognized Claim." Settlement Notice ¶ 78. The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. *Id.* ¶ 87. If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant (*id.* ¶ 88), and those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum.

The Plan of Allocation is fair and reasonable because it is consistent with the damages and loss causation calculations performed by Lead Plaintiffs' expert and reasonably allocates funds to Class Members based on the amount of their losses attributable to the alleged fraud. ¶ 91. To date, after mailing of nearly 1.8 million copies of the Notices, no Class Members have objected to the Plan of Allocation. *Id.*

## IV.  NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23, DUE PROCESS, AND THE PSLRA

In accordance with the Court's Preliminary Approval Order, A.B. Data began mailing copies of the Postcard Notice on July 11, 2024. *See* Ewashko Decl. (Ex. 3), at ¶¶ 2-5. Through August 22, 2024, A.B. Data has mailed or emailed a total of 1,795,315 Postcard Notices or Settlement Notices. *See id.* ¶ 7. In addition, A.B. Data caused the Summary Settlement Notice to be published in *The Wall Street Journal* and transmitted over the *PR Newswire* on July 23, 2024. *Id.* ¶ 8. A.B. Data also updated the dedicated case website, www.QualcommSecuritiesLitigation.com, to provide information about the Settlement, as well as access to downloadable copies of the Settlement Notice and Claim Form and other Settlement-related documents. *See id.* ¶ 11.

In accordance with Rule 23 and the PSLRA, the Postcard Notice and Settlement Notice (collectively, "Notices") apprised Class Members of, *inter alia*: (i) the claims asserted in the Action and the definition of the Class; (ii) the amount of the Settlement; (iii) the reasons why the Parties are proposing the Settlement; (iv) the estimated average recovery per affected share of Qualcomm common stock; (v) the maximum amount of attorneys' fees and expenses that will be sought; (vi) the identity and contact information for representatives from Lead Counsel available to answer questions concerning the Settlement; (vii) the right of Class Members to object to the Settlement, Plan of Allocation, or motion for attorneys' fees and expenses; (viii) the dates and deadlines for certain Settlement-related events; and (ix) the opportunity to obtain additional information about the Action and the Settlement by contacting Lead Counsel, the Claims Administrator, or visiting the Settlement website. *See* Fed. R. Civ. P. 23(c)(2)(B); 15 U.S.C. § 78u-4(a)(7). The Settlement Notice also set forth the Plan of Allocation and provided Class Members with detailed information on how to object or submit a Claim Form in order to be eligible to receive a distribution from the Net Settlement Fund.

Courts have approved notice programs similar to this one in a multitude of class action settlements. *See, e.g.*, *Baker v. SeaWorld Ent., Inc.*, 2020 WL 818893, at *3 (S.D. Cal. Feb. 19, 2020) (approving comparable notice plan); *Walters v. Target Corp.*, 2019 WL 6696192, at *8 (S.D. Cal. Dec. 6, 2019) (same); *Gutierrez-Rodriguez v. R.M. Galicia, Inc.*, 2018 WL 1470198, at *4, *8 (S.D. Cal. Mar. 26, 2018). Moreover, this Court has already found that the proposed notice program is adequate, at set forth in the Preliminary Approval Order. *See* Preliminary Approval Order (ECF No. 433), at ¶¶ 5-6. Lead Counsel and A.B. Data have carried out the notice program as proposed in that order.

Accordingly, Lead Plaintiffs respectfully submit that the Notice fairly apprises Class Members of their rights with respect to the Settlement and is the best notice practicable under the circumstances.

## V. CONCLUSION

For all the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated: August 23, 2024

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By: */s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

-and-

Salvatore J. Graziano (*Pro Hac Vice*)
salvatore@blbglaw.com
Rebecca E. Boon (*Pro Hac Vice*)
rebecca.boon@blbglaw.com
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

**MOTLEY RICE LLC**
Gregg S. Levin (*Pro Hac Vice*)
glevin@motleyrice.com
William S. Norton (*Pro Hac Vice*)
bnorton@motleyrice.com
Christopher F. Moriarty (*Pro Hac Vice*)
cmoriarty@motleyrice.com
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

1

Tel: (843) 216-9000
Fax: (843) 216-9450

2

3

*-and-*

4

William H. Narwold (*Pro Hac Vice*)
bnarwold@motleyrice.com
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103

5

6

7

8

*Counsel for Lead Plaintiffs Sjunde AP-Fonden and Metzler Asset Management GmbH, and Lead Counsel for the Class*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28