# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In Re: Qualcomm Incorporated Securities Litigation | Case No. **3:17-CV-00121-JO-MSB**<br><br>HIGHLY CONFIDENTIAL-<br>ATTORNEYS' EYES ONLY |

# EXPERT REPORT OF JONATHAN BARNETT

December 11, 2023

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................4

A. Qualifications ....................4

II. BACKGROUND, ASSIGNMENT, AND SUMMARY OF CONCLUSIONS ....................5

A. Background ....................5

B. Assignment and Summary of Conclusions ....................8

III. PURPOSES AND ENFORCEMENT OF ANTITRUST LAW ....................13

A. Overview of Antitrust Law ....................13

1. Antitrust Agencies: The DOJ and FTC ....................14

a. Enforcement Powers ....................14

b. Process for Bringing an Enforcement Action ....................15

2. Private Antitrust Enforcement ....................15

B. Assessing the Antitrust Risk of Qualcomm's Allegedly Undisclosed Practices ....................16

C. Bundled Discounts are Generally Good for Competition and Consumers ....................19

1. Discount-Attribution Test ....................23

2. Rule of Reason and/or Exclusive Dealing Tests ....................25

IV. THE INTERSECTION BETWEEN ANTITRUST LAW AND THE WIRELESS COMMUNICATIONS INDUSTRY ....................26

A. Overview of the Wireless Communications Industry ....................26

1. Stakeholders in the Wireless Communications Ecosystem ....................27

a. Technology Innovators ....................27

b. Chipset Manufacturers ....................29

c. Original Equipment Manufacturers (OEMs) ....................30

2. Licensors like Qualcomm Agree to Offer License Terms that are FRAND-Compliant ....................31

3. FRAND Violations Are Not Standalone Antitrust Violations ....................31

V. ANTITRUST LAW AND QUALCOMM'S PREVIOUSLY DISCLOSED CONDUCT ....................33

A. Qualcomm's Business Model ....................................................................33

B. Device-Level Licensing ..........................................................................36

C. Qualcomm's Practice of Selling Chips Only to Licensees ...................................40

VI. THE PROPOSED ANTITRUST THEORIES OF COMPETITIVE HARM ATTRIBUTED TO THE PURPORTEDLY UNDISCLOSED BUNDLING PRACTICES ARE NOT WELL-FOUNDED IN ANTITRUST LAW AND LACK FACTUAL SUPPORT....................................................................45

A. Qualcomm's practice of providing chip discounts, marketing development funds, and/or strategic relationship funds to OEM licensees................................45

B. Leveraging of the publicly disclosed practice that Plaintiffs call "no license, no chips" ..........................................................................48

C. Exclusive dealing..............................................................................51

D. Negotiating licensing and chip contracts at the same time ...................................58

VII. PROFESSOR SIMCOE HAS NO BASIS FOR HIS ASSERTION THAT ANTITRUST LAWSUITS BASED ON PURPORTEDLY UNDISCLOSED "BUNDLING" PRACTICES WERE "HIGHLY LIKELY," FORESEEABLE, OR INEVITABLE.........................................................................................59

A. None of these lawsuits were inevitable or foreseeable .........................................59

B. The legal theories in these cases were novel, untested, idiosyncratic (and ultimately unsuccessful) attempts to extend the boundaries of antitrust law.........62

# I. INTRODUCTION

## A. Qualifications

1. My name is Jonathan M. Barnett. I am the Torrey H. Webb Professor of Law at the University of Southern California, Gould School of Law. I have taught at the law school since 2006.

2. I publish on legal and economic issues involving antitrust and intellectual property law, with a focus on licensing practices in information technology markets. I have published one book (with Oxford University Press) and approximately 30 articles in legal academic and economics journals, three book chapters, and approximately 10 articles in policy publications. I have published multiple articles on antitrust and intellectual property law that address legal and economic issues relating to the enforcement and licensing of patents, standard-essential patents ("SEPs") and other intellectual property rights in wireless communications and other information technology markets, including articles in the Berkeley Technology Law Journal, Harvard Journal of Law & Technology, Journal of Antitrust Enforcement, Jurimetrics, Michigan Technology Law Review, and a book chapter in a forthcoming book to be published by Cambridge University Press. I have also addressed these issues in portions of a book that I published with Oxford University Press. My curriculum vitae, which lists all publications that I have authored or co-authored, is attached as **Exhibit 1.**

3. I regularly teach antitrust law, contract law, and intellectual property law at the law school. I also teach an annual course on intellectual property law at the World Intellectual Property Organization Summer School.

4. Prior to academia, I practiced law during 2000-06 at Cleary Gottlieb Steen & Hamilton LLP in New York (except for 2002-03, when I was a visiting professor at Fordham University School of Law in New York).

5. I am a graduate of Yale Law School. I have an undergraduate degree from the University of Pennsylvania and a graduate degree from Cambridge University.

6. I have co-written submissions to the U.S. Department of Justice (DOJ), the Federal Trade Commission (FTC), the United Kingdom Intellectual Property Office, and the European Commission concerning the treatment of SEP licensing and enforcement practices under antitrust, patent, and contract law and the economic function of SEPs in wireless technology markets. My curriculum vitae, attached as Exhibit 1, lists all such submissions.

7. I regularly present at conferences and other events on antitrust and intellectual property law and policy topics, including events or panels that specifically address the enforcement and licensing of SEPs and other intellectual property rights in wireless communications markets. My curriculum vitae attached as Exhibit 1, lists all such presentations.

8. I am being compensated for my work on this case at a rate of $500 per hour. This compensation is unrelated to the substance of my testimony or the outcome of this matter.

## II. BACKGROUND, ASSIGNMENT, AND SUMMARY OF CONCLUSIONS

### A. Background

9. I understand that this litigation concerns certain statements Qualcomm made about some of its business practices, which Plaintiffs allege were materially misleading in certain respects, and that when the alleged truth regarding Qualcomm's business practices were revealed to the market, Qualcomm's stock price allegedly fell and caused harm to stockholders. I further understand that the District Court overseeing this litigation has ruled that some of the business practices that have been at issue in this litigation were in fact known to the market, while finding that Plaintiffs met their burden on class certification that other practices remained allegedly concealed.

10. I understand that the District Court has ruled—or Plaintiffs have acknowledged—

that the practices below were disclosed business practices.[1]

a. Device-Level Licensing- I understand that it was known during the Class Period that Qualcomm generally only licensed SEPs or other patents to original equipment manufacturers ("OEMs") or contract manufacturers involved in the production of computing or communications devices. I further understand that it was known during the Class Period (2012-2016) that Qualcomm did not exhaustively license SEPs or other patents to producers of chipsets or other components for computing or communications devices.

b. No License, No Chips- I understand that it was known during the Class Period that Qualcomm only agreed to sell chipsets to purchasers who had licensed from Qualcomm a portfolio of SEPs relating to the relevant technology standard.[2] I further understand that despite initially arguing in this litigation that certain of these practices were concealed from the market, Plaintiffs now recognize that they were in fact disclosed.[3]

11. I understand that Plaintiffs allege that there were two purported practices that Plaintiffs allege were undisclosed to the market.

a. Marketing incentives and/or chip discounts when an OEM would ask for lower royalty rates- I understand that Plaintiffs allege that Qualcomm failed to disclose

---

[1] Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, *In re Qualcomm Sec. Litig.*, Case No. 3:17-cv-00121-JO-MSB (S.D. Cal. Mar. 20, 2023), ECF No. 279 ("Order"), at 22-28.
[2] *Id.*
[3] Oct. 18, 2022 Letter from Graziano to The Honorable Jinsook Ohta ("Letter") at 1 (recognizing that "the market understood that Qualcomm would only sell chips to licensed companies" and that "the market understood that Qualcomm based its royalties on device-level pricing[.]"); Expert Report of Timothy Simcoe, Ph.D. ("Simcoe Report") ¶ 62 (recognizing that "Refusal to license[,]" "Device-level licensing[,]" and "No license, no chips" were all "disclosed practices").

to investors during the Class Period that, when an OEM would ask for lower royalty rates, Qualcomm sometimes offered chip discounts and/or incentive payments that accrued when an OEM would purchase Qualcomm chips.[4]

i. I note that, in its securities disclosures during the Class Period, Qualcomm disclosed that it had agreed to grant incentive payments and cost reimbursements to OEMs. For example, in its 2015 Form 10-K filing with the Securities and Exchange Commission, Qualcomm disclosed that it "records reductions to revenues for customer incentive arrangements, including volume-related and other pricing rebates and cost reimbursements for marketing and other activities involving certain of the Company's products and technologies."[5] Similar disclosures can be found in all other Form 10-Ks filed by Qualcomm during the Class Period.

b. Using "chip supply" as a stick during license negotiations- I understand that Plaintiffs allege that Qualcomm failed to disclose to investors during the Class Period that it threatened to withhold chipsets as part of license negotiations with OEMs.[6] Much of the correspondence and other documentation provided by the Expert Report of Timothy Simcoe, Ph.D. ("Simcoe Report") concerning alleged threats by Qualcomm to withhold chip supply[7] repeat allegations set forth in a

[4] *In re Qualcomm Incorporated Securities Litigation*, Case No. 3:17-cv-00121-JAH-WVG (S.D. Cal. July 3, 2017), ECF 32, at 37 (stating that "[i]t has also been revealed that Qualcomm . . . bundled the terms and negotiations of its standard-essential patent licenses with its chipset agreements"), 44 ("Qualcomm bundled its licenses to the standard-essential patents to the customers' agreement to buy Qualcomm chipsets"), and 68 ("Qualcomm . . . bundled the terms and negotiations of its license and chipset agreements"). See also Letter at 1 (alleging that Qualcomm bundled "lower license royalties when customers purchased Qualcomm chipsets").
[5] See, e.g., Qualcomm, Form 10-K, at 95 (Nov. 4, 2015).
[6] Simcoe Report ¶¶ 56-61, App. E; *see also* Order, at 30 (stating that "the Third Corrective Disclosure allegedly revealed that Qualcomm . . . 'induced certain OEMs to accept its preferred license terms using [ ] the 'stick' of supply disruption'").
[7] Simcoe Report ¶¶ 56-61, App. E.

Complaint publicly filed by the FTC on January 17, 2017[8] in its antitrust lawsuit against Qualcomm. Any purported threatened refusal by Qualcomm to supply chips to unlicensed OEMs would appear to be the natural consequence of what Plaintiffs call Qualcomm's "no license, no chips" practice, which I understand was known to the market during the Class Period. In the appeal of the FTC's antitrust lawsuit against Qualcomm, the Court of Appeals for the Ninth Circuit unanimously held that this practice does not violate federal antitrust laws.[9]

i. Moreover, the Ninth Circuit observed that Qualcomm's "sometimes aggressive defense of these policies" (including the "no license, no chips" policy) elicited "disciplin[ing]" responses from its customers, including "arbitration claims, negotiations, threatening to change chip suppliers, and litigation[,]" which "generally resulted in settlements and renegotiated licensing and chip-supply agreements[.]"[10] The Simcoe Report never references the Ninth Circuit opinion or the fact that it overruled the district court opinion in its entirety.

**B. Assignment and Summary of Conclusions**

12. Counsel for Defendants have asked me to review and respond to the theories, analyses, and opinions offered by Plaintiffs' expert, Prof. Timothy Simcoe. In particular, Defendants have requested that I review the record and express my opinions regarding the issues

---

[8] Q2014FTC04095248 at -95269 (*FTC v. Qualcomm* Complaint stating that "Qualcomm has induced certain OEMs to accept its preferred license terms using [] the 'stick' of threatened supply disruption").

[9] *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020). A court in the Northern District of California has also concluded that the policy does not violate California's Cartwright Act. *See In re Qualcomm Antitrust Litig.*, No. 17-MD-02773-JSC, 2023 WL 121983, at *18 (N.D. Cal. Jan. 6, 2023) ("Without any basis in case law, the Court cannot invent a novel tying violation here. Plaintiffs' tying claim fails as a matter of law.").

[10] *FTC*, 969 F.3d. at 985.

below. The summary of my conclusions follows each issue:

13. How bundling is viewed in antitrust law, principles, and literature: Bundling refers to selling multiple products as one "bundle." Bundled discounts refers to any practice involving a package of goods or services that are sold together at a total price that reflects a discount relative to purchasing each of the goods or services separately. It is widely recognized in antitrust case law and the scholarly literature that bundling is a common commercial practice, has favorable pricing effects and transaction-cost savings for buyers, and therefore generally does not give rise to antitrust concern. In limited circumstances, antitrust case law recognizes that bundling can cause competitive harm by deterring entry by equally or more efficient single-product competitors.

14. How antitrust law intersects with the wireless communications industry: I provide a brief background on the wireless communications industry and its intersection with antitrust law. I first provide an overview of the different stakeholders in the wireless communications industry—including technology innovators, carriers, chipset manufacturers, and OEMs—as well as the role of standards-development organizations ("SDOs" or "SSOs"), SEPs, and the FRAND requirement in adopting, developing, and implementing these standards. I further explain that technology innovators like Qualcomm invest significantly more resources in getting standards adopted and implemented than other stakeholders in the wireless communications industry. And although I do not opine on the FRAND requirement itself, I explain that an alleged breach of a FRAND requirement almost never gives rise to an antitrust violation. Instead, courts have long-held that these are matters for patent and contract law unless there is proof of deception resulting in the acquisition of market power.

15. Antitrust law and principles on Qualcomm's concededly disclosed conduct: I provide an overview of how antitrust law, principles, and literature view the conduct that Plaintiffs concede was previously disclosed to the market. Specifically, I focus on two of

Qualcomm's practices. First, Qualcomm's practice of selling chipsets only to licensed OEMs—referred to by the FTC and Plaintiffs as the "no license, no chips" practice—and second, its practice of only licensing exhaustively at the device level—which the Ninth Circuit called "no license, no problem." I provide an overview of these practices, the procompetitive justifications for each practice, and explain that, under U.S. antitrust law, neither of these practices rose to the level of being an antitrust violation. In fact, they were considered to be "hypercompetitive" by the Ninth Circuit.

16. Whether simultaneously negotiating SEP licenses and modem chip[11] sales raised significant antitrust concerns during the Class Period. There is no antitrust doctrine under which this practice by itself would have been considered an antitrust offense during the Class Period. If this practice could be properly characterized as part of a bundled discount comprising Qualcomm's license and modem chip sales, then it would be addressed under the discount-attribution test. I understand that neither Plaintiffs nor any of their experts have alleged, suggested, or attempted to demonstrate that Qualcomm's licensing and modem chip sale practices gave rise to a significant risk of antitrust liability under the requirements set forth in that test.

17. Whether providing discounts, incentives, or marketing funds to OEMs who both (a) entered into a license to pay royalties for their use of Qualcomm's SEPs, and (b) purchased Qualcomm's chips raised significant antitrust concerns during the Class Period: This practice could not reasonably be expected to raise significant antitrust concerns during the Class Period. If this practice is construed as a bundled discount, I understand that neither Plaintiffs nor any of their experts have provided any evidence showing that Qualcomm's licensing, chipset sales, and incentive payment arrangements would likely give rise to a significant risk of antitrust liability

[11] In this report, "modem chips," "baseband modem chips," "chipsets," and "chips" are used interchangeably, unless otherwise specified.

under the discount-attribution test. And if these discounts were construed as an exclusive dealing arrangement, I understand that neither Plaintiffs nor any of their experts have provided any evidence (including in particular, any evidence of a foreclosure effect in a substantial share of any relevant market) showing that this practice would likely give rise to a significant risk of antitrust liability under the rule-of-reason test as applied to such arrangements.

18. Whether antitrust laws or principles prohibited Qualcomm, during licensing negotiations with OEMs, from communicating its publicly disclosed practice of selling modem chips only to licensed OEMs. Antitrust laws or principles did not prohibit Qualcomm, during licensing negotiations with OEMs, from communicating its publicly disclosed practice of selling modem chips only to licensed OEMs. As found by the Ninth Circuit, this policy (which the FTC had argued that Qualcomm leveraged) was a lawful, "chip-supplier neutral" policy that charged a licensee the same royalty rate regardless of whether it elected to purchase chips from Qualcomm or any other supplier.[12] Indeed, the Ninth Circuit generally characterized Qualcomm's business practices as "[h]ypercompetitive."[13] Hence, what Plaintiffs call Qualcomm's "no license, no chips" policy did not cause competitive harm and did not constitute an offense under the antitrust laws.

19. Whether any of the antitrust regulatory actions brought against Qualcomm during the Class Period were well-founded in U.S. antitrust law and practice such that they could be considered inevitable or foreseeable results of the allegedly undisclosed practices at issue in this lawsuit.[14] The antitrust litigation brought by the FTC against Qualcomm in 2017 could not be

---

[12] *FTC*, 969 F.3d at 985.
[13] *Id.* at 1005.
[14] As discussed below, regulatory actions themselves are unpredictable because agency and governmental enforcement actions are based on many considerations, including political considerations. Thus, there is little way to say that any particular enforcement action could be inevitable or foreseeable. William E. Kovacic, Politics and Partisanship in U.S. Federal Antitrust Enforcement, 79 *Antitrust L.J.* 687, 689 (2014) ("For academics, practitioners, and public officials, the question is not whether political forces surround the DOJ and the FTC, or whether

considered an inevitable or foreseeable result of the allegedly undisclosed practices at issue in this lawsuit. The FTC's lawsuit was approved by the Commission based on a vote by only three (out of the full five) members,[15] one of which issued an unusual public dissent stating that the Commissioners had not been presented with any "robust economic evidence of exclusion and anticompetitive effects" and characterizing the agency's theory of competitive harm as a "possibility theorem."[16] As found unanimously by the Ninth Circuit, the district court's ruling in the FTC's favor relied on a novel and idiosyncratic theory of competitive harm that represented an "improper excursion beyond the outer limits of the Sherman Act[,]"[17] lacked evidentiary support[18], and misapplied or ignored Supreme Court precedent.[19] The FTC conceded error in part of the district court's ruling[20] and declined to appeal any part of the Ninth Circuit's reversal. The DOJ, meanwhile, took the unusual step of intervening in the FTC's trial and appellate proceedings to make filings in defense of Qualcomm.[21]

20. The list of documents and materials I relied upon in forming my opinions is

---

decisions by elected officials sometimes influence agency behavior. They assuredly do."); B. Dan Wood & James E. Anderson, *The Politics of U.S. Antitrust Regulation*, 37 Am. J. Pol. Sci. 1, 2 (1993) ("Our analysis shows that politics, not economics or bureaucracy, is the best explanation for the changing vigor and substance of U.S. antitrust regulation through time.").

[15] At the time, two Commission seats were vacant.

[16] Jan. 17, 2017 Federal Trade Commission, Dissenting Statement of Commissioner Maureen K. Ohlhausen in the Matter of Qualcomm, Inc. (File No. 141-0199) at 2.

[17] *FTC*, 969 F.3d at 980.

[18] *Id.* at 1001 (finding that the FTC "offer[ed] no evidence that Qualcomm engaged in predatory pricing").

[19] *Id.* at 993-996 (finding that district court's reasoning is inconsistent with *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985)); *See also id.* at 1001 (finding that the district court's reasoning is inconsistent with *Pacific Bell Tel. Co. v. linkLine Communications Inc.*, 555 U.S. 438 (2009)).

[20] *Id.* at 994.

[21] United States' Statement of Interest Concerning Qualcomm's Motion for Partial Stay of Injunction Pending Appeal, *FTC v. Qualcomm, Inc*, Case No. 19-16122 (9th Cir. July 16. 2019) ECF No. 25 (stating that the district court "misapplied Supreme Court precedent" and that its ruling against Qualcomm "threatens competition, innovation, and national security."); *FTC v. Qualcomm, Inc.*, Case No. 19-16122 (9th Cir. Aug. 30. 2019) ECF No. 86 at 9 (arguing that the district court's ruling was erroneous, "threaten[ed] to disserve the purposes of antitrust law[,]" and "to harm national security").

attached to this report as **Exhibit 2.**

## III. PURPOSES AND ENFORCEMENT OF ANTITRUST LAW

### A. Overview of Antitrust Law

21. The goal of antitrust is to protect competition. Therefore, any antitrust cause of action must allege harm to the competitive process (and ultimately consumers), rather than merely harm to an individual competitor.[22] Any claim that fails to do so does not satisfy the antitrust injury requirement.[23] As stated by the Ninth Circuit, "[i]t can't be said often enough that the antitrust laws protect competition, not competitors."[24]

22. Broadly speaking, antitrust law targets two categories of offenses. First, the Sherman Act prohibits concerted action among competitors to distort pricing or output relative to the levels that would prevail in a competitive market.[25] Second, the Sherman Act prohibits practices that constitute "monopolization" or attempted monopolization,[26] which are generally understood to mean practices through which a firm secures or maintains market power by taking actions that fall outside "competition on the merits."[27]

23. The scope of each of these offenses has been determined through decades of case law developed by the federal judiciary. Additionally, federal antitrust enforcement agencies periodically issue guidelines or make other policy statements, which may provide information about the antitrust risk involved in a particular practice, although those guidelines are not legally binding.

24. Causes of action under the antitrust laws can be brought by the federal

---

[22] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977).
[23] *Id.*
[24] *United States v. Syufy Enters.*, 903 F.2d 659, 668 (9th Cir. 1990); *see also FTC*, 969 F.3d at 993.
[25] 15 U.S.C. § 1 (prohibiting "contract, combination . . . or conspiracy in restraint of trade").
[26] 15 U.S.C. § 2 (prohibiting action to "monopolize" or "attempt to monopolize").
[27] *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993).

government, state attorneys general, or private plaintiffs (which typically comprise either competitor litigations or consumer class-action litigations). At the federal level, both the DOJ and the FTC have the authority to bring enforcement actions under the antitrust laws, although, as described subsequently, there are some differences in the remedies each agency may seek.

### 1. Antitrust Agencies: The DOJ and FTC

#### a. Enforcement Powers

25. The DOJ can bring actions against alleged offenses under the Sherman Act or the Clayton Act. The FTC enforces the antitrust laws pursuant to the Federal Trade Commission Act, which empowers the FTC to bring enforcement actions for "[u]nfair methods of competition[.]"[28] This enforcement authority encompasses practices that constitute offenses under the Sherman Act or the Clayton Act, or "stand-alone" offenses under Section 5 of the FTC Act. During the Class Period, the FTC's authority to bring actions against "stand-alone" Section 5 offenses did not appear to extend materially beyond its enforcement authority under the Sherman Act or the Clayton Act.[29] Consistent with this understanding, two FTC Commissioners stated even before the Class Period that the agency's enforcement authority concerning "unfair" practices could only capture conduct that had "not only been unfair to rivals in the market, but, more important, is likely to harm consumers, taking into account any efficiency justifications for the conduct in question."[30]

---

[28] 15 U.S.C. § 43 (Commission may "prosecute any inquiry necessary to its duties"), § 45(a)(1) (Commission is authorized to prevent "unfair methods of competition").

[29] Maureen K. Ohlhausen, "Section 5 of the FTC Act: principles of navigation," 2 *Journal of Antitrust Enforcement* 1, 18-20 (2013) (observing that the FTC's stand-alone Section 5 cases are most common in the case of invitations to collude and exchanges of competitively sensitive information among competitors, which fall outside the scope of the Sherman Act).

[30] Dec. 16, 2009 Statement of Chairman Leibowitz and Commissioner Rosch (*In re Intel Corp.*, FTC File No. 061-0247) at 2, *available at* https://www.ftc.gov/system/files/documents/public_statements/568601/091216intelchairstatement.pdf.

**b. Process for Bringing an Enforcement Action**

26. The DOJ brings enforcement actions by filing suit in federal district court. The FTC can bring an enforcement action in either federal district court or its internal administrative tribunal (whose rulings are appealable to the Commission, which in turn is subject to judicial review).[31] If the FTC prevails in the internal administrative proceeding, it must petition a district court to secure an injunction or other remedies.

27. In litigations brought by the DOJ or the FTC, the remedies for adjudicated antitrust offenses primarily comprise injunctive relief, which may involve structural or behavioral remedies. During the Class Period, the FTC had asserted the authority to also seek disgorgement penalties that compel the defendant to forfeit its profits reasonably attributable to the adjudicated offense.[32] In many cases, the DOJ and the FTC settle an enforcement action with the defendant through a consent decree or consent order (subject to judicial review) that may involve some combination of behavioral and structural remedies.

**2. Private Antitrust Enforcement**

28. Private plaintiffs may bring litigation to target alleged antitrust offenses, either individually or as part of a class-action suit and may seek treble monetary damages. In addition to the generally applicable "case or controversy" requirement that applies to all civil litigation, private plaintiffs under the Sherman or Clayton Acts must satisfy two other standing requirements unique to antitrust litigation. First, the plaintiff must show injury to competition,

[31] Federal Trade Commission Act § 13(b), 15 U.S.C. § 53(b) (Commission is authorized to seek injunctive relief to remedy "any provision of law enforced" by the FTC); Federal Trade Commission Act § 5(c), 15 U.S.C. § 45(c) (providing that respondent may file petition for review with federal appellate court).

[32] *AMG Capital Mgmt., LLC v. FTC*, 141 S.Ct. 1341, 1343–44 (2021) (stating that, in the late 1990s, the FTC began to use its "permanent injunction" authority under Section 13(b) of the FTC Act to seek monetary awards, such as restitution and disgorgement, in antitrust cases). The Court in *AMG*, however, held that the FTC did not have such authority. *Id.*

rather than solely injury to a particular competitor.[33] Second, the plaintiff may not be an indirect purchaser who is two or more "steps" removed from the defendant or defendants who engaged in the alleged antitrust offense.[34]

### B. Assessing the Antitrust Risk of Qualcomm's Allegedly Undisclosed Practices

29. In assessing the risk that the allegedly undisclosed practices at issue in this lawsuit purportedly "Led to Antitrust Regulation and Litigation,"[35] the Simcoe Report relies substantially on economic models of anticompetitive harm in the academic literature,[36] with meager and selective discussion of applicable legal doctrine. The theoretical models on which the Simcoe Report relies do not provide a reliable indication of the likelihood that a regulator, who has a legal obligation to apply governing antitrust law, or a court interpreting and applying that law, would find a particular practice to constitute an antitrust offense, except to the extent that courts had already adopted any such model in previous cases involving similar practices. In particular, economic models that only identify hypothetical circumstances in which competitive harm *may* arise, without contemplating any countervailing efficiencies (which are omitted in the Simcoe Report), are especially unreliable when evaluating the antitrust risk associated with practices that courts typically assess under rule-of-reason standards that weigh anticompetitive effects and procompetitive justifications. Concerning bundled discounts specifically, the Ninth Circuit had expressed reluctance to base determinations of antitrust liability on theoretical models of competitive harm without empirical support or an existing body of case law that had

[33] *Brunswick Corp.*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 320 (1962)).

[34] *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977). Following *Illinois Brick*, thirty-five states and the District of Columbia passed "repealer laws" giving indirect purchasers the ability to pursue damages under state antitrust statutes. *See, e.g.*, Cal. Bus. & Prof. Code § 16700 et seq; *see also Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1064 (9th Cir. 2021).

[35] Simcoe Report ¶ 69 (title of Section IV).

[36] *See, e.g.*, Simcoe Report ¶¶ 70-75.

applied those models to specific practices.[37]

30. In assessing the antitrust risk attributable to Qualcomm's allegedly undisclosed bundling practices, the Simcoe Report relies substantially on an article by Prof. Einer Elhauge.[38] That article posits a theoretical model in which a bundled discount gives rise to competitive harm. Yet the article has only been referenced by a single judicial opinion, which cited it for a point unrelated to bundled discounts.[39] The judiciary's lack of interest in Prof. Elhauge's theory is not surprising since the article endorses the outlier view that antitrust law should find competitive harm even in the case of discounting practices that cause "less efficient rivals to be foreclosed" from the market and also states that "[e]ven . . . the set of rivals who could never be equally efficient" should be protected from exclusion.[40] These idiosyncratic propositions are incompatible with fundamental principles of U.S. antitrust case law, which has consistently held that antitrust law should never be used to protect less efficient competitors, since doing so would harm consumers. As the Ninth Circuit held, "It is the very nature of competition that the vigorous, efficient firm will drive out less efficient firms. This is not proscribed by the antitrust laws."[41] Similarly, as observed in an analysis of bundled discounts published in 2005 by Judge

---

[37] *Cascade Health Solutions. v. PeaceHealth*, 515 F.3d 883, 908-09 (9th Cir. 2008) (stating that "[t]here is insufficient experience with bundled discounts to this point to make a firm judgment about the relative prevalence of exclusionary versus procompetitive bundled discounts"). For similar views in a case involving bundled discounts, *see Ortho Diagnostic Sys., Inc. v. Abbott Laboratories, Inc.*, 920 F. Supp. 455, 471 (S.D.N.Y. 1996) ("In order to defeat a properly submitted motion for summary judgment, a party may not rest on economic theories that may or may not apply to the facts of the case . . .").

[38] Simcoe Report ¶¶ 71-72, 75 nn. 101-102 (citing Einer Elhauge, "Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory," 123 *Harvard L. Rev.* 397 (2009)).

[39] *Cung Le, et al. v. Zuffa, LLC*, Case No. 2:15-cv-01045-RFB-BNW (D. Nev. Aug. 9, 2023), ECF No. 839 at n. 27.

[40] Elhauge, *supra* note 38, at 463. The same article also specifically rejects the discount-attribution test used by most courts (and, as discussed subsequently in Section III.C., endorsed by the influential report of the Antitrust Modernization Commission) during the Class Period to assess antitrust challenges to bundled discounts. *See id.* at 463 n.194. For purposes of assessing antitrust liability during the Class Period, this type of theoretical argumentation is irrelevant.

[41] *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855 (9th Cir. 1977), *cert. denied*, 439 U.S. 829 (1978).

Richard Posner of the Seventh Circuit, widely recognized during the Class Period as one of the country's most prominent judges in antitrust law and one of the world's preeminent antitrust scholars, "the antitrust concern is with the exclusion of equally or more efficient competitors."[42] Given that the Simcoe Report relies substantially on a theoretical model that explicitly rejects these basic principles of antitrust law, it is unlikely to provide a reliable assessment of the antitrust risk attributable to Qualcomm's allegedly undisclosed bundling practices.

31. To assess the antitrust risk associated with the practices at issue in this litigation, each practice must be addressed in light of governing legal doctrines that courts would likely have applied during the Class Period to determine liability under antitrust law, taking into account available evidence. By contrast, the Simcoe Report aggregates Qualcomm's disclosed and purportedly undisclosed practices into a bespoke anticompetitive strategy[43] (while stating that "these practices have little impact on their own . . . in the absence of bundling"[44]), with little reference to applicable legal doctrine. Some courts disfavor this type of "monopoly broth" theory that aggregates claims that do not individually have "stand-alone" legal validity, especially concerning practices for which there are well-developed tests for antitrust liability.[45] Reflecting this view, the Court of Appeals for the Second Circuit had stated in response to a multi-element "monopoly broth"-type theory of competitive harm: "we reject the notion that if there is a fraction of validity to each of the basic claims [of the theory] and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act."[46] Similarly, the Supreme Court specifically held in 2009 that a plaintiff may not join two "claim[s]

---

[42] Richard A. Posner, "Vertical Restraints and Antitrust Policy," 72 *U. Chicago L. Rev.* 229, 240 (2005).
[43] Simcoe Report ¶¶ 64-68.
[44] *Id.* ¶ 64 n. 254.
[45] Daniel Crane, "Does Monopoly Broth Make Bad Soup?," 76 *Antitrust L.J.* 663, 668 (2010) ("Where there are developed tests for a particular species of competitive conduct . . . a plaintiff must first satisfy the test as to each species of allegedly anticompetitive conduct before measuring the cumulative . . . effect of the conduct").
[46] *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 928-29 (2d Cir. 1981).

that cannot succeed," and "alchemize them into a new form of antitrust liability[.]"[47]

### C. Bundled Discounts are Generally Good for Competition and Consumers

32. The Simcoe Report mischaracterizes how bundled discounts are viewed from an antitrust perspective and, in particular, seems to suggest that bundled discounts are a chronic source of antitrust concern.[48] As I will shortly discuss, the opposite is the case: both the case law and scholarly literature widely assert that bundling practices in general, and bundled discounts in particular, are commonly used and typically benefit consumers. As a result of this truncated view of the scholarly literature, compounded by the nearly complete omission of any case law applicable during the Class Period, the Simcoe Report overstates the potential antitrust risk resulting from the allegedly undisclosed practices related to what Plaintiffs call "bundling".

33. Bundled discounts refer to any practice involving a package of goods or services that are sold together at a total price that reflects a discount relative to purchasing each of the goods or services separately. Antitrust case law, scholarship and practitioner commentary generally recognize that bundled discounts are a ubiquitous commercial practice,[49] inherently have favorable pricing effects, yield transaction-cost savings, or promote a new product,[50] and, contrary to the suggestions of the Simcoe Report[51] (which even characterizes a bundled discount

[47] *linkLine*, 555 U.S. at 457.
[48] The Simcoe Report describes "strands" of the theoretical economic literature that identify anticompetitive tying practices, but fails to mention that antitrust scholarship widely recognizes that bundling practices (including bundled discounts) are generally efficient and pose no antitrust concern. Simcoe Report ¶¶ 70-73.
[49] *Cascade Health Solutions*, 515 F.3d at 894 (stating that bundled discounts are "pervasive"); Herbert J. Hovenkamp & Erik Hovenkamp, "Complex Bundled Discounts and Antitrust Policy," 57 *Buffalo L. Rev.* 1227, 1228 (2009) ("[b]undled discounting is an exceedingly common practice in commercial contracts involving suppliers of multiple interrelated products").
[50] Antitrust Modernization Commission, Report and Recommendations 95 (2007) ("AMC Report"), *available at* https://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf.
[51] Simcoe Report ¶ 70 ("Economists have long recognized that bundling practices like those adopted by Qualcomm can be anti-competitive. Several economic theories predict how and when tying (when products are *only* offered as a bundle) and bundled discounts (when the bundle is offered at a lower price than the individual products) will lead to less competition and higher prices").

as a "penalty"[52]), therefore typically do not give rise to antitrust concern.[53] An influential report issued in 2007 by the Antitrust Modernization Commission (the "AMC Report"), which included prominent antitrust practitioners and former antitrust regulators, stated that "[w]idspread agreement exists that discounts offered for bundled products . . . often benefit consumers."[54] In 2008, the Ninth Circuit held that "[b]undled discounts generally benefit buyers because the discounts allow the buyer to get more for less."[55] Writing in 2009 concerning bundled discounts more specifically, one of the co-authors of a treatise on antitrust law wrote that "[u]nquestionably, a great majority of such [bundled] discounting practices are competitively harmless"[56] and "[t]rue anticompetitive exclusion by means of bundled discounts is undoubtedly a rarity."[57] The Simcoe Report ignores all of this scholarship, literature, and case law.

34. For antitrust purposes, bundled discounts are part of a broader set of practices that reduce prices and therefore presumptively pose a low risk of antitrust concern. As such, courts have been especially cautious about finding antitrust liability concerning these practices. In a sequence of decisions starting in the early 1980s, courts repeatedly expressed the view that especially compelling evidence of competitive harm is necessary to support intervention on antitrust grounds when plaintiffs contest practices that lower prices. In a 1983 decision, the First Circuit observed that "a legal precedent or rule of law that prevents a firm from unilaterally cutting its prices risks interference with one of the Sherman Act's most basic objectives: the low

[52] *Id.* ¶ 70 ("it is important to recognize that the term 'discount' does not imply that bundling leads to lower prices").

[53] Herbert Hovenkamp, *The Antitrust Enterprise* 173 (2009) ("[t]he great majority of discounts, bundled and otherwise, are procompetitive"); M. Laurence Popofsky and Adam J. Gromfin, "Bundled Discounting: From LePage's to PeaceHealth, & Beyond," 9 *Sedona Conf. J.* 99 (2008) ("[i]t is by now well accepted that price discounts are almost always procompetitive"); Daniel Crane, "Mixed Bundling, Profit Sacrifice, and Consumer Welfare," 55 *Emory L.J.* 423, 431 (2006) ("[m]ost of the plausible explanations for mixed bundling [(a synonym for bundled discounting)] are procompetitive or competitively neutral at worst").

[54] AMC Report, *supra* note 50, at 82.

[55] *Cascade Health Solutions*, 515 F.3d at 895.

[56] Hovenkamp & Hovenkamp, *supra* note 49, at 1228.

[57] *Id.* at 1255.

price levels that one would find in well-functioning competitive markets."[58] In 1993, the Supreme Court cautioned: "As a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting."[59] Concerning predatory pricing claims, the Court similarly stated that "mistaken inferences [of antitrust liability] are especially costly, because they chill the very conduct the antitrust law are designed to protect."[60]

35. Several subsequent decisions from the Supreme Court dating from before the Class Period reiterated the general principle that courts should apply an especially demanding standard of proof when assessing antitrust claims that target practices that lower prices. In a 2007 decision concerning a "predatory bidding" claim, the Court stated that it was "particularly wary of allowing recovery for above-cost price-cutting because allowing such claims could, perversely, 'chil[l] legitimate price cutting'[.]"[61] In a 2009 decision concerning a "price squeeze" claim, the Court stated: "To avoid chilling aggressive price competition, we have carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low."[62] These decisions were noted by lower courts, including the Ninth Circuit, which stated that "[t]he Court's reasoning [concerning predatory pricing] show[s] a measured concern to leave unhampered pricing practices that might benefit consumers, absent the clearest showing that an injury to the competitive process will result."[63]

36. Any court assessing an antitrust claim against bundled discounts during the Class

---

[58] *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 234 (1st Cir. 1983).
[59] *Brooke Group Ltd. V. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993).
[60] *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986).
[61] *Weyerhauser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 319–21 (2007) (quoting *Brooke Group*, 509 U.S. at 223-24).
[62] *linkLine,* 555 U.S. at 451.
[63] *Cascade Health Solutions*, 515 F.3d at 902.

Period would have been aware of the Court's repeated concerns about making erroneous findings of antitrust liability when examining challenges to business practices that lower prices. Antitrust legal practitioners, and in-house legal departments, would likely similarly have been aware of these widely discussed decisions by the Court and its interest in mitigating the risk of false-positive liability determinations in antitrust law. In 2009, a partner at a national law firm and former Deputy Solicitor General observed that "the Court has . . . shown its continuing concern about the need to avoid false positives resulting from legal rules that are not sufficiently protective of procompetitive conduct."[64] In 2007, partners at a major national law firm observed more specifically that, in light of the Court's decisions concerning predatory pricing, "bundled rebates, market-share discounts, and the like should now be beyond reproach, so long as the incentive payments do not exceed the profits on the incremental volume they generate."[65]

37. During the Class Period, courts that addressed bundled discounts applied two tests to identify specialized circumstances in which bundled discounts may cause competitive harm. Both tests are designed to prohibit bundled discounts only in circumstances where this practice excludes "an equally efficient producer of the competitive product or products" in the bundle.[66] That critical qualification is necessary to target only bundled discounts that harm competition, and not only a particular competitor. As discussed below, the Simcoe Report fails to opine that Qualcomm foreclosed any equally efficient competitor.

---

[64] Thomas G. Hungar and Ryan G. Koopmans, "Appellate Advocacy in Antitrust Cases: Lessons from the Supreme Court," 23 *Antitrust* 53, 56 (Spring 2009).
[65] Tefft W. Smith, Colin R. Kass, and Scott Abeles, "Competition is Good Again," *LegalTimes*, Mar. 19, 2007.
[66] *See, e.g.*, *Cascade Health Solutions*, 515 F.3d at 909 (stating that the discount-attribution test for bundled discounts "ensures that the only bundled discounts condemned as exclusionary are those that would exclude an equally efficient producer of the competitive product or products"); *Ortho Diagnostic Sys.*, 920 F.Supp. at 467 (S.D.N.Y. 1996) ("The question, therefore, is whether a firm that enjoys a monopoly on one or more of a group of complementary products, but which faces competition on others, can price all of its products above average variable cost, and yet still drive an equally efficient competitor out of the market.").

### 1. Discount-Attribution Test

38. Consistent with Supreme Court guidance concerning antitrust challenges to business practices that lower prices, the Ninth Circuit held that bundled discounts usually advance competition[67] and, given the ubiquity of the practice, recognized "the need to ensure that the rule adopted does not expose inventive and legitimate forms of price competition to an overbroad liability standard."[68] The court, however, recognized that bundled discounts could yield competitive harms in a specific circumstance: when a supplier can offer a total price for two or more complementary products such that an equally or more efficient supplier of only one of those products would be unable to operate at a profit. The decision applied the discount-attribution test to identify this specific circumstance. The court referenced the AMC Report,[69] which had proposed a similar test for purposes of both identifying a circumstance in which bundled discounts can give rise to competitive harm and creating a safe harbor for all other bundled discounts that businesses could offer without fear of antitrust liability. During and before the Class Period, other courts applied closely related forms of the discount-attribution test.[70]

---

[67] *See, e.g.*, *Cascade Health Solutions*, 515 F.3d at 895 (stating that "[b]undled discounts generally benefit buyers"). The discount-attribution test allocates discounts to the "competitive" good regardless of how a company's accounting allocates its discounts and incentives.
[68] *Id.* at 895 n. 5.
[69] *Id.* at 899.
[70] *See, e.g.*, *Info Res., Inc. v. Dun & Bradstreet Corp.*, 359 F.Supp.2d 307 (S.D.N.Y. 2004); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 69 F.Supp.2d 571, 580 n. 8 (S.D.N.Y. 1999), aff'd 257 F.3d 256 (2d Cir. 2001). In a variation on the discount-attribution test, one court held that a bundled discount could be challenged if (1) the discount results in prices below average variable cost for the contestable good, *or* (2) the purportedly excluded firm is an equally or more efficient producer of the competitive good. *Ortho Diagnostic Sys.*, 920 F.Supp. at 469-70. One court had found antitrust liability in the case of an above-cost bundled rebate, see *LePage's, Inc. v. 3M Co.*, 324 F.3d 141, 155 (3d Cir. 2003). However, the decision was widely criticized (see AMC Report, *supra* note 50, at 97) and the appeals court that issued it subsequently suggested caution in applying the decision in light of intervening Supreme Court decisions that had applied below-cost tests to predatory pricing, and so-called predatory bidding and price squeeze claims, see *Eisai, Inc. v. Sanofi Aventis U.S., LLC,* 821 F.3d 394, 406 n. 35 (3rd Cir. 2016).

39. Under the discount-attribution test, bundled discounts may cause competitive harm and give rise to antitrust liability if (1) the defendant has market power in an "uncompetitive" product in the bundle, and (2) the discount results in prices that are below the defendant's average variable cost to produce the "competitive" good (or goods) in the bundle.[71] The test is designed to identify discounting practices that reduce the price of the competitive good to a level that cannot be sustained by equally or more efficient single-product providers. Below-cost discounts are potentially a form of "predatory pricing," which refers to the practice of setting the price of a good below cost so that equally or more efficient firms might be unable to compete. However, courts have always been careful to avoid erroneously punishing firms that offer low prices as part of the competitive process, which directly and immediately benefit consumers. As discussed previously, the Supreme Court emphasized this principle in several decisions during and prior to the Class Period.[72] Consistent with this approach (and as discussed by the influential report issued by the Antitrust Modernization Commission[73]), the discount-attribution test necessarily implies that any firm that provides above-cost bundled discounts—which therefore *could* be matched by equally or more efficient single-product providers—operates in a safe harbor shielded from antitrust liability.

40. The Ninth Circuit decision that adopted the discount-attribution test also indicated that, even if a bundled discount yielded a price for the competitive good that fell below the defendant's average variable cost, a court would consider countervailing efficiencies attributable to that practice.[74] This qualification is necessary to ensure that a court does not erroneously

[71] *Cascade Health Solutions*, 515 F.3d at 906. Here, Qualcomm's chips would be the "competitive good."

[72] *See supra* ¶¶ 33–37; *see also linkLine*, 555 U.S. at 438 (citing *Brooke Group,* 509 U.S. at 222-24).

[73] AMC Report, *supra* note 50, at 98-99.

[74] *Cascade Health Solutions*, 515 F.3d at 910, n. 21. The court held that these efficiencies would be taken into account when determining if the plaintiff's claim satisfied the "antitrust injury" requirement.

condemn a practice that sets a below-cost price (after attributing the entire discount to the contestable good) but does not reduce consumer welfare once countervailing procompetitive effects are taken into account. This qualification was again consistent with clear and repeated guidance from the Supreme Court that courts should take great care when assessing antitrust claims against pricing practices that are purportedly "too low."[75]

### 2. Rule of Reason and/or Exclusive Dealing Tests

41. During the Class Period, one outlier court examined a purported bundled discount under the rule of reason test applicable to exclusive dealing claims.[76] But even there, the court indicated that an antitrust challenge to a bundled discount construed as an exclusive dealing arrangement must show that the practice foreclosed equally or more efficient rivals.[77]

42. Under the rule of reason applicable to exclusive dealing arrangements, the plaintiff must show (1) the existence of contracts that either explicitly require, or effectively require as a *de facto* matter, exclusivity; (2) the exclusive dealing agreement is likely to substantially foreclose competition in a substantial share of the relevant market; and (3) the exclusive dealing agreement gives rise to likely or actual anticompetitive effects.[78] Stated more succinctly, "[t]he legality of an exclusive dealing arrangement depends on whether it will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition."[79] The Supreme Court had emphasized that exclusive dealing arrangements are only unlawful "if the 'probable effect' of the arrangement is to substantially lessen competition,

---

[75] *See id.*
[76] *Eisai, Inc.,* 821 F.3d at 401 (plaintiffs claimed that the defendant bundled "incontestable" and "contestable" demand for the same product, which the court treated as an exclusive dealing arrangement).
[77] *Id.* at 406 ("[N]othing in the record indicates that an equally efficient competitor was unable to compete with Sanofi").
[78] *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326–27 (1961).
[79] *ZF Meritor, LLC,* 696 F.3d at 271 (citing *Tampa Elec. Co.,* 365 U.S. at 328; *Barr Labs, Inc. v. Abbott Labs*, 978 F.2d 98, 110 (3d Cir. 1992)).

rather than merely disadvantage rivals."[80]

43. During the Class Period, courts observed that "[e]xclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition."[81] When applying the rule of reason test to exclusive dealing arrangements, courts assessed whether the arrangement caused substantial foreclosure in the relevant market and then considered other factors to assess the likely or actual anticompetitive effects of the practice, including (1) whether the exclusive dealing arrangement was of "sufficient duration to prevent meaningful competition by rivals," (2) the ability of a party to terminate the exclusive dealing arrangement, and (3) an assessment of "likely or actual anticompetitive effects considered in light of any procompetitive effects[.]"[82]

## IV. THE INTERSECTION BETWEEN ANTITRUST LAW AND THE WIRELESS COMMUNICATIONS INDUSTRY

### A. Overview of the Wireless Communications Industry

44. The wireless communications device industry comprises a global supply chain that includes, but of course is not limited to, four principal groups of companies: (1) technology innovators, which specialize in the research and development ("R&D") required to develop new technologies in the wireless communications industry, (2) chip manufacturers, which produce and supply physical chipsets to OEMs, (3), carriers, which set up the networks on which the phones operate,[83] and (4) OEMs, which embed those chipsets and related technologies in computing and communications devices distributed to businesses and individual users.

---

[80] *ZF Meritor*, 696 F.3d at 271 (quoting *Tampa Elec. Co.,* 365 U.S. at 328)

[81] *ZF Meritor, LLC,* 696 F.3d at 270 (citing *Race Tires Am., Inc. v. Hoosier Racing Tire Corp*., 614 F.3d 57, 76 (3d Cir. 2010)).

[82] *ZF Meritor, LLC*, 696 F.3d at 271–72. For a similar framework, see *Eisai, Inc.*, 821 F.3d at 403.

[83] I do not focus on network carriers—like AT&T or Verizon—in this report given that the conduct underlying these regulatory actions and lawsuits center around Qualcomm's conduct with respect to OEMs.

### 1. Stakeholders in the Wireless Communications Ecosystem

#### a. Technology Innovators

45. In its description of the wireless communications industry, the Simcoe Report focuses on the royalties that OEMs must pay to Qualcomm to license its SEP-protected technology.[84] This emphasis on the costs borne by OEMs to secure a license to Qualcomm's SEP portfolio overlooks two critical functions played by Qualcomm—and specifically, Qualcomm's licensing-based business model—in generating economic gains for the market as a whole by supporting innovation incentives among chip-design firms and promoting access to technological inputs among device producers.[85]

46. First, the Simcoe Report's focus on OEMs' royalty burden fails to clarify that Qualcomm, like other leading wireless technology innovators such as Ericsson and Nokia, required a patent portfolio to recover and earn a reasonable return on the billions of dollars it had invested in R&D annually to continuously make contributions to next-generation wireless technology standards. There was only limited assurance that those investments would result in new communications technologies that would be technically feasible, included in the next-generation wireless technology standards, and ultimately adopted by producers and consumers.

47. Even compared to other leading technology companies, technology innovators such as Qualcomm, Ericsson, and Nokia that stood at the apex of the wireless supply chain allocated disproportionately large portions of their resources to R&D activities. For example, in 2016, each of Qualcomm, Ericsson, and Nokia allocated 22%, 14%, and 21%, respectively, of its total revenues to R&D, as compared to 7.3% for Samsung and 4.5% for Apple, two of the

---

[84] Simcoe Report ¶ 21 ("[E]very company that implements cellular standards must obtain a patent license from Qualcomm or risk being sued by Qualcomm for patent infringement").

[85] On the value-creating functions of licensing models in wireless markets, see Jonathan M. Barnett, "The 'License as Tax' Fallacy," 28 *Mich. Tech. L. Rev.* 197, 227-31, 235-38 (2022); Jonathan M. Barnett, "Antitrust Overreach: Undoing Cooperative Standardization in the Digital Economy," 25 *Mich. Tech. L. Rev.* 163, 183-89 (2019).

leading OEMs.[86] To protect, and earn a return on, these exceptionally large R&D investments, Qualcomm and other lead innovators in wireless communications relied on patent portfolios to deter infringement and to enable distribution of their technology through licensing and other business relationships with OEMs and other producers.

48. During the Class Period, Qualcomm relied almost entirely on revenues from chip sales and licensing because it did not produce mobile communications devices for sale to end-users. Qualcomm operated principally under a fabless model, which is comprised of two components. [87] Qualcomm distributed physical chipsets to OEMs through the Qualcomm CDMA Technologies (QCT) division.[88] And Qualcomm distributed its technology through intellectual property licenses negotiated with OEMs by its Qualcomm Technology Licensing (QTL) division.

49. Second, the Simcoe Report's focus on OEMs' royalty burden overlooks that Qualcomm's licensing-based business model generated returns for a broad range of stakeholders by disseminating its standard-essential and other patented wireless technology among device producers. Qualcomm's research and development resulted in wireless technology that was licensed and distributed to OEM producers, which in turn promoted device interoperability and enabled the development of new wireless-enabled products and services throughout the digital ecosystem.[89]

---

[86] Sources: Annual report filed for each company (on Form 10-K or 20-F) with the SEC and annual business report for Samsung, in each case for the fiscal year 2016. Values for these companies in other years during the Class Period are similar.

[87] *See, e.g.*, Qualcomm, Form 10-K, at 9 (Nov. 4, 2015) (stating that the company contracts with "independent third-party suppliers to perform the manufacturing and assembly, and most of the testing, of our integrated circuits based on our proprietary designs").

[88] *See, e.g.*, Qualcomm, Form 10-K, at 10 (Nov. 4, 2015) (stating that the company contracts with "independent third-party suppliers to perform the manufacturing and assembly, and most of the testing, of our integrated circuits based primarily on our proprietary designs").

[89] Jonathan M. Barnett, "Antitrust Overreach: Undoing Cooperative Standardization in the Digital Economy," 25 *Mich. Tech. L. Rev.* 163, 186-87 (2019).

50. Qualcomm is widely credited with the development of WCDMA and CDMA (code-division multiple access) technology in the early 2000s as well as the 4G/LTE wireless standards in the late 2000s.[90] Those standards enabled the transmission and processing of "rich" streams of textual, audio, and video data through mobile communications and computing devices.[91] In turn, these wireless-enabled data-processing and transmission functionalities formed the basis for new business models and technology platforms that have lowered costs and improved product and service quality for business users and end-users.[92]

**b. Chipset Manufacturers**

51. The semiconductor market encompasses a wide variety of chips for different purposes. During the Class Period, Qualcomm and other producers, such as Samsung, Intel, MediaTek, HiSilicon, and VIA Telecom (purchased by Intel in 2015), supplied various types of cellular modem chips to OEMs,[93] which installed those chips in mobile computing and communications devices.

52. Qualcomm differed from other chip vendors because it was also a significant technology innovator who contributed to the 2G, 3G, and 4G/LTE wireless standards and monetized its R&D investments through both chip sales to, and intellectual property licenses with, OEMs. During the Class Period, Qualcomm had existing agreements with other chip vendors, which provided a non-exhaustive right to make and sell chips under Qualcomm's SEPs on the condition that they sell chips only to licensed OEMs.[94] In conjunction with Qualcomm's

---

[90] Yona Kwon, et al., "Coopetition in the SoC Industry: The Case of Qualcomm Incorporated," 6 *Journal of Open Innovation: Technology, Market, and Complexity* 9 (2020).
[91] Rafael Saraiva Campos, "Evolution of Positioning Techniques in Cellular Networks, from 2G to 4G," *Wireless Communications & Mobile Computing* (2017), at 1-2; Theodore S. Rappaport, et al., "Wireless Communications: Past Events and a Future Perspective," 40 *IEEE Communications Magazine* 148 (May 2002)
[92] David J. Teece, "Profiting from innovation in the digital economy: Enabling technologies, standards, and licensing models in the wireless world," 47 *Research Policy* 1367, 1371-72 (2018).
[93] *FTC*, 969 F.3d at 983.
[94] *Id.* at 984–85.

OEM licensing program, under these agreements chip producers had access to any necessary SEPs to make and sell products to OEMs implementing the wireless standards, without incurring royalties, which were paid by the OEMs.[95] Because it enforces its patents at the OEM level, Qualcomm does not prevent chipmakers from having access to or using its cellular SEPs. Chipmakers practice some of those patents, and do so at no cost, without taking a license from Qualcomm.[96]

### c. Original Equipment Manufacturers (OEMs)

53. OEMs produce various wireless computing and communications devices for business users and individual users. As each wireless generation launches, OEMs adopt the patent-protected and standard-essential technologies developed by firms that specialize in chip-design and other wireless innovations.

54. The largest OEMs, which include some of the largest technology companies and most valuable consumer brands in the world, constitute a significant share of mobile communications device markets and, as a result, represent a large share of the total revenue stream of a technology innovator that relies on a licensing-based business model. During the Class Period, the two largest OEMs and Qualcomm's two largest licensees, Samsung and Apple, held 26% and 16% quarterly shares on average of global smartphone sales as measured by units shipped, respectively.[97] It should be noted that Samsung has maintained chip-design and chip-production capacities during the Class Period,[98] but that Qualcomm has continued to sell chips—

---

[95] *Id.*
[96] *Id.*
[97] Calculations based on IDC, Global smartphone market share from fourth quarter 2009 to second quarter 2023 (by vendor), *available at* https://www.statista.com/statistics/271496/global-market-share-held-by-smartphone-vendors-since-4th-quarter-2009/. If measured by revenues, rather than units shipped, Apple's market share would rise significantly since its devices tend to sell at higher prices compared to other brands.
[98] Kwon, *supra* note 90, at 12 (noting that Samsung released the Galaxy S7 in February 2016 with versions using Qualcomm and internally produced chipsets).

and license its SEPs— to Samsung.

### 2. Licensors like Qualcomm Agree to Offer License Terms that are FRAND-Compliant

55. Technology innovators, OEMs, and other entities interact within SDOs or SSOs to develop new wireless communications standards. SDOs drive the introduction of new, innovative technologies, and the publication of detailed technical specifications for implementing those technologies that allow all industry participants—including infrastructure makers, component makers, device makers, carriers and more—to comply with the standards and thus ensure interoperability between devices and networks around the world. As a condition for inclusion of a contributor's patented technology in the standard, the SDO typically requires that a contributor enter into a commitment to make its technology available on "fair, reasonable, and nondiscriminatory ('FRAND') terms."[99] That commitment is set forth in a document governed by the contract law of a selected jurisdiction. Any patents that are necessarily infringed when an end-user device utilizes the standard are subject to the "fair, reasonable, and nondiscriminatory" licensing commitment and are known as SEPs. This report does not express any view on the terms and practices that are likely to comply or not comply with the FRAND commitment, which I understand is addressed in the expert report by Professor Brismark.

### 3. FRAND Violations Are Not Standalone Antitrust Violations

56. The Simcoe Report states that "some FRAND violations have been prosecuted as antitrust claims," an assertion that is supported by a formal comment by Ericsson to the FTC and an amicus brief by an SDO in a litigation involving alleged deception by a patent owner.[100] But

[99] *See, e.g.*, European Telecommunications Standards Institute, ETSI Directives at 36 (2013), *available at* http://portal.etsi.org/directives/home.asp.

[100] *See* Simcoe Report ¶ 36. Professor Simcoe primarily argues that Qualcomm's conduct violates the "non-discriminatory" prong of FRAND. I note that, after reviewing the complaints underlying the corrective disclosures here, no party alleged that Qualcomm's conduct violated the "nondiscriminatory" requirement of Qualcomm's FRAND commitment.

these statements, which reflect advocacy by two private entities, are not applicable to the purportedly undisclosed licensing practices at issue in this litigation since both statements concerned antitrust claims that targeted alleged deception by an SEP owner. The Simcoe Report omits that U.S. courts have held that a purported breach of the FRAND commitment cannot independently support an antitrust cause of action, except in narrow circumstances where there is proof of deception resulting in the willful acquisition of market power.[101] I understand that there are no such allegations concerning the licensing practices at issue in this litigation. Moreover, the Ninth Circuit specifically held that the "deception exception" did not apply to the facts at issue in the FTC's antitrust case against Qualcomm.[102] That is why the Ninth Circuit "decline[d] to hold that Qualcomm's alleged breach of its SSO commitments to license its SEPs on FRAND terms, even assuming there was a breach, amounted to anticompetitive conduct in violation of § 2."[103] Indeed, the court expressly cautioned against "using the antitrust laws to remedy what are essentially contractual disputes between private parties engaged in the pursuit of technological innovation."[104] In all circumstances other than the deception scenario, U.S. courts have rejected the relevance of antitrust law to the FRAND requirement, which is treated as a contractual obligation set forth in the commitment made by the SEP holder to the relevant SDO.[105] Any user of an SEP-protected technology is then deemed to be a third-party beneficiary of that

---

[101] *Rambus Inc. v. FTC*, 522 F.3d 456, 466-67 (D.C. Cir. 2008), *cert. denied,* 555 U.S. 1171 (2009); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310-12 (3d Cir. 2007).
[102] *FTC,* 969 F.3d at 997.
[103] *Id.* It is also important to note that the Ninth Circuit never held that Qualcomm's conduct violated its FRAND commitments.

[104] *Id.*

[105] HTC *Corp. v. Telefonaktiebolaget LM Ericsson*, 407.F.Supp.3d 631 (E.D. Tex. 2019); *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 884 (9th Cir. 2012); *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL No. 2303, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013); *Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-CV-178-bbc, 2011 WL 7324582, at *10 (W.D. Wis. June 7, 2011).

commitment.[106] Outside the deception scenario, an SEP licensor or licensee would therefore expect that interpretation by a U.S. court of any term of the FRAND commitment is a matter of contract or patent law, not antitrust law.

## V. ANTITRUST LAW AND QUALCOMM'S PREVIOUSLY DISCLOSED CONDUCT

### A. Qualcomm's Business Model

57. Since its inception in the 1990s, the wireless industry has thrived under the licensing-based business model used by leading SEP owners and technology innovators. This model facilitates the efficient division of labor among technology innovators and device producers, and promotes the dissemination of standard-essential technology among OEMs, which reduces entry costs and promotes standards adoption among devices, ultimately benefiting business users and individual users.

58. Royalty payments from licensed OEMs sustain R&D investment by innovators based on a modest portion of the device sale price. Economic evidence has shown that the wireless communications device industry has consistently exhibited expanding output, robust entry into device production, and continuous innovation in the form of new functionalities and product releases.[107]

59. Qualcomm and other SEP owners and innovators that rely on a licensing-based

---

[106] The Simcoe Report acknowledges this point. Simcoe Report ¶ 35 n. 48.

[107] On expanding output, see Jason Dedrick & Kenneth L. Kraemer, Economic Research Working Paper No. 41, Intangible assets and value capture in global value chains: the smartphone industry, at 3-4 (November 2017) (finding that, on a global basis, unit shipments in the smartphone industry grew from 123.9 million in 2007 to 1.47 billion in 2017 while the total value of shipments grew from $52 billion in 2007 to $452 billion in 2015). On increases in functionality, see Keith Mallinson, "Don't Fix What Isn't Broken: The Extraordinary Record of Innovation and Success in the Cellular Industry under Existing Licensing Practices," 23 *George Mason L. Rev.* 967, 984-90, 993-94 (2016). On increased entry into device production, see Kirti Gupta, "Technology Standards and Competition in the Mobile Wireless Industry," 22 *George Mason L. Rev.* 865, 894 (2015).

business model have often encountered formidable obstacles in enforcing their patent portfolios in U.S. and foreign courts. As disclosed by Qualcomm in its securities filings during the Class Period,[108] SEP owners typically must incur significant litigation costs and delays in securing remuneration for patent-protected technology that is being used by unlicensed OEMs or OEMs that refuse to pay royalties under an existing license. There is an inherent asymmetry in negotiations when SEP owners seek to license the largest OEMs since the SEP owner has already made a significant up-front R&D investment while the OEM has extensive resources to support multiple protracted litigations.[109] This asymmetry is exacerbated by the fact that these large OEMs may represent a significant portion of an SEP licensor's revenue stream.[110] As Qualcomm disclosed in its securities filings during the Class Period, each of the Samsung and Apple-associated contract manufacturers (considered collectively) accounted for more than 10%

---

[108] Qualcomm Inc., Form 10-K (2015), at 21 ("We have had and may in the future have difficulty in certain circumstances in protecting or enforcing our intellectual property rights and/or contracts . . . certain companies have yet to enter into or delayed entering into license agreements for their use of our intellectual property, and licensees and companies may continue to do so in the future . . . We may need to litigate in the United States, China, India or elsewhere in the world to enforce our contract and/or intellectual property rights . . .").

[109] A source referenced in the Simcoe Report describes precisely how a legal environment in which a patent owner has no means to block unauthorized usage facilitates opportunistic conduct by infringers. *See Rudenberg v. Clark*, 81 F.Supp. 42, 45 (D. Mass. 1948) (observing that perpetually maintaining in place a government order that had instituted compulsory licensing of the petitioner's patent would "place the individual holder of patents at the mercy of large corporate enterprises which could use the invention, decline to accept the inventor's reasonable offers, allow him to sue for infringement and, in the end, if beaten in the infringement suit, pay him not even a royalty high enough to cover the expenses of the litigation but the lowest royalty rate the inventor is receiving from anyone whatsoever"). The Simcoe Report relies on a truncated quotation from the same paragraph in this decision (apparently cited from a third-party source). Simcoe Report ¶ 34 n. 46.

[110] This point is overlooked in the Simcoe Report, which asserts that "[e]conomists . . . generally agree that availability or an award of injunctive relief prior to determining the appropriate FRAND royalty will overcompensate SEP holders." *Id.* ¶ 31. This statement is incorrect. Several economists and legal scholars have taken the view that the absence of injunctive relief distorts the licensing marketplace by systematically favoring licensees, who have incentives to decline to license and engage in "patent holdout." *See generally, e.g.,* Bowman Heiden and Nicolas Petit, "Patent Trespass and the Royalty Gap," 34 *Santa Clara High Tech L.J.* 179 (2017); Gerard Llobet and Jorge Padilla, "A theory of socially inefficient patent holdout," *J. Econ. & Mgmt. Strategy* (2023); Kalyan Dasgupta and David Teece, "Protecting Innovation in the Mobile Wireless Ecosystem: Understanding and Addressing 'Patent Holdout,'" 38 *Berkeley Tech. L.J.* 313 (2023). This is merely a representative sample of scholarly contributions that have expressed this view.

of its annual revenues.[111]

60. Royalty rates in a licensing agreement are the result of negotiations between a licensor and licensee. However, licensees can also seek to "negotiate" the royalty rate by undertaking legal action, or persuading governmental enforcers to take legal action, against a licensor for purportedly supra-FRAND royalty rates or other purported offenses supposedly applicable under antitrust or competition law. As Qualcomm disclosed in its securities filings during the Class Period, certain firms had incentives to lobby for regulatory or other legal action to minimize the royalties that Qualcomm could seek from OEMs for use of its technology.[112] Some firms had done so by lobbying competition regulators in various jurisdictions to bring investigations and enforcement actions against Qualcomm concerning its licensing practices.[113] As I discuss subsequently in Section V.C, internal Apple communications that were disclosed in the litigation between Apple and Qualcomm show that Apple had undertaken efforts to lobby regulators to undermine Qualcomm's licensing-based business model. Qualcomm also disclosed to investors the risk that government regulators or other entities could bring lawsuits concerning its licensing practices[114] and disclosed enforcement actions or investigations taken by Chinese, European, Korean, and other competition enforcers[115], and the antitrust investigation initiated by

---

[111] Qualcomm Inc., Form 10-K (2012), at 6; Form 10-K (2013), at 9; Form 10-K (2014), at 10; Form 10-K (2015), at 13; Form 10-K (2016), at 14.
[112] Qualcomm Inc., Form 10-K (2015), at 35-36 ("[W]e expect that certain companies may continue to be dissatisfied with the need to pay reasonable royalties for the use of our technology . . . We expect that such companies and/or governments or regulators will continue to challenge our business model in various forums throughout the world").
[113] *Id.* at 20 (disclosing that "companies initiate various strategies to attempt to . . . mitigate and/or eliminate their need to pay royalties to us for use of our intellectual property . . . [including] lobbying governmental regulators and elected officials for the purpose of seeking the imposition of some form of compulsory licensing and/or to weaken a patent holder's ability to enforce its right or obtain a fair return for such rights").
[114] Qualcomm Inc., Form 10-K (2015), at 21.
[115] *Id.* at 35 (discussing enforcement action brought by Chinese competition regulators), F-24 (discussing enforcement action brought by Korean and European competition regulators).

the FTC in 2015.[116]

**B. Device-Level Licensing**

61. Since well before the Class Period, Qualcomm has exhaustively licensed its SEP and non-SEP portfolio solely to OEMs and has declined to exhaustively license at higher levels of the wireless communications supply chain—i.e., at the component level. As found by the Ninth Circuit[117], this practice does not raise any antitrust concern.

62. Antitrust law has emphasized that businesses in general do not have any duty to "deal" with any other entity, especially their own rivals.[118] As long ago as 1919, the Supreme Court stated that the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal[.]"[119] In 2009, the Supreme Court held that only in "rare circumstances" can a firm incur liability for a unilateral refusal to deal.[120] As the FTC stated in a filing in 2007 to the OECD, "U.S. antitrust law rarely, if ever, intervenes when a manufacturer unilaterally, unconditionally refuses to deal with any particular party . . ."[121] Courts had recognized the same principle concerning intellectual property licensing.[122] Moreover, as the Federal Circuit observed, the Patent Act specifically provided that "[n]o patent owner otherwise entitled to relief [for infringement] . . . shall be denied relief or deemed guilty of

[116] *Id.* at F-25.
[117] *FTC*, 969 F.3d at 984-85, 994.
[118] *linkLine,* 555 U.S. at 446; *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko,* 540 U.S. 398, 408 (2003).
[119] *U.S. v. Colgate & Co*., 250 U.S. 300, 307 (1919).
[120] *linkLine,* 555 U.S. at 441.
[121] Oct. 12, 2007 Organization for Economic Cooperation and Development, Directorate for Financial and Enterprise Affairs, Competition Committee, Roundtable on Refusals to Deal: Note by the United States, (DAF/COMP/WD(2007)99) at 8.
[122] *Novell, Inc. v. Microsoft Corp*., 731 F.3d 1064, 1074-75 (10th Cir. 2013); U.S. Department of Justice and Federal Trade Commission, Antitrust Guidelines for the Licensing of Intellectual Property 4 (1995) (stating that market power does not "impose on the intellectual property owner an obligation to license the use of that property to others").

misuse or illegal extension of the patent right by reason of his having . . . refused to license or use any right to the patent[.]"[123]

63. The only possible exception to this "no duty to deal" principle is articulated in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*[124] In *Aspen Skiing,* the U.S. Supreme Court held that a refusal to deal can give rise to liability under Section 2 of the Sherman Act when the following circumstances are satisfied: (1) the defendant unilaterally terminates a voluntary, long-term and profitable course of dealing, (2) the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition, and (3) the refusal to deal involves products that the defendant sells to other similarly situated customers.[125] In 2003, however, the Court held that *Aspen Skiing* stands at the "outer boundary" of liability under Section 2 of the Sherman Act, suggesting that it should only be applied in exceptional circumstances.[126]

64. As found by the Ninth Circuit—and conceded by the FTC[127]—Qualcomm's practice of not licensing chip manufacturers does not meet the strict conditions set forth in *Aspen Skiing* and therefore falls within the standard case in which a refusal to deal with a particular entity cannot give rise to antitrust liability. This is because Qualcomm's device level licensing failed to meet any one of the three prongs laid out under *Aspen Skiing*.

65. First, there is no evidence that Qualcomm was engaged in long-term and profitable licensing relationships with chip suppliers. Before the Class Period, Qualcomm entered into non-exhaustive arrangements with certain chip suppliers, granting them certain

[123] *In re Ind. Service Organizations Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000) (citing 35 U.S.C. § 271(d) (1999)).
[124] 472 U.S. 585 (1985).
[125] *Id.* at 593–94; see also *MetroNet Services Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004).
[126] *Verizon Communications, Inc.*, 540 U.S. at 409.
[127] *FTC*, 969 F.3d at 993-95.

rights.[128]. However, it stopped this practice in response to developments in patent law's exhaustion doctrine.[129] This occasional and lapsed form of interaction with certain chip manufacturers bears no resemblance to the continuous business relationship at issue in the facts of Aspen Skiing.

66. Second, Qualcomm's cessation from entering into non-exhaustive arrangements with chip sellers did not involve sacrificing short-term profits to exclude competitors and to extract long-term gains. Rather, as observed by the Ninth Circuit, Qualcomm's licensing at the device level was "more lucrative," both in the short term and long term.[130]

67. Third, Qualcomm did not decline to license any chip supplier in particular; rather, the policy applied neutrally across the board. Moreover, Qualcomm's practice of only exhaustively licensing at the OEM level did not deny chip manufacturers access to the technology covered by its SEP and patent portfolio. As found by the Ninth Circuit*,* this "no license, no problem" policy provided chip manufacturers with access to Qualcomm's SEP- and patent-protected system-level technology at a zero royalty.[131]

68. Qualcomm's practice of licensing only to OEMs reflects a rational adaptation to legal constraints imposed by court decisions that had expanded the scope of the doctrine of patent exhaustion. Under that doctrine, the "first sale" of a product embodying a patented technology terminates the patent owner's rights to control the use, sale, licensing, or distribution of that technology.[132]

69. Prior to the Class Period, judicial decisions had expanded the scope of the doctrine of patent exhaustion. In 2008, the U.S. Supreme Court held that an unconditional sale of

[128] *Id.* at 994.
[129] *Id.*
[130] *Id.* at 994-95.
[131] *Id.* at 995.
[132] *Quanta Computer, Inc. v. LG Electronics, Inc.,* 553 U.S. 617, 625 (2008) (the "initial authorized sale of a patented item terminates all patent rights to the item").

a patented product rendered unenforceable post-sale use restrictions agreed-upon as part of a license at a higher tier in the supply chain, and immunized downstream purchasers from liability for infringement of patents embodied in those licensed products.[133] As observed subsequently by a district court, the decision adopted "a broad understanding of patent exhaustion in the face of Federal Circuit case law that had narrowed the scope of the doctrine."[134] Specifically, the *Quanta* decision cast doubt on previous appellate court rulings that had upheld post-sale use restrictions when expressly agreed upon as part of a license or sale transaction involving a patented product.[135]

70. As found by the Ninth Circuit, this expansion of the patent exhaustion doctrine placed at risk Qualcomm's previous practice of sometimes providing non-exhaustive licenses to chip manufacturers.[136] That risk was heightened by lower-court decisions following *Quanta* that invalidated post-sale use restrictions, which shielded buyers of licensed chips from infringement suits, such that once a chipmaker was licensed, the OEM would have no need for a license covering its end-user products—precisely where the SEPs' value is reflected.[137] Qualcomm reasonably addressed this risk by licensing only at the OEM level situated at the end of the supply chain.

71. Qualcomm's practice of licensing only at the OEM level also reflects

[133] *Id.* at 621 (holding that "patent exhaustion applies to the sale of components of a patented system that must be combined with additional components in order to practice the patented methods").
[134] *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F.Supp.2d 575, 582–83 (E.D. Ky. 2009).
[135] *See, e.g.*, *B. Braun Med., Inc. v. Abbott Labs*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) (holding that "an expressly conditional sale or license" does not trigger patent exhaustion); *Mallinckrodt Inc. v. Medipart Inc.,* 976 F.2d 700, 708 (Fed. Cir. 1992) (upholding a single-use restriction in a label license).
[136] *FTC*, 969 F.3d at 994.
[137] *Static Control Components*, 615 F.Supp.2d at 575; *Tessera Inc.*, 646 F.3d 1357 (Fed. Cir. 2011).

procompetitive business considerations and long-standing practices in the wireless industry.[138] Situating licensing at one point on the supply chain minimizes transaction costs as compared to a multi-level licensing system that would involve far greater numbers of licensees, which would in turn increase negotiation, monitoring, and enforcement costs. Situating licensing at the device level provides the most reliable reflection of the value of the licensed technology by using an economic metric (device sales) that reflects consumer demand,[139] more accurately represents the SEPs' economic value,[140] and is straightforward to track and calculate, which also minimizes transaction costs and the incidence of disputes.[141]

### C. Qualcomm's Practice of Selling Chips Only to Licensees

72. During the Class Period, Qualcomm required that purchasers of its chipsets enter into a license agreement for a selected SEP and patent portfolio before purchasing chips. This policy—what Plaintiffs refer to as "no license, no chips"—reflects the fact that Qualcomm was the only firm in the wireless chipset market that was both an SEP innovator that contributed to technology standards and a producer that sold the physical chips that support OEMs' implementation of that standard. As found by the Ninth Circuit, this practice did not impose competitive harm.[142] Instead, Qualcomm's practices represented a reasonable response to the

[138] Marvin Blecker, et al., "An Experience-Based Look at the Licensing Practices that Drive the Cellular Communications Industry: Whole Portfolio/Whole Device Licensing, *Les Nouvelles* (Dec. 2016), at 230 (stating that "[f]rom the start of the cellular communications industry, the device (handset) price has been the widely used royalty base in license agreements") and 230-31 ("all significant patent holders in the cellular communications industry use the device price as the royalty base in license agreements").

[139] Alexander Galetovic and Stephen Haber, "SEP Royalties: What Theory of Value and Distribution Should Courts Apply?," 17 *Ohio St. Tech. L. J.* 189, 203 ("[t]he source and limit of all surplus in the smartphone production chain is the value that consumers assign to the things that they can do with a smartphone").

[140] For example, products like Uber could not exist without ubiquitous data connectivity and GPS, both of which are enabled through Qualcomm SEPs.

[141] Bowman Heiden and Jens Andreasson, "Reevaluating Patent Damages in the Knowledge Economy: The Intellectual Value Chain and the Royalty Base for Standard-Essential Patents," 1 *Criterion Journal on Innovation* 229, 261-262 (2016); Blecker, et al., *supra* note 138, at 231-232.

[142] *FTC*, 969 F.3d. at 1005.

business and legal environment in which Qualcomm operated.

73. First, Qualcomm operated in a legal environment in which the patent exhaustion doctrine had been expanded as a result of the Supreme Court's 2008 decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*[143] As discussed previously in Section V.B., the Court's ruling in Quanta cast doubt on previous understandings that parties could mutually agree to limit the patent exhaustion doctrine through contractual agreement. Given this legal uncertainty, as the Ninth Circuit observed,[144] any sale of a chipset to an unlicensed OEM risked exhausting Qualcomm's ability to assert its rights over its CDMA and/or LTE-related system-level technology. Requiring that chipset purchasers enter into a license before purchasing chips mitigated this significant risk to Qualcomm's ability to receive a return on the billions of dollars of R&D investments that stood behind its patent-protected technology assets.

74. Second, Qualcomm's policy reflected a reasonable practice of not selling chips to OEMs that refused to compensate Qualcomm for their use of the standard-essential technology that is incorporated into the OEM's end-user devices. It is important to appreciate that Qualcomm expends billions of dollars in R&D investments (between $5 billion and $5.5 billion annually during each year of the Class Period[145]) prior to the potential adoption of its innovations in a technology standard, which is then followed potentially by adoption of its standard-essential technology by OEMs. But the OEMs that incorporate Qualcomm's standard essential technology in their end-user devices do not face the same sunk costs and can choose to infringe and wait for the SEP holder to bring an infringement suit. Indeed, some OEMs are among the largest companies in the world and have ample resources to sustain litigation over an extended period,

[143] 553 U.S. 617, 637 (2008).
[144] *FTC*, 969 F.3d. at 985 (observing that, without what the FTC called Qualcomm's "no license, no chips" policy, OEMs could purchase chips from Qualcomm but "decline to take licenses, arguing instead that their purchase of chips from Qualcomm extinguished Qualcomm's patent rights with respect to any CDMA or LTE technologies embodied in the chips").
[145] Data and calculations derived from disclosures in Form 10-K filings by Qualcomm during the Class Period.

which can be funded in part by the sale of devices that continue to use the SEP owner's patent-protected technology. For example, the former head of licensing at Apple, one of the largest OEMs, stated publicly that "'efficient infringement,' where the benefits outweigh the legal costs of defending against a suit, could almost be viewed as a 'fiduciary responsibility,' at least for cash-rich firms that can afford to litigate without end."[146] In other words a well-resourced OEM—of which there are several—has little incentive to enter into a license; rather, its best strategy is to infringe and compel the patent owner to incur the costs of bringing an infringement lawsuit.[147]

75. Qualcomm legitimately sought to protect itself against a predicament in which it would be unable to earn commensurate returns on these sunk research and development investments during a protracted litigation process and to avoid the economically irrational situation in which it would be selling chips to companies that refused to compensate Qualcomm for their use of Qualcomm's intellectual property. To achieve these goals, Qualcomm rationally required that the OEM agree to compensate Qualcomm for the use in its end-user devices of Qualcomm's systems-level technology relating to the relevant wireless standard before Qualcomm would agree to sell the OEM chipsets for the devices that implemented that standard.

76. The Simcoe Report fails to explain how this practice, or the alleged ***leveraging*** of this practice (discussed below in Section VI.B.), would exclude competition in any relevant market.

77. The Simcoe Report ignores that there is no competition to exclude in the market

---

[146] "The trouble with patent-troll-hunting," *The Economist* (Dec. 14, 2019) *available at* https://www.economist.com/business/2019//12/14/the-trouble-with-patent-troll-hunting.

[147] The Simcoe Report alleges that Qualcomm's bundling practices "prevent" OEMs from engaging in FRAND litigation. Simcoe Report ¶¶ 15, 84, 86. This assertion is counterfactual to the realities of the SEP licensing environment, which is characterized by a high incidence of litigation involving SEP owners and licensees or alleged infringers in judicial venues around the world. Indeed, the Ninth Circuit noted OEMs have been successful in "disciplining" Qualcomm's pricing through arbitration. *FTC*, 969 F.3d at 1001.

for licenses to Qualcomm's SEPs. Qualcomm is the only holder of the SEPs and there is no alternative seller—and thus there's no competition to exclude. As the Supreme Court stated, "mere possession of monopoly power" through developing patents is "not only not unlawful; it is an important element of the free-market system."[148]

78. The Simcoe Report also fails to explain how this practice could have excluded competition in the chip market. Indeed, the Ninth Circuit determined that Qualcomm's practice of selling chips only to licensed OEMs did ***not*** preclude OEMs from securing chips from other suppliers.[149] Each OEM was "required to pay a per-unit licensing royalty to Qualcomm for its patent portfolios regardless of which company they choose to source their chips from."[150] In fact, some OEMs exercised this freedom to choose chip suppliers by moving to other suppliers for some or all of their chip requirements or by shifting to self-supply. For example, Apple initially sourced baseband modems exclusively from Qualcomm (after switching in 2011 from Infineon as its chip supplier) but, starting in 2016, sourced modem chips partially from Intel and, as of 2018, entirely from Intel. More generally, Qualcomm's share of the baseband modem market declined significantly during the Class Period,[151] as Intel and MediaTek entered the market and Samsung and Huawei shifted to self-supply for certain purposes.[152] This evidence suggests that

---

[148] *Trinko*, 540 U.S. at 407.
[149] *FTC*, 969 F.3d at 1002–03 ("unlike a hypothetical 'no chips, no license' policy, 'no license, no chips' is chip-neutral: it makes no difference whether an OEM buys Qualcomm's chip or a rival's chips.").
[150] *Id.* at 985. Additionally, as I discuss in more detail in Sections III.C. and VI.A., to the extent Qualcomm did offer any "bundled" discounts, those discounts would be attributed under applicable law to the chips—as the product that faced competition—not the licenses. *Cascade Health,* 515 F.3d at 906. But the Simcoe Report provides no evidence that the chips were sold below cost even when accounting for the discounts.
[151] Statista, Global cellular baseband processor revenue share by vendor from 2014 to 2021, *available at* https://www.statista.com/statistics/427073/cellular-baseband-processor-supplier-share/.
[152] Plaintiff Federal Trade Commission's Proposed Findings of Fact and Conclusions of Law, *FTC v. Qualcomm, Inc.,* Case No. 5:17-cv-00220-LHK-NMC (N.D. Cal. Feb. 20, 2019), ECF No. 1472 at 18. *See* Kwon, *supra* note 90, at 12 (observing that, starting in February 2016, Samsung sourced chips for the Galaxy S7 both from Qualcomm and its internal production).

Qualcomm's policy of not selling chips to unlicensed OEMs did not pose an entry barrier to equally or more efficient suppliers and did not bar technically capable OEMs from shifting to self-supply.

79. Instead, what Plaintiffs call Qualcomm's "no license, no chips" policy enhanced competition by supporting innovation incentives in the chip-design market and imposed no competitive harms in the chip-production market since OEMs were free to purchase chipsets from other suppliers. As illustrated by Apple's switch to Intel as an alternative chip supplier in 2016 and other OEMs' shift to self-supply, OEMs took advantage of this option once other suppliers could produce, or the OEM itself could self-supply, chips that satisfied OEMs' particular technical requirements for relevant mobile communications devices.

80. As Qualcomm disclosed in its securities filings, and elsewhere, this policy was challenged by regulators in several jurisdictions, often in response to lobbying and advocacy efforts by certain OEMs and other entities.[153] As disclosed in the litigation between Qualcomm and Apple, Apple internal documents show that Apple undertook lobbying and litigation efforts during the Class Period to induce legal and regulatory actions and to secure rulings designed to lower its "net royalty" to Qualcomm, including statements such as "***Reshaping*** FRAND – Licensing, Litigation & Competition Law", "Devalue SEPs", "Create Leverage by Building

[153] Qualcomm Inc., Form 10-K (2015), at 20 (disclosing that "companies initiate various strategies to attempt to . . . mitigate and/or eliminate their need to pay royalties to us for use of our intellectual property . . . [including] lobbying governmental regulators and elected officials for the purpose of seeking the imposition of some form of compulsory licensing and/or to weaken a patent holder's ability to enforce its right or obtain a fair return for such rights"); *see also id.* at 35-36 ("[W]e expect that certain companies may continue to be dissatisfied with the need to pay reasonable royalties for the use of our technology . . . We expect that such companies and/or governments or regulators will continue to challenge our business model in various forums throughout the world"); *see also* Q121SEC00079115.

Pressure", and "***Put Qualcomm's Business Model at Risk***."[154] Apple had a business interest in reducing its input costs, which included license fees owing to technology innovators in the smartphone supply chain, and undertook lobbying and litigation activities to achieve that objective by influencing the application of competition and intellectual property laws in a manner that constrains SEP owners' licensing and enforcement capacities.

## VI. THE PROPOSED ANTITRUST THEORIES OF COMPETITIVE HARM ATTRIBUTED TO THE PURPORTEDLY UNDISCLOSED BUNDLING PRACTICES ARE NOT WELL-FOUNDED IN ANTITRUST LAW AND LACK FACTUAL SUPPORT

### A. Qualcomm's practice of providing chip discounts, marketing development funds, and/or strategic relationship funds to OEM licensees

81. The Simcoe Report asserts that Qualcomm bundled the sale of the chipsets with a license to its SEPs by providing various rebates in the form of chip discounts, marketing development funds, and/or strategic relationship funds (generally, "incentive arrangements") to OEMs that entered into both license and chip supply agreements with Qualcomm.[155] This practice purportedly gave rise to antitrust risk insofar as it allegedly constitutes an illegal bundling practice by offering an implied discount on the license when the chipset and license are purchased together.

82. It is not clear that it is appropriate to characterize this practice as a bundled discount. Based on external correspondence between Qualcomm and various OEMs, internal correspondence of Qualcomm and various OEMs, and disclosures in Qualcomm's securities filings, [redacted]

[154] Opening Statement slides, *In re Qualcomm Litigation*, Case No. 3:17-cv-00108-GPC-MDD (S.D. Cal. April 16, 2019), at 7, 12 ("Opening Statement slides"), *available at* https://www.scribd.com/document/407463620/Qualcomm-opening-statement; APL-QC-FTC_33946740.
[155] Simcoe Report ¶¶ 41–43.

[redacted][156] Additionally, it is not clear why discounts based specifically on the volume of chips purchased, or on an exclusive chip purchasing commitment, should be treated as a reduction in the royalty rate, and the Simcoe Report provides no basis for this conclusion.[157] As an economic matter, these divergent characterizations are immaterial. Under the Simcoe Report's theory, in choosing between sourcing chips from Qualcomm or another supplier (or both), the OEM compares in each case the "all-in" price consisting of (1) the royalties paid to patent and SEP holders—including Qualcomm's SEPs—plus (2) the chip price, less (3) volume-based and other payments to the OEM under negotiated incentive arrangements. Given Qualcomm's "no license, no problem" practice, chip suppliers other than Qualcomm were free to compete on elements (2) and (3) of this package.

83. Assuming that a court would treat the combination of the license, the chips, and the incentive arrangements as a bundled discount, this observation by itself does not support an antitrust violation. The Simcoe Report argues that bundled discounts will lead to less competition and higher prices.[158] Under that theory, any bundle of complementary goods—a widespread

---

[156] [redacted]

[redacted]

business practice—would lead to less competition and higher prices, and thus constitute an antitrust violation. That opinion has no basis in antitrust scholarship or case law, which, as discussed previously in Section III.C., generally views bundled discounts as procompetitive, except for specialized circumstances in which a bundled discount has an exclusionary effect that deters entry by single-product firms that are equally or more efficient. As observed by the author of a treatise on antitrust law, "bundled discounting is commonly used even in highly competitive markets where exclusion of rivals is not possible"[159] and therefore does not generally give rise to antitrust concern. The suggestion that bundled discounts are inherently anticompetitive ignores the large majority of bundled discounts that benefit consumers through lower prices and reduced transaction costs.

84. To determine whether a bundled discount has an exclusionary effect on equally or more efficient rivals (but without suppressing the great majority of bundling practices that benefit buyers), most courts during the Class Period applied the discount-attribution test. As discussed previously in Section III.C.1., this test ***requires*** showing that (1) the defendant has market power in one good in the bundle, and (2) the defendant offers the other "competitive" good at a price below the defendant's average variable cost to produce that good.[160] For this purpose, Ninth Circuit precedent ***requires*** that the entire discount be allocated to the competitive good to determine whether that good is sold below cost.[161]

85. The Simcoe Report offers no opinion or analysis that Qualcomm priced the chipset (which would be the competitive good) below its average variable cost, after taking into

[159] Hovenkamp & Hovenkamp, *supra* note 49, at 1230.
[160] *Cascade Health Solutions*, 515 F.3d at 910 ("To prove that a bundled discount was exclusionary or predatory for the purposes of a monopolization or attempted monopolization claim under § 2 of the Sherman Act, the plaintiff must establish that, after allocating the discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them").
[161] *Id.* at 901. The competitive good here would be the chipset.

account the offsetting payments made under the incentive arrangements. In the absence of such evidence, there would have been no basis under applicable legal doctrine during the Class Period to treat the bundled discount as a possible antitrust offense; rather, it falls into the presumptively protected category of bundled discounts that lower prices consistent with "competition on the merits." As contemporary commentators observed, the discount-attribution test effectively establishes a "safe harbor" for any above-cost discounting practice.[162]

86. The Ninth Circuit further indicated that, even if a bundled discount fails the discount-attribution test, the defendant would nonetheless still prevail if it were able to show that the plaintiff had not demonstrated antitrust injury (as distinguished from harm to a particular competitor).[163] In making this determination, a court would take into account procompetitive efficiencies reasonably attributable to the bundled discount. As the author of a leading antitrust treatise explains, it is necessary to do so because there are plausible circumstances in which a bundled discount may fail the discount-attribution test but nonetheless pose no risk of competitive harm because it does not exclude equally or more efficient competitors.[164] The Simcoe Report does not even attempt to opine on these potential efficiencies. In the following Section, I show that the terms of the incentive arrangements between Qualcomm and OEMs (and in particular, Apple) indicate that these arrangements had no significant foreclosure effects, but did have significant procompetitive effects, in the chip production market.

**B. Leveraging of the publicly disclosed practice that Plaintiffs call "no license,**

[162] Popofsky and Gromfin, *supra* note 53, at 100.
[163] *Cascade Health Solutions*, 515 F.3d at 910 n. 21 (stating that analysis of whether bundled discount has adverse effect on competition (after finding that the bundled discount fails the discount-attribution test) is "redundant because it is no different than the general requirement of 'antitrust injury' that a plaintiff must prove in any private antitrust action"). The same observation was made by contemporary commentators, see Popofsky and Gromfin, *supra* note 53, at 100 (observing that the "Ninth Circuit reserved such Rule of Reason analysis for those cases failing the above-cost safe harbor it adopted for bundled discount cases").
[164] Hovenkamp & Hovenkamp, *supra* note 49, at 1233-34 (stating that "[o]nce a firm's bundle flunks the attribution test, a full analysis of market structure, competitive effects, and rationales for the profitability of the defendant's bundle remain to be examined").

**no chips"**

87. The Simcoe Report asserts that Qualcomm "leverage[d]" its "no license, no chips" policy to extract supracompetitive royalty rates.[165] This assertion suffers from three fatal flaws.

88. First, from an antitrust perspective, there is no meaningful distinction between having what the Simcoe report calls the "no license, no chips" practice and implementing that same practice. Indeed, the practice makes sense only if the company communicates it to OEMs by telling them that Qualcomm will not sell the OEM chips if it is unlicensed to Qualcomm's SEPs. I understand that Plaintiffs have recognized that the market knew and understood that Qualcomm would not sell chips to unlicensed OEMs.[166] Qualcomm's OEM customers are undoubtedly part of the market for Qualcomm's chips and SEPs. The Simcoe Report fails to explain how the "no license, no chips" practice was understood by the market, yet the "leveraging" of that practice–by communicating it to OEMs–was somehow undisclosed.

89. Second, the Simcoe Report overlooks the procompetitive business justifications for the "no license, no chips" policy for OEMs, especially when understood in conjunction with Qualcomm's "no license, no problem" policy for chip suppliers. As a patent holder, Qualcomm legitimately sold its chips only to companies that agreed to payment of a per-unit royalty. This royalty enables Qualcomm to earn a return on its R&D investment. As the Ninth Circuit found, "it is undisputed that Qualcomm's current royalty rates . . . are based on the patent portfolio chosen by the OEM customer regardless of where the OEM sources its chips."[167] Hence this policy was "chip-neutral": that is, any OEM-licensee was free to purchase chips from Qualcomm

[165] Simcoe Report ¶ 42. Elsewhere the Simcoe Report asserts that Qualcomm's payments to OEMs under various incentive arrangements constituted an implicit reduction in the royalty rate. *Id.* at ¶ 76. These two assertions appear to stand in logical contradiction.
[166] Letter at 1 ("the market understood that Qualcomm would only sell chips to licensed companies"); Simcoe Report ¶ 62 (noting Qualcomm's disclosed business practice of "refusing to sell modem chipsets to OEMs . . . that have not first obtained a license from QTL").
[167] *FTC*, 969 F.3d at 997.

or other chip suppliers,[168] which could then compete for OEMs' chip requirements on quality and price (including, as discussed in the immediately preceding Section, by offering volume discounts and other incentive arrangements). Concurrently, because Qualcomm focused its licensing efforts on the OEMs, chip companies were able to access the chip market without paying Qualcomm any royalties for SEPs. As a result, Qualcomm facilitated entry by other chip suppliers through its "no license, no problem" policy. Consistent with this understanding, Qualcomm lost significant market share in the baseband modem chip market to Intel, MediaTek, and self-suppliers starting in 2015,[169] once competitors had apparently achieved sufficient improvements in chip performance.

90. As observed by the Ninth Circuit, there might have been reasonable grounds for antitrust liability if Qualcomm had implemented a "no chips, no license" practice whereby Qualcomm would not license OEMs unless they bought Qualcomm chips.[170] However, Qualcomm does not implement this practice and no regulator, competitor or Qualcomm customer ever alleged that Qualcomm implemented this practice. The Simcoe Report conflates the two theories when, in fact, Qualcomm's practice of selling chips only to licensees did not give rise to a significant risk of antitrust liability.

91. Third, to support this leveraging theory of antitrust harm, the Simcoe Report relies substantially on testimony (including inherently biased testimony from Qualcomm's licensees

---

[168] *Id.* at 985 ("Qualcomm's practices, taken together, are "chip supplier" neutral—that is, OEMs are required to pay a per-unit licensing royalty to Qualcomm for its patent portfolios regardless of which company they choose to source their chips from").

[169] On market share, see Statista, Global cellular baseband processor revenue share by vendor from 2014 to 2021, *available at* https://www.statista.com/statistics/427073/cellular-baseband-processor-supplier-share/; on entry by other suppliers, see Plaintiff Federal Trade Commission's Pretrial Proposed Findings of Fact and Conclusions of Law, *FTC v. Qualcomm, Inc.,* Case No. 5:17-cv-00220-LHK-NMC (N.D. Cal. Feb. 20, 2019), ECF No. 1472 at 18.

[170] *FTC*, 969 F.3d at 1002–03 ("unlike a hypothetical 'no chips, no license' policy, 'no license, no chips' is chip-neutral: it makes no difference whether an OEM buys Qualcomm's chip or a rival's chips.").

and chip purchasers) and other evidence presented in the *FTC v. Qualcomm* trial, held before the district court in 2019.[171] However, the Simcoe Report omits a crucial fact—the Ninth Circuit considered the evidence concerning Qualcomm's business practices and concluded that it did ***not*** support an antitrust violation.[172] Instead, the Ninth Circuit referred to Qualcomm's business practices as "***[h]ypercompetitive.***"[173]

**C. Exclusive dealing**

92. The Simcoe Report suggests that the incentive arrangements between Qualcomm and OEMs might be alternatively construed as a form of exclusive dealing to the extent that a court found that the payments from Qualcomm to the OEMs under those arrangements had the practical effect of discouraging the OEM from switching to other chip suppliers.[174] During the Class Period, some appellate courts had adopted a "de facto" exclusive dealing theory under which a plaintiff can demonstrate the existence of an exclusive dealing arrangement even in the absence of a formal agreement with an express exclusivity provision.[175]

93. The Simcoe Report asserts that Qualcomm "sought to exclude rivals by conditioning its bundled discounts on a customer's agreement to purchase all or most of its

[171] *See, e.g.*, Simcoe Report ¶¶ 58-60 (describing communications between Qualcomm and Sony executives), which largely repeats information described in *FTC v. Qualcomm, Inc.*, 411 F.Supp.3d 658, 677-79, 703-06, 808-09 (N.D. Cal. 2019). Much of the communications between Qualcomm and various OEMs described in the Simcoe Report (App. E) similarly repeat evidence described in the district court opinion. Qualcomm's securities filings consistently disclosed that licensors of its SEPs may make these arguments in order to obtain lower royalty rates. *See, e.g.*, Qualcomm Inc., Form 10-K (2015).

[172] *FTC,* 969 F.3d., at 985 (noting Qualcomm's "sometimes aggressive defense" of its licensing policies, including the "no license, no chips" policy, and customers' attempts to "discipline" Qualcomm through negotiations and threatening to change chip suppliers, and observing that "[t]hese maneuvers generally resulted in settlements and renegotiated licensing and chip-supply agreements") and 1001-02 (similar statement).

[173] *Id.* at 1005.

[174] Simcoe Report ¶ 77 ("Qualcomm also sought to exclude rivals by conditioning its bundled discounts on a customer's agreement to purchase all or most of its modem chipsets from Qualcomm"). Of note, no regulator pursued this theory with respect to any other OEM besides Apple.

[175] *ZF Meritor*, 696 F.3d at 282 n.14; *McWane, Inc. v. FTC*, 783 F.3d 814, 833-35 (11th Cir. 2015).

modem chipsets from Qualcomm" and, as evidence, relies on (1) a ruling by the European Commission against Intel in 2009 concerning conditional rebates to device manufacturers in exchange for exclusive purchasing commitments, and (2) testimony by Apple and Samsung executives.[176] This evidence is unpersuasive and misleading. The General Court of the European Union reversed that Intel ruling in 2022, finding that the European Commission's findings and analysis could not support the conclusion that the rebates were capable of excluding an equally efficient competitor.[177] Of even greater relevance, the General Court reversed less than six months later a decision by the European Commission against Qualcomm that was based on the same theories.[178] Moreover, the Ninth Circuit specifically held that the alleged exclusive dealing arrangement between Qualcomm and Apple did not constitute an antitrust offense because it did not foreclose competition in the relevant market.[179] Following that ruling, the Ninth Circuit vacated an order certifying a nationwide consumer class action relying on the same theories.[180]

94. Exclusive dealing arrangements (including bundled discounts construed as a form of exclusive dealing) are addressed under a form of the rule of reason.[181] As discussed previously in Section III.C.2., an antitrust claim against an alleged exclusive dealing arrangement must show that (1) the defendant had market power and (2) the exclusive dealing arrangement had significant foreclosure effects, causing competitive harms that are weighed against countervailing competitive benefits attributable to the arrangement.[182] Under that standard, it

---

[176] Simcoe Report ¶¶ 77-79.

[177] Judgment of the General Court, *Intel v. Commission* (Case T-286/09, Jan. 26, 2022), *available at* https://curia.europa.eu/jcms/upload/docs/application/pdf/2022-01/cp220016en.pdf.

[178] Judgment of the General Court, *Qualcomm v. Commission*, (Case T-235/18, ECLI:EU:T:2022:358 June 15, 2022).

[179] *FTC*, 969 F.3d at 1004-05.

[180] *Stromberg v. Qualcomm Inc*., 14 F.4th 1059 (9th Cir. 2021). The Ninth Circuit strongly suggested that the case should be dismissed, but noted it could not do so procedurally. The District Court thereafter granted summary judgment in favor of Qualcomm, see *In re Qualcomm Antitrust Litigation,* Case 3:17-md-02773-JSC (N.D. Cal., Sept. 26, 2023), ECF No. 1005.

[181] *Eisai, Inc.,* 821 F.3d at 403.

[182] *Tampa Elec. Co.*, 365 U.S. at 329; *ZF Meritor, LLC,* 696 F.3d at 271.

would be unlikely that the incentive payment agreements offered by Qualcomm to certain OEMs, if construed as forms of exclusive dealing, would have given rise to a significant risk of antitrust liability. There are three reasons.

95. First, since Qualcomm's share of the baseband LTE chip market declined significantly from 2014 through 2016[183] (reflecting the entry of Intel and MediaTek), it does not appear that there was a significant foreclosure effect. Moreover, as observed by the Ninth Circuit[184] and the General Court of the European Union,[185] no other firm could match Qualcomm's technical performance during 2011-2015,[186] in which case the exclusive dealing arrangement had no incremental foreclosure effect beyond the fact that other chip suppliers were technologically behind Qualcomm. That is: even absent the exclusivity commitment, Apple would have sourced LTE chips during this period solely from Qualcomm, and the discounts reflect, if anything, Apple leveraging its bargaining power to secure additional discounts from Qualcomm on the price of its chips. As soon as other chipset suppliers met Apple's technical requirements, entry into the LTE chip market took place, further supporting the view that Qualcomm's technological excellence, rather than the exclusivity-based payments, had deterred entry into the market during a portion of the Class Period. [redacted]

---

[183] Statista, Global cellular baseband processor revenue share by vendor from 2014 to 2021, https://www.statista.com/statistics/427073/cellular-baseband-processor-supplier-share/.
[184] *FTC*, 969 F.3d at 1004-05.
[185] Judgment of the General Court, *Qualcomm v. Commission* (Case T-235/18, June 15, 2022) at 407 ("Qualcomm v. Commission").
[186] *Id.* at 407, 414.
[187] [redacted]

[redacted] Ultimately, Apple undertook both actions (in 2016 and 2019, respectively).

96. Second, there is no evidence to support the view that volume-based and other discounts deterred entry by any chip supplier *who was as or more efficient* than Qualcomm. So long as the chip price (adjusted to reflect the incentive payments) remained above-cost, any equally or more efficient competitor would be able to match or exceed those discounts. During the Class Period, courts had repeatedly held that volume and market share discounts pose no antitrust concern so long as the discounts do not result in below-cost pricing.[189] That position reflected in turn the First Circuit's decision in 1983, and two later Supreme Court decisions in 1986 and 1996, that emphasized the favorable competitive effects of discounting practices as a general matter.[190] Any other rule would deploy antitrust law to protect specific competitors, at the expense of competition and consumers.

97. Third, volume-based discounts and incentive arrangements had favorable efficiency effects by increasing the likelihood that the OEM would purchase a sufficient number of chips to enable Qualcomm to justify the customization investments specific to its relationship with any particular OEM. While the Simcoe Report ascribes anticompetitive motivations and foreclosure effects to the volume-based discounts and exclusivity provisions[191], both the

---

188 [redacted]

189 *Virgin Atl. Airways,* 257 F.3d at 269 (in the context of a volume-discount program, stating that "[a]s long as low prices remain above predatory levels, they neither threaten competition nor give rise to antitrust injury") (citing *Atlantic Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 340 (1990); *Concord Boat Corp. v. Brunswick Corp*., 207 F.3d 1039, 1060-61 (8th Cir. 2000) (upholding market-share discount against monopolization challenge on ground that pricing was above-cost).

190 *Barry Wright,* 724 F.2d at 236 (upholding volume discounts so long as price above average total cost); *Matsushita Elec. Industrial Co.*, 475 U.S. at 604–607 (holding that antitrust claim against alleged predatory pricing must show below-cost pricing and reasonable expectation of recovering losses through subsequent monopoly profits); *Brooke Group Ltd.,* 509 U.S. at 232–35 (upholding even below-cost volume discounts absent reasonable prospect or, under Section 2 of the Sherman Act, dangerous probability of recoupment).

191 Simcoe Report ¶¶ 32, 77–78 (volume discounts); 77, 92 n.124 (exclusivity commitments).

scholarly literature and case law have recognized that these contractual provisions can have procompetitive efficiency effects by inducing relationship-specific investments that operate to both parties' mutual benefit.[192] Additionally, the volume-based discounts enabled the OEM to share in some of Qualcomm's economies of scale. Consistent with this view, Apple internal documents, disclosed in its litigation with Qualcomm, show that average modem chip prices (and, in particular, prices for CDMA and LTE chips) were declining during the Class Period.[193]

98. In the case of incentive agreements that contemplated termination and forfeiture of incentive payments if the OEM failed to meet its volume commitments or decided to source particular chips from a non-Qualcomm vendor,[194], those terms could potentially be matched or exceeded by an equally or more efficient competitor. Alternatively, an OEM may have decided that it valued having multiple chip suppliers over the discounts earned by using a single supplier. [redacted] Given the fact that Apple then elected to terminate its incentive agreement with Qualcomm by switching to Intel as a second-source chip supplier in 2016 and then as a sole-source chip supplier in 2018, and MediaTek entered the

[192] *Virgin Atl. Airways*, 257 F.3d at 265 ("These kinds of [incentive] agreements allow firms to reward their most loyal customers. Rewarding customer loyalty promotes competition on the merits"); Benjamin Klein, et al., "Vertical Integration, Appropriable Rents, and the Competitive Contracting Process," 21 *J. L. & Econ.* 297, 310 n. 28 (1978) ("[i]t is obvious that long-term exclusive dealing contracts are necessary if such [relationship-specific] investments are to be made by nonvertically integrated firms"); Daniel A. Crane, "Bargaining Over Loyalty" 92 *Tex. L. Rev.* 253, 298-99 (2013) (describing the efficiency benefits ascribed to exclusivity commitments, including reduced seller opportunism, minimizing transaction costs, reducing procurement costs, avoiding supply-chain disruptions, and achieving economies of scale).
[193] Opening Statement Slides at slides 22-23.
[194] *See, e.g.*, QNDCAL05841317 at -1319 (providing that agreement will terminate if Apple sells an Apple product with a non-Qualcomm cellular baseband modem and further providing that, if Apple sells an Apple product with a non-Qualcomm cellular baseband after a certain date, then Apple must return to Qualcomm a certain portion of previously paid "transition funds").
[195] A [redacted]

CDMA and LTE chip markets during this time,[196] the Ninth Circuit appropriately concluded that the incentive agreements did not give rise to a significant foreclosure effect.[197] This is consistent with decisions by other courts during the Class Period that rejected antitrust challenges to discounts construed as exclusivity commitments when buyers were able to, and did in fact, exit the commitment when competitors offered more attractive product and price combinations.[198]

99. Antitrust concerns over exclusive dealing arrangements are diminished in circumstances where a defendant faces countervailing bargaining power from the counterparty (since it is then challenging to infer that the exclusivity commitment reflects market power on the part of the defendant). This consideration is especially pertinent in assessing Qualcomm's incentive agreements with Apple, one of its two largest customers during the Class Period.[199] Apple's uniquely branded position in the smartphone market, and exceptionally large customer base, translated into bargaining power when negotiating with suppliers, especially when a supplier relies on Apple for a substantial portion of its revenues.[200] In Qualcomm's case, it lacked a credible threat to "walk away" from its relationship with Apple since it derived such a large portion of its revenues from Apple. As previously noted, Qualcomm had disclosed in its securities filings during the Class Period that *each* of Samsung and Apple-associated contract

---

[196] *FTC*, 969 F.3d at 984 (entry by Intel and MediaTek), 996 (same) and 1002 (Apple's switch to Intel in 2014).
[197] *Id.* at 1004-05.
[198] *See, e.g.*, *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 997 (9th Cir. 2010) (holding that competitors are not foreclosed when "a competing manufacturer need[] only offer a better product or . . . a better deal to acquire [a customer's business]"); *Concord Boat Corp.,* 207 F.3d at 1059, 1063 (stating that competitors are not foreclosed when customers are "free to walk away" from the discount and they do in fact walk away when "competitors offer[] better discounts").
[199] Kwon et al., *supra* note 90 at 13.
[200] Jason Dedrick, et al., "Who Profits from Innovation in Global Value Chains? A Study of the iPod and notebook PCs"*,* 19 *Industrial and Corporate Change* 1, 82 (2010) ("[w]ithin its supply chain, Apple has strong bargaining power thanks to the large market opportunity it provides"); *See also id.* at 95 (noting that an Apple supplier's "market power with Apple . . . was dissipated by its dependence on Apple for its revenues").

manufacturers (considered collectively) accounted for more than 10% of its annual revenues.[201]

100. The Simcoe Report assumes throughout that Qualcomm consistently exercises market power as a result of its SEP portfolio. While this is a common assumption in theoretical economic models of SEP licensing, it ignores the fact that, in real-world SEP licensing markets, an SEP owner's pricing power will be substantially curtailed when bargaining with an OEM that constitutes a large portion of the SEP owner's revenues. During the Class Period, Apple was the second-largest producer of smartphone devices (as measured by units shipped) in the world.[202] This bargaining environment is reflected by the estimated division of value generated by an iPhone 7 device (as of 2017): Apple captured 42% of the retail price, as compared to 5% for all IP licensors in total.[203] Apple internal documents show that it recognized that it could wield bargaining power in negotiations with chip suppliers such as Qualcomm, including statements such as: "We can leverage our purchasing power[.]"[204]

101. In the case of Qualcomm's efforts to enter into a chip supply agreement with Apple, Apple exercised significant bargaining power since it offered Qualcomm the opportunity to partner with the producer of the iPhone, one of the world's most popular smartphone brands, and specifically to facilitate the launch of CDMA-enabled and LTE-enabled iPhone devices, which promoted adoption and monetization of technologies that Qualcomm had developed at great expense. Moreover, as explained previously in paragraph 45, a technology innovator such as Qualcomm must incur billions of dollars in R&D expenditures on next-generation wireless technologies prior to having any assurance that it will secure sufficient adoption among OEMs (and ultimately end-users) to monetize its investment. Sophisticated prospective licensees such

---

[201] Qualcomm Inc., Form 10-K (2012), at 6; Form 10-K (2013), at 9; Form 10-K (2014), at 10; Form 10-K (2015), at 13; Form 10-K (2016), at 14.
[202] Dedrick & Kraemer, *supra* note 107 at 5 (Table 3) (citing IDC Worldwide Mobile Phone Tracker).
[203] Dedrick & Kraemer, *supra* note 107 at 16-17.
[204] Opening Statement Slides at slide 8.

as Apple are aware of the innovator-licensor's predicament, which can impact the distribution of bargaining power in licensing negotiations, especially when a licensee (such as Apple) constitutes a significant portion of the target consumer market.

102. The Simcoe Report characterizes the volume-based and other discounts offered by Qualcomm to Apple and certain other OEMs as anticompetitive mechanisms to foreclose competitors.[205] Once contextualized in the real-world business context and legal environment during the Class Period, the volume-based and other discounts in certain incentive arrangements between Qualcomm and Apple are best understood as inducements offered by Qualcomm to Apple to induce it to use Qualcomm as its chip supplier for the transition to CDMA and LTE wireless technology for its iPhone devices.[206] Those discounts operated to both parties' mutual advantage by encouraging Apple to purchase a sufficient volume of baseband modem chips to promote adoption of CDMA and LTE technology and, as a result, to enable Qualcomm to achieve scale efficiencies (which were shared with Apple through the volume discounts) and earn returns on its R&D investments in those technologies and customization investments for the iPhone device. This understanding is consistent with the fact that one of the incentive agreements between Qualcomm and Apple specifically conditioned certain payments based on the launch of devices embodying CDMA and/or LTE technology on multiple carrier networks.[207]

**D. Negotiating licensing and chip contracts at the same time**

103. The Simcoe Report asserts that Qualcomm's practice of sometimes concurrently

---

[205] Simcoe Report ¶ 77, 92 n. 124.

[206] See, e.g., QNDCAL05841317 at -1319 (Feb. 11, 2011 Transition Agreement Between Apple and Qualcomm providing for periodic payments by Qualcomm of Marketing Funds and Variable Incentive Funds to Apple, [redacted]).

[207] The Transition Agreement executed in 2011 provided for payment to Apple from a Transition Fund and Marketing and Development Fund, to be paid in quarterly installments, following launch by Apple of a handset with a Qualcomm CDMA and/or LTE modem chips during 2012. QNDCAL05841317 at -1319.

negotiating licensing and chip deals (including incentive payments) with an OEM gave rise to a significant risk of antitrust liability.[208]

104. There is no antitrust doctrine under which this practice by itself would be considered an offense. If this practice is considered to be part of an alleged bundled discount, then it would be addressed under the discount-attribution or rule-of-reason tests explained previously. As discussed extensively above, neither test supports the view that Qualcomm's purported bundled discount practices gave rise to a significant risk of antitrust liability.

## VII. PROFESSOR SIMCOE HAS NO BASIS FOR HIS ASSERTION THAT ANTITRUST LAWSUITS BASED ON PURPORTEDLY UNDISCLOSED "BUNDLING" PRACTICES WERE "HIGHLY LIKELY," FORESEEABLE, OR INEVITABLE.

### A. None of these lawsuits were inevitable or foreseeable

105. The analysis above shows that the alleged bundling practices attributed to Qualcomm did not give rise to a significant risk of antitrust liability, based on governing antitrust case law and principles during the Class Period.

106. The same conclusion follows for foreign regulatory agencies to the extent that they use U.S. antitrust case law as a source of guidance concerning the purportedly undisclosed bundling practices. In this respect, I note in particular the European Commission's Statement of Objections in 2015 and ruling in 2018 against Qualcomm concerning the discounts it provided to Apple conditional on an exclusive purchasing commitment. While the Simcoe Report notes that the Commission determined that this practice constituted a violation of European competition law,[209] it overlooks the fact that this decision was annulled in 2022 by the General Court of the European Union.[210] As discussed previously, the General Court found that the Commission had

[208] Simcoe Report ¶ 43.

[209] Simcoe Report ¶¶ 123-26.

[210] Judgment of the General Court, *Qualcomm v. Commission* (Case T-235/18, June 15, 2022).

failed to provide findings and analysis sufficient to demonstrate that the exclusivity-based discounts in the agreements between Qualcomm and Apple had caused competitive harm.

107. As found by the Delaware Court of Chancery, Qualcomm believed that its chip sales and licensing practices were not "violative of any country's antitrust laws and that the legal actions it faced [concerning those practices] were the result of political and competitive opposition, as opposed to an indication of actual illegal conduct."[211] Consistent with this view, internal Apple documents disclosed in the litigation between Apple and Qualcomm showed that Apple pursued a strategy to "[d]evalue SEPs" and "put Qualcomm's licensing model at risk" by lobbying regulators and undertaking litigation using competition law.[212] As disclosed by Qualcomm in its securities filings, this behavior was expected on the part of OEMs and other entities who were "net IP" licensees and sought to reduce their royalty rates through lobbying and litigation.[213] As noted in the Simcoe Report, Apple, in its 2019 settlement agreement with Qualcomm, specifically admits to having made "claims that aspects of Qualcomm's licensing and chip business are and have been contrary to competition laws in various jurisdictions, including the United States, China, Korea, Taiwan, and Europe."[214]

108. To summarize, an understanding of the business and legal environment in the wireless communications industry during the Class Period shows that each of Qualcomm's disclosed and purportedly undisclosed business strategies reflected the "competition on the merits" that antitrust law seeks to encourage, rather than constituting an elaborate anti-

---

[211] *Melbourne Municipal Firefighters' Pension Trust Fund v. Paul E. Jacobs*, C.A. No. 10872-VCMR, 2016 WL 4076369, at *10 (Del. Ch. Aug. 1, 2016).
[212] Opening Statement Slides at slides 7, 12; APL-QC-FTC_33946740.
[213] Qualcomm Inc., Form 10-K (2015), at 20 (disclosing that "companies initiate various strategies to attempt to . . . mitigate and/or eliminate their need to pay royalties to us for use of our intellectual property . . . [including] lobbying governmental regulators and elected officials for the purpose of seeking the imposition of some form of compulsory licensing and/or to weaken a patent holder's ability to enforce its right or obtain a fair return for such rights").
[214] Simcoe Report ¶ 160 n. 253 (citing Q121SEC00936196, at -6197).

competitive mechanism as asserted in the Simcoe Report.

109. First, Qualcomm implemented a practice of selling its chips only to OEMs that compensated Qualcomm for the use of its standard essential technology that were embodied in these OEMs' end devices. This licensing-based business model sustained R&D incentives, promoted the distribution of wireless technology, facilitated entry into device production, and promoted standards adoption and interoperability in consumer device markets. These are all positive output effects consistent with the fundamental purposes of antitrust law.

110. Second, Qualcomm's OEM-level licensing policies, coupled with a "no license, no problem" policy for all higher-tier suppliers, reflected the legal constraints imposed by the judicially expanded scope of the patent exhaustion doctrine, so that it could maintain the competitive pursuit of transaction-cost savings achieved through "device-level licensing"—a pervasive industry practice among SEP licensors. Chip suppliers retained access to Qualcomm's SEP-protected technology during the Class Period and, once they made sufficient improvements in chip performance, diverted a substantial portion of OEM chip purchases away from Qualcomm.

111. Third, Qualcomm's incentive arrangements with OEMs, whether construed as bundled discounts or exclusivity commitments, enabled Qualcomm to secure returns to cover customization investments, to promote adoption of the CDMA and LTE technology standards, and to maximize economies of scale that lowered unit costs for OEMs and consumers. OEMs were free to switch to alternative chip suppliers and, as indicated by Qualcomm's declining share of the chip market starting in 2015 and, in particular, Apple's migration to Intel as an alternative chip supplier, did so once competitors made sufficient improvements in chip performance.

112. Without any valid precedent under U.S. antitrust law, these regulatory actions were not an inevitable or foreseeable result of these allegedly undisclosed practices. What was foreseeable was that OEMs and other competitors could make claims challenging Qualcomm's

publicly disclosed business model. Yet, Qualcomm repeatedly warned of such risks in its public disclosures.

**B. The legal theories in these cases were novel, untested, idiosyncratic (and ultimately unsuccessful) attempts to extend the boundaries of antitrust law.**

113. The lawsuit brought by the FTC against Qualcomm in 2017 relied on an idiosyncratic "taxation" theory that departed from settled antitrust law principles and relied substantially on theoretical models and biased testimony from Qualcomm licensees that inherently have a business interest in reducing royalty rates. Litigation based on such a weakly grounded antitrust theory would not reasonably have been expected to arise from Qualcomm's disclosed and purportedly undisclosed bundling practices.

114. The Commission (which normally has five members) authorized the lawsuit against Qualcomm in January 2017 based on a two-to-one vote due to two open seats on the Commission.[215] In an unusual public statement, Maureen Ohlhausen, one of the FTC Commissioners, dissented from the Commission's decision to undertake the litigation, stating: "I have been presented with no robust economic evidence of exclusion and anticompetitive effects, either as to the complaint's core 'taxation' theory or to associated allegations like exclusive dealing. What I have been presented with is simply a possibility theorem."[216]

115. In the district court proceedings, the DOJ undertook the unprecedented step of filing a "Statement of Interest" to support Qualcomm.[217] Even more unusually, the DOJ, the Department of Defense, and the Department of Energy, in addition to two former Chief Judges of the Court of Appeals for the Federal Circuit, filed amicus briefs at the Ninth Circuit in support

---

[215] Stephen Nellis, U.S. Justice Department asks for hearing in Qualcomm antitrust case, *Reuters* (May 2, 2019), *available at* https://www.reuters.com/article/us-qualcomm-ftc/us-justice-department-asks-for-hearing-in-qualcomm-antitrust-case-idUSKCN1S82G1.
[216] Jan 17, 2017 Federal Trade Commission, Dissenting Statement of Commissioner Maureen K. Ohlhausen in the Matter of Qualcomm, Inc. (File No. 141-0199) at 2.
[217] Statement of Interest of the United States of America, *FTC v. Qualcomm, Inc.*, Case No. 5:17-cv-00220-LHK (N.D. Cal., May 2, 2019).

of Qualcomm's motion for a stay of the district court's enforcement order (which the appellate court granted).[218] One of the former Chief Judges of the Federal Circuit that filed an amicus brief wrote: "The decision [by the trial court] represents an unheralded use of antitrust law against a company that ***epitomizes the effective use (of patent rights)***[.]"[219] These unusual interventions illustrate the extent to which the FTC's lawsuit departed from settled antitrust law and principles.

116. When Qualcomm appealed the district court's ruling in favor of the FTC, the district court's ruling was reversed in all respects by a unanimous Ninth Circuit panel.[220] The FTC even conceded on appeal that the district court had erred in finding an antitrust duty to deal under *Aspen Skiing*.[221] The Ninth Circuit observed that the district court's ruling lacked any basis in antitrust doctrine or factual evidence and, in part of the opinion, misapplied or ignored Supreme Court precedent.[222] The fact that the FTC elected not to appeal the Ninth Circuit's decision to the Supreme Court suggests that even the agency recognized the weakness of its case.



JONATHAN BARNETT

[218] United States' Statement of Interest Concerning Qualcomm's Motion for Partial Stay of Injunction Pending Appeal, *FTC v. Qualcomm, Inc.*, Case No. 19-16122 (9th Cir., July 16, 2019) ECF No. 25-1; Brief of the United States of America as Amicus Curiae in Support of Appellant and Vacatur, *FTC v. Qualcomm, Inc.*, Case No. 19-16122 (9th Cir., Aug. 30, 2019); Adam Mossoff, "The DOJ and Other Federal Agencies Oppose the FTC in *FTC v. Qualcomm,"* The Federalist Society (July 23, 2019), *available at* https://fedsoc.org/commentary/fedsoc-blog/the-doj-and-other-federal-agencies-oppose-the-ftc-in-ftc-v-qualcomm.
[219] Mike Freeman, "Legal, economics experts join Justice Department in seeking reversal of monopoly ruling against Qualcomm" *San Diego Union-Tribune* (Sept. 3, 2019) at 3.
[220] *FTC*, 969 F.3d at 974.
[221] *Id.* at 994.
[222] *Id.* at 994-95.

# Exhibit 1

# JONATHAN M. BARNETT

## PROFESSIONAL EXPERIENCE

**University of Southern California, Gould School of Law**
*Torrey H. Webb Professor of Law* (Fall 2006-Present)
*Director, Media, Entertainment & Technology Law Program*

*Courses*: Antitrust; Business Organizations; Contracts; Deals; Intellectual Property; Mergers and Acquisitions; Writing for Publication

Co-Organizer, “Reforming Patent Reform” Conference (2019)
Chair, Faculty Appointments Committee (2016-17)
Chair, Business Law Program Committee (2014-16)
Chair, Administration and Finance Committee (2014-15)
Co-Director, Center for Law, Economics & Organization (2011-13)

**New York University, School of Law**
*Visiting Professor* (Fall 2010)

**Fordham University School of Law**
*Adjunct Professor* (Spring 2004); *Visiting Assistant Professor* (2002-03)

**Cleary Gottlieb Steen & Hamilton LLP** (New York)
*Associate Attorney (Corporate)* (2000-2006; Summer 1998)
Specialized in mergers and acquisitions (with focus on private transactions), private equity, joint venture, venture capital, and financing transactions. Geographic focus on Brazil and Mexico.

## OTHER INSTITUTIONAL AFFILIATIONS

**International Center for Law and Economics**
*Academic Affiliate* (2023-Present)

**Center for Intellectual Property and Innovation Policy**
*Senior Fellow for Innovation Policy* (2020-2022)

## BOOKS

*5G and Beyond: Intellectual Property and Competition Policy in the Internet of Things* (eds. Jonathan M. Barnett and Sean M. O’Connor, Cambridge University Press 2023)

*Innovators, Firms, and Markets: The Organizational Logic of Intellectual Property* (Oxford University Press 2021)

**ARTICLES AND BOOK CHAPTERS**

*"Killer Acquisitions" Reexamined: Economic Hyperbole in the Age of Populist Antitrust,* University of Chicago Business Law Review (forthcoming 2024)

*Illusions of Dominance: Revisiting the Market Power Assumption in Platform Ecosystems,* Antitrust Law Journal (forthcoming 2024)

*A Critical Reassessment: Classical Liberalism and Intellectual Property Rights,* in Handbook on Classical Liberalism (eds. Richard Epstein, Mario Rizzo, and Liya Palagashvilli, forthcoming 2024)

*Restoring Deterrence: Enhanced Damages in a No-Injunction Patent System* (with David J. Kappos), in 5G and Beyond: Intellectual Property and Competition Policy in the Internet of Things (eds. Jonathan M. Barnett and Sean M. O'Connor, Cambridge University Press 2023)

*Antitrust Mercantilism: The Strategic Devaluation of Intellectual Property Rights in Wireless Markets,* 38 Berkeley Technology Law Journal 259 (2023)

*Regulatory Rents: An Agency-Cost Analysis of the FTC Rulemaking Initiative,* in FTC's Rulemaking Authority (ed. Daniel Crane, Concurrences 2022)

*The "License as Tax" Fallacy*, 28 Michigan Technology Law Review 197 (2022)

*The Economic Case Against Licensing Negotiation Groups in the Internet of Things,* Journal of Antitrust Enforcement (2022)

*The Great Patent Grab*, in The Battle Over Patents: History and Politics of Innovation (eds. Stephen Haber and Naomi Lamoreaux, Oxford University Press 2021)

*Patent Groupthink Unravels,* 34 Harvard Journal of Law & Technology 419 (2021)

*The Certification Paradox*, in The Cambridge Handbook of Technical Standardization Law, Vol. 2 (ed. Jorge L. Contreras, Cambridge University Press 2020)

*The Case for Noncompetes* (with Ted Sichelman), 87 Univ. of Chicago Law Review 953 (2020)

*Antitrust Overreach: Undoing Cooperative Standardization in the Digital Economy*, 25 Michigan Technology Law Review 163 (2019)

*The Costs of Free: Commoditization, Bundling and Concentration,* 14 Journal of Institutional Economics 1097 (2018)

*Has the Academy Led Patent Law Astray?*, 32 Berkeley Technology Law Journal 1313 (2017)

*Patent Tigers: The New Geography of Global Innovation,* 2 Criterion Journal on Innovation 429 (2017)

*Why is Everyone Afraid of IP Licensing?,* 30 Harvard Journal of Law & Technology 123 (2017)

*Three Quasi-Fallacies in the Conventional Understanding of Intellectual Property*, 12 Journal of Law, Economics & Policy 1 (2016)

*Hollywood Deals: Soft Contracts for Hard Markets,* 64 Duke Law Journal 605 (2015)

*The Anti-Commons Revisited*, 29 Harvard Journal of Law & Technology 127 (2015)

*From Patent Thickets to Patent Networks: The Legal Infrastructure of the Digital Economy,* 55 Jurimetrics 1 (2014)

*Copyright Without Creators*, 9 Review of Law & Economics 389 (2013)

*Intermediaries Revisited: Is Efficient Certification Consistent with Profit Maximization?,* 37 Journal of Corporation Law 475 (2012)

*The Host's Dilemma: Strategic Forfeiture in Platform Markets for Informational Goods*, 124 Harvard Law Review 1861 (2011)

*What's So Bad About Stealing?*, 4 Journal of Tort Law 1 (201

*Intellectual Property as a Law of Organization*, 84 Southern California Law Review 785 (2011)

*Do Patents Matter? Empirical Evidence on the Incentive Thesis,* in Handbook on Law, Innovation and Growth (ed. Robert Litan, Edward Elgar Publishing 2011)

*The Illusion of the Commons,* 25 Berkeley Technology Law Journal 1751 (2010)

*The Fashion Lottery: Cooperative Innovation in Stochastic Markets*
(with Gilles Grolleau and Sana El Harbi), 39 Journal of Legal Studies 159 (2010)

*Property as Process: How Innovation Markets Select Innovation Regimes,* 119 Yale Law Journal 284 (2009)

*Is Intellectual Property Trivial?,* 157 University of Pennsylvania Law Review 1691 (2009)

*Certification Drag: The Opinion Puzzle and Other Transactional Curiosities*, 33 Journal of Corporation Law 95 (2007)

*Shopping for Gucci on Canal Street: Status Consumption, Intellectual Property and the Incentive Thesis*, 91 Virginia Law Review 1381 (2005)

*Private Protection of Patentable Goods*, 25 Cardozo Law Review 1251 (2004)

*Cultivating the Genetic Commons: Imperfect Patent Protection and the Network Model of Innovation*, 37 San Diego Law Review 987 (2000)

**SHORTER PUBLICATIONS**

*"Killer Acquisitions" Revisited: Economic Hyperbole in the Age of Populist Antitrust,* Harvard Law School Forum on Corporate Governance, Sept. 25, 2023

*Free Riding*, *Global Dictionary of Competition Law*, Concurrences (posted July 2023)

*Fragile Giants: Reassessing Market Power in Platform Ecosystems,* CPI Antitrust Chronicle (Jan. 2023)

*Taking Cost-Benefit Analysis Seriously in Consumer Data Regulation,* Truth on the Market Symposium: FTC Rulemaking on Unfair Methods of Competition, Sept. 12, 2022

*How patents facilitate market entry and promote competition,* Intellectual Asset Management (July 2022)

*Is the West Giving Away the Game?* (with David Teece), Networks Law Review (July 2022)

*Intellectual Property and Transactional Choice: Rethinking the IP/Antitrust Dichotomy,* CPI Antitrust Chronicle (July 2022)

*The FTC Abandons the Free Market,* Symposium on FTC UMC Rulemaking Authority, International Center for Law & Economics (May 2022)

*Anti-innovation Policy*, Policy Brief, Renewing American Innovation Project, Center for Security and International Studies (June 2021)

*How IP Rights Keep Markets Free*, Policy Memo, Intellectual Property Forum, Hudson Institute (June 2021)

*Why Big Tech Likes Weak IP,* Regulation (Spring 2021)

*How and Why Almost Every Competition Regulator Was Wrong About Standard-Essential Patents*, CPI Antitrust Chronicle (December 2020)

*The Long Shadow of the Blackberry Shutdown That Wasn't*, Policy Brief, Center for the Protection of Intellectual Property (July 2020)

*The End of Patent Groupthink*, Policy Brief, Center for the Protection of Intellectual Property (April 2020)

*'Patent Tigers', Global Innovation,* Regulation (Winter 2020)

*Stealth Commoditization: The Misuse of Smartphone Antitrust,* CPI Antitrust Chronicle (September 2019)

*The Patent System at a Crossroads,* 41 Regulation 1 (Spring 2018)

*Are There Really Patent Thickets?*, 39 Regulation 14 (Winter 2017)

**SUBMISSIONS TO COURTS AND REGULATORY AGENCIES**

*Comment Letter from Law Professors, Economists, and Business School Professors to the Federal Trade Commission on the Proposed Non-Compete Clause Rule,* Apr. 19, 2023 (co-lead author with Adam Mossoff and Ted Sichelman)

*Letter from Former Judges and Government Officials, Legal Academics, and Economists to Assistant Attorney General Jonathan Kanter on Standard-Essential Patents and Patent Pools,* Nov. 30, 2022 (co-lead author with Adam Mossoff)

*Comment of 25 Law Professors, Economists, and Former Government Officials in Response to EU Commission Call for Evidence on Standard-Essential Patents* (submitted to European Commission on May 9, 2022; co-lead author with Adam Mossoff)

*Response to Call for Views on Standard-Essential Patents and Innovation* (submitted to United Kingdom Intellectual Property Office on March 1, 2022; co-lead author with Adam Mossoff)

*Comment of Legal Academics, Economists, and Former Government Officials on Draft Policy Statement on the Licensing Negotiations and Remedies for Standard-Essential Patents* (submitted to Department of Justice on February 8, 2022; co-lead author with Adam Mossoff)

*Public Comment on the Federal Trade Commission Workshop, Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues* (submitted February 12, 2020, with Ted Sichelman)

*Letter to the Federal Trade Commission in Response to Request for Public Comments Following Hearing #4 on Innovation and Intellectual Property Policy* (submitted December 21, 2018; co-lead author with Adam Mossoff)

*Brief of 44 Law, Economics and Business Professors as Amici Curiae in Support of Respondent in Impression Products, Inc. v. Lexmark, International Inc., Supreme Court of the United States* (filed Feb. 23, 2017; co-lead author with Ted Sichelman)

**COMMENTARY**

*Game over at the Federal Trade Commission*, The Hill, July 18, 2023

*The Antitrust Assault on the Startup Economy,* The Hill, May 11, 2023

*Enhanced Damages Necessary in No-Injunction Patent System* (with David Kappos), Law360, Jan. 5, 2023

*Pop Goes the Antitrust Bubble*, The Hill, Dec. 10, 2022

*The End of Reason at the FTC*, Truth on the Market, Nov. 15, 2022

*The case Against the FTC*, The Hill, Oct. 3, 2022

*Market Drops Show Tech Antitrust Reform Isn't Needed,* Law360, August 5, 2022

*Antitrust populism would shift US from free market to managed economy*, The Hill, June 15, 2022

*The Market Challenge to Populist Antitrust,* Truth on the Market, May 17, 2022

*How Not to Promote U.S. Innovation*, Truth on the Market, Feb. 18, 2022

*Time to Nix Antitrust Policies that Fueled Blocked Nvidia Deal*, Law360, Feb. 10, 2022

*Does the Market Know Something the FTC Doesn't?*, Truth on the Market, Feb. 10, 2022

*FTC strays from fact-based enforcement and rule of law*, The Hill, Nov. 16, 2021

*Startup Exit Strategies in the New Antitrust Era,* Bloomberg Law, August 11, 2021

*Old Ideas and the New New Deal,* Truth on the Market, August 2, 2021

*The Flawed Case Against Noncompetes* (with Ted Sichelman), The Hill, July 29, 2021

*Going Back to Antitrust Basics*, Truth on the Market, July 2, 2021

*Antitrust Lessons from AT&T's M&A Fiasco,* Truth on the Market, May 25, 2021

*Have Tech Platforms Captured the Supreme Court?,* The Hill, April 17, 2021

*Covid-19 Vaccine Highlights the Need for Balanced Patent Policy* (with David Kappos), Bloomberg Law, March 16, 2021

*Investors and Regulators Can Both Fall for Platform Bubbles,* Truth on the Market, March 2, 2021

*Antitrust by Fiat,* Truth on the Market, Feb. 24, 2021 (also posted on Competition Policy International, Feb. 26, 2021, and Concurrences, Feb. 2021)

*How* FTC v. Qualcomm *Led to the Nvidia-Arm Acquisition,* Truth on the Market, Feb. 17, 2021

*How Patents Enable Mavericks and Challenge Incumbents*, IPWatchdog, January 24, 2021

*Antitrustifying Contract: Thoughts on* Epic Games v. Apple *and* Apple v. Qualcomm, Truth on the Market, October 26, 2020

*'Unfair use,' democracy and the Supreme Court,* The Hill, October 6, 2020

*Will Montesquieu Rescue Antitrust?,* Truth on the Market, August 25, 2020

*Lessons from Luckin Coffee: The Underappreciated Risks of Variable Interest Entities,* CLS Blue Sky Blog (Columbia Law School), July 29, 2020

*Big is not necessarily bad,* The Hill, July 30, 2020

*For the Bar, Competition Is Always "Unethical",* Truth on the Market, June 8, 2020

*The Forgotten Virtues of Doing Nothing,* Truth on the Market, November 12, 2019

*The Puzzling Case of the WeWork Non-IPO*, CLS Blue Sky Blog (Columbia Law School), October 8, 2019

FTC v. Qualcomm: *A Case of Regulatory Capture?,* Truth on the Market, July 19, 2019

*Qualcomm ruling a case of antitrust gone wrong,* The Hill, May 28, 2019 (also posted at Competition Policy International)

*Thanks to smart antitrust, Whole Foods is no longer 'Whole Paycheck',* The Hill, April 8, 2019 (also posted at Competition Policy International)

*Antitrust Overreach: Undoing Cooperative Standardization in the Digital Economy,* CLS Blue Sky Blog (Columbia Law School), November 28, 2018

*Digital Disruption Demands Antitrust Restraint,* The Hill, July 4, 2018 (also posted at Competition Policy International)

*SCOTUS is about to hear the easiest antitrust case ever,* The Hill, March 31, 2018 (also posted at Competition Policy International)

*Does the Supreme Court Understand the Innovation Economy?,* Forbes, July 12, 2017 (with Ted Sichelman)

**EDUCATION**

Yale Law School
J.D. 1999

King's College, Cambridge University
M.Phil. 1995

University of Pennsylvania
B.A., 1994, *magna cum laude*; M.A., 1995
Phi Beta Kappa; Dean's List

**RESEARCH GRANTS**

Berkeley Research Group Institute (2022-23). *Publication:* "Reexamining 'Killer Acquisitions': Economic Hyperbole in Populist Antitrust," University of Chicago Business Law Review (forthcoming 2024).

International Center for Law and Economics (2022-23). *Publication:* "Illusions of Dominance: Revisiting the Market Power Assumption in Platform Ecosystems," *Antitrust Law Journal* (forthcoming 2024).

4iP Council (2021-22). *Publication: "*The Economic Case Against Licensing Negotiation Groups in the Internet of Things,*"* Journal of Antitrust Enforcement (2022).

Leonardo Da Vinci Fellowship, Center for the Protection of Intellectual Property (2015-16). *Publication:* "Patent Tigers: The New Geography of Global Innovation," 2 Criterion Journal on Innovation 429 (2017).

Leonardo Da Vinci Fellowship, Center for the Protection of Intellectual Property (2013-14). *Publication:* "From Patent Thickets to Patent Networks: The Legal Infrastructure of the Digital Economy," 55 Jurimetrics 1 (2014).

Southern California Innovation Project (Kauffman Foundation) (2009-10). *Publication:* "The Host's Dilemma: Strategic Forfeiture in Platform Markets for Informational Goods," 124 Harvard Law Review 1861 (2011).

University of Southern California, Office of the Provost, Advancing Scholarship in the Humanities and Social Sciences (2008-09). *Publication:* "The Illusion of the Commons," 25 Berkeley Technology Law Journal 1751 (2010).

**BAR ADMISSION; PROFESSIONAL MEMBERSHIPS; REFEREE**

*Member,* New York State Bar Association
*Member*, American Bar Association, Antitrust Law Section
*Member*, American Law and Economics Association

*Referee*: American Law and Economics Association; Bar-Ilan University; Cambridge University Press; Concurrences, Antitrust Writing Awards; Columbia University Press; European Law and Economics Association; Israel Science Foundation; Journal of Competition Law & Economics; Journal of Legal Studies; Journal of Institutional Economics; Northwestern University Law Review; Princeton University Press; SMU Dedman School of Law; Southern California Law Review.

**CONFERENCE AND SEMINAR PRESENTATIONS**

Keynote Address, "An Unconventional View of Intellectual Property," The Importance of the Innovation Ecosystem, Duke University, Hudson Institute, and Information Technology and Innovation Foundation, Washington DC, May 31, 2023

"The Big Steal," Classical Liberal Institute at New York University School of Law, May 11, 2023 (by video link)

"Killer Acquisitions Reexamined: Economic Hyperbole in the Age of Populist Antitrust," Competition Law Working Group, European University Institute, May 10, 2023

"Killer Acquisitions Reexamined: Economic Hyperbole in the Age of Populist Antitrust," Yale Law School-Hebrew University Conference in Law & Economics, Hebrew University, Mar. 19, 2023

"Illusions of Dominance: Revisiting the Market Power Assumption in Platform Ecosystems," Law and Economics Workshop, Tel Aviv University Faculty of Law, Mar. 15, 2023

"Antitrust Mercantilism: The Strategic Devaluation of Intellectual Property Rights in Global Wireless Markets," Berkeley-NYU Innovation Symposium, Haas School of Business, University of California at Berkeley, Feb. 23, 2023

"Illusions of Dominance: Revisiting the Market Power Assumption in Platform Ecosystems," Law, Economics, and Empirical Legal Studies Workshop, Hebrew University Faculty of Law, Jan. 3, 2023

"Illusions of Dominance: Revisiting the Market Power Assumption in Platform Ecosystems," Market Structure Roundtable, International Center for Law & Economics, Portland, Oregon, Sept. 16, 2022

"Regulatory Rents: An Agency-Cost Analysis of the FTC Rulemaking Initiative", Symposium on the FTC's Rulemaking Authority, Concurrences, Washington DC, June 27, 2022

"Restoring Deterrence: Enhanced Damages in a No-Injunction Patent System" (with David Kappos), Conference on Intellectual Property and Innovation Policy in the Internet of Things, Center for Intellectual Property and Innovation Policy, George Mason University, December 2, 2021

"Innovators, Firms, and Markets: The Organizational Logic of Intellectual Property," Escuela de Gobierno, Universidad Adolfo Ibàñez, October 14, 2021 (by video link)

"Innovators, Firms, and Markets: The Organizational Logic of Intellectual Property," IP Leadership, April 20, 2021 (by video link)

"Innovators, Firms, and Markets: The Organizational Logic of Intellectual Property," European University Institute, Florence Competition Programme, February 16, 2021 (by video link)

"Innovators, Firms, and Markets: The Organizational Logic of Intellectual Property," Classical Liberal Institute at New York University School of Law, January 14, 2021 (by video link)

"Why Incumbents (Usually) Prefer Weak Intellectual Property Rights," Annual Meeting of the Israel Law & Economics Association, September 7, 2020 (by video link)

"The Great Patent Grab," Law and Economics Workshop, Hebrew University, Faculty of Law, May 13, 2020 (by video link)

"The Great Patent Grab," Law and Economics Workshop, Bar-Ilan University, Faculty of Law, May 12, 2020 (by video link)

"The Great Patent Grab," Law and Economics Workshop, Tel Aviv University, Faculty of Law, March 25, 2020 (by video link)

"Innovation Capital: The Organizational Logic of Intellectual Property," hosted by the Classical Liberal Institute at New York University School of Law, at Stanford University, January 24, 2020

"Antitrust Overreach: Undoing Cooperative Standardization in the Digital Economy," Summer Institute of the Center for the Protection of Intellectual Property, Beaver Creek, Colorado, July 24, 2019

"Antitrust Overreach: Undoing Cooperative Standardization in the Digital Economy," Annual Meeting of the American Law & Economics Association, New York University School of Law, May 17, 2019

"Royalty Setting and Patent Policy," Conference on Institutions and Regulation for the Fourth Industrial Revolution, Hoover Institution, University of Liege Competition and Innovation Institute, and University of Gothenburg Center for Intellectual Property, Brussels, Belgium, May 3, 2019

"The Great Patent Grab," IP Speaker Series, University of San Diego School of Law, March 28, 2019

"Exploding the Supply Chain: Strong Patents and Vertical Disintegration," Winter Deals Conference, Brigham Young University School of Law, March 8, 2019

"The Economic Approach to Patent Law", Thomas Edison Innovation Fellowship Meeting, Center for the Protection of Intellectual Property, San Diego, California, February 28, 2019

"Preserving Bottom-Up Standardization in the Digital Economy," Sixth Annual Fall IP Conference, Center for the Protection of Intellectual Property, George Mason University, October 12, 2018

"The Great Patent Grab", Center for Law and Social Sciences, University of Southern California, Gould School of Law, August 27, 2018

"The Great Patent Grab", Conference of the Society for Institutional and Organizational Economics, HEC Montreal, June 22, 2018

"The Great Patent Grab", Hoover Institution, Stanford University, May 18, 2018

"The Great Patent Grab", Annual Conference of the American Law & Economics Association, Boston University, May 11, 2018

"The Economic Approach to Patent Law", Thomas Edison Innovation Fellowship Meeting, Center for the Protection of Intellectual Property, Carlsbad, California, March 8, 2018

"The Costs of Free: Commoditization, Bundling and Concentration", Mallen Conference on the Economics of Filmed Entertainment, Yeshiva University, Dept. of Economics, November 9, 2017

"The Great Patent Grab", Hoover Institution, Washington, DC, October 17, 2017
"Patent Tigers: The New Geography of Global Innovation", Summer Institute of the Center for the Protection of Intellectual Property, Beaver Creek, Colorado, July 13, 2017

"Patent Tigers: The New Geography of Global Innovation", Conference of the Western Economics Association International, San Diego, June 26, 2017

"Patent Tigers: The New Geography of Global Innovation", Conference of the Society for Institutional and Organizational Economics, Columbia Law School, June 23, 2017

"Has the Academy Led Patent Law Astray?", $IP^2$ Conference, Hoover Institution, Stanford University, May 18, 2017

"Patent Tigers: The New Geography of Global Innovation", Annual Meeting of the American Law & Economics Association, Yale Law School, May 12, 2017

"Patent Tigers: The New Geography of Global Innovation", Conference of the Israel Law and Economics Association, Tel Aviv, Israel, March 13, 2017

"The Economic Approach to Patent Law", Thomas Edison Innovation Fellowship Meeting, Center for the Protection of Intellectual Property, Carlsbad, California, March 3, 2017

"Patent Tigers: The New Geography of Global Innovation", University of Southern California, School of Law, Center for Law and Social Sciences, January 30, 2017

"Patent Tigers: The New Geography of Global Innovation", University of San Diego, School of Law, December 15, 2016

"The Costs of Free: Commoditization, Bundling and Concentration", Conference on Innovation from the Bottom-Up, New York University, Dept. of Economics, Dec. 2, 2016

"Has the Academy Led Patent Law Astray?", Conference on Antitrust and Standard Essential Patents, University of California at Berkeley, Haas School of Business, October 29, 2016

"Patent Tigers: The New Geography of Global Innovation", Intellectual Property Scholars Conference, Stanford Law School, August 2016

"Three Quasi-Fallacies in the Conventional Understanding of Intellectual Property", Annual Meeting of the American Law & Economics Association, Harvard Law School, May 21, 2016

"Rethinking Labor Mobility in Innovation Markets" (with Ted Sichelman), Annual Meeting of the American Law & Economics Association, Harvard Law School, May 21, 2016

"Rethinking Labor Mobility in Innovation Markets", Center for Law and Social Sciences, University of Southern California, School of Law, April 18, 2016

"Why Is Everyone Afraid of IP Licensing?", Intellectual Property and Private Law Conference, Harvard Law School, March 11, 2016

"The Anti-Commons Revisited", Law & Economics Workshop, Stanford Law School, January 2016

"The Anti-Commons Revisited", Center for Innovation, Technology and Competition, University of Pennsylvania Law School, October 2015

"From Patent Thickets to Patent Networks: The Legal Infrastructure of the Digital Economy", Hoover Institution, Stanford University, May 7, 2015

"From Patent Thickets to Patent Networks: The Legal Infrastructure of the Digital Economy", Annual Conference of the Western Economics Association International, Denver, Colorado, June 27, 2014

"From Patent Thickets to Patent Networks: The Legal Infrastructure of the Digital Economy", International Society for New Institutional Economics, Annual Conference, Harvard Law School, June 18, 2015

"From Patent Thickets to Patent Networks: The Legal Infrastructure of the Digital Economy", Summer Institute of the Center for the Protection of Intellectual Property, Beaver Creek, Colorado, July 23, 2014

"Dynamic Analysis of Intellectual Property: Theory, Evidence and Policy", Harvard Law School, Law & Economics Workshop, April 1, 2014

"From Patent Thickets to Patent Networks: The Legal Infrastructure of the Digital Economy", University of San Diego, School of Law, February 13, 2014

"From Patent Thickets to Patent Networks: The Legal Infrastructure of the Digital Economy", Center for Law and Social Sciences, University of Southern California, School of Law, November 25, 2013

"Copyright Without Creators", Intellectual Property Scholars Conference, Cardozo Law School, New York, August 8, 2013

"Dynamic Analysis of Intellectual Property: Theory, Evidence and Policy", Faculty Workshop, Stanford University School of Law, May 6, 2013

"Dynamic Analysis of Intellectual Property: Theory, Evidence and Policy", Center for Law, Economics & Organization Workshop, University of Southern California, School of Law, April 8, 2013

"Hollywood Deals: Soft Contracts for Hard Markets", Contracts and Organizations Workshop, Columbia University, School of Law, February 25, 2013

"Hollywood Deals: Soft Contracts for Hard Markets", International Society of New Institutional Economics, Annual Conference, University of Southern California, June 2012

"Private and Public Intellectual Property Rights", International Society of New Institutional Economics, Annual Conference, University of Southern California, June 2012

"Hollywood Deals: Soft Contracts for Hard Markets", Faculty Workshop, University of Southern California, School of Law, December 8, 2011

"The Host's Dilemma: Strategic Forfeiture in Platform Markets for Informational Goods", Engelberg Innovation Colloquium, New York University, School of Law, March 31, 2011

"The Host's Dilemma: Strategic Forfeiture in Platform Markets for Informational Goods", Faculty Workshop, University of Connecticut, School of Law, October 20, 2010

"Intellectual Property as a Law of Organization", Intellectual Property and Media Law Symposium, UCLA Law School, November 8, 2010

"What's So Bad About Stealing?", Tort, Property & Private Law Theory Conference, University of Southern California, School of Law, October 22, 2010

"Intellectual Property as a Law of Organization", Faculty Workshop, New York University, School of Law, September 2010

"Intellectual Property as a Law of Organization", Intellectual Property Scholars Conference, Cardozo Law School, New York, August 2010

"The Host's Dilemma: Strategic Forfeiture in Platform Markets for Informational Goods", Intellectual Property Scholars Conference, University of California at Berkeley, School of Law, August 12, 2010

"Intellectual Property as a Law of Organization", Annual Meeting of the American Law & Economics Association, Princeton University, May 8, 2010

"Intellectual Property as a Law of Organization", Law and Economics Workshop, Tel Aviv University, Faculty of Law, April 12, 2010

"The Host's Dilemma: Voluntary Forfeiture in Platform Markets for Informational Goods*", Law and Innovation Symposium, Univ. of Southern California School of Law, March 5, 2010*

"Intellectual Property as a Law of Organization", Law and Economics Workshop, Univ. of Chicago Law School, February 16, 2010

"Intellectual Property as a Law of Organization", Faculty Workshop, Univ. of Southern California School of Law, September 2009

"Property as Process: How Innovation Markets Select Innovation Regimes", Annual Meeting of the International Society for New Institutional Economics, University of California at Berkeley, June 19, 2009

"Property as Process: How Innovation Markets Select Innovation Regimes", Annual Meeting of the American Law & Economics Association, Univ. of San Diego School of Law, May 15, 2009

"Regime Change in Innovation Markets", Faculty Workshop, USC Gould School of Law, August 24, 2007

"Degenerate Certification: The Opinion Puzzle and Other Transactional Curiosities*", *2007 Stanford/Yale Junior Faculty Forum, Stanford Law School, May 18, 2007

**SHORT COURSES**

"Fundamentals and Economics of Intellectual Property," World Intellectual Property Organization and Center for Intellectual Property and Innovation Policy, Summer School on Intellectual Property, June 5, 2023 (by video link)

"Fundamentals and Economics of Intellectual Property," World Intellectual Property Organization and Center for Intellectual Property and Innovation Policy, Summer School on Intellectual Property, June 6, 2022 (by video link)

"Fundamentals and Economics of Intellectual Property," World Intellectual Property Organization and Center for the Protection of Intellectual Property, Summer School on Intellectual Property, June 1, 2021 (by video link)

"Fundamentals and Economics of Intellectual Property," World Intellectual Property Organization and Center for the Protection of Intellectual Property, Summer School on Intellectual Property, June 8, 2020 (by video link)

"U.S. Intellectual Property: A Practical Introduction," Bar-Ilan University, Faculty of Law, May 3-6, 2020 (by video link)

"Economic Theory of Patent Law," World Intellectual Property Organization and Center for the Protection of Intellectual Property, Summer School on Intellectual Property, George Mason University, Antonin Scalia Law School, June 3, 2019

"Law and Economics of Intellectual Property", Summer Program, Hoover Institution, Stanford University, August 16, 2018

"Economic Theory of Patent Law", World Intellectual Property Organization and Center for the Protection of Intellectual Property, Summer School on Intellectual Property, George Mason University, Antonin Scalia Law School, June 11, 2018

**COMMENTATOR, PANELIST, AND PODCAST APPEARANCES**

Invited Participant, Dynamic Competition Initiative Roundtable: US Draft Merger Guidelines, Sept. 7, 2023 (webinar)

Panelist, "IP & Antitrust: Hot Issues Conference, Regulation of SEP Licensing: Developments Across Jurisdictions," Concurrences, July 5, 2023 (webinar)

Invited Participant, Berkeley Roundtable on Navigating Global Competition Challenges, Dynamic Competition Initiative, University of California at Berkeley, May 22, 2023

Invited Participant, Dynamic Competition Initiative Conference, European University Institute, April 13-14, 2023

Invited Participant, Competition Policy Roundtable, International Center for Law & Economics, February 7-8, 2023

Podcast, "How US Innovation Policy Can Incentivize R&D," Moor Insights, Dec. 22, 2022

Podcast, "The China Innovation Challenge: A Conversation with Professor Jonathan Barnett," Center for Strategic & International Studies, Dec. 9, 2022

Moderator, "How Weak Patent Rights Distort Innovation Markets," Annual Fall Conference, Center for Intellectual Property and Innovation Policy, George Mason University, Sept. 23, 2022

Podcast, "What Happens to the Economy When Patent Protections Are Weakened," Information Technology and Innovation Foundation, August 15, 2022

"How Patents Drive Innovation and Growth: Insights from the Biotech and Semiconductor Industries", Boston Patent Law Association, June 22, 2022 (by video link)

Panelist, "The US Innovation System in a Changed World," Center for Intellectual Property and Innovation Policy and the Smithsonian Foundation, Lemelson Center for the Study of Invention and Innovation, June 15, 2022 (by video link)

Panelist, "IP & Antitrust: Hot Issues #1", Concurrences, June 7, 2022 (by video link)

Panelist, "Standard Essential Patents: The Evolving Licensing Framework," European University Institute, Florence School of Regulation, April 21, 2022 (by video link)

Panelist, "Competition and Intellectual Property: How to Create a Diverse Innovation Ecosystem," LeadershIP 2022, Washington DC, April 5, 2022

Panelist, "The Good, the Bad, and the Ugly – Outlook for the U.S. Patent System," IP Watchdog, October 28, 2021 (by video link)

Panelist, "Toward a Deeper Understanding: Berkeley Asia IP SEP Talk Series 2021, The Role of Antitrust," University of California at Berkeley, School of Law, October 15, 2021 (by video link)

Panelist, "The value of IP: FRAND licensing of SEPs," IP & Antitrust: Hot Issues Conference, Concurrences, June 15, 2021 (by video link)

Participant, "The Case for Patents," Classical Liberal Institute at NYU School of Law, May 11, 2021 (by video link)

Panelist, "Maintaining a Trans-Atlantic Consensus on Antitrust and IP Licensing," Hudson Institute, March 15, 2021 (by video link)

Panelist, "IP, Antitrust and Standards: Have We Reached Global Convergence?", IP Leadership, February 2, 2021 (by video link)

Discussant, "Intellectual Property and Entrepreneurship," Center for Intellectual Property Forum, December 10, 2020 (by video link)

Discussant, "Intellectual Property and the Constitution Roundtable," Hudson Institute, Forum for Intellectual Property, December 3, 2020 (by video link)

Discussant, "Big Tech and the Digital Economy Seminar," Classical Liberal Institute at NYU School of Law, November 18, 2020 (by video link)

Panelist, "Markets Work: Private Ordering Mechanisms in Patent-Intensive Markets," Annual Fall Conference, Center for the Protection of Intellectual Property, October 8, 2020 (by video link)

Panelist, "How to Improve Data Methodology and Communication Around Patent Licensing," Innovation Alliance Webinar, September 21, 2020 (by video link)

Moderator, "Measuring the Value of Patent Licensing," Center for the Protection of Intellectual Property Roundtable, Sept. 17, 2020 (by video link)

Panelist, “Prospects for the Protection of Intellectual Property Rights,” Annual Conference on Innovation Economics, Northwestern Center on Law, Business, and Economics, August 27, 2020 (by video link)

Panelist, “5G Innovation Roundtable,” Hudson Institute, Forum for Intellectual Property, August 20, 2020 (by video link)

Interviewee, “Patents and Economic Development: Examining the Success of the Patent Tigers,” Hudson Institute, Forum for Intellectual Property, June 1, 2020 (by video link)

Moderator, USC Trojan Entertainment Network, DLA Piper LLP, Los Angeles, California, December 5, 2019

Moderator, “Entertainment and Intellectual Property,” Conference on The Future of Intellectual Property: Examining IP in a Changing World, Michelson 20MM Foundation, University of Southern California, November 15, 2019

Panelist, “The IP Policy Landscape: US and the World,” IP Leadership Conference, Washington DC, March 26, 2019

“Patent Year in Review”, USC Intellectual Property Institute, Santa Monica, California, March 19, 2019

“Legal Developments in SEP/RAND Issues”, Qualcomm Inc., San Diego, California, February 8, 2018

Panelist, “Supreme Court Patent Cases: Oil States and SAS Industries”, Patent Disputes Forum South, Beverly Hills, December 6, 2017

Panelist, “Intersection Between IP and Competition Policy: SEPs and FRAND Licensing”, Conference on Competition Policy, Tech and IP, University of Southern California, Gould School of Law, Center for Transnational Law and Business, November 10, 2017

Panelist, “Is IP a Barrier to Entry or a Source of Innovation?”, Global Competition Review Live, Hoover Institute, Stanford University, May 25, 2017

Invited Participant, National Bureau of Economic Research, Program on Productivity, Innovation and Entrepreneurship, Cambridge, MA, March 25, 2016

Moderator, “IP Developments at the Supreme Court”, USC Intellectual Property Institute, Los Angeles, March 24, 2015

Panelist, “What’s New in IP at the Supreme Court”, USC Institute of Corporate Counsel, Los Angeles, December 3, 2014

Presenter, “Copyright: Year in Review”, Los Angeles Intellectual Property Law Association, Las Vegas, June 9, 2013

Commentator on Robert Merges, “Justifying Intellectual Property”, Intellectual Property and Media Law Symposium, UCLA Law School, November 8, 2011

**Exhibit 2 – List of Materials Considered by Expert Jonathan Barnett**

**Pleadings**

- *In re Qualcomm Incorporated Securities Litigation*, Case No. 3:17-cv-00121-JAH-WVG (S.D. Cal. July 3, 2017), ECF No. 32
- Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, *In re Qualcomm Sec. Litig.*, Case No. 3:17-cv-00121-JO-MSB (S.D. Cal. Mar. 20, 2023), ECF No. 279

**Other Litigation**

- United States' Statement of Interest Concerning Qualcomm's Motion for Partial Stay of Injunction Pending Appeal, *FTC v. Qualcomm Inc.*, Case No. 19-16122 (9th Cir., July 16, 2019) ECF No. 25-1
- *Cung Le, et al. v. Zuffa, LLC*, Case No. 2:15-cv-01045-RFB-BNW (D. Nev. Aug. 9, 2023), ECF No. 839
- Plaintiff Federal Trade Commission's Proposed Findings of Fact and Conclusions of Law, *FTC v. Qualcomm,* Case No. 5:17-cv-00220-LHK-NMC (N.D. Cal. Feb. 20, 2019), ECF No. 1472
  *In re Qualcomm Antitrust Litigation,* Case 3:17-md-02773-JSC (N.D. Cal., Sept. 26, 2023) ECF No. 1005
- Statement of Interest of the United States of America, *FTC v. Qualcomm*, Case No. 5:17-cv-00220-LHK (N.D. Cal., May 2, 2019) ECF No. 1487
- Brief of the United States of America as Amicus Curiae in Support of Appellant and Vacatur, *FTC v. Qualcomm Inc.*, Case No. 19-16122 (9th Cir., Aug. 30, 2019) ECF No. 86

**Case Law and Legal Authorities**

- *AMG Capital Mgmt., LLC v. FTC*, 141 S.Ct. 1341 (2021)
- *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985)
- *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)
- *Info Res., Inc. v. Dun & Bradstreet Corp*., 359 F.Supp.2d 307 (S.D.N.Y. 2004)
- *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 69 F.Supp.2d 571 (S.D.N.Y. 1999), *aff'd* 257 F.3d 256 (2d. Cir. 2001)
- *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977)
- *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059 (9th Cir. 2021)
- *Cascade Health Solutions. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008)
- *Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.*, 920 F. Supp. 455 (S.D.N.Y. 1996)
- *Barry Wright Corp. v. ITT Grinnell Corp*., 724 F.2d 227 (1st Cir. 1983)
- *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)
- *Matsushita Elec. Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986)
- *Weyerhauser Co. v. Ross-Simmons Hardwood Lumber Co*., 549 U.S. 312 (2007)
- *Pacific Bell Tel. Co. v. linkLine Communications Inc.*, 555 U.S. 438 (2009)
- *U.S. v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990).

- Judgment of the General Court, *Qualcomm v. Commission* (Case T-235/18, June 15, 2022)
- *Melbourne Municipal Firefighters' Pension Trust Fund v. Paul E. Jacobs*, C.A. No. 10872-VCMR, 2016 WL 4076369 (Del. Ch. Aug. 1, 2016)
- *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921 (2d Cir. 1981).
- *LePage's, Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003)
- *Eisai, Inc. v. Sanofi Aventis U.S., LLC,* 821 F.3d 394 (3rd Cir. 2016)
- *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3rd Cir. 2012)
- *Rudenberg v. Clark*, 81 F.Supp. 42 (D. Mass. 1948)
- *In re Independent Service Organizations Antitrust Litigation*, 203 F.3d 1322 (Fed. Cir. 2000)
- *MetroNet Services Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004)
- *Quanta Computer, Inc. v. LG Electronics, Inc.,* 553 U.S. 617 (2008)
- *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F.Supp.2d 575 (E.D. Ky. 2009)
- *B. Braun Med., Inc. v. Abbott Labs*, 124 F.3d 1419 (Fed. Cir. 1997)
- *Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.*, 377 U.S. 476 (1964)
- *Tessera, Inc. v. ITC*, 646 F.3d 1357 (Fed. Cir. 2011)
- *Mallinckrodt Inc. v. Medipart Inc.,* 976 F.2d 700 (Fed. Cir. 1992)
- *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2003)
- *United States v. Colgate & Co.*, 250 U.S. 300 (1919)
- *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013).
- *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)
- *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000)
- *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)
- *Barr Labs, Inc. v. Abbott Labs*, 978 F.2d 98 (3d Cir. 1992)
- *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010)
- *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008), *cert. denied,* 555 U.S. 1171 (2009)
- *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007)
- *HTC Corp., v. Telefonaktiebolaget LM Ericsson*, 407 F.Supp.3d 631 (E.D. Tex. 2019)
- *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012)
- *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL No. 2303, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013)
- *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F.Supp.2d 1061 (W.D. Wisc. 2012)
- *FTC v. Qualcomm Inc.*, 411 F.Supp.3d 658 (N.D. Cal. 2019)
- *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015)
- *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991 (9th Cir. 2010)
- *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977), *cert. denied*, 439 U.S. 829 (1978)
- *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)
- *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012)
- *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F.Supp.2d 1061 (W.D. Wisc. 2012)
- *In re Qualcomm Antitrust Litig.*, No. 17-MD-02773-JSC, 2023 WL 121983 (N.D. Cal. Jan. 6, 2023)
- 15 U.S.C. § 1
- 15 U.S.C. § 2

- 35 U.S.C. § 271(d)
- 15 U.S.C. § 13
- 15 U.S.C. § 14
- 15 U.S.C. § 43
- 15 U.S.C. § 45 (FTC Act § 5)
- 15 U.S.C. § 53
  Cal. Bus. & Prof. Code § 16700

**Discovery**

- Expert Report of Timothy Simcoe, Ph.D., dated September 12, 2023

**Academic Articles**

- Benjamin Klein, et al., "Vertical Integration, Appropriable Rents, and the Competitive Contracting Process," 21 *J. L. & Econ.* 297
- Daniel A. Crane, "Bargaining Over Loyalty*,"* 92 *Tex. L. Rev.* 253 (2013)
- Jason Dedrick, et al., "Who Profits from Innovation in Global Value Chains? A Study of the iPod and notebook PCs," 19 *Industrial and Corporate Change* 1 (2010)
- B. Dan Wood & James E. Anderson, "The Politics of U.S. Antitrust Regulation," 37 Am. J. Pol. Sci. 1 (1993)
- Mike Freeman, "Legal, economics experts join Justice Department in seeking reversal of monopoly ruling against Qualcomm" *San Diego Union-Tribune* (Sept. 3, 2019)
- William E. Kovacic, "Politics and Partisanship in U.S. Federal Antitrust Enforcement" 79 *Antitrust L.J.* 687 (2014)
- Maureen K. Ohlhausen, "Section 5 of the FTC Act: principles of navigation," 2 *Journal of Antitrust Enforcement* 1 (2013)
- Einer Elhauge, "Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory," 123 *Harvard L. Rev.* 397 (2009)
- Richard A. Posner, "Vertical Restraints and Antitrust Policy," 72 *U. Chicago L. Rev.* 229 (2005)
- Daniel Crane, "Does Monopoly Broth Make Bad Soup?," 76 *Antitrust L.J* 663 (2010)
- Herbert Hovenkamp, *The Antitrust Enterprise* 173 (2009)
- M. Laurence Popofsky & Adam J. Gromfin, "Bundled Discounting: From LePage's to PeaceHealth, & Beyond," 9 *Sedona Conf. J.* 99 (2008)
- Daniel Crane, "Mixed Bundling, Profit Sacrifice, and Consumer Welfare," 55 *Emory L. J.* 423 (2006)
- Thomas G. Hungar & Ryan G. Koopmans, "Appellate Advocacy in Antitrust Cases: Lessons from the Supreme Court," 23 *Antitrust* 53 (Spring 2009)
- Tefft W. Smith, et al., "Competition is Good Again," *LegalTimes*, Mar. 19, 2007
- Herbert J. Hovenkamp & Erik Hovenkamp, "Complex Bundled Discounts and Antitrust Policy," 57 *Buffalo L. Rev.* 1227 (2009)
- Jonathan M. Barnett, "The 'License as Tax' Fallacy," 28 *Mich. Tech. L. Rev.* 197 (2022)
- Jonathan M. Barnett, "Antitrust Overreach: Undoing Cooperative Standardization in the Digital Economy," 25 *Mich. Tech. L. Rev.* 163 (2019)
- Yona Kwon, et al., "Coopetition in the SoC Industry: The Case of Qualcomm Incorporated," 6 *Journal of Open Innovation: Technology, Market, and Complexity* 9 (2020)
- Rafael Saraiva Campos, "Evolution of Positioning Techniques in Cellular

Networks, from 2G to 4G," *Wireless Communications & Mobile Computing* (2017)

- Theodore S. Rappaport, et al., "Wireless Communications: Past Events and a Future Perspective," 40 *IEEE Communications Magazine* 148 (May 2002)
- David J. Teece, "Profiting from innovation in the digital economy: Enabling technologies, standards, and licensing models in the wireless world," 47 *Research Policy* 1367 (2018)
- Jason Dedrick & Kenneth L. Kraemer, Economic Research Working Paper No. 41, "Intangible assets and value capture in global value chains: the smartphone industry" (November 2017)
- Keith Mallinson, "Don't Fix What Isn't Broken: The Extraordinary Record of Innovation and Success in the Cellular Industry under Existing Licensing Practices," 23 *George Mason L. Rev.* 967 (2016)
- Kirti Gupta, "Technology Standards and Competition in the Mobile Wireless Industry," 22 *George Mason L. Rev.* 865 (2015)
- Bowman Heiden and Nicolas Petit, "Patent 'Trespass' and the Royalty Gap: Exploring the Nature and Impact of Patent Holdout," 34 *Santa Clara High Tech L. J.* 179 (2017)
- Gerard Llobet & Jorge Padilla, "A theory of socially inefficient patent holdout," *J. Econ. & Mgmt. Strategy* (2023)
- Kalyan Dasgupta and David Teece, "Protecting Innovation in the Mobile Wireless Ecosystem: Understanding and Addressing 'Patent Holdout,'" 38 *Berkeley Technology L.J.* 313 (2023).
- Marvin Blecker, et al., "An Experience-Based Look at the Licensing Practices that Drive the Cellular Communications Industry: Whole Portfolio/Whole Device Licensing," *Les Nouvelles* (Dec. 2016)
- Alexander Galetovic & Stephen Haber, "SEP Royalties: What Theory of Value and Distribution Should Courts Apply?," 17 *Ohio St. Tech. L. J.* 203 (2023)
- Bowman Heiden & Jens Andreasson, "Reevaluating Patent Damages in the Knowledge Economy: The Intellectual Value Chain and the Royalty Base for Standard-Essential Patents," 1 *Criterion Journal on Innovation* 229 (2016)

**Miscellaneous**

- Spreadsheet re IDC Mobile Phone Tracker, 2017 Q4 Qualcomm
- October 18, 2022 Letter from Graziano to The Honorable Jinsook Ohta
- October 12, 2007 Organization for Economic Cooperation and Development, Directorate for Financial and Enterprise Affairs, Competition Committee, Roundtable on Refusals to Deal (DAF/COMP/WD(2007)99)
- January 17, 2017 Federal Trade Commission, Dissenting Statement of Commissioner Maureen K. Ohlhausen in the Matter of Qualcomm, Inc. (File No. 141-0199)
- December 16, 2009 Statement of Chairman Leibowitz and Commissioner Rosch (*In re Intel Corp*., FTC File No. 061-0247), *available at* https://www.ftc.gov/system/files/documents/public_statements/568601/091216intelchairstatement.pdf
- Antitrust Modernization Commission, Report and Recommendations 95 (2007) ("AMC Report"), *available at* https://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf

- Statista, IDC Global smartphone market share from 4th quarter 2009 to 2nd quarter 2003 (by vendor), *available at* https://www.statista.com/statistics/271496/global-market-share-held-by-smartphone-vendors-since-4th-quarter-2009/
- Statista, Global cellular baseband processor revenue share by vendor from 2014 to 2021, *available at* https://www.statista.com/statistics/427073/cellular-baseband-processor-supplier-share/
- European Telecommunications Standards Institute, ETSI Directives (2013), *available at* http://portal.etsi.org/directives/home.asp
- "The trouble with patent-troll-hunting," *The Economist* (Dec. 14, 2019), *available at* https://www.economist.com/business/2019//12/14/the-trouble-with-patent-troll-hunting
- Opening Statement slides, *In re Qualcomm Litigation*, Case No. 3:17-cv-00108-GPC-MDD (S.D. Cal. April 16, 2019), *available at* https://www.scribd.com/document/407463620/Qualcomm-opening-statement
- Judgment of the General Court, *Intel v. Commission* (Case T-286/09, June 12, 2014), *available at* https://curia.europa.eu/juris/document/document.jsf?text=&docid=153543&pageIndex=0&doclang=en&mode=lst&dir=&occ=first&part=1&cid=28238
- Stephen Nellis, U.S. Justice Department asks for hearing in Qualcomm antitrust case, *Reuters* (May 2, 2019), *available at* https://www.reuters.com/article/us-qualcomm-ftc/us-justice-department-asks-for-hearing-in-qualcomm-antitrust-case-idUSKCN1S82G1
- Adam Mossoff, "The DOJ and Other Federal Agencies Oppose the FTC in *FTC v. Qualcomm,*" The Federalist Society (July 23, 2019), *available at* https://fedsoc.org/commentary/fedsoc-blog/the-doj-and-other-federal-agencies-oppose-the-ftc-in-ftc-v-qualcomm
- U.S. Department of Justice and Federal Trade Commission, Antitrust Guidelines for the Licensing of Intellectual Property (1995)
- Apple Inc., Form 10-K (2015)
- Ericsson Telephone Company, Form 20-F (2016)
- Nokia Corp., Form 20-F (2015)
- Qualcomm Inc., Form 10-K (2012)
- Qualcomm Inc., Form 10-K (2013)
- Qualcomm Inc., Form 10-K (2014)
- Qualcomm Inc., Form 10-K (2015)
- Qualcomm Inc., Form 10-K (2016)
- Samsung Elecs. Co., Ltd. 2016 Business Report


**Produced Documents**

- APL-QC-FTC_24211856
- APL-QC-FTC_33946740
- APL-QC-FTC_34007323
- Q2014FTC04095248
- Q121SEC00079115
- Q121SEC00936196
- QNDCAL05841317

# Exhibit 4

# *In re Qualcomm Securities Litigation*

Expert Report of Professor John Coates

September 12, 2023

**Confidential**

# Table of Contents


I. Qualifications ..... 1

A. Academic Experience ..... 1

B. Prior Work Experience ..... 1

C. Consulting and Litigation Experience ..... 2

D. Publications, Speaking Engagements, and Affiliations ..... 3

II. Background and Assignment ..... 4

A. Background on the Litigation ..... 4

B. Background on Qualcomm ..... 6

C. Assignment ..... 7

III. Summary of Opinions ..... 8

IV. Background on Disclosure Process Customs and Practices in Large Public Companies ..... 9

A. Fundamental Elements of Disclosure Practices by Large Public Companies ..... 9

B. Overview of Legal and Regulatory Requirements ..... 11

1. MD&A (Item 303) ..... 12

2. Business Description (Item 101) ..... 16

3. Legal Proceedings (Item 103) ..... 17

C. Iterative Disclosure Process Involving Multiple Departments, Officers and Directors, and Senior Staff ..... 18

D. Customs and Practices for Preparing Particular Types of Voluntary Disclosure in Large Public Companies ..... 20

1. Quarterly and Annual Earnings Releases ..... 20

2. Earnings Calls ..... 21

3. Analyst Events ..... 23

4. Media Interviews ..... 24

V. The Disclosure Processes at Qualcomm Involved Relevant Departments and Individuals and Were Consistent with Disclosure Customs and Practices in Large Public Companies. ..... 25

A. Qualcomm's Disclosure Policy ..... 26

B. Qualcomm's Disclosure Policy Committee and Disclosure Committee ..... 28

C. Qualcomm's Investor Relations Team ..... 31

D. Qualcomm's Practices for Particular Types of Disclosures ..... 33

1. Qualcomm's Disclosure Practices for Forms 10-K and 10-Q ............33
2. Qualcomm's Practices for Earnings Disclosures ................................38
3. Qualcomm's Disclosure Practices for Analyst Events ........................44
4. Qualcomm's Disclosure Practices for Media Interviews.....................51

VI. Qualcomm's Disclosure Processes for the SEC Filings, Analyst Conferences, and Media Interview Containing the At-Issue Disclosures Involved Relevant Departments and Individuals and Were Consistent With the Company's General Disclosure Practices and Disclosure Customs and Practices in Large Public Companies. ........................................................................................53

A. Exemplar At-Issue Disclosures in Forms 10-K and 10-Q ..............................54
1. Fiscal Year 2012 Form 10-K ............................................................54
2. Fiscal Q2 2013 Form 10-Q ...............................................................63

B. At-Issue Disclosures at Analyst Conferences ..................................................71
1. 2012 Credit Suisse Technology Conference.......................................71
2. 2013 GSM Association Mobile World Congress ...............................75

C. At-Issue Disclosures in Taipei Times Interview.............................................79

# I. Qualifications

## A. Academic Experience

1. I am the Deputy Dean for Finance and Strategic Initiatives, John F. Cogan Jr. Professor of Law and Economics, and Research Director of the Center on the Legal Profession at Harvard Law School. At Harvard Law School, I teach, among other courses, the basic courses on contracts, corporations, partnerships, limited liability companies and other business organizations; and advanced courses on securities law and regulation, financial regulation, corporate governance, and mergers and acquisitions ("M&A"), including basic principles of accounting, economics and finance as they relate to corporate, securities or financial institutions law or the design and implementation of disclosure controls and processes.

2. I also teach at Harvard Business School and have taught at the Harvard Kennedy School, including courses on finance, corporate governance, and M&A. At both Harvard Law School and Harvard Business School, I teach executive education courses, including courses in which the participants are managing partners of law firms and general counsel of large public and private companies. Among the material covered are customary relationships among professionals who work on internal controls and disclosure documents, as well as securities-law-based disclosure obligations and processes. Before joining the Harvard University ("Harvard") faculty in 1997, I taught M&A at New York University for five years, and at Boston University. In my courses, I teach students about disclosure requirements, processes, and controls.

3. A copy of my curriculum vitae, including a list of my publications, is attached as **Appendix A**.

## B. Prior Work Experience

4. Before joining the Harvard faculty, I was a partner at the New York law firm of Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), one of the nation's leading corporate law firms and consistently ranked one or two in American Lawyer's Am Law 100. I worked at Wachtell Lipton from 1988 to 1997. In my practice at Wachtell Lipton, I represented large public companies and other firms involved in large financial transactions, including public

offerings, private placements, recapitalizations, stock and asset purchases, corporate mergers, business combinations, joint enterprises, and buyouts. I routinely advised parties as to their rights and obligations under relevant securities and corporate laws and regulations, as well as the customs and practices relevant to them.

5. I was personally responsible for preparing documents filed by large public companies under U.S. securities laws, including documents under both the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act"). I advised public companies on the design and implementation of internal controls and disclosure processes. I provided securities law and practice advice and services on an array of registered securities offerings, including working for Goldman Sachs & Co. on approximately $7.4 billion of debt and equity financings by Sears, Roebuck and Co., as well as for J.P. Morgan, Credit Suisse First Boston, Morgan Stanley, and other investment banks working for large domestic and foreign companies issuing securities.

6. In 2021, I served as the Securities and Exchange Commission's ("SEC") General Counsel, and as Acting Director of the Division of Corporation Finance. In those capacities, I oversaw the legal functions at the SEC, including advising the Chair and the other Commissioners on a range of legal issues, including issues related to disclosure. Those issues arose in the context of regulation, policy statements, speeches, staff interpretations and guidance, Congressional testimony, enforcement matters, and litigation, both at trial and in appeals.

**C. Consulting and Litigation Experience**

7. Since joining Harvard, I have provided or am providing paid or unpaid consulting services to the U.S. Department of Justice ("DOJ"), the U.S. Department of the Treasury, the Office of the White House Counsel, the SEC, the Public Company Accounting Oversight Board, the New York Stock Exchange, members, subcommittees and staff of the U.S. Senate and House of Representatives and the Board of Governors of the Federal Reserve System, and organizations and individuals actively involved in corporate and financial transactions, including private equity funds, mutual funds, hedge funds, public and private companies, law firms, investment and commercial banks, regulatory agencies, trade organizations, and entrepreneurs. In my consulting, I have addressed disclosure laws and regulations, disclosure compliance, and disclosure processes, among other topics. For example, I served on the Investor Advisory Committee of the SEC, and am currently serving as an independent DOJ

monitor of and compliance consultant for a large, publicly traded company. In those roles, I have reviewed and provided independent assessments of disclosure controls and processes, and disclosure compliance, among other things.

8. I have testified as an expert witness more than twenty-five times at trial and more than seventy times by deposition, including multiple arbitrations. My testimony has been on behalf of both plaintiffs or claimants and defendants or respondents. I have testified in disputes in federal and state courts concerning securities disclosure obligations and practices, corporate governance and controls, and related laws and regulations. I have never been disqualified as an expert in the fields in which I prepared to give testimony. A list of cases in which I have testified or been deposed as an expert in the previous four years is attached as **Appendix B**.

**D. Publications, Speaking Engagements, and Affiliations**

9. I have studied and written extensively about securities law and regulation, financial markets and financial regulation, and the law and economics of corporate transactions, as well as the contracts and customs and practices of business persons and lawyers relevant to such topics.

10. My articles have appeared, or are forthcoming, in top journals, both peer-reviewed and non-peer-reviewed, including Yale Law Journal, Harvard Business Law Review, Yale Journal on Regulation, Stanford Law Review, California Law Review, University of Pennsylvania Law Review, Texas Law Review, Journal of Corporation Law, Business Lawyer, Accounting Horizons, Journal of Economic Perspectives, Journal of Legal Analysis, Journal of Accounting Research, Law and Contemporary Problems, and Journal of Empirical Legal Studies. A number of courts have cited several of my articles. For example, see *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 760 (7th Cir. 2007), citing John C. Coates, "The Goals and Promise of the Sarbanes-Oxley Act," 21 J. ECON. PERSPECTIVES 91, 101–08, Winter 2007; *Union Illinois 1995 Inv. Ltd. Partnership v. Union Financial Group, Ltd.*, 847 A.2d 340 (Del. Ch. 2004), citing John C. Coates, "'Fair Value' as an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions," 147 U. PA. L. REV. 1251, 1999; *In re TransPerfect Global, Inc.*, 2018 WL 904160 (Del. Ch. 2018), citing John C. Coates, "The Powerful and Pervasive Effects of Ownership on M&A," Working Paper, June 2, 2010.

11. I have been invited to be a speaker at the SEC, the Commodity Futures Trading Commission, the Public Company Accounting Oversight Board, the Federal Reserve Board, and the Federal Reserve Bank of New York; the law schools or faculties of University of Oxford, Yale University, Stanford University, New York University, Columbia University, University of Chicago, University of Pennsylvania, University of Texas, University of California, Berkeley, University of Virginia, Northwestern University, and Georgetown University, among others; Harvard Business School, the Stern School of Business at New York University, the University of Chicago Booth School of Business, the Wharton School, and the MIT Sloan School of Management; the Federal Judicial Center, American Law Institute, American Bar Association, American Finance Association, Boston Bar Association, International Bar Association, American Association of Law Schools, and the American Law and Economics Association; the National Bureau of Economic Research; the Mutual Fund Directors Forum; the Royal College of Spain, and the High Level Group of Corporate Law Experts established under the auspices of the European Union. I am or have been a member of the Legal Advisory Committee to the New York Stock Exchange, the American Bar Association, the American Association of Law Schools, the American Law Institute, the American Finance Association, and the board of directors of the American Law and Economics Association.

12. I will receive my customary fee of $1,950 per hour in this matter. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

## II. Background and Assignment

### A. Background on the Litigation

13. Plaintiffs represent a Class of purchasers of common stock of Qualcomm Incorporated ("Qualcomm" or the "Company") from February 1, 2012 through January 20, 2017 ("Class Period").[1] Plaintiffs allege, among other things, that Qualcomm falsely

[1] Consolidated Class Action Complaint for Violation of the Federal Securities Laws, *In re Qualcomm Incorporated Securities Litigation*, Case No. 3:17-cv-00121-JAH-WVG, July 3, 2017 ("Complaint"), p. 1.

represented that "it licensed its standard-essential patents on a non-discriminatory basis to the entire cellular communications industry."[2] Plaintiffs further allege that "[i]n addition to misrepresenting its willingness to license to the entire industry, Qualcomm also falsely assured investors that the Company did not 'bundle' the terms of its license and chipset agreements."[3] Plaintiffs further allege that "Qualcomm and its top officers not only committed to license on non-discriminatory terms—and, thus, not bundle—but they also affirmatively represented to investors that 'we don't bundle.'"[4] Plaintiffs claim that Qualcomm, as a result of its alleged licensing practices, has faced enforcement actions from regulators in the United States, Europe, and Asia.[5]

14. I understand that the Class has been certified with respect to allegations concerning certain "alleged bundling misrepresentations" and denied with respect to allegations concerning certain "alleged licensing misrepresentations."[6] I further understand that the alleged bundling misrepresentations include the following categories of misrepresentations:

a. "Qualcomm executives described the licensing and chip-supply businesses as separate and represented that Qualcomm did not bundle";
b. "Qualcomm licensed on a 'fair,' 'reasonable,' or 'non-discriminatory' basis"; and
c. Qualcomm's "business model facilitated competition in the industry."[7]

**Exhibit 1** summarizes each disclosure ("at-issue disclosure") that I understand remains at issue as an alleged bundling misrepresentation or omission.[8] I further understand that Plaintiffs have explained what they mean by "bundling" for purposes of their allegations, having told the Court that although "the market understood that Qualcomm would only sell chips to licensed companies," that "is different than bundling lower license royalties when customers purchased Qualcomm chipsets."[9] As shown in the exhibit, Qualcomm included one or more of the at-issue disclosures in all Forms 10-K and 10-Q during the Class Period, as well as in statements made at the 2012 Credit Suisse Technology Conference and the 2013

---

[2] Complaint, ¶ 1.
[3] Complaint, ¶ 13.
[4] Complaint, ¶ 13.
[5] Complaint, ¶ 12.
[6] Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, *In re Qualcomm Incorporated Securities Litigation*, Case No. 17cv121-JO-MSB, March 20, 2023 ("Class Certification Order"), p. 35.
[7] Class Certification Order, pp. 4–5. I understand that disclosures made in press releases on November 17, 2015 (Complaint, ¶¶ 173–174) and January 17, 2017 (Complaint, ¶¶ 186–187) also contain alleged bundling-related misrepresentations. As I explain further below, those disclosures are not within the scope of my assignment.
[8] I exclude disclosures made in press releases on November 17, 2015 and January 17, 2017 as those disclosures are not within the scope of my assignment.
[9] Letter to The Honorable Jinsook Ohta from Bernstein Litowitz Berger & Grossmann, "Re: *In re Qualcomm Incorporated Securities Litigation*, No. 3:17-cv-00121-JO-MSB," October 18, 2022.

GSM Association Mobile World Congress ("MWC"), and in a media interview published in June 2016.

### B. Background on Qualcomm

15. Qualcomm develops certain foundational technologies for wireless products such as mobile devices.[10] These technologies include wireless technologies, such as 3G, 4G, and 5G, and processor technologies, such as computing and artificial intelligence technologies.[11] During the Class Period, Qualcomm described itself as a leader in "the commercialization of a digital communication technology called CDMA (Code Division Multiple Access)" and "the OFDMA (Orthogonal Frequency Division Multiple Access) family of technologies, including LTE (Long Term Evolution) … for cellular wireless communication applications."[12]

16. During the Class Period, Qualcomm owned intellectual property ("IP"), such as patents, "applicable to products that implement any version of CDMA and OFDMA."[13] Companies in the mobile communication industry that sought to develop, manufacture, or sell products using CDMA- or LTE-based standards generally would have obtained a patent license from Qualcomm.[14] Qualcomm also owned IP related to other technologies during the Class Period.[15] The Company's Qualcomm Technology Licensing ("QTL") segment granted licenses or otherwise provided rights to use portions of Qualcomm's IP portfolio, including "certain patent rights essential to and/or useful in the manufacture and sale of certain wireless products."[16] QTL's licensees manufacture products such as mobile device handsets, laptops, and tablets.[17] For fiscal years ("FY") 2014 through 2016, QTL's revenues comprised 29% to 33% of Qualcomm's revenues.[18]

17. During the Class Period, Qualcomm also produced and sold integrated circuits called "chips" or "chipsets."[19] The Company's Qualcomm CDMA Technologies ("QCT") segment

---

[10] Qualcomm Incorporated, Form 10-K, November 2, 2022 ("Qualcomm FY 2022 10-K"), p. 6.
[11] Qualcomm FY 2022 10-K, p. 6.
[12] Qualcomm Incorporated, Form 10-K, November 2, 2016 ("Qualcomm FY 2016 10-K"), p. 4. *See also* Qualcomm Incorporated, Form 10-K, November 7, 2012 ("Qualcomm FY 2012 10-K"), p. 1.
[13] Qualcomm FY 2016 10-K, p. 4. *See also* Qualcomm FY 2012 10-K, p. 1.
[14] Qualcomm FY 2016 10-K, p. 4. *See also* Qualcomm FY 2012 10-K, pp. 1–2.
[15] Qualcomm FY 2016 10-K, p. 4.
[16] Qualcomm FY 2016 10-K, pp. 9, 11. *See also* Qualcomm FY 2012 10-K, pp. 2, 8.
[17] Qualcomm FY 2016 10-K, p. 11. *See also* Qualcomm FY 2012 10-K, p. 2.
[18] Qualcomm FY 2016 10-K, p. 9. Qualcomm used "a 52-53 week fiscal year ending on the last Sunday in September" during the Class Period. Qualcomm FY 2016 10-K, p. 4. *See also* Qualcomm FY 2012 10-K, p. 1.
[19] Qualcomm FY 2016 10-K, pp. 4–5. *See also* Qualcomm FY 2012 10-K, pp. 1–2.

developed and supplied chips based on CDMA, OFDMA and other technologies.[20] QCT sold chips to manufacturers of wireless devices such as mobile phones, tablets, and laptops.[21] The Company's integrated circuit products included "entry-level products for emerging regions, such as … Qualcomm Reference Design (QRD) products."[22] For FY 2014 through 2016, QCT's revenues comprised 65% to 70% of Qualcomm's revenues.[23]

### C. Assignment

18. I have been retained by Cooley LLP, counsel for Qualcomm and the individual defendants, and have been asked to prepare this report and offer testimony regarding: (1) disclosure customs and practices in large market capitalization public companies,[24] including factors that such companies consider in determining whether and how to disclose information to the public; (2) whether Qualcomm's practices during the Class Period regarding the disclosure of information to the public were consistent with customs and practices in large public companies; and (3) the specific processes Qualcomm employed with respect to the SEC filings, analyst conferences, and media interview containing the at-issue disclosures.[25]

---

[20] Qualcomm FY 2016 10-K, p. 9. *See also* Qualcomm FY 2012 10-K, pp. 2, 6.
[21] Qualcomm FY 2016 10-K, p. 9. *See also* Qualcomm FY 2012 10-K, pp. 2, 6.
[22] Qualcomm FY 2012 10-K, p. 7. *See also* Qualcomm FY 2016 10-K, p. 9.
[23] Qualcomm FY 2016 10-K, p. 9.
[24] In this report, I generally use the phrase "large public companies" or "large market capitalization public companies" to mean companies that are "large accelerated filers" of disclosure documents as defined by the Securities Exchange Act of 1934 and the SEC. Rule 12b-2 of the Securities Exchange Act of 1934 defines a large accelerated filer as a company that meets all the following conditions as of the end of its fiscal year: (i) the aggregate worldwide market value of the voting and non-voting common equity held by non-affiliates (or public float) was $700 million or more as of the last business day of its most recently completed second fiscal quarter; (ii) the company has been subject to the reporting requirements of Sections 13(a) or 15(d) of the Exchange Act for at least 12 calendar months; (iii) the company has previously filed at least one annual report under Sections 13(a) or 15(d) of the Securities Exchange Act; and (iv) the company is not eligible to use certain requirements for smaller reporting companies. *See* 17 CFR. § 240.12b-2 (2012); "Accelerated Filer and Large Accelerated Filer Definitions," SEC Release No. 34-88365 Final Rule, March 12, 2020, https://www.sec.gov/files/rules/final/2020/34-88365.pdf; "Internal Control Over Financial Reporting in Exchange Act Periodic Reports of Non-Accelerated Filers," SEC Release No. 33-9142; 34-62914, September 15, 2010, https://www.sec.gov/files/rules/final/2010/33-9142.pdf, footnote 11.
[25] As noted above (*see* footnote 7), I do not address in this report, and do not intend to offer testimony regarding, the disclosures contained in Qualcomm's press releases on November 17, 2015 and January 17, 2017. I understand that documents and communications relating to those disclosures have been redacted or withheld on the basis of attorney-client privilege. Specifically, I have reviewed a privilege log produced by Qualcomm on October 14, 2022, in which approximately 140 entries reference email communications leading up to the November 17, 2015 and January 17, 2017 press releases containing alleged bundling-related misrepresentations. Based solely on my review of the privilege log entries, it appears that Qualcomm sought and received legal advice concerning certain draft press releases. Those email communications also appear to have involved many individuals from multiple departments including Alex Rogers (SVP & Legal Counsel), Derek Aberle (President), Tina Asmar (Sr. Director, Government & Public Affairs), Bill Bold (SVP, Government Affairs), Matthew Heim (VP & Counsel), Carol Lam (SVP & Deputy General Counsel), Te-Won Lee (VP & President, Qualcomm Korea), Chris Longman (Sr. Director, Legal Counsel), Christie Thoene (Sr. Director, Public Affairs), Christine Trimble (VP, Public Affairs), David Zuckerman (VP & Legal Counsel), Fabian Gonell (Sr. Legal Counsel), Eric Reifschneider (SVP, QTL), Warren Kneeshaw (VP, Investor Relations), Don Rosenberg (EVP & General Legal Counsel), Sean Murphy (VP & Counsel, International Government Affairs), Steve Mollenkopf (CEO), Kurt Kjelland (Senior Director, Legal Counsel), John Scott (VP & Legal Counsel), Mark Snyder (VP, Patent Counsel, Litigation), and numerous individuals from Qualcomm's outside counsel. *See* "Alex Rogers," LinkedIn, https://www.linkedin.com/in/alex-rogers-865419130/; "FY4Q15 Earnings Release Calendar," Q121SEC00201645–50 at 47; "Tina Asmar," LinkedIn, https://www.linkedin.com/in/tina-asmar-458a95a4/; "Bill Bold," LinkedIn, https://www.linkedin.com/in/bill-bold-9b13768/;

19. To form my opinions to date, the materials I have considered include, among other things: Qualcomm's publicly available SEC filings, transcripts of depositions taken in this case, and documents produced during discovery in this case. A complete list of materials I have considered to date is attached as **Appendix C**.

## III. Summary of Opinions

20. In the course of my review of the record in this matter, I considered materials relating to Qualcomm's disclosure practices during the Class Period.[26] These materials included documents relating to the Company's disclosure policies as well as the processes, persons, and departments involved in the preparation of Forms 10-K and 10-Q; information disclosed in quarterly earnings press releases, earnings calls, and accompanying slide presentations; and materials prepared in connection with analyst events and media interviews.[27]

21. Based on my review of the above-described information, and based on my academic and professional experience, I analyzed Qualcomm's disclosure process as it compared to the disclosure customs and practices in large public companies and reached the following opinions:

a. Qualcomm's processes during the Class Period for determining the disclosure of information to the public involved relevant departments and individuals and were consistent with disclosure customs and practices in large public companies.

b. Qualcomm's disclosure processes for the SEC filings, analyst conferences, and media interview containing the at-issue disclosures involved relevant departments and individuals and were consistent with the Company's general

"Matthew Heim," LinkedIn, https://www.linkedin.com/in/mathewheim/; "Carol Lam," LinkedIn, https://www.linkedin.com/in/carol-lam-529972215/; "Te-Won Lee," LinkedIn, https://www.linkedin.com/in/te-won-lee-255b3a15/; "Chris Longman," LinkedIn, https://www.linkedin.com/in/chris-longman-17728bb0/, "Christie Thoene," LinkedIn, https://www.linkedin.com/in/christie-thoene-19b1b713/details/experience/; "Christine Trimble," LinkedIn, https://www.linkedin.com/in/christine-trimble-49b909153/; "Fabian Gonell," LinkedIn, https://www.linkedin.com/in/fabian-gonell-796b132/; "Eric R.," LinkedIn, https://www.linkedin.com/in/eric-r-06413/; "Sean Murphy," LinkedIn, https://www.linkedin.com/in/sean-murphy-41468436/; "Kurt M. Kjelland," LinkedIn, https://www.linkedin.com/in/kurtkjelland/; "Mark Snyder," LinkedIn, https://www.linkedin.com/in/mark-snyder-932183209/. Additional information regarding employee titles from counsel. It is typical for internal and external legal counsel—who are most familiar with the subject matter—to have a prominent role in preparing press releases that discuss legal matters such as a government investigation or enforcement action or a pending litigation. *See*, *e.g.*, Chapter 4. *Informal Disclosure Issues in Specific Contexts*, Corp. Communications Handbook § 4:31 (2022–2023) ("Litigation counsel's input on the contents of any informal disclosure regarding the case will also be useful, since the company's public statements may have adverse strategic consequences in the litigation. This input will also be useful in avoiding the issuance of informal disclosure which requires regular updating as the case proceeds.").

[26] I do not offer any opinions concerning whether any of the at-issue disclosures were accurate.

[27] I refer to both analyst conferences and analyst days collectively as "analyst events."

disclosure practices and disclosure customs and practices in large public companies.

## IV. Background on Disclosure Process Customs and Practices in Large Public Companies

22. To provide context for the disclosure processes Qualcomm employed during the Class Period, it is useful to briefly analyze fundamental elements of disclosure practices by large public companies, including as context some of the legal and regulatory requirements and customs and practices that govern or inform the decisions by large public companies to disclose information in periodic and ongoing SEC filings, quarterly earnings releases and calls, analyst events, and media interviews.

23. I begin with a summary of the fundamental elements of disclosure practices by large public companies, including management's role in evaluating information and determining whether information is necessary to disclose. I then provide an overview of the general legal and regulatory disclosure requirements—not because I intend to offer a legal opinion about these topics, but to provide relevant background and context for the opinions I do offer. Next, I summarize the iterative process that large public companies undertake when preparing disclosures, and I conclude by discussing the customs and practices large public companies follow when preparing voluntary disclosures.

### A. Fundamental Elements of Disclosure Practices by Large Public Companies

24. A fundamental element of disclosure practices is a focus on the "materiality" of information to be disclosed. Following U.S. Supreme Court precedent, the SEC defines information as material: (1) "if there is a substantial likelihood that a reasonable investor would consider the information important in deciding how to vote or make an investment decision"; and (2) "if there is a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available."[28]

[28] "Business and Financial Disclosure Required by Regulation S-K," SEC Release No. 33-10064, April 13, 2016, https://www.sec.gov/rules/2016/04/business-and-financial-disclosure-required-regulation-s-k ("SEC Release No. 33-10064"), p. 23925.

25. Companies must disclose information required by specific disclosure requirements ("line items") in forms specified by the SEC, along with other information necessary to avoid making whatever disclosures companies may be required (or choose) to make materially misleading. Public companies are required to make periodic filings (quarterly and annual reports, discussed below) and report specifically identified "current" events. Between required SEC reports, companies may choose to make additional disclosures, subject to the requirement that they do so in a materially true and complete way.

26. Regulation S-K, under both the 1933 Act and the 1934 Act, provides further guidance by setting forth disclosure requirements (other than for financial statements) that are "principles-based" and that "provide management with flexibility to describe the financial matters impacting the registrant."[29] Taking into account their specific business and financial conditions as well as the audience of the disclosure, companies must—and customarily do—exercise judgment to evaluate whether a piece of information is "material." In particular, the SEC has stated that many of its disclosure rules "require disclosure when information is material to investors," and that "[t]hese rules rely on a [company's] management to evaluate the significance of information in the context of the [company's] overall business and financial circumstances and determine whether disclosure is necessary."[30] Stated differently, SEC guidance indicates that management has discretion in applying judgment as to the materiality of information and whether disclosure is necessary. According to the SEC, this approach "may allow [companies] to more effectively tailor their disclosure to provide only the information about their specific business and financial condition that is important to investors."[31] The SEC has also noted that this approach "may allow [companies] to readily adapt their disclosure to facts and circumstances that may change over time."[32] In section IV.B.1 below, I further discuss the principles-based disclosure requirements under the "management's discussion and analysis of financial condition and results of operations" ("MD&A").

27. Another fundamental element of disclosure practices is that public companies customarily attempt to not *over*-disclose information—that is, to not disclose information that is not specified in a line item or not otherwise required to be disclosed, is duplicative of

---

[29] "Financial Reporting Manual: TOPIC 9 – Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A)," *SEC*, September 30, 2008, https://www.sec.gov/corpfin/cf-manual/topic-9.
[30] SEC Release No. 33-10064, p. 23925.
[31] SEC Release No. 33-10064, p. 23927.
[32] SEC Release No. 33-10064, p. 23927.

previously disclosed or publicly available information, or would overwhelm the reader. Recognizing that the effectiveness of disclosures decreases with "information overload," the SEC has published interpretive guidance that discourages companies from disclosing unnecessary information, making duplicative disclosures, and creating information overload.[33] For example, the SEC has emphasized that "[c]ompanies should avoid unnecessary duplicative disclosure that can tend to overwhelm readers and act as an obstacle to identifying and understanding material matters."[34] Specifically, the SEC stated:

> "There is [...] a larger and more up-to-date universe of information, financial and non-financial alike, that companies have and should evaluate in determining whether disclosure is required. This situation presents companies with the challenge of identifying information that is required to be disclosed or that promotes understanding, while avoiding unnecessary information overload for readers by not disclosing a greater body of information, just because it is available, where disclosure is not required and does not promote understanding."[35]

28. Similarly, a former Chair of the SEC discussed concerns regarding over-disclosure in a conference in October 2013:

> "When disclosure gets to be 'too much' or strays from its core purpose, it could lead to what some have called 'information overload' – a phenomenon in which ever-increasing amounts of disclosure make it difficult for an investor to wade through the volume of information she receives to ferret out the information that is most relevant … Expressing the view that disclosure should generally be tethered to the concept of materiality, the Commission … not[ed] that 'as a practical matter, it is impossible to provide every item of information that might be of interest to some investor in making investment and voting decisions.'"[36]

### B. Overview of Legal and Regulatory Requirements

29. Consistent with the underlying disclosure requirements discussed in the previous section, more specific requirements have been enacted to govern companies' disclosure of

---

[33] *See, e.g.*, "Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations," SEC Release No. 33-8350, December 19, 2003, https://www.sec.gov/rules/interp/33-8350.htm ("2003 SEC Guidance on MD&A"). *See also* Chair Mary Jo White, "The Path Forward on Disclosure," Speech at the National Association of Corporate Directors – Leadership Conference 2013 in National Harbor, MD, October 15, 2013, https://www.sec.gov/news/speech/spch101513mjw.
[34] 2003 SEC Guidance on MD&A, p. 75057.
[35] 2003 SEC Guidance on MD&A, p. 75060.
[36] Chair Mary Jo White, "The Path Forward on Disclosure," Speech at the National Association of Corporate Directors – Leadership Conference 2013 in National Harbor, MD, October 15, 2013, https://www.sec.gov/news/speech/spch101513mjw.

"line items" in certain SEC filings. Regulation S-K, as referenced above, sets forth disclosure requirements (other than for financial statements) under both the 1933 Act and the 1934 Act.[37] As part of the "integrated disclosure system" created in 1982,[38] Regulation S-K's requirements are applicable to both public offerings and ongoing reporting forms, such as Forms S-1, 10-K,[39] and 10-Q.[40] In addition to financial statements and footnotes, these three forms include disclosures that relate to specific "line items" required by detailed form requirements and the SEC's instructions to forms.[41] Many line items are specifically qualified as to whether the information is "material" in specific ways. For example, line items in Regulation S-K include MD&A (Item 303), business description (Item 101), and legal proceedings (Item 103).[42] I discuss each of these line items below.

30. The overall requirement that companies disclose additional information beyond the line items is limited to periodic disclosures of material and new information within the context of a particular company's business and financial conditions. I address these legal requirements to provide context for my discussion of the disclosure customs and practices of large public companies.

### 1. MD&A (Item 303)

31. One important line item is a discussion of the company's business, entitled MD&A. Required under Item 303 of Regulation S-K, MD&A must contain disclosure of information relevant to assessing a registrant's financial condition, changes in financial condition, and

---

37 In this report, I discuss the disclosure requirements that were in effect during the Class Period.

38 "Report on Review of Disclosure Requirements in Regulation S-K, as Required by Section 108 of the Jumpstart Our Business Startups Act," *SEC*, December 2013, https://www.sec.gov/news/studies/2013/reg-sk-disclosure-requirements-review.pdf, pp. 7–8.

39 Because they are typically lengthy documents and require audited annual financials, Forms S-1 and 10-K customarily go through an elaborate process of drafting and revision before being finalized and filed. For large accelerated filers, Forms 10-K are typically filed within 60 days of the end of the full fiscal year, *e.g.*, by late February or early March for a company with a fiscal year that ends at the same time as its calendar year. *See* "Revisions to Accelerated Filer Definition and Accelerated Deadlines for Filing Periodic Reports," SEC Release No. 33-8644 Final Rule, December 21, 2005, https://www.sec.gov/rules/final/33-8644.pdf.

40 Forms 10-Q are filed quarterly and are similar to Forms 10-K, except that they do not contain audited financial statements and must comply with fewer and less extensive line items, and are shorter in length. Because Forms 10-Q do not need to contain as much information as Forms 10-K, the preparation process is customarily simpler, quicker, and involves fewer people than for Forms 10-K. For large accelerated filers, Forms 10-Q are typically filed within 40 days of the end of each fiscal quarter (other than for the last quarter, for which a Form 10-K is filed). For a company with a calendar-year fiscal year, Forms 10-Q are typically filed by early May, early August, and early November of each year. *See* "Revisions to Accelerated Filer Definition and Accelerated Deadlines for Filing Periodic Reports," SEC Release No. 33-8644 Final Rule, December 21, 2005, https://www.sec.gov/rules/final/33-8644.pdf.

41 "Line items" in Forms S-1, 10-K, and 10-Q are blocks of required disclosure under Regulation S-K. Examples include Item 1 Business, Item 1A Risk Factors, Item 1B Unresolved Staff Comments, and Item 2 Properties in Form 10-K. *See, e.g.,* "Form 10-K," *SEC*, https://www.sec.gov/about/forms/form10-k.pdf, p. 8.

42 17 CFR. § 229.101 (2012); 17 CFR. § 229.303 (2012); 17 CFR. § 229.103 (2012).

results of operations.[43] The SEC has stated that MD&A is "principles-based" and allows management discretion in describing disclosures.[44] As specified in the guidance the SEC provided in 2003, these MD&A requirements are intended to satisfy "three principal objectives":

a. "[t]o provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management";

b. "[t]o enhance the overall financial disclosure and provide the context within which financial information should be analyzed"; and

c. "[t]o provide information about the quality of, and potential variability of, a company's earnings and cash flow, so investors can ascertain the likelihood that past performance is indicative of future performance."[45]

32. The SEC has previously noted that "MD&A is intended to give the investor an opportunity to look at the company through the eyes of management."[46] As part of fulfilling this disclosure standard, companies are advised to provide "a historical and prospective analysis," which includes "particular emphasis on the registrant's prospects for the future."[47]

33. In its 1989 interpretive rule, the SEC emphasized the flexibility available to management in preparing MD&A. Specifically, the SEC advised:

> "The MD&A requirements are intentionally flexible and general. Because no two registrants are identical, good MD&A disclosure for one registrant is not necessarily good MD&A disclosure for another. The same is true for MD&A disclosure of the same registrant in different years. The flexibility of MD&A creates a framework for providing the marketplace with appropriate information concerning the registrant's financial condition, changes in financial condition and results of operations."[48]

The SEC has commented that this flexibility "has resulted in disclosures that keep pace with the evolving nature of business trends without the need to continuously amend the text of the rule."[49]

---

[43] 2003 SEC Guidance on MD&A, p. 75056.
[44] "Financial Reporting Manual: TOPIC 9 - Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A)," *SEC*, September 30, 2008, https://www.sec.gov/corpfin/cf-manual/topic-9.
[45] 2003 SEC Guidance on MD&A, p. 75056.
[46] "Interpretive Rule: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures," SEC Release No. 33-6835, May 18, 1989, https://www.sec.gov/rules/1989/05/managements-discussion-and-analysis-financial-condition-and-results-operations ("SEC Release No. 33-6835").
[47] SEC Release No. 33-6835.
[48] SEC Release No. 33-6835.
[49] "Interpretation: Commission Guidance Regarding Disclosure Related to Climate Change," SEC Release No. 33-9106, February 2, 2010, https://www.sec.gov/files/rules/interp/2010/33-9106.pdf, p. 16.

34. With respect to results of operations, the MD&A may include a discussion of key variables and financial measures that management uses in operating the business. To provide investors with a view of the company "through the eyes of management," the SEC's 2003 guidance on MD&A encourages companies to "identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."[50] Here too, management must exercise judgment to avoid information overload. Indeed, the SEC advises companies to consider whether non-financial information should be disclosed given the increase in "the amount of information available to management" and the need to avoid "unnecessary information overload for readers."[51]

35. Consistent with the principles-based approach set forth in Item 303,[52] the SEC does not prescribe any specific "key variables and other qualitative and quantitative factors" management should disclose.[53] Nor does the SEC require that *all* key variables be disclosed. Instead, the SEC allows for management to exercise judgment in determining the company's disclosures in light of management's own assessment of the significance of particular kinds of information in the context of the company's overall business and financial circumstances.[54]

36. Management generally has discretion with respect to information in the MD&A, although the SEC also provides related guidance to companies. For example, the SEC has advised companies to improve MD&A disclosures by "using language that is clearer and less convoluted" and to avoid using "boilerplate disclaimers and other generic language."[55] The SEC provided additional advice to companies concerning presentation of MD&A, including to:

a. "consider whether a tabular presentation of relevant financial or other information may help a reader's understanding of MD&A … followed by a narrative discussion and analysis of known changes, events, trends, uncertainties and other matters";

---

[50] 2003 SEC Guidance on MD&A, p. 75060, quoting SEC Release No. 33-6835.
[51] 2003 SEC Guidance on MD&A, p. 75060.
[52] "Financial Reporting Manual," *SEC Division of Corporate Finance*, September 30, 2008, https://www.sec.gov/files/cf-financial-reporting-manual.pdf at 9110.2, p. 295.
[53] 2003 SEC Guidance on MD&A, p. 75060.
[54] 2003 SEC Guidance on MD&A, pp. 75059–75061.
[55] 2003 SEC Guidance on MD&A, p. 75059.

b. "consider whether the headings they use assist readers in following the flow of, or otherwise assist in understanding, MD&A, and whether additional headings would be helpful in this regard";

c. "add[] an introductory section or overview that would facilitate a reader's understanding" and the content of such a disclosure, "[a]s with all disclosure … will depend on the circumstances of the particular company"; and

d. "consider using a 'layered' approach … [to] assist readers in identifying more readily the most important information."[56]

37. The SEC does not require that all forward-looking information be disclosed. MD&A requires disclosures of known events and uncertainties unless the company concludes that "it is *not* reasonably likely" (emphasis added) that (a) the event or uncertainty will occur; or (b) if the event occurs, there will be a material impact on the company's liquidity, capital resources, or operational results.[57] The SEC further advises companies to "include forward-looking information in circumstances where that information may not be required, but will provide useful material information for investors that promotes understanding."[58]

38. The evolving nature of "line item" disclosure was also documented in a study by the Financial Executives Research Foundation ("FERF") and Ernst & Young ("EY"). The two entities reviewed the Forms 10-K of companies in the S&P 500 index during the 2012–2015 fiscal years to document the key changes that those companies had implemented.[59] Many of the changes focused on MD&A.[60] Specifically, the study highlighted several changes introduced in the presentation of MD&A: (1) use of "layering" to highlight the most significant information first (including through executive summaries); (2) "[i]ncreased use of bullet points or tables to replace lengthy text and emphasize key information"; (3) "[i]ncreased use of cross-referencing"; (4) "[u]se of charts and graphs to depict changes in key measures such as revenues and margins," rather than attempting to convey such information in narrative form; (5) "[e]limination of boilerplate language and accounting terminology in favor of plain-English disclosures"; (6) "[r]evised organization of the MD&A based on topical information"; and (7) "[r]emoval of information that may have resulted from

[56] 2003 SEC Guidance on MD&A, p. 75059.
[57] 2003 SEC Guidance on MD&A, p. 75061.
[58] 2003 SEC Guidance on MD&A, p. 75059.
[59] "Disclosure effectiveness in action: companies make great strides," *Financial Executives Research Foundation and Ernst & Young*, September 2016, https://www.financialexecutives.org/Research/FERF-Files/2016/ey-ferf-disclosure-effectiveness-in-action-compani.aspx ("Disclosure Effectiveness in Action"), p. 3.
[60] Disclosure Effectiveness in Action, p. 7.

renewed materiality considerations."[61] These changes in MD&A are in part due to SEC efforts to eliminate repetitive and outdated disclosure and encourage companies to focus on relevant information, and are consistent with greater reliance by companies on judgment in deciding how to respond to SEC line items. Overall, the average length of MD&A declined in terms of average word count between 2012 and 2015.[62]

### 2. Business Description (Item 101)

39. Another required line item is a description of a company's business, pursuant to Item 101 of Regulation S-K, which lays the foundation for "understanding and assessing a company, its operations, and financial condition."[63] At the time of the Class Period, Item 101(a) required a company to disclose the general development of the company's business during the past five years.[64] Item 101(a) required that the company include, among other things, the year of organization, the form of organization, and the nature and results of any merger, acquisition, disposition, or bankruptcy. Companies were also required to provide a narrative discussion of any material changes in the conduct of the company's business.[65] Item 101(c) of Regulation S-K required a narrative description of the company's business, with a focus on information concerning the company's dominant segment or each reportable segment for which financial information is disclosed. This included certain material information concerning the company's products and services, intellectual property, and competitive conditions.[66]

40. The study by the FERF and EY noted above also found that S&P 500 companies had revised business descriptions to "better align the discussion of business strategies and portfolio composition" in the SEC filings to their websites and investor presentations and had eliminated redundancies between business description and MD&A, including by increasingly using cross-references.[67] These changes are consistent with general efforts by the SEC to encourage companies to streamline and deploy judgment in their disclosures generally. SEC filings generally have long been "tailored" using management judgment to the size and nature

---

[61] Disclosure Effectiveness in Action, p. 7.
[62] Disclosure Effectiveness in Action, pp. 8–9.
[63] SEC Release No. 33-10064, p. 23931.
[64] 17 CFR. § 229.101(a)(1). Regulation S-K also requires information to be disclosed for earlier periods if the information is material to an understanding of the general development of the business. If a company is engaged in business for fewer than five years, then the company is required to describe its general business development for that shorter period. *See* SEC Release No. 33-10064, p. 23931.
[65] SEC Release No. 33-10064, p. 23931.
[66] 17 CFR. § 229.101(c); SEC Release No. 33-10064, p. 23932.
[67] Disclosure Effectiveness in Action, p. 7.

of the companies involved, rather than having to follow rigid one-size-fits-all rules; in my own research, I have found significant differences in the length of annual reports on Form 10-K filed by companies of different sizes and industries.[68] I observed similar differences more recently during my time as Acting Director of the Division of Corporation Finance at the SEC.

#### 3. Legal Proceedings (Item 103)

41. During the Class Period, pursuant to SEC Regulation S-K Item 103, companies also were required to disclose "any material pending legal proceedings, other than ordinary routine litigation incidental to the business."[69] That is, companies were *not* required to disclose pending proceedings that involve actions or claims "[i]f the business ordinarily results in actions for negligence or other claims … unless [the action or claim] departs from the normal kind of such actions"; or that involve "primarily a claim for damages if the amount involved, exclusive of interest and costs, does not exceed 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis."[70]

42. Companies were, however, required to disclose pending proceedings that were deemed material and non-ordinary. Such disclosure should have included, with certain limitations: (1) any material bankruptcy or similar proceeding; (2) any material proceeding to which an officer, director, or affiliate is a party adverse to the company; and (3) any material proceeding under laws or regulations regulating protection of the environment.[71] To provide information that investors need to make informed investment decisions, companies were required to disclose "the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, [and] a description of the factual basis alleged to underlie the proceeding and the relief sought."[72] Companies were also required to disclose this information for "proceedings known to be contemplated by governmental authorities."[73]

---

[68] Coates IV, John C., "Private vs. Political Choice of Securities Regulation: A Political Cost/Benefit Analysis," *Virginia Journal of International Law* 41, no. 3, 2001, pp. 531–582 at 551.
[69] 17 CFR. § 229.103.
[70] 17 CFR. § 229.103.
[71] 17 CFR. § 229.103.
[72] 17 CFR. § 229.103.
[73] 17 CFR. § 229.103.

### C. Iterative Disclosure Process Involving Multiple Departments, Officers and Directors, and Senior Staff

43. Large public companies spend considerable time preparing for disclosures. Individuals in different positions and departments within a large public company routinely participate in an iterative process to prepare, review, check, and approve information contained in the company's disclosures.

44. It is common for companies to enact policies that govern disclosure practices.[74] These policies control how companies disseminate material information and which employees are authorized to disseminate information to the financial community.[75] If companies identify flaws or opportunities for improvement in their disclosure policies or processes, it is common practice to update those policies or processes to resolve those flaws and improve how the companies prepare disclosures.

45. Disclosure committees play an important role in preparing and reviewing disclosure materials. Large public companies typically establish a disclosure committee to help senior management and the audit committee of the board of directors evaluate the appropriateness of the company's disclosure controls and procedures and ensure the company's compliance with legal and regulatory disclosure requirements.[76] Although regulations do not require companies to establish or maintain a disclosure committee, the SEC recommends creating a disclosure committee with "responsibility for considering the materiality of information and determining disclosure obligations on a timely basis."[77] The composition of the disclosure committee varies across companies and may include members of the management team, such as chief accounting officer or controller, general counsel, risk management officer, investor

---

[74] *See*, *e.g.*, "Selective Disclosure and Insider Trading," SEC Release No. 33-7881 Final Rule, August 15, 2000, https://www.sec.gov/rules/final/33-7881.htm ("SEC Release No. 33-7881 Final Rule"), footnote 90 ("We are aware that many, if not most, issuers already have policies and procedures regarding disclosure practices, the dissemination of material information, and the question of which issuer personnel are authorized to speak to analysts, the media, or investors.").

[75] *See*, *e.g.*, SEC Release No. 33-7881 Final Rule, footnote 90 ("We are aware that many, if not most, issuers already have policies and procedures regarding disclosure practices, the dissemination of material information, and the question of which issuer personnel are authorized to speak to analysts, the media, or investors."); Chapter 3. Components of Securities Compliance Program, Corp. Compl. Series: Securities § 3:28 (2022) ("In light of a company's need to respond to the financial community's requests for additional information in an accurate, intelligent, and timely manner, a company should first designate a person or a small group of persons to have the responsibility of speaking on behalf of the company to the financial community.").

[76] *See, e.g.*, "Practical Law Corporate & Securities, Disclosure Committee Charter," Westlaw Practice Note Standard Document, https://content.next.westlaw.com/practicallaw/document/I0fa0104aef0811e28578f7ccc38dcbee/Disclosure-Committee-Charter?viewType=FullText&transitionType=Default&contextData=(sc.Default)&firstPage=true; "Lexis Practice Advisor, Disclosure Committee Charter," Lexis Practice Note Standard Document, https://advance.lexis.com/open/document/openwebdocview/Disclosure-Committee-Charter/?pdmfid=1000522&pddocfullpath=%2Fshared%2Fdocument%2Fforms%2Furn%3AcontentItem%3A5H08-90V1-JJK6-S0MX-00000-00&pdcomponentid=500752; "Disclosure Committee Essentials," *PwC*, July 2022, https://www.pwc.com/us/en/governance-insights-center/publications/assets/pwc-disclosure-committee-essentials.pdf, p. 2.

[77] "Certification of Disclosure in Companies' Quarterly and Annual Reports," SEC Release No. 33-8124 Final Rule, August 28, 2002, https://www.sec.gov/rules/final/33-8124.htm ("SEC Release No. 33-8124 Final Rule").

relations officer ("IRO"),[78] and business unit representatives, as the company deems appropriate.[79]

46. Various other individuals and departments often participate in the disclosure process as necessary given the subject matter of a particular disclosure. For example, accounting, finance, and internal audit personnel typically help with preparing and checking the accuracy of financial and operational metrics included in the disclosure. Senior management, other members from management teams, business heads from relevant departments, the audit committee, and internal and external legal counsel[80] also provide input when developing and iterating on draft disclosure materials.[81]

47. Among the individuals involved in the disclosure process, IROs also play a significant role in developing disclosure materials, soliciting and incorporating feedback from other individuals and departments, and checking the accuracy of the materials. The disclosure materials may take various forms. For example, for earnings calls, IROs are typically responsible for developing the script of the speakers, preparing a list of questions that may arise from the audience and their answers, developing a strategy for handling unanticipated questions, managing the queue of questions, and rehearsing the call.[82] As part of their responsibility to communicate the company narrative—what the company is doing and how it is doing it—with the investment community, IROs interact regularly with analysts and institutional investors. These interactions place IROs at "the center of many disclosure-related activities, including quarterly earnings conference calls."[83]

---

[78] Bill Davidson was the Senior Vice President of Investor Relations at Qualcomm during a portion of the Class Period. Qualcomm's 2003 disclosure policy referred to the Senior Vice President of Investor Relations as a "QUALCOMM officer[]." *See* Deposition of Bill Davidson, September 29, 2022 ("Davidson Deposition"), pp. 8–9; "Qualcomm Incorporated Disclosure Policy," April 28, 2003, Q121SEC00168819–23 at 19.

[79] SEC Release No. 33-8124 Final Rule.

[80] Legal counsel's involvement in the disclosure process extends beyond simply providing legal advice. Legal counsel also customarily provides valuable input in the drafting of statements that are of a legal nature, which are commonly found in disclosures. Throughout this report, I focus on the role played by legal counsel in drafting disclosed statements and do not offer any opinions concerning any legal advice that they may have provided.

[81] *See, e.g.*, Michael Zeidel, "Earnings Releases: Regulatory Framework and Disclosure Process," *Lexis Practice Advisor*, October 14, 2020, https://plus.lexis.com/api/permalink/4c99fa9b-1f5e-45be-b69c-33d56519eab2/?context=1530671, p. 10; CFO Journal - Deloitte, "Disclosure Committees – Frequently Asked Questions," *Wall Street Journal*, January 3, 2014, https://deloitte.wsj.com/cfo/2014/01/03/disclosure-committees-frequently-asked-questions; "New Rules Requiring Additional Certifications by CEO and CFO Under Section 302 of Sarbanes-Oxley Act Are In Effect," *Fenwick & West LLP*, September 3, 2002, https://assets.fenwick.com/legacy/FenwickDocuments/Corp_Sec_09-03-02.pdf, pp. 6–7.

[82] Brown, Lawrence D., et al., "Managing the narrative: Investor relations officers and corporate disclosure," *Journal of Accounting and Economics* 67, no. 1, 2019, pp. 58–79 ("Managing the Narrative: Investor Relations Officers and Corporate Disclosure") at p. 59. The study found that "IROs have significant input on all forms of company disclosures, with nearly 70% of IROs reporting they have considerable influence on the substance and form of press releases and about 84% saying the same about the prepared remarks of public earnings conference calls."

[83] Managing the Narrative: Investor Relations Officers and Corporate Disclosure, p. 58.

### D. Customs and Practices for Preparing Particular Types of Voluntary Disclosure in Large Public Companies

48. As discussed above in Section IV.B, mandatory disclosures are governed by legal and regulatory requirements. In addition, large public companies customarily make various forms of voluntary disclosures through, for example, earnings releases and calls, analyst events, and media interviews. I discuss below the customs and practices for preparing these voluntary disclosures in large public companies.

49. Information voluntarily disclosed by companies is subject to Regulation Fair Disclosure ("Regulation FD"), which prevents the selective disclosure of material nonpublic information ("MNPI"). Under Regulation FD, whenever a company, or any person acting on its behalf, releases any MNPI regarding a company or its securities, the company must make "public disclosure" of that information simultaneously if the release was intentional or "promptly" if the release was unintentional.[84] Regulation FD defines "public disclosure" as a disclosure in either Form 8-K or information disseminated "through another method (or combination of methods) of disclosure that is reasonably designed to provide broad, non-exclusionary distribution of the information to the public."[85] According to the SEC, acceptable methods of public disclosure include channels such as widely-disseminated press releases, press conferences, and conference calls.[86]

#### 1. Quarterly and Annual Earnings Releases

50. Large public companies typically issue earnings releases in addition to their SEC filings. The format and content of earnings releases are not specifically regulated by the SEC. When a company issues an earnings release, it is required to furnish a copy of the release with its Form 8-K.[87] According to SEC estimates, in 2017 about 97% of companies in the S&P 500 and 98% of companies in the S&P 1500 Super Composite indices distributed earnings releases via Form 8-K.[88]

---

[84] 17 CFR. § 243.100(a) (2012).
[85] 17 CFR. § 243.101(e) (2012); SEC Release No. 33-7881 Final Rule, p. 51723.
[86] SEC Release No. 33-7881 Final Rule, pp. 51723–51724.
[87] "Request for Comment on Earnings Releases and Quarterly Reports," SEC Release No. 33-10588, December 18, 2018, https://www.sec.gov/rules/other/2018/33-10588.pdf ("SEC Release No. 33-10588"), p. 9.
[88] SEC Release No. 33-10588, footnote 31.

51. Many market participants view the Form 10-Q, which is often filed subsequent to the issuance of earnings releases,[89] as a compliance document that confirms the material information in earnings releases. This is because there is an overlap between the information typically contained in earnings releases and the information that is required to be disclosed in a Form 10-Q.[90] However, other market participants may view the Form 10-Q as providing additional relevant information regarding earnings releases.[91]

### 2. Earnings Calls

52. Earnings calls have become a common venue for corporate disclosure,[92] representing one of the major forms of communication that firms use to voluntarily supplement the information contained in their financial statements and regulatory filings. In particular, the adoption of Regulation FD in 2000,[93] coupled with technological solutions facilitating information access and dissemination, turned earnings calls into routine, public disclosure events[94] that accompany earnings press releases.[95] During earnings calls, senior managers of public companies communicate directly with the investment community, providing analysts

---

[89] Firms often issue earnings releases prior to filing their Forms 10-Q or 10-K, but a growing number of firms issue earnings releases concurrently with such filings. According to a 2016 National Investor Relation Institute survey, 57% (76%) of polled companies issue earnings releases prior to their 10-Q (10-K) filings, while 43% (24%) issue earnings releases concurrently with their 10-Q (10-K) filings. Companies choose to issue earnings releases prior to filing their Forms 10-Q or 10-K so that their investors will receive a quicker update about the company's performance. A company may not have completely finalized the language in their Forms 10-Q or 10-K when it chooses to issue an early earnings release. *See* "Earnings Process Practices Research Report," *National Investor Relations Institute Analytics*, 2016, https://www.niri.org/NIRI/media/Protected-Documents_ExcludeGlobalSubs/Analytics%20Reports/Analytics_Guidance/NIRI-Earnings-Process-Practices-Report-2016.pdf ("2016 NIRI Earnings Process Report"), p. 16; Letter to the SEC from Grant Thornton, "Re: File No. S7-26-18, Request for Comment on Earnings Releases and Quarterly Reports," March 15, 2019, https://www.sec.gov/comments/s7-26-18/s72618-5134338-183346.pdf, p. 2.

[90] "The Promise of Market Reform," *Nasdaq*, February 2018, https://www.nasdaq.com/docs/Nasdaq_Blueprint_to_Revitalize_Capital_Markets_April_2018_tcm5044-43175.pdf, p. 9 ("[C]ompanies provide key data via an earnings press release each quarter" and "[f]or virtually all investors, the press release is the quarterly report. Yet companies are then required to file a formal Form 10-Q…which is complex, time-consuming, and provides little additional actionable information that cannot be found in the press release."). *See also* Colin J. Diamond and Irina Yevmenenko, "Earnings Releases and Earnings Calls," *Practical Law*, 2015, https://www.whitecase.com/sites/whitecase/files/files/download/publications/article-earnings-releases-and-earnings-calls.pdf, p. 1 ("[E]arnings releases and calls are among the most material announcements that reporting companies make" and "often result in significant movements in a reporting company's stock price . . . [A] company's stock price usually is not affected by the filing of its Form 10-K or Form 10-Q following a corresponding earnings release, because all material information has already been disclosed in the earnings release.").

[91] Letter to the SEC from the Council of Institutional Investors, "Re: File No. S7-26-18," March 21, 2019, https://www.cii.org/files/issues_and_advocacy/correspondence/2019/March%2021,%202019%20letter%20to%20SEC%20on%20RFC%20(final).pdf, p. 3.

[92] 2016 NIRI Earnings Process Report, p. 19 (indicating that 97% of surveyed companies held earnings calls in 2016, relative to 80% in 1996).

[93] SEC Release No. 33-7881 Final Rule, p. 51716.

[94] Under Regulation FD, the information from earnings calls should be made available to all interested parties, including investors, analysts, and members of the media. Fully accessible, non-exclusionary webcasts or telephonic conference calls are recognized as a means for full and fair disclosure.

[95] Brochet, Francois, et al., "Information transfer and conference calls," *Review of Accounting Studies* 23, no. 3, 2018, pp. 907–957 ("Information Transfer and Conference Calls") at pp. 908–909.

and investors with opportunities to assess the "quality of management"[96] and management's view of the general direction of the company's product strategies, and to ask questions about topics not necessarily covered in formal disclosure requirements.[97]

53. A public company typically holds an earnings call on the same day or within a day of issuing an earnings release.[98] Such calls "typically last less than an hour and include a presentation by the firm's management followed by a question and answer [("Q&A")] session with invited financial market participants."[99] The presentation portion of earnings calls often "offers insights on operational developments within a firm as well as broader economic and regulatory news."[100] It is not uncommon for companies to engage with analysts about the content of earnings calls before, during, and after the calls as long as those communications do not violate Regulation FD requirements. For example, it is customary for companies to provide feedback to analysts concerning the types of questions to which the company could reasonably and constructively respond. Not all questions that analysts ask on earnings calls are answered, such as questions that seek more precision in forward-looking information than companies can reliably provide or those that seek proprietary details that companies cannot provide without violating non-disclosure agreements or risking disruption of ongoing negotiations or planning.

54. Earnings calls also may contain information about events that have occurred after the closing period of the company's most-recent SEC filing and information incremental to that disclosed in earnings releases.[101] In addition, earnings calls provide an important window for management to express its opinions about recent performance and future firm potential.[102] The presentation section of an earnings call can provide supplemental disclosure from or analysis by key executives and personnel, while the Q&A session can prompt "nonscripted

[96] "Measures that Matter," *Ernst & Young*, 1997, http://valuementors.com/pdf/Measures%20that%20Matter.pdf, pp. 1, 6–9. This study found that quality of management was one of the most important nonfinancial factors that a sample of 275 portfolio managers valued in making fund assets allocations.
[97] "Standards of Practice for Investor Relations," *National Investor Relations Institute*, January 2004, http://media.corporate-ir.net/media_files/priv/27585/standards_practice.pdf ("2004 NIRI Standards"), pp. 12–13.
[98] 2016 NIRI Earnings Process Report, pp. 22–23.
[99] Information Transfer and Conference Calls, pp. 911–912.
[100] Information Transfer and Conference Calls, p. 908.
[101] 2004 NIRI Standards, pp. 31–32.
[102] *See*, *e.g.*, Fabens, Andrew L., and Sean Sullivan, "Practical Strategies for Effective Management of Earnings Calls," *Insights: The Corporate & Securities Law Advisor* 28, no. 6, 2014, pp. 1–7 at p. 1 ("Many [public companies] hold an earnings call to discuss the company's historical financial performance, and in some cases, give forward-looking guidance.").

[*sic*] disclosure driven by the questions of financial market participants such as sell-side"[103] and buy-side analysts.[104]

55. The use of simple, plain language is particularly important in disclosures targeting a less sophisticated audience,[105] which can apply to earnings calls—while many participants on such calls may be sophisticated, some may not be. When managers answer analysts' questions during an earnings call, it is not uncommon for them to adhere to pre-determined language, in part (based on my experience) to avoid inadvertently creating inconsistencies in disclosed information or inadvertently conveying more precision in their responses than they can reliably provide, particularly about forward-looking information.

### 3. Analyst Events

56. Companies also may communicate with the public through presentations to analysts and investors at conferences, which may be held over a single day or longer and involve numerous companies.[106] At these conferences, one or more management representatives of each company typically presents prepared remarks and responds to questions for 30–45 minutes.[107]

57. Additionally, companies may communicate with analysts through presentations made during analyst days. Analyst days may range from half a day to one-and-a-half days and may have a wide range of presenters, including senior management, operating personnel, major customers, suppliers, and/or industry experts, with senior management typically presenting most of the time.[108]

58. During analyst days or conferences,[109] management may use slides and scripts as part of the prepared remarks.[110] These materials may leverage information previously prepared by

---

[103] Information Transfer and Conference Calls, p. 912.
[104] Jung, Michael J., et al., "Buy-Side Analysts and Earnings Conference Calls," *Journal of Accounting Research* 56, no. 3, 2018, pp. 913–952.
[105] *See*, *e.g.*, "A Plain English Handbook: How to create clear SEC disclosure documents," *SEC*, August 1998, https://www.sec.gov/pdf/handbook.pdf, pp. 5, 9.
[106] Bushee, Brian J., et al., "Conference Presentations and the Disclosure Milieu," *Journal of Accounting Research* 49, no. 5, 2011, pp. 1163–1192 ("Conference Presentations and the Disclosure Milieu") at pp. 1164, 1171–1172.
[107] Conference Presentations and the Disclosure Milieu, p. 1168.
[108] Kirk, Marcus P., and Stanimir Markov, "Come on Over: Analyst/Investor Days as a Disclosure Medium," *The Accounting Review* 91, no. 6, 2016, pp. 1725–1750 ("Come on Over: Analyst/Investor Days as a Disclosure Medium") at p. 1728.
[109] Throughout my report I refer to analyst and industry conferences as "analyst conferences." Industry conferences are typically focused on a single industry and are attended by analysts and investors with knowledge of that industry. *See* Conference Presentations and the Disclosure Milieu, pp. 1171–1172.
[110] *See*, *e.g.*, Chapter 3. Logistical Framework, Corp. Communications Handbook § 3:12 (2022-2023) ("For all 'oral' disclosure presentations, the informal disclosure group should brief the designated officer and encourage the use of a script for the presentation.").

the company for prior analyst events or its most-recent quarter's earnings calls. Following the presentation, management typically answers attendees' questions.[111] Management may also meet with attendees outside of the presentation.[112]

59. The Q&A session allows participants to pose questions to management. Management may receive some, but not necessarily all, of the topics or questions in advance of the presentation. When management answers participants' questions during these events, it is not uncommon for them to adhere to predetermined language or talking points to the extent that they are aware of the topics or questions in advance of the event or have otherwise prepared for the questions. In doing so, management may leverage materials that were previously prepared for prior quarterly disclosures, earnings calls, and/or analyst events. For questions that management did not receive in advance of the event or has not had to previously address, management may not have prepared a scripted response or talking points. Instead, management typically responds to such questions in real time based on prior disclosures and any related talking points that they may have previously prepared.

60. Management typically does not selectively disclose MNPI at these events and instead focuses the presentation on the firm's strategy and operations.[113] However, if management inadvertently discloses new material information during these events, then that disclosure triggers requirements under Regulation FD, as discussed above.[114]

### 4. Media Interviews

61. Companies also communicate information to the public through media interviews.[115] Individuals from departments responsible for external communications, such as investor relations, public relations, or communications teams, may be involved in preparing interviewees for media interviews. Similar to preparing for analyst conferences, companies customarily attempt to anticipate the subject matters and questions that may be asked during

---

[111] Conference Presentations and the Disclosure Milieu, p. 1168; Come on Over: Analyst/Investor Days as a Disclosure Medium, p. 1728.

[112] Conference Presentations and the Disclosure Milieu, p. 1168; Come on Over: Analyst/Investor Days as a Disclosure Medium, p. 1728.

[113] Conference Presentations and the Disclosure Milieu, pp. 1164–1165, 1168.

[114] 17 CFR. § 243.100(a) (2012).

[115] *See*, *e.g.*, Chapter 17. Regulation FD, Res. Corp. Fed. Sec. L. P 1707 (C.C.H.), 2015 WL 5616177 ("As a general matter, acceptable methods of public disclosure for purposes of Regulation FD will include … announcements made through press conferences or conference calls that interested members of the public may attend or listen to either in person, by telephonic transmission, or by other electronic transmission, including use of the Internet.").

media interviews and brief the interviewee in advance.[116] Talking points or scripted responses may also be prepared for the interviewee.[117] In advance of the interview, companies also customarily collect information such as the journalist's profile, background on the publication, or the context of the interview.[118] The extent of these preparations may vary depending on the importance of the subject matter, significance of the publication, or the interviewees' preferences and experience in dealing with the media. If questions are asked soliciting MNPI, interviewees typically avoid answering those questions.[119]

## V. The Disclosure Processes at Qualcomm Involved Relevant Departments and Individuals and Were Consistent with Disclosure Customs and Practices in Large Public Companies.

62. My review of materials related to disclosure practices at Qualcomm during the Class Period indicates that the Company had established disclosure policies and procedures. **Exhibit 2** shows selected entities that were involved in the Company's disclosure process. For quarterly and annual SEC filings, the Company's processes and procedures followed an iterative approach that involved multiple relevant committees, departments, and individuals. For analyst conferences, Investor Relations personnel helped prepare talking points responsive to anticipated analyst questions and leveraged materials that the Company had previously prepared for prior events, such as analyst days and earnings calls. The Company's process for developing materials for analyst days, earnings releases, and earnings calls followed an iterative approach that involved multiple relevant departments and individuals. For media interviews, the relevant external communications department within Qualcomm

---

[116] *See*, *e.g.*, "Practical Law Commercial Transactions, Dealing with the Media: Business Briefing," Thomson Reuters Practical Law Practice Note 5-513-4266, https://anzlaw.thomsonreuters.com/5-513-4266?originationContext=document&transitionType=DocumentItem&contextData=(sc.Default)&ppcid=7b7f21b841f442f8827d88cd6bccf636 ("Before you agree to speak to the press, make sure that you: … Ask the journalist for a list of questions he wishes to ask. At the very least, try to establish what will be the main line of questioning and anticipate as much as possible the questions that you are likely to be asked.").

[117] *See*, *e.g.*, Chapter 3. Logistical Framework, Corp. Communications Handbook § 3:12 (2022-2023) ("For all 'oral' disclosure presentations, the informal disclosure group should brief the designated officer and encourage the use of a script for the presentation.").

[118] *See*, *e.g.*, "Practical Law Commercial Transactions, Dealing with the Media: Business Briefing," Thomson Reuters Practical Law Practice Note 5-513-4266, https://anzlaw.thomsonreuters.com/5-513-4266?originationContext=document&transitionType=DocumentItem&contextData=(sc.Default)&ppcid=7b7f21b841f442f8827d88cd6bccf636 ("Before you agree to speak to the press, make sure that you: … Know who you are talking to and the name and type of publication or program … Know the context of the piece, what it is likely to be about, and what the journalist is trying to achieve.").

[119] *See*, *e.g.*, "Practical Law Commercial Transactions, Dealing with the Media: Business Briefing," Thomson Reuters Practical Law Practice Note 5-513-4266, https://anzlaw.thomsonreuters.com/5-513-4266?originationContext=document&transitionType=DocumentItem&contextData=(sc.Default)&ppcid=7b7f21b841f442f8827d88cd6bccf636 ("If you are at all unsure about whether information is material non-public information or may impact stock price in any event, do not answer the question. Tell the journalist that you are not authorized to answer the question and refer it to the corporate communications or legal department if appropriate.").

provided briefing materials containing anticipated interview topics and Q&A talking points and background information on the media personnel conducting the interview to aid the preparation of the interviewees. Based on the materials I have reviewed, I conclude that the processes employed by the Company during the Class Period for determining the disclosure of information to the public involved relevant departments and individuals and were consistent with the disclosure customs and practices in large public companies described above in Section IV.

### A. Qualcomm's Disclosure Policy

63. During the Class Period, consistent with the disclosure customs and practices in large public companies described in Section IV.C, Qualcomm maintained a disclosure policy that outlined the ways in which the Company would evaluate and/or make external disclosures. The policy was approved in 2003 and aimed to address the following three goals:

- Ensuring "that communications by QUALCOMM officials to securities market professionals, such as analysts and institutional investors, and company stockholders comply with the provisions of Regulation FD adopted by the Securities and [E]xchange Commission;
- [Ensuring] that QUALCOMM discloses only accurate and credible information, consistent with legal and regulatory requirements, to enable orderly behavior in the market and to allow the investment community to have fair access to material information about QUALCOMM; and
- Developing realistic investor expectations by making required disclosures of material information."[120]

64. The 2003 disclosure policy also set forth the role of the Company's Board of Directors in the disclosure process. Specifically, the 2003 disclosure policy stated that the Board "should be kept aware of material developments and significant information disseminated to the public" and that "Board members, including specifically the members of the Audit Committee, and other insiders will be apprised of material developments which QUALCOMM is not ready to announce publicly, in order to avoid premature or selective disclosure or inadvertent insider trading."[121]

65. The 2003 disclosure policy applied to all Qualcomm employees, directors, and others who provided services to Qualcomm and were in possession of MNPI or confidential

[120] "Qualcomm Incorporated Disclosure Policy," April 28, 2003, Q121SEC00168819–23 at 19.
[121] "Qualcomm Incorporated Disclosure Policy," April 28, 2003, Q121SEC00168819–23 at 23 (emphasis in original).

information, and it covered disclosures made in SEC filings, press releases, communications with analysts, and communications with the press, among others.[122] Consistent with the disclosure customs and practices of large public companies described in Section IV.C, the 2003 disclosure policy further outlined which individuals at the Company were authorized to make external disclosures and prohibited any "communication by any [non-authorized] employee with the financial community, stockholders and the media regarding QUALCOMM's business" unless prior approval from a designated business leader was received.[123]

66. The disclosure policy was updated in 2014 and again set forth three goals: (i) ensuring "that communications by the Company to securities market professionals, including analysts and institutional investors, stockholders and the investing public (the 'financial community') are timely, factual and accurate, and that [MNPI] is broadly disseminated in accordance with all applicable legal and regulatory requirements, including Regulation FD adopted by the Securities and Exchange Commission ('SEC')"; (ii) ensuring "that the Company discloses only accurate and credible information, consistent with legal and regulatory requirements, to enable orderly behavior in the markets and to allow the financial community to have fair access to material information disclosed about the Company"; and (iii) ensuring "that confidential or proprietary information of the Company is disclosed to third parties only under the protection of a confidentiality agreement or similar instrument, or to persons already under an obligation of confidentiality in relation to the Company and its confidential or proprietary information."[124]

67. Similar to the 2003 disclosure policy, the 2014 disclosure policy applied to all Qualcomm employees, directors, executive officers, and others who provided services to Qualcomm and were exposed to material non-public or confidential information, and it covered disclosures made in SEC filings, press releases, "communications with the financial community," and communications with the media, among others.[125] Consistent with the disclosure customs and practices of large public companies described above, and similar to the 2003 disclosure policy, the 2014 disclosure policy further outlined which individuals at the Company were authorized to make external disclosures.[126]

---

[122] "Qualcomm Incorporated Disclosure Policy," April 28, 2003, Q121SEC00168819–23 at 19–20.
[123] "Qualcomm Incorporated Disclosure Policy," April 28, 2003, Q121SEC00168819–23 at 20–21
[124] *See* "Qualcomm Incorporated Disclosure Policy," November 2014, Q121SEC00937613–9 at 3.
[125] "Qualcomm Incorporated Disclosure Policy," November 2014, Q121SEC00937613–9 at 3–4.
[126] "Qualcomm Incorporated Disclosure Policy," November 2014, Q121SEC00937613–9 at 4.

### B. Qualcomm's Disclosure Policy Committee and Disclosure Committee

68. Consistent with the disclosure customs and practices in large public companies and the SEC's recommendation to establish a disclosure committee discussed in Section IV.C, Qualcomm had designated to certain individuals the responsibility to assess the Company's disclosures. Also consistent with the composition of disclosure committees in large public companies described above in Section IV.C, these individuals included members of the management team, investor relations employees, and representatives of the internal legal team.

69. The 2003 disclosure policy established a "Disclosure Policy Committee" comprised of the CEO, the Vice President and General Counsel, the CFO, the Senior Vice President of Investor Relations, and the Vice President of Marketing and Public Relations.[127] These individuals were tasked with "[r]eview[ing], coordinat[ing], and monitor[ing] public disclosures by QUALCOMM and its employees to determine whether modification or amendment [was] warranted."[128] Individuals on the Disclosure Policy Committee along with the Company's corporate counsel were to "be apprised of company developments to enable them to evaluate and discuss those events that may impact the disclosure process."[129]

70. The Company's updated 2014 disclosure policy designated a group of individuals to perform a disclosure-related role similar to the role of the Disclosure Policy Committee established by the 2003 disclosure policy. The 2014 disclosure policy stated that "[a]ppropriate members of the Company's management, Investor Relations department …, Corporate Finance department, Corporate Communications department … and/or Corporate Legal department … should be apprised of Company developments to enable them to evaluate and discuss those events that may impact the disclosure process."[130] The 2014 disclosure policy also designated to an "employee with the title of 'Director' or above in Investor Relations" responsibilities related to "scheduling and developing presentations for meetings and other communications with the financial community, arranging appropriate interviews with Company management," "responding to inquiries from the financial community for additional information," and monitoring disclosures "to ensure accurate reporting and to take corrective measures, if and when necessary."[131]

---

[127] "Qualcomm Incorporated Disclosure Policy," April 28, 2003, Q121SEC00168819–23 at 19.
[128] "Qualcomm Incorporated Disclosure Policy," April 28, 2003, Q121SEC00168819–23 at 20.
[129] "Qualcomm Incorporated Disclosure Policy," April 28, 2003, Q121SEC00168819–23 at 21.
[130] "Qualcomm Incorporated Disclosure Policy," November 2014, Q121SEC00937613–9 at 4.
[131] "Qualcomm Incorporated Disclosure Policy," November 2014, Q121SEC00937613–9 at 4.

71. In 2016, Qualcomm adopted a Disclosure Committee Charter that formed a Disclosure Committee.[132] Qualcomm's Disclosure Committee members included the Company's CFO, CFOs from the QCT and QTL business units, and "key personnel" from the Corporate Controllership, General Counsel, Investor Relations, Financial Planning, Internal Audit, Tax, Treasury, Compliance, Human Resources, and Engineering departments.[133] Not all individuals were necessarily members of this Disclosure Committee at all times. The membership of this Disclosure Committee varied based on the type of disclosure that was discussed. For example, personnel from Human Resources and Engineering were not involved in preparation of Forms 10-K or 10-Q.[134] Moreover, some personnel were designated as members of this Disclosure Committee "on an as-needed basis … depending on the content" of the disclosure.[135] For example, for disclosures contained in Forms 8-K, other than earnings releases, the Disclosure Committee was comprised of the CFO, key personnel from Corporate Controllership, General Counsel, and Investor Relations, and key personnel on an as-needed basis from Financial Planning, Tax, and Compliance.[136]

72. Qualcomm's 2016 Disclosure Committee Charter stated the following as the purpose of the Disclosure Committee:

> "The Committee has been formed to assist the officers and directors of the Company in their consideration of public disclosures made or to be made by or on behalf of the Company, including assisting the Senior Officers in their certification obligations under applicable law and stock exchange regulations, and to help ensure that public disclosures made by the Company, including those in its Securities and Exchange Commission (the 'SEC') filings and to the investment community, comply with the high standards of public disclosure as well as applicable laws and stock exchange regulations."[137]

73. The Company's 2016 Disclosure Committee Charter stated the following as the responsibilities of the Disclosure Committee:

a. "Review the Company's (i) Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, proxy statement, registration statements, and any other information filed with, or submitted to, the SEC …

[132] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6.
[133] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6.
[134] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6.
[135] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6.
[136] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6.
[137] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6 at 5. The "Senior Officers" include the CEO and CFO of Qualcomm.

(ii) press releases containing financial information, earnings guidance, forward-looking statements with respect to financial data or information about material transactions and (iii) materials presented at Analyst Day, the Annual Stockholder Meeting or in connection with any debt or equity roadshow (collectively, the 'Disclosure Statements')."[138]

b. "Participate in discussions and make recommendations to the Senior Officers regarding decisions related to materiality of information and determination of disclosure obligations with respect to the Disclosure Statements."[139]

c. "Discuss with the Senior Officers all other relevant information with respect to the Committee's proceedings and the preparation of the Disclosure Statements."[140]

d. "The Committee shall also have such other responsibilities as the Senior Officers may assign to it from time to time."[141]

74. According to the Company's 2016 Disclosure Committee Charter, the Disclosure Committee met or acted "as frequently and as formally or informally as it deem[ed] necessary to facilitate the fulfillment of its responsibilities."[142]

75. **Exhibit 3** summarizes the composition of the Disclosure Policy Committee designated by the 2003 disclosure policy, the group of individuals designated by the 2014 updated disclosure policy to perform a similar disclosure-related role, and the Disclosure Committee designated by the 2016 Disclosure Committee Charter. As I discuss below in Section V.D.1, during the Class Period, the Company held meetings of the Disclosure Compliance Review Committee[143] as part of the disclosure process for Forms 10-K and 10-Q.[144] The Disclosure Compliance Review Committee was involved in reviewing quarterly and annual SEC filings, consistent with the disclosure customs and practices for Disclosure

---

[138] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6 at 5.
[139] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6 at 5.
[140] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6 at 5.
[141] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6 at 5.
[142] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6 at 6.
[143] It appears that the Disclosure Compliance Review Committee was internally referred to as the Disclosure Committee even before a Disclosure Committee was formally introduced in 2016. An internal Company email in connection with the preparation of the Form 10-K for FY 2012 shows an individual from AP&R referring to the Disclosure Compliance Review Committee as the Disclosure Committee. *See* Email from Sal Bono to Charles Chivetta et al., "QCT FY12 10K Post Close Draft 1," October 16, 2012, Q2014FTC03354275.
[144] *See, e.g.*, "FY12 Q4 Management Report Audit Committee of the Qualcomm Board of Directors," November 5, 2012, Q121SEC00195953–75 at 54; "FY13 Q3 Management Report Audit Committee of the Qualcomm Board of Directors," July 22, 2013, Q121SEC00196301–21 at 02; "FY14 Q1 Management Report Audit Committee of the Qualcomm Board of Directors," January 27, 2014, Q121SEC00197208–29 at 10; "FY15 Q2 Management Report Audit Committee of the Qualcomm Board of Directors," April 20, 2015, Q121SEC00879780–98 at 82; "Audit Committee Meeting – April 2016 Quarterly Meeting," April 18, 2016, QNDCAL02102650–781 at 659.

Committees in large public companies discussed above in Section IV.C.[145] Also consistent with the disclosure customs and practices for Disclosure Committees in large public companies discussed above in Section IV.C, the Disclosure Compliance Review Committee included senior executives and other management including the CFO (Bill Keitel and George Davis), Controller (Bud Nelson and John Murphy), and individuals from the Investor Relations (Mr. Davidson, John Sinnott, and Mr. Kneeshaw), Legal (Bill Sailer and Mr. Rosenberg), Finance (Erin Polek and Joyce Ford), and Audit (Mark Dunham) departments.[146]

### C. Qualcomm's Investor Relations Team

76. During the Class Period, consistent with the disclosure customs and practices in large public companies discussed in Section IV.C, the Company had an Investor Relations team that played an active role in assisting with the communication of Company disclosures to market participants. As part of its role, the Investor Relations team hosted various events, including conferences and earnings calls, and engaged with analysts who covered the Company.[147]

77. Qualcomm's Investor Relations role involved a cross-functional team that was comprised of individuals from:

- "Accounting practices & reporting
- Financial planning & analysis
- Divisional accounting/finance/marketing/PR/etc.
- Corporate tax
- Treasury
- Global business development
- Public relations
- Management
- Legal (internal & external (DLA Piper))
- Government affairs

[145] *See, e.g.*, Email from Jamie Henson to Dick Grannis, et al., "Qualcomm Fiscal 2012 Disclosure Compliance Review Draft 10-K," October 18, 2012, Q121SEC00794513; Email from Jamie Henson to Dick Grannis, et al., "Qualcomm Q1 Fiscal 2013 Disclosure Compliance Review Draft 10-Q," January 16, 2013, Q121SEC00777056; Email chain from Bud Nelson to Jamie Henson and George Davis, "RE: 10-Q Review Meeting Follow On," April 18, 2013, QNDCAL00812271–2; Email from Joyce Ford to George Davis, et al., "Qualcomm Fiscal 2015 10-K: Disclosure Compliance Review Draft," October 14, 2015, Q2014FTC04817411.

[146] *See, e.g.*, Email from Jamie Henson to Dick Grannis, et al., "Qualcomm Fiscal 2012 Disclosure Compliance Review Draft 10-K," October 18, 2012, Q121SEC00794513; Email from Jamie Henson to Dick Grannis, et al., "Qualcomm Q1 Fiscal 2013 Disclosure Compliance Review Draft 10-Q," January 16, 2013, Q121SEC00777056; Email from Jamie Henson to George Davis, et al., "Qualcomm Q2 Fiscal 2013 Disclosure Compliance Review Draft 10-Q," April 13, 2013, Q121SEC00776715; Email from Joyce Ford to George Davis, et al., "Qualcomm Fiscal 2015 10-K: Disclosure Compliance Review Draft," October 14, 2015, Q2014FTC04817411; "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222; "FY1Q14 Earnings Release Calendar," Q121SEC00879249–54 at 51; "Bill Sailer," LinkedIn, https://www.linkedin.com/in/bill-sailer-88a7a59; "Mark Dunham," LinkedIn, https://www.linkedin.com/in/mark-dunham-b275472b.

[147] Deposition of Warren Kneeshaw, October 7, 2022 ("Kneeshaw Deposition"), p. 74.

- Social responsibility”[148]

The Investor Relations function could also draw upon a “[w]ide variety of additional groups as applicable depending on the topic.”[149]

78. These teams collaborated as part of a “joint effort”[150] on multiple “Key Projects,” including:

- “SEC filings (10-Q/K) disclosure compliance review
- Earnings release/ guidance update
- Earnings call script
- Earnings web slides
- Annual stockholder meeting
- Annual New York analyst day
- Investor conferences
- Tradeshows/in-house investor meetings”[151]

The cross-functional team also assisted with “various ad-hoc reviews of externally disclosed information.”[152]

79. Individuals on the Investor Relations team routinely reviewed disclosures prepared by the Company. When preparing disclosures, Investor Relations would work with individuals from the Company’s relevant business units to review the disclosures for accuracy.[153] A senior member of the Investor Relations team was tasked with monitoring the Company’s disclosures “to ensure accurate reporting and to take corrective measures, if and when necessary.”[154] The Company also designated a senior member of the Investor Relations team as one of “the primary company spokespersons.”[155]

80. A senior member of the Investor Relations team also helped “schedul[e] and develop[] presentations for meetings and other communications with analysts, institutional

[148] “Investor Relations Perspective – GMD,” June 25, 2014, Q121SEC00746290.
[149] “Investor Relations Perspective – GMD,” June 25, 2014, Q121SEC00746290.
[150] “Investor Relations Overview,” Q121SEC00208649–53 at 52.
[151] “Investor Relations Perspective – GMD,” June 25, 2014, Q121SEC00746290.
[152] “Investor Relations Perspective – GMD,” June 25, 2014, Q121SEC00746290.
[153] Davidson Deposition, pp. 223–224.
[154] “Qualcomm Incorporated Disclosure Policy,” April 28, 2003, Q121SEC00168819–23 at 21; “Qualcomm Incorporated Disclosure Policy,” November 2014, Q121SEC00937613–9 at 4.
[155] The Company’s 2014 disclosure policy assigned the senior member of the Investor Relations team as one of the “primary spokespersons for the Company with respect to the financial community.” “Qualcomm Incorporated Disclosure Policy,” April 28, 2003, Q121SEC00168819–23 at 20; “Qualcomm Incorporated Disclosure Policy,” November 2014, Q121SEC00937613–9 at 4.

investors and shareholders, arrang[e] appropriate interviews with Company management and respond[] to inquiries from the public for additional information."[156]

### D. Qualcomm's Practices for Particular Types of Disclosures

#### 1. Qualcomm's Disclosure Practices for Forms 10-K and 10-Q

81. I have reviewed materials related to Qualcomm's process for preparing Forms 10-K and 10-Q during the Class Period. My review indicates that the Company's disclosure process for preparing quarterly and annual SEC filings during the Class Period followed an iterative approach that involved multiple relevant committees, departments, and individuals and was consistent with the disclosure customs and practices in large public companies described in Section IV.

82. Consistent with the disclosure customs and practices in large public companies, many individuals in different positions and departments within Qualcomm participated in an iterative process to prepare, review, check, and approve information contained in the Company's quarterly and annual SEC filings. The financial statements and associated footnotes contained in these SEC filings were "developed through the accounting systems of the company and reviewed through a variety of controllership groups …"[157] Afterwards, Investor Relations and various other individuals and groups, including Company executives, the Company's legal department, and the Audit Committee, reviewed the information and made edits where necessary.[158] This process represented an "extensive" effort over multiple months and involved "tens if not hundreds of people."[159] Consistent with the discussion above in Section IV.C, the Company's process for preparing and finalizing Forms 10-K and 10-Q involved numerous steps and various groups. Each quarter, the Company prepared a calendar outlining the accounting and disclosure process steps that had been taken or were

---

[156] "Qualcomm Incorporated Disclosure Policy," April 28, 2003, Q121SEC00168819–23 at 21. *See also* "Qualcomm Incorporated Disclosure Policy," November 2014, Q121SEC00937613–9 at 4.
[157] Kneeshaw Deposition, pp. 161–162. *See also* D&O Renewal Presentation, 2014, at Q121SEC00495280–7 at 5; Email from Roel Dill to Larry Griffith, "QTL Pre-close Draft of the Q3FY13 10-Q," June 12, 2013, Q121SEC00115547; Email from Chris Thomas to Warren Kneeshaw, et al., "For your review: IR/FP&A Q3 FY13 Draft 10Q," July 8, 2013, Q121SEC00160884; Email chain from Erin Polek to Amy Berguson, "RE: Summary of proposed 10-K changes," June 18, 2013, Q121SEC00335612.
[158] Kneeshaw Deposition, pp. 161–162; Davidson Deposition, p. 15; Deposition of Derek Aberle, September 30, 2022 ("Aberle Deposition"), pp. 28–29; Deposition of Steven Altman, September 7, 2022, p. 216; Deposition of Paul E. Jacobs, September 9, 2022 ("Jacobs Deposition"), pp. 43, 106; Deposition of Steve M. Mollenkopf, September 13, 2022, pp. 197, 203; "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 174; "Qualcomm Audit Committee Meeting," April 21, 2014, Q121SEC00205021–117 at 030; "Qualcomm Audit Committee Meeting," July 21, 2014, Q121SEC00287914–8052 at 7923.
[159] Kneeshaw Deposition, pp. 162–163.

scheduled to occur. For example, the list of steps for the Q3 2013 earnings cycle included the following steps:

- "Accounting Practice Council"
- "Identify All Quarter Events & Material Items"
- "Identify Balance Sheet Review Topics"
- "Tax Issues and Provision Reviews"
- "Issue Balance Sheet Review Topic E-mails"
- "Quarterly Balance Sheet Reviews" by numerous business units including QCT, QTL, Corporate Accounting, and others
- "Legal Dept. Review"
- "Human Resources Dept. Review"
- "Document all QAD Items"
- "Document open items from Balance Sheet Reviews"
- "QC Accounting and Disclosure (QAD) Meeting"
- "SOX Status and Review with PwC"
- "Disclosure Compliance Review Meeting"
- "10-Q Draft to AC, Sr. Mgmt, and other Board Members"
- "Unplugged and Qtr End Status Review w/ CFO"
- "Sr. Mgmt Financial Certifications"
- "PwC Qtrly Review Closure with CFO"
- "AC Chair Qtrly Review with CFO"
- "AC Chair Qtrly Review with PwC"
- "CEO/CFO Final Review and Certification"
- "CEO Executive Session w/PwC and DLA Piper"
- "Audit Committee Meeting"
- "Audit Committee Executive Session"
- "Conf Call Script Review (Reg FD and G)"
- "Management Representation Letter Signed"
- "Earnings Release"
- "8-K Filing with SEC"
- "10-Q Filing with SEC (including XBRL)"
- "Load Supplemental schedules on web site"
- "Conference Call"[160]

83. The process listed above typically began nine weeks before and ended approximately three weeks after the quarter's end, and it entailed "[s]ystematic checks and balances" from the "CEO, CFO, Controller, Treasury, Legal, Tax, Internal Audit, [Investor Relations], [Human Resources], [and outside counsel] DLA Piper."[161]

---

[160] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 174. Similar calendars were prepared throughout the Class Period. *See, e.g.*, "FY12 Q1 Management Report: Audit Committee of the Qualcomm Board of Directors," January 30, 2012, Q121SEC00194425–38 at 26; "Qualcomm Audit Committee Meeting," April 21, 2014, Q121SEC00205021–117 at 030; "FY15 Q3 Management Report: Audit Committee of the Qualcomm Board of Directors," July 20, 2015, Q121SEC00879959–79 at 61; "FY16 Q1 Management Report: Audit Committee of the Qualcomm Board of Directors," January 25, 2016, Q121SEC00880194–216 at 197.

[161] D&O Renewal Presentation, 2014, at Q121SEC00495280–7 at 5.

84. According to the 2016 Disclosure Committee Charter, various individuals from the Disclosure Committee contributed to the disclosure process for Forms 10-K and 10-Q. As summarized in **Exhibit 3**, "key personnel of the Company" including the CFO, QCT and QTL CFOs, Corporate Controllership, General Counsel, Financial Planning, Internal Audit, Investor Relations, Tax, Treasury, and Compliance departments were part of the Disclosure Committee that prepared Forms 10-K and 10-Q.[162] The Disclosure Compliance Review Committee[163] met as part of the Company's disclosure process for Forms 10-K and 10-Q.[164] In advance of these meetings, members of the Disclosure Compliance Review Committee received drafts of the Forms 10-K and 10-Q for "review and discussion" at the meeting.[165]

85. Additionally, multiple individuals were assigned to prepare and review portions of the Forms 10-K and 10-Q. For example, a list assigning responsibilities for the preparation of the Q3 2013 Form 10-Q shows that Roel Dill (Sr. Manager of AP&R), Chris Thomas (Staff Technical Accountant of AP&R), Sal Bono (Financial Reporting Sr.), Ms. Polek (Director of AP&R), Reza Barzegar (Accountant), and Ms. Ford (Sr. Director, Finance) were assigned to prepare various sections of the MD&A, and Ms. Ford, Ms. Polek, Jamie Henson (VP of AP&R), and Mr. Dill were assigned to review sections of the MD&A that they did not prepare.[166]

---

[162] "Qualcomm Incorporated Charter of the Disclosure Committee," July 11, 2016, Q121SEC00320235–6.

[163] As discussed above in Section V.B, even before the Disclosure Committee was formally created by the 2016 Disclosure Committee Charter, it appears that the Disclosure Compliance Review Committee was internally referred to as the Disclosure Committee.

[164] *See, e.g.*, "FY12 Q4 Management Report Audit Committee of the Qualcomm Board of Directors," November 5, 2012, Q121SEC00195953–75 at 54; "FY13 Q3 Management Report Audit Committee of the Qualcomm Board of Directors," July 22, 2013, Q121SEC00196301–21 at 02; "FY14 Q1 Management Report Audit Committee of the Qualcomm Board of Directors," January 27, 2014, Q121SEC00197208–29 at 10; "FY15 Q2 Management Report Audit Committee of the Qualcomm Board of Directors," April 20, 2015, Q121SEC00879780–98 at 82; "Audit Committee Meeting – April 2016 Quarterly Meeting," April 18, 2016, QNDCAL02102650–781 at 659.

[165] *See, e.g.*, Email from Jamie Henson to Dick Grannis, et al., "Qualcomm Fiscal 2012 Disclosure Compliance Review Draft 10-K," October 18, 2012, Q121SEC00794513; Email from Jamie Henson to Dick Grannis, et al., "Qualcomm Q1 Fiscal 2013 Disclosure Compliance Review Draft 10-Q," January 16, 2013, Q121SEC00777056; Email from Jamie Henson to George Davis, et al., "Qualcomm Q2 Fiscal 2013 Disclosure Compliance Review Draft 10-Q," April 13, 2013, Q121SEC00776715; Email from Joyce Ford to George Davis, et al., "Qualcomm Fiscal 2015 10-K: Disclosure Compliance Review Draft," October 14, 2015, Q2014FTC04817411.

[166] Summary_of_Responsibilities_Q3FY 13.xlsx.xlsx, Q121SEC00878777. Similar lists were created for other quarters.. *See, e.g.,* Summary_of_Responsibilities_Q1_FY12.xlsx.xlsx, Q121SEC00878069; Summary_of_Responsibilities_Q2FY 13.xlsx.xlsx, Q121SEC00878611; Summary_of_Responsibilities_Q1FY14.xlsx.xlsx, Q121SEC00879217; FY15 Summary of Year End Responsibilities.xlsx.xlsx, Q121SEC00880117; FY16 Summary of Year End Responsibilities.xlsx, Q121SEC00875109; "FY2Q13 Earnings Release Calendar," Q121SEC00878838–43 at 40; "FY4Q13 Earnings Release Calendar," Q121SEC00878878–84 at 80; "Roel Dill," LinkedIn, https://www.linkedin.com/in/roel-dill-06a07b5/; "Sal Bono," LinkedIn, https://www.linkedin.com/in/sal-bono-9ba90638/. Additional information regarding employee titles from counsel.

86. Following various management review meetings, but before the Company's earnings release, the Company's Audit Committee, which consisted of independent directors,[167] met.[168] Qualcomm executives, senior management, internal auditors, individuals from PwC (Qualcomm's independent auditor), and individuals from DLA Piper (Qualcomm's corporate counsel) were invited to attend these meetings.[169] Prior to the meetings, drafts of the Form 10-Q or 10-K and drafts of the earnings release were circulated to members of the Committee for their review.[170] Reports were also prepared and circulated to the Audit Committee prior to the meetings, summarizing the Company's financial performance and the independent auditor's review of the financial statements.[171]

87. Consistent with customary responsibilities of audit committees in large public companies to review draft disclosure materials and assess whether those materials comply with legal and regulatory requirements, the Audit Committee reviewed the Company's financial results, draft SEC filings, and disclosure processes.[172] Additionally, the independent auditor reported to the Audit Committee on the auditor's review of the Company's consolidated financial statements.[173]

[167] Qualcomm Incorporated, Form DEF 14A, January, 19, 2012, p. 4; Qualcomm Incorporated, Form DEF 14A, January 17, 2013, p. 4; Qualcomm Incorporated, Form DEF 14A, January 16, 2014, p. 13; Qualcomm Incorporated, Form DEF 14A, January 22, 2015, p. 14; Qualcomm Incorporated, Form DEF 14A, January 21, 2016, pp. 12–13; Qualcomm Incorporated, Form DEF 14A, January 19, 2017 p. 8.

[168] *See, e.g.*, "Qualcomm Audit Committee Meeting," January 30, 2012, Q121SEC00607262–340 at 264; "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 169, 174; "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated," April 21, 2014, Q121SEC00412476–8 at 6–7; "Minutes of a Meeting of the Audit Committee of the Board of Directors of Qualcomm Incorporated," November 2, 2015, Q121SEC00466948–51 at 48–49.

[169] *See, e.g.*, "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated, April 16, 2012," May 1, 2012 Draft, Q121SEC00727430–2 at 0; "Qualcomm Audit Committee Meeting," January 28, 2013, Q121SEC00587353–434 at 353–354; "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated," January 27, 2014, Q121SEC00412359–61 at 59; "Minutes of a Meeting of the Audit Committee of the Board of Directors of Qualcomm Incorporated," November 2, 2015, Q121SEC00466948–51 at 48.

[170] *See, e.g.*, "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated, April 22, 2013," May 1, 2013 Draft, Q121SEC00196297–9 at 8; "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated, July 16, 2012," July 23, 2012 Draft, Q121SEC00727569–71 at 70; "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated," April 21, 2014, Q121SEC00412476–8 at 7; "Minutes of a Meeting of the Audit Committee of the Board of Directors of Qualcomm Incorporated," November 2, 2015, Q121SEC00466948–51 at 49–50; "Qualcomm Audit Committee Meeting," October 9, 2016, QNDCAL02106013–181 at 021.

[171] *See, e.g.*, "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated, April 22, 2013," May 1, 2013 Draft, Q121SEC00196297–9 at 7–8; "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated, April 16, 2012," May 1, 2012 Draft, Q121SEC00727430–2 at 0–1; "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated," April 21, 2014, Q121SEC00412476–8 at 6–7; "Minutes of a Meeting of the Audit Committee of the Board of Directors of Qualcomm Incorporated," November 2, 2015, Q121SEC00466948–51 at 48–49"Qualcomm Audit Committee Meeting," October 9, 2016, QNDCAL02106013–181 at 020–021.

[172] *See, e.g.*, "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated, April 22, 2013," May 1, 2013 Draft, Q121SEC00196297–9 at 7–8; "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated, April 16, 2012," May 1, 2012 Draft, Q121SEC00727430–2 at 0–1; "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated," January 27, 2014, Q121SEC00412359–61 at 59–60; "Minutes of a Meeting of the Audit Committee of the Board of Directors of Qualcomm Incorporated," November 2, 2015, Q121SEC00466948–51 at 48, 50; "Qualcomm Audit Committee Meeting," October 9, 2016, QNDCAL02106013–181 at 20–21.

[173] *See, e.g.*, "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated, April 22, 2013," May 1, 2013 Draft, Q121SEC00196297–9 at 8; "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated, July 16, 2012," July 23, 2012 Draft, Q121SEC00727569–71 at 70; "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated," April 21, 2014, Q121SEC00412476–8 at 7; "Minutes of a Meeting of the

88. Exemplar Audit Committee meeting minutes for the Q3 2013 reporting period noted that the Audit Committee was briefed by management on "the material changes from the prior periods with respect to various line-items of the financial statements, including an analysis of the factors influencing those changes," and "provided an update on customer incentives."[174] The minutes also indicate that prior to the meeting, the Audit Committee received the draft Form 10-Q and the committee members "did not have any questions about or comments" on it at that time.[175] During the meeting, "members of the Committee asked numerous questions about the financial statements and other aspects of the Company's financial results."[176]

89. Additionally, a written report by PwC related to its review of the Company's financial statements was provided to the Audit Committee prior to the meeting and was discussed during the meeting.[177] The report listed numerous procedures conducted by PwC as part of its review, including:

- "Inquiries of management and others in the organization and reading of internal audit reports."
- "Review of memos prepared by management and reading of underlying contracts, where appropriate, on the more significant accounting matters that arose during the quarter."
- "Attendance at management's quarterly, pre-close Balance Sheet Review meetings for each of the business units and corporate functions."
- "Attendance at the Disclosure Compliance Review meeting, reading of the Company's certification letters and attendance at the CEO/CFO certification meeting."
- "Obtaining a management representation letter."
- "Reading the Form 10-Q."[178]

90. Based on the materials I have reviewed, I conclude that the Company's disclosure process for preparing quarterly and annual SEC filings during the Class Period followed an iterative approach that involved multiple relevant committees, departments, and individuals

---

Audit Committee of the Board of Directors of Qualcomm Incorporated," November 2, 2015, Q121SEC00466948–51 at 49; "Qualcomm Audit Committee Meeting," October 9, 2016, QNDCAL02106013–181 at 021.

[174] "Qualcomm Audit Committee Meeting," November 4, 2013, Q121SEC00772265–434 at 268–269.

[175] "Qualcomm Audit Committee Meeting," November 4, 2013, Q121SEC00772265–434 at 269.

[176] "Qualcomm Audit Committee Meeting," November 4, 2013, Q121SEC00772265–434 at 269. *See also* "Minutes of the Audit Committee of the Board of Directors of Qualcomm Incorporated, April 22, 2013," May 1, 2013 Draft, Q121SEC00196297–9 at 8.

[177] "Qualcomm Audit Committee Meeting," November 4, 2013, Q121SEC00772265–434 at 269.

[178] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 207–208.

and was consistent with the disclosure customs and practices in large public companies described in Section IV.

### 2. Qualcomm's Practices for Earnings Disclosures

91. As discussed above in Section V.D.1, the Company followed an iterative process involving multiple departments and individuals for preparing its Forms 10-K and 10-Q. I similarly review the Company's process for preparing earnings disclosures, focusing my review on the period leading up to and following the analyst conferences in 2012 and 2013 containing the at-issue disclosures. My review indicates that the Company's disclosure process for preparing earnings disclosures in the period leading up to and following the analyst events containing the at-issue disclosures followed an iterative approach that involved multiple relevant departments and individuals and was consistent with the disclosure customs and practices in large public companies described in Section IV.

92. After the end of each fiscal quarter, Qualcomm announced its earnings in a press release and held an earnings call.[179] In connection with earnings calls, Qualcomm typically published slides that summarized the Company's operating results and business developments during the quarter.[180] Consistent with the disclosure customs and practices in large public companies, many individuals in different positions and departments within Qualcomm participated in an iterative process to prepare, review, and approve information that would be disclosed in earnings press releases and during the earnings calls.

93. Preparation for earnings press releases and earnings calls began several weeks in advance and involved numerous individuals from multiple teams. Individuals from the

---

[179] *See, e.g.*, "Qualcomm Announces Record First Quarter Fiscal 2012 Results," February 1, 2012, https://investor.qualcomm.com/news-events/press-releases/detail/334/qualcomm-announces-record-first-quarter-fiscal-2012-results#:~:text=--%20Record%20First%20Quarter%20Results%2C%20Raising%20Fiscal%202012,%20%20%20%203%20more%20rows%20; "Qualcomm Announces Fourth Quarter and Fiscal 2012 Results Fiscal 2012 Revenues $19.1 Billion," November 6, 2012, https://www.qualcomm.com/news/releases/2012/11/qualcomm-announces-fourth-quarter-and-fiscal-2012-results-fiscal-2012#:~:text=Qualcomm%20Announces%20Fourth%20Quarter%20and%20Fiscal%202012%20Results,offered%20by%20Qualcomm%20Technologies%2C%20Inc.%20and%2F; "Qualcomm Announces Third Quarter Fiscal 2013 Results," July 23, 2013, https://www.qualcomm.com/news/releases/2013/07/qualcomm-announces-third-quarter-fiscal-2013-results; "Qualcomm Announces Fourth Quarter and Fiscal 2013 Results," November 5, 2013, https://www.qualcomm.com/news/releases/2013/11/qualcomm-announces-fourth-quarter-and-fiscal-2013-results.

[180] *See, e.g.*, "Fourth Quarter Fiscal 2012 Earnings," *Qualcomm*, November 7, 2012, https://d1io3yog0oux5.cloudfront.net/_4508f36106307b067fbb404cbc1bb3af/qualcomm/db/773/6365/file/Q4FY12+Earnings+Web+Final.pdf; "First Quarter Fiscal 2013 Earnings," *Qualcomm*, January 30, 2013, https://d1io3yog0oux5.cloudfront.net/_4508f36106307b067fbb404cbc1bb3af/qualcomm/db/773/6370/file/Q1FY13+Executive+Presentation.pdf; "Second Quarter Fiscal 2013 Earnings," *Qualcomm*, April 24, 2013, https://d1io3yog0oux5.cloudfront.net/_4508f36106307b067fbb404cbc1bb3af/qualcomm/db/773/6374/file/Q2FY13+Executive+Presentation.pdf; "Edited Transcript: QCOM - Q4 2012 Qualcomm Inc Earnings Conference Call," November 7, 2012, Q121SEC00759765–84; "Edited Transcript: QCOM - Q1 2013 Qualcomm Inc. Earnings Conference Call," January 30, 2013, Q121SEC00759785–804; "Edited Transcript: QCOM - Q2 2013 Qualcomm Inc. Earnings Conference Call," April 24, 2013, Q121SEC00759805–23.

General Ledger department began the process by preparing information used in the Company's financial statements and disclosures.[181] The Financial Planning and Analysis ("FP&A") team then received budgets and forecasts from the Company's business units and consolidated the "submissions into a baseline and produce[d] [an] Executive Presentation."[182] The FP&A team also coordinated with individuals from other teams, including Investor Relations, AP&R, and Corporate Tax to prepare earnings disclosure materials including the "CFO Earnings Package"; "CFO Narrative"; "Guidance Table"; and "Certification and Tie-Out" of the "Earnings Release, Executive Scripts, 10-K/10-Q, Webslides, [and] Reconciliations."[183]

94. Investor Relations also played a role in the earnings release process. Individuals from Investor Relations helped to refine, update, "ensure alignment … and obtain input/review from working teams" on "key [Investor Relations] deliverables," including "Earnings Release (ER), Executive Presentation, Scripts, FAQ, IR Fast Facts, [and] PR Earnings Highlights."[184] Additionally, Investor Relations met with various groups including the Audit Committee, FP&A, and AP&R to review and discuss earnings materials; collaborated with FP&A and AP&R to draft the earnings release; and circulated drafts of the earnings release to individuals from various teams.[185]

95. Prior to earnings calls, Investor Relations helped draft scripts to be used by management during the calls.[186] Drafts of these scripts were provided to multiple individuals from different departments, including Jim Lederer (EVP & General Manager, QCT), Sanjay Mehta (SVP & CFO, QCT), Murthy Renduchintala (EVP, Qualcomm Technologies Inc. and Co-President, Qualcomm CDMA Technologies), Cristiano Amon (President, QCT), Tim McDonough (VP & Chief Marketing Officer, Qualcomm CDMA Technologies), Steven Mollenkopf (President & COO), Derek Aberle (EVP & President, QTL), and Mr. Sinnott (Sr. Director of Investor Relations).[187] These individuals reviewed, edited, and iterated on the

---

[181] "Qualcomm's Quarterly Earnings Release Process," May 6, 2014, Q121SEC00737441–56 at 42–43.
[182] "Qualcomm's Quarterly Earnings Release Process," May 6, 2014, Q121SEC00737441–56 at 44.
[183] "Qualcomm's Quarterly Earnings Release Process," May 6, 2014, Q121SEC00737441–56 at 45.
[184] "Qualcomm's Quarterly Earnings Release Process," May 6, 2014, Q121SEC00737441–56 at 46.
[185] "Qualcomm's Quarterly Earnings Release Process," May 6, 2014, Q121SEC00737441–56 at 46, 54–55.
[186] Kneeshaw Deposition, p. 75; Davidson Deposition, pp. 10–12; Email chain from Warren Kneeshaw to Paul Kranhold, "RE: Draft Questions," October 31, 2013, Q121SEC00804271–2.
[187] *See, e.g.*, Kneeshaw Deposition Exhibit 662, Q2014FTC00552116–27. *See also* Email chain from Eric Lam to Chris Thomas and Taylor Cabaniss, "RE: Q4'12 Certification of Bill K's script," Q121SEC00164067–8; Email chain from John Sinnott to Steven Mollenkopf, et al., "RE: earnings call major themes," July 22, 2013, Q2014FTC04006669–71; "Email chain from Warren Kneeshaw to Steven Mollenkopf, et al., "RE: key point on mix for script," July 24, 2013, QNDCAL00811967–8; Email chain from Steven Mollenkopf to Warren Kneeshaw, "RE: SM Script FY13Q3 v3 2 gsd edits," July 20, 2013, Q2014FTC01825440–2; "Q2FY13 Earnings Release Calendar," Q121SEC00878838–43 at 40;

draft scripts.[188] The Company's General Counsel also reviewed the scripts to "make sure [he was] comfortable as the general counsel with what Qualcomm and its senior executives were telling investors."[189] Individuals from AP&R and the Corporate Controller were also tasked with reviewing scripts when necessary and providing comments and edits to Investor Relations.[190] At times, remarks given during the calls were prerecorded.[191] Dr. Paul Jacobs (former CEO and Executive Chairman) testified at deposition that there was "an effort on [his] part to be truthful and accurate during the calls," and that he had the same expectation of the other Qualcomm executives.[192]

96. Investor Relations also prepared Q&A talking points concerning analysts' anticipated topics of interest and assisted in preparing the management team for earnings calls.[193] As part of this process, Qualcomm's General Counsel participated in "preliminary discussions about what was going to be discussed and the possible questions that would be asked and how [management] would respond to them."[194] According to the Company's AP&R Investor Relations Procedures, individuals from AP&R also assisted with the preparation for analyst questions.[195] Prior to the earnings call, Investor Relations was to "forward accounting-related questions that they receive[d] or expect[ed] to receive from analysts," after which AP&R would "[c]oordinate responses with the applicable parties."[196] AP&R would also "[r]eview any responses drafted by other departments to ensure accuracy and reasonableness" and

---

"FY4Q13 Earnings Release Calendar," Q121SEC00878878–84 at 80; "Dr. Murthy Renduchintala," LinkedIn, https://www.linkedin.com/in/dr-murthy-renduchintala-0a79891/details/experience/; "Cristiano R. Amon," LinkedIn, https://www.linkedin.com/in/cristiano-r-amon/; "Tim McDonough," LinkedIn, https://www.linkedin.com/in/timothymcdonough/details/experience/; "Sanjay Mehta," LinkedIn, https://www.linkedin.com/in/sanjay-mehta-1139517a/.

[188] *See, e.g.*, Kneeshaw Deposition Exhibit 662, Q2014FTC00552116–27. *See also* Email chain from Eric Lam to Chris Thomas and Taylor Cabaniss, "RE: Q4'12 Certification of Bill K's script," Q121SEC00164067–8; Email chain from John Sinnott to Steven Mollenkopf, et al., "RE: earnings call major themes," July 22, 2013, Q2014FTC04006669–71; "Email chain from Warren Kneeshaw to Steven Mollenkopf, et al., "RE: key point on mix for script," July 24, 2013, QNDCAL00811967–8; Email chain from John Sinnott to Akash Palkhiwala, "RE: *Revised Draft* Steve Earnings Script," April 22, 2013, Q2014FTC04721694–5; Email chain from Warren Kneeshaw to Neil Martin, et al., "RE: Draft Scripts - Legal Privilege," October 31, 2015, Q121SEC00658615–8; Email chain from Clare Conley to Greg Heinzinger and Warren Kneeshaw, "RE: earning script," July 2, 2013, Q121SEC00269105–7; Email chain from Steven Mollenkopf to Warren Kneeshaw, "RE: SM Script FY13Q3 v3 2 gsd edits," July 20, 2013, Q2014FTC01825440–2.

[189] Deposition of Donald J. Rosenberg, October 12, 2022 ("Rosenberg Deposition"), pp. 30–31.

[190] "Qualcomm Incorporated Accounting Practices and Reporting Group (AP&R)," March 23, 2015, Q121SEC00937620–31 at 25.

[191] Jacobs Deposition, p. 56.

[192] Jacobs Deposition, pp. 9–11, 56–57.

[193] "Third Quarter Fiscal 2013 Earnings, Investor Question Topics & Messaging Notes," Q121SEC00752353–65; Kneeshaw Deposition, pp. 75–76; Davidson Deposition, p. 86; Email chain from Warren Kneeshaw to Steven Mollenkopf, "RE: SM Script FY13Q3 v3 2 gsd edits," July 20, 2013, Q2014FTC04820411; "Third Quarter Fiscal 2013 Earnings: Investor Question Topics & Messaging Notes," Q2014FTC04820412–22.

[194] Rosenberg Deposition, p. 30.

[195] "Qualcomm Incorporated Accounting Practices and Reporting Group (AP&R)," March 23, 2015, Q121SEC00937620–31 at 20, 29.

[196] "Qualcomm Incorporated Accounting Practices and Reporting Group (AP&R)," March 23, 2015, Q121SEC00937620–31 at 29.

would assist Investor Relations with identifying information that had already been publicly disclosed.[197]

97. As mentioned above, "Fast Facts" documents were prepared by Investor Relations as part of the earnings release process.[198] These documents contained "all pertinent public data points that the [Investor Relations] team use[d] when talking to the investment community."[199] A variety of publicly available information, including earnings results, slides from prior Company events, message guides, and facts about Qualcomm were included in the documents.[200] The Fast Facts documents were updated "before and after quarterly earnings and guidance updates," as well as prior to some Company events.[201]

98. Qualcomm also published slides in connection with its earnings calls. Individuals from multiple teams, including FP&A, AP&R, QTL, and Investor Relations worked on the slides.[202] Investor Relations coordinated the development of the slides and updated the slide content based on the Company's earnings press release.[203] Individuals from Finance and AP&R provided some of the content used in the slides and proofread drafts of the presentations.[204] For example, on January 29, 2013, Min Shan (Staff Analyst of Investor Relations) circulated a draft of the slides to Mr. Thomas, Eric Lam (Sr. Manager of Finance), Adam Johnson (Staff Financial Analyst), and Taylor Cabaniss (Sr. Director of Finance) (and copied Ms. Polek and Amy Berguson (Director of Investor Relations)).[205] After receiving the draft slides, Mr. Lam provided comments from the FP&A team, and these comments were incorporated into the presentation.[206]

---

[197] "Qualcomm Incorporated Accounting Practices and Reporting Group (AP&R)," March 23, 2015, Q121SEC00937620–31 at 29.

[198] "Qualcomm's Quarterly Earnings Release Process," May 6, 2014, Q121SEC00737441–56 at 46.

[199] "Process Documentation: Taylor Searles," Q121SEC00122439–59 at 44.

[200] *See, e.g.*, "Qualcomm Incorporated Investor Relations – Fast Facts," December 20, 2013, Q121SEC00751809–917.

[201] *See, e.g.,* Email from Rikta Nagrani, "Fast Facts Updates," February 24, 2012, Q121SEC00651268; "Process Documentation: Taylor Searles," Q121SEC00122439–59 at 44.

[202] *See, e.g.*, "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222; "Qualcomm's Quarterly Earnings Release Process," May 6, 2014, Q121SEC00737441–56 at 45, 49–50, 54; Email from Min Shan to Chris Thomas, "Q4 ER Slides," November 6, 2012, Q121SEC00663252; Email from Amy Berguson to John Sinnott, "FW: Q4FY12 ER Slides," November 7, 2012, Q121SEC00404508–9; "Q1FY13 Earnings Release Calendar," Q121SEC00878582–7 at 2; "Q2FY13 Earnings Release Calendar," Q121SEC00878684–9 at 4.

[203] *See, e.g.*, "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222; "Q1FY13 Earnings Release Calendar," Q121SEC00878582–7 at 2; "Q2FY13 Earnings Release Calendar," Q121SEC00878684–9 at 4; "Qualcomm's Quarterly Earnings Release Process," May 6, 2014, Q121SEC00737441–56 at 54.

[204] *See, e.g.*, "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222; "Q1FY13 Earnings Release Calendar," Q121SEC00878582–7 at 2; "Q2FY13 Earnings Release Calendar," Q121SEC00878684–9 at 4; "Qualcomm's Quarterly Earnings Release Process," May 6, 2014, Q121SEC00737441–56 at 54.

[205] Email chain from Chris Thomas to David Zuckerman and Doug Rein, "FW: Q1FY13 ER Web Slides," January 30, 2013, Q121SEC00436733–4 at 4; "QY1FY13 Earnings Release Calendar," Q121SEC00878582–7 at 4; "Adam Johnson," LinkedIn, https://www.linkedin.com/in/adam-johnson-6062335/.

[206] Email chain from Chris Thomas to David Zuckerman and Doug Rein, "FW: Q1FY13 ER Web Slides," January 30, 2013, Q121SEC00436733–4 at 3; "First Quarter Fiscal 2013 Earnings," January 30, 2013, Q121SEC00436735–56. A similar process was followed for other quarters. *See, e.g.*, Email chain from Min Shan to Eric Lam and Adam Johnson, "RE:

99. Each quarter, Investor Relations prepared an earnings release calendar that listed events to be completed for the earnings release.[207] The following selected events from the earnings release calendar for Q4 2012 demonstrates the iterative process described above:

- 10/16/12: Meeting with individuals from Investor Relations, Finance, AP&R, Corporate Finance, and Market Intelligence to "discuss initial draft."[208]
- 10/19/12: Distribution of first draft of the earnings release to individuals from Legal, Treasury, Investor Relations, Finance, Controllership, AP&R, Corporate Finance, Tax, and Market Intelligence.[209]
- 10/23/12: Meeting to discuss draft of the earnings release with individuals from Legal, Treasury, Investor Relations, Finance, Controllership, AP&R, Corporate Finance, Tax, and Market Intelligence, and "[o]btain DLA Piper's approval of latest earnings release."[210]
- 10/25/12: Distribution of the updated draft of the earnings release to individuals from Legal, Treasury, Investor Relations, Finance, Controllership, AP&R, Corporate Finance, Tax, Market Intelligence, and the CFO.[211]
- 10/26/12: Meeting to discuss QCT earnings call material with individuals from QCT, FP&A, and Investor Relations.[212]
- 10/31/12: Update earnings release with guidance and outlook information and distribute updated earnings release to executives and others.[213]

Q2FY13 ER Slides for Review," April 24, 2013, Q121SEC00436796; "Second Quarter Fiscal 2013 Earnings," April 24, 2013, Q121SEC00436797–818; Email chain from Chris Thomas to David Zuckerman, "FW: Q4FY13 ER Slides," November 6, 2013, Q121SEC00499865–6.

[207] "Qualcomm Incorporated Accounting Practices and Reporting Group (AP&R)," March 23, 2015, Q121SEC00937620–31 at 20.

[208] Individuals included Mr. Davidson, Warren Kneeshaw (VP of Investor Relations), Ms. Berguson (Sr. Manager of Investor Relations), Ms. Shan, Ms. Polek, Mr. Thomas (Sr. Technical Accountant of AP&R), John Gilbert (VP of Corporate Finance), Mr. Cabaniss, Mr. Lam, Rikta Nagrani (Senior Analyst of Investor Relations), and Pete Lancia (Sr. Director of Market Intelligence). *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[209] Individuals included Mr. Davidson, Mr. Kneeshaw, Mr. Sinnott, Ms. Berguson, Ms. Shan, Ms. Polek, Mr. Thomas, Mr. Cabaniss, Mr. Lam, Ms. Nagrani, Mr. Lancia, Mr. Gilbert, David Zuckerman (VP & Legal Counsel), Richard Grannis (Sr. VP & Treasurer), Mr. Nelson (Sr. VP & Corporate Controller), Ms. Henson, Ryan Gibbs (Sr. Financial Analyst), Tim Jackson (Financial Analyst), Steve Gardner (VP of Tax and Trade), Heidi Wagner (Director of Tax), Jay Rains (DLA Piper), and Doug Rein (DLA Piper). *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[210] Individuals included Mr. Davidson, Mr. Kneeshaw, Mr. Sinnott, Ms. Berguson, Ms. Shan, Ms. Polek, Mr. Thomas, Mr. Cabaniss, Mr. Lam, Ms. Nagrani, Mr. Lancia, Mr. Gilbert, Mr. Zuckerman, Mr. Grannis, Mr. Nelson, Ms. Henson, Mr. Gibbs, Mr. Jackson, Mr. Gardner, Ms. Wagner, Mr. Rains, and Mr. Rein. *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[211] Individuals included Mr. Davidson, Mr. Kneeshaw, Mr. Sinnott, Ms. Berguson, Ms. Shan, Ms. Polek, Mr. Thomas, Mr. Cabaniss, Mr. Lam, Ms. Nagrani, Mr. Lancia, Mr. Gilbert, Mr. Zuckerman, Mr. Grannis, Mr. Nelson, Ms. Henson, Mr. Gibbs, Mr. Jackson, Mr. Gardner, Ms. Wagner, Mr. Rains, Mr. Rein, and Mr. Keitel (CFO). *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[212] Individuals included "Sanjay M., Akash P., Jiten B., Andrew W., Tim M., John G., Taylor C., Eric L., Warren K., John S., Amy B., Min S, [and] Rikta N." *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222; "2012 Q4 BU Certification checklist.xlsx," Q121SEC00874176.

[213] The updated draft was sent by email to Dr. Jacobs, Steve Altman (Vice Chairman), Mr. Mollenkopf, Mr. Keitel, Mr. Aberle, Don Rosenberg (EVP & General Legal Counsel), Mr. Davidson, Mr. Kneeshaw, and Mr. Rains (and copying Mr. Zuckerman, Mr. Grannis, Mr. Lederer, Ms. Berguson, Mr. Nelson, Ms. Henson, Ms. Polek, Mr. Thomas, Mr. Gilbert, Mr. Cabaniss, Mr. Lam, Mr. Gibbs, Mr. Jackson, Mr. Gardner, Ms. Wagner, Mr. Sinnott, Mr. Lancia, Ms. Shan, Ms. Nagrani, Dan Novak (VP of Global Marketing), and Mr. Rein). *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

- 11/1/12: Guidance review meeting with individuals from FP&A, Investor Relations, and AP&R and walk through earnings release with executives.[214]
- 11/2/12: Meeting to discuss final draft with individuals from Legal, Treasury, Investor Relations, Finance, Controllership, AP&R, Corporate Finance, Tax, Market Intelligence, and the CFO.[215]
- 11/2/12: "Email [Audit Committee] Draft of Earnings Release."[216]
- 11/2/12: Draft of earnings release sent to PwC.[217]
- 11/5/12: Audit Committee Meeting.[218]
- 11/5/12: Investor Relations and AP&R to review Audit Committee changes.[219]
- 11/5/12: Investor Relations to "[u]pdate Webslides per the latest draft."[220]
- 11/5/12: Public Relations review of material for grammar and trademarks.[221]
- 11/6/12: Earnings Release sent to executives and others for final approval.[222]
- 11/6/12: Web schedules and reconciliations to be emailed to Investor Relations.[223]
- 11/6/12: AP&R to "[p]roofread and tick & tie Webslides."[224]
- 11/6/12: Investor Relations and AP&R to send earnings release to wire service.[225]
- 11/6/12: "Final walkthrough" of earnings release to be conducted by "Office of the CFO."[226]
- 11/7/12: Investor Relations and AP&R to "[r]ead through and proof" earnings release wire and Form 8-K.[227]
- 11/7/12: Mr. Kneeshaw to "[a]uthorize outgoing Earnings Release."[228]

---

[214] Individuals involved in the guidance review meeting included "John G., Taylor C., Eric L., Warren K., John S., Amy B., Min S., Rikta N., Erin P., [and] Chris Thomas." "Executive walk-through" of earnings release involved Mr. Kneeshaw (Investor Relations VP) and other attendees "[a]s needed." *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[215] Individuals included Mr. Davidson, Mr. Kneeshaw, Mr. Sinnott, Ms. Berguson, Ms. Shan, Ms. Polek, Mr. Thomas, Mr. Cabaniss, Mr. Lam, Ms. Nagrani, Mr. Lancia, Mr. Gilbert, Mr. Zuckerman, Mr. Grannis, Mr. Nelson, Ms. Henson, Mr. Gibbs, Mr. Jackson, Mr. Gardner, Ms. Wagner, Mr. Rains, Mr. Rein, and Mr. Keitel. *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222. *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[216] The updated draft was sent by email to Dr. Jacobs, Mr. Altman, Mr. Mollenkopf, Mr. Keitel, Mr. Aberle, Mr. Rosenberg, Mr. Davidson, Mr. Kneeshaw, and Mr. Rains (and copying Mr. Zuckerman, Mr. Grannis, Mr. Lederer, Ms. Berguson, Mr. Nelson, Ms. Henson, Ms. Polek, Mr. Thomas, Mr. Gilbert, Mr. Cabaniss, Mr. Lam, Mr. Gibbs, Mr. Jackson, Mr. Gardner, Ms. Wagner, Mr. Sinnott, Mr. Lancia, Ms. Shan, Ms. Nagrani, Mr. Novak, and Mr. Rein). *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[217] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[218] Individuals and entities who were to attend the meeting include Mr. Keitel, Mr. Davidson, Mr. Kneeshaw, Mr. Nelson, Ms. Henson, Ms. Polek, Mr. Thomas, PwC, Ray Dittamore (Audit Committee), Barbara Alexander (Audit Committee), and Don Cruickshank (Audit Committee). *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[219] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[220] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[221] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[222] The updated draft was sent by email to Dr. Jacobs, Mr. Altman, Mr. Mollenkopf, Mr. Keitel, Mr. Aberle, Mr. Rosenberg, Mr. Davidson, Mr. Kneeshaw, and Mr. Rains (and copying Mr. Zuckerman, Mr. Lederer, Ms. Berguson, Mr. Nelson, Ms. Henson, Ms. Polek, Mr. Thomas, Mr. Gilbert, Mr. Cabaniss, Mr. Lam, Mr. Gibbs, Mr. Jackson, Mr. Sinnott, Mr. Lancia, Ms. Shan, Ms. Nagrani, Mr. Novak, and Mr. Rein). *See* "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[223] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[224] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[225] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[226] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[227] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

[228] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.

- 11/7/12: AP&R to furnish the Form 8-K to the SEC.[229]
- 11/7/12: Investor Relations to provide "formatted version of [earnings release]/slides for the web."[230]
- 11/7/12: Link of posted earnings release to be sent to Web Team.[231]

Similar calendars were prepared for other quarters in the period leading up to and following the conferences in 2012 and 2013 containing the at-issue disclosures.[232]

100. Based on the materials I have reviewed, I conclude that the Company's disclosure process for preparing earnings disclosures in the period leading up to and following the analyst events containing the at-issue disclosures followed an iterative approach that involved multiple relevant departments and individuals and was consistent with the disclosure customs and practices in large public companies described in Section IV.

### 3. Qualcomm's Disclosure Practices for Analyst Events

101. I have reviewed materials related to Qualcomm's process for preparing for analyst conferences and analyst days during the Class Period. In preparing materials for analyst conferences, Qualcomm's Investor Relations team developed talking points responsive to anticipated analyst questions and used material that had been previously prepared for the Company's prior analyst events or earnings releases; those materials were prepared using an iterative approach that involved multiple relevant departments and individuals.[233] My review indicates that the Company's disclosure process for preparing for analyst events during the Class Period involved multiple relevant departments and individuals and was consistent with the disclosure customs and practices in large public companies described in Section IV.

102. During the Class Period, Qualcomm held events with analysts and other market participants. These events included analyst days[234] hosted by Qualcomm and analyst

---

[229] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.
[230] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.
[231] "Q412 Earnings Release Calendar and Task List.xls," Q121SEC00165222.
[232] *See, e.g.*, "FY1Q12 Earnings Release Calendar," Q121SEC00878155–60; "FY2Q12 Earnings Release Calendar," Q121SEC00878295; "Q312 Earnings Release Calendar and Task List.xlsx.xlsx," Q121SEC00878380; "Q1FY13 Earnings Release Calendar," Q121SEC00878582–7 at 2; "Q2FY13 Earnings Release Calendar," Q121SEC00878684–9; "Q2FY13 [*sic*] Earnings Release Calendar," Q121SEC00206912–7 at 2; "FY4Q13 Earnings Release Calendar," Q121SEC00878878–84.
[233] Aberle Deposition, pp. 29–31; Kneeshaw Deposition, pp. 173–174.
[234] At analyst days, Qualcomm management presented on the Company's financials and business to invited analysts and institutional investors. The events were webcast and rebroadcast on Qualcomm's website. *See, e.g.*, "Qualcomm Analyst Day," November 15, 2012, Q121SEC00743078–229; "Qualcomm to Host Analyst Meeting," November 19, 2013, Q121SEC00742446.

conferences hosted by third-parties.[235] During these events, Qualcomm disclosed information about the Company and answered questions from analysts.[236] Qualcomm also sometimes presented slides that summarized the Company's recent operating results and business developments.[237] Below, I discuss Qualcomm's practices for disclosures made at analyst days and analyst conferences.

#### a) Analyst Days

103. In preparing materials for analyst days, Qualcomm followed an iterative approach that involved multiple relevant departments and individuals, who prepared, discussed, reviewed, and checked the disclosures for accuracy. Qualcomm typically held an analyst day each year where management discussed the Company's financials, outlook for the next fiscal year, and strategy.[238] These meetings were announced in advance through a press release and were "by invitation only for financial analysts and institutional investors."[239] The meetings were also webcasted on Qualcomm's website and were available for up to one year following the event.[240] Materials created for Qualcomm's analyst days were sometimes used to prepare for

---

[235] *See, e.g.*, "Qualcomm Inc. at Goldman Sachs Group Inc Technology and Internet Conference – Final," *CQ FD Disclosure*, February 14, 2012; "Qualcomm Inc. at JPMorgan TMT Conference – Final," *CQ FD Disclosure*, May 17, 2012; "Qualcomm at Canaccord Genuity's Global Growth Conference – Final," *CQ FD Disclosure*, August 16, 2012; "Qualcomm at Roth Conference – Final," *CQ FD Disclosure*, March 19, 2013; "Qualcomm at Pacific Crest Global Technology Leadership Forum – Final," *CQ FD Disclosure*, August 12, 2013.

[236] *See, e.g.*, "Qualcomm Inc. at Goldman Sachs Group Inc Technology and Internet Conference – Final," *CQ FD Disclosure*, February 14, 2012; "Qualcomm Inc. at JPMorgan TMT Conference – Final," *CQ FD Disclosure*, May 17, 2012; "Qualcomm at Canaccord Genuity's Global Growth Conference – Final," *CQ FD Disclosure*, August 16, 2012; "Qualcomm at Roth Conference – Final," *CQ FD Disclosure*, March 19, 2013; "Qualcomm at Pacific Crest Global Technology Leadership Forum – Final," *CQ FD Disclosure*, August 12, 2013; "Qualcomm Analyst Day," November 15, 2012, Q121SEC00743078–229 at 216–229; "Qualcomm 2012 Analyst Meeting – Final," *CQ FD Disclosure*, November 15, 2012.

[237] *See, e.g.*, "2013 New York Analyst Day," *Qualcomm*, November 20, 2013, https://ia902607.us.archive.org/33/items/qualcomm_202304/2013_08.pdf; "25th Annual Roth Conference," March 19, 2013, Q121SEC00746302–32.

[238] Aberle Deposition, p. 30. *See also* "Qualcomm Analyst Day," November 15, 2012, Q121SEC00743078–229; "Qualcomm Analyst Meeting – Final," *CQ FD Disclosure*, November 20, 2013; "2014 New York Analyst Day," November 19, 2014, Q121SEC00742447–603.

[239] *See, e.g.*, "Qualcomm to Host Analyst Meeting," Qualcomm, November 14, 2012, https://d1io3yog0oux5.cloudfront.net/_620db46c315a9f549ec2bb723f150ee1/qualcomm/news/2012-11-14_Qualcomm_to_Host_Analyst_563.pdf; "Qualcomm to Host Analyst Meeting," November 19, 2013, Q121SEC00742446; "Qualcomm to Host Analyst Meeting," Qualcomm, November 18, 2014, https://d1io3yog0oux5.cloudfront.net/_620db46c315a9f549ec2bb723f150ee1/qualcomm/news/2014-11-18_Qualcomm_to_Host_Analyst_656.pdf.

[240] *See, e.g.*, "Qualcomm to Host Analyst Meeting," Qualcomm, November 14, 2012, https://d1io3yog0oux5.cloudfront.net/_620db46c315a9f549ec2bb723f150ee1/qualcomm/news/2012-11-14_Qualcomm_to_Host_Analyst_563.pdf; "Qualcomm to Host Analyst Meeting," November 19, 2013, Q121SEC00742446; "Qualcomm to Host Analyst Meeting," Qualcomm, November 18, 2014, https://d1io3yog0oux5.cloudfront.net/_620db46c315a9f549ec2bb723f150ee1/qualcomm/news/2014-11-18_Qualcomm_to_Host_Analyst_656.pdf.

other events, such as the 2012 Credit Suisse Technology Conference, where one of the at-issue disclosures was made.[241]

104. Similar to Qualcomm's practices for earnings calls discussed above, the Company prepared slides summarizing the Company's operating results and business developments and held Q&A sessions.[242] In preparation for these events, scripts were prepared for management's presentations, and "messaging highlights," which summarized various statistics about the Company's operations, were developed.[243]

105. Preparation for Qualcomm's 2012 Analyst Day, held on November 15, 2012, began several months in advance. For example, on August 16, 2012, approximately three months before the 2012 Analyst Day, Ms. Berguson (Sr. Manager of Investor Relations) sent Mr. Kneeshaw, Mr. Sinnott, Pete Lancia (Sr. Director of Market Intelligence), and Mr. Davidson an outline of the analyst day presentation.[244] Ms. Berguson explained that information presented at the prior year's analyst day was included in the outline and that it would need to be updated.[245] She also mentioned that certain sections of the outline were blank until input from QCT was received.[246] Individuals from the group discussed and iterated on the outline, and meetings to review the outlines with the executives who would present at the analyst day were scheduled to occur during the first week of September.[247]

106. Drafts of the slides used in the 2012 Analyst Day were then prepared, reviewed, iterated on, and checked for accuracy by numerous individuals from several teams, including

---

[241] *See, e.g.*, Email chain from Warren Kneeshaw to Amy Berguson, "RE: Credit Suisse 2012 Technology Conference Questions.doc," November 20, 2012, Q121SEC00077593–4 at 3; "Credit Suisse 2012 Technology Conference – Qualcomm, Derek Aberle (EVP and Group President)," Q121SEC00077595–7; Email chain from Amy Berguson to Warren Kneeshaw, "FW: Updated Q&A and Factoids," November 20, 2012, Q121SEC00296927; "Credit Suisse 2012 Technology Conference – Qualcomm, Derek Aberle (EVP and Group President)," Q121SEC00296942–6. *See also* Email from Pete Lancia to Steven Mollenkopf, "upcoming presentations," November 6, 2012, Q2014FTC02126259 ("3G/4G HK summit[:] I believe Paul is no longer attending so you will be giving the keynote and Cristiano will present the QMC positioning. We are planning to leverage both Paul's and your Analyst Day slides for the content as this will be fresh."); "Bloomberg West Broadcast Key Earnings Stats and Factoids & Paul Jacobs," November 28, 2012, Q121SEC00265306–12 at 10–12.

[242] *See, e.g.*, "Qualcomm Analyst Day," November 15, 2012, Q121SEC00743078–229; "2013 New York Analyst Day," *Qualcomm*, November 20, 2013, https://ia902607.us.archive.org/33/items/qualcomm_202304/2013_08.pdf; "2014 New York Analyst Day," November 19, 2014, Q121SEC00742447–603.

[243] *See, e.g.*, "Qualcomm Analyst Day," November 15, 2012, Q121SEC00743078–229; "2012 Analyst Day Messaging Highlights," Q121SEC00754413–20.

[244] Email chain from John Sinnott to Amy Berguson, et al., "RE: NY Analyst Outline Draft 2," August 31, 2012, Q121SEC00070659; "FY2Q12 Earnings Release Calendar," Q121SEC00878295; "FY4Q12 Earnings Release Calendar," Q121SEC00878481–6 at 3.

[245] Email chain from John Sinnott to Amy Berguson, et al., "RE: NY Analyst Outline Draft 2," August 31, 2012, Q121SEC00070659.

[246] Email chain from John Sinnott to Amy Berguson, et al., "RE: NY Analyst Outline Draft 2," August 31, 2012, Q121SEC00070659.

[247] Email chain from John Sinnott to Amy Berguson, et al., "RE: NY Analyst Outline Draft 2," August 31, 2012, Q121SEC00070659; "2012 New York Analyst Day Presentation Topics," Q121SEC00070660–6; Email chain from Pete Lancia to Warren Kneeshaw, "Re:," September 5, 2012, Q121SEC00072672; "2012 New York Analyst Day Presentation Topics," Q121SEC00072673–82; Email from Amy Berguson to Warren Kneeshaw, et al., "NY Outline v6," September 7, 2012, Q121SEC00068870; "2012 New York Analyst Day Presentation Topics," Q121SEC00068871–9.

Investor Relations, Legal, AP&R, FP&A, and the QCT and QTL business units.[248] For example, on October 22, 2012, a meeting was held with Mr. Mollenkopf to review his portion of the 2012 Analyst Day presentation.[249] Feedback from Mr. Mollenkopf was provided during the presentation and later implemented.[250] Input from other individuals, including Mr. Amon, Dr. Renduchintala, Mr. Lederer, and Anand Chandrasekher (Chief Marketing Officer) was also collected.[251] Prior to finalizing the presentation, Mr. McDonough emailed Mr. Mollenkopf's portion of the presentation to Mr. Mollenkopf, Mr. Amon, Mr. Chandrasekher, Mr. Lederer, Craig Barratt (President of Qualcomm Atheros), Raj Talluri (SVP and GM), Dr. Renduchintala (and copied Mr. Kneeshaw, Rob Chandhok (President, Qualcomm Internet Services), Mr. Davidson, and Mr. Sinnott).[252] Mr. McDonough informed the group that the deck contained "all of [their] input," that legal was conducting a review, and that the group should let him know if they found "anything glaringly off" before the presentation was finalized.[253]

107. Likewise, meetings were scheduled with Mr. Aberle to discuss the portion of the presentation that he would present at the 2012 Analyst Day, and drafts of his portions of the presentation were distributed to David Zuckerman (VP & Legal Counsel), Mr. Thomas (Sr. Technical Accountant of AP&R), Ms. Polek, Roy Hoffinger (VP, Legal Counsel), Jay Rains

---

[248] *See, e.g.*, "NYAD2012_DA v6.pptx," Q2014FTC02992434; "121482_Qualcomm_PJacobs_2012_NYAD_v13_CU_PL.pptx," Q2014FTC02110288; "NYAD2012_DA v4.2.pptx," QNDCAL00110449; "NYAD2012_DA v3.pptx," Q2014FTC03477465; Email chain from Tim McDonough to Warren Kneeshaw, et al., "This PM's edition of Steve's Analyst Day deck," November 14, 2012, Q2014FTC01620832; "121715_Qualcomm_SMollenkopf_NYAD2012_v37_compressed.pptx," Q2014FTC01620833; Email from Tim McDonough to Steven Mollenkopf, et al., "Latest version of Qualcomm Analyst Day deck for QCT," November 10, 2012, Q121SEC00554426; Email chain from Amy Berguson to David Zuckerman, et al., "Initial Derek Deck," November 14, 2012, Q121SEC00794058; "BKeitel_2012 NY Analyst v7_AB.pptx," Q121SEC00109797; Email from Amy Berguson to Dick Grannis, "Bill K. NY slides- treasury info.," October 19, 2012, Q121SEC00127169; Email from Chris Thomas to Amy Berguson, et al., "Qualcomm Analyst Day - Bill's Deck Certification," November 15, 2012, Q121SEC00109788. The preparation of the 2013 Analyst Day presentation also involved multiple individuals. For example, on November 15, 2013, Ms. Berguson sent Mr. Aberle an email attaching an updated slide deck for the New York Analyst Day. In her email, Ms. Berguson noted that "Eric [Reifschneider] [SVP, QTL] and Tom [Rouse] [VP, Patent Counsel, QTL] [would] be sending [Mr. Aberle] additional input separately regarding the 3G/4G position slides." *See* Kneeshaw Deposition Exhibit 653, Q121SEC00684323–4 at 3; "Eric R.," LinkedIn, https://www.linkedin.com/in/eric-r-06413/; "Thomas Rouse," LinkedIn, https://www.linkedin.com/in/thomas-rouse/.

[249] Email chain from Steven Mollenkopf to Tim McDonough, et al., "Re: Your notes/comments on NYAD deck?" November 1, 2012, Q2014FTC03854342–3.

[250] Email chain from Steven Mollenkopf to Tim McDonough, et al., "Re: Your notes/comments on NYAD deck?" November 1, 2012, Q2014FTC03854342–3.

[251] Email chain from Steven Mollenkopf to Tim McDonough, et al., "Re: Your notes/comments on NYAD deck?" November 1, 2012, Q2014FTC03854342–3 at 2; "Anand Chandrasekher," LinkedIn, https://www.linkedin.com/in/anandchandrasekher/. *See also* Email from Tim McDonough to Steven Mollenkopf, et al., "Your Analyst Day deck from today for your review," November 2, 2012, Q121SEC00554467.

[252] Email chain from Tim McDonough to Steven Mollenkopf, et al., "Steve's final deck," November 15, 2012, Q2014FTC01620830; "Craig Barratt," LinkedIn, https://www.linkedin.com/in/craig-h-barratt/details/experience/; "Raj Talluri," LinkedIn, https://www.linkedin.com/in/raj-talluri-988b011/; "Rob Chandhok," LinkedIn, https://www.linkedin.com/in/rchandhok/details/experience/.

[253] Email chain from Tim McDonough to Steven Mollenkopf, et al., "Steve's final deck," November 15, 2012, Q2014FTC01620830.

(DLA Piper), and Doug Rein (DLA Piper) for their review.[254] Meetings were also scheduled for Mr. Keitel, to help him prepare for his portion of the 2012 Analyst Day presentation.[255]

108. Information in the 2012 Analyst Day presentation was checked against the Company's prior earnings release issued on November 7, 2012, as well as against internal Company financial data.[256] Additionally, multiple individuals helped check the presentation for accuracy. For example, on November 15, 2012, Mr. Thomas emailed Mr. Keitel's portion of the 2012 Analyst Day presentation to Ms. Berguson, Mr. Cabaniss, and Mr. Lam (and copied Ms. Polek).[257] Mr. Thomas stated that he was "unable to substantiate certain information" in the presentation, and included a list of the groups that provided the information to Investor Relations, and who were "responsible for substantiating."[258] These groups included FP&A, the QCT and QTL business units, and Treasury.[259]

109. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for preparing for analyst days during the Class Period involved multiple relevant departments and individuals and was consistent with the disclosure customs and practices in large public companies described in Section IV.

#### b) Analyst Conferences

110. During the Class Period, Qualcomm participated in over 40 analyst conferences.[260] In preparing materials for analyst conferences, Qualcomm's Investor Relations team developed talking points responsive to anticipated analyst questions and used material that had been previously prepared for the Company's prior analyst events or earnings releases. As discussed above in Sections V.D.2 and V.D.3.a, those materials were prepared using an iterative approach that involved multiple relevant departments and individuals.

111. As discussed above in Section IV.D.3, analyst conferences are often hosted by third-parties and involve presentations from one or more companies. During the Class Period, Qualcomm was occasionally invited to speak at these conferences and hold "fireside chats,"

---

[254] Email chain from Amy Berguson to David Zuckerman, et al., "Initial Derek Deck," November 14, 2012, Q121SEC00794058; "FY4Q12 Earnings Release Calendar," Q121SEC00878481–6 at 3; "Roy Hoffinger," LinkedIn, https://www.linkedin.com/in/roy-hoffinger-5a5353130/.
[255] Email from Amy Berguson to Dick Grannis, "Bill K. NY slides- treasury info.," October 19, 2012, Q121SEC00127169.
[256] *See, e.g.*, "NYAD2012_DA v5_QTL_Finace_data_validation.pptx," Q2014FTC03476394.
[257] Email from Chris Thomas to Amy Berguson, et al., "Qualcomm Analyst Day - Bill's Deck Certification," November 15, 2012, Q121SEC00109788.
[258] Email from Chris Thomas to Amy Berguson, et al., "Qualcomm Analyst Day - Bill's Deck Certification," November 15, 2012, Q121SEC00109788.
[259] Email from Chris Thomas to Amy Berguson, et al., "Qualcomm Analyst Day - Bill's Deck Certification," November 15, 2012, Q121SEC00109788.
[260] *Refinitiv*.

meetings in which investment analysts would ask Qualcomm executives questions about the business.[261] At these meetings, Qualcomm responded to both anticipated questions, which the Company may have received in advance and prepared responses for, and impromptu questions from audience members.

112. Investor Relations drafted talking points in preparation for analyst conferences, incorporating any questions received in advance from analysts.[262] These talking points were based on publicly available information as well as other relevant information, such as "interesting metrics."[263] As mentioned above, portions of the talking points originated from materials prepared for other Qualcomm events, such as analyst days.[264] Investor Relations received support from "various groups" at Qualcomm to develop the content of the talking points when necessary, and the talking points went through several rounds of iteration.[265] For example, on February 11, 2013, Mr. Kneeshaw emailed Cindy Ping (Director of Marketing and Communications, QTL) and Mr. Lancia (and copied Mr. Sinnott), asking for their help with developing part of the Q&A talking points for an upcoming Goldman Sachs fireside chat.[266] Ms. Ping and Mr. Kneeshaw iterated on one of the talking points related to subsidies, eventually deciding to withdraw it.[267] Talking points for the Goldman Sachs fireside chat were later utilized in developing the talking points for the 2013 GSM Association MWC,

---

[261] Aberle Deposition, p. 124; Kneeshaw Deposition, pp. 173–174.

[262] *See, e.g.*, Kneeshaw Deposition, pp. 173–174; "GS Technology and Internet Conference, February 10-12, 2015," Q121SEC00752798–808. *See also* Email chain from Warren Kneeshaw to John Sinnott and Amy Berguson, "FW: Next week," February 11, 2015, Q121SEC00162189–91; "GS Technology and Internet Conference, February 10-12, 2015," Q121SEC00162192–3; Email chain from Warren Kneeshaw to John Sinnott and Amy Berguson, "RE: Fireside Chat Questions," May 20, 2016, Q121SEC00693614–7; Email chain from John Sinnott to David Cianflone, et al., "Pls Review - Steve Fireside Chat Questions," May 20, 2016, Q121SEC00693603–5.

[263] Kneeshaw Deposition, pp. 173–174 ("[Q.] What would the process or review process for putting together talking points such as these for a fireside chat by a Qualcomm executive? … A. So here the questions would have come from the analysts, and we in IR knowing what is in the public realm and what is, you know, relevant to discuss on these matters including, you know, interesting metrics that make sense to be disclosed and what is going to be a reg FD-compliant environment, in other words, it's a webcast that's broadly available, so these are suggested talking points. To the extent that there is a need to go and, you know, help in the content, we would have gone to various groups. I've not reviewed this document to know what we may have done as far as that is concerned, but we would be tracking what is in the public realm on key matters from a materiality standpoint and therefore putting that together in this type of a document."). Mr. Kneeshaw testified that fireside chats were compliant with Regulation FD as they were "a webcast that's broadly available."

[264] *See, e.g.*, Email from Pete Lancia to Steven Mollenkopf, "upcoming presentations," November 6, 2012, Q2014FTC02126259 ("3G/4G HK summit[:] I believe Paul is no longer attending so you will be giving the keynote and Cristiano will present the QMC positioning. We are planning to leverage both Paul's and your Analyst Day slides for the content as this will be fresh."); "Bloomberg West Broadcast Key Earnings Stats and Factoids & Paul Jacobs," November 28, 2012, Q121SEC00265306–12 at 10–12; "GS Technology and Internet Conference, February 10-12, 2015," Q121SEC00752798–808 at 807.

[265] Kneeshaw Deposition, pp. 173–174. *See, e.g.*, Email chain from Warren Kneeshaw to John Sinnott and Amy Berguson, "RE: Fireside Chat Questions," May 20, 2016, Q121SEC00693614–7; Email chain from John Sinnott to David Cianflone, et al., "Pls Review - Steve Fireside Chat Questions," May 20, 2016, Q121SEC00693603–5; *See, e.g.*, "Aberdeen Conference Call Q&A," Q121SEC00753301–8; "Aberdeen Conference Call Q&A," Q121SEC00753285–92; "GS Technology and Internet Conference, February 11-13, 2014," Q121SEC00752519–26 at 23.

[266] Email chain from Rikta Nagrani to Warren Kneeshaw, et al., "RE: fireside chat prep," February 12, 2013, Q121SEC00371385–7 at 7; "Cindy Ping," LinkedIn, https://www.linkedin.com/in/cindy-ping-517ab6/.

[267] Email chain from Rikta Nagrani to Warren Kneeshaw, et al., "RE: fireside chat prep," February 12, 2013, Q121SEC00371385–7 at 5.

discussed below in Section VI.B.[268] Similarly, on February 6, 2015, Simona Jankowski, an analyst from Goldman Sachs, sent Mr. Kneeshaw questions for an upcoming fireside chat.[269] Mr. Kneeshaw then sent the questions to Mr. Sinnott and Ms. Berguson and asked them to work on responses, noting that the work would involve "a lot of cut and paste as expected."[270] Likewise, on May 19, 2016, Rod Hall, an analyst from JP Morgan sent Mr. Kneeshaw questions for an upcoming fireside chat.[271] After receiving the questions, Mr. Kneeshaw sent them to Mauricio Lopez-Hodoyan (VP Business Operations), Akash Palkhiwala (SVP & CFO, QCT), and David Cianflone (SVP, Finance, QTL) (and copied Ms. Berguson and Mr. Sinnott (VP of Investor Relations)).[272] Mr. Kneeshaw informed the group that Investor Relations would draft responses to the questions and then send them to the group later that day.[273] Once the talking points were drafted, Mr. Sinnott emailed them to Mr. Cianflone, Mr. Palkhiwala, Mr. Lopez-Hodoyan, Mr. Cabaniss (VP, QCT Finance FP&A), Cliff Dickey (Sr. Director, Finance) (and copied Mr. Kneeshaw and Ms. Berguson) and asked that the group review the talking points, some of which contained information taken from the Company's prior earnings call and analyst day.[274] Additionally, Mr. Sinnott requested that Mr. Lopez-Hodoyan check a "couple [of] points."[275] The Q&A talking points were later sent to Mr. Mollenkopf (CEO) and Mr. Davis (EVP & CFO) for review.[276]

113. Based on the materials I have reviewed, I conclude that the Company's disclosure process for preparing for analyst events during the Class Period involved multiple relevant

---

[268] Email from Amy Berguson to Warren Kneeshaw, "MWC Q&A draft 1," February 19, 2013, Q121SEC00937599; "Mobile World Congress Investor Relations- Recent Q&A Items," Q121SEC00937600–5; "Mobile World Congress Investor Relations- Recent Q&A Items," Q121SEC00937606–11.

[269] Email chain from Warren Kneeshaw to John Sinnott and Amy Berguson, "FW: Next week," February 11, 2015, Q121SEC00162189–91.

[270] Email chain from Warren Kneeshaw to John Sinnott and Amy Berguson, "FW: Next week," February 11, 2015, Q121SEC00162189–91.

[271] Email chain from John Sinnott to David Cianflone, et al., "Pls Review - Steve Fireside Chat Questions," May 20, 2016, Q121SEC00693603–5.

[272] Email chain from John Sinnott to David Cianflone, et al., "Pls Review - Steve Fireside Chat Questions," May 20, 2016, Q121SEC00693603–5; "FY2Q16 Earnings Release Calendar," Q121SEC00192564–6 at 5; "Mauricio Lopez-Hoyodan," LinkedIn, https://www.linkedin.com/in/mauricio-lopez-hodoyan-446565/details/experience/; "Akash Palkhiwala," LinkedIn, https://www.linkedin.com/in/akash-palkhiwala-1b369520/; Additional information regarding employee titles from counsel.

[273] Email chain from John Sinnott to David Cianflone, et al., "Pls Review - Steve Fireside Chat Questions," May 20, 2016, Q121SEC00693603–5.

[274] Email chain from John Sinnott to David Cianflone, et al., "Pls Review - Steve Fireside Chat Questions," May 20, 2016, Q121SEC00693603–5; "JP Morgan Fireside Chat Q&A," May 24, 2016, Q121SEC00693606–13; "Taylor Cabaniss," LinkedIn, https://www.linkedin.com/in/taylor-cabaniss-76a941/. Additional information regarding employee titles from counsel.

[275] Email chain from John Sinnott to David Cianflone, et al., "Pls Review - Steve Fireside Chat Questions," May 20, 2016, Q121SEC00693603–5 at 3. Mr. Kneeshaw later asked Mr. Lopez-Hodoyan to comment on open items in the Q&A talking points. *See* Email chain from Warren Kneeshaw to Mauricio Lopez-Hodoyan, "FW: Brief Documents - JP Morgan TMT Conference / Investor Roadshow Meetings, May 24 - 25, 2016," May 23, 2016, Q121SEC00693589–90 at 90; "JP Morgan Fireside Chat Q&A," May 24, 2016, Q121SEC00693591–8.

[276] Email chain from Warren Kneeshaw to Steve Mollenkopf and George Davis, "RE: Brief Documents - JP Morgan TMT Conference / Investor Roadshow Meetings, May 24 - 25, 2016," May 21, 2016, Q121SEC00661024; "FY2Q16 Earnings Release Calendar," Q121SEC00192564–6 at 5.

departments and individuals and was consistent with the disclosure customs and practices in large public companies described in Section IV.

### 4. Qualcomm's Disclosure Practices for Media Interviews

114. I have reviewed materials related to Qualcomm's process for preparing for media interviews before and after the at-issue disclosures made during the media panel involving the *Taipei Times* on June 21, 2016.[277] My review indicates that the Company's processes and procedures involved the preparation of briefing materials by the relevant department to aid in the preparation of interviewees. These briefing materials included information on the topics anticipated to be discussed, Q&A talking points, and background information on the media personnel conducting the interview. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for preparing for media interviews during the Class Period involved relevant departments and individuals and was consistent with the disclosure customs and practices in large public companies described in Section IV.

115. To prepare for media interviews, Qualcomm executives were provided with media briefing sheets and talking points prepared by individuals from Public Relations.[278] The briefing sheets contained background information on the media personnel that would participate in the event along with the topics that might be covered and areas on which the Qualcomm executives should focus their responses.[279] The talking points included questions that the executives might receive during the interview as well as facts pertaining to the potential interview topics.[280] Q&A talking points that were prepared for prior events were sometimes provided to Qualcomm executives to help them prepare for media interviews.[281]

116. Exemplar materials related to the preparation for an interview in October 2015 between Matt Grob (EVP & CTO) and Stacey Higginbotham, a reporter from *Fortune*,

---

[277] Email from Tina Asmar to Don Rosenberg, "RE: Taiwan sponsored media trip," June 21, 2016, QAPPCMSD09927154–5; "Taiwan Visiting Journalist Program June 20 - 21, 2016 – San Diego Briefing Sheet," QNDCAL00663874–89 at 74.

[278] *See, e.g.*, Email from Conor Campbell to Matt Grob, "Briefing Documents: Interview with Stacey Higgenbotham [*sic*], Fortune," October 8, 2015, QNDCAL00690124; "Briefing Sheet – Stacey Higginbotham, *Fortune* Thursday, October 8, 2015," QNDCAL00690125–9; "Briefing with Stacey Higgenbotham [*sic*] Qualcomm and the Future of Connectivity Key Talking Points," QNDCAL00690130–33; Email from Emily Kilpatrick to Derek Aberle, "FW: Prep Materials for Media Meetings in San Francisco," December 1, 2016, Q121SEC00579285; "San Francisco Media Tour Thursday, December 1 Briefing Sheet – Derek Aberle," Q121SEC00579286–97; "EXC Talk Track – Q4 FY16," Q121SEC00579298–308; "NXP Acquisition: Media Talking Points," October 26, 2016, Q121SEC00579309–13.

[279] *See, e.g.*, "Briefing Sheet – Stacey Higginbotham, *Fortune* Thursday, October 8, 2015," QNDCAL00690125–9; "San Francisco Media Tour Thursday, December 1 Briefing Sheet – Derek Aberle," Q121SEC00579286–97.

[280] *See, e.g.*, "Briefing with Stacey Higgenbotham [*sic*] Qualcomm and the Future of Connectivity Key Talking Points," QNDCAL00690130–33; "NXP Acquisition: Media Talking Points," October 26, 2016, Q121SEC00579309–13.

[281] *See, e.g.*, Email chain from Emily Kilpatrick to Derek Aberle, "FW: Prep Materials for Media Meetings in San Francisco," December 1, 2016, Q121SEC00579285; "NXP Acquisition: Media Talking Points," October 26, 2016, Q121SEC00579309–13.

demonstrate the process described above.[282] In preparation for the interview, Conor Campbell (Corporate Communications and Analyst Relations) briefed Mr. Grob on what topics he should expect to discuss during the interview and what areas he should focus on.[283] Mr. Campbell also provided Mr. Grob with a briefing sheet and a document containing "Key Talking Points" to help him prepare for the interview.[284] A similar process was followed to prepare for other media events.[285]

117. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for preparing for media interviews during the Class Period involved relevant departments and individuals and was consistent with the disclosure customs and practices in large public companies described in Section IV.

---

[282] "Matt Grob," LinkedIn, https://www.linkedin.com/in/matt-grob-624b3042.

[283] Email from Conor Campbell to Matt Grob, "Briefing Documents: Interview with Stacey Higgenbotham [*sic*], Fortune," October 8, 2015, QNDCAL00690124; "Connor Campbell," LinkedIn, https://www.linkedin.com/in/conorkcampbell/.

[284] Email from Conor Campbell to Matt Grob, "Briefing Documents: Interview with Stacey Higgenbotham [*sic*], Fortune," October 8, 2015, QNDCAL00690124; "Briefing Sheet – Stacey Higginbotham, *Fortune* Thursday, October 8, 2015," QNDCAL00690125–9 at 5; "Briefing with Stacey Higgenbotham [*sic*] Qualcomm and the Future of Connectivity Key Talking Points," QNDCAL00690130–3.

[285] *See, e.g.*, Email chain from John Sinnott to Patty Schaeffer, "FW: SF Tour Briefing Book," July 8, 2013, Q121SEC00404393; "Pre-Q3FY13 Earnings San Francisco Media Tour Thursday, July 11, 2013 Briefing Sheet – Bill Davidson," Q121SEC00404394–414; "Pre-Q3FY13 Earnings San Francisco Media Tour Thursday, July 11, 2013 Master Message Platform," Q121SEC00404415–24; Email from Emily Kilpatrick to George Davis, "RE: Paul Jacobs Media Meetings at Uplinq," August 30, 2013, Q121SEC00647173–4; "Uplinq 2013 September 4 – 5, 2013 Master Message Platform," Q121SEC00647175–86; "Parsed Q&A Transcript Q3 FY2013 Earnings Call," Q121SEC00647187–207; "Uplinq 2013- Press Panel Wednesday, September 4, 2013 Backgrounder – Paul Jacobs," Q121SEC00647208–11; "Qualcomm Toq Messaging and Q&A," August 28, 2013, Q121SEC00647212–21; "Uplinq 2013 September 4 – 5, 2013; Hilton San Diego Bayfront Media Briefing Sheet – Paul Jacobs," Q121SEC00647222–36; "IR Q&A," August 2013, Q121SEC00647237; "Uplinq September 3-5, 2013; Hilton San Diego Bayfront Communications Overview," Q121SEC00647238–52; "Third Quarter Fiscal 2013 Earnings Investor Question Topics & Messaging Notes," Q121SEC00647253–65; Email from Dan Novak to Derek Aberle, "FW: SF media tour briefing materials," March 18, 2014, Q121SEC00527018; "'One LTE' Talking Points – Qualcomm Mobile World Congress 2014," Q121SEC00527019–22; "Qualcomm Messaging Factoids Summary," February 20, 2014, Q121SEC00527023–8; "Qualcomm's Contributions to China's Mobile Ecosystem," Q121SEC00527029–32; "Fiscal First Quarter 2014 Quick Facts," Q121SEC00527033–9; "San Francisco Media Tour Wednesday, March 19, 2014 Briefing Book – Derek Aberle," Q121SEC00527040–61; Email chain from Dan Novak to Derek Aberle, "FW: Briefing Materials For San Francisco Media Tour," March 17, 2015, Q121SEC00245612–3; "San Francisco Media Tour – Derek Aberle, George Davis March 17, 2015," Q121SEC00245614–9; "Qualcomm: Capital Return Program Top Q&A," Q121SEC00245626–7; "Global Inclusion & Diversity (GID) Q&A," Q121SEC00245628–30; "GA Messaging," March 2015, Q121SEC00245631–3; "Discussion Areas & Key Messages for SF Media Tour," March 10, 2015, Q121SEC00245642–3; "Qualcomm Announces Major Increase in Capital Return Program," Q121SEC00245620–5; Email chain from Emily Kilpatrick to Derek Aberle, "FW: Prep Materials for Media Meetings in San Francisco," December 1, 2016, Q121SEC00579285; "San Francisco Media Tour Thursday, December 1 Briefing Sheet – Derek Aberle," Q121SEC00579286–97; "EXC Talk Track – Q4 FY16," Q121SEC00579298–308; "NXP Acquisition: Media Talking Points," October 26, 2016, Q121SEC00579309–13.

## VI. Qualcomm's Disclosure Processes for the SEC Filings, Analyst Conferences, and Media Interview Containing the At-Issue Disclosures Involved Relevant Departments and Individuals and Were Consistent With the Company's General Disclosure Practices and Disclosure Customs and Practices in Large Public Companies.

118. As discussed in Section II.A, Plaintiffs allege that Qualcomm "falsely assured investors that the Company did not 'bundle' the terms of its license and chipset agreements"[286] by "bundling lower license royalties when customers purchased Qualcomm chipsets."[287] I understand that these alleged misrepresentations fall under the following categories: (i) "Qualcomm executives described the licensing and chip-supply businesses as separate and represented that Qualcomm did not bundle"; (ii) "Qualcomm licensed on a 'fair,' 'reasonable,' or 'non-discriminatory' basis"; and (iii) Qualcomm's "business model facilitated competition in the industry."[288] As shown in **Exhibit 1**, Plaintiffs allege that misrepresentations related to these issues were made in each of the Company's Forms 10-K and 10-Q during the Class Period, the 2012 Credit Suisse Technology Conference, the 2013 GSM Association MWC, and a media interview held in June 2016.

119. In this section, I examine specific examples of Qualcomm's disclosure processes during the Class Period for disclosures that contained one or more of the at-issue disclosures. I review the procedures and processes followed by Qualcomm for exemplar disclosures made in the Company's Forms 10-K and 10-Q, as well as the 2012 Credit Suisse Technology Conference, the 2013 GSM Association MWC, and the June 2016 media interview,[289] and relate these to disclosure customs and practices for large public companies generally, and to Qualcomm's disclosure practices, described above.

120. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure processes for the SEC filings, 2012 and 2013 analyst conferences, and June 2016 media interview containing the at-issue disclosures involved relevant departments and individuals and were consistent with the Company's general disclosure practices described in Section V and the disclosure customs and practices in large public companies described in Section IV.

---

[286] Complaint, ¶ 13.
[287] Letter to The Honorable Jinsook Ohta from Bernstein Litowitz Berger & Grossmann, "Re: *In re Qualcomm Incorporated Securities Litigation*, No. 3:17-cv-00121-JO-MSB," October 18, 2022.
[288] Class Certification Order, pp. 4–5.
[289] As noted above, I do not address in this report, and do not intend to offer testimony regarding, the disclosures contained in Qualcomm's press releases on November 17, 2015 and January 17, 2017. *See* footnotes 7 and 25.

### A. Exemplar At-Issue Disclosures in Forms 10-K and 10-Q

#### 1. Fiscal Year 2012 Form 10-K

121. On November 7, 2012, Qualcomm filed its Form 10-K for FY 2012 with the SEC.[290] Plaintiffs allege that Qualcomm made materially false and misleading statements in the business description line item of its Form 10-K. Specifically, as shown in **Exhibit 1**, Plaintiffs claim that the following statements regarding the Company's commitment to licensing "on a fair and reasonable basis free from unfair discrimination" were materially false and misleading:

> "We have committed to … standards bodies that we will offer to license our essential patents for these CDMA standards on a fair and reasonable basis free from unfair discrimination."[291]

> "We have licensed or otherwise provided rights to use our patented technologies to interested companies on terms that are fair, reasonable and free from unfair discrimination."[292]

Plaintiffs allege these statements were materially false and misleading because "the Company has … discriminated against licensees by providing royalty relief to customers who agreed to purchase exclusively Qualcomm chipsets."[293] Plaintiffs further claim that Qualcomm "omitted material facts … including that … Qualcomm, in licensing its essential patents, has discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm."[294] Additionally, Plaintiffs allege that Qualcomm's statement in the Form 10-K that it has "facilitated competition in the wireless communications industry by licensing and enabling a large number of manufacturers,"[295] was materially false and misleading because "Qualcomm stifled competition in the cellular communications industry, and did so by, among other things … bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets."[296]

---

[290] Qualcomm FY 2012 10-K.
[291] Qualcomm FY 2012 10-K, p. 10; Complaint, ¶¶ 138–139.
[292] Qualcomm FY 2012 10-K, p. 11; Complaint, ¶¶ 138–139.
[293] Complaint, ¶ 139.
[294] Complaint, ¶ 139.
[295] Qualcomm FY 2012 10-K, p. 10.
[296] Complaint, ¶ 140.

122. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for the 2012 Form 10-K followed an iterative approach that involved multiple relevant committees, departments, and individuals and was consistent with the Company's general disclosure practices described in Section V and the disclosure customs and practices in large public companies described in Section IV. The preparation of the 2012 Form 10-K began several months before it was filed with the SEC, and a schedule was created to coordinate the preparation and review of the 2012 Form 10-K by Qualcomm's business units, functional groups, the Disclosure Compliance Review Committee, and the Audit Committee.[297]

123. Drafting of the 2012 Form 10-K began as early as August 2012 and leveraged the prior year's Form 10-K.[298] For example, on August 28, 2012, Ms. Ford (Director, Finance, Accounting Practices and Reporting) sent an email attaching a draft of the 2012 Form 10-K to Ms. Henson, Ms. Polek, Mr. Dill (Manager of AP&R), Mr. Thomas, Dustin Mersy (Accounting Manager), and Mr. Bono.[299] Ms. Ford explained that the draft was "created … by rolling forward the Fiscal 2011 10K 'As Filed'" and that the draft had "been conformed to be consistent with the Q3 Fiscal 2012 10Q."[300]

124. Portions of the draft 2012 Form 10-K were then shared with multiple individuals and business units over the course of several months for their review and comments. For example, on August 29, 2012, Mr. Bono circulated an email attaching portions of the draft 2012 Form 10-K pertaining to QCT[301] and which contained the at-issue disclosure regarding Qualcomm's facilitation of "competition in the wireless communications industry by licensing and enabling a large number of manufacturers" to Charles Chivetta (VP Accounting & Finance), Mr. Mehta, Prabha Desikan (Sr. Director, Finance), Catherine Rice (Sr. Public Relations Coordinator), Mr. McDonough, Adam Tachner (VP & General Counsel), Larissa Cochron (Sr. Director of Qualcomm Atheros, Inc.), Mr. Palkhiwala (VP, QCT Finance),

---

[297] Email chain from Min Shan to Taylor Cabaniss, et al., "Q4FY12 IR Calendar," October 4, 2012, Q121SEC00165221.

[298] For example, on August 1, 2012, Ms. Polek emailed Mr. Grannis, stating that "[a]s part of our annual 10-K process, we are looking at our risk factors to ensure that we have adequately addressed the significant risks facing Qualcomm" and asked if he could write "a sentence or two on" risks that he thought were "sufficiently material to Qualcomm." Ms. Polek also noted that a meeting would be held to "review all the potential changes to the 10-K in mid-August." *See* Email from Erin Polek to Dick Grannis, "10-K Risk Factors: Treasury-related items," August 1, 2012, Q121SEC00164256.

[299] Email from Joyce Ford to Jamie Henson, et al., "FY2012 10K," August 28, 2012, Q121SEC00107281; "Roel Dill," LinkedIn, https://www.linkedin.com/in/roel-dill-06a07b5/; "Dustin Mersy, CPA," LinkedIn, https://www.linkedin.com/in/dustin-mersy-cpa-3493bb14/. Additional information regarding employee titles from counsel.

[300] Email from Joyce Ford to Jamie Henson, et al., "FY2012 10K," August 28, 2012, Q121SEC00107281.

[301] According to Qualcomm's 2012 Form 10-K, Qualcomm's QCT segment "is a leading developer and supplier of integrated circuits and system software based on CDMA, OFDMA and other technologies for use in voice and data communications, networking, application processing, multimedia and global positing system products." *See* Qualcomm FY 2012 10-K, p. 6.

Jonathan Weiser (SVP, Division Counsel), Ms. Henson, and Mr. Dill.[302] In his email, Mr. Bono explained that certain sections in the draft 2012 Form 10-K were leveraged from the 2011 Form 10-K and would "need to be reviewed and updated for any changes that occurred during FY2012."[303] Mr. Bono further explained that the "Finance Department for each BU has primary responsibility for that BU's 10-K disclosures," and that "[t]o the extent that other departments outside of QCT Finance (e.g. Marketing, Engineering, etc.) are utilized to review the BU disclosures, QCT Finance should coordinate with those departments and submit consolidated changes / updates in 'track changes' mode to Corporate Reporting."[304] Mr. Bono asked those he emailed to "review and provide comments" on the attached excerpts of the draft 2012 Form 10-K no later than September 26, 2012, and he provided a list of "upcoming key dates related to the 10-K distribution," including:

- "September 28th: Pre-close draft due to Corp. Reporting
- October 15th: Post-close draft of 10K sent to BU for review
- October 16th: Post-close draft due to Corp. Reporting
- October 17th: Distribute 10K to Disclosure Compliance Committee"[305]

125. Individuals from Investor Relations also reviewed portions of the draft 2012 Form 10-K and provided suggested edits and comments.[306] For example, on August 29, 2012, Ms. Polek emailed "technical sections" of the draft 2012 Form 10-K to Ms. Berguson, Mr. Kneeshaw, Mr. Sinnott, Mr. Lancia, Rasmus Hellberg (Sr. Director, Technical Marketing), and Ms. Ping (and copied Mr. Thomas), and asked for feedback.[307] In response, multiple

---

302 Email from Sal Bono to Charles Chivetta, et al., "QCT 2012 10-K pre-close draft," August 29, 2012, Q2014FTC03354550; Excerpts of Draft Qualcomm 2012 Form 10-K, Q2014FTC03354551–65 at 54; "Akash Palkhiwala," LinkedIn, https://www.linkedin.com/in/akash-palkhiwala-1b369520/; "Charles Chivetta," LinkedIn, https://www.linkedin.com/in/charles-chivetta/; "Prabha Desikan," LinkedIn, https://www.linkedin.com/in/prabha-desikan-1318686/; "Catherine Baker," LinkedIn, https://www.linkedin.com/in/catherinerice/; "Adam Tachner," LinkedIn, https://www.linkedin.com/in/adam-tachner/; "Larissa Cochron," LinkedIn, https://www.linkedin.com/in/larissa-cochron-4a49153/; Additional information regarding employee titles from counsel.

303 Email from Sal Bono to Charles Chivetta, et al., "QCT 2012 10-K pre-close draft," August 29, 2012, Q2014FTC03354550.

304 Email from Sal Bono to Charles Chivetta, et al., "QCT 2012 10-K pre-close draft," August 29, 2012, Q2014FTC03354550.

305 Email from Sal Bono to Charles Chivetta, et al., "QCT 2012 10-K pre-close draft," August 29, 2012, Q2014FTC03354550. As explained in Section V.B above, internal Company correspondence shows that the Disclosure Compliance Review Committee was also referred to as the Disclosure Committee.

306 Email chain from Amy Berguson to Prakash Sangam, et al., "FW: For your review: Technical sections of FY12 10-K," October 17, 2012, Q121SEC00267134–5; Email chain from Erin Polek to Edward Tiedemann, et al., "For your review: Next round - Technical sections of FY12 10-K," October 19, 2012, Q2014FTC01876850–1; "Rasmus Hellberg," LinkedIn, https://www.linkedin.com/in/rasmus-hellberg-719a41/.

307 Email chain from Amy Berguson to Erin Polek and Chris Thomas, "FW: For your review: Technical sections of FY12 10-K," October 17, 2012, Q121SEC00356719–21.

individuals including Ms. Berguson, reviewed the sections of the draft 2012 Form 10-K and provided comments and edits.[308]

126. Similar emails with draft 2012 Form 10-K excerpts were also sent to other business units for review. For example, Ms. Polek sent an email on August 30, 2012 to John Gilbert (VP, Corporate Finance), Sanjay Vakharia (Director, Strategic Finance), and Debbie Middleton (Director, Finance, Qualcomm Retail Solutions, Inc.), attaching excerpts of the draft 2012 Form 10-K that were related to the Company's Firethorn Division[309] and which included the at-issue disclosure regarding Qualcomm's facilitation of "competition in the wireless communications industry by licensing and enabling a large number of manufacturers."[310] Ms. Polek asked the email recipients to "make any needed changes/updates … in a 'track changes' mode" by September 26, 2012, so that Ms. Polek could "clearly see the changes."[311] Ms. Polek also explained that the "Finance Department for each BU has primary responsibility for that BU's 10-K disclosures," and listed "key dates" regarding the development of the Form 10-K.[312]

127. Additionally, Mr. Dill sent an email on August 30, 2012 to Mr. Aberle, Eric Reifschneider (SVP, QTL), Marv Blecker (SVP, QTL), Larry Griffith (Director, Finance), Mr. Cianflone (VP, Finance, QTL), Fabian Gonell (Sr. Legal Counsel), and Samimi Abbaseh (VP, Technology Licensing), attaching sections of the draft 2012 Form 10-K that were related to QTL[313] and which contained each of the at-issue disclosures.[314] Mr. Dill informed the group that he was taking over "managing the '10-K and 10-Q draft process' for QTL" from Ms. Polek and asked that the group make any edits in tracked changes to facilitate his

---

[308] Email chain from Amy Berguson to Erin Polek and Chris Thomas, "FW: For your review: Technical sections of FY12 10-K," October 17, 2012, Q121SEC00356719–21. *See also* Email chain from Larry Griffith to Derek Aberle, et al., "RE: FW: For your review: QTL FY12 10K Post Close Draft 1," October 17, 2012, Q2014FTC03077348–50.

[309] Qualcomm's Firethorn Division fell under the QWI segment. According to the Company's 2012 Form 10-K, "Firethorn builds and manages software applications that enable mobile commerce services." *See* Qualcomm FY 2012 10-K, p. 31.

[310] Email from Erin Polek to John Gilbert et al., "For Your Review: Firethorn Pre-Close Draft FY12 10-K," August 30, 2012, Q121SEC00333864; "Firethorn, FY12 10-K – Preclose Draft, Due: September 26th," Q121SEC00333865–72 at 66; "FY2Q12 Earnings Release Calendar," Q121SEC00878295; "FY4Q12 Earnings Release Calendar," Q121SEC00878481–6 at 3; "Sanjay Vakharia," LinkedIn, https://www.linkedin.com/in/sanjay-vakharia-6aa3ba2/; "Debbie Middleton," LinkedIn, https://www.linkedin.com/in/demiddleton/.

[311] Email from Erin Polek to John Gilbert, et al., "For your review: Firethorn Pre-close draft FY12 10-K," August 30, 2012, Q121SEC00333864.

[312] Email from Erin Polek to John Gilbert, et al., "For your review: Firethorn Pre-close draft FY12 10-K," August 30, 2012, Q121SEC00333864.

[313] Qualcomm's QTL segment "grants licenses or otherwise provides rights to use portions of [Qualcomm's] intellectual property portfolio, which, among other rights, includes certain patent rights essential to and/or useful in the manufacture and sale of certain wireless products." *See* Qualcomm FY 2012 10-K, p. 31.

[314] Email from Roel Dill to Derek Aberle, et al., "For your review: QTL FY12 10K Preclose Draft," August 30, 2012, Q2014FTC00173589; "QTL FY 2012 10-K Preclose Draft," Q2014FTC00173590–605; "Eric R.," LinkedIn, https://www.linkedin.com/in/eric-r-06413/; "Larry Griffith," LinkedIn, https://www.linkedin.com/in/larry-griffith-5a6a053/details/experience/; "Fabian Gonell," LinkedIn, https://www.linkedin.com/in/fabian-gonell-796b132/; "Samimi Abbaseh," LinkedIn, https://www.linkedin.com/in/samimi-abbaseh-b6275823/; Additional information regarding employee titles from counsel.

review.[315] He also instructed the group to "coordinate any necessary review with any additional QTL employees outside of Finance" and specified "key dates related to the 10-K distribution," including when comments were due.[316]

128. Updated versions of the draft 2012 Form 10-K were circulated to the business units on October 15 and 16, 2012, after prior edits from various individuals and business units were received and implemented.[317] For example, on October 15, 2012, Mr. Thomas emailed Ms. Berguson, Mr. Kneeshaw, Mr. Davidson, Mr. Sinnott, Mr. Gilbert, Mr. Cabaniss, and Mr. Lam a "draft of the Recent Developments and Looking Forward sections of the 10-K for [their] review," and asked them to submit any changes by October 17, 2012.[318] Mr. Thomas also informed the group that he included "responses to comments/changes from both IR and FP&A, relating to the Risk Factors distributed last week," and he later sent an email with an updated draft of the Risk Factors section for the group's review.[319]

129. Similarly, on October 16, 2012, Mr. Bono sent updated draft 2012 Form 10-K excerpts related to QCT to the group he emailed on August 29, 2012.[320] In his email, Mr. Bono communicated that the updated excerpts incorporated changes from Mr. Chivetta.[321] He further asked the group to make any updates to the draft in tracked changes and instructed them that "[t]o the extent that other departments outside of QCT Finance (e.g. Marketing Engineering, etc.) are utilized to review the BU disclosures, QCT Finance should coordinate with those departments and submit consolidated changes."[322] Mr. Bono asked that draft comments be returned to him by October 16, 2012, in advance of the draft being sent to the

---

[315] Email from Roel Dill to Derek Aberle, et al., "For your review: QTL FY12 10K Preclose Draft," August 30, 2012, Q2014FTC00173589. Ms. Polek continued to coordinate the preparation of other sections of the draft Form 10-K. *See, e.g.*, Email from Erin Polek to Debbie Middleton, et al., "For your review: Firethorn - Post Close Draft 1 of FY12 10-K," October 16, 2012, Q121SEC00323699.
[316] Email from Roel Dill to Derek Aberle, et al., "For your review: QTL FY12 10K Preclose Draft," August 30, 2012, Q2014FTC00173589.
[317] Email from Erin Polek to Jamie Henson, et al., "Draft 10-K for BU Distribution," October 16, 2012, Q121SEC00334292.
[318] Email chain from Chris Thomas to Amy Berguson, et al., "RE: 2012 Draft 10-K_Post Close 1_Investor Relations & FP&A," October 16, 2012, Q121SEC00073089.
[319] Email chain from Chris Thomas to Amy Berguson, et al., "RE: 2012 Draft 10-K_Post Close 1_Investor Relations & FP&A," October 16, 2012, Q121SEC00073089.
[320] Email from Sal Bono to Charles Chivetta, et al., "QCT FY12 10K Post Close Draft 1," October 16, 2012, Q2014FTC03354275; Excerpts of Draft Qualcomm 2012 Form 10-K, Q2014FTC03354276–96. The email sent on August 29, 2012 lists Catherine Rice as one of several recipients of the email, while the email sent on October 16, 2012 lists Catherine Baker as one of several recipients of the email. *See* Email from Sal Bono to Charles Chivetta, et al., "QCT 2012 10-K pre-close draft," August 29, 2012, Q2014FTC03354550.
[321] Email from Sal Bono to Charles Chivetta, et al., "QCT FY12 10K Post Close Draft 1," October 16, 2012, Q2014FTC03354275.
[322] Email from Sal Bono to Charles Chivetta, et al., "QCT FY12 10K Post Close Draft 1," October 16, 2012, Q2014FTC03354275.

Disclosure Compliance Review Committee[323] on October 17, 2012.[324] He also provided a list of remaining "key dates related to the 10-K distribution":

- "October 16: Post Close Draft due to Corp. Reporting by 5PM
- October 17: Distribute draft10K [*sic*] to Disclosure Compliance Review Committee
- October 24: Distribute Post Close Draft 2 to the BUs
- October 25: Post Close Draft 2 due to Corp. Reporting by Noon
- October 26: Distribute draft 10K to Audit Committee."[325]

On October 17, 2012, the group returned to Mr. Bono a draft of the Form 10-K with comments.[326]

130. Likewise, on October 16, 2012, Mr. Dill sent updated draft 2012 Form 10-K excerpts related to QTL, and which contained the at-issue disclosures, to the group he emailed on August 30, 2012.[327] In his email, Mr. Dill reported that the updated draft incorporated changes from Mr. Reifschneider and Mr. Blecker, and he asked the group for any updates to be made in tracked changes by October 16, 2012, in advance of when the draft 2012 Form 10-K would be sent to the Disclosure Compliance Review Committee on October 17, 2012.[328] Mr. Dill also notified the group that they were waiting for "QTL's submission of the applicable schedules" before updating the licensee numbers, and he provided an updated timeline of "key dates related to the 10-K distribution."[329] In response to Mr. Dill's email, Mr. Blecker provided comments and suggested edits for the draft 2012 Form 10-K, which were reviewed and incorporated.[330]

131. On October 16, 2012, a similar email attaching updated excerpts of the draft Form 10-K related to Firethorn was sent by Ms. Polek to the group she emailed on August 30,

[323] As explained in Section V.B above, internal Company correspondence shows that the Disclosure Compliance Review Committee was also referred to as the Disclosure Committee.
[324] Email from Sal Bono to Charles Chivetta, et al., "QCT FY12 10K Post Close Draft 1," October 16, 2012, Q2014FTC03354275.
[325] Email from Sal Bono to Charles Chivetta et al., "QCT FY12 10K Post Close Draft 1," October 16, 2012, Q2014FTC03354275.
[326] Email chain from Charles Chivetta to Sal Bono, "QCT FY12 10K Post Close Draft 1," October 17, 2012, QNDCAL00624900–1; Email chain from Susan Lansing to Charles Chivetta and Sal Bono, "RE: QCT FY12 10K Post Close Draft 1," October 17, 2012, QNDCAL00624877–8.
[327] Email from Roel Dill to Derek Aberle, et al., "For your review: QTL FY12 10K Post Close Draft 1," October 16, 2012, Q121SEC00663255; Excerpts of Draft Qualcomm 2012 Form 10-K, Q121SEC00663256–77 at 61–62.
[328] Email from Roel Dill to Derek Aberle, et al., "For your review: QTL FY12 10K Post Close Draft 1," October 16, 2012, Q121SEC00663255.
[329] Email from Roel Dill to Derek Aberle, et al., "For your review: QTL FY12 10K Post Close Draft 1," October 16, 2012, Q121SEC00663255.
[330] Email chain from Roel Dill to Marv Blecker, et al., "RE: For your review: QTL FY12 10K Post Close Draft 1," October 17, 2012, QNDCAL03539419–20. Mr. Griffith also provided "additional edits" to the same group. *See* Email chain from Larry Griffith to Marv Blecker, et al., "RE: For your review: QTL FY12 10K Post Close Draft 1," October 17, 2012, Q2014FTC00173385–6.

2012.[331] The email recipients were again instructed to make updates to the draft in tracked changes and were reminded that the "Finance Department for each BU has primary responsibility for that BU's 10-K disclosures."[332]

132. The draft 2012 Form 10-K was sent to the Disclosure Compliance Review Committee on October 18, 2012 to be reviewed at the Disclosure Compliance Review Committee Meeting, which was scheduled to be held four days later on October 22, 2012.[333] The email explained that the draft 2012 Form 10-K contained items that were highlighted to signify that the information to complete the items was not available yet.[334]

133. On October 23, 2012, Mr. Dill contacted the group from his previous email in which he circulated the excerpts from the draft 2012 Form 10-K related to QTL, and asked them to conduct a final review of the updated excerpts.[335] This draft included edits in tracked changes along with "responses to comments made by QTL."[336] Mr. Dill asked for new comments to be provided by October 25, 2012, in advance of when the draft 2012 Form 10-K would be sent to the Audit Committee, and he listed the "remaining key dates" for the draft 2012 Form 10-K distribution.[337] In response, Mr. Griffith sent comments to Mr. Dill on October 25, 2012.[338]

134. On October 24, 2012, two days after the Disclosure Compliance Review Meeting, Ms. Polek announced through email that the draft 2012 Form 10-K was again "[r]eady for distribution to BUs."[339] On this day, Mr. Bono sent an updated version of sections of the draft Form 10-K related to QCT to the individuals included in his prior emails circulating the draft, asking that they provide any comments by October 25, 2012 in advance of the draft being sent to the Audit Committee on October 26, 2012.[340]

---

[331] Email from Erin Polek to Debbie Middleton, et al., "For your review: Firethorn - Post Close Draft 1 of FY12 10-K," October 16, 2012, Q121SEC00323699; "Firethorn FY12 10-K – Post Close Draft Due: October 16th COB," Q121SEC00323709–17.
[332] Email from Erin Polek to Debbie Middleton, et al., "For your review: Firethorn - Post Close Draft 1 of FY12 10-K," October 16, 2012, Q121SEC00323699.
[333] Email from Jamie Henson to Dick Grannis, et al., "Qualcomm Fiscal 2012 Disclosure Compliance Review Draft 10-K," October 18, 2012, Q121SEC00794513.
[334] Email from Jamie Henson to Dick Grannis, et al., "Qualcomm Fiscal 2012 Disclosure Compliance Review Draft 10-K," October 18, 2012, Q121SEC00794513; "Disclosure Compliance Review Committee Draft," Q121SEC00794514–602.
[335] Email chain from Larry Griffith to Roel Dill, "RE: Final review: QTL fiscal 2012 10-K Post Close Draft," October 25, 2012, Q121SEC00663302; Excerpts of Draft Qualcomm 2012 Form 10-K, Q121SEC00663303–25 at 08–09. Mr. Dill's email copied Ms. Polek and did not include Marv Blecker as a recipient.
[336] Email chain from Larry Griffith to Roel Dill, "RE: Final review: QTL fiscal 2012 10-K Post Close Draft," October 25, 2012, Q121SEC00663302.
[337] Email chain from Larry Griffith to Roel Dill, "RE: Final review: QTL fiscal 2012 10-K Post Close Draft," October 25, 2012, Q121SEC00663302.
[338] Email chain from Larry Griffith to Roel Dill, "RE: Final review: QTL fiscal 2012 10-K Post Close Draft," October 25, 2012, Q121SEC00663302.
[339] Email from Erin Polek to Chris Thomas, et al., "10-K ready for BU distribution," October 24, 2012, Q121SEC00334452.
[340] Email from Sal Bono to Charles Chivetta, et al., "QCT FY12 10K Post Close Draft 2," October 24, 2012, Q2014FTC03354219.

135. Likewise, on October 24, 2012, Mr. Thomas sent the draft Form 10-K to individuals from Investor Relations and FP&A for review and asked for any comments to be submitted by the next day.[341] In response, Mr. Gilbert passed along "comments for consideration" for the draft 2012 Form 10-K.[342] On the following day, Ms. Polek sent the draft 2012 Form 10-K to PwC.[343]

136. After the various reviews discussed above, on October 26, 2012, Ms. Henson distributed the draft 2012 Form 10-K by email to the Audit Committee and other individuals[344] and explained that "[c]ertain sections [of the draft 2012 Form 10-K were] highlighted for [their] reference, however due to the number of modifications made to this document, there are many other changes and updates throughout that have not been highlighted."[345] Ms. Henson also informed the group that the draft would be discussed with the Audit Committee on November 5, 2012, and that the Form 10-K was expected to be filed with the SEC on November 7, 2012.[346] Several days later, on November 3, 2012, Ms. Polek sent a draft of the Form 10-K to Laura Rack from PwC.[347]

137. Qualcomm's Audit Committee met on November 5, 2012.[348] Audit Committee members Ray Dittamore, Barbara Alexander, and Don Cruickshank attended the meeting along with a number of executives and individuals from PwC and DLA Piper.[349] Prior to the meeting, drafts of the 2012 Form 10-K and earnings press release were circulated to members of the Audit Committee for their review.[350] Reports were also prepared and circulated to the

---

[341] Email from Chris Thomas to Amy Berguson, et al., "Final Distribution: 2012 10-K_IR & FP&A Draft," October 24, 2012, Q121SEC00266431. The email was sent to Ms. Berguson, Mr. Kneeshaw, Mr. Davidson, Mr. Sinnott, Mr. Gilbert, Mr. Cabaniss, and Mr. Lam (and copied Ms. Polek).

[342] Email chain from Erin Polek to John Gilbert, et al., "RE: Final Distribution: 2012 10-K_IR & FP&A Draft," October 26, 2012, Q121SEC00267738.

[343] Email from Erin Polek to Amanda Neal and Peter Wieghaus, "updated 10-K," October 25, 2012, Q121SEC00111237.

[344] The email was sent to Mr. Grannis, Mr. Keitel, Dr. Jacobs, Mr. Altman, Mr. Aberle, Mr. Sailer (SVP, Legal Counsel), Mr. Gardner, Mr. Davidson, Mr. Rains, Mr. Rein, Mr. Nelson, Ryan Spencer (PwC), Mr. Rosenberg, Carol Lam (SVP & Deputy General Counsel), Mr. Mollenkopf, Mr. Kneeshaw, Terrence Ward (PwC), Peter Wieghaus (PwC), Mr. Zuckerman, Dianna Taylor (PwC), and Mr. Dunham (VP & Chief Audit Executive) (and copied Ms. Polek, Mr. Cabaniss, Mr. Lancia, Ms. Ford, Taka Matsuo (Sr. Manager, Finance), Mr. Dill, Mr. Thomas, Ms. Berguson, Beth Wapner (Sr. Director, Tax), Mr. Sinnott, Ms. Wagner, Mr. Mersy, Mr. Lederer, Mr. Gilbert, Mr. Bono, and Katherine Cassidy (Sr. Director, Internal Audit). *See* Email from Jamie Henson to Dick Grannis, et al., "Qualcomm 2012 10-K Audit Committee Draft," October 26, 2012, Q121SEC00520677; "Bill Sailer," *LinkedIn*, https://www.linkedin.com/in/bill-sailer-88a7a59; "Carol Lam," *LinkedIn*, https://www.linkedin.com/in/carol-lam-529972215; "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 16; "Mark Dunham," *LinkedIn*, https://www.linkedin.com/in/mark-dunham-b275472b; "Taka Matsuo, CPA" *LinkedIn*, https://www.linkedin.com/in/taka-matsuo-cpa-2424b01b; "Beth Wapner," *LinkedIn*, https://www.linkedin.com/in/beth-wapner-37521a4/details/experience; "Katherine McKeon Cassidy," *LinkedIn*, https://www.linkedin.com/in/katherinemckeoncassidy.

[345] Email from Jamie Henson to Dick Grannis, et al., "Qualcomm 2012 10-K Audit Committee Draft," October 26, 2012, Q121SEC00520677.

[346] Email from Jamie Henson to Dick Grannis, et al., "Qualcomm 2012 10-K Audit Committee Draft," October 26, 2012, Q121SEC00520677.

[347] Email from Erin Polek to Laura Rack, "latest 10-K," November 3, 2012, Q121SEC00110830.

[348] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 18.

[349] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 18.

[350] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 19–20.

Audit Committee prior to the meeting, summarizing the Company's financial performance and the independent auditor's review of the financial statements.[351]

138. Minutes of the meeting stated that Mr. Nelson (Sr. VP & Corporate Controller) presented a previously circulated report to the Audit Committee on the Company's financial performance during the quarter.[352] Mr. Nelson reviewed with the Audit Committee the financial results for the quarter as well as the Company's "accounting and disclosure quarterly processes that had been completed or were scheduled to be completed prior to filing the Form 10-K and conducting the earnings conference call."[353] According to a checklist in the report, each of the Company's accounting and disclosure year-end process events was either completed or was scheduled to be completed within the next two days.[354]

139. Mr. Nelson also "highlighted for the Committee the material changes from the prior quarter and prior year quarter with respect to various line-items of the financial statements, including an analysis of the factors influencing those changes," and "briefed the Committee on customer incentives."[355] During and after Mr. Nelson's presentation, "members of the Committee asked numerous questions of Mr. Nelson, the other members of the financial management team and Terry Ward (PwC) and engaged in a thorough discussion of these matters."[356]

140. The Audit Committee also discussed the Company's draft earnings release and "provided various inputs to Mr. Kneeshaw as well as inquiring of management on various disclosure matters."[357] Additionally, Mr. Ward from PwC "briefed the Committee on the fiscal 2012 integrated audit" and "reviewed the status of items to be completed in connection

[351] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 18–19.
[352] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 18; "FY2Q13 Earnings Release Calendar," Q121SEC00878838–43 at 40.
[353] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 18.
[354] "FY12 Q4 Management Report: Audit Committee of the Qualcomm Board of Directors," November 5, 2012, Q121SEC00195953–75 at 54.
[355] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 18–19.
[356] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 19.
[357] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 19. Email correspondence indicates that one of the disclosure items discussed was regarding whether to add a disclosure about "the migration to the nodes business" to the Form 10-K. In response, Mr. Dill emailed Mr. Chivetta asking whether "QCT believe[ed] [they] should add something on this." In response, Mr. Chivetta proposed draft language and circulated it to others at QCT. *See* Email chain from Sanjay Mehta to Jim Lederer, et al., "FW: Nodes - 10-K Disclosure," November 6, 2012, Q2014FTC03859062–9; "Akash Palkhiwala," LinkedIn, https://www.linkedin.com/in/akash-palkhiwala-1b369520/; "Sanjay Mehta," LinkedIn, https://www.linkedin.com/in/sanjay-mehta-1139517a/. The new language was incorporated in the 2012 Form 10-K. *See* Qualcomm FY 2012 10-K, p. 5 ("We make investments to provide our integrated circuit customers with chipsets designed on leading-edge technology nodes that combine multiple technologies for use in consumer devices, including smartphones, consumer electronics and other data devices.").

with the audit."[358] According to the meeting minutes, the Audit Committee members "asked several questions during [Mr. Ward's] presentation."[359]

141. As mentioned above, a draft of the 2012 Form 10-K had been circulated to the Audit Committee prior to the meeting. The meeting minutes indicate that "Committee members provided comments on various sections" of the draft 2012 Form 10-K and "Mr. Dittamore noted that all other members of the Board of Directors had also received the draft Form 10-K, and that the other members of the Board had been invited to join the meeting … to provide any input to the Committee and management beyond that which had already been provided."[360] However, no additional members of the Board joined the meeting at the appointed time.[361] At the conclusion of the discussion, the Audit Committee "recommend[ed] that the audited financial statements be included in the Company's Annual Report on Form 10-K."[362]

142. After the Audit Committee meeting, a draft of the 2012 Form 10-K was sent to PwC on November 6, 2012 and it was ultimately filed with the SEC on November 7, 2012.[363]

143. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for the 2012 Form 10-K followed an iterative approach that involved multiple relevant committees, departments, and individuals and was consistent with the Company's general disclosure practices described in Section V and the disclosure customs and practices in large public companies described in Section IV.

### 2. Fiscal Q2 2013 Form 10-Q

144. On April 24, 2013, Qualcomm filed its Form 10-Q for Q2 2013 with the SEC.[364] Plaintiffs allege that Qualcomm made false and misleading statements in the MD&A line item of its Form 10-Q. Specifically, as shown in **Exhibit 1**, Plaintiffs allege that Qualcomm's statements regarding "the benefits of [its] business model in promoting a highly competitive and innovative wireless industry," and "the success of [its] business model in enabling new, highly cost-effective competitors to [certain companies'] products" were false and misleading because "Qualcomm stifled competition by bundling the terms of its chipset

---

[358] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 19.
[359] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 19.
[360] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 20.
[361] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 20.
[362] "Qualcomm Audit Committee Meeting," December 10, 2012, Q121SEC00762315–89 at 20.
[363] Email from Erin Polek to Laura Rack and Heidi Wagner, "Latest 10-K," November 6, 2012, Q121SEC00111611; Qualcomm FY 2012 10-K.
[364] Qualcomm Incorporated, Form 10-Q, April 24, 2013 ("Qualcomm, Form 10-Q, April 24, 2013").

and license agreements, conditioning royalty relief on the customer's exclusive use of Qualcomm chipsets."[365]

145. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for the Q2 2013 Form 10-Q followed an iterative approach that involved multiple relevant committees, departments, and individuals and was consistent with the Company's general disclosure practices described in Section V and the disclosure customs and practices in large public companies described in Section IV. The process Qualcomm followed when preparing its disclosures in the Q2 2013 Form 10-Q was similar to the process followed to prepare disclosures in the 2012 Form 10-K. Drafting of certain portions of the Q2 2013 Form 10-Q began as early as March 2013 and leveraged the prior quarter's Form 10-Q.[366] For example, on March 13, 2013, Ms. Ford sent an email attaching a draft of the Q2 2013 Form 10-Q to Ms. Henson, Ms. Polek, Mr. Dill, Mr. Thomas, Mr. Bono, and Mr. Mersy.[367] Ms. Ford explained that the draft was "created … by rolling forward the Q1 Fiscal 2013 10Q 'As Filed'" and that the draft had "been conformed to be consistent with the Q2 Fiscal 2012 10Q."[368] Ms. Ford further informed the group that the draft "should be used for distribution to the BUs/Corporate Functions" by March 15, 2013.[369]

146. In accordance with Ms. Ford's instructions, Mr. Dill sent an email on March 14, 2013 to Mr. Griffith (and copied Mr. Cianflone and Ms. Polek), attaching sections of the draft Q2 2013 Form 10-Q that were related to QTL and which contained the at-issue disclosures.[370] Mr. Dill's email stated that the "Finance Department for each BU has primary responsibility for that BU's 10-Q disclosures," and that "[t]o the extent that other departments outside of QTL Finance (e.g. Legal, Marketing, etc.) are utilized to review the BU disclosures, QTL Finance should coordinate with those departments and submit consolidated changes / updates in 'track changes' mode to Corporate Reporting" by March 29, 2013.[371] Mr. Dill further informed the group that an updated version of the draft with "Q1 [*sic*] numbers, as well as other changes made by [Accounting Practices and Reporting]" would be circulated on April

[365] Qualcomm, Form 10-Q, April 24, 2013, p. 25; Complaint, ¶ 145.
[366] Email from Joyce Ford to Jamie Henson, et al., "FY2013 Q2 10Q," March 13, 2013, Q121SEC00115327.
[367] Email from Joyce Ford to Jamie Henson, et al., "FY2013 Q2 10Q," March 13, 2013, Q121SEC00115327.
[368] Email from Joyce Ford to Jamie Henson, et al., "FY2013 Q2 10Q," March 13, 2013, Q121SEC00115327; Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00115328–72.
[369] Email from Joyce Ford to Jamie Henson, et al., "FY2013 Q2 10Q," March 13, 2013, Q121SEC00115327.
[370] Email from Roel Dill to Larry Griffith, "QTL Pre-close Draft of the Q2FY13 10-Q," March 14, 2013, Q121SEC00336764; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00336765–78 at 69. A similar email was sent to the QCT business unit. *See, e.g.*, Email from Sal Bono to Charles Chivetta, et al., "QCT Q2 2013 10-Q pre-close draft," March 15, 2013, Q2014FTC03358774; "QCT Q2FY2013 10-Q Pre-close Draft," Q2014FTC03358775–87.
[371] Email from Roel Dill to Larry Griffith, "QTL Pre-close Draft of the Q2FY13 10-Q," March 14, 2013, Q121SEC00336764.

10, 2013 and that edits to that version would need to be submitted by April 11, 2013 in advance of it being circulated to the Disclosure Compliance Review Committee.[372] In response to Mr. Dill's email, Mr. Griffith returned edits to the draft Q2 2013 Form 10-Q on March 29, 2013.[373]

147. Later, on April 11, 2013, Ms. Polek emailed Ms. Ford, Mr. Bono, Mr. Dill, Mr. Thomas, and Mr. Mersy an updated version of the draft Q2 2013 Form 10-Q to be circulated to the business units and informed the group that their comments were due by the close of business that day.[374] In accordance with Ms. Polek's instructions, drafts were circulated to various business units. For example, on April 11, 2013, Mr. Dill sent an email to Mr. Griffith (and copied Ms. Polek), attaching sections of the draft Q2 2013 Form 10-Q that were related to QTL and which contained the at-issue disclosures.[375] Mr. Dill explained that the attached draft was marked to show changes compared to the prior draft "that QTL commented on," and asked that any comments be submitted by 5:00 PM that day.[376] He further informed the recipients that the next version of the draft would be sent on April 16, 2013, with comments due on April 17, 2013.[377] In response, Mr. Griffith returned a copy of the draft Q2 2013 Form 10-Q with comments.[378]

148. Likewise, on April 11, 2013, Mr. Bono sent an email to Mr. Chivetta, Mr. Mehta, Ms. Desikan, Mr. McDonough, Mr. Tachner, Ms. Cochron, Mr. Palkhiwala, and Mr. Weiser (and copied Mr. Dill and Ms. Henson), attaching sections of the draft Q2 2013 Form 10-Q that were related to QCT and which contained the at-issue disclosures.[379] Mr. Bono's email stated that the "Finance Department for each BU has primary responsibility for that BU's 10-Q disclosures," and that "[t]o the extent that other departments outside of QCT Finance (e.g.

---

[372] Email from Roel Dill to Larry Griffith, "QTL Pre-close Draft of the Q2FY13 10-Q," March 14, 2013, Q121SEC00336764.
[373] Email chain from Larry Griffith to Roel Dill, "RE: QTL Pre-close Draft of the Q2FY13 10-Q," March 29, 2013, Q121SEC00356402; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00356403–16.
[374] Email from Erin Polek to Joyce Ford, et al., "10-Q ready for BU Distribution," April 11, 2013, Q121SEC00334590; Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00334591–635.
[375] Email from Roel Dill to Erin Polek, "For your review: QTL Q2FY13 10-Q Post Close Draft 1," April 11, 2013, Q121SEC00666924; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00666925–38 at 29.
[376] Email from Roel Dill to Erin Polek, "For your review: QTL Q2FY13 10-Q Post Close Draft 1," April 11, 2013, Q121SEC00666924.
[377] Email from Roel Dill to Erin Polek, "For your review: QTL Q2FY13 10-Q Post Close Draft 1," April 11, 2013, Q121SEC00666924.
[378] Email chain from Larry Griffith to Roel Dill, "RE: For your review: QTL Q2FY13 10-Q Post Close Draft 1," April 12, 2013, Q121SEC00666953; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00666954–67.
[379] Email from Sal Bono to Charles Chivetta, et al., "QCT Q2 2013 10-Q Post-close Draft 1," April 11, 2013, Q2014FTC03358649; "QCT Q2FY2013 10-Q: Post-close Draft 1," Q2014FTC03358650–63 at 53–54. A similar email was sent to the QES business unit. *See, e.g.*, Email from Chris Thomas to James Hover, et al., "For your review: Pre-Close - Q2 FY13 10-Q - QES," April 11, 2013, Q121SEC00115373; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00115374–7; Email chain from Chris Thomas to Erin Polek, "Fwd: For your review: Pre-Close - Q2 FY13 10-Q - QES," April 11, 2013, Q121SEC00164968–9.

Marketing, Engineering, etc.) are utilized to review the BU disclosures, QCT Finance should coordinate with those departments and submit consolidated changes / updates in track changes mode to Corporate Reporting" by 5:00 PM on April 11, 2013.[380] Mr. Bono further stated that "[a]ll QCT comments from the pre-close draft were made and are reflected" in the attached draft Form 10-Q and that he "inserted a few of [their] typical confirmation requests" for Mr. Chivetta to confirm.[381] Additionally, Mr. Bono informed the group that an updated version of the draft incorporating "all Q2 numbers, as well as other changes made by AP&R and the Disclosure Compliance Committee" would be sent to them on April 16, 2013.[382] In response, Mr. Chivetta returned a copy of the draft Q2 2013 Form 10-Q with comments.[383]

149. Excerpts of the Q2 2013 draft Form 10-Q were also circulated to individuals from Investor Relations and Finance. For example, on April 11, 2013, Mr. Thomas sent excerpts of the draft Q2 2013 Form 10-Q that included the at-issue disclosures to Mr. Kneeshaw, Mr. Sinnott, Mr. Davidson (SVP of Investor Relations & QFN Sales & Marketing), Ms. Berguson, Mr. Gilbert, Mr. Cabaniss, and Mr. Lam and asked them to submit any edits to the draft by 5:00 PM that day.[384] In response, Mr. Cabaniss and Ms. Berguson returned copies of the draft Q2 2013 Form 10-Q with comments.[385] On April 12, 2013, Mr. Thomas again emailed individuals from Investor Relations, this time attaching a document highlighting proposed changes in the Form 10-Q risk factors section, and informed the group that the full draft Q2 2013 Form 10-Q would be sent later with highlighting for the Disclosure Compliance Review Committee.[386]

150. On April 13, 2013, the draft Q2 2013 Form 10-Q was sent to the Disclosure Compliance Review Committee, which was scheduled to meet on April 16, 2013 to discuss

---

[380] Email from Sal Bono to Charles Chivetta, et al., "QCT Q2 2013 10-Q Post-close Draft 1," April 11, 2013, Q2014FTC03358649.
[381] Email from Sal Bono to Charles Chivetta, et al., "QCT Q2 2013 10-Q Post-close Draft 1," April 11, 2013, Q2014FTC03358649.
[382] Email from Sal Bono to Charles Chivetta, et al., "QCT Q2 2013 10-Q Post-close Draft 1," April 11, 2013, Q2014FTC03358649.
[383] Email from Charles Chivetta to Sal Bono, "Re: QCT Q2 2013 10-Q Post-close Draft 1," April 12, 2013, Q2014FTC03358644.
[384] Email from Chris Thomas to Warren Kneeshaw, et al., "For your review: IR/FP&A Q2FY13 10Q Post-close Draft #1," April 11, 2013, Q121SEC00160881; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00160882–3; "FY2Q13 Earnings Release Calendar," Q121SEC00878838–43 at 40.
[385] Email from Taylor Cabaniss to Chris Thomas, et al., "RE: For your review: IR/FP&A Q2FY13 10Q Post-close Draft #1," April 11, 2013, Q121SEC00073398; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00073399–400; Email chain from Amy Berguson to Taylor Cabaniss, et al., "RE: For your review: IR/FP&A Q2FY13 10Q Post-close Draft #1, April 11, 2013, Q121SEC00075764; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00075765–6.
[386] Email from Chris Thomas to Amy Berguson, "Risk Factors – Compare Doc," April 12, 2013, Q121SEC00090861; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00090862–71.

the draft.[387] In response, Mr. Zuckerman returned a draft of the Q2 2013 Form 10-Q with edits.[388]

151. On April 17, 2013, the day after the scheduled Disclosure Compliance Review Committee Meeting, Ms. Henson discussed "follow on items from the Disclosure Compliance Review meeting" in an email sent to Mr. Davis (and copying Mr. Nelson).[389] The follow on items included bringing "wording forward from the 10-K to the QTL description in MD&A to reiterate the revenue recognition lag," adding "a section to MD&A to mention seasonality," and deleting "the reference to the display businesses in the MD&A discussion of R&D expenses as the increases [were] not material."[390]

152. On the same day, Mr. Mersy distributed an updated draft of the Q2 2013 Form 10-Q to Ms. Polek, Mr. Thomas, Mr. Dill, Ms. Ford, and Mr. Bono, and announced that it was "ready to be distributed to the business units."[391] Mr. Dill then emailed Mr. Griffith (and copied Ms. Polek) updated excerpts of the draft Q2 2013 Form 10-Q related to QTL and which contained the at-issue disclosures.[392] The email included a version of the draft Q2 2013 Form 10-Q that showed changes made "to the prior version provided by QTL" with "responses to comments made by QTL" along with other "questions and comments."[393] Mr. Dill asked that any changes to the draft be submitted by April 17, 2013, in advance of the draft being sent to the Audit Committee.[394] He further listed the following "remaining key dates" regarding the Q2 2013 Form 10-Q filing:

- "April 17 – Final comments due from QTL
- April 17 – Distribute to the Audit Committee

---

[387] Email from Jamie Henson to George Davis, et al., "Qualcomm Q2 Fiscal 2013 Disclosure Compliance Review Draft 10-Q," April 13, 2013, Q121SEC00776715; "Disclosure Compliance Review Committee Draft," Q121SEC00776716–64.
[388] Email chain from David Zuckerman to Jamie Henson, "RE: Qualcomm Q2 Fiscal 2013 Disclosure Compliance Review Draft 10-Q," April 16, 2013, Q121SEC00666968; "Disclosure Compliance Review Committee Draft," Q121SEC00666969–7017.
[389] Email chain from Bud Nelson to Jamie Henson and George Davis, "RE: 10-Q Review Meeting Follow On," April 18, 2013, QNDCAL00812271–2.
[390] Email chain from Bud Nelson to Jamie Henson and George Davis, "RE: 10-Q Review Meeting Follow On," April 18, 2013, QNDCAL00812271–2.
[391] Email from Dustin Mersy to Erin Polek, et al., "10-Q ready for BU Distribution," April 17, 2013, Q121SEC00115380; Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00115381–425.
[392] Email from Roel Dill to Larry Griffith, "FINAL REVIEW QTL Q2FY13 Post close draft 2," April 17, 2013, Q121SEC00667018; Excerpts of Draft Q2 2013 Form 10-Q, Q121SEC00667019–32 at 23; Excerpts of Draft Q2 2013 Form 10-Q, Q121SEC00667033–46 at 37.
[393] Email from Roel Dill to Larry Griffith, "FINAL REVIEW QTL Q2FY13 Post close draft 2," April 17, 2013, Q121SEC00667018; Excerpts of Draft Q2 2013 Form 10-Q, Q121SEC00667019–32; Excerpts of Draft Q2 2013 Form 10-Q, Q121SEC00667033–46.
[394] Email from Roel Dill to Larry Griffith, "FINAL REVIEW QTL Q2FY13 Post close draft 2," April 17, 2013, Q121SEC00667018.

- April 24 – File 10-Q."[395]

In response, Mr. Griffith returned a draft of the Q2 2013 Form 10-Q with comments.[396]

153. Similar emails were sent to other business units. For example, on April 17, 2013, Mr. Bono sent an email to Mr. Chivetta, Mr. Mehta, Ms. Desikan, Mr. McDonough, Mr. Tachner, Ms. Cochron, Mr. Palkhiwala, and Mr. Weiser (and copied Mr. Dill and Ms. Henson), attaching updated sections of the draft Q2 2013 Form 10-Q that were related to QCT and which contained the at-issue disclosures.[397] Mr. Bono's email stated that the "Finance Department for each BU has primary responsibility for that BU's 10-Q disclosures," and that "[t]o the extent that other departments outside of QCT Finance (e.g. Marketing, Engineering, etc.) are utilized to review the BU disclosures, QCT Finance should coordinate with those departments and submit consolidated changes / updates in track changes mode to Corporate Reporting" by noon on April 17, 2013.[398] Mr. Bono further informed the group that "[a]ll QCT comments from the post-close draft 1 were made and [were] reflected" in the attached draft Form 10-Q and that he "inserted a few additional comments" in the draft for Mr. Chivetta's review.[399] In response, Mr. Chiavetta returned a draft of the Q2 2013 Form 10-Q with comments from QCT and informed Mr. Bono that "confirmation on competitors and seasonality [was] to follow."[400]

154. Updated excerpts of the draft Q2 2013 Form 10-Q were also circulated to individuals from Investor Relations and Finance. On April 17, 2013, Mr. Thomas emailed Mr. Cabaniss, Mr. Kneeshaw, Mr. Sinnott, Mr. Davidson, Mr. Gilbert, Mr. Lam, and Ms. Berguson updated excerpts of the draft Q2 2013 Form 10-Q that included the at-issue disclosures.[401]

---

[395] Email from Roel Dill to Larry Griffith, "FINAL REVIEW QTL Q2FY13 Post close draft 2," April 17, 2013, Q121SEC00667018.
[396] Email from Larry Griffith to Roel Dill, "RE: FINAL REVIEW QTL Q2FY13 Post close draft 2," April 17, 2013, Q121SEC00667047; Excerpts of Draft Q2 2013 Form 10-Q, Q121SEC00667048–61.
[397] Email from Sal Bono to Charles Chivetta, et al., "QCT Q2 2013 10-Q Post-close Draft 2," April 17, 2013, Q2014FTC03358599; "QCT Q2FY2013 10-Q: Post-close Draft 2," Q2014FTC03358600–12 at 04; "QCT Q2FY2013 10-Q: Post-close Draft 2," Q2014FTC03358613–25 at 16–17. A similar email was sent to the QES business unit. *See, e.g.*, Email from Chris Thomas to James Hover, et al., "Final Distribution: Q2 2013 10-Q_QES," April 17, 2013, Q121SEC00115426; Excerpts of Draft Q2 2013 Form 10-Q, Q121SEC00115427–30; Excerpts of Draft Q2 2013 Form 10-Q, Q121SEC00115431–4.
[398] Email from Sal Bono to Charles Chivetta, et al., "QCT Q2 2013 10-Q Post-close Draft 2," April 17, 2013, Q2014FTC03358599.
[399] Email from Sal Bono to Charles Chivetta, et al., "QCT Q2 2013 10-Q Post-close Draft 2," April 17, 2013, Q2014FTC03358599.
[400] Email chain from Charles Chivetta to Sal Bono, "QCT Q2 2013 10-Q Post-Close Draft 2," April 17, 2013, Q2014FTC03358585; "QCT Q2FY2013 10-Q: Post-close Draft 2," Q2014FTC03358586–98.
[401] Email from Chris Thomas to Taylor Cabaniss, et al., "Final Distribution: Q2 2013 10-Q_FP&A and IR," April 17, 2013, Q121SEC00268705; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00268706–7 at 7; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00268708–9 at 9; Excerpts of Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00268710–20.

155. After the various reviews discussed above, on April 18, 2013, Ms. Henson distributed the draft Q2 2013 Form 10-Q by email to the Audit Committee and other individuals[402] and explained that "[c]ertain sections [of the draft Form 10-Q were] highlighted for [their] reference."[403] Ms. Henson also informed the group that the draft would be discussed with the Audit Committee on April 22, 2013, and that the Form 10-Q was expected to be filed with the SEC on April 24, 2013.[404] Between April 20, 2013 and April 24, 2013, Ms. Polek sent drafts of the Q2 2013 Form 10-Q to Scott Dudzik from PwC.[405]

156. Qualcomm's Audit Committee met on April 22, 2013.[406] Audit Committee members Mr. Dittamore, Barbara Alexander (Audit Committee), and Don Cruickshank (Audit Committee) attended the meeting along with a number of Qualcomm executives and individuals from PwC and DLA Piper.[407] Prior to the meeting, drafts of the Q2 2013 Form 10-Q and earnings press release were circulated to members of the Audit Committee for their review.[408] Reports were also prepared and circulated to the Audit Committee prior to the meeting, summarizing the Company's financial performance and the independent auditor's review of the financial statements.[409]

157. Minutes of the meeting stated that Mr. Nelson presented a previously circulated report to the Audit Committee on the Company's financial performance during the quarter.[410] Mr. Nelson reviewed with the Audit Committee the financial results for the quarter as well as the Company's "accounting and disclosure quarterly processes that had been completed or were scheduled to be completed prior to filing the Form 10-Q and conducting the quarterly

---

[402] The email was sent to Mr. Davis, Mr. Grannis, Dr. Jacobs, Mr. Sailer, Mr. Gardner (SVP of Tax & Trade), Mr. Davidson, Mr. Rains, Mr. Rein, Mr. Nelson, Mr. Spencer, Mr. Rosenberg, Mr. Mollenkopf, Mr. Kneeshaw, Mr. Ward, Mr. Wieghaus, Mr. Zuckerman, Ms. Taylor, and Mr. Dunham, (and copied Mr. Altman, Ms. Lam, Mr. Aberle, Dan Sullivan (EVP & Corporate Officer, Human Resources) , Mr. Lederer, Mr. Keitel (EVP & Sr. Advisor), Ms. Polek, Mr. Cabaniss, Mr. Lancia, Ms. Ford, Mr. Matsuo, Mr. Dill, Mr. Thomas, Ms. Berguson, Ms. Wapner (VP Tax & Trade), Mr. Sinnott, Ms. Wagner, Mr. Mersy, Mr. Gilbert, Mr. Bono, and Ms. Cassidy). *See* Email from Jamie Henson to George Davis, et al., "Qualcomm Q2FY13 10-Q Audit Committee Draft," April 18, 2013, Q2014FTC00538355; "Q2FY13 Earnings Release Calendar," Q121SEC00878838–43 at 40; "Beth Wapner," *LinkedIn*, https://www.linkedin.com/in/beth-wapner-37521a4/details/experience; "Daniel L. Sullivan, Ph.D," *LinkedIn*, https://www.linkedin.com/in/drdanielsullivan.

[403] Email from Jamie Henson to George Davis, et al., "Qualcomm Q2FY13 10-Q Audit Committee Draft," April 18, 2013, Q2014FTC00538355; "Audit Committee Draft," Q2014FTC00538356–404.

[404] Email from Jamie Henson to George Davis, et al., "Qualcomm Q2FY13 10-Q Audit Committee Draft," April 18, 2013, Q2014FTC00538355.

[405] Email from Erin Polek to Scott Dudzik, "Latest 10-Q," April 20 2013, Q121SEC00111798; Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00111799–844; Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00111845–88; Email from Erin Polek to Heidi Wagner, et al., "Latest 10-Q," April 23, 2013, Q121SEC00111517; Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00111518–63; Email from Erin Polek to Amy Berguson, et al., "Latest 10-Q," April 24, 2013, Q121SEC00334543; Draft Qualcomm Q2 2013 Form 10-Q, Q121SEC00334544–89.

[406] "Qualcomm Audit Committee Meeting," April 22, 2013, Q121SEC00633744–824 at 744.

[407] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 170.

[408] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 171.

[409] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 170–171.

[410] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 170.

conference call."[411] According to a checklist in the report, each of the Company's accounting and disclosure quarter-end process events were either completed or were scheduled to be completed within the next two days.[412]

158. Mr. Nelson also "highlighted for the Committee the material changes from the prior periods with respect to various line-items of the financial statements, including an analysis of the factors influencing those changes," and "briefed the Committee on customer incentives."[413] During Mr. Nelson's presentation, "members of the Committee asked numerous questions of Mr. Nelson and the management team and engaged in a thorough discussion of these matters."[414] The Audit Committee also discussed the Company's draft earnings release and "provided input on various sections of the earnings release."[415]

159. Additionally, Mr. Ward from PwC "briefed the Committee on the [second quarter financial review] and the more significant items noted in PwC's review."[416] According to the meeting minutes, the Audit Committee members "asked numerous questions during [Mr. Ward's] presentation."[417]

160. As mentioned above, a draft of the Q2 2013 Form 10-Q had been circulated to the Audit Committee prior to the meeting. The meeting minutes indicate that "Committee members provided comments on various sections" of the draft Q2 2013 Form 10-Q and, "Ms. Henson reviewed a change to the risk factors from the draft that had been circulated to the members of the Committee."[418] During the meeting, Dr. Jacobs and Mr. Davis also "noted that they had been involved in the customary briefings and procedures related to the quarterly results and Form 10-Q, and they knew of no issues that would prevent them from providing the required certifications with the filing."[419]

161. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for the Q2 2013 Form 10-Q followed an iterative approach that involved multiple relevant committees, departments, and individuals and was consistent with the Company's general disclosure practices described in Section V and the disclosure customs and practices in large public companies described in Section IV.

---

[411] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 170.
[412] "FY13 Q2 Management Report: Audit Committee of the Qualcomm Board of Directors," April 22, 2013, Q121SEC00587846–65 at 47.
[413] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 170–171.
[414] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 171.
[415] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 171.
[416] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 171.
[417] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 171.
[418] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 171.
[419] "Qualcomm Audit Committee Meeting," July 22, 2013, Q121SEC00555166–319 at 172.

### B. At-Issue Disclosures at Analyst Conferences

162. During the Class Period, Qualcomm made disclosures about its business practices at the 2012 Credit Suisse Technology Conference and the 2013 GSM Association MWC. Qualcomm's process for preparing for these events involved the development by Investor Relations personnel of talking points responsive to anticipated analyst questions and the use of materials that the Company had previously prepared for prior events such as analyst days and earnings releases. As I explain above in Section V.D, the Company's process for developing materials for analyst days and earnings disclosures followed an iterative approach involving multiple relevant departments and individuals. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for analyst conferences containing the at-issue disclosures involved multiple relevant departments and individuals and was consistent with the Company's general disclosure practices described in Section V and disclosure customs and practices in large public companies described in Section IV.

#### 1. 2012 Credit Suisse Technology Conference

163. On November 27, 2012, Qualcomm was one of several technology companies that participated in the annual Credit Suisse Technology Conference.[420] During the conference, Kulbinder Garcha, an analyst from Credit Suisse, held a fireside chat with Mr. Aberle, Qualcomm's EVP and Group President, during which Mr. Garcha asked Mr. Aberle a number of questions related to the Company's licensing business.[421] Afterwards, Mr. Aberle received and responded to questions from audience members.[422]

164. During this event, Mr. Aberle made the following statements in response to questions by an audience member:

> "Unidentified Audience Member: Okay, thanks—a few questions on the China market, how you structure the licensing. I think when you

[420] *See, e.g.*, Email from Achal Sultania on behalf of Kulbinder Garcha "IT Hardware / Telecom Equipment – Credit Suisse Tech Conference 2012: Day 1 Takeaways," November 28, 2012, Q121SEC00091735–6; "QUALCOMM at Credit Suisse Technology Conference - Final," CQ FD Disclosure, November 27, 2012; "Tableau Software Management to Participate at Credit Suisse 2012 Annual Technology Conference," November 20, 2012, https://www.tableau.com/about/press-releases/2012/tableau-software-management-participate-credit-suisse-2012-annual; "Responsys to Present at Credit Suisse 2012 Annual Technology Conference," November 27, 2012, https://finance.yahoo.com/news/responsys-present-credit-suisse-2012-130000139.html; "Cognizant to Present at the Credit Suisse Annual Technology Conference," November 20, 2012, https://news.cognizant.com/2012-11-20-Cognizant-to-Present-at-the-Credit-Suisse-Annual-Technology-Conference; "Informatica to Present at Credit Suisse Annual Technology Conference," November 26, 2012, https://www.globenewswire.com/en/news-release/2012/11/26/507412/11123/en/Informatica-to-Present-at-Credit-Suisse-Annual-Technology-Conference.html.

[421] Qualcomm, Inc. Credit Suisse Technology Conference Transcript, November 27, 2012, Q121SEC00759112–21 at 13.

[422] Qualcomm, Inc. Credit Suisse Technology Conference Transcript, November 27, 2012, Q121SEC00759112–21 at 19–20.

went into China a number of years back, you had most-favored nation or lower rate to Chinese manufacturers. So I wanted to see if those still apply.

The second one is on TD, and also TD LTE, how that affects royalties relative to WCDMA; and then also if there's any potential to bundle so you offer a lower royalty, get more share with the QRD platform.

Derek Aberle: So in China, about—I guess, more than 10 years ago, in order to help open the market to CDMA, we ended up signing some deals that were just specific to CDMA2000 with a relatively small number of vendors that the Chinese government had identified. Again, those agreements implied only that CDMA2000 were for a limited number of companies, and many of those remain today.

As we then started to license for WCDMA, we did not extend those special terms into WCDMA. And so the agreements that we've licensed in China around WCDMA have been around one of our standard terms.

If you think about—so the situation around TD—in TD-SCDMA, we've got quite a large number of companies licensed. But, given the way the technology has been positioned in China and some of the political sensitivities there, I think we have been pretty open that we've had some challenges collecting on all the TD-SCDMA volume in China. And we are continuing to actively work that and try to improve the situation there. But there is some portion of that volume that we are not collecting on today.

So as you think about China Mobile going forward from a Qualcomm perspective, I think a couple of things are happening which are positive. One is, as they look at the higher end of their portfolio, they are pushing more and more devices to multi-mode. So, although they are supporting TD-SCDMA, they are also implementing UMTS. And that's—they want to give a global roaming opportunity to their higher-end subscribers. And so, even if the device has TD-SCDMA, as long as it has UMTS, we are able to collect on that without the same sensitivities.

Similarly, they are aggressively pushing to move to LTE TDD. And there's rumors that—or even their own announcements that say they are going to launch commercial trials next year. We've started to license in China around LTE, and we've got, obviously, ZTE licensed as well as a number of other Chinese companies. And at least at this point, there don't appear to be the same types of sensitivities around LTE TDD, which is—obviously, got a tremendous amount of commonality with the FDD version and is a worldwide standard.

> And so, as that volume moves over to—from just TD-SCDMA only to LTE, it will make it much easier for us to collect royalties on that volume as well. So I think those trends, we expect, will help us resolve some of these issues in the coming years.
>
> Unidentified Audience Member: (Inaudible) get more QRD business?
>
> Derek Aberle: Yes, so we haven't done that. And within the Company, we tend to keep the licensing and the chip business very separate. Obviously, our view is that companies need a license if they are doing 3G or 4G devices, sort of irrespective of whose chip they use. And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and we don't bundle those together."[423]

165. As shown in **Exhibit 1**, Plaintiffs assert that Mr. Aberle's response to the last, partially inaudible question regarding Qualcomm's QRD business was false and misleading because "[c]ontrary to Defendant Aberle's statement, Qualcomm did not keep the 'licensing and chip business very separate'; rather, it refused to license competitor chipmakers and bundled the terms of its license and chip agreements."[424] Plaintiffs also allege that Mr. Aberle's statement "omitted material facts, including that … Qualcomm bundled the terms of its license agreements with the terms of its chipset agreements by providing royalty relief to Apple and other customers who purchased all or most of their chipsets from Qualcomm."[425]

166. In preparing materials for the Credit Suisse conference, Qualcomm's Investor Relations team developed talking points responsive to anticipated analyst questions, relying on material that had been previously prepared, including for the 2012 Analyst Day, in which Mr. Aberle also participated approximately two weeks prior to the conference.[426] As discussed above in Section V.D.3.a, the Company followed an iterative approach that involved multiple relevant departments and individuals, who prepared, discussed, reviewed, and checked the disclosures for accuracy when preparing materials for analyst days.

167. On November 19, 2012, more than a week before the conference, Mr. Garcha emailed Mr. Kneeshaw questions that Mr. Aberle might be asked during the fireside chat.[427] Mr. Kneeshaw worked with Ms. Berguson and Mr. Sinnott to draft talking points in response to the questions received.[428] Mr. Sinnott prepared an initial draft of the talking points, after

[423] Kneeshaw Deposition Exhibit 648, Q121SEC00359497–505 at 504; Complaint, ¶¶ 142–143.
[424] Complaint, ¶¶ 142–143.
[425] Complaint, ¶¶ 142–143.
[426] "Qualcomm Analyst Day," November 15, 2012, Q121SEC00743078–229 at 185.
[427] Kneeshaw Deposition Exhibit 646, Q121SEC00073340–1.
[428] Kneeshaw Deposition Exhibit 647, Q121SEC00296941–54; Email chain from Amy Berguson to Warren Kneeshaw, "FW: Updated Q&A and Factoids," November 20, 2012, Q121SEC00266876. *See also* Kneeshaw Deposition, pp. 103–104.

which Ms. Berguson reviewed and edited the talking points before sending them to Mr. Kneeshaw.[429] Mr. Kneeshaw then reviewed and edited the talking points and asked Ms. Berguson to supplement them with information from the Company's Analyst Day speaker notes and presentation held on November 15, 2012, after which Ms. Berguson added the requested information to the draft talking points.[430] As discussed above in Section V.D.3.a, Qualcomm followed an iterative process when preparing materials for the 2012 Analyst Day that involved many individuals and departments, who prepared, discussed, reviewed, and checked the disclosures for accuracy.

168. In addition to including information from the Company's 2012 Analyst Day, Ms. Berguson also incorporated into the talking points information from a table with various industry facts and statistics called the "Qualcomm Messaging Factoids Summary."[431] Information in the Qualcomm Messaging Factoids Summary was sourced from various third-parties, including data providers.[432] On November 20, 2012, Mr. Kneeshaw emailed Mr. Aberle the talking points and the Qualcomm Messaging Factoids Summary table for his review and informed him that a "briefing package" would be delivered the following Monday.[433]

169. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for the 2012 Credit Suisse Technology Conference involved multiple relevant departments and individuals and was consistent with the Company's general disclosure practices described in Section V and disclosure customs and practices in large public companies described in Section IV.

---

[429] Email chain from Warren Kneeshaw to Amy Berguson, "RE: Credit Suisse 2012 Technology Conference Questions.doc," November 20, 2012, Q121SEC00077593–4.

[430] Email chain from Warren Kneeshaw to Amy Berguson, "RE: Credit Suisse 2012 Technology Conference Questions.doc," November 20, 2012, Q121SEC00077593–4 at 3; "Credit Suisse 2012 Technology Conference – Qualcomm, Derek Aberle (EVP and Group President)," Q121SEC00077595–7; Email chain from Amy Berguson to Warren Kneeshaw, "FW: Updated Q&A and Factoids," November 20, 2012, Q121SEC00296927; "Credit Suisse 2012 Technology Conference – Qualcomm, Derek Aberle (EVP and Group President)," Q121SEC00296942–6; "Qualcomm Messaging Factoids Summary," November 6, 2012, Q121SEC00296947–54.

[431] "Credit Suisse 2012 Technology Conference – Qualcomm, Derek Aberle (EVP and Group President)," Q121SEC00161155–7; "Credit Suisse 2012 Technology Conference – Qualcomm, Derek Aberle (EVP and Group President)," Q121SEC00266877–81; Email from Amy Berguson to Warren Kneeshaw and John Sinnott, "Updated Q&A and Factoids," November 20, 2012, Q121SEC00266617; "Qualcomm Messaging Factoids Summary," November 6, 2012, Q121SEC00266623–30; "Credit Suisse 2012 Technology Conference – Qualcomm, Derek Aberle (EVP and Group President)," Q121SEC00266618–22.

[432] "Qualcomm Messaging Factoids Summary," November 6, 2012, Q121SEC00266623–30.

[433] Email from Warren Kneeshaw to Derek Aberle, "CSFB," November 20, 2012, Q121SEC00649574; "Credit Suisse 2012 Technology Conference – Qualcomm, Derek Aberle (EVP and Group President)," Q121SEC00649575–9; "Qualcomm Messaging Factoids Summary," November 6, 2012, Q121SEC00649580–7.

### 2. 2013 GSM Association Mobile World Congress

170. Between February 25 and February 28, 2013, Qualcomm attended the 2013 GSM Association MWC.[434] The event drew several thousand media and industry analysts in addition to "executives from the world's largest and most influential mobile operators, software companies, equipment providers, internet companies and companies from industry sectors such as automotive, finance and healthcare, as well as government delegations from across the globe."[435] Executives from several companies, including Qualcomm, made keynote presentations, and the conference also included "focused sessions" exploring various topics.[436] At the event, Qualcomm participated in a variety of meetings, including "One-on-one Press Interviews," "Media Roundtables," an "IR Investor Briefing," "Analyst Briefings," press conferences, fireside chats, panels, and seminars.[437] On February 25, 2013, Mr. Mollenkopf, Mr. Aberle, and Dr. Jacobs participated in an "investor briefing session," during which these individuals answered questions from analysts.[438] Mr. Mollenkopf made the following statements in response to an analyst's questions during the session:

> "Mark McKechnie, Evercore Partners: Mark McKechnie, Evercore. A question for Steve. In December the kit business performed quite well, good solid margins. But then on the guidance the outlook—in kind of typical Qualcomm fashion you didn't raise your margin target for the full year.
>
> I want to kind of dig in on that a little bit, maybe what are some of the puts and takes and I'm doing it as conservative, but I mean is there a real reason why you weren't able to raise the bar there with ASPs getting better and your costs from—and the scale on the 28 nanometer starting to hit?
>
> Steve Mollenkopf: Well, I think what we came out with was a couple things. One is we did deliver I think a strong quarter in December, probably a little stronger than we had thought.

---

[434] *See, e.g.*, "Mobile World Summit 2013 Keynote Panels Briefing Sheet – Paul Jacobs February 25 & 26, 2013," QNDCAL03305885–92; "Mozilla Press Conference Info 2-12-13_TA.ppt," QNDCAL03305897; "Mobile World Congress 2013 February 25 – 28, 2013; Barcelona, Spain Briefing Sheet – Dr. Paul E. Jacobs," QNDCAL03305913–4; "Mobile World Congress 2013 February 25 – 28; Barcelona, Spain Communications Overview," QNDCAL03305915–28 at 15.

[435] "GSMA Mobile World Congress 2013 Sets New Records," February 28, 2013, https://www.gsma.com/newsroom/press-release/gsma-mobile-world-congress-2013-sets-new-records.

[436] "GSMA Mobile World Congress 2013 Sets New Records," February 28, 2013, https://www.gsma.com/newsroom/press-release/gsma-mobile-world-congress-2013-sets-new-records.

[437] "Mobile World Congress 2013 February 25 – 28; Barcelona, Spain Communications Overview," QNDCAL00837161–74 at 63–66.

[438] "QUALCOMM at GSM Association Mobile World Congress," February 25, 2013, *Thomson Reuters*, Q121SEC00646481–94; Email from Warren Kneeshaw to Paul Jacobs, et al., "Investor Q&A session in Barcelona - logistics," February 22, 2013, Q2014FTC02531166.

> There is also—and I think we talked about this in November, there is some variability in the demand, it is a little bit more peaky and it tends to be more modulated by—it is kind of a hero device launch versus anything else these days. And as a result maybe some of our visibility is probably not as high as it would have been in days gone by. So you see a little bit of that.
>
> But we also see—but we also mentioned that we thought the year was going to unfold pretty much the way that we thought and we did raise the year, as you know. So—or excuse me, the margin we continue to keep where it is.
>
> We—you see—sequentially you do see the March quarter is different than the December quarter, there is a different OpEx profile because of the full year, there is a number of things—there's obviously a different volume outlook, you saw the numbers that we gave continue to be strong. But we think the year is going to continue to unfold pretty much the way that we thought.
>
> We also mentioned that we do our yearly price resets in the March quarter. We also—when we do our pricing policy it's not just short-term but it is also long-term pricing policy. And what that does is we may be looking at particular accounts and we may make a long-term move versus a short-term move and some of those things all factor into what happens with the margin.
>
> Mark McKechnie, Evercore Partners: (Inaudible – microphone inaccessible)?
>
> Steve Mollenkopf: Well, they are really separate businesses. I mean we have been very clear that we keep those two things separate—separate propositions to the customer. So, really two different things.[439]

171. As shown in **Exhibit 1**, Plaintiffs allege that Mr. Mollenkopf's response to the final, inaudible question was false and misleading because "[c]ontrary to Defendant Mollenkopf's statement, Qualcomm did not keep the licensing and chip business 'really separate,' and the terms of the agreements were not 'separate propositions to the customer.'"[440] Plaintiffs further claim that "Qualcomm refused to license competitors to its chipset business and bundled the terms and negotiations of its license and chipset agreements" and that Mr. Mollenkopf's statements "omitted material facts, including that: (i) Qualcomm bundled the terms of its license agreements with the terms of its chipset agreements by providing royalty

---

[439] Complaint, ¶¶ 77, 146; "QUALCOMM at GSM Association Mobile World Congress," February 25, 2013, *Thomson Reuters*, Q121SEC00646481–94 at 89.
[440] Complaint, ¶¶ 146–147.

relief to Apple and other licensees who purchased all or most of their chipsets from Qualcomm."[441]

172. In preparing materials for the 2013 GSM Association MWC, Qualcomm's Investor Relations team developed materials that were provided to the executives that would participate in the 2013 GSM Association MWC to aid in their preparation for the various events. These materials included the collection of facts and talking points about the Company and its products. Information from the Company's prior earnings release and earnings call, which Mr. Mollenkopf, Mr. Aberle, and Dr. Jacobs participated in, was also included in some of the preparation materials.[442] As discussed above in Section V.D.2, the Company followed an iterative approach that involved multiple relevant departments and individuals when preparing materials for these earnings disclosures.

173. Prior to the 2013 GSM Association MWC, materials were sent to Mr. Mollenkopf, Mr. Aberle, and Dr. Jacobs to help them prepare for the various events that they would participate in. For example, on February 15, 2013, Tina Asmar (Sr. Director Public Relations) emailed Dr. Jacobs a set of materials to prepare him for the multiple events he would be involved in at the 2013 GSM Association MWC.[443] These materials included a "Briefing Sheet"; "Communications Overview"; "Factoids Document"; "Mozilla Talking Points, Messaging/Q&As and Press Conference Agenda"; "Asus talking points"; "Snapdragon Roadmap/Update Slides"; and "Keynote information."[444] Three days later, on February 18, 2013, Ms. Asmar sent a similar email with materials including a "Briefing Sheet," "Communications Overview," "Factoids Document," "QMC Quick Facts," "Snapdragon Roadmap/Update Slides," and "GA Memo" to Mr. Mollenkopf to assist him in

---

[441] Complaint, ¶¶ 146–148.

[442] "Q1 2013 QUALCOMM Inc. Earnings Conference Call - Final," *CQ FD Disclosure*, January 30, 2013.

[443] Email from Tina Asmar to Paul Jacobs, "MWC media briefing materials," February 15, 2013, QNDCAL03305884; "Tina Asmar," *LinkedIn*, https://www.linkedin.com/in/tina-asmar-458a95a4.

[444] Email from Tina Asmar to Paul Jacobs, "MWC media briefing materials," February 15, 2013, QNDCAL03305884; "Mobile World Summit 2013 Keynote Panels Briefing Sheet – Paul Jacobs February 25 & 26, 2013," QNDCAL03305885–92; "Firefox OS Announcement @ MWC 2013 February 2013," December 1, 2012, QNDCAL03305893–6; "Mozilla Press Conference Info 2-12-13_TA.ppt," QNDCAL03305897; "Mobile World Congress 2013 February 25 – 28, 2013 Master Message Platform," QNDCAL03305898–912; "Mobile World Congress 2013 February 25 – 28, 2013; Barcelona, Spain Briefing Sheet – Dr. Paul E. Jacobs," QNDCAL03305913–4; "Mobile World Congress 2013 February 25 – 28; Barcelona, Spain Communications Overview," QNDCAL03305915–28; "ASUS Press Conference Talking Points," QNDCAL03305929–30; "QMC MWC 2013 - Snapdragon Update_Exec.pptx," QNDCAL03305931. Ms. Asmar informed Dr. Jacobs that the "Mozilla Talking Points, Messaging/Q&A, and Press Conference Agenda" had been reviewed by Jason Bremner (SVP, Product Management), and that the Asus talking points had been reviewed by Terry Yen (Wireless Business Development). Ms. Asmar further explained that "all of the press releases and their accompanying Q&As [were] still routing through approvals" and would be sent soon and that "new/updated materials" would be delivered to Dr. Jacobs the following Sunday. *See* Email from Tina Asmar to Paul Jacobs, "MWC media briefing materials," February 15, 2013, QNDCAL03305884; "Jason Bremner," *LinkedIn*, https://www.linkedin.com/in/jason-bremner-305b9564; "Terry Yen," *LinkedIn*, https://www.linkedin.com/in/terry-yen-996b281b0.

his preparation for the several events that he would participate in at the 2013 GSM Association MWC.[445]

174. The Factoids documents that Dr. Jacobs and Mr. Mollenkopf received contained talking points along with various facts about the Company and industry, many of which cited third-party sources.[446] The documents also contained highlights from the Company's Q1 2013 earnings results, which were reported on January 30, 2013.[447]

175. On February 22, 2013, Mr. Kneeshaw emailed Dr. Jacobs, Mr. Mollenkopf, and Mr. Aberle details on the upcoming investor briefing session where the at-issue disclosure was made and attached preparation materials for this event.[448] The materials included "Recent Q&A Items" talking points as well as "key messages" and Q&A related to "Qualcomm's new RF Front End solution."[449] The "Recent Q&A Items" talking points were developed by individuals in the Investor Relations department and covered multiple topics, including a recent JP Morgan downgrade, product demand, chipsets, and opportunity in the "PC/Tablet" space.[450] Several of the talking points were taken from the Company's prior earnings call

---

[445] Email from Tina Asmar to Steven Mollenkopf, "MWC media briefing materials," February 18, 2013, QNDCAL00837142; "Mobile World Congress 2013 February 25 – 28, 2013 Master Message Platform," QNDCAL00837143–57; "Mobile World Congress 2013 February 25 – 28, 2013; Barcelona, Spain Briefing Sheet – Steve Mollenkopf," QNDCAL00837158–60; "Mobile World Congress 2013 February 25 – 28; Barcelona, Spain Communications Overview," QNDCAL00837161–74; "MWC 2013 Data Protection & Privacy Policy Ongoing Discussions in Europe -State of Play & Potential Red Flags-," February 23, 2013, QNDCAL00837175–6; "First Quarter 2013 Quick Facts: QMC," QNDCAL00837177–82; "QMC MWC 2013 - Snapdragon Update_Exec.pptx," QNDCAL00837183.

[446] "Mobile World Congress 2013 February 25 – 28, 2013 Master Message Platform," QNDCAL03305898–912; "Mobile World Congress 2013 February 25 – 28, 2013 Master Message Platform," QNDCAL00837143–57.

[447] "Mobile World Congress 2013 February 25 – 28, 2013 Master Message Platform," QNDCAL03305898–912 at 905–906; "Mobile World Congress 2013 February 25 – 28, 2013 Master Message Platform," QNDCAL00837143–57 at 51–52; "Qualcomm Announces First Quarter Fiscal 2013 Results," January 30, 2013, https://investor.qualcomm.com/news-events/press-releases/detail/89/qualcomm-announces-first-quarter-fiscal-2013-results.

[448] Email from Warren Kneeshaw to Paul Jacobs, Steven Mollenkopf, and Derek Aberle, "Investor Q&A session in Barcelona - logistics," February 22, 2013, Q2014FTC02531166; "Mobile World Congress, Investor Relations- Recent Q&A Items," Q2014FTC02531167–72; "Qualcomm RF360 Front End – Corporate Key Messages/Q&A Announcement – Thursday, February 21, 2013," February 21, 2013, Q2014FTC02531174–82.

[449] Email from Warren Kneeshaw to Paul Jacobs, Seven Mollenkopf, and Derek Aberle, "Investor Q&A session in Barcelona - logistics," February 22, 2013, Q2014FTC02531166; "Mobile World Congress, Investor Relations- Recent Q&A Items," Q2014FTC02531167–72; "Qualcomm RF360 Front End – Corporate Key Messages/Q&A Announcement – Thursday, February 21, 2013," February 21, 2013, Q2014FTC02531174–82.

[450] "Mobile World Congress, Investor Relations- Recent Q&A Items," Q2014FTC02531167–72; Email from Amy Berguson to Warren Kneeshaw, "MWC Q&A draft 1," February 19, 2013, Q121SEC00937599; "Mobile World Congress Investor Relations- Recent Q&A Items," Q121SEC00937600–5; "Mobile World Congress Investor Relations- Recent Q&A Items," Q121SEC00937606–11; Email from Amy Berguson to Kelley Uyeda, "current Q&A doc," February 21, 2013, Q121SEC00937592; "Mobile World Congress Investor Relations- Recent Q&A Items," Q121SEC00937593–8.

held on January 30, 2013,[451] and the preparation of the talking points utilized Q&A talking points prepared for the prior Goldman Sachs fireside chat discussed in Section V.D.3.b.[452]

176. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for the 2013 GSM Association MWC involved multiple relevant departments and individuals and was consistent with the Company's general disclosure practices described in Section V and disclosure customs and practices in large public companies described in Section IV.

### C. At-Issue Disclosures in Taipei Times Interview

177. On June 24, 2016 in Taiwan (corresponding to June 23, 2016 in the United States), the *Taipei Times* published an article about ongoing investigations into Qualcomm's licensing business, claiming that the Company faced "a slew of probes launched by global competition watchdogs over concerns that [Qualcomm's] licensing practices might hamper market competition."[453] The article also mentioned that a group of reporters from Taiwan had visited Qualcomm's headquarters where the Company's General Counsel, Mr. Rosenberg, stated, "[w]hen we charge our license it will be fair, reasonable and non-discriminate. We have done that for 30 years."[454] As shown in **Exhibit 1**, Plaintiffs claim that the statements by Mr. Rosenberg (EVP & General Legal Counsel) were false and misleading because "Qualcomm, in licensing its essential patents, has discriminated against and provided

---

[451] *See, e.g.*, "Mobile World Congress, Investor Relations- Recent Q&A Items," Q2014FTC02531167–72 at 67–68 ("As we commented on the call: We did factor in seasonality. In the last few years, we often see a dip going into the March quarter, but relative to five, six, seven years ago, is not as much as we used to see back then. We also think that the channel inventory is being managed pretty tightly. So hopefully, we're right on that estimate. And therefore, maybe a bit less dip than what you otherwise would see. Many of our customers are relying on us much more for their inventory needs. …our inventories grew pretty nicely in the December quarter, in line with what we wanted them to grow. So I think we've got Q2 pegged pretty well. Albeit keep in mind that the order interval has decreased and so there is more volatility in that MSM number. Midpoint is about 169 million MSM's compared to the 182 million we just reported having shipped in Q1."); "Q1 2013 Qualcomm Inc. Earnings Conference Call – Final," *CQ FD Disclosure*, January 30, 2013 ("[W]e did factor in seasonality. In the last few years, we often see a dip going into the March quarter, but relative to five, six, seven years ago, it is not as much as we used to see back then. … We also think that the channel inventory is being managed pretty tightly. So hopefully, we're right on that estimate. And therefore, maybe a bit less dip than what you otherwise would see. … [M]any of our customers are relying on us much more for their inventory needs. … [O]ur inventories grew pretty nicely in the December quarter, in line with what we wanted them to grow. So I think we've got Q2 pegged pretty well. Albeit keep in mind that the order interval has decreased and so there is more volatility in that MSM number. … Midpoint is about 169 million MSMs compared to the 182 million we just reported having shipped in Q1.").

[452] Email from Amy Berguson to Warren Kneeshaw, "MWC Q&A draft 1," February 19, 2013, Q121SEC00937599 ("Warren- here is the initial MWC Q&A, clean version attached. The edits vs. the Goldman Sachs Firside [*sic*] chat Q&A are indicated in the marked copy. I added in the items you requested. Let me know if you wanted others included as well."); "Mobile World Congress Investor Relations- Recent Q&A Items," Q121SEC00937600–5; "Mobile World Congress Investor Relations- Recent Q&A Items," Q121SEC00937606–11.

[453] Lisa Wang, "Qualcomm defends licensing fees," *Taipei Times*, June 24, 2016, https://www.taipeitimes.com/News/biz/archives/2016/06/24/2003649305.

[454] Lisa Wang, "Qualcomm defends licensing fees," *Taipei Times*, June 24, 2016, https://www.taipeitimes.com/News/biz/archives/2016/06/24/2003649305.

unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm."[455]

178. The documents I have reviewed indicate that the relevant external communications department within Qualcomm prepared briefing materials to aid in Mr. Rosenberg's preparation for the media interview. These materials were provided by Qualcomm's Government/Public Affairs individuals and included anticipated questions from the media in addition to background information on media personnel and the Company's business in Taiwan. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for the Taiwan media day involved relevant departments and individuals and was consistent with the Company's general disclosure practices described in Section V and disclosure customs and practices in large public companies described in Section IV.

179. Qualcomm hosted the group of reporters from Taiwan on June 20–21, 2016 for a media day several days prior to the publication of the *Taipei Times* article.[456] As part of the media day, Mr. Rosenberg was asked to participate in a panel to be held on June 21, 2016, where he would answer questions.[457] To prepare for this event, Mr. Rosenberg received various preparation materials, discussed below. Additionally, approximately two weeks prior to the Taiwan media day, Mr. Rosenberg participated in a separate trip to Taiwan and South Korea where he met with various government officials.[458] As part of this trip, Mr. Rosenberg received briefing materials to help him prepare for several meetings.[459] The briefing materials for the trip contained a section with talking points related to "Qualcomm's Contributions to Taiwanese Industry and Society."[460] Among the "[k]ey takeaway[s]" in this section was that "Qualcomm licenses intellectual property openly to all companies on a FRAND basis, including its competitors."[461]

180. On June 17, 2016, in preparation for the panel that Qualcomm would host at the Taiwan media day in San Diego on June 21, 2016, Mr. Rosenberg received a briefing sheet from Ms. Asmar (Sr. Director, Government & Public Affairs) that contained potential

---

[455] Complaint, ¶¶ 181–182, 219; "FY2Q16 Earnings Release Calendar," Q121SEC00192564–6 at 5.
[456] Email chain from Tina Asmar to Don Rosenberg, "RE: Taiwan sponsored media trip," June 21, 2016, QAPPCMSD09927154–5 at 5; "Taiwan Visiting Journalist Program, June 20 - 21, 2016 – San Diego, Briefing Sheet," QNDCAL00663874–89.
[457] Email chain from Tina Asmar to Don Rosenberg, "RE: Taiwan sponsored media trip," June 21, 2016, QAPPCMSD09927154–5 at 5.
[458] Email from Monique Rodriguez to Don Rosenberg, "Briefing Materials for Taipei/Seoul June 3-8 2016," June 4, 2016, Q121SEC00787479; "Briefing Materials for Don Rosenberg Taipei/Seoul June 3-8 2016," Q121SEC00787480–593.
[459] Email from Monique Rodriguez to Don Rosenberg, "Briefing Materials for Taipei/Seoul June 3-8 2016," June 4, 2016, Q121SEC00787479; "Briefing Materials for Don Rosenberg Taipei/Seoul June 3-8 2016," Q121SEC00787480–593.
[460] "Briefing Materials for Don Rosenberg Taipei/Seoul June 3-8 2016," Q121SEC00787480–593 at 505.
[461] "Briefing Materials for Don Rosenberg Taipei/Seoul June 3-8 2016," Q121SEC00787480–593 at 505.

questions he might encounter while participating in the media day.[462] The questions focused on several topics including Qualcomm's "[c]orporate strategy and market competition" and the "[a]ntitrust investigation and IPR protection."[463] The briefing sheet also included a "Regional Backgrounder," which contained information on industry developments in Taiwan, competition in the industry, and Qualcomm's business in Taiwan.[464] Additionally, a "Media Backgrounder" was also included, which consisted of information about the media personnel who would attend the media day.[465] On June 20, 2016, the day before the panel took place, Ms. Asmar sent Mr. Rosenberg a summary of a Q&A session held with Mr. Gonell and Mr. Aberle (President) with the media earlier that day, highlighting questions these individuals received along with their responses.[466]

181. Following the Taiwan media day, on June 23, 2016, Mr. Kneeshaw received notice of the *Taipei Times* article mentioned above, and he identified a factual error (unrelated to the at-issue disclosure), which he raised to Christine Thoene (Sr. Director of Public Affairs), Ms. Berguson, and Ms. Asmar.[467] In response, Ms. Asmar told Mr. Kneeshaw that she would contact the reporter.[468] Later that day, Ms. Asmar also emailed Mr. Aberle the article and notified him that she was "confirming that the inaccuracies" in the article were "not due to a translation issue and then [she would] get the inaccuracies corrected."[469] The error identified in the article by Mr. Kneeshaw was later corrected.[470]

182. Based on the materials I have reviewed, I conclude that Qualcomm's disclosure process for the Taiwan media day involved relevant departments and individuals and was

---

[462] Email chain from Tina Asmar to Don Rosenberg, "RE: Taiwan sponsored media trip," June 21, 2016, QAPPCMSD09927154–5 at 5; "Tina Asmar," *LinkedIn*, https://www.linkedin.com/in/tina-asmar-458a95a4.
[463] "Taiwan Visiting Journalist Program, June 20 - 21, 2016 – San Diego, Briefing Sheet," QNDCAL00663874–89.
[464] "Taiwan Visiting Journalist Program, June 20 - 21, 2016 – San Diego, Briefing Sheet," QNDCAL00663874–89 at 75–79.
[465] "Taiwan Visiting Journalist Program, June 20 - 21, 2016 – San Diego, Briefing Sheet," QNDCAL00663874–89 at 79–89.
[466] Email chain from Tina Asmar to Don Rosenberg, "RE: Taiwan sponsored media trip," June 21, 2016, QAPPCMSD09927154–5 at 4; "FY2Q16 Earnings Release Calendar," Q121SEC00192564–6 at 5.
[467] Email from Tina Asmar to Warren Kneeshaw, et al., "RE: Taipei Times: Qualcomm defends licensing fees," June 23, 2016, Q121SEC00654360–1; "Christie Thoene," LinkedIn, https://www.linkedin.com/in/christie-thoene-19b1b713/details/experience/.
[468] Email chain from Tina Asmar to Warren Kneeshaw, et al., "RE: Taipei Times: Qualcomm defends licensing fees," June 23, 2016, Q121SEC00654360–1.
[469] Email chain from Tina Asmar to Derek Aberle, "FW: Taipei Times: Qualcomm defends licensing fees," June 23, 2016, QNDCAL04120537–8.
[470] For example, Mr. Kneeshaw identified that the following statement in the article was inaccurate: "Qualcomm settled one case with the Chinese government about 18 months ago by slashing licensing fees by 65 percent for Chinese firms and other companies that sell goods containing Qualcomm's chips." *See* Email chain from Tina Asmar to Warren Kneeshaw, et al., "RE: Taipei Times: Qualcomm defends licensing fees," June 23, 2016, Q121SEC00654360–1 at 60. This statement was later revised to say: "Qualcomm settled one case with the Chinese government about 18 months ago by slashing licensing fees by 35 percent for Chinese firms and other companies that sell goods containing Qualcomm's chips." *See* Lisa Wang, "Qualcomm defends licensing fees," *Taipei Times*, June 24, 2016.

consistent with the Company's general disclosure practices described in Section V and disclosure customs and practices in large public companies described in Section IV.

Executed this 12th day of September, 2023

John Coates

Professor John C. Coates IV

# Summary of Alleged Bundling Misrepresentations and Omissions

| Date(s) | Disclosure Channel[1] | Alleged Misrepresentation | Alleged Misstatement/Omission |
|---|---|---|---|
| 11/7/12<br>11/6/13<br>11/5/14<br>11/4/15<br>11/2/16 | Form 10-K[2] | "We have committed to such standards bodies that we will offer to license our essential patents for these CDMA standards" on a fair, reasonable, and non-discriminatory basis. | "Qualcomm [has] discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm." |
| 11/7/12<br>11/6/13 | Form 10-K[2] | "We have licensed or otherwise provided rights to use our patented technologies to interested companies on terms that are fair, reasonable and" non-discriminatory. | "Qualcomm [has] discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm." |
| 11/7/12<br>11/6/13<br>11/5/14<br>11/4/15<br>11/2/16 | Form 10-K[2] | "We have facilitated competition in the wireless communications industry by" licensing technologies to "a large number of manufacturers." | "Qualcomm stifled competition in the cellular comminutions industry … by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets." |
| 2/1/12<br>4/18/12<br>7/18/12<br>1/30/13<br>4/24/13<br>7/24/13<br>1/29/14<br>4/23/14<br>7/23/14 | Form 10-Q[3] | Qualcomm noted that its business model promotes "a highly competitive … wireless industry" and enables "new, highly cost-effective competitors" in the industry. | "Qualcomm stifled competition by bundling the terms of its chipset and license agreements, conditioning royalty relief on [the] customer's exclusive use of Qualcomm chipsets." |
| 1/28/15<br>4/22/15<br>7/22/15 | Form 10-Q[3][4] | Qualcomm noted that its business model promotes "a highly competitive … wireless industry" and enables "new, highly cost-effective competitors" in the industry. | |
| 1/27/16<br>4/20/16<br>7/20/16 | Form 10-Q[3] | Qualcomm noted that its business model promotes "a highly competitive … wireless industry" and enables "new, highly cost-effective competitors" in the industry. | "Qualcomm maintained a successful licensing program by bundling the terms of its license agreements with the terms of its chipset agreements and by providing royalty relief to Apple and other licensees who purchased all or most of their chipsets from Qualcomm." |

# Summary of Alleged Bundling Misrepresentations and Omissions

| Date(s) | Disclosure Channel[1] | Alleged Misrepresentation | Alleged Misstatement/Omission |
|---|---|---|---|
| 11/27/12 | Credit Suisse Technology Conference | "UNIDENTIFIED AUDIENCE MEMBER: (Inaudible) get more QRD business?<br>[Defendant] Aberle: ... And within the Company, we tend to keep the licensing and the chip business very separate. Obviously, our view is that companies need a license if they are doing 3G or 4G devices, sort of irrespective of whose chip they use. And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and we don't bundle those together." | "Qualcomm bundled the terms of its license agreements with the terms of its chipset agreements by providing royalty relief to Apple and other customers who purchased all or most of their chipsets from Qualcomm." |
| 2/25/13 | GSM Association Mobile World Congress | "MARK MCKECHNIE: (Inaudible - microphone inaccessible)?<br>[Defendant] Mollenkopf: Well, they are really separate businesses. I mean we have been very clear that we keep those two things separate -- separate propositions to the customer. So, really two different things." | "Qualcomm bundled the terms of its license agreements with the terms of its chipset agreements by providing royalty relief to Apple and other licensees who purchased all or most of their chipsets from Qualcomm." |
| 6/24/16[5] | *Taipei Times* Interview | "'When we charge our license, it will be fair, reasonable and non-discriminate.' … [Defendant] Rosenberg said." | "Qualcomm [has] discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm." |

Source: Complaint; Class Certification Order; Qualcomm, Forms 10-K, filed between November 7, 2012 and November 2, 2016; Qualcomm, Forms 10-Q, filed between February 1, 2012 and July 20, 2016; "QUALCOMM at Credit Suisse Technology Conference - Final," *CQ FD Disclosure*, November 27, 2012; "QUALCOMM at GSM Association Mobile World Congress - Final," *VIQ FD Disclosure*, February 25, 2013; Lisa Wang, "Qualcomm Defends Licensing Fees," *Taipei Times*, June 24, 2016

Note:
[1] Excludes disclosures made in press releases on November 17, 2015 and January 17, 2017, as those disclosures are not within the scope of my assignment.
[2] The alleged misrepresentation was included under the Business line item.
[3] The alleged misrepresentation was included under the MD&A line item.
[4] Plaintiffs do not allege any bundling omissions for any of the Forms 10-Q filed in 2015.
[5] The *Taipei Times* published the article on June 24, 2016 in Taiwan, which corresponds to June 23, 2016 in the United States.

# Selected Entities Involved in Disclosure Process

| Entity | Description of Selected Tasks |
|---|---|
| Audit Committee | - Met at least once for each quarterly earnings cycle with company management, including CEO, CFO, Corporate Controllership, Legal, Compliance, Investor Relations, Accounting Practices & Reporting, PwC, DLA Piper, and other senior leadership<br>- Reviewed accounting and disclosure quarterly processes<br>- Reviewed and discussed quarterly financial performance and material changes from prior quarters<br>- Reviewed and provided comments on draft Forms 10-K and 10-Q<br>- Reviewed and discussed draft earnings press releases<br>- Reviewed and discussed PwC audit plans and reports<br>- Reviewed various investigation matters and held executive sessions with members of Company management |
| Disclosure Committee[1] | - Reviewed draft Forms 10-K and 10-Q<br>- Committee members included: CFO, QCT and QTL CFO, Corporate Controllership, General Counsel, Financial Planning, Internal Audit, Investor Relations, Tax, Treasury, Compliance, Human Resources, and Engineering[2] |
| CEO/CFO | - Attended Audit Committee meetings<br>- Discussed audit procedures and proposed disclosures with Audit Committee and other members of executive management<br>- Reviewed draft earnings press releases<br>- Reviewed and signed Forms 10-K and 10-Q |
| Investor Relations | - Attended Audit Committee meetings<br>- Worked on draft earnings press releases and earnings call scripts<br>- Met to discuss draft earnings press releases with various groups, including Financial Planning, Corporate Controllership, Accounting Practices & Reporting, Legal, and DLA Piper<br>- Responsible for monitoring the Company's disclosures<br>- Communicated with various individuals across departments to solicit information and prepare disclosures<br>- Responsible for developing presentations and other materials for communications with analysts, institutional investors, and shareholders<br>- Responsible for arranging interviews with Company management and responded to inquiries from the public<br>- Worked on draft Forms 10-K and 10-Q<br>- Drafted briefing sheets, Q&A talking points, and other preparation materials for executive participation in various conferences, events, and media interviews |
| Corporate Controllership | - Attended Audit Committee meetings<br>- Reviewed accounting and disclosure quarterly processes<br>- Reviewed disclosures in the financial statements and draft Forms 10-K and 10-Q<br>- Met to discuss draft earnings press releases with various groups, including Investor Relations, Financial Planning, Accounting Practices & Reporting, Legal, and DLA Piper |

# Selected Entities Involved in Disclosure Process

| Entity | Description of Selected Tasks |
|---|---|
| Financial Planning | - Prepared business outlook and guidance for earnings press releases, executive scripts, and presentations<br>- Checked for consistency across financials presented in Forms 10-K and 10-Q, earnings press releases, executive scripts, and webslides<br>- Reviewed draft Forms 10-K and 10-Q<br>- Met to discuss draft earnings press releases with various groups, including Investor Relations, Corporate Controllership, Accounting Practices & Reporting, Legal, and DLA Piper |
| Accounting Practices & Reporting | - Worked with Investor Relations to coordinate earnings press releases<br>- Worked with business units to prepare draft Forms 10-K and 10-Q<br>- Coordinated issuance of Forms 8-K<br>- Met to discuss draft earnings press releases with various groups, including Investor Relations, Corporate Controllership, Financial Planning, Legal, and DLA Piper |
| Legal | - Attended Audit Committee meetings<br>- Reviewed draft Forms 10-K and 10-Q and provided comments<br>- Reviewed draft earnings press releases and provided comments<br>- Reviewed and provided comments on draft earnings call scripts and Q&A talking points<br>- Met to discuss draft earnings press releases with various groups, including Investor Relations, Corporate Controllership, Accounting Practices & Reporting, Financial Planning, and DLA Piper |
| Independent Auditor (PwC) | - Reviewed draft Forms 10-K and 10-Q<br>- Attended Audit Committee meetings and executive sessions, prepared quarterly audit reports, and discussed the reports with the Audit Committee<br>- Reviewed quarterly financial results and financial statements |
| External Counsel (DLA Piper) | - Attended Audit Committee meetings and executive sessions<br>- Met to discuss draft earnings press releases with various groups, including Investor Relations, Corporate Controllership, Accounting Practices & Reporting, Legal, and Financial Planning |

Source: Q121SEC00647173; Q121SEC00937599; Q121SEC00649574; Q121SEC00649575; Q121SEC00649580; Q121SEC00776715; Q121SEC00794513; Q121SEC00075764; Q121SEC00075103; Q121SEC00295276; Q121SEC00073398; Q121SEC00323659; Q121SEC00772265; Q121SEC00412359; QNDCAL00812271; Q121SEC00737441; Q2014FTC04690078; Q121SEC00762315; Q121SEC00727569; Q121SEC00727430; Q121SEC00666969; Q121SEC00356719; Q121SEC00356295; Q121SEC00355702; Q121SEC00269167; Q121SEC00266466; Q121SEC00211008; Q121SEC00208610; Q121SEC00111237; Q121SEC00073089; Q121SEC00666883; Q121SEC00663255; Q121SEC00520677; Q121SEC00492075; Q121SEC00168819; Q121SEC00320235; Q121SEC00266617; Q2014FTC02531166; Q2014FTC03354275; Davidson Deposition, pp. 223–224; Rosenberg Deposition, pp. 30–31; Qualcomm, Forms DEF 14A, filed between January 19, 2012 and January 19, 2017; Qualcomm, Forms 10-K, filed between November 7, 2012 and November 2, 2016; Qualcomm, Forms 10-Q, filed between February 1, 2012 and July 20, 2016

Note:
[1] An internal Company email from October 2012 suggests that the Disclosure Compliance Review Committee was also called the Disclosure Committee.
[2] According to the “Qualcomm Incorporated Charter of the Disclosure Committee,” Disclosure Committee members varied based on the type of disclosure.

## Composition of Disclosure Committee Designated by 2016 Disclosure Committee Charter and Disclosure Groups Designated by Disclosure Policies

| Member or Department | Disclosure Policy Committee Designated by 2003 Disclosure Policy[1] | Disclosure Group Designated by 2014 Disclosure Policy[2] | Forms 10-Q and 10-K Disclosure Committee Designated by 2016 Disclosure Committee Charter[3] |
|---|---|---|---|
| CEO | ✓ | | |
| CFO | ✓ | | ✓ |
| Management | | ✓ | |
| QCT and QTL CFO | | | ✓ |
| General Counsel | ✓ | | ✓ |
| Corporate Legal | | ✓ | |
| Investor Relations | ✓ | ✓ | ✓ |
| Marketing and Public Relations | ✓ | | |
| Corporate Communications | | ✓ | |
| Corporate Finance | | ✓ | |
| Financial Planning | | | ✓ |
| Corporate Controllership | | | ✓ |
| Internal Audit | | | ✓ |
| Tax | | | ✓ |
| Treasury | | | ✓ |
| Compliance | | | ✓ |

Source: Q121SEC00320235; Q121SEC00168819; Q121SEC00937613.

Note:
[1] Represents “QUALCOMM officers” from the listed departments. The 2003 Disclosure Policy specifically designates the following “QUALCOMM officers” as members of the Disclosure Policy Committee: the CEO, the Vice President and General Counsel, the CFO, the Senior Vice President of Investor Relations, and the Vice President of Marketing and Public Relations.
[2] Represents “[a]ppropriate members” from the listed departments.
[3] Represents “key personnel” from the listed departments for Forms 10-Q and 10-K disclosures.

**JOHN C. COATES IV**

647 Commonwealth Avenue (617) 496-4420
Newton, Massachusetts 02459 jcarr1964@gmail.com

Harvard University and Harvard Law School, Cambridge, MA

Vice Dean for Finance and Strategic Initiatives 8/18 – 1/21, 10/21 – Present
Deputy Dean 7/22 – Present
Chair, Committees on Executive Education, Lifelong Learning 3/13 – 1/21, 7/22 – Present

Supervising preparation of financial statements and budgets, developing strategic initiatives for online and executive education; led design and implementation of University-wide conflict of interest and conduct policies

John F. Cogan Jr. Professor of Law and Economics 6/06 – Present

Teaching and researching financial analysis, business valuation, accounting, contracts, mergers and acquisitions, corporations, governance, and finance

Professor of Law, Assistant Professor of Law 6/01 – 6/06, 6/97 - 6/01

Securities and Exchange Commission, Washington, D.C.

General Counsel 6/21 to 10/21
Director (Acting), Division of Corporation Finance 2/21 to 6/21
Independent Consultant (Compliance, Distribution of Fair Funds) 5/04 to 1/21
Investor Advisory Committee, Chair of Investor-as-Owner Subcommittee 5/17 to 6/20

Harvard Business School, Boston, MA

Lecturer, Executive Education Instructor (Finance, Boards, M&A) 9/11 – 1/21
Visiting Professor of Business Administration (Finance, M&A) 7/15 – 7/16

U.S. Department of Justice, Boston, MA 6/17 to Present

Independent compliance monitor for large financial institution pursuant to deferred prosecution agreement with Department of Justice

Consultant, Newton, MA 6/97 to Present

Mergers and acquisitions, corporate governance, conflicts of interest

Public Company Accounting Oversight Board, Washington, D.C.

Consultant, academic referee for research conferences 7/12 to 1/18

Wachtell, Lipton, Rosen & Katz, NYC

Partner 1/96 – 5/97
Associate (Full- or Part-Time) 3/88 – 6/89, 9/89 – 12/95

Managed teams for legal work on 50+ corporate mergers and acquisitions, recapitalizations, buyouts, freezeouts, and public offerings, managed disclosure and compliance "crises" at public companies

| MEMBERSHIPS / AFFILIATIONS / AWARDS | PRESENT OR PAST |
|---|---|
| American Bar Association | Member, Section on Business Law |
| American Bar Foundation | Fellow |
| American College of Governance Counsel | Fellow |
| American Finance Association | Member |
| American Law and Economics Association | Member, Board of Directors |
| American Law Institute Corporate Governance Restatement | Adviser |
| Association of American Law Schools | Member |
| Committee on Capital Market Regulation | Task Force Member,Primary Author |
| Cornerstone Research | Affiliated Expert |
| European Corporate Governance Institute | ECGI Fellow, Board of Directors |
| Free Speech for People | Member, Legal Advisory Committee |
| Harvard Ad Hoc Group on Corporate Governance | Founding Member |
| Harvard University | Masters of Arts (Honoris Causa) |
| Harvard University Financial Regulatory Discussion Group | Member |
| National Bureau of Economic Research | Invited Speaker / Researcher |
| New York Stock Exchange | Member, Legal Advisory Board; Judge, Corporate Governance Awards |
| NYU School of Law Alumni Association | Teaching Award |
| Society for Empirical Legal Studies | Member |
| Society of Investment Law | Founding Member, Board Member |

EDUCATION

| | |
|---|---|
| <u>New York University School of Law</u> | J.D. Cum Laude, May 1989 |
| New York University Law Review | 1988-89 -- Editorial Board, Articles Editor |
| Law Review Alumni Association Award | George P. Foulk Memorial Award |
| Pomeroy Prize | Outstanding Academic Performance |
| Order of the Coif | American Jurisprudence Awards (contracts, procedure, securities) |
| <u>University of Virginia</u> | B.A. (History), Highest Distinction, May 1986 |
| Thesis: "Christianity, Kingship and a Carolingian Lord" | Younger Prize for Distinction in History |
| Jefferson Scholar, Echols Scholar | Four-year Merit-Based Scholarship |

<u>Congressional Testimony</u>

Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs to Examine Index Fund Voting (June 2022)

Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on Legislative Proposals to Examine Corporate Governance Securities Law Reforms (June 2018)

Before the U.S. Senate Subcommittee on Securities, Insurance and Investment on Proposed Securities Law Reforms (December 2011)

Before the Committee on House Administration, House of Representatives on the Disclose Act (H.R. 5175) (May 2010)

Before the U.S. Senate Subcommittee on Securities, Insurance and Investment of the Committee on Banking, Housing and Urban Affairs on Financial Regulatory Reform (July 2009)

## PUBLICATIONS

SPAC Law and Myths, Business Lawyer (2023)

THE PROBLEM OF TWELVE: INDEX FUNDS, PRIVATE EQUITY AND CORPORATE GOVERNANCE, Columbia Global Press (2023)

Corporate Governance, Core Reading for MBA Program, Harvard Business Publishing (2018) (with Suraj Srinivasan)

The M&A Process, Core Reading for MBA Program, Harvard Business Publishing (2017)

The Volcker Rule as Structural Law: Implications for Cost-Benefit Analysis and Administrative Law, 10 *Capital Markets Law Journal* 447 (2015)

M&A Contracts: Purposes, Types, Regulation and Patterns of Practice (April 2014), in RESEARCH HANDBOOK ON MERGERS AND ACQUISITIONS (Claire Hill and Steven Davidoff Solomon, eds., Edward Elgar 2015)

Corporate Speech and the First Amendment: History, Data and Implications, 30 *Constitutional Commentary* 223 (2015)

Securities Litigation in The Roberts Court: An Early Assessment, 57 *Arizona Law Review* 1 (2015)

Mergers, Acquisitions, and Restructuring: Types, Regulation, and Patterns of Practice (July 2014), in OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (eds. J. Gordon and G. Ringe Oxford University Press 2015)

Thirty Years of Evolution in the Roles of Institutional Investors in Corporate Governance (May 2014), in RESEARCH HANDBOOK ON SHAREHOLDER POWER (Jennifer Hill and Randall Thomas, eds., Edward Elgar 2015)

Towards Better Cost-Benefit Analysis: An Essay on Regulatory Management, 78 *Law and Contemporary Problems* 1 (2015)

Cost-Benefit Analysis of Financial Regulation: Case Studies and Implications, 124 *Yale Law Journal* 882 (2014-2015)

What Courses Should Law Students Take? Harvard's Largest Employers Weigh In, 64 *Journal of Legal Education* (2014) (with Jesse Fried and Kathryn Spier)

SOX After Ten Years: A Multidisciplinary Review, 28:3 *Accounting Horizons* 627 (2014) (with Suraj Srinivasan)

Corporate Politics, Governance, and Value Before and After *Citizens United,* 9 *Journal of Empirical Legal Studies,* 657-696 (2012), selected as one of 10 best securities law articles published during 2012-13 by academics surveyed

Evidence-based M&A: Less Can Be More When Allocating Risk in Deal Contracts, 27 *Journal of International Banking, Finance and Law* 708 (2012)

Managing Disputes Through Contract: Evidence from M&A, *Harvard Business Law Review, Vol. 2, pp. 301-349* (2012)

Hiring Teams, Firms and Lawyers: Evidence of the Evolving Relationships in the Corporate Legal Market, 36 *Law & Social Inquiry* 999-1031 (2011) (with Michele DeStefano, Ashish Nanda and David B. Wilkins)

*M&A Break Fees: U.S. Litigation versus U.K. Regulation, in* REGULATION VERSUS LITIGATION: PERSPECTIVES FROM ECONOMICS AND LAW*, Daniel Kessler, ed. Chicago: University of Chicago Press* (2011)

Corporate Purchasing Project: How S&P Companies Evaluate Outside Counsel (A White Paper), Harvard Law School Program on the Legal Profession (2011) (with Michele DeStefano Beardslee, Ashish Nanda, Erik Ramanathan and David B. Wilkins)

Fulfilling Kennedy's Promise: Why the SEC Should Mandate Disclosure of Corporate Political Activity, 2011 (with Taylor Lincoln)

The Downside of Judicial Restraint: The (Non-) Effect of *Jones v. Harris*, 6 Duke J. of Constitutional Law and Public Policy 58 (2010)

Reforming the Taxation and Regulation of Mutual Funds: A Comparative Legal and Economic Analysis, 1 *J. Legal Anal.* 591 (Summer 2009)

Lowering the Cost of Bank Recapitalization, 26 *Yale J. Reg.* 373 (Summer 2009) (with David Scharfstein)

The Keynote Papers and the Current Financial Crisis, 47 *J. Acctg. Res.* 427 (May 2009)

Competition in the Mutual Fund Industry: Evidence and Implications for Policy, 33 *J. Corp. L.* 151 (2008) (with R. Glenn Hubbard)

The Goals and Promise of the Sarbanes-Oxley Act, 21 *J. Econ. Persp.* 91 (Winter 2007)

Ownership, Takeovers and EU Law: How Contestable Should EU Corporations Be?, in COMPANY AND TAKEOVER LAW IN EUROPE, eds. E. Wymeersch & G. Ferrarini (Oxford University Press 2004)

The Powerful Antitakeover Force of Staggered Boards: Further Findings and a Reply to Symposium Participants, 55 *Stan L. Rev.* 885 (2003) (with Lucian A. Bebchuk and Guhan Subramanian), selected as one of 10 best corporate law articles published during 2003 by academics surveyed

The Trouble with Staggered Boards: A Reply to Georgeson's John Wilcox, Corporate Governance Advisor (2002) (with Lucian A. Bebchuk and Guhan Subramanian)

The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence and Policy, 54 *Stan. L. Rev.* 887 (2002) (with Lucian A. Bebchuk and Guhan Subramanian), selected as one of 10 best corporate law articles published during 2002 by academics surveyed

Explaining Variation in Takeover Defenses: Blame the Lawyers, 89 *Cal. L. Rev.* 1301 (2001), selected as one of 10 best corporate law articles published during 2002 by academics surveyed, reprinted in MERGERS AND THE MARKET FOR CORPORATE CONTROL, ed. Fred S. McCheney (Edward Elgar 2010) and in LAW AND ECONOMICS OF MERGERS AND ACQUISITIONS (eds. Steven M. Davidoff and Claire A. Hill, Edward Elgar 2013)

Private vs. Public Choice of Securities Regulation: A Political Cost/Benefit Analysis, 41 *Va. J. Int'l L.* 531 (2001), selected as one of 10 best securities law articles published during 2001 by academics surveyed

Second-Generation Shareholder Bylaws: Post-*Quickturn* Alternatives, 56 *Bus. Law.* 1323 (2001) (with Bradley C. Faris)

A Buy-Side Model of M&A Lockups: Theory and Evidence, 53 Stan. L. Rev. 307 (2000) (with Guhan Subramanian)

Takeover Defenses in the Shadow of the Pill: A Critique of the Scientific Evidence on Takeover Defenses, 79 Tex. L. Rev. 271 (2000), reprinted in 43 Corp. Practice Commentator 1 (2002) as one of 10 best corporate law articles published in 2001-02 by academics surveyed

Empirical Evidence on Structural Takeover Defenses: Where do We Stand?, 54 *U. Miami L. Rev.* 783 (2000)

"Fair Value" as a Default Rule of Corporate Law: Minority Discounts in Conflict Transactions, 147 U. Penn. L. Rev. 1251 (1999), reprinted in 41 Corp. Practice Commentator 1 (2000) and selected as one of 10 best corporate law articles published in 1999-2000 by academics surveyed

Measuring the Domain of Mediating Hierarchy: How Contestable Are US Public Corporations?, 24 *J. Corp. L.* 837 (1999)

Freezeouts, Management Buyouts and Going Private, in TAKEOVERS & FREEZEOUTS (eds. M. Lipton & E. Steinberger, Law Journal Seminars-Press 1998)

Reassessing Risk-Based Capital in the 1990s: Encouraging Consolidation and Productivity, in BANK MERGERS AND ACQUISITIONS (eds. Y. Amihud & G. Miller, Kluwer Academic Publishers 1998)

Purchase Accounting Deals: A Look at Pricing Formulas and Allocation Procedures, 15 Banking Policy Report 1 (Nov. 18, 1996) (with Edward Herlihy, et al.)

Acquisitions of Financial Advisory and Investment Management Businesses, 17 *Bank & Corp. Gov. L.* Rep. 8 (Sep. 1996) (with Edward Herlihy et al.)

New Guidance for Freezeouts and MBOs -- Negotiation Strategy Privileged from Disclosure, Corp. Rep. (Aspen Law & Business (June 1996) (with Paul Rowe)

M&A Strategies, 9 Bank Accounting and Finance 40 (Winter 1995-96) (with Edward Herlihy, et al.)

Bank M&A Preparedness, 66 Corp. Rep. 1 (Aspen Law & Business Nov. 15, 1995) (with Edward Herlihy, et al.)

Mergers and Acquisitions of Financial Institutions – 1995: An Unprecedented Year of Consolidation, Securities Activities of Banks, Fifteenth Annual Institute (1995) (with Edward Herlihy, et al.)

Deal Developments Update, Corporate Control Alert (August 1995) (with Edward Herlihy et al.)

Updating the Use of Special Committees in Freeze-Outs and Other Conflict Transactions, Corp. Rep. (Aspen Law & Business Aug. 15, 1995)

Banking on Nonbank Acquisitions, The Community Banker 46 (Second Quarter 1995)

Fundamental Rules for Bank Merger Transactions Remain Unchanged After Paramount, in Banking Expansion Institute, Thirteenth Annual (Aspen Law & Business 1995) (with Edward Herlihy, et al.)

Bank and Thrift Mergers and Acquisitions -- 1994, in Securities Activities of Banks, Prentice-Hall Law & Business, Fourteenth Annual Institute (1994) (with Edward Herlihy, et al.)

Stock Buybacks: Strategic, Legal and Fiduciary Issues, 8 Insights 10 (Nov. 1994) (with Edward Herlihy et al.)

Concentration Limits: New Interstate Moves Still Face Minefield of Deposit Cap Statutes, in a Special Report on Interstate Banking, 13 *Banking Policy Rep*. 23 (Aug. 15, 1994) (with David Neill)

Mergers of Equals: Achieving a Delicate Balance of Control, 13 *Banking Policy Report* 1 (Oct. 3, 1994) (with Edward Herlihy et al.)

Banking on Non-Bank Acquisitions and Current Issues in Bank Acquisitions, in Bank Mergers and Acquisitions, Practicing Law Institute (1994) (with Edward Herlihy, et al.)

Current Issues in Bank Acquisitions, 7 Bank Acct'g & Fin. 44 (Spring 1994) (with Edward Herlihy et al.)

Recent Deals Feature New Pricing Formulas, 13 Banking Pol. Rep. 2 (Apr. 4, 1994) (with Edward Herlihy et al.) M&A Strategies, 7 Bank Accounting & Finance 48 (Winter 1993- 94) (with Edward Herlihy et al.)

Assessing the Current Bank Merger Environment: A Preparedness Checklist, 12 Banking Policy Report 1 (Oct. 18, 1993) (with Herlihy et al.)

Bank Mergers and Acquisitions -- 1993: A Year of Increasing Franchise Consolidation, in *Securities Activities of Banks*, Prentice-Hall Law & Business, 13th Annual Institute (1993) (with Edward Herlihy, et al.)

Hostile Acquisition Overtures at Smaller Banks and Thrifts, 11 Bank & Corp. Gov. L. Rep. 47 (1993) (with Herlihy et al.) Flexibility on Safety and Soundness, 3 Bank Director 3 (Third Quarter 1993) (with Craig Wasserman)

Designing Bank Governance Structures, 12 Bank Policy Report (Apr. 19, 1993) (with Edward Herlihy et al.)

Capital and Compliance Strategies in the Era of Prompt Corrective Action, in *The New Implementing Regulations Under FDICIA* (Prentice Hall 1992) (with Craig Wasserman et al.)

1992 -- A Year of Continuing Financial Industry Consolidation: Current Trends and Various Considerations in Bank Mergers and Acquisitions, in Securities Activities of Banks, Prentice-Hall Law & Business, Twelfth Annual Institute (1992) (with Edward Herlihy, et al.)

Bank Regulators Turn Up Intensity in Examination of Racial Discrimination in Lending Practices, 9 Bank & Corp. Governance L. Rep. 758 (December 1992) (with Warren Stern et al.)

Meeting the Challenge of Loan Bias Scrutiny, Am. Banker (August 21, 1992) (with Warren Stern et al.)

Investment Company Act Exemption Proposed, 11 Int'l Fin. L. Rev. 41 (July 1992) (with Eric Robinson)

Dealing with Market Risks in Stock Mergers: Collars and Walkaways, 6 Insights 4 (July 1992) (with Edward Herlihy et al.)

Market Risks in Bank Mergers, 1 Bank Governance L. Rep. 1114 (July 1992) (with Edward Herlihy et al.)

Racial Discrimination in Lending Practices, 1 Bank Gov. L. Rep. 1114 (July 1992) (with Warren Stern et al.)

Disclosure of the Analyses Underlying Investment Banker Fairness Opinions, 6 Insights 11 (March 1992) (with Edward Herlihy et al.)

Federal Reserve Board Approval Criteria for Bank Mergers, 7 Bank & Corp. Governance L. Rep. 45 (1992) (with Edward Herlihy et al.)

Consensus Needed on Early Resolution's Legal Issues, Am. Banker (Mar. 25, 1992) (with Craig Wasserman)

An Overview of Current Trends and Various Considerations in Bank Mergers and Acquisitions, in Securities Activities of Banks, Prentice-Hall Law & Business, Eleventh Annual Institute (1991) (with Edward Herlihy et al.)

Management Buyouts and the Duties of Independent Directors to Shareholders and Creditors, in Corporate Deleveragings and Restructurings, Practising Law Institute (1991) (with Lawrence Lederman et al.)

ANNUAL SURVEY OF DEVELOPMENTS IN MERGERS AND ACQUISITIONS OF FINANCIAL INSTITUTIONS 1990-1998 (with Herlihy et al.) (co-authored leading annual survey for eight years; privately published)

Liabilities Under Sections 11, 12, 15 and 17 of the Securities Act of 1933 and Sections 10, 18 and 20 of the Securities Exchange Act of 1934, in Introduction to Securities Law 1990, Practising Law Institute (1990) (with Paul Vizcarrondo et al.)

Advising the Board of Directors of a Target Company Regarding Defensive Strategies, in Dynamics of Corporate Control IV, American Bar Association National Institute (1989) (with James Fogelson)

State Takeover Statutes and Corporate Theory: The Revival of an Old Debate, 64 *N.Y.U. L. Rev.* 806 (1989)

State Takeover Statutes: A Fifty-State Survey (privately published) (1989) (with Eric Robinson et al.)

The Reorganization Plan: Statutory Framework and Commercial Realities, in Business Reorganizations and Workouts, Law Journal Seminars-Press (1988) (with Meyer Koplow)

Working Papers

Reverse Termination Fees in M&A: Design, Signals, and Bidder Returns, Working Paper (August 2017) (with Darius Palia and Ge Wu)

Why Have M&A Contracts Grown? Evidence from Twenty Years of Deals, Working Paper (September 2016)

Quantifying Foreign Institutional Block Ownership at Publicly Traded U.S. Corporations, Working Paper (September 2016) (with Ron Fein, Kevin Crenny, and L. Vivian Dong)

Allocating Risk Through Contract: Evidence from M&A and Policy Implications (August 2012)

The Link between the Acquisitions Market and the Market for CEOs (January 2011) (with Reinier Kraakman) The

Powerful and Pervasive Effects of Ownership on M&A, Olin Center Discussion Paper No. 669 (June 2010)

An Empirical Reassessment of MBO Bids: Techniques, Outcomes, and Delaware Corporate Law, Working Paper (October 2005)

Why Are Firms Sold? The Role of the Target CEO's Age, Tenure, And Share Ownership, Working Paper (October 2005) (with Reinier Kraakman)

The Legal Origins of the Politically Puzzling U.S. "Market" for Corporate Charters, Working Paper (October 2004)

The Power of Defenses, National Bureau of Economics Research Working Paper (July 2003) (with Lucian Arye Bebchuk and Guhan Subramanian)

CEO Incentives and M&A Activity in the 1990s: Stock Options and Real Options, Working Paper (March 2002) (with Reinier Kraakman)

An Index of the Contestability of Corporate Control: Studying Variation in Legal Takeover Vulnerability, Working Paper (June 1999)

Case Studies, available at:

http://www.law.harvard.edu/academics/post-grad/case-studies/products/available-cases-online/index.html

Emery Celli Brinckerhoff & Abady (2011)

Hilton's Hostile Bid for ITT (2011)

In a Pickle: Barclays Capital and the Sale of Del Monte Foods (with Clayton Rose and David Lane) (2011)

Barclays Capital and the Sale of Del Monte Foods (with Clayton Rose and David Lane) (2012)

El Paso's Sale to Kinder Morgan (with Clayton Rose and David Lane) (2012)

Slater & Gordon (with Ashish Nanda and Monet Brewerton) (2012)

Workers' Rights in the Hudson Valley (with Sara Del Nido) (2012)

IBM's Hostile Bid for Lotus (2013)

Cerberus Tries to Walk Away from United Rentals (2014)

AmesCard (with Karina Shaw) (2015)

When a Deal Goes Bad: Integrated Services (2016)

Allergan Board Under Fire (with Lynn S. Paine, Suraj Srinivasan, and David Lane (2016)

A Difficult Discussion with the Board (2016)

After the Sale (2016)

GE Capital After the Crisis (with David Scharfstein and John Dionne) (2017)

After the Purchase (2017)

"Knowledge is King" in the Texas Oil Patch (2019)

A Tale of a Tail (2019)

Silver Lake Bids for Dell (2019)

J&J Bids for Guidant (2019)

Jockeying for Mobile Dominance Together: Microsoft and Nokia (with Rachel Gordon) (2020)

Columns, op eds, and other short works

Law Firms and Russian Profits (2022) (with Ian Ayres and Robert Daines)

Proposal on Climate-Related Disclosures Falls Within the SEC's Authority, Harvard Corporate Governance Forum (June 22, 2022)

Petition to SEC on Human Capital, Working Group On Human Capital Accounting Disclosure Petition for Rulemaking (June 7, 2022)

SPAC Law and Myths, Harvard Corporate Governance Forum (February 28, 2022)

New SEC chair needs to tackle these 5 big issues, *MarketWatch* (Dec. 17, 2020)

Recommendation from the Investor-as-Owner Subcommittee of the SEC Investor Advisory Committee Relating to ESG Disclosure, Harvard Corporate Governance Forum (May 28, 2020) (with Allison Bennington and Anne Sheehan)

Corporations Like Exxon Are Using Spurious Free Speech Claims to Fend Off Regulation, *Vox* (Feb 14, 2017) (with Jeff Clements)

Corporations Are Perverting the Notion of Free Speech, Newsweek (Aug. 4, 2015) (with Ron Rein)

Bill to Help Businesses Raise Capital Goes Too Far, *Washington Post* (March 14, 2012) (with Robert Pozen)

Fulfilling the Promise of "Citizens United," *Washington Post* (September 6, 2011) (with Taylor Lincoln), republished in Business Ethics (Sep. 2011)

Corporate Governance After the Financial Crisis, Proceedings of the 2010 Annual Symposium: Legal Aftershocks of the Global Financial Crisis, 6 *NYU J. of Law & Business* 171 (2010)

A Costly Lesson in the Rule of 'Loser Pays', *Financial Times* (November 2, 2009)

The Bailout is Robbing the Banks, *New York Times* (February 18, 2009) (with David Scharfstein)

The Greatest American Shambles: An Exchange, 38 *N.Y. Rev. of Books* 59 (June 13, 1991)

**<u>Trial Testimony and Depositions September 2019 to September 2023</u>**

*NRP Trona LLC* and *NRP (Operating) LLC v. Anadarko Holding Company* and *Big Island Trona Company* 157th Judicial District Court, District of Country, Texas, Cause No: 2017-47604, Deposition 7/18/19, Trial Testimony 10/1/19

*Kris B. Hermance and R. Christopher Hermance, et al. v. M&T Bank Corporation and Wilmington Trust Corporation., et al.,* United States District Court, District of New Jersey, Civil Action No. 17-cv-10552-SDW-SCM, Deposition 10/22/19

*Ahmed D. Hussein v. Sheldon Razin, Steven Plochocki, Quality Systems, Inc.,* Superior Court of the State of California, For the County of Orange, Case No. 30-2013-00679600-CU-NP-CJC, Deposition 6/16/15, Trial Testimony 6/16/17, Deposition 1/21/21

*Energy Transfer LP, formerly known as Energy Transfer Equity, L.P. and LE GP, LLC v. Williams Companies, Inc.*, Delaware Chancery Court, C.A.No.12168-VCG, C.A.No.12377-VCG, Deposition 7/10/20, Trial Deposition 1/29/21

*Thompson Petroleum Corporation, J. Cleo Thompson, and James Thompson, JR., L.P., v. Paul Rudnicki v. Linda Thompson Gordon, Jean Christine Thompson and Dorothy Kuntz Thompson*, United States 6th Judicial District Court, District of Dallas County, Texas, Cause No. DC-18-00644, Deposition 7/17/20

*MAPS Hotels and Resorts One, LLC, Mirae Asset Capital Co., LTD, Mirae Asset Daewoo Co., LTD., Mirae Asset Global Investments, Co., LTD., and Mirae Asset Life Insurance Co., LTD., v. AB Stable VIII LLC,* Delaware Chancery Court, C.A. No. 2020-0310-JTL, Deposition 8/14/20

*Perspecta Inc. v. DXC Technology Company*, International Institute for Conflict and Resolution, Deposition 9/02/20, Trial Testimony 10/2/20

*Autoridad Del Canal De Panama* v. *Grupo Unidos Por El Canal, S.A., Sacyr S.A., Salini-Impregilo S.P.A., Jan De Nul N.V., and Constructora Urbana, S.A.*, ICC Case No. 22465/ASMA/JPA (C-22966/JPA), Trial Testimony 3/31/22 & 4/1/22

*FSG Services LLC v. Flutter Entertainment, plc*, Judicial Arbitration and Mediation Services, Reference No. 1425034540, Trial Testimony 7/6/22

*Politan Capital Management LP, et al., v. Masimo Corporation*, et al., No. 2022-0948-NAC, Deposition 2/4/23

# Documents Considered List

**Academic Articles**

- Brochet, Francois, et al., "Information transfer and conference calls," *Review of Accounting Studies* 23, no. 3, 2018, pp. 907–957
- Brown, Lawrence D., et al., "Managing the narrative: Investor relations officers and corporate disclosure," *Journal of Accounting and Economics* 67, no. 1, 2019, pp. 58–79
- Bushee, Brian J., et al., "Conference Presentations and the Disclosure Milieu," *Journal of Accounting Research* 49, no. 5, 2011, pp. 1163–1192
- Coates IV, John C., "Private vs. Political Choice of Securities Regulation: A Political Cost/Benefit Analysis," *Virginia Journal of International Law* 41, no. 3, 2001, pp. 531–582
- Fabens, Andrew L., and Sean Sullivan, "Practical Strategies for Effective Management of Earnings Calls," *Insights: The Corporate & Securities Law Advisor* 28, no. 6, 2014, pp. 1–7
- Jung, Michael J., et al., "Buy-Side Analysts and Earnings Conference Calls," *Journal of Accounting Research* 56, no. 3, 2018, pp. 913–952
- Kirk, Marcus P., and Stanimir Markov, "Come on Over: Analyst/Investor Days as a Disclosure Medium," *The Accounting Review* 91, no. 6, 2016, pp. 1725–1750

**Depositions**

- Deposition of Steven Altman, September 7, 2022
- Deposition of Paul E. Jacobs, September 9, 2022
- Deposition of Steve M. Mollenkopf, September 13, 2022
- Deposition of Bill Davidson, September 29, 2022
- Deposition of Derek Aberle, September 30, 2022
- Deposition of Warren Kneeshaw, October 7, 2022
- Deposition of Donald J. Rosenberg, October 12, 2022

**Meeting Transcripts and Presentations**

- "Qualcomm Inc. at Goldman Sachs Group Inc Technology and Internet Conference – Final," *CQ FD Disclosure*, February 14, 2012

- "Qualcomm Inc. at JPMorgan TMT Conference – Final," *CQ FD Disclosure*, May 17, 2012
- "Qualcomm at Canaccord Genuity's Global Growth Conference – Final," *CQ FD Disclosure*, August 16, 2012
- "Fourth Quarter Fiscal 2012 Earnings," Qualcomm, November 7, 2012, https://d1io3yog0oux5.cloudfront.net/_4508f36106307b067fbb404cbc1bb3af/qualcomm/db/773/6365/file/Q4FY12+Earnings+Web+Final.pdf
- "Qualcomm 2012 Analyst Meeting – Final," *CQ FD Disclosure*, November 15, 2012
- "QUALCOMM at Credit Suisse Technology Conference - Final," *CQ FD Disclosure*, November 27, 2012
- "First Quarter Fiscal 2013 Earnings," Qualcomm, January 30, 2013, https://d1io3yog0oux5.cloudfront.net/_4508f36106307b067fbb404cbc1bb3af/qualcomm/db/773/6370/file/Q1FY13+Executive+Presentation.pdf
- "Q1 2013 Qualcomm Inc. Earnings Conference Call – Final," *CQ FD Disclosure*, January 30, 2013
- "QUALCOMM at GSM Association Mobile World Congress - Final," *VIQ FD Disclosure*, February 25, 2013
- "Qualcomm at Roth Conference – Final," *CQ FD Disclosure*, March 19, 2013
- "Second Quarter Fiscal 2013 Earnings," Qualcomm, April 24, 2013, https://d1io3yog0oux5.cloudfront.net/_4508f36106307b067fbb404cbc1bb3af/qualcomm/db/773/6374/file/Q2FY13+Executive+Presentation.pdf
- "Qualcomm at Pacific Crest Global Technology Leadership Forum – Final," *CQ FD Disclosure*, August 12, 2013
- "2013 New York Analyst Day," Qualcomm, November 20, 2013, https://ia902607.us.archive.org/33/items/qualcomm_202304/2013_08.pdf
- "Qualcomm Analyst Meeting – Final," *CQ FD Disclosure*, November 20, 2013

**Pleadings and Other Legal Documents**

- Consolidated Class Action Complaint for Violation of the Federal Securities Laws, *In re Qualcomm Incorporated Securities Litigation*, Case No. 3:17-cv-00121-JAH-WVG, July 3, 2017
- Letter to The Honorable Jinsook Ohta from Bernstein Litowitz Berger & Grossmann, "Re: *In re Qualcomm Incorporated Securities Litigation*, No. 3:17-cv-00121-JO-MSB," October 18, 2022

- Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, *In re Qualcomm Incorporated Securities Litigation*, Case No. 17cv121-JO-MSB, March 20, 2023

**Press Releases**

- "Qualcomm Announces Record First Quarter Fiscal 2012 Results," February 1, 2012, https://investor.qualcomm.com/news-events/press-releases/detail/334/qualcomm-announces-record-first-quarter-fiscal-2012-results#:~:text=--%20Record%20First%20Quarter%20Results%2C%20Raising%20Fiscal%202012,%20%20%20%203%20more%20rows%20
- "Qualcomm Announces Fourth Quarter and Fiscal 2012 Results Fiscal 2012 Revenues $19.1 Billion," November 6, 2012, https://www.qualcomm.com/news/releases/2012/11/qualcomm-announces-fourth-quarter-and-fiscal-2012-results-fiscal-2012#:~:text=Qualcomm%20Announces%20Fourth%20Quarter%20and%20Fiscal%202012%20Results,offered%20by%20Qualcomm%20Technologies%2C%20Inc.%20and%2F
- "Qualcomm to Host Analyst Meeting," Qualcomm, November 14, 2012, https://d1io3yog0oux5.cloudfront.net/_620db46c315a9f549ec2bb723f150ee1/qualcomm/news/2012-11-14_Qualcomm_to_Host_Analyst_563.pdf
- "Cognizant to Present at the Credit Suisse Annual Technology Conference," November 20, 2012, https://news.cognizant.com/2012-11-20-Cognizant-to-Present-at-the-Credit-Suisse-Annual-Technology-Conference
- "Tableau Software Management to Participate at Credit Suisse 2012 Annual Technology Conference," November 20, 2012, https://www.tableau.com/about/press-releases/2012/tableau-software-management-participate-credit-suisse-2012-annual
- "Informatica to Present at Credit Suisse Annual Technology Conference," November 26, 2012, https://www.globenewswire.com/en/news-release/2012/11/26/507412/11123/en/Informatica-to-Present-at-Credit-Suisse-Annual-Technology-Conference.html
- "Responsys to Present at Credit Suisse 2012 Annual Technology Conference," November 27, 2012, https://finance.yahoo.com/news/responsys-present-credit-suisse-2012-130000139.html
- "Qualcomm Announces First Quarter Fiscal 2013 Results," January 30, 2013, https://investor.qualcomm.com/news-events/press-releases/detail/89/qualcomm-announces-first-quarter-fiscal-2013-results

- "GSMA Mobile World Congress 2013 Sets New Records," February 28, 2013, https://www.gsma.com/newsroom/press-release/gsma-mobile-world-congress-2013-sets-new-records
- "Qualcomm Announces Third Quarter Fiscal 2013 Results," July 23, 2013, https://www.qualcomm.com/news/releases/2013/07/qualcomm-announces-third-quarter-fiscal-2013-results
- "Qualcomm to Host Analyst Meeting," Qualcomm, November 18, 2014, https://d1io3yog0oux5.cloudfront.net/_620db46c315a9f549ec2bb723f150ee1/qualcomm/news/2014-11-18_Qualcomm_to_Host_Analyst_656.pdf
- "Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report," November 17, 2015, https://www.prnewswire.com/news-releases/qualcomm-confirms-receipt-of-korea-fair-trade-commissions-case-examiners-report-300180670.html
- "Qualcomm Responds to Complaint from U.S. Federal Trade Commission," January 17, 2017, https://www.prnewswire.com/news-releases/qualcomm-responds-to-complaint-from-us-federal-trade-commission-300392395.html

**Public Press**

- Lisa Wang, "Qualcomm defends licensing fees," *Taipei Times*, June 24, 2016

**SEC Filings**

- Qualcomm Incorporated, Form DEF 14A, January 19, 2012
- Qualcomm Incorporated, Form 10-Q, February 1, 2012
- Qualcomm Incorporated, Form 10-Q, April 18, 2012
- Qualcomm Incorporated, Form 10-Q, July 18, 2012
- Qualcomm Incorporated, Form 10-K, November 7, 2012
- Qualcomm Incorporated, Form DEF 14A, January 17, 2013
- Qualcomm Incorporated, Form 10-Q, January 30, 2013
- Qualcomm Incorporated, Form 10-Q, April 24, 2013
- Qualcomm Incorporated, Form 10-Q, July 24, 2013
- Qualcomm Incorporated, Form 10-K, November 6, 2013
- Qualcomm Incorporated, Form DEF 14A, January 16, 2014
- Qualcomm Incorporated, Form 10-Q, January 29, 2014

- Qualcomm Incorporated, Form 10-Q, April 23, 2014
- Qualcomm Incorporated, Form 10-Q, July 23, 2014
- Qualcomm Incorporated, Form 10-K, November 5, 2014
- Qualcomm Incorporated, Form DEF 14A, January 22, 2015
- Qualcomm Incorporated, Form 10-Q, January 28, 2015
- Qualcomm Incorporated, Form 10-Q, April 22, 2015
- Qualcomm Incorporated, Form 10-Q, July 22, 2015
- Qualcomm Incorporated, Form 10-K, November 4, 2015
- Qualcomm Incorporated, Form DEF 14A, January 21, 2016
- Qualcomm Incorporated, Form 10-Q, January 27, 2016
- Qualcomm Incorporated, Form 10-Q, April 20, 2016
- Qualcomm Incorporated, Form 10-Q, July 20, 2016
- Qualcomm Incorporated, Form 10-K, November 2, 2016
- Qualcomm Incorporated, Form DEF 14A, January 19, 2017
- Qualcomm Incorporated, Form 10-Q, January 25, 2017
- Qualcomm Incorporated, Form 10-K, November 2, 2022

**Legal Codes and Regulations and SEC Publications**

- 17 CFR. § 229.101 (2012)
- 17 CFR. § 229.103 (2012)
- 17 CFR. § 229.303 (2012)
- 17 CFR. § 240.12b-2 (2012)
- 17 CFR. § 243.100 (2012)
- 17 CFR. § 243.101 (2012)
- "A Plain English Handbook: How to create clear SEC disclosure documents," *SEC*, August 1998, https://www.sec.gov/pdf/handbook.pdf
- "Accelerated Filer and Large Accelerated Filer Definitions," SEC Release No. 34-88365 Final Rule, March 12, 2020, https://www.sec.gov/files/rules/final/2020/34-88365.pdf

- "Business and Financial Disclosure Required by Regulation S-K," SEC Release No. 33-10064, April 13, 2016, https://www.sec.gov/rules/2016/04/business-and-financial-disclosure-required-regulation-s-k
- "Certification of Disclosure in Companies' Quarterly and Annual Reports," SEC Release No. 33-8124 Final Rule, August 28, 2002, https://www.sec.gov/rules/final/33-8124.htm
- Chair Mary Jo White, "The Path Forward on Disclosure," Speech at the National Association of Corporate Directors – Leadership Conference 2013 in National Harbor, MD, October 15, 2013, https://www.sec.gov/news/speech/spch101513mjw
- "Financial Reporting Manual," *SEC Division of Corporate Finance*, September 30, 2008, https://www.sec.gov/files/cf-financial-reporting-manual.pdf
- "Financial Reporting Manual: TOPIC 9 - Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A)," *SEC*, September 30, 2008, https://www.sec.gov/corpfin/cf-manual/topic-9
- "Form 10-K," *SEC*, https://www.sec.gov/about/forms/form10-k.pdf
- "Internal Control Over Financial Reporting in Exchange Act Periodic Reports of Non-Accelerated Filers," SEC Release No. 33-9142; 34-62914, September 15, 2010, https://www.sec.gov/files/rules/final/2010/33-9142.pdf
- "Interpretation: Commission Guidance Regarding Disclosure Related to Climate Change," SEC Release No. 33-9106, February 2, 2010, https://www.sec.gov/files/rules/interp/2010/33-9106.pdf
- "Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations," SEC Release No. 33-8350, December 19, 2003, https://www.sec.gov/rules/interp/33-8350.htm
- "Interpretive Rule: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures," SEC Release No. 33-6835, May 18, 1989, https://www.sec.gov/rules/1989/05/managements-discussion-and-analysis-financial-condition-and-results-operations
- Letter to the SEC from Grant Thornton, "Re: File No. S7-26-18, Request for Comment on Earnings Releases and Quarterly Reports," March 15, 2019, https://www.sec.gov/comments/s7-26-18/s72618-5134338-183346.pdf
- Letter to the SEC from the Council of Institutional Investors, "Re: File No. S7-26-18," March 21, 2019, https://www.cii.org/files/issues_and_advocacy/correspondence/2019/March%2021,%202019%20letter%20to%20SEC%20on%20RFC%20(final).pdf

- "Report on Review of Disclosure Requirements in Regulation S-K, as Required by Section 108 of the Jumpstart Our Business Startups Act," *SEC*, December 2013, https://www.sec.gov/news/studies/2013/reg-sk-disclosure-requirements-review.pdf
- "Request for Comment on Earnings Releases and Quarterly Reports," SEC Release No. 33-10588, December 18, 2018, https://www.sec.gov/rules/other/2018/33-10588.pdf
- "Revisions to Accelerated Filer Definition and Accelerated Deadlines for Filing Periodic Reports," SEC Release No. 33-8644 Final Rule, December 21, 2005, https://www.sec.gov/rules/final/33-8644.pdf
- "Selective Disclosure and Insider Trading," SEC Release No. 33-7881 Final Rule, August 15, 2000, https://www.sec.gov/rules/final/33-7881.htm

**Other Publicly Available Materials**

- "Adam Johnson," LinkedIn, https://www.linkedin.com/in/adam-johnson-6062335
- "Adam Tachner," LinkedIn, https://www.linkedin.com/in/adam-tachner
- "Akash Palkhiwala," LinkedIn, https://www.linkedin.com/in/akash-palkhiwala-1b369520
- "Alex Rogers," LinkedIn, https://www.linkedin.com/in/alex-rogers-865419130
- "Anand Chandrasekher," LinkedIn, https://www.linkedin.com/in/anandchandrasekher
- "Beth Wapner," LinkedIn, https://www.linkedin.com/in/beth-wapner-37521a4/details/experience
- "Bill Bold," LinkedIn, https://www.linkedin.com/in/bill-bold-9b13768
- "Bill Sailer," LinkedIn, https://www.linkedin.com/in/bill-sailer-88a7a59
- "Carol Lam," LinkedIn, https://www.linkedin.com/in/carol-lam-529972215
- "Catherine Baker," LinkedIn, https://www.linkedin.com/in/catherinerice
- CFO Journal - Deloitte, "Disclosure Committees – Frequently Asked Questions," *Wall Street Journal*, January 3, 2014, https://deloitte.wsj.com/cfo/2014/01/03/disclosure-committees-frequently-asked-questions
- "Charles Chivetta," LinkedIn, https://www.linkedin.com/in/charles-chivetta
- "Chris Longman," LinkedIn, https://www.linkedin.com/in/chris-longman-17728bb0
- "Christie Thoene," LinkedIn, https://www.linkedin.com/in/christie-thoene-19b1b713/details/experience
- "Christine Trimble," LinkedIn, https://www.linkedin.com/in/christine-trimble-49b909153

- "Cindy Ping," LinkedIn, https://www.linkedin.com/in/cindy-ping-517ab6
- Colin J. Diamond and Irina Yevmenenko, "Earnings Releases and Earnings Calls," *Practical Law*, 2015, https://www.whitecase.com/sites/whitecase/files/files/download/publications/article-earnings-releases-and-earnings-calls.pdf
- "Connor Campbell," LinkedIn, https://www.linkedin.com/in/conorkcampbell
- "Craig Barratt," LinkedIn, https://www.linkedin.com/in/craig-h-barratt/details/experience
- "Cristiano R. Amon," LinkedIn, https://www.linkedin.com/in/cristiano-r-amon
- "Daniel L. Sullivan, Ph.D.," LinkedIn, https://www.linkedin.com/in/drdanielsullivan
- "Debbie Middleton," LinkedIn, https://www.linkedin.com/in/demiddleton
- "Diana Hatley," LinkedIn, https://www.linkedin.com/in/diana-hatley-6a542698
- "Disclosure Committee Essentials," *PwC*, July 2022, https://www.pwc.com/us/en/governance-insights-center/publications/assets/pwc-disclosure-committee-essentials.pdf
- "Disclosure effectiveness in action: companies make great strides," *Financial Executives Research Foundation and Ernst & Young*, September 2016, https://www.financialexecutives.org/Research/FERF-Files/2016/ey-ferf-disclosure-effectiveness-in-action-compani.aspx
- "Dr. Murthy Renduchintala," LinkedIn, https://www.linkedin.com/in/dr-murthy-renduchintala-0a79891/details/experience/
- "Dustin Mersy, CPA," LinkedIn, https://www.linkedin.com/in/dustin-mersy-cpa-3493bb14
- "Earnings Process Practices Research Report," *National Investor Relations Institute Analytics*, 2016, https://www.niri.org/NIRI/media/Protected-Documents_ExcludeGlobalSubs/Analytics%20Reports/Analytics_Guidance/NIRI-Earnings-Process-Practices-Report-2016.pdf
- "Eric R.," LinkedIn, https://www.linkedin.com/in/eric-r-06413
- "Fabian Gonell," LinkedIn, https://www.linkedin.com/in/fabian-gonell-796b132
- "Jason Bremner," LinkedIn, https://www.linkedin.com/in/jason-bremner-305b9564
- "Katherine McKeon Cassidy," LinkedIn, https://www.linkedin.com/in/katherinemckeoncassidy
- "Kurt M. Kjelland," LinkedIn, https://www.linkedin.com/in/kurtkjelland

- "Larissa Cochron," LinkedIn, https://www.linkedin.com/in/larissa-cochron-4a49153
- "Larry Griffith," LinkedIn, https://www.linkedin.com/in/larry-griffith-5a6a053/details/experience
- "Lexis Practice Advisor, Disclosure Committee Charter," Lexis Practice Note Standard Document, https://advance.lexis.com/open/document/openwebdocview/Disclosure-Committee-Charter/?pdmfid=1000522&pddocfullpath=%2Fshared%2Fdocument%2Fforms%2Furn%3AcontentItem%3A5H08-90V1-JJK6-S0MX-00000-00&pdcomponentid=500752
- "Mark Dunham," LinkedIn, https://www.linkedin.com/in/mark-dunham-b275472b
- "Mark Snyder," LinkedIn, https://www.linkedin.com/in/mark-snyder-932183209
- "Matt Grob," LinkedIn, https://www.linkedin.com/in/matt-grob-624b3042
- "Matthew Heim," LinkedIn, https://www.linkedin.com/in/mathewheim
- "Mauricio Lopez-Hoyodan," LinkedIn, https://www.linkedin.com/in/mauricio-lopez-hodoyan-446565/details/experience
- "Measures that Matter," *Ernst & Young*, 1997, http://valuementors.com/pdf/Measures%20that%20Matter.pdf
- Michael Zeidel, "Earnings Releases: Regulatory Framework and Disclosure Process," *Lexis Practice Advisor*, October 14, 2020, https://plus.lexis.com/api/permalink/4c99fa9b-1f5e-45be-b69c-33d56519eab2/?context=1530671
- "New Rules Requiring Additional Certifications by CEO and CFO Under Section 302 of Sarbanes-Oxley Act Are In Effect," *Fenwick & West LLP*, September 3, 2002, https://assets.fenwick.com/legacy/FenwickDocuments/Corp_Sec_09-03-02.pdf
- "Prabha Desikan," LinkedIn, https://www.linkedin.com/in/prabha-desikan-1318686
- "Practical Law Commercial Transactions, Dealing with the Media: Business Briefing," Thomson Reuters Practical Law Practice Note 5-513-4266, https://anzlaw.thomsonreuters.com/5-513-4266?originationContext=document&transitionType=DocumentItem&contextData=(sc.Default)&ppcid=7b7f21b841f442f8827d88cd6bccf636
- "Practical Law Corporate & Securities, Disclosure Committee Charter," Westlaw Practice Note Standard Document, https://content.next.westlaw.com/practicallaw/document/I0fa0104aef0811e28578f7ccc38dcbee/Disclosure-Committee-Charter?viewType=FullText&transitionType=Default&contextData=(sc.Default)&firstPage=true
- "Raj Talluri," LinkedIn, https://www.linkedin.com/in/raj-talluri-988b011

- "Rasmus Hellberg," LinkedIn, https://www.linkedin.com/in/rasmus-hellberg-719a41
- "Rob Chandhok," LinkedIn, https://www.linkedin.com/in/rchandhok/details/experience
- "Roel Dill," LinkedIn, https://www.linkedin.com/in/roel-dill-06a07b5
- "Roy Hoffinger," LinkedIn, https://www.linkedin.com/in/roy-hoffinger-5a5353130
- "Sal Bono," LinkedIn, https://www.linkedin.com/in/sal-bono-9ba90638
- "Samimi Abbaseh," LinkedIn, https://www.linkedin.com/in/samimi-abbaseh-b6275823
- "Sanjay Mehta," LinkedIn, https://www.linkedin.com/in/sanjay-mehta-1139517a
- "Sanjay Vakharia," LinkedIn, https://www.linkedin.com/in/sanjay-vakharia-6aa3ba2
- "Sean Murphy," LinkedIn, https://www.linkedin.com/in/sean-murphy-41468436
- "Standards of Practice for Investor Relations," *National Investor Relations Institute*, January 2004, http://media.corporate-ir.net/media_files/priv/27585/standards_practice.pdf
- "Taka Matsuo, CPA" LinkedIn, https://www.linkedin.com/in/taka-matsuo-cpa-2424b01b
- "Taylor Cabaniss," LinkedIn, https://www.linkedin.com/in/taylor-cabaniss-76a941
- "Terry Yen," LinkedIn, https://www.linkedin.com/in/terry-yen-996b281b0
- "Te-Won Lee," LinkedIn, https://www.linkedin.com/in/te-won-lee-255b3a15
- "The Promise of Market Reform," *Nasdaq*, February 2018, https://www.nasdaq.com/docs/Nasdaq_Blueprint_to_Revitalize_Capital_Markets_April_2018_tcm5044-43175.pdf
- "Thomas Rouse," LinkedIn, https://www.linkedin.com/in/thomas-rouse
- "Tim McDonough," LinkedIn, https://www.linkedin.com/in/timothymcdonough/details/experience
- "Tina Asmar," LinkedIn, https://www.linkedin.com/in/tina-asmar-458a95a4


**Produced Documents (Only First Bates Number Shown)**

- Q121SEC00068870
- Q121SEC00068871
- Q121SEC00070659
- Q121SEC00070660
- Q121SEC00072672
- Q121SEC00072673
- Q121SEC00073089
- Q121SEC00073340
- Q121SEC00073341
- Q121SEC00073398

- Q121SEC00073399
- Q121SEC00075103
- Q121SEC00075764
- Q121SEC00075765
- Q121SEC00077593
- Q121SEC00077595
- Q121SEC00082356
- Q121SEC00090861
- Q121SEC00090862
- Q121SEC00091735
- Q121SEC00107281
- Q121SEC00109788
- Q121SEC00109797
- Q121SEC00110830
- Q121SEC00111237
- Q121SEC00111517
- Q121SEC00111518
- Q121SEC00111611
- Q121SEC00111798
- Q121SEC00111799
- Q121SEC00111845
- Q121SEC00115327
- Q121SEC00115328
- Q121SEC00115373
- Q121SEC00115374
- Q121SEC00115380
- Q121SEC00115381
- Q121SEC00115426
- Q121SEC00115427
- Q121SEC00115431
- Q121SEC00115547
- Q121SEC00122439
- Q121SEC00127169
- Q121SEC00131384
- Q121SEC00150690
- Q121SEC00160881
- Q121SEC00160882
- Q121SEC00160884
- Q121SEC00161155
- Q121SEC00161158
- Q121SEC00162189
- Q121SEC00162192
- Q121SEC00164022
- Q121SEC00164047
- Q121SEC00164067
- Q121SEC00164256
- Q121SEC00164968
- Q121SEC00165221
- Q121SEC00165222
- Q121SEC00168819
- Q121SEC00169323
- Q121SEC00170728
- Q121SEC00192564
- Q121SEC00194425
- Q121SEC00194539
- Q121SEC00194623

- Q121SEC00194630
- Q121SEC00194829
- Q121SEC00194837
- Q121SEC00195953
- Q121SEC00196080
- Q121SEC00196297
- Q121SEC00196301
- Q121SEC00196506
- Q121SEC00196513
- Q121SEC00196681
- Q121SEC00196860
- Q121SEC00196866
- Q121SEC00197203
- Q121SEC00197208
- Q121SEC00201645
- Q121SEC00202513
- Q121SEC00202624
- Q121SEC00205021
- Q121SEC00205131
- Q121SEC00205135
- Q121SEC00205254
- Q121SEC00206912
- Q121SEC00207608
- Q121SEC00208282
- Q121SEC00208610
- Q121SEC00208649
- Q121SEC00210546
- Q121SEC00210703
- Q121SEC00210834
- Q121SEC00211008
- Q121SEC00211013
- Q121SEC00232397
- Q121SEC00245612
- Q121SEC00245614
- Q121SEC00245620
- Q121SEC00245626
- Q121SEC00245628
- Q121SEC00245631
- Q121SEC00245642
- Q121SEC00265306
- Q121SEC00266431
- Q121SEC00266466
- Q121SEC00266617
- Q121SEC00266618
- Q121SEC00266623
- Q121SEC00266876
- Q121SEC00266877
- Q121SEC00266882
- Q121SEC00267134
- Q121SEC00267738
- Q121SEC00268705
- Q121SEC00268706
- Q121SEC00268708
- Q121SEC00268710
- Q121SEC00269105
- Q121SEC00269167

- Q121SEC00269913
- Q121SEC00287914
- Q121SEC00295276
- Q121SEC00295708
- Q121SEC00296927
- Q121SEC00296928
- Q121SEC00296933
- Q121SEC00296941
- Q121SEC00296942
- Q121SEC00296947
- Q121SEC00319095
- Q121SEC00320235
- Q121SEC00323658
- Q121SEC00323659
- Q121SEC00323699
- Q121SEC00323709
- Q121SEC00326860
- Q121SEC00327135
- Q121SEC00330264
- Q121SEC00333864
- Q121SEC00333865
- Q121SEC00334292
- Q121SEC00334452
- Q121SEC00334543
- Q121SEC00334544
- Q121SEC00334590
- Q121SEC00334591
- Q121SEC00334919
- Q121SEC00335612
- Q121SEC00336764
- Q121SEC00336765
- Q121SEC00355702
- Q121SEC00356295
- Q121SEC00356402
- Q121SEC00356403
- Q121SEC00356719
- Q121SEC00359497
- Q121SEC00371385
- Q121SEC00404393
- Q121SEC00404394
- Q121SEC00404415
- Q121SEC00404508
- Q121SEC00411896
- Q121SEC00411899
- Q121SEC00412164
- Q121SEC00412226
- Q121SEC00412316
- Q121SEC00412347
- Q121SEC00412359
- Q121SEC00412384
- Q121SEC00412469
- Q121SEC00412473
- Q121SEC00412476
- Q121SEC00433638
- Q121SEC00435996
- Q121SEC00436733

- Q121SEC00436735
- Q121SEC00436796
- Q121SEC00436797
- Q121SEC00436874
- Q121SEC00436875
- Q121SEC00436876
- Q121SEC00436877
- Q121SEC00436878
- Q121SEC00440556
- Q121SEC00440557
- Q121SEC00443411
- Q121SEC00443473
- Q121SEC00466732
- Q121SEC00466830
- Q121SEC00466948
- Q121SEC00473540
- Q121SEC00487475
- Q121SEC00489625
- Q121SEC00492075
- Q121SEC00494824
- Q121SEC00495280
- Q121SEC00497271
- Q121SEC00497333
- Q121SEC00499865
- Q121SEC00505042
- Q121SEC00510846
- Q121SEC00520677
- Q121SEC00527018
- Q121SEC00527019
- Q121SEC00527023
- Q121SEC00527029
- Q121SEC00527033
- Q121SEC00527040
- Q121SEC00554426
- Q121SEC00554467
- Q121SEC00555166
- Q121SEC00579285
- Q121SEC00579286
- Q121SEC00579298
- Q121SEC00579309
- Q121SEC00586709
- Q121SEC00587353
- Q121SEC00587846
- Q121SEC00588070
- Q121SEC00601353
- Q121SEC00603437
- Q121SEC00603513
- Q121SEC00607262
- Q121SEC00631028
- Q121SEC00632293
- Q121SEC00633144
- Q121SEC00633744
- Q121SEC00633942
- Q121SEC00634568
- Q121SEC00634569
- Q121SEC00638321

- Q121SEC00646480
- Q121SEC00646481
- Q121SEC00647173
- Q121SEC00647175
- Q121SEC00647187
- Q121SEC00647208
- Q121SEC00647212
- Q121SEC00647222
- Q121SEC00647237
- Q121SEC00647238
- Q121SEC00647253
- Q121SEC00649245
- Q121SEC00649246
- Q121SEC00649248
- Q121SEC00649255
- Q121SEC00649262
- Q121SEC00649271
- Q121SEC00649272
- Q121SEC00649273
- Q121SEC00649289
- Q121SEC00649293
- Q121SEC00649574
- Q121SEC00649575
- Q121SEC00649580
- Q121SEC00651268
- Q121SEC00654360
- Q121SEC00658304
- Q121SEC00658615
- Q121SEC00661024
- Q121SEC00663252
- Q121SEC00663255
- Q121SEC00663256
- Q121SEC00663302
- Q121SEC00663303
- Q121SEC00666883
- Q121SEC00666924
- Q121SEC00666925
- Q121SEC00666953
- Q121SEC00666954
- Q121SEC00666968
- Q121SEC00666969
- Q121SEC00667018
- Q121SEC00667019
- Q121SEC00667033
- Q121SEC00667047
- Q121SEC00667048
- Q121SEC00671320
- Q121SEC00684323
- Q121SEC00693589
- Q121SEC00693591
- Q121SEC00693603
- Q121SEC00693606
- Q121SEC00693614
- Q121SEC00717700
- Q121SEC00718307
- Q121SEC00725844

- Q121SEC00725864
- Q121SEC00726789
- Q121SEC00726924
- Q121SEC00727430
- Q121SEC00727569
- Q121SEC00727775
- Q121SEC00732477
- Q121SEC00737441
- Q121SEC00740790
- Q121SEC00742446
- Q121SEC00742447
- Q121SEC00742604
- Q121SEC00743078
- Q121SEC00746290
- Q121SEC00746302
- Q121SEC00751809
- Q121SEC00752353
- Q121SEC00752519
- Q121SEC00752798
- Q121SEC00753285
- Q121SEC00753301
- Q121SEC00754413
- Q121SEC00759112
- Q121SEC00759765
- Q121SEC00759785
- Q121SEC00759805
- Q121SEC00762315
- Q121SEC00763266
- Q121SEC00764441
- Q121SEC00764927
- Q121SEC00765858
- Q121SEC00768942
- Q121SEC00770802
- Q121SEC00771489
- Q121SEC00772095
- Q121SEC00772171
- Q121SEC00772265
- Q121SEC00775084
- Q121SEC00776715
- Q121SEC00776716
- Q121SEC00776820
- Q121SEC00776821
- Q121SEC00776822
- Q121SEC00776823
- Q121SEC00776824
- Q121SEC00777056
- Q121SEC00787479
- Q121SEC00787480
- Q121SEC00794058
- Q121SEC00794513
- Q121SEC00794514
- Q121SEC00797122
- Q121SEC00797294
- Q121SEC00799422
- Q121SEC00801013
- Q121SEC00801793

- Q121SEC00804271
- Q121SEC00820597
- Q121SEC00874176
- Q121SEC00875109
- Q121SEC00878069
- Q121SEC00878155
- Q121SEC00878242
- Q121SEC00878295
- Q121SEC00878329
- Q121SEC00878380
- Q121SEC00878402
- Q121SEC00878481
- Q121SEC00878512
- Q121SEC00878582
- Q121SEC00878611
- Q121SEC00878684
- Q121SEC00878777
- Q121SEC00878838
- Q121SEC00878866
- Q121SEC00878878
- Q121SEC00879217
- Q121SEC00879249
- Q121SEC00879294
- Q121SEC00879370
- Q121SEC00879428
- Q121SEC00879640
- Q121SEC00879710
- Q121SEC00879780
- Q121SEC00879872
- Q121SEC00879959
- Q121SEC00880050
- Q121SEC00880117
- Q121SEC00880194
- Q121SEC00896362
- Q121SEC00935730
- Q121SEC00937080
- Q121SEC00937592
- Q121SEC00937593
- Q121SEC00937599
- Q121SEC00937600
- Q121SEC00937606
- Q121SEC00937613
- Q121SEC00937620
- Q2014FTC00173385
- Q2014FTC00173589
- Q2014FTC00173590
- Q2014FTC00410564
- Q2014FTC00538355
- Q2014FTC00538356
- Q2014FTC00552116
- Q2014FTC01601757
- Q2014FTC01620830
- Q2014FTC01620832
- Q2014FTC01620833
- Q2014FTC01825440
- Q2014FTC01876850

- Q2014FTC02109930
- Q2014FTC02109932
- Q2014FTC02109934
- Q2014FTC02110288
- Q2014FTC02126259
- Q2014FTC02163832
- Q2014FTC02531166
- Q2014FTC02531167
- Q2014FTC02531173
- Q2014FTC02531174
- Q2014FTC02531183
- Q2014FTC02820500
- Q2014FTC02826490
- Q2014FTC02992434
- Q2014FTC03077348
- Q2014FTC03112009
- Q2014FTC03354219
- Q2014FTC03354275
- Q2014FTC03354276
- Q2014FTC03354550
- Q2014FTC03354551
- Q2014FTC03358585
- Q2014FTC03358586
- Q2014FTC03358599
- Q2014FTC03358600
- Q2014FTC03358613
- Q2014FTC03358644
- Q2014FTC03358649
- Q2014FTC03358650
- Q2014FTC03358774
- Q2014FTC03358775
- Q2014FTC03361158
- Q2014FTC03361941
- Q2014FTC03476394
- Q2014FTC03477465
- Q2014FTC03591360
- Q2014FTC03839981
- Q2014FTC03854342
- Q2014FTC03859062
- Q2014FTC04006669
- Q2014FTC04690078
- Q2014FTC04708931
- Q2014FTC04717687
- Q2014FTC04721694
- Q2014FTC04817411
- Q2014FTC04820411
- Q2014FTC04820412
- Q2014FTCBCM06714558
- Q2014FTCBCM06734328
- QAPPCMSD09927154
- QNDCAL00110449
- QNDCAL00624877
- QNDCAL00624900
- QNDCAL00634550
- QNDCAL00636328
- QNDCAL00663874

- QNDCAL00690124
- QNDCAL00690125
- QNDCAL00690130
- QNDCAL00764650
- QNDCAL00811967
- QNDCAL00812271
- QNDCAL00837142
- QNDCAL00837143
- QNDCAL00837158
- QNDCAL00837161
- QNDCAL00837175
- QNDCAL00837177
- QNDCAL00837183
- QNDCAL02099525
- QNDCAL02102650
- QNDCAL02104698
- QNDCAL02106013
- QNDCAL02225262
- QNDCAL02827446
- QNDCAL02844402
- QNDCAL02987750
- QNDCAL03161993
- QNDCAL03305884
- QNDCAL03305885
- QNDCAL03305893
- QNDCAL03305897
- QNDCAL03305898
- QNDCAL03305913
- QNDCAL03305915
- QNDCAL03305929
- QNDCAL03305931
- QNDCAL03526660
- QNDCAL03539419
- QNDCAL03551486
- QNDCAL04120537
- QNDCAL04225322
- QNDCAL04421130

**Data**

- *Refinitiv*

**Other**

- Chapter 3. Components of Securities Compliance Program, Corp. Compl. Series: Securities § 3:28 (2022)
- Chapter 3. Logistical Framework, Corp. Communications Handbook § 3:12 (2022-2023)
- Chapter 4. Informal Disclosure Issues in Specific Contexts, Corp. Communications Handbook § 4:31 (2022-2023)

- Chapter 17. Regulation FD, Res. Corp. Fed. Sec. L. P 1707 (C.C.H.), 2015 WL 5616177
- Qualcomm Privilege Log Produced on October 14, 2022

**In addition to the documents on this list, I considered all documents cited in my report and my exhibits to form my opinions.**

# Exhibit 5

# *In re Qualcomm Securities Litigation*

## Expert Reply Report of Professor John Coates

February 2, 2024

**Confidential**

# Table of Contents


I. Introduction ..... 1

II. Summary of Opinions ..... 2

III. The Seligman Report Responds to an Opinion I Did Not Offer in the Coates Report. ..... 3

IV. Contrary to Professor Seligman's Opinion, My Analysis of the Company's Disclosure Processes *Includes* the Channels Containing the At-Issue Disclosures. ..... 4

- A. Professor Seligman Incorrectly Opines that the Coates Report Focused "on Purported Customs and Practices and Internal Disclosure Processes that Have No Relationship to the Alleged False Statements." ..... 5
- B. Professor Seligman Does Not Dispute Several Elements of my Opinion Concerning Qualcomm's Disclosure Process. ..... 8

V. The "Internal Control Issues" Discussed by Professor Seligman Do Not Alter My Opinions in the Coates Report. ..... 13

- A. Qualcomm's Response to Mr. Felke's Concerns Does Not Alter My Opinions in the Coates Report. ..... 14
- B. Qualcomm's Response to Concerns Raised in the "Press Release Process Issues" Document Does Not Alter My Opinions in the Coates Report. ..... 17
- C. Professor Seligman's Opinion Regarding the SEC's Recognition of Weaknesses in Qualcomm's Internal Controls is Unrelated to Qualcomm's Disclosure Process. ..... 18

VI. Professor Seligman Incorrectly Implies That the Coates Report Should Have Addressed Whether Qualcomm Disclosed "Bundling Practices." ..... 19

## I. Introduction

1. On September 12, 2023, I submitted an expert report in this matter (the "Coates Report") analyzing the disclosure process employed by Qualcomm Incorporated ("Qualcomm" or the "Company") from February 1, 2012 through January 20, 2017 (the "Class Period") as it compared to the disclosure customs and practices in large public companies.[1] Based on my review of materials relating to Qualcomm's disclosure practices during the Class Period and my academic and professional experience, I opined:[2]

a. Qualcomm's processes during the Class Period for determining the disclosure of information to the public involved relevant departments and individuals and were consistent with disclosure customs and practices in large public companies.

b. Qualcomm's disclosure processes for the SEC filings, analyst conferences, and media interview containing the at-issue disclosures involved relevant departments and individuals and were consistent with the Company's general disclosure practices and disclosure customs and practices in large public companies.[3]

2. On December 11, 2023, Professor Joel Seligman submitted a rebuttal expert report (the "Seligman Report") that offered opinions concerning "[w]hether review of a company's disclosure processes as described in the [Coates Report] is sufficient to determine if a company has fulfilled its disclosure obligations under the Federal Securities laws applicable to this case" and whether my analysis "supports [my] conclusion that 'Qualcomm's disclosure processes for the SEC filings, analyst conferences, and media interview(s) containing the at-issue disclosures involved relevant departments and individuals and were consistent with the Company's general disclosure practices and disclosure customs and practices in large public companies.'"[4]

3. I have been asked by Cooley LLP, counsel for Qualcomm and the individual defendants, to offer testimony regarding the opinions contained in the Seligman Report.

---

[1] Expert Report of Professor John Coates, filed September 12, 2023 ("Coates Report").
[2] Coates Report, ¶¶ 20–21.
[3] Exhibit 1 of the Coates Report summarizes each disclosure ("at-issue disclosure") that I understand remains at issue as an alleged bundling misrepresentation or omission, excluding disclosures made in press releases on November 17, 2015 and January 17, 2017, as those disclosures are not within the scope of my assignment. *See* Coates Report, ¶ 14, footnote 8, Exhibit 1.
[4] Rebuttal Expert Report of Joel Seligman, filed December 11, 2023 ("Seligman Report"), ¶ 10.

4. My curriculum vitae, including a list of my publications, is attached as **Appendix A**. An updated list of cases in which I have testified or been deposed as an expert in the previous four years is attached as **Appendix B**. A complete list of materials I have considered to date in reaching my opinions is attached as **Appendix C**.

5. I will receive my customary fee of $2,250 per hour in this matter. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

## II. Summary of Opinions

6. After my review of the Seligman Report and materials cited therein, and based on my academic and professional experience, I have formed the following opinions:

a. Professor Seligman does not rebut any of my opinions by asserting that a review of a company's internal disclosure process is insufficient to determine whether that company has fulfilled its disclosure obligations under applicable federal securities laws.

b. Professor Seligman incorrectly opines that I focused on disclosure processes that have no relationship to the at-issue disclosures. Contrary to Professor Seligman's opinion, my analysis of the Company's disclosure processes includes the channels containing the at-issue disclosures. Professor Seligman also does not dispute several elements of my opinion concerning Qualcomm's disclosure process.

c. Professor Seligman's opinions concerning certain internal control issues do not alter my opinions set forth in the Coates Report. Specifically, based on the materials I have reviewed relating to Qualcomm's responses to former employee Magnus Felke's stated concerns and the matters addressed in the "Press Release Process Issues" document, my opinions in the Coates Report remain unchanged. Additionally, Professor Seligman's opinion regarding the SEC's recognition of

weaknesses in Qualcomm's internal controls is unrelated to—and does not change my opinions regarding—Qualcomm's disclosure process during the Class Period.

d. Professor Seligman incorrectly implies that in the Coates Report I should have addressed whether Qualcomm disclosed its "bundling" practices. It is my understanding that the accuracy of Qualcomm's disclosures is for the Court or a jury to determine rather than for experts.

## III. The Seligman Report Responds to an Opinion I Did Not Offer in the Coates Report.

7. Much of Professor Seligman's report responds to an opinion I did not offer. He asserts that a "[r]eview of a company's disclosure processes as described in the Coates Report is not sufficient to determine whether a company has fulfilled its disclosure obligations under the Federal Securities laws applicable to this case."[5] Professor Seligman further asserts that I identify "no industry custom or practice that would permit a corporation to insulate itself from liability simply by claiming that it had an 'iterative' disclosure process in place."[6] In the Coates Report, however, I did not state that a "review of a company's disclosure process" is "sufficient to determine whether a company has fulfilled its disclosure obligations under the Federal Securities laws" or that a company's disclosure process can shield the company from liability.

8. I was asked to evaluate Qualcomm's general disclosure practices and found that Qualcomm's processes during the Class Period for determining the disclosure of information to the public involved relevant departments and individuals and were consistent with disclosure customs and practices in large public companies.[7] I was also asked to evaluate the specific disclosure processes Qualcomm employed with respect to the channels containing the at-issue disclosures.[8] I found that the disclosure processes that Qualcomm used in the channels containing the at-issue disclosures involved relevant departments and individuals and were

---

[5] Seligman Report, ¶ 11.
[6] Seligman Report, ¶ 21.
[7] Coates Report, ¶¶ 18, 21.
[8] Coates Report, ¶ 18. As I noted in the Coates Report, I do not address, and do not intend to offer testimony regarding, the disclosures contained in Qualcomm's press releases on November 17, 2015 and January 17, 2017. *See* Coates Report, footnote 25.

consistent with the Company's general disclosure practices and disclosure customs and practices in large public companies.[9]

9. I understand that the Company's compliance with federal securities laws is the ultimate legal issue that the Court or a jury will determine in this case. Accordingly, I was not tasked with evaluating whether Qualcomm's disclosure processes permit it to "insulate itself from liability" under federal securities laws and did not offer an opinion on that issue.[10] I note, however, my understanding that scienter is an element of plaintiffs' claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934. I further note, without offering a legal opinion, my understanding that the extent to which the Company employs a customary disclosure process, as I found Qualcomm did during the Class Period, is relevant to the ultimate determination of whether the Company and/or its executives acted with scienter, and that it may also be relevant to other aspects of how the relevant law in this case is applied to facts that are in dispute.

## IV. Contrary to Professor Seligman's Opinion, My Analysis of the Company's Disclosure Processes *Includes* the Channels Containing the At-Issue Disclosures.

10. Professor Seligman asserts that I focus "large portions of [the Coates Report] on customs and practices and internal disclosure processes that do not effectively address the alleged false statements in this case."[11] It is unclear what Professor Seligman means by "effectively address the alleged false statements." If he is suggesting that I should have offered expert opinions regarding the accuracy of the at-issue disclosures, then I note that I understand that is an issue for the Court or jury to determine.

11. My opinions concerning Qualcomm's disclosure processes provide important context as to the care with which the Company typically prepared its disclosures, including but not limited to the at-issue disclosures. Providing that context requires an evaluation of whether the Company's general disclosure process was consistent with disclosure customs and practices in large public companies. After conducting that evaluation, I then assessed whether the

[9] Coates Report, ¶ 21.
[10] Seligman Report, ¶ 21.
[11] Seligman Report, ¶ 19.

Company's process for preparing disclosure channels containing the at-issue disclosures was consistent with the Company's general disclosure process.

12. In this section, I explain in greater detail that Professor Seligman mischaracterizes the Coates Report as focused on "[c]ustoms and [p]ractices and [i]nternal [d]isclosure [p]rocesses that [h]ave [n]o [r]elationship to the [a]lleged [f]alse [s]tatements."[12] I also reiterate the findings included in the Coates Report that Professor Seligman did not dispute.

### A. Professor Seligman Incorrectly Opines that the Coates Report Focused "on Purported Customs and Practices and Internal Disclosure Processes that Have No Relationship to the Alleged False Statements."

13. Professor Seligman opines that I focused on disclosure customs and practices and internal disclosure processes that have no relationship to the at-issue disclosures.[13] In doing so, however, Professor Seligman focuses on only a few aspects of my opinions in the Coates Report concerning the Company's general disclosure process. My analysis consisted of more than simply assessing select individual components of the disclosure process. As explained above, one of my assignments was to evaluate Qualcomm's general disclosure practices, and my resulting opinions are informative as to the care with which the Company typically prepared its disclosures, including the at-issue disclosures.

14. Professor Seligman further ignores that I assessed Qualcomm's general disclosure processes for the disclosure channels *containing the at-issue disclosures* and found that those disclosure processes involved relevant departments and individuals and were consistent with the Company's general disclosure practices and disclosure customs and practices in large public companies.[14]

15. Professor Seligman also asserts that Qualcomm's "disclosure processes regarding its *financial statements* are not at issue in this case."[15] He further asserts that "Qualcomm's auditor, [*sic*] provided an audit opinion only as to Qualcomm's financial statements and Qualcomm's internal control over financial reporting [("ICFR")]—not to the portions of the SEC Reports at issue or any earnings releases, analyst events, or media interviews."[16] However, Professor

[12] Seligman Report, II.A.
[13] Seligman Report, ¶ 20.
[14] Coates Report, ¶¶ 118–182.
[15] Seligman Report, ¶ 22. Emphasis in original.
[16] Seligman Report, ¶ 23.

Seligman ignores that Qualcomm's process for preparing its Forms 10-K and 10-Q was not limited to the financial statements and ICFR. As I explained in the Coates Report, Investor Relations, Company executives, the legal department, and the Audit Committee were involved in reviewing Forms 10-K and 10-Q.[17] I also discussed in the Coates Report that members of the Disclosure Compliance Review Committee received drafts of the Forms 10-K and 10-Q for "review and discussion" at the Disclosure Compliance Review Committee meeting.[18] I further discussed in the Coates Report that several individuals were assigned to prepare or review various sections of the management's discussion and analysis of financial condition and results of operations ("MD&A").[19] Professor Seligman ignores this discussion of Qualcomm's general disclosure process and instead focuses on a select few aspects of Qualcomm's disclosure process—financial statements and ICFR—in his rebuttal opinions.

16. Professor Seligman's opinions concerning the involvement of Qualcomm's auditor in the disclosure process do not imply that Qualcomm's disclosure process was inconsistent with disclosure customs and practices in large public companies. Even if auditors provide an audit opinion only as to financial statements and ICFR in Form 10-K, Professor Seligman does not dispute that, as I explained in the Coates Report, individuals from PwC (Qualcomm's independent auditor)[20] were involved in other aspects of the Company's disclosure process. For example, in connection with the Q3 2013 reporting period, PwC reported to the Audit Committee that it had reviewed the Form 10-Q.[21] As outlined in the Coates Report, PwC also received a draft of the Q4 2012 earnings release.[22] Moreover, PwC received for its review drafts of the 2012 Form 10-K prior to the Audit Committee meeting.[23] According to Auditing Standards

---

[17] Coates Report, ¶ 82. I cited several documents in the Coates Report (footnote 158), including deposition testimony by Warren Kneeshaw (VP of Investor Relations), Bill Davidson (SVP of Investor Relations), Derek Aberle (President), and Steve Mollenkopf (CEO). *See* Coates Report, footnotes 25, 78, 158. For example, Mr. Kneeshaw testified that "the business owners, the legal review teams at the business level, at the corporate level, SEC level" all contributed to the review of Qualcomm's Form 10-K. Mr. Davidson testified that the "controller's department handled the writing of the [Form 10-Q] or the [Form 10-K]" and that he "was a reviewer at the tail end of that process closer to earnings." Mr. Aberle testified that he reviewed parts of Forms 10-K and 10-Q that were relevant to his responsibilities, including "sections dealing with the company's licensing practices" when he was "running QTL directly." Mr. Mollenkopf testified that the legal team and individuals in charge of licensing were involved in preparation of Form 10-K. *See* Deposition of Warren Kneeshaw, October 7, 2022 ("Kneeshaw Deposition"), pp. 161–162; Deposition of Bill Davidson, September 29, 2022, p. 15; Deposition of Derek Aberle, September 30, 2022 ("Aberle Deposition"), pp. 28–29; Deposition of Steve M. Mollenkopf, September 13, 2022, p. 203.

[18] Coates Report, ¶ 84.

[19] Coates Report, ¶ 85.

[20] *See* Coates Report, ¶ 86.

[21] Coates Report, ¶¶ 88–89.

[22] Coates Report, ¶ 99.

[23] Coates Report, ¶¶ 135–136.

published by the Public Company Accounting Oversight Board ("PCAOB"), even if PwC was only responsible for information concerning the financial statements and ICFR in the Form 10-K (as Professor Seligman asserts), it would be expected to review other parts of the document and bring to the attention of the Company any material misstatements that it identified:

> "The auditor's responsibility with respect to information in a document does not extend beyond the financial information identified in his report, and the auditor has no obligation to perform any procedures to corroborate other information contained in a document. However, he should read the other information and consider whether such information, or the manner of its presentation, is materially inconsistent with information, or the manner of its presentation, appearing in the financial statements. If the auditor concludes that there is a material inconsistency, he should determine whether the financial statements, his report, or both require revision. If he concludes that they do not require revision, he should request the client to revise the other information. If the other information is not revised to eliminate the material inconsistency, he should communicate the material inconsistency to the audit committee and consider other actions, such as revising his report to include an explanatory paragraph, including an appropriate title, describing the material inconsistency, withholding the use of his report in the document, and withdrawing from the engagement. The action he takes will depend on the particular circumstances and the significance of the inconsistency in the other information.
>
> If, while reading the other information . . . , the auditor becomes aware of information that he believes is a material misstatement of fact that is not a material inconsistency . . . , he should discuss the matter with the client. . . .
>
> If, after discussing the matter as described [above], the auditor concludes that a material misstatement of fact remains, the action he takes will depend on his judgment in the particular circumstances. He should communicate the material misstatement of fact to the client and the audit committee, in writing, and consider consulting his legal counsel as to further appropriate action in the circumstances."[24]

17. Professor Seligman also asserts that I do not explain in the Coates Report "how any disclosure processes could have prevented the making of false and misleading statements during unscripted analyst events and media interviews."[25] As I stated in the Coates Report, if management receives a question that it has not had to previously address and for which management has not prepared a scripted response or talking points, management typically

---

[24] "AS 2710: Other Information in Documents Containing Audited Financial Statements," *PCAOB*, https://pcaobus.org/oversight/standards/auditing-standards/details/AS2710, accessed on January 22, 2024.
[25] Seligman Report, ¶ 20.

responds to such questions in real time based on prior disclosures and any related talking points that they may have previously prepared.[26] If management inadvertently discloses new material information during these events, then, as discussed in the Coates Report, the company is required under Regulation FD to make "public disclosure" of that information either simultaneously or "promptly."[27] Qualcomm also had a disclosure policy that provided for relevant individuals to "monitor public disclosures . . . to determine whether modification or amendment is warranted."[28]

18. For example, materials I have reviewed show that, consistent with this policy, individuals at Qualcomm monitored Qualcomm's disclosures related to the Taiwan media day. As I discussed in the Coates Report, Mr. Kneeshaw identified a factual error unrelated to the at-issue disclosure in the June 2016 *Taipei Times* article and brought it to the attention of Tina Asmar (Sr. Director, Government & Public Affairs),[29] who worked to correct the inaccuracies.[30] Additionally, materials I have reviewed show that members of Qualcomm's Investor Relations team received transcripts of the 2012 Credit Suisse Technology Conference and the 2013 GSM Association Mobile World Congress ("MWC").[31] I also have reviewed materials indicating that Mr. Kneeshaw personally reviewed and prepared notes on the transcript of the 2013 GSM Association MWC.[32]

### B. Professor Seligman Does Not Dispute Several Elements of my Opinion Concerning Qualcomm's Disclosure Process.

19. Professor Seligman does not dispute several elements of my opinion that Qualcomm's processes during the Class Period for determining the disclosure of information to the public

---

[26] Coates Report, ¶ 59.
[27] Coates Report, ¶¶ 49, 60.
[28] "Qualcomm Incorporated Disclosure Policy," April 28, 2003, Q121SEC00168819–23 at 19–20. *See also* "Qualcomm Incorporated Disclosure Policy," November 2014, Q121SEC00937613–9 at 4 ("The Company's disclosures will be monitored by an employee with the title of 'Director' or above in Investor Relations to ensure accurate reporting and to take corrective measures, if and when necessary.")
[29] Coates Report, ¶ 180.
[30] Coates Report, ¶ 181.
[31] Email from Rikta Nagrani to Rebecca Zulka, et al., "Final Transcript-Credit Suisse Conference 11/27/2012," November 27, 2012, Q121SEC00359496; Kneeshaw Deposition Exhibit 648, Q121SEC00359497–505; Email chain from Warren Kneeshaw to Warren Kneeshaw, "MWC Investor Exec Q&A Final transcript," February 25, 2013, Q121SEC00646480; "QUALCOMM at GSM Association Mobile World Congress," February 25, 2013, *Thomson Reuters*, Q121SEC00646481–94. I understand that "ir.mail" was an email group for individuals in Qualcomm's Investor Relations team.
[32] Kneeshaw Deposition, pp. 106–107; Kneeshaw Deposition Exhibit 649, Q121SEC00208282–95. *See also* Kneeshaw Deposition, p. 175.

involved relevant departments and individuals and were consistent with disclosure customs and practices in large public companies.[33] As I detailed in the Coates Report, consistent with disclosure customs and practices in large public companies, Qualcomm maintained a disclosure policy that outlined the ways in which the Company would evaluate and/or make external disclosures, including those made in SEC filings, press releases, communications with analysts, and communications with the press.[34] The policy also outlined which individuals at Qualcomm were authorized to make external disclosures.[35] Consistent with disclosure customs and practices at large public companies, Qualcomm had also designated to certain individuals, including members of the management team, investor relations employees, and representatives of the internal legal team, the responsibility to assess the Company's disclosures.[36] These designated individuals were tasked with monitoring, reviewing, coordinating, evaluating, discussing, and developing external disclosures.[37] Qualcomm also had an Investor Relations team that played an active role in assisting with the communication of Company disclosures to market participants, consistent with disclosure customs and practices in large public companies.[38] This role included hosting events such as conferences and earnings calls, engaging with analysts who covered the Company, and assisting with various types of disclosures (e.g., SEC filings, earnings releases, earnings call scripts, among others).[39] Professor Seligman does not dispute any of these elements of my opinion.

20. I also detailed in the Coates Report Qualcomm's disclosure practices related to its Forms 10-K and 10-Q, earnings announcements, analyst events, and media interviews. Qualcomm's disclosure process for preparing quarterly and annual SEC filings during the Class Period followed an iterative approach that involved multiple relevant committees, departments, and individuals and was consistent with the disclosure customs and practices in large public companies.[40] Many individuals in different positions and departments within Qualcomm participated in an iterative process to prepare, review, check, and approve information contained

[33] Coates Report, ¶ 21.
[34] Coates Report, ¶¶ 63, 65.
[35] Coates Report, ¶¶ 65–67.
[36] Coates Report, ¶ 68.
[37] Coates Report, ¶¶ 68–70, 73.
[38] Coates Report, ¶ 76.
[39] Coates Report, ¶¶ 76, 78.
[40] Coates Report, ¶ 81.

in the Company's quarterly and annual SEC filings.[41] In particular, multiple individuals were responsible for preparing or reviewing the MD&A.[42] Besides questioning the relevance of the disclosure processes that involved Qualcomm's auditor or specifically applied to financial statements included in Qualcomm's SEC filings, which I discuss in Section IV.A, Professor Seligman does not dispute any of these elements of my opinion.

21. I similarly reviewed the Company's disclosure process for earnings disclosures leading up to and following the analyst conferences in 2012 and 2013 containing the at-issue disclosures and found that the Company's disclosure process followed an iterative approach that involved multiple relevant departments and individuals and was consistent with the disclosure customs and practices in large public companies.[43] Many individuals in different positions and departments within Qualcomm participated in an iterative process to prepare, review, and approve information that would be disclosed in earnings press releases and during earnings calls.[44] For example, numerous individuals from multiple departments were involved in preparing or reviewing drafts of earnings call scripts.[45] Multiple departments were also involved in preparing Q&A talking points and earnings call slides.[46] Professor Seligman does not dispute any of these elements of my opinion.

22. The Company's disclosure process for preparing for analyst events during the Class Period involved multiple relevant departments and individuals and was consistent with the disclosure customs and practices in large public companies.[47] In preparing materials for analyst days, Qualcomm followed an iterative approach that involved multiple relevant departments and individuals, who prepared, discussed, reviewed, and checked the disclosures for accuracy.[48] For example, numerous individuals from several teams helped prepare slides for the 2012 Analyst Day.[49] In preparing materials for analyst conferences, Qualcomm's Investor Relations team developed talking points responsive to anticipated analyst questions and used material from prior analyst events or earnings releases that had been prepared using an iterative approach that

---

[41] Coates Report, ¶ 82.
[42] Coates Report, ¶ 85.
[43] Coates Report, ¶ 91.
[44] Coates Report, ¶ 92.
[45] Coates Report, ¶ 96.
[46] Coates Report, ¶¶ 96, 98.
[47] Coates Report, ¶ 101.
[48] Coates Report, ¶ 103.
[49] Coates Report, ¶ 106.

involved multiple relevant departments and individuals.[50] Professor Seligman does not dispute any of these elements of my opinion.

23. In the Coates Report, I also analyzed the Company's disclosure process for preparing for media interviews before and after the at-issue disclosures made during the media panel involving the *Taipei Times* on June 21, 2016.[51] I concluded that Qualcomm's disclosure process for preparing for media interviews during the Class Period involved relevant departments and individuals and was consistent with the disclosure customs and practices in large public companies.[52] The Company's processes and procedures involved the preparation of briefing materials by the relevant department to aid in the preparation of interviewees.[53] These briefing materials included information on the topics anticipated to be discussed, Q&A talking points, and background information on the media personnel conducting the interview.[54] Professor Seligman does not dispute any of these elements of my opinion.

24. In short, Professor Seligman does not dispute many elements of my opinion concerning Qualcomm's disclosure process for quarterly and annual SEC filings, earnings disclosures, analyst events, and media interviews.

25. Nor does Professor Seligman dispute several elements of my opinion that Qualcomm's disclosure processes for the SEC filings, analyst conferences, and media interview containing the at-issue disclosures involved relevant departments and individuals and were consistent with the Company's general disclosure practices and disclosure customs and practices in large public companies.[55] My opinion was based on my review of the procedures and processes followed by Qualcomm for exemplar disclosures made in the Company's Forms 10-K and 10-Q, as well as the 2012 Credit Suisse Technology Conference, the 2013 GSM Association MWC, and the June 2016 media interview that contained the at-issue disclosures.[56]

26. In the Coates Report, I opined that Qualcomm's disclosure process for the exemplar 2012 Form 10-K followed an iterative approach that involved multiple relevant committees, departments, and individuals and was consistent with the Company's general disclosure practices

---

[50] Coates Report, ¶ 110.
[51] Coates Report, ¶ 114.
[52] Coates Report, ¶ 114.
[53] Coates Report, ¶ 114.
[54] Coates Report, ¶ 114.
[55] Coates Report, ¶ 21.
[56] Coates Report, ¶ 119.

and the disclosure customs and practices in large public companies.[57] For example, numerous individuals from multiple departments were asked to review and provide comments on portions of the draft Form 10-K that contained at-issue disclosures.[58] I also opined that Qualcomm's disclosure process for the exemplar Q2 2013 Form 10-Q followed an iterative approach that involved multiple relevant committees, departments, and individuals and was consistent with the Company's general disclosure practices and the disclosure customs and practices in large public companies.[59] For example, numerous individuals from multiple departments were provided sections of the draft Form 10-Q that contained at-issue disclosures.[60] Besides questioning the relevance of the disclosure processes that involved Qualcomm's auditor or specifically applied to financial statements included in Qualcomm's SEC filings, which I discuss in Section IV.A, Professor Seligman does not dispute any of these elements of my opinion.

27. I further opined in the Coates Report that Qualcomm's disclosure process for the 2012 Credit Suisse Technology Conference and the 2013 GSM Association MWC involved multiple relevant departments and individuals and was consistent with the Company's general disclosure practices and disclosure customs and practices in large public companies.[61] For example, in preparing materials for the Credit Suisse conference, Qualcomm's Investor Relations team developed talking points responsive to anticipated analyst questions, relying on material that had been previously prepared, including for the 2012 Analyst Day, in which Mr. Aberle also participated approximately two weeks prior to the conference.[62] Moreover, Qualcomm's Investor Relations team provided preparatory materials to participating Company executives in the 2013 GSM Association MWC that included talking points about the Company and its products and information from the Company's prior earnings release and earnings call.[63] Professor Seligman does not dispute any of these elements of my opinion.

28. I also opined in the Coates Report that Qualcomm's disclosure process for the Taiwan media day involved relevant departments and individuals and was consistent with the Company's

[57] Coates Report, ¶ 122.
[58] Coates Report, ¶¶ 124, 126–127.
[59] Coates Report, ¶ 145.
[60] Coates Report, ¶¶ 148, 154.
[61] Coates Report, ¶¶ 169, 176.
[62] Coates Report, ¶ 166.
[63] Coates Report, ¶ 172.

general disclosure practices and disclosure customs and practices in large public companies.[64] For example, the relevant external communications department within Qualcomm prepared briefing materials, including anticipated questions from the media and background information on media personnel and the Company's business in Taiwan, to aid in Don Rosenberg's (EVP & General Legal Counsel)[65] preparation for the media interview that was later published in an article in the *Taipei Times*.[66] Additionally, as discussed in the Coates Report, Mr. Rosenberg had participated in a separate trip to Taiwan and South Korea approximately two weeks prior to the Taiwan media day, in which he met with various government officials, and the briefing materials for that trip noted that "Qualcomm licenses intellectual property openly to all companies on a FRAND basis, including its competitors."[67] Professor Seligman does not dispute any of these elements of my opinion.

29. In sum, Professor Seligman does not dispute many elements of my opinion concerning Qualcomm's disclosure process for the exemplar Forms 10-K and 10-Q, as well as the at-issue disclosures at the 2012 Credit Suisse Technology Conference, the 2013 GSM Association MWC, and the June 2016 media interview.

## V. The "Internal Control Issues" Discussed by Professor Seligman Do Not Alter My Opinions in the Coates Report.

30. Professor Seligman asserts that in the Coates Report, I did "[n]ot [a]ddress [w]hether Qualcomm [t]ook [i]nto [a]ccount [i]nternal Qualcomm [d]ocuments and [t]estimony [d]escribing [s]ignificant [i]nternal [c]ontrol [i]ssues."[68] Professor Seligman discusses three instances pertaining to the "[i]nternal [c]ontrol [i]ssues": (i) questions raised by Mr. Felke (Senior Director of co-marketing)[69] concerning Qualcomm's "use of strategic funds to discount a handset manufacturer's (called an OEM) license of standard essential patents (called SEPs)" and Mr. Felke's claim that, in his opinion, such agreements "violated FRAND";[70] (ii) testimony by Mr. Kneeshaw in connection with a 2013 document titled "Press Release Process Issues"; and

---

[64] Coates Report, ¶ 182.
[65] Coates Report, ¶ 177.
[66] Coates Report, ¶¶ 178–179.
[67] Coates Report, ¶ 179; "Briefing Materials for Don Rosenberg Taipei/Seoul June 3-8 2016," Q121SEC00787480–593 at 505.
[68] Seligman Report, Section II.C.
[69] Deposition of Magnus Felke, September 21, 2022 ("Felke Deposition"), p. 44.
[70] *See* FELKE_097 ("Felke Memo").

(iii) "weaknesses in Qualcomm's internal controls . . . recognized by the Securities and Exchange Commission."[71] As I explain below, Qualcomm's response to concerns raised by Mr. Felke and in the "Press Release Process Issues" document does not alter my opinions in the Coates Report. In addition, I explain below that Professor Seligman's opinion regarding "weaknesses in Qualcomm's internal controls . . . recognized by" the SEC is unrelated to Qualcomm's disclosure processes discussed in the Coates Report.

### A. Qualcomm's Response to Mr. Felke's Concerns Does Not Alter My Opinions in the Coates Report.

31. Professor Seligman asserts that in the Coates Report I "should have considered how Qualcomm addressed [certain] concerns and issues in its disclosure processes and procedures" arising out of statements made by Mr. Felke.[72] Mr. Felke prepared a document (the "Felke Memo") that described his views concerning the circumstances of his termination from the Company in May 2016.[73] In his Memo, Mr. Felke claimed that under certain strategic fund agreements, Qualcomm would make payments to handset manufacturers in exchange for the handset manufacturer undertaking "mutually agreed strategic projects of equal value," such as product development and marketing campaigns.[74] Mr. Felke further claimed in the Felke Memo that "strategic fund agreements were a veiled discount to the patent license agreements" and opined that Qualcomm was "violating the FRAND principle in its licensing agreements by providing 'discounts' to some of its licensees in the form of strategic funds."[75] Mr. Felke stated that he had raised his concerns to management over the period 2013–2016 and that he believed he was terminated "at least in part" because he raised those concerns.[76]

32. I have reviewed the Felke Memo as well as Mr. Felke's deposition testimony. I do not express a view on whether Mr. Felke's assertions are truthful or accurate. I note that it is not my role, nor Professor Seligman's, as experts, to opine on whether Qualcomm's disclosures were truthful or accurate, or on the truthfulness or accuracy of any individual's opinions about Qualcomm's business practices, such as those expressed by Mr. Felke.

---

[71] Seligman Report, ¶¶ 33, 39, 41.
[72] Seligman Report, ¶ 36.
[73] Felke Memo.
[74] Felke Memo.
[75] Felke Memo.
[76] Felke Memo.

33. As Professor Seligman acknowledges, Mr. Felke stated that he discussed his opinions and questions about the value Qualcomm received under strategic fund agreements with Qualcomm senior executives.[77] The types of senior executives who I would expect to have been made aware of Mr. Felke's opinions were indeed made aware of those opinions, including: Deborah Dwight, Vice President and Attorney for QTL; Mr. Rosenberg, Executive Vice President of Legal; Fabian Gonell, QTL Division Counsel; Alex Rogers, Senior Vice President and General Manager of QTL; Eric Reifschneider, "the head of QTL"; and "many of the QTL attorneys."[78] Mr. Felke also had an opportunity to raise his concerns during a "co-marketing review" meeting with Mr. Aberle, Chief Operating Officer, in 2013.[79] During that meeting with Mr. Aberle, Mr. Felke purportedly "showed an estimate of the marketing value [Qualcomm was] receiving from LG in return for strategic fund payments."[80]

34. I have reviewed Mr. Aberle's deposition testimony concerning Mr. Felke's presentation of the amounts forecasted to be paid by Qualcomm under certain agreements and the corresponding "'[e]xpected actual marketing value.'"[81] Mr. Aberle testified that in May 2012, Mr. Felke "provid[ed] a presentation where he provided his view along this line of an expected [marketing] value, which myself and many others did not agree was accurate" and Mr. Felke's "opinion [was] without really any foundation."[82] Mr. Aberle also testified: "I actually remember in the meeting expressing disagreement with this. He was not involved in any of the negotiations of any of these deals. He's a relatively junior marketing guy. And he came in and presented this, and when he was asked what's the foundation of it, you know, he couldn't back it up and we didn't agree with it."[83]

---

[77] Seligman Report, ¶¶ 33–34.
[78] Seligman Report, ¶ 34; Felke Deposition, pp. 169–171; Felke Memo.
[79] Seligman Report, ¶ 34; Felke Memo.
[80] Felke Memo.
[81] Aberle Deposition, pp. 292–305.
[82] Aberle Deposition, pp. 295–296.
[83] Aberle Deposition, pp. 296–297. Mr. Aberle was also asked in his deposition testimony about Mr. Felke's presentation in February 2013, which purportedly showed that out of $178.5 million in co-marketing value, only $2 million was categorized as "true MDF." He testified that Mr. Felke "came up with some definition of true MDF, which I don't know why he did" and that "there's all kinds of comarketing agreements and strategic funds, and he's not indicating that there's no marketing value coming through all these other agreements . . . I don't want to leave the implication that, in your words, true MDF is the only thing that has value and none of this other stuff does. Because I definitely don't agree with that." Mr. Aberle also testified that Mr. Felke's definition of "true MDF" was "narrow." Aberle Deposition, pp. 298–305. Mr. Felke testified that "MDF stands for market development funds. And it's a broad term that describes funds that one company pays to another company with the intent of company B using that for—to include company A in their marketing." Mr. Felke further testified that "there were different ways that this could be structured in QCT agreements where some had more leverage than others and some were more specific and others were more vague. I think the true MDF was more specific where—and it says here that it's tied to a chipset discount. I

35. I have also reviewed Mr. Felke's deposition testimony in which he states that Mr. Rosenberg had shared the same concerns regarding whether the strategic funds agreements violated FRAND terms.[84] Mr. Felke testified that ultimately Mr. Rosenberg met with Mr. Gonell to discuss his concerns and that Mr. Gonell "alleviated" those concerns.[85]

36. Professor Seligman asserts that Mr. Felke's concerns should have been elevated to the Audit Committee given his "position and the position of the individuals he complained to."[86] He also states, without any basis, that "the evidence suggests that Mr. Felke's concerns were not brought to the attention of the Qualcomm Audit Committee."[87] I have not seen any evidence confirming that Mr. Felke's concerns were or were not elevated to the Qualcomm Audit Committee. Regardless, a disclosure process consistent with disclosure customs and practices of large public companies (as was that of Qualcomm) does not require that the board or audit committee be apprised of all concerns, complaints, or opinions of all employees. As discussed above, Mr. Felke had the opportunity to raise concerns, and he ultimately did raise his concerns with at least six of Qualcomm's senior executives and attorneys. Professor Seligman fails to consider the deposition testimony by Mr. Felke and Mr. Aberle described above that suggests that senior executives were aware of Mr. Felke's questions regarding the value Qualcomm received under strategic fund agreements and determined that further action was not warranted.

37. As I explained in the Coates Report, SEC guidance discourages companies from disclosing unnecessary information, making duplicative disclosures, and creating information overload.[88] In line with this guidance, public companies customarily attempt to not over-disclose information.[89] In addition, it is common for companies to possess nonpublic information that is competitively sensitive or confidential, and thus inappropriate for voluntary public disclosure. For example, information concerning the structure and specific terms of commercial agreements with third parties might be competitively sensitive and disclosing such information could be

believe the structure of that was that the OEM was getting a discount on their chipset acquisition price. And that discount was supposed to be used or applied to what's marketing. So it was more of a direct linkage there versus I think other QCT agreements had vaguer marketing terms and then, as a result, less leverage. That's what we tried to distinguish there." He further testified that "a true MDF would give Qualcomm more leverage and control than what's labeled here as just an MDF." Felke Deposition, pp. 140–142.

[84] Felke Deposition, p. 280.

[85] Felke Deposition, p. 280.

[86] Seligman Report, ¶ 37.

[87] Seligman Report, ¶ 37.

[88] Coates Report, ¶ 27.

[89] Coates Report, ¶ 27.

counter to the company's confidentiality obligations. It is also common for companies to possess information that may reflect emerging trends affecting their business, but which may also be transient or immaterial. Disclosure committees and other participants in the disclosure process customarily engage in discussion and exercise judgment with respect to factors such as whether the information in the company's possession is required to be disclosed, whether it would otherwise be useful to disclose, or whether it would create information overload, among other factors. Given the complexity associated with making disclosure decisions for large public companies, it is common for participants in a customary disclosure practice to debate and disagree about particular disclosure decisions, including whether the information to be disclosed would be meaningful, useful, or material.

### B. Qualcomm's Response to Concerns Raised in the "Press Release Process Issues" Document Does Not Alter My Opinions in the Coates Report.

38. In preparing the Coates Report, I had reviewed the 2013 document titled "Press Release Process Issues" that is referenced in the Seligman Report.[90] My view of the significance of this document is unchanged after reviewing the Seligman Report.

39. Related to the document titled "Press Release Process Issues," I have reviewed deposition testimony from Mr. Kneeshaw regarding certain lapses in Qualcomm's press release disclosure process around 2013.[91] Mr. Kneeshaw's testimony indicates that, consistent with disclosure customs and practices in large public companies,[92] Qualcomm worked to improve its press release disclosure process once it identified press release process issues. Specifically, Mr. Kneeshaw testified that "the idea here is to improve the process on a continuous basis and using examples to, you know, discuss how we can make improvements and make sure that there was alignment on the standards across the group."[93] Consistent with this testimony, the "Press Release Process Issues" document shows that the Company was working to identify solutions to its press release disclosure process issues.[94] As I explained in the Coates Report, this process of

[90] That document was included in Appendix C of the Coates Report. Coates Report, Appendix C (listing Q121SEC00295708 among the list of documents considered on p. 13).
[91] Kneeshaw Deposition, pp. 81–101, 175–179.
[92] *See* Coates Report, ¶ 44.
[93] Kneeshaw Deposition, p. 91.
[94] *See* Email from Tina Asmar to Paul Syrowik et al., "Press release process issues for discussion," March 25, 2013, Q121SEC00295708–17.

identifying and improving elements of a disclosure process is common among large public companies.[95]

40. For example, one process issue identified in the document is that certain changes made by counsel to a draft press release were inadvertently not incorporated in the final press release.[96] The "Press Release Process Issues" document proposed the following solutions to the process issue: "We can add division counsel to the Corp thread when routing to ensure that they have indeed seen the release. Alternatively, division counsel (rather than the PR person) can submit the release to Corp PR to ensure we're receiving the correct version."[97]

41. As another example, and as the Seligman Report also states, the document questioned who was "exercising the initial 'gatekeeper function' over what [was] newsworthy."[98] The document referenced certain "new guidelines" and noted that divisional marketing leads and the Public Relations team would serve as gatekeepers.[99] The document further noted that "support" from certain executives was needed to improve the gatekeeper function.[100] However, something being "newsworthy" does not imply that it must be disclosed under the federal securities laws. As I explained in the Coates Report, SEC guidance discourages companies from disclosing unnecessary information, making duplicative disclosures, and creating information overload.[101] As such, public companies customarily attempt to not over-disclose information.[102]

### C. Professor Seligman's Opinion Regarding the SEC's Recognition of Weaknesses in Qualcomm's Internal Controls is Unrelated to Qualcomm's Disclosure Process.

42. Professor Seligman asserts that "weaknesses in Qualcomm's internal controls also were recognized by the Securities and Exchange Commission which in 2016 instituted and settled for $7.5 million a Cease-and-Desist Proceeding against Qualcomm for violations of the Foreign

---

95 Coates Report, ¶ 44.
96 Email from Tina Asmar to Paul Syrowik et al., "Press release process issues for discussion," March 25, 2013, Q121SEC00295708–17 at 10.
97 Email from Tina Asmar to Paul Syrowik et al., "Press release process issues for discussion," March 25, 2013, Q121SEC00295708–17 at 10.
98 Email from Tina Asmar to Paul Syrowik et al., "Press release process issues for discussion," March 25, 2013, Q121SEC00295708–17 at 9; Seligman Report, ¶ 39.
99 Email from Tina Asmar to Paul Syrowik et al., "Press release process issues for discussion," March 25, 2013, Q121SEC00295708–17 at 9–10.
100 Email from Tina Asmar to Paul Syrowik et al., "Press release process issues for discussion," March 25, 2013, Q121SEC00295708–17 at 9–10.
101 Coates Report, ¶ 27.
102 Coates Report, ¶ 27.

Corrupt Practices Act that occurred between 2002 and 2012."[103] These SEC proceedings were in connection with certain "things of value" that Qualcomm provided to foreign officials "to try to influence these decision makers to favor and/or promote Qualcomm-developed technology in an evolving international telecommunications market, thereby providing Qualcomm with a business advantage."[104] The SEC stated in its order that "Qualcomm failed to implement a system of internal accounting controls that was sufficient to provide reasonable assurances that transactions were executed and access to assets was permitted in accordance with management's authorization, and that transactions were recorded as necessary to permit the preparation of financial statements in conformity with generally accepted accounting principles."[105] The order additionally stated: "Qualcomm . . . violated Exchange Act Section 13(b)(2)(A) when it provided things of value and engaged in transactions that caused the company to fail to make and keep books, records, and accounts, which, in reasonable detail accurately and fairly reflected the transactions and disposition of assets of the company."[106]

43. Professor Seligman conflates internal controls over company assets and internal controls over disclosures. As the above excerpts from the SEC's order show, the SEC's proceeding against Qualcomm was based on issues concerning internal control over assets and transactions rather than issues concerning internal control over disclosures. Companies can have issues concerning internal controls over assets without having issues concerning internal controls over disclosures. Professor Seligman fails to explain how this SEC proceeding is relevant to the Company's disclosure process during the Class Period.

## VI. Professor Seligman Incorrectly Implies That the Coates Report Should Have Addressed Whether Qualcomm Disclosed "Bundling Practices."

44. Professor Seligman asserts that the Coates Report does "[n]ot [a]ddress [w]hether Qualcomm [t]imely [d]isclosed [b]undling [p]ractices."[107] He also references certain regulatory

---

[103] Seligman Report, ¶ 41.
[104] "ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER," In the Matter of Qualcomm Incorporated, SECURITIES EXCHANGE ACT OF 1934 Release No. 77261, March 1, 2016 ("SEC Cease-and-Desist Order"), p. 2.
[105] SEC Cease-and-Desist Order, p. 7.
[106] SEC Cease-and-Desist Order, p. 8.
[107] Seligman Report, Section II.D.

investigations of Qualcomm in connection with allegations of bundling and violations of FRAND, and asserts that in the Coates Report, I did not "consider how Qualcomm responded to these investigations."[108] In making this assertion, he appears to assume that Qualcomm did in fact "bundle," as Plaintiffs allege, and suggests that I should have offered an expert opinion assessing whether Qualcomm appropriately disclosed those alleged practices. However, it is my understanding that the accuracy of Qualcomm's disclosures is for the Court or the jury to determine rather than for experts.

45. Additionally, I reiterate that, as discussed in Section IV.B above, Professor Seligman does not dispute several elements of my opinion concerning Qualcomm's disclosure process. In particular, as discussed in Section IV.B above, Professor Seligman does not dispute several elements of my opinion concerning Qualcomm's disclosure process for the exemplar Forms 10-K and 10-Q, or my opinion concerning the 2012 Credit Suisse Technology Conference, the 2013 GSM Association MWC, and the June 2016 media interview, each of which contained an at-issue disclosure.

Executed this 2nd day of February, 2024




Professor John C. Coates IV

[108] Seligman Report, ¶¶ 44–46. I note that Professor Seligman does not assert that Qualcomm failed to timely disclose the existence of the investigations by the Korea Fair Trade Commission, European Commission, Taiwan Fair Trade Commission, or United States Fair Trade Commission.

**JOHN C. COATES IV**

647 Commonwealth Avenue (617) 496-4420
Newton, Massachusetts 02459 jcarr1964@gmail.com

Harvard University and Harvard Law School, Cambridge, MA

Vice Dean for Finance and Strategic Initiatives 8/18 – 1/21, 10/21 – Present
Deputy Dean 7/22 – Present
Chair, Committees on Executive Education, Lifelong Learning 3/13 – 1/21, 7/22 – Present

Supervising preparation of financial statements and budgets, developing strategic initiatives for online and executive education; led design and implementation of University-wide conflict of interest and conduct policies

John F. Cogan Jr. Professor of Law and Economics 6/06 – Present

Teaching and researching financial analysis, business valuation, accounting, contracts, mergers and acquisitions, corporations, governance, and finance

Professor of Law, Assistant Professor of Law 6/01 – 6/06, 6/97 - 6/01

Securities and Exchange Commission, Washington, D.C.

General Counsel 6/21 to 10/21
Director (Acting), Division of Corporation Finance 2/21 to 6/21
Independent Consultant (Compliance, Distribution of Fair Funds) 5/04 to 1/21
Investor Advisory Committee, Chair of Investor-as-Owner Subcommittee 5/17 to 6/20

Harvard Business School, Boston, MA

Lecturer, Executive Education Instructor (Finance, Boards, M&A) 9/11 – 1/21
Visiting Professor of Business Administration (Finance, M&A) 7/15 – 7/16

U.S. Department of Justice, Boston, MA 6/17 to Present

Independent compliance monitor for large financial institution pursuant to deferred prosecution agreement with Department of Justice

Consultant, Newton, MA 6/97 to Present

Mergers and acquisitions, corporate governance, conflicts of interest

Public Company Accounting Oversight Board, Washington, D.C.

Consultant, academic referee for research conferences 7/12 to 1/18

Wachtell, Lipton, Rosen & Katz, NYC

Partner 1/96 – 5/97
Associate (Full- or Part-Time) 3/88 – 6/89, 9/89 – 12/95

Managed teams for legal work on 50+ corporate mergers and acquisitions, recapitalizations, buyouts, freezeouts, and public offerings, managed disclosure and compliance "crises" at public companies

| MEMBERSHIPS / AFFILIATIONS / AWARDS | PRESENT OR PAST |
|---|---|
| American Bar Association | Member, Section on Business Law |
| American Bar Foundation | Fellow |
| American College of Governance Counsel | Fellow |
| American Finance Association | Member |
| American Law and Economics Association | Member, Board of Directors |
| American Law Institute Corporate Governance Restatement | Adviser |
| Association of American Law Schools | Member |
| Committee on Capital Market Regulation | Task Force Member,Primary Author |
| Cornerstone Research | Affiliated Expert |
| European Corporate Governance Institute | ECGI Fellow, Board of Directors |
| Free Speech for People | Member, Legal Advisory Committee |
| Harvard Ad Hoc Group on Corporate Governance | Founding Member |
| Harvard University | Masters of Arts (Honoris Causa) |
| Harvard University Financial Regulatory Discussion Group | Member |
| National Bureau of Economic Research | Invited Speaker / Researcher |
| New York Stock Exchange | Member, Legal Advisory Board; Judge, Corporate Governance Awards |
| NYU School of Law Alumni Association | Teaching Award |
| Society for Empirical Legal Studies | Member |
| Society of Investment Law | Founding Member, Board Member |

EDUCATION

| | |
|---|---|
| New York University School of Law | J.D. Cum Laude, May 1989 |
| New York University Law Review | 1988-89 -- Editorial Board, Articles Editor |
| Law Review Alumni Association Award | George P. Foulk Memorial Award |
| Pomeroy Prize | Outstanding Academic Performance |
| Order of the Coif | American Jurisprudence Awards (contracts, procedure, securities) |
| University of Virginia | B.A. (History), Highest Distinction, May 1986 |
| Thesis: "Christianity, Kingship and a Carolingian Lord" | Younger Prize for Distinction in History |
| Jefferson Scholar, Echols Scholar | Four-year Merit-Based Scholarship |

Congressional Testimony

Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs to Examine Index Fund Voting (June 2022)

Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on Legislative Proposals to Examine Corporate Governance Securities Law Reforms (June 2018)

Before the U.S. Senate Subcommittee on Securities, Insurance and Investment on Proposed Securities Law Reforms (December 2011)

Before the Committee on House Administration, House of Representatives on the Disclose Act (H.R. 5175) (May 2010)

Before the U.S. Senate Subcommittee on Securities, Insurance and Investment of the Committee on Banking, Housing and Urban Affairs on Financial Regulatory Reform (July 2009)

PUBLICATIONS

SPAC Law and Myths, Business Lawyer (2023)

THE PROBLEM OF TWELVE: INDEX FUNDS, PRIVATE EQUITY AND CORPORATE GOVERNANCE, Columbia Global Press (2023)

Corporate Governance, Core Reading for MBA Program, Harvard Business Publishing (2018) (with Suraj Srinivasan)

The M&A Process, Core Reading for MBA Program, Harvard Business Publishing (2017)

The Volcker Rule as Structural Law: Implications for Cost-Benefit Analysis and Administrative Law, 10 *Capital Markets Law Journal* 447 (2015)

M&A Contracts: Purposes, Types, Regulation and Patterns of Practice (April 2014), in RESEARCH HANDBOOK ON MERGERS AND ACQUISITIONS (Claire Hill and Steven Davidoff Solomon, eds., Edward Elgar 2015)

Corporate Speech and the First Amendment: History, Data and Implications, 30 *Constitutional Commentary* 223 (2015)

Securities Litigation in The Roberts Court: An Early Assessment, 57 *Arizona Law Review* 1 (2015)

Mergers, Acquisitions, and Restructuring: Types, Regulation, and Patterns of Practice (July 2014), in OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (eds. J. Gordon and G. Ringe Oxford University Press 2015)

Thirty Years of Evolution in the Roles of Institutional Investors in Corporate Governance (May 2014), in RESEARCH HANDBOOK ON SHAREHOLDER POWER (Jennifer Hill and Randall Thomas, eds., Edward Elgar 2015)

Towards Better Cost-Benefit Analysis: An Essay on Regulatory Management, 78 *Law and Contemporary Problems* 1 (2015)

Cost-Benefit Analysis of Financial Regulation: Case Studies and Implications, 124 *Yale Law Journal* 882 (2014-2015)

What Courses Should Law Students Take? Harvard's Largest Employers Weigh In, 64 *Journal of Legal Education* (2014) (with Jesse Fried and Kathryn Spier)

SOX After Ten Years: A Multidisciplinary Review, 28:3 *Accounting Horizons* 627 (2014) (with Suraj Srinivasan)

Corporate Politics, Governance, and Value Before and After *Citizens United,* 9 *Journal of Empirical Legal Studies,* 657-696 (2012), selected as one of 10 best securities law articles published during 2012-13 by academics surveyed

Evidence-based M&A: Less Can Be More When Allocating Risk in Deal Contracts, 27 *Journal of International Banking, Finance and Law* 708 (2012)

Managing Disputes Through Contract: Evidence from M&A, *Harvard Business Law Review, Vol. 2, pp. 301-349* (2012)

Hiring Teams, Firms and Lawyers: Evidence of the Evolving Relationships in the Corporate Legal Market, 36 *Law & Social Inquiry* 999-1031 (2011) (with Michele DeStefano, Ashish Nanda and David B. Wilkins)

*M&A Break Fees: U.S. Litigation versus U.K. Regulation, in* REGULATION VERSUS LITIGATION: PERSPECTIVES FROM ECONOMICS AND LAW*, Daniel Kessler, ed. Chicago: University of Chicago Press* (2011)

Corporate Purchasing Project: How S&P Companies Evaluate Outside Counsel (A White Paper), Harvard Law School Program on the Legal Profession (2011) (with Michele DeStefano Beardslee, Ashish Nanda, Erik Ramanathan and David B. Wilkins)

Fulfilling Kennedy's Promise: Why the SEC Should Mandate Disclosure of Corporate Political Activity, 2011 (with Taylor Lincoln)

The Downside of Judicial Restraint: The (Non-) Effect of *Jones v. Harris*, 6 Duke J. of Constitutional Law and Public Policy 58 (2010)

Reforming the Taxation and Regulation of Mutual Funds: A Comparative Legal and Economic Analysis, 1 *J. Legal Anal.* 591 (Summer 2009)

Lowering the Cost of Bank Recapitalization, 26 *Yale J. Reg.* 373 (Summer 2009) (with David Scharfstein)

The Keynote Papers and the Current Financial Crisis, 47 *J. Acctg. Res.* 427 (May 2009)

Competition in the Mutual Fund Industry: Evidence and Implications for Policy, 33 *J. Corp. L.* 151 (2008) (with R. Glenn Hubbard)

The Goals and Promise of the Sarbanes-Oxley Act, 21 *J. Econ. Persp.* 91 (Winter 2007)

Ownership, Takeovers and EU Law: How Contestable Should EU Corporations Be?, in COMPANY AND TAKEOVER LAW IN EUROPE, eds. E. Wymeersch & G. Ferrarini (Oxford University Press 2004)

The Powerful Antitakeover Force of Staggered Boards: Further Findings and a Reply to Symposium Participants, 55 *Stan L. Rev.* 885 (2003) (with Lucian A. Bebchuk and Guhan Subramanian), selected as one of 10 best corporate law articles published during 2003 by academics surveyed

The Trouble with Staggered Boards: A Reply to Georgeson's John Wilcox, Corporate Governance Advisor (2002) (with Lucian A. Bebchuk and Guhan Subramanian)

The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence and Policy, 54 *Stan. L. Rev.* 887 (2002) (with Lucian A. Bebchuk and Guhan Subramanian), selected as one of 10 best corporate law articles published during 2002 by academics surveyed

Explaining Variation in Takeover Defenses: Blame the Lawyers, 89 *Cal. L. Rev.* 1301 (2001), selected as one of 10 best corporate law articles published during 2002 by academics surveyed, reprinted in MERGERS AND THE MARKET FOR CORPORATE CONTROL, ed. Fred S. McCheney (Edward Elgar 2010) and in LAW AND ECONOMICS OF MERGERS AND ACQUISITIONS (eds. Steven M. Davidoff and Claire A. Hill, Edward Elgar 2013)

Private vs. Public Choice of Securities Regulation: A Political Cost/Benefit Analysis, 41 *Va. J. Int'l L.* 531 (2001), selected as one of 10 best securities law articles published during 2001 by academics surveyed

Second-Generation Shareholder Bylaws: Post-*Quickturn* Alternatives, 56 *Bus. Law.* 1323 (2001) (with Bradley C. Faris)

A Buy-Side Model of M&A Lockups: Theory and Evidence, 53 Stan. L. Rev. 307 (2000) (with Guhan Subramanian)

Takeover Defenses in the Shadow of the Pill: A Critique of the Scientific Evidence on Takeover Defenses, 79 Tex. L. Rev. 271 (2000), reprinted in 43 Corp. Practice Commentator 1 (2002) as one of 10 best corporate law articles published in 2001-02 by academics surveyed

Empirical Evidence on Structural Takeover Defenses: Where do We Stand?, 54 *U. Miami L. Rev.* 783 (2000)

"Fair Value" as a Default Rule of Corporate Law: Minority Discounts in Conflict Transactions, 147 U. Penn. L. Rev. 1251 (1999), reprinted in 41 Corp. Practice Commentator 1 (2000) and selected as one of 10 best corporate law articles published in 1999-2000 by academics surveyed

Measuring the Domain of Mediating Hierarchy: How Contestable Are US Public Corporations?, 24 *J. Corp. L.* 837 (1999)

Freezeouts, Management Buyouts and Going Private, in TAKEOVERS & FREEZEOUTS (eds. M. Lipton & E. Steinberger, Law Journal Seminars-Press 1998)

Reassessing Risk-Based Capital in the 1990s: Encouraging Consolidation and Productivity, in BANK MERGERS AND ACQUISITIONS (eds. Y. Amihud & G. Miller, Kluwer Academic Publishers 1998)

Purchase Accounting Deals: A Look at Pricing Formulas and Allocation Procedures, 15 Banking Policy Report 1 (Nov. 18, 1996) (with Edward Herlihy, et al.)

Acquisitions of Financial Advisory and Investment Management Businesses, 17 *Bank & Corp. Gov. L.* Rep. 8 (Sep. 1996) (with Edward Herlihy et al.)

New Guidance for Freezeouts and MBOs -- Negotiation Strategy Privileged from Disclosure, Corp. Rep. (Aspen Law & Business (June 1996) (with Paul Rowe)

M&A Strategies, 9 Bank Accounting and Finance 40 (Winter 1995-96) (with Edward Herlihy, et al.)

Bank M&A Preparedness, 66 Corp. Rep. 1 (Aspen Law & Business Nov. 15, 1995) (with Edward Herlihy, et al.)

Mergers and Acquisitions of Financial Institutions – 1995: An Unprecedented Year of Consolidation, Securities Activities of Banks, Fifteenth Annual Institute (1995) (with Edward Herlihy, et al.)

Deal Developments Update, Corporate Control Alert (August 1995) (with Edward Herlihy et al.)

Updating the Use of Special Committees in Freeze-Outs and Other Conflict Transactions, Corp. Rep. (Aspen Law & Business Aug. 15, 1995)

Banking on Nonbank Acquisitions, The Community Banker 46 (Second Quarter 1995)

Fundamental Rules for Bank Merger Transactions Remain Unchanged After Paramount, in Banking Expansion Institute, Thirteenth Annual (Aspen Law & Business 1995) (with Edward Herlihy, et al.)

Bank and Thrift Mergers and Acquisitions -- 1994, in Securities Activities of Banks, Prentice-Hall Law & Business, Fourteenth Annual Institute (1994) (with Edward Herlihy, et al.)

Stock Buybacks: Strategic, Legal and Fiduciary Issues, 8 Insights 10 (Nov. 1994) (with Edward Herlihy et al.)

Concentration Limits: New Interstate Moves Still Face Minefield of Deposit Cap Statutes, in a Special Report on Interstate Banking, 13 *Banking Policy Rep.* 23 (Aug. 15, 1994) (with David Neill)

Mergers of Equals: Achieving a Delicate Balance of Control, 13 *Banking Policy Report* 1 (Oct. 3, 1994) (with Edward Herlihy et al.)

Banking on Non-Bank Acquisitions and Current Issues in Bank Acquisitions, in Bank Mergers and Acquisitions, Practicing Law Institute (1994) (with Edward Herlihy, et al.)

Current Issues in Bank Acquisitions, 7 Bank Acct'g & Fin. 44 (Spring 1994) (with Edward Herlihy et al.)

Recent Deals Feature New Pricing Formulas, 13 Banking Pol. Rep. 2 (Apr. 4, 1994) (with Edward Herlihy et al.) M&A Strategies, 7 Bank Accounting & Finance 48 (Winter 1993- 94) (with Edward Herlihy et al.)

Assessing the Current Bank Merger Environment: A Preparedness Checklist, 12 Banking Policy Report 1 (Oct. 18, 1993) (with Herlihy et al.)

Bank Mergers and Acquisitions -- 1993: A Year of Increasing Franchise Consolidation, in *Securities Activities of Banks*, Prentice-Hall Law & Business, 13th Annual Institute (1993) (with Edward Herlihy, et al.)

Hostile Acquisition Overtures at Smaller Banks and Thrifts, 11 Bank & Corp. Gov. L. Rep. 47 (1993) (with Herlihy et al.) Flexibility on Safety and Soundness, 3 Bank Director 3 (Third Quarter 1993) (with Craig Wasserman)

Designing Bank Governance Structures, 12 Bank Policy Report (Apr. 19, 1993) (with Edward Herlihy et al.)

Capital and Compliance Strategies in the Era of Prompt Corrective Action, in *The New Implementing Regulations Under FDICIA* (Prentice Hall 1992) (with Craig Wasserman et al.)

1992 -- A Year of Continuing Financial Industry Consolidation: Current Trends and Various Considerations in Bank Mergers and Acquisitions, in Securities Activities of Banks, Prentice-Hall Law & Business, Twelfth Annual Institute (1992) (with Edward Herlihy, et al.)

Bank Regulators Turn Up Intensity in Examination of Racial Discrimination in Lending Practices, 9 Bank & Corp. Governance L. Rep. 758 (December 1992) (with Warren Stern et al.)

Meeting the Challenge of Loan Bias Scrutiny, Am. Banker (August 21, 1992) (with Warren Stern et al.)

Investment Company Act Exemption Proposed, 11 Int'l Fin. L. Rev. 41 (July 1992) (with Eric Robinson)

Dealing with Market Risks in Stock Mergers: Collars and Walkaways, 6 Insights 4 (July 1992) (with Edward Herlihy et al.)

Market Risks in Bank Mergers, 1 Bank Governance L. Rep. 1114 (July 1992) (with Edward Herlihy et al.)

Racial Discrimination in Lending Practices, 1 Bank Gov. L. Rep. 1114 (July 1992) (with Warren Stern et al.)

Disclosure of the Analyses Underlying Investment Banker Fairness Opinions, 6 Insights 11 (March 1992) (with Edward Herlihy et al.)

Federal Reserve Board Approval Criteria for Bank Mergers, 7 Bank & Corp. Governance L. Rep. 45 (1992) (with Edward Herlihy et al.)

Consensus Needed on Early Resolution's Legal Issues, Am. Banker (Mar. 25, 1992) (with Craig Wasserman)

An Overview of Current Trends and Various Considerations in Bank Mergers and Acquisitions, in Securities Activities of Banks, Prentice-Hall Law & Business, Eleventh Annual Institute (1991) (with Edward Herlihy et al.)

Management Buyouts and the Duties of Independent Directors to Shareholders and Creditors, in Corporate Deleveragings and Restructurings, Practising Law Institute (1991) (with Lawrence Lederman et al.)

ANNUAL SURVEY OF DEVELOPMENTS IN MERGERS AND ACQUISITIONS OF FINANCIAL INSTITUTIONS 1990-1998 (with Herlihy et al.) (co-authored leading annual survey for eight years; privately published)

Liabilities Under Sections 11, 12, 15 and 17 of the Securities Act of 1933 and Sections 10, 18 and 20 of the Securities Exchange Act of 1934, in Introduction to Securities Law 1990, Practising Law Institute (1990) (with Paul Vizcarrondo et al.)

Advising the Board of Directors of a Target Company Regarding Defensive Strategies, in Dynamics of Corporate Control IV, American Bar Association National Institute (1989) (with James Fogelson)

State Takeover Statutes and Corporate Theory: The Revival of an Old Debate, 64 *N.Y.U. L. Rev.* 806 (1989)

State Takeover Statutes: A Fifty-State Survey (privately published) (1989) (with Eric Robinson et al.)

The Reorganization Plan: Statutory Framework and Commercial Realities, in Business Reorganizations and Workouts, Law Journal Seminars-Press (1988) (with Meyer Koplow)

<u>Working Papers</u>

Reverse Termination Fees in M&A: Design, Signals, and Bidder Returns, Working Paper (August 2017) (with Darius Palia and Ge Wu)

Why Have M&A Contracts Grown? Evidence from Twenty Years of Deals, Working Paper (September 2016)

Quantifying Foreign Institutional Block Ownership at Publicly Traded U.S. Corporations, Working Paper (September 2016) (with Ron Fein, Kevin Crenny, and L. Vivian Dong)

Allocating Risk Through Contract: Evidence from M&A and Policy Implications (August 2012)

The Link between the Acquisitions Market and the Market for CEOs (January 2011) (with Reinier Kraakman) The

Powerful and Pervasive Effects of Ownership on M&A, Olin Center Discussion Paper No. 669 (June 2010)

An Empirical Reassessment of MBO Bids: Techniques, Outcomes, and Delaware Corporate Law, Working Paper (October 2005)

Why Are Firms Sold? The Role of the Target CEO's Age, Tenure, And Share Ownership, Working Paper (October 2005) (with Reinier Kraakman)

The Legal Origins of the Politically Puzzling U.S. "Market" for Corporate Charters, Working Paper (October 2004)

The Power of Defenses, National Bureau of Economics Research Working Paper (July 2003) (with Lucian Arye Bebchuk and Guhan Subramanian)

CEO Incentives and M&A Activity in the 1990s: Stock Options and Real Options, Working Paper (March 2002) (with Reinier Kraakman)

An Index of the Contestability of Corporate Control: Studying Variation in Legal Takeover Vulnerability, Working Paper (June 1999)

Case Studies, available at:

http://www.law.harvard.edu/academics/post-grad/case-studies/products/available-cases-online/index.html

Emery Celli Brinckerhoff & Abady (2011)

Hilton's Hostile Bid for ITT (2011)

In a Pickle: Barclays Capital and the Sale of Del Monte Foods (with Clayton Rose and David Lane) (2011)

Barclays Capital and the Sale of Del Monte Foods (with Clayton Rose and David Lane) (2012)

El Paso's Sale to Kinder Morgan (with Clayton Rose and David Lane) (2012)

Slater & Gordon (with Ashish Nanda and Monet Brewerton) (2012)

Workers' Rights in the Hudson Valley (with Sara Del Nido) (2012)

IBM's Hostile Bid for Lotus (2013)

Cerberus Tries to Walk Away from United Rentals (2014)

AmesCard (with Karina Shaw) (2015)

When a Deal Goes Bad: Integrated Services (2016)

Allergan Board Under Fire (with Lynn S. Paine, Suraj Srinivasan, and David Lane (2016)

A Difficult Discussion with the Board (2016)

After the Sale (2016)

GE Capital After the Crisis (with David Scharfstein and John Dionne) (2017)

After the Purchase (2017)

"Knowledge is King" in the Texas Oil Patch (2019)

A Tale of a Tail (2019)

Silver Lake Bids for Dell (2019)

J&J Bids for Guidant (2019)

Jockeying for Mobile Dominance Together: Microsoft and Nokia (with Rachel Gordon) (2020)

<u>Columns, op eds, and other short works</u>

Law Firms and Russian Profits (2022) (with Ian Ayres and Robert Daines)

Proposal on Climate-Related Disclosures Falls Within the SEC's Authority, Harvard Corporate Governance Forum (June 22, 2022)

Petition to SEC on Human Capital, Working Group On Human Capital Accounting Disclosure Petition for Rulemaking (June 7, 2022)

SPAC Law and Myths, Harvard Corporate Governance Forum (February 28, 2022)

New SEC chair needs to tackle these 5 big issues, *MarketWatch* (Dec. 17, 2020)

Recommendation from the Investor-as-Owner Subcommittee of the SEC Investor Advisory Committee Relating to ESG Disclosure, Harvard Corporate Governance Forum (May 28, 2020) (with Allison Bennington and Anne Sheehan)

Corporations Like Exxon Are Using Spurious Free Speech Claims to Fend Off Regulation, *Vox* (Feb 14, 2017) (with Jeff Clements)

Corporations Are Perverting the Notion of Free Speech, Newsweek (Aug. 4, 2015) (with Ron Rein)

Bill to Help Businesses Raise Capital Goes Too Far, *Washington Post* (March 14, 2012) (with Robert Pozen)

Fulfilling the Promise of "Citizens United," *Washington Post* (September 6, 2011) (with Taylor Lincoln), republished in Business Ethics (Sep. 2011)

Corporate Governance After the Financial Crisis, Proceedings of the 2010 Annual Symposium: Legal Aftershocks of the Global Financial Crisis, 6 *NYU J. of Law & Business* 171 (2010)

A Costly Lesson in the Rule of 'Loser Pays', *Financial Times* (November 2, 2009)

The Bailout is Robbing the Banks, *New York Times* (February 18, 2009) (with David Scharfstein)

The Greatest American Shambles: An Exchange, 38 *N.Y. Rev. of Books* 59 (June 13, 1991)

# APPENDIX B

**Trial Testimony and Depositions January 2020 to January 2024**

*Ahmed D. Hussein v. Sheldon Razin, Steven Plochocki, Quality Systems, Inc.,* Superior Court of the State of California, For the County of Orange, Case No. 30-2013-00679600-CU-NP-CJC, Deposition 6/16/15, Trial Testimony 6/16/17, Deposition 1/21/21

*Energy Transfer LP, formerly known as Energy Transfer Equity, L.P. and LE GP, LLC v. Williams Companies, Inc.*, Delaware Chancery Court, C.A.No.12168-VCG, C.A.No.12377-VCG, Deposition 7/10/20, Trial Deposition 1/29/21

*Thompson Petroleum Corporation, J. Cleo Thompson, and James Thompson, JR., L.P., v. Paul Rudnicki v. Linda Thompson Gordon, Jean Christine Thompson and Dorothy Kuntz Thompson,* United States 6th Judicial District Court, District of Dallas County, Texas, Cause No. DC-18-00644, Deposition 7/17/20

*MAPS Hotels and Resorts One, LLC, Mirae Asset Capital Co., LTD, Mirae Asset Daewoo Co., LTD., Mirae Asset Global Investments, Co., LTD., and Mirae Asset Life Insurance Co., LTD., v. AB Stable VIII LLC,* Delaware Chancery Court, C.A. No. 2020-0310-JTL, Deposition 8/14/20

*Perspecta Inc. v. DXC Technology Company*, International Institute for Conflict and Resolution, Deposition 9/02/20, Trial Testimony 10/2/20

*Autoridad Del Canal De Panama* v. *Grupo Unidos Por El Canal, S.A., Sacyr S.A., Salini-Impregilo S.P.A., Jan De Nul N.V., and Constructora Urbana, S.A.*, ICC Case No. 22465/ASMA/JPA (C-22966/JPA), Trial Testimony 3/31/22 & 4/1/22

*FSG Services LLC v. Flutter Entertainment, plc,* Judicial Arbitration and Mediation Services, Reference No. 1425034540, Trial Testimony 7/6/22

*Politan Capital Management LP, et al., v. Masimo Corporation*, et al., No. 2022-0948-NAC, Deposition 2/4/23

*In re EQT Corporation Securities Litigation*, No. 2:19-cv-00754-RJC, United States District Court, Western District of Pennsylvania, Deposition 10/31/23

# Documents Considered List

## Academic Articles

- Brochet, Francois, et al., "Information transfer and conference calls," Review of Accounting Studies 23, no. 3, 2018, pp. 907–957
- Brown, Lawrence D., et al., "Managing the narrative: Investor relations officers and corporate disclosure," Journal of Accounting and Economics 67, no. 1, 2019, pp. 58–79
- Bushee, Brian J., et al., "Conference Presentations and the Disclosure Milieu," Journal of Accounting Research 49, no. 5, 2011, pp. 1163–1192
- Coates IV, John C., "Private vs. Political Choice of Securities Regulation: A Political Cost/Benefit Analysis," Virginia Journal of International Law 41, no. 3, 2001, pp. 531–582
- Fabens, Andrew L., and Sean Sullivan, "Practical Strategies for Effective Management of Earnings Calls," Insights: The Corporate & Securities Law Advisor 28, no. 6, 2014, pp. 1–7
- Jung, Michael J., et al., "Buy-Side Analysts and Earnings Conference Calls," Journal of Accounting Research 56, no. 3, 2018, pp. 913–952
- Kirk, Marcus P., and Stanimir Markov, "Come on Over: Analyst/Investor Days as a Disclosure Medium," The Accounting Review 91, no. 6, 2016, pp. 1725–1750

## Depositions

- Deposition of Steven Altman, September 7, 2022
- Deposition of Magnus Felke, September 21, 2022
- Deposition of Paul E. Jacobs, September 9, 2022
- Deposition of Steve M. Mollenkopf, September 13, 2022
- Deposition of Bill Davidson, September 29, 2022
- Deposition of Derek Aberle, September 30, 2022
- Deposition of Warren Kneeshaw, October 7, 2022
- Deposition of Donald J. Rosenberg, October 12, 2022

**Expert Reports**

- Expert Report of Professor John Coates, filed September 12, 2023
- Rebuttal Expert Report of Joel Seligman, filed December 11, 2023

**Meeting Transcripts and Presentations**

- "Qualcomm Inc. at Goldman Sachs Group Inc Technology and Internet Conference – Final," *CQ FD Disclosure*, February 14, 2012
- "Qualcomm Inc. at JPMorgan TMT Conference – Final," *CQ FD Disclosure*, May 17, 2012
- "Qualcomm at Canaccord Genuity's Global Growth Conference – Final," *CQ FD Disclosure*, August 16, 2012
- "Fourth Quarter Fiscal 2012 Earnings," Qualcomm, November 7, 2012, https://d1io3yog0oux5.cloudfront.net/_4508f36106307b067fbb404cbc1bb3af/qualcomm/db/773/6365/file/Q4FY12+Earnings+Web+Final.pdf
- "Qualcomm 2012 Analyst Meeting – Final," *CQ FD Disclosure*, November 15, 2012
- "QUALCOMM at Credit Suisse Technology Conference - Final," *CQ FD Disclosure*, November 27, 2012
- "First Quarter Fiscal 2013 Earnings," Qualcomm, January 30, 2013, https://d1io3yog0oux5.cloudfront.net/_4508f36106307b067fbb404cbc1bb3af/qualcomm/db/773/6370/file/Q1FY13+Executive+Presentation.pdf
- "Q1 2013 Qualcomm Inc. Earnings Conference Call – Final," *CQ FD Disclosure*, January 30, 2013
- "QUALCOMM at GSM Association Mobile World Congress - Final," *VIQ FD Disclosure*, February 25, 2013
- "Qualcomm at Roth Conference – Final," *CQ FD Disclosure*, March 19, 2013
- "Second Quarter Fiscal 2013 Earnings," Qualcomm, April 24, 2013, https://d1io3yog0oux5.cloudfront.net/_4508f36106307b067fbb404cbc1bb3af/qualcomm/db/773/6374/file/Q2FY13+Executive+Presentation.pdf
- "Qualcomm at Pacific Crest Global Technology Leadership Forum – Final," *CQ FD Disclosure*, August 12, 2013
- "2013 New York Analyst Day," Qualcomm, November 20, 2013, https://ia902607.us.archive.org/33/items/qualcomm_202304/2013_08.pdf
- "Qualcomm Analyst Meeting – Final," *CQ FD Disclosure*, November 20, 2013

**Pleadings and Other Legal Documents**

- Consolidated Class Action Complaint for Violation of the Federal Securities Laws, *In re Qualcomm Incorporated Securities Litigation*, Case No. 3:17-cv-00121-JAH-WVG, July 3, 2017
- Letter to The Honorable Jinsook Ohta from Bernstein Litowitz Berger & Grossmann, "Re: *In re Qualcomm Incorporated Securities Litigation*, No. 3:17-cv-00121-JO-MSB," October 18, 2022
- Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, *In re Qualcomm Incorporated Securities Litigation*, Case No. 17cv121-JO-MSB, March 20, 2023
- "ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER," In the Matter of Qualcomm Incorporated, SECURITIES EXCHANGE ACT OF 1934 Release No. 77261, March 1, 2016

**Press Releases**

- "Qualcomm Announces Record First Quarter Fiscal 2012 Results," February 1, 2012, https://investor.qualcomm.com/news-events/press-releases/detail/334/qualcomm-announces-record-first-quarter-fiscal-2012-results#:~:text=--%20Record%20First%20Quarter%20Results%2C%20Raising%20Fiscal%202012,%20%20%20%203%20more%20rows%20
- "Qualcomm Announces Fourth Quarter and Fiscal 2012 Results Fiscal 2012 Revenues $19.1 Billion," November 6, 2012, https://www.qualcomm.com/news/releases/2012/11/qualcomm-announces-fourth-quarter-and-fiscal-2012-results-fiscal-2012#:~:text=Qualcomm%20Announces%20Fourth%20Quarter%20and%20Fiscal%202012%20Results,offered%20by%20Qualcomm%20Technologies%2C%20Inc.%20and%2F
- "Qualcomm to Host Analyst Meeting," Qualcomm, November 14, 2012, https://d1io3yog0oux5.cloudfront.net/_620db46c315a9f549ec2bb723f150ee1/qualcomm/news/2012-11-14_Qualcomm_to_Host_Analyst_563.pdf
- "Cognizant to Present at the Credit Suisse Annual Technology Conference," November 20, 2012, https://news.cognizant.com/2012-11-20-Cognizant-to-Present-at-the-Credit-Suisse-Annual-Technology-Conference
- "Tableau Software Management to Participate at Credit Suisse 2012 Annual Technology Conference," November 20, 2012, https://www.tableau.com/about/press-releases/2012/tableau-software-management-participate-credit-suisse-2012-annual

- "Informatica to Present at Credit Suisse Annual Technology Conference," November 26, 2012, https://www.globenewswire.com/en/news-release/2012/11/26/507412/11123/en/Informatica-to-Present-at-Credit-Suisse-Annual-Technology-Conference.html
- "Responsys to Present at Credit Suisse 2012 Annual Technology Conference," November 27, 2012, https://finance.yahoo.com/news/responsys-present-credit-suisse-2012-130000139.html
- "Qualcomm Announces First Quarter Fiscal 2013 Results," January 30, 2013, https://investor.qualcomm.com/news-events/press-releases/detail/89/qualcomm-announces-first-quarter-fiscal-2013-results
- "GSMA Mobile World Congress 2013 Sets New Records," February 28, 2013, https://www.gsma.com/newsroom/press-release/gsma-mobile-world-congress-2013-sets-new-records
- "Qualcomm Announces Third Quarter Fiscal 2013 Results," July 23, 2013, https://www.qualcomm.com/news/releases/2013/07/qualcomm-announces-third-quarter-fiscal-2013-results
- "Qualcomm to Host Analyst Meeting," Qualcomm, November 18, 2014, https://d1io3yog0oux5.cloudfront.net/_620db46c315a9f549ec2bb723f150ee1/qualcomm/news/2014-11-18_Qualcomm_to_Host_Analyst_656.pdf
- "Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report," November 17, 2015, https://www.prnewswire.com/news-releases/qualcomm-confirms-receipt-of-korea-fair-trade-commissions-case-examiners-report-300180670.html
- "Qualcomm Responds to Complaint from U.S. Federal Trade Commission," January 17, 2017, https://www.prnewswire.com/news-releases/qualcomm-responds-to-complaint-from-us-federal-trade-commission-300392395.html

**Public Press**

- Lisa Wang, "Qualcomm defends licensing fees," *Taipei Times*, June 24, 2016

**SEC Filings**

- Qualcomm Incorporated, Form DEF 14A, January 19, 2012
- Qualcomm Incorporated, Form 10-Q, February 1, 2012
- Qualcomm Incorporated, Form 10-Q, April 18, 2012
- Qualcomm Incorporated, Form 10-Q, July 18, 2012

- Qualcomm Incorporated, Form 10-K, November 7, 2012
- Qualcomm Incorporated, Form DEF 14A, January 17, 2013
- Qualcomm Incorporated, Form 10-Q, January 30, 2013
- Qualcomm Incorporated, Form 10-Q, April 24, 2013
- Qualcomm Incorporated, Form 10-Q, July 24, 2013
- Qualcomm Incorporated, Form 10-K, November 6, 2013
- Qualcomm Incorporated, Form DEF 14A, January 16, 2014
- Qualcomm Incorporated, Form 10-Q, January 29, 2014
- Qualcomm Incorporated, Form 10-Q, April 23, 2014
- Qualcomm Incorporated, Form 10-Q, July 23, 2014
- Qualcomm Incorporated, Form 10-K, November 5, 2014
- Qualcomm Incorporated, Form DEF 14A, January 22, 2015
- Qualcomm Incorporated, Form 10-Q, January 28, 2015
- Qualcomm Incorporated, Form 10-Q, April 22, 2015
- Qualcomm Incorporated, Form 10-Q, July 22, 2015
- Qualcomm Incorporated, Form 10-K, November 4, 2015
- Qualcomm Incorporated, Form DEF 14A, January 21, 2016
- Qualcomm Incorporated, Form 10-Q, January 27, 2016
- Qualcomm Incorporated, Form 10-Q, April 20, 2016
- Qualcomm Incorporated, Form 10-Q, July 20, 2016
- Qualcomm Incorporated, Form 10-K, November 2, 2016
- Qualcomm Incorporated, Form DEF 14A, January 19, 2017
- Qualcomm Incorporated, Form 10-Q, January 25, 2017
- Qualcomm Incorporated, Form 10-K, November 2, 2022

**Legal Codes and Regulations and SEC Publications**

- 17 CFR. § 229.101 (2012)
- 17 CFR. § 229.103 (2012)
- 17 CFR. § 229.303 (2012)

- 17 CFR. § 240.12b-2 (2012)
- 17 CFR. § 243.100 (2012)
- 17 CFR. § 243.101 (2012)
- "A Plain English Handbook: How to create clear SEC disclosure documents," SEC, August 1998, https://www.sec.gov/pdf/handbook.pdf
- "Accelerated Filer and Large Accelerated Filer Definitions," SEC Release No. 34-88365 Final Rule, March 12, 2020, https://www.sec.gov/files/rules/final/2020/34-88365.pdf
- "Business and Financial Disclosure Required by Regulation S-K," SEC Release No. 33-10064, April 13, 2016, https://www.sec.gov/rules/2016/04/business-and-financial-disclosure-required-regulation-s-k
- "Certification of Disclosure in Companies' Quarterly and Annual Reports," SEC Release No. 33-8124 Final Rule, August 28, 2002, https://www.sec.gov/rules/final/33-8124.htm
- Chair Mary Jo White, "The Path Forward on Disclosure," Speech at the National Association of Corporate Directors – Leadership Conference 2013 in National Harbor, MD, October 15, 2013, https://www.sec.gov/news/speech/spch101513mjw
- "Financial Reporting Manual," SEC Division of Corporate Finance, September 30, 2008, https://www.sec.gov/files/cf-financial-reporting-manual.pdf
- "Financial Reporting Manual: TOPIC 9 - Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A)," SEC, September 30, 2008, https://www.sec.gov/corpfin/cf-manual/topic-9
- "Form 10-K," SEC, https://www.sec.gov/about/forms/form10-k.pdf
- "Internal Control Over Financial Reporting in Exchange Act Periodic Reports of Non-Accelerated Filers," SEC Release No. 33-9142; 34-62914, September 15, 2010, https://www.sec.gov/files/rules/final/2010/33-9142.pdf
- "Interpretation: Commission Guidance Regarding Disclosure Related to Climate Change," SEC Release No. 33-9106, February 2, 2010, https://www.sec.gov/files/rules/interp/2010/33-9106.pdf
- "Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations," SEC Release No. 33-8350, December 19, 2003, https://www.sec.gov/rules/interp/33-8350.htm
- "Interpretive Rule: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures," SEC Release No. 33-6835, May 18, 1989, https://www.sec.gov/rules/1989/05/managements-discussion-and-analysis-financial-condition-and-results-operations

- Letter to the SEC from Grant Thornton, "Re: File No. S7-26-18, Request for Comment on Earnings Releases and Quarterly Reports," March 15, 2019, https://www.sec.gov/comments/s7-26-18/s72618-5134338-183346.pdf
- Letter to the SEC from the Council of Institutional Investors, "Re: File No. S7-26-18," March 21, 2019, https://www.cii.org/files/issues_and_advocacy/correspondence/2019/March%2021,%202019%20letter%20to%20SEC%20on%20RFC%20(final).pdf
- "Report on Review of Disclosure Requirements in Regulation S-K, as Required by Section 108 of the Jumpstart Our Business Startups Act," SEC, December 2013, https://www.sec.gov/news/studies/2013/reg-sk-disclosure-requirements-review.pdf
- "Request for Comment on Earnings Releases and Quarterly Reports," SEC Release No. 33-10588, December 18, 2018, https://www.sec.gov/rules/other/2018/33-10588.pdf
- "Revisions to Accelerated Filer Definition and Accelerated Deadlines for Filing Periodic Reports," SEC Release No. 33-8644 Final Rule, December 21, 2005, https://www.sec.gov/rules/final/33-8644.pdf
- "Selective Disclosure and Insider Trading," SEC Release No. 33-7881 Final Rule, August 15, 2000, https://www.sec.gov/rules/final/33-7881.htm

**Other Publicly Available Materials**

- "Adam Johnson," LinkedIn, https://www.linkedin.com/in/adam-johnson-6062335
- "Adam Tachner," LinkedIn, https://www.linkedin.com/in/adam-tachner
- "Akash Palkhiwala," LinkedIn, https://www.linkedin.com/in/akash-palkhiwala-1b369520
- "Alex Rogers," LinkedIn, https://www.linkedin.com/in/alex-rogers-865419130
- "Anand Chandrasekher," LinkedIn, https://www.linkedin.com/in/anandchandrasekher
- "AS 2710: Other Information in Documents Containing Audited Financial Statements," *PCAOB*, https://pcaobus.org/oversight/standards/auditing-standards/details/AS2710, accessed on January 22, 2024
- "Beth Wapner," LinkedIn, https://www.linkedin.com/in/beth-wapner-37521a4/details/experience
- "Bill Bold," LinkedIn, https://www.linkedin.com/in/bill-bold-9b13768
- "Bill Sailer," LinkedIn, https://www.linkedin.com/in/bill-sailer-88a7a59
- "Carol Lam," LinkedIn, https://www.linkedin.com/in/carol-lam-529972215

- "Catherine Baker," LinkedIn, https://www.linkedin.com/in/catherinerice
- CFO Journal - Deloitte, "Disclosure Committees – Frequently Asked Questions," Wall Street Journal, January 3, 2014, https://deloitte.wsj.com/cfo/2014/01/03/disclosure-committees-frequently-asked-questions
- "Charles Chivetta," LinkedIn, https://www.linkedin.com/in/charles-chivetta
- "Chris Longman," LinkedIn, https://www.linkedin.com/in/chris-longman-17728bb0
- "Christie Thoene," LinkedIn, https://www.linkedin.com/in/christie-thoene-19b1b713/details/experience
- "Christine Trimble," LinkedIn, https://www.linkedin.com/in/christine-trimble-49b909153
- "Cindy Ping," LinkedIn, https://www.linkedin.com/in/cindy-ping-517ab6
- Colin J. Diamond and Irina Yevmenenko, "Earnings Releases and Earnings Calls," Practical Law, 2015, https://www.whitecase.com/sites/whitecase/files/files/download/publications/article-earnings-releases-and-earnings-calls.pdf
- "Connor Campbell," LinkedIn, https://www.linkedin.com/in/conorkcampbell
- "Craig Barratt," LinkedIn, https://www.linkedin.com/in/craig-h-barratt/details/experience
- "Cristiano R. Amon," LinkedIn, https://www.linkedin.com/in/cristiano-r-amon
- "Daniel L. Sullivan, Ph.D.," LinkedIn, https://www.linkedin.com/in/drdanielsullivan
- "Debbie Middleton," LinkedIn, https://www.linkedin.com/in/demiddleton
- "Diana Hatley," LinkedIn, https://www.linkedin.com/in/diana-hatley-6a542698
- "Disclosure Committee Essentials," PwC, July 2022, https://www.pwc.com/us/en/governance-insights-center/publications/assets/pwc-disclosure-committee-essentials.pdf
- "Disclosure effectiveness in action: companies make great strides," Financial Executives Research Foundation and Ernst & Young, September 2016, https://www.financialexecutives.org/Research/FERF-Files/2016/ey-ferf-disclosure-effectiveness-in-action-compani.aspx
- "Dr. Murthy Renduchintala," LinkedIn, https://www.linkedin.com/in/dr-murthy-renduchintala-0a79891/details/experience/
- "Dustin Mersy, CPA," LinkedIn, https://www.linkedin.com/in/dustin-mersy-cpa-3493bb14

- "Earnings Process Practices Research Report," National Investor Relations Institute Analytics, 2016, https://www.niri.org/NIRI/media/Protected-Documents_ExcludeGlobalSubs/Analytics%20Reports/Analytics_Guidance/NIRI-Earnings-Process-Practices-Report-2016.pdf
- "Eric R.," LinkedIn, https://www.linkedin.com/in/eric-r-06413
- "Fabian Gonell," LinkedIn, https://www.linkedin.com/in/fabian-gonell-796b132
- "Jason Bremner," LinkedIn, https://www.linkedin.com/in/jason-bremner-305b9564
- "Katherine McKeon Cassidy," LinkedIn, https://www.linkedin.com/in/katherinemckeoncassidy
- "Kurt M. Kjelland," LinkedIn, https://www.linkedin.com/in/kurtkjelland
- "Larissa Cochron," LinkedIn, https://www.linkedin.com/in/larissa-cochron-4a49153
- "Larry Griffith," LinkedIn, https://www.linkedin.com/in/larry-griffith-5a6a053/details/experience
- "Lexis Practice Advisor, Disclosure Committee Charter," Lexis Practice Note Standard Document, https://advance.lexis.com/open/document/openwebdocview/Disclosure-Committee-Charter/?pdmfid=1000522&pddocfullpath=%2Fshared%2Fdocument%2Fforms%2Furn%3AcontentItem%3A5H08-90V1-JJK6-S0MX-00000-00&pdcomponentid=500752
- "Mark Dunham," LinkedIn, https://www.linkedin.com/in/mark-dunham-b275472b
- "Mark Snyder," LinkedIn, https://www.linkedin.com/in/mark-snyder-932183209
- "Matt Grob," LinkedIn, https://www.linkedin.com/in/matt-grob-624b3042
- "Matthew Heim," LinkedIn, https://www.linkedin.com/in/mathewheim
- "Mauricio Lopez-Hoyodan," LinkedIn, https://www.linkedin.com/in/mauricio-lopez-hodoyan-446565/details/experience
- "Measures that Matter," Ernst & Young, 1997, http://valuementors.com/pdf/Measures%20that%20Matter.pdf
- Michael Zeidel, "Earnings Releases: Regulatory Framework and Disclosure Process," Lexis Practice Advisor, October 14, 2020, https://plus.lexis.com/api/permalink/4c99fa9b-1f5e-45be-b69c-33d56519eab2/?context=1530671
- "New Rules Requiring Additional Certifications by CEO and CFO Under Section 302 of Sarbanes-Oxley Act Are In Effect," Fenwick & West LLP, September 3, 2002, https://assets.fenwick.com/legacy/FenwickDocuments/Corp_Sec_09-03-02.pdf

- “Prabha Desikan,” LinkedIn, https://www.linkedin.com/in/prabha-desikan-1318686
- “Practical Law Commercial Transactions, Dealing with the Media: Business Briefing,” Thomson Reuters Practical Law Practice Note 5-513-4266, https://anzlaw.thomsonreuters.com/5-513-4266?originationContext=document&transitionType=DocumentItem&contextData=(sc.Default)&ppcid=7b7f21b841f442f8827d88cd6bccf636
- “Practical Law Corporate & Securities, Disclosure Committee Charter,” Westlaw Practice Note Standard Document, https://content.next.westlaw.com/practicallaw/document/I0fa0104aef0811e28578f7ccc38dcbee/Disclosure-Committee-Charter?viewType=FullText&transitionType=Default&contextData=(sc.Default)&firstPage=true
- “Raj Talluri,” LinkedIn, https://www.linkedin.com/in/raj-talluri-988b011
- “Rasmus Hellberg,” LinkedIn, https://www.linkedin.com/in/rasmus-hellberg-719a41
- “Rob Chandhok,” LinkedIn, https://www.linkedin.com/in/rchandhok/details/experience
- “Roel Dill,” LinkedIn, https://www.linkedin.com/in/roel-dill-06a07b5
- “Roy Hoffinger,” LinkedIn, https://www.linkedin.com/in/roy-hoffinger-5a5353130
- “Sal Bono,” LinkedIn, https://www.linkedin.com/in/sal-bono-9ba90638
- “Samimi Abbaseh,” LinkedIn, https://www.linkedin.com/in/samimi-abbaseh-b6275823
- “Sanjay Mehta,” LinkedIn, https://www.linkedin.com/in/sanjay-mehta-1139517a
- “Sanjay Vakharia,” LinkedIn, https://www.linkedin.com/in/sanjay-vakharia-6aa3ba2
- “Sean Murphy,” LinkedIn, https://www.linkedin.com/in/sean-murphy-41468436
- “Standards of Practice for Investor Relations,” National Investor Relations Institute, January 2004, http://media.corporate-ir.net/media_files/priv/27585/standards_practice.pdf
- “Taka Matsuo, CPA” LinkedIn, https://www.linkedin.com/in/taka-matsuo-cpa-2424b01b
- “Taylor Cabaniss,” LinkedIn, https://www.linkedin.com/in/taylor-cabaniss-76a941
- “Terry Yen,” LinkedIn, https://www.linkedin.com/in/terry-yen-996b281b0
- “Te-Won Lee,” LinkedIn, https://www.linkedin.com/in/te-won-lee-255b3a15

- "The Promise of Market Reform," Nasdaq, February 2018, https://www.nasdaq.com/docs/Nasdaq_Blueprint_to_Revitalize_Capital_Markets_April_2018_tcm5044-43175.pdf
- "Thomas Rouse," LinkedIn, https://www.linkedin.com/in/thomas-rouse
- "Tim McDonough," LinkedIn, https://www.linkedin.com/in/timothymcdonough/details/experience
- "Tina Asmar," LinkedIn, https://www.linkedin.com/in/tina-asmar-458a95a4

**Produced Documents (Only First Bates Number Shown)**

- FELKE_097
- Q121SEC00068870
- Q121SEC00068871
- Q121SEC00070659
- Q121SEC00070660
- Q121SEC00072672
- Q121SEC00072673
- Q121SEC00073089
- Q121SEC00073340
- Q121SEC00073341
- Q121SEC00073398
- Q121SEC00073399
- Q121SEC00075103
- Q121SEC00075764
- Q121SEC00075765
- Q121SEC00077593
- Q121SEC00077595
- Q121SEC00082356
- Q121SEC00090861
- Q121SEC00090862
- Q121SEC00091735
- Q121SEC00107281
- Q121SEC00109788
- Q121SEC00109797
- Q121SEC00110830
- Q121SEC00111237
- Q121SEC00111517
- Q121SEC00111518
- Q121SEC00111611
- Q121SEC00111798
- Q121SEC00111799
- Q121SEC00111845
- Q121SEC00115327
- Q121SEC00115328
- Q121SEC00115373
- Q121SEC00115374
- Q121SEC00115380
- Q121SEC00115381
- Q121SEC00115426
- Q121SEC00115427
- Q121SEC00115431
- Q121SEC00115547

- Q121SEC00122439
- Q121SEC00127169
- Q121SEC00131384
- Q121SEC00150690
- Q121SEC00160881
- Q121SEC00160882
- Q121SEC00160884
- Q121SEC00161155
- Q121SEC00161158
- Q121SEC00162189
- Q121SEC00162192
- Q121SEC00164022
- Q121SEC00164047
- Q121SEC00164067
- Q121SEC00164256
- Q121SEC00164968
- Q121SEC00165221
- Q121SEC00165222
- Q121SEC00168819
- Q121SEC00169323
- Q121SEC00170728
- Q121SEC00192564
- Q121SEC00194425
- Q121SEC00194539
- Q121SEC00194623
- Q121SEC00194630
- Q121SEC00194829
- Q121SEC00194837
- Q121SEC00195953
- Q121SEC00196080
- Q121SEC00196297
- Q121SEC00196301
- Q121SEC00196506
- Q121SEC00196513
- Q121SEC00196681
- Q121SEC00196860
- Q121SEC00196866
- Q121SEC00197203
- Q121SEC00197208
- Q121SEC00201645
- Q121SEC00202513
- Q121SEC00202624
- Q121SEC00205021
- Q121SEC00205131
- Q121SEC00205135
- Q121SEC00205254
- Q121SEC00206912
- Q121SEC00207608
- Q121SEC00208282
- Q121SEC00208610
- Q121SEC00208649
- Q121SEC00210546
- Q121SEC00210703
- Q121SEC00210834
- Q121SEC00211008
- Q121SEC00211013

- Q121SEC00232397
- Q121SEC00245612
- Q121SEC00245614
- Q121SEC00245620
- Q121SEC00245626
- Q121SEC00245628
- Q121SEC00245631
- Q121SEC00245642
- Q121SEC00265306
- Q121SEC00266431
- Q121SEC00266466
- Q121SEC00266617
- Q121SEC00266618
- Q121SEC00266623
- Q121SEC00266876
- Q121SEC00266877
- Q121SEC00266882
- Q121SEC00267134
- Q121SEC00267738
- Q121SEC00268705
- Q121SEC00268706
- Q121SEC00268708
- Q121SEC00268710
- Q121SEC00269105
- Q121SEC00269167
- Q121SEC00269913
- Q121SEC00287914
- Q121SEC00295276
- Q121SEC00295708
- Q121SEC00296927
- Q121SEC00296928
- Q121SEC00296933
- Q121SEC00296941
- Q121SEC00296942
- Q121SEC00296947
- Q121SEC00319095
- Q121SEC00320235
- Q121SEC00323658
- Q121SEC00323659
- Q121SEC00323699
- Q121SEC00323709
- Q121SEC00326860
- Q121SEC00327135
- Q121SEC00330264
- Q121SEC00333864
- Q121SEC00333865
- Q121SEC00334292
- Q121SEC00334452
- Q121SEC00334543
- Q121SEC00334544
- Q121SEC00334590
- Q121SEC00334591
- Q121SEC00334919
- Q121SEC00335612
- Q121SEC00336764
- Q121SEC00336765

- Q121SEC00355702
- Q121SEC00356295
- Q121SEC00356402
- Q121SEC00356403
- Q121SEC00356719
- Q121SEC00359496
- Q121SEC00359497
- Q121SEC00371385
- Q121SEC00404393
- Q121SEC00404394
- Q121SEC00404415
- Q121SEC00404508
- Q121SEC00411896
- Q121SEC00411899
- Q121SEC00412164
- Q121SEC00412226
- Q121SEC00412316
- Q121SEC00412347
- Q121SEC00412359
- Q121SEC00412384
- Q121SEC00412469
- Q121SEC00412473
- Q121SEC00412476
- Q121SEC00433638
- Q121SEC00435996
- Q121SEC00436733
- Q121SEC00436735
- Q121SEC00436796
- Q121SEC00436797
- Q121SEC00436874
- Q121SEC00436875
- Q121SEC00436876
- Q121SEC00436877
- Q121SEC00436878
- Q121SEC00440556
- Q121SEC00440557
- Q121SEC00443411
- Q121SEC00443473
- Q121SEC00466732
- Q121SEC00466830
- Q121SEC00466948
- Q121SEC00473540
- Q121SEC00487475
- Q121SEC00489625
- Q121SEC00492075
- Q121SEC00494824
- Q121SEC00495280
- Q121SEC00497271
- Q121SEC00497333
- Q121SEC00499865
- Q121SEC00505042
- Q121SEC00510846
- Q121SEC00520677
- Q121SEC00527018
- Q121SEC00527019
- Q121SEC00527023

- Q121SEC00527029
- Q121SEC00527033
- Q121SEC00527040
- Q121SEC00554426
- Q121SEC00554467
- Q121SEC00555166
- Q121SEC00579285
- Q121SEC00579286
- Q121SEC00579298
- Q121SEC00579309
- Q121SEC00586709
- Q121SEC00587353
- Q121SEC00587846
- Q121SEC00588070
- Q121SEC00601353
- Q121SEC00603437
- Q121SEC00603513
- Q121SEC00607262
- Q121SEC00631028
- Q121SEC00632293
- Q121SEC00633144
- Q121SEC00633744
- Q121SEC00633942
- Q121SEC00634568
- Q121SEC00634569
- Q121SEC00638321
- Q121SEC00646480
- Q121SEC00646481
- Q121SEC00647173
- Q121SEC00647175
- Q121SEC00647187
- Q121SEC00647208
- Q121SEC00647212
- Q121SEC00647222
- Q121SEC00647237
- Q121SEC00647238
- Q121SEC00647253
- Q121SEC00649245
- Q121SEC00649246
- Q121SEC00649248
- Q121SEC00649255
- Q121SEC00649262
- Q121SEC00649271
- Q121SEC00649272
- Q121SEC00649273
- Q121SEC00649289
- Q121SEC00649293
- Q121SEC00649574
- Q121SEC00649575
- Q121SEC00649580
- Q121SEC00651268
- Q121SEC00654360
- Q121SEC00658304
- Q121SEC00658615
- Q121SEC00661024
- Q121SEC00663252

- Q121SEC00663255
- Q121SEC00663256
- Q121SEC00663302
- Q121SEC00663303
- Q121SEC00666883
- Q121SEC00666924
- Q121SEC00666925
- Q121SEC00666953
- Q121SEC00666954
- Q121SEC00666968
- Q121SEC00666969
- Q121SEC00667018
- Q121SEC00667019
- Q121SEC00667033
- Q121SEC00667047
- Q121SEC00667048
- Q121SEC00671320
- Q121SEC00684323
- Q121SEC00693589
- Q121SEC00693591
- Q121SEC00693603
- Q121SEC00693606
- Q121SEC00693614
- Q121SEC00717700
- Q121SEC00718307
- Q121SEC00725844
- Q121SEC00725864
- Q121SEC00726789
- Q121SEC00726924
- Q121SEC00727430
- Q121SEC00727569
- Q121SEC00727775
- Q121SEC00732477
- Q121SEC00737441
- Q121SEC00740790
- Q121SEC00742446
- Q121SEC00742447
- Q121SEC00742604
- Q121SEC00743078
- Q121SEC00746290
- Q121SEC00746302
- Q121SEC00751809
- Q121SEC00752353
- Q121SEC00752519
- Q121SEC00752798
- Q121SEC00753285
- Q121SEC00753301
- Q121SEC00754413
- Q121SEC00759112
- Q121SEC00759765
- Q121SEC00759785
- Q121SEC00759805
- Q121SEC00762315
- Q121SEC00763266
- Q121SEC00764441
- Q121SEC00764927

- Q121SEC00765858
- Q121SEC00768942
- Q121SEC00770802
- Q121SEC00771489
- Q121SEC00772095
- Q121SEC00772171
- Q121SEC00772265
- Q121SEC00775084
- Q121SEC00776715
- Q121SEC00776716
- Q121SEC00776820
- Q121SEC00776821
- Q121SEC00776822
- Q121SEC00776823
- Q121SEC00776824
- Q121SEC00777056
- Q121SEC00787479
- Q121SEC00787480
- Q121SEC00794058
- Q121SEC00794513
- Q121SEC00794514
- Q121SEC00797122
- Q121SEC00797294
- Q121SEC00799422
- Q121SEC00801013
- Q121SEC00801793
- Q121SEC00804271
- Q121SEC00820597
- Q121SEC00874176
- Q121SEC00875109
- Q121SEC00878069
- Q121SEC00878155
- Q121SEC00878242
- Q121SEC00878295
- Q121SEC00878329
- Q121SEC00878380
- Q121SEC00878402
- Q121SEC00878481
- Q121SEC00878512
- Q121SEC00878582
- Q121SEC00878611
- Q121SEC00878684
- Q121SEC00878777
- Q121SEC00878838
- Q121SEC00878866
- Q121SEC00878878
- Q121SEC00879217
- Q121SEC00879249
- Q121SEC00879294
- Q121SEC00879370
- Q121SEC00879428
- Q121SEC00879640
- Q121SEC00879710
- Q121SEC00879780
- Q121SEC00879872
- Q121SEC00879959

- Q121SEC00880050
- Q121SEC00880117
- Q121SEC00880194
- Q121SEC00896362
- Q121SEC00935730
- Q121SEC00937080
- Q121SEC00937592
- Q121SEC00937593
- Q121SEC00937599
- Q121SEC00937600
- Q121SEC00937606
- Q121SEC00937613
- Q121SEC00937620
- Q2014FTC00173385
- Q2014FTC00173589
- Q2014FTC00173590
- Q2014FTC00410564
- Q2014FTC00538355
- Q2014FTC00538356
- Q2014FTC00552116
- Q2014FTC01601757
- Q2014FTC01620830
- Q2014FTC01620832
- Q2014FTC01620833
- Q2014FTC01825440
- Q2014FTC01876850
- Q2014FTC02109930
- Q2014FTC02109932
- Q2014FTC02109934
- Q2014FTC02110288
- Q2014FTC02126259
- Q2014FTC02163832
- Q2014FTC02531166
- Q2014FTC02531167
- Q2014FTC02531173
- Q2014FTC02531174
- Q2014FTC02531183
- Q2014FTC02820500
- Q2014FTC02826490
- Q2014FTC02992434
- Q2014FTC03077348
- Q2014FTC03112009
- Q2014FTC03354219
- Q2014FTC03354275
- Q2014FTC03354276
- Q2014FTC03354550
- Q2014FTC03354551
- Q2014FTC03358585
- Q2014FTC03358586
- Q2014FTC03358599
- Q2014FTC03358600
- Q2014FTC03358613
- Q2014FTC03358644
- Q2014FTC03358649
- Q2014FTC03358650
- Q2014FTC03358774

- Q2014FTC03358775
- Q2014FTC03361158
- Q2014FTC03361941
- Q2014FTC03476394
- Q2014FTC03477465
- Q2014FTC03591360
- Q2014FTC03839981
- Q2014FTC03854342
- Q2014FTC03859062
- Q2014FTC04006669
- Q2014FTC04690078
- Q2014FTC04708931
- Q2014FTC04717687
- Q2014FTC04721694
- Q2014FTC04817411
- Q2014FTC04820411
- Q2014FTC04820412
- Q2014FTCBCM06714558
- Q2014FTCBCM06734328
- QAPPCMSD09927154
- QNDCAL00110449
- QNDCAL00624877
- QNDCAL00624900
- QNDCAL00634550
- QNDCAL00636328
- QNDCAL00663874
- QNDCAL00690124
- QNDCAL00690125
- QNDCAL00690130
- QNDCAL00764650
- QNDCAL00811967
- QNDCAL00812271
- QNDCAL00837142
- QNDCAL00837143
- QNDCAL00837158
- QNDCAL00837161
- QNDCAL00837175
- QNDCAL00837177
- QNDCAL00837183
- QNDCAL02099525
- QNDCAL02102650
- QNDCAL02104698
- QNDCAL02106013
- QNDCAL02225262
- QNDCAL02827446
- QNDCAL02844402
- QNDCAL02987750
- QNDCAL03161993
- QNDCAL03305884
- QNDCAL03305885
- QNDCAL03305893
- QNDCAL03305897
- QNDCAL03305898
- QNDCAL03305913
- QNDCAL03305915
- QNDCAL03305929

- QNDCAL03305931
- QNDCAL03526660
- QNDCAL03539419
- QNDCAL03551486
- QNDCAL04120537
- QNDCAL04225322
- QNDCAL04421130

**Data**

- *Refinitiv*

**Other**

- Chapter 3. Components of Securities Compliance Program, Corp. Compl. Series: Securities § 3:28 (2022)
- Chapter 3. Logistical Framework, Corp. Communications Handbook § 3:12 (2022-2023)
- Chapter 4. Informal Disclosure Issues in Specific Contexts, Corp. Communications Handbook § 4:31 (2022-2023)
- Chapter 17. Regulation FD, Res. Corp. Fed. Sec. L. P 1707 (C.C.H.), 2015 WL 5616177
- Qualcomm Privilege Log Produced on October 14, 2022

**In addition to the documents on this list, I considered all documents cited in this report and the report, including accompanying appendices and exhibits, I submitted on September 12, 2023.**

# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: QUALCOMM INCORPORATED SECURITIES LITIGATION | Case No. 3:17-CV-00121-JO-MSB<br><br>HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY |

# EXPERT REPORT OF CELESTE C. SARAVIA, PH.D.

December 11, 2023

# Table of contents

**1. Introduction ... 1**

1.1. Qualifications ... 1

1.1. Assignment ... 2

**2. Summary of Opinions ... 3**

**3. Prof. Simcoe Offers Multiple Theories of Bundling ... 6**

3.1. Prof. Simcoe's Theory of Bundling Based on Alleged Market Power in Modem Chips (the "Chip Leverage Theory") ... 9

3.2. Prof. Simcoe's Theory of Bundling Based on Alleged Market Power in Licensing (the "Licensing Leverage Theory") ... 10

**4. Bundling and Bundled Discounts Are Generally Good for Consumers and Competition ... 13**

**5. Prof. Simcoe's Multiple Bundling Theories Are Premised on Contrasting Assumptions and Make Conflicting Predictions ... 17**

**6. Prof. Simcoe's Chip Leverage Theory of Antitrust Liability Lacks Economic and Factual Support ... 20**

6.1. Prof. Simcoe Has Not Defined Any Modem Chip Market in Which Qualcomm Had Market Power or in Which Competition Could Have Been Harmed ... 20

6.2. Prof. Simcoe Has Not Established That Qualcomm Had the Ability to Effectively "Threaten" OEMs ... 21

6.3. Prof. Simcoe Has Not Established That Qualcomm Charged an Above-FRAND Royalty Rate ... 24

6.4. Prof. Simcoe Has Not Established That a FRAND Violation Is Anticompetitive or That It Is Expected to Lead to an Antitrust Action ... 26

6.5. Prof. Simcoe Has Not Established That "Bundling" According to His Chip Leverage Theory Could Have Caused Anticompetitive Harm ... 28

**7. Prof. Simcoe's Licensing Leverage Theory of Antitrust Liability Lacks Economic and Factual Support ... 30**

7.1. Prof. Simcoe's Licensing Leverage Theory Is Flawed Because It Ignores OEMs' Ability to Bring a FRAND Challenge ... 31

7.2. Prof. Simcoe Incorrectly Characterizes Procompetitive Modem Chip Discounts as Anticompetitive Bundling ... 33

7.3. Prof. Simcoe Incorrectly Characterizes Claims of Exclusive Dealing as Bundling ... 35

**8. Prof. Simcoe Has Not Established That Qualcomm's Alleged Bundling Caused Anticompetitive Harm ... 38**

**9. Prof. Simcoe Has Failed to Show That Qualcomm's Undisclosed Bundling Practices Caused the At-Issue Complaints ... 43**

9.1. KFTC ... 46

9.2. EC ..... 51

9.3. TFTC ..... 54

9.4. FTC ..... 56

9.5. Apple ..... 61

**10. Prof. Simcoe Has No Basis to Opine That the At-Issue Complaints Were a Foreseeable Consequence of the Alleged Undisclosed Bundling ..... 63**

**11. Mr. Mintzer's Discussion of Accounting Treatments Is Irrelevant to Bundling as a Matter of Antitrust Economics ..... 64**

## Exhibit list

Exhibit 1 WCDMA Modem Chip Sales Shares by Year (2008–2013) ........ 22
Exhibit 2 LTE Modem Chip Sales by Year (2012–2017) ........ 40
Exhibit 3 LTE Modem Chip Sales Shares by Year (2012–2017) ........ 41
Exhibit 4 WCDMA, CDMA, and LTE Modem Chip Sales Shares by Year (2008–2017) ........ 42

# 1. Introduction

## 1.1. Qualifications

1. My name is Celeste C. Saravia. I am an economist with expertise in industrial organization. I received my Ph.D. in Economics from the University of California, Berkeley, in 2004 and have since worked at Cornerstone Research as a consultant on economic issues related to competition. I hold an appointment as a Lecturer in the Economics Department at the University of California, Berkeley where I will be teaching Industrial Organization in 2024. I have assessed competition issues in cases involving allegations of collusion, vertical restraints, and other allegedly anticompetitive behavior. I have also assessed the competitive effects of mergers. I have conducted these analyses across a wide number of industries, including pharmaceutical drug products, medical devices, information technology, payment systems, aviation, energy, telecommunications, and media distribution.

2. I have published on competition issues in one of the leading economic journals, the *American Economic Review*, and have contributed to multiple books and treatises on competition issues for the American Bar Association. I contributed to the market definition chapter in the Seventh Edition of *Antitrust Law Developments* and to *The Indirect Purchaser Litigation Handbook* and *Antitrust Law and Economics of Product Distribution*. I have previously served as a Vice Chair of the Pricing Conduct and Distribution and Franchising Committees of the American Bar Association's Antitrust Section.

3. I have testified on competition issues at deposition, trial, and arbitration. I have provided testimony in antitrust cases involving a wide range of allegations, including cases involving allegations of exclusionary discounts and exclusive dealing, and a wide range of industries, including in technology. As part of my work at Cornerstone Research, I have acted as a consultant to Qualcomm on

multiple competition matters.[1] A complete copy of my CV, including a list of prior testimony, is attached to this report as **Appendix A**.

4. Cornerstone Research is being compensated for my time in this matter at my customary billing rate of $1,020 per hour. Additional staff at Cornerstone Research have worked under my direction and assisted me in my work on this matter. The compensation received by Cornerstone Research is not in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

## 1.1. Assignment

5. Counsel for Qualcomm has asked me to review and respond to the theories, analyses, and opinions offered by Plaintiffs' expert, Prof. Timothy Simcoe.[2] In particular, I have been asked to assess:

a. Whether Prof. Simcoe has presented any coherent theory of how Qualcomm's alleged bundling practices could have caused anticompetitive harm.

b. Whether Prof. Simcoe has provided economic and factual support for his theories regarding Qualcomm's alleged bundling practices.

c. Whether Prof. Simcoe has established that the 2015 KFTC Case Examiner's Report, the TFTC Investigation, the EC's Statement of Objection, the FTC Complaint, or the Apple Complaint were caused by, or were a foreseeable consequence of, Qualcomm's alleged undisclosed bundling practices.[3]

---

[1] All of the opinions in this report are my own and are based solely on the documents produced in this case and identified in the Documents Relied Upon List. I have not based any of my opinions on my work in any other matter.

[2] Expert Report of Timothy Simcoe, Ph.D., September 12, 2023 ("Simcoe Report").

[3] Prof. Simcoe opines that "Qualcomm's bundling led to a series of regulatory actions and lawsuits across the globe, including the 2015 KFTC Case Examiner's Report, the TFTC investigation, the EC's Statement of Objection, the FTC Complaint, and the Apple Complaint." See Simcoe Report, ¶97. The Class Certification Order states that Plaintiffs allege four corrective disclosures: "Qualcomm's press release in response to an antitrust investigation initiated by the Korean Fair Trade Commission," "the European Commission's press release announcing that it was investigating Qualcomm for violating European competition law," "a complaint publicly filed by the Federal Trade Commission," and "a complaint filed by Apple alleging antitrust violations." See Class

6. Finally, I have been asked to review the analysis and opinions offered by Plaintiffs' expert, Mr. Andrew M. Mintzer, and to assess their relevance to bundling as a concept in antitrust economics.[4]

7. The list of documents and materials I relied upon in forming my opinions is attached to this report as **Appendix B**.

## 2. Summary of Opinions

8. My overall conclusion is that Prof. Simcoe has not established, and has no basis to establish, that the 2015 KFTC Case Examiner's Report, the TFTC Investigation, the EC's Statement of Objection, the FTC Complaint, or the Apple Complaint (the "At-Issue Complaints") were caused by or were a foreseeable consequence of Qualcomm's alleged undisclosed bundling practices.[5] My conclusion is based on the following:

a. Prof. Simcoe presents two bundling theories: a Chip Leverage Theory and a Licensing Leverage Theory. These theories are premised on contrasting assumptions regarding the source of market power Qualcomm allegedly leveraged (in modem chips or in licensing), and make conflicting predictions regarding the economic effect that the leveraging allegedly had. According to Prof. Simcoe's Chip Leverage Theory, Qualcomm leveraged its alleged market power in modem chips to obtain above-FRAND royalty rates. According to Prof. Simcoe's Licensing Leverage Theory, Qualcomm leveraged its market power in licensing to foreclose competition in modem chips (Section 3).

---

Certification Order, *In Re Qualcomm Incorporated Securities Litigation*, March 20, 2023 ("Class Certification Order"), pp. 6–8.

[4] Expert Report of Andrew M. Mintzer, CPA, CFF, CFE, September 12, 2023 ("Mintzer Report").

[5] Prof. Simcoe opines that "Qualcomm's bundling led to a series of regulatory actions and lawsuits across the globe, including the 2015 KFTC Case Examiner's Report, the TFTC investigation, the EC's Statement of Objection, the FTC Complaint, and the Apple Complaint." See Simcoe Report, ¶97. Prof. Simcoe does not clearly articulate which conduct he defines as undisclosed bundling. However, I note that, even if he does define Qualcomm's practice of selling modem chips only to licensed OEMs as bundling, this practice was disclosed. See Letter from Salvatore J. Graziano to Honorable Jinsook Ohta, In re Qualcomm Incorporated Securities Litigation, No. 3:17-cv-00121-JO-MSB, October 18, 2022 ("Plaintiffs' Disclosure Letter") ("2. Are Plaintiffs currently alleging that the market did not know that Qualcomm only sold its chips to licensed companies? No, the market understood that Qualcomm would only sell chips to licensed companies, but this is different than bundling lower license royalties when customers purchased Qualcomm chipsets.").

b. In contrast to Prof. Simcoe's claim that "[e]conomists have long recognized that bundling practices like those adopted by Qualcomm can be anti-competitive,"[6] bundling and bundled discounts are ubiquitous and typically considered procompetitive. Hence, even if one accepts Prof. Simcoe's claim that Qualcomm used bundling, this does not, by itself, raise antitrust concerns (Section 4).

c. Prof. Simcoe's two theories of alleged bundling make conflicting predictions on whether Qualcomm used bundling to increase or decrease the royalty rate in its licensing agreements. While the Chip Leverage Theory implies higher royalty rates for original equipment manufacturers ("OEMs") that use Qualcomm modem chips, the Licensing Leverage Theory implies the reverse, that is, lower royalty rates for OEMs that use Qualcomm modem chips (Section 5).

d. Prof. Simcoe's Chip Leverage Theory lacks economic and factual support. This theory is premised on the assumptions that (1) Qualcomm had market power in some modem chip market(s) and (2) that it could use its market power in modem chips to "threaten" OEMs in order to obtain above-FRAND royalty rates. Hence, the theory predicts that Qualcomm has obtained above-FRAND royalty rates. Yet, Prof. Simcoe has failed to establish or even attempt to establish that either of these assumptions hold or that Qualcomm's royalty rates were above FRAND. Furthermore, Prof. Simcoe has not established that the assumed above-FRAND royalty rates were expected to lead to an antitrust action or could have caused any anticompetitive harm (Section 6).

e. Prof. Simcoe's Licensing Leverage Theory similarly lacks economic and factual support and cannot establish that Qualcomm's conduct could have caused anticompetitive harm. This theory is premised on the assumption that Qualcomm leveraged its market power in licenses for its standard-essential patents ("SEPs") into modem chips by (1) setting a nominal royalty for its SEPs that is above the FRAND rate but then (2) offering discounts off the above-FRAND rate (presumably to

[6] Simcoe Report, ¶70.

FRAND or below-FRAND rates) to OEMs that agreed to purchase Qualcomm's modem chips, which, according to Prof. Simcoe, resulted in discriminatory royalties. This theory is fundamentally flawed because it ignores OEMs' ability to bring a FRAND challenge were Qualcomm to set a nominal above-FRAND royalty. Prof. Simcoe's analysis is further flawed because he mischaracterizes modem chip discounts as "discriminatory royalties" and claims that the supposed "discriminatory royalties" harmed competition for chips. Yet, Prof. Simcoe has failed to demonstrate that the alleged discriminatory royalty rates could have harmed competition. For example, he has failed to provide any analysis that these discounts resulted in modem chip prices that were below cost. He also incorrectly characterizes alleged exclusive-dealing agreements as bundling (Section 7).

f. Prof. Simcoe cites to the exit of certain modem chip makers as support for his opinion that Qualcomm's alleged bundling caused anticompetitive harm.[7] Yet, he has failed to provide any economic analysis or evidence that the alleged bundling *caused* the exit of these rival modem chip makers. Prof. Simcoe merely makes the observation that certain modem chip makers exited, but cites no evidence that Qualcomm's alleged bundling caused or was connected to the exits. Furthermore, he has failed to consider reasons unrelated to Qualcomm's alleged bundling (whether disclosed or undisclosed) that can explain the exit of these rival modem chip makers. Prof. Simcoe has also failed to acknowledge that Qualcomm's share of modem chip sales declined during the class period. Hence, he has failed to establish that Qualcomm's alleged bundling caused anticompetitive harm (Section 8).

g. Prof. Simcoe has failed to show that Qualcomm's alleged undisclosed bundling practices caused any of the At-Issue Complaints. Contrary to Prof. Simcoe's assertions, the prominent elements in the At-Issue Complaints were Qualcomm's disclosed practices ("no license, no chips" and refusal to license chip makers) and its alleged exclusive-dealing agreements with Apple, which the At-Issue Complaints did not describe as bundling. Furthermore, not one of the At-Issue Complaints focused on a

[7] Simcoe Report, ¶82.

theory of harm alleging that Qualcomm's licensing terms were anticompetitive due to the alleged undisclosed bundling practices creating discriminatory royalties that were in violation of the "nondiscriminatory" requirement of FRAND. (Section 9).

9. Given (a)–(g) above, Prof. Simcoe has no basis for his conclusion that the At-Issue Complaints were a foreseeable consequence of Qualcomm's alleged undisclosed bundling (Section 10).

10. Finally, I find that Mr. Mintzer's analysis of the accounting treatment of Qualcomm's agreements with certain OEMs is irrelevant for assessing Qualcomm's intention, incentive, or ability to engage in anticompetitive bundling or the competitive effect of such conduct (Section 11).

## 3. Prof. Simcoe Offers Multiple Theories of Bundling

11. Prof. Simcoe claims that "Qualcomm engaged in bundling by jointly negotiating its chipset procurement and patent license agreements."[8] He further claims that Qualcomm engaged in what is known as "bundled discounting," which he describes as "bundling by charging lower prices to actual and prospective licensees that agreed to purchase modem chipsets from Qualcomm."[9] Prof. Simcoe claims that bundling had economic effects both on modem chip competition and on Qualcomm's licensing terms: "[b]undling enhanced and protected the profits of Qualcomm's chip and licensing businesses by excluding rival chipmakers from the market and leveraging the resulting market power in chips to prevent OEMs from engaging in FRAND litigation."[10]

12. As a starting point, I note that it is not the case that each circumstance that Prof. Simcoe labels as undisclosed bundling truly represents "jointly negotiating . . . chipset procurement and patent license agreements" during the relevant period.[11] Observing that some OEMs obtained both modem chips and

[8] Simcoe Report, ¶15.a.

[9] Simcoe Report, ¶15.b.

[10] Simcoe Report, ¶15.c.

[11] Simcoe Report, ¶15.a. For example, Prof. Simcoe points to "lower 'caps' on the royalty payment per-device" as an example of Qualcomm's strategy "to provide device manufacturers with bundled discounts." However, he ignores that these caps were typically set voluntarily by Qualcomm, often years after the license agreements were

licenses from Qualcomm is insufficient to conclude that Qualcomm engaged in the alleged undisclosed bundling, or that license and modem chip terms were jointly determined. Similarly, observing that Qualcomm offered certain OEMs rebates or discounts on modem chips does not demonstrate that Qualcomm offered bundled discounts, or conditioned the rebates or discounts on purchasing the bundle. Given that Qualcomm sells modem chips only to licensed OEMs, under this flawed reasoning every modem chip discount that Qualcomm offered an OEM would be categorized as a bundled discount.[12] This would be true even if the OEM had signed a license agreement years before it purchased modem chips from Qualcomm, and even if Qualcomm simply offered the OEM procompetitive discounts on modem chips—for example, in the face of specific competitive threats from other modem chip makers.

13. Nonetheless, even if one were to consider Qualcomm's licensing and modem chip sales as bundling, Prof. Simcoe would still have no basis for his opinion that the assumed "[b]undling enhanced and protected the profits of Qualcomm's chip and licensing businesses by excluding rival chipmakers" because he has not described a coherent theory of harm.[13]

---

signed, implying that Qualcomm's offer of these discounts did not constitute a joint negotiation of modem chips and licenses. Furthermore, in addition to ignoring that many of these royalty caps were offered after a license agreement was signed, Prof. Simcoe also ignores that the royalty caps he identified were from the early 2000s, and were no longer in effect years before the At-Issue Complaints were filed. See Simcoe Report, ¶44; Simcoe Report Appendix D, ¶77 [redacted]. See also Letter from Marvin Blecker (Qualcomm) to Hitoshi Sugimoto (Sony), April 23, 2001, QNDCAL04397693 [redacted] As another example, Prof. Simcoe cites to Qualcomm's 2007 Marketing Incentive Agreement with Apple as "another example of how Qualcomm implemented its bundled discounts," but ignores the fact that Apple did not sell devices with Qualcomm modem chips until 2011. See Simcoe Report, ¶46.

[12] Qualcomm's practice of only selling modem chips to licensed OEMs (the so-called "no license, no chips" practice) cannot constitute undisclosed bundling because it was a disclosed practice. See Plaintiffs' Disclosure Letter ("2. Are Plaintiffs currently alleging that the market did not know that Qualcomm only sold its chips to licensed companies? No, the market understood that Qualcomm would only sell chips to licensed companies, but this is different than bundling lower license royalties when customers purchased Qualcomm chipsets."). Furthermore, Qualcomm's practice of providing modem chip discounts was public. See, e.g., Qualcomm Incorporated, SEC Form 10-K for the fiscal year ended September 26, 2010, filed on November 3, 2010, p. 35 ("We record reductions to revenue for customer incentive programs, including special pricing agreements and other volume-related rebate programs.") or Qualcomm Incorporated, SEC Form 10-K for the fiscal year ended September 25, 2011, filed on November 2, 2011, p. F-9 ("The Company records reductions to revenues for customer incentive arrangements, including volume-related and other pricing rebates and cost reimbursements for marketing and other activities involving certain of the Company's products."). This means that even if one incorrectly categorized all modem chip discounts as bundling, such bundling would not be "undisclosed."

[13] Simcoe Report, ¶15.c.

14. To assess Prof. Simcoe's opinions, one must first tease out his various—and often internally inconsistent—theories of harm based on the alleged bundling.[14] In general, a theory of monopoly leveraging assumes that a multi-product firm that has monopoly power in one market exploits this power to obtain a competitive advantage in a second competitive market.[15] Here, Prof. Simcoe offers two theories that differ primarily in their claims regarding the product over which Qualcomm allegedly has market, or monopoly, power. One theory is premised on an assumption that Qualcomm had market power in modem chips and that it leveraged or used that market power to obtain higher royalty rates. The other is premised on an assumption that Qualcomm had market power in licensing its SEPs and leveraged or used that market power to obtain additional sales of modem chips.[16]

15. I outline each of these proposed theories in the subsections that follow (Sections 3.1 and 3.2). I then explain that in contrast to Prof. Simcoe's claims of economic harm, bundling and bundled discounting are generally seen as being good for consumers and competition. I summarize this in Section 4. In Section 5, I explain that Prof. Simcoe's multiple theories of bundling are internally inconsistent and conflict with one another: they rely on contrasting assumptions and make conflicting predictions. In Sections 6 and 7, I further discuss each theory and explain that each lacks economic or factual support. In Section 8, I explain that Prof. Simcoe has failed to show that Qualcomm's alleged bundling caused anticompetitive harm. Thus, as I explain in Sections 9 and 10, Prof. Simcoe has no basis for his claim that "[t]he regulatory actions and lawsuits brought against Qualcomm . . . were caused by and a foreseeable consequence of Qualcomm's bundling practices."[17]

---

[14] I note that Prof. Simcoe does not make claims that Qualcomm engaged in (a) bundling of SEPs and non-SEPs, or (b) bundling of all SEPs rather than licensing them on a patent-by-patent basis.

[15] See, e.g., Kaplow, Louis, "Extension of Monopoly Power Through Leverage," *Columbia Law Review*, 85, No. 3, 1985, pp. 515–556 at p. 516 ("Traditional leverage theory claims that a monopolist's use of its power in its own market to control activities in another market typically represents an attempt to spread its power to the other market."); Rey, Patrick and Tirole, Jean, *A Primer on Foreclosure*, (Handbook of Industrial Organization III, 2007), p. 2182 ("We now turn to horizontal foreclosure, referring to situations in which: (i) a firm *M* is present in two final markets, *A* and *B*; and (ii) this firm *M* has substantial market power in market *A*, called for simplicity the 'monopoly segment' and faces actual or potential competition in market *B*, labeled the 'competitive segment'. In such a situation, the traditional 'leverage' concern is that *M* could foreclosure[*sic*] competitors in market *B* by tying the bottleneck good *A* to its own offering in *B*. This leverage theory has been used in many high-profile cases involving complements – particularly when product *B* has low value, or is even useless, unless combined with product *A* (memory or software and CPUs for mainframe computers, parts or maintenance services and original equipment, and so forth).").

[16] Prof. Simcoe claims that Qualcomm linked "discounts to the purchase of a SEP-plus-chip bundle." See Simcoe Report, ¶41. I understand Qualcomm's license agreements with OEMs typically cover SEPs and non-essential patents in Qualcomm's patent portfolio.

[17] Simcoe Report, ¶15.f.

### 3.1. Prof. Simcoe's Theory of Bundling Based on Alleged Market Power in Modem Chips (the "Chip Leverage Theory")

16. One of Prof. Simcoe's bundling theories assumes that "Qualcomm used the leverage provided by its chip supply relationships to exert pressure in license negotiations."[18] Specifically, he claims that "Qualcomm bundled its license and modem chip sales . . . by threatening to halt an OEM's supply of chipsets until that customer agreed to sign a new license on terms that were acceptable to Qualcomm."[19] Prof. Simcoe claims that "[w]hen OEMs have made design commitments to Qualcomm chips or require access to chipsets for which Qualcomm has a near monopoly, they have little choice but to accept Qualcomm's royalty rate, even if they do not believe it is FRAND."[20] Prof. Simcoe claims that Qualcomm's threat to disrupt modem chip supply "makes it prohibitively costly for its customers to challenge its royalties in court."[21] Thus, according to Prof. Simcoe, "[a] credible threat of chip supply disruption will lead prospective licensees to accept rates above a FRAND level."[22] I refer to this theory as Prof. Simcoe's **Chip Leverage Theory**.

17. Prof. Simcoe's Chip Leverage Theory is premised on the assumption that Qualcomm's modem chips were "necessary" for certain OEMs, or that Qualcomm had market power in modem chips.[23] Prof. Simcoe's sole claim regarding the economic effect of his Chip Leverage Theory is that it enabled Qualcomm to enter into licensing terms with licensees, which viewed Qualcomm's modem chips as "necessary," at rates that were "above a FRAND level."[24] Prof. Simcoe has made no claims regarding the effect, if any, of the purported above-FRAND royalty rates on competition in any market.[25] I discuss this further in Section 6.

---

[18] Simcoe Report, ¶58.

[19] Simcoe Report, ¶56.

[20] Simcoe Report, ¶86.

[21] Simcoe Report, ¶60. See also Simcoe Report, ¶42 ("These customers are more likely to accept QTL's royalty demands than to challenge Qualcomm's royalties in court if a court challenge implies that they lose any ability to supply cellular devices in the interim.").

[22] Simcoe Report, ¶86.

[23] Simcoe Report, ¶42 ("Many OEMs require access to QCT chips because of design commitments, or because of QCT's market power in some segments of the market for cellular modem chips.").

[24] Simcoe Report, ¶86 ("A credible threat of chip supply disruption will lead prospective licensees to accept rates above a FRAND level.").

[25] Section IV.A.1 of the Simcoe Report ("Exclusion of Rival Chip Producers") does not discuss any exclusionary effect from the threat of withholding modem chip supply. Further, Section III.A.2 of the Simcoe Report ("Qualcomm Threatened To Withhold Chipsets During License Negotiations") does not discuss any exclusionary effect in any modem chip market, or in any other market.

18. Notably, as I explain in Section 6.2 below, Prof. Simcoe has not explained whether or how the conduct underlying his Chip Leverage Theory is anything other than Qualcomm communicating its previously disclosed practice of selling modem chips only to licensed OEMs, which the FTC referred to as Qualcomm's "no license, no chips" policy.[26]

### 3.2. Prof. Simcoe's Theory of Bundling Based on Alleged Market Power in Licensing (the "Licensing Leverage Theory")

19. Prof. Simcoe's second bundling theory is that Qualcomm has monopoly power *in licensing its SEPs* and that it used bundled discounts to extend or leverage this monopoly power into modem chips. According to Prof. Simcoe, "by linking discounts to the purchase of a SEP-plus-chip bundle, Qualcomm can price discriminate between QCT customers and customers of rival chip producers, effectively charging a higher royalty to the latter group. Bundling thereby allows Qualcomm to extend its monopoly power over licenses (where it faces no competition) into modem chipsets (where it often does face competition)."[27] I refer to this theory as Prof. Simcoe's **Licensing Leverage Theory**.

20. In contrast to the Chip Leverage Theory, Prof. Simcoe claims that the effect of the bundling described in his Licensing Leverage Theory is exclusion of rival chip makers from the market for modem chips.[28] He claims that the discriminatory licensing rates (i.e., different rates for OEMs that buy Qualcomm modem chips versus OEMs that do not) supposedly inherent in bundled discounting distorts competition for modem chips.[29] He claims that discrimination "imposes a tax or surcharge on OEMs who want to purchase a license from Qualcomm and modem chip from another supplier."[30]

21. The Licensing Leverage Theory is a theory of discriminatory royalties that is premised on the assumption that Qualcomm offered a high "nominal royalty rate" to potential OEM licensees, and then offered a discount off of this nominal

---

[26] Prof. Simcoe acknowledges that this conduct was disclosed. See Simcoe Report, ¶62.

[27] Simcoe Report, ¶41.

[28] Simcoe Report, Section IV.A.1.

[29] Simcoe Report, ¶90 ("In my opinion, the record strongly supports the conclusion that Qualcomm's discriminatory bundled discounts distorted competition for the supply of cellular modem chipsets.").

[30] Simcoe Report, ¶85. See also Simcoe Report, ¶76.

royalty rate to OEMs that purchased its modem chips, resulting in discriminatory licensing rates.[31] The theory therefore predicts that OEMs that purchased Qualcomm's modem chips would pay lower effective royalty rates—that is, the theory predicts that Qualcomm would charge discriminatory royalties.

22. Prof. Simcoe claims that Qualcomm's bundled discounting could have taken a number of forms, including "side payments," rather than specifically different licensing rates.[32] He claims that Qualcomm used side payments or "incentives to close the 'gap' between what a cellular device manufacturer wanted to pay in negotiating license and chip purchase agreements with Qualcomm and what Qualcomm wanted to charge."[33] These incentives could accrue based on purchases of Qualcomm's chipsets,[34] but "Qualcomm's OEM customers understood that the incentive agreements were simply royalty discounts under a different name."[35]

23. The end result, Prof. Simcoe claims, was that "a customer who signed a license and who also committed to purchase Qualcomm chipsets would pay a lower total royalty (and a lower average royalty rate per unit) than a customer who did not commit to purchase Qualcomm chipsets."[36]

24. Prof. Simcoe references what he calls a "second strand" of the literature on monopoly leveraging, based on Qualcomm's alleged monopoly power in licensing.[37] According to Prof. Simcoe, this "second strand of the literature on monopoly leveraging describes how a regulated monopolist can use bundling to extend its monopoly into an otherwise competitive unregulated market to realize greater profits."[38] Prof. Simcoe claims, "The basic idea is simple. A monopolist that cannot collect the full monopoly profits in its primary market due to price regulation may condition access to its primary product on the

---

[31] Simcoe Report, ¶76 (emphasis in original) ("Qualcomm's basic strategy was to set the nominal royalty rates for licensing its patents at a higher level and offer discounts to OEMs that disputed these rates *if* they agreed to also buy chipsets from Qualcomm."). See also Simcoe Report, ¶72.

[32] Simcoe Report, ¶44 ("Qualcomm utilized multiple strategies to provide device manufacturers with bundled discounts over many years. At various times, Qualcomm's bundled discounts took the form of lower percentage royalty rates, lower 'caps' on the royalty payment per-device, or side payments that were specified in separate contracts negotiated alongside a patent license.").

[33] Simcoe Report, ¶49.

[34] Simcoe Report, ¶49

[35] Simcoe Report, ¶54.

[36] Simcoe Report, ¶44.

[37] Simcoe Report, ¶83.

[38] Simcoe Report, ¶83.

purchase of a second product whose price is not regulated."[39] The "price regulation" Prof. Simcoe is referring to is the FRAND commitment Qualcomm made when contributing its SEPs to the cellular standard.

25. Under Prof. Simcoe's theory of Qualcomm's alleged undisclosed bundling, the "regulated market" would be the market for licenses for Qualcomm's SEPs (i.e., regulated via the FRAND commitment), and the "unregulated market" would be the market for modem chips. Thus, Prof. Simcoe appears to argue that Qualcomm could evade its FRAND commitments by conditioning access to its SEP licenses on the purchase of its modem chips. Doing so, in his view, would allow Qualcomm to charge supra-competitive prices for its modem chips while nominally offering FRAND royalty rates, thereby extracting above-FRAND royalties in a roundabout way. This theory appears to rest on a fundamental misunderstanding or distortion of Qualcomm's practices and the allegations at issue in this litigation. For this theory to apply here, Qualcomm would have had to require licensees to purchase Qualcomm's modem chips. In other words, Qualcomm would have had to undertake a "no chips, no license" practice as opposed to a "no license, no chips" practice. However, based on my review of the record, Qualcomm has not implemented such a practice, no regulator has ever charged Qualcomm with implementing such a practice, and neither Prof. Simcoe nor Plaintiffs point to any evidence that Qualcomm implemented such a practice.

26. Furthermore, Prof. Simcoe fails to acknowledge that this strategy would be unworkable in light of OEMs' ability to purchase modem chips from rival chip makers and the potential to resolve a FRAND dispute through litigation.[40] If Qualcomm were attempting to condition a FRAND license on an OEM's commitment to purchase modem chips at elevated prices, the OEM could simply buy modem chips from rivals at competitive prices and manufacture its end devices. If Qualcomm were to sue the OEM for patent infringement, a court could determine a royalty rate that would be compliant with Qualcomm's FRAND obligation.

27. Finally, Prof. Simcoe neither claims this as a theory of exclusionary conduct, nor does he claim that this affected competition in any modem chip market or any other market. Rather, he presents it solely as a theory of how Qualcomm

---

[39] Simcoe Report, ¶83.

[40] Simcoe Report, ¶35 ("[D]isputes over FRAND (or other aspects of SSO IPR policies) are usually resolved through litigation. . . . When there is a bilateral dispute over terms to a SEP license, many courts require the plaintiff to first show that it owns one or more valid and infringed SEPs.").

could extract monopoly rents if, contrary to the facts, it conditioned access to its SEP licenses on the purchase of its modem chips.

## 4. Bundling and Bundled Discounts Are Generally Good for Consumers and Competition

28. In this section, I briefly describe how economists use the terms bundling and bundled discounts. Then, I discuss common examples of each practice, which illustrate the broader point that bundling and bundled discounts are commonly used in competitive industries. I then present a number of economic explanations for why bundling and bundled discounts are often considered procompetitive, rather than exclusionary. Finally, I explain that regulatory agencies typically consider bundling and bundled discounts to be procompetitive.

29. Prof. Simcoe describes Qualcomm's practices as "bundling." Yet, he fails to offer a comprehensive discussion of bundling as an economic concept. Bundling and bundled discounts are pricing strategies regularly used by firms that sell multiple, often related, products. Although the two pricing strategies are related, they refer to distinct practices.

- A firm is ***bundling*** two products when it sells the products together. The products can be sold only as a bundle (pure bundling), or if also sold separately, sold at a discount when purchased jointly (mixed bundling).[41]
- A firm offers a ***bundled discount*** on two products when it sells the products jointly and separately, but the price for the joint purchase of both products is lower than their individual prices.[42] Bundled discounts are therefore essentially mixed bundles.

[41] Nalebuff, Barry, "Bundling, Tying, and Portfolio Effects," *DTI Economics Paper No. 1*, February 2003, pp. 1–96 ("Nalebuff 2003") at pp. 9, 13, 14. Prof. Simcoe defines "bundling" as "the practice of selling two or more goods together." He further explains that "[b]undles can be sold together in a single package (e.g., a razor with blades) or as separate products with a discount conditioned on the purchase of both products (e.g., a razor sold separately from blades, with a rebate offered on the purchase of both a razor and blades)." See Simcoe Report, ¶39. See also Simcoe Report, ¶32 ("Bundling is another form of price discrimination where buyers choose from a menu of options provided by the seller, but in this case the menu consists of different sets (or 'bundles') of products, rather than different amounts of the same product.").

[42] Nalebuff 2003 at p. 14. Prof. Simcoe defines "bundled discounts" as a situation "when the bundle is offered at a lower price than the individual products." See Simcoe Report, ¶70.

30. Prof. Simcoe claims that "[e]conomists have long recognized that bundling practices like those adopted by Qualcomm can be anti-competitive."[43] Contrary to Prof. Simcoe's claims, bundling and bundled discounts are commonly used in competitive industries and generally considered procompetitive.[44] A few prominent examples illustrate that these practices are commonly used for reasons that are likely unrelated to exclusion:

- A prominent example of a pure bundle is left shoes and right shoes that are only offered as a pair.
- A prominent example of a mixed bundle consists of a PC, a screen, a keyboard, and a mouse. These can either be sold together in a single package as a desktop computer or separately.
- A prominent example of bundled discounts are fast food combo meals that bundle a soft drink, hamburger, and fries. The difference between the total cost of buying the products separately and the price of the bundle is referred to as the "bundled discount." If the price of a combo meal is $5.50 while the total price of purchasing the products separately is $6.25, then the bundled discount is $0.75 ($6.25–$5.50).

31. In line with the examples above, economists have identified a number of procompetitive rationales that explain and predict consumer benefits from companies' use of bundling and bundled discounts:

[43] See Simcoe Report, ¶70.

[44] OECD, "Fidelity and Bundled Rebates and Discounts," 2008 ("OECD 2008") at p. 7 ("Many speakers and many submissions emphasised that bundled discounts and single-product loyalty discounts are common commercial practices that, in most cases, have no anti-competitive purpose or effect."); United States Department of Justice, "U.S. Submission For OECD Roundtable On Bundled And Loyalty Discounts And Rebates," 2008 ("DOJ Submission to OECD") at p. 3 ("Generally, such package discounting is viewed as an efficient means of competing that raises no antitrust concerns."); Evans, David S. and Salinger, Michael, "Why do firms bundle and tie? Evidence from the competitive markets and implications for tying law," *Yale Journal on Regulation*, 22, 2005, pp. 37–89 ("Evans and Salinger 2005") at p. 40 ("Yet casual empiricism suggests that efficiencies must be the major explanation for tying: tying is common in competitive markets and therefore cannot result mainly from foreclosure or from price discrimination."); Muris, Timothy J. and Smith, Vernon L., "Antitrust and Bundled Discounts: An Experimental Analysis," *Antitrust Law Journal*, 75, No. 2, 2008, pp. 399–432 at p. 399 ("Bundling—the sale of two or more distinct goods as a package—is a diverse, ubiquitous, and generally procompetitive pricing practice."); Hovenkamp, Herbert J. and Hovenkamp, Erik, "Complex Bundled Discounts and Antitrust Policy," *Buffalo Law Review*, 57, 2009, pp. 1227–1266 ("Hovenkamp and Hovenkamp 2009") at p. 1228 ("Bundled discounting is an exceedingly common practice in commercial contracts involving suppliers of multiple interrelated products. Unquestionably, a great majority of such discounting practices are competitively harmless and should be lawful."); Carlton, Dennis W., Greenlee, Patrick and Waldman, Michael, "Assessing the Anticompetitive Effects of Multiproduct Pricing," *Antitrust Bulletin*, 53, No. 3, 2008, pp. 587–622 ("Carlton et al. 2008") at p. 587 ("Given that [bundling, tying, and bundled loyalty discounts] often enhance consumer surplus and total welfare, per se condemnation is unwarranted."), p. 622 ("Since bundling and quantity discounts are ubiquitous even in the absence of significant market power, we know that there are underlying procompetitive justifications for them.").

- First, as a general matter, discounts—including bundled discounts—are the hallmark of vigorous competition: consumers benefit as competition drives firms to offer their customers lower prices.[45]
- Second, bundled discounts may reflect socially-beneficial, output-expanding pricing by a firm that sells two complementary products.[46] For example, a restaurant may offer a discount on fries when purchased with a drink because the lower price for fries encourages the additional purchase of a drink.
- Third, bundling and bundled discounts may reflect that a firm has lower costs when it sells multiple products jointly than when selling them separately.[47] For example, it is cheaper to sell an album on one CD than it is to sell a separate CD for each song.
- Fourth, bundling may reflect that it is cheaper for a firm to combine two products than for consumers to do so, and consumers may prefer the combined product to the individual products.[48] For example, consumers

---

[45] OECD 2008 at p. 7 ("Many speakers and many submissions emphasised that bundled discounts and single-product loyalty discounts are common commercial practices that, in most cases, have no anti-competitive purpose or effect."); DOJ Submission to OECD at p. 3 ("As a leading antitrust treatise has stated, 'Discounting is presumptively precompetitive and should be condemned only in the presence of significant market power and proven anticompetitive effects.' ... Generally, such package discounting is viewed as an efficient means of competing that raises no antitrust concerns."); Hovenkamp and Hovenkamp 2009 at p. 1228 ("Bundled discounting is an exceedingly common practice in commercial contracts involving suppliers of multiple interrelated products. Unquestionably, a great majority of such discounting practices are competitively harmless and should be lawful."); Carlton et al. 2008 at p. 590 ("Given our view that bundled discounts are generally procompetitive, we would tolerate the inability of a price cost test to detect all instances of anticompetitive exclusionary conduct.").

[46] Nalebuff 2003 at p. 38 ("For a more modern example, one can think of the two goods as hardware and software or a lift ticket to a ski mountain and ski equipment rentals. . . . The simple intuition is that the lower price of lift tickets stimulates sales of equipment rentals and vice versa. This is because customers care only about the combined price when deciding to make a purchase. When firms set prices independently, this effect is not considered.").

[47] Carlton, Dennis W. and Perloff, Jeffrey M., *Modern Industrial Organization*, Fourth Edition (Reading, MA: Addison Wesley, 2015) ("Carlton and Perloff 2015"), p. 343 ("Tie-in sales may be used to increase efficiency."); Varian, Hal R., *Intermediate Microeconomics: A Modern Approach*, (New York, NY: W. W. Norton & Company, 2010) ("Varian 2010"), p. 474 ("Bundling can be due to cost savings: it is often less expensive to sell several articles stapled together than it is to sell each of them separately."); Nalebuff, Barry, "Bundling as an entry barrier," *The Quarterly Journal of Economics*, February 2004, pp. 159–187 ("Nalebuff 2004") at p. 161 ("Price discrimination and entry deterrence are only two of many reasons to offer a bundled product. Creating cost savings is another (see Salinger [1995]) as is creating a more valuable product."); Nalebuff 2003 at p. 31 ("Perhaps the most obvious reason to bundle two products together is that this leads to a cost saving or quality improvement or both. For example, it is cheaper to deliver a suite of software packages on a single CD than to send out each one separately."); Evans and Salinger 2005 at p. 89 ("Product-specific scale economies are a major factor in making tying efficient"); Evans, David S. and Salinger, Michael, "The Role of Cost in Determining When Firms Offer Bundles," *The Journal of Industrial Economics*, 56, 2008, pp. 143–168 at p. 165 ("Cost effects by themselves can explain a richer set of bundling and tying behavior than had previously been recognized in the formal economics literature.").

[48] Carlton and Perloff 2015, p. 343 ("The same is true of an automobile, which could be regarded as a package including an engine, tires, and a car body. Obviously, each of these products could be sold separately, but because consumers desire assembled products, they come tied together."); Bernheim, Douglas and Whinston, Michael D., *Microeconomics*, (New York, NY: McGraw-Hill/Irwin, 2008) ("Bernheim and Whinston 2008), pp. 694–695 ("For example, one can think of a car as a package consisting of an engine, brakes, headlights, and so forth. Toyota and General Motors sell cars that way because they can assemble the parts more efficiently than

prefer a car to the individual components of a car, and it is cheaper for a car manufacturer to combine the components than it is for consumers.

- And fifth, bundling and bundled discounts may allow firms to target additional purchases by consumers who, absent the practice, would only buy a subset of the products in the bundle. Put differently, bundled discounts can be a type of output-expanding price discrimination.[49] For example, to attract fans who are interested in several football games but only highly value one of them, a team may offer season passes at a discount relative to individual game tickets.

32. Antitrust regulators have also long recognized that bundles and bundled discounts are typically a form of competition rather than an attempt to exclude rivals. For example:

- In a submission to the Organisation for Economic Co-operation and Development ("OECD"), the U.S. Department of Justice ("DOJ") explained that "[t]he practice of sellers offering discounts contingent upon a buyer's purchase of two or more different products is very common and generally benefits consumers."[50] The DOJ further explained that "package discounting is viewed as an efficient means of competing that raises no antitrust concerns."[51]
- In the same submission, the United Kingdom's Office of Fair Trade argued that "[c]onditional discounts can have strong pro-competitive effects by allowing suppliers to price-discriminate and increase output, benefiting consumers," and cites as evidence "the prevalence of conditional discounts amongst smaller firms with limited market power

---

consumers can."); Varian 2010, p. 474 ("Or [bundling] may be due to complementarities among the goods involved: software programs sold in bundles often work together more effectively than off-the-shelf programs."); Nalebuff 2004 at p. 161 ("An obvious explanation for many bundles is that the company can integrate the products better than its customers can."); Nalebuff 2003 at p. 31 ("In the case of automobiles, it is less expensive for the manufacturer to assemble the car than for the customer to purchase the components individually and assemble them at home."); Evans and Salinger 2005 at p. 41 ("Bundling—offering two or more products at a single price—can provide efficiencies such as marginal cost savings, quality improvements, and customer convenience. Bundling enables producers to offer the bundle more cheaply or to provide more value to consumers who want both products.").

[49] Nalebuff 2004 at p. 159 ("The traditional explanation for bundling that economists have given is that it serves as an effective tool of price discrimination by a monopolist[.]"); Nalebuff 2003 at p. 33 ("The majority of the economics literature on bundling has developed the theory of how bundling can be used as a price-discrimination tool by a multi-good monopolist."); Evans and Salinger 2005 at p. 49 ("There are two price discrimination explanations for bundling. The first, from Stigler, is that tying enables firms to extract more consumer surplus from consumers who place different valuations on the separate goods. The second explanation, due to Bowman, is that tying a consumable product to a durable product may help firms charge more for consumers with greater demand for the durable good.").

[50] DOJ Submission to OECD at p. 3.

[51] DOJ Submission to OECD at p. 3.

and no ability to foreclose, such as loyalty cards at coffee shops or free bread served with meals at a restaurant."[52]

- Summarizing, the OECD acknowledges that "bundled and loyalty discounts are common, even among firms with no market power, and they usually reflect efficiencies or the kind of competitive behaviour that competition policy seeks to promote."[53]

33. Because bundling and bundled discounting are widespread practices that are generally procompetitive, even taking Prof. Simcoe's claim that Qualcomm engaged in bundling at face value, the observation that a company like Qualcomm engaged in bundling or bundled discounting does not by itself raise antitrust concerns.

34. While Prof. Simcoe cites to a number of academic papers that present theories of potentially anticompetitive bundling, which may apply in a limited number of specific situations, he has not shown that the assumptions in any of these papers are satisfied here. Therefore, he cannot establish that any of these theories could potentially apply to Qualcomm's alleged bundling.[54] Instead, he makes tautological statements about "exclusionary bundling" that fall far short of demonstrating that practices along the lines of Qualcomm's alleged conduct can be anticompetitive.[55] As I explain below, the theories that Prof. Simcoe presents are internally inconsistent and lack economic and factual support.

## 5. Prof. Simcoe's Multiple Bundling Theories Are Premised on Contrasting Assumptions and Make Conflicting Predictions

35. As I outlined in Section 3, Prof. Simcoe presents multiple theories of Qualcomm's alleged bundling of patent licensing terms with modem chip procurement terms. As I explain in this section, these theories are inherently in conflict with each other. A set of inconsistent and contradictory theories cannot

[52] OECD 2008 at p. 122.

[53] OECD 2008 at p. 7.

[54] Simcoe Report, ¶¶70–75.

[55] For example, Prof. Simcoe argues that "[e]xclusionary bundling can be profitable as long as the incremental profit created through reduced competition exceeds any cost associated with the bundled discounts (where both profit and cost are measured relative to the no-bundling but-for world)," which merely means that a practice is profitable if its benefit exceeds its cost. Similarly, his "simplified example" merely states that "Qualcomm's bundled 'discount' leads to higher prices if B exceeds the 'but for' price level (i.e., when B > F + C)," but does not provide any way to identify when that is the case. See Simcoe Report, ¶¶72, 75.

be combined to provide a reliable framework for analyzing conduct, or for making a showing of likely anticompetitive harm.

36. The Chip Leverage Theory is a theory that Qualcomm's alleged market power in modem chips was used to affect licensing terms and allowed Qualcomm to license at above-FRAND rates. The Licensing Leverage Theory is a theory that Qualcomm used its monopoly power in SEP licenses to affect competition in some modem chip market(s) via bundled discounting. The conflict between these two theories arises because the theories have contrasting assumptions regarding where Qualcomm has market, or monopoly, power, and how Qualcomm is alleged to have used this power. These contrasting assumptions create a conflict between each theory's prediction regarding royalty rates paid by differentially situated OEMs.

37. The key assumptions underlying the two theories differ as follows. As I noted, Prof. Simcoe calls the Licensing Leverage Theory a form of monopoly leveraging.[56] This is a theory whereby Qualcomm allegedly exploits its *monopoly power in licensing* in order to gain a competitive advantage in modem chip market(s). In contrast, the Chip Leverage Theory is a theory whereby Qualcomm allegedly uses its *market power in modem chips* to increase SEP royalty rates to above-FRAND levels.[57] Thus, the two theories are based on contrasting assumptions, or allegations, of where Qualcomm has market, or monopoly power, and where Qualcomm is alleged to be using that market/monopoly power to its advantage.[58] One theory assumes monopoly power in licenses is used to affect modem chip market(s), and the other theory assumes market/monopoly power in modem chip market(s) is used to affect licensing terms.

---

[56] Simcoe Report, Section IV.A.1. See also Simcoe Report, ¶41. Prof. Simcoe states, "Economists use the term 'monopoly leveraging' to describe a situation where a firm with monopoly power in one market exploits that power to obtain a competitive advantage in a second market." See Simcoe Report, ¶74.

[57] It is unclear whether Prof. Simcoe has concluded that Qualcomm had market or monopoly power in modem chips. In some places in his report, Prof. Simcoe claims that Qualcomm had market power in modem chips. See, e.g., Simcoe Report, ¶42 ("because of QCT's market power in some segments of the market for cellular modem chips."). In other places, he claims that Qualcomm had monopoly power in modem chips. See, e.g., Simcoe Report, ¶65 ("[I]f an unlicensed OEM wished to use a chip from a market segment where Qualcomm had a monopoly position…"). The two concepts are not synonymous. The FTC explains that "A 'monopolist' is a firm with significant and durable market power." See "Monopolization Defined," FTC, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined.

[58] Economists typically define market power as the ability of a firm to profitably charge a price above marginal cost. See, e.g., Bernheim and Whinston 2008, p. 623 ("A firm may produce a product that only a few other producers sell, or it may be the only seller of a product for which there are few or no close substitutes. In these circumstances, firms can increase their profit by charging a price that is above marginal cost. When a firm can profitably charge a price that is above its marginal cost, we say that it has market power.").

38. Prof. Simcoe attempts to square this by claiming that the Licensing Leverage Theory results in Qualcomm obtaining market power in modem chips that it then turns around and uses, via the Chip Leverage Theory, to obtain above-FRAND royalty rates.[59] However, Prof. Simcoe's attempt to reconcile his two theories fails because it does not, and cannot, address the conflicting predictions of the two theories regarding royalty rates for OEMs that use Qualcomm modem chips, and OEMs that do not.

39. The Licensing Leverage Theory is a theory of bundled discounting. OEMs that both license Qualcomm's SEPs and buy Qualcomm's modem chips are claimed to be getting an effective royalty rate *discount* relative to if they licensed Qualcomm's SEPs and procured modem chips from one of Qualcomm's rivals. In other words, per the theory, the nominal royalty rate is higher for an OEM that does not buy Qualcomm modem chips versus an OEM that does buy Qualcomm's modem chips.[60] Adopting Prof. Simcoe's notation, the Licensing Leverage Theory assumes that the bundled royalty rate (B–C) is lower than the standalone royalty rate, S (or B–C<S).[61] In contrast, the Chip Leverage Theory is a theory whereby an OEM that both licenses Qualcomm's SEPs and buys Qualcomm's modem chips pays an *inflated* effective royalty rate versus an OEM that does not buy Qualcomm's modem chips, or relative to the royalty rate that the OEM would pay if it did not buy Qualcomm modem chips.[62] In Prof. Simcoe's notation, that means that the bundled royalty rate is higher than the standalone royalty rate, S (or B–C>S).

40. This fundamental conflict undermines Prof. Simcoe's claim that he has established, via economic theory, that Qualcomm has engaged in bundling that "created a very high risk of antitrust regulation or litigation related to exclusionary conduct, FRAND violations, or both."[63]

---

[59] Simcoe Report, ¶15.c ("Bundling enhanced and protected the profits of Qualcomm's chip and licensing businesses by excluding rival chipmakers from the market and leveraging the resulting market power in chips to prevent OEMs from engaging in FRAND litigation.").

[60] Simcoe Report, ¶44 ("In each case, however, a customer who signed a license and who also committed to purchase Qualcomm chipsets would pay a lower total royalty (and a lower average royalty rate per unit) than a customer who did not commit to purchase Qualcomm chipsets.").

[61] In Prof. Simcoe's notation, "'S' represents the price Qualcomm charges for a standalone SEP license[,] 'B' denotes the amount Qualcomm charges for a bundle that also includes a chipset[, and 'C' is the unobserved price] that Qualcomm would charge for chipsets in the absence of bundling." See Simcoe Report, ¶72.

[62] See Simcoe Report, ¶57 ("[W]hen a customer selects Qualcomm as its sole or near-sole supplier of chipsets, that OEM becomes dependent on Qualcomm's supply of chips to sell its cellular devices. This gives Qualcomm a great deal of leverage in license negotiations. If Qualcomm credibly threatens to cut off the supply of chips, a customer must decide between accepting Qualcomm's licensing terms and halting their device sales."), ¶86 ("A credible threat of chip supply disruption will lead prospective licensees to accept rates above a FRAND level.").

[63] Simcoe Report, ¶15.e.

## 6. Prof. Simcoe's Chip Leverage Theory of Antitrust Liability Lacks Economic and Factual Support

41. In Section 3.1, I described Prof. Simcoe's Chip Leverage Theory. Prof. Simcoe states that "Qualcomm used the leverage provided by its chip supply relationships to exert pressure in license negotiations."[64] In Section 5, I explained that this Chip Leverage Theory and his Licensing Leverage Theory rely on contrasting assumptions and make conflicting predictions. In this section, I demonstrate that Prof. Simcoe's Chip Leverage Theory also lacks economic and factual support. First, while Prof. Simcoe claims that Qualcomm had market power in certain "segments of the market for cellular modem chips,"[65] he has not defined the antitrust market nor articulated in which "segment" Qualcomm supposedly had market power (Section 6.1). Nor has Prof. Simcoe demonstrated that Qualcomm had the ability to "threaten" OEMs as his theory assumes (Section 6.2). He has also failed to provide any evidence to support his assertion that Qualcomm charged above-FRAND royalties (Section 6.3). Critically, Prof. Simcoe has not established that a FRAND violation inherently presents a harm to competition (Section 6.4) and has failed to show that bundling, according to his Chip Leverage Theory, could have harmed competition (Section 6.5).

### 6.1. Prof. Simcoe Has Not Defined Any Modem Chip Market in Which Qualcomm Had Market Power or in Which Competition Could Have Been Harmed

42. Prof. Simcoe opines that "[m]any OEMs require access to QCT chips because of design commitments, or because of QCT's market power in some segments of the market for cellular modem chips."[66] Yet, Prof. Simcoe has failed to undertake the basic analysis purporting to study market power: he has neither defined any relevant modem chip market, nor has he articulated the "segments of the market for cellular modem chips" in which he claims Qualcomm held market power. Rather, Prof. Simcoe simply asserts that

---

[64] Simcoe Report, ¶58.

[65] Simcoe Report, ¶42.

[66] Simcoe Report, ¶42. See also Simcoe Report, ¶19 ("Qualcomm's QCT division is a leading supplier of smartphone chips in the world market. Although Qualcomm has, at times, held a near monopoly in some key segments of the global market for cellular modem chipsets[.]"). In footnote 57 above, I further noted that in some places in his report, Prof. Simcoe claims that Qualcomm had market power in modem chips, and in other places he claims that Qualcomm had monopoly power in modem chips.

Qualcomm has market power in some undefined segment of an undefined market for cellular modem chips while failing to conduct any analysis to support either of these claims.

## 6.2. Prof. Simcoe Has Not Established That Qualcomm Had the Ability to Effectively "Threaten" OEMs

43. Prof. Simcoe's Chip Leveraging Theory is premised on the assumption that Qualcomm held market power over OEMs and that this market power gave Qualcomm the ability to "threaten" OEMs with loss of modem chip supply in order to extract above-FRAND royalties. Yet, Prof. Simcoe has failed to conduct any analysis to establish that Qualcomm held the requisite market power to "threaten" OEMs. Rather, he merely notes that "Qualcomm was the largest cellular modem chip supplier,"[67] but this statement does not establish that Qualcomm was able to effectively "threat[en] to cut-off chip supply" or make any OEM "unable to sell devices."[68]

44. An analysis of Qualcomm's share of WCDMA modem chip sales demonstrates the flaw in Prof. Simcoe's Chip Leverage Theory. Exhibit 1 below demonstrates that, while "Qualcomm was the largest [WCDMA] cellular modem chip supplier" from 2009 through 2013, OEMs could, and many did, purchase modem chips from other chip makers.[69] Specifically, Qualcomm's share of WCDMA modem chip sales was below 40 percent in each year from 2008 through 2010 and did not exceed 50 percent at any point in time.

45. Exhibit 1 demonstrates that OEMs wishing to make a WCDMA device had many options for sourcing their modem chips. Consequently, Prof. Simcoe's Chip Leverage Theory does not apply to Qualcomm's WCDMA-only license agreements and cannot explain any above-FRAND royalty rate in these agreements. Furthermore, given that Qualcomm's WCDMA and CDMA license agreements have the same royalty rate of 5 percent, Prof. Simcoe's Chip

---

[67] Simcoe Report, ¶25.

[68] Simcoe Report, ¶65.

[69] Simcoe Report, ¶25 and fn. 19.

Leverage Theory also fails to establish that Qualcomm's royalty rates for CDMA licenses were above FRAND.[70]

***EXHIBIT 1***
***WCDMA Modem Chip Sales Shares by Year (2008–2013)***




Source: Strategy Analytics, "Baseband Market Share Tracker Q1 2018," June 2018
Note: Strategy Analytics reports unit sales by OEM on a quarterly basis. Strategy Analytics reports sales based on the highest order air interface supported by a modem chip. This analysis therefore only includes modem chips where WCDMA is the highest order air interface.

46. Prof. Simcoe seems to suggest that Qualcomm's ability to threaten OEMs may not come from Qualcomm's market power, but rather from OEMs'

[70] I understand that Qualcomm's royalty rate has been 5 percent for its CDMA and WCDMA licenses. See, e.g., "Overview of Qualcomm License Agreements," May 1, 2015, Q2017MDL1_03097135 ("Overview of Qualcomm License Agreements") at 41 ("Almost all of Qualcomm's SULAs granting a license for Subscriber Units that implement CDMA-based standards contain the same royalty structure. Licensees pay a royalty of: . . . 5.0%, if the licensee sells more than 100,000 Subscriber Units in the quarter."). See also Overview of Qualcomm License Agreements at 40 ("For many years, licensees who wished to implement CDMA-based technologies have had the option to select (a) a license limited to devices that implement CDMA2000 and its evolutions, (b) a license limited to other CDMA-based standards such as UMTS (which includes WCDMA and/or TD-SCDMA) and their evolutions, or (c) a license covering all CDMA-based standards (i.e., (a) and (b)).") I also understand that royalties for LTE devices that support CDMA or WCDMA standards are paid pursuant to a CDMA/WCDMA license.

"commit[ment] to use a specific modem chipset within a device, making it costly and time-consuming to switch suppliers," which "gives Qualcomm a great deal of leverage in license negotiations."[71] This claim is flawed for at least three reasons.

47. First, Prof. Simcoe has not explained how the alleged "threat to withhold chip supply" during license negotiations is anything other than Qualcomm communicating its previously disclosed practice of selling modem chips only to licensed OEMs, which the FTC referred to as Qualcomm's "no license, no chips" policy.[72] Prof. Simcoe has not and cannot distinguish the conduct underlying his Chip Leverage Theory from the disclosed "no license, no chips" practice underlying the At-Issue Complaints.[73]

48. Second, Prof. Simcoe's argument of leverage from "threat to cut-off chip supply" is flawed because it assumes, without any basis, that a *licensed* OEM cannot simultaneously purchase modem chips from Qualcomm and bring a FRAND challenge. This claim ignores that, if a licensed OEM views Qualcomm's offer for a new license to be inconsistent with FRAND, it could maintain its modem chip supply while also contesting the proposed terms in the new license, as long as it continued to pay royalties under the existing license.[74] Prof. Simcoe has failed to provide an explanation or a rationale for why OEMs could not do that. Prof. Simcoe has failed to present any evidence (and I am unaware of any evidence in the record) of Qualcomm ceasing to supply modem chips or threatening to cease the supply of modem chips to OEMs while the OEM has a license in existence and is complying with its royalty and other obligations under its license agreement.[75]

49. Third, Prof. Simcoe's argument appears to rest on the assumption that OEMs are either myopic or irrational. Prof. Simcoe claims that OEMs "commit

---

[71] Simcoe Report, ¶57.

[72] Simcoe Report, ¶86. See also Simcoe Report, Section III.A.2 ("Qualcomm Threatened To Withhold Chipsets During License Negotiations").

[73] Prof. Simcoe himself states that "if an unlicensed OEM wished to use a chip from a market segment where Qualcomm had a monopoly position, the 'no license, no chips' policy functioned exactly the same as a threat to cut-off chip supply—it forced OEMs to enter a license on Qualcomm's terms or be unable to sell devices." See Simcoe Report, ¶65.

[74] Simcoe Report, ¶65. See also Simcoe Report, ¶86.

[75] Prof. Simcoe discusses Qualcomm's negotiations with Sony as his main example of a threat by Qualcomm to cut off OEMs' modem chip supply. Sony's example cannot be generalized because Sony's unlicensed status was unanticipated. Sony had a joint venture with Ericsson and paid royalties pursuant to Ericsson's license agreement, and Sony became unlicensed for WCDMA devices after its joint venture with Ericsson dissolved. See "Sony Completes Full Acquisition of Sony Ericsson Sony to Rename the Company Sony Mobile Communications and Accelerate Business Integration," Sony Press Release, February 16, 2012, available at https://www.sony.net/SonyInfo/News/Press/201202/12-025E/; Simcoe Report, ¶¶58–59.

to use a specific modem chipset within a device, making it costly and time-consuming to switch suppliers," which "gives Qualcomm a great deal of leverage in license negotiations."[76] Yet, given Qualcomm's disclosed practice of selling modem chips only to licensed OEMs, and given the evidence presented above that OEMs *had other options for modem chips*, an OEM would rarely find itself in the position Prof. Simcoe posits unless it failed to recognize the fact that it would need a new license prior to its next design decision. Furthermore, because an OEM would know when its license expires and/or when a new generation of the cellular standards will be deployed, the OEM could strategically reduce its "dependence" on Qualcomm's modem chips in anticipation of licensing negotiations.

## 6.3. Prof. Simcoe Has Not Established That Qualcomm Charged an Above-FRAND Royalty Rate

50. Prof. Simcoe claims that by using "leverage in license negotiations," Qualcomm is able to prevent OEMs from bringing a FRAND litigation and thus obtain an above-FRAND royalty rate.[77] However, Prof. Simcoe has not established that Qualcomm used any leverage to obtain above-FRAND royalty rates, or that the royalty rates in Qualcomm's license agreements were above FRAND. Without showing that the basic premise of his Chip Leverage Theory holds, Prof. Simcoe's theory remains nothing more than a theoretical conjecture based on unsupported assumptions.[78]

51. First, despite arguing that Qualcomm's rates were above FRAND, Prof. Simcoe neither cites to any evidence nor makes any attempt to estimate a FRAND rate for any of Qualcomm's licenses.[79] Hence, Prof. Simcoe has no basis to claim that the royalty rate in any of Qualcomm's license agreements has been above FRAND.

---

[76] Simcoe Report, ¶57.

[77] Simcoe Report, ¶¶57, 86 ("A credible threat of chip supply disruption will lead prospective licensees to accept rates above a FRAND level."). See also Simcoe Report, ¶84.

[78] Critically, Prof. Simcoe has not only failed to provide any evidence that Qualcomm's royalty rates are above FRAND, he has also failed to point to a finding of above-FRAND royalty rates by any final arbiter of the At-Issue Complaints.

[79] I provide no opinion on whether a "FRAND rate" exists or what the "FRAND rate" for Qualcomm's portfolio would have been if a court were to determine that there was such a thing as a "FRAND rate." I refer to a "FRAND rate" only to highlight that Professor Simcoe makes an assertion that Qualcomm's royalty rates have been above FRAND without any support for what Qualcomm's FRAND rate would be. See Simcoe Report, ¶¶72, 86.

52. Second, Prof. Simcoe has not provided any evidence that Qualcomm obtained a higher royalty rate in license negotiations in which it had more "leverage" compared to negotiations in which it did not. Prof. Simcoe conceded that Qualcomm "often does face competition" in modem chips, meaning that it often does not have "leverage" in modem chips and therefore cannot obtain an above-FRAND royalty rate.[80] As Prof. Simcoe acknowledged, Qualcomm cannot charge an above-FRAND rate in a situation where the modem chip market is already competitive.[81]

53. In particular, Prof. Simcoe's Chip Leverage Theory cannot explain how Qualcomm could have "forced" OEMs that did not purchase any modem chips from Qualcomm, including any new licensee, to agree to a license agreement on non-FRAND terms. Similarly, it cannot explain how Qualcomm could have "forced" OEMs that purchased a relatively small share of their modem chips from Qualcomm or had alternative options for modem chips to agree to a license agreement on non-FRAND terms. For example, Prof. Simcoe's theory does not apply to Apple between 2007 and 2011 because Apple did not sell devices with Qualcomm modem chips until 2011.[82] Similarly, Prof. Simcoe's theory cannot apply to the OEMs, including LG and Samsung, that entered CDMA licenses with Qualcomm before Qualcomm began selling modem chips.[83] His Chip Leverage Theory also cannot explain why an OEM like Samsung, that can self-supply its modem chips, would agree to an above-FRAND royalty rate.[84] Furthermore, Prof. Simcoe's theory cannot explain how

---

[80] Simcoe Report, ¶41.

[81] Simcoe Report, ¶65 ("[I]f an unlicensed OEM wished to use a chip from a market segment ***where Qualcomm had a monopoly position***, the 'no license, no chips' policy functioned exactly the same as a threat to cut-off chip supply—it forced OEMs to enter a license on Qualcomm's terms or be unable to sell devices.") (emphasis added).

[82] See, e.g., "Qualcomm chip in Verizon iPhone," The San Diego Union-Tribune, February 8, 2011, available at https://www.sandiegouniontribune.com/sdut-qualcomm-chip-in-verizon-iphone-2011feb08-story.html ("Qualcomm hasn't had a chip in the iPhone before. . . . Apple used Infineon, which recently sold its wireless business to Intel.").

[83] The first CDMA network was launched in 1995. See "Our Company," Qualcomm, available at https://www.qualcomm.com/company ("1995: CDMA rolled out commercially"). Samsung and LG signed CDMA license agreements in 1993. See "Infrastructure and Subscriber License and Technical Assistance Agreement," agreement between Qualcomm and Samsung Electronics Co., August 31, 1993, Q2017MDL1_02928988; "Infrastructure and Subscriber License and Technical Assistance Agreement," agreement between Qualcomm and Goldstar Information & Communications, Ltd., August 31, 1993, Q2017MDL1_02717201.

[84] See, e.g., "Tailored for the 5G era," Samsung, available at https://semiconductor.samsung.com/us/processor/modem/.

Qualcomm was able to obtain above-FRAND rates when it faced substantial competition, as it did for WCDMA.[85]

54. Third, Prof. Simcoe's claim that Qualcomm charges above-FRAND rates is inconsistent with the fact that Qualcomm's royalty rates were relatively constant for over two decades, including before the relevant standards were set. Specifically, Qualcomm's royalty rates in license agreements that were signed prior to the CDMA standard being adopted reflected the same royalty rates as those signed after it was adopted.[86] Licenses that were signed prior to a standard being adopted literally satisfied the *ex ante* definition of FRAND that Prof. Simcoe endorses.[87] Hence, Prof. Simcoe cannot argue that Qualcomm's licensing terms, which literally satisfy the *ex ante* definition of FRAND, are above-FRAND. Given that some of Qualcomm's license agreements literally satisfied the *ex ante* FRAND definition, Prof. Simcoe has failed to explain how other licenses with the same terms could be inconsistent with FRAND.

## 6.4. Prof. Simcoe Has Not Established That a FRAND Violation Is Anticompetitive or That It Is Expected to Lead to an Antitrust Action

55. Prof. Simcoe claims that "bundling license and chip negotiations provides Qualcomm with the stick of a threat to withhold chip supply from OEMs who refuse its terms" and that "[a] credible threat of chip supply disruption will lead

---

[85] Prof. Simcoe acknowledges that Qualcomm "often does face competition" to its modem chips. See Simcoe Report, ¶41. I understand that Qualcomm's royalty rate has been 5 percent for its CDMA and WCDMA licenses. See, e.g., Overview of Qualcomm License Agreements at 39 ("Almost all of Qualcomm's SULAs granting a license for Subscriber Units that implement CDMA-based standards contain the same royalty structure. Licensees pay a royalty of: . . . 5.0%, if the licensee sells more than 100,000 Subscriber Units in the quarter.").

[86] I understand that between January 1990 and July 1993, five companies, including AT&T, Motorola, and Nokia, signed CDMA license agreements with Qualcomm. See Overview of Qualcomm License Agreements at 40 ("Qualcomm has used this royalty rate structure for CDMA-based standards since its licensing program began in the 1990s. At that time, no CDMA-based technology had yet been standardized. The earliest licensees, such as Motorola and AT&T, were sophisticated, entrenched participants in the industry, and were well-equipped to understand the value that Qualcomm's CDMA technology delivered. Thus, these agreements reflect the value that interested industry participants placed on Qualcomm's technology before standardization. Qualcomm has continued to enter into CDMA-based licenses using this same royalty structure, with nearly all of its licensees, large and small, with very few exceptions."; "Qualcomm's early agreements with Motorola and AT&T had a [redacted] of subscriber equipment. This rate reflected the early investment made by Motorola and AT&T to help fund Qualcomm's R&D program in CDMA, and also the investments and risks that AT&T and Motorola would have to take in order to bring this new technology to the market. These agreements anticipated that a royalty rate of 5% would be granted to later licensees that did not share in the early risks taken by Motorola and AT&T."). The CDMA standard was adopted by the Telecommunications Industry Association (a standard setting organization) in July 1993. See "Commonalities between CDMA2000 and WCDMA Technologies," Qualcomm, October 2006, available at https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Commonalities_CDMA2000_WCDMA_wp.pdf, p. 4.

[87] Simcoe Report, ¶31.

prospective licensees to accept rates above a FRAND level."[88] Prof. Simcoe further claims that "Qualcomm's bundling created a very high risk of antitrust regulation or litigation related to . . . FRAND."[89] However, contrary to Prof. Simcoe's claim, even if an above-FRAND rate occurs, this does not in and of itself change competitive conditions in a way that would result in competitive harm.[90]

56. First, Prof. Simcoe has failed to explain why, absent a showing that a particular FRAND violation could harm competition, there would be a reason to assume it would raise antitrust concerns.[91] Furthermore, given that Prof. Simcoe has not shown that the alleged FRAND violation could have harmed competition, he has no basis to conclude that it was expected to lead to any antitrust action.

57. Second, Prof. Simcoe acknowledges that there is no "automatic" antitrust concern associated with a FRAND violation. He acknowledges that "disputes over FRAND (or other aspects of SSO IPR policies) are usually resolved through [patent or contract] litigation" (rather than via regulatory antitrust action) and that only "***some*** FRAND violations have been prosecuted as antitrust claims."[92] That is, according to Prof. Simcoe, in certain situations a FRAND violation may be associated with antitrust concerns and lead to antitrust litigation. Yet, Prof. Simcoe has failed to articulate a situation in which an above FRAND royalty rate could lead to an antitrust concern nor has he demonstrated (or even attempted to demonstrate) that Qualcomm's conduct aligned with such unstated situations.[93] Furthermore, I understand that it is not the case that all

---

[88] Simcoe Report, ¶86.

[89] Simcoe Report, ¶15.e.

[90] In his discussion of the non-discriminatory aspect of a FRAND commitment, Prof. Simcoe recognizes the importance of analyzing whether the terms lead to a change in competitive conditions in the downstream market. Yet, in his discussion of whether a FRAND violation, in and of itself, is an antitrust violation, he fails to consider whether there is or could be a change in competition. Specifically, Prof. Simcoe notes that "nondiscriminatory rates are those that do not distort downstream competition—they foster a level playing field for downstream competitors. While non-discrimination does not necessarily require a single uniform price or price structure, it does require that price differences do not affect competition." See Simcoe Report, ¶34.

[91] For example, the FTC explains that "for over 100 years, the antitrust laws have had the same basic objective: to protect the process of competition for the benefit of consumers, making sure there are strong incentives for businesses to operate efficiently, keep prices down, and keep quality up." See "The Antitrust Laws," FTC, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/antitrust-laws.

[92] Simcoe Report, ¶¶35–36 (emphasis added).

[93] Qualcomm has disclosed to investors that its customers have claimed that Qualcomm's royalty rates were not FRAND. See Qualcomm Incorporated, SEC Form 10-K for the fiscal year ended September 29, 2013, filed on November 6, 2013, p. 16 ("Some manufacturers and users of standard-compliant products advance interpretations of these FRAND commitments that are adverse to our licensing business, including interpretations that would limit the amount of royalties that we could collect on the licensing of our patent portfolio."). Prof. Simcoe has not established that, to the extent that Qualcomm's alleged conduct led to above FRAND royalty rates, such FRAND violation would have heightened the risk of antitrust enforcement.

FRAND violations raise competitive concerns and are prosecuted as antitrust claims.

58. Finally, Prof. Simcoe ignores that in its opinion granting Qualcomm's appeal in the FTC case, the Ninth Circuit explicitly stated that "the general rule [is] that breaches of SSO commitments do not give rise to antitrust liability."[94]

### 6.5. Prof. Simcoe Has Not Established That "Bundling" According to His Chip Leverage Theory Could Have Caused Anticompetitive Harm

59. As I explained above, Prof. Simcoe claims—without showing—that Qualcomm was able to use its alleged leverage in modem chips to obtain above-FRAND royalty rates. However, even assuming that Qualcomm was able to obtain above-FRAND royalty rates, Prof. Simcoe has not established that the allegedly elevated royalty rates could have caused anticompetitive harm.

60. First, Prof. Simcoe has not shown that above-FRAND royalties would harm consumers via higher prices.[95] The economic theory of "one monopoly rent" indicates that a monopolist cannot charge a monopoly price in a market it monopolizes and at the same time collect additional rents in another market.[96] In this case, the one monopoly rent theory predicts that if Qualcomm were to use its alleged market power or "leverage" in modem chips to obtain a higher royalty rate, it would not be able to also use all of its market power and charge a "full price" for its modem chips. Put differently, in order for Qualcomm to get an OEM to agree to pay a higher royalty rate, Qualcomm would have to reduce its modem chip prices. In fact, because the royalties apply to all devices produced by the OEM (including those that use a Qualcomm or a rival's modem chip), Qualcomm would likely have to reduce its modem chip prices by *more* than one-to-one for the OEM to accept a license agreement with an elevated

---

[94] Opinion, *United States Court of Appeals for the Ninth Circuit, FTC v. Qualcomm Incorporated*, August 11, 2020 ("Ninth Circuit FTC v. Qualcomm Opinion"), p. 39.

[95] As I explain below, Prof. Simcoe's Chip Leverage Theory also does not establish any long-run harm to competition.

[96] See, e.g., Whinston, Michael D., "Tying, Foreclosure, and Exclusion," *The American Economic Review* 80, No. 4, 1990, pp. 837–859 at p. 837 ("Suppose that a firm is a monopolist of some good *A* that a consumer values at level $v_A$ and that costs $c_A$ to produce. The consumer also consumes some other competitively supplied product *B* that she values at level $v_B$ and that can be produced at a unit cost of $c_B$. Now, the monopolist *could* require the consumer to purchase good B from him if she wants good *A*, but what will he gain? The consumer will only purchase such a bundle if its price is no larger than $v_A + c_B$, and so the monopolist can do no better than earning $(v_A - c_A)$, the level he earns selling good *A* independently. In short, there is only one monopoly profit that can be extracted.").

royalty rate. Thus, even if the premise of Prof. Simcoe's theory were true, his theory does not predict short-run harm to consumers.

61. Second, because Prof. Simcoe's Chip Leverage Theory cannot establish harm to competition in any modem chip market, it cannot establish any long-run harm to competition.[97] Prof. Simcoe has not explained how Qualcomm's royalties, which are the same regardless of whether the OEM uses Qualcomm's or a rival's modem chips, would be exclusionary.[98] Furthermore, he has cited no evidence that any OEM had a license with royalty rates that depended on the modem chip manufacturer after 2010, and I am not aware of any such evidence.[99] An OEM that signed a license agreement with Qualcomm, even assuming that the rate is above FRAND, would be indifferent to buying a modem chip from Qualcomm or from a rival. Hence, Qualcomm's license agreements do not prevent competition on the merits between modem chip makers and are not exclusionary. The lack of competitive effect is further

---

[97] Qualcomm cannot use modem chip leverage to exclude competitors for licensing its SEPs. See Simcoe Report, ¶21 ("When Qualcomm's technology is chosen to be included in a cellular standard, no other company can provide a license to use Qualcomm's SEPs.").

[98] As I explain in Section 7.2 below, Prof. Simcoe incorrectly characterizes procompetitive modem chip discounts as discriminatory royalties and has not shown that royalty discounts on devices that use Qualcomm modem chips are exclusionary.

[99] I understand that for many years Qualcomm's license agreements included royalty rates that did not depend on whether the OEM purchased modem chips from Qualcomm or a rival chip maker. There are a few exceptions in which the royalty rates depended on the whether or not the OEM used a Qualcomm modem chip. One exception is the "Chinese Framework" agreements which required Qualcomm to enter into license agreements with certain government-selected manufacturers on specified terms in return for the Chinese government approval of the use of CDMA technology in China . See Qualcomm Presentation, "Overview of Issues Relevant to FTC Questions Concerning Qualcomm's Licensing Business," February 20, 2015, Q2017MDL1_02021163 ("FTC Licensing Presentation"), p. 11 ("In return for approving the use of CDMA technology in China, the Chinese government required Qualcomm to enter into license agreements with certain government-selected manufacturers on specified terms. . . . The condition that the Framework Licensees buy all of their CDMA2000 modem chips from Qualcomm was rarely enforced and is now a dead letter."). A second exception is Qualcomm's early Korean agreements that Qualcomm entered into in connection with the Korean government's approval of CDMA, which resulted in a specific terms. See FTC Licensing Presentation, p. 12 ("In connection with approving the use of CDMA in the 1990s, the Korean government required Qualcomm to enter into joint license negotiations with certain government-selected manufacturers, which resulted in a set of Korea-standard terms. . . . Since 2009, no Korean manufacturer has paid lower royalties on devices that incorporate a Qualcomm chip versus a non-Qualcomm chip."). [redacted] See FTC Licensing Presentation, p. 10 ("Qualcomm's royalty caps do not vary depending on what chip an OEM uses."); Overview of Qualcomm License Agreements at 39 ("Royalty caps for the applicable types of products are generally put into effect by letters that Qualcomm voluntarily sends to its licensees."); See, e.g., Letter from Derek Aberle (Former President of Qualcomm) to Shinji Ina (Sony Corporation), "Re: That certain Subscriber Unit License Agreement between QUALCOMM Incorporated ('QUALCOMM') and Sony Corporation ('LICENSEE') dated 9/27/1996, as amended (the 'License Agreement')," July 23, 2010, QNDCAL04400458 ("Under this revised voluntary royalty cap program the Twenty-Five U.S. Dollars (US$25) royalty cap applies regardless of the chipset used in such Subscriber Unit."). See also Ninth Circuit FTC v. Qualcomm Opinion, p. 50 ("'no license, no chips' is chip-neutral: it makes no difference whether an OEM buys Qualcomm's chip or a rival's chips.").

demonstrated by the entry of modem chip rivals, including Intel and MediaTek, during the class period.[100]

62. Finally, Prof. Simcoe ignores that the Ninth Circuit rejected the FTC's theory—which he adopts throughout his report—that Qualcomm's alleged elevated royalties caused anticompetitive harm in any modem chip market. The Ninth Circuit found that "the district court's 'anticompetitive surcharge' theory fails to state a cogent theory of anticompetitive harm" and that "even if we were to accept the district court's conclusion that Qualcomm's royalty rates are unreasonable, we conclude that the district court's surcharging theory still fails as a matter of law and logic."[101] Despite citing to documents and arguments that the FTC presented in that case, Prof. Simcoe ignores the fact that those arguments ultimately failed to support the FTC's claim of anticompetitive harm.[102]

63. Accordingly, for the reasons I stated in Sections 6.1 to 6.5, it is my opinion that Prof. Simcoe's Chip Leverage Theory lacks economic and factual support.

## 7. Prof. Simcoe's Licensing Leverage Theory of Antitrust Liability Lacks Economic and Factual Support

64. In Section 3.2, I described Prof. Simcoe's Licensing Leverage Theory. According to Prof. Simcoe, "by linking discounts to the purchase of a SEP-plus-chip bundle, Qualcomm can price discriminate between QCT customers and customers of rival chip producers, effectively charging a higher royalty to the latter group. Bundling thereby allows Qualcomm to extend its monopoly power over licenses (where it faces no competition) into modem chipsets (where it often does face competition)."[103] In Section 5, I explained that this Licensing Leverage Theory and his Chip Leverage Theory rely on contrasting assumptions and make conflicting predictions. In this section, I demonstrate that Prof. Simcoe's Licensing Leverage Theory lacks economic and factual support. First,

---

[100] Ninth Circuit FTC v. Qualcomm Opinion, p. 37 ("The FTC's conclusion that OEM-level licensing does not further competition on the merits is not only belied by MediaTek and Intel's entries into the modem chip markets in the 2015–2016 timeframe, it also gives inadequate weight to Qualcomm's reasonable, procompetitive justification that licensing at the OEM and chip-supplier levels simultaneously would require the company to engage in 'multi-level licensing,' leaving to inefficiencies and less profit."). See also Section 8.

[101] Ninth Circuit FTC v. Qualcomm Opinion, pp. 41–42.

[102] Simcoe Report, ¶67; Simcoe Report, Section IV.C.4. See also, e.g., Simcoe Report, ¶¶27, 36, 79; Simcoe Report, fns. 60–61, 80, 92, 108–112, 120.

[103] Simcoe Report, ¶41.

Prof. Simcoe's Licensing Leverage Theory is flawed because it ignores the possibility of an OEM bringing a FRAND challenge (Section 7.1). In addition, Prof. Simcoe incorrectly characterizes procompetitive modem chip discounts as anticompetitive bundling (Section 7.2) and confuses exclusive dealing with bundled discounts (Section 7.3). Furthermore, as I demonstrate in Section 8 below, Prof. Simcoe has failed to examine whether Qualcomm's alleged bundling caused competitive harm in any modem chip market and ignores evidence that it did not.

## 7.1. Prof. Simcoe's Licensing Leverage Theory Is Flawed Because It Ignores OEMs' Ability to Bring a FRAND Challenge

65. Prof. Simcoe's Licensing Leverage Theory assumes that Qualcomm could extend its alleged monopoly power in SEPs to modem chips by engaging in discriminatory, exclusionary bundling. This theory is premised on the assumption that Qualcomm gains modem chip sales by setting a high "nominal royalty rate" to potential OEM licensees and then offers discounts off the nominal royalty rate to OEMs that purchase its modem chips.[104] Prof. Simcoe suggests (without providing any evidence) that the standalone "nominal royalty rate" is above FRAND.[105] Prof. Simcoe then claims that "[t]he higher royalty rates for an unbundled patent license acted as a 'tax' on OEMs that chose to purchase from rival chipmakers, but not Qualcomm's customers who received the bundled discount."[106]

66. Prof. Simcoe's theory is flawed because it is based on the assumption that an OEM's only recourse to paying the allegedly inflated nominal royalty rate is to accept the bundle. Yet, Prof. Simcoe acknowledges that OEMs can respond to allegedly elevated nominal royalty rates by bringing a FRAND challenge.[107] This implies that Qualcomm's ability to leverage its monopoly power over SEP licensing is limited by its FRAND commitment. And indeed, Prof. Simcoe

[104] Simcoe Report, ¶76 (emphasis in original) ("Qualcomm's basic strategy was to set the nominal royalty rates for licensing its patents at a higher level and offer discounts to OEMs that disputed these rates *if* they agreed to also buy chipset from Qualcomm."). See also Simcoe Report, ¶72.

[105] Prof. Simcoe offers a "simplified example" of exclusionary bundling that assumes the standalone license rate of S is above his assumed FRAND rate of F. See Simcoe Report, ¶72. In addition, Prof. Simcoe argues that Qualcomm offers discounts to "OEMs that dispute" the high royalty rates, which again suggests he is arguing that the nominal rates are above FRAND. Simcoe Report, ¶76. I offer no opinion on the meaning of the FRAND declaration, but only highlight the lack of evidence that (or to what extent) such an above-FRAND rate exists.

[106] Simcoe Report, ¶76.

[107] Simcoe Report, ¶42.

argues that Qualcomm is limited by its FRAND commitment.[108] That is, if Qualcomm attempted to charge a standalone above-FRAND rate (S, in Prof. Simcoe's notation), then OEMs would have an option to bring a FRAND challenge and seek a court-ordered royalty rate.[109] The OEM can also use a rival's modem chip and wait for Qualcomm to sue it ("patent hold out") and then adjudicate the FRAND rate.[110] Hence, Qualcomm cannot simply raise its nominal royalty rate to above-FRAND levels and then offer supposed exclusionary "bundled discounts" off of that rate to OEMs that also buy its modem chips.

67. Prof. Simcoe appears to recognize the flaw in his Licensing Leverage Theory and attempts to fix it by arguing that "[b]undling enhanced and protected the profits of Qualcomm's chip and licensing businesses by excluding rival chipmakers from the market and leveraging the resulting market power in chips to prevent OEMs from engaging in FRAND litigation."[111] That is, he seems to argue that Qualcomm used licensing leverage to obtain modem chip market power and then used this modem chip market power to prevent FRAND challenges (per his Chip Leverage Theory), which in turn allowed for above-FRAND royalty rates.

68. However, such a circular claim ignores that his Licensing Leverage Theory requires that the nominal royalty rate be greater than the bundled royalty rate while the Chip Leverage Theory requires that the bundled royalty rate be greater than the standalone royalty rate. Specifically, Prof. Simcoe's Licensing Leverage Theory is premised on the assumption that Qualcomm begins with an above-FRAND *nominal* royalty rate and then gives discounts to OEMs that purchase modem chips: under Prof. Simcoe's Licensing Leverage Theory, Qualcomm must provide an incentive, in the form of a discount off of the above-FRAND nominal royalty rate, to get OEMs to purchase its modem chips (i.e., the theory is premised on the assumption that, absent the licensing leverage, OEMs would *not* purchase Qualcomm modem chips). Yet, under Prof. Simcoe's Chip Leverage Theory, the supposed modem chip leverage only allows Qualcomm to charge an above-FRAND royalty to OEMs that view

---

[108] Simcoe Report, ¶¶66, 84.

[109] Simcoe Report, ¶76 ("Qualcomm's basic strategy was to set the nominal royalty rates for licensing its patents at a higher level and offer discounts to OEMs that disputed these rates *if* they agreed to also buy chipsets from Qualcomm."). See also Simcoe Report, ¶72.

[110] See, e.g., Chien, Colleen V., "Holding Up and Holding Out," *Michigan Telecommunications and Technology Law Review*, Vol. 21, 1, Fall 2014, pp. 1–41 at p. 1 ("Patent 'hold-out' is the practice of companies routinely ignoring patents and resisting patent owner demands because the odds of getting caught are small.").

[111] Simcoe Report, ¶15.c.

Qualcomm's modem chips to be necessary, implying they "accept the bundle": it does not provide a mechanism through which Qualcomm could increase the nominal royalty rate for all OEMs, including those over which it has no modem chip leverage. Thus, even if Qualcomm had modem chip leverage over some OEMs, the use of this modem chip leverage would not result in the *nominal* royalty rate for all OEMs increasing. To the contrary, the nominal royalty rate, as discussed above, is constrained by the possibility of an OEM bringing a FRAND challenge or "holding out" knowing it can obtain an adjudicated FRAND rate.[112] Thus, because the Licensing Leverage Theory requires the bundled royalty rate to be below the nominal royalty rate, the bundled royalty rate is also constrained by the possibility of a FRAND challenge. Therefore, Prof. Simcoe's attempt to rely on his Chip Leverage Theory to obtain above-FRAND royalty rates fails.

## 7.2. Prof. Simcoe Incorrectly Characterizes Procompetitive Modem Chip Discounts as Anticompetitive Bundling

69. Prof. Simcoe's Licensing Leverage Theory posits that the alleged bundling led to "discriminatory licenses" that harmed rival chip makers' ability to compete with Qualcomm. Specifically, he claims that "[t]he higher royalty rates for an unbundled patent license acted as a 'tax' on OEMs that chose to purchase from rival chipmakers, but not Qualcomm's customers who received the bundled discount. Because OEMs pay the total price of the two components (chipset plus patent license), Qualcomm's bundling placed rival chipmakers in the position of having to match a discount that most OEMs viewed as a royalty reduction, or risk losing a sale."[113]

70. Prof. Simcoe claims that "Qualcomm utilized multiple strategies to provide device manufacturers with bundled discounts over many years."[114] He claims that "[a]t various times, Qualcomm's bundled discounts took the form of lower percentage royalty rates, lower 'caps' on the royalty payment per device, or side payments that were specified in separate contracts negotiated alongside a

[112] Prof. Simcoe seems to acknowledge that OEMs can and do bring FRAND challenges against Qualcomm, which would undermine his Licensing Leverage Theory. See Simcoe Report, ¶66 ("QTL was subject to device manufacturers demanding lower royalty rates on QTL's SEPs, including through lawsuits that alleged QTL was charging unreasonably high royalties in violation of its FRAND commitments.").

[113] Simcoe Report, ¶76. See also Simcoe Report, ¶88.

[114] Simcoe Report, ¶44.

patent license."[115] The evidence in the record does not support Prof. Simcoe's claim that Qualcomm offered bundled discounts that effectively created discriminatory royalties that excluded rivals.

71. As evidence that Qualcomm offered "lower percentage royalty rates [or] lower 'caps'" to OEMs that elected to use Qualcomm modem chips, Prof. Simcoe points to certain license agreements that Qualcomm entered into with Korean OEMs.[116] Yet, he acknowledges, these agreements were amended in 2009 to *remove* the conditional discounts. Specifically, Prof. Simcoe notes, in 2009 "[t]he KFTC enjoined Qualcomm from providing rebates to Korean device manufacturers that were conditioned on those device manufacturers both taking a license and purchasing Qualcomm's chipsets."[117] Furthermore, contrary to Prof. Simcoe's Licensing Leverage Theory, Qualcomm did not impose the discriminatory royalties on Korean OEMs to entice them to purchase Qualcomm's modem chips. Rather, the agreements were originally entered at the request of the Korean government and *were removed* at the request of the Korean government.[118]

72. Prof. Simcoe further claims that Qualcomm's alleged exclusionary bundling took the form of "side payments that were specified in separate contracts negotiated alongside a patent license."[119] While Prof. Simcoe asserts that such side deals create discriminatory royalties that are a "tax" on rivals, he fails to explain why the supposed "side payments" are anything other than a discount on modem chips. He also fails to explain how, if for the sake of argument one assumes the "side payments" are royalty discounts that create a "tax," such a "tax" forecloses rivals.[120]

73. From an economic perspective, discounts or side agreements that are conditional on an OEM purchasing modem chips from Qualcomm are *modem*

[115] Simcoe Report, ¶44.

[116] Simcoe Report, ¶¶44–45.

[117] Simcoe Report, ¶98.

[118] FTC Licensing Presentation, p. 12 ("In connection with approving the use of CDMA in the 1990s, the Korean government required Qualcomm to enter into joint license negotiations with certain government-selected manufacturers, which resulted in a set of Korea-standard terms. Consistent with a Model License Agreement promulgated by the Korean government, these Designated Manufacturers were permitted to deduct from the royalty base on devices sold for use in Korea the cost of any chips they purchased from Qualcomm. Comparable provisions were later agreed with some Korean manufacturers for devices sold for use outside Korea. . . . Since 2009, no Korean manufacturer has paid lower royalties on devices that incorporate a Qualcomm chip versus a non-Qualcomm chip.").

[119] Simcoe Report, ¶44.

[120] Furthermore, as I explained above, FRAND violations are generally not an antitrust violation. See, e.g., Ninth Circuit FTC v. Qualcomm Opinion, p. 39 ("[T]he general rule [is] that breaches of SSO commitments do not give rise to antitrust liability[.]").

*chip discounts*. The reason for this is that, when deciding which modem chip to purchase, an OEM will consider the "side payment" that is conditioned on purchasing Qualcomm's modem chips as a discount on Qualcomm's modem chips—because it only receives the payment or incentive if it purchases Qualcomm's modem chips. This means that the OEM will compare Qualcomm's discounted modem chip price (i.e., the modem chip price less the discount, which Prof. Simcoe refers to as the supposed "tax" that is set forth in the supposed side deal) to the price of Qualcomm's rivals' modem chips. This means that Qualcomm's rivals could compete with the supposed "tax" (which is really just a discount on Qualcomm's chips) by simply offering lower-priced modem chips, which would benefit OEMs. Prof. Simcoe fails to offer any analysis to demonstrate that rival chip makers were unable to offer such discounts or to explain how consumers are harmed by Qualcomm offering discounts.

74. Prof. Simcoe argues that discriminatory royalties could, in theory, exclude an equally efficient competitor if the royalties were such that the equally efficient competitor would have to price below its cost or if the discriminatory royalties "den[ied] rival chipmakers the opportunity to reach efficient scale."[121] Yet, he fails to conduct any analysis to determine if this theory is relevant or applicable to the current case. Prof. Simcoe performs no analysis nor offers any evidence of rivals' costs or scale. He also conducts no analysis to determine if, after applying the allegedly discriminatory discounts, Qualcomm's modem chips are priced below an appropriate level of costs. Furthermore, he ignores clear evidence that Qualcomm's modem chip sales are profitable.[122]

## 7.3. Prof. Simcoe Incorrectly Characterizes Claims of Exclusive Dealing as Bundling

75. Prof. Simcoe claims that "[t]he relationship between Qualcomm and Apple provides another example of how Qualcomm implemented its bundled discounts."[123] Prof. Simcoe claims that "[b]eginning in 2007, Apple and Qualcomm negotiated a series of interconnected multi-year agreements that

---

[121] Simcoe Report, ¶72 and fn. 99.

[122] Qualcomm's 2018 10-K indicates that QCT's Earnings Before Tax were $2,966 million in 2018, $2,747 million in 2017, and $1,812 million in 2016. See Qualcomm Incorporated, SEC Form 10-K for the fiscal year ended September 30, 2018, filed on November 7, 2018, p. 47.

[123] Simcoe Report, ¶46.

were extended in 2011 and 2013. Through these agreements, Apple obtained an [redacted], but only if Apple purchased almost all of its chips from Qualcomm."[124]

76. Prof. Simcoe's characterization of the Apple agreements as bundled discounts is misleading and fails to accurately describe the relationship between Qualcomm and Apple during the relevant period. In particular, Qualcomm's 2007 Marketing Incentive Agreement with Apple did not and could not include a bundled discount because Apple ***did not sell devices with Qualcomm modem chips until 2011***.[125]

77. Furthermore, Prof. Simcoe's characterization of the 2011 and 2013 agreements as bundled discounts is inconsistent with how these agreements were characterized in the At-Issue Complaints. As I describe in Section 9, the At-Issue Complaints that addressed Qualcomm's 2011 and 2013 agreements with Apple analyzed the agreements as de facto exclusive-dealing agreements. For example, the European General Court explained that "the [European] Commission stated that the payments concerned were exclusivity payments," rather than bundling.[126]

78. Exclusive-dealing agreements are agreements that require one firm to sell a product exclusively to one buyer or purchase an input exclusively or near-exclusively from one seller. As the FTC explains:

> Exclusive dealing or requirements contracts between manufacturers and retailers are common and are generally lawful. In simple terms, an exclusive dealing contract prevents a distributor from selling the products of a different manufacturer, and a requirements contract prevents a manufacturer from buying inputs from a different supplier.

---

[124] Simcoe Report, ¶46.

[125] See, e.g., "Qualcomm chip in Verizon iPhone," The San Diego Union-Tribune, February 8, 2011, available at https://www.sandiegouniontribune.com/sdut-qualcomm-chip-in-verizon-iphone-2011feb08-story.html ("Qualcomm hasn't had a chip in the iPhone before. . . . Apple used Infineon, which recently sold its wireless business to Intel.").

[126] See Judgement of the General Court (Sixth Chamber, Extended Composition), *Qualcomm Incorporated v. European Commission*, June 15, 2022 ("2022 General Court Qualcomm v. EC Judgement"), ¶33. The EC press release that Plaintiffs allege was a corrective disclosure further states that Qualcomm allegedly "paid a major customer for exclusively using its chipsets and sold chipsets below cost," which indicate that the exclusivity payments were alleged to be *modem chip discounts*. See European Commission Press Release, "Antitrust: Commission sends two Statements of Objections on exclusivity payments and predatory pricing to Qualcomm," December 8, 2015 ("EC Press Release"), p. 1. In Section 9 below, I explain in more detail, the prominent element in the At-Issue Complaints was the alleged exclusive-dealing nature of Qualcomm's agreements with Apple and not allegations of bundling or monopoly leverage.

These arrangements are judged under a rule of reason standard, which balances any procompetitive and anticompetitive effects.[127]

79. One noticeable difference between "bundling" and "exclusive dealings" is that while bundling involves at least two markets, exclusive-dealing agreements deal with one market at a time.

80. Exclusive-dealing agreements are typically considered procompetitive as they can prevent free riding and encourage relationship-specific investments.[128] Exclusive-dealing arrangements can be anticompetitive if they are used by a firm that holds market power to prevent smaller competitors from successfully competing in the market.[129] Yet, Prof. Simcoe ignores that the Ninth Circuit "conclude[d] that the 2011 and 2013 agreements did not have the actual or practical effect of substantially foreclosing competition in the CDMA modem chip market" and therefore did not constitute an antitrust violation.[130]

81. Accordingly, for the reasons I stated in Sections 7.1 to 7.3, it is my opinion that Prof. Simcoe's Licensing Leverage Theory lacks economic and factual support.

---

[127] "Exclusive Dealing or Requirements Contracts," FTC, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-supply-chain/exclusive-dealing-or-requirements-contracts.

[128] See, e.g., Klein, Benjamin, Robert Crawford, and Armen Alchian, "Vertical Integration, Appropriable Rents, and the Competitive Contracting Process," *Journal of Law and Economics*, 21, No. 2, 1978, pp. 297–326, at 298 ("After a specific investment is made and such quasi rents are created, the possibility of opportunistic behavior is very real."). See also "Exclusive Dealing or Requirements Contracts," FTC, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-supply-chain/exclusive-dealing-or-requirements-contracts ("Most exclusive dealing contracts are beneficial because they encourage marketing support for the manufacturer's brand. … For instance, the consumer may take a 'free ride' on the valuable services offered by one retailer, and then buy the same product at a lower price from another retailer that does not offer high-cost amenities, such as a discount warehouse or online store. If the full-service retailer loses enough sales in this way, it may eventually stop offering the services. If those services were genuinely useful, in the sense that the product plus the services together resulted in greater sales for the manufacturer than the product alone would have enjoyed, there is a loss both for the manufacturer and the consumer. As a result, antitrust law generally permits nonprice vertical restraints such as exclusive dealing contracts that are designed to encourage retailers to provide extra services.").

[129] "Exclusive Dealing or Requirements Contracts," FTC, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-supply-chain/exclusive-dealing-or-requirements-contracts ("On the other hand, a manufacturer with market power may potentially use these types of vertical arrangements to prevent smaller competitors from succeeding in the marketplace. For instance, exclusive contracts may be used to deny a competitor access to retailers or distributors without which the competitor cannot make sufficient sales to be viable.").

[130] Ninth Circuit FTC v. Qualcomm Opinion, pp. 54–55. I understand that Judge Corley recently reached the same conclusion when applying California antitrust law, granting Qualcomm's motion for summary judgment. See Summary Judgement of the United States District Court Northern District of California, *In re Qualcomm Antitrust Litigation*, September 26, 2023 ("Further, at oral argument the Court specifically asked Plaintiffs where in the record there is expert testimony supporting a finding of substantial foreclosure for each separate market. … On this issue, they have not met their burden."). I also understand that the European Union General Court reached the same conclusion. See 2022 General Court Qualcomm v. EC Judgement, ¶511.

## 8. Prof. Simcoe Has Not Established That Qualcomm's Alleged Bundling Caused Anticompetitive Harm

82. Prof. Simcoe claims that the "regulatory actions were highly likely to occur given Qualcomm's bundling practices and their anticompetitive effects."[131] As support for his claim of anticompetitive effects, Prof. Simcoe points to "[t]he exit of many competitors from the merchant market for supplying cellular modem chipsets," which he claims "suggests that Qualcomm's exclusionary bundling practices were successful."[132] Prof. Simcoe has assumed that Qualcomm's alleged exclusionary bundling caused these firms to exit. Yet, he has failed to conduct any analysis or provide any evidence linking exit to Qualcomm's (disclosed or allegedly undisclosed) conduct to support this opinion. Furthermore, he has ignored reasons, unrelated to Qualcomm's allegedly exclusionary conduct, that can explain the exit of these rivals. He also ignores the fact that over the course of the relevant period Qualcomm lost market share as rival chip makers entered and expanded.

83. Prof. Simcoe claims that "[b]y 2016, . . . the market for cellular modem chipsets became more concentrated through the exit of many of Qualcomm's competitors, including Nvidia, FreeScale, Texas Instruments, ST-Ericsson, and Broadcom."[133] Prof. Simcoe has not shown that the exit of any of the competitors that he listed was *caused by* Qualcomm's alleged bundling. Put differently, he has not shown that any of these rivals would not have exited the market absent Qualcomm's bundling. Instead, he merely assumes the very thing he is attempting to establish.

84. In addition to confusing correlation (or coincidence) with causation, Prof. Simcoe's claim that the exit of rival chip makers is evidence of anticompetitive effects ignores the fundamental characteristics of the modem chip industry. Economists have long recognized that industries characterized by high fixed costs, like the modem chip industry which requires large R&D investments, tend to have a smaller number of large firms.[134] Economic theory predicts that an industry with the characteristics of the modem chip industry will tend to

---

[131] Simcoe Report, ¶164. See also Simcoe Report, ¶179.

[132] Simcoe Report, ¶82.

[133] Simcoe Report, ¶25.

[134] Fixed costs impact the number of firms that can profitably operate, as the costs must be recovered by future modem chip sales. The higher the fixed costs, the higher the modem chip sales per firm required to recover the cost, and the lower the number of firms. See Tirole, Jean, *The Theory of Industrial Organization* (Cambridge, MA: MIT Press, 1988), p. 284 ("The above equations show that an increase in fixed costs causes a decrease in the number of firms and an increase in the profit margin (pc - c).").

have a small number of large firms and frequent exit of firms. Furthermore, the modem chip industry is characterized by frequent disruptive innovation, a factor that economists recognize can trigger firm exit.[135]

85. With regard to specific examples of rival exits that Prof. Simcoe discusses, he has failed to establish that the exit of these rival chip makers was the result of Qualcomm's alleged conduct. Specifically, Prof. Simcoe has not conducted any analysis to assess whether the exit of these rivals can be explained by factors unrelated to Qualcomm's conduct. Hence, he cannot argue that any rival chip maker would not have exited the market absent Qualcomm's alleged conduct.[136]

86. Qualcomm's declining market shares are also inconsistent with Prof. Simcoe's claim that Qualcomm's conduct was exclusionary. For example, Exhibits 2 and 3 show that between 2013 and 2017 Qualcomm's share of LTE modem chip sales was cut in half, as it declined from 93 percent to 47 percent. These exhibits show that Qualcomm was an early entrant into LTE, but quickly faced competition, which led to a rapidly declining share of a growing market. Prof. Simcoe has failed to explain how this rapid decline in Qualcomm's share of LTE modem chip sales is consistent with his claim of exclusion.

---

[135] Samaniego, Roberto M., "Entry, Exit, and Investment-Specific Technical Change," *American Economic Review*, 100, No. 1, 2010, pp. 164–192 at p. 164 ("This paper finds a strong, positive link between industry entry and exit rates and the pace of technical progress in the capital goods that the industry uses[.]").

[136] I understand that Prof. Edward Snyder testified in the FTC case against Qualcomm that he "conducted in-depth studies of all the major chip suppliers since 2002," evaluated whether "there [were] outcomes that were not explained by independent industry factors," and "didn't find any real world outcomes of that type." Prof. Snyder found a number of factors that can explain the exit of rival chip makers, including "foresight, investment, and execution." Prof. Simcoe has made no attempt to assess whether any of these factors can explain the exit of any or all of the chip makers he discusses. See FTC Trial Testimony of Edward Snyder, January 22, 2019, 1783:25–1784:3, 1787:6–1788:10. I do not rely on the testimony of Prof. Snyder in reaching my opinions. I only highlight that Prof. Simcoe has failed to undertake any economic analysis to isolate the effect of Qualcomm's alleged conduct on any rival.

***EXHIBIT 2***
***LTE Modem Chip Sales by Year (2012–2017)***




Source: Strategy Analytics, "Baseband Market Share Tracker Q1 2018," June 2018

Note: Strategy Analytics reports unit sales by OEM on a quarterly basis. Strategy Analytics reports sales based on the highest order air interface supported by a modem chip. This analysis therefore only includes modem chips where LTE is the highest order air interface.

***EXHIBIT 3***
***LTE Modem Chip Sales Shares by Year (2012–2017)***




Source: Strategy Analytics, "Baseband Market Share Tracker Q1 2018," June 2018
Note: Strategy Analytics reports unit sales by OEM on a quarterly basis. Strategy Analytics reports sales based on the highest order air interface supported by a modem chip. This analysis therefore only includes modem chips where LTE is the highest order air interface.

87. Qualcomm's share of all modem chip sales had also declined during this time period. As Exhibit 4 shows, Qualcomm's share of modem chips declined from 57 percent in 2013 to 42 percent in 2017.[137]

[137] According to the data cited by Prof. Simcoe, Qualcomm's share of worldwide Smartphone Application Processor sales declined from 52 percent in 2014 to 31 percent in 2020. See Simcoe Report, fn. 11; "Smartphone application processor (AP) market vendor revenue share worldwide from 2014 to 2020," Statista, available at https://www.statista.com/statistics/233415/global-market-share-of-applications-processor-suppliers/.

***EXHIBIT 4***
***WCDMA, CDMA, and LTE Modem Chip Sales Shares by Year (2008–2017)***




Source: Strategy Analytics, "Baseband Market Share Tracker Q1 2018," June 2018
Note: Strategy Analytics reports unit sales by OEM on a quarterly basis. Strategy Analytics reports sales based on the highest order air interface supported by a modem chip. This analysis therefore only includes modem chips where LTE, WCDMA, CDMA, or TD-SCDMA is the highest order air interface.

88. The entry and expansion of rival chip makers further weakens Prof. Simcoe's claim of anticompetitive harm from Qualcomm's alleged bundling practices. For example:

- [redacted]

[138] "Early iPhone 7 Teardowns: Intel & Qualcomm Modems, TSMC SoC, 2 to 3 GB of RAM," AnandTech, September 16, 2016, available at https://www.anandtech.com/show/10687/early-iphone-7-teardown-modems-and-more; Deposition of Jeff Williams, March 15, 2018, Q121SEC-AEO-00013675, 34:14–35:2 [redacted]).

- MediaTek began selling WCDMA modem chips in 2010 and LTE modem chips in 2014. MediaTek's share of WCDMA, CDMA, and LTE modem chip sales rapidly increased from a mere 2 percent in 2009 to 24 percent in 2017.[139]
- Spreadtrum only offered TD-SCDMA modem chips in 2008 with a total share of less than 0.1 percent. In 2012, Spreadtrum started offering WCDMA and LTE modem chips. By 2017, Spreadtrum's share of WCDMA, CDMA, and LTE modem chips reached 10 percent.[140]
- Samsung entered the market in 2010, self-supplying modem chips for its own devices, and reached over 9 percent by 2017.[141]
- Hi-Silicon, which supplied modem chips for Huawei devices, increased its market share from 0.2 percent in 2008 to 6.6 percent in 2017.[142]

89. Accordingly, for the reasons I stated in Sections 6–8, it is my opinion that Prof. Simcoe has not established that Qualcomm's alleged bundling practices caused or could have caused anticompetitive harm.

## 9. Prof. Simcoe Has Failed to Show That Qualcomm's Undisclosed Bundling Practices Caused the At-Issue Complaints

90. Prof. Simcoe claims that "Qualcomm's bundling practices caused the specific regulatory actions and lawsuits leading to the corrective disclosures."[143] In this section, I explain that Prof. Simcoe has not shown that Qualcomm's alleged *undisclosed* bundling practices *caused* the At-Issue Complaints. Rather than demonstrating any causal relationship between the alleged undisclosed bundling and the At-Issue Complaints, Prof. Simcoe merely (1) points to evidence that the regulatory bodies sought information related to the alleged undisclosed bundling during the investigative phase of the actions, (2) for some At-Issue Complaints, points to specific phrases in case documents purporting to show that each concerned the alleged undisclosed bundling, and (3) points to evidence from the At-Issue Complaints and other case documents related to

---

[139] Strategy Analytics, "Baseband Market Share Tracker Q1 2018," June 2018.
[140] Strategy Analytics, "Baseband Market Share Tracker Q1 2018," June 2018.
[141] Strategy Analytics, "Baseband Market Share Tracker Q1 2018," June 2018.
[142] Strategy Analytics, "Baseband Market Share Tracker Q1 2018," June 2018.
[143] Simcoe Report, Section IV.C.

practices that he concedes were disclosed. Yet, Prof. Simcoe ignores that Qualcomm's disclosed practices and the alleged exclusive-dealing nature of its agreements with Apple were the prominent elements in the At-Issue Complaints.

91. Critically, Prof. Simcoe has no economic basis for this opinion because he has failed to show that the alleged undisclosed bundling—as opposed to something else—led to the At-Issue Complaints. That is, Prof. Simcoe has failed to demonstrate that the At-Issue Complaints would not have been filed absent the alleged undisclosed bundling practices. He has also failed to demonstrate that the risk Qualcomm faced from regulatory actions or litigation would have been significantly lower absent the alleged undisclosed bundling practices. Without showing that the At-Issue Complaints would not have been filed absent the alleged undisclosed conduct, Prof. Simcoe cannot reach his causal conclusion that the undisclosed conduct caused the At-Issue Complaints.[144] Furthermore, the evidence that Prof. Simcoe cites does not support his opinion that the undisclosed practices were prominent elements of, and hence could have caused, the At-Issue Complaints.

92. To assess Prof. Simcoe's claim, I consider the alleged bundling under Prof. Simcoe's Licensing Leverage Theory to be the undisclosed practices and evaluate whether these practices were a prominent element in the At-Issue Complaints. As I explained in Section 3.2 above, Prof. Simcoe's Licensing Leverage Theory is that Qualcomm allegedly used bundled discounts to extend or leverage its monopoly power in licensing into modem chips. According to Prof. Simcoe, "by linking discounts to the purchase of a SEP-plus-chip bundle, Qualcomm can price discriminate between QCT customers and customers of rival chip producers, effectively charging a higher royalty to the latter group."[145]

93. I provide no opinion on whether the alleged conduct underlying Prof. Simcoe's Licensing Leverage Theory was disclosed. Instead, for my analysis, I

---

[144] Prof. Simcoe claims that the undisclosed bundling caused the At-Issue Complaints, but he has failed to analyze whether the At-Issue Complaints would have been filed in a but-for world in which Qualcomm continued to take all of the disclosed actions while not engaging in the alleged undisclosed bundling. See, e.g., Hastings, Justine and Williams, Michael, "What Is a 'But-For' World?" *Antitrust*, 31, No. 1, Fall 2016 ("An expert economist generally begins the analysis of antitrust impact or damages by specifying the alleged anticompetitive conduct, e.g., colluding to fix prices, and what would have occurred in the absence of the alleged conduct. This 'description of the defendant's proper actions in place of its unlawful actions and a statement about the economic situation absent the wrongdoing' defines the but-for world that guides the economic and statistical modeling the economist will employ to estimate prices in the but-for world. Antitrust injury and damages can be analyzed by comparing actual and but-for prices. This requires an analysis of a but-for world that holds all factors constant with the exception of the alleged conduct.").

[145] See Simcoe Report, ¶41.

adopt Plaintiffs and Prof. Simcoe's claim that the alleged conduct underlying his Licensing Leverage Theory was undisclosed.[146] I focus on the alleged conduct at issue in Prof. Simcoe's Licensing Leverage Theory as the alleged undisclosed conduct for a number of reasons.

94. First, I understand from counsel that Plaintiffs have represented that the undisclosed bundling practices consist of "bundling lower license royalties when customers purchased Qualcomm chipsets," which is consistent with Prof. Simcoe's Licensing Leverage Theory.[147] Second, Prof. Simcoe acknowledges that Qualcomm's practices of selling modem chips only to licensed OEMs and not offering licenses to chip makers, which are the bases of his Chip Leverage Theory, were disclosed.[148] Third, I do not focus on conduct at issue in Prof. Simcoe's Chip Leverage Theory, because he does not appear to claim that the alleged chip leveraging, standing alone, led to anticompetitive harm.[149] Prof. Simcoe appears to claim that the effect of his Chip Leverage Theory is a FRAND violation, but he makes no claim that a FRAND violation excludes any competitor in any relevant market. Because the At-Issue Complaints were concerned with antitrust issues rather than alleged FRAND violations, I evaluate whether the conduct Prof. Simcoe considers anticompetitive and the reasons he offers for why it was anticompetitive were prominent elements in those At-Issue Complaints.

95. For each of the At-Issue Complaints, I assess Prof. Simcoe's opinion that the undisclosed bundling *caused* the complaint by reviewing the materials he cites in addition to the relevant pleadings associated with each complaint. I review the relevant pleadings to assess whether Prof. Simcoe's Licensing Leverage Theory of harm was the theory outlined in the pleading. Specifically, I assess whether each complaint is based on an assumption that Qualcomm used bundled discounts to offer discriminatory royalties (i.e., dependent on the identity of the licensee) and that these discriminatory royalties foreclosed rival chip makers. I find that this theory of anticompetitive discriminatory royalties

[146] I adopt this claim for each of the alleged corrective disclosures, even though the disclosures happened over time (from November 2015 to January 2017). The fact that the corrective disclosures happened over time means that allegedly undisclosed conduct which was allegedly disclosed in an earlier corrective disclosure should be considered disclosed when considering later alleged corrective disclosures. Prof. Simcoe has failed to consider this issue.

[147] Plaintiffs' Disclosure Letter ("2. Are Plaintiffs currently alleging that the market did not know that Qualcomm only sold its chips to licensed companies? No, the market understood that Qualcomm would only sell chips to licensed companies, but this is different than bundling lower license royalties when customers purchased Qualcomm chipsets.").

[148] Simcoe Report, ¶62.

[149] See Section 3.1.

is not present in any of the complaints. Rather, my review of the pleadings indicates that the prominent elements in the At-Issue Complaints were Qualcomm's disclosed conduct and/or conduct distinct from bundling. Given that the *disclosed*, or non-bundling, conduct was the prominent element of each of the At-Issue Complaints, Prof. Simcoe has no basis for his claim that the alleged undisclosed bundling caused the actions.

## 9.1. KFTC

96. Prof. Simcoe has not established that the alleged undisclosed bundling practices created a "high risk" or "caused" the KFTC Case Examiner's Report ("KFTC ER").[150] Contrary to Prof. Simcoe's claim, Qualcomm's disclosed practices and other licensing practices unrelated to bundling were the prominent elements in the KFTC ER against Qualcomm. He has not shown that the KFTC ER was related to the alleged undisclosed bundling, let alone that the KFTC ER would not have been brought against Qualcomm absent the *undisclosed* bundling practices.

97. To support his opinion that Qualcomm's alleged undisclosed bundling practices caused the KFTC ER, Prof. Simcoe cites to information about Qualcomm's pre-2010 license agreements (which were modified prior to the relevant period), the KFTC's questions to market participants, the market participants' responses, and vague statements from the KFTC ER. None of this evidence demonstrates that the KFTC ER was "caused by . . . Qualcomm's undisclosed bundling."[151]

98. First, Prof. Simcoe cites to information from the 2009 KFTC decision that pertains to certain licensing agreements that Qualcomm entered into in the early 2000s.[152] He notes that these licensing agreements offered OEMs lower

---

[150] Simcoe Report, ¶15.e ("Qualcomm's bundling created a very high risk of antitrust regulation or litigation related to exclusionary conduct, FRAND violations, or both."); Korea Fair Trade Commission Examiner's Report, *Case of Abuse of Market Dominance, Etc. by Qualcomm Inc., Etc.,* November 13, 2015, Q2017MDL1_03096224 ("KFTC Case Examiner's Report"). I understand that Plaintiffs have stated that Qualcomm's November 17, 2015 press release about the KFTC Case Examiner's Report was a corrective discloser. See Qualcomm Press Release, "Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report," November 17, 2015 ("Qualcomm KFTC Press Release"); Class Certification Order, p. 6.

[151] Simcoe Report, ¶179.

[152] Simcoe Report, ¶98; "Decision," The Korea Fair Trade Commission, Case of Abuse of Dominance by Qualcomm Incorporated, Qualcomm Korea Ltd. and Qualcomm CDMA Technologies Korea Ltd., December 30, 2009, Q2017MDL1_00763006.

royalties if they purchased Qualcomm modem chips.[153] However, Prof. Simcoe has failed to consider that these discontinued practices were disclosed through the 2009 KFTC decision.[154] The 2009 KFTC action therefore means that, if anything, Qualcomm's alleged bundling practices, at least with respect to Korean OEMs, were disclosed.[155] Prof. Simcoe has also failed to recognize that these terms could not have caused the 2015 KFTC ER because they were discontinued prior to the 2015 KFTC ER.[156] Finally, he has failed to recognize that Qualcomm entered into these agreements in connection with the Korean government's approval of CDMA, which resulted in specific terms.[157]

99. Second, Prof. Simcoe cites the KFTC's questionnaires to market participants. Critically, evidence that a regulatory agency sought information about a specific alleged conduct does not demonstrate that the specific conduct (if it occurred) caused the subsequent complaint. Furthermore, Prof. Simcoe has failed to explain how the questionnaires he cites are related to undisclosed bundling or his Licensing Leverage Theory. [redacted]

100. Third, Prof. Simcoe cites certain market participants' answers to the KFTC's requests for information but fails to explain how these answers support his assertion that the undisclosed conduct caused the KFTC ER. Critically, evidence that some market participants referenced a specific conduct does not

---

[153] Simcoe Report, ¶110.

[154] See, e.g., Korea Fair Trade Commission Press Release, "Qualcomm's Abuse of Market Dominance," July 23, 2009 ("Licensing its CDMA technology to mobile handset makers, Qualcomm charged discriminatively high royalties for using non-Qualcomm modem chips. . . . For the sale of its CDMA modem chips/RF chips to mobile handset makers, Qualcomm offered rebates on condition that they should meet the great portion of their demand with Qualcomm chips."); "Decision," The Korea Fair Trade Commission, Case of Abuse of Dominance by Qualcomm Incorporated, Qualcomm Korea Ltd. and Qualcomm CDMA Technologies Korea Ltd., December 30, 2009, Q2017MDL1_00763006, p. 32, fn. 30 ("The Defendants' conduct of granting royalty discounts when competitors entered the modem chip market also occurred in 1999 prior to the conduct at issue. As Samsung succeeded in developing its own modem chips (IS-95) in 1999, [redacted] ). Prof. Simcoe notes that in 2009 "[t]he KFTC enjoined Qualcomm from providing rebates to Korean device manufacturers that were conditioned on those device manufacturers taking a license and purchasing Qualcomm's chipsets." See Simcoe Report, ¶98.

[155] Prof. Simcoe also cites to a footnote in the KFTC Case Examiner's Report that states that Qualcomm was "providing contractual disadvantages in license agreement [and] imposing higher patent royalties." He fails to note that this footnote is based on information from the (disclosed) 2009 KFTC regulatory action against Qualcomm. See Simcoe Report, ¶110; KFTC Case Examiner's Report, p. 152, fn. 187.

[156] FTC Licensing Presentation, p. 12 ("These provisions were eliminated over five years ago. Since 2009, no Korean manufacturer has paid lower royalties on devices that incorporate a Qualcomm chip versus a non-Qualcomm chip.").

[157] FTC Licensing Presentation, p. 12 ("In connection with approving the use of CDMA in the 1990s, the Korean government required Qualcomm to enter into joint license negotiations with certain government-selected manufacturers, which resulted in a set of Korea-standard terms.").

[redacted]

demonstrate that any subsequent complaint was related to or caused by the conduct. Furthermore, Prof. Simcoe ignores that the market participant responses he cites are either (1) related to the disclosed conduct,[159] (2) unrelated to the alleged undisclosed bundling, or (3) do not support his Licensing Leverage Theory of harm. [redacted] But Qualcomm's "Chinese Framework" agreements had terms that were set in return for the Chinese government approval of CDMA technology in China.[162] He fails to explain how terms that were set through a government intervention (i.e., not imposed by Qualcomm) and were publicly disclosed could support his claim that undisclosed bundling caused the KFTC ER.[163] Finally, even if one

---

[159] [redacted] See Simcoe Report, ¶¶105–106; MRVL-00000059 at 069–070, 079–081. He also cites to evidence of Qualcomm allegedly using the disclosed "no license, no chips" practice to obtain higher royalty rates. See Simcoe Report, ¶¶112–116, 118; KFTC Case Examiner's Report, pp. 56, 189, 201–202, 207–209, 216, 226–227, 238, 242–246.

[redacted]

[161] [redacted] Prof. Simcoe also cites to footnotes in the KFTC Case Examiner's Report about [redacted] See Simcoe Report, ¶118; KFTC Case Examiner's Report, pp. 56, 238.

[162] FTC Licensing Presentation, p. 11 ("In return for approving the use of CDMA technology in China, the Chinese government required Qualcomm to enter into license agreements with certain government-selected manufacturers on specified terms."); Qualcomm Submission to NDRC, March 12, 2014, Q2017MDL1_02930845 at 857 ("One important exception to the general similarity of Qualcomm licenses is the set of SULAs that Qualcomm signed with certain Chinese manufacturers designated by the Chinese Ministry of Information Industry ('MII') pursuant to Qualcomm's Framework Agreement for CDMA Intellectual Property ('Framework Agreement') with China Unicom, which was signed on January 28, 2000 and ratified in the MOU signed November 29, 2000 between MII and Qualcomm. As explained in our December 20 submission, the Framework Agreement was approved by the MII, which determined its content in several important respects. The Framework Agreement established guidelines to which SULAs relating to CDMA2000 devices with the designated Chinese licensees (signed within five years of the Framework Agreement) would have to adhere."), 999 ("One exception is that Framework Licensees in China pay lower royalty rates on some devices. In accordance with Section 3 of the Framework Agreement, Subscriber Units implementing the CDMA2000 standard (and its evolutions) that are manufactured in China by a Chinese company and sold in China for use in China have a special, lower royalty rate of 2.65%, which continues to this day. CDMA2000 Subscriber Units manufactured outside of China, manufactured by a non-Chinese company, sold outside of China, or sold for use outside of China carried a royalty rate of 7% for the first three years following the date of the agreement. After three years the royalty structure for those CDMA2000 Subscriber Units reverted to the standard rates set out above.").

[163] Prof. Simcoe has failed to acknowledge that Qualcomm's agreements with Chinese OEMs were disclosed. See email Alex Rogers to Marty Schenker et al., July 2, 2010, Q2017MDL1_00661503 at 506 ("May 5, 2005 Spring Analyst Meeting Q&A with Steve Altman, President . . . Q: Why did QUALCOMM provide Chinese manufacturers with different license terms and are those terms more favorable than other licensees? A. After several years of negotiations in China, QUALCOMM determined that, in order to ensure a more rapid deployment of CDMA in

assumes that any of the answers are consistent with the alleged undisclosed bundling practices, the fact that the KFTC ER did not adopt Prof. Simcoe's Licensing Leverage Theory indicates that this conduct did not cause or create a "high risk" for a regulatory action.

101. Fourth, Prof. Simcoe quotes vague statements in the KFTC ER that do not support his opinion that the undisclosed bundling caused the complaint.

- Prof. Simcoe quotes a footnote about Qualcomm "providing certain discounts to mobile device makers who purchase larger quantities of its own chipsets." Yet, providing "discounts to mobile device makers who purchase larger quantities of" modem chips is not bundling.[164]
- Prof. Simcoe cites evidence that Qualcomm provided [redacted] Yet, offering reductions and rebates in response to competitive pressure from rival modem chip makers is a competitive response unrelated to bundling.[165]
- Prof. Simcoe quotes a statement that Qualcomm was "[c]oercing mobile device makers to accept package licensing terms" but fails to indicate that the "package" refers to licenses that cover SEPs and non-essential patents—not any "bundle" comprising both licensing and modem chip supply terms.[166]

102. A review of the KFTC ER demonstrates that, contrary to Prof. Simcoe's claim that the alleged undisclosed bundling practices caused the KFTC ER, the prominent conduct referenced in the KFTC ER were Qualcomm's disclosed bundling practices and other elements unrelated to bundling. For example, the first page of the KFTC ER lists the "facts" that were at issue. The three "facts"

China, it was necessary to provide certain Chinese manufacturers with license terms different from our standard terms. The royalty rates provided to certain Chinese manufacturers for products manufactured and sold in China for use in China are more favorable than our standard rates. However, in order to benefit from these more favorable rates in China, the Chinese manufacturer must provide substantial, additional value to QUALCOMM, including, among other things, (i) paying, for a period of time, a royalty on sales outside of China at a rate higher than our standard rate and (ii) committing to use QUALCOMM's ASIC in their worldwide sales of CDMA subscriber units and infrastructure."). Prof. Simcoe also cites to Huawei's answers related to Qualcomm's disclosed practices. See Simcoe Report, ¶¶103–104; FTC-PROD-0011240 at 250–253, 263, 247; FTC-PROD-0011282 at 285, 287.

[164] Simcoe Report, ¶110; KFTC Case Examiner's Report, p. 155.

[165] Simcoe Report, ¶111; KFTC Case Examiner's Report. pp. 158–159.

[166] Simcoe Report, ¶117; KFTC Case Examiner's Report, p. 57.

that were stated in the report as the practices at issue are not conduct that falls under Prof. Simcoe's Licensing Leverage Theory:[167, 168]

- [redacted]:[169] This is the disclosed "refusal to license" practice.[170]
- "Coercing mobile device makers to execute and comply with patent license agreements as a condition to supplying and for the use of modem chipsets":[171] This is the disclosed "no license, no chips" practice.[172]
- "Unilaterally collecting a certain percentage of the selling price of mobile devices as royalties from mobile device makers without engaging in negotiations conforming to the FRAND conditions with mobile device makers and coercing mobile device makers to license their patents to Respondents or not to assert their patents against third parties":[173] These are practices related to certain elements of Qualcomm's license agreements that are unrelated to bundling of modem chip-supply and license negotiations and were found lawful by the Seoul High Court.[174]

---

[167] KFTC Case Examiner's Report, p. 3.

[168] Prof. Simcoe has not shown, or even tried to show, that Qualcomm's press release in response to the KFTC ER, which the Class Certification Order identifies as the first corrective disclosure, was related to Qualcomm's alleged undisclosed bundling practices. See Class Certification Order, p. 6. Qualcomm's press release mentioned that "[t]he [examiner's report] alleges, among other things, that we do not properly negotiate aspects of our licenses, and that our practice of licensing our patents only at the device level and requiring that our chip customers be licensed to our intellectual property violate Korean competition law." See Qualcomm KFTC Press Release. While the press release discussed some of Qualcomm's disclosed licensing practices (refusal to license chip makers), it did not explicitly mention any of the alleged undisclosed bundling practices. Accordingly, it is not the case that this corrective disclosure disclosed any alleged undisclosed bundling practices as articulated by Prof. Simcoe in his Licensing Leverage Theory.

[169] KFTC Case Examiner's Report, p. 3. See also Korea Fair Trade Commission Press Release, "Strict Sanctions on Qualcomm's Abuse of Cellular SEPs," December 28, 2016, Q121SEC0037861, ("KFTC 2016 Press Release") p. 1 [redacted]; Seoul High Court Decision, *2017 Nu 48 Revocation of the Corrective Order, etc.*, December 4, 2019 ("2019 Seoul High Court Decision"), pp. 32–33 [redacted].

[170] Simcoe Report, ¶62; Class Certification Order, pp. 22–28. See also 2019 Seoul High Court Decision, p. 32 ("Conduct 1: Refusing or restricting the license of cellular SEPs to competing model chipset manufacturers.").

[171] KFTC Case Examiner's Report, p. 3. See also KFTC 2016 Press Release, p. 2 ("By linking the chipset supply with patent license agreements, Qualcomm has coerced the execution and performance of unfair license agreements by using its chipset supply as leverage, while circumventing FRAND commitment"). See also 2019 Seoul High Court Decision, p. 33 ("Conduct 2: Executing patent license agreements with handset manufacturers based on tying the modem chipset supply agreement with patent license agreement.").

[172] Simcoe Report, ¶62; Class Certification Order, pp. 22–28.

[173] KFTC Case Examiner's Report, p. 3. See also KFTC 2016 Press Release, p. 2 ("Qualcomm has provided handset companies with only comprehensive portfolio licenses and coerced unilaterally determined royalty terms without conducting a procedure to calculate fair compensation, while coercing unfair agreements, e.g., demanding handset companies to license their patents for free"); 2019 Seoul High Court Decision, p. 33 ("Conduct 3: Imposing terms of portfolio license, royalties based on handset price and cross-grant in the patent license agreement with handset manufacturers.").

[174] 2019 Seoul High Court Decision, pp. 245, 248.

103. Finally, Prof. Simcoe's Licensing Leverage Theory is based on an assumption that Qualcomm's licenses are discriminatory and "violated the nondiscrimination prong of its FRAND commitments."[175] However, the KFTC ER did not focus on a theory of harm alleging that Qualcomm's licensing terms were anticompetitive due to the alleged undisclosed bundling practices creating discriminatory royalties that were in violation of the "nondiscriminatory" requirement of FRAND.[176]

104. Because he has not established that Qualcomm's alleged undisclosed bundling practices were a prominent element of the KFTC ER, Prof. Simcoe has not established that the undisclosed practices "caused" the KFTC ER. Furthermore, because Qualcomm's disclosed practices were the prominent element of the KFTC ER, Prof. Simcoe has no basis to argue that the KFTC ER would not have been filed absent Qualcomm's alleged undisclosed bundling practices. Therefore, he has no basis for his claim that the allegedly undisclosed practices "caused" the KFTC ER.

## 9.2. EC

105. Prof. Simcoe has not established that the alleged undisclosed bundling practices created a "high risk" or "caused" the European Commission ("EC")

[175] Simcoe Report, ¶15.d. See also Simcoe Report, Section IV.B ("Qualcomm's Bundling Violated its FRAND Commitments by Discriminating Between OEMs Based on Chip Supplier").

[176] Discriminatory royalties based on the identity of the modem chip maker were mentioned in the 2015 KFTC Case Examiner's Report only in the context of the licenses that were disclosed as part of the 2009 KFTC action. See KFTC Case Examiner's Report, fn. 187 ("The examples of providing contractual disadvantages in license agreements with mobile device makers who purchased the competitor's chipsets can be found in the form of imposing higher patent royalties. In 2009, the KFTC had issued a corrective order (Resolution No. 2009-281, December 30, 2009) regarding the Respondent's discriminatory conduct of setting a different [net selling] price that is the basis for calculating the royalties depending on whether or not the licensee purchases the Respondent's own chipset (i.e., providing a discount for the price of chipset from the price of mobile device when purchasing the Respondent's chipset). However, the scope of such corrective order was limited to Korean mobile device makers."); KFTC Case Examiner's Report, pp. 280–281 ("In 2009, the KFTC imposed corrective measures on the conduct of charging discriminatory royalties depending on whether a company purchased modem chipsets from Respondent; this conduct was implemented by calculating the amount of royalties after deducting the price of the chipsets from the royalty base when chipsets were purchased from Respondent (referred to as 'price-netting')."). Where the 2015 KFTC ER discussed other violations of the nondiscrimination prong of FRAND, it did so in connection with the disclosed conduct of refusing to license chip makers, and as a result of cross licensing terms; not as a result of the alleged undisclosed bundling practices. See KFTC Case Examiner's Report, p. 176 ("When viewed from a different point of view, the refusal/restriction of licenses to competitors also constitutes a discriminatory conduct which goes against the Respondent's FRAND commitment."); KFTC Case Examiner's Report, p. 280 ("The effect of Respondent's [imposition of discriminatory royalties via pool of covenants not to sue] is similar to the effect of imposing discriminatory royalties on a mobile device maker depending on whether the mobile device maker purchases modem chipsets from Respondent or from Respondent's competitor.").

Statement of Objections ("SO") against Qualcomm.[177] Contrary to Prof. Simcoe's claim, the alleged exclusive-dealing nature of Qualcomm's agreements with Apple was the prominent element in the EC SO against Qualcomm. He has not shown that the EC SO was related to the alleged undisclosed bundling, let alone that the EC would not have brought the exclusive-dealing SO against Qualcomm absent the alleged undisclosed bundling practices.

106. Prof. Simcoe claims that in its 2015 SO against Qualcomm, the "Commission concluded that Qualcomm's use of bundled discounts that were conditioned on exclusively purchasing Qualcomm chipsets constituted an infringement of European law."[178] However, neither the source cited by Prof. Simcoe (the "Introduction" section of the SO) nor any other part of the document mentions Qualcomm's undisclosed bundling as a practice at issue in the enforcement action.

107. Furthermore, Prof. Simcoe cites statements in the EC SO that he purports as relating to bundling, but these are related to the disclosed "no license, no chips" practice.[179]

108. Prof. Simcoe has not shown that the EC filed its SO against Qualcomm because it considered Qualcomm's agreements with Apple to be bundling. Contrary to Prof. Simcoe's claims, the practice at issue in the EC SO against Qualcomm was the allegedly exclusionary effects of its agreements with Apple, which were alleged to be exclusive-dealing agreements. The SO explains that "[t]he abusive conduct" was "Qualcomm's grant of payments to Apple on condition that it obtains all of its requirements of UMTS and LTE baseband chipsets," which the Commission considered "an abuse of a dominant position" in those modem chip markets.[180] Hence, the EC SO was about the alleged exclusive-dealing nature of Qualcomm's agreements with Apple and *not* about the alleged undisclosed bundling practices. Accordingly, the SO also did not focus on a theory of harm alleging that Qualcomm's licensing terms were anticompetitive due to the alleged undisclosed bundling practices creating

---

[177] Simcoe Report, ¶15.e; Q2017MDL1_03133196 ("EC Statement of Objections").

[178] Simcoe Report, ¶123 and fn. 183; EC Statement of Objections at 205.

[179] Simcoe Report, ¶127; EC Statement of Objections at 254. For example, he cites to Apple's statement that "Qualcomm [] use[s] the leverage it has from dominance in [baseband chipset] supply to demand higher patent royalties," which relates to the *disclosed* practices underlying Prof. Simcoe's Chip Leverage Theory.

[180] EC Statement of Objections, §10.2 ("10.2. The abusive conduct; (254) The Commission has reached the preliminary conclusion that, absent any objective justification or efficiency gains, Qualcomm's grant of payments to Apple on condition that it obtains all of its requirements of UMTS and LTE baseband chipsets from Qualcomm constitutes an abuse of a dominant position (Section 10.3).").

discriminatory royalties that were in violation of the "nondiscriminatory" requirement of FRAND. Prof. Simcoe, therefore, has no basis to argue that the action would not have been brought absent Qualcomm's undisclosed bundling (i.e., if these alleged exclusive-dealing agreements were shown to be unrelated to license negotiations) and cannot conclude that the alleged undisclosed bundling caused the EC action.[181]

109. Finally, Prof. Simcoe has failed to acknowledge that in 2022, similar to the U.S. Ninth Circuit in the FTC matter, the EU General Court dismissed the action against Qualcomm. He mentions that "the European Commission stated that it intended to require Qualcomm to halt the anticompetitive conduct and to pay a fine,"[182] but ignores the later General Court decision reversing that decision and stating that:

> [T]he examination of the capability of the payments concerned to have anticompetitive effects is founded on an analysis which was not carried out in the light of all the relevant factual circumstances and . . . the examination of the actual effects of the payments concerned is founded on an analysis which does not make it possible to support the findings made by the Commission.[183]

110. Because the alleged exclusive nature of Qualcomm's agreements with Apple, and not bundling, was the prominent element in the EC SO against Qualcomm, Prof. Simcoe has no basis to argue that the alleged undisclosed bundling practices "caused" the EC's regulatory action.

---

[181] Prof. Simcoe has not shown, or even tried to show, that the EC's press release announcing that it was investigating Qualcomm for violating European competition law, which the Class Certification Order identifies as the alleged second corrective disclosure, was related to Qualcomm's alleged undisclosed bundling practices. See Class Certification Order, p. 6. In fact, the EC's press release mentions, "The Commission informed Qualcomm of its preliminary conclusions that the company may have illegally paid a major customer for exclusively using its chipsets and sold chipsets below cost with the aim of forcing a competitor out of the market." See EC Press Release, p. 1. While the press release discussed the alleged exclusive-dealing nature of Qualcomm's agreements with Apple, it did not mention any of the alleged undisclosed bundling practices. The EC's press release explicitly mentioned that the payments were modem chip discounts that allegedly led to below cost chip prices, hence not "royalty discounts" as in Prof. Simcoe's License Leverage Theory. Accordingly, it is not the case that this corrective disclosure disclosed any alleged undisclosed bundling practices as articulated by Prof. Simcoe.

[182] Simcoe Report, ¶129.

[183] 2022 General Court Qualcomm v. EC Judgement, ¶511.

### 9.3. TFTC[184]

111. Prof. Simcoe claims that "Qualcomm's bundling led to ... [the] TFTC investigation,"[185] but has not established that the alleged undisclosed bundling practices created a "high risk" or "caused" the Taiwan Fair Trade Commission's ("TFTC") investigation against Qualcomm.[186] Prof. Simcoe merely cites to documents from the TFTC's investigative phase, which, as I discuss below, cannot support his claim that the alleged undisclosed bundling practices caused the TFTC's investigation against Qualcomm. Contrary to Prof. Simcoe's claim, Qualcomm's disclosed practices and its alleged exclusive-dealing agreements with Apple were the prominent elements addressed in the Decision of the Taiwanese Fair Trade Commission against Qualcomm.

112. To support his opinion that Qualcomm's alleged undisclosed bundling practices caused the TFTC investigation, Prof. Simcoe cites to the TFTC's information requests to Qualcomm and to Qualcomm's 10-K listing the seven different issues the TFTC investigated at the time, neither of which can support his claim about the cause of the later action.[187] For example, Prof. Simcoe cites two TFTC questions from the early investigation stage.[188] He fails to acknowledge that these questions were only two out of 15 questions that covered many different business practices.[189] Furthermore, he ignores the fact that one of the questions was related to Qualcomm's Korean licenses, which had already been modified in response to the earlier KFTC investigation.[190]

113. Prof. Simcoe also cites Qualcomm's 2016 10-K, in which Qualcomm reported that "the TFTC specified that the allegations under investigation include whether . . . (vii) the Company provided royalty rebates to certain

---

[184] I understand that neither Plaintiffs nor the Court have considered the announcement of the TFTC investigation to be an actionable corrective disclosure. See Class Certification Order. I further understand that Plaintiffs did not allege that the TFTC investigation disclosed anything new to the market. I only address the TFTC investigation out of an abundance of causation given that Prof. Simcoe has opined on this action.

[185] Simcoe Report, ¶97.

[186] Simcoe Report, ¶15.e.

[187] Simcoe Report, ¶¶131–135; Q121SEC00766259 at 260; QNDCAL04075420 at 422; Qualcomm Incorporated, SEC Form 10-K for the fiscal year ended September 25, 2016, filed on November 2, 2016 ("Qualcomm 2016 10-K"), p. F-27.

[188] Simcoe Report, ¶131; Q121SEC00766259 at 260.

[189] He cites to a TFTC question, in the early investigation stage, about whether "Qualcomm provide[s] any royalty discount to licensees who purchase Qualcomm's chip," which was one of 15 different questions the TFTC asked Qualcomm, covering many of its business practices. Simcoe Report, ¶131; Q121SEC00766259 at 259–261.

[190] He cites to a TFTC question, in the early investigation stage, about "Qualcomm's rectification measures to its patent licensing arrangement after KFTC's decision in 2009," which was one of 15 different questions the TFTC asked Qualcomm covering many of its business practices and has no clear relation to any alleged undisclosed bundling practices. See Simcoe Report, ¶131; Q121SEC00766259 at 259–261.

companies in exchange for their exclusive use of the Company's chipsets."[191] As I explain below, the eventual Decision of the Taiwanese Fair Trade Commission addressed, among other things, the alleged exclusive-dealing nature of Qualcomm's agreements with Apple, but not whether the payments to Apple were "royalty rebates."

114. A review of the "Decision of [the Taiwanese] Fair Trade Commission" demonstrates that, contrary to Prof. Simcoe's claim that the alleged undisclosed bundling practices caused the TFTC investigation, the prominent elements underlying the TFTC investigation were Qualcomm's disclosed bundling practices and the alleged exclusive-dealing nature of its agreements with Apple. In its decision, the TFTC explains the "facts" for why it initiated its investigation against Qualcomm:

> After investigating and interviewing relevant Taiwan enterprises, it is learnt that Qualcomm indeed refuses to license to competing enterprises, imposes restrictions on handset companies (including handset brands and OEMs, the same below) that such companies would not be able to obtain chip (including relevant chips of baseband processors, the same below) supply if they do not enter into patent license agreements with Qualcomm, and provides exclusive rebate to Apple Inc. ("Apple") as incentive, which are suspected to restrict competition. Therefore, the TFTC initiated the investigation on Qualcomm.[192]

115. As the TFTC explanation makes clear, the prominent elements of the TFTC's investigation against Qualcomm were its disclosed practices (i.e., the alleged refusal to license chip makers and the "no license, no chip" practice) and the alleged exclusive-dealing nature of its agreements with Apple. The TFTC decision also did not focus on a theory of harm alleging that Qualcomm's licensing terms were anticompetitive due to the alleged undisclosed bundling practices creating discriminatory royalties that were in violation of the "nondiscriminatory" requirement of FRAND.[193] Hence, Prof. Simcoe has not shown that the TFTC would not have brought its action against Qualcomm absent the alleged undisclosed bundling practices (as opposed to the disclosed

---

[191] Simcoe Report, ¶135, fn. 206; Qualcomm 2016 10-K, p. F-27.

[192] "Decision of Fair Trade Commission," QNDCAL04959941 ("Decision of TFTC"), p. 2.

[193] The TFTC claims that Qualcomm's licensing practices led to "discrimination against a high-priced handset[s]" and that "[r]efusing to license or selectively choosing who will be licensed is discriminatory," none of which relate to the alleged undisclosed bundling practices. See Decision of TFTC at pp. 4–5, 7, 20, 34.

practices or the alleged exclusive-dealing nature of the agreements with Apple), meaning that he has no support for his claim that Qualcomm's undisclosed bundling practices "caused" the TFTC action.

## 9.4. FTC

116. Prof. Simcoe has not established that the alleged undisclosed bundling practices created a "high risk" or "caused" the FTC complaint against Qualcomm.[194] Contrary to Prof. Simcoe's claim, Qualcomm's disclosed practices and its alleged exclusive-dealing agreements with Apple were the prominent elements in the FTC complaint against Qualcomm. As a result, Prof. Simcoe has failed to establish that, absent the alleged undisclosed bundling, the FTC would not have brought the complaint. Furthermore, because the prominent elements of the FTC complaint were similar to those of the other regulatory actions, Prof. Simcoe has also failed to identify which alleged undisclosed conduct was, or could have been, *newly* disclosed by the FTC complaint.

117. To support his opinion that Qualcomm's alleged undisclosed bundling practices caused the FTC complaint, Prof. Simcoe cites several documents related to the FTC's information requests to Qualcomm, none of which can support his claim about the eventual cause of the later action.[195] Furthermore, it is unclear why any information that was not eventually included in the FTC complaint is relevant for the alleged corrective disclosure.

118. The FTC complaint did not put forward Prof. Simcoe's Licensing Leverage Theory of harm. The FTC complaint highlighted the following alleged conduct:

a. Qualcomm withholds its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred by

---

[194] Simcoe Report, ¶15.e.

[195] Simcoe Report, ¶¶136–142; Q2017MDL1_01852504 at 506–09; Q2017MDL1_03097131; QNDCAL03250372 at 430–432; Q121SEC00469664 at 667, 671-672; INTEL-QCOM008210601; SFT-17632907; APL-QC-FTC_32290159; APL-QC-FTC_37402048 at 050, 054; APL-QC_18028497; Q2017MDL1_03130758; Q2017MDL1_03120294 at 310; Q2017MDL1_03367499 at 503, 525–531; QNDCAL04506711; QNDCAL04506817 at 374:15–18, 397:4–5; QNDCAL04506917; QNDCAL04507133 at 73:25–74:2, 138:18-21, 235:7-9; QNDCAL04507233; QNDCAL04507033; QNDCAL04507352; APL-QC-FTC_37235151; APL-QC_13701960. I note that many of the requests Prof. Simcoe refers to address the alleged exclusive-dealing nature of Qualcomm's agreements with Apple and other business practices unrelated to the alleged undisclosed bundling.

Qualcomm, including elevated royalties that the customer must pay when using competitors' processors ("no license-no chips").

b. In some instances, Qualcomm has offered customers incentive payments (often tied to their purchase of Qualcomm's processors) to induce those customers to accept Qualcomm' s preferred license terms.[196]

c. Qualcomm has consistently refused to license its cellular standard-essential patents to its competitors, in violation of Qualcomm's FRAND commitments.

d. Qualcomm entered into exclusive dealing arrangements with Apple Inc., a particularly important cell phone manufacturer.[197]

119. Items (a)–(c) above refer to the FTC's first theory of harm that Qualcomm's practices allowed it to obtain above-FRAND royalties that led to the exclusion of rival chip makers.[198] Item (d) refers to the FTC's second theory of harm based on Qualcomm's alleged exclusive-dealing agreements with Apple.[199]

120. To assess Prof. Simcoe's claim that the alleged undisclosed bundling practices caused the FTC complaint, I evaluate whether each of the FTC's two theories of harm relied on the alleged undisclosed bundling underlying his Licensing Leverage Theory.

**The FTC's elevated, exclusionary royalties theory**

121. Prof. Simcoe has not established that the FTC complaint based on its theory of elevated, exclusionary royalties was "caused" by the alleged undisclosed bundling practices described in his Licensing Leverage Theory. Prof. Simcoe asserts that the FTC's claim that "[o]n some occasions, Qualcomm

---

[196] As I explain below in this section, the FTC's theory of how Qualcomm used "incentive payments" is fundamentally different from Prof. Simcoe's Licensing Leverage Theory.

[197] Complaint (Unredacted Version of Document Sought to be Sealed), *Federal Trade Commission v. Qualcomm Incorporated*, January 17, 2017, Q121SEC00703172 ("FTC Complaint Unredacted"), ¶3. See also FTC Complaint Unredacted, ¶¶4–9. I note that the portions of the FTC complaint that addressed Qualcomm's alleged use of incentive payments to OEMs (point b. above) were redacted from the public version of the Complaint, which Plaintiffs allege was the third corrective disclosure. See Complaint (Redacted Version of Document Sought to be Sealed), *Federal Trade Commission v. Qualcomm Incorporated*, January 17, 2017; Class Certification Order, p. 7 ("The Third Corrective Disclosure[;] January 17, 2017 – A Complaint publicly filed by the Federal Trade Commission.").

[198] FTC Complaint Unredacted, ¶7.

[199] FTC Complaint Unredacted, ¶8.

has induced certain OEMs to accept its preferred license terms using both the 'stick' of threatened supply disruption and the 'carrot' of funds conditioned on the OEM's acceptance of Qualcomm's preferred terms" is evidence that the alleged undisclosed bundling practices caused the FTC complaint.[200] Prof. Simcoe has mischaracterized the FTC's theory and ignores evidence that is inconsistent with his Licensing Leverage Theory.

122. First, the FTC's theory of elevated, exclusionary royalties and Prof. Simcoe's Licensing Leverage Theory make contradictory predictions about whether OEMs that purchase large shares (i.e., all or most) or small shares (i.e., little or none) of their modem chips from Qualcomm will receive funds from Qualcomm. The FTC claimed that Qualcomm used funds as "carrots" to induce OEMs to accept an above-FRAND rate.[201] The logic of this claim is that Qualcomm would use this "carrot" with OEMs that are not subject to Qualcomm's "stick" of threatened modem chip supply. That is, Qualcomm would provide incentive funds to "close the gap" with OEMs that purchase *small* shares (or none) of their modem chips from Qualcomm (and thus were less "dependent" on Qualcomm's modem chips) to incentivize them to agree to Qualcomm's licensing terms.[202] The incentive funds were therefore alleged to be conditioned on agreeing to above-FRAND *royalty rates*.

123. To the contrary, Prof. Simcoe's Licensing Leverage Theory has the exact opposite explanation: Prof. Simcoe claims that Qualcomm used the funds to "offer discounts to OEMs that disputed these [royalty] rates *if* they agreed to also buy chipsets from Qualcomm," meaning that Qualcomm would provide incentive funds to OEMs in return for their agreement to purchase *large* shares of their modem chips from Qualcomm (i.e., to incentivize them to buy Qualcomm's modem chips).[203] Under Prof. Simcoe's theory, the incentive funds were therefore alleged to be conditioned on agreeing to purchase *modem chips*.[204]

---

[200] FTC Complaint Unredacted, ¶102; Simcoe Report, ¶146. See also Simcoe Report, ¶¶143–144.

[201] FTC Complaint Unredacted, ¶102.

[202] FTC Complaint Unredacted, ¶5 ("Qualcomm's use of incentive payments helps Qualcomm 'close the gap' with customers that resist license terms that they regard as unreasonable."), ¶104 ("Conditioning such funds on OEMs' acceptance of license terms has helped Qualcomm 'close the gap' with OEMs that resist license terms that they regard as unfair, and to maintain high royalties on handsets that use competitors' baseband processors.").

[203] Simcoe Report, ¶76.

[204] The prediction that Qualcomm will provide funds to OEMs that purchase a large share of their modem chips from Qualcomm also holds under Prof. Simcoe's "second strand" of the theory in which a monopolist condition access to the monopolized product (e.g., SEP licenses) on the purchase of a competitive product (e.g., modem chips). See Simcoe Report, ¶83.

124. Second, the FTC alleged that Qualcomm only used funds "[o]n some occasions" and with "certain OEMs."[205] This is because, per the FTC, these funds were used with OEMs that were not reliant on Qualcomm's modem chips.[206] In contrast, Prof. Simcoe's Licensing Leverage Theory requires that all, or almost all, OEMs receive "bundled discounts," or funds that are conditioned on purchasing Qualcomm modem chips. Prof. Simcoe's Licensing Leverage Theory crucially relies on Qualcomm's conditioning "discounts" on purchases of Qualcomm's modem chips to an extent great enough to affect competition in the modem chip market(s). The FTC's theory of harm was primarily that, by using its disclosed practices (and in particular "no license, no chips"), Qualcomm was able to obtain elevated royalties from OEMs that demanded Qualcomm's modem chips.[207] In other words, the FTC was concerned about Qualcomm's conduct that allegedly allowed it to obtain above-FRAND royalty rates, which is based more on the "stick" of threatened modem chip supply, rather than the "carrot" of incentive funds. Thus, because the FTC's theory was based on the disclosed practices and did not depend on any incentive funds, Prof. Simcoe has not established that the FTC would not have filed the complaint absent any undisclosed bundling, including any payments he claims were related to his Licensing Leverage Theory.

125. Third, the FTC complaint also noted that only "in some cases [these funds] accrued based on OEMs' purchase of Qualcomm's processors."[208] It is crucial to Prof. Simcoe's Licensing Leverage theory that these funds are conditioned on purchasing Qualcomm's modem chips. His theory does not apply in situations when the payments were not based on modem chip purchases (i.e., lump-sum funds).[209] The FTC's theory, on the other hand, does not depend on whether any payment was a lump sum or accrued based on modem chip purchases. The FTC's theory is that the payments were conditioned on accepting Qualcomm's licensing terms, not on purchasing Qualcomm's modem chips.

[205] FTC Complaint Unredacted, ¶102.

[206] As I explained above, according to the FTC, Qualcomm will use the "stick" when OEMs are reliant on Qualcomm's modem chips and would provide incentive funds to OEMs that are less reliant on Qualcomm's modem chips to "close the gap." See FTC Complaint Unredacted, ¶¶5, 102–104.

[207] FTC Complaint Unredacted, ¶¶4–7.

[208] FTC Complaint Unredacted, ¶103.

[209] Simcoe Report, ¶49 ("Instead of agreeing to lower its royalty directly, Qualcomm would instead offer to provide a separate 'incentive' that would accrue based on purchases of its chipsets. The incentive was money that Qualcomm would place in a 'fund' for the cellular device manufacturer to use. Qualcomm would put money into the fund for each device that the cellular manufacturer sold in each quarter that incorporated a Qualcomm chipset. The more devices the cellular device manufacturer sold each quarter with a Qualcomm chipset, the more money Qualcomm would put into the fund.").

126. Because the FTC complaint described a different theory of harm related to the use of the incentive funds, even if one were to assume that the incentive funds did amount to bundled discounts, Prof. Simcoe would have no basis to argue that the alleged undisclosed bundling, as he articulated it in his Licensing Leverage Theory, "caused" the FTC complaint.

127. Finally, the FTC complaint did not focus on a theory of harm alleging that Qualcomm's licensing terms were anticompetitive due to the alleged undisclosed bundling practices creating discriminatory royalties that were in violation of the "nondiscriminatory" requirement of FRAND.

**The FTC's theory of exclusive-dealing agreements with Apple**

128. Prof. Simcoe has not established that the alleged undisclosed bundling caused the FTC complaint based on its theory that Qualcomm's agreements with Apple were allegedly de facto exclusive-dealing. Because the prominent element of the FTC complaint's allegations with relation to the agreements with Apple had to do with the alleged exclusive-dealing nature of these agreements, Prof. Simcoe has no basis to argue that the FTC would not have filed the complaint absent the alleged undisclosed bundling (i.e., if these alleged exclusive-dealing agreements were shown to be unrelated to license negotiations). Hence he cannot conclude that the alleged undisclosed bundling caused the FTC complaint.

129. Prof. Simcoe's own explanation of the FTC allegations with relation to Apple indicates that the FTC's complaint was related to the alleged exclusive-dealing nature of Qualcomm's agreements with Apple and not on whether these agreements were undisclosed bundling. Prof. Simcoe explains:

> Specific to Apple, the FTC alleged, among other things, that "Qualcomm's 2011 and 2013 agreements with Apple were, and were intended by Qualcomm to be, *de facto* exclusive deals that were as effective as express purchase requirements and that effectively foreclosed Qualcomm's competitors from gaining baseband processor business at Apple." The FTC concluded, "As a result of the exclusivity terms in its agreements with Qualcomm, Apple sourced baseband processors exclusively from Qualcomm for all new iPad and iPhone

products that it launched over the five-year period from October 2011 until September 2016."[210]

130. Because he has not established that Qualcomm's undisclosed bundling practices were a prominent element of the FTC complaint or a necessary element in its theory of harm, Prof. Simcoe has not established that the undisclosed practices "caused" the FTC complaint. Furthermore, because Qualcomm's disclosed practices and the allegedly exclusive nature of Qualcomm's agreements with Apple were the prominent elements of the FTC complaint, Prof. Simcoe has no basis to argue that the complaint would not have been filed absent Qualcomm's alleged undisclosed bundling practices. Therefore, he has no basis for his claim that the undisclosed practices "caused" the FTC complaint.

## 9.5. Apple

131. Prof. Simcoe has not established that the alleged undisclosed bundling practices created a "high risk" or "caused" the Apple complaint against Qualcomm.[211] Prof. Simcoe merely cites Apple's characterization of its agreements with Qualcomm as providing "rebates on [Apple's] license fee," which falls short of showing that the alleged undisclosed bundling practices (rather than allegations of exclusive dealing) caused Apple to bring the lawsuit.[212] Contrary to Prof. Simcoe's claim, Qualcomm's disclosed practices and its alleged exclusive-dealing agreements with Apple were the prominent elements in the Apple complaint against Qualcomm.

132. Prof. Simcoe's citations to a couple of places in Apple's complaint where Apple characterizes the payments it received from Qualcomm as "rebates" are insufficient to support his claim that Qualcomm's undisclosed bundling "caused" Apple's lawsuit.[213] As in the FTC case, while Apple characterized payments it received from Qualcomm as "royalty relief," whether or not the payments were related to royalties has no effect on any theory of harm from these alleged exclusive-dealing agreements. Prof. Simcoe has not shown that

[210] Simcoe Report, ¶147; Q2014FTC04094294 at 318.

[211] Simcoe Report, ¶15.e.

[212] Simcoe Report, ¶156; Complaint, *Apple Inc. v. Qualcomm Incorporated*, January 20, 2017, QNDCAL04948743 ("Apple Complaint"), ¶95–97.

[213] Simcoe Report, ¶¶156–157; QNDCAL04070093 at 111, 117, 121–122.

Apple filed the complaint because these payments were "royalty relief" nor that Apple would not have filed the complaint if the agreements had been exclusive-dealing agreements but without providing "royalty relief." These citations merely demonstrate Apple's interpretation of the payments and do not establish whether that interpretation has any impact on whether the agreements caused anticompetitive harm, created an antitrust issue, or caused Apple to file its complaint. Hence, Prof. Simcoe has not established that Qualcomm's undisclosed bundling, as opposed to the disclosed conduct and the alleged exclusive-dealing nature of Qualcomm's agreements with Apple, "caused" the Apple complaint.

133. The prominent elements of the Apple complaint against Qualcomm were similar to those of the regulatory actions.[214] As the Apple complaint explains, Apple's theories of harm were similar to the FTC's and were based on (1) Qualcomm's alleged use of its disclosed practices to obtain elevated, exclusionary royalties, and (2) the alleged exclusive-dealing nature of Qualcomm's agreements with Apple:

> The FTC's complaint alleged the same integrated cycle of anticompetitive conduct which Apple alleges here, including Qualcomm's refusal to license its competitors, its refusal to sell chipsets without a license, and its imposition of exclusivity on Apple in exchange for a degree of royalty relief, all of which has had, according to the FTC, the effect of marginalizing Qualcomm's competitors and elevating prices above competitive levels.[215]

Therefore, Apple itself indicates that its theory of harm was similar to the FTC's theories I discussed above.

134. Furthermore, the Apple complaint did not focus on a theory of harm alleging that Qualcomm's licensing terms were anticompetitive due to the alleged undisclosed bundling practices creating discriminatory royalties that were in violation of the "nondiscriminatory" requirement of FRAND.[216]

---

[214] Because the prominent elements of the Apple complaint were similar to those of the other At-Issue Complaints, Prof. Simcoe has also failed to identify which alleged undisclosed conduct was, or could have been, *newly* disclosed by the Apple complaint.

[215] Apple Complaint, ¶164.

[216] The Apple complaint argued that Qualcomm was "discriminating between potential licensees by refusing to license its SEPs to competitors" and by charging royalties "expressed as a percentage of the entire market value of

135. Because he has not established that Qualcomm's undisclosed bundling practices were a prominent element of the Apple complaint, Prof. Simcoe has not established that the undisclosed practices "caused" the Apple complaint. Furthermore, because Qualcomm's disclosed practices and the alleged exclusive-dealing nature of its agreements with Apple were the prominent element of the complaint, Prof. Simcoe has no basis to argue that Apple would not have filed the complaint absent Qualcomm's undisclosed bundling practices. Therefore, he has no basis for his claim that the undisclosed practices "caused" the Apple complaint.

## 10. Prof. Simcoe Has No Basis to Opine That the At-Issue Complaints Were a Foreseeable Consequence of the Alleged Undisclosed Bundling

136. Prof. Simcoe claims that "[t]he regulatory actions against Qualcomm were a foreseeable consequence of Qualcomm's undisclosed bundling practices."[217] He further explains that "[i]t is [his] opinion that regulatory actions were highly likely to occur given Qualcomm's bundling practices and their anticompetitive effects."[218] In this section, I explain that Prof. Simcoe has no basis to opine that the At-Issue Complaints were a foreseeable consequence of Qualcomm's undisclosed bundling. This is because Prof. Simcoe has failed to show that Qualcomm's undisclosed bundling practices harmed or could have harmed competition, and because he has failed to show that Qualcomm's undisclosed bundling practices caused the At-Issue Complaints.

137. As I explained in Section 7 above, Prof. Simcoe's Licensing Leverage Theory lacks economic and factual support and cannot establish that Qualcomm's undisclosed bundling practices could have harmed competition.

138. Furthermore, as I showed in Section 8, Prof. Simcoe has failed to show that Qualcomm's conduct caused anticompetitive harm, because he ignores reasons for rivals' exits unrelated to Qualcomm's conduct, and because Qualcomm's limited and declining market shares are inconsistent with exclusion.

---

the finished device," but not based on the identity of the chip maker as Prof. Simcoe asserts based on his Licensing Leverage Theory. See Apple Complaint, ¶¶51, 142–143.

[217] Simcoe Report, ¶164.

[218] Simcoe Report, ¶164.

139. Finally, as I showed in Section 9 above, Prof. Simcoe has failed to show that Qualcomm's undisclosed bundling practices caused the At-Issue Complaints.

140. For each of the reasons above, and for all of them together, it is my opinion that Prof. Simcoe has no basis for his claim that the At-Issue Complaints were a foreseeable consequence of Qualcomm's undisclosed bundling practices.

## 11. Mr. Mintzer's Discussion of Accounting Treatments Is Irrelevant to Bundling as a Matter of Antitrust Economics

141. Mr. Mintzer was asked "to provide expert testimony about whether the Relevant Accounting Memoranda show that Qualcomm documented, considered and accounted for certain sales arrangements with multiple agreements, elements, or deliverables, including customer incentives, as part of a single sales arrangement under GAAP."[219]

142. Mr. Mintzer opines that "indicia of bundled sales arrangements" include six "relevant indicia."[220] He "reviewed certain [Qualcomm accounting] memoranda" related to Qualcomm's agreements with nine OEMs and applied the "relevant indicia" to determine whether "Qualcomm documented, considered and accounted for certain sales arrangements discussed in the Relevant Accounting Memoranda as bundled sales arrangements."[221]

143. I have reviewed the six factors that Mr. Mintzer opines are "indicia of bundled sales arrangements."[222] In my opinion as an antitrust economist, these six factors are not relevant to whether a practice constitutes anticompetitive bundling as a matter of antitrust economics. Whatever relevance they may have to accounting, these six factors are not relevant to antitrust economics.[223]

144. As a matter of antitrust economics, the accounting treatment of any sale is unrelated to either the incentive or the ability of any party to engage in

[219] Mintzer Report, ¶5.

[220] Mintzer Report, ¶11.

[221] Mintzer Report, ¶¶3, 11–12.

[222] Mintzer Report, ¶11.

[223] I am not an expert in accounting and therefore express no opinion regarding the relevance of Mr. Mintzer's six factors to generally accepted accounting principles or how the Qualcomm accounting memoranda Mr. Mintzer discusses applied generally accepted accounting principles.

anticompetitive bundling or in any other anticompetitive conduct. The accounting treatment of any sale is also unrelated to the competitive effects of any bundling. Finally, the accounting treatment of any sale is also unrelated to the intention of any party to exclude or enhance competition. Consequently, the six factors that Mr. Mintzer identified are not relevant to the question of whether Qualcomm engaged in undisclosed exclusionary bundling.

Celeste Saravia, Ph. D.
Date: December 11, 2023

**Appendix A**


# CELESTE SARAVIA, PH.D.
## Vice President

**Cornerstone Research**
Two Embarcadero Center, 20th Floor • San Francisco, CA 94111
415.229.8116 • fax 415.229.8199
csaravia@cornerstone.com


### ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1998–2004 | **University of California, Berkeley**<br>*Ph.D. in Economics, 2004* | Berkeley, California |
| 1994–1998 | **Northwestern University**<br>*B.A. in Mathematics, 1998* | Evanston, Illinois |

### PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 2023–Present | **University of California, Berkeley**<br>*Lecturer* | Berkeley, California |
| 2004–Present | **Cornerstone Research**<br>*Vice President* | San Francisco, California |

***Representative Antitrust Experience as a Consultant***

Managing role in supporting class certification, liability, and damage analyses in antitrust matters involving claims of foreclosure and price fixing; and mergers. Matters include:

- Alleged vertical and horizontal conspiracy among content providers and distributors in the media industry.
- Alleged vertical conspiracy among manufacturers of and distributors of certain construction products. Class certification.
- Alleged use of exclusive contracts and anti-competitive bundling by a large supplier of security products. Damages analysis for the defendant.
- Alleged monopolization by the largest purchaser of a natural resource. Preliminary injunction analysis, class certification, liability, and damages for the defendants.
- Price fixing case in semiconductor industry. Class certification in direct and indirect cases. Work required extensive analysis of large proprietary data sets produced by five alleged conspirators.
- Alleged monopolization by the largest participants in the payment services industry. Liability for multiple defendants in a case brought by competitors.
- Alleged anti-competitive bundling by a large medical device manufacturer. Class certification. Work required extensive analysis of detailed transaction data.
- Alleged predatory pricing in the aerospace industry. Liability, market definition, and damages analyses for the defendant.
- Analysis of the competitive effects of the proposed merger of two energy companies.
- Analysis of the competitive effects of the proposed merger of two medical device manufacturers.
- Analysis of the competitive effects of the proposed merger of two high-technology manufacturing firms.
- Analysis of competitive effects of the proposed merger of two firms in the food industry.

***Other Cornerstone Research Experience***

- Analysis of reasonable royalty rates, lost profits, and price erosion due to patent infringement.
- Analysis of the competitive effects of the settlement terms imposed on a subset of market participants in a consumer product market.
- Breach of contract in the hospitality industry. Class certification, liability, and damages analyses for the defendant.

2000–2004 **University of California Energy Institute** Berkeley, California

*Research Assistant*

Developed and implemented models for econometric analysis of the efficiency of the California electricity market. Maintained and updated large electricity databases.

2002 **Analysis Group** San Francisco, California

*Summer Associate*

Developed analytical models for an economic consulting project.

1999–2000 **University of California, Berkeley** Berkeley, California

*Teaching Assistant*

*Instructed sections for Graduate Micro Economics and Introduction to Economics*

**OTHER PROFESSIONAL ACTIVITIES**

2017–2023 Vice Chair, ABA Pricing Conduct Committee, Section of Antitrust Law

2014–2017 Vice Chair, ABA Franchising and Distribution Committee, Section of Antitrust Law

**PUBLICATIONS**

"Comments on the Potential Implications of the Draft FTC-DOJ Merger Guideline 4 for the U.S. Pharmaceutical Industry," with Sarah Abraham, John Asker, Avigail Kifer, Margaret Kyle, and Ariel Pakes, September 18, 2023, available at https://www.regulations.gov/comment/FTC-2023-0043-1505

"Necessity as the Mother of Invention? Streamlining the Evaluation of Competitor Collaborations" with I. Simmons, G. Bashour, and A. Klein, *Antitrust Magazine*, Vol.34, No 3, Summer 2020

**"**Bright Line**"** Apple v. Pepper Invites Further Economic Analysis**,** with T. Kumler, *Competition Policy International*, July 2019

"Tying Law and Policy," (contributor) Antitrust Law and Economics of Product Distribution Second Edition, 2016

"Class Certification under Rule 23," (contributor) *ABA Indirect Purchaser Litigation Handbook,* 2016.

"Analyzing Incentives and Liability in 'Hub-and-Spoke' Conspiracies," with C. Falls, *Distribution: The Newsletter of the Distribution and Franchising Committee,* Vol 19, No. 1, April 2015

"Relevant Markets," (contributor) *ABA Antitrust Law Developments (Seventh),* Vol. 1, Chapter 6, March 2012

"Horizontal Merger Guidelines and Market Definition in Monopolization Cases," with E. Bruegmann and N. Soboleva, *Global Competition Review: The Antitrust Review of the Americas*, 2011

"Economics of Antitrust: The Current State of Law and Economics on Bundled Discounts," with V. Howell, *Global Competition Review: The Antitrust Review of the Americas* (special issue), 2009

**PUBLICATIONS (CONT.)**

"Vertical Arrangements, Market Structure, and Competition: An Analysis of Restructured U.S. Electricity Markets," with J. Bushnell and E. Mansur, *American Economic Review,* Volume 98, Issue 1, March 2008, pages 237-266

**PRESENTATIONS**

Panel presentation, "Big Data and Evolving Views of Market Definition and Power" Antitrust in the Financial Sector Summit, New York, NY, September 2023

Panel presentation, "Transatlantic Antitrust Class Actions" Fordham University, 49th Annual Antitrust Conference, New York, NY, September 2022

Panel presentation, "Certifiable? Navigating Class Actions Today" American Bar Association 70th Antitrust Law Spring Meeting, April 2022

Panel presentation, "12th Summit on Biosimilars & Innovator Biologics" American Conference Institute, June 2021

Panel presentation, "Big Tech Trial Juror Study" American Bar Association Antitrust Law Section, May 2021

Panel presentation, "Fundamentals—Economics" American Bar Association 69th Antitrust Law Virtual Spring Meeting, March 2021

Panel presentation "Women in Lead Roles: First Chairs and Expert Witnesses" American Bar Association Antitrust Law Section, February 2021

Panel presentation, "Tech Enforcement and Digital Competition Challenges" Antitrust TX, October 2020

Panel presentation, "Economic Analysis in Antitrust, Consumer and Securities Class Actions" The Chicago Bar Association Webinar, May 2020

Moderated Panel presentation, "Antitrust Counseling on Competitor Collaborations and Price Gouging during COVID-19" American Bar Association Section of Antitrust Law teleconference, April 2020

Panel presentation, "FTC vs. Qualcomm and Other Recent Antitrust Developments in High Tech and Life Sciences" 20th Annual Berkeley-Stanford Advanced Patent Law Institute: Silicon Valley, East Palo Alto, CA, December 2019

Panel presentation, "Legal Standards for Class Certification and Regression Analysis" The Economics of Class Certification, San Francisco, CA November 2019

Panel presentation, "A Deep Dive into Spokeo: Including a Discussion of the Use of Experts and Statistical Sampling at Class Certification in light of Spokeo and Tyson," Bridgeport Continuing Education 2017 Class Action Litigation Conference, San Francisco CA, September 2017

Panel presentation, "Proof Agreements, Incentives and Liabilities in Hub-and-Spoke Antitrust Conspiracies: A 2017 Update," The Knowledge Group Teleconference, May 2017

Panel presentation, "Clarifying Liability in Hub-and-Spoke Conspiracies," 64th American Bar Association Section of Antitrust Law Spring Meeting, Washington D.C., April 2016

Panel presentation, "Trial Practice Fundamentals: Working with Your Expert," American Bar Association Webinar, May 2015

**PRESENTATIONS (CONT.)**

Panel presentation, "Downloading the Future: Media Mergers and Content Distribution," 63rd American Bar Association Section of Antitrust Law Spring Meeting, April 2015

Panel presentation, "Analyzing Conspiracies with Both Vertical & Horizontal Elements," American Bar Association Teleconference, January 2015

Expert in mock trial focusing on pay-for-delay to teach State and Federal court judges, "Antitrust Law & Economics Institute for Judges," American Bar Association/George Mason University School of Law Judicial Education Program, October 2014

## HONORS AND AWARDS

Selected by 2016, 2017, 2019, 2020 and 2023 Who's Who Legal: Consulting Experts as a leading economic consulting and competition economist.

Received a Best Antitrust Business Article award in the concerted practices category in 2016 for the publication, "Analyzing Incentives and Liability in 'Hub-and-Spoke' Conspiracies," with C. Falls, published by the American Bar Association Section of Antitrust Law, *Distribution and Franchising Committee Newsletter*.

## EXPERT TESTIMONY

*Tevra Brands, LLC v Bayer Healthcare LLC, et al.* United States District Court, Northern District of California San Jose Division. Filed Expert Report and gave deposition testimony (2023)

*In re: Broiler Chicken Grower Antitrust Litigation Haff Poultry, Inc., al, v. Tyson Foods, Inc., et al.* United States District Court Eastern District of Oklahoma. Filed expert report (2022) and gave deposition testimony (2023)

*In re HIV Antitrust Litigation.* United States District Court, Northern District of California San Francisco Division. Filed expert report, gave deposition testimony (2022) and testified at jury trial (2023)

*O.E.M. Glass Network, Inc. et al v. Mygrant Glass Company, Inc. et al.* United States District Court for the Eastern District of New York. Filed expert report (2021) and gave deposition testimony (2022)

*B & R Supermarket, Inc., et al. v. Visa, Inc., et al.* U.S. District Court, Eastern District of New York. Filed expert report and gave deposition testimony (2021)

*eBay v. Amazon et al.* American Arbitration Association. Filed expert report (2020), gave deposition testimony (2020) and arbitration testimony (2020)

*All-Tag Corp. v. Checkpoint Systems, Inc.* U.S. District Court, Southern District of Florida. Filed expert report (2019) and gave deposition testimony (2019)

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation.* U.S. District Court, Eastern District of New York. Filed expert reports (2019) and gave deposition testimony (2019)

*Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars v. Ningbo Sunny Electronic Co. Ltd.* U.S. District Court, Northern District of California. Filed expert report (2019), gave deposition testimony (2019), and testified at jury trial (2019)

*Fresenius Kabi v Par Sterile Products, LLC and Par Pharmaceuticals Companies, Inc.* U.S. District Court, District of New Jersey. Filed expert report (2019) and gave deposition testimony (2019)

*Inline Packaging, LLC v. Graphic Packaging International, Inc.* U.S. District Court, District of Minnesota. Filed expert report (2017) and gave deposition testimony (2018)

## EXPERT TESTIMONY (CONT.)

*In RE: Dental Supplies Antitrust Litigation,* U.S. District Court, Eastern District of New York. Filed expert report (2017) and gave deposition testimony (2018)

*The Rack LLC, v. Westfield LLC, Westfield Promenade LLC.* Superior Court, State of California for the County of Los Angeles. Gave deposition testimony (2017)

*J&M Distributing Inc. v. Hearth & Home Technologies Inc. and Magnotti and Sons, Inc. d/b/a The Fireplace and the Patio Place.* U.S. District Court, District of Minnesota. Filed expert report (2014) and testified at jury trial (2015)

*The Morning Star Packing Company, et al. v. SK Foods, L.P., et al.* U.S. District Court, Eastern District of California. Filed expert report (2015) and gave deposition testimony (2015)

# Documents Relied Upon

## Academic Articles


- Carlton, Dennis W., Greenlee, Patrick and Waldman, Michael, "Assessing the Anticompetitive Effects of Multiproduct Pricing," *Antitrust Bulletin*, 53, No. 3, 2008, pp. 587–622.
- Chien, Colleen V., "Holding Up and Holding Out," *Michigan Telecommunications and Technology Law Review*, Vol. 21, 1, Fall 2014, pp. 1–41.
- Evans, David S. and Salinger, Michael, "The Role of Cost in Determining When Firms Offer Bundles," *The Journal of Industrial Economics*, 56, 2008, pp. 143–168.
- Evans, David S. and Salinger, Michael, "Why do firms bundle and tie? Evidence from the competitive markets and implications for tying law," *Yale Journal on Regulation*, 22, 2005, pp. 37–89.
- Hastings, Justine and Williams, Michael, "What Is a 'But-For' World?" *Antitrust*, 31, No. 1, Fall 2016, pp. 102–108.
- Hovenkamp, Herbert J. and Hovenkamp, Erik, "Complex Bundled Discounts and Antitrust Policy," *Buffalo Law Review*, 57, 2009, pp. 1227–1266.
- Kaplow, Louis, "Extension of Monopoly Power Through Leverage," *Columbia Law Review*, 85, No. 3, 1985, pp. 515–556.
- Klein, Benjamin, Crawford, Robert and Alchian, Armen, "Vertical Integration, Appropriable Rents, and the Competitive Contracting Process," *Journal of Law and Economics*, 21, No. 2, 1978, pp. 297–326.
- Muris, Timothy J. and Smith, Vernon L., "Antitrust and Bundled Discounts: An Experimental Analysis," *Antitrust Law Journal*, 75, No. 2, 2008, pp. 399–432.
- Nalebuff, Barry, "Bundling as an entry barrier," *The Quarterly Journal of Economics*, February 2004, pp. 159–187.
- Nalebuff, Barry, "Bundling, Tying, and Portfolio Effects," *DTI Economics Paper No. 1*, February 2003, pp. 1–96.
- Rey, Patrick and Tirole, Jean, *A Primer on Foreclosure*, (Handbook of Industrial Organization III, 2007).
- Samaniego, Roberto M., "Entry, Exit, and Investment-Specific Technical Change," *American Economic Review*, 100, No. 1, 2010, pp. 164–192.
- Whinston, Michael D., "Tying, Foreclosure, and Exclusion," *The American Economic Review* 80, No. 4, 1990, pp. 837–859.

**Bates Stamped Documents**

- APL-QC_13701960
- APL-QC_18028497
- APL-QC-FTC_22481155
- APL-QC-FTC_32290159
- APL-QC-FTC_34544415
- APL-QC-FTC_37235151
- APL-QC-FTC_37402048
- FTC-PROD-0011240
- FTC-PROD-0011282
- INTEL-QCOM008210601
- MRVL-00000059
- QNDCAL03250372
- QNDCAL04070093
- QNDCAL04075420
- QNDCAL04397693
- QNDCAL04400458
- QNDCAL04506711
- QNDCAL04506817
- QNDCAL04506917
- QNDCAL04507033
- QNDCAL04507133
- QNDCAL04507233
- QNDCAL04507352
- QNDCAL04948743
- QNDCAL04959941
- Q121SEC-AEO-00013675
- Q121SEC0037861
- Q121SEC00469664
- Q121SEC00703172
- Q121SEC00766259

- Q2014FTC04094294
- Q2017MDL1_00661503
- Q2017MDL1_00763006
- Q2017MDL1_01852504
- Q2017MDL1_02021163
- Q2017MDL1_02717201
- Q2017MDL1_02928988
- Q2017MDL1_02930845
- Q2017MDL1_03096224
- Q2017MDL1_03097131
- Q2017MDL1_03097135
- Q2017MDL1_03120294
- Q2017MDL1_03130758
- Q2017MDL1_03133196
- Q2017MDL1_03367499
- SFT-17632907

### Data Sources

- Strategy Analytics, "Baseband Market Share Tracker Q1 2018," June 2018.

### Depositions and Trial Testimonies

- FTC Trial Testimony of Edward Snyder, January 22, 2019.

### Expert Reports

- Expert Report of Andrew M. Mintzer, September 12, 2023.
- Expert Report of Timothy Simcoe, September 12, 2023.

### Legal Documents

- Class Certification Order, *In Re Qualcomm Incorporated Securities Litigation*, March 20, 2023.
- Complaint (Redacted Version of Document Sought to be Sealed), *Federal Trade Commission v. Qualcomm Incorporated*, January 17, 2017.

- Judgement of the General Court (Sixth Chamber, Extended Composition), *Qualcomm Incorporated v. European Commission*, June 15, 2022.
- Opinion, *United States Court of Appeals for the Ninth Circuit, FTC v. Qualcomm Incorporated*, August 11, 2020.
- Seoul High Court Decision, *2017 Nu 48 Revocation of the Corrective Order, etc.*, December 4, 2019.
- Summary Judgement of the United States District Court Northern District of California, *In re Qualcomm Antitrust Litigation*, September 26, 2023.

### Letters

- Letter from Salvatore J. Graziano to Honorable Jinsook Ohta, "In re Qualcomm Incorporated Securities Litigation, No. 3:17-cv-00121-JO-MSB," October 18, 2022.

### Press Release

- European Commission Press Release, "Antitrust: Commission sends two Statements of Objections on exclusivity payments and predatory pricing to Qualcomm," December 8, 2015.
- Korea Fair Trade Commission Press Release, "Qualcomm's Abuse of Market Dominance," July 23, 2009.
- Qualcomm Press Release, "Qualcomm Confirms Receipt of Korea Fair Trade Commission's Case Examiner's Report," November 17, 2015.

### Publicly Available Documents

- OECD, "Fidelity and Bundled Rebates and Discounts," 2008.
- United States Department of Justice, "U.S. Submission For OECD Roundtable On Bundled And Loyalty Discounts And Rebates," 2008.

### SEC Filings

- Qualcomm Incorporated, SEC Form 10-K for the fiscal year ended September 26, 2010, filed on November 3, 2010.
- Qualcomm Incorporated, SEC Form 10-K for the fiscal year ended September 25, 2011, filed on November 2, 2011.
- Qualcomm Incorporated, SEC Form 10-K for the fiscal year ended September 29, 2013, filed on November 6, 2013.
- Qualcomm Incorporated, SEC Form 10-K for the fiscal year ended September 25, 2016, filed on November 2, 2016.

- Qualcomm Incorporated, SEC Form 10-K for the fiscal year ended September 30, 2018, filed on November 7, 2018.


## Textbooks


- Bernheim, Douglas and Whinston, Michael D., *Microeconomics*, (New York, NY: McGraw-Hill/Irwin, 2008).
- Carlton, Dennis W. and Perloff, Jeffrey M., *Modern Industrial Organization*, Fourth Edition (Reading, MA: Addison Wesley, 2015).
- Tirole, Jean, *The Theory of Industrial Organization*, (Cambridge, MA: MIT Press, 1988).
- Varian, Hal R., *Intermediate Microeconomics: A Modern Approach*, (New York, NY: W. W. Norton & Company, 2010).


## Websites


- "Commonalities between CDMA2000 and WCDMA Technologies," Qualcomm, October 2006, available at https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Commonalities_CDMA2000_WCDMA_wp.pdf.
- "Early iPhone 7 Teardowns: Intel & Qualcomm Modems, TSMC SoC, 2 to 3 GB of RAM," AnandTech, September 16, 2016, available at https://www.anandtech.com/show/10687/early-iphone-7-teardown-modems-and-more.
- "Exclusive Dealing or Requirements Contracts," FTC, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-supply-chain/exclusive-dealing-or-requirements-contracts.
- "Monopolization Defined," FTC, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/single-firm-conduct/monopolization-defined.
- "Our Company," Qualcomm, available at https://www.qualcomm.com/company.
- "Qualcomm chip in Verizon iPhone," The San Diego Union-Tribune, February 8, 2011, available at https://www.sandiegouniontribune.com/sdut-qualcomm-chip-in-verizon-iphone-2011feb08-story.html.
- "Smartphone application processor (AP) market vendor revenue share worldwide from 2014 to 2020," Statista, available at https://www.statista.com/statistics/233415/global-market-share-of-applications-processor-suppliers/.
- "Sony Completes Full Acquisition of Sony Ericsson Sony to Rename the Company Sony Mobile Communications and Accelerate Business Integration,"

Sony Press Release, February 16, 2012, available at https://www.sony.net/SonyInfo/News/Press/201202/12-025E/.

- "Tailored for the 5G era," Samsung, available at https://semiconductor.samsung.com/us/processor/modem/
- "The Antitrust Laws," FTC, available at https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/antitrust-laws.

# Exhibit 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE:<br>QUALCOMM INCORPORATED<br>SECURITIES LITIGATION | **Case No. 3:17-CV-00121-JO-MSB** |

**Reply Expert Report of Timothy Simcoe, Ph.D.**

February 2, 2024

## TABLE OF CONTENTS


I. Introduction ..... 1

II. Summary of Opinions ..... 1

III. Response to Common Critiques of My Opening Report ..... 3

- A. Proving Antitrust Violation or Anticompetitive Harm ..... 3
- B. Foreseeability ..... 4
- C. Bundled Negotiations and Chip Supply Threats ..... 8
- D. FRAND ..... 11

IV. Additional Responses to Dr. Saravia ..... 13

- A. Antitrust Violation ..... 13
- B. Theories of Harm ..... 15
  - 1. There is No Conflict Between What Dr. Saravia Calls "Chip Leverage" and "Licensing Leverage" ..... 15
  - 2. "License Leverage" Does Not Imply That Qualcomm Conditions License Access on Chip Purchases ..... 19
- C. Qualcomm's Bundling Practices ..... 20
- D. Causation ..... 24
  - 1. KFTC Decision ..... 24
  - 2. EC Decision ..... 27
  - 3. TFTC Matter ..... 28
  - 4. FTC Case ..... 29
  - 5. Apple Litigation ..... 31
- E. Foreseeability of Antitrust Enforcement ..... 31

V. Additional Responses to Professor Barnett ..... 32

- A. Bundled Discounts ..... 32

B. Economics of the Wireless Industry ..................... 34

VI. Additional Response to Mr. Brismark ..................... 35

# I. Introduction

1. My name is Timothy S. Simcoe. I submitted a report in this matter on September 12, 2023 ("Simcoe Report").[1] Counsel for Plaintiffs have asked me to review and respond to the expert opinions of Dr. Celeste Saravia, Professor Jonathan Barnett, and Mr. Gustav Brismark.[2] As set forth below, the expert reports by Dr. Saravia, Professor Barnett and Mr. Brismark do not change any of my expert opinions in this case.

2. A list of materials that I relied upon to prepare this report is provided in Appendix A. I reserve the right to supplement this report to incorporate new information should it be relevant to the opinions I express.

3. I am being compensated for my work on this case at my standard rate of $900 per hour. This compensation is unrelated to the outcome of this matter. My work in this case has been supported by staff at the consulting firm CRA. I also receive compensation from CRA based on CRA's staff billings on this case.

# II. Summary of Opinions

4. In my opening report I addressed Qualcomm's business practice of bundling chipset procurement negotiations with patent license negotiations, as well as Qualcomm's bundling of the terms of its chipset and patent license agreements.[3] I also addressed the economic principles for assessing whether such conduct, when undertaken by a holder of a standard essential patent (SEP), implicates a FRAND violation and/or anticompetitive harm.[4] I concluded that Qualcomm's bundling practices, which violated its commitment to license its SEPs on FRAND terms and conditions, were a central part of its business model.[5] Further, I opined that the type of bundling

---

1 I have also provided an expert declaration at the class certification stage of these proceedings, Expert Declaration of Timothy Simcoe, Ph.D, August 19, 2022 ("Simcoe Declaration").

2 Expert Report of Celeste C. Saravia, Ph.D., December 11, 2023 ("Saravia Report"), Expert Report of Jonathan Barnett, December 11, 2023 ("Barnett Report"), Rebuttal Expert Report of Gustav Brismark, December 11, 2023 ("Brismark Report").

3 Simcoe Report, ¶13.

4 Simcoe Report, Sections II.C, IV.A, IV.B.

5 Simcoe Report, ¶13.

practices engaged in by Qualcomm created a very high risk of antitrust regulation or litigation related to exclusionary conduct, FRAND violations, or both.[6] In particular, I referenced numerous objective factors that would have been relevant to any rational economic agent when assessing the foreseeability of such actions.[7] I also opined that the regulatory actions and lawsuits brought against Qualcomm by (i) the Korea Fair Trade Commission, (ii) the European Commission, (iii) the Taiwan Fair Trade Commission, (iv) the U.S. Federal Trade Commission, and (v) Apple were caused by and a foreseeable consequence of Qualcomm's bundling practices.

5. Dr. Saravia, Professor Barnett, and Mr. Brismark offer certain opinions regarding the facts and conclusions presented in my opening report in this matter. This reply report provides a response to various opinions expressed by Dr. Saravia, Professor Barnett and Mr. Brismark. In summary:

- Dr. Saravia and Professor Barnett argue that in order to demonstrate that Qualcomm's undisclosed business practices caused a foreseeable risk of regulatory or civil actions, it is necessary in this litigation to prove that anticompetitive harm actually occurred. This is incorrect. The risk of regulatory and civil actions was foreseeable because Qualcomm's undisclosed business practices raised concerns regarding their potential to cause anticompetitive harm. My opening report explained how these concerns about antitrust harm led to multiple regulatory actions and lawsuits across the globe. It further explained that evidence of anticompetitive harm was presented in those cases, including by expert economic witnesses. Whether anticompetitive harm was successfully proven under the laws applicable in each jurisdiction does not matter to an evaluation of the risk that competition authorities and private plaintiffs would challenge Qualcomm's undisclosed business practices. That risk was foreseeable, regardless of the ultimate outcomes of the various regulatory and civil actions taken against Qualcomm, for the reasons explained in my opening report.
- Dr. Saravia and Prof. Barnett argue that bundling is "ubiquitous" and generally "pro-competitive." The implication, as I understand it, is that it is therefore surprising (or not foreseeable) that Qualcomm's bundling practices led to the antitrust actions. I disagree.

---

6 Simcoe Report, ¶13.

7 Simcoe Report, ¶164-179.

The fact that *some* bundling can be benign is irrelevant to the question of whether the sort of *bundling practiced by Qualcomm* poses a well understood risk of regulatory or civil actions regarding anticompetitive harm.

- Dr. Saravia claims that my opening report contains two distinct antitrust theories of harm ("Licensing Leverage" and "Chip Leverage") that contradict one another. This is incorrect. I explain below how the alleged contradiction is a direct result of Dr. Saravia's unwarranted assumption that Qualcomm could not charge more than a FRAND royalty. My opening report explained why this assumption is incorrect, and noted that claims of supra-FRAND royalties were made in the FTC, KFTC, TFTC and Apple actions.
- Dr. Saravia argues that I failed to show causation because Qualcomm's bundling practices were not "prominent" in each of the regulatory and civil actions that led to corrective disclosures. To reach this opinion, however, she first distinguishes between "bundling" and "exclusive dealing" and then argues that I conflate the two. As I explain below, there is extensive literature in antitrust law and economics that treats conditional discounts as a form of bundling, and that debates whether bundling should be litigated as a form of exclusive dealing.
- Mr. Brismark argues that my interpretation of FRAND is incorrect because I failed to consider the drafting history of the ETSI IPR policy. He is incorrect. My opening report cited numerous articles, including some that I co-authored, that describe the origins of the ETSI IPR policy. Furthermore, Qualcomm participates in many SSOs, and a proper interpretation of FRAND requires a broader perspective than Mr. Brismark's narrow focus on a single organization.

## III. Response to Common Critiques of My Opening Report

### *A. Proving Antitrust Violation or Anticompetitive Harm*

6. I understand this is a securities case where Plaintiffs allege that Qualcomm publicly misrepresented certain business practices which, when disclosed accurately through regulatory and civil actions, "caused substantial losses for Qualcomm's investors."[8] My opening report

8 Consolidated Class Action Complaint For Violation Of The Federal Securities Laws, Case No. 3:17-cv-00121-JAH-WVG (S.D. Cal. July 3, 2017), ECF No. 32 ("Complaint"), ¶121.

explains what Qualcomm's undisclosed bundling practices were, and why those practices were a central element of the regulatory and civil actions that have been identified as sources of corrective disclosures in this matter.

7. Dr. Saravia attempts to criticize my report for failing to prove an antitrust violation. She states: "it is my opinion that Prof. Simcoe has not established that Qualcomm's alleged bundling practices caused or could have caused anticompetitive harm."[9] Likewise, Professor Barnett attempts to critique my opening report for failing to conduct specific tests (a "discount attribution test" or a "rule of reason test") to establish the exclusionary effects of Qualcomm's conditional rebates and exclusivity provisions.[10]

8. These criticisms miss the point. Plaintiffs in this *securities* litigation have not alleged antitrust harm. Instead, they have alleged that the bundling practices disclosed in several prior regulatory and civil actions caused a decline in Qualcomm's stock price.[11] My report described elements of Qualcomm's business practices, how those business practices were necessary elements of economic theories of anticompetitive harm put forward in the regulatory actions and civil litigations, and how such undisclosed business practices were revealed as the result of those actions and litigations. I was not asked to prove anticompetitive harm.

### *B. Foreseeability*

9. The attempted criticisms offered by Dr. Saravia and Professor Barnett regarding foreseeability are misplaced. Dr. Saravia claims that I have failed to show that the aforementioned actions and litigations were a foreseeable consequence of Qualcomm's bundling practices because she asserts that I "failed to show that Qualcomm's undisclosed bundling practices harmed or could

---

[9] Saravia Report, ¶89. See also, ¶¶8d-8e, 59-63, 82-89.

[10] Barnett Report, ¶¶37-43.

[11] For example, in the U.S. FTC litigation, Professor Carl Shapiro provided evidence that Qualcomm sacrificed profits through its exclusivity payments to Apple, based on both internal Qualcomm documents and a profit sacrifice test. See Expert Report of Carl Shapiro, May 24, 2018, Q121SEC00048094 ("Shapiro Report"), ¶389-390. See also Shapiro Report, ¶406 ("I find that Qualcomm sacrificed profits to win the contestable sales at Apple, regardless of the approach taken.").

have harmed competition, and because [I] failed to show that Qualcomm's undisclosed bundling practices caused the At-Issue Complaints."[12] I disagree.

10. My opening report showed that Qualcomm's bundling practices were central to a series of regulatory actions and lawsuits around the globe.[13] Specifically, I explained how Qualcomm's bundling practices, which included conditional rebates, exclusivity provisions, and threats to terminate chip-supply, were core elements of the regulatory actions and cases brought against Qualcomm. I also explained the economic basis for claims, made by the regulators and parties filing those cases, that Qualcomm's undisclosed practices could have harmed competition. And I explained why those actions would not have been taken but-for Qualcomm's bundling practices, which were an integral part of its overall business model.[14]

11. Professor Barnett argues that because the Ninth Circuit overturned the district court's decision in the FTC case, and the General Court of the European Union annulled the ruling against Qualcomm by the European Commission, the Complaint filed by the FTC (following its investigation) and the European Commission's Statement of Objections (following its investigation) could not be foreseeable consequences of Qualcomm's bundling practices.[15] I disagree. The fact that multiple regulators (the Korean Fair Trade Commission, European Commission, Taiwan Fair Trade Commission, and the FTC) and a Qualcomm customer (Apple) took action and filed lawsuits– all alleging anticompetitive harm – provides strong evidence of significant anticompetitive concerns, regardless of how those investigation and/or cases were ultimately resolved.

12. Moreover, Professor Barnett does not discuss the outcome of the Korean litigation, where an initial determination that Qualcomm's licensing practices violated antitrust law was upheld by Korea's Supreme Court with the largest regulatory fine in the history of the KFTC.[16] Nor does he discuss Qualcomm's settlements in the litigation with Apple or the TFTC.

---

12 Saravia Report, ¶136.

13 Simcoe Report, ¶¶97-158.

14 Simcoe Report, ¶¶159-163.

15 Barnett Report, ¶¶19, 106 ("foreseeable" is in the Section heading).

16 Simcoe Report, ¶98.

13. Indeed, the KFTC Case Examiner found that "it is clear" that Qualcomm's bundling conduct of disrupting a company's chipset supply by holding "its modem chipsets as a hostage" "is in breach of [its] FRAND commitment."[17] In addition, the KFTC found that "[a]s vertically-integrated enterprises in both the patent licensing market and the modem chipset market, [Qualcomm] avoided the good-faith negotiation obligation under their FRAND declarations by using their dominance in the modem chipset market," concluding that "[Qualcomm's] acts served as measures to unilaterally coerce license terms desired by [Qualcomm] upon mobile device makers by neutralizing the FRAND restrictions, which replace competition between technologies, and increasing the dominance in the licensing market."[18]

14. Likewise, the Korean government submitted a 2019 note to the Organization for Economic Co-operation and Development ("OECD"), explaining that Qualcomm's conduct included bundling. For example, the Korean government described the "facts of violation" as including that "if handset makers did not conclude or execute the license agreement, it could refuse or suspend supply of its chipsets at any time" and that "in order to gain the upper hand in license agreement negotiations with handset makers, Qualcomm threatened that it would suspend its chipset supply to them."[19] The Korean government further described its "Assessment of Illegality" as follows:

> Qualcomm virtually nullified its FRAND commitment by using its supply of modem chipset as a leverage to coerce the conclusion and execution of its unfair patent licensing agreements. Handset makers that had no other option but to use Qualcomm's chipset were forced to accept the terms demanded by Qualcomm because if the modem chipset supply is suspended, they cannot run their business. As a result, handset makers were not able to negotiate for SEPs licensing terms on an equal footing.[20]

---

17 Korean Fair Trade Commission, Examiner's Report on the Case of Abuse of Market Dominance, Etc. by Qualcomm Inc., Etc., Case No. 2015SiGam2118, ("Certified Translation of the 2015 KFTC Case Examiner's Report") at p. 216, footnote 105 of certified translation.

18 Certified Translation of the 2015 KFTC Case Examiner's Report at p. 5.

19 Licensing of IP rights and competition law – Note by Korea, May 17, 2019, available at <https://one.oecd.org/document/DAF/COMP/WD(2019)23/en/pdf>, p. 4.

20 Licensing of IP rights and competition law – Note by Korea, May 17, 2019, available at <https://one.oecd.org/document/DAF/COMP/WD(2019)23/en/pdf>, p. 5. *See also* Korean Fair Trade Commission Full-Session Hearing Decision No. 2017-025, Case of Abuse of Market

15. The Korean government further explained the measures imposed by its 2017 Order:

> In January 2017, the KFTC imposed remedial orders and an administrative fine of 1.3 trillion won. The orders include the followings: 1) Upon modem chipset makers' request, Qualcomm should engage in good-faith negotiations for patent license agreements, 2) Qualcomm should not coerce patent license agreements by using its modem chipset supply as a leverage, and should amend or delete relevant provisions in the agreements, and 3) In concluding a patent license agreement with handset makers, Qualcomm should not coerce unfair agreement terms, and upon handset makers' request, Qualcomm should re-negotiate existing patent license agreements.[21]

16. The settlement between Qualcomm and the Taiwan Fair Trade Commission revoked an initial finding that Qualcomm had violated antitrust law, but only in return for commitments from Qualcomm to (i) refrain from threatening OEM chip supply during license negotiations, (ii) refrain from offering royalty rebates in exchange for chip exclusivity, and (iii) make certain investments in the Taiwanese telecommunications sector.[22]

17. Ultimately, Professor Barnett's reliance on the outcome of the U.S. and European appeals – which came many years after the regulatory actions against Qualcomm at issue– is misplaced. If those outcomes were predictable when the actions were filed, as his argument presumes, it becomes very hard to explain: (1) the FTC's initial decision to file a case, (2) the European Commission's initial decision to file a Statement of Objections, (3) the public response to each of these actions, (4) the decision by the U.S. District Court and, (5) the ruling by the European Commission. The actions taken by these sophisticated and well-informed participants in US and European antitrust enforcement show that the theories of harm explained in my opening report have sufficient merit to create significant antitrust risk for Qualcomm.

---

Dominance, Etc. by Qualcomm Inc., Etc., Case No. 2015SiGam2118, January 20, 2017 ("KFTC Decision"), QNDCAL04943967.

21 Licensing of IP rights and competition law – Note by Korea, May 17, 2019, available at <https://one.oecd.org/document/DAF/COMP/WD(2019)23/en/pdf>, pp. 5-6.

22 FTC News Release, August 10, 2018, available at <https://www.ftc.gov.tw/internet/english/doc/docDetail.aspx?uid=179&docid=15565>.

### *C. Bundled Negotiations and Chip Supply Threats*

18. Professor Barnett and Dr. Saravia both dismiss Qualcomm's bundling of SEP licenses and modem chip sales during license negotiations (which I explain in my opening report took the form of threats to chipset supply) as a neutral application of Qualcomm's "no license, no chip" policy.[23] Their arguments conflate Qualcomm's general practice of requiring that OEMs obtain a SEP license for every cellular device that they sell (i.e., "no license no chip"), with Qualcomm's specific practice of threatening to withhold modem chips from OEMs that are already dependent on Qualcomm as a supplier during the course of licensing negotiations.

19. First, it is important to recognize that the details of Qualcomm's negotiating conduct were not publicly disclosed, and were in fact protected by nondisclosure agreements that were strictly enforced by Qualcomm.[24]

20. Second, when describing the relationship between QCT and QTL, Qualcomm made various public statements indicating that it did not bundle SEP and chip supply negotiations. For example:

---

[23] *See, e.g.*, Barnett Report, ¶¶72-80; Saravia Report, ¶94 ("Second, Prof. Simcoe acknowledges that Qualcomm's practices of selling modem chips only to licensed OEMs and not offering licenses to chip makers, which are the bases of his Chip Leverage Theory, were disclosed."); *id*. at ¶18 (asserting that the "Chip Leverage Theory" is the same as "Qualcomm communicating its previously disclosed practice of selling modem chips only to licensed OEMs").

[24] Simcoe Report, ¶¶170-172. *See* Memo from Steve Gardner (Qualcomm), "Taiwan Withholding Tax Creditability," October 5, 2011, Ex. 58, Q2017MDL1_01145263 at -264, -266, footnote 5 ("Qualcomm has strictly enforced the confidentiality provisions of its license agreements and does not consent to disclose the terms of any license agreement unless compelled to do so…Qualcomm requires potential licensees to enter into a nondisclosure agreement ('NDA') before engaging in substantive licensing negotiations or providing a first draft agreement to any such potential licensees."). Email from Eric Reifschneider (Qualcomm) to Thomas Yardley (Lenovo) regarding a proposed strategic funding agreement, November 6, 2013, Ex. 42, Q2017MDL1_01627342 at -344-345 ("This proposal and its terms are subject to the confidentiality agreement in place between Lenovo and Qualcomm, and is strictly confidential."). Deposition of Hank Robinson (Qualcomm), July 28, 2022, pp. 214:11-25 ("Q. So just so it's clear, the nature of the Apple/Qualcomm relationship, based on your experience at Qualcomm, was highly confidential; correct? A. I think that's a fair description, yes. Q. Okay. And maintaining high confidentiality was a facet of working with any customer at Qualcomm based on your experience; correct? A. Yes.").

- During a quarterly earnings call in July 2005, Steven Altman (then President of Qualcomm Inc.) told investors: "I am not going to get into details of our license agreements, but I will say absolutely they are done without QCT's involvement. It's a QTL business unit that is responsible for that."[25]
- During a Qualcomm event in 2006, Andrew Gilbert (then Executive Vice President of Qualcomm Inc.) addressed questions about Qualcomm licensing practices. Asked whether he agreed that Qualcomm's bundling practices make Qualcomm a "de facto monopoly," Gilbert responded: "No, don't agree with [that] at all. I don't think the assertion is correct in the first place. We do not enforce or insist on any kind of bundling."[26]
- Questioned during an interview in 2009, Paul Jacobs (then CEO of Qualcomm Inc.) assured investors: "The chip business is separate from the licensing business."[27]
- Derek Aberle (then Executive Vice President of Qualcomm Inc.) told investors during a late 2012 investor call that: "within the Company, we tend to keep the licensing and the chip business very separate. Obviously, our view is that companies need a license if they are doing 3G or 4G devices, sort of irrespective of whose chip they use. And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and we don't bundle those together."[28]
- Steven Mollenkopf (then Chief Operating Officer of Qualcomm Inc.) told investors during a 2013 investor conference that: "Well, they are really separate businesses. I mean we have been very clear that we keep those two things separate – separate propositions to the customer. So, really two different things."[29]

---

25 Transcript of Qualcomm quarterly earnings call, July 23, 2005, LP_0005907 at -914.

26 Transcript of Qualcomm event, "Qualcomm: Our Rights to Royalties Video," August 17, 2006, p. 3.

27 *Modern Weekly*, "Qualcomm Chairman and CEO Dr. Paul Jacobs: Wireless Evolution," July 11, 2009, Q2014FTC04162850 at -856.

28 Transcript of Qualcomm presentation during the 2012 Credit Suisse Technology Conference, "Qualcomm at Credit Suisse Technology Conference," November 27, 2012, LP_0000742 at -746.

29 Transcript of Qualcomm presentation during the 2013 GSM Association Mobile World Congress, "Qualcomm at GSM Association Mobile World Congress," February 26, 2013, LP_0001126 at -130.

21. Third, there are many ways that Qualcomm could unbundle its license negotiations from the supply of chips to an existing customer. For example, the parties could agree that the OEM will pay "back royalties" on all cellular devices sold during the negotiating period at a rate to be specified in a final agreement. Qualcomm could supply chips to a licensed contract manufacturer (as it did for Apple) while negotiating effective royalties with the OEM. Qualcomm could add provisions to its chip-supply agreements that specify "default" royalties in the event that a prior patent license expires. The precise method of unbundling license negotiations from chip supply is not important. The key point is that there is a clear distinction between a general policy of seeking royalties for every cellular device containing a Qualcomm chip, and a specific policy of threatening to stop shipments to existing chip customers as a method of exerting leverage in license negotiations.

22. Dr. Saravia erroneously claims that I have not provided "an explanation or a rationale" for why an OEM could not "maintain its modem chip supply while also contesting the proposed terms in the new license, as long as it continued to pay royalties under the existing license."[30] As explained in my opening report, Qualcomm's threats were typically made when an OEM's license was close to expiration.[31] Moreover, challenging a FRAND rate in litigation can take years to resolve, whereas the economic impacts of losing access to an essential component, such as a modem chipset, are *immediate*.[32] Thus, the alternatives available to OEMs at the point in time when Qualcomm typically made its threat were: (i) sign a new license, making it much harder to challenge the royalty rate but maintaining their chip supply, or (ii) risk losing their chip supply by letting the old license expire while negotiations for a new license continued.

23. Dr. Saravia also asserts that "OEMs are either myopic or irrational" for not "strategically reduc[ing] its 'dependence' on Qualcomm's modem chips in anticipation of licensing negotiations."[33] However, in the antitrust actions filed against Qualcomm, plaintiffs alleged that Qualcomm had market power in critical modem chip markets, making it the exclusive or nearly

---

30 Saravia Report, ¶48.

31 Simcoe Report, ¶¶56-61 and Appendix E.

32 Simcoe Report, ¶65

33 Saravia Report, ¶49.

exclusive source of supply. Dr. Saravia's own Exhibit 1 shows Qualcomm having a market share that both U.S. antitrust agencies, the DOJ and the FTC, define as constituting a "dominant position."[34] Dr. Saravia's Exhibit 1 also obscures the fact that not all chips are created equal. As I explained in my report, these are differentiated products, phones are designed to work with a specific chipset and switching a supplier is costly, as acknowledged by Qualcomm.[35] Because OEMs commit to using a specific modem chipset within a device, switching suppliers is costly and time-consuming.[36] This is one reason why [redacted][37]

### *D. FRAND*

24. Mr. Brismark and Professor Barnett mischaracterize my position on FRAND based on their own excessively narrow interpretation that ignores SSOs other than ETSI and countries outside the United States.

25. First, much of Mr. Brismark's report is spent arguing that "Prof. Simcoe fails to consider the objectives, history, and practical application of ETSI's FRAND policy"[38] That is not the case. My opening report explained how standard essential patent licensing works, including the FRAND commitment, its practical application, and how disputes over FRAND are resolved.[39] In particular,

---

[34] For example, the new Merger Guidelines proposed by the U.S. DOJ and FTC use 30 percent market share to define a dominant position. See "Merger Guidelines," U.S. DOJ and FTC, available at <https://www.justice.gov/d9/2023-07/2023-draft-merger-guidelines_0.pdf>, p. 19. Dr. Saravia's Exhibit 1 shows Qualcomm's market share varying between 34 percent and 49 percent. Saravia Report, Exhibit 1. Dr. Saravia also points to Qualcomm's declining market share which she claims is not consistent with exclusion. Such economic conclusion requires showing what the Qualcomm's *but-for* market share would have been absent the accused conduct, which Dr. Saravia fails to consider. Saravia Report, ¶¶61, 81-88, 138. *See also* Barnett Report, ¶¶78, 89, 95, footnotes 151, 169, 183.

[35] Simcoe Report, ¶26.

[36] Simcoe Report, ¶57.

[37] Certified Translation of the 2015 KFTC Case Examiner's Report at p. 216, footnote 105.

[38] Brismark Report, ¶30.

[39] Simcoe Report, ¶¶28-37.

I discussed the ETSI FRAND policy in my opening report.[40] I also cited several studies – including some that I co-authored – that discuss the history, objectives and practical application of ETSI's FRAND policy. Those articles show that other authorities on the history and objectives of the ETSI IPR policy have disputed Mr. Brismark's interpretation of key provisions in that policy.[41]

26. It is also appropriate that my opening report does not focus exclusively on the ETSI IPR policy. FRAND principles neither begin nor end with ETSI.[42] Qualcomm, like many SEP owners, is subject to the IPR policies of multiple SSOs, not just ETSI. For example, the antitrust litigation filed by the U.S. FTC alleged that Qualcomm violated the intellectual property policies of two other SSOs – ATIS and TIA – whose policies are not discussed in Mr. Brismark's report.[43] Thus, Professor Brismark's focus solely on ETSI makes his analysis less relevant here.

27. Second, Professor Barnett argues that a "breach of a FRAND requirement almost never gives rise to an antitrust violation."[44] He then further narrows this down to the "*interpretation by a U.S. court of any term of the FRAND commitment* is a matter of contract or patent law, not antitrust law."[45] Professor Barnett's narrow focus on the U.S. court interpretation simply diverts attention from the regulatory actions and lawsuits brought against Qualcomm in multiple jurisdictions.[46]

---

[40] Simcoe Report, ¶30, footnote 33 and ¶¶34-35, footnotes 46 and 47.

[41] For example, Mr. Brismark opines that only "implementers of end-user products" (i.e., OEMs) are third-party beneficiaries of the FRAND commitment (Brismark Report, ¶¶148-149). Karl-Heinz Rosenbrock, the former Director General of ETSI, argues that *all* implementers, including component suppliers, are entitled to a FRAND license ("Why the ETSI IPR Policy Requires Licensing to All," p. 4, available at <http://www.fair-standards.org/wp-content/uploads/2017/08/Why-the-ETSI-IPR-Policy-Requires-Licensing-to-All_Karl-Heinz-Rosenbrock_2017.pdf>).

[42] ETSI is only one out of seven standard setting organizations ("SSOs") participating in Third Generation Partnership Project ("3GPP") which is a partnership among the SSOs to develop different generations of mobile communications standards, including 3G, 4G, and 5G technologies. See ETSI, "Third Generation Partnership Project (3GPP)," available at <https://www.etsi.org/committee/3gpp>.

[43] Ex. 833, Q2014FTC04094292 at -314-315.

[44] Barnett Report, ¶14 (see also Barnett Report, ¶56)

[45] Barnett Report, ¶56 (emphasis added).

[46] Simcoe Report, ¶15.

28. As explained in my opening report, FRAND cases typically involve elements of contract, patent and antitrust law.[47] For example, Korean authorities have held that a FRAND violation may constitute conduct in violation of Korean competition laws.[48] Likewise, in Europe it is possible to bring an *antitrust* case for breach of a FRAND commitment if a SEP owner seeks to enjoin a willing licensee from practicing the standard.[49]

29. Professor Barnett's proposed interpretation of U.S. law also ignores policy arguments by large cellular SEP licensors for the antitrust enforceability of FRAND commitments. For example, my opening report noted that in 2011 (during Mr. Brismark's term as Ericsson's Vice President, Strategy and Portfolio management for IPR and Licensing) Ericsson argued to the U.S. FTC that, "even if (F)RAND obligations could be enforceable through contact [sic] law, it is also important that competition law can be used."[50]

# IV. Additional Responses to Dr. Saravia

## *A. Antitrust Violation*

30. Dr. Saravia attempts to criticize the lack of "economic and factual support" for the antitrust theory of harm described in my report (which she divides into two parts that she calls the "Chip Leverage Theory" and the "Licensing Leverage Theory").[51] Dr. Saravia makes three specific claims:

- First, that I have not "defined the antitrust market nor articulated in which 'segment' Qualcomm supposedly had market power;"

---

47 Simcoe Report, ¶¶35-36.

48 KFTC Plenary Hearing Decision No. 2009-291 Case of Abuse of Dominance by Qualcomm Incorporated, Qualcomm Korea Ltd. and Qualcomm CDMA Technologies Korea Ltd., Case No. 2009Jisik0329, December 30, 2009, Q2017MDL1_01729917.

49 Simcoe Report, ¶35 (footnote 49).

50 Brismark Report, ¶¶7, 15; Simcoe Report, ¶36.

51 Saravia Report, ¶¶8a, 8d, and 8e. Dr. Saravia consistently characterizes the Chip Leverage Theory and the Licensing Leverage Theory as "his" theories of antitrust harm. *See, e.g.,* Saravia Report, Sections 3.1 and 3.2. This is misleading. I am simply describing the theories of harm in these regulatory actions and lawsuits.

- Second, that I have not "demonstrated that Qualcomm had the ability to 'threaten' OEMs as his theory assumes;" and
- Third, that I have not shown "that Qualcomm charged above-FRAND royalties."[52]

31. All of these critiques miss the point. As I explained in Section III.A, this is not an antitrust case. Nevertheless, it is worthwhile to highlight how the types of evidence that Dr. Saravia is seeking were provided in the regulatory actions and litigations that I cited to in my opening report.

32. Dr. Saravia suggests that it is necessary to define an antitrust market.[53] In the U.S. FTC case, for example, Professor Carl Shapiro defined markets for CDMA and Premium LTE chipsets[54] and opined that Qualcomm had monopoly power in each of those markets.[55] Likewise, the European Commission defined a relevant "UMTS (baseband) chipset" market.[56]

33. Dr. Saravia suggests I have not shown that Qualcomm had the ability to "threaten" OEMs. I disagree. Qualcomm's ability to issue these threats is derived from its market power in the modem chipset markets discussed in the previous paragraph. My opening report provides numerous examples of cases where Qualcomm actually did threaten OEMs.[57]

34. Finally, Dr. Saravia suggests that it is necessary to show that Qualcomm's rates were above a FRAND level. The FTC's expert Michael Lasinski analyzed Qualcomm's licenses and concluded that the royalties were "far above" a FRAND level.[58]

---

52 Saravia Report, ¶41.

53 Saravia Report, ¶¶41-42.

54 Shapiro Report, Section VI.A and VI.B.

55 Shapiro Report, Section VII and Section VIII.

56 See European Commission, "Commission Decision," July 18, 2019, available at <https://ec.europa.eu/competition/antitrust/cases/dec_docs/39711/39711_4493_4.pdf>, ¶178.

57 Simcoe Report, ¶¶56-61 and Appendix E.

58 Expert Report of Michael J. Lasinski, May 24, 2018, Figure 8, ¶¶ 27-28.

## *B. Theories of Harm*

### 1. There is No Conflict Between What Dr. Saravia Calls "Chip Leverage" and "Licensing Leverage"

35. Dr. Saravia claims the two Qualcomm bundling practices described in my opening report "are premised on contrasting assumptions regarding the source of market power Qualcomm allegedly leveraged (in modem chips or in licensing), and make conflicting predictions regarding the economic effect that the leveraging allegedly had."[59] She goes on to say that the Chip Leverage Theory and the Licensing Leverage Theory (her terms) "make conflicting predictions on whether Qualcomm used bundling to increase or decrease the royalty rate in its licensing agreements."[60] Specifically, adopting notation from a simplified example in my opening report, she claims the Licensing Leverage Theory predicts $B - C < S$ while the Chip Leverage Theory claims $B - C > S$ (where B, C, and S are the price of a bundle, unbundled chipset, and SEP license respectively).[61]

36. There is no conflict between the predictions of these theories. Qualcomm may simultaneously possess market power in chips and SEPs, and exploit that market power to both elevate royalties and exclude rivals in the chip market. This is why various competition authorities characterized Qualcomm's bundling practices as "connected systemically" and "working together" across the QTL and QCT business units.[62] For example, the KFTC Case Examiner documented how [redacted][63] The FTC also alleged in its complaint that Qualcomm used its market dominance in both the licensing and chipset markets to harm competition in both markets, explaining that "Qualcomm's practices have harmed competition and

---

59 Saravia Report, ¶8a. See also, ¶¶15, 35-40.

60 Saravia Report, ¶8c.

61 Saravia Report, ¶39.

62 Simcoe Report, ¶¶67-68.

63 Simcoe Report, ¶107, citing Certified Translation of the 2015 KFTC Case Examiner's Report at p. 53.

consumers both within the markets for CDMA [licenses] and premium LTE baseband processors [chipsets] and in other baseband processor markets in which OEMs pay Qualcomm inflated royalties."[64]

37. The simplified example in my opening report was used to make two points. First, when $B < S + C$, bundled discounts can be used to foreclose an as-efficient rival in the chip market. Dr. Saravia does not appear to dispute this point. Second, exclusionary bundled discounts would be profitable for Qualcomm as long as $F + C < B$. Together, this pair of inequalities implies that the "bundled royalty" $(B - C)$ is above a FRAND rate (*F*), but less than Qualcomm's standalone royalty rate (*S*).

38. Dr. Saravia claims that Chip Leverage implies $B - C > S$, and that this contradicts the necessary condition for exclusion of an as-efficient chip rival.[65] To reach this opinion, Dr. Saravia assumes that Qualcomm's standalone royalties must be FRAND (i.e., $S \leq F$).[66] She then replaces $F$ with $S$ in the inequality the guarantees Qualcomm profits from bundling (i.e., $F + C < B$) to derive the inequality $S < B - C$. This argument is wrong because Dr. Saravia has no basis to assume that Qualcomm's standalone royalties are FRAND.

39. As an initial matter, the U.S. FTC, KFTC, TFTC and Apple all claimed that Qualcomm's royalties were above FRAND.[67] Thus, the "contradiction" alleged by Dr. Saravia is belied by

---

[64] Simcoe Report, ¶148 (citing Ex. 833, Q2014FTC04094292 at -322).

[65] Saravia Report, ¶68 ("Chip Leverage Theory requires that the bundled royalty rate be greater than the standalone royalty rate.").

[66] Saravia Report, ¶¶66-68 ("if Qualcomm attempted to charge a standalone above-FRAND rate (*S*, in Prof. Simcoe's notation), then OEMs would have an option to bring a FRAND challenge and seek a court-ordered royalty rate.") I explain below why her view that OEMs could prevent an above-FRAND rate by bringing a FRAND challenge is flawed.

[67] Q2014FTC04094293 at ¶4 (FTC Unredacted Complaint, alleging "Qualcomm's customers have accepted elevated royalties and other license terms that do not reflect an assessment of terms that a court or other neutral arbiter would determine to be fair and reasonable"); KFTC: Certified Translation of the 2015 KFTC Case Examiner's Report at pp. 6, 53 ("undue royalties"); TFTC: QNDCAL04959941 at -967 ("Qualcomm not only collected royalties higher than FRAND commitment from Apple, but also from Taiwan handset brands (such as HTC and Asus)…"); Apple: Ex. 849, QNDCAL04070093 at -121, ("Since 2006, Apple has looked for ways to reduce its exorbitant royalty burden. And after this date, Apple attempted to negotiate a lower royalty rate in the form of a worldwide FRAND license directly from Qualcomm...but Qualcomm has never made a worldwide offer on FRAND terms for a direct license to Apple.).

actions that were announced and the cases that were filed. Moreover, there are at least three reasons why her assumption that "if Qualcomm attempted to charge a standalone above-FRAND rate (*S*, in Prof. Simcoe's notation), then OEMs [that do not purchase Qualcomm chips] would have an option to bring a FRAND challenge and seek a court-ordered royalty rate" is unwarranted. These reasons are related to the information, incentives, and abilities of OEMs that do not purchase Qualcomm chips.

40. First, from an informational perspective, the fact that Qualcomm's bundled discounts were not disclosed means that an OEM that did not use Qualcomm chips would expect that other OEMs were paying the nominal rate (*S*). Qualcomm encouraged this line of reasoning by telling OEMs that it could not give royalty discounts because of the nondiscrimination prong of its FRAND commitments.[68]

41. Second, an OEM that believes its rivals pay Qualcomm's "program rates" (*S*) will have weak incentives to engage in costly and risky litigation – even if it suspects that rate is above FRAND – for at least two reasons. One reason is that, while the individual OEM would incur all costs of litigation, it would share any benefits associated with a favorable decision with its rivals.[69] A second reason is that, in assessing the strength of its case, the OEM would expect Qualcomm to have many "comparable agreements" at the nominal rate, and to argue that the existence of those agreements implies a FRAND rate.[70] Qualcomm encouraged this line of reasoning by ignoring the bundled discounts when characterizing its "program rates" to prospective licensees.[71]

---

[68] See, e.g., Ex. 85, QNDCAL03316353 at -356-357 (Email exchange between Qualcomm and Sony, in which Sony requested a lower royalty rate but Qualcomm "has stated publicly on a number of occasions that its standard royalty rate is 5%" and "do[es] not understand why Sony Mobile would expect to pay anything other than a 5% royalty [rate]…").

[69] Joseph Farrell and Carl Shapiro, "How Strong Are Weak Patents?" *American Economic Review*, Vol. 98, No. 4 (2008), p. 1349. I note that in practice, the externalities described in this article by Professors Farrell and Shapiro can arise either because of a binding nondiscrimination commitment or because rival OEMs could use a public FRAND benchmark in subsequent negotiations with Qualcomm.

[70] Indeed, Qualcomm continues to make these arguments in its expert reports in this matter. Brismark Report, ¶145.

[71] Ex. 472, FELKE_097 ("Derek asked me to remove any mention of the marketing value Qualcomm was receiving from LG from the slide and any other documentation. He explained: 'I get deposed on this stuff and have to be able to say that we are receiving equal value to what we

42. Finally, as described in my opening report, the "carrot" of a bundled discount was offered to the OEMs with the most bargaining power.[72] Thus, it was the relatively weak OEMs – those with the least incentive and ability to finance a high-stakes FRAND challenge – who paid the standalone rates.

43. Given that the "standalone" licensees who Dr. Saravia alleges would file a FRAND challenge lacked the information, incentives and ability to challenge Qualcomm's rates, her assumption that Qualcomm's nominal standalone rates are FRAND is unwarranted. Without that assumption, her argument that there is an inconsistency between what she calls Chip Leverage and License Leverage falls apart.

44. Dr. Saravia's assumption that Qualcomm's conditional discounts caused its above-FRAND nominal royalties to become below-FRAND effective royalties is also unwarranted.[73] As explained in my opening report, several antitrust authorities alleged that Qualcomm's royalty rates were above a FRAND level, based on its chip-supply threats.[74] The fact that *some* OEMs received discounts from an above-FRAND rate does not imply that any of those bundled rates were FRAND. Dr. Saravia conducted no analysis to show whether or not Qualcomm' royalties are FRAND, nor did she analyze the effects of Qualcomm's bundling practices on those rates. Elsewhere in her report, she argues (incorrectly, in my view) that the conditional discounts should be applied only to chip purchases.[75]

45. Finally, at a broader level, Dr. Saravia's effort to characterize my opening report as proposing two separate theories of harm – Chip Leverage and Licensing Leverage – is misleading.

---

are paying under the strategic funds.'"). Ex. 492, QNDCAL03895881 at -881 (July 10, 2012 email from Magnus Felke stating, "OEMs see this money as 'theirs'"); Ex. 493, QNDCAL03899888 at -909 (July 10, 2012 Qualcomm presentation stating, "OEMs view the funds as 'theirs'"); Ex. 552, QNDCAL00549325 at -331, -355 (March 8, 2012 Qualcomm marketing presentation explaining, "Lack of leverage-$ sit with OEM procurement, not marketing"; "Historically, $ tied to chip volumes, not marketing program validation"; and that for the "ZTE Strategic Fund Marketing Proposal": Qualcomm's "Expectations" were "Do not anticipate ZTE will agree to use strategic funds for co-marketing in this round"). Ex. 494, Q2014FTC04831757 at -758 (August 14, 2012 email from Tim McDonough stating, "OEM discounts (called MDF only in name).").

72 Simcoe Report, ¶161; Brismark Report, ¶¶93-95.

73 Saravia Report, ¶¶8(e), 65-68.

74 Simcoe Report, ¶86, Appendix E.

75 Saravia Report, ¶73.

First, these are not my theories: they are the theories of anticompetitive harm put forward by parties in the relevant investigations and litigations. Second, as explained in my opening report, competition regulators, including the U.S. FTC and the Korean FTC, have also observed that Qualcomm's disclosed and undisclosed business practices all worked together as a set of interrelated practices that reinforce each other.[76] For example, the KFTC Case Examiner's Report [redacted][77] Indeed, the 2015 KFTC Case Examiner [redacted][78] Similarly, the U.S. FTC argued in its trial against Qualcomm, among other things, that Qualcomm has "four interrelated practices that reinforce each other" to allow Qualcomm to maintain a high royalty rate and harm chipset competition.[79] In particular, the FTC's January 17, 2017, federal complaint against Qualcomm alleged that Qualcomm had "excluded competitors and harmed competition" through a set of "interrelated policies and practices," including "offer[ing] customers incentive payments (often tied to their purchase of Qualcomm's processors) to induce those customers to accept Qualcomm's preferred license terms" and "enter[ing] into exclusive dealing arrangements with Apple Inc., a particularly important cell phone manufacturer."[80]

### 2. "License Leverage" Does Not Imply That Qualcomm Conditions License Access on Chip Purchases

46. Dr. Saravia also misapprehends (or mischaracterizes) my argument that, because of the threat of a FRAND challenge, Qualcomm might shift some of the monopoly rents that would be

---

[76] Simcoe Report, ¶¶67-68 (citing FTC Opening Statement (01/04/2019) FTC Trial Tr. at 9:3-11).

[77] Certified Translation of the 2015 KFTC Case Examiner's Report at p. 53, footnote 102.

[78] Certified Translation of the 2015 KFTC Case Examiner's Report at p. 57.

[79] Simcoe Report, ¶¶67-68 (citing FTC Opening Statement (01/04/2019) FTC Trial Tr. at 9:3-11).

[80] Simcoe Report, ¶143 (citing Ex. 833, Q2014FTC04094292, at -294-95).

available in an unconstrained SEP licensing market to the chipset price.[81] As described in my opening report, exclusionary bundling reduces competition in chips, and this allows Qualcomm to balance two threats: the threat of a FRAND challenge and level of competitive constraint in the modem chip market.[82] This is why Qualcomm's practices are better understood as an integrated whole, rather than two distinct theories of Chip Leverage and License Leverage, as Dr. Saravia presents them.

47. In any case, Dr. Saravia argues that the "regulatory" License Leverage theory would require Qualcomm to have a "no chips, no license" policy instead of its actual "no license, no chips" policy.[83] I disagree. If Qualcomm's undisclosed policy of "no bundle, no discount" works to foreclose rival chipmakers, then Qualcomm can raise its chip prices above a competitive level.

### *C. Qualcomm's Bundling Practices*

48. With the exception of the bundled discounts to Apple, which she characterizes as an exclusive discount, Dr. Saravia does not appear to dispute that the Qualcomm's undisclosed conduct is bundling.[84] She claims that I have not proven it is anticompetitive bundling but does not dispute that it is bundling.[85]

---

81 Saravia Report, ¶¶24-27.

82 Simcoe Report, ¶¶66, 117.

83 Saravia Report, ¶25 ("For this theory to apply here, Qualcomm would have had to require licensees to purchase Qualcomm's modem chips. In other words, Qualcomm would have had to undertake a 'no chips, no license' practice as opposed to a 'no license, no chips' practice."). Although Dr. Saravia appears to understand that this practice is an application of "Baxter's Law" (or the Bell Doctrine), she does not acknowledge that it is one of numerous exceptions to the "one monopoly rent theory" that she relies on elsewhere in her report (Saravia Report, ¶60) See, *e.g.*, Joseph Farrell and Philip J. Weiser, "Modularity, Vertical Integration, and Open Access Policies: Towards a Convergence of Antitrust and Regulation in the Internet Age", Harvard Journal of Law & Technology, Vol. 17, No. 1 (2003).

84 Dr. Saravia disputes that the undisclosed conditional discounts to Apple and other OEMs were bundling and instead characterizes them as exclusive dealing. I explain below that bundled discounts can be pled in litigation as either unlawful bundling or exclusive dealing.

85 Dr. Saravia erroneously claims that I "cited no evidence that any OEM had a license with royalty rates that depended on the modem chip manufacturer after 2010, and I am not aware of any such evidence." (Saravia Report, ¶¶12, 59-61). Appendix D to the Simcoe Report provides over 40 pages of such examples. Her statement seems to be a legal argument that relies on a

49. Dr. Saravia says that "bundling and bundled discounts are ubiquitous and typically considered procompetitive."[86] I agree that bundled discounts can, under *certain* circumstances that are not present here, be pro-competitive.[87] However, as I explained in my opening report, some bundling practices, like those adopted by Qualcomm, *can* harm competition.[88] Dr. Barnett appears to agree with me, asserting that "antitrust case law recognizes that bundling can cause competitive harm by deterring entry by equally or more efficient single-product competitors."[89] Dr. Saravia does not appear to dispute this point either, but she claims I have not proven that Qualcomm's undisclosed bundling practices were capable of doing so.

50. With regard to the bundled discounts to Apple, Dr. Saravia claims that I "incorrectly characterize[d] alleged exclusive-dealing agreements as bundling."[90] I disagree. Rebates conditioned on the purchase of another product, such as Qualcomm's "exclusive-dealing agreements" with Apple, are a form of bundling because the rebate is paid only if both products are purchased. Specifically, with regard to Qualcomm's agreements with Apple, the rebate was paid only if Apple purchased both the SEP license and the specified volume of chipsets.

51. There is a large body of literature describing such conditional rebates as bundles as well as literature discussing why such bundling arrangements could be characterized as exclusive dealing

---

particular interpretation of the terms "license" and "royalty rate" as opposed to an economic analysis of the effects of Qualcomm's conditional discounts and negotiating practices.

86 Saravia Report, ¶8b.

87 Patrick Rey and Jean Tirole, "A Primer on Foreclosure," Editor(s): Mark Armstrong and Rob Porter, *Handbook of Industrial Organization, Vol*. 3, 2007, pp. 2145-2220.

88 Simcoe Report, ¶70.

89 Barnett Report, ¶13.

90 Saravia Report, ¶8e. *See also* ¶8g, where Dr. Saravia says "the At-Issue Complaints did not describe [the Apple agreements] as bundling."

agreements.[91] Professor Barnett seems to agree with me, explaining in his report how some courts have described bundled discounts as exclusive dealing arrangements.[92]

52. The FTC has also explained that exclusive dealing is viewed from the standpoint of the conditional nature of the actual practice and its competitive effects; this means that a license "may have the effect of exclusive dealing if it is structured to increase significantly a licensee's cost when it uses competing technologies."[93] Qualcomm's bundled discounts with Apple, which imposed significant financial penalties if Apple switched to a different chipset supplier, readily fit this description.

53. Dr. Saravia and Professor Barnett also attempt to criticize my analysis by arguing that the antitrust actions do not make specific findings about "bundling."[94] This is a distinction without a difference. The conduct at issue unquestionably involves bundling, as I explained in my opening report. Moreover, I understand that, consistent with my opinions, Judge Ohta recognized in her Class Certification decision in this action that the public disclosure of certain details about Qualcomm's exclusive-dealing arrangement with Apple was corrective information about bundling, including that Qualcomm "illegally paid a major customer [Apple] for exclusively using Qualcomm chipsets" to force competitors out of the market, that Qualcomm "conditioned partial [royalty] relief on [] exclusive use," of Qualcomm's chipsets, and that "Apple accused Qualcomm of deterring it from switching to other chip suppliers via royalty rebates."[95]

---

91 Patrick Greenlee, David Reitman, and David S. Sibley, "An antitrust analysis of bundled loyalty discounts," *International Journal of Industrial Organization*, Vol. 26, No. 5 (2008): 1132-1152. Timothy J. Brennan, "Bundled rebates as exclusion rather than predation," J*ournal of Competition Law and Economics,* Vol. 4, No. 2 (2008): 335-374. Gianluca Faella, "The antitrust assessment of loyalty discounts and rebates," *Journal of Competition Law and Economics*, Vol. 4 No. 2 (2008): 375-410. Sean P. Gates, "Antitrust by analogy: Developing rules for loyalty rebates and bundled discounts," *Antitrust Law Journal*, Vol 79, No. 1 (2013): 99-137.

92 Barnett Report, ¶41.

93 See "Antitrust Guidelines for the Licensing of Intellectual Property," U.S. Department of Justice and the Federal Trade Commission, April 6, 1995, available at <https://www.ftc.gov/sites/default/files/attachments/competition-policy-guidance/0558.pdf>. Updated January 12, 2017, available at <https://www.justice.gov/atr/IPguidelines/dl>.

94 Saravia Report, Section 9 and Barnett Report, Section VII.

95 Class Certification Order, ECF No. 279, p. 6, 7.

54. Dr. Saravia claims that the bundled discounts in this litigation should be interpreted as modem chip discounts rather than royalty rebates because, "when deciding which modem chip to purchase, an OEM… only receives the payment or incentive if it purchases Qualcomm's modem chips."[96] Qualcomm's conditional discounts certainly produce an incentive to purchase Qualcomm's chips – that is why they can have exclusionary effects. But Dr. Saravia's assertion that they are "modem chip discounts" (i.e. unrelated to royalties) is incorrect. One could equally accurately describe them as royalty discounts because they were granted to induce the acceptance of otherwise objectionable license terms.[97] As explained in my opening report, the conditional discounts frequently emerge from license negotiations, and in that context an OEM would consider the "all in" price of a chip and SEP license.[98] Dr. Saravia simply ignores these *ex ante* negotiations along with a great deal of evidence that points towards joint determination of the royalties and conditional rebates.[99] Even Professor Barnett finds that "these divergent characterizations are immaterial."[100]

55. Finally, Dr. Saravia states that I have "not shown that the assumptions in any of" several academic papers that describe potentially anticompetitive bundling "are satisfied here."[101] However, she does not appear to dispute that factual evidence regarding the specific anticompetitive bundling at issue here was presented and evaluated in these regulatory actions and litigations. Instead, she complains that I have not shown that bundling caused antitrust harm.[102] As explained earlier, I understand that proving antitrust harm is not central to this securities litigation.

---

96 Saravia Report, ¶73.

97 Williams (01/14/2019) FTC Trial Tr., p. 870:22-24, 871:8-12, 871:16-872:6. Simcoe Report, Appendix D.

98 Simcoe Report, ¶76.

99 Simcoe Report, ¶¶49-54, Appendix D.

100 Barnett Report, ¶¶81-82.

101 Saravia Report, ¶34.

102 Saravia Report, ¶15.

### *D. Causation*

56. Dr. Saravia states that "Professor Simcoe has failed to show that Qualcomm's alleged undisclosed bundling practices caused any of the At-Issue Complaints."[103] She appears to adopt two different standards for assessing causation. First, she argues that Qualcomm's undisclosed bundling practices must be "prominent" elements of the regulatory actions and civil actions, a standard she does not otherwise define.[104] Second she claims the regulatory actions and civil litigations "would not have been filed absent the alleged undisclosed bundling practices".[105] Regardless of the standard for assessing causation, I disagree with her claim.

57. As discussed in my opening report, the undisclosed bundling practices were indeed central to the regulatory actions and lawsuits described in my report.[106] On the other hand, Dr. Saravia argues that the "disclosed, or non-bundling, conduct was the prominent element of each of the At-Issue Complaints."[107] Below, I consider some of Dr. Saravia's suggested "prominent elements" of conduct for each of the cases and explain why Dr. Saravia mischaracterizes them as "disclosed, or non-bundling, conduct."[108]

#### 1. KFTC Decision

58. Dr. Saravia argues that "Qualcomm's alleged bundling practices, at least with respect to Korean OEMs" mentioned in the 2009 KFTC investigation were disclosed through the 2009 KFTC action and could not have been a reason for the 2015 KFTC ER "because they were discontinued prior to the 2015 KFTC ER."[109]

---

103 Saravia Report, ¶8g.

104 *See, e.g.,* Saravia Report, ¶135 ("Because he has not established that Qualcomm's undisclosed bundling practices were a prominent element of the Apple complaint, Prof. Simcoe has not established that the undisclosed practices 'caused' the Apple complaint."). *See also* Saravia Report, ¶90 ("Prof. Simcoe ignores that Qualcomm's disclosed practices and the alleged exclusive-dealing nature of its agreements with Apple were the prominent elements in the At-Issue Complaints.").

105 Saravia Report, ¶91.

106 Simcoe Report, Section IV.C, ¶159.

107 Saravia Report, ¶95.

108 Saravia Report, ¶95.

109 Saravia Report, ¶98.

59. Dr. Saravia ignores that the Korean enforcement agency issued public guidelines in a 2014 working paper to the OECD that reiterated its enforcement priorities, including stating that "the breach of an obligation to ensure FRAND (Fair Reasonable And Non-Discriminatory) terms in the course of granting a license to use a standard-essential patent," implicates Korean competition law.[110] Moreover, as referenced in my opening report, the KFTC Case Examiner knew that Qualcomm "still employs the strategy where it ties the chipset purchases and license agreement by providing certain discounts to mobile device makers who purchase larger quantities of its own chipsets . . ."[111]

60. Dr. Saravia assumes that because the bundling practices were disclosed by the 2009 KFTC action that they had been *discontinued*.[112] This conflicts, however, with the 2015 KFTC Case Examiner's Report which found that Qualcomm continued to engage in these bundling practices. Dr. Saravia's assumption that the practices had been discontinued thus supports a conclusion that these bundling practices were *undisclosed*, because Dr. Saravia, like the public, had been led to believe that such practices were halted in 2009. In fact, they were not halted, as was later disclosed during the Class Period.

61. Dr. Saravia also argues that the KFTC's questionnaires and industry participants' responses to the KFTC's requests for information do not show that bundling caused the investigation.[113] [redacted][114] [redacted][115] [redacted]

---

[110] Intellectual Property and Standard Setting – Note by Korea, Nov. 20, 2014, p. 2, available at <https://one.oecd.org/document/DAF/COMP/WD(2014)115/en/pdf>.

[111] Simcoe Report, ¶110, citing Certified Translation of the 2015 KFTC Case Examiner's Report at p. 155, footnote 192.

[112] Saravia Report, ¶¶71, 98.

[113] Saravia Report, ¶99.

[114] [redacted]

[115] [redacted]

[redacted]"[117] Based on Huawei's answers, the KFTC issued another request for information to Huawei specifically about [redacted].[118] The KFTC also issued questionnaires to chipset makers about the anticompetitive effects of Qualcomm's bundling practices, including to [redacted] who responded that [redacted][119] These are all examples of conduct involving bundling, so I disagree with Dr. Saravia's assertion that I have not linked the questionnaire and responses to the issue of bundling.

62. The 2015 KFTC Case Examiner's Report also makes clear that Qualcomm's undisclosed bundling practices contributed to the findings. For instance, the 2015 KFTC Case Examiner's Report [redacted][121] The 2015 KFTC Case Examiner's Report further states, [redacted][122]

63. In addition, Dr. Saravia incorrectly argues that the examples of Qualcomm nominally providing discounts for purchases of chipsets in conjunction with the negotiation of a SEP license that are found in the 2015 KFTC Case Examiner's Report are not a form of bundling.[123] I disagree.

---

116 Simcoe Report, ¶103, citing FTC-PROD-0011240 at -253.

117 Simcoe Report, ¶103-104, citing FTC-PROD-0011282 at -287.

118 Simcoe Report, ¶104, citing FTC-PROD-0011282 at -287.

119 [redacted]

120 Certified Translation of the 2015 KFTC Case Examiner's Report at p. 226.

121 Certified Translation of the 2015 KFTC Case Examiner's Report at p. 56, footnote 105.

122 Certified Translation of the 2015 KFTC Case Examiner's Report at p. 56, footnote 105.

123 Saravia Report, ¶101.

As I explained above in Section IV.C, discounts conditioned on the acceptance of otherwise unacceptable license terms are a form of bundling.

64. The examples in the 2015 KFTC Case Examiner's Report that I referenced in my opening report often involved conditional rebates.[124] For example, the KFTC Case Examiner knew [redacted][125] Dr. Saravia seems to have ignored the statements in the KFTC Case Examiner's Report [redacted][126] These statements clearly [redacted] i.e., they describe a bundled discount. Moreover, such conditional rebates are, as a matter of economics, properly described as bundled discounts even if they are litigated as exclusive-dealing agreements.[127]

### 2. EC Decision

65. Dr. Saravia argues that the "alleged exclusive-dealing nature of Qualcomm's agreements with Apple was the prominent element in the EC SO against Qualcomm."[128] However, the agreements between Apple and Qualcomm constitute bundling, and were only accomplished through bundling, even if they were litigated as exclusive-dealing agreements.[129]

---

[124] Simcoe Report, ¶¶107-119.

[125] Simcoe Report ¶110, citing Certified Translation of the 2015 KFTC Case Examiner's Report at p. 155, footnote 192.

[126] Simcoe Report ¶110, citing Certified Translation of the 2015 KFTC Case Examiner's Report at p. 155, footnote 192.

[127] See, e.g., Ex. 318, Q2017MDL1_01089127 at -129 [redacted]. *See also* Ex. 475, Q2017MDL1_03163364 at -366 [redacted].

[128] Saravia Report, ¶105.

[129] Simcoe Report, ¶46-47, Appendix D.

66. Dr. Saravia states that the statements I referenced in my Opening Report from the EC SO "Introduction" section do not mention undisclosed bundling.[130] However, the EC SO clearly states that "Qualcomm has granted payments to [Apple] on condition that it obtains all of its future [chipsets] from Qualcomm."[131] As discussed in my opening report, these payments were conditioned on the purchase of both a SEP license and chipsets and are a form of bundled discount.[132]

67. Dr. Saravia also states that a separate reference in my Opening Report to the EC SO is actually part of the disclosed "no license, no chips" practice.[133] This is inaccurate, as the practice discussed is related to what Dr. Saravia coins the "Chip Leverage Theory," which I have explained in my opening report is a form of undisclosed bundling.[134] In particular, the Commission explains that Apple tried to find a way "so that Qualcomm cannot use the leverage it has from dominance in [baseband chipset] supply to demand higher patent royalties from Apple than the patents themselves may deserve."[135] Dr. Saravia mischaracterizes the EC SO statements as the "no license, no chips" practice when it is actually a form of bundling.

### 3. TFTC Matter

68. In discussing the questions from the TFTC information requests to Qualcomm, Dr. Saravia states that I "fail[] to acknowledge that these questions were only two out of 15 questions that covered many different business practices."[136] I do not see how the number of questions asked is dispositive of the nature of the TFTC's concerns, nor does the fact that the questions covered multiple business practices diminish the significance of the questions regarding Qualcomm's

---

130 Saravia Report, ¶106.

131 Ex. 813, Q2017MDL1_03133196 at -205 (EC Statement of Objections).

132 Simcoe Report, ¶46-47, 102.

133 Saravia Report, ¶107.

134 Simcoe Report, ¶56, Section III.A.2.

135 Simcoe Report, ¶127. *See also*, Ex. 813, Q2017MDL1_03133196 at -254 (EC Statement of Objections).

136 Saravia Report, ¶112.

bundling practices. The point remains that the TFTC inquired about Qualcomm's bundling practices during its investigation.[137]

69. Dr. Saravia also discusses how the TFTC decision "addressed…the alleged exclusive-dealing nature of Qualcomm's agreements with Apple, but not whether the payments to Apple were 'royalty rebates'."[138] As mentioned previously, the agreements between Apple and Qualcomm constitute bundling even if they were litigated as exclusive-dealing agreements.

#### 4. FTC Case

70. Dr. Saravia asserts that "none of" the documents related to the FTC information requests to Qualcomm "can support his claim about the eventual cause of the later action."[139] However, Dr. Saravia acknowledges that many of the documents that I referenced "address the alleged exclusive-dealing nature of Qualcomm's agreements with Apple."[140] As mentioned previously, the agreements between Apple and Qualcomm constitute bundling even if they are litigated as exclusive-dealing agreements.

71. When analyzing the FTC Complaint, Dr. Saravia puts forth what she considers the "FTC's two theories of harm" and argues that I have not shown that either theory was caused by Qualcomm's undisclosed bundling practices.[141] First, Dr. Saravia argues that the FTC's theory of "elevated, exclusionary royalties" and her characterization of my "Licensing Leverage Theory" result in contradictory predictions about the type of OEM that was induced to purchase chips from Qualcomm. This prediction element is irrelevant, as both can exist simultaneously. It does not matter whether OEMs purchasing small or large shares of chipsets were the target of these incentive funds, because the incentive funds were used to secure license agreements (via rebates conditioned on the purchase of both a license and chipsets, i.e., bundling).[142]

---

137 Simcoe Report, ¶¶131-135.

138 Saravia Report, ¶113.

139 Saravia Report, ¶117.

140 Saravia Report, footnote 195.

141 Saravia Report, ¶120-121.

142 The "predictions" that Dr. Saravia contrasts do not appear to be actual claims that appear in either the Simcoe Report or the FTC Complaint. Rather they are based her own arguments, and

**72.** Dr. Saravia claims that the FTC alleged the incentive funds were only used for specific OEMs, but my so-called "Licensing Leverage Theory" requires that "all, or almost all" OEMs were offered the funds.[143] This supposed inconsistency is misguided. Dr. Saravia simply *assumes* that in order to influence chip prices, conditional discounts would have to be offered to "almost all" OEMs. In practice, conditional rebates that target a single large customer (e.g., Apple) might be sufficient to exclude competitors, as alleged in the EC complaint.

**73.** In addition, Dr. Saravia's claim that the FTC case "did not depend on any incentive funds"[144] is puzzling in light of the prominence of the various incentive agreements with Apple and other OEMs in the FTC's case.[145]

74. Dr. Saravia also claims the FTC alleged only that "in some cases [these funds] accrued based on OEMs' purchase of Qualcomm's processors."[146] However, Dr. Saravia does not point to any examples of an incentive fund referenced in the FTC's complaint that is not conditioned on the purchase of Qualcomm's chips. Dr. Saravia appears to rely on language from the FTC's Complaint that Qualcomm's funds have "in some cases accrued based on OEMs' purchase of Qualcomm's processors."[147] I do not read the FTC's Complaint so narrowly. The paragraph that Saravia cites is within a section of the FTC Complaint called "Qualcomm uses it dominant position in baseband processors to preclude OEMs from challenge its preferred licensing terms," and the FTC made clear the context was Qualcomm "using funds tied to OEMs' purchase of Qualcomm baseband processors to induce OEMs to pay Qualcomm a higher royalty applicable to OEMs' use

---

require additional assumptions (e.g. about the substitutability of "carrots" and "sticks" in bundled negotiations) that are not needed for the theories of harm described by me or the FTC.

143 Saravia Report, ¶124.

144 Saravia Report, ¶124.

145 Q2014FTC04094293 at ¶3(b) (FTC Unredacted Complaint, "Qualcomm has offered customers incentive payments (often tied to their purchase of Qualcomm's processors) to induce those customers to accept Qualcomm's preferred license terms."); *id*. ¶5 ("Qualcomm's use of incentive payments helps Qualcomm 'close the gap' with customers that resist license terms that they regard as unreasonable."); *id*. at Section VIII (discussing Qualcomm's "substantial incentive payments from 2011 through 2016, explicitly conditioned upon Apple using Qualcomm baseband processors exclusively in all new iPhone and iPad models").

146 Saravia Report, ¶125. See also, Q2014FTC04094293 at ¶103 (FTC Unredacted Complaint).

147 Saravia Report, ¶125 citing Q2014FTC04094293 at ¶103 (FTC Unredacted Complaint ).

of competitors' processors."[148] My opinions regarding Qualcomm's bundling are consistent with the conduct described by the FTC in its complaint.

75. Dr. Saravia also claims the "exclusive-dealing agreements with Apple" are not bundling.[149] As previously explained, the agreements between Apple and Qualcomm constitute bundling even if they were litigated by the FTC as exclusive-dealing agreements.[150]

#### 5. Apple Litigation

76. Dr. Saravia claims that one of the "prominent elements" in the Apple complaint related to Apple's agreements with Qualcomm was exclusive dealing, not bundling.[151] As mentioned previously, the agreements between Apple and Qualcomm constitute bundling even if they were litigated by Apple as exclusive-dealing agreements.[152]

### *E. Foreseeability of Antitrust Enforcement*

77. Dr. Saravia erroneously claims I have failed to show that the regulatory actions and lawsuits were a foreseeable consequence of Qualcomm's bundling practices because I "failed to show that Qualcomm's undisclosed bundling practices harmed or could have harmed competition."[153]

78. As I explained above in Section III.A, Plaintiffs in this securities litigation have not alleged antitrust harm. Instead, they have alleged that the bundling practices at issue in several prior antitrust actions caused a decline in Qualcomm's stock price. My report described elements of Qualcomm's business practices that were integral to the antitrust claims in those actions and were not disclosed until alleged in those actions. My report further explained why those actions were caused by the undisclosed practices and were foreseeable, had the practices been disclosed.

---

148 Q2014FTC04094293 at ¶106 (FTC Unredacted Complaint).

149 Saravia Report, ¶¶128-130.

150 Simcoe Report, ¶46-47, Appendix D.

151 Saravia Report, ¶131.

152 Simcoe Report, ¶46-47, Appendix D.

153 Saravia Report, ¶136.

79. In my opening report, I concluded that Qualcomm's undisclosed bundling practices led to the antitrust actions across the globe.[154] I further concluded that these antitrust actions were foreseeable.[155] These conclusions were based on economic analysis showing the practices were capable of causing anticompetitive harm and on my review of extensive evidence showing that the undisclosed practices were prominent in the antitrust actions brought by competition authorities and Apple. Dr. Saravia largely fails to engage with this evidence and analysis, and thus her criticisms have no merit.

## V. Additional Responses to Professor Barnett

80. Professor Barnett largely opines on various aspects of antitrust law in the United States .[156] To the extent not otherwise addressed in my Report, I address those of Professor Barnett's opinions that relate to issues addressed in my opening report below.

### *A. Bundled Discounts*

81. Professor Barnett and I agree that "antitrust case law recognizes that bundling can cause competitive harm by deterring entry by equally or more efficient single-product competitors."[157]

82. Professor Barnett argues that my opening report overlooks a body of "scholarship, literature and case law" that shows bundling is not *generally* anticompetitive.[158] My opening report focused on Qualcomm's undisclosed bundling practices, rather than bundling as a general matter. As it happens, I have co-authored an article with one of the authorities repeatedly cited by Professor Barnett in his critique of my discussion of bundling.[159] Our article explains the particular

---

154 Simcoe Report, Section IV.C.

155 Simcoe Report, Section IV.D.

156 Barnett Report, ¶¶13-18. Professor Barnett does not opine as to the anti-competitive enforcement landscape in other jurisdictions, such as Korea or Europe. Further, he expressly declined to "express any view on the terms and practices that are likely to comply or not comply with the FRAND commitment. . ." Barnett Report, ¶55.

157 Barnett Report, ¶13.

158 Barnett Report, ¶33.

159 Barnett Report, footnotes 49, 56, 57, 159.

importance of Qualcomm's FRAND commitments in assessing why Qualcomm's bundling practices (called "tying" in our article) should be understood to have anticompetitive effects.[160]

83. Professor Barnett claims that I provide no basis for the claim that incentive payments should be treated as a reduction in royalties.[161] I strongly disagree. Paragraphs 33 to 54 of my opening report, and Appendix D, explain why Professor Barnett's claims that the incentive provisions could simply be "volume discounts" on chip purchases is incorrect.

84. Professor Barnett's report seems to misapprehend the basic economics of exclusionary bundled discounts. In particular, he argues that "chip suppliers other than Qualcomm were free to compete on [other payments to the OEM under negotiated incentive arrangements]."[162] In fact, it is *not* possible for an as-efficient competitor to compete for an OEMs' chip business by offering a discount on *Qualcomm's* royalties. Because Qualcomm's patents are standard essential, anyone buying chips from a competitor still needs a license from Qualcomm and must negotiate a royalty with Qualcomm. Only Qualcomm can discount a bundle consisting of chipsets and a license to *its* SEPs, and the evidence cited in my opening report shows that they did so.

85. Professor Barnett also appears to claim that Qualcomm disclosed its bundling practices because it disclosed "incentive payments and cost reimbursements to OEMs," through the following statement in Qualcomm's 2015 Form 10-K: "The Company records reductions to revenues for customer incentive arrangements, including volume-related and other pricing rebates and cost reimbursements for marketing and other activities involving certain of the Company's products and technologies."[163] This statement does not disclose, however, that these "incentives" included, among other things, (i) licensing rebates conditioned on the purchase of Qualcomm chipsets; and (ii) rebates paid by QTL even when the incentive accrued based on the purchase of Qualcomm chipsets.

---

160 Erik Hovenkamp and Timothy S. Simcoe, "Tying and Exclusion in FRAND Licensing: Evaluating Qualcomm," *Antitrust Source, Forthcoming*, Boston University Questrom School of Business Research Paper No. 3523797, January 22, 2020, available at <https://ssrn.com/abstract=3523797>.

161 Barnett Report, ¶82.

162 Barnett Report, ¶82.

163 Barnett Report, ¶11(a) (citing Qualcomm 2015 Form 10-K).

## *B. Economics of the Wireless Industry*

86. Professor Barnett also offers a number of opinions about the economics of the cellular industry that are unfounded, incomplete or flawed.

87. For example, Professor Barnett opines that the "focus on OEMs' royalty burden" in my opening report caused me to overlook benefits produced by Qualcomm's R&D and licensing activity.[164] But my opening report is not focused on the OEM's royalty burden – it is focused on Qualcomm's FRAND commitments and undisclosed bundling practices. Qualcomm's R&D activity is relevant only to the extent Professor Barnett is claiming that the specific bundling practices at issue in this case are necessary to induce Qualcomm's R&D (and even then, only as a potential efficiency defense in an actual antitrust case).

88. Professor Barnett also argues that chipmakers practice Qualcomm's SEPs "at no cost" through non-exhaustive agreements.[165] This discussion concerns Device-Level Licensing—not Qualcomm's bundling practices discussed in my opening report. The claim is also wrong as a matter of economics.[166]

89. Finally, Professor Barnett seems to suggest that all of the antitrust cases were not a foreseeable consequence of Qualcomm's conduct at all, but instead can be explained by a combination of "random political factors" and "coercion" by Apple, neither of which he substantiates.[167]

90. When multiple independent agencies take similar actions, that is a strong indicator that they are responding to the merits of the case, as opposed to random political factors (which would be likely to influence each agency differently). As I explained in my opening report, for many years, Qualcomm's license and chipset customers regularly told Qualcomm that Qualcomm's

---

164 Barnett Report, ¶¶46-50.

165 Barnett Report, ¶¶52, 67.

166 It is a textbook proposition in economics that the cost of a per-transaction fee (such as a patent royalty charged on chips that practice Qualcomm's SEPs) is shared between the buyer (OEM) and seller (chipmaker) *regardless* of whether the buyer or seller pays the nominal fee. *See,* for example, Hal R. Varian, Intermediate Microeconomics: A Modern Approach, 9th ed. (W.W. Norton & Company, 2014), at p. 302. Mr. Brismark makes the same economic error when he argues that chip-suppliers are "not part of th[e] equation" when an OEM takes a SEP license (Brismark Report, ¶149).

167 Barnett Report, ¶¶60, 74-75, 80.

[redacted][168] This alone makes the regulatory actions and civil litigations discussed above foreseeable.

91. Professor Barnett also attempts to blame Apple for driving the regulatory actions through a "strategy to 'devalue SEPs,'" but offers no support for his apparent assertion that multiple government regulators failed to conduct independent investigations and instead brought regulatory actions across the world based solely on a purported "strategy" from a single OEM.[169] In fact, the European Commission, KFTC, and U.S. FTC undertook extensive investigations, and solicited the views of a broad cross-section of cellular industry stakeholders.[170] Professor Barnett's report simply dismisses the testimony that OEMs provided in these investigations and the litigation that followed.[171] But he offers no reason for why this evidence would be "inherently biased," nor does he describe which evidence – including testimony delivered under oath – he believes was untrue.[172]

## VI. Additional Response to Mr. Brismark

92. Mr. Brismark and I agree that when a SEP licensing negotiation fails, "whether a particular offer is FRAND is… for a court or arbitrator to decide if put at issue by one or both of the parties."[173] Section II.C. of my opening report describes principles that scholars and practitioners

---

168 Simcoe Report, ¶168.

169 Barnett Report, ¶107.

170 See, e.g., FTC-PROD-0011240 ("Questionnaire for handset manufacturers"); [redacted] See also, QNDCAL00522501 (HTC, "Notice of intent to disclose agreements for European Commission Investigation"); Q2014FTC04139439 (Samsung, "Samsung intent to disclose"); QNDCAL04011381 [redacted]

171 Barnett Report, ¶91.

172 Mr. Brismark's dismissal of sworn testimony by OEM's and chipmakers because "FRAND is not determined based on what third parties say" is also unwarranted and misrepresents my use of that testimony to explain the effects of Qualcomm's bundled discounts. Brismark Report, ¶151.

173 Brismark Report, ¶31.

have suggested courts and arbitrators should use to assess whether an actual or proposed license agreement is FRAND, including:[174]

- "The 'reasonable' (or 'fair and reasonable') prong of FRAND represents a commitment to license implementers at a price that reflects *ex ante* competition among the alternative technologies that might have been included in the standard."[175]
- The non-discrimination part of a FRAND commitment relates to the economic concept of price discrimination. Nondiscrimination "ensures that specific implementers within any downstream market will not be placed at a competitive disadvantage because they are denied access to a license on preferable rates."[176]

93. In contrast, Mr. Brismark's report does not propose any objective standard that a court or an arbitrator could use to assess whether an offer or a license is fair, reasonable, or non-discriminatory. Instead, he opines that FRAND "is a framework under which parties negotiate at arm's length to reach agreements."[177]

94. I understand Mr. Brismark to mean that FRAND is merely a promise to negotiate with certain groups of implementers in good faith[178] and that any actual agreement between parties (no matter the final terms or circumstances of the negotiation) complies with FRAND.[179] I disagree. His interpretation of the FRAND commitment imposes essentially no limitations on the royalty or other contractual terms offered for a SEP license. That approach is inconsistent with the language

---

174 Simcoe Report, Section II.C.

175 Simcoe Report, ¶31.

176 Simcoe Report, ¶34.

177 Brismark Report, ¶126.

178 Brismark Report, ¶129. I understand that "good faith" is a legal construct related to honesty, fairness, and a duty to conduct oneself so as not to "destroy or injure the right of the other party, to receive the fruits of the contract." (e.g. Uniform Commercial Code, Sections 1-304 and 1-302, available at <https://www.law.cornell.edu/ucc/1/1-304> and < https://www.law.cornell.edu/ucc/1/1-302>). See also, Brismark Report, footnote 32, where Mr. Brismark defines good faith as "genuinely seeking to conclude a negotiated license agreement as efficiently as possible."

179 Brismark Report, ¶¶64, 145.

in SSO IPR policies (which explicitly link FRAND commitments to the "terms and conditions" of a license) and leads to an unworkable standard.[180]

95. For example, Mr. Brismark suggests that a court or arbitrator can resolve SEP licensing disputes.[181] Without an objective FRAND standard, it is unclear how the courts or arbitrators should evaluate offers. Relying on prior agreements merely raises the question of how to determine whether the first license was FRAND.[182] In practice, moreover, even when parties have reached an agreement on royalties for SEPs, some courts have found those agreements to be inconsistent with FRAND principles.[183]

96. Mr. Brismark also mistakenly argues that it is improper to analyze the individual prongs of the FRAND commitment, separating reasonableness from non-discrimination.[184] In fact, the distinction between these two "prongs" of the FRAND commitment is a routine and nearly ubiquitous feature of the economic and legal literature cited in my report, as well as many of the

180 Simcoe Report, footnote 33 (citing ETSI and IEEE policies). See also, ETSI, "ETSI Directives Version 37," April 2017, p. 36, available at <https://portal.etsi.org/directives/37_directives_apr_2017.pdf>; IEEE, "Section 6 Patents," available at <https://standards.ieee.org/about/policies/bylaws/sect6-7.html>.

181 Brismark Report, ¶31 ("The FRAND commitment sets a background principle against which licensors and prospective licensees negotiate in good faith; whether a particular offer is FRAND *is for the parties to negotiate*, and if they fail, for a court or arbitrator to decide if put at issue by one or both of the parties." (emphasis added).

182 *See, e.g.,* Jonathan S. Masur, "The Use and Misuse of Patent Licenses," *Northwestern University Law Review 110:115-57*, 2015; William F. Lee & A. Douglas Melamed, "Breaking the Vicious Cycle of Patent Damages," *Cornell Law Review 101:385-466*, p. 438-439, 2016.

183 For example, a UK Court in *InterDigital v. Lenovo* concluded that as to licensing negotiations with the patent owner InterDigital (as SEP owner): "I am driven to the conclusion that *by consistently seeking supra-FRAND rates*, InterDigital did not act as a willing licensor." (emphasis added), InterDigital v Lenovo [2023] EWHC 539 ("Interdigital v. Lenovo") at ¶928. The court further states that "It assumes that all the comparable licences on which Lenovo chose to rely were FRAND in every particular, but I do not consider this to be a valid assumption." ¶435. That is, some of the signed SEP licenses may not be on FRAND terms. Similarly, a court in *Optis v. Apple* opined that rates in "Optis Comparables [licenses for Optis SEPs] produce outcomes that are commercial and defensible on their own terms, but which cannot be used to draw any wider conclusions as regards FRAND rates." *Optis v. Apple,* ¶470.

184 Brismark Report, ¶¶106-108.

papers cited by Mr. Brismark himself.[185] Many court decisions also distinguish between the reasonable and non-discriminatory parts of a FRAND commitment.[186] Mr. Brismark's insistence

---

[185] For example, Mr. Brismark cites an article by leading scholars who write: "We stress that the non-discrimination ('ND') prong of FRAND should not be invoked as a reason to base awards either on 'best prices' or even averages across licensees…" and further explain in the footnote "In the context of the 'ND' prong of FRAND (but less so the 'FR' prong), an analysis of which implementers are the closest competitors to the implementer in question may be germane to evaluating the effect on competition." Brismark Report, footnote 10, citing Kaylan Dasgupta and David Teece, "Protecting Innovation in the Mobile Wireless Ecosystem: Understanding and Addressing 'Holdout'," *Berkeley Tech. L. J.*, Vol. 38, 2023, available at <https://btlj.org/wp-content/uploads/2023/11/38_Haas_FullIssue.pdf>, p. 320 and footnote 17.

Mr. Brismark cites another paper which defines the "fair and reasonable" and "non-discriminatory" aspects separately and analyses them separately as well: "The first three factors define a "fair and reasonable" royalty. The fourth factor defines a "nondiscriminatory" royalty. I explain now the economic reasoning for this interpretation of FRAND…" Brismark Report, footnote 11, Gregory J. Sidak, "The meaning of FRAND, part I: Royalties," *Journal of Competition Law and Economics*, Vol. 9, No. 4, 2013, at pp. 993-1000, available at <https://www.criterioneconomics.com/docs/sidak-the-meaning-of-frand-part-i-royalties-9-j.-competition-l.-econ.-931-2013.pdf>.

Mr. Brismark cites another paper where the authors discuss the "Fairness and reasonableness" and "Non-discrimination" elements of FRAND separately. Brismark Report, footnote 11, citing Damien Geradin and Miguel Rato, "Can standard-setting lead to exploitative abuse? A dissonant view on patent hold-up, royalty stacking and the meaning of FRAND," *European Competition Journal*, Vol. 3, No. 1, 2007, at p. 25.

[186] *TCL v. Ericsson*, Memorandum of Findings of Fact and Conclusions of Law, *Case 8:14-cv-00341-JVS-DFM,* December 21, 2017, at p. 57 ("[P]ermitting Ericsson to define similarly situated very narrowly by picking and choosing criteria with no relation to its SEPs or the FRAND commitment would effectively allow Ericsson to read the non-discrimination prong out of the FRAND commitment"). *Optis v. Apple*, Approved Judgement, May 10, 2023, at ¶¶427, 434 ("Non-Discriminatory… This is the first of the two elements that comprise FRAND that I am going to consider. The 'ND' stands for 'Non-Discriminatory'…The terms 'Fair' and 'Reasonable' (the 'F' and the 'R' of FRAND) are words of ordinary usage where it is not helpful to seek to define them further."). Mr. Brismark cites an earlier decision in *Unwired Planet v. Huawei* ("[A]t least the UK High Court has opined that 'ND' in FRAND is not 'hard-edged', *i.e.*, that a license cannot be challenged as not FRAND simply because another similarly situated licensee was granted a license at a lower rate."), Brismark Report, ¶117. However, the UK Supreme Court that considered this very matter after this UK High Court decision was appealed, explained that "Non-discrimination between licensees is achieved, because the FRAND rate is objectively determined based on the value of the portfolio and it **does not take into account the characteristics of individual licensees**." See *Unwired Planet v. Huawei*, [2020] UKSC 37, ¶121.

that this is "not how FRAND was intended to work" highlights both his narrow focus on the ETSI policy language and his idiosyncratic views on the overall topic of FRAND licensing.

97. Mr. Brismark mischaracterizes my opening report's statements about the ability of SEP owners to seek injunctive relief. In particular, he claims that "FRAND does not limit injunctive relief as Prof. Simcoe suggests."[187] What my report actually said, however, was that the "availability or an award of injunctive relief *prior to determining the appropriate FRAND royalty* will overcompensate SEP holders."[188] The link between injunctive relief and overcompensation is a relatively straightforward proposition under the *ex ante* interpretation of reasonableness, as shown by several of the papers cited in my opening report.[189]

98. The court cases cited by Mr. Brismark to show that injunctive relief may be available for FRAND committed SEPs reinforce my point, because they show that courts first ask whether the offer is FRAND. For example, Mr. Brismark notes that injunctions may be available in some parts of Europe against an "unwilling licensee" or in the United States "where an infringer unilaterally refuses *a FRAND royalty* or unreasonably delays negotiations to the same effect."[190] Note, the U.S. approach cited by Mr. Brismark requires the royalty to be FRAND. The notion of "unwilling licensee" as explained in a recent UK FRAND dispute requires knowing whether the offers were on FRAND terms.[191] As the UK Supreme Court explained in another case, "in the United Kingdom, it is not the practice to grant a final injunction unless the court is satisfied that the patent is valid and infringed, and it has determined a FRAND rate."[192] Mr. Brismark's own source indicates that German courts also require determining whether the offer is on FRAND terms for

---

187 Brismark Report, Section 2b (Title, ¶¶103-105).

188 Simcoe Report, ¶31 (emphasis added).

189 Simcoe Report, footnote 36.

190 Brismark Report, ¶105, footnote 74 (emphasis added).

191 *InterDigital v. Lenovo*, ¶95 ("Overall, I was puzzled as to how anyone could reach conclusions effectively as to whether Lenovo was an unwilling licensee without considering the all-important valuation of the offers which were under discussion. In other words, how can a final conclusion be reached until it is possible to review the negotiating history against what is found to be FRAND.").

192 See *Unwired Planet v. Huawei*, [2020] UKSC 37, ¶151, available at < https://www.supremecourt.uk/cases/docs/uksc-2018-0214-judgment.pdf>

injunctions.[193] All of these approaches are entirely consistent with my view that availability of injunctive relief without FRAND assessment will overcompensate SEP holders.

99. Mr. Brismark does not mention that seeking an injunction against a "willing licensee" in Europe may be a violation of antitrust law. He also does not mention that U.S. courts typically decline to award injunctive relief for SEP infringement under the *eBay* standard.

100. Mr. Brismark argues that the "notion that Prof. Simcoe's understanding of FRAND represents the consensus of economists is incorrect. In fact, many economists disagree with his one-sided view that *the objective of FRAND is only to benefit implementers*."[194] Mr. Brismark could safely cite to many of my own papers to support his argument because it is not my view that "that the objective of FRAND is only to benefit implementers."[195] This is a gross misrepresentation of my view.

101. Contrary to Mr. Brismark's mischaracterization of my "view of FRAND," which he claims "ignores the need to incentivize continued investments in the development of technology standards,"[196] the economic literature cited in my report describes how an *ex ante* competitive royalty compensates SEP holders for the value that their technology creates and contributes to the standard beyond what is offered by alternative solutions available at the time of standardization.[197] In other words, the opinions set forth in my opening report replicate the balance and incentives normally provided by the patent system (and associated technology licensing markets) *but for* the competitive distortions introduced by the standardization process. Indeed, the *ex ante* benchmark is closely related to reasonable royalty determination outside the SEP context.[198]

---

193 Brismark Report, footnote 74, citing Ruben Ladde and Jelle Drok, "SEP-based injunctions issued by the Dutch Court of Appeal," Lexology (2019), available at <https://www.lexology.com/library/detail.aspx?g=8c0aa537-c63b-43a8-99d0-c69928c0773d>.

194 Brismark Report, ¶40 (emphasis added).

195 Brismark Report, ¶40.

196 Brismark Report, ¶31.

197 Simcoe Report, ¶29, ¶31, footnotes 32, 35.

198 *See, e.g.,* The Sedona Conference, "Commentary on Patent Reasonable Royalty Determinations," December 2016, p. 47. ("Principle No 7 (b): The total economic cost to the accused infringer of implementing the next best commercially acceptable and available noninfringing alternative may serve to cap the reasonable royalty award."). See also, Thomas Cotter et al., "Reasonable Royalties," *Patent Remedies and Complex Product: Towards a Global*

102. My opening report described how "[t]he monopoly granted by such specific patents [SEPs] is balanced by SEP holders' commitment to license these patents on fair, reasonable and non-discriminatory (FRAND) terms, allowing access to market to implementers."[199] The need for balance arises because in addition to the market power granted by a patent, after a patented technology is included in a standard, a SEP owner has no competition in the market for a license to use its patents in products that implement the standard. Thus, inclusion of a patented technology in a standard, and the assertion that patents are standard-essential, may, if not constrained, significantly enhance the power of a patent holder to extract greater compensation for the use of its technology. The motivating concern is not about *undercompensating* the inventor; it is about *overcompensating* the inventor, above and beyond the value of their contribution.[200]

103. Mr. Brismark objects to my use of the term "consensus" to characterize the view of many economists that, "FRAND represents a commitment to license implementers at a price that reflects *ex ante* competition among the alternative technologies that might have been included in the standard."[201] It is not surprising that Mr. Brismark can find some scholars who take a different

*Consensus* (Biddle, Contreras, Love & Siebrasse eds.) (2019), p. 16 (The first step in their main proposal is "Calculate the incremental value of the invention and divide it appropriately between the parties.").

199 Simcoe Report, footnote 115.

200 For example, in *Ericsson Inc. et al v. D-Link Systems, Inc. et al.* (Case No. 10-CV-0473, E.D. Tex., December 4, 2014) at p. 56, the Federal Circuit wrote, "We further hold that district courts must make clear to the jury that any royalty award must be based on the incremental value of the invention, not the value of the standard as a whole or any increased value the patented feature gains from its inclusion in the standard."

201 Simcoe Report, ¶31.

perspective.[202] Nevertheless, in my view, there is broad agreement among economists on the *ex ante* perspective.[203]

104. Mr. Brismark describes a number of, "variations that parties use in negotiating FRAND licensing agreements."[204] But his discussion of hypothetical licensing terms fails to address Qualcomm's actual bundling practices, as described in my opening report.[205] I explained at length why the so-called "incentives" provided by Qualcomm were actually a form bundling.[206] I also addressed how Qualcomm threatened to withhold chipsets during license negotiations.[207] Mr. Brismark fails to cite or respond to any of these specific paragraphs (38-61) in his Response, and he fails to identify any other example of a company engaging in the specific bundling conduct undertaken by Qualcomm.

105. Mr. Brismark mischaracterizes my opinion when he claims my Appendix D "offers examples of companies agreeing to different prices" for *Qualcomm licenses* and that such price differences "are relatively small."[208] Appendix D in my opening report shows that Qualcomm conditioned its royalty rates on OEMs' purchase of Qualcomm's chipsets. That practice is a bundled discount, which is a type of price discrimination, which is a violation of the ND prong of

---

202 I note, however, that most of the academic papers cited by Mr. Brismark are not directly on point: they focus on the evidence of hold up, and not the related question of whether FRAND implies an *ex ante* competitive benchmark. Indeed, Mr. Brismark either mischaracterizes or misunderstands my views on these topics when he critiques "scholarship that paint[s] a consensus of FRAND *as creating* hold up." (Brismark Report, footnote 10) (emphasis added). The literature cited in the Simcoe Report suggests that FRAND commitments, properly interpreted, can be a *solution* to the hold-up problem.

203 *See, e.g.,* Section 4.1 of Part 3.3 ("The *Ex ante* Approach") in the report of European Commission's SEP Expert group (which includes at least one of the authors cited by Mr. Brismark on this point). "Group of Experts on Licensing and Valuation of Standard Essential Patents 'SEPs Expert Group' - full contribution," January 23, 2021, available at <https://ec.europa.eu/docsroom/documents/45217>.

204 Brismark Report, ¶90-96.

205 *See, e.g.*, Simcoe Report, Section III.A.

206 Simcoe Report, ¶¶48-55.

207 Simcoe Report, ¶¶56-61.

208 Brismark Report, ¶146.

the FRAND commitment.[209] I disagree with Mr. Brismark's claims to the contrary.[210] Moreover, Mr. Brismark's unsupported claims about the *economic* effects of price discrimination, such as, "To give the same OEM two different royalties for a license to a certain technology standard (based on chip supplier) will not affect the overall adoption of that OEM's products in the market" reveal a lack of understanding on the topic.[211]

*Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

Executed on: February 2, 2024

Signature: 

[209] Simcoe Report, ¶15d.

[210] Brismark Report, ¶¶147-148.

[211] Brismark Report, footnote 108.

# Appendix A – Additional Materials Relied Upon

## Bates-Numbered Documents

APL-QC-FTC_22481155

Ex. 42, Q2017MDL1_01627342

Ex. 85, QNDCAL03316353

Ex. 318, Q2017MDL1_01089127

Ex. 472, FELKE_097

Ex. 475, Q2017MDL1_03163364

Ex. 492, QNDCAL03895881

Ex. 493, QNDCAL03899888

Ex. 494, Q2014FTC04831757

Ex. 552, QNDCAL00549325

Ex. 813, Q2017MDL1_03133196

Ex. 833, Q2014FTC04094292

Ex. 849, QNDCAL04070093

FTC-PROD-0011240

FTC-PROD-0011282

INTEL-QCOM008210601

LP_0000742

LP_0001126

LP_0005907

MRVL-00000059

Q121SEC00048094

Q2014FTC04094293

Q2014FTC04139439

Q2014FTC04162850

Q2017MDL1_01145263

Q2017MDL1_01729917

QNDCAL00522501

QNDCAL04011381

QNDCAL04959941

SFT-17632907

## Court Documents

Class Certification Order, ECF No. 279

Consolidated Class Action Complaint For Violation Of The Federal Securities Laws, Case No. 3:17-cv-00121-JAH-WVG (S.D. Cal. July 3, 2017), ECF No. 32

Deposition of Hank Robinson (Qualcomm), July 28, 2022

Ericsson Inc. et al v. D-Link Systems, Inc. et al. (Case No. 10-CV-0473, E.D. Tex., December 4, 2014)

Korean Fair Trade Commission Full-Session Hearing Decision No. 2017-025, Case of Abuse of Market Dominance, Etc. by Qualcomm Inc., Etc., Case No. 2015SiGam2118, January 20, 2017

Korean Fair Trade Commission, Examiner's Report on the Case of Abuse of Market Dominance, Etc. by Qualcomm Inc., Etc., Case No. 2015SiGam2118

TCL v. Ericsson, Memorandum of Findings of Fact and Conclusions of Law, Case 8:14-cv-00341-JVS-DFM, December 21, 2017

## Expert Reports

Expert Declaration of Timothy Simcoe, Ph.D., August 19, 2022

Expert Report of Celeste C. Saravia, Ph.D., December 11, 2023

Expert Report of Jonathan Barnett, December 11, 2023

Expert Report of Timothy Simcoe, Ph.D., September 12, 2023

Rebuttal Expert Report of Gustav Brismark, December 11, 2023

## Public Sources

"Antitrust Guidelines for the Licensing of Intellectual Property," U.S. Department of Justice and the Federal Trade Commission, April 6, 1995, available at <https://www.ftc.gov/sites/default/files/attachments/competition-policy-guidance/0558.pdf>. Updated January 12, 2017, available at <https://www.justice.gov/atr/IPguidelines/dl>.

"Group of Experts on Licensing and Valuation of Standard Essential Patents 'SEPs Expert Group' - full contribution," January 23, 2021, available at <https://ec.europa.eu/docsroom/documents/45217>

"Merger Guidelines," U.S. DOJ and FTC, available at <https://www.justice.gov/d9/2023-07/2023-draft-merger-guidelines_0.pdf>

"Why the ETSI IPR Policy Requires Licensing to All," available at <http://www.fair-standards.org/wp-content/uploads/2017/08/Why-the-ETSI-IPR-Policy-Requires-Licensing-to-All_Karl-Heinz-Rosenbrock_2017.pdf>

Damien Geradin and Miguel Rato, "Can standard-setting lead to exploitative abuse? A dissonant view on patent hold-up, royalty stacking and the meaning of FRAND," European Competition Journal, Vol. 3, No. 1, 2007

Erik Hovenkamp and Timothy S. Simcoe, "Tying and Exclusion in FRAND Licensing: Evaluating Qualcomm," Antitrust Source, Forthcoming, Boston University Questrom School of Business Research Paper No. 3523797, January 22, 2020, available at <https://ssrn.com/abstract=3523797>

ETSI, "ETSI Directives Version 37," April 2017, available at https://portal.etsi.org/directives/37_directives_apr_2017.pdf; IEEE, "Section 6 Patents," available at <https://standards.ieee.org/about/policies/bylaws/sect6-7.html>

ETSI, "Third Generation Partnership Project (3GPP)," available at <https://www.etsi.org/committee/3gpp>

European Commission, "Commission Decision," July 18, 2019, available at <https://ec.europa.eu/competition/antitrust/cases/dec_docs/39711/39711_4493_4.pdf>

FTC News Release, August 10, 2018, available at <https://www.ftc.gov.tw/internet/english/doc/docDetail.aspx?uid=179&docid=15565>

Gates, Sean P. "Antitrust by analogy: Developing rules for loyalty rebates and bundled discounts," Antitrust Law Journal, Vol 79, No. 1 (2013): 99-137

Gianluca Faella, "The antitrust assessment of loyalty discounts and rebates," Journal of Competition Law and Economics, Vol. 4 No. 2 (2008): 375-410

Greenlee, Patrick, David Reitman, and David S. Sibley, "An antitrust analysis of bundled loyalty discounts," International Journal of Industrial Organization, Vol. 26, No. 5 (2008): 1132-1152

Gregory J. Sidak, "The meaning of FRAND, part I: Royalties," Journal of Competition Law and Economics, Vol. 9, No. 4, 2013, available at <https://www.criterioneconomics.com/docs/sidak-the-meaning-of-frand-part-i-royalties-9-j.-competition-l.-econ.-931-2013.pdf>

Hal R. Varian, Intermediate Microeconomics: A Modern Approach, 9th ed. (W.W. Norton & Company, 2014)

Intellectual Property and Standard Setting – Note by Korea, Nov. 20, 2014, available at <https://one.oecd.org/document/DAF/COMP/WD(2014)115/en/pdf>

InterDigital v Lenovo [2023] EWHC 539

Jonathan S. Masur, "The Use and Misuse of Patent Licenses," Northwestern University Law Review 110:115-57, 2015

Joseph Farrell and Carl Shapiro, "How Strong Are Weak Patents?" American Economic Review, Vol. 98, No. 4 (2008)

Joseph Farrell and Philip J. Weiser, "Modularity, Vertical Integration, and Open Access Policies: Towards a Convergence of Antitrust and Regulation in the Internet Age", Harvard Journal of Law & Technology, Vol. 17, No. 1 (2003)

Kalyan Dasgupta and David Teece, "Protecting Innovation in the Mobile Wireless Ecosystem: Understanding and Addressing 'Holdout'," Berkeley Tech. L. J., Vol. 38, 2023, available at <https://btlj.org/wp-content/uploads/2023/11/38_Haas_FullIssue.pdf>

Licensing of IP rights and competition law – Note by Korea, May 17, 2019, available at <https://one.oecd.org/document/DAF/COMP/WD(2019)23/en/pdf>

Optis v. Apple, Approved Judgement, May 10, 2023

Patrick Rey and Jean Tirole, "A Primer on Foreclosure," Editor(s): Mark Armstrong and Rob Porter, Handbook of Industrial Organization, Vol. 3, 2007, pp. 2145-2220

Ruben Ladde and Jelle Drok, "SEP-based injunctions issued by the Dutch Court of Appeal," Lexology (2019), available at <https://www.lexology.com/library/detail.aspx?g=8c0aa537-c63b-43a8-99d0-c69928c0773d>

The Sedona Conference, "Commentary on Patent Reasonable Royalty Determinations," December 2016

Thomas Cotter et al., "Reasonable Royalties," Patent Remedies and Complex Product: Towards a Global Consensus (Biddle, Contreras, Love & Siebrasse eds.) (2019)

Timothy J. Brennan, "Bundled rebates as exclusion rather than predation," Journal of Competition Law and Economics, Vol. 4, No. 2 (2008): 335-374

Transcript of Qualcomm event, "Qualcomm: Our Rights to Royalties Video," August 17, 2006

Uniform Commercial Code, Sections 1-304 and 1-302, available at <https://www.law.cornell.edu/ucc/1/1-304> and < https://www.law.cornell.edu/ucc/1/1-302>)

Unwired Planet v. Huawei, [2020] UKSC 37, ¶151, available at < https://www.supremecourt.uk/cases/docs/uksc-2018-0214-judgment.pdf>

William F. Lee & A. Douglas Melamed, "Breaking the Vicious Cycle of Patent Damages," Cornell Law Review 101:385-466, 2016

Williams (01/14/2019) FTC Trial Tr.

**And all materials cited in the Footnotes and Attachments to this report.**

# Exhibit 11

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
---000---

IN RE: QUALCOMM INCORPORATED
SECURITIES LITIGATION

CASE NO. 3:17-CV-00121-JO-MSB

---

VIDEO-RECORDED DEPOSITION OF EXPERT
JONATHAN BARNETT
San Francisco, California
Wednesday, February 28, 2024

Stenographically Reported by: Ashley Soevyn,
CSR No. 12019
ESQUIRE Job No. J10809724
Pages 1 - 285

Page 2

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
---000---

IN RE QUALCOMM INCORPORATED
SECURITIES LITIGATION

CASE NO. 3:17-CV-00121-JO-MSB

---

Video-recorded Deposition of JONATHAN BARNETT, taken on behalf of the Plaintiff, Pursuant to Notice, at the offices of Keker Van Nest & Peters, 633 Battery Street, San Francisco, California beginning at 8:59 a.m. and ending at 4:45 p.m. on Wednesday, February 28, 2024, before me, ASHLEY SOEVYN, Certified Shorthand Reporter No. 12019.

Page 3

A P P E A R A N C E S:
For the Plaintiff:
BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
BY: JONATHAN USLANER
BY: LAUREN CRUZ (REMOTE APPEARANCE)
Attorneys at Law
2121 Avenue of the Stars
Los Angeles, California 90067
jonathanu@blbglaw.com
lauren.cruz@blbglaw.com
(310) 819-3480
-AND-
MOTLEY RICE LLC
BY: COURTNEY WOLF (REMOTE APPEARANCE)
Attorney at Law
28 Bridgeside Blvd.
Mount Plesant, South Carolina 29464
(843) 216-9000

Page 4

A P P E A R A N C E S:
For the Defendants Qualcomm Incorporated:
KEKER VAN NEST & PETERS
BY: CODY HARRIS
BY: DANIEL B. TWOMEY (REMOTE APPEARANCE)
Attorneys at Law
633 Battery Street
San Francisco, California 94111
charris@keker.com
dtwomey@keker.com
(415) 391-5400
-AND-
COOLEY LLP
BY: KOJI FUKUMURA (REMOTE APPERANCE)
Attorney at Law
Three Embarcadero Center, 20th Floor
San Francisco, California 94111
kfukumura@cooley.com
(858) 550-6008

ALSO PRESENT: James Terrel, Videographer
Kurt Kjelland, VP & Legal Counsel, Qualcomm

Page 57

courts would be relevant.
BY MR. USLANER:
Q Okay.
THE STENOGRAPHIC REPORTER: Exhibit 916.
MR. USLANER: Do you know --
THE STENOGRAPHIC REPORTER: Exhibit 916, then. Hold on.
There you go.
(Exhibit 916 marked for identification.)
MR. USLANER: Which one is that?
THE STENOGRAPHIC REPORTER: 916.
BY MR. USLANER:
Q Sir, I've handed you what's been marked as Exhibit 906 -- 916, excuse me. This is the report indicating the citation references by an article titled:
(As read):
"Tying, Bundled Discounts, and the Death of the Single" by Einer Elhauge in the Harvard Law Review.
Do you see that, sir?
A Yes.
Q Okay. And this reflects, sir, that that article has been cited by 154 law reviews, correct?
MR. HARRIS: Object to the form.

Page 58

THE WITNESS: Correct.
BY MR. USLANER:
Q That's 153 more law review citations than your article, "The 'License as Tax' Fallacy," correct?
MR. HARRIS: Object to the form.
THE WITNESS: Correct.
BY MR. USLANER:
Q And this also indicates that the -- the article by Professor Elhauge has been cited by a court in the case, correct?
MR. HARRIS: Object to the form.
BY MR. USLANER:
Q You see, sir, where it says:
(As read):
"Cases"
And then, "1"?
A Yes.
Q Okay. And that's one more case citation than your article, correct?
MR. HARRIS: Object to the form.
THE WITNESS: Correct.
BY MR. USLANER:
Q Sir, you're not admitted to practice law in any country outside the United States, correct?

Page 59

A No.
Q You're not authorized to practice law in Korea, correct?
A No.
Q You're not authorized to practice law in China?
A No.
Q You're not authorized to practice law in the European Union?
A No.
Q You're not authorized to practice law in Taiwan?
A No.
Q In fact, you're fairly uninformed about Chinese antitrust law, correct?
MR. HARRIS: Object to the form.
THE WITNESS: I have some knowledge of Chinese competition law.
BY MR. USLANER:
Q In fact, you're also fairly uninformed about Japanese antitrust law, correct?
MR. HARRIS: Object to the form.
THE WITNESS: I do not have expertise in that area.

Page 60

BY MR. USLANER:
Q Sir, you participated in a US [sic] Gould Center for Transnational Law conference in November of 2017, correct?
A You'd have to give me more information. It's a while ago.
Q Sir, I'm going to show you my computer. Do you -- do you see that gentlemen here on the computer?
MR. HARRIS: For the record --
(Cross talk.)
MR. USLANER: I'm going to -- I'm going to introduce this exhibit.
THE STENOGRAPHIC REPORTER: Exhibit 917.
(Exhibit 917 marked for identification.)
BY MR. USLANER:
Q 917 is a video from --
THE STENOGRAPHIC REPORTER: Hold on.
BY MR. USLANER:
Q -- the November 2017 USC Gould Center for Transnational Law and Business conference.
Sir, is that you on -- on the far left here?
MR. HARRIS: Again, for the record, counsel is showing a videos -- a computer screen

Page 61

with what appears to be a photograph that looks like a portion or a still frame of a video.
BY MR. USLANER:
Q Is that you, sir?
A It appears to be.
Q I just want to make sure, for the record, that this is . . . .
(Video played during the deposition.)
BY MR. USLANER:
Q Sir, did you make those statements at the November 2017 USC Gould Center for Transnational Law and Business conference that we just heard?
MR. HARRIS: And I'll simply object that we've heard a two-second snippet of a larger video.
BY MR. USLANER:
Q Go ahead.
MR. HARRIS: But you can answer the question.
THE WITNESS: That appears to be the case.
BY MR. USLANER:
Q Okay.
A I would like to, if I may, clarify one particular point. You had asked me, a few questions ago, about my knowledge of Chinese competition law.

Page 62

And unlike Japanese antitrust law, I had mentioned to you that I do have some familiarity with Chinese competition law sitting here right now.
And the reason that I say that is because I published, recently, a project paper in the Berkeley Technology Law Journal that I spent over two years researching various aspects of Chinese competition law. I would not venture to say I have expertise in that area, but I would like you to understand what I said, that I have some familiarity in that area.
When I made the statement that you just showed in 2017, it would have been accurate to say, as I did say, that I did not have familiarity, at that time, with Chinese competition law. However, that is not the case today. So I would like to clarify why I made that statement.
Q Thank you.
The article you referenced was about Chinese antitrust law; is that right?
MR. HARRIS: I'm sorry. Object to the form.
THE WITNESS: The article that I just referenced?

Page 63

BY MR. USLANER:
Q In your prior answer; I just want to clarify.
A Yeah. It has to do with Chinese competition law --
Q Okay.
A -- specifically in the wireless industry.
Q But it remains the case today that you're not familiar with Japanese competition law, right?
A No. And I do not purport to have that expertise.
Q And it remains the case today that you're not familiar with Korean antitrust law, correct?
A Correct.
Q And it remains the case today that you don't purport to be an expert in European competition law, right?
A Yes. But as in the case with Chinese competition law, I do have some familiarity; in fact, somewhat greater familiarity, with European competition law.
Q Okay.
But just so the record is clear, you don't purport to be an expert in European competition law, right?

Page 64

A I do not.
MR. USLANER: Do you want to take a break?
THE STENOGRAPHIC REPORTER: Yes, please.
MR. USLANER: Let's take a quick break.
THE VIDEOGRAPHER: Off the record at 10:08.
(Recess.)
THE VIDEOGRAPHER: On the record at 10:17 a.m.
BY MR. USLANER:
Q Sir, I want to direct you to your report, and specifically, the Section 3:
(As read):
"Purposes and Enforcement of Antitrust Law."
Are you there?
A Yeah. I'm sorry. Do you -- sorry. I found my glasses. Sorry. Which paragraph or page?
Q This is Section 3, beginning on page 13, paragraph 21.
A Yup.
Q Are you with me?
A Yup.
Q Do you see you have a section in your

Page 65

report called "Purposes and Enforcement of Antitrust Law"?
A Yes.
Q And that section goes from paragraphs 21 through 43, correct?
A Yeah. The Roman numeral III section continues entitled.
Q Take the time you need, sir. But can you please confirm that that section does not cite to any case from any non-U.S. jurisdiction?
A That is correct.
Q All right. And it's true, sir, that your report's discussion of the purposes and enforcement of antitrust law also does not cite a single statute from any non-U.S. jurisdiction, right?
A Let me double-check.
That's correct.
Q And it's fair to say, sir, that you're not opining, in this case, on how competition law works in other non-U.S. countries, right?
A No. I am not.
Q And it's also fair to say, sir, that you're not opining on this case on how antitrust law works in any other non -- strike that.
It's fair to say, sir, that you're not

Page 66

opining, in this case, on how antitrust law works in any non-U.S. country, right?
A Yes. Aside from certain references in the report to disclosures that had been made by Qualcomm about activity by competition regulators in non-U.S. jurisdictions.
Q All right.
But just to be clear, you're not offering any opinions in this case on how antitrust law works in any non-U.S. country, right?
MR. HARRIS: Object to the form.
THE WITNESS: That's correct. Typically known as competition law inside the U.S.
BY MR. USLANER:
Q I want to direct your attention, sir, to page 14 of your report. You see you have as Section 1, Antitrust Agencies, the "DOJ" and "FTC."
Do you see that?
A Yes.
Q You understand, sir, that the DOJ and FTC are not the antitrust regulators in Korea, right?
A Yes. I mean, that's a true statement.
Q All right. The regulator in Korea is the KFTC, correct?
A To the best of my knowledge, yes.

Page 67

Q In your discussion in your report about the antitrust agencies -- strike that.
Your opinions in connection with this case, with respect to antitrust agencies, does not include the KFTC, correct?
A That is correct.
Q And your discussion in your report concern -- strike that.
Your opinions in this case concerning antitrust agencies does not include the European commission, correct?
A Yes. Aside from certain limited references to disclosures made by Qualcomm, concerning certain actions or litigations relating to competition law in the European Union.
I believe they also included a reference to update certain information in plaintiff expert's report concerning the reversal of a certain decision by the European Commission.
Outside of those two cases, my report does not touch on matters of European competition law.
Q Okay. Your discussions -- well, strike that.
Your opinions in this case concerning

Page 68

antitrust agencies, does not include the Japanese FTC, right?
A Correct.
Q You're not opining, in this case, on how foreign regulators act, right?
MR. HARRIS: Object to the form.
THE WITNESS: Aside from certain references to disclosures made by Qualcomm concerning either certain actions by non-U.S. regulators or advocacy or lobbying activity undertaken by certain entities in the wireless industry to influence regulatory action in those jurisdictions.
MR. HARRIS: So I think his -- answer was a little bit confused. I just want to make sure we're on the same page.
THE WITNESS: Okay.
MR. USLANER: Maybe I'll introduce a similar question.
BY MR. USLANER:
Q You're not opining on whether or not it was foreseeable that any foreign regulators would act in a certain way with respect to Qualcomm's alleged bundling, right?
MR. HARRIS: Object to the form.

Page 69

THE WITNESS: I am not.
BY MR. USLANER:
Q And you're not opining on whether or not it was foreseeable that any foreign regulators would bring any enforcement actions with respect to Qualcomm's alleged bundling, right?
MR. HARRIS: Object to the form.
THE WITNESS: To clarify, you're referring specifically to foreign regulators?
BY MR. USLANER:
Q Yes, sir.
A No. Again, aside to the references made to certain disclosures by Qualcomm concerning the possibility and/or likelihood that a foreign regulator would bring actions under competition law against the company.
Q Just to be clear, you're not offering an opinion in this case that it was not foreseeable that the KFTC would issue its case examiner report, with respect to Qualcomm's business conduct, right?
MR. HARRIS: Object to the form.
THE WITNESS: I am not opining on that point.
BY MR. USLANER:
Q And you're not opining -- strike that.

Page 70

You're not offering an opinion in this case that it was not foreseeable that the European commission would issue its statement of objections, with respect to Qualcomm's business conduct, right?
MR. HARRIS: Object to the form.
THE WITNESS: I agree with that statement.
BY MR. USLANER:
Q You agree that you're not offering such an opinion, right?
A Correct.
Q I want to direct your attention to paragraph 37 of your report.
You say:
(As read):
"During the class period, courts that address bundled discounts apply two tests."
And then you continue on.
When you say "courts" in paragraph 37, you're referring to U.S. courts, right?
A U.S. Federal courts.
Q You're not offering any opinions in this matter on how Korean courts were likely to act, right?

Page 71

A Correct.
Q You're not offering an opinion in this matter on how European courts likely are likely to act, correct?
A Correct.
Q You're not offering an opinion in this matter on how Japanese courts were likely to act, correct?
A Correct.
Q You would agree that there are very key distinguishing features between U.S. antitrust laws and laws in the EU and East Asian jurisdictions, right?
MR. HARRIS: Object to the form.
THE WITNESS: I can say, based on my knowledge, that there are significant differences between Chinese competition law and U.S. antitrust law, based on my knowledge.
There are material but significantly lesser differences between U.S. and EU competition law. I have no opinion on the other jurisdictions you referenced.
BY MR. USLANER:
Q But you would agree that there are very key distinguishing features between U.S. antitrust law and the laws in the EU, right?

Page 72

MR. HARRIS: Object to the form.
THE WITNESS: In certain areas, based on my knowledge, there is great commonality. In certain areas, there are material differences.
BY MR. USLANER:
Q You would agree that one key distinguishing feature between U.S. antitrust law and the antitrust law in other jurisdictions is that in the U.S., we don't have the equivalent of what, in the EU antitrust law, is called the abuse of dominance principle, correct?
MR. HARRIS: Object to the form.
THE WITNESS: U.S. antitrust law does not have an abuse of dominance principle or cause of action.
BY MR. USLANER:
Q And EU antitrust law does have an abuse of dominance, cause of action, correct?
MR. HARRIS: Object to the form.
THE WITNESS: It does.
BY MR. USLANER:
Q And that's a very key distinguishing feature between U.S. antitrust law and antitrust law in other jurisdictions, including the EU, correct?

Page 73

MR. HARRIS: Object to the form.
THE WITNESS: It is a distinguishing feature in the area of single-firm conduct.
To the best of my knowledge, there are a variety of views about the extent to which abuse of dominance causes of action can encompass a broader range of activities than the closest equivalent under U.S. antitrust law, which would be monopolization, under Section 2 of the Sherman Act.
(Video played during the deposition.)
BY MR. USLANER:
Q Sir, did you participate in a discussion on January 11th, 2019, with the Federalist Society concerning the title, "Dispatches from the Patent Wars: The High-Stakes Battle Between Qualcomm and Apple."
A I've presented in many, many events. I don't specifically recall. If you have something you can show me, it might refresh my memory.
Q If you can confirm, please, that this is your voice on the audio, that would be greatly appreciated.
(Video played during the deposition.)
BY MR. USLANER:
Q Sir, was that your voice on the audio we

Page 74

just played?
MR. HARRIS: I will just object, for the record, that we don't know where that recording was made or came from. We just heard it here for the first time.
But hearing what you've heard, you can answer the question.
THE WITNESS: To be honest, I'm not sure.
BY MR. USLANER:
Q Do you deny having made those remarks that we just listened to?
MR. HARRIS: Object to the form.
THE WITNESS: As I said, I've appeared at many events. And I can't recall specifically.
I endeavor, in my CV, to have as complete a list as possible. It appears there, I would have appeared.
Based on the audio quality, I just can't honestly recognize if that's definitely my voice. So I don't want to say for sure.
BY MR. USLANER:
Q Well, do you agree that a very key distinguishing feature between U.S. antitrust law and antitrust law in other jurisdictions is that in the U.S., we do not have the equivalent of what in

Page 75

the EU antitrust law is called the abuse of dominance principle?
MR. HARRIS: Object to the form.
THE WITNESS: Yes. I believe that's generally agreed in the area of single firm conduct, that that is an important difference.
As I said previously, there may be a variety of views about the implications of that difference. How big that difference is. And it may change over time as U.S. monopolization case law and EU abuse of dominance law either move in the same, move in different directions, and so forth.
BY MR. USLANER:
Q And do you agree that the abuse of dominance principle that's applicable in the EU and East Asian jurisdictions allows actions to be brought against Qualcomm for essentially engaging in -- strike that.
Do you agree, sir, as stated in the audio, that in the EU and East Asian jurisdictions, cases can be brought against Qualcomm for, in essence, price regulation?
MR. HARRIS: Object to the form.
THE WITNESS: When a scholar speaks at an event, the style of speaking is more informal than

Page 76

would be the case in the way we're speaking right now or in scholarly writing.
In my scholarly work, I have described in my most -- in my recent publication that I referenced in Berkeley Technology Law Journal, 2023, how Chinese competition law has been used as a form of price regulation or royalty rate regulation in the wireless industry.
In my scholarly work, I have not addressed the other jurisdictions that you're referencing, and I have no opinion.
BY MR. USLANER:
Q Okay. It's fair to say, though, that, as you said in the talk, that Qualcomm's conduct was challenged in Europe and East Asia based on the, quote, "abuse of dominance principle", right?
MR. HARRIS: Object to the form. Misstates . . .
THE WITNESS: I do not have specific knowledge concerning the specific cause of action under which Qualcomm was targeted in those jurisdictions.
I'm only specifically familiar with the -- NDRC was the former -- one of the three former Chinese competition regulators, their

Page 77

enforcement actions against Qualcomm approximately in 2015.
BY MR. USLANER:
Q Okay. So you said in your prior answer: I don't have specific knowledge concerning specific causes of action under which Qualcomm was targeted with the exception of the NDRC. I just want to make sure the record is clear.
All right. It's the case, sir, that you don't have specific knowledge concerning specific causes of action under which Qualcomm was charged in Korea, right?
A No. I do not.
Q And it's the case, sir, that you don't have specific knowledge concerning specific causes of actions under which Qualcomm was charged in the EU, right?
A No. I do not.
Q Okay. Is the discount attribution testified in Korea?
MR. HARRIS: Object to the form.
THE WITNESS: I have no expertise in Korean competition law.
BY MR. USLANER:
Q Is the discount attribution testified in

Page 78

the EU?
MR. HARRIS: Object to the form.
THE WITNESS: I do not have sufficient expertise to respond to that question.
BY MR. USLANER:
Q Is the discount attribution testified in Taiwan?
MR. HARRIS: Object to the form.
THE WITNESS: I do not have sufficient expertise in that jurisdiction's law to answer that question.
BY MR. USLANER:
Q Does the FTC endorse the discount attribution test?
A I'm not specifically familiar if the FTC, in any of its statements, has endorsed the test.
Q Okay.
THE STENOGRAPHIC REPORTER: Exhibit 918 for the record.
(Exhibit 918 marked for identification.)
BY MR. USLANER:
Q Sir, I handed you what has been marked as Exhibit 918. This is -- the FTC's amicus brief on behalf of the Federal Trade Commission filed in Central District of California.

Page 79

Have you seen this document before, sir?
A No. I haven't.
Q I want to direct your attention to page 14 of the document.
MR. HARRIS: Again, this is a lengthy document. Take your time to familiarize yourself with it to the extent that you need to.
BY MR. USLANER:
Q Are you there, sir?
A Yes.
Q Do you see on page 14 of the amicus brief -- strike that. Before I get there.
You understand that this is a brief submitted by the FTC in the U.S., right?
A That appears to be the case.
Q Okay.
And if you look on page 14 of the FTC's brief, you see that the FTC writes:
(As read):
"The incremental price test is controversial."
Do you see that?
MR. HARRIS: Object to the form.
THE WITNESS: Yes.

Page 80

BY MR. USLANER:
Q And you understand, sir, that the incremental price test is another way of describing the discount attribution test, right?
MR. HARRIS: Object to the form.
THE WITNESS: Sometimes that term is used as a synonym.
BY MR. USLANER:
Q Okay.
And you see that the FTC writes:
(As read):
"The incremental price-cost test is controversial."
Do you see that?
A Yes.
Q And then if you look on the next page, you see it says:
(As read):
"For these and similar reasons, the FTC does not endorse the test."
Do you see that?
A Yes.
Q And it says:
(As read):
"Nor does the Third Circuit."

Page 81

Do you see that too?
A Yes.
Q Okay. Prior to reading this, were you aware that the FTC did not endorse the discount attribution test?
MR. HARRIS: Object to the form.
THE WITNESS: You're referring to the FTC as of 2023?
BY MR. USLANER:
Q At any time, were you aware, sir, that the FTC did not endorse the discount attribution test?
MR. HARRIS: Object to the form.
THE WITNESS: Let me break that up, if I may.
BY MR. USLANER:
Q Well, let me do it differently.
Have you ever seen a statement by the FTC where it endorses the discount attribution test?
MR. HARRIS: Object to the form.
THE WITNESS: I do not have sufficient recollection of the materials that I looked at to agree or disagree with that statement.
BY MR. USLANER:
Q If you look, sir, at Footnote 8 of the

Page 82

FTC's brief. Do you see the FTC writes:
(As read):
"The Ninth Circuit has not addressed the test for bundling under the broader FTC Act, which the FTC enforces."
Do you see that?
A Yes.
Q Okay. Do you have any reason to dispute the FTC statement in this brief, that the Ninth Circuit does not address the test for bundling under the broader FTC Act, which the FTC enforces?
MR. HARRIS: Object to the form.
THE WITNESS: Well, allow me to read the text to which the footnote refers.
Can you repeat the question? I forgot it.
BY MR. USLANER:
Q Do you have any reason to dispute the FTC statement in this brief, that the Ninth Circuit has not addressed the test for bundling under the broader FTC Act, which the FTC enforces?
A It's difficult for me to evaluate the language in this footnote because there are two ambiguities here, in my view. It refers to the test for bundling.

Page 83

Bundling practices are a broad category that encompasses but goes beyond bundle discounts, which incremental price-cost test refers to.
Even if we were to construe the words, the test for bundling is being confined to bundle discounts, it's not clear to me what the brief writer was referring to by the "broader FTC Act", which encompasses the agency's ability to bring actions under the full set of antitrust laws, in addition to its standalone Section 5 authority.
So I really can't evaluate that statement without understanding what was meant by "the broader FTC Act".
Q Has the Ninth Circuit addressed the test for bundling under the FTC's standalone Section 5 authority?
MR. HARRIS: Object to the form.
THE WITNESS: I have not specifically researched that narrow legal question. So I do not know.
BY MR. USLANER:
Q Has the Ninth Circuit addressed whether the discount attribution test applies to the FTC under the FTC's standalone Section 5 authority?
A I'm sorry. I might be misunderstanding.

Page 84

That seems like the same question.
Q Is your answer the same?
MR. HARRIS: Object to the form.
BY MR. USLANER:
Q I can ask -- I can ask the question again. I just want to make sure the record is clear.
A Repeat.
Q You're not wrong that --
A I don't want to say that --
Q Has the Ninth Circuit addressed whether the discount attribution test applies to the FTC under the FTC's standalone Section 5 authority?
A As I said, I can't answer that question because I haven't specifically researched it.
I would like to point out that until a recent policy change, I believe in 2023, it was generally understood and the case law generally supported the view, that the FTC's standalone Section 5 authority should be, and was generally interpreted by courts, as being largely coterminous with actions it could bring under Section 1 or 2 of the Sherman Act.
What I'm trying to say to you is that until the recent policy change, the standards

Page 85

developed by courts under the Sherman Act to address its practice, in my view, would most likely be the same standard that would be applied if the FTC were to address the same practice under its standalone Section 5 authority.

BY MR. USLANER:

Q You say that this policy change occurred in 2023; is that right?

A It's either in 2022 or in 2023. I do not recall right now.

Q Before that, there was another policy change with respect to the standalone ability of the FTC, with respect to the Sherman Act, right?

MR. HARRIS: Object to the form.

THE WITNESS: There was, in 2015, a statement issued by the FTC with one commissioner dissenting, if my recollection is correct, that clarified that the Section 5 standalone authority would generally be exercised and adjudicated in conformity with the same standards that would apply if a particular practice were addressed under the Sherman Act, with what I believe is generally understood as a minor qualification, that the FTC's standalone Section 5 authority could enable it, in certain circumstances, to address certain practices

Page 86

that violate or deem to violate the spirit of the antitrust laws.

But I would like to clarify that, it is my understanding that that statement was generally understood to mean that it had essentially, simply clarified the understanding that Section 5 authority, Sherman Act authority, that these were largely overlapping outside certain idiosyncratic and highly limited circumstances.

BY MR. USLANER:

Q When you say, "it's your understanding", did you speak to the FTC's commissioner with respect to this issue?

A No. I did not.

Q Did you speak to any member of the FTC with respect to their views on this issue?

A No. I did not.

Q Has any court required the FTC, a federal agency, to adhere to the discount attribution tests?

A Can you repeat that?

Q Sure.

In your report, you reference the Ninth Circuit decision, "Cascade Health."

Do you recall that?

A Yes.

Page 87

Q Cascade Health did not involve the FTC, right?

A No.

Q Okay. During the class period, 2012 to 2017?

A Uh-huh.

Q Was the discount attribution test applied in any case involving the FTC, a federal agency?

A I did not specifically research that question; I can't answer one way or the another.

Q Please identify for the jury, any instance in which the discount attribution test was applied in a case involving the FTC?

A Sitting here right now, I do not have a specific case to cite. But to clarify, because I did not specifically research that question, I don't want to exclude the possibility that there may be such a case.

Q Does your report identify any case in which the discount attribution test was applied in a case involving the FTC -- a federal agency?

A I don't believe so.

Q Sir, in the FTC's amicus brief, it says that the Ninth -- strike that.

Sir, in the amicus brief filed by the

Page 88

FTC, it says that:

(As read):

"The discount attribution test was not endorsed by the Third Circuit."

Do you see that?

A Can you give me a page number?

Q Yes, sir. On page 15.

A I see the sentence you're referring to.

Q Have you ever read the -- the page decision by the Third Circuit?

A I have.

Q Okay. Are you aware that the Third Circuit rejected the discount attribution test?

A I believe the FTC's statement, in this portion of the brief, does not give an entirely accurate picture of the state of the law in the Third Circuit, and I say that for two reasons.

One is that it is well known that the LePage's decision has been widely criticized and is generally not considered to be indicative of the manner in which courts are likely to address a discounted bundling practice.

The second reason -- and please give me a moment.

The second reason I say that is that in

the Eisai, Inc. v. Sanofi Aventis case, which is a 2016 decision by the Third Circuit, my recollection is that, in that case, the Third Circuit advised that in -- in light of Pacific v. Link -- Linkline v. Pacific, Supreme Court decision 2008, LePage's should not be heavily relied upon in the language, which I believe appears in a footnote, narrows the case to its facts.

So putting those two things together, I don't -- I feel the statement in FTC's brief does not give the full picture of the manner in which this type of practice is likely to be addressed in the Third Circuit if the case were brought today.

Q Okay. So fair to say that you disagree with the FTC with respect to the applicability of the discount attribution test, right?

MR. HARRIS: Object. Mischaracterizes.

THE WITNESS: Can you clarify what you mean by "applicability of the" --

BY MR. USLANER:

Q Well, the -- you see in -- in footnote 8 of the amicus brief, the FTC writes:

(As read):

"The Ninth Circuit has not addressed the test for bundling under the broader



FTC Act, which the FTC enforces."

Do you see that?

A Yeah.

Q Okay. And you'd agree that you disagree that the FTC is -- is not bound by the price costs -- strike that.

You disagree with the notion that the FTC is not bound by the discount attribution test, right?

MR. HARRIS: Object to the form.

THE WITNESS: Let me take a step back here to answer the question.

The agencies are bound by law to apply the antitrust laws as they exist in the statute as interpreted by the courts. It would be my view that, if the FTC were to address a bundling practice under the Sherman Act, it would most likely be bound by the discount attribution test as has been adopt -- adopted most widely in the Appellate Courts concerning this practice.

With only slightly less confidence, I would anticipate that the FTC, if it brought a standalone Section 5 action against a discount -- discounted bundling practice, it would reach the legal conclusion that it must follow the same



standard.

The reason being, that notwithstanding the FTC's recent policy change, in my view, the preponderance of the case law tends to endorse the conventional view that Section 5 authority is largely coterminous with; meaning it should be exercised largely in conformity with the same standards that apply under the Sherman Act.

BY MR. USLANER:

Q You're not a judge, right?

A No.

Q Okay. You say, "the preponderance of the case law." You agree there's case law that goes both ways on this issue, right?

MR. HARRIS: Object to the form.

THE WITNESS: Are you referring to the scope of the standalone Section 5 authority?

BY MR. USLANER:

Q Yes, sir.

MR. HARRIS: Same objection.

THE WITNESS: I would agree with you that the case law is not entirely settled, in part, for the reason that, historically, the F -- the FTC has not widely exercised its standalone Section 5 authority. However, I would reiterate the view that



the case law tends to view Section 5 authority as being subject to largely the same standards.

BY MR. USLANER:

Q Please identify a case that supports that.

A I did not specifically research that question. So I do not have a specific case to give you right now.

Q You -- you state in your prior answer:

(As read):

"ANSWER: It would be my view that if the FTC were to address a bundling practice under the Sherman Act, it would most likely be bound by the discount attribution test."

Now, please identify a case that supports that the FTC would be bound by the discount attribution test if it were to bring an action.

MR. HARRIS: And object to the form.

THE WITNESS: And again, just to be super precise, we're talking about discounted bundling, which is a subset of a much larger universe of bundling practices.

BY MR. USLANER:

Q Yes.

Page 93

A We're only talking about discounted bundling?
Q Sure.
A I did not specifically research that question, and I do not have a specific case to give you at this time. But I cannot exclude that such a case exists.
THE STENOGRAPHIC REPORTER: Exhibit 919, for the record.
(Exhibit 919 marked for identification.)
BY MR. USLANER:
Q Sir, I've handed what's been marked as Exhibit 919, which is the "June 23rd, 2014 Workshop Transcript on Conditional Pricing Practices: Economic Analysis & Policy Implications" for the Federal Trade Commission and the U.S. Department of Justice.
Do you have that in front of you?
A Yes.
MR. HARRIS: Counsel, do you have another copy?
MR. USLANER: I don't.
MR. HARRIS: You don't.
BY MR. USLANER:
Q Have you seen this before, sir?

Page 94

A I do not believe I have.
Q Did you consider this document in rendering your opinions in this case?
A Well, as I just said, I have not seen it before. So I could not possibly have considered it.
Q Okay. If you look on page 4 of the document. You see that there's remarks by Assistant Attorney General, William Baer.
Do you see that?
A Yes.
Q Do you understand that Mr. Baer was the Assistant Attorney General for the Department of Justice of the United States of America, correct?
A That appears to be the case.
Q Okay. I want to direct your attention to page -- page 5 of his statements. Do you see he says:
(As read):
"We do have concerns, however, when a monopolist, when a dominant firm uses loyalty or bundled pricing in a way that restricts competition and maintains or enhances a position of market power within a supply chain."
Do you see that?

Page 95

A Yes.
Q Were you aware that that was the Department of Justice's position at the time?
MR. HARRIS: Object to the form.
THE WITNESS: As I said, I haven't seen this document. I'm not certain that remarks made at a particular event would necessarily be characterized as agency policy, as distinguished from some of the more formal policy statements that the agencies make, which are more clearly characterizable as such.
BY MR. USLANER:
Q Okay. You have no reason to believe that -- that Mr. -- Mr. Baer was lying when he spoke and stated that:
(As read):
"We do have concerns, however, when a monopolist, when a dominant firm uses loyalty or bundled pricing in a way that restricts competition and maintains or enhances a position of market power within a supply chain."
Right?
MR. HARRIS: Object to the form.
THE WITNESS: Well, I -- I didn't raise

Page 96

any implication that he wasn't being truthful. I was just trying to draw a distinction between agency policies, which I think is a more definitive statement of -- of -- of where the agency is going on a particular issue, and a speech made at a particular event.
BY MR. USLANER:
Q And you understand that the "we" in that statement to be the Department of Justice, right?
MR. HARRIS: Object to the form.
THE WITNESS: Yes. And I understand that to mean the head or -- of the antitrust division expressing the -- the view of the -- the view of the -- of the division on that particular practice at that particular time.
BY MR. USLANER:
Q Okay. I want you now to look at page 7.
Do you see that there's remarks by Maureen Ohlhausen? Do you see that?
A Ohlhausen. Yeah.
Q And who do you understand Ms. Ohlhausen to be at the time?
A One of the commissioners of the FTC.
Q Okay. This is the U.S. FTC, correct?
A Yes.

Q Okay. I want direct you to page 9 of Commissioner Ohlhausen's remarks.
You see at the -- in the middle paragraph --
A Okay.
Q -- she says:
(As read):
"And this suggests to me that price-cost tests may not necessarily be the panaceas of administrability we thought they were, and I look forward to today's discussion about it from this perspective."
Do you see that?
A Yes.
Q Were you aware that the FTC Commissioner Ohlhausen had the view that price-cost tests may not necessarily be the panaceas of administrability that the FTC thought they were?
MR. HARRIS: I'll object to the form. This is a 184-page document that we're being directed to a sentence of. So if you're not familiar with the document, you can --
(Cross talk.)
MR. USLANER: Sir, if you can keep your



speaking objections to a minimum, it would be appreciated. But totally un -- unacceptable in the district. Thank you.
MR. HARRIS: He can take the time to read the document, Counsel.
BY MR. USLANER:
Q Go ahead, sir.
A Sorry, can I hear that question --
MR. HARRIS: No problem.
THE WITNESS: -- again? I just want to get it exact.
MR. HARRIS: It's totally fine.
BY MR. USLANER:
Q Were you aware, sir, that the FTC Commissioner Ohlhausen was of the view that price-cost tests may not necessarily be the panaceas of administrability we thought they were?
MR. HARRIS: Object to the form.
THE WITNESS: It's hard for me to respond to your question because without reading Commissioner Ohlhausen's remarks in their entirety, I don't feel I can reliably understand exactly what she meant by that particular sentence, and I don't want to take it out of context inadvertently.



BY MR. USLANER:
Q Okay. Well, why don't you look at the prior paragraph. You see that -- that Commissioner Ohlhausen references the Ninth Circuit's adoption of the discount attribution cost test and PeaceHealth case?
A Yes, I see that.
Q Okay. And then if you look, sir, at the -- the last sentence of that same paragraph, you see Commissioner Ohlhausen says:
(As read):
" . . . questions linger about whether the difficulties associated with calculating the appropriate measure of cost render this test unworkable, cutting against predictability, transparency, and fairness."
Do you see that?
A Yes. I see that.
Q Okay. And were you aware, sir, that Commissioner Ohlhausen of the FTC had stated publicly that -- that the Commission had concerns with respect to use of the discount attribution cost test?
MR. HARRIS: Object to the form.



THE WITNESS: Well, just to be super precise, the statements -- unlike Assistant Attorney General Baer, a statement by one commissioner represents, in this case, her personal views. And I don't think would typically -- unless we were talking about the chair of the Commission, wouldn't -- wouldn't typically be understood to be the views of the Commission.
I mean, as I said, I have not seen this document. So I, of course, therefore wouldn't have been aware of her remarks. I don't feel comfortable interpreting what her remarks mean without taking the time to see the fuller context of the document. I appreciate that you've drawn me to surrounding paragraphs. But I don't feel that would be sufficient for me to fully understand what she was getting at precisely.
BY MR. USLANER:
Q Well, you can -- you can take the time you need to -- to get familiar with the document, sir.
A Sure.
Q So, you know, at any time, if you -- if you want do that, you're more than -- I know you're more than qualified to -- to read the document, so

Page 101

please, feel free. Okay?
I want to direct your attention to the roundtable discussion on page 163.
Sir, were you invited to participate in the FTC and Department of Justice's June 23rd, 2014 Workshop on Conditional Pricing Practices: Economic Analysis and Policy Implications?
A No. I was not.
Q Okay. I want you now to look at the roundtable discussion. And you see that the first participant is Jonathan Baker from -- the professor of law, America University.
Do you know Professor Baker?
A I'm familiar, generally, with -- with his work.
Q Okay. What's your understanding as to the quality of his work?
MR. HARRIS: Object to the form.
THE WITNESS: I don't feel I've read a sufficient amount to -- to -- to state a view.
BY MR. USLANER:
Q Okay. At the bottom of the -- the first page, you see Professor Baker says:
(As read):
"Thank you, Renata and Debbie and FTC

Page 102

and DOJ. I think the big takeaway for me -- and I don't think it was 100 percent for the panel -- but what I got out of this was the price-cost tests or creeping Brooke-ism, as you said, is really not helpful. There are a few people who defended it, but the main reasons I thought that came through were, first, there is a big risk of false negatives -- not finding a violation when it is really harmful."
Did I read that right?
A That's -- I'm reading the same as -- same thing as you.
Q And, sir, you're aware that there has been academic criticism of the price -- of the distribution attribution test for producing false negatives, correct?
A I'm aware that -- that if you go back to the 2007 report of the antitrust modernization commission, and if you look at scholarly and the practitioner commentary, there are a range of approaches that are considered, and they involve various tradeoffs between false positives, false negatives, administrability, and so forth.

Page 103

And this sounds like it's part of that -- that conversation. But I -- I don't -- my impression is that, that would not be fair to characterize the practitioner and scholarly conversation as -- as -- as -- as -- as being critical, in general, of the price-cost test.
Q Okay. Can you identify any instance where the FTC has stated that it believes it's bound by the discount attribution test at any time?
MR. HARRIS: Object to the form.
THE WITNESS: I'm not aware of a specific document. I haven't specifically searched for such a document. So I can't exclude the possibility.
BY MR. USLANER:
Q And who enforces the U.S. antitrust laws?
A Among government plaintiffs, would be the DOJ Antitrust Division; the FTC; in certain circumstances, state attorneys general; and private plaintiffs are effectively deputized enforcers, if you want to think of it that way.
Q All right. I want to direct your attention to Deborah Feinstein's remarks. Do you -- do you know who Professor Feinstein is?
No, strike that.
Deborah Feinstein is -- is -- I

Page 104

apologize. Let me start over, sir.
Do you see on page 169, in the middle of the page, there's remarks by Professor Whinston. Do you know Michael Whinston of MIT?
A I understand he's an economist who sometimes writes on economics issues relating to antitrust.
Q Are you an economist?
MR. HARRIS: Object to the form.
THE WITNESS: I believe you asked me that already. And no, I'm not.
BY MR. USLANER:
Q And Mr. Whinston, in the second paragraph of his remarks, says:
(As read):
"And there's a question whether the price-cost test is really doing those things well. So I guess my own sense is, when you go through the other kinds of arguments, it's in line with what a lot of people said. I think it's not at all clear that it's doing it well."
Did I read that right?
A Yes.
Q Okay. And were you aware that that was

Page 105

Professor Whinston's view with respect to the discount attribution test?
MR. HARRIS: Object to the form.
THE WITNESS: No. I -- I have -- unfamiliar.
BY MR. USLANER:
Q Okay. And -- and I take it you -- you were unaware that this view was expressed by Professor Whinston to the FTC in 2014, right?
A As I said, I was unaware of this document. So therefore, I'm unaware of the specific contents of the document.
Q Okay. If you could look down further in the document. On page 169, there's remarks by Professor Fiona Scott Morton.
Do you see that?
A Yes.
Q Okay. And do you know who Professor Fiona Scott Morton is?
A Yes.
Q And what do you understand about her academic work?
A She's an antitrust economist.
Q And Professor Morton says:
(As read):

Page 106

"I just want to say one brief thing about -- it's not clear to me that the price-cost test is so terribly useful . . . "
Do you see that?
A Yes.
Q Okay. And were you aware that that was Professor Fiona Scott Morton's view?
MR. HARRIS: Object to the form.
THE WITNESS: I was not aware she made this statement, no.
MR. HARRIS: And, Counsel, the document you've handed now --
MR. USLANER: I want to turn to --
MR. HARRIS: Can I ask question about the document? It goes from page 10 to 163. Is --
MR. USLANER: Yeah.
MR. HARRIS: Am I correct to assume this is an excerpt of a larger document?
MR. USLANER: Correct. It's an excerpt. It's publicly available, if you want to --
MR. HARRIS: Thank you.
BY MR. USLANER:
Q I want to now direct your attention to page 179 of the document.

Page 107

Do you see on page 179, Professor Fiona Scott Morton tells the FTC and other attendees:
(As read):
"I think price-cost tests have all sorts of disadvantages, as many people have pointed out, and depending on the circumstances, might not really tell you anything very useful."
Do you see that?
A Yes.
Q And again, you were unaware that Professor Fiona Scott Morton had relayed this to the FTC, correct?
A Again, not aware of this document. So I'm not aware of any specific contents in the document.
Q Okay. I want to now direct your attention to the closing remarks of the FTC and Department of Justice, beginning on Page 181.
Do you see that?
A "Closing Remarks." Yes.
Q Okay. And I want you to look at, please, at the remarks of Robert Porter [sic] of the FTC.
A Robert Potter, yeah.

Page 108

Q Potter. Excuse me.
Do you know who Mr. Potter is?
A No. I don't. I don't.
Q If you look on Page 183, at the bottom, Mr. Potter says:
(As read):
"Secondly, I wanted to just mention that these types of workshops and the material we get at them are very, very important in our policy and enforcement planning. We look at these for years and years to figure out, 'Oh, wait a minute, in the workshop we thought about that issue. Let's go back and check that and think about that in the context of this particular case.' So I wanted to say that this is not sort of a 'one day and it goes away.' This is something that is going to impact our enforcement for years and years."
Did I read that right?
A Yes.
Q Do you have any reason to believe that Mr. Porter -- excuse me, Mr. Potter, of the Department of Justice was not telling the truth in

Page 109

these statements?
MR. HARRIS: Object to the form.
THE WITNESS: I have no reason to doubt the veracity of what he's saying. I also have no reason to -- to -- to know the extent to which his remarks are representative of the agency in general.
BY MR. USLANER:
Q Okay. Sir, you understand that Qualcomm, during the Class Period, owned standard essential patents, right?
A Yes.
Q Okay. And you'd agree with me that Qualcomm has market power in licensing its standard essential patents, right?
MR. HARRIS: Object to the form.
BY MR. USLANER:
Q Let me -- let me rephrase it differently.
Nobody, other than Qualcomm, can license its standard essential patents, right?
A Unless it chose to sublicense them to another party and give them the authority to sublicense further. Other than that scenario, your statement is correct.
Q Okay. And are you aware of any instance in which Qualcomm sublicensed its rights to standard

Page 110

essential patents?
A I am not.
Q So it's the case, sir, that Qualcomm had a monopoly on its standard essential patents that it owned, correct?
A That depends on how you understand the word "monopoly."
Q Well, it's the case, sir, that Qualcomm was the only owner that could exist for the standard essential patents that it owned, correct?
A Unless it assigned them to another entity.
Q And again, we're not aware of Qualcomm ever assigning its standard essential patents to another entity, correct?
A Well, there's a lot of standard essential patents. I have no idea if they assigned them to anyone else.
Q Okay. Sitting here today, are you aware of Qualcomm ever assigning any of its standard essential patents to anyone?
A Personally, I am not.
Q Okay. So you'd agree with me, sir, that Qualcomm has marketing power in licensing the standard essential patents that it owns, right?

Page 111

MR. HARRIS: Object to the form.
THE WITNESS: I believe you asked if they have marketing power?
BY MR. USLANER:
Q Market power.
MR. HARRIS: Same objection.
BY MR. USLANER:
Q Let me -- let me make sure the record is clear so there's no --
You'd agree with me, sir, that Qualcomm has market power in licensing its standard essential patents that it owns, right?
A In many cases. But not necessarily always.
Q With respect to its standard essential patents -- well, strike that.
Why -- why -- I want to focus on the -- the instances where you believe it does have market power.
With respect to wireless communications, you'd agree that Qualcomm's -- Qualcomm has market power over its standard essential patents, right?
MR. HARRIS: Object to the form.
THE WITNESS: It depends on what you mean by "market power." Market power is generally

Page 112

understood to mean the ability to raise price above costs. In certain cases, there are disciplining constraints on Qualcomm's pricing power, notwithstanding the fact that it is the only owner of certain SEP portfolios or -- that are necessary to implement a standard.
Those disciplining constraints can arise in the case where it is facing an entity that constitutes a large portion of its revenues. It could also arise in all cases. Its pricing is disciplined by the fact that Qualcomm seeks to maximize its revenues over multiple standards; and therefore, has reasons to constrain its pricing power in order to maintain good will with licensees so that it can deploy future standards into which it's investing R&D dollars.
BY MR. USLANER:
Q Okay. That's all fine and good.
My question was simply: You'd agree that Qualcomm does have pricing power with respect to its standard essential patents that it owns, right?
A It may, in certain cases.
Q And -- and in what cases does Qualcomm have pricing power in its standard essential patents it owns?

# Exhibit 14

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

IN RE QUALCOMM INCORPORATED: CASE NO.
SECURITIES LITIGATION : 3:17-CV-00121-JO-MSB
___________________________

VIDEO DEPOSITION OF JOHN COATES
Friday, February 23, 2024
Boston, Massachusetts

Reported by: Dana Welch, CSR, RPR, CRR
Job No. J10809723

Page 2

Friday, February 23, 2024
9:00 a.m.

Video Deposition of JOHN COATES, taken on behalf of the Plaintiff, pursuant to Notice, at the offices of Cooley LLP, 500 Boylston Street, Boston, Massachusetts, at 9:00 a.m. on Friday, February 23, 2024, before Dana Welch, Certified Court Reporter, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the Commonwealth of Massachusetts.

Page 3

A P P E A R A N C E S:
For the Plaintiff:
BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
BY: ROBERT KRAVETZ, ESQ.
THOMAS SPERBER, ESQ. (Via Zoom)
JASMINE COOPER-LITTLE, ESQ. (Via Zoom)
1251 6th Avenue
New York, New York 10020
(212) 554-1400
robert.kravetz@blbglaw.com
thomas.sperber@blbglaw.com
jasmine.cooper-little@blbglaw.com
For the Defendants Qualcomm Incorporated:
COOLEY LLP
BY: CHRISTOPHER B. DURBIN, ESQ.
1700 Seventh Avenue, Suite 1900
Seattle, WA 98101-1355
(206) 452-8700
cdurbin@cooley.com
-- and --
COOLEY LLP
BY: KOJI F FUKUMURA, ESQ.
TINA JENSEN, ESQ. (Via Zoom)
10265 Science Center Drive
San Diego, CA 92121
(858)550-6000
kfukumura@cooley.com
tjensen@cooley.com

For Metzler Asset Management GmbH:
MOTLEY RICE LLC
VANESSA ANNE DAVIS, ESQ.
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843)216-9000
vdavis@motleyrice.com

Also Present: Adam Cerro, Videographer

Page 4

I N D E X

WITNESS:
JOHN COATES

| EXAMINATION: | PAGE: |
|---|---|
| BY MR. KRAVETZ | 6 |
| BY MR. DURBIN | 164 |

EXHIBITS MARKED:

| NO. DESCRIPTION | PAGE: |
|---|---|
| Exhibit 909, Expert Reply Report of Professor John Coates, February 2, 2024 | 6 |
| Exhibit 910, Expert Report of Professor John Coates, September 12, 2023 | 7 |
| Exhibit 911, Westlaw 2020 WL 9073168, In Re Twitter Order | 143 |

NOTATIONS:

| | |
|---|---|
| Transcript order | 166 |

Exhibits retained by reporter.

page 7 of your report, footnote 25, and let me know when you're there.
A. Yes. There we go.
Q. And do you see in footnote 25 where you note, "Specifically, I have reviewed a privileged log produced by Qualcomm on October 14, 2022 in which approximately 140 entries reference e-mail communications leading up to the November 17, 2015 and January 17, 2017 press releases containing alleged bundling-related misrepresentations"? Is that accurate?
A. Yes.
Q. And then you note, "Based solely on my review of the privilege log entries, it appears that Qualcomm sought and received legal advice concerning certain draft press releases"; is that accurate?
A. Yes.
Q. All right. And does that refresh your memory in terms of your use of the privilege log in this matter?
A. Yes.
Q. All right. Now, am I correct, then, that you have not reviewed any of the underlying documents or communications that have been withheld



as privileged?
A. That's correct.
Q. All right. And you haven't spoken with any Qualcomm employees or counsel about the documents or communications, correct?
MR. DURBIN: Object to form.
A. No. I've not had communications about those withheld documents, no.
Q. And so as a result, you're not offering any opinion at trial regarding these two press releases, correct?
A. That would -- that's my, sitting here today, current plan, recognizing, again, that if Professor Seligman comments on all of this in some way, maybe I might have something to say, but I would not expect to.
Q. Is it beyond the scope of your assignment to provide any opinion regarding the assertion of attorney-client privilege?
A. I have not undertaken any analysis of whether the privilege itself has been correctly asserted or not, no.
Q. And you're also not offering any opinion regarding an advice-of-counsel defense, correct?
A. No. Not for this case, no.



Q. And you're not offering any opinions concerning any legal advice that lawyers may have provided in connection with the disclosures?
MR. DURBIN: Object to form.
A. You mean the press releases? No. I mean, the press releases are -- they're just not something that I'm commenting on at all, that's right.
Q. All right. Thank you.
If you can turn next to -- and actually, go back one page, to page 6, to a section entitled "Background on Qualcomm," and let me know when you're there.
A. Yeah, I'm there.
Q. All right. And section II.B. of your report, that spans from paragraphs 15 to 17, correct?
A. Yes.
Q. And each of the citations in paragraphs 15 to 17 relates to a Qualcomm SEC filing; am I right?
A. Yes.
Q. Is that how you derived your personal knowledge of Qualcomm's background?
A. It's the primary way. I mean, I had many conversations with counsel and with Cornerstone,



and I'm generally aware of Qualcomm's role in the world and the market, and I no doubt had other information in my head about it. But for purposes of this summary, I certainly drew on the SEC filings to present the basics of the business.
Q. All right. If I could ask, if you could turn to page 9 of your report.
A. Okay.
Q. And this section is entitled background on disclosure practices of large public companies; is that correct?
A. Yes.
Q. And just to be clear, you're not purporting to provide a legal opinion in connection with this matter; is that correct?
A. That is correct.
Q. All right. Now, the first part of your opinion here is to give background on disclosure process customs and practices of large public companies; is that right?
A. Yes.
Q. And you write that there are legal and regulatory requirements and customs and practices that govern or inform disclosure decisions of large public companies, correct?

A. Yes.
Q. Can you describe the sources of legal and regulatory requirements that govern or inform disclosure decisions?
MR. DURBIN: Object to form.
A. Well, they're summarized in the section we're talking about. But the general overview would be the federal securities laws, the SEC's regulations under those laws, court decisions interpreting both, guidance that the SEC puts out to help inform companies about SEC staffs' views about what is good practice under their regulations.
Then the SEC incorporates, you know, indirectly, accounting standards, which then inform part of the overall framework for this. The PCAOB applies auditing standards to auditors who have to audit within the framework of the laws that I've just summarized. That's a pretty good overview. I may have left something out, but I think that covers it.
Q. In your opinion, do these legal and regulatory requirements help inform industry customs and practices regarding disclosures?
A. Yes. The principal documents that include



the greatest amount of information that large public companies routinely disclose are created in light of the laws I just referred to. They do include -- companies do include in them other information they choose to add.
And they also make routine disclosures outside of the requirements. But I think the requirements form a framework, a cadence; to understand why quarterly reports, for example, are the norm, you have to understand that there is a requirement for quarterly reports, et cetera.
So it informs the process by which companies then routinely engage in disclosures and what that process would have to consist of, and then that then forms customs for companies generally.
Q. And so in your view, is it an industry practice and custom to attempt to comply with legal and regulatory requirements?
MR. DURBIN: Object to form.
A. Yeah, I think as a general matter, yes. I mean, to be clear, disclosure practices, both the actual content of the disclosures and the processes the companies follow to create them are not exclusively compliance exercises, but I do think



companies routinely attempt to comply with the law, yes.
Q. In paragraph 24 of your report you cite to supreme court precedent in defining materiality; is that correct?
A. Yes.
Q. And refer to the standard of "a substantial likelihood that a reasonable investor would consider the information important in deciding how to vote or make an investment decision"; is that correct?
A. That's the first one, and then there's another, yes.
Q. And then the second one would be that information is material "if there is a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available"; is that correct?
A. Yes.
Q. And so the SEC has incorporated the standard of supreme court precedent in terms of assessing materiality?
A. Part of the guidance the SEC provides to companies that it oversees filings for is to refer



to the supreme court cases, and so then that becomes a norm for businesses generally. I think investors generally understand the concept of materiality with that case law in mind.
Q. And materiality under that standard is assessed from the standpoint of a reasonable investor; is that correct?
A. Generally speaking, yes.
Q. Not from the company's perspective, correct?
MR. DURBIN: Object to form.
A. Well, yes and no. I mean, it is true that the initial anchor for thinking about the concept is through reasonable investor lens, but then the SEC has gone on to augment that with further glosses about particular parts of their requirements which speak specifically to through the eyes of management as a way to specify line items which incorporate materiality as a relevant part of the analysis.
So I actually think in practice, yes, reasonable investor, but also maybe one way of understanding this hesitancy on my part is reasonable investors care about what companies think, so the two things are not easily separated

Page 53

historical boom, the number of filings that were being processed was large, and I reviewed a couple of those myself in detail to make sure I understood what was the nature of the disclosures that those companies were making. There may be others, but those are the ones that come to mind.
Q. Do you recall conducting any reviews of technology companies?
MR. DURBIN: Object to form.
A. You know, it's possible. I did, as I say look at -- for the meme stock, there were several companies, and I don't remember all of their industries for the SPAC. I looked at least to one of which was not tech. I don't remember the other one vividly. So it was possible, but I don't have any specific memory of that right now.
Q. Did any of your reviews result in referrals to the enforcement division?
A. I'm not sure I could tell you that. But in any event, I mean, as a general matter, during the time I was there, there were referrals from corp fin to enforcement. I don't think my own personal reviews led to those that I can remember.
Q. Have you worked on any enforcement actions for the SEC?

Page 54

A. As general counsel, all enforcement actions went through my office. I did not look at the details of most of them, but I did get pulled into specific legal issues that arose for specific enforcement matters. And then whenever any enforcement matter went to the commission during the time I was general counsel, I was the principal representative for the general counsel's office in advising on the legal issues involved in the enforcement matter.
Q. And have you been engaged by the SEC to work on any litigation matters?
A. Yes. Over the course of my career, I have, yes.
Q. And would those matters consist of providing opinions or advice relating to disclosure practices of large public companies?
A. That was not the core focus of the work that I've done. There have been -- so for example, I served as an independent compliance consultant where the job related to compliance generally, which would have included disclosure practices, but that was not the -- claims about the disclosure practices were not the trigger for the need for the consulting role and was not a dominant part of the

Page 55

work.
Q. Now, you explain in your report that you analyzed Qualcomm's disclosure process as it compared to the disclosure practices in large public companies, correct?
A. Yes.
Q. Who would you describe to be Qualcomm's peer companies?
A. Well, for this purpose, it would be other large public companies, which I describe somewhere in the report in one of the footnotes early on, large cap, subject to the full range of regulations, as well as ability to take advantage of incorporation by reference, listed on a stock exchange, actively traded markets, disperse shareholder base, et cetera. So for disclosure process purposes, that's the relevant comparison set.
Q. So are there any particular companies that you would consider to be comparable large public companies to Qualcomm?
A. The S&P 500 would be a set. They all have the characteristics I just described.
Q. So you don't have any particular large public companies in mind when writing your report

Page 56

and your reply report?
MR. DURBIN: Object to form.
A. I mean, I -- within the universe of large public companies, I don't have a particular company that I would have given more weight in my understanding of customs in this area, no.
Q. In determining what constitutes relevant customs and practices, have you reviewed the public filings of any companies that you believe to be peer institutions to Qualcomm?
A. Yes.
Q. What are the particular public companies whose filings you have reviewed?
A. All of the large public companies whose filings I've reviewed over the course of my career.
Again, to be clear, I did not -- at the outset of this assignment, I didn't identify some specific company and go refer to their public filings for purposes of this assignment.
I have over the course of my career reviewed thousands of large public companies' filings of some component, in some cases quite comprehensively.
All of that forms a basis for my understanding of disclosure of customs and

Page 57

practices, which then I'm relating to Qualcomm's.
Q. So you have not focused on a specific industry in describing the disclosure practices in large public companies?
A. Not -- no, not for purposes of this assignment, no.
Q. How many companies would fit the definition -- your definition of a large public company?
A. In excess of 500, but I don't have a precise number in my mind.
Q. So am I correct that your baseline would be all of the companies that are in the S&P 500 would be considered large public companies that are comparable to Qualcomm?
MR. DURBIN: Object to form.
A. All large public companies, for purposes of the disclosure processes that large public companies are both expected to and customarily do follow would count as the relevant benchmark, yes.
Q. Have you reviewed any other public filings of large public companies holding a standard essential patent to determine how those companies characterize their obligations under FRAND, F-R-A-N-D?

Page 58

MR. DURBIN: Object to form.
A. I don't know. I certainly did not do that for purposes of this assignment, and the reason is, as we covered earlier, I wasn't asked to comment directly on the accuracy of any FRAND-related disclosures.
Q. Have you reviewed any other public filings of large public companies who have been subject to investigations regarding whether they engaged in anticompetitive harm?
MR. DURBIN: Object to form.
A. I think -- I don't know. I expect, yes, because of the number of large public companies' filings I've reviewed over my career and the number of times that antitrust allegations are brought involving large companies. But, again, I was not in this matter attempting to look at the specific disclosures that Qualcomm made and then relate those to disclosures of other companies. I was looking at the processes they followed in order to produce the disclosures, and for that purpose, the particular end product disclosure that we're trying to back into, to relate to how they went about making their disclosures, is not a relevant consideration. I'm starting at the beginning of

Page 59

the process, not at the end, where you end up with the disclosure that plaintiffs are questioning.
Q. In determining what constitutes relevant customs and practices, have you conducted any surveys of other large public companies to determine their disclosure practices regarding particular disclosure channels?
A. So I have myself not conducted a formal survey. I have consumed the literature, some of which I cite in the report that's produced by other researchers about particular channels of communication. And as I've mentioned over the course of my career, I've reviewed many, many companies' disclosure documents as well as the processes that led to their creation, and I've done research on how companies implement requirements to have disclosure controls and processes under the SEC's oversight.
So no formal survey, but lots of other information that you might think of as that. And I'm sure in some of the academic work there were surveys conducted.
Q. And sitting here today, can you name any specific large public company that would be as an exemplar for disclosure practices regarding customs

Page 60

and practices in large public companies?
MR. DURBIN: Object to form.
A. Again, I don't have any specific company in mind. I mean, I could just name some randomly chosen large public companies, but those are not going to be the ones that form the basis for my understanding of what large public companies do to create customary disclosure processes.
Obviously, my legal advisory clients, that's all privileged and more or less long ago. The consulting work, work I've done at the SEC, and research, has just been about large companies, it's not been about a specific comparison.
Q. Is there anything in terms of your experience that's public regarding the disclosure practices of large public companies?
MR. DURBIN: Object to form.
A. I mean, I'm not understanding.
Q. Sure.
In terms of -- you mentioned that there may be information that's privileged in terms of your consulting work.
A. Yeah.
Q. Can you identify any large public companies where the work is not privileged, it's

Page 61

public, in terms of examining the disclosure practices of large public companies?
MR. DURBIN: Object to form.
A. So my own work, I don't think -- as either a lawyer or as a consultant, I don't think has ever been published as such. I mean, the role, I mean, you mentioned earlier the State Street engagement, that was to oversee a large public company and its internal processes to prevent a recurrence of fraud, and that included a review of their disclosure processes. So that's a public example of a company in which I certainly spent a lot of time looking at how they conducted, among other things, disclosure.
I'm sure there are others that you could probably find with my name attached to them, but I don't -- again, this -- I've not thought about each individual company that way. There's a standard norm about how large public companies go about producing disclosure documents that has been consistent every time I've ever been involved with a large public company, and that's the benchmark that I'm using for this report.
MR. DURBIN: Robert, we've been going a little over an hour.

Page 62

MR. KRAVETZ: Yeah. I just have one last question and then I think we would be there for a break.
Q. Sitting here today, are you able to identify any specific large public companies that produce chipsets like Qualcomm that you could review in terms of their disclosure, customs, and practices?
MR. DURBIN: Object to form.
A. I'm generally aware of the chip industry, but just -- I would not identify a specific company for this purpose because, again, the production of chips as an activity, or chipsets or services related to chips, all of that is not a determinant of the customary way in which a large public company, whether or not they make chips, goes about creating their disclosure documents.
MR. KRAVETZ: I think we can go off record for a break.
THE VIDEOGRAPHER: The time is 10:13 a.m. We're off the record.
(Proceedings interrupted at 10:13 a.m. and reconvened at 10:24 a.m.)
THE VIDEOGRAPHER: The time is 10:24 a.m. We're on the record.

Page 63

BY MR KRAVETZ:
Q. Professor Coates, if you could turn next to page 20 of your report.
A. Okay.
Q. Let me know when you're there.
A. I'm there.
Q. Okay. And Section IV.D. of your report is entitled, "Customs and Practices for Preparing Particular Types of Voluntary Disclosure in Large Public Companies"; is that correct?
A. Yes.
Q. And throughout this section, you refer to specific disclosure channels, including quarterly and annual earnings releases?
A. Yes.
Q. And earnings calls?
A. Yes.
Q. Analyst events?
A. Yes.
Q. And media interviews, correct?
A. Correct.
Q. All right. And am I correct none of the alleged bundling misrepresentations and omissions listed in Exhibit 1 relate to statements in earnings releases published by Qualcomm, correct?

Page 64

A. I believe that is correct.
Q. And none of the alleged bundling misrepresentations or omissions listed in Exhibit 1 relate to statements made during earnings calls, correct?
A. I believe that's right.
Q. And we talked earlier that you're not offering an opinion as to the November 2015 and January 2017 press releases, correct?
A. Correct.
Q. There are no additional alleged bundling misrepresentations and omissions listed in Exhibit 1 that are found in press releases, correct?
A. Correct.
Q. In paragraphs 48 and 49, you reference "mandatory disclosures" and "information voluntarily disclosed by companies," correct?
A. Yes.
Q. And I'll let you get to Exhibit 1, and let me know when you're there, then I'll have a question about that.
A. Okay. I'm there.
Q. All right. With reference to Exhibit 1, what are the statements that you considered to be

Page 77

SEC work, it has come up in enforcement actions, some of which are public, some of which are not, as to whether companies had adequate disclosure policies.
To be clear, there's a requirement that the SEC has that companies have a disclosure controls policy, and that's part of the attestation work that companies do, and that's been part of the research and teaching that I've done since being at Harvard.
Q. Am I correct that in connection with this case, you don't cite to any specific disclosure policies of similarly situated large public companies, correct?
A. That's correct, I'm not drawing on non-public information for this. This is what I've myself experienced over the time that I've been teaching, writing, advising, consulting.
Q. And here you had access to a large litigation database with a number of internal company documents. And, again, without identifying any particular clients, have you had the occasion to review documents like this in any of your other engagements?
A. Yes.

Page 78

Q. And can you estimate how often you would have reviewed similar types of documents in your other engagements?
A. More than 25, probably fewer than a hundred.
Q. In paragraph 71, you reference that Qualcomm adopted a disclosure committee charter on or about July 11, 2016; is that correct?
A. Yes.
Q. On that date, July 11, 2016, that would have postdated all but one of the SEC filings and the article on the Taipei Times; is that correct?
A. I don't have the chronology memorized quite to that fine point, but I take your -- I believe you're -- to be clear, there aren't significant changes to this process.
This is just a fact that they did a new charter in 2016. So for completeness, I'm giving the whole chronology of the documents I received relevant to their disclosure process. But I don't believe there's anything meaningfully different about the process that was before and after 2016 for purposes of my opinions.
Q. In Section V.C. of your report, starting on page 31, that section is entitled "Qualcomm's

Page 79

Investor Relations Team," correct?
A. Yes.
Q. And you note that the company's investor relations team played a, quote, active role, end quote, in assisting with the communication of company disclosures to market participants; is that right?
A. Yes.
Q. You base that opinion on your review -- solely from your review of internal company documents; is that right?
A. And testimony of participants in the disclosure process.
Q. And you haven't otherwise, outside of testimony, had any conversations with members of Qualcomm's investor relations team, correct?
A. That's correct.
Q. You cite to the deposition testimony of a Mr. Warren Kneeshaw, K-n-e-e-s-h-a-w.
A. Yes.
Q. Is that correct?
A. Yes.
Q. Who is Mr. Kneeshaw?
A. I confess, I have a terrible memory for names, so I couldn't tell you precisely without

Page 80

looking it up. So that's the answer, I don't know off the top of my head.
Q. And, conceivably, given that the citation is in this section, Mr. Kneeshaw would have had some relation to Qualcomm's investor relations team?
A. Yes. I believe that he was in fact part of the investor relations team, but that's based on inference from the section and the testimony citation.
Q. And since you cited his testimony, conceivably, Mr. Kneeshaw would be able to testify about the role played by Qualcomm's investor relations team, correct?
MR. DURBIN: Object to form.
A. Yes. I'm quite sure that whatever his personal experience is, he could testify to it, yes.
Q. And the same with others who are part of the investor relations cross-functional team?
A. Yes.
Q. In paragraph 79, you note, quote, When preparing disclosures, investor relations would work with individuals from the company's relevant business units to review the disclosures for

Page 81

accuracy, end quote; is that correct?
A. That sounds right.
Q. And the basis for that statement is the deposition testimony of Mr. Bill Davidson; is that right?
A. Yes.
Q. And do you know what Mr. Davidson's position was?
A. Again, I don't have the particular titles memorized, but he was involved in the disclosure process.
Q. And you cite to Mr. Davidson's deposition in footnote 153, correct?
A. Yes.
Q. Now, the accompanying text in paragraph 79, you don't quote any specific testimony; is that right?
A. For the sentence that I'm citing to Mr. Davidson's deposition, correct, although I do quote in the next sentence; but, yes, that's right.
Q. Are you accepting as true for purposes of your report that the investor relations division would review disclosures for accuracy?
MR. DURBIN: Object to form.
A. No. In the sense that I looked at a

Page 82

variety of documents and a variety of deposition testimony from a variety of individuals involved in the process, and looked for relevant information across all of them, and if there had been inconsistencies or gaps that would have undermined the credibility of any particular witness, I would have noted that and taken that into account. But I don't remember there being any. And so for purposes of this cite, I believe it is accurate, to the best of my knowledge.
Q. Likewise in paragraph 79, in the next section, you cite to a document -- you quote to a document stating that "the investor relations team was tasked with monitoring the company's disclosures to ensure accurate reporting"; is that correct?
A. Yes, the quote goes on, but yes, that's right.
Q. And that's a specific quote to the company's disclosure policy?
A. Correct.
Q. And, again, you're not taking any position as to whether the at-issue statements were in fact accurate, correct?
A. Right. As we covered this morning, I was

Page 83

not asked, wouldn't understand myself to have a role to give an opinion on the ultimate factual question in the case.
Q. And you're not taking an opinion as to whether the investor relations department's efforts did in fact result in accurate disclosures, correct?
MR. DURBIN: Object to form.
A. So stated that very precisely, no. But for completeness, as I said already today, I believe that a process like the one that I think is indisputably evidenced by the records that I reviewed would tend to make accuracy more likely than not, all else equal.
Q. But the specific answer is no, correct?
A. Again, my answer is the answer I gave you.
Q. In Section D, beginning on page 33, that section is entitled "Qualcomm's Practices for Particular Types of Disclosures," correct?
A. Yes.
Q. And the first type of disclosure relates to the company's disclosure practices for Forms 10-K and 10-Q, correct?
A. Yes.
Q. And in paragraph 82, you note that there

Page 84

was an iterative process to prepare the company's Form 10-Q and Form 10-K SEC reports; is that correct?
A. Yes.
Q. And the first part of the SEC reports that you cite are the financial statements and associated footnotes; is that correct?
A. The next sentence is about financial statements, yes.
Q. And, again, none of the at-issue -- yes or no -- none of the at-issue disclosures are present in the financial statements or footnotes, correct?
A. The ones listed on Exhibit 1 in my report are not part of the financial statements, no.
Q. In paragraph 83, you describe the process for a particular earnings cycle; is that correct?
A. Yeah, I believe that's fair.
Q. And then in paragraph 83 and footnote 161, you have a citation to "D&O Renewal Presentation"; is that correct?
A. Yes.
Q. Do you know what that refers to?
A. Director and officer renewal presentation, insurance.
Q. And do you know whether that type of

Page 85

presentation was kept in the course of the regularly conducted activity of Qualcomm?
MR. DURBIN: Object to form.
A. I have no independent view as to the regularity of it, although it would surprise me if D&O insurance documentation was not part of a regular practice at a large public company.
Q. But sitting here today, you don't have any independent knowledge of whether the making of the D&O renewal presentation was a regular practice of Qualcomm?
A. No. Again, I haven't undertaken the specific D&O insurance documentation practices with that idea.
I would say the presentation summary, which is what I quote, is consistent with all the other evidence that's cited in this section. And it would be hard to imagine that the documents that are produced, described here, could be done in, you know, significantly different time with different inputs from different people. So this was consistent with my general knowledge, which I've already reviewed in the prior section and with the other documents cited in this section.
Q. In paragraph 85, on page 35, you identify

Page 86

multiple individuals who were assigned to prepare and review portions of SEC reports; is that correct?
A. Yes.
Q. And your source for that statement is a list which is entitled "Summary of Responsibilities," correct?
A. Yes. It was a spreadsheet, yes.
Q. It's an Excel spreadsheet?
A. Yes.
Q. Have you gathered any independent evidence beyond the list as to whether these specific individuals actually prepared and reviewed portions of the SEC filings?
MR. DURBIN: Object to form.
A. Again, I believe that this set of assignments and individual names is consistent with other references to the individuals and the subject matter areas that they represented that are found in other documents. Although sitting here today, I'm not -- I didn't go through and tick off each one in some other place, no.
Q. And conceivably any of these individuals could testify about their personal experiences as part of preparing and reviewing portions of the

Page 87

company's public filings?
MR. DURBIN: Object to form.
A. I have no information one way or the other about their availability for testimony, but...
Q. But outside of their availability for testimony, in terms of personal knowledge, you would expect that any of these individuals could testify about their personal experiences in preparing or reviewing portions of the company's public filings?
A. I have no reason to think otherwise.
Q. Starting in paragraph -- starting in paragraph 86, there's a reference to the company's audit committee; is that correct?
A. Yes.
Q. And the audit committee is distinct from the disclosure committee; is that right?
A. Yes.
Q. And the audit committee is generally comprised of independent members of the board of directors; is that right?
A. You mean across companies? Yes, that would be generally always required for public or listed companies, and was true here.
Q. And that's an outgrowth of the

Page 88

Sarbanes-Oxley Act?
A. I actually don't think Sarbanes-Oxley significantly changed practice for companies of the nature of Qualcomm. I do think it changed some companies' choices about who is on an audit committee, but by and large, most large public companies had fully independent audit committees even before 2002.
Q. And generally the audit committee of a large public company will meet with the company's public accounting firm each quarter; is that correct?
A. Yes.
Q. And would you agree that the audit committee's focus tends to be on financial accounting issues and internal controls over financial reporting?
MR. DURBIN: Object to form.
A. No. The audit committee's remit once might have been fairly described as even exclusively what you just asked about, but I would say over the last 25 years, the nature of the things that the audit committee understands itself generally to have to think about go beyond the financial statements. Primarily, as a word you

Page 89

used in your question and depending on how you think about that, you could get to a yes for it even today, because financial statements contain a great deal of qualitative information and because auditors have to think about inconsistencies between that information and other information that they're aware of, and because the audit committee is a subset of the board and the board has full responsibility for the entirety of the company's operations, I don't actually think most audit committees think that way anymore. They clearly have at the top of their checklist audited financial statements, but primarily it would be a hard thing to agree to in practice.
Q. Now, large public companies typically have an internal audit function and an external auditor, correct?
A. Yes.
Q. And, ultimately, all of that information is filtering up to or under the supervision of the audit committee; is that right?
A. The audit committee supervises both the external audit relationship as well as typically oversees the internal audit, although some companies don't necessarily have a direct line to

Page 90

the audit committee for internal audit.
Q. You note in paragraph 87 that the independent auditor, which was PwC, reported to Qualcomm's audit committee on the auditor's review of the company's consolidated financial statements; is that correct?
A. Yes.
Q. Now, Qualcomm's auditors did not audit the financial statements on a quarterly basis, correct?
A. I don't believe they did, would not be customary to do a full audit. They would typically review the quarterly but not give a full audit on it.
Q. And a full audit opinion is typically given in connection with an annual report; is that correct?
A. Yes.
Q. And, likewise, typically, an auditor would not provide a certification regarding internal controls over financial reporting in a quarterly report; is that correct?
A. You mean an attestation? No. That, again, is an annual cycle. They do, however, typically maintain a continuous engagement with large public companies because to concentrate all

Page 91

of the work necessary to support an attestation in, you know, the last quarter could be difficult, so they do engage throughout the year. And if there were significant changes in the control environment, I would expect that independent auditors would come to know that in advance of the end-of-year attestation process.
Q. But generally, the attestation is provided in the annual report, correct?
A. Yes.
Q. All right. In paragraph 89, on the next page, you refer to a written report by PwC related to its review of the company's financial statements; is that correct?
A. Yes.
Q. And then the footnote cites to an audit committee meeting on November 4th, 2013; is that right?
A. Yes.
Q. And, thereafter, in the next sentence, you say, "The report listed numerous procedures conducted by PwC as part of its review, including," and then there's a bulleted list; is that right?
A. Yes.
Q. That next citation is to a different audit

Page 92

committee, though, a meeting, though, isn't that right, July 22nd, 2013?
A. Yes.
Q. So when you refer to "the report" in the second sentence of paragraph 89, you're not referring to the written report in the preceding sentence, which was from the November 4th, 2013 meeting; is that correct?
A. I actually don't specifically have a memory of those two particular cites, sitting here today. It's entirely possible that it's the same report but simply being described in two different documents, but I don't, sitting here today, remember that.
Q. The next section is entitled "Qualcomm's Practices for Earnings Disclosures," correct?
A. Yes.
Q. And that spans from pages 38 to 44?
A. Yes.
Q. And, again, in this section you cite to numerous internal Qualcomm documents relating to the company's practices for earnings disclosures?
A. Correct.
Q. And as with the preceding section, would you agree that Qualcomm employees who are involved

Page 93

in the earnings disclosure process could testify about the company's processes?

MR. DURBIN: Object to form.

A. As a general matter, yes. I don't have any particular knowledge one way or the other about particular individuals, but as a collective, yes.

Q. In paragraph 92, you state that quote, consistent with the disclosure customs and practices in large public companies, many individuals in different positions and departments within Qualcomm participated in an iterative process to prepare, review, and approve information that would be disclosed in earnings press releases and during the call." Is that accurate?

A. Yes.

Q. And, again, we've touched on this before, but you're not giving an opinion as to the accuracy of any of the information disclosed by the company in press releases or during earnings calls, correct?

A. Again, I've not been asked and have not conducted independent investigation into facts at issue in the case, no.

Q. And as we saw in Exhibit 1, none of the specific at-issue disclosures were made in earnings

Page 94

releases, correct?

A. Correct. The Exhibit 1 does not incorporate, because I looked in the complaint and didn't see specific references to earnings disclosures, no.

Q. And nor are there any references to earnings calls in Exhibit 1, correct?

A. Correct.

Q. In paragraph 93, you list several Qualcomm departments that were involved in the earnings release process; is that correct?

A. Yes.

Q. The first is Financial Planning and Analysis or FP&A; is that right?

A. Yes.

Q. Do you know the role of that department within Qualcomm?

MR. DURBIN: Object to form.

A. For my purposes, it was the lead team setting up the process for preparing the earnings release, which coordinated obtaining information from the different departments and effectively function as the project manager for this part of their overall disclosure program, which just to be clear, when you've ask me, you know, about

Page 95

Exhibit 1 and I've given you the sort of narrow answer, I just want to make sure I'm clear, the fact that something is not on Exhibit 1 doesn't mean that it's not part of the overall disclosure process, which is relevant to everything on Exhibit 1, but just wanted to say that.

Go ahead.

Q. Now, your report references the FP&A team's consolidation of budget and forecast information, correct?

A. Yes.

Q. And then you refer to AP&R; is that right?

A. Yes.

Q. And that would be Accounting Practices and Reporting?

A. I believe that's the acronym, yes.

Q. And then you refer to Corporate Tax?

A. Yes.

Q. Are you aware whether any of these departments, FP&A, AP&R, or Corporate Tax would have any role regarding qualitative disclosures such as the company's compliance with its FRAND commitment?

A. I don't have a view one way or the other as to that. It's possible, but I don't know.

Page 96

Q. In paragraph 95, in the last sentence you cite the deposition testimony of Dr. Paul Jacobs regarding his own expectations of earnings calls; is that correct?

A. Sorry. Which footnote were you --

Q. It's paragraph 95, the last sentence.

A. Oh, I see. Yes. Sorry. Next page. Yes. Yes, I see that now.

Q. And none of Dr. Jacobs statements during the earnings calls are the at-issue disclosures in this case, correct?

A. I don't believe any of his specific statements are on Exhibit 1, although they may be related to them, but they're not independently a basis for the list in Exhibit 1.

Q. And you take no position one way or the other regarding the accuracy of Dr. Jacobs' quoted statement in paragraph 95, correct?

A. Correct.

Q. In paragraph 98 on page 41 -- let me know when you're there.

A. Yeah.

Q. You reference the fact that Qualcomm published slides in connection with its earnings calls; is that right?

A. Yes.
Q. And none of the specific at-issue disclosures were made in slides published or in connection with earnings calls, correct?
A. Not that I can recall. They may be related, but I don't recall them being separately on a slide, no.
Q. In paragraph 99, you note that investor relations published an earnings release calendar regarding earnings release dates; is that correct?
A. Yes.
Q. What is the fact that you would like the trier of fact to conclude from the dates that you list in the bullet points to paragraph 99?
MR. DURBIN: Object to form.
A. So at a very high level, this paragraph, as with this entire section, as with the entire overall section of the report, is meant to illustrate that the process by which Qualcomm produced its disclosures here, voluntary earnings disclosures, but overall, was iterative, involved multiple departments, involved many opportunities for people to interact about a variety of different kinds of information, to reflect on that information with gaps in between to make sure this



was not being rushed, was deliberate, planned, and part of a project management process that would be customary for disclosure practices.
Q. And obviously you weren't present at any of the meetings that are cited in paragraph 99, correct?
A. I was not.
Q. And so you have no independent knowledge whether any of the at-issue disclosures were actually discussed during these particular meetings?
A. No, I don't know for a fact. I note that the earnings release covers the earnings, which is derived from the activities of the company, which in turn are derived from its overall activities, as explained in the 10-K, in which -- and the 10-Qs, in which some of the at-issue disclosures appear.
So these would have been opportunities for discussion if there were some reason to think about updating or changing the at-issue disclosures. But I don't have any independent knowledge of specifically what was said at these meetings.
Just to be clear about what I'm saying, as important as what is specifically said is the opportunity for people to raise questions or think



about different kinds of disclosures.
Q. But sitting here today, you're unaware as to whether there was any particular debate regarding any of the at-issue disclosures in the case?
A. No. I don't believe that I've seen evidence at these particular meetings of any particular part of the at-issue being debated. I'm just making clear that these were opportunities on a multi -- you know, many, many days for lots of different people to think about the overall earnings release.
Q. And in the next section, beginning on page 44, there's a section entitled "Qualcomm's Disclosure Practices for Analyst Events," correct?
A. Yes.
Q. And the first type of analyst event that you address are analyst days; is that right?
A. And conferences, yes.
Q. You address both in this section, correct?
A. Yes.
Q. So the first one that you address are analyst days on page 45?
A. Oh, sorry. On the next page.
Q. Yeah.



A. Yeah, that's correct.
Q. All right. And is it your understanding that Qualcomm held an analyst day once per year?
A. Yes.
Q. And as you indicate, it was an invitation only event for financial analysts and institutional investors, correct?
A. That's my understanding.
Q. And just to confirm, none of the at-issue disclosures on Exhibit 1 were made during an analyst day, correct?
A. Again, I don't recall. I'm fairly sure that Exhibit 1 list of disclosures were not specifically made on an analyst day, although, again, they may have been relevant to things that were discussed on analyst days.
Q. And as with the preceding section, you identify some of the employees who would have been involved in the analyst event process; is that right?
A. Yes.
Q. And these employees involved in the analyst event process could testify about the company's processes; is that correct?
MR. DURBIN: Object to form.

Page 101

A. Again, I don't have any view as to individuals. As a group, certainly, I believe there probably are some.
Q. In paragraph 108, you reference a PowerPoint prepared in connection with the 2012 analyst day presentation.
A. Yes.
Q. And you state in that paragraph that "multiple individuals helped check the presentation for accuracy"; is that correct?
A. Yes.
Q. And you cite one e-mail in particular that a Qualcomm employee, the senior technical accountant of AP&R, "was unable to substantiate certain information in the presentation"; is that correct?
A. Yes.
Q. And then you included a list of people who were responsible for substantiating; is that right?
A. Yes.
Q. All right. And in your report, you don't cite any further e-mails regarding whether the information was, in fact, substantiated, correct?
A. My memory is that, in fact, the documents show that the disclosures were either substantiated

Page 102

or the disclosure was changed. But I cite what I cite, so I mean, you can look at the native documents if you want.
Q. And you haven't expressed an opinion one way or the other as to whether the information in the November 2012 PowerPoint was, in fact, accurate, correct?
A. Again, I'm not offering an opinion in this case and would not understand my role or Professor Seligman's role to offer an opinion about accuracy of ultimate disclosures, no.
Q. If we can turn next to the section entitled "Analyst Conferences."
A. Okay.
Q. And analyst conferences would be the second type of analyst event that you cover in your report, correct?
A. Yes.
Q. All right. In paragraph 110, you note that "Qualcomm participated in over 40 analyst conferences" during the class period; is that right?
A. Yes.
Q. And the source for that states simply Refinitiv; is that right?

Page 103

A. Yes.
Q. What is Refinitiv?
A. It's a database that collects business information, often including investor information, and then, among other things, collects information about analysts' interactions, including analyst conferences with public companies.
Q. And did you personally review all of the materials for each of the 40 analyst conferences during the class period?
A. I'm not sure what you mean by "all of the materials." I did have my team verify that, in fact, there were 40 conferences referenced within Refinitiv to support this sentence.
I didn't do further work beyond that to somehow validate anything else.
Q. Yeah.
A. But Refinitiv is the cited source for this.
MR. KRAVETZ: Maybe try to ask it a little bit better.
Q. But in terms of assessing the company's customs and practices relating to analyst conferences, did you request and review internal company information with respect to each of the 40

Page 104

analyst conferences during the class period?
A. No. That would have been exhausting and exhaustive and not terribly helpful. No.
Q. Do you recall how many specifically you reviewed?
A. No. I don't have a precise number in my head. The goal was to verify that there was a process, that it was followed. I did look at the particular at-issue disclosure events, which included conferences, but I don't have a specific number that I did beyond that.
Q. And there were two at-issue events involving analyst conferences, correct?
A. On Exhibit 1, yes, there are two different things that would be fair to call analyst conferences.
Q. Do you recall reviewing the full body of internal documents relating to any other analyst conferences other than those two?
MR. DURBIN: Object to form.
A. I don't have a specific recollection. It's possible, but that's asking a slightly different question than I was attempting to verify.
Q. If you can turn to page 51, and let me know when you're there.

Page 105

A. I am there.
Q. On page 51, you have a section entitled "Qualcomm's Disclosure Practices for Media Interviews"; is that correct?
A. Yes.
Q. And is the purpose of that section to discuss the company's disclosure practices for media interviews, as you understand it to be?
A. Yes. And to provide a basis for being able to compare that to how media interviews customarily would be prepared for in the context of an overall disclosure program in which the various background elements that I discuss earlier in the report would bear on how they're doing that.
Q. Do you recall how many sets of briefing materials that you actually reviewed regarding media interviews of Qualcomm employees during the class period?
MR. DURBIN: Object to form.
A. I don't. I believe I cite the ones that I focused on here. There's one down below from October 2015, there's the one that's at issue, and then there are other cites, and I haven't attempted in my own head to break those out into a specific number.

Page 106

Q. Do you recall any other sets of briefing materials that you've reviewed other than those listed in footnotes 277 to 281?
A. Well, I mean, that section carries over onto the next page, through footnote 285. So if you want to wrap that in, that's the set of what I'm citing to.
Q. Okay. And in paragraph 115, you reference that Qualcomm executives would use briefing sheets and talking points to prepare for media interviews; is that correct?
A. Yes.
Q. I mean, you haven't separately interviewed any Qualcomm employees as to how they actually used the briefing sheets and talking points, correct?
A. No. I did not conduct my own personal, not subject to cross-examination, depositions, no.
Q. And sitting here today you don't have any personal knowledge as to how Qualcomm employees actually prepared for interviews, correct?
MR. DURBIN: Object to form.
A. I have the knowledge and the informational basis that's summarized in the report, that's my knowledge. I don't have some independent uncited or undescribed basis for knowledge.

Page 107

MR. KRAVETZ: Go off record for a moment.
THE VIDEOGRAPHER: The time is 11:18 a.m. We're off the record.
(Proceedings interrupted at 11:18 a.m. and reconvened at 11:32 a.m.)
THE VIDEOGRAPHER: The time is 11:32 a.m. We're on the record.
BY MR. KRAVETZ:
Q. Professor Coates, if you could open your report to page 53, please?
A. I am there.
Q. And the next section in your report is entitled Qualcomm's Disclosure Processes Were Consistent With the Company's General Practices and Disclosure Customs and Practices in Large Public Companies; is that correct?
A. Yes.
Q. And in Section VI, you provide your opinion as to the disclosure processes relating to each of the at-issue disclosures you list in Exhibit 1; is that correct?
A. Yes.
Q. All right. And, again, the opinions in this section relate to the disclosure processes and not the substance of the statements themselves,

Page 108

correct?
MR. DURBIN: Object to form.
A. As a general matter, yes, that's a fair statement.
Q. Now, in this particular section, you're not offering any opinion as to the knowledge or state of mind of any particular individuals who made or contributed to the statements; is that correct?
A. That's correct.
Again, as with accuracy, I think a good disclosure process, like the one that I describe here, tends to make it more likely that individuals, you know, come to share the same take on a given issue, but I don't have a particular view about particular individuals and their state of mind.
Q. On page 54, you have a section entitled "Fiscal Year 2012 Form 10-K"; is that correct?
A. Yes.
Q. And the at-issue statements were made within the business line description line item, correct?
A. Yes.
Q. Now, in this particular section regarding

Page 109

the 2012 Form 10-K, you include -- your section spans from page 54 to page 63, correct?
A. Yes.
Q. And you have approximately 22 paragraphs of factual information beginning on paragraph 121 and spanning through paragraph 143; is that correct?
A. Yes.
Q. How did you collect the exact documents and draft the nine-page narrative relating to the Form 10-K?
A. In the same way that I described earlier, I asked for documents relevant to how the disclosure process worked for, in this case, the 2012 10-K, and then to the extent that they referred to other documents, asked for those, to the extent that testimony related to particular documents, asked for those.
Q. And you touched on this earlier, but you didn't have any assistance from specific Qualcomm employees in selecting documents, correct?
A. I didn't interview any particular individual, no. I did work through counsel and Cornerstone with people at Qualcomm. I don't think counsel independently had this information other

Page 110

than their role in this case, but... So my understanding is ultimately there were individuals at Qualcomm, but I didn't personally interact with them, no.
Q. And so you had no interactions with Qualcomm employees as to the meaning of particular e-mails or documents?
A. No. I tried to limit myself to stating and presenting information that didn't require substantive interpretation.
Q. And if you did have any questions regarding particular documents, who would supply you with the answers?
A. I think for this section, I don't recall having any. But if in general I had questions, again, it would be filtered through counsel. I did at some points talk to internal counsel at Qualcomm, but I don't remember any specific questions about this section.
Q. And without disclosing any of those communications, with whom did you have discussions who were internal counsel at Qualcomm?
A. Sorry. I'm terrible with names, and I don't remember the names.
Q. If you can turn to paragraph 137, please,

Page 111

and that will be on page 61. And just let me know when you're there.
A. I'm there.
Q. That references an audit committee meeting; is that correct?
A. Yes.
Q. And it notes that there was a summary of the company's financial performance and the auditor's review of the financial statements; is that correct?
A. Yes.
Q. And paragraph 139 also references, quote, various line items of the financial statements, correct?
A. Yes.
Q. And paragraph 140 references the company's 2012 integrated audit; is that correct?
A. Yes.
Q. And the particular at-issue disclosure for the 2012 Form 10-K was made in the business line section of the annual report, correct?
A. Yes.
Q. Okay. Not in the financial statements, correct?
A. Not separately stated in the financial

Page 112

statements. But again, the financial statements were prepared for a company about which the business line description is a description of, and the traditional review of financial statements would include understanding their role in an overall disclosure document.
Q. Have you reviewed the specific audit work papers relating to the company's 2012 integrated audit?
A. I don't remember specifically. It's possible, but I don't remember it.
Q. Do you recall whether you have reviewed the external auditor's working papers in connection with the 2012 integrated audit?
MR. DURBIN: Object to form.
A. Again, I don't have a specific recollection, but it's possible. If I did and relied on it, I would be citing it.
Q. And sitting here today, you're unaware of whether there was any discussion by the audit committee of the specific at-issue disclosures for the 2012 Form 10-K, correct?
MR. DURBIN: Object to form.
A. I am not aware of any reference in the documents I cite to a specific discussion about the

Page 113

specific words that I cite in Exhibit 1, no.
I mean, the audit committee, again, reviews financials in relation to the overall SEC filing, has a role documented in the disclosure process for the overall 10-K, and would understand itself to have a role in overseeing and asking questions about any disclosures in the 10-K, but I don't remember anything specific in the meeting documents that I saw about those words on Exhibit 1, no.
Q. And sitting here today, are you aware of whether the audit committee discussed any issues regarding FRAND in connection with the 2012 Form 10-K?
MR. DURBIN: Object to form.
A. Again, I don't have any specific recollection of a document that shows that. FRAND is, as I think not disputed in this case, relevant to an understanding of the company's business. I have every reason to believe the audit committee was informed in a general sense about the company's business, so FRAND would have been part of the overall information set that the audit committee had. But, again, I don't have a specific recollection of a document showing that they were

Page 114

discussing FRAND per se.
Q. Are you aware whether any of the audits conducted by PwC would test for the company's compliance with FRAND?
A. I'm not. I mean, I'm aware that auditors are required to identify, if it comes to their attention, directed material noncompliance. So to that extent, that would have been within scope. But I don't have any reason to think they designed testing specifically with respect to not FRAND. I've not seen anything in the documents I've looked at that says they did; maybe they did, but it wasn't part of the record I reviewed.
Q. So you have no independent knowledge sitting here whether testing for or giving an opinion relating to FRAND compliance was within the scope of PwC's audit opinion?
MR. DURBIN: Object to form.
A. So, again, Section 10A of the '34 Act requires auditors to take some -- take responsibility for things they know have a direct and material -- sorry -- restate -- take responsibility for knowledge they have about directing material noncompliance with law, to that extent that's just general knowledge. I have no

Page 115

specific knowledge relevant to how PwC thought about its engagement or was otherwise designing its process related to FRAND.
Q. And sitting here today, do you have any independent knowledge as to whether the company's internal audit group would have assessed the company's compliance with FRAND?
A. Same answer as I've given for the audit committee. They clearly have a role in understanding the business as a whole. To the extent that FRAND is material to the business, that would then be material to their work; beyond that, no.
Q. The next section beginning on page 63 is entitled "Fiscal Q2 2013 Form 10-Q"; is that correct?
A. Yes.
Q. And then in this particular section, starting on page 63 and proceeding through page 70, you begin a discussion of the exemplar second quarter 2013 Form 10-Q; is that correct?
A. Yes.
Q. And that spans from paragraph 144 to 161, correct?
A. Yes.

Page 116

Q. And you cite within the section to a number of internal company e-mails and documents relating to the exemplar Form 10-Q; is that right?
A. Yes.
Q. And as you noted earlier, the at-issue statements for the 2013 second quarter Form 10-Q were made within the MD&A section of that document; is that correct?
A. Yes.
Q. What was your process in collecting the documents cited in the 17 paragraphs of this particular section?
A. The same as I've described for earlier sections.
Q. And, again, you didn't have any specific assistance from any Qualcomm employees in selecting documents?
A. I didn't personally specifically speak to any Qualcomm employee. I worked through counsel and Cornerstone to obtain documents relevant to what I've described in this section and to put them in the database that I was drawing on for purposes of writing this report.
Q. And as with the other section, the 2012 Form 10-K, you didn't have any discussions with

Page 125

Q. And then you quote Mr. Aberle's response; is that correct?
A. In this transcript, yes.
Q. And there's -- he states, "Yes, so we haven't done that. And within the company, we tend to keep the licensing and the chip business very separate."
Did I read that accurately?
A. Yes.
Q. And he continues, "Obviously, our view is that companies need a license if they are doing 3G or 4G devices, sort of irrespective of whose chip they use."
Did I read that accurately?
A. Yes.
Q. And then finally, "And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and we don't bundle those together."
Did I read that accurately?
A. Yes.
Q. Okay. And, again, in connection with your opinion in this matter, you're not giving an opinion as to the accuracy of the statement one way or the other from Mr. Aberle, correct?
A. Correct. I'm not giving testimony about

Page 126

my belief about the accuracy of that or other particular disclosures.
Q. In paragraph 167, you reference certain talking points that were drafted for Mr. Aberle in advance of the conference; is that right?
A. Yes.
Q. Does your report, and in particular, there's a citation in footnote 428 to Exhibit 647; is that right?
A. To the deposition, yes, of Mr. Kneeshaw.
Q. And does your report indicate whether any of the talking points provided to Mr. Aberle related to keeping the licensing and chip business very separate?
A. My report does not discuss that. My memory is that I don't think the talking points directly addressed something that would be connected to the words that were used by the unidentified audience member.
Q. And does your report indicate whether any of the talking points related to Qualcomm trying to keep the sale of licenses separate from whether a company is using a QRD or a Qualcomm chip?
MR. DURBIN: Object to form.
A. Yeah, I don't remember those words in the

Page 127

talking points, no.
Q. And does your report indicate whether any of the talking points referenced bundling licenses and chipsets?
A. My memory is they did not.
Q. Sitting here today, do you know whether any of the other documents cited in paragraph 167 or the accompanying footnotes refer to the bundling of licenses and chipsets or keeping the licensing and chip businesses very separate?
A. Sitting here today, I don't recall there being any in there. It's maybe possible because I don't think I looked at it quite that way, but I don't recall there being any.
Q. In paragraph 168, you reference a document called the "Qualcomm Messaging Factoids Summary"; is that correct?
A. Yes.
Q. And does your report indicate whether the factoids summary referenced keeping the licensing and chip business very separate?
A. No.
Q. Does your report indicate whether the factoid summary related to Qualcomm trying to keep the sale of licenses separate from whether a

Page 128

company is using a QRD or a Qualcomm chip?
A. No.
Q. And does your report indicate whether the factoid summary referenced bundling licenses and chipsets?
A. No.
Q. And sitting here today, and outside of your report, do you have any independent recollection whether the factoid summary, in fact, referred to the bundling of licenses and chipsets or the keeping of the licensing and chip businesses very separate?
A. Sitting here today, I don't remember that, no.
Q. Now, during this type of Q&A that's referenced in paragraph 164, am I correct that no one from investor relations would have been on stage with Mr. Aberle at that time; is that right?
MR. DURBIN: Object to form.
A. I don't remember having an understanding of that very particular question. I do think it's both sometimes done and sometimes not done to have investor relations, you know, sort of part of the physical presentation. Sometimes companies have an array of people and sometimes they don't.

Q. And do you have any understanding whether Mr. Aberle consulted with anyone after receiving the questions from the audience member and before giving his answers?
A. I have no understanding one way or the other about that.
Q. It doesn't appear that way from the transcript, correct?
A. There's nothing indicated in the transcript about that.
Q. And would you agree that answers to specific questions cannot always be scripted in advance?
A. Correct.
Q. And you haven't identified any specific evidence that the response by Mr. Aberle cited in paragraph 164 was scripted in advance, correct?
A. If by that you mean part of the talking points that were prepared specifically for this event, no. I mean, as a general matter, of course the questions relate to the overall business. Mr. Aberle was a senior executive in the overall business, had been part of the 10-K and 10-Q process, and was aware generally of the operations from his role as a manager, but I don't recall



there being any specific preparation about that particular question framed in that quite specific way.
Q. If you can turn next to page 75, and let me know when you're there.
A. Okay.
Q. And next you have a section on the 2013 GSM Association Mobile World Congress; is that correct?
A. Yes.
Q. And you include information from pages 75 through 79 of your report; is that right?
A. Yes.
Q. And in connection therewith, you cite to some internal Qualcomm e-mails and documents; is that right?
A. Yes.
Q. And, again, can you describe your process in collecting the documents in this section regarding the GSM Association Mobile World Congress from approximately 11 years ago?
A. It would have been the same as for the prior sections.
Q. And same with respect to the prior sections, you did not conduct any interviews with



Qualcomm employees in the relevant departments relating to the Mobile World Congress analyst event; is that correct?
A. That's correct.
Q. And you haven't had specific conversations with any Qualcomm employees regarding the documents or e-mails that you cite therein; is that correct?
A. I don't recall separately directly talking to any Qualcomm employees other than as assisted by counsel.
Q. You don't recall speaking with anyone who actually participated in the preparation or the disclosure process for the 2013 GSM Association Mobile World Congress; is that correct?
A. Correct. I did not interview individuals, no.
Q. If you can turn to -- well, the first paragraph, paragraph 170, here you include Mr. Mollenkopf's statements in response to an analyst's questions during the session; is that right?
A. Yes.
Q. And like the Credit Suisse Technology Conference, this was an unscripted event, am I right?



MR. DURBIN: Object to form.
A. Actually, I think both were scripted, if what you're meaning is did this particular question, which is inaudible, get asked, I don't know, since I don't know what the question was.
MR. KRAVETZ: Maybe I can ask it hopefully a slightly better way.
Q. There wasn't a script provided in advance in either the Credit Suisse event or the Mobile World Congress event in terms of what a specific questioner was going to ask in advance, correct?
MR. DURBIN: Object to form.
A. Well, I'm not sure I agree with that. I mean, the burden, in part, of the two sections that I summarize is they did do preparation that included talking points and scripted answers that would draw on the prior disclosures and the 10-K and the 10-Q, as well as prior answers that had been developed in connection other analyst events, that those had all been processed and discussed and thought about, and that was part of the information in documentary form that the speakers from Qualcomm would have had going into the event.
If what you're asking is, was there literally like with the questioners ahead of time,

Page 133

did they get advance word of what the question would be and then they write the question down and write an answer down, no, they didn't do that. This was a live Q&A session. But it was very much prepared for with scripts and questions and answers and talking points.

Q. And I think the second part of your answer addressed my question, so thank you.

And then on page 76, you cite a specific statement from Mr. Mollenkopf; is that correct?

A. Yes.

Q. And the statement is, quote, well, they are really separate businesses. I mean, we have been very clear that we keep those two things separate -- separate propositions to the customer. So, really two different things. End quote.

Did I read that accurately?

A. Yes.

Q. And, again, you're not providing any opinion one way or the other as to the accuracy of that statement, correct?

A. Correct.

Q. Now, as with the Credit Suisse conference, you include citations to certain internal Qualcomm briefing materials that were provided in advance of

Page 134

the conference; is that right?

A. Yes.

Q. So for example, if you can turn to the next page, to paragraph 173, you cite to a briefing sheet prepared for Dr. Jacobs at footnote 443.

A. Yes.

Q. And an e-mail with similar materials provided to Mr. Mollenkopf, which you cite in footnote 444.

A. Correct.

Q. Does your report indicate whether any of the materials that you cite in Section 6.B.2. of your report referenced keeping any Qualcomm businesses separate?

A. So other than the general fact that at a high-level the company had segment reporting in its Ks and Qs and that was a part of the informational basis on which these documents were prepared, no. In fact, it's -- I'm not really sure how I would be able to identify what the answer to an inaudible question was about, so linking that to any particular talking point, I think would be hard at a minimum.

Q. So the answer is no, there are no specific talking points relating to keeping the businesses

Page 135

separate?

MR. DURBIN: Object to form.

A. Again, other than to the extent that the talking points in the scripts reflect the background information that's in the published documents, which reflects segment reporting, which reflects separate businesses, I don't recall there being anything beyond that.

Q. And you noted that the statement from Mr. Mollenkopf that you quote in paragraph 170 was made during an audience Q&A at the analyst event; is that correct?

A. Yes.

Q. And there's no indication from the transcript whether Mr. Mollenkopf consulted with any other Qualcomm employees before providing the statement that you include on page 76; is that right?

A. Between the question and the answer, there's no indication in the transcript one way or the other about any further discussions, correct.

Q. If you could turn to page 79 and let me know when you're there.

A. I'm there.

Q. And in that section you address the

Page 136

at-issue disclosures in the Taipei Times interview; is that correct?

A. Yes.

Q. Similar to my questions regarding the other disclosures, what was your process in collecting the documents in this section regarding the Taipei Times interview?

A. Same process.

Q. And you did not have any direct assistance from Qualcomm employees in selecting particular documents, am I correct?

A. I did not directly communicate with Qualcomm individuals as part of this, no.

Q. And you include in paragraph 177, a quotation from Qualcomm's general counsel, Mr. Rosenberg; is that right?

A. Yes.

Q. And that quote that you include is, quote, when we charge our license, it will be fair, reasonable, and non-discriminate. We have done that for 30 years, end quote.

Did I cite that accurately?

A. Yes.

Q. And do you have any knowledge one way or the other sitting here today whether Mr. Rosenberg,

# Exhibit 16

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

IN RE: QUALCOMM INCORPORATED SECURITIES LITIGATION
Case No. 3:17-CV-00121 JO-MSB

______________________________

**HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER**
VIDE DEPOSITION OF CELESTE C. SARAVIA, Ph.D.
San Francisco, California
Friday, February 16, 2024
Volume 1

STENOGRAPHICALLY REPORTED BY:
REBECCA L. ROMANO, RPR, CSR, CCR
California CSR No. 12546
Nevada CCR No. 827
Oregon CSR No. 20-0466
Washington CCR No. 3491
JOB NO. J10809720
PAGES 1 - 235

Page 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

IN RE: QUALCOMM INCORPORATED SECURITIES LITIGATION
Case No. 3:17-CV-00121 JO-MSB

______________________________

DEPOSITION OF CELESTE C. SARAVIA, Ph.D., taken on behalf of the Plaintiffs, at Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, California, commencing at 9:06 a.m., Friday, February 16, 2024 before REBECCA L. ROMANO, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter.

Page 3

APPEARANCES OF COUNSEL

For the Plaintiffs:
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
BY: ROBERT KRAVETZ
Attorney at Law
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400
robert.kravetz@blbglaw.com
and
BY: LAUREN M. CRUZ
Attorney at Law
2121 Avenue of the Stars
Suite 2575
Los Angeles, California 90067
(310) 819-3470
lauren.cruz@blbglaw.com

/////

Page 4

APPEARANCES OF COUNSEL(cont'd)

For the Plaintiffs:
MOTLEY RICE LLC
BY: COURTNEY R. WOLF(via Web conference)
Attorney at Law
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
(843) 216-9000
cwolf@motleyrice@.com

For the Defendants:
CRAVATH, SWAINE & MOORE LLP
BY: BRENT BYARS
BY: JANE RAMAGE
Attorneys at Law
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019-7475
(212) 474-1000
mbyars@cravath.com
jramage@cravath.com

/////

Q. Was the "Analysis of reasonable royalty rates" that you pointed to in the patent infringement case, was that a damages opinion?
A. I -- yes, I would have been on a consulting team supporting a damages expert.
Q. And have any of your representative antitrust experience as a consultant involved FRAND licensing?
A. The ones on page 1, those do not.
Q. What about page 2, "Other Cornerstone Research Experience"?
A. Not that I recall.
Q. And then, also on page 2, you list your publications; is that correct?
A. That's correct; it starts on page 2.
Q. And then other than your publication regarding the most-favored entry clause that you mention at the outset, is this an accurate list of your publications?
A. That's definitely my goal, and I don't think any have been left off.
Q. And have you published anything in the areas of FRAND or standard essential patents?
A. I have not.
Q. Can you identify whether any of your



articles have been subject to peer review?
A. Yes.
So the one on page 3 that's the "American Economic Review" is arguably the best economic journal, the most prestigious, or tied for it with a few others. So that one is clearly subject to peer review.
And I'm not sure about any of the other ones, but that would definitely be.
Q. You currently lecture at the University of California Berkeley; is that correct?
A. That's correct.
Q. What class do you teach?
A. I'm currently teaching industrial organization.
Q. And is this the first class you have taught at the university level?
A. No.
Q. What else have you taught?
A. I've taught natural resource economics.
Q. And what was the -- the general focus of natural resource economics?
A. In that class, the main focus was when -- I think the name is pretty descriptive.
It's the economics of natural resources,



the economics of oil extraction, of externalities to the environment. We spent a lot of things -- time on things like technological change, backstop technologies. And we did both renewable and nonrenewable resources, so in addition to oil, so fisheries and logging.
And those were some of the things we touched on.
Q. Sounds like a good class.
And you currently teach what at Cal Berkeley?
A. Industrial organization and -- I believe the title of it is "Industrial Organization and Public Policy" or -- but it's industrial organization and some antitrust.
Q. Is that an undergraduate or graduate-level class?
A. It is undergraduate.
Q. What's the general subject of that course?
A. So industrial organization is how firms complete. And so we have started out the semester learning about different models of competition, starting with perfect competition and the many different models of monopoly and price



discrimination.
Now we are moving on to models of oligopolistic competition and collusion.
And then we are going to touch on mergers, competitive effects of mergers. And we are going to also analyze models of unilateral conduct.
So it's -- it's a pretty broad course of industrial organization, and then competition and -- and some antitrust policy.
Q. And have either of your courses at Cal Berkeley focused on standard essential patents or FRAND licensing?
A. No.
The industrial organization one will touch on intellectual property in general, just as it relates to competition. But the -- the focus will not be on FRAND or SEPs.
Q. And you haven't taught a course with a specific focus on intellectual property; is that correct?
A. No.
Q. Okay. On Appendix A, you also -- I will just allow to get there, to the next page, on page 3 -- you list your presentations; is that

correct?
A. That's correct.
Q. And if you can take a moment, have any of your presentations addressed standard-setting organizations, standard essential patents or FRAND licensing?
A. So the presentation at the 20th Annual Berkeley-Stanford Advanced Patent Law Institute touched on some of those issues.
Q. This was the one entitled "FTC versus Qualcomm and Other Recent Antitrust Developments in High Tech and Life Sciences"?
A. That's right.
I don't remember exactly how we divided what and who talked about what on that panel. But SEPs were definitely an issue in that panel.
I think that may be the only one.
Q. And then if you go next to pages 4 and 5.
Do you list your expert testimony in that section?
A. That's correct.
Q. And these are occasions in which you testified in a deposition or at trial?
A. That's correct, or an arbitration.
Q. And it's a complete list, right?



A. Yes.
Q. Did your testimony in any of those matters involve FRAND or standard essential patents?
A. They did not involve FRAND or standard essential patents. Some of them were related to intellectual property issues, but not specific to FRAND or SEPs.
Q. And in any of the cases listed on pages 4 and 5, did you provide an opinion as to whether any bundling or bundled discounts implicated antitrust concerns?
A. Let's see.
In All-Tag versus Checkpoint -- so, yes, that case involved allegations -- Plaintiffs alleged an allegation of exclusionary bundled or bundling discounts.
And also in Inline Packaging versus Graphic.
Q. Between your consulting work and your expert testimony, can you identify or estimate the general percentage of cases in which you've been retained by Defense counsel to provide opinions versus the cases in which you've been retained by Plaintiffs' counsel to provide opinions?



A. So when I work as a consultant, I'm not retained to provide opinions usually. I may provide consulting services, but I'm not offered -- I'm -- I'm not retained to offer a -- an opinion in terms of testimony.
And so in terms of consulting, I'm not sure. There have been a number of cases in which I have worked on -- for Plaintiffs as a consultant. These would include some mergers that -- where I support an expert who was retained by the FTC or DOJ, and then also some private actions.
In terms of testimony or when I have been retained to give testimony, I've been retained by the DOJ, but the -- to offer testimony, but the -- the parties abandoned the merger, so I didn't actually off the testimony. But that would be -- the DOJ would have been a plaintiff in this case.
Q. All right. In the other cases, you have been retained by Defendants?
A. That's correct.
These were -- in any antitrust claims, they were defendants.
It may be the case that -- it's possible that some of these are some counterclaim cases where -- where I don't know whether you'd call them



the defendant or the plaintiff. But in terms of the antitrust issues, they were a defendant.
Q. I know you've just begun teaching at Cal Berkeley.
Do you currently sit on any doctoral advising committees?
A. No, I don't.
Q. And have you served as a member of the board of editors for any economic journals?
A. I have not served on the board of editors.
Q. Have you served as a peer-reviewer for any economic journals?
A. I have been asked, and I think I have done it maybe a couple of times. But it -- but not that frequently.
Q. Okay. Have you served on any professional committees relating to standard-setting organizations?
A. I have not.
Q. Have you applied for or received any grants for research works?
A. I don't believe so.
Q. Have you served on any national committees, such as that National Institute of

Science and Technology, or the President's Council of Economic Advisers?
A. No.
Q. Are you a member of the National Academy of Sciences?
A. No.
Q. And have you ever served as an associate or a fellow of the National Bureau of Economic Research?
A. No.
Q. And you graduated from Cal Berkeley in 2004 with a Ph.D. in economics, correct?
A. That's correct.
Q. What was the subject of your Ph.D. dissertation?
A. So my fields were industrial organization and econometrics. And then my dissertation was on competition in electricity markets, and also about -- just generally, it was about competition across different electricity markets.
Q. Was Professor Simcoe one of your classmates at Cal Berkeley?
A. We overlapped. He was in a different department and, I think, was a year below me, or two years. I'm not sure.



Q. And are you aware of his general research and academic focus?
A. I haven't kept up with it. I had a general understanding of what he was doing back then.
Q. What's your general understanding?
A. He was doing, I believe, work on standard-setting organizations.
Q. If you can turn to Appendix B, please.
And let me know when you are there.
A. I am there.
Q. And the title of Appendix B is "Documents Relied Upon"; is that correct?
A. That's correct.
Q. All right. And what does that term mean to you?
MR. BYARS: Objection to form.
THE DEPONENT: I -- Appendix B is the documents that I relied upon in coming to the opinions set forth in my -- in my report.
Q. (By Mr. Kravetz) The first category is "Academic Articles"; is that correct?
A. That's correct.
Q. Can you identify which, if any, of these academic articles relate to FRAND?



A. None of these do.
I was focused on the antitrust issues. These -- these cases -- these articles, I don't believe any of them touch on FRAND.
Q. And if you can go to the next page, the section header states "Bates Stamped Documents"; is that correct?
A. That's correct.
Q. What does this category refer to?
A. This category would refer to the Bates-stamped documents that I cited in the report and relied upon.
Q. And this consists of all the case documents, the Bates-stamped documents, that you relied upon to provide your opinion?
A. That's definitely the intention.
If we -- if I cited any Bates-stamped document in the report that is not included here, then that -- that would be the equivalent of a typo.
Q. Understood.
And how did you go about selecting these documents?
A. So our process was, after I had reviewed Dr. Simcoe's report, we -- I came up with a list of



topics that I would want to address. And then I believe we asked for -- counsel for specific documents related to areas that -- that I thought would be important to -- to respond to Dr. Simcoe's opinion.
Q. It's approximately 45 or 46 documents?
A. That -- that may be.
I -- I could count them, but I -- I don't know. That may be right.
Q. It's just a page -- a page and a half of bulleted list of documents, correct?
A. That's correct.
Q. And, presumably, from your bio that we talked about earlier, you are aware of more than the documents listed here from your prior consulting work; is that correct?
A. I think you are asking me -- or are you asking me, am I aware that there could be more documents than these 45 presented -- produced in this case, given my prior work for Qualcomm?
Is that -- is that what you are asking?
Q. Correct.
A. Yes, I am aware there are other documents, and I'm aware of the documents that -- that -- yes, I'm aware there are other documents.

Page 41

articles?
A. That would -- that would be part of it. We would -- yeah, we would think about whether or not the theory of harm is coherent, what's the relevant economic literature, both theoretical and empirical.
So, yes, definitely.
Q. And it could also include the types of documents like the OECD documents that you cited?
MR. BYARS: Object to form.
THE DEPONENT: It could potentially, if they are relevant. I mean, I think it's -- we would look what's relevant to assess the -- the question at hand.
Q. (By Mr. Kravetz) And you could potentially review textbooks and websites; is that correct?
A. Yes, we often -- often review textbooks; I mean, websites.
It would -- would depend on the relevance to the question at hand.
Q. You do have a section on -- on textbooks on page 5; is that right?
And just going back to Appendix B.
A. Oh, yes.

Page 42

Q. Do any of the textbooks that you cite on page 5 relate to FRAND?
A. Each of these textbooks is -- well, two of them are general industrial organization textbooks. Carlton, Perloff is the -- one of the most often used undergrad textbooks; and then Tirole is maybe more graduate.
And then the other two are more basic -- are more general microeconomics but would also touch on industrial organization.
I don't know if either -- if any of these textbooks have sections on FRAND. The Carlton and Perloff textbook has a lot of examples, so it may have one when dealing with something that -- that discusses FRAND. I just don't know off the top of my head. It's a long book.
So they may have sections on them, but they are not textbooks on FRAND. They are textbooks either on industrial organization or microeconomics.
Q. On page 5, going on to page 6, you have a section on websites; is that correct?
A. That's correct.
Q. And if you look at the third bullet point down, there is a reference to an FTC website; is

Page 43

that correct?
A. That's correct.
Q. And the fourth bullet down, there's another reference to an FTC Web page; is that correct?
A. That's correct.
Q. And why did you rely on Web pages from the FTC?
A. I would have to see exactly where I cited them. I think it was -- these were two just -- I think it was two.
The "Exclusive Dealing" one would have been to provide a definition of exclusive dealing, I believe. Let's see.
Yes, it was to provide a definition of exclusive dealing arrangements. I cite it in paragraph 78.
Q. Do any of the websites that you have cited relate to FRAND?
A. I don't think so.
FRAND wasn't a relevant -- there wasn't a need to cite to a website about FRAND to respond to Dr. Simcoe's opinions that I responded to.
Q. If you can turn to the body of your report on page 2, paragraph 5, and just let me know

Page 44

when you are there.
Are you there?
A. I am.
Q. Okay. In paragraph 5 you state that "Counsel for Qualcomm has asked me to review and respond to the theories, analyses, and opinions offered by Plaintiffs' expert, Professor Timothy Simcoe."
Is that correct?
A. That's correct.
Q. And then you list an A, B and C of paragraph 5, the -- what, in particular, you have been asked to assess by counsel; is that right?
A. That's correct.
Q. And is this a complete list of what you were asked to assess?
A. Yes.
Q. And then, in paragraph 6, you state "Finally, I have been asked to review the analysis and opinions offered by Plaintiffs' expert, Mr. Andrew M. Mintzer, and to assess their relevance to bundling as a concept in antitrust economics."
Is that correct?
A. That's correct.

not sure if they also sell to third parties.
Q. Okay.
MR. KRAVETZ: All right. If we can go off record and take our break.
THE VIDEOGRAPHER: Off record at 10:23.
(Recess taken.)
THE VIDEOGRAPHER: On record at 10:34.
Q. (By Mr. Kravetz) Dr. Saravia, can you please turn to page 14, paragraph 30, of your report.
And I want to start just by asking about the concept of "bundling." As an economist, when you use the term "bundling," what do you mean by that?
A. So "bundling" can mean very different things. It can mean just selling two products together. So, for example, you could have bundling of software, where you have one -- this is back 15 years ago, but one CD that has both -- that has all Microsoft Office Suite on it.
You could have bundled discounts, which would be where, if a multiproduct firm says, if you buy one of my products, the price is X; but if you buy both, you will actually get them at a lower price than -- than the two standalone prices. So I


offer the example of like a -- a combo meal at a fast food place would be a bundle discount.
So those -- those are kind of the -- a couple of good examples, and very similar to the ones that offer in the report.
Like you could think of -- you could actually think of shoes as bundling, because a left shoe and a right shoe are two separate -- potentially two separate products, but they are only offered as a pair.
Q. And you are referencing the examples in the three bullet points on paragraph 30; is that correct?
A. That last one was, but then I also gave examples outside of it.
Q. And do any of your examples on page 14 involve a company that has a standard essential patent?
A. No, these three examples are not specific to standard essential patents.
It's making the point that bundling is ubiquitous. And, in particular, bundled discounts are really the -- they are discounts, and they are the hallmark of competition just in general in the economy.


So this isn't specific to SEPs. It's -- it's more a general discussion of bundling and bundled discounts.
Q. And you note that "bundling and bundled discounts are ubiquitous" and generally considered procompetitive; is that right?
A. That's correct.
Q. And you used the word "generally," correct?
A. That's correct.
Q. And would you agree that in certain circumstances, bundling practices may be anticompetitive?
A. I agree that there are theoretical economic models that suggest, in specific circumstances, bundling discounting could be used -- could have the effect of excluding rivals.
However, as I have noted, the -- the bundling, and, in particular, bundling discounting, is generally assumed to be procompetitive because it is fundamentally a discount, which is competition.
Q. And have you noted in any of your publications that there are academic papers stating that bundling may consist of anticompetitive


conduct under certain circumstances?
A. Yes, I have a paper on bundled discounting where it -- it points out that there are theoretical papers that suggest that bundled discounting can be anticompetitive.
Yet, because bundling discounting is fundamentally a discount, and so it is -- it will -- the presumption is that it should almost always benefit consumers, the paper points out that we need to be careful in terms of any sort of -- it points out that being overzealous in part of -- of attempting to find bundled discounting anticompetitive would actually have the effect of -- of stopping clearly procompetitive discounting.
Q. And are you referring -- this is the publication entitled "Standards for Assessing Bundled Discounts"?
A. That's right, I assume that's what you're -- I think that's my only publication on bundling.
Q. And in that publication, you cite to these other academic papers that propose models which, under certain circumstances, bundled discounts could be used to exclude competitors?


EX 16
Page 889

Page 101

intellectual property rights."
Did I read that correctly?
A. I think you did.
Q. And it notes that "The guidelines were enacted initially in August of 2000 and wholly amended in 2010 to explicitly include foreign businesses in the scope of application of the guidelines -- of the guidelines and cover recently raised issues in connection with intellectual property rights such as patent pool, technical standards, and the abuse of patent litigations." [as read]
Is that correct?
A. Yes, you read it correctly.
Q. And then, if you turn to -- to page-- paragraph 8 for a moment.
And paragraph 8 indicates "More specifically, as the conducts that constitute the abuse of an intellectual property right are enumerated in the guidelines."
And then if you can look at romanette iv, which is the last one, it states "unreasonable discrimination in terms and conditions concerning the practice of a patented invention or the imposition of unreasonable license fees."

Page 102

Did I read that correctly?
A. You read that correctly.
Q. And do you understand that to be an accurate depiction of the Korean regulatory landscape regarding standard essential patents?
MR. BYARS: Objection.
THE DEPONENT: So I am not an expert on Korean law, so first I will just put that out there.
Second, I am not sure. So -- so the big picture is, I am not a legal expert and definitely not a Korean legal expert.
However -- or not even however. I'm not sure that what you read was even about standards -- SEPs. Your little romanette iv, it doesn't say SEP in there, and so I'm not -- I'm not sure -- I would just have to read this whole thing.
So you have assumed that this was there, something to do with FRAND, and you're going to have to give me a minute to read all of -- of paragraph 8, because romanette 4, as you read it, doesn't seem to include the word "FRAND" or "SEP."
And so even just not as a legal expert or a Korean expert, I am just not sure on its face, out of what you read, that that has anything to do

Page 103

with -- with FRAND.
Q. (By Mr. Kravetz) Well, can I ask -- can you go the next page, the top of page 4.
There's a reference to "Other relevant regulations," correct?
A. That's correct.
Q. And paragraph 11 references guidelines that were established in January 2012, correct?
A. This sentence says "In January 2012, the KFTC established the -- the 'Guidelines for Exemplary Management of Standard-Setting Organizations for Ensuring Compliance with the Fair Trade Act.'" [as read]
So that's -- that's what it says.
Q. Are you personally familiar with the Guidelines for Exemplary Management of Standard-Setting Organizations for Ensuring Compliance with the Fair Trade Act?
A. I am not.
Q. And then in -- if you look at paragraph 12, it states "The guidelines enumerated unfair concerted acts such as cartels and pricing, the exclusions -- exclusion of competitors in the course of standard setting," and then "(the restriction on participation of particular

Page 104

businesses in the course of standard setting, or the restriction on the establishment of standards for particular technologies, and the restriction on the possibility of use of an established standard), patent, ambush, or the breach of a FRAND obligation in detail as anticipated violations of the Fair Trade Act in the course of standard setting."
Did I read that correctly?
A. I believe you did.
Q. And then if you can turn to page 7, please.
There's a Section 4 entitled "Conclusion: Abuse of Intellectual Property Rights in Consent Decree System."
Do you see that?
A. Yes.
Q. And there's a reference in paragraph 29 to the Qualcomm case.
Do you see that?
A. Yes.
Q. And are you aware whether there was an action brought by the KFTC against Qualcomm in 2009?
A. Yes, I -- I don't know the exact timing, but I'm aware -- I cite it somewhere in my report

about -- I believe it's a 2009 case.
But I don't know when it was brought versus decision versus so forth and so on.
Q. And it notes in paragraph 29 that "a typical case examined by the KFTC with regard to the abuse of intellectual property rights. It took more than three years to close the case."
Is that your understanding of -- of the length of time it took for the earlier KFTC action against Qualcomm?
MR. BYARS: Objection to form.
THE DEPONENT: I -- I have no -- as I said, I have no knowledge one way or another.
I know that -- I'm aware of some Korean investigation around this period. I'll have to find where I reference it. But I have no knowledge of its duration, when it was filed, when it was concluded, that kind of detail, or even -- I'll have to look at the footnotes, even remind myself if I even know exactly what it covered.
So I -- I have no way of knowing whether this is correct, incorrect --
Q. (By Mr. Kravetz) Okay.
A. -- usual.
Q. And you didn't work on the earlier matter



involving Qualcomm; is that correct?
A. I did not work on a KFTC Qualcomm matter in the -- around 2009.
Q. And I just wanted to go back to one last -- one last paragraph of this report, and then we'll be able to put it to the side.
If you go to page 2, paragraph 4.
A. And I'm -- I should be clear. I'm assuming -- I don't know if you said the 2009. I'm just assuming it's around 2009, because this document is from 2014, and it says it took more than three years to close. So it can't be the KFTC ER report at issue in this indicates.
I'm sorry, what did you want me to look at?
Q. Just in paragraph 4 of the OECD submission. We skipped over this paragraph before.
But do you see, in paragraph 4, it notes "This report will focus on various issues that arise in connection with standard setting and standard essential patents in making judgment on the abuse of intellectual property rights under competition law"?
A. You read that correctly.
Q. And so that's the focus of the submission



to the OECD in 2014, correct?
A. That's what that sentence said. But I -- I haven't read the entire -- I only read the sentences that you pointed me to, so...
Q. I think you've alluded to this before, but you've never been qualified as expert as to the regulatory landscape relating to Korean competition law, correct?
A. No.
Q. Have you ever opined as to whether particular conduct results in anticompetitive harm in Korea?
A. No.
Q. Have you ever been qualified as an expert as to intellectual property law or regulations in Korea?
A. No.
Q. And have you ever opined on intellectual property issues in Korea under Korean law and regulations?
A. No.
Q. All right. We can put those materials to the side.
Now that you have a moment here, if you have your report -- I believe you have it in front



of you. If you can turn to paragraph 70 of your report, please.
A. I'm wondering, how long have we been going?
MR. BYARS: We can take a break if you would like. We've been going about an hour and 10. There's 20 minutes until 12:00.
MR. KRAVETZ: Yeah, lunch will be in 20 minutes. Maybe 15 minutes.
MR. BYARS: But we're happy to take a break if you need one now.
THE DEPONENT: I'd like -- let's take a break.
MR. BYARS: Sure.
THE VIDEOGRAPHER: Off the record at 11:39.
(Recess taken.)
THE VIDEOGRAPHER: On the record at 11:47.
Q. (By Mr. Kravetz) Dr. Saravia, if you can turn next to paragraph 70 of your report, please. And let me know when you are there.
A. Yes, I'm there.
Q. And the last sentence of paragraph 70, you write "The evidence in the record does not

how long that takes?
A. No.
Q. And have you ever assessed how costly it is to switch from one chipset manufacturer to another?
MR. BYARS: Objection. Form.
THE DEPONENT: I have not analyzed the -- an OEM's cost of switching chipsets.
Q. (By Mr. Kravetz) Have you reviewed any testimony from third parties concerning the cost of switching from one chipset manufacturer to another?
MR. BYARS: So I'm just going to object.
And you are entitled to things she relied upon, not everything she's ever reviewed in any context.
Q. (By Mr. Kravetz) In terms of materials relied upon, you have listed one trial transcript in terms of the testimony you have replied upon; is that correct?
A. That's correct, as -- as of time of my report.
Q. And do you recall whether that testimony related to the cost of switching from one OEM to another?
A. It wouldn't have related specifically to


that. The testimony that I referenced Professor Snyder was analyzing, the reasons for the exit of a number of chip -- chip makers. And he had -- he had concluded that they all exited for reasons unrelated to any Qualcomm conduct, I believe.
Q. Are you aware whether the specific terms of Qualcomm's agreements, licensing agreements and chipset agreements, were protected by nondisclose agreements?
MR. BYARS: Objection to form.
THE DEPONENT: I -- they may have been. I don't have any direct recollection of any specific agreement, sitting here.
Q. (By Mr. Kravetz) And are you aware whether the specific terms of Qualcomm's agreements with its customers were made public, as a general matter?
A. The terms of a specific agreement, the -- may not have been made public. The -- I am not sure, though. We would have to look at a specific agreement.
Q. Are you aware whether there were certain agreements that prevented Qualcomm's customers from initiating litigation against a third party or


actively inducing a third party to initiate litigation against Qualcomm?
A. I think you may be referring to some -- I have heard of terms that may have been something like that in Apple.
I don't remember the specific ones or the specific agreement. You would have to look -- show it to me.
Q. And are you aware whether there were -- whether Qualcomm would negotiate license and incentive agreements together and execute both agreements on or about the same date?
MR. BYARS: Objection to form.
THE DEPONENT: I'm sorry, can you ask me that question again?
Q. (By Mr. Kravetz) Sure.
Would you have any basis to dispute that there are examples of Qualcomm negotiating license and incentive agreements together and executing both on or about same date?
A. I have -- if you want to you show me a specific example, I'm happy to look at it. I have no reason to dispute or to say that's true either way.
Q. And do you have any basis to dispute that


Qualcomm provided OEMs with incentive agreements, marketing development funds, and strategic funds on occasion?
MR. BYARS: Objection to form.
THE DEPONENT: Qualcomm offered OEMs many different types of discounts and had different agreements. So that is something that I have noted in my report.
Q. (By Mr. Kravetz) And do you know whether -- is it your position that -- that Qualcomm intended to receive consideration through the market development funds and strategic funds?
MR. BYARS: Objection to form.
THE DEPONENT: I think you would want to show me a specific agreement.
I -- Qualcomm has offered many different incentives and market development funds to chip make- -- to, sorry, OEMs.
So I'm -- I'm not sure about in the abstract if I know one way or the other what Qualcomm expected to receive from any given agreement.
Q. (By Mr. Kravetz) Do you know whether the OEMs were required to spend any additional funds on marketing beyond what they were already spending?

[redacted]



Q. In your report, you state that "Exclusive-dealing commitments are typically considered procompetitive." [as read]
Is that correct?
A. Could you point me to where you are?
Q. If you go to paragraph 80 on page 37.
A. Yes, I see that.
Q. And for that proposition, in footnote 127, you cite to an FTC Web page entitled "Exclusive Dealing or Requirements Contracts."
Is that correct?
A. That's not correct.
Q. What is incorrect about that?
A. You read the sentence "Exclusive dealing agreements are typically considered procompetitive as they can prevent free riding and encourage relationship-specific investments."
For that, I -- oh, sorry, that is one of things I pointed to. But I pointed to Benjamin Klein and -- I -- I pointed to many things.
Sorry, I thought were reading paragraph 127.
MR. BYARS: So I'm just going to object.
You referred to 127, not 128.
Q. (By Mr. Kravetz) So let me -- let me



just rephrase.
In footnotes 127, 128 and 129, you reference an FTC Web page entitled "Exclusive Dealing or Requirements Contracts."
Is that correct?
A. That's correct.
Q. And what was the purpose of citing to that particular FTC Web page?
A. So there are different things.
And so paragraph -- in footnote 127, I have actually -- that footnote goes on a quote from that document, where the document explains what the FTC -- where the FTC document has offered an explanation of exclusive dealing.
So that would be footnote 127. It's just simply a footnote on the quote in the report, where the quote says -- and this is from the FTC document -- "Exclusive-dealing or requirement contracts between manufacturers and retailers are common and are generally lawful. In simple terms, an exclusive-dealing contract prevents a distributor from selling the product of a different manufacturer, and a requirements contract prevents a manufacturer from buying inputs from a different supplier. These arrangements are judged under a



rule of reason standard, which balances any procompetitive and anticompetitive effects." [as read]
So that -- that is footnote 127, where it is explaining what exclusive-dealing arrangements are.
In footnote 128, I'm again citing the FTC document, along with other documents. And in 128, what I note is that the FTC has stated "Most exclusive-dealing contracts are beneficial because they encourage market support for the manufacturer's brand. For instance, the consumer may take a free ride on the valuable services offered by one retailer and then buy the same product at a lower price from another."
And it goes on and on. And it talks about the reasons that exclusive-dealing or requirements contracts can be procompetitive. So that's -- that's 128.
And then you asked about 129 too. So 129 is, again, citing the same document, pointing out that the FTC has noted that they can be -- that the use of the vertical arrangements can be used to prevent smaller competitors from succeeding.
So there were three different reasons to

Page 165

taken outside of the case, because it's just saying, here's a theory, which is a mathematical model; here's another theory; they contradict each other.

So I think it -- you really have to go opinion by opinion.

Q. What about with respect to your opinions as to the exclusive-dealing contracts with Apple?

A. What opinion do you specifically mean?

Because, again, I want to go -- be specific about the opinion you are talking about.

Q. Certainly.

Have you offered rebuttal opinions with respect to the exclusive-dealing contracts between Qualcomm and Apple?

MR. BYARS: Objection to form.

THE DEPONENT: So I think you are talking about paragraph -- starting at paragraph 75.

And so here, what I have pointed out is that, yes, so "Professor Simcoe claims that the relationship between Qualcomm and Apple provides another example of how Qualcomm implemented its bundled discounts."

And here, I point out that, first of all, Simcoe's characterization of the Apple agreements

Page 166

as a bundled discount is misleading. And the first thing I point out is that he is calling these agreements "bundled discounts" even though Apple had not sold a single device with a Qualcomm chip in it. So what's the bundling?

So that's very fact-specific.

So we can keep on going on, but I think we need to -- if you have questions about the opinions, it's -- it's all of the paragraphs here that I can -- I can continue with, or you could ask me a specific question.

Q. (By Mr. Kravetz) Sure.

You note that "Professor Simcoe's characterization of the Apple agreements... is misleading and fails to accurately describe the relationship between Qualcomm and Apple."

In your materials relied upon, have you relied upon any of the specific agreements between Qualcomm and Apple?

A. I did not cite any of the agreements.

Q. So you did not rely upon any of those agreements?

A. No.

The support for that sentence is the very next sentence, which is the idea that the

Page 167

agreements were bundling. It's so clear that that's a mischaracterization, because Apple did not -- that the agreements did not and could not have included a bundle, the 2007 agreement, "because Apple did not sell devices with Qualcomm's modem chips until 2011."

Q. So that's the sole basis for your disagreement with Professor Simcoe?

MR. BYARS: Objection to form.

THE DEPONENT: No.

I'm -- you are asking me about that sentence, and that -- that was what I am pointing to right there.

Q. (By Mr. Kravetz) Now, you point to the fact that "Qualcomm's 2007 Marketing Incentive Agreement with Apple" could -- "did not and could not include a bundled discount because Apple did not sell devices with Qualcomm chips until 2011."

Is that correct?

A. That's correct.

Q. And so you focused on the fact that Apple did not sell phones with Qualcomm chips until 2011, right?

A. In this paragraph, that's what I'm pointing to, is that his statement that these --

Page 168

his simple statement that -- that -- and this is the quote from Professor Simcoe.

"Beginning in the 2007, Apple and Qualcomm negotiated a series of interconnected" multiple years that were extended through 20- -- sorry, I messed up -- in 2011 and '12. These agreements, Apple obtained royalty relief, "but only if Apple purchased almost all of its chips from Qualcomm."

My point is, that sentence is incorrect. And that's what I pointed out in 76, is Dr. Simcoe sentence is just factually incorrect.

Q. And you say it's factually incorrect based on the date in which Qualcomm -- which Apple began to sell Qualcomm chipsets, phones with Qualcomm chipsets, correct?

A. That -- yes, that's one of the -- that's the point in paragraph 76 is that his -- his statement is just factually incorrect.

Because it cannot be the case that [redacted]

That factually cannot be the case, given that Apple did not purchase its -- its chips from

unlicensed OEM was disclosed. So this is in my report, paragraph -- footnote 5.

So here, I note that -- I note that even if he does define Qualcomm's practice of selling modem chips only to licensed OEMs as bundling, this practice was disclosed, and I cite a letter to Judge Ohta in which Plaintiffs' disclosure letter said that the market understood that Qualcomm would only sell to licensed companies.

And then, also, Dr. Simcoe similarly states on -- on his page 30 that he claims that the disclosed practices included no license/no chips, refusing to sell modem chipsets to OEMs or ODMs that have not first obtained a license from QTL.

So the fact that that policy was disclosed is -- is I understand Plaintiffs and Plaintiffs' expert agree with it. I understand that Simcoe has now stated that somehow the actual implementation or following through of a policy is somehow distinct from policy itself. From an economic standpoint, that makes no sense.

And so if that's -- if you are asking why do I -- what's my opinion for it being disclosed, it's not my opinion. Your expert says it's disclosed. I understand Plaintiffs say it's



disclosed. And so the implementation of it is disclosed.

Q. What specific economic opinion are you giving as to whether the disclosure of the general practice of no license/no chips discloses the specific practice of coercion during renegotiations?

MR. BYARS: Object to form.

THE DEPONENT: So the -- economically, the idea that having a policy -- that there is some distinction from having a stated policy and following through on a stated policy makes no sense. It's as if Dr. Simcoe wants to say, you had a stated policy that's disclosed; but the fact that you actually followed your stated policy, now that's not disclosed; I thought you were actually going to sell to OEMs that were unlicensed.

That makes no sense.

Qualcomm had a policy, and I understand Plaintiffs and I understand your expert agree that it was disclosed. And if it's disclosed, OEMs knew it was disclosed. And so this idea that somehow actually following through with a disclosed policy and not selling to unlicensed OEMs, that is no different than having the policy.



And so you can -- you can change the word -- economically, changing -- stating that you followed the policy or you threatened to follow the policy, either way it was a policy, and you executed on it. There's no difference, from an economic standpoint, from having a policy and following through on it.

Q. (By Mr. Kravetz) And when you say it makes no sense, you're bringing to bear your training and experience as an economist to say that that position makes no sense?

Or are you interpreting -- you simply interpreting your understanding of what no license/no chips means?

MR. BYARS: Objection. Compound.

THE DEPONENT: I'm responding to Dr. Simcoe.

Dr. Simcoe now appears to be saying that Qualcomm had a policy that was disclosed; and yet, somehow, Qualcomm following through on that policy or telling OEMs about the policy is somehow something different than having a policy.

And from an economic standpoint, if an OEM is rational and Qualcomm has the policy, how is there any difference between having the policy and



Qualcomm telling the OEM it had the policy? Those are the same thing.

Your expert has somehow decided that, economically, there's a difference between having a policy and implementing the policy.

And he -- I think he's even suggested, well, you didn't have to implement the policy. I mean, I'll have to find that. But that -- that's the thing that's not economics to assume that -- that executing on a policy is -- is somehow distinct and undisclosed from having the policy itself.

Q. (By Mr. Kravetz) Would you agree that during the period of the renegotiation, the customer actually had a license?

MR. BYARS: Objection.

THE DEPONENT: I think you are going to have to show me specific examples that you want to talk about.

So if -- as I understand it, if the OEM had a license, then it could continue to pay and buy over those -- under that license.

Q. (By Mr. Kravetz) Even if it expires?

A. No, if it expires, it needs a new license. But the OEM -- a rational OEM will know

cannot simultaneously purchase modem chips from Qualcomm and bring a FRAND challenge."
Is that correct?
A. That's what it says, yes; that's right.
Q. In general -- you cited a number of cases that you have been involved in. Most complex litigation takes multiple years to resolve, correct?
MR. BYARS: Objection to form. Outside the scope.
THE DEPONENT: I'm not a legal expert.
Q. (By Mr. Kravetz) Well, so just examples in this case.
So the Apple complaint was filed in January 2017 and settled in April 2019, right?
A. That sounds about right.
Q. So that's a little bit over two years?
A. That sounds about right.
Q. And the KFTC, you know, we saw an earlier reference to, the first KFTC action took three years; is that right?
A. Yes, we saw that reference.
Q. And then the later KFTC action, the case examiner report came out in 2015.
And was that ultimately resolved, to the



best of your knowledge, in 2023?
A. I don't know when -- when it -- the ultimate resolution of that.
Q. So at least with respect to -- and FTC versus Qualcomm, that took several years between the filing of the action and the decision by the U.S. Court of Appeals for the Ninth Circuit, correct?
MR. BYARS: Objection to form.
THE DEPONENT: It -- it took a couple -- yeah, it took some amount of time.
I don't know the exact time.
Q. (By Mr. Kravetz) If a license expires, does the OEM run the risk of a patent infringement lawsuit?
A. Yes.
Q. And wouldn't the possibility of such a lawsuit have the potential to impact license renewal negotiations?
MR. BYARS: Objection to form.
THE DEPONENT: I mean, it's not -- so you are asking me if -- if an OEM is unlicensed and producing phones, then could it be subject to a patent infringement claim by Qualcomm? Yes, I assume it would be.



And the resolution of that lawsuit could be a FRAND determination.
Q. (By Mr. Kravetz) While any FRAND dispute is ongoing, is the manufacturer able to freely sell its products?
MR. BYARS: Objection to form. Outside the scope.
THE DEPONENT: Yeah, that's outside the scope of my expertise.
Q. (By Mr. Kravetz) Now, are you aware whether the KFTC addressed the argument that Qualcomm advanced that it hadn't yet stopped supplying chips over any licensing dispute?
A. Would you please repeat the question.
Q. Sure.
It's probably easier if you take a look at the KFTC document. I don't want you to guess.
Do you need one?
A. I've got it here.
Q. [redacted]

Page 193

claims were -- his -- his theory applies to.
And so while I'm not offering an overall statement about what is FRAND and what is not FRAND, I have pointed out things that are inconsistent with his claim that Qualcomm's royalty rates are supra-FRAND.
And I have noted that he has provided no evidence and no support for his claim that it's supra-FRAND, and this is some evidence that is inconsistent with that claim.
Q. (By Mr. Kravetz) And when you say you are not offering an overall statement about what is FRAND and what is not FRAND, you know, in terms of your report, there isn't a particular section in your report where you address the economic principles for assessing whether certain conduct undertaken by the holder of a standard essential patent may or may not implicate a FRAND violation, correct?
MR. BYARS: Objection to form.
THE DEPONENT: There is nowhere that I have -- I have not offered opinion about whether or not something is a FRAND violation.
Q. (By Mr. Kravetz) Would you agree that the particular regulatory actions and complaints

[redacted]

Page 194

either found or alleged that Qualcomm engaged in practices that violated FRAND?
MR. BYARS: Objection. Compound.
THE DEPONENT: I think we would need to go one by one.
So, for example, I am almost positive -- let's see.
I don't believe the EC said anything about that.
And so we'd really need to go -- we'd need to go complaint by complaint instead of characterizing all of them, because I -- the one that stands out to me is -- that's likely not true would be the EC.
[redacted]

been filed.
Isn't that simply a description of but-for causation?
A. It is -- yes, he is saying that -- so what he says, his opinion, is that Qualcomm's bundling practices caused -- "caused"; this is his word.
His opinion is Qualcomm's bundling practice caused specific regulatory actions and lawsuits relating to the corrective disclosures.
Now, as an economist, economists have an idea of what "caused" means. And other people, if -- if -- now, if Simcoe is not offering an economic opinion, if he's offering something else besides an economic opinion -- if he's offering a legal opinion, or if he's offering a factual opinion, or if he is doing something else besides economics -- that's his issue.
As an economist, when he says that Qualcomm's bundling practices caused the specific regulatory actions and lawsuits leading to the corrective disclosures, as an economist, that has meaning to me.
And if he's not being an economist, then maybe it has some other meaning to him. But as an


economist, that means -- causality as an economist means that in the absence of the undisclosed bundlings, these complaints would not have been brought.
He has no basis for that. And that's what I'm what pointing out in -- in -- no economic basis.
Now, if he's offering a legal opinion, then that's something different. But as an economist, he has not put forward an economic framework to offer that opinion, and that's what I'm pointing out in Section 9.
Q. And that's the type of but-for causation you've given in other antitrust cases?
MR. BYARS: Objection.
THE DEPONENT: That is the -- this is how economists think about causation, is you say that in the absence of -- some conduct caused an outcome; if, in the absence of the conduct, the outcome changes. So that's -- economic causation.
Q. (By Mr. Byars) And do you recall using the word "prominent" to describe, you know, the elements of particular actions in -- in other expert reports or testimony?
A. Well, so, in other -- in other economic


reports, I'm -- I'm responding to something. I'm offering a different opinion.
In this case, I'm responding to Professor Simcoe's opinion that he somehow states -- and I think he's an economist, and I think he's offering an economic opinion. And if he's not, again, then -- then he has some methodology that's not economics.
But for him, he has offered an affirmative opinion. He has offered the opinion that this undisclosed bundling caused these complaints.
And I am pointing out that there is nothing in the complaints -- the theory of harm in the complaints is not his licensing leverage theory.
The theory of harm in a number of the complaints is his chip leverage theory. That -- that is in these complaints. However, that's disclosed. That's no license/no chip.
So -- so I had to -- I used the word "prominent" because I am looking at these -- all of these complaints; and his theory of harm, his theory of undisclosed bundling, isn't in these -- isn't in these complaints.


And, now, if -- if he has some -- if he's not offering an economic opinion, well, then -- then this causation -- thinking of it as a causal question, then he's not doing that. He's doing something else that's not economics.
Q. I think you made clear before, you're not offering a legal opinion in this matter, correct?
A. No, I'm offering an economic opinion.
Q. And you are not offering a legal opinion that -- that "prominent" is the correct legal standard for causation, correct?
A. No. As I have pointed -- this -- this is not legal causation. This is as an economist.
An economist -- we -- empirical economists assess causal impacts. We think about causation. And not from a legal standpoint, but as an empirical economist. And that's what I'm coming at this from.
And so he has offered an affirmative opinion that these complaints were caused by the undisclosed bundling.
And I have pointed out that -- that the theories that he's offered, one of them is prominent in these complaints, but it was disclosed. The other one is not in these

complaints.
And so that -- that's what I've pointed out.
Q. Are you aware that the KFTC, the FTC and Apple allege that Qualcomm's disclosed and undisclosed practices constitute a single course of conduct?
MR. BYARS: Objection to form.
THE DEPONENT: So, first of all, I don't think that any of these complaints used "disclosed" and "undisclosed," that language. It's still not entirely clear to me what you mean by undisclosed conduct.
So -- so I think we need to go and -- unfortunately, I think we need to go complaint by complaint if you want to ask me questions about the complaint.
Q. (By Mr. Kravetz) Yeah.
So I want to ask you in -- in general, are there factors that a company, you know, a rational economic actor, may assess in connection with determining whether an enforcement action or a civil action for anticompetitive harm is foreseeable?
MR. BYARS: Objection to form.



THE DEPONENT: That -- that's outside my scope.
I'm responding to, you know, your expert. I'm not offering legal counseling or antitrust counseling.
Q. (By Mr. Kravetz) Well, I'm not asking about counseling. I'm just -- in general, with your background and experience, are there sorts of materials that are available for a company to consult when assessing whether conduct may result in anticompetitive harm?
MR. BYARS: Objection to form.
THE DEPONENT: That sounds like a consulting -- like a -- like a legal consulting question or an antitrust counseling -- sorry, not consulting -- counseling question.
So, I mean, there are certain things that -- sorry, can you state it one more time. I may have something helpful to tell you.
Q. (By Mr. Kravetz) Sure.
The question was, what sorts of materials are available for a company to consult when assessing whether conduct may result in anticompetitive harm?
MR. BYARS: Objection. Form.



THE DEPONENT: Again, that sounds like an antitrust counseling question. I think it is probably outside my scope. There would be some things like -- that -- yeah, I mean, I -- it's probably -- it's outside the scope.
Q. (By Mr. Kravetz) When assessing whether an event would be foreseeable to a rational actor, do you consider information up until the time of the event?
MR. BYARS: Objection.
THE DEPONENT: I'm sorry, can you please repeat the question.
I am not -- I don't think I understand it.
Q. (By Mr. Kravetz) Sure.
When a rational actor is assessing whether an event would be foreseeable, would a rational actor consider information only up until the time of the event?
MR. BYARS: Objection to form.
THE DEPONENT: I think you are asking me -- actually, can you ask it again.
Q. (By Mr. Kravetz) Let me ask it a bit differently.
When assessing whether an event would be



foreseeable, do you consider any information after the event itself?
MR. BYARS: Objection.
THE DEPONENT: "Foreseeable."
So I -- I don't know exactly what you mean by "foreseeable."
So what -- yeah, if you can help me with what exactly what you mean.
Q. (By Mr. Kravetz) Sure.
Can you turn to Section 10 of your report, which is on page 63.
This section is entitled "Professor Simcoe Has No Basis to Opine That the At-Issue Complaints Were a Foreseeable Consequence of the Alleged Undisclosed Bundling."
Did I read that correctly?
A. Yes.
Q. So in this section, you are providing an opinion relating to foreseeability, correct?
A. I am responding to "Professor Simcoe's claims that 'the regulatory actions against Qualcomm were a foreseeable consequence of Qualcomm's undisclosed bundling practices.'"
So I am responding to his claims.
Q. In responding to Professor Simcoe's

claim, are you relying upon any information after the corrective disclosure dates in terms of rebutting Professor Simcoe's opinion as to foreseeability?
MR. BYARS: Objection.
THE DEPONENT: Okay. So what I have pointed out in this case -- in this section is that Professor Simcoe has failed to show that Qualcomm's undisclosed bundling practices harmed or could have harmed competition and -- as we just talked about, and because he's failed to show that Qualcomm's undisclosed bundling practices caused the at-issue complaints.
In addition, I point out that there's no -- his licensing leverage theory lacks economic and factual support. And so he cannot establish that the -- Qualcomm's undisclosed bundling practices could have harmed competition.
We would have go back through Section 7 to see if anything in there relies on postcomplaint issues.
Q. (By Mr. Kravetz) Well, let me ask you about a specific.
In your report, you cite to certain appellate decisions from the U.S. Court of Appeals



for the Ninth Circuit and the European Union, correct?
MR. BYARS: First of all, were you done with your prior answer?
THE DEPONENT: I mean, I was just going to go through the other things that I point out, or that he's failed to show that the conduct causes anticompetitive harm; and he's failed to show that the -- that the complaints were caused by the at-issue conduct.
So he has no -- if he can't do those building blocks, he can't -- he has no basis, no economic basis, for saying that the -- that the at-issue complaints were a foreseeable consequence.
Q. (By Mr. Kravetz) Are you finished with your answer?
A. Yes.
Q. All right. So in your report, you cite to certain appellate decisions from the U.S. Court of Appeals for the Ninth Circuit and the European Union, correct?
A. That's correct.
Q. And those opinions were issued in 2020 and 2022, respectively, correct?
A. That sounds right.



Q. You would agree that those decisions were issued several years after the onset of those regulatory actions, those actions being the FTC action and the EC action; is that correct?
A. That's correct.
Q. And you are not citing decisions from several years after the onset of the at-issue complaints as relevant to the foreseeability of those complaints, are you?
MR. BYARS: Objection to form.
THE DEPONENT: So as I pointed out, I am simply rebutting Simcoe's claims that he has shown that the -- the complaints were an un -- were a foreseeable consequence of Qualcomm's undisclosed bundling. I am pointing out that he has no basis for that. That is my opinion, and I have pointed out why.
And when pointing why he has no basis, when I'm pointing that he has no basis for his claim, I have not cited those -- those complaints. I am simply pointing out that he has offered an opinion for which he has no economic basis.
Q. (By Mr. Kravetz) All right.
So you are not providing an affirmative decision -- an affirmative opinion that the Ninth



Circuit decision is relevant to the foreseeability of the FTC complaint, correct?
MR. BYARS: Objection to form.
THE DEPONENT: That's -- that's not an opinion that I have offered.
Q. (By Mr. Kravetz) And you are not offering an opinion that the decision by the European Union in 2022 is relevant to the foreseeability of the EC action several years earlier, correct?
A. That's not an issue I'm addressing.
Q. Okay. And you're not purporting to offer any opinion as to the state of mind or intent of any of the defendants in this matter, correct?
A. No.
Q. What is purpose for which you cite the Ninth Circuit's decision and EU's appellate decision?
A. Do you happen to know where I cite that? That might speed us up. Otherwise, I -- I can look.
I'm sorry, I don't know all 200 footnotes by heart.
Q. So one example is paragraph 80.
A. Thank you.

Page 221

Q. Actually, I'm sorry. I think the better example is page -- paragraph 58.
A. I'm sorry, what was it? Page 58?
Q. Uh-huh.
A. My eyes may be going very bad, but I don't see it on page 58.
MR. BYARS: I'm sorry, paragraph 58, I think we are supposed to be.
MR. KRAVETZ: Paragraph 58.
THE DEPONENT: Okay. Oh, yes.
Yup, I see it.
Okay. So you are asking what -- why I am citing?
Q. (By Mr. Kravetz) Yes.
A. So in this section, Section 6.4 -- so, first of all, all of Section 6 is about Professor Simcoe's chip leverage theory. And in this section, I'm pointing issues with his chip leverage theory. And so I point out a number of different issues.
And in this section, I'm pointing out that Simcoe has not -- so -- so the first thing I point out is that, as I understand his chip leverage theory, this is where it diverts or doesn't go all the way as the FTC -- as far as the

Page 222

FTC's no license/no chip theory.
He does not seem to be actually claiming any kind of effect on competition in the chip market, as I understand his chip leverage theory. It's simply a theory of supra-FRAND royalties. So in some sense, it's half of the FTC's theory.
And so what I'm pointing out here is that he hasn't -- is that if his chip leverage theory -- so I am not saying it's right. I've already pointed out it's based on -- it's based on disclosed practices. He has no evidence that it happened. He has no evidence of supra-FRAND relating to -- to chip leverage. He's ignored evidence. He's inconsistent.
If we ignore all of that, he hasn't established that his chip leverage theory could have caused anticompetitive harm. So that's what this section is about, that his chip leverage theory seems to just be a theory of supra-FRAND, of above-FRAND rates.
Tons of issues with that theory, but putting that aside, I'm pointing out that -- that he hasn't -- or, sorry, that -- that it's just -- it's just a theory of supra-FRAND rates, and yet he hasn't established that only -- that a theory of

Page 223

just supra-FRAND rates is a violation, is anticompetitive, or that it would be expected to lead to antitrust actions. So that's -- that's this section.
And then what I'm citing the Ninth Circuit for is the Ninth Circuit just says the general rule is that breaches of SSO commitments do not give rise to antitrust liability.
So the Ninth Circuit is making a general statement that -- that -- that a supra -- that a violation of FRAND -- it's supportive of my point that even if he were right that chip leverage led to supra-FRAND rates, that wouldn't, in and of itself -- he hasn't explained why that would be, in and of itself, an antitrust violation.
And the Ninth Circuit said the general rule is that breaches of SSO commitments do not give rise to antitrust liability.
Q. Can you advance to paragraph 62, please.
You cite once again to the Ninth Circuit. And you claim that "Professor Simcoe ignores that the Ninth Circuit rejected the FTC's theory -- which he adopts throughout his report -- that Qualcomm's alleged elevated royalties caused anticompetitive harm in any modem chip market."

Page 224

Did I state that correctly?
A. Yes, I think you read that correctly.
Q. And you note that "Professor Simcoe ignores the fact that those arguments ultimately failed to support the FTC's claim of anticompetitive harm."
Is that correct?
A. That's correct.
Q. I'm curious, in your report, did you cite to the ultimate outcome of the KFTC litigation?
A. I don't know if I did or didn't. I don't think I did.
Q. Did you discuss in your report that Qualcomm ultimately settled its regulatory enforcement action with the TFTC?
A. I don't remember if I discussed that, whether or not.
Q. And do you recall in your report whether you discussed that Qualcomm ultimately settled the Apple litigation with -- with Apple?
A. I don't know if I did or did not. I mean, Qualcomm -- yes, Qualcomm ultimately settled the Apple litigation.
Q. Do you identify anything regarding the terms of the settlement between Apple and Qualcomm